**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

## JOINT PRETRIAL STATEMENT

Pursuant to Local Bankruptcy Rule 7016 and Rule 16 of the Local Rules of the District Court, Vitol Inc. ("***Plaintiff***" or "***Vitol***") and Arthur Jacob Brass ("***Defendant***", "***Brass***", or "***Debtor***") jointly submit the following Joint Pretrial Statement, as follows:

1.      **Appearance of Counsel**

**Plaintiff Vitol, Inc.**

**Reed Smith LLP**
Keith M. Aurzada (SBN 24009880)
Michael P. Cooley (SBN24034388)
Bradley J. Purcell (SBN 24063965)
Lindsey L. Robin (SBN 24091422)
2501 N. Harwood, Suite 1500
Dallas, Texas 75201
T:  469.680.4200

**Reed Smith LLP**
Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834

**Defendant Arthur J. Brass**

**Walker & Patterson P.C.**
Miriam Goott (SBN 24048846)
Johnie J Patterson
P.O. Box 61301
Houston, TX 77208-1301
T: 713.956.5577

2.      Statement of the Case.

Plaintiff's Response:

In this adversary proceeding, Vitol seeks a determination from the Court that the debt owed to Vitol under that certain Agreed Final Judgment entered on November 19, 2020 (the "*Agreed Judgment*") is non-dischargeable as to Brass under the provision of one or more of 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). Specifically, Vitol alleges that this debt, which is in the amount of $10,000,000 plus interest accruing under the Agreed Judgment (collectively, the "*Agreed Judgment Debt*"), is a personal and non-dischargeable obligation of Brass because it is a debt arising from: (i) false pretense, false representation, or actual fraud, including through transfers made with actual fraud as recognized in *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715 (Bankr. S.D. Tex. 2017); (ii) embezzlement of funds rightfully belonging to Vitol; and (iii) willful and malicious injury to Vitol or Vitol's property.

Brass denies all such allegations and alleges that any obligations owed to Vitol are those of Gulf Coast Asphalt Company ("*GCAC*") and/or are otherwise dischargeable.

By order entered on June 24, 2022 [Docket No. 79], the Court previously granted partial summary judgment in favor of Brass and dismissed Vitol's claim for relief under § 523(a)(4) based on fraud while acting in a fiduciary capacity.

Defendant's Response:

Mr. Brass denies the allegations contained in Vitol's Complaint.  Vitol's Complaint is premised on the fact that Vitol alleges that it "loaned" GCAC money, and that GCAC not only failed to repay the loan, but subsequently transferred Vitol's money to Mr. Brass. Mr. Brass asserts that neither he nor GCAC ever borrowed a single penny from Vitol. Instead, Vitol and GCAC entered into a joint venture where they worked together on a nearly daily basis for six months to sell asphalt.

After agreeing to the joint venture with GCAC, and after working deals with GCAC pursuant to their joint venture, Vitol breached its agreement with GCAC when Vitol's executives learned that Vitol's UK branch had previously entered into a non-compete agreement with a third party that strictly prohibited Vitol from entering into a joint venture with GCAC to sell asphalt.

As a result of Vitol's refusal to comply with the joint venture agreement, GCAC lost significant amounts of money and sued Vitol in state court for breaching the joint venture agreement. Vitol brought counterclaims and after years of fighting, the Debtor was outlawyered and outspent by Vitol – a billion-dollar company who has endless means. As a business decision, Mr. Brass entered into an agreed judgment with Vitol in order to put an end to years of litigation and the outrageous cost of attorney's fees that Mr. Brass could no longer afford. The Agreed Judgment is the basis of the debt owed to Vitol.  The Agreed Final Judgment does not include nor reference any liability on the basis of fraud.Finally, the Debtor asserts that this Court previously granted him partial summary judgment and dismissed Vitol's claim under Section 523(a)(4) based on fraud while acting in a fiduciary capacity.

### 3.    Jurisdiction.

The parties agree that this matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter final judgment on the merits of this adversary proceeding.

### 4.    Motions.

There are no pending motions at this time.

### 5.    Contentions of Parties.

<u>Plaintiff's Contentions</u>:

***First***, Vitol contends that the Agreed Judgment Debt is nondischargeable under § 523(a)(2) because it represents money obtained from Vitol through its reliance on Brass's false representation to Vitol that all proceeds of asphalt sales received by GCAC would be remitted directly to Vitol. In particular, Vitol contends that Brass represented to Vitol that GCAC would remit to Vitol all proceeds of asphalt and related components that Vitol provided to GCAC for sale, and that—in light of the irredeemable insolvency of GCAC and Brass's own history of transferring money freely to insiders—Brass had no intention of complying. Vitol further contends that the original damages comprising the claims that were settled in the agreed amount of the Agreed Judgment Debt arose directly from Brass's willful breach of this false promise to Vitol, and are therefore nondischargeable under § 523(a)(2).

***Second***, Vitol contends that the Agreed Judgment Debt is nondischargeable under § 523(a)(2) because it arose from Brass's actual fraud in the form of his transfer of approximately $8.9 million to himself and his mother. As recognized in *Husky*, the term "actual fraud" is not limited to misrepresentations found in traditional common law fraud, but has been more broadly construed to include "fraudulent conveyance schemes, even when those schemes do not involve a false representation."[1]

Here, the Agreed Final Judgment is nondischargeable under § 523(a)(2) because, from July 2017 to [December 2019], Brass caused GCAC to transfer approximately $8,900,000 (collectively, the "***Transfers***") to himself and to his mother as part of a fraudulent scheme to hinder, delay, or defraud Vitol. Vitol contends that Brass's fraudulent intent is evidenced by several of the traditional "badges of fraud," including—

(1) All of the Transfers were made to or for the benefit of two insiders—himself and his mother, Joyce Brace. Brass was a GCAC insider by virtue of his position as president of GCAC and beneficial owner of 50% of the membership interest in GCAC through a wholly owned entity, Trifinery, Inc., and Joyce Brass owned the other 50% membership interest in GCAC. Brass also exercised complete control over GCAC's finances.

---

[1] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 355, 136 S. Ct. 1581, 1583 (2016).

(2)  Brass retained direct or indirect control over the Transfers as both transferor (through his control of GCAC) and transferee (as primary beneficiary of the Transfers).

(3)  Brass took various actions to conceal the Transfers, including by failing to list them in GCAC's *Schedules of Asset and Liabilities* as loans (and therefore the assets of GCAC that he contends they were) and by refusing to authenticate even basic financial records and financial statements of GCAC that would contain evidence of the Transfers. This conduct is of a piece with Brass's concealment of other assets, including several million dollars in nonexempt jewelry that was omitted from the *Schedules of Asset and Liabilities* filed in his own case.

(4)  The Transfers were made while litigation was pending against GCAC and Brass, including both a lawsuit for fraud filed against them by Superior Crude Gathering, Inc. in February 2017 and the counterclaims filed against them by Vitol in litigation commenced by Brass himself in May 2018. Indeed, the pace of Transfers—which notably commenced at approximately the same time as the relationship between Vitol and GCAC—continued unabated from June 2017 until at least December 2019.

(5)  The Transfers represented substantially all of GCAC's assets, totaling approximately $6.9 million—or approximately 70%—of GCAC's assets measured as of December 2018. Eventually, the Transfers totaled approximately $8.9 million.

(6)  Aside from the Transfers, Brass removed and concealed other assets, including individual pieces of jewelry worth millions of dollars and insured under a Chubb Lloyd's Insurance Company of Texas insurance rider issued to Brass as insured.

(7)  Although GCAC's financial statements record the Transfers as "loans" to Brass and his mother, these alleged loans are not supported by any written agreement or promissory note nor accompanied by any terms of repayment. GCAC's failure to affirmatively claim these alleged "loans" as assets in its Schedules of Assets and Liabilities further indicates that the Transfers were in fact made for no consideration whatsoever.

(8)  As Vitol's unchallenged[2] expert will testify at trial, GCAC was insolvent at all relevant times.

(9)  The Transfers were made at the same time that GCAC was incurring substantial debt to Vitol in the form of unpaid amounts accruing through GCAC's use of Vitol's credit to trade asphalt and related products.

**Third**, Vitol contends that the Agreed Judgment Debt is nondischargeable under § 523(a)(6) because it arose from Brass's embezzlement of funds entrusted to his care. In particular, Vitol contends that cash proceeds received by GCAC from the sale of asphalt provided by Vitol was expressly earmarked for Vitol's use and thus represented its property in GCAC's care. By converting those funds to his own improper uses (including to fund the

---

[2] Brass has not engaged an expert in this case to testify as to the solvency of GCAC or to challenge the conclusions of Vitol's expert.

Transfers), Brass effectively embezzled approximately $8.9 million from Vitol. In addition, to the extent the Court should conclude that Vitol and GCAC were at any point in time participants in a joint venture, Vitol would still have had an equal right to any distributes made to the joint venture participants. Under such circumstances, to the extent Brass distributed funds to himself and not to Vitol, such distributions constitute embezzlement under § 523(a)(4).

*Fourth*, Vitol contends that the Agreed Judgment is nondischargeable under § 523(a)(6) because it arose from a willful or malicious injury to Vitol resulting from Brass's knowing breach of a clear contractual obligation to Vitol. Although there was no written contract between the parties, Vitol and GCAC (through Brass) had unequivocally agreed that GCAC would remit to Vitol all cash proceeds received by GCAC from the sale of asphalt provided by Vitol immediately upon receipt. Vitol contends that Brass knowingly caused GCAC to breach this clear contractual obligation, and that the Agreed Judgment Debt arises directly from this breach and is therefore nondischargeable under § 523(a)(6).

*Finally*, Vitol also seeks a determination that its fees and expenses incurred in pursuing this adversary proceeding, as well as pre-judgment and post-judgment interest, are a non-dischargeable obligation of Brass.

Defendant's Contentions:

**Debtor's Response to Vitol's Claim under Section 523(a)(2):**

Vitol alleges throughout its complaint that Vitol was merely a lender who loaned GCAC money and that the basis of their relationship was that of a borrower/lender.  However, there is absolutely no loan agreement that exists, neither written nor verbal. During discovery, Brass requested that Vitol produce all documents that supports Vitol's theory that Vitol "loaned" GCAC money. Not a single document or email communication was produced that shows that either party agreed to a loan.

GCAC never agreed to borrow any money from Vitol. Instead GCAC and Vitol entered into a joint venture to buy and sell asphalt, not borrow money. All of the business transactions and email communications between GCAC and Vitol clearly show that these two parties conducted business together on a nearly daily basis for a six-month period. The joint venture was simple: GCAC would market the deals for the joint venture as GCAC had the contacts and industry knowledge.  Vitol would hedge and fund the transaction, and the parties would then split the profits and losses.

The evidence overwhelming shows that Vitol and GCAC worked together toward their joint venture on a nearly daily basis with each side having a specific role in the business.  Vitol admits in its pleadings that during the course of its six-month business venture with GCAC, that GCAC transferred over $16 million to Vitol.  These funds were transferred by GCAC to Vitol as part of the profits owed to Vitol, not as a loan repayment.

The evidence will **NOT** show that 1) a loan existed; 2) the terms of any alleged loan; 3) any actions of a lender; 4) any actions of a borrower; or 5) any attempts by Vitol to collect on an alleged loan.

Vitol and GCAC were conducting business under the terms of their joint venture until Vitol learned that its UK branch previously entered into a non-compete agreement with a third party (the Sargeant Family) which specifically prohibited Vitol from entering into any deals with third parties related to the sale of asphalt. Vitol understood that conducting business with GCAC would likely result in Vitol getting sued by the Sargeant Family for violating their non-compete. Vitol decided that they would rather breach their agreement with GCAC (a small and inconsequential player) than to breach their non-compete with the Sergeant Family who had millions of dollars invested in their deal with Vitol.

Vitol breached its agreement with GCAC which resulted in a significant loss for GCAC. In response, GCAC sued Vitol for breaching the joint venture agreement.  Vitol, a billion-dollar company, hired teams of big firm attorneys and outspent Mr. Brass during litigation. In the end, Mr. Brass was forced to make a business decision and entered into an Agreed Final Judgment in order to put an end to the years of litigation and the outrageous attorney's fees that he could no longer afford.  Mr. Brass merely wanted to move on with his life and Vitol wants a pound of flesh. (See Below - Paragraph 12)

**Debtor's Response to Vitol's Claim under Section 523(a)(2) - Fraud:**

Vitol contends that the Agreed Judgment Debt is nondischargeable under § 523(a)(2) because it arose from Brass's actual fraud in the form of his transfer of approximately $8.9 million to himself and his mother. First, Vitol does not have evidence to show that Vitol's money or the proceeds from Vitol's assets were transferred by GCAC to the Debtor.

Furthermore, as discussed in greater detail above, Vitol and GCAC were working together under a joint venture, not under any loan agreement.  GCAC and Vitol were working together on a nearly daily basis for a six-month period buying and selling asphalt.  During that time, both GCAC and Vitol were making deals with an understanding that their respective profits (and losses) would be trued up in the future.  In fact, Vitol admits that they received periodic payments from GCAC to the tune of $16 million.  These funds were paid by GCAC to Vitol as part of their true up, not as a repayment of some fictious loan that Vitol now claims to have had with GCAC.

Vitol refuses to admit that it had a joint venture with GCAC as that would result in further litigation for Vitol's breach of its non-compete by the Sargeant Family.  Vitol cannot have it both ways.  On one hand, Vitol refuses to allege that it had a joint venture as this would expose them to litigation. Instead, Vitol claims that its debt is non-dischargeable because Mr. Brass fraudulently obtained the funds it "borrowed" from Vitol. Vitol is bound by its pleadings and the factual allegations contained in their pleadings, and as a result cannot prevail under Section 523(a)(2).

**Debtor's Response to Vitol's Claim under Section 523(a)(4):**

In the Joint Pretrial statement, Vitol contends that if the Court concludes that Vitol and GCAC participated in a joint venture, then Vitol should still be entitled to any distributions made to GCAC because such distributions constitute embezzlement under § 523(a)(4).

In its Complaint, Vitol wholly failed to plead in the alternative. Vitol never asked this Court to determine that its debt should be found to be non-dischargeable if the Court determined that it had a joint venture, and not a loan. Therefore, this issue cannot be raised for the first time at trial.  Furthermore, the fact that Vitol and its team of extremely experienced and sophisticated attorneys chose not to plead in the alternative (*i.e.* that a joint venture existed) is further evidence that Vitol feared that it would be sued for violating their non-compete.

Finally, this Court already ruled in its Order on Partial Summary Judgment, that **there is no evidence of a cognizable fiduciary duty owed by Brass to Vitol for purposes of Section 523(a)(4).**

**Debtor's Response to Vitol's Claim under Section 523(a)(6):**

Vitol contends that the Agreed Judgment is nondischargeable under § 523(a)(6) because it arose from a willful or malicious injury to Vitol resulting from Brass's knowing breach of a "**clear contractual obligation to Vitol**".  Vitol alleges in its Complaint that the contractual obligation is based on an alleged loan.

In response, Brass asserts the following: 1) No written contractual obligation related to a loan exists between Vitol and GCAC; 2) No verbal agreements were made related to any loan from Vitol; 3) All of the evidence shows that the parties were conducting business together on a nearly daily basis; 4) No evidence exists of a lender attempting to collect on any alleged loan; and 5) no evidence exists that Mr. Brass "**knowingly**" breached a loan agreement that did not exist.

**Debtor's Response to Vitol's Claim for Attorney's Fees and Expenses.**

Vitol seeks a determination that it is entitled to its fees and expenses incurred in pursuing this adversary proceeding.

First, there is nothing in the Bankruptcy Code that expressly awards attorney's fees to a creditor who successfully contests the dischargeability of its claim.  Furthermore, the Fifth Circuit has held that creditors are only entitled to an award of attorney's fees in bankruptcy claims if they have a contractual right to them under valid state law. *Jordan v. Se. Nat'l Bank,* 927 F.2d 221, 226-27 (5th Cir. 1991).  In order for Vitol to have a claim for attorney's fees, interest and costs they must first show this Court that they have a contractual right to recover these fees under state law.  Vitol admits that there is no executed contract or loan agreement with GCAC.  Therefore, there is no contract under state law that could possibly provide for Vitol's request for attorney's fees, expenses or interest.

6.     **Admissions of Fact.**

a.     Vitol is an energy and commodities company that ships and trades crude oil and other related products.

b.     GCAC marketed and traded asphalt and other related products for sale to third parties.

c.      Brass was the president of GCAC from at least 2017 until GCAC filed for bankruptcy.

d.      Brass held a 50% beneficial interest in GCAC through his 100% ownership of Trifinery, Inc. from at least 2017 until GCAC filed for bankruptcy.

e.      Joyce Brass was a 50% member of GCAC from at least 2017 until GCAC filed for bankruptcy.

f.      Joyce Brass is Brass's mother.

g.      GCAC never executed any loan agreements with Vitol.

h.      Vitol received approximately $16 million from GCAC.

i.      In October 2020, Brass, Trifinery, and GCAC entered into a Confidential Settlement Agreement and Mutual Global Release which required them to pay Vitol $8 million.

j.      No payments were made to Vitol pursuant to the Confidential Settlement Agreement and Mutual Global Release.

k.      GCAC sued Vitol in state court.

l.      On November 5, 2020, Brass, Trifinery, and GCAC entered into a Second Confidential Settlement Agreement and Mutual Global Release with Vitol, pursuant to which Brass, Trifinery, and GCAC consented to the entry of an Agreed Final Judgment in the amount of $10 million.

m.      On November 20, 2020, the 295th Judicial District Court of Harris County, Texas entered an Agreed Final Judgment in Cause No. 2018-31578 in favor of Vitol against Brass, GCAC, and Trifinery.

n.      The Agreed Final Judgment is in the amount of $10,000,000 jointly and severally against Brass, GCAC, and Trifinery and authorizes post-judgment interest at 5% per annum from the Judgment Date until the award is satisfied.

o.      No payments have been made on account of the Agreed Final Judgment.

p.      The entire Agreed Final Judgment remains due and owing to Vitol along with post-judgment interest.

**7.      Contested Issues of Fact.**

a.      Vitol never loaned GCAC any money.

b.      Vitol never loaned Brass any money.

c.      Vitol entered into a Joint Venture with GCAC.

d.      Vitol operated under the Joint Venture with GCAC by purchasing asphalt, selling asphalt and entering into hedges as part of the Joint Venture.

e.      Vitol and GCAC communicated on a regular basis regarding the business transactions related to the purchase and sale of asphalt.

f.      Vitol and GCAC communicated on a regular basis regarding the business transactions related to hedges placed by Vitol in connection with the purchase and sale of asphalt.

g.      Vitol backed out of the Joint Venture as a result of its non-compete agreement related to its Valt deal.

h.      GCAC sustained damages as a result of Vitol backing out of the joint venture.

i.      Mr. Brass sustained damages as a result of Vitol backing out of the joint venture.

j.      Any funds transferred by GCAC to the Debtor or his mother did not belong to Vitol.

k.      The entire Agreed Final Judgment remains due and owing to Vitol along with post-judgment interest.

l.      The Agreed Final Judgment contains no admissions or references to fraud.

m.      Vitol has refused to accept payment from the Debtor to settle and satisfy the Agreed Final Judgment.

n.      Upon information and belief, all other contentions made by the parties in Part 5 above, except for those Admissions of Fact set forth in Part 6 above, are disputed issues of fact.

**8.      Agreed Applicable Propositions of Law.**

None.

**9.      Contested Issues of Law.**

Plaintiff's Contentions:

a.      Whether the Agreed Judgment Debt or any portion thereof is nondischargeable under § 523(a)(2) because it arose from a false representation. *See* 11 U.S.C. § 523(a)(2)(A).

b.      Whether the Agreed Judgment Debt or any portion thereof is nondischargeable under § 523(a)(2) because Brass incurred the obligation by actual

fraud. *See* 11 U.S.C. § 523(a)(2)(A); Tex. Bus. & Com. C. §§ 21.223, 24.005; *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 719 (Bankr. S.D. Tex. 2017).

       c.      Whether the Agreed Judgment Debt or any portion thereof is nondischargeable under § 523(a)(4) Brass incurred the obligation by embezzling funds rightfully belonging to Vitol. *See* 11 U.S.C. § 523(a)(4); Tex. Bus. & Com. C. §§ 21.223, 24.005; *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 719 (Bankr. S.D. Tex. 2017); *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 550 (Tex. 1998).

       d.      Whether the Agreed Judgment Debt or any portion thereof is nondischargeable under § 523(a)(6) because it arose from a willful and malicious injury to Vitol. *See* 11 U.S.C. § 523(6).

**10.**    **Exhibits.**

The Court has instructed the parties to file exhibit lists separately and exchange exhibits on or before 4:00 pm on August 22, 2022.

**11.**    **Witnesses.**

The Parties have agreed to file witness lists separately on or before 4:00 pm on August 22, 2022.

**12.**    **Settlement.**

Plaintiff's Response: The Parties have discussed potential mediation on multiple occasions but have not agreed to attend mediation. There are no outstanding settlement offers pending at this time. The case cannot be settled and it will have to be tried. Plaintiff disputes the accuracy of the factual contentions made in Defendant's Response below, and submits that disclosure of confidential settlement communications is not appropriate in a joint pretrial order.

Defendant's Response:

In order to avoid filing bankruptcy, the Debtor transferred $1.2 million (non-exempt cash) to his counsel Walker & Patterson's trust account. Debtor's counsel contacted Vitol's counsel and offered to transfer these funds to Vitol to avoid the bankruptcy filing. In response, Vitol's counsel informed Ms. Goott in writing, that they were sending a subpoena to Walker & Patterson for turnover of the funds held in its trust account.

After the bankruptcy was filed, the Debtor repeatedly asked Vitol if they would attend mediation. As late as June, 2022, the Debtor again asked Vitol to attend mediation and offered to sell his homestead and turnover the entirety of the proceeds to Vitol. Plaintiff's above response that there are *"no outstanding settlement offers pending at this time"* and that the *"Parties discussed potential mediation but have not agreed to mediation"* is misleading. In June, 2022 (the last communication regarding settlement), Vitol's counsel sent an email to Ms. Goot, and stated, *"At this time I still do not have a position from the client on your twin proposals of mediation or a possible cash settlement involving the sale of the homestead"*.

Therefore, Vitol's assertion that there is no outstanding settlement offer pending at this time is inaccurate as they never responded accepting or rejecting the Debtor's offer. Furthermore, Vitol's assertion that the parties "discussed" settlement is also misleading as Vitol never responded to the Debtor's offer to attend mediation.

Finally, Vitol's counsel previously stated that Vitol is just angry that the Debtor filed a lawsuit against Vitol in state court. Based on this comment and based on Vitol's actions over the course of this Adversary Proceeding, it is the Debtor's belief that settlement is not an option as Vitol does not want the Debtor's money. Vitol simply wants a pound of flesh.

## 13.    Estimated Trial Time.

Based upon the Court's instruction at the last status conference, the parties anticipate that the trial will take two days.

## 14.    Additional Materials.

None.

Dated: August 22, 2022                        Respectfully submitted,

| **REED SMITH LLP** | **WALKER & PATTERSON, P.C.** |
|---|---|
| By: _/s/ Michael P. Cooley_<br>Keith M. Aurzada (SBN 24009880)<br>Michael P. Cooley (SBN 24034388)<br>Bradley J. Purcell (SBN 24063965)<br>Lindsey L. Robin (SBN 24091422)<br>2850 N. Harwood Street, Suite 1500<br>Dallas, Texas 75201<br>T: 469.680.4200<br>F: 469.680.4299<br>kaurzada@reedsmith.com<br>mpcooley@reedsmith.com<br>bpurcell@reedsmith.com<br>lrobin@reedsmith.com<br><br>and<br><br>Michael H. Bernick (SBN 24078277)<br>Mason W. Malpass (SBN 24109502)<br>811 Main Street, Suite 1700<br>Houston, TX 77002<br>T: 713.469.3834<br>F: 713.469.3899<br>mbernick@reedsmith.com<br>mmalpass@reedsmith.com<br><br>_Attorneys for Vitol Inc._ | By: _/s/  Miriam T. Goot_<br>Johnie Patterson (SBN 15601700)<br>Miriam T. Goott (SBN 24048846)<br>P.O. Box 61301<br>Houston, TX 77208<br>mgoott@walkerandpatterson.com<br>713.956.5577 (telephone)<br><br>COUNSEL FOR DEBTOR |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on August 22, 2022, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing (ECF) system on all parties registered to receive electronic notices in this case, including counsel for both Plaintiff and Defendant.

/s/  Michael P. Cooley
Michael P. Cooley

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **ARTHUR JACOB BRASS** | § | Chapter 7 |
| **DEBTOR** | § | CASE NO.   21-60025 |
| | § | |
| **VITOL INC.** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ARTHUR JACOB BRASS** | § | |
| | § | ADVERSARY NO.  21-06006 |
| **Defendant.** | § | |

# CORRECTED TRIAL EXHIBIT 43 ATTACHED

Dated: <u>August 22, 2022</u>

<div style="margin-left:50%">

Respectfully submitted,
By:  <u>/s/ Johnie Patterson</u>
     Johnie Patterson
     SBN 15601700
     COUNSEL FOR THE
     DEBTOR/DEFENDANT

</div>

001775

Message

| | |
|---|---|
| **From:** | Patrick Perugini [pperugini@gcachouston.com] |
| **Sent:** | 7/19/2017 2:48:33 PM |
| **To:** | Eric Kuo [ejk@Vitol.com]; Arthur Brass [aj@gcachouston.com] |
| **Subject:** | FW: Emailing: Presentation to Vitol Regarding GCAC Asphalt Business 3.pptx |
| **Attachments:** | Presentation to Vitol Regarding GCAC Asphalt Business 3.pptx |

Eric,

I think this is what you send Valt.

We are happy to have a further conversation w/ them.

Let me know if you need anything else.


-----Original Message-----
From: Jason Goldstein
Sent: Wednesday, July 19, 2017 10:27 AM
To: Patrick Perugini <pperugini@gcachouston.com>
Subject: Emailing: Presentation to Vitol Regarding GCAC Asphalt Business 3.pptx

Your message is ready to be sent with the following file or link attachments:

Presentation to Vitol Regarding GCAC Asphalt Business 3.pptx


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types
of file attachments.  Check your e-mail security settings to determine how attachments are handled.



001776

Confidential                                                                    VITOL_00001846

# Presentation to Vitol Regarding GCAC/Rio Asphalt Business

May 16, 2017

Confidential

## Overview

- GCAC has been a blender, trader and marketer of asphalt since 1993 and prior to that through refining and terminalling operations at Trigeant since the mid 1980's
- We believe there is a strong opportunity to be a leader in USGC asphalt with US supply tightening
- Contemplating a structure for Vitol to replace Rio as the provider of working capital, hedging and credit support for the operation
- Believe we can have a mutually beneficial relationship with VALT

Confidential

# Historical Margin

| | 2015 MTM Margin | 2015 BBLS | 2016 MTM Margin | 2016 BBLS | 2017 MTM Margin | 2017 BBLS |
|---|---|---|---|---|---|---|
| Jan | | | $365,693 | 50,357 | $(266,736) | 209,587 |
| Feb | | | 170,453 | 60,632 | 508,572 | 190,691 |
| Mar | $254,553 | $106,701 | 204,813 | 181,096 | 593,884 | 213,187 |
| 1Q | 254,553 | 106,701 | 740,960 | 292,085 | 835,720 | 613,464 |
| Apr | (761,417) | 81,760 | (25,827) | 111,975 | | |
| May | 82,937 | 35,491 | (166,744) | 121,983 | | |
| Jun | 458,940 | 64,096 | 573,803 | 227,141 | | |
| 2Q | (219,541) | 181,348 | 381,233 | 461,099 | | |
| Jul | 1,714,776 | 237,847 | (108,278) | 111,954 | | |
| Aug | 1,822,895 | 83,540 | (82,490) | 154,529 | | |
| Sep | (786,096) | 159,171 | (908,276) | 82,496 | | |
| 3Q | 2,751,575 | 480,557 | (1,099,044) | 348,979 | | |
| Oct | 3,405,932 | 46,403 | (1,179,468) | 9,356 | | |
| Nov | 227,592 | 41,763 | (584,060) | 50,004 | | |
| Dec | (389,023) | 34,963 | (1,840,714) | 113,695 | | |
| 4Q | 3,244,501 | 123,130 | (3,604,242) | 173,054 | | |
| Total | $6,031,088 | $93,736 | $(3,581,084) | 1,275,217 | $835,720 | 613,464 |

Confidential

## Historical Margin – Critical Factors

- Traditionally solid margin business buying asphalt blend stocks below fuel oil and selling above fuel oil

- Late 2016 – sold inventory at a non-optimal time when USGC barge low asphalt was ~$10/BBL under fuel; need to hold when asphalt dislocates to the downside vs. fuel or coker feed

- Went into the winter (late 2016) season long too much inventory – amplified non-optimal sale issue above

- Started with new location in Corpus Feb 2016 – start-up costs + taking time to build retail business vs. take-or-pay minimums



Confidential

# Base Case Pro Formas

**Key Assumptions**

**Base Assumptions:**

| | | |
|---|---|---|
| Mobile Monthly Tank Lease Excluding Heat, etc. | $ | 139,925 |
| Corpus Monthly Tank Lease Excluding Heat, etc. | $ | 146,033 |
| Corpus Truck Rack Minimum Tons/Month | | 5,400 |
| Corpus Truck Loading Fees/Ton | $ | 15.00 |
| Corpus PMA Minimum Tons/Month | | 2,300 |
| Corpus PMA Fees/Ton | $ | 25.00 |
| Corpus Assumed Polymer Costs/Ton | $ | 55.00 |
| Corpus Rail Loading/Unloading Fees/Ton | $ | 18.00 |
| Assumed Heat Costs/BBL | $ | 0.35 |
| Assumed COM/BBL | $ | 0.15 |
| Assumed Miscellaneous/BBL | $ | 0.50 |
| Assumed Asphalt BBLs/Ton | | 5.50 |

**Sales Assumptions:**

| | | |
|---|---|---|
| Wholesale Marine Volumes/Month (BBLs) | | 175,000 |
| Wholesale Marine Gross Product Margin/BBL | $ | 4.54 |
| Wholesale Rail Volumes/Month (BBLs) | | 20,000 |
| Wholesale Rail Gross Product Margin/BBL | $ | 4.54 |
| Retail Truck Rack Volumes/Month (BBLs) | | 20,000 |
| % of Retail Truck Rack Volumes That are PMA | | 50.0% |
| Non-PMA Additional Retail Margin/Ton vs. Wholesale | $ | 22.00 |
| PMA Additional Margin/Ton vs. PG Retail | | |
| (Excludes Cost of Polymer) | $ | 125.00 |

**Financial Analysis**

**Annual Gross Product Margin:**

| | | |
|---|---|---|
| Wholesale Marine | $ | 9,534,000 |
| Wholesale Rail | | 1,089,600 |
| Truck Rack Non-PMA Uplift | | 2,049,600 |
| Truck Rack PMA Uplift (Net of Costs of Polymer) | | 1,527,273 |
| Total Gross Product Margin | $ | 14,200,473 |

**Costs (Excludes Overhead Allocation):**

| | |
|---|---|
| Tank Rental - Shell Capacity - Corpus and Mobile | (3,427,650) |
| Excess Tank Turns Fees | - |
| Less Truck Rack Fees (Incl. Take-or-Pay Mins) | (972,000) |
| Less Rail Loading Fees (No Mins) | (785,455) |
| Less PMA Fees (Incl. Take-or-Pay Mins) | (632,182) |
| Less Heat | (903,000) |
| Less COM | (387,000) |
| Less Miscellaneous | (1,290,000) |
| Total Costs | (8,397,286) |

| | | |
|---|---|---|
| Pro Forma Gross Profit Margin | $ | 5,803,186 |

Confidential

# Corpus Retail Rack Opportunity

- Currently negotiating supply/marketing deals with two large oil companies that each have TX retail asphalt presence regarding one of those companies taking over Corpus retail rack marketing in exchange for high quality asphalt supply and other economic advantages:
  - Advantages:
    - Attractive option to purchase high quality, light asphalt blend stocks at attractive prices; ability to secure longer-term structural shorts with additional quality buffer
    - Future take-or-pay minimums to be borne by counterparty, not us
    - Attractive supply terms for us to supply wholesale BBLs to retail rack
    - Potential for additional fees/payments
  - Disadvantages:
    - Give up portion of retail marketing uplift

Confidential

## Miscellaneous/VALT

- Continues existing mutually beneficial supply/marketing dynamic with VALT
- We propose that VALT assume asphalt ship term charter that GCAC affiliate has starting July 2017 so as not to compete with VALT for shipping
- We would view our wholesale supply partner relationship with VALT as synergistic to VITOL/VALT and not competitive

Confidential

Message

| | |
|---|---|
| **From:** | Jason Goldstein [jg@gravitymidstream.com] |
| **Sent:** | 1/19/2015 9:41:55 PM |
| **To:** | Steve Barth [SZB@Vitol.com] |
| **CC:** | Rob James [rwj@Vitol.com]; Jason Goldstein [jg@gravitymidstream.com]; AJ Brass [aj@abrass.com]; Craig Peus [cp@gravitymidstream.com] |
| **Subject:** | Gravity Proposal |

Steve,

As per our recent conversations, this email is intended to outline a proposal for light crude/condensate storage and throughput at the facility located in Corpus Christi, TX currently owned by Trigeant, Ltd.

We propose to offer you 800 KBBL of shell capacity tankage floating roof tanks for the storage of light crude/condensate, beginning January 2016 for a term of three years. Approximately half of the tankage would be existing tankage, and we would build new tankage for the balance to get you to 800 KBBL of shell capacity. The tankage would be connected to Port of Corpus Christi Oil Dock #14, capable handling ships of up to 920' LOA at 45' draft (Aframax capable).

From mid-2015 through January 2016, we can offer you the existing floating roof tankage of approximately 400 KBBL with the existing dock (700' LOA at 35' draft, with a spacer barge). The dock can handle inland barges, ocean going barges, and MR product ships.

We propose a rate structure as follows:

- $0.70/BBL/month based on shell capacity (take-or-pay)
- $0.50/BBL/month for excess volumes in excess of one tank turn
- $0.35/BBL/month for excess volumes in excess of two tank turns
- Reimbursement of separately metered utilities
- Reimbursement of Port of Corpus Christi public wharfage fees (currently $0.09375/BBL)
- Reimbursement of other third party costs (lab testing, etc., at Vitol's direction)

As discussed, we would be happy to explore various options around Gravity converting the existing unit to be run as a condensate stabilizer or splitter. We have completed FEED engineering around retrofitting the unit as a full six-product, EF90-like splitter, and we are in the process of developing a timeline and capital expenditure budget around simply retrofitting the unit as a stabilizer. We are open to various economic structures around being able to offer you this option.

Please call with any questions.

Best,

Jason

Jason Goldstein
Chief Financial Officer
**Gravity Midstream, LLC**
11 Greenway Plaza, Suite 2950
Houston, TX 77046
Tel: (832) 426-3302
Cel: (713) 459-1990
jg@gravitymidstream.com



Confidential

Message

| | |
|---|---|
| **From:** | Arthur Brass [aj@abrass.com] |
| **Sent:** | 5/19/2017 12:32:13 PM |
| **To:** | Steve Barth [SZB@Vitol.com] |
| **Subject:** | Fwd: Vitol PP GCAC Splits v3 vV.xlsx |
| **Attachments:** | Vitol PP GCAC Splits v3 vV.xlsx |

Pls take a quick look before I send to EK

AJ

Get Outlook for iOS



Confidential

VITOL_00002315

## VITOL/GCAC Analysis

**ASSUMED VITOL AND GCAC COSTS IN THE JOINT BOOK**

| GCAC Personal Dedicated to Book: | Role | Base | Approximate Benefits % [2] | Full Burden [3] |
|---|---|---|---|---|
| Patrick Perugini | Head Trader | $ 250,000 [1] | 25% | $ 312,500 |
| George Grace | Sr. Trader | 271,000 | 20% | 325,200 |
| Dave Cutting | Retail Sales | 165,000 | 32% | 217,800 |
| Joe Mattingly | Operations | 160,000 | 28% | 204,800 |
| Kenny Hucker | Master Blender | 175,000 | 23% | 215,250 |
| | | $ 1,021,000 | | $ 1,275,550 |

|  |  |  |
|---|---|---|
| + GCAC Allocated Costs | | 500,000 [4] |
| | | $ 1,775,550 [5] |

**TRADE BOOK PROFITS, DISTRIBUTIONS TO PARTIES and GCAC ii PROFITABILITY**

| | | | | | |
|---|---|---|---|---|---|
| Gross Profit | $ 3,000,000 | $ 5,800,000 | $ 10,000,000 | $ 20,000,000 |
| Incurred Costs | (1,775,550) | (1,775,550) | (1,775,550) | (1,775,550) |
| Net Profits | 1,224,450 | 4,024,450 | 8,224,450 | 18,224,450 |
| Payments to Trade Team .......... 10% | (122,445) | (402,445) | (822,445) | (1,822,445) |
| Available to Distribute | 1,102,005 | 3,622,005 | 7,402,005 | 16,402,005 |
| | | | | |
| **Splits to Each Party (Vitol/GCAC) ........... 50%** | **$ 551,003** | **$ 1,811,003** | **$ 3,701,003** | **$ 8,201,003** |
| | | | | |
| Total Payments to Patrick (Incl. Base) | $ 311,223 | $ 451,223 | $ 661,223 | $ 1,161,223 |
| Total Bonuses to Rest of Team | 61,223 | 201,223 | 411,223 | 911,223 |

[1] Patrick's base is a draw against percentage of profits.

[2] Benefits include payroll taxes, 401-K matching, insurance, and misc. For Dave Cutting, includes automobile allowance.

[3] Includes all benefits but does not include employee reimbursement for expenses incurred in employment (T&E, etc.).

[4] Payment to GCAC to partially offset office rent, administration support, information technology, asphalt organization membership subscriptions and dues, general counsel services, workers' compensation insurance, office supplies, and related expenses.

Confidential

**Message**

| From: | Jason Goldstein [jgoldstein@gcachouston.com] |
|---|---|
| **Sent**: | 6/30/2017 11:50:26 AM |
| **To**: | Eric Kuo [ejk@Vitol.com] |
| **CC**: | Steve Barth [SZB@Vitol.com]; aj@abrass.com |
| **Subject**: | Trade Team Salaries and Benefits for Vitol.xlsx |
| **Attachments**: | Trade Team Salaries and Benefits for Vitol.xlsx |

Eric,

As per my recent conversation with AJ, attached please find the following trade team salaries and estimated benefits we had previously sent in late May.

Best,

Jason



EXHIBIT

21

001788

VITOL_00004947

Vitiol/NewCo Analysis

**TRADE TEAM SALARIES AND BENEFITS**

| NewCo Personal Dedicated to Book: | Role | Base | | Approximate Benefits %[2] | Full Burden[3] | |
|---|---|---|---|---|---|---|
| Patrick Perugini | Head Trader | $ | 250,000 [1] | 25% | $ | 312,500 |
| George Grace | Sr. Trader | | 271,000 | 20% | | 325,200 |
| Dave Cutting | Retail Sales | | 165,000 | 32% | | 217,800 |
| Joe Mattingly | Operations | | 160,000 | 28% | | 204,800 |
| Kenny Hucker | Master Blender | | 175,000 | 23% | | 215,250 |
| | | $ | 1,021,000 | | $ | 1,275,550 |

[1] Not finalized.

[2] Benefits include payroll taxes, 401-K matching, insurance, and misc.  For Dave Cutting, includes automobile allowance.

[3] Includes all benefits but does not include employee reimbursement for expenses incurred in employment (T&E, etc.)

Highly Confidential

| From: | Jason Goldstein |
|---|---|
| Sent: | Tuesday, May 30, 2017 4:06 PM CDT |
| To: | Steve Barth |
| CC: | Arthur Brass |
| Subject: | RE: Vitol Asphalt Book Splits v 25 May 2017.xlsx |

I'm not exactly sure what you are asking.

If you are asking for a description to literally drop into a legal document, I would probably relay the terms to Hubenak and let him draft something up.

If you are just asking for a layman's description that you can then translate into a legal document, I guess something like ..

"joint trade book covering the blending, retail and wholesale asphalt and any new related business lines as mutually agreed upon between parties (referring to, for example, other prospective opportunities relayed to Eric) generating a book profitability. Book will be responsible for paying or reimbursing individual parties for: (a) in the case of Vitol, its TVM, or (b) in the case of NewCo, employees that are directly responsible for the trade book (initially 5, subject to increase or decrease by mutual consent of the two parties) including salaries and benefits, and (c) reimbursement to either party of direct expenses of the book (e.g., attending a trade conference related to the book or a subscriptions related to the book). The book will not reimburse either party for a discretionary allocation of overhead. To the extent both parties agree, the book may pay (d) incentive bonuses to trade team members, but it is the intent of the parties that any incentive compensation reasonable for Patrick Perugini, if any, would be paid by NewCo, at NewCo's discretion. The net profits after (a), (b), (c) and possibly (d) would be split 50/50 on a monthly basis."

Something like that. Again, I did not draft with an intent for this to be dropped into a legal document. Let me know if this is something along the lines of what you were seeking.

Jason

**From:** Steve Barth [mailto:SZB@Vitol.com]
**Sent:** Tuesday, May 30, 2017 2:19 PM
**To:** Jason Goldstein
**Cc:** aj@abrass.com
**Subject:** RE: Vitol Asphalt Book Splits v 25 May 2017.xlsx
Jason,

Is there a written description of this structure that we can incorporate into the JSMA? We can use this spreadsheet as an example but we probably need to verbalize as well.

Steve

**From:** Jason Goldstein [mailto:jgoldstein@gcachouston.com]
**Sent:** Thursday, May 25, 2017 05:15 PM
**To:** Eric Kuo; Steve Barth; aj@abrass.com
**Cc:** Jason Goldstein
**Subject:** Vitol Asphalt Book Splits v 25 May 2017.xlsx
Guys,

Here is a recap spreadsheet from today. It is pretty simple and straightforward.

I put in one bell and whistle based on the conversation regarding TVM. In cell E6 you can now put in the factor by which TVM changes with changes in gross margin assumptions. If you put 100% in E6, if gross



PENGAD 800-831-6989

**EXHIBIT**
22

margin increases 40% from the baseline level (used $6MM), TVM will increase 40%. If you put 75% in E6 using that same scenario, TVM will only increase 30%.
Let me know if this captures everyone's understanding and all of the necessary details.
Also, please note that in the interest of time I have not shared this with AJ prior to sending it to the group.
Best, Jason

To verify that the signature to this message is valid and trusted, click on the authentication stamp. Its function is to assist you to ensure that the email is indeed generated by a sender from @vitol.com

IMPORTANT: This email (including all attachments) is confidential and may be privileged. It may be read, copied and used only by the intended recipients, and must not be re-transmitted in any form without our consent. If you have received it in error, please contact us immediately by return email. Please then delete it and do not disclose its contents to any other person.

Security and reliability of email is not guaranteed. Communications should be verified from a mailed or faxed copy. All emails to anyone @vitol.com are communications to the firm and are not private or confidential to any named individual.

001791
**GCAC000753**

### ~~Amended and Restated~~ Joint Marketing Agreement

Joint Marketing Agreement (the "Agreement") made as of this ___ day of ~~May~~June 2017 by and between Vitol Inc., a Delaware corporation located at 2925 Richmond Avenue, 11th Floor, Houston, Texas 77098 ("Vitol") and ~~Gulf Coast Asphalt Company, L.L.C., an Alabama~~NewCo, a [Delaware] limited liability company located at _____ ~~GCAC will now become NEWCO.(~~1990 Post Oak Blvd., Suite 2400, Houston, TX 77056 ("NewCo"). (Vitol and ~~GCAC~~NewCo may be referred to individually~~,~~ as a "Party" or collectively, as "Parties").

### Witnesseth:

Whereas, Vitol and ~~GCAC~~NewCo wish to use their resources and expertise to jointly pursue the sourcing, purchase, blending, selling and marketing of asphalt and asphalt related products~~(~~, and other products (collectively, the "Products") ~~to and~~as mutually agreed between the Parties from time to time (collectively, the "Business"). Initially, the Parties shall pursue Business utilizing leased storage at (a) the GOTAC Terminal (the "GOTAC Terminal") located in Corpus Christi, Texas, owned and operated, as of the date hereof, by Gravity Midstream Corpus Christi, LLC ~~(the "GOTAC Terminal"~~("Gravity"), and the Arc Terminal located in Mobile, Alabama~~,~~ (the "Mobile Terminal", and together with the GOTAC Terminal, the "Terminals"), operated by Arc Terminals Holdings LLC ~~(the "Mobile Terminal") (the GOTAC Terminal and the Mobile Terminal hereinafter referred to collectively as the "Terminals") (the sourcing, purchasing, blending, selling and/or marketing of Products for wholesale or retail purchase for use in the United States, or for sale to third parties for the sale or delivery of product outside North America~~is referred to herein as the "Business");("Arc").; and

Whereas, the Parties wish to set forth in writing their understandings and agreements;

Now, therefore, in consideration of the premises and the covenants contained herein, the Parties agree as follows:

### Article I

### Terminals

During the term of this Agreement, Vitol shall use its commercially reasonable efforts to ~~maintain~~:

~~(a)    A~~Obtain use of the assets pertaining to the current terminal services agreement between Rio Energy International, Inc. ("Rio") and Gravity at the GOTAC Terminal ~~(the "GOTAC Terminal Agreement"), upon such~~, upon such terms and conditions as currently exist between Rio and Gravity, or on such other terms and conditions as the Parties shall mutually determine from time to time~~.~~

1



(a)   A sublease, or (ii) receive an assignment from Rio of such terminal services agreement.

(b)   Maintain consecutive short-term subleases from Gulf Coast Asphalt Company, L.L.C. ("GCAC") of the terminalling agreement at the Mobile Terminal (the "Mobile Terminal Agreement"), upon such terms and conditions as currently exist, or as the Parties shall mutually determine from time to time.

## Article II

(a)   Intentionally left blank.

### Article III

## Purchase of Products

Upon the prior mutual agreement of the Parties as to quantity, specifications, price and frequency of purchase, Vitol will use its commercially reasonable efforts to purchase Products for delivery to the Terminals, or such other locations as mutually agreed between the Parties, and arrange, as necessary, for the blending of the Products.

## Article IVIII

## Sale of Products

43.1   Sale of Products. Upon the mutual agreement of the Parties as to quantity, specifications, price and identity of customer, Vitol and GCACNewCo will each use its commercially reasonable efforts to sell Products for delivery from the Terminals.

43.2   Direct Sales by GCACNewCo. For Products sold by GCACNewCo directly to a customer, immediately prior to the sale by GCAC, GCACNewCo, NewCo will purchase the Products from Vitol upon such terms and conditions and price as the Parties shall mutually determine.

## Article VIV

## Hedging

2

GCAC000872

Vitol may maintain such hedging of the Product as the Parties may mutually determine from time to time.

## Article ~~V~~IV

### Facility/~~Vessel~~ Costs and Cost Allocations

~~6~~5.1    Vitol Costs. Vitol will pay all costs incurred with respect to the Terminals, including comprehensive property, casualty and liability insurance coverage as agreed by the Parties, and all costs incurred for any additional facilities or equipment acquired by Vitol during the term of this Agreement, for use in connection with this Agreement, with the consent of ~~GCAC~~NewCo (the "Vitol Costs").

~~6.2~~

~~6~~5.2    NewCo Costs. NewCo will pay or reimburse all costs related to the personnel directly responsible for the sourcing, ~~purchase~~purchasing, ~~sale~~selling, blending and operations related to the Products and the Business, including all wages, salaries, benefits and other costs, including but not limited to discretionary bonuses as mutually agreed to between the Parties from time to time ~~including other costs as shall be agreed to from time to time by the Parties~~ (the "Newco Costs"), including all salaries, wages, bonuses, employment taxes, and benefits (the "Trade Team Personnel"). The personnel shall include the Trade Team Personnel as of the date of this Agreement as set forth on Schedule A. Any changes to the Trade Team Personnel or changes to their compensation shall be mutually agreed upon between the Parties from time to time.

## Article ~~VII~~VI

### Calculation of Profits and Losses

~~7~~6.1    Costs. Costs for purposes of determining profits and losses, and the sharing of costs and profits and losses, for transactions governed by this Agreement, shall include the Vitol Costs and the ~~GCAC~~NewCo Costs, and all obligations, liabilities and reasonable costs and expenses incurred by either Party, as well as taxes paid or payable, other than taxes imposed upon the income of the Parties, in connection with the Business, including letter of credit fees, cost of funds for financing the costs and purchase of Product, ~~and~~ hedging gains and losses, direct and out-of-pocket costs incurred by either Party and mutually agreed upon between the Parties, as well as all other costs as mutually determined by the Parties. To the extent both parties agree, the book may pay ~~(d)~~ incentive bonuses to ~~trade team members~~Trade Team Personnel, but it is the intent of the ~~parties~~Parties that any incentive compensation reasonable for Patrick Perugini, if any, would be paid by NewCo, at NewCo's discretion and expense.

3

001794
GCAC000873

7~~6~~.2    Overhead.  Except as may be mutually agreed by the Parties from time to time, costs for purposes of determining profits and losses shall not include any general overhead expenses of either Party ~~or the costs of any personnel employed by a Party~~other than the specific Vitol Costs or Newco Costs described in Section 6.~~2~~5.2, but shall include direct, out-of-pocket expenses of either Party incurred directly as a result of pursuing the Business (e.g., asphalt industry association fees or personnel fees incurred with attending an industry conference), as mutually agreed between the Parties.

6~~7~~.3    Currency.  All amounts of costs, profits and losses under this Agreement, and any payments to be made, shall be calculated using U.S. Dollars.

## Article ~~VIII~~VII

## Reconciliation/Sharing of Profits and Losses/Records/Audit Rights

7~~8~~.1.    Monthly Payments and ~~Quarterly~~ Reconciliation.  ~~On or before~~ The Parties agree that it is their intent to equally share on a fifty/fifty percent basis the ~~thirtieth (30th )~~profits and losses of the Business.  To effect that intent, the Parties agree as follows:

(a)    On the first day of each calendar month ~~and within sixty (60)~~, Vitol shall reimburse NewCo for fixed costs related to the Business, such month's payments under the Arc terminalling agreement and expected Trade Team Personnel salaries, draws and related benefits/full burden (collectively, "First of Month Charges"), provided that NewCo shall invoice Vitol for First of Month Charges five business days prior to the start of such month, and if NewCo fails to invoice Vitol for First of Month Charges five business days prior to the start of such month, such payment shall not be due until five business days following invoice.

(b)    No later than the 10th business day after the end of each ~~calendar quarter, Vitol and GCAC will jointly determine~~ month, (a) Vitol shall provide a draft reconciliation of the gross profit, and net profit including but not limited to the Vitol Costs~~, the GCAC~~ and NewCo Costs~~, and~~ to NewCo, and (b) NewCo shall provide a reconciliation of any changes to First of Month Charges previously invoiced as well as any other ~~costs related to the Business,  the gross profit from sales of Product, and the net profit (or loss) of the Business during the prior calendar month or applicable quarter for transactions consummated during such month or applicable quarter in accordance with the provisions of this Agreement.~~reconciling items, including but not limited to inspection charges, utility charges, etc., to Vitol.  Parties shall seek to review such drafts and agree to final monthly reconciliations of profits and losses ("Final Reconciliation") no later than the 15th business day following the end of such month.  To the extent that one Party is entitled to a payment from the other Party in order for ~~the~~ Parties to equally share ~~the costs, and net~~in profits ~~(or losses)~~ of the Business, ~~equally, ~~or on such other basis as the Parties ~~shall~~may mutually determine in writing from time to time, a payment will~~shall~~ be made~~much~~ to such Party from the other Party within ~~ten (10)~~three business days ~~after~~of such ~~determination~~Final Reconciliation.

4

(c)      To the extent that, subsequent to the Final Reconciliation, either Party finds errors or discovers previously undiscovered income or costs related to the Business, such Party may present such errors or discoveries to the other Party, and the Parties shall seek to correct any such prior Final Reconciliations and make applicable payments in a reasonable period of time.

78.2     AnnualFinal Accounting.  Within sixty (60) days after the end of each calendar year, the Parties will perform an accounting of all transactions under this Agreement for the prior calendar year (the "Annual Accounting"), on the basis for the monthly and quarterly reconciliations.  To the extent that one Party is entitled to a payment from the other Party, a payment will be made to such Party from the other Party within ten (10) business days after such determination.

8.3      Final Accounting.  Within ninety (90) days after the expiration or termination of this Agreement or, if later, the earlier of the Expiration Date and the date Vitol shall have no further obligations under the Terminal Agreements., the Parties will mutually perform a final accounting of all transactions under this Agreement (the "Final Accounting"), on the basis that the Parties are to share all costs and profits and losses equally, or on such other basis as the Parties mutually determined in writing.  The Party entitled to payment from the other based on the Final Accounting will generate and send an invoice for the amount as determined in the Final Accounting, which will be paid within ten (10)three business days thereafter.

8.47.3    Records and Audit Rights.

(a)      Each Party shall keep complete, true and accurate books and records in relation to this Agreement and the Business. Each Party will keep such books and records for at least one (1) year following the completion of the Final Accounting.

(b)      Each Party may, upon written request and at its expense and no more than once per year, audit, during ordinary business hours, the books and records relating to the Business of the other Party and the correctness of any payments made or required to be made to or by such Party during such quarter, fiscal year or upon the Final Accounting, and any report, data or calculation underlying such payment (or lack thereof), pursuant to the terms of this Agreement.

(c)      On a monthly, quarterly and annual basis, each Party shall provide the other with a reasonably detailed report of all costs incurred by, sales by and gross profits from sales by, such Party, with respect to transactions under this Agreement.

Article VIII

Article IX

5

001796
GCAC000875

### Term and Termination

~~9~~8.1   Term.  The initial term (the "Initial Term") of this Agreement shall commence on the ~~Effective Date,~~date of this Agreement and shall ~~terminate~~expire on ~~December 31, 2020 (the "Expiration Date"), subject~~second anniversary of the date of this Agreement.  The Initial Term shall automatically renew for an additional one year terms ("Renewal Term") unless written notice is provided by the non-renewing Party at least 180 days prior to ~~earlier termination~~the expiration of the Renewal Term or Initial Term, as applicable, unless terminated early in accordance with ~~Section 9~~8.2 ~~hereof~~.

~~9.2~~   8.2   Termination Events.

(a)   In addition to the termination provisions of Section 8.1 of this Agreement, ~~t~~The Parties may terminate this Agreement at any time upon mutual written agreement.

~~(b)   Either Party may terminate this Agreement effective on or after December 31, 2016, upon not less than ninety (90) days prior written notice to the other.~~

~~(c)~~(b)   In the event of a material breach of this Agreement by a Party (the "Defaulting Party"), which is not cured within thirty (30) days after written notice from the other Party (the "Non-Defaulting Party") specifying the particulars of such breach, the Non-Defaulting Party may terminate this Agreement.

~~(d)~~(c)   Either Party may terminate this Agreement ~~with~~upon written notice if an Insolvency Event occurs in relation to the other Party. In any event when a Party first becomes aware of the likely occurrence of any Insolvency Event in regard to that Party, it shall promptly so notify the other Party in sufficient time to give the other Party sufficient notice to protect its interests under this Agreement.

~~9.3~~   8.3   Effect of Termination.  Upon a termination or expiration of this Agreement:

(a)   All Product at the Terminals, ~~in the Vessels,~~ or other mutually agreed storage facilities, as of the effective date of termination of this Agreement, will be sold at mutually agreed market price.

~~(b)   Vitol will retain all rights to the Terminals, as evidenced by the continued sublease of the Mobile Terminal Agreement and GOTAC Terminal Agreement, (collectively the "Terminal Agreements"), and be subject to all obligations and liabilities thereunder.~~

~~(c)   GCAC and GCCGM will retain all rights to the Vessels, as evidenced by the Vessel Charters, and be subject to all obligations and liabilities thereunder.~~

~~(d)   If this Agreement is terminated prior to the Expiration Date, other than as a result of an Insolvency Event relating to Vitol, GCAC will reimburse Vitol for fifty percent (50%)~~

6

~~of the costs, expenses and liabilities incurred by Vitol with respect to the Terminals during the period commencing on the termination date and terminating on the earlier of the termination date of the Terminal Agreements and the Expiration Date, in excess of any payments received by Vitol from third Parties for use of the Terminals, to the extent that the Terminals are not used by Vitol for its business purposes~~

~~(e)      Each Party covenants and agrees to use its reasonable commercial efforts to mitigate the costs and expense reimbursable by the other under clauses (d) and (e) hereof; provided, however, that (i) in the event Vitol proposes to sublease or assign any or all of its rights under the Terminal Agreements (a "Terminal Assignment"), Vitol shall provide notice to GCAC of the terms and conditions of the Terminal Assignment and provide GCAC with the opportunity to accept a Terminal Assignment upon the same terms and conditions; and (ii) in the event GCAC or GCCGM propose to sublease or assign any or all of their rights under the Vessel Charters (a "Charter Assignment"), GCAC and/or GCCGM shall provide notice to Vitol of the terms and conditions of the Charter Assignment and provide Vitol with the opportunity to accept a Charter Assignment upon the same terms and conditions.~~

(b)      Except in the event of a termination of this Agreement by ~~NewCo~~ Vitol under (i) 8.2(b) or (ii) 8.2(c):

      a.  If Vitol terminates, at the termination of this Agreement, at the request of NewCo, (x) Vitol and GCAC shall terminate the Mobile Terminal sublease, leaving GCAC with possession of the Mobile Terminal agreement with Arc, and, at the request of NewCo, (y) Vitol shall assign its rights under the GOTAC Terminal agreement to NewCo, whether such rights are rights between Vitol and Rio or, in the event that Rio has assigned the GOTAC terminal agreement to Vitol, Vitol shall assign such agreement to NewCo. In the event of a termination as contemplated in this subsection and an exercise of NewCo's rights herein, for a period of one year after such termination, Vitol shall comply with Section 9.1 and in connection therewith Vitol shall not compete with NewCo's activities in anyway related to the continuance of the Business after termination, except that Vitol and its affiliates may continue to operate in businesses in which it was already operating prior to such termination.

      b.  Notwithstanding anything to the contrary set forth above in this subsection, within 10 days following delivery of NewCo's request of assignment of either or both of the Mobile Terminal sublease and/or the GOTAC Terminal agreement, Vitol may elect, by providing written notice of the same to NewCo during such 10 day period ("Sale Notice"), , to elect to sell all of the rights of the Parties in the Business including all of their respective rights relating to the Mobile Terminal sublease and/or the GOTAC Terminal agreement (the "Purchased Assets") in an bona fide arms' length transaction a third party unaffiliated with Vitol,

7

provided that such agreement(s) in each case are transferable under the terms of such agreements. If Vitol timely provides the Sale Notice, (i) Vitol shall have 60 days from date of delivery to attempt to sell the Purchased Assets, and (ii) prior to entering into any agreements for such sale, Vitol shall give NewCo written notice of the terms of any such sale (including all details relating thereto, including purchase price, payment terms, conditions, etc. (collectively, the "Payment Terms") and offer NewCo the right to purchase Vitol's 50% share of the Purchased Assets on such Payment Terms (less 50% of the amounts included therein), and NewCo shall have a right to the same on such terms, by providing Vitol with notice of acceptance of such offer within 20 days of delivery of the Sale Notice to NewCo If NewCo delivers such acceptance notice, then within 30 days thereafter Vitol shall sell all of its rights, title and interest in and to the Purchased Assets at a time and place determined by NewCo for 50% of the Payment Terms (and otherwise on the terms and conditions thereof.. If NewCo does not provide a timely acceptance notice, Vitol may sell the Purchased Assets for a period of 60 days after the end of the period during which NewCo could have delivered an acceptance notice, but only at a purchase price that it is at least equal to the Purchase Terms. If Vitol does not complete such sale during the period referred to in the immediately preceding sentence, then Vitol shall fully comply with NewCo's request described in the first sentence of this subsection.

(c) In the event of a termination by ~~NewCo under~~ Vitol (i) 8.2(b) or 8.2(c), NewCo shall assign any rights it may have, if any, under the Mobile Terminal agreement and the GOTAC Terminal agreement to Vitol. In the event of a termination under this Section 8.3(~~b~~c) and an assignment to Vitol of any agreements outlined in this paragraph, for a period of one year after such termination, NewCo agrees not to compete with Vitol's activities related to the continuance of the Business after termination.

~~(f)~~(d) Except as otherwise expressly provided herein, the expiration or termination of this Agreement for any reason shall not release either Party from any liability that, at the time of such expiration or termination, has already accrued to the other Party or that is attributable to a period prior to such expiration or termination.

Article IX

8

9.4.    Assignment of Terminal Agreements.  Notwithstanding the provisions of Section 9.3 hereof, in the event Vitol shall elect to terminate this Agreement in accordance with Section 9.2 (b) hereof, upon an election by GCAC, in writing, within thirty (30) days after receipt of the notice of termination from Vitol, Vitol shall assign all of its rights under the Terminal Agreements to GCAC, and GCAC shall assume all of Vitol's obligations under the Terminal Agreements, effective as of the termination date of this Agreement.  Upon such assignment, Vitol shall have no obligations to reimburse GCAC for any costs, expenses or liabilities incurred by GCAC under the Terminal Agreements.

Article X

Exclusivity

~~10~~9.1  Exclusivity Undertaking by Vitol. During the Term of this Agreement, except in accordance with this Agreement or as agreed to by ~~GCAC~~NewCo, Vitol shall not, and shall cause each of its Affiliates, other than ~~those affiliates~~VALT which is already operating in lines of business related to shipping asphalt on an international basis, not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others) in the Business, including, without limitation and by way of example only, (a) the acquisition of any interest in any company or undertaking engaged in the Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out the Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) Vitol and its applicable Affiliates from performing their respective obligations under this Agreement and any applicable Terminal Agreement and (ii) Vitol's or any of its Affiliates' purchase of a class of publicly traded equity securities of a company engaged in the Business so long as Vitol and its Affiliates do not collectively own more than five percent (5%) of such class of issued and outstanding equity securities of such publicly traded company, and so long as neither Vitol or any of its Affiliates otherwise exercise any management or control with respect to such publicly traded company

~~10~~9.2  Exclusivity Undertaking by ~~GCAC~~NewCo. During the Term of this Agreement, except in accordance with this Agreement or as agreed to in writing by Vitol, ~~GCAC~~NewCo shall not, and shall cause each of its Affiliates not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others), directly or indirectly, in the Business, including, without limitation and by way of example only, (a) the acquisition of any interest in any company or undertaking engaged in the Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out the Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) ~~GCAC~~NewCo and its applicable Affiliates from performing their respective obligations under this Agreement and any applicable Vessel Charter or the terminalling agreement at the Mobile Terminal ~~Agreement~~and (ii) ~~GCAC's~~NewCo's or any of its Affiliates' purchase, including ownership, of a class of publicly traded equity securities of a company engaged in the Business so long as ~~GCAC~~NewCo and its Affiliates do not collectively own more than five percent (5%) of such class of issued and

9

outstanding equity securities of such publicly traded company, and so long as neither ~~GCAC~~NewCo or any of its Affiliates otherwise exercise any management or control with respect to such publicly traded company.

## Article ~~XIX~~

### FCPA

Each Party warrants to the other Party that it is familiar with the United States Foreign Corrupt Practices Act (as amended, the "FCPA") and its purposes, including its prohibition against paying or giving anything of value, directly or indirectly, by an American company to an official of a non-U.S. government for the purpose of influencing any act or decision in his or her official capacity, inducing such official to violate his or her lawful duty, inducing such official to use his or her influence with a non-U.S. government or an instrumentality thereof to affect or influence any act of such government or instrumentality, or obtaining any improper advantage in order to assist the American company to obtain or retain business. Each Party hereto warrants to the other that it shall not undertake any acts prohibited by the FCPA.

## Article ~~XII~~XI

### Confidentiality

~~12~~11.1 Duty of Confidence. Each Party will maintain in confidence (and will not use to the detriment of the other Party), and will cause its respective Affiliates to maintain in confidence (and not to use to the detriment of the other Party), any written, oral or other Confidential Information obtained from the other Party in connection with this Agreement or the transactions contemplated hereby, or any Confidential Information concerning the Business, unless (a) such information becomes publicly available through no fault of such Party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consents or approvals required for the Business, or (c) the use of such information in connection with any claims by a Party under this Agreement or otherwise in respect of the Business. In the event the recipient Party is required to disclose Confidential Information of the disclosing Party by law or in connection with bona fide legal process, such disclosure shall not be a breach of this Agreement; provided that the recipient Party (i) if legally permitted, informs the disclosing Party as soon as reasonably practicable of the required disclosure; (ii) limits the disclosure to the required purpose; and (iii) at the disclosing Party's request and expense, assists in an attempt to object to or limit the required disclosure.

~~12~~11.2 Enforcement. To the fullest extent permitted by law, if a Party or any of its Affiliates breaches, or threatens to commit a breach of, Section ~~12~~11.1, the other Party shall have the right and remedy to have Section ~~12~~11.1 specifically enforced by any court having

10

jurisdiction, it being acknowledged and agreed that money damages would not provide an adequate remedy in the event of a breach of Section ~~12~~11.1. Nothing herein shall be construed to limit the right of a Party to collect money damages in the event of a breach of Section ~~12~~11.1 by the other Party.

## Article ~~XIII~~XII

### Intellectual Property

~~13~~12.1        Pre-Existing Property. Except as specifically documented in writing between the Parties, all property owned by a Party (whether real or personal, Intellectual Property, tangible or intangible or any other property) shall be owned by such Party, and the other Party shall not have any ownership interest of any nature in such property.

~~13~~12.2 Ownership of Inventions. All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement shall be owned as follows:

(a)        All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement, including any patent applications and patents, covering such inventions, trade secrets or other Intellectual Property, made solely by employees or agents of a Party, or its affiliates, shall be owned by such Party or its respective affiliate(s).

(b)        All such inventions, trade secrets or other Intellectual Property developed jointly by employees or consultants of both Parties shall be owned jointly by the Parties. Determination of inventorship shall be made in accordance with the patent laws of the United States, and any patent rights with a named inventor that is an employee or consultant of each Party will be jointly owned.

~~13~~12.3 No Other License Grants. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property, except as expressly provided in this Agreement.

~~13~~12.4 Other Property Rights. Nothing in this Agreement creates, or is intended to create, any direct or indirect interest or right of a Party in the property and assets of the other Party, except as may be separately agreed to between the Parties.

## Article ~~XIV~~XIII

### Representations of the Parties

~~14~~13.1 Representations and Warranties by Vitol. Vitol represents and warrants to ~~GCAC~~NewCo that: (a) it is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas; (b) it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by law and its

11

001802
**GCAC000881**

organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) all consents, approvals and authorizations from all governmental authorities or other third Parties required to be obtained by Vitol in connection with this Agreement have been obtained; and (e) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it, or any of its Affiliates, is a party; or (iii) violate any law or order applicable to it or its properties.

~~14~~13.2 Representations and Warranties by ~~GCAC.~~ ~~GCAC~~NewCo. NewCo represents and warrants to Vitol that: (a) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of ~~Alabama;~~[XXXX]; (b) it is duly qualified to transact business in and is in good standing in the State of Texas; (c) it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by law and its organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) all consents, approvals and authorizations from all governmental authorities or other third Parties required to be obtained by ~~GCAC~~NewCo in connection with this Agreement have been obtained; and (e) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it is a party; or (iii) violate any law or order applicable to it or its properties.

~~14~~13.3 No Other Warranties.  EXCEPT AS EXPRESSLY STATED IN THIS ARTICLE XIV, (A) NO REPRESENTATION, CONDITION OR WARRANTY WHATSOEVER IS MADE OR GIVEN BY OR ON BEHALF OF VITOL OR ~~GCAC~~NewCo; AND (B) ALL OTHER CONDITIONS AND WARRANTIES WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE ARE HEREBY EXPRESSLY DISCLAIMED AND EXCLUDED.

## Article ~~XV~~XIV

### Limitation of Liabilities

~~15~~14.1 Special, Indirect and Other Losses.  NEITHER PARTY NOR ANY OF ITS AFFILIATES SHALL BE LIABLE IN CONTRACT, TORT, NEGLIGENCE, BREACH OF STATUTORY DUTY OR OTHERWISE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR FOR LOSS OF PROFITS SUFFERED BY THE OTHER PARTY.

## Article XV

12

Miscellaneous

~~16~~15.1 Assignment. This Agreement and the rights hereunder may not be assigned by a Party without the prior written consent of the other Party, which consent may be withheld in such Party's sole discretion.

~~16~~15.2 Relationship of the Parties. Nothing contained in this Agreement shall be deemed to constitute a partnership, joint venture, or legal entity of any type between the Parties, or to constitute one as the agent of the other. Moreover, each Party agrees not to construe this Agreement, or any of the transactions contemplated hereby, as a partnership for tax or any other purposes. Each Party shall act solely as an independent contractor, and nothing in this Agreement shall be construed to give any Party the power or authority to act for, bind, or commit the other.

~~16~~15.3 Further Assurances. Vitol and ~~GCAC~~NewCo hereby covenant and agree, without the necessity of any further consideration, to execute, acknowledge and deliver any and all such other documents and take any such other action as may be reasonably necessary to carry out the intent and purposes of this Agreement.

~~16~~15.4 Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without reference to any choice of law provisions that would result in the application of the laws of another jurisdiction.

~~16~~15.5 Meeting of the Parties. Not less frequent than quarterly, the Parties shall meet to discuss and analyze the performance and strategy of the transactions hereunder.

~~16~~15.6 Compliance with Law. Each Party shall perform its obligations under this Agreement in accordance with all applicable laws. No Party shall, or shall be required to, undertake any activity under or in connection with this Agreement which violates, or which it believes, in good faith, may violate, any applicable law.

~~16~~15.7 Expenses. Each Party shall pay the fees and expenses of its respective lawyers and other experts and all other expenses and costs incurred by such Party incidental to the negotiation, preparation, execution and delivery of this Agreement, none of which shall be included in the determination of profits or losses or the sharing thereof.

~~16~~15.8 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

~~16~~15.9 Cumulative Remedies. No remedy referred to in this Agreement is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to in this Agreement or otherwise available under law.

~~16~~15.10      Dispute Resolution.

13

001804
GCAC000883

(a)　　In the event of a dispute relating to the interpretation, performance or alleged breach of this Agreement, the Parties will refer the dispute to the senior executive officers of the Parties for discussion and resolution. If the senior executive officers cannot resolve such dispute within thirty (30) days of the matter being referred to them, either Party may request to mediate such dispute through a one-day mediation with a mutually agreed mediator. If the dispute is not settled through mediation (if any), ~~,~~ either Party may ~~be free to~~ initiate litigation in Harris County, Texas, to whose jurisdiction the Parties hereby subject themselves. In any such proceeding the Parties hereby waive any objection to forum including, without limitation, any objection based on lack of personal jurisdiction, improper venue, or inconvenient forum. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT.

(b)　　Notwithstanding any of the other provisions hereof, nothing herein shall limit, restrict or delay a Party's right to seek and obtain injunctive relief or specific performance from a court of competent jurisdiction in order to protect its interests without first complying with this Section ~~16~~15.10(a).

~~16~~15.11　　Waivers and Amendments. The failure of any Party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other Party. No waiver shall be effective unless it has been given in writing and signed by the Party giving such waiver. No provision of this Agreement may be amended or modified other than by a written document signed by authorized representatives of each Party.

~~16~~15.12　　Force Majeure. Neither Party shall be responsible to the other for any failure or delay in performing any of its obligations under this Agreement, or for other nonperformance hereunder, if such delay or nonperformance is caused by strike, stoppage of labor, lockout or other labor trouble, fire, flood, accident, war, act of terrorism or of the government of any country or of any local government, or by cause unavoidable or beyond the control of any Party hereto~~, which event continues for more than one (1) month.~~. In such event, the Party affected will use its commercially reasonable efforts to resume performance of its obligations.

~~16~~15.13　　Notices. All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when received by the addressee, at the addresses set forth below (or to such other addresses as a Party may designate by notice):

If to Vitol Inc.:

2925 Richmond Avenue, 11th Floor

14

001805
GCAC000884

Houston, Texas 77098
Attn:_____

If to ~~Gulf Coast Asphalt Company, L.L.C.:~~NewCo:

Attention: ~~Vice President and General Counsel~~Chief Financial Officer
1990 Post Oak Blvd~~.~~
~~.,~~ Suite 2400
Houston, Texas 77056

~~16~~

With a copy to:
Steven Canner
Baker & McKenzie LLP
425 Fifth Avenue
New York, NY 10018

15.14   Entire Agreement.  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and no modification or revision thereof shall have any force or effect unless the same is in writing and executed by the Parties hereto.

15.15   Survival.  Sections 8.3(b), 8.3(c), 9.1, 9.2, 10, and 11.1 shall survive the termination of this Agreement.

## Article XVII

### Definitions

For purposes of this Agreement, the following terms shall have the meanings set forth in this Article:

"Affiliate" means, with respect to a Party, any Person that controls, is controlled by, or is under common control with that Party.

"Confidential Information" means all proprietary information, trade secrets and other confidential data of a financial, commercial or technical nature which the disclosing Party or any of its Affiliates has supplied or otherwise made available to the other Party or its Affiliates, whether made available orally, in writing or in electronic form.

"Insolvency Event" means, in relation to either Party, any one of the following: (a) that Party is the subject of voluntary or involuntary bankruptcy proceedings instituted on behalf of or against such Party (except for involuntary bankruptcy proceedings which are dismissed within sixty (60) days of commencement); (b) an administrative receiver, receiver and manager, interim receiver, custodian, sequestrator or similar officer is appointed in respect of that Party (collectively, the

15

001806
GCAC000885

"Receiver") and that Party has not caused the underlying action or the Receiver to be dismissed within sixty (60) days after the Receiver's appointment; (c) the board of directors (or similar governing authority of such Party) has passed a resolution to wind up that Party, or such a resolution shall have been passed other than a resolution for the solvent reconstruction or reorganization of that Party; (d) a resolution shall have been passed by that Party or that Party's directors to make an application for an administration order or to appoint an administrator; or (e) that Party makes a general assignment, composition or arrangement with or for the benefit of all or the majority of that Party's creditors, or makes, suspends or threatens to suspend making payments to al or the majority of that Party's creditors.

"Intellectual Property" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases that are owned or used by the applicable Party and its affiliates.

"Person" means any individual, partnership, limited liability company, firm, corporation, association, trust, unincorporated organization or other entity.

"Third Party" means any Person other than a Party or an Affiliate of a Party.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed on their respective behalf, by their respective officers, duly authorized, in multiple originals.

VITOL INC.

By:_____
Print Name:_____
Title:_____


NEWCOGULF COAST ASPHALT COMPANY, L.L.C.

By:_____
Print Name:_____
Title:_____

AGREED FOR THE SOLE PURPOSE OF SECTION 1(b):

GULF COAST ASPHALT COMPANY, L.L.C.


By:_____

16

001807
GCAC000886

Name:  Arthur J. Brass
Title:  President and Manager

17

001808
GCAC000887

**Schedule A**
**Trade Team Personnel**

001809
GCAC000888

Message

| | |
|---|---|
| **From:** | Ernie Kohnke [ewk@Vitol.com] |
| **Sent:** | 7/12/2017 11:03:30 PM |
| **To:** | 'Dave Hubenak' [dhubenak@gcachouston.com] |
| **CC:** | Eric Kuo [ejk@Vitol.com]; Steve Barth [SZB@Vitol.com] |
| **Subject:** | Revised Vitol-NewCo Joint Marketing Agreement |
| **Attachments:** | GCAC Vitol JSMA draft 7-12-2017.docx |

Dave,

Attached is the further revised JSMA between Vitol and NewCo. Eric and Steve has not had a chance to review/revise this version, but in the interests of time I'm sending it to you to let GCAC start its review. If Eric and Steve have other changes, we'll incorporate those in the next turn.

Thanks.

Ernie

**Ernie Kohnke**

--------------------------------------------------------------------------------

Vitol Inc
2925 Richmond Avenue, Suite 1100, Houston, TX 77098

T: +1 713-230-2628
M: +1 713-882-5676
E: ewk@vitol.com





**EXHIBIT**

24

<u>Joint Marketing Agreement</u>

Joint Marketing Agreement (the "Agreement") made as of this ___ day of July 2017 by and between Vitol Inc., a Delaware corporation located at 2925 Richmond Avenue, 11th Floor, Houston, Texas 77098 ("Vitol") and NewCo, a [Delaware] limited liability company located at 1990 Post Oak Blvd., Suite 2400, Houston, TX 77056 ("NewCo"). (Vitol and NewCo may be referred to individually as a "Party" or collectively as "Parties").

<div align="center">Witnesseth:</div>

Whereas, Vitol and NewCo wish to use their resources and expertise to jointly pursue the sourcing, purchase, blending, selling and marketing of asphalt and asphalt related products, and other products (collectively, the "Products") as mutually agreed between the Parties from time to time (collectively, the "Business"). Initially, the Parties shall pursue Business utilizing leased storage at (a) the GOTAC Terminal (the "GOTAC Terminal") located in Corpus Christi, Texas, owned and operated, as of the date hereof, by Gravity Midstream Corpus Christi, LLC ("Gravity"), and the Arc Terminal located in Mobile, Alabama (the "Mobile Terminal", and together with the GOTAC Terminal, the "Terminals"), operated by Arc Terminals Holdings LLC ("Arc"); and

Whereas, the Parties wish to set forth in writing their understandings and agreements;

Now, therefore, in consideration of the premises and the covenants contained herein, the Parties agree as follows:

<div align="center">Article I</div>

<div align="center">Terminals</div>

During the term of this Agreement, Vitol shall use its commercially reasonable efforts to:

(a)     Obtain use of the assets pertaining to the current terminal services agreement between Rio Energy International, Inc. ("Rio") and Gravity at the GOTAC Terminal, upon such terms and conditions as currently exist between Rio and Gravity, or on such other terms and conditions as the Parties shall mutually determine from time to time, or (ii) receive an assignment from Rio of such terminal services agreement.

(b)     Maintain consecutive short-term subleases from Gulf Coast Asphalt Company, L.L.C. ("GCAC") of the terminalling agreement at the Mobile Terminal, upon such terms and conditions as currently exist, or as the Parties shall mutually determine from time to time.

<div align="center">1</div>

001811

Confidential

VITOL_00009573

## Article II

## Purchase of Products

Upon the prior mutual agreement of the Parties as to quantity, specifications, price and frequency of purchase, Vitol will use its commercially reasonable efforts to purchase Products for delivery to the Terminals, or such other locations as mutually agreed between the Parties, and arrange, as necessary, for the blending of the Products.

## Article III

## Sale of Products

3.1    Sale of Products. Upon the mutual agreement of the Parties as to quantity, specifications, price and identity of customer, Vitol and NewCo will each use its commercially reasonable efforts to sell Products for delivery from the Terminals.

3.2    Direct Sales by NewCo. For Products sold by NewCo directly to a customer, immediately prior to the sale by NewCo, NewCo will purchase the Products from Vitol upon such terms and conditions and price as the Parties shall mutually determine.

## Article IV

## Hedging

Vitol may maintain such hedging of the Product as the Parties may mutually determine from time to time.

## Article V

## Facility Costs and Cost Allocations

5.1    Vitol Costs. Vitol will pay all costs incurred with respect to the Terminals, including comprehensive property, casualty and liability insurance coverage as agreed by the Parties, and all costs incurred for any additional facilities or equipment acquired by Vitol during the term of this Agreement, for use in connection with this Agreement, with the consent of NewCo (the "Vitol Costs").

5.2    NewCo Costs. NewCo will pay or reimburse all costs related to the personnel directly responsible for the sourcing, purchasing, selling, blending and operations related to the Products and the Business, including all wages, salaries, benefits and other costs, including but

2

Confidential

not limited to discretionary bonuses as mutually agreed to between the Parties from time to time (the "Newco Costs"), including all salaries, wages, bonuses, employment taxes, and benefits (the "Trade Team Personnel"). The personnel shall include the Trade Team Personnel as of the date of this Agreement as set forth on Schedule A. Any changes to the Trade Team Personnel or changes to their compensation shall be mutually agreed upon between the Parties from time to time.

## Article VI

### Calculation of Profits and Losses

6.1     Costs. Costs for purposes of determining profits and losses, and the sharing of costs and profits and losses, for transactions governed by this Agreement, shall include the Vitol Costs and the NewCo Costs, and all obligations, liabilities and reasonable costs and expenses incurred by either Party, as well as taxes paid or payable, other than taxes imposed upon the income of the Parties, in connection with the Business, including letter of credit fees, cost of funds for financing the costs and purchase of Product, hedging gains and losses, direct and out-of-pocket costs incurred by either Party and mutually agreed upon between the Parties, as well as all other costs as mutually determined by the Parties. To the extent both parties agree, the book may pay incentive bonuses to Trade Team Personnel, but it is the intent of the Parties that any incentive compensation reasonable for Patrick Perugini, if any, would be paid by NewCo, at NewCo's discretion and expense.

6.2     Overhead. Except as may be mutually agreed by the Parties from time to time, costs for purposes of determining profits and losses shall not include any general overhead expenses of either Party other than the specific Vitol Costs or Newco Costs described in Section 5.2, but shall include direct, out-of-pocket expenses of either Party incurred directly as a result of pursuing the Business (e.g., asphalt industry association fees or personnel fees incurred with attending an industry conference), as mutually agreed between the Parties.

6.3     Currency. All amounts of costs, profits and losses under this Agreement, and any payments to be made, shall be calculated using U.S. Dollars.

## Article VII

### Reconciliation/Sharing of Profits and Losses/Records/Audit Rights

7.1.     Monthly Payments and Reconciliation. The Parties agree that it is their intent to equally share on a fifty/fifty percent basis the profits and losses of the Business. To effect that intent, the Parties agree as follows:

(a)     On the first day of each calendar month, Vitol shall reimburse NewCo for fixed costs related to the Business, such month's payments under the Arc terminalling agreement and expected Trade Team Personnel salaries, draws and related benefits/full burden

3

Confidential

(collectively, "First of Month Charges"), provided that NewCo shall invoice Vitol for First of Month Charges five business days prior to the start of such month, and if NewCo fails to invoice Vitol for First of Month Charges five business days prior to the start of such month, such payment shall not be due until five business days following invoice.

(b)     No later than the 10th business day after the end of each month, (a) Vitol shall provide a draft reconciliation of the gross profit, and net profit including but not limited to the Vitol Costs and NewCo Costs to NewCo, and (b) NewCo shall provide a reconciliation of any changes to First of Month Charges previously invoiced as well as any other reconciling items, including but not limited to inspection charges, utility charges, etc., to Vitol. Parties shall seek to review such drafts and agree to final monthly reconciliations of profits and losses ("Final Reconciliation") no later than the 15th business day following the end of such month. To the extent that one Party is entitled to a payment from the other Party in order for Parties to equally share in profits or losses of the Business, or on such other basis as the Parties may mutually determine in writing from time to time, a payment shall be much to such Party from the other Party within three business days of such Final Reconciliation.

(c)     To the extent that, subsequent to the Final Reconciliation, either Party finds errors or discovers previously undiscovered income or costs related to the Business, such Party may present such errors or discoveries to the other Party, and the Parties shall seek to correct any such prior Final Reconciliations and make applicable payments in a reasonable period of time.

7.2     Final Accounting.  Within sixty days after the termination of this Agreement, the Parties will mutually perform a final accounting of all transactions under this Agreement (the "Final Accounting"), on the basis that the Parties are to share all costs and profits and losses equally, or on such other basis as the Parties mutually determined in writing. The Party entitled to payment from the other based on the Final Accounting will generate and send an invoice for the amount as determined in the Final Accounting, which will be paid within three business days thereafter.

7.3     Records and Audit Rights.

(a)     Each Party shall keep complete, true and accurate books and records in relation to this Agreement and the Business. Each Party will keep such books and records for at least one (1) year following the completion of the Final Accounting.

(b)     Each Party may, upon written request and at its expense and no more than once per year, audit, during ordinary business hours, the books and records relating to the Business of the other Party and the correctness of any payments made or required to be made to or by such Party during such quarter, fiscal year or upon the Final Accounting, and any report, data or calculation underlying such payment (or lack thereof), pursuant to the terms of this Agreement.

4

Confidential

(c)    On a monthly basis, each Party shall provide the other with a reasonably detailed report of all costs incurred by, sales by and gross profits from sales by, such Party, with respect to transactions under this Agreement.

## Article VIII

## Term and Termination

8.1    Term. The initial term (the "Initial Term") of this Agreement shall commence on the date of this Agreement and shall expire on the second anniversary of the date of this Agreement. The Initial Term shall automatically renew for an additional one year terms ("Renewal Term") unless written notice is provided by the non-renewing Party at least 180 days prior to the expiration of the Renewal Term or Initial Term, as applicable, unless terminated early in accordance with 8.2.

8.2    Termination Events.

(a)    In addition to the termination provisions of Section 8.1 of this Agreement, the Parties may terminate this Agreement at any time upon mutual written agreement.

(b)    Either party may terminate this Agreement effective on or after the first year of the Initial Term, upon not less than ninety (90) days prior written notice to the other.

(c)    In the event of a material breach of this Agreement by a Party (the "Defaulting Party"), which is not cured within thirty (30) days after written notice from the other Party (the "Non-Defaulting Party") specifying the particulars of such breach, the Non-Defaulting Party may terminate this Agreement.

(d)    Either Party may terminate this Agreement upon written notice if an Insolvency Event occurs in relation to the other Party. In any event when a Party first becomes aware of the likely occurrence of any Insolvency Event in regard to that Party, it shall promptly so notify the other Party in sufficient time to give the other Party sufficient notice to protect its interests under this Agreement.

8.3    Effect of Termination. Upon a termination or expiration of this Agreement:

(a)    All Product at the Terminals, or other mutually agreed storage facilities, as of the effective date of termination of this Agreement, will be sold at mutually agreed market price.

(b)    Except in the event of a termination of this Agreement by Vitol under (i) 8.2(b) or (ii) 8.2(c):

5

001815

Confidential    VITOL_00009577

a. If Vitol terminates, at the termination of this Agreement, at the request of NewCo, (x) Vitol and GCAC shall terminate the Mobile Terminal sublease, leaving GCAC with possession of the Mobile Terminal agreement with Arc, and, at the request of NewCo, (y) Vitol shall assign its rights, if any, under the GOTAC Terminal agreement to NewCo, or Vitol will permit substitution of NewCo in place of Vitol as the party instructing Rio with respect to use of the GOTAC Terminal Agreement as it relates to this Agreement.

(c)   In the event of a termination by Vitol under Section 8.2(b) or if terminated by NewCo other than under Section 8.2(b), at the request of Vitol NewCo shall assign any rights it may have, if any, under the Mobile Terminal agreement and the GOTAC Terminal agreement to Vitol.

(d)   Notwithstanding anything to the contrary set forth above in this Sections 8.2(b) or 8.2(c), if with Vitol or NewCo elects to terminate this Agreement (as applicable, the "Terminating Party"), within 10 days following delivery of a request from other Party (the "Remaining Party") to the Terminating Party to assign to the Remaining Party the Mobile Terminal sublease and/or the GOTAC Terminal agreement, as applicable, the Terminating Party may elect, by providing written notice of the same to the Remaining Party during such 10 day period ("Sale Notice"), to elect to sell all of the rights of the Parties in the Business including all of their respective rights relating to the Mobile Terminal sublease and/or the GOTAC Terminal agreement (the "Purchased Assets") in an bona fide arms' length transaction a third party unaffiliated with Terminating Party, provided that such agreement(s) in each case are transferable under the terms of such agreements. If Terminating Party timely provides the Sale Notice, (i) Terminating Party shall have 60 days from date of delivery  to attempt to sell the Purchased Assets, and (ii) prior to entering into any agreements for such sale, Terminating Party shall give Remaining Party written notice of the terms of any such sale (including all details relating thereto, including purchase price, payment terms, conditions, etc. (collectively, the "Payment Terms") and offer Remaining Party the right to purchase Terminating Party's 50% share of the Purchased Assets on such Payment Terms (less 50% of the amounts included therein), and Remaining Party shall have a right to the same on such terms, by providing Terminating Party with notice of acceptance of such offer within 20 days of delivery of the Sale Notice to Remaining Party  If Remaining Party delivers such acceptance notice, then within 30 days thereafter Terminating Party shall sell all of its rights, title and interest in and to the Purchased Assets at a time and place determined by Remaining Party for 50% of the Payment Terms (and otherwise on the terms and conditions thereof..  If Remaining Party does not provide a timely acceptance notice, Terminating Party may sell the Purchased Assets for a period of 60 days after the end of the period during which Remaining Party could have delivered an acceptance notice, but only at a purchase price that it is at least equal to the Purchase Terms. If Terminating Party does not complete such sale during the period referred to in the immediately preceding sentence, then Terminating Party shall fully comply with Remaining Party's request described in the first sentence of this subsection.

6

(e)     Except as otherwise expressly provided herein, the expiration or termination of this Agreement for any reason shall not release either Party from any liability that, at the time of such expiration or termination, has already accrued to that Party or that is attributable to a period prior to such expiration or termination.

## Article IX

### Exclusivity

9.1     Exclusivity Undertaking by Vitol. During the Term of this Agreement, except in accordance with this Agreement or as agreed to by NewCo, Vitol shall not, and shall cause each of its Affiliates which are organized within the United States, other than VALT which is already operating in lines of business related to shipping asphalt on an international basis, not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others) in the Business, including, without limitation and by way of example only, (a) the acquisition of any interest in any company or undertaking engaged in the Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out the Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) Vitol and its applicable Affiliates from performing their respective obligations under this Agreement and any applicable Terminal Agreement and (ii) Vitol's or any of its Affiliates' purchase of a class of publicly traded equity securities of a company engaged in the Business so long as Vitol and its Affiliates do not collectively own more than five percent (5%) of such class of issued and outstanding equity securities of such publicly traded company, and so long as neither Vitol or any of its Affiliates otherwise exercise any management or control with respect to such publicly traded company

9.2     Exclusivity Undertaking by NewCo. During the Term of this Agreement, except in accordance with this Agreement or as agreed to in writing by Vitol, NewCo shall not, and shall cause each of its Affiliates not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others), directly or indirectly, in the Business, including, without limitation and by way of example only, (a) the acquisition of any interest in any company or undertaking engaged in the Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out the Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) NewCo and its applicable Affiliates from performing their respective obligations under this Agreement or the terminalling agreement at the Mobile Terminal and (ii) NewCo's or any of its Affiliates' purchase, including ownership, of a class of publicly traded equity securities of a company engaged in the Business so long as NewCo and its Affiliates do not collectively own more than five percent (5%) of such class of issued and outstanding equity securities of such publicly traded company, and so long as neither NewCo or any of its Affiliates otherwise exercise any management or control with respect to such publicly traded company.

7

001817

Confidential                                                    VITOL_00009579

## Article X

## FCPA

Each Party warrants to the other Party that it is familiar with the United States Foreign Corrupt Practices Act (as amended, the "FCPA") and its purposes, including its prohibition against paying or giving anything of value, directly or indirectly, by an American company to an official of a non-U.S. government for the purpose of influencing any act or decision in his or her official capacity, inducing such official to violate his or her lawful duty, inducing such official to use his or her influence with a non-U.S. government or an instrumentality thereof to affect or influence any act of such government or instrumentality, or obtaining any improper advantage in order to assist the American company to obtain or retain business.  Each Party hereto warrants to the other that it shall not undertake any acts prohibited by the FCPA.

## Article XI

## Confidentiality

11.1     Duty of Confidence. Each Party will maintain in confidence (and will not use to the detriment of the other Party), and will cause its respective Affiliates to maintain in confidence (and not to use to the detriment of the other Party), any written, oral or other Confidential Information obtained from the other Party in connection with this Agreement or the transactions contemplated hereby, or any Confidential Information concerning the Business, unless (a) such information becomes publicly available through no fault of such Party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consents or approvals required for the Business, or (c) the use of such information in connection with any claims by a Party under this Agreement or otherwise in respect of the Business. In the event the recipient Party is required to disclose Confidential Information of the disclosing Party by law or in connection with bona fide legal process, such disclosure shall not be a breach of this Agreement; provided that the recipient Party (i) if legally permitted, informs the disclosing Party as soon as reasonably practicable of the required disclosure; (ii) limits the disclosure to the required purpose; and (iii) at the disclosing Party's request and expense, assists in an attempt to object to or limit the required disclosure.

11.2     Enforcement. To the fullest extent permitted by law, if a Party or any of its Affiliates breaches, or threatens to commit a breach of, Section 11.1, the other Party shall have the right and remedy to have Section 11.1 specifically enforced by any court having jurisdiction, it being acknowledged and agreed that money damages would not provide an adequate remedy in the event of a breach of Section 11.1. Nothing herein shall be construed to limit the right of a Party to collect money damages in the event of a breach of Section 11.1 by the other Party.

8

## Article XII

## Intellectual Property

12.1    Pre-Existing Property. Except as specifically documented in writing between the Parties, all property owned by a Party (whether real or personal, Intellectual Property, tangible or intangible or any other property) shall be owned by such Party, and the other Party shall not have any ownership interest of any nature in such property.

12.2    Ownership of Inventions. All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement shall be owned as follows:

(a)    All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement, including any patent applications and patents, covering such inventions, trade secrets or other Intellectual Property, made solely by employees or agents of a Party, or its affiliates, shall be owned by such Party or its respective affiliate(s).

(b)    All such inventions, trade secrets or other Intellectual Property developed jointly by employees or consultants of both Parties shall be owned jointly by the Parties. Determination of inventorship shall be made in accordance with the patent laws of the United States, and any patent rights with a named inventor that is an employee or consultant of each Party will be jointly owned.

12.3    No Other License Grants. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property, except as expressly provided in this Agreement.

12.4    Other Property Rights. Nothing in this Agreement creates, or is intended to create, any direct or indirect interest or right of a Party in the property and assets of the other Party, except as may be separately agreed to between the Parties.

## Article XIII

## Representations of the Parties

13.1    Representations and Warranties by Vitol. Vitol represents and warrants to NewCo that: (a) it is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas; (b) it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by law and its organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) all consents, approvals and authorizations from all governmental authorities or other third parties required to be obtained by Vitol in connection with this Agreement have been obtained;

9

001819

VITOL_00009581

and (e) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it is a party; or (iii) violate any law or order applicable to it or its properties.

13.2    Representations and Warranties by NewCo. NewCo represents and warrants to Vitol that: (a) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of [XXXX]; (b) it is duly qualified to transact business in and is in good standing in the State of Texas; (c) it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by law and its organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) all consents, approvals and authorizations from all governmental authorities or other third parties required to be obtained by NewCo in connection with this Agreement have been obtained; and (e) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it is a party; or (iii) violate any law or order applicable to it or its properties.

13.3    No Other Warranties. EXCEPT AS EXPRESSLY STATED IN THIS ARTICLE XIV, (A) NO REPRESENTATION, CONDITION OR WARRANTY WHATSOEVER IS MADE OR GIVEN BY OR ON BEHALF OF VITOL OR NewCo; AND (B) ALL OTHER CONDITIONS AND WARRANTIES WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE ARE HEREBY EXPRESSLY DISCLAIMED AND EXCLUDED.

## Article XIV

### Limitation of Liabilities

14.1    Special, Indirect and Other Losses. NEITHER PARTY NOR ANY OF ITS AFFILIATES SHALL BE LIABLE IN CONTRACT, TORT, NEGLIGENCE, BREACH OF STATUTORY DUTY OR OTHERWISE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR FOR LOSS OF PROFITS SUFFERED BY THE OTHER PARTY.

## Article XV

### Miscellaneous

15.1    Assignment. This Agreement and the rights hereunder may not be assigned by a Party without the prior written consent of the other Party, which consent may be withheld in such Party's sole discretion.

10

15.2    Relationship of the Parties. Nothing contained in this Agreement shall be deemed to constitute a partnership, joint venture, or legal entity of any type between the Parties, or to constitute one as the agent of the other. Moreover, each Party agrees not to construe this Agreement, or any of the transactions contemplated hereby, as a partnership for tax or any other purposes. Each Party shall act solely as an independent contractor, and nothing in this Agreement shall be construed to give any Party the power or authority to act for, bind, or commit the other.

15.3    Further Assurances. Vitol and NewCo hereby covenant and agree, without the necessity of any further consideration, to execute, acknowledge and deliver any and all such other documents and take any such other action as may be reasonably necessary to carry out the intent and purposes of this Agreement.

15.4    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without reference to any choice of law provisions that would result in the application of the laws of another jurisdiction.

15.5    Meeting of the Parties. Not less frequent than quarterly, the Parties shall meet to discuss and analyze the performance and strategy of the transactions hereunder.

15.6    Compliance with Law. Each Party shall perform its obligations under this Agreement in accordance with all applicable laws. No Party shall, or shall be required to, undertake any activity under or in connection with this Agreement which violates, or which it believes, in good faith, may violate, any applicable law.

15.7    Expenses. Each Party shall pay the fees and expenses of its respective lawyers and other experts and all other expenses and costs incurred by such Party incidental to the negotiation, preparation, execution and delivery of this Agreement, none of which shall be included in the determination of profits or losses or the sharing thereof.

15.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.9    Cumulative Remedies. No remedy referred to in this Agreement is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to in this Agreement or otherwise available under law.

15.10   Dispute Resolution.

(a)    In the event of a dispute relating to the interpretation, performance or alleged breach of this Agreement, or in any way relating to, arising out of, or in connection with this Agreement, the Parties will refer the dispute to the senior executive officers of the Parties

11

Confidential

for discussion and resolution. If the senior executive officers cannot resolve such dispute within thirty (30) days of the matter being referred to them, either Party may request to mediate such dispute through a one-day mediation with a mutually agreed mediator. If the dispute is not settled through mediation (if any), either Party may initiate litigation in Harris County, Texas, to whose jurisdiction the Parties hereby subject themselves. In any such proceeding the Parties hereby waive any objection to forum including, without limitation, any objection based on lack of personal jurisdiction, improper venue, or inconvenient forum. **EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT.**

(b)     Notwithstanding any of the other provisions hereof, nothing herein shall limit, restrict or delay a Party's right to seek and obtain injunctive relief or specific performance from a court of competent jurisdiction in order to protect its interests without first complying with this Section 15.10(a).

15.11   Waivers and Amendments. The failure of any Party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other Party. No waiver shall be effective unless it has been given in writing and signed by the Party giving such waiver. No provision of this Agreement may be amended or modified other than by a written document signed by authorized representatives of each Party.

15.12   Force Majeure. Neither Party shall be responsible to the other for any failure or delay in performing any of its obligations under this Agreement, or for other nonperformance hereunder, if such delay or nonperformance is caused by strike, stoppage of labor, lockout or other labor trouble, fire, flood, accident, war, act of terrorism or of the government of any country or of any local government, or by cause unavoidable or beyond the control of any Party hereto. In such event, the Party affected will use its commercially reasonable efforts to resume performance of its obligations.

15.13   Notices. All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when received by the addressee, at the addresses set forth below (or to such other addresses as a Party may designate by notice):

If to Vitol Inc.:

2925 Richmond Avenue, 11th Floor
Houston, Texas 77098
Attn: Contract Administration
With a copy sent to Vitol Inc., Attn: General Counsel

If to NewCo:

12

Confidential

Attention:  Chief Financial Officer
1990 Post Oak Blvd., Suite 2400
Houston, Texas 77056

With a copy to:
Steven Canner
Baker & McKenzie LLP
425 Fifth Avenue
New York, NY 10018

15.14  Entire Agreement.  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and no modification or revision thereof shall have any force or effect unless the same is in writing and executed by the Parties hereto.

15.15  Survival.   Sections  8.3,  9.1,  9.2,  10,  11.1,  14.1,  and  15.10  shall  survive  the termination of this Agreement.

## Article XVII

### Definitions

For purposes of this Agreement, the following terms shall have the meanings set forth in this Article:

"Affiliate" means, with respect to a Party, any Person that controls, is controlled by, or is under common control with that Party.  Control means the ownership, directly or indirectly, of more than 50% of the shares or the rights of voting authority in a company, partnership or other legal entity.

"Confidential Information" means all proprietary information, trade secrets and other confidential data of a financial, commercial or technical nature which the disclosing Party or any of its Affiliates has supplied or otherwise made available to the other Party or its Affiliates, whether made available orally, in writing or in electronic form.

"Insolvency Event" means, in relation to either Party, any one of the following: (a) that Party is the subject of voluntary or involuntary bankruptcy proceedings instituted on behalf of or against such Party (except for involuntary bankruptcy proceedings which are dismissed within sixty (60) days of commencement); (b) an administrative receiver, receiver and manager, interim receiver, custodian, sequestrator or similar officer is appointed in respect of that Party (collectively,  the  "Receiver")  and  that  Party  has  not  caused  the  underlying  action  or  the Receiver to be dismissed within sixty (60) days after the Receiver's appointment; (c) the board of directors (or similar governing authority of such Party) has passed a resolution to wind up that Party, or such a resolution shall have been passed other than a resolution for the solvent

13

reconstruction or reorganization of that Party; (d) a resolution shall have been passed by that Party or that Party's directors to make an application for an administration order or to appoint an administrator; or (e) that Party makes a general assignment, composition or arrangement with or for the benefit of all or the majority of that Party's creditors, or makes, suspends or threatens to suspend making payments to al or the majority of that Party's creditors.

"Intellectual Property" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases that are owned or used by the applicable Party and its affiliates.

"Person" means any individual, partnership, limited liability company, firm, corporation, association, trust, unincorporated organization or other entity.

"Third Party" means any Person other than a Party or an Affiliate of a Party.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed on their respective behalf, by their respective officers, duly authorized, in multiple originals.

VITOL INC.

By:_____
Print Name:_____
Title:_____

NEWCO

By:_____
Print Name:_____
Title:_____

AGREED FOR THE SOLE PURPOSE OF SECTION 1(b):

GULF COAST ASPHALT COMPANY, L.L.C.

By: _____
Name: Arthur J. Brass
Title: President and Manager

14

001825

Confidential

VITOL_00009587

<u>Schedule A</u>
<u>Trade Team Personnel</u>

16

001826

Confidential

VITOL_00009588

**From:** Jason Goldstein
**Sent:** Friday, July 28, 2017 11:09 AM CDT
**To:** Arthur Brass
**CC:** Jason Goldstein
**Subject:** Things We Should Touch Base on Today

Things we should discuss before I leave Sunday:



2.  Vitol JMA Related Items
    a.  Payment of July fixed costs / reimbursement of freight
    b.  JMA
    c.  GCAC Arc sublease to Hermosa and Hermosa sublease to Vitol
    d.  Meeting with Vitol actg./ops.
    e.  Setting up Hermosa bank account
    f.  Mgmt. services agree. Hermosa/GCAC
3.  Trade Book
    a.  Position report
    b.  P&L



EXHIBIT
25
PENGAD 800-631-6989

001827
GCAC003478

**From:** Arthur Brass
**Sent:** Monday, August 21, 2017 9:43 PM CDT
**To:** Eric Kuo
**Subject:** FW: Vitol Interim Financing Structure Bullets v2.docx
**Attachments:** Vitol Interim Financing Structure Bullets v2.docx

This is roughly what we are thinking for interim

Lets talk in AM

Thanks

A.J.

---

**From:** Jason Goldstein <jgoldstein@gcachouston.com>
**Date:** Monday, August 21, 2017 at 5:44 PM
**To:** Arthur Brass <aj@abrass.com>
**Cc:** Jason Goldstein <jgoldstein@gcachouston.com>
**Subject:** Vitol Interim Financing Structure Bullets v2.docx



EXHIBIT
26

001828
GCAC004694

**Vitol/GCAC Interim Transaction**

Rio Energy

- Vitol funds GCAC acquisition/cancellation of Rio interest in GCAC/Rio JSMA for (a) original purchase terms or (b) an up-front amount lesser than full earn-out potential, TBD
- GCAC repays Vitol purchase price upon expiration or cancellation of working capital line
- Vitol agrees to backstop any potential liability of Rio's under Rio/Gravity Corpus terminalling agreement (preference for Rio to assign to GCAC with Vitol guaranteeing credit to Gravity/new buyer; prior to assignment, continues as operating today) in order to consummate transaction

GCAC/Asphalt

- Vitol provides credit/provides cash for all GCAC inventory purchases
- Vitol provides receivables financing for GCAC wholesale and retail asphalt sales
- Vitol provides capital for all terminalling fees (Corpus and Mobile)
- For TVM, interest rate of [x]% TBD

GCAC/Non-Asphalt Products

- Vitol and GCAC JV other deals as per mutual agreement
- All capital priced at Vitol TVM
- Profits net of allocable costs (TBD) split 50/50

001829
**GCAC004695**

**From:** Jason Goldstein
**Sent:** Monday, September 25, 2017 11:50 AM CDT
**To:** Karen Caldwell; Arthur Brass
**Subject:** RE: Monday

Have we sent this as two separate invoices in past months as well?

**From:** Karen Caldwell
**Sent:** Monday, September 25, 2017 10:36 AM
**To:** Jason Goldstein <jgoldstein@gcachouston.com>; Arthur Brass <aj@abrass.com>
**Subject:** RE: Monday

**From:** Jason Goldstein
**Sent:** Monday, September 25, 2017 10:06 AM
**To:** Karen Caldwell <kcaldwell@gcachouston.com>
**Subject:** RE: Monday

Plz send to me and aj first.

**From:** Karen Caldwell
**Sent:** Monday, September 25, 2017 9:52 AM
**To:** Jason Goldstein <jgoldstein@gcachouston.com>
**Subject:** RE: Monday

Should I send it to AJ or send it to Eric at Vitol?

**From:** Jason Goldstein
**Sent:** Monday, September 25, 2017 9:46 AM
**To:** Karen Caldwell <kcaldwell@gcachouston.com>
**Subject:** Monday

Good morning.  We need to invoice Vitol today for October tank rental and trade team personnel as we have done in prior months.



**EXHIBIT**
27

PENKO 000-001-6689

001830
**GCAC005373**

| From: | Jason Goldstein |
|---|---|
| Sent: | Monday, October 9, 2017 7:01 PM CDT |
| To: | Marc Horowitz |
| CC: | Arthur Brass; Patrick Perugini |
| Subject: | Re: GCAC Asphalt Hedging |

Yes, copying a couple guys in case they want to come.

Up for about anywhere. Roka akor? Or you name it.

Sent from my iPhone

On Oct 9, 2017, at 6:06 PM, Marc Horowitz <mhorowitz80@gmail.com> wrote:

Are we still on for lunch tomorrow?
On Oct 5, 2017, at 5:17 PM, Jason Goldstein <jgoldstein@gcachouston.com> wrote:

Will try to get. We don't have that data any more but I can get it.

From: Marc Horowitz [mailto:mhorowitz80@gmail.com]
Sent: Thursday, October 5, 2017 4:35 PM
To: Jason Goldstein <jgoldstein@gcachouston.com>
Subject: RE: GCAC Asphalt Hedging

Can you send the corresponding crude prices too? That should give me enough to at least start before we get together next week.

On Oct 5, 2017, at 4:26 PM, Jason Goldstein <jgoldstein@gcachouston.com> wrote:

That sounds good.

What would be best to get? I have historical asphalt vs. USGC 3% fuel oil prices, which is attached.

But I am not sure that this is everything you may want. Right now we are simply shorting fuel equal to our physical asphalt position. But I am thinking some combination of shorting and options may make sense, and I am not positive fuel oil is the right hedge for all of it (I know we discussed crude at our last lunch). Maybe. Further, as we believe that as asphalt deviates from fuel too much (plus or minus), it will correct ... so perhaps it makes sense to adjust the strategy dynamically based on spot asphalt vs. fuel.

Anyway, a lot of moving pieces, and I look forward to the chat.

Let me know if you need any more data. I don't have much more, but I may be able to get it.

EXHIBIT
28

GCAC005688

Thanks,

Jason

**From:** Marc Horowitz [mailto:mhorowitz80@gmail.com]
**Sent:** Thursday, October 5, 2017 3:32 PM
**To:** Jason Goldstein <jgoldstein@gcachouston.com>
**Subject:** Re: GCAC Asphalt Hedging

Hi Jason,

I can do lunch on Tuesday if that works. I do think it would be best if you could send me some numbers first, so I can take a look and have some questions for you in addition to what you are thinking.

Looking forward to it,

Marc

On Oct 5, 2017, at 2:35 PM, Jason Goldstein <jgoldstein@gcachouston.com> wrote:

Hey Marc,

Hope all has been well for you.

I really want to take the time to dig deeper into our asphalt hedging strategies. I am not sure that what we are doing is bad, but I can't help but think there is a lot of optimization that could be done. AJ certainly believes you are the guy to help me figure out how to figure it out.

I was wondering I could buy you lunch (maybe would bring another guy or two from my shop) to discuss. If it is helpful for us to talk first on the phone and/or for me to pull some data together before we meet, I would be happy to of course.

Next week I'm free for lunch other than Thursday. Next week I look wide open.

Hope to see you soon.

Best,

Jason Goldstein

Execution Version

## Marketing Agreement

This Marketing Agreement (this "Agreement"), dated as of January __, 2018 (the "Effective Date"), is by and between Mercuria Energy Trading, Inc., a Delaware corporation ("Mercuria") located at 20 E. Greenway Plaza, Houston, TX 77046, and Gulf Coast Asphalt Company, L.L.C., an Alabama limited liability company ("GCAC") located at 1990 Post Oak Blvd., Suite 2400, Houston, Texas 77056. Mercuria and GCAC may be referred to, individually, as a "Party" or, collectively, as "Parties". Capitalized terms used but not defined herein shall have the meanings assigned to them on Annex A.

### Witnesseth:

WHEREAS, Mercuria wishes to engage GCAC to perform the Services (as such term is defined below) in connection with the Business; and

WHEREAS, the Parties wish to set forth in writing their understandings and agreements regarding such engagement.

WHEREAS, in connection with the foregoing, simultaneously with the execution of this Agreement, (i) GCAC and Rio Energy International, Inc. ("Rio") have executed a termination agreement pursuant to which the parties thereto have agreed that, as of the date of execution of such termination agreement, the Rio GCAC JMA is terminated and of no further force or effect, (ii) Rio has executed a Novation Agreement pursuant to which it has assigned to Mercuria all of Rio's rights and interests arising under (A) The First Amended and Restated Terminal Services Agreement, effective as of August 31, 2016, (B) the Tank 314 Terminal Services Agreement, effective as of August 31, 2016 and (c) the Terminal Services Agreement for Tank 304, effective as of July 17, each between Rio and Gravity Midstream Corpus Christi, LLC, each of which are attached as Exhibit 2 (collectively, the "GOTAC Terminal Agreements") and (iii) GCAC and Mercuria have entered into a sublease agreement (the "Mobile Sublease") pursuant to which GCAC has, commencing on the Effective Date, subleased to Mercuria all of GCAC's rights and interests arising under (i) that Terminalling Services Agreement 36,140 BBLS dated February 8, 2013 between GCAC and Arc Terminals Holdings LLC (predecessor to Zenith Energy U.S., L.P. ) and (ii) that Terminalling Services Agreement 150K dated February 8, 2013 between GCAC and Arc Terminals Holdings LLC (predecessor to Zenith Energy U.S., L.P.) (together, the "GCAC Lease") attached as Exhibit 1.

NOW THEREFORE, in consideration of the premises and the covenants contained herein, the Parties agree as follows:

### Article I

### Services; Certain Rights; Terminals

1.1 Services.

1

**EXHIBIT**

29

**GCAC 000001**
001833

Execution Version

(a) The marketing and logistics services to be provided by GCAC hereunder (the "Services") shall consist of identifying and analyzing opportunities for the purchase and sale of Products in the Territory, referring such opportunities to Mercuria for acceptance or rejection, assisting Mercuria in the preparation, submission and negotiation of contracts or confirmations for such purchases and sales of Products, and providing the logistics, blending and other services hereinafter described. Except with the express written authority of Mercuria, or pursuant to the Pre-Approved Transaction procedure (as defined below), GCAC shall not be authorized to enter into a contract or confirm any purchase or sale of Products or other transaction on behalf of or otherwise bind Mercuria, and GCAC shall not represent to any Third Party that it has any such right, and shall not make any representations or agreements on Mercuria's behalf without Mercuria's prior written consent. In no event shall GCAC act in the Territory in any manner as an advisor to a Third Party in connection with the Services it is providing to Mercuria under this Agreement; it being understood that GCAC shall not be prohibited from acting as an advisor to any Third Party so long as it does not provide in the Territory services thereto that are substantially similar to the Services.

(b) GCAC shall have the right to confirm purchases and sales that are to be entered into by Mercuria, provided that such purchase and sales are with counterparties, at trading volumes and upon other terms and conditions (including without limitation the terms and conditions of any contracts or confirmations with third party service providers that are to be entered into in connection with such purchases and sales), in each case pre-approved in writing by Mercuria (the "Pre-Approved Transactions"), subject always to any specific (or contrary) instructions from Mercuria and updates to such pre-approvals.

1.2 GCAC Staffing. GCAC shall operate and maintain at its own expense an appropriately skilled, professional office and staff to perform the Services required by this Agreement, including equipment and facilities reasonably required to perform the Services. Subject only to (i) its right to receive Overhead Payments upon the terms and subject to the conditions set forth herein and (ii) Section 6.1(c) hereof, GCAC shall be solely responsible for all of the costs of its business operations and office, including its employee costs (e.g., salaries, healthcare, insurance) travel and entertainment, publications, technology, office rent, phones, consultants, professional fees and general and administrative costs.

1.3 Certain Rights. Nothing in this Agreement shall prohibit or otherwise prevent Mercuria, in the exercise of its sole and unfettered discretion, from (i) rejecting any proposed purchase and/or sale of Products solicited by GCAC and referred to Mercuria, and/or (ii) engaging in transactions with customers (including in the Territory), including without limitation physical and financial transactions, for the purchase and sale of any products or commodities, except to the extent expressly prohibited by Section 11.1.

1.4    Mobile Terminal.    Prior to the expiration of the GCAC Lease, if the Parties jointly determine that GCAC should extend the duration of the GCAC Lease, then GCAC will use its commercially reasonable efforts to extend the GCAC Lease on terms mutually approved by the Parties. If the Parties jointly determine that the GCAC Lease should be extended, then the Parties shall enter into a new Mobile Sublease with such Mobile Sublease ending upon the termination of the GCAC Lease (or, subject to Sections 10.3(a) and (b), if shorter, at end of the Term).

2

Execution Version

## Article II

### Purchase of Products

2.1   Purchase of Products.

(a)   Throughout the Term, GCAC shall identify opportunities for Mercuria to purchase Product from counterparties and shall promptly notify Mercuria of such opportunities. Unless otherwise directed by Mercuria, GCAC shall negotiate directly with potential sellers of Products and shall present Mercuria with requests (by telephone, email, instant message or other means of communication) that Mercuria buy Products from such counterparties on such terms as are identified in such request. If such terms and such counterparty are acceptable to Mercuria in its sole discretion, Mercuria will enter into a purchase contract or confirmation with such counterparty. Mercuria shall not enter into any purchase contract or confirmation unless it is fully satisfied with the counterparty and all of the terms of the purchase contract or confirmation. Mercuria may, but is not required to, identify opportunities to purchase Products from one or more potential counterparties and if so, shall notify GCAC of any such opportunities; and Mercuria may, at its option, negotiate directly with potential sellers of Products. Upon the mutual agreement of the Parties, Mercuria will purchase the Products for delivery to the Terminals or for delivery to other locations that the Parties mutually agree upon. The foregoing procedures shall be subject to the right of GCAC to confirm Pre-Approved Transactions in accordance with (and subject to the limitations set forth in) Section 1.1(b).

(b)   The Parties will arrange, as necessary, for the blending and processing of the Products. GCAC shall arrange for all blending logistics for the Business (provided that GCAC shall consult with Mercuria and will not take any actions that are disapproved by Mercuria). GCAC shall use its know-how and Intellectual Property for the benefit of the Business.

## Article III

### Sale of Products

3.1   Sales of Products.

(a)   Throughout the Term, GCAC shall identify opportunities for Mercuria to sell Product to counterparties and shall promptly notify Mercuria of such opportunities. Unless otherwise directed by Mercuria, GCAC shall negotiate directly with potential buyers of Products and shall present Mercuria with

3

Execution Version

requests (by telephone, email, instant message or other means of communication) that Mercuria sell Products to such counterparties on such terms as are identified in such request. If such terms and such counterparty are acceptable to Mercuria in its sole discretion, Mercuria will enter into a sale contract or confirmation with such counterparty. Mercuria shall not enter into any sale contract or confirmation unless it is fully satisfied with all of the terms of the sale contract or confirmation. Mercuria may, but is not required to, identify opportunities to sell Products to one or more potential counterparties and if so, shall notify GCAC of any such opportunities; and Mercuria may, at its option, negotiate directly with potential buyers of Products. The foregoing procedures shall be subject to the right of GCAC to confirm Pre-Approved Transactions in accordance with (and subject to the limitations set forth in) Section 1.1(b).

(b)    GCAC shall arrange for all logistics with regard to sales and purchases of Products, including shipping and barging decisions; provided that (i) GCAC shall consult with Mercuria and will not take actions that Mercuria disapproves, (ii) Mercuria shall be the counterparty to any contracts or confirmations with third party service providers who are providing any and all such shipping and other logistical services and (iii) Mercuria shall only enter into such contracts or confirmations where such contracts or confirmations are acceptable to it or are in connection with Pre-Approved Transactions. Mercuria will sell Products for delivery from the Terminals or other locations that the Parties mutually agree upon. Each Party shall cooperate with the other Party in connection with sales of the Products.

3.2    Direct Sales by GCAC. Notwithstanding anything to the contrary set forth in this Article III, GCAC shall be permitted to sell Products directly to Third Party customers who purchase via the truck rack at the GOTAC Terminal, provided that (i) immediately prior to any such sale by GCAC, GCAC purchases such Products from Mercuria (but shall only be required to pay for such Products from the proceeds actually received from the Third Party purchaser of such Products (and GCAC does not guarantee or provide any assurance that such proceeds will be received or as to the timing thereof)), (ii) except to the extent that the amount of such funds are netted off against an Overhead Payment pursuant to Section 5.1(b) or netted off against a Participation Fee pursuant to Section 7.2(b), GCAC holds all funds remitted from Third Party purchasers to GCAC as a result of such Third Party sales in a separate bank account that GCAC opens and maintains exclusively for this purpose, and (iii) Mercuria approves the specifics of such banking arrangements in advance of any such sale. Except to the extent that the amount of such funds are netted off against an Overhead Payment pursuant to Section 5.1 (b) or netted off against a Participation Fee pursuant to Section 7.2(b), the proceeds of such bank account shall be paid over by GCAC to Mercuria within 5 days of GCAC's receipt of any such funds. GCAC may, without the need for Mercuria's consent, enter into contracts or confirmations for the sale of Products via the truck rack at the GOTAC Terminal to a prior GCAC customer on the general terms and conditions of prior contracts or confirmations entered into by GCAC with such customer if such prior customer, and the general terms and conditions for such customer, have been pre-approved by Mercuria and such approval has not been rescinded by Mercuria (each an "Approved

4

Third Party Contract"), but GCAC shall not enter into any other contracts or confirmations for the sale of Products via the truck rack at the GOTAC Terminal without the approval of Mercuria. Each time GCAC enters into a contract or confirmation with a Third Party with respect to sales of Products from the truck rack at the GOTAC Terminal Mercuria and GCAC agree to enter into a contract or confirmation (pursuant to which Mercuria will supply GCAC with the Product to be sold by GCAC) and such contract or confirmation will be back-to-back to the Approved Third Party Contract or other contract or confirmation approved by Mercuria, and be substantially on the same terms as the corresponding Approved Third Party Contract or other contract or confirmation approved by Mercuria (provided, that, GCAC will not be required to pay any amounts for the purchase of such Products except from the proceeds actually received from the Third Party purchaser of such Products from GCAC (and GCAC does not guarantee or provide any assurance that such proceeds will be received or as to the timing thereof)).

## Article IV

### Hedging

4.1     Hedging Activity. Mercuria and GCAC will work together in good faith to design a hedging strategy relating to the purchase and sale of the Products and Mercuria shall make reasonable efforts to maintain all hedging of the Product in a manner consistent with such strategy. All hedging shall be determined by, and executed by, Mercuria; provided that Mercuria shall consult with GCAC, in good faith, on a regular basis regarding such hedging activities.

## Article V

### Certain Payments

5.1     Overhead Payment.

(a)     During the Term, subject to Section 7.1, Mercuria shall pay the Overhead Payment to GCAC in respect of each fiscal quarter, in arrears, within thirty (30) days following the end of each fiscal quarter, to offset a portion of GCAC's overhead costs. "Overhead Payment" means the following: (a) for the first fiscal quarter of each fiscal year during the Term, the lesser of (x) $500,000 and (y) the Profits for such fiscal quarter; (b) for the second fiscal quarter of each fiscal year during the Term, the lesser of (x) $1,000,000 and (y) the Profits for the first two fiscal quarters of such fiscal year, in either case, less any payment made under clause (a) of this definition in respect of the first quarter of such fiscal year; (c) for the third fiscal quarter of each fiscal year during the Term, the lesser of (x) $1,500,000 and (y) the Profits for the first three fiscal quarters of such fiscal year, in either case, less any payment(s) made under clauses (a) and (b) of this definition in respect of the first and second quarters of such fiscal year; and (d) for the fourth fiscal quarter of each fiscal year during the Term, the lesser of (x) $2,000,000 and (y) the Profits for the

5

Execution Version

entire fiscal year, in either case, less any payment(s) made under clauses (a), (b) and (c) of this definition in respect of the first, second and third quarters of such fiscal year. The fiscal year for all purposes of this Agreement shall be the same as the calendar year, with each quarter ending on March 31, June 30, September 30 and December 31.

(b)    Mercuria shall have the right to net off all or part of any overdue or unpaid receivable that GCAC is required to pay Mercuria under Section 3.2 against (and thereby reduce) Overhead Payments (provided that, with respect to such account receivable (or such part thereof, as the case may be), (x) Mercuria has not exercised its rights under Section 7.2(b) and (y) if Mercuria exercises the right provided by this sentence, (1) Mercuria shall not exercise its right described in Section 7.2(b) and (2) GCAC shall be entitled to retain the amount so netted off and received by GCAC in respect of such account receivable or such part thereof, as the case may be (and Mercuria shall have no further right to receive any amounts under Section 3.2 in respect of such account receivable or such part thereof, as the case may be). If, however, GCAC cures it breach of Section 3.2 by paying the overdue or unpaid receivable within the cure period set forth in Section 10.2(c)(ii), then Mercuria will reverse the offset and corresponding Overhead Payment reduction.

## Article VI

### Costs; Gross Revenues; Profits

6.1    Costs.

(a)    Mercuria will be responsible for all costs with respect to the Business (the "Costs"), including such costs as:

(i)   cost of the Products;
(ii)  the Mobile Terminal Fees and the GOTAC Terminal Fees;
(iii) comprehensive property, casualty and liability insurance coverage;
(iv)  any additional facilities or equipment that Mercuria acquires for the Business (but the costs of an acquisition shall not be considered Costs unless (i) GCAC has provided its prior written consent to such acquisition, or (ii) GCAC at any time during the Term agrees to utilize such additional facilities or equipment in connection with providing the Services; it being understood that GCAC shall not be permitted to use any such additional facilities or equipment unless and until it provides such prior written consent);
(v)   the Overhead Payments;
(vi)  GCAC Costs (as such term is defined below);
(vii)     transport, shipping, and barging;

6

Execution Version

(viii)   Product testing;

(ix) inspection;

(x) demurrage;

(xi) third party letter of credit fees;

(xii) cost of funds for any Working Capital financing, which the Parties agree shall be equal to 4.0% per annum on outstanding amounts (regardless of the actual cost thereof);

(xiii)   pass-through hedging costs and losses (including without limitation losses on a marked-to-market basis consistent with Mercuria Marking Policies);

(xiv)   inspections, third-party brokerage/agency commissions and fees;

(xv) customs charges;

(xvi)   duty draw back that is created in connection with the purchase and sale of the Products;

(xvii)   tax filing fees;

(xviii) litigation and/or performance claim reserves (which shall be established in accordance with U.S. generally accepted accounting practices using the same methodology for the Business as Mercuria uses for its other oil trading businesses);

(xix)   the amounts of accounts receivable that are overdue by more than twenty (20) days (provided, that (a) such account receivable was included in the calculation of Gross Revenues, Costs, Profits and Loss and (b) amounts paid in respect of any such account receivable shall be included within the calculation of Costs, Gross Revenues, Losses and Profits from and after receipt thereof);

(xx) loss or degradation of Product that is not covered by insurance or otherwise reimbursed by third parties;

(xxi)   other related out-of-pocket costs (but any such other costs shall not be considered Costs unless GCAC had provided its prior written consent to the same, which consent shall not be unreasonably withheld, delayed or conditioned).

(b)   For the avoidance of doubt, Costs shall exclude costs associated with Mercuria's, of its Affiliates', overhead or other internal costs or expenses, including, but not limited to, any taxes, salaries, compensation, benefits of employees and consultants of Mercuria and its Affiliates.

(c)   GCAC shall not incur any costs that are to be allocated to the Business without the approval of Mercuria. Mercuria shall reimburse GCAC for any such approved costs paid by GCAC, on a monthly basis ("GCAC Costs"). For the avoidance of doubt, GCAC Costs shall exclude the salaries, compensation and benefits of employees and consultants of GCAC and its Affiliates.

6.2 Monthly Estimates.

7

**GCAC 000007**
001839

Execution Version

Mercuria shall provide on a monthly basis (not later than twenty (20) business days after the end of each month) to GCAC a reasonably detailed report that includes estimates of (a) the Costs, (b) the Gross Revenues, (c) Profits (if applicable) and (d) Losses (if applicable), for such month.

6.3     Currency. All amounts of Costs, Gross Revenues, Losses and Profits under this Agreement, and any payments to be made under this Agreement, shall be calculated and made using U.S. Dollars.

6.4     Taxes. Each Party shall be responsible for the payment of any taxes payable by it in respect of its allocation of the Profits.

6.5     Exclusions. Notwithstanding anything to the contrary set forth in this Agreement, any amounts paid or payable by Mercuria or GCAC under Section 7.2 (solely with respect to the Participation Fee) and 19.9 shall be excluded from the determination of Gross Revenues, Costs, Losses and Profits, and any amounts received by GCAC under Section 5.1, 6.1(c) or 7.2 shall be excluded from the determination of Gross Revenues, Losses and Profits (except for the inclusion of Overhead Payments in Costs).

## Article VII

### Reconciliation; Participation Fee; Records; Audit Rights

7.1     Calculations; Reconciliations.

(a)     Quarterly Calculations and Reconciliations. Within thirty (30) days following the end of each fiscal quarter, the Parties will jointly estimate the Costs, Gross Revenues, Losses and Profits that the Parties realized (including on a marked-to-market basis determined by Mercuria in a manner consistent with the mark-to-market policies utilized by Mercuria for purposes of reporting to its lending institutions ("Mercuria Marking Policies") during the prior fiscal quarter in connection with the Business. For purposes of this Agreement, a reconciliation is the process that occurs at the end of each fiscal quarter as contemplated by this Section 7.1 and the process that occurs after the end of each fiscal year and/or the Stub Year described in Section 7.2 ("Reconciliation Process").

(b)     For purposes of calculating Profits and Losses, only actual accounts receivables, sales proceeds and actual Costs shall be used to calculate Profits and Losses. Neither Party may reserve for Costs which have not yet been incurred. Notwithstanding the foregoing, inventory and hedging gains and losses, on a marked-to-market basis consistent with Mercuria Marking Policies, shall be included in calculating Profits and Losses.

8

**Confidential**

Execution Version

7.2 Annual Accounting and True-up.

(a) Within sixty (60) days after the end of each fiscal year (including in respect of the partial fiscal year ending on December 31, 2018) and the Term, the Parties will account all transactions under this Agreement and related to the Business for the applicable fiscal year and/or for the period commencing at the beginning of the fiscal year (in which the Term ended) and ending on the date the Term ends (the "Stub Year") (each, an "Annual Accounting"), and the Annual Accounting shall be jointly approved by the Parties. Losses for any fiscal year or Stub Year, as the case may be, shall be fully borne by Mercuria (but the foregoing shall in no way limit the rights of Mercuria under Section 10.3(d) or Section 16.2). In the event that there has been a Profit for a fiscal year or Stub Year, as the case may be, Mercuria shall pay a fee to GCAC (the "Participation Fee") in an amount equal to forty percent (40%) of the Profits (after taking into account as Costs all Overhead Payments), for such fiscal year or Stub Year, as the case may be. Any Participation Fee payments due under this Section 7.2 shall be made within ten (10) days following mutual approval by the Parties of the annual accounting by the Parties for such fiscal year or Stub Year, as applicable; provided if the Stub Year occurs in 2017, only an accounting with respect to the Stub Year will be completed and no accounting shall be required in respect of the entire 2017 fiscal year.

(b) Mercuria shall have the right to net off all or part of any overdue or unpaid receivable that GCAC is required to pay Mercuria under Section 3.2 against (and thereby reduce) Participation Fees (provided that, with respect to such account receivable (or such part thereof, as the case may be), (x) Mercuria has not exercised its rights under Section 5.1(b), and (y) if Mercuria exercises the right provided by this sentence, (1) Mercuria shall not exercise its right described in Section 5.1(b) and (2) GCAC shall be entitled to retain the amount so netted off and received by GCAC in respect of such account receivable or such part thereof, as the case may be (and Mercuria shall have no further right to receive any amounts under Section 3.2 in respect of such account receivable or such part thereof, as the case may be). If, however, GCAC cures it breach of Section 3.2 by paying the overdue or unpaid receivable within the cure period set forth in Section 10.2(c)(ii), then Mercuria will reverse the offset and corresponding Participation Fee reduction.

(c) The Parties agree to cooperate and act in good faith to conclude as promptly as possible each Reconciliation Process or true up process contemplated by this Agreement.

7.3 Reports; Books and Records.

Confidential

Execution Version

a.  Mercuria will provide GCAC, on a timely, as reasonably needed basis, with written reports of its activities undertaken pursuant to this Agreement, such as purchases, sales, inventory positions, hedging positions, Costs and Profits (estimated as necessary).  Mercuria shall maintain fairly presented accounting records of all its activities undertaken pursuant to this Agreement, including Costs incurred and sale proceeds realized, and shall provide copies of such records to GCAC within a reasonable time after GCAC's request therefor.

b.  By the fifth (5th) Business Day of each month of the Term, Mercuria shall provide GCAC with a report setting forth in reasonable detail the mark-to-market calculations consistent with Mercuria Marking Policies with respect to all accounts receivable, inventory and hedging positions, in each case as of the last Business Day of the immediately preceding calendar month.

c.  To the extent information provided by Mercuria shall be subject to any confidentiality restrictions imposed by Third Parties, GCAC shall agree to be subject to the same restrictions with respect to such information.

7.4.   Valuations.

All valuations, including without limitation all mark-to-market calculations, shall be done by Mercuria in accordance with Mercuria Marking Policies.

## Article VIII

## Audit Rights

8.1    Auditing Procedures.

(a) GCAC may, upon written request and, subject to the following provisions of this Article VIII, at its expense, cause a nationally recognized independent accounting firm selected by it (other than one to whom Mercuria has a reasonable objection) (the "Audit Team") to audit during ordinary business hours the books and records of Mercuria, but only those books and records (or portions thereof) that relate to the Costs, Gross Revenues and Profits of the Business for the preceding fiscal year, to determine the correctness of any payments made or required to be made to or by GCAC during such fiscal year. Prior to commencing such work, the Audit Team shall enter into a customary confidentiality agreement with Mercuria. The Audit Team shall disclose to both Parties all of the audit results and its conclusions, including without limitation the audit report and basis for any determination by the Audit Team (the "Audit Results"), and each Party shall treat such conclusions as Confidential Information.

10

**Confidential**

Execution Version

(b) In respect of each audit: (i) Mercuria shall be audited not more frequently than once per fiscal year, and (ii) no books and records for any given fiscal year may be audited more than once.

(c) In order to initiate an audit for a particular period, GCAC must provide written notice to Mercuria, which notice shall include one or more proposed dates for the audit and which notice shall be given not less than thirty (30) days prior to the first proposed audit date. Mercuria will reasonably accommodate the scheduling of such audit, and will provide the Audit Team with access to the applicable books and records and otherwise reasonably cooperate with such audit.

(d) If the Audit Results conclude that the Costs are lower than provided by Mercuria and/or the Profits are higher than provided by Mercuria, and Mercuria, within 30 days after being delivered the Audit Results (the "Review Period") doesn't dispute the same in a writing delivered to the GCAC, the Costs and/or Profits (as the case may be) shall be recomputed to give effect to the results of Audit Results and the Parties shall make a payment(s) to one another so that Costs, Profits and Overhead Payments are properly allocated in accordance with the terms of Section 7.2 of this Agreement, within 10 days after the end of the Review Period. If Mercuria, by 5 pm EST on the last day of the Review Period (or if such last day is not a Business Day, on the next Business Day after such last day) disputes the same in writing delivered to GCAC, the Parties shall attempt to resolve such dispute within 15 days of such writing being delivered (and if the Parties resolve such disputes, the Costs and Profits and Overhead Payments shall be recomputed to give effect to such resolution and, if required by such recomputation, the Parties shall make a payment(s) to one another such that Costs and Profits and Overhead Payments are properly allocated in accordance with the terms of this Agreement, within five days after such resolution). If the Parties are not able to resolve such dispute within such 15-day period, either Party may refer such matters in dispute to another nationally recognized independent accounting firm that shall make a final determination (the "Final Determination") as to the matters in dispute, which determination shall be binding upon the Parties, absent manifest error (and the Costs and Profits and Overhead Payments shall be recomputed to give effect to such determination and the Parties shall make a payment(s) to one another such that Costs and Profits and Overhead Payments are properly allocated in accordance with the terms of Section 7.2 of this Agreement, within five days after such determination).

(e) If the finally agreed Audit Results (or the Final Determination, if there is one) for any one or more fiscal years shows an underpayment by Mercuria to GCAC for that period in excess of twenty percent (20%) of the amounts properly determined, Mercuria shall reimburse GCAC for the fees and expenses paid by it to the Audit Team, in connection with such audit, and to the accounting firm engaged to make the Final Determination, if one is so engaged, which reimbursement shall be made

11

Execution Version

within ten (10) days of receiving appropriate invoices and other support for such costs. Otherwise, the fees and expenses of the Audit Team and of the accounting firm engaged to make the Final Determination shall be paid by GCAC.

## Article IX

[Intentionally omitted]

## Article X

## Term and Termination

10.1 Term. The initial term of this Agreement shall commence on the Effective Date and shall expire on January 31, 2021; provided, however, that the initial term may be extended for one or more successive additional one (1) year periods, if, not later than 270 days prior to the expiration of the initial term (or any extension thereof pursuant to this Article X) the Parties mutually agree in writing to extend the term; provided further that, this Agreement is subject to earlier termination under Section 10.2 (collectively, the "Term").

10.2 Early Termination.

(a) Notwithstanding anything to the contrary set forth herein, if (i) for any consecutive 12 month period during the Term the aggregate Losses, or (ii) on and as of any date during the period commencing on the Effective Date and ending on such date, cumulative Losses (after being reduced by any Profits during such period), of the Business equal or exceed the Minimum Performance Hurdle, Mercuria may elect to terminate this Agreement (and the Term) by delivery of written notice of termination to GCAC within 60 days after the last day of such 12 month period or within 60 days after such date. Failure to timely deliver such notice shall constitute an irrevocable waiver by Mercuria of its right to terminate this Agreement pursuant to this Section 10.2 in respect of such period (provided, however, that, for purposes of any calculation under clause (i) or clause (ii) of this subclause (a), all (in the case of a calculation under clause (ii)) or part (in the case of a calculation under clause (i)) of any period for which notice could have been given but was not given may be included within the calculation with respect to any subsequent period for which notice is given). For example, with respect to clause (i) above, if the aggregate Losses for the 12 month period commencing on January 15, 2018 equal or exceed the Minimum Performance Hurdle, but Mercuria does not give the notice within 60 days after the end of such 12 month period, Mercuria loses its right to give such notice for such period; however, (notwithstanding that it did not give the notice for that period), if the aggregate Losses for the 12 month period commencing on January 16, 2018 equal or exceed the Minimum Performance Hurdle, Mercuria may give the notice for such 12 month period if it does so within 60 days after the end of such 12 month period. Furthermore, for example, with respect to clause (ii) above, if the aggregate Losses for the period commencing on the Effective Date and ending on June 30, 2018 equal or exceed the Minimum Performance Hurdle, but Mercuria does not give the notice

12

Execution Version

within 60 days after the end of such period, Mercuria loses its right to give such notice for such period, but (notwithstanding that it did not give the notice for that period) if the aggregate Losses for the period commencing on the Effective Date and ending on July 1, 2018 equal or exceed the Minimum Performance Hurdle, Mercuria may give the notice for such period if it does so within 60 days after the end of such period.

(b) Mercuria may, upon written notice, terminate this Agreement (in which case, notwithstanding anything herein to the contrary, the date of such termination shall be the last day of the Term) for any of the following:

(i)  subject to Section 19.12, the material breach by GCAC of Mercuria's trading policies and/or procedures and/or compliance policies and procedures that have been provided to GCAC in writing and are generally applicable to all of Mercuria, and its Affiliates petroleum traders which is not cured within thirty (30) days after written notice thereof by Mercuria to GCAC specifying the particulars of such breach; or

(ii)  Arthur J. Brass no longer Controls or is no longer substantially involved in the management and operations of GCAC.

(c) Either Party (or the Parties), as applicable, may also terminate this Agreement (and the Term) as follows:

(i)  the Parties may terminate this Agreement (and the Term) at any time upon mutual written agreement;

(ii)  subject to Section 19.12, in the event of a material breach of any obligation, representation, warranty, or covenant under this Agreement by a Party or a material violation of law by a Party (the "Defaulting Party"), which is not cured within thirty (30) days after written notice from the other Party (provided such period shall be inapplicable with respect to a material breach of Section 12) (the "Non-Defaulting Party"), specifying the particulars of such breach, the Non-Defaulting Party may terminate this Agreement by delivering the Defaulting Party notice of termination.

(iii)  either Party may terminate this Agreement if an Insolvency Event occurs in relation to the other Party by sending a notice of termination to the Party that suffers an Insolvency Event (and termination shall be immediate upon delivery thereof). In any event when a Party first becomes aware of the likely occurrence of any Insolvency Event in regard to that Party, it shall promptly so notify the other Party in sufficient time to give the other Party sufficient notice to protect its interests under this Agreement. Article XI shall automatically terminate with respect to the Party that has not suffered the Insolvency Event upon the occurrence of the Insolvency Event involving the other Party (without any further action, notice or other step.

13

Confidential     GCAC 000013
001845

Execution Version

10.3   Effect of Termination. Upon a termination or expiration of this Agreement (and the Term):

(a)   If GCAC terminates this Agreement under Section 10.2(c)(ii) or Section 10.2(c)(iii), then GCAC may, at its option upon notice to Mercuria, either (x) terminate the Mobile Sublease, whereupon GCAC will be entitled to possession of all rights and shall be responsible for all obligations at the Mobile Terminal arising under the GCAC Lease or (y) notwithstanding anything to the contrary set forth herein, elect not to terminate the Mobile Sublease, in which case Mercuria shall in effect pay all obligations under and be entitled to all of the benefits of the GCAC Lease for the full remaining term thereof. In addition, if GCAC terminates this Agreement under Section 10.2(c)(ii) or Section 10.2(c)(iii), Mercuria shall, immediately upon the termination of this Agreement, pay to GCAC in a single lump sum, cash in the amount equal to the product of (x)(a) the difference between 37 and (b) the number of full calendar months that elapsed between the Effective Date and the date on which notice of termination of this Agreement was delivered in accordance with this Agreement and (y) $74,324.32. The Parties agree that it would be impossible to calculate the amount of damages that would be suffered by GCAC in the event of the early termination of this Agreement and that the foregoing amount is reasonable, not a penalty but shall constitute liquidated damages. GCAC would not have entered into this Agreement in the absence of the foregoing terms of this Section. GCAC hereby agrees that, other than for the obligation of Mercuria to make payment to GCAC of any amounts due and owing to GCAC prior to the date of termination of the Agreement, (A) this Section GCAC Section 10.3(a) states the entire liability of Mercuria for a breach by Mercuria described in Section 10.2(c)(ii) and/or the occurrence of an event described under Section 10.2(c)(iii) with respect to Mercuria, (B) the remedies set forth in this Section 10.3(a) are the sole and exclusive remedies for such a breach by Mercuria and/or the occurrence of such an event with respect to Mercuria, and (C) GCAC hereby waives any and all rights to any and all other remedies with respect to such a breach and/or the occurrence of such an event.

(b)   If Mercuria terminates this Agreement under Section 10.2(a), Section 10.2(b), Section 10.2(c)(ii) or Section 10.2(c)(iii), then Mercuria may, at its option upon notice to GCAC, either (x) terminate the Mobile Sublease, whereupon GCAC will be entitled to possession of all rights and shall be responsible for all obligations at the Mobile Terminal arising under the Mobile Lease or (y) notwithstanding anything to the contrary set forth herein, elect not to terminate the Mobile Sublease, in which case the Mobile Sublease will continue in effect until the end of the term of the GCAC Lease (unless earlier terminated pursuant to the terms thereof).

14

Confidential

Execution Version

(c)     In addition, as part of the Reconciliation Process for the Stub Year, all Profits and Losses associated with existing and uncompleted contracts or confirmations relating to the sale or purchase of Products shall be marked-to-market in accordance with Mercuria Marking Policies (on the basis that the transactions contemplated by all such contracts and confirmations had been completed as of the date of the termination of this Agreement).

(d)     Except as otherwise expressly provided herein, the expiration or termination of this Agreement for any reason shall not release either Party from any liability that, at the time of such expiration or termination, has already accrued to the other Party or that is attributable to a period prior to such expiration or termination, nor will any termination of this Agreement preclude either Party from pursuing all rights and remedies it may have under this Agreement, or at law or in equity, with respect to any breach of this Agreement. Notwithstanding anything to the contrary set forth in this Agreement, the provisions of Sections 7.1, 7.2, 10.3, 11.4, 11.5, 17.3 and 17.4, Articles XIII, XIV, XVI, XVIII and XIX shall survive expiration or termination of this Agreement (and, if applicable, stay in effect for the period stated therein and if no period is stated therein shall survive indefinitely).

## Article XI

### Non-Competition; Non-Solicitation; Non-Disparagement

11.1    Non-Competition Undertaking by Mercuria. During the Term, Mercuria shall not, and shall cause each of its Affiliates not to, engage (alone or jointly with others) in any Mercuria Competing Business in which Mercuria and/or its Affiliates engages in the trading of commodities;  provided, however, that the foregoing shall not preclude, restrict or prohibit Mercuria and/or its Affiliates from (a) acquiring any interest or securities in any company or undertaking engaged in a Mercuria Competing Business, provided that Mercuria does not exercise direct or indirect control of the buying or selling of any Products where such buying or selling would constitute a Mercuria Competing Business;  or (b) performing their respective obligations under this Agreement and any applicable Ancillary Agreement.

11.2    Non-Competition Undertaking by GCAC. During the Term, GCAC shall not, and shall cause each of its Affiliates not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others), in any GCAC Competing Business including, without limitation and by way of example only, (a) the acquisition of any interest or securities in any company or undertaking engaged in a GCAC Competing Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out any GCAC Competing Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) GCAC and its Affiliates and Representatives from performing their respective obligations under this Agreement and any applicable Ancillary Agreement, or (ii) GCAC's or any of its Affiliates' purchase of a class of equity securities listed on a United States or

15

Confidential

Execution Version

international stock exchange of a company engaged in a GCAC Competing Business so long as GCAC and its Affiliates do not collectively own more than two percent (2%) of such class of issued and outstanding equity securities, and so long as neither GCAC nor any of its Affiliates otherwise exercise any management or control with respect to such company.

11.3    Notice of Termination. Notwithstanding anything to the contrary set forth herein, upon either Party's delivery of a notice to terminate this Agreement in compliance with Article X, each Party may engage in preparatory work regarding business initiatives that would otherwise be precluded by this Article XI, provided that no such initiatives may start commercial operations until this Agreement is terminated.

11.4    Non-Solicitation of Employees. During the Term and for twelve (12) months following the end of the Term, each Party agrees not to, and shall cause its respective Affiliates and Representatives not to, directly or indirectly, either individually or acting in concert with another Person or Persons, solicit for employment or retention, or hire, employ, retain or engage (as a consultant or otherwise) any Person who is an employee or officer of the other Party or any of its Affiliates or has been an employee or officer of the other Party within the 6 (six) month period preceding such solicitation, retention, hiring, employment or engagement, or influence or attempt to influence any such employee to terminate his or her employment with the applicable Party or Affiliate.  Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall prevent a Party from soliciting or employing any Person whose employment had been terminated by the other Party or its Affiliates.

11.5    Non-Disparagement. During the Term and for twelve (12) following the end of the Term, no Party shall make, and each Party shall cause its respective Affiliates and Representatives not to make, any negative, derogatory or disparaging statements or communications regarding the other Party or its Affiliates; provided, that this Section 11.5 shall not restrict the making of claims, or bringing of enforcement actions, relating to this Agreement, the Ancillary Agreements or any transaction contemplated hereby or thereby.

### Article XII

#### COMPLIANCE WITH LAWS; AFFIRMATIVE COVENANTS

Each Party warrants to the other Party that it is familiar with the United States Foreign Corrupt Practices Act (as amended, the "FCPA") and its purposes, including its prohibition against paying or giving anything of value, directly or indirectly, by an American company to an official of a non-U.S. government for the purpose of influencing any act or decision in his or her official capacity, inducing such official to violate his or her lawful duty, inducing such official to use his or her influence with a non-U.S. government or an instrumentality thereof to affect or influence any act of such government or instrumentality, or obtaining any improper advantage in order to assist the American company to obtain or retain business. Each Party represents and warrants to, and agrees in favor of, the other that it shall not and shall cause each of its Affiliate not to, undertake any acts prohibited by the FCPA.

16

Confidential

Notwithstanding anything to the contrary herein, nothing in this Agreement is intended, and nothing herein should be interpreted or construed, to induce or require either Party hereto to act in any manner (including failing to take any actions in connection with a transaction) which is inconsistent with, penalized or prohibited by (i) such international sanction laws issued by the United Nations, Switzerland, the European Union, the United States of America or any other jurisdiction that may be applicable to that Party and/or (ii) any laws relating to money laundering, bribery, anti-slavery, trade controls, export controls, embargoes or international boycotts of any type applicable to that Party (together the "applicable Laws and Regulations").

In addition each Party hereby also represents, warrants, and covenants that, with respect to any activities undertaken in connection with this Agreement or transactions contemplated hereby, it has not violated or failed, and will not violate or fail, to comply with any of the applicable Laws and Regulations and that all activities undertaken in connection with this Agreement can be fully performed (including making and receiving payment) without infringing any of the applicable Laws and Regulations.

Each Party represents that neither it nor any of its Affiliates is an individual or entity (or is owned or controlled by or acting for or on behalf of an individual or entity) with whom transactions of the kind envisaged by this Agreement are currently prohibited or restricted under the applicable Laws and Regulations, including by reason of being included on any list of restricted entities, persons or organizations published by the United States of America government, the Swiss State Secretariat for Economic Affairs, the United Nations or the European Union or any member state of the European Union (a "Sanctioned Entity").

If a Party breaches any of its obligations under this Article XII or if it becomes a Sanctioned Entity, the other Party shall have the right of unilateral full or partial termination or suspension of this Agreement by written notice to the other Party and no liability will be applied to the terminating Party for such early termination and/or suspension of this Agreement. The Party in breach of its obligations under this Article XII shall be liable for any losses and damages suffered by the other Party as a result thereof.


## Article XIII

### Confidentiality

13.1    Duty of Confidence. Each Party will maintain in confidence (and will not use for any purpose other than the conduct of the Business), and will cause its respective Affiliates and Representatives to whom it discloses any Confidential Information of the other Party to maintain in confidence (and not to use for any purpose other than the conduct of the Business), any written, oral, digital or other Confidential Information such Party obtained from the other Party or its Affiliates, concerning its businesses and operations, or concerning the Business, unless (a) such information is as of the date hereof, or becomes, publicly available through no fault of the

17

Execution Version

Party receiving such Confidential Information and its Representatives, (b) the use of such Confidential Information is necessary or appropriate in making any filing or obtaining any consents or approvals required for the Business, or (c) the use of such information in connection with any claims by a Party under this Agreement, any Ancillary Agreement or otherwise in respect of the Business. A Party shall be responsible for any breach of this Article XIII by any of its Affiliates or Representatives. Notwithstanding anything to the contrary set forth herein, in the event the recipient Party is required to disclose Confidential Information of the disclosing Party by law or in connection with bona fide legal process, such disclosure shall not be a breach of this Agreement; provided, that the recipient Party (i) if legally permitted, informs the disclosing Party as soon as reasonably practicable of the required disclosure; (ii) limits the disclosure to the required purpose; and (iii) at the disclosing Party's request and expense, assists in an attempt to object to or limit the required disclosure. The foregoing obligations shall be in effect during the Term and shall remain in effect for a period of two years after the end of the Term.

## Article XIV

### Rights in Property

14.1   Pre-Existing Property. Except as specifically documented in writing between the Parties, all property owned by a Party or its Affiliates (whether real or personal, Intellectual Property, tangible or intangible or any other property) shall be owned by such Party and its Affiliates, and the other Party and its Affiliates shall not have any ownership interest of or any other rights of any nature in such property.  The Agreement shall not require any Party to disclose to, or share with the other any of its Intellectual Property with the other Party (except to the extent that such information is shared pursuant to Section 2.1).

14.2   Ownership of Inventions.

(a) All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement developed solely by a Party, its Affiliates, or the Representatives of a Party or its Affiliates shall be solely owned by such Party or its respective Affiliates.

(b) All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement developed jointly by employees or Representatives of both Parties shall be jointly owned by the Parties.

14.3   No Other License Grants. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property (except to the extent that such information is shared pursuant to Section 2.1).

14.4   Other Property Rights. Nothing in this Agreement creates, or is intended to create, any direct or indirect interest or right of a Party (or its Affiliates) in the property and assets of the other Party, except as may be separately agreed to between the Parties (except to the extent that such information is shared pursuant to Section 2.1).

## Article XV

18

001850

Execution Version

### Representations of the Parties

15.1    Representations and Warranties by Mercuria. Mercuria represents and warrants to GCAC that: (a) it is a corporation duly formed, validly existing, and in good standing under the laws of the State of Delaware; (b) it has full corporate power and authority to execute, deliver, and perform this Agreement and each Ancillary Agreement to which it is a party, and has taken all required limited liability company action to authorize its execution and delivery of this Agreement and each Ancillary Agreement to which it is a party and the consummation of the transactions contemplated by this Agreement and each such Ancillary Agreement; (c) this Agreement and each Ancillary Agreement to which it is a party constitutes a valid and binding agreement enforceable against it and or its applicable Affiliates in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer or similar laws affecting the enforcement of creditors' rights generally and general principles of equity (whether considered in a proceeding at law or in equity); (d) all consents, approvals and authorizations from all governmental authorities or other third parties required to be obtained by Mercuria or any of its Affiliates in connection with this Agreement and any applicable Ancillary Agreement (and the performance thereby hereof or thereof) have been obtained; (e) it and its respective Affiliates have all rights in and to their respective assets and properties that will be used in the conduct of the Business; and (f) the execution and delivery of this Agreement and each Ancillary Agreement to which it (or any of its Affiliates) is a party and all other instruments and documents required to be executed pursuant to this Agreement and each such Ancillary Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it (or any of its Affiliates) is a party or bound; or (iii) violate any law or order applicable to it (or any of its Affiliates) or its properties.

15.2    Representations and Warranties by GCAC. GCAC represents and warrants to Mercuria that: (a) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Alabama; (b) it has full limited liability company power and authority to execute, deliver, and perform this Agreement and each Ancillary Agreement to which it is a party, and has taken all required limited liability company action to authorize its execution and delivery of this Agreement and each Ancillary Agreement to which it is a party and the consummation of the transactions contemplated by this Agreement and each such Ancillary Agreement; (c) this Agreement and each Ancillary Agreement to which it is a party constitutes a valid and binding agreement enforceable against it and or its applicable Affiliates in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer or similar laws affecting the enforcement of creditors' rights generally and general principles of equity (whether considered in a proceeding at law or in equity); (d) all consents, approvals and authorizations from all governmental authorities or other third parties required to be obtained by GCAC or any of its Affiliates in connection with this Agreement and any applicable Ancillary Agreement (and the performance thereby hereof or thereof) have been obtained; (e) it and its respective Affiliates have all rights in and to their respective assets and properties that will be used in the conduct of the Business;

19

**Confidential**

(f) the execution and delivery of this Agreement and each Ancillary Agreement to which it (or any of its Affiliates) is a party and all other instruments and documents required to be executed pursuant to this Agreement and each such Ancillary Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it (or any of its Affiliates) is a party or bound; or (iii) violate any law or order applicable to it (or any of its Affiliates) or its properties; and (g) Exhibit 1 is a true and complete copy of the GCAC Lease, including all amendments and addendums, as in effect on and as of the Effective Date.

## Article XVI

### Indemnification; Limitations on Liability

16.1    By Mercuria. Mercuria agrees to defend, indemnify and hold harmless GCAC and its Affiliates and Representatives, and their respective successors and assigns, from and against any and all Third Party actions, claims, demands, costs, liabilities, expenses and damages, including reasonable attorney's fees and expenses associated therewith or with successfully establishing the right to indemnification hereunder (collectively, the "GCAC Liabilities"), to the extent that a Third Party action claim, demand, costs, liability, expense or damage arises out of or relates to (a) any breach of this Agreement or the breach of any applicable Ancillary Agreement by Mercuria or its Affiliates, (b) any negligence or willful misconduct of Mercuria or any of its Affiliates, or (c) for injury or harm to any Person, including death, or damage to tangible, whether real or personal, property in connection with the performance of this Agreement by Mercuria or any of its Affiliates or Representatives; provided, that, GCAC and the other parties to be indemnified hereby shall not be entitled to indemnification pursuant to this Section 16.1 for any GCAC Liabilities to the extent that such GCAC Liabilities result from GCAC's gross negligence, bad faith or willful misconduct.

.    16.2    By GCAC. GCAC agrees to defend, indemnify and hold harmless Mercuria and its Affiliates and Representatives, and their respective successors and assigns, from and against any and all Third Party actions, claims, demands, costs, liabilities, expenses and damages, including reasonable attorney's fees and expenses associated therewith or with successfully establishing the right to indemnification hereunder (collectively, the "Mercuria Liabilities"), to the extent that a Third Party action, claim, demand, cost, liability, expense or damage arises out of or relates to (a) any breach of this Agreement or the breach of any applicable Ancillary Agreement by GCAC or its Affiliates, (b) any negligence or willful misconduct of GCAC or any of its Affiliates, or (c) for injury or harm to any Person, including death, or damage to tangible, whether real or personal, property in connection with the performance of this Agreement by GCAC or any of its Affiliates or Representatives; provided, that, Mercuria and the other parties to be indemnified hereby shall not be entitled to indemnification pursuant to this Section 16.2 for any Mercuria Liabilities to the extent that they result from Mercuria's gross negligence, bad faith or willful misconduct.

20

Confidential

Execution Version

16.3 <u>Procedures</u>. The Party giving notice of a claim pursuant to <u>Section 16.1</u> or <u>16.2</u> (the "<u>Indemnified Party</u>") shall promptly notify the other Party (the "<u>Indemnifying Party</u>") in writing of any claim for indemnification under this Agreement; provided, that, the failure to provide such notice to the Indemnifying Party will not relieve the Indemnifying Party of any liability that it may have to the Indemnified Party, except to the extent that the Indemnifying Party demonstrates that the defense of such claim is materially prejudiced by the Indemnified Party's failure to timely give such notice. Subject to the following provisions, the Indemnifying Party shall be entitled to control the defense with counsel selected by it (and approved by the other Party, which approval shall not be unreasonably withheld, delayed or conditioned) and all related settlement negotiations with respect to the claim or action. The Indemnified Party shall have the right, but not the obligation, to participate in the defense of any such claim or action through counsel of its own choosing at its own expense; provided, however, that, if the Indemnifying Party fails to promptly assume the defense of such claim, the Indemnified Party may assume the defense at the Indemnifying Party's cost and expense. The Indemnified Party shall cooperate in the defense of such claim. The Indemnified Party shall not settle, compromise or consent to the entry of a judgment in connection with any claim or action for which it may be indemnified under this Agreement without the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld, delayed or conditioned). The Indemnifying Party shall not settle, compromise or consent to the entry of a judgment in connection with any claim or action for which the other Party or its Affiliates or Representatives may seek indemnification hereunder without the consent of the Indemnified Party (which shall not be unreasonably withheld, delayed or conditioned), provided that such consent shall not be required if such settlement, compromise or consent (x) does not contain any finding or admission of the violation of any law or any violation of the rights of any Person, (y) does not restrict the business of the Indemnified Party or any of its Affiliates in any respect and (z) provides that the sole relief provided is the payment of money damages that are paid in full by the Indemnifying Party.

16.4 <u>Special, Indirect and Other Losses</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, NEITHER PARTY NOR ANY OF ITS AFFILIATES SHALL BE LIABLE IN CONTRACT, TORT, NEGLIGENCE, BREACH OF STATUTORY DUTY OR OTHERWISE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR FOR LOSS OF PROFITS SUFFERED BY THE OTHER PARTY, EXCEPT TO THE EXTENT ANY SUCH DAMAGES ARE REQUIRED TO BE PAID TO A THIRD PARTY AS PART OF A CLAIM FOR WHICH A PARTY PROVIDES INDEMNIFICATION UNDER THIS <u>ARTICLE XVI</u>.

## Article XVII

## Covenants

17.1 <u>Certain Covenants</u>. From the Effective Date until the termination of this Agreement pursuant to its terms, neither Party shall (and each Party shall cause its respective Affiliates not to) without the consent of the other Party:

21

Execution Version

(a)      change the manner in which such Party accounts for its applicable Costs and Profits in respect of the Business;

(b)      take any action that is intended to prevent or materially impede or delay the transactions contemplated by this Agreement or the operation of the Business;

(c)      enter into any agreement, contract or other obligation that would in any way restrict it from engaging in the Business;

(d)      take any action, or fail to take any action or fulfill any obligation, with respect to the Business in a timely manner which has or would likely have the effect of causing a material default under any commitment, agreement or obligation to which the applicable Party is bound and which relates, directly or indirectly, to the Business;

(e)      agree, authorize, resolve, arrange or commit to do any of the things described in this Section 17.1.

17.2    Cooperation. Each Party will, and it will cause its respective Affiliates, to act in the best interests of the Business and in a commercially reasonable manner and, to the extent permitted by applicable law, furnish such information, execute such applications and similar documents as are required by any governmental agency, and take such other actions requested by the Parties as may be necessary, in each case in connection with the Business.

17.3    Separate Debts. No Party shall do anything whereby the capital or the property of the Business or the other Party may be attached, taken in execution, or otherwise impaired, and each Party punctually shall pay its separate debts.

17.4    Limitation on Authority. Neither Party shall have any authority to act, and neither Party shall act or hold itself out has having authority to act (a) as agent of the Business in any matter, or (b) except in connection with Pre-Approved Transactions, to convey any interest in any property of any kind, without regard to who holds title thereto, which is used in the conduct of the Business, in either case unless the Parties delegates specific authority to the Party to act as agent for the Business in respect of a particular matter. Any Party incurring an obligation on behalf of the Business contrary to this Section 17.4 shall be individually obligated to discharge such liability.

## Article XVIII

## Publication

18.1    Use of Names. Neither Party shall use the name, symbol, trademark, trade name or logo of the other Party or its Affiliates in any press release, publication or other form of public disclosure without the prior written consent of the other Party.

22

Confidential

Execution Version

18.2     Press Releases and Publicity Related to this Agreement. Only with prior written approval of each Party, the Parties may issue a press release or other public statements regarding the arrangements contemplated by this Agreement.

18.3. Permitted Representations.  Notwithstanding anything to the contrary set forth in this Article XVIII, each Party shall have the right to disclose to third parties during the Term that GCAC is acting as Mercuria's asphalt marketer in the Territory; provided, however, that any such disclosure made by GCAC in any written (or electronic) form must be pre-approved in writing by Mercuria.

## Article XIX

### Miscellaneous

19.1     Assignment. This Agreement and the rights hereunder may not be assigned by a Party without the prior written consent of the other Party, which consent may be withheld in such Party's sole discretion; provided, however, that Mercuria shall have the right to assign this Agreement to an Affiliate; provided, that, no such assignment shall relieve Mercuria from any of its obligations hereunder.

19.2     [Intentionally Omitted]

19.3     Relationship of the Parties. This Agreement shall not be construed to create between Mercuria and GCAC the relationship of employer, principal or agent, joint venturers, co-partners or any other similar relationship, the existence of which is hereby expressly denied by GCAC and Mercuria. Neither GCAC nor any of its employees shall be entitled, as a result or by reason of this Agreement, to any benefits under any employee benefit plan that Mercuria or any of its Affiliates presently have in effect or may put into effect in the future; nor shall GCAC or any of its employees be considered an employee of Mercuria or any of its Affiliates for purposes of any tax or contribution now or hereafter levied by any federal, state or municipal government. Neither Mercuria nor any of its or its Affiliates' employees shall be entitled, as a result or by reason of this Agreement, to any benefits under any employee benefit plan that GCAC or any of its Affiliates presently have in effect or may put into effect in the future; nor shall Mercuria or any of its employees be considered an employee of GCAC or any of its Affiliates for purposes of any tax or contribution now or hereafter levied by any federal, state or municipal government. Moreover, each Party agrees not to construe this Agreement, or any of the transactions contemplated hereby, as a partnership for any tax purposes.

19.4     Severability.

(a)     Should one or more of the provisions of this Agreement become void or unenforceable as a matter of law, then this Agreement shall be construed as if such provision were not contained herein and the remainder of this Agreement shall continue in full force and effect. The Parties will use their commercially reasonable efforts to substitute for the invalid or

23

unenforceable provision a valid and enforceable provision which conforms as nearly as possible to the original intent of the Parties.

(b)    To the extent a court of competent jurisdiction determines any part of Article XI is not enforceable, the Parties agree that the court may apply the "blue pencil" doctrine to reformat the applicable provisions of Article XI by reducing the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

19.5    Further Assurances. Mercuria and GCAC hereby covenant and agree, without the necessity of any further consideration, to execute, acknowledge and deliver any and all such other documents and take any such other action as may be reasonably necessary to carry out the intent and purposes of this Agreement.

19.6    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to any choice of law provisions that would result in the application of the laws of another jurisdiction. Each Party agrees that it shall bring any proceeding in respect of any questions, claims, disputes, remedies or damages arising out of or related to this Agreement or the Ancillary Agreements or the transactions contained in or contemplated hereby or thereby exclusively in the United States District Court for the Southern District of New York or any New York State court sitting in New York County (the "Chosen Courts"), and, solely in connection with claims arising under this Agreement or the Related Agreements or the transactions that are the subject hereof and thereof (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives and agrees not to assert any objection to laying venue in any such action or proceeding in the Chosen Courts and (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

19.7    Compliance with Law. Each Party shall perform its obligations under this Agreement in accordance with all applicable laws. No Party shall, or shall be required to, undertake any activity under or in connection with this Agreement which violates, or which it believes, in good faith, may violate, any applicable law.

19.8    No Third Party Beneficiary Rights. Except as expressly provided in Article XVI, the provisions of this Agreement are for the sole benefit of the Parties and their successors and

24

permitted assigns, and they shall not be construed as conferring any rights to any Third Party (including any Third Party beneficiary rights).

19.9    Expenses. Except as otherwise expressly provided in this Agreement, each Party shall pay the fees and expenses of its respective lawyers and other experts and all other expenses and costs incurred by such Party incidental to the negotiation, preparation, execution and delivery of this Agreement and the Ancillary Agreements.

19.10   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

19.11   Cumulative Remedies. No remedy referred to in this Agreement is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to in this Agreement or otherwise available under law.

19.12   Force Majeure. Neither Party shall be responsible to the other for any failure or delay in performing any of its obligations under this Agreement, or for other nonperformance hereunder, if such delay or nonperformance is caused by strike, stopoage of labor, lockout or other labor trouble, fire, flood, accident, war, act of terrorism or of the government of any country or of any local government, or by cause unavoidable or beyond the control of any Party hereto. In such event, the Party affected will use its commercially reasonable efforts to resume performance of its obligations. In the event that such failure continues such that the affected Party fails to materially perform its obligations hereunder for more than 90 days, the other Party may terminate this Agreement upon notice to the affected Party.

19.13   Waivers and Amendments. The failure of any Party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other Party. No waiver shall be effective unless it has been given in writing and signed by the Party giving such waiver. No provision of this Agreement may be amended or modified other than by a written document signed by authorized representatives of each Party.

19.14   Notices. All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt); (b) sent by email; or (c) when received by the addressee, if sent by an internationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and fax numbers set forth below (or to such other addresses and fax numbers as a Party may designate by notice):

Mercuria:

Mercuria Energy Trading, Inc.
33 Benedict Place

25

**Confidential**

Execution Version

Greenwich, CT 06830
Attention: Brian Falik
Email: bfalik@mercuria.com

with a copy to:

Mercuria Energy Trading, Inc.
33 Benedict Place
Greenwich, CT 06830
Attention: Anthony Salese
Email: asalese@mercuria.com

Gulf Coast Asphalt Company, L.L.C.:

1990 Post Oak Blvd.
Suite 2400
Houston, Texas 77056
Attention:Arthur Brass
Email: aj@abrass.com

19.15   Enforcement. To the fullest extent permitted by law, if a Party or any of its Affiliates breaches or threatens to commit a breach of Article XI, XIII or XVII the other Party shall have the right and remedy to have such article specifically enforced, it being acknowledged and agreed that money damages would not provide an adequate remedy in the event of a breach of any such Article. Nothing herein shall be construed to limit the right of a Party to collect money damages in the event of a breach of Article XI, XIII or XVII by the other Party.

19.16   Entire Agreement. This Agreement together with its exhibits constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all proposals, oral or written, and all other prior communications between the Parties with respect to the subject matter hereof.

[*remainder of page intentionally left blank*]

26

**Confidential**

Execution Version

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on their respective behalf, by their respective officers, duly authorized, in multiple originals.

MERCURIA ENERGY TRADING, INC.

By:

Print Name: Daniel J House

Title: President

GULF COAST ASPHALT COMPANY, L.L.C.

By:

Print Name:

Title:

Confidential

GCAC 000027

001859

Execution Version

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on their respective behalf, by their respective officers, duly authorized, in multiple originals.

MERCURIA ENERGY TRADING, INC.

By:_____

Print Name:_____

Title:_____


GULF COAST ASPHALT COMPANY, L.L.C.

By:_____

Print Name:____Arthur T. Brass_____

Title:____President_____

**Confidential**

Execution Version

### ANNEX A

### DEFINITIONS

"Affiliate" means, with respect to a Party, any Person that Controls, is Controlled by, or is under common Control with that Party.

"Agreement" is defined in the introductory paragraph.

"Ancillary Agreements" means, as applicable, the GOTAC Terminal Agreements and the Mobile Sublease.

"Annual Accounting" is defined in Section 7.2.

"Business" means, within the Territory, (i) the sourcing, purchasing and blending of asphalt and VTBs; and (ii) the selling and marketing of Products.

"Business Day" means any day other than a Saturday, Sunday or any day on which banks located in Houston, Texas are authorized or required to be closed for the conduct of regular banking business..

"Confidential Information" means all proprietary information, trade secrets and other data of a financial, commercial or technical nature which the disclosing Party or any of its Affiliates has supplied or otherwise made available to the other Party or its Representatives, whether made available orally, in writing or in electronic form.

"Control" (including the correlative terms "Controlling" or "Controlled by" and "under common Control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise .

"Costs" is defined in Section 6.1.

"Defaulting Party" is defined in Section 10.2.

"Effective Date" is defined in the introductory paragraph.

"FCPA" is defined in Article XII.

"Final Determinaton" is defined in Article VIII.

"GCAC" is defined in the introductory paragraph.

Confidential

Execution Version

"GCAC Competing Business" means the purchase and/or sale of (i) VTB's, coker feed and/or fuel oil in the Territory and/or (ii) the purchase and/or sale of asphalt.

"GCAC Costs" is defined in Section 6.1.

"GCAC Lease" has the meaning set forth in the WHEREAS clauses hereof.

"GCAC Liabilities" is defined in Section 16.1.

"GOTAC Terminal" means the terminal located at 6600 Up River Rd, Corpus Christi, Texas, operated by Pin Oak.

"GOTAC Terminal Agreements" has the meaning set forth in the WHEREAS clauses hereof..

"GOTAC Terminal Fees" for each month means all of the amounts that Mercuria (or an Affiliate thereof) would be required to pay such month to GOTAC for all storage, throughput, tank cleaning and other services, taking into account all of the transactions and operations actually carried out (during the Term of this Agreement) under the GOTAC Terminal Agreements, as if Mercuria were charged for such services in accordance with the fee and fee structure set forth in the GOTAC Terminal Agreements in the form attached as Exhibit 2 to this Agreement, without taking into account any modifications or amendments to the fees and/or fee structure of the GOTAC Terminal Agreements that may become effective after the Effective Date. Mercuria represents and warrants that a true and complete copy of the GOTAC Terminal Agreements, as in effect on the Effective Date, is attached hereto as Exhibit 2.

"Gross Revenues" for any period means the total amount of gains on inventory and hedging (each, on a marked-to-market or realized basis in accordance with Mercuria Marking Policies), accounts receivable, and, without duplication, proceeds received from sale of Products, for such period.

"Indemnified Party" is defined in Section 16.3.

"Indemnifying Party" is defined in Section 16.3.

"Insolvency Event" means, in relation to either Party, any one of the following: (a) that Party is the subject of voluntary or involuntary bankruptcy proceedings instituted on behalf of or against such Party (except for involuntary bankruptcy proceedings which are dismissed within sixty (60) days of commencement); (b) an administrative receiver, receiver and manager, interim receiver, custodian, sequestrator or similar officer (collectively, the "Receiver") is appointed in respect of that Party and that Party has not caused the underlying action or the Receiver to be dismissed within sixty (60) days after the Receiver's appointment; (c) the board of directors (or similar governing authority of such Party) has passed a resolution to wind up that Party, or such a resolution shall have been passed other than a resolution for the solvent reconstruction or

Confidential