Execution Version

reorganization of that Party; (d) a resolution shall have been passed by that Party or that Party's directors to make an application for an administration order or to appoint an administrator; or (e) that Party makes a general assignment, composition or arrangement with or for the benefit of all or the majority of that Party's creditors, or makes, suspends or threatens to suspend making payments to all or the majority of that Party's creditors.

"Intellectual Property" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, know-how, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases that are owned or used by the applicable Party and its Affiliates.

"Losses" in respect of any period means the amount by which Costs in respect of such period exceed Gross Revenues in respect of such period.

"Mercuria" is defined in the introductory paragraph.

"Mercuria Competing Business" means (a) the purchase of asphalt or VTB's produced at or sold from the GOTAC Terminal, (b) the purchase or sale or other transaction relating to any VTB's sold by CITGO or any Affiliate thereof in, to or from Corpus Christi, Texas, and (c) the purchase or sale of asphalt in the Territory.

"Mercuria Liabilities" is defined in Section 16.2.

"Mercuria Marking Policies" is defined in Section 7.1.

"Minimum Performance Hurdle" means the Business has recognized $5,000,000 in cumulative Losses (after reducing the amount of Losses for the cumulative amount of Profits realized by the Business) (i) in respect of any period of twelve (12) consecutive months or (ii) on and as of any date, for the period commencing with the start of the Term and ending on such date.

"Mobile Terminal" means the terminal located in Mobile, Alabama, operated by Arc Terminals Holdings LLC.

"Mobile Terminal Fees" for each month means the amounts that Mercuria is required to pay GCAC per such month under the Mobile Sublease (as modified or amended from time to time).

"Non-Defaulting Party" is defined in Section 10.2.

"Party" is defined in the introductory paragraph.

**Confidential**

Execution Version

"Person" means any individual, partnership, limited liability company, firm, corporation, association, trust, unincorporated organization or other entity.

"Pin Oak" means Pin Oak Corpus Christi, LLC.

"Products" means asphalt, VTBs, coker feed and fuel oil.

"Profits" in respect of any period means the amount by which Gross Revenues in respect of such period exceed Costs in respect of such period.

"Reconciliation Process" is defined in Section 7.1.

"Representatives" means, of any Party, such Party's directors, officers, employees, consultants and other representatives.

"Rio" has the meaning set forth in the WHEREAS clauses hereof.

"Rio GCAC JMA" means that certain joint marketing agreement between GCAC and Rio, dated February 2016.

"Stub Year" is defined in Section 7.2.

"Term" is defined in Section 10.1.

"Terminals" means the GOTAC Terminal and Mobile Terminal.

"Territory" means North America, Central America and South America (including the Caribbean).

"Third Party" means any Person other than a Party or an Affiliate of a Party.

"VTBs" means vacuum tower bottoms.

"Working Capital" means any and all inventory, receivables and other capital needed by the Business.

Confidential

Execution Version

## Exhibit 1

GCAC Lease

Confidential



<u>TERMINALLING AGREEMENT 36,140 BBLS</u>

THIS TERMINALLING AGREEMENT (the "Agreement"), made this 8th day of February, 2013, by and Gulf Coast Asphalt Company having an office at 11 Greenway Plaza, Suite 2950 Houston, Texas 77046 hereinafter to be referred to as "GCAC" and Arc Terminals Holdings LLC, a Delaware corporation having an office at 3000 Research Forest Drive The Woodlands, Texas 77381, hereinafter to be referred to as "Arc," covers terminalling of the products described below under the following terms and conditions, effective as of February 8, 2013 (Effective Date). Arc and GCAC may be referred to individually as "Party" or collectively as "Parties".

### A) ARC LOCATION:

Arc's Facility Address:

Mobile Terminal
835 Cochrane Causeway
Mobile, AL 36610

### B) FACILITY SERVICES:

1) Storage:

Arc will provide segregated tankage of 36,140 barrels of storage capacity

Mobile Tank 18 (5,000 barrels)
Mobile Tank 20 (10,500 barrels)
Mobile Tank 134 (10,500 barrels)
Mobile Tank 147 (3,800 barrels)
Mobile Tank 170 (2,600 barrels)
Mobile Tank 124 (930 barrels)
Mobile Tank 125 (930 barrels)
Mobile Tank 135 (940 barrels)
Mobile Tank 136 (940 barrels)
Mobile Tank 702 (55,189)          (all together "the Tanks")

2) Products:

Petroleum based material suitable for Tanks' specifications (no vapor controls required). Storage shall be limited to the capabilities identified below

| Mobile Tank 18 | insulated | 1.0 gravity |
|---|---|---|
| Mobile Tank 20 | insulated | 1.0 gravity |
| Mobile Tank 134 | non- insulated | 1.0 gravity |
| Mobile Tank 147 | insulated | 1.0 gravity |
| Mobile Tank 170 | non-insulated | 1.0 gravity |
| Mobile Tank 124 | non-insulated | 1.0 gravity |
| Mobile Tank 125 | non-insulated | 1.0 gravity |
| Mobile Tank 135 | non-insulated | 1.0 gravity |
| Mobile Tank 136 | non-insulated | 1.0 gravity |

1

**Confidential**

Mobile Tank 702      insulated        1.0 gravity

3) Modes:

Mobile Tank 18
IN: In-Tank Transfer/Truck
OUT: Truck/In-Tank Transfer

Mobile Tank 20
IN:  Marine/In-Tank Transfer
OUT:  Marine/In-Tank Transfer

Mobile Tank 134
IN:  Marine/In-Tank Transfer
OUT:  Marine/In-Tank Transfer

Mobile Tank 147
IN:  Marine/In-Tank Transfer/Truck
OUT:  Marine/Truck/In-Tank Transfer

Mobile Tank 170
IN: In-Tank Transfer
OUT:  In-Tank Transfer

Mobile Tank 124
IN: In-Tank Transfer/Truck
OUT: Truck/In-Tank Transfer

Mobile Tank 125
IN:  In-Tank Transfer/Truck
OUT:  Truck/In-Tank Transfer

Mobile Tank 135
IN:  In-Tank Transfer/Truck
OUT: Truck/In-Tank Transfer

Mobile Tank 136
IN: In-Tank Transfer/Truck
OUT: Truck/In-Tank Transfer

Mobile Tank 702
IN: In-Tank Transfer/Truck/Marine
OUT: Truck/In-Tank Transfer/Marine

(Upon mutual agreement, additional Modes can be
added later by Addendum.)

2

Confidential

GCAC 000035
001867

## C) CONSIDERATION:

| | |
|---|---|
| 1) Contract Base Quantity: | $0.75 per barrel per month of storage for 91,329 barrels of storage space through March 31, 2013 or per Section K (3), at which time barrels of storage space shall be reduced to 36,140 |
| 2) Excess Turn: | $0.75 per barrel for more than 91,329 barrels of outbound volumes/in-tank transfers during any calendar month period through April 1, 2013. Upon April 1, 2013 or per Section K (3), the excess turn shall be reduced to $0.75 per barrel for more than 36,140 barrels of outbound volumes/in-tank transfers during any calendar month period |
| 3) Heat/Electricity: | Actual cost without markup |
| 4) Scale Fee: | $15 per truck |
| 5) Mutually Agreed Upon Fees: | Actual cost without markup |
| 6) Facility Clean and Disposal: | The Tanks will be tankage dedicated to GCAC. Upon completion of this Agreement, GCAC shall return the Tanks in substantially the same condition as the effective date of this Agreement.. |

It is understood that Arc is obligated to lease Mobile Tank 702 to Equilon Enterprises LLC ("Equilon") on February 9, 2013 or per Section K (3) of this Agreement. Upon GCAC's exit from Tank 702, GCAC shall be obligated to clean Mobile Tank 702 and its associated piping unless agreed upon otherwise by Equilon.

Upon mutual agreement, other services can be added later by Addendum.

## D) PRODUCT TESTING:

GCAC will be responsible for testing and determining the Product quality delivered to Arc. However, Arc has the right to require GCAC to provide a Certificate of Analysis or MSDS of Product prior to accepting it into the terminal. Arc has the right to deny any shipment, if Product is not suitable for storage in the Tanks. GCAC shall have the right to sample Product in storage to satisfy itself that the minimum Product specifications are maintained. The cost of such sampling and testing shall be borne by GCAC and shall be charged in accordance with the attached Exhibit C.

## E) METHOD OF HANDLING LOSSES:

If receipt and storage of GCAC's Product into Arc's receiving Facility results in handling losses, the handling and accountability of such will be as follows: (1) GCAC will absorb

3

**Confidential**

ordinary evaporation and handling losses up to one half (1/2) of one (1) percent of monthly throughput of Product, and (2) Arc shall be responsible for all ordinary evaporation and handling in excess of one half (1/2) of one (1) percent of monthly throughput of Product.

If at the end of this contract, there are gains in the segregated tank, GCAC shall be entitled to all gains.

F) **TERM OF THE AGREEMENT:**

This Agreement will be in effect for a term from the Effective Date until February__, 2017 (the "Initial Term"). This Agreement may only be extended upon mutual written agreement between the Parties, which shall be agreed upon or negotiated 180 days before of the termination date.

G) **ESCALATOR:**

The Monthly Base Rate set forth herein shall be fixed for the entire term of the Agreement. There shall be no inflation adjustment or rate adjustment mechanism during the effectiveness of this Agreement. Provided however, the Parties shall negotiate a new Monthly Base Rate upon completion of the Initial Term.

H) **NOTICE ADDRESSES:**

Arc:
  3000 Research Forest Drive
  Suite 250
  The Woodlands, TX 77381
  Attn: Kenny McBride

GCAC:
  11 Greenway Plaza, Suite 2950
  Houston, TX 77046
  Attn: Vice President and General Counsel

I) **OPERATIONAL CONTACTS:**

GCAC:

| | | |
|---|---|---|
| Scheduling: | Kenny Hucker | Phone: (832) 426-3310 |
| Operations: | AJ Brass | Phone: (832) 426-3310 |
| Invoicing: | Jason Goldstein | Phone: (832) 426-3310 |

Arc:

| | | |
|---|---|---|
| Operations Manager: | John Blanchard | Phone: (281) 292-3008 |
| Terminal Manager | Kenny McBride | Phone: (251) 432-7666 |

J) **CLEAN/INSPECT/REPAIR:**

The Tanks shall be required to undergo an internal inspection per American Petroleum Institute regulation 653 ("API 653 inspection"). GCAC agrees that it shall continue to pay the fees identified herein while each of the tanks identified above are taken out of service to undergo an API 653 inspection and any subsequent repairs.

4

**GCAC 000037**
001869

K) OTHER PROVISIONS:

1) Prior to the movement of Product that requires heat, GCAC and Arc will agree upon a minimum operating temperature for Product movements. If the Product temperature falls below that agreed upon temperature, Arc shall have the right to apply heat to the Product to meet and/or maintain the agreed upon minimum operating temperature that will allow for Arc to achieve a minimum pumping rate during Product movements.

2) Upon request by GCAC, ARC shall provide warehouse receipts in a form suitable to GCAC's lenders, if any, and ARC confirming GCAC's inventory

3) Equilon is contractually obligated to lease Tank 702 effective July 1, 2013; however, Equilon has requested that it begin the Tank 702 lease effective April 1, 2013. It is understood that GCAC shall lease Tank 702 from Arc until April 1, 2013 at which time Arc is scheduled to lease Tank 702 to Equilon. If Equilon elects to not lease Tank 702 until original agreed upon effective date of July 1, 2013, then GCAC shall continue to lease Tank 702 until July 1, 2013.

The Additional Terms and Conditions attached are a part of this Agreement. All references herein to the Agreement shall include the Additional Terms and Conditions.

5

**Confidential**

Executed this 1st day of February 2013

GULF COAST ASPHALT COMPANY, L.L.C.

By: _____
Name: Arthur J. Brass
Title: President

[Signature Page to New Storage Agreement for 36,140 Barrels of Storage]

**Confidential**

**GCAC 000039**
001871

ARC TERMINALS HOLDINGS LLC

By: _____
Name: John Blanchard
Title: President

[Signature Page to New Storage Agreement for 36,140 Barrels of Storage]

Confidential

GCAC 000040
001872

## ADDITIONAL TERMS AND CONDITIONS

1. FACILITIES.  Arc agrees to provide the facilities identified in the Agreement, hereinafter referred to as "Facility(ies)," for the storage and handling of GCAC's Product.

2. TERMINALLING SERVICES.  When instructed by GCAC, Arc agrees to receive GCAC's Product into the Facilities, to store such Product, and to deliver same, all as specified in the Agreement.  The aggregate quantity of Product Arc agrees to receive shall be as specified in the Agreement and referred to as the "Contract Base Quantity."

3. CHARGES AND PAYMENT.  Commencing with the Effective Date(s) specified in the Agreement, GCAC agrees to pay Arc the following charges as specified in the Agreement:
   a) Contract Base Quantity Fee
   b) Marine Delivery/Receipt Fee
   c) Truck (Un)loading Fee
   d) All other fees and charges as set forth in the Agreement and as may be agreed upon between GCAC and Arc from time to time during the term of the Agreement.

   Arc shall deliver to Customer each calendar month of the Term an invoice for the all Fees, costs, expenses and other charges due from or assessable to Customer in accordance with the Fee Schedule in Section C of this Agreement.  Unless otherwise provided in said Fee Schedule, each such invoice shall be due and payable within fifteen (15) days of receipt thereof.  Any such invoice not paid in full as and when due shall be assessed interest payable by Customer at the rate of One and One-Half Percent (1.5%) thereof for each month (or portion thereof) said invoice remains unpaid.

4. DETERMINATION OF QUANTITY AND QUALITY OF PRODUCT.  The quantity of the Product handled hereunder shall be determined by Arc, or at GCAC's option by a representative of GCAC, or at GCAC's option by an independent inspector mutually acceptable to both parties.  The charges for an independent inspector shall be paid by GCAC.

   The quantity of Product handled hereunder shall be determined as follows:
   a) The quantity of Product received from or delivered to a marine vessel shall be determined from Arc's shore tank gauge reading taken before and after loading Product into or out of Arc's shore tanks in accordance with applicable API standards.  If receiving or delivering shore tank(s) is/are active, the vessel's ullage with application of the Vessel's Experience Factor shall be used to determine the quantity.

   b) The quantity of Product received from or delivered to a tank truck shall be determined as follows: Arc's loading meters, or in the case of meter failure or absence of meters, tank truck calibrations shall be used when the Product is loaded to the compartment measuring finger, alternatively, trucks shall be weighed in and out of the facility.  Arc shall maintain seals on its meters and shall test and calibrate its meters at maximum intervals of six (6) months, or more often as found necessary (or as required by federal, state or local authorities), in accordance with approved methods.

7

Confidential

For the purpose of the Agreement, a barrel shall consist of forty-two (42) U.S. gallons and a gallon shall contain two hundred thirty-one (231) cubic inches when corrected to 60°F. All measurements shall be in accordance with API standards.

Arc shall not be responsible for determining the quality of GCAC's Product.

5. FACILITY HOURS OF OPERATION AND CAPABILITIES. The Facility will remain open ten (10) hours a day, five days a week for delivery of Product via Tank Truck and twenty-four (24) hours a day seven (7) days a week for the receipt and/or delivery of Product via marine and/or as specified in Exhibit A. Should services under this Agreement require overtime, charges will be as specified in the Agreement. Arc and GCAC agree to adhere to the provisions specified in Exhibit B (Marine Provisions).

6. COMPLIANCE WITH LAWS AND REGULATIONS. GCAC and Arc hereby agree to comply fully in the performance of the Agreement with all federal, state, and local governmental laws, regulations, and rules. In addition, the Parties agree to file all reports as may be required by state and local taxing jurisdictions.

Arc covenants, represents and warrants to GCAC that (i) it will provide a safe berth to Vessels and otherwise that the Terminal, including the Pier Facilities are in operating condition, are sufficient to secure and off load Vessels specific in Exhibit A containing Product, (ii) the Terminal, including the Pier Facilities are each, and during the Term will be operated and maintained in compliance with all Laws, including Environmental Laws; and (iii) that the maintenance and operation of the Terminal and all other services to be provided by Arc hereunder shall be performed at a minimum in accordance with the generally recognized industry standards for such services, and at all times in compliance with Arc's own operational, health, safety and environmental guidelines. GCAC represents and warrants to Arc that the Product will at all times comply with the specifications for Product set forth herein and will otherwise conform to all other generally recognized industry standards.

In the event, at any time after the date the Agreement is entered into, any governmental or regulatory body shall require the installation or modification of facilities or fixtures, or require changes in Arc's normal operating procedures related to the storage and handling of GCAC's Product, Arc shall notify GCAC of the necessity and cost of such installation of facilities or fixtures, or changes in operating procedures, and GCAC and Arc shall work, in good faith, to provide such installation of facilities or fixtures, or to make such necessary changes to Arc's operating procedures, and to adjust the compensation under the Agreement to reflect Arc's additional costs of compliance. In the event Arc or GCAC decides that such increase in costs or change in operating procedure is onerous or prohibitive, either party may, in its sole discretion, upon sixty (60) days written notice, cancel those portions of the Agreement which are affected. GCAC expressly relieves Arc of any and all obligations hereunder to provide facilities and/or services when such facilities and/or services are contrary to any law, regulation or ruling.

7. REPORTS. Arc agrees to provide daily electronic reports (a) summarizing receipts, deliveries and in-tank transfers of GCAC's Product, into and out of storage, including the quantities received and delivered, the date of each such transaction, and (b) of the actual inventory by product (side gauge) of GCAC's Product in each of the storage tanks covered

8

Confidential

by the Agreement, each business day (Monday through Friday).   At the end of each calendar month during the term hereof, Arc shall provide to GCAC a report, summarizing for such month, receipts and deliveries of GCAC's Product, into and out of storage, the beginning storage inventory, the ending inventory, and any gain or loss of actual physical inventory over computed inventory.   Arc shall furnish its standard Bills of Lading, forms, etc. Arc shall not be obligated to perform any additional administrative duties other than those set forth in this Section, unless GCAC and Arc agree, in writing, to such additional duties and compensation, if any, for their performance.

8.   VESSEL RELATED COSTS NOT PART OF TERMINAL SERVICES.  Arc shall not be responsible for charges, fees and costs for the services of or relating to any steamship agency, booming charges, assist tugs, line-handlers, pilotage, U.S. customs charges, lay time, demurrage, taxes and other costs relating to Vessels berthing at the Pier Facilities with Product for GCAC, unless to the extent such charges, fees or costs directly result from the negligence or willful misconduct of Arc or any of its employees, agents or contractors or a failure of Arc's equipment, or a breach by Arc of any term in this Agreement.

9.   TERMINAL ACCESS.  When accessing the Terminal under this Agreement, GCAC and its employees and agents, and common carriers shall comply with all operating and safety procedures of the Terminal and GCAC will request that its common carriers do the same. GCAC shall request that its agents and common carriers execute and deliver to Arc such agreements as Arc may require from time to time in connection with GCAC's access to the Terminal, including, but not limited to a Terminal Access Agreement. GCAC's on-site handling Personnel will be required to possess a Transportation Worker Identification Credential (TWIC) and keep in their possession at all times in order to gain access to the Terminal. However, if they do not possess a TWIC, the Customer will provide the necessary personnel with TWIC to be responsible for escorting these common carriers in and out of the Terminal at the Terminal Manager's defined escort ratio.

10.  PRIORITIES AND VACATING BERTH. GCAC understands that the Terminal berthing facilities are utilized by several different shippers and Arc will berth Vessels on a first-come, first served basis.  Arc will not be responsible for demurrage charges if any Vessel is unable to enter the berth because of the presence of another vessel which has not exceeded that vessel's scheduled laytime.   The Parties agree to provide reasonable cooperation to each other on a continuing basis in order to accommodate each other's needs as to berthing. GCAC will give Arc the earliest reasonable notice as to the expected Vessel arrival times and will update that notice at reasonable times (not less frequently than seventy-two (72) hours forty-eight (48) hours and twenty-four (24) hours before arrival) as the Vessel arrival time draws near. When a Vessel's arrival is pending, Arc will keep GCAC informed as to the expected lay times and unloading to the extent reasonably possible. The laytime of GCAC's vessel will be calculated by dividing the Vessel's bill of lading weight by the Minimum Discharge Rate as set forth in **Exhibit A** attached hereto.  If the Vessel remains at the berth after its laytime expires due to cargo or Vessel problems, or any other problem not caused by Arc personnel, equipment or operation, and another ship is waiting to berth, GCAC shall either (1) vacate the berth immediately and allow the waiting vessel to discharge its cargo, or (2) reimburse Arc for any waiting ship demurrage which Arc incurs and documents, and which is attributable to GCAC's failure to vacate the berth. All costs associated with the shifting of Vessels shall be borne by GCAC, unless such costs are directly caused by the negligence or willful misconduct of Arc or any of its employees, agents or contractors, a failure of Arc's equipment, or a breach by Arc of any term in this

9

Confidential

Agreement, in which cases Arc will be responsible for such costs. Upon completion of the discharge of a Vessel, the Vessel will vacate the berth forthwith if another vessel is scheduled or waiting to utilize the berth. If said Vessel fails to vacate the berth and Arc incurs demurrage charges from such other waiting or scheduled vessel, GCAC will pay Arc for such documented charges. If any such Vessel remains at the berth after laytime expires because of Arc's failure to properly render terminal services or other problems attributable to Arc's personnel, equipment or operation, GCAC shall not be liable for any such demurrage or Vessel shifting costs.

11. AUDITING AND INSPECTION. GCAC, at its expense, shall have the right during the term of the Agreement: a) to make periodic operational inspections of the Facilities, b) to conduct audits of any pertinent records including those that substantiate Arc's charges to GCAC and those records which are the basis for periodic escalation of the various charges to GCAC, and c) to conduct physical verifications of the amount of Product stored in the Facilities; provided all such inspections shall be made during Arc's normal working hours and after reasonable notice to Arc such that performance of said inspections will not unreasonably disrupt Arc's operations.

12. CLEANING OF FACILITIES. The Agreement covers segregated tankage and as such at the end of this Agreement, Arc will retain the services of a tank cleaning contractors to clean each of the segregated tank and associated piping at actual cost. Arc shall bill GCAC for this service once it has been completed unless otherwise agreed.

13. WEATHER RESTRICTIONS. At the sole option of Arc, Arc may decline to provide services or may provide limited services or restrict Customer's operations at Terminal related to Product during periods of inclement weather when a serious risk to health or safety is present. Such periods of work stoppage or slowdown due to inclement weather are hereby agreed to be causes beyond Arc's control for purposes of Section 20 of these Terms and Conditions, relating to a Force Majeure Circumstance.

14. RESPONSIBILITY FOR LOSS, DAMAGE OR CONTAMINATION. Arc shall not be responsible for any type of loss of or damage (including contamination) to the Product while it is in Arc's custody except when loss or damage is caused by Arc's failure to use reasonable care in receiving, handling, storing, and/or delivering such Product. Arc shall not in any event be liable for more than the actual cost of the Product for any contamination or loss of Product, nor for special or consequential damages arising out of any contamination or loss of Product no matter how such contamination, damages or loss shall have occurred or been caused. Actual costs shall be based on Platt's Gulf Coast Mean average price (the month the Product Loss occurred). At Arc's option, Arc will either (1) replace product of like kind and quality at some agreed location or (2) restore Product to receipt quality. Any salvage or residual value received or credited for the lost or damaged Product Arc revert to or be credited to Arc in the event that Arc replaces any portion or all of the lost or damaged product. Adjustments for evaporation and handling losses shall be made annually on the anniversary of the Agreement or at the termination of the Agreement, if such termination occurs prior to the anniversary. Such adjustments will be based on the net loss determined by monthly loss and gain calculations experienced during the period. Adjustments for other loss, contamination, or damage shall be made upon discovery thereof. In the event Arc is responsible hereunder for either ordinary evaporation or

10

Confidential

handling losses to the Product, Arc and Direct agree that Arc's responsibility for said Product shall be that specified in the Agreement.

15.  INSURANCE.

A.  GCAC Insurance Requirements: At all times and at GCAC's sole cost, GCAC shall maintain with insurance companies with a minimum rating by A.M. Best Company of A- or equivalent the following minimum types and limits of insurance in compliance with all applicable laws and satisfactory to Arc:

   (a) Workers Compensation Insurance and/or Longshoremen's and Harborworkers' Compensation Insurance with statutory limits, and Employer's Liability Insurance with limits of not less than USD $5,000,000 each occurrence, both coverages to be endorsed as required under any state or federal statute or through any common law process;

   (b) Commercial General Liability Insurance (including, but not limited to, contractual liability and products liability) with combined bodily/personal injury and property damage limits of not less than USD $5,000,000 each occurrence;

Whenever requested, GCAC shall furnish evidence satisfactory to Arc that such insurances are in effect. To the maximum extent permitted by applicable law, all insurance policies maintained by GCAC in accordance with this Article and any other insurance maintained applicable to GCAC's performance hereunder shall, to the extent of the liabilities assumed under this Agreement, provide a waiver of subrogation in favor of Arc, its parent, subsidiaries, affiliates and coventurers and any of its agents, directors, officers and employees and include Arc, its parent, subsidiaries, affiliates and coventurers and any of its agents, directors, officers and employees as additional insureds without limitation and on all policies, except for Workers Compensation.

To the extent of the liabilities assumed under this Agreement, any such insurance shall be regarded as primary insurance underlying any other insurance available to Arc. These insurance requirements shall not be limited by the liability and indemnity provisions contained in this Agreement. Insurance policies shall give Arc thirty (30) days written notice of cancellation or material change and any deductible or retention of insurable risks shall be for GCAC's account.

If it is judicially determined that any of the insurance obligations under this Agreement are unenforceable in any respect under applicable law, said obligations shall automatically be amended to conform to the maximum limits and other provisions in the applicable law for so long as the law is in effect.

B.  ARC Insurance Requirements:

Arc will each procure and maintain, at its sole expense, policies of insurance with the minimum amounts outlined below or such other coverages and amounts as are acceptable to GCAC. Evidence of such insurance must be provided in the form of an Accord Certificate of Insurance or such other form as may be reasonably acceptable to both Parties. All insurance companies must have a financial rating from A.M. Best & Company of A IX or better. In all insurance carried by the Arc, to the extent of the liabilities assumed by the Arc under this Agreement, Arc shall cause (i) all deductibles to be for its own account, (ii) the

11

Confidential

insurer to waive all rights of subrogation in favor of GCAC, (iii) (except on workers' compensation policies) GCAC to be listed as additional insured, and (iv) such policy to be primary as to any existing valid and collectible insurance of GCAC.

1) COMMERCIAL GENERAL LIABILITY

- Limit per Occurrence     $1,000,000.
(Bodily Injury & Property Damage Combined Single Limit)
- General Aggregate     $2,000,000.
- Products & Completed Operations Aggregate     $1,000,000.
- Personal & Advertising Injury     $1,000,000.

Policy extensions and/or modifications

a) Occurrence Insuring Agreement
b) Sudden & Accidental Pollution (as per standard Insuring Agreement) arising out of Products and Completed Operations
c) Broad Form Property Damage coverage
d) Full Contractual Liability coverage
e) No exclusions as respects X, C or U (Explosion, Collapse and Underground).
f) No limitation as respects policy territory
(included in CGL)

2) AUTOMOBILE LIABILITY

- Limit per Accident     $1,000,000.
(Bodily Injury & Property Damage Combined Single Limit)

Policy Extensions and/or Modifications

a) Coverage for all Owned, Hired and Non-Owned Vehicles.

3) WORKER'S COMPENSATION

- Worker's Compensation     Statutory State of Hire Benefits
- Employer's Liability     $1,000,000 Each Accident
    $1,000,000 Disease-Each Employee
    $1,000,000 Disease-Policy Limit

Policy Extensions and/or Modifications

a) Including United States Longshoremen and Harbor Workers Act
b) Maritime Employers Liability Endorsement to include coverage under the Jones Act including Transportation Wages, Maintenance and Cure, Death on the High Seas Act and "In Rem" Endorsement
c) Voluntary Compensation Endorsement
d) Alternate Employer Endorsement
e) Insurance must be in accordance with the Alabama Workers' Compensation Act and provided by an Admitted Carrier. No alternative programs will be acceptable.

12

**Confidential**

4) UMBRELLA / EXCESS LIABILITY

- Limit per Occurrence          $5,000,000.
(Bodily Injury & Property Damage Combined Single Limit)
- Annual Aggregate          $5,000,000.

Policy Extensions and/or Modifications

    a) Occurrence Insuring Agreement
    b) Sudden & Accidental Pollution (as per standard Insuring Agreement) arising out of Products and Completed Operations
    c) Broad Form Property Damage coverage
    d) Full Contractual Liability coverage
    e) No exclusions as respects X, C or U (Explosion, Collapse and Underground).

5) MARINE TERMINAL OPERATORS LIABILITY

- Limit per Occurrence          $1,000,000
- Annual Aggregate          $1,000,000

    Policy Extensions and/or Modifications

    a) Including American Institute Wharfingers Liability Wording (Customer only)
    b) Including American Institute Stevedores Liability Wording
    c) Seepage and Pollution as per 7/90 day buy back wording

6) POLLUTION LEGAL LIABILITY

- Limit per Occurrence          $5,000,000
- Annual Aggregate          $5,000,000

The limits required herein may be obtained with the use of more than policy of insurance.

Policy Extensions and/or Modifications

    a) Applicable to bodily injury, property damage, including loss of use of damaged property or loss of property that has not been physically injured or destroyed
    b) Including cleanup costs and defense, including costs and expenses incurred in the investigation, defense or settlement of claims
    c) Coverage to apply to sudden and non-sudden pollution conditions resulting from the escape or release of smoke, vapors, fumes, acids, alkalis, toxic chemicals, liquids, gases, waste materials, or other irritants, contaminants or pollutants

7)      It is expressly understood that the insurance provisions of this Section 15(B), including the minimum required limits outlined above are intended to assure that certain minimum standards of insurance protection are afforded by Arc

13

Confidential

and the specifications in this Agreement of any amount will be construed to support but not in any way limit the amount or scope of liabilities and indemnity obligations (express or implied) of Arc. The minimum limits required in this Agreement for any particular type of insurance may be satisfied by a combination of the specific type of insurance and umbrella or excess liability insurance. Arc shall be responsible for all deductibles for all insurance maintained by Arc.

8) Failure to Secure. Subject to Section 15(B), failure to secure the insurance coverage, or failure to comply fully with any of the insurance provisions of this Agreement, or the failure to secure such endorsements on the policies as may be necessary to carry out the terms and conditions of this Agreement, will in no way relieve Arc from the obligations of this Agreement.

16. INDEMNIFICATION. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS SPECIFIED OTHERWISE ELSEWHERE IN THE AGREEMENT:

GCAC SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS ARC, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES AND THEIR DIRECTORS, EMPLOYEES AND AGENTS FOR AND AGAINST ANY LOSS, DAMAGE, CLAIM, SUIT, LIABILITY, FINE, PENALTY, JUDGMENT AND/OR EXPENSE (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF LITIGATION) (COLLECTIVELY "LIABILITY(IES)"), (A) ARISING FROM (I) INJURY, DISEASE OR DEATH OF ANY PERSONS, (II) DAMAGE TO OR LOSS OF ANY PROPERTY, OR (III) DISCHARGES OR SPILLS OR LEAKS OF PRODUCT, CAUSED BY OR RESULTING FROM THE NEGLIGENT ACTS OR OMISSIONS OR WILLFUL MISCONDUCT OF GCAC, IN GCAC'S PERFORMANCE OF THIS AGREEMENT OR (B) ARISING OUT OF GCAC'S FAILURE TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE, OR LOCAL GOVERNMENTAL LAWS, REGULATIONS, AND RULES.

ARC SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS GCAC, ITS MEMBERS, SUBSIDIARIES, AFFILIATES AND JOINT VENTURE PARTNERS AND THEIR DIRECTORS, EMPLOYEES AND AGENTS FOR AND AGAINST ANY LIABILITIES, (A) ARISING FROM (I) INJURY, DISEASE OR DEATH OF ANY PERSONS, (II) DAMAGE TO OR LOSS OF ANY PROPERTY (INCLUDING, BUT NOT LIMITED TO GCAC'S FACILITIES), OR (III) DISCHARGES OR SPILLS OR LEAKS OF PRODUCT, CAUSED BY OR RESULTING FROM THE NEGLIGENT ACTS OR OMISSIONS OR WILLFUL MISCONDUCT OF ARC, ITS EMPLOYEES, AGENTS, OR CONTRACTORS, IN THE PERFORMANCE OF THIS AGREEMENT OR (B) ARISING OUT OF ARC'S, ITS AGENTS', OR CONTRACTORS' FAILURE TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE, OR LOCAL GOVERNMENTAL LAWS, REGULATIONS, AND RULES.

IN THE EVENT ARC AND GCAC ARE JOINTLY RESPONSIBLE FOR ANY LIABILITY(IES), THEN THE PARTIES SHALL JOINTLY SHARE RESPONSIBILITY AND INDEMNIFY EACH OTHER FOR THE LIABILITY(IES) IN PROPORTION TO EACH PARTY'S CONTRIBUTION TO THE INJURY, DISEASE, OR DEATH OF ANY PERSONS, DAMAGE TO OR LOSS OF PROPERTY, OR DISCHARGE, LEAK, OR SPILL OF PRODUCT.

Confidential

GCAC 000048
001880

IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE LOSS, DAMAGE, OR EXPENSES (INCLUDING LOST PROFITS OR SAVINGS) EVEN IF IT HAS BEEN A DVISED OF THEIR POSSIBLE EXISTENCE.

GCAC OR ARC, AS SOON AS PRACTICABLE AFTER RECEIVING NOTICE OF ANY SUIT BROUGHT AGAINST IT WITHIN THIS INDEMNITY, SHALL FURNISH TO THE OTHER FULL PARTICULARS WITHIN ITS KNOWLEDGE THEREOF AND SHALL RENDER ALL REASONABLE ASSISTANCE REQUESTED BY THE OTHER IN THE DEFENSE. EACH SHALL HAVE THE RIGHT, BUT NOT THE DUTY TO PARTICIPATE, AT ITS OWN EXPENSE, WITH COUNSEL OF ITS OWN SELECTION, IN THE DEFENSE AND/OR SETTLEMENT THEREOF WITHOUT RELIEVING THE OTHER OF ANY OBLIGATIONS HEREUNDER. THE PARTIES' OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE ANY TERMINATION OF THE AGREEMENT.

17. DEMURRAGE ON MARINE AND TRUCK EQUIPMENT. Arc does not assume liability for any demurrage on truck or marine equipment which occurs as a result of Arc's operations, unless such demurrage is caused by Arc's failure to use reasonable operating practices.

18. TITLE AND CUSTODY. Title to the Product stored and/or handled hereunder shall always remain with GCAC. Arc shall be deemed to have custody of and responsibility for the Product starting from the time during receipt when it passes (a) the flange connection of the vessel's delivery line, (b) the flange of the receipt line at Arc's Facility on pipeline receipts, or (c) the tank truck's/railcar's delivery connection, and ending during delivery when the Product passes the flange connection between Arc's delivery line and the vessel's receiving line, or the pipeline's receiving connections, or the railcar's and/or tank truck's receiving equipment.

19. TAXES. Any taxes applicable to the ownership, transportation, or storage of Product, which is the subject of this Agreement, or the services provided by Arc hereunder, shall be borne and paid for by GCAC, except to the extent any such taxes are, by law, required to be paid directly by Arc, in which event, such taxes shall be paid by Arc and reimbursed by GCAC upon receipt of invoice and supporting documentation reasonably requested by GCAC for same. GCAC will furnish the requisite documentation if entitled to an exemption from such taxes.  In addition, GCAC and Arc agree to cooperate with each other in defending the non-taxability of or rate applied to the Product or services pursuant to this Agreement in the event that either party is audited by or on behalf of a taxing jurisdiction, including, but not limited to producing existing documentation, generating new reports from existing electronic reporting systems and making employees available at no cost, other than reasonable out-of-pocket expenses, to the other party. Both parties further agree, in furtherance of this cooperation agreement, to retain applicable records for a period of not less than the applicable statute of limitations, including any waivers thereof, executed by either party for any taxes  collected by or reimbursed to that party.  A party shall not be liable to the other party for any taxes that are statutorily imposed on the first party that are measured by or imposed upon net income, capital, or property, including without limitation, income, capital, franchise, and margin based taxes and taxes measured by the value of owned or leased real, tangible or intangible property.  A party shall not be liable to the other party for business license taxes on particular occupations.

15

Confidential

20. FORCE MAJEURE. Either party hereto shall be released from liability hereunder for failure to perform any of the obligations herein imposed for the time and to the extent such failure is occasioned by acts of God, federal, state, county or municipal order, rule, legislation or regulation, or by war, acts of the public enemies, strikes, lockouts or other labor disturbances, riots, explosions, fire, floods, hurricanes, destruction from any involuntary cause of the Facility herein involved, or any cause or causes of any kind or character (except financial) reasonably beyond the control of the party failing to perform. In the event GCAC is prevented from performing hereunder by force majeure and the Facility continue to be operational, GCAC may notify Arc in writing of the period of time during which GCAC's performance is expected to be so prevented and Arc upon being so notified, shall use all reasonable efforts to utilize the Facility in other service.

21. DEFAULT. A material breach of any of the terms and conditions of the Agreement by either party shall constitute a default hereunder. Upon default, the non-defaulting party shall, within thirty (30) days of knowledge thereof, notify, in writing, the defaulting party of the particulars of such default and the defaulting party shall have thirty (30) days after receipt of such notice to cure such default. Upon the defaulting party's failure to cure the default within the thirty (30) day grace period, any and all obligations, including payments of fees due hereunder, shall, at the option of the non-defaulting party, become immediately due and payable. In the event of default and defaulting party's failure to cure during the cure period, the non-defaulting party shall also have the option to terminate the Agreement upon written notice to the defaulting party. The waiver by the non-defaulting party of any right hereunder shall not operate to waive any other such right nor operate as waiver of that right at any future date upon another default by either party hereunder.

22. SECURITY INTEREST. GCAC hereby grants unto Arc a general statutory warehouseman's lien against any and all of GCAC's Products in Arc's possession pursuant to this Agreement for any amounts past due and owing by GCAC hereunder after giving effect to any applicable cure periods, regardless of whether such amounts are owed for the Products then in the Facilities.

Without prejudice to any other remedies that Arc may have at law, in equity and/or pursuant to the terms and provisions hereof, Arc may enforce the warehouseman's lien granted herein by public or private sale of any or all of GCAC's Products remaining in Arc's possession at any time or place and on any commercially reasonable terms within thirty (30) or more Business Days after delivery to GCAC's of a written notice. The proceeds of any such sale may be applied to Arc's reasonable attorney's fees and expenses incurred in disposing of collateral and/or amounts due and owing by GCAC to Company.
Arc specifically reserves the right to refuse to deliver Products held by GCAC at any time that there remains any amounts due and owing by GCAC to Arc according to the terms hereof.

23. ARBITRATION. Any controversy or claim ("claim"), whether based on contract, tort, statute or other legal or equitable theory (including but not limited to any claim of fraud, misrepresentation or fraudulent inducement or any question of validity or effect of this Agreement including this clause) arising out of or related to the Agreement (including any amendments or extensions), or the breach or termination thereof shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), and this provision. The arbitration shall be governed by the United

16

Confidential

States Arbitration Act, 9 U.S.C. §§ 1-16 to the exclusion of any provision of state law inconsistent therewith or which would produce a different result, and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction.

The arbitration shall be held in Houston, Texas.

There shall be one arbitrator.

The arbitrator shall determine the claims of the Parties and render a final award in accordance with the substantive law of the State of Texas, excluding the conflicts provisions of such law. The arbitrator shall set forth the reasons for the award in writing.

Any claim by either Party shall be time-barred if the asserting Party commences arbitration with respect to such claim later than two (2) years after the cause of action accrues. All statutes of limitations and defenses based upon passage of time applicable to any claim of a defending Party (including any counterclaim or setoff) shall be tolled while the arbitration is pending.

The Parties shall use their best efforts to cause the obligation to arbitrate any claim to extend to any officer, director, employee, shareholder, agent, trustee, affiliate, or subsidiary. The terms hereof shall not limit any obligations of a Party to defend, indemnify or hold harmless another party against court proceedings or other claims, losses, damages or expenses.

The arbitrator shall order the Parties to promptly exchange copies of all exhibits and witness lists, and, if requested by a Party, to produce other relevant documents, to answer up to ten (10) interrogatories (including subparts), to respond to up to ten (10) requests for admissions (which shall be deemed admitted if not denied) and to produce for deposition and, if requested, at the hearing all witnesses that such Party has listed and up to four other persons within such party's control. Any additional discovery shall only occur by agreement of the parties or as ordered by the arbitrator upon a finding of good cause.

Each Party shall bear its own costs, expenses and attorney's fees; provided that if court proceedings to stay litigation or compel arbitration are necessary, the Party who unsuccessfully opposes such proceedings shall pay all reasonable associated costs, expenses, and attorney's fees in connection with such court proceeding.

In order to prevent irreparable harm, the arbitrator shall have the power to grant temporary or permanent injunctive or other equitable relief. Prior to the appointment of an arbitrator a Party may, notwithstanding any other provision of this agreement, seek temporary injunctive relief from any court of competent jurisdiction; provided that the Party seeking such relief shall (if arbitration has not already been commenced) simultaneously commence arbitration. Such court ordered relief shall not continue more than ten (10) days after the appointment of the arbitrator (or in any event for longer than sixty (60) days).

If any part of this arbitration provision is held to be unenforceable, it shall be severed and shall not affect either the duty to arbitrate or any other part of this provision.

24. ASSIGNABILITY/SUBLEASING. Arc may assign or transfer its interest to this Agreement at any time. The Agreement shall not be assigned to another party, in whole or in part, by GCAC without the prior written consent by Arc, which shall not be unreasonably withheld, conditioned or delayed but if so assigned, shall be binding upon and shall inure to the

17

**Confidential**

benefit of the successors of the respective parties hereto; provided, however, GCAC may assign or transfer Its interest in this Agreement to an affiliate without prior written consent. It is provided that no assignment by assignor shall relieve assignor of its liability under the terms of this Agreement for any breaches thereof by its assignee.

Notwithstanding anything to the contrary in this Agreement, GCAC shall have the right to sublease the Tanks to another party under the following conditions:
i. Short Term Sublease: at any time for non-consecutive ninety (90) day periods without the prior consent of Arc; and
ii. Long Term Sublease: GCAC shall have the right to sublease the Tanks for periods longer than ninety (90) only upon the prior written consent of Arc, which shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding anything to the contrary, any sublease by GCAC intended to finance GCAC's inventory or directly related to GCAC's trading business is reasonable and Arc's withholding of such consent would unreasonable. Also, for greater clarity, Arc may withhold such consent if such assignment would breach the Non-Competition Agreement dated February 8, 2013.

25. MODIFICATION. The Agreement shall not be modified or changed except by written instrument executed by the duly authorized manager or officer of the parties hereto.

26. NOTICES. Any notice required or permitted hereunder by one party to the other shall be in writing and the same shall be given and shall be deemed to be served and given if (1) delivered in person to the address set forth in the Agreement for the party to whom the notice is given, or (2) if placed in the United States mail, postage prepaid, addressed to the party at the address set forth in the Agreement, or (3) sent by facsimile with receipt acknowledged. The addresses for Arc and GCAC shall be as specified in the Agreement. From time to time, either party may designate another address for the purpose of the Agreement by giving to the other party notice of such change of address, which shall be effective fifteen (15) days after the giving of such notice.

27. INDEPENDENT CONTRACTOR. In performing services pursuant to the Agreement, Arc is acting solely as an independent contractor maintaining complete control over its employees and operations. Neither GCAC nor Arc is authorized to take any action in any way whatsoever for or on behalf of the other, except as may be necessary to prevent injury to persons or property, or, in accordance with Section 29 of the Agreement, to contain, reduce or clean up any spills that may occur.

28. PLANT OPERATING REQUIREMENTS. GCAC, its employees, agents, or contractors will adhere to all Arc Plant Operating Procedures for GCAC pickup, minimum quantities, and split loading of products. All transport equipment tendered to the Facility for (un)loading shall be in a safe, serviceable condition and meet Department of Transportation, state, and local authority regulations and standards. In addition, all transport equipment must be compatible with (un)loading equipment at the Facility. Arc reserves the right to refuse loading privileges to individuals that are not properly trained or certified by Arc's local management or are perceived to be unsafe operators.

29. SPILLS/ENVIRONMENTAL POLLUTION. In the event of any Product spill or discharge or other environmental pollution caused by or in connection with GCAC's delivery or Arc's receiving operations, Arc may commence containment or clean-up operations as deemed appropriate or necessary by Arc or required by any governmental authorities and shall

18

Confidential

notify GCAC immediately of such operations. All liability and reasonable costs of containment and clean-up for such spill or discharge shall be borne by Arc; except that, in the event a spill or discharge is the result of joint negligence by both parties, liability and costs of containment and clean-up shall be borne jointly by GCAC and Arc in proportion to each party's negligence. In the event a third party is legally liable for costs and expenses borne by GCAC under this Section, they shall cooperate with each other for the purpose of obtaining reimbursement.

30. GOVERNING LAW. This Agreement, and any disputes arising hereunder, shall be governed by the laws of the State of Texas, without giving effect to any law which would defer to the laws of another state, and shall be subject to proper venue in any court in Harris County, Texas having jurisdiction.

31. MISCELLANEOUS. If any section or provision of the Agreement or any exhibit or rider hereto shall be determined to be invalid by applicable law, then for such period that the same is invalid, it shall be deemed to be deleted from the Agreement and the remaining portions of the Agreement shall remain in full force and effect.

The failure of a party hereunder to assert a right or enforce an obligation of the other party shall not be deemed a waiver of such right or obligation.

The Agreement constitutes the entire agreement of the parties regarding the matters contemplated herein or related thereto, and no representations or warranties shall be implied or provisions added hereto in the absence of a written agreement to such effect between the parties hereafter. In the event of any ambiguity between the Agreement and the Additional Terms and Conditions, the Agreement shall control.

**End of Other Provisions**

**Confidential**

**GCAC 000053**
001885

Exhibit A
To
Agreement

## TERMINAL DESCRIPTION,

## and VESSEL SPECIFICATIONS

**Terminal:**   Mobile Terminal

**Address:**   835 Cochrane Causeway
Mobile, AL 36610

**Phone:**   251-432-7666

**Manager:**   Kenny McBride, Terminal Manager

**E-mail:**   kmcbride@arcterminals.com

**Hours:** Vessels – 24 hours/day, 365 days/year, except Holidays

**Vessel Specifications:**

Maximum Length:   750 feet

Maximum Beam:   120 feet

Maximum Draft:   38 feet

Minimum Discharge Rate:   2,500 bbls/hour

**Additional Information:**
Holidays include New Year's Day, Memorial Day,
Independence Day, Labor Day, Thanksgiving Day,
Christmas Eve Day and Christmas Day

20

**Confidential**

GCAC 000054
001886

Exhibit C
To
Agreement

# SCHEDULE OF TESTING CAPABILITIES AND FEES

| ASTM / AASHTO METHODS | TEST METHOD | UNIT PRICE |
|---|---|---|
| | D402/ | |
| Ductillity | T78 | $195 |
| COC Flash Point | D92/T48 | $115 |
| COC Smoke Point | State Method | $75 |
| Penetration | D5/T49 | $145 |
| API by Pycnometer | D70/T228 | $115 |
| Softening Point | D36/T53 | $125 |
| Viscosity Absolute | D2171/T202 | $165 |
| Viscosity Kinematic | D2170/T201 | $150 |
| Saybolt Viscosity | T72 | $115 |
| Tag Open Cup | | |
| Flash | T79 | $115 |
| Elastic Recovery | T301 | $195 |

**Preformance Grading**

| | | |
|---|---|---|
| Grade Verification | M320 | $1,350 |
| Bending Beam | T313 | $215 |
| Dynamic Shear | T315 | $215 |
| Pressure Aging | R28 | $375 |
| Rolling Thin Film | D2872/T240 | $140 |
| Brookfield Viscosity | D4402/T316 | $140 |

Blends will be done at $100/hour and normal testing rates will apply on blended material

Confidential

GCAC 000055
001887



<u>TERMINALLING AGREEMENT – 150K BBLS</u>

THIS TERMINALLING AGREEMENT – 150K (the "Agreement"), made this 8th day of February, 2013, by Gulf Coast Asphalt Company having an office at 11 Greenway Plaza, Suite 2950 Houston, Texas 77046 hereinafter to be referred to as "GCAC" and Arc Terminals Holdings LLC, a Delaware corporation having an office at 3000 Research Forest Drive The Woodlands, Texas 77381, hereinafter to be referred to as "Arc," covers terminalling of the products described below under the following terms and conditions, effective as of February 8, 2013 (Effective Date). Arc and GCAC may be referred to individually as "Party" or collectively as "Parties".

A) **ARC LOCATION:**

Arc's Facility Address:

Mobile Terminal
835 Cochrane Causeway
Mobile, AL 36610

B) **FACILITY SERVICES:**

1) Storage:

Arc will provide segregated tankage of 150,000 barrels of storage capacity constructed in accordance with API 650 Appendix M, steam coiled and insulated
Mobile Tank 6001 (60,000 barrels)
Mobile Tank 6002 (60,000 barrels)
Mobile Tank 3003 (30,000 barrels)
(all together "the Tanks") Tanks have not yet been constructed.

2) Products:

Petroleum based material suitable for the Tanks' specifications (no vapor controls required). Storage shall be limited to the capabilities identified below

| | | |
|---|---|---|
| Mobile Tank 6001 | insulated | 1.0 gravity |
| Mobile Tank 6002 | insulated | 1.0 gravity |
| Mobile Tank 3003 | insulated | 1.0 gravity |

3) Modes:

IN: Marine/In Tank Transfer
OUT: Marine/In Tank Transfer
Tanks will be a segregated system with access to the existing dock via a segregated pipeline.
See Exhibit A for Marine Capabilities (Upon mutual agreement, additional Modes can be added later by Addendum.)

1

**Confidential**

C) **CONSIDERATION:**

| | |
|---|---|
| 1) Contract Base Quantity: | $0.75 per barrel per month of storage for 150,000 barrels of storage space |
| 2) Excess Turn: | $0.75 per barrel for more than 150,000 barrels of outbound volumes/in-tank transfers during any calendar month period |
| 3) Heat/Electricity: | Actual cost without markup |
| 4) Scale Fee: | $15 per truck |
| 5) Mutually Agreed Upon Fees. | Actual cost without markup |
| 6) Facility Clean and Disposal: | The Tanks will be dedicated to GCAC and will be clean and empty upon the Effective Date of this Agreement.  Upon completion of this Agreement, GCAC shall have the right to sell its respective tank bottoms to a new/next customer of the Tanks, if so desired by that new customer.  If a new customer is not readily available to lease the Tanks upon completion of this Agreement or that new customer is not interested in purchasing GCAC tank bottoms, GCAC shall be responsible to return the Tanks to the same condition as the Effective Date of this Agreement |

Upon mutual agreement, other services can be added later by Addendum.

D) **PRODUCT TESTING:**

GCAC will be responsible for testing and determining the Product quality delivered to Arc. However, Arc has the right to require GCAC to provide a Certificate of Analysis or MSDS of Product prior to accepting it into the terminal.  Arc has the right to deny any shipment, if Product is not suitable for storage in the Tanks. GCAC shall have the right to sample Product in storage to satisfy itself that the minimum Product specifications are maintained. The cost of such sampling and testing shall be borne by GCAC and shall be charged in accordance with the attached Exhibit C.

E) **METHOD OF HANDLING LOSSES:**

If receipt and storage of GCAC's Product into Arc's receiving Facility results in handling losses, the handling and accountability of such will be as follows: (1) GCAC will absorb ordinary evaporation and handling losses up to one half (1/2) of one (1) percent of monthly throughput of Product, and (2) Arc shall be responsible for all ordinary evaporation and handling in excess of one half (1/2) of one (1) percent of monthly throughput of Product.

2

**Confidential**

F)  **TERM OF THE AGREEMENT:**

This Agreement will be in effect for a term from the Effective Date until June 30, 2017 (the "Initial Term").  This Agreement may only be extended upon mutual written agreement between the Parties, which shall be agreed upon or negotiated 180 days before the termination date

G)  **ESCALATOR:**

The Monthly Base Rate set forth herein shall be fixed for the entire term of the Agreement. There shall be no inflation adjustment or rate adjustment mechanism during the effectiveness of this Agreement.  Provided however, the Parties shall negotiate a new Monthly Base Rate upon completion of the Initial Term.

H)  **NOTICE ADDRESSES:**

Arc:
    3000 Research Forest Drive
    Suite 250
    The Woodlands, TX 77381
    Attn: Kenny McBride

GCAC:
    11 Greenway Plaza, Suite 2950
    Houston, TX 77046
    Attn:  Vice President and General Counsel

I)  **OPERATIONAL CONTACTS:**

GCAC:

| | | |
|---|---|---|
| Scheduling: | Kenny Hucker | Phone:  (832) 426-3310 |
| Operations: | AJ Brass | Phone:  (832) 426-3310 |
| Invoicing: | Jason Goldstein | Phone:  (832) 426-3310 |

Arc:

| | | |
|---|---|---|
| Operations Manager: | John Blanchard | Phone: (281) 292-3008 |
| Terminal Manager | Kenny McBride | Phone: (251) 432-7666 |

J)  **OTHER PROVISIONS:**

1)  Prior to the movement of Product that requires heat, GCAC and Arc will agree upon a minimum operating temperature for Product movements.  If the Product temperature falls below that agreed upon temperature, Arc shall have the right to apply heat to the Product to meet and/or maintain the agreed upon minimum operating temperature that will allow for Arc to achieve a minimum pumping rate during Product movements. (referenced in Exhibit A)

2)  It is understood that Tanks 6001, 6002 and 3003 are currently not constructed at the Mobile Terminal and that the Effective Date included herein may change if the

3

**Confidential**

construction of the tankage has not been completed by the Effective Date. Regardless, the Effective Date shall be the earlier of August 15, 2013 or the date the Tank construction is completed (the "new Effective Date"). GCAC shall be notified 15 days prior to the new Effective Date that the Tanks are ready to be placed into service. If the Effective Date is not August 15, 2013, GCAC agrees that the Initial Term of the Agreement shall be from the new Effective Date until the fifth anniversary of the new Effective Date.

3) GCAC agrees to not hinder or delay the permitting or construction of the Tanks.

4) GCAC or its representative have right to come on site for the purpose of inspecting and sampling.

5) Inventory reports will be provided by ARC to GCAC each business day

6) Upon request by GCAC, ARC shall provide warehouse receipts in a form suitable to GCAC's lenders, if any, and ARC confirming GCAC's inventory.

The Additional Terms and Conditions attached are a part of this Agreement. All references herein to the Agreement shall include the Additional Terms and Conditions.

4

**Confidential**

Executed this _8th_ day of February 2013

GULF COAST ASPHALT COMPANY, L.L.C.

By: _____

Name: Arthur J. Brass
Title: President

[Signature Page to New Storage Agreement for 150K Barrels of Storage]

Confidential

ARC TERMINALS HOLDINGS LLC

By: _____
Name: John Blanchard
Title: President

[Signature Page to New Storage Agreement for 150K Barrels of Storage]

Confidential

## ADDITIONAL TERMS AND CONDITIONS

1.   FACILITIES.  Arc agrees to provide the facilities identified in the Agreement, hereinafter referred to as "Facility(ies)," for the storage and handling of GCAC's Product.

2.   TERMINALLING SERVICES.  When instructed by GCAC, Arc agrees to receive GCAC's Product into the Facilities, to store such Product, and to deliver same, all as specified in the Agreement.  The aggregate quantity of Product Arc agrees to receive shall be as specified in the Agreement and referred to as the "Contract Base Quantity."

3.   CHARGES AND PAYMENT.  Commencing with the Effective Date(s) specified in the Agreement, GCAC agrees to pay Arc the following charges as specified in the Agreement:
   a)  Contract Base Quantity Fee
   b)  Marine Delivery/Receipt Fee
   c)  Truck (Un)loading Fee
   d)  All other fees and charges as set forth in the Agreement and as may be agreed upon between GCAC and Arc from time to time during the term of the Agreement.

Arc shall deliver to Customer each calendar month of the Term an invoice for the all Fees, costs, expenses and other charges due from or assessable to Customer in accordance with the Fee Schedule in Section C of this Agreement.  Unless otherwise provided in said Fee Schedule, each such invoice shall be due and payable within fifteen (15) days of receipt thereof.  Any such invoice not paid in full as and when due shall be assessed interest payable by Customer at the rate of One and One-Half Percent (1.5%) thereof for each month (or portion thereof) said invoice remains unpaid.

4.   DETERMINATION OF QUANTITY AND QUALITY OF PRODUCT.  The quantity of the Product handled hereunder shall be determined by Arc, or at GCAC's option by a representative of GCAC, or at GCAC's option by an independent inspector mutually acceptable to both parties.  The charges for an independent inspector shall be paid by GCAC.

The quantity of Product handled hereunder shall be determined as follows:
   a)  The quantity of Product received from or delivered to a marine vessel shall be determined from Arc's shore tank gauge reading taken before and after loading Product into or out of Arc's shore tanks in accordance with applicable API standards. If receiving or delivering shore tank(s) is/are active, the vessel's ullage with application of the Vessel's Experience Factor shall be used to determine the quantity.

   b)  The quantity of Product received from or delivered to a tank truck shall be determined as follows:  Arc's loading meters, or in the case of meter failure or absence of meters, tank truck calibrations shall be used when the Product is loaded to the compartment measuring finger, alternatively, trucks shall be weighed in and out of the facility.  Arc shall maintain seals on its meters and shall test and calibrate its meters at maximum intervals of six (6) months, or more often as found necessary (or as required by federal, state or local authorities), in accordance with approved methods.

6

For the purpose of the Agreement, a barrel shall consist of forty-two (42) U.S. gallons and a gallon shall contain two hundred thirty-one (231) cubic inches when corrected to 60°F. All measurements shall be in accordance with API standards.

Arc shall not be responsible for determining the quality of GCAC's Product.

5. FACILITY HOURS OF OPERATION AND CAPABILITIES. The Facility will remain open ten (10) hours a day, five days a week for delivery of Product via Tank Truck and twenty-four (24) hours a day seven (7) days a week for the receipt and/or delivery of Product via marine and/or as specified in Exhibit A. Should services under this Agreement require overtime, charges will be as specified in the Agreement. Arc and GCAC agree to adhere to the provisions specified in Exhibit B (Marine Provisions).

6. COMPLIANCE WITH LAWS AND REGULATIONS. GCAC and Arc hereby agree to comply fully in the performance of the Agreement with all federal, state, and local governmental laws, regulations, and rules. In addition, the Parties agree to file all reports as may be required by state and local taxing jurisdictions.

Arc covenants, represents and warrants to GCAC that (i) it will provide a safe berth to Vessels and otherwise that the Terminal, including the Pier Facilities are in operating condition, are sufficient to secure and off load Vessels specific in Exhibit A containing Product, (ii) the Terminal, including the Pier Facilities are each, and during the Term will be operated and maintained in compliance with all Laws, including Environmental Laws; and (iii) that the maintenance and operation of the Terminal and all other services to be provided by Arc hereunder shall be performed at a minimum in accordance with the generally recognized industry standards for such services, and at all times in compliance with Arc's own operational, health, safety and environmental guidelines. GCAC represents and warrants to Arc that the Product will at all times comply with the specifications for Product set forth herein and will otherwise conform to all other generally recognized industry standards.

In the event, at any time after the date the Agreement is entered into, any governmental or regulatory body shall require the installation or modification of facilities or fixtures, or require changes in Arc's normal operating procedures related to the storage and handling of GCAC's Product, Arc shall notify GCAC of the necessity and cost of such installation of facilities or fixtures, or changes in operating procedures, and GCAC and Arc shall work, in good faith, to provide such installation of facilities or fixtures, or to make such necessary changes to Arc's operating procedures, and to adjust the compensation under the Agreement to reflect Arc's additional costs of compliance. In the event Arc or GCAC decides that such increase in costs or change in operating procedure is onerous or prohibitive, either party may, in its sole discretion, upon sixty (60) days written notice, cancel those portions of the Agreement which are affected. GCAC expressly relieves Arc of any and all obligations hereunder to provide facilities and/or services when such facilities and/or services are contrary to any law, regulation or ruling.

7. REPORTS. Arc agrees to provide daily electronic reports (a) summarizing receipts, deliveries and in-tank transfers of GCAC's Product, into and out of storage, including the quantities received and delivered, the date of each such transaction, and (b) of the actual inventory by product (side gauge) of GCAC's Product in each of the storage tanks covered

7

**Confidential**

by the Agreement, each business day (Monday through Friday). At the end of each calendar month during the term hereof, Arc shall provide to GCAC a report, summarizing for such month, receipts and deliveries of GCAC's Product, into and out of storage, the beginning storage inventory, the ending inventory, and any gain or loss of actual physical inventory over computed inventory. Arc shall furnish its standard Bills of Lading, forms, etc. Arc shall not be obligated to perform any additional administrative duties other than those set forth in this Section, unless GCAC and Arc agree, in writing, to such additional duties and compensation, if any, for their performance.

8. VESSEL RELATED COSTS NOT PART OF TERMINAL SERVICES. Arc shall not be responsible for charges, fees and costs for the services of or relating to any steamship agency, booming charges, assist tugs, line-handlers, pilotage, U.S. customs charges, lay time, demurrage, taxes and other costs relating to Vessels berthing at the Pier Facilities with Product for GCAC, unless to the extent such charges, fees or costs directly result from the negligence or willful misconduct of Arc or any of its employees, agents or contractors or a failure of Arc's equipment, or a breach by Arc of any term in this Agreement.

9. TERMINAL ACCESS. When accessing the Terminal under this Agreement, GCAC and its employees and agents, and common carriers shall comply with all operating and safety procedures of the Terminal and GCAC will request that its common carriers do the same. GCAC shall request that its agents and common carriers execute and deliver to Arc such agreements as Arc may require from time to time in connection with GCAC's access to the Terminal, including, but not limited to a Terminal Access Agreement. GCAC's on-site handling Personnel will be required to possess a Transportation Worker Identification Credential (TWIC) and keep in their possession at all times in order to gain access to the Terminal. However, if they do not possess a TWIC, the Customer will provide the necessary personnel with TWIC to be responsible for escorting these common carriers in and out of the Terminal at the Terminal Manager's defined escort ratio.

10. PRIORITIES AND VACATING BERTH. GCAC understands that the Terminal berthing facilities are utilized by several different shippers and Arc will berth Vessels on a first-come, first served basis. Arc will not be responsible for demurrage charges if any Vessel is unable to enter the berth because of the presence of another vessel which has not exceeded that vessel's scheduled laytime. The Parties agree to provide reasonable cooperation to each other on a continuing basis in order to accommodate each other's needs as to berthing. GCAC will give Arc the earliest reasonable notice as to the expected Vessel arrival times and will update that notice at reasonable times (not less frequently than seventy-two (72) hours forty-eight (48) hours and twenty-four (24) hours before arrival) as the Vessel arrival time draws near. When a Vessel's arrival is pending, Arc will keep GCAC informed as to the expected lay times and unloading to the extent reasonably possible. The laytime of GCAC's vessel will be calculated by dividing the Vessel's bill of lading weight by the Minimum Discharge Rate as set forth in Exhibit A attached hereto. If the Vessel remains at the berth after its laytime expires due to cargo or Vessel problems, or any other problem not caused by Arc personnel, equipment or operation, and another ship is waiting to berth, GCAC shall either (1) vacate the berth immediately and allow the waiting vessel to discharge its cargo, or (2) reimburse Arc for any waiting ship demurrage which Arc incurs and documents, and which is attributable to GCAC's failure to vacate the berth. All costs associated with the shifting of Vessels shall be borne by GCAC, unless such costs are directly caused by the negligence or willful

8

Confidential

misconduct of Arc or any of its employees, agents or contractors, a failure of Arc's equipment, or a breach by Arc of any term in this Agreement, in which cases Arc will be responsible for such costs. Upon completion of the discharge of a Vessel, the Vessel will vacate the berth forthwith if another vessel is scheduled or waiting to utilize the berth. If said Vessel fails to vacate the berth and Arc incurs demurrage charges from such other waiting or scheduled vessel, GCAC will pay Arc for such documented charges. If any such Vessel remains at the berth after laytime expires because of Arc's failure to properly render terminal services or other problems attributable to Arc's personnel, equipment or operation, GCAC shall not be liable for any such demurrage or Vessel shifting costs.

11. AUDITING AND INSPECTION. GCAC, at its expense, shall have the right during the term of the Agreement: a) to make periodic operational inspections of the Facilities, b) to conduct audits of any pertinent records including those that substantiate Arc's charges to GCAC and those records which are the basis for periodic escalation of the various charges to GCAC, and c) to conduct physical verifications of the amount of Product stored in the Facilities; provided all such inspections shall be made during Arc's normal working hours and after reasonable notice to Arc such that performance of said inspections will not unreasonably disrupt Arc's operations.

12. CLEANING OF FACILITIES. The Agreement covers segregated tankage and as such at the end of this Agreement, Arc will retain the services of a tank cleaning contractors to clean each of the segregated tank and associated piping at actual cost. Arc shall bill GCAC for this service once it has been completed unless otherwise agreed.

13. WEATHER RESTRICTIONS. At the sole option of Arc, Arc may decline to provide services or may provide limited services or restrict Customer's operations at Terminal related to Product during periods of inclement weather when a serious risk to health or safety is present. Such periods of work stoppage or slowdown due to inclement weather are hereby agreed to be causes beyond Arc's control for purposes of Section 20 of these Terms and Conditions, relating to a Force Majeure Circumstance.

14. RESPONSIBILITY FOR LOSS, DAMAGE OR CONTAMINATION. Arc shall not be responsible for any type of loss of or damage (including contamination) to the Product while it is in Arc's custody except when loss or damage is caused by Arc's failure to use reasonable care in receiving, handling, storing, and/or delivering such Product. Arc shall not in any event be liable for more than the actual cost of the Product for any contamination or loss of Product, nor for special or consequential damages arising out of any contamination or loss of Product no matter how such contamination, damages or loss shall have occurred or been caused. Actual costs shall be based on Platt's Gulf Coast Mean average price (the month the Product Loss occurred). At Arc's option, Arc will either (1) replace product of like kind and quality at some agreed location or (2) restore Product to receipt quality. Any salvage or residual value received or credited for the lost or damaged Product Arc revert to or be credited to Arc in the event that Arc replaces any portion or all of the lost or damaged product. Adjustments for evaporation and handling losses shall be made annually on the anniversary of the Agreement or at the termination of the Agreement, if such termination occurs prior to the anniversary. Such adjustments will be based on the net loss determined by monthly loss and gain calculations experienced during the period. Adjustments for other loss, contamination, or damage shall be made upon discovery thereof. In the event Arc is responsible hereunder for either

9

GCAC 000065
001897

ordinary evaporation or handling losses to the Product, Arc and Direct agree that Arc's responsibility for said Product shall be that specified in the Agreement.

15. <u>INSURANCE</u>.

A. GCAC Insurance Requirements: At all times and at GCAC's sole cost, GCAC shall maintain with insurance companies with a minimum rating by A.M. Best Company of A- or equivalent the following minimum types and limits of insurance in compliance with all applicable laws and satisfactory to Arc:

   (a) Workers Compensation Insurance and/or Longshoremen's and Harborworkers' Compensation Insurance with statutory limits, and Employer's Liability Insurance with limits of not less than USD $5,000,000 each occurrence, both coverages to be endorsed as required under any state or federal statute or through any common law process;

   (b) Commercial General Liability Insurance (including, but not limited to, contractual liability and products liability) with combined bodily/personal injury and property damage limits of not less than USD $5,000,000 each occurrence;

Whenever requested, GCAC shall furnish evidence satisfactory to Arc that such insurances are in effect. To the maximum extent permitted by applicable law, all insurance policies maintained by GCAC in accordance with this Article and any other insurance maintained applicable to GCAC's performance hereunder shall, to the extent of the liabilities assumed under this Agreement, provide a waiver of subrogation in favor of Arc, its parent, subsidiaries, affiliates and coventurers and any of its agents, directors, officers and employees and include Arc, its parent, subsidiaries, affiliates and coventurers and any of its agents, directors, officers and employees as additional insureds without limitation and on all policies, except for Workers Compensation.

To the extent of the liabilities assumed under this Agreement, any such insurance shall be regarded as primary insurance underlying any other insurance available to Arc. These insurance requirements shall not be limited by the liability and indemnity provisions contained in this Agreement. Insurance policies shall give Arc thirty (30) days written notice of cancellation or material change and any deductible or retention of insurable risks shall be for GCAC's account.

If it is judicially determined that any of the insurance obligations under this Agreement are unenforceable in any respect under applicable law, said obligations shall automatically be amended to conform to the maximum limits and other provisions in the applicable law for so long as the law is in effect.

B. ARC Insurance Requirements:

Arc will each procure and maintain, at its sole expense, policies of insurance with the minimum amounts outlined below or such other coverages and amounts as are acceptable to GCAC. Evidence of such insurance must be provided in the form of an Accord Certificate of Insurance or such other form as may be reasonably acceptable to both Parties. All insurance companies must have a financial rating from A.M. Best & Company of A IX or better. In all insurance carried by the Arc, to the extent of the liabilities assumed by the Arc under this Agreement, Arc shall cause (i) all deductibles to be for its own

10

**GCAC 000066**
001898

account, (ii) the insurer to waive all rights of subrogation in favor of GCAC, (iii) (except on workers' compensation policies) GCAC to be listed as additional insured, and (iv) such policy to be primary as to any existing valid and collectible insurance of GCAC.

1) COMMERCIAL GENERAL LIABILITY

- Limit per Occurrence            $1,000,000.
(Bodily Injury & Property Damage Combined Single Limit)
- General Aggregate             $2,000,000.
- Products & Completed Operations Aggregate    $1,000,000.
- Personal & Advertising Injury        $1,000,000.

Policy extensions and/or modifications

       a) Occurrence Insuring Agreement
       b) Sudden & Accidental Pollution (as per standard Insuring Agreement) arising out of Products and Completed Operations
       c) Broad Form Property Damage coverage
       d) Full Contractual Liability coverage
       e) No exclusions as respects X, C or U (Explosion, Collapse and Underground).
       f) No limitation as respects policy territory
       (included in CGL)

2) AUTOMOBILE LIABILITY

- Limit per Accident            $1,000,000.
(Bodily Injury & Property Damage Combined Single Limit)

     Policy Extensions and/or Modifications

       a) Coverage for all Owned, Hired and Non-Owned Vehicles.

3) WORKER'S COMPENSATION

- Worker's Compensation       Statutory State of Hire Benefits
- Employer's Liability          $1,000,000  Each Accident
                                 $1,000,000  Disease-Each Employee
                                 $1,000,000  Disease-Policy Limit

Policy Extensions and/or Modifications

     a) Including United States Longshoremen and Harbor Workers Act
     b) Maritime Employers Liability Endorsement to include coverage under the Jones Act including Transportation Wages, Maintenance and Cure, Death on the High Seas Act and "In Rem" Endorsement
     c) Voluntary Compensation Endorsement
     d) Alternate Employer Endorsement
     e) Insurance must be in accordance with the Alabama Workers' Compensation Act and provided by an Admitted Carrier. No alternative programs will be acceptable.

Confidential

GCAC 000067
001899

4) UMBRELLA / EXCESS LIABILITY

- Limit per Occurrence $5,000,000.
(Bodily Injury & Property Damage Combined Single Limit)
- Annual Aggregate $5,000,000.

Policy Extensions and/or Modifications

    a) Occurrence Insuring Agreement
    b) Sudden & Accidental Pollution (as per standard Insuring Agreement) arising
out of Products and Completed Operations
    c) Broad Form Property Damage coverage
    d) Full Contractual Liability coverage
    e) No exclusions as respects X, C or U (Explosion, Collapse and Underground).

5) MARINE TERMINAL OPERATORS LIABILITY

- Limit per Occurrence $1,000,000
- Annual Aggregate $1,000,000

Policy Extensions and/or Modifications

a) Including American Institute Wharfingers Liability Wording (Customer only)
b) Including American Institute Stevedores Liability Wording
c) Seepage and Pollution as per 7/90 day buy back wording

6) POLLUTION LEGAL LIABILITY

- Limit per Occurrence $5,000,000
- Annual Aggregate $5,000,000

The limits required herein may be obtained with the use of more than policy of insurance.

Policy Extensions and/or Modifications

    a) Applicable to bodily injury, property damage, including loss of use of damaged property or loss of property that has not been physically injured or destroyed
    b) Including cleanup costs and defense, including costs and expenses incurred in the investigation, defense or settlement of claims
    c) Coverage to apply to sudden and non-sudden pollution conditions resulting from the escape or release of smoke, vapors, fumes, acids, alkalis, toxic chemicals, liquids, gases, waste materials, or other irritants, contaminants or pollutants

7)      It is expressly understood that the insurance provisions of this Section 15(B), including the minimum required limits outlined above are intended to assure that certain minimum standards of insurance protection are afforded by Arc and the specifications in this Agreement of any amount will be construed to

12

**Confidential**

support but not in any way limit the amount or scope of liabilities and indemnity obligations (express or implied) of Arc. The minimum limits required in this Agreement for any particular type of insurance may be satisfied by a combination of the specific type of insurance and umbrella or excess liability insurance. Arc shall be responsible for all deductibles for all insurance maintained by Arc.

8)     Failure to Secure. Subject to Section 15(B), failure to secure the insurance coverage, or failure to comply fully with any of the insurance provisions of this Agreement, or the failure to secure such endorsements on the policies as may be necessary to carry out the terms and conditions of this Agreement, will in no way relieve Arc from the obligations of this Agreement.

16.  **INDEMNIFICATION. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS SPECIFIED OTHERWISE ELSEWHERE IN THE AGREEMENT:**

GCAC SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS ARC, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES AND THEIR DIRECTORS, EMPLOYEES AND AGENTS FOR AND AGAINST ANY LOSS, DAMAGE, CLAIM, SUIT, LIABILITY, FINE, PENALTY, JUDGMENT AND/OR EXPENSE (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF LITIGATION) (COLLECTIVELY "LIABILITY(IES)"), (A) ARISING FROM (I) INJURY, DISEASE OR DEATH OF ANY PERSONS, (II) DAMAGE TO OR LOSS OF ANY PROPERTY, OR (III) DISCHARGES OR SPILLS OR LEAKS OF PRODUCT, CAUSED BY OR RESULTING FROM THE NEGLIGENT ACTS OR OMISSIONS OR WILLFUL MISCONDUCT OF GCAC, IN GCAC'S PERFORMANCE OF THIS AGREEMENT OR (B) ARISING OUT OF GCAC'S FAILURE TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE, OR LOCAL GOVERNMENTAL LAWS, REGULATIONS, AND RULES.

ARC SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS GCAC, ITS MEMBERS, SUBSIDIARIES, AFFILIATES AND JOINT VENTURE PARTNERS AND THEIR DIRECTORS, EMPLOYEES AND AGENTS FOR AND AGAINST ANY LIABILITIES, (A) ARISING FROM (I) INJURY, DISEASE OR DEATH OF ANY PERSONS, (II) DAMAGE TO OR LOSS OF ANY PROPERTY (INCLUDING, BUT NOT LIMITED TO GCAC'S FACILITIES), OR (III) DISCHARGES OR SPILLS OR LEAKS OF PRODUCT, CAUSED BY OR RESULTING FROM THE NEGLIGENT ACTS OR OMISSIONS OR WILLFUL MISCONDUCT OF ARC, ITS EMPLOYEES, AGENTS, OR CONTRACTORS, IN THE PERFORMANCE OF THIS AGREEMENT OR (B) ARISING OUT OF ARC'S, ITS AGENTS', OR CONTRACTORS' FAILURE TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE, OR LOCAL GOVERNMENTAL LAWS, REGULATIONS, AND RULES.

IN THE EVENT ARC AND GCAC ARE JOINTLY RESPONSIBLE FOR ANY LIABILITY(IES), THEN THE PARTIES SHALL JOINTLY SHARE RESPONSIBILITY AND INDEMNIFY EACH OTHER FOR THE LIABILITY(IES) IN PROPORTION TO EACH PARTY'S CONTRIBUTION TO THE INJURY, DISEASE, OR DEATH OF ANY PERSONS, DAMAGE TO OR LOSS OF PROPERTY, OR DISCHARGE, LEAK, OR SPILL OF PRODUCT.

13

**Confidential**

IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE LOSS, DAMAGE, OR EXPENSES (INCLUDING LOST PROFITS OR SAVINGS) EVEN IF IT HAS BEEN A DVISED OF THEIR POSSIBLE EXISTENCE.

GCAC OR ARC, AS SOON AS PRACTICABLE AFTER RECEIVING NOTICE OF ANY SUIT BROUGHT AGAINST IT WITHIN THIS INDEMNITY, SHALL FURNISH TO THE OTHER FULL PARTICULARS WITHIN ITS KNOWLEDGE THEREOF AND SHALL RENDER ALL REASONABLE ASSISTANCE REQUESTED BY THE OTHER IN THE DEFENSE. EACH SHALL HAVE THE RIGHT, BUT NOT THE DUTY TO PARTICIPATE, AT ITS OWN EXPENSE, WITH COUNSEL OF ITS OWN SELECTION, IN THE DEFENSE AND/OR SETTLEMENT THEREOF WITHOUT RELIEVING THE OTHER OF ANY OBLIGATIONS HEREUNDER. THE PARTIES' OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE ANY TERMINATION OF THE AGREEMENT.

17. DEMURRAGE ON MARINE AND TRUCK EQUIPMENT. Arc does not assume liability for any demurrage on truck or marine equipment which occurs as a result of Arc's operations, unless such demurrage is caused by Arc's failure to use reasonable operating practices.

18. TITLE AND CUSTODY. Title to the Product stored and/or handled hereunder shall always remain with GCAC. Arc shall be deemed to have custody of and responsibility for the Product starting from the time during receipt when it passes (a) the flange connection of the vessel's delivery line, (b) the flange of the receipt line at Arc's Facility on pipeline receipts, or (c) the tank truck's/railcar's delivery connection, and ending during delivery when the Product passes the flange connection between Arc's delivery line and the vessel's receiving line, or the pipeline's receiving connections, or the railcar's and/or tank truck's receiving equipment.

19. TAXES. Any taxes applicable to the ownership, transportation, or storage of Product, which is the subject of this Agreement, or the services provided by Arc hereunder, shall be borne and paid for by GCAC, except to the extent any such taxes are, by law, required to be paid directly by Arc, in which event, such taxes shall be paid by Arc and reimbursed by GCAC upon receipt of invoice and supporting documentation reasonably requested by GCAC for same. GCAC will furnish the requisite documentation if entitled to an exemption from such taxes. In addition, GCAC and Arc agree to cooperate with each other in defending the non-taxability of or rate applied to the Product or services pursuant to this Agreement in the event that either party is audited by or on behalf of a taxing jurisdiction, including, but not limited to producing existing documentation, generating new reports from existing electronic reporting systems and making employees available at no cost, other than reasonable out-of-pocket expenses, to the other party. Both parties further agree, in furtherance of this cooperation agreement, to retain applicable records for a period of not less than the applicable statute of limitations, including any waivers thereof, executed by either party for any taxes collected by or reimbursed to that party. A party shall not be liable to the other party for any taxes that are statutorily imposed on the first party that are measured by or imposed upon net income, capital, or property, including without limitation, income, capital, franchise, and margin based taxes and taxes measured by the value of owned or leased real, tangible or intangible property. A party shall not be liable to the other party for business license taxes on particular occupations.

14

Confidential

20. FORCE MAJEURE. Either party hereto shall be released from liability hereunder for failure to perform any of the obligations herein imposed for the time and to the extent such failure is occasioned by acts of God, federal, state, county or municipal order, rule, legislation or regulation, or by war, acts of the public enemies, strikes, lockouts or other labor disturbances, riots, explosions, fire, floods, hurricanes, destruction from any involuntary cause of the Facility herein involved, or any cause or causes of any kind or character (except financial) reasonably beyond the control of the party failing to perform. In the event GCAC is prevented from performing hereunder by force majeure and the Facility continue to be operational, GCAC may notify Arc in writing of the period of time during which GCAC's performance is expected to be so prevented and Arc upon being so notified, shall use all reasonable efforts to utilize the Facility in other service.

21. DEFAULT. A material breach of any of the terms and conditions of the Agreement by either party shall constitute a default hereunder. Upon default, the non-defaulting party shall, within thirty (30) days of knowledge thereof, notify, in writing, the defaulting party of the particulars of such default and the defaulting party shall have thirty (30) days after receipt of such notice to cure such default. Upon the defaulting party's failure to cure the default within the thirty (30) day grace period, any and all obligations, including payments of fees due hereunder, shall, at the option of the non-defaulting party, become immediately due and payable. In the event of default and defaulting party's failure to cure during the cure period, the non-defaulting party shall also have the option to terminate the Agreement upon written notice to the defaulting party. The waiver by the non-defaulting party of any right hereunder shall not operate to waive any other such right nor operate as waiver of that right at any future date upon another default by either party hereunder.

22. SECURITY INTEREST. GCAC hereby grants unto Arc a general statutory warehouseman's lien against any and all of GCAC's Products in Arc's possession pursuant to this Agreement for any amounts past due and owing by GCAC hereunder after giving effect to any applicable cure periods, regardless of whether such amounts are owed for the Products then in the Facilities.

Without prejudice to any other remedies that Arc may have at law, in equity and/or pursuant to the terms and provisions hereof, Arc may enforce the warehouseman's lien granted herein by public or private sale of any or all of GCAC's Products remaining in Arc's possession at any time or place and on any commercially reasonable terms within thirty (30) or more Business Days after delivery to GCAC's of a written notice. The proceeds of any such sale may be applied to Arc's reasonable attorney's fees and expenses incurred in disposing of collateral and/or amounts due and owing by GCAC to Company.
Arc specifically reserves the right to refuse to deliver Products held by GCAC at any time that there remains any amounts due and owing by GCAC to Arc according to the terms hereof.

23. ARBITRATION. Any controversy or claim ("claim"), whether based on contract, tort, statute or other legal or equitable theory (including but not limited to any claim of fraud, misrepresentation or fraudulent inducement or any question of validity or effect of this Agreement including this clause) arising out of or related to the Agreement (including any amendments or extensions), or the breach or termination thereof shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American

15

GCAC 000071
001903

Arbitration Association ("AAA"), and this provision. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 to the exclusion of any provision of state law inconsistent therewith or which would produce a different result, and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction.

The arbitration shall be held in Houston, Texas.

There shall be one arbitrator.

The arbitrator shall determine the claims of the Parties and render a final award in accordance with the substantive law of the State of Texas, excluding the conflicts provisions of such law. The arbitrator shall set forth the reasons for the award in writing.

Any claim by either Party shall be time-barred if the asserting Party commences arbitration with respect to such claim later than two (2) years after the cause of action accrues. All statutes of limitations and defenses based upon passage of time applicable to any claim of a defending Party (including any counterclaim or setoff) shall be tolled while the arbitration is pending.

The Parties shall use their best efforts to cause the obligation to arbitrate any claim to extend to any officer, director, employee, shareholder, agent, trustee, affiliate, or subsidiary. The terms hereof shall not limit any obligations of a Party to defend, indemnify or hold harmless another party against court proceedings or other claims, losses, damages or expenses.

The arbitrator shall order the Parties to promptly exchange copies of all exhibits and witness lists, and, if requested by a Party, to produce other relevant documents, to answer up to ten (10) interrogatories (including subparts), to respond to up to ten (10) requests for admissions (which shall be deemed admitted if not denied) and to produce for deposition and, if requested, at the hearing all witnesses that such Party has listed and up to four other persons within such party's control. Any additional discovery shall only occur by agreement of the parties or as ordered by the arbitrator upon a finding of good cause.

Each Party shall bear its own costs, expenses and attorney's fees; provided that if court proceedings to stay litigation or compel arbitration are necessary, the Party who unsuccessfully opposes such proceedings shall pay all reasonable associated costs, expenses, and attorney's fees in connection with such court proceeding.

In order to prevent irreparable harm, the arbitrator shall have the power to grant temporary or permanent injunctive or other equitable relief. Prior to the appointment of an arbitrator a Party may, notwithstanding any other provision of this agreement, seek temporary injunctive relief from any court of competent jurisdiction; provided that the Party seeking such relief shall (if arbitration has not already been commenced) simultaneously commence arbitration. Such court ordered relief shall not continue more than ten (10) days after the appointment of the arbitrator (or in any event for longer than sixty (60) days).

If any part of this arbitration provision is held to be unenforceable, it shall be severed and shall not affect either the duty to arbitrate or any other part of this provision.

**Confidential**

**GCAC 000072**
001904

24. ASSIGNABILITY/SUBLEASING. Arc may assign or transfer its interest to this Agreement at any time. The Agreement shall not be assigned to another party, in whole or in part, by GCAC without the prior written consent by Arc, which shall not be unreasonably withheld, conditioned or delayed but if so assigned, shall be binding upon and shall inure to the benefit of the successors of the respective parties hereto; provided, however, GCAC may assign or transfer its interest in this Agreement to an affiliate without prior written consent. It is provided that no assignment by assignor shall relieve assignor of its liability under the terms of this Agreement for any breaches thereof by its assignee.

Notwithstanding anything to the contrary in this Agreement, GCAC shall have the right to sublease the Tanks to another party under the following conditions:

i.     Short Term Sublease: at any time for non-consecutive ninety (90) day periods without the prior consent of Arc; and

ii.    Long Term Sublease: GCAC shall have the right to sublease the Tanks for periods longer than ninety (90) only upon the prior written consent of Arc, which shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding anything to the contrary, any sublease by GCAC intended to finance GCAC's inventory or directly related to GCAC's trading business is reasonable and Arc's withholding of such consent would unreasonable. Also, for greater clarity, Arc may withhold such consent if such assignment would breach the Non-Competition Agreement dated February 8, 2013.

25. MODIFICATION. The Agreement shall not be modified or changed except by written instrument executed by the duly authorized manager or officer of the parties hereto.

26. NOTICES. Any notice required or permitted hereunder by one party to the other shall be in writing and the same shall be given and shall be deemed to be served and given if (1) delivered in person to the address set forth in the Agreement for the party to whom the notice is given, or (2) if placed in the United States mail, postage prepaid, addressed to the party at the address set forth in the Agreement, or (3) sent by facsimile with receipt acknowledged. The addresses for Arc and GCAC shall be as specified in the Agreement. From time to time, either party may designate another address for the purpose of the Agreement by giving to the other party notice of such change of address, which shall be effective fifteen (15) days after the giving of such notice.

27. INDEPENDENT CONTRACTOR. In performing services pursuant to the Agreement, Arc is acting solely as an independent contractor maintaining complete control over its employees and operations. Neither GCAC nor Arc is authorized to take any action in any way whatsoever for or on behalf of the other, except as may be necessary to prevent injury to persons or property, or, in accordance with Section 29 of the Agreement, to contain, reduce or clean up any spills that may occur.

28. PLANT OPERATING REQUIREMENTS. GCAC, its employees, agents, or contractors will adhere to all Arc Plant Operating Procedures for GCAC pickup, minimum quantities, and split loading of products. All transport equipment tendered to the Facility for (un)loading shall be in a safe, serviceable condition and meet Department of Transportation, state, and local authority regulations and standards. In addition, all transport equipment must be compatible with (un)loading equipment at the Facility. Arc reserves the right to refuse loading privileges to individuals that are not properly trained or certified by Arc's local management or are perceived to be unsafe operators.

17

Confidential

29. <u>SPILLS/ENVIRONMENTAL POLLUTION</u>. In the event of any Product spill or discharge or other environmental pollution caused by or in connection with GCAC's delivery or Arc's receiving operations, Arc may commence containment or clean-up operations as deemed appropriate or necessary by Arc or required by any governmental authorities and shall notify GCAC immediately of such operations. All liability and reasonable costs of containment and clean-up for such spill or discharge shall be borne by Arc; except that, in the event a spill or discharge is the result of joint negligence by both parties, liability and costs of containment and clean-up shall be borne jointly by GCAC and Arc in proportion to each party's negligence. In the event a third party is legally liable for costs and expenses borne by GCAC under this Section, they shall cooperate with each other for the purpose of obtaining reimbursement.

30. <u>GOVERNING LAW</u>. This Agreement, and any disputes arising hereunder, shall be governed by the laws of the State of Texas, without giving effect to any law which would defer to the laws of another state, and shall be subject to proper venue in any court in Harris County, Texas having jurisdiction.

31. <u>MISCELLANEOUS</u>. If any section or provision of the Agreement or any exhibit or rider hereto shall be determined to be invalid by applicable law, then for such period that the same is invalid, it shall be deemed to be deleted from the Agreement and the remaining portions of the Agreement shall remain in full force and effect.

The failure of a party hereunder to assert a right or enforce an obligation of the other party shall not be deemed a waiver of such right or obligation.

The Agreement constitutes the entire agreement of the parties regarding the matters contemplated herein or related thereto, and no representations or warranties shall be implied or provisions added hereto in the absence of a written agreement to such effect between the parties hereafter. In the event of any ambiguity between the Agreement and the Additional Terms and Conditions, the Agreement shall control.

**End of Other Provisions**

18

**Confidential**

Exhibit A
To
Agreement

## TERMINAL DESCRIPTION,

## and VESSEL SPECIFICATIONS

**Terminal:** Mobile Terminal

**Address:** 835 Cochrane Causeway
Mobile, AL 36610

**Phone:** 251-432-7666

**Manager:** Kenny McBride, Terminal Manager

**E-mail:** kmcbride@arcterminals.com

**Hours:** Vessels – 24 hours/day, 365 days/year, except Holidays

**Vessel Specifications:**

    **Maximum Length:**    750 feet

    **Maximum Beam:**    120 feet

    **Maximum Draft:**    38 feet

    **Minimum Discharge Rate:**    2,500 bbls/hour

    **Additional Information:**
       Holidays include New Year's Day, Memorial Day,
       Independence Day, Labor Day, Thanksgiving Day,
       Christmas Eve Day and Christmas Day

19

**Confidential**

**GCAC 000075**
001907

Exhibit C
To
Agreement

## SCHEDULE OF TESTING CAPABILITIES AND FEES

| ASTM / AASHTO METHODS | TEST METHOD | UNIT PRICE |
|---|---|---|
| | D402/ | |
| Ductillity | T78 | $195 |
| COC Flash Point | D92/T48 | $115 |
| COC Smoke | | |
| Point | State Method | $75 |
| Penetration | D5/T49 | $145 |
| API by | | |
| Pycnometer | D70/T228 | $115 |
| Softening Point | D36/T53 | $125 |
| Viscosity Absolute | D2171/T202 | $165 |
| Viscosity | | |
| Kinematic | D2170/T201 | $150 |
| Saybolt Viscosity | T72 | $115 |
| Tag Open Cup | | |
| Flash | T79 | $115 |
| Elastic Recovery | T301 | $195 |

| Preformance Grading | | |
|---|---|---|
| Grade Verification | M320 | $1,350 |
| Bending Beam | T313 | $215 |
| Dynamic Shear | T315 | $215 |
| Pressure Aging | R28 | $375 |
| Rolling Thin Film | D2872/T240 | $140 |
| Brookfield | | |
| Viscosity | D4402/T316 | $140 |

Blends will be done at $100/hour and normal testing rates will apply on blended
material

20

**Confidential**



Amendment #1

The following is Amendment #1 to adjust the various sections of the Terminalling Agreement – 36,140 BBLS (the "Agreement") at the Mobile Terminal by and between Arc Terminals Holdings LLC ("Arc") and Gulf Coast Asphalt Company ("GCAC") dated February 8, 2013.

Notwithstanding anything to the contrary contained in the Agreement, it is hereby understood and agreed that the information provided in this Amendment #1 shall be in addition to or in replacement of the items in the Agreement as follows effective February 8, 2013.

All references to Arc Terminals Holdings LLC shall be changed to Arc Terminals Mobile Holdings LLC

**F)    TERM OF THE AMENDMENT # 1 AGREEMENT**

Section F shall change to the following:

This Agreement will be in effect for a term from the Effective Date until February 7, 2018 (the "Initial Term"). This Agreement may only be extended upon the mutual written agreement between the Parties, which shall be agreed upon or negotiated 180 days before the termination date.

All other terms and conditions in the Agreement remain unchanged.

Executed this 24 day of October , 2013

Gulf Coast Asphalt Company, LLC    Arc Terminals Holdings LLC

By: _____    By: _____

Title: VP & General Counsel    Title: PRESIDENT

Confidential



Amendment #1

The following is Amendment #1 to adjust the various sections of the Terminalling Agreement - 150K BBLS (the "Agreement") at the Mobile Terminal by and between Arc Terminals Holdings LLC ("Arc") and Gulf Coast Asphalt Company ("GCAC") dated February 8, 2013.

Notwithstanding anything to the contrary contained in the Agreement, it is hereby understood and agreed that the information provided in this Amendment #1 shall be in addition to or in replacement of the items in the Agreement as follows effective November 1, 2013 (the "new Effective Date").

All references to Arc Terminals Holdings LLC shall be changed to Arc Terminals Mobile Holdings LLC

## F) TERM OF THE AMENDMENT # 1 AGREEMENT

Per Section J (2), this Amendment #1 Agreement shall change the Effective Date to November 1, 2013 (the "new Effective Date") and the Agreement shall be in effect from the new Effective Date until October 31, 2018.

All other terms and conditions in the Agreement remain unchanged.

Executed this 24ᵗʰ day of October , 2013

Gulf Coast Asphalt Company, LLC    Arc Terminals Holdings LLC

By: _____    By: _____

Title: VP. + General Counsel    Title: PRESIDENT



### Addendum #1

The following is Addendum #1 to adjust the various sections of the Terminalling Agreement (the "Agreement") at the Mobile Terminal by and between Arc Terminals Mobile Holdings LLC ("Arc") and Gulf Coast Asphalt Company ("GCAC") dated February 8, 2013.

Notwithstanding anything to the contrary contained in the Agreement, it is hereby understood and agreed that the information provided in this Addendum #1 shall be in addition to the items in the Agreement as follows effective January 28, 2014 (the "Truck Unloading Effective Date") through February 15, 2014.

**B)**     **FACILITY SERVICES:**

    3) Modes:                 In: Truck
                                    (upon mutual agreement, additional Modes can be added later by Addendum.)

**C) CONSIDERATION:**

    1) Truck Unloading Fee:          GCAC shall have the ability to unload trucks at the Mobile Terminal at a rate of $35 per truck. Trucks will only be unloaded when a vessel is not discharging at the Mobile Terminal dock.

All other terms and conditions in the Agreement remain unchanged.

Executed this 50th day of ___JANUARY___, 2014

Gulf Coast Asphalt Company       Arc Terminals Mobile Holdings LLC

By: _____        By: _____

Title: _MANAGER_           Title: _PRESIDENT_

**Confidential**

# **Arc Terminals**

### Addendum #2

The following is Addendum #2 to adjust the various sections of the Terminalling Agreement (the "Agreement") at the Mobile Terminal by and between Arc Terminals Mobile Holdings LLC ("Arc") and Gulf Coast Asphalt Company ("GCAC") dated February 8, 2013.

Notwithstanding anything to the contrary contained in the Agreement, it is hereby understood and agreed that the information provided in this Addendum #1 shall be in addition to the items in the Agreement as follows effective January 14, 2015 (the "Truck Unloading Effective Date") through February 15, 2015.

**B)     FACILITY SERVICES:**

    3) Modes:

        In: Truck
(upon mutual agreement, additional Modes can be added later by Addendum.)

**C) CONSIDERATION:**

    1) Truck Unloading Fee:

        GCAC shall have the ability to unload trucks at the Mobile Terminal at a rate of $35 per truck. Trucks will only be unloaded when a vessel is not discharging at the Mobile Terminal dock.

All other terms and conditions in the Agreement remain unchanged.

Executed this 14ᵗʰ day of JANUARY, 2015

Gulf Coast Asphalt Company         Arc Terminals Mobile Holdings LLC

By: _____               By: _____

Title: VP. OPS                     Title: PRESIDENT

**Confidential**

JSB

## SECOND AMENDMENT
## TO
## TERMINALLING AGREEMENT *Mobile*

This Second Amendment to Terminalling Agreement, dated as of August 7, 2015 (the *"Second Amendment"*), is entered into by and between Arc Terminals Holdings LLC, a Delaware limited liability company (*"Arc"*), and Gulf Coast Asphalt Company, an Alabama limited liability company (*"GCAC"*). Arc and GCAC are sometimes referred to herein as, individually, a *"Party"* and, collectively, the *"Parties."*

### RECITALS:

**WHEREAS**, Arc and GCAC are parties to that certain Terminalling Agreement, dated February 8, 2013, and as amended by that certain First Addendum to Terminalling Agreement, dated as of January 28, 2014 (the *"Terminalling Agreement"*); and

**WHEREAS**, the Parties desire to further amend the Terminalling Agreement for the purpose of unloading trucks, upon the terms and conditions contained herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and other good valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agrees as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.1** Unless otherwise defined herein, capitalized terms used in this Second Amendment shall have the respective meanings ascribed to such terms in the Terminalling Agreement.

### ARTICLE II
### AMENDMENT TO TERMINALLING AGREEMENT

**Section 2.1** Amendment to Paragraph B) FACILITY SERVICES of the Terminalling Agreement. The Terminalling Agreement is hereby amended by inserting the following new clause at the end of Paragraph B) 3) Facility Services of the Terminalling Agreement:

> In: Truck
> (upon mutual agreement, additional Modes can be added later by Addendum.)

**Section 2.1** Amendment to Paragraph C) CONSIDERATION of the Terminalling Agreement. The Terminalling Agreement is hereby further amended by inserting the following new clause at the end of Paragraph C) 1) Consideration of the Terminalling Agreement:

> 7) Truck Unloading Fee: $35 per truck. Trucks shall only be unloaded when a vessel is not discharging at the Mobile Terminal dock.

### ARTICLE III
### GENERAL PROVISIONS

**Section 3.1** **Effectiveness and Ratification**. All of the provisions of this Second Amendment shall be effective as of the date hereof. Except as specifically provided for in this Second Amendment, the terms of the Terminalling Agreement shall remain in full force and effect. In the event of any conflict or inconsistency between the terms of this Second Amendment and the Terminalling Agreement, the terms of this Second Amendment shall prevail and govern.

Page 1

**Confidential**

Section 3.2   **Term of Second Amendment**.   The Second Amendment shall be in effect for a term from the Commencement Date until August 21, 2015. This Second Amendment may only be extended upon mutual written agreement between the Parties.

Section 3.3   **Headings**.   The headings of the sections of this Second Amendment have been inserted for convenience of reference only and are not to be considered part of this Second Amendment and shall in no way affect the interpretation of any of the provisions of this Second Amendment.

Section 3.4   **Governing Law**.   This Second Amendment shall be governed and construed according to the laws of the state of Texas, without regard to any principles of law governing the conflict of laws which, if applied, might require the application of the laws of another jurisdiction.

Section 3.5   **Counterparts**.   This Second Amendment may be executed in any number of counterparts (including facsimile or portable document format (PDF) counterparts), each of which, when so executed and delivered, shall be deemed an original, and all of which together shall constitute a single instrument.   Delivery of a copy of this Second Amendment bearing an original signature by facsimile transmission or by electronic mail shall have the same effect as physical delivery of the paper document bearing the original signature.

*[signature page follows]*

**Confidential**

GCAC 000082
001914

IN WITNESS WHEREOF, the Parties have caused this Second Amendment to be executed by their duly authorized representatives as of the date first written above.

**GCAC:**

**Gulf Coast Asphalt Company**

By: _____
Name: Kenny Hucker
Title: V. P.

**Arc:**

**Arc Terminals Holdings LLC**

By: _____
Name: John Blanchard
Title: President

Page 3

**Confidential**

**GCAC 000083**
001915

Execution Version

## Exhibit 2

**GOTAC Terminal Agreements**

Confidential

## FIRST AMENDED AND RESTATED TERMINAL SERVICES AGREEMENT

This First Amended and Restated Terminal Services Agreement ("Agreement"), effective as of August 31, 2016 (the "Effective Date"), is made and entered into by and between **Gravity Midstream Corpus Christi, LLC** ("Operator"), and **Rio Energy International, Inc.** ("Customer"). Operator and Customer may be referred to herein individually as a "Party" and collectively as the "Parties". Capitalized terms that are used, but not defined, will have the meaning assigned to them in Exhibit B attached hereto.

In consideration of the premises, the terms and conditions hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     **Terminal.** The Services contemplated by this Agreement will be performed with the Facilities (as defined herein) operated by Operator and located at its GOTAC Terminal located at 6600 Up Road, Corpus Christi, Texas 78409 (the "Terminal").

2.     **Services.** Subject to the terms and conditions of this Agreement, Operator will perform the following services for Customer at the Terminal in accordance with the provisions of the Agreement and the General Terms (collectively, the "Services"):

     (a)     receipt of the Product in accordance with Section 6(a) of this Agreement;

     (b)     handling, transferring, blending and throughputting of the Product within the Terminal;

     (c)     dedicated storage services as provided by Section 7(a) of this Agreement;

     (d)     redelivery of the Product in accordance with Section 6(b) of this Agreement;

     (e)     dedicated and exclusive access to the asphalt truck loading rack;

     (f)     dedicated and exclusive access to the polymer mill and related services (the "PMA Plant");

     (g)     measurement, sampling and testing of the Product in accordance with the terms of the Agreement;

     (h)     such regulatory compliance reporting that Operator is required to perform as the Terminal operator; and

     (i)     such other services provided herein.

Customer acknowledges and agrees that, subject to Sections 2(e), 2(e), 2(f) and 7(a) of this Agreement (in which the relevant Services are provided on a dedicated and/or exclusive basis), all of the Services will be subject to the availability of, and the operational capabilities and considerations with respect to, the Facilities required for the performance or provision of the Services (or any of them) as described in Section 1(c) of the General Terms, provided that the foregoing does not limit Customer's

36557693.2

**Confidential**

**GCAC 000085**
001917

rights otherwise provided under this Agreement, whether under Section 8(d), in the event of a Force Majeure, or otherwise.

3. **Term**. This Agreement is effective from the Effective Date, and, subject to the terms and conditions herein contained, shall continue for an initial term of five (5) years ending at 11:59 PM Central Time on January 31, 2021 (the "Initial Term"). Following expiration of the Initial Term, this Agreement shall continue on a year-to-year basis (each one-year period, a "Renewal Term") unless and until terminated (a) by one Party providing the other Party written notice at least three (3) months prior to the end of the Initial Term or at least sixty (60) days prior to the end of the applicable Renewal Term, with such termination effective at the end of the applicable Initial Term or Renewal Term, or (b) pursuant to Section 19 of the General Terms. The Initial Term and all such succeeding Renewal Terms, if any, full or partial, are collectively referred to herein as the "Term".

4. **Product**. The product to be received at and redelivered from the Terminal for or on the account of Customer is as set forth in Exhibit C, provided that such product (a) is tendered and delivered by or on behalf of Customer and (b) meets the applicable Specifications (defined below) set forth with respect to such product (each type and grade of product, alternatively or collectively, as applicable, the "Product").

5. **Specifications**.

(a) Product Representation and Warranty. Customer represents and warrants that any and all Product received at the Terminal under the terms and conditions of this Agreement meets minimum specifications set forth in Exhibit C (the "Specifications"). Subject to Section 5(e) below, Operator shall have no obligation to receive and/or handle any product that does not meet the applicable Specifications ("Non-Conforming Product").

(b) Specification/Product Limitations. The Specifications are minimum specifications for the Terminal and do not supersede any published or otherwise required specification(s) set forth by any delivering or receiving Pipeline that may be more stringent for movements on such Pipeline. Notwithstanding anything herein to the contrary, Operator reserves the right, upon prior written notice to Customer, to impose reasonable limitations on Product delivered to the Terminal in order to (i) comply with Applicable Law (including any permit restrictions), (ii) protect health and safety, (iii) protect the pumps, pipes, lines, and other equipment or facilities at the Terminal, including the Tanks or (iv) protect other product or operations at the Terminal.

(c) Non-Conforming Product.

(i) In the event that Customer knows, or has reason to believe, that any Product tendered to Operator at the Terminal does not conform with the Specifications when tendered, it shall be the responsibility of Customer to notify Operator to such effect as soon as reasonably possible. Without prejudice to any other rights and remedies of Operator hereunder, Operator shall have the right to reject and refuse receipt of any or all Non-Conforming Product and, at Operator's sole and absolute discretion, either (A) require Customer to take redelivery of (1) all of Customer's product that was, at the time of delivery, Non-Conforming Product and (2) all Product that, after the time of such delivery, became Non-Conforming Product (collectively, the "Rejected Product") or (B) otherwise dispose of, or cause Customer to dispose of, said Rejected Product, in each case, at

Page -2-

**Confidential**

Customer's sole expense. In any event, and in addition to Customer's other obligations under this Section 5(c), all costs, expenses and/or liabilities incurred as a result of the delivery or handling of Rejected Product, including but not limited to (x) cleaning and degassing the Facilities, or any part thereof, including Tanks, used to handle any Rejected Product and (y) disposing of and/or replacing any third party products (whether owned by an Operator Party or a Third Party) that became off-specification product as a result of contact with Rejected Product, shall be for Customer's sole account.

(ii)    In the event that Customer, from time to time, desires to tender Non-Conforming Product, Customer will (A) notify Operator, in writing, at least forty-five (45) days prior to the time such Non-Conforming Product is to be tendered to Operator at the Terminal and (B) identify the extent to which the product specifications applicable to said Non-Conforming Product are expected to be exceeded. Upon timely receipt of said notice, Operator will notify Customer (1) whether it will accept said Non-Conforming Product and (2) if Operator is willing to accept said Non-Conforming Product, of any additional terms associated with such acceptance (the "Non-Conforming Product Terms"). Upon Customer's receipt of said Non-Conforming Product Terms, Customer may elect to either accept or reject such Non-Conforming Product Terms by providing written notice to Operator no later than 5:00 PM Central Time on the next Business Day. If Customer timely elects to accept the Non-Conforming Product Terms, then said Non-Conforming Product will be received, handled and redelivered pursuant to this Agreement, as modified by the Non-Conforming Product Terms. If Customer elects not to accept the Non-Conforming Product Terms or fails to timely make such election, then Operator will not be required to receive, handle or store said Non-Conforming Product.

(d)    No Waiver. Acceptance by Operator of any Customer Party's samples or tests of Customer's product (including any tests showing that such Product meets the Specifications) and/or acceptance by Operator of any Non-Conforming Product at the Terminal shall not operate as a waiver of the requirements and obligations of Customer under this Section 5 (or as a waiver of any subsequent default, whether of a like or different character), nor in any way prevent Operator from refusing any additional quantities or future receipts of Non-Conforming Product.

(e)    CUSTOMER SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE OPERATOR PARTIES FROM AND AGAINST ANY AND ALL LIABILITIES (AS THE TERM IS DEFINED HEREIN) (INCLUDING ALL COSTS AND EXPENSES INCURRED DUE TO REMOVAL AND DISPOSAL OF THE NON-CONFORMING PRODUCT AND/OR IN CONNECTION WITH THE CLEANING, REPAIR AND RESTORING OF THE FACILITIES) ARISING OUT OF OR RESULTING FROM OR ATTRIBUTABLE TO THE DELIVERY, BY OR ON BEHALF OF CUSTOMER, OF NON-CONFORMING PRODUCT TO THE TERMINAL, EXCEPT TO THE EXTENT OPERATOR HAS ACTUAL KNOWLEDGE OF THE NON CONFORMING NATURE OF THE NON-CONFORMING PRODUCTS, CUSTOMER HAS FULLY COMPLIED WITH SECTIONS 5(c)(i) AND 5(c)(ii), AND (i) OPERATOR DOES NOT REJECT THE NON-CONFORMING PRODUCT, IN ACCORDANCE WITH SECTION 5(c)(i); (ii) OPERATOR ACCEPTS THE NON-CONFORMING PRODUCT AND CUSTOMER ACCEPTS THE NON-CONFORMING PRODUCT TERMS, IN ACCORDANCE WITH SECTION 5(c)(ii); OR (iii) SUCH LIABILITIES ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE OPERATOR PARTIES.

36557693.2

Confidential

GCAC 000087
001919

6.  **Receipts and Deliveries**.

(a)    Subject to the terms and conditions of this Agreement, Product will be received at the Terminal as follows:

(i)    from any connected Pipeline that is capable of delivering Customer's nominated Product to the Terminal, insofar as such pipeline is in commercial service on the date of requested service by Customer;

(ii)   from trucks at the Truck Rack;

(iii)  by rail car;

(iv)   from Vessels at the Dock; or

(v)    any other means to which the Parties agree in writing from time to time.

(b)    Subject to the terms and conditions of this Agreement, Product will be redelivered from the Terminal as follows:

(i)    to any connected Pipeline that is capable of accepting redelivery of Customer's nominated Product from the Terminal, insofar as such pipeline is in commercial service on the date of requested service by Customer;

(ii)   to one or more storage tanks (including another Tank to the extent they are interconnected by pipelines) at the Terminal, subject to a confirmed nomination between Operator and the applicable third party with respect to the acceptance of the applicable Product into such third party's storage tank if the recipient of such redelivery is a person or entity other than Customer;

(iii)  to any trucks at the Truck Rack;

(iv)   to any rail cars;

(v)    to Vessels at the Dock; or

(vi)   any other means to which the Parties agree in writing from time to time.

7.  **Services**.

(a)    Tankage.  During the Term, Operator shall provide Customer sole and exclusive use of the following storage tanks (each, a "Tank" and collectively, the "Tanks") with an aggregate shell Barrel capacity of **One Hundred Sixty-Nine Thousand, Seven Hundred and Ten (169,710) shell Barrels** (the "First Tank Turn");

| Tank Number: | Shell Barrel Capacity: |
| --- | --- |
| Tank 312: | 60,000 |
| Tank 313: | 60,000 |

Page -4-

**Confidential**

GCAC 000088
001920

| | |
|---|---|
| Tank 315: | 25,000 |
| Tank 401 | 3,000 |
| Tank 402 | 3,000 |
| Tank 403 | 3,000 |
| Tank 404 | 3,000 |
| Tank 405 | 3,000 |
| Tank 406 | 3,000 |
| Tank 407 | 3,000 |
| Tank 422 | 1,000 |
| Tank 423 | 360 |
| Tank 424 | 1,000 |
| Tank 425 | 1,000 |
| Tank 426 | 350 |
| | |
| Total | 169,710 |

Unless mutually agreed by the Parties in writing, Operator shall not be responsible to provide any shell capacity in excess of **169,713 Barrels**. For the avoidance of doubt, Customer's Product stored in the Tanks will not be commingled with any Third Party's or Operator Parties' products.

(b)  Blending Operations. If requested by Customer and agreed to by Operator, Operator will blend Customer's Product stored at the Terminal; *provided* that Customer will provide Operator with written instructions in respect thereof. Except as otherwise required by Applicable Law, Customer will be the blender of record. Customer acknowledges and agrees that the degree of success, if any, from the performance of such blending operations is dependent upon the particular characteristics of the Product and blendstocks involved and is beyond the control of Operator, and Customer hereby releases and discharges Operator Parties from any Liability for any damage to Product or any failure, either in part or in whole, to attain any specific result from any mixing, blending and/or circulation of Product by Operator, except to the extent the Operator was negligent or acted with willful misconduct in carrying out its blending obligations hereunder. **CUSTOMER FURTHER AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE OPERATOR PARTIES FROM AND AGAINST ALL CLAIMS ARISING FROM OR RELATED, WHETHER DIRECTLY OR INDIRECTLY, TO THE MIXING, BLENDING AND/OR CIRCULATION OF PRODUCT BY OPERATOR, EXCEPT TO THE EXTENT OF THE OPERATOR PARTIES' NEGLIGENCE OR WILLFUL MISCONDUCT.** For the avoidance of doubt, all references to negligence in this Section 7(b) shall include (i) failure to follow Customer's written instructions, and (ii) failure of the Operator Parties to observe and employ good industry practice in performing the blending operations.

(c)  Tank Substitution. Notwithstanding anything herein to the contrary, Operator, at its expense, upon written notice to Customer, will have the right from time to time to substitute a tank or tanks at the Terminal for one or more of the Tanks as Operator deems necessary, so long as the available capacity, throughput rates, condition and quality of such substituted tank(s) are comparable in all material respects to those replaced. Any such substitute tank while in use hereunder shall be considered one of the "Tank(s)" referred to in this Agreement and the terms of this Agreement shall apply to such Tank(s).

Page -5-

36557693.2

**Confidential**

**GCAC 000089**
001921

(d)    PMA Operations. During the Term, Customer commits to process PMA in a minimum amount of **Two thousand, three hundred (2,300) Tons** per month (for the avoidance of doubt, Customer's failure to process PMA in such minimum amount does not constitute a breach or default by Customer of this Agreement, provided that Customer pays the PMA Fee provided in Section 8(a)(viii) hereof for any month in which Customer fails to do so). Customer will provide Operator with written instructions for such services. Except as otherwise required by Applicable Law, Customer will be the processor of record. Customer acknowledges and agrees that the degree of success, if any, from the performance of such operations is dependent upon the particular characteristics of the Product, blendstocks, and polymers involved and is beyond the control of Operator, and Customer hereby releases and discharges Operator Parties from any Liability for any damage to Product, PMA, and PMA Plant facilities or any failure, either in part or in whole, to attain any specific result from any mixing, processing, milling, blending and/or circulation of Product, PMA and polymers by Operator, except to the extent the Operator was negligent or acted with willful misconduct in carrying out its processing obligations hereunder. **CUSTOMER FURTHER AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE OPERATOR PARTIES FROM AND AGAINST ALL CLAIMS ARISING FROM OR RELATED, WHETHER DIRECTLY OR INDIRECTLY, TO THE PROCESSING, MILLING, MIXING, BLENDING AND/OR CIRCULATION OF PRODUCT BY OPERATOR, EXCEPT TO THE EXTENT OF THE OPERATOR PARTIES' NEGLIGENCE OR WILLFUL MISCONDUCT.** For the avoidance of doubt, all references to negligence in this Section 7(d) shall include (i) failure to follow Customer's written instructions and (ii) failure of the Operator Parties to observe or employ good industry practice in performing the processing activities hereunder.

8.    **Fees and Reimbursements.**

(a)    Tankage, Services and Throughput Fees. From and after the Effective Date, for each month during the Term, Customer shall pay to Operator the following Fees:

(i)    Storage Services Fee. A storage services fee of **$0.75** per shell Barrel of the First Tank Turn, which is **One Hundred Sixty-Nine Thousand, Seven Hundred and Ten (169,710)** shell Barrels, equaling **One Hundred Twenty-Seven Thousand, Eight-Two and 50/100 Dollars ($127,282.50)** (the "Storage Services Fee"), which fee (1) shall be payable regardless of the quantity of Product (if any) that Customer requires Operator to store in the Tanks during the applicable month, except as set forth below and in the General Terms.

(ii)    Excess Storage Throughput Fee.

(1)    **Thirty-seven and One Half cents ($0.375)** per Barrel for each Barrel of Product that is the subject of a Confirmed Nomination (whether such volume is actually received into the Terminal or not), during the applicable month in excess of the First Tank Turn;

(iii)    Tank-to-Tank Transfer Fee. A tank-to-tank transfer fee of seven and one half cents ($0.075) per Barrel for all volumes of Product pumped from one tank into another tank within the Terminal ("Transfer Fee"), other than in connection with Operator substituting a Tank pursuant to Section 7(c) of this Agreement;

Page -6-

36557693.2

**Confidential**

(iv)    <u>Intentionally left blank.</u>

(v)    <u>Truck Loading</u>. A fee of Fifteen Dollars ($15.00) per ton loaded into a truck; provided, however, that in the event that at the end of any calendar year during the Term, Customer shall have loaded fewer than 64,800 tons during the preceding year (5,400 tons per month multiplied by 12), Owner will invoice Customer and Customer will pay Operator (in accordance with the terms and conditions herein applicable to monthly payments from Customer to Operator) an amount equal the difference between 64,800 tons and the total number of tons loaded by Customer during the year *multiplied by* $15.00);

(vi)    <u>Rail Loading and Unloading</u>. A loading/unloading fee of Eighteen Dollars ($18.00) per ton loaded into a railcar;

(vii)    <u>Truck Unloading</u>. An unloading fee of Fifty Dollars ($50.00) per truck unloaded;

(viii)    <u>PMA Fee</u>. A PMA Plant fee of Twenty-Five Dollars ($25.00) per ton processed by Customer; provided, however, that in the event that at the end of any calendar year during the Term, Customer shall have processed fewer than 27,600 of tons of PMA during the preceding year (2,300 tons per month multiplied by 12), Owner will invoice Customer and Customer will pay Operator (in accordance with the terms and conditions herein applicable to monthly payments from Customer to Operator) an amount equal the difference between 27,600 tons and the total number of tons of PMA processed by Customer during the year multiplied by $25.00;

(ix)    <u>Pipeline Fee</u>. A fee of Ten Cents ($0.10) per Barrel for each Barrel transferred through a Pipeline;

(x)    <u>Lab Fee</u>. A minimum lab fee of $5,000 per month plus, if applicable, any additional lab services in accordance with Exhibit D provided in excess of the monthly minimum; and

(xi)    <u>Other Fees</u>. All other fees and charges (other than those specified in <u>Section 8(b)</u>) accrued during the applicable month under this Agreement.

(b)    <u>Reimbursements</u>.

(i)    <u>Tank Cleaning and Degassing Fee</u>. Upon termination of this Agreement, with respect to any particular Tank(s), Customer shall pay to Operator an amount equal to either (a) fifty percent (50%) of Tank Cleaning Expenses for such Tank(s), plus an administrative fee equal to ten percent (10%) of Customer's 50% share of such Tank Cleaning Expenses if Operator does not elect to clean such Tank(s) during the Term, or (b) one hundred percent (100%) of Tank Cleaning Expenses, plus an administrative fee of ten percent (10%) of such Tank Cleaning Expenses, if Operator elected to clean such Tank(s) during the Term. For the sake of clarity, all direct and indirect costs and expenses associated with cleaning any Tank (including but not limited to Tank Cleaning Expenses) incurred by or on behalf of Operator or any other party for any reason during the Term will be for the account of Operator, and Customer will only be responsible for Tank Cleaning Expenses (or any administrative fee) incurred by Operator with respect to any Tanks in accordance with clause (a) or (b) above and within ninety (90) days after the conclusion of the Term and in any event prior

36557693.2

Page -7-

**Confidential**

GCAC 000091
001923

to use of the Tank by any other customer or user. For purposes of this Agreement, "Tank Cleaning Expenses" means all direct costs and expenses incurred by or on behalf of Operator in connection with (i) removal of any Product remaining in the Tank(s) immediately prior to cleaning; (ii) cleaning of the Tank(s) up to the point necessary for the Tank(s) to meet API Standard 653; and (iii) transportation and disposal of Product and waste removed from the Tank(s) in connection with such cleaning. For the avoidance of doubt, the Parties agree that this Section 8(b) supercedes and replaces in their entirety the provisions establishing the Customer's liability for product removal and tank cleaning contained in the General Terms and Conditions (including Sections 5 and 6 thereof).

(ii)     Utilities and Product Heating Fee. Customer shall pay to Operator an amount equal to all direct costs and expenses (including all direct energy costs and utilities, e.g., natural gas, water and electricity) incurred by or on behalf of Operator in connection with any Product heating services requested by Customer or otherwise required in connection with the performance of the Services, plus an administrative fee of ten percent (10%) of such direct costs and expenses.

(iii)     Sampling Fee. Customer shall pay to Operator an amount equal to all direct costs and expenses incurred by or on behalf of Operator in connection with any Product sampling requested by Customer or otherwise required in connection with the performance of the Services, plus an administrative fee of ten percent (10%) of such direct costs and expenses.

(iv)     Marine Access Fee Reimbursement. Customer shall pay to Operator an amount equal to all actual costs and expenses incurred by or on behalf of Operator in obtaining and providing Customer with access to and use of the Dock in connection with the performance of the Services, including all use and access fees assessed against Operator by the Dock owner/operator. For the sake of clarity, the amounts contemplated in this subsection 8(b)(iv) shall be a pass through fee and shall not be subject to markup by Operator. Customer shall pay only the actual fees assessed in connection with access to and use of the Dock. For that portion of the Term that the Dock License Agreement is in effect (and subject to revision, amendment, modification or replacement of the Dock License Agreement during its Term (as such term is defined in the Dock License Agreement) but limited as to the Customer as further described herein), the Marine Access Fee Reimbursement will be an amount equal to:

(1)     $0.15 per Barrel of Asphalt loaded aboard or unloaded from Customer's vessels at the Dock; and

(2)     $0.075 per Barrel of Non-Asphalt Product loaded aboard or unloaded from Customer's vessels at the Dock;

(3)     The amounts identified in Section 8(b)(iv)(1) and 8(b)(iv)(2) are subject to increase by the dock owner/operator in any future extension, revision or amendment of the Dock License Agreement. Any such increase shall be limited to 25%, with respect to Customer's obligation to reimburse such amounts to Operator. For greater clarity and for illustrative purposes only, the maximum amount for which Customer would reimburse to Operator would be: (a) $0.188 per Barrel for Asphalt and (b) $0.094 per Barrel for Non-Asphalt Products. Any increase in excess of these amounts would be the responsibility of Operator.

Page -8-

36557693.2

Confidential

(v)     Public Wharfage Fee. For each Barrel of Product loaded onto or discharged from a Vessel at a Dock, an amount equal to the public wharfage fee chargeable by the Port of Corpus Christi Authority (the "Port Authority") at the time of such loading or discharge. As of the Effective Date, the Port Authority charges a public wharfage fee of $0.0987 per Barrel, but such public wharfage fee is subject to revision, amendment and/or modification by the Port Authority from time to time.

(vi)    Dock Fees. Notwithstanding anything to the contrary in this Agreement, Customer shall pay to Operator an amount equal to all direct costs and expenses incurred by or on behalf of Operator in connection with any dock watch, dockage and wharfage fees (except to the extent covered by the public wharfage fee set forth in Section 8(b)(iv), above) assessed by any dock owner/operator in connection with the performance of the Services.

(vii)   Pipeline Tariffs and/or Fees. Customer shall pay to Operator an amount equal to all direct costs and expenses incurred by or on behalf of Operator in connection with any tariff or fee assessed by any pipeline (including but not limited to the Pipelines) owner/operator in connection with the performance of the Services.

(viii)  Additional Services. Except as otherwise provided herein, if (1) Operator performs any services at Customer's request other than the Services, including special handling services, (2) as a direct result of the failure of Customer's product to comply with the Specifications, it becomes necessary for Operator to perform any additional services, or (iii) Operator incurs any other cost or expense in connection with the Services, then Customer shall pay Operator an amount equal to the actual costs of such services and/or expenses incurred, plus and administrative fee of ten percent (10%) of such actual costs.

(c)     Ad Valorem Taxes. Customer shall be responsible for payment of all ad valorem taxes assessed against Product to which Customer has title, and shall reimburse Operator for any ad valorem taxes assessed against and paid by Operator in respect of the Product to which Customer holds title, less any rebates received by Operator, that are improperly assessed against Operator.

(d)     Adjustments. In addition to Customer's remedy for limited availability of the Tanks as set forth in Section 1(d) of the General Terms, in the event Customer is unable (i) to utilize the PMA Plant for processing services or (ii) to load trucks, Customer will receive credit against its annual volume requirements under Sections 8(a)(v) and 8(a)(viii) for any volumes that it is unable to process or unload (as applicable) as a result of unavailability of Facilities or Services. Notwithstanding the foregoing, Customer shall have the right to terminate this Agreement upon sixty (60) days' written notice to Operator, if the percentage of total Tank service that is unavailable to Customer is fifty percent (50%) or more of the First Tank Turn and substitute Tanks are not provided by Operator in accordance with Section 7(c).

9.     Escalation. The fees and charges set forth at Section 8(a), above, (including the charge under Section 14(c)(i) of the General Terms) will automatically escalate annually on the anniversary date of the Effective Date by the percentage increase in the Consumer Price Index for Finished Goods, not seasonally adjusted ("CPI") as published by the U.S. Department of Labor, Bureau of Labor Statistics. The percentage increase in the CPI means the percentage increase in the CPI between (a) the CPI for the month that is four (4) months prior to the month in which the Effective Date occurs and (b) the

Page -9-

Confidential

CPI for the same month of the immediately preceding year. In the event that the CPI has either decreased or not changed, then the Terminal Fees shall remain unchanged for the applicable contract year.

10. **Dock Provisions**.

(a) _Limitations_. Customer acknowledges that the Dock is owned and/or operated by Third Parties and such Dock is, or will be, subject to limitations that may be imposed by such Third Parties (including limitations regarding the length, width, draft and capabilities of Vessels that can be accommodated thereat). As of the Effective Date, the Dock is capable of accommodating Vessels other than those in excess of six hundred feet (600') length overall, one hundred feet (100') in width and twenty-eight feet (28') draft. Customer agrees, and agrees to cause all Vessels nominated by it, to comply with all limitations imposed by the owners and/or operators of the Dock.

(b) _Marine Provisions; Port Procedures; Other Restrictions_. Notwithstanding the foregoing, or anything else herein to the contrary, Operator reserves the right, from time to time and at any time, upon notice to Customer (1) to implement standard marine provisions and port procedures governing the rights and responsibilities of Operator's customers, as well as the owners, operators and intermediate charterers of Vessels calling upon the Docks, with respect to any dock services provided by Operator (including any revisions, amendments or other modifications thereto as Operator may make from time to time), and/or (2) to impose any further restrictions that it determines to be necessary for the protection of the Docks and/or the Terminal's facilities. Customer agrees, and agrees to cause all Vessels nominated by it, to comply with all such marine provisions, port procedures and further restrictions.

11. **Notices**. All notices, consents, waivers, and other communications under this Agreement must be provided pursuant to Section 26(a) of the General Terms and Conditions, and delivered to the respective contacts below:

If to Operator:  Gravity Midstream Corpus Christi, LLC
1990 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Attn: Vice President and General Counsel
Email: dh@gravitymidstream.com

If to Customer:  Rio Energy International, Inc.
5718 Westheimer Road, Suite 1806
Houston, Texas 77057
Attn: Legal Department

12. **Exhibits**. The following exhibits are attached to and incorporated into this Agreement: Exhibit A (General Terms and Conditions), Exhibit B (Defined Terms), Exhibit C (Specifications) and Exhibit D (Laboratory Services). In the event of conflict between the provisions of the main body of this Agreement and any of the exhibits hereto, the provisions of the main body of this Agreement shall prevail, and then each of the following documents shall take precedence over the next listed document: (1) Specifications, (2) General Terms and Conditions, and (3) the Defined Terms.

Page -10-

36557693.2

Confidential

GCAC 000094
001926

13.     **Prior Agreement**. Upon the Effective Date, this First Amended and Restated Terminal Services Agreement between the Parties shall supercede and replace the Terminal Services Agreement between the Parties dated February 1, 2016.

*[Signature Page Follows on Next Page]*

36557693.2

**Confidential**

GCAC 000095
001927

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers.

RIO ENERGY INTERNATIONAL, INC.

By: _William Cousins_

Name: _William Cousins_

Title: _President_

GRAVITY MIDSTREAM CORPUS CHRISTI, LLC

By: _[signature]_

Name: _J. DAVID HUBBARD_

Title: _V.P. + General Counsel_

[Signature Page to Terminal Services Agreement]

**Confidential**

## Exhibit A
## General Terms and Conditions

1.    Terminal.

(a)    Services. All Services performed hereunder by Operator, including the maintenance and operation of the Facilities, shall be performed in a commercially reasonable manner consistent with good industry practice and in compliance with all Applicable Law.

(b)    Description of Facilities. As part of the Services and in accordance with the terms and conditions set forth in this Agreement, Operator shall provide, operate and maintain at the Terminal and for Customer's non-exclusive use (except as otherwise provided in the Agreement), the Facilities.

(c)    Shared Use. Except as otherwise provided for in the Agreement, Customer understands and acknowledges that (i) the Terminal is a common usage facility and may be shared with Operator's other customers and (ii) the services provided herein may be subject to other Terminal customer's rights to the services with higher priorities. Operator will use commercially reasonable efforts to allocate and utilize the Terminal to minimize delays for all parties in accordance to the parties' rights under their respective agreements with Operator; *provided, however,* that Operator shall not have any liability to Customer arising out of any such delays.

(d)    Availability of Facilities. To the extent that the unavailability and/or insufficiency of any of the Facilities limits the availability of the Tanks for any reason, Operator shall not be obligated to provide such storage Services to Customer. In such circumstances, it is acknowledged and agreed that Customer's sole remedy shall be a proportionate reduction in the Storage Services Fee; *provided, however,* that no such reduction of the Storage Services Fee shall be allowed if such unavailability or insufficiency is caused by any fault of a Customer Party. Such abatement shall continue for so long as the availability of the Tanks remain so impaired or for so long as substitute tanks are not provided; *provided, however,* that Operator may, but shall not be required to remedy the unavailability or the insufficiency (whether by repairing or replacing the affected Facilities or otherwise). Furthermore, to the extent that such unavailability and/or insufficiency of the Facilities is caused by any fault of a Customer Party and such unavailability and/or insufficiency prevents Operator from providing services (in whole or in part) to any other customer at the Terminal, Customer shall reimburse Operator for any losses (including lost revenue) incurred or sustained by Operator in connection therewith.

(e)    Access. Any person seeking entry into the Terminal shall possess a Transportation Worker Identification Credential (or be escorted by a Terminal representative) and shall abide by all Terminal safety rules and regulations. All motor carriers seeking entry into the Terminal shall complete and execute a copy of the Terminal's access agreement prior to entering the Terminal premises. Operator may refuse entry to, or remove immediately from the Terminal premises, any person, motor carrier, equipment or property that Operator, in its sole discretion, believes presents a risk of injury or damage to the Terminal, another person, other property, or the environment.

Exhibit A - 1

Confidential

GCAC 000097
001929

(f)   No Action.

(i)   The Parties have entered into this Agreement based on the assumption that the Facilities are engaged in intrastate transportation and that the Facilities are not subject to the Interstate Commerce Act, as amended ("ICA"). If, for any reason other than a reason contemplated by Sections 1(f)(ii) and 1(f)(iii), the Facilities (or any part thereof) become regulated by or subject to jurisdiction of the United States Federal Energy Regulatory Commission ("FERC") or any successor entity thereto, this Agreement will be deemed of its own terms to terminate on the day before the date on which the Facilities become regulated by or subject to jurisdiction of the FERC.

(ii)   Customer shall not, directly or indirectly, take any action challenging the non-jurisdictional nature of the Facilities or otherwise take any action, directly or indirectly, advocating that the Facilities be subject to the jurisdiction of the FERC.

(iii)   Should Customer perform any act, or cause any act to be performed, at any time during the Term, that results in the Facilities becoming regulated by or subject to the jurisdictional consequences of the FERC, then without prejudice to any rights and remedies that Operator may have pursuant to this Agreement, at law or in equity, this Agreement will be deemed of its own terms to terminate on the day before the date of such occurrence.

(g)   EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THERE ARE NO GUARANTEES OR WARRANTIES OF ANY KIND, EXPRESSED OR IMPLIED. OPERATOR SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF ANY KIND OR NATURE, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE.

2.   Quality.

(a)   Limitations. Except as expressly provided otherwise in the Agreement, Customer will only deliver Product to the Terminal of the type specified in the Agreement and that otherwise complies with the Specifications and any applicable specifications imposed by the applicable Pipeline(s) and Applicable Law.

(b)   Sampling and Testing. Unless otherwise provided herein, sampling and testing of the Product will be done at the Customer's written request. Operator reserves the right, at its sole discretion, to sample and test (or cause to be sampled and/or tested) any Product being delivered into or stored at the Terminal in order to verify Customer's compliance with this Agreement and to maintain the quality of the Product and other products at the Terminal. Testing conducted by or on behalf of Operator will be done in accordance with then-current ASTM procedures. Operator will provide (or arrange to provide) Customer with a copy of any testing reports produced or obtained by Operator regarding any Product.

(c)   Commingling. Unless otherwise provided for in the Agreement, Customer acknowledges and agrees that, in connection with the Services, its Product may be commingled or intermixed with other, similar product at the Terminal within the

Exhibit A - 2

Confidential

Specifications. Operator is not obligated to redeliver the identical Product delivered by Customer into the Terminal.

3.   **Product Measurement**. Unless otherwise agreed to by the Parties, Operator shall, or shall cause to, perform all measurement of the quantity of the Product received at or redelivered from the Terminal, in accordance with API procedures, including temperature correction to 60° Fahrenheit. Absent fraud or manifest error, all such measurements will be binding on Customer. Each of Operator and Customer reserves the right to witness any and all measurements taken under this Agreement, at such Party's sole cost and expense. All measurement, procedures, calculations, and practices that require an inspector shall be performed by a mutually agreed independent inspector (the "Independent Inspector"). Customer shall pay all costs associated with the Independent Inspector. Without limiting the foregoing, the following measurement methods will apply:

(a)   Pipeline. The quantity of Product received at the Terminal from, or redelivered from the Terminal to, a Pipeline will be measured and determined by one of the following methods in order of preference: (i) an API approved custody meter located at or near the Terminal; (ii) if the meter fails or is not available, hand gauges of static tanks by Operator, at Customer's expense. If the Terminal's meters are inoperable, fullness of pipelines will be verified by the Independent Inspector according to the then-current API guidelines or procedures prior to any Vessel loading any of Customer's Product.

(b)   Vessel. The quantity of Product received at the Terminal from Vessels and/or redelivered from the Terminal into Vessels (as applicable) will be measured and determined by using one of the following methods (in order of preference and based on available equipment): (i) shore meters; (ii) static shore tank gauges; (iii) the Vessel volume with qualified VEF applied; or (iv) as may be commercially agreed by the Parties in writing.

(c)   Rail. The quantities of Product received by rail rack shall be measured by the following (in order of preference), subject to Operator's reasonable discretion to choose an alternative method: (i) by Operator's meters, if available; (ii) if meters are not available or are not functioning properly, then by tank gauges of the tank containing Product; or (iii) if meters and tank gauges are not available or are not functioning properly, then by the rail car bill of lading after correcting for in-transit losses.

(d)   Truck. The quantities of Product received from trucks at the Truck Rack shall be measured by the following (in order of preference), subject to Operator's reasonable discretion to choose an alternative method: (i) by Operator's meters or scales, if available; (ii) if such meters or scales are not available or are not functioning properly, then by tank gauges of the tank containing Product; or (iii) if meters and tank gauges are not available or are not function properly, then by the applicable truck's bill of lading after correcting for in-transit losses.

4.   **Product Movements; Nomination Provisions**. Operator reserves the right, at any time and from time to time, upon prior written notice to Customer, to issue nomination procedures governing the receipt, redelivery and other movements of product (including Product) at, from and within the Terminal and/or the Dock (the "Nomination Procedures"), which nomination procedures will apply generally to customers at the Terminal.  Once issued, said Nomination Procedures shall be subject to modification by Operator, upon written notice to Customer, to take account of changes in the

Exhibit A - 3

**Confidential**

nomination procedures and/or other procedures applicable from time to time at the Terminal. Customer shall be bound by the rules, regulations and obligations set forth in the Nomination Procedures, if and as issued. In the absence of any Nomination Procedures, or to the extent not covered by the then-current Nomination Procedures, Customer will schedule Product receipts and redeliveries in writing with Operator pursuant to the following terms and conditions set forth in this Section 4.

(a)    Product Movement. Customer shall arrange for, bear the risk of, and pay all costs associated with, the transportation of its Product to and from the Terminal. Customer will deliver Product to and receive Product from the Terminal by the method(s) stated in Section 6 of the Agreement. All receipts of Product at, redeliveries of Product from, and movements of Product within the Terminal shall be subject to a Confirmed Nomination by Operator.

(b)    Pipeline Nominations. Subject to Section 1(d) of the General Terms, Operator will receive Customer's Product from the Pipeline twenty-four (24) hours per day, seven (7) days per week. To the extent practicable, Customer will notify Operator of pipeline nominations at least five (5) days prior to the expected time of receipt or desired time of redelivery and Customer will notify Operator of any change in the time of receipt or redelivery (as applicable) as soon as Customer becomes aware of the change. Pipeline receipts and redeliveries will be subject to approval by Operator, which approval will not be unreasonably withheld. To the extent possible, Customer will provide scheduled movement data on the Pipeline when the Pipeline operator issues its schedule under its nomination and scheduling processes.

(c)    Truck and Rail. Subject to Section 1(d) of the General Terms, Operator grants to Customer and its authorized representatives permission to enter the Terminal to load and/or unload Products at (i) a Truck Rack from trucks operated by Customer or its authorized representatives and (ii) the rail track from rail cars operated by Customer or its authorized representatives. Customer and its authorized representatives may enter the Terminal for such purpose at such times as are designated in this Agreement. To the extent practicable, Customer will notify Operator of (A) shipments to be loaded and/or unloaded at the Truck Rack twelve (12) hours in advance and (B) shipments to be loaded and/or unloaded at the rail track twenty-four (24) hours in advance. The Truck Rack and rail track shall be available twenty-four (24) hours per day, seven (7) days per week.

(d)    Vessel. Customer will arrange with Operator for the receipt and/or redelivery of Customer's Product from or to one or more Vessels nominated by Customer which have been vetted and otherwise approved in advance by Operator or one of its Affiliates in accordance with the terms of Operator's standard marine provisions and port procedures (as the same may be amended, modified, revised or otherwise changed, from time to time, in Operator's sole discretion). Subject to Section 1(d) of the General Terms, the Terminal will be available for the receipt and/or redelivery of Product to Vessels twenty-four (24) hours per day, seven (7) days per week.

(e)    Prioritizing of Movements. Customer recognizes and accepts that operations of the Facilities (including with respect to access to any Pipeline or the Dock) will be coordinated to maximize movements through the Terminal while working within the constraints of the Facilities. In certain circumstances, this may lead to a delay in the provision of Services to

Exhibit A - 4

**Confidential**

GCAC 000100
001932

Customer. Customer acknowledges and agrees that Operator shall not have any liability to Customer arising out of any such delays. Without limiting the foregoing, in the event that more volume of product is nominated for movement into, out of or within the Terminal than can be moved at such time, Operator will use commercially reasonable efforts to allocate access to the Facilities in a fair and equitable manner; *provided* that (i) customers nominating product for movement on a firm or committed basis level of service shall have priority over customers nominating product for movement on an as available basis level of service; and (ii) nominations for the receipt of product into or the redelivery of product from the Terminal shall have priority over nominations for tank-to-tank transfers.

(f) Demurrage.

(i) MARINE. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL ANY OPERATOR PARTY BE LIABLE TO ANY CUSTOMER PARTY, VESSEL OR PIPELINE FOR ANY CLAIM, LOSS, DAMAGE OR EXPENSES ARISING OUT OF OR IN CONNECTION WITH DEMURRAGE, INCLUDING ANY (A) DELAY IN BERTHING, RECEIVING, OR RELEASING A VESSEL, (B) DELAY IN RECEIVING, LOADING, REDELIVERING OR DISCHARGING PRODUCT, OR (C) DELAY IN ORDERING A VESSEL TO VACATE THE DOCK, REGARDLESS OF HOW CAUSED AND REGARDLESS OF THE THEORY OF RECOVERY, EXCEPT TO THE EXTENT THAT CUSTOMER PARTY, THE VESSEL OR PIPELINE (AS APPLICABLE) INCURS ANY SUCH CLAIM, LOSS, DAMAGE, OR EXPENSE AS A DIRECT RESULT OF OPERATOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(ii) RAIL. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL ANY OPERATOR PARTY BE LIABLE TO ANY CUSTOMER PARTY OR RAIL CARRIER FOR ANY CLAIM, LOSS, DAMAGE OR EXPENSES ARISING OUT OF OR IN CONNECTION WITH DEMURRAGE, INCLUDING ANY (A) DELAY IN SPOTTING, RECEIVING, OR RELEASING A RAILCAR, (B) DELAY IN RECEIVING, LOADING, REDELIVERING OR DISCHARGING PRODUCT, OR (C) DELAY IN ORDERING A RAILCAR(S) TO VACATE THE RAIL LOADING FACILITY, REGARDLESS OF HOW CAUSED AND REGARDLESS OF THE THEORY OF RECOVERY, EXCEPT TO THE EXTENT THAT CUSTOMER PARTY OR THE RAIL CARRIER (AS APPLICABLE) INCURS ANY SUCH CLAIM, LOSS, DAMAGE, OR EXPENSE AS A DIRECT RESULT OF OPERATOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(iii) TRUCK. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL ANY OPERATOR PARTY BE LIABLE TO ANY CUSTOMER PARTY OR TRUCK CARRIER FOR ANY CLAIM, LOSS, DAMAGE OR EXPENSES ARISING OUT OF OR IN CONNECTION WITH DEMURRAGE, INCLUDING ANY (A) DELAY IN RECEIVING OR RELEASING A TRUCK TANKER, (B) DELAY IN

Exhibit A - 5

Confidential

RECEIVING, LOADING, REDELIVERING OR DISCHARGING PRODUCT, OR (C) DELAY IN ORDERING A TRUCK(S) TO VACATE THE TRUCK RACK, REGARDLESS OF HOW CAUSED AND REGARDLESS OF THE THEORY OF RECOVERY, EXCEPT TO THE EXTENT THAT CUSTOMER PARTY OR THE TRUCK CARRIER (AS APPLICABLE) INCURS ANY SUCH CLAIM, LOSS, DAMAGE, OR EXPENSE AS A DIRECT RESULT OF OPERATOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(iv)     Claims under this clause (f) for such claims, loss, damage, or expenses arising out of or related to demurrage must be received by Operator no later than ninety (90) days after the first day for which demurrage is claimed. IF SUCH CLAIM IS NOT SUBMITTED TO OPERATOR WITHIN THE FOREGOING TIME PERIOD, THE CLAIM SHALL BE DEEMED WAIVED AND SHALL BE EXTINGUISHED IN ITS ENTIRETY.

(g)    Overage Fees.

(i)     Vessel Overages.  In the event that any Customer's Vessel refuses or fails to vacate the applicable berth after completing loading or unloading operations or when released or otherwise ordered by Operator, then Customer shall pay Operator an overage fee equal to **One Thousand Dollars ($1,000)** per hour (or any part thereof) beginning six (6) hours after notice of release, the order to vacate or the order to shift berths is given to such Vessel and continuing until such Vessel vacates the berth, regardless of any intervening circumstances other than (A) events of Force Majeure affecting the Dock and/or Port of Corpus Christi, (B) channel unavailability or (C) delays caused by a governmental authority having jurisdiction over the Terminal or the Dock. If such Customer's Vessel does not timely vacate her berth, in addition to the overage fee, Operator shall be entitled to all losses, costs and expenses (including legal costs and expenses) incurred in connection with the moving of such Customer's Vessel, which shall be solely for Customer's account.

(ii)    Railcar Overage Fees.  Customer shall not store railcars at the Facility, and Customer shall remove such railcars as soon as reasonably practical after any loading or unloading operations have been completed.  In the event that Customer refuses or fails to remove one or more rail cars from the Facilities (or part thereof) after being notified by Operator of the need to do so regardless of any intervening circumstances other than events of Force Majeure, then Customer shall pay Operator an overage fee equal to Twenty-Five Dollars ($25.00) per rail car per twenty-four (24) hours (or any part thereof) beginning twenty-four (24) hours after such notice of removal is given to Customer and continuing until such rail car(s) are removed from the Facilities (or the applicable part thereof).  If such rail car(s) do not timely vacate the Facilities, in addition to the overage fee, Operator shall be entitled to all losses, costs and expenses (including legal costs and expenses) incurred in connection with the moving of such rail car(s), which shall be solely for Customer's account.

Exhibit A - 6

Confidential

(iii)    Nothing contained in this Section 4(g) is intended to authorize Customer to use any of the Docks or the Terminal's rail facilities unless use of said facilities is authorized pursuant to the other terms and conditions of this Agreement.

5.    **Tank Operations.**

(a)    Tank Use. Except as provided for herein, the Tanks shall be used by Customer only for the storage of the Products; *provided, however*, that anything in this Agreement to the contrary notwithstanding, Customer shall not deliver to the Terminal any Product which (a) would in any way be injurious to the Tanks, (b) would render the Tanks unfit, after cleaning, for the proper storage of water, white oils, or chemicals, (c) may not lawfully be stored in the Tanks, including Products with vapor pressures which exceed the limitations imposed by any Applicable Law, or (d) does not match, in all material respects, the specifications for the Product that Customer provides to Operator in advance of such Product's delivery to the Terminal.

(b)    Tank Cleaning and Waste.

(i)    Cleaning Upon Expiration or Termination. Customer acknowledges that the Tanks were originally designated for use and accepted by Customer in a condition suitable for the storage of the Product. If upon termination of this Agreement or, due to a change in any Product stored during the term hereof, cleaning of the Tank(s), in the reasonable opinion of Operator, is necessary, Customer shall reimburse Operator for the cost of said Tank cleaning in accordance with Section 8(b)(i) of the Agreement. Upon expiration or termination of this Agreement, Customer shall be responsible for the removal and disposal of the Product and Waste in accordance with Section 6(a) of the General Terms.

(ii)    Interim Tank Cleaning. Customer acknowledges that from time to time Tank cleaning may be necessary to perform maintenance or emergency repairs. In the event such maintenance and/or repairs occur more than one (1) year after the commencement of storage by Customer in a particular Tank, Customer agrees to reimburse Operator for the actual cost of removing Product, cleaning the Tank(s) and disposing of any Waste in accordance with Section 6(a) of the General Terms.    Operator will be responsible for any required Tank cleaning costs for up to one (1) year from the completion of any such repairs and Customer shall be responsible for such costs thereafter following such maintenance and/or repairs. Customer will be responsible for the cost of Waste removal and disposal any time Tank cleaning is required. This paragraph does not supersede or change in any way Customer's obligations under Section 5(b)(i) of the General Terms.

(iii)    Waste Charge. Customer shall be responsible for all reasonable and documented costs associated with the handling of waste resulting from Tank cleaning, a change in Product to be stored in the Tank, Tank water draws and any other operations associated with Customer's Product. Customer shall reimburse Operator for the cost of said cleaning and disposal of waste in accordance with the rates for additional services pursuant to Section 8(b)(iv) of the Agreement.

Exhibit A - 7

**Confidential**

(c)     Tank. Customer acknowledges that it is familiar in all respects with the Tanks. Customer shall have a representative inspect and accept the Tank as clean and suitable in all respects for Customer's Product and for Customer's needs before the initial receipt of Customer's Product by Operator. If Customer fails to do so, then the Tank shall be deemed clean and suitable in all respects for Product and for Customer's needs. Operator shall use commercially reasonable efforts to cause the Tank to comply in all material respects with all Applicable Law, as well as the applicable API standards.

(d)     Floating Roof. Intentionally left blank.

6.     **Removal of Products and Waste.**

(a)     Tank Product and Waste. Upon the expiration or termination of this Agreement, or at such earlier time as may be necessary in the reasonable judgment of Operator during the Term for the purposes of Tank maintenance or repairs, Customer shall remove or pay all the expense to remove all Products and Waste from the Tank(s) in accordance with all Applicable Law. Operator shall arrange for removal and disposal of Waste. Operator shall provide Customer with an estimate of the cost for such cleaning, and Customer may obtain its own estimate for such removal and disposal by a contractor acceptable to Operator. In any event, Customer shall pay the documented costs for such removal and disposal of Waste, including the cost of any charges, taxes, disposal fees, regulatory authority charges, preparation of documents or other costs incurred in connection therewith, upon receipt of an invoice with supporting documentation. Waste shall be identified using Customer's EPA Hazardous Waste generator number unique for each Terminal location. In the event Customer fails to provide such EPA Hazardous Waste generator number, Customer agrees to reimburse Operator for the documented cost to dispose of Waste using a destructive method, such as incineration. Customer shall pay for all costs and indemnify, defend and hold harmless Operator from and against all liability arising from the waste disposal method selected by Operator.

(b)     Vessel Waste. No Vessel shall be permitted to discharge ballast water and/or any liquid wastes at or into the Terminal.

(c)     Flushings and Samples. The quantity of all Products used as flushing materials or samples in connection with operations conducted by Operator for Customer shall not constitute losses for which Operator is liable to Customer. If such flushing materials or samples can be recovered by Operator, they shall be loaded into drums or other receptacles either provided by Customer or secured by Operator at Customer's cost and expense. All such flushing materials or samples shall be the property of Customer and unless otherwise agreed to by Operator, shall be stored and handled by Operator in accordance with written instructions given to Operator by Customer, and shall be removed from Operator's property and properly disposed of in accordance with Section 6(a) of the General Terms, at the expense of Customer, within thirty (30) days from the date of each flushing or from the last day of the applicable sample retention period.

(d)     Additional Equipment. Any fixtures attached to the Tanks or equipment otherwise placed in the Terminal by Customer or Operator at the request of Customer and paid for by Customer shall be considered property ("Property") of Customer. Title to such Property shall

**Confidential**

vest in Operator upon expiration or termination of the Agreement unless Operator agrees in writing that Customer may remove such Property at that time. Customer shall pay for the restoration of the Tanks and surrounding area, and pay for all damage to Operator's Tanks or facilities caused by the removal of any such Property. Unless otherwise provided in the Agreement, Taxes, insurance, maintenance and operating costs related to the Property will be paid by Operator and are included in the rates charged to Customer for warehousing services.

(e)     Tank Inner Lining. If it is agreed by Customer and Operator that a Tank inner lining is required to protect the Product or the Tank or both, the documented direct and indirect costs of installing, maintaining, and repairing such lining and its removal, if such removal is required by Operator upon expiration or termination of this Agreement, shall be paid for by Customer.

7.     **Payment Terms**.

(a)     Terminal Fee Invoices. On or before the tenth (10th) day of each calendar month, Operator will render to Customer an invoice (each, an "Invoice"), for (i) the Storage Services Fee for the following month, (ii) all other fees owed for Services under Section 8(a) provided to Customer for the preceding month, (iii) all reimbursement charges due under Section 8(b) attributable to the preceding month and (iv) any other amounts as may be due under this Agreement.

(b)     Payments. Payments of amounts included in any Invoice shall be due and payable on or before the later of (i) the twentieth (20th) day of the calendar month in which such Invoice was delivered, and (ii) the date that is five (5) Business Days after Customer's receipt of the applicable Invoice. All payments shall be made, in U.S. Dollars, without offset, discount, deduction or counterclaim by wire transfer, ACH debit or another form of acceptable electronic payment, of immediately available funds to Operator at such account as Operator may designate in writing. Invoices and supporting documents received after 12:00 p.m. Central Standard Time shall be considered to be received on the next Business Day. Customer's obligations to pay for Services performed or provided pursuant to the terms and conditions of this Agreement will survive the termination of the Agreement. Operator's acceptance of payment for any Service performed or provided after the termination of the Agreement will not be deemed a renewal of the Agreement.

(c)     Split Weekend Clause. If the payment due date falls on a Sunday, or on a Monday that is not a Business Day in the place where payment is to be made, payment shall be made in immediately available funds to Operator on the next Business Day after such payment due date. If the payment due date falls on a Saturday, or on a non-Business Day other than a Monday in the place where payment is to be made, payment shall be made in immediately available funds to Operator on the last Business Day prior to such payment due date.

(d)     Interest and Costs. Any amount payable by Customer hereunder shall, if not paid when due, bear interest from the payment due date until, but excluding the date payment is received by Operator, at the Interest Rate.

**Confidential**

(e)    Disputed Invoices. Customer shall pay the amount invoiced in full. If Customer, in good faith, disputes the accuracy of any amount invoiced by Operator, Customer shall provide written notice stating the reasons why the invoice amount is incorrect, along with supporting documentation acceptable in industry practice. In the event the Parties are unable to resolve such dispute, either Party may pursue any remedy available at law or in equity to enforce its rights hereunder. To the extent that it is determined or agreed that Operator must or will reimburse Customer for the disputed amount, Operator shall credit an amount equal to such reimbursable amount on the Invoice immediately following such determination or agreement.

8.    **Adequate Assurance.** In addition to any credit support that Operator may require in connection with the execution of the Agreement, if at any time during the Term, Operator has reasonable grounds for believing that Customer cannot or will not be able to meet its current or future obligations, then as adequate assurance of performance, Operator may require, at its option, Customer to provide (a) an irrevocable stand-by letter of credit from a bank acceptable to Operator, and on terms and in an amount acceptable to Operator; (b) a guaranty from a party, and on terms, acceptable to Operator; or (c) prepayment in an amount sufficient to provide, in Operator's sole reasonable discretion, adequate security for payment by Customer of all its obligations for the next two (2) years or if shorter, the remainder of the Term. If Customer fails to provide the required adequate assurance within five (5) Business Days of its receipt of Operator's notice requiring same, Operator may terminate this Agreement immediately upon notice to Customer.

9.    **Taxes and Assessments.**

(a)    General. During the Term, any Taxes assessed by any federal, state, local or other governmental authority upon or as a result of the ownership, transportation, sale, removal or withdrawal of any Product, or the Services provided by Operator to Customer hereunder, shall be borne and paid for by Customer, except to the extent any such Taxes are, by Applicable Law, required to be paid directly by Operator, in which event, such Taxes shall be paid by Operator and reimbursed by Customer. The above notwithstanding, Operator shall remain liable for and Customer shall have no obligation to reimburse Operator for (i) any Taxes imposed on or calculated based upon net profits, gross or net income, profit margin or gross receipts of Operator (such taxes, "Income Taxes"), (ii) any Taxes measured by capital value or net worth of Operator; or (iii) any ad valorem or personal property taxes on the Terminal or the property of Operator. Any penalties or interest imposed by a taxing authority on either Party due to failure to pass information by the other Party will be paid by the Party failing to pass along necessary tax notices.

(b)    Excise Tax. Without limiting Section 9(a) above, (i) Customer is hereby advised that Operator is required by Applicable Law to report Product inventory to local taxing authorities and (ii) Customer agrees to supply Operator with a completed signed original Notification Certificate of Gasoline and Diesel Fuel Registrant as required by the Internal Revenue Service's excise tax regulations or written confirmation that such registration is not required by regulation. Customer further agrees to comply with all other requirements imposed by Operator and Applicable Law with respect to such excise taxes.

(c)    New Tax. If any New Taxes (other than Income Taxes or property taxes related to ownership of the Terminal) are imposed on Operator which increases the cost to Operator of

Exhibit A - 10

**Confidential**

GCAC 000106
001938

rendering the Services, Operator shall provide written notice to Customer with supporting documentation of the additional cost of the New Taxes and Customer's proportionate share. Customer may then decide whether to pay its proportionate share or terminate this Agreement. If Customer elects to terminate, it must provide sixty (60) days' written notice to Operator, at which point neither Party will have any further liability to the other Party except for the liabilities and obligations previously accrued. If Customer provides no such termination notice to Operator, on the sixtieth (60th) day following Customer's receipt of the notice of New Taxes, such costs will be automatically added to the Agreement by amendments that restore to Operator the same economic bargain as would have resulted if Customer, rather than Operator, had paid the New Taxes.

10.   **Title and Custody.** Title to Customer's Product will remain with Customer at all times subject to (a) any lien in favor of Operator created pursuant to the terms of this Agreement, (b) any statutory warehouseman's lien in favor of Operator and/or (c) any common law lien rights that have accrued in favor of Operator, in each case while such Product is in Operator's custody. Custody of Customer's Product shall transfer between Customer and Operator as follows:

(a)   For Pipeline receipts at the Terminal, custody of Product shall pass to Operator when the Product passes the last permanent flange connection between the delivering Pipeline and the Operator's receiving pipeline connection.

(b)   For Pipeline redeliveries from the Terminal, custody of Product shall pass back to Customer when the Product passes the last permanent flange connection between the Operator's delivering pipeline connection and the receiving Pipeline.

(c)   For receipts at the Terminal from Vessels, custody of the Product shall pass to Operator when the Product passes the first permanent flange connection between the Vessel's connection hoses and Operator's shore receiving line.

(d)   For redeliveries from the Terminal to Vessels, custody of the Product shall pass back to Customer when the Product passes the last permanent flange connection between Operator's shore loading line and the Vessel's connection hoses.

(e)   For receipts from truck or rail car, custody of the Product shall pass to Operator when the Product passes the last permanent flange connection between the truck or rail car's delivery hose and the Terminal's receiving flange.

(f)   For redeliveries to truck, custody of the Product shall pass back to Customer when the Product passes the first permanent flange connection between the truck's delivery hose and the Terminal's redelivery flange.

11.   **Operating Volumes.**

(a)   Tank Bottoms/Heels and Line Fill. Promptly following the commencement of the Services (or any one of them), Customer shall purchase the tank heel of each Tank from Operator for one Dollar ($1.00) per Tank. Promptly following expiration or termination of this Agreement, said tank heels will be repurchased by Operator from Customer for an amount equal to one Dollar ($1.00) per Tank. If the amount of the heels at the end of the Term is

Exhibit A - 11

**Confidential**

different than on the Effective Date, any discrepancy will be settled at the current POTEN mean price. In addition, Customer shall be responsible for providing a pro rata share of the line fill used by Operator for the handling of the Product at the Terminal in connection with the Services.

(b)     Storm Preparations.

(i)     The Terminal can be affected by storms with high winds and flooding. During such conditions, the Operator may require its Facilities to contain a certain volume of product. If Operator determines a storm may affect the Facilities, Operator will provide Customer advance notice of the need to adjust (either to increase or decrease) the volume of Product in the tanks (including the Tanks) and/or any connecting pipelines. If Customer is unable to make any such adjustment, Customer hereby authorizes Operator to move Product within the Terminal into the Terminal's tanks (including the Tanks) or move Product from the Tanks to other tankage, lines and/or manifolds as needed to establish required minimum levels in the Facilities. Operator will endeavor to use either Product designated by Customer, or a substantially similar product when available.

(ii)     Notwithstanding anything to the contrary in this Agreement, Operator Parties shall have no liability to Customer for the loss of, or degradation in the value of Product in tanks (including the Tanks) and/or lines that result from any action or inaction of Operator in anticipation of or during a storm; *provided* that Operator acts in a commercially reasonable manner to prevent loss and/or degradation of Customer's Product.

12.     **Product Loss or Damage.** Customer acknowledges during the terminaling, processing, and storage of product at the Terminal certain product losses are expected as a result of evaporation, shrinkage, line loss, measurement inaccuracies, interface losses and other normal losses. Notwithstanding any provision in this Agreement to the contrary, (i) Operator will not be liable to Customer for any contamination, damage, degradation, misdelivery or loss of Product associated with any particular Product movement to the extent that any such contamination, damage, degradation, misdelivery or loss of Product affects a volume that is less than or equal to one half of one percent (0.50%) of the volume in such Product movement (the "Loss Allowance"), and (ii) Operator will not be liable to Customer for any contamination, damage, degradation, misdelivery or loss of Product associated with any particular Product movement that exceeds the Loss Allowance unless and to the extent such contamination, damage, degradation, misdelivery or loss occurs as a result of Operator's negligence, willful misconduct, or breach of any of its obligations in this Agreement. Operator and Customer will promptly review any instances of contamination, damage, degradation, misdelivery or loss of Product (regardless of liability therefor) that affects volumes in excess of the Loss Allowance (including the reasons therefor, any mitigants with respect thereto, or any corrective actions taken as a result). Customer must make any claims for the contamination, damage, degradation, misdelivery or loss of Product by written notice to Operator within ninety (90) days of the date that Customer becomes aware of such contamination, damage, degradation, misdelivery or loss, and Customer irrevocably waives any claim for which the required notice is not provided within the required time. NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, OPERATOR'S LIABILITY ARISING OUT OF CONTAMINATION, DAMAGE,

Exhibit A - 12

**Confidential**

DEGRADATION, MISDELIVERY OR LOSS OF PRODUCT SHALL NEVER IN ANY EVENT EXCEED AN AMOUNT EQUAL TO (i) THE LESSER OF (1) THE REPLACEMENT VALUE OF THE PRODUCT AT THE TIME OF THE LOSS OR DAMAGE BASED UPON THE POSTED PRICE FOR SIMILAR PRODUCT IN THE SAME LOCALITY, OR (2) THE ACTUAL COST PAID FOR THE PRODUCT BY CUSTOMER (AS SUPPORTED BY INVOICE), LESS (ii) THE SALVAGE VALUE, OF ANY OF THE LOST OR DAMAGED PRODUCT. OPERATOR SHALL NOT IN ANY EVENT BE RESPONSIBLE OR LIABLE FOR ANY CONSEQUENTIAL DAMAGES (AS DEFINED HEREIN), NO MATTER HOW SUCH CONTAMINATION, DAMAGE, DEGRADATION, OR LOSS OF PRODUCT SHALL HAVE OCCURRED OR BEEN CAUSED. THE REMEDIES SET FORTH IN THIS SECTION 12 SHALL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES AGAINST OPERATOR PARTIES WITH RESPECT TO ANY LIABILITIES, CLAIMS OR LOSSES ARISING OUT OF OR IN CONNECTION WITH ANY CONTAMINATION, DAMAGE, DEGRADATION, MISDELIVERY OR LOSS OF PRODUCT, AND CUSTOMER HEREBY RELEASES AND DISCHARGES THE OPERATOR PARTIES FROM ANY AND ALL OTHER LIABILITIES, CLAIMS OR DAMAGES RELATED THERETO OR RESULTING THEREFROM.

13.   **Compliance with Applicable Law; Changes in Applicable Law.**

(a)   Operator and Customer each agree to comply fully in the performance of this Agreement with all Applicable Law.

(b)   Customer will comply, and will cause all Customer Parties to comply, with (i) all signs, rules, policies and procedures posted at the Terminal and (ii) all rules, policies and procedures of Operator furnished to Customer. Operator may, from time to time, adopt and enforce such rules, policies and procedures as it deems necessary or appropriate in connection with environmental, health and safety standards. Operator reserves the right from time to time to alter, amend, supplement, modify or revoke its rules, policies and procedures. Operator shall provide reasonable notice to Customer of any such alteration, supplementation, modification or revocation of its rules, policies and procedures in accordance with Section 26(a).

(c)   If, during the Term, one or more Applicable Law are amended or enacted that (individually or in the aggregate) require Operator to make substantial or unanticipated capital expenditures with respect to the Facilities (or any part thereof) or require changes to the provision of the Services and/or operation of the Facilities (or any part thereof) that cause Operator to incur material additional operating costs, Operator shall provide written notice to Customer with supporting documentation of the additional operating costs and Customer's proportionate share. Customer may then decide whether to pay its proportionate share or terminate this Agreement. If Customer elects to terminate, it must provide sixty (60) days' written notice to Operator, at which point neither Party will have any further liability to the other Party except for the liabilities and obligations previously accrued. If Customer provides no such termination notice to Operator, on the sixtieth (60th) day following Customer's receipt of the notice of additional operating costs, Operator may impose a monthly surcharge upon Customer to cover Customer's pro rata share of the cost of Operator's compliance with such Applicable Law, based upon the percentage of Customer's use of the Services, Terminal,

Exhibit A - 13

**Confidential**

and/or Facilities impacted by such Applicable Law relative to the overall capacity of the Terminal.

14.   **Use of Facilities; Removal**.

(a)   Customer agrees to use the Facilities only for the handling, storage, and throughput of Customer's Product specified in this Agreement, and Customer shall be responsible for any damage to the Facilities if and to the extent caused by any of Customer's Product which (i) is not expressly authorized under the terms hereof, or (ii) contains any contaminant introduced into Customer's Product prior to Operator taking custody of such Product.

(b)   Unless otherwise mutually agreed, as soon as possible upon the termination or expiration of this Agreement, but in no event later than the date that is ten (10) days following the expiration or termination of this Agreement (the "Removal Date") Operator will remove and redeliver to Customer, and Customer will accept, all of Customer's Product at the Terminal, including that amount of Customer's Product allocated to Customer's pro rata share of the line fill, and redeliver it, to the redelivery mode(s) designated by Customer. Notwithstanding the foregoing, Customer shall be responsible for the disposal cost of such residual Product if and to the extent any such residual Product remains in the tanks and/or lines at the Terminal after the Removal Date. Title to such residual Product attributable to Customer shall remain with Customer at all times.

(c)   For any of Customer's Product that remains at the Terminal beyond the Removal Date:

(i)   Customer will pay Operator, in addition to any other applicable Terminal Fees, a holdover charge of **Two Dollars ($2.00)** per Barrel of the gross shell Barrel capacity for each Tank the Customer's Product occupies per month (or part thereof) until the day that all such Product is removed from the Terminal; and

(ii)   Operator may, at its option, remove Customer's Product from the Terminal after the Removal Date, and shall so notify Customer in writing and may thereafter (A) arrange the removal and temporary storage of Customer's Product at another terminal or tankage, with Customer to pay all costs of removal and storage, and/or (B) upon such notice as is required by Applicable Law, (1) sell Customer's Product under any terms that are commercially reasonable, (2) deduct all amounts due and payable by Customer to Operator under this Agreement and all direct costs incurred by Operator in connection with the sale from the proceeds received, plus an administrative markup of fifteen percent (15%), and (3) remit the net amount of the proceeds received, if any, to Customer within thirty (30) days of the date of the sale.

(d)   The terms and conditions of this Section 14 (and the Terminal Fees insofar as such fees and charges correspond with services provided to remove Customer's Product from the Terminal following expiration or termination of this Agreement) shall survive through the date that Customer's Product is completely removed from the Terminal and all charges due and payable hereunder have been fully paid by Customer.

15.   **Maintenance**. Operator may take any facility or equipment at the Terminal, or any portion or part thereof, out of service during the Term in order to perform inspections, maintenance, or repairs.

Exhibit A - 14

**Confidential**

Except for any Emergency where providing advance notice is not practicable, Operator will use commercially reasonable efforts to provide Customer with at least thirty (30) days prior written notice of any such maintenance which affects any Service hereunder.

16.   **Insurance.**

(a)   The Terminal Fees do not include any insurance covering "ALL RISK" of Physical insurance (typically referred to as Cargo and or Storage insurance) to or for loss of Customer's Product while it is in the custody of Operator, it being expressly understood and agreed that insurance, if any is desired by Customer, shall be carried by Customer at its own expense.

(b)   Without in any way limiting any of Customer's obligations, indemnities or liabilities as specified elsewhere in this Agreement, at all times during the Term, Customer shall obtain and maintain at its expense the following minimum insurance:

(i)   Worker's Compensation and Employer's Liability Insurance as prescribed by and in accordance with Applicable Law.

(ii)   Commercial General Liability with a limit of liability for bodily injury or property damage of five million Dollars ($5,000,000) per occurrence on ISO Coverage Form CG 00 01 (or equivalent), such coverage to include products/completed operations liability, premises/operations, independent contractors, broad form bodily injury and property damage, personal injury, *in rem* (if applicable), sudden and accidental pollution liability, and contractual liability covering the indemnities, obligations, and liabilities under this Agreement.

(iii)   Commercial Automobile Liability Insurance including owned, non-owned and hired vehicles, with limit of one million Dollars ($1,000,000) per occurrence for bodily injury and property damage combined.

(iv)   Excess Liability Insurance with limits of not less than ten million Dollars ($10,000,000) per occurrence and in the aggregate providing additional limits of insurance of the coverage described above (excepting Worker's Compensation).

(c)   If Customer is permitted under this Agreement to nominate one or more Vessels to deliver or accept redelivery of Customer's Product at the Dock, then without in any way limiting any of Customer's obligations, indemnities or liabilities as specified elsewhere in this Agreement, at all times during the Term, Customer covenants and agrees that each such Customer's Vessel (including any Vessels owned, operated or demised chartered by or on behalf of Customer) shall procure and maintain the following minimum insurance, satisfactory to Operator and in compliance with all Applicable Law:

(i)   Hull and Machinery Insurance on each Vessel, in an amount not less than the fair market value of the Vessel, with navigation limits adequate for the Vessel's trade; and

(ii)   Protection and Indemnity ("P&I") Insurance provided through any combination of (A) full entry with a P&I Club (that is a member of the International

Exhibit A - 15

**Confidential**

**GCAC 000111**
001943

Group of P&I Clubs); and/or (B) policy(ies) with a commercial insurance company(ies) or underwriters syndicate(s) acceptable to Operator with terms no less broad than those customarily carried by similar marine carriers. Such P&I insurance shall include coverage for injury to or death of master, mates, and crew; tower's liability; excess collision liability; cargo legal liability; pollution liability; and contractual liability. The P&I Insurance coverage against pollution liability shall be at limits of (x) not less than one billion Dollars ($1,000,000,000) per incident for Ships, and (y) no less than two hundred million Dollars ($200,000,000) per incident for Inland Barges.

(d)     Without in any way limiting any of Operator's obligations, indemnities or liabilities as specified elsewhere in this Agreement, at all times during the Term, Operator shall obtain and maintain at its expense the following minimum insurance:

(i)     Worker's Compensation and Employer's Liability Insurance as prescribed by and in accordance with Applicable Law.

(ii)     Commercial General Liability with a limit of liability for bodily injury or property damage of five million Dollars ($5,000,000) per occurrence on ISO Coverage Form CG 00 01 (or equivalent), such coverage to include products/completed operations liability, premises/operations, independent contractors, broad form bodily injury and property damage, personal injury, in rem (if applicable), sudden and accidental pollution liability, and contractual liability covering the indemnities, obligations, and liabilities under this Agreement.

(iii)     Commercial Automobile Liability Insurance including owned, non-owned and hired vehicles, with limit of one million Dollars ($1,000,000) per occurrence for bodily injury and property damage combined.

(iv)     Excess Liability Insurance with limits of not less than ten million Dollars ($10,000,000) per occurrence and in the aggregate providing additional limits of insurance of the coverage described above (excepting Worker's Compensation).

(e)     Upon request, a Party (the "Coverage Holder") shall provide the other Party (the "Requesting Party") with certificates or other documentary evidence of the above insurance, reasonably satisfactory to the requesting Party. Acceptance of any such certificate or other documentation shall not constitute a waiver, release or modification of any of the insurance coverages and endorsements required hereunder if the certificate or documentation is inconsistent with those coverages and endorsements. The above required insurance policies shall provide that the Requesting Party will receive thirty (30) days' written notice prior to the cancellation or material change of the insurance. The insurance specified in Sections 16(b)(ii), (iii), (iv) and in Section 16(c) of the General Terms shall name the Operator Parties as additional insureds, and the insurance specified in Sections 16(d)(ii), (iii), (iv) of the General Terms shall name the Customer Parties as additional insureds, and each of Operator and Customer shall cause the underwriters of such insurance policies to waive subrogation rights against the Customer Parties (in the case of the Operator), and Operator Parties (in the case of the Customer).

Exhibit A - 16

**Confidential**

(f)     With respect to insurance required under Section 16(c) of the General Terms, (i) the insurance coverages required will be maintained by each primary named insured at its sole cost and expense at all times during the term of the Agreement and (ii) if liability for loss or damage is denied by the insurer(s) of a Party, in whole or in part, because of the (A) breach by such Party of any policy for the insurance coverages required hereunder, or (B) failure by such Party to obtain or maintain any of the insurance coverages required hereunder, **THE PARTY BREACHING ANY POLICY OF INSURANCE OR FAILING TO OBTAIN OR MAINTAIN INSURANCE COVERAGES REQUIRED HEREUNDER SHALL HOLD HARMLESS AND INDEMNIFY THE OTHER PARTY (INCLUDING THE OPERATOR PARTIES (IF THE OTHER PARTY IS THE OPERATOR) OR CUSTOMER PARTIES (IF THE OTHER PARTY IS THE CUSTOMER)) AGAINST ALL SUCH LOSSES.**

(g)     The insurance requirements set forth herein shall not in any way limit a Party's legal or contractual obligations under or in connection with this Agreement, or the liability of any Customer Parties or Operator Parties, as applicable. Each Party agrees to procure and maintain or cause the Customer Parties, or Operator Parties, as applicable, to procure and maintain insurance coverage in compliance with the requirements of this Section 16, and deductibles (or self-insurance retentions) associated therewith shall be carried and paid, as applicable, by the party procuring and maintaining such required insurance.

(h)     **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED ABOVE, THE OPERATOR PARTIES DO NOT CARRY INSURANCE COVERING THE PROPERTY OF ANY CUSTOMER PARTY OR VESSEL. OPERATOR PARTIES WILL NOT BE RESPONSIBLE FOR, AND EACH CUSTOMER PARTY HEREBY RELEASES AND DISCHARGES, AND SHALL ENSURE THAT EACH VESSEL RELEASES AND DISCHARGES, THE OPERATOR PARTIES** from, any and all liability for any injuries (including death) or property damage relating to, resulting from, caused by, or arising out of the use of the Terminal or Dock, except to the extent directly resulting from Operator's gross negligence or willful misconduct. **CUSTOMER HEREBY AGREES AND COVENANTS NOT TO, AND TO CAUSE EACH CUSTOMER PARTY NOT TO, SUE OR PROSECUTE ANY OPERATOR PARTY** on any claims, or for any damages, within the release stated above.

17.     Indemnity and Liability.

Duty to Indemnify Customer Parties. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, OPERATOR HEREBY AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE CUSTOMER PARTIES FROM AND AGAINST ANY AND ALL LIABILITIES (INCLUSIVE OF CLAIMS MADE BY OR LIABILITIES OF A THIRD PARTY) FOR ANY INJURY OR DEATH OF PERSONS AND/OR DAMAGE, LOSS, OR INJURY TO ANY PROPERTY (EXCLUDING LOSS OF PRODUCT) DIRECTLY OR INDIRECTLY ARISING OUT OF, INCIDENT TO, OR IN CONNECTION WITH, PERFORMING THEIR OBLIGATIONS UNDER THIS AGREEMENT, TO THE EXTENT SUCH LIABILITIES DIRECTLY ARISE OUT OF (I) THE NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR; OR (II)

Exhibit A - 17

OPERATOR'S BREACH OF APPLICABLE LAW OR BREACH OF ANY PROVISION OF THIS AGREEMENT.

(b)     Duty to Indemnify Operator Parties. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, CUSTOMER HEREBY AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE OPERATOR PARTIES FROM AND AGAINST ANY AND ALL LIABILITIES (INCLUSIVE OF CLAIMS MADE BY OR LIABILITIES OF A THIRD PARTY) FOR ANY INJURY OR DEATH OF PERSONS AND/OR DAMAGE, LOSS, OR INJURY TO ANY PROPERTY (EXCLUDING LOSS OF PRODUCT) DIRECTLY OR INDIRECTLY ARISING OUT OF, INCIDENT TO, OR IN CONNECTION WITH PERFORMING THEIR OBLIGATIONS UNDER THIS AGREEMENT TO THE EXTENT SUCH LIABILITIES DIRECTLY ARISE OUT OF THE NEGLIGENCE OR WILLFUL MISCONDUCT OF CUSTOMER; OR (II) CUSTOMER'S BREACH OF APPLICABLE LAW OR BREACH OF ANY PROVISION OF THIS AGREEMENT.

(c)     Notice and Defense. A party indemnified hereunder shall, as soon as practicable after receiving notice of any suit brought against it within this indemnity, furnish to the indemnifying party the full particulars within its knowledge thereof and shall render all reasonable assistance requested by the indemnifying party in the defense of any Liabilities. Each indemnified party shall have the right but not the duty to participate, at its own expense, with counsel of its own selection, in the defense and/or settlement thereof without relieving the indemnifying party of any obligations hereunder; *provided, however,* that the indemnifying party shall have control over the defense and settlement as long as the settlement does not impose any obligations on the indemnified party.

18.     Limitations of Liability. Notwithstanding anything to the contrary in this Agreement:

IN NO EVENT SHALL ANY PARTY BE LIABLE TO ANOTHER PARTY, AND OPERATOR HEREBY RELEASES CUSTOMER AND THE OTHER CUSTOMER PARTIES, AND CUSTOMER HEREBY RELEASES OPERATOR AND THE OTHER OPERATOR PARTIES, FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL LOSSES OR DAMAGES; SPECIAL OR PUNITIVE DAMAGES; COSTS, EXPENSES, OR LIABILITIES FOR ANY LOSS OF SERVICES OR REPLACEMENT (WHETHER WHOLE OR PARTIAL) SERVICES; OR FOR LOSS OF REVENUE, LOSS OF BUSINESS AND/OR LOST PROFITS (ALL OF THE FOREGOING, COLLECTIVELY OR ALTERNATIVELY, THE "CONSEQUENTIAL DAMAGES") WHICH ARISE OUT OF OR RELATE TO THIS AGREEMENT OR THE PERFORMANCE OR BREACH THEREOF WHETHER IN CONTRACT, TORT OR OTHERWISE; *PROVIDED, HOWEVER,* THIS WAIVER SHALL NOT APPLY TO DAMAGES SUFFERED OR INCURRED BY A THIRD PARTY FOR WHICH A PARTY TO THIS AGREEMENT IS OWED INDEMNIFICATION UNDER SECTION 17 OF THE GENERAL TERMS OR SECTION 5(e) OF THE AGREEMENT.

19.     Termination and Suspension.

Exhibit A - 18

**Confidential**

GCAC 000114
001946

(a)     An event of default with respect to a Party shall mean any of the following (each an "Event of Default"):

(i)     such Party's failure to make any payment when due and such failure is not cured within ten (10) Business Days of such Party's receipt of notice thereof;

(ii)     except for an occurrence under Section 19(a)(i), Section 19(a)(iv), Section 19(d) and Section 22 of the General Terms, such Party's failure to materially comply with any obligation or covenant under this Agreement, and the failure is not cured within thirty (30) Business Days after such Party's receipt of notice thereof;

(iii)     a Party is subject to an Insolvency Event; and

(iv)     Customer's failure to timely provide adequate assurance under Section 8 of the General Terms.

(b)     If an Event of Default of the type described:

(i)     in Section 19(a)(i), (ii) or (iv) occurs, in addition to all other remedies available under this Agreement, at law or in equity, the non-defaulting Party shall have the right to, at its sole discretion, immediately terminate this Agreement upon notice to the defaulting Party.

(ii)     in Section 19(a)(iii) occurs, in addition to all other remedies available under this Agreement, at law or in equity, the non-defaulting Party shall have the right to, at its sole discretion, immediately terminate this Agreement without notice to the defaulting Party.

(c)     Without limiting Section 19(b) of the General Terms, if an Event of Default occurs with respect to Customer, Operator shall have the right to, at its sole discretion, immediately suspend any or all of its performance hereunder, until the day the Event of Default has been fully cured in accordance with the terms of this Agreement.

(d)     If use of the Tank or handling of Customer's Product is restrained or enjoined by judicial process or terminated by any governmental authority or terminated by right of eminent domain, Operator may, at its option and without liability to Customer, terminate this Agreement upon notice to Customer.

(e)     The terms and conditions of this Section 19 shall survive through the date that Customer's Product is completely removed from the Terminal and all charges due and payable hereunder have been fully paid by Customer.

20.     **Product Handling/Safety.** Each Party will comply with all Applicable Law regarding the storage, handling, and throughputting of Product and any Hazardous Material in connection with this Agreement.

21.     **Spills/Environmental Pollution.**

Exhibit A - 19

Confidential

(a)     In the event of any Product spill or discharge or other environmental pollution (or threat thereof) caused by or in connection with Product at the Terminal, Operator may commence containment or clean-up operations as deemed appropriate or necessary by Operator or required by any governmental authorities and shall notify Customer immediately of such operations. Nothing in this Agreement shall limit either Party's respective rights to seek to obtain reimbursement of such costs from any governmental entity or to seek to recover any portion of the costs of containment or clean-up from any Third Party.

(b)     Customer represents and warrants that (i) each Vessel nominated or substituted by or behalf of it hereunder (if any) and her respective owner shall be in full compliance with the Oil Pollution Act of 1990 ("OPA90"), as same may be amended from time to time, (ii) such Vessel shall comply with all Applicable Law covering water, air, and land pollution (and the prevention thereof) while at the Terminal and (iii) such Vessel will have on board all certificates demonstrating evidence of financial responsibility as may be required by Applicable Law relating to marine oil spill pollution (and the prevention thereof).

(c)     Customer represents and warrants that each Vessel nominated or substituted by or on behalf of it hereunder (if any) shall be owned or demise chartered by a member of the International Tankers Owners Pollution Federation Ltd, ("ITOPF"), or for an inland river barge, by an equivalent body.

22.     **Force Majeure.**

(a)     Effect of Force Majeure. If a Party is unable to perform or is delayed in performing, in whole or in part, any obligation or condition under this Agreement (other than the obligation to make payments when due), as a result of an event of Force Majeure, then that Party shall promptly notify the other party of the event of Force Majeure with reasonably full particulars. Such Party shall also promptly notify the other Party when the event of Force Majeure terminates or no longer adversely affects its ability to perform under this Agreement. The obligations of the Party giving notice, so far as they are affected by the event of Force Majeure, shall be suspended during, but not longer than, the continuance of the Force Majeure event. The affected Party shall (i) use its commercially reasonable efforts to (1) continue to perform its obligations hereunder, (2) mitigate or limit damages to the other Party, to the extent such action will not adversely affect its own interests, and (3) remove the causes or circumstances constituting such Force Majeure as soon as and to the extent reasonably practicable and (ii) promptly notify the other Party once the Force Majeure event no longer affects its ability to perform under the Agreement; *provided, however,* that (A) no Party shall be compelled to resolve any strikes, lockouts or other industrial disputes other than as it shall determine to be in its best interests and (B) no provision of this Agreement shall be interpreted to require Customer to deliver, or Owner to receive, Product at any delivery point other than at the Facilities. During the period that a Party's performance of its obligations under this Agreement has been suspended in whole or part by reason of an event of Force Majeure, the other Party likewise may suspend the performance of all or part of its obligations to the extent that such suspension is commercially reasonable, except for any payment and/or indemnification obligations.

Exhibit A - 20

**Confidential**

(b)     Termination. In the event that the period of suspension due to a Force Majeure event shall continue in excess of ninety (90) consecutive days from the date that notice of such event is given, and so long as such event is continuing, either Party, in its sole discretion, may terminate this Agreement by written notice to the other Party, and neither Party shall have any further liability to the other Party except for the liabilities and obligations previously accrued; *provided, however,* that no such termination right shall apply for so long as either Party is taking steps to overcome the Force Majeure event.

23.     **Auditing and Inspection**. Customer will have the right, upon reasonable notice, to review for compliance with the terms of this Agreement, (a) the movement of Customer's Product into, through, and out of the Terminal, (b) the relevant portion of all books, records, and information kept by or on behalf of Operator that reasonably relate to Customer's rights and obligations under the Agreement, and (c) any Terminal Fees or other fees and/or costs charged by Operator pursuant to this Agreement including matters that require the direct reimbursement by Customer (except information subject to attorney-client privilege, proprietary information or confidential information associated with other customers or Terminal's personnel or other Operator operations). Operator will retain all such books and records for a period of two (2) years from the date the Services are rendered. Customer may audit such books and records at Operator's locations where such books and records are stored. Any such audit will be at Customer's expense and will take place during normal office hours (9:00 AM to 4:00 PM local time, Monday through Friday excepting any holidays) or as mutually agreed between the parties. Any and all information, audits, inspections and observations made by Customer under this Section 23 shall:

(a)     be held in confidence, with Customer exercising a degree of care not less than the care used by Customer to protect its own proprietary or confidential information that it does not wish to disclose;

(b)     be restricted solely to those with a need to know and who agree not to disclose it to any other person (it being understood that Customer shall notify each such person of his or her obligations with respect to such information prior to disclosing the same); and

(c)     be used only in connection with the operations that relate to this Agreement.

24.     **Liens**. Customer warrants that it has clear and unencumbered title to the Product at the time it is delivered to the Terminal and that no third party claims an interest in the Product at the time it is delivered. Operator shall have, and Customer hereby grants to Operator, an express contractual lien and security interest upon all Product at any time delivered, received, stored, handled, or redelivered hereunder for all of the Terminal Fees and other amounts payable by Customer to Operator pursuant to this Agreement. Operator may refuse to redeliver a volume of Customer's Product of equal value to the amounts then owed to the Operator until all Terminal Fees and other amounts (including any applicable interest) have been paid. Said contractual lien and security interest may be foreclosed by Operator in accordance with the provisions of Article 9 of the Texas Uniform Commercial Code then in effect. Such lien and security interest and other remedies of Operator provided in this Agreement shall not be exclusive, but shall be cumulative and shall be in addition to all other remedies at law or in equity (whether by statute or under the common law). CUSTOMER WILL RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS OPERATOR FROM AND AGAINST ANY AND ALL CLAIMS BY ANY THIRD PARTY OR OTHER PERSON OR ENTITY

**Confidential**

CLAIMING TO HAVE SUPERIOR RIGHT, TITLE, CUSTODY, AND/OR INTERESTS IN THE PRODUCT AND/OR PRIOR LIENS IN AND AGAINST THE PRODUCT.

25.     **Independent Contractor.**  Operator is an independent contractor with respect to all Services it provides under this Agreement. Operator may suspend the provision of Services and/or operations at the Terminal if, in its sole discretion, Operator believes that any person, equipment, property, or the environment is at risk of injury or damage, and Operator shall have no liability to Customer arising out of any such suspension.

26.     **Miscellaneous.**

(a)     Notices.  Any notice required under this Agreement must be sent or transmitted by (i) United States mail, certified or registered, return receipt requested, (ii) confirmed overnight courier service, or (iii) confirmed facsimile transmission properly addressed or transmitted to the address of the Party indicated in Section 10 of the Agreement or to such other address or facsimile number as one Party shall provide to the other Party in accordance with this provision. All notices, consents, requests, demands and other communications hereunder are to be in writing, and are deemed to have been duly given or made on the delivery date if delivery is made before or during applicable normal business hours or on the next Business Day if delivered after applicable normal business hours.  In the event a delivery/notice deadline falls on weekend or holiday, then the applicable deadline will be extended to include the first Business Day following such weekend or holiday.

(b)     No Waiver.  No waiver of any right or obligation under the Agreement at any time will serve as a waiver of the same right or obligation at any future date.

(c)     Amendment.  No amendment to the Agreement will be effective unless made in writing and signed by an authorized representative of each Party.

(d)     Severability.  If a provision of this Agreement is unenforceable under any Applicable Law, that provision will be enforced to the maximum extent permitted by Applicable Law. The remaining provisions of this Agreement will continue in full force and effect.

(e)     Assignment.

(i)     Customer shall not assign this Agreement or any of its rights, duties, or obligations provided for under this Agreement, in whole or in part, without the prior written consent of Operator, which such approval shall not be unreasonably withheld, delayed or conditioned.

(ii)     Operator shall not assign this Agreement or any of its rights, duties, or obligations provided for under this Agreement, in whole or in part, without the prior written consent of Customer, which such approval shall not be unreasonably withheld, delayed or conditioned; *provided, however,* upon written notice to Customer, Operator may assign this Agreement without Customer's consent (1) to an Affiliate; (2) in connection with a sale by Operator of all or substantially all of its assets; (3) in connection with the sale by Operator of the Terminal and/or Facilities; or (4) in connection with, or as collateral for, any financing of the Terminal and/or Facilities.

Exhibit A - 22

**Confidential**

Nothing herein this Agreement shall prevent Operator, in its discretion, from subcontracting any or all of the Services to one or more Affiliates or third parties.

(iii)    Any purported assignment of this Agreement in violation of this Section 26(e) will be void.

(f)    No Third Party Beneficiaries.  This Agreement is entered into for the benefit of the Parties only, and except as may be specifically set forth herein, including the indemnity provisions at Section 17 of the General Terms, no other person or entity shall be entitled to enforce any provision hereof or otherwise be a third party beneficiary hereunder.

(g)    Conflict of Interest.  Neither Party will pay any commission, fee, or rebate to an employee of the other Party or favor an employee of the other Party with any gift or entertainment of significant value.

(h)    Governing Law and Jurisdiction. The Agreement will be governed and construed in accordance with the laws of the State of Texas, without reference to the choice of law principles thereof. Any disputes arising out of this Agreement will be subject to the exclusive jurisdiction of the United States District Court for the Southern District of Texas (Houston Division) if federal jurisdiction is available and to the courts of the State of Texas located in Harris County, Texas, if federal jurisdiction is not available. **EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.**

(i)    Counterparts.  The Agreement may be executed in one or more counterparts, each of which will be deemed an original and part of one and the same document.

(j)    Survival.  Notwithstanding termination or expiration of this Agreement for any reason, (i) Sections 5(e), 7(b), 7(d) of the Agreement and Sections 4(f), 5(b), 6, 9, 12, 13, 16, 17, 18, 21, 24, and 26 of Exhibit A shall survive such termination or expiration of this Agreement, and (ii) each Party will be liable for all of its accrued obligations hereunder up to and including the date on which such termination or expiration becomes effective.

(k)    Entire Agreement.  The Agreement represents the entire agreement of the Parties with respect to the matters contemplated by the Agreement.  Any previous agreements and understandings between the Parties regarding these matters, whether written or oral, are superseded by this Agreement.

(l)    Construction.  The following rules of construction will govern the interpretation of the Agreement: (a) "days," "months," and "years" shall mean calendar days, months and years unless otherwise indicated; (b) the Defined Terms shall apply equally to both singular and plural forms of the defined terms; (c) the word "including" shall not limit the preceding word(s) and/or phrase(s); (d) section titles do not affect interpretation; (e) "hereof," "herein," and "hereunder" and words of similar meaning refer to the Agreement as a whole and not to any particular provision of the Agreement; (f) "Party" includes such Party's successors and

Exhibit A - 23

**Confidential**

permitted assigns; and (g) no rule of construction interpreting the Agreement against the drafter will apply.

*[End of General Terms]*

Exhibit A - 24

**Confidential**

## Exhibit B

### Defined Terms

The following definitions will apply to the Agreement and the General Terms.

"Affiliate" means any entity that directly or indirectly controls, is controlled by, or is under common control with the referenced entity, including the referenced entity's parents and their general partners. In the definition, "control" means the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" is defined in the preamble of the Agreement to which this Exhibit B is attached, and includes all Exhibits attached thereto, as such may be amended from time to time.

"API" means American Petroleum Institute, including any successor.

"Applicable Law" means any and all applicable federal, state, and local codes, constitutions, decrees, directives, laws, licenses, ordinances, injunctions, orders, permits, regulations, requirements, rules, and statutes which have been implemented, and are enforced, by any judicial, regulatory, or governmental authority, agency, body, commission, or department.

"Asphalt" means oil product related material used for paving roads and/or roofing materials.

"ASTM" means ASTM International, formerly known as the American Society for Testing and Materials.

"Barrel" means 42 Gallons when measured at 60° F.

"Berry" means Berry GP, Inc.

"Business Day" means a day on which banks are open for general commercial business in Houston, Texas.

"Business Hours" means 12:00 AM to 11:59 PM local time at the Terminal, Sunday through Saturday each day of the year.

"Confirmed Nomination" means nomination made by Customer for the receipt, redelivery and/or movement of Product at, from or within the Terminal in accordance with the terms and provisions of the Agreement that has been confirmed, in writing, as accepted by Operator.

"Consequential Damages" is defined in Section 18 of the General Terms.

"CPI" is defined in Section 9 of the Agreement.

"Customer" is defined in the preamble of the Agreement, and includes its successors and permitted assigns..

Exhibit B - 1

Confidential

"Customer Parties" means Customer, its Affiliates, and its and their respective equity holders, officers, directors, employees, representatives, agents, contractors (other than Operator), successors and permitted assigns, and all owners, operators, and intermediate charterers of Vessels calling upon the Terminal.

"Defined Terms" means, collectively, the defined terms set forth in this Exhibit B.

"Dock" means the marine dock and berthing facility which is adjacent to, and connected by pipelines and other connections to, the Terminal commonly referred to as the "Berry Dock" which is owned by Berry.

"Dock License Agreement" means the Dock License Agreement dated as of February 22, 2016 between Berry and Operator.

"Dollars" means the lawful currency of the United States of America.

"Effective Date" is defined in the preamble of the Agreement.

"Emergency" means an act of God or other sudden and unexpected occurrence or event (terrorism, explosion, fire, flood, release, spill, discharge, or threat thereof) where time is of the essence in order to protect, safeguard or minimize damage to property, persons, or the environment.

"Event of Default" is defined in Section 19(a) of the General Terms.

"Facilities" means the Terminal, tanks, Truck Rack, rail rack, rail lines, Docks, PMA Plant, and all pipelines, gauges, pump suction lines, pumps and related appurtenances sufficient to provide the Services and to receive Product into the Terminal and thereafter re-deliver Product from the Terminal.

"FERC" is defined in Section 1(f)(i) of the General Terms.

"First Tank Turn" is defined in Section 7(a) of the Agreement.

"Force Majeure" means any event or circumstances that are not within the reasonable control of the Party claiming suspension of its obligations hereunder and that by the exercise of due diligence such Party is unable to prevent or overcome, including acts of God, strikes, lockouts or other industrial disputes or disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, tornadoes, hurricanes, storms, and warnings for any of the foregoing that may necessitate the precautionary shut-in of the Pipeline, the Facilities, loading facilities, terminals, the Port Facility, railroad or any portion thereof, the Facilities or any portion thereof, or other related facilities, floods, washouts, arrests and restraints of governments (either federal, state, civil or military), civil disturbances, explosions, sabotage, breakage or accidents to equipment, machinery, the Port Facility, railroad or any portion thereof, the Facilities or any portion thereof, or lines of pipe, the making of unscheduled repairs or alterations to any of the foregoing, unscheduled maintenance, inability to secure labor or materials, freezing of equipment, machinery, plants, the Port Facility, railroad or any portion thereof, the Terminal or any portion thereof, or lines

Exhibit B - 2

Confidential

of pipe, partial or entire power shortages, necessity for compliance with any court order, or any law, statute, ordinance, rule, regulation or order promulgated by a governmental authority having or asserting jurisdiction, inclement weather that necessitates extraordinary measures and expense to construct facilities and/or maintain operations, or any other causes that satisfies the definition of Force Majeure as set forth above, whether of the kind enumerated herein or otherwise. Any of the following will not, in any event or circumstance, constitute an event of Force Majeure under the Agreement: loss of Customer's supply and/or markets; Customer's inability to economically use or resell the Product or any Non-Conforming Product; and any inability of Customer to deliver Product to or receive Product from the Terminal, including Customer's Vessel's inability to timely arrive, dock, load or unload Product or Non-Conforming Product, or vacate her berth at a Dock (except to the extent such inability of Customer's Vessel is itself due to Force Majeure); *provided, however,* that the foregoing shall not in any event limit or prevent Operator from declaring Force Majeure under the Agreement in response to one or more events affecting the Terminal, the Dock, the Port Facilities, or any other applicable port, anchorage, or ship channel, in each case, serving the Dock.

"Gallon" means 231 cubic inches.

"General Terms" means the General Terms and Conditions attached to the Agreement as Exhibit A and incorporated therein for all purposes.

"Hazardous Material" means any substance, material or waste, that is regulated by Applicable Law as hazardous or toxic, as a pollutant or as a contaminate, or with words of a similar meaning including petroleum, petroleum products, ethanol, bio-diesel, gasoline additives, distillate additives, and methyl tertiary butyl ether.

"ICA" is defined in Section 1(f)(i) of the General Terms.

"Income Taxes" is defined in Section 9(a) of the General Terms.

"Independent Inspector" is defined in Section 3 of the General Terms.

"Initial Term" is defined in Section 3 of the Agreement.

"Insolvency Event" means with respect to a Party, such Party (a) makes a general assignment, arrangement or composition with or for the benefit of creditors, (b) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, or has such a petition filed against it, (c) becomes insolvent (or is unable to pay its debts as they fall due), (d) seeks or becomes subject to an order for winding up or dissolution or to the appointment of an administrator, examiner, receiver, custodian, liquidator, trustee, or other similar official, (e) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced, or sued on or against all or substantially all its assets and such secured party maintains possession or any such process is not dismissed, discharged, stayed or restrained, in each case, within fifteen (15) days thereafter, or (f) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

Exhibit B - 3

**Confidential**

"Interest Rate" means an annual rate (based on a 360-day year) equal to the lesser of (i) two percent (2%) over the prime rate as published under "Money Rates" in the Wall Street Journal in effect at the close of the Business Day on which payment was due and (ii) the maximum rate permitted by Applicable Law.

"Invoice" is defined in Section 7(a) of the General Terms.

"ITOPF" is defined in Section 21(c) of the General Terms.

"Liabilities" means actions, claims, causes of action, costs, demands, damages, expenses, fines, lawsuits, liabilities, losses, obligations, and penalties including court costs, and reasonable attorneys' fees.

"New Taxes" means (i) any Taxes enacted and effective after the Effective Date, including that portion of any Taxes or New Taxes that constitutes an increase or (ii) any law, order, rule or regulation, or interpretation thereof, enacted and effective after the Effective Date resulting in the application of any Taxes to a new or different class of parties.

"Nomination Procedures" is defined in Section 4 of the General Terms.

"Non-Asphalt Product" means all Product other than Asphalt.

"Non-Conforming Product" is defined in Section 5(a) of the Agreement.

"Non-Conforming Product Terms" is defined in Section 5(c)(ii) of the Agreement.

"Operator" is defined in the preamble of the Agreement, and includes its successors and permitted assigns.

"OPA90" is defined in Section 21(b) of the General Terms.

"Operator Parties" means Operator, its Affiliates, and its and their respective equity holders, officers, directors, employees, representatives, agents, contractors, successors and permitted assigns.

"P&I" is defined in Section 16(b)(vi) of the General Terms.

"Party" and "Parties" are defined in the preamble of the Agreement.

"Pipeline" means the pipelines which connect the Terminal to CITGO's East Refinery and to Valero's Bill Greehey Refinery.

"PMA" means polymer modified asphalt.

"Property" is defined in Section 6(d) of the General Terms.

"Port Facility" means the port facilities serving the Terminal which are located at and within the jurisdiction of the Port of Corpus Christi Authority of Nueces County, Texas.

Exhibit B - 4

**Confidential**

"Product" is defined in Section 4 of the Agreement.

"Rejected Product" is defined in Section 5(c)(i) of the Agreement

"Removal Date" is defined in Section 14(b) of the General Terms.

"Sampling Fee" is defined in Section 7(d) of the Agreement.

"Services" is defined in Section 2 of the Agreement.

"Specifications" is defined in Section 5(a) of the Agreement.

"Storage Services Fee" is defined in Section 8(a)(i) of the Agreement.

"Tank" and "Tanks" are defined in Section 7(a) of the General Terms.

"Taxes" means any and all foreign, federal, state and local taxes, duties, fees and charges of every description, including all motor fuel, excise, gasoline, aviation fuel, special fuel, diesel, environmental, spill, gross earnings or gross receipts and sales and use taxes, however designated, paid or incurred with respect to the purchase, storage, exchange, use, transportation, resale, importation, exportation or handling of the Product; *provided, however,* that "Taxes" does not include: (i) any tax imposed on or measured by net profits, gross or net income, or gross receipts (excluding, for the avoidance of doubt, any transaction taxes such as sales, use, gross earnings or gross receipts or similar taxes that are based upon gross receipts, gross earnings or gross revenues received only from the sale of petroleum products); (ii) any tax measured by capital value or net worth, whether denominated as franchise taxes, doing business taxes, capital stock taxes or the like; (iii) business license or franchise taxes or registration fees; or (iv) any ad valorem or personal property taxes.

"Term" is defined in Section 3 of the Agreement.

"Terminal" is defined in Section 1 of the Agreement.

"Terminal Fees" means, collectively, the fees and charges set forth at Section 8 of the Agreement.

"Third Party" means any party other than Customer Parties and Operator Parties.

"Ton" means a U.S. short ton of Two Thousand (2,000) pounds.

"Transfer Fee" is defined in Section 8(a)(iii) of the Agreement.

"Truck Rack" means each pipe inlet flange located at the Facilities where any truck may connect for the purpose of delivering and/or receiving Product at the Facilities.

Exhibit B - 5

**Confidential**

"VEF" means vessel experience factor, always qualified and consistent with current API standards.

"Vessel" means any tankship, tank barge (including any attending tug or towboat), or other watercraft which is capable of receiving or discharging Product at the Terminal on behalf of, at the request of, or for the benefit of Customer.

"Waste" means any tank bottom, tank heel, water, sludge, sediment, particulate, or other residual matter resulting from the storage and handling of the Product.

*[End of Defined Terms]*

**Confidential**

## Exhibit C

### Product Specifications

| | |
|---|---|
| Viscosity | Maximum 2000 cst @ 275°F |
| Temperature | Minimum 260°F; Maximum 325°F |
| H₂S | Notify Operator of Content Prior to Delivery |
| Water | Product May Not Contain Water |

Exhibit C - 1

**Confidential**

GCAC 000127
001959

## Exhibit D

### Laboratory Services

# SCHEDULE OF GRAVITY TESTING CAPABILITIES

| ASTM / AASHTO METHODS | TEST METHOD | UNIT PRICE |
|---|---|---|
| Ductility | D402/ T78 | $ 195.00 |
| COC Flash Point | D92/T48 | $ 115.00 |
| Penetration | D5/T49 | $ 145.00 |
| API by Pycnometer | D70/T228 | $ 115.00 |
| Softening Point | D36/T53 | $ 125.00 |
| Viscosity Absolute | D2171/T202 | $ 165.00 |
| Viscosity Kinematic | D2170/T201 | $ 150.00 |
| Elastic Recovery | T301 | $ 195.00 |

**Preformance Grading**

| | | |
|---|---|---|
| PG Grade Verification | M320 | $ 1,350.00 |
| Bending Beam | T313 | $ 215.00 |
| Dynamic Shear | T315 | $ 215.00 |
| Pressure Aging | R28 | $ 375.00 |
| Rolling Thin Film | D2872/T240 | $ 140.00 |
| Brookfield Viscosity | D4402/T316 | $ 140.00 |
| | | |
| AC Grade Verification | | $ 1,080.00 |

*Blends will be done at $100/hour and normal testing rates will apply on blended material.*

Exhibit D - 1

**Confidential**

**GCAC 000128**
001960

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re:  ARTHUR JACOB BRASS | § | |
| *Debtor,* | § | Case No. 21-60025 |
| | § | Chapter 7 |
| | § | |
| | § | |
| VITOL, INC. | § | |
| *Plaintiff,* | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS, | § | |
| *Defendant.* | § | |

### EMERGENCY MOTION TO QUASH SUBPOENA FOR TRIAL UPON NON-PARTY DZ JEWELRY LLC D/B/A ZADOK JEWELERS

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act through their attorney.

Emergency relief has been requested. If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.

Non-party DZ Jewelry LLC d/b/a Zadok Jewelers (**"Zadok"**) submits the following

Emergency Motion to Quash Subpoena for Trial, as follows:

1

1.      Zadok was served on August 25, 2022 by Vitol, Inc. ("**Vitol**") with a subpoena to appear at trial (**EXHIBIT A**) scheduled August 30, 2022 – **a mere three (3) business days notice to appear**.  Vitol's counsel <u>never</u> provided any advance coordination respecting the subpoena, and <u>never</u> warned Zadok that a trial witness subpoena would be forthcoming. Zadok was caught completely by surprise, and it was not until <u>after</u> service of process on August 25, 2022, that Zadok learned it was subpoenaed for trial.

2.      Vitol's "eleventh hour" subpoena fails to provide reasonable time for compliance and is prohibited by Fed. R. Civ. P. 45(d)(3)(A)(i) and (iv) (made applicable in this adversary proceeding by Fed. R. Bankr. P. 9016).  Vitol's counsel had advanced knowledge of the trial setting as early as July 19, 2022 [ECF 84], and likely even earlier on July 8, 2022 at the Court's minute hearing.  Yet, Vitol's counsel waited thirty-seven (37) days from the date the Court signed the Order setting the August 30, 2022 trial date [ECF 84] to subpoena and serve Zadok.  This delay is unconscionable and has now caused Zadok to incur attorneys' fees to respond on an emergency basis to an incredibly burdensome trial subpoena. Due to Vitol's dilatory preparation, Zadok and his lawyer are now left in the unenviable position with insufficient time to prepare for trial testimony and analyze trial exhibits.  As represented by Vitol's lawyer by telephone on August 25, 2022 with the undersigned, the testimony Vitol seeks to elicit at trial is substantially broader testimony than routine business records authentication.

3.      Segev Zadok, the company's corporate representative and custodian of records with any material knowledge of the Debtor's business transactions with Zadok, is scheduled to travel out-of-state for a very important, pre-planned business trip on Monday August 29,

2

2022 through Tuesday August 30, 2022 (after trial already commences).  Mr. Zadok has incurred significant expenditures in connection with these travel plans.  Air-travel and lodging expenses confirming Mr. Zadok's unavailability are enclosed (**Exhibit B**).

4.      Given the lack of time to plan and prepare with counsel in advance of trial, any requirement for Zadok to appear at the scheduled trial would irretrievably disrupt Zadok's business, will cause substantial lost business opportunity and profits, will cause Zadok significant monetary loss of travel expenditures already incurred, and is prejudicial to the interests of the non-party witness.  For these expanded reasons, the subpoena subjects Zadok to undue burden in violation of Fed. R. Civ. P. 45(d)(3)(A)(iv).

5.      This adversary case has been pending since 2021. Vitol had ample opportunity to take the discovery it needed, plan ahead and preserve non-party witness testimony. Requiring Zadok to appear at trial with 3 business days notice would serve to impose prejudicial hardship on an innocent non-party and reward Vitol's failure to timely serve a trial subpoena that is compliant with Rule 45.

## **PRAYER**

6.      Zadok respectfully prays this Court quash the trial subpoena served August 25, 2022, and award Zadok it's reasonable attorneys' fees as a sanction pursuant to Fed. R. Civ. P. 45(d)(1).  In the alternative, and to the extent the Court denies quashing the subpoena, Zadok would request the Court modify the subpoena to require Zadok to appear at trial on Thursday September 1, 2022, while concurrently awarding Zadok its lost earnings as a result of the disruption and lost profits to its business activities, inclusive of reasonable attorneys'

3

fees.  Pursuant to Local Rule 9013-1(i), a ruling on this emergency relief is requested on Friday August 26, 2022 to avoid the consequences of the emergency.

## CERTIFICATE OF CONFERENCE

The parties, through counsel, have conferred by telephone respecting the above requested relief.   Vitol, Inc. is opposed.  Debtor Arthur Jacob Brass is not opposed to the emergency relief to quash.

## CERTIFICATE PURSUANT TO LOCAL RULE 9013-1(i)

The undersigned counsel certifies the accuracy of this motion seeking emergency relief.

Dated:  August 26, 2022

JEFFREY ROBIN LAW PLLC

By:   _/s/  Jeffrey S. Robin_____
Jeffrey S. Robin
Texas State Bar No. 24084466
S.D. Tex. I.D. No. 3521832
2450 Fondren Road, Suite 309
Houston, Texas 77063
Tel.  832.844.6888
Fax. 888.849.0169
jeffrey@jeffreyrobinlaw.com
**Counsel for Non-Party DZ Jewelry LLC d/b/a Zadok Jewelers**

## CERTIFICATE OF SERVICE

I certify that on August 26, 2022, a true and correct copy of the foregoing document was served via E-Mail upon Plaintiff's counsel, Defendant's counsel and the Court's Electronic Case Filing (ECF) system upon, and all parties registered to receive electronic notices in this case, including the Debtor and his counsel and the Office of the United States Trustee.

_/s/  Jeffrey S. Robin_____
Jeffrey S. Robin

4

001964

B2550 (Form 2550 – Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Southern _____ District of Texas _____

In re Arthur Jacob Brass _____
_____
Debtor

*(Complete if issued in an adversary proceeding)*

Vitol, Inc. _____
_____
Plaintiff
v.
Arthur Jacob Brass _____
_____
Defendant

Case No. 21-60025 _____

Chapter 7 _____

Adv. Proc. No. 21-06006 _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: DZ Jewelry, LLC c/o Dror Zadok, 1801 Post Oak Blvd, Suite 100, Houston, Texas 77056
_____
*(Name of person to whom the subpoena is directed)*

☑ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE 515 Rusk, Courtroom 401<br>Houston, Texas 77002 | COURTROOM 401 |
|---|---|
| | DATE AND TIME<br>August 30, 2022 at 9:00 a.m. |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:




The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: August 24, 2022 _____

CLERK OF COURT

OR

_____        /s/ Keith M. Aurzada
*Signature of Clerk or Deputy Clerk*        _____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Vito, Inc. _____ , who issues or requests this subpoena, are:

Keith M. Aurzada, Reed Smith LLP, 2850 N. Harwood Street, Suite 1500, Dallas TX 75201 (469) 680-4211,
kaurzada@reedsmith.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT A

001965

B2550 (Form 2550 – Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____
on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

001966

B2550 (Form 2550 – Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court -- may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

Confirmation Number:



| Flight 1 of 2 UA1850 | Class: United Economy (V) |
|---|---|

| Mon, Aug 29, 2022 | Mon, Aug 29, 2022 |
|---|---|
| **09:41 AM** | **11:45 AM** |
| Houston, TX, US (IAH) | San Francisco, CA, US (SFO) |

| Flight 2 of 2 UA1444 | Class: United Economy (Q) |
|---|---|

| Tue, Aug 30, 2022 | Tue, Aug 30, 2022 |
|---|---|
| **10:58 AM** | **05:02 PM** |
| San Francisco, CA, US (SFO) | Houston, TX, US (IAH) |

### Traveler Details

eTicket number: ███████████  Seats: **IAH-SFO 25A**
Frequent Flyer: ████████ **Member**  **SFO-IAH 10B**

ZADOK/SEGEVADAM
eTicket number: ███████████  Seats: **IAH-SFO 23A**
Frequent Flyer: ██████ **Premier Platinum**  **SFO-IAH 10A**

EXHIBIT B



Dear M/M Segev Zadok,

Thank you for choosing Fairmont San Francisco. We look forward to hosting you. Below, please find your reservation confirmation number and additional details.

For more than 130 years, our loyal guests and employees at Accor properties across North & Central America have entrusted us with their care and safety.

We have a long-standing tradition of setting new benchmarks for service excellence in our industry and today is no different.

As we navigate through this unprecedented moment in our history, we remain deeply committed to the wellbeing of our Accor family. Welcoming, safeguarding and taking care of others is at the very heart of what we do and who we are.

Today, this means keeping our guests and employees safe by preventing the spread of COVID-19 – partnering with top experts, including Bureau Veritas, a world leader in testing, inspections and certification; Dr. Amesh Adalja, Senior Scholar at the Johns Hopkins University Center for Health Security; and Ruth Petran, Ph.D., CFS, Senior Corporate Scientist, Food Safety and Public Health, Ecolab, to release new standards of safety and enhanced operational protocols and procedures which are among the most stringent in the hospitality industry. For more information, please visit ALLSafeandWell.com.

As always, we recommend that all travelers review guidance from the World Health Organization and follow any travel advice issued by their home countries.

We look forward to welcoming you to Fairmont San Francisco!

We are delighted to count you as a Classic member of ALL – Accor Live Limitless. Your status entitles you to a range of benefits to enhance your travel experience, including our Members' Rate, complimentary internet access, free local calls and daily newspaper delivery during your stay. Plus, you can tailor your experience to suit your needs.

Log in to your profile to customize your preferences and explore all the benefits of your membership—as well as those you'll enjoy when you reach Silver status.


Best Regards,
Fairmont Hotels & Resorts

| | |
|---|---|
| **Confirmation #** | ▮▮▮▮▮ |
| **First Name** | Segev |
| **Last Name** | Zadok |
| **Arrival Date** | Monday, 29-Aug, 2022 |
| **Arrival Time** | 23:00 |
| **Departure Date** | Tuesday, 30-Aug, 2022 |
| **Number Of Nights** | 1 |
| **Number Of Adults** | 2 |
| **Room Type** | Fairmont Exterior Queen / Queen NS |
| **Rate Per Room Per Night** | USD 379.05 |
| **Deposit Policy** | 1 night room and tax required at time of booking |
| **Deposit Due Amount** | USD 476.32 |
| **Deposit Due Date** | Wednesday, 17-Aug, 2022 |
| **Cancellation Policy** | 24 hours prior to arrival |
| **Cancel Date To Avoid Fees** | Sunday, 28-Aug, 2022 |
| **Cancellation Amount** | USD 476.32 |
| | *Local Currency* |
| | *The amount may be subject to taxes, gratuities, resort levy or other fees* |

Fairmont San Francisco
950 Mason Street
San Francisco, California
USA
94108
**Toll Free** 1 866 540 4491
**Tel** +1 415 772 5000
**Fax** +1 415 772 5013
**E-mail** Saffrontdesk@fairmont.com

If you want to unsubscribe from marketing mails, then please click here.
www.fairmont.com | Privacy Policy

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re:  ARTHUR JACOB BRASS | § | |
| *Debtor,* | § | Case No. 21-60025 |
| | § | Chapter 7 |
| | § | |
| | § | |
| VITOL, INC. | § | |
| *Plaintiff,* | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS, | § | |
| *Defendant.* | § | |

**ORDER GRANTING NON-PARTY DZ JEWELRY LLC'S
EMERGENCY MOTION TO QUASH SUBPOENA FOR TRIAL**

Upon this date came on for consideration non-party DZ Jewelry LLC d/b/a Zadok Jeweler's

Emergency Motion to Quash Subpoena for Trial along with any arguments or evidence presented

in opposition of and against the emergency relief requested, this Court, after due deliberation,

ORDERS that the emergency relief requested is hereby GRANTED.

The Court finds that the matters presented constitute an emergency.  The Court quashes

the subpoena for trial served August 25, 2022 upon non-party DZ Jewelry LLC d/b/a Zadok

Jewelers.  The Court grants DZ Jewelry LLC d/b/a Zadok Jewelers' entitlement to an award of

reasonable attorneys' fees as an appropriate sanction pursuant to F.R.C.P. 45(d)(1), the amount

for which shall be presented to the Court upon motion.

Signed this _____ of _____, 2022

_____
Judge

1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| Arthur Jacob Brass, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |
| Vitol, Inc., | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adv. No. 21-06006 |
| | § | |
| Arthur Jacob Brass, | § | |
| Defendant. | § | |

## VITOL, INC.'S RESPONSE TO DZ JEWELRY, LLC'S (D/B/A ZADOK JEWELERS) MOTION TO QUASH

Creditor and party in interest Vitol Inc. ("**Vitol**") files this its response in opposition (the "**Response**") to the *Emergency Motion to Quash Subpoena for Trial* [Docket No. 109] (the "**Motion**") filed by DZ Jewelry, LLC (d/b/a Zadok Jewelers) ("**Zadok**") seeking to quash the trial subpoena Vitol served on Zadok and, in support thereof, would respectfully show the Court as follows:

### INTRODUCTION

1.      The Motion is an attempt by Zadok to avoid testifying against a very large customer – the Debtor. The records to which Zadok will testify show that Mr. Brass – while not paying Vitol – spent $665,105.65 with Zadok in the month of December, 2017 **alone** buying high end jewelry instead of paying debts owed to Vitol. The records further show a longstanding relationship in which Mr. Brass purchased millions of dollars of jewelry.

2.      Vitol has offered to admit these documents by business records affidavit, which is appropriate and allowed under applicable Fifth Circuit law. Yet, counsel for the Defendant has

objected, necessitating Zadok's testimony. Further, electronic testimony, which would be accommodating to Zadok and agreeable with Vitol, is not possible because of the Defendant's objection. To suggest that Vitol should have subpoenaed Zadok earlier ignores that Fifth Circuit law allowing parties to rely upon business records affidavits for the admission of documents, which are indeed authentic.

## **BACKGROUND**

3.      On July 8, 2022 the chapter 7 trustee for the above-styled case issued a notice of subpoena for a Rule 2004 Examination of Zadok. *See* Main Docket No. 125-1. On information and belief, the trigger for the subpoena was the Trustee's discovery that the Debtor had a longstanding undisclosed deposit account with Zadok Jewelers, as well as receipts from purchases of high-end jewelry from Zadok. The Trustee's discovery was not based on a last minute disclosure by the Debtor, but rather, a fortuitous turnover of dozens of boxes of the Debtor's personal and business financials records by the Debtor's former landlord.

4.      On or about July 28, 2022 – long after the discovery cut-off in this Adversary Proceeding[1] - Zadok provided the documents at issue to the Trustee, which Vitol now seeks to authenticate by live witness based on the refusal of Debtor's counsel to allow the use of business record affidavits meant to authenticate the Defendant's own business records.

5.      On August 25, 2022, Vitol served the trial subpoena (the "**Subpoena**") in substantially the form attached hereto as **Exhibit A** to the Motion on Zadok pursuant to Rule 45 of the Federal Rules of Civil Procedure, made applicable to the above-captioned matter by Rule 9016 of the Federal Rules of Bankruptcy Procedure. A few hours later, Vitol contacted Zadok in

---

[1] Counsel for Zadok is likely unaware that the existence of the Zadok records was unknown to Vitol and the Trustee until after the discovery cut-off in this Adversary Proceeding and, therefore, contrary to the assertion in the Motion, Vitol did not have "ample opportunity to take the discovery it needed, plan ahead and preserve non-party witness testimony." Similarly, Zadok's counsel is likely unaware that Vitol did not "wait[] thirty-seven (37) days" after the trial setting to subpoena Zadok, as the Zadok records were not produced until after trial was set.

001973

an attempt to discuss the purpose of the subpoena and to coordinate logistics of the trial. Several hours later, Zadok notified Vitol through counsel that he intended to seek to quash the subpoena. On August 26 2022, Zadok filed the Motion seeking to quash the Subpoena.

## ARGUMENTS & AUTHORITIES

6.      Rule 45(d)(3) provides that upon affected party's timely motion, a subpoena may be quashed or modified when it (i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception of waiver applies; and (iv) subjects a person to undue burden. FED. R. CIV. P. 45(d)(3)(A).   The party moving to quash or modify a subpoena "must meet the heavy burden of establishing that compliance with the subpoena would be unreasonable and oppressive."   *Halliburton Energy Services, Inc. v. M-I, LLC*, No. H06MC00053, 2006 WL 2663948 at *2 (S.D. Tex. Sep. 15, 2006) (quoting *Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D.Tex.1998); *see also Anzures v. Prologis Texas I LLC*, 300 F.R.D. 316, 317 (W.D. Tex. 2012) (stating that "a party seeking to quash a subpoena under Rule 45(c)(3) bears the burden of proof").

7.      Here, Zadok faces no such undue burden. In the Motion, Zadok asserts two grounds for quashing the Subpoena: (i) there is insufficient time to prepare for trial; and (ii) the witness is unavailable on Tuesday, August 29, 2022. Neither meets the standard of demonstrating a "heavy burden." First, there is no need for extensive trial preparation of the Zadok witness. Vitol intends to call Zadok in order to establish the authenticity, accuracy, and business nature of 110 pages of documents produced by Zadok less than a month ago – July 28. Indeed, Vitol has repeatedly expressed its desire to **not** call Zadok as a witness at trial, but rather, to admit Zadok's business records into evidence by affidavit under FRE 902(11).

8.      Second, there is no scheduling conflict that would prevent Zadok's testimony or cause the Zadok witness to cancel a business trip. On August 25, 2022, counsel for Vitol informed

counsel for Zadok that it would honor any reasonable request for accommodation by Zadok, including calling Zadok as its first witness at 9:00 am on August 31 – the day after the witness' business trip. Vitol's offer still stands – it is willing to call Zadok as the first witness of the day on Wednesday, August 31, 2022. Further, the offer to call Zadok's witness at 9:00 am should minimize (if not completely alleviate) any "lost business opportunity and profits" for the witness, as the Zadok Jewelry store does not open until 10:00 am.[2] Moreover, the witness could likely be called at the conclusion of the day on Tuesday, August 30 (if more convenient) if permitted to give his sworn testimony by video, as Defendant has already consented to allow for the Trustee.

9.      Regardless, Zadok's trial subpoena is only necessary because of the Defendant's continued opposition to the use of business record affidavits meant to authenticate the Defendant's own business records, and is only relevant to the extent the Court does not allow those affidavits to be given full effect under Fed. R. Evid. 902(11).  In that event, however, the testimony of Zadok will be critical to authenticate records demonstrating how the Defendant used funds fraudulently transferred from GCAC to, among other things, purchase millions of dollars in jewelry through a joint account he maintains with his wife Catherine Brass.

10.     Zadok seeks to quash this Subpoena which was largely precipitated by Debtor's counsel's objections to all proposed routes of efficiency. This is a records heavy case, a fact which Debtor's counsel is trying to exploit in order to obfuscate the merits of the case.  At issue in the Adversary Proceeding are millions of dollars that the Debtor has funneled out of his bankruptcy estate through various means to avoid paying creditors like Vitol.  [Adv. Docket No. 1, at ¶¶ 8-11] Accordingly, Vitol has compiled thousands of pages of documents evidencing such transfers in preparation for trial, and has sought to streamline the process by obtaining business records

---

[2] https://zadok.com/about/
("STORE HOURS Mon–Sat, 10am–6pm Closed Sundays").

001975

affidavits sufficient to trigger the self-authentication of such records under Federal Rule of Evidence 902(11). Under Rule 902(11), a proponent seeking to introduce records kept in the ordinary course of business must provide the opposing party "reasonable written notice of the intent to offer the record" so as to provide the opposing party a fair opportunity to challenge such records. FED. R. EVID. 902(11).

11.     In an effort to streamline the admission of exhibits, at a pre-trial hearing on August 24, 2022, Vitol sought to introduce certain records maintained by Zadok as custodian (the "**Zadok Records**") pursuant to Federal Rule of Evidence 902(11). Vitol had previously provided notice of its intent to offer the exhibits to Debtor's counsel on August 18, 2022 (12 days before trial). A true and correct copy of that correspondence is attached hereto as **Exhibit B**. The Court did not admit the exhibits based in large part on the objection of Debtor's counsel.

12.     Vitol sought to decrease the burden upon third parties by offering to allow third parties to testify virtually via Zoom, however, Debtor's counsel objected yet again, thus necessitating live, in-court testimony from third party witnesses at trial. As a result, Vitol was left with no option but to issue the Subpoena requiring live testimony.

13.     It is perhaps unsurprising that Zadok is resistant to testifying live in this matter given that his testimony would be offered against one of its most lucrative customers. Based on the records produced, the Debtor has funneled several million dollars—including funds he received directly from GCAC—into jewelry purchased from Zadok while Vitol holds a judgment against him for over $10 million. Simply stated, the Debtor has made multi-million dollar purchases of luxury goods with funds that rightfully belong to Vitol.

14.     If the Court does not allow the self-authentication of the Zadok records under Fed. R. Evid. 902(11), Vitol will be substantially prejudiced if prevented from eliciting the brief testimony necessary from Zadok to authenticate those same documents he already produced in

001976

discovery.  Zadok, on the other hand, will suffer no such burden—much less any *undue* burden—if compelled to testify.

**PRAYER**

In light of the foregoing, Vitol Inc. respectfully requests that this court deny the Motion and requests any such other and further relief, at law or in equity, to which Vitol may show itself to be justly entitled.

Dated: **August 26, 2022**          Respectfully submitted,

**REED SMITH LLP**

By: _/s/  Michael P. Cooley_
Keith M. Aurzada (SBN 24009880)
Michael P. Cooley (SBN 24034388)
Bradley J. Purcell (SBN 24063965)
Lindsey L. Robin (SBN 24091422)
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
kaurzada@reedsmith.com
mpcooley@reedsmith.com
bpurcell@reedsmith.com
lrobin@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
811 Main Street, Suite 1700
Houston, TX 77002
T: 713.469.3834
F: 713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

6

**CERTIFICATE OF SERVICE**

I certify that on August 26, 2022 a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing (ECF) system upon all parties registered to receive electronic notices in this case, including counsel for Debtor/Defendant.

                                        */s/  Michael P. Cooley*
                                        Michael P. Cooley

001978

# EXHIBIT A

001979

B2550 (Form 2550 – Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Southern _____ District of Texas _____

In re Arthur Jacob Brass _____
_____
Debtor

*(Complete if issued in an adversary proceeding)*

Vitol, Inc. _____
_____
Plaintiff

v.

Arthur Jacob Brass _____
_____
Defendant

Case No. 21-60025 _____

Chapter 7 _____

Adv. Proc. No. 21-06006 _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: DZ Jewelry, LLC c/o Dror Zadok, 1801 Post Oak Blvd, Suite 100, Houston, Texas 77056 _____

*(Name of person to whom the subpoena is directed)*

☑ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE 515 Rusk, Courtroom 401<br>Houston, Texas 77002 | COURTROOM 401 |
|---|---|
| | DATE AND TIME<br>August 30, 2022 at 9:00 a.m. |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: August 24, 2022 _____

CLERK OF COURT

_____         OR         /s/ Keith M. Aurzada
Signature of Clerk or Deputy Clerk                         _____
                                                                              *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Vito, Inc. _____, who issues or requests this subpoena, are:

Keith M. Aurzada, Reed Smith LLP, 2850 N. Harwood Street, Suite 1500, Dallas TX 75201 (469) 680-4211, kaurzada@reedsmith.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

001980

B2550 (Form 2550 – Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*:  DZ Jewelry, LLC c/o Dror Zadok

on *(date)* 8/24/2022    .

☒ I served the subpoena by delivering a copy to the named person as follows:  DZ Jewelry, LLC c/o Dror Zadok

_____ on (*date*)  8/25/2022_____ ; or

☐ I returned the subpoena unexecuted because:  _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $  65                                                       .

 My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


        I declare under penalty of perjury that this information is true and correct.

Date:   8/25/2022_____

                                                     *Kimberly Odell*
                                                     *Server's signature*

                                          Kimberly Odell, PSC 18757, EXP 8/31/2022
                                                     *Printed name and title*


                                          16903 Red Oak Drive, Suite 270, Houston, Texas 77090
                                                     *Server's address*


Additional information concerning attempted service, etc.:

001981

B2550 (Form 2550 – Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (Page 3)

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
        (i) is a party or a party's officer; or
        (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
    (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
    *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
        (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
        (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
    *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
        (i) fails to allow a reasonable time to comply;
        (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
        (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
        (iv) subjects a person to undue burden.
    *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
        (i) disclosing a trade secret or other confidential research, development, or commercial information; or

        (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
        (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
        (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
    *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
        (i) expressly make the claim; and
        (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT B

001983

**Cooley, Michael P.**

| | |
|---|---|
| **From:** | Purcell, Bradley |
| **Sent:** | Thursday, August 18, 2022 5:12 PM |
| **To:** | Miriam Goott |
| **Cc:** | Aurzada, Keith M.; Cooley, Michael P.; Robin, Lindsey L.; Malpass, Mason W. |
| **Subject:** | Adv. No. 21-06006; Vitol Inc., v. Brass |

Miriam,

Pursuant to Federal Rules of Evidence 902(11) and 803(6), Vitol intends to seek admission of the following Certified Domestic Records of a Regularly Conducted Activity without a sponsoring witness at trial:

- Veritex Community Bank;
- EEPB, PC;
- International Bank of Commerce;
- Chubb Lloyds Insurance Company of Texas;
- Cadence Bank, NA;
- IberiaBank; and
- DZ Jewelry, LLC, Inc.

All such records have previously been produced in this matter. Each set of records will be transmitted to you today using a ShareFile link that will be separately emailed to you. Please let me know if you object to the admission of any such records and, if so, the grounds for your objection.

Additionally, please let me know your availability on Tuesday, August 23, 2022 to meet and confer regarding the parties' pretrial materials that will be exchange on Monday, August 22, so that we can raise any issues with the Court on Wednesday, March 24.

Thanks,

Brad

**Bradley Purcell**
Counsel
bpurcell@reedsmith.com

**Reed Smith LLP**
2850 N. Harwood Street
Suite 1500
Dallas, TX 75201
T: +1 469 680 4224
F: +1 469 680 4299
**www.reedsmith.com**

001984

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| IN RE | § | CASE NO. 21-60025 |
| | § | |
| ARTHUR J. BRASS | § | |
| DEBTOR | § | |
| | § | |
| VITOL INC. | § | ADVERSARY NO. 21-06006 |
| Plaintiff | § | |
| v. | § | |
| | § | |
| ARTHUR J. BRASS | § | |
| Defendants | § | |

## DEFENDANT'S RESPONSE TO DZ JEWELRY, LLC'S MOTION TO QUASH

COMES NOW, Arthur J. Brass (the **"Debtor" or "Defendant"**) and files this Response to DZ Jewelry, LLC's *Motion to Quash*, and respectfully shows the Court the following.

### BACKGROUND FACTS

1. Vitol filed its Adversary Proceeding against the Debtor on July 9, 2021 (the, "**Adversary**").

2. Discovery concluded on **February 14, 2022**.

3. Vitol did not file a Motion to Extend Discovery to either depose or subpoena documents from DZ Jewelry, LLC ("**Zadok**").

4. Vitol and its counsel are well aware of their ability to seek such relief from the Court as this Court previously granted Vitol's Motion to Extend Discovery as it related to the deposition of Mr. Tomaszewski. *Exhibit A*

### SUBPOENA SERVED BY TRUSTEE, NOT VITOL

5. On July 8, 2022, nearly five months after the close of discovery in the Adversary, the Chapter 7 Trustee (not Vitol) served Zadok with a Subpoena. *Exhibit B*

6. The Chapter 7 Trustee's Subpoena was **not** served in the Adversary, but was instead served in the main bankruptcy case.

7. The Chapter 7 Trustee is not a party to the Adversary.

### DISCLOSURE OF WITNESS AND DOCUMENTS

8. Zadok was not disclosed in Vitol's Initial Disclosures. *Exhibit C*

1

9. Vitol never supplemented its Initial Disclosures in the Adversary to include Zadoks as a potential witness. *Exhibit D*

10. Four days ago, on August 22, 2022, Vitol filed its Witness and Exhibit List for trial, and for the first time disclosed that it intended on 1) calling Zadok as a witness at trial; and 2) intended on introducing documents that were allegedly received by the Chapter 7 Trustee in another proceeding, nearly five months after the close of discovery. *Exhibit E*

**Zadok Subpoena to Testify**

11. This Court set a trial date in the Adversary on July 8, 2022.

12. Vitol waited until three business days before trial to serve Zadok with a trial subpoena. *Exhibit F*

13. Zadok justifiably filed its Motion to Quash on August 26, 2022 ("**Motion to Quash**").

14. Vitol filed its response to the Motion to Quash and in Paragraph 3 asserts (upon information and belief) that the Chapter 7 Trustee issued his subpoena to Zadok when he allegedly found dozens of boxes related to transactions between the Debtor and Zadok that were in the Debtor's landlord's possession.

15. However, Vitol conveniently failed to inform this Court that on June 23, 2022 (two months ago), Vitol's counsel personally accompanied the Chapter 7 Trustee to review the very same documents allegedly held by the Debtor's landlord. *Exhibit G*

16. If Vitol was truly surprised by the existence of the Zadok documents that they allegedly discovered two months ago, then Vitol should have 1) amended their disclosures; 2) filed a motion with this Court seeking permission to conduct additional discovery after the close of discovery as they did with Mr. Tomazewski; and 3) provided the Debtor with notice that they intend to call Zadok as a witness at trial.

17. Furthermore, Vitol asserts in its Response to the Motion to Quash, that their failure to comply with the rules is really the Debtor's fault. Vitol states that "*Debtor's counsel is trying to exploit in order to obfuscate the merits of the case*". Vitol apparently believes that the rules don't apply to them and if they do not comply it must be the Debtor's fault.

18. Finally, without ever having deposed Zadok, Vitol brazenly alleges in its Response that it is "*unsurprising that Zadok is resisting to testify in this matter given that his testimony would be offered against one of its most lucrative customers*". First, it is wholly inappropriate for Vitol to make disparaging remarks in a public filing about a third-party

2

witness who has nothing to do this with this litigation.  Second, it is unclear how Vitol or its counsel has any personally knowledge regarding Zadok's intentions or whether Brass is really their "most lucrative customer".

### RULES VITOL HAS ASKED THIS COURT TO IGNORE

19. Once again Vitol is asking this Court to ignore the Federal Rules of Civil Procedure in order to accommodate their failure to comply with the rules.

    a. **Federal Rule of Civil Procedure 26(a)(1)** – A party **must** provide it their initial disclosures, without awaiting a discovery request, the name, address of phone number of each individual likely to have discoverable information.

        i. Vitol failed to disclose Zadok in its Initial Disclosures.

    b. **Federal Rule of Civil Procedure 26(e)** - A party who has made disclosures under Rule 26(a) **must** supplement its disclosures in a timely manner if the party learns of new information.

        i. Vitol failed to amend its Initial Disclosures to identify Zadok.

    c. **Federal Rule of Civil Procedure 26(a)(3)(B)** – Disclosures must be made **at least 30** days before trial.

        i. The documents that Vitol seeks to introduce, including a business records affidavit, were produced by Vitol to the Debtor on August 22, 2022, which is eight days before trial, not the required thirty-day deadline.

        ii. More importantly, Vitol admits that they are seeking to introduce documents and have Zadok authenticate documents that were obtained by Vitol months after the close of discovery.

    d. **Federal Rule of Civil Procedure 45(d)(3)**

        i. As outlined in Zadok's Motion to Quash, the subpoena issued on Zadok violates Rule 45(d)(3) which requires reasonable notice, especially to a third-party witness.

### SUMMARY

20. This Court instructed all of the parties in this case that the Federal Rules of Civil Procedure will apply at trial.

001987

21. Vitol's attempt to introduce evidence and a witness that were only disclosed eight days before trial is the definition of prejudice and violates the above referenced rules.

22. The Debtor requests that the Court grants the Motion to Quash.

Dated: <u>August 26, 2022</u>

Respectfully submitted,

By: <u> /s/ Miriam Goott</u>

Miriam Goott
SBN#24048846
COUNSEL FOR DEBTOR

OF COUNSEL:
WALKER & PATTERSON, P.C.
P.O. Box 61301
Houston, TX 77208-1301
(713) 956-5577
(713) 956-5570 (fax)
mgoott@walkerandpatterson.com

## <u>CERTIFICTE OF SERVICE</u>

I, Miriam Goott, hereby certify that on August 26, 2022, I served a copy of the Response on Vitol's counsel and Zadom's counsel via email.

By: <u> /s/ Miriam Goott</u>
Miriam Goott

001988

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

## <u>VITOL, INC.'S EXPEDITED MOTION TO EXTEND DISCOVERY</u>

COMES NOW, Vitol Inc. ("**Plaintiff**" or "**Vitol**") and submits the following Expedited Motion to Extend Discovery, as follows:

### I. INTRODUCTION

1.      Vitol seeks to extend fact discovery for the limited purpose of taking two short depositions of former employees of Gulf Coast Asphalt Company ("**GCAC**") because the Debtor/Defendant has inexplicably disavowed critical knowledge of GCAC's finances. Despite admitting that he had "complete authority over the finances of GCAC [] since 2017," Brass now disclaims any meaningful knowledge of its finances and refused to authenticate GCAC's core financial records. To the extent Brass's current inabilities serve to obstruct Vitol's opportunity to establish GCAC's insolvency, Vitol seeks to depose two witnesses identified by Brass himself: John Tomaszewski and Kevin Boston. According to Brass' recent testimony, Tomaszewski oversaw financials at GCAC and Boston provided bookkeeping services. Vitol anticipates each deposition will last only 2 hours and will be used for the limited purposes of (i) understanding

GCAC's core financial documents; (ii) establishing the accuracy of GCAC's core financial documents; and (iii) confirming the sources and uses of GCAC's core financial documents.

## II. RELEVANT FACTUAL BACKGROUND

**A.    Brass had complete control over GCAC's finances.**

2.     Since 2009, Brass has been a 50% member of GCAC, through his wholly owned company Trifinery, Inc.[1] The only other member of GCAC is Brass' mother.[2] Since at least 2009, Brass has been the president of GCAC.[3] During a prior deposition Brass admitted that he had "complete authority over the finances of GCAC [] since 2017."[4] He has further admitted that he "can take out money from GCAC as a loan whenever he wants" and "for whatever reason he wants to take it out."[5] In accordance with that doctrine, Brass transferred several million dollars to himself, his creditors, and his mother.

**B.    GCAC's Core Financial Documents traced Brass's misappropriations.**

3.     GCAC's general ledger tracked the "loans" that Brass extended to himself and his mother.[6] GCAC produced the general ledger in the state court litigation against Vitol that gave rise to the $10 million Agreed Final Judgment that serves as the basis for Vitol's claim.[7]

**C.    In an attempt to evade liability, Brass now refuses to affirm the accuracy of the financial documents provided by GCAC's accountants.**

4.     Despite controlling the finances of GCAC at all relevant times, including the time in which the general ledger was produced by GCAC, during his March 25, 2022 deposition Brass refused to authenticate the general ledger or attest to its accuracy.[8]

---

[1] *See* Deposition of Arthur Brass dated 6/28/2018 at 45:23-46:19, attached hereto as **Exhibit 1**.
[2] *Id.*
[3] *Id.* at 36:6-10.
[4] *See* Deposition of GCAC dated 11/03/2020 at 89:11-14, attached hereto as **Exhibit 2**.
[5] *Id.* at 90:10-25.
[6] *See* GCAC009845, attached hereto as **Exhibit 3.**
[7] *See* Agreed Final Judgment , attached hereto as **Exhibit 4**; *see also* Proof of Claim attached hereto as **Exhibit 5.**
[8] *See* Deposition of Arthur Brass dated 3/25/2022, at 111:22-112:18; 116:4-117:11 attached hereto as **Exhibit 6.**

001990

5.    Similarly, GCAC's balance sheet and income statement for 2017 and 2018 were produced in the state court litigation by the accounting firm EEPB.[9] Although Brass admitted that EEPB prepared GCAC's tax returns, he refused to authenticate the balance sheet and income statement produced by EEPB as GCAC's accountants.[10] Indeed, Brass and GCAC admitted in the state court litigation that EEPB "is or was responsible for tracking GCAC's finances and preparing GCAC's tax returns."[11] Despite these admissions, Brass contested the accuracy of the financial documents produced by EEPB.[12]

6.    In fact, Brass disavowed any pertinent knowledge of GCAC's finances – stating that he only reviewed financial information a few times a year and that he was not generally familiar with GCAC's assets or liabilities.[13]

**C.    Because of Brass's strategic ignorance, the financial records must be verified by other witnesses.**

7.    Based on Brass' inability to substantiate even the most basic financial information for GCAC, Vitol sought to identify those GCAC employees that would be able to verify the financial documents. In response, Brass identified Kevin Boston and John Tomaszewski as individuals likely to substantiate GCAC's financial information.[14]

8.    Because of Brass' inexplicable inability to testify about GCAC's basic financial information, Vitol seeks an order extending fact to discovery to allow it to depose Kevin Boston and John Tomaszewski. Vitol anticipates each deposition lasting only 2 hours and for the limited

---

[9] *See* Balance Sheets and Income Statement **Exhibits 7-10.**
[10] *See* Deposition of Arthur Brass dated 3/25/2022, at 69:6-12 ("Q And who prepared the company's -- and by "companies," I mean GCAC and Trifinery -- who prepared the tax returns? ... A I believe that they used EEPB.").
[11] *See* GCAC's Response to Vitol Inc.'s Fifth Set of Interrogatories, attached hereto as **Exhibit 11.**
[12] *See* Deposition of Arthur Brass dated 3/25/2022 at 102:8-19.
[13] *See* Deposition of Arthur Brass dated 3/25/2022 at 40:11-12, 19-20; 41:20-25; 100:6-15 ("Q Did you review the financial reports of GCAC? … From time to time, I reviewed financial information of GCAC. … Q How often is "time to time"? A Several times a year. Q How many times is "several"? ... A One to five.")
[14] Deposition of Arthur Brass dated 3/25/2022 at 68:17-23. Brass' counsel refused to provide the contact information for the potential witnesses. Deposition of Arthur Brass dated 3/25/2022 at 104:25-105:19.

purposes of (i) understanding GCAC's basic financial documents; (ii) establishing the accuracy of GCAC's basic financial documents; and (iii) confirming the sources and uses of GCAC's basic financial documents.

### III.    Legal Standard

9.      Rule 16(b)(4) provides that, once a scheduling order is entered, it "may be modified for good cause and with the judge's consent." Fed. R. Bankr. P. 7016; Fed. R. Civ. P. 16(b)(4). In order to receive a post-deadline amendment, "a party must show good cause for not meeting the deadline." *Petroleum Prods. & Servs. v. Kana Energy Servs. (In re Petroleum Prods. & Servs.)*, 557 B.R. 918, 921-22 (Bankr. S.D. Tex. 2016) (*Isgur*); *Fahim v. Marriott Hotel Servs., Inc*., 551 F.3d 344, 348 (5th Cir. 2008). "Four factors in particular are relevant to the Court's determination of good cause: '(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice.'" *Kana Energy Servs.*, 557 B.R. at 921-22 (*citing Sw. Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003). "Overall, the Court has broad discretion to preserve the integrity and purpose of the pretrial order, which, toward the end of court efficiency, is to expedite pretrial procedure." *Id.*

### IV.    ARGUMENT

**A. It was not unreasonable for Vitol to presume that Brass could authenticate his company's core financial documents.**

10.      Vitol has two good faith reasons for failing to timely amend the scheduling order. First, Vitol reasonably assumed that Brass would be able to authenticate GCAC's core financial documents and testify as to their accuracy because of his role as president of GCAC and because of his previous testimony that he had "complete authority over the finances of GCAC."[15] He

---

[15] *See* Deposition of GCAC dated 11/03/2020 at 89:11-14.

further admitted that he orchestrated the transfer of millions of dollars to himself, his creditors, and his mother because he "can take out money from GCAC as a loan whenever he wants" and "for whatever reason he wants to take it out."[16] Thus, it was reasonable for Vitol to anticipate that Brass could authenticate and attest to the veracity of GCAC's: (a) general ledger (produced by GCAC while he was president); (b) balance sheets (produced by GCAC's accountants); and (c) income statements (produced by GCAC's accountants).

**B. The need to extending the discovery period only arose because Brass's deposition was postponed multiple times until the very end of the discovery period.**

11.     Second, Brass' deposition would have been completed much earlier were it not for a series of continuances to accommodate Brass. On December 8, 2021, the Court entered the Scheduling Order [Docket No. 17] based on the agreement of parties. The Scheduling Order required that fact discovery be completed by February 7, 2022. However, the parties ultimately had to file six stipulations extending discovery due to scheduling issues in connection with the deposition of the Debtor. See Docket Nos. 28, 34, 37, 40, 46, and 49.[17]

A.     Vitol granted Brass a three-week extension to respond to Vitol's written discovery, moving the deadline from December 3, 2021 to December 27, 2021.

B.     The parties rescheduled the deposition and extended the discovery period because Brass contracted COVID-19.

C.     The parties again rescheduled the due to delays in Debtor's production of documents to Vitol.

D.     Before the new date for the deposition could be set, counsel for the Debtor experienced a loss in the family, and deposition scheduling was set aside until March 2022.

E.     Given the schedules of counsel for each Party, Brass's deposition was ultimately scheduled for – and occurred on – Friday, March 25, 2022.

---

[16] *Id.* at 90:10-25.
[17] *See* correspondence exchanged between counsel for the parties related to the scheduling of Brass' deposition, attached hereto as **Exhibit 12.**

12.     But for several accommodations in favor of Brass, the deposition would have taken place in January 2022. Accordingly, Vitol has multiple good faith reasons for failing to timely amend the scheduling order

**C.     The core Financial Documents are an integral part of Vitol's case.**

13.     Amending the scheduling order is critically important to Vitol's case. Vitol seeks to have its claim against Brass declared non-dischargeable based on Brass' orchestration of a fraudulent transfer scheme.[18] Brass' scheme included transferring millions of dollars from GCAC to himself, his creditors, and his mother at a time when GCAC was insolvent and owed millions of dollars to Vitol. Vitol's claims, thus, significantly hinge on evidence contained in GCAC's financial documents. If these documents are not properly authenticated and admitted into evidence, Vitol's ability to pursue its claims will be significantly diminished.

**D.     There is no prejudice.**

14.     Importantly, there is no prejudice to Brass in allowing the additional depositions. Vitol has not requested additional documents from Brass, additional discovery responses from Brass, or requested an additional deposition of Brass. Rather, Vitol seeks **third party** depositions. The depositions will be limited in scope (the authenticity and accuracy of a few financial documents) and time (2 hours). Moreover, the depositions will not delay trial of this matter or any other pending deadlines. There is currently no trial date and the pre-trial hearing is set for June 2, 2022 – 58 days from the filing of this Motion. No other deadlines will be impacted by the requested depositions and, thus, there is no prejudice to Brass in allowing the depositions.

15.     Because the requested discovery will not prejudice Brass in any way, there is no need to consider the availability of a continuance to cure any such prejudice. Thus, all factors weigh in favor of allowing the continuance.

---

[18] *See, e.g., Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 719 (Bankr. S.D. Tex. 2017).

16.     Importantly, judicial efficiency and economy also weigh in favor of allowing the discovery. Counsel for Brass suggested during the pre-trial status conference that the proposed deponents may be called at trial to establish the authenticity and accuracy of GCAC's financial records. Calling two additional trial witnesses for the simple purpose of authenticating basic financial documents is a waste of judicial resources. The Court's time is better served by allowing the requested depositions so that the financial records can be authenticated without the need to call additional trial witnesses.

## **PRAYER**

17.     In light of the foregoing, Vitol respectfully requests that this court grant the Motion and allow Vitol to depose Tomaszewski and Kevin Boston as soon as practicable and on dates that are mutually agreeable to the witnesses and the parties.

001995

Dated: April 5, 2022                    Respectfully submitted,

                                        By: */s/ Keith M. Aurzada*
                                           Keith M. Aurzada (SBN 24009880)
                                           Lindsey L. Robin (SBN 24091422)
                                           Devan J. Dal Col (SBN 24116244)
                                           **REED SMITH LLP**
                                           2501 N. Harwood, Suite 1700
                                           Dallas, Texas 75201
                                           T: 469.680.4200
                                           F: 469.680.4299
                                           kaurzada@reedsmith.com
                                           lrobin@reedsmith.com
                                           ddalcol@reedsmith.com

                                           and

                                           Michael H. Bernick (SBN 24078277)
                                           Mason W. Malpass (SBN 24109502)
                                           **REED SMITH LLP**
                                           811 Main Street, Suite 1700
                                           Houston, TX 77002
                                           T: 713.469.3834
                                           F: 713.469.3899
                                           mbernick@reedsmith.com
                                           mmalpass@reedsmith.com

                                           *Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on April 5, 2022 a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing (ECF) system upon all parties registered to receive electronic notices in this case, including the Debtor and his counsel and the Office of the United States Trustee.

                                        */s/ Keith M. Aurzada*
                                        Keith M. Aurzada

001996

# UNITED STATES BANKRUPTCY COURT

_____ Southern _____  District of _____ Texas _____

In re   Arthur Brass _____   Case No. ____ 21-60025 _____

                                Debtor

                                                         Chapter _____ 7 _____

## SUBPOENA FOR RULE 2004 EXAMINATION

To:  Records Custodian for DZ Jewelry, LLC, c/o Dror Zadok, 1801 Post Oak Blvd, Suite 100, Houston, Texas 77056

*(Name of person to whom the subpoena is directed)*

[X] *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure. A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
| Jones Murray LLP<br>602 Sawyer St., Suite 400<br>Houston, Texas 77007 | July 29, 2022 at 10:00 a.m.<br>**(DOCUMENTS MAY BE PRODUCED IN LIEU OF APPEARANCE)** |

The examination will be recorded by this method: _____

[X] *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

    **See Exhibit A attached hereto**

        The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

                CLERK OF COURT

                                                OR

_____                       _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
 **Christopher Murray, Ch 7 Trustee**  , who issues or requests this subpoena, are:

| | |
|---|---|
| **J. Maxwell Beatty, The Beatty Law Firm PC** | **832-529-3381** |
| **1127 Eldridge Pkwy, Suite 300, #383, Houston, Texas 77077** | **max@beattypc.com** |

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

       I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

    (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

    (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

        (i) is a party or a party's officer; or

        (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

    (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

    (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

    *(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

    *(2) Command to Produce Materials or Permit Inspection.*

    (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

    (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

        (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

        (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

    *(3) Quashing or Modifying a Subpoena.*

    (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

        (i) fails to allow a reasonable time to comply;

        (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

        (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

        (iv) subjects a person to undue burden.

    (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

        (i) disclosing a trade secret or other confidential research, development, or commercial information; or

        (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

    (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

        (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

        (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

    *(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

    (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

    (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

    (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

    (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

    *(2) Claiming Privilege or Protection.*

    (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

        (i) expressly make the claim; and

        (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

    (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## Exhibit A

**Request No. 1.** - All invoices for sales made relating to account number 1016831.

*Response:*

**Request No. 2.** - All receipts for sales made relating to account number 1016831.

*Response:*

**Request No. 3.** - All payment histories for account number 1016831.

*Response:*

**Request No. 4.** - All statements for account number 1016831.

*Response:*

**Request No. 5.** - All customer files for account number 1016831.

*Response:*

**Request No. 6.** - All photos, listings, or other documents describing any goods sold relating to account number 1016831.

*Response:*

**Request No. 7.** - All valuations of any goods sold relating to account number 1016831.

*Response:*

**Request No. 8.** - All invoices for sales made to the Debtor, Arthur Brass (a/k/a. A.J. Brass).

*Response:*

**Request No. 9.** - All receipts for sales made to the Debtor, Arthur Brass (a/k/a. A.J. Brass).

*Response:*

**Request No. 10.** - All payment histories for any accounts related to the Debtor, Arthur Brass (a/k/a. A.J. Brass).

*Response:*

**Request No. 11.** - All statements for accounts held in the name of the Debtor, Arthur Brass (a/k/a. A.J. Brass).

*Response:*

**Request No. 12.** - All customer files for the Debtor, Arthur Brass (a/k/a. A.J. Brass).

*Response:*

**Request No. 13.** - All photos, listings, or other documents describing any goods sold to the Debtor, Arthur Brass (a/k/a. A.J. Brass).

*Response:*

**Request No. 14.** - All valuations of any goods sold to the Debtor, Arthur Brass (a/k/a A.J. Brass).

*Response:*

**Request No. 15.** - All invoices for sales made to Katie Brass.

*Response:*

**Request No. 16.** - All receipts for sales made to Katie Brass.

*Response:*

**Request No. 17.** - All payment histories for any accounts related to Katie Brass.

*Response:*

**Request No. 18.** - All statements for accounts held in the name of Katie Brass.

*Response:*

**Request No. 19.** - All customer files for Katie Brass.

*Response:*

**Request No. 20.** - All photos, listings, or other documents describing any goods sold to Katie Brass.

*Response:*

**Request No. 21.** - All valuations of any goods sold to Katie Brass.

*Response:*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

## **PLAINTIFF VITOL INC.'S INITIAL DISCLOSURES**

Pursuant to Rule 26(a) of a Federal Rules of Civil Procedure, made applicable to this Adversary Proceeding under Rule 7026 of the Federal Rules of Bankruptcy Procedure, Plaintiff Vitol Inc. (the "**Vitol**" or "**Plaintiff**") files its Initial Disclosures as follows. These disclosures are based on information reasonably available to Vitol as of the date of this filing. Vitol does not represent that it is identifying every document, individual, or piece of evidence possibly relevant to this lawsuit, nor does Vitol waive any right to object to production of any document or other evidence on the basis of any privilege, the work product doctrine, relevancy, undue burden, or any other valid basis. Vitol reserves its right to supplement and/or amend these disclosures to the extent additional documents and/or information may be discovered.

## **I.   Individuals.**

Pursuant to Rule 26(a)(1)(A)(i), Vitol discloses the following individuals likely to have discoverable information. With respect to Vitol or its employees, all contact should be only through Vitol's undersigned attorneys.

1.      Eric Kuo
        c/o Keith M. Aurzada
        Reed Smith LLP
        2850 N. Harwood Street, Ste. 1500
        Dallas, TX 75201
        T:  469.680.4211
        Mr. Kuo has general knowledge of the business relationship between Vitol and
        GCAC and interacted with Defendant Brass during the pendency of that
        relationship.

2.      Mike Loya
        c/o Keith M. Aurzada
        Reed Smith LLP
        2850 N. Harwood Street, Ste. 1500
        Dallas, TX 75201
        T:  469.680.4211
        Mr. Loya has general knowledge of the business relationship between Vitol and
        GCAC and interacted with Defendant Brass during the pendency of that
        relationship.

3.      Patrick Perugini
        Address unknown
        Mr. Perugini worked for the Debtor at GCAC and had knowledge of his
        appropriating funds properly due to Vitol.

4.      A.J. Brass
        c/o Miriam Goott
        Walker & Patterson P.C.
        P.O. Box 61301
        Houston, TX 77208
        T:  713.956.5577
        As the Defendant and the Debtor, Mr. Brass has personal knowledge of his
        misrepresentations and frauds committed against Vitol.

5.      Catherine Mattingly Brass
        2508 Pelham Dr.
        Houston, TX 77019
        As the wife of the Debtor, Catherine Brass may have knowledge of Debtor's
        finances and his use of company funds to support their lifestyle and the transfer of
        proceeds from the Hockley House to her personal bank accounts.

6.      Joyce Brass
        2508 Pelham Dr.
        Houston, TX 77019
        As the co-owner of GCAC, Joyce Brass should have knowledge of the Debtor's use of company funds and the undocumented loans transferred to her personal accounts.

7.      Sandra Brass
        Address unknown
        Sandra Brass should have knowledge of the alleged loan transferred to her personal accounts.

8.      All persons identified in documents disclosed by any party herein pursuant to Rule 26(a)(1), in response to requests for discovery, attached to pleadings, or otherwise.

9.      Vitol reserves the right to supplement these disclosures consistent with the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure.

## II.     **Documents**.

Concurrently with serving these Disclosures, Vitol is producing on a rolling basis all documents in its possession, custody, or control that it presently has reason to believe are relevant to facts alleged in the pleadings. These documents include documents produced in the state court litigation.

## III.    **Computation of Damages**.

Vitol seeks to prevent Debtor from discharging at least $10 Million in damages arising from Debtor's conduct. In the state-court litigation, Vitol asserted damages of at least $14,793,974 arising from Debtor's conduct. Debtor and Vitol entered an Agreed Judgment in the state-court litigation for $10 Million as part of a settlement of Vitol's claims.

## IV.    **Insurance Agreements**.

Rule 26(a)(1)(D) requires production of "any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment." Vitol is unaware of any insurance agreement fitting this description.

Dated: **October 29, 2021.**

Respectfully submitted,

By: */s/ Keith M. Aurzada*

Keith M. Aurzada (SBN 24009880)
Lindsey L. Robin (SBN 24091422)
**REED SMITH LLP**
2501 N. Harwood, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
kaurzada@reedsmith.com
lrobin@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP**
811 Main Street, Suite 1700
Houston, TX 77002
T: 713.469.3834
F: 713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on **October 29, 2021** a true and correct copy of the foregoing document was served on Defendant's counsel *via email*.

*/s/ Keith M. Aurzada*

Keith M. Aurzada

## U.S. Bankruptcy Court
## Southern District of Texas (Victoria)
## Adversary Proceeding #: 21-06006

*Assigned to:* Bankruptcy Judge Christopher M. Lopez          *Date Filed:* 07/09/21
*Lead BK Case:* 21-60025
*Lead BK Title:* Arthur Jacob Brass
*Lead BK Chapter:* 7
*Demand:*

*Nature[s] of Suit:* 41 Objection / revocation of discharge - 727(c),(d),(e)
                     65 Dischargeability - other


### *Plaintiff*
----------------------
**Vitol Inc.**                          represented by **Keith Miles Aurzada**
2928 Richmond Ave                                       Reed Smith LLP
Houston, TX 77098                                       2850 N. Harwood Street
                                                        Suite 1500
                                                        Dallas, TX 75201
                                                        469-680-4211
                                                        Email: kaurzada@reedsmith.com

                                                        **Michael Halley Bernick**
                                                        Reed Smith LLP
                                                        811 Main St
                                                        Ste 1700
                                                        Houston, TX 77002
                                                        713-469-3834
                                                        Email: mbernick@reedsmith.com

                                                        **Michael P Cooley**
                                                        Reed Smith LLP
                                                        2501 N. Harwood, Suite 1700
                                                        Dallas, TX 75201
                                                        469-680-4213
                                                        Email: mpcooley@reedsmith.com

                                                        **Bradley James Purcell**
                                                        Reed Smith LLP
                                                        2501 N. Harwood St.
                                                        Suite 1700
                                                        Dallas, TX 75201
                                                        469-680-4200
                                                        Fax : 469-680-4299
                                                        Email: bpurcell@reedsmith.com

                                                        **Lindsey Lee Robin**
                                                        Reed Smith

2850 N. Harwood St.
Suite 1500
Dallas, TX 75201
469-680-4222
Fax : 469-680-4299
Email: lrobin@reedsmith.com

V.

**Defendant**
-----------------------

**Arthur Jacob Brass**
2508 Pelham Dr
Houston, TX 77019
SSN / ITIN: xxx-xx-7454

represented by **Miriam Goott**
Walker & Patterson, PC
PO Box 61301
Houston, TX 77208
713-956-5577
Fax : 713-956-5570
Email: mgoott@walkerandpatterson.com

**Johnie J Patterson**
Walker & Patterson,P.C.
P.O. Box 61301
Houston, TX 77208-1301
713-956-5577
Fax : 713-956-5570
Email: jjp@walkerandpatterson.com

| Filing Date | # | Docket Text |
|---|---|---|
| 07/09/2021 | 1 (12 pgs; 2 docs) | Adversary case 21-06006. Nature of Suit: (41 (Objection / revocation of discharge - 727(c),(d),(e))),(65 (Dischargeability - other)) Complaint *Complaint to Determine Dischargeability of Debts* by Vitol Inc. against Arthur Jacob Brass. Fee Amount $350 (Attachments: # 1 Exhibit A) (Robin, Lindsey) (Entered: 07/09/2021) |
| 07/09/2021 | | Receipt of Complaint(21-06006) [cmp,cmp] ( 350.00) Filing Fee. Receipt number 23138378. Fee amount $ 350.00. (U.S. Treasury) (Entered: 07/09/2021) |
| 07/09/2021 | 2 (2 pgs) | Notice *Aversary Proceeding Cover Sheet*. (Related document(s):1 Complaint) Filed by Vitol Inc. (Robin, Lindsey) (Entered: 07/09/2021) |
| 07/09/2021 | 3 (2 pgs) | Docketed in Error - Request for Issuance of Summons on Arthur Jacob Brass. (Robin, Lindsey) Modified on 7/12/2021 (hler). (Entered: 07/09/2021) |
| 07/09/2021 | 4 (2 pgs) | Request for Issuance of Summons on Arthur Jacob Brass. (Robin, Lindsey) (Entered: 07/09/2021) |
| 07/12/2021 | 5 (2 pgs) | Summons Issued on Arthur Jacob Brass Date Issued 7/12/2021. (hler) (Entered: 07/12/2021) |

| 08/02/2021 | 6<br>(14 pgs; 3 docs) | Motion to Dismiss Adversary Proceeding. Objections/Request for Hearing Due in 21 days. Filed by Arthur Jacob Brass (Attachments: # 1 Exhibit A - Objection to Exemptions # 2 Proposed Order) (Goott, Miriam) (Entered: 08/02/2021) |
| --- | --- | --- |
| 08/23/2021 | 7<br>(32 pgs; 3 docs) | Response *and Motion for Leave to Amend* (related document(s):6 Motion to Dismiss Adversary Proceeding. Filed by Vitol Inc. (Attachments: # 1 Complaint # 2 Proposed Order) (Robin, Lindsey) (Entered: 08/23/2021) |
| 09/29/2021 | 8<br>(1 pg) | Order Denying Motion to Dismiss Adversary Proceeding 6:21-ap-6006 (Related Doc # 6) Signed on 9/29/2021. (kpico) (Entered: 09/29/2021) |
| 10/01/2021 | 9<br>(2 pgs) | BNC Certificate of Mailing. (Related document(s):8 Order on Motion to Dismiss Adversary Proceeding) No. of Notices: 2. Notice Date 10/01/2021. (Admin.) (Entered: 10/01/2021) |
| 10/06/2021 | 10<br>(10 pgs) | First Amended Complaint (Related document(s):1 Complaint) (Aurzada, Keith) (Entered: 10/06/2021) |
| 10/13/2021 | 11<br>(3 pgs) | Answer to Complaint (Related document(s):10 Amended Complaint) Filed by Arthur Jacob Brass (Goott, Miriam) (Entered: 10/13/2021) |
| 10/20/2021 | 12<br>(5 pgs) | Joint Discovery Plan/Case Management Plan (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 10/20/2021) |
| 10/24/2021 | 13<br>(2 pgs) | Initial Disclosure Rule 26 (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 10/24/2021) |
| 10/29/2021 | 14<br>(5 pgs) | Initial Disclosure Rule 26 (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 10/29/2021) |
| 11/29/2021 | | Certificate of Email Notice. Contacted M. Goot and L. Robin. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1 Complaint) Scheduling Conference is scheduled for 12/8/2021 at 11:30 AM by telephone and video conference. (kpico) (Entered: 11/29/2021) |
| 11/30/2021 | 15<br>(2 pgs) | Notice for Conference. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 11/30/2021) |
| 12/08/2021 | 16<br>(5 pgs) | Joint Discovery Plan/Case Management Plan (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 12/08/2021) |
| 12/08/2021 | | Courtroom Minutes. Time Hearing Held: 11:30 a.m. - 11:46 a.m. Appearances: Keith Aurzada for Plaintiff and Miriam Goott for Defendant (Related document(s):1 Scheduling Conference). Parties provide a status report and discuss deadlines. Court to issue scheduling order. Pretrial Conference is scheduled for 4/1/2022 at 11:00 AM by telephone and video conference. (kpico) (Entered: 12/08/2021) |
| 12/08/2021 | 17<br>(1 pg) | Scheduling Order Signed on 12/8/2021 (Related document(s):1 Complaint) Pre-Trial Conference set for 4/1/2022 at 11:00 AM at Houston, Courtroom 401 (CML). Discovery due by 2/7/2022. (kpico) (Entered: 12/08/2021) |

| 12/10/2021 | 18<br>(2 pgs) | BNC Certificate of Mailing. (Related document(s):17 Scheduling Order) No. of Notices: 2. Notice Date 12/10/2021. (Admin.) (Entered: 12/10/2021) |
|---|---|---|
| 12/15/2021 | 19<br>(13 pgs) | Notice *of Subpoena to Hightower Advisors*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/15/2021) |
| 12/15/2021 | 20<br>(10 pgs) | Notice *of Subpoena to EEPB*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/15/2021) |
| 12/15/2021 | 21<br>(15 pgs) | Notice *of Subpoena to Cadence Bank*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/15/2021) |
| 12/15/2021 | 22<br>(12 pgs) | Notice *of Subpoena to Chubb Lloyds Insurance Company of Texas*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/15/2021) |
| 12/17/2021 | 23<br>(2 pgs) | Stipulation By Vitol Inc. and. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 12/17/2021) |
| 12/17/2021 | 24<br>(14 pgs) | Notice *of Subpoena to International Bank of Commerce*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/17/2021) |
| 12/17/2021 | 25<br>(14 pgs) | Notice *of Subpoena to IberiaBank*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/17/2021) |
| 12/17/2021 | 26<br>(14 pgs) | Notice *of Subpoena to Veritex Community Bank*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/17/2021) |
| 12/17/2021 | 27<br>(3 pgs) | Answer to Complaint (Related document(s):1 Complaint, 10 Amended Complaint) Filed by Arthur Jacob Brass (Goott, Miriam) (Entered: 12/17/2021) |
| 12/20/2021 | 28<br>(2 pgs) | Stipulation and Agreed Order (Related document(s):23 Stipulation). Signed on 12/20/2021 . (rsal) (Entered: 12/20/2021) |
| 12/22/2021 | 29<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):28 Generic Order) No. of Notices: 2. Notice Date 12/22/2021. (Admin.) (Entered: 12/22/2021) |
| 12/29/2021 | 30<br>(2 pgs) | Stipulation By Veritex Community Bank f/k/a Green Bank, N.A. and. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Veritex Community Bank f/k/a Green Bank, N.A. ).(Related document(s):26 Notice) (Marmon, Shelley) (Entered: 12/29/2021) |
| 12/30/2021 | 31<br>(2 pgs) | Joint Stipulation Regarding Extension of Time to Respond to Subpoena (Related document(s): 30 Stipulation). Signed on 12/30/2021. (rsal) (Entered: 12/30/2021) |
| 01/01/2022 | 32<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):31 Generic Order) No. of Notices: 2. Notice Date 01/01/2022. (Admin.) (Entered: 01/01/2022) |
| 01/18/2022 | 33 | Stipulation By Vitol Inc. and Arthur J. Brass (Debtor). Does this |

| | (3 pgs) | document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Purcell, Bradley) (Entered: 01/18/2022) |
|---|---|---|
| 01/19/2022 | 34 (3 pgs) | Second Stipulation and Agreed Order. Signed on 1/19/2022 (Related document(s):33 Stipulation) (kpico) (Entered: 01/19/2022) |
| 01/21/2022 | 35 (5 pgs) | BNC Certificate of Mailing. (Related document(s):34 Generic Order) No. of Notices: 2. Notice Date 01/21/2022. (Admin.) (Entered: 01/21/2022) |
| 01/24/2022 | 36 (3 pgs) | Stipulation By Arthur Jacob Brass and Vitol, Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Arthur Jacob Brass ). (Purcell, Bradley) (Entered: 01/24/2022) |
| 01/28/2022 | 37 (3 pgs) | Third Stipulation and Agreed Order. Signed on 1/28/2022 (Related document(s):36 Stipulation) (kpico) (Entered: 01/28/2022) |
| 01/30/2022 | 38 (5 pgs) | BNC Certificate of Mailing. (Related document(s):37 Generic Order) No. of Notices: 2. Notice Date 01/30/2022. (Admin.) (Entered: 01/30/2022) |
| 02/04/2022 | 39 (3 pgs) | Stipulation By Vitol Inc. and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Purcell, Bradley) (Entered: 02/04/2022) |
| 02/07/2022 | 40 (3 pgs) | Fourth Stipulation and Agreed Order. Signed on 2/7/2022 (Related document(s):39 Stipulation) (kpico) (Entered: 02/07/2022) |
| 02/09/2022 | 41 (5 pgs) | BNC Certificate of Mailing. (Related document(s):40 Generic Order) No. of Notices: 2. Notice Date 02/09/2022. (Admin.) (Entered: 02/09/2022) |
| 02/16/2022 | 42 (3 pgs) | Stipulation By Vitol Inc. and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 02/16/2022) |
| 02/17/2022 | 43 (3 pgs) | Fifth Stipulation and Agreed Order (Related document(s): 42 Stipulation). Signed on 2/17/2022. (rsal) (Entered: 02/17/2022) |
| 02/19/2022 | 44 (5 pgs) | BNC Certificate of Mailing. (Related document(s):43 Generic Order) No. of Notices: 2. Notice Date 02/19/2022. (Admin.) (Entered: 02/19/2022) |
| 02/22/2022 | 45 (3 pgs) | Stipulation By Arthur Jacob Brass and Vitol, Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Arthur Jacob Brass ).(Related document(s):17 Scheduling Order, 43 Generic Order) (Patterson, Johnie) (Entered: 02/22/2022) |
| 02/23/2022 | 46 (3 pgs) | Amended Fifth Stipulation and Agreed Order. Signed on 2/23/2022 (Related document(s):45 Stipulation) (kpico) (Entered: 02/23/2022) |

| | | |
|---|---|---|
| 02/25/2022 | 47<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):46 Generic Order) No. of Notices: 2. Notice Date 02/25/2022. (Admin.) (Entered: 02/25/2022) |
| 03/10/2022 | 48<br>(3 pgs) | Stipulation By Vitol Inc. and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Purcell, Bradley) (Entered: 03/10/2022) |
| 03/21/2022 | 49<br>(3 pgs) | Sixth Stipulation and Agreed Order (Adversary). Signed on 3/21/2022. (rsal) (Entered: 03/21/2022) |
| 03/23/2022 | 50<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):49 Generic Order (Adversary)) No. of Notices: 2. Notice Date 03/23/2022. (Admin.) (Entered: 03/23/2022) |
| 04/01/2022 | 51 | Courtroom Minutes. Time Hearing Held: 11:00 a.m. Appearances: Keith Aurzada, Vijay D'Cruz, Shawn Beloin, and Bradley Purcell for Plaintiff; Miriam Goott for Defendant. (Related document(s):1 Pretrial Conference). Comments made by parties. Mr. Azurada is to file a Discovery Related Motion by April 5, 2022. Mrs. Goott is to file a response by Noon on 4/7/2022. Hearing is scheduled for 4/8/2022 at 11:00 AM by telephone and video conference. Pre-trial conference is continued to 6/2/2022 at 11:00 AM by telephone and video conference. (kpico) (Entered: 04/01/2022) |
| 04/05/2022 | 52<br>(391 pgs; 3 docs) | Motion to Extend Time *Vitol, Inc.'s Expedited Motion to Extend Discovery* Filed by Vitol Inc. (Attachments: # 1 Declaration # 2 Proposed Order) (Aurzada, Keith) (Entered: 04/05/2022) |
| 04/05/2022 | 53<br>(5 pgs; 2 docs) | Response *in Opposition* (related document(s):52 Motion to Extend Time). Filed by Arthur Jacob Brass (Attachments: # 1 Exhibit A - Email) (Goott, Miriam) (Entered: 04/05/2022) |
| 04/08/2022 | 54<br>(1 pg) | Order Granting Motion to Extend Discovery. (Related Doc # 52) Signed on 4/8/2022. (kpico) (Entered: 04/08/2022) |
| 04/08/2022 | | Courtroom Minutes. Time Hearing Held: 11:00 a.m. Appearances: Miriam Goott for Defendant and Bradly Purcell for Plaintiff. (Related document(s): 52 Emergency Motion to Extend Discovery). Arguments heard. Court grants Motion to Extend Discovery for the reasons stated on the record; Order signed. (kpico) (Entered: 04/08/2022) |
| 04/08/2022 | 55<br>(5 pgs; 2 docs) | Notice *of Subpoena to John Tomaszewski*. Filed by Vitol Inc. (Attachments: # 1 Subpoena - Tomaszewski)(Aurzada, Keith) (Entered: 04/08/2022) |
| 04/10/2022 | 56<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):54 Order on Motion to Extend Time) No. of Notices: 2. Notice Date 04/10/2022. (Admin.) (Entered: 04/10/2022) |
| 04/14/2022 | 57<br>(5 pgs; 2 docs) | Notice *of Withdrawal and Issuance of Subpoena*. (Related document(s):55 Notice) Filed by Vitol Inc. (Attachments: # 1 Subpoena)(Purcell, Bradley) (Entered: 04/14/2022) |
| 04/18/2022 | 58 | Motion For Summary Judgment. Objections/Request for Hearing Due |

| | | |
|---|---|---|
| | (97 pgs; 12 docs) | in 21 days. Filed by Arthur Jacob Brass (Attachments: # 1 Exhibit 1 - Vitol's Amended Complaint # 2 Exhibit 2 - Settlement Agreement # 3 Exhibit 3 - Defendant's RFA # 4 Exhibit 4 - Vitol's Responses to RFA # 5 Exhibit 5 - POC with Agreed Judgment Attached # 6 Exhibit 6 - Affidavit # 7 Exhibit 7 - Responses to RFP # 8 Exhibit 8 - Responses to Interrogatories # 9 Exhibit 9 - The Email # 10 Exhibit 10 - Check rejected by Vitol # 11 Proposed Order) (Goott, Miriam) (Entered: 04/18/2022) |
| 04/22/2022 | 59 (4 pgs; 2 docs) | ***DISREGARD: Attorney efile error. Will be docketed the corrected entry/event**** Motion to Amend (related document(s):55 Notice, 57 Notice). Filed by Plaintiff Vitol Inc. (Attachments: # 1 Amended Subpoena; Purcell, Bradley) Modified on 4/22/2022 (BrittanyBoniface). (Entered: 04/22/2022) |
| 04/22/2022 | 60 (4 pgs; 2 docs) | Amended Notice of Subpoena. (Related document(s):55 Notice, 57 Notice) Filed by Vitol Inc. (Attachments: # 1 Notice of Amended Subpoena)(Purcell, Bradley) (Entered: 04/22/2022) |
| 04/25/2022 | | Certificate of Email Notice. Contacted M. Goott. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):58 Motion For Summary Judgment). Hearing is scheduled for 6/2/2022 at 11:00 AM by telephone and video conference. (rsal) (Entered: 04/25/2022) |
| 04/25/2022 | 61 (34 pgs; 11 docs) | Notice of Production of GCAC009845. Filed by Vitol Inc. (Attachments: # 1 Exhibit A # 2 Exhibit A-1 # 3 Exhibit A-3 # 4 Exhibit A-3 # 5 Exhibit A-4 # 6 Exhibit A-5 # 7 Exhibit B # 8 Exhibit B-1 # 9 Exhibit B-2 # 10 Exhibit B-3)(Bernick, Michael) (Entered: 04/25/2022) |
| 04/25/2022 | 62 (28 pgs; 8 docs) | Notice of Production of EEPB Documents. Filed by Vitol Inc. (Attachments: # 1 Exhibit A # 2 Exhibit A-1 # 3 Exhibit A-2 # 4 Exhibit A-3 # 5 Exhibit A-4 # 6 Exhibit A-5 # 7 Exhibit A-6)(Bernick, Michael) (Entered: 04/25/2022) |
| 04/26/2022 | 63 (24 pgs; 7 docs) | Supplemental Notice of Production. (Related document(s):61 Notice, 62 Notice) Filed by Vitol Inc. (Attachments: # 1 Exhibit A # 2 Exhibit A-1 # 3 Exhibit A-2 # 4 Exhibit B # 5 Exhibit B-1 # 6 Exhibit B-2) (Robin, Lindsey) (Entered: 04/26/2022) |
| 04/26/2022 | 64 (30 pgs; 8 docs) | Motion to Strike. Objections/Request for Hearing Due in 21 days (related document(s):60 Notice, 61 Notice, 62 Notice, 63 Notice). Filed by Arthur Jacob Brass (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 - Portion of depo transcript # 3 Exhibit 3 - Email with transcript # 4 Exhibit 4 - Second transcript after hearing # 5 Exhibit 5 - Vitol's Declaration # 6 Exhibit 6 - Declaration # 7 Proposed Order) (Goott, Miriam) (Entered: 04/26/2022) |
| 05/05/2022 | | Certificate of Email Notice. Contacted M. Goott. Movant to notice all interested parties and file a certificate of service with the court (Related document(s): 64 Motion to Strike). Hearing is scheduled for 6/2/2022 at 11:00 AM by telephone and video conference. (rsal) (Entered: 05/05/2022) |
| 05/09/2022 | 65 (30 pgs; 2 docs) | Response in Opposition to Debtor's Motion for Summary Judgment (related document(s):58 Motion For Summary Judgment). Filed by |

| | | Vitol Inc. (Attachments: # 1 Proposed Order) (Purcell, Bradley) (Entered: 05/09/2022) |
|---|---|---|
| 05/09/2022 | 66 (3 pgs) | Motion *to file Under Seal Exhibits to Its Response in Opposition to Debtor's Motion for Summary Judgment* Filed by Vitol Inc. (Purcell, Bradley) (Entered: 05/09/2022) |
| 05/09/2022 | 67 | Sealed Document *Motion to file Under Seal Exhibits to Its Response in Opposition to Debtor's Motion for Summary Judgment* (Filed By Vitol Inc. ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10) (Purcell, Bradley) (Entered: 05/09/2022) |
| 05/09/2022 | 68 | Sealed Document *Exhibits 11-25 to Motion to File Under Seal Exhibits to Its Response in Opposition to Debtors Motion for Summary Judgment* (Filed By Vitol Inc. ). (Attachments: # 1 Exhibit 11 # 2 Exhibit 12 # 3 Exhibit 13 # 4 Exhibit 14 # 5 Exhibit 15 # 6 Exhibit 16 # 7 Exhibit 17 # 8 Exhibit 18 # 9 Exhibit 19 # 10 Exhibit 20 # 11 Exhibit 21 # 12 Exhibit 22 # 13 Exhibit 23 # 14 Exhibit 24 # 15 Exhibit 25) (Purcell, Bradley) (Entered: 05/09/2022) |
| 05/16/2022 | | Certificate of Email Notice. Contacted M. Goott, M. Beatty, and K. Aurzada. (Related document(s): 1 Complaint). Status Conference is scheduled for 5/17/2022 at 10:00 AM by telephone and video conference. (rsal) (Entered: 05/16/2022) |
| 05/17/2022 | 69 | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: M. Goott, M. Beatty, K. Aurzada, M. Durrschmidt, and B. Purcell. ERO: R. Saldana. (Related Document: 1 Status Conference). Status Conference held. Comments made by parties. There is no need for a further Status Conference. (rsal) (Entered: 05/17/2022) |
| 05/17/2022 | 70 (59 pgs; 11 docs) | Response *in Opposition to* (related document(s):64 Motion to Strike). Filed by Vitol Inc. (Attachments: # 1 Declaration of J. Tolbert # 2 Exhibit A-1 # 3 Exhibit A-2 # 4 Exhibit A-3 # 5 Exhibit A-4 # 6 Exhibit A-5 # 7 Exhibit B # 8 Exhibit C # 9 Exhibit D # 10 Exhibit E) (Bernick, Michael) (Entered: 05/17/2022) |
| 05/30/2022 | 71 (599 pgs; 14 docs) | Witness List, Exhibit List (Filed By Arthur Jacob Brass ).(Related document(s):64 Motion to Strike) (Attachments: # 1 Exhibit 1 - Agreed Order # 2 Exhibit 2 - Declaration to Vitol's Motion to Depose # 3 Exhibit 3 - Order Granting Vitol's Motion # 4 Exhibit 4 - First transcript # 5 Exhibit 5 - Email from Purcell with transcript # 6 Exhibit 6 - Spreadsheet emailed during depo # 7 Exhibit 7 - Second transcript # 8 Exhibit 9 - Vitol's First Notice # 9 Exhibit 9 - Vitols Notice Docket 61 - Declaration # 10 Exhibit 10 - Vitol's Second Declaration # 11 Exhibit 11 - Docket # 12 Exhibit 12 - Properties of spreadsheet sent during depo # 13 Exhibit 13 - Size properties of spreadsheet emailed during deposition) (Goott, Miriam) (Entered: 05/30/2022) |
| 05/30/2022 | 72 (1 pg) | Notice *of Hearing*. (Related document(s):64 Motion to Strike) Filed by Arthur Jacob Brass (Goott, Miriam) (Entered: 05/30/2022) |
| 05/31/2022 | 73 (413 pgs; 26 docs) | Witness List, Exhibit List (Filed By Vitol Inc. ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit |

|  |  |  |
|---|---|---|
|  |  | 15 # <u>16</u> Exhibit 16 # <u>17</u> Exhibit 17 # <u>18</u> Exhibit 18 # <u>19</u> Exhibit 19 # <u>20</u> Exhibit 20 # <u>21</u> Exhibit 21 # <u>22</u> Exhibit 22 # <u>23</u> Exhibit 25 # <u>24</u> Exhibit 26 # <u>25</u> Exhibit 27) (Bernick, Michael) (Entered: 05/31/2022) |
| 05/31/2022 | <u>74</u><br>(75 pgs) | Additional Attachments Re: *Exhibit 23 part 1 of 3* (related document(s):<u>73</u> Witness List, Exhibit List) (Filed By Vitol Inc. ). (Related document(s):<u>73</u> Witness List, Exhibit List) (Bernick, Michael) (Entered: 05/31/2022) |
| 05/31/2022 | <u>75</u><br>(75 pgs) | Additional Attachments Re: *Exhibit 23 part 2 of 3* (related document(s):<u>73</u> Witness List, Exhibit List) (Filed By Vitol Inc. ). (Related document(s):<u>73</u> Witness List, Exhibit List) (Bernick, Michael) (Entered: 05/31/2022) |
| 05/31/2022 | <u>76</u><br>(70 pgs) | Additional Attachments Re: *Exhibit 23 part 3 of 3* (related document(s):<u>73</u> Witness List, Exhibit List) (Filed By Vitol Inc. ). (Related document(s):<u>73</u> Witness List, Exhibit List) (Bernick, Michael) (Entered: 05/31/2022) |
| 06/02/2022 | 77 | Courtroom Minutes. Time Hearing Held: 11:00 AM. Appearances: Miriam Goott and Johnie Patterson for Defendant; Keith Azurada, Michael Bernick, and Bradley Purcell for Plaintiff; Max Beatty for Christopher Murray. (Related document(s):<u>1</u> Pretrial Conference, <u>58</u> Motion for Summary Judgment, and <u>64</u> Motion to Strike. Witness: James Tolbert. Arguments heard. Evidence presented. Vitol's exhibits 14 and 15 are admitted. Court takes <u>58</u> Motion for Summary Judgment under advisement for the reasons stated on the record. Hearing as to the Motion to Strike is continued to 7/8/2022 at 10:00 AM at Houston, Courtroom 401 (CML). (kpico) (Entered: 06/02/2022) |
| 06/22/2022 | <u>78</u><br>(16 pgs) | Declaration re: *James E. Tolbert* (Filed By Vitol Inc. ). (Bernick, Michael) (Entered: 06/22/2022) |
| 06/24/2022 | <u>79</u><br>(9 pgs) | Order Granting in part and Denying in part Motion For Summary Judgment in 6:21-ap-6006 (Related Doc # <u>58</u>). Signed on 6/24/2022. (rsal) (Entered: 06/24/2022) |
| 06/26/2022 | <u>80</u><br>(11 pgs) | BNC Certificate of Mailing. (Related document(s):<u>79</u> Order on Motion For Summary Judgment) No. of Notices: 2. Notice Date 06/26/2022. (Admin.) (Entered: 06/26/2022) |
| 07/01/2022 | <u>81</u><br>(19 pgs; 4 docs) | Supplemental Witness List (Filed By Vitol Inc. ). (Attachments: # <u>1</u> Exhibit 29 - Declaration of James Tolbert # <u>2</u> Exhibit 30 - Exhibit A to Tolbert Declaration # <u>3</u> Exhibit 31 - Exhibit A to Tolbert Declaration) (Bernick, Michael) (Entered: 07/01/2022) |
| 07/08/2022 | 82 | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: M. Goott, J. Patterson, M. Cooley, B. Purcell, M. Beatty, and S. Marmon. (Related document(s): <u>64</u> Motion to Strike/Status Conference). Motion is abated to a date to be determined. Parties are to file an agreed scheduling order. Witness/Exhibit lists and pre-trial statements are due by 4:00 PM on 8/22nd. Pre-Trial Hearing is scheduled for 8/24/2022 at 10:00 AM. (rsal) (Entered: 07/08/2022) |
| 07/18/2022 | <u>83</u><br>(3 pgs) | Stipulation By Vitol Inc. and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a |

| | | |
|---|---|---|
| | | document? Yes. (Filed By Vitol Inc. ). (Cooley, Michael) (Entered: 07/18/2022) |
| 07/19/2022 | [84](#) (3 pgs) | Sixth Stipulation and Agreed Order Pre-Trial Order, witness lists, and exhibits are due by 8/22/2022. Hybrid Pre-Trial Conference set for 8/24/2022 at 10:00 AM. Trial date set for 8/30/2022 and 8/31/2022 at 09:00 AM at Houston, Courtroom 401 (CML). Signed on 7/19/2022. (rsal) (Entered: 07/22/2022) |
| 07/27/2022 | [85](#) (1 pg) | Proposed Order RE: (Filed By Vitol Inc. ).(Related document(s):[64](#) Motion to Strike) (Cooley, Michael) (Entered: 07/27/2022) |
| 07/27/2022 | [86](#) (1 pg) | Order Regarding Attendance of Trial Witness (Related document(s): [64](#) Motion to Strike). Signed on 7/27/2022. (rsal) (Entered: 07/27/2022) |
| 07/27/2022 | [87](#) (6 pgs; 3 docs) | Notice *of Suboena to John Tomaszewski*. Filed by Vitol Inc. (Attachments: # [1](#) Trial Subpoena # [2](#) Proposed Order) (Aurzada, Keith) (Entered: 07/27/2022) |
| 07/27/2022 | [88](#) (5 pgs) | BNC Certificate of Mailing. (Related document(s):[84](#) Scheduling Order) No. of Notices: 2. Notice Date 07/27/2022. (Admin.) (Entered: 07/27/2022) |
| 07/29/2022 | [89](#) (3 pgs) | BNC Certificate of Mailing. (Related document(s):[86](#) Generic Order) No. of Notices: 2. Notice Date 07/29/2022. (Admin.) (Entered: 07/29/2022) |
| 08/08/2022 | [90](#) (41 pgs; 14 docs) | Docketed in Error - Notice *Trial Subponeas*. Filed by Vitol Inc. (Attachments: # [1](#) Trial Subpoena - AJ Brass # [2](#) Trial Subpoena - Arc Logistics Partners, LP # [3](#) Trial Subpoena - Cadence Bank # [4](#) Trial Subpoena - Catherine Brass # [5](#) Trial Subpoena - Chris Murray, Ch 7 Trustee for GCAC # [6](#) Trial Subpoena - Chubb Lloyd Insurance Co # [7](#) Trial Subpoena - EEPB PC # [8](#) Trial Subpoena - Hightower Advisors # [9](#) Trial Subpoena - IBC Bank # [10](#) Trial Subpoena - Jason Goldstein # [11](#) Trial Subpoena - Joe Mattingly # [12](#) 2022.08.08 - Trial Subpoena - Patrick Perugini # [13](#) Trial Subpoena - Vertext Community Bank) (Aurzada, Keith) Modified on 8/9/2022 (hler). (Entered: 08/08/2022) |
| 08/08/2022 | [91](#) (93 pgs; 14 docs) | Notice *of Trial Subpoena*. Filed by Vitol Inc. (Attachments: # [1](#) A_2022.08.08 - Trial Subpoena - AJ Brass # [2](#) B_2022.08.08 - Trial Subpoena - Patrick Perugini # [3](#) C_2022.08.08 - Trial Subpoena - Joe Mattingly # [4](#) D_2022.08.08 - Trial Subpoena - Jason Goldstein # [5](#) E_2022.08.08 - Trial Subpoena - Catherine Brass # [6](#) F_2022.08.08 - Trial Subpoena - EEPB PC # [7](#) G_2022.08.08 - Trial Subpoena - IBC Bank # [8](#) H_2022.08.08 - Trial Subpoena - Arc Logistics Partners, LP # [9](#) I_2022.08.08 - Trial Subpoena - Chubb Lloyd Insurance Co # [10](#) J_2022.08.08 - Trial Subpoena - Hightower Advisors # [11](#) K_2022.08.08 - Trial Subpoena - Veritext Community Bank # [12](#) L_2022.08.08 - Trial Subpoena - Chris Murray, Ch 7 Trustee for GCAC # [13](#) M_2022.08.08 - Trial Subpoena - Cadence Bank)(Aurzada, Keith) (Entered: 08/08/2022) |
| 08/09/2022 | [92](#) (4 pgs; 2 docs) | Notice *of Objection*. (Related document(s):[86](#) Generic Order, [87](#) Notice) Filed by Vitol Inc. (Attachments: # [1](#) Exhibit A)(Aurzada, Keith) (Entered: 08/09/2022) |
| 08/10/2022 | [93](#) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by Vitol |

| | | |
|---|---|---|
| | (2 pgs) | Inc/Mason Malpass. This is to order a transcript of Motion Status Conference 7-8-2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Vitol Inc. ). (Bernick, Michael) Electronically forwarded to Veritext Legal Solutions 8/10/2022. Estimated Transcript Completion Date 8/17/2022. Modified on 8/10/2022 (BrandisIsom). (Entered: 08/10/2022) |
| 08/15/2022 | 94 (4 pgs) | Request for Hearing (Filed By Vitol Inc. ).(Related document(s):92 Notice) (Cooley, Michael) (Entered: 08/15/2022) |
| 08/15/2022 | 95 (6 pgs; 2 docs) | Response (Filed By Arthur Jacob Brass ).(Related document(s):94 Request for Hearing) (Attachments: # 1 Proposed Order) (Goott, Miriam) (Entered: 08/15/2022) |
| 08/17/2022 | 96 (7 pgs; 2 docs) | Notice *of of Trial Subpoena of Kevin Boston*. Filed by Vitol Inc. (Attachments: # 1 Exhibit Trial Subpoena - Kevin Boston)(Aurzada, Keith) (Entered: 08/17/2022) |
| 08/17/2022 | 97 | Transcript RE: held on 07/08/2022 before Judge Christopher M. Lopez. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 11/15/2022. (VeritextLegalSolutions) (Entered: 08/17/2022) |
| 08/18/2022 | 98 (1 pg) | Notice of Filing of Official Transcript as to 97 Transcript. Parties notified (Related document(s):97 Transcript) (hcar) (Entered: 08/18/2022) |
| 08/20/2022 | 99 (3 pgs) | BNC Certificate of Mailing. (Related document(s):98 Notice of Filing of Official Transcript (Form)) No. of Notices: 2. Notice Date 08/20/2022. (Admin.) (Entered: 08/20/2022) |
| 08/22/2022 | | Hearing Continued (Related document(s): 84 Scheduling Order). The Pre-Trial Conference scheduled for 8/24/2022 at 10:00 AM is RESET to 8/24/2022 at 4:00 PM (TIME CHANGE ONLY). (rsal) (Entered: 08/22/2022) |
| 08/22/2022 | 100 (5 pgs) | Order Denying Motion to Strike (Related document(s): 64). Signed on 8/22/2022. (rsal) (Entered: 08/22/2022) |
| 08/22/2022 | 101 (7 pgs) | Exhibit List, Witness List (Filed By Vitol Inc. ).(Related document(s):84 Scheduling Order) (Cooley, Michael) (Entered: 08/22/2022) |
| 08/22/2022 | 102 (3 pgs) | Notice *of Vitol's Designations of Deposition Testimony*. (Related document(s):84 Scheduling Order) Filed by Vitol Inc. (Cooley, Michael) (Entered: 08/22/2022) |
| 08/22/2022 | 103 (8 pgs) | Proposed Findings of Fact and Conclusions of Law (Filed By Vitol Inc. ).(Related document(s):84 Scheduling Order) (Cooley, Michael) (Entered: 08/22/2022) |
| 08/22/2022 | 104 (1382 pgs; 50 docs) | Witness List, Exhibit List (Filed By Arthur Jacob Brass ). (Attachments: # 1 Exhibit #1 # 2 Exhibit #2 # 3 Exhibit #3 # 4 Exhibit #4 # 5 Exhibit #5 # 6 Exhibit #6 # 7 Exhibit #7 # 8 Exhibit #8 # 9 Exhibit #9 # 10 Exhibit #10 # 11 Exhibit #11 # 12 Exhibit #12 # 13 Exhibit #13 # 14 Exhibit #14 # 15 Exhibit #15 # 16 Exhibit #16 # 17 |

| | | |
|---|---|---|
| | | Exhibit #17 # <u>18</u> Exhibit #18 # <u>19</u> Exhibit #19 # <u>20</u> Exhibit #20 # <u>21</u> Exhibit #21 # <u>22</u> Exhibit #22 # <u>23</u> Exhibit #23 # <u>24</u> Exhibit #24 # <u>25</u> Exhibit #25 # <u>26</u> Exhibit #26 # <u>27</u> Exhibit #27 # <u>28</u> Exhibit #28 # <u>29</u> Exhibit #29 # <u>30</u> Exhibit #30 # <u>31</u> Exhibit #31 # <u>32</u> Exhibit #32 # <u>33</u> Exhibit #33 # <u>34</u> Exhibit #34 # <u>35</u> Exhibit #35 # <u>36</u> Exhibit #36 # <u>37</u> Exhibit #37 # <u>38</u> Exhibit #38 # <u>39</u> Exhibit #39 # <u>40</u> Exhibit #40 # <u>41</u> Exhibit #41 # <u>42</u> Exhibit #42 # <u>43</u> Exhibit #43 # <u>44</u> Exhibit #44 # <u>45</u> Exhibit #45 # <u>46</u> Exhibit #46 # <u>47</u> Exhibit #47 # <u>48</u> Exhibit #48 # <u>49</u> Exhibit #49) (Patterson, Johnie) (Entered: 08/22/2022) |
| 08/22/2022 | <u>105</u><br>(4 pgs) | Proposed Findings of Fact and Conclusions of Law (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 08/22/2022) |
| 08/22/2022 | <u>106</u><br>(12 pgs) | Joint Pre Trial Statement (Filed By Vitol Inc. ).(Related document(s):<u>84</u> Scheduling Order) (Cooley, Michael) (Entered: 08/22/2022) |
| 08/22/2022 | <u>107</u><br>(186 pgs; 3 docs) | Additional Attachments Re: *Corrected Defendant's Trial Exhibit #43* (related document(s):<u>104</u> Witness List, Exhibit List) (Filed By Arthur Jacob Brass ).(Related document(s):<u>104</u> Witness List, Exhibit List) (Attachments: # <u>1</u> Exhibit #43a (Correct) # <u>2</u> Exhibit #43b (Correct)) (Patterson, Johnie) (Entered: 08/22/2022) |
| 08/24/2022 | | Courtroom Minutes. Time Hearing Held: 4:00 PM. Appearances: Michael Cooley, Miriam Goott, Max Beatty, Johnie Patterson. (Related document(s): <u>84</u> Pre-Trial Conference). Pre-Trial Conference held. Trial to commence on 08/30/2022 at 1:00 PM at Houston, Courtroom 401 (CML). (ZildeMartinez) (Entered: 08/24/2022) |
| 08/24/2022 | <u>108</u><br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):<u>100</u> Generic Order) No. of Notices: 2. Notice Date 08/24/2022. (Admin.) (Entered: 08/24/2022) |
| 08/26/2022 | <u>109</u><br>(11 pgs; 4 docs) | Emergency Motion *to Quash Subpoena for Trial* Filed by Witness DZ Jewelry LLC (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B # <u>3</u> Proposed Order) (Robin, Jeffrey) (Entered: 08/26/2022) |
| 08/26/2022 | | Certificate of Email Notice. Contacted J. Robin, B. Purcell, and M. Goott. Movant to notice all interested parties and file a certificate of service with the court (Related document(s): <u>109</u> Emergency Motion to Quash Subpoena for Trial). Hybrid Hearing is scheduled for 8/26/2022 at 02:30 PM. (rsal) (Entered: 08/26/2022) |
| 08/26/2022 | <u>110</u><br>(13 pgs; 3 docs) | Response (related document(s):<u>109</u> Emergency Motion). Filed by Vitol Inc. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B) (Cooley, Michael) (Entered: 08/26/2022) |
| 08/26/2022 | <u>111</u><br>(2 pgs) | Notice *of Emergency Hearing*. (Related document(s):<u>109</u> Emergency Motion) Filed by DZ Jewelry LLC (Robin, Jeffrey) (Entered: 08/26/2022) |

**PACER Service Center**

| **Transaction Receipt** | | | |
|---|---|---|---|
| 08/26/2022 12:01:18 | | | |
| **PACER Login:** | miriamgoott | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 21-06006 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

002019

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

## PLAINTIFF VITOL INC.'S WITNESS AND EXHIBIT LIST

Plaintiff Vitol Inc. ("**Plaintiff**") hereby submits its *Witness and Exhibit List for Trial*.

## WITNESSES

Plaintiff designates the following individuals who may be called as witnesses:

(a)  Gene Deetz

(b)  Mike Ruzek

(c)  Mike Loya

(d)  Eric Kuo

(e)  James Tolbert

(f)  A.J. Brass

(g)  Chris Murray, as chapter 7 trustee for Gulf Coast Asphalt Company, LLC

(h)  Jason Goldstein

(i)  John Tomaszewski [may be presented by deposition testimony]

(j)  EEPB, PC [unless presented by business records affidavit]

(k)  IberiaBank [unless presented by business records affidavit]

(l)  International Bank of Commerce [unless presented by business records affidavit]

(m)     Cadence Bank [unless presented by business records affidavit]

(n)     Chubb Lloyd's Insurance Company of Texas [unless presented by business records affidavit]

(o)     Kevin Boston

(p)     DZ Jewelry, LLC [unless presented by business records affidavit]

(q)     Veritex Community Bank [unless presented by business records affidavit]

(r)     Any witness listed or called by any other party.

(s)     Any witness necessary to rebut the testimony of a witness called or designated by any other party.

Plaintiff reserves the right to call or not call any witnesses designated by any other party, as well as rebuttal witnesses.

## **EXHIBITS**

Plaintiff designates the following exhibits that may be admitted:

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|------------|-----------|------|-------------|-------|-------|
| **Emails** | | | | | | |
| 1 | VITOL_00004187 | VITOL_00004188 | 11/17/2016 | Email re: GCAC Talking Points (and attachment) | | |
| 2 | VITOL_00073451 | VITOL_00073453 | 5/10/2017 | Email chain re: USGC Asphalt | | |
| 3 | VITOL_00000791 | VITOL_00000791 | 7/17/2017 | Email re Purchase Citgo SHCF | | |
| 4 | VITOL_00001834 | VITOL_00001835 | 7/21/2017 | Email re Summary Truck Report | | |
| 5 | VITOL_00001836 | VITOL_00001836 | 7/21/2017 | Excel attachment to email re Summary Truck Report | | |
| 6 | VITOL_00001837 | VITOL_00001844 | 7/21/2017 | Attachment to Summary Truck Report: presentation to Vitol re GCAC/Rio asphalt business | | |
| 7 | VITOL_00000379 | VITOL_00000379 | 8/1/2017 | Email re Rio Energy Invoice | | |
| 8 | AJB0003997 | AJB0003997 | 8/1/2017 | Email re cash needed | | |
| 9 | AJB0003960 | AJB0003960 | 8/3/2017 | Email re Payroll account | | |
| 10 | AJB0003984 | AJB0003984 | 8/3/2017 | Email re wires did not come in … need to cover! | | |
| 11 | AJB0004657 | AJB0004657 | 8/3/2017 | Email re payroll account | | |
| 12 | GCAC004631 | GCAC004632 | 8/15/2017 | Email 2 deals | | |
| 13 | GCAC004666 | GCAC004666 | 8/18/2017 | Email re Hedge price | | |
| 14 | GCAC004694 | GCAC004695 | 8/21/2017 | Email re Interim Financing Structure Bullets (with attachment) | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|-----------|-----------|------|-------------|-------|-------|
| 15 | AJB0005305 | AJB0005306 | 8/21/2017 | Email re Interim Financing Structure Bullets AJB (with attachment) | | |
| 16 | AJB0005448 | AJB0005449 | 8/21/2017 | Email re Interim Financing Structure Bullets (with attachment) | | |
| 17 | VITOL_00000794 | VITOL_00000794 | 8/25/2017 | Email re image001 | | |
| 18 | GCAC005167 | GCAC005168 | 9/15/2017 | Email re Valt sale out of Rio-mobile | | |
| 19 | GCAC005427 | GCAC005428 | 9/25/2017 | Email re Exxon purchase | | |
| 20 | GCAC005439 | GCAC005444 | 9/25/2017 | Email re 2 deals out of Rio Inventory | | |
| 21 | GCAC005591 | GCAC005593 | 10/2/2017 | Email re GCAC sale to valt out rio inventory | | |
| 22 | VITOL_00000801 | VITOL_00000801 | 10/11/2017 | Email re Sale from GCAC to Gunvor | | |
| 23 | GCAC005727 | GCAC005728 | 10/11/2017 | Email re Sale from GCAC to Gunvor | | |
| 24 | GCAC005781 | GCAC005783 | 10/16/2017 | Email re exxon purchase | | |
| 25 | Vitol_00001083 | Vitol_00001085 | 10/25/2017 | Email re Draft term sheet GCAC | | |
| 26 | GCAC006121 | GCAC006122 | 11/3/2017 | Email re Citgo and Phillips purchases | | |
| 27 | GCAC006224 | GCAC006227 | 11/16/2017 | Email re REVISED Deal recap | | |
| 28 | AJB0004098 | AJB0004100 | 11/16/2017 | Email re Vitol Invoices | | |
| 29 | GCAC006719 | GCAC006719 | 12/8/2017 | Email re Confirmation | | |
| 30 | GCAC006722 | GCAC006724 | 12/8/2017 | Email re Reconciliation 11-28 | | |
| 31 | GCAC006725 | GCAC006725 | 12/8/2017 | Excel attachment to Reconciliation 11-28: GCAC/Rio summary | | |
| 32 | GCAC006726 | GCAC006726 | 12/8/2017 | Excel attachment to Reconciliation 11-28: Vitol/Rio/Asphalt deals | | |
| 33 | VITOL_00004500 | VITOL_00004500 | 12/8/2017 | Email re GCAC-Rio Reconciliation | | |
| 34 | VITOL_00004501 | VITOL_00004501 | 12/8/2017 | Excel attachment to Email re GCAC-Rio Reconciliation: reconciliation from GCAC with alleged actual volumes | | |
| 35 | AJB0004103 | AJB0004103 | 12/15/2017 | Email re Wire to Vitol | | |
| 36 | VITOL_00001726 | VITOL_00001727 | 12/15/2017 | Email re Payment | | |
| 37 | GCAC007237 | GCAC007243 | 1/11/2018 | Email re 2 deals out of Rio inventory | | |
| 38 | VITOL_00000819 | VITOL_00000820 | 1/12/2018 | Email re p66 asphalt price | | |
| 39 | VITOL_00000341 | VITOL_00000342 | 1/16/2018 | Email re GCAC-Rio Reconciliation 12-20 | | |
| 40 | VITOL_00000343 | VITOL_00000343 | 1/16/2018 | Email re GCAC Rio Reconciliation 12-20 | | |
| 41 | VITOL_00000344 | VITOL_00000344 | 1/16/2018 | Excel attachment to Email re GCAC-Rio Reconciliation 12-20 | | |
| 42 | VITOL_00000821 | VITOL_00000826 | 1/19/2018 | Email re 2 deals out of Rio Inventory | | |
| 43 | VITOL_00000827 | VITOL_00000827 | 1/19/2018 | Email re Deal 50 | | |
| 44 | VITOL_00002127 | VITOL_00002129 | 1/25/2018 | Email re GCAC 1st Pass Settlement | | |
| 45 | VITOL_00002130 | VITOL_00002130 | 1/25/2018 | Excel attachment: GCAC 1st pass settlement | | |
| 46 | VITOL_00072820 | VITOL_00072822 | 1/25/2018 | Email re GCAC Inspection Reports | | |
| 47 | AJB0000008 | AJB0000008 | 1/26/2018 | Email re Vitol | | |
| 48 | VITOL_00074556 | VITOL_00074558 | 1/30/2018 | Email re GCAC | | |
| 49 | VITOL_00002197 | VITOL_00002198 | 2/5/2018 | Email re Product Sales to GCAC | | |
| 50 | VITOL_00000358 | VITOL_00000360 | 2/6/2018 | Email re Product Sales to GCAC | | |
| 51 | VITOL_00000194 | VITOL_00000194 | 2/13/2018 | Email re Fwd: | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 52 | AJB0000017 | AJB0000017 | 2/26/2018 | Email re GCAC/Vitol | | |
| 53 | VITOL_00005403 | VITOL_00005407 | 3/6/2018 | Email re Vitol/GCAC Product Invoice | | |
| 54 | VITOL_00001529 | VITOL_00001529 | 4/10/2018 | Email re GCAC Sheet | | |
| 55 | VITOL_00001530 | VITOL_00001530 | 4/10/2018 | Excel attachment to Email re GCAC Sheet | | |
| 56 | VITOL_00001979 | VITOL_00001979 | 4/10/2018 | Email re GCAC position 10 Apr 18 | | |
| 57 | VITOL_00001980 | VITOL_00001980 | 4/10/2018 | Excel attachment to Email re GCAC position 10 Apr 18 | | |
| 58 | VITOL_00080065 | VITOL_00080065 | 4/11/2018 | Email re GCAC Sheet | | |
| 59 | VITOL_00080066 | VITOL_00080066 | 4/11/2018 | Excel attachment to email re GCAC Sheet | | |
| 60 | | | 12/13/2019 | Email re GCAC v. Vitol | | |

### *Financial Documents*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 61 | | | 12/22/2017 | ARC Logistic Partners, LP K-1 2017 | | |
| 62 | 20201021_0000079 | 20201021_0000079 | 12/31/2017 | Gulf Coast Asphalt Company Consolidated Balance Sheet 2017 (EEPB-00000174) | | |
| 63 | 20201021_0000080 | 20201021_0000080 | 12/31/2017 | Gulf Coast Asphalt Company Consolidated Income Statements 2017 (EEPB-00000175) | | |
| 64 | VITOL_00084993 | VITOL_00084993 | Feb-18 | GCAC futures/swaps spreadsheet | | |
| 65 | GCAC009845 | GCAC009845 | 7/31/2018 | GCAC General Ledger | | |
| 66 | 20220218_0000021 | | 12/31/2018 | 2018 GCAC consolidated Income Statement | | |
| 67 | 20220218_0000043 | | 12/31/2018 | consolidated balance sheet | | |
| 68 | 20220221_0000003 | | 12/31/2018 | general ledger - Brass loans | | |
| 69 | 20220221_0000028 | | 12/31/2018 | general ledger - Joyce Brass loans | | |
| 70 | GCAC009515 | GCAC009520 | 6/30/2019 | GCAC General Ledger – Loan Brass loans | | |
| 71 | GCAC009511 | GCAC009514 | 6/30/2019 | GCAC General Ledger – Loan Joyce Brass | | |
| 72 | | | 10/13/2021 | Arthur J. Brass Market Value Personal Property Appraisal | | |
| 73 | | | 8/14/2017 | GCAC Members' Certificate | | |
| 74 | | | 12/17/2009 | Martin Katz, Ltd. receipts | | |

### *Business Records*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 75 | IBC_000001 | IBC_0002799 | 12/30/2021 | Business Records of International Bank of Commerce with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 76 | VCB000001 | VCB001397 | 1/20/2022 | Business Records of Veritex Community Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 77 | Chubb000001 | Chubb001175 | 2/23/2022 | Business Records of Chubb Lloyds Insurance Company of Texas with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|-----------|-----------|------|-------------|-------|-------|
| 78 | Zadok000001 | Zadok000110 | 7/28/2022 | Business Records of DZ Jewelry, LLC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 79 | Iberia_000001 | Iberia_003650 | 1/4/2022 | Business Records of Iberia Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 80 | Cadence_000001 | Cadence_000363 | 1/25/2022 | Business Records of Cadence Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 81 | EEPB-00000001 | EEPB-00000240 | 9/4/2020 | Business Records of EEPB, PC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) – production copies | | |
| 82 | | | 9/4/2020 | Business Records of EEPB, PC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) – native copies | | |

### *Pleadings*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|-----------|-----------|------|-------------|-------|-------|
| 83 | | | 2/10/2017 | Certified Copy of Superior Crude - Original Petition (admitted under FRE 902(4)) | | |
| 84 | | | | Certified Copy of Superior Crude – Answer (admitted under FRE 902(4)) | | |
| 85 | | | 5/10/2018 | Certified Copy of GCAC's Original Petition (admitted under FRE 902(4)) | | |
| 86 | | | 9/12/2019 | Certified Copy of Vitol Second Amended Counterclaims (admitted under FRE 902(4)) | | |
| 87 | BK-Vitol_0000022 | BK-Vitol_0000033 | 10/2020 | Confidential Settlement Agreement and Mutual Global Release | | |
| 88 | BK-VITOL_0000009 | BK-VITOL_0000017 | 11/5/2020 | Second Confidential Settlement Agreement and Mutual Global Release | | |
| 89 | | | 11/19/2020 | Agreed Final Judgment | | |
| 90 | | | 4/27/2021 | Arthur Brass Bankruptcy Schedules | | |
| 91 | | | 4/27/2021 | Trifinery Bankruptcy Schedules | | |
| 92 | | | 4/27/2021 | Trifinery Statement of Financial Affairs | | |
| 93 | | | 4/27/2021 | GCAC Bankruptcy Schedules | | |
| 94 | | | 4/27/2021 | GCAC Statement of Financial Affairs | | |
| 95 | | | 12/16/2021 | AJ Brass Amended Bankruptcy Schedules | | |
| 96 | | | 12/27/2021 | Brass Interrogatory Responses | | |

### *Expert Documents*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|-----------|-----------|------|-------------|-------|-------|
| 97 | | | 4/1/2022 | Deetz Expert Report | | |
| 98 | | | 4/1/2022 | Deetz Expert Report Exhibits 1-9 | | |
| 99 | | | | Section 461 Internal Revenue Code | | |
| 100 | | | 9/15/2018 | GCAC Tax Returns 2017 | | |
| 101 | | | 4/1/2022 | Trial Balance Rollup to 2017 Form 1065 | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 102 | | | 4/1/2022 | AJ and Joyce Loan Accounts from GL to Bank Statement Recon | | |
| 103 | 20201021-0000061 | 20201021-0000061 | 12/22/2017 | 2017 Arc Logistics Schedule K-1 to GCAC | | |
| 104 | EEPB-00000174 | EEPB-00000174 | | GCAC Consolidated Monthly Balance Sheets for January to June 2017 and December 31, 2018 | | |
| 105 | EEPB-00000175 | EEPB-00000175 | | GCAC Consolidated Monthly Income Statements for January to June 2017 and December 31, 2018 | | |
| 106 | EEPB-00000181 | EEPB-00000181 | | GCAC Consolidated Balance Sheet as of December 2018 | | |
| 107 | 20201021-0000025 | 20201021-0000025 | | Consolidated Trial Balance | | |

***Tomaszewski Deposition Exhibits***

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 108 | | | | Exhibit 1 to deposition of John Tomaszewski – subpoena of John Tomaszewski | | |
| 109 | Confidential Bates GCAC 009845 | | | Exhibit 3 to deposition of John Tomaszewski – Confidential Bates GCAC 009845 (excel general ledger) | | |
| 110 | 20201021_0000079 | | | Exhibit 4 to deposition of John Tomaszewski – GCAC Consolidated Balance Sheets 2017 | | |
| 111 | 20201021_0000079 | | | Exhibit 5 to deposition of John Tomaszewski – 20201021_0000079 (excel GCAC Consolidated Balance Sheets 2017) | | |
| 112 | 20220218_0000043 | | | Exhibit 6 to deposition of John Tomaszewski – GCAC Consolidated Balance Sheet 2018 | | |
| 113 | 20220218_0000043 | | | Exhibit 7 to deposition of John Tomaszewski – 20220218_0000043 (excel GCAC Consolidated Balance Sheet 2018) | | |
| 114 | 20201021_0000080 | | | Exhibit 8 to deposition of John Tomaszewski – GCAC Income Statement 2017 | | |
| 115 | 20201021_0000080 | | | Exhibit 9 to deposition of John Tomaszewski – 20201021_0000080 (excel GCAC Income Statement 2017) | | |

***Other Documents***

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 116 | GCAC000001 | GCAC000128 | Jan-18 | Marketing Agreement (Mercuria) | | |
| 117 | GCAC000599 | GCAC000601 | 6/15/2018 | Affidavit of Arthur J. Brass | | |
| 118 | | | 6/28/2018 | Deposition of Arthur Brass 6/28/2018 (impeachment only) | | |
| 119 | | | 12/12/2019 | Affidavit of Arthur J. Brass | | |
| 120 | | | 11/3/2020 | Deposition of Arthur Brass as the Corporate Representative of GCAC (impeachment only) | | |
| 121 | | | 3/25/2022 | Deposition of Arthur Brass (impeachment only) | | |
| 122 | | | | Selected Brass Documents | | |
| 123 | | | | Selected GCAC Documents | | |

| No. | Beg. Bates | End Bates | Date | Description | O f f e r | A d m i t |
|-----|-----------|-----------|------|-------------|-----------|-----------|
| 124 | | | | Select Debtor Documents Produced by M. Goot on 12/28/2021 | | |

Dated: **August 22, 2022.**

Respectfully submitted,

By: */s/ Keith M. Aurzada*
    Keith M. Aurzada (SBN 24009880)
    Michael P. Cooley (SBN 24034388)
    Bradley J. Purcell (SBN 24063965)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T: 469.680.4200
    F: 469.680.4299
    kaurzada@reedsmith.com
    mpcooley@reedsmith.com
    bpurcell@reedsmith.com
    lrobin@reedsmith.com

*Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on **August 22, 2022**, a true and correct copy of the above foregoing document was served via the Court's Electronic Case Filing (ECF) system on all parties registered to receive electronic service in this matter, including counsel for the Defendant.

    */s/    Keith Miles Aurzada*
    Keith M. Aurzada

B2550 (Form 2550 – Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Southern _____  District of  Texas _____

In re  Arthur Jacob Brass _____
                    Debtor

*(Complete if issued in an adversary proceeding)*

Vitol, Inc. _____
                    Plaintiff
                        v.
Arthur Jacob Brass _____
                    Defendant

Case No.  21-60025 _____

Chapter  7 _____

Adv. Proc. No.  21-06006 _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  DZ Jewelry, LLC c/o Dror Zadok, 1801 Post Oak Blvd, Suite 100, Houston, Texas 77056 _____
                    *(Name of person to whom the subpoena is directed)*

[✓] **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE  515 Rusk, Courtroom 401 Houston, Texas 77002 | COURTROOM  401 |
|---|---|
| | DATE AND TIME  August 30, 2022 at 9:00 a.m. |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  August 24, 2022 _____

                    CLERK OF COURT

                                        OR

_____                         /s/ Keith M. Aurzada _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Vito, Inc. _____ , who issues or requests this subpoena, are:

Keith M. Aurzada, Reed Smith LLP, 2850 N. Harwood Street, Suite 1500, Dallas TX 75201 (469) 680-4211, kaurzada@reedsmith.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT A

002027

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

      I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## M Gmail

**Miriam Goott <mgoott@walkerandpatterson.com>**

---

## Brass - GCAC document review

**Robin, Lindsey L.** <LRobin@reedsmith.com>                           Tue, Jun 14, 2022 at 1:26 PM
To: Miriam Goott <mgoott@walkerandpatterson.com>
Cc: Max Beatty <max@beattypc.com>, "Purcell, Bradley" <BPurcell@reedsmith.com>

Hi Miriam,


The trustee received GCAC documents from GCAC's former landlord. I am going down on
June 23 (next Thursday) to review the documents at the storage unit with Max Beatty. I
wanted to loop you in so could review the documents then as well in case your client may
need to update his disclosures.


FYI, Max said the storage unit is not climate controlled.


Thanks,


**Lindsey L. Robin** | Associate Attorney

ReedSmith LLP | 2850 N. Harwood | Suite 1500 | Dallas, TX  75201

Tel: 469.680.4222 | lrobin@reedsmith.com


* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have
received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this
message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other
person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S TRIAL BRIEF ON THE ADMISSIBILITY
OF BUSINESS RECORDS UNDER FED. R. EVID. 803(6) AND 902(11)**

Vitol Inc. (the "*Vitol*" or "*Plaintiff*") files this trial brief regarding admissibility of business records under Fed. R. Evid. 803(6) and 902(11) and respectfully states as follows:

**I.
PROCEDURAL HISTORY**

1.      The objections to dischargeability of Defendant's $10 million debt to Plaintiff turn in significant part on such matters as the solvency of Defendant's closely held company, Gulf Coast Asphalt Company ("*GCAC*"), and the timing, amount, and recipient of numerous alleged fraudulent transfers that Defendant caused GCAC to make to himself.  These issues necessarily depend heavily on a variety of financial records, including general ledgers, bank statements, tax returns, and the like.

2.      In a case involving the president and 50% owner of a closely held organization, such records would ordinarily be obtained from the organization (or its principal) and authenticated by the principal or another corporate representative.  Here, however, Mr. Brass was unwilling or unable to authenticate any of the books and records that Vitol previously obtained from GCAC in

discovery.  Accordingly, Vitol obtained documents with accompanying business records affidavits from seven third parties to authenticate the general ledgers, bank statements, tax returns, and other financial records that would ordinarily have been authenticated through traditional means.

3.      Vitol submits this trial brief in support of its use of these affidavits as sufficient to self-authenticate the corresponding records accompanying the affidavits as authorized under Federal Rule of Evidence 902(11).

## II.
## ARGUMENTS AND AUTHORITIES

### A.      Business Records Overview

4.      Fed. R. Evid. 803(6) provides an exception to the rule against hearsay for records of regularly conducted activity kept and maintained in the regular court of business.  It states that a record of an act, event, condition, opinion, or diagnosis is admissible if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

5.      The rationale underlying this exception is a commonsense one: "the inherent reliability of business records is 'supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.'" *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1990) (quoting *United States v. Veytia-Bravo*, 603 F.2d 1187,

1189 (5th Cir. 1979) cert. denied, 444 U.S. 1024, (1980); Fed. R. Evid. 803(6) Notes of Advisory Committee on Proposed Rules).  Put differently, we trust business records because the businesses creating those records have a naturally vested interest in the predictable, competent preparation of accurate records relating to their business activity.  Thus, "[w]hether evidence is admissible under Rule 803(6) is 'chiefly a matter of trustworthiness.'" *United States v. Wells*, 262 F.3d 455, 462 (5th Cir. 2001) (quoting Fed. R. Evid. 803(6) Committee Note)(citing *Mississippi River Grain Elevator, Inc. v. Bartlett & Co.,* 659 F.2d 1314, 1319 (5th Cir. 1981)).

6.     As summarized by the Fifth Circuit, the Federal Rules of Evidence allow the admission of "records of regularly conducted activity" so long as the record was (1) "made at or near the time by, or from information transmitted by, a person with knowledge," (2) "kept in the course of a regularly conducted business activity," and (3) "it was the regular practice of that business activity to make the [record]." *United States v. Ned*, 637 F.3d 562, 569 (5th Cir. 2011) (citing Fed. R. Evid. 803(6).).

7.     The admissibility of certain key categories of document as business records is discussed below.

### *Email*

8.     "A party seeking to introduce an email made by an employee about a business matter under the hearsay exception under Rule 803(6) must show that the employer imposed a business duty to make and maintain such a record. Courts examine whether it was the business duty of an employee to make and maintain emails as part of his job duties and whether the employee routinely sent or received and maintained the emails." *Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*, No. H-06-1330, 2008 U.S. Dist. LEXIS 37803, at *34 (S.D. Tex. 2008) (J. Rosenthal). "Courts have held that conventional letters, memos, or notes are admissible under the business records exception if they are regularly made in furtherance of the

employer's needs and not for the personal purposes of the employee who made them." *Id*. at *33 (internal citations omitted).

9.      Accordingly, for an email to be admissible as a business record: (1) the employee must have been under a duty to make and maintain emails as part of his job function; and (2) the emails must have been made in furtherance of the employer's business.  Accordingly, while personal correspondence would not necessarily fall within this category, emails discussing the ordinary business activity of the company would. *See e.g. id.* at *36-37 (holding email admissible as business record where affidavit stated it was made and maintained in the normal course of business by a person with personal knowledge at the time of the events recorded); *Sand Storage, LLC v. Trican Well Serv., L.P.*, No. 2:13-CV-303, 2014 U.S. Dist. LEXIS 151984, at *5 n.1 (S.D. Tex. 2014) ("Plaintiff objects to the consideration of the email messages sent by Scott Berendt based on hearsay…These email messages are submitted as attachments to the Business Record Declaration of Jack Kardow and are business records admissible pursuant to Fed. R. Evid. 803(6) and are properly considered."), *report and recommendation adopted*, *2014 U.S. Dist. LEXIS 173829* (S.D. Tex. 2014);  *Hunt v. Millennium Info. Servs.*, No. H-18-1698, 2020 U.S. Dist. LEXIS 134191, at *9 (S.D. Tex. 2020) ("Hersheway established that the emails attached to her declaration were business records, and the emails provide evidence supporting Hersheway's statements in the third and fourth paragraphs. Thus, regardless of whether Hersheway can personally testify about the communications between Plaintiff and Morris, she authenticated the emails that provide the information."), *report and recommendation adopted*, 2020 U.S. Dist. LEXIS 133204 (S.D. Tex. 2020).

### *Ledgers and Spreadsheets – 903(6) and 1006*

10.      Under Rule 803(6), computer data compilations—such as general ledgers and spreadsheets compiling data related to business activity—may be business records themselves, and

should be treated as any other record of regularly conducted activity.  In the Fifth Circuit, such computer business records are admissible so long as three conditions are met: (1) "[t]he records must be kept pursuant to some routine procedure designed to assure their accuracy," (2) "they must be created for motives that would tend to assure accuracy (preparation for litigation, for example, is not such a motive)"; and (3) "they must not themselves be mere accumulations of hearsay or uninformed opinion." *St. Michael's Emergency Ctr., LLC v. Aetna Health Mgmt., LLC*, No. H-08-2336, 2011 U.S. Dist. LEXIS 155623, at *22-23 (S.D. Tex. 2011) (quoting *Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980)).

11.     Thus for example, in *St. Michaels* the court denied a motion to strike a spreadsheet attached to the defendant's motion for summary judgment because it was accompanied by a business records affidavit from one of the defendant's executives. *Id.* at *21. The objecting party argued that because the executive did not prepare the spreadsheet himself, the executive could not attest to the accuracy of the spreadsheet. *Id.* at *24. The court rejected this argument because "[a]ny person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records; he need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records" and thus denied the objection under the business records exception. *St. Michael's*, 2011 U.S. Dist. LEXIS 155623 at *24-25 (quoting *Rosenberg*, 624 F.2d at 665).  In the Fifth Circuit,

> there is no requirement that the witness who lays the foundation for the admission of a record under the business records exception to the hearsay rule be the author of the record or be able to personally attest to its accuracy.  Rather, a qualified witness is one who can explain the record keeping system of the organization and vouch that the requirements of the business records exception are met.

*Ned*, 637 F.3d at 569-70 (internal citations and quotations omitted).  The Fifth Circuit has also held it was appropriate to admit a ledger of city revenues through a city clerk to prove the amount

of funds obtained from the federal government, even though the clerk did not go through the underlying transaction documents showing the source of the funds. *United States v. Smith*, 804 F.3d 724, 728-29 (5th Cir. 2015). The court found that the clerk did not need to be able to testify to the accuracy of the ledger for it to qualify as a business record and that arguments regarding accuracy went to the weight, not the admissibility of the ledger. *Id*. at 729-30.

### *Records Prepared by an Outsider*

12.     Finally, although business records kept by one organization but prepared by another outside entity can raise concerns of "hearsay within hearsay," the Fifth Circuit has concluded that business records prepared by an outsider do *not* create such a double hearsay problem if the records are relied upon by the organization for the conduct of its own business.  "If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6)." *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991).  "There is no requirement that the records be created by the business having custody of them." *Duncan*, 919 F.2d at 986 (citing to *Miss. River Grain Elevator*, 659 F.2d at 1319; *Veytia-Bravo*, 603 F.2d at 1189).

13.     Accordingly, "Rule 803(6) allows business records to be admitted if witnesses testify that the records are integrated into a company's records and relied upon in its day to day operations. Even if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity." *Cline v. Deutsche Bank Nat'l Tr. Co.*, 2015 U.S. Dist. LEXIS 86269, at *6-8 (N.D. Tex. 2015); *see also Duncan*, 919 F.2d at 986 (holding that an insurance company's business records compiled from hospital records that were themselves business records were admissible); *see also Miss. River Grain Elevator*, 659 F.2d at 1318-19 (holding that origin weight certificates prepared by outside agencies represented business records of the grain trader for whom they were prepared); *United*

*States v. Lawrence*, 276 F.3d 193, 196 (5th Cir. 2001) (holding that student loan records and promissory notes in the custody of the Department of Education represented business records of that agency).

14.     In short, "the primary emphasis of rule 803(6) is on the reliability or trustworthiness of the records sought to be introduced . . . The district court has great latitude on the issue of trustworthiness." *United States v. Duncan*, 919 F.2d at 986-87.

**B.     Admissibility of Business Records without a Sponsoring Witness**

15.     Under Fed. R. Evid. 902(11), records of a regularly conducted activities—i.e., business records—are self-authenticating if the proponent provides a certificate showing the document meets the requirements of the business records exception to hearsay under Fed. R. Evid. 803(6). "The rationale underlying this exception to the rule against hearsay is that the inherent reliability of business records is 'supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.'" *Duncan*, 919 F.2d at 986 (quoting *Veytia-Bravo*, 603 F.2d at 1189; Fed. R .Evid. 803(6) (Notes of Advisory Committee on Proposed Rules.)).

16.     Accordingly, "certificates from a records custodian that 'track the language of Rule 803(6) nearly word for word' render the records self-authenticating." *United States v. Oladimeji Seun Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) (citing *Zapata Off-Shore*, 939 F.2d at 272); *see also United States v. Towns*, 718 F.3d 404, 409 (5th Cir. 2013) ("A proper foundation is laid for business records simply by an affidavit that attests to the requisite elements of FRE 803(6)."). When accompanied by such a custodial certification, ***the live testimony of the custodian or another witness is not required to admit the records***. *Oladimeji*, 917 F.3d at 402 ("The Federal Rules of Evidence except business records from hearsay. To qualify, a records

custodian with knowledge must testify unless they're 'self-authenticating.' Records are self-authenticating if they include a custodian certification that the records 'meet[] the requirements of Rule 803(6)(A)-(C).'"); *see also United States v. Osuagwu*, 858 F. App'x 137, 145 (5th Cir. 2021) ("the Federal Rules of Evidence provide that certified domestic records of regularly conducted activity are self-authenticating and so may be admitted without the trial testimony of a qualified witness. *See* Fed. R. Evid. 803(6)(D), 902(11).").

17.     To qualify to admit records without testimony, the certification must: (1) be made by a custodian or one who can explain the record keeping system of the organization; (2) state the records were "made at or near the time" by a person with knowledge; (3) state the records were kept in the course of a regularly conducted business activity; and (4) state that it was the regular practice of that business activity to make that record.  If an affidavit of certification meets these elements, the records are admissible without any live testimony and are not hearsay. *See Oladimeji*, 917 F.3d at 402.

*18.*     Rule 902(11) also requires the proponent to provide "reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection" prior to trial. The Fifth Circuit has held that five days' notice before trial is reasonable. *United States v. Daniels*, 723 F.3d 562, 581 (5th Cir. 2013) (citing *United States v. Olguin*, 643 F.3d 384, 391 (5th Cir. 2011) ("*Olguin* stands for the more general proposition that five days' notice is sufficient under Rule 902(11).").  In *Daniels*, the court even held that it was not an abuse of discretion to admit records under 902(11) where notice was given mid-trial that the proponent intended to introduce the evidence under the rule in three days. *Id.*

19.     Here, Vitol intends to introduce certified business records from seven third parties: (1) EEPB, P.C.; (2) IberiaBank; (3) International Bank of Commerce; (4) Chubb Lloyds Insurance

Company of Texas; (5) Cadence Bank; (6) DZ Jewelry, LLC; and (7) Veritex Community Bank. Vitol has obtained the affidavit of records custodians from each that track the language of FRE 803(6). On August 18, 2022, Vitol provided by email to the Debtor of its intent to offer the corresponding records under these affidavits—two days more than the five days' notice deemed sufficient by the Fifth Circuit. Moreover, all of the third party records relate to the account and finances of the Debtor and his companies, and indeed many of the documents were also produced by the Debtor and his company in this proceeding or in the state court litigation. As such, admitting these documents will cause no prejudice or surprise. Accordingly, such records are deemed self-authenticating and admissible without a sponsoring witness.

Dated: August 26, 2022

Respectfully submitted,

By: */s/ Michael P. Cooley*
    Keith M. Aurzada (SBN 24009880)
    Michael P. Cooley (SBN 24034388)
    Bradley J. Purcell (SBN 24063965)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T:  469.680.4200
    F:  469.680.4299
    kaurzada@reedsmith.com
    mpcooley@reedsmith.com
    bpurcell@reedsmith.com
    lrobin@reedsmith.com

    and

    Michael H. Bernick (SBN 24078277)
    Mason W. Malpass (SBN 24109502)
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T:  713.469.3834
    F:  713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

    *Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on August 26, 2022, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all parties registered to receive electronic notices in this adversary proceeding, including counsel for the Defendant.

    */s/  Michael P. Cooley*
    Keith M. Aurzada

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 26, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re:  ARTHUR JACOB BRASS | § | |
| *Debtor,* | § | Case No. 21-60025 |
| | § | Chapter 7 |
| | § | |
| | § | |
| VITOL, INC. | § | |
| *Plaintiff,* | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS, | § | |
| *Defendant.* | § | |

**ORDER GRANTING NON-PARTY DZ JEWELRY LLC'S**
**EMERGENCY MOTION TO QUASH SUBPOENA FOR TRIAL**

Upon this date came on for consideration non-party DZ Jewelry LLC d/b/a Zadok Jeweler's

Emergency Motion to Quash Subpoena for Trial along with any arguments or evidence presented

in opposition of and against the emergency relief requested, this Court, after due deliberation,

ORDERS that the emergency relief requested is hereby GRANTED.

The Court finds that the matters presented constitute an emergency.  The Court quashes

the subpoena for trial served August 25, 2022 upon non-party DZ Jewelry LLC d/b/a

Zadok Jewelers for the reasons stated on the August 26, 2022 hearing.

Signed:  August 26, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

002041

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE SOUTHERN DISTRICT OF TEXAS

 3                          HOUSTON DIVISION

 4   VITOL INC.                    §    CASE NO. 21-6006
                                   §    HOUSTON, TX
 5   VERSUS                        §    FRIDAY,
                                   §    AUGUST 26, 2022
 6   ARTHUR JACOB BRASS            §    2:31 P.M. TO 2:57 P.M.

 7                               MOTION

 8          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                    UNITED STATES MAGISTRATE JUDGE
 9
                             APPEARANCES:
10

11       FOR THE PARTIES:            SEE NEXT PAGE

12       COURT REPORTER:             ZILDE MARTINEZ

13       COURT CLERK:                ZILDE MARTINEZ

14

15

16

17

18

19

20

21                     TRANSCRIPTION SERVICE BY:

22                     Veritext Legal Solutions
                     330 Old Country Road, Suite 300
23                         Mineola, NY 11501
                   Tel: 800-727-6396 ▼ www.veritext.com
24
         Proceedings recorded by electronic sound recording; transcript
25                  produced by transcription service.
```

002042

```
 1                            APPEARANCES:

 2

 3   FOR THE PLAINTIFF:          REED SMITH LLP
                                 Keith Aurzada
 4                               2850 N. Harwood Street
                                 Suite 1500
 5                               Dallas, TX 75201
                                 469-680-4211
 6

 7   FOR THE DEFENDANTS:         WALKER & PATTERSON, PC
                                 Miriam Goott
 8                               PO Box 61301
                                 Houston, TX 77208
 9                               713-956-5577

10
                            (APPEARING TELEPHONICALLY)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              HOUSTON, TEXAS; FRIDAY, AUGUST 26, 2022; 2:31 P.M.

 2              THE COURT:  Okay, good afternoon, everyone.  This is

 3    Judge Lopez.  Today is August 26th.  I'm going to call the 2:30

 4    hearing into an emergency motion to quash a subpoena in Vitol

 5    v. Brass.  Let me go ahead and take appearances.  Who wishes to

 6    make an appearance on behalf of the Plaintiff, Vitol Inc.?  Mr.

 7    Aurzada, you're on mute.

 8              MR. AURZADA:  Good afternoon, Your Honor, Keith

 9    Aurzada and Michael Cooley on behalf of Vitol, Inc.  Thank you.

10              THE COURT:  Okay.  Good afternoon.  Ms. Goott, I see

11    you there.  Good afternoon.

12              MS. GOOTT:  Good afternoon, Judge.

13              THE COURT:  Okay.  Anyone wish to make an appearance

14    on behalf of Zadok?

15              MR. ROBIN:  Yes, (indiscernible).  Oh I'm sorry.

16    Yes, this is Jeffrey Robin.  I am Counsel for Zadok.

17              THE COURT:  Okay.

18              MR. ROBIN:  And Mr. Segev Zadok is also joining

19    today's hearing.

20              THE COURT:  Okay, good afternoon to both of you.

21    Anyone else wish to make an appearance?

22              MR. BEATTY:  Yes, Your Honor.  Max Beatty on behalf

23    of the Trustee.  (indiscernible) the Trustee is here with me

24    today.  Given the fact that (indiscernible) an issue or the

25    issue raised was about the subpoena that we sent, we thought we
```

1    would appear in case (indiscernible).

2          THE COURT:  Okay.  Thank you.  Okay, Mr. Robin, you

3    filed the motion, you get to go first.

4          MR. ROBIN:  Zadok received service of this subpoena

5    yesterday in the early afternoon.  I was retained shortly

6    thereafter and immediately contacted both Plaintiffs and

7    Counsel with respect to this subpoena.  We have a trial set on

8    August 30th.  And I informed both Plaintiffs and Defendants

9    that Zadok was seeking to quash the subpoena on an emergency

10   basis given the constraints between now and the trial.

11         Three business days' notice to comply with the trial

12   subpoena that was served completely by surprise to Zadok, and

13   for the reasons we expanded upon in our motion, we believe that

14   there are bases to quash the subpoena for undue hardship and

15   inconvenience expense.  And due to the lack of time to comply.

16         In addition, Zadok has produced documents in this

17   case back in July, July 28th.  There is no reason why Plaintiff

18   could not have subpoenaed Zadok to appear at trial after they

19   had received service of those documents, or even earlier, when

20   the Plaintiffs knew of this trial setting as early as July of

21   this year, because the trial order was agreed upon and

22   submitted for entry and it was signed by the Court on July

23   19th.

24         So it's perplexing to Zadok why the Plaintiff waited

25   until three business days before the trial setting to serve a

1   trial subpoena.  At all times, Zadok has cooperated with the

2   document requests.  There's been no suggestion that Zadok

3   wouldn't cooperate in any discovery in execution of a business

4   records affidavit.

5       And Mr. Zadok is here to testify as to those issues

6   and to serve his receipt of service and subpoena.  Mr. Zadok is

7   scheduled to travel on a business trip starting on Monday, and

8   he returns from that trip out of state, he's returning late in

9   the evening after hours on Tuesday August 30th, and the trial

10  has already begun.  And he's already incurred expenses with his

11  trip.

12      And Mr. Zadok will have no time between now and the

13  trial to get prepared with Counsel because he's getting ready

14  for his trip.  And so, for those reasons, the others that we

15  have provided in our emergency motion, we believe this does

16  constitute an emergency.  The subpoena should be quashed.

17      And we'd be happy to further discuss any other

18  concerns.  We do want to cooperate, but at the same time, we're

19  just putting this -- we were placed in this situation not by

20  our own doing, but by the circumstances that were presented on

21  us.

22      THE COURT:  Okay, let me -- Ms. Goott, you also filed

23  a response in support of the motion to quash.  I think it makes

24  sense for you to go and then I'll hear from the other side.  So

25  I have everyone's papers, I'm just giving everyone an

1    opportunity.  Thanks everyone for filing their responses on

2    very short notice.

3              But I thought it made sense to hold the hearing today

4    because if Mr. Zadok is going to fly out on Monday or scheduled

5    to be out, (indiscernible) day to make a decision, so I thought

6    it made sense.  So let me hear from you, Ms. Goott, and then

7    I'll turn to Vitol.

8              MS. GOOTT:  Thank you, Judge.  And can you hear me

9    okay?  I'm hearing a little bit of static.

10             THE COURT:  Just fine.  Thank you.

11             MS. GOOTT:  Great.  And I don't want to waste

12   anybody's time and repeat what was in my response, but I

13   appreciate Zadok's position that it's untimely.  It's three

14   days before trial when we've had this date set for well over a

15   month.  And furthermore, the docket shows that Vitol had time

16   to serve other parties with trial subpoenas with sufficient

17   notice, and they didn't do it here.

18             And in their response, Vitol talks about how this

19   isn't their fault, that they shouldn't be held accountable to

20   comply with these rules.  But the reality is, they caused this

21   problem themselves.  They have known about this issue that they

22   claim for quite a while and to serve them three days before

23   doesn't comply with the rules.

24             But I think that we need to take one step back and

25   before we even get to the issue of whether or not it would be

1    an undue burden on Zadok and whether it was timely filed.  The

2    issue is, is that none of this gets to come in anyway.  They

3    didn't disclose Zadok in the initial disclosures.

4            They said, hey, we didn't know.  We didn't find out

5    about this until two months ago.  Okay.  Assume that's true.

6    If they only found out about it two months ago, these lawyers

7    know exactly what to do because they've done it before in this

8    adversary and they come to the Court and say, Judge, we just

9    found out Zadok is a crucial witness, open discovery.

10           But discovery has been closed since February.  They

11   did that with Mr. (indiscernible).  They came to Court without

12   evidence and said, please, let us tell you why this is so

13   important.  And the Court granted it.  They know how to do it,

14   but they didn't do it here.  They didn't come to Court and say,

15   Judge, we just found this out.

16           They weren't even the ones that served the subpoena,

17   and that's fundamentally unfair.  The Trustee who is not a

18   party to this case serves the subpoena, gets documents, and

19   then takes these alleged documents and shares them with the

20   Plaintiff.  And the Plaintiff says, now I'm going to use

21   documents that I received after the close of discovery that

22   I've known about for a few months?

23           And then they send me a notice, oh, we're going to

24   use the business records affidavit.  We don't get to use a

25   business records affidavit.  We don't get to bring a witness

1   and you sure don't get to produce documents that were obtained

2   after discovery was closed.  It's such an important thing.  You

3   would have come to this Court and said, Judge, this is what we

4   think.

5           Let us talk to Mr. Zadok.  Let us find out who made

6   these purchases.  But what do they do?  They file a response

7   today.  And they put all of the facts that are not admissible

8   before the Court.  It's so inappropriate for them to file a

9   pleading and say, Judge, we're going to tell you everything

10  that we think that this guy did was wrong without him having to

11  comply with the rules of evidence, without having to comply

12  with the rules of procedure, because now you know what they

13  think without a witness.

14          But Rule 37(c) says that this does not come in.  And

15  then it cannot be permitted to come in at trial when it wasn't

16  disclosed.  Initial disclosure specifically states, if you find

17  something out, supplement it.  They didn't do any of it.  And

18  to come in three days before trial and say, surprise, we're

19  going to have Mr. Zadok come in, we didn't get to depose Mr.

20  Zadok.

21          I couldn't have.  Discovery was closed.  They didn't

22  even depose Mr. Zadok.  But what did they tell you in their

23  response?  Judge, it's not our fault.  Really?  Whose fault is

24  it that we didn't do this timely?  It's Miriam Goott's fault.

25  She's trying to -- I don't even remember the language that they

1    used, but it must be my fault because I'm asking them to comply

2    with the rules of evidence.  It's totally inappropriate.  And I

3    ask the Court, I support Zadok's motion to quash.  Thank you.

4              THE COURT:  Thank you.  Anything from Vitol?

5              MR. AURZADA:  Your Honor, thank you very much.  Keith

6    Aurzada for Vitol.  First, I can totally appreciate where Mr.

7    Robin is coming from.  Zadok really doesn't need to come to

8    testify at the trial because the business records affidavit is

9    sufficient all by itself.  And I'm going to address that in a

10   minute.

11             I'm going to address a couple of other things first.

12   First of all, there can be no argument that there is surprise

13   here.  Mr. Brass himself engaged in the transaction in 2017.

14   He knows about these records.  These are his records.  These

15   are records that reflect his own transaction.  So it's not like

16   an unfair surprise.  The issue of disclosure is interesting me,

17   Your Honor, because Mr. --

18             THE COURT:  Well, the issue is unfair surprise to Mr.

19   Zadok about appearing at trial, all right?  That's what I'm

20   focused on.  I'm just telling everyone now.

21             MR. AURZADA:  Okay.  So --

22             THE COURT:  Because that's the motion in front of me.

23             MR. AURZADA:  I'm going to say one other --

24             THE COURT:  In other words, that's the motion that's

25   before me, right?  That's what Mr. Robin filed, so that's where

1   my focus is.

2   MR. AURZADA:  Okay.  Then Your Honor, this is where I

3   would focus your attention, then.  Rule 90211 talks about the

4   admission of business records affidavits.  The Fifth Circuit

5   has said consistently that certificates from a records

6   custodian attract the language of Rule 8036 nearly word for

7   word render the records self-authenticating that US versus --

8   I'm going to butcher the last name -- Ayelotan, 917 F.3d 394

9   (indiscernible) cite to Page 402 Fifth Circuit, 2019.

10  When accompanied by a custodial certification, the

11  live testimony of the custodian for another witness is not

12  required to admit the records.  That would alleviate Mr. Zadok

13  from having to testify at the trial.  What are we reacting to?

14  We're reacting to Ms. Goott's statement at the pre-trial day,

15  the day before yesterday that she wants to cross-examine the

16  witness but sign the affidavit.

17  Presumably, she has some cross-examination that's

18  going to elicit a response from Mr. Zadok that the records he

19  produced are not his business records.  Now, if that's true and

20  she can elicit that testimony, these records won't come in

21  because that would mean that the affiant was not telling the

22  truth when he signed it.

23  It -- this is important evidence to my client, Your

24  Honor.  This is important evidence that meets one of the

25  (indiscernible) factors.  How did we find out about this

1    evidence?  We received a call or learned of this after

2    discovery had closed and they were records of the affiliate

3    Debtor GCAC in storage unit, where (indiscernible) from my

4    office flew to Houston and looked at the records with Mr.

5    Beatty.

6            Ms. Goott was invited to that, to look at those

7    records.  The Trustee, based upon that issue to subpoena

8    (indiscernible) end of July, we received the business records

9    affidavit plus 109 pages from (indiscernible).  Now in the year

10   '26, disclosures, Mr. Brass did not disclose this.

11           My client would've had no way of knowing that these

12   transfers existed or that the scope of the records.  And so, we

13   (indiscernible) witness and exhibit list like the pre-trial

14   order said.  And by the way, on that score, the Rule 26 talks

15   about when do you disclose unless -- and the specific word is,

16   wording is, unless otherwise ordered by the Court.  And so, we

17   did that.

18           So to the main thrust here, I get where Mr. Robin is

19   coming from.  Apparently Mr. Zadok is available to testify

20   right now.  I'd be willing to have him testify to these

21   business records right now and the he doesn't have to worry

22   about his trip.  Because all I'm going to ask him is did you

23   say the truth in your affidavit and are these your business

24   records.  And that's the end of my request for testimony.

25           We can do that right now.  We don't even need to wait

1    for trial.  And so, with that, Your Honor, the trial subpoena

2    is appropriate.  This is evidence that the Court needs to hear.

3    And that's all I have to say, Your Honor, that plus what's in

4    our papers.  Thank you.

5              THE COURT:  Thank you.  Anyone else wish to be heard?

6              MS. GOOTT:  May I respond, Your Honor?

7              THE COURT:  Sure.  Yes.

8              MS. GOOTT:  Mr. Aurzada did not answer your question.

9    There is no response to why Mr. Zadok was served three business

10   days before trial.  All he wants to argue is why you should

11   allow a business records affidavit, but that also is not before

12   the Court.  In fact, the Court already rules that we're going

13   to deal with those at trial.  We have no evidence that the

14   documents that were produced were even business records.

15             They just want you to assume that.  But what they

16   don't address is the fact that these documents that they want

17   in were produced far after the discovery cutoff, wholly

18   prejudicial, and no response as to why this was served three

19   days before trial when they knew about the trial date for over

20   a month, where they served other witnesses, other third party

21   banks with trial subpoenas, but they didn't serve Zadok.  Thank

22   you, Judge.

23             THE COURT:  Anyone else wish to be heard?  Okay.  So

24   before the Court is an emergency motion to quash the subpoena

25   for trial.  Was filed by DZ Jewelry LLC.  It was filed earlier

1    today.  The Court is going to grant emergency consideration of

2    the motion in light of a pending trial scheduled.  Today's

3    Friday August 26th.  A trial is scheduled for next Tuesday

4    August 30th.

5           So I'm going to find the Court has jurisdiction to

6    consider this motion, that's certainly a core proceeding as it

7    relates to an adversary regarding the dischargeability of debt.

8    Ad hoc seeks to quash a subpoena that was -- no party disputes

9    was received by Zadok on August 25th.

10          The ad hoc seeks to quash this subpoena under Federal

11   Rule of Civil Procedure 45, which I would note is made

12   applicable in this adversary proceeding under Federal Rule of

13   Bankruptcy Procedure 9016.  There's no question that the trial

14   is scheduled to begin next Tuesday and that Vitol has provided

15   the ad hoc approximately three business days' notice of a trial

16   to testify.

17          Mr. Zadok has indicated that no party has contested.

18   Mr. Zadok is going to be out of town beginning -- and is

19   scheduled to arrive back in town on Tuesday August the 30th,

20   which is the day the trial commences.  So that's kind of where

21   we are.  So what does the law have to say kind of about where

22   things stand.

23          To that, I'd note that under Federal Rule of Civil

24   Procedure 45, again, which is made applicable under Rule 9016,

25   the party may serve a subpoena, all right, that commands a

 1    nonparty to testify to attend and to testify at a trial.  And

 2    that subpoena is issued under Rule 45(c).

 3         Certainly, this subpoena was issued, and there's no

 4    question about that.  So the question is whether this can be

 5    quashed.  This ad hoc points to two points here.  And I want to

 6    make sure -- I'm just looking at your pleading to make sure

 7    I've got it -- I have it right.

 8         Justify -- they're objecting to the timing and to the

 9    undue burden standard.  I know that Rule 45(d)(3)(a) motion the

10    Fifth Circuit has held.  If you look at the (indiscernible),

11    the Royal Dutch Petroleum Company decision 392 F.3d 812 of

12    Fifth Circuit 2004 case.  And a motion to quash to modify a

13    subpoena, the Northern Party has the burden of proof.

14         They certainly believe that there's been satisfaction

15    of that, right?  Looking at the notice that has been provided

16    under the circumstances and the travel schedule, I certainly

17    believe that there has been certainly there.  And on a motion,

18    there's two kind of points that, as I understand Mr. Robin is

19    arguing on behalf of his client.

20         One is the unreasonable notice, and two, the undue

21    burden standard here.  And I think he satisfies both. I think

22    providing three days' notice of a subpoena to testify in a

23    trial is certainly very little notice and there are cases in

24    the Fifth Circuit.  I'm happy to cite some if you need some,

25    providing very short notice of a time to testify in trial is

1    unreasonable and overly burdensome and oppressive and three

2    days' notice.

3            And apparently receiving it on a Thursday to come

4    testify in a trial, in a contested trial on a Tuesday is

5    certainly burdensome.  (indiscernible) is an undue burden.  No

6    question about that and no one should be forced to fly back on

7    a Tuesday and show up and testify but show up and testify on

8    one day and then give a testimony on the next day.

9            When do you have time to prepare with your counsel?

10   When do you have time to think about these issues?  Mr. Aurzada

11   notes that he only wants him for a specific purpose, but you

12   know, that doesn't mean that a witness shouldn't have the

13   appropriate time to prepare for a testimony at trial.  So I'm

14   going to grant the motion to quash.

15            (Motion to quash granted).

16            THE COURT:  Apparently it -- testimony is not really

17   even needed because parties are going to make a business record

18   argument.  That's going to be reserved for trial.  And as well

19   as Mr. Goott's argument that it doesn't come in under 7037.  So

20   everybody's rights are preserved at trial.

21            I would note that the Fifth Circuit case law, and if

22   you look at the (indiscernible) case, it also notes that you

23   know, modification of a subpoena is also appropriate.  But the

24   trial is currently scheduled for two days.  If the trial goes

25   out further to another day, and maybe the subpoena could be

```
 1    modified to permit trial on another date.

 2              I'm not available on September 1st, Mr. Robin.  So

 3    but your client won't have to show up on the 30th or the 31st.

 4    If this gets pushed out to another date, maybe it's appropriate

 5    to have your client.  But everybody's rights are going to be

 6    preserved.

 7              But before your client has to come forward and

 8    testify, I think I would need to take up, and despite Ms.

 9    Goott, you're going to have to tee the issue up if that's what

10    you want, whether it comes in or not, whether it --

11    (indiscernible) should be struck as a witness.  And I'm not

12    ruling on that one way or the other.

13              I'm just saying, I don't want a witness to come here

14    to testify in person and then if that issue is going to get

15    teed up, if the issue gets teed up, then either I'll deal with

16    it at trial and do the business records affidavit issue when we

17    meet next Tuesday or Wednesday.

18              And but if this gets pushed out and you know, he's

19    available, then I'll certainly entertain a motion to strike and

20    certainly give everyone the opportunity.  I do note, I'm a

21    little surprised that we're dealing with this at the 11th hour.

22    I do note that I did extend discovery.  And that was --

23    somebody filed a motion on a Tuesday to extend discovery and I

24    granted a motion on a Friday on three business days' notice.

25              So certainly work under (indiscernible).  That
```

```
 1    doesn't mean that people don't have the right to do it.  I just

 2    note that if anyone asks this Court for a hearing as it's

 3    displayed under many hearings before this Court.  And Mr. Robin

 4    now knows if you want a hearing, you'll get one, and you'll get

 5    one on short notice when it makes sense.

 6          So that's always been what we've been doing.  Maybe

 7    it's not an issue.  Maybe Vitol wins on the business record

 8    affidavit.  Maybe they don't.  I will be honest with everyone.

 9    And I've done it intentionally.  I have not reviewed any

10    exhibits.  I haven't looked at one of them.

11          I'm going to take them up, and if they come up, I

12    don't want to -- I'm only going to review the evidence that

13    gets admitted into the record and look to file stuff on the

14    docket.  I will see what Vitol presents in the form of their

15    evidence and I will review it at that time so everyone's rights

16    are preserved.

17          But I'm going to grant a motion to quash, certainly

18    to testify as to the 30th and the 31st.  I believe that the

19    Fifth Circuit case law there is certainly an undue burden

20    there.  And I don't think modification on three business days'

21    notice is appropriate.  But if it goes further out, then maybe

22    that changes.  Mr. Robin, do you have any questions about my

23    ruling?

24          MR. ROBIN:  No, Your Honor.

25          THE COURT:  Does anyone have any questions?  Okay.
```

1    All right.

2            MR. ROBIN:  No, Your Honor.

3            THE COURT:  Thank you.  That's my ruling.  I'll enter

4    a short order on the docket.  Folks continue to talk.  I really

5    strongly encourage it.  All righty.  Thank you.  We'll see each

6    other on Tuesday.

7            MAN:  Thank you, Judge.

8        (Hearing adjourned at 2:57 P.M.)

9                              * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                I   N   D   E   X

2

3                                     RULINGS

4                                                        Page          Line

5      Motion to quash is GRANTED                         15            15

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  August 29, 2022
```

002061

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S OBJECTIONS TO**
**DEFENDANT ARTHUR BRASS' TRIAL EXHIBITS**

Plaintiff Vitol Inc. ("**Plaintiff**") submits its *Objections* to the *Trial Exhibits* [Docket

No. 104] identified by the Defendant Arthur Jacob Brass ("**Defendant**") as follows:

**EXHIBITS**

| Brass Ex. No. | Description | Objection |
|---|---|---|
| 1 | 5-18-15 Email early JV talk | |
| 2 | 5-3-17 Kuo email to Bake | |
| 3 | 6-26-17 Email re JV Business | FRE 106 (optional completeness) |
| 4 | 7-13-17 Emails re Gravity (Barth) | |
| 5 | 7-13-17 Emails re Gravity (Kuo) | |
| 6 | 7-25-17 Email Fay to Kuo (why NEWCO) | |
| 7 | 7-25-17 Email string Newco personnel and costs | |
| 8 | 7-31-17 Bake Email (regrets) | |
| 9 | 7-31-17 Email re Chris Bake | |
| 10 | 7-31-17 Email re GCAC Telcon | |
| 11 | 8-8-17 Email re Personnel Costs | |
| 12 | 8-10-17 Barth email | |
| 13 | 8-17-17 Emails re Nick Fay rebukes Kuo | |

| Brass Ex. No. | Description | Objection |
|---|---|---|
| 14 | 8-21-17 Jason Email re Interim Financing | |
| 15 | 9-27-17 Chris Bake email | |
| 16 | 10-13-17 Dan Sargent Email | |
| 17 | Bake and Fay emails | |
| 18 | Email for Vitol_72920 | |
| 19 | Email for Vitol_74289 | |
| 20 | Email for Vitol_76284 | |
| 21 | April 2018 Settlement Communication | |
| 22 | $1.2M check | |
| 23 | Kuo Text Messages | |
| 24 | Rio JSMA Fully Executed | |
| 25 | Redline - Vitol JSMA NewCo Draft Jun 20 2017 Sent to Vitol Jun 20 2017 a.._ | |
| 26 | Copy of FULLER000005 (Native To Be Utilized) | FRE 802 (hearsay) |
| 27 | Copy of VITOL_00072105 (Native To Be Utilized) | |
| 28 | Copy of VITOL_00072920 (Native To Be Utilized) | |
| 29 | Copy of VITOL_00074289 (Native To Be Utilized) | |
| 30 | Copy of VITOL_00076284 (Native To Be Utilized) | |
| 31 | Fuller Report | FRE 801 (hearsay); FRCP 26 (expert testimony not previously disclosed) |
| 32 | Rebuttal Report of Bob Broxson (rec'd 03.23.20) | FRE 801 (hearsay); FRCP 26 (expert testimony not previously disclosed) |
| 33 | Settlement Agreement | |
| 34 | First Amended Complaint | |
| 35 | Response To MSJ | |
| 36 | Vitol Inc.'s Amended Emergency Motion For Leave | |
| 37 | Initial Disclosures - Vitol | |
| 38 | Vitol Responses to RFP | |
| 39 | Vitol Responses to Rogs | |
| 40 | Vitol's Responses to RFA | |
| 41 | Rio-Vitol Assignment Agreement | |
| 42 | Goldstein, Jason - full (taken 05.16.19) | FRE 801 (hearsay) |
| 43(a) | Goldstein, Jason Exhibits 18-29 (taken 05.16.19) | FRE 801 (hearsay) |

| Brass Ex. No. | Description | Objection |
|---|---|---|
| 43(b) | Goldstein, Jason Exhibits 18-29  (taken 05.16.19) | FRE 801 (hearsay) |
| 44 | Perugini, Patrick - condensed (taken 06.29.2018) | FRE 801 (hearsay) |
| 45 | Perugini, Patrick Ex 11-17 (taken 06.29.18) | FRE 801 (hearsay) |
| 46 | Brass, Arthur - full (taken 06.28.18) | FRE 801 (hearsay) |
| 47 | Brass, Arthur Exhibits 1-10 (taken 06.28.18) | FRE 801 (hearsay) |
| 48 | Adversary Docket | |
| 49 | Bankruptcy Docket | |

Dated:  **August 29, 2022.**

Respectfully submitted,

By: */s/ Keith M. Aurzada*
Keith M. Aurzada (SBN 24009880)
Michael P. Cooley (SBN 24034388)
Bradley J. Purcell (SBN 24063965)
Lindsey L. Robin (SBN 24091422)
**REED SMITH LLP**
2501 N. Harwood, Suite 1500
Dallas, Texas 75201
T:  469.680.4200
F:  469.680.4299
kaurzada@reedsmith.com
mpcooley@reedsmith.com
bpurcell@reedsmith.com
lrobin@reedsmith.com

*Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on **August 29, 2022**, a true and correct copy of the above foregoing document was served via the Court's Electronic Case Filing (ECF) system on all parties registered to receive electronic service in this matter, including counsel for the Defendant.

*/s/      Keith Miles Aurzada*
Keith M. Aurzada

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S TRIAL BRIEF ON ITS PRODUCTION OF THIRD-PARTY
BUSINESS RECORDS TO DEFENDANT AND THEIR ADMISSIBILITY**

Vitol Inc. (the "***Vitol***" or "***Plaintiff***") files this trial brief regarding the production and transmission of third party business records and business records affidavits to clarify the record for the Court and respond to questions raised by the Court at trial and respectfully states as follows:

**I.
PROCEDURAL BACKGROUND**

1.      At trial on August 30, 2022, Vitol moved to admit its Exhibits 75-82 which are business records from seven third-parties through business records affidavits pursuant to Fed. R. Evid. 803(6) and 902(11). These third-parties provided banking services, accounting services, insurance, and sold jewelry to the Defendant and GCAC. The seven third-parties are:

- International Bank of Commerce        Vitol's Ex. 75
- Veritex Community Bank                Vitol's Ex. 76
- Chubb                                 Vitol's Ex. 77
- Zadok Jewelers                        Vitol's Ex. 78
- IberiaBank                            Vitol's Ex. 79
- Cadence Bank                          Vitol's Ex. 80
- EEPB, PC                              Vitol's Ex. 81 and 82

2.      On August 18, 2022, Vitol's counsel notified Defendant's counsel by email that Vitol intended introduce business records from the seven third parties identified above through the use of accompanying business records affidavits. While the parties dispute whether the business records were received by Defendant's counsel on that day, it is undisputed that Vitol gave the Defendant notice that Vitol would be seeking to admit records from IBC, Veritex, Chubb, Zadok, Iberia, Cadence, and EEPB through business records affidavits under Fed. R. Evid. 902(11) and 803(6).  It is also undisputed that Debtor's counsel received Exhibits 75-82 on August 22, 2022 and that each of the exhibits contain a signed and executed business records affidavit.

3.      At a pretrial conference on August 24, 2022, Defendant's counsel stated that the Defendant objected to the use of the business records affidavits but did not articulated a basis for such objection.

4.      At the first day of trial, the Court expressed questions concerning whether the Debtor had access to the documents contained within Vitol's Exhibits 75-82 prior to the August 22, 2022 exhibit exchange. The answer is "YES," as detailed below.

## II.
## DEBTOR'S PRIOR ACCESS TO THE BUSINESS RECORDS

### A.      International Bank of Commerce – Vitol's Ex. 75

5.      Vitol received documents from International Bank of Commerce ("***IBC***") pursuant to a subpoena served in connection with this proceeding. On February 10, 2022, Vitol provided these documents and the accompanying business record affidavit dated January 11, 2022 by IBC's custodian to Debtor's counsel via Sharefile, producing IBC documents labeled IBC_0000001 - IBC_0002799. This transmission is confirmed by a contemporaneous email from James Tolbert, a Senior Client Technology Solutions Analyst at Reed Smith, with whom this Court is familiar from the Motion to Strike and its related briefing. *See* Order Denying Motion to Strike at Dkt. 100.



6.     The business record affidavit is located at IBC_0000006 and was produced to the

Defendants on February 10, 2022 along with other documents from IBC. Vitol's Exhibit 75, which

consists of IBC_0000001 - IBC_0002799, was downloaded by Defendant's Counsel on August

22, 2022.



## B. Veritex – Vitol's Ex. 76

7. Vitol received documents from Veritex Community Bank ("Veritex") pursuant to a subpoena served in connection with this proceeding. Vitol provided these documents to the Defendant's counsel on January 28, 2022. This is confirmed both by a Sharefile transmission report and Sharefile activity logs which Reed Smith's IT department was able to recover.





8. As shown by both the Sharefile report and the Sharefile log, the Zip file of Veritex Bank records was sent to Defendant's counsel on January 28, 2022. At the same time, Vitol also provided Defendant's counsel with documents from other third parties which Vitol obtained in discovery. Notably, the Sharefile log shows that Defendant's counsel downloaded documents from

Mercuria, JPMC, and Hightower Securities on February 1, 2022, but there is no record that Defendant's counsel downloaded the Veritex documents which were sent the same day.

9.      Although Vitol cannot establish with documentary evidence that the business records affidavit was included in the January 28, 2022 transmission as the link has expired and the affidavit was not bates labeled, Vitol states unequivocally that Defendant's counsel had access to the affidavit on August 22, 2022 and had access to the documents at issue since January 28, 2022. Moreover, there is confirmation that Defendant's counsel downloaded Vitol's Ex. 76 on August 22, 2022.  The Veritex business records affidavit is located at the first two pages of Vitol's Ex. 76.[1]



**C.     Chubb  – Vitol's Ex. 77**

10.     Vitol received documents from Chubb, who issued insurance policies to Mr. Brass, pursuant to a subpoena served in connection with this proceeding. Vitol produced all of the Chubb documents along with the business records affidavit to Defendant's counsel on August 22, 2022 as Vitol's Ex. 77. Defendant's counsel downloaded Vitol's Ex. 77 the same day.

---

[1] The below excerpt, and all excerpts of the August 22, 2022 exhibit downloads, is from the same Sharefile report inserted above with the proof of IBC download.

11.     Notably, the file name for Vitol's Ex. 77 is "Chubb 000001-001174 – **w BRA [business records affidavit] at last page**." A review of Exhibit 77 confirms the fact that the affidavit is located at the last page of the exhibit. Vitol also provided parts of the Chubb production to Defendant prior the August 22, 2022 exchange. For instance, Mr. Brass was presented with pages Chubb 000143-Chubb 000174 at his deposition on March 25, 2022, where it was exhibit 12. Additionally, Vitol's counsel emailed a copy of Chubb 000143-Chubb 000174 to Defendant's counsel on April 18, 2022 in connection with a request for a 2004 examination.

12.     As such, the Defendant has had access to all of the Chubb documents and the business records affidavit since August 22, 2022 and was specifically directed to the last page of Vitol's Ex. 77 for an opportunity to inspect the certification. Defendant also knew as of August 18, 2022 that Vitol intended to introduce documents from Chubb via a business records affidavit.

**D.     Zadok – Vitol's Ex. 78**

13.     Vitol received the Zadok documents after the Trustee served a subpoena on Zadok Jewelers seeking documents related to jewelry purchased by the Defendant which may be part of the bankruptcy estate. On July 28, 2022, Max Beatty, the Trustee's counsel, produced the Zadok documents and the business records affidavit to the Defendant's counsel.

14.     On August 22, 2022, Vitol provided the Defendants with the full set of Zadok documents again as Vitol's Exhibit 78. The business records affidavit is the first page of Vitol's Exhibit 78. The Defendant's counsel downloaded Exhibit 78 on the day it was sent.

### E.    Iberia  – Vitol's Ex. 79

15.    Although Vitol served a subpoena on IberiaBank ("Iberia") in December 2021, Vitol did not actually receive any documents from Iberia until August 16, 2022. As soon as Vitol had the complete set of documents from Iberia, it shared them with Defendant's counsel. These documents included a business records affidavit from Iberia's custodian.





16.    Vitol provided the Iberia document to the Defendant again on August 22, 2022 during the exhibit exchange as Vitol's Ex. 79 and Defendant's counsel downloaded it the same day. The first two pages of Exhibit 79 are the business records affidavit.

Name: **Vitol Exhibit 079 - IberiaAllProd w BRA**.pdf
Size: 649.41 MB · Downloaded: 8/22/22 5:11p
User: **M. Goott**

17.      The title of the exhibit also indicates that it includes the business records affidavit.

**F.      Cadence - Vitol's Ex. 80**

18.      Vitol received documents from Cadence Bank pursuant to a subpoena served in connection with this proceeding. Vitol provided these documents to the Defendant on February 10, 2022 at the same time Vitol transmitted the IBC documents. Specifically, Vitol sent documents labeled CADENCE_0000001-CADENCE_0000363 as confirmed by a contemporaneous email from James Tolbert.

| | |
|---|---|
| **From:** | Tolbert, James E. Gravity Stack |
| **Sent:** | Thursday, February 10, 2022 5:28 PM |
| **To:** | Rhea, Shikendra B.; Robin, Lindsey L; Purcell, Bradley |
| **Subject:** | RE: Vitol/Brass - document production |

Just circling back on this. These files were sent out today.

| First Bates Value | Last Bates Value |
|---|---|
| CADENCE_0000001 | CADENCE_0000363 |
| IBC_0000001 | IBC_0002799 |

19.      As with Veritex, because the Cadence business records affidavit is not bates labeled, Vitol cannot definitively prove this earlier transmission included the affidavit; however, Vitol provided the Cadence documents a second time along with the business records affidavit during the exhibit exchange on August 22, 2022 as Vitol's Ex. 80. The business records affidavit is located at the first two pages of Exhibit 80. Defendant's counsel downloaded Exhibit 80 the same day it was sent.



20.     The title of the file expressly notes that it is accompanied by a business records affidavit ("W BRA").

**G.      EEPB - Vitol's Ex. 81 and 82**

21.     Vitol served a subpoena on EEPB during the state court litigation once Vitol learned that EEPB prepared GCAC's tax return and that it may have GCAC's financial statements – which GCAC asserted it did not possess. EEPB provided the documents to Vitol in the Fall of 2020 by sending a flash drive to Vitol. The documents from EEPB were not bates labeled when they were received but did include a business records affidavit. When Vitol downloaded the files from EEPB and then uploaded them to Relativity, the business records affidavit was given the control number 20201021_0000001 – indicating it was the first document. Vitol provided the Defendants with the EEPB documents as they were produced to Vitol on October 29, 2021 arranged by control number.





22.    Vitol again provided the EEPB documents to the Defendant during the exhibit exchange on August 22, 2022 as Vitol's Exhibits 81 and 82. Exhibit 81 consists of the same documents sent on October 29, 2021 with the files named by the internal control numbers. For ease of reference, Vitol also provided a bates labeled set of the EEPB documents as its exhibit 82. For both exhibits, the business records affidavit is the first document.

### III.
### CONCLUSION

23.    As the foregoing affirms, the Defendant was provided access to the vast majority of the business records Vitol seeks to admit under Fed. R. Evid. 902(11) and 803(6) for months. The Defendant has also had multiple of the business records affidavits for months as well. It cannot be disputed that by August 18, 2022 at the latest, the Defendant knew that Vitol intended to introduce documents from IBC, Veritex, Chubb, Zadok, Iberia, Cadence, and EEPB through business records affidavits.

24.    The Defendant had access to all of the one- to two-page affidavits by no later than August 22, 2022. The affidavits are at the beginning of the exhibits for Veritex, Zadok, Iberia, Cadence, and EEPB. For IBC, the affidavit is at the sixth page and the Defendant was provided with the affidavit more than six months ago. While Defendant's counsel complained that the Chubb affidavit was at the final page of the Exhibit (indicating they were able to find it), the file name for Vitol's Exhibit 77 expressly stated the Chubb affidavit was on the last page.

25.    As such, Vitol provided Defendant sufficient notice of Vitol's intention to rely upon business records affidavits, Vitol provided Defendant with the opportunity to access the underlying

business records well before trial, and even in the most charitable recounting of the facts, the Defendant has had eight days to inspect the records and affidavits – which is more than enough time to challenge them as a matter of law. The Defendant has not challenged the authenticity or accuracy of any of the documents and therefore cannot meet his burden under Fed. R. Evid. 803(6)(E) to show the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

26.     Therefore, Vitol respectfully requests the Court overrule Defendant's objections and admit Vitol Exhibits 75-82.

Dated: August 30, 2022

Respectfully submitted,

By: */s/ Michael P. Cooley*
    Keith M. Aurzada (SBN 24009880)
    Michael P. Cooley (SBN 24034388)
    Bradley J. Purcell (SBN 24063965)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T:  469.680.4200
    F:  469.680.4299
    kaurzada@reedsmith.com
    mpcooley@reedsmith.com
    bpurcell@reedsmith.com
    lrobin@reedsmith.com

    and

    Michael H. Bernick (SBN 24078277)
    Mason W. Malpass (SBN 24109502)
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T:  713.469.3834
    F:  713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

    *Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on August 30, 2022, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all parties registered to receive electronic notices in this adversary proceeding, including counsel for the Defendant.

    */s/  Michael P. Cooley*
    Michael P. Cooley

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S TRIAL BRIEF ON DESIGNATION OF EXPERT WITNESS**

Counsel for Vitol Inc. (the "*Vitol*" or "*Plaintiff*") files this trial brief regarding the designation of expert witness Gene L. Deetz and respectfully states as follows:

**I.**
**PROCEDURAL HISTORY**

1.     On December 8, 2021, the parties to this adversary proceeding filed a *First Amended Joint Discovery/Case Management Plan Pursuant to Federal Rule of Civil Procedure 26(f)* [Docket No. 16].  A true and correct copy of the Case Management Plan is attached hereto as **Exhibit A**.  In the Case Management Plan, the parties agreed that "the parties with the burden of proof must designate experts by January 15, 2021."  Case Management Plan ¶ 10(f).

2.     This deadline was thereafter extended by a series of scheduling orders culminating in a *Sixth Stipulation and Agreed Order* [Docket No. 49] (the "*Sixth Scheduling Order*").  A true and correct copy of the Sixth Scheduling Order is attached hereto as **Exhibit B**.  The Sixth Scheduling Order states that:

> Vitol's deadline to designate and provide an expert report shall be extended to April 1, 2022. The Debtor shall designate its expert and

provide a report no Vitol no later than April 15, 2022. Vitol is entitled to take a deposition of the Debtor's expert after such expert is designated.

Sixth Scheduling Order ¶ 2.

3.      On April 1, 2022—almost five months before the trial in this adversary proceeding— Vitol's counsel transmitted to Debtor's counsel their expert's report.  A true and correct copy of that correspondence is attached hereto as **Exhibit C**. The expert report is titled "Expert Report of Gene L. Deetz," and the email both refers to the report as "Vitol's expert report" and invites counsel to "let us know when you would like to depose Mr. Deetz."

4.      Debtor's counsel did not respond to the April 1, 2022 email communication, and at no time requested a deposition of Mr. Deetz.

5.      On August 22, 2022, Vitol timely filed its witness and exhibit lists [Docket No. 101] (the "*W&E List*").  "Gene Deetz" is the first witness identified in the witness list, and the exhibit list identifies Exhibit 97 as "Deetz Expert Report" and "Deetz Expert Report Exhibits 1-9." *See* W&E List at 1, 5.[1]

6.      At the commencement of this trial on August 30, 2022, counsel for Defendant "invoked the Rule" to exclude fact witnesses from the courtroom.  At that time—and for the first time—Defendant's counsel objected to the presence of Mr. Deetz in the courtroom on the ground that he was not properly designated as an expert.  The *sole* justification counsel gave for their position was that Mr. Deetz had not been expressly identified as an expert on the W&E List in accordance with Local Rule 9013-2(c).  Counsel also suggested that Mr. Deetz should also have been identified as an expert witness in a supplement to Vitol's initial disclosures required under Fed. R. Civ. P. 26(a)(1).

---

[1] Exhibits 97 and 98 expressly state "Deetz Expert Report" and "Deetz Expert Report Exhibits 1-9."

7.      Vitol submits this trial brief in support of its use of Deetz as an expert witness and, more generally, its use of both witnesses and evidence that Debtor's counsel was aware of, or should have been aware of, both through discovery and in writing, as allowed by Federal Rule of Civil Procedure 26(e)(1).

## II.
## ARGUMENTS AND AUTHORITIES

8.      The Debtor's assertion that any evidence or witnesses that have not been formally supplemented pursuant to Federal Rule of Civil Procedure 37(c) must be excluded is patently false and ignores the express language of the Rule. Federal Rule of Civil Procedure 37(c) states in relevant part: "If a party fails to provide information or identify a witness *as required by Rule 26(a) or (e)*, the party is not allowed to use that information or witness to supply evidence . . . at a trial, *unless the failure was* substantially justified or is *harmless*." Fed. R. Civ. P. 37(c) (emphasis added). The rule regarding designation of expert witnesses, Federal Rule of Civil Procedure 26(a)(2) requires parties to identify any expert witnesses they may use at trial, along with a written report. Here, Vitol was not required to supplement its initial disclosures pursuant to Federal Rule of Civil Procedure 26(e) when Vitol identified its expert witness, Deetz, months ago while simultaneously transmitting the requisite written report, as required by Federal Rule of Civil Procedure 26(a)(2).

*A.      Rule 26(a)(2), and not Rule 26(a)(1), governs the initial disclosure of expert witnesses*

9.      As an initial matter, Defendant's counsel is incorrect in their assertion that some additional disclosure of Mr. Deetz was required as a supplement to Vitol's initial disclosures.

10.     Rule 26(a)(1) enumerates four categories of information that parties are required to disclose at the outset of an adversary proceeding "without awaiting a discovery request," including the names of "each individual likely to have discoverable information."    Fed. R. Civ. P.

26(a)(1)(A)(i).  Rule 26(a)(1) makes no mention of expert witnesses or other persons likely to offer opinions under Fed. R. Evid. 703.  Indeed, an expert witness is generally questioned his or her expert *opinions*, not "discoverable information."

11.     Rule 26(a)(2) governs the disclosure of expert witnesses, and states that "[i]n addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Evid. 26(a)(2)(A).  The timing of this disclosure is governed by Rule 26(a)(2), which directs such disclosure to be made "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D) (setting an outside date of 90 days before trial in the absence of such orders).

12.     As outlined above, the Court's Sixth Scheduling Order directed the disclosure of Vitol's expert witness to be made on or before April 1, 2022, and Vitol in fact disclosed both its expert and that expert's report to Defendant by email on that date.  The suggestion that the absence of Mr. Deetz from Vitol's initial disclosures runs afoul of either Rule 26(a)(1) or the continuing duty to supplement under Rule 26(e) is nothing more than a mischaracterization of the plain language of the federal rules and this Court's prior orders.

**B.     Rule 26(e)(2) imposes no duty to supplement where the other party has otherwise been made aware of the information**

13.     Indeed, the obligation to supplement under Rule 26(e)(1)(A) is not an absolute one, but one that arises **"**if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A). Therefore, even assuming that Rule 26(a)(1) could be construed to extend to expert witnesses, the designation of Mr. Deetz as an expert witness had "otherwise been made known" in accordance with Rule 26(a)(3) and the Sixth Scheduling Order.

14.     Indeed, courts have reiterated the requirements of the Rule in no uncertain terms: "[C]ourts have declined to exclude evidence or witnesses where the opposing party knew or should have known of an exhibit and its contents or the identity of a person and the scope of her testimony well before trial." *Drechsel v. Liberty Mut. Ins. Co.*, 2015 U.S. Dist. LEXIS 153336, at *5-6 (N.D. Tex. Nov. 12, 2015) (citing *Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Marketing Co. W.L.L.*, Civ. A. No. H-07-2684, 2008 U.S. Dist. LEXIS 97855, at *45-47 n.22 (S.D. Tex. Dec. 3, 2008)). "A party is not required to supplement its discovery if the additional or corrective information has 'otherwise been made known to the other parties during the discovery process or in writing[.]'" *In re Sambrano*, 440 B.R. 702, 707 (Bankr. W.D. Tex. 2010) (citing Fed. R. Civ. P. 26(e) and *Barker v. Bank One, N.A.*, 2005 U.S. Dist. LEXIS 19449, at *3 (N.D. Tex. Sept. 7, 2005) (finding that defendant was not required to supplement its discovery by identifying as witnesses individuals the plaintiff had deposed during discovery); 8 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. 3d § 2049.1 (West 2010)); *see also* 8A Wright, Miller, & Marcus, Federal Practice and Procedure, § 2049.1 at p. 313 (2019 supp.) (the analysis of whether a disclosure violation occurred is a "pragmatic" one, "[t]he focus is on the pragmatic question whether sufficient and timely correction was made."); *Bankston v. Kan. City Southern Ry.*, No. 03 Civ. 577 (CN), 2005 U.S. Dist. LEXIS 50783, 2005 WL 8155221, at *4 (M.D. La. Oct. 17, 2005) (("[T]he duty to supplement imposed by [FRCP] 26(e) should not require form over substance in this case.").

15.     In this instance, Vitol's counsel timely notified Defendant of its selection of Gene Deetz as a testifying expert (litigants do not volunteer the reports of *consulting* witnesses and invite

their deposition)[2] on April 1, 2022, provided a copy of Mr. Deetz's expert report, and invited Defendant to take Mr. Deetz's deposition (which Defendant declined).

16.     Finally, the Court should note that just a few weeks after the initial expert disclosure in April 2022, on May 9, 2022, Vitol filed its *Response in Opposition to Debtor's Motion for Summary Judgment* [Docket No. 65] (the "**MSJ Response**") accompanied by, among other summary judgment evidence, a *Declaration of Gene L. Deetz* [Docket No. 67-5] (filed under seal). In that declaration, which Vitol also included as part of Exhibit 97 in the W&E List, Mr. Deetz generally describes the scope of his engagement and affirms that "[i]f called to testify at trial in this matter, I would testify consistently with the statements contained in my report."  A true and correct copy of that declaration is attached hereto as **Exhibit D** and was cited repeatedly in the MSJ Response.

17.     Accordingly, even if Rule 26(e) operated to require independent disclosure of an expert in addition to the required disclosure under Rule 26(a)(2), Rule 26(e) is satisfied insofar as Mr. Deetz's expert status had "otherwise been made known to the other parties during the discovery process or in writing."

## C.     *Defendant is not prejudiced by Vitol's omission of the "expert" designation from its witness and exhibit list.*

18.     Local Rule 9013-2(c) states that, if a witness list does not delineate a witness as a fact witness or an expert witness, "the witness will only be allowed to testify as a fact witness *unless otherwise ordered by the Court*."  Although the local rules don't come with explanatory notes, it's nevertheless clear the rule contemplates the Court's exercise of discretion, which most logically, where the prejudice of noncompliance with the rule is de minimis.

---

[2] To that end, Rule 26 broadly shields from discovery "opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.  Fed. R. Civ. P. 26(b)(4)(D).

19.     Here, Defendant claims no actual prejudice from Vitol's failure to specifically identify Mr. Deetz on the W&E List as an expert.  That's with good reason, because Defendant was made aware of Mr. Deetz's designation as an expert and provided a copy of his report on April 1, 2022, saw that same report referenced repeatedly in summary judgment briefing, and yet never saw fit to seek his deposition.

20.     Courts are afforded "wide latitude" in allowing parties to designate expert witnesses beyond the applicable deadline and are encouraged to use "intelligent flexibility" in making a decision regarding allowance of the designation. *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1000 (5th Cir. 1998) (citation omitted). In considering whether to allow an expert witness to testify, the Fifth Circuit has identified four factors that Courts must consider: (1) the importance of the witness's testimony; (2) the prejudice to the opposing party if the witness is allowed to testify; (3) the possibility that a continuance would cure potential prejudice; and (4) the explanation given for the failure to identify the witness.  *Patek v. Alfaro (In re Primera Energy, LLC)*, Nos. 15-51396-CAG, 15-05047-CAG, 2018 Bankr. LEXIS 970, at *9 (Bankr. W.D. Tex. Mar. 29, 2018) (citing *Bradley v. United States*, 866 F.2d 120, 124 (5th Cir. 1989)).

21.     In this case the factors strongly weigh in favor of allowing Deetz to testify. *First*, the Deetz testimony is critical to properly addressing questions surrounding the insolvency of GCAC and the amount and pace of the fraudulent transfers at the heart of Vitol's claims.  Deetz's testimony goes to the heart of demonstrating that, as GCAC and Brass fell deeper into insolvency, Brass responded by accelerating the pace of cash transfers to himself and his family.

22.     *Second*, the prejudice to the Debtor is negligible, as the Debtor was timely notified of this expert months ago and made the inexplicable decision *not* to take his deposition. Indeed, the Fifth Circuit has held that a failure to disclose was harmless where "the witness in support of

whose testimony the [exhibits] were offered had been designated properly as a witness before trial," and, in any event, any such prejudice was cured "by the approximately one month during which [opposing party] was allowed to examine and respond to the contested evidence." *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003). Here, Debtor's counsel was made aware of the Deetz expert report and had over four months to "examine and respond" to it, but chose not to.

23.     *Third*, whereas a continuance might be useful in some cases to permit a litigant time to depose a previously undisclosed expert, here Defendant has already passed on the opportunity to depose Mr. Deetz.  It is therefore unclear what prejudice could be cured by a continuance.  That said, to the extent Defendant requests a continuance to cure whatever prejudice Defendant may claim, Vitol does not oppose a continuance.

24.     *Fourth*, the undersigned counsel respectfully submits that the failure to specifically identify Mr. Deetz as an expert on the W&E List was an oversight on the part of counsel, and was not motivated in any way by an intent to deceive Defendant—as corroborated by the fact that Vitol has openly identified and described Mr. Deetz as its anticipated expert for the last several months of this trial.

**D.     *Deetz Should Not be Stricken as an Expert Witness But Rather Debtor Should be Offered a Continuance Under Local Rule 9013-2(c)***

25.     The U.S. Bankruptcy Court for the Southern District of Texas has overruled a motion to strike an expert witness that was based upon Local Rule 9013-2(c) (the "***Local Rule***"). In the *Diamond Offshore Drilling* case, counsel opposing the allowance of the expert testimony pointed out the strict compliance required by the Local Rule and argued that they were not provided previous notice of the expert designation ***at all*** until his declaration was filed a month prior to the

hearing.[3] There, Judge David R. Jones overruled a motion to strike an expert witness based on the Local Rule and instead offered the opposing party a continuance. *See In re Diamond Offshore Drilling, Inc.*, Case No. 20-32307 (Bankr. S.D. Tex. June 8, 2020) Docket Nos. 313, 316, 318). In so ruling, Judge Jones observed that he wrote the Local Rule at issue.[4]

## **CONCLUSION**

26.     Defendant's objection is premised on a continuing theme of doing whatever possible to distract the Court from the merits of the case prevent this Court from seeing the compelling evidence that supports Vitol's claims. To exclude Vitol's expert witness would be to elevate form above substance in a way wholly contrary to the underlying purpose of the procedural rules that govern this adversary proceeding. Accordingly, Vitol requests that this Court allow Vitol to present Gene Deetz as an expert witness in this case.

---

[3] *See* PDF audio file at Docket No. 318, at approximately 27:00, 28:40, 29:00.
[4] *See* PDF audio file at Docket No. 318, at approximately 30:45.

002086

Dated: August 30, 2022

Respectfully submitted,

By: */s/ Michael P. Cooley*
    Keith M. Aurzada (SBN 24009880)
    Michael P. Cooley (SBN 24034388)
    Bradley J. Purcell (SBN 24063965)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T:  469.680.4200
    F:  469.680.4299
    kaurzada@reedsmith.com
    mpcooley@reedsmith.com
    bpurcell@reedsmith.com
    lrobin@reedsmith.com

    and

    Michael H. Bernick (SBN 24078277)
    Mason W. Malpass (SBN 24109502)
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T:  713.469.3834
    F:  713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

    *Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on August 30, 2022, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all parties registered to receive electronic notices in this adversary proceeding, including counsel for the Defendant.

    */s/  Michael P. Cooley*
    Michael P. Cooley

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**FIRST AMENDED JOINT DISCOVERY/CASE MANAGEMENT PLAN
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(f)**

1.      State where and when the meeting of the parties required by Rule 26(f) was held, and identify the counsel who attended for each party.

> The Parties conducted a Rule 26 conference by phone on October 8, 2021. The Parties finalized this Plan on October 19, 2021.

> The following counsel contributed to this Joint Discovery/Case Management Plan: Keith M. Aurzada, Lindsey L. Robin, and Mason M. Malpass, counsel for Plaintiff Arthur Jacob Brass, and Miriam Goott, counsel for Defendant Arthur J. Brass.

2.      List the cases related to this one that are pending in any state or federal court with case number and court.

> *In re Arthur Jacob Brass,* Case No. 21-60025, pending in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division.

3.      <u>Briefly</u> describe what this case is about.

> Plaintiff asserts that Defendant's debts owed to Plaintiff are non-dischargeable under Sections 523(a)(2)(A), (a)(4), and (a)(6).

> Defendant asserts that the Plaintiff has no basis to object to the dischargeability of the Debtor's debts.

4.      Specify the allegations of federal jurisdiction.

> The Parties agree that this adversary proceeding is a core proceeding because this

Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

5.    Name the parties who disagree and the reasons.

No parties disagree regarding jurisdiction.

6.    List anticipated additional parties that should be included, when they can be added, and by whom they are wanted.

None anticipated at this time.

7.    List anticipated interventions.

None anticipated at this time.

8.    Describe class-action issues.

None.

9.    State whether each party represents that it has made the initial disclosures required by Rule 26(a). If not, describe the arrangements that have been made to complete the disclosures.

Both Plaintiff and Defendant will make their initial disclosures by October 29, 2021.

10.    Describe the proposed agreed discovery plan, including:

a.    Responses to all matters raised in Rule 26(f).

The Parties believes that discovery can be completed by February 7, 2021.

b.    When and to whom the Plaintiff anticipates it may send interrogatories.

Plaintiff anticipates sending interrogatories to the Debtor in his individual capacity and as president of GCAC and Trifinery, his wife, and his mother before the end of the discovery period.

c.    When and to whom the Defendant anticipate they may send interrogatories.

Defendant anticipate sending interrogatories.

d.    Of whom and by when the Plaintiff anticipates taking oral depositions.

At this time, Plaintiff anticipates taking the oral depositions of the Debtor in his individual capacity and as the corporate representative of GCAC and Trifinery and

Defendant's wife.

Defendant's counsel, although she does not represent Defendant's wife, has agreed to provide the Defendant's wife with a copy of any properly executed subpoena issued by the Plaintiff, however Plaintiff's counsel cannot accept service on her behalf as she is not her attorney.

    e.      Of whom and by when the Defendant anticipates taking oral depositions.

Defendant anticipates taking oral depositions.

    f.      When the Plaintiff (or the party with the burden of proof on an issue) will be able to designate experts and provide the reports required by Rule 26(a)(2)(B), and when the opposing party will be able to designate responsive experts and provide their reports.

The Parties believe that parties with the burden of proof must designate experts by January 15, 2021 and that opposing parties must designate responsive experts and provide their reports by February 7, 2021.

    g.      List expert depositions the Plaintiff (or the party with the burden of proof on an issue) anticipates taking and their anticipated completion date. See Rule 26(a)(2)(B) (expert report).

The Parties anticipate taking expert depositions if they are designated.

    h.      List expert depositions the Defendant anticipates taking under their anticipated completing date. See Rule 26(a)(2)(B) (expert report).

The Defendant anticipates taking expert depositions.

11.    If the parties are not in agreement on a part of the discovery plan, describe the separate views and proposals of each party.

None.

12.    Specify the discovery beyond initial disclosures that has been undertaken to date.

None.

13.    State the date the planned discovery can reasonably be completed.

Plaintiff believes planned discovery can be completed by February 7, 2022.

The Parties agree that all discovery shall be produced in electronic format. All discovery shall be sent to Defendant's counsel at the following email address: mgoott@walkerandpatterson.com

14.     Describe the possibilities for a prompt settlement or resolution of the case that were discussed in your Rule 26(f) meeting.

The Parties do not currently believe that alternative dispute resolution will be productive at this time, but are open to settlement discussions and mediation.

15.     Describe what each party has done or agreed to do to bring about a prompt resolution.

None at this point in time.

16.     Specify the number of hours it will take to present the evidence in this case.

The Parties anticipate trial will take 3 days.

17.     List pending motions that could be ruled on at the initial pretrial and scheduling conference.

None.

18.     List other motions pending.

None.

19.     Indicate other matters peculiar to this case, including discovery that deserves the special attention of the court at the conference.

None at this time.

20.     List the name, bar number, address and telephone number of all counsel.

Keith M. Aurzada                          Miriam Goott
State Bar No. 24009880              State Bar No. 24048846
Lindsey L. Robin                          WALKER & PATTERSON, P.C.
State Bar No. 24091422              P.O. Box 61301
REED SMITH LLP                        Houston, TX 77208
2850 N. Harwood St., Suite 1500   T:  713.956.5577
Dallas, Texas 75201                     F:  713.956.5570
T:  469.680.4200
F:  469.680.4299                          Counsel for Defendant

and

Michael H. Bernick
State Bar No. 24078277
Mason W. Malpass
State Bar No. 24109502
REED SMITH LLP
811 Main Street, Suite 1700
Houston, TX 77002
T: 713.469.3834
F: 713.469.3899

Counsel for Plaintiff

Dated: December 8, 2021

REED SMITH LLP                                    Walker & Patterson, P.C.

By: */s/ Keith M. Aurzada*_____         By: */s/ Miriam Goott (with permission)*_____
     Keith M. Aurzada                                 Miriam Goott
     State Bar No. 24009880                           State Bar No. 24048846
     Lindsey L. Robin                                 P.O. Box 61301
     State Bar No. 24091422                           Houston, Texas 77208
     2850 N. Harwood St., Suite 1500                  T: 713.956.5577
     Dallas, Texas 75201                              F: 713.956.5570
     T: 469.680.4200                                  mgoott@walkerandpatterson.com
     F: 469.680.4299
     kaurzada@reedsmith.com                           *Counsel to Defendant Arthur Jacob Brass*
     lrobin@reedsmith.com

and

     Michael H. Bernick
     State Bar No. 24078277
     Mason W. Malpass
     State Bar No. 24109502
     REED SMITH LLP
     811 Main Street, Suite 1700
     Houston, TX 77002
     T: 713.469.3834
     F: 713.469.3899
     mbernick@reedsmith.com
     mmalpass@reedsmith.com

*Counsel to Plaintiff Vitol, Inc.*

# EXHIBIT B

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
March 21, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**SIXTH STIPULATION AND AGREED ORDER**

This Stipulation is entered into by and among, Arthur J. Brass ("**Debtor**") and Vitol, Inc. ("**Vitol**"). The Debtor and Vitol are collectively referred to as the "**Parties**".

**RECITALS**

WHEREAS, on July 9, 2021, Vitol filed an Adversary Proceeding against the Debtor.

WHEREAS, on December 8, 2021, the Court entered a Scheduling Order setting deadlines ("**Scheduling Order**").

WHEREAS, by agreement the Parties seek to make the following changes to the Scheduling Order.

NOW, THEREFORE, the Parties agree as follows:

1.      The deadline to conduct non-expert discovery shall be extended to March 29, 2022. The Debtor shall make himself available for deposition on or before March 25, 2022.

2.      Vitol's deadline to designate and provide an expert report shall be extended to April 1, 2022. The Debtor shall designate its expert and provide a report no Vitol no later than April 15, 2022. Vitol is entitled to take a deposition of the Debtor's expert after such expert is designated.

002095

3.      Motions for Summary Judgment shall be filed prior to April 26, 2022.

4.      Other than the items listed above, this Order does not modify or change any of the other deadline contained in the Scheduling Order.

Signed:  March 21, 2022

Christopher Lopez
United States Bankruptcy Judge

AGREED AS TO FORM AND CONTENT:

By: _/s/ Johnie Patterson_

Johnie Patterson
SBN 15601700
Miriam T. Goott
SBN 24048846
WALKER & PATTERSON, P.C.
P.O. Box 61301
Houston, TX 77208
mgoott@walkerandpatterson.com
713.956.5577 (telephone)
**COUNSEL FOR DEBTOR**

By: */s/ Keith M. Aurzada*
Keith M. Aurzada (SBN 24009880)
Lindsey L. Robin (SBN 24091422)
Devan J. Dal Col (SBN 24116244)
**REED SMITH LLP**
2850 N. Harwood, Suite 1500
Dallas, Texas 75201
T:  469.680.4200
F:  469.680.4299
kaurzada@reedsmith.com
lrobin@reedsmith.com
ddalcol@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP**
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834
F:  713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*