# EXHIBIT C

**Robin, Lindsey L.**

---

| | |
|---|---|
| **From:** | Purcell, Bradley |
| **Sent:** | Friday, April 1, 2022 10:39 AM |
| **To:** | Miriam Goott |
| **Cc:** | Aurzada, Keith M.; Robin, Lindsey L. |
| **Subject:** | Vitol expert report |
| **Attachments:** | Expert Report Gene L. Deetz April 1 2022_signed.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Miriam,

Attached is Vitol's expert report. Please let us know when you would like to depose Mr. Deetz.

Brad

**Bradley Purcell**
Counsel
bpurcell@reedsmith.com

**Reed Smith LLP**
2850 N. Harwood Street
Suite 1500
Dallas, TX 75201
T: +1 469 680 4224
F: +1 469 680 4299
**www.reedsmith.com**

002099

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| ARTHUR JACOB BRASS, | Case No. 21-60025 |
| Debtor. | |
| VITOL INC. | |
| v. | |
| ARTHUR JACOB BRASS | Adversary No. 21-06006 |

**Expert Report of**
**Gene L. Deetz**

April 1, 2022



## TABLE OF CONTENTS

I.     BACKGROUND ...................................................................................................... 1

II.    SCOPE OF WORK ................................................................................................ 3

III.   QUALIFICATIONS .............................................................................................. 4

IV.   SUMMARY OF OPINIONS ................................................................................ 6

V.    DETAILED ANALYSIS ...................................................................................... 7

    A.   *Accounting for the Vitol/GCAC Transactions* ................................................ 7

    B.   *GCAC's Investments/Loan in Other Affiliated Companies* ......................... 12

    C.   *GCAC was insolvent at June 30, 2017, at December 31, 2017, and at January 31, 2018.* ............ 14

    i.   *Balance Sheet Test* ..................................................................................... 15

    ii.  *Capital Adequacy Test* ............................................................................... 25

    iii.  *Cash Flow Test* ........................................................................................... 28

    D.   *Transfers to Insiders* ................................................................................. 30

002101

## LIST OF APPENDICES AND EXHIBITS

Appendix I:   Deetz CV

Appendix II:   Documents Considered

Exhibit 1:   Unadjusted Monthly GCAC Balance Sheets from June 30, 2017 through January 31, 2018.

Exhibit 1.1:   Base Case: Adjusts GCAC's Net Assets to Write-off Investments/Loan Accounts.

Exhibit 1.2:   Sensitivity Case: Adjusts GCAC's Net Assets to Write-off Investments/Loan Accounts and Adjusts $14.8 million in Accounts Payable Contingent Liabilities to Vitol's $10 million Judgment.

Exhibit 2:   Actual and Adjusted – GCAC's Monthly and Cumulative Income Before Taxes from June 30, 2017 through January 31, 2018.

Exhibit 3:   Summary of GCAC's General Ledger Accounts 1250-Loan AJ Brass, and 1270-Loan Joyce Brass, January 1, 2015 through June 30, 2019.

Exhibit 4:   Non-operating GCAC Entities – Summary of Assets and Liabilities, January 2017 through December 31, 2018.

Exhibit 5:   Non-operating GCAC Entities – Summary of Monthly Losses, January 2017 through December 2017.

Exhibit 6:   Non-operating GCAC Entities – Summary of Monthly Revenues and Expenses, January 2017 through December 2017.

Exhibit 7:   GCAC's Cash Sales and Payments for Product Inventory, July 2017 through January 2018.

Exhibit 8:   GCAC's Monthly Net Working Capital, Including Cash, June 30, 2017 through January 31, 2018.

Exhibit 9:   Vitol's Calculation of Amounts Due from GCAC Sent to Arthur on April 10, 2018 Compared to Amounts Recorded by GCAC.

Expert Report of Gene L. Deetz, April 1, 2022

## I.   BACKGROUND

1. Vitol, Inc. ("Vitol"), an energy and commodities company that ships and trades crude oil and other related products,[1] and Gulf Coast Asphalt Company, LLC ("GCAC"), a company that filed for voluntary Chapter 7 bankruptcy on March 26, 2021 (the "Petition Date")[2] and previously marketed and traded asphalt and other related products for sale to third parties,[3] entered into certain transactions from July 2017 through January 2018 (hereinafter referred to as the "Vitol/GCAC Transactions") for the sale and purchase of asphalt product.

2. Arthur J. Brass ("Arthur") was the president and 50% owner of GCAC, through a wholly owned entity, Trifinery, Inc. ("Trifinery").[4,5] The other 50% owner of GCAC was Joyce Brass ("Joyce"), Arthur's mother.[6]

3. It is my understanding that the Vitol/GCAC Transactions were funded by Vitol and that Vitol is claiming, among other things, that it is entitled to repayment for the unpaid balance from GCAC.[7]

4. Prior to the Vitol/GCAC Transactions, GCAC had a Joint Marketing Agreement ("JMA") with Rio Energy International, Inc. ("Rio"), a Houston, Texas based corporation engaged in the domestic and international trade of

---

[1] First Amended Complaint to Determine Dischargeability of Debts, paragraph 6.
[2] March 26, 2021 Chapter 7, Official Form 201 - Voluntary Petition for Non-Individuals Filing For Bankruptcy, Gulf Coast Ashpalt Company, LLC and separately for Trifinery, Inc.
[3] Arthur J. Brass Answer to Amended Complaint Filed by Vitol, Inc., paragraph 4.
[4] Arthur J. Brass' Motion to Dismiss Vitol's Complaint with Prejudice for Failure to State Cause of Action Under Rule 12(b)(6), Relevant Background Facts, page 2 of 8.
[5] First Amended Complaint to Determine Dischargeability of Debts, paragraph 6.
[6] First Amended Complaint to Determine Dischargeability of Debts, paragraph 6.
[7] GCAC's general ledger shows a liability to Vitol of $14.8 million as of December 31, 2017 [GCAC009845], and subsequently GCAC, Arthur Brass, and Trifinery jointly and severally agreed to a settlement and judgment in 2020 to repay Vitol $10 million [November 20, 2020 Agreed and Final Judgment entered for Vitol against the Brass parties, BK-VITOL_0000954].

1

Expert Report of Gene L. Deetz, April 1, 2022

crude oil, petrochemicals, refinery feedstocks, and refined petroleum products,[8] signed on or around February 25, 2016.[9] In his June 18, 2018 Affidavit ("Arthur Affidavit"), Arthur described the JMA with Rio as an agreement to "…jointly pursue the sourcing, purchasing, blending, selling, and marketing of asphalt and asphalt related products."[10]

5.  During May and June 2017 leading up to the first of the series of Vitol/GCAC Transactions, Vitol and GCAC circulated various documents and draft language that outlined a potential joint venture between Vitol and GCAC[11] whereby Vitol would replace Rio:[12]

> "In early 2017, GCAC and Vitol began discussions for Vitol to replace the regional firm [Rio] as GCAC's partner in the JMA. The parties began exchanging draft agreements as early as May 2017. As of July 1, 2017, Vitol and GCAC began transacting under the JMA (the "Business"). After July 1, 2017, the parties continued to exchange drafts a contract to memorialize the agreement that had already commenced business operations."

6.  I have not reviewed a signed joint venture agreement between Vitol and GCAC and it is my understanding that the potential joint venture agreement described above was never signed by the parties.[13] Further, GCAC recorded 100% of the amount requested by Vitol related to the Vitol/GCAC Transactions as a

---

[8] https://www.rioenergy.com/#!/about.

[9] Joint Marketing Agreement by and between Rio Energy International, Inc. and Gulf Coast Asphalt Company, LLC [VITOL_0078947 and VITOL_00078949].

[10] June 28, 2018 Brass Deposition Exhibit 6, June 15, 2018 Affidavit of Arthur J. Brass, paragraph 3.

[11] *See for example*, June 2, 2017 draft redline of a potential JMA between Vitol and GCAC [VITOL_00004917 and VITOL_00004918].

[12] June 28, 2018 Brass Deposition Exhibit 6, June 15, 2018 Affidavit of Arthur J. Brass, paragraph 4.

[13] Drafts of the JMA between Vitol and NewCo went unsigned. *See for example*, July 12 2017 email between Vitol and GCAC [GCAC001216, VITOL_9572]. Additionally, GCAC formed Hermosa Energy, LLC as the NewCo entity [Vitol_00009562, Vitol_00007640, July 3, 2017 Hermosa Energy LLC Certificate of Formation, and January 25, 2019 Charter Forfeiture]. I have seen no accounting records in the documents made available to me for Hermosa Energy LLC.

Expert Report of Gene L. Deetz, April 1, 2022

liability as of December 31, 2017,[14] indicating that Vitol provided interim financing support for GCAC until it could find a replacement for Rio.[15]

## II.    SCOPE OF WORK

7.   I have been asked by Reed Smith, LLP ("Reed Smith"), counsel to Vitol, to analyze the solvency and financial condition of GCAC as of three dates: June 30, 2017, December 31, 2017 and January 31, 2018, using the three recognized solvency tests: the balance sheet, adequate capital, and cash flow tests.[16]

8.   Additionally, I was asked to prepare a summary of the accounting for the Vitol/GCAC Transactions, and document GCAC's use of the proceeds from the sales of asphalt (originally purchased by Vitol) by GCAC to third parties, and the transfers from GCAC to Arthur and Joyce.

9.   The documents I considered in rendering my opinions in this report are contained in Appendix II and include the general ledger of GCAC, monthly balance sheets, income statements, and other accounting documents of GCAC, bank records of GCAC, Vitol and GCAC analysis and correspondence of the status of the asphalt purchases and sales, settlement correspondence and pleadings, depositions of Arthur, and other materials produced and subpoenaed in this proceeding.

---

[14] GCAC's general ledger [GCAC 009845].
[15] August 21, 2017 email and attachment from Arthur to Eric Kuo subject: Vitol Interim Financing Structure Bullets v2.docx [GCAC004694, GCAC004695].
[16] 11 U.S. Code § 548(a) and the Uniform Voidable Transactions Act.

002105

Expert Report of Gene L. Deetz, April 1, 2022

10. I reserve the right to update my report, appendices, exhibits, and analysis as new information becomes available to me. Ankura is being compensated for my time at $950 per hour. Staff working under my direction have rates that range from $375 per hour to $725 per hour. The fees Ankura incurs in connection with this matter are not contingent upon the outcome.

11. This report contains a complete statement of all my opinions and the basis for them including the methodologies I have applied in reaching my opinions. It also contains a complete list of the data and documents produced in this matter that I have considered in forming my opinions. This report also includes my analysis reflected in exhibits, my qualifications including a list of all my publications in the previous 10 years and a list of all other cases in which I have testified in the previous 4 years, and a statement of my hourly rate and the range of rates for staff working under my direction.

## III.    QUALIFICATIONS

12. I am a Certified Public Accountant ("CPA") and an Accredited Senior Appraiser ("ASA"). I am Accredited in Business Valuation ("ABV"), Certified in Entity and Intangible Valuations ("CEIV"), Certified in Valuation of Financial Instruments ("CVFI"), and Certified in Financial Forensics ("CFF") issued by the American Institute of Certified Public Accountants ("AICPA"). I have been a CPA since 1975, and I am licensed in California, New York, and Pennsylvania.

4

002106

Expert Report of Gene L. Deetz, April 1, 2022

13. I am currently a Senior Managing Director in the Valuation and Transaction Advisory practice of Ankura Consulting Group, LLC ("Ankura"), where I perform complex damages analyses, accounting analyses, conduct solvency analyses, and perform valuations of business interests, intangible assets, and fixed income securities and related derivatives.

14. For more than ten years a focus of my practice has included performing solvency analyses, and providing expert testimony in United States Bankruptcy Court and other venues on the application of the three recognized solvency tests (balance sheet, adequate capital, and cash flow) as contemplated under the Bankruptcy Code and other fraudulent transfer laws.[17] My work has also included significant forensic accounting analyses related to fraudulent conveyance and related party transactions in solvency and other litigated matters.

15. Before joining Ankura in August 2018, I was a Managing Director at Navigant Consulting. Before that, I was a Principal at Chicago Partners, LLC. Earlier in my career I held senior positions in other consulting and accounting firms including LECG, LLC, Arthur Andersen, Noell Deetz Agnew and Morse LLP, and Stoughton Davidson, starting in 1972.

16. My qualifications are disclosed in more detail in my CV, which is attached as Appendix I.

---

[17] 11 U.S. Code § 548(a) and the Uniform Voidable Transactions Act.

Expert Report of Gene L. Deetz, April 1, 2022

## IV.   SUMMARY OF OPINIONS

17. Consolidated GCAC[18] was insolvent at June 30, 2017, at December 31, 2017, and at January 31, 2018 failing all three recognized tests of solvency at each date.

18. Standalone GCAC was insolvent at June 30, 2017, at December 31, 2017, and at January 31, 2018 failing all three recognized tests of solvency at each date.

19. Standalone GCAC's balance sheets from June 30, 2017 through January 31, 2018 contain $6.6 million of assets identified as Investments/Loans in affiliated companies that have minimal or zero assets, negative book equity, zero revenues, and negative income before tax. These Investments/Loans in affiliated companies have been excluded from the Standalone GCAC solvency analysis as these affiliated companies do not demonstrate any ability to repay amounts reflected on Standalone GCAC's balance sheets.

20. From July 1, 2017 through December 31, 2018 (the last balance sheet produced), GCAC transferred a net $6.9 million to Arthur and Joyce.[19] The net amounts transferred to Arthur and Joyce were recorded as "Due from Shareholders" assets of GCAC and represented more than 70% of Consolidated GCAC's $8.9 million of total assets.[20] The amounts transferred

---

[18] Consolidated GCAC and Standalone GCAC defined below.

[19] GCAC is an LLC owned 50% by Arthur through his 100% ownership in Trifinery, and 50% by Joyce.  Arthur testified that as president and owner, it is within his sole discretion to make loans.

*Q: As far as the decision to make - - make a loan, the timing, frequency, and amount of that loan, that is all in the sole discretion of the president of GCAC, A.J. Brass, correct? A: That's correct.* November 3, 2020 Brass Deposition, pages 89:23-90:2.

[20] Balance sheets, income statements, or general ledgers of GCAC subsequent to December 31, 2018 were not produced.

002108

Expert Report of Gene L. Deetz, April 1, 2022

to Arthur and Joyce took place during a period that Consolidated GCAC had negative book equity.[21]

## V.    DETAILED ANALYSIS

### A.   *Accounting for the Vitol/GCAC Transactions*

21. The following detailed analysis is based on my review of contemporaneous accounting records produced by both Vitol, GCAC, and EEPB P.C. ("EEPB"). My work does not involve an audit for assurance purposes.

22. In the aggregate from the beginning of the Vitol/GCAC Transactions in July 2017 through the end of the relationship in January 2018, accounting records produced by Vitol indicate that Vitol funded asphalt product inventory purchases and costs for shipping and storage, hedging, and related interest charges totaling $69.4 million, as shown in the table below.[22]

| Description of Costs Paid by Vitol | Amount |
|---|---:|
| Rio Beginning Inventory | $    13,308,102 |
| Additional Asphalt Product Purchases | 45,076,856 |
| Freight, demurrage, inspection costs, and other costs | 1,596,219 |
| Storage Costs | 2,632,253 |
| Time Value of Money | 351,012 |
| Third Party Credit Risk | 200,890 |
| Net Cost of Hedging | 6,244,480 |
| **Subtotal** | **$    69,409,811** |

23. With regard to the Vitol/GCAC Transactions through January 31, 2018, Vitol received from, or gave credit to, GCAC a total of $54.6 million (as calculated

---

[21] EEPB-00000174, EEPB-00000181 and GCAC 009845.
[22] VITOL_80066. Vitol_00084993.

Expert Report of Gene L. Deetz, April 1, 2022

by Vitol and shown in the table below), including cash payments and transfers of inventory.

| Description of Payments made by GCAC and Other Transfers | Amount |
|---|---|
| GCAC payment on 11/17/2017 | $ 4,000,000 |
| GCAC payment on 12/15/2017 | 3,700,000 |
| GCAC payment on 1/26/2018 | 8,934,401 |
| Rio Ending Inventory | 8,952,522 |
| Rio Lockbox Cash Pass through | 4,590,119 |
| 3rd Party Sales (excludes GCAC) | 24,438,822 |
| **Subtotal** | **$54,615,864** |

24. Thus, the net amount outstanding Vitol calculates is due from GCAC as reflected in the tables above is $14.8 million, calculated as $69.4 million less $54.6 million.[23]

25. As explained above, the amounts and components of the Vitol/GCAC Transactions were summarized from contemporaneous Vitol schedules. Using GCAC's financial information, and in particular the general ledger, I was able to identify the accounting entries recorded by GCAC relevant to the Vitol/GCAC Transactions demonstrating that GCAC recorded the $14.8 million amount outstanding as a liability on GCAC's December 31, 2017 balance sheet.[24]

26. GCAC recorded the Vitol/GCAC Transactions in the following journal entries:

---

[23] *See* Vitol_80066. The workbook bates stamped Vitol_00001980 was produced by Vitol (and is the same workbook as the workbook bates stamped Vitol_80066) and sent to Arthur on April 10, 2018 in Vitol_00001979.
[24] EEPB-00000174 and GCAC 009845.

002110

Expert Report of Gene L. Deetz, April 1, 2022

| Entry #1 | Debit | Credit |
|---|---|---|
| 1330 | GCAC Trade Receivables | |
| 3450 | | Deferred Revenue (Credit) |

a. Entry #1 reflects future cash due to GCAC from a sale that has yet to be delivered (generally known as deferred revenue). This entry has no income statement impact as it affects an asset and liability account by the same amount.[25]

| Entry #2 | Debit | Credit |
|---|---|---|
| 1036 | Cash (Sales - Gulf Coast Asphalt) | |
| 1330 | | GCAC Trade Receivables |

b. Entry #2 was recorded after entry #1 described above, often times within the same month, or the following month if the sale transaction was entered into close to month-end. This entry also has no impact on the income statement as one asset account increases (cash) and another asset account decreases (accounts receivable) for the same amount.

| Entry #3 | Debit | Credit |
|---|---|---|
| 3450 | Deferred Revenue (Credit) | |
| 5005 | | Sales Trading & Blending |

c. Entry #3 has the effect of decreasing a liability and increasing revenues. GCAC did not record any revenues from January 2017

---

[25] Under double entry accounting concepts, a debit to an asset account increases an entity's assets and a credit to an asset account decreases an entity's assets. A debit to a liability account decreases an entity's liabilities and a credit to a liability account increases an entity's liabilities. For revenues, a credit increases revenues and a debit decreases revenues. For expenses, a debit increases expenses and a credit decreases expenses.

9

Expert Report of Gene L. Deetz, April 1, 2022

through November 2017 to the sales account in the income statement, and in December 2017 it adjusted the deferred revenue account to zero.

27. The above description and my analysis of GCAC's accounting for asphalt product sales demonstrates that GCAC was collecting cash from third parties during the periods from July 2017 through November 2017, but not recording revenues during these periods.

28. Importantly, GCAC was not contemporaneously paying for the cost of the asphalt product it was selling. GCAC was purchasing asphalt product inventory on credit and selling this product before paying for the cost of the inventory.

    a. For example, from July 2017 through November 2017, GCAC had collected $13 million of cash from third party asphalt product sales, and at this point in time, had only paid for $5.8 million of asphalt product inventory. During this same time period, GCAC made net cash transfers to Arthur and Joyce of $1.3 million.

    b. *See* Deetz Exhibit 7 for an analysis of GCAC's monthly cash collected from asphalt product sales and cash paid for asphalt product inventory. This Exhibit suggests that had GCAC paid for the asphalt product inventory as it was selling this product, GCAC would have had significant negative cash balances throughout the time period of July 2017 through January 2018.

002112

Expert Report of Gene L. Deetz, April 1, 2022

29. GCAC's accounting for the cost of asphalt product related to Vitol purchases does not begin until September 2017 and is recorded in four entries, described below:

| Entry #1 | Debit | Credit |
|---|---|---|
| 2615 | Deferred Debit | |
| 3240 | | Accounts Payable - Operating |

    a.  Entry #1 records an obligation to pay for the asphalt product inventory.

| Entry #2 | Debit | Credit |
|---|---|---|
| 3240 | Accounts Payable - Operating | |
| 1036 | | Cash (Sales - Gulf Coast Asphalt) |

    b.  Entry #2 decreases cash and reduces the accounts payable-operating account by the same amount.

| Entries #3 & 4 | Debit | Credit |
|---|---|---|
| 6080 | Purchase Sweet VTBs | |
| 3245 | | Accts Pay Contingent Liability |
| | | |
| 3245 | Accts Pay Contingent Liability | |
| 2615 | | Deferred Debit |

    c.  Entries #3 and #4 occurred in December 31, 2017 and remove the inventory cost from the balance sheet (deferred debit).

30. By December 31, 2017, all inventory product cost related to the Vitol/GCAC Transactions appear to have been recorded by GCAC, in the December 31, 2017 balance sheet and income statement which includes the $14.8 million liability from GCAC to Vitol. *See* Deetz Exhibit 9 for a comparison of the

002113

Expert Report of Gene L. Deetz, April 1, 2022

contemporaneous amounts calculated by Vitol versus the amounts recorded by GCAC at December 31, 2017.

31. The Vitol/GCAC Transactions occurred from July 2017 through January 2018, and in January of 2018 GCAC had a signed agreement with Mercuria in which Mercuria was to purchase Product (defined in the agreement as asphalt, VTBs, coker feed, and fuel oil) and sell such Product to counterparties as identified by GCAC, among other things.[26]

32. Vitol attempted to collect the remaining amounts it believed it was owed by GCAC from January 2018[27] which ultimately resulted in a judgment ordering Arthur, GCAC, and Trifinery to jointly and severally pay Vitol $10 million.[28]

33. Arthur filed a voluntary petition for Chapter 7 bankruptcy on March 26, 2021 (the "Petition Date").[29] GCAC and Trifinery filed for bankruptcy the same date.[30]

**B. GCAC's Investments/Loan in Other Affiliated Companies**

34. I have been provided the records produced by EEPB and understand that EEPB provided tax preparation services to GCAC during at least 2017 and 2018.[31] In addition to the general ledger produced by GCAC, EEPB produced certain general ledger account details, certain bank statements, certain trial balances,

---

[26] Marketing Agreement by and between Mercuria Energy Trading, Inc. and Gulf Coast Asphalt Company LLC [GCAC000001].
[27] *See for example*, January 25, 2018 email from Vitol to GCAC [VITOL_00002127].
[28] November 20, 2020 Agreed and Final Judgment entered for Vitol against the Brass parties [BK-VITOL_0000954].
[29] March 26, 2021 Chapter 7, Official Form 101 - Voluntary Petition for Individuals Filing For Bankruptcy, Arthur Jacob Brass.
[30] March 26, 2021 Chapter 7, Official Form 201 - Voluntary Petition for Non-Individuals Filing For Bankruptcy, Gulf Coast Ashpalt Company, LLC and separately for Trifinery, Inc.
[31] September 4, 2020 Business Records Affidavit and Schedule A Subpoena [20201021_0000001].

Expert Report of Gene L. Deetz, April 1, 2022

and certain account reconciliations covering the periods from December 31, 2016 through June 30, 2019.

35. EEPB also produced consolidated monthly balance sheets and income statements from January 2017 through June 30, 2017, and annually for December 31, 2017 and annually for December 31, 2018. The entities included in the consolidation include Gulf Coast Asphalt Company, LLC ("Standalone GCAC" or "GCAC"), GCAC Holdings LLC, Gulf Crude Gathering, and AG Bullet (collectively, "Consolidated GCAC").

36. On March 29, 2022 I interviewed Michael Wagner, CPA and Director at EEPB who confirmed to me that EEPB's tax preparation services included the preparation of GCAC's Federal and state income tax returns from the underlying records described above.

37. My interview with Mr. Wagner, combined with my detailed review and analysis of the documents produced by EEPB, GCAC, and Vitol are, based on my education, training, and experience, reasonable and reliable evidence that I considered in forming my opinions.

38. From January 2017 through December 2017, GCAC Holdings LLC, Gulf Crude Gathering, and AG Bullet had minimal or zero assets, negative book equity, zero revenues, negative income before tax, and had intercompany

002115

Expert Report of Gene L. Deetz, April 1, 2022

liabilities to GCAC.[32] *See* Deetz Exhibits 4, 5, and 6 for my analysis of these entities.

   a.   In the 2021 GCAC bankruptcy filing, in Part 13 to Official Form 207: Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, GCAC lists Gulf Coast Crude Gathering and Marketing as other businesses in which the debtor has had an interest. The filing describes this entity as non-operating and that this business existed from 2013 to 2017. The filing does not list any assets or liabilities for this entity.[33]

**C.  GCAC was insolvent at June 30, 2017, at December 31, 2017, and at January 31, 2018.**

39. In analyzing solvency, there are three recognized solvency tests, which are the:[34]

40. <u>Balance Sheet Test</u>: Assesses whether the debtor was insolvent on the date that a challenged transfer was made or challenged obligation was incurred, or became insolvent as a result of such transfer or obligation.

41. <u>Capital Adequacy Test</u>: Assesses whether the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

---

[32] EEPB-00000174, EEPB-00000175.
[33] April 27, 2021 GCAC Official Form 207: Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy.
[34] 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III) – Fraudulent transfers and obligations.

002116

Expert Report of Gene L. Deetz, April 1, 2022

42. <u>Cash Flow Test</u>: Assesses whether the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

43. Based on the financial information produced to me with respect to GCAC, I have performed all three tests.

### i. *Balance Sheet Test*

44. The balance sheet test considers the debtor's financial condition as a point-in-time assessment (*i.e.*, at a particular balance sheet date), and considers whether the debtor was insolvent under the balance sheet test when a challenged transfer was made, or a challenged obligation was incurred, or became insolvent as a result of such transfer or obligation.

45. The description of the financial condition in Section 548(a)(1)(B)(ii)(I) of the U.S. Bankruptcy Code refers to the term "insolvent." The meaning of "insolvent" is defined elsewhere in Section 101(32)(A) of the U.S. Bankruptcy Code, as follows:[35]

> "(32) The term 'insolvent' means:
>
> (A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of —
>
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title;"

---

[35] 11 U.S.C. § 101(32)(A) – Definitions.

002117

Expert Report of Gene L. Deetz, April 1, 2022

46. In analyzing whether the sum of GCAC's debts was greater than its assets, at a fair valuation, I analyzed whether the book value of any of GCAC balance sheet assets or liabilities should be adjusted to reflect an estimate of the market value for those assets or liabilities. My analysis begins with GCAC's books and records as described below.

47. GCAC's assets listed on its balance sheets from June 30, 2017 through January 31, 2018 consisted primarily of cash, trade accounts receivable for sales with customers, accounts receivable due from Arthur and Joyce ("Due from Shareholders"), accounts receivable from employees, and investments in or loans to other GCAC affiliated entities (mentioned above as GCAC Holdings LLC, Gulf Crude Gathering, and AG Bullet).

48. The investments in or loans to other GCAC affiliated entities eliminate in Consolidated GCAC's monthly balance sheets from January 31, 2017 through June 30, 2017. The next available consolidated balance sheet is as of December 31, 2017. In this December 31, 2017 consolidated balance sheet, the investments in or loans to other GCAC affiliated entities are presented as assets of standalone GCAC, and as liabilities of these other affiliated entities, which has the same effect as eliminating them from equity.[36]

49. Further, and as explained above, these other affiliated entities had minimal or zero assets, negative book equity, zero revenues, and negative income before tax.

---

[36] A Consolidated GCAC balance sheet as of January 2018 was not produced. Per EEPB-00000181, "Total Members' Equity" on the December 2018 Consolidated balance sheet was approximately negative $11.4 million, which did eliminate the investments in or loans to other GCAC affiliated entities.

002118

Expert Report of Gene L. Deetz, April 1, 2022

50. GCAC's liabilities reflected on its balance sheets from June 30, 2017 through January 31, 2018 consisted primarily of accounts payable (including recording the $14.8 million liability), accrued liabilities, and loans due to shareholders.

51. *See* the table below where I present the actual balance sheets of Consolidated GCAC as of June 30, 2017 and December 31, 2017, which show liabilities significantly greater than assets resulting in negative equity.[37]

---

[37] EEPB-00000174.

Expert Report of Gene L. Deetz, April 1, 2022

| Consolidated GCAC | | |
|---|---|---|
| | June 2017 | December 2017 |
| Cash | $ (62,132) | $ 4,623,309 |
| Accounts Receivable Trade | 1,239,340 | 719,229 |
| Accounts Receivable Trade Accrued | 246,940 | 7,855,784 |
| Accounts Receivable Employees | 429,915 | 392,946 |
| Accounts Receivable Trifinery Inc | (54,144) | (54,144) |
| Accrued Interest Receivable | 52,100 | - |
| Due From Shareholders | 86,696 | 2,998,569 |
| Prepaid | 7,698 | 6,995 |
| Total Current Assets | 1,946,413 | 16,542,688 |
| Deposits & Bonds | 112,000 | 32,000 |
| Investments in Arc Terminals | 930,726 | - |
| Investments/Loan GCAC Holdings | - | 4,183,753 |
| Investment Gulf Coast Crude | - | 2,437,087 |
| Investment AJ Bullet | - | 39,347 |
| Goodwill | 350,000 | 300,000 |
| Total Other Assets | 1,392,726 | 6,992,187 |
| **Total Assets** | **$ 3,339,139** | **$ 23,534,875** |
| Accounts Payable Trade | 3,241,432 | 1,823,023 |
| Accounts Payable Accrued | 957,849 | 9,634,060 |
| Accounts Payable Contingent Liability | - | 14,866,973 |
| Deferred Credit | 210,685 | - |
| Prepaid Sales | 1,547,409 | 1,547,409 |
| Total Current Liabilities | 5,957,375 | 27,871,465 |
| Member Shareholder Loan | 1,039,332 | 6,900,187 |
| Total Long Term Debt | 1,039,332 | 6,900,187 |
| **Total Liabilities** | **$ 6,996,707** | **$ 34,771,652** |
| **Net Assets (Assets minus Liabilities)** | **$ (3,657,568)** | **$ (11,236,777)** |

52. In addition to my analysis of Consolidated GCAC, I analyze the financial
statements and general ledger of Standalone GCAC. In the table below I
present Standalone GCAC balance sheets as of June 30, 2017, December 31,

002120

Expert Report of Gene L. Deetz, April 1, 2022

2017, and January 31, 2018.[38]  *See* also, Deetz Exhibit 1.

| | June 2017 | December 2017 | January 2018 |
|---|---|---|---|
| Cash | $ (82,196) | $ 4,623,136 | $ 3,581,706 |
| Accounts Receivable Trade | 1,233,304 | 712,898 | 532,855 |
| Accounts Receivable Trade Accrued | 246,940 | 7,855,784 | - |
| Accounts Receivable Employees | 429,915 | 392,946 | 385,046 |
| Accounts Receivable Trifinery Inc | (54,144) | (54,144) | (54,144) |
| Accrued Interest Receivable | 52,100 | - | - |
| Due From Shareholders | (712,635) | 2,998,569 | 3,363,569 |
| Prepaid | 7,698 | 6,995 | 32,289 |
| Total Current Assets | 1,120,983 | 16,536,184 | 7,841,321 |
| Deposits & Bonds | 112,000 | 32,000 | 32,000 |
| Investments in Arc Terminals | 930,726 | - | - |
| Investments/Loan GCAC Holdings | 4,183,753 | 4,183,753 | 4,183,753 |
| Investment Gulf Coast Crude | 2,430,117 | 2,437,087 | 2,437,087 |
| Investment AJ Bullet | 37,871 | 39,347 | 44,108 |
| Goodwill | 350,000 | 300,000 | 300,000 |
| Total Other Assets | 8,044,467 | 6,992,187 | 6,996,947 |
| **Total Assets** | **$ 9,165,450** | **$ 23,528,371** | **$ 14,838,268** |
| Accounts Payable Trade | 2,990,493 | 1,479,962 | 1,288,159 |
| Accounts Payable Accrued | - | 8,934,401 | 30,540 |
| Accounts Payable Contingent Liability | 166,619 | 14,866,973 | 14,866,973 |
| Deferred Credit | 210,685 | - | - |
| Total Current Liabilities | 3,367,797 | 25,281,336 | 16,185,671 |
| Member Shareholder Loan | 240,000 | 240,000 | 240,000 |
| Total Long Term Debt | 240,000 | 240,000 | 240,000 |
| **Total Liabilities** | **$ 3,607,797** | **$ 25,521,336** | **$ 16,425,671** |
| **Net Assets (Assets minus Liabilities)** | **$ 5,557,653** | **$ (1,992,965)** | **$ (1,587,403)** |

53. As shown above, before adjustments Standalone GCAC's total assets exceed

its total liabilities at June 30, 2017, reflecting book equity of $5.6 million.

Standalone GCAC's as presented book equity contains $6.6 million as of June

30, 2017, December 31, 2017, and January 31, 2018 for investments in or loans

to affiliated entities ("Investments/Loan GCAC Holdings", "Investment Gulf

Coast Crude", and "Investment AG Bullet").

---

[38] GCAC009845.

Expert Report of Gene L. Deetz, April 1, 2022

54. As discussed above, from January 2017 through December 2017, GCAC Holdings LLC, Gulf Crude Gathering, and AG Bullet had minimal or zero assets, negative book equity, zero revenues, negative income before tax, and liabilities to Standalone GCAC.[39] This is a strong indication that the below GCAC assets of $6.6 million are not realizable and should be written off Standalone GCAC's balance sheet for assessing its solvency.[40]

| | June 2017 | December 2017 | January 2018 |
|---|---|---|---|
| Investments/Loan GCAC Holdings | $    4,183,753 | $    4,183,753 | $    4,183,753 |
| Investment Gulf Coast Crude | 2,430,117 | 2,437,087 | 2,437,087 |
| Investment AJ Bullet | 37,871 | 39,347 | 44,108 |
| **Total** | **$    6,651,741** | **$    6,660,187** | **$    6,664,947** |

55. Adjusting Standalone GCAC's balance sheet net asset amounts for the investments/loan assets, its equity is negative as of June 30, 2017, December 31, 2017, and January 2018.[41] *See* Deetz Exhibit 1.1 and the summary table below, which represents my base case scenario under the balance sheet test.

| | June 2017 | December 2017 | January 2018 |
|---|---|---|---|
| **As Reported** | | | |
| **Net Assets (Assets minus Liabilities)** | **$    5,557,653** | **$    (1,992,965)** | **$    (1,587,403)** |
| | | | |
| **Adjustments** | | | |
| Investments/Loan GCAC Holdings | (4,183,753) | (4,183,753) | (4,183,753) |
| Investment Gulf Coast Crude | (2,430,117) | (2,437,087) | (2,437,087) |
| Investment AJ Bullet | (37,871) | (39,347) | (44,108) |
| Subtotal | $    (6,651,741) | $    (6,660,187) | $    (6,664,947) |
| | | | |
| **Adjusted** | | | |
| **Net Assets (Assets minus Liabilities)** | **$    (1,094,088)** | **$    (8,653,152)** | **$    (8,252,350)** |

---

[39] EEPB-00000174, EEPB-00000175.  I note that in the 2021 GCAC bankruptcy filing, in Part 13 to Official Form 207: Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, GCAC lists Gulf Coast Crude Gathering and Marketing as other businesses in which the debtor has had an interest.  The filing describes this entity as non-operating and that this business existed from 2013 to 2017.  The filing does not list any assets or liabilities for this entity [April 27, 2021 GCAC Official Form 207: Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy].
[40] EEPB-00000174, GCAC009845.
[41] EEPB-00000174, GCAC009845.

Expert Report of Gene L. Deetz, April 1, 2022

56. In addition to my base case, as presented in Deetz Exhibit 1.1, I performed a
    sensitivity case that makes another adjustment to GCAC's balance sheets to
    replace the liability recorded by GCAC at December 31, 2017 of $14.8 million
    with the November 20, 2020 $10.0 million Vitol judgment. This adjustment
    has the effect of increasing GCAC's equity by $4.8 million.

57. As presented in the table below and at Deetz Exhibit 1.2, adding $4.8 million
    to GCAC's equity from the above described adjustment, GCAC is still
    insolvent at June 30, 2017, December 31, 2017, and January 31, 2018.

| | | June 2017 | | December 2017 | | January 2018 |
|---|---|---|---|---|---|---|
| **As Reported** | | | | | | |
| **Net Assets (Assets minus Liabilities)** | $ | **5,557,653** | $ | **(1,992,965)** | $ | **(1,587,403)** |
| | | | | | | |
| **Adjustments** | | | | | | |
| Investments/Loan GCAC Holdings | | (4,183,753) | | (4,183,753) | | (4,183,753) |
| Investment Gulf Coast Crude | | (2,430,117) | | (2,437,087) | | (2,437,087) |
| Investment AJ Bullet | | (37,871) | | (39,347) | | (44,108) |
| Addback - Total Accrued Contingent Liability | | | | 14,866,973 | | 14,866,973 |
| Replace with $10 million Vitol Judgment | | | | (10,000,000) | | (10,000,000) |
| **Subtotal** | $ | (6,651,741) | $ | (1,793,214) | $ | (1,797,974) |
| | | | | | | |
| **Adjusted** | | | | | | |
| **Net Assets (Assets minus Liabilities)** | $ | **(1,094,088)** | $ | **(3,786,179)** | $ | **(3,385,377)** |

58. Further, I analyze whether there may be assets or liabilities not reflected in the
    balance sheets of GCAC that should be considered for solvency purposes.

59. I considered information available in the Arthur, GCAC, and Trifinery
    bankruptcy filings and the March 25, 2022 Arthur deposition from the
    perspective of whether or not information related to any potential off-balance
    sheet assets or liabilities would be known or knowable as of June 30, 2017
    through January 31, 2018.

002123

Expert Report of Gene L. Deetz, April 1, 2022

60. Below I provide a brief summary of the assets and liabilities disclosed in the three bankruptcy filings listed above.

61. Arthur's bankruptcy filing lists total assets of $5.1 million comprised of $3 million in real estate, $1.7 million in financial assets (primarily a $1.6 million certificate of deposit at IBC Bank),[42] $351,200 of personal and household items, $74,200 in vehicles, and $6,600 in other property.[43]

    a.  Further, Arthur lists various investments in limited partnerships where "Debtor is unaware of the FMV of his interest…" and these assets have "…been pledged as collateral for a debt owed to Veritex Bank."[44]

    b.  Also, Arthur lists 3 other limited partnership investments that are described as "minority non-transferrable" and the values were "unknown".[45]

    c.  Lastly, Arthur lists a 30% interest in Square 1 Containers, LLC. There is no value information provided and a description of this asset includes: "There are no distributions from this company."[46]

62. Arthur lists $22.1 million of liabilities in the bankruptcy filing as follows:[47]

---

[42] Note that the $1.5 million certificate of deposit is pledged as collateral for a secured claim by IBC Bank.  *See* April 27, 2021 Official Form 106D – Schedule D: Creditors Who Have Claims Secured by Property.
[43] December 16, 2021 Amended Schedule B and C, Official Form 106A/B.  Note that Arthur claims that $2 million of the $3 million value of real estate be exempt, as well as a portion of the value of the vehicles be exempt.
[44] December 16, 2021 Amended Schedule B and C, Official Form 106A/B.
[45] December 16, 2021 Amended Schedule B and C, Official Form 106A/B.
[46] December 16, 2021 Amended Schedule B and C, Official Form 106A/B.
[47] *See* April 27, 2021 Official Form 106D – Schedule D: Creditors Who Have Claims Secured by Property and Official Form 106E/F: Creditors Who Have Unsecured Claims.

002124

Expert Report of Gene L. Deetz, April 1, 2022

| Type of Claim | Entity | Amount |
|---|---|---|
| Secured | IBC Bank | $ 1,549,246 |
| Secured | Wells Fargo | 938,703 |
| Unsecured | Veritex Bank | 948,000 |
| Unsecured | Internal Revenue Service | 7,000,000 |
| Unsecured | Superior Crude Gathering | 1,600,000 |
| Unsecured | Vitol | 10,000,000 |
| Unsecured | Credit Card and Utilities | 74,000 |
| | **Subtotal** | **$22,109,949** |

63. With respect to GCAC's bankruptcy filing, it lists total personal property of $40,000, primarily related to accounts receivable. It also lists a patent asset for "improving asphalt quality in a refinery." The value attributable to this patent is listed as "unknown", and no information is provided as to when the patent was obtained, or how long the patent is active for. Another asset listed with an unknown value is Houston Astros season tickets.[48]

64. GCAC lists unsecured liabilities of $11.6 million, primarily related to a $1.6 million claim from Superior Crude and Gathering and a $10.0 million claim from Vitol.[49]

65. With respect to Trifinery's bankruptcy filing, the totality of its listed assets is its 50% ownership interest in GCAC, or approximately $20,000 ($40,000 x 50%). Trifinery lists liabilities of $14.0 million, consisting primarily of a $4.0 million priority claim from the Internal Revenue Service and a $10 million unsecured claim from Vitol.[50]

---

[48] April 27, 2021 GCAC Official Form 206 Schedules.
[49] April 27, 2021 GCAC Official Form 206 Schedules.
[50] April 27, 2021 Trifinery Official Form 206 Schedules.

002125

Expert Report of Gene L. Deetz, April 1, 2022

66. Out of the assets and liabilities described above in the bankruptcy filings, there are two items that I considered for solvency purposes.

67. The first is the listed patent for "improving asphalt quality in a refinery". As explained above, there is no value ascribed or other information about it such as patent number, expiration date, or whether or not there is actually protected technology that has ever been licensed.[51]

68. In addition to the lack of any information supporting a value for the patent provided in GCAC's bankruptcy filing, Arthur testified that he was unsure if the patent was active or had expired during 2017, as well as having no specific recollection that the patent had ever generated any licensing fees for GCAC.[52]

69. Additionally, I have not seen any licensing fees reflected in the financial statements, trial balances, or general ledger that I have reviewed. Based on my review of the available information regarding the patent explained above, I do not add a patent asset to GCAC's balance sheets at June 30, 2017, December 31, 2017, or January 31, 2018.

70. The second item I considered from GCAC's bankruptcy filings is a $1.6 million unsecured claim by Superior Crude and Gathering resulting from transactions as early as 2014 and 2015, resulting in a judgment.[53] To the extent such amounts were known or knowable as of my solvency dates, adding this

---

[51] April 27, 2021 GCAC Official Form 206 Schedules.
[52] March 25, 2022 deposition of Arthur Brass at pages 62-65.
[53] 2021-7-12  - Brass - Doc 1 - ADVERSARY - 21-06007 - Complaint to determine Dischargeability of a Debt, ¶14.  2021-04-27 - Gulf Coast - Doc 12 - Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy.

002126

Expert Report of Gene L. Deetz, April 1, 2022

$1.6 million liability to GCAC's reported balance sheets would indicate further insolvency.

71. In my opinion based on the analysis discussed above and as reflected in Deetz Exhibits 1.1. and 1.2, Consolidated GCAC and Standalone GCAC were balance sheet insolvent at June 30, 2017, December 31, 2017, and January 2018.

### ii. *Capital Adequacy Test*

72. The capital adequacy test is a determination of whether a debtor has sufficient capital to have a reasonable prospect of avoiding bankruptcy through the normal ebbs and flows of economic cycles.[54] In other words, the capital adequacy test measures whether a debtor has a sufficient cushion in its cash flow estimates, working capital, equity capital, and access to capital.[55]

73. My analysis of GCAC's capital adequacy considers GCAC's available historical income statements (during the period preceding Vitol – the Rio JMA period), GCAC's income statements from June 30, 2017 through January 31, 2018 (the period of the Vitol/GCAC Transactions), GCAC's working capital from June 30, 2017 through January 31, 2018, GCAC's equity capital from June 30, 2017 through January 31, 2018, and GCAC's access to lines of credit or other available sources of financing.

---

[54] AICPA & CIMA. 2020. Forensic & Valuation Services Practice Aid. Providing Bankruptcy and Reorganization Services, Vol. 2 – Valuation in Bankruptcy. p. 99.
[55] AICPA & CIMA. 2020. Forensic & Valuation Services Practice Aid. Providing Bankruptcy and Reorganization Services, Vol. 2 – Valuation in Bankruptcy. p. 99.

002127

Expert Report of Gene L. Deetz, April 1, 2022

74. From January 1 through December 31, 2016 GCAC lost $2.2 million.[56] From January 1 through June 30, 2017 GCAC lost $3.0 million.[57] During 2016 and through June 2017, GCAC was in a joint venture contract with Rio.[58]

| Summary - GCAC Income Statement | Twelve months ended 12/31/2016 | | Six months ended 6/30/2017 | | Cumulative Loss | |
|---|---|---|---|---|---|---|
| Revenues | $ | 11,585,575 | $ | 2,865,768 | | |
| Cost of Sales | | 9,891,776 | | 3,099,686 | | |
| Gross Profit | | 1,693,799 | | (233,918) | | |
| Operating Expenses | | 2,066,011 | | 1,158,399 | | |
| General & Administrative Expenses | | 2,058,541 | | 1,655,876 | | |
| Other Income (Expense) | | 192,598 | | - | | |
| **Standalone - Loss Before Taxes** | **$** | **(2,238,154)** | **$** | **(3,048,193)** | **$** | **(5,286,348)** |
| **Consolidated- Loss Before Taxes** | **$** | **(2,924,052)** | **$** | **(3,313,517)** | **$** | **(6,237,569)** |

75. The $5.2 million of losses over this 18-month period was coupled with an overdrawn cash balance at June 30, 2017 of negative ($82,196).[59] GCAC continued to lose another $7.1 million from July 1, 2017 through January 31, 2018 as presented in Deetz Exhibit 2.

76. Also presented in Deetz Exhibit 2 is the impact on GCAC's income statement of adjusting GCAC's balance sheet to replace the $14.8 million liability with the $10 million Vitol judgment. The results of this adjustment show that

---

[56] 20201021_0000025. Consolidated GCAC had a loss of $2.9 million for the twelve months ended December 31, 2016 comprised of a $2.2 million loss generated at Standalone GCAC and a $0.7 million loss in the other affiliated entities.
[57] EEPB-00000175, GCAC009845. Consolidated GCAC had a loss of $3.3 million from January 2017 to June 2017 comprised of $3.0 million loss generated at Standalone GCAC and a $0.3 million loss in the other affiliated entities. *See also* Deetz Exhibits 2, 5, and 6.
[58] Joint Marketing Agreement by and between Rio Energy International, Inc. and Gulf Coast Asphalt Company, LLC [VITOL_0078947 and VITOL_00078949].
[59] GCAC009845.

002128

Expert Report of Gene L. Deetz, April 1, 2022

GCAC would still incur $2.3 million of losses from July 1, 2017 through January 31, 2018.

77. Demonstrated in the table below and at Deetz Exhibit 8, GCAC also had current liabilities in excess of current assets, reflecting negative working capital.[60]

| | June 2017 | December 2017 | January 2018 |
|---|---|---|---|
| Cash | $ (82,196) | $ 4,623,136 | $ 3,581,706 |
| Accounts Receivable Trade | 1,233,304 | 712,898 | 532,855 |
| Accounts Receivable Trade Accrued | 246,940 | 7,855,784 | - |
| Accounts Receivable Employees | 429,915 | 392,946 | 385,046 |
| Accounts Receivable Trifinery Inc | (54,144) | (54,144) | (54,144) |
| Accrued Interest Receivable | 52,100 | - | - |
| Due From Shareholders | (712,635) | 2,998,569 | 3,363,569 |
| Prepaid | 7,698 | 6,995 | 32,289 |
| Total Current Assets | 1,120,983 | 16,536,184 | 7,841,321 |
| | | | |
| Accounts Payable Trade | 2,990,493 | 1,479,962 | 1,288,159 |
| Accounts Payable Accrued | - | 8,934,401 | 30,540 |
| Accounts Payable Contingent Liability | 166,619 | 14,866,973 | 14,866,973 |
| Deferred Credit | 210,685 | - | - |
| Total Current Liabilities | 3,367,797 | 25,281,336 | 16,185,671 |
| | | | |
| **Current Assets Less Curent Liabilities** | **$ (2,246,814)** | **$ (8,745,152)** | **$ (8,344,350)** |

78. As shown in the table above, even including cash,[61] GCAC operated with negative working capital indicating that GCAC used credit from Vitol as a source of capital. During the same time period, GCAC transferred over $4 million to Arthur and Joyce.[62]

---

[60] EEPB-00000174, GCAC009845.
[61] Generally net working capital does not include cash.
[62] *See* Deetz Exhibit 1.1.

Expert Report of Gene L. Deetz, April 1, 2022

79. Even replacing the $14.8 million liability reflected above with the $10 million Vitol Judgment (and leaving the "Due from Shareholders" assets from Arthur and Joyce intact), GCAC's current liabilities would exceed its current assets.

80. Consolidated GCAC's and Standalone GCAC's adjusted financial statements reflect an entity in financial distress, negative equity, loss making, and with negative working capital at June 30, 2017, December 31, 2017, and at January 31, 2018. In my opinion and based on my analysis, Consolidated GCAC and Standalone GCAC fail the capital adequacy test at June 30, 2017, December 31, 2017, and January 31, 2018.

### iii. Cash Flow Test

81. The cash flow test considers whether or not the debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured. A debtor's ability to pay its debts as they come due is based on its available expected cash flows to the firm.[63]

82. As explained above, GCAC historically had losses from January 1, 2016 through June 30, 2017 in the amount of $5.2 million. As presented below and in Deetz Exhibit 2, GCAC continued to accumulate losses from July 1, 2017 through January 31, 2018.

---

[63] AICPA & CIMA. 2020. Forensic & Valuation Services Practice Aid. Providing Bankruptcy and Reorganization Services, Vol. 2 – Valuation in Bankruptcy. pp. 97-98.

002130

Case 6:23-cv-00002   Document 8-5   Filed on 03/10/23 in TXSD   Page 34 of 300

Expert Report of Gene L. Deetz, April 1, 2022

| July 1, 2017 through January 31, 2018 | | |
|---|---|---|
| As prepared - Cumulative Loss before taxes | $ | (7,145,056) |
| Deetz Exhibit 1.2 - Sensitivty Adjustment | | 4,866,973 |
| Adjusted - Cumulative Loss before taxes | $ | (2,278,083) |

83. In aggregate from January 1, 2016 through January 31, 2018, GCAC lost $12.4 million on a standalone basis and $13.8 million on a consolidated basis from January 1, 2016 through December 31, 2017.[64]

| Summary - GCAC Income Statement | Twelve months ended 12/31/2016 | Six months ended 6/30/2017 | Seven months ended 1/31/2018 | Cumulative Loss |
|---|---|---|---|---|
| Revenues | $ 11,585,575 | $ 2,865,768 | $ 41,880,128 | |
| Cost of Sales | 9,891,776 | 3,099,686 | 42,251,221 | |
| Gross Profit | 1,693,799 | (233,918) | (371,094) | |
| Operating Expenses | 2,066,011 | 1,158,399 | 3,926,326 | |
| General & Administrative Expenses | 2,058,541 | 1,655,876 | 2,847,636 | |
| Other Income (Expense) | 192,598 | - | - | |
| Standalone Loss Before Taxes | $ (2,238,154) | $ (3,048,193) | $ (7,145,056) | $(12,431,404) |
| | Twelve months ended 12/31/2016 | Six months ended 6/30/2017 | Six months ended 12/31/2017 | Cumulative Loss |
| Consolidated Loss Before Taxes | $ (2,924,052) | $ (3,313,517) | $ (7,579,249) | $(13,816,818) |

84. From July 1, 2017 through January 31, 2018, GCAC increasingly financed its operations through credit provided to it by Vitol, and its net working capital position correspondingly deteriorated as reflected in the table above. In other words, GCAC collected cash from asphalt sales in advance of paying Vitol for the asphalt products it sold. During the same period GCAC consistently made cash transfers to Arthur and Joyce.

---

[64] 20201021_0000025, EEPB-00000175, GCAC009845. *See* also Deetz Exhibits 5 and 6.

Expert Report of Gene L. Deetz, April 1, 2022

85. Consolidated GCAC's and Standalone GCAC's adjusted financial statements reflect entities in financial distress, negative equity, loss making, and with negative working capital at June 30, 2017, December 31, 2017, and at January 31, 2018. Additionally, these companies have not demonstrated any other source of cash flow available to them to continue to pay their debts as they became due. In my opinion and based on my analysis, both Consolidated GCAC and Standalone GCAC fail the cash flow test at June 30, 2017, December 31, 2017, and January 31, 2018.

### D. Transfers to Insiders

86. I have analyzed GCAC's "Due from Shareholders" (transfers to insiders) accounts to Arthur (GCAC general ledger account 1250) and Joyce (GCAC general ledger account 1270) from January 2015 through June 2019,[65] and note that during the six month period from July 1, 2017 through December 31, 2017, GCAC made cash transfers to Arthur and Joyce that were more than triple the average amount transferred to them in the preceding periods.[66]

87. Through June 30, 2017 (the month-end prior to the first Vitol/GCAC Transaction), Joyce had an outstanding loan balance of approximately $86,000, and 100% of the "Due from Shareholders" account for Arthur had been fully repaid by June 30, 2017, and reflected approximately $800,000 payable to Arthur.[67]

---

[65] This time period is the full period with which financial information was produced related to GCAC transfers recorded as "Due from Shareholders" to Arthur and Joyce.
[66] Deetz Exhibit 3.
[67] EEPB-00000174, GCAC009845, GCAC009511.

Expert Report of Gene L. Deetz, April 1, 2022

88. For the period July 1, 2017 through December 31, 2017, a total of $3.8 million in cash transfers were made to Arthur and Joyce. This 6-month period of cash transfer activity is more than 3 times the average 6-month transfer activity to them from January 1, 2015 through June 30, 2017 of $1 million (and more than double the next highest previous 6-month period of activity from January 1, 2015 through June 30, 2015 of $1.7 million).[68]

89. Subsequent to December 31, 2017, an additional $4.9 million in transfers were made to Arthur and Joyce from January 1, 2018 through June 30, 2019.[69]

90. With respect to repayments, the level of repayments from Arthur and Joyce during the 6-month period ending December 31, 2017 was significantly less from Arthur and Joyce (on average nearly 90% less) than the prior 6-months periods from January 2015 through June 2017.[70]

91. The table below summarizes my analysis of the Arthur and Joyce "Due from Shareholders" accounts in GCAC's accounting records as described above:[71]

---

[68] EEPB-00000174, GCAC009845, GCAC009511.
[69] EEPB-00000174, GCAC009845, GCAC009511.
[70] EEPB-00000174, GCAC009845, GCAC009511.
[71] EEPB-00000174, GCAC009845, GCAC009511. *See* also Deetz Exhibit 3.

Expert Report of Gene L. Deetz, April 1, 2022

| | | | | | | | | 7/1/17-12/31/17 Period compared to historical high and average | |
| | | | | | | | | Total Amount Transferred | Total Amount Repaid |
| *Amounts in USD dollars* | | **Due from Shareholders - Arthur + Joyce** | | | | | | | |
| Year | Activity Period | Total Amount Transferred | | Total Amount Repaid | | Balance | | | |
| 2015 | 1/1-6/30 | $ | 1,771,802 | $ | (150,000) | $ | 1,621,802 | | |
| 2015 | 7/1-12/31 | | 1,000,000 | | (549,160) | | 2,072,642 | | |
| 2016 | 1/1-6/30 | | 1,462,648 | | (1,330,000) | | 2,205,290 | | |
| 2016 | 7/1-12/31 | | 166,000 | | (952,000) | | 1,419,290 | | |
| 2017 | 1/1-6/30 | | 836,975 | | (2,968,900) | | (712,635) | | |
| | Total | $ | 5,237,425 | $ | (5,950,060) | | | | |
| | Average per period | $ | 1,047,485 | $ | (1,190,012) | | | | |
| **2017** | **7/1-12/31** | **$** | **3,851,322** | **$** | **(140,118)** | **$** | **2,998,569** | **+217%/+368%** | **-88%** |
| 2018 | 1/1-6/30 | $ | 2,281,769 | $ | - | $ | 5,280,338 | | |
| 2018 | 7/1-12/31 | | 1,246,000 | | (280,000) | | 6,246,338 | | |
| 2019 | 1/1-6/30 | | 1,431,552 | | (350,000) | | 7,327,889 | | |
| | Total | $ | 4,959,320 | $ | (630,000) | | | | |
| | Average per period | $ | 1,653,107 | $ | (210,000) | | | | |
| Total | 1/1/15-6/30/19 | $ | 14,048,067 | $ | (6,720,178) | $ | 7,327,889 | | |

92. Arthur testified that GCAC had a long history of making loans to himself and
the loans would be repaid,[72] consistent with the information shown in the table
above through June 2017.

93. Arthur also testified that as president and owner, it is within his sole discretion
to make loans.[73]

"Q: As far as the decision to make - - make a loan, the timing, frequency, and
amount of that loan, that is all in the sole discretion of the president of GCAC,
A.J. Brass, correct?

A: That's correct."

94. I have seen no analysis, documentation, or any support providing the business
purpose or the terms of repayment for the transfers to Arthur and Joyce

---

[72] *See for example*, November 3, 2020 Brass Deposition, page 88:5-9.
[73] November 3, 2020 Brass Deposition, pages 89:23-90:2.

Expert Report of Gene L. Deetz, April 1, 2022

recorded as "Due from Shareholders" during this time period or why the aggregate balance to Arthur and Joyce was allowed to increase to over $7 million by June 30, 2019 without any documentation memorializing the terms of and security for repayment.

95. As demonstrated above, GCAC, in my opinion, was insolvent at June 30, 2017, December 31, 2017, and January 31, 2018. During this period, GCAC was selling asphalt product that it had not fully paid for, while it was also making cash transfers to insiders (Arthur and Joyce) during this same period.

96. From July 1, 2017 through December 31, 2018 (the last balance sheet produced), GCAC transferred a net $6.9 million to Arthur and Joyce. This substantial amount was recorded as a "Due from Shareholders" asset of GCAC and represented over 70% of Consolidated GCAC's total assets of $8.9 million. For the twelve months ended December 31, 2018 an additional $3.2 million of GCAC's assets continued to be transferred to insiders (Arthur and Joyce).

002135

Expert Report of Gene L. Deetz, April 1, 2022

Submitted on April 1, 2022 by:

_____

Gene L. Deetz

002136





## GENE L. DEETZ
Senior Managing Director

485 Lexington Avenue, 10th Floor
New York, NY 10017
United States

+1.646.227.4235 Direct
+1.646.334.9899  Mobile
gene.deetz@ankura.com

### EDUCATION
BA, Economics, California State
University, Fresno

### CERTIFICATIONS
Certified Public Accountant
(California, New York and
Pennsylvania)

Certified in Financial Forensics
(CFF)

Accredited Senior Appraiser,
American Society of Appraisers
(ASA)

Accredited in Business Valuation
(ABV)

Certified in Entity and Intangible
Valuations (CEIV)

Certified in Valuations of
Financial Instruments (CVFI)

### AFFILIATIONS
American Institute of Certified
Public Accountants

California Society of Certified
Public Accountants

New York State Society of
Certified Public Accountants

Gene L. Deetz is a Senior Managing Director at Ankura, based in New York. Gene conducts complex damage analysis and valuations of business interests, intangible assets, private equities, and fixed income securities and related derivatives. His valuation work includes valuation and solvency analysis for litigation in U.S. Federal and state courts as well as London in the High Court of Justice, Chancery Division and the London Center for International Arbitration. Additionally, Gene's current engagements also include complex tax disputes, solvency opinions, and the application of US GAAP and IFRS.

Gene is an experienced, well credentialed valuation and damages expert.  For over twenty years Gene has provided expert valutions and damages analysis to companies in the energy industry including diversified energy producers, and in the oil and gas industry.

For the last ten plus years Gene's solvency work has addressed fraudulent conveyance matters, preferences, and non-arms length insider transactions.

Gene also specializes in cross-border tax reporting investigations, tax controversy, accounting standards, claims, and dispute matters, including material adverse change litigation and post-acquisition purchase price disputes. This work also includes significant experience in product-level cost accounting and cost allocations covering several industries. Gene's expert witness testimony relates to commercial, regulatory, and tax controversy matters.

Gene's work on post-acquisition disputes matters includes, among others, the application of U.S. GAAP and IFRS including accounting for business combinations, calculation of working capital and its components, evaluation of domestic and foreign tax obligations, evaluation of contingent liabilities, and the evaluation of deal metrics including earnings before interest, taxes, depreciation and amortization (EBITDA), revenue, and gross profit.

Gene's professional experience also includes:

- Valuation, and Damage Analysis in Post-Acquisition Disputes including Material Adverse Change Cases: Provided analysis and testimony regarding the application of US GAAP and related valuation standards in financial analysis, valuation, and damage analysis.

- Complex Federal Income Tax Litigation: Provided analysis of tax regulations and damage calculations.

- Solvency, Fraudulent Conveyance and Ability-to-Pay analysis: Provided analysis and testimony regarding valuation and damage analysis.

- Damage analysis and cost to complete allocations related to a joint venture partner dispute regarding completion of middle-eastern sovereign infrastructure projects.

- Regulatory Investigation: Provided services regarding the application of US GAAP, IFRS, including ASC 820 and IFRS 13.

- Shareholder Litigation in Mergers and Acquisitions: Provided analysis and testimony regarding the application of IFRS including valuation standards in shareholder litigation of large financial services institutions.

- Independent examiner of Swiss private bank reporting to the DOJ regarding cross-border tax matters under the DOJ / Swiss "Program".

- Analysis of fair value accounting and related disclosure standards including compliance with US GAAP and IFRS. Evaluation of techniques and assumptions used by market participants including model calibration and related inputs.

- Provided expert and consulting valuation and forensic accounting services to the oil and gas industry including working with some of the world's largest oil and gas companies and joint venture exploration companies.

- Valuation and alleged damages of intellectual property contributed to an acquired subsidiary.

- Complex securities valuation and derivative close-out issues.

- Valuation and accounting for structured financial products with underlying residential real estate collateral, analysis of held for sale vs. held for investment considerations, and analysis of amount and timing of loan loss reserve allowances.

- Valuation regarding investments in CLNs and CDOs.

- Valuation of mortgage-related securities including CDOs and RMBS.

- Financial accounting and valuation of private equities and sovereign debt instruments.



**GENE L. DEETZ**

- Analysis of ISDA swap valuation considering market disruption and exercise conditions.

- Analysis of asset-backed commercial paper conduit, including mortgage-backed securities and collateralized debt obligations with subprime assets. Analysis of structure, portfolio selection, and portfolio performance.

- Valuation and accounting for fixed income assets and liabilities, derivatives, and mortgage-backed securities including advances, whole loans, and subprime assets.

- Analysis of supply contract including its market, forward markets, and derivatives.

- Brand value and purchase price allocation upon sale of brand.

- Analysis of damage allegations concerning accounting fraud impact on business acquisition.

## Deposition and / or Trial Testimony

- American Fidelity Assurance Company v. The Bank of New York Mellon, United States District Court, Western District of Oklahoma. Case No. CIV-11-1284-D.

- John Michael Sharp (and the other Claimants detailed in the GLO Register) v. Sir Michael Victor Blank, John Eric Daniels, Timothy Tookey, Helen Weir, George Truett Tate, and Lloyds Banking Group PLC, The Hight Court of Justice, Chancery Division, London UK. Case Nos: HC-2014-000292, HC-2014-001010, HC-2014-001387, HC-2014-001388, HC-2014-001389, HC-2015-000103, HC-2015-000105.

- Emerald Casino, Inc. and Frances Gecker, as Trustee for Emerald Casino, Inc. v. Estate of Kevin F. Flynn, et al., United States District Court, Northern District of Illinois, Eastern Division. Dist. Ct. No. 11-cv-04714.

- JAMS Ref. No. 1425028944 BEFORE Hon. Garrett E. Brown, Jr., Hon. David H. Coar, and Hon. Thomas I. Vanaskie

- Seaport Global Securities v. SB Group HoldCo, DG Capital Management, et al. Supreme Court of the State of New York, County of New York. Index No. 655723/2017.

- Stone Panels, Inc. and Stone Panels Holding Corp., Debtors, Robert Yaquinto Chapter 7 Trustee, Plaintiff, v. The Privatebank and Trust Company, et. al, Defendants, United States Bankruptcy Court for the Northern District of Texas Dallas Division. Deposition and Trial Testimony.

- Michael Molnar and Kyle Jones Baker v. GreenTech Capital Advisors L.P., et al. Supreme Court of the State of New York, County of New York. Index No. 650242(3)/2022.



## GENE L. DEETZ

### Work History

| | |
|---|---|
| Senior Managing Director, Ankura Consulting Group, LLC | 2018 – Present |
| Managing Director, Navigant Consulting, Inc. | 2008 – 2018 |
| Principal, Chicago Partners, LLC | 2006 – 2008 |
| Director, LECG, LLC | 2002 – 2006 |
| Managing Director, Arthur Andersen | 2001 – 2002 |
| Partner, Noell Deetz Agnew & Morse LLP | 1998 – 2001 |
| Partner, Stoughton Davidson | 1972 – 1998 |



GENE L. DEETZ

## Publications

Bloomberg News. "Navigant's Deetz Expects ECB Will Act if Crisis Worsens." Online video clip. YouTube. YouTube, December 19, 2011.

Navigant Consulting, Inc. "Cornelia Meyers Joins the Navigant/OMFIF Program: 'The ECB and Its Balance Sheet' [Press Release]." March 20, 2012.

Deetz, G. "A plea for more transparency: Accounting analysis applied to central banking." OMFIF Bulletin. May 2012.

Deetz, G., Malik, P., and Gendler, H. "Eurozone Crisis: In-Country Bank Analysis – July 2012." Navigant Consulting, Inc. July 23, 2012.

Deetz, G., Malik, P., and Gendler, H. "Navigant's EU/Eurozone Analysis – July 2012: Key Economic Statistics and Commentary Regarding the European Union, Its Member States and the World's Major Economies." Navigant Consulting, Inc. September 13, 2012. (Navigant's EU/Eurozone Analysis – August and November 2012)

Deetz, G. and Taylor, T. "Eurozone Crisis: Litigation, Restructuring and Risk Mitigation." The Commercial Bar Association: Professional Education Programme 2012. International Dispute Resolution Center, London, UK. October, 25, 2012. Lecture.

Deetz, G., Bajaj, M., Godellas, B., and Lipper, H. "The Valuation Minefield: Independence, Accuracy and Litigation." Fund Governance Summit: Regulatory Enforcement, Dispute Resolution and Asset Recovery. Executive Conference Center, New York, NY. October, 2, 2013. Panel Discussion.

Deetz, G. and Kennelly, M. "Business Valuations, Fundamentals and Complex Issue Litigation Matters." September 2014.

Deetz, G., V. Kapoor, and Kennelly, M. "Assessing the Impact of COVID-19 in Liquidity and Solvency Matters." May 2020.

Deetz, G., V. Kapoor, and Kennelly, M. "Managing Through the Liquidity and Solvency Crises Resulting from the COVID-19 Pandemic." May 2020.

Deetz, G., Kennelly, M., St. Martin, M., and Rollins, J. "Assessing the Impact of COVID-19 in Complex Disputes and Restructurings." May 2020.



Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| **Documents Produced by EEPB under September 4, 2020 Business Records Affidavit Subpoena** | |
| 20201021_0000001 | Business Records Affidavit dated September 4, 2020 |
| 20201021_0000002 | GCAC Holdings LLC Account Reconciliation as of December 31, 2016 for account 1001 - Cash Iberia Operating |
| 20201021_0000003 | Iberia Bank statement for GCAC Holdings LLC operating account dated December 30, 2016 |
| 20201021_0000004 | GCAC Holdings LLC Account Reconciliation as of December 31, 2016 for account 1002 - Cash Iberia Payroll |
| 20201021_0000005 | Iberia Bank statement for GCAC Holdings LLC payroll account dated December 30, 2016 |
| 20201021_0000006 | GCAC Account Reconciliation as of December 31, 2016 for account 1006 - Rentals - Gulf Coast Asphalt |
| 20201021_0000007 | Iberia Bank statement for GCAC lockbox account dated December 30, 2016 |
| 20201021_0000008 | GCAC Account Reconciliation as of December 31, 2016 for account 1021 - Operating - Gulf Coast Asphalt |
| 20201021_0000009 | Iberia Bank statement for GCAC operating account dated December 30, 2016 |
| 20201021_0000010 | GCAC Account Reconciliation as of December 31, 2016 for account 1030 - Payroll - Gulf Coast Asphalt |
| 20201021_0000011 | Iberia Bank statement for GCAC payroll account dated December 30, 2016 |
| 20201021_0000012 | GCAC Account Reconciliation as of December 31, 2016 for account 1036 - Sales - Gulf Coast Asphalt |
| 20201021_0000013 | Iberia Bank statement for GCAC asphalt sales account dated December 30, 2016 |
| 20201021_0000014 | GCAC Account Reconciliation as of December 31, 2016 for account 1040 - MoneyMkt - Gulf Coast Asphalt |
| 20201021_0000015 | Iberia Bank statement for GCAC account ending 5516 dated December 30, 2016 |
| 20201021_0000016 | Gulf Coast Crude Gathering & Marketing Account Reconciliation as of December 31, 2016 for account 1044 - GulfCoastCrudeGathering Oper |
| 20201021_0000017 | Iberia Bank statement for Gulf Coast Crude Gathering & Marketing operating account dated December 30, 2016 |
| 20201021_0000018 | AG Bullet, LLC Account Reconciliation as of December 31, 2016 for account 1055 - Cash Operating |
| 20201021_0000019 | Iberia Bank statement for AG Bullet LLC operating account dated December 30, 2016 |
| 20201021_0000020 | General ledger detail for account 1360 - Accrued Interest for the year 2016 |
| 20201021_0000021 | General ledger detail for account 3245 - Accounts Payable Accrued for the year 2016 |
| 20201021_0000022 | General ledger detail for account 1255 - Accounts Receivable Employee for the year 2016 |
| 20201021_0000023 | Aged receivables schedule - 2017 |
| 20201021_0000024 | Aged payables schedule - 2017 |
| 20201021_0000025 | GCAC consolidated trial balance as of December 31, 2016 |
| 20201021_0000026 | General ledger detail for account 2600 - Deposits & Bonds for the year 2016 |
| 20201021_0000027 | General ledger detail for account 9160 - Donations for the year 2016 |
| 20201021_0000028 | General ledger detail for account 1250 - Loan-A.J. Brass for the year 2016 |
| 20201021_0000029 | General ledger detail for account 1270 - Loan Joyce Brass for the year 2016 |
| 20201021_0000030 | General ledger detail for account 1100 - Due from Trifinery for the year 2016 |
| 20201021_0000031 | General ledger detail for account 9170 - Dues & Subscriptions for the year 2016 |
| 20201021_0000032 | General ledger detail for account 9170 - Dues & Subscriptions for the year 2016 |

002142

Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| 20201021_0000033 | General ledger detail for Property, Plant & Equipment accounts for the year 2016 |
| 20201021_0000034 | General ledger detail for account 2630 - Goodwill for the year 2016 |
| 20201021_0000035 | General ledger detail for account 2611 - Investment in Arc Terminal for the year 2016 |
| 20201021_0000036 | General ledger detail for account 2613 - Investment in GCAC Holdings for the year 2016 |
| 20201021_0000037 | General ledger detail for account 9660 - Miscellaneous Income for the year 2016 |
| 20201021_0000038 | General ledger detail for account 9340 - Taxes-Other for the year 2016 |
| 20201021_0000039 | General ledger detail for account 9340 - Taxes-Other for the year 2016 |
| 20201021_0000040 | General ledger detail for account 9305 - Outside Services for the year 2016 |
| 20201021_0000041 | General ledger detail for account 1410 - Prepaid for the year 2016 |
| 20201021_0000042 | General ledger detail for account 9710 - Prior Year Adjustment for the year 2016 |
| 20201021_0000043 | General ledger detail for account 3613 - Member Shareholder Loan for the year 2016 |
| 20201021_0000044 | General ledger detail for account 2618 - Investment in AG Bullet for the year 2016 |
| 20201021_0000045 | General ledger detail for account 2617 - Investment in Gulf Coast Crude for the year 2016 |
| 20201021_0000046 | Iberia Bank statement for Trifinery, Inc. account ending 8301 dated December 30, 2016 |
| 20201021_0000047 | GCAC depreciation and sale of property tax schedules, 2016 |
| 20201021_0000048 | GCAC Arc Logistics Partners K-1, 2016 |
| 20201021_0000049 | General ledger detail for account 3245 - Accounts Payable-Accrued for the year 2017 |
| 20201021_0000050 | General ledger detail for account 3245 - Accts Payable Contingent Liab for the year 2017 |
| 20201021_0000051 | General ledger detail for account 3250 - Accounts Payable-Product for the year 2017 |
| 20201021_0000052 | GCAC consolidated trial balance as of December 31, 2017 |
| 20201021_0000053 | General ledger detail for account 9160 - Donations for the year 2017 |
| 20201021_0000054 | General ledger detail for account 9170 - Dues & Subscriptions for the year 2017 |
| 20201021_0000055 | General ledger detail for account 9340 - Taxes-Other for the year 2017 |
| 20201021_0000056 | General ledger detail for account 1335 - Accrued A/R GCAC for the year 2017 |
| 20201021_0000057 | General ledger detail for account 3250 - Accounts Payable-Product for the year 2017 |
| 20201021_0000058 | General ledger detail for account 1255 - Accounts Receivable Employee for the year 2017 |
| 20201021_0000059 | A/R aging schedule - 2018 |
| 20201021_0000060 | General ledger detail for account 1250 - Loan-A.J. Brass for the year 2017 |
| 20201021_0000061 | GCAC Arc Logistics Partners K-1, 2017 |
| 20201021_0000062 | Email correspondence between EEPB and GCAC regarding tax issues dated July 2018 |
| 20201021_0000063 | BLANK |
| 20201021_0000064 | BLANK |
| 20201021_0000065 | Iberia Bank statement for GCAC account ending 8681 dated December 29, 2017 |
| 20201021_0000066 | Iberia Bank statement for GCAC account ending 8630 dated December 29, 2017 |
| 20201021_0000067 | Iberia Bank statement for GCAC account ending 8665 dated December 29, 2017 |
| 20201021_0000068 | GCAC tax schedule |
| 20201021_0000069 | GCAC tax schedule of GCAC basis in Arc Logistics Partners |

002143

Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| 20201021_0000070 | GCAC consolidated trial balance as of December 31, 2017 |
| 20201021_0000071 | Email correspondence between EEPB and GCAC regarding tax issues dated July 2018 |
| 20201021_0000072 | BLANK |
| 20201021_0000073 | BLANK |
| 20201021_0000074 | Email correspondence between EEPB, Popper & Company, LLP and GCAC regarding tax issues dated August-September 2018 |
| 20201021_0000075 | BLANK |
| 20201021_0000076 | Iberia Bank statement for GCAC account ending 8673 dated December 29, 2017 |
| 20201021_0000077 | General ledger detail for account 1270 - Loan Joyce Brass for the year 2017 |
| 20201021_0000078 | General ledger detail for accounts 1250 - Loan-A.J. Brass and 1270 - Loan Joyce Brass for the year 2017 |
| 20201021_0000079 | Gulf Coast Asphalt Company Consolidated Monthly Balance Sheets for periods January - June 2017 and December 2017 |
| 20201021_0000080 | Gulf Coast Asphalt Company Consolidated Monthly Income Statements for periods January - June 2017 and December 2017 |
| 20201021_0000081 | GCAC prepaid insurance schedule, 2017 |
| 20201021_0000082 | General ledger detail for account 3260 - AP-Adjustments for the year 2018 |
| 20201021_0000083 | General ledger detail for account 1335 - Accrued A/R GCAC for the year 2018 |
| 20201021_0000084 | Aged payables schedule - 2019 |
| 20201021_0000085 | Aged receivables schedule - 2019 |
| 20201021_0000086 | Gulf Coast Asphalt Company Consolidated Balance Sheet as of December 31, 2018 |
| 20201021_0000087 | GCAC consolidated trial balance as of December 31, 2018 |
| 20201021_0000088 | General ledger detail for account 2600 - Deposits & Bonds for the year 2018 |
| 20201021_0000089 | General ledger detail for account 9160 - Donations for the year 2018 |
| 20201021_0000090 | General ledger detail for account 1250 - Loan-A.J. Brass for the year 2018 |
| 20201021_0000091 | General ledger detail for account 1270 - Loan Joyce Brass for the year 2018 |
| 20201021_0000092 | General ledger detail for account 1100 - Due from Trifinery for the year 2018 |
| 20201021_0000093 | General ledger detail for account 9170 - Dues & Subscriptions for the year 2018 |
| 20201021_0000094 | General ledger detail for account 1255 - Accounts Receivable Employee for the year 2018 |
| 20201021_0000095 | Gulf Coast Asphalt Company Consolidated Income Statement for 2018 |
| 20201021_0000096 | Prepaid insurance schedule, 2018 |
| 20201021_0000097 | General ledger detail for account 1410 - Prepaid for the year 2018 |
| 20201021_0000098 | Net revenues schedule |
| 20201021_0000099 | General ledger detail for account 3260 - AP-Adjustments for the year 2018 |
| 20201021_0000100 | A/R aging schedules - 2019 |
| 20201021_0000101 | General ledger detail for account 1335 - Accrued A/R GCAC for the year 2018 |
| 20201021_0000102 | General ledger detail for account 3260 - AP-Adjustments for the year 2018 |
| 20201021_0000103 | A/P operating aging schedule - 2019 |
| 20201021_0000104 | General ledger detail for account 1255 - Accounts Receivable Employee for the year 2018 |
| 20201021_0000105 | Iberia Bank statement for GCAC account ending 8665 dated December 31, 2018 |
| 20201021_0000106 | General ledger detail for account 2600 - Deposits & Bonds for the year 2018 |

002144

Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| 20201021_0000107 | General ledger detail for account 1100 - Due from Trifinery for the year 2018 |
| 20201021_0000108 | Net revenues schedule |
| 20201021_0000109 | Iberia Bank statement for GCAC account ending 8673 dated December 31, 2018 |
| 20201021_0000110 | Iberia Bank statement for GCAC account ending 8681 dated December 31, 2018 |
| 20201021_0000111 | Iberia Bank statement for GCAC account ending 8630 dated December 31, 2018 |
| 20201021_0000112 | Iberia Bank statement for GCAC account ending 8665 dated December 31, 2018 |
| 20201021_0000113 | General ledger detail for account 1250 - Loan-A.J. Brass for the year 2018 |
| 20201021_0000114 | General ledger detail for account 1270 - Loan Joyce Brass for the year 2018 |
| 20201021_0000115 | General ledger detail for accounts 1100 - Due from Trifinery, 1250 - Loan-A.J. Brass and 1270 - Loan Joyce Brass for the year 2018 |
| 20201021_0000116 | Iberia Bank statement for GCAC account ending 8673 dated December 31, 2018 |
| 20201021_0000117 | Prepaid insurance schedule, 2018 |
| 20201021_0000118 | General ledger detail for account 1410 - Prepaid for the year 2018 |
| 20201021_0000119 | Trade receivables aging schedule - 2019 |
| EEPB-00000173 | General ledger detail for account 1270 - Loan Joyce Brass for the year 2017 |
| EEPB-00000174 | Gulf Coast Asphalt Company Consolidated Monthly Balance Sheets for periods January - June 2017 and December 2017 |
| EEPB-00000175 | Gulf Coast Asphalt Company Consolidated Monthly Income Statements for periods January - June 2017 and December 2017 |
| EEPB-00000181 | Gulf Coast Asphalt Company Consolidated Balance Sheet as of December 31, 2018 |
| EEPB-00000190 | Gulf Coast Asphalt Company Consolidated Income Statement for 2018 |
| EEPB-00000233 | General ledger detail for account 1270 - Loan Joyce Brass for the year 2018 |

**Other Documents Produced**

| | |
|---|---|
| 2021-03-26 - Brass - Doc 01 - Voluntary Petition | Official Form 101, Voluntary Petition for Individuals Filing for Bankruptcy, Arthur Brass, dated March 26, 2021 |
| 2021-03-26 - Gulf Coast - Doc 01 - Voluntary Petition | Official Form 201, Voluntary Petition for Non-Individuals Filing for Bankruptcy, Gulf Coast Asphalt Company, LLC, dated March 26, 2021 |
| 2021-03-26 - Trifinery - Doc 01 - Voluntary Petition | Official Form 201, Voluntary Petition for Non-Individuals Filing for Bankruptcy, Trifinery, Inc., dated March 26, 2021 |
| 2021-04-27 - Brass Doc 19 - Form 106A_B Schedules | Official Form 106, Schedules of Property, Author Brass, dated April 27, 2021 |
| 2021-04-27 - Gulf Coast - Doc 11 - Form 206A_B - Schedule A_B_ Assets -- Real and Personal Property | Official Form 206A/B, Real and Personal Property, Gulf Coast Asphalt Company, LLC, dated April 27, 2021 |
| 2021-04-27 - Gulf Coast - Doc 12 - Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy | Official Form 207, Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, Gulf Coast Asphalt Company, LLC, dated April 27, 2021 |
| 2021-04-27 - Trifinery - Doc 11 - Form 206A_B - Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy | Official Form 206A/B, Real and Personal Property, Trifinery, Inc., dated April 27, 2021 |
| 2021-04-27 - Trifinery - Doc 12 - Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy | Official Form 207, Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, Trifinery, Inc., dated April 27, 2021 |
| 2021-7-12 - Brass - Doc 1 - ADVERSARY - 21-06007 - Complaint to determine Dischargeability of a Debt | Complaint To Determine Dischargeability Of A Debt, Superior Crude Gathering, Inc. v. Arthur J. Brass, dated July 12, 2021 |
| 2021-08-02 DOC 006 Brass 12b6 Motion to Dismiss | Arthur J. Brass' Motion To Dismiss Vitol's Complaint With Prejudice For Failure To State A Cause Of Action Under Rule 12(b)(6), Vitol Inc. v. Arthur J. Brass, dated August 2, 2021 |
| 2021-10-06 Doc 010 Vitol_s First Amended Complaint | First Amended Complaint To Determine Dischargeability Of Debts, Vitol Inc. v. Arthur J. Brass, dated October 6, 2021 |

Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| 2021-10-13 Doc 011 Brass_s Original Answer | Arthur J. Brass's Answer To Amended Complaint Filed By Vitol, Inc., Vitol Inc. v. Arthur J. Brass, dated October 13, 2021 |
| 2021-10-20 Doc 012 Joint Discovery Plan | Joint Discovery/Case Management Plan Pursuant to Federal Rule of Civil Procedure 26(f) dated October 20, 2021 |
| 2021-10-24 Doc 013 Brass_s Initial Disclosures | Defendant's Rule 26(A) Initial Disclosures dated October 24, 2021 |
| 2021-10-29 Doc 014 Vitol_s Initial Disclosures | Plaintiff Vitol Inc.'s Initial Disclosures dated October 29, 2021 |
| 2021-11-03 Vitol_s First Requests for Production (adv) | Plaintiff Vitol Inc.'s First Request for Production of Documents dated November 3, 2021 |
| 2021-11-03 Vitol_s First Set of Interrogatories (adv) | Plaintiff Vitol Inc.'s First Set of Interrogatories to Debtor dated November 3, 2021 |
| 2021-11-03 Vitol_s First Set of Interrogatories (adv) responses copy | Defendant's Responses to Vitol's First Set of Interrogatories to Debtor dated November 3, 2021 |
| 2021-12-16 - Brass - Doc 85 - Amended Schedules | Amended Schedules to Official Form 106A/B, Schedules of Property, Arthur Brass, dated December 16, 2021 |
| BK-VITOL_0000001 | Email correspondence between Vitol and GCAC regarding follow-up of final settlement, dated April 2018 |
| BK-VITOL_0000003 | Email correspondence between Hall Maines Lugrin and Reed Smith regarding production of documents, dated December 2019 |
| BK-VITOL_0000006 | Email correspondence between Hall Maines Lugrin and Reed Smith regarding Vitol/GCAC Settlement Agreement, dated October 2020 |
| BK-VITOL_0000008 | Email correspondence from Hall Maines Lugrin to Reed Smith regarding executed Vitol/GCAC Settlement Agreement, dated October 2020 |
| BK-VITOL_0000009 | Second Confidential Settlement Agreement and Mutual Global Release by and among A.J. Brass, GCAC, Trifinery, Inc. and Vitol, dated November 5, 2020 |
| BK-VITOL_0000437 | Email correspondence between Jaworski Law Firm, Reed Smith and Hall Maines Lugrin regarding GCAC v. Vitol fully executed Rule 11 Agreement, dated September 16, 2020 |
| BK-VITOL_0000438 | Letter from Jaworski Law Firm to Hall Maines Lugrin, Reed Smith and Schiffer Hicks Johnson regarding the Rule 11 Agreement and terms of settlement, dated September 14, 2020 |
| BK-VITOL_0000441 | Email correspondence between Fibich Leebron Copeland Briggs, Reed Smith and A.J. Brass regarding production of documents, dated December 2020 |
| BK-VITOL_0000450 | Email correspondence between Reed Smith and Hall Maines Lugrin regarding executed Settlement Agreement and related settlement payment, dated October 2020 |
| BK-VITOL_0000483 | Gulf Coast Asphalt Company, LLC's Response to Vitol Inc.'s Third Set of Interrogatories and Third Requests for Production, dated October 19, 2018 |
| BK-VITOL_0000524 | Plaintiff's Second Amended Petition, GCAC v. Vitol, dated February 21, 2019 |
| BK-VITOL_0000548_Depo Vol 1 (marked) | Deposition of Arthur J. Brass dated November 3, 2020 and related exhibits |
| BK-VITOL_0000681 | Email correspondence from A.J. Brass to Vitol regarding interim balance due Vitol, dated February 13, 2018 |
| BK-VITOL_0000691_Ex 6 | Affidavit of Arthur J. Brass, dated June 15, 2018 |
| BK-VITOL_0000695 | Email correspondence from Vitol to A.J. Brass regarding amount due Vitol by GCAC, dated April 10, 2018 |
| BK-VITOL_0000719 | Email correspondence from Vitol to A.J. Brass regarding Vitol/GCAC settlement, dated April 13, 2018 |
| BK-VITOL_0000723_Transcript | Deposition of Arthur Brass in the case of Vitol, Inc. v. Gulf Coast Asphalt, LLC dated June 28, 2018 and related exhibits |
| BK-VITOL_0000951 | Email correspondence between Reed Smith and the Gerber Law Firm regarding the Vitol/GCAC Agreed Judgment, dated February 2021 |
| BK-VITOL_0000954 | Agreed Final Judgement of Gulf Coast Asphalt, LLC v. Vitol, Inc. dated November 20, 2020 |

002146

Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| BK-VITOL_0000958 | Judgment-Creditor Vitol's First Set of Requests for Production and First Set of Post-Judgment Interrogatories to Trifinery, Inc. in Aid of Collecting Its Judgment, GCAC v. Vitol v. A.J. Brass and Trifinery, dated December 30, 2020 |
| BK-VITOL_0000968 | Arthur J. Brass' Responses to Defendant's Request For Production and Interrogatories, GCAC v. Vitol v. A.J. Brass and Trifinery, dated December 23, 2020 |
| BK-VITOL_0000988 | Judgment-Creditor Vitol's First Set of Requests for Production and First Set of Post-Judgment Interrogatories to A.J. Brass in Aid of Collecting Its Judgment, GCAC v. Vitol v. A.J. Brass and Trifinery, dated November 25, 2020 |
| BK-VITOL_0000999 | Judgment-Creditor Vitol's First Set of Requests for Production and First Set of Post-Judgment Interrogatories to GCAC in Aid of Collecting Its Judgment, GCAC v. Vitol v. A.J. Brass and Trifinery, dated November 25, 2020 |
| BK-VITOL_0001011 | GCAC's Responses to Defendant's Request For Production and Interrogatories, GCAC v. Vitol v. A.J. Brass and Trifinery, dated December 23, 2020 |
| BK-VITOL_0001027 | Email correspondence between Reed Smith and the Gerber Law Firm regarding the Vitol/GCAC Agreed Judgment, dated February 2021 |
| BK-VITOL_0001044 | Email correspondence between Reed Smith and the Gerber Law Firm regarding the Vitol/GCAC Agreed Judgment, dated March 2021 |
| BK-VITOL_0001060 | Email correspondence from Reed Smith to the Gerber Law Firm regarding the Vitol/Brass LP Charging Order, dated February 25, 2021 |
| BK-VITOL_0001061 | Order Granting Vitol Inc.'s Motion for Entry of Charging Order on Arthur J. Brass's Partnership Interests in Limited Partnerships, GCAC v. Vitol v. A.J. Brass and Trifinery, dated February 10, 2021 |
| BK-VITOL_0001063 | Email correspondence from Reed Smith to A.J. Brass regarding Vitol/Brass/GCAC Order Granting Motion to Compel, dated February 5, 2021 |
| BK-VITOL_0001064 | Order Granting Vitol Inc.'s Post-Judgment Motion to Compel, GCAC v. Vitol, dated February 3, 2021 |
| BK-VITOL_0001066 | Answer to Writ of Garnishment, Vitol v. A.J. Brass, GCAC, Trifinery, Inc. and Cadence Bank, dated January 27, 2021 |
| BK-VITOL_0001096 | Email correspondence from Reed Smith to the Gerber Law Firm regarding document discovery and payment of settlement, dated March 9, 2021 |
| BRASS000050-90 | Brass IBC Bank Statements, June 2017-August 2018 |
| BRASS000091 | Invoice from Byer Builders to A.J. and Katie Brass dated August 1, 2017 and related documentation |
| Corpus Chrisit Case against GCAC | Plaintiff's Third Amended Original Petition in the case of Superior Crude Gathering, Inc. v. Gulf Coast Crude Gathering & Marketing, LLC, Gulf Coast Asphalt Company, LLC And Arthur J. Brass dated June 24, 2019 |
| GCAC 009511-20 | Account 1250 and 1270 Detail from GCAC General Ledger for the Period from January 1, 2015 to June 30, 2019 |
| GCAC 009845- GCAC 010078 | GCAC Bank Statements and Account Reconciliations, July 2017-July 2018 |
| GCAC000001 | Marketing Agreement between Mercuria Energy Trading, Inc. and Gulf Coast Asphalt Company, LLC dated January 2018 |
| GCAC000257 | Presentation to Vitol Regarding GCAC/Rio Asphalt Business dated May 16, 2017 |
| GCAC000266 | Assumed Vitol and GCAC Costs in the Joint Book |
| GCAC000271 | GCAC/Vitol Analysis Assumed Vitol and GCAC Costs in the Joint Book, Altercation for Vitol Counter Proposal on May 23 |
| GCAC000272 | GCAC/Vitol Analysis Assumed Vitol and GCAC Costs in the Joint Book, Analysis of Profitability to Vitol under Vitol Counter Proposal dated May 23 |
| GCAC000273 | Vitol May 23 Proposal |
| GCAC000274 | GCAC May 24 Counter Offer |

Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| GCAC000277 | Asphalt Venture - Simple Econs Spreadsheet |
| GCAC001216 | Email from Ernie Kohnke to Dave Hubenak on Revised Joint Marketing Agreement dated July 12, 2017 |
| GCAC001217 | Redlined Joint Marketing Agreement between Vitol, Inc. and NewCo. dated July 2017 |
| GCAC004631 | Email from Eric Kuo to Patrick Perugini on 2 deals dated August 15, 2017 |
| GCAC004666 | Email from Patrick Perugini to Eric Kuo on Hedge Price dated August 18, 2017 |
| GCAC004694 | Email from Arthur Brass to Eric Kuo on Vitol Interim Financial Structure dated August 21, 2017 |
| GCAC004695 | Vitol/GCAC Interim Transaction |
| GCAC005167 | Email from Eric Kuo to Patrick Perugini on Valt sale out of Rio Inventory dated September 15, 2017 |
| GCAC005427 | Email from Eric Kuo to Patrick Perugini on exxon purchase dated September 25, 2017 |
| GCAC005439 | Email from Eric Kuo to Patrick Perugini on Valt two deals out of Rio Inventory dated September 25, 2017 |
| GCAC005591 | Email from Eric Kuo to Patrick Perugini on GCAC Sale to valt out Rio Inventory dated October 2, 2017 |
| GCAC005727 | Email from Eric Kuo to Patrick Perugini and Arthur Brass on Sale of GCAC out of Rio dated October 11, 2017 |
| GCAC005781 | Email from Eric Kuo to Patrick Perugini on exxon purchase dated October 16, 2017 |
| GCAC006107 | Email from Eric Kuo to Patrick Perugini on Vitol buys davison dated November 2, 2017 |
| GCAC006121 | Email from Eric Kuo to Patrick Perugini on Citgo and Phillips purchases dated November 3, 2017 |
| GCAC006224 | Email from Eric Kuo to Patrick Perugini on deal recap dated November 16, 2017 |
| GCAC006719 | Email from Patrick Perugini to Eric Kuo on Confirmation of the deal dated December 8, 2017 |
| GCAC007237 | Email from Eric Kuo to Patrick Perugini on 2 deals out of Rio Inventory dated January 11, 2018 |
| GCAC009509 | Rio P&L through December 2016 |
| GCAC009510 | Rio P&L July 2017 |
| GCAC009845 | GCAC General Ledger |
| GCAC010095 | Account statements and tax documents for GCAC, 2017-2018 |
| January 25, 2019 Charter Forfeiture | Hermosa Energy LLC Certificate of Forfeiture dated January 25, 2019 |
| July 3, 2017 Hermosa Energy LLC Certificate of Formation | Hermosa Energy LLC Certificate of Formation dated July 3, 2017 |
| 11-Nov | Cadence Bank statement for A.J. and Catherine Brass account 2609, November 2019 |
| 12-Dec | Cadence Bank statement for A.J. and Catherine Brass account 2609, December 2021 |
| 10-Oct | Cadence Bank statement for A.J. Brass and Hallie Brass account 4737, October 2019 |
| 10-Oct | Cadence Bank statement for A.J. Brass and Hallie Brass account 4737, October 2021 |
| 10-Oct | Cadence Bank statement for A.J. Brass and Diana Brass account 4919, October 2019 |
| 12-Dec | Cadence Bank statement for A.J. Brass and Diana Brass account 4919, December 2021 |
| 6-Jun | Cadence Bank statement for GCAC account 5961, June 2020 |
| 9-Sep | Cadence Bank statement for GCAC account 5961, September 2021 |
| 10-October | Cadence Bank statement for Catherine Brass real estate account 9550, October 2020 |
| 13-State | Cadence Bank statement for Catherine Brass real estate account 9550, December 2021 |
| VCB000014-22 | Personal financial statements for A.J. Brass, March 17, 2017 |

Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| VCB000023-27 | Personal financial statements for A.J. Brass, August 9, 2018 |
| VCB000597-598 | Notice of Federal Tax Lien for A.J. and Catherine Brass, March 5, 2020 |
| VCB000599-600 | Notice of Federal Tax Lien for A.J. and Catherine Brass, October 31, 2018 |
| VCB001174-176 | Veritex Bank statement for GCAC sales account, June 2020 |
| VCB001181-186 | Veritex Bank statement for GCAC sales account, August 2019 |
| VCB001251-253 | Veritex Bank statement for GCAC operating account, June 2020 |
| VCB001262-263 | Veritex Bank statement for GCAC operating account, August 2019 |
| VCB001360-361 | Veritex Bank statement for GCAC payroll account, May 2020 |
| VCB001368-369 | Veritex Bank statement for GCAC payroll account, September 2019 |
| VITOL_00000047 | Email correspondence between Vitol and GCAC regarding amount due Vitol, dated February 2018 |
| VITOL_00000120 | Email correspondence between Vitol and GCAC regarding amount due Vitol, dated February 2018 |
| VITOL_00000194 | Email correspondence from A.J. Brass to Vitol regarding interim balance due Vitol, dated February 2018 |
| VITOL_00000221 | Email correspondence from A.J. Brass to Vitol regarding balance due Vitol, dated February 26, 2018 |
| VITOL_00000228 | Email from Arthur Brass to Eric Kuo on Vitol PP GCAC Splits dated May 19, 2017 |
| VITOL_00000229 | Vitol PP GCAC Splits dated May 19, 2017 |
| VITOL_00000234 | Email from Arthur Brass to Eric Kuo on Revised JSMA Structure dated May 23, 2017 |
| VITOL_00000300 | Email from Arthur Brass to Nick Fay on Profitability Analysis dated August 3, 2017 |
| VITOL_00000304 | Pro Forma Analysis with Summary Projections dated August 3, 2017 |
| VITOL_00000326 | Schedule of total product costs and reconciliation of amount due Vitol |
| VITOL_00000358 | Email correspondence between Vitol and GCAC regarding amount due Vitol, dated February 2018 |
| VITOL_00000377 | Email correspondence between Vitol and GCAC regarding amount due Vitol, dated February 2018 |
| VITOL_00002116 | Email correspondence between Vitol and GCAC regarding amount due Vitol, dated February 2018 |
| VITOL_00002127 | Email from Eric Kuo to Jason Goldstein on GCAC 1st pass settlement with attached 1st pass settlement file dated January 25, 2018 |
| VITOL_00004187 | Email from Steve Barth to AJ Brass on joint venture talking points dated November 17, 2016 |
| VITOL_00004188 | Vitol/GCAC Transaction Overview dated November 2016 |
| VITOL_00004222 | Email correspondence from Vitol to GCAC regarding Vitol product sales to GCAC, dated February 5, 2018 |
| VITOL_00004228_Production003_20190320 | Email correspondence between Vitol and GCAC regarding support for deal related costs and amount due Vitol, dated February 2018 |
| VITOL_00004261_Production001_20190207 | Email correspondence between Vitol and GCAC regarding support for deal related costs and amount due Vitol, dated February 2018 |
| VITOL_00004452 | Email from Jason Goldstein to Steve Barth on Corpus Proposal thoughts dated November 28, 2016 |
| VITOL_00004522_Production003_20190320 | Email correspondence from Vitol to GCAC regarding Vitol cost sheet, dated March 26, 2018 |
| VITOL_00004917 | Email from Steve Barth to AJ Brass on Redline Joint Marketing Agreement dated June 2, 2017 |
| VITOL_00004918 | Amended and Restated Joint Marketing Agreement between Vitol and GCAC dated May 2017 |
| VITOL_00004947 | Email from Jason Goldstein to Eric Kuo on Trade Team Salaries and Benefits dated June 30, 2017 |
| VITOL_00004948 | Trade Team Salaries and Benefits dated June 30, 2017 |
| VITOL_00006592_Production001_20190207 | Email correspondence between Vitol and GCAC regarding support for deal related costs and amount due Vitol, dated February 2018 |
| VITOL_00008558 | Email from Jason Goldstein to Eric Kuo on Vitol Asphalt Book Splits dated May 25, 2017 |
| VITOL_00008559 | Vitol Asphalt Book Splits dated May 25, 2017 |

002149

Expert Report of Gene L. Deetz April 1, 2022
Appendix II - Documents Considered

| File Name | Document Description |
|---|---|
| VITOL_00072709 | Email from Steve Barth to Jason Goldstein on existing offer dated April 13, 2017 |
| VITOL_00073451 | Email from Steve Barth to Steve Bake on USGC Asphalt dated May 10, 2017 |
| VITOL_00075082 | Email from Steve Barth to Mike Loya on GCAC dated June 10, 2015 |
| VITOL_00078837 | Email from Steve Barth to AJ Brass as follow up to meeting dated March 2, 2015 |
| VITOL_00078947 | Email from Steve Barth to Ernie Kohnke on executed JSMA dated May 10, 2017 |
| VITOL_00078949 | Joint Marketing Agreement between Rio Energy International, Inc. and Gulf Coast Asphalt Company dated February 2016 |
| VITOL_00080111 | Internal email correspondence at Vitol regarding GCAC payments, dated January 2018 |
| VITOL_00080066 | GCAC Costs by Deal |
| VITOL_00084993 | GCAC Hedges - Futures/Swaps, July 2017 to February 2018 |
| VITOL_00084994 | Schedule of GCAC hedges - futures/swaps, July 2017-February 2018 |
| VITOL_00001979 | Email from Eric Kuo to AJ Brass on GCAC sheet dated April 10, 2018 |
| VITOL_00001980 | GCAC Costs by Deal |
| Vitol_125 | Email from Vitol to A.J. Brass with attached draft Vitol Promissory Note, dated April 23, 2018 |
| Vitol_4612 | Email correspondence between Vitol and A.J. Brass regarding $3.7 million payment, dated December 2017 |
| VITOL_9572 | Email from Ernie Kohnke to Dave Hubenak on Revised Joint Marketing Agreement dated July 12, 2017 |
| Vitol_76042 | Email correspondence between Vitol and GCAC regarding Vitol invoices and receipt of $4 million payment from GCAC, dated November 2017 |
| Vitol_00009562 | Email from Jason Goldstein to Steve Barth on Discussion Doc dated June 27, 2017 |
| Vitol_00007640 | Email from Steve Barth to Jason Goldstein on Vitol/NewCo deal dated July 5, 2017 |
| VITOL_00003093 | Email correspondence between Vitol and GCAC regarding support for Vitol costs for deals 1-20, dated March 2018 |
| VITOL_00003097 | Email attachment of invoices and related documentation in support of Vitol costs for deals 1-20 |
| VITOL_00006791 | Email correspondence between Vitol and GCAC regarding support for Vitol costs for deals 21-33, dated March 2018 |
| VITOL_00006795 | Email attachment of invoices and related documentation in support of Vitol costs for deals 21-33 |
| VITOL_00010074 | Email correspondence between Vitol and GCAC regarding support for Vitol costs for deals 34-41, dated March 2018 |
| VITOL_00010079 | Email attachment of invoices and related documentation in support of Vitol costs for deals 34-41 |
| VITOL_00007545 | Email correspondence between Vitol and GCAC regarding support for Vitol costs for deals 42-50, dated March 2018 |
| VITOL_00007550 | Email attachment of invoices and related documentation in support of Vitol costs for deals 42-50 |
| BK-VITOL_0000022_First settlement | Confidential Settlement Agreement and Mutual Global Release, GCAC v. Vitol v. A.J. Brass and Trifinery, dated October 2020 |
| VITOL_00000475_14.9M Settlement proposal | Email from A.J. Brass to Vitol regarding settlement proposal, dated April 13, 2018 |
| ArthurJBrass_PDFTran | Deposition of Arthur J. Brass dated March 25, 2022 and related exhibits |

**Other Documents**

| | |
|---|---|
| 11 U.S. Code § 101 - Definitions | Definitions of Terms in 11 U.S. Code |
| 11 U.S.C. § 548 – Fraudulent transfers and obligations | 11 U.S.C. § 548 – Fraudulent transfers and obligations |
| AICPA Forensic & Valuation Services Practice Aid - 2020 | AICPA Forensic & Valuation Services Practice Aid Providing Bankruptcy and Reorganization Services, Vol. 2 — Valuation in Bankruptcy |

002150

**Expert Report of Gene L. Deetz April 1, 2022**
**Appendix II - Documents Considered**

| File Name | Document Description |
|---|---|
|  |  |
| Uniform Voidable Transactions Act | 2014 Uniform Voidable Transactions Act (As Amended in 2014) |
| Vitol and Sargeant Marine's new asphalt business VALT launches today article | "Vitol and Sargeant Marine's new asphalt business VALT launches today" article dated February 29, 2016 |
| Rio Energy Website https://www.rioenergy.com/#!/about | About Rio Energy website https://www.rioenergy.com/#!/about |

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

| Exhibit 1 - Unadjusted Monthly GCAC Balance Sheets | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sources: | [A] [B] | [B] | [B] | [B] | [B] | [B] | [A] [B] | [B] |
| | June 2017 | July 2017 | August 2017 | September 2017 | October 2017 | November 2017 | December 2017 | January 2018 |
| Cash | $ (82,196) | $ (4,786) | $ 2,645,017 | $ 20,646 | $ 3,439,512 | $ 2,747,408 | $ 4,623,136 | $ 3,581,706 |
| Accounts Receivable Trade | 1,233,304 | 3,386,865 | 2,913,754 | 6,292,708 | 7,270,799 | 8,039,853 | 712,898 | 532,855 |
| Accounts Receivable Trade Accrued | 246,940 | 246,940 | 246,940 | 246,940 | 246,940 | 246,940 | 7,855,784 | |
| Accounts Receivable Employees | 429,915 | 429,785 | 429,785 | 429,785 | 429,785 | 439,385 | 392,946 | 385,046 |
| Accounts Receivable Trifinery Inc | (54,144) | (54,144) | (54,144) | (54,144) | (54,144) | (54,144) | (54,144) | (54,144) |
| Accrued Interest Receivable | 52,100 | 52,100 | 52,100 | 4,507 | 4,507 | 4,507 | - | - |
| Due From Shareholders | (712,635) | (827,635) | (154,898) | (84,648) | 367,352 | 658,352 | 2,998,569 | 3,363,569 |
| Prepaid | 7,698 | 13,229 | 18,760 | 30,659 | 36,748 | 42,578 | 6,995 | 32,289 |
| **Total Current Assets** | **1,120,983** | **3,242,355** | **6,097,314** | **6,886,454** | **11,741,500** | **12,124,880** | **16,536,184** | **7,841,321** |
| | | | | | | | | |
| Deposits & Bonds | 112,000 | 112,000 | 112,000 | 112,000 | 112,000 | 112,000 | 32,000 | 32,000 |
| Investments in Arc Terminals | 930,726 | 930,726 | 930,726 | 580,726 | 580,726 | 580,726 | - | - |
| Investments/Loan GCAC Holdings | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 |
| Investment Gulf Coast Crude | 2,430,117 | 2,430,117 | 2,435,937 | 2,437,087 | 2,437,087 | 2,437,087 | 2,437,087 | 2,437,087 |
| Investment AJ Bullet | 37,871 | 37,901 | 37,901 | 38,296 | 38,937 | 39,347 | 39,347 | 44,108 |
| Deferred Debit | - | - | 141,313 | 1,938,515 | 1,938,515 | 6,544,997 | - | - |
| Goodwill | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 300,000 | 300,000 |
| **Total Other Assets** | **8,044,467** | **8,044,497** | **8,191,629** | **9,640,376** | **9,641,017** | **14,247,910** | **6,992,187** | **6,996,947** |
| | | | | | | | | |
| **Total Assets** | **$ 9,165,450** | **$ 11,286,852** | **$ 14,288,944** | **$ 16,526,830** | **$ 21,382,517** | **$ 26,372,790** | **$ 23,528,371** | **$ 14,838,268** |
| | | | | | | | | |
| Accounts Payable Trade | $ 2,990,493 | $ 3,565,294 | $ 3,681,184 | $ 3,271,058 | $ 2,615,048 | $ 1,679,686 | 8,934,401 | 30,540 |
| Accounts Payable Accrued | - | - | - | - | - | - | 8,934,401 | 30,540 |
| Accounts Payable Contingent Liability | 166,619 | - | - | - | - | - | 14,866,973 | 14,866,973 |
| Deferred Credit | 210,685 | 1,933,173 | 4,973,048 | 7,929,855 | 13,501,080 | 19,200,506 | - | - |
| **Total Current Liabilities** | **3,367,797** | **5,498,467** | **8,654,232** | **11,200,913** | **16,116,128** | **20,880,192** | **25,281,336** | **16,185,671** |
| | | | | | | | | |
| Member Shareholder Loan | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| **Total Long Term Debt** | **240,000** | **240,000** | **240,000** | **240,000** | **240,000** | **240,000** | **240,000** | **240,000** |
| | | | | | | | | |
| **Total Liabilities** | **3,607,797** | **5,738,467** | **8,894,232** | **11,440,913** | **16,356,128** | **21,120,192** | **25,521,336** | **16,425,671** |
| | | | | | | | | |
| Retained Earnings | 8,605,846 | 8,605,846 | 8,605,846 | 8,605,846 | 8,605,846 | 8,605,846 | 8,605,846 | (1,992,965) |
| Net Income | (3,048,192) | (3,057,461) | (3,211,134) | (3,519,929) | (3,579,457) | (3,353,247) | (10,598,811) | 405,562 |
| Distributions | - | - | - | - | - | - | - | - |
| **Total Members' Equity** | **5,557,653** | **5,548,384** | **5,394,711** | **5,085,916** | **5,026,389** | **5,252,598** | **(1,992,965)** | **(1,587,403)** |
| | | | | | | | | |
| **Total Liabilities & Equity** | **$ 9,165,450** | **$ 11,286,852** | **$ 14,288,944** | **$ 16,526,830** | **$ 21,382,517** | **$ 26,372,790** | **$ 23,528,371** | **$ 14,838,268** |

Sources:
[A] EEPB-00000174.
[B] GCAC009845.

002152

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

| Exhibit 1.1 - Base Case: Adjusts GCAC's Net Assets to Write-off Investments/Loan Accounts | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 30-Jun-17 | 31-Jul-17 | 31-Aug-17 | 30-Sep-17 | 31-Oct-17 | 30-Nov-17 | 31-Dec-17 | 31-Jan-18 | Sources | Notes |
| Net Assets (Total Assets less Total Liabilities) | $ 5,557,653 | $ 5,548,384 | $ 5,394,711 | $ 5,085,916 | 5,026,389 | 5,252,598 | (1,992,965) | (1,587,403) | [A][B] | |
| **Adjustments to Net Assets** | | | | | | | | | | |
| **Write-off Amount Recorded as:** | | | | | | | | | | |
| Investments/Loan GCAC Holdings | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | [A][B] | [1] |
| Investment Gulf Coast Crude | (2,430,117) | (2,430,117) | (2,435,937) | (2,437,087) | (2,437,087) | (2,437,087) | (2,437,087) | (2,437,087) | [A][B] | [1] |
| Investment AJ Bullet | (37,871) | (37,901) | (37,901) | (38,296) | (38,937) | (39,347) | (39,347) | (44,108) | [A][B] | [1] |
| Subtotal | (6,651,741) | (6,651,771) | (6,657,591) | (6,659,135) | (6,659,777) | (6,660,187) | (6,660,187) | (6,664,947) | Calc. | |
| **Adjusted Net Assets** | $ (1,094,088) | $ (1,103,386) | $ (1,262,879) | $ (1,573,219) | $ (1,633,387) | $ (1,407,588) | $ (8,653,152) | $ (8,252,350) | Calc. | |
| **Net Amounts Transferred and Recorded in the Loan Accounts for Arthur and Joyce:** | | | | | | | | | | |
| Amounts Transferred | | $ - | $ (687,737) | $ (70,250) | $ (452,000) | $ (296,000) | $ (2,345,335) | (365,000) | [B][C] | [2] |
| Amounts Repaid | | 115,000 | 15,000 | - | - | 5,000 | 5,118 | - | [B][C] | [2] |
| Subtotal | | 115,000 | (672,737) | (70,250) | (452,000) | (291,000) | (2,340,217) | (365,000) | Calc. | |
| **Cumulative Net Amounts Transferred** | | | $ (557,737) | $ (627,987) | $ (1,079,987) | $ (1,370,987) | $ (3,711,204) | $ (4,076,204) | Calc. | |

Sources:
[A] EEPB-00000174.
[B] GCAC009845.
[C] GCAC009511-20.

Notes:

[1] These entities appear to be non-operating as they have minimal assets if any, negative net assets, zero revenues, and losses. Therefore I have removed these investments/loans from GCAC's balance sheet as these related parties do not appear to have the ability to repay any of these amounts to GCAC if they are treated as loans, and if they are accounted for as investments they appear worthless. See Deetz Exhibits 4, 5, and 6 for an analysis of these entities.

[2] During the period of June 30, 2017 through January 31, 2018 the Arthur and Joyce loan accounts (net amounts transferred from GCAC) increased by $4,076,204. During this same time period, the gross amounts transferred to Arthur and Joyce were $4,216,322, and payments back to GCAC were $140,118. See Deetz Exhibit 3 for further analysis of these loan accounts.

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

**Exhibit 1.2 - Sensitivity Case: Adjusts GCAC's Net Assets to Write-off Investments/Loan Accounts and Adjusts $14.8 million in Accounts Payable Contingent Liabilities to Vitol's $10 million Judgment**

| | 30-Jun-17 | 31-Jul-17 | 31-Aug-17 | 30-Sep-17 | 31-Oct-17 | 30-Nov-17 | 31-Dec-17 | 31-Jan-18 | Sources | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Assets (Total Assets less Total Liabilities) | $ 5,557,653 | $ 5,548,384 | $ 5,394,711 | $ 5,085,916 | $ 5,026,389 | $ 5,252,598 | $ (1,992,965) | $ (1,587,403) | [A][B] | |
| **Adjustments to Net Assets** | | | | | | | | | | |
| **Write-off Amount Recorded as:** | | | | | | | | | | |
| Investments/Loan GCAC Holdings | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | (4,183,753) | [A][B] | |
| Investment Gulf Coast Crude | (2,430,117) | (2,430,117) | (2,435,937) | (2,437,087) | (2,437,087) | (2,437,087) | (2,437,087) | (2,437,087) | [A][B] | |
| Investment AJ Bullet | (37,871) | (37,901) | (37,901) | (38,296) | (38,937) | (39,347) | (39,347) | (44,108) | [A][B] | |
| Subtotal | (6,651,741) | (6,651,771) | (6,657,591) | (6,659,135) | (6,659,777) | (6,660,187) | (6,660,187) | (6,664,947) | Calc. | |
| **Replace Accounts Payable Contingent Liability with $10m Vitol Judgment** | | | | | | | | | | |
| Addback - Total Accounts Payable Contingent Liability | | | | | | | 14,866,973 | 14,866,973 | [A][B] | |
| Replace with $10 million Vitol Judgment | | | | | | | (10,000,000) | (10,000,000) | [C] | [1] |
| Subtotal | | | | | | | 4,866,973 | 4,866,973 | Calc. | |
| **Adjusted Net Assets** | $ (1,094,088) | $ (1,103,386) | $ (1,262,879) | $ (1,573,219) | $ (1,633,387) | $ (1,407,588) | $ (3,786,179) | $ (3,385,377) | Calc. | |

Sources:
[A] EEPB-00000174.
[B] GCAC009845.
[C] November 20, 2020 Agreed and Final Judgment for Vitol resolving all matters and disposing of all issues in the Harris County District Court litigation Cause No. 2018-31578.

Notes:
[1] Included in GCAC's December 31, 2017 and January 31, 2018 balance sheet is a $14.8 million accrual for remaining unpaid product cost and other transaction costs as calculated by Vitol. I have replaced these accrued costs with the final agreed judgment in favor of Vitol of $10 million.

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

| Exhibit 2 - Actual and Adjusted – GCAC's Monthly and Cumulative Income Before Taxes | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 30-Jun-17 | 31-Jul-17 | 31-Aug-17 | 30-Sep-17 | 31-Oct-17 | 30-Nov-17 | 31-Dec-17 | 31-Jan-18 | Sources | Notes |
| **Income Statement - Actual** | | | | | | | | | | |
| Per month Income / (Loss) before taxes | $ - | $ (9,269) | $ (153,673) | $ (308,795) | $ (59,528) | $ 226,209 | $ (7,245,564) | $ 405,562 | [A][B] | |
| **Cumulative Income / (Loss) before taxes from January 2017** | $ (3,048,192) | $ (3,057,461) | $ (3,211,134) | $ (3,519,929) | $ (3,579,457) | $ (3,353,247) | $ (10,598,811) | $ (10,193,249) | Calc. | [1] |
| **Income Statement - Adjusted** | | | | | | | | | | |
| Per month Income / (Loss) before taxes | | $ (9,269) | $ (153,673) | $ (308,795) | $ (59,528) | $ 226,209 | $ (7,245,564) | $ 405,562 | [A][B] | |
| Exhibit 1.2 Sensitivity Case Adjustment | | | | | | | 4,866,973 | | Deetz Exhibit 1.2 | |
| Adjusted - Per month Income / (Loss) before taxes | $ - | $ (9,269) | $ (153,673) | $ (308,795) | $ (59,528) | $ 226,209 | $ (2,378,591) | $ 405,562 | Calc. | |
| **Adjusted - Cumulative Income / (Loss) before taxes from January 2017** | $ (3,048,192) | $ (3,057,461) | $ (3,211,134) | $ (3,519,929) | $ (3,579,457) | $ (3,353,247) | $ (5,731,838) | $ (5,326,276) | Calc. | |

Sources:
[A] GCAC009845.
[B] EEPB-00000175.

Notes:
[1] The monthly loss from January 2017 through June 2017 is as follows:

| | | |
|---|---|---|
| January | $ (1,214,751) | |
| February | (434,257) | |
| March | (400,632) | |
| April | (485,332) | |
| May | (503,086) | |
| June | (7,795) | |
| Difference | (2,337) | June 2017 Prepared Balance Sheet vs. General Ledger |
| Rounding | (2) | |
| **Total** | **$ (3,048,192)** | [B] |

002155

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

| | | **Exhibit 3: Summary of GCAC's General Ledger Accounts 1250-Loan AJ Brass, and 1270-Loan Joyce Brass** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Year** | **Activity Period** | **Account 1250-AJ Brass** | | | | **Account 1270-Joyce Brass** | | | | **Total** | Sources | Notes |
| | | Loans | Repayments | Balance | | Loans | Repayments | Balance | | Loan Balance | | |
| 1/1/2015 | | $ - | $ - | $ - | | $ - | $ - | $ - | | $ - | | [1] |
| 2015 | 1/1-6/30 | 1,635,045 | (150,000) | 1,485,045 | | 136,757 | - | 136,757 | | 1,621,802 | [A] | |
| 2015 | 7/1-12/31 | 1,000,000 | (500,000) | 1,985,045 | | - | (49,160) | 87,597 | | 2,072,642 | [A] | |
| 2016 | 1/1-6/30 | 1,462,648 | (1,330,000) | 2,117,693 | | - | - | 87,597 | | 2,205,290 | [A] | |
| 2016 | 7/1-12/31 | 166,000 | (952,000) | 1,331,693 | | - | - | 87,597 | | 1,419,290 | [A] | |
| 2017 | 1/1-6/30 | 836,975 | (2,968,000) | (799,332) | | - | (900) | 86,697 | | (712,635) | [A][B] | |
| **Account Balance at 6/30/2017** | | **5,100,668** | **(5,900,000)** | **(799,332)** | | **136,757** | **(50,060)** | **86,697** | | **(712,635)** | Calc. | |
| **Activity from 7/1-12/31 2017** | | **3,031,322** | **(140,118)** | **2,891,204** | | **820,000** | **-** | **820,000** | | **3,711,204** | [A][B] | [2][3][4] |
| **Account Balance at 12/31/2017** | | **$ 8,131,990** | **$ (6,040,118)** | **$ 2,091,872** | | **$ 956,757** | **$ (50,060)** | **$ 906,697** | | **$ 2,998,569** | Calc. | |
| 2018 | 1/1-6/30 | 1,592,020 | - | 3,683,892 | | 689,749 | - | 1,596,445 | | 5,280,338 | [A] | [4] |
| 2018 | 7/1-12/31 | 1,141,000 | (130,000) | 4,694,892 | | 105,000 | (150,000) | 1,551,445 | | 6,246,338 | [A] | [4] |
| 2019 | 1/1-6/30 | 1,181,552 | (110,000) | 5,766,444 | | 250,000 | (240,000) | 1,561,445 | | 7,327,889 | [A] | |
| **Account Balance at 6/30/2019** | | **$ 12,046,562** | **$ (6,280,118)** | **$ 5,766,444** | | **$ 2,001,505** | **$ (440,060)** | **$ 1,561,445** | | **$ 7,327,889** | Calc. | |

Source:
[A] GCAC 009511-20.
[B] GCAC009845.

Notes:
[1] On the balance sheet of GCAC there is an additional liability account #3613 - Member Shareholder Loan in the amount of $240,000.

[2] In the month of January 2018 GCAC made four additional transfers recorded as loans to Arthur totaling $325,000, and made an additional transfer recorded as a loan to Joyce of $40,000.  There were no repayments in January 2018.

[3] The total net amounts transferred from July 2017 through January 2018 is $4,076,204.  See Deetz Exhibit 1.1.  This is the 6-month ending December 31, 2017 activity of $3,711,204 plus $365,000 in January 2018.

[4] The general ledger produced to me in this matter cover the periods from July 1, 2017 through July 31, 2018 and includes all of the detailed transactions impacting Arthur's and Joyce's loan accounts.  I have confirmed that each journal entry from 7/1/2017 through 7/31/2018 reflects a cash transaction with a net cash outflows through June 30, 2018 of $5,992,973.

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

| Exhibit 4: Non-operating GCAC Entities - Summary of Assets and Liabilities | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | GCAC Holdings | Gulf Crude Gathering | AG Bullet | Sources | Notes | GCAC Holdings | Gulf Crude Gathering | AG Bullet | Sources |
| **Total Assets** | | | | [A] | | | | | |
| January 2017 | $ 3,436 | $ 211 | $ 3,370 | | | | | | |
| February 2017 | - | 211 | 3,370 | | | | | | |
| March 2017 | - | 211 | 3,370 | | | | | | |
| April 2017 | - | 211 | 3,370 | | | | | | |
| May 2017 | - | 211 | 3,370 | | | | | | |
| June 2017 | - | 17,838 | 6,041 | | | | | | |
| December 2017 | - | 168 | 6,336 | | | | | | |
| December 2018 | - | 168 | 6,041 | [B] | | | | | |
| **Total Liabilities** | | | | [A] | | | Investments/Loans due to GCAC included in Total Liabilities | | [A] |
| January 2017 | (4,187,189) | (4,735,523) | (37,831) | | [1] | (4,187,189) | (2,108,804) | (37,831) | |
| February 2017 | (4,183,753) | (4,736,597) | (37,831) | | | (4,183,753) | (2,109,878) | (37,831) | |
| March 2017 | (4,183,753) | (4,736,597) | (38,576) | | | (4,183,753) | (2,109,878) | (37,831) | |
| April 2017 | (4,183,753) | (4,736,597) | (38,576) | | | (4,183,753) | (2,109,878) | (37,831) | |
| May 2017 | (4,183,753) | (4,736,597) | (38,576) | | | (4,183,753) | (2,109,878) | (37,831) | |
| June 2017 | (4,183,753) | (5,018,240) | (39,404) | | | (4,183,753) | (2,430,117) | (37,831) | |
| December 2017 | (4,183,753) | (5,026,470) | (40,092) | | | (4,183,753) | (2,437,087) | (39,347) | |
| December 2018 | (4,183,753) | (5,026,470) | (58,973) | [B] | | (4,183,753) | (2,437,087) | (58,973) | [B] |

Source:
[A] EEPB-00000174.
[B] EEPB-00000181.

Notes:
[1] GCAC Crude Gathering and AG Bullet have accrued liabilities in addition to intercompany debt payable to GCAC, and GCAC Crude Gathering has $1.5 million of prepaid sales recorded as a liability.

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

| Exhibit 5: Non-operating GCAC Entities - Summary of Monthly Losses | | | | | |
|---|---|---|---|---|---|

| | GCAC Holdings | Gulf Crude Gathering | AG Bullet | Sources | Notes |
|---|---|---|---|---|---|
| **Monthly Income/(Losses) Before Taxes** | | | | [A] | |
| January 2017 | $    - | $    - | $  (3,669) | | |
| February 2017 | - | (1,075) | - | | |
| March 2017 | - | - | (745) | | |
| April 2017 | - | - | - | | |
| May 2017 | - | - | - | | |
| June 2017 | - | (264,016) | 1,844 | | |
| **January through June 2017** | **$    -** | **$  (265,091)** | **$  (2,570)** | [A] | Calc. |
| | | | | | |
| **January through December 2017** | **$    -** | **$  (290,991)** | **$  (2,964)** | [A] | |

Source:
[A] EEPB-00000175.

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

| Exhibit 6: Non-operating GCAC Entities - Summary of Revenues and Expenses | | | | | |
|---|---|---|---|---|---|

| | GCAC Holdings | Gulf Crude Gathering | AG Bullet | Sources | Notes |
|---|---|---|---|---|---|
| **Monthly Revenues** | | | | [A] | |
| January 2017 | $ - | $ - | $ - | | |
| February 2017 | - | - | - | | |
| March 2017 | - | - | - | | |
| April 2017 | - | - | - | | |
| May 2017 | - | - | - | | |
| June 2017 | - | - | - | | |
| **January through June 2017** | **-** | **-** | **-** | [A] | Calc. |
| **January through December 2017** | **$ -** | **$ -** | **$ -** | [A] | |
| **Monthly Expenses** | | | | [A] | |
| January 2017 | $ - | $ - | $ (3,669) | | |
| February 2017 | - | (1,075) | - | | |
| March 2017 | - | - | (745) | | |
| April 2017 | - | - | - | | |
| May 2017 | - | - | - | | |
| June 2017 | - | (264,016) | 1,844 | | |
| **January through June 2017** | **$ -** | **$ (265,091)** | **$ (2,570)** | [A] | Calc. |
| **January through December 2017** | **$ -** | **$ (290,991)** | **$ (2,964)** | [A] | |

Source:
[A] EEPB-00000175.

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

| | Exhibit 7: GCAC's Cash Sales and Payments for Product Inventory from July 2017 through January 2018 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual Vitol/ GCAC Transactions | | | | | | | But-For Vitol/ GCAC Transactions | | | | |
| Month | Beginning Cash Balance | Cash Sales | Product Inventory When Paid | Net Distributions to Arthur and Joyce | Other Sources/(Uses) of Cash | Ending Cash Balance | Month | Beginning Cash Balance | Cash Sales | Product Inventory When Incurred | Net Distributions to Arthur and Joyce | Other Sources/(Uses) of Cash | Ending Cash Balance |
| Sources: | [A] | [A] | [A] | Deetz Exhibit 1.1 | [A] | [A] | | [A] | [A] | [2] | Deetz Exhibit 1.1 | [A] | [A] |
| Notes: | | | | [1] | | | | | | | [1] | | |
| July 2017 | (82,196) | 285,063 | - | 115,000 | (322,653) | (4,786) | July 2017 | (82,196) | 285,063 | (207,393) | 115,000 | (322,653) | (212,178) |
| August 2017 | (4,786) | 3,039,874 | - | (672,737) | 282,666 | 2,645,017 | August 2017 | (212,178) | 3,039,874 | (2,211,608) | (672,737) | 282,666 | 226,017 |
| September 2017 | 2,645,017 | - | (1,690,065) | (70,250) | (864,056) | 20,646 | September 2017 | 226,017 | - | - | (70,250) | (864,056) | (708,289) |
| October 2017 | 20,646 | 4,806,272 | (107,137) | (452,000) | (828,269) | 3,439,512 | October 2017 | (708,289) | 4,806,272 | (3,496,720) | (452,000) | (828,269) | (679,006) |
| November 2017 | 3,439,512 | 4,961,458 | (4,000,000) | (291,000) | (1,362,562) | 2,747,408 | November 2017 | (679,006) | 4,961,458 | (3,609,623) | (291,000) | (1,362,562) | (980,733) |
| December 2017 | 2,747,408 | 7,411,428 | (3,700,000) | (2,340,217) | 504,518 | 4,623,136 | December 2017 | (980,733) | 7,411,428 | (5,392,056) | (2,340,217) | 504,518 | (797,061) |
| January 2018 | 4,623,136 | 10,010,956 | (8,934,401) | (365,000) | (1,752,986) | 3,581,706 | January 2018 | (797,061) | 10,010,956 | (7,283,298) | (365,000) | (1,752,986) | (187,388) |
| **Total** | | $ 30,515,051 | $ (18,431,603) | $ (4,076,204) | $ (4,343,343) | | **Total** | | $ 30,515,051 | $ (22,200,697) | $ (4,076,204) | $ (4,343,343) | |

**Percentage of Total Product Inventory to Cash Sales**    72.8%

Sources:
[A] GCAC009845.

Notes:
[1] In December 2017, GCAC's general ledger [GCAC009845] indicates that 59,205 shares of Arc Terminals stock were sold for $978,235 and instead of collecting the cash, it recorded a loan receivable due from Arthur, which indicates that Arthur received the cash directly.
[2] Applying the 72.8% ratio (product inventory of $22.2 million as a percentage of sales of $30.5 million) to the month in which cash sales were recorded.

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

**Exhibit 8 - GCAC's Monthly Net Working Capital, Including Cash**

Sources:

| | [A] [B] | [B] | [B] | | [B] | [B] | [A] [B] | [B] |
|---|---|---|---|---|---|---|---|---|
| | June 2017 | July 2017 | August 2017 | September 2017 | October 2017 | November 2017 | December 2017 | January 2018 |
| Cash | $ (82,196) | $ (4,786) | $ 2,645,017 | $ 20,646 | $ 3,439,512 | $ 2,747,408 | $ 4,623,136 | $ 3,581,706 |
| Accounts Receivable Trade | 1,233,304 | 3,386,865 | 2,913,754 | 6,292,708 | 7,270,799 | 8,039,853 | 712,898 | 532,855 |
| Accounts Receivable Trade Accrued | 246,940 | 246,940 | 246,940 | 246,940 | 246,940 | 246,940 | 7,855,784 | |
| Accounts Receivable Employees | 429,915 | 429,785 | 429,785 | 429,785 | 429,785 | 439,385 | 392,946 | 385,046 |
| Accounts Receivable Trifinery Inc | (54,144) | (54,144) | (54,144) | (54,144) | (54,144) | (54,144) | (54,144) | (54,144) |
| Accrued Interest Receivable | 52,100 | 52,100 | 52,100 | 4,507 | 4,507 | 4,507 | | |
| Due From Shareholders | (712,635) | (827,635) | (154,898) | (84,648) | 367,352 | 658,352 | 2,998,569 | 3,363,569 |
| Prepaid | 7,698 | 13,229 | 18,760 | 30,659 | 36,748 | 42,578 | 6,995 | 32,289 |
| **Total Current Assets** | **1,120,983** | **3,242,355** | **6,097,314** | **6,886,454** | **11,741,500** | **12,124,880** | **16,536,184** | **7,841,321**  [A] |
| | | | | | | | | |
| Deposits & Bonds | 112,000 | 112,000 | 112,000 | 112,000 | 112,000 | 112,000 | 32,000 | 32,000 |
| Investments in Arc Terminals | 930,726 | 930,726 | 930,726 | 580,726 | 580,726 | 580,726 | | |
| Investments/Loan GCAC Holdings | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 | 4,183,753 |
| Investment Gulf Coast Crude | 2,430,117 | 2,430,117 | 2,435,937 | 2,437,087 | 2,437,087 | 2,437,087 | 2,437,087 | 2,437,087 |
| Investment AJ Bullet | 37,871 | 37,901 | 37,901 | 38,296 | 38,937 | 39,347 | 39,347 | 44,108 |
| Deferred Debit | - | - | 141,313 | 1,938,515 | 1,938,515 | 6,544,997 | | -  [B] |
| Goodwill | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 300,000 | 300,000 |
| **Total Other Assets** | **8,044,467** | **8,044,497** | **8,191,629** | **9,640,376** | **9,641,017** | **14,247,910** | **6,992,187** | **6,996,947** |
| | | | | | | | | |
| **Total Assets** | **$ 9,165,450** | **$ 11,286,852** | **$ 14,288,944** | **$ 16,526,830** | **$ 21,382,517** | **$ 26,372,790** | **$ 23,528,371** | **$ 14,838,268** |
| | | | | | | | | |
| Accounts Payable Trade | $ 2,990,493 | $ 3,565,294 | $ 3,681,184 | $ 3,271,058 | $ 2,615,048 | $ 1,679,686 | $ 1,479,962 | $ 1,288,159 |
| Accounts Payable Accrued | - | - | - | - | - | - | 8,934,401 | 30,540 |
| Accounts Payable Contingent Liability | 166,619 | - | - | - | - | - | 14,866,973 | 14,866,973 |
| Deferred Credit | 210,685 | 1,933,173 | 4,973,048 | 7,929,855 | 13,501,080 | 19,200,506 | - | - |
| **Total Current Liabilities** | **3,367,797** | **5,498,467** | **8,654,232** | **11,200,913** | **16,116,128** | **20,880,192** | **25,281,336** | **16,185,671**  [C] |
| | | | | | | | | |
| **Total Current Assets less Total Current Liabilities and including Deferred Debit amounts.** | **$ (2,246,814)** | **$ (2,256,112)** | **$ (2,415,606)** | **$ (2,375,944)** | **$ (2,436,113)** | **$ (2,210,314)** | **$ (8,745,152)** | **$ (8,344,350)**  [D] = [A] + [B] - [C] |
| | | | | | | | | |
| **Total Current Assets less Total Current Liabilities and including Deferred Debit amounts adjusted for $10m Vitol Judgment ($8,745,151+$14,866,973-$10,000,000) for December 2017 and January 2018.** | **$ (2,246,814)** | **$ (2,256,112)** | **$ (2,415,606)** | **$ (2,375,944)** | **$ (2,436,113)** | **$ (2,210,314)** | **$ (3,878,179)** | **$ (3,477,377)**  [D] = [A] + [B] - [C] |

Sources:
[A] EEPB-00000174.
[B] GCAC009845.

002161

Expert Report of Gene L. Deetz April 1, 2022

*Amounts in USD dollars*

**Exhibit 9: Vitol's Calculation of Amounts Due from GCAC Sent to Arthur on April 10, 2018 Compared to Amounts Recorded by GCAC**

| | Sources: | [A] Vitol | [B] GCAC | Calc. Difference | Memo Line GCAC Journal Entry | Notes: |
|---|---|---|---|---|---|---|
| Product cost true up due Vitol | | $ 3,769,093 | $ 3,769,093 | $ - | GJ/JT12-38 | |
| Deal related costs (Freight, Demurrage, Inspection, etc.) | | 1,339,629 | 1,325,088 | 14,541 | GJ/JT12-23 | [1] |
| Storage related costs (Tank lease, heat, throughput, take or pay) | | 2,632,253 | 2,632,253 | - | GJ/JT12-22 | |
| TVM | | 351,012 | 255,551 | 95,461 | GJ/JT12-33 | [2] |
| TCR | | 200,890 | 174,048 | 26,843 | GJ/JT12-23 | [1] |
| Hedging | | 6,244,480 | 6,431,730 | (187,250) | GJ/JT12-34 | |
| Arc Mobile tank rental Jul '17 & Aug '17 ($139,605 x 2) | | - | 279,210 | (279,210) | GJ/JT12-30 | |
| Freight Titanio delivery Deal #3 | | 256,590 | | 256,590 | | |
| | | $ 14,793,947 | $ 14,866,973 | $ (73,026) | | |

Sources:

[A] Vitol_80066.  The workbook bates stamped Vitol_00001980 was produced by Vitol (and is the same workbook as the workbook bates stamped Vitol_80066) and sent to AJ Brass on April 10, 2018 in Vitol_00001979.

[B] GCAC 009845.

Notes:

[1] In journal entry GJ/JT12-23, GCAC records amounts for interest which add up to $174,048 that I assume relate to the counter party credit charge known as TCR in Vitol's schedule.

[2] From Vitol_80066, tab 'GCAC TVM' at row 183, the amount GCAC records is the amount calculated as of December 31, 2017.  The amount Vitol presents in Vitol_80066 is as of April 10, 2018.

002162

# EXHIBIT D

002163

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**DECLARATION OF GENE L. DEETZ**

Pursuant to 28 U.S.C. § 1746, Gene L. Deetz declares as follows:

1.      I have been asked by Reed Smith, LLP ("Reed Smith"), counsel to Vitol, to analyze the solvency and financial condition of Gulf Coast Asphalt Corporation ("GCAC") as of three dates: June 30, 2017, December 31, 2017 and January 31, 2018, using the three recognized solvency tests: the balance sheet, adequate capital, and cash flow tests.

2.      Additionally, I was asked to prepare a summary of the accounting for the Vitol/GCAC Transactions, and document GCAC's use of the proceeds from the sales of asphalt (originally purchased by Vitol) by GCAC to third parties, and the transfers from GCAC to Arthur Brass and Joyce Brass.

3.      Attached hereto as **Exhibit A** is a true and correct copy of my report issued on April 1, 2022. My report contains a complete statement of all my opinions and the basis for them including the methodologies I have applied in reaching my opinions. It also contains a complete list of the data and documents produced in this matter that I have considered in forming my opinions. The report also includes my analysis reflected in exhibits, my qualifications including a

list of all my publications in the previous 10 years and a list of all other cases in which I have testified in the previous 4 years, and a statement of my hourly rate and the range of rates for staff working under my direction.

4.     The documents I considered in rendering my opinions are contained in Appendix II to my report and include the general ledger of GCAC, monthly balance sheets, income statements, and other accounting documents of GCAC, bank records of GCAC, Vitol and GCAC analysis and correspondence of the status of the asphalt purchases and sales, settlement correspondence and pleadings, depositions of Arthur Brass, and other materials produced and subpoenaed in this proceeding.

5.     If called to testify at trial in this matter, I would testify consistently with the statements contained in my report.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on May 9, 2022

                                        /s/  Gene L. Deetz
                                        Gene L. Deetz

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S AMENDED WITNESS AND EXHIBIT LIST**

Plaintiff Vitol Inc. ("**Plaintiff**") hereby submits its *Amended Witness and Exhibit List for Trial*.

**WITNESSES**

Plaintiff designates the following individuals who may be called as witnesses:

(a)     Gene Deetz, *expert*

(b)     Mike Ruzek

(c)     Mike Loya

(d)     Eric Kuo

(e)     James Tolbert

(f)     A.J. Brass

(g)     Chris Murray, as chapter 7 trustee for Gulf Coast Asphalt Company, LLC

(h)     Jason Goldstein

(i)     John Tomaszewski [may be presented by deposition testimony]

(j)     EEPB, PC [unless presented by business records affidavit]

(k)     IberiaBank [unless presented by business records affidavit]

(l)     International Bank of Commerce [unless presented by business records affidavit]

(m)     Cadence Bank [unless presented by business records affidavit]

(n)     Chubb Lloyd's Insurance Company of Texas [unless presented by business records affidavit]

(o)     Kevin Boston

(p)     DZ Jewelry, LLC [unless presented by business records affidavit]

(q)     Veritex Community Bank [unless presented by business records affidavit]

(r)     Any witness listed or called by any other party.

(s)     Any witness necessary to rebut the testimony of a witness called or designated by any other party.

Plaintiff reserves the right to call or not call any witnesses designated by any other party, as well as rebuttal witnesses.

## **EXHIBITS**

Plaintiff designates the following exhibits that may be admitted:

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|------------|-----------|------|-------------|-------|-------|
| *Emails* | | | | | | |
| 1 | VITOL_00004187 | VITOL_00004188 | 11/17/2016 | Email re: GCAC Talking Points (and attachment) | | |
| 2 | VITOL_00073451 | VITOL_00073453 | 5/10/2017 | Email chain re: USGC Asphalt | | |
| 3 | VITOL_00000791 | VITOL_00000791 | 7/17/2017 | Email re Purchase Citgo SHCF | | |
| 4 | VITOL_00001834 | VITOL_00001835 | 7/21/2017 | Email re Summary Truck Report | | |
| 5 | VITOL_00001836 | VITOL_00001836 | 7/21/2017 | Excel attachment to email re Summary Truck Report | | |
| 6 | VITOL_00001837 | VITOL_00001844 | 7/21/2017 | Attachment to Summary Truck Report: presentation to Vitol re GCAC/Rio asphalt business | | |
| 7 | VITOL_00000379 | VITOL_00000379 | 8/1/2017 | Email re Rio Energy Invoice | | |
| 8 | AJB0003997 | AJB0003997 | 8/1/2017 | Email re cash needed | | |
| 9 | AJB0003960 | AJB0003960 | 8/3/2017 | Email re Payroll account | | |
| 10 | AJB0003984 | AJB0003984 | 8/3/2017 | Email re wires did not come in … need to cover! | | |
| 11 | AJB0004657 | AJB0004657 | 8/3/2017 | Email re payroll account | | |
| 12 | GCAC004631 | GCAC004632 | 8/15/2017 | Email 2 deals | | |
| 13 | GCAC004666 | GCAC004666 | 8/18/2017 | Email re Hedge price | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 14 | GCAC004694 | GCAC004695 | 8/21/2017 | Email re Interim Financing Structure Bullets (with attachment) | | |
| 15 | AJB0005305 | AJB0005306 | 8/21/2017 | Email re Interim Financing Structure Bullets AJB (with attachment) | | |
| 16 | AJB0005448 | AJB0005449 | 8/21/2017 | Email re Interim Financing Structure Bullets (with attachment) | | |
| 17 | VITOL_00000794 | VITOL_00000794 | 8/25/2017 | Email re image001 | | |
| 18 | GCAC005167 | GCAC005168 | 9/15/2017 | Email re Valt sale out of Rio-mobile | | |
| 19 | GCAC005427 | GCAC005428 | 9/25/2017 | Email re Exxon purchase | | |
| 20 | GCAC005439 | GCAC005444 | 9/25/2017 | Email re 2 deals out of Rio Inventory | | |
| 21 | GCAC005591 | GCAC005593 | 10/2/2017 | Email re GCAC sale to valt out rio inventory | | |
| 22 | VITOL_00000801 | VITOL_00000801 | 10/11/2017 | Email re Sale from GCAC to Gunvor | | |
| 23 | GCAC005727 | GCAC005728 | 10/11/2017 | Email re Sale from GCAC to Gunvor | | |
| 24 | GCAC005781 | GCAC005783 | 10/16/2017 | Email re exxon purchase | | |
| 25 | Vitol_00001083 | Vitol_00001085 | 10/25/2017 | Email re Draft term sheet GCAC | | |
| 26 | GCAC006121 | GCAC006122 | 11/3/2017 | Email re Citgo and Phillips purchases | | |
| 27 | GCAC006224 | GCAC006227 | 11/16/2017 | Email re REVISED Deal recap | | |
| 28 | AJB0004098 | AJB0004100 | 11/16/2017 | Email re Vitol Invoices | | |
| 29 | GCAC006719 | GCAC006719 | 12/8/2017 | Email re Confirmation | | |
| 30 | GCAC006722 | GCAC006724 | 12/8/2017 | Email re Reconciliation 11-28 | | |
| 31 | GCAC006725 | GCAC006725 | 12/8/2017 | Excel attachment to Reconciliation 11-28: GCAC/Rio summary | | |
| 32 | GCAC006726 | GCAC006726 | 12/8/2017 | Excel attachment to Reconciliation 11-28: Vitol/Rio/Asphalt deals | | |
| 33 | VITOL_00004500 | VITOL_00004500 | 12/8/2017 | Email re GCAC-Rio Reconciliation | | |
| 34 | VITOL_00004501 | VITOL_00004501 | 12/8/2017 | Excel attachment to Email re GCAC-Rio Reconciliation: reconciliation from GCAC with alleged actual volumes | | |
| 35 | AJB0004103 | AJB0004103 | 12/15/2017 | Email re Wire to Vitol | | |
| 36 | VITOL_00001726 | VITOL_00001727 | 12/15/2017 | Email re Payment | | |
| 37 | GCAC007237 | GCAC007243 | 1/11/2018 | Email re 2 deals out of Rio inventory | | |
| 38 | VITOL_00000819 | VITOL_00000820 | 1/12/2018 | Email re p66 asphalt price | | |
| 39 | VITOL_00000341 | VITOL_00000342 | 1/16/2018 | Email re GCAC-Rio Reconciliation 12-20 | | |
| 40 | VITOL_00000343 | VITOL_00000343 | 1/16/2018 | Email re GCAC Rio Reconciliation 12-20 | | |
| 41 | VITOL_00000344 | VITOL_00000344 | 1/16/2018 | Excel attachment to Email re GCAC-Rio Reconciliation 12-20 | | |
| 42 | VITOL_00000821 | VITOL_00000826 | 1/19/2018 | Email re 2 deals out of Rio Inventory | | |
| 43 | VITOL_00000827 | VITOL_00000827 | 1/19/2018 | Email re Deal 50 | | |
| 44 | VITOL_00002127 | VITOL_00002129 | 1/25/2018 | Email re GCAC 1st Pass Settlement | | |
| 45 | VITOL_00002130 | VITOL_00002130 | 1/25/2018 | Excel attachment: GCAC 1st pass settlement | | |
| 46 | VITOL_00072820 | VITOL_00072822 | 1/25/2018 | Email re GCAC Inspection Reports | | |
| 47 | AJB0000008 | AJB0000008 | 1/26/2018 | Email re Vitol | | |
| 48 | VITOL_00074556 | VITOL_00074558 | 1/30/2018 | Email re GCAC | | |
| 49 | VITOL_00002197 | VITOL_00002198 | 2/5/2018 | Email re Product Sales to GCAC | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|-----------|-----------|------|-------------|-------|-------|
| 50 | VITOL_00000358 | VITOL_00000360 | 2/6/2018 | Email re Product Sales to GCAC | | |
| 51 | VITOL_00000194 | VITOL_00000194 | 2/13/2018 | Email re Fwd: | | |
| 52 | AJB0000017 | AJB0000017 | 2/26/2018 | Email re GCAC/Vitol | | |
| 53 | VITOL_00005403 | VITOL_00005407 | 3/6/2018 | Email re Vitol/GCAC Product Invoice | | |
| 54 | VITOL_00001529 | VITOL_00001529 | 4/10/2018 | Email re GCAC Sheet | | |
| 55 | VITOL_00001530 | VITOL_00001530 | 4/10/2018 | Excel attachment to Email re GCAC Sheet | | |
| 56 | VITOL_00001979 | VITOL_00001979 | 4/10/2018 | Email re GCAC position 10 Apr 18 | | |
| 57 | VITOL_00001980 | VITOL_00001980 | 4/10/2018 | Excel attachment to Email re GCAC position 10 Apr 18 | | |
| 58 | VITOL_00080065 | VITOL_00080065 | 4/11/2018 | Email re GCAC Sheet | | |
| 59 | VITOL_00080066 | VITOL_00080066 | 4/11/2018 | Excel attachment to email re GCAC Sheet | | |
| 60 | | | 12/13/2019 | Email re GCAC v. Vitol | | |

### *Financial Documents*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|-----------|-----------|------|-------------|-------|-------|
| 61 | | | 12/22/2017 | ARC Logistic Partners, LP K-1 2017 | | |
| 62 | 20201021_0000079 | 20201021_0000079 | 12/31/2017 | Gulf Coast Asphalt Company Consolidated Balance Sheet 2017 (EEPB-00000174) | | |
| 63 | 20201021_0000080 | 20201021_0000080 | 12/31/2017 | Gulf Coast Asphalt Company Consolidated Income Statements 2017 (EEPB-00000175) | | |
| 64 | VITOL_00084993 | VITOL_00084993 | Feb-18 | GCAC futures/swaps spreadsheet | | |
| 65 | GCAC009845 | GCAC009845 | 7/31/2018 | GCAC General Ledger | | |
| 66 | 20220218_0000021 | | 12/31/2018 | 2018 GCAC consolidated Income Statement | | |
| 67 | 20220218_0000043 | | 12/31/2018 | consolidated balance sheet | | |
| 68 | 20220221_0000003 | | 12/31/2018 | general ledger - Brass loans | | |
| 69 | 20220221_0000028 | | 12/31/2018 | general ledger - Joyce Brass loans | | |
| 70 | GCAC009515 | GCAC009520 | 6/30/2019 | GCAC General Ledger – Loan Brass loans | | |
| 71 | GCAC009511 | GCAC009514 | 6/30/2019 | GCAC General Ledger – Loan Joyce Brass | | |
| 72 | | | 10/13/2021 | Arthur J. Brass Market Value Personal Property Appraisal | | |
| 73 | | | 8/14/2017 | GCAC Members' Certificate | | |
| 74 | | | 12/17/2009 | Martin Katz, Ltd. receipts | | |

### Business Records

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|-----------|-----------|------|-------------|-------|-------|
| 75 | IBC_000001 | IBC_0002799 | 12/30/2021 | Business Records of International Bank of Commerce with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 76 | VCB000001 | VCB001397 | 1/20/2022 | Business Records of Veritex Community Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 77 | Chubb000001 | Chubb001175 | 2/23/2022 | Business Records of Chubb Lloyds Insurance Company of Texas with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |

| No. | Beg. Bates | End Bates | Date | Description | O f f e r | A d m i t |
|-----|-----------|-----------|------|-------------|-----------|-----------|
| 78 | Zadok000001 | Zadok000110 | 7/28/2022 | Business Records of DZ Jewelry, LLC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 79 | Iberia_000001 | Iberia_003650 | 1/4/2022 | Business Records of Iberia Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 80 | Cadence_000001 | Cadence_000363 | 1/25/2022 | Business Records of Cadence Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 81 | EEPB-00000001 | EEPB-00000240 | 9/4/2020 | Business Records of EEPB, PC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) – production copies | | |
| 82 | | | 9/4/2020 | Business Records of EEPB, PC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) – native copies | | |

### *Pleadings*

| No. | Beg. Bates | End Bates | Date | Description | | |
|-----|-----------|-----------|------|-------------|---|---|
| 83 | | | 2/10/2017 | Certified Copy of Superior Crude - Original Petition (admitted under FRE 902(4)) | | |
| 84 | | | | Certified Copy of Superior Crude – Answer (admitted under FRE 902(4)) | | |
| 85 | | | 5/10/2018 | Certified Copy of GCAC's Original Petition (admitted under FRE 902(4)) | | |
| 86 | | | 9/12/2019 | Certified Copy of Vitol Second Amended Counterclaims (admitted under FRE 902(4)) | | |
| 87 | BK-Vitol_0000022 | BK-Vitol_0000033 | 10/2020 | Confidential Settlement Agreement and Mutual Global Release | | |
| 88 | BK-VITOL_0000009 | BK-VITOL_0000017 | 11/5/2020 | Second Confidential Settlement Agreement and Mutual Global Release | | |
| 89 | | | 11/19/2020 | Agreed Final Judgment | | |
| 90 | | | 4/27/2021 | Arthur Brass Bankruptcy Schedules | | |
| 91 | | | 4/27/2021 | Trifinery Bankruptcy Schedules | | |
| 92 | | | 4/27/2021 | Trifinery Statement of Financial Affairs | | |
| 93 | | | 4/27/2021 | GCAC Bankruptcy Schedules | | |
| 94 | | | 4/27/2021 | GCAC Statement of Financial Affairs | | |
| 95 | | | 12/16/2021 | AJ Brass Amended Bankruptcy Schedules | | |
| 96 | | | 12/27/2021 | Brass Interrogatory Responses | | |

### *Expert Documents*

| No. | Beg. Bates | End Bates | Date | Description | | |
|-----|-----------|-----------|------|-------------|---|---|
| 97 | | | 4/1/2022 | Deetz Expert Report | | |
| 98 | | | 4/1/2022 | Deetz Expert Report Exhibits 1-9 | | |
| 99 | | | | Section 461 Internal Revenue Code | | |
| 100 | | | 9/15/2018 | GCAC Tax Returns 2017 | | |
| 101 | | | 4/1/2022 | Trial Balance Rollup to 2017 Form 1065 | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 102 | 20201021-0000061 | 20201021-0000061 | 12/22/2017 | 2017 Arc Logistics Schedule K-1 to GCAC | | |
| 103 | | | 4/1/2022 | AJ and Joyce Loan Accounts from GL to Bank Statement Recon | | |
| 104 | EEPB-00000174 | EEPB-00000174 | | GCAC Consolidated Monthly Balance Sheets for January to June 2017 and December 31, 2017 | | |
| 105 | EEPB-00000175 | EEPB-00000175 | | GCAC Consolidated Monthly Income Statements for January to June 2017 and December 31, 2017 | | |
| 106 | EEPB-00000181 | EEPB-00000181 | | GCAC Consolidated Balance Sheet as of December 2018 | | |
| 107 | 20201021-0000025 | 20201021-0000025 | | Consolidated Trial Balance | | |

### *Tomaszewski Deposition Exhibits*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 108 | | | | Exhibit 1 to deposition of John Tomaszewski – subpoena of John Tomaszewski | | |
| 109 | Confidential Bates GCAC 009845 | | | Exhibit 3 to deposition of John Tomaszewski – Confidential Bates GCAC 009845 (excel general ledger) | | |
| 110 | 20201021_0000079 | | | Exhibit 4 to deposition of John Tomaszewski – GCAC Consolidated Balance Sheets 2017 | | |
| 111 | 20201021_0000079 | | | Exhibit 5 to deposition of John Tomaszewski – 20201021_0000079 (excel GCAC Consolidated Balance Sheets 2017) | | |
| 112 | 20220218_0000043 | | | Exhibit 6 to deposition of John Tomaszewski – GCAC Consolidated Balance Sheet 2018 | | |
| 113 | 20220218_0000043 | | | Exhibit 7 to deposition of John Tomaszewski – 20220218_0000043 (excel GCAC Consolidated Balance Sheet 2018) | | |
| 114 | 20201021_0000080 | | | Exhibit 8 to deposition of John Tomaszewski – GCAC Income Statement 2017 | | |
| 115 | 20201021_0000080 | | | Exhibit 9 to deposition of John Tomaszewski – 20201021_0000080 (excel GCAC Income Statement 2017) | | |

### *Other Documents*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 116 | GCAC000001 | GCAC000128 | Jan-18 | Marketing Agreement (Mercuria) | | |
| 117 | GCAC000599 | GCAC000601 | 6/15/2018 | Affidavit of Arthur J. Brass | | |
| 118 | | | 6/28/2018 | Deposition of Arthur Brass 6/28/2018 | | |
| 119 | | | 12/12/2019 | Affidavit of Arthur J. Brass | | |
| 120 | | | 11/3/2020 | Deposition of Arthur Brass as the Corporate Representative of GCAC | | |
| 121 | | | 3/25/2022 | Deposition of Arthur Brass | | |
| 122 | | | | Selected Brass Documents | | |
| 123 | | | | Selected GCAC Documents | | |

| No. | Beg. Bates | End Bates | Date | Description | O f f e r | A d m i t |
|-----|------------|-----------|------|-------------|-----------|-----------|
| 124 |  |  |  | Select Debtor Documents Produced by M. Goott on 12/28/2021 |  |  |
| 125 |  |  |  | Complete deposition of John Tomaszewski and exhibits |  |  |

Dated:  **September 5, 2022.**                              Respectfully submitted,

By: */s/ Michael P. Cooley*
    Keith M. Aurzada (SBN 24009880)
    Michael P. Cooley (SBN 24034388)
    Bradley J. Purcell (SBN 24063965)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T:  469.680.4200
    F:  469.680.4299
    kaurzada@reedsmith.com
    mpcooley@reedsmith.com
    bpurcell@reedsmith.com
    lrobin@reedsmith.com

    and

    Michael H. Bernick (SBN 24078277)
    Mason W. Malpass (SBN 24109502)
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T:  713.469.3834
    F:  713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

    *Attorneys for Vitol Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on **September 5, 2022**, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all counsel of record, including counsel for the Defendant.

<i>/s/  Michael P. Cooley</i>
Michael P. Cooley

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § § § § § § | |
| Debtor. | § | Adversary No. 21-06006 |
| | § § | |

VITOL INC.

v.

ARTHUR JACOB BRASS

**PLAINTIFF VITOL INC.'S _AMENDED_ WITNESS AND EXHIBIT LIST**

Plaintiff Vitol Inc. ("**Plaintiff**") hereby submits its _Amended_ Witness and Exhibit List for Trial.

**WITNESSES**

Plaintiff designates the following individuals who may be called as witnesses:

(a)   Gene Deetz_, expert_

(b)   Mike Ruzek

(c)   Mike Loya

(d)   Eric Kuo

(e)   James Tolbert

(f)   A.J. Brass

(g)   Chris Murray, as chapter 7 trustee for Gulf Coast Asphalt Company, LLC

(h)   Jason Goldstein

(i)   John Tomaszewski [may be presented by deposition testimony]

(j)   EEPB, PC [unless presented by business records affidavit]

(k)   IberiaBank [unless presented by business records affidavit]

(l)   International Bank of Commerce [unless presented by business records affidavit]

(m)

(n)     Cadence Bank [unless presented by business records affidavit]

(o)     Chubb Lloyd's Insurance Company of Texas [unless presented by business records affidavit]

(p)     Kevin Boston

(q)     DZ Jewelry, LLC [unless presented by business records affidavit]

(r)     Veritex Community Bank [unless presented by business records affidavit]

(s)     Any witness listed or called by any other party.

(t)     Any witness necessary to rebut the testimony of a witness called or designated by any other party.

Plaintiff reserves the right to call or not call any witnesses designated by any other party, as well as rebuttal witnesses.

## **EXHIBITS**

Plaintiff designates the following exhibits that may be admitted:

| No. | Beg. Bates | End Bates | Date | Description | f f e r | A d m i t |
|-----|-----------|-----------|------|-------------|--------|-----------|
| **Emails** | | | | | | |
| 1 | VITOL_00004187 | VITOL_00004188 | 11/17/2016 | Email re: GCAC Talking Points (and attachment) | | |
| 2 | VITOL_00073451 | VITOL_00073453 | 5/10/2017 | Email chain re: USGC Asphalt | | |
| 3 | VITOL_00000791 | VITOL_00000791 | 7/17/2017 | Email re Purchase Citgo SHCF | | |
| 4 | VITOL_00001834 | VITOL_00001835 | 7/21/2017 | Email re Summary Truck Report | | |
| 5 | VITOL_00001836 | VITOL_00001836 | 7/21/2017 | Excel attachment to email re Summary Truck Report | | |
| 6 | VITOL_00001837 | VITOL_00001844 | 7/21/2017 | Attachment to Summary Truck Report: presentation to Vitol re GCAC/Rio asphalt business | | |
| 7 | VITOL_00000379 | VITOL_00000379 | 8/1/2017 | Email re Rio Energy Invoice | | |
| 8 | AJB0003997 | AJB0003997 | 8/1/2017 | Email re cash needed | | |
| 9 | AJB0003960 | AJB0003960 | 8/3/2017 | Email re Payroll account | | |
| 10 | AJB0003984 | AJB0003984 | 8/3/2017 | Email re wires did not come in … need to cover! | | |
| 11 | AJB0004657 | AJB0004657 | 8/3/2017 | Email re payroll account | | |
| 12 | GCAC004631 | GCAC004632 | 8/15/2017 | Email 2 deals | | |
| 13 | GCAC004666 | GCAC004666 | 8/18/2017 | Email re Hedge price | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|-----|-----------|-----------|------|-------------|-------|-------|
| 14 | GCAC004694 | GCAC004695 | 8/21/2017 | Email re Interim Financing Structure Bullets (with attachment) | | |
| ~~No.~~ | ~~Beg. Bates~~ | ~~End Bates~~ | ~~Date~~ | ~~Description~~ | ~~Offer~~ | ~~Admit~~ |
| 15 | AJB0005305 | AJB0005306 | 8/21/2017 | Email re Interim Financing Structure Bullets AJB (with attachment) | | |
| 16 | AJB0005448 | AJB0005449 | 8/21/2017 | Email re Interim Financing Structure Bullets (with attachment) | | |
| 17 | VITOL_00000794 | VITOL_00000794 | 8/25/2017 | Email re image001 | | |
| 18 | GCAC005167 | GCAC005168 | 9/15/2017 | Email re Valt sale out of Rio-mobile | | |
| 19 | GCAC005427 | GCAC005428 | 9/25/2017 | Email re Exxon purchase | | |
| 20 | GCAC005439 | GCAC005444 | 9/25/2017 | Email re 2 deals out of Rio Inventory | | |
| 21 | GCAC005591 | GCAC005593 | 10/2/2017 | Email re GCAC sale to valt out rio inventory | | |
| 22 | VITOL_00000801 | VITOL_00000801 | 10/11/2017 | Email re Sale from GCAC to Gunvor | | |
| 23 | GCAC005727 | GCAC005728 | 10/11/2017 | Email re Sale from GCAC to Gunvor | | |
| 24 | GCAC005781 | GCAC005783 | 10/16/2017 | Email re exxon purchase | | |
| 25 | Vitol_00001083 | Vitol_00001085 | 10/25/2017 | Email re Draft term sheet GCAC | | |
| 26 | GCAC006121 | GCAC006122 | 11/3/2017 | Email re Citgo and Phillips purchases | | |
| 27 | GCAC006224 | GCAC006227 | 11/16/2017 | Email re REVISED Deal recap | | |
| 28 | AJB0004098 | AJB0004100 | 11/16/2017 | Email re Vitol Invoices | | |
| 29 | GCAC006719 | GCAC006719 | 12/8/2017 | Email re Confirmation | | |
| 30 | GCAC006722 | GCAC006724 | 12/8/2017 | Email re Reconciliation 11-28 | | |
| 31 | GCAC006725 | GCAC006725 | 12/8/2017 | Excel attachment to Reconciliation 11-28: GCAC/Rio summary | | |
| 32 | GCAC006726 | GCAC006726 | 12/8/2017 | Excel attachment to Reconciliation 11-28: Vitol/Rio/Asphalt deals | | |
| 33 | VITOL_00004500 | VITOL_00004500 | 12/8/2017 | Email re GCAC-Rio Reconciliation | | |
| 34 | VITOL_00004501 | VITOL_00004501 | 12/8/2017 | Excel attachment to Email re GCAC-Rio Reconciliation: reconciliation from GCAC with alleged actual volumes | | |
| 35 | AJB0004103 | AJB0004103 | 12/15/2017 | Email re Wire to Vitol | | |
| 36 | VITOL_00001726 | VITOL_00001727 | 12/15/2017 | Email re Payment | | |
| 37 | GCAC007237 | GCAC007243 | 1/11/2018 | Email re 2 deals out of Rio inventory | | |
| 38 | VITOL_00000819 | VITOL_00000820 | 1/12/2018 | Email re p66 asphalt price | | |
| 39 | VITOL_00000341 | VITOL_00000342 | 1/16/2018 | Email re GCAC-Rio Reconciliation 12-20 | | |
| 40 | VITOL_00000343 | VITOL_00000343 | 1/16/2018 | Email re GCAC Rio Reconciliation 12-20 | | |
| 41 | VITOL_00000344 | VITOL_00000344 | 1/16/2018 | Excel attachment to Email re GCAC-Rio Reconciliation 12-20 | | |
| 42 | VITOL_00000821 | VITOL_00000826 | 1/19/2018 | Email re 2 deals out of Rio Inventory | | |
| 43 | VITOL_00000827 | VITOL_00000827 | 1/19/2018 | Email re Deal 50 | | |
| 44 | VITOL_00002127 | VITOL_00002129 | 1/25/2018 | Email re GCAC 1st Pass Settlement | | |
| 45 | VITOL_00002130 | VITOL_00002130 | 1/25/2018 | Excel attachment: GCAC 1st pass settlement | | |
| 46 | VITOL_00072820 | VITOL_00072822 | 1/25/2018 | Email re GCAC Inspection Reports | | |
| 47 | AJB0000008 | AJB0000008 | 1/26/2018 | Email re Vitol | | |

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 48 | VITOL_00074556 | VITOL_00074558 | 1/30/2018 | Email re GCAC | | |
| 49 | VITOL_00002197 | VITOL_00002198 | 2/5/2018 | Email re Product Sales to GCAC | | |
| 50 | VITOL_00000358 | VITOL_00000360 | 2/6/2018 | Email re Product Sales to GCAC | | |
| 51 | VITOL_00000194 | VITOL_00000194 | 2/13/2018 | Email re Fwd: | | |
| ~~No.~~ | ~~Beg. Bates~~ | ~~End Bates~~ | ~~Date~~ | ~~Description~~ | ~~Offer~~ | ~~Admit~~ |
| 52 | AJB0000017 | AJB0000017 | 2/26/2018 | Email re GCAC/Vitol | | |
| 53 | VITOL_00005403 | VITOL_00005407 | 3/6/2018 | Email re Vitol/GCAC Product Invoice | | |
| 54 | VITOL_00001529 | VITOL_00001529 | 4/10/2018 | Email re GCAC Sheet | | |
| 55 | VITOL_00001530 | VITOL_00001530 | 4/10/2018 | Excel attachment to Email re GCAC Sheet | | |
| 56 | VITOL_00001979 | VITOL_00001979 | 4/10/2018 | Email re GCAC position 10 Apr 18 | | |
| 57 | VITOL_00001980 | VITOL_00001980 | 4/10/2018 | Excel attachment to Email re GCAC position 10 Apr 18 | | |
| 58 | VITOL_00080065 | VITOL_00080065 | 4/11/2018 | Email re GCAC Sheet | | |
| 59 | VITOL_00080066 | VITOL_00080066 | 4/11/2018 | Excel attachment to email re GCAC Sheet | | |
| 60 | | | 12/13/2019 | Email re GCAC v. Vitol | | |

*Financial Documents*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 61 | | | 12/22/2017 | ARC Logistic Partners, LP K-1 2017 | | |
| 62 | 20201021_0000079 | 20201021_0000079 | 12/31/2017 | Gulf Coast Asphalt Company Consolidated Balance Sheet 2017 (EEPB-00000174) | | |
| 63 | 20201021_0000080 | 20201021_0000080 | 12/31/2017 | Gulf Coast Asphalt Company Consolidated Income Statements 2017 (EEPB-00000175) | | |
| 64 | VITOL_00084993 | VITOL_00084993 | Feb-18 | GCAC futures/swaps spreadsheet | | |
| 65 | GCAC009845 | GCAC009845 | 7/31/2018 | GCAC General Ledger | | |
| 66 | 20220218_0000021 | | 12/31/2018 | 2018 GCAC consolidated Income Statement | | |
| 67 | 20220218_0000043 | | 12/31/2018 | consolidated balance sheet | | |
| 68 | 20220221_0000003 | | 12/31/2018 | general ledger - Brass loans | | |
| 69 | 20220221_0000028 | | 12/31/2018 | general ledger - Joyce Brass loans | | |
| 70 | GCAC009515 | GCAC009520 | 6/30/2019 | GCAC General Ledger – Loan Brass loans | | |
| 71 | GCAC009511 | GCAC009514 | 6/30/2019 | GCAC General Ledger – Loan Joyce Brass | | |
| 72 | | | 10/13/2021 | Arthur J. Brass Market Value Personal Property Appraisal | | |
| 73 | | | 8/14/2017 | GCAC Members' Certificate | | |
| 74 | | | 12/17/2009 | Martin Katz, Ltd. receipts | | |

*Business Records*

| No. | Beg. Bates | End Bates | Date | Description | Offer | Admit |
|---|---|---|---|---|---|---|
| 75 | IBC_000001 | IBC_0002799 | 12/30/2021 | Business Records of International Bank of Commerce with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 76 | VCB000001 | VCB001397 | 1/20/2022 | Business Records of Veritex Community Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |

| 77 | Chubb000001 | Chubb001175 | 2/23/2022 | Business Records of Chubb Lloyds Insurance Company of Texas with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| No. | **Beg. Bates** | **End Bates** | **Date** | **Description** | f f e r | A d m i t |
| 78 | Zadok000001 | Zadok000110 | 7/28/2022 | Business Records of DZ Jewelry, LLC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 79 | Iberia_000001 | Iberia_003650 | 1/4/2022 | Business Records of Iberia Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 80 | Cadence_000001 | Cadence_000363 | 1/25/2022 | Business Records of Cadence Bank with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) | | |
| 81 | EEPB-00000001 | EEPB-00000240 | 9/4/2020 | Business Records of EEPB, PC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) – production copies | | |
| 82 | | | 9/4/2020 | Business Records of EEPB, PC with Business Records Affidavit (admitted under FRE 902(11) & FRE 807) – native copies | | |

*Pleadings*

| 83 | | | 2/10/2017 | Certified Copy of Superior Crude - Original Petition (admitted under FRE 902(4)) | | |
| 84 | | | | Certified Copy of Superior Crude – Answer (admitted under FRE 902(4)) | | |
| 85 | | | 5/10/2018 | Certified Copy of GCAC's Original Petition (admitted under FRE 902(4)) | | |
| 86 | | | 9/12/2019 | Certified Copy of Vitol Second Amended Counterclaims (admitted under FRE 902(4)) | | |
| 87 | BK-Vitol_0000022 | BK-Vitol_0000033 | 10/2020 | Confidential Settlement Agreement and Mutual Global Release | | |
| 88 | BK-VITOL_0000009 | BK-VITOL_0000017 | 11/5/2020 | Second Confidential Settlement Agreement and Mutual Global Release | | |
| 89 | | | 11/19/2020 | Agreed Final Judgment | | |
| 90 | | | 4/27/2021 | Arthur Brass Bankruptcy Schedules | | |
| 91 | | | 4/27/2021 | Trifinery Bankruptcy Schedules | | |
| 92 | | | 4/27/2021 | Trifinery Statement of Financial Affairs | | |
| 93 | | | 4/27/2021 | GCAC Bankruptcy Schedules | | |
| 94 | | | 4/27/2021 | GCAC Statement of Financial Affairs | | |
| 95 | | | 12/16/2021 | AJ Brass Amended Bankruptcy Schedules | | |
| 96 | | | 12/27/2021 | Brass Interrogatory Responses | | |

*Expert Documents*

| 97 | | | 4/1/2022 | Deetz Expert Report | | |
| 98 | | | 4/1/2022 | Deetz Expert Report Exhibits 1-9 | | |
| 99 | | | | Section 461 Internal Revenue Code | | |
| 100 | | | 9/15/2018 | GCAC Tax Returns 2017 | | |

| No. | Beg. Bates | End Bates | Date | Description | f f e r | A d m i t |
|---|---|---|---|---|---|---|
| 101 | | | 4/1/2022 | Trial Balance Rollup to 2017 Form 1065 | | |
| ~~102~~ | | | ~~4/1/2022~~ | ~~AJ and Joyce Loan Accounts from GL to Bank Statement Recon~~ | | |
| ~~103~~102 | 20201021-0000061 | 20201021-0000061 | 12/22/2017 | 2017 Arc Logistics Schedule K-1 to GCAC | | |
| 103 | | | 4/1/2022 | AJ and Joyce Loan Accounts from GL to Bank Statement Recon | | |
| 104 | EEPB-00000174 | EEPB-00000174 | | GCAC Consolidated Monthly Balance Sheets for January to June 2017 and December 31, ~~2018~~2017 | | |
| 105 | EEPB-00000175 | EEPB-00000175 | | GCAC Consolidated Monthly Income Statements for January to June 2017 and December 31, ~~2018~~2017 | | |
| 106 | EEPB-00000181 | EEPB-00000181 | | GCAC Consolidated Balance Sheet as of December 2018 | | |
| 107 | 20201021-0000025 | 20201021-0000025 | | Consolidated Trial Balance | | |

*Tomaszewski Deposition Exhibits*

| No. | Beg. Bates | End Bates | Date | Description | f f e r | A d m i t |
|---|---|---|---|---|---|---|
| 108 | | | | Exhibit 1 to deposition of John Tomaszewski – subpoena of John Tomaszewski | | |
| 109 | Confidential Bates GCAC 009845 | | | Exhibit 3 to deposition of John Tomaszewski – Confidential Bates GCAC 009845 (excel general ledger) | | |
| 110 | 20201021_0000079 | | | Exhibit 4 to deposition of John Tomaszewski – GCAC Consolidated Balance Sheets 2017 | | |
| 111 | 20201021_0000079 | | | Exhibit 5 to deposition of John Tomaszewski – 20201021_0000079 (excel GCAC Consolidated Balance Sheets 2017) | | |
| 112 | 20220218_0000043 | | | Exhibit 6 to deposition of John Tomaszewski – GCAC Consolidated Balance Sheet 2018 | | |
| 113 | 20220218_0000043 | | | Exhibit 7 to deposition of John Tomaszewski – 20220218_0000043 (excel GCAC Consolidated Balance Sheet 2018) | | |
| 114 | 20201021_0000080 | | | Exhibit 8 to deposition of John Tomaszewski – GCAC Income Statement 2017 | | |
| 115 | 20201021_0000080 | | | Exhibit 9 to deposition of John Tomaszewski – 20201021_0000080 (excel GCAC Income Statement 2017) | | |

*Other Documents*

| No. | Beg. Bates | End Bates | Date | Description | f f e r | A d m i t |
|---|---|---|---|---|---|---|
| 116 | GCAC000001 | GCAC000128 | Jan-18 | Marketing Agreement (Mercuria) | | |
| 117 | GCAC000599 | GCAC000601 | 6/15/2018 | Affidavit of Arthur J. Brass | | |
| 118 | | | 6/28/2018 | Deposition of Arthur Brass 6/28/2018 ~~(impeachment only)~~ | | |
| 119 | | | 12/12/2019 | Affidavit of Arthur J. Brass | | |
| 120 | | | 11/3/2020 | Deposition of Arthur Brass as the Corporate Representative of GCAC ~~(impeachment only)~~ | | |

| No. | Beg. Bates | End Bates | Date | Description | f f e r | A d m i t |
|---|---|---|---|---|---|---|
| 121 | | | 3/25/2022 | Deposition of Arthur Brass ~~(impeachment only)~~ | | |
| 122 | | | | Selected Brass Documents | | |
| 123 | | | | Selected GCAC Documents | | |
| 124 | | | | Select Debtor Documents Produced by M. ~~Goot~~Goott on 12/28/2021 | | |
| 125 | | | | Complete deposition of John Tomaszewski and exhibits | | |

Dated: ~~August 22~~September 5, 2022.                    Respectfully submitted,

By: /s/ ~~Keith M. Aurzada~~Michael P. Cooley
Keith M. Aurzada (SBN 24009880)
Michael P. Cooley (SBN 24034388)
Bradley J. Purcell (SBN 24063965)
Lindsey L. Robin (SBN 24091422)
**REED SMITH LLP** 2501 N. Harwood, Suite 1500 Dallas, Texas 75201 T: 469.680.4200 F: 469.680.4299
kaurzada@reedsmith.com
mpcooley@reedsmith.com
bpurcell@reedsmith.com
lrobin@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP** 811 Main Street, Suite 1700 Houston, TX 77002 T: 713.469.3834 F: 713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I ~~hereby~~ certify that on ~~August 22~~September 5, 2022, a true and correct copy of the ~~above foregoing~~forgoing document was served via the Court's Electronic Case Filing (ECF) system ~~onto~~ all ~~parties registered to receive electronic service in this matter~~counsel of record, including counsel for the Defendant.

/s/ ~~Keith Miles Aurzada~~ Michael P. Cooley
~~Keith M. Aurzada~~Michael P. Cooley

Document comparison by Workshare Compare on Monday, September 5, 2022
10:36:35 PM

| Input: | |
|---|---|
| Document 1 ID | file://\\HOME-DAL\llrobin$\original WE.pdf |
| Description | original WE |
| Document 2 ID | file://\\HOME-DAL\llrobin$\Amended WE.pdf |
| Description | Amended WE |
| Rendering set | ReedSmith Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 47 |
| Deletions | 49 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 96 |

002182

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S TRIAL BRIEF ON DISCLOSURE OF
CHAPTER 7 TRUSTEE AS A FACT WITNESS REGARDING SCHEDULES**

Counsel for Vitol Inc. ("**Vitol**") files this trial brief regarding the designation of Christopher Murray, chapter 7 trustee for both the Debtor individually and the Debtor's bankrupt companies, as a fact witness. In brief, the Rules do not require a party to make duplicative disclosure of information already known to – and indeed disclosed by – an adversary. Accordingly, Vitol respectfully requests the Court overrule the Debtor's oral objection to Mr. Murray's testimony and, in support thereof, would respectfully show the Court as follows:

## I.  INITIAL STATEMENT

1.      The Debtor objects to Vitol calling Mr. Murray, the chapter 7 trustee for the Debtor's own bankruptcy estate and his two bankrupt entities GCAC and Trifinery. The Debtor basis his objection on the so-called failure of Vitol to list the Trustee on its initial disclosures. But the Debtor's objection that Vitol failed to give proper notice that Mr. Murray was an "individual likely to have discoverable information" should be overruled for two fundamental reasons. First, any failure of Vitol to supplement its initial disclosures a second time was *unnecessary* because

the Trustee was identified *by the Debtor* as the only individual with knowledge of GCAC's financial records just four days before the end of discovery (which deadline was repeatedly extended to accommodate the Debtor). Second, such an error, if it could be called that, is completely *harmless* because the Debtor himself identified the Trustee as the only individual with knowledge of GCAC's financial records (despite the fact that the Debtor was the sole individual in control of GCAC prior to both their chapter 7 bankruptcy filings). The duty to disclose was not on Vitol but on the Debtor. As such, the Debtor cannot now in good faith claim surprise, harm, or prejudice. This brief demonstrates that Vitol had no duty to disclose the Trustee as a witness and has, in fact, satisfied its discovery obligations. Vitol should be allowed to call the Trustee as a witness.

2.     The Federal rules of discovery, by design, are calculated to prevent "trial by ambush." *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978). "The basic purpose of the [Rule 26] supplementation rule is to prevent prejudice or surprise." *Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994); *accord, Dilmore*, v. Stubbs, 636 F.2d 966, 969 (5th Cir. 1981) ("The rules of discovery are designed to narrow and clarify the issues and give the parties mutual knowledge of all relevant facts, thereby preventing surprise"). Calling the person that the Debtor identified as having certain knowledge to testify to that knowledge at trial does not amount to ambush and does not prejudice the Debtor; it is what the Debtor instructed Vitol to do.

3.     Furthermore, it must be noted that the Court is once again asking Vitol to prove the sufficiency and propriety of its own discovery efforts when it is the Debtor who has abused the process. The Debtor's disingenuous accusations and refusal to properly comply with discovery has—intentionally—caused confusion and delay in the trial of this matter.

4.    *First*, the Debtor opposed Vitol's moving to depose Kevin Boston, GCAC's former bookkeeper as untimely when Debtor identified Mr. Boston for the first time during his deposition just four days prior to the close of discovery. Docket No. 53; Docket No. 52. The Debtor accused Vitol of lack of diligence, when in fact it was the Debtor's own failure to identify Mr. Boston as an individual with knowledge was responsible for Vitol's Motion. *See, e.g.*, Debtor's Initial Disclosures at Docket No. 13; *see also* Debtor's Responses to Vitol's Request for Interrogatories.[1] The Court ultimately allowed Vitol to depose John Tomaszewski, GCAC's former CEO, for 2 hours on limited subject matter. Docket No. 52. The Debtor did not list Mr. Boston or Mr. Tomaszewski on his disclosures and he never supplemented his disclosure after his admission during his deposition that they possessed relevant information.

5.    *Second*, the Debtor interrupted the deposition of Mr. Tomaszewski with objections to the use of certain financial records in native Microsoft Excel form despite the clear language in the Court's order allowing the use of certain documents *identified* in Vitol's motion to extend the discovery deadline. Docket No. 54, ¶ 2 ("The deposition topics are limited to (i) understanding GCAC financial documents **identified** on Exhibits 3, 7, 8, 9, and 10 to the Motion (the "Documents") . . ."). In support of its objection, the Debtor represented to the Court that Vitol had produced "only a handful" of documents in this adversary proceeding.

6.    In response, Vitol credibly demonstrated that it had in fact produced to the Debtor's counsel the documents at issue in the Tomaszewski deposition several months prior. Docket Nos. 61, 62, and 63; Docket No. 100 at FN 9 ("Brass argued in the motion to strike that GCAC 009845 was not produced. Based on Tolbert's testimony and the record, GCAC 009845 was

---

[1] A true and correct copy of Debtor's Response to Vitol's Requests for Interrogatories is attached as **Exhibit A**. In response to Interrogatory No. 2, which instructed the Debtor to "[i]dentify all individuals that had control over *or access to* GCAC's finances," the Debtor responded: "Arthur Brass and John Tomaszewski."

---

produced to Brass's counsel in October 2021."). In fact, Vitol produced thousands of documents on October 29, 2021 in compliance with the Debtor's *own request* that Vitol share all of the production from the state court litigation. *See* Docket No. 63. (Such compliance has now earned Vitol accusations by the Debtor of "dumping" documents).

7.     At the same time, the Debtor, *without any evidence*, also accused Vitol of *doctoring* the documents used at the deposition of Mr. Tomaszewski. *See e.g.* Docket No. 64, ¶ 29-35. The Debtor had zero evidence to support these serious accusations against Vitol's counsel and, when Vitol filed a second declaration demonstrating the absence of any change to the substance of the documents [Docket No. 78 at ¶¶11-14], the Debtor could not answer that evidence with anything to show otherwise. On the evidence presented, Vitol was vindicated in the Court's subsequent order concluding that the documents were not doctored or altered in any substantive fashion. Docket No. 100 ("Again, there is no change to the contents of the spreadsheet"). Nevertheless, Vitol was put to significant additional expense to refute the Debtor's baseless claims.

8.     *Third*, on the first day of trial in this adversary proceeding the Debtor again accused Vitol of not previously producing a large quantity of business records during the active discovery process. Once again, Vitol was compelled to assemble records and prepare a supplemental filing to demonstrate that Vitol had in fact produced the documents in question several months earlier. Docket No. 124.

9.     *Finally*, on the second day of trial in this adversary proceeding the Debtor also claimed during trial that certain Chubb documents—including the "jewelry rider"—were not timely produced during the active discovery process. *See, e.g.,* Docket No. 126 beginning at 2:32:30 (asking for a ruling on "the fact that it wasn't produced and not part of discovery in this main case"). As shown in the notice and accompanying declaration of James Tolbert filed

concurrently herewith [Docket No. 137], once again Vitol's allegation is demonstrably false. In fact, Vitol both *noticed* the subpoena in this Adversary Proceeding [Docket No. 22] and *produced* the responsive documents it received from Chubb to Debtor. Specifically, on March 8, 2022, during the discovery period, Vitol produced the documents it received from Chubb in response to its properly-noticed and properly-served subpoena. *See* Docket No. 137, ¶5. Again, it appears Debtor's counsel never downloaded the Chubb documents.

10.     Now Vitol once again submits to this Court that it has timely complied with its discovery obligations under the Federal Rules of Civil Procedure, and that the Debtor's objection is merely another attempt to distract this Court from the evidence steadily accumulating in this adversary proceeding in favor of Vitol. The Debtor did not comply with the express rules or spirit of discovery, but is now trying to use those same rules governing discovery as a weapon because the Debtor knows that if Vitol is allowed to present its case using properly identified and disclosed evidence, the $10 Million judgment against the Debtor will not be discharged.

## II.  BACKGROUND

11.     Defendant Arthur Jacob Brass (the "**Debtor**") filed his chapter 7 bankruptcy on March 26, 2021, four months after the Agreed Judgment was entered resolving the state court litigation between the parties. Gulf Coast Asphalt Company, LLC ("**GCAC**") and Trifinery Inc ("**Trifinery**"), entities controlled by the Debtor, filed bankruptcy petitions under chapter 7 that same day.

12.     On March 29, 2021, the Court designated Christopher R. Murray (the "**Trustee**") as the chapter 7 trustee for the Debtor, GCAC, and Trifinery. Main Docket No. 6; Case No. 21-60024, Docket No. 3; Case No. 21-60023, Docket No. 3. The Debtor owned 50% of GCAC through his complete ownership of Trifinery. The Debtor signed both his personal bankruptcy schedules and statement of financial affairs and the bankruptcy schedules and statement of

financial affairs for both GCAC and Trifinery. *See, e.g.,* Main Docket No. 19 at pg. 68 (Vitol Exhibit 90); Case No. 21-60024, Docket No. 11 at pg. 17 (Vitol Exhibit No. 93); Case No. 21-60023, Docket No. 11 at pg. 15 (Vitol Exhibit No. 91).

13.     On May 11, 2021, the Debtor appeared at the meeting of the creditors required in each of the three chapter 7 cases pursuant to 11 U.S.C. § 341. The May 11th meeting functioned as a joint meeting of the creditors for the Debtor individually, GCAC, and Trifinery. At this meeting, the Debtor appeared and represented himself in his personal capacity and GCAC and Trifinery as their corporate designee.

14.     Vitol filed the above-captioned Adversary Proceeding against the Debtor on July 9, 2021. *See* Docket No. 1. Vitol served its Initial Disclosures to the Debtor's counsel on October 29, 2021 and its First Amended Disclosures on January 28, 2022. Vitol's Initial Disclosures are available at Docket No. 14. A true and correct copy the First Amended Disclosures is attached as **Exhibit B**. After listing each individual Vitol identified as likely to have discoverable information, Vitol also included "All persons identified in documents disclosed by any party herein pursuant to Rule 26(a)(1), in response to request for discovery, attached to pleadings, or otherwise." *See* First Amended Disclosures, ¶ 10.

15.     The discovery deadline in this adversary proceeding was extended by a series of scheduling orders culminating in the *Sixth Stipulation and Agreed Order* [Docket No. 49] (the "**Sixth Scheduling Order**"). The Sixth Scheduling Order ordered the Debtor to finally appear for his deposition by March 25, 2022 and extended discovery through March 29, 2022. *See* Docket No. 49, ¶ 1.

16.     On Friday, March 25, 2022, after numerous rescheduling accommodations, the Debtor's deposition occurred. During the deposition, the Debtor identified the Trustee in his

capacity as the chapter 7 trustee for GCAC as having possession of GCAC's books and records and directed Vitol's counsel to "go to the trustee."

> **Q:** If you want to define[2] the books and records of Gulf Coast including an income statement, a balance sheet, and a general ledger, where would you go to find it?
>
> **Mr. Patterson:** Objection, calls for speculation. We are going to play hide and seek. But if you are really looking for them, go to the trustee. They have possession of everything.
>
> **A.** The – not having an accountant anymore, if I went to look for something today, I suppose I would have to go to the trustee or get access – have someone get access to the accounting system and print out the balance sheet, the income statements.

Brass Dep. 104:4-16, 25 Mar. 2022. The Debtor later testified that he was not sure when, how, or by whom GCAC's accounting records were transmitted to the Trustee. Brass Dep. 162:8-164:14, 25 Mar. 2022. Fact discovery closed the following Tuesday, on March 29, 2022.

17.     Prior to the Debtor's deposition, the Debtor had never previously identified the Trustee on his initial disclosures or otherwise indicated that the Trustee was an individual with discoverable information about GCAC's financial records, although such information would have been specifically responsive to Vitol's discovery requests regarding GCAC's financial documentation. *See* Vitol's First Request for Production of Documents, Request Nos. 4, 5, and 6, attached hereto as **Exhibit C**.

18.     After the Debtor's deposition, counsel for Vitol contacted Max Beatty, counsel to the Trustee, to inquire about these documents. Mr. Beatty indicated there was no need to serve a subpoena on the Trustee because the Trustee had received nothing from the Debtor in the GCAC bankruptcy.

---

[2] Upon information and belief, the question actually began "If you *wanted to find* the books and records," which is both phonetically similar and consistent with Mr. Patterson's allusion to playing "hide and seek" in response. Vitol's argument stands under either interpretation.

19.     On July 8, 2022, the Court set this matter for trial beginning August 30, 2022. *See* Docket Nos. 82 and 84. On August 8, 2022, Vitol filed its notices of trial subpoena which included the subpoena to the Trustee as "Chapter 7 Trustee for Gulf Coast Asphalt Company, LLC." *See* Docket No. 91-12.

20.     On August 22, 2022, Vitol timely filed its witness and exhibit list [Docket No. 101] (the "**W&E List**"). The Trustee is designated as a witness, again in his capacity as the chapter 7 trustee for Gulf Coast Asphalt Company, LLC, on the first page of the W&E List. *See* Docket No. 101, ¶ (g).

21.     On the fourth day of this trial on September 2, 2022, the Debtor for the first time objected to the Trustee as a witness in this adversary proceeding.[3] The Debtor did not file an objection to Vitol's witness list or a motion in limine relating to the Trustee's testimony. The sole stated basis of the Debtor's objection is that the Trustee was not identified on Vitol's initial disclosures (or any supplement) required under Fed. R. Civ. P. 26(a)(1) and 26(e).

22.     Vitol submits this trial brief in support of its use of the Trustee as a fact witness and, more generally, its use of both witnesses and evidence that Debtor's counsel was aware of, or should have been aware of, both through discovery and in writing, as allowed by Federal Rule of Civil Procedure 26(e)(1).

### III.  <u>ARGUMENTS AND AUTHORITIES</u>

23.     It is a strange reading of the Rules of Civil Procedure that puts Vitol in the position of having to defend the use of witnesses that the Debtor himself identified as having potentially relevant information. Specifically, the Debtor *himself* identified the Trustee as a party with

---

[3] Since the exchange of witness and exhibit lists on August 22, 2022, counsel for Vitol has made repeated attempts to discuss objections and stipulations to witnesses and exhibits. Counsel for the Debtor has refused all such attempts and—consistent with counsel's courtroom statements—affirmed their intention to reserve all such objections for trial.

discoverable information relating to GCAC's financial information during the course of his deposition. Vitol is entitled to rely on the Debtor's testimony, and the Debtor's own testimony is notice as required under Rule 26.[4]

24.    The Debtor's assertion that any evidence or witnesses that have not been formally supplemented pursuant to Federal Rule of Civil Procedure 37(c) must be excluded ignores the express language of the Rule. Rule 37(c) specifically does not extend to alleged failures of disclosure where "*the failure was substantially justified or is harmless.*" Fed. R. Civ. P. 37(c) (emphasis added). Here, Vitol was not required to supplement its initial disclosures pursuant to Federal Rule of Civil Procedure 26(e) when the Debtor and his counsel identified the Trustee during the Debtor's deposition.

**A.    Rule 26(a)(1) governs initial disclosures**

25.    Rule 26(a)(1) enumerates four categories of information that parties are required to disclose at the outset of an adversary proceeding "without awaiting a discovery request," including the names of "each individual likely to have discoverable information." Fed. R. Civ. P. 26(a)(1)(A)(i).

26.    Although the Debtor apparently knew the Trustee was the only individual with knowledge of GCAC's books and records since March 29, 2021 when the Trustee was appointed, the Debtor did not identify the Trustee in his initial disclosures or his responses to written discovery. In fact, the Debtor did not identify the Trustee until March 25, 2022—as it happens, the same date the Debtor first identified Kevin Boston as a potentially relevant witness, and refused

---

[4] As briefed to the Court previously, the relevance of GCAC's financial information is for Vitol to pursue an exception to discharge under the *Husky* case in that the Debtor orchestrated the transfer of funds from his closely held company as the expense of Vitol.

to provide Mr. Boston's telephone number to counsel. After the March 25, 2022 deposition, the Debtor did not supplement his disclosures.

**B.     Rule 26(e)(2) imposes no duty to supplement where the other party already knows the information**

27.     The obligation to supplement under Rule 26(e)(1)(A) is not an absolute one, but one that arises "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Therefore, there is no duty to supplement the designation of the Trustee as a fact witness because the Trustee's relevant knowledge had "otherwise been made known" in accordance with Rule 26(a)(3) by the Debtor's own testimony.

28.     To that end, courts have consistently reiterated the limitations of the obligation to supplement under Rule 26(e)(1). "[C]ourts have declined to exclude evidence or witnesses where the opposing party knew or should have known of an exhibit and its contents or the identity of a person and the scope of her testimony well before trial." *Drechsel v. Liberty Mut. Ins. Co.*, 2015 U.S. Dist. LEXIS 153336, at *5-6 (N.D. Tex. Nov. 12, 2015) (citing *Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Marketing Co. W.L.L.*, Civ. A. No. H-07-2684, 2008 U.S. Dist. LEXIS 97855, at *45-47 n.22 (S.D. Tex. Dec. 3, 2008)). "A party is not required to supplement its discovery if the additional or corrective information has 'otherwise been made known to the other parties during the discovery process or in writing[.]'" *In re Sambrano*, 440 B.R. 702, 707 (Bankr. W.D. Tex. 2010) (citing Fed. R. Civ. P. 26(e) and *Barker v. Bank One, N.A.*, 2005 U.S. Dist. LEXIS 19449, at *3 (N.D. Tex. Sept. 7, 2005) (finding that defendant was not required to supplement its discovery by identifying as witnesses individuals the plaintiff had deposed during discovery); 8 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. 3d § 2049.1 (West 2010)); *see also* 8A Wright, Miller, & Marcus, Federal Practice and Procedure, § 2049.1 at p. 313

(2019 supp.) (the analysis of whether a disclosure violation occurred is a "pragmatic" one, "[t]he focus is on the pragmatic question whether sufficient and timely correction was made."); *Bankston v. Kan. City Southern Ry.*, No. 03 Civ. 577 (CN), 2005 U.S. Dist. LEXIS 50783, 2005 WL 8155221, at *4 (M.D. La. Oct. 17, 2005) (("[T]he duty to supplement imposed by [FRCP] 26(e) should not require form over substance in this case."). Once again, the Debtor's objection here is entirely form over substance.

29.     Vitol had no *obligation* to update its disclosures to identify the Trustee, because the Debtor (and his counsel) knew the Trustee's identity and the likely scope of his testimony long before trial. Indeed, after refusing to produce his own company's business records or authenticate them during his deposition, it was the Debtor's counsel who noted that the financial records were with the Trustee. Because the Debtor's counsel notified Vitol that the Trustee had discoverable information regarding GCAC's financial records, any such supplementation would have been precisely the sort of duplicative and wasteful exercise that courts have emphasized is *not* the purpose of the rule. *See, e.g.*, *Reed*, 16 F.3d at 85 n.8 ("Indeed supplemental [interrogatory] responses herein, in light of Reed's deposition admissions, might largely be viewed as a duplicative, wasteful exercise.").

C.     **If the Rules did require Vitol to supplement its initial disclosures to identify the Trustee, any failure to do so was harmless**

30.     If the Court determines Vitol were under an obligation to supplement its initial disclosures to include the Trustee, such failure to do so is harmless given the Debtor himself identified the Trustee as the person having such information.

31.     In determining whether a failure to supplement is harmless under Rule 37(c), the court examines "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and

(4) the explanation for the party's failure to disclose." *Lundy Enters. v. Wausau Underwriters Ins. Co.*, 2010 U.S. Dist. LEXIS 157930, at *5 (E.D. La. Jan. 21, 2010) (plaintiff not permitted to introduce evidence in support of its damages claim when that claim was first identified at a deposition 24 months after a discovery request seeking such information); *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 401-402 (5th Cir. 2003) (failure to amend discovery to disclose invoices was harmless because "the prejudice to the adverse parties was negligible" given that the witness testifying in support of the invoices was properly designated as a witness prior to trial and any prejudice was cured by the one month given to the adverse parties to examine and respond to the contested evidence); *Schinabeck v. Wells Fargo Bank, N.A. (In re Schinabeck)*, 2014 Bankr. LEXIS 4444, at *13-15 (Bankr. E.D. Tex. Oct. 20, 2014) ("it could be persuasively argued that no supplementation [of Defendant's interrogatories] was needed here at all under Rule 26 (e)(1)(A) due to information tendered by the Defendant during the discovery process."); *Dilmore*, 636 F.2d at 969 n2.

32.     Here, the Trustee's testimony is important because it will highlight a glaring contradiction in the Debtor's story that goes to the crux of this proceeding. When confronted with numerous transfers from GCAC to or for the benefit of himself and his mother, the Debtor has consistently sought to characterize the transfers as loans and deferred to the Trustee as the person who has "possession of everything." Upon information and belief, the Trustee will testify that he never received any documents from the Debtor and will further testify that GCAC's own bankruptcy schedules do not identify *any* loans owed by the Debtor or his mother as assets of GCAC. This evidence is a crucial part of the evidence necessary to establish the badges of fraud underpinning Vitol's *Husky* claim.

33.     If Vitol were not able to demonstrate these Transfers, Vitol's case against the Debtor would be prejudiced.

34.     To the extent necessary, Vitol is willing to agree to a continuance to allow the Debtor to depose the Trustee or take whatever discovery the Debtor needs to identify the information that the Trustee received from the Debtor regarding the Debtor's bankrupt companies. However, Vitol submits that no such continuance is necessary given that the Debtor has already declined the opportunity to depose the Trustee during the active discovery process.

35.     Vitol did not supplement its initial disclosures to disclose the identity of the Trustee because the Debtor himself had already demonstrated awareness of the Trustee's existence and potential relevance. Vitol believed that the Debtor's testimony instructing Vitol to seek the desired information from the Trustee adequately made the Debtor aware of that information. The Debtor was not harmed by Vitol not listing the Trustee on its disclosures.

**D.     Vitol should not be punished for the Debtor's continuous and intentional failure to disclose the Trustee as an individual with "discoverable information" until four days before discovery closed.**

36.     The 1983 Advisory Committee Notes to Rule 26 make clear that the purpose of discovery is to provide a mechanism for making relevant information available to the litigants. Fed. R. Civ. P. 26 Advisory Committee's Note (1983). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Id*. citing to *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). "Thus the spirit of the rules is violated when advocates attempt to use discovery tools as *tactical weapons* rather than to expose the facts and illuminate the issues by overuse of discovery or unnecessary use of defensive weapons or evasive responses." *Id*. (emphasis added). "All of this results in excessively costly and time-consuming activities that are disproportionate to the nature of the case, the amount involved, or the issues or values at stake." *Id*.

37.     As the Plaintiff, Vitol bears the burden of establishing its case. Vitol is ready and prepared to meet that burden. But Vitol does not – and *should* not – bear the burden of disclosing information in discovery that is unknown to Vitol and that the Debtor and his counsel continuously concealed despite Debtor's ongoing obligation to disclose it. Excluding the Trustee would reward Debtor for concealing relevant facts.

## CONCLUSION

38.     Once again, Defendant's oral objection to testimony is calculated to distract the Court from the merits of this adversary proceeding, to prevent this Court from seeing the compelling evidence that supports Vitol's claims, and to drive up the expense of litigating this case. To exclude the chapter 7 Trustee as a fact witness is not consistent with the rules which are designed to avoid unfair surprise or prejudice, not require duplicative reproduction of information already known to an adversary. Accordingly, Vitol requests that this Court overrule the Defendant's objection, allow Vitol to present the Trustee as a witness in this case, and for any such other and further relief, at law or in equity, to which Vitol may show itself to be justly entitled.

Dated: **September 5, 2022**                    Respectfully submitted,

By: */s/ Michael P. Cooley*
    Keith M. Aurzada (SBN 24009880)
    Michael P. Cooley (SBN 24034388)
    Bradley J. Purcell (SBN 24063965)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T:  469.680.4200
    F:  469.680.4299
    kaurzada@reedsmith.com
    mpcooley@reedsmith.com
    bpurcell@reedsmith.com
    lrobin@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP**
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834
F:  713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on **September 5, 2022**, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all parties registered to receive electronic notices in this adversary proceeding, including counsel for the Defendant.

/s/  Michael P. Cooley
Michael P. Cooley

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| VITOL INC. | § | |
| | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**<u>DEFENDANT'S RESPONSES TO VITOL'S</u>**
**<u>FIRST SET OF INTERROGATORIES TO</u>**
**<u>DEBTOR</u>**

**INTERROGATORY NO. 1:**  Describe in detail Your duties as president of GCAC.

**RESPONSE:**  I had general management responsibility for GCAC strategy, long-term planning, financial matters, and general employment issues.

**INTERROGATORY NO. 2** Identify all individuals that had control over or access to GCAC's finances.

**RESPONSE:** Arthur Brass and John Tomaszewski

**INTERROGATORY NO. 3** For all individuals identified under Interrogatory No. 2 identify the source of authority to control GCAC's finances and what control was exercised.

**RESPONSE:**  The source of these individuals authority is their agency relationship with GCAC. Arthur Brass had control and access to all of GCAC's finances.  John Tomaszewski had signatory authority at Iberia Bank. John Tomaszewski's authority was limited to acting as signatory at Arthur Brass direction.

**INTERROGATORY NO. 4:** Identify each payment, transfer, loan, salary, wage, distribution, or other money You received from GCAC.

**RESPONSE:**  See attached spreadsheet for payments from 3-17-2017 through 10-29-2019.

**INTERROGATORY NO. 5:** How much money did GCAC transfer to You or for Your benefit.

**RESPONSE:**  See Response to Interrogatory #4

**INTERROGATORY NO.6:**  Identify each payment, transfer, loan, salary, wage, distribution, or other money your wife received from GCAC.

**RESPONSE:**  See attached.  Mr. Brass allocated a portion of his salary to be direct deposited to his wife convenience purposes to be used for general household expenses.

**INTERROGATORY NO.7:** Identify each payment, transfer, loan, salary, wage, distribution, or other money your mother received from GCAC.

**RESPONSE:**  See attached, Debtor produced all information within his possession.

**INTERROGATORY NO. 8:** Identify each payment, transfer, loan, salary, wage, distribution, or other money your sister received from GCAC.

**RESPONSE:** All payments made by GCAC to the Debtor's sister were made on behalf of their mother. Therefore, the spreadsheet responsive to Interrogatory #7 includes all payments.

**INTERROGATORY NO. 9:** Identify the date, amount, and purpose of all funds GCAC received from third parties for the sale of asphalt and other commodities.

**RESPONSE:**  See attached

**INTERROGATORY NO. 10:** Identify the date, amount, and purpose of all funds you allege GCAC paid to Vitol.

**RESPONSE:**  Attached

**INTERROGATORY NO. 11:**  Identify the sources of working capital for GCAC.

**RESPONSE:**  GCAC did not have any bank loans for working capital during this period of time. GCAC received funds from 1); cash on hand; 2) loans from shareholders; and 3) proceeds from sales of product.

**INTERROGATORY NO. 12:**  Describe in detail the factual basis for your contention that GCAC was not insolvent during the pendency of its relationship with Vitol, as set forth in paragraph 6 of your Answer.

**RESPONSE:**  GCAC had an ongoing business that was valuable and worth more than its obligations.

Dated: _____

I declare under penalty of perjury that the information, statements and facts given above are true and correct to the best of my knowledge.

_____
Arthur J. Brass

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S FIRST AMENDED INITIAL DISCLOSURES**

Pursuant to Rule 26(a) of a Federal Rules of Civil Procedure, made applicable to this Adversary Proceeding under Rule 7026 of the Federal Rules of Bankruptcy Procedure, Plaintiff Vitol Inc. (the "**Vitol**" or "**Plaintiff**") files its First Amended Initial Disclosures as follows. These disclosures are based on information reasonably available to Vitol as of the date of this filing. Vitol does not represent that it is identifying every document, individual, or piece of evidence possibly relevant to this lawsuit, nor does Vitol waive any right to object to production of any document or other evidence on the basis of any privilege, the work product doctrine, relevancy, undue burden, or any other valid basis. Vitol reserves its right to supplement and/or amend these disclosures to the extent additional documents and/or information may be discovered.

**I.    Individuals.**

Pursuant to Rule 26(a)(1)(A)(i), Vitol discloses the following individuals likely to have discoverable information. With respect to Vitol or its employees, all contact should be only through Vitol's undersigned attorneys.

1.    Eric Kuo
      c/o Keith M. Aurzada
      Reed Smith LLP
      2850 N. Harwood Street, Ste. 1500
      Dallas, TX 75201
      T:  469.680.4211
      Mr. Kuo has general knowledge of the business relationship between Vitol and
      GCAC and interacted with Defendant Brass during the pendency of that
      relationship.

2.    Mike Ruzek
      c/o Keith M. Aurzada
      Reed Smith LLP
      2850 N. Harwood Street, Ste. 1500
      Dallas, TX 75201
      T:  469.680.4211
      Mr. Ruzek has general knowledge of the business relationship between Vitol and
      GCAC and interacted with Defendant Brass during the pendency of that
      relationship.

3.    Mike Loya
      c/o Keith M. Aurzada
      Reed Smith LLP
      2850 N. Harwood Street, Ste. 1500
      Dallas, TX 75201
      T:  469.680.4211
      Mr. Loya has general knowledge of the business relationship between Vitol and
      GCAC and interacted with Defendant Brass during the pendency of that
      relationship.

4.    Tom Moran
      c/o Keith M. Aurzada
      Reed Smith LLP
      2850 N. Harwood Street, Ste. 1500
      Dallas, TX 75201
      T:  469.680.4211
      Mr. Moran has general knowledge of the business relationship between Vitol and
      GCAC and interacted with Defendant Brass during the pendency of that
      relationship.

5.    Patrick Perugini
      Address unknown
      Mr. Perugini worked for the Debtor at GCAC and had knowledge of his
      appropriating funds properly due to Vitol.

6.      A.J. Brass
c/o Miriam Goott
Walker & Patterson P.C.
P.O. Box 61301
Houston, TX 77208
T:  713.956.5577
As the Defendant and the Debtor, Mr. Brass has personal knowledge of his misrepresentations and frauds committed against Vitol.

7.      Catherine Mattingly Brass
2508 Pelham Dr.
Houston, TX 77019
As the wife of the Debtor, Catherine Brass may have knowledge of Debtor's finances and his use of company funds to support their lifestyle and the transfer of proceeds from the Hockley House to her personal bank accounts.

8.      Joyce Brass
2508 Pelham Dr.
Houston, TX 77019
As the co-owner of GCAC, Joyce Brass should have knowledge of the Debtor's use of company funds and the undocumented loans transferred to her personal accounts.

9.      Sandra Brass
Address unknown
Sandra Brass should have knowledge of the alleged loan transferred to her personal accounts.

10.     All persons identified in documents disclosed by any party herein pursuant to Rule 26(a)(1), in response to requests for discovery, attached to pleadings, or otherwise.

11.     Vitol reserves the right to supplement these disclosures consistent with the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure.

## II.    **Documents**.

Vitol believes that it has produced all relevant documents responsive to Debtor's requests.

## III.    **Computation of Damages**.

Vitol seeks to prevent Debtor from discharging at least $10 million in obligations owed to

Vitol arising from Debtor's conduct. In the state-court litigation, Vitol asserted damages of at least

$14,793,974 arising from Debtor's conduct. Debtor and Vitol entered an Agreed Judgment in the state-court litigation for $10 Million as part of a settlement of Vitol's claims.

## IV.     **Insurance Agreements**.

Rule 26(a)(1)(D) requires production of "any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment." Vitol is unaware of any insurance agreement fitting this description.

**January 28, 2022.**                         Respectfully submitted,

By: */s/ Keith M. Aurzada*
Keith M. Aurzada (SBN 24009880)
Lindsey L. Robin (SBN 24091422)
**REED SMITH LLP**
2850 N. Harwood, Suite 1500
Dallas, Texas 75201
T:  469.680.4200
F:  469.680.4299
kaurzada@reedsmith.com
lrobin@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP**
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834
F:  713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on **January 28, 2022** a true and correct copy of the foregoing document was served on Defendant's counsel *via email*.

_/s/ Keith M. Aurzada_____
Keith M. Aurzada

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

## **PLAINTIFF VITOL INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

TO:   Defendant Arthur Jacob Brass, by and through his counsel of record, WALKER & PATTERSON, P.C., Miriam Goott, P.O. Box 61301, Houston, TX 77208.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, made applicable to this proceeding through Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 9014 and 7034, Plaintiff Vitol Inc. serves the following *First Requests for Production of Documents* (each, a "**request**") as attached hereto as **Exhibit A** on Defendant. Defendant is instructed to respond to these Requests in writing and produce documents no later than **December 3, 2021**. Plaintiff requests that Defendant supplement his answers as may be necessary and appropriate.

Dated:  November 3, 2021.

Respectfully submitted,

By: */s/ Keith M. Aurzada*_____
    Keith M. Aurzada
    State Bar No. 24009880
    Lindsey L. Robin
    State Bar No. 24091422
    **REED SMITH LLP**
    2850 N. Harwood St., Suite 1500
    Dallas, Texas 75201
    T:  469.680.4200
    F:  469.680.4299
    kaurzada@reedsmith.com
    lrobin@reedsmith.com

and

    Michael H. Bernick
    State Bar No. 24078277
    Mason W. Malpass
    State Bar No. 24109502
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T:  713.469.3834
    F:  713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

*Counsel to Plaintiff Vitol, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 3, 2021, a true and correct copy of the foregoing document was served on Defendant's counsel of record ***via email***.

Miriam Goott
State Bar No. 24048846
**WALKER & PATTERSON, P.C.**
P.O. Box 61301
Houston, TX 77208
T:  713.956.5577
F:  713.956.5570
mgoott@walkerandpatterson.com

*/s/  Keith M. Aurzada*
Keith M. Aurzada

**EXHIBIT A**

## <u>INSTRUCTIONS</u>

1.      In answering these Requests, you are to be guided by these Instructions and the Definitions provided below.

2.      Each Request is addressed to Defendant, along with any person or entity acting on behalf of Defendant, including any officer, director, employee, agent, representative, investigator, consultant, or attorney of Defendant.

3.      In answering each Request, furnish all information and documents available to you, including information and documents in the possession of your agents, representatives, employees, investigators, attorneys, or anyone acting on their behalf or on your behalf, and not merely such information within your personal knowledge.

4.      These discovery requests are continuing in nature until the date of the trial or other final resolution of this matter, and you are requested to supplement your responses as additional information may become available to you. Such supplemental responses shall be served within a reasonable time after the occurrence of the events necessitating the supplemental response. In addition, you are under a duty to amend any response to these requests if you obtain information or documents which indicate that your prior response was incorrect when made or that the response, though correct or complete when made, is no longer correct or complete.

5.      If you object to any part of these discovery requests, these instructions, or the definitions below, please state the nature of your objection with sufficient specificity so that the parties, if possible, can resolve their differences with respect to the request without involving the Court.

6.      If you claim that the attorney-client or other privilege or the work product doctrine is applicable to any document the identification of which is sought by these requests, then with respect to each such document (a) identify the privilege, doctrine or other protection you claim; (b) identify the document's date, author(s), addressee(s), copy addressee(s) and others to whom the document was disclosed, and their position (e.g., employee, in-house attorney or outside legal counsel); (c) identify the type and subject or heading of the document; and (d) provide a description of the document's subject matter sufficient to permit adjudication of your privilege claim.

7.      These discovery requests are continuing in nature until the date of the trial or other final resolution of this matter, and you are requested to supplement your responses as additional information may become available to you. Such supplemental responses shall be served within a reasonable time after the occurrence of the events necessitating the supplemental response.

8.      As to all documents that are responsive to this request but that were lost or destroyed, you are requested to identify each such document by date, author(s), recipient(s), and subject matter and to describe how the document was lost or destroyed.

9.      **<u>Time Period</u>**. Unless otherwise specified, the relevant time period for these requests is from January 1, 2017 through the present.

## DEFINITIONS

The following Definitions apply to these Requests:

1.      "**Document**" or "**documents**" shall be used in their broadest sense and shall mean any tangible thing upon which any expression, communication, data or representation has been recorded by any means including, but not limited to, handwriting, typewriting, printing, photostatting, electronic mail (e-mail), electronically stored information ("ESI"), photographing, magnetic impulse, or mechanical or electronic recording and any non-identical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, memoranda, charts, notes, records of any sort of meetings, invoices, financial statements, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, audio or video tape recordings, microfilm, microfiche, computer tape, computer disk, computer printout, computer card, and all other writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

2.      "**ESI**" or "**Electronically Stored Information**" includes, without limitation, the following: (a) structured and unstructured data, as those terms are defined in The Sedona Conference Glossary, available at www.thesedonaconference.org/publications; (b) activity listings of electronic mail receipts and/or transmittals; (c) output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messaging programs and applications ( e.g., AOL Instant Messenger, Blackberry Messenger, Google Talk, Windows Live Messenger, and iChat), text-messaging programs or applications, or bulletin board programs, operating and backup systems, source code, PRF files, PRY files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a backup file or system, a deleted file or system, or file fragment; (d) any and all items stored on computer memories, hard disks, floppy disks, clouds, memory sticks, SD cards, CD-ROM, magnetic tape, microfiche, or in any other vehicle for digital data usage, storage or transmittal, such as, but not limited to, desktop computers, servers and other network computers, backup tapes or systems, laptop computers, tablets (e.g., iPads), home or personal computers used for business purposes, cellphones, smartphones, personal digital assistants, or similar devices running mobile operating systems, including such devices owned by your Employees and used in any way for business purposes, external storage devices (such as "keychain" drives) and file folder tabs, or containers and labels appended to or relating to any physical storage device associated with each original or copy of all Documents requested herein; (e) any and all content stored on voicemail systems, websites, company intranet sites, chat rooms and social networking websites (e.g., Facebook, LinkedIn, Twitter and social network websites, including those listed at http://en.wikipedia.org/wiki/List_of_social_networking_websites); and (f) any and all data, data compilations, and data analyses.

3.      "**Communication**" or "**Communications**" shall mean any written, oral, or electronic conversation, meeting, contact, promise, representation, exchange or inducement of which you have any knowledge or information, whether internal or external.

4.      The terms "**concerning**," "**relating to**," "**regarding**," "**reflecting**," and "**referring to**" shall mean constituting, evidencing, mentioning, describing, pertaining to, responding to, used or relied on in preparation of or in conjunction with, or being connected with in any way, either directly or indirectly.

5.      "**Any**" or "**each**" should be understood to include and encompass "all"; "**or**" should be understood to include and encompass "and"; and "**and**" should be understood to include and encompass "or."

6.      The term "**including**" should be understood to encompass "but not limited to."

7.      "**Describe in detail**" means to state each and every fact concerning the information requested by the Interrogatory, including, without limitation, (a) the identity of each person having knowledge of each fact or opinion relating to the information requested, (b) the identity of each document reflecting or relating to the information requested, (c) the identity of all communications relating to the information requested, and (d) all relevant date and time periods.

8.      "**State the basis**" means to state with specificity all facts supporting, contradicting, or otherwise relating to the subject matter of the interrogatory, and to identify all communications or documents relating to such facts, and all persons likely to have knowledge of such facts.

9.      "**Person**" shall mean any natural person, firm, corporation, partnership, joint venture or any form of business entity or other organization.

10.     "**You**," "**Your**," "**Debtor**," or "**Defendant**" shall refer to Defendant Arthur Jacob Brass and includes his affiliates, related entities, successors, assigns, employees, representatives, investigators, agents, or attorneys; provided, however, that if the context of a discovery request indicates that inclusion of "attorneys" in the foregoing terms would require the production of information protected from discovery, then such discovery requests should be answered with an understanding that the foregoing terms do not include "attorneys."

11.     "**GCAC**" means Gulf Coast Asphalt Company, LLC, its successors, predecessors, divisions, subsidiaries, present and former officers, agents, employees, and all other persons acting on behalf of defendant or its successors, predecessors, divisions, and subsidiaries.

12.     "**Trifinery**" means Trifinery, Inc., its successors, predecessors, divisions, subsidiaries, present and former officers, agents, employees, and all other persons acting on behalf of defendant or its successors, predecessors, divisions, and subsidiaries.

13.     "**Plaintiff**" or "**Vitol**" shall mean Plaintiff Vitol Inc. including its affiliates, related entities, employees, representatives, investigators, agents, or attorneys.

14.     "**Petition Date**" shall mean March 26, 2021.

15.     "**Complaint**" shall mean the *First Amended Complaint to Determine Dischargeability of Debts* filed by Vitol at Docket No. 10.

16.     "**Answer**" shall mean the *Answer to Amended Complaint filed by Vitol, Inc.* filed by Debtor as Adv. Docket No. 11.

17.     "**General Ledger**" means the data from GCAC's record keeping system for tracking GCAC's transactional and financial data, including subledgers or subsets.

18.     "**Byer Builders**" means Byer Builders, Inc. and all its successors, predecessors, divisions, subsidiaries, present and former officers, agents, employees, and all other persons acting on behalf of defendant or its successors, predecessors, divisions, and subsidiaries.

19.     The "**Hockley House**" means the entire property and any and all fixtures located at 14 Lakeside Ln., Hockley, TX 77447.

20.     The use of the singular herein also includes the plural, the masculine and the feminine, as appropriate in the context. The use of any tense of any verb shall include also within its meaning all other tenses of the verb. Any capitalized term used but not defined herein has the meanings assigned to them in the Complaint.

## REQUESTS FOR PRODUCTION

1.     All correspondence between You and third parties to whom GCAC sold asphalt and other commodities.

2.     All documents evidencing the ownership and management structures of GCAC and Trifinery.

3.     All documents evidencing all individuals with authority over or access to GCAC's finances.

4.     All documents evidencing GCAC's and Trifinery's sources of working capital.

5.     All documents evidencing GCAC's financial condition, including documents evidencing its solvency, if any, from January 1, 2017 to the Petition Date.

6.     All documents evidencing GCAC's financial condition, including documents evidencing its solvency, if any, on June 30, 2017.

7.     All documents evidencing GCAC paying for expenses or liabilities incurred by Vitol.

8.     All documents evidencing each payment, transfer, loan, salary, wage, or other money You received from GCAC.

9.     All documents evidencing each payment, transfer, loan, salary, wage, or other money your wife received from GCAC.

10.     All documents evidencing each payment, transfer, loan, salary, wage, or other money your mother received from GCAC.

- 8 -

11.    All documents relating to the sale of the Hockley House, including documents evidencing the sale price, the date of sale, and where the proceeds from the sale were directed.

12.    All documents evidencing transfers you made to your wife, including bank statements.

002214

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|                          |   |                         |
|--------------------------|---|-------------------------|
| IN RE                    | § | CASE NO. 21-60025       |
|                          | § |                         |
| ARTHUR J. BRASS          | § |                         |
| DEBTOR                   | § |                         |
|                          | § |                         |
| VITOL INC.               | § | ADVERSARY NO. 21-06006  |
| Plaintiff                | § |                         |
| v.                       | § |                         |
|                          | § |                         |
| ARTHUR J. BRASS          | § |                         |
| Defendants               | § |                         |

## DEFENDANT'S RESPONSE TO VITOL'S BRIEF

COMES NOW, Arthur J. Brass ("**Debtor**") and files this Response to Vitol's Brief filed at Docket No. 138.

### TESTIMONY OF CHRISTOPHER R. MURRAY, CHAPTER 7 TRUSTEE

1. During trial, Vitol called Christopher R. Murray, to testify as a fact witness.

2. Mr. Murray is the Chapter 7 Trustee for the Debtor and GCAC, and has been the Trustee since these bankruptcy cases were filed more than one year ago.

3. The Debtor objected to Vitol calling Mr. Murray as a witness because Vitol never identified Mr. Murray as a witness in its Initial Disclosures as required by Rule 7026(a).

4. As a result, Mr. Murray did not testify.

5. Subsequently, Vitol filed a brief attempting to explain why Mr. Murray should be allowed to testify and why Vitol is not required to comply with the rules regarding disclosure (the, "**Brief**").

6. In summary, Vitol argues that the Debtor was unable to answer questions about GCAC's financial documents during his deposition, and that Vitol's counsel **first** learned that Mr. Murray, the Chapter 7 Trustee for GCAC, was the individual who would have discoverable information about GCAC and its finances, during this deposition (the, "**Deposition**").

7. The Deposition occurred on March 25, 2022.

1

**DEBTOR'S RESPONSE**

8.  First, Vitol is a creditor in the GCAC bankruptcy case and was well aware that Mr. Murray was the Chapter 7 Trustee for GCAC before it filed its lawsuit against the Debtor.

9.  Second, Vitol filed its Initial Disclosures in the Adversary long after the GCAC bankruptcy was filed and did not disclose Mr. Murray.

10. Third, Vitol propounded written discovery on the Debtor and never asked who was in possession of GCAC's financial documents – the very same documents that Vitol now suddenly claims are so crucial to their case.  *See Exhibit A*

11. Fourth, GCAC never amended its Initial Disclosures.

12. Fifth, Vitol alleges that its counsel first learned on March 25, 2022, that Mr. Murray is the individual with information about GCAC.  However, Vitol never filed a Motion asking this Court to reopen discovery to depose Mr. Murray and never served Mr. Murray with a subpoena to produce relevant documents.

13. Instead, Vitol waited until the week before trial to notify the Debtor that he intended to call Mr. Murray as a witness at trial.

**VITOL'S INCREDULOUS ARGUMENT**

14. More fundamentally, Vitol's argument that its counsel first learned that the Chapter 7 Trustee for GCAC would be the one with information about GCAC, borders on frivolous and disingenuous.

15. Vitol's counsel are sophisticated bankruptcy attorneys who should know that a Chapter 7 Trustee is precisely the person who would have possession of financial information about a corporate Debtor.

16. According to Reed Smith's website, Mr. Cooley's practice is centered on matters of federal bankruptcy law and that Mr. Cooley authored 26 original chapters on procedural rules governing bankruptcy litigation.

17. There is absolutely no explanation provided by Vitol that would explain why Mr. Murray was not disclosed in its Initial Disclosures.  Furthermore, Vitol never provided the Debtor with informal notice that it intended to call Mr. Murray as a witness at trial.

2

<u>**The Rules**</u>

18. There is not one ounce of doubt that Rule 26(a)(1)(A) and Rule 37(c) require disclosure of witnesses that will testify at trial, and that failure to identify a witness prohibits their testimony.

19. There is also not one ounce of doubt that Vitol failed to disclose Mr. Murray as required by the Rules.

20. Vitol's counsel is asking this Court to ignore the rules and focus on limited exceptions to rules.  Once again, Vitol takes no responsibility for its continued failure to comply with basic pretrial disclosure requirements.

Dated: <u>September 6, 2022</u>

Respectfully submitted,

By: <u> /s/ Miriam Goott</u>

Miriam Goott
SBN#24048846
COUNSEL FOR DEBTOR

OF COUNSEL:
Walker & Patterson, P.C.
P.O. Box 61301
Houston, TX 77208-1301
(713) 956-5577
(713) 956-5570 (fax)
mgoott@walkerandpatterson.com

002217



VITOL EXHIBIT

96

Adv. No.: 21-06006 8/30/2022

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**DEFENDANT'S RESPONSES TO VITOL'S
FIRST SET OF INTERROGATORIES TO
DEBTOR**

**INTERROGATORY NO. 1:**  Describe in detail Your duties as president of GCAC.

**RESPONSE:**  I had general management responsibility for GCAC strategy, long-term planning, financial matters, and general employment issues.

**INTERROGATORY NO. 2** Identify all individuals that had control over or access to GCAC's finances.

**RESPONSE:** Arthur Brass and John Tomaszewski

**INTERROGATORY NO. 3** For all individuals identified under Interrogatory No. 2 identify the source of authority to control GCAC's finances and what control was exercised.

**RESPONSE:**  The source of these individuals authority is their agency relationship with GCAC. Arthur Brass had control and access to all of GCAC's finances.  John Tomaszewski had signatory authority at Iberia Bank. John Tomaszewski's authority was limited to acting as signatory at Arthur Brass direction.

**INTERROGATORY NO. 4:** Identify each payment, transfer, loan, salary, wage, distribution, or other money You received from GCAC.

**RESPONSE:**  See attached spreadsheet for payments from 3-17-2017 through 10-29-2019.

**INTERROGATORY NO. 5:** How much money did GCAC transfer to You or for Your benefit.

**RESPONSE:**  See Response to Interrogatory #4

**INTERROGATORY NO.6:**  Identify each payment, transfer, loan, salary, wage, distribution, or other money your wife received from GCAC.

**RESPONSE:** See attached. Mr. Brass allocated a portion of his salary to be direct deposited to his wife convenience purposes to be used for general household expenses.

**INTERROGATORY NO.7:** Identify each payment, transfer, loan, salary, wage, distribution, or other money your mother received from GCAC.

**RESPONSE:** See attached, Debtor produced all information within his possession.

**INTERROGATORY NO. 8:** Identify each payment, transfer, loan, salary, wage, distribution, or other money your sister received from GCAC.

**RESPONSE:** All payments made by GCAC to the Debtor's sister were made on behalf of their mother. Therefore, the spreadsheet responsive to Interrogatory #7 includes all payments.

**INTERROGATORY NO. 9:** Identify the date, amount, and purpose of all funds GCAC received from third parties for the sale of asphalt and other commodities.

**RESPONSE:** See attached

**INTERROGATORY NO. 10:** Identify the date, amount, and purpose of all funds you allege GCAC paid to Vitol.

**RESPONSE:** Attached

**INTERROGATORY NO. 11:** Identify the sources of working capital for GCAC.

**RESPONSE:** GCAC did not have any bank loans for working capital during this period of time. GCAC received funds from 1); cash on hand; 2) loans from shareholders; and 3) proceeds from sales of product.

**INTERROGATORY NO. 12:** Describe in detail the factual basis for your contention that GCAC was not insolvent during the pendency of its relationship with Vitol, as set forth in paragraph 6 of your Answer.

**RESPONSE:** GCAC had an ongoing business that was valuable and worth more than its obligations.

Dated: _____

I declare under penalty of perjury that the information, statements and facts given above are true and correct to the best of my knowledge.

_____
Arthur J. Brass

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 09, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-60025** |
| **ARTHUR JACOB BRASS,** | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |
| | § | |
| **VITOL INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 21-06006** |
| | § | |
| **ARTHUR JACOB BRASS,** | § | |
| | § | |
| Defendant. | § | |

### <u>Arthur J. Brass Testimony Order</u>

Federal Rule of Evidence 614 authorizes a bankruptcy court to call a witness on its own or at the request of a party. FED. R. EVID. 614(a).

A trial in this adversary proceeding started in August 2022. Arthur J. Brass is the debtor in this chapter 7 case and the defendant. For the reasons stated on the record at the September 7, 2022 hearing, the Court orders Mr. Brass to appear and testify as a witness on September 16, 2022.

Signed:  September 08, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

002221

```
 1                  UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3    Arthur Jacob Brass,            )
                                     ) CASE NO. 21-60025
 4              Debtor.              )
      ------------------------------)
 5    Vitol Inc.,                    ) CASE NO: 21-06006
                                     ) ADVERSARY
 6              Plaintiffs,          )
                                     ) Houston, Texas
 7        Vs.                        )
                                     ) Wednesday, September 7, 2022
 8    Arthur Jacob Brass,            )
                                     ) 10:32 A.M. to 6:02 P.M.
 9              Defendants.          )
      ------------------------------)
10
                                TRIAL
11           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE
12


13    APPEARANCES:
      For Plaintiffs:          MICHAEL P. COOLEY
14                             KEITH MILES AURZADA
                               Reed Smith, LLP
15                             2501 N. Harwood, Suite 1700
                               Dallas, TX 75201
16
      For Defendant:           MIRIAM GOOTT
17                             JOHNIE J. PATTERSON
                               Walker & Patterson, PC
18                             P.O. Box 61301
                               Houston, TX 77208
19
      Court Reporter:          ZILDE MARTINEZ
20
      Courtroom Deputy:        ZILDE MARTINEZ
21
      Transcribed by:          Veritext Legal Solutions
22                             330 Old Country Road, Suite 300
                               Mineola, NY 11501
23                             Tel: 800-727-6396

24    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
25
```

```
 1                              INDEX

 2    PLAINTIFFS' WITNESSES    DIRECT   CROSS    REDIRECT    RECROSS

 3    ERIC KUO                 27/58    130/213

 4

 5    DEFENDANT'S WITNESSES    DIRECT   CROSS    REDIRECT    RECROSS

 6

 7

 8    PLAINTIFFS' EXHIBITS                        RECEIVED

 9    EXHIBIT 1                                   32

10    EXHIBIT 14                                  61

11    EXHIBIT 25                                  73

12    EXHIBIT 3                                   78

13    EXHIBIT 12                                  81

14    EXHIBIT 18                                  91

15    EXHIBIT 19                                  95

16    EXHIBIT 22                                  99

17    EXHIBIT 23                                  100

18    EXHIBIT 54                                  115

19    EXHIBIT 86                                  126

20

21    DEFENDANT'S EXHIBITS                        RECEIVED

22    EXHIBIT 25                                  181

23    EXHIBIT 23                                  205

24

25
```

```
 1     HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 7, 2022; 10:32 A.M.

 2                       (Call to Order)

 3          THE COURT:  Okay, good morning, everyone.  This is

 4     Judge Lopez.  Today is September 7th.  We are back on the

 5     record in Vitol v. Brass.  I hope everyone had a good

 6     holiday weekend.  I see counsel for Vitol here.  Counsel for

 7     Brass is here.

 8          Why don't we talk a little housekeeping?  Before

 9     we do, I want to make sure to talk, that no one is in the

10     room where the rule has been invoked and that if there's any

11     witness that -- can we just make sure that they're not

12     actually kind of sitting out here, that they are further

13     down the hallway so they can't actually hear what we're

14     saying so that the rule can actually be the rule?  We're

15     good?  Okay.

16          Mr. Cooley, why don't we talk a little

17     housekeeping?

18          MR. COOLEY:  Of course, Your Honor.

19          THE COURT:  I saw that you filed some stuff.  So

20     if you want to talk about it now.

21          MR. COOLEY:  Very well, Your Honor.  The --

22          THE COURT:  Why don't you get closer to the mic.

23     I want to make sure we can hear you.

24          MR. COOLEY:  Of course.  Over the weekend we filed

25     just a handful of things.  We filed an amended witness and
```

Page 4

```
 1    exhibit list I think together with a redline of it to show

 2    the changes which had to do with some of the items that had

 3    been previously described to the Court; the renumbering of

 4    the misnumbered exhibits, I believe we added on the

 5    Tomaszewski deposition, and there might have been one or two

 6    other edits that were noted in the redline.  We filed that.

 7    That's one.

 8              THE COURT:  Okay.

 9              MR. COOLEY:  Next, Your Honor, we also filed what

10    we titled a Notice of Production of Chubb Documents.  This

11    was just to answer the objection that had been raised by

12    opposing counsel that certain documents that had been

13    produced by Chubb in the course of this litigation,

14    including a document we have referred colloquially as the

15    jewelry rider had not previously been produced to counsel in

16    this case.  This got into the question of being able to

17    verify transmittals through share file and such.  The Court

18    may recall we discussed that last week.  So we filed a

19    notice together with an affidavit from Mr. James Tolbert,

20    whom the Court has heard from previously -- he is our e-

21    discovery technician at Reed Smith -- detailing the efforts

22    he went to and the confirmations that he found in the system

23    that --

24              THE COURT:  You think the Chubb docs were

25    previously produced minus the one page?  I'm assuming the
```

1    business record affidavit that was attached to it?

2         MR. COOLEY:  Correct, Your Honor.  We believe all

3    of those documents were previously produced.

4         THE COURT:  Are you going to try to get a -- are

5    you going to try to get, whoever the witness was, to try to

6    -- are you going to try to proceed to get Chubb in, or

7    what's your thought now that you've produced that?

8         MR. COOLEY:  Your Honor, I think the only issue --

9    if I recall correctly, the only issue with respect to Chubb

10   was the question of whether or not they had previously been

11   produced.  I believe that was the document as to which there

12   was no --

13        THE COURT:  I agree.  So are you going to seek to

14   try to move that in at some point?

15        MR. COOLEY:  Yes, Your Honor.  Yes.

16        THE COURT:  Okay.  And are you going to try to

17   move through business record affidavit or are you going to

18   try to move it through a witness, or what's your plan?

19        MR. COOLEY:  Well, Your Honor, since there was no

20   -- since as I understood it counsel withdrew their objection

21   to the authenticity of the document, that was no longer in

22   question.  The issue was solely whether or not the document

23   had in fact been produced previously, i.e. whether there was

24   an unfair surprise.

25        THE COURT:  Okay.

```
 1            MR. COOLEY:  I believe we've addressed that.  And
 2    with the withdrawal of the authenticity objection, Your
 3    Honor, we would submit that that document is ripe for
 4    admission to the record.
 5            THE COURT:  Okay.  We'll see what the plan -- let
 6    me ask you another question.
 7            MR. COOLEY:  Yes, Your Honor.
 8            THE COURT:  Before we broke the other day there
 9    was a question about Mr. Brass and you had started
10    describing about being unable to serve him with a subpoena
11    in connection with his testimony.  It was the end of the day
12    and I didn't want to take up a new topic, quite frankly, at
13    that point.  But just at the 10,000-foot level -- and I mean
14    it, no spin zone -- where do things stand with your attempt
15    to try to subpoena Mr. Brass, or do you have any knowledge -
16    - and I'll turn to Ms. Goott as well.  Maybe she has better
17    knowledge, or Mr. Patterson.  This is just me trying to
18    understand what we started talking about on Friday.
19            MR. COOLEY:  Yes, Your Honor.  At a very high
20    level -- and to the extent we need more detail, Mr. Aurzada
21    can get into the details.  But just at a high level, we have
22    over the last some number of days, several days been making
23    -- been employing process servers to serve Mr. Brass with a
24    trial subpoena.  They have so far been unsuccessful.  I'm
25    not going to get into the spin --
```

```
1            THE COURT:  That's all I need to know.

2            MR. COOLEY:  They have so far been unsuccessful.

3            THE COURT:  Okay.

4            MR. COOLEY:  And those efforts continue.

5            THE COURT:  Okay.  Mr. Murray.

6            MR. COOLEY:  and with respect to Mr. Murray, Your

7    Honor, again, we uploaded or we filed over the weekend some

8    briefing on the Rule 26(a) and 26(e) questions with respect

9    to the initial disclosures and the obligation and the

10   limits, candidly, of the obligation to supplement that

11   disclosure.  I know that counsel filed a response to that I

12   believe last night.  Frankly, I think we are satisfied with

13   the briefing.  We don't believe that counsel has articulated

14   -- has identified any caselaw in support of opposing

15   counsel's interpretation of it, nor any explanation for why

16   it is insufficient that Mr. Murray was identified in the

17   course of a deposition, as much as the advisory committee

18   note describes.

19           THE COURT:  Okay.

20           THE COURT:  I think we're satisfied with the

21   briefing.

22           Your Honor, our view on this is this is

23   essentially of a piece with the pattern of objections that

24   Defendant's counsel have raised in this --

25           THE COURT:  I don't want to go there.  I want to -
```

1    - let me ask you today what's the plan in terms of witnesses

2    who may come today.

3            MR. COOLEY:  Mr. Kuo is here in an anteroom down

4    the hall.  And we are prepared to proceed with him today.  I

5    imagine that his testimony could take the day given --

6            THE COURT:  How much time do you think you need on

7    direct for him?

8            MR. COOLEY:  I think the direct, Your Honor, is on

9    the order of an hour give or take.

10           THE COURT:  But do you think we can work at a

11   minimum to see if we can get through?  And I want you to

12   take as much time as you want.  But maybe the game plan

13   would be see if we can get through Mr. Kuo's direct by

14   lunchtime.  And then if we're done by that time, then we

15   could pick up with the cross beginning in the afternoon if

16   it takes -- if you get before then, then we'll start on the

17   cross, maybe stop around 12:30, come back to 1:30, and then

18   we'll go until about 6:00.

19           MR. COOLEY:  Absolutely, Your Honor.  We are

20   prepared to do whatever we can to -- if it is possible to

21   get the witness done in the day so that he can go back to

22   his job, we are here to do what we can to advance that aim.

23           THE COURT:  In terms of additional days that the

24   parties could come back -- I know I pitched out the 16th and

25   the 30th.  How do those days look for Mr. Dietz?  And I know

1    we have to talk about Brass.  But in terms of Mr. Dietz, is

2    there a date that works better?

3         MR. COOLEY:  I think either of those -- I think

4    both of those days.  And the Court had mentioned the 29th as

5    a possibility.

6         THE COURT:  Yes.

7         MR. COOLEY:  And then the 30th in Victoria.  We

8    all took a field trip.  Mr. Dietz can make wither of those

9    dates work.  And so I think probably in part based on where

10   we get to by the end of the day and also perhaps as a

11   function of what happens with Mr. Brass, we'll be ready to

12   keep this moving forward regardless.

13        THE COURT:  Okay.  Thank you.  Ms. Goott, let me -

14   - or Mr. Patterson, let me ask if you can just -- I wrote a

15   list.  And you can take them up in any order that you want.

16   I know -- if I were to say Chubb, Brass, Murray, you can

17   take them up in any order that you wish.

18        MS. GOOTT:  Sure.

19        THE COURT:  I've read your response.  But

20   certainly give you a fair opportunity to just describe it.

21   Maybe we can -- Chubb is the one that I kind of want to --

22        MS. GOOTT:  Sure.

23        THE COURT:  If we can start with that one first

24   And then whether you want to go to Brass or Murray next,

25   I'll leave that up to you.

1          MS. GOOTT:  I'll go in your order.

2          Chubb.  The Chubb issue is really simple.  And I

3    can pull up the docket number if it's helpful for you.  But

4    after the close of discovery in this adversary case, Vitol

5    filed the second time a motion for 2004 exam in the main

6    case.  I object.  Wait a second, you've got a pending

7    adversary.  And if you recall a year ago, they did the same

8    thing.  They filed a 2004.  I said you can't do this, we

9    have a pending adversary.  We came to court.  The judge

10   denied your 2004.

11         Fast-forward.  Discovery is over, and they file a

12   motion for a 2004 exam in the main case.  And if you look at

13   it, the whole thing is about this jewelry rider with Chubb.

14   And we have a hearing.  And I said, Judge, we have a trial

15   coming up.  They're going to come in and try to use this.

16   And they said no, judge, this is about the objection to

17   exemptions.  We have this jewelry rider.  We need to go

18   through it.  We need to ask not only the Debtor, but his

19   non-filing spouse about it.  And you said okay, I'm going to

20   give you guys this limited opportunity in the main case to

21   do a 2004.  And if you look at the motion, it's all about

22   the jewelry rider.

23         And then they serve the debtor with a subpoena for

24   documents only about this Chubb rider and the insurance and

25   they schedule him for a 2004 exam, which was scheduled to

1    occur one week before trial.  And why is that important?

2    We're going into this after they make representations to

3    this Court that this Chubb rider -- it's not about the

4    adversary, because I knew.  It's not the first time I've had

5    a law firm try to do this.  We're going to play it through

6    the main case.  And I brought it to the court and they said

7    no, Judge, they represented everybody.  No, no, no.  This is

8    for our objection to exemptions.  And they told this Court

9    Mr. Murray wants to sell assets to the Debtor and we need to

10   know what it's worth.  Okay.  If they're going to take this

11   position, because that's what they represented.  And in

12   fact, they scheduled this 2004 exam one week before trial.

13   A day before, they cancel it.  I ask them why.  Nobody

14   responds to me.  But the point is I go up until the -- our

15   exhibit list was due the day they were going to do the 2004

16   exam of Mr. Brass.  So I go into that day assuming based on

17   their motion, the subpoena, their representation to this

18   Court that this jewelry rider is all about the objection to

19   exemption.

20          And then they file and include it in the exhibit

21   list and say no, for the adversary, it's for the adversary.

22   You told us it was for the exemptions, but now you're

23   telling me it's for the adversary.  And I'm willing to bet

24   that when this case is over, they're going to come back in

25   and say okay, now we're ready to do our 2004 exam of the

1    jewelry rider and we're going to have the same problem.

2    They can't come in here and argue one way to get the relief

3    they want and then turn around and say, surprise.  That's my

4    position.  Chubb.

5         Mr. Brass.  I'm sorry, Mr. Murray I think you said

6    next.

7         THE COURT:  Oh no.  Whichever one.

8         MS. GOOTT:  I don't need to cite and do research

9    for a weekend on caselaw because the rule is abundantly

10   clear.  They have to give notice of witnesses they intend to

11   use at trial.  And what did they tell this Court?  Judge,

12   it's not our fault.  They should have known.  But more

13   importantly, we only found out at a deposition that Mr.

14   Murray, the corporate trustee of GCAC was the one that had

15   documents.  I said what I said in my response.  I don't need

16   to repeat it.

17        But the bottom line is they assumed -- Vitol tells

18   you multiple times we assumed that Mr. Brass would know the

19   finances of GCAC.  We've told you that multiple times.  They

20   came in here after discovery and said, Judge, we thought Mr.

21   Brass was going to know about the finances of GCAC and he

22   did it, so we really need to go depose Mr. Tomaszewski.  I

23   keep hearing this.  We didn't know.  We found out.

24        And what did they do then?  They came to court and

25   they said, Judge, we didn't know.  Please extend discovery.

1   Please let us go depose Mr. Tomaszewski.  And you did.  And

2   they got it.  But they didn't come in here, tell you, tell

3   me, oh, we didn't know that the Chapter 7 trustee was the

4   guy.  Well, they didn't -- they sent me interrogatories.

5   They didn't say who has these vital documents.  They're

6   telling this Court it's so prejudicial and important.

7          If this is the crux of what they need for this

8   case, wouldn't that be the first thing they asked for; where

9   are they, who has got them, where can we find them?  But to

10  turn around and say oh, they didn't tell us that the Chapter

11  7 trustee for GCAC might be the person.  And even after they

12  found out, they tell this Court I found out in March.  We

13  are in September and they still never did anything.  And we

14  know they can file briefs and motions.  File a witness and

15  exhibit list midway through trial?  That's wholly

16  inappropriate.  That is not in compliance with this Court's

17  order of when to file it.

18          And I know you didn't ask, but I have one comment.

19  They say, Judge, we just -- we amended the exhibit list, we

20  just misnumbered it.  I would ask you to please look at that

21  exhibit list.  There is more than just numbering.  They

22  specify how they're going to call Mr. Brass.  They fixed it.

23  Right?  In the middle of trial.  Because -- and this brings

24  me to Mr. Brass.

25          A couple days ago in open court, they tell you,

```
 1    Judge, we're either going to call Mr. Brass as a witness if
 2    he's here or we're going to offer the deposition transcript.
 3    That's what they said in open court.  Then they changed
 4    their mind.  Then after they make that representation to the
 5    Court, then they start looking for him, in the middle of
 6    trial.  That was their strategy.
 7            THE COURT:  Where is Mr. Brass?
 8            MS. GOOTT:  I don't know where he is right now.
 9    If you're asking me to find out, I will find out.
10            THE COURT:  Oh no, no, no.  I'm just asking if...
11            MS. GOOTT:  It is -- okay.
12            THE COURT:  I guess I'm just trying to understand.
13    Is it -- I don't want to draw conclusions because it's just
14    totally -- I just go into a room and I come out.  I don't
15    know what goes on outside of -- I know they're saying they
16    can't find him or that folks have been trying to serve Mr.
17    Brass --
18            MS. GOOTT:  For the last few days is what they
19    said.  In the middle of trial after they've told this Court
20    that if he's not here, we're going to offer his deposition
21    transcript.
22            THE COURT:  Got it.
23            MS. GOOTT:  It's their burden.  About a trial
24    that's been set for months.  And then midway through trial,
25    they want to come in here and say, oh, Judge, we can't find
```

```
 1    them?  Ask them if they ever called me one time or emailed
 2    me one time and said will you bring them.  Not once.  Now in
 3    the middle of trial to come in here and say, oh, we've been
 4    trying to serve him?  It's not how a trial works.  It just
 5    can't be.  In the middle of trial amending exhibit lists,
 6    changing strategy?  It's inappropriate.
 7              THE COURT:  Thank you.
 8              Mr. Cooley, what say you to the -- oh, Mr.
 9    Patterson, please.
10              MR. PATTERSON:  (indiscernible).
11              THE COURT:  It's still out there.  Oh, no.  Thank
12    you.  No, no.  That's on my mind, Mr. Patterson, I assure
13    you.
14              MS. GOOTT:  I'm so sorry.
15              THE COURT:  No, no.  Go ahead.
16              MS. GOOTT:  I left off one thing about Chubb.
17              THE COURT:  Okay.
18              MS. GOOTT:  I just want to make a correction to
19    what Mr. Cooley said.  He said that they tried to offer the
20    Chubb documents and that I objected, saying that I didn't
21    get the documents.  I did not raise that objection.  the
22    Court said to him please show me that you served her,
23    because we know that's coming.  I never said a word about
24    it.
25              THE COURT:  I agree.
```

1          MS. GOOTT:  So it's a misrepresentation for him to

2     say that was the basis.  That was not the basis of my

3     objection.  My objection was of the representations made and

4     my belief of what the jewelry rider was for in the main

5     case.

6          THE COURT:  Yeah.  Mr. Cooley, what response do

7     you have?

8          MR. COOLEY:  Just briefly, Your Honor.  On the --

9     with respect to the Chubb document, I would note that we

10    also -- that we filed a notice of subpoena to Chubb on

11    December 15th, 2021 in the adversary proceeding.  That's at

12    Docket 22.  And so they were subpoenaed as part of this

13    adversary proceeding as well.

14         And as I said before and as we detail in the

15    notice that we filed and the accompanying affidavit from Mr.

16    Tolbert, those documents that were received from Chubb were

17    produced to counsel via share file on March 8th, 2022, which

18    I believe -- I don't think I heard any dates, but I believe

19    that March 8th of 2022 was prior to the events that counsel

20    described.  And I just wanted to make that note for the

21    Court.

22         As far as Mr. Brass is concerned, I am not sure

23    that I agree with the timeline as Counsel is laying it out.

24    Counsel is also not laying out any specific dates for when

25    things started and stopped and so on.  And the Court wanted

1    me to stay at a high level -- stay away for the time being.

2    I'll just say I'm not sure I agree with that timeline.

3    Happy to answer any other questions the Court has.

4            THE COURT:  Have you picked up the phone and

5    called him, tried to find him?

6            MR. COOLEY:  Tried to call...

7            THE COURT:  Opposing counsel.

8            MR. COOLEY:  Your Honor, we have not reached out

9    to opposing counsel.  Early on we served a subpoena to Mr.

10   Brass by delivering it to counsel.  And that subpoena was

11   not accepted.  We have not reached out to counsel.

12           THE COURT:  Okay.  Here's what we're going to do

13   on all three.  And I'll give you all a second to sit down,

14   and then let's bring Mr. Kuo in.

15           So there's three things here.  I'll go -- I've

16   written down Chubb, Brass, Murray.  Don't read too much into

17   the order.  It's just what I wrote down.  We'll go in that

18   order.  You have an opportunity to get -- I did ask the

19   question because there were some other questions about other

20   documents that were produced let's just say in connection

21   with the witness and exhibit list.  But if it was Iberia

22   Bank, there were some issues there.  And I did ask the

23   question about Chubb.

24           I did note that Chubb was served with a trial

25   subpoena in this case and all the evide -- from what I can

Page 18

 1   see, what was provided to me, the question was answered to

 2   me that Chubb -- whatever -- the 1,174 pages, and I haven't

 3   scrolled through them, are they were produced to counsel.

 4   They are on the witness and exhibit list as the Bates

 5   labeled them out.  If you want to get a witness here to try

 6   to prove them up, if you can get Counsel to agree on a

 7   business record affidavit, that's one thing.  If not, you're

 8   going to have to go the traditional route.  Well find a date

 9   where it works.

10          So I'm not going to exclude the Chubb documents.

11   Okay?  I'm not going to exclude the opportunity to try to

12   get the Chubb documents in.  You can try to get them in

13   through a business record affidavit.  If you can get the

14   gentleman in, we can do what we did with Wagner, or you can

15   try to do something else.  But I get it, they were

16   subpoenaed, it was produced.

17          Mr. Murray, you know, we talked about Mr. Murray

18   testifying.  I listened to the arguments that you made

19   before.  I think you satisfied the standards for disclosure.

20          I thought a lot about writing something, putting

21   stuff in writing about the way I thought discovery went and

22   how open I was to putting things into discovery had someone

23   just reached out to the Court, who Mr. Murray is, previous

24   issues related to trial documents.  I decided not to do

25   that.  But if you ask me to, I'll do it.  But I want you to

1    give some thought to what I would have to do to get

2    comfortable that I've covered all the bases as to why I

3    don't think Mr. Murray should testify.  And I want you all

4    to think about whether you really want me to write it or

5    not.  But if you do, I'll write it in short order.  But I'm

6    hoping we can settle, just resolve the Murray issue as is.

7            With Mr. Brass, I need to hear from Mr. Brass.

8    Normally judges let cases fly, but Federal Rule of Evidence

9    614 allows the Court to call a witness on its own or at the

10   request of a party.  There is no way in the interest of

11   justice that I could resolve the issues that are provided in

12   here without hearing from Mr. Brass.  Mr. Brass is a debtor

13   in this case.  Whether Mr. Brass is -- one could read this

14   as evading a subpoena or not.  I'm not going to get into all

15   that.  And I think it would be incredibly prejudicial and

16   unfair for me to presume anything like that.  It hasn't

17   happened.  But Mr. Brass will have to testify if I call him

18   or not one way or the other.  There's going to be testimony

19   that's going to be required that will not be elicited by the

20   facts as I see them.

21           If I call Mr. Brass, I suspect the parties could -

22   - I'm trying to avoid conducting my own examination.

23   Federal Rule of Evidence 614 is clear.  I certainly do this.

24   I am within my right to do it.

25           And I'll tell you where this goes.  And that's why

1    I don't want the witness here.  There's testimony so far.

2    And based on the briefing and the arguments that have been

3    made to me, there are a couple of issues that are out there.

4    I haven't reached a conclusion on any of them, but there are

5    issues out there.  Was there a JV?  Was there product,

6    asphalt product actually released to Mr. Brass?  If it was,

7    what did he do with it?  What was his understanding of what

8    he was supposed to do with it?  Did he sell it?  Is there

9    asphalt laying somewhere out there that we don't know about?

10   If he did sell it, what did he do with the money?  Did he

11   operate under the assumption of a JV or not?  Did he not

12   give any of it back?  Did he blow it?  And I don't know

13   anything what's going on, but I think Mr. Brass is the only

14   one that can tell me what his understanding it as it relates

15   to whether there was a JV or not.

16           I haven't seen any documents.  Maybe somebody will

17   get an assigned JV or not.  I don't know.  But I do know, or

18   at least it appears that testimony is going to be that Mr.

19   Brass received something.  And the question is, well, what

20   happened after that?  And I think he is the only one that

21   can kind of answer it, the part B of it, because one of the

22   elements -- one of the causes of action is willful intent,

23   right?  Willful and malicious injury, right?  And fraud and

24   there's embezzlement, right?  If you take something lawfully

25   and then do some or other with it -- and I don't know and

1    I'm not drawing any conclusions about what Mr. Brass did or

2    didn't do.  I just know that I need to hear from Mr. Brass.

3    And so I'm not sure that the testimony is going to be

4    elicited from there.

5         So if Mr. Brass wants to show up and the subpoena

6    finds him and he shows up to testify on one of those two

7    dates, I don't -- it's fine with me.  But if not, I am going

8    to call him.  But I don't want to do my own examination

9    because I think at some level -- I'll do it if I have to,

10   but I don't want to put my thumb on the scale.  And I think

11   sometimes people can read into questions, but I'm really

12   just trying to understand what exactly happened.  But that's

13   the Debtor.  The Debtor has submitted himself to the

14   jurisdiction of this court.  So I'm not going to accept that

15   Mr. Brass just doesn't show up.  I'll call him.

16        And I'm not saying anybody is -- I'm not saying

17   he's evading.  What I'm saying is if you can find somebody

18   to get him in, you can try to get him in.

19        Murray, I'm really asking you to think about

20   Murray.  Brass will testify, and I'll -- I want to keep my

21   thumb off the scale and not ask any questions because I

22   think it's just right for me to just do what exactly

23   happened with Mr. Loya.  I may ask a clarifying question one

24   way or the other.  And I don't want anyone to read anything

25   into me thinking anything about Mr. Brass, whether Mr. Brass

```
 1    is one way or the other.  I've just got to hear from him in

 2    connection with this case and the interest of justice

 3    because I can't -- I can't resolve this.  And I understand

 4    that it's the Debtor's -- I mean, it is the burden of Vitol

 5    in this case, but I don't know -- in other words, the only

 6    option is that I just keep pushing out this until he gets

 7    found.  But if there's a valid subpoena out there -- and I'm

 8    just trying to avoid that.  We can kind of keep all the

 9    evidence and what's straight in the judge's head at one

10    spot.  So that's kind of where we are.

11              MS. GOOTT:  Judge, all they had to do was ask.

12    They didn't.  But now that I hear you, I will bring him.

13              THE COURT:  But I want to make it -- we've got two

14    days.  And I think --

15              MS. GOOTT:  I'll make it happen.

16              THE COURT:  One of those days -- but it doesn't

17    mean that -- I don't know what's going on.  For example,

18    there were other people who were traveling and have other

19    schedules and things I think.

20              MS. GOOTT:  He was traveling.  His mother-in-law

21    has been in the hospital.

22              THE COURT:  That's what I'm saying.

23              MS. GOOTT:  They would know if they would have

24    picked up the phone.

25              THE COURT:  I got it.
```

1           MS. GOOTT:  But they didn't.  And they want to

2   just make it look -- they want to keep it high level so that

3   it looks bad.

4           THE COURT:  And that's why you're hearing it from

5   me.  I don't want to reach out into anything --

6           MS. GOOTT:  They could have put an email in front

7   of you, Judge.  Look, she didn't respond.  But anyway, he

8   will be here -- yes.

9           THE COURT:  We can just pick one of those two

10  days.  And Dietz can go one day and -- or we can make sure

11  that Dietz is here one day and we can make sure that Mr.

12  Brass is here one day and we can just kind of take it up.

13          MS. GOOTT:  Thank you, Judge.

14          THE COURT:  Okay.

15          MS. GOOTT:  He will be here.  And I would prefer

16  that the questions come from him because I don't --

17          THE COURT:  I prefer it, too.

18          MS. GOOTT:  Yes.  I never like objecting to a

19  Court's questions.

20          THE COURT:  I would prefer to stay out of it a

21  hundred percent.  But I think you all can coordinate on

22  whether it's the -- Ms. Goott, I didn't get your thoughts on

23  the 16th and the 30th.  That was the other piece.

24          MS. GOOTT:  I believe those are fine.  September

25  16th.  Those are --

```
 1              THE COURT:  You're out on the 30th?  Okay.  So

 2    maybe we can --

 3              MS. GOOTT:  Can I tell him to be here on the 16th?

 4              THE COURT:  Yeah, we can do that.

 5              MS. GOOTT:  Let's just do that.

 6              THE COURT:  Okay.  And then Mr. Patterson?  I

 7    don't want to set any times now when I want people to show

 8    up.  I want everybody to think about it.  Because I want to

 9    pick that second date so that we know -- and Mr. Patterson,

10    I want you to just -- maybe the easiest thing to do is the

11    parties can -- my case manager can just throw you all some

12    additional dates and then we can find another slot.

13              MR. PATTERSON:  (indiscernible).

14              THE COURT:  Sure.

15              MR. PATTERSON:  (indiscernible).

16              THE COURT:  Well, the concern I have is that --

17    but then if that's the case, then I can't rule on a 7052

18    motion.  If that's the case then --

19              MR. PATTERSON:  (indiscernible).

20              THE COURT:  There's nothing I can do without

21    hearing from him on a 7052 is subpoenaed, I'm -- or need to

22    hear from him there.  I don't think -- procedurally I think

23    I would just let it play out if that was the case.

24              MR. PATTERSON:  (indiscernible).

25              THE COURT:  No.  And I appreciate it.  And I
```

```
 1   wouldn't want to read into it.  That's why I thought it was
 2   easier for me to bring up the issue so that we can take --
 3   so that that element never cracked up.  And no one else had
 4   the opportunity to do it.  But maybe my case manager can
 5   throw some dates.  And we'll hold the 16th.  Things are
 6   starting to fill up and I just want to make sure that we
 7   hold the 16th.  So with that said -- and you're going to
 8   have to think about timing on -- but I want to make sure
 9   they know whatever somebody is going to come about if you're
10   going to try to get Chubb docs in, that they know exactly
11   what day that's going to go forward.  Because we're going to
12   pick two trial dates.
13                MR. COOLEY:  Yes, Your Honor.
14                THE COURT:  But maybe we can just bring Mr. Kuo in
15   and get going.
16                MR. COOLEY:  We are prepared to do that if the
17   Court's ready to proceed.
18                THE COURT:  Okay.  Let's get him in.  And
19   depending on the timing, maybe we can really -- now that
20   it's like 11:10, maybe we can keep the timing.  And you do
21   your direct, take as long as you want.  But then we'll work
22   through the direct and then we'll take a break for lunch.
23   And then we'll start with the cross there.  And I'll make
24   sure that -- I'll make sure to give him the admonition to
25   make sure.
```

```
 1              MR. COOLEY:  That works for me, Your Honor.

 2              THE COURT:  Okay.

 3              Okay, sir, why don't you come up.  Mr. Kuo, before

 4    we begin, in terms of giving someone power as presenter.

 5              MR. COOLEY:  Your Honor, Ms. Mehta is back with us

 6    today.  If she could have the power.  Thank you, Your Honor.

 7              THE COURT:  I'll swear the witness in.  Ms. Mehta,

 8    are you okay?  Okay.

 9              Sir, can you please raise your right hand?  Do you

10    swear to tell the truth, the whole truth, and nothing but

11    the truth?

12              MR. KUO:  Yes.

13              THE COURT:  Okay.  I want you to pull that

14    microphone just a little bit closer to you.  If you'd keep

15    it in the general direction where you are, it's really good

16    to pick it up.  Counsel is going to ask you questions.  You

17    may hear objections to some of the questions I asked.  If

18    you give me an opportunity to resolve the objection, and

19    then if necessary I'll let you know if you can answer the

20    question or if counsel was to ask you another question.

21    Okay?  Thank you.

22              Mr. Cooley, you may proceed.

23              MR. COOLEY:  Thank you, Your Honor.

24                   DIRECT EXAMINATION OF ERIC KUO

25    BY MR. COOLEY:
```

```
 1   Q    Would you go ahead and state your name for the record,

 2   please?

 3   A    Eric Kuo.

 4   Q    And where are you currently employed?

 5   A    Vitol, Inc.

 6   Q    How long have you worked for Vitol?

 7   A    Almost 12 years now.

 8   Q    And what's your role there?

 9   A    I am a fuel oil trader.

10   Q    What does a fuel oil trader at Vitol do?

11   A    It's a couple fold.  I mean, we buy and sell fuel oil

12   components, lend product, sell to end users.  We sell to

13   other traders and study markets and, you know, make opinions

14   and guesses and bets on where we think the market may be

15   headed.

16   Q    How long have you worked as a trader over your career

17   in its entirety?

18   A    Probably almost 25 years.

19   Q    And just in fuel oil or in anything else?

20   A    Mainly in fuel oil, but I've traded a few other

21   products over that course of time.

22   Q    Just to give the Court some sense of scale, what would

23   be a typical volume of trading for you in a year, whether by

24   dollars or number of trades or whatever?

25   A    Oh, gosh.  It would -- gosh.  I would say I do hundreds
```

1    of trades over the course of the year.  It just depends.  In

2    certain years it's busier and in certain years it's...

3    Q    And when you do these trades, who are the

4    counterparties you're trading with generally?

5    A    It can be oil majors, it can be refiners, it can be

6    other trading companies.  Some end users like cruise lines,

7    it could be -- and some of it's just done on exchanges.  So

8    it's just bilateral with the clearing court.

9    Q    Are there limitations on who you can trade with?

10   A    On the physical side there is, yeah.  We have to clear

11   all the counterparts that are not through a KYC process

12   where, you know, we have to vet the company, we have to know

13   kind of who we're dealing with, the management and so forth.

14   Q    I think you gave us an acronym there, KYC.  What's

15   that?

16   A    It stands for Know Your Counterpart so that we have a

17   thorough due diligence on companies we deal with.

18   Q    Is hedging at all a part of your business?

19   A    It is.

20   Q    And when I mean you, I mean you personally.

21   A    Yes, it is.

22   Q    How does a hedging transaction work in the context of

23   what you do?

24   A    A hedge is an offset to a transaction which provides --

25   it limits the amount of risk in a particular transaction.

```
 1    So a physical deal where you will hedge a deal to limit the

 2    fixed price exposure or any sort of other basis exposure

 3    that we would have to a particular commodity.

 4    Q    And what's the purpose of doing that in the context of

 5    the trading you do?

 6    A    It limits your risk on a particular transaction.

 7    Q    And why is that important?

 8    A    Well, unless you're just planning on outright gambling

 9    on the direction of a market, the hedge is put in place to

10    limit some of that exposure.

11    Q    Ms. Mehta, could I have Vitol Exhibit 1 on the screen,

12    please?  Perfect.

13            MR. COOLEY:  Ms. Mehta, could I have Vitol Exhibit

14    1 on the screen, please?  Perfect.

15    BY MR. COOLEY:

16    Q    Mr. Kuo, I'll ask you to take a look at the document on

17    the screen which has been marked as Exhibit 1.  Do you

18    recognize that document?

19    A    Yes, I do.

20    Q    Can you identify it to the Court?

21    A    This was an email written by one of my colleagues,

22    Steve Barth, in November of 2016.

23    Q    Were you a recipient of the email?

24    A    Yes.

25    Q    And does it appear to be a true and correct copy of
```

1   what it purports to be?

2   A    Yes, it does.

3          MR. COOLEY:  Your Honor, I would move the

4   admission of Vitol Exhibit 1.

5          THE COURT:  Any objection?  Vitol Exhibit 1 is

6   admitted.

7   BY MR. COOLEY:

8   Q    Let me scroll to the second page of the document here.

9   And I probably should have done this before I did that, but

10   I'll go ahead and go through this just to make the record

11   clear.  Do you recognize what's on the screen now?

12   A    Yes, I do.

13   Q    And would you describe it for the Court?

14   A    These were some bullet points for a potential JV that

15   we were looking at with GCAC.

16   Q    In November of 2016?

17          MS. GOOTT:  (indiscernible).

18          THE COURT:  Sustained.

19          MR. COOLEY:  Scroll back to Page 1, please.  I

20   thought the witness had testified, but I'll ask the question

21   differently.

22   BY MR. COOLEY:

23   Q    What time period were you referring to in the answer

24   you just gave?

25          THE COURT:  The question is what did we just

1   admit.  Vitol 1 is admitted now.  But is this part of Vitol

2   1?  Or is Vitol 1 one page or is Vitol 1 --

3               MR. COOLEY:  Vitol 1 is a two-page document, Your

4   Honor.  I can lay an additional foundation if the Court

5   would like.

6               THE COURT:  Why don't you do that?  Because I

7   think that's appropriate.  I understood it to just be an

8   email.

9               MR. COOLEY:  I apologize, Your Honor.  Let me

10  clear that up with Mr. Kuo now.

11  BY MR. COOLEY:

12  Q    Mr. Kuo, looking back to the original, the first page

13  of Exhibit 1, does the email that you described to the

14  Court, did it come with any attachments?

15  A    I believe so, yes, based on the subject in the

16  attachments.

17  Q    And what is the name of the attachment if any to this

18  document?

19              MS. GOOTT:  (indiscernible).

20              THE COURT:  Sustained.

21              MR. COOLEY:  All right.

22              BY MR. COOLEY:

23  Q    Do you understand there to have been any attachments

24  that accompanied this email when it was sent to you in

25  November of 2016?

```
 1    A    I do.

 2              MR. COOLEY:  If I could have Page 2, Ms. Mehta?

 3    BY MR. COOLEY:

 4    Q    And here I've put on the screen what is Page 2 of

 5    Exhibit -- what's been marked Exhibit 1.  Do you recognize

 6    what's on the screen?

 7    A    I do.

 8    Q    Can you describe it to the Court?

 9    A    This is an outline for a potential JV that we were

10    looking at.

11    Q    And do you know whether or not this was the attachment

12    that was referenced on the first page?

13    A    Yes, I believe so.

14    Q    And do you recognize it as such?

15    A    Yes, I do.

16              MR. COOLEY:  Your Honor, I would move the

17    admission of the two-page document comprising Exhibit 1.

18              THE COURT:  Any objection?

19              MS. GOOTT:  (indiscernible).

20              THE COURT:  Okay.

21              MR. COOLEY:  And I apologize.  That was on my part

22    absolutely, Your Honor.

23              THE COURT:  Exhibit 1 -- Vitol Exhibit 1 is

24    admitted for real this time, Ms. Martinez.

25              (Vitol Exhibit 1 Admitted into Evidence.)
```

1   BY MR. COOLEY:

2   Q    In or around the time of this email communication, did

3   you ever have any conversations with Mr. Brass about these

4   bullet points?

5   A    Yes, we did discuss that.

6   Q    And are you familiar with a company, Gulf Coast Asphalt

7   Company, or GCAC?

8   A    Yes, I am.

9   Q    Who do you understand to be the principal at GCAC?

10  A    Mr. -- AJ Brass.

11  Q    And who would have been your primary day-to-day contact

12  at GCAC?

13  A    Mr. Brass and Mr. Perugini.

14  Q    And -- all right.  What was your understanding of the

15  business of GCAC?

16  A    GCAC was a company which was engaged in the buying and

17  selling of asphalt.

18  Q    To your knowledge, was GCAC able to do that by itself?

19         MS. GOOTT:  (indiscernible).

20         THE COURT:  Sustained.

21  BY MR. COOLEY:

22  Q    If GCAC was involved in the asphalt business, why were

23  they talking to you?

24         MS. GOOTT:  (indiscernible).

25         THE COURT:  Sustained.

1    BY MS. GOOTT:

2    Q    Why were you talking to them?

3          THE COURT:  I think we know the them is GCAC.

4    Your point is there, but you can ask that -- why don't you

5    ask?

6    BY MR. COOLEY:

7    Q    Why were you talking -- in November of 2016, why were

8    you talking to GCAC about the asphalt business?

9          THE COURT:  In November of 2016, why were you

10   talking to GCAC, if at all?  There's your question.

11   BY MR. COOLEY:

12   Q    We were discussing getting into the asphalt business

13   because Vitol did not have any business in the asphalt

14   business.  And so we were discussing with them about a

15   potential JV in asphalt.

16   Q    And based on those discussions, did you have an

17   understanding as to what GCAC wanted from Vitol?

18   A    Yes.  GCAC needed Vitol's financing to help finance

19   their business.

20   Q    Did GCAC not have its own financing power?

21         MS. GOOTT:  (indiscernible).

22         MR. COOLEY:  Your Honor, the witness has just

23   testified that they were being asked to provide that.  I'm

24   asking if they didn't have it themselves.

25         THE COURT:  I think the way you worded it.  I'll

1   sustain the objection.

2   BY MR. COOLEY:

3   Q    At the time of these discussions in November of 2016,

4   what if any role was Vitol contemplating that it would play

5   in a business relationship with GCAC?

6   A    Well, Vitol was looking at becoming a partner with GCAC

7   in the asphalt business.  And what we brought to the table

8   primarily was the ability to fund any sort of projects.

9   Q    Is that something that you've done before with

10  counterparties in your work at Vitol?

11  A    What do you mean?

12  Q    Funding the projects of others.

13          MR. COOLEY:  Your Honor, the couns -- counsel

14  asked...

15          THE COURT:  Overruled.  Overruled.

16  BY MR. COOLEY:

17  Q    You can answer.

18  A    Sorry.

19  Q    Is that something that -- let me see if I can ask this

20  question the same way twice.  Is that -- is funding the

21  projects of other counterparties something that you have

22  done before in your work at Vitol?

23  A    I have explored it in previous encounters, but nothing

24  that we have -- nothing that we had signed.

25  Q    And in what form was Vitol to provide this funding

Page 36

```
 1   support or whatever you want to call it?

 2   A     In the initial points on the JV, we would --  Vitol

 3   would be -- financing would be paying for all the ancillary

 4   costs of doing the business and including buying the

 5   product, blending the product, paying for transportation,

 6   blending, hedging.  Basically all the financial commitments

 7   of the deal.

 8   Q    And just to be clear from the Vitol standpoint -- we

 9   talked about GCAC.  From the Vitol standpoint, who was

10   spearheading these conversations with GCAC?

11   A     Myself and Steve Barth.

12   Q    And why did you want to do transactions like this?

13   A     Well, you know, we are an entrepreneurial business.

14   And so we -- you know, that's how we are compensated.  We

15   develop the businesses and they're profitable.  It's kind of

16   -- that's our business in general.

17   Q    So after the time of this email, Exhibit 1, did there

18   come a time when Vitol did get into a trading business

19   relationship of some kind with GCAC?

20   A     Yes.

21   Q    When did that start?

22   A     It started around about in July of 2017.

23   Q    And how did it start?

24   A     Well, we initially -- we initially acquired the assets

25   or some components of the oil from Rio energy, who was the
```

1    JV counterpart of GCAC prior to them exiting the business.

2    Q    So did Vitol actually buy product from Rio?  What

3    happened?

4    A    Yes.  Vitol purchased the produce from Rio.  Yes.

5    Q    In its own name or in the name of someone else?

6    A    In the name of Vitol.

7    Q    Was that an important distinction to you?

8    A    Yes, because once we purchased the oil and titled it in

9    Vitol's name, we retained control over the oil and the

10   asset.

11   Q    From that point forward, how many other asphalt trades

12   would you say you engaged in with GCAC over the course of

13   the relationship?

14   A    Well, I would say first of all --

15          MS. GOOTT:  (indiscernible).

16          THE COURT:  Okay, sustained.

17   BY MR. COOLEY:

18   Q    After this Rio purchase, did you engage in any other

19   trades involving Asphalt with GCAC?

20          MS. GOOTT:  (indiscernible).

21          THE COURT:  I'm going to overrule that.

22   Overruled.

23   BY MR. COOLEY:

24   A    I think there were approximately 50 trades done with

25   GCAC, but they were done on behalf of the direction of GCAC,

1    not necessarily in conjunction.  They were done on behalf of

2    GCAC.

3    Q    Would you explain to the court, or to me frankly, what

4    you mean by that distinction that you just highlighted?

5    A    Well, the trades that GCAC did were given to me after

6    the fact, after they had already completed the transaction.

7    So we were not involved.  I was not involved in the decision

8    making of when to buy it, what price to purchase at, what

9    location or -- and conversely on the sales side.  I was not

10   involved in any of the discussions on how the deal was

11   consummated or concluded.

12   Q    Was anyone else at Vitol Inc. involved in that

13   decision-making process?

14          MS. GOOTT:  (indiscernible).

15          THE COURT:  Sustained.  You can clarify.

16   BY MR. COOLEY:

17   Q    I think you just -- if you weren't involved in the

18   decision-making process on buys and sells that were

19   presented to you from GCAC, was anybody else at Vitol?

20          MS. GOOTT:  (indiscernible).

21          THE COURT:  Overruled.  You can answer.

22   BY MR. COOLEY:

23   A    I'm sorry.  Can you repeat the question one more time?

24   Q    You said you weren't involved in discussions about the

25   buys and sells.  Was anyone else at Vitol?

Page 39

```
 1   A    No.  It would have been just me.
 2   Q    So then once that information was provided to you, what
 3   if any role did you have?  What were you supposed to do with
 4   that information?
 5           MS. GOOTT:  (indiscernible).
 6           THE COURT:  Overruled.
 7   BY MR. COOLEY:
 8   A    So once they sent an email or called or texted the
 9   trade, I would first hedge the deal.  And second, I would
10   enter the deal into our trading system.
11   Q    Did these transactions have any costs associated with
12   them?
13   A    Yes.  There was financing cost to purchase the product.
14   It depends on what the deal was in particular, but there
15   were --
16   Q    Let's break it down.  Some of these trades you said
17   included purchase of product.  Is that a fair
18   characterization?
19   A    Yes.
20   Q    Did somebody have to pay to purchase the product?
21   A    Yes.
22   Q    Who paid to purchase the product?
23   A    Vitol did.
24   Q    Were there any other expenses associated with the
25   product once it was purchased?
```

1    A    Potentially, yes.  If the purchase -- if the product

2    was purchased in a different location, it would have to be

3    barged over, so moved from one location to the next.  It

4    would -- there was inspection costs that were associated

5    with it.  There were storage costs associated with putting

6    it into a particular terminal, and there are hedging costs

7    that are associated with each deal.  So there are multitudes

8    of ancillary costs associated with a particular deal.

9    Q    And who paid those expenses?

10   A    Vitol did.

11   Q    You mentioned hedging.  Is there ever a cost or an

12   expense associated with hedging that has to be paid?

13   A    Yes.  There is margining requirements that have to be

14   put up for hedging.

15   Q    Who paid that?

16   A    Vitol did.

17   Q    Do you know if GCAC was ever made aware --

18             MS. GOOTT:  (indiscernible).

19             THE COURT:  I don't think he finished the

20   question, so I don't know if he's leading or speculating.

21             MR. COOLEY:  Your Honor, I'll finish the question.

22   BY MR. COOLEY:

23   Q    Do you know if GCAC was ever made aware that Vitol was

24   paying these various costs?

25             MS. GOOTT:  (indiscernible).

```
 1              THE COURT:  Overruled.
 2   BY MR. COOLEY:
 3   A    Yes.  GCAC was well aware that we were paying all of
 4   these costs.
 5   Q    How do you know that?
 6   A    Because that was discussed from the onset of the when
 7   we first, you know, started this business.
 8   Q    You mentioned hedging.  Who was in charge of hedging
 9   transactions?
10   A    I was.
11   Q    And so did you decide when to hedge?
12              MS. GOOTT:  (indiscernible).
13              THE COURT:  Sustained.
14   BY MR. COOLEY:
15   Q    If you were in charge of hedging, what does that mean?
16   A    That means once a deal is done, I decide on which
17   instrument to use to put the hedge on, when to do it, and at
18   what price.
19   Q    Did you ever make GCAC aware you were doing that?
20              MS. GOOTT:  (indiscernible).
21              THE COURT:  It's a fair --
22              MR. COOLEY:  I'm referring to --
23   BY MR. COOLEY:
24   Q    With reference to -- you said you would decide what
25   hedges to put on.  Did you ever make GCAC aware of the
```

1    hedging trades or the hedging transactions you entered into

2    relating to their transactions?

3    A    Yes, on every deal I told them which -- what the deal -

4    - what hedge was placed at what price and which instrument

5    was used.

6    Q    Why did you tell them?

7    A    Because that was my duty.  Because once the deal was

8    hedged, I was -- we used to tell them what hedges were put

9    on so they would know.

10   Q    Why?  Why did they need to know that information?

11   A    Because this is -- it goes hand in hand with a

12   transaction.  It's a part of the overall transaction.  It's

13   multifaceted.

14   Q    I want to make sure the Court understands and I want to

15   make sure the record is clear what the stuff is that we're

16   talking about in these transactions.  My question for you is

17   this.  What's the commodity that we are talking about

18   related to these transactions with GCAC?

19   A    We're talking about asphalt and asphalt components,

20   meaning that asphalt is not -- a finished-grade asphalt is

21   not necessarily -- you know, it doesn't come out that way

22   when it's produced.  And so it needs to be blended with

23   different products to achieve a finished grade.

24   Q    So what are the components?  Broad strokes.

25   A    It's a vacuum-tower bottom, it's a heavy, viscous oil,

1    which is then blended with other components to -- whether

2    it's aggregate and some other -- I'm not really familiar

3    with all the components that go into asphalt.  But there's

4    multiple components that are used to produce a final product

5    which is then used to pave the roads outside.

6    Q    Do you have an understanding as to how one makes a

7    profit from these types of transactions?

8    A    Sure.  You know, this is kind of what we do each day.

9    We try to -- we generally know what the price of a finished

10   component is.  So, you know, if you liken it to baking a

11   cake, if you know what you can sell your cake for and all

12   the components that go into a cake, which is your flour and

13   sugar and your yeast and whatever else, if you can buy those

14   at a cheaper price and deliver them to somebody with a

15   margin included, then you make money.  And if you do not buy

16   these components at a price equal to or less than your sales

17   price, then you will lose money.

18   Q    And on the hedging side, are you also hedging asphalt?

19   I'll say it differently.  What commodity or what -- what do

20   you hedge with in the transactions accompanying these GCAC

21   purchases and sales?

22   A    Well, since there is no -- there is no asphalt swaps

23   market, there's not a direct hedge for asphalt, we use two

24   different components.  We may use high sulfur fuel oil,

25   which is a derivative of one of the components in asphalt,

```
1    or --

2              THE COURT:  Can you say that word slower?

3              THE WITNESS:  Sure.  We may use high sulfur fuel

4    oi.

5              THE COURT:  Thank you.

6    BY MR. COOLEY:

7    A    Which is a derivative of the components that -- so

8    they're very interchangeable, right?  Sometimes these

9    components can go into a fuel oil blend, and sometimes they

10   can go into an asphalt commodity.  So they can go either way

11   depending on pricing.

12             And then -- I'm sorry, your question was?

13   Q    What do you hedge, what do you use to hedge.

14   A    Oh, yes.  And then the other component of the hedge is

15   we may at times use Brent futures.  And generally I use that

16   when there's very little liquidity in the high sulfur

17   market.  The high sulfur is generally a better hedge.  But

18   at times we receive these trades later in the afternoon,

19   4:00 or 5:00 when there was very little liquidity in the

20   fuel oil swaps market.  So I would use Brent or WTIs hedge.

21   Q    And why do you use those two as opposed to anything

22   else?

23   A    Well, they are the closest component to the particular

24   -- to asphalt.

25   Q    And what would happen if you engaged in these purchase
```

1    and sale transactions without hedging?

2              MS. GOOTT:  (indiscernible).

3              THE COURT:  He's the head of trading at Vitol.  I

4    think he can answer the question.  Overruled.

5    BY MR. COOLEY:

6    A    I'm sorry, your question again was?  If you...

7    Q    What happens if you engage in these purchase and sale

8    transactions of asphalt without hedging?

9              MS. GOOTT:  (indiscernible).

10             THE COURT:  He's a fact witness, but he is the

11   head of trading at Vitol.  He can answer the question, his

12   understanding.

13   BY MR. COOLEY:

14   A    So if you don't hedge, you're essentially just betting

15   on if the market is going up or going down.  So if it's

16   going up, you'll make money if you bought something.  If it

17   goes down and you have not hedged, then you'll lose money.

18   So we generally do not engage in -- we are not so much in

19   the practice of just betting one way where the market goes

20   up or if it goes down.  So hence we put a hedge on because

21   we believe that we're in a physical driven market, so we buy

22   physical product.  And we blend it and then sell the

23   component with a margin.  We don't buy hoping that the

24   market will go up or down.

25   Q    So we'll finish out this concept.  Earlier I asked you

1    about what happens with the purchase.  I want to ask you

2    about the sales side.  Does there come a point in time when

3    these components, this asphalt gets sold?

4              MS. GOOTT:  (indiscernible).

5              THE COURT:  I'm not sure it was a lead.  More of a

6    segue.  But you can just ask the question, yeah.

7    BY MR. COOLEY:

8    Q    Does there come a point in time when you sell the

9    products or components that were previously purchased?

10   A    Yes.  I mean, at some point you hope to sell.  You

11   don't want to keep it in the tank indefinitely.  You will

12   want to make a sale at some point.

13   Q    How is the price set for that sale transaction?

14   A    I'm not sure I understand the question.

15   Q    Is there a market price for these products that

16   determines the price at which they're sold?

17   A    Yes, there is generally a publication -- for example,

18   Argus and Platts.  There's a multitude of different

19   publications which give an assessment of where -- and this

20   goes for all oil commodities -- an approximate value of

21   where a particular commodity is assessed.

22   Q    And does the seller have to pay for the product when it

23   purchases it?

24   A    Unless you're giving it to them for free, then yes,

25   they have to pay for it.

Page  47

```
1    Q    Excuse me.  I asked that question poorly, and I've

2    heard counsel call me out.  Let me just make sure I got the

3    question right.  Does the buyer have to pay for the product

4    when they purchase it?

5    A    Yes.  Yes, you do.

6    Q    Are there any credit terms associated with such a

7    transaction?

8              MS. GOOTT:  (indiscernible).

9              THE COURT:  Why don't you ask a clarifying

10   question?

11   BY MR. COOLEY:

12   Q    Are there typically credit terms associated with a

13   transaction for the sale of asphalt and its components?

14   A    Yes.  It varies by counterpart, but yes, there are

15   credit terms given to each particular company that is set by

16   a team at Vitol which determines how much credit or no

17   credit that we will provide.

18   Q    Coming back to this November 2016 email, Exhibit 1, did

19   GCAC and Vitol ever finalize an agreement on the terms for

20   joint venture?

21   A    No, we never finalized the terms, nor did we sign any.

22   Q    Did GCAC -- I think you just anticipated my next

23   question, but I'm going to ask it just to make the record

24   clear.  Did GCAC and Vitol ever execute a joint venture or

25   similar agreement?
```

Page 48

```
 1    A     No.  There was never a signed....

 2    Q     Why not?

 3    A     We had many negotiating points that were outstanding.

 4    There was -- there were numerous reasons that we weren't

 5    able to execute it until all conflicts were cleared within

 6    Vitol.  So we had numerous redlines back and forth through

 7    legal channels.  We had multiple discussions over the course

 8    of many months over the structure of potential JV.  But --

 9    and so these deals needed to be signed off by senior

10    management.  We just needed time to get all of these points

11    taken care of.

12    Q     What conflicts were there within Vitol?

13    A     Well, unbeknownst to me after the fact, I did not --

14    there was a -- we have a company based in Europe called

15    VALT, which stands for Vitol Asphalt Limited Trading.

16    Q     And would you just spell that for the record?

17    A     It's an acronym.  VALT.

18    Q     Thank you.

19    A     So VALT was engaged in the buying and selling and

20    trading of asphalt.

21    Q     Where?

22    A     It was across the world, but at the time had not been

23    active in the United States.

24    Q     So did that create some kind of a conflict with respect

25    to the proposed GCAC transaction?
```

1    A    Yes.  There was a global non-compete that was in place

2    with VALT.

3    Q    When did you first learn of the existence of that

4    global non-compete that you just described?

5    A    I would say sometime before the end of July of 2017.

6    Q    So based on that conflict that you described, did there

7    come a point in time when GCAC -- excuse me.  Based on this

8    conflict you described, did there come a point in time when

9    Vitol decided not to proceed with the JV?

10              MS. GOOTT:  (indiscernible).

11              THE COURT:  That was the sidebar.  The objection

12   is sustained.

13   BY MR. COOLEY:

14   Q    You testified -- you said earlier that Vitol and GCAC

15   never executed a written JV agreement.  Did I recall that

16   correctly?

17              MS. GOOTT:  (indiscernible).

18              THE COURT:  Overruled.

19   BY MR. COOLEY:

20   A    Yes, that's correct.

21   Q    Are you still negotiating the terms of a JV today?

22   A    With GCAC?

23              MS. GOOTT:  (indiscernible).

24              THE COURT:  Overruled.

25   BY MR. COOLEY:

```
1    A    Are you saying with GCAC?

2    Q    Yeah.

3    A    No, we are not.

4    Q    So did the talks stop at some point?

5    A    Yes, they did.

6    Q    When did those talks around a JV stop?

7    A    I think -- there were many discussions around the

8    structure of how this deal would be done.  And I don't know

9    when exactly it stopped, but sometime before the end of July

10   into early August I would say.

11   Q    And was that communicated to Mr. Brass?

12   A    Yes, it was.

13   Q    Nevertheless, Vitol -- did Vitol also stop doing

14   business with GCAC at that time?

15            MS. GOOTT:  (indiscernible).

16            THE COURT:  Overruled.

17   BY MR. COOLEY:

18   A    When you say did business with GCAC, do you mean just

19   in general?

20            MS. GOOTT:  (indiscernible).

21            THE COURT:  Sustained.

22            BY MR. COOLEY:

23   Q    After the point in time when JV talks stopped, did

24   Vitol continue to do any kind of business with GCAC?

25   A    Yes.  We...
```

```
 1              MS. GOOTT:  (indiscernible).

 2              THE COURT:  I don't have anything in front of me,

 3     but -- do you want to --

 4              MR. COOLEY:  Your Honor.

 5              THE COURT:  I'm just saying I'm sure -- I don't

 6     have anything in front of me to know one way or the other.

 7     But we can take that up.  I don't want to take it up with

 8     the witness here.

 9              MR. COOLEY:  Your Honor, I'm not asking the

10     witness for a legal conclusion.  I'm asking the point person

11     for Vitol if they continue to do business of any kind.

12              THE COURT:  I think you said yes.

13              MR. COOLEY:  Then I can ask another question if

14     the Court would like.

15              THE COURT:  You're saying that there's some --

16     there are some questions about -- let me ask you this.  Is

17     this something we need to take -- outside the witness, or

18     are you going to say stuff that you don't want him to hear?

19              MS. GOOTT:  Probably better for him to step out so

20     that it's --

21              THE COURT:  Okay.  Mr. Kuo, why don't you step out

22     for a few minutes and just kind of -- some of you need to

23     just put him in a room or down the hallway.  Just don't sit

24     right outside here.

25              THE WITNESS:  Okay.
```

```
 1              THE COURT:  And I would remind you that you are
 2    still under oath and you are not to discuss your testimony
 3    with anyone.  Anyone.  Okay?  Thank you.  You can walk out
 4    that way.
 5              (Witness exits courtroom)
 6              THE COURT:  Mr. Patterson, are you going to need
 7    the podium?  Okay.  Which one should I focus on, Mr.
 8    Patterson?
 9              MR. PATTERSON:  Starting at Number 4.
10              THE COURT:  Okay.
11              MR. PATTERSON:  Describe in detail -- if I can --
12    I'll scroll to the bottom.  These are signed by Vitol.
13              THE COURT:  Okay.
14              MR. PATTERSON:  Please describe in detail the
15    relationship between the Debtor and Vitol.  And Number 5,
16    please describe in detail the relationship between GCAC and
17    Vitol.  Both elicited objections, saying it called for a
18    legal conclusion.  And all they would provide is that there
19    was a borrower/lender relationship.  And that's what they're
20    stuck with, Judge.  They can't go beyond that.  They are
21    bound by their sworn testimony already.  And to try to
22    elicit something more is improper.  I think it's as simple
23    as that.
24              THE COURT:  Okay.
25              MR. PATTERSON:  And that was Ms. Goott's
```

```
 1   objection.

 2            THE COURT:  What was the date of the -- I'm sorry,

 3   I just wanted to make sure I wrote it down.  Dated January

 4   of 2022?

 5            MR. PATTERSON:  Yes.  And it's -- and I know it's

 6   out of turn and it's -- it's our Exhibit 39.

 7            THE COURT:  Okay.  No, no, no.

 8            MR. PATTERSON:  We can either admit it or we can

 9   do it later with Mr. Kuo.

10            THE COURT:  Mr. Cooley?

11            MR. COOLEY:  First of all, Your Honor, I think the

12   question specifically that was asked was it in the nature of

13   a factual inquiry, were there -- I don't recall the exact

14   phrasing, but were there -- I was asking about whether and

15   what the nature of the transactions was following that

16   point.

17            THE COURT:  I think your question -- yeah.

18            MR. COOLEY:  And first I would note, Your Honor,

19   that the witness has been on the stand testifying for a good

20   half hour or 45 minutes about the nature and details and

21   mechanics of transactions leading up to this point in time

22   where we've gotten to.  And so the testimony that I thought

23   I was eliciting from that question and from the questions

24   that were describing the actual nature of the transactions.

25            I would note for the Court that the interrogatory
```

1    in its entirety says, please describe in detail the

2    relationship between the Debtor and Vitol, e.g. lender,

3    borrower, partner, joint venture, et cetera, Your Honor.

4    And the answer, objects on the grounds that it calls for a

5    legal conclusion.  And then goes on to say, "Subject to the

6    foregoing; GCAC and Vitol had a borrower/lender

7    relationship."  And then goes on to say, "Moreover, GCAC as

8    a fiduciary of Vitol based on the special trust and

9    confidence.  The interrogatory in the question posed gives

10   examples of the type of answer it is looking for.  We do

11   believe that ultimately the question of whether it is a

12   borrower/lender relationship or a JV relationship is a legal

13   conclusion that the Court will reach based upon facts

14   elicited by witnesses about what the parties did during the

15   relevant time periods and what the parties thought during

16   the relevant time periods.  That's all I'm looking to elicit

17   from the witness.  And I would submit to the court that it

18   is in no way foreclosed by these interrogatories and their

19   responses.

20            MR. PATTERSON:  (indiscernible).

21            MR. COOLEY:  May I respond, Your Honor?

22            THE COURT:  Well, my question is I look at

23   Paragraph 30 and 31 of the first-amended complaint that says

24   the Debtor lawfully obtained property belonging to Vitol by

25   selling assets and related products purchased by Vitol.  The

1    Debtor appropriated, lawfully obtained funds for his own

2    personal use or benefit with fraudulent intent.  It seems to

3    go beyond lender/borrower relationship.

4              No, no, no, I was just -- that's an A4 claim.

5              MR. PATTERSON:  (indiscernible).

6              THE COURT:  No, that's embezzlement.  That's --

7              MR. PATTERSON:  (indiscernible).

8              THE COURT:  The question is can they ask about the

9    nature of their relationship and what happened afterwards.

10   I think they can ask about it.  But I think you get to cross

11   him on it.  And so I think the testimony comes up, and I

12   think you're going to be able to cross him on it.  I do

13   think they say that the Debtor willfully and maliciously

14   caused injury through specific actions and there's been harm

15   to them.  I just think it's -- I agree with you, I think the

16   interrogatory certain describes the business relationship as

17   lender/borrower.  I think he can describe it and you can

18   come back and cross him on it.  But I think he gets to talk

19   about it.  I think you're going to be able to cross him on

20   it.  And maybe -- I agree with you, they're going to be have

21   to be held to the pleadings.  I just don't know enough yet

22   to know what they are arguing by saying were there other

23   transactions after this JV relationship broke down.  That's

24   all I know.

25             MR. PATTERSON:  (indiscernible).

```
 1            THE COURT:  I guess what I'm saying is you get to
 2    cross him on it, and everybody gets held to the pleadings.
 3    I agree with you there.
 4            MR. PATTERSON:  (indiscernible).
 5            THE COURT:  No, no, no.  Understood.
 6            MR. PATTERSON:  (indiscernible).
 7            MR. COOLEY:  Your Honor, I object to the sidebars.
 8    We've gone well beyond this objection.
 9            THE COURT:  Nobody's here.  We can talk about it.
10    Okay.  Go ahead.
11            MR. COOLEY:  Just two points if I may.  Just very
12    briefly, Your Honor.
13            THE COURT:  Get close to the mic.  Make sure we
14    can hear you.
15            MR. COOLEY:  First, just to be clear, we are not
16    arguing the issue today.  But I disagree with the contention
17    that embezzlement under 523(a)(4) requires an employee
18    relationship.  In the Fifth Circuit, the standard looks to
19    whether property was entrusted to the Debtor.  And whether
20    or not -- you know, commonly it arises in an employee
21    context, but that is not a stated element of the claim.
22    That's not for today.  I just wanted to state that for the
23    record.
24            Second, Your Honor, if the testimony to be
25    elicited was solely and exclusively to course onto the black
```

```
1    and white statements in a complaint, trials would last 15
2    minutes.  The point is whether or not there has been notice
3    to the party of the nature of the allegations.  The
4    testimony is always going to go into detail and the question
5    is whether it is relevant to the claims as pled, as we have
6    said throughout this process.  And clearly the Court has
7    come to understand at this point a borrower/lender
8    relationship can take a variety of forms.  It isn't
9    necessarily a promissory note.  It can arise in a variety of
10   contexts.  The Court has heard some testimony about that
11   already and we are seeking to proceed in that vein.  And
12   ultimately the Court will decide whether such a relationship
13   existed and whether it even matters to the outcome of the
14   trial.
15            THE COURT:  Let's bring Kuo back in.  I'm going to
16   allow the testimony to continue.  I'm not going to make any
17   judgments about -- everybody's rights are reserved.  Maybe
18   that's the better way of saying it.  Certainly Brass has
19   every right to come in and argue if you're arguing outside
20   of the pleadings.  And we'll take that up and I'll make that
21   determination at an appropriate time.  But for now, the
22   testimony comes in.  I think you can talk about it.
23            Mr. Cooley, what do you think?  You have an hour
24   or less?  What do you think from a timing standpoint?  I'm
25   not trying to rush you.  I'm just thinking about --
```

002278

1          MR. COOLEY:  No, no.  I was thinking about that

2   very thing myself, Your Honor.  It's been going a little

3   more slowly than I anticipated based on -- as a function of

4   my prior estimate.

5          THE COURT:  Mr. Kuo is in the room, so I just want

6   you to give a number.

7          MR. COOLEY:  Halfway mark.

8          THE COURT:  Okay.  Let's just work through the

9   direct.

10         Mr. Kuo, why don't you come up?  And I would

11  remind you, sir, that you are still under oath.  Okay?  Mr.

12  Cooley is going to ask you a brand new question, because I

13  don't expect you to know what the last one was.

14         Mr. Kuo, do you understand that you are still

15  under oath?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  Okay.  Thank you.

18         CONTINUED DIRECT EXAMINATION OF ERIC KUO

19  BY MR. COOLEY:

20  Q   After the JV talks ended as you described, did Vitol

21  and GCAC continue to do business in any way?

22  A   Yes.  Vitol --

23  Q   I think you answered my question.  I'll ask you the

24  next one.  What was the nature of that business?

25  A   Vitol agreed to be the financing partner for GCAC,

Page 59

1   essentially acting as their bank.

2   Q    Was that proposed to -- was that communicated to GCAC?

3   A    Yes, it was.

4   Q    Was it communicated to Mr. Brass?

5   A    Yes, it was.

6   Q    Do you recall around when?

7   A    I believe it was that timeframe in July or early

8   August.

9           MR. COOLEY:  Your Honor -- or Ms. Mehta, could I

10   have Vitol Exhibit 14?  She may need control back.

11          THE COURT:  Hold on a second.  Ms. Mehta, let me

12   know if you still have it.  If not --

13   BY MR. COOLEY:

14   Q    I'll put up on the screen what has been marked as

15   Exhibit 14.  Do you recognize the document on the screen

16   before you?

17   A    Yes, I do.

18   Q    Can you identify it to the Court?

19          THE COURT:  Can you scroll through everything?  I

20   want to make sure that we do this once if there's anything

21   there.

22          MR. COOLEY:  That's exactly what I was looking to

23   make sure of, Your Honor.

24          THE COURT:  All right.  If not, we can go hard

25   copy if we have to.  I just don't want to -- I just want you

1    to take a look at -- I'm going to say nothing.

2            MR. COOLEY:  I think this is a two-page document.

3    Ms. Mehta, can we have the two pages side-by-side?

4    BY MR. COOLEY:

5    Q    What's before you is now a two-page exhibit marked

6    Exhibit 14.  Looking at the two pages, do you recognize this

7    document?

8    A    Yes, I do.

9    Q    Can you identify these two pages to the Court?

10   A    This was an email sent by Mr. Brass on August 21st,

11   2017.

12           THE COURT:  Let me stop you.  Ms. Mehta, I'm going

13   to want you to just let him describe stuff, because I get

14   nervous when I see folks doing things.  It could be an

15   unintentional way of leading the witness.  So let him just

16   talk and then let counsel then direct you to where it want

17   you to go.  I'm sure it's done a bunch of different ways,

18   and I'm not making any assumptions about what you're doing.

19   I just -- for me, just for purposes of me, I want him to be

20   able to talk.  And then if counsel directs you to highlight

21   something, you are free to use every bit of it.  I just want

22   to make sure that it's done at the direction of counsel and

23   not through any other way.  And this is just a Lopez thing.

24   You go into another court, you can do it any other way.

25   It's just for me.

1          Excuse me, Mr. Kuo, can you please describe what
2    you -- describe the document?
3          THE WITNESS:  This is an email sent by Mr. Brass
4    to me on August 21st of 2017 titled Vitol Interim Financing
5    Structure Bullets.
6    BY MR. COOLEY:
7    Q    Do you recall -- are you identified as a recipient of
8    this email?
9    A    Yes, I am.
10   Q    Do you recall receiving this email?
11   A    Yes, I do.
12   Q    And do you recall -- can you identify the second page,
13   by the way, of this exhibit?
14   A    These were the discussion points that Vitol and GCAC
15   were discussing with regards to a financing structure.
16   Q    And when this email came to you, did it have the
17   attachment to it?
18   A    I believe so.
19   Q    Do you recognize the attachment?
20   A    I do.
21         MR. COOLEY:  I would move for the admission of
22   Vitol Exhibit 14.
23         THE COURT:  Any objection?
24         Okay, Vitol Exhibit 14 is admitted.
25         (Vitol Exhibit 14 Admitted into Evidence.)

```
 1   BY MR. COOLEY:

 2   Q    What did you understand to be the purpose of this email

 3   communication and the attachment?

 4             MS. GOOTT:  (indiscernible).

 5             MR. COOLEY:  I asked the witness's understanding.

 6             THE COURT:  Yeah.  Why don't you ask a different

 7   question.

 8   BY MR. COOLEY:

 9   Q    Were you surprised to get this email?

10             MS. GOOTT:  (indiscernible).

11             THE COURT:  Overruled.

12   BY MR. COOLEY:

13   A    No, I was not surprised to receive this.

14   Q    Why is that?

15   A    Because this was just a -- this was an email which put

16   into writing a structure that we had been discussing.

17   Q    And did that structure -- and just generally speaking,

18   what was the structure that was being described at this time

19   as you understood it?

20   A    This structure would be put in place outside of the

21   potential JV that we had initially discussed.  So this was a

22   financing agreement or the bullet point for a financing

23   structure that we were going to -- Vitol was going to

24   provide for GCAC because we were not able to go forward with

25   the initial structure of the JV as it was proposed.
```

1   Q    Did Vitol accept the terms as they're laid out in this

2   email and attachment?

3   A    Well, we did finalize all the points, meaning that

4   there were some areas here that we never formalized, such as

5   the interest rate on the financing.  So no, we did not

6   finish all of the points.

7   Q    Did Vitol ever communicate to GCAC terms under which it

8   would be willing to proceed with GCAC?

9   A    I'm sorry, I don't really exactly understand the

10  question.

11  Q    Did GCAC ever communicate -- I did it again.  Did Vitol

12  ever communicate to GCAC under what terms it would be

13  willing to proceed with an arrangement?

14  A    Not every point, but the majority of points, yes.

15  Q    What points that you recall were conveyed to GCAC?

16  A    The fact that Vitol was willing to finance --

17          MS. GOOTT:  (indiscernible).

18          THE COURT:  Just taking it as his understanding

19  and not that there's anything that's been locked down.  But

20  that's a fair point.  That's a fair point.  So I will

21  sustain the objection to the extent it's referring to a

22  document that's not been admitted into evidence.

23  BY MR. COOLEY:

24  Q    These terms that were communicated to GCAC, were they

25  communicated in writing?

```
1    A    The main point of the structure are here in this

2    document.

3    Q    Were there other deal terms not identified in this term

4    sheet?

5              MS. GOOTT:  (indiscernible).

6              THE COURT:  My understanding of the question --

7    I'm going to overrule based on -- my understanding of the

8    question is was there a deal in place that included some

9    terms that are not listed in this document, other deal

10   terms.

11             THE WITNESS:  That's not the way I understand the

12   question.

13             THE COURT:  Okay.  Well then I'm going to sustain

14   her objection because I misunderstood the question then.

15   BY MR. COOLEY:

16   Q    Did Vitol communicate deal terms to GCAC that are not

17   reflected in this particular document?

18   A    The term of repayment is not set forth in this

19   document.

20   Q    Did you ever have a conversation with Mr. Brass or

21   anyone else about that particular deal term?

22             MS. GOOTT:  (indiscernible).

23             THE COURT:  Overruled.

24   BY MR. COOLEY:

25   A    Yes.  We spoke many times about the repayment of funds
```

Page 65

```
1    that were collected by GCAC that were due Vitol over the

2    course of many months.

3    Q    And what on that subject did you communicate to GCAC?

4          A    Well, first of all, the communication was

5    mainly done by our finance team.  And --

6          MS. GOOTT:  (indiscernible).

7          THE COURT:  Sustained.  The question as what did

8    you communicate to Mr. Brass.

9    BY MR. COOLEY:

10   A    So I spoke to Mr. Brass multiple times about repaying

11   the amounts of money that were due Vitol from GCAC over the

12   course of several months.

13   Q    And what was the nature of those conversations?

14   A    They were requests for payment because I was receiving

15   -- I was receiving numerous emails --

16         MS. GOOTT:  (indiscernible).

17         THE COURT:  Sustained.

18   BY MR. COOLEY:

19   Q    To your knowledge, did Vitol and GCAC ever reach

20   agreement on terms by which they would continue to engage in

21   purchases and sales of asphalt after the time of this email?

22   A    I'm not sure I fully understand the question.

23   Q    I will rearrange it and see if it helps.  Following

24   this email, did Vitol and GCAC ever reach agreement on terms

25   by which they would continue to engage in transactions
```

1    involving the purchase and sale of asphalt?

2    A    Vitol notified GCAC that we would continue financing

3    their operation.

4                MS. GOOTT:  (indiscernible).

5                THE COURT:  Overruled.

6    BY MR. COOLEY:

7    Q    And under those terms, who would pay the purchase price

8    associated with the purchase of any materials?

9                MS. GOOTT:  (indiscernible).

10               THE COURT:  Sustained.

11   BY MR. COOLEY:

12   Q    After the time of this email, did Vitol and GCAC engage

13   in any more transactions together involving the purchase of

14   asphalt?

15   A    Yes.

16   Q    After the time of this email, did Vitol and GCAC engage

17   in any transactions involving the sale of asphalt?

18   A    Yes.

19   Q    In connection with those purchase transactions, who

20   would pay the purchase price to the seller?

21   A    Vitol would.

22   Q    And who would then own the product that was purchased?

23   A    Vitol would retain title of the product.

24   Q    Who would pay the expenses associated with that

25   product?

1    A    Vitol paid all the expenses.

2    Q    And when the product was sold, who was supposed to get

3    the sale proceeds?

4    A    Vitol was supposed to.

5    Q    And to the extent that the sale proceeds didn't cover

6    all the expenses, who was supposed to be liable with

7    ultimately paying those expenses?

8              MS. GOOTT:  (indiscernible).

9              THE COURT:  Sustained.  I think it assumes facts

10   not in evidence.  It assumes...

11   BY MR. COOLEY:

12   Q    Were there ever any of these --

13             THE COURT:  I will also say it was vague.  I don't

14   know who the who in your hypo refers to when there's

15   potentially multiple parties.  Maybe you can just ask it in

16   a more direct way.

17   BY MR. COOLEY:

18   Q    In these transactions you're describing, was the sale

19   price that Vitol -- that was obtained from the product sold

20   ever insufficient to cover all the expenses associated with

21   it?

22             MS. GOOTT:  (indiscernible).

23             MR. COOLEY:  Your Honor, I'm seeking to elicit a

24   fact.

25             THE COURT:  Less compound.  Why don't you ask it

1   in another way?

2   BY MR. COOLEY:

3   Q    Were the sale transactions ever such that they did not

4   generate sufficient sale proceeds to cover all of the

5   associated expenses?

6   A    Yes.

7   Q    Do you have an understanding as to who as between Vitol

8   and GCAC was to be liable for those additional expenses?

9            MS. GOOTT:  (indiscernible).

10           THE COURT:  Well, I think he -- I think I'm going

11   to overrule that.  I think -- you can answer.

12   BY MR. COOLEY:

13   A    Well, GCAC would be responsible ultimately for the

14   expenses that were not received above and beyond the sales

15   price.

16   Q    Did you ever participate in conversations with Mr.

17   Brass about these expectations of who would pay and who

18   would -- so forth?

19           MS. GOOTT:  (indiscernible).

20           THE COURT:  It was the last part that got you

21   there.  So I will sustain the objection.

22   BY MR. COOLEY:

23   Q    These various -- with respect to the matters of the

24   last few questions, who was expected -- I have to -- did you

25   ever participate in conversations with Mr. Brass about -- to

1    discuss Vitol's expectation of who would fund the purchase

2    price for purchase transactions?

3    A    Well, Vitol was funding the purchase price.  Now, the

4    sales proceeds were understood to be received by Vitol as

5    well as all the sales proceeds.

6    Q    Was that understanding to your knowledge ever --

7              MS. GOOTT:  (indiscernible).

8              THE COURT:  Hold on a second.  Hold on a second.

9              MS. GOOTT:  (indiscernible).

10             THE COURT:  Overruled.  You can ask another

11   question.

12   BY MR. COOLEY:

13   Q    Was that ever communicated, those expectations ever

14   communicated to Mr. Brass?

15   A    Yes, fully.

16   Q    Was Vitol's expectation that GCAC would ultimately be

17   liable for any additional expenses communicated to Mr.

18   Brass?

19             MS. GOOTT:  (indiscernible).

20             THE COURT:  Sustained.

21   BY MR. COOLEY:

22   Q    You testified that Vitol expected GCAC to pay any

23   excess expenses not covered by sale proceeds.  Was that ever

24   communicated to Mr. Brass?

25             MS. GOOTT:  (indiscernible).

1          MR. COOLEY:  Your Honor, there's no way to --

2          THE COURT:  Overruled.  Overruled.

3    BY MR. COOLEY:

4    A    Yes.  All costs and expenses, ancillary costs, costs of

5    doing the business need to be paid by GCAC ultimately in the

6    end.

7    Q    To your knowledge did Mr. Brass ever represent to Vitol

8    that GCAC would perform in accordance with those terms?

9          MS. GOOTT:  (indiscernible).

10         THE COURT:  It's also leading.  Sustained.

11   BY MR. COOLEY:

12   Q    Did Mr. Brass ever represent to you that GCAC would

13   perform in accordance with these terms?

14         MS. GOOTT:  (indiscernible).

15         THE COURT:  That one I think worked.  I'm going to

16   overrule the objection.

17   BY MR. COOLEY:

18   A    I'm sorry, could you repeat that questions?

19   Q    Did Mr. Brass ever represent to you that GCAC would

20   perform in accordance with these terms?

21         MS. GOOTT:  (indiscernible).

22         THE COURT:  Overruled.

23   BY MR. COOLEY:

24   A    Yes.  We spoke about that many times, that he would be

25   responsible for the payments.

1    Q    Did GCAC in fact -- did GCAC actually remit -- during

2    the time period following this email, did GCAC engage in

3    sale transactions involving product that Vitol had

4    purchased?

5              THE COURT:  You started one question and then you

6    asked another one.  So I'm going to -- you talked about

7    remitting and then you asked another question.  Maybe you

8    can just -- I didn't understand which question you were

9    going to ask.

10             MR. COOLEY:  Yes, Your Honor.

11   BY MR. COOLEY:

12   Q    After the time of this email, did GCAC engage in sale

13   transactions involving product that had been purchased by

14   Vitol?

15             MS. GOOTT:  (indiscernible).

16             THE COURT:  Overruled.

17   BY MR. COOLEY:

18   A    Yes.  There were multiple sales that GCAC made to

19   counterparts and received funds for the sales of the

20   product.

21   Q    And so were any of those sale proceeds received by GCAC

22   instead of Vitol?

23   A    Yes.

24   Q    Did GCAC remit all of those sale proceeds to Vitol?

25             MS. GOOTT:  (indiscernible).

```
 1              THE COURT:  Overruled.  He can testify if he

 2    knows.

 3    BY MR. COOLEY:

 4    A    No.  Not all the funds were remitted to Vitol over the

 5    course of the sales, the overall sales.

 6    Q    How long did this arrangement that you described

 7    continue?

 8    A    It continued until the end of 2017.

 9    Q    And why did it stop?

10    A    We notified GCAC sometime in I would say September that

11    we were not willing to move forward with the financing

12    arrangement past the end of the year.

13              MR. COOLEY:  Ms. Mehta, could I have Vitol Exhibit

14    25?

15    BY MR. COOLEY:

16    Q    This is -- and for the record, I've put up on the

17    screen the first page of a three-page email -- excuse me, a

18    three-page document.  And Mr. Kuo, would you look at the

19    document on the screen?  And Ms. Meta, would you slowly

20    scroll through the three pages?  And then if you would take

21    us back to Page 1.

22         Mr. Kuo, do you recognize the document up on the screen

23    which I have marked as Vitol Exhibit 25?

24    A    I do.

25    Q    Can you identify it to the Court?
```

```
 1    A    The most recent one was an email sent by Dan Sergeant

 2    to Chris Bake and numerous other people.

 3    Q    Were you a recipient of this email?

 4    A    Yes.

 5    Q    Do you recall receiving this email?

 6    A    I do.

 7    Q    Does it appear to be a true and correct copy of that

 8    email?

 9    A    Yes, it does.

10             MR. COOLEY:  Your Honor, I move to admit Vitol

11    Exhibit 25.

12             THE COURT:  Any objection?

13             MS. GOOTT:  (indiscernible).

14             THE COURT:  Vitol Exhibit 25 is admitted.

15             (Vitol Exhibit 25 Admitted into Evidence.)

16    BY MR. COOLEY:

17    Q    And I want to direct your attention -- still on the

18    first page -- to the second paragraph of the second email.

19    And just so you can find it, the paragraph begins with the

20    words, "Vitol have advised".  Do you see that paragraph in

21    the middle of the page?

22             MR. COOLEY:  Your Honor, I just want to make sure

23    we're all on the same paragraph.

24             THE COURT:  Then just say that.  Just point him to

25    a paragraph.
```

```
 1              MR. COOLEY:  All right.

 2      BY MR. COOLEY:

 3      Q    In the second email on the page, the second paragraph,

 4      would you read to me the first three words of the paragraph?

 5      A    "Vitol have advised."

 6      Q    Thank you.  And I would ask you to -- in this sentence

 7      -- well, first of all, this was an email from -- this

 8      particular email came from whom according to this document?

 9      A    It was sent by Chris Bake.

10      Q    Do you know who that is?

11      A    Yes, I do.

12      Q    Who is Mr. Bake?

13      A    Mr. Bake is a board member of Vitol.

14      Q    In the first sentence of that Paragraph, Mr. Bake

15      writes the following.

16              MS. GOOTT:  (indiscernible).

17              MR. COOLEY:  Your Honor, this is neither leading

18      nor coaching.  I want to put a sentence into the record and

19      then ask the witness a question about the sentence.

20              MS. GOOTT:  (indiscernible).

21              THE COURT:  I think everybody is coaching now.  I

22      think you can just ask a question.

23      BY MR. COOLEY:

24      Q    Mr. Kuo, would you read to yourself the first sentence?

25              MS. GOOTT:  (indiscernible).
```

```
 1            THE COURT:  I think he's allowed to ask him to

 2   read a question and then ask him a question about it so that

 3   he knows what he's talking about.  I think that's fair.  You

 4   know, rights are reserved.  I am overruling her objection.

 5   BY MR. COOLEY:

 6   A    I'm sorry, which sentence did you want me to read?  The

 7   very first sentence?

 8   Q    Yes, sir.

 9   A    Of the second email.

10   Q    Correct.  Do you agree with the statement made?

11            MS. GOOTT:  Objection.  (indiscernible).

12            THE COURT:  I'm not sure coaching is a valid

13   objection.  Overruled.  But I got the point.  But if we're

14   going to play by the rules, then -- if it's what you want,

15   then we've all got to play by the rules.  And that's not an

16   objection.

17            MS. GOOTT:  (indiscernible).

18            THE COURT:  That's sustained.

19   BY MR. COOLEY:

20   Q    How does Mr. Bake describe the nature of the current

21   arrangement?

22            MS. GOOTT:  (indiscernible).

23            THE COURT:  Overruled.

24   BY MR. COOLEY:

25   A    I'm sorry.  You asked me how Mr. Bake characterizes...
```

1    Q    How does he describe the current arrangement in that

2    sentence?

3              MS. GOOTT:  (indiscernible).

4              THE COURT:  I'm going to sustain that objection.

5    I don't think it's -- now I'm coaching.  I don't think it's

6    for you to testify as to what his understanding is or how

7    he's phrasing stuff.  He stated words.  They are what they

8    are.  So I think you can ask a question about that.

9    BY MR. COOLEY:

10   Q    Did you ever discuss the nature of GCAC's relationship

11   to Vitol with Mr. Bake?

12   A    Yes.

13   Q    Did you ever discuss with Mr. Bake your understanding

14   of the nature of the relationship with GCAC?

15   A    Yes.

16   Q    Based on those discussions, do you know if Mr. Bake had

17   an understanding of the nature of the relationship?

18   A    I believe he did, yes.

19   Q    And what was that understanding?

20             MS. GOOTT:  (indiscernible).

21             THE COURT:  What's your response, Counsel?

22             MR. COOLEY:  Your Honor, I've not asked what Mr.

23   Bake has ever said.  I've asked what the witness's

24   understanding was.  Counsel is welcome to cross-examine to

25   investigate the basis of that understanding.

```
 1              THE COURT:  I'm going to overrule.  You can answer

 2    the question.

 3    BY MR. COOLEY:

 4    A    I'm sorry, can you repeat the question?

 5    Q    What is your understanding of what Mr. Bake's

 6    understanding was of the nature of the relationship?

 7              MS. GOOTT:  (indiscernible).

 8              THE COURT:  Sustained.

 9              BY MR. COOLEY:

10    Q    Over the course of the relationship between Vitol and

11    GCAC, how were -- how was information about purchases and

12    sales communicated between the two?

13    A    They were generally -- they were communicated either

14    through a phone call -- well, phone call and then an email

15    or text.

16    Q    What about hedging transactions?  How if at all were

17    those communicated?

18    A    Those were sent initially by text or email and always

19    confirmed.

20              MR. COOLEY:  Ms. Mehta, could I have Vitol Exhibit

21    3, please?

22    BY MR. COOLEY:

23    Q    Mr. Kuo, I have put up on the screen what has been

24    marked as Exhibit 3, which is a one-page document.  Do you

25    recognize this document?
```

```
 1    A    I do.

 2    Q    Can you identify it to the Court?

 3    A    This is an email from Patrick Perugini sent to me and

 4    the contracts group and the broker, July 17th.

 5    Q    How many emails are on the page?

 6    A    There are two.

 7    Q    Do you recognize both emails?

 8    A    Yes, I do.

 9    Q    And are you -- were you a recipient of this email?

10    A    Yes.

11    Q    Do you recall receiving this email?

12    A    I do.

13    Q    Does it appear to be a true and correct copy of the

14    email that you recall?

15    A    It does.

16              MR. COOLEY:  I move the admission of Vitol Exhibit

17    3.

18              THE COURT:  Any objection?  Vitol Exhibit 3 is

19    admitted.

20              (Vitol Exhibit 3 Admitted into Evidence.)

21    BY MR. COOLEY:

22    Q    Start briefly with the second email at the bottom.  Do

23    you know the identity of the sender of the earlier email at

24    the bottom of the page?

25    A    Yes, I do.
```

1    Q    Who is that?

2    A    Reggie Nichols, who is the admin person for a broker

3    called Market Exchange.

4    Q    Do you know why you were copied on Mr. Nichols' email?

5    A    Ms. Nichols.

6    Q  I apologize.  Do you know why you were copied on Ms.

7    Nichols' email?

8    A    Yes.  She was just recapping the review that was done

9    by GCAC.

10   Q    In the -- coming back to the email at the top of the

11   page from Mr. Perugini, do you know why Mr. Perugini was

12   asking if you could hedge the remaining barrels?

13              MS. GOOTT:  (indiscernible).

14              THE COURT:  He can answer if he knows.  Overruled.

15   BY MR. COOLEY:

16   A    Yes.  Well, each deal that was entered into, we agreed

17   that everything would be hedged.  And so in this email, he

18   is asking me to hedge the deal that they had just completed.

19              MR. COOLEY:  Could I have Vitol Exhibit 12,

20   please?

21   BY MR. COOLEY:

22   Q    I have put up on the screen what's been marked as

23   Exhibit 12.  This is a two-page document.

24              MR. COOLEY:  Ms. Mehta, could we get both pages?

25   BY MR. COOLEY:

1   Q    Mr. Kuo, looking at the two pages up on the screen, do

2   you recognize this document?

3   A    I do.

4   Q    Can you identify it to the Court?

5   A    It's an -- there's two parts.  There's one that was

6   sent by Mr. Perugini to myself and some other people within

7   GCAC and Rio Energy stating the specifics of a fuel

8   transaction.

9   Q    Do you recognize the email?

10  A    I do.

11  Q    Do you recall -- and are you a sender or a recipient of

12  each of these two emails?

13  A    On the second email, I am the sender.

14  Q    And by the second email, are you referring to -- which

15  one?

16  A    The top one.

17  Q    And were you a recipient of the earlier email below it?

18  A    Yes.

19  Q    And does this appear to be a true and correct copy of

20  the email as you recall it?

21  A    Yes, it is.

22       MR. COOLEY:  Your Honor, I move the admission of

23  Vitol Exhibit 12.

24       THE COURT:  Is there any objection?  Vitol Exhibit

25  12 is admitted.

```
1                (Vitol Exhibit 12 Admitted into Evidence.)

2    BY MR. COOLEY:

3    Q    Let's start with the earlier of the two emails from Mr.

4    Perugini.  And I'll just start by asking if you have an

5    understanding as to why Mr. Perugini would have sent you

6    this email.

7    A    Yes.

8    Q    What is that understanding?

9                MS. GOOTT:  (indiscernible).

10               THE COURT:  What's your response, Counsel?

11               MR. COOLEY:  Your Honor, this is -- well...

12               THE COURT:  What's your objection?  What's your

13   response to relevance.  I should break it out.  What's your

14   objection to relevance?

15               MR. COOLEY:  Your Honor, the --

16               THE COURT:  Response to the objection to

17   relevance.  I apologize.

18               MR. COOLEY:  We submit that the email -- I'm

19   struggling with how to respond without drawing a coaching

20   objection, Your Honor.  Because --

21               THE COURT:  No, it's a relevance objection.  So

22   you're going to have to put on the record why you think it's

23   relevant.

24               MR. COOLEY:  Your Honor, it's relevant as -- I'm

25   sorry?
```

```
 1              THE COURT:  I'm saying Ms. Goott -- I guess it

 2   doesn't mean that you have to -- I think there's a way you

 3   can not testify about a document, but I think you can answer

 4   a relevance objection.

 5              MS. GOOTT:  (indiscernible).

 6              THE COURT:  I'm with you.  No, no, no.  We're on

 7   the same -- yeah.  There's obviously a more artful way of

 8   describing -- I apologize.  That's the better way to

 9   describe it.

10              MS. GOOTT:  (indiscernible).

11              MR. COOLEY:  Candidly, Your Honor, I confess I'm

12   not sure I understand the objection as is articulated.  I'll

13   be happy to try and ask another question.  Your Honor, the -

14   -

15              THE COURT:  My understanding is -- what's the

16   relevance of asking this witness what Mr. Perugini's --

17   what's the relevance of asking this witness what his

18   understanding of why Mr. Perugini sent him this email?

19              MR. COOLEY:  Your Honor --

20              THE COURT:  Ms. Goott, did I get that right?

21              MS. GOOTT:  (indiscernible).

22              THE COURT:  Okay.  Okay.  Okay.

23              MR. COOLEY:  Your Honor, I will ask the question a

24   different way.

25              THE COURT:  Okay.
```

1   BY MR. COOLEY:

2   Q    Were you surprised to get this email from Mr. Perugini?

3            MS. GOOTT:  (indiscernible).

4            THE COURT:  I will sustain that.

5   BY MR. COOLEY:

6   Q    Is this the first email you'd ever received from Mr.

7   Perugini?

8   A    No.

9   Q    Was this the first email with information of this type

10   that you'd ever received from Mr. Perugini?

11            MS. GOOTT:  (indiscernible).

12            THE COURT:  Overruled.

13   BY MR. COOLEY:

14   A    No, this is not the first type of email I've received

15   from Mr. Perugini.

16   Q    Just for the Court's benefit, what is -- do you have --

17   do you understand the information that's provided in that

18   email from Mr. Perugini?

19   A    Yes, I do.

20   Q    Does that information have meaning to you?

21   A    Yes, it does.

22   Q    I would like you to take me through it.  And let's

23   start with -- and let's start with the first line of the

24   email below the subject line.  Would you read me that first

25   line so I know we're looking at the same thing?

1   A      "Deal Number One, Rio inventory in Mobile."

2   Q      There's a series of lines underneath it.  Does that

3   information provided there have meaning to you?

4   A      Yes, it does.

5   Q      And can you tell me essentially what it is that that

6   information conveys to you?

7   A      It's telling me that Vitol is purchasing oil from Hunt

8   refining in Mobile at a certain price in a certain

9   timeframe.

10  Q      Are you telling me Mr. Perugini was telling you that

11  Vitol was going to purchase product?

12             MS. GOOTT:  (indiscernible).

13             THE COURT:  Overruled.

14             BY MR. COOLEY:

15  A      Yes.  Because the deals were done because --

16             MS. GOOTT:  (indiscernible).

17             THE COURT:  Overruled.

18  BY MR. COOLEY:

19  A      GCAC concluded these deals on their own cognizance and

20  informed me after the fact what the deal terms and the

21  specifics of the deal were by an email like this.  This is

22  very common, the recap of the particular deal that they had

23  done.

24  Q      And remind me again, who is Mr. Perugini in all of

25  this?

1    A    He was an employee of GCAC and the primary trader that

2    I dealt with.

3    Q    And so still just staying on Deal Number One, that

4    section of the email, what did you do I think that -- what

5    did you do with that information when you got it?

6              MS. GOOTT:  (indiscernible).

7              THE COURT:  Overruled.

8    BY MR. COOLEY:

9    A    I would enter the specific deal into Vitol's trading

10   system and subsequently hedge the particular deal.

11   Q    Now, this Deal Number One you said had Vitol as the

12   buyer.  Did Vitol have to pay a purchase price of any kind

13   associated with that?

14   A    If you're asking if Vitol had to remit funds for this

15   purchase?  Is that what you're asking?

16   Q    Yes, that is what I'm asking.

17   A    The answer is yes.

18   Q    And to your knowledge did Vitol do so?

19   A    I don't receive payments, but I assume that we did.

20   Q    And I want to ask you about the second-to-last line

21   again of this Deal One section.  The line begins with the

22   word credit.  Do you see that line?

23   A    Yes, I do.

24   Q    Do you -- does the information provided in that line

25   have meaning to you?

1          MS. GOOTT:  (indiscernible).

2          THE COURT:  Overruled.

3   BY MR. COOLEY:

4   A    Yes, it does.

5   Q    Can you tell the Court what that information means to

6   you?

7   A    In this --

8          MS. GOOTT:  (indiscernible).

9          THE COURT:  That's my understanding.

10          MR. COOLEY:  It is, Your Honor.  I'm trying not to

11   read it into the record.

12          THE COURT:  That's my understanding.

13          MR. COOLEY:  But yes, just that one line.

14   BY MR. COOLEY:

15   A    In the line under credit, it says, mutual between

16   credit.  Three ROI, which stands for receipt of invoice.  So

17   in this particular credit term, Vitol was obliged to pay for

18   the product three days after it receives the invoice.

19   Q    Moving down the page now to the next section of the

20   email.  Do you see that?

21   A    Deal Number Two?

22   Q    Yes.

23   A    Yes.

24   Q    Do you understand what's being communicated to you in

25   that section that begins Deal Number Two?

```
 1    A    Yes, I do.

 2    Q    And what is that?

 3              MS. GOOTT:  (indiscernible).

 4              THE COURT:  Overruled.

 5    BY MR. COOLEY:

 6    A    Yes, I understand the deal.

 7    Q    And would you explain to the Court what that

 8    information under the heading Deal Number Two means to you?

 9    A    This is whereby Vitol sells the oil to GCAC under a

10    certain time period and a certain price and a certain volume

11    under certain credit terms.

12    Q    You said the oil.  Which oil are you referring to?

13    A    Under quality it states the specifics of the oil being

14    sold.

15    Q    And was there any credit term associated with this Deal

16    Number Two?

17    A    Yes.  Under credit, it says open five days after

18    receipt of invoice.

19    Q    And what does that mean to you?

20    A    That means that five days after they receive an invoice

21    from Vitol, GCAC is obliged to pay for the product.

22    Q    Now let's just look at the last piece at the bottom of

23    Page 1 that continues on to Page 2.  Do you see that third

24    section of the email there?

25    A    I do.
```

```
 1   Q    Would you tell me what words it begins with just so we

 2   are oriented correctly?

 3   A    Back up to Deal Number Two.

 4   Q    Do you understand the information that's provided in

 5   that third section?

 6   A    I do.

 7   Q    Does that information have meaning to you?

 8   A    Yes, it does.

 9   Q    What does that information -- what do you understand

10   those lines to communicate to you?

11   A    This is the specifics of the deal that GCAC made with

12   Gunvor.

13   Q    On this -- relating in any way to the deals described

14   in the rest of the inventory -- the rest of the email?

15        MS. GOOTT:  (indiscernible).

16        THE COURT:  Sustained.

17   BY MR. COOLEY:

18   Q    Is this backup section -- does it bear any relationship

19   to the two sections that precede it?

20        MS. GOOTT:  (indiscernible).

21        THE COURT:  Overruled.

22        BY MR. COOLEY:

23   A    Yes, it does.  It gives the -- it gives the specifics

24   of what GCAC did with the oil after it purchased it.  They

25   subsequently sold the product to Gunvor.  So here you can
```

1   see it says seller, GCAC, buyer, Gunvor.  So this is -- this

2   shows the transaction flow of what happened after GCAC

3   purchased the product.

4   Q    And would there have been a purchase price associated

5   with that transaction between GCAC and Gunvor?

6           MS. GOOTT:  (indiscernible).

7           THE COURT:  If he knows.  Overruled.

8   BY MR. COOLEY:

9   Q    Do you know?

10           MS. GOOTT:  (indiscernible).

11           THE COURT:  Overruled.

12   BY MR. COOLEY:

13   A    Yes.  It states here that the sales price from GCAC to

14   Gunvor is $251.

15   Q    And are there any credit terms associated with whether

16   or when that is supposed to be paid?

17   A    Yes.  Here it states that Gunvor is to remit payment to

18   GCAC three days after the receipt of invoice.

19   Q    Do you know whether the product described in the backup

20   deal at the bottom bears any relationship to the product

21   described in deal number one at the top?

22   A    Yes.  It looks to be the exact same product that was

23   purchased.

24   Q    Now, after all of that, you respond in the email above.

25   Do you see your response?

1    A     Yes, I do.

2    Q     Do you recognize it?

3    A     Yes, I do.

4    Q     Do those words have meaning to you?  The words and

5    symbols and such?

6    A     Yes.

7    Q     Would you explain to the Court what information you are

8    communicating with that email?

9              MS. GOOTT:  (indiscernible).

10             THE COURT:  Overruled.

11   BY MR. COOLEY:

12   A     I am communicating to Mr. Perugini and Mr. Brass that I

13   am hedging the deal that was done by GCAC.  So here it says

14   on the -- on 10KB, which is 10,000 barrels, I purchased as a

15   hedge 10,000 barrels of (indiscernible) high sulfur -- HS

16   stands for high sulfur fuel -- at the price of $44.50.

17   Q     And why did you send that email?

18   A     Because all the deals that were done, we agreed that

19   they would be hedged upon completion.

20             MR. COOLEY:  Ms. Mehta, could I have Vitol Exhibit

21   18?  And this is another two-page document.  Could I get the

22   two pages side-by-side, please?  Thank you.

23   BY MR. COOLEY:

24   Q     Mr. Kuo, I have put up on the screen the two pages of

25   what I have marked as Exhibit -- Vitol Exhibit 18.  First of

1    all, take a look at the two pages and tell me if you

2    recognize the document.

3    A    Yes, I recognize this.

4    Q    Can you identify it to the Court?

5    A    The first email is an email from Patrick Perugini to

6    myself and Mike Ruzic along with other employees of GCAC.

7    Q    And do you recognize the second email as well?

8    A    The one I sent?

9    Q    Yes, sir.

10   A    Yes, I do.

11   Q    And are you either the sender or recipient of each of

12   these two emails?

13   A    Yes.

14   Q    And does this document appear to be a true and correct

15   copy of the document that you recall?

16   A    Yes, it is.

17         MR. COOLEY:  I move the admission of Vitol Exhibit

18   18.

19         THE COURT:  Any objection?  Vitol Exhibit 18 is

20   admitted.

21         (Vitol Exhibit 18 Admitted into Evidence.)

22   BY MR. COOLEY:

23   Q    Now, I want to start again -- and we're not going to go

24   through in quite so much detail this time, but I want to

25   start with the first line of Mr. Perugini's email.  Do you

002312

1    see that?

2    A    Yes, I do.

3    Q    Would you read the line for me so I know we are

4    oriented in the same place?

5    A    Deal Number One, Rio Inventory Overview.

6    Q    And does the information provided underneath that line

7    have meaning to you?

8    A    Yes, it does.

9    Q    And just generally what is being communicated -- what

10   is -- what does this information mean to you?

11   A    This is GCAC recapping the deal that Vitol sold product

12   to GCAC and just sending the recap of the specific terms of

13   the deal.

14   Q    And then if we move down to the bottom of the page,

15   there is a section in blue with a heading of its own.  Do

16   you see that?

17   A    Backup for Deal Number Two?

18   Q    Yes.  And what is that information -- what do you

19   understand that information to communicate to you?

20   A    This is the -- this is the corollary to the deal that

21   was done from Vitol to -- the sale from Vitol to GCAC and

22   showing us that Vitol -- I mean GCAC went forward and sold

23   the product to VALT.

24   Q    And what did you do with this information when you

25   received it?

```
 1   A    Well, first off, I hedged the deal.  And then second of

 2   all, I entered the deal into our trading system.

 3   Q    Are these the only two emails you ever got from Mr.

 4   Perugini communicating this type of information to you?

 5   A    No, this was one of the deals done.

 6   Q    One of what?  I'm sorry.

 7   A    One of many deals done by GCAC.

 8   Q    And just your -- in your email at the top, once again,

 9   what is it that you were communicating to Mr. Perugini?

10   A    I am giving him the hedge prices.  So here I purchased

11   28 lots of November Brent at 55.55, which is the hedge

12   against this fixed price sale to GCAC.

13   Q    And why did you communicate that information to Mr.

14   Perugini?

15   A    Because all deals that were done were to be hedged.

16   Q    And why did he need to know?

17        MS. GOOTT:  (indiscernible).

18        THE COURT:  Sustained.

19   BY MR. COOLEY:

20   Q    Were you ever asked to provide such information to Mr.

21   Perugini?

22   A    Yes.  It was --

23        MS. GOOTT:  (indiscernible).

24        THE COURT:  Sustained.

25   BY MR. COOLEY:
```

1    Q    By whom were you asked?

2            MS. GOOTT:  (indiscernible).

3            THE COURT:  Overruled.

4    BY MR. COOLEY:

5    A    The hedging specifics were to be --

6            MS. GOOTT:  (indiscernible).

7            THE COURT:  Sustained.

8    BY MR. COOLEY:

9    Q    By whom were you asked to communicate this type of

10   information to Mr. Perugini?

11   A    By Mr. Brass.

12           MR. COOLEY:  Could I have Vitol Exhibit 19,

13   please?  And again, if I could have both pages.  This is

14   another two-page document.

15           Mr. Kuo -- that doesn't look right.

16   BY MR. COOLEY:

17   Q    Mr. Kuo, I have put on the screen what I have marked as

18   the two-page document, Vitol Exhibit 19.  Do you recognize

19   this document?

20   A    I do.

21   Q    Can you identify it to the Court?

22   A    This was an email sent by Patrick Perugini to myself

23   and Mike Ruzic with the members of GCAC and copy in an email

24   from myself.

25           MR. COOLEY:  I will move for the admission of

```
 1    Vitol 19.  Thank you, Your Honor.

 2               (Vitol Exhibit 19 Admitted into Evidence.)

 3               THE COURT:  Let me ask you, Mr. Cooley -- I'm

 4    trying to think of a spot to where we could take a break.

 5    And I need to give Ms. Martinez's fingers a break.

 6               MR. COOLEY:  I probably have...

 7               THE COURT:  You want to ask questions about this

 8    document and then maybe we can break.

 9               MR. COOLEY:  Yes, Your Honor.  That would be just

10    fine.

11               THE COURT:  Okay.  Why don't we just do that?

12               MR. COOLEY:  And, Your Honor, I want to make sure

13    the record was clear.  I appreciate Counsel's statement

14    regarding this document.  I do move the admission of Exhibit

15    19.

16               THE COURT:  No, I heard you.  And Vitol -- I did

17    note that Vitol 19 is admitted.

18               MR. COOLEY:  Okay.

19               THE COURT:  Just for clarification purposes.

20               MR. COOLEY:  I just wanted to make sure.  Thank

21    you, Your Honor.

22               THE COURT:  Yeah, yeah.

23    BY MR. COOLEY:

24    Q    I would just direct your attention to the first line of

25    this email, the email from Mr. Perugini.
```

Page 96

1    A    Yes, I see it.

2    Q    Okay.  Would you just read it so I know we are oriented

3    in the same place?

4    A    Exxon purchase (indiscernible) sale.

5    Q    I'm sorry, I'm not sure we're looking at the same

6    thing.  The first line of Mr. Perugini's email in about the

7    middle of the page.

8         THE COURT:  In my world you can just say deal one,

9    deal two, deal three and we can move this along.

10        MR. COOLEY:  Ordinarily I would do that, Your

11   Honor.  I think I've drawn objections for doing that.  I'm

12   trying to navigate.

13        THE COURT:  I feel good about your chances if you

14   just say those two words and get him there.

15   BY MR. COOLEY:

16   Q    Mr. Kuo, I will direct your attention to the portion of

17   Mr. Perugini's email beginning with the word -- with the

18   words Deal One.  Do you see that?

19   A    Yes, I do.

20   Q    Deal Number One.  Okay.  Does that information have

21   meaning to you?

22   A    Yes, it does.

23   Q    Is this information describing another one of these

24   transactions that you have testified to?

25        MS. GOOTT:  (indiscernible).

```
 1              THE COURT:  Overruled.

 2    BY MR. COOLEY:

 3    A    Yes, it does.

 4    Q    And your -- directing your attention to your email

 5    above, what are you communicating to -- what are you

 6    communicating back in your email?

 7    A    This is an email back to GCAC with the hedges that were

 8    placed on this transaction.

 9    Q    And just briefly looking back at Mr. Perugini's email,

10    did the transactions -- strike that.

11              MR. COOLEY:  Could I have Vitol -- you wanted to

12    stop there, Your Honor.  I am done with that exhibit.  If

13    the Court would like to stop there, I am fine to stop at

14    that point.

15              THE COURT:  That's a good stopping point.  Why

16    don't we just break for lunch, come back -- why don't we do

17    1:45 just to -- come back in 45 minutes.

18              Mr. Kuo, I would remind you that you are under

19    oath and you are not to discuss your testimony with anyone.

20    And that includes these lawyers or anyone else.  Okay?  Do

21    you understand that?

22              THE WITNESS:  I do.

23              THE COURT:  Okay.  Just from a housekeeping

24    standpoint, how much longer do you think you're going to...

25              MR. COOLEY:  I am going to take advantage of this
```

```
1    opportunity to confer with my colleagues to see what I can

2    do to --

3              THE COURT:  Okay.

4              MR. COOLEY:  We're going to get in the information

5    we need to, I assure the Court of that.  But to the extent

6    we can move it along...

7              THE COURT:  Okay.  We will come back at 1:45.

8    Thank you.

9              MR. COOLEY:  Very good.  Thank you.

10             (Recess)

11             CLERK:  All rise.

12             THE COURT:  Please be seated.  Thank you.  We are

13   back on the record in Vitol v. Brass.  Mr. Kuo, I would

14   remind you that you're still under oath.

15             THE WITNESS:  Yes.

16             THE COURT:  Okay.  We're continuing with the

17   direct examination.  Mr. Cooley, you may proceed.

18             MR. COOLEY:  Thank you, Your Honor.  Ms. Mehta,

19   could I have Vitol Exhibit 22, please?  And this is a one-

20   page document, just for the record.

21   BY MR. COOLEY:

22   Q    Mr. Kuo, would you take a look at the document on the

23   screen before you that has been marked as Exhibit -- Vitol

24   Exhibit 22 and tell me if you recognize the document?

25   A    Yes, I recognize it.
```

Page 99

```
 1   Q    Can you identify it to the Court?

 2   A    This was an email originally from Patrick Perugini on

 3   October 11, 2017 to myself and A.J. Brass and some other

 4   people at GCAC in Rio and --

 5   Q    Oh, sorry.

 6   A    -- and a reply from myself back to them, to Patrick.

 7   Q    And is this -- were you a sender or recipient of each

 8   of the emails in this thread?

 9   A    Yes.

10   Q    And do you recall receiving and participating in this

11   email exchange?  Your Honor, I move the admission of Exhibit

12   22.

13             THE COURT:  Vitol 22 is admitted.

14             (Vitol Exhibit 22 Admitted into Evidence.)

15             MR. COOLEY:  And I have just one more of these.

16   If I could have Vitol 23?  This is a two-page document.  Ms.

17   Mehta, could I get both pages, please?

18   BY MR. COOLEY:

19   Q    Mr. Kuo, I've put before you a two-page document marked

20   as Vitol Exhibit 23.  Do you recognize this document?

21   A    Yes, I do.

22   Q    Can you identify it to the Court?

23   A    It's (indiscernible) sent from GCAC to myself and Mr.

24   Perugini.

25             MR. COOLEY:  Your Honor, I'll move the admission
```

1    of Vitol Exhibit 23.

2              THE COURT:  Vitol Exhibit 23 is admitted.

3              (Vitol Exhibit 23 Admitted into Evidence.)

4    BY MR. COOLEY:

5    Q    At the conclusion of all of the transactions that

6    occurred between GCAC and Vitol, was there a balance

7    remaining due from one party to the other?

8    A    Yes, there was.

9    Q    And what was the amount that was due?

10             THE COURT:  Mr. Kuo, just a second.  All right.

11   Sounds like, Mr. Kuo, you know the routine.  I'm just going

12   to ask you to step out for a moment and let me just address

13   an issue.  Please step down and remember not to discuss your

14   testimony with anyone and we'll take something out.  Okay.

15   Mr. Patterson, what do you wish to show me?

16             MR. PATTERSON:  (indiscernible)

17             THE COURT:  Okay.  (indiscernible) podium.

18             MR. PATTERSON:  Thank you.  And again, Your Honor,

19   this is Exhibit Number 39.

20             THE COURT:  Are these the same Interrogatories we

21   looked at earlier?

22             MR. PATTERSON:  Yes.

23             THE COURT:  Okay.  Thank you.

24             MR. PATTERSON:  And you'll see, starting in

25   Interrogatory 7, we ask, "Please identify what property the

1    Debtor obtained from Vitol", and this response is the form

2    response they use for each question that we ask, that Mr.

3    Brass asks, regarding how much is owed.  And you'll see this

4    form answer was cut and pasted several times, each time that

5    the question regarding an amount was asked.  They would not

6    or could not identify an amount of money that was obtained,

7    was owed, and let's go back to the beginning.  "Please

8    describe, in detail, how much money GCAC obtained from

9    Vitol's alleged in Paragraph 23, similar to the following

10   interrogatory, "Please identify the amount of money that

11   GCAC received from Vitol, the date that the money received

12   and how much and how the money was received, transfer of

13   check, direct deposit, etc."  And you'll see, the response

14   was very generic, that they received -- again, they didn't

15   identify, tens of million dollars in credit from Vitol over

16   $14 million of which remains unpaid and then they object.

17   And now they want to come in and put on this evidence of

18   what's owed and why it was owed and how it was owed.  We

19   gave them the opportunity to do that, and they just refused

20   to do it.  Simple question.  But they can't come in now and

21   do it.

22            THE COURT:  Mr. Cooley, what's your response?

23            MR. PATTERSON:  How much, when and how?  How much,

24   when and how we got the money, and they just refuse to do

25   it.  They can't do it now.

1          MR. COOLEY:  A couple of things, Your Honor.

2     First, Your Honor, as I look at Interrogatory Number 2,

3     which --

4          THE COURT:  Maybe --

5          MR. COOLEY:  I'm sorry --

6          THE COURT:  I just want to -- going to give it to

7     Mr. Mehta, maybe she can point me to what you're looking at.

8          MR. COOLEY:  I think this would be --

9          THE COURT:  Or is it -- it's Exhibit 39, right?

10         MR. COOLEY:  It is Debtor Exhibit 39.

11         THE COURT:  Okay.  I just want to pull that up

12    just so I can -- 39 -- okay.  Okay.  All righty, Number 2.

13    I'm here.

14         MR. COOLEY:  So, if I could have the third page,

15    Ms. Mehta.  Perfect.  The first thing I want to note, Your

16    Honor, is that Interrogatory Number 1 and Interrogatory

17    Number 2 -- Interrogatory Number 1 asks to identify, "All

18    money property services or an extension or removal or

19    refinancing of credit that the Debtor received as alleged in

20    the Complaint."  That's a different question, first of all,

21    than the question that I asked the witness, which was, "What

22    was the balance remaining due at the end?," and I'm

23    essentially paraphrasing that.  That's point the first, as I

24    would submit it's an entirely different question.

25         Second of all, Your Honor, as I read the response,

1    we answered the question and said, throughout the course of

2    the interim financing arrangement, Vitol provided Debtor

3    with tens of millions of dollars of financing consisting of

4    -- it goes on to list various things of which it consists.

5    Then it goes on to say, "Although the Debtor caused GCAC to

6    make three payments totaling $16 million and change, over

7    $14 million remains unpaid."  That actually goes to the

8    question that I had actually posed to the witness and there

9    it is right there.  It then continues on and refers the

10   Debtor, in particular, to specific, what are described here

11   as Comprehensive Spreadsheets, contemporaneously tracking

12   and aggregating the credit and they are identified by Bates

13   number.  If we scroll down to -- if we look at Interrogatory

14   Number 2, same basic issue, "Please describe, in detail, how

15   much money the Debtor obtained from Vitol", and the response

16   goes on and says, "As provided in more detail in response to

17   Interrogatory Number 1, the Debtor, through his alter ego,

18   GCAC, received tens of millions of dollars in credit from

19   Vitol, over $14 million --", could we have the next page,

20   Ms. Mehta?  "-- over $14 million of which remains unpaid."

21   Which actually goes straight to the specific question I was

22   asking.

23            I would also note for the Court, and again, refers

24   the Debtor to circumstances surrounding it and also

25   identifies specifically by Bates number three spreadsheets

1    described as Comprehensive Spreadsheets contemporaneously

2    tracking and aggregating extensions of credit.  Finally, I

3    would note, Your Honor, that in addition to alleging the

4    amount owed in the Complaint, the initial disclosures that

5    were filed by Vitol in this case on or about October 29,

6    2021, specifically say --

7              THE COURT:  Why don't you point me there?

8              MR. COOLEY:  The initial disclosures, I believe

9    would be Debtor Exhibit 37.

10             THE COURT:  Okay.  Hold on.  Just give me a second

11   to get there.  Oh, it's up already.

12             MR. COOLEY:  And Ms. Mehta, if I could have, I

13   think it is Page 3.  Thank you.  Directing the Court to Part

14   3 at the bottom titled "Computation of Damages", we

15   disclosed in the initial disclosures that Vitol seeks to

16   prevent Debtor from discharging at least $10 million in

17   damages arising from Debtor's conduct.  In the State

18   litigation, Vitol asserted damages of at least $14 million

19   and change arising from Debtor's conduct.  Debtor and Vitol

20   entered into an agreed judgment in the State Court

21   litigation for $10 million as a part of the settlement of

22   Vitol's claim.

23             THE COURT:  Okay.  I'm satisfied that the

24   Interrogatories were answered sufficiently.  The expressed

25   damages of at least $14.7 million, several locations there

1    are exhibits that are noted.  He was asked whether the

2    balance was.  If it's consistent with that, I think that's

3    what parties would have been put on notice for.  I'm

4    satisfied, so I'm going to overrule the objection, and

5    everybody's rights are reserved.

6              MR. PATTERSON:  (indiscernible)

7              THE COURT:  Well, I --

8              MR. PATTERSON:  (indiscernible)

9              THE COURT:  I think the damages are just capped at

10   10, but the fraud claim that's behind it was for at least

11   $14.7 million, but the cap is at 10 because that's what

12   people agreed to.  I think that's the way I read that.

13   That's the way I read Archer.

14             MR. COOLEY:  And I'll say, Your Honor, we -- that

15   is correct, Your Honor, the claim that is sought to be

16   discharged -- denied from -- accepted from discharge is in

17   the amount of $10 million --

18             THE COURT:  In other words -- let me just back up

19   for a second.

20             MR. COOLEY:  -- but it arises from --

21             THE COURT:  Let me say it this way --

22             MR. COOLEY:  Yes, Your Honor.

23             THE COURT:  There is -- it is impossible in the

24   circumstance in which there was a settlement agreement for

25   $10 million for the witness to testify that the debt was

1   exactly $10 million, but that's what it's capped at.  The

2   number, it may be larger than that and there may have been a

3   debt owed that was greater than that at the time and that's

4   the fact.  The damage is just capped no matter what it is,

5   up to a million bucks.  It could be less.

6            MR. COOLEY:  That's correct, Your Honor.

7            THE COURT:  It could be less, it could be more, --

8            MR. COOLEY:  And as to the relevant --

9            THE COURT:  -- but you're capped at the 10.

10            MR. COOLEY:  That's right Your Honor, and as to

11   the relevancy --

12            THE COURT:  But the witness can't testify it -- as

13   to that, at the time.

14            MR. COOLEY:  And as to the relevancy, the issue

15   becomes whether or not the present-day debt arose from --

16            THE COURT:  That's the way I understand it.

17            MR. PATTERSON:  Well, it --

18            THE COURT:  In other words, the witness can't

19   testify to 10, right?

20            MR. PATTERSON:  (indiscernible)

21            THE COURT:  Okay.  (indiscernible) at 10.  The

22   witness can't testify to 10 because the number is never

23   going to add up to 10.

24            MR. PATTERSON:  (indiscernible)

25            THE COURT:  You don't have to prove up to 10.

```
 1              MR. PATTERSON: (indiscernible)

 2              THE COURT:  Here is the basis of the fraud claim,

 3    which was in (indiscernible) and capped at 10.

 4              MR. PATTERSON:  (indiscernible)

 5              THE COURT:  I'm trying to -- but we haven't gotten

 6    there though.  Isn't that the point?  Don't they get a

 7    chance to say that there was a judgment -- that there was an

 8    amount of debt that gets claims to the 10 million?  Other

 9    than that, they can't prove it up.

10              MR. PATTERSON:  (indiscernible)

11              THE COURT:  I disagree with that.  I disagree with

12    that.

13              MR. PATTERSON:  (indiscernible)

14              THE COURT:  (indiscernible) I agree with you, but

15    they've asserted damages of at least $14 million

16    (indiscernible), but the question is, did they answer the

17    question?  That's the question before me.  Did they answer

18    the question in the interrogatories?  That was -- the point

19    was made; he can't testify it because they never told us

20    what the number was.  That's what I heard.

21              MR. PATTERSON:  (indiscernible)

22              THE COURT:  No, no, no.

23              MR. PATTERSON:  (indiscernible)

24              THE COURT:  It should come out the way it comes

25    out.
```

```
 1              MR. PATTERSON:  (indiscernible)

 2              THE COURT:  Mm hm.

 3              MR. PATTERSON:  (indiscernible)

 4              THE COURT:  Mm hm.

 5              MR. PATTERSON:  (indiscernible)

 6              THE COURT:  Mm hm.

 7              MR. PATTERSON:  (indiscernible)

 8              THE COURT:  Can we go back to the Interrogatories?

 9              MR. PATTERSON:  (indiscernible)

10              THE COURT:  No, no, no.  I just want to go back

11      because I'm looking at --

12              MR. COOLEY:  The Debtor Exhibit 39.

13              THE COURT:  Well, let's look at 2 first.  "The

14      Debtor caused GCAC to make three payments with Vitol

15      totaling $16.6 million, partial repayment for the financing.

16      Over $14 million remains unpaid."  That's the point.

17      Subject to the foregoing -- and then, I haven't seen the

18      spreadsheets, but there are spreadsheets that people can

19      then cross him on, obviously, that are supposedly showing --

20      tracking the aggregate credits.

21              MR. PATTERSON:  (indiscernible)

22              THE COURT:  Last sentence.

23              MR. COOLEY:  But I think -- is the Court looking

24      at Number 1?

25              THE COURT:  Oh, sorry.
```

```
 1              MR. COOLEY:  And --

 2              THE COURT:  I'm on that last point of 1.  I'm

 3    sorry.  I'm looking at the wrong part of the screen here.

 4              MR. COOLEY:  And I would also direct the Court's

 5    attention to the first sentence of Response Number 1, which

 6    specifically references product purchases, hedging services,

 7    purchases, deal cost, storage and transportation costs and

 8    so forth.

 9              MR. PATTERSON:  (indiscernible)

10              THE COURT:  I think he can -- but he has been

11    testifying that there has been some alleged financing.

12              MR. PATTERSON:  (indiscernible)

13              THE COURT:  That's arguable.  That's their point

14    and I got your point, but that's their point.  He's saying

15    that, in the course of these transactions, consisting of

16    hedging services, purchase deal, transportation costs, that

17    there were three payments -- GCAC made three payments to

18    Vitol in partial repayment, but over $14 million remains

19    unpaid.  I don't -- what I did with that information, I

20    don't know.  But I do -- if he can prove up that at least --

21    he did say there was $14 million unpaid, so at least justify

22    how we even get close to 10.  But the answer can't be based

23    on the settlement.  They better be able to prove a fraud on

24    their own, but they're capped at the number.

25              MR. PATTERSON:  (indiscernible)
```

Page 110

1            THE COURT:  They have to get to a number.  That's

2      factual, and then cap themselves at 10.

3            MR. PATTERSON:  (indiscernible)

4            THE COURT:  Overruled.  Thank you.  Why don't we

5      bring Mr. Kuo in.  Everybody's right to reserve.  I'm just

6      telling you, I think you can ask him the question.  Mr. Kuo,

7      I'd remind you that you're under oath.  Mr. Cooley, you may

8      proceed.

9            MR. COOLEY:  Yes, Your Honor.

10     BY MR. COOLEY:

11     Q    At the end of -- at the conclusion of all of the

12     transactions between Vitol and GCAC, what was the balance

13     that remained owed?

14            MS. GOOTT:  Objection.

15            THE COURT:  Overruled.  Overruled.

16     BY MR. COOLEY:

17     A    It was approximately $15 million.

18     Q    And how do you know that?

19     A    We did a long, exhaustive reconciliation of the deals

20     and that was the number.  That was the final number.

21     Q    When you say, "we," who did the reconciliation?

22     A    It was done by Mike Ruzic.

23     Q    And who is that?

24     A    Mike Ruzic is an employee that's -- he was originally

25     an operator, meaning that he took care of the physical

```
 1   operations of cargos and barges and he worked for Vitol or

 2   still works for Vitol, 15-20 plus, 20 years.  So, he is

 3   assigned to do special projects and really understands the

 4   accounting and ins and outs of physical transactions.

 5   Q    Why was he assigned that task?

 6   A    I think --

 7             MS. GOOTT:  Objection.

 8             THE COURT:  Sustained.

 9   BY MR. COOLEY:

10   Q    Who assigned that task to him?

11   A    I'm not certain the answer to that.

12   Q    Okay.  Do you know -- okay, do you know if he, in fact,

13   prepared such a reconciliation?

14   A    Yes, he's the one who prepared it.

15   Q    Would you recognize that reconciliation if you saw it?

16   A    Yes, I would.

17   Q    Could I have Vitol Exhibit 54?  And I'm just going to

18   make sure -- I've put on the screen what is a one-page

19   document which has been marked Vitol Exhibit 54.  Do you

20   recognize this document?

21   A    Yes, I do.

22   Q    Can you describe it to the Court?

23   A    It was an email initially sent by Mike Ruzic to myself

24   and Tom Moran in which -- and then the other email

25   subsequently I forwarded this to Mr. Brass.
```

1    Q    And were you either the sender or recipient of each of

2    the emails on this document?

3    A    Yes.

4    Q    And does it appear to be a true and correct copy of the

5    document you recall?

6    A    Yes.

7    Q    I move the admission of Exhibit 54.

8              THE COURT:  Any objection?

9              MS. GOOTT:  Yes (indiscernible)

10             THE COURT:  Counsel?

11             MR. COOLEY:  Your Honor, certainly not double

12   hearsay because the witness has authenticated the rest of

13   the document.  However, I believe that in -- a statement is

14   not necessarily hearsay if it has been adopted by a

15   declarant available for cross-examination.

16             THE COURT:  Yeah, he's not the declarant in the

17   email, though.

18             MR. COOLEY:  That's right, Your Honor.  But the

19   question would be if it has been adopted.

20             THE COURT:  You can offer it for --

21             MR. COOLEY:  Your Honor, I'll offer the document

22   for the fact of its being said if that -- in other words,

23   not for the truth of the matter asserted, but for the fact

24   of its existence, essentially.

25             MS. GOOTT:  Then, I'm going to (indiscernible)

1           THE COURT:  I'll overrule that.  That's relevant

2     here.  It's the reconciliation that he was describing that

3     he understood.

4           MS. GOOTT:  But my objection (indiscernible).

5           THE COURT:  No, you just said it was irrelevance.

6     He's not -- he said he wasn't offering it for the truth of

7     the matter asserted, he was offering it for the purpose that

8     there was an email sent to -- from Mike to Eric.  That's my

9     understanding, Ms. Goott.  But Mr. Cooley, you correct me if

10    I'm wrong about that.

11          MR. COOLEY:  No, that's correct, Your Honor.

12          THE COURT:  And then I thought you followed up

13    with, relevance on that.  And then you're going back to

14    hearsay, so I just --

15          MS. GOOTT:  (indiscernible)

16          THE COURT:  Oh no.  I'm accepting this as an email

17    from Mike to Mr. Kuo.

18          MS. GOOTT:  (indiscernible)

19          THE COURT:  Because that's what it says.

20          MS. GOOTT:  (indiscernible)

21          THE COURT:  He -- let me just say this, counsel

22    said he wasn't offering it for the truth of the matter

23    asserted, so that's what I've got to take it as.  That's my

24    -- Mr. Kuo, you correct me if I'm wrong.

25          THE WITNESS:  No, that is correct, Your Honor.

1          THE COURT:  Okay.  So, then I can't read it for

2     anything more than that.

3          MS. GOOTT:  (indiscernible) information

4     (indiscernible) only offering (indiscernible)

5          MR. COOLEY:  Respectfully, I disagree, Your Honor.

6     A statement made could have significance --

7          THE COURT:  Wait, wait, Ms. Goott, is your

8     objection to hearsay if he --

9          MS. GOOTT:  (indiscernible)

10          THE COURT:  Right.  What I'm saying is, I think we

11     then have to get there and then deal with that.  If he's

12     asking that it meant 54 or if it says what it says, the

13     question is, then you can, I think from there, you can -- I

14     think you still have your rights to argue hearsay.

15          MS. GOOTT:  (indiscernible)

16          THE COURT:  The question is, do you object to its

17     admission for it being an email from Mike to Eric?

18          MS. GOOTT:  (indiscernible)

19          THE COURT:  The question is yes or no, Ms. Goott.

20     Do you know?

21          MS. GOOTT:  (indiscernible)

22          THE COURT:  On what basis?

23          MS. GOOTT:  (indiscernible)

24          THE COURT:  All right.  It's overruled.  I'm going

25     to -- overruled.  I'm going to admit it for the purpose that

1    it's an email and it says what it says.  I'm not entering --

2    I'm not -- it's not admitted for the truth of the matter

3    asserted.  It's admitted as an email that says what it says.

4              (Vitol Exhibit 54 Admitted into Evidence.)

5    BY MR. COOLEY:

6    Q    Do you know why this email was sent to you?

7    A    Yes.

8    Q    Why was this email sent to you?

9              MS. GOOTT:  Objection.  Calls for (indiscernible)

10             THE COURT:  If he knows.  You can answer if you

11   know.

12             MS. GOOTT:  (indiscernible)

13             THE COURT:  Overruled.  You can answer.

14   BY MR. COOLEY:

15   A    Yes, this email was sent to me to show me what the

16   outstanding debt was from GCAC to Vitol.

17   Q    And why did you forward this information on to Mr.

18   Brass?

19   A    I forwarded it to Mr. Brass so that he could verify,

20   check and go through our reconciliation to make sure that he

21   agreed with our numbers.

22   Q    And whether or not Mr. Ruzic did his homework

23   correctly, what was the total that Mr. Ruzic calculated in

24   his reconciliation?

25             MS. GOOTT:  Objection (indiscernible)

```
 1            THE COURT:  Sustained.  Quit while you're ahead,
 2   Mr. Cooley.
 3            MR. COOLEY:  Could we take down Exhibit 54,
 4   please?
 5   BY MR. COOLEY:
 6   Q    Do you know what the elements of the reconciliation
 7   were that Mr. Ruzic performed?
 8   A    What do you mean by "the elements"?
 9   Q    The components of what he tallied?
10   A    Yes, I do.
11   Q    Can you summarize what you understood those to include?
12            MS. GOOTT:  Objection (indiscernible)
13            THE COURT:  Overruled.  No, no.  Understanding the
14   components -- it's not -- it's understanding of what the
15   components were.  You could answer the question.
16   BY MR. COOLEY:
17   A    So, this was an accumulation of the amounts that were
18   due from the outstanding products that were sold and not
19   received.  The funds that were received from GCAC and not
20   remitted back to Vitol.  They were for hedging losses.  They
21   were for ancillary costs such as tank storage fees, barging,
22   inspection costs and any costs associated with the deal
23   transactions.  And also, I think, part of the component was
24   some time value of money calculations.  I might have missed
25   one, but that's approximately -- that's the bulk of it.
```

1    Q    Could I have Vitol Exhibit 86 please?  I've put up on

2    the screen the first page of what has been marked as Vitol

3    Exhibit 86.  And let me just ask you first, do you recognize

4    this document, or would you like me to go through the entire

5    document?

6    A    I recognize this document.

7    Q    Can you identify it to the Court?

8    A    This is a --

9         THE COURT:  Hold on.  What's going on?

10   BY MR. COOLEY:

11   A    This -- I may get my verbiage wrong, but this is a --

12   this is a suit filed by GCAC against Vitol.

13   Q    And does this appear to be a true and correct copy of

14   that document?

15   A    The first page, yes.  (indiscernible) any other pages.

16   Q    Were you at all involved in the preparation of this

17   document or the information that went into it?

18        MS. GOOTT:  (indiscernible)

19        MR. COOLEY:  No, I'm establishing -- I'm trying to

20   establish a foundation for the witness' familiarity with it.

21        THE COURT:  I'll sustain.  You can ask in a

22   different way.

23   BY MR. COOLEY:

24   Q    Were you involved, at all, in the preparation of this

25   document?

1    A    I'd have to see the rest of the document.  I don't

2    recall everything in this document.

3              MR. COOLEY:  Could we have -- Ms. Mehta, could we

4    have Exhibit -- Page -- pdf Page 12 of this document?

5              THE COURT:  I'll overrule the objection.

6              MR. COOLEY:  Let's just so we can be precise on

7    the record, Ms. Mehta, could I have Page 1 again?  Would you

8    please --

9              THE COURT:  I'm not going to let you do that.

10   Just go ask another question.

11             MR. COOLEY:  Page 12 then, please.

12   BY MR. COOLEY:

13   Q    Do you recognize this particular page of the document?

14             MS. GOOTT:  (indiscernible)

15             THE COURT:  Overruled.

16   BY MR. COOLEY:

17   A    Yes, I recognize this.

18             THE COURT:  That was the question.

19   BY MR. COOLEY:

20   Q    Can you -- can you identify what this page is to the

21   Court?

22   A    This is a Statement of Verification by myself.

23   Q    And is that your signature?

24   A    Yes, it is.

25   Q    Is Exhibit 12 a -- does Exhibit 12 appear to be a true

1   and correct copy of the document as you recall it?

2          MS. GOOTT:  Objection (indiscernible)

3          MR. COOLEY:  I'm sorry.  Your Honor, I apologize.

4   I did.  I did refer to the wrong -- I was thinking I had the

5   page number in my head.  I apologize.

6   BY MR. COOLEY:

7   Q    Does this appear to be a true and correct copy of what

8   you understand Vitol Exhibit 86 to be?

9   A    I don't know if it's Exhibit 86.  Maybe that's what it

10  was at the beginning, but I do recognize this Statement

11  here, but I don't know if it was Exhibit 86.

12  Q    If we could just have the first page of the document

13  back, please.

14  A    Yes, I agree.

15         MR. COOLEY:  Your Honor, I move the admission of

16  Vitol Exhibit 86.

17         THE COURT:  Any objection?

18         MS. GOOTT:  (indiscernible)

19         THE COURT:  I'm trying to understand -- I guess

20  that's a --

21         MR. COOLEY:  We're offering it as a certified copy

22  in the upper right corner of a Court filing.  I'm not

23  seeking to approve the allegations in it.

24         MR. PATTERSON:  (indiscernible) prove it up, just

25  get the lawyer on this thing.

 1          MR. COOLEY:  Your Honor, this was not being

 2    offered to prove the allegations made in the Complaint.

 3          THE COURT:  For what purposes are you offering it

 4    then, counsel?

 5          MR. COOLEY:  Showing -- again, Your Honor, we

 6    believe that this is relevant to connecting the dots between

 7    the history between the parties and the claim that is the

 8    subject of the dispute before this Court.

 9          THE COURT:  Yeah.  What about 9024?

10          MS. GOOTT:  (indiscernible)

11          THE COURT:  Mm hm.

12          MS. GOOTT:  (indiscernible)

13          THE COURT:  I'm asking about 9024.

14          MS. GOOTT:  (indiscernible)

15          THE COURT:  Can you tell me where the word "real

16    property" is located in 9024?

17          MS. GOOTT:  (indiscernible)

18          THE COURT:  I think that's fair.

19          MS. GOOTT:  No, I'm not -- I'm just saying, I

20    don't -- the question that -- I think 9024 comes into

21    effect.  I don't think it applies to real estate, but the

22    question is, for what purpose are you offering it, counsel?

23          MR. COOLEY:  Yes, Your Honor.

24          THE COURT:  In other words, for what purpose are

25    you offering -- you're offering that there's a public Court

1    record that was filed that Mr. Kuo certified that says what

2    it says or are you offering -- because as you're supposed to

3    know, the counterclaim and third parties seek, you know,

4    under Texas Rules of Civil Procedure, like, that's the --

5              MR. COOLEY:  Yes, Your Honor --

6              THE COURT:  That's the fine distinction that we're

7    getting into, and I think that's where Ms. Goott is going.

8              MR. COOLEY:  And I can speak to the Court's --

9              THE COURT:  And I want to make sure that we're all

10   just clear as to what you're -- for what purpose you're

11   offering it and other records -- I got it.

12             MR. COOLEY:  And I can speak to the Court's

13   question.  I believe that -- first of all, I believe 9024

14   does apply.  902, I would note, goes to the question of

15   whether or not the document is authentic as opposed to the

16   hearsay question.  The hearsay question is separate and so,

17   I do believe 9024 applies to it.  Ms. Mehta, could we have

18   Page 14?  And with respect to the hearsay question, Your

19   Honor, I am offering the document for the fact of its

20   existence --

21             THE COURT:  I'm just saying they're different

22   questions.  They're different questions and I agree with

23   you.

24             MR. COOLEY:  Yes.

25             THE COURT:  But what I'm saying is, it's a self-

1    authentic -- I believe it's a self-authenticating document.

2    The question is, for what purpose are you now offering it?

3    And I think that's the heart of where Ms. Goott is going.

4         MR. COOLEY:  Or the fact of its existence and the

5    existence of the claims that were asserted.  Just that

6    allegations were made and what those allegations were.  I'm

7    not trying to offer it to prove an allegation made in a

8    lawsuit that was filed somewhere else.  I am offering it to

9    show that the pleading was filed, making the allegations and

10   asserting the claims that it contains, including fraud,

11   which is the relevance.

12        MR. PATTERSON:  (indiscernible)

13        THE COURT:  No, no, no.  But hold on.  I think you

14   need a better explanation because I got confused as to for

15   what purpose it was being offered so --

16        MR. PATTERSON:  The authentication for the

17   disability other than it's the first step.  The first step

18   only, we believe (indiscernible)

19        THE COURT:  No, no, no.  What I'm saying is, Mr.

20   Patterson, I -- all I was trying to do was break them into

21   two parts.  Authentication is one issue, 9024, I think kicks

22   in.  Then, I think you're entitled to a -- I didn't

23   understand for what purpose you were offering it.  I think

24   you need -- I think if we all -- I think we've got to figure

25   out -- Ms. Goott is going to the hearsay part.  I was trying

1    to break it into two parts.  I probably didn't do a good job

2    of doing that, Ms. Goott, on my part, in terms of, kind of,

3    knowing where I was going.  I think the document can be

4    authenticated.  The question is, for what purpose is it

5    being now offered.  You're saying, if it's being offered for

6    the truth of the matter asserted within the statements

7    within there, then that's hearsay.  I got your point.

8            MS. GOOTT:  Yes.

9            THE COURT:  I did a very bad job of breaking it

10   out and it looked like we were talking against each other

11   when, I think, I was in agreement with you.  I was just

12   trying to take it step by step.

13           MS. GOOTT:  I apologize.

14           THE COURT:  No, no, no.  That's on me.

15           MS. GOOTT:  (indiscernible)

16           THE COURT:  That's on me.

17           MS. GOOTT:  (indiscernible)

18           THE COURT:  No, no, no.  That's on me.

19           MS. GOOTT:  (indiscernible)

20           THE COURT:  So, for what purpose are you offering

21   it, Mr. Cooley?  Because I heard a couple of reasons and I

22   just want to make sure that we're all clear as to which one

23   it is.

24           MR. COOLEY:  Yes, Your Honor.  And it's being

25   offered -- as I said, it's being -- I probably said it

1    inartfully, so I'm going to try it again.  The document is

2    being offered to demonstrate, to prove that in a Court

3    filing, Vitol made certain claims against GCAC, including a

4    claim for fraud, which is a fundamental question before this

5    Court.

6              THE COURT:  No, no.  I don't want you to go there.

7              MR. COOLEY:  Okay.

8              THE COURT:  I'm willing to admit it as a document

9    that was filed on the docket and not for the truth of the

10   matter asserted (indiscernible).

11             MR. COOLEY:  Should I proceed, Your Honor?

12             THE COURT:  No, I guess -- I need to just, kind

13   of, hone down on a couple of things and then I want Mr.

14   Patterson and Ms. Goott to weigh in.  Are you offering it to

15   say Kuo worked on a pleading -- attached the certification

16   to a pleading that alleged fraud, and not necessarily that

17   the fraud allegation itself is true?  Or just -- or are you

18   trying to then make the additional point that you believe

19   that the fraud claim asserted within there, you want me to

20   take, essentially, for the truth of the matter asserted that

21   there is a valid fraud claim asserted therein?

22             MR. COOLEY:  I understand the Court's question.  I

23   am not offering it to prove the validity of the claim

24   asserted in this document.  I am offering it to prove that

25   the claim was made.

```
 1              THE COURT:  Ms. Goott, what's your response to

 2    that?  I just wanted to bear down so at least I understood

 3    what was being asked so that you could file a response --

 4    you could respond to it.

 5              MS. GOOTT:  (indiscernible)

 6              THE COURT:  If (indiscernible) Mr. Cooley, this

 7    document came in for a limited purpose that he would say, he

 8    should move on to another document.  Mr. Cooley, how do you

 9    want to play now?  I'll let you try if you want, but I'm not

10    going to let the witness read about claims or license and

11    litigation, which -- he can -- I'm not sure what he's

12    certifying to, and I think I would need to let Ms. Goott and

13    Mr. Patterson in (indiscernible) as to what he actually

14    knows what's in this document and what he thinks that

15    document means, and I'm not sure.

16              MR. COOLEY:  I was not planning to do that, Your

17    Honor.

18              THE COURT:  But if you do, that would be the

19    route.  In other words, if they're going to -- if you're

20    going to want to ask questions about the document, then I

21    think I'm going to have to let them understand the nature of

22    the certification.  So, if it's just to say that there was a

23    cross-Complaint filed or a document that was filed that's on

24    this day and at that time, then I'm okay admitting it for

25    that purpose.  But if you want to ask questions about what's
```

1    in the doc, then I'll let them get up and ask questions to

2    understand what Mr. Kuo really understands about the doc.

3              MR. COOLEY:  Very well.  I will attempt to move

4    on.

5              THE COURT:  Okay.

6              MR. COOLEY:  But just so I have the record clear

7    on that limited basis, do I understand that Vitol 86 is

8    admitted?

9              THE COURT:  Ms. Goott, are you okay with that?

10             MS. GOOTT:  (indiscernible)

11             THE COURT:  Mm hm.  Limited to that purpose and

12   I'm not going to add to it.  Just that's -- Ms. Martinez,

13   just say it was admitted for the reasons stated on the

14   record.  Okay.  Where do we go next?

15             MR. COOLEY:  Mr. --

16             THE COURT:  Oh, wait.  What was the number of the

17   exhibit?  I think -- it's nice to know that.

18             MR. COOLEY:  Vitol 86.

19             THE COURT:  Vitol 86.  Okay.  Okay.

20             (Vitol Exhibit 86 Admitted into Evidence.)

21   BY MR. COOLEY:

22   Q    Do you know what the ultimate outcome in that lawsuit

23   was?

24   A    I don't know for certain.

25   Q    Do you know if there was a trial?

```
 1   A     I don't believe so.

 2   Q     Do you know if it was settled?

 3              MS. GOOTT:  Objection.

 4              THE COURT:  Sustained.

 5   BY MR. COOLEY:

 6   Q     (indiscernible)

 7              MS. GOOTT:  Objection.

 8              THE COURT:  Sustained.

 9              MR. COOLEY:  Your Honor, could I have just a

10   moment to confer with my counsel?

11              THE COURT:  Yes.  Yup, and in the interim, Ms.

12   Goott, I again -- I want to apologize.  I was trying to make

13   the point that we were probably talking about the same

14   thing.  I just wanted to look at it in two different ways

15   and I did a very terrible job on that.  So, I'm sorry.

16              MS. GOOTT:  No, I'm sorry.

17              THE COURT:  No, I am.

18              MS. GOOTT:  I misunderstood you and --

19              THE COURT:  No, well you had to misunderstand me

20   because I was not speaking clearly, so I apologize.

21              MR. COOLEY:  Your Honor, I don't want to waste the

22   Court's time.  I think I am within, literally, a handful of

23   questions of being done.  Could I ask the Court for just

24   five minutes to confer with my co-counsel to confirm?

25              THE COURT:  Absolutely.  I'll come back in -- it's
```

1    2:36.  I'll come back in five minutes.

2              MR. COOLEY:  Thank you, Your Honor.

3              CLERK:  All rise.

4         (Recess)

5              THE COURT:  So I want everybody to be really clear

6    about this.  With respect to the pleading that just went in,

7    it essentially functions as judicial notice.  That's the way

8    I view the world.  And if anybody -- everybody's rights are

9    reserved.

10             But in terms of the pleading that went in, the

11   admission with all the reservations is essentially judicial

12   notice.  I can take notice that it was -- it's in the --

13   it's in the record as evidence.  But it's a document that

14   says what it says.

15             But the documents -- but the statements contained

16   therein, I am not taking them for the truth of the matter

17   asserted.  And if that's the case, then I think you've got

18   another witness -- that's the way -- if one is to think

19   about the way I'm going to view it, it's essentially the

20   same.

21             MR. COOLEY:  Your Honor, that is literally what I

22   was going to come back and suggest to the Court.

23             THE COURT:  Okay.  So it's the functional

24   equivalent in my mind.  But I wanted to clean up the record

25   because it was being admitted with a bunch of caveats, which

1    were correct to do so.  But I wanted to make sure everybody

2    was kind of clear about the way I was thinking about it in

3    terms of how I will be viewing the doc, okay?

4         Mr. Kuo, it has nothing to do with you.  You've

5    got a couple more questions and then some more.

6         THE WITNESS:  Okay.  Thank you.

7         MR. COOLEY:  I thank the Court for the recess.  I

8    pass the witness.

9         THE COURT:  Okay.  Okay.

10         MR. AURZADA:  Your Honor, while Mr. Patterson is

11    setting up, from a planning perspective, do you know how

12    late we'll work tonight.  And the reason I say that is that

13    Mr. Kuo has an engagement, as I understand it, at 6:30.

14    We'll need to leave by 6:00.

15         THE COURT:  Yeah.  I can't tell you.

16         MR. AURZADA:  Okay.

17         THE COURT:  I said earlier we were going to stop

18    somewhere around 6:00, 6:15, around that area.  So it'll be

19    there.  So Mr. Kuo, you may be a few minutes late.  But what

20    I don't want to do is have a hard stop where Mr. Patterson

21    maybe needed a few more minutes.  I want to give him the

22    flexibility to find a decent stop.  Maybe he's done, maybe

23    he's not.  But I want to give him the flexibility that we

24    can find an appropriate stopping point somewhere in the

25    6:00-ish range.  I'm not going to be able to do tomorrow.

```
 1   Okay.  Yeah.
 2                  CROSS-EXAMINATION OF ERIC KUO
 3   BY MR. PATTERSON:
 4   Q    Good evening, Mr. Kuo.  Did I say that right?  I don't
 5   want to mispronounce your name.
 6   A    That's right.
 7   Q    Kuo?
 8   A    Yes.
 9   Q    Okay.  How long have you been with Vitol?
10   A    Almost 12 years now.
11   Q    Almost how long?
12   A    Twelve years.
13   Q    Twelve years.  And where were you before then?
14   A    I worked at a company called Atlantic Trading.
15   Q    You have to speak up for me.  I apologize.
16   A    Sorry.  I worked for a company called Atlantic Trading.
17   Q    Atlantic Trading?  And when you started at Vitol, what
18   did you -- what were you doing for them?
19   A    I was hired as a fuel oil trader.
20   Q    All right, and I think you said now that you're head
21   broker there at Vitol.
22   A    No.  I didn't say that.
23   Q    You're not a broker at Vitol?
24   A    I'm a trader.
25   Q    A trader.  And so what's the difference?  Just your
```

```
 1   industry has specific language, as does ours, and I want to

 2   make sure we're saying the same thing.  So what is the

 3   difference, broker to trader?

 4   A    A trader acts as principal, meaning that they will take

 5   positions.

 6   Q    Right.

 7   A    A broker is someone who matches up a buyer and a

 8   seller.

 9   Q    A broker -- in essence, a broker executes trades for

10   other people?

11   A    Yes.

12   Q    All right, and a trader actually goes in and takes a

13   position.

14   A    That's correct.

15   Q    You take a position on behalf of Vitol.

16   A    Most of the time, yes.

17   Q    Right, and do you provide broker services at Vitol at

18   all?

19   A    Generally no.

20   Q    All right.  So I apologize.  You're a head trader at

21   Vitol.  You don't have brokers at Vitol, right?

22   A    We do not.

23   Q    All right.  So you're the head trader.  How long have

24   you been the head trader at Vitol?

25   A    Since I've been there.
```

1    Q    Oh, that's the only thing you've done at Vitol is head

2    trader?

3    A    I've been a trader since the day I started there.

4    Q    And you've been head trader?

5    A    We don't -- we don't have monikers like head and --

6    Q    Oh, I apologize.  I thought that you were referred to

7    earlier by your lawyer over here as head trader.  There is

8    no such thing at Vitol?

9    A    We generally do not have titles like head trader.

10   Q    Okay.  I understand generally.  I'm asking you

11   specifically --

12   A    We do not.

13   Q    -- with respect to you.  I think you were referred to

14   as head trader.  Is that just incorrect?

15   A    Yes.  That's incorrect.

16   Q    All right.  So you don't -- you, nor any other trader

17   there, carries any kind of moniker or title on the floor,

18   right?

19   A    No.

20   Q    Is that correct?  I'm sorry.  Is that a correct

21   statement --

22   A    Yes.

23   Q    -- that no trader carries any kind of title or moniker?

24   A    I don't know everybody's title.  But I think so.

25   Q    All right.  So you're a trader, not a broker.  You

1    don't do trades for other people, right?  Do you have to

2    have a different license to do that?

3                MR. COOLEY:  Objection, compound.

4                THE COURT:  Overruled.

5                THE WITNESS:  Do I have to have a license for?

6    BY MR. PATTERSON:

7    Q    A different license to trade for third parties.

8    A    I don't know.

9    Q    You don't?

10   A    I do not.

11   Q    What licenses do you hold as a trader?

12   A    I don't hold any licenses.

13   Q    You have no license?

14   A    I do not.

15   Q    So you're not aware that in order for me to call you,

16   for you to trade for me, you may need, say, a Series 7

17   license?

18   A    For equities, yes, I believe so.

19   Q    Right.  How about commodities?

20   A    I don't have a license, no.

21   Q    No.  My question is what do you need to trade on my

22   behalf in commodities.

23   A    I think it's a Series 3.

24   Q    A Series 3, and a Series 7 for equities, right?

25   A    I think so, yes.

```
 1   Q    So to be a broker and to trade on others' behalf, you

 2   have to pass and be certified or get a license from the

 3   regulatory agencies, right?

 4           MR. COOLEY:  Objection, vague.  Counsel used the

 5   word broker.

 6           MR. PATTERSON:  I think he understood what I

 7   meant.  That's what we're talking about, being a broker.

 8           THE COURT:  Yeah.  I think the questions were

 9   about being a broker.

10           MR. PATTERSON:  Right.

11           THE COURT:  That's --

12           MR. PATTERSON:  you need a license to be a broker.

13           THE COURT:  That's -- yeah, I'll overrule.

14           MR. COOLEY:  In that case, foundation.  The

15   witness has testified that the witness is a trader, not a

16   broker.

17           THE COURT:  What's your -- what's your response to

18   that, Mr. Patterson?

19           MR. PATTERSON:  Well, my response is that is

20   correct.  Unfortunately it wasn't my question.  It doesn't

21   have anything to do with my question.  My question, he

22   testified as to his knowledge of what was necessary --

23           THE COURT:  To be a trader, to be a broker.

24           MR. PATTERSON:  To be a broker for third parties.

25   I was following up on the second part of that question with
```

```
 1   respect to --

 2             THE COURT:  Okay.

 3             MR. PATTERSON:  -- trading commodities for third

 4   parties.

 5             THE COURT:  I'll give him a little leeway.  We'll

 6   see where this goes.

 7             MR. PATTERSON:  Thank you, Your Honor.

 8   BY MR. PATTERSON:

 9   Q    So you need a Series 3.  You would have to be licensed

10   from the regulatory agency to trade for a third party,

11   correct?

12   A    I don't know.

13   Q    Well, you just said you thought you needed a Series 3

14   to be a broker in commodities.

15   A    I've never taken a Series 3.  I don't know anything

16   about Series 3s.

17   Q    No.  I understand.  But earlier you testified that you

18   thought you need a Series 3 --

19   A    I thought.

20   Q    -- to trade brokers --

21   A    I thought.

22   Q    Right.  We're just talking about what you know, what

23   you think, what you understand, right?  That's all we can

24   talk about today.  I'm not trying to trick you or pin you

25   down.  I just want to make sure I understand, right, because
```

1    I'm talking about your industry now.  So that's all.  So

2    your understanding is you need a Series 3 to trade for other

3    people in commodities.

4             MR. COOLEY:  Objection, mischaracterizes.  The

5    question have been about broker.

6             THE COURT:  Yeah.  That's -- I'll sustain that

7    objection.

8    BY MR. PATTERSON:

9    Q    What does a broker do?  Let's go back to the basics

10   since we're drawing objections.  Brokers -- the difference

11   between brokers and traders?  Go ahead.

12            MR. COOLEY:  Objection, asked and answered.

13            THE COURT:  Yeah.  Mr. --

14            MR. PATTERSON:  Okay.

15            THE COURT:  -- Patterson, I just think it was a

16   timing question.  I think the witness's testimony was that

17   he believed a broker required a Series 3, and I think your

18   question was so a trader needs a Series 3.

19            MR. PATTERSON:  No, a broker.  Just -- no, to

20   trade --

21            THE COURT:  That's what your question said.

22   That's all I mean.

23            MR. PATTERSON:  -- for a third party.  Okay.

24   BY MR. PATTERSON:

25   Q    To make a trade for a third party, you would need

1   whatever a broker is required to have, a Series 3 or a

2   Series 7, right?  You would agree with me?

3   A    I don't -- I don't know.

4          MR. COOLEY:  Objection, vague.

5          THE COURT:  Okay.

6          MR. COOLEY:  Your Honor, the whole point is the

7   capacity in which it's happening.

8          THE COURT:  Overruled.  He can answer if he knows.

9          THE WITNESS:  I don't know what a Series 3

10  specifically entails.

11  BY MR. PATTERSON:

12  Q    Right.  To your understanding or your belief, do you

13  have the ability to execute a trade on my behalf as you sit

14  here today in commodities?

15  A    Possibly.

16  Q    All right.  Explain.

17  A    Well, first, if you were a counterpart that we

18  approved, then we could execute a trade for you.

19  Q    A counterparty as if I'm buying or selling myself,

20  right?

21  A    Well, if you were in the business and we've done our

22  KYC process for you --

23  Q    Right.

24  A    -- then we potentially could buy on your behalf.

25  Q    Okay.  I am a retail customer.  Mr. Kuo, I need a

1   forward contract on a hundred barrels of oil.  Can you

2   execute this for me?

3              MR. COOLEY:  Objection, vague, retail customer.

4              THE COURT:  Overruled.

5              THE WITNESS:  As a retail customer, I do not

6   believe so.  but I do not -- I do not invent these

7   processes.  That's --

8   BY MR. PATTERSON:

9   Q    Right.  You don't think so, and it's not what you do

10  anyways, right?

11  A    It is not.

12  Q    All right.  And so, okay, we'll come back to that.  You

13  are an acquaintance of Mr. Brass; is that correct?

14  A    Currently or in the past?

15  Q    In the past.

16  A    Yes.

17  Q    How did you meet Mr. Brass?

18  A    He's a person in the oil community, and we meet persons

19  in the oil community at various events or -- I know a lot of

20  people in the oil business.

21  Q    You know a lot of people in the asphalt business?

22  A    A few.

23  Q    That takes me to a side track.  We talked about trading

24  asphalt or asphalt components.  How many traders at Vitol

25  trade asphalt or asphalt components that you're aware of?

002359

 1    A    Today?

 2    Q    Yeah.  Sure.  Let's start with today.

 3    A    I think there is one person that does.

 4    Q    Who's that?

 5    A    It's a guy named Daniel Halls.

 6    Q    All right, and in 2016-2017, how many traders did Vitol

 7    have that traded asphalt or asphalt components?

 8    A    Which part of the world are we talking about?

 9    Q    Which part of the physical world geographically?

10    A    Geographically.

11    Q    North America.

12    A    None that I knew of.

13    Q    None.  And what piece of the asphalt world did you

14    trade in 2016 and 2017?

15    A    As I described earlier, there are pieces of or

16    components of the asphalt business which overlap with the

17    fuel oil business --

18    Q    Right.

19    A    -- which is what I trade.  So there are -- at times

20    there was overlap between the two commodities.

21    Q    I understand.  And so of asphalt or asphalt components

22    in 2016 and 2017, were there any traders at Vitol?

23    A    I'm sorry.  Were there any traders at Vitol that?

24    Q    Traded in asphalt or asphalt components.

25    A    That would be me.

```
 1    Q    All right.  You were it?

 2    A    Well, there's another trader who -- another fuel oil

 3    trader who trades in another region.

 4    Q    Another region other than the Americas, right?

 5    A    Well, he trades in the Caribbean.

 6    Q    Right.  All right.  So it was you.  And you had

 7    necessarily just run into Mr. Brass I guess just being in

 8    that world, right, that asphalt world or did you know him

 9    outside of business?  Like was he your neighbor, for

10    example?  Is that --

11    A    No.  He was not my neighbor.  I did not know him

12    outside of a -- I did not meet him outside of a business

13    function.

14    Q    It was some form of business function, trade show,

15    right?

16    A    I don't remember exactly the first time I met him, but

17    most likely.

18    Q    It was business-related.  It wasn't social.

19    A    I mean, I have seen him in a social environment.  But

20    I've not -- I don't know when I met him, if you're asking me

21    that.

22    Q    Okay, and you said in your earlier testimony that in

23    November, November 2016, remember you looked at the email

24    about the joint venture talk dated back in November of 2016?

25    Do you remember that?
```

1    A    I do.

2    Q    And I believe your testimony was in 2016, Vitol did not

3    have a presence in asphalt, right?

4    A    Specifically in asphalt, no.  We did not.

5    Q    Right, and you're careful there now.  You said

6    specifically in asphalt.  Let me in on what you're thinking

7    there.

8            MR. COOLEY:  Objection, sidebar.

9            THE COURT:  Sustained.

10   BY MR. PATTERSON:

11   Q    Why are you so specific now as to asphalt?  Why clarify

12   it for me?

13           MR. COOLEY:  Objection, mischaracterizes

14   testimony.

15           THE COURT:  Overruled.

16           THE WITNESS:  I'm sorry.  Can you repeat the

17   question?

18   BY MR. PATTERSON:

19   Q    Sure.  When I asked you this time about your earlier

20   testimony, where you said Vitol did not have a presence in

21   asphalt in November of 2016, when I asked you about it, you

22   were very careful to say specifically asphalt.  Why did you

23   say that?

24   A    Because we did not engage in the buying and selling of

25   asphalt, finished grade asphalt.

Page 142

```
 1   Q    And you said specifically asphalt because you did
 2   trade, I guess, in the components, right?
 3   A    Well, as I mentioned to you earlier, there are
 4   components that can swing from one product to the other --
 5   Q    Right.
 6   A    -- based on relative price.
 7   Q    Right.  So while you did maybe trade -- Vitol did have
 8   a presence in the components.  Your testimony is Vitol did
 9   not have a presence in finished asphalt in November of 2016,
10   right?
11   A    Yes.  That's correct.  We did not.
12   Q    All right, and you're aware of the VALT relationship
13   with Vitol, right?
14   A    Well, VALT is a subsidiary of Vitol.
15   Q    Right.  Right.  And so when you say VALT did not have -
16   - when you say Vitol did not have a presence, does that
17   include VALT or are you specifically excluding VALT when you
18   say Vitol?
19   A    Yes.  To clarify, I meant Vitol, Inc., which is the
20   North American entity of Vitol.  That's why I asked you
21   earlier --
22   Q    Oh, okay.
23   A    -- specifically geography, geographically where you
24   were talking about.
25   Q    So when you said Vitol did not have a presence in
```

1   asphalt in November 2016, you were excluding VALT and any

2   other entity other than Vitol, Inc., right?

3   A    Can I clarify?

4   Q    Of course.

5   A    Vitol, Inc. did not have a presence in asphalt.  Vitol

6   as a whole company, as the parent company Vitol, we did have

7   a presence in asphalt through VALT.

8   Q    Right, and you knew -- you knew that, right?

9   A    Yes, I did.

10   Q    All right.  So at the time, in November of 2016, you

11   knew for a fact that Vitol as an entity, a worldwide entity,

12   had interest in asphalt, right?

13          MR. COOLEY:  Objection, mischaracterizes the

14   testimony.

15          MR. PATTERSON:  It's a question.  I didn't

16   characterize anything.

17          THE COURT:  Overruled.

18          THE WITNESS:  I'm sorry.  Say that one more time.

19   BY MR. PATTERSON:

20   Q    So in November 2016, you did know that Vitol as an

21   organization had an interest in the asphalt business, right?

22   A    Yes, I did.

23   Q    All right, and so your testimony earlier would have

24   been more accurate to say Vitol, Inc. didn't have an

25   interest, right?

1   A    That's correct.

2   Q    All right.  But you did know that VALT existed at that

3   time, November 2016, right?

4   A    Yes.

5   Q    All right, and so is that where you got the idea of

6   this joint venture with GCAC?

7              MR. COOLEY:  Objection, vague.

8              THE COURT:  Overruled.

9              THE WITNESS:  Can you be more specific, like when

10   you say --

11   BY MR. PATTERSON:

12   Q    Your knowledge of the VALT deal, is that where the idea

13   of this joint venture with GCAC came up?

14              MR. COOLEY:  Objection, foundation, assumes facts

15   not in evidence.

16              THE COURT:  Overruled.

17              THE WITNESS:  This venture was initially conceived

18   or brought to light from a colleague of mine, Steve Barth.

19   BY MR. PATTERSON:

20   Q    Okay, and Steve is -- what is he at Vitol?

21   A    He is a business development guy.

22   Q    All right, and so he came to you when?

23   A    I don't remember exactly the date.  I would say

24   sometime in 2015, I think.

25   Q    All right, and generally what was the pitch?

1    A    So our business development guys go out and look for

2    new businesses that we can expand into, and so he is tasked

3    with looking at undercover -- like looking under stones and

4    trying to find new businesses that we can engage in.

5    Q    Right.

6    A    And so he came to me and asked and proposed an idea of

7    looking at getting into the asphalt business.

8    Q    All right, and did he have anyone in mind?

9    A    Yes.  Mr. Brass.

10   Q    Okay.  So he actually suggested to you, hey, this may

11   be an opportunity, right?

12   A    They suggested many, many ideas.

13   Q    Of course.  I mean, that's their job, right?  So he's

14   pitching you and the other traders all the time, right?

15   A    Yes.

16   Q    And he's coming to you with asphalt why, with an

17   asphalt business venture idea why?  Because you're the one

18   trader that dabbles in the components?

19             MR. COOLEY:  Objection, calls for speculation and

20   that was multiple questions.

21             THE COURT:  Overruled.

22             THE WITNESS:  Because fuel oil, the component that

23   I trade, is nearest in comparison to asphalt, meaning that

24   it is, as I mentioned to you earlier, it's a component that

25   can swing between both products.

Page 146

```
 1   BY MR. PATTERSON:

 2   Q    Right.  So it seemed like you could fit, that you would

 3   have knowledge of the markets, hedging opportunities and

 4   asphalt in general, right?  He thought you would be the guy

 5   that knew the most or might appreciate it the most.

 6               MR. COOLEY:  Objection, calls for speculation.

 7               THE COURT:  Sustained.

 8   BY MR. PATTERSON:

 9   Q    So he pitched it to you when again?  I apologize.  You

10   told me this, but --

11   A    I think it was sometime in 2015 is --

12   Q    2015?

13   A    I think.  I don't recall exactly.

14   Q    Yeah, and so by November 2016, you're talking a lot

15   more detail in getting into the asphalt business, right?

16   You have engaged with Mr. Brass and GCAC and seeing if

17   there's a deal to be made, right?

18   A    Yes.  We had begun discussions.

19   Q    Right, and generally what did -- how did those

20   discussions start?  For example, did you approach Mr. Brass

21   or did Mr. Brass get word that you were interested and he

22   called you?  How did they start up?

23   A    A lot of the initial due diligence was done by Mr.

24   Barth.  So he liaised with Mr. Brass quite regularly in the

25   early parts of the construction of this deal.
```

1    Q    And so if that resulted -- I'll put on your screen

2    Exhibit Number 1.  Do you see that?

3    A    Yes.

4    Q    And so is this the first time that you talked in

5    writing with Mr. Brass or anyone at GCAC about doing a deal?

6            MR. COOLEY:  Objection, mischaracterizes the

7    document to the extent the question is you talked.

8            THE COURT:  Overruled.

9            THE WITNESS:  I'm sorry.  Your question again was?

10   BY MR. PATTERSON:

11   Q    Is this kind of the first writing?  Is this the

12   initiation of the written correspondence regarding the joint

13   venture?

14   A    I believe it was roundabout.  I don't know if it was

15   the first one.  But I would say it was probably -- it was

16   one of the earlier drafts.

17   Q    Right, and did you and Steve talk about -- well, why

18   the joint venture structure?

19   A    As opposed to?

20   Q    Anything else.  Standalone corporation, a partnership,

21   being a limited partner, being -- you know, I don't know,

22   any other structure.  Why the joint venture?  How did that

23   come about?  Whose idea was it?  Do you remember?

24   A    I think it was Steve Barth's idea.

25   Q    All right, and just generally you talked about this a

Page 148

```
 1    little bit.  But I mean, this -- as a trader, you're looking

 2    for new ideas, right, as a trader at Vitol?  You're looking

 3    at new business ideas all the time, right?

 4    A    Yes and no.  Not always, but sometimes.

 5    Q    And in fact, I mean, you're encouraged -- you're

 6    encouraged to go out and seek new businesses to start or

 7    invest in, right?

 8    A    We are.

 9    Q    I mean, and in fact that can impact your compensation

10    in any particular year or quarter, right?

11    A    Yes, both positively and negatively.

12    Q    Correct.  So if you -- and let's forget about this

13    deal.  You find an oil production facility in a

14    transportation terminal that is being mis-utilized or

15    underutilized.  You have the capability to go out and invest

16    or purchase and turn that thing around and have it impact

17    your compensation, right, in general terms?

18    A    We have the right to explore deals.

19    Q    Right.

20    A    Like we have the right to look at any deals that we

21    want to.

22    Q    Right.  You can't just go write a check.

23    A    No.  Correct.

24    Q    Right.  But you find a deal.  You pitch it upwards,

25    upstairs.  You get the go ahead, and it takes off.  You're
```

002369

1    going to be rewarded economically, right?

2    A    Generally, yes.

3    Q    Okay.  So you thought this looked like a deal in which

4    you, being Vitol, and you could make money?

5    A    That's correct.

6    Q    Right, and for whatever reason it was structured as a

7    joint venture, right?  You don't remember, I think you said,

8    but --

9            MR. COOLEY:  Object to the form of the question as

10   to timeframe.

11           THE COURT:  Sustained.

12   BY MR. PATTERSON:

13   Q    As of 2016, November 2016, Exhibit 1 on the screen,

14   you're talking joint venture, right?

15   A    Yes.  That was -- that was --

16   Q    Right.  So we have an internal agreement regarding all

17   elements -- you're saying we are not representing that we

18   have an internal agreement regarding all elements of the

19   structure.  So you're -- not you, but Mr. Barth, Vitol is

20   saying, correct me if I'm wrong, we don't have all the

21   internal approvals of all these details yet.  But let's get

22   the ball rolling.  Let's start talking, right?

23   A    Well, I didn't write this email.  But my

24   characterization of it would be that this was a starting

25   point for discussing a framework of a potential deal.

1   Q    Right.  So let's go through  where this thing started.

2   Vitol and GCAC, Newco, I assume that means either GCAC or

3   some new entity to be created, right?  Newco is a generic

4   reference in your mind?

5   A    Yes.

6   Q    All right.  Which engage in discussions related to the

7   purchase of the Gravity Midstream LLC asset.  What is that,

8   the Gravity Midstream LLC assets?

9              MR. COOLEY:  Objection to the relevance, Your

10  Honor.  The witness has testified that this never came to

11  fruition.

12             MR. PATTERSON:  Okay.  This is their exhibit.  I'm

13  entitled to ask him about it.

14             THE COURT:  Yeah.  Overruled.

15  BY MR. PATTERSON:

16  Q    what is the Gravity Midstream LLC assets?

17  A    This was a terminal and a small refinery located in

18  Corpus Christi.

19  Q    All right.  And why was that important?  Because I

20  thought we were talking about asphalt and now we're talking

21  about this Gravity plant.  Why -- connect the dots for me.

22  A    Well, in the early parts of these discussions, we threw

23  a lot of balls in the air.

24  Q    Okay.

25  A    And this was one of them.

```
 1   Q    And this was just -- what kind of production -- what
 2   kind of plant was it?
 3   A    I think at the time it wasn't operational.  But it had
 4   a storage terminal that was onsite.
 5   Q    Okay.  So you were looking at it more storage,
 6   inventory control, than production.
 7   A    No, both.
 8   Q    Both.  Okay, and who owned it at the time?  Do you
 9   remember?
10   A    Gravity.
11   Q    Gravity?
12   A    I think so.
13   Q    Okay.
14   A    I don't recall the actual owner of it.  But --
15   Q    All right.  And so to run through these bullet points
16   real fast so we have kind of a baseline as we go through
17   some additional emails, Vitol and Newco wish to commence
18   discussions.  Right, we've talked about that.  Acquisition
19   of the refinery and storage facilities.  The assets consist
20   of an asphalt refinery, existing storage tanks, truck
21   loading and offloading, right?  Rail handling and sufficient
22   land to construct approximately 500,000 barrels of
23   additional storage and access to various (indiscernible)
24   pipelines, other related --
25              MR. COOLEY:  Objection, Your Honor.  Counsel's
```

1   just reading the document, which we've not been doing.  Is

2   there a question about the document?

3          MR. PATTERSON:  Okay.  That's not an objection

4   that I've ever read in the rules of evidence.

5          MR. COOLEY:  Objection, sidebar.

6          MR. PATTERSON:  It's just -- it's just a sidebar

7   that he wants to make a comment.  He can object.  Otherwise

8   I suggest he not interrupt me and I conduct my cross.

9          THE COURT:  I'll sustain the objection.  Why don't

10  you ask a question?

11         MR. PATTERSON:  Your Honor, if I can't lay a basis

12  for a cross-examination question --

13         THE COURT:  You can.  But you can --

14         MR. PATTERSON:  Okay.  I read a piece of evidence

15  to ask him a question about, Your Honor.  I can either do

16  that or say please read silently.  I'm going to ask you a

17  question.  It's frustrating that --

18         THE COURT:  Well no, it's playing it fair on both

19  sides.  And I know --

20         MR. PATTERSON:  (indiscernible)

21         THE COURT:  I know it's not the same, direct and

22  cross.  But --

23         MR. PATTERSON:  It's not, and he stood up here and

24  read six emails in a row, do you understand what this says,

25  do you have a --

```
 1              THE COURT:  I just think there's a way we can --
 2              MR. PATTERSON:  Well, I would --
 3              THE COURT:  We can (indiscernible) --
 4              MR. PATTERSON:  -- appreciate the ability to
 5    conduct my cross-examination however I would like.
 6              THE COURT:  I know.  I want you to hear what I'm
 7    saying.  I think there's a way you can do it where you can
 8    tell him -- I will say this to Mr. Cooley, if he's just
 9    reading one bullet at a time, it doesn't -- none of this
10    bothers me at all quite frankly.  So let's just all be
11    mindful.
12              Mr. Patterson, go ahead and continue your
13    examination.
14              MR. PATTERSON:  Thank you, Your Honor.
15    BY MR. PATTERSON:
16    Q    Back to the email, the evidence that's already been
17    admitted, Mr. Kuo, and your bullet points coming from Vitol,
18    I was discussing them with you and making sure you
19    understood them.  This site had sufficient land for
20    expansion, right, of all of those things, you felt?
21    A    Well, I didn't write the email.  But this was --
22    Q    Correct.  Your understanding --
23    A    -- Mr. Barth's -- my understanding.
24    Q    All right.  You would continue to purchase -- the
25    parties currently contemplate 50/50 ownership.  Do you see
```

1    that?

2    A    I see that.

3    Q    And that's where it started, a 50/50 joint venture,

4    right?

5              MR. COOLEY:  Objection, where what started.

6              MR. PATTERSON:  I know he's just trying --

7              THE COURT:  No.  I think both of you have been

8    doing it.  I think both of you have been doing it.

9              MR. PATTERSON:  That's fine.

10             THE COURT:  So we can talk about what the it is.

11   Both of you have been doing it.  So I'll allow it.  I

12   allowed it on one side.

13             MR. PATTERSON:  Right.

14             THE COURT:  You can ask a clarifying question.

15             MR. PATTERSON:  If he doesn't understand --

16   BY MR. PATTERSON:

17   Q    You understand, Mr. Kuo, if I ask you something and you

18   don't understand what I'm asking you, you understand you

19   just need to tell me, right?  So don't try to answer a

20   question you don't understand.  Do we have that agreement?

21   A    Yes.

22   Q    Okay, and if my question comes out and you don't

23   understand or it's ambiguous or it's vague and you're not

24   sure how to answer, you'll also tell me that, won't you?

25   A    Yes.

1    Q    Okay, and I don't want you to try.  I want my questions

2    to be clear so that we're communicating, understood?

3    A    Understood.

4    Q    All right.  This emails says that the parties currently

5    contemplate an equal ownership of 50/50 of all the existing

6    and resulting facilities that would hold in a joint venture

7    of an agreed-upon entity, right?

8    A    Yes.  We were contemplating this.

9    Q    Correct.  I get it.  This is November of 2015, right?

10   A    2016.

11   Q    The first email.  2016.  Right?  The first email I

12   think you said -- or the first one you couldn't remember,

13   correct, right?  Contemplation.  That's what it says, right?

14   50/50.  Also include a joint venture but possibly held in a

15   separate entity.  Parties agree they will own and operate

16   wholesale and retail asphalt business, right?  So you've got

17   -- you were contemplating 50/50 ownership of production,

18   storage, transportation and sales, right?

19   A    There was a lot of -- there was a lot of items that we

20   were contemplating here.

21   Q    Absolutely.  I'm talking November 2016.  These are

22   things getting thrown out, right, ideas?

23   A    Yes, ideas.

24   Q    Right.  Also going to look at assets in Mobile,

25   Alabama, right?

1    A    Yes.

2    Q    Operational expenses to be borne by the joint venture,

3    which is again 50/50, right, at least contemplated right

4    now, right?

5    A    That's what it says here.

6    Q    Explain this piece to me, if you would.  The joint

7    venture will also offer to Vitol and/or to affiliates a

8    first right of refusal for purchase of all volumes FOV

9    Corpus or Mobile.  Do you recall why that piece was in the

10   initial discussion points?

11   A    I believe -- I'm not a hundred percent sure.  But I

12   believe that it was just giving Vitol the ability to buy the

13   product rather than selling it to the marketplace in case

14   Vitol had an interest in it.

15   Q    You think that had anything to do with VALT?

16        MR. COOLEY:  Object, to the extent it calls for

17   speculation.

18        THE COURT:  Sustained.

19   BY MR. PATTERSON:

20   Q    Did it have anything to do with VALT?

21        MR. COOLEY:  Same objection.

22        THE COURT:  He can answer if he knows that

23   question.

24        THE WITNESS:  No.  It did not.

25   BY MR. PATTERSON:

1    Q    All right.  Anything on here about or that you would

2    interpret to be lender-borrower arrangements?

3                MR. COOLEY:  Objection, vague.

4                THE COURT:  Overruled.

5                THE WITNESS:  Can you scroll down a little bit?

6                MR. PATTERSON:  Sure.

7                THE WITNESS:  The next statement under that.

8                MR. PATTERSON:  I'm sorry?  Where?

9                THE WITNESS:  Under your red line of -- right

10   there.

11               MR. PATTERSON:  Here?

12               THE WITNESS:  The joint venture agrees that it

13   will use utilize Vitol's purchasing and credit capacity.

14   BY MR. PATTERSON:

15   Q    Okay.  So the joint -- and it reads, for the record,

16   the joint venture agrees that it will utilize Vitol

17   purchasing and credit capacity for the purpose of acquiring

18   feedstock or product to be processed or sold through the

19   joint venture, right?  So Vitol credit capacity, and you

20   think that has some reference to financing for GCAC or

21   lender-borrower?

22   A    Yes.

23   Q    Okay.  Anything else?

24   A    No.

25   Q    All right.  Now you said earlier this morning and this

1    afternoon when your lawyer was talking to you that -- before

2    we get there, when did you find out you were coming here

3    today to talk to us?

4    A    You mean that I was going on the stand?

5    Q    Mm-hmm.

6    A    Friday, I think.

7    Q    And when did you find out you were going to be a

8    witness at this trial, not any particular day, but that you

9    were going to be a witness?

10   A    Oh, gosh.  I think -- I don't know.  I don't know.

11   Six-plus months ago.

12   Q    All right.

13   A    Maybe.  I really don't know when the exact date it was.

14   Q    And so what did you do once you found out you were

15   going to be a witness?  What did you do?  Did you go back

16   and review docs, talk to people, ask people questions?

17   A    No, I didn't, because this has been going on for five

18   years now, six years, five years.  So no, I did not review

19   any.

20   Q    Didn't look at anything?

21   A    Not really.  Not really.

22   Q    Well, not really means maybe something, right?

23   A    Well, I spoke with our lawyers.

24   Q    Right.  What did you read?

25   A    What do you mean?

 1              MR. COOLEY:  Objection, vague.  Can we get a

 2   timeframe?  What's the timeframe we're asking about?

 3              THE COURT:  Sustained.  I think that's fair.

 4   BY MR. PATTERSON:

 5   Q    You understand that the scope of my question goes back

 6   to when you found out you were going to be a witness today,

 7   right, Mr. Kuo?  You understood that, right?

 8   A    No.

 9   Q    Okay.  I'm telling you, so --

10   A    Okay.

11   Q    Going back to when you found out you were going to be a

12   witness at trial, what have you read in preparing for your

13   testimony?

14   A    Nothing outside what my attorneys gave me.

15   Q    Okay.  What did your attorneys give you to read?

16              MR. COOLEY:  And I just want to -- Your Honor, I

17   just want to instruct the witness because I suspect we're

18   going to get into a similar area, that the witness should

19   not describe any content of any conversations.  I just want

20   to give that admonition to the witness before the witness

21   delves into this area.

22              THE COURT:  I'm sure you'll jump up if he starts

23   to say something.  So I think he can answer the question of

24   what he reviewed.

25              THE WITNESS:  I mean, I don't know what you're

1    asking.  Do you want me to tell you every document that they

2    gave me?

3    BY MR. PATTERSON:

4    Q    Yes.

5    A    I don't recall every document.

6    Q    Okay.  Tell me the documents you do recall.

7    A    Most of them were in these exhibits.

8    Q    Okay.  But I need you to tell me the ones you do

9    recall.

10   A    I recall seeing the reconciliation.

11   Q    Performed by whom?

12   A    By Mike Ruzic.

13   Q    That email that you looked at, that reconciliation?

14   A    No.  It was a spreadsheet with all the details of each

15   transaction.

16   Q    Oh, because you referred to that email as a

17   reconciliation, or your lawyer did, right?  That's not a

18   reconciliation?

19   A    Yes, it was.

20   Q    It was.  It's one and the same?

21   A    It is the same.

22   Q    It's the same thing?

23   A    It is --

24   Q    Or is it a summary?

25   A    It's a summary of the reconciliation.

1    Q    Ah, okay.  It's not the same.  It's different.  The
2    same numbers, the same total.
3    A    They all come from the same spreadsheet.
4    Q    Okay.  I got it.  The email was compressed into a
5    summary, right?
6    A    The figures were compressed into a summary, yes.
7    Q    Right, right, and you're saying there's a spreadsheet
8    that's much more detailed that Mr. Ruzic prepared.
9    A    Yes.  He prepared that for everybody, including Mr.
10   Brass.
11   Q    All right, and so you looked at that.  What else?
12   A    I mean, if you're asking me to tell you the specific
13   title of the email or the subject, I don't know.
14   Q    Tell me what you remember.
15   A    I remember some emails between myself and Mr. Brass
16   asking for repayment of the debts that he owed.  I remember
17   reading some emails about the suits filed, like the one that
18   was presented as evidence.  I remember emails based on the
19   transactions that were done by GCAC.
20   Q    All right.  Anything else?
21   A    I don't know.  We looked at, you know, all the
22   documents that have been shown today.
23   Q    They reviewed all the exhibits ahead of time that they
24   showed you today?
25   A    I don't -- I didn't see them all.

1    Q    All right.  Some?

2    A    Some.

3    Q    Okay.  Anything else that you can think of?

4    A    I mean, no.

5    Q    Is that a no, I don't think so, or a no, there's too

6    many or --

7    A    There were a lot of documents.

8    Q    Right.

9    A    So if you're asking me if I can tell you every single

10    one, I don't know.

11    Q    But were they in paper form, electronic?  How did you

12    see them?

13    A    On paper.

14    Q    All right.  So a hard copy.  Did they give you a

15    notebook?

16    A    Well, they didn't give it to me.  But I saw a notebook.

17    Q    They put a notebook in front of you with documents,

18    right?

19    A    Yes.

20    Q    All right, and how long did you spend going through

21    those documents?

22    A    Minutes.

23    Q    Minutes?

24    A    Yes.

25    Q    oh, how thick was this notebook?

```
 1    A    I don't know.  There were probably 25 different

 2    exhibits.

 3    Q    I mean, was it a half-inch binder, or was it a three-

 4    inch binder?

 5    A    No.  It was less than a half-inch.

 6    Q    Less than a half-inch?  A quarter inch binder?

 7    A    I don't recall exactly the size of the binder.

 8    Q    It was a small binder, not a big binder?

 9    A    Not a big binder, right.

10         MR. PATTERSON:  Judge, we'd likewise ask

11    production of this notebook, of course.

12         MR. COOLEY:  Object on relevance grounds.

13         MR. PATTERSON:  There is no relevance.  The rules

14    say I'm entitled to it.

15         THE COURT:  Are you asking for it to the extent

16    that there were some documents that were shown to the

17    witness that are not on the witness and exhibit list?

18         MR. PATTERSON:  Absolutely.

19         THE COURT:  Okay.  No, no.  I'm just -- I'm asking

20    for the clarification.

21         MR. PATTERSON:  Yes.  I'm asking -- he was given a

22    notebook of documents.

23         THE COURT:  I just want to make sure that I

24    understood what the --

25         MR. PATTERSON:  Yes.  Everything in the notebook.
```

1    It has nothing to do with admissibility.  The rules say that

2    if he reviewed it in preparation, I'm entitled to it.

3              THE COURT:  Mr. Cooley?

4              MR. COOLEY:  Your Honor, the documents -- it cuts

5    both ways.  The documents that counsel might think that are

6    relevant for a witness to review and documents that counsel

7    might think are not relevant or may have probative effect

8    one way or another delves straight into the question of --

9    the matter of attorney work product.

10             THE COURT:  I think --

11             MR. COOLEY:  The documents themselves --

12             THE COURT:  I mean, not what was said about them,

13   but that objection, if you look at the decision, is

14   overruled.  It doesn't get into attorney work product.  Just

15   take a look at the (indiscernible) decision.  It's already

16   there.  That issue has been decided by the district court.

17             The work product objection was specifically

18   considered in the very decision that I read, and you'll see

19   that it doesn't -- at least in the Southern District of

20   Texas, that that doesn't go.  So I think they're entitled to

21   it.  But I think we can continue now.

22             MR. PATTERSON:  Correct.  They'll just get it to

23   us today.

24             MR. COOLEY:  Well, I -- we'll get those assembled,

25   Your Honor.

```
 1              MR. PATTERSON:  Thank you, Your Honor.  Well, it
 2    should be assembled.  It's a notebook.
 3    BY MR. PATTERSON:
 4    Q    Now I know you said you talked to your lawyers, and I
 5    don't want to know what you talked about.  Did you talk to
 6    anybody else to prepare?
 7    A    I did not.
 8    Q    Did you talk to Mr. Loya?
 9    A    I did not, not about the case.
10    Q    What did you talk to him about?
11    A    When?
12    Q    Well, you clarified and said not about the case.  I
13    assume you were thinking of talking to Mr. Loya and you felt
14    like you had to clarify.  When is it that you spoke to him?
15    A    You asked me if I spoke with anybody about the case,
16    and I said no.  Then you asked me if I spoke to Mr. Loya.
17    Q    When is the last time you spoke to Mr. Loya?
18    A    He was in the office a week or two ago.
19    Q    All right, and what did you all talk about?
20    A    What he's been doing.  He's been retired and where he
21    resides.  That's about it, nothing regarding the case.
22    Q    Nothing about the case --
23    A    Nothing.
24    Q    -- your testimony, anything.
25    A    Nothing.
```

```
 1   Q    I mean, did the lawsuit come up?

 2   A    No.

 3   Q    Did Mr. Brass come up?

 4   A    No.

 5   Q    Not even any comments or offhanded remarks about the

 6   lawsuit or, you know, nothing?

 7   A    No.

 8   Q    Did you say -- well, how long had it been since you'd

 9   seen Mr. Loya since then, since before then?

10   A    I don't know.  Maybe a year.

11   Q    And did you say what are you doing here?

12   A    No.  I mean --

13   Q    You didn't?

14   A    No.  I don't question why he's there.

15   Q    I mean, he hadn't been there in a year, right?

16   A    Maybe he had.  I don't know.  I don't see him every

17   time he walks into the office.

18   Q    I understand.  But you hadn't seen him in a year,

19   right?  As far as you know, he hadn't been to the office in

20   a year, right?

21   A    I had not seen him.

22   Q    Right, and you didn't say, hey, what are you doing here

23   --

24   A    No.

25   Q    -- what's going on, why are you over here?  No?
```

002387

```
 1    A     No.

 2    Q     Nothing?  Okay.  Didn't talk to anybody else about the

 3    lawsuit or your testimony?

 4    A     I did not.

 5    Q     Okay.

 6    A     Outside of my attorneys, no.

 7    Q     Right, right, and I don't -- of course, of course.  And

 8    you haven't talked to your general counsel, in-house?

 9    A     About this case?

10    Q     Mm-hmm.

11    A     The general counsel?  No.

12    Q     Okay.  Back to your testimony this morning --

13    A     If you're asking about Vijay, he's not my --

14    Q     I'm sorry?

15    A     Did you ask about Vijay or are you talking about --

16    Q     Yes.

17    A     Well, he's not the general counsel.

18    Q     Okay.  He's the one that's been here, right?  Did you

19    talk to him?

20    A     To Vijay?

21    Q     Yeah.

22    A     Yes.

23    Q     About the lawsuit?

24    A     Yes.

25    Q     And about your testimony?
```

 1   A    We didn't -- I mean, what do you mean about the

 2   testimony?

 3   Q    Well, did he -- like, for example, did he give you an

 4   outline to read about what you were going to be asked?  Did

 5   he tell you how the case was going, anything like that?

 6   A    He did not.

 7          MR. COOLEY:  Objection, privilege, the attorney

 8   work product.

 9          MR. PATTERSON:  No.  Neither one of those things

10   are privileged, Judge, because they're -- well, I won't say

11   because of the witness here.  But neither one of those are

12   privileged under any privilege that I am aware of.

13          THE COURT:  You mean a witness can't talk to their

14   general counsel?  It's not privileged conversation in

15   connection with a lawsuit?

16          MR. PATTERSON:  No.  Yeah.  We're going to go in

17   depth, but you have to go back to the content of my

18   question, Judge.  There are things -- there are things that

19   are not protected even because you talk to a lawyer or your

20   lawyer about it, right?

21          THE COURT:  Agreed.

22          MR. PATTERSON:  So neither of those topics are

23   privileged under any scenario.

24          THE COURT:  I'm not sure about that.  But we'll

25   see where it goes.

```
 1                MR. PATTERSON:  All right.

 2                THE COURT:  I think the question you asked him is

 3     certainly covered.

 4                MR. PATTERSON:  I'm sorry, Your Honor?

 5                THE COURT:  I think -- well --

 6                MR. PATTERSON:  The rule was invoked.

 7                THE COURT:  Yeah, I know.  I think --

 8                MR. PATTERSON:  We'll be careful and I'll go slow,

 9     and if the Court disagrees with where I'm going --

10                THE COURT:  That's all I'm saying.  We're going to

11     take it one by one.

12                MR. PATTERSON:  Of course.

13     BY MR. PATTERSON:

14     Q    Did anyone, including Vijay, talk to you about how the

15     trial was going or testimony that had come out so far?

16                MR. COOLEY:  Objection, compound, and I'm not sure

17     what time period we're talking about.

18                MR. PATTERSON:  The trial.

19                THE COURT:  Mr. Kuo, I think you can answer that.

20     Mr. Patterson, why don't you ask the question again just so

21     he --

22     BY MR. PATTERSON:

23     Q    All right.  Did you talk to anyone about how the trial

24     was going?  We'll start there.

25                MR. COOLEY:  Objection, privileged.
```

1              THE COURT:  I don't --

2              MR. PATTERSON:  Anyone, and an identification

3     would not be privileged.  Only contents are privileged.

4              THE COURT:  Clarification -- I think the

5     identification is different than the content of the

6     conversation.

7              THE WITNESS:  I told my wife I was coming to court

8     if that's what you're -- if you're asking if I talked about

9     the trial.  I told her I was coming to court.

10    BY MR. PATTERSON:

11    Q    Right, and I'm -- no.  My question is did you talk to

12    anyone about what has transpired at the trial so far prior

13    to today and through today.

14    A    I asked, and they wouldn't tell me.

15    Q    All right, and has anyone -- have you talked to anyone

16    about the testimony that's been provided up through today in

17    this trial?

18    A    The testimony by whom?

19    Q    Anyone.

20    A    Yeah.  I asked, and they wouldn't tell me.

21    Q    Okay, and in your prior testimony, let's go back to

22    this morning as you started talking about Exhibit Number 1,

23    the November 2016 email.  You read a statement that GCAC

24    needed our financing.  Do you remember that?

25    A    In what context?  I mean, I'm not sure.

```
 1    Q    That was your testimony.  You said that GCAC needed

 2    your financing and that was part of why the impetus of this

 3    Exhibit Number 1, this email.

 4    A    Yes.  I remember it.

 5    Q    Okay.  How do you know they needed your financing?

 6    A    They told us.

 7    Q    They said we need your money?

 8    A    They said they needed our -- they needed -- our balance

 9    sheet was stronger than theirs.

10    Q    Right.  $300 billion and a local, right?  Of course.

11    You're much bigger, much stronger, right  Anything else with

12    respect to needing financing that was relayed to you or any

13    of your business development guys?

14    A    By?

15    Q    Mr. Brass, anyone at GCAC.

16    A    I don't know about Mr. Barth.  But for me, I don't -- I

17    mean, there were multiple discussions about financing and

18    capital.

19    Q    Right, and at least through, let's start at, at least

20    through November of 2016, as far as you know, Vitol had

21    never been a lender in any transaction.  Isn't that true?

22    A    No.  I don't believe that to be true.

23    Q    All right.  Who did they loan to?

24    A    I don't know the specifics.  I'm a fuel oil trader.  I

25    don't know.  there's many products across the organization.
```

1    There's many -- there's public pre-finance deals that Vitol

2    has done for countries, for oil companies and there's a

3    multiple -- there's (indiscernible) --

4    Q    Okay.  So does that mean that you know of financing

5    deals or you just know that some existed?

6    A    I don't know the specifics.  I know some existed.

7    Q    All right.

8    A    I don't know the specifics of each one.

9    Q    All right.  Very large deals, I assume, right?

10   A    I don't know the sizes of them.

11   Q    You don't know.  And do you know if it was -- well, you

12   don't know any details, do you, of any of these lending

13   transactions?

14            MR. COOLEY:  Objection, vague.

15            THE COURT:  Overruled.

16            THE WITNESS:  I don't know the specifics of the

17   deals.

18   BY MR. PATTERSON:

19   Q    Okay, and I think you said you've never funded deals

20   before, right, at Vitol?

21   A    I said that?

22   Q    That's what I wrote down.  I was listening to you and

23   you said, as far as you know, Vitol had never funded a deal

24   before.  You had provided funding support or financing,

25   paying for a product, but never funding.

1        MR. COOLEY:  And, Your Honor, I'll object to the

2   extent it mischaracterizes the testimony.  The testimony was

3   what it was.

4        THE COURT:  He can answer as to whether he recalls

5   that was his testimony.

6        THE WITNESS:  I vaguely remember saying -- talking

7   about the funding.  I'm not sure if it was in the context of

8   me personally or Vitol as an entity.

9   BY MR. PATTERSON:

10  Q    Right.  All right.  Now after this first email in

11  November of 2016, discussions continued with GCAC between

12  you, Mr. Brass, GCAC, Vitol, your business development guys,

13  right?

14  A    Yes.

15  Q    When did the lawyers get involved?

16  A    When did the lawyers get involved with?

17  Q    Drafting the joint venture agreement.

18  A    Oh.  I don't remember.  I think somewhere probably in

19  that timeframe, maybe as early -- I think there was an

20  exhibit.  I recall a draft that was sent back and forth

21  between lawyers.  I don't remember exactly when it was

22  drafted.  But it was -- I think it was early 2017.

23       MR. PATTERSON:  Sorry for the delay, Judge.  One

24  second.

25       THE COURT:  Take your time.

Page 174

```
 1   BY MR. PATTERSON:

 2   Q    And so when did you actually start -- I say you, you

 3   and Vitol start entering into what I'll call transactions

 4   that involved the GCAC.

 5   A    I believe it was in July, early July of 2017.

 6   Q    In July of 2017?

 7   A    I believe so.

 8   Q    And why and under what circumstance did you start

 9   participating in transactions with GCAC in July?

10   A    When did we start participating in transactions with

11   GCAC?  Is that what you said?

12   Q    Well, you said it was sometime in July, right?  Right?

13   A    The first iteration of it was when we purchased some

14   oil from Rio Energy.  I think it was in early July.

15   Q    Right, and isn't it true that -- well, let's give some

16   context.  GCAC was in a prior joint venture with Rio,

17   correct?

18   A    I believe so.

19   Q    And you were aware of that, right?

20   A    Yes.  I was.

21   Q    And isn't it true that in late June and into July of

22   2017, discussions were being made for Vitol to buy out Rio's

23   position in that joint venture, right?

24             MR. COOLEY:  Objection, vague.

25             THE COURT:  Overruled.  He can answer.
```

1               THE WITNESS:  The discussions were not necessarily

2     that we were entering into Rio's JV, but that we would have

3     a separate joint venture with GCAC.

4     BY MR. PATTERSON:

5     Q     And my question is weren't you discussing purchasing

6     their interest in the joint venture that they were in with

7     GCAC.

8     A     That's not how I remember it.

9     Q     You don't recall it that way?

10    A     I do not.

11    Q     Okay, and once you started entering into transactions

12    that involved GCAC in July of 2017, how often were

13    transactions entered into that involved GCAC?

14    A     I'd have to look at the records.  I don't know how

15    often they were done.  Maybe once or twice a week.  I'm not

16    sure of the frequency of them.

17    Q     But maybe, at a minimum, once a week?

18    A     Potentially.

19    Q     And so when was -- when was the joint venture agreement

20    executed?

21              MR. COOLEY:  Objection, assumes facts not in

22    evidence, mischaracterizes prior testimony.

23              THE COURT:  Sustained.

24              MR. PATTERSON:  I didn't assume anything.  I asked

25    him if there was -- when --

```
1              THE COURT:  You said when was the joint venture --
2              MR. PATTERSON:  That's right.
3              THE COURT:  -- signed.
4              MR. PATTERSON:  Right.
5              THE COURT:  I think that's assuming facts not in
6  evidence, right?
7  BY MR. PATTERSON:
8  Q    When did you finalize the documents for the joint
9  venture that started back in November of 2016?
10             MR. COOLEY:  Objection, assumes facts not in
11 evidence, mischaracterizes prior testimony.
12             THE COURT:  He can -- he can answer the question.
13 But I'll allow it.
14             THE WITNESS:  I'm sorry.  Can you rephrase the
15 question again?
16 BY MR. PATTERSON:
17 Q    When were the joint venture documents finalized?
18 A    They were never finalized.
19 Q    Never finalized?  How close did they get?
20 A    I don't recall because I was not part of the legal
21 proceedings on back and forth with the redline.  So they
22 were -- I can't tell you how close they were.
23 Q    They were?  Were you not involved to the very end?
24 A    I was.  But at one point -- at some point it was mainly
25 the lawyers going back and forth.
```