Page 177

```
1    Q    At what point was that?

2    A    In July -- into July.

3    Q    Late July?

4    A    I don't recall the exact date.

5    Q    I've put a document up on the screen for you to look

6    at.  All right, and I'm going to scroll through it slowly.

7    I'm not asking you to read it.  I'm just going to ask if

8    you've seen this before, and just tell me if and when you

9    recognize this document.  Ever seen this before?

10   A    I have.

11   Q    You have?

12   A    I have seen this document.

13   Q    What is it?

14   A    It is a draft for a potential JV with GCAC and Vitol.

15   Q    Okay, and is this in fact the form that the parties

16   were working off of --

17   A    I believe so.

18   Q    -- in July of 2017?

19   A    I believe so.  Yes.

20        MR. PATTERSON:  I'd ask the Court to admit Exhibit

21   Number 25.

22        MR. COOLEY:  Your Honor, I would object to the

23   document on hearsay and relevance grounds.  I would also

24   note that counsel's last question referred to the timeframe

25   of July 2017 and the file name of the document --
```

1           MR. PATTERSON:  Judge, this is a sidebar.  He's
2    coaching the witness --
3           MR. COOLEY:  Your Honor --
4           MR. PATTERSON:  If he has an objection --
5           THE COURT:  I think everybody's been doing it
6    today.  So I'm going to let it go.
7           MR. PATTERSON:  So we're allowed to coach and just
8    sidebar the witness?
9           THE COURT:  It's what everybody's been doing all
10   day, Mr. Patterson.
11          MR. PATTERSON:  Okay.
12          THE COURT:  That's the kind of stuff that's been
13   going on all day.
14          MR. PATTERSON:  And unfortunately --
15          THE COURT:  No.
16          MR. PATTERSON:  -- it's their witnesses that
17   they're coaching, so.
18          THE COURT:  I'm not sure that's really true.  But
19   --
20          MR. PATTERSON:  Judge, we haven't called a single
21   witness.
22          THE COURT:  You know, okay.
23          MR. COOLEY:  I just don't know how to articulate
24   that without pointing the Court to the issue.
25          THE COURT:  Yeah.

1          MR. PATTERSON:  He identified it.

2          THE COURT:  He identified it.

3          MR. PATTERSON:  It's part -- this is the document

4    they were working on, their drafts --

5          THE COURT:  No, no.  No, no.  I think now you're

6    doing it.  What is the --

7          MR. COOLEY:  Let me reframe my objection and see

8    if that helps.  I object -- actually my objection is to

9    counsel's last question as mischaracterizing the document.

10         MR. PATTERSON:  He agreed and answered in the

11   affirmative.  How -- he --

12         THE COURT:  What -- hold on --

13         MR. PATTERSON:  I said this is the revision you're

14   working --

15         THE COURT:  Hold on.  About what part of the

16   framing of the question?  That's the part that I'm a little

17   hazy on.

18         MR. COOLEY:  The date, Your Honor.  Counsel's

19   question --

20         THE COURT:  Why don't you just -- look, I do agree

21   with him there.  He did recognize the document.  But the

22   date, we can clarify as to the date.  I think that's fair.

23   BY MR. PATTERSON:

24   Q    All right.  I'll ask you again, Mr. Kuo.  Is this the

25   document, based upon your recollection, that you, you Vitol

1    and you, and GCAC was working off of in July of 2017?

2           MR. COOLEY:  Same objection, to the extent it

3    mischaracterizes the document.

4           THE COURT:  Overruled.

5           THE WITNESS:  it is the document that we were

6    working off of.  I don't know the exact date.

7    BY MR. PATTERSON:

8    Q    Well, when did you have a written document first

9    reflecting a potential joint venture between Vitol and GCAC?

10   Was it before July 2017?

11   A    It was the exhibit that you put up.

12   Q    All right.  Was it before July of 2017?

13   A    Yes.

14   Q    It was.  It was June 2017?

15   A    Which one are you -- I'm not sure which document you're

16   talking about.

17   Q    The only document on your screen, Mr. Kuo.

18   A    Oh, this one here?

19   Q    Yes, sir.

20   A    I mean, if you look at the first sentence, I think it

21   states the date, this day, it's left blank of July -- or it

22   was originally June of 2017.  So that's what it states here.

23   Q    Okay, and you would agree with me this seems to

24   indicate you were working on this in July of 2017, correct?

25   A    I didn't draft this.  But I believe so, yes.

1          MR. PATTERSON:  All right, and I've offered it.  I

2     don't know that the Court has ruled on it.  But we've

3     offered the admission of Exhibit 25.

4          THE COURT:  Any objection?

5          MR. COOLEY:  No, Your Honor.

6          THE COURT:  Okay.  I want to make sure I've got it

7     right.  Is this -- I want to make sure that I've -- it's

8     Exhibit 25.  Is this a -- so Brass Exhibit 25?

9          MR. COOLEY:  Yes, Your Honor.

10          THE COURT:  Okay.  I just want to make sure that

11     I've got the --

12          MR. COOLEY:  I'll double-check.  Yes.

13          THE COURT:  Okay.  So Brass Exhibit 25 is

14     admitted.

15          (Brass Exhibit 25 Admitted into Evidence.)

16     BY MR. PATTERSON:

17     Q    All right.  And you would agree -- well, do you know

18     whose redlines are contained in this document?  Was it

19     Vitol's changes or was it GCAC's changes?

20     A    I don't know.

21     Q    All right.  And there came a point in time in which you

22     believed there was a document ready to be signed.  Isn't

23     that correct?  A joint venture?

24     A    I did not believe that it was ready to be signed, no.

25     Q    Not this.  My question is there came a point in time in

1  July of 0217 in which you believed there was a document that

2  was ready to be executed, correct?

3  A    That's not correct.

4  Q    There wasn't a time in July when you were on vacation

5  in 2017 and not available to execute?  Do you recall that?

6  A    It wasn't because I was on vacation.

7  Q    Okay.  Do you recall being on vacation late, end of

8  July 2017?

9  A    End of July, no.  I don't believe so.

10  Q    No, and you didn't indicate to Mr. Brass you couldn't

11  sign or you would sign when you got back from vacation?

12  A    I don't -- I don't recall that exact -- that email.  I

13  think it was early July that I was on vacation, but not late

14  July.

15  Q    All right.  And you indicated you would be executing

16  when you got back, correct?

17         MR. COOLEY:  Objection, foundation and best

18  evidence to the extent we're talking about a communication.

19         THE COURT:  I'll sustain that objection.

20  BY MR. PATTERSON:

21  Q    So did you send a text at the end of June indicating

22  you were on vacation?

23  A    I don't -- I don't know.  I'd have to see it.

24  Q    What do you mean you don't know?  If you don't remember

25  --

1    A     You asked --

2    Q     You don't remember.  That's fine.

3    A     I don't remember.  I mean, you're asking if a sent a

4    text five years ago in June.  I don't know.  Possibly.

5    Q     You don't remember being on vacation, getting texts

6    saying, hey, when are you going to execute the joint venture

7    agreements?

8              MR. COOLEY:  Objection, foundation.

9              THE COURT:  I think that's a different question

10   than the others.  So I think he can answer that.  Overruled.

11             THE WITNESS:  I'm sorry.  Your question again?

12   BY MR. PATTERSON:

13   Q     You don't remember being in vacation and exchanging

14   texts regarding execution of a joint venture agreement when

15   you get back?

16             MR. COOLEY:  Objection, asked and answered, and

17   assumes facts not in evidence.

18             THE COURT:  I don't think he's actually answered

19   this one.  So I'll overrule.

20             THE WITNESS:  I remember receiving texts from I'm

21   not sure who, Rio, that were asking about the documents to

22   be signed.

23   BY MR. PATTERSON:

24   Q     Okay.  Let's get more specific.  You were at a wedding

25   in France.  Do you remember that?

```
 1    A      A wedding in France?

 2    Q      June of 2017.

 3    A      A wedding in France?  I don't believe so.

 4    Q      All right.

 5    A      A wedding in France?

 6    Q      Okay.  So were documents ever signed?

 7    A      No.  They were not.

 8    Q      Why?

 9    A      Because there were still a lot of negotiating points

10    and conflicts to clear before we were comfortable signing.

11    Q      Right, and you said that earlier.  And so walk me

12    through a little bit of two things.  The conflicts, what

13    conflicts needed to be cleared?

14    A      Any conflicts.  I didn't know.  That's why we had to --

15    Q      No.  You said there were many conflicts that needed to

16    be cleared.  What were they?

17    A      I said any.  I said any conflicts, not many.  I said

18    any conflicts to be solved.

19    Q      Okay.  Name one.

20    A      Well, we're a big company.  I don't know everybody's

21    business across the world.  So we needed to talk to senior

22    management who does know all the businesses and make sure

23    that we're not in conflict with any of our businesses.

24    Q      You said that you never finalized the joint venture

25    because there were conflicts that needed to be cleared.
```

1    Tell me what any of those conflicts were.

2    A    Well, for one, it was the conflict with the global

3    noncompete with (indiscernible) --

4    Q    So in June, you knew that there was a global

5    noncompete?

6    A    No.

7    Q    Okay.  You just said that that was one of the conflicts

8    that needed to be cleared.

9    A    I didn't -- I didn't know of that until late July.

10    Q    Okay.  So how could it be something that needed to be

11    cleared?  You didn't even know about it, right?

12    A    No.  I just -- we just had -- besides the conflict, we

13    had to make sure that the documents were acceptable to both

14    parties and we needed to make sure that there were no

15    conflicts.  So it took some time.

16    Q    Okay.  What issues remained unresolved, if any?

17    A    Some of the points in this draft I believe were still

18    unclear from the legal standpoint.  Our legal team was not

19    clear, was not comfortable.

20    Q    All right.  Let's look at -- maybe we can identify some

21    issues.  What I've got on the screen is Exhibit Number 25, a

22    comment there in the first paragraph, can't be sure if an

23    affiliate in Asia might be conducting similar business in

24    the Far East, but that should not be a problem given the

25    scope of this agreement.  So that wasn't really an issue,

1   right, just more of a comment.

2   A    I don't know.  I didn't write that.

3   Q    I understand.  But you were part of the negotiations at

4   this stage, were you not?

5   A    On the legal part, no.  On this document, I was --

6   Q    No.  On the joint venture.

7   A    But you asked about this particular --

8   Q    Okay.  You answer my question, all right?  Were you a

9   part of the negotiations about the joint venture through

10  July of 2017?

11  A    I was involved with the discussions on the potential

12  joint venture, yes.

13  Q    Okay, and are you aware of what this means?

14       MR. COOLEY:  Objection, foundation.  I don't think

15  we've even established who it came from.

16       MR. PATTERSON:  Asking someone if they're aware is

17  part of the foundation.

18       THE COURT:  I'll overrule.  I think he can answer

19  to the extent that he knows.

20       THE WITNESS:  I don't know.

21  BY MR. PATTERSON:

22  Q    All right.  Next paragraph, they talk about the

23  business, right, collectively the business, which is the

24  buying, selling, blending, marketing of asphalt, everything

25  the joint venture was going to do as defined as "the

1    business," right?  And the comment is, should this have a

2    geographic restriction, will the business be conducted

3    domestically, North America, in A plus Mexico.  You see

4    that?  Were you aware of this concern or question?

5              MR. COOLEY:  Objection, foundation, assumes facts

6    not in evidence.

7              MR. PATTERSON:  Well, the fact is in evidence

8    since we're looking at it.

9              THE COURT: The document -- the document's in

10   evidence.  He can answer if he knows.

11             THE WITNESS:  I'm not sure who wrote this, but --

12   BY MR. PATTERSON:

13   Q    I haven't asked you who wrote it.  I asked if you're

14   aware of the issue.

15   A    I was not aware of the issue.

16   Q    All right.  Calculation of profits and losses, you see

17   this comment?  Before execution of this agreement, the

18   parties agree to have their respective operational and

19   accounting personnel meet to discuss operational accounting

20   issues to be addressed during the term of this agreement and

21   based on their discussions we can modify articles six and

22   seven accordingly.  Were you aware of this issue?

23   A    I don't think this was an issue.  I think this was just

24   a statement.

25   Q    Okay.  Termination of events, someone added either

```
 1   party may terminate this agreement effective on or after the

 2   first year of the initial term upon not less than 90 days'

 3   written notice to the other.  Were you aware that this was

 4   an issue that needed to be addressed in July of 2017?

 5            MR. COOLEY:  Objection, mischaracterizes the

 6   document.

 7            THE COURT:  Overruled.  He can answer if he knows.

 8            THE WITNESS:  I don't recall this point there.

 9   BY MR. PATTERSON:

10   Q   Okay.  So the effective termination there is a change.

11   There's an addition, a modification and a deletion and a

12   provision of termination.  Do you see that?

13   A   I see it.  Yes.

14   Q   Were you aware of this issue in July of 2017?

15   A   I don't recall exactly this.

16   Q   If I go through any of these changes, are you going to

17   be able to tell me whether they were issues that needed to

18   be addressed that you were referencing in your earlier

19   testimony?

20   A   I don't know.  I'd have to go through them all and --

21   Q   Okay.  We can do that.  I think that this is a drafting

22   issue here.  But termination, are you aware -- were you

23   aware of this issue?

24   A   I don't recall, to be honest.

25   Q   Okay.  These are drafting.  I think these are just
```

```
 1    referencing different defined terms.  The deletion of

 2    paragraph C here on Page 7, do you see that?

 3    A    I do.

 4    Q    Were you aware of this issue still outstanding?

 5    A    I am not.

 6    Q    Okay.

 7    A    I was not.

 8    Q    Sort of a comment on exclusivity.  Excuse me.  It says

 9    can't be sure if an affiliate in Asia might be conducting

10    similar business in the Far East, but that should not be a

11    problem given the scope of this agreement.  You see that?

12    Were you aware of that issue?

13    A    I was not.

14    Q    Okay.  Exclusivity undertaken by Newco, Paragraph 9.2,

15    there was an issue or a question in which someone is saying

16    please explain this particular provision.  Were you aware of

17    this issue?

18         MR. COOLEY:  Again, object, to the extent that it

19    mischaracterizes the document as to what is or is not an

20    issue.

21         THE COURT:  I'm going to overrule the objection.

22    But I understand the question asking the witness, not so

23    much identifying that there's a redline comment and that

24    whenever there's a comment, that that is an issue, not an

25    issue as in a legal issue or some other issue.
```

1              Mr. Patterson, you can clarify if I'm wrong about

2    this.  You're pointing out comments to decide and

3    identifying them as issues.

4              MR. PATTERSON:  Well --

5              THE COURT:  Am I understanding it right?

6              MR. PATTERSON:  You are.

7              THE COURT:  Okay.  That's all I'm saying.

8              MR. PATTERSON:  Yes.

9              THE COURT:  Then overruled.

10             MR. PATTERSON:  Yes.

11   BY MR. PATTERSON:

12   Q    Are you aware --

13   A    Yes.

14   Q    Were you aware of this issue outstanding as of July

15   2017?

16   A    I don't know if it's an issue or a comment.

17   Q    Right.

18   A    I mean, we can read the whole thing and then decide if

19   it's an issue or a comment.  I don't know without reading

20   the entire phrase.

21   Q    I understand you've picked up on the comments.  But

22   someone highlighted the fact that this phrase is in here.

23   would you not agree with me that by putting a comment and

24   marking it, someone believes it's an issue or would like an

25   explanation, right?

```
 1   A    Yeah.  I don't know if this is -- I don't know if this

 2   is Vitol's or if this is GCAC's comment.

 3   Q    Correct.

 4   A    I don't know that.

 5   Q    Right, and you said you needed to go through it all,

 6   and that's what we're doing.

 7   A    Okay.  I don't know who's -- by the fact that there is

 8   something on the side, I assume that one of the two

 9   companies has made a comment.

10   Q    Right.

11   A    I don't know whose comment it is and I don't know about

12   it without -- I don't know about that -- I don't remember

13   that particular comment, if that's what you're asking.

14   Q    Right, and I asked you is that going to be your comment

15   about all of them, and you said, I don't know, I'll have to

16   look at them, right?

17   A    Yeah, and you're asking me for every single one in this

18   document.  I don't know.

19   Q    Okay, and if you're not familiar with the document,

20   wouldn't your answer be, yeah, I don't know any of them

21   because I'm not familiar with the document?

22   A    I have seen the document.

23   Q    Okay, and you're familiar with redlines as they came

24   through, right?

25   A    I was not.  I did not see every redline that came
```

1    through.  No.

2    Q    I didn't say did you see every redline.  I said you

3    were familiar with the redlines as they were coming through,

4    right?  They would be forwarded to you.  am I correct or

5    incorrect?

6    A    Not necessarily.  Not necessarily.

7    Q    Okay.  Ever?

8    A    Yes.

9    Q    Okay.  So you were aware of some redline documents.

10   A    Yes.  some.

11   Q    Right.  You were kept aware of the status of the

12   drafting of the final agreement, true or false?

13   A    False.

14   Q    So someone else was taking the lead on this

15   transaction?

16   A    From the legal side, yes.

17   Q    Who?

18   A    Our attorney.

19   Q    Who at Vitol was in charge?  The attorneys weren't

20   driving the deal, were they?

21   A    No.  But they were working out specifics.

22   Q    Okay.  Who was driving the business deal?

23   A    I was.

24   Q    All right.  But you're going to tell me as we go

25   through this document you're not -- you weren't currently

1    aware of any outstanding issues as highlighted in this

2    document in July of 2017, correct?

3    A      I think there were.  I think there were issues.

4    Q    Okay.  Tel me what they were.

5              AUTOMATED VOICE:  Our system will end this

6    conference in five minutes.  To extend this call for one

7    hour -- please enter the moderator -- your conference has

8    been extended for 60 minutes.

9              THE COURT:  I apologize, Mr. Patterson.

10             MR. PATTERSON:  No problem.

11             THE WITNESS:  I'm sorry.  Can you ask that again?

12   BY MR. PATTERSON:

13   Q    What were the issues?

14   A    I don't recall all of the issues.  But I knew there

15   were outstanding --

16   Q    I didn't say what are all the issues.

17   A    I don't recall any of the issues.

18   Q    You don't?

19   A    No.

20   Q    Then how do you know there were issues outstanding July

21   of 2017?

22   A    Because our attorney is saying we are not comfortable

23   moving forward yet.

24   Q    But it's not your attorney's deal, right?  It's your

25   deal.

1    A    The legal aspect of it is not my deal.

2              MR. PATTERSON:  Yes, sir.  Usually when you stand,

3    it's you want to say something.  Did you want something?

4              MR. COOLEY:  Not at this time.  Thank you.

5              MR. PATTERSON:  Okay.  Can you have a seat,

6    please?

7              THE COURT:  Mr. Patterson, come on.  Let's ask a

8    question.

9              MR. PATTERSON:  Judge, it's distracting and you

10   stand when you want to speak and that's why he's standing.

11   So if he's just going to play games --

12             THE COURT:  You can ask another question.  Let's

13   keep it going.

14             MR. PATTERSON:  All right.

15             AUTOMATED VOICE:  Conference muted.

16   BY MR. PATTERSON:

17   Q    June 26, 2017, you see that?  This is an email from you

18   to Mr. Huth, Mr. Moran, Mr. Calden.  You see that?

19             MR. COOLEY:  Objection, Your Honor.  The document

20   has not even been identified by counsel, much less anyone

21   else.

22             MR. PATTERSON:  I'm not here to identify anything,

23   and it won't be identified by me.  It's in evidence.

24             THE COURT:  This document is Vitol 3, right?

25             MR. PATTERSON:  Yes, sir.

1           THE COURT:  Vitol 3, I believe, was admitted

2    earlier today.

3           MR. PATTERSON:  Correct.

4           THE COURT:  So I think he can ask about it.

5    BY MR. PATTERSON:

6    Q    Who is Mr. Huth?

7    A    He was one of -- well, he is a credit officer.

8    Q    All right.  Mr. Moran?

9    A    He's a credit officer.

10          MR. COOLEY:  Sorry, Your Honor --

11   BY MR. PATTERSON:

12   Q    Mr. Calden --

13          THE COURT:  Hold on a second.  Hold on.

14          MR. COOLEY:  Objection.  There may have been some

15   confusion.  This is not Vitol Exhibit 3.  This is --

16          THE COURT:  This is Brass 3?

17          MR. COOLEY:  This appears to be Brass 3.

18          MR. PATTERSON:  Correct.

19          THE COURT:  Ah, okay.  That was just my confusion.

20   What's the objection?  I apologize.

21          MR. COOLEY:  Your Honor, I understand it has been

22   admitted.  I think we were just trying to catch up because

23   counsel went into the document without identifying it.  But

24   I understand that Brass 3 has previously been admitted, so.

25          THE COURT:  Okay.  So this is Brass 3.  Brass 3

Page 196

```
 1   was admitted.  I apologize, Mr. Patterson.  Please proceed.
 2   BY MR. PATTERSON:
 3   Q    Who's Mr. Calden?
 4   A    He was a credit officer.
 5   Q    So you were sending an email to three credit guys at
 6   Vitol, right?
 7   A    Yes.
 8   Q    All right.  We are entering into a JV with GCAC.  Do
 9   you see that?  Do you see that?
10   A    Yes.
11   Q    All right.  Doing business in the wholesale and retail
12   asphalt space.  FYI, we plan on having this JV signed for
13   July 1st.  Do you see that?
14   A    Yes.
15   Q    All right.  Why would you be telling your credit guys
16   these two things if they weren't true?
17   A    I guess I was not specific email on this email because
18   it should have been a potential JV.
19   Q    Okay.  It looks pretty specific to me.  Tell me again
20   what wasn't specific enough.
21   A    We hadn't agreed on all of the terms of the deal.
22   Q    Okay.  But you don't address --
23   A    I said we plan on.  I didn't say we are.
24   Q    Oh, you did.  Look at the first two words.
25   A    That was a mistake by me then.
```

1    Q    Okay.  And how do you explain the phrase, "We plan on

2    having this JV signed for July 1st"?

3    A    I mean, I could say we plan on anything.  It doesn't

4    have to be set in stone.  Just because we plan on something

5    doesn't mean we're doing it.

6    Q    All right.  Now in June, at the time of this email,

7    were you aware of VALT?

8    A    That it exited?

9    Q    Yes.

10   A    Yes.

11   Q    And who had you talked to over at VALT about this joint

12   venture?

13   A    I spoke to Nick Fay about it.

14   Q    When?

15   A    I don't recall exactly the date.

16   Q    Well, it was before this email to your credit guys?

17   A    I don't recall the date that I spoke to Nick.

18   Q    Well, was it August of 2017?

19   A    I believe we did have a discussion in August.

20   Q    Was it July of 2017?

21   A    I think we did have a -- I don't know the exact date.

22   Q    All right, and what was the discussion?

23   A    I told him what we were looking at potentially doing

24   with GCAC.

25   Q    And what did he say?

1   A    He said that we couldn't do it.

2   Q    And did you say why?

3   A    Yes.

4   Q    And what did he say?

5   A    He said that there was a global noncompete with VALT

6   that no one else in the -- any other Vitol entity could

7   enter into the asphalt business.

8   Q    All right, and so this would be important in

9   determining whether you do a joint venture with GCAC or not,

10  right?

11  A    Yes.

12  Q    And so what did you do when you had this conversation

13  with Nick Fay?

14  A    What do you mean?  What do you mean what did I do?

15  Q    What did you do?  You had a phone call, right, and he

16  said you can't do this.  Vitol and all of Vitol entities

17  have non-competes worldwide in the asphalt business, right?

18  That's what he told you?

19  A    Correct.

20  Q    What did you do when you hung up the phone?

21  A    I called Mr. Brass.  I don't know if it was that day or

22  the next day.  I'm not sure at what time I called him.  But

23  I called him to tell him that we would not be able to

24  proceed under a joint venture.

25  Q    Okay, and what did you do within Vitol?

```
 1    A    What do you mean what did I do within Vitol?

 2    Q    Who did you talk to, if anyone?

 3    A    I spoke to Mike Loya.

 4    Q    All right.  What did you tell Mr. Loya?

 5    A    I told him that we had a discussion, me and Nick, and

 6    there was a global noncompete, that we could not move

 7    forward and he suggested we look at alternatives for working

 8    with GCAC.

 9    Q    What do you mean alternatives?

10    A    Doing a different deal other than a JV.

11    Q    So Mr. Loya didn't say, Mr. Kuo, we're done, no more,

12    cut ties with GCAC?  He didn't say that?

13    A    He said you cannot do a JV with GCAC.

14    Q    Okay.  Got that.  Number one, he said no joint venture,

15    right?  And then where did the discussion go?

16    A    I believe I recall he suggested that we speak with GCAC

17    about financing their operation.

18    Q    And this was when, in July?

19    A    Yes.  I think it was.  I don't recall the exact date.

20    I think it was late July.

21    Q    Late July, maybe early August?

22    A    Potentially.

23    Q    All right.  I'm going to put up on the screen for you

24    Brass Exhibit Number 13 for the record.  All right.  Now do

25    you see this email dated July 31, 2017?
```

```
 1   A    I do.

 2   Q    All right.  Do you recall this email?

 3   A    I do.

 4   Q    And can you place it in a timeline with the phone call

 5   you just referenced that you said you had with Mr. Fay?

 6   A    I believe this was -- I'm not entirely sure.  But I

 7   believe it was prior to July 31st of 2017, the phone call.

 8   Q    So you think this email came after the phone call?

 9   A    Correct.

10   Q    And do you recall it being immediately after the phone

11   call or maybe a week, days, work days or minutes?

12   A    I don't recall exactly.

13   Q    You don't recall?

14   A    No.

15   Q    Was this before or after you went and had your meeting

16   with Mr. Loya after the phone call?

17   A    Sorry.  Are you asking did this email come after my

18   discussion with Mr. Loya?

19   Q    Correct.

20   A    I don't remember.  I believe it came -- this email was

21   before the discussion with Mr. Loya, I think.  I'm not a

22   hundred percent sure.

23   Q    So after the phone call with Mr. Fay, before your

24   discussion with Mr. Loya came the email, you think.

25   A    I believe so.
```

1    Q    Okay.  So Mr. Fay sends this email after he's talked to

2    you.  He was very direct with you on the phone, is that

3    correct, about this joint venture?

4    A    In terms of what?

5    Q    In terms of you cannot do this, right?

6    A    Yes.

7    Q    And did Mr. Fay say you need to figure out another way

8    to get this done or did he say stop everything, get out of

9    the asphalt business?

10   A    No, because I attempted to allow Mr. Fay to try to work

11   on a deal with Mr. Brass and GCAC.

12   Q    To include them?

13   A    To include them.

14   Q    Yeah.

15   A    Because at that point it was out of my hands.  I knew I

16   could not move forward under the structure that I had

17   proposed.  So I was trying to find a workaround so that we

18   would not leave Mr. Brass out there.

19   Q    Okay, and so Mr. Fay sends this email to you and Mr.

20   Barth who is -- again, he is the business development guy,

21   right?

22   A    Right.

23   Q    Chris Bake.  Who is Chris Bake?

24   A    Chris Bake is an executive and board member of Vitol.

25   Q    I'm sorry.  You got -- you're very soft.

```
1    A    He's an executive and board member of Vitol.

2    Q    And where was he based, in Houston?

3    A    No.  He's based on London.

4    Q    One second.  I'm going to put up on the screen what's

5    been marked as Mr. Brass's Exhibit Number 23.  I'm going to

6    ask you -- I'm going to thumb through this and I'm going to

7    ask you if you recognize this, all right?

8    A    Can you make it a little bigger?

9    Q    Is that better?

10   A    Yes.

11   Q    So far, do you recognize this?

12   A    Vaguely, yes.

13   Q    All right.  I'm going to flip through because it's 60

14   pages long.  All right.  And from here, it is the same.  Do

15   you recognize this?  Not this particular page, but it goes

16   on for 48 more pages, all right?  And I don't want you to

17   focus on a particular -- but do you recognize this as

18   anything?

19              MR. COOLEY:  Your Honor, I'm going to raise an

20   objection at this point.

21              MR. PATTERSON:  I haven't offered it, Judge.

22              MR. COOLEY:  At least what we're looking at right

23   now appears to have no Bates numbers.  It hasn't been

24   identified to the Court.  I don't know if it's proper --

25              MR. PATTERSON:  Judge, he's standing up here
```

1    talking to his witness.

2              THE COURT:  I think he objected.

3              MR. PATTERSON:  Make an objection.

4              THE COURT:  I think he identified it as Brass 23.

5              MR. COOLEY:  That's correct, Your Honor.  I

6    understood him to identify it as Brass 23, the first -- I

7    don't know how many pages appear to be Bates-numbered.  The

8    balance of it, the screenshots did not.  I don't know what

9    their provenance is or where anything comes from.

10             MR. PATTERSON:  I haven't offered it, and he's

11   standing there talking to his witness, Judge, and I'm going

12   to object.

13             THE COURT:  What's the response now, Mr. --

14             MR. PATTERSON:  I haven't offered it.

15             THE COURT:  I know.  I know you haven't.  But the

16   question is, is this -- let me ask you this a more accurate

17   way.  Are all of these pages one Brass 23 that you've

18   identified?

19             MR. PATTERSON:  Yes.

20             THE COURT:  Okay.  We'll see where it goes.

21   BY MR. PATTERSON:

22   Q    Do you see these, Mr. Kuo?

23   A    I do.

24   Q    Do you want me to keep going?

25   A    No.

```
 1    Q    You recognize these?

 2    A    The pages that you showed me, I do vaguely recognize.

 3    Q    What are they?

 4    A    They look like text messages.

 5    Q    Between whom?

 6    A    Myself and Mr. Brass.

 7    Q    Okay, and I'm going to flip through, and you can

 8    identify these as text messages between you and Mr. Brass?

 9    A    In general, yes.  I mean, I haven't read every single

10    one of them.

11    Q    Right.  I mean, it's 60 pages and I want to flip

12    through and make sure that you at least see all 60 pages

13    that you're comfortable, all right, not that you've read

14    everything but they all appear to be the same thing, all

15    right?  All right.  Is your answer the same after we've gone

16    through all 60?

17    A    On the surface, yes, they do appear to be all text

18    messages.

19         MR. PATTERSON:  All right, and I'll offer Exhibit

20    23, Judge.  We'll go with Pages 12 to 60.  I know the other

21    is different.  I'm happy to talk about it.  I'm happy to not

22    talk about it.  But 12 through 60, we'd offer.

23         THE COURT:  And just for my clarification, is 12

24    through 60, is that beginning where the text messages begin?

25         MR. PATTERSON:  Yes.
```

1              THE COURT:  Okay.  Any objection?

2              MR. COOLEY:  To the admission of Pages 12 to 60,

3    Your Honor?

4              THE COURT:  Twelve through sixty.

5              MR. COOLEY:  Your Honor, if we're going to move

6    the admission of this document, we would prefer just to have

7    the whole thing in.

8              MR. PATTERSON:  That's fine.

9              THE COURT:  Okay.

10             MR. PATTERSON:  I'm all right with that.

11             THE COURT:  Then Brass Exhibit 23 is admitted.

12   Did I get that right, Mr. Patterson, 23?

13             MR. PATTERSON:  Yes, sir.

14             THE COURT:  Okay.  Brass 23 is admitted.

15             (Brass Exhibit 23 Admitted into Evidence.)

16   BY MR. PATTERSON:

17   Q    All right, and Mr. Kuo, I want to talk -- let's go to

18   early June.  All right.  And I believe that the top there,

19   you say we're waiting for the redline back from you guys.

20   Mr. Brass says, let me check, attorneys are reviewing, hope

21   to have it back to you tomorrow, we need you to help

22   progress and procedures, want this to start off smooth.  You

23   say you think that's it for now.  Does this refresh your

24   recollection what's going on mid-June 2017?

25   A    I believe it's the attorneys were reviewing it still

1    and we didn't need anything more from them at the moment.

2    Q    All right.  June 26th, on the next page, this is Page

3    16 of this document.  On June 26, 2017, I know you're on

4    vacay but do you have two minutes to discuss a trade we're

5    working on.  No worries.  Enjoy and call whenever

6    convenient.  And then you text back a few hours later, free.

7    Does this help you remember that you weren't around late

8    June 2017?

9    A    Yes.

10   Q    And you're getting close, or at least everyone believes

11   they're getting close.  I mean, you're talking about trades

12   already, right?

13   A    Yeah.  I mean, I don't recall exactly what the trade

14   was.  But do I believe we were close?  We'd been close for

15   months.  So I don't know.  You know, we can be close and --

16   Q    June 28, Mr. Brass, not getting any response from your

17   credit guys, am I doing this right and he says talk to them,

18   I think we're on the right track.  Let me know when you have

19   a second.  You say you're out.  Mr. Brass says, sure,

20   cleared credit, just wanted to make sure you were cool with

21   a couple of deals.  You see that?

22   A    Yes.

23   Q    July the 10th, welcome home.  So you're back, right?

24   June the 10th, 2017.

25   A    I don't -- it appears so.  But I don't know --

1    Q    Right.  Still on final deal, right?  But you're talking

2    about trades already, right?

3    A    Yes.

4    Q    July the 11th, hey, did you talk to VALT.  Your

5    response was, yes, wasn't the easiest.  What do you mean?

6    What happened?

7    A    I assume that that's when I first spoke with Nick.

8    Q    So you think this is referring to the phone call with

9    Mr. Fay that you were talking about earlier?

10   A    I believe so.

11   Q    All right, and you say -- and looking at this, does it

12   help you recall was the phone call earlier on July the 11th

13   or was it the day before?  Do you remember?

14   A    I don't recall what day it was.

15   Q    Okay.  You say it wasn't the easiest.  Then it looks

16   like Mr. Brass shows up at your office to talk, right?

17   A    Yes.

18   Q    Right, and do you recall that meeting, the next day?

19   A    Vaguely.

20   Q    Is this when you told them what Mr. Fay had to say?

21   A    I don't recall.

22   Q    All right.  Now July 26th says what time is your VALT

23   call.  This is another call.  Do you recall that?

24   A    Do I remember the VALT call?

25   Q    Right.  It looks like there's another VALT call on July

1   the 26th.

2   A    Right.  We were trying to find a workaround and that's

3   why I was talking to VALT.

4   Q    Okay.  So you -- after the initial call from Mr. Fay in

5   which he said you're not doing this deal, right, you felt

6   like Mr. Fay left an opening in which maybe you could make a

7   deal if you could include VALT.

8   A    No.

9   Q    No?

10   A    No.

11   Q    Okay.  Then explain what did you think you could still

12   do.

13   A    I was not trying to do anything form here.  IT was

14   going to be VALT's decision if they wanted to work with

15   GCAC.  I was trying to partner those two up, not with me

16   anymore.  I was stepping out of the picture and allowing

17   them to try to work a deal together.

18   Q    Okay.  You were trying to structure --

19   A    Not trying to structure.  I was just allowing them to -

20   -

21   Q    Trying to structure --

22   A    -- speak to each other to try to work on a deal

23   together --

24   Q    All right.

25   A    -- without me.

```
 1   Q    You were making introductions in effect.

 2   A    Well, they knew each other.  So I wasn't introducing

 3   them.

 4   Q    So why the phone call?

 5   A    To VALT?

 6   Q    Yeah.

 7   A    Just to tell them what -- I don't recall exactly the

 8   phone call.  But I assume that it was to discuss how they

 9   may be able to work together because VALT did not work in

10   North America.

11   Q    Right.

12   A    And they wanted to -- they probably had some questions

13   with regard to terminals and maybe some other operational.

14   Q    All right, and so when did you tell VALT, hey, we're

15   just going to finance their asphalt business?

16   A    I don't know the date.  But I believe that it was

17   sometime after the fact that they could not find a working

18   venture together.

19   Q    When did you tell VALT that you were going to finance

20   GCAC's operations?

21            MR. COOLEY:  Objection, asked and answered.

22            THE COURT:  Overruled.

23            THE WITNESS:  When did I -- I'm sorry.  Can you

24   repeat the question again?

25   BY MR. PATTERSON:
```

1   Q    Sure.  When did you notify Mr. Fay or anyone at VALT

2   that the joint venture's over, we're just going to provide

3   financing, we're going to loan them money?

4   A    It was sometime after VALT decided that they could not

5   find a common ground to work with GCAC.  I don't know what

6   the date was.

7   Q    But you formally said, hey, no joint venture, but we're

8   going to finance them?

9   A    Yes.

10  Q    And they were okay with that?

11  A    Yes.  I believe they were.

12  Q    I'm sorry?

13  A    I believe they were.  I don't know.  I mean, you're

14  asking me a question that I don't -- unless I answered it, I

15  don't know.

16  Q    All right.  We're going to go back to -- this is Brass

17  Exhibit Number 13 that we had up, and this is an email now

18  dated July 31st.  And this is after your phone call with

19  VALT in which they said no more, right?  Right?  And this is

20  after the follow-up phone call where you tried to get GCAC

21  and VALT maybe together to do a deal, right?  That didn't

22  happen, right?  And had you told them we're done, we're just

23  financing them at this point?  Had you told them that yet,

24  VALT?

25            MR. COOLEY:  Objection.  Objection, compound.

```
 1              THE COURT:  Sustained.

 2    BY MR. PATTERSON:

 3    Q    As of July 31st, had you told VALT that you're just

 4    financing GCAC?

 5    A    I don't believe so, no.

 6    Q    How come?

 7    A    Because I think they were still trying to find a

 8    workaround.

 9    Q    Well, let's see.  So Mr. Fay writes you.  This email is

10    to you, isn't it, right?  You and Mr. Barth?

11    A    Yes.

12    Q    All right.  Would you both be available for a call

13    early this morning with Chris Bake and our team?  As soon

14    after 2 p.m. UK as you can manage would be good as Chris has

15    to leave midafternoon.  We are considering the following

16    three options with few comments, issues below that occur to

17    me.  Do you see that?

18    A    Yes.

19    Q    Number one, this is what you were talking about, right?

20    How much adaptation of the agreement that you have made to

21    VALT need to make in order to step in and work the joint

22    venture with (indiscernible) and GCAC.  Work the joint

23    venture, right?

24    A    I didn't write that.

25    Q    Right.  I didn't suggest you did.  I think I clarified
```

1    this was to you, right?

2    A     It was.

3    Q     Okay.  Why does VALT refer to the joint venture if

4    there wasn't one?

5              MR. COOLEY:  Objection, speculation.

6              THE COURT:  He can answer if he knows.

7              THE WITNESS:  I don't know.  I didn't write this

8    email.

9    BY MR. PATTERSON:

10   Q     Okay.  Again, I didn't suggest you did.  In fact, I

11   clarified it that it was to you, right?  This email is to

12   you, right?

13   A     It is.

14   Q     And you didn't draft this email?

15   A     No.

16   Q     Okay.

17             THE COURT:  Mr. Patterson, I don't want to

18   interrupt your groove.  I want you to -- when you find a

19   good spot that we can take a five-, six-minute break to give

20   everyone --

21             MR. PATTERSON:  We can do it right now.

22             THE COURT:  Would that work now?

23             MR. PATTERSON:  No problem.

24             THE COURT:  Okay.  Mr. Kuo, I remind you that

25   you're still under oath.  Why don't we -- it's -- well, I'll

1    come back at -- it's 4:43.  I'll come back at 4:50.  Give

2    everyone -- just you're not allowed to speak about your

3    testimony with anyone, okay?

4              THE WITNESS:  Yeah.

5              THE COURT:  Thank you.

6              CLERK:  All rise.

7              (Recess)

8              CLERK:  All rise.

9              THE COURT:  Please be seated.  All right.  Mr.

10   Kuo, I think you know, but I'll remind you, just for the

11   record, that you're still under oath.

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.  From a -- let's just go until

14   about six and see where we are, maybe we can get a better

15   assessment.  We'll go from there.

16             MR. PATTERSON:  Thank you, Your Honor.

17             THE COURT:  Please proceed.

18               CONTINUED CROSS-EXAMINATION OF ERIC KUO

19   BY MR. PATTERSON:

20   Q    So Mr. Kuo, we were talking about Exhibit 13 that I

21   have on the screen, and Mr. Faye has sent an email to you

22   and Mr. Barth, who is a business development guy, right?

23   A    (indiscernible).

24   Q    Mr. Barth is a business development guy, right?

25   A    Yes.

1    Q    And then Chris Bake, and we went through the parties,

2    but -- and so Mr. Faye or VALT, you understand that this

3    email was in essence from VALT, right?  Mr. Faye speaks for

4    VALT?

5    A    Yes.

6    Q    Right, and so, these -- these options were coming from

7    VALT.  Option one, he says we're considering three options

8    with few comments, which she's listed below, that occurred

9    to me.  Basically adapt the current joint venture agreement

10   to --

11   A    There was no agreement.

12   Q    -- well, he thinks there is, right?

13   A    I don't know.

14   Q    Well, he wrote that there is.  The joint venture,

15   right?

16   A    He was mistaken.

17   Q    Maybe.  Maybe, but that's what he wrote, right?

18   A    Yes.

19   Q    Okay.  You didn't reply and say hey, there's no joint

20   venture.  There's nothing to modify.  You didn't do that did

21   you?

22   A    I don't believe so.

23   Q    No.  So when you read it, your reaction was a little

24   bit different than it is today, right?

25                MR. COOLEY:  Objection, mischaracterized his

1    testimony.

2              THE COURT:  Overruled.

3    BY MR. PATTERSON:

4    Q    Right?

5    A    I'm sorry, question?

6    Q    Your -- your reaction in July of 2017 was a little bit

7    different than it is today, right?

8    A    I don't know what my reaction was in 2017.

9    Q    Well, luckily we have the string so we can kind of see,

10   right?  And while you did respond, you didn't say anything

11   about hey, there's not a joint venture to modify or adapt,

12   or change, did you?

13   A    It doesn't appear so, no.

14   Q    No, not at all.  In fact, you -- well, we'll go back,

15   but in adapting the agreement at Option One, he talks about

16   different ideas or issues that need to be addressed, right?

17   A    Yes, these are ideas.

18   Q    Okay.  He says George Grace cannot be part of it.

19   Explain that to me.  Who's -- number one, who's George

20   Grace?

21   A    George Grace worked for GCAC.

22   Q    Okay.  And Mr. Faye was indicating there was no deal if

23   George Grace is involved?

24   A    I believe so.

25   Q    All right.  Option two, if we leave joint venture, you

1    see that?

2    A    Yes.

3    Q    Again referring to a joint venture, to run more or less

4    as proposed, can VALT have a preferred or sole all taker

5    role at a price that's attractive?  Right?  They want a --

6    correct me if I'm wrong, but it appears they want to

7    participate if the joint venture goes forward, but they want

8    attractive pricing for finished product, right?

9    A    I believe so.  I'm not 100 percent sure.

10    Q    Is that the way you read it?  Just --

11    A    Yes.

12    Q    Okay.  And it goes through arrangements and pricing and

13    some things -- some details, right?  And number five, where

14    does the asphalt P&L of JV go?  He's asking you a question,

15    right?  What was the answer to that?  Where does the asphalt

16    profit and loss of the joint venture go?

17    A    I wasn't able to answer that because there wasn't a JV.

18    Q    Okay, and that's what you told him?

19    A    That's why I didn't answer it.

20    Q    Is that what you told him?

21    A    Possibly on the phone.

22    Q    But not in the email, right?

23    A    Not in the email.

24    Q    All right.  Number three, exit and close the joint

25    venture completely, right?  The joint venture.  Is this

```
 1   still an option?  What trades have been concluded so far?
 2   Has any asphalt been sold yet at rack of FCA by Vic?  Why is
 3   he saying is it still an option to exit and close the joint
 4   venture?
 5           MR. COOLEY:  Objection, calls for speculation.
 6           THE COURT:  Sustained.
 7   BY MR. PATTERSON:
 8   Q    What's your understanding?  Why would he ask that
 9   question, in your mind?
10   A    I don't know.
11   Q    And in response to this, did you say, number three is
12   easy, there is no joint venture.  Did you say that?
13   A    I didn't write that.
14   Q    No.  In response did you say that?  This -- this --
15   these questions are directed at you, right?
16   A    Not just me.
17   Q    Okay, I didn't say just you, but they're directed at
18   you, correct?  Do we need to go back up and see who this
19   email is addressed to?
20   A    Sure.
21   Q    Okay.  To, you're the first guy there, right?
22   A    And Steve Barth as well.
23   Q    I said you're the first guy there, right?
24   A    Yes.
25   Q    Yeah.  Nick wrote this email to you --
```

1    A    And Steve Barth.

2    Q    Yes or no.

3    A    And Steve Barth, yes.

4    Q    I didn't say that.  He wrote this to you, didn't he?

5    A    And Steve.

6    Q    Okay.  That wasn't my question.

7         THE COURT:  Why don't you just answer the

8    question, Kuo -- Mr. Kuo.

9    BY MR. PATTERSON:

10   A    He wrote it to me, yes.

11   Q    Okay.  And in response, so that means he's asking you

12   these questions, correct?

13   A    I assume so.

14   Q    And in response did you say, number three's easy, we

15   don't have a joint venture?

16   A    I didn't say it on email.

17   Q    Right.  In fact, let's go and see what you did say.  So

18   in response, next day, right?  Nick, any idea which way you

19   guys are leaning on this?  Bunch of loose ends on our side

20   and looking for some direction from you to decide how we

21   proceed with current items.  Thanks.  What does that mean?

22   A    It means it's their decision on which way they want to

23   go.

24   Q    Nick, any idea which way you guys are leaning on this?

25   You want to know what their preference is, right?

1    A    It's not their preference, it's their choice.

2    Q    Correct, and you say leaning?  Which way are you

3    leaning?  Right?  Where -- where do you think you're going

4    to go?  Which option, right?

5    A    Correct.

6    Q    You're trying to get some insight?

7    A    Correct.

8    Q    Right?  Bunch of loose ends on our side and looking for

9    some direction from you to decide how we proceed with

10   current items, right?  Nowhere in there did you say let me

11   do this for you, this is easy.  We got nothing.  We'll walk.

12   A    Frankly, I didn't know what we had going, so, it was --

13   Q    What do you mean, you don't know?

14   A    I didn't -- we didn't know what direction we were

15   going.  We -- there was a lot of confusion as to what we

16   were going to do.  We didn't know if it was going to be a

17   finance agreement.  We didn't know if it was going to be a

18   JV.  We didn't know if it was going to be a VALT deal.  We

19   didn't know what we were going to do.

20   Q    Well, let's look here.  This is Vitol Exhibit Number 3,

21   and what's the date of this?

22   A    July 17th, 2017.

23   Q    Before the email we were just looking at, right?

24   A    Yes.

25   Q    By two weeks, right?

```
 1    A    Yes.

 2    Q    So this is a trade email; is it not?

 3    A    It's a deal that GCAC had concluded, yes.

 4    Q    That GCAC had concluded or Vitol had concluded?

 5    A    GCAC had concluded for Vitol to put into their system,

 6    yes, for us to pay for it.  Nothing --

 7    Q    So --

 8    A    I had no involvement in this deal.

 9    Q    Why are you on the email string then?

10    A    Because I'm the contact.  I'm the Vitol contact for

11    GCAC.

12    Q    Hi Patrick and Eric, here's our confirmation of your

13    purchase of Citgo short residual coker feed tank transferred

14    then 12/14 and 12 to 25 July 2017.  Your purchase.  Who's

15    buying?

16    A    Vitol is the buyer of record.

17    Q    Right.  Vitol's buying, not GCAC.  You keep saying GCAC

18    bought it, but Vitol bought it.

19    A    But GCAC concluded the deal without any consultation

20    with Vitol.

21    Q    How, they don't have any money.

22    A    Because we agreed to finance -- we agreed to pay for

23    all the product, as stated in the --

24    Q    In the joint venture?

25    A    -- in the layout of it.
```

1    Q    Where -- where is this agreement we're talking about?

2    A    In the contracts that you pulled up earlier.

3    Q    Those drafts?

4    A    Yes.

5    Q    Oh you were operating under the draft already on July

6    17, 2017?

7    A    We were -- we were okay to purchase the oil because it

8    was under our control.

9    Q    Okay.  My question is, were you operating under the

10   terms of those agreements on July 17th, 2017?

11   A    To be honest, I don't know what terms we were operating

12   on at the time.

13   Q    Well, you just testified that you knew that Mr. Brass

14   or GCAC owed you money, and you were sure of that --

15   A    I didn't know --

16   Q    -- hold on.  And you were sure of why they owed you

17   money going back to June of 2017, right?

18   A    Yes.

19   Q    But now you're sitting here today saying, I don't

20   really know what we were doing?

21   A    I don't know if it was a financing deal.  I didn't know

22   if it was a JV.  I didn't know if it was a deal with VALT.

23   I just knew that we were proceeding until we figured it out.

24   Q    Okay.  Pursuant to the document we looked at earlier,

25   that draft?

1    A    Some of those terms, yes.

2    Q    Which ones?

3    A    The ones where we -- Vitol would purchase the product -

4    -

5    Q    And how --

6    A    On behalf of GCAC.

7    Q    -- and how would Brass and GCAC know which ones that

8    Vitol had picked and chose to comply with, and which ones

9    they picked and chose not to comply with?

10   A    I don't know.

11   Q    They really couldn't, right?

12   A    I guess not.

13   Q    And in fact, these were joint venture trades at this

14   point in time, isn't that correct?

15            MR. COOLEY:  Objection.  Legal conclusion,

16   mischaracterizes prior testimony.

17            THE COURT:  Overruled.

18   BY MR. PATTERSON:

19   A    I'm sorry, can you repeat the question?

20   Q    If you'll -- if you'll look at your screen, all right?

21   For example, this trade, right here.  This would be fairly

22   characterized as a trade or a transaction of the joint

23   venture, correct?

24            MR. COOLEY:  Objection, vague.

25            THE COURT:  Overruled.

```
1    BY MR. PATTERSON:

2    A    It would be characterized as a trade that we were -- of

3    a framework of at JV that we had discussed.

4    Q    Right.  Right.  It wasn't a final -- this wasn't part

5    of this financing, right?

6    A    We didn't know -- we didn't have the financing -- we

7    didn't discuss that just yet --

8    Q    Right.

9    A    At least I didn't believe so.

10   Q    Right.  So that's -- that's off the table as of July

11   17th, right?  Not off the table, it hadn't even come up yet?

12   A    I don't believe so.

13   Q    Right.  And so, these were done, still, we're probably

14   going to get this joint venture done, let's do the trades,

15   right?

16   A    Possibly.

17   Q    What do you mean, possibly?

18   A    I don't know.

19   Q    You were there, right?

20   A    Yes.

21   Q    Okay.  Why -- why -- why would you --

22   A    I don't know what was the -- what occurred on July

23   17th.  I don't know where we were in the discussions.

24   Q    I know.  But you know you purchased the Citco fuel,

25   right?
```

```
 1   A     Yes.

 2   Q     You, being Vitol?

 3   A     Correct.

 4   Q     In your name, Vitol's name?

 5   A     Correct.

 6   Q     And your money?

 7   A     We purchased product in our name and our money all the

 8   time.

 9   Q     Right.  Every day.  All the time.  That's what you do,

10   right?

11   A     Correct.

12   Q     And there's nothing in here and -- there's nothing in

13   here that indicates that it's on behalf of GCAC directly,

14   right?

15   A     No.

16   Q     Right.  And looking at it, you would testify today,

17   isn't it -- wouldn't you, that to the best of your

18   recollection, to the best of your knowledge, this was done

19   pursuant to the joint venture between Vitol and GCAC and Mr.

20   Brass, right?

21         MR. COOLEY:  Objection, assumes facts not in

22   evidence.

23         THE COURT:  What's your response, Mr. Patterson?

24         MR. PATTERSON:  My response is it's totally

25   consistent with everything he's said for the last ten
```

```
 1    minutes.  We've talked about this over and over and it's
 2    exactly what he said.
 3               THE COURT:  Sustained.  You can ask it, just a
 4    different way.  I know where you're getting.
 5               MR. PATTERSON:  I think I'm good.
 6    BY MR. PATTERSON:
 7    Q    Okay.  Let's go back to Exhibit 13, where we were
 8    talking about the options.  You get the email from Mr. Faye,
 9    July 31st, you respond.  You're wanting to know what he's
10    thinking, right?  Mr. Faye responds the same day.  And this
11    email is directly to you, right?  You see that?
12    A    I do.
13    Q    And he says to you, Dan has reached out to A.J.  Dan,
14    who's Dan?
15    A    Dan Sargent.
16    Q    Dan Sargent, and who is he?  How does he fit into this?
17    A    He is part of the VALT -- he's part of VALT.
18    Q    Right.  Is he just an employee?  Is he a director?  Is
19    he --
20    A    I don't know.
21    Q    -- a shareholder?  You don't know?
22    A    I don't know.
23    Q    You just know he's associated with VALT?
24    A    Yes.
25    Q    All right.  So Dan has reached out to A.J., that's Mr.
```

1   Brass?  Is that what your understanding is?

2   A    I believe so.

3   Q    An outline that we see the three options below.  So, do

4   you understand this the way it is written that Mr. Faye is

5   saying now, Mr. Brass knows that there's only three options

6   because of VALT?  Right?

7           MR. COOLEY:  Objection, mischaracterizes the

8   email.

9           THE COURT:  Overruled.  He can answer.

10  BY MR. PATTERSON:

11  A    I'm sorry, can you ask that again?

12  Q    Okay.  Do you read this first sentence as VALT

13  indicating to Mr. Brass the same options that are down here

14  in the first email?

15  A    I believe so.

16  Q    All right, and so you believe that at least as August

17  1st, Mr. Brass knows the same thing you know about what

18  VALT's intentions are?

19  A    I believe so.

20  Q    A.J. was very keen to work with VALT to avoid number

21  three.  Do you see that?

22  A    Yes.

23  Q    What is number three?  Exit and close the joint venture

24  completely.  Again, you didn't respond saying there is no

25  joint venture, did you?

1    A    Not by email.

2    Q    And in fact Mr. Faye doesn't say hey, we've talked to

3    A.J., and he's not aware there's a joint venture.

4    A    I don't know -- I don't know what he said --

5    Q    Well, it's not -- we know he didn't put that in the

6    email, right?

7    A    I don't see it in this email, no.

8    Q    And in fact, he says, A.J. was very keen to work with

9    VALT to avoid number three, which is terminate and exit the

10   joint venture, right?

11   A    I don't know what he wrote.  I don't know what he

12   meant, I should say.

13   Q    Well, we know what he wrote though?

14   A    I know what he wrote.

15   Q    We have some of the list of info we require and waiting

16   for the output.  If we can come out of this with flow, an

17   attractive price flow, being product?  Finished product?

18   A    I -- I assume so.

19   Q    And limited downside, then we can see a good outcome.

20   Double will be in the details, of course with A.J.  Dan is

21   in Qatar now and will be in Montreal on Monday.  We'll see

22   A.J. and Patrick (indiscernible).  What are the loose ends?

23   Right?  What are you hearing from A.J. and Patrick?  So he

24   asked you the same question I asked you.  What -- what is

25   pending?  What are you referring to as issues or loose ends,

```
1    right?

2    A    To me it refers to the structure of the JV.

3    Q    Right.

4    A    We still haven't concluded that.  That's why there are

5    a lot of loose ends.

6    Q    So on August 1st, you think it's still sitting out

7    there with loose ends?

8    A    I believe so.

9    Q    It's not over?  It's still possible you're going to get

10   this joint venture up and running?

11   A    We were hoping so.

12   Q    Oh, okay.  Same day, you replied.  They want us to pay

13   storage invoices, some other miscellaneous costs, I'm trying

14   to push them off until we get some clarity and direction.  I

15   think you can definitely get flow.  What's flow?

16   A    I assume that meant they would get the product after it

17   was blended and ready for sale.

18   Q    Well, I mean, this is your email.  Your words.  What

19   did you mean?

20   A    That's what I meant.

21   Q    Oh, so it is final product?  Asphalt?

22   A    I think so, yes.

23   Q    All right.  He keeps -- you keep hedging.  This is your

24   email.

25   A    I mean, I wrote this --
```

1    Q    What did you mean?

2    A    -- this was written five years ago.

3    Q    I understand.

4    A    I told you what I thought it meant.

5    Q    Okay.  And or term supply at attractive pricing.  That

6    was always the objective.  Nick responds, same day, August

7    1st.  Okay.  Not sure how to advise you here as far as we

8    want to make something work, it's all down to the people now

9    and that's hard -- that's hard to call.  You finally respond

10   asking Mr. Faye, on August the 9th, right?  Have there been

11   any new developments?  I'm fielding multiple calls from Real

12   at GCAC, daily with both companies almost getting in the

13   panic mode.  Not sure if they want to dissolve this

14   altogether or not, but it feels like something extreme is

15   going to happen soon; meaning they will just walk away and

16   do this with another party and Nick will be forced to pay

17   some of the damages.  Do you see that?

18   A    I do.

19   Q    Right?  And so what were you trying to get Mr. Faye to

20   do?

21   A    To decide on what they wanted to do with GCAC.

22   Q    Right.  Which is back to the bottom -- the three

23   options, right?

24   A    That's correct.

25   Q    And so, we're into the second week of August 2017, VALT

```
 1   has told you, you've got three options.  You, being you and

 2   GCAC with this joint venture, right?  Financing --

 3   A    Not me.

 4   Q    I'm sorry?

 5   A    It wasn't my option; it was their option.

 6   Q    Correct.  Correct.  I'm sorry if I suggested otherwise,

 7   but VALT is in the driver seat now, right?

 8   A    Correct.

 9   Q    We're into the second week of August.  We still haven't

10   talked about financing, right?

11   A    I don't -- there is an email with the financing

12   structure, I don't recall what day that was sent out.

13   Q    Right.  But to your recollection, it's not -- it's not

14   on the radar screen yet, right?

15   A    I don't recall what day it was put on the radar screen.

16   Q    Well --

17   A    If you look at the email that they sent it will tell

18   you.

19   Q     This what you're talking about?

20   A    Correct.

21   Q    So this is third week of August, right?  So when I said

22   second week of August, we're still not there.  No one's even

23   talking about financing, right?

24   A    I think we discussed this prior to this email being

25   sent.
```

1    Q    Well --

2              MR. COOLEY:  Your Honor, objection --

3    Q    -- but didn't --

4              MR. COOLEY:  Object to the extent the witness is

5    being questioned about a document that has not been

6    identified for the record.

7              MR. PATTERSON:  What document is that?  I'm sorry,

8    I must have missed something.

9              THE COURT:  What are you referring to?

10             MR. PATTERSON:  This document right here on the

11   screen?  Vitol Exhibit 14's been admitted.

12             THE COURT:  Right.  You just wanted it to be

13   identified that we're talking about Vitol?

14             MR. COOLEY:  If the document is the basis of the

15   question to the witness, I just want the record to be clear

16   as to what document the witness is being questioned about at

17   this moment.

18             THE COURT:  Okay.  All right.  We're talking about

19   Vitol 14.

20   BY MR. PATTERSON:

21   Q    Vitol 14, do you see that on your screen?

22   A    I do.

23   Q    So, Vitol 14, you talked about a little bit earlier,

24   which was the -- what we'll refer to as the financing email,

25   right?

1    A    Yes.

2    Q    And you're suggesting that this August 21st date of the

3    email, there was something prior to that?

4    A    The discussions were made prior to August 21st.  It

5    wasn't -- it was proposed.  I don't remember the time, but

6    it was proposed a week, ten days, prior to this email being

7    sent.

8    Q    That's your recollection today, right?

9    A    That's my recollection.

10   Q    But we don't have anything.

11   A    It wasn't done the hour of the email sent.

12   Q    Right.  But we don't -- we haven't seen anything in

13   writing, right?

14   A    I don't know.

15   Q    Well, have you seen anything in writing today prior to

16   August 21st, talking about financing?

17   A    I haven't seen all the emails.

18   Q    Well, that's not what I said.  I said today, have you

19   seen anything --

20   A    Today I have not seen anything.

21   Q    All right.  And you're lawyer would probably show it to

22   you if it was there, right?

23   A    I don't know.

24   Q    Okay.  So, you believe it was talked about before?

25   A    Yes.

1    Q    Right.  And all we know that is at last by August 21st,

2    this memo went out, right?  We do know that.

3    A    Yes.

4    Q    Because this is to you from Mr. Brass, right?

5    A    Yes.

6    Q    Now, on August the 21st, had the joint venture

7    agreement been finalized?

8    A    No.

9    Q    But there was a joint venture in place, you would agree

10   with me, right?

11          MR. COOLEY:  Objection.  Mischaracterizes

12   testimony.  Legal conclusion.

13          THE COURT:  Objection.  He can answer the

14   question.

15   BY MR. PATTERSON:

16   A    No, there was no -- there was no joint venture in

17   place.

18   Q    How come?  Tell me -- tell me in your mind, why there

19   wasn't a joint venture on August the 21st, 2017?

20   A    Because there was a conflict within Vitol whereby we

21   could not proceed with the joint venture.

22   Q    Okay.  And you found out about this conflict this non-

23   compete, right?  When?

24   A    I think I told you earlier, it was sometime in July.

25   Q    Right.  And prior to you finding out, was there a joint

1    venture between Vitol and GCAC and/or Mr. Brass?

2              MR. COOLEY:  Objection.

3              THE COURT:  I think --

4    BY MR. PATTERSON:

5    Q    In your mind?

6              THE COURT:  Overruled.

7    BY MR. PATTERSON:

8    A    There was no signed agreement.  There was no signed

9    joint venture.

10   Q    I got that.  My question's a little bit different

11   though, all right?  My question is, in your mind, was there

12   a joint venture?

13             MR. COOLEY:  Objection, relevance.

14             THE COURT:  Mr. Cooley, please let him answer.

15   Okay.  Overruled.

16   BY MR. PATTERSON:

17   A    In my mind I did not know where we were, quite frankly.

18   Q    And why is that?  And I want to clarify.  I'm talking

19   about before you found out about the noncompete, and you get

20   instructions from VALT, and they tell you -- you can't do

21   this, and you're getting lots of instruction before that.

22   The paperwork is way down the road, right?  You got some

23   comments, but you're already trading.  In your mind, was

24   there a joint venture?

25   A    No.

1    Q    Why?

2    A    Because we still had a lot of loose ends that we hadn't

3    tied up.

4    Q    Is it because there was no writing that -- that

5    addressed each of the material terms?

6    A    That was part of it.

7    Q    That was the least part of it, right?  I mean, is that

8    what you're alluding to?  Look, we had details that we

9    couldn't pin down.  Right?

10   A    There were legal details that weren't pinned down.

11   There were still points in the document that were not agreed

12   upon, such as, the TVM that would be paid, and Rio had put

13   pressure on us to take them out of this deal.  So that's

14   what -- that's why we did not wait longer to start this

15   deal.

16   Q    Right.  And you mentioned TVM, and you've done that a

17   couple of times today.  I just want to make sure that we

18   understand what you're referring to, that's Time Value of

19   Money, right?

20   A    That's correct.

21   Q    TVM.  And so, in your mind, mid-July 2017, there's no

22   joint venture, but you're doing trades in mid-July, right?

23   2017?

24   A    We're doing trades on behalf of GCAC, yes.

25   Q    Well, we'll figure that out, but you're doing trades,

```
 1   right?  Under -- and under what terms?

 2   A     Under the terms in which GCAC lays them out.

 3   Q     And which GCAC what?

 4   A     Lays them out -- I mean, tells us what the terms of the

 5   deal that they concluded.

 6   Q     Okay.  So you're acting as a broker?

 7   A     No, we're acting as their -- as the -- as a -- as the

 8   purchaser to the face of the market.

 9   Q     Yeah, you're the buyer, right?

10   A     We're the buyer.

11   Q     Not GCAC.  You keep saying that, but the reality is,

12   you're the buyer, Vitol, on every one of these trades?

13   A     Because we -- we --

14   Q     I haven't asked you why.

15   A     But that's why.

16   Q     I haven't asked you why.  So my question is, isn't it

17   true that on every trade, whether it be in June of 2017 or

18   January 2018, Vitol was the buyer or the seller?  They were

19   the party to the transaction, correct?

20   A     Not all of them.

21   Q     Not all of them?

22   A     No.

23   Q     How many were GCAC parties to?

24   A     I don't know the exact number?

25   Q     Any?
```

1   A     That they?  I'm not sure I understand the question

2   correctly.

3   Q     So, in August of 2017, you get this email from Mr.

4   Brass, and this is after Mr. Faye has called him, right?  Or

5   Dan.  I think Mr. Sargent called him, right?  Isn't that

6   what the email said?

7   A     I believe they had multiple meetings, yes.

8   Q     All right.  And so, we don't know what was said.  We

9   know what they told you they said, but we don't know what

10  was said in those conversations, right?  But it appears that

11  Mr. Brass, you would agree with me, was told this joint

12  venture has to end, right?

13  A     I don't know what they told him.

14  Q     Well, let's go back.  I apologize.  Look back at Brass

15  Exhibit Number 13, on the August 1st memo -- email.  Dan has

16  reached out to A.J. and outlined that we see the three

17  options below.  We know, at least what they're telling us

18  happened, right?  That on August 1st, around August 1st, Mr.

19  Sargent called Mr. Brass, and at least they're telling us,

20  or telling you, that he outlined the same three options that

21  they outlined to you.  And one of them, Number three, being

22  exit and close the joint venture completely, right?

23  A     Yes, it appears so.  It appears that they had a

24  discussion.

25  Q     Right.  And then two weeks later is, at least the first

1    time we've seen, we, being here in this little room, any

2    talk of any financing, right?

3    A    I'm sorry, say that one more time?

4    Q    Two weeks after this, sometimes, approximately two

5    weeks after Mr. Sargent has called Mr. Brass, is the first

6    time we see anything in writing -- that we've seen anything

7    in writing that references any kind of financing, right?

8              MR. COOLEY:  Objection to the extent it

9    mischaracterizes the evidence of this trial.

10             THE COURT:  And so noted.  He can answer.

11   BY MR. PATTERSON:

12   A    Well, there were discussions before the draft was made.

13   It was sent on August 21st, but there were discussions prior

14   --

15   Q    I know.  You keep saying that.

16   A    -- that email saying --

17   Q    And my question --

18   A    -- and that's important.

19   Q    My question was, it's the first thing we've seen with

20   our eyes, today, right?

21   A    That's the first thing we've seen today, yes.

22   Q    Yes, that was my question.  Right?  And that is -- you

23   would agree with that, right?

24   A    The first thing we've seen, yes.

25   Q    All right.  So let's keep going on Exhibit Number 13.

```
 1    You -- we talked about your response on August the 9th to

 2    Mr. Faye saying what's the update?  Right?  And then Mr.

 3    Faye responds the next day and he sends this email to you,

 4    and he copies Mr. Parsons.  Who's Mr. Parsons?

 5    A    He is -- he was the lead guy of All Field Oil

 6    Worldwide.

 7    Q    And Mr. Bake we've talked about, he's overseas in the

 8    UK.  He's a Vitol shareholder -- Vitol Group shareholder,

 9    right?

10    A    He's an executive board member of Vitol.

11    Q    Right.  Mr. Faye says, to you, Eric, as you know there

12    have been some meetings in Montreal between teams on Tuesday

13    and Wednesday of this week.  I'm waiting for a full update

14    when Dan -- Dan, that's Mr. Sargent, right?

15    A    I believe so.

16    Q    Gets in tomorrow.  However, from a brief telcon, I know

17    the following.  First bullet point, the forward econs remain

18    unclear.  What does that mean to you?

19    A    I think it means that the business plan forward is not

20    clear from a profitability standpoint.

21    Q    All right.  Rio/GCAC have made no money for the past

22    two and a half years.  We need to do some more work on that.

23    I asked you and Steve Barth for comment on these on Monday

24    the 7th.  Please can you respond?  Which indicates you

25    haven't responded to his 7th email, correct?
```

```
 1    A    I -- I don't know.

 2    Q    Well, doesn't he ask you to please respond?

 3    A    I don't know if I responded or not.

 4    Q    Prior to this did you respond?

 5    A    I don't -- I don't recall.

 6    Q    All right.  Second bullet point.  GCAC advises they

 7   were specifically instructed Vic to not discuss this deal

 8   with VALT.  Is that true?

 9         MR. COOLEY:  Objection, vague.

10         THE COURT:  Overruled.

11   BY MR. PATTERSON:

12    A    I don't remember exactly why this -- why we would have

13   instructed them not to discuss the deal with VALT.

14    Q    I didn't ask you why.  I said is it true that you did?

15    A    I don't know.

16    Q    What do you mean you don't know?

17    A    I don't recall.

18    Q    You just were wondering why you would have done it and

19   now you're telling me you don't remember if you did it or

20   not?

21    A    I don't remember -- I don't know why they would say

22   that.

23    Q    Well, it's -- I can help you here.  It says, GCAC

24   advised, which seems to indicate they talked to GCAC, Mr.

25   Faye, or Mr. Sargent, right?  Remember the prior email?  It
```

1   says that Dan called A.J., remember?

2   A    Yeah, but they can write whatever they want in here, I

3   don't know.

4   Q    Of course.  I'm not suggesting anything.  I'm trying to

5   figure out what they mean and why they're saying it, right?

6   A    I don't know what he means by this.

7   Q    Okay.  GCAC said that they were specifically instructed

8   by Vic.  Who's Vic?

9   A    It's Vitol, Inc.

10   Q    And who is that?

11   A    That's the North American entity for Vitol.

12   Q    That's where you work, right?

13   A    I do work there, yes.

14   Q    All right.  They -- GCAC was specifically instructed by

15   Vic, to not discuss this deal with VALT.  Right?  In the

16   deal build up prior to July 13th.  Please explain why in

17   bold.  Did you?

18   A    Vic can be anybody.  There's 400 employees --

19   Q    Who was working on this deal?

20   A    It doesn't specifically say my name.  It says --

21   Q    Who was working on this deal?  The GCAC deal at Vic.

22   A    Multiple people.

23   Q    Who?

24   A    The attorneys, myself, Steve Barth, the credit people.

25   There was probably ten.

1    Q    Okay.  But he says Vic instructed them.  So it wouldn't

2    be the lawyers, right?  They're not Vic.

3              MR. COOLEY:  Objection, (indiscernible).

4              THE COURT:  Hold on there's an objection.

5              MR. COOLEY:  Objection, speculation.

6              THE COURT:  He can answer if he knows, Mr.

7    (indiscernible).

8    BY MR. PATTERSON:

9    A    I don't know.  I don't know who they're referring to by

10   Vic.  It could be --

11   Q    You just said you did know what Vic was.

12   A    I said by saying by Vic, I do not know in who -- a

13   particular person would say that.

14   Q    I think that was the impetus of my question.  Vic is --

15   what -- what do you understand Vic to means?

16   A    Vitol Inc.

17   Q    Okay.  Who was working on this deal for Vitol Inc?

18             MR. COOLEY:  Objection, asked and answered.

19             THE COURT:  Sustained.

20   BY MR. PATTERSON:

21   Q    Did you tell GCAC not to mention this joint venture,

22   this deal to VALT?

23   A    I don't recall ever telling them that.

24   Q    You could have, though?

25   A    I don't recall telling them.

```
 1   Q    All right.  Listen to my question.  You could have?

 2              MR. COOLEY:  Objection, speculation.

 3              THE COURT:  He can answer, but yeah.  Overruled.

 4   BY MR. PATTERSON:

 5   A    I don't recall.

 6   Q    I know you don't recall.  That means you could have

 7   just as well told them, right?

 8              MR. COOLEY:  Asked and answered.

 9              THE COURT:  Overruled.

10   BY MR. PATTERSON:

11   A    I did not tell them that.

12   Q    Now you remember?

13   A    I do not recall doing that.

14   Q    Well, that's two different answers.  You're under oath

15   here.  So which is it?  Do you not remember?

16   A    I don't remember.

17   Q    Okay.  So when you say you didn't, that's not true?

18   Because you understand the distinction right?  You can't

19   swear that you didn't if you don't remember, right?  You

20   would agree with me?

21   A    Yes.

22   Q    All right.  Next bullet point.  Again, this is from Mr.

23   Faye, which is for VALT, to you.  The whole market is

24   talking about your deal and how it was done behind the back

25   of VALT.  Do you see that?
```

1    A    Yes.

2    Q    It was an uncomfortable AI for the VALT team, and

3    especially for Dan.  What's AI?

4    A    I don't know.  Maybe that stands for Asphalt Institute.

5    I think it was a conference that they were at.

6    Q    Right, in Canada?

7    A    I believe so it was Montreal.

8    Q    Right.  The whole market is talking about your deal.

9    Your deal.  And how it was done behind the back of VALT.

10   It was an uncomfortable AI for the VALT team and especially

11   for Dan.  Is it coming back to you now?  It was done without

12   telling VALT and then you told GCAC not to say anything,

13   right?

14   A    No.

15   Q    GCAC are trying to sell barrels onto the US East Coast

16   in direct competition with VALT.  That doesn't have anything

17   to do with -- well, the trades would come through  you,

18   right?

19   A    They were supposed to come through us, yes.

20   Q    Right.  So you would be the one trading on the East

21   Coast.

22   A    Not trading, entering the deals.  It's a big

23   distinction.

24   Q    You were trading on behalf of Vitol on the East Coast

25   in asphalt, weren't you?

Page 245

```
 1   A    Depends on how you define trading.

 2   Q    I understand.

 3   A    I need clarity of it to answer the question.

 4   Q    Yes, sir.  Next bullet point, at a personal level, you

 5   have failed to be straight with me at every stage of this

 6   process.  Do you see that?

 7   A    Yes.

 8   Q    Is that true?

 9   A    That's his characterization.

10   Q    Is it true?

11   A    I don't know.

12   Q    What do you mean you don't know?  He's talking to you.

13   A    I don't know if he's -- I don't know if he's -- what

14   he, you know, he can characterize it however he wants to.

15   Q    That's not a characterization, you would agree with me,

16   right?  That's not a characterization.  You have failed to

17   be straight with me at every stage of this process.  Is that

18   true?

19   A    No.

20   Q    But he believes it doesn't he?  Mr. Faye.

21   A    I don't know.  He wrote that --

22   Q    Well, he wouldn't write it if he didn't believe it,

23   right?

24   A    I don't know.  I don't know what he writes.

25   Q    We're looking at it.
```

```
 1    A    I --

 2    Q    We're reading it.  We know what he wrote.  Right?  On

 3    top, as the Vitol guy in the VALT JV, I have been having to

 4    apologize repeatedly as the details of how you have

 5    deliberately bypassed my team have come to light.  Do you

 6    see that?  Is that true?

 7    A    I don't know exactly what he means?

 8    Q    Is it true?

 9    A    I don't know -- what true?

10    Q    That you bypassed his team at VALT, deliberately?

11    A    Bypassed what?

12    Q    His team.

13    A    For what?

14    Q    In putting this deal together.  You're reading the same

15    thing I am.  Are you telling me you read this and you came

16    away going, I don't know what the guys mean.  I don't know

17    what he's talking about.  I don't have a clue.  I don't need

18    to respond to this because I don't understand it.

19            MR. COOLEY:  Objection, argumentative.

20            THE COURT:  Overruled.

21    BY MR. PATTERSON:

22    A    I'm sorry, what was your question?

23    Q    My question is so, based upon your testimony today, I

24    would guess, and I'm asking you, on August the 10th, 2017,

25    when you got this email, you read it and you said to
```

```
1    yourself, I don't believe what he's talking about.

2    A    No, I didn't (indiscernible).

3    Q    This is crazy.

4    A    You can see my response.

5    Q    I'm asking you right now, because every question I've

6    asked you about these direct attacks on you, you've told me,

7    I don't know what he's talking about.  I don't know what

8    he's talking about.

9    A    I don't know what he's talking about when he's saying

10   deliberate, like deliberately bypassed my team.  I'm not

11   sure what he's -- he's talking about here.

12   Q    Well, do you want to go back through my questions?

13   A    Sure.

14   Q    Okay.  First bullet point.  GCAC advised that they were

15   specifically instructed by Vic not to discuss this deal with

16   VALT.  You understand what he's saying?

17   A    I -- Vic can mean a lot of people.

18   Q    I understand.  But this email is directed at you.  It

19   has your name on it.

20   A    I understand that he wrote this, yes.

21   Q    Okay.  Does that give you any understanding of what he

22   was saying?  Are you still going to testify you don't

23   understand what he's saying?

24   A    I do understand what he's saying.  I don't know who

25   he's directing -- I don't know when he says Vic, it means
```

1   me.  It could have meant the credit people.  It could have

2   meant the lawyers.  It could have meant multiple people.

3   Q    Do you know anyone who told GCAC not to mention it?

4   A    I do not.

5   Q    Did you do it?

6   A    I did not.

7   Q    All right.

8   A    Not that I recall.

9   Q    So you could have?  You don't remember?

10  A    I don't recall.

11  Q    You don't remember.

12  A    I don't remember.

13  Q    Okay.  So, he then says, talking about your deal.  Do

14  you know what he's talking about when he says your deal?

15  A    The potential JV.

16  Q    Okay, that's the way you spin it, but you know what I'm

17  talking about?  You know what he's talking about?

18         MR. COOLEY:  Your Honor, I object to the sidebar.

19  Counsel's asked the question.  The witness answered it.

20         THE COURT:  Sustained.

21  BY MR. PATTERSON:

22  Q    The whole market is talking about your deal.  You read

23  that email, what do you think?

24  A    He's talking about the potential JV that we're looking

25  at doing.

1   Q    Okay.  And how it was done behind the back of VALT.  Do

2   you know what he's talking about?

3   A    Yes.

4   Q    Okay.  Explain it.

5   A    Well we do not consult with Valk -- VALT about this

6   deal, as I told you prior, until we cleared the conflict

7   with him in July, so they would not have known about it.

8   Q    Wait a minute.  You didn't tell him that you were

9   trying to clear a conflict with him?

10  A    Well, that's when we told him.  That's when he told us

11  that we were not able to proceed as a JV.

12  Q    Okay.  It was an uncomfortable AI for the VALT team and

13  especially for Dan.  Do you understand that?

14  A    I was not there, but -- I was not there.

15  Q    Do you understand what he's saying?

16  A    That they felt uncomfortable?  I guess.  I don't know

17  what he -- exactly what (indiscernible).

18  Q    Do you know why he felt -- they felt uncomfortable?

19  A    I think it's probably the prior statement.

20  Q    Okay.  Referring right back to the prior -- prior

21  comment, right?  At a personal level, okay, now he's talking

22  to you.  You and him, right?  Mr. Faye, Mr. Kuo, right?  Is

23  that the way you read that?  At a personal level.

24  A    Yes.

25  Q    You understand he's talking to you, man to man?  Right?

1    A    Yes.

2    Q    All right.  You have failed to be straight with me at

3    every stage of this process.  Do you understand what he's

4    talking about?

5    A    I don't know what he talks about every stage.

6    Q    Okay.  Pick a stage.  Which one do you know that you

7    weren't straight with him?

8    A    About our potential JV with VALT -- I mean, with GCAC.

9    Q    So about the whole thing?  You think he's talking --

10   you just hid the whole thing from him?

11          MR. COOLEY:  Objection, I don't think that was a

12   question.

13          THE COURT:  I think that is a question.  So you

14   hid the whole thing from him?

15   BY MR. PATTERSON:

16   Q    Right?  You would agree with that?

17   A    I did not tell him about this deal until I think it was

18   in July.

19   Q    And he's upset about that?

20   A    Yes.

21   Q    And that's why he says you hid it from him, at every

22   stage?

23          MR. COOLEY:  Objection, mischaracterizes the

24   document.

25          THE COURT:  All sustain.

```
1    BY MR. PATTERSON:

2    Q    You have failed to be straight with me at every stage.

3    What stages?

4    A    I don't know.

5    Q    Approval?

6    A    I don't know what he's --

7    Q    Starting to trade under the joint venture?

8    A    I don't know what he means.

9    Q    Initial discussions?

10   A    I don't know,

11   Q    How many stages are there?  He clearly thinks there are

12   multiple stages to this deal, right?

13            MR. COOLEY:  Objection, calls for speculation.

14            THE COURT:  Oh -- overruled.

15   BY MR. PATTERSON:

16   A    I don't know what he thinks about the stages.

17   Q    We only know what he wrote, right?  And if it's clear,

18   we have to assume that's what he mean, right?  And that's

19   what he was thinking.

20   A    I don't know what he was thinking.

21   Q    Okay.  We're not making any progress.  Let's go down to

22   the bottom bullet point.  From the above, you can appreciate

23   there's a huge amount of trust internally and externally

24   that needs to be restored to make this a workable deal.  You

25   understand what he's talking about?
```

```
 1    A    Not exactly

 2    Q    What do you think he's talking about?

 3    A    I don't know what he means by trust externally.

 4    Q    Okay.  What do you think he's talking about?

 5    A    The internal trust is I guess the trust between VALT

 6    and Vic.  The external one, I do not know what he's talking

 7    about.

 8    Q    Maybe you and him, personally?

 9    A    I -- I don't know.

10    Q    Okay.  We will come back with a final view shortly, but

11    as you can see, I am pessimistic anything profitable or

12    workable can come from this.  As a Vitol shareholder, you

13    told me that he is a shareholder, right?

14    A    I don't know if he's a Vitol shareholder, that's not -

15    -

16    Q    Well, he says his right?

17    A    I assume that he is  based on that.

18    Q    And that means, Vitol Group, right?  That's the only

19    shareholders?

20    A    There's multiple stages of shareholding.

21    Q    All of Vitol Group though, right?

22    A    I don't -- what do you mean?

23    Q    Is Vitol Group -- is Vitol Group the 100 percent owner

24    of each of the Vitol operating entities?

25    A    No, there's other entities that -- that own other parts
```

1    of -- it's a whole complicated structure that I do not know

2    all of --

3    Q    Okay.  Is he talking about being a shareholder of Vic?

4    Vitol, Inc?

5    A    I don't know if he's a shareholder of Vic.  I don't

6    know what he's a shareholder of.

7    Q    He says he's a shareholder, right?

8    A    Okay.  That's what he says.

9    Q    I sincerely hope  there will not be damages for Vic on

10   exit.  Do you see that?

11   A    I do.

12   Q    Exit of what?

13          MR. COOLEY:  Objection, speculation.

14          THE COURT:  He can answer if he knows.

15   BY MR. PATTERSON:

16   A    I think he means on exit of whatever -- whatever deal

17   that they end up going with.

18   Q    I don't understand what you said.  What is -- what is

19   your understanding of him being hopeful there won't be

20   damages for Vic on exit?  What does that mean?

21   A    Upon termination of whatever we were looking at doing

22   with them.

23   Q    Termination of the joint venture, with GCAC?

24   A    There was no joint venture.

25   Q    Then there would be no damages, right?

```
 1              MR. COOLEY:  Objection, legal conclusion.

 2   BY MR. PATTERSON:

 3   Q    You're understanding right?

 4              THE COURT:  Overruled.

 5   BY MR. PATTERSON:

 6   Q    Right?

 7   A    I'm sorry?

 8   Q    That's your understanding right?

 9   A    About what?

10   Q    If there's  no joint venture, what's there to

11   terminate?

12   A    Well, we had some -- we had some storage leases.  We

13   had to terminate the storage leases that were on Vitol's --

14   Q    Done pursuant to the joint venture?

15   A    Not necessarily.  They were  -- that was part of the

16   (indiscernible).

17   Q    I know not necessarily, but were they?

18   A    That was part of the framework, yes.

19   Q    So it was done part of the joint venture?  So there was

20   something  to exit, right?

21   A    Well, there were certainly deals that were done on

22   behalf of GCAC and deals that were done by GCAC, so

23   presumably there was a reconciliation on the end.

24   Q    Why is there a reconciliation if it was all done with a

25   loan to GCAC?  That's easy, right?
```

```
 1    A    Because there were times -- there were deals where GCAC

 2    made the sales and collected the money.  That's where the

 3    reconciliation would come from .

 4    Q    It's their money that they borrowed, that's easy,

 5    right?

 6    A    That they received the proceeds for.

 7    Q    Well, they borrowed the money to buy it.  Why wouldn't

 8    they?  Right?

 9    A    Well, they didn't buy it.  We purchased it.

10    Q    No, you said you loaned them the money.  You didn't buy

11    it.  Which is it?

12          MR. COOLEY:  Objection, argumentative.

13          THE COURT:  I'll allow it.

14    BY MR. PATTERSON:

15    A    Some of the deals we  purchased.  I should say all  the

16    deals we purchased.

17    Q    I didn't loan them the money?  Right?

18    A    Well, we financed their deals.  It's different.   We

19    didn't give them the money.

20    Q    Okay.   What's the difference?  It's their money --

21    A    When you loan someone --

22    Q    -- right?

23    A    -- money, you give them the money.  When you finance

24    it, you're like a bank.

25    Q    It's their money, right?
```

1   A    No.

2   Q    Why not?  Then they don't  have to pay it back?

3   A    I'm not sure I understand the question.

4   Q    If you finance it, you borrow -- if you sell your house

5   and you get money, right?

6   A    Correct.  Go on?

7        THE COURT:  He just asked the question.

8   BY MR. PATTERSON:

9   Q    Now, you went on August the 10th, you responded to Mr.

10  Faye, right?  Just a few hours later.  Nick, I'm a bit taken

11  aback at your comments below and disagree with your with

12  your characterization of my actions.  From the beginning

13  there was never any intention to harm Vitol or VALT.  But

14  more of a complement to the fuels business.  I'm open to

15  discuss any and all concerns you have.  In the end, Vitol is

16  following VALT's lead on this deal and is happy to provide

17  US based support if VALT wants to go forward with GCAC.

18  You didn't say, we don't have a deal.  There's no joint

19  venture.  Did you?

20  A    I clearly state here that they are  taking the lead on

21  this in terms of how they want to move forward.

22  Q    Okay.  And then it looks like you forwarded to Mr.

23  Balk, right?

24  A    Yes.

25  Q    Who is Max Balk?

1   A    He is the head of operations for Vic.

2   Q    What does that mean, operations?  Just explain to me.

3   A    He oversees all -- at the time he was overseeing all

4   non-traders.

5   Q    So, I'm just trying to understand.  So if, Vitol owns a

6   terminal on the East Coast, that would fall under his

7   responsibilities?

8   A    I -- I don't know the specifics of which -- everything

9   that falls under his responsibility.

10   Q    Right, or is it more of staff --

11   A    Support person --

12   Q    -- administrative, support personnel, that kind of

13   operations?

14   A    Well, operations in terms of directly related to moving

15   of product, and we have what they call operators which   --

16   Q    (indiscernible).

17   A    -- assist in the movement of -- they liaise with the

18   terminal.  They liaise with the with the barge operators,

19   and they are the people that make everything happen.

20   Q    All right.  So why -- why did you forward to Mr. Balk?

21   A    I think because he  -- he knew of this -- this -- of

22   this deal that we were doing.

23   Q    Is he a personal friend of yours?

24   A    He is, at the time, he was a personal friend.

25   Q    Okay.  So maybe it was just hey, look what's -- he knew

1    what was going on?

2    A    No, well, not that because he's involved with all the -

3    - he heads all of the operations.

4    Q    Right.  So he responds good times.  You ever responded

5    to your last note, and later on the 17th, you say no.

6    Right?  Nope.  What else came of this  exchange of emails?

7    Anything?  Did this -- was this just the end of it?

8              MR. COOLEY:  Objection, vague.

9              THE COURT:  Overruled.

10   BY MR. PATTERSON:

11   A    Can you be more clear?  What do you mean, what came of

12   this?

13   Q    Any follow-up?

14   A    Yes, they decided they didn't want to move forward with

15   GCAC.

16   Q    Whose --

17   A    Under any capacity.

18   Q    All right.  And that was told to you by whom?

19   A    I think it was Nick.

20   Q    By email?

21   A    I don't -- I don't recall.

22   Q    Phone call?

23   A    I don't recall how he told me.

24   Q    Conference call?

25   A    I don't recall.

```
 1    Q    Okay, so up until even through the 17th, you believed

 2    it was still possible that there may be some form of this

 3    joint venture that would survive, right?

 4    A    On August 17th, I was  -- it was no longer in my hands.

 5    It was in the hands of VALT and GCAC.

 6    Q    Correct.  And that's not what I asked you.   My

 7    question is, on August the 17th, 2017,  you still believed

 8    there was a possibility that some form of the joint venture

 9    would survive?  Or it was possible, correct?

10    A    No.

11    Q    All right.  You told me that it was after this that

12    VALT told you that they decided  to terminate.

13    A    At this point, I had no  involvement with GCAC and VALT

14    were going to do.

15    Q    I understand that, and my question is --

16    A    So I had no hope for them to do a deal.  It wasn't on

17    the -- it was not my -- it was not my deal anymore.

18    Q    It was after August 17th, 2017, that VALT notified you

19    they were choosing option three.  Isn't that correct?

20    A    I'm sorry, what was the date?

21    Q    Sometime after August the 17th, 2017.

22    A    I don't know the exact date, but sometime after August

23    17th, yes.

24    Q    Okay.  That was my question, after 2017.

25    A    I believe so.
```

1   Q    You were notified that they chose option three, right?

2   Exit and close the joint venture completely, right?

3   A    I don't -- it doesn't say specifically they chose

4   option three.

5   Q    It doesn't say anything.  You told me they did, right?

6   A    No, I didn't say they chose everything involved with

7   option three.  They just -- they decided they did not want

8   to move forward.  It doesn't say anything about anything

9   else with option three.  They just said they did not want to

10  move forward.

11           MR. PATTERSON:  Judge, it's close to six, I don't

12  remember exactly when you said we were going to stop, but

13  this is a good point,

14           THE COURT:  Okay.

15           MR. PATTERSON:  I'm happy to keep going, but this

16  is a good breaking point for me.

17           THE COURT:  If it's a good breaking point for me,

18  then let's do it.  What I didn't want to do is interrupt you

19  if -- while you continued your examination on this document.

20  But if it's a good stopping point, then we should --

21           MR. PATTERSON:  Yes.

22           THE COURT:  -- do that there.  And then we can

23  continue whenever we meet again, we can -- I believe is the

24  16th?  We can conclude Mr. Kuo, and then I believe Mr. Brass

25  may be here, but we'll see.  If he can, if not, I just --

1    let's have something to do.

2           MR. COOLEY:  Yes, Your Honor.

3           THE COURT:  I'll let the parties talk about it.

4    We'll have something to do, if we can complete -- why don't

5    we start on the 16th, let me take a look at my -- why don't

6    we start at 10 a.m. on the 16th.  Well, hold on a second.

7    Hold on.  Parties are going to tell me I've got something.

8    Why don't we start at -- I've got a current -- let's plan on

9    starting right at 10:00.  I may push it to 10:30, but I'll

10   give everyone, plenty, plenty, plenty of advance notice.  I

11   have an uncontested 11, and I just -- I can go really fast,

12   if that's the case.  Mr. Patterson, between now and then,

13   you know, it'll give me a good opportunity to really think

14   about the redaction issue and we can -- I'll have an answer

15   for you at that time.  Okay?

16          MR. PATTERSON:  Now, I guess I just --

17          THE COURT:  Not like a ruling, just to be able to

18   kind of at least address -- give you some thoughts it, as

19   well.

20          MR. PATTERSON:  Of course.  No, no.  I just -- I

21   just raise it because I just don't want it to fall off and

22   we all forget about it.

23          THE COURT:  No, and I don't want to wait until the

24   end.

25          MR. PATTERSON:  That's all.

1            THE COURT:  I don't want to wait until the very

2    end, because if -- if I want the redactions, then I think

3    someone's going to have to get started on them right away.

4            MR. PATTERSON:  Right.

5            THE COURT:  And that's going to be sooner rather

6    than later, so --

7            MR. PATTERSON:  The second thing is, and I mean,

8    the best way to do it is just to be direct.  Are you

9    ordering us to bring Mr. Brass at the next hearing on the

10   16th, and --

11           THE COURT:  Well it depends --

12           MR. PATTERSON:  Well, I told you, we're not -- I'm

13   not hiding the ball.

14           THE COURT:  No, no, no.

15           MR. PATTERSON:  We were going to -- we were going

16   to bring him for our case in chief.  If they -- they can do

17   what they want.

18           THE COURT:  Okay.  If he's going to -- if he's

19   going to show up under the subpoena, if not, I'm going to

20   order him.

21           MR. PATTERSON:  Or --

22           THE COURT:  For the 16th, but if the 16th doesn't

23   work, I'm going to be flexible on that.

24           MR. PATTERSON:  Okay.

25           THE COURT:  Because I don't know what his schedule

```
 1   (indiscernible) --

 2             MR. PATTERSON:  So you're order -- you -- you want

 3   him here on the 16th?

 4             THE COURT:  I want him here on the 16th.

 5             MR. PATTERSON:  Yes, sir.

 6             THE COURT:  Okay.  All right.  Mr. Kuo, I'm going

 7   to -- and this is I really, really want you to hear me out.

 8   You're not to speak with anyone about your testimony, and

 9   it's strictly because we're going to come back on the 16th.

10   You are to discuss nothing with your lawyers, with no one,

11   anything about your testimony until it's complete.  You're

12   staying under oath.  And we will complete your examination

13   at that time.  But I just really, I need you to hear it from

14   me.  Okay?

15             THE WITNESS:  Yes.

16             THE COURT:  Any questions?

17             MR. PATTERSON:  No.

18             THE COURT:  Okay.  I'll see everyone on the 16th.

19   Mr. Patterson?

20             MR. PATTERSON:  One last thing, my notebook of

21   documents?

22             THE COURT:  My understanding is you're going to

23   get it either today or in the morning whenever the docs are

24   there.

25             MR. COOLEY:  Yes, Your Honor, I obviously I've
```

 1    been here the whole time, but we've -- we've sent out to

 2    make sure that we've -- we have it, can put our hands on it,

 3    and as soon as we have that and I'll -- I should be able to

 4    check after this, I don't see why we can't have it couriered

 5    over to Mr. Patterson's office.

 6            THE COURT:  Sounds like a tomorrow issue.  Or

 7    email.  Yeah.  Sounds like a tomorrow.  Okay.

 8            MR. COOLEY:  Yes, Your Honor.

 9            THE COURT:  Okay.  Thanks everyone.

10            MR. COOLEY:  Thank you, Your Honor.

11            CLERK:  All rise.

12

13        (Proceedings adjourned at 6:02 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7    Sonya N. Ledanski Hyde

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 14, 2022
```

```
 1                   IN THE UNITED STATES BANKRUPTCY COURT

 2                  FOR THE SOUTHERN DISTRICT OF TEXAS

 3                          VICTORIA DIVISION

 4   ARTHUR JACOB BRASS,            §   CASE NO.
                                    §   21-60025
 5                    Debtor.       §
     - - - - - - - - - - - - - x §
 6   VITOL INC.                     §   ADV. PROC. NO.
                                    §   21-06006
 7                    Plaintiff,    §
     v.                             §   VICTORIA, TEXAS
 8                                  §   Tuesday, August 30, 2022
     ARTHUR JACOB BRASS,            §
 9                                  §
                      Defendant.    §
10   - - - - - - - - - - - - - x §

11      HEARING ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBTS
                            TRIAL – DAY 1
12
                 BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
13                     UNITED STATES BANKRUPTCY JUDGE

14   APPEARANCES:

15
         FOR THE PARTIES:        SEE NEXT PAGE
16       COURTROOM DEPUTY/ERO:   Zilde Martinez

17

18

19

20

21                      TRANSCRIPTION SERVICE BY:

22                      Veritext Legal Solutions
                       330 Old Country Road, Suite 300
23                          Mineola, NY 11501
                            Tel: 800-727-6396
24                           www.veritext.com

25      Proceedings recorded by electronic sound recording; transcript
                     produced by transcription service.
```

002487

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:              KEITH M. AURZADA, ESQ.
     VITOL INC.                      MICHAEL P. COOLEY, ESQ.
 3                                   BRADLEY J. PURCELL, ESQ.
                                     REED SMITH LLP
 4                                   2850 North Harwood Street
                                     Suite 1500
 5                                   Dallas, TX 75201

 6                                   MASON W. MALPASS, ESQ.
                                     REED SMITH LLP
 7                                   811 Main Street
                                     Suite 1700
 8                                   Houston, TX, 77002

 9   FOR THE DEFENDANT/DEBTOR:       MIRIAM GOOTT, ESQ.
     Arthur Jacob Brass             JOHNIE J PATTERSON, ESQ.
10                                   WALKER & PATTERSON, PC
                                     P.O. Box 61301
11                                   Houston, TX 77208

12   FOR THE CHAPTER 7 TRUSTEE       J. MAXWELL BEATTY, ESQ.
     CHRISTOPHER R. MURRAY, ESQ.     THE BEATTY LAW FIRM PC
13                                   1127 Eldridge Parkway
                                     Suite 300, #338
14                                   Houston, Texas 77007

15

16

17

18

19

20

21

22

23

24

25
```

 1          <u>VICTORIA, TEXAS; TUESDAY, AUGUST 30, 2022; 1:22 PM</u>

 2          THE CLERK:  All rise.

 3          THE COURT:  Please be seated.  Okay.  Good afternoon,

 4    everyone.  This is Judge Lopez.  We're here in the trial of

 5    Vitol v. Brass.  Let me go ahead and take appearances in the

 6    courtroom.  And then I will see if anyone's on the line who

 7    wishes to make an appearance.

 8          I see the line is completely unmuted so I would ask

 9    everyone to please take a look at your phone and put it on your

10    mute.  I will mute the entire line if necessary and folks are

11    going to have 5* but I'm trying to avoid that because I'm going

12    to be focused on what's going on in the courtroom and it's

13    going to be hard for me to focus on who's hitting 5*.  So --

14    but theoretically, everyone who's going to make an argument

15    should be in the courtroom.  So I'll start with appearances.

16          Good afternoon, sir.

17          MR. AURZADA:  Thank you, Your Honor.  Keith Aurzada,

18    Michael Cooley and Brad Purcell of Reed Smith on behalf of

19    Vitol.  And if I  may, I'd like to make a couple of

20    introductions to the Court --

21          THE COURT:  Okay.  Why don't you get that mic closer

22    just to make sure one can pick you up.  I understand that

23    there's going to be a couple of moving mics.  Just get close to

24    one of them.  I don't -- I just want to make sure we have a

25    good record.

```
 1              MR. AURZADA:  Absolutely, Your Honor.

 2              THE COURT:  Thank you.

 3              MR. AURZADA:  The introductions -- well, I'll start

 4     again.  Keith Aurzada, Michael Cooley and Bradley Purcell of

 5     Reed Smith on behalf of Vitol.

 6              I'd like to make a couple introductions.  In the

 7     courtroom, we have Vijay D'Cruz, who is in-house counsel for

 8     Vitol.  Also, Gene Deetz of Ankura who will be our expert

 9     witness.  And then none of this happens without the tech

10     people.  I want to introduce our trial technician, Ms. Meta

11     (ph) and then our paralegal, Shikendra Rhea.

12              THE COURT:  Okay.

13              MR. AURZADA:  Thank you, Your Honor.

14              THE COURT:  Good afternoon to everyone.

15              Okay.  Ms. Goott, good afternoon.

16              MS. GOOTT:  Good afternoon, Your Honor.  Miriam Goott

17     and Johnie Patterson here on behalf of Mr. Brass.

18              THE COURT:  Okay.  Good afternoon.

19              Okay.  I don't believe anyone on the phone would need

20     to make an appearance but I will open it up.  Everybody has a

21     right to reserve if anyone wants to do so.

22         (Pause)

23              THE COURT:  All right.  Mr. Beatty, good move.

24              Go ahead.

25              MR. AURZADA:  Your Honor, I'm going to start with an
```

1    opening statement.

2            THE COURT:  Okay.  Why don't we just talk

3    housekeeping.  Are we all -- are the parties ready to proceed?

4            MR. AURZADA:  Yes, Your Honor.

5            THE COURT:  Okay.

6            MS. GOOTT:  Yes.

7            THE COURT:  Okay.  Is there anything we need to talk

8    about before we get into any form of an -- I don't know if you

9    meant opening as in opening statement or opening as in

10   housekeeping.  So I just want to make sure that we were --

11   covered everything before we officially began.

12           MR. AURZADA:  I think we're ready to begin with

13   openings right now, Your Honor.

14           THE COURT:  Okay.  Is there anything we need to

15   discuss?

16           MS. GOOTT:  I'd ask that we invoke the rule.

17           THE COURT:  Okay.

18           MS. GOOTT:  I don't know if there's -- all these

19   people are here with them so I don't know.

20           THE COURT:  Okay.  The rule has been invoked.  Are

21   there any witnesses who intend to testify or who will be called

22   today?

23           MR. WAGNER:  Michael Wagner.

24           MR. AURZADA:  He should probably be -- the rule would

25   apply to him, I believe, Your Honor.

Page 6

```
1                THE COURT:  Okay.
2                MR. MURRAY:  Judge, Chris Murray on the phone.  I
3    think I'm listed as a witness perhaps for tomorrow.  But I'm
4    also the trustee in the case so I'm not sure if the rule
5    applies.
6                THE COURT:  Ms. Goott, do you care?  No.  I think we
7    should exclude him.
8                MS. GOOTT:  I think so.  He's not a party to this
9    case.
10               THE COURT:  Yeah.  Mr. Murray, I'm going to exclude
11   you now.  You're free to hang up.  I'd ask -- I've got
12   confidence that you'll do that.  Just stay close by.  Have an
13   opportunity through Mr. Beatty.  I'll let you know when it's
14   time to get you on.
15               MR. MURRAY:  Okay.  Thank you, Judge.
16               THE COURT:  Okay.  Thank you.
17               MR. BEATTY:  Your Honor, clarification about me.  I
18   know Mr. Murray's excluded.  Does that include me as well?
19               THE COURT:  Ms. Goott, do you care?  Mr. Beatty
20   (indiscernible)?
21               MS. GOOTT:  I don't care.
22               THE COURT:  Okay.
23               MS. GOOTT:  I trust that he is not going to
24   communicate --
25               THE COURT:  Yeah.
```

```
 1             MS. GOOTT:  -- anything to --
 2             THE COURT:  Mr. Beatty, you're fine.  My
 3    understanding --
 4             MR. BEATTY:  Thank you, Your Honor.
 5             THE COURT:  -- was that Mr. Wagner who was a witness
 6    -- I don't know -- I just heard him identify himself as Mr.
 7    Wagner was the only witness in the room.  I just want to
 8    confirm.  Are there any other witnesses or potential witnesses
 9    who will appear?
10             MR. AURZADA:  Your Honor, Mike Pesce is in the back
11    of the room.  He works at Ankura.  He will not be testifying
12    under any circumstance.  But that's the only other person that
13    I think would be of interest as a potential person as it
14    relates to the rule.  But again, he will not be testifying.
15             THE COURT:  Okay.
16             MS. GOOTT:  As long as he's not going to be called as
17    a rebuttal or impeachment witness of any kind.
18             MR. AURZADA:  Nope.  He won't take the witness stand.
19             MS. GOOTT:  And then in his -- in Mr. Aurzada's
20    introduction, he mentioned something about an expert.  I don't
21    know who that is because there was no designation of an expert
22    witness on the witness list.  So if there's someone else in
23    here that they think they're going to try to get to testify, I
24    think that person needs to be excluded.
25             MR. AURZADA:  Your Honor, Mr. Deetz was designated as
```

1    an expert witness long ago and he's on the exhibit list.

2              THE COURT:  I don't know.  We can take it up if the

3    person wants to come in.  But I have not -- and we can deal

4    with it now.

5              MR. AURZADA:  Mr. Deetz is right here.

6              THE COURT:  Okay.  But you want to --

7              MS. GOOTT:  Yeah.  Your Honor, the -- and the Court

8    can look at Deetz (indiscernible) exhibit list.  Our local

9    rules specifically require that an expert witness be identified

10   as an expert witness on the witness list.  There is no

11   designation of him as an expert witness.  And also in the --

12   thank you.  And also in the initial disclosures, he's not

13   identified.

14             THE COURT:  Is there something you can point me to,

15   counsel?

16             MR. AURZADA:  Sure.  First of all, his report is an

17   exhibit.  Also, we did designate him on time pursuant to the

18   scheduling order.  If you'll give me a minute, I'll provide

19   that.

20             THE COURT:  Yeah.  No, no.  I'm not -- we can take it

21   now or we can take it up at the appropriate time.

22             MS. GOOTT:  And my only point right now is that if

23   he's going to be -- if we don't resolve it now then he needs to

24   leave the room.  The rule's invoked.

25             THE COURT:  Counsel?

1           MR. AURZADA:  Let's just deal with it now.  Give me a

2     moment.  I'll get proof that the other side has been on side

3     regarding this expert since the deadline called for in the

4     scheduling order.

5           THE COURT:  Okay.

6           MR. AURZADA:  There's no question about it.

7           THE COURT:  Okay.

8           MR. AURZADA:  Just give me a moment.

9           THE COURT:  Sure.

10     (Pause)

11           MS. GOOTT:  Your Honor, while they're looking for

12     whatever they're looking for, in an interest of time, if I

13     could ask the Court to look at docket 101 in this adversary

14     which is the witness list.  It doesn't delineate anyone as an

15     expert witness.  And Local Rule 9013-2(c) requires that.

16     Otherwise that person can only testify the facts.

17           And number two, I'd ask the Court to look at docket

18     14 which are the initial disclosures filed by Vitol.  There

19     were no amended disclosures filed.  And there's -- 26(f)

20     requires them to disclose who their expert is going to be and

21     identify them.  So -- thank you.

22           THE COURT:  101 and 14?

23           MS. GOOTT:  Yes, sir.

24           THE COURT:  Okay.  Thank you.

25     (Pause)

```
 1            MR. PATTERSON:  Also, while they're looking, Judge, I
 2    should have raised this a little bit earlier.  I have a hearing
 3    at 2 o'clock just down the hall.
 4            THE COURT:  I remember you mentioned that.
 5            MR. PATTERSON:  Status conference.  And so if I step
 6    out --
 7            THE COURT:  Completely understand.  And you're free
 8    to come in and out.  No worries.
 9            MR. PATTERSON:  Thank you, Your Honor.
10            THE COURT:  I do remember you mentioned that to me.
11    Not a problem at all.  But I appreciate the -- thank you for
12    reminding me.
13         (Pause)
14            THE COURT:  Folks, it's 1:33.  Why don't we just give
15    everyone an opportunity to kind of get everything together.
16    I'll come back on in seven minutes.  I'm just going to step off
17    and come back on.
18            Mr. Patterson, if you need to leave before then, in
19    and out, I completely understand.  There's no need to --
20            MR. PATTERSON:  Yes.  Thank you.
21            THE COURT:  Thank you.
22            THE CLERK:  All rise.
23         (Recess from 1:34 p.m. until 1:41 p.m.)
24            THE CLERK:  All rise.
25            THE COURT:  Please be seated.  Okay.  Back on the
```

1    record in Vitol v. Brass.

2            Mr. Aurzada, what can you tell me?

3            MR. AURZADA:  Your Honor, I would show a couple of

4    things here.

5            THE COURT:  Okay.

6            MR. AURZADA:  First, I'm going to ask Ms. Meta to

7    show the transmittal email on April 1st, 2020.

8            THE COURT:  I want to know where you identify the

9    witness according to the local rules.  That's what I'm looking

10   for.

11           MR. AURZADA:  Okay.

12           THE COURT:  Where you designated according to the

13   local rules.

14           MR. AURZADA:  Mr. Deetz is the first witness listed.

15   It does not say that he's going to testify as an expert

16   witness.

17           THE COURT:  Oh.

18           MR. AURZADA:  I am going to ask the Court to, under

19   the local rule, order that -- unless the Court orders

20   otherwise, is the ruling -- or is the rule.  I'm going to ask

21   the Court to do so or continue the trial because of the

22   prejudicial effect that this would have on Vitol.  And what I

23   want to do is make a presentation to the Court as to the fact

24   that this is not a surprise.  There's no surprise here.

25           THE COURT:  The issue is not surprise.  The issue is

1    compliance.

2                MR. AURZADA:  I get it, Your Honor.

3                THE COURT:  No, no, no.  I'm going to read -- 9013-2

4    says:  "Counsel for each party shall also exchange and file

5    exhibit and witness lists with the Clerk of the Court" --

6    right?  "Witness lists must identify whether each witness is to

7    be called as a fact witness or as an expert."  So both the

8    exchange and the file version.  All right.  "If no delineation

9    is made, the witness will only be allowed to testify as a fact

10   witness unless otherwise ordered by the Court, or the witness

11   is an owner" -- "unless otherwise ordered by the Court" is

12   where  you're going.  Okay.  All right?  That was just me

13   setting the table just to understand exactly what you were

14   going to argue.  Okay?

15               MR. AURZADA:  Yes, Your Honor.

16               THE COURT:  Okay.

17               MR. AURZADA:  Yeah.  I want to look at the

18   transmittal email on April 1st, 2022 and ask Ms. Meta to show

19   that to the Court.

20               THE COURT:  Ms. Meta -- I need to make you a

21   presenter, don't I?  Okay.  Just sent you something.

22               MR. AURZADA:  Okay.  What I'm showing you here, Your

23   Honor, is the email transmitting Vitol's expert report and

24   making the offer to Ms. Goott as to when she would like to

25   depose Mr. Deetz.

1          THE COURT:  Okay.

2          MR. AURZADA:  Two things about this.  One, it's

3    disclosing him as an expert; and, two, offering the deposition.

4          THE COURT:  Okay.

5          MR. AURZADA:  The deposition did not happen, just so

6    we're clear.

7          THE COURT:  Okay.

8          MR. AURZADA:  Not because it wasn't -- not because we

9    didn't offer him but because it wasn't asked for.

10          And the second thing I'd like to look at is the sixth

11    amended scheduling order.

12          THE COURT:  Ms. Meta, will you control that or

13    someone -- okay.

14      (Pause)

15          MR. AURZADA:  If we look at pdf page 3, it should

16    show the deadline for the report.

17          Page 1?  Oh.  I'm sorry.  "Vitol's deadline to

18    designate and provide an expert report shall be extended to

19    April 1, 2022."  So that's -- what I'm trying to draw a

20    straight line here, Your Honor, is that did we get a report?

21    Yes.  Was it disclosed?  Yes.  Was the deposition offered?

22    Yes.  And was it done by the deadline?  The answer to that is

23    also yes.

24          THE COURT:  Okay.

25          MR. AURZADA:  I would note that Mr. Deetz' expert

1    report is an exhibit on our exhibit list.  There is no question

2    that he is an outsider to this transaction.  We've produced

3    hundreds of thousands of pages of documents.  He's mentioned

4    nowhere in any of them until his report is there.  To exclude

5    him as an expert witness would be highly and absurdly

6    prejudicial to Vitol at this point.

7           So I'm asking the Court to order otherwise as allowed

8    by Local Rule 9013 and, in the alternative, asking the Court to

9    continue the trial so that whatever time needs to elapse so

10   that this is not a surprise -- yeah, I do.

11          Let's look at the 26(f) conference as well.

12          This is a joint conference document.  "The parties

13   believe that parties with the burden of proof must designate

14   experts by January 15th and that opposing parties must

15   designate responsive experts and provide their reports by

16   February 7, 2021."

17         So what we are -- what we're at here, Your Honor, is

18   that there was no secret here.  The parties submitted a joint

19   report.  This would be the ultimate in form over substance.

20         I get that the relief that Vitol is asking for is the

21   exception from discharge and that's important to Mr. Brass.

22   But this is really the height of substance over form given the

23   circumstances of this case.  And I think there is plenty of

24   room for the Court to order otherwise on this issue and/or

25   grant a continuance of the trial.

1          THE COURT:  Just so I understand, what would the

2    continuance accomplish?

3          MR. AURZADA:  I presume that the issue here is Ms.

4    Goott has not had an opportunity to prepare for this trial

5    because of the way Mr. Deetz was designated.  That's the only

6    sensible argument that could be made in which case that could

7    be cured with time.

8          THE COURT:  Okay.

9          MR. AURZADA:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          Yes, Ms. Goott.

12          MS. GOOTT:  The email that I received on April 1st --

13          THE COURT:  Is that the one that you're referring to

14    Ms. Meta (indiscernible)?

15          MS. GOOTT:  Yes, sir.  It doesn't tell me this guy's

16    going to testify.  The expert report that's attached talks

17    about the scope of work.  It doesn't say he's going to testify

18    at trial.  Parties hire experts for consulting purposes and it

19    tells me in there if they want to rely on that that he's going

20    to testify.

21          But more importantly, the rules require them to

22    disclose their expert in their initial disclosures.  The rules

23    also require them to amend and update their initial disclosures

24    to notify the expert.  They didn't comply with the federal

25    rules.  They also didn't comply with the local rules.  The

1    local rules are clear.  They have to be designated as an

2    expert.  Otherwise, the Court hears it as a fact witness unless

3    the Court orders otherwise.  And when does that happen?  When a

4    lawyer comes in here and says, Judge, I made a mistake.  They

5    didn't come in here and say that.  They tell you we complied

6    with the rules.  This email is sufficient.  I don't have to

7    designate it.  I don't have to designate it on the record.  I

8    don't have to designate it on the witness list.  We complied.

9    And it's prejudicial to them.

10          What's most prejudicial is to the debtor who's trying

11   to get a discharge.  It's not prejudicial to $100 billion

12   company because their team of lawyers was a trial coordinator

13   doesn't comply with the rules.  And this is the routine of what

14   we're hearing in this case from the beginning.

15          We filed the 2004 exam even though an adversary was

16   filed.  We missed the discovery deadline.  We need this one.

17   They're constantly asking this Court to use its discretion

18   instead of making them comply with the rules.  We're here for

19   trial.  This is not -- I'm not going against a pro se litigant

20   that needs leniency.  This is the largest privately held oil

21   and gas company in the world with a team of lawyers.

22          I ask the Court to please enforce the rules and our

23   local rule.  Thank you.

24          THE COURT:  Ms. Goott, let me ask you.

25          MS. GOOTT:  Yes.  Sorry.

```
 1              THE COURT:  I asked Mr. Aurzada a question.  And

 2     what's your argument about -- what are your thoughts on -- I

 3     guess is alternative request for relief which is, Judge, if

 4     that's the case then give us a brief delay essentially of trial

 5     or at least to give us an opportunity to give Ms. Goott an

 6     opportunity to do that?

 7              MS. GOOTT:  It's not a brief delay.  It's a

 8     continuance of not giving my client the opportunity, his day to

 9     get his discharge that has him go incur more time, more money.

10     For them, it's no big deal to go spend a few thousand dollars

11     on an expert deposition.  We're done.  Discovery has been over

12     since February.  It's just not right.  They can't just say,

13     okay, we didn't follow the rules.  Now you go spend more time

14     and you go spend more money.  We're here.  Today is the day.

15     And this Court has instructed them, we're going to follow the

16     rules.  And it's not form over substance.  This is the court of

17     evidence.  That's -- they have the burden.  And they have to

18     prove it.  And they have lots of witnesses.  They have other

19     ways.  If they're so confident, they can do it.  But to come in

20     here and say, oh, we're going to put off trial, go depose

21     somebody else because it's their mistake, it's just

22     fundamentally unfair.

23              THE COURT:  Okay.  I'm going to take this -- I'm

24     going to think about this today.  I don't want Mr. Deetz to

25     testify today.  And I want to give some thought to go back and
```

```
 1    look at some documents and dates.  And I think it'd be unfair
 2    if I don't delay everything.  Just give me -- Mr. Deetz is not
 3    going to testify today anyway.  I'll have an answer for you in
 4    the morning whether Mr. Deetz can be here and testify.  But he
 5    doesn't need to be here today and he should leave the room just
 6    to make sure and to preserve his rights to testify.  It's an
 7    issue.  I just was -- I'm not comfortable making the call on a
 8    big issue like this without giving it due proper thought on
 9    both sides.
10              MR. PATTERSON:  If I could say one thing --
11              THE COURT:  I --
12              MR. PATTERSON:  I'm sorry.
13              THE COURT:  No, no.  I'm just saying I'm not going to
14    -- I don't see what a continuance does.  And I don't know what
15    that means, quite frankly.  If there was a continuance, I'd
16    send you both to mediation, quite frankly, so at least it'd be
17    productive.  If -- no.  Just (indiscernible) it was going to
18    happen.  Right?  I wouldn't just send people out and
19    (indiscernible) three months later or a month and a half later
20    to prepare and all that.  I just wouldn't do that.  But today
21    we need to do that.
22              MR. PATTERSON:  (Completely inaudible)
23              THE COURT:  No.  It does.  And I'm thinking about
24    37(c).  But the operative language in -- and this is why I want
25    to give it some thought.  I don't want to hide anything.  37(c)
```

```
 1   says the witness is not allowed -- right?  And unless
 2   (indiscernible) substantially justified or is harmless, right?
 3   And that's what Mr. Aurzada is going to argue or he's arguing.
 4   He's already telling us you knew about the report.  You got the
 5   report.  Deetz was identified.  Everybody knew Deetz.
 6   Everybody knew Deetz was an expert.  And so that's the --
 7   that's why I want to think a little bit about it.  I want to
 8   kind of go back and think about -- because the local rule does
 9   tie with essentially 37(c) is the way I see it.  But I want to
10   give it some thought.
11           But let's proceed otherwise today.  I'll give you an
12   answer as to what we're going to do.
13           MS. GOOTT:  (Completely inaudible)
14           THE COURT:  (Indiscernible).  Anything else we need
15   to talk about before we start in terms of forms of opening?
16           Okay.  Mr. Aurzada?
17           MS. GOOTT:  Confirming there's no other witness.
18           THE COURT:  That was my understanding.  And --
19           MR. AURZADA:  That's true.
20           THE COURT:  Okay.  And Mr. Deetz has left the room,
21   right?
22           MR. AURZADA:  Yes.
23           THE COURT:  Okay.  All right.
24           MR. AURZADA:  Your Honor, the fundamental truth of
25   this case is that the defendant orchestrated the transfer of
```

1    over $8 million to himself and his mother while his company was

2    insolvent.  That's what happened.

3            I'm going to give the Court some basics.  Mr. Brass

4    filed a Chapter 7 bankruptcy on March 26th, 2021.  On the same

5    day, two companies that he controlled also filed Chapter 7.

6    Those are Gulf Coast Asphalt Company, which I'll refer to as

7    GCAC, and Trifinery, Inc., which I'll refer to as Trifinery.

8            GCAC, under Brass' direction, did business with Vitol

9    between July 1st, 2017 and December 31st, 2017.  And when the

10    dust settled, Vitol ended up with a $10 million judgment

11    against all three and a total loss of over $15 million while

12    Mr. Brass sent out the back door over 8 million to his mother,

13    himself, the builder of his vacation home.

14            The Court is going to hear that Vitol financed over

15    $65 million to fund asphalt transactions.  And none of these

16    basic facts are in dispute.  Vitol purchased raw asphalt, paid

17    almost all expenses to move that asphalt to the terminal

18    (indiscernible) to get it to the end customer and sell it.

19            At some point in the business relationship, GCAC,

20    controlled by Mr. Brass, started taking possession of the

21    physical inventory, sold it on the market, collected the cash

22    and did not remit the sales proceeds to Vitol.  That's how

23    Vitol got a judgment in its claim.

24            At the same time that that was ongoing, Vitol was

25    racking up expenses.  Instead of GCAC giving the money to

1    Vitol, he took it for himself.

2          The facts as I've outlined them there are exactly the

3    same facts as Huskey with one exception.  And that is, in

4    Huskey, the defendant directed the funds not to himself but to

5    another entity that he had an interest in.

6          So I'm going to lay out three basic things.  The

7    basic corporate structure that -- and the debts that are

8    involved.  I've touched on that a little bit; the business

9    relationship with Brass and GCAC, on one hand, and Vitol on the

10   other; and then describe how the (indiscernible) brought in

11   other elements of the Huskey analysis will be proven in the

12   evidence that you're going to hear in that regard.

13         From the Vitol side of things, the Court's going to

14   hear from two primary witnesses.  That's going to be Mike Loya,

15   the former CEO, and Eric Kuo, the fuel oil trader with whom Mr.

16   Brass and the GCAC employees dealt with most frequently.

17         The Court's going to hear from Mr. Gene Deetz who's

18   going to show that GCAC was insolvent at all relevant times.

19   And the Court's going to hear from Mr. Brass, either by

20   deposition or in person.  He's not here today.  If he's here,

21   I'm going to call him.  If he doesn't appear, we're going to

22   put in his deposition testimony.

23         I talked about the basic corporate structure.  Brass

24   owned Trifinery.  Trifinery owned 50 percent of GCAC.  The

25   other 50 percent of GCAC was owned by Mr. Brass' mother, Joyce.

1          As the Court knows from summary judgment, Vitol holds

2    a $10 million judgment.  Having tried to settle with Mr. Brass

3    and GCAC and Trifinery twice -- there were two settlement

4    agreements, one for 8 million, one for 10 million.  No payments

5    were made on account of those settlement agreements ever.

6          Prior to the spring of 2017 -- now I'm switching to

7    the actual business transaction now.  Prior to the spring of

8    2017, GCAC and Vitol had had preliminary discussions regarding

9    a potential relationship in the asphalt business.  As July 1st,

10   2017 approached, there came a time when Vitol, on one side, and

11   GCAC on the other wanted to enter into a business relationship.

12   Why?  Two reasons.  One, the current credit provider that GCAC

13   was using was a company called Rio and they wanted to get out

14   of the asphalt business.  And on the other hand, Vitol was

15   interested in getting into the asphalt business in Texas.  And

16   so they started discussing a business relationship.  You'll see

17   the emails on this.  And the first thing that happened is in

18   early July, Vitol purchased all of the outstanding inventory

19   from the prior provider of the credit Rio and to get it in its

20   own name.  Because it took it in its own name, it felt

21   comfortable that it had possession of the inventory that

22   supported its purchase.

23          The parties tried to negotiate a JV.  They exchanged

24   drafts of that JV.  But there will be no question that in early

25   August 2017, Vitol unequivocally informed Brass there would be

Page 23

1    no joint venture and that it would be a lender/borrower

2    relationship.  And you're going to see several pieces of

3    evidence and you'll hear the testimony of Mr. Kuo.  But I want

4    you to look in particular at two things.  There's a text

5    message on August 12th, 2017 that makes it clear that the deals

6    would be done under GCAC's name subject to credit support --

7    credit approval by Vitol.  And then there's an August 21st,

8    2017 email from Brass outlining the terms of the proposed

9    lender/borrower relationship.

10         At some point, Your Honor, GCAC changed the structure

11   of the physical transactions and convinced Vitol to release the

12   physical commodity, the asphalt, which had previously served as

13   Vitol's security.  And then what happened?  Vitol entrusts the

14   asphalt to GCAC.  GCAC sells it but doesn't remit the proceeds

15   to Vitol.  What was done with the money?  The money was

16   distributed to Mr. Brass, his mother, his sister and his second

17   home, the builder of his second home.

18         Brass was insolvent at the time and was under

19   financial distress.  He bounced many, many checks in the months

20   in which he was doing business with Vitol.  So we get to the

21   badges of fraud.  This is the Husky elements that have to be

22   met here.  First, the transfers were insiders.  I've already

23   mentioned to whom those transfers were made.  Mr. Brass is

24   likely to argue that they were loans not transfers.  But the

25   evidence is completely to the contrary.  There were no

1    promissory notes, no repayment schedules, no interest accruals

2    on the books.

3         The debtor absolutely retained control of the cash

4    transfers that were in his bank account, his (indiscernible).

5    The transfers were also concealed.  If you look at the

6    schedules and statements filed by GCAC, there is no asset

7    listed as a due -- a payable or, I guess, it would be a

8    receivable for GCAC.  There's no receivable (indiscernible)

9    amount due for Mr. Brass if those were loans.  They should be

10   listed as an asset.

11        Further, you're going to hear testimony that he

12   didn't disclose -- and this is part just a broader pattern --

13   significant amount of personal property in the form of jewelry.

14        At the time of the transaction between July of 2017,

15   December 2017, GCAC knew it had creditors and was in litigation

16   with Superior Crude which, when the Court sees those papers,

17   you'll see that the allegations are very similar to the

18   allegations that Vitol made.

19        The transfers comprised substantially out of GCAC's

20   assets, $8 million against its current assets.  No value was

21   given in exchange.  And the transfers occurred while the debtor

22   was actively not paying Vitol.

23        So but I want to highlight three other things for the

24   Court because I don't want there to be a distraction in the

25   trial which is the JV versus lender/borrower issues.  A lot of

1    ink has been spilled on this.  Husky doesn't really care what

2    the nature of the relationship is, whether it's a JV or a

3    lender/borrower.  I think it's important that the Court find it

4    was lender/borrower because it was and that's what the facts

5    will show.  But the Husky claim can be made even by just a

6    general unsecured creditor that is a regular trade creditor.

7    It doesn't have to be the intense relationship that is here.

8    So that's a bit of a red herring.

9            But there's only one way to square this which is to

10   say it's lender/borrower because when you look at GCAC's

11   balance sheets and books and records, you're going to see they

12   book it as a liability.  And then ultimately, the tax returns

13   also show it as the same way.  So if he's willing to file a tax

14   return that characterizes the liability to Vitol as a debt then

15   that's probably right.

16           I think this case is really going to be more about

17   Mr. Brass not wanting the Court to hear the evidence and to

18   just seek an obfuscation that it is to really defend on the

19   merits because the facts of the case are really very

20   straightforward.

21           Your Honor, at its core, this is not an honest but

22   unfortunate debtor looking for a fresh start.  Vitol has no

23   ill-will personally against Mr. Brass.  But this is not a

24   dischargeable debt.

25           I want to point out that if Mr. Brass had just been

1    the owner of a failed business, if GCAC had just failed and he

2    had left all the money in, he would be getting his discharge.

3    But he didn't.  He took the money out of the business and it

4    was no longer available to repay Vitol.  GCAC doesn't have a

5    bunch of other creditors because Vitol paid them all when they

6    were paying for the expenses of the operation.

7             At the conclusion of the evidence, Your Honor, Vitol

8    will ask this Court to accept its debt from discharge under 523

9    of the Bankruptcy Code.  Thank you, Your Honor.

10             THE COURT:  Thank you.

11             Ms. Goott?

12             MS. GOOTT:  Thank you, Judge.  May I approach the

13   board?

14             THE COURT:  Absolutely.

15             MS. GOOTT:  I'm going to grab the mic a second.

16             THE COURT:  Go for it.

17             MS. GOOTT:  Can you hear me?  Hello?  Ahh, there we

18   go.  I'm having a problem.  Can you hear me?

19             THE COURT:  I can hear you just fine.

20             MS. GOOTT:  Okay.  This fell off.

21             THE COURT:  Oh.

22             MS. GOOTT:  But you can hear me.

23             THE COURT:  Just fine.

24             MS. GOOTT:  Okay.  Great.

25             I want to go through this and big picture explain

1    what happened.

2         THE COURT:  Okay.

3         MS. GOOTT:  And there are three main players in this

4    case.  First one is Mr. Brass.  Mr. Brass is the president of

5    GCAC.  Mr. Brass is the debtor.  GCAC and Mr. Brass, they're in

6    the asphalt business.  That's what Mr. Brass does.  He knows

7    how to take materials, the sludge at the bottom of the oil

8    barrel, mix it with other stuff and make asphalt.  He's also

9    the connection guy.  He knows who wants to buy asphalt.  He

10   knows that end user.  He sells -- makes it; he sells it.  And

11   that's what ends up on our roads.

12        GCAC was a company started by his father.  But he's

13   (indiscernible) gone.  Excuse me.  GCAC, in 2017, had a deal, a

14   joint marketing agreement, not a lender agreement, as Mr.

15   Aurzada said.  They had a joint marketing agreement with Rio

16   Energy.  And the guy at Rio Energy, Mr. Perugini -- it was 2017

17   that they had this joint marketing agreement.  They're

18   partners.  Rio Energy is a trader.  And their business is

19   simple.  And you'll see in the exhibits.  Rio Energy wasn't a

20   lender of GCAC.  Rio Energy and GCAC have this joint venture.

21   And it was simple.  Rio Energy was a commodities trader.  They

22   buy the commodities, the oil, the stuff they need to make

23   asphalt and they would make a hedge on that purchase.  GCAC

24   would get the product, make the asphalt, find the end user and

25   say go to Rio and buy from them the asphalt.  Rio would close

1    on that sale, close the hedge and then Rio and GCAC would split

2    the profit.  That's what you're going to see.  That's what

3    their deal was.  Rio wasn't loaning money.  They had a very

4    specific role on the back end of doing the trade.  And GCAC

5    sold the asphalt but through Rio.  Rio was the contractor with

6    Rio and the third party.

7           Mr. Perugini worked at Rio Energy.  All right?  Mr.

8    Perugini did the trade.  And Mr. Brass at GCAC was the front

9    end.  After a few months, Rio didn't want to be in the asphalt

10   business anymore.  It was too risky of a business for them and

11   they wanted out.  They wanted out from this agreement that they

12   had signed.  Now Mr. Perugini, who's at Rio, is saying, hey, my

13   bosses want out but I think this is a good business.  So Mr.

14   Perugini says to GCAC, to Mr. Brass, let's talk to Vitol.

15   Let's see if Vitol wants to come in and step in the shoes of

16   what I've been doing at Rio.

17          And that's where our third person comes in, Eric Kuo.

18   Mr. Kuo.  He works for Vitol.  Big trader at Vitol.  So Mr.

19   Perugini, who is working at Rio, and Mr. Brass and Mr. Kuo sit

20   down.  And they explain they had this great business what we

21   were doing with Rio.  Vitol, you come in.  And Mr. Perugini

22   says you come in.  If you step into the shoes of this joint

23   marketing agreement, I'll quit my job at Rio and I'll go work

24   at GCAC.  And they made a deal.

25          Now Mr. Kuo is at Vitol, the U.S. branch.

1   Headquarters are in the U.K.  And that's really important.  And
2   I'll get to that in a minute.  This deal is supposed to close
3   on July the 1st, 2017.  The agreement between these guys was
4   all drafted but it wasn't signed.  Mr. Kuo at Vitol says I'm
5   going on vacation.  Start work.  I'm gone but start work.  When
6   I get back, we'll sign everything.  And while Mr. Kuo's on
7   vacation -- and you're going to see this -- they start working.
8   They start doing trades.  July 1st, there are trades happening.
9   And you'll see communication daily between Mr. Perugini who has
10  now quit his job at Rio and is working at GCAC, with Vitol
11  guys.  We're buying this, we're hedging.  We're buying, we're
12  hedging, we're selling.
13          And then what happens?  Mr. Kuo, the head guys at the
14  U.K. headquarters for Vitol -- he's in the U.S.  But the U.K.
15  division, the bosses, tell him you can't do this deal with
16  GCAC.  And the reason you can't have us, Vitol, involved in
17  this is because we have a much bigger deal going on.  Vitol,
18  the U.K., had a joint venture called Valt.  And Valt was in
19  agreement between Vitol and the Sargeant family.  The Valt deal
20  -- this Valt deal was a huge deal, way bigger than this joint
21  venture with GCAC.  But most importantly, in the Valt deal,
22  there was a non-compete that specifically said no -- you cannot
23  enter into the asphalt business.  So Mr. Kuo's bosses,
24  headquarters, are saying get out of this deal.  You can't do
25  this.

1          Now Vitol's in a box.  They've got an agreement with

2   GCAC that they're working daily, daily working.  But they have

3   a non-compete with the Sargeant family, very big family.

4          So what do they do?  They tell him we got to figure

5   this out.  They're trying to work it out.  Their deal's

6   happening.  So they go down two different roads.  First, Vitol

7   says, okay, if you bring us a buyer, GCAC, that is a company

8   like Chevron who we normally do deals with, we're going to do

9   it just like you did with Rio.  We're going to buy the

10  materials needed for asphalt.  We're going to hedge them.  And

11  we're going to enter into the contract with the Chevron because

12  nobody will think anything if Vitol has an agreement with

13  Chevron.  But, Mr. Brass, if you bring us a deal from some

14  third party that's clearly in the asphalt world, that we can't

15  have our name on it.  So for those deals, you're going to --

16  GCAC is going to enter into the sale agreement with that third

17  party asphalt buyer.  And the agreement with Vitol, like it was

18  with Rio, was the same.  Everybody's going to do their part and

19  then we're going to figure out who spent what and we're going

20  to divide the profit and losses, 50/50.  That was the deal.

21  Nobody knew exactly how much it was.  They were going to true

22  it up in the end.

23         But over the course of this five-month relationship,

24  GCAC transferred, and they admit, $16 million to Vitol as an

25  estimate as part of their true up.  GCAC didn't know how much

1    Vitol owed them because they hadn't trued it up.  And they're

2    operating this way.  They were not operating, like Mr. Aurzada

3    says, as a lender.  Vitol comes back toward the end and says we

4    need to talk about some financing.

5          Vitol is an oil and gas company.  They're not

6    lenders.  They don't do that.  That's not what their business

7    is.  This is a 100 -- in 2021, they generated over almost $300

8    billion.  They're not lenders.  But let's just say we go with

9    their story that they loaned him money.  No evidence of a loan.

10   No loan agreement.  No promissory note.  No terms.  Nothing.

11         The same stuff that Mr. Aurzada says, Judge, you

12   can't find that GCAC had loans with Mr. Brass or his mom

13   because where's the loan agreement.  Where are the terms?

14   Right?  Vitol, who has armies of lawyers, what would they do if

15   it was really a loan?  There would be some document.  All they

16   have to show is an email that says what about these terms

17   because the parties were talking when Vitol wanted out.  They

18   said, well, what if we loan you money.  And they started

19   talking about it.  You will not see an email that says I accept

20   the terms.  Nothing.  And nothing was documented.

21         But more so, even without the documents, the Court is

22   going to see the activity between Vitol and GCAC.  It is not a

23   big borrower or a lender.  It's two parties working business

24   transactions.  Every week you will see communications where

25   Vitol is involved in the daily business transactions of GCAC.

1    When does a lender get involved in the daily affairs of their

2    borrower?  They don't.  They do the opposite.  They stay away

3    from it or they expose themselves to liability.   No documents

4    and all the acts show that they were working together toward

5    this joint venture.

6          And then finally what happened?  U.K. tells U.S.

7    Vitol done.  You're out.  We can't do this anymore.  We're

8    going to get sued by the Sargeant family.  So they walk away.

9    And they leave Mr. Brass and his company holding the bad.

10   They're stuck.  So GCAC files a lawsuit against Vitol.  GCAC

11   goes to state court and says, Judge, we had a joint venture

12   agreement and they bailed.  And Vitol's response is, no, we're

13   a lender.  We're just the lender.  And they fought.  And

14   lawyers.  And depositions.  And you name it.  And they outspent

15   him.  This hundred billion dollar company can outspend anybody.

16   And that's what they did.  And when it got down to it, Mr.

17   Brass couldn't fight anymore.  He didn't have the money to

18   fight anymore.  He didn't have the strength to fight anymore.

19   And he agreed to the judgment.  They tell you, oh, we got a

20   judgment.  They got an agreed judgment because Mr. Brass

21   couldn't afford it anymore.

22         And as soon as they got that judgment, they go to get

23   a receiver appointed.  They want to pound the flesh.  And how

24   do I know that?  When a receiver's about to get appointed, he

25   ends up in my office.  What I always do is how do we avoid

1   bankruptcy first.  And I call Vitol's lawyers.  And I tell

2   them, look, he doesn't have $10 million.  He has $1.2 million

3   in cash.  That's what he has.  And I know there's a lot of

4   mistrust between these parties.  So I wasn't going to call you

5   until I had that 1.2 million in my hand.  And I took a picture

6   of a cashier's check and I sent it to them.  And the response

7   is Vitol is angry.  They're angry because Mr. Brass sued them.

8   Did they come back and say can we take 3, can we do 5?  No.  I

9   explained to them you've put him in a box.  I'm going to have

10   to file a Chapter 7.  And I explained to their very

11   sophisticated counsel what's going to happen in a 7.  Chapter 7

12   trustee's going to take 10 percent off the top.  Chapter 7

13   trustee's going to hire lawyers that are going to take I

14   presume a good portion of that money.  But most importantly,

15   Mr. Brass owes the IRS money.  And they're a priority creditor.

16   They're going to get every penny that's left over.

17          But they didn't care.  Their response was we are

18   serving Walker & Patterson with a subpoena for that check.  And

19   so Mr. Brass had to file.  He had to file for himself.  He

20   filed for GCAC and had to walk away from the business his

21   father started.  And even during the pendency of the bankruptcy

22   case, I don't have a clue but I'm going to guess Vitol has

23   spent over a million dollars fighting this case.  They fight

24   objection to exemptions when the money and the assets are going

25   to go to the IRS anyway.  I asked them to mediate.  No.  Even

1   on the eve of trial, let's mediate.  If you want to pound the

2   flesh, how about this?  How about he sells his exempt homestead

3   which you're never going to get no matter if you chase him

4   forever, you're never going to get that equity.  Sell it.  Put

5   this to an end.  Mr. Brass and his wife and his two daughters

6   are done.  They're done with the fighting.

7           They don't even respond.  Not no.  Rent out the house

8   and this and that.  Give us all your jewel -- nothing.  They

9   don't respond because they don't want money.  They don't need

10  money but they don't want it.

11          And this Court has asked this multiple times.  Please

12  talk.  They don't want to talk.  They want you to punish him.

13          But the bottom line, and I'm going to get to --

14  sorry.  I have my notes -- is that they file this adversary

15  proceeding.  And then when you look at the complaint, they've

16  asked for relief.  Three causes of action.  The first one,

17  523(a)(2).  They're bound by their pleadings.  And in their

18  pleadings, what do they tell this Court?  We're just a lender.

19  In my responses to interrogatories, I asked them, what's your

20  relationship?  Borrower/lender.  Under 523(a)(2), they have to

21  show this Court what they pled.

22          Let me turn this off.

23          They have to show that they loaned him this money.

24  They have to show and prove what they pled.  And there will be

25  no evidence before this Court that there was money loaned.

1    They want to just jump to the end.  Oh, he transferred assets.

2    But they have to first show this Court that there was money

3    lent by Vitol to him and then he did something wrong after the

4    fact.

5         Second, 523(a)(4).  In order for them to succeed

6    there, they can't show that it was because of a breach of

7    fiduciary duty.  The Court already got rid of that in summary

8    judgment.  So what's left?  Embezzlement and larceny.

9         Embezzlement requires Mr. Brass to have been an

10    employee of Vitol.  He wasn't.  Their responses to

11    interrogatories said our relationship was borrower/lender.

12         Larceny.  That he unlawfully took possession of what

13    they said in their complaint, their money.  They can't have it

14    both ways.  They can't come in here and say, Judge, we loaned

15    him money voluntarily and then tell you, oh, but he took

16    possession of our money improperly under larceny.  It fails as

17    a matter of law.

18         They can't -- they're trying to protect themselves.

19    They're trying to protect themselves from their non-compete

20    with the Sargeant family and that Valt deal.  And the way they

21    do that is by coming up with a story, oh, we were just the

22    lender.  But that's not the reality.  But that's what they're

23    stuck with because that's what they're claiming.  They didn't

24    come in here and say -- they didn't file a complaint like most

25    lawyers say.  Judge, we believe it's a loan but, in the

1    alternative, if you find that it wasn't, then he did these bad

2    things and breached his fiduciary duty as our partner.  They

3    don't do that because they can't without getting sued by the

4    Sargeant family.  So they're stuck with their story of this

5    being a lender.

6           And then that brings me to their final cause of

7    action which is (a)(6).  (a)(6) requires a willful and

8    malicious injury.  The Fifth Circuit talked about this.  And

9    the Fifth Circuit says that "Section 523(a)(6) excepts from

10   discharge debts arising from willful and malicious injury

11   rather than willful and malicious acts which cause an injury."

12   And in the Delaney case in the Fifth Circuit, guy loads his

13   firearm, carries the firearm, points it at somebody through

14   their car window and it goes off.  And the Fifth Circuit says,

15   no, that debt is dischargeable.  Why?  Because the debtor, the

16   guy who shot this firearm, he didn't mean to kill him.  He

17   didn't mean for it to disarm.

18          The burden on Vitol is one to show that Mr. Brass

19   intended to injure them.  There's nothing in their complaint

20   that says that he intended to injure them.  And they're never

21   going to have him testify that he had any intention of injuring

22   them.  He had every intention of making the business successful

23   until they backed out.

24          And finally, the Fifth Circuit said "exceptions to

25   discharge must be strictly construed against a creditor and

```
 1    liberally construed in favor or a debtor."

 2              I ask the Court, listen to the evidence, see any

 3    evidence of a loan.  You won't see it.  This was a business

 4    relationship that soured when Vitol realized that they had

 5    entered into a non-compete.  And now they're trying to get out

 6    of it.

 7              Thank you, Your Honor.

 8              THE COURT:  Thank you very much.

 9              MR. AURZADA:  Your Honor, I have a question for the

10    Court.  How would you like the exhibits?  I have a thumb drive.

11    I also have paper.  And I'm happy to provide both or one or the

12    other.

13              THE COURT:  Why don't you give me -- if it's -- okay.

14    I'll take both, actually.

15              MR. AURZADA:  And the same has been provided to Ms.

16    Goott.  So --

17              THE COURT:  Yeah.

18              MR. AURZADA:  May I approach, Your Honor?

19              THE COURT:  Yes.

20              MR. AURZADA:  This is the thumb drive.  And it has a

21    password associated with it.  It's written on the drive.

22              THE COURT:  Okay.  Thank you.  Okay.

23              MR. AURZADA:  Your Honor, may I put the exhibits over

24    here?

25              THE COURT:  Oh, yeah.  You can just drop them right
```

1    there.  I'll grab them.

2            MR. AURZADA:  Your Honor, at this time, to kind of

3    get us started, I'd like to move the admission of the documents

4    comprising each of Vitol exhibits 75 through 82.

5            THE COURT:  Let me make sure -- I've got a docket --

6    75 through 82.

7            MR. AURZADA:  Yes, Your Honor.

8            THE COURT:  Okay.

9            MR. AURZADA:  I think I owe it to the Court to

10   explain what I'm doing and what's going on here.  So if you'll

11   bear with me.

12           THE COURT:  Yep.  Go for it.

13           MR. AURZADA:  Yeah.  Each of these exhibits

14   represents a collection of business records of the third party

15   supported by a business records affidavit which is in the -- as

16   part of the exhibit.  They're admissible pursuant to Federal

17   Rule of Evidence 902(11) because they're self-authenticating.

18   Business records falling within the corresponding hearsay

19   exception under Federal Rule of Evidence 803(6).  Meaning,

20   there's an affidavit by a records custodian that says these are

21   the documents of the affiant collected at the time, regular

22   course of business, and the affidavits are in there.  We can

23   read them if we want to.

24           The purpose of Federal Rule 902(11) is to avoid

25   unnecessary witness testimony for business records.  The

1    Circuit has ruled on this a number of times repeatedly

2    recognizing that use of business records affidavits like this

3    is norm and not the exception.  We don't have a witness here

4    for these right now.  And the Fifth Circuit has stated thus

5    under 902.11, the authenticity of business records may be

6    established by written declaration of the custodian provided to

7    opposing counsel a reasonable period before trial.

8            In this case, we gave notice on August 18th of our

9    intention to offer these exhibits.  And we asked if there were

10   any objection and what the grounds for that objection would be.

11           THE COURT:  Was the record made for inspection?

12           MR. AURZADA:  Of course.  Yes, Your Honor.  Yeah.

13   Not only -- we gave the records.  We transmitted the records.

14           THE COURT:  No, no.  I meant the business record --

15   the affidavit.  Was anyone able to inspect it to then determine

16   whether the record, the affidavit itself, could be subject to

17   inspection?  So I'm giving you an example.  Hey, we intend to

18   offer this business record affidavit into evidence.  This is

19   legally -- this is self-authenticated and satisfies 803(6).  It

20   contains, you know, the magical language.  Do you have any

21   objection to this?  Or is it just a statement --

22           MR. AURZADA:  Your Honor --

23           THE COURT:  Hold on.  Just let me finish.  I just

24   want to make sure that I understand what got offered.

25           Was it a statement that just says, hey, we intend to

002525

1   offer a business record affidavit.  Do you object?  I see them

2   different.

3            MR. AURZADA:  Your Honor, may I approach and hand up

4   the exact communication?

5            THE COURT:  Sure.

6            MS. GOOTT:  Can I see what it is?

7            THE COURT:  Yes.  I want to make sure they see it,

8   too.

9        (Pause)

10           MS. GOOTT:  Yeah.  There's nothing attached to this.

11           THE COURT:  So I ask my question again.  Mr. Aurzada,

12   so I'm looking at this.  Mr. Purcell sends an email to Ms.

13   Goott:  "...seek the admission of the following certified

14   domestic records"  It identifies -- help me.  (Indiscernible)

15   identify the documents, doesn't identify a business record

16   affidavit and one can expect it does not include any documents

17   that are sought to be included as business records.  So --

18           MR. AURZADA:  Your Honor, we -- if you --

19   respectfully, if you read the rest of the email, it says, "All

20   such records have been previously produced in the matter."

21           THE COURT:  But how do you know which ones they are?

22           MR. AURZADA:  I'm about to get to that.

23           THE COURT:  Okay.

24           MR. AURZADA:  "Each set of records will be

25   transmitted to you today using a ShareFile link that will be

1    separate emailed to you.  Please let us know if you object to

2    the admission of any such records and, if so, the grounds for

3    your objection."  And I'll represent to the Court that that

4    ShareFile link --

5              THE COURT:  But where's the transmission that

6    shows -- I got this email.

7              MR. AURZADA:  Sure.  Happy to -- if you'll give us a

8    moment, we'll get it.

9              THE COURT:  I just want to know -- in other words,

10   was there a business record affidavit attached that someone

11   could then inspect and then determine whether that, in and of

12   itself, was a qualifying business record affidavit or did

13   someone just identify -- that's what I'm just trying to get to.

14   I -- and I don't want anybody to take anything one way or the

15   other.  I'm just trying to understand.  Is there a record that

16   someone said here's the business record affidavit that I'm

17   intending to admit.  Take a look at this.  Tell me if you

18   object because we believe it's self-authenticating.

19             MR. AURZADA:  This is it.  This is absolutely it.

20             THE COURT:  But I don't --

21             MR. AURZADA:  The Share --

22             THE COURT:  -- see an affidavit.  It's in the

23   ShareFile link.  Every single one of these documents is

24   supported by an affidavit, one at a time.

25             THE COURT:  That's what I'm trying to get to.

```
1              MR. AURZADA:  Yeah.  Of course.

2              THE COURT:  You just handed this to me.  That's why

3    I'm asking.

4              MR. AURZADA:  Yes.

5              THE COURT:  Okay.  Where do I see that?

6              MR. AURZADA:  We can start by looking at the Exhibit

7    75.

8              THE COURT:  But how do I know it was transmitted?

9              MR. AURZADA:  Okay.  First of all, I'm sure Ms. Goott

10   will admit that she received the ShareFile link.  But I'll dig

11   out the email --

12             THE COURT:  I just want a clean record.  I don't want

13   to rely on anything.  Everything's going to get objected to

14   today and you ought to assume that and I'm sure it's coming

15   both ways.  I want to know each set of records will be

16   transmitted to you today.  I want to make sure that that

17   actually happened and that there's a document that then when I

18   look at it, I can try A with B and then see where it is.

19             MR. AURZADA:  Bear with me, Your Honor.

20             THE COURT:  So if you tell me where it is, I can look

21   at it.

22             MR. AURZADA:  We'll collect it.

23             THE COURT:  Sure.

24             MR. AURZADA:  One moment.  As a matter of fact, may

25   we just have 10 minutes?  That way we're not wasting the
```

1    Court's --

2              THE COURT:  Yeah.  Absolutely.

3              MR. AURZADA:  -- time.

4              THE COURT:  It is 2:38.  Why don't we start at

5    2:40 -- it's 2:38.  Why don't we do 10:50 (sic)?  Does that

6    work --

7              MR. AURZADA:  Yes, Your Honor.

8              THE COURT:  -- for everyone?  Okay.

9              MR. AURZADA:  Thank you.

10             THE CLERK:  All rise.

11         (Recess from 2:38 p.m. until 2:54 p.m.)

12             THE CLERK:  All rise.

13             THE COURT:  Please be seated.

14             Okay.  Back on the record in Vitol v. Brass.  Mr.

15   Aurzada?

16             MR. AURZADA:  Thank you, Your Honor.

17             So the Court asked me a good question which is, you

18   know, can I prove that on the 18th day of August did this get

19   transmitted.  I know what we did.  We put it in the Share link

20   system which made it available to Ms. Goott.  She's an officer

21   of the court.  If she wants to tell the Court otherwise that's

22   fine.  She can tell the Court whatever she wants.

23             We did make sure to transmit the exhibits on the

24   22nd.  We know that went.  That was eight days ago.  We asked

25   in the same email that I handed up, on August 18th, for her

1    availability to have a conference to meet and confer regarding

2    the pretrial materials to which she did not respond.

3          And further, the rule requires that we must make the

4    record and certification available for inspection after giving

5    written notice of intent.  And that's exactly what we did.  And

6    so the --

7          THE COURT:  Was there -- I'm just looking -- I'm just

8    reading the email.  Was there anything transmitted to them

9    using a ShareFile link what was separately emailed to counsel?

10         MR. AURZADA:  It was uploaded to the system.  It is

11   our belief sitting here right now today that that would have

12   generated an automatic email on the 18th.  But we are uncertain

13   whether -- I mean, we can't prove to the Court that right at

14   this moment.  I'm sure we could get into the software logs and

15   I'm sure there's a very technical explanation.  We know the

16   exhibits were transmitted on the 22nd.  Okay?  And so --

17         THE COURT:  How do you move for the admission of a

18   document that you can't prove that they actually received?

19         MR. AURZADA:  They got the exhibits.

20         THE COURT:  How do you prove that to me?  How do you

21   prove it to me?  Are you make them stand up and say didn't you

22   get it or are you going to prove that you got it?  I'm just

23   asking.

24         MR. AURZADA:  Well, one minute, Your Honor.

25         He has the proof -- Mr. Malpass -- sorry.  Mr.

Page 45

1    Malpass has proof that it was transmitted on the 22nd.  And by

2    "it", I mean --

3             THE COURT:  What do you mean by transmitted?  Why

4    don't we start there?

5             MR. AURZADA:  May I have those?

6             THE COURT:  Yeah, of course.

7             MR. MALPASS:  Thank you, Your Honor.  So for the

8    18th, I uploaded them.

9             THE COURT:  Just state your name for the record,

10   please.

11            MR. MALPASS:  Oh.  Excuse me.  Mason Malpass.

12            THE COURT:  Okay.

13            MR. MALPASS:  Thank you.

14            On the 18th, I uploaded the business records

15   documents which have the affidavits contained in them onto a

16   Share file.  I do not have the proof that it was transmitted.

17   I can shot this upload.  I can show Ms. Goott what was on the

18   folder.

19            But on the 22nd, when we exchanged exhibits, I have

20   proof that they were all sent -- some documents from that

21   folder were downloaded by Ms. Goott.  I believe Mr. Patterson

22   as well.  And that folder has Vitol's Exhibits 75 through 82.

23   So after the notice on August the 18th, which said we intend to

24   admit these as business records with business records

25   certifications, four days later, all of those documents were

```
 1   sent and those tabs --

 2              THE COURT:  On the 22nd?

 3              MR. MALPASS:  Correct.

 4              THE COURT:  Okay.  What proof do you have for me

 5   today?

 6              MR. MALPASS:  I can show you the email log.  If you

 7   want me to --

 8              THE COURT:  I'm just asking.  So you can't prove

 9   anything on the 18th?  Is that what you're saying?

10              MR. MALPASS:  That's correct.

11              THE COURT:  Okay.  And the 22nd -- let me just see

12   where we're going here.  I'm not saying Ms. Goott didn't get

13   it.  But it's -- you're the one that's moving for admission.

14   Let me just save you a little time for the objection that's

15   coming your way.

16              So let's see.  Okay.  What do you wish to show me,

17   counsel?

18              MR. MALPASS:  May I have a moment, please?

19         (Pause)

20              THE COURT:  I just want the record to be clean.  We

21   were in pretrial.  And I know that Ms. Goott objected to these

22   documents.  And I know we were going to take this issue up

23   today.  I'd rather understand your case-in-chief so I can

24   better understand if she still has an objection.  So I'm just

25   making sure that there's enough support for the 803(6)/902(11)
```

002532

1   in the affirmative.  That's really what I'm doing.  I'm not

2   presupposing that there's any objection.  I just kind of think

3   I have an independent duty to determine.  Okay.

4           Counsel, what do you wish to show me?

5           MR. MALPASS:  Okay.  So, Your Honor, this is a report

6   generated by the ShareFile.  Sent message details.  It was

7   generated on August the 22nd 4:51 p.m.  It shows the

8   recipients.  We have JJP at Walker & Patterson.

9           THE COURT:  Uh-huh.

10          MR. MALPASS:  So Mr. Patterson.  We have Ms. Goott.

11  At that time, they had not downloaded them yet.  But as we

12  scroll down, you'll see the contents of the folder that was

13  sent to them.  So, for instance, Vitol Exhibit 81, that's one

14  of our business records.  And if you'd like, I can go in,

15  access this folder, download that document and show you what's

16  in each of these.  But each of the business records that Vitol

17  seeks to admit are within this folder and were sent on this day

18  as shown by this report.

19          THE COURT:  Show me an example of one business record

20  affidavit that's contained there.

21          MR. MALPASS:  Yes.  If I can have a moment to access

22  this folder.

23          THE COURT:  Okay.

24      (Pause)

25          THE COURT:  I'm only asking because I see -- I'm just

1    looking at what you're showing me.  I see Trifinery BK schedule

2    summary rack sales, Vitol Exhibit 81.  I don't know whether

3    that's actually a business record affidavit.  I'm just --

4    that's why I'm asking.  I don't want you to --

5            MR. MALPASS:  No.  I understand, Your Honor.  On page

6    2, there is Vitol Exhibit 75.

7            THE COURT:  Okay.  You want to pull that up?

8            MR. MALPASS:  Scroll down, please.

9            THE COURT:  You're saying that -- okay.  Let me read

10   it.

11           MR. MALPASS:  This shows we sent Vitol Exhibit 75.

12           Can you please pull that up?  Could you go to -- I

13   believe it's page 6 of this exhibit.  And then here's the

14   business records affidavit.

15           THE COURT:  I want to make sure I got this right.  So

16   Brass' counsel to know they would have had to have worked

17   through a -- something up (indiscernible) the first page of the

18   pdf that you (indiscernible) federal tax loan they would have

19   to have scrolled through here and then found it?  Is there any

20   place where you direct them that says, hey, it's found on page

21   x?  In other words -- I'm making up something.  If 500 pages of

22   documents are sent and you want to point out to a business

23   record affidavit, (indiscernible) open up a pdf and it said

24   notice of tax lien on it, how does the reader then -- or the

25   recipient know then to scroll to page whatever you have there

1    to then determine?  Or do they just click at the front and say

2    notice of tax lien, don't need to pay attention to that?  Is

3    there something where you sent them a transmittal and said let

4    me go to this page?  Go to here.  Here -- our affidavits are

5    based on this page to this page.

6              MR. MALPASS:  No, there's not.  And I appreciate your

7    concern.  And I wish I had taken a different one that had the

8    business records affidavit on the first page because there are

9    several like that.

10             But we produced these.  We uploaded them, designated

11   them as exhibits in the same order they were provided to us by

12   these third parties.  So --

13             THE COURT:  So the third party sent you a notice of

14   tax lien?

15             MR. MALPASS:  Correct.  IBC Bank sent us 2,700 some

16   pages of documents.

17             THE COURT:  How many pages were sent in that

18   production that you sent?

19             MR. MALPASS:  That we provided to Ms. Goott?

20             THE COURT:  Uh-huh.  On that day.

21             MR. MALPASS:  Pages --

22             THE COURT:  Bates pages.  Let me give you a fair --

23   just a (indiscernible) in the envelope.  Over 2000?

24             MR. MALPASS:  Yes.  And 15, 20,000.

25             THE COURT:  Okay.  Let's see.  What's the date of

1    this business record affidavit?

2             MR. MALPASS:  Excuse me, Your Honor?

3             THE COURT:  I just want to know the date of the

4    business record affidavit.  I apologize.

5             MR. MALPASS:  It's on the bottom of the second page

6    here.

7             THE COURT:  Okay.  So that would have been January

8    11th?

9             MR. MALPASS:  Yes.

10            THE COURT:  Are there any documents attached to this?

11            MR. MALPASS:  Yes.

12            THE COURT:  In other words, can the reader then say

13   here's a Jan -- here's a business record affidavit dated

14   January?  And then here are the documents that follow?  In

15   other words, does it chronologically follow or does the reader

16   then have to read these two pages and then scroll down and find

17   the natural documents that they're referring to somewhere else?

18            MR. MALPASS:  So this exhibit, Exhibit 75, is all of

19   the IBC documents together and only those documents.

20            THE COURT:  So can you scroll to the page before?  I

21   just want to scroll down just a little bit.  Okay.  So you're

22   an assistant VP -- just scroll down a little bit more.  I

23   apologize.  Ms. Meta, I really appreciate it.

24            So attached hereto (indiscernible) CD with 1314

25   records.  You're saying that this -- I would -- is it just pdf

1    75 that has the 1314 records?  I'm just trying to understand?

2              MR. MALPASS:  Yes.  That's correct.  So Vitol Exhibit

3    75 is everything provided to us from International Bank of

4    Commerce pursuant to subpoena.  And we kept that in the order

5    that they provided it to us.  They put it -- the affidavit at

6    page 6.  We didn't want to reorganize that since they labeled

7    them.

8              THE COURT:  Can you give me another example?

9              MR. MALPASS:  Sure.

10             Could you please pull up Exhibit --

11             MS. GOOTT:  Exhibit 77 has the business records

12   affidavit on the very last --

13             THE COURT:  No, no.  I just want to -- I'll give you

14   another chance.  I'm just trying to understand what we're

15   doing.  So this was dated in January.  Okay.

16             MR. MALPASS:  Can you please pull up Exhibit 76?

17             THE COURT:  It's 76.  Okay.  This is another example.

18   So who is this?  This is --

19             MR. MALPASS:  This is Veritext, Your Honor.

20             THE COURT:  Veritext.  Okay.  Can you scroll down

21   just a little bit.  When was this one dated?

22             MR. MALPASS:  That'll be on the second page.

23             THE COURT:  These are all January.  And then is it

24   fair to say that 76 also has like 1308 -- whatever the number

25   of pages?

1            MR. MALPASS:  Right.  So --

2            THE COURT:  Is it one pdf -- like, in other words, is

3    Vitol Exhibit 76 1300 or so pages?

4            MR. MALPASS:  It is one exhibit that is everything

5    they gave us.

6            THE COURT:  Okay.  Is there something that would have

7    identified -- this email says it'll be transmitted to you

8    today.  Is there something that said, hey, here's the email --

9    here's ECF or Vitol Exhibit 75, 76 -- I mean, these are the

10   ones.  Let me know if these are the ones that you want, if

11   there's any objection to them.

12           MR. MALPASS:  We do not have that in that same order.

13   We gave the notice on the 18th --

14           THE COURT:  But how is --

15           MR. MALPASS:  -- which lists --

16           THE COURT:  -- somebody supposed to know that Vitol

17   75 is what you're referring to in this email?  I gather it's

18   the 22nd, right?  They got it on the 22nd.  But did someone

19   point it out to them?  Is there something that you said

20   affirmatively?

21           MR. MALPASS:  On the exhibit list that was also

22   exchanged and filed on the 22nd, these exhibits are all in

23   their own section labeled business records --

24           THE COURT:  What I'm pointing out to you is that the

25   deal -- the decision that you're going to rely on, right, was a

Page 53

```
1    case where someone, five days before trial, handed them a
2    business record affidavit and said, hey, here's the record that
3    I want to get in.  Right?  I'm trying to figure out if there's
4    a parallel here or is it just if you happen to see what we
5    sent.  That's the connection that I'm looking for even the day
6    before trial.  Right?  Here's something here.  I'll give you an
7    opportunity to inspect.  Here's what's going on.  That's what
8    I'm trying to find whether there's something there.  I know the
9    case you're trying to rely on.  Right?  And that's where I'm
10   going.  But you're going to say -- you're going to tell me that
11   -- maybe there's a connection there or not.  That's why I'm
12   prodding.  If not, then they have the right to object and
13   you're going to have to show up with a witness to --
14           MR. MALPASS:  I'll show you one more thing, Your
15   Honor.
16           THE COURT:  Oh, absolutely.  I'm just telling you
17   where I'm going.  I don't want to -- I think sometimes judges
18   tend to ask questions and it's unclear which way they're going.
19   I'm telling you.  I know what case you're going to and I'm
20   trying to understand if there's a connection there or not.
21   'Cause I read the brief that you cited.  That's where I'm
22   going.  I don't want there to be any confusion.  I'm a little
23   confused by this.
24           Yes.  Show me whatever you want.
25           MR. MALPASS:  Do you have the exhibit list, Vitol's
```

1   exhibit list that was filed?

2        (Pause)

3             MR. AURZADA:  Your Honor, can we just put it up on

4   the Elmo?

5             MR. MALPASS:  On the overhead.

6             THE COURT:  Excuse me?

7             UNIDENTIFIED SPEAKER:  (Indiscernible) put it up?

8             THE COURT:  Yeah, yeah.  No, no, no.  Absolutely.

9   Yes.  Or you can hand it up to me.  I don't care.  You can show

10  me a page through the Elmo should work.  It worked

11  (indiscernible) the other day.  It's always when you want to do

12  something.  Why don't you just show me -- oh, there it is.

13  Yep.

14            MR. MALPASS:  This is our witness exhibit list.

15            THE COURT:  And when was that filed?

16            MR. MALPASS:  It was filed on the 2 --

17            THE COURT:  22nd.  Okay.

18            MR. MALPASS:  The same day that they were exchanged

19  on ShareFile.  Starting down here, Exhibit 75, business

20  records, 75, IBC, at the Bates labels that they were provided

21  to us.

22            THE COURT:  Yep.

23            MR. MALPASS:  And the description, Business Records

24  of International Bank of Commerce with Business Records

25  Affidavit (be admitted under Federal Rules of Evidence 902(11)

1    & 807).

2             THE COURT:  Just give me a second.  I want to ask you

3    a question.  What was the date of our pretrial conference?

4             MR. MALPASS:  24th?

5             THE COURT:  Okay.  So two days later they object to

6    every one of these things.  So now what?  Where do we find

7    ourselves?  Ms. Goott stated on the record unequivocally I

8    there's any question about it, we object.  Right?  Well, get

9    the custodian here.  So if they objected to the business record

10   and -- (indiscernible) find yourselves?

11            MR. MALPASS:  If we're just discussing their

12   objection, they have a burden to show that there is an

13   untrustworthiness in these documents under 803(6)(e).  They

14   haven't done anything other than saying we would like to

15   cross-examine witnesses, custodians to judge their credibility.

16   But they have not done anything to show that either the

17   documents themselves or these affidavits lack the

18   trustworthiness.

19            THE COURT:  So here's my question.  Let me pull that

20   up.  What's the docket number on that?  This is Exhibit --

21            MR. MALPASS:  On the exhibit list, Your Honor?

22            THE COURT:  No, no, no, no.  The docket -- your

23   witness and exhibit list was filed at docket number --

24            MR. MALPASS:  101.

25            THE COURT:  Can you just scroll down a little bit --

Page 56

1    down.  I can just -- what's the date --

2              MR. MALPASS:  It's 101.

3              THE COURT:  101.  That's what I need to know.  What

4    page -- oh, I see it.  I see it.

5              MR. MALPASS:  It begins at page 4.

6         (Pause)

7              THE COURT:  Okay.  And I (indiscernible) look to --

8    that's an interesting question.  That's an interesting

9    question.  I think we looked at -- what was the ones that we

10   pulled up earlier?  Cadence?  Was that one of them?

11             MR. MALPASS:  Looked at Veritext and IBC.

12             THE COURT:  Can you pull up the Veritext one again?

13   Oh.  I got to change my --

14             MR. MALPASS:  Oh.

15             THE COURT:  I've got to -- can you just pull up

16   Veritext document again?  Okay.  Just make that a little

17   bigger.  Scroll to the bottom.  Veritext.  Where's Veritext?

18   Just a little bit further down.

19             How does one know that that's VCB001397?  I'm just --

20   I should be clearer.  Your witness and exhibit list identifies

21   VCB001397.  But you're showing me a document without a Bates

22   label.  I just --

23             MR. MALPASS:  Yes.  Understand, Your Honor.  The

24   Bates numbers start on the next page.

25             THE COURT:  Okay.

1           MR. MALPASS:  The affidavit says "Attached hereto are

2     1,397 pages."  And so they labeled them after the affidavit.

3     So then the following pages, the total pdf is 1,3999, I

4     believe.

5           THE COURT:  But your witness and exhibit list doesn't

6     actually -- so if someone went to 1397 -- right?  So in other

7     words, how is it produced (indiscernible) to -- how was it

8     produced to Brass?  (Indiscernible) when these documents were

9     produced, in what form was VCB0 -- was it always Exhibit --

10    Vitol Exhibit 75 for the first time?

11          MR. MALPASS:  No.  These were initially produced

12    after we received them from the third parties.

13          THE COURT:  So then if I looked at this business

14    record, what are the (indiscernible) I'm going to find the

15    business record affidavit based on this if you just looked at

16    this?

17          MR. MALPASS:  This being Vitol 76.

18          THE COURT:  Just the witness and exhibit list.  If

19    you just look at the witness and exhibit list, it says

20    VCB001397.  Again, that's going to be able to affirm -- and I

21    appreciate the clarification.  That's how I'm going to be

22    (indiscernible) and then go look at the box.  But where do they

23    then find the business record affidavit?  Then they have to

24    then go find Vitol Exhibit 75 and then combine it with this?

25          MR. MALPASS:  No.  This --

```
 1              THE COURT:  These are the documents.  Where's the

 2   business record affidavit that tracks --

 3              MR. MALPASS:  In Exhibit 75.

 4              THE COURT:  In Exhibit 75.  But they would then have

 5   to know that Exhibit 75 is the business record affidavit that

 6   you want them to see.  Right?  (Indiscernible) combine --

 7              MR. MALPASS:  (Indiscernible) 76.

 8              THE COURT:  Huh?

 9              MR. MALPASS:  I've been saying 75.  We're -- 76.

10              THE COURT:  Oh, no, no, no.  I apologize.

11   (Indiscernible) --

12              MR. MALPASS:  Pardon me, Your Honor.

13              THE COURT:  -- (indiscernible).

14              MR. MALPASS:  So if Mr. Brass (indiscernible) his

15   counsel sees the exhibit list --

16              THE COURT:  Then they read that and she -- they see

17   the documents, the 1397 documents.  Where do they find the

18   affidavit that they can then track who's the custodian?

19              MR. MALPASS:  As soon as they open that pdf.  That's

20   the first page.

21              THE COURT:  No.  But this tells them to go to 1397,

22   right?  VCB 1397 that you just told me, the separate

23   production.  In other words, how does VCB001397 produced

24   into -- in its original -- when was it originally produced to

25   Brass?
```

1               MR. COOLEY:  If I could, Your Honor -- and I hate to

2     interject --

3               THE COURT:  No, no.  I'm just trying to understand.

4     I saw on Exhibit 75 that have two -- Exhibit 75.  Let's just

5     use that for an example.  That had a two-page business

6     record --

7               MR. COOLEY:  And I think --

8               THE COURT:  -- certification.

9               MR. COOLEY:  And I think I can clear it up, Your

10    Honor.

11              THE COURT:  Okay.

12              MR. COOLEY:  We've conflated two different exhibit

13    numbers.  Right now on the page -- on the left-hand page, this

14    last one ending VCB1397, that is the very last page of Exhibit

15    76 on the witness and exhibit list.  If we go to the very first

16    page of that document, there is the business record

17    affidavit --

18              THE COURT:  No.

19              MR. COOLEY:  -- corresponding to those documents in

20    the same pdf.

21              THE COURT:  That's what I'm trying to figure out.  So

22    was the first time they received this on August 22nd?

23              MR. MALPASS:  No, Your Honor.

24              THE COURT:  Or August 18th?

25              MR. MALPASS:  They received --

1          THE COURT:  Or when the transmittal -- that's what

2     I'm trying to understand.  Did they receive VCB -- I guess what

3     I'm trying to understand -- I'm not doing a very good job by

4     explaining this.  Here's what I'm trying to understand and I

5     could be absolutely wrong and tell me if I'm wrong.

6          I'm just -- (indiscernible) VCB1397.  Is that then

7     taken to a different database where a different set of

8     documents that were produced earlier in time without a business

9     record affidavit?  Or does then someone then -- which could

10    create -- may or may not (indiscernible) some confusion.  You

11    know, this -- (indiscernible) your production where VCB1397 was

12    first produced or is it (indiscernible) received the VCB1397 if

13    they would have just gone to the first page, they would have

14    seen that this was the business record affidavit at the

15    beginning?

16         MR. MALPASS:  You're asking when it was initially

17    produced.  I have the records somewhere.  But let's say around

18    January we received Veritext --

19         THE COURT:  A better question is if this says

20    VCB1397, is that going to make Brass have to go to Exhibit 76

21    or could they have gone to an earlier set of production of

22    documents?

23         MR. MALPASS:  They could look at the earlier set but,

24    I mean, on our exhibit list, it's the range.  Right?  VCB1 to

25    VCB1397.

```
 1              THE COURT:  No, no, no.  I'm with you.  VCB1.  But

 2     then would that produced at one certain time and then Exhibit

 3     76 or 75 then added the business record?  That's what I'm

 4     trying to figure out.

 5              MR. MALPASS:  So you're asking was the business

 6     records affidavit provided to them --

 7              THE COURT:  At the same time VCB1 through 1397 --

 8              MR. MALPASS:  -- at the same time VCB was --

 9     originally.  Not on the 22nd?

10              THE COURT:  At any time.  I don't know when it was

11     produced.

12              MR. COOLEY:  Your Honor, I think this is the

13     confusion.  Exhibit 75 is an entirely separate business record

14     affidavit with an entirely separate basket of documents

15     attached to it.  Exhibit 76 is the Veritext business record

16     affidavit to which is appended the documents 1 through -- pages

17     1 through 1397.  Exhibit 75 has its own business record

18     affidavit for IBC --

19              THE COURT:  That's what I'm trying to figure out.  So

20     how would Brass then know by looking at this exhibit where the

21     affidavit is?

22              MR. COOLEY:  Your Honor, if Brass downloaded the

23     documents provided to him and opened the documents as Mr.

24     Malpass did here, other than that one where there was a tax

25     lien for the first page --
```

1           THE COURT:  No.  I'm not asking about --

2           MR. COOLEY:  -- it would be the business record

3    affidavit --

4           THE COURT:  Here's what I'm trying to say.  Was VCB1

5    through 1397 produced at an earlier set in time as well?

6           MR. COOLEY:  I think it may have been produced within

7    the normal course of --

8           THE COURT:  But that's what I'm saying.  So then does

9    someone -- is someone going to go to that set of documents and

10   not look at Exhibit 76 thinking that they've been looking at

11   what's earlier and not seeing an affidavit next to it?  Because

12   nothing here points you to an affidavit.

13          MR. COOLEY:  Your Honor, the Exhibit 76 --

14          THE COURT:  With the business record affidavit.  But

15   when I go to 1 through 1397, it's not with the business record

16   affidavit.

17          MR. COOLEY:  Yes, Your Honor, it is.  It's at the

18   very beginning of that same document, Exhibit 76.

19          THE COURT:  The Bates label VCB1 (indiscernible) then

20   go to 1397 --

21          MR. COOLEY:  Right.  I apologize, Your Honor.  You're

22   correct.  1 through 1397 are the business records themselves.

23   The affidavit is in --

24          THE COURT:  But that's what I'm saying.  This doesn't

25   identify where the affidavit is.

```
 1              MR. COOLEY:  That's true, Your Honor.  But if you
 2    open Exhibit 76, the first page there you will see would be the
 3    business record affidavit as we did.
 4              THE COURT:  I'm with you.  Got it.  So this is --
 5    okay.
 6              MR. COOLEY:  As Mr. Malpass said --
 7              THE COURT:  So the first time anybody's seen a
 8    business record affidavit, they would have had to have opened
 9    up 75 or 76 or 77.  Got it.  That's what I need to understand.
10    I'm with you.  So these are (indiscernible) sequentially in
11    order of exhibit number or the business -- got it.  I'm with
12    you.  Okay.
13              Ms. Goott, I'll hear from you.  Or, Mr. Patterson.  I
14    didn't mean to --
15              MS. GOOTT:  I want to make sure I'm responding to
16    your question.  Are we --
17              THE COURT:  Or you can take up -- you can respond to
18    my question and you can respond to -- I don't think any --
19    (indiscernible) at this time.  I'm not taking up any attempt to
20    move it in.  I just need to understand what you understood.
21    I'm trying to understand --
22              MS. GOOTT:  Here's what I can tell this Court is that
23    August 22nd was the deadline for us to exchange exhibits.
24              THE COURT:  Uh-huh.
25              MS. GOOTT:  And I received their exhibits on the
```

Page 64

1    22nd.  And these business records that they're trying to ask

2    the Court for permission now to introduce, there are some --

3    and I can take you to -- one had a business record affidavit at

4    the very last page.  We have -- and these exhibits are 2000,

5    3000 pages.  I sat there clicking, clicking trying to find it

6    once they come into court and say we're using these business

7    records affidavits.  But I agree with you.  To give me a 3000-

8    page document a week before trial and say here's the affidavit

9    -- yes, they sent me that email saying we intend to use it.

10   They didn't attach the business records affidavit.  And then

11   when you look at the business records affidavit, there are some

12   that don't even reference the pages that say N/A when --

13             THE COURT:  Did you communicate it with them?

14             MS. GOOTT:  Yes, sir.

15             THE COURT:  Each one of these have to get taken up on

16   their own.  That's why I'm asking.

17             MS. GOOTT:  Yes, sir.  And I have them separated.  So

18   I will -- I'll -- yes, sir.

19             Can you pull up, please, Mr. Patterson --

20             THE COURT:  Hold on.  Mr. Patterson, I need to make

21   you an -- oh.  You're plugged in on that side?  All right.

22   Let's see if I can --

23             MS. GOOTT:  If you could turn to --

24             THE COURT:  Did it work?

25             MS. GOOTT:  -- Exhibit 80, please.

1          THE COURT:  Ms. Martinez and I are the only one that

2    can make fun of -- just take me down.  I want to figure out --

3    I want to know who this is.  Cadence.

4          MS. GOOTT:  Well, this -- yes, sir.  This is the

5    Cadence Bank -- right there.  Number 3.  Attached hereto are

6    N/A pages of record.  Not sure what I'm supposed to do with

7    that.  But I know that that doesn't comply with the business

8    records affidavit.  That was someone swearing to me that these

9    records that aren't identified and produced on the 22nd, a week

10   before trial.  I'll give you another example of -- Mr.

11   Patterson, if you can turn to Exhibit 81.  Now this was

12   produced separately, not even as an exhibit.  I have to open up

13   every single one.  I don't know.  Mr. Patterson, you can see

14   how many pdfs -- this is how they were produced.  For one

15   exhibit, we have how many pdfs and Excel -- 197 items.  You see

16   that at the bottom left.

17         THE COURT:  Can you go to the first page again, Mr.

18   Patterson?  To the actual --

19         MS. GOOTT:  And then if you look there, again, it

20   doesn't even identify which pages.  If you look at paragraph 3,

21   it's blank.

22         THE COURT:  Can you go to the second page?

23         MS. GOOTT:  And this is from before this trial even

24   started.  But it doesn't identify for me what documents this

25   person is swearing to are their business records.

```
 1              I know they're --

 2              THE COURT:  Wait.  I think -- actually, can you pull

 3       that up again?  I just want to see something.  No.  This is --

 4       got it.  So this is GCAC v. Vitol.  Business record affidavit

 5       from the prior -- the 2018 -- it predates the bankruptcy case.

 6       That's why I'm asking.

 7              MS. GOOTT:  Right.  That affidavit is not from this

 8       Court.  And it doesn't reference.  It's defective on its face.

 9       I don't know how someone swears to documents that they don't

10       identify.

11              And then back to the other point that was raised, Mr.

12       Patterson if you can turn to Exhibit 77.  Page 1.  This

13       document is 1,175 pages.  You go through it.  Where is the

14       business records affidavit?  This is -- well, I'm sorry.  If

15       you could just go back up.  All right.  This is their 77 for

16       Chubb.  I look at it.  Okay.  This looks like a document from

17       the insurance company.  You've got to go through 1,173 pages

18       before you find, at the very end, the business records

19       affidavit.  And this -- to get it the week before trial in --

20       aside from the fact that this document is this long --

21              THE COURT:  Can I see the very top of the document,

22       Mr. Patterson?

23              MR. PATTERSON:  Page 1?

24              THE COURT:  No, no, no.  I just want to see this

25       document.  I'm trying to read the top.  I apologize.  Thank
```

```
1    you.  And this is Exhibit 77?

2              MS. GOOTT:  Yes, sir.

3              THE COURT:  Okay.

4              MS. GOOTT:  And this is one exhibit of -- they

5    have --

6              THE COURT:  Let me just say this.  Take a seat.  I

7    just want to -- I just need to communicate something to

8    everyone.  And I want everybody to kind of hear me out for a

9    second.

10             It looks like -- I have the utmost respect for every

11   one of the attorneys that's practicing in front of me here

12   today.  I think you all are some of the best that practice --

13   as a practitioner against some of (indiscernible) -- I'm being

14   asked to (indiscernible) lot of business records affidavits

15   based on pdfs that were not really pointed out until the 22nd.

16   And if you did, you had to open up a 1700 pdf and some of them

17   to get to the last page on one and the other one is the

18   business record affidavit from a case that predates these but

19   then have N/A on the records.

20             I'm being asked to think about allowing an expert

21   witness to testify who wasn't designated as an expert.

22   (Indiscernible) an email that said that business records

23   affidavits were going to be transmitted on the day and then

24   they weren't which then makes me ask just the logical question,

25   I think, which is, is there something that one can then trace
```

1    and then track so that there's no -- so that there is harmless

2    error that one can then point it out and then identify what it

3    is just so everybody's on the same page in terms of what

4    everybody saw and everybody knew it was coming and not just,

5    well, had you clicked on it, you would have seen it.

6            Ten million dollars is a lot to anyone.  I don't care

7    if it's Vitol, Mr. Brass.  That's just a lot of money to -- a

8    lot of -- it's just a lot of money one way or the other.  There

9    are now witnesses here hoping kind of to testify as to what

10   they are.  The custodians, maybe they're outside, maybe they're

11   not.  But I just -- yep.  Folks, you all (indiscernible) sit

12   down and think about this case and kind of where it goes.  And

13   if I'm forced to make rulings, I'm going to make rulings that I

14   think for some of you are going to like, some of you are going

15   to hate.  But everyone's going to feel like the case was

16   prejudiced in a way because no one else is going to be able to

17   put on the case that they wanted to based upon what I'm saying.

18   I don't -- I don't where this goes.  I don't know how this

19   goes.  I think you're going to have a tricky time getting

20   (indiscernible) business record affidavit that (indiscernible)

21   documents but can't tell if their pdf is appropriate

22   (indiscernible) of a business record affidavit.

23   (Indiscernible) maybe you get in some, maybe you don't.  Some

24   might say N/A.  I don't know if they're on the last/ page.

25   Maybe some of them are legit.

```
1              And there certainly is case law.  Mr. Patterson and

2    Ms. Goott, you know, giving someone appropriate notice, you

3    know, maybe even four or five days in advance of an affidavit

4    and giving you an opportunity to object or (indiscernible)

5    custodian an -- the Fifth Circuit has said that under certain

6    instances, that's enough.  That's good enough because you have

7    (indiscernible).  There's no surprise.  You have the docs.  You

8    should have been able to make a determination.  But there has

9    to be some level of transparency where the plaintiff can then

10   point and say they knew.  They absolutely knew and there's no

11   question about it that they knew.  I showed it to them.  I

12   handed it to them.  I (indiscernible) handed it to them and I

13   told them this is what I wanted to do.  No one responded or

14   they didn't say anything and it's five days later or it's two

15   days before trial, Your Honor.  At the worst, (indiscernible).

16   But (indiscernible) I think when you look at the

17   (indiscernible) of the case (indiscernible) 37 and you look at

18   the (indiscernible), you're not supposed to track the

19   (indiscernible), the reality of (indiscernible) not admitting

20   documents and not allowing witnesses to testify.  You know the

21   cases (indiscernible) country especially within the Fifth

22   Circuit.  There has to be some level of an effort to try to

23   make the case work to allow the documents to admit -- to allow

24   the witnesses to testify, to allow the evidence to come out

25   because the Court -- if there's evidence that (indiscernible)
```

```
1    harm (indiscernible) there is sometimes as a justification for

2    it.

3            As I sit here today, I don't know, the local rules

4    say what they say and (indiscernible) local rules if you don't

5    enforce them.  And then what are the instances in which

6    (indiscernible) otherwise ordered by the Court should apply.

7    Under what instances should I allow an expert to testify who

8    hasn't been designated as an expert?  Is the fact that opposing

9    counsel had an expert report, is that good enough?  Does that

10   identify him?  I'm sure Mr. Aurzada would tell me, you know,

11   well, for what other purpose would I have offered Mr. Deetz,

12   for crying out loud.  Ms. Goott says the rules are the rules

13   (indiscernible) what do we have?  If we don't have rules when

14   people identify a document and identify witnesses -- we did

15   ours.  But what's the harm?  I don't know.  I need to think

16   about that.  But I also need to think about whether documents

17   get admitted or not.

18           It's just clear (indiscernible) the parties haven't

19   been talking.  And that's fine.  But the question -- I think

20   both of you are going to have to ask yourselves is that

21   certainly not an apprehension to make call.  I think you've

22   seen that.  I think you've seen me rule on motions to strike

23   when I'm being asked (indiscernible).  But I think it was asked

24   at the status conference.  And I just ruled on the issue and

25   gave out a written decision on that.  You've seen me rule on
```

1   motions for summary judgment in a timely manner.

2          Again, this is a kind of a zero sum game.  Either

3   there's a discharge or there's not.  And there's -- you know,

4   at least somewhere, I don't know, 8 to $10 million on the line.

5   The question is do you really want me to rule on this or do you

6   all want to take a chance and try to see if you can figure

7   something out.

8          I think you all need to think about all that.  And

9   (indiscernible) apprehension (indiscernible) right now, I just

10  (indiscernible) parties really want me to (indiscernible)

11  affect the (indiscernible) presentation that each of you have.

12  So you all figure out what you want to do (indiscernible).

13         We'll start at 9 a.m. in the morning.  If I don't

14  hear anything, I'm just going to -- I'm going to start out by

15  just ruling.  I'm going to rule on the expert.  I'm going to

16  rule on (indiscernible) at them.  And I might (indiscernible).

17  And maybe there's a custodian here.  But then they'll take

18  extra issue up and maybe that's notice and whether you don't

19  need time to take it up (indiscernible) for needless delay for

20  this trial that's been going on for a while.  Everybody told me

21  they were ready.

22         I want to stress again.  This is -- it sounds like

23  I'm being hard on the lawyers and I'm not.  And just

24  (indiscernible) everyone to think about what they're -- what

25  (indiscernible) doing here.  I don't know who wins.  No one has

1    presented a docket in front of me.  No one has testified.  I

2    haven't heard from Mr. Brass.  I haven't heard from anyone

3    (indiscernible).  I just know that $10 million is a lot of

4    money.  And I want people to think about this because what's

5    going to happen if I rule is some stuff is going to come in,

6    some stuff is going to come out.  But the things that you care

7    about you may not get.  Either party.  And that's just the

8    reality.

9         So take the night and think about what I'm saying.

10   We'll start at 9 a.m.

11        THE CLERK:  All rise.

12     (Hearing adjourned at 3:39 p.m.)

13                    *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

002558

Page 73

1                    I N D E X

2

3                  R U L I N G S

4

5    DESCRIPTION                          PAGE      LINE

6    Rule on witnesses invoked              5        20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 C E R T I F I C A T I O N

 2

 3   I, Lisa Beck, certify that the foregoing is a true and accurate

 4   transcript from the official electronic sound recording.

 5

 6

 7   Lisa Beck

 8

 9

10   Veritext Legal Solutions

11   330 Old Country Road

12   Suite 300

13   Mineola, NY 11501

14

15   Date:  September 14, 2022

16

17

18

19

20

21

22

23

24

25
```

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3    Arthur Jacob Brass,            )
                                     ) CASE NO. 21-60025
 4              Debtor.              )
      ----------------------------)
 5    Vitol Inc.,                    ) CASE NO: 21-06006
                                     ) ADVERSARY
 6              Plaintiff,           )
                                     ) Houston, Texas
 7        Vs.                        )
                                     ) Thursday, September 1, 2022
 8    Arthur Jacob Brass,            )
                                     ) 1:03 P.M. to 5:59 P.M.
 9              Defendant.           )
      ----------------------------)
10
                            TRIAL
11          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
12

13    APPEARANCES:
      For Plaintiffs:          KEITH MILES AURZADA
14                             Reed Smith, LLP
                               2501 N. Harwood, Suite 1700
15                             Dallas, TX 75201

16    For Defendant:           MIRIAM GOOTT
                               JOHNIE J. PATTERSON
17                             Walker & Patterson, PC
                               P.O. Box 61301
18                             Houston, TX 77208

19    Court Reporter:          ZILDE MARTINEZ

20    Courtroom Deputy:        ZILDE MARTINEZ

21    Transcribed by:          Veritext Legal Solutions
                               330 Old Country Road, Suite 300
22                             Mineola, NY 11501
                               Tel: 800-727-6396
23
      Proceedings recorded by electronic sound recording;
24    Transcript produced by transcription service.

25
```

002561

```
 1                              INDEX

 2    PLAINTIFFS' WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

 3

 4    Miguel Loya                 6        17

 5

 6    DEFENDANT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

 7

 8

 9    PLAINTIFFS' EXHIBITS                               RECEIVED

10

11

12    DEFENDANT'S EXHIBITS                               RECEIVED

13    Exhibit 104-40                                     54

14    Exhibit 104-1                                      118

15    Exhibit 104-2                                      124

16    Exhibit 104-3                                      138

17    Exhibit 104-9                                      181

18

19

20

21

22

23

24

25
```

```
 1       HOUSTON, TEXAS; THURSDAY, SEPTEMBER 1, 2022; 1:03 P.M.

 2            THE COURT:  Okay.  Good afternoon, everyone.  This

 3     is Judge Lopez.  Today is September the 1st, here on a

 4     continuation of the trial in Vitol v. Brass.  I think I see

 5     counsel for Vitol, and I see counsel for Brass.  You're all

 6     here.  Where do we proceed?

 7            MR. AURZADA:  Your Honor, Vitol would call Mr.

 8     Mike Loya to the stand.

 9            THE COURT:  But before we start, what's the game

10     plan for today?  How are we proceeding?

11            MR. AURZADA:  Your Honor, we're going to proceed

12     with three witnesses today.  The first will be Mike Loya,

13     the second will be the continuation of Mr. Wagner from

14     yesterday --

15            THE COURT:  Mike Wood, Mr. Wagner?

16            MR. AURZADA:  Yes.

17            THE COURT:  Okay.

18            MR. AURZADA:  And then, the third will be Eric

19     Kuo.

20            THE COURT:  Okay.  All righty.

21            MR. PATTERSON:  Your Honor (indiscernible).

22            THE COURT:  Is this -- this one of the witnesses

23     that (indiscernible)?

24            MR. AURZADA:  This was the witness from EEPB.  Did

25     I get his name wrong?
```

Page 4

1          MAN 1:  No, you got it correctly.

2          MR. AURZADA:  No.  Mr. Wagner is from EEPB.  He's

3     the accountant.

4          THE COURT:  No, no.  No worries.  No, I'm glad

5     we're all talking about this anyway.  So, Wagner comes in

6     second?

7          MR. AURZADA:  Yes, Your Honor.

8          THE COURT:  That's right.  Okay.

9          MR. PATTERSON:  And (indiscernible).

10          THE COURT:  Okay, thank you.  And I took a look at

11     my schedule.  Kind of, if this -- well, sounds like we're

12     not going to get done today.  I'm giving everyone a little

13     heads-up.  I'm going to give you some dates, and if you want

14     to, take some time and think about them, but I'll shoot you

15     some dates.  We could do -- I've got a 9:00 a.m. tomorrow

16     that won't last more than 10 minutes, so we can -- we can go

17     all day tomorrow.  Wednesday, we've got a 10:00 a.m., but we

18     can start at 9:00 and just take a quick break, if we had to,

19     at 10:00 and go.  And then, Friday afternoon.

20          I'm not encouraging all those three days; I'm just

21     giving y'all three days and we'll kind of see where we are.

22     I want to work hard today, and maybe if the parties can work

23     hard tomorrow, but I'm just giving you a couple extra days,

24     just in case one works better than the other, witnesses and

25     what have you.  You can give it some thought and kind of go

 1    from there.  But maybe by the -- by the end of day, y'all

 2    can tell me if you want to come tomorrow and what times

 3    tomorrow, and then we can tentatively -- it's Monday, so

 4    federal holiday, and Tuesday gets tricky for me.  And maybe

 5    we at least have a game plan as to what we're going to do

 6    next week as well.

 7            But let's just -- I know you're going to call

 8    witnesses.  I just wanted to get someone thinking about that

 9    as we kind of proceed today.  We'll not hit you at the last

10    minute with it.  Okay?

11            MR. AURZADA:  Good, Your Honor.

12            THE COURT:  Okay.  Go ahead and call your next

13    witness.

14            MR. AURZADA:  Call Mike Loya, please.

15            MR. LOYA:  Where do I go?

16            THE COURT:  Oh, you get the special seat.  Okay,

17    sir, please raise your right hand.  Do you swear to tell the

18    truth, the whole truth, and nothing but the truth?

19            MR. LOYA:  I do.

20            THE COURT:  Okay, thank you.  Please have a seat.

21    Counsel (indiscernible) will provide an examination.

22    Parties may -- you may hear objections to questions that are

23    asked.  I'm just going to ask that you please give me an

24    opportunity to resolve the objection.  And if needed, I'll

25    let you know if you can answer the question or if Counsel

```
 1    would need to ask you another question.
 2              Please don't answer a question that's pending an
 3    objection.  If you need clarity from me as to whether you
 4    can answer or not, I'll let you know.  Okay?
 5              MR. LOYA:  All right.
 6              THE COURT:  Thank you.
 7                   DIRECT EXAMINATION OF MIGUEL LOYA
 8    BY MR. AURZADA:
 9    Q    Mr. Loya, can you introduce yourself to the Court?
10    A    I'm Miguel (indiscernible) Loya.  I used to be the CEO
11    of Vitol Inc.  Currently, I'm retired, investor and
12    different things.
13              THE COURT:  Thank you.  Can you spell your last
14    name, just for the record?
15              MR. LOYA:  L-O-Y-A.
16              THE COURT:  Thank you, sir.
17    BY MR. AURZADA:
18    Q    Mr. Loya, where were you born and raised?
19    A    I was born and raised in El Paso, Texas.
20    Q    And can you describe for the Court your educational
21    background?
22    A    I went to a local high school, Burges High School.
23    Then I went to a local college.  I commuted.  It was
24    University of Texas at El Paso, UTEP.  I got a degree in
25    mechanical engineering, and from there, I went into -- I
```

1    went to Harvard, Harvard Business School, where I got a

2    master's in business administration, MBA.  Then, after that,

3    I worked.

4    Q    And where did you work?

5    A    Various places.  When I graduated from Harvard, I

6    joined Exxon, here in Houston.  And then, after that, I

7    joined another Houston company called Tenneco.  I'm not even

8    sure they exist anymore or not, but it was a large

9    conglomerate in those days.

10       I worked for Tenneco Oil, and after several years with

11   Tenneco, I joined a private trading company, oil trading

12   company, called Transworld Oil, or TW.  They used to go by

13   two names.  And then -- here in Houston -- a couple years

14   here in Houston, then TW transferred me to TW Oil UK, or

15   Transworld Oil UK, obviously in London.  I worked there for

16   several years.

17       I left Transworld Oil in the UK, and I joined Amerada

18   Hess to start the trading group in London.  That was maybe

19   about eight months.  I didn't particularly like it there.

20   And I probably made the best decision of my life.  I quit

21   Amerada Hess, and I joined a small trading company called

22   Vitol, and I was there for 29 years, 29, 21 of those as the

23   head of Vitol Inc.  And I retired in -- May 1st or April

24   30th of 2020.

25   Q    Can you tell the Court a little bit about what your job

1    entailed while you were at Vitol?

2    A    The last one, as the CEO, or from the beginning?

3    Q    As the CEO.

4    A    Well, I was the CEO of a trading company, so it -- it's

5    hard to say that I had a specific role every day.  I was

6    mainly monitoring the risk, looking at projects, approving

7    any term deals that we might do, look at when we were doing

8    hedging property, basically monitoring the day-to-day of the

9    organization, interspersed with various projects that came

10   up.

11        We looked at a lot of investments, potential

12   activities, entering new markets, hiring new people.  It was

13   -- it was a busy day most days, but it was difficult to plan

14   ahead exactly what was going to happen every day.  It

15   varied, depending on what the needs of the day were.

16   Q    Can you explain Vitol's business to the Court at the

17   point in time when you were the CEO?

18   A    Vitol was at -- when I was the CEO, it was a large

19   energy trading company.  What an energy trading company

20   does, mainly, it's a logistics company.  Basically, it buys

21   product, it blends it, it changes it.  Maybe it buys in bulk

22   and breaks it up.  Maybe it transports it in bulk, and thus

23   you have great savings.  It blends different components to

24   make a different product.  It manages the risk by hedging.

25   It finances it, it transports it, it stores it, and

Page 9

1   eventually, sells it.

2       And that applied for -- at the time when I was CEO.  We

3   grew over time.  When I got there, it was -- there were 48

4   people.  I think when I left, it was about 300 and -- 330

5   people.  And there were different products, from natural

6   gas, to electricity, to liquified petroleum gas, LPG, or

7   propane or ethane, to naphtha, to gasoline, to diesel, to

8   jet fuel, and towards the bottom of the barrel, fuel oil and

9   ethyl.

10  Q    And can you describe for the Court Vitol's corporate

11  structure?

12           MS. GOOTT:  (indiscernible)

13           THE COURT:  Sustained.

14  BY MR. AURZADA:

15  Q    While you were the CEO, can you describe the corporate

16  structure of Vitol?

17  A    I'll describe it towards the -- towards the end of my

18  tenure there.  It was, there were three major -- three major

19  operating companies.  Vitol SA, in Europe, did most of the

20  business in Europe.  Vitol Inc. did the business in the US.

21  And Vitol SA did the business in Singapore.  And that

22  reported to people in -- they reported to a holding company,

23  and then the holding company was owned by shareholders.

24  Q    Okay.  Do you know Mr. Arthur Brass, and do you know of

25  his company, Gulf Coast Asphalt Company?

1    A    I known AJ for some time.  I knew him socially, and I

2    also knew him professionally, and I know of his company,

3    GCAC.

4    Q    How did you interact with Mr. Brass and his company,

5    GCAC, on a professional level?

6              MS. GOOTT:  (indiscernible).

7              THE COURT:  Sustained.

8    BY MR. AURZADA:

9    Q    How did you interact with Mr. Brass on a professional

10   level?

11   A    On a professional level, first -- first time we

12   interacted with AJ, I mean, we, I mean Vitol, he worked with

13   Michael Bertuccio.  Michael Bertuccio was a trader working

14   for Vitol at the time.  And they worked some time, trying to

15   put together a transaction where we were -- Vitol was

16   buying, I believe it was fuel oil out of -- out of our

17   refinery in Mobile.  And we did that -- we only did that

18   transaction once.  It was very complicated.  It was -- the

19   logistics were messy.  It just became a very convoluted

20   transaction that we did.  And we did it, it was fine, and I

21   told Michael that we were not likely to do that ever again.

22   And if I remember correctly, Michael then, for different

23   reasons, he left, got a job elsewhere.

24          Now, the second time that I'm aware that we dealt with

25   AJ was when Eric Kuo, our fuel oil trader, started doing

1   transactions with AJ.

2   Q    Okay.  When was that?

3   A    I think he started doing transactions with AJ probably

4   in 2015.

5   Q    Now, how did Vitol interact with Gulf Coast Asphalt

6   Company, on a professional level?

7              MS. GOOTT:  (indiscernible).

8              THE COURT:  Overruled.  I think he can provide.

9              MS. GOOTT:  (indiscernible).

10             THE COURT:  I think that's fair.  Why don't you

11  just ask that way, in terms of timing?

12  BY MR. AURZADA:

13  Q    When did -- when did Vitol interact with Gulf Coast

14  Asphalt Company, on a business level?

15  A    I don't remember exactly when we started to do -- to

16  transact with them.  I know that we were -- we were

17  transacting with them in 2017.  At the time, because we had

18  been -- had been involved with them --

19             MS. GOOTT:  (indiscernible).

20             THE COURT:  Sustained.

21  BY MR. AURZADA:

22  Q    When Vitol started to do business with GCAC, what was

23  the nature of the relationship?

24             MS. GOOTT:  (indiscernible).

25             MR. AURZADA:  I'll be clear.

```
 1                  THE COURT:  Thank you.
 2   BY MR. AURZADA:
 3   Q    In July of 2017, what was the relationship between
 4   Vitol and Gulf Coast?
 5   A    In the summer, we had a borrow/lender relationship with
 6   GCAC.  We provided financing for their business.
 7   Q    As the CEO in 2017, were you responsible for approving
 8   any joint ventures that Vitol might enter into?
 9   A    I think first, you have to clarify joint ventures and
10   Vitol.  We have -- we refer to --
11                  MS. GOOTT:  (indiscernible).
12                  THE COURT:  I actually didn't hear a word he said,
13   so I can't tell if he was responsive or not.
14                  MR. AURZADA:  Your Honor, I'm happy to rephrase
15   this question.
16                  MS. GOOTT:  (indiscernible) responsive.
17   (indiscernible).
18                  THE COURT:  I honestly didn't hear a word he said,
19   so I --
20                  MR. AURZADA:  Let's start over, Your Honor.
21                  THE COURT:  -- why don't you just ask another
22   question?
23   BY MR. AURZADA:
24   Q    As the CEO of Vitol in 2017, did you approve joint
25   ventures that would be entered into by Vitol?
```

1    A    I would approve all joint ventures that require more

2    than one transaction.

3    Q    Did you approve a joint venture between Vitol and GCAC?

4    A    I did not.

5    Q    Did you approve a joint venture between GCAC and

6    Mr. Brass?  Excuse me, excuse me, did you approve a joint

7    venture between Vitol and Mr. Brass?

8    A    I did not.

9    Q    Okay.  Why not?

10   A    We didn't want to do that.  We discussed that prior to

11   that period, but we concluded it's not a business for us.

12   We didn't want to do that business.

13   Q    Was Vitol willing to loan money to GCAC at that time?

14   And by, at that time, I mean in 2017.

15   A    We did so, yes.

16   Q    Okay.  What made Vitol feel secure in making those

17   loans?

18   A    Well, while we were providing --

19           MS. GOOTT:  Objection (indiscernible).

20           THE COURT:  He called it -- he asked if -- whether

21   he made a loan, and he said yes.  And you can -- you can

22   take him up as to whether it was not a loan, but he said

23   they were willing to loan money and that they loaned money.

24           MS. GOOTT:  (indiscernible).

25           THE COURT:  He said -- he said yeah.

```
 1              MS. GOOTT:  (indiscernible).

 2              THE COURT:  I --

 3              MS. GOOTT:  (indiscernible).

 4              THE COURT:  I don't think there's a fact that

 5   there is a loan in evidence.  I haven't heard anything about

 6   it.

 7              MS. GOOTT:  Thank you (indiscernible).

 8   BY MR. AURZADA:

 9   Q    Did Vitol loan money to GCAC?

10   A    We provided financing, both for inventory financing and

11   for operational purposes.

12   Q    Okay.  And in so doing, did Vitol do anything to make

13   itself feel secure about that loan?

14   A    We retained the title of product, and we did not

15   release it until we had security.  Once we had security, we

16   released the product.  That made us feel that we had control

17   of the asset.

18   Q    Okay.  Did Vitol entrust Mr. Brass and GCAC with

19   anything?

20              MS. GOOTT:  Objection (indiscernible).

21              THE COURT:  Sustained.

22   BY MR. AURZADA:

23   Q    Did Vitol expect to be repaid?

24   A    Of course.

25   Q    What makes you say that?
```

1    A    Because it was the only reason we were providing

2    financing.  It wasn't a gift; it was financing, and it was a

3    condition that he would pay back.  Of course.

4    Q    What did Mr. Brass tell you about his intentions to

5    repay?

6    A    I did not deal with that with AJ until -- until the

7    end, until towards the end.  In 2018, when Eric was

8    insisting on payment, he --

9              MS. GOOTT:  (indiscernible).

10             MR. LOYA:  No, I was there when he was talking

11   to --

12             THE COURT:  Sustained.

13   BY MR. AURZADA:

14   Q    What did Mr. Brass tell you?

15   A    He called me up and said, I need time to pay you.  I

16   would -- I would like to propose a payment schedule.  I

17   would like time.  And he threw a couple ideas.  I could pay

18   you -- if I remember completely is, I can pay you $1 million

19   now, and I can pay you $1 million a month.  My answer was,

20   no, pay me now.  You owe it.  Pay me now.

21   Q    And in that discussion, did he tell you that we're

22   joint venture partners --

23   A    No.

24   Q    -- or did he just say he would pay you?

25   A    He just called me and told me he would pay me.  He

```
 1   needed more time, and he wanted me to, because of our
 2   friendship or whatever, to give him -- give him terms.  I
 3   said no.
 4        MR. AURZADA:  Your Honor, may I have a moment to
 5   confirm with co-counsel?
 6        THE COURT:  Yes.
 7        MR. AURZADA:  No further questions at this time,
 8   Your Honor.
 9        THE COURT:  Okay.  I just have one clarifying
10   question.  You, sir, indicated that Vitol provided, I
11   believe you called it inventory financing to Mr. -- to GCAC.
12   Do you remember the amount, in total, that you would have
13   provided?
14        MR. LOYA:  It would have been -- Your Honor, it
15   would have been a continued financing.  So, he would pay
16   some of it back, and we would buy more inventory.  So, I'm
17   not sure what you -- what you're asking me with that.
18        THE COURT:  Okay, no, no --
19        MR. LOYA:  Yeah, cumulative or at -- or a peak
20   number?
21        THE COURT:  That's a good question, so I
22   appreciate the clarification.  When you said that Mr. Brass
23   owed Vitol money and you said, no, pay me now, what was the
24   amount that you believe was -- that Brass owed Vitol at that
25   time?
```

002576

```
 1              MR. LOYA:  About $50 million.

 2              THE COURT:  Thank you.

 3              MR. PATTERSON:  Sorry for the delay.

 4              THE COURT:  No.  Mr. Patterson, I've given you --

 5    I've turned it over to the podium, and I'll let you use it

 6    as you see fit.

 7              MR. PATTERSON:  Okay.  I won't plug it in until

 8    I'm ready.

 9              THE COURT:  Okay.

10              CROSS-EXAMINATION OF MIGUEL LOYA

11    BY MR. PATTERSON:

12    Q    Good afternoon, Mr. Loya.

13    A    Good afternoon.

14    Q    Now, I want to talk a little bit more about Vitol.  And

15    you said you were CEO of Vitol Inc.?

16    A    Correct.

17    Q    Where's that based?

18    A    In Houston.

19    Q    All right.  And is that the same entity that's located

20    in the UK?

21    A    No.

22    Q    What is that entity referred to?

23    A    Well, there's a -- it's not an easy answer.  There's a

24    UK company.

25    Q    What's the name of it?
```

```
 1    A    Vitol Limited, I'm just -- I'm just guessing.

 2    Q    You were CEO, and you don't know?

 3    A    No, I'm CEO of Vitol Inc.

 4    Q    Okay.  You don't know your sister company in the UK?

 5    A    Well, if you -- if you remember what I -- in my answer,

 6    I said one of the transactions Vitol SA.

 7    Q    Okay, but listen to my question.

 8    A    (indiscernible) my company.

 9    Q    Listen to my question, please.  You were CEO of Vitol

10    Inc.

11    A    Yes.

12    Q    Which is the United States operations, right?

13    A    Yes.

14    Q    Based in Houston, right?

15    A    Yes.

16    Q    You don't know the name of the UK entity that does the

17    same thing in the UK?

18    A    I don't think that UK entity does the same thing in the

19    UK.

20    Q    How do you know?  You don't even know the name.

21    A    I know it's a small company that handles the

22    operations, meaning the costs and running all the office in

23    the UK.

24    Q    Okay.  Who did you answer to?  Who -- well, let me ask

25    a different question.  Who owned the interest in Vitol Inc.?
```

```
 1    A    I think it was owned by Vitol SA.

 2    Q    Vitol SA, right?

 3    A    Yes.

 4    Q    And where is Vitol -- I'm sorry, where was Vitol SA

 5   headquartered?

 6    A    Geneva.

 7    Q    Geneva.  And who ran, who was in charge of Vitol SA?

 8    A    Gerard Delsad.

 9    Q    Would you spell the last name, please?

10    A    D-E-S-A --

11    Q    Delsad?

12    A    Desault, U-L-T.  No, S-A-L-D, Delsad.

13    Q    L-T.

14    A    A-L-D, as in dog.

15    Q    D as in dog.  And did you have a position with Vitol

16   SA?

17    A    I did not.

18    Q    All right.  And we're going to talk about -- a little

19   bit about an entity named Sargeant, or VALT.  Are you

20   familiar with that?

21    A    Yes.

22    Q    All right.  And they had a relationship with a Vitol

23   entity, correct?

24    A    Who's they?

25    Q    VALT.
```

```
 1    A    VALT was a Vitol company.

 2    Q    Okay, which Vitol company?

 3    A    I think --

 4    Q    Which Vitol entity owned or had an interest in VALT?

 5    A    I don't know.  I think it was probably Vitol SA.  I

 6    don't know.

 7    Q    You don't?

 8    A    I don't remember.

 9    Q    Okay.  And I guess before we get too far, you said you

10    don't remember, which raises a question.  What did you do to

11    prepare for today?  I mean, you knew you were coming to

12    testify, right?

13    A    Yes.

14    Q    And what did you do to get ready, if anything?

15    A    I discussed with my lawyers what to expect.

16    Q    That your lawyer right there?

17    A    Well, they've -- yes, they've been --

18    Q    They are?

19    A    -- they've been -- yes.

20    Q    They represent you?

21    A    Yes.

22    Q    Reed Smith is your lawyer?

23    A    Yes.

24    Q    Okay.  Since when?  How long have they represented you?

25    A    Since I was notified that I was going to have to
```

1    testify.

2    Q    When was that?

3    A    Two weeks ago, three weeks ago.

4    Q    Now, you're not longer an employee of VALT, right?

5    A    I never was an employee of VALT.

6    Q    I mean Vitol Inc.

7    A    I'm not.  I'm retired.

8    Q    Okay.  But my question is, you're not longer an

9    employee of Vitol Inc., right?

10    A    No, I'm not.  I'm retired.

11    Q    Okay.  And so, do you have a fee agreement with these

12    lawyers?

13    A    No, Vitol's paying for that.

14    Q    Vitol's paying for it.  Who informed you that they were

15    going to pay for your lawyer, Reed Smith?

16    A    I just know they would.

17    Q    How?

18    A    That's what I would do when I was the head of the

19    company.

20    Q    Well, I know that's what you would do.  How do you know

21    they're your lawyer?

22    A    Because we discussed it.  They're --

23    Q    Oh, you did?  And what did they tell you?

24         MR. AURZADA:  Objection, Your Honor.  Now, that

25    calls for attorney-client privilege if he's asking what Reed

1    Smith told him.

2              MR. PATTERSON:  Your Honor, if they represent this

3    third-party witness, I think they have a conflict.  They're

4    going to come in here and say, and I -- and this is what's

5    going to happen, Judge, right?  Every witness that's

6    associated with Vitol, past, present, they're going to stand

7    up and say just thing:  Oh, that's our client, and you can't

8    talk about what we discussed.  And if that's -- if that's

9    correct, they have a conflict.

10             They can't, because I'm going to keep asking him,

11   and we're going to find out if he paid them any money.

12   We're going to find out if he has a fee agreement with them,

13   and the answer is going to be no, and this is just a façade.

14   They're trying -- look, you heard -- I'm going to elicit

15   testimony that's going to highlight how we know that he's

16   been coached and he's been told and he's been shown what he

17   needs to say.  And that makes a fundamentally unfair trial,

18   and in fact, it probably borders on witness tampering to

19   come in with a third party and say, oh, that's my client.

20   You can't ask what we talked to him about.  Really?  Why

21   not?

22             And so, I'm entitled to find out if this is real

23   or not real, number one.  And if it's real, what are the

24   consequences?

25             THE COURT:  Counsel?  Mr. Aurzada, what's your

```
 1   response?

 2            MR. AURZADA:  Your Honor, we have represented Mr.

 3   Loya.  I will represent --

 4            THE COURT:  Let me just ask you, do you mean

 5   personally or in his capacity as the CEO?  I just need to --

 6            MR. AURZADA:  In his capacity as the former CEO of

 7   the company.  And --

 8            MR. PATTERSON:  It's two different things, Judge.

 9   I'm sorry.

10            THE COURT:  I know.  It's two different things.

11   I'm just asking.

12            MR. PATTERSON:  Sorry.

13            THE COURT:  That's why I'm asking for the

14   clarification.  When you say you represented Mr. Loya, you

15   represented him -- you represented Vitol, is what you're

16   saying, not him individually.

17            MR. AURZADA:  Correct.

18            THE COURT:  Okay.

19            MR. AURZADA:  But I will tell you this as an

20   officer of the court.  I would never tell a witness what to

21   say.

22            THE COURT:  I'm not saying you did.  I was just

23   trying to make sure that I understood the relationship.  I

24   didn't -- what's your response to what Mr. Patterson is

25   saying in terms of his ability to question, ask the witness
```

1   questions?

2          MR. AURZADA:  I mean, he can ask the witness what

3   he did to prepare for the deposition -- or for the -- for

4   the hearing.

5          THE COURT:  What's the attorney-client

6   relationship if he no longer works there?  That's what Mr.

7    -- I'm framing the question that I think Mr. Patterson is

8   really getting at.  If he's no longer employed by the

9   company, then what's the privilege?

10          MR. AURZADA:  Your Honor, may I have a moment to

11  confer with my co-counsel for a second?

12          THE COURT:  No, no, I --

13          MR. AURZADA:  I want to make sure I ask this --

14  answer this the right way.

15          THE COURT:  Mr. Patterson, tell me if I'm right,

16  if I've framed the question correctly that you're arguing?

17          MR. PATTERSON:  That is the preliminary question--

18          THE COURT:  Okay.

19          MR. PATTERSON:  -- that's correct.

20          THE COURT:  Okay.  I just wanted to make sure I

21  got it right.

22          MR. AURZADA:  Your Honor, the communications that

23  we've had with him as the former CEO are privileged.

24          THE COURT:  You want to show me -- you want to

25  tell me how?  I got it, but I'm making a distinction between

1    your prior -- when you -- when Reed Smith represented Vitol

2    and he was an employee of Vitol.  I'm separating that from

3    witness prep in connection with this case, so I'm separating

4    the two.

5            I think there's no question that there's attorney-

6    client privilege extended to communications where Mr. Loya,

7    in his capacity as CEO, was there.  But my understanding is

8    Mr. Loya is retired, so he no longer works at Vitol, so tell

9    me how the attorney-client communication extends in your

10   representation of Vitol to the former CEO.

11           Let's just say Mr. Loya worked -- stopped working

12   at Vitol and then went to go work for -- back to Exxon.

13   Would the privilege extend there?  I mean, there's no

14   difference between being retired and going to work at

15   another place, right?

16           MR. AURZADA:  I fundamentally disagree with the

17   premise.  We can represent Vitol.  We can represent a former

18   employee.

19           THE COURT:  But I'm asking you, who do you

20   represent?  That's the question, right, so let's start with

21   the premise.  I'm just getting to where you're headed.

22           You're saying you never -- you don't represent

23   Mr. Loya in his individual capacity, but you represent

24   Vitol.  Maybe you can -- I got that, so tell me how the

25   privilege extends to the former -- to a former employee.

1    I'm really trying to explore the issue with the parties.

2              MR. AURZADA:  Your Honor, I just, I represent him

3    individually, and I don't see that as a problem.

4              THE COURT:  So, you do represent him individually?

5              MR. AURZADA:  Yes.  I don't see that as a problem

6    for --

7              THE COURT:  I'm just asking.  So, you represent

8    Vitol and Mr. Loya individually?

9              MR. AURZADA:  I believe that's correct, Your

10   Honor.

11             THE COURT:  You -- I don't need you to believe, I

12   need you to tell me one way or the other.  You're the

13   lawyer.  If you believe an attorney-client relationship

14   exists, then you have to tell me.

15             MR. AURZADA:  I need to -- I need to confer with

16   someone, Your Honor.  Give me five minutes (indiscernible).

17             THE COURT:  I'm more than happy to -- I need to

18   know the answer.  I think this is -- this is just really

19   fundamental.  I need to -- hold on.  I just need to

20   understand.  And again, I'm not -- I don't want anyone to

21   take into what I'm saying as leaning one way or the other.

22   I'm really just trying to explore what the issue is.

23             I believe Mr. Patterson is trying to explore, or

24   ask the question, which made now me ask the question, based

25   on what you said.  Do you -- I know you represent Vitol Inc.

```
 1              MR. AURZADA:  Correct.

 2              THE COURT:  So, there's no question about that.

 3    The question is, do you represent -- if you don't represent

 4    Mr. Loya individually, then the question then becomes, does

 5    the privilege extend to a former employee in connection with

 6    this litigation?  Prior litigation, I -- no question that

 7    the privilege extends.  The question is, does it extend in

 8    this case?  And if you represent -- well, you have to then

 9    tell me, if you do represent Mr. Loya in connection with

10    this case, then I -- I haven't given it any thought, to be

11    honest with you.

12              I think I just need to know that, because then I

13    know Mr. Patterson's going to argue -- well, he's already

14    argued that there's a conflict, and then you'll have to tell

15    me that there's no conflict.  I just need to kind of know

16    what the answers are, so that I know which path to then

17    analyze.

18              MR. AURZADA:  And there's some information

19    internal to Reed Smith that I need to --

20              THE COURT:  No, no, no, I understand that, and I

21    don't want to -- you know, and I -- do you represent him in

22    connection with this case?  Do you represent him generally

23    in other matters?  I don't know, but I think you have to

24    just give me an answer as to whether -- because ultimately,

25    the question is, does the privilege apply, if he's asserting
```

```
 1    the privilege and you're going to -- you're going to assert

 2    the privilege?  I just need to know so I can do the analysis

 3    --

 4              MR. AURZADA:  Fair enough.

 5              THE COURT:  -- and which tree to --

 6              MR. AURZADA:  Give me a moment.  I don't need to

 7    talk to Mr. Loya to determine this.

 8              THE COURT:  No, no, I'm -- well, you can't.

 9              MR. AURZADA:  Right, and I won't.

10              THE COURT:  He's on the stand, so -- but you can

11    then chat.  Okay.  I guess I'll -- I don't want to give a

12    lot of time on this, but he's going to -- Mr. Loya, I'm

13    going to let you, if you need to use the restroom or

14    something, you're more than happy, but you can't talk to any

15    of those folks over there.  You can't talk to anyone about

16    your testimony, okay?

17              MR. LOYA:  I'm fine.

18              THE COURT:  Okay.  No, I just wanted to make -- I

19    say it to everyone.  I don't want you to read too much into

20    that, either.  All righty, I'll come back in a few minutes.

21    I do need to know the answer to this.  I'm a little

22    surprised that we don't, but I want to make sure we have

23    clear answers on the record so we can get there.  I'll come

24    back in a -- well, why don't you -- I'm going to come back

25    out, no question, no later than 10 minutes.  But if someone
```

```
1   before that, you can let Ms. DeSantis, my law clerk, know

2   and she'll get me out.  Thank you.

3        (Recess)

4        CLERK:  All rise.

5        THE COURT:  Mr. Aurzada, what can you tell me?  I

6   should say we're back on the record in Vitol v. Brass.  This

7   is Judge Lopez, September 1st.

8        MR. AURZADA:  Thank you, Your Honor.  I can tell

9   you that our engagement of Vitol extends to former employees

10  in this matter, that includes Mr. Voya.  And there is no

11  separate fee agreement; Vitol has agreed to pay the fees.

12       THE COURT:  Okay, thank you.  I'm going to -- I

13  think about it.  I think we can think about this in a couple

14  of different ways.  Understanding what you just told me, and

15  there's no question that the privilege applies where within

16  the scope of his employment when he was with Vitol, right;

17  there's no question about that.

18            I certainly think the privilege would also apply

19  if he were testifying about instances in which -- in the

20  past, right, while he was there, right.  He may not be there

21  now, but also applies in the past now.  You're telling me

22  that there's an agreement, an attorney-client relationship

23  that extends to Mr. Loya as a former employee.

24            But really, it's two -- when you think about it,

25  there's almost one extended representation, but also two
```

 1    separate representations there, right?

 2              MR. AURZADA:  I can only speak to this matter.

 3              THE COURT:  No, no, no.  I'm only talking about

 4    this matter.  So, you know, the question is in my mind

 5    whether there's a conflict between -- that I can think of

 6    between what Mr. Loya's testifying now and what Vitol is

 7    seeking in connection with this matter.  I'm unaware of one

 8    now, but I think he was just -- from what I've heard, he's

 9    testified that Vitol lent Mr. Brass a certain amount of

10    money and believes the nature of the relationship and

11    believes that it was not paid.

12              Miss Goott earlier points, you know, I think --

13    I'm sure parties can explore about the nature of that

14    relationship and then cross-examine on that.

15              But I'm okay with the privilege -- saying that the

16    privilege applies in this instance for this employee, but

17    I'm going to take every employee on a -- I certainly -- and

18    I also take into perspective that Mr. Loya also believes

19    that an attorney-client relationship existed, right.  And I

20    think you got to look to see whether, quite frankly, under

21    state law whether, you know, the perceptions of the client

22    as well; that has to be extended.

23              So Mr. Patterson, I'll take briefing on it if you

24    think I'm wrong.  If I'm wrong about it, I want to know, and

25    we can pick them back up if I'm wrong about that at a later

1   time and we can clarify those questions.  But why don't we

2   just proceed today as if the privilege does extend and apply

3   in this case.  And if I'm proven wrong or if you tell me I'm

4   wrong and you can show me it, I reserve the right to require

5   this witness to come back and answer questions about that.

6           MR. PATTERSON:  Then I guess I still have a

7   question, Judge, and maybe I wasn't listening carefully

8   enough and that happens to me sometimes.  I understand and I

9   think the law is that communications as he's an employee

10  would be privileged.  I ask him about discussions that may

11  have happened yesterday.  Those aren't privileged.  That

12  can't be under the umbrella of a corporate privilege.  This

13  man has been on the street for two years.

14          And so, we're going to fight this fight every time

15  someone comes in here that used to work for Vitol.  And I

16  think Upjohn, I think the Supreme Court has just said it's

17  just unreasonable to go that far, right; that there are some

18  limits, and the Supreme Court said it stops.

19          It has to stop, or we don't -- we get into this

20  problem, right, because then every time Reed Smith brings in

21  someone and they had some connection with Vitol, they're

22  going to say, oh, you can't ask about what we talked to him

23  about.  Well, they're witnesses.  He's a material witness

24  and I'm entitled to find out if he has prejudice, whether

25  he's been tampered with.  I'm not suggesting these things.

Page 32

1          THE COURT:  I understand.

2          MR. PATTERSON:  But I have a right to probe those

3     things for the Court for his credibility or Vitol's

4     credibility.  And what Reed Smith is saying is you can't ask

5     any of that because that's privilege and it's just got to

6     fail; that claim has got to fail.

7          And on top of that, not only that, is how do they

8     not know what this relationship is, right?  The witness says

9     they're my personal lawyer.  They said we're his personal

10    lawyer.  Then they said we don't know.  Then they said let's

11    check.  Then we said we got to talk to someone, and they go

12    huddle and the army goes, and they come back, and they go,

13    oh, the best answer is it's under the corporate umbrella.

14         That is just not adequate.  You really don't know

15    if he's a client, seriously?  Because it sounded like they

16    just jumped up and said, oh, we don't want to -- we don't

17    want to hear that stuff on the record, we got to stop it,

18    right.

19         So I'd like to make a record, quite frankly.

20         THE COURT:  No, no, no, no.  I understand what

21    you're saying.  And again, what I'm saying is for purposes

22    of today, let's proceed as if it does, but if -- and I'm

23    going to do some research on it.  I think you all know me.

24    But if you find something as well and if I'm wrong, I want

25    you to tell me I'm wrong and I want you to show me, but I'll

1   do my own research and I'm going to reserve the right to

2   recall.  And if it turns out that I feel comfortable that

3   does not apply, we're going to call him back in and he'll

4   answer those questions.  I'm just talking about for purposes

5   of today.

6             MR. PATTERSON:  Of course.

7             THE COURT:  With the reservation of rights.

8             MR. PATTERSON:  Of course.  And also --

9             THE COURT:  But I think you're right to establish

10   a record -- not right, but I think you're certainly entitled

11   to, and I understand it.

12             MR. PATTERSON:  Right.  And we're going to --

13   you're going to think about this.  The last thing to think

14   about is we're going to ask the Court to allow us to make an

15   offer of proof if things come down at that point.

16             THE COURT:  I completely understand that.

17             MR. PATTERSON:  Thank you.

18             THE COURT:  And I also want to note, this is -- no

19   one should think about -- I mean, I think the way I'm

20   thinking about the issue is -- I don't know if this is going

21   to happen with another witness, you're telling me it is;

22   I'll know it when I see.  But we're going to take this one

23   by one, the same way we did with the business records

24   affidavit.

25             MR. PATTERSON:  Yes.

Page 34

```
 1              THE COURT:  And the witness will be treated and,
 2   quite frankly, I see the former CEO at minimum in a
 3   different light than -- and other folks, but we'll see.
 4              MR. PATTERSON:  Yes, sir.
 5              THE COURT:  And I may need to see there depending
 6   on what we get there.  We'll see.  Please proceed, Mr.
 7   Patterson.
 8              MR. PATTERSON:  Thank you, Your Honor.
 9   BY MR. PATTERSON:
10   Q    Mr. Loya, I apologize for the delay and the
11   interruption, but I'm going to go back.  So when did you
12   meet with these lawyers prior to today?  When's the first
13   time you met with these lawyers once you knew you were going
14   to have to testify?
15   A    Last week.
16   Q    Last week.  What day last week, do you remember?
17   A    Wednesday, maybe.
18   Q    If you don't remember, just tell me you don't remember.
19   A    I don't remember.
20   Q    I would rather you not guess if you don't remember.
21   A    I don't remember.
22   Q    And who was it that you met with?
23   A    I met with the lawyer from Reed.
24   Q    Which one?
25   A    Gentleman right there.
```

1    Q    Okay.  Do you know his name?

2    A    I forget.

3    Q    Okay.  Anyone else?

4    A    And VJ.

5    Q    VJ, the in-house counsel for Vitol, right?  Anybody

6    else at the meeting?

7    A    There was another gentleman there also worked for Reed.

8    I don't remember his name.

9    Q    Another one, right?  And is that the only time you met

10   with them?

11   A    Yes.

12   Q    Last week, that's it?  Did you meet with them this

13   morning?

14   A    Well, I met them as I came in.

15   Q    I mean, did you have a meeting?  Did you discuss -- I'm

16   not asking you what you did discuss -- did you discuss what

17   was going to happen today?

18   A    No.  They told me they were going to call me and we're

19   waiting for that.

20   Q    Right.  Now how old are you, Mr. Loya?

21   A    66.

22   Q    66?  And is there any reason -- and again, there's a

23   reason and I apologize, it's not meant to be offensive.  But

24   is there any reason that would impair your ability to recall

25   facts that might be important with what's going on today?

1    A    Not that I know of.  I always had a poor memory, but

2    it's always been the same, so I don't think it's any

3    different.

4    Q    So you believe you have a poor memory, a poor memory

5    for facts?

6    A    For events.

7    Q    Events, facts, people?

8    A    Yeah.

9    Q    So really, your testimony regarding things that

10   happened in the past may not be that accurate?

11   A    No, it'll be accurate.

12   Q    Well, how will you know if you have a poor memory for

13   facts and people and circumstances?

14   A    I may not remember the name, I may not remember the

15   date, but other than that, I will tell you what I remember

16   and I don't have false memories or anything like that.  What

17   I remember, I remember it correctly.

18   Q    Well, you wouldn't -- you would agree with me you

19   wouldn't know whether they were a false memory or not,

20   right?  If that was what you actually recalled and it's

21   false, you wouldn't know it's false, right?  You would think

22   it's true.

23   A    No.  I know how I think, and I know the quality of my

24   memories.

25   Q    All right.  And you don't take any medication that

Page 37

```
1    would impair your ability to recall and testify clearly?

2    A    No.

3    Q    Nothing today that you believe would affect your

4    ability to do two things: to recall facts up to five years

5    ago and to describe them accurately in court under oath.

6    A    Nothing.

7    Q    All right.  You've never been accused of having

8    selective memory, have you, Mr. Loya?

9    A    No.

10   Q    Okay.  Now, when we got off track, we were talking

11   about kind of back to the corporate structure of Vitol and I

12   think I got hung up on the fact that you were CEO; that's

13   the boss, right, that's the highest there is in Vitol, Inc.,

14   right?

15   A    Yes.

16   Q    You didn't have a boss within Vitol, Inc., did you?

17   A    I did not.

18   Q    For how many years?

19   A    21.

20   Q    21 years, you were the man in the United States for

21   Vitol, right?

22   A    That's correct.

23   Q    All right.  And your sister company in the U.K., you

24   can't remember the name of that entity.  Is that what you

25   were telling me; you just don't remember?
```

Page 38

```
 1   A     No, it changed.  It's more complex than that.

 2   Q     Okay.  Well, explain it to me.

 3   A     All right.  There were several companies and they

 4   changed throughout the years.

 5   Q     Okay.

 6   A     The one that did most of the execution roughly this

 7   time was I think Vitol Brokers, and Vitol Brokers I think

 8   was owned by Vitol U.K.  That is not the --

 9   Q     You think?

10   A     That is not a -- it's under the umbrella of the Vitol

11   Group, but it's not a (indiscernible) entity.

12   Q     Let me ask it this way.  Who was your contemporary in

13   the U.K.?  Who was the man who had the same job as you in

14   the U.K.?

15   A     It would be Russell Hardy.

16   Q     Russell Hardy, H-A-R-D-Y?

17   A     Yes.

18   Q     And was it roughly the same time period?

19   A     Yes.

20   Q     So you and Russell -- Russell was the CEO of what

21   entity?

22   A     He was the CEO of -- I'm not even sure what his title

23   was.  He was the head of the trading group in the U.K.  The

24   U.K. transacted on behalf of Vitol S.A.

25   Q     Okay.  Anything else that he was over?
```

Page 39

```
 1    A    He was a board member like I was.

 2    Q    A board member of what, what entity?

 3    A    The Vitol Group.

 4    Q    The Vitol Group, that's a new name, right?

 5    A    Well, it --

 6    Q    We haven't talked about that, right?

 7    A    No, we haven't.

 8    Q    Okay.  What's the formal name of this group, Vitol

 9    Group?

10    A    I think it's Vitol Holding, S.A.

11    Q    Vitol Holding, S.A.  And you were a board member, Mr.

12    Hardy was a board member, right?

13    A    Yes.

14    Q    Who else?

15    A    Ian Taylor.

16    Q    I'm sorry?

17    A    Ian Taylor.

18    Q    All right.

19    A    Chris Bake.

20    Q    Chris Bake?

21    A    Yes.

22    Q    What did Chris Bake do for Vitol while you were there?

23    A    Well, he did a lot of things.  At one time, he was the

24    head over the Middle East.

25    Q    Okay.
```

```
 1    A     And then during this period that we're talking about --
 2    and by this period, I mean, (inaudible) time -- he was head
 3    of projects out of London.
 4    Q     Head of projects in London, right?
 5    A     Yeah.
 6    Q     And that earned him a board seat at Vitol Holding,
 7    S.A.; is that a very high position in Vitol?
 8    A     He had the board seat well before then.
 9    Q     I'm sorry?  He had the board seat before then.
10    A     Well before then.
11    Q     And what did he do to earn the board seat before that?
12    A     I think by his work in the Middle East.
13    Q     His work in the Middle East?
14    A     Yes.
15    Q     And Vitol Holding, S.A., who owns Vitol Holding, S.A.?
16    A     I believe it's Vitol Holding -- Vitol Holding, S.A., I
17    think is owned by a trust out of Luxembourg.
18    Q     Okay.  And do you have any remaining interest in any
19    Vitol entity?
20    A     I have what we call preferred shares, meaning they're
21    frozen in value, and I'm slowly getting paid out.
22    Q     They're buying them back from you.
23    A     Yes.
24    Q     And who's they?
25    A     The Vitol Group.
```

```
 1    Q     The Vitol Group.  So you have preferred shares in the

 2    Vitol Group.

 3    A     Yes.

 4    Q     And is that common for CEOs or people like Chris Bake

 5    and Ian Taylor.

 6    A     Among many.

 7    Q     Among other people, correct.  I'm not suggesting you're

 8    the select few.  That is compensation for high-level

 9    executives at Vitol, right?

10    A     It's compensation for executives.  I think at the time,

11    the shareholdings were over 400 individuals, so it's well

12    spread out.

13    Q     Right.  And so, you still have an interest, a monetary

14    interest, in the profitability of Vitol, right?

15    A     Well, yes.

16    Q     So it's important to you that they make money, that

17    they win here today, right?

18    A     I think it's important that the right thing is done.

19    Q     It's important that the truth get told, right?

20    A     Yes.

21    Q     And that you tell the truth.

22    A     Of course.

23    Q     And you're going to tell the truth, right?

24    A     No, I tell the truth.

25    Q     No, I know you know the truth.
```

1    A    I know and I tell it.

2    Q    Right.  That was your intention of coming here today,

3    to make sure the truth is known, whether it's good or bad,

4    right?

5    A    No, my intention is to answer -- the fact that I was

6    asked to come here and tell what I know.

7    Q    Right.  All right, so let's get more directly to this

8    period of time.  Do you remember what year it was when Vitol

9    and GCAC and Mr. Brass had this relationship -- I'll refer

10   to generically, relationship?

11   A    2017.

12   Q    2017.  And do you remember what month kind of it

13   started?

14   A    I think discussions were spring to summer.  I think

15   into late summer, we decided not to go ahead, and that's

16   where we went to basically a banker/lender relationship or

17   banker/borrower.

18   Q    And we'll get to that.  And I think you also said when

19   I guess your lawyer was asking you questions, that as CEO,

20   you're in Houston for the United States operations.  You're

21   over all the United States operations and I assume continent

22   states, North America maybe?

23   A    Yes.

24   Q    Canada too, right?

25   A    Yes.

1    Q    All right.  Any other territories geographically in

2    which you were responsible?

3    A    Well, I wasn't responsible.  I had general overview of

4    the Americas.

5    Q    All the Americas.

6    A    For the board basically.

7    Q    And I think you also said that it was also your job, or

8    you were responsible for approving any joint venture which

9    would include more than one trade.  Did I get that right?

10   A    Yes.

11   Q    Okay.  So if one of your traders wants to enter into a

12   joint venture with someone and it involved more than a

13   trade, they had to come to you, right?  And what did you

14   require in order to review such a proposal?  One of your

15   traders wants to do a joint venture that involves -- I'm

16   making it up -- 50 trades over six months with a particular

17   entity.  What do you require to look at?

18   A    I would require the reason why we're doing that.

19   Q    Right.

20   A    The estimate of profitability of the deal.

21   Q    Right.

22   A    Whether the -- how the risks, have they been

23   identified, how we're going to manage those risks.

24   Q    I don't mean to interrupt you, I'm sorry.  But when you

25   say risk -- and I think I'm thinking like you, but when you

1    say risk, you're thinking financial risk, right?

2    A    Oh no.  I'm actually thinking of market and financial

3    risk.

4    Q    Right.  But a market risk does affect your financial

5    risk, right?  The market risk, that is financial risk.

6    That's where your guys at Vitol live in the market, right?

7    A    Well, ultimately, everything's a financial risk at the

8    end with planning to still do it all, yes.

9    Q    I mean, you're doing this for the money is my point.

10   Deals are done to make money, right?

11   A    Yes.

12   Q    And you want to know from your trader or your project

13   guy how are we going to make money, right?  That's what you

14   need to know.

15   A    Among many things.

16   Q    Right.  But that's one of the most important things,

17   right?  Vitol does business transactions and trades to make

18   money ultimately, right; that's the ultimate goal, right?

19   A    Or to not lose money.

20   Q    To not --

21   A    Losing money is just as important, not losing money.

22   Q    Okay.  So you want to make sure you're not going to

23   lose money, right?

24   A    No, we have to -- yes, in a way to put it is we have to

25   assess the risk involved in the trades and the setup what we

1   do and what risks are there.  And we try to identify all the

2   risks; how are we going to manage them.

3   Q    Right.

4   A    And it could be political risk, it'll be transactional

5   risk or performance risk.

6   Q    Of course.

7   A    It could be market risk.  It could be financial risk.

8   Q    I mean, that's why you guys are successful, right?

9   You're good -- you and your team is very effective at

10  identifying those risks, right?

11  A    And managing them, yes.

12  Q    And managing them and measuring them, right?

13  A    Estimating them, yes.

14  Q    Okay.  But you spent a lot of time on that; you

15  expected your guys to do that too, didn't you?

16  A    It's a day to day, we do that day to day.

17  Q    Every day, right?  That's what Vitol does, right?

18  A    One of the things, yes.

19  Q    Well, and you gave a list, and I guess maybe this is a

20  good time to get to that.  You gave a list of -- your lawyer

21  asked you again what did Vitol do during 2017.  And I guess

22  hasn't really changed a lot, right, over the last five

23  years; they still kind of do basically the same thing?

24  A    Basically.  I think it's more complex than that, yes.

25  Q    Right.  And I think your response was and I'm going to

Page 46

```
 1    try to read them back -- just tell me if I'm wrong -- but

 2    logistics.  You buy, blend, and transport commodities.  You

 3    manage risk by hedging.  You transport, right?  You deal in

 4    commodities, right?

 5    A    Yes.

 6    Q    Vertically.  Vertically, you deal -- Vitol deals with

 7    commodities, right?

 8    A    Yes.

 9    Q    Primarily oil and gas, right?

10    A    Yes.

11    Q    Right?

12    A    Oil and oil products, oil being a very comprehensive

13    category, right?

14    Q    Right, right.  And I guess this is the problem -- and

15    maybe you can answer this for me, Mr. Loya -- then you went

16    off and said you did a deal with GCAC, and you loaned money,

17    right?  That's what you said.

18    A    Well, we (crosstalk) --

19    Q    Am I correct?

20    A    Yes.

21    Q    Okay.

22    A    We provide financing in order to --

23    Q    And I went back to your list, and I tried to fit that

24    in somewhere.  Where would you put lender in that vertical

25    operation of what you said, the oil market; where is that?
```

```
 1   A    Well, you would be enabling the transaction, buying and

 2   selling the oil.

 3   Q    Well, that's different, right?  You buy and sell on

 4   credit for a particular client, right?  A trade, you might

 5   execute a trade, a hedge for a big client without having the

 6   money in your account, right?  You might do that, correct?

 7   A    Say that again.  I'm not sure I follow.

 8   Q    You might execute a trade for a client; isn't that what

 9   you do, or do you trade for third parties?

10   A    No.

11   Q    Only for yourself.

12   A    Yes.

13   Q    Okay.  And so, you would sell a product to a third

14   party without having the money in your account, right?

15   A    If the risk was assessed to be appropriate.

16   Q    Right.

17   A    You can sell to Exxon, yes.  You would not --

18   Q    Of course.

19   A    You would trust them to pay.

20   Q    That's right.  You would sell on credit, right?  That's

21   a financing transaction, you would agree with me, right?

22   A    Yes.

23   Q    Okay.  That's not what I'm talking about.  You said you

24   entered into a loan agreement.

25            MR. AURZADA:  Objection, Your Honor.  That
```

1    mischaracterized the testimony.

2              THE COURT:  I will sustain because it's not what I

3    heard.

4    BY MR. PATTERSON:

5    Q    Did you enter into a loan agreement with GCAC?

6    A    No.  We don't lend money, but we just provided

7    financing.

8    Q    No, listen to my question.  Did you enter into a loan

9    agreement with GCAC?  I'm sorry, not you personally.  When I

10   say you, I'm talking about Vitol, okay, unless I say

11   identify separately.  Did Vitol enter into a loan agreement

12   with GCAC?

13             MR. AURZADA:  Objection, Your Honor.  It's a vague

14   question.

15             MR. PATTERSON:  What's vague about it?

16             THE COURT:  I'm going to overrule.  He can answer.

17   BY MR. PATTERSON:

18   Q    Did they?

19   A    We provided financing.  We provided the capital to buy

20   the product that we held on behalf of GCAC.  You want to

21   characterize -- I don't know what label you want to put on

22   it, I don't know, but that's what we did.

23   Q    I know.  I'm fully aware.  I can say pretty much what I

24   want.  You don't need to tell me that, right.  I'm asking

25   you a question and the direct question is, did Vitol enter

Page 49

1   into a loan agreement with GCAC.  That's how I'm

2   characterizing it and that's how I would like for you to

3   answer.

4   A    I don't know if I would call it a loan or not.  It is

5   too simplistic a description of -- did Vitol provide the

6   capital in order to buy on behalf of GCAC inventory, held

7   that inventory and released it to GCAC whenever they

8   provided security; that's what they did.

9   Q    I'm going to try one more time, all right.  My question

10  is, we'll just use my words, okay, is did Vitol enter into a

11  loan agreement with GCAC in 2017.

12  A    Again, what Vitol did was provide the capital to buy

13  the product for GCAC and held it on their behalf and

14  released it to them when they were willing to provide

15  security; that's exactly what we told them.

16  Q    Okay.  And did -- let me move on and we'll come back to

17  that one because you don't want to answer that one.

18  A    No, I think I'm giving you a more thorough explanation.

19  Q    Okay.  I don't need a more thorough explanation.  I

20  just need you to answer my question, okay, to the best of

21  your ability truthfully.  Can you do that?

22  A    I've done exactly that.

23  Q    Okay.  I don't need you to fix my question or explain

24  my question.  I just need you to answer it.

25          MR. AURZADA:  Your Honor, it's argumentative.

```
 1              THE COURT:  Yeah.

 2              MR. AURZADA:  He can ask questions.

 3              THE COURT:  I'll sustain that.  Mr. Loya, let me

 4  ask you a question.  To your knowledge, is there a written

 5  loan agreement between Vitol and GCAC?

 6              THE WITNESS:  No, Your Honor, not that I know of.

 7              THE COURT:  To your knowledge, is there a written

 8  loan agreement between Vitol and Mr. Brass?

 9              THE WITNESS:  No, Your Honor, not that I know of.

10              THE COURT:  Okay, thank you.

11              MR. PATTERSON:  Thank you, Your Honor.

12  BY MR. PATTERSON:

13  Q    Was there ever a loan agreement executed with GCAC?

14  A    Not that I know of.

15  Q    Was there ever a loan agreement executed with Mr.

16  Brass?

17  A    Not that I know of.

18  Q    Was there ever an executed agreement to loan money in

19  the future to GCAC by Vitol?

20  A    You mean by executed agreement, a signed document

21  stating that?

22  Q    You tell me, was there?

23  A    There was no signed document stating that.

24  Q    Okay.  To the best of your knowledge, right; you only

25  know what you know, right?  There could be a written
```

Page 51

```
1    document that Vitol has in its file that you don't know

2    about, right?

3    A    I only know what I know.

4    Q    You only know what you know.  Well, let me ask you

5    this.  Based upon your experience, 20-plus years as CEO,

6    would it surprise you if there's a written signed agreement

7    that you don't know about with GCAC or Mr. Brass?

8    A    Very much.

9    Q    Very much.  And why is that?

10   A    Because we didn't do that with anybody.  We didn't sign

11   loan agreements.  We do not -- Vitol all the time did not go

12   around lending money.

13   Q    Right.  That's not what Vitol did, right?

14   A    We often provided financing to counterparties.

15   Q    To counterparties.  You sell a million barrels of oil

16   to Exxon, right?  You extend credit, right?

17   A    We provide to other companies financing to finance the

18   transaction.

19   Q    Right, right.  A core function of Vitol, like, trading,

20   transporting, mixing, right?  Your counterparty may need

21   credit and that's what you do, right?

22   A    We provide the financing, yes, against security.

23   Q    Right.  And you keep saying financing and I guess you

24   just -- was it a loan?

25   A    Was money involved?  Yes.
```

1   Q    No, listen to my question, all right?  I understand

2   what you want to say or maybe what you were told to say, but

3   please just answer what I'm asking, all right, and if you

4   don't understand, just tell me.  If my question is not very

5   good or it's vague, tell me I don't know what you're asking

6   me, right.  Did you --

7   A    But --

8   Q    Hold on.  I haven't asked you yet.  Did Vitol during

9   your 20-plus years as CEO seek out and enter into any

10  lending relationships in which you just advanced working

11  capital for someone or advanced funds to buy inventory?

12  A    Yes, we did.

13  Q    All right.  Who?

14  A    I can't think of any companies right now specifically,

15  but it was usually --

16  Q    None?

17  A    No, no, there were several companies that we did that.

18  Q    No, my question is you can't remember any, not even

19  one?

20  A    Well, we like to be a small company.  We like to be a

21  small producer for refinery.  The Venezuelans --

22  Q    You're guessing.

23  A    No, I know.

24  Q    You're guessing, right, because you don't remember?

25  A    No.  PDVSA, for example, was a very good example; we

1   provided financing to them.

2   Q    And there's a loan agreement?

3   A    In PDVSA?  No, we would provide financing.

4   Q    For?

5   A    For products.

6   Q    That you traded for them?

7   A    We wouldn't trade for them; we traded with them.

8   Q    Right, with them.  And they didn't pay you on delivery,

9   so you advanced credit, right?

10          MR. AURZADA:  Your Honor, I would object and ask

11   that the witness please be allowed to answer the questions

12   without being interrupted.

13          THE COURT:  Yeah, I agree.  I just want to make

14   sure we're getting one question and one answer at a time.

15   Thank you.  Mr. Patterson, why don't you ask a question so

16   we can start it.

17   BY MR. PATTERSON:

18   Q    So did you have a loan agreement with these people?

19   A    No, it would be in the form, for example, and that

20   would be in the form of prepayment for product.

21   Q    Form of prepayment, and it would be for product that

22   you traded with them, right?

23   A    Yes.

24   Q    All right.  Not like a loan for inventory that you just

25   advanced money, right?

1   A    No, we did that as well.  I just can't think of -- to

2   give you an example right now.

3   Q    Right.  Now, you know, I asked you this series of

4   questions about entering loan agreement, entering into -- I

5   don't think I said it, but did you execute or enter into a

6   promissory note with GCAC or Mr. Brass?

7   A    No, we did not.

8   Q    Any reason why when I asked Vitol that same question,

9   they disagree with you; do you know why?

10  A    I don't know who says that.

11  Q    Is that answer just wrong?

12  A    I don't know what -- perhaps they're -- what I call

13  financing, they're calling it a loan.

14  Q    Let's look.  Let's look, all right?

15          MR. PATTERSON:  I'm going to ask the Court to

16  admit Mr. Brass's Exhibit No. 40, which is -- it's going to

17  be 104-40.

18          THE COURT:  Any objection?

19          MR. AURZADA:  No.

20          THE COURT:  Okay.  104-40 is admitted.

21          (Defendant's Exhibit 104-40 entered into evidence)

22          MR. PATTERSON:  Thank you, Your Honor.

23  BY MR. PATTERSON:

24  Q    I've got up on the screen -- it doesn't matter what --

25  but these are requests for admissions that were sent to

```
 1    Vitol after you were gone in this litigation, all right.

 2    Look at No. 19 at the top of your screen; do you see that?

 3    "Admit that Vitol never executed any loan agreements with

 4    the Debtor," and they denied that, which means they say they

 5    did execute loan agreements.  Is that wrong or right?

 6    A    Whoever was responding to this is saying that the

 7    written emails and correspondence was the agreement.

 8    Q    Oh.

 9    A    My response to a loan was referring to a document

10    executed by both parties outlining the entire --

11    Q    Now that's something that you discussed, like, last

12    week, right, this email.

13    A    No.

14    Q    No?

15    A    Which email?

16    Q    You just said --

17    A    No, I'm saying --

18    Q    No, what do you mean -- hold on.

19         THE COURT:  Hold on a second, folks.  One

20    question, one at a time.

21    BY MR. PATTERSON:

22    Q    You said what email.  You said email, not me.

23    A    No, I said correspondence, perhaps emails.  The written

24    correspondence -- this is what you showed me.

25    Q    Okay.  Do you know what they're talking about email?
```

1    A    No.  My guess is that exchange of documents or

2    correspondence must be emails.

3    Q    Okay.  Now show me on this page that's on your screen

4    where the word email is.

5    A    No.  I said I assume that's what correspondence alluded

6    to.

7    Q    I think you referred to an email, right?

8    A    Again, when you asked me about whether Vitol, why would

9    Vitol say that.  I said it says right here because written

10   correspondence, which I assume to mean emails.

11   Q    Why would email just come into your head for

12   correspondence?

13   A    That's how we conducted a lot of communication, emails.

14   Q    All right, okay.  Back to my question, why would Vitol

15   say that they executed loan agreements with the Debtor?  Why

16   would they say that, do you know?

17   A    Because they believed that -- it's right here.  It

18   tells you what -- I can read it to you.

19   Q    I'm not asking you what it says, Mr. Loya.

20   A    Well, you asked me what Vitol, why would Vitol say

21   that.

22   Q    Yes.

23   A    That's what is right there; it's telling you there.

24   Q    I asked you if you knew.  I didn't ask you if you could

25   read.  I fully anticipate you can read.

1          MR. AURZADA:  Objection, Your Honor.  This is

2    argumentative.  Ask the witness questions but having a

3    dialogue like this with statements coming from counsel is

4    not appropriate.

5          THE COURT:  I think that's fine.  Why don't we

6    just ask questions and answer, get answers.

7    BY MR. PATTERSON:

8    Q    Right?  So read the document, answer my question,

9    please.  Do you know why they would say that?

10   A    I don't know why.

11   Q    Okay, that's all I need.  Let's go to the next one, No.

12   20.  "Admit that Vitol never executed a loan agreement with

13   GCAC."  Response, deny, right?  Which means that Vitol

14   believes they executed a loan agreement with GCAC; you see

15   that?  Do you know why they would say that?

16   A    Yes.

17   Q    Why would they say that?

18   A    Because apparently, they're assuming that the written

19   correspondence among the parties created a binding

20   agreement.

21   Q    Okay.  Again, I didn't ask you to read the document.  I

22   asked if you knew -- hang on.  I asked if you knew

23   independently from what I'm putting in front of you, all

24   right?

25          MR. AURZADA:  Your Honor, again, that's statements

1    from counsel.  He should be asking the witness questions.

2            THE COURT:  And I agree.  Mr. Patterson, I think

3    if his answer is consistent with what he believes he's

4    reading, then I don't see the difference.

5    BY MR. PATTERSON:

6    Q    You don't know anything other than what someone puts in

7    front of you about this transaction, Mr. Loya?

8            MR. AURZADA:  Objection.  Argumentative.  He's

9    been testifying about it for 20 minutes now.

10           THE COURT:  I agree.  Mr. Patterson, I'm not sure

11   that that's what he's saying.  In other words, two

12   statements can be both true at the same time.

13           MR. PATTERSON:  Correct.  And I'm allowed to ask

14   him what his independent knowledge is.

15           THE COURT:  You keep asking the same question and

16   maybe you could ask the question in a different way.  I'm

17   not sure you're going to get a different answer.

18           MR. PATTERSON:  I'm not happy with his answer.

19   BY MR. PATTERSON:

20   Q    When I ask you if you know, did you know before today

21   that Vitol believes they executed a loan agreement.

22   A    I do not know.

23   Q    All right.  21, "Admit that Vitol never executed a

24   written financing agreement with the Debtor."  Deny.  Did

25   you know before today that Vitol believed they had executed

```
 1   a written financing agreement?

 2   A    I did not know.

 3   Q    All right.  And when you were CEO, did Vitol execute a

 4   written financing agreement with the Debtor?

 5   A    No.

 6   Q    When you were the CEO, did Vitol execute a loan

 7   agreement with GCAC?

 8   A    No.

 9   Q    While you were CEO of Vitol, did Vitol ever execute a

10   loan agreement with Mr. Brass?

11   A    No.

12   Q    While you were CEO, did Vitol ever execute a written

13   financing agreement with GCAC?

14   A    No.

15   Q    All right.  I'm going to try No. 23 now.  While you

16   were CEO, did Vitol ever sign a loan agreement -- did Mr.

17   Brass ever sign a loan agreement with Vitol?

18   A    I don't know.  I don't think so.

19   Q    Who would know?  You were the CEO, right?

20   A    Yes.

21   Q    Wouldn't they have to bring this deal to you?

22   A    No.

23   Q    No.

24   A    But if it was a joint venture, it had to be approved by

25   me.
```

Page 60

```
 1   Q    All right.  And did someone talk to you about --
 2   A    Transactions, I did not get involved with.
 3   Q    Not even a loan?
 4   A    A refinancing agreement or financing agreement?
 5   Q    No, the loan.  The loan for $60 million.
 6   A    Nobody ever came to me asking for permission to enter a
 7   loan for $60 million.
 8   Q    All right.  Would they be required to come to you to
 9   approve a loan for $10 million to someone?
10   A    Yes.
11   Q    All right.  Would they be required to come to you to
12   get approval for a $20 million loan to someone?
13   A    Yes.
14   Q    All right.  Would they be required to come to you to
15   get approval for a $30 million loan to someone?
16   A    Yes.
17   Q    And if I were to keep raising the number, they --
18   everyone in Vitol would have to come to you to get approval
19   of a loan of $10 million or more; isn't that true?
20   A    I'm defining a loan as -- in answering your question,
21   defining a loan as an agreement which we will extend a bunch
22   of money against a document, against a signed document.
23   Q    All right.
24   A    They would have come to me in that, yes.
25   Q    All right.
```

1   A    They did not have to come to me for financing

2   transactions.

3   Q    So if they -- so did anyone come to you and say can we

4   loan GCAC $10 million or more?

5   A    No.

6   Q    Right.  Did anyone come to you and say can we loan -- I

7   don't remember if I asked you Mr. Brass or GCAC the other --

8   $10 million or more?

9   A    Did anybody come to me for that?

10  Q    Yeah.

11  A    No.

12  Q    So as far as you know, Vitol never agreed to loan Mr.

13  Brass any money.

14  A    No.  I gave instructions to Eric in I think August

15  where we decided not to continue with the JV or JV

16  discussions.  When we dropped the whole thing, I said let's

17  not leave them outstanding, let's provide him financing

18  until December, and I gave that instruction to Eric, and I

19  knew that was going to be done.

20  Q    You said, and it may have been a slipup and correct me

21  if I'm wrong, but you referred to continuing the joint

22  venture, right?

23  A    No, not continue, within discussions.  We ended the

24  discussions sometime in the middle of summer.

25  Q    And so when was this discussion with Mr. Kuo about

1    continuing the discussions of the joint venture?

2    A    When we made that decision.

3    Q    When, when was that in 2017?

4         MR. AURZADA:  Your Honor, he keeps interrupting

5    the witness.  It's fine for him to ask questions.  It's fine

6    for him to ask about these topics, but he's got to stop

7    interrupting.

8         THE COURT:  Yeah, I agree.  Mr. Patterson, let him

9    answer the question.

10        THE WITNESS:  If I recall correctly, summer of

11   '17.

12   BY MR. PATTERSON:

13   Q    What month?

14   A    I don't remember exactly, July/August?

15   Q    So when did the joint venture conversations begin then?

16   A    If I remember correctly, I think it was done in the

17   springtime.  I wasn't involved.  This is discussion where

18   among Eric and GCAC and, at times, Chris Bake.

19   Q    And so, well, help me understand that.  Didn't they

20   have to come to you for approval of this joint venture?

21   A    Not the discussions.  They have to come to me for

22   approval.  If the conclusion was we're going to put a joint

23   venture together, then they would have -- they might have to

24   have my approval.

25   Q    Right.  And they came to that conclusion, right?

002622

```
 1   A     We never --

 2   Q     They came to the conclusion that they wanted to put a

 3   joint venture together, right?

 4   A     No.  There were discussions regarding that.  We never

 5   concluded that we wanted to do it or to do it.  In fact, it

 6   was the opposite; we concluded we did not want to do it.

 7   Q     When did you determine you didn't want to do it?  Let's

 8   go there first.

 9   A     I think the summer of '17.

10   Q     What month, do you remember?

11   A     July or August, because at that point is when I told

12   Eric that we're not proceeding, discussions are over, and

13   provide -- we're going to provide financing to not leave

14   those guys high and dry basically until December.  I gave

15   them until December to finish all the business with him.

16   Q     And when you say Eric -- because we're in a courtroom,

17   we're a little more formal, I know -- is that Mr. Kuo?

18   A     Yes.

19   Q     Okay.  And why was it your recollection that the

20   determination was made that the conversations would end on

21   this discussion of a joint venture?

22   A     Ask me again.  I'm not sure I follow that.

23   Q     Why did the discussions end?  Why did you terminate the

24   discussions?

25   A     No.  The conclusion to not go ahead with the joint
```

Page 64

```
 1   venture was made, I believe, mainly by Chris Bake.  And when
 2   I was informed of that, I simply made it clear to Eric that
 3   we're going to stop all discussions and we're going to
 4   basically just provide financing for him to have time to
 5   find other financing and we give him until December.
 6   Q    Okay.  Chris Bake, let's go back.  Chris Bake is U.K.
 7   He's a projects guy in the U.K., right?  I think that's what
 8   you told me.
 9   A    Yes.  He was also involved -- he was basically, yeah.
10   Q    Okay.  I think you said projects guy and he's on the
11   board of Vitol Group, right?  Right?
12   A    So he was involved with the acquisition of Sargeant.
13   Q    We're not there yet.  I'll ask you about it.  So we
14   have Chris --
15   A    In asphalt, yes.
16   Q    He's in the U.K.  He didn't work in Houston, did he?
17   A    No.
18   Q    He didn't live in Houston, did he?
19   A    No.
20   Q    Did he work for you?
21   A    No.
22   Q    Did you work for him?
23   A    No.
24   Q    All right.  I think what you told me is you were the
25   man for the Americas for Vitol, correct?
```

Page 65

1    A    Yes.

2    Q    And you could approve any deal in the Americas, right?

3    A    Within reason, yes.

4    Q    Of course.  You're running a business, right?  Of

5    course, subject to your discretion.  What does Chris Bake

6    have to do with your decision to enter a joint venture with

7    GCAC or Mr. Brass?

8    A    It was an asphalt transaction.  It would have been an

9    asphalt business and Chris was involved in asphalt.

10   Q    Okay.  What does that have to do with you running the

11   Americas?

12   A    It wouldn't make sense because as it run, it would

13   impact and be working with VALT, which is the company that

14   was in asphalt for Vitol, and Chris was running that and,

15   therefore, it had to work together with that.

16   Q    Why?

17   A    That's the only way you can operate.  You can't have

18   competition within the same company.  He had to agree that

19   it was more important that he agreed how it's going to

20   operate.

21   Q    I think you were pretty clear that it wasn't the same

22   company.  You don't even know the name of them, right?

23   A    What are you talking about?

24   Q    The U.K. company, you said you didn't even remember the

25   name of the company in the U.K., Vitol's sister company.

```
 1    You testified -- you don't even remember, but now you're
 2    saying --
 3            MR. AURZADA:  Your Honor, he's being argumentative
 4    and he's interrupting the witness.
 5            THE COURT:  I don't think so on that one.  I'll
 6    allow the question.
 7            THE WITNESS:  I think you're confused.  I think
 8    that Chris was involved in both, which was Vitol in asphalt.
 9    BY MR. PATTERSON:
10    Q    No, I'm not confused.  But if you'll listen to my
11    question, I might have heard you wrong.  But earlier, I was
12    asking you about the entities of Vitol and we talked about
13    Vitol, Inc. here in the United States, rights?  And I said,
14    what's the comparable company in the U.K. and you go, I
15    don't know the name, I don't remember.  Remember?  And I had
16    this discussion.  I said, wait a minute, you're the CEO for
17    20 years and you don't remember the name of the company in
18    the U.K.  Remember that conversation?
19    A    That's the early part of the conversation.  Later on,
20    we had another conversation where I clarified.  First, it
21    wasn't a counterparty -- it wasn't a company to the level of
22    a Vitol, Inc.  The company that's level to Vitol, Inc. is
23    Vitol, S.A.  You asked me what the administrative company in
24    the U.K. was.  I told you they had changed over time.
25    Q    Okay.  Now Chris Bake is telling you stop.  Did you not
```

1    have an asphalt guy in the Americas?

2    A    Eric was as much of an asphalt was going to be.

3    Q    Mr. Kuo.  I'm sorry, I didn't mean to interrupt.

4    A    Eric Kuo.

5    Q    He was an asphalt guy.

6    A    Yes.

7    Q    So why are you worried about an asphalt guy in the

8    U.K.?

9    A    Because Chris Bake wasn't just an asphalt guy.  He ran

10   Vitol Asphalt, and that's the company that Vitol was trying

11   to grow in the asphalt business.  Whatever activities that

12   Eric did in asphalt had to fit within that.

13   Q    Vitol Asphalt, what's the formal name of that?

14   A    I don't know, Vitol Asphalt.  I think it was probably

15   just a name under which the Vitol business, maybe a

16   transaction was done by Vitol S.A.

17   Q    Maybe, so you don't know now.

18   A    I don't remember how it would be exact accounting.

19   Q    But a company in the U.K. who happens to trade asphalt

20   tells you you can't trade asphalt, or you can't enter into a

21   joint venture for asphalt in Houston, Texas.

22   A    No.

23   Q    Okay.  I thought that's what you said.  What happened?

24   A    (Indiscernible)

25   Q    Okay, what happened?

1    A    When?

2    Q    When your communications ceased on the joint venture

3    with GCAC and Mr. Brass.

4    A    Chris Bake was involved in the discussions.  I talked

5    to him.  He said it's not going to work, it doesn't work.

6    We don't want to do it.  I wasn't going to push.  I mean,

7    basically is it didn't make sense to what we're trying to do

8    in asphalt, which he was in charge of, so I told Eric we

9    stop.

10   Q    Worldwide in charge of asphalt; is that what you're

11   telling me?  Chris Bake was worldwide.

12   A    Yeah.

13   Q    Yeah?  And so, he looked at the joint venture and says

14   it doesn't work; is that what you're telling me?

15   A    Well, he had discussions --

16        MR. AURZADA:  Objection, Your Honor.  Assumes

17   facts not in evidence, and the fact is that there was a

18   joint venture.

19        THE COURT:  I don't think he --

20        MR. PATTERSON:  Sidebar.

21        MR. AURZADA:  And for him to coach is

22   inappropriate.  Just object.

23        THE COURT:  Well, quite frankly, I'm playing it

24   fair.  I think both of you are engaging in it, so I'm

25   allowing it, but I think we can all cut back.  I don't think

1    that that assumption has been made here.

2                MR. AURZADA:  Perfect.  Thank you, Your Honor.

3                THE COURT:  Go ahead, Mr. Patterson.

4    BY MR. PATTERSON:

5    Q    So Mr. Bake was worldwide in charge of asphalt.

6    A    In Vitol, we have a role of coordinator in which you

7    coordinate, so he was the worldwide coordinator for asphalt.

8    Q    And on what did he base his rejection of what you

9    referred to as continued conversations about the joint

10   venture?

11   A    He would keep me up to date on the conversations.  He

12   did not believe it would work with the transaction that we

13   did with Sargeant -- I think at the time, we had bought half

14   of Sargeant -- and he felt it didn't work.  I think that

15   GCAC wanted to be able to trade, not on the golf course, but

16   outside the golf course maybe in other parts of the Americas

17   and Chris did not see it as a fit for what he wanted to do.

18   Q    Right.  So let's talk a little bit about that

19   transaction.  You said VALT purchased half of the Sargeant

20   family asphalt business?

21   A    I think so, yes.

22   Q    Okay.  And was there a name for this entity or joint

23   venture with the Sargeant family?

24   A    I don't remember.

25   Q    Okay.  Because I think you said it earlier; is it VALT?

1    A    Oh, VALT was the Vitol company that was in charge of

2    asphalt.

3    Q    All right.  And so, there was a separate joint venture

4    with the Sargeant family?

5    A    It was an agreement -- it was a purchase of half their

6    interest.

7    Q    Of what, half their interest of what?

8    A    Of their business, I believe.  I don't -- I wasn't that

9    involved in that to that detail.

10   Q    And that was a large transaction for Vitol, right?

11   A    I don't remember how big it was.

12   Q    Well, it was an important part of the asphalt,

13   worldwide asphalt business for Vitol, correct?

14   A    Which was a very minor -- that was a business where

15   Vitol was trying to develop, so it was at the time quite

16   small.

17   Q    That Sargeant transaction or VALT transaction was

18   papered, correct?

19   A    It was a purchase, yes.

20   Q    There were documents, right?

21   A    I think so, yes.

22   Q    You think, you don't know?

23   A    I wasn't involved in the documentation of the deal.

24   Q    I understand you weren't involved, but you could still

25   know if there were papers, right, written documents in that

1    transaction.

2    A    I don't know.

3    Q    Do you know if there were conditions on that purchase?

4    A    I don't know.

5    Q    Do you know if Sargeant had a say-so in the

6    conversations with Vitol, Inc. and GCAC and Mr. Brass in the

7    asphalt business?

8    A    I did not know that.  I would be assuming that.

9    Q    So as far as you know, no one on behalf of the Sargeant

10   family got involved with the GCAC conversations with Vitol,

11   Inc., right?

12   A    I knew that Chris was dealing with one of the persons

13   in the Sargeant family.

14   Q    Who's that?

15   A    I don't remember his name.  I think it was the son of

16   Harry Sargeant.

17   Q    And what was told to you?  What did they tell you when

18   you -- I assume you had a conversation in which Chris, Mr.

19   Bake said you got to stop, no more, we're not doing this,

20   just be done, no more conversation.

21   A    I know that we had conversations regarding how they're

22   going to -- if it made sense to have a joint venture,

23   whether it made sense to put it all in one umbrella, whether

24   it made separate.  I knew that they were discussing

25   different alternatives.  In conversations with Chris, I

1    would get updated on how it was going to no great detail.

2    And when he told me, look, we looked at it, it doesn't make

3    any sense, we don't want to go forward with a joint venture,

4    it was fine.  It's great, okay.

5    Q    If you would listen to my question.  In that

6    conversation in which he said it's not a good fit; do you

7    recall that conversation with Mr. Bake?

8    A    Not the words, but the content.

9    Q    Do you recall that particular conversation?

10   A    Yes.

11   Q    All right.  Why did he say it was not a good fit?

12   A    If I remember correctly, it was because basically,

13   there was a difference in goals on how they wanted to grow,

14   participation in markets, and just whether Chris felt that

15   it would be a -- he could make GCAC fit into what he was

16   trying to do.

17   Q    Okay.  But the conversations, these joint venture

18   conversations were with Vitol, Inc., right?  They

19   contemplated a joint venture with Vitol, Inc., which is the

20   Americas, right?

21   A    It would have been with Inc. because it would be

22   operating in the Americas.

23   Q    Right.

24   A    All the business that we did in the Americas.  No, I'm

25   sorry.  All the business that we did in the U.S. went

1    through Inc.  Those transactions, whether they happen in the

2    U.S. would have been through Inc.; that's how Inc. was

3    involved.  And also, because Eric Kuo was the one who

4    brought GCAC.

5    Q    Right, so I guess back to Mr. Bake.  If the transaction

6    was with Inc., what did it matter if it fit with VALT?  VALT

7    was owned by U.K., right?

8    A    It doesn't work that way.  VALT was the one who was

9    trying to develop the worldwide market for asphalt.  They

10   would have been the primary driver of the asphalt business

11   for Vitol.  It was.

12   Q    So why --

13   A    So within that, GCAC, even though executing with Inc.

14   in transactions, would have to fit in within that.

15   Q    Okay.  Well, then why the conversations, why weren't

16   they directed to VALT immediately if that was the lay of the

17   land?  You understood it, right?  It's what you're saying.

18   A    When somebody's exploring a business or a potential

19   joint venture, you deal with the local entities and then try

20   to identify the opportunities, and you don't go to whatever

21   you may seem to be where it would be the top -- you have to

22   first identify the opportunity and develop it from there.

23   When it became serious enough, VALT got involved.  We

24   brought VALT in to be involved.  It had to be that way.

25   Q    But you just said that VALT was a Vitol venture

002633

```
1    involved in the worldwide production or distribution, the

2    asphalt business, right?  That's what you said.  Why would

3    you not send these discussions directly to VALT, right?  It

4    makes sense.  That's where it got to go, right?

5    A    The activities of GCAC would revolve around Eric Kuo,

6    it would be based in the U.S.; that is why it started in

7    Inc.  As it evolved or if it would have evolved, it would

8    have been part of VALT's business.  Overall, at the end of

9    the whole thing if we did a joint venture, it would have be

10   have to under the umbrella of VALT.

11   Q    And you knew that, right?

12   A    That's why VALT got involved.

13   Q    Right.  And Mr. Kuo knew that, right?

14   A    Somewhere along the way, he found that out.

15   Q    Come on.

16   A    Or he came to realize that, yes.

17   Q    Come on.  He's an asphalt trader, you said, right?

18   A    He's mainly a fuel trader.

19   Q    No, you said he's in charge of the asphalt trading for

20   Vitol, Inc., right?

21   A    He was the only person, yes.  He was the only person

22   who did -- part of his business, he did some asphalt, yes.

23   Q    Okay.  He's the only guy at Vitol, Inc. doing asphalt,

24   right?

25   A    Yes.
```

1    Q    And you're suggesting to me that Vitol had an entity

2    working on worldwide asphalt trading, transportation,

3    mixing, and you're trader didn't know about it?

4    A    He knew about it.

5    Q    That was my point.  He knew about it, right?

6    A    I don't know --

7    Q    Hold on.  And so why wouldn't he immediately take this

8    joint venture then to VALT?

9    A    I don't know.  I would not have done it that way.  The

10   way that you suggest is not the way that we did business.

11   He would have to develop -- Eric Kuo would have to develop

12   the business internally, identify the opportunities, develop

13   that, and then as it grew that it fit in with VALT.

14   Q    Right, okay.  So I think you probably answered my

15   question, so let's continue on with the story.  So there

16   were conversations, there was talk about a joint venture

17   over a couple of months, 30 days, 90 days?  How long did

18   this conversation last before Mr. Bake said stop, no more?

19   A    Oh, it took months.

20   Q    Months, 60/90 days maybe?

21   A    I would say probably, yeah, three or four months.

22   Q    Okay.  In the June/July/August/September of 2017?

23   A    No, no.  Maybe more like April/May/June.

24   Q    April/May/June.  And so when do you think --

25   A    I think July.

1    Q    Okay.  And when do you think that you ordered the

2    discussions terminated or Mr. Bake ordered the discussions

3    terminated?

4    A    July or August.

5    Q    July or August, all right.  And so, who communicated

6    that to Mr. Kuo?

7    A    I did directly.  I remember vividly on that one.

8    Q    Okay, you do.  And so, you had a face to face with him

9    or a phone call?  Face to face.

10   A    Yes.

11   Q    What'd you tell him?

12   A    I tell him that we're not going ahead with the joint

13   venture or JV, we're not.  We decided that and we're not

14   going to do asphalt business.  So for him not to just do, as

15   a favor to AJ, not to leave him hanging, we're going to give

16   him financing until December, give him time to find other

17   financing and we're getting out of the business with AJ.

18   Q    Okay.  So the financing was your idea.

19   A    No.

20   Q    I thought that's what you just said.  You told Mr. Kuo,

21   as an accommodation because he's my friend, let's give him

22   financing; that's what you said.

23   A    I should correct myself.  Let's continue giving him

24   financing.

25   Q    Oh, continue now.  I thought you remembered vividly

Page 77

1    this conversation?

2    A    I misspoke.  I mean, there's a time we were providing

3    some financing.  I said continue until December.

4    Q    You're trying to be very careful with your words today,

5    aren't you?

6    A    No.  I'm just trying to answer your questions.

7    Q    Okay.  But this conversation you remember vividly,

8    right?  I thought you said you told Mr. Kuo as an

9    accommodation to Mr. Brass, let's provide financing.

10   A    Let's continue providing financing.

11   Q    Okay.  But how would that be an accommodation if you

12   were going to continue?

13   A    Oh, we could have shut him down.  I mean, we could have

14   shut him down and stopped providing financing and he would

15   have been out of business immediately.

16   Q    Oh.  I thought the conversation was to communicate to

17   Mr. Kuo to terminate the joint venture discussions, but now

18   you're telling me that the conversation was let's just keep

19   financing.

20   A    No.  You asked me what an accommodation was, and I was

21   answering your question.

22   Q    No.  My prior question was, remember, I asked you about

23   communicating this termination of the joint venture

24   discussion to Mr. Kuo.  And you go, I remember vividly, I

25   went to see him; remember that?

1    A     No.  I didn't say I went to see him.

2    Q     Okay, let's go back then.  How did you communicate to

3    Mr. Kuo this news that the joint ventures communications

4    discussions were going to end?

5    A     He had come to see me, and we were outside my office,

6    and I told him.

7    Q     Okay.  So now he came to see you.

8    A     No now, that's what happened.

9    Q     Okay.  But do you remember this meeting vividly?

10   A     I remember him and me standing there and telling him.

11   Q     My question is do you remember this meeting vividly.

12   A     Which meeting?

13   Q     I think you answered my question.  So you didn't

14   communicate to Mr. Kuo that joint venture discussions needed

15   to stop then.  When did you?

16   A     What do you mean by then; when is then?

17   Q     Well, at this meeting that may have happened.

18   A     What meeting?  I'm just asking, but you said answering

19   your question.  What meeting, when is then?  I'm confused

20   with your time schedule.  You're not specifying time.

21   You're just basically saying then and meeting.  Please be

22   more specific.  I'm getting confused.

23   Q     Okay.  So far, we've only talked about one meeting with

24   you and Mr. Kuo, right?  Have we talked about more meetings,

25   Mr. Loya?

1  A    Are you referring to that time when I told him to stop

2  the joint venture; is that what you mean?

3  Q    No.  My question -- my question to you is have we

4  discussed more than one meeting that you had with Mr. Kuo?

5  It's yes or no.

6  A    No.

7  Q    All right, so there's only one meeting and when I say

8  that meeting, you know what I'm talking about, right?

9  A    No, I was confused.  I wasn't sure when you were

10 referring to.

11 Q    Okay.  So this one meeting that we've talked about

12 where you talked about continuing now financing.  When was

13 the next meeting with Mr. Kuo in which you informed him that

14 you he should terminate the joint venture discussions?

15 A    There is no second meeting.  He was told that in the

16 meeting we're referring to, the one meeting you're talking

17 about.

18 Q    All right.  So that single meeting, the only one we've

19 talked about in which I believe now Mr. Kuo came to see you;

20 is that correct?

21 A    Yes.

22 Q    Right, and you told him stop the joint venture, right?

23 A    At that particular meeting, I told him that the joint

24 venture was going to stop -- stop discussions, not stop the

25 joint venture, stop discussions on the joint venture.

1    Q    Okay.

2    A    Yes, that was the instruction.

3    Q    Okay.  What else?

4    A    What else what?

5    Q    What else did you discuss?

6    A    And I told him that, and as accommodation to AJ, we

7    will continue financing until the end of December.  So to

8    tell him and that way, he would know he has to find

9    alternative financing after December.

10   Q    Okay.  So in this meeting, you tell me, when did this

11   meeting take place that we were just discussing with Mr.

12   Kuo, when did it take place?

13   A    I think it was in August.

14   Q    Of what year?

15   A    2017.

16   Q    You think, are you pretty sure?

17   A    I'm pretty sure.

18   Q    Because you said you had a vivid memory of this.

19   A    No, I'm pretty sure.

20   Q    Pretty sure in August.  Early August or late August?

21   A    I don't remember that.

22   Q    Sometime in August, not that vivid of a memory.

23   A    Well, it's sometime in August.  It could be late July.

24   It was around that period.

25   Q    Okay.  And so, you're suggesting that as of sometime

1    between late July and late August, there was already a

2    financing arrangement in place; is that what you're

3    suggesting?

4    A    I believe we had financing already in place.  He was to

5    tell AJ that financing would only go through December.

6    Q    Right.  And did you have that in writing?

7    A    Did I have what in writing?

8    Q    The financing arrangement that we just discussed.

9    A    No.

10   Q    Okay.  But they would have had to come to you to get

11   that approved, right?

12   A    Not if it was structured properly and at the beginning.

13   At that point in time, it was structured properly.  We're

14   simply financing -- go ahead.

15   Q    How do you know it was structured properly if they

16   didn't come to you?

17   A    Well, we had conversations along the way.  In the

18   trading floor, I walked around, and I would have

19   conversations.

20   Q    So they did come to you?

21   A    They would not.

22   Q    They did not.  So now you didn't have conversations.

23   A    No.  I would be informed of what's going on.

24   Q    Okay.  But you said that it was structured properly,

25   right?

1   A    Yeah.  I knew that we held the inventory.  We never

2   (indiscernible) security was provided.  I know that.  I was

3   told that.

4   Q    By whom?

5   A    I believe Eric Kuo.

6   Q    Okay.  So was it at a prior meeting that Mr. Kuo talked

7   to you about the financing?

8   A    I knew that already, so it must have been.  It was --

9   we had informal meetings.  I walked around the floor, I

10  would ask people things.  They keep me informed.

11  Q    Okay.  Because earlier, I think what you told me -- and

12  correct me if I'm wrong -- but you said if someone was going

13  to provide credit over $10 million, they needed to come to

14  you, right?

15  A    No, a loan, it's a loan.

16  Q    Loan, right.

17  A    And by loan, I meant it to be a loan with a document

18  outlining the -- and we're extending money/funds with a

19  signed document.

20  Q    Oh.  Do you consider that to be the same -- well, how

21  would you refer to that form of relationship?  Just explain

22  it to me in one or more words.

23  A    We provide loans.

24  Q    Would that be a lending relationship?

25  A    A loan where we lent cash, yes.

1    Q     Okay.

2    A     A cash lending operation if we put a label on it.

3    Q     Okay.  So if I said, did you loan Mr. Brass money,

4    that's what you would believe in your head, right, that

5    we're talking about a document and I give him cash and he

6    pays me back, right?

7    A      In my mind, you call it a loan if you're giving cash in

8    exchange for a document in which you pay me back.

9    Q     Right.

10   A     So now we're providing credit or we're extending

11   financing to buy product on his behalf, we hold it in

12   inventory, and we release it to him against security.

13   That's the transaction that we did and that's what we did.

14   Q     Fair enough.  So I want to make sure we're using words

15   consistently between you and me, okay?  And so, when you or

16   I say financing, in your mind, this goes hand in hand with

17   your traders in which they may buy or sell with a

18   counterparty and you extend credit, right?

19   A     No.

20   Q     No?

21   A     No.

22   Q     Okay.  Then explain financing to me again then.

23   A     We're only financing it when we are extending -- we're

24   using company's funds in order to facilitate a trade,

25   whether it be buying inventory, holding inventory -- buying

Page 84

```
1    product, holding it in inventory, and then releasing it over

2    time when we get paid or other types of security as the

3    finance -- when we're financing.

4              When you say to me a loan, the come to me and say,

5    hey, I want to give somebody a loan.  What do you mean a

6    loan?  To me, that was taking an amount of money,

7    transferring to their account in exchange for a document

8    that says I shall pay you this amount over a certain period

9    of time.

10   Q    All right.  And so, in your example, a financing

11   arrangement wouldn't require any writing.  Vitol extends

12   financing without a writing, right?

13   A    As long as we had the security, as long as we control

14   the security, yes, we were fine, we were.  Just as long as

15   we had control of the asset, we can do other financing.  We

16   didn't need the writing.

17   Q    And you control the asset and, therefore, you control

18   your loss or gain, right?  Because now you have it, there's

19   not going to be a loss because you got the stuff, right?

20   A    No.  We control the asset, therefore, the risk is much

21   smaller.  There are other risks associated with it, right?

22   Q    Of course.

23   A    There's non-performance, market risk.

24   Q    Okay.  And so, are you --

25   A    But...
```

1    Q    Are you suggesting that I could call Vitol -- call Mr.

2    Kuo, use him as an example -- I want to buy 100 barrels of

3    oil, right.  Mr. Kuo goes to, I assume, your credit

4    department, right?

5    A    Yes.

6    Q    And says Patterson wants to buy 100 barrels.  Your

7    credit department says, let's figure out who this Patterson

8    guy is.  If he's going to buy on credit, right, is he good

9    for it.  And they do their diligence, right?

10   A    Okay.

11   Q    No.  I'm asking you is that correct.

12   A    Yes.

13   Q    Okay.  And they come back and go, yeah, we think

14   Patterson's good for it, right?  That's our guess, that's

15   our best judgment is he's good for it, right?  They tell Mr.

16   Kuo --

17   A    Not exactly.

18   Q    They made a decision that I'm credit worthy.  Let's

19   forget about what they do; that's Vitol's business.  But

20   they come to a conclusion that I'm credit worthy, all right?

21   Let's assume that for me.

22   A    And to what extent?

23   Q    Hundred barrels of oil, right?  Mr. Kuo calls me and

24   says, yeah, you're good.  I say, all right, buy me 100

25   barrels.

1              MR. AURZADA:  Your Honor, I object.  This is

2     completely a hypothetical question and it's compound.  I'm

3     having a hard time following him.

4              THE COURT:  I followed it.  You can answer the

5     question.

6     BY MR. PATTERSON:

7     Q    I say to Mr. Kuo, buy me 100 barrels of oil, right?

8     A    No.

9     Q    No?

10    A    He's not a broker; he's a trader.

11    Q    Okay.  What kind of trade would I do; what would be a

12    common small trade for a small client?

13    A    Let's just use your example, okay.  First, the amount

14    is too small to be...

15    Q    Correct.  I agree with you 100 percent.

16    A    Just assume that it's --

17             THE COURT:  Folks, again --

18             MR. PATTERSON:  I apologize.

19             THE COURT:  No worries.  Let him ask you a

20    question and I want you to answer the question.  We're

21    starting to get a little back and forth and I want to make

22    sure we just keep it to question and answer.  I'm speaking

23    to both of you at the same time.  Thank you.

24             Mr. Patterson, go ahead and ask a question.

25    BY MR. PATTERSON:

Page 87

```
 1   Q     Give me a common transaction if you will, a smaller

 2   transaction; what would it look like?

 3   A     Company A wants to buy a delivered cargo of gasoline

 4   and it's so many thousand tons and it's a value of $10

 5   million.

 6   Q     Okay.

 7   A     And that company would have to have approval by credit

 8   of a certain amount.  If that amount is greater than $10

 9   million, then the trader can sell to that company open

10   credit.

11   Q     Okay.  What documents are involved in that transaction

12   right there, anything, anything in writing between the buyer

13   and Vitol?

14   A     No.  The deal is done, it's agreed.  The deal gets

15   specified what it is:  You're selling me a cargo of gasoline

16   delivered at this period of time and this location and this

17   type of quality, et cetera, et cetera, all the details done.

18   Q     Okay.  But from the beginning of that transaction,

19   Vitol is going to do that all over the phone; no documents,

20   no signatures, nothing.

21   A     Yes.

22   Q     Okay.  But if I were to say loan to you, in your mind -

23   - or if you say loan, in your mind, you believe that's an

24   extension of cash in return for a written promise to repay,

25   right?
```

1    A    Say company came up and called up and said, can you

2    please send us $10 million as a loan over the next -- the

3    answer would be, like, what, we're not a banker.

4    Q    Exactly.

5    A    We're traders.

6    Q    Vitol is not a banker, right?  They're traders.

7    A    We will finance a deal, what is it, and you say, well,

8    I'm going to buy gasoline over here.  They don't plan for

9    whatever, they have the part I want, but they don't extend

10   credit to me for whatever reason.  I need to buy us a great

11   deal.  I said we'll finance it, but we will control the

12   storage, we'll control the product.  We would only release

13   it when we have security.

14   Q    Okay.  Anything that you think was left out of this

15   story, this story arch of discussions of joint venture with

16   Mr. Brass and GCAC.  I think you suggested that maybe that

17   was coupled with a financing agreement at the same time.  Or

18   no, did that come later?

19   A    No, it wasn't coupled with anything.  There was

20   discussions on the potential joint venture that were

21   terminated when we chose not to do so -- not to have that

22   joint venture.

23   Q    When did the financing begin with GCAC and Mr. Brass?

24   A    I don't know that.

25   Q    You don't?

1    A    I don't.

2    Q    How did you know that it was going to continue then

3    when you met with Mr. Kuo to tell him no more joint venture

4    conversations?

5    A    Because I knew we were doing transactions with him, and

6    I  knew that it was a financing arrangement with GCAC.

7    Q    And I just asked you when did you become aware of that

8    and you said you didn't remember.

9    A    No, you asked me when it started.

10   Q    Yeah.  When did it start?

11   A    I don't know when it started.

12   Q    When did you become aware of it?

13   A    Sometime during the discussion that we were doing

14   business with him.  I mean, sometimes -- I was aware we were

15   doing business with GCAC and how we were doing business with

16   him.

17   Q    I'm going to pull up a document for you.

18        THE WITNESS:  Your Honor, can I have some water,

19   please?

20        THE COURT:  Yeah.  Mr. Patterson, you're in

21   between -- you think we can take five minutes?

22        MR. PATTERSON:  Sure.

23        THE COURT:  Let me just grab some...

24        MR. PATTERSON:  Of course.  Anytime you need a

25   break, it's great with me.

```
 1              THE COURT:  Why don't we take five to seven
 2    minutes and just take a break here.
 3              MR. PATTERSON:  Sure.
 4              THE COURT:  I just want to remind you that you're
 5    still under oath and you're not going to be able to speak
 6    with anyone about your testimony, sir.
 7              THE WITNESS:  Okay.
 8              THE COURT:  I'm sure somebody can find you a
 9    bottle of water and we can let you use the restroom as well.
10    Thank you.
11              THE WITNESS:  Thank you.
12              (Recess)
13              CLERK:  All rise.  Be seated.
14              THE COURT:  I remind you that you're still under
15    oath.  We're back on the record in Vital v. Brass.
16              MR. PATTERSON:  Thank you, Your Honor.
17    BY MR. PATTERSON:
18    Q    Mr. Loya, I think we've kind of gotten through this
19    period of time in which Vitol and GCAC and Mr. Brass were
20    involved.  Would you agree with me?  By December-ish of
21    2017, the relationship whatever it was, was done.  Would you
22    agree with me?
23    A    It should have been done.
24    Q    Should have been.  Well, was it?
25    A    No, it wasn't.
```

1    Q    How come?

2    A    I don't know.  I found out it wasn't done, I think

3    March next year, of that following year, '18.

4    Q    Didn't you communicate to whomever that the

5    relationship was done, the financing was over, the joint

6    venture, conversations were over, everything?

7    A    Everything is rather all encompassing.  I instructed

8    Eric that it should be over by the end of December.

9    Q    Why wasn't it?

10   A    Because we hadn't gotten paid.

11   Q    Well, did you provide financing after the end of 2017

12   in your -- what you've described as financing?

13   A    No.

14   Q    No trades, no transactions after the end of 2017?

15   A    I don't know.

16   Q    Well --

17   A    -- exactly.

18   Q    Well, that's not what you just said.  Do you not know

19   or do you know?

20   A    I don't know exactly when we stopped doing -- when we

21   did the last transaction.

22   Q    Why?

23   A    Why what?

24   Q    Why don't you know when it ended?

25   A    It wasn't my role to keep track of when it ended.

1    Q    It wasn't?  Whose was it?

2    A    Eric.  Was his role to execute.

3    Q    Eric worked for you, right?

4    A    Yes.

5    Q    And you're the one that -- you were instructed to end

6    the relationship, correct?

7    A    I wasn't instructed.  I instructed.

8    Q    You made this decision on your own?

9    A    I'm sorry?

10    Q    You made this decision on your own?

11    A    Which decision?  To stop the discussion of JV or to --

12    Q    Terminate the relationship.

13    A    The decision I made was that we would extend financing

14    through December.  I expected at the end of December to have

15    no more financing outstanding.  No more issues.

16    Q    Okay.  And you made that decision on your own or you

17    were instructed from someone?

18    A    No, I made on my own.

19    Q    Okay, but you were instructed to end the JV

20    conversations, correct?

21    A    I was not.

22    Q    I -- maybe I misunderstood.  My understanding was that

23    Chris Bake said this isn't going to fit.  Stop.

24    A    And I agreed with him.  I mean, we could have

25    continued.  I mean, it's -- the relationship is

1    collaborative, so --

2    Q    No.  I -- well, maybe it is, but you need to explain

3    that to me because I've understood that Chris Bake said,

4    this needs to stop and he was in charge of Asphalt Worldwide

5    for Vitol, right?

6    A    He said he wasn't interested in a joint venture.

7    Q    Okay.  And if Chris Bake isn't interested in a joint

8    venture regarding asphalt, it's not going to happen, right?

9    A    Most likely not.  I would have --

10   Q    No.  You understand my frustration, Mr. Loya, because

11   earlier --

12   A    If --

13            THE COURT:  Hold on, folks.  Just one question,

14   one answer, Mr. Loya.  You got to let him ask the question -

15   -

16            THE WITNESS:  Okay.

17            THE COURT:  -- then you'll answer.  Thank you.

18            THE WITNESS:  Sorry.

19   BY MR. PATTERSON:

20   Q    My understanding earlier, and maybe I misunderstood,

21   was that you got call from Chris Bake who was in charge of

22   Asphalt Worldwide and said, this is not going to fit.  It

23   needs to stop.  And you said, okay.  Right?  And look, let's

24   do it this way.  Let's try to do it this way.

25            MR. PATTERSON:  If I can use -- I could use the

1    board, Your Honor.

2              THE COURT:  Absolutely.

3              MR. PATTERSON:  Can you hear me okay?  Now can you

4    hear me?  Now can you hear me?  Are we good?  Okay.

5              THE COURT:  I still believe you have your former

6    colleague's Picasso up there, but --

7              MR. PATTERSON:  I'm going to use this.

8    BY MR. PATTERSON:

9    Q    So let's see if we can get this pinned down if we can,

10   Mr. Loya.  So when did the conversations start regarding a

11   possible joint venture with GCAC?

12   A    Probably April of 2017.  Around.

13   Q    Okay.  Do you see what I wrote?  April 2017,

14   discussions of joint venture began.  That accurate?

15   A    It was my perception.  Could've -- it could've been

16   earlier.  It could have been -- it's roughly my best

17   estimate.

18   Q    Your recollection?

19   A    Yes.

20   Q    All right.  Second step was financing for GCAC.  When

21   did that begin?

22   A    I don't know.

23   Q    When did you first become aware that Vitol was

24   financing, in your words, GCAC or Mr. Brass?

25   A    Right around the same time frame.  April, May.

```
 1   Q    I would prefer you tell me you don't recall, if you

 2   don't recall, instead of guessing.  Do you recall?

 3   A    No.

 4   Q    You don't know?

 5   A    I don't recall.

 6   Q    Well, you do know or you testified that you knew about

 7   it when you had this meeting with Mr. Kuo?

 8   A    Yes.

 9   Q    Right?

10   A    Yes.

11   Q    Let's go from there.  When was the meeting with Mr.

12   Kuo, the one you vividly remember, that meeting

13   A    July or August same year.

14   Q    So July or August, meeting with Kuo, terminate joint

15   venture discussions, right?

16   A    Yes.

17   Q    That accurate?  July, August 2017?

18   A    Yes.

19   Q    You had a meeting with Mr. Kuo and you instructed him

20   to terminate the joint venture discussions, right?

21   A    Yes.

22   Q    Right.  And at that time, you were aware that Vitol was

23   providing financing to either Mr. Brass or GCAC, correct?

24   A    Right.

25   Q    So somewhere in here, right, you became aware.  Right?
```

1    A    I don't recall.  It could have been earlier.  It could

2    have been before the April --

3    Q    Right --

4    A    -- JV.

5    Q    Now, the other thing that happened in this time frame

6    is you had a discussion with Chris Bake, right?

7    A    I had regular communications with Chris Bake.

8    Q    Right.

9    A    On --

10   Q    You had --

11   A    -- subjects.

12   Q    You had a discussion with Mr. Bake in which he told

13   you, stop the joint venture discussions, it's not going to

14   fit.

15   A    Okay, yes.

16   Q    When did that occur?

17   A    Probably July or August, because I would have told Eric

18   shortly thereafter.

19   Q    Same time frame?

20   A    What?  Roughly earlier.  Maybe a few days earlier.

21   Q    Right.  And he told you to terminate it, right?  Right?

22   A    Yes.

23   Q    And he told you to terminate because it didn't fit in

24   with the worldwide strategy of Vitol and Asphalt?

25   A    He didn't think it fit with the strategy, yeah.

Page 97

1    Q    Okay.

2    A    Wasn't interested.

3    Q    Okay.  And just briefly, what did the joint venture

4    encompass?  Just general terms.

5    A    Which joint venture?

6    Q    With -- the proposed with GCAC and Mr. Brass.

7    A    It would be in which we would be -- Vitol and GCAC

8    would be trading asphalt around sourcing, selling of asphalt

9    in the Gulf Coast.  There was at times discussion about

10   selling it in other countries.  I think it was Venezuela.

11   No, sourcing from Venezuela, but involve South American

12   countries as well.

13   Q    Okay.  And --

14   A    It ranged.

15   Q    It ranged.  And what was the financing generating?

16   What were you financing for GCAC and Mr. Brass?

17   A    The financing was buying inventory.

18   Q    What?  Asphalt, right?

19   A    Asphalt.

20   Q    The same things that joint venture was going to do,

21   right?

22   A    No.  It was -- it would buy the asphalt, finance it.

23   It would pay for the asphalt.

24   Q    Right.

25   A    It would be in storage controlled by -- tankage

1    controlled by Vitol.

2    Q     Right.

3    A     Vitol will hold it.

4    Q     Right.

5    A     And if there were opportunities to sell it --

6    Q     Right.

7    A     Sell directly or if it was sold to agent who sold to

8    somebody else, he would have to provide security in order

9    for the product to --

10   Q     Okay.  So according -- correct me if I'm wrong, but I'm

11   trying to fit it in here.  According to you, none of that

12   occurred after your call from Mr. Bake, right?  None of

13   those extra things that you just talked about, the mixing,

14   the selling, the storage, those things didn't occur because

15   that was joint venture.  You just were financing trades,

16   right?

17   A     I never said that.

18   Q     Well, what else do you finance?  That's what you told

19   me financing was, the trade.

20   A     Well, when you're buying inventory, you don't buy

21   finished products.  You blend it.  Sometimes you -- you're

22   buying components and when you have it in tankage, you blend

23   it.  It's -- and then you sell the finished product.  That's

24   what Vitol was financing, that inventory and that activity.

25   Q     Okay.  So you were financing exactly what you talked

1    about doing in the joint venture --

2    A    No --

3    Q    -- right?

4    A    The joint venture would have been joining the -- it

5    would P&L impacts.  It would be sharing the profit. It would

6    be entering tenders to supply customers in very -- outside

7    the U.S.

8    Q    Right.

9    A    That was all part of the discussion.

10   Q    But as far as transactions are concerned, the storage,

11   the mixing, the purchase of inventory, inventory costs,

12   right, tankage.  That all was in the joint venture and now I

13   think you're telling me it was also in your mind part of the

14   financing.  Right?

15   A    There was never no -- a joint venture.

16   Q    Well, venture discussions.  I'm sorry.  Right?  So the

17   activities are identical.  When we look at activities

18   because we're going to get there, right -- when we look at

19   the activities that you say you financed those are the exact

20   same activities that you just described for the Court that

21   were going to occur in the joint venture.  Right?

22   A    The joint venture would encompass more activities, but

23   --

24   Q    Well --

25   A    Those activities would be part of the --

1    Q    What?  Tell me what additional would have happened in

2    the joint venture that didn't happen in the financing?

3    A    Supplying cargoes to VALT, supplying cargoes to other

4    customers, participating in tenders, having a split of the

5    profits.  Also, how to determine profits with VALT, how to

6    split it with GCAC.  All those things would have to be

7    discussed on how would you set up a P&L, responsibility and

8    a company, an operating company within VALT.

9    Q    Right.

10   A    That's what joint venture would be discussing.  Much

11   more complicated than financing or marketing-wise.

12   Q    I understand.  I understand.  That's not what I asked,

13   though.  So listen to me, all right?  Those would be part of

14   the deal terms, right?  You're saying, we never agreed to

15   split the profits.  We never agreed to split the cost.  We

16   didn't know what the split would be and we would have had

17   the market to VALT.  Those things didn't happen.  Right?

18   What transaction -- hold on.  Let me ask it -- try to ask it

19   a different way.  What transaction did you finance -- you

20   being Vitol -- did Vitol finance that would not have

21   occurred within the joint venture, if any?

22   A    (indiscernible), what --

23   Q    Transaction.  Buy, sell, anything that costs -- you

24   allege, anything that costs Vitol money, would any of those

25   things have not happened under the contemplated joint

1    venture?

2            MR. AURZADA:  Objection, Your Honor.  It's a

3    compound question.

4            THE WITNESS:  I'm not sure --

5            THE COURT:  Sustained.

6            THE WITNESS:  -- understand the question.

7            THE COURT:  Sustained.  Going to have him break it

8    up to you.

9            MR. PATTERSON:  All right.

10           THE COURT:  Different question.

11   BY MR. PATTERSON:

12   Q    Let me ask it different.  You believe GCAC, Mr. Brass,

13   owes Vitol money, correct?

14   A    Yes.

15   Q    And you believe that they owed you money for what --

16   you again, Vitol.  I know you're not there anymore, but

17   Vitol.  What did they owe Vitol for, in big buckets?  I'm

18   not asking you to detail it.  Big bucket.

19   A    For the product provided to them.

20   Q    Product.  Okay.

21   A    I believe hedging.

22   Q    Hedging.  All right.  What else?  Storage?

23   A    Storage, transportation.

24   Q    Storage, transportation.  What else?

25   A    I can't think of any more.

```
 1    Q    Okay.  My point is, the joint venture contemplated each

 2    of these items as part of the joint venture.  Right?

 3    A    That and much more.

 4    Q    What?  That's what I'm asking you.  What else?  What

 5    else did it contemplate as far as transactions are

 6    concerned?  I understand you believe there was never an

 7    agreement to split the profits or those kind of deal terms.

 8    I'm looking at transactions that would have generated income

 9    or expense for the joint venture.  Anything else other than

10    these things?

11    A    If we limit ourselves to physical movement, marketing,

12    things like that, all that -- it would include probably

13    tenders in which you will be offering to supply product.  It

14    would be -- tenders to buy product whether it's finished or

15    components.

16    Q    And we have that product, tender or buy.  Those are

17    just different ways to get product.  Right?  Or sell

18    product.

19    A    Or sell.

20    Q    Right.

21    A    But well in a --

22    Q    Just a different way.

23         MR. AURZADA:  The witness needs to be allowed to

24    answer that question.

25         THE COURT:  Well, the witness is also interrupting
```

1    the question, so I'm going to again ask everyone to please

2    allow one question, one answer.  And I know that sometimes

3    you get additional thoughts in your head, just allow it.

4    Just give each other some space here.

5    BY MR. PATTERSON:

6    Q    What else?  What else did the joint venture contemplate

7    that didn't, that wasn't financed by Vitol through the end

8    of December, at least?

9    A    Participating in in international markets, co-shipments

10   with VALT.

11   Q    Again, let's focus on transaction.  Right?  Those are

12   just different markets, different places, different

13   partners.  What transaction would have occurred as

14   contemplated by the joint venture that you didn't -- that

15   Vitol didn't go ahead and finance on their own, under your

16   theory?

17   A    I'm telling you is that joint venture would include a

18   joining -- co-transportation of product.

19   Q    Okay.

20   A    A different -- a broader management of the inventory

21   would have been supplied, to participate in tenders.

22   Q    Okay.  So in the July/August time frame of 2017, you

23   got the call from Bake.  He said terminate the joint venture

24   talk.  You very soon thereafter had the meeting with Kuo,

25   told him to terminate the joint venture discussions, right?

1    A    Yes.

2    Q    And then in that same conversation you talked about

3    financing to accommodate Mr. Brass or GCAC, right?

4    A    To give them time to find alternative financing.

5    Q    Right.  And then you say that everything was finished.

6    A    I don't know if anything was finished or not.

7    Q    Supposed to be.  Pursuant to your instruction,

8    financing was to end December 31, 2017, correct?

9    A    Yes.

10   Q    All right.  So does that look accurate to you?

11   A    Yes.

12   Q    All right.  You wouldn't make any changes?  You're not

13   remembering anything else?

14   A    No.

15   Q    Now, we have VALT over here.  I'm sorry, I don't know

16   if you can see it, but VALT.  VALT is a partnership entity,

17   a joint business venture with the Sargeant family and Vitol,

18   the Vitol unit out of the UK, correct?

19   A    No.

20   Q    All right.  Clarify it for me, then.  What is it?

21   A    I think it was a business arrangement.  I don't know to

22   what detail, but it was only one of the Sargeants, not the

23   Sargeant family.

24   Q    Okay, one of the -- I'm sorry.  So one of the Sargeants

25   from overseas and the retail unit in the UK came together

1    and traded, marketed, did all these things with asphalt,

2    right?  Storage, transportation, product, hedging.  They did

3    all those things worldwide with asphalt, correct?

4    A    They (indiscernible), and they were trying to do that.

5    It was a new -- it's a new organization, so --

6    Q    It was.  When did it -- when was it created?

7    A    I don't remember.  Maybe -- I'm guessing -- a year

8    before then.

9    Q    How are you telling us it's new if you don't remember?

10   A    I vaguely remember.

11   Q    You remember or not remember?

12   A    I vaguely remember.

13   Q    What do you vaguely remember?

14   A    That it was a new organization, rather small.  They

15   were trying to establish themselves in asphalt.

16   Q    Okay.  But Mr. Bake was in charge of it?

17   A    Yes.

18   Q    Right?  Right?

19   A    Well, he was -- yes, along with another guy from -- I

20   forget his name -- in London.

21   Q    You need a minute to think?

22   A    No, it won't make any difference.  I can't remember his

23   name.

24   Q    And what did he do?

25   A    He was doing the day to day, I think.  Chris was more

002665

1    the strategic.

2    Q    And how well known was VALT within the Vitol

3    organization worldwide?  You knew about it, right?

4    A    I knew about it, on the board, but --

5    Q    Right.

6    A    I don't know.  I don't know how to answer that

7    question.

8    Q    Okay.  But you knew about it because you're on the

9    board and it came to the board.  It got board approval,

10   right, the transaction?

11   A    No.  I just -- I think somebody in London decided to do

12   it.  So I assume they got Russell approval.

13   Q    Right, but they told the board.  You knew because you

14   were on the board of Vitol Group.

15   A    It was -- one of the companies was mentioned, yeah.

16   Q    Right.  And so when you were brought the discussions of

17   the joint venture in April of 2017, is that when you called

18   Mr. Bake and told him about what Mr. Kuo was thinking about?

19   A    I don't remember when we told Chris.  I think Chris --

20   I don't know how to respond to that.  My guess is he would

21   have found out through Eric talking to the individual in

22   London.  I can't remember his name.

23   Q    Right.  And isn't it --

24   A    and --

25   Q    I'm sorry.

1    A    It would be at that level, at the trader level.

2    Q    Right.  And isn't it true when you got the call from

3    Mr. Bake in July or August of 2017, isn't it true that he

4    told you, you can't do this because we have a noncompete.

5    We can't compete with VALT.  There's a noncompete with the

6    Sargeant family and we're going to get sued if we do it.

7    Isn't that true?

8    A    I don't remember that.

9    Q    You don't?

10   A    No.

11   Q    When I tell you, does it refresh your recollection when

12   I say, didn't he tell you there was a noncompete?  Does that

13   ring a bell somewhere?

14   A    No, it rings a bell that basically I know that he was

15   trying to make it all work within the arrangements he had or

16   VALT had with Sargeant, whatever his first name is.  So that

17   was part of the discussion.  It was part of -- because at

18   one time, there was discussion about making all just one big

19   joint venture.

20   Q    Right.  And you discussed the noncompete, right, with

21   Mr. Bake.

22   A    I didn't.

23   Q    You knew about it.

24   A    No, I just knew there were issues that they had some

25   agreement and it was not a straightforward agreement.  It

1    was just --

2    Q    Okay.

3    A    -- complicated.

4    Q    Okay.  Listen to my question, though.  Were you aware

5    of the noncompete agreement between VALT and the Sargeant

6    family that bound Vitol?

7    A    No.

8    Q    You weren't?

9    A    No.

10   Q    To this day, you're not aware?

11   A    No, not to any degree.

12   Q    I didn't ask you to what degree,  I said, are you aware

13   at all?  You're hedging.

14   A    I'm aware there was a -- some agreement with

15   complications.  I didn't know the details.

16   Q    What complications?

17   A    It was complicated.  I just knew it was -- somehow

18   Sargeant had to agree in all this arrangement.

19   Q    Okay.  We're getting somewhere.  Sargeant had to agree.

20   What did they have to agree to?

21   A    I don't know that.

22   Q    Well, okay, so Mr. Bake said Sargeant doesn't agree

23   with this joint venture, so you got to stop.  Is that what

24   he said?

25   A    No.

1   Q    What did he say?

2   A    He said, we've been discussing.  It's not going to

3   work.  We don't want to do it.  We're not going to do it.

4   Okay.

5   Q    We?  I thought you said you -- I thought you were going

6   to do this.  Now you say we --

7   A    It's the royal we.  He said he's not -- that's how we

8   talk in Vitol.  We, but it's -- he said, we, Vitol, do not

9   want to go forward with this.

10   Q    So your testimony today -- I just want to -- I'm going

11   to write it down because we're going to come back to this.

12   But your testimony today is you're not aware of any

13   agreement that Vitol had entered into that restricted or

14   caused Mr. Bake to tell you to terminate the joint venture

15   with GCAC and Mr. Brass.  Is that your testimony?  You're

16   not aware of any of that?

17   A    I'm not aware to any details.

18   Q    Okay.  Let's go, then.  I don't want to know details.

19   I want to know what you know.

20   A    Okay.

21   Q    So tell me what you know.

22   A    I knew that there was an arrangement with Sargeant that

23   VALT had that had to be part of the solution, if we're going

24   to go forward with the joint venture.

25   Q    In what way?

1   A    It had to work.  I don't know, whatever the agreement

2   was, had to fit in or had to be amended or something.  It

3   had to be part of consideration for the JV.

4   Q    Okay.  So you understood that the documentation at VALT

5   restricted your ability to do a joint venture with GCAC and

6   Mr. Brass, correct?

7   A    I don't know if it's in documentation and I don't know

8   to what it restricted.  I know it was an issue that had to

9   be dealt with.

10  Q    Okay.  You said it was in the document.  Is it not in

11  the documents?

12  A    I never said --

13  Q    The complications within the documents, you said.

14  A    I'm not aware -- then I misspoke.  I'm not aware of any

15  documents.  I never saw any documents.

16  Q    Okay, now you're not aware of any documents on the VALT

17  deal?

18  A    I never saw them.  I never read them.  I'm not aware of

19  the content or there were any.

20  Q    I didn't ask you any of those questions.  I asked you

21  if you were aware of documentation related to the VALT and

22  Sargeant deal.

23  A    No.

24  Q    You're not.  And so when you told the Court under oath

25  that there were complications in the documents, now you're

1    not saying that?  You're saying that that wasn't true?

2    A    I understood there to -- no.

3    Q    No it's not true or no you didn't say that?

4    A    No, I misspoke.  I'm not aware of the documents.  I

5    knew there were issues that had to be resolved, whether

6    there --

7    Q    What issues?

8    A    -- document or not, I don't know.

9    Q    Okay, so now you're not aware of any documents.  You're

10   not aware of any complications?

11   A    No, I was aware of complications.

12   Q    Okay.  What were the complications?

13   A    I don't know.  To a degree there were.  That's all I

14   knew.

15   Q    You were the CEO of Vitol, Inc.  The CEO.  And Mr.

16   Bake, who's not the CEO of anything, calls you, the CEO, and

17   says, stop; and you don't ask any questions?

18            MR. AURZADA:  Your Honor, this is getting

19   repetitive.  We're on the same question over and over.

20            MR. PATTERSON:  We're also on the third version of

21   events.

22            THE COURT:  Yeah, I think we just need to clarify

23   and I'm -- so I'll give a little bit of leeway.  I think

24   there was some discussion about papers and now there's not

25   papers.  I'll give a little bit of clarification --

```
1            MR. PATTERSON:  Thank you, Your Honor.
2            THE COURT:  -- little leeway.
3    BY MR. PATTERSON:
4    Q    Mr. Bake just calls you, the CEO of Vitol, Inc. and
5    says, stop and you don't ask any questions?  You just say,
6    okay?
7    A    No.  he calls up and says that's not going to work.
8    We're not interested in pursuing the JV.  I won't
9    particularly care whether we pursued it or not, so fine.
10   Q    But why did it matter whether he was interested?  I
11   thought you were doing this deal.  Mr. Kuo was doing the
12   deal.  Why did it matter whether Mr. Bake was interested in
13   the deal?
14   A    The joint venture discussions were involving Mr. Bake.
15   Q    They were.  Mr. Kuo and Mr. Bake were talking about the
16   joint venture.
17   A    Yes.  I was not involved in discussion --
18   Q    Okay.  Well, why didn't Mr. Bake just tell Mr. Kuo, no,
19   we're not doing it?
20   A    Beca8use it falls in the purview of Vitol, Inc. is what
21   he told me.  I don't know if he told Eric the same thing,
22   but I made it clear to Eric, that's it, we're done, stop
23   wasting time on this.
24   Q    So Mr. Bake and Mr. Kuo were discussing this.
25   A    Along with AJ, yes.
```

002672

1  Q    For how long?  How long had they been discussing it?

2  A    Months.

3  Q    And so I assume that Mr. Bake's, then, conversation

4  with you was a heads up, I've nixed the deal with Mr. Kuo.

5  I just want to let you know.

6  A    It would've been more diplomatic than that, yeah.

7  Something like that.

8  Q    Earlier he said he called and said terminate.

9  A    No, he --

10  Q    You said, call from Mr. Bake, terminate joint venture

11  discussions, and you said, yeah, that looks accurate.

12  Right?  And then you went and told Mr. Kuo top terminate.

13  But now you said Mr. Bake told Mr. Kuo because they were

14  talking about it or no?

15  A    No.  You asked me if they --

16  Q    Okay.

17  A    He might have told Eric.  Eric Kuo and Chris Bake and

18  AJ were the ones discussing the joint venture.

19  Q    All right.  Okay.  So how far along did the joint

20  venture discussions get?

21  A    I don't know what you mean.

22  Q    Well, I mean, was it one meeting?  Did you talk, were

23  you down to the final details?  Where were you in the joint

24  venture discussions, if they had to be terminated?

25  A    I don't know to what degree they got.

002673

1    Q    You don't?

2    A    No.

3    Q    Were there documents being circulated?

4    A    I don't recall any.  Perhaps I may have received an

5    email saying, hey, we're negotiating or something, but I

6    don't recall any particular documents.

7    Q    Were there lawyers involved?

8    A    I don't think so.

9    Q    No?  You would know that, right?  I mean, if Vitol,

10   Inc. went out and hired lawyers to do a transaction,

11   wouldn't you know about that?

12   A    Probably.  Not necessarily but probably.

13   Q    Probably, right.  If they were hired to draft joint

14   venture documents, you would know about that, right?

15   A    Maybe.

16   Q    Okay.

17   A    Probably.

18   Q    All right.  And then one more thing before we get to

19   some documents.  You said when we talked about financing,

20   you remember we talked about kind of the steps that your

21   credit department goes through, right, and if I wanted to

22   participate in a transaction -- if I wanted to participate

23   in a transaction with Vitol and you didn't know me and my

24   information went to your credit department, right.  Remember

25   talking about that?

Page 115

```
1    A    Yeah.

2    Q    All right.

3    A    But we did not discuss details.

4    Q    I'm sorry?  We didn't discuss what?

5    A    Details.  You said -- earlier, you said the process of

6    the credit department.  We didn't discuss any process.

7    Q    Correct.  Right.  That's what we're fixing to do.  How

8    many people work in that department?

9    A    I don't know.

10   Q    How many people worked in that department while you

11   were CEO?

12   A    I don't remember.  I can guess, estimate.

13   Q    Okay.  Did they do a good job?

14   A    Most of the time.

15   Q    Did they do a thorough job?

16   A    Most of the time.  We had issues.  They made mistakes.

17   Q    And what would they produce when they vetted a

18   potential new customer or third party?

19   A    They would assess the line of credit that we would give

20   them.

21   Q    What else would they produce other than a number?

22   A    I don't know.

23   Q    You don't know.

24   A    No.

25   Q    Did you not ever review any of the work done by your
```

1    credit, 22 years as CEO?

2    A    No, I didn't.  I --

3    Q    Never?

4    A    I (indiscernible) the CFO.  I would get involved if

5    there's a problem.

6    Q    Okay.  So CFO would know.  You would --

7    A    Yes.

8    Q    Based upon your experience, 22 years as CEO, based upon

9    your experience, would your credit department approve as a

10   third party an insolvent company?

11   A    Of course not.

12   Q    Of course not, right?  Never happen.

13   A    It would give them, not for credit.  Would not.

14   Q    Right.  You wouldn't finance them, right?

15   A    We couldn't.

16   Q    I know you would.  Vitol can do almost anything.

17   A    We would -- it was all based on security.  We would

18   sell to a bankrupt company.  We'll finance a bankrupt

19   company, if we have proper security.

20   Q    All right. Do you know when Mr. Kuo began talking with

21   Mr. Bake about a possible joint venture with GCAC or Mr.

22   Brass or both?

23   A    No, I wouldn't know.  I mean, I don't remember.

24   Q    You don't remember.  Was it before you found out?

25   A    It could be, yes.  Probably.  It could.  Was it?

1    Q    Okay.

2    A    I don't know.

3    Q    Okay.  But I thought -- so your testimony is that prior

4    to April 2017, Mr. Kuo and Mr. Bake may have been discussing

5    this joint venture.

6    A    They may have.  I don't know what they would --

7    Q    You're not aware, right?

8    A    I don't remember being aware.

9    Q    Right.  As far as you know, you found out at the same

10   time?

11   A    As whom?

12   Q    Mr. Kuo about the joint -- possible joint venture.

13   A    I'm sorry, I --

14   Q    Well, look --

15   A    -- rephrase the question.  It's --

16   Q    Okay.  You're right.  Your earlier testimony, I

17   believe, was that if there was a joint venture and involved

18   more than one transaction, you were the man who approved or

19   disapproved of it, period.  Right?

20   A    The final approval --

21   Q    Yeah.

22   A    It if was in Vitol, Inc. would come to me.

23   Q    That's right.  And so an idea, a trader has an idea for

24   a joint venture, he knows he's got to get your approval,

25   right?

1    A    Not for an idea.  You can explore --

2    Q    A joint venture.

3    A    He can explore all he wants.

4    Q    Can you spend money on lawyers?

5    A    I prefer not to.  I would -- if I find out, I would

6    question why.

7    Q    All right.  And could he draft joint venture agreements

8    ahead of time before letting you know?

9    A    I don't know if they were trying to -- it would be up

10   to them.

11             MR. PATTERSON:  All right.  So I put up on the

12   screen what is for the Court 104-1 and based upon

13   representation of counsel, I don't believe there's an

14   objection to this.  I'll go ahead and offer it.

15             THE COURT:  Any objection.

16             MR. AURZADA:  Your Honor, may I take a look at it

17   --

18             THE COURT:  Sure.

19             MR. PATTERSON:  And I apologize.  I'm just going

20   by the document they filed with the Court indicating they

21   had no objection.

22             MR. AURZADA:  Yeah, actually, he's correct.  Yeah.

23   No objection.

24             THE COURT:  Okay.  104-1 is admitted.

25             (Defendant's Exhibit 104-1 entered into evidence)

Page 119

```
 1              MR. PATTERSON:  All right.

 2   BY MR. PATTERSON:

 3   Q    So Mr. Loya, if you look on your screen, see that?

 4   A    I can only see part of it.

 5   Q    Right.  We're going to -- we're going to fix that,

 6   right.  And we talked about Mr. Kuo, right?

 7   A    Yes.

 8   Q    Who's Mr. James?  You see him in the email string?

 9   A    He was a business development guy.

10   Q    I'm sorry?

11   A    He was a business development person.

12   Q    Okay.  For Inc.?

13   A    Yes.

14   Q    One of your guys?

15   A    Yes.

16   Q    And Steve Barth?

17   A    Another business development guy.

18   Q    Okay.  Let's see.  Mr. James here, you'll see sent an

19   email out, right, he initiated this string; you would agree

20   with me?

21   A    Well, on this email, it looks like yes, yes.

22   Q    All right.  And he says, "Any new movement on this

23   front?  Are we still thinking of putting the JV in place?"

24   Right?  You see that?

25   A    Yes.
```

1  Q    May the 18th, 2015.  Right?

2  A    Yes.

3  Q    Okay.  Response, Eric, Mr. Kuo:  "Just waiting on some

4  figures from them.  Mike wants to proceed slowly."  Is that

5  you?

6  A    Probably.

7  Q    Probably, right?  "Wants to proceed slowly anyway, so

8  not pushing them, but yes, we still want to move forward."

9  So this is two years, right, way before you remember.  But

10  you were clearly in the loop.  In fact, you were giving

11  instruction, right?

12  A    I wasn't giving -- I think it's probably they reacted

13  to my -- whatever, reacted to whatever they presented to me.

14  I'm sure they probably present to be some idea.

15  (indiscernible), go ahead.  I mean, just develop it.  Be

16  careful.

17  Q    You're guessing.  You don't know.  You don't remember,

18  because you already told me you don't remember, right?

19  A    -- remember, no.

20  Q    Right.  But your instruction, they seem to indicate

21  your instruction was move slowly, right, in 2015.  Right?

22  So let's go.  James, Mr. James, also a business development

23  guy for you, responds to Mr. Kuo.  "Okay, figured as much.

24  Let me know when you (in conjunction with them) are ready to

25  engage in the JV documentation.  That process can take a

1    little while as well and it's much less transparent of a

2    stall technique."  Do you see that?

3    A    Yes.

4    Q    All right.  And that was, in fact, to satisfy you,

5    right, that you wanted them to move slowly and they wanted

6    to make sure they weren't looking like they were stalling.

7    Right?

8    A    I don't know if that's what --

9    Q    I'm -- we can only see what's on the paper.

10   A    Right.  So I don't know --

11   Q    Right?

12   A    I can't --

13   Q    Mr. James, and so Mr. Kuo,  "Will do for sure.  Ball is

14   in their court for now."  So back in 2015, two years already

15   talking about the GCAC.  You'll see in the subject line,

16   GCAC joint venture.  Right?

17   A    Yes.

18   Q    Okay.  Now let's go through these.  Where is Mr. Bake

19   on any of these emails?

20   A    I don't see him there.

21   Q    And where is this name anywhere in here?

22   A    It's not.

23   Q    But you are.

24   A    Yes.

25   Q    You think it's you.  You're pretty sure they're

1    referring to you, right?

2    A    Yes.

3    Q    That would be you, right?  Why would they need to go

4    slowly on this?

5    A    Why did I -- why do they believe I said go slowly?

6    Q    No.  I didn't ask you what they believe.  I asked you

7    why would they need to go slowly on this deal?

8    A    I don't know they need to go slowly or fast.

9    Q    So because of VALT?

10   A    I don't know why they have to go slowly or not.

11   Q    Okay.

12   A    Probably because of GCAC.

13   Q    All right.  I've put up and I'll offer 104-2 again, the

14   same, I believe, at least what they filed with the Court

15   there's no objection.

16          MR. AURZADA:  I'll be clear.  I'm going to make a

17   call on these one at a time.  We raised some objections in

18   the document that we filed.  We didn't stipulate to admit.

19   So I'm going to take a look at each one of these as they go.

20   First one I stipulated to.  I'm going to have to take a look

21   at this one, same as all the others.

22          THE COURT:  Okay.

23          MR. PATTERSON:  Think they need to -- they take a

24   position, they change; take a position, change.  They filed

25   the document.  I mean, come on.  I --

1          MR. AURZADA: Your Honor --

2          MR. PATTERSON:  Hold on.  Hold on.  If I can't

3     rely on what they file and show the Court, then they just

4     need to tell me and I won't, but as any lawyer, if they file

5     something and make a representation, I'm going to rely on

6     it.  All they need to do is tell me, hey, we're not -- we,

7     you know, surprise.  We withdraw it and we're going to do it

8     different.  That's all they need to say.  Just tell me.

9          MR. AURZADA:  We filed some objections but did not

10    waive any in that filing, Your Honor.  We wanted to give as

11    much notice as possible.  I would note that they didn't file

12    objections either and they've been raising them the whole

13    the whole hearing.

14         THE COURT:  Why don't you just give me the answer

15    to 104.

16         MR. AURZADA:  Thank you, Your Honor.

17         MR. PATTERSON:  121 came with an email saying,

18    here are our objection, Judge.  Then --

19         THE COURT:  -- looking at 121 now.  What are you

20    talking about?

21         MR. PATTERSON:  I'm not sure. It could be any.

22    Clearer.  This group reminds me, he also sent an email

23    saying, we stipulate to the other stuff.  But again --

24         MR. AURZADA:  Wait --

25         MR. PATTERSON: But again, what does that mean?

1          MR. AURZADA:  We were prepared to stipulate.  We

2     wanted to engage in a consultation.  It never --

3          MR. PATTERSON:  Surprise.

4          THE COURT:  Why don't we just -- tell me about

5     104-2 and then people can ask questions about --

6          MR. PATTERSON:  I'm getting ready to look at it,

7     Your Honor.

8          THE COURT:  All right.  Why don't you get to it.

9          MR. AURZADA:  No objection, Your Honor.

10         THE COURT:  104-2 is admitted.

11         (Defendant's Exhibit 104-2 entered into evidence)

12     BY MR. PATTERSON:

13     Q    Okay.  Mr. Loya, you see on your screen is an email,

14     right?

15     A    Yes.

16     Q    And it's a single email from Mr. Kuo to Mr. Bake and

17     you, right?

18     A    Yes.

19     Q    And what's the date of this?

20     A    May 3rd, 2017.

21     Q    Okay.  "Hi, Chris.  I spoke with Mike briefly this

22     afternoon about an asphalt opportunity that has resurfaced

23     again after a couple of years."  Referring kind of back to

24     our prior email, write, a couple of years ago.  You guys

25     talked and -- remember that one?

1    A    What, that conversation?

2    Q    That email that I just showed you.

3    A    Yes.

4    Q    Okay.  "As you may remember, we spoke about this

5    venture a couple of years ago but with the Sargeant

6    acquisition, we tabled the discussion and GCAC partnered

7    with Rio Energy."  You recall that?

8    A    Recall what?

9    Q    The facts that I just read to you, that there was a

10   Sargeant acquisition and during the last two years, you all

11   tabled the GCAC joint venture for that reason.

12   A    No.

13   Q    You don't remember those facts?

14   A    No.

15   Q    This doesn't help refresh your recollection?

16   A    No.

17   Q    After reading it, it doesn't jog your memory?

18   A    No.

19   Q    Okay.  "In short, Rio's management are keen on getting

20   out of the business due to the risk associated with asphalt

21   pricing and its lack of a hedging mechanism and are trying

22   to sell their interest.  This currently involves the

23   blending of the VTVs."  What is VTV?

24   A    What is vacuum tower bottoms.

25   Q    I'm sorry?

```
1    A     Vacuum tower bottoms.

2    Q     Vacuum tower bottoms?

3    A     Yes.

4    Q     Okay.  And that's the oil that settles at the bottom of

5    those vacuum towers, right?

6    A     That's the name.

7    Q     And I'm asking you to clarify it for the Court, make

8    sure my explanation is correct, right.  A vacuum tower

9    bottom refers to the oil that remains at the bottom of a

10   vacuum tower, a big tower that stores oil, right?  Once it's

11   depleted, there's a layer left at the bottom, right?

12   A     No.

13   Q     No?  Okay, then explain it to me.

14   A     A vacuum tower is a unit in a refinery that operates in

15   a vacuum and it extracts lighter material from the top --

16   Q     Right.

17   A     -- and heavy material from the bottom.  When it gets

18   extracted from the bottom, this vacuum tower, the unit

19   bottoms.

20   Q     Right.  And so they were concerned about the hedging in

21   the market for the vacuum power bottoms.  To finish, "back

22   in both Corpus and Mobile along with a take or pay rack

23   system."  What is a rack system?

24   A     A set of pipes and valves and all that, that sells out

25   of a rack.  That's what it's called, a rack, sells product
```

1    into trucks or barges.

2    Q    Is it also kind of leftover or sludge material or is it

3    processed?  I'm asking you.

4    A    A rack can sell gasoline.  A rack is just a system of

5    delivering product from a tank --

6    Q    Okay.

7    A    -- into a truck.

8    Q    It could be anything.

9    A    Yes.

10   Q    All right.  "This will proceed even without the

11   purchase of the gravity refinery."  What is the gravity

12   refinery?

13   A    I don't know.

14   Q    You don't have any idea?

15   A    I can guess.

16   Q    I don't want you to guess.  I'm asking if you have any

17   idea.

18   A    I have some idea, but it's 60'40.

19   Q    "Give us more exposure to the VTV market in the fuel

20   oil when asphalt is weak or out of season.  The coker feed

21   market will at times be stronger than asphalt and we

22   currently try and supply this market with the 2020, 0.5

23   percent five bunkers.  There could be an interesting

24   opportunity buying low sulfur fuel or ST run from FHR Corpus

25   and supplying their coker with VTVs.  P&L-wise, they think

1    this is a $5 to $15 million a year business with interesting

2    optionality, especially with the closure of the Exxon

3    refinery on the East Coast.  Happy to discuss this further,

4    go through the numbers, but I think this is something Vitol

5    as a company should take a good look at.  Thanks, Eric."  Do

6    you recall receiving this email?

7    A    No.

8    Q    By reading it, do you recall now that you and Mike were

9    copied on the same email at the same time, refreshing this

10   old joint venture deal?

11   A    I'm sorry, you said me and Mike.

12   Q    I'm sorry you and Mr. Bake.  I apologize.

13   A    I don't remember this email, but I'm sure I read it.

14   Q    But it doesn't refresh your recollection that you and

15   Mr. Bake were informed -- reinformed of this joint venture

16   prospect at the same time?

17   A    No.

18   Q    And so in light of this, would you follow up with Mr.

19   Kuo in May of 2017 from this email?

20   A    I don't remember.  I probably asked him to go -- to

21   involve Chris, to basically work this out with Chris.

22   Q    You said, hey, if Mr. Back is good with it,  I'm good

23   with it?

24   A    Basically.

25   Q    All right.

1    A    But still, I got --

2    Q    And it says --

3    A    -- develop, if it's a joint venture develop, then I

4    would have had more -- at this moment, I would say yeah,

5    talk to Bake.  You guys work it out.

6    Q    Are you guessing or you recall having that conversation

7    with Mr. Kuo?

8    A    That's what I normally would do in any situation like

9    this.  Do I remember specifically done in this case?  No.

10   Q    What do you mean, normally in a case like -- what is a

11   case like this?  What are we --

12   A    Basically, he's making a pitch about doing a --

13   something with asphalt.

14   Q    So any asphalt pitch you would send to Mr. Bake?

15   A    I'm sorry?

16   Q    Any asphalt pitch, you would send to Mr. Bake?

17   A    I wouldn't.  This was sent by Eric, not me.

18   Q    I just asked you what you did to follow up on this

19   email, and you said in a case like this I would normally

20   just tell him to go talk with Chris.

21   A    I would --

22   Q    And --

23   A    Yes.

24   Q    Okay.  And then I said, when you refer to a case like

25   this, in what kind of case are you referring, and I think

1    you said asphalt, right?

2    A    No, I didn't say that.  I said, when somebody's

3    proposing a -- some sort of deal where it's getting to a new

4    business or expanding or something like that, I would, you

5    know, he's just informing me.  I'm not getting involved in

6    this case.

7    Q    Okay.

8    A    Not yet, at this point.  Not in this case, wrong, at

9    this point.

10   Q    Also says that Rio is trying to sell their interests.

11   Do you recall that?

12   A    I remember Rio selling their interest.

13   Q    To whom?

14   A    To us.

15   Q    You bought Rio's interest?

16   A    It was basically -- what Rio was doing, they had

17   tankage and I think we took over the tankage.

18   Q    Well --

19   A    -- we came to the asphalt business.

20   Q    Did they sell you their interest or not?

21   A    I don't remember.

22   Q    Could be, right?  Possible.

23   A    I don't know how the transfer was done.

24   Q    There was a transfer of their interest to Vitol, right?

25   A    Their position, whether it was -- what it involved, I

Page 131

1    don't know.  I don't remember.

2    Q    You don't remember.

3    A    I --

4    Q    Let me see if I can help you remember, right.  You

5    recall 2015, we looked at that email, remember?  Said, hey,

6    we got this deal.  Remember?  You want to look at that email

7    again?

8    A    No, no --

9    Q    2015.  You remember, right?  GCAC, Vitol doesn't do a

10   deal.  Vitol goes and does a joint marketing agreement with

11   Rio.  You recall that?

12   A    No.

13   Q    No?  Well then what interest do you think of Rio you

14   would have bought?  Because you said you bought their

15   interest, so what is it you were thinking?

16   A    Well, I remember us taking over the position.  They had

17   --

18   Q    Right.

19   A    -- tankage.

20   Q    No, their position.  You added that later when you

21   realized what you said, but you said you bought their

22   position, right?

23   A    We took over their position.  I don't know if we --

24   Q    Right.

25   A    -- bought it or --

1    Q    Okay.

2    A    -- if it just transferred or they gave it up and we

3    took it over.  I don't remember.

4    Q    Right.

5    A    We just took over their position in storage.

6    Q    You took over their position with respect to the deal

7    they had with GCAC and Mr. Brass, right?

8    A    I don't know that.

9    Q    You don't?  Well then, whose position were you talking

10   about and what deal?

11   A    The storage that Rio had for asphalt.

12   Q    With respect to what joint venture?

13   A    There is no joint venture.  What (indiscernible) you

14   talking about?

15   Q    Look.  Let's to -- look at your screen.  All right?

16   Look at the middle -- the second sentence -- the third

17   sentence of this email.  "In short, Rio's management are

18   keen on getting out of the business due to the risk

19   associated with assault pricing and its lack of a hedging

20   mechanism and are trying to sell their interest."  Right?  I

21   asked you and you said, yes, my understanding is we took

22   over their interest,  right?  Isn't that what you said?

23   A    Their position.

24   Q    Okay.  Their position.  Right?  You understand their

25   position with respect to the joint venture they had with

1    GCAC, right?

2    A    Their position regarding assets they had.

3    Q    GCAC partnered with Rio Energy.  You see that?

4    A    Yes.

5    Q    "In short, Rio's management are keen on getting out of

6    the business due to the risk associated with asphalt pricing

7    and its lack of a hedging mechanisms and are trying to sell

8    their interest."  Right?  Their interest in the partnership

9    with GCAC.  You see that?

10   A    No.  That says --

11   Q    Okay.

12   A    -- their interest.  It doesn't define what their

13   interests are.

14   Q    Your right, and we'll go down that path every time.

15   All right?  Your position today is you're not supposed to

16   say you bought into a partnership, right?

17   A    No, my position is to tell the truth.

18   Q    Okay.

19   A    This --

20   Q    The truth is -- I'm sorry, go ahead.

21   A    No, it's -- you're sowing confusion.

22   Q    No.  What's confusing about this email?  Let's take it

23   a step at a time.  Rio and GCAC were in a partnership.

24   Right?

25   A    I assume so, based on the email.  I don't know that.

1    Q    Correct.  That's what it says.

2    A    What it says.

3    Q    That's what it says, right.  Next sentence.  "Rio's

4    management is keen on getting out of the business," right?

5    For whatever reason.  Third point.  "They are trying to sell

6    their interest."  You understand their interest is their

7    interest in the preceding partnership in the sentence right

8    before it, right?

9    A    Maybe.  It's not defined.  It's not defined in that

10   Gmail.

11   Q    Okay.  What's your highest level of education, Mr.

12   Loya?

13   A    I have a master's in business.

14   Q    Any other education?

15   A    No.

16   Q    All right.  Where did you get that MBA?

17   A    Harvard.

18   Q    And you're telling me that you don't understand the

19   sentence structure in a paragraph.

20   A    I understand --

21              MR. AURZADA:  This is --

22              THE WITNESS:  (indiscernible).

23              MR. AURZADA:  This is argumentative.  We're

24   talking about structure in a paragraph.  That has nothing to

25   do with this and he's interpreting somebody else's document

Page 135

1    in a way that --

2              THE COURT:  I don't want the sidebar.  I just -- I

3    want an objection and I want it --

4              MR. AURZADA:  Objection, argumentative.

5              THE COURT:  Sustained.

6    BY MR. PATTERSON:

7    Q    All right.  Make sure I understand.  You don't know,

8    even after reading this email, whether the interests or the

9    position of Rio that Vitol purchased was from a partnership

10   with GCAC or not; is that your sworn testimony today?

11   A    I don't know that.

12   Q    Okay.  Did you have a follow up discussion with Mr. Kuo

13   after this email regarding the possible joint venture?

14   A    I probably did.  I don't recall.

15             MR. PATTERSON:  All right.  I brought up a

16   document on the screen.  I'm going to go ahead and offer it.

17   It's probably mistake based on the filings of Vitol, no

18   objection.

19             MR. AURZADA:  What number is it, Your Honor?

20             MR. PATTERSON:  Forty-one.

21             THE COURT:  Don't ask me.  Yeah.  104-41?

22             MR. PATTERSON:  Yes, sir.

23             THE COURT:  Okay.

24             MR. AURZADA:  Your Honor, at this point, I don't

25   know that there's any authentication or foundation for the

1   document, so we will object to it.

2          THE COURT:  All right.

3          MR. PATTERSON:  I'm going to do it, Judge.  Just

4   for the record, I'm going to ask you to hold them to their

5   stipulation.

6          THE COURT:  I don't see -- I'm just looking at --

7   the only one I've been able to see is 121, and you --

8   they're submitting the objections to the trial exhibits and

9   I don't see anything saying they stipulate to everything

10  else.

11         MR. PATTERSON:  I got the email.  We'll come back

12  to it, but --

13         THE COURT:  Okay.  I'm just looking at 121 if

14  there's something more, I'll also look at it.

15         MR. PATTERSON:  That's fine.  But also, understand

16  that I'm -- when I'm finished, I'm going to ask the Court

17  not to release Mr. Loya because we're going to recall him as

18  a rebuttal once I get these exhibits admitted through my

19  other witnesses.  I'm happy to do it and they wanted -- they

20  have every right to do it, I guess, but we'll do it but just

21  so everyone knows.  I don't want any surprises.  I'm going

22  to ask you not to release him and I'm going to recall him.

23         THE COURT:  I don't think we can, in any event,

24  because I still think we need to think about the original

25  question that we're all talking about from the very

1    beginning of our discussion about the privilege extension

2    and all that stuff.  So I can't release him one way or the

3    other.

4              MR. PATTERSON:  Okay.  Okay, I was thinking you

5    couldn't, but that's -- just so I --

6              THE COURT:  I don't --

7              MR. PATTERSON:  I don't want them raising a fuss

8    because they said he has limited availability and I

9    appreciate that.  I do.  But that's --

10             THE COURT:  Yeah.  I got it.

11             MR. PATTERSON:  That's where we go.

12             THE COURT:  Yeah.  Are you going to -- okay,

13   you're going to try to get --

14             MR. PATTERSON:  Sure.

15             THE COURT:  Yeah.

16   BY MR. PATTERSON:

17   Q    You see the document on your screen, Mr. Loya?

18   A    Yes.

19   Q    Do you recognize that?

20   A    No.

21   Q    Okay.  Do you see the --

22             MR. PATTERSON:  Again, I'll go ahead and offer

23   104-3, see what happens.

24             MR. AURZADA:  No objection, Your Honor.

25             THE COURT:  104-3 is admitted.