```
 1              (Defendant's Exhibit 104-3 entered into evidence)
 2              MR. PATTERSON:  One second.  I just don't want to
 3    see my email, but for the Court, I've put on the screen the
 4    email from Mr. Cooley to Ms. Goott, August 23rd at --
 5              THE WITNESS:  Hold on, hold.  Let me get reading
 6    glasses.
 7              MR. AURZADA:  No, no, Mr. Loya
 8              THE COURT:  No, no.  That's not for you.
 9              THE WITNESS:  Sorry.  Sorry.
10              MR. PATTERSON:  And I'll leave it to the Court,
11    but --
12              THE COURT:  Court's going to put on his reading
13    glasses.  Okay.  This one's for me.
14              THE WITNESS:  All right.  Sorry, Judge.
15              THE COURT:  No, no, no.  I see that they're
16    prepared to stipulate, not that they --
17              MR. PATTERSON:  Okay.
18              THE COURT:  Not that there's agreement on
19    stipulation.
20              MR. PATTERSON:  Okay.  We're going to let them do
21    that.  That's fine, Judge.
22              THE COURT:  I'm not letting them do anything.  I
23    just -- I don't see anything that that confirms agreement on
24    both parties.
25              MR. PATTERSON:  That's fine, and you don't need --
```

```
 1   We don't need a comment, Mr. Cooley.  That's -- I got it.

 2         MR. COOLEY:  (indiscernible), sounds like.  There

 3   are more things I could say, but the email speaks for

 4   itself.

 5   BY MR. PATTERSON:

 6   Q    So, back Mr. Loya to Exhibit No. 3 -- 104-3, is an

 7   email dated June 2017 -- June 26, 2017.  And who is Doug H-

 8   U-T-H?

 9   A    I don't know.  I think it's one of the credit guys/

10   Q    Mr. Moran.  Who is that?

11   A    He's a credit guy in Vitol in Houston.

12   Q    In Vitol, he's a credit --

13   A    Person.  I think he's a credit person.

14   Q    Okay.  And Mr. Colvin?

15   A    Think it's another one as well.

16   Q    All right.  So June the 26th, 2017.  We are entering --

17   this is from Mr. Kuo.  "We are entering into a JV with GCAC

18   doing business in the wholesale and retail asphalt space."

19   Do you see that?

20   A    Yes.

21   Q    Why would mister -- well, all JVs got approved through

22   you that involved more than one transaction, right?

23   A    Yes.

24   Q    And so had you approved this joint venture?

25   A    It was not submitted to me for approval.
```

1    Q    It wasn't?

2    A    No.

3    Q    Mr. Kuo is going to come in here and he's going to

4    testify that he never brought this to you?

5    A    No, no.  He -- we had discussed it whenever he

6    mentioned it.

7    Q    Because we just looked at an email where you were on

8    where he said, hey this this has arisen, right?  You want me

9    to go back?  You see here, May 2017.  "I spoke with Mike

10   briefly this afternoon about an asphalt opportunity."  See

11   that?

12   A    Yeah.

13   Q    Okay.  So that's May the 3rd, 2017.

14   A    Right.

15   Q    June the 26th, "We are entering into a JV."

16   A    It hasn't been approved.

17   Q    And you approved it.

18   A    No, I didn't approve it.

19   Q    Why would he say, we're doing it?

20   A    He's not.  We -- he would have said, we are in a JV.  I

21   never approved the JV.  And in fact, we made that clear

22   there was going to be a JV later on.

23   Q    Later on.

24   A    But we never --

25   Q    Not before this, right?

1   A    Well this is not -- of being approved.

2   Q    Right.

3   A    And it's not approved, a JV.

4   Q    Okay.  That's your recollection.  Mr. Kuo may have a

5   different recollection.

6   A    He would be wrong.

7   Q    Would it be -- would you be surprised if I told you

8   he's testified differently?

9   A    I would, yes.

10  Q    Okay.  Why would that surprise you?

11  A    Because I never approved a JV.

12  Q    Okay.  "AJ Brass is our main point of contact with GCAC

13  and he is currently looking to vet a counterpart or a

14  prompt-ish sale."  Right?  "Can you please assist him with

15  this?"  So you're doing credit for GCAC or Mr. Brass, right?

16  A    We're going him a favor.

17  Q    Vitol does favors?

18  A    Yeah.

19  Q    Really?

20  A    Sure.

21  Q    Okay.  So you're just doing him a favor loaning out

22  your credit department for this guy, just because.

23  A    We provide them assistance.

24  Q    Okay.  Why?  Because you all were in business together?

25  A    And good will.  We always do favors.  You get good

1    will.

2    Q    Because you're in business together, right?   Joint

3    venture?

4    A    No, because you do business with a lot of people.   You

5    do favors.   They pay him back.

6    Q    All right.   "FYI, we plan on having this JV signed for

7    July 1st" --

8    A    It isn't --

9    Q    Right?   June the 26th, few days later.   Few business

10   days, right?   This email just wrong?

11   A    Well, putting a date to July 1 when it hasn't been

12   approved, yes.   It's wrong.

13   Q    So Mr. Kuo --

14   A    Being very optimistic, that's what he --

15   Q    Or dishonest.   One extreme or the other, right?

16   A    (indiscernible).   He's just probably putting a bit of

17   push on the credit guys to do this quickly.

18   Q    Or --

19   A    A prompt-ish sale.

20   Q    Or he's gotten approval and you don't remember.

21   A    No, I would remember that.

22   Q    Really?

23   A    Yes, because I remember saying don't -- we're not doing

24   it.

25   Q    Right, but we also talked about a meeting that you had

Page 143

```
 1   a vivid memory of, right?

 2   A    Yeah, yeah, but I know where I'm agreeing and

 3   disagreeing.  Whatever.  Don't do that.

 4   Q    Now at this stage, June the 26th, there were documents

 5   prepared reflecting this potential joint venture, wasn't

 6   there, between Vitol and GCAC --

 7   A    I don't know that.

 8   Q    -- right?

 9   A    I don't know that.

10   Q    Right?  And in fact, there are also documents that

11   reflect Vitol's purchase of the position of Rio in the prior

12   joint venture between Rio and GCAC; isn't that correct?

13   A    I don't know that.

14   Q    You don't?

15   A    No.

16   Q    No recollection of that?

17   A    No.

18   Q    Even though you do recall telling the Court that you

19   took Rio's position,, right?

20   A    Yes.

21   Q    Why would you not document that?

22   A    I don't know if there are documents or not.

23   Q    I know.  Why wouldn't you÷

24   A    Not document it?

25   Q    Yeah.
```

1   A    I don't know.

2   Q    What do you mean, you don't know?

3   A    I don't know what -- in what form we took over their

4   position.  If we bought their inventory, then we had the

5   inventory.  There'd be no documents, as an example.  You

6   want more examples?

7   Q    Sure.

8   A    It could be that we took over the lease on the tankage.

9   Then it would be just simply a -- the tankage company saying

10  now Vitol is the one who's paying for the lease.  I don't

11  know the details of how we took over their position, and

12  therefore I don't know what documentation (indiscernible).

13  Q    And you likewise you don't know what position you took

14  over, right?

15  A    Details of what, no.  I know we have tankage and I

16  don't know the rest.

17  Q    Now you do know there was tankage?

18  A    Huh?  Well, I know that we used -- tankage

19  (indiscernible) control in order to provide security for us

20  to provide financing.

21  Q    You do remember that?

22  A    Yes.

23  Q    Okay.  What else do you remember?

24  A    I just remember having security on the financing.  That

25  was -- that is in my area.

1    Q    From Rio?  I thought you were financing GCAC.

2    A    No, no.  We have the control of the tankage, however

3    that came about.  We had the control of the tankage.  We can

4    provide financing to GCAC.

5    Q    That's because you control the money and the inventory

6    that way, right?

7    A    No, the money already been paid to whoever supplies the

8    product.  We don't control the money.  Money's gone to the

9    supplier, but we control the inventory.

10   Q    So when it's sold, you control the money.

11   A    When it's sold, first when it's released, not when it's

12   sold, when it's released is when the risk is.  You don't

13   release it unless you have security.

14   Q    But the money came to Vitol since they owned the

15   inventory, right?

16   A    Yes.

17   Q    Okay.  We're going to come back to that because that's

18   really important.  I'm going to write it down, right. So we

19   don't forget.  Vitol owns the inventory.  That means the

20   money comes to Vitol.

21   A    On a sale by Vitol.

22   Q    Well, who else would it be by?  You own the inventory,

23   right?

24   A    No, but --

25   Q    Who else owns the inventory?

1    A    Your sentence is incomplete.

2    Q    Did you own the inventory or no?  Throughout the whole

3    relationship with GCAC, was there a moment in time you,

4    Vitol, didn't own all the inventory?

5    A    When the inventory was released, it's a matter of risk.

6    Q    Listen to my question.  Was there a moment in time in

7    2017 or 2018 in which -- forget about what kind of

8    transaction,  right.  But was there a moment in time or one

9    barrel or one contract in which Vitol didn't own a security

10   or whatever -- you're calling it security.  Was there a

11   moment in time that there was one asset, one piece of

12   inventory that Vitol didn't own, ever?

13   A    I don't know that.

14   Q    You just said you wouldn't do it otherwise.

15   A    I wouldn't do it otherwise.

16   Q    Okay, then who would?

17   A    -- security?

18   Q    Would someone do it?  Would you allow one of your

19   traders to do that?

20   A    It would be a mistake.  It would not be allowed.

21   Q    That's right.  It would be a mistake.  You wouldn't let

22   them, would you?

23   A    I would not approve that.

24   Q    And you haven't reviewed this loan, this extension of

25   credit, you haven't reviewed it over and over since 2018 --

1   A     I have not.

2   Q     -- with GCAC?

3   A     No, I have not.

4   Q     Really?  You don't care?

5           MR. AURZADA:  Objection.  Argumentative.

6           THE COURT:  Sustained.

7   BY MR. PATTERSON:

8   Q     Why haven't you looked at it?

9   A     I don't have to.  I mean basically we had security.

10  Q     I know you don't have to.

11  A     And we have -- and when we have the product we expect

12  to get paid.

13  Q     Right.  And it's all your inventory.

14  A     He himself call me to say, (indiscernible) want pay me.

15  Q     Right, and it's all your inventory, right?

16  A     No.  He took it.  We --

17  Q     How did you let him take it?

18  A     That was a mistake.

19  Q     Who let him take it?  You're -- now you're suggesting

20  that he came and took your inventory?  That's really why

21  you're suing him?

22  A     No, it was released by mistake without security.

23  Q     Who released it?

24  A     Eric.

25  Q     When did he release it?

1   A    It was it was sometime during the transaction, we

2   started releasing inventory without security, as I'm told,

3   the explanation of why we haven't gotten paid.

4   Q    Explanation from whom?

5   A    Eric.

6   Q    So Eric said it was his mistake that Vitol didn't get

7   paid?

8   A    (indiscernible).

9   Q    That's what you just said.

10  A    I said, he released inventory for GCAC.

11  Q    Which was a mistake.  You said --

12  A    No, it's -- my view, it was a mistake.

13  Q    Right.

14  A    Trust him and release it without security.

15  Q    No.

16  A    That's what I said.

17  Q    You said you wouldn't do it.

18  A    I wouldn't do it.  I -- he did it, and I consider that

19  a mistake.

20  Q    He works for you, right?

21  A    Yes.

22  Q    How long?

23  A    How many years --

24  Q    Yeah.

25  A    -- before this or --

1    Q    Yeah.

2    A    -- or --

3    Q    Yeah.

4    A    Can't remember.  Maybe six years, eight years.

5    Q    How many times has he made this mistake?

6    A    I don't know.  That was the first time.

7    Q    No, I didn't ask you if it was the first time.  I said,

8    how many times did he make this mistake?

9    A    Which mistake?  Release product without security?

10   About $12 million worth.

11   Q    How many times did Mr. Kuo make this mistake?

12   A    I don't know.

13   Q    More than once?

14   A    Yes.

15   Q    More than twice?

16   A    Probably.

17   Q    Are you counting an occurrence as each piece of

18   inventory or each date of occurrence?

19   A    Any time he released it.

20   Q    All right.  On more than one --

21   A    -- inventory leave our control that was taking an

22   unacceptable risk.

23   Q    Right, and he's going to acknowledge that when he comes

24   in here?

25   A    I don't know what he's going to acknowledge.

```
 1    Q     Well, didn't you -- you didn't confront him about this,
 2    this huge mistake?
 3    A     Yes.  We had several discussions.
 4    Q     Okay.  So he's going to acknowledge that --
 5    A     -- know what he's going to do.
 6    Q     He should, right?
 7    A     I don't know what he's going to do.
 8    Q     And that's a reason.  That's the reason that GCAC and
 9    Mr. Brass ended up owing Vitol money, isn't it?
10    A     What is the reason?  Be more specific.
11    Q     The release, this mistake Mr. Kuo made in releasing
12    inventory.
13    A     Releasing --
14    Q     -- security.
15    A     -- security allowed AJ to not pay us.
16    Q     That's the reason, in your view, why Vitol's owed
17    money, right?
18    A     In my view, that's how we got into this mess in the
19    first place.
20    Q     Right.  And if he gave it to -- I'm sorry go ahead.
21    A     Trusted him.
22    Q     I'm sorry?
23    A     Eric trusted AJ.
24    Q     right.
25    A     GCAC.  He shouldn't have.
```

1   Q    Right.  And so if Mr. Kuo mistakenly gave him this

2   inventory with security, right --

3   A    Released it.

4   Q    -- released it, Mr. Brass certainly didn't take it

5   improperly, did he?  It was given to him.  Right?

6   A    I'm not saying AJ took it improperly.  I mean, AJ

7   didn't pay for it.  It was released to him.

8   Q    Yeah.

9   A    He owed the money for it.

10   Q    Voluntarily.  It was voluntarily released, right?

11   A    Yeah.

12   Q    Yeah.  Right.  And I assume I'm going to see an email

13   immediately afterwards to Mr. Brass saying, hey, that was a

14   mistake.  Right?

15   A    I don't know when.  I think Eric became aware of the

16   mistake much later.  I'm just -- I'm speculating.

17   Q    I thought -- when did you talk to him about it?

18   A    In probably March of 2018, when I became aware of it.

19   Q    How did you become aware of it?  I was walking in the

20   trading floor and I hear Eric having a heated conversation

21   and I listened to it.  It sounds like he's talking to AJ.

22   When he hangs up, I said, why are you talking to AJ?  We

23   don't do business with him anymore.  We stopped doing

24   business in December.  No, because he owes me.  He owes me

25   money.  He hasn't paid us and he's coming up with excuses

```
 1    not to pay.  How much is it?  He gave me a number and I
 2    immediately went and got accounting to start working on it.
 3    And over a period of time we got to the final number, which
 4    was much higher than what he told me.
 5    Q    You remember this, March 2018.
 6    A    Roughly March.  I think it was maybe February.
 7    Q    No, you said March.
 8    A    Okay.  Maybe February.  Correcting myself.
 9    Q    Okay, so when was it?
10    A    February/March.  That period.  Sometime
11    (indiscernible).
12    Q    The mistake was discovered February or March 2018,
13    right, by you?
14    A    By me.
15    Q    Mr. Kuo already knew.
16    A    Yeah.
17    Q    All right.  And you went in and you said, I'm going to
18    find out what happened, right?
19    A    No, I said, I want to know how much he owes me and how.
20    Explain it to me.
21    Q    Well, how else would you find out how much he owes you,
22    if you didn't find out what happened, right?
23    A    Right.  I mean, first you have to explain to me how it
24    happened, how did we get the situation, how much money are
25    we talking about.
```

1    Q    Right.

2    A    What is he proposing, what he's going to pay us.  Thake

3    through it.  And the same time --

4    Q    You're -- this is your conversation with Mr. Kuo?

5    A    Yes.

6    Q    Okay.  And what did he do?  What did he say?

7    A    He told me that he had been releasing product to AJ,

8    trusting him to pay for it, and as the bills came due, he

9    wasn't paying and he was coming up with different stories

10   and avoiding the whole issue and he was putting pressure on

11   him.  When I told him to get on there and tell him we need

12   to get paid, Eric came back and insisted that I -- insisted

13   that I talk to AJ.  He wanted to talk to me and he needed to

14   talk to me and I took the phone call where AJ proceeded to

15   say, tried to discuss different terms to pay the money he

16   owed.  I said, no.  I wanted to be paid now.  He came back

17   and he was offering different payments and then through Eric

18   continued to offer different payment terms.

19   Q    I guess my question is, lawyers and Vitol told us over

20   and over that there was a loan agreement and this was a loan

21   and if that was the case, wouldn't you already know the

22   payment term?  I mean, wouldn't you know that it was due?

23   Wouldn't you know what the installment was?  Why, at the

24   very end March of 2018, you for the very first time are

25   trying to figure out what's owed; it doesn't make sense to

1    me.  Can you explain it?

2    A    Yea, easily.

3    Q    Okay.

4    A    So it wasn't a loan.  It was a series of product

5    releases where at the beginning we're doing business, we'll

6    release it against security.  He stopped providing security.

7    Eric continued to provide him product.  Every time providing

8    product, he had payment terms and he just stopped paying.  I

9    became aware of it.  Eric was well aware of it.  I became

10   aware of it February or March.

11   Q    Because, see, this is -- and I guess I'm trying to fit

12   together because your lawyers over here, they filed this

13   lawsuit and they told a particular story and I'm going to

14   take -- ask the Court to take notice of the first amended

15   complaint.  It is on the exhibit list, 104-34, but it is the

16   pleading that was filed by Vitol.

17          MR. AURZADA:  No objection, Your Honor.

18          THE COURT:  So noted.

19   BY MR. PATTERSON:

20   Q    And so, because this is what they say happened.  I

21   understand what you're saying, right, and there would have

22   been a release and there would have been money going back

23   and forth for their joint venture, right.  That makes sense,

24   right?

25   A    No.

1   Q    Okay.

2   A    No.

3   Q    But they say Vitol separately agreed to finance GCAC's

4   operations.  Is that what you did?  I thought you said you

5   financed transactions.

6   A    We finance the business of marketing that.  We financed

7   business.  We finance the inventory.  We financed the

8   different components.  We financed the storage.

9   Q    You understand that there's a little bit difference

10  there, right?  Vitol is in the business of oil, vertically,

11  right?  We talked about this.  Vertically, Vitol is oil.

12  Transportation, mixing, delivery, storage.  But your lawyers

13  say you finance their operations.

14             MR. AURZADA:  Your Honor, can I ask him --

15  BY MR. PATTERSON:

16  Q    Right?

17             MR. AURZADA:  -- tell me where he's reading in the

18  --

19             MR. PATTERSON:  Right on your -- I'm sorry.  Thank

20  you.

21  BY MR. PATTERSON:

22  Q    Your lawyer said Vitol separately agreed -- separately

23  -- to finance GCAC's operation.  You see that?

24  A    Where?

25  Q    Right there on your screen.

002715

1   A   Okay.

2   Q   That's not what you're telling me happened, right?

3   A   It's exactly what I'm telling you what happened.

4   Q   You financed their operations?

5   A   Yes, and it tells you right there.  Go back to where

6   you say.  Go back to it.  "Including the purchase and

7   storage of asphalt."

8   Q   Right, including.  But not limited to, right?  It's

9   their operations.  You financed their business, right?  Is

10   that what you did?

11   A   The marketing of asphalt.

12   Q   -- marketing.  I said, you financed their business.

13   That's what your lawyer said.  I'm just trying to see if

14   that's what you said.

15   A   Yes.

16   Q   You did.  So now you financed more than just

17   transactions.  You financed their business.

18   A   Well transactions, you have to deliver, you have to

19   blend it.  You have to do --

20   Q   Of course.

21   A   You have to make product that's marketable.

22   Q   Right.  Right.  One hundred percent.

23   A   That's what Vitol was financing.

24   Q   Okay.  So you agree with this now.  You agree you're

25   your lawyer said?

1    A    (indiscernible).

2    Q    I'm sorry?

3    A    That's what I've been doing is -- now, always.

4    Q    Okay.  And you've got an outline of a financing

5    agreement?

6    A    Do I have one?  Did I get one?

7    Q    Did you get one?

8    A    A financing agreement?

9    Q    Yeah.  You know what that is?

10   A    Yeah, I mean --

11   Q    You do?

12   A    It could take different forms in a --

13   Q    But --

14   A    -- bank, whatever, but --

15   Q    I thought you told me -- again, correct me if I'm wrong

16   -- but I thought you told me that Vitol doesn't use written

17   agreements, that you would finance a transaction with no

18   writing.

19   A    No, no.  You asked me if I know the financing agreement

20   is.  I know.  I know in my personal life.  I know.

21   Q    Listen to my question.

22   A    I answered your question.

23   Q    No, you didn't.  So I asked you earlier, correct me if

24   I'm wrong, I asked you and you answered that Vitol does

25   financing transactions with no writing.

1    A    That's correct.

2    Q    Right.  Why would your lawyer say that you received a

3    draft of the outline of the financing agreement?  Would you

4    just throw that away?

5    A    I don't know.  We do -- Vitol does transactions without

6    the financing agreement.  If they had a finance agreement

7    here, better.

8    Q    So now maybe there was one?  Is that what you're

9    suggesting?

10   A    I don't know if there was one or not.  I do not know

11   that.

12   Q    I think you testified under oath that you're not aware

13   of one.

14   A    I --

15   Q    I asked you.  Remember we went through these questions?

16   A    I said that I don't know if there was one or not.

17   That's no different.

18   Q    I understand.  I understand.  Your lawyer said that you

19   provided working capital to GCAC.  Is that true?

20   A    Yes.

21   Q    You did?  And did you wire that money to them?

22   A    I don't know how we did it.  I think working capital

23   were mainly paying the bills, like the purchase of

24   inventory.

25   Q    You write him a check?

```
 1   A     I don't know how we did it.  I don't know the details.
 2   Q     They did this without your knowledge as CEO?  I thought
 3   you told me that you were the guy who approved these kinds
 4   of transactions.
 5   A     No, that I approved a joint venture.  That's what I
 6   told you.
 7   Q     Yeah.
 8   A     Yes.  This was --
 9   Q     But if it's a loan, you also said you don't do loans.
10   Vitol does not do loans.  That's -- wasn't that what you
11   told me?
12   A     My parlance, to me it's financing.  We provide
13   financing.  I told you that earlier.
14   Q     That's right.
15   A     We as Vitol provide financing.
16   Q     That's right.  Remember, we went through to make sure
17   that our words mean the same things, right?
18   A     And we found there was a difference.
19   Q     That's right.  Financing is when you transact a trade
20   without receiving the money up front.
21   A     No, that's what you were stipulating.  For me,
22   financing is providing the funds in order to acquire the
23   product and finance the cost of marketing it.  That's
24   financing.  You were saying that it was a loan for -- a
25   formal loan.  Vitol didn't do.
```

1   Q    Your lawyer said, Debtor obtained money from Vitol.  Is

2   that true or false?  Why is that so difficult?

3   A    It's difficult because the definition of money.  I mean

4   if it's currency, I don't know.

5   Q    Currency.  Money is currency.  Let's agree to that,

6   okay?

7   A    No, let's not agree.  I mean, money could be value.  It

8   could be inventory.

9   Q    No, I'm telling you, money is currency.

10  A    I don't know.

11  Q    Really?  You sued this man for two-and-a-half years and

12  you don't know if he got any money from you?

13  A    I don't know if he got any cash.  I know that the

14  value, the $10 million of product that he didn't pay for.

15  That's the value.  That's the --

16  Q    No.  No.  I think you said that Mr. Kuo released it to

17  him voluntarily.

18  A    No.  He released it --

19  Q    Yeah.

20  A    He released it with no security.

21  Q    That's right.  He released it.

22  A    Yes, on --

23  Q    Right?

24  A    On the -- it was given to him for him to pay.

25  Q    No.  Now you're adding things.  That's not what you

161

1    said.  You want to add some stuff to that, now?  There were

2    conditions to the release?

3    A    Yes, you pay --

4    Q    Okay, we're --

5             THE COURT:  I agree.  Folks, we got to -- again --

6             MR. PATTERSON:  I apologize.

7             THE COURT:  We've got to get the conversation.

8    No, I think it's everybody, but just one question, one

9    answer.

10            MR. PATTERSON:  Right.

11            THE COURT:  Want to make sure there's not a

12   conversation, there's more of a question/answer format,

13   okay?

14   BY MR. PATTERSON:

15   Q    What were the conditions?

16   A    You expect to get paid for it?

17   Q    And those were in writing?

18   A    When you sell, somebody an expectation -- there's an

19   expression to get paid.

20   Q    It was assumed, is what you're saying.

21   A    -- assuming.  That's understood.

22   Q    What was it -- where do I read it?

23   A    That's how you do in your transactions.  I'm giving you

24   the product.  You're going to pay for it.

25   Q    That's just the way it works, what you're saying.

1    A    Way it is.

2    Q    Okay.  Okay.  I'm not questioning you.  I'm trying to

3    understand what you're saying.  You're saying, that's just

4    the way it works.  It's not in writing.  No one said it.

5    Everyone just understood it.  Right?

6    A    If I want to sell -- if you want to purchase from me in

7    order to get the product, for AJ would be to provide

8    security and we'll release it to you.  You buy it from me,

9    but you don't get it until you provide security.

10   Q    Okay.

11   A    The mistake was releasing that sale to AJ without

12   security that provided him the opportunity to not perform,

13   not pay for it to defraud Vitol, to steal from Vitol,

14   however you want to put it.

15   Q    You're trying to explain it.  I'm trying to get a

16   better explanation.  All right?  So let's go back to this

17   money.  They said the Debtor obtained money.  Mr. Brass

18   obtained money from Vitol.  Is that true or is that false?

19   A    If we define money as currency, I --

20   Q    Yes.

21   A    -- don't know.

22   Q    Money is currency.

23   A    I don't know.

24   Q    So when you went back to try to figure out how much AJ

25   allegedly owes you, you didn't figure that out?  Did you ask

1    someone, how much money did we give this guy?

2    A    No, I didn't ask that.  I --

3    Q    Really?

4    A    I was told how much product was given to this guy.

5    Q    I'm talking about money.  Your lawyer -- your lawyers

6    said money.  How much money?

7    A    Define money as currency?

8    Q    Yes.

9    A    -- don't know.

10    Q    and my follow-up question was, you didn't ask and find

11    out before you sued him?

12    A    I did not.

13    Q    Okay.  Your lawyer said that Mr. Brass willfully and

14    maliciously caused injury to Vitol.  You see that on your

15    screen?

16    A    Yes.  When -- actions described above.

17    Q    Okay, I just asked if you saw it.

18    A    Yes.

19    Q    All right.  What did Mr. Brass do -- let's start in

20    general terms -- that caused the injury to your company

21    Vitol while you were there.

22    A    In general, I have nothing to do with this statement.

23    Q    I want to know generally whether it relates to this or

24    not.  I want you to tell me what he did that injured your

25    Vitol while you were there.

```
 1   A     Failed to pay for product that was delivered to him as

 2   well as failed to pay for hedging losses that he instructed.

 3   Q     All right.  What else?

 4   A     I think that's all I know.

 5   Q     Is that it?

 6   A     I don't know, there may be more details, but --

 7   Q     I do.

 8   A     -- suggest to it.

 9   Q     I do.  I need to know today whether there's anything

10   else that you believe Mr. Brass did that caused Vitol injury

11   at any time.

12   A     Yes.  Whatever money we spent in providing him product

13   and the ability to market it and deliver it, that he

14   (indiscernible) pay for us -- pay to us, he did not pay.

15   Q     Okay.  What else?

16   A     Losses incurred from hedges that he asked to be put on

17   to hedge his -- the product that was in inventory.

18   Q     Now, were those his hedges or Vitol's hedges?

19   A     No, they were -- Vitol was hedging the product.  He

20   took the risk on the -- on the value of the product and he

21   was hedging that through Vitol.  We put on the hedges and he

22   would get the result.

23   Q     In whose name?

24   A     Positive or negative.

25   Q     He was entitled to 100 percent of the profits or liable
```

1    for 100 percent of the losses on those hedges; is that what

2    you're saying?

3    A    I don't recall how it was --

4    Q    I thought you just said you did.  Now you don't

5    remember?

6    A    I don't know how it was split.  I mean, that was put on

7    behalf for him, so --

8    Q    Okay, so it was split.  There was some agreement to

9    split up those profit.

10   A    I -- no.  I believe that it was all his.  I don't know

11   --

12   Q    Well, you just that you thought they were split.  You

13   weren't sure how they were split.

14   A    I don't know if it's 100 and zero, could be a split, or

15   it could be -- I just know that basically Vitol was hedging

16   for him.

17   Q    Really?  How many placed in his name?

18   A    I don't know the details of that.

19   Q    How many hedges were placed in GCAC's name?

20   A    I don't know details --

21   Q    How many hedges were placed in Vitol's name?

22   A    I don't know (indiscernible).  All that can be provided

23   you by Vitol.

24   Q    You told me in 2018 you went back to figure this out.

25   So were their hedges placed in Mr. Brass' name?  Any?

1   A    I don't know how they did the hedging.  I know there

2   was -- I was told that it was about $5 million worth of

3   hedging losses.

4   Q    Whose losses, though?  Vitol was the trader, right?

5   A    I was told the agreement was that they were done on his

6   behalf and he would cover them.

7   Q    Now you were in business together.  You were doing the

8   hedges, but he was also liable for some of the losses?

9   A    No.  Is --

10  Q    Well, how --

11  A    The risk was solely his on the product, and if he chose

12  to hedge it, he could hedge it.  We provided hedging but he

13  would have to cover the losses or the gains, he would take

14  get the (indiscernible), but --

15  Q    Okay.  I'm trying to sort this out because what you're

16  describing is that he's entitled to all the profits of the

17  hedges.  Is that true or not true?

18  A    I believe so.  I don't know.

19  Q    How do you not know if -- hold on.  Was there an

20  agreement to share?  Could there have been an agreement to

21  share these profits?

22  A    I don't know.

23  Q    Possible, right?

24  A    Possible.

25  Q    And an agreement to share the losses, right?

```
 1   A    Possible.  I don't know that.

 2   Q    Who --

 3   A    Eric would know that.

 4   Q    Would Eric be allowed to trade in Vitol's name without

 5   your permission?

 6   A    Yes.  He does that every day.

 7   Q    Right.

 8   A    Previous to that.

 9   Q    Every day, right?  And so these trades in Vitol's name,

10   Vitol was at risk.  Isn't that correct?

11   A    When Vitol's transacts, yeah, Vitol's at risk.

12   Q    That's right.  So explain to the Court and explain to

13   me how -- and we'll show, we're going to look at these

14   trades, they're in Vitol's name.  How do you get all the way

15   to Mr. Brass if they're in your name?

16   A    If the transaction is done, we're in agreement where

17   we're doing it on behalf of them.

18   Q    And where is that agreement?  Now we're getting

19   somewhere.  Where is that agreement?

20   A    In our business, a lot of the agreements are just

21   verbal.

22   Q    Right.

23   A    It's done in the actions.  Like --

24   Q    Right.  It's let's look at how we're acting.  It's not

25   necessarily in writing, right?
```

1   A    No, it's -- basically it's understood that basically

2   when you have an agreement, it's, in our business is your

3   word is your bond.  Now if your word is not worth much, then

4   you have security behind it.  In this case we have security

5   but Eric made a mistake --

6   Q    Okay.

7   A    -- trying to transact without that security.

8   Q    You wandered off a little bit on me.  My question is,

9   where is that agreement?

10  A    I don't know.

11  Q    You said, these trades were on behalf of someone.  That

12  would be in writing, wouldn't it?

13  A    It may be in the emails.

14  Q    I'm not asking you to guess.

15  A    I don't know.

16  Q    You were the CEO.

17  A    No, the CEO doesn't get involved to that detail.  At

18  least I didn't.

19  Q    Okay.  But you've been involved in litigation with Mr.

20  Brass for how many years?  Five?  You haven't looked for

21  this yet?

22  A    I've been retired for two years.

23  Q    Okay, three.  So you sued him for three years.  Where

24  is it?

25  A    Whatever evidence, whatever detail we have, Vitol has.

1    Q    Okay.

2    A    They have --

3    Q    So --

4    A    -- providing to you, I'm sure.

5    Q    So if we don't have it, it doesn't exist.  Is that your

6    testimony?

7    A    If Vitol tells you it doesn't exist, it doesn't exist.

8    Q    No, I didn't ask you if they said it doesn't exist.  If

9    we don't have it, it's your testimony it doesn't exist.

10   Right?

11   A    It's my testimony I don't know if there is documents or

12   not.  I hate to speculate what that --

13   Q    Well, you sit up here and you've sued a man for three

14   years based upon your allegation --

15        MR. AURZADA:  Objection, Your Honor.  That's not a

16   question.

17        THE COURT:  I agree.  Why don't you ask it again?

18   BY MR. PATTERSON:

19   Q    If you don't even know if Mr. Brass is liable for the

20   trading losses, what's the basis of your lawsuit for the

21   past five years?

22   A    He himself admitted the losses and he wanted to pay me

23   for the losses.  He asked for terms to the losses.  He

24   himself admitted those losses there.  It was an agreement

25   between Eric and AJ, an agreement that was functioning from

1   August onwards for a period of time until --

2   Q    Right.  There was a deal made in August, wasn't there?

3   What you just said, there was a deal made between Mr. Kuo

4   and Mr. Brass in August of 2017, wasn't there?

5   A    No.  In August --

6   Q    That's what you just said.  You just said there was an

7   agreement among those two since August of 2017.  Is that not

8   true?

9            MR. AURZADA:  Argumentative, Your Honor.

10           THE WITNESS:  That's not what I said.

11           THE COURT:  No, overruled.

12   BY MR. PATTERSON:

13   A    I said on August of '17, he was informed that we would

14   only provide financing support until the end of the year.

15   Q    So the financing didn't start until August now, right?

16   A    No.  It was going on before then.

17   Q    You just said in August that was the agreement you were

18   referring to.

19   A    No, in August, he was notified that it wasn't going to

20   be any further financial support at the end of -- this by

21   the end of December.

22           THE COURT:  Mr. Patterson, I don't want to

23   interrupt you.  We've got to stop at six, just so I can --

24           MR. PATTERSON:  Well --

25           THE COURT:  I just wanted to give you that little

1    bit of -- just so you can plan accordingly.  We can talk

2    about tomorrow and all that stuff.

3              MR. PATTERSON:  No, I will do my best to stop a

4    little bit before six.

5    BY MR. PATTERSON:

6    Q    All right, so Mr. Loya, try this a different way.  You

7    believe that Mr. Brass owes Vitol money for any number of

8    hedges, one or more?

9    A    Yes.

10   Q    All right.  How many?

11   A    I don't know the number.

12   Q    And how do you come to that conclusion?  What led you

13   to that conclusion?

14   A    I was told by Eric the number of hedges over the period

15   of time that he had done for AJ.

16   Q    Okay.

17   A    -- his instructions.

18   Q    And what else?

19   A    And the agreement was he would cover them.

20   Q    All right.  What else?

21   A    (indiscernible).

22   Q    Well, you told me about your stroll through the trading

23   floor in March of 2018, Mr. Loya.  Remember that?

24   A    Yes.

25   Q    And you heard Mr. Kuo on the phone --

```
 1              MR. AURZADA:  Objection.  Asked and answered.

 2              THE COURT:  Overruled.

 3    BY MR. PATTERSON:

 4    Q    And you remember what you said you did when you found

 5    out what the conversation was?

 6    A    I said yes.

 7    Q    What did you do?

 8    A    Like I said, I asked him why are you talking to AJ when

 9    we're not supposed to be --

10    Q    After that, what did you do?  What did you tell me you

11    did after that?

12    A    I asked him to figure out how much money he owed us.

13    Q    Didn't you say you went back to your office and you

14    started figuring it out?

15    A    I didn't figure it out.

16    Q    Okay.

17    A    I asked him to provide me the details.

18    Q    Did he?

19    A    Started to, yes.

20    Q    Started to.  Did he finish?

21    A    No, it took time to get everything together and have

22    accounting check it.

23    Q    Did he give you the detail in toto?

24    A    Yes.

25    Q    All right.  How many hedges, approximately, did Mr.
```

```
1    Brass owe Vitol for?

2    A    I don't recall the number.

3    Q    Okay.  More than one?

4    A    Yes.

5    Q    More than six?

6    A    I have no idea.

7    Q    Right.

8    A    Don't recall.

9    Q    How many of those trades were done in Mr. Brass' name?

10   A    Are we talking about the hedges again or are we now

11   talking about trades?

12   Q    Hedges.

13   A    I don't know.  I believe all of them were done for

14   mister --

15   Q    That's not what I asked you.

16   A    They were all done --

17   Q    I know that's your allegation, right, and you have no

18   paperwork and you have no writings, but that's what you want

19   everyone to believe and we're trying to figure it out.  How

20   many were done in his name?

21   A    I don't know.

22   Q    Any.  Were there any done in his name?

23   A    I don't know.  I don't think so.  They were all done

24   probably in Vitol's name.

25   Q    That's right.  Now let's talk about the trades.  Your
```

```
 1    allegation is that Mr. Brass and GCAC owes Vitol money for

 2    trades.  Is that true or false?

 3    A    He owes Vitol money for product released to him, sold

 4    to him.

 5    Q    That's two different things.  Two different things.

 6    You understand that, right?  Released to him and sold to him

 7    are two different things.  You understand that, don't you?

 8    A    Yes.

 9    Q    Okay.

10    A    One --

11    Q    Which was it?

12    A    -- and you release it.  Both.  First you sell it.  We

13    control the tankage.  Vitol controlled the tankage.  Then

14    Vitol releases it for him to be able to take it.  He can't

15    take it unless Vitol releases it.

16    Q    That's right.

17    A    Vitol sells it and then instructs the terminal to

18    release it.

19    Q    And you did that.

20    A    I believe we did, yes.

21    Q    Okay.  What did Mr. Brass do wrong in that transaction?

22    A    He didn't pay for it.

23    Q    You didn't sell it to him, did you?

24    A    It was sold to him.

25    Q    No, it wasn't.  It was sold to a third party, wasn't
```

1    it?  Mr. Loya.  You know that, right?

2    A    No, I don't know that.  I don't know --

3    Q    You do.  How much oil -- how much product did GCAC or

4    Mr. Brass buy from Vitol over the course of your

5    relationship, ever?

6    A    I don't know that.  I don't know that number.

7    Q    Any?

8    A    I don't know that number.

9    Q    You just said -- no, I said any.

10   A    No, I'm sure -- yes, of course.

11   Q    You say that like you know, but you don't remember

12   anything.

13   A    We've been transacting with him for many years.

14   Q    I understand.  Isn't it true that he went out and found

15   buyers and due to your relationship to the prior Rio deal,

16   the transactions were generally three-part or four-part in

17   order to satisfy your obligations to Rio?  Isn't that true?

18            MR. AURZADA:  Objection, Your Honor.  That's a

19   compound question.

20            THE COURT:  Sustained.

21   BY MR. PATTERSON:

22   Q    How much product did you actually sell to Mr. Brass or

23   GCAC, Mr. Loya?

24   A    I believe it's $10 million worth.

25   Q    Really?  $10 million?  That's your sworn testimony

1    today?

2    A    That's my belief.

3    Q    No, I want to know what you know, because I'm going to

4    write it down.  You think it's $10 million?

5    A    Yes.

6    Q    All right.  He bought $10 million dollars of product.

7    What kind?  I'm going to put it right up here at the top.

8    What kind of product?

9    A    It would be either fuel oil or asphalt.

10   Q    Fuel oil or asphalt.  And this was purchased by whom?

11   Mr. Brass?

12   A    It was sold to AJ, yes.

13   Q    To Mr. Brass.  So it was purchased by Mr. Brass and he

14   didn't pay for it, right?

15   A    That's my belief.

16   Q    I'm not asking you what you believe.  I'm asking you

17   what you know.

18   A    I don't know --

19   Q    Are you guessing?

20   A    Yes.

21   Q    You're guessing.  So that's -- this is just a guess to

22   support this five years of litigation?

23   A    No, I'm not -- Vitol is litigating.

24   Q    But you were --

25   A    I was there.  And when it was presented to me, it was -

1    - that was what I recall.

2    Q    Why are you really continuing the litigation with Mr.

3    Brass?  Tell me the motivation, why.

4    A    It's rare when we not get paid for product and I think

5    that we owe it to our shareholders to pursue Debtors or

6    people, and -- vigorously.  I think it's part of the job of

7    management and I think that AJ probably took funds and

8    stashed them away in different places and -- in order to

9    simply defraud Vitol.  That's why.

10   Q    That's your belief?

11   A    That's my belief.

12   Q    And you believe that's why the litigation continues

13   today?

14   A    I think that the litigation continues because he's been

15   twofaced at either providing data, providing information.

16   He's doctored information.  He's behaved in a very dishonest

17   way.  So I think that we -- this could have been resolved

18   much earlier had we had a somewhat honest counterparty.

19   Q    So shareholders are all high level executives, right?

20   A    No --

21   Q    We talked about that.

22   A    We talked about that.  I corrected you.  No.

23   Q    Employees or past employees?

24   A    Yes.

25   Q    Right.  You said it was high level executive

1    compensation, right?  Preferred stock.  Isn't that what you

2    told the Court?

3    A    No.  You asked me if I -- no, I didn't say that.  You

4    asked me if I own shares that have preferred stock right

5    now.

6    Q    All right.  Who obtained preferred stock from Vitol

7    Holdings?

8    A    One has to be a shareholder, a common shareholder

9    first.  Once one stops being a shareholder, his common

10   shares become preferred stock.

11   Q    How do you become a shareholder?

12   A    You are rewarded by management and for various reasons,

13   whether it's profitability or coming up with a great idea,

14   dedication, solving a problem, solving a bad business,

15   whatever, is a way for management to compensate long term

16   individuals.

17   Q    Everyone's available to get that?

18   A    No.  The board of Vitol decides who gets that.

19   Q    Is everyone available?  It's available to secretaries?

20   A    It used to be.  Not anymore.

21   Q    It is available to traders?

22   A    Yes.

23   Q    Okay.  So that's your shareholders, right.

24   A    I'm sorry?

25   Q    You don't think your shareholders were interested in $3

1    million to settle this?

2    A    I think that shareholders will look at any offer now

3    that it's up to them to decide what's acceptable.  Although

4    frankly, I think any offer by AJ is highly suspect.

5    Q    That's the real answer, isn't it?  You're not

6    interested in settling with GCAC or Mr. Brass, are you?

7    A    I would have loved to settle with him, but I --

8    Q    Really?  What would it take?  Tell the Court.  What

9    would it take?

10   A    It's now up to Vitol.  I'm not -- no longer there.  I

11   can't --

12   Q    When you were there.

13   A    -- decide.

14   Q    What was -- what would've been?

15        MR. AURZADA:  Objection.  Outside the scope of

16   direct and not relevant.

17        THE COURT:  Sustained.

18   BY MR. PATTERSON:

19   Q    So Mr. Loya, when you approved, Vitol approved the,

20   what you're referring to as financing arrangement, what was

21   the interest rate?

22   A    If I recall correctly, I think my answer was I don't

23   approve financing.  I don't get involved in approving

24   financing arrangements.

25   Q    So there was no financing?

1   A    I didn't say that.  I said it wasn't involved.

2   Q    Somebody approved it.

3   A    (indiscernible).

4   Q    Okay.  What does Vitol charge for financing?  What

5   would be the term?

6   A   Vitol doesn't enter into terms like that.  Vitol will

7   do financing when it sees a profit opportunity, whether it

8   enhances our -- enhances Vitol's ability to trade in the

9   market, whether ability to do bigger trades, learn about the

10   market, and usually there's little or no or minimal interest

11   rate.  It's not entering into these deals to make an

12   interest rate.  It's entering into a deal to acquire market

13   penetration or to enhance its trading abilities.

14   Q   Going to put on the screen for you, Mr. Loya, a

15   document.

16          MR. PATTERSON:  And for the Court, it's 104-25.

17   Again, probably I'm going to offer it based upon the filings

18   made by counsel.

19          THE COURT:  I'll give counsel an opportunity

20   review.  Let me know.

21          MR. AURZADA:  Based upon the offer, it lacks

22   foundation.

23   BY MR. PATTERSON:

24   Q   You recognize this document?  Let me scroll through

25   because you would be the guy that -- to approve a joint

1    venture, right?

2    A    Yes.

3    Q    Right?  This doesn't ring a bell?

4    A    No.

5    Q    Keep scrolling.  None of this?  Doesn't jog your

6    memory?  You don't remember this?

7    A    I would have to read it.  I mean the way you're

8    scanning it, I have no idea.

9    Q    Well, I don't want you reading it until we figure out

10   what it is, if you can tell me.

11   A    I don't recognize it.

12   Q    Let me finish.  Long document.  Kind of glance through

13   it.  See if it jogs your memory, you remember this?  Nothing

14   still?

15   A    No.

16   Q    All right.  We'll come back to that.  All right.  I'm

17   going to put on screen for you, try it one more time.  This

18   is 104-9.

19          MR. PATTERSON:  I'll go ahead and offer it again.

20   We'll see where that goes.

21          MR. AURZADA:  No objection, Your Honor.

22          THE COURT:  Okay, 104-9 is admitted.

23          (Defendant's Exhibit 104-9 entered into evidence)

24   BY MR. PATTERSON:

25   Q    Okay, Mr. Loya, on the screen is an email.  104-9 is

1    the exhibit.  And you'll see down at the bottom May the 3rd,

2    2017.  This is an email we looked at a little bit earlier as

3    a standalone document.  Do you remember that?

4    A    Yes.

5    Q    Where Mr. Kuo emails you and Mr. Bake.  "Hey, this is

6    an old deal, but the Sargeant acquisition caused us to table

7    it.  Let's talk about it again."  Right?

8    A    Okay.

9    Q    And here, we have the response to this and Chris Bake,

10   who -- this is the guy over in the UK you is in charge

11   worldwide of asphalt and he's the one that shut this deal

12   down -- the discussions, I'm sorry.  Right?  Did I get that

13   right?

14   A    Yes.

15   Q    All right.  And so July 31st, this is several months

16   after the original email, right.  "Thank you both for your

17   time this morning."  You both, being, I assume Mr. Kuo and

18   Mr. Barth?

19   A    I assume so.

20   Q    Mr. Loya?

21   A    Yes.

22   Q    Is that who?

23   A    Reading what -- yes --

24   Q    Okay, let me just take a break and let you read instead

25   of trying to do both.

```
1    A    Okay.  Yes, he's talking to Eric and Steve.

2    Q    Now, are you aware of any other responses to the May

3    3rd, 2017 email that we looked at earlier?

4    A    I don't remember.  I wouldn't know.  I wouldn't recall.

5    I don't know.

6    Q    Well, you might recall.  I'm asking you if you do.

7    A    I don't.

8    Q    Okay.  As far as you know, this is the only response

9    from the May 3rd, 2017 email, right?

10   A    I don't know that.  I just --

11   Q    I said as far as you know, this is the only response.

12   So you either know of other responses or you don't.

13   A    I don't know.  Let's put it that way.  I don't know of

14   other responses.

15   Q    Okay.  So as far as you know, this is the only

16   response, right?

17   A    (indiscernible) response.

18   Q    I'm sorry?

19   A    Okay.

20   Q    Not okay.  I'm asking you to testify under oath here

21   today.

22   A    And that's what I'm doing.  As far as I know right now

23   --

24   Q    This is --

25   A    -- right now, this is the only response I've seen.
```

```
 1    Q    Thank you.  It's the only one you know of, right?

 2    A    It's the only one I've seen.  I don't know of --

 3    Q    And I asked you, if it's the only one you know of.

 4    A    I don't know of any others.

 5    Q    Okay.

 6    A    This time.

 7    Q    My question's yes or no.  Is this the only one you know

 8    of?  Yes or no?

 9    A    At this point, yes.

10    Q    "Thank you both for your time this a.m."  And this is

11    Mr. Bake who you say is in charge of asphalt worldwide for

12    Vitol.  "As agreed, we're trying to cajole Dan into a

13    discussion with AJ."  Who's Dan?

14    A    That must be Dan Sargeant.

15    Q    All right.  He is the VALT man in the UK, right?

16    A    He's a Sargeant guy.  I don't know what his role was in

17    VALT, but he was involved in VALT.

18    Q    Well, why would he be in this email if he wasn't

19    involved in asphalt?

20    A    No, he's the asphalt guy.  I didn't say -- I didn't

21    know what his role was in VALT.  I don't know if he was the

22    guy in VALT.

23    Q    All right.  "Trying to cajole Dan into a discussion

24    with AJ and find a way forward."  Right?  This is July 31,

25    right?  Looking at your timeline, this is about the time
```

1   that Mr. Bake tells you to stop, right?

2   A     July/August, so yeah.

3   Q     All right.  Mr. Bake says, we're trying to find a way

4   forward, aside from having one face to the market as far as

5   bitumen.  Is that how you say it?

6   A     Bitumen.

7   Q     Bitumen?

8   A     Yeah.

9   Q     What is that?

10  A     Asphalt.

11  Q     Okay, "selling goes, we have to cross a few other

12  bridges, like competing with the likes of Valero on rack

13  sales, which precludes us from buying bulk from them for

14  Central America, et cetera.  I think that all possible, but

15  there will need to be parameters agreed.  I really regret

16  that when I received your heads up below, Eric, on the

17  proposition below, that I did not go back and discuss more

18  proactively with you the extent of the Vitol involvement on

19  the asphalt side.  Anyway, we are where we are and we need

20  to try and find a way to make this work."  Did I read that

21  correctly?

22  A     Yes.

23  Q     All right.  And you're CC-ed on this email, right?

24  A     Yes.

25  Q     Well, he's not saying stop the discussion, is he?

Page 186

```
 1    A     No.

 2    Q     July.  What is he talking about?  The joint venture

 3    discussions?

 4    A     It sounds like there is a -- some issue or problem with

 5    --

 6    Q     With what?  That's what I'm trying to figure out.  The

 7    joint venture?

 8    A     It doesn't say joint venture.  It just said, basically

 9    it's having a asphalt business and having a asphalt business

10    if the way -- asphalt business be involved versus an asphalt

11    business the way GCAC wants to conduct.

12    Q     Right.  Talking about a way for asphalt business with

13    AJ, right, Mr. Brass?

14    A     No, it -- yes.  Sounds like --

15    Q     Right?

16    A     if we do something with AJ, it's going to cause

17    problems with Valero.

18    Q     No, that's not what it says.  Where does it say that?

19    Where does it say it's going to cause problems?

20    A     I'm reading between the lines, but there -- "few other

21    bridges," obviously problems, "like competing with the likes

22    of Valero on rack sales" means you're competing with them in

23    their home territory and "preclude us from buying bulk from

24    then for Central America."  They may not sell to us in

25    Central America, which is very important.  So --
```

002746

1    Q    Okay.

2    A     He's saying there's an issue here that if --

3    Q    I --

4    A    -- see --

5    Q    "I think that all possible, but there will need to be

6    parameters agreed."  Doesn't sound like big problems to me,

7    right?

8    A    That's --

9    Q    And you're talking about getting into business with AJ,

10   right?  That's a JV.

11   A    -- said it's possible.

12   Q    Right?

13   A    Possible.

14   Q    Right?  I agree with you.  But that's what they're

15   talking about, right?

16   A    "I think all possible."  I don't know if they're

17   talking about AJ, a JV, or some other arrangement.

18   Q    I understand.  You --

19   A    -- possible.

20   Q    Of course not.  Where is financing in this email?

21   A    not in there.

22   Q    Anywhere, right?

23   A    No.

24   Q    It's not even mentioned, is it?

25   A    Bake is not involved in financing.

1    Q    Right.  So why talk to him, if all you're doing

2    financing?  You said your financing from the beginning, why

3    have this email discussion, right?

4    A    (indiscernible).

5    Q    Would only be for JV, right?

6           THE COURT:  Got to let him answer the question.

7           MR. PATTERSON:  I'm sorry.

8    BY MR. PATTERSON:

9    A    It would be -- it would be that Chris and Eric are

10   talking about how does the business -- how to do business

11   with GCAC.

12   Q    Right.

13   A    Part of that involves joint venture, but we're guessing

14   that.

15   Q    Right.  No, we're not, because you just said they would

16   never discuss financing on this email, right?

17          MR. AURZADA:  Objection.  Argumentative.

18          THE COURT:  Overruled.

19   BY MR. PATTERSON:

20   Q    Right?

21   A    No -- yes, right.

22   Q    That's correct, so it wouldn't be financing, so what

23   else could it be?

24   A    Doing business somehow together.

25   Q    There you go.  So let's move on.  Steve Barth, which is

```
1   a business guy of yours, right, or was, when you were there,

2   right?  Same day, to Mr. Kuo.  "Had a brief chat with Chris,

3   after our conference call."  Who would be Chris?  Chris

4   Bake?

5   A    Yes.

6   Q    All right.  Had a brief call -- after our conference

7   call.  "His note below is indicative of where he is at this

8   point.  Wants resolution and fortunately has basically

9   taking the responsibility for the situation."  What does

10  that mean?

11  A    Barth is optimistic.  It's ridiculous.

12  Q    Why do you say -- you need to explain what you're

13  talking about.

14  A    You want me to explain?

15  Q    Yes.  Of course.

16  A    I think Barth's saying, I just talked to Chris and you

17  see the note below, he's -- everything is possible and he's

18  going to take responsibility to a situation.

19  Q    What does that mean?

20  A    I think that's a very optimistic view that somehow

21  Chris is going to solve the whole thing.

22  Q    Solve what thing?  What are you talking about?

23  A    How to do business with GCAC.

24  Q    Right.  The joint venture, right?

25  A    Or other ways to do business.  It doesn't specify just
```

1    the joint venture.  He made be talking about something else.

2    Q    What could it be?  It's not financing.  We know that.

3    Right?  We know that.  You said that.  What else could it

4    be?

5    A    It wouldn't be financing.  It would be --

6    Q    Right.

7    A    It'll be whether we -- you limit yourself to this kind

8    of arrangement and you market this in a market over here,

9    whatever.  It may be somehow --

10   Q    Joint venture of some kind, right"

11   A    Some arrangement.

12   Q    Some arrangement.

13   A    -- arrangement.

14   Q    Some commercial business arrangement, right, other than

15   financing.  Right?

16   A    Yes.

17   Q    All right.  Now Mr. Kuo responds again on the same day,

18   later in the day.  "That's what I gathered from his email.

19   Hopefully we can find an amicable solution for all parties.

20   Hard to imagine we can't."  Solution from what?  What are we

21   trying to find a solution for?

22   A    Obviously, problems regarding the -- doing business

23   with GCAC.  He, Chris, alluded to one of them.

24   Q    And then help me.  Help me figure this out then.  Was

25   there a problem with the financing?

1    A     Not that I know of.  No.

2    Q     What's the problem?

3    A     Again, Chris alludes to it.  If you do the business,

4    rack business, we may lose Valero's supplier to Central

5    America.

6    Q     Is that what he says?

7    A     That's exactly what he says.

8    Q     "Aside from having one face to the market as far as

9    asphalt selling goes" -- he's talking about Sargeant or

10   VALT, right?  Doesn't want to have VALT and another deal out

11   there in the market.  Right?  Vitol needs to have one face.

12   Right?

13   A     "Aside from having one face to the market" -- yes.

14   That's one problem.  We have to have -- do something.

15   Having two face is a problem.

16   Q     Right.

17         THE COURT:  Mr. Patterson, we've got a few minutes

18   left.  I don't want you to get too much into it if you got -

19   -

20         MR. PATTERSON:  I didn't see the time.

21         THE COURT:  Does it make sense to --

22         MR. PATTERSON:  Okay.  Yes.  One second, please.

23         Just a couple things to follow up and we'll wrap

24   up and get out of here, Judge.

25         THE COURT:  No worries.

1      MR. PATTERSON:  I won't try to get to another

2  exhibit.

3  BY MR. PATTERSON:

4  Q    Now, on July 31st, the exhibit we just looked at, July

5  31st, 2017, were you doing transactions -- you being Vitol -

6  - doing transactions with GCAC and/or Mr. Brass at that

7  time?

8  A    I believe so, yes.

9  Q    And were they profit transactions?  So splitting

10  profit, splitting losses?

11  A    I don't know what arrangements were.

12  Q    But there were some arrangements.

13  A    I'm sure that Eric and him had an agreement or what

14  they were doing.

15  Q    And you're going to rely on what Eric said, Mr. Kuo

16  says?

17  A    Yes.  I mean, he was the one doing it.

18      MR. PATTERSON:  All right.  No further questions

19  for now.  I'm not finished.

20      THE COURT:  Understand, for purposes of today.

21      MR. PATTERSON:  No, I'll pick up when we start

22  back.

23      THE COURT:  Okay.  No worries.  Mr. Loya, sounds

24  like you're going to join us tomorrow.  I would remind you

25  that you're still under oath and you're not to discuss your

 1    testimony with anyone today or period.  Why don't we start

 2    tomorrow at -- I've got a nine o'clock.  I don't know how

 3    long it'll go, but I want to give it due respect, give

 4    everyone opportunity.

 5            Everyone can leave everything here just the way it

 6    is.  That's not going to be a problem.  Why don't we start

 7    at 10:30 then go for maybe two hours, 10:30 to 12:30, and

 8    then take a lunch break and then we'll just go late in the

 9    day and we'll see where we end up.  And then -- I want you

10    to, you know, write down the dates that we were talking

11    about.  If you can just give some thoughts to what we look

12    like next week, maybe when we start tomorrow.  We can at

13    least, before we continue with your examination of the

14    witness, we can plot out next week.  I just want to make

15    sure that Ms. Saldana knows to clock out certain dates just

16    in case folks -- because folks contact her over the weekend,

17    and that kind of -- okay?

18            MR. PATTERSON:  Yes, sir.

19            THE COURT:  Thank you.

20            MR. PATTERSON:  And --

21            THE COURT:  Yes.

22            MR. PATTERSON:  Just make sure he understands that

23    that includes not even his own lawyers as we understand it

24    now.

25            THE COURT:  Yeah. That means everyone.  You're to

```
1    discuss with no one.  Okay?  Yes, and that does include your

2    lawyers.  Okay?

3               THE WITNESS:  Okay.

4               THE COURT:  All righty, folks.  Thank you very

5    much.  I very much appreciate everyone's time.  Thank you.

6               CLERK:  All rise.

7          (Proceedings adjourned at 5:59 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 15, 2022
```

```
 1                   UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3   ARTHUR JACOB BRASS,              )
                Debtor.              ) CASE NO: 21-60025-CML
 4                                    )
     ------------------------------)
 5   VITOL INC.,                     ) CASE NO: 21-06006-CML
                                      ) ADVERSARY
 6              Plaintiff,           )
                                      ) Houston, Texas
 7        Vs.                         )
                                      ) Friday, September 2,
 8   BRASS,                          ) 2022
                                      ) 10:50 a.m. - 4:40 p.m.
 9              Defendant.            )
     ------------------------------)
10
                              TRIAL
11
              BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
12                UNITED STATES BANKRUPTCY JUDGE

13   APPEARANCES:

14   For Plaintiff:          MICHAEL P. COOLEY, ESQ.
                             BRADLEY PURCELL, ESQ.
15                           KEITH AURZADA, ESQ.
                             Reed Smith LLP
16                           2850 North Harwood St., Suite 1500
                             Dallas, TX 75201
17
     For Defendant:          MIRIAM GOOTT, ESQ.
18                           JOHNIE J. PATTERSON, ESQ.
                             Walker & Patterson, PC
19                           PO Box 61301
                             Houston, TX 77208
20
     For Trustee:            JON MAXWELL BEATTY, ESQ.
21                           The Beatty Law Firm PC
                             1127 Eldridge Pkwy, Suite
22                           300, #383
                             Houston, TX 77077
23

24

25
```

```
 1   Court Reporter:          Zilde Martinez

 2   Courtroom Deputy:        Zilde Martinez

 3   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite   300
 4                            Mineola, NY 11501
                              Tel: 800-727-6396
 5

 6
     Proceedings recorded by electronic sound recording;
 7   Transcript produced by transcription service.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                     T E S T I M O N Y

 3    WITNESS          DIRECT   CROSS   REDIRECT   RECROSS   V.D.

 4    MIGUEL LOYA        --      28       106       124       --

 5    MICHAEL WAGNER  158,167 --         --         --       164

 6

 7                     E X H I B I T S

 8    NO.       DESCRIPTION                              PAGE

 9    Vitol:

10    81-175    Spreadsheet                             166
      81-181    Spreadsheet                             168
11    81-190    Spreadsheet                             171

12    Defendant:

13    104-13    Email                                    55
      104-34    First Amended Complaint                 148
14

15

16

17

18

19

20

21

22

23

24

25
```

002758

```
 1       HOUSTON, TEXAS; FRIDAY, SEPTEMBER 2, 2022; 10:50 A.M.

 2                      (Call to Order)

 3            THE COURT:  Okay.  This is -- good morning,

 4       everyone.  This is Josh Lopez back on the record in Vitol

 5       v. Brass today, September 2nd.  We are starting around

 6       10:50 this morning.  I see counsel for Vitol, counsel for

 7       Brass.  I see the witness here.  I'm going to ask the

 8       witness to step out just for a moment.  I'm going to ask

 9       that you not step directly right outside the hallway.

10       Perhaps there's a bench right on the other side and

11       somebody can come grab you.  I just want to talk

12       housekeeping and you probably don't need to -- have more

13       fun things to do than listen to that.  Just give them a

14       second.  I just want to make sure.

15            UNIDENTIFIED:  I wanted to apologize for

16       (indiscernible - 10:51:24).

17            THE COURT:  No.  It's completely fine.

18            UNIDENTIFIED:  (Indiscernible - 10:51:26).

19            THE COURT:  No, no, no.  Look, we did this at the

20       last second.  And I think I've been flexible with Vitol,

21       and both parties whenever anybody's needed a break or some

22       time to kind of think about stuff.  So I -- completely

23       fine.  That's not an issue at all.  So -- I did tell the

24       parties, I had another hearing where somebody came up to me

25       and asked me if -- they told me that they had to have a
```

1   hearing in front of Judge Jones, and I jokingly told a

2   younger lawyer, you know, you tell Jones that, you know, at

3   some point I'm going to have to take over and supersede

4   this thing, and he actually told the judge in the middle of

5   a hearing.  Jones sent a message back, telling me that when

6   I have more grey hair than he does then I'm allowed to get

7   it done.

8          So I apologize.  No one needs to hear bad jokes

9   in the morning.  Can we just talk housekeeping in terms of

10   kind of what we're going to accomplish today, potential

11   days that folks may need to come back.  And then I'd also

12   like to communicate something -- maybe I'll start with

13   that.  It was a witness who was informed was in the

14   hospital.

15          MR. COOLEY:  Yes, Your Honor.  And in fact, we

16   had at least some update --

17          THE COURT:  Okay.

18          MR. COOLEY:  -- or at least some more information

19   (indiscernible - 10:52:47).

20          THE COURT:  No.  I would -- I just -- I want to

21   get on the record that my case manager called the number

22   and a female answered the phone, I can't tell young, old,

23   but said that at least as of yesterday afternoon, he was

24   still in the hospital and that's all I -- that's all that I

25   had.

1          And so I'm just communicating that.  I don't know

2     who it was, but maybe you've got additional information.  I

3     just wanted to communicate that because that was something

4     that my chambers did.

5          MR. COOLEY:  A little bit, Your Honor.  We

6     received an email from Mr. Boston -- or from what I

7     understand to be Mr. Boston's email address yesterday

8     afternoon.  I have copies of it because I -- it -- he

9     describes his actual medical situation.  It does appear to

10    be not insignificant.  For HIPAA reasons, I don't want to

11    just read it into the record.  I'm happy to hand a copy to

12    parties.  But the short version is it does appear that he

13    has -- they have found a medical condition of some

14    significant.  He says they are determining what the next

15    steps are.  I do not know how long I will be here.  I

16    believe he's referring to the hospital.

17         He mentions that the court called to remind him

18    he is still under subpoena and asked, let me know where we

19    go from here.  We responded, and it's in the thread, to

20    just say I'm sorry to hear that.  Thank you for the update.

21    We will inform the Court and let you know.  I'm happy to

22    hand --

23         THE COURT:  No, no, no.  That's --

24         MR. COOLEY:  -- a copy to anyone --

25         THE COURT:  That's consistent with what I -- what

1    we heard, and I'm glad that it was communicated that we

2    reached out.  I just -- I didn't want to sit on the

3    information that we had actually heard from someone.

4            In terms of what we accomplish today or in the

5    next few days, how do you -- what's your -- how do you

6    envision?

7            MR. COOLEY:  Your Honor, what I think we see from

8    here, and this will depend a little bit on --

9            THE COURT:  Actually, before we begin, I know the

10   rule is invoked.  Are we all clear in terms of who can be

11   here or not?

12           MR. COOLEY:  Yes, Your Honor.

13           THE COURT:  Okay.

14           MR. COOLEY:  So far as I can tell.

15           THE COURT:  Okay.  Thank you.

16           MR. COOLEY:  Subject to sort of how much longer

17   the cross of Mr. Loya will be going, and counsel may be --

18   may have an estimate of that.  They may have a sense, but

19   we'll take that up.  As far as sequencing, we'll see how

20   far we get.  We will obviously begin by continuing with and

21   completing Mr. Loya.  Mr. Wagner is here again today from

22   EEPB.  We've put him in a room out in the hallway somewhere

23   to get some work done.

24           We will then recall him to continue and complete

25   his testimony relating to some business records.  We would

1    then -- we sort of re-shuffled a little bit, given that

2    we're now to the Friday of a holiday weekend and people's

3    schedules get a little tricky, and we would then propose to

4    call Mr. Murray, the Chapter 7 Trustee.  I think at least

5    from our perspective, his testimony -- his direct

6    examination is relatively brief.  Cross-examination will be

7    what it is.  And then, just from a sequencing perspective,

8    if we still have daylight left and have not yet worn out

9    our welcome with the Court this afternoon, we would next

10   proceed to take up the matter of Mr. Tomashevsky's

11   (phonetic) deposition, which as the Court knows, we intent

12   to provide by deposition excerpt.

13          We have a couple of different ways we can do

14   that, and if we get that far, we can take that up in

15   whatever manner the Court prefers.

16          THE COURT:  Okay.  So after Tomashevsky, then

17   what other witnesses do you anticipate calling?

18          MR. COOLEY:  Then after Mr. Tomashevsky, and I'm

19   quite certain we won't get past that today -- or quite

20   confident, I should say.  After that would be Mr. Kuo, Eric

21   Kuo from Vitol.  We then would plan to call Mr. Brass, the

22   Defendant, who we've delivered a trial subpoena, and he's

23   on the witness list and so forth.

24          And then finally, I believe our last witness

25   would then be Mr. Dietz, the expert witness, at which point

1    I think that would complete things from our end.  That is

2    the expectation right now.

3           The Mr. Boston issues lingers --

4           THE COURT:  I got it.

5           MR. COOLEY:  -- insofar as we haven't really

6    figured that out yet, but that's still out there, but we're

7    obviously very aware of what seems to be --

8           THE COURT:  From a --

9           MR. COOLEY:  -- a meaningful situation here.

10          THE COURT:  I just call it from a direct

11   examination standpoint, Kuo, Brass, Dietz, how much time do

12   you think -- court time do you think you're going to need?

13          MR. COOLEY:  Your Honor, I think Mr. Kuo's direct

14   examination is less than an hour.  Mr. Brass's examination

15   -- two to three hours for Mr. Brass on direct.  And Mr.

16   Dietz is also, I think, in the two-to-three-hour range on

17   direct.

18          THE COURT:  Okay.  Are there any other witnesses?

19   I just want to make sure -- I'm going to repeat to you what

20   I understand.

21          MR. COOLEY:  Yes, Your Honor.

22          THE COURT:  We'll finish with Mr. Loya.  Put Mr.

23   Wagner back on, Mr. Murray.  We'll take up Tomashevsky --

24   yeah, what we'll call the depo portion, Mr. Kuo --

25          MR. COOLEY:  Yes, Your Honor.

```
1              THE COURT:  -- Brass, Dietz.

2              MR. COOLEY:  Correct, Your Honor.

3              THE COURT:  Okay.  Okay.  Are there -- I realize

4    I gave you some days that we were -- I was available next

5    week.  Any of them work better than others, and obviously

6    I'm going to turn to Mr. Patterson and Ms. Goott to ask as

7    well.

8              MR. COOLEY:  Right, Your Honor.  We have some

9    scheduling conflicts on Wednesday, I know.

10             THE COURT:  Okay.

11             MR. COOLEY:  I think our hope was to ask the

12   Court -- the real sensitivity we have is by and large,

13   people are local.  We're in Dallas, but that's pretty

14   close.  Mr. Dietz, however, the expert, is travelling back

15   and forth from New York, which makes it a little more

16   complicated from just a timing and planning perspective,

17   getting back and forth.

18             Our hope was to see if the Court might have,

19   whether it was a two-day block or a three-day block,

20   perhaps on a Monday, Tuesday of one of the upcoming weeks.

21   Not this first week, we have a Wednesday conflict, but

22   where we could get everybody together in sort of a one and

23   done session, rather than having -- trying to get Mr. Dietz

24   to go back and forth, which is just going to get very

25   difficult for his schedule.  And given how this trial has
```

1    run so far, it's hard to predict --

2              THE COURT:  Yeah.  Let me just take a look --

3              MR. COOLEY:  -- timing.

4              THE COURT:  I'm looking at the mornings --

5    Tuesday mornings are bad for me, but I free up at 1 o'clock

6    in the afternoon.  But in terms of next Monday, I have a

7    Chapter 13 panel, and that I can't move.  In other words, I

8    guess if we were going to do like a Monday/Tuesday, it

9    would have to be probably the 19th and the 20th -- 19th --

10   I could probably do that.  Maybe fit in a hearing, if I had

11   to.  I don't think it's going to be terribly complicated to

12   do that one hearing.  Ms. Aldania (phonetic) will correct

13   me if I'm wrong.  Let's see.  And then maybe the 20th in

14   the afternoon.  That I could probably do.

15             If that works for you.  If not, then the

16   Wednesday/Fridays are probably better for me.

17             MR. COOLEY:  I know that the --

18             THE COURT:  I will tell you as well, I apologize,

19   the 22nd and the 23rd, I am out of the state.  So -- and I

20   get back on -- I fly -- I'm going to do my Chapter 13 panel

21   in another city on the 26th, and then I come back on the

22   27th.  So the 12th and the 26th, I've got Chapter 13 panels

23   in the morning, and then those Tuesdays, I teach in the

24   morning.  I probably added more confusion than you probably

25   wanted.

Page 12

```
1              MR. COOLEY:  More information is always a good

2     thing, Your Honor.

3              THE COURT:  That depends on what the information

4     is.

5              MR. COOLEY:  Fair enough.  And from our

6     perspective, at least, we thought that might work most

7     effectively.

8              THE COURT:  So nothing next week?  I'll leave it

9     up to you.  I just want to hear from you all.  Couldn't we

10    do Kuo or Brass or something next week, or if we -- at all?

11    And fit Dietz in -- or get someone in next week?

12             MR. COOLEY:  I could double check Mr. Kuo's

13    schedule, Your Honor, but I think we could probably fit him

14    in next week, subject to what his cross will be --

15             THE COURT:  Yeah.

16             MR. COOLEY:  -- you know, it may be lengthy.  We

17    might be able to do that.

18             THE COURT:  I mean, but I can -- I mean, like in

19    other words, next Wednesday, you can have -- depending on

20    what your schedule is, or we can do Brass next Wednesday.

21    We can just fit him in, get one of them in all day.  And I

22    can give you the whole day.  We can start at 9 o'clock, and

23    just go until we're done.  On one of them.

24             MR. COOLEY:  Yes, Your Honor.

25             THE COURT:  I just -- what I don't want to do is
```

1   just -- because now we're starting to go to the 19th, and

2   that means we're going to start to spill into October, and

3   that's going to get tricky for me, and I want this trial

4   done in September.

5            MR. COOLEY:  And we're cognizant of that fact,

6   Your Honor.

7            THE COURT:  I know everybody else is, so I'm not

8   -- I know -- I'm sure I'm speaking for everybody else.

9   Just -- I think it just makes sense to get it all done.

10            MR. COOLEY:  Your Honor, we'll find a way to make

11   Wednesday work of next week.

12            THE COURT:  Okay.  But just give plenty of heads

13   up.  I don't need to know who the next witness is, but if

14   it's going to be Brass or Kuo, then obviously they need to

15   know.

16            Let's work hard then today to see if we can do

17   Loya, Wagner, Murray, Tomashevsky.  If we can accomplish

18   that today, maybe we can work towards that and then figure

19   out where we go next week, maybe Wednesday of next week,

20   and then we can talk about additional days.

21            MS. GOOTT:  Yeah.  If we could just get in as

22   soon as the Court is available.  End of September is tricky

23   with Jewish holidays, and so --

24            THE COURT:  No, no.  And so I'm incredibly

25   sensitive to that.

```
 1              MS. GOOTT:  Yeah.  So if -- I appreciate they're

 2     from Dallas, but Vitol chose to hire Dallas lawyers for --

 3              THE COURT:  No, I mean -- look, I'm completely

 4     sensitive.

 5              MS. GOOTT:  Yeah.  Thank you.

 6              THE COURT:  My -- just say I -- let's just find

 7     the days that work.  And at least -- and even if we're just

 8     fitting in one day, but if Dietz had a firm date, then

 9     Dietz could get a flight and come in.  I think that's what

10     we're trying to figure out, especially for Dietz.  Dietz

11     can't come in and get stuck, because you know -- and have

12     to stay here for two days and have to try to go out.  We

13     just need to give Dietz a date, whether it's the 19th, and

14     just pick it, and just say Dietz is the 19th, or for other

15     witnesses.

16              MR. PATTERSON:  Hold on.  (Indiscernible -

17     11:04:07).

18              THE COURT:  No, I know that.  What I'm saying,

19     Mr. Patterson, but it's easier, I think, on his schedule if

20     we just picked a date and said, you know, on the 19th,

21     that's his date.  And if we can -- if we need to go out of

22     order or something, I don't mind doing that.

23              MR. PATTERSON:  (Indiscernible - 11:04:23).

24              THE COURT:  We can -- if it's Kuo or Brass, then

25     let's just pick -- it may be easier to just do that then
```

1   and pick days.

2         MR. COOLEY:  And we can try that -- we can try to

3   do that as well, and I can check --

4         THE COURT:  The way I'm looking at this, at least

5   in terms of your case in chief is we probably have, in

6   addition to today, two full days -- two -- two and a half

7   full days of -- right, because if -- we're probably looking

8   at two, two and a half full days from there, and maybe we

9   just pick those days, and then you can kind of go from

10  there.

11        MR. COOLEY:  I think that's right.  And that's

12  what we were hoping.  And again --

13        THE COURT:  No.  I got what you were doing.  And

14  maybe the 19th and the 20th are good days to complete

15  everything, but maybe we can fit someone in next week, and

16  just so we know the 19th or the 20th, because I then fly

17  out the 22nd, and then I want to make sure that we get

18  whatever it is.

19        And, Ms. Goott, I ought to ask you, in terms of -

20  - do you -- in addition to these individuals, do you

21  anticipate calling any other witness?  Putting aside

22  rebuttal and all that stuff.

23        MS. GOOTT:  So, I mean, I don't -- obviously, I'm

24  not -- we're going to see what they even accomplish in

25  direct.  We may not even have to go --

```
1              THE COURT:  Okay.

2              MS. GOOTT:  -- depending on what they do.

3              THE COURT:  Okay.  No, no.  That's what I'm just

4    saying.

5              MS. GOOTT:  And I also just want to make it very

6    clear when we're talking about scheduling of witnesses,

7    that nobody mistakes my agreement for scheduling that I

8    don't have an objection to that witness being called.

9              THE COURT:  Completely understand.

10             MS. GOOTT:  Okay.

11             THE COURT:  I think that's just the day that -- I

12   view scheduling as that's the day that we know the witness

13   will be --

14             MS. GOOTT:  Okay.

15             THE COURT -- in town and in the courtroom,

16   subject to whatever objections and anybody's rights.  I

17   appreciate the clarification.

18             MS. GOOTT:  Right.  I just don't want you to say,

19   well, Ms. Goott, we were talking about this witness, and

20   you agreed to this date.  Why didn't you tell me that you

21   objected to their testimony?  That's all.

22             THE COURT:  That makes sense to me.

23             MS. GOOTT:  I just --

24             THE COURT:  So hypothetical example, there's an

25   objection to Mr. Cooley, then Brass should be around.  Or
```

1    the next witness should be there so if one's there, we can

2    slip in and not lose the day.  That's completely

3    understand.

4            MS. GOOTT:  Thank you.  I just don't want to

5    waive it.

6            THE COURT:  Okay.  Yeah.  But I will say, to the

7    extent that you -- there is any objection that you think

8    would be helpful for me to have a heads up on, I'll take

9    it, at the appropriate time.  But obviously, everybody's

10   rights are reserved.

11           MR. PATTERSON:  (Indiscernible - 11:07:00).

12           THE COURT:  No, no, no.  I don't want to take

13   them up now.  I just -- but if there's something that you

14   want to -- maybe at the end of the day because I know these

15   -- you'll -- well, these will get taken up no matter what

16   today, and we'll deal with them.  But for the future, maybe

17   today you could -- I don't want you to reveal something you

18   don't want to.  But if there's something you want me

19   thinking about as other folks come up, like you kind of

20   gave me a heads up on the (indiscernible - 11:07:26) issue

21   and that kind of stuff, it might be helpful for me to just

22   think about it over the weekend.

23           MR. PATTERSON:  (Indiscernible - 11:07:35) unless

24   you want (indiscernible - 11:07:40).

25           THE COURT:  Okay.  Got it.

1              MR. PATTERSON:  (Indiscernible - 11:07:54).

2              THE COURT:  That kind of -- okay.  Got you.

3      Okay.  No, no, no, but that -- the flavor is what I was

4      looking for.  That's perfect.  Thank you.

5              Okay.  So do you think by the end of the -- I

6      don't want to go into the weekend.  I think by the end of

7      the day today you can kind of tell me what -- whether next

8      Wednesday would work for one party, and who that might be

9      so we can all think about it, subject to everyone's

10     objections.

11             MR. PATTERSON:  (Indiscernible - 11:08:27).

12             THE COURT:  Okay.  Any other housekeeping we need

13     to think about today or this morning?

14             MR. PATTERSON:  (Indiscernible - 11:08:33).

15             THE COURT:  Okay.  I did give a lot of thought

16     last night, and early this morning to one issue and I

17     wanted to at least put something on the record for all

18     parties to kind of, at least understand they way I think

19     about the issue.  And I looked at -- I was up here late and

20     then early this morning thinking about it, because I think

21     the case, especially as we break for the holiday and we

22     start thinking about other days that -- scheduling issues,

23     and arguments of the parties.

24             I was asked to consider whether the

25     attorney/client privilege applied to former employees.  A

1    1981 decision of (indiscernible - 11:09:30) is the seminal

2    case, the foundational case of an attorney/client privilege

3    in the organizational realm.  I'm going to cite *Upjohn v.*

4    *United States*, 449 U.S. 383 (1981).  I'm going to read a

5    number of cases into the record.

6             I would also note that my courtroom deputy is

7    recording this hearing and you'll have it tonight.  In

8    *Upjohn*, Upjohn's general counsel sent out a questionnaire

9    to certain employees to determine the nature of potentially

10   improper payments to foreign officials.  That's at 386 --

11   449 U.S. 386.  Issued a summons requesting the production

12   of such questionnaires.  Ms. Upjohn refused, claiming the

13   attorney/client privilege.

14            The Supreme Court agreed with Upjohn, finding

15   that communications made by employees to counsel concerning

16   matters within the scope of the employee's corporate duties

17   were protected by the attorney/client privilege.  That's at

18   page 394.

19            In reaching its conclusion, the Court stated that

20   the privilege exists to protect not only the giving of

21   professional advice to those who can act on it, but also

22   the giving of information to the lawyer to enable him to

23   give sound and informed advice.  That's at 390.

24            As for corporations, the Court noted that there

25   will often be employees beyond the control group who "will

1    possess the information needed by the corporation's

2    lawyers."  That's at 392.  Thus, the Court reasoned that

3    the extension of the privilege beyond the controlling

4    officers, which was the control group there and not just

5    regular employees was necessary to preserve a corporate

6    attorney's ability to gather the information necessary to

7    represent the corporation, and to allow communications

8    between an employee and counsel.

9         The Supreme Court expressly declined to consider

10   -- or to decide, I should say, whether the privilege

11   extended to former employees because the issue was not

12   properly before the Supreme Court.  And if you look at

13   Footnote 3, the Court cites that the District Court and the

14   Court of Appeals did not address the issue.  So the Supreme

15   Court didn't decide that issue.

16        Chief Justice Berger, however, wrote a concurring

17   opinion and this is what he said.  "In my view, the Court

18   should make clear now that as a general rule, a

19   communication is privileged, as least when as here, an

20   employee or former employee speaks at a direction of

21   management with an attorney regarding conduct or proposed

22   conduct within the scope of employment.  The attorney must

23   be the one authorized by the management to inquire into the

24   subject, and must be seeking information to assist counsel

25   in performing the following functions: evaluating whether

Page 21

1    the employee's conduct has bound or would bind the

2    corporation; assessing the legal consequences of any of

3    that conduct; or formulating appropriate legal responses to

4    action that have or may have been taken by others with

5    regard to conduct."  That's at 403.  Chief Justice Berger

6    concurring.

7         Since *Upjohn* was decided, two circuit courts have

8    addressed the issue as to former employees.  Both the Ninth

9    and Fourth Circuit Courts of Appeal have adopted Justice

10   Berger's reasoning and extended the privilege to former

11   employees.  *In re Allen*, 106. F.4th 582, pen cite 606,

12   Fourth Circuit, 1997; *United States v. Chen*, 99 F.3d 1495,

13   1502 pen cite, Ninth Circuit, 1996.

14        Also note that in 1999, the District Court for

15   Connecticut in *Paralta v. Sandant Corp* (phonetic)

16   considered whether discussions held between a company's

17   former employee and a lawyer in preparation for the former

18   employee's deposition had a discrimination suit filed by

19   Paralta were privileged.  The cite on that is 190 FRD 38,

20   District of Connecticut, 1999.

21        The Court concluded that any privileged

22   information the former employee obtained while employed by

23   Sundant, including any information conveyed by counsel

24   during that time, remained privileged, even after she left

25   the company.

002776

```
 1              The Court also reasoned that the distinction

 2    drawn by the Court between attorney/client privileged and

 3    non-privileged communication with former employees should

 4    not be difficult to apply if the essential point is kept in

 5    the (indiscernible - 11:14:14) communication relate to the

 6    former employee's conduct and knowledge, or communication

 7    with Defendant's counsel during his or her employment.  If

 8    so, such communication is protected from disclosure by the

 9    Defendant's attorney/client privilege under Upjohn.

10              In Fisher v. Holoberton (phonetic), which is the

11    unreported decision in this district on this issue, Judge

12    (indiscernible - 11:14:42) considered whether the

13    attorney/client privilege applied to a former employee,

14    that's cited in matters 2009 Westlaw 483890 as the

15    (indiscernible - 11:14:54) February 5th, 2009.

16              Like Paralta, Fisher also involved whether

17    communications between the Defendant's former supervisor

18    and Defendant's counsel in preparation for the supervisor's

19    deposition were privileged.  The Fisher court was persuaded

20    by the Fourth Circuit's reasoning in In re: Allen, which

21    found that because former employees could possess

22    information needed by the corporation's lawyers and agreed

23    with adopted Justice Berger's reasoning, Fisher held --

24    this is Judge Grey-Miller talking, and I quote, "All

25    communications between the former employee and Defendant's
```

002777

Page 23

```
1    counsel are protected by -- are protected provided they

2    relate to events concerning the former employee's duties

3    while employed by the Defendants."

4           The District Court also held, however, that

5    questions about which documents the supervisor reviewed in

6    preparation for the deposition were not by itself

7    considered work product.  The Court held (indiscernible -

8    11:16:03) every compilation of documents reviewed by a

9    witness before testifying at trial or at deposition, with a

10   work product privilege protection, would all put rewrite

11   Rule 612 of the Federal Rules of Evidence out of existence.

12          Therefore, without an independent privilege

13   attached to the documents, the identity of the documents

14   the supervisor reviewed in preparation were not privileged,

15   but the conversations between the former employee and his

16   counsel about those documents was privileged.

17          So I agree with Judge Grey's analysis and

18   reasoning in Fisher, and I adopt it in this case.  Official

19   decision aligns what the two appellate circuit courts that

20   have addressed this issue, and it also aligns with Justice

21   Berger's concurrence in Upjohn.

22          I'd also note that virtually every federal court

23   outside of this district has joined Fisher -- has joined

24   the reasoning in Fisher, I should say, in extending the

25   Upjohn doctrine to former employees.  I would cite Export
```

1    *Import Bank of the United States v. Asia Pulp and Paper*

2    *Co.*, 232 FRD 103, Southern District of New York, 2005 case.

3    And the quote is, "Virtually all courts hold that

4    communications between company counsel and former company

5    employees are privileged, that they concern information

6    obtained during the course of employment."  There's a 2008

7    Westlaw 11380016, District of Utah, June 12th, 2008 case,

8    *Misner v. Potter* (phonetic).  It states, "Under *Upjohn* and

9    its progeny, the attorney/client privilege applies to

10   confidential communications concerning matters within the

11   scope of the employee's corporate duties, whether or not

12   they're currently employed."  *Jacobs v. Aron*, 2020 Westlaw

13   3064435, Eastern District of Michigan, June 6th, 2020 case.

14   Same result.

15           So as it applies -- and again, I'm taking these

16   up one on one from what I've heard so far based on the

17   direct, the questions that were -- Mr. Loya has been

18   testifying about matters that were -- occurred within the

19   scope of his employment.  To the extent there are

20   communications in preparation for trial today that relate

21   to discussions about the scope in connection advice seeking

22   and discussions in the prep meeting in preparation for

23   testimony today about matters that occurred within the

24   scope of his employment, or while he was employed, the

25   attorney/client privilege will extend -- I think Judge

1    Grey-Miller's analysis is reasonable.  I think it's also

2    fair game to ask what documents he reviewed in preparation

3    for that.

4              I think parties understand that that's not

5    protected, but maybe communications about what they -- what

6    was said about those documents would be, again, that just

7    applies to Loya, but you know at least the way I'm thinking

8    about this, what I believe the district court is doing in

9    this district, and federal courts are doing throughout the

10   country, the two circuit courts, every witness will be

11   taken up on his own, depending on what the question is, but

12   there is my legal reasoning.  I've laid it out there.

13             I did not want the witness to be in here,

14   listening to any of that.  I thought it would have been

15   inappropriate.  Everybody's rights are reserved on this

16   issue, one way or the other.  No one should read this as

17   anything -- as something beyond what the question that was

18   asked to me about Loya.

19             So everybody can reserve their rights about that.

20   And I think I can listen to, when I read the cases, I'm

21   happy for someone to tell me I'm wrong about the reasoning

22   there.  But I think I owed Mr. Patterson an answer to his

23   question, and not just a blanket ruling that will -- I've

24   tried to give it a well-reasoned, laid out reason, based on

25   case law about the answer to that specific question while

1    Mr. Loya was here.

2              So anyway, everybody's rights are reserved.  With

3    that said, Ms. Goott, any comments about that?

4              MS. GOOTT:  One last thing.

5              THE COURT:  Yes, absolutely.

6              MS. GOOTT:  One more question about that.  Thank

7    you, Judge.  Just in response to your prior comment, is

8    there anything we want you to think about.

9              THE COURT:  Uh-huh.

10             MS. GOOTT:  And I just -- if we get to the point

11   where they close, I just want to let the Court know that

12   depending on what is or isn't elicited, that I will be

13   making an oral motion under Rule 52, asking the Court to

14   issue a judgment if they haven't met their burden.

15             THE COURT:  I think that's entirely appropriate.

16   Thank you.

17             Okay.  Mr. Aurzada, unless you have anything --

18   or Mr. Cooley, anything to say, I think we can bring the

19   witness in and get him back on.

20             MR. AURZADA:  Yes, Your Honor.

21             THE COURT:  Okay.  Starting with Mr. Patterson's

22   cross.

23             Mr. Patterson, I'm just going to turn over the

24   podium to you.

25             MR. PATTERSON:  Thank you, Your Honor.

```
 1              THE COURT:  And then you can use it at your --
 2    Mr. Loya, why don't you come on up.
 3              Before we begin, there's a binder up there.  I
 4    don't know if it's a layover from something yesterday or if
 5    we should remove it.
 6              MR. LOYA:  It's been there since I was --
 7              THE COURT:  Huh?
 8              MR. LOYA:  It was there all afternoon --
 9              THE COURT:  Yeah.  I just want to make sure.
10    Thank you.  Okay.  Mr. Loya, I would remind you that you
11    are still under oath, and we were going to continue with
12    the cross-examination.  Okay?
13              MR. LOYA:  Okay.
14              THE COURT:  Folks, let's -- depending on where
15    this is going, maybe we try to -- I want to finish Loya,
16    and we'll go until we're done with Loya, and then we'll
17    break for lunch.  I think it would be a good time to do it
18    there.
19              So I know I said yesterday 12:30, Mr. Patterson,
20    and for other parties, but if we -- if there's a window to
21    get this done, then let's shoot to get there.  But take
22    your time.  That's not to rush you.  It's just to tell you
23    I don't want you -- let's see if we can finish.
24              MR. PATTERSON:  Not a problem, Judge.  And I
25    don't mind working through lunch, but I don't want to
```

1    inconvenience anyone else.

2          THE COURT:  Let's go.

3            MIGUEL LOYA, WITNESS, PREVIOUSLY SWORN

4                      CROSS-EXAMINATION

5    BY MR. PATTERSON:

6    Q.   Good morning, Mr. Loya, I want to -- before we get

7    started, I want to recap just a couple of points that I

8    think you made yesterday, and I want to verify that with

9    you this morning.  We talked about this relationship that

10   Vitol says that they had with GCAC and Mr. Brass; do you

11   recall that?

12   A.   Not specifically, no.

13   Q.   Okay.  It was just yesterday.  You don't remember?  Do

14   you remember me and you talking yesterday, like all

15   afternoon?

16   A.   I remember that.  Yes.

17   Q.   Okay.  Do you have a recollection of the content of

18   our discussion from yesterday?

19   A.   Yes.

20   Q.   Okay.  And do you recall the content -- one of the

21   pieces of content that me and you discussed was Vitol and

22   GCAC and Vitol and Mr. Brass having some type of

23   relationship?

24   A.   No.

25   Q.   You don't remember that?

```
 1    A.    No.

 2    Q.    Okay.

 3          THE COURT:  Mr. Loya, can I ask you just to speak

 4    a little bit louder and make sure that the record is

 5    picking you up.

 6    BY MR. PATTERSON:

 7    Q.  Are you on any medication today, Mr. Loya?

 8    A.    No.

 9    Q.  Are you on any illegal substance today?

10    A.    No.

11    Q.  I'm going to ask you again, do you have an issue with

12    memory or recall that would impair your ability to provide

13    this Court information?

14    A.    No.

15    Q.  All right.  But you seem to have trouble remembering

16    yesterday.

17    A.  I don't think so.

18    Q.  Well, we had a long -- hour's long discussion

19    yesterday about Vitol.  Let me ask you this, do you know

20    who Mr. Brass is?

21    A.    Yes.

22    Q.  Do you recognize GCAC as an entity at all?

23    A.    Yes.

24    Q.  All right.  So do you recall me asking you questions

25    yesterday when you were here about Vitol and Mr. Brass?
```

Page 30

1    A.   Yes.  Many.

2    Q.   All right.  Now you remember.  And do you remember me

3    asking you questions about Vitol and GCAC yesterday?

4    A.   Yes.

5    Q.   Okay.  So it's coming back to you?

6    A.   No.

7    Q.   No, it's not coming back to you?

8    A.   No, it was always there.  It didn't go anywhere.

9    There's nowhere to come back from.

10   Q.   Okay.  Because I asked you if you remembered, and you

11   said no.

12   A.   No.  I just did -- need to be more specific.  What

13   relationship?

14   Q.   Was there not a relationship at all?

15   A.   It was a client that -- a commercial relationship.

16   Q.   Commercial relationship.  Okay.  So you left here last

17   night.  What did you do knowing you're going to come back

18   today to talk?  Did you do anything in preparation?

19   A.   No.

20   Q.   And we talked about your preparation for your first

21   day here.  Do you remember that?

22   A.   Yes.

23   Q.   All right.  Do you remember you told me you met with

24   these gentlemen over here, like Wednesday of last week?

25   A.   Yes.

Page  31

```
 1   Q.   All right.  Now, did you go to their office?

 2   A.   Wednesday of last week?

 3   Q.   Yes, sir.

 4   A.   I went to the Vitol office.

 5   Q.   And they came to Vitol's office to meet you.

 6   A.   Yes.

 7   Q.   All right.  And who all was in that meeting?

 8   A.   The gentleman at the table and VJ.

 9   Q.   And you.

10   A.   And me.

11   Q.   Anyone else?

12   A.   No.

13   Q.   And the meeting was because you were going to come

14   testify, right?

15   A.   Yes.

16   Q.   Now, they told you -- did they give you anything to

17   look at?

18   A.   They showed me a couple of documents where my name was

19   in a couple of emails.

20   Q.   A couple of emails.  Do you remember which ones?

21   A.   I think one was a presentation that -- not a

22   presentation but Eric was alluding to a plan to get into

23   business with GCAC, and they were dated 2015.

24   Q.   Did we look at that email yesterday?

25   A.   I don't remember seeing it.  No.
```

1   Q.   Did they give you a copy to take with you?

2   A.   No.

3   Q.   They kept it.

4   A.   Yes.

5   Q.   But tell me what the content of that document was?

6   What do you recall from the document that you reviewed in

7   preparation for your testimony?

8   A.   I just read it, but he said -- Eric said we're

9   thinking about a -- doing business with GCAC, and I think

10  he said here's the presentation also.  I did not review any

11  presentation.

12  Q.   Okay.  What kind of business?

13  A.   If I recall correctly, he just said business.

14  Q.   He didn't say joint venture?

15  A.   No, he did not say that.

16  Q.   Didn't say financing?

17  A.   No.

18  Q.   Didn't say loan agreement?

19  A.   No.

20  Q.   What was the date again, your recollection?

21  A.   Sometime in 2015.

22  Q.   2015.  And the presentation was like a PowerPoint

23  presentation?

24  A.   I don't recall.  The presentation was not attached to

25  the --

Page 33

```
 1   Q.   It wasn't attached.

 2   A.   No.

 3   Q.   Did they show it to you separately?

 4   A.   No.

 5   Q.   Right.  What else did you look at?

 6   A.   I can't recall exactly.  I just remember another

 7   document, another email with my name -- with me copied in

 8   it.  I don't remember the specifics of it.

 9   Q.   Well, you read it, didn't you?

10   A.   Yeah.  I scanned it.

11   Q.   Your lawyer gives you an email in preparation for your

12   testimony, and you only scanned it?

13   A.   Well, I scanned it -- I read it quickly and said it's

14   big documents like these that weren't --

15   Q.   And I'm sorry, I didn't understand what you --

16   A.   We didn't discuss it.  We didn't discuss the document.

17   Q.   All right.  I'm not asking you what you discussed.

18   I'm asking you what you read.  What was the date of this

19   email?

20   A.   Sometime in 2017.

21   Q.   All right.  And who else was on the email?

22   A.   I don't recall.

23   Q.   What was the content?

24   A.   I don't recall.

25   Q.   It was last week.  Wednesday, in preparation for your
```

1    testimony.  How is it you don't remember?

2    A.    I don't remember.

3    Q.    Okay.  What else?

4    A.    We discussed what --

5    Q.    No.  Hold on.  Don't --

6          MR. AURZADA:  Objection.  You really shouldn't

7    talk about what he discussed.

8          MR. PATTERSON:  All right.  I haven't asked him

9    what he discussed.  So please don't mention, unless the

10   judge up here tells you, do not tell me what was said.

11   Okay?  Please?  Would you do that for me, Mr. Loya?  I just

12   want to talk about documents.  Things they put in front of

13   your first, okay?  We have that agreement?  Okay.

14   BY MR. PATTERSON:

15   Q.    So a 2015 email that had a presentation that wasn't

16   attached to it, right, from Mr. Kuo, and you were on the

17   email, right?

18   A.    Yes.

19   Q.    Right.  But it didn't have the presentation attached

20   is what you I believe testified to, right?

21   A.    Correct.

22   Q.    And then a 2017 email that you scanned.  And what was

23   the topic?

24   A.    I don't recall.  I'm sure it was GCAC, but I don't

25   recall the text.

Page 35

```
 1   Q.   All right.  So it was a GCAC email, but you -- that's
 2   about all you remember from it?
 3   A.   Yes.
 4   Q.   All right.  Okay.  What else?
 5   A.   We discussed things.
 6   Q.   I don't want to know discussed, I want to know
 7   documents that were put in front of you.
 8   A.   I don't recall any other document.
 9   Q.   Just two emails, that's it?
10   A.   Yes.
11   Q.   All right.  Did they put any agreements in front of
12   you?
13   A.   No.
14   Q.   Did they put anything up on the screen for you to look
15   at, like we're doing -- like we did yesterday?
16   A.   The two emails were on the screen.  Not on a --
17   Q.   Not on hard copy.  What else did they put on the
18   screen for you?  Document-wise?
19   A.   Nothing.
20   Q.   Nothing?  Just two emails in preparation for your
21   testimony?
22   A.   Yes.
23   Q.   All right.  Did they send you anything before or after
24   that meeting via email or other electronic transmission?
25   A.   No.
```

1    Q.   Did they tell you -- I'm sorry.  Did you

2    independently, before or after that meeting, review any

3    documents?

4    A.   No.

5    Q.   So in preparation for your testimony, these lawyers

6    gave you two emails, and that's your sworn testimony, and

7    that's it?

8    A.   As far as documents?  Yes.

9    Q.   Okay.  And tell me which -- when I say documents, what

10   do you understand that to mean?

11   A.   Two emails.

12   Q.   I understand.  Did you read anything else in

13   preparation for your testimony?

14   A.   No.

15   Q.   Either before your meeting with the lawyers, during

16   the meeting with your lawyers, or after the meeting with

17   your lawyers --

18   A.   No.

19   Q.   -- did you read anything else?

20   A.   The only thing I read was an email from VJ telling me

21   when to be here in Court.

22   Q.   All right.  Did it have any instructions on your

23   testimony?

24   A.   None.

25   Q.   All right.  Did you receive any text messages from any

Page 37

```
 1    of these lawyers or VJ regarding your testimony?

 2    A.   None.

 3    Q.   No emails other than the one -- when to be here?

 4    A.   Yes.

 5    Q.   All right.  Did they give you a copy of these two

 6    emails?

 7    A.   No.

 8    Q.   All right.

 9              MR. PATTERSON:  Your Honor, I would ask for

10    production of these two emails from the lawyers.  We're

11    entitled to those.

12              MR. AURZADA:  We'll get them.  It's going to take

13    me a minute, but we'll get them.  I mean, we have a team

14    here, Judge.

15              THE COURT:  You're saying it's not going to do it

16    right now, but you'll get it done?

17              MR. AURZADA:  Yeah.  I mean, I will ask Ms. Robin

18    to begin the process of trying to find those emails.

19              THE COURT:  Okay.  Thank you.

20              MR. PATTERSON:  And if you'll just have them

21    email them to me would be the quickest, or Ms. Goott, if

22    you have her email.

23              THE COURT:  Just not me.

24              MR. PATTERSON:  Just not the judge.

25    BY MR. PATTERSON:
```

Page 38

```
 1    Q.   Did you go talk to Mr. Kuo about this -- this trial?

 2    A.   No.

 3    Q.   Did you talk to him on the phone?

 4    A.   What period of time are we talking about?

 5    Q.   Well, let's start in the month of August of 2022.

 6    A.   No.

 7    Q.   July of 2022.

 8    A.   No.

 9    Q.   This year?

10    A.   No.

11    Q.   All right.  And did you have an independent meeting

12    with Vitol's in-house counsel that didn't involve these

13    gentlemen?

14    A.   No.

15    Q.   In preparation for today.  So how long was this

16    meeting at Vitol with your lawyers?  How long -- timespan

17    did it last?

18    A.   15, 20 minutes.

19    Q.   That's it?

20    A.   Yeah.

21    Q.   And you left right after the meeting, or you hung

22    around?

23    A.   I hung around.

24    Q.   All right.  And who -- the lawyers left, right?

25    A.   I don't know where they went.
```

```
1    Q.   Well, right.  I mean, you left the meeting.

2    A.   Yes.

3    Q.   And what did you do?  Did you mingle?  Did you go see

4    some old people?  What?

5    A.   Yeah.  I went and talked to some of my colleagues --

6    ex-colleagues.

7    Q.   Who'd you go talk to?

8    A.   I talked to Ben Marshall mostly.

9    Q.   Ben Marshall?

10   A.   Yeah.

11   Q.   What does Mr. Marshall do?

12   A.   He's the current CEO.

13           MR. AURZADA:  Object to the relevance of this.

14   Unless it has to do with this hearing, who he talked to

15   doesn't really matter.

16           MR. PATTERSON:  Okay.  That's --

17           MR. AURZADA:  We talked about this hearing --

18           THE COURT:  No.  Hold on a second.  Hold on a

19   second.  Is this a relevance objection?

20           MR. PATTERSON:  It's a relevance, and that's a

21   side bar, and again attempt to coach --

22           THE COURT:  That's why I'm stopping it.

23           MR. PATTERSON:  -- this witness, Judge.

24           THE COURT:  So --

25           MR. PATTERSON:  It's frustrating.
```

```
 1                    THE COURT:  I don't know if it's relevant or not.

 2                    MR. PATTERSON:  Right.

 3                    THE COURT:  Because we don't know who the

 4    individual is.  So overruled.

 5                    MR. PATTERSON:  Thank you, Your Honor.

 6    BY MR. PATTERSON:

 7    Q.   What did you and Mr. Marshall talk about?

 8    A.   We talked about where the company is, different

 9    investments of the company, catching up on the Board

10    members.

11    Q.   Anything else?

12    A.   General conversation.

13    Q.   Any other topic?

14    A.   How I've been doing.  How well Vitol's doing.

15    Q.   How long had it been since you'd seen Mr. Marshall?

16    A.   Maybe a couple of months.

17    Q.   How long had it been since he saw you walking the

18    halls of Vitol?

19    A.   Over two years.

20    Q.   A long time, right?  So when he saw you, didn't he

21    say, Mike, what are you doing here?

22    A.   No.

23    Q.   He didn't?  After two years, and you show up at his

24    office?

25    A.   No.  That wasn't what happened.
```

1   Q.   Did you call him ahead of time and say, hey, I'm going

2   to be in the building, I'm going to come by and see you?

3   A.   No.  He stopped by and said, when you're done, come by

4   the office.

5   Q.   All right.  And he never said why are you here?

6   A.   No.  He seemed to know.

7   Q.   He didn't say, why are you talking to my lawyers?

8   A.   No.

9            MR. AURZADA:  Asked and answered, Your Honor.

10  And now I do re-urge the relevance objection.

11           THE COURT:  I think there is a relevance

12  objection.  Mr. Patterson, what's the relevance?

13           MR. PATTERSON:  Well, I think I'm entitled to

14  find out if he discussed his testimony or the facts with

15  someone other than his lawyers.  And I think it's

16  reasonable to suggest that he wasn't there for two years,

17  and sees an old friend, and the friend doesn't say, what

18  are you doing here?  There's something there that I think

19  that I'm entitled to try to elicit.

20           THE COURT:  I just want you to get there.

21           MR. PATTERSON:  I'm trying, Judge.  I'm not very

22  effective sometimes, but I'm trying.

23           THE COURT:  I'll sustain the objection.

24  BY MR. PATTERSON:

25  Q.   Did you discuss this litigation with anyone other than

1    your lawyers while you were in that building?

2    A.    No.

3    Q.    You didn't discuss GCAC or Mr. Brass with anyone in

4    that building?

5    A.    I -- on the way out, I said hello to Eric Kuo, ran

6    into him, said hi, I'm here for this.  (Indiscernible -

7    11:40:11).  That's it.

8    Q.    I'm sorry, what was -- what was your comment in the

9    end?

10   A.    That I just made a comment that this was a pain in the

11   ass.  And he said agreed, and that was it.

12   Q.    That was it?  You hadn't talked to Mr. Kuo all year,

13   and it was a passing, this is a pain in the ass?

14   A.    We purposely -- at least, I don't know, I did not want

15   to talk to him about this case at all.

16   Q.    Well, how did he know why you were there?  How did he

17   know what you were referencing when you said this is a pain

18   in the ass?

19   A.    Because he probably guessed why I was there.  I mean,

20   I --

21   Q.    No.  Now you're guessing.

22   A.    I don't know.  Easy assumption.

23   Q.    You just said this is a pain in the ass, and you

24   hadn't talked to him in a year?

25   A.    Or longer.

```
 1   Q.   Or longer.  And you pass him in the hall and you make
 2   one comment, and that's it?
 3           MR. AURZADA:  Objection, Your Honor.  He's
 4   already testified to this.
 5           THE COURT:  Sustained.
 6   BY MR. PATTERSON:
 7   Q.   Do you think you might have a memory problem with that
 8   also?
 9   A.   No.
10   Q.   But I guess this is my problem, I just asked if you
11   recalled when's the last time you saw Mr. Kuo, and what was
12   your answer?  Do you remember that?  Remember, I said let's
13   start with this month, with August, right, remember that?
14   And you said no.  And I said how about two months, and you
15   said no.  And then I said, how about 2020 -- do you
16   remember that exchange?
17   A.   Yes, I remember that exchange.
18   Q.   And what was your answer?
19   A.   No, I hadn't seen him.
20   Q.   Okay.  But now you just said you saw him last week.
21   A.   You refreshed my memory when -- I was just -- it was -
22   -
23   Q.   Okay.
24   A.   -- a passing hello.
25   Q.   No.  You saw him and you talked to him, right?
```

z

002798

1    A.    Yes.

2    Q.    Okay.  You swore you hadn't in over a year, and now

3    you're telling me it was last week.  So I want you to stop

4    and think, please.  Try to remember what you talked about

5    with Mr. Kuo when you saw him last week.

6    A.    It wasn't longer than a few seconds.  And I said

7    hello, this is a pain in the ass.  Yeah, it's a pain in the

8    ass.  That was it.  I don't remember anything else.

9    Q.    I know you don't remember.  You didn't remember even

10   seeing him.  That's why I asked you to take a minute

11   because you're testifying under oath, Mr. Loya.

12   A.    And I'm telling you what I know.

13   Q.    I don't need you to try to figure out what I want to

14   know.  I need you to answer truthfully and fully.  Do you

15   understand that?

16   A.    Yes.  And I'm answering --

17   Q.    Okay.

18   A.    -- what I know, not what you know or -- what I know.

19   Q.    All right.  Because you know I'm going to ask him the

20   same thing.  He's going to sit right there, and I'm going

21   to ask him.

22   A.    That's fine.

23   Q.    Okay.  So again, when's the last time you saw Mr. Kuo

24   --

25              MR. AURZADA:  Asked --

```
 1   BY MR. PATTERSON:

 2   Q.   -- before -- can I ask my question please?

 3           MR. AURZADA:  My apologies.

 4   BY MR. PATTERSON:

 5   Q.   -- before last week?

 6   A.   I don't remember seeing him for a long, long time.  I

 7   don't remember the last time I had met him before then.

 8   Q.   All right.

 9   A.   It would have been a long time.

10   Q.   When's the last time you talked to Mr. Kuo since last

11   week?

12   A.   I don't remember talking to him any time.

13   Q.   When's the last time you communicated with him,

14   electronically or otherwise, since last week?

15   A.   I don't recall communicating in any way with him since

16   I left the company.

17   Q.   You don't remember or you're pretty sure it hasn't

18   happened?

19   A.   I don't remember talking to him.

20   Q.   All right.  While you were walking the halls, who else

21   did you talk to?

22   A.   I wasn't walking the halls.  It was on the trading

23   floor.  There are no halls there.

24   Q.   While you were in the building at Vitol, no matter

25   where you were, who else did you talk to?
```

Page 46

```
 1           MR. AURZADA:  Objection, Your Honor, relevance
 2   and asked and answered.  And I'm not going to get the
 3   relevance --
 4           THE COURT:  I'm going to sustain.  I'm going to
 5   sustain the objection.  I think you can ask the question in
 6   a different way, Mr. -- getting to the point.
 7   BY MR. PATTERSON:
 8   Q.   So you remember coming for the first day of trial, and
 9   everyone was lined up outside?
10   A.   The first day of trial?  Yesterday?
11   Q.   No, Tuesday.
12   A.   I wasn't here Tuesday.
13   Q.   When was the first day you were here?
14   A.   Yesterday.
15   Q.   All right.  Did you sit out in the hall at all?
16   A.   No.
17   Q.   You sat in here?
18   A.   I met VJ when I came out of the elevator.  I briefly
19   went into the side room.  I came here.
20   Q.   You went into the side room, I guess that you figured
21   out who had testified and who was coming up?
22   A.   No.  I just asked how long it would take and --
23   Q.   No.  Don't tell me what he did say.  I haven't asked
24   that.  Please.  Just to be safe.  Not yet.  But you haven't
25   seen Mr. Kuo down here at any time?
```

```
 1    A.    No.

 2    Q.    Down here in this building.

 3    A.    No.

 4    Q.    In the hallway or someplace else?

 5    A.    No.

 6    Q.    All right.  Where are we on the documents?

 7           MR. AURZADA:  Your Honor, I believe we have them.

 8    I need to look at them, but I think we have them.

 9           THE COURT:  All right.  Let's keep going.

10           MR. PATTERSON:  All right.

11    BY MR. PATTERSON:

12    Q.    So yesterday -- let's go back before we got

13    sidetracked here, Mr. Kuo -- I'm sorry, Mr. Loya.  Back to

14    my original question.  Do you recall yesterday us talking

15    about Vitol's relationship, whatever that may be, with GCAC

16    and Mr. Brass?  Is it all coming back to you now?

17    A.    I understand.  I remember what I said.

18    Q.    Okay.  And we talked about -- do you remember we

19    talked about Vitol's transaction with Vault, right?  Right?

20    A.    We talked about Vitol's relationship with Vault.

21    Q.    Transaction, relationship, whatever you want to --

22    what do you want to call it?  How would you describe it?

23    A.    Relationship.  I'm not sure of the transaction with --

24    Q.    Okay.  And I asked you when it occurred, right?  When

25    did that transaction occur?
```

Page 48

```
 1    A.    What transaction?  I mean, transaction --

 2    Q.    With Vault between Vitol?

 3    A.    Vault is a part of Vitol.

 4    Q.    I understand.  Was it always a part, or did it happen

 5    one day?

 6    A.    It was formed under Vitol.

 7    Q.    I understand.  When?

 8    A.    I believe probably around 2015.

 9    Q.    I don't want you to guess.  Do you know?  Do you

10    remember?

11    A.    No.

12    Q.    You don't remember?

13    A.    I don't know exactly when it was.

14    Q.    It happened while you were CEO of Vitol, Inc., though,

15    right?

16    A.    It had nothing to do with me or my position --

17    Q.    I --

18    A.    -- or my job.

19    Q.    I haven't suggested, and that wasn't my question.  I

20    said it happened while you were CEO of Vitol, Inc.,

21    correct?

22    A.    Yes.

23    Q.    See if I can help you maybe refresh your recollection.

24    One second.  I'm going to ask you to look at your screen

25    and tell me if you recognize that, and if it helps you
```

```
 1   remember when the transaction with Vault and Vitol

 2   occurred.

 3   A.   By transaction, it's --

 4   Q.   However, you want to describe it.

 5   A.   Why don't we call it -- are you asking me --

 6   Q.   I'm asking you when it occurred.

 7   A.   When Vault was formed?

 8   Q.   Yes.  When the transaction with Vault was created.

 9   You said you didn't remember when, and I'm asking you to

10   look at your screen and tell me if that helps you remember

11   when it occurred.

12   A.   Well, it didn't help me remember, it tells me when it

13   is.

14   Q.   Okay.  Now, do you have a recollection of when it

15   occurred?

16   A.   No, now I know when it occurred.

17   Q.   Okay.  When?

18   A.   Apparently sometime in February 2016.

19   Q.   All right.  And does it help you recall what it was

20   that happened?

21   A.   That he performed a business to do asphalt.

22   Q.   With the world's largest asphalt company, right?

23   Remember I asked you that.  The world's largest asphalt

24   company.

25   A.   Okay.
```

Page 50

1   Q.   Right?  Not okay.

2   A.   It says so there.  I don't know.

3   Q.   Right?  Well, I believe your suggestion was that this

4   was a small company, (indiscernible - 11:51:29) the Vault

5   was a small company based out of the UK.

6   A.   I believe --

7   Q.   Isn't that your testimony?  Your reference that it was

8   a small company?

9   A.   If I recall correctly, my point was that Vault was a

10  small company.

11  Q.   Right.

12  A.   Yes.

13  Q.   Small as compared to Vitol, which is what $300 billion

14  in revenue?

15  A.   I don't know what it was at the time, but that varies

16  with the price of oil.

17  Q.   Right?  Well, for the last couple of years, what was

18  the revenue of Vitol?

19  A.   I don't know.  I haven't been the head the last couple

20  of years.

21  Q.   You're on the Board of Vitol Group.  You didn't know?

22  A.   The last two years, I haven't been -- I've been

23  retired --

24  Q.   The last two years, you were there.  2019 and 2020.

25  A.   Those were the last two years.  Probably -- it depends

Page 51

```
 1    on the price of oil.
 2    Q.   It's already occurred.  It doesn't depend on anything.
 3    It has already occurred what was approximate total revenue.
 4    A.   Probably around 180 million -- billion.  180 billion.
 5    Q.   Okay.  200 billion is that big or small?
 6    A.   It's a lot of money.
 7    Q.   A lot of money.  Is that big or small?
 8    A.   Big.
 9    Q.   All right.  Vault is small compared to that, right?
10    A.   Yes.
11    Q.   All right.  100 million versus 100 billion is a
12    significant difference, right?
13    A.   Yes.
14    Q.   Okay.  So that's your reference when you say small.
15    Your big is 200 billion, your small is 200 million, right?
16    A.   Yes.
17    Q.   Okay.
18    A.   We're talking about revenue as well.
19    Q.   I understand.  And so compare Vault to GCAC.  That's
20    again much smaller, right?
21    A.   Yes.
22    Q.   Much smaller.
23    A.   Yes.
24    Q.   And so if there was a choice between Vault and GCAC,
25    Vitol's going to go with Vault, right?
```

```
 1   A.   I don't know that.  I don't know.  It's not my choice.

 2   Q.   Well, if you couldn't do both.  What's good with that?

 3   If you couldn't do both, what's Vitol going to do?

 4   A.   It will probably choose Vault.

 5   Q.   Uh-huh.

 6   A.   Considering it's his own company.

 7   Q.   That's right.  And if Vault said stop what you're

 8   doing with GCAC, and GCAC said stop what you're doing with

 9   Vault, what's Vitol going to do?

10   A.   Well, first, Vault --

11        MR. AURZADA:  Asking for a hypothetical answer,

12   Your Honor.

13        THE COURT:  Sustained.

14   BY MR. PATTERSON:

15   Q.   In fact, Vault told you, told Vitol, stop what you're

16   doing with GCAC.  Isn't that what they said?

17   A.   No.

18   Q.   It's not?  Nick Fay (phonetic) didn't tell Mr. Bake,

19   Mr. Fay, didn't both say stop what you're doing with GCAC.

20   No more joint venture talk.  Isn't that what's happened?

21        MR. AURZADA:  Calls for a hearsay answer.

22        THE COURT:  Mr. Patterson, what's the response?

23        MR. PATTERSON:  We've already looked at the

24   email.  And it's his statement.  It's the basis of why he

25   talked to Mr. Kuo.
```

1          MR. AURZADA:  I'd suggest he show him the email.

2     I think that makes it easier.

3          MR. PATTERSON:  Well, I don't need his

4     suggestions.  He can make an objection and ask the Court

5     rule.

6          MR. AURZADA:  Then I object.

7          THE COURT:  Mr. Patterson, why don't you show him

8     the email?

9          Folks, while we're doing this, I'm going to just

10    hang up the line and I'm not going to let anyone listen.

11    It's been the third day in a row where I've -- folks should

12    know to put their phone on mute.  Thank you.

13    BY MR. PATTERSON:

14    Q.   Do you see what I've put up on the screen for you?

15    A.   I see it.

16    Q.   Do you recognize it?

17    A.   No.

18    Q.   You don't?

19    A.   No.

20    Q.   Do you recognize that email at the top of the page?

21    The email address?

22    A.   Which one?

23    Q.   Any of them?

24    A.   Eric Kuo?

25    Q.   Yes.

1    A.   Max Bulk (phonetic)?

2    Q.   Yes.

3    A.   I recognize the names.  I assume that's their email

4    address.

5    Q.   All right.  Is that the proper format for a Vitol

6    email address?

7    A.   Yes.

8    Q.   All right.  Do you see down here, the very bottom

9    right-hand corner; do you recognize that?

10   A.   Where it says Vitol and a bunch of numbers?

11   Q.   Right.

12   A.   No.

13   Q.   Well, that indicates that it came from Vitol.  They

14   found it and produced it.  This looks like an email from

15   Vitol, right?

16   A.   Yeah.

17   Q.   In 2017, did Eric Kuo work for Vitol?

18   A.   Yes.

19   Q.   In 2017, did Max Bulk work for Vitol?

20   A.   Yes.

21        MR. PATTERSON:  All right.  I'd offer 104-13,

22   Your Honor.

23        THE COURT:  Any objection?

24        MR. AURZADA:  No.

25        THE COURT:  104-13 is admitted.

```
1              (Defense Exhibit 104-13 admitted into evidence)
2    BY MR. PATTERSON:
3    Q.   So let's go down here.  And I just want to remind you
4    of what we were talking about, where I said didn't Nick Fay
5    -- didn't Mr. Bake tell you -- tell Vitol stop this
6    business with GCAC and Mr. Brass?  And you said no, right?
7    Isn't that what you said?
8    A.   When did I say that?
9    Q.   Like two minutes ago.  Is that not -- are you telling
10   me that that's not what happened?  Hold on.  So let's talk
11   about what happened.  Why did Vitol stop?  Why?  Why did
12   you have the August -- July/August 2017 discussion with Mr.
13   Kuo, telling him stop the JV talk, the joint venture talk?
14   Why did that happen?
15   A.   Because prior to that, Chris Bake talked to me and
16   informed me that Vault was not interested in pursuing that.
17   Q.   That's right.  Vault told you to stop, right?
18   A.   They told me that they were not interested in pursuing
19   it.
20   Q.   They told you to stop, didn't they?
21   A.   What they told me is they were not interested in
22   pursuing it.
23   Q.   Right.  And to stop.
24   A.   They told me they were not interested in pursuing it.
25   Q.   That's right.  And you had the conversation because of
```

1    that discussion, didn't you?

2    A.    The conversation with Eric Kuo?

3    Q.    Yes.

4    A.    Yes.

5    Q.    And you told him stop, right?

6    A.    Yes.

7    Q.    So what does it matter if Vault is interested or not?

8    This is a Vitol, Inc. deal.  This is your deal, right?

9    Right?

10   A.    No.

11   Q.    I thought it was.  It wasn't?  Was this a Vault deal?

12   A.    It was a Vitol deal.

13   Q.    Vitol, Inc.

14   A.    No, Vitol itself was looking at the opportunity.

15   Q.    What do you mean Vitol itself?  What is that?

16   A.    Well, it involved Vault.  It involved Vitol, Inc.

17   Q.    Eric Kuo works for Vault?

18   A.    The discussions -- no, he doesn't.

19   Q.    He worked for you.

20   A.    Yes.

21   Q.    Right?  Okay.  So why wasn't Mr. Bake telling Mr. Kuo

22   to stop?

23   A.    He wasn't.

24   Q.    I know.  Why?  If this was a deal that Mr. Kuo was

25   doing with Vault, why wasn't Nick Fay for Mr. Bake telling

1    Mr. Kuo to stop the JV talk?

2    A.   Because we were then discussing it with Inc.  They

3    just decided to tell me --

4    Q.   How do you --

5    A.   -- the proper way to do it.

6    Q.   How do you know they decided that?

7    A.   Because they did it.

8    Q.   Let's look at the email.  All right.  Let's start at

9    the bottom and work up.  July 31st, 2017; do you see that?

10   A.   Yes.

11   Q.   Nick Fay.  Who is Nick Fay?

12   A.   He was the one in Vitol -- Vault, in charge of doing

13   the day-to-day business.

14   Q.   All right.  Let's go down and see the signature of

15   Nick Fay.  It's Vault, right?

16   A.   Yes.

17   Q.   He works for Vault.  He speaks for Vault, right?

18   A.   Yes.

19   Q.   Is that correct?

20   A.   Yes.

21   Q.   So on July the 31st, 2017, to Mr. Kuo, Mr. Barth,

22   who's your -- a business development guy --

23   A.   Yes.

24   Q.   -- for Vitol?  Mr. Bake, we've talked about already.

25   A.   Yes.

```
1    Q.   Is UK operations guy, right?

2    A.   Who is?

3    Q.   Mr. Bake.

4    A.   No, he's based in the UK, but he is a senior business

5    opportunity guy basically.  He gets involved in a lot of

6    different things.

7    Q.   Okay.

8    A.   He's not involved in operations.

9    Q.   I'm sorry?

10   A.   He's not involved in operations.  You called him an

11   operations guy.  He's not involved -- he wasn't involved in

12   operations.

13   Q.   What do you consider operations?  Again, we're having

14   a language barrier problem, I think.

15   A.   In Vitol, operations is somebody who's involved in

16   moving ships, scheduling ships, scheduling deliveries,

17   contracting inspectors basically operating the transactions

18   that are done.

19   Q.   Okay.  I can't pronounce the next name.  Can you?

20   A.   No.

21   Q.   You can't?  You don't know who that is?

22   A.   No.

23   Q.   All right.  Dan Sargent (phonetic).  Who's Mr.

24   Sargent?

25   A.   He was a member of the Sargent family that associated
```

1    -- that did the business with Vault.

2    Q.   All right.  Mr. Finoky (phonetic), who's that?

3    A.   I don't know.

4    Q.   Mr. Parsons?

5    A.   A -- the head of fuel oil in Europe.

6    Q.   Fuel oil?

7    A.   Yeah.

8    Q.   Subject: GCAC Telcon.  What does Telcon stand for?

9    A.   Telephone conversation, I assume.

10   Q.   Telephone conference or telephone conversation?  So

11   can we do early Houston a.m.?  So Nick writes primarily to

12   Mr. Kuo and Mr. Barth, who are both your employees, right?

13   A.   Yes.

14   Q.   Good morning, Eric and Steve.  Were you copied on this

15   email?

16   A.   No.

17   Q.   Not even a blind copy?  Maybe not showing up?

18   A.   No.

19   Q.   All right.  Good morning, Eric and Steve.  Again, from

20   Nick Fay, who's -- he's not -- Nick Fay is not Vitol.  Nick

21   Fay is Vault, right?

22   A.   No, he is Vitol.

23   Q.   You just told me he's Vault.  Let's look at his

24   signature.  Vault, right?

25   A.   But Vault is Vitol.  Vault is under Vitol.

```
 1    Q.   Okay.  You -- now you say that, but before, you didn't
 2    even understand the transaction, right?
 3    A.   No, that's not right.
 4    Q.   Okay.  Let's talk about the transaction.  What is the
 5    transaction between Vitol and the Sargent Family which
 6    created Vault?
 7    A.   I don't know the details.
 8    Q.   You just said you did.
 9    A.   No, I didn't.
10    Q.   You just told me it -- you knew that it was part of
11    Vitol.
12              MR. AURZADA:  Argumentative, Your Honor.
13              THE COURT:  Sustained.
14    BY MR. PATTERSON:
15    Q.   Do you know or do you not know?
16    A.   What?
17    Q.   I think I'll leave that one on the record.  Nick Fay
18    from Vault, not Vitol, Vault, Good morning, Eric and Steve.
19    Would you both be available for a call early this morning
20    with Chris Bake and our team?  As soon after 2:00 p.m. UK
21    as you can manage would be good, as Chris has to leave mid-
22    afternoon.  We are considering -- we -- being Vault, right,
23    this is coming from Vault.
24              MR. AURZADA:  Objection, Your Honor.
25              THE COURT:  What is the objection?
```

Page 61

```
1              MR. PATTERSON:  What's the objection?

2              MR. AURZADA:  If he has a question, he should ask

3    it.  He's just otherwise reading the document.

4              MR. PATTERSON:  It's already in evidence.  I'm

5    allowed to do that.  What's the objection?

6              THE COURT:  Overruled.

7              MR. AURZADA:  Your Honor?

8              MR. PATTERSON:  That I'm reading something from

9    evidence?

10             MR. AURZADA:  (Indiscernible - 12:05:28)

11   evidence.

12             THE COURT:  Hold on a second.  Guys.  Hey, I need

13   both of you, tone the temperature down.  We can just ask

14   questions and keep it going.  I --

15             MR. PATTERSON:  Your Honor, I'm allowed to

16   provide a basis for my question and refer to evidence in

17   the record, which is all I'm doing.

18             THE COURT:  I completely understand that.  I'm

19   talking about tone.

20             MR. PATTERSON:  Yes, sir.

21             THE COURT:  I -- why don't you just ask

22   questions, but he's allowed to read the document.  It's in

23   evidence.

24   BY MR. PATTERSON:

25   Q.   We are -- we, he's referring to Vault, right?
```

Page 62

1    A.    I don't know that.

2    Q.    Where is this email from?  What's the source?

3    A.    Nick Fay.

4    Q.    All right.  Let's go back here.  Nick Fay, and his

5    signature is from what company?

6    A.    Vault.

7    Q.    Okay.  So when Nick Fay says we on a business email,

8    who would you think he's referring to?

9    A.    He could be referring to himself and the other parties

10   of Vault, or he may be talking about we as in the group

11   that's discussing this business.

12   Q.    All right.  We are considering the following three

13   options with few comments/issues listed below that occurred

14   to me.  Speaking for Vault.  Number one, how much

15   adaptation of the agreement that you have made -- do Vault

16   need to make in order to step in and work the what?  What

17   does it say?

18   A.    Are you asking me to read the --

19   Q.    Yeah.  What's the next word?

20   A.    JV.

21   Q.    JV.  With Vit Fuel and GCAC.  So doesn't this indicate

22   to you that Mr. Fay believes there's an existing joint

23   venture with GCAC?

24   A.    Or one's being discussed.

25   Q.    Or one's being discussed.  But it says what it says.

1   Number one, would GCAC accept the material changes to the

2   agreement?  Newco (phonetic) team would have to change

3   (indiscernible - 12:07:42) or any other asphalt trader

4   cannot be part of it.  What role does AJ intend to play in

5   this joint venture?  How does Vault finance the 10 to 15

6   million working capital?  Do we have Eric to support --

7   Eric's support to run the fuel side with Roberto looking at

8   asphalt.  All right?

9       So Vault is looking to step in, and modify, and/or

10  change the joint venture with GCAC so they can be involved.

11  Isn't that your understanding?

12  A.   No.  My understanding is all those things have to be

13  addressed in order for a JV to occur.

14  Q.   Okay.  Option two -- I'm sorry.  I forgot one thing.

15  If you look at paragraph 11 of this email from Nick Fay,

16  he's asking about changes, but he references the agreement.

17  Do you see that?  Material changes to the agreement.  Why

18  would he reference an agreement if what you say is true,

19  there wasn't an agreement?

20  A.   They were discussing an agreement, so --

21  Q.   Okay.  But that's not what he says, right?  You would

22  agree with me there.

23  A.   Well, he refers to an agreement.

24  Q.   That's right.  What's an agreement to you?  Tell me

25  what you understand an agreement to mean?

Page  64

```
 1   A.   An agreement is -- in this context, it's an agreement
 2   that's being discussed.  It's obviously not finalized,
 3   otherwise --
 4   Q.   It's obvious?  Show me why it's obvious.
 5   A.   Because he's got issues, and he desires to adapt the
 6   agreement, and change it, and the issues that have to be
 7   addressed.
 8   Q.   Right.  He wants to adapt the agreement, right?  Which
 9   means there's an agreement that he wants changed.
10   A.   I don't think it's clear.
11   Q.   You don't?
12   A.   No.  I think it's there -- it could be -- it's an
13   agreement being worked at the ink level, or it's being
14   discussed broadly.  It's not clear.
15   Q.   Okay.
16   A.   If there was an agreement, there would be an
17   agreement.
18   Q.   And it would be referred to as an agreement, right?
19   A.   No.  We would have evidence of there being the
20   agreement.
21   Q.   Okay.
22   A.   It would be signed.  It would be, this we agreed, and
23   signed.
24   Q.   Okay.  Let's keep going and we'll come back to that.
25   But this email is from Vault, and it says we are
```

Page 65

1    considering the following three options.  We being Vault,

2    are considering three options.  Number one, adapt the

3    agreement.  Right?  Number two, if we leave joint venture

4    to run, more or less as proposed, can Vault have a

5    preferred or sole off taker role at a price that's

6    attractive?  Do you see that?

7    A.   Yeah.  It clearly right there, it states it's a

8    proposal, not a finished agreement.

9    Q.   In your mind, you read this and say there's no deal.

10   I read it and it says if we leave joint venture to run,

11   which means there's a joint venture, right?

12   A.   More or less as proposed.  Not it's finalized.  Not

13   it's agreed.  Not it's --

14   Q.   Okay.

15   A.   As proposed.

16   Q.   All right.  And Vault wants to know, how do we manage

17   the presence of the Vic, what's Vic?

18   A.   Vitol, Inc.

19   Q.   That's you, right?

20   A.   Yeah.

21   Q.   Vault wants to know.  How do we manage the presence of

22   Vitol, Inc., GCAC joint venture, and Vault in the USGC

23   asphalt market with other players?  What does that mean to

24   you?

25   A.   I'm not sure.  Perhaps it alludes to he worries about

1    Bolero (phonetic) not liking the -- a joint venture.

2    Q.   Right.  He also asked, where does the asphalt P&L,

3    which is profit and loss, right?

4    A.   Yes.

5    Q.   Right?  Of joint venture go?  He wants to know where -

6    - how you're splitting the profits in the joint venture,

7    right?

8    A.   If there is one, yeah.

9    Q.   Right.  Option three, exit and close the joint venture

10   completely.  Why is that an option if there isn't a joint

11   venture?

12   A.   I don't know what he means by that.

13   Q.   You don't?  Well, there's only six words in that

14   sentence.

15   A.   Well, it could be he's saying we -- by that he means

16   we close all discussions.

17   Q.   Well, he could mean that, but that's not what it says,

18   right?

19   A.   Well, it could mean that.

20   Q.   Sure, it could.  It could also mean the sky is blue,

21   but that's not what it says, right?

22   A.   No, it --

23   Q.   You would agree with me?

24   A.   No, I would not.

25   Q.   You wouldn't agree with me?

1   A.   No, it can't possibly mean the sky is blue --

2   Q.   Exit and close the joint venture completely.  You

3   believe that's open to interpretation?

4   A.   Yes.

5   Q.   So if there's not a joint venture in place, how would

6   it be an option to close that joint venture?  How do you

7   close something that doesn't exist?

8   A.   By close, it could mean that close means finalize.  As

9   you close the deal.  You finalize it.

10  Q.   You close the purchase of a piece of land.  I get

11  that.  Close itself has multiple definitions.  I agree with

12  you.  However, in context, that's not what it means, does

13  it?

14  A.   Like I said, I think it means a lot of different

15  things.

16  Q.   Okay.

17  A.   I'm not sure what it means.

18  Q.   Exit and close the joint venture completely.  How do

19  you exit and close under your interpretation completely?

20  How can you do both of those things?  If you exit it,

21  you're not going to finalize it, right?

22  A.   If you close, it could be -- close it could be cease

23  discussions.  Close also under your interpretation means

24  implies a JV that is not open.

25  Q.   Okay.  You desperately do not want to acknowledge that

1    there could have been an existing joint venture on July

2    31st; isn't that true, Mr. Loya?

3              MR. AURZADA:  Argumentative.

4              THE COURT:  Overruled.

5              THE WITNESS:  No.

6    BY MR. PATTERSON:

7    Q.   Then why do you refuse in the face of clear language

8    that there could possibly be a joint venture on July 31st,

9    2017?  Why?

10   A.   I disagree with your interpretation of what I'm doing.

11   Q.   And I'm asking you why it's so hard for you to say

12   under oath that that's a possibility.  You've told --

13   you've given me three different possible interpretations of

14   this sentence, and none of them include the existence of a

15   joint venture.  Why is that?

16   A.   Because I was adding those three possibilities to the

17   possibility that you were making of it being a closed -- a

18   done deal.

19   Q.   Okay.  So you were adding to my interpretation.  So

20   I'm going to give you the opportunity.  You would agree

21   with me, would you not, that one interpretation is that

22   there was an existing joint venture, and you should stop

23   and close it immediately?

24   A.   (Indiscernible - 12:15:55).  I read it to basically as

25   the most likely interpretation to be there is an open JV

1    discussion.

2    Q.   Okay.  And what I asked you, since you've given three

3    or four possible interpretations of paragraph three, I'm

4    asking you, would you agree with me under oath that one

5    interpretation is that there is an existing joint venture

6    on July 31st, 2017, and Vault is suggesting that Vitol Inc.

7    close it, and exit completely.  Isn't that a reasonable

8    interpretation of paragraph three, Mr. Loya?  A

9    possibility.

10    A.   It would be bad English, but it's possible.

11    Q.   Okay.  It's bad English according to you.

12    A.   Yes.  I struggle with the word completely.

13    Q.   You do?

14    A.   Exit and close it --

15    Q.   Why?  Why does that -- why do you struggle with that?

16    A.   Completely means implies that the JV is open.

17    Q.   Right.

18    A.   That it's under discussion, it's not closed.

19    Q.   Exactly.  That it exists, right?

20    A.   The discussions exist.  That's what it implies, in my

21    view.

22    Q.   Okay.  You think it's only discussions.  Well, let's

23    go back to an earlier part of this email.  First numbered

24    paragraph, how much adaptation of the agreement that you

25    have made.  Is there some kind of confusion there with that

```
 1   English?  The agreement that you have made.  That refers to

 2   an agreement that's in existence, right?

 3   A.   But he still has to adapt a lot more details.

 4   Q.   If Vault wants to get involved, or Vault's going to

 5   allow it to go forward.  I agree.  That's what Mr. Fay is

 6   saying.  If this is going to continue, if you guys are

 7   going forward with this joint venture, we need to do one of

 8   three things: make changes, right, to the agreement; make

 9   changes to management; or exit and close the joint venture

10   completely, right?  Isn't that the gist of this email?

11   A.   In order to continue and have an agreement, I have the

12   following objections.  That's how I read that note.

13   Q.   Okay.  Yeah.  So let's go -- see the follow up to this

14   email, all right, from Mr. Fay from Vault.  And so Mr. Kuo

15   responds to Mr. Fay, right, the next day.  Nick, any idea

16   which way you guys are leaning on this?  Bunch of loose

17   ends on our side, and looking for some direction from you

18   to decide how we proceed with current items.  Thanks.  Do

19   you see that?

20   A.   Yes.

21   Q.   So why is Mr. Kuo going to Mr. Fay, looking for

22   direction, instead of you?

23   A.   Because that's how Vitol works.

24   Q.   No.  Yesterday, you told me a joint venture comes to

25   you.  If it involves more than one transaction, you approve
```

 1   it.

 2   A.   Yes.

 3   Q.   Period.

 4   A.   Correct.

 5   Q.   Okay.  You would agree with me this joint venture

 6   involved more than one trade?

 7   A.   Yes.  The discussions which were --

 8   Q.   All right.  And your testimony was it comes to you.

 9   Now, why was this not coming to you?  Why was it going to

10   Mr. Fay?

11   A.   Because they're trying to put together the joint

12   venture.  They're discussing it and trying to put it

13   together.

14   Q.   No.

15   A.   It comes to me for final decision.

16   Q.   Okay.

17   A.   Which I never gave.

18   Q.   Right.  Well, we looked at the prior email.  That's

19   not exactly what's going on here, right?  Vault is saying

20   you need to fix this, right?  We're the king of asphalt.

21   We don't want you guys doing this the way you're doing it.

22   Some changes need to be made.  Isn't that what's happening?

23   A.   They're saying some changes need to be made for this

24   to be a joint venture.

25   Q.   All right.  Let's keep going.  Mr. Fay responds,

Page 72

1   right?  Dan has reached out.  Who's Dan?

2   A.   Sargent.

3   Q.   Dan Sargent.  Mr. Sargent, who's Vault, right?

4   A.   Yes.

5   Q.   Has reached out to AJ and outlined that we see the

6   three options below.  AJ was very keen to work with Vault

7   to avoid number three.  What was number three again?  Oh

8   yeah, exit and close the joint venture, right?  So AJ was

9   very keen to work with Vault to avoid number three.  He

10  didn't want it terminated.  We've sent him a list of the

11  info we require, we being whom?  This is from --

12  A.   It would probably be Vault in this case.

13  Q.   Vault, right?  Mr. Fay.  He speaks for Vault.  So

14  Vault has sent him a list of the info that Vault requires,

15  and we're waiting for the output.  If we can come out of

16  this with flow at attractive price and limited downside,

17  then can see a good outcome.  What does that mean?  If we -

18  - if Vault can come out of this with flow.  What would be

19  flow?

20  A.   Flow would mean physical --

21  Q.   Volume of asphalt, right?

22  A.   Yes.

23  Q.   All right.  So if Vault can come out of this with an

24  inventory or a market for asphalt at an attractive price

25  and limited downside, then can see a good outcome.  Devil

Page 73

```
 1    will be in the detail, of course, with AJ.  Dan, Mr.
 2    Sargent, is in Qatar now, and will be in Montreal Monday,
 3    and we'll see AJ and Patrick with Roberto.  What are the
 4    loose ends?  What are you hearing from AJ and Patrick.  So
 5    Nick is not aware there's loose ends, right?  No one's told
 6    him.  So let's keep going.
 7    A.   I don't know that.
 8    Q.   Now, to kind of set the stage, you're aware that GCAC
 9    and Vault were competitors, right?
10    A.   Yes.
11    Q.   Yeah.  Right?  So that's the genesis of this
12    discussion, the genesis of kind of the discord is that
13    Vault and GCAC compete in the world asphalt business,
14    right?
15    A.   No, not necessarily.  No.  GCAC was a small operation.
16    Mainly they came across each other at times in the Gulf
17    Coast in the market.
18    Q.   That's right.  Vault is the big player -- the biggest
19    in the world, GCA is a small player, right?  Didn't we talk
20    about this already?
21    A.   No.  The announcement made a reference to it being
22    with the largest asphalt company in the world.
23    Q.   That's right.
24    A.   (Indiscernible - 12:23:18) but --
25    Q.   Okay.  Back to my question.  You would agree with me,
```

002828

1    Vault, being the biggest in the world, GCAC is a small

2    player in the asphalt business, but they're competitors

3    nonetheless, right?

4    A.    In the Gulf Coast region, yes.

5    Q.    I didn't limit it.  They're competitors, correct?

6    A.    They compete.

7    Q.    That's right.  They're in the same business, they're

8    competitors.  That's the problem here, isn't it?

9    A.    There is no problem.  They're just trying to put

10   together two companies.

11   Q.    There is a problem because of the first email we read,

12   right?  Vault says there's three options and one of them is

13   get out of this joint venture and close it.  That's what

14   they're telling you, Vitol Inc., right?  Because they're

15   the biggest in the world, right?

16   A.    No.

17   Q.    Right.  So Mr. Kuo then on August 1st, 2017, responds

18   and says they want us to pay storage invoices, some other

19   miscellaneous costs, and I'm trying to push them off until

20   we get some clarity on direction.  I think you can

21   definitely get flow and/or term supplied at attractive

22   pricing.  That was always the objective.  Nothing from

23   AJ/Patrick.  They keep asking me where things stand.

24        Why are Mr. -- why is Mr. Brass unclear about where

25   things stand on August the 1st, 2017?  Do you know?

1   A.   Because he hasn't been told that there is no JV going

2   forward, or he wants one.  I guess he doesn't know where it

3   is.

4   Q.   How do you know that?  Do you remember that?

5   A.   No, I just -- I guessed.

6   Q.   Okay.  You're guessing again.  I don't want you to

7   guess, all right?

8   A.   That's why I said --

9   Q.   Can we have that agreement?  Because you're under

10   oath.

11   A.   Yes.  That's why I said --

12   Q.   All right.  You're swearing.

13   A.   I said I guess.

14   Q.   I don't want you to guess.  If you don't know, I want

15   you to tell me you don't know.  Can you do that?

16   A.   I'll try very hard.

17   Q.   All right.  Well, no, I don't want you to try.  Can we

18   have that agreement?

19   A.   Well, no, I'm just saying I will do it but I'll make

20   sure I guess --

21   Q.   Okay.  So let's try this question again.  Why was Mr.

22   Brass asking about where things stand on August the 1st,

23   2017.  Do you know?

24   A.   No.

25   Q.   All right.  Thank you.  Mr. Fay then responds on

```
 1   August the 1st, okay, not sure how to advise you here
 2   (indiscernible - 12:25:58).  We want to make something
 3   work.  It's all down to the people now, and that's a hard
 4   call.  Mr. Kuo then a week later, on August the 9th, is
 5   pinging Mr. Fay.  Nick, have there been any new
 6   developments?  I'm fielding multiple calls from Rio and
 7   GCAC daily with both companies almost getting into panic
 8   mode.  Not sure if they want to dissolve this.  What's
 9   there to dissolve on August the 9th, 2017?
10   A.   I don't know.  I'd be guessing.
11   Q.   But you just said you knew there wasn't a joint
12   venture, right?
13   A.   I knew.  I hadn't approved one.
14   Q.   Right.  It never came to you, right?  Is Mr. Kuo doing
15   this on his own?
16   A.   Not allowed.
17   Q.   Not allowed.  So what's there to dissolve?
18   A.   I don't know.
19   Q.   Who would know?
20   A.   Whoever wrote those emails.
21   Q.   Mr. Kuo, right?
22   A.   If he's the one who wrote that email, he can tell you
23   what he meant by that.
24   Q.   Okay.  But you don't have any idea.
25   A.   I would be guessing.  No.  I don't have any idea.
```

```
 1    Q.   Now, also yesterday, and I'm -- I'm moving around, but

 2    we'll come back, I promise.  But also yesterday, we talked

 3    a little bit about what you described was the relationship

 4    between Vitol and Mr. Brass and GCAC.  And you talked about

 5    it being financing, right?

 6    A.   Yes.

 7    Q.   And we talked about how you kept a security, you being

 8    Vitol, and I asked you about a writing.  And you said our

 9    word is our bond.  We don't do writings, right?

10    A.   Correct.

11    Q.   Our word is our bond, right?

12    A.   It is.

13    Q.   Okay.

14    A.   Most of our transactions are done.

15    Q.   Right.

16    A.   Agreed verbally.

17    Q.   Does that include your employees?

18    A.   What do you mean by our employees?

19    Q.   Mr. Kuo.  You demand that of your employees, right?

20    A.   Is he allowed to enter into --

21    Q.   His word is his bond, right?

22    A.   Transactions.  When he enters into transactions, he's

23    speaking for Vitol.

24    Q.   That's right.

25    A.   In transactions, he's allowed, yes.  In single
```

1    transactions.

2    Q.    Right.

3    A.    We do that.

4    Q.    That's right.

5    A.    Yes.

6    Q.    Mr. Kuo is telling the world, we have a joint venture,

7    right?

8    A.    I don't know what Mr. Kuo's saying.

9    Q.    We're looking at it.  Let's look at it again.  If Mr.

10   Kuo says it, is it not true, but if you say it, it is true?

11   A.    As far as I know, we did not have a joint venture.  I

12   did not approve one.

13   Q.    But you also said this was going through Vault, right?

14   So it wouldn't necessarily come to you.  Which is it?

15   First, you defer to Vault and Mr. Bake, and said Mr. Kuo

16   was working through them.  But now you're saying it had to

17   come through you.  Which is it?

18   A.    There was a -- it would have to go through me.

19   Q.    All right.

20   A.    What I said is if there's an agreement to be done, it

21   would have to be agreed with Vault as well.

22   Q.    Why agreed with Vault?

23   A.    Because they're operating in asphalt.

24   Q.    They're competitors, right?

25   A.    They're operating in the asphalt market.  They were

002833

```
 1   trying to do.

 2   Q.   Right.  So on August the 10th, Mr. Fay responds to Mr.

 3   Bake, and Mr. Kuo, and Mr. Parsons.  Again, Mr. Parsons is

 4   a business development guy here, worked for you, right?

 5   A.   No.

 6   Q.   No?  Who's Mr. Parsons?  I apologize.

 7   A.   He's the head of fuel oil in London.

 8   Q.   London.  London.  So this is all London guys

 9   communicating with Mr. Kuo.  Do you know why you're not

10   included on this, or were you?

11   A.   That's two questions.  Which one do you want me to

12   answer?

13   Q.   Fully aware of that, but it would be the same answer,

14   right?  Were you included on this email?

15   A.   No.

16   Q.   Not are you listed.  Were you included?  It could be a

17   blind copy, right?

18   A.   It could be.

19   Q.   So Mr. Fay responds on August the 10th to Mr. Kuo,

20   Eric, as you know, there have been some meetings in

21   Montreal at AI.  What's AI?

22   A.   I don't know.

23   Q.   Between the teams on Tuesday and Wednesday of this

24   week.  I'm waiting for full update when Dan, that's Mr.

25   Sargent, right?
```

1    A.   Yes.

2    Q.   Gets in tomorrow.  However, from brief telecon, I know

3    the following: the forward economics, which is what econs

4    stand for, right?

5    A.   Yes.

6    Q.   The forward economics remain unclear.  Rio GCAC have

7    made no money for the last two and a half years.  We need

8    to do some more work on that.  I ask you and Steve Barth

9    for comment on these on Monday, the 7th.  Please can you

10   respond.  Next bullet point.  GCAC advised they were

11   specifically instructed by VIC.  VIC is what?

12   A.   Vitol Inc.

13   Q.   Vitol Inc., that's you.

14   A.   That's the one that I was head of, yes.

15   Q.   Right.

16   A.   That's the one that I was head of.

17   Q.   That's right.  At the time, you were head of this,

18   right?

19   A.   Yes.

20   Q.   GCAC advised that they were specifically instructed by

21   VIC to not discuss this deal.  Do you see that?

22   A.   No.  Your screen now is --

23   Q.   I'm sorry.

24   A.   I see it.

25   Q.   Right.  Is that true?

002835

```
 1   A.   I don't know.

 2   Q.   What do you mean you don't know?

 3   A.   I don't know.

 4   Q.   Were you the CEO?

 5   A.   Yes.

 6   Q.   Of VIC?

 7   A.   Yes.

 8   Q.   Okay.  And didn't you saw that a joint venture has to

 9   come through you?

10   A.   Yes.

11   Q.   All right.

12   A.   For final approval.

13   Q.   Okay.  And he wants to know why that they were

14   instructed that way, right?  The whole market is talking

15   about your deal, and how it was done behind the back of

16   Vault.  Do you see that?

17   A.   Yes.

18   Q.   I thought you said there wasn't a deal?

19   A.   There wasn't a deal.

20   Q.   Why is Vault --

21   A.   There wasn't a joint venture.  I don't know what kind

22   of deal they're talking about.  There wasn't a joint

23   venture.  Let's be clear.

24   Q.   I know.  You're very specific.  Over and over.  Why

25   are you so insistent to add that to every discussion we
```

1    have, Mr. Loya?

2              MR. AURZADA:  Objection.  Argumentative.

3              THE COURT:  Sustained.

4    BY MR. PATTERSON:

5    Q.   Is there a reason you feel the need to add the comment

6    there was no joint venture to every other answer, Mr. Loya?

7              MR. AURZADA:  Same objection.

8              THE COURT:  Sustained.

9    BY MR. PATTERSON:

10   Q.   You can hear me okay, Mr. Loya?

11   A.   Yes.

12   Q.   All right.  GCAC are trying to sell barrels onto the

13   USEC, I assume United States East Coast, in direct

14   competition with Vault.  Do you see that?

15   A.   Yes.

16   Q.   At a personal level, you have failed to be straight

17   with me at every stage of this process.  Do you see that?

18   A.   Yes.

19   Q.   On top as the Vitol guy in a Vault joint venture, I

20   have been having to apologize repeatedly as the details of

21   how you have deliberately bypassed my team have come to

22   light.  Do you see that?

23   A.   Yes.

24   Q.   Now, you told me he was working with their team, and

25   not working with you.  But their team says he was bypassing

Page 83

```
 1    their team, which -- right?  Isn't that what he said?
 2              MR. AURZADA:  Compound question, Your Honor.
 3              THE COURT:  Sustained.
 4    BY MR. PATTERSON:
 5    Q.   Did I read that correctly, Mr. Loya?
 6    A.   You read it exactly as it's written.
 7    Q.   Right.  So Mr. Fay, who's Vault, is indicating that
 8    this deal was done behind his back.  Isn't that what he
 9    said?
10    A.   No.
11    Q.   Well, let me read it again.  You have failed -- you,
12    Mr. Kuo, which is VIC, to be straight with me at every
13    stage of this process.  On top, as the Vitol guy in the
14    Vault joint venture, I have been having to apologize
15    repeatedly as the details of how you have deliberately
16    bypassed my team have come to light.  Again, did I read
17    that correctly?
18    A.   Yes.
19    Q.   Is there something in there you didn't understand?
20    A.   No.
21    Q.   Was it unclear?
22    A.   Your reading was as written, perhaps with --
23    Q.   Were the words unclear?
24    A.   No, the words are the words.  I understand the words.
25    Q.   And they're vague?
```

Page 84

1   A.   No.

2   Q.   They confusing?

3   A.   No.

4   Q.   All right.  So he says that Mr. Kuo wasn't working

5   with him to put this joint venture together, right?

6   A.   It says what it says right there.

7   Q.   I'm asking you if you agree with me that that's what

8   it says.

9   A.   Not exactly.

10  Q.   Not exactly.  What do you think it says?  Interpret it

11  for me.

12  A.   He's saying I'm upset that you haven't been completely

13  forthright with me.  It puts me in a bad situation.  That's

14  what it says.

15  Q.   All right.  And you've left out the last part.  You

16  have deliberately bypassed my team.  What does that mean to

17  you?

18  A.   To me, it means that he's not been forthright with

19  either Nick or the other guys involved in the discussion.

20  Q.   Okay.  Forthright isn't in there.  Forthright means

21  not really honest.  This says bypassed.  What does bypass

22  mean to you?

23  A.   Forthright, I summarized to mean failed to be

24  straight.

25  Q.   Okay.  And I asked you to go to the second part of the

```
 1   sentence that says they were bypassed.  What does that mean
 2   to you?
 3   A.   It means that they were not included in discussions he
 4   thought they should have been.
 5   Q.   That's right.  So if they weren't, your testimony was
 6   Mr. Kuo was working with Vault to get this deal done, this
 7   joint venture, but Vault is saying they weren't included.
 8   A.   Both --
 9   Q.   That means it came to you, right?
10   A.   No.  It means he's unhappy with how they're working.
11   Q.   Is it your testimony that Mr. Kuo is out on an island
12   doing his own thing, not telling anybody?
13   A.   Not at all.
14   Q.   Right.  He wouldn't stick around, would he?  You're
15   not going to keep someone that does that, right?
16            MR. AURZADA:  Argumentative.
17            THE COURT:  Overruled.
18   BY MR. PATTERSON:
19   Q.   Right?
20   A.   Ask me again, please.
21   Q.   You're not going to keep someone employed that does
22   things out on their own without following the right
23   approvals, the channels, especially with so much money,
24   right?
25   A.   No.  It would be a lot of room for him to negotiate a
```

1    deal?

2    Q.   As a Vitol shareholder, that's Mr. Fay, right?

3    A.   Yes.

4    Q.   He's a shareholder of VIC?

5    A.   No.

6    Q.   Of Vitol Group?

7    A.   Yes.

8    Q.   Is he on the Board with you?

9    A.   No.

10   Q.   As a Vitol shareholder, I sincerely hope there will

11   not be damages for VIC, which is you, right?  Vitol Inc.?

12   A.   Yes.

13   Q.   On exit.  Why would we be concerned about damages on

14   an exit of a deal that doesn't exist?

15   A.   He may be concerned about whether we stopped doing

16   business with GCAC.  I can only guess.

17   Q.   Really?  That doesn't make sense to you at all?

18   A.   It makes sense to me he says he hopes there are no

19   losses for VIC.

20   Q.   Right.  On exit.  What are you exiting from?

21   A.   Whatever transactions he's doing with GCAC.  The rest

22   of the sentence speaks for itself.

23   Q.   I would agree with you, Mr. Loya.

24   A.   No deal was signed.

25   Q.   Mr. Kuo does respond.  Nick, I'm a bit taken aback at

1   your comments below and disagree with your characterization

2   of my actions.  From the beginning, there was never any

3   intention to harm Vitol or Vault, but more of a compliment

4   to the fuels business.  I'm open to discuss any and all

5   concerns.  In the end, Vitol is following Vault's lead on

6   this deal, and is happy to provide U.S.-based support if

7   Vault wants to go forward with GCAC, right?  So Mr. Kuo is

8   acknowledging, we're going to do what you want.  You tell

9   us, Vault, what you want us to do.  Right?

10  A.   Yes.

11  Q.   Okay.  So back to my -- an often-asked question today.

12  Who was making the decision on this joint venture?  Vault

13  or you?

14  A.   Ultimately for me, for there to be a joint venture, it

15  would have to be approved by Vitol Inc.

16  Q.   Right.  And in fact, isn't it true that the joint

17  venture was approved without telling Vault.  They found

18  out, and said stop.  Exit.  Isn't that true?

19          MR. AURZADA:  Objection.  It calls for facts not

20  in evidence.

21          THE COURT:  Sustained.

22  BY MR. PATTERSON:

23  Q.   Isn't it true that the joint venture was in existence

24  on August the 1st?  The GCAC --

25          MR. AURZADA:  Argumentative and calls for facts

1    not in evidence.

2            MR. PATTERSON:  I think all the facts are there,

3    Judge.

4            THE COURT:  Overruled.  You can answer that

5    question.

6            THE WITNESS:  No.

7    BY MR. PATTERSON:

8    Q.   No.  But Vault was demanding that you exit an

9    agreement that didn't exist?  An arrangement that didn't

10   exist?  Is that your testimony today?

11   A.   They were asking to exit the discussions.

12   Q.   Okay.

13           THE COURT:  Guys, why don't we take five minutes?

14   We've got to -- the phone line got hung up.  I want to dial

15   it back in, and then maybe we can go until -- I'll come

16   back in five minutes and then maybe we can go to 1:30 and

17   then see where we are.

18           MR. PATTERSON:  Sure.  Perfect.

19           THE COURT:  Mr. Loya, I'll remind you that you're

20   still under oath.  If you need to use the restroom or

21   something, now is the time.  Thank you.

22           THE WITNESS:  Thanks.

23           THE CLERK:  All rise.

24           (Recessed at 12:42 p.m.; to reconvene at 12:49

25   p.m.)

```
 1              THE COURT:  I just wanted to make sure.  You

 2     know, you made me think about something.  Rosh Hashanah is

 3     when, the last week in September?

 4              MS. GOOTT:  Yes.

 5              THE COURT:  The 20 --

 6              MS. GOOTT:  Third or something.

 7              THE COURT:  Can you let me know the dates,

 8     because I'm -- we're definitely going to block out those

 9     dates to the extent -- every party should just be made

10     aware.  I just want it on the record, but --

11              MS. GOOTT:  (Indiscernible - 12:51:38).

12              THE COURT:  No, no, no.  I'm incredibly --

13              MS. GOOTT:  (Indiscernible - 12:51:40).

14              THE COURT:  No, no, no.  I know it changes from

15     year to year.  I thought this year it was like the 25th to

16     the 27th, but I could be wrong.  Or sundown on the 25th

17     through the 27th.

18              MS. GOOTT:  (Indiscernible - 12:51:54) sundown or

19     if that's --

20              THE COURT:  Can you just let me know, because

21     that -- I know it may slip into that Monday or Tuesday, the

22     26th and the 27th, and I -- so --

23              MS. GOOTT:  I appreciate that.

24              THE COURT:  Yeah.  We'll block out those dates.

25              MS. GOOTT:  Yeah.  (Indiscernible - 12:52:10).
```

1          THE COURT:  No, no, no.  Yeah, but we'll -- that

2    whole week is bad.  No, but I'm trying to finish the trial

3    in September.

4          MS. GOOTT:  Perfect.  Then it will only

5    (indiscernible - 12:52:21).

6          THE COURT:  So it will just be Rosh Hashanah,

7    right?  Just for those.  Okay.  So just make sure we know

8    the dates.  But I just want to make sure that among the

9    other dates, that one is definitely blocked out, and then

10   we can talk about other stuff.

11         MS. GOOTT:  Yes.  Monday is blocked out.

12   Wednesday, I have a medical procedure (indiscernible -

13   12:52:47).

14         THE COURT:  No, no, no.  That's what I'm saying,

15   but I always thought it was -- let's just figure it all

16   out.  But those three days we'll block out.

17         MS. GOOTT:  I've been told (indiscernible -

18   12:52:54).

19         THE COURT:  Okay.  And then maybe like the 30,

20   31st, would that?  I'm just thinking about -- no, there's

21   no 31st in September.  The 30th or something like -- 29th

22   or 30th.

23         MS. GOOTT:  (Indiscernible - 12:53:11), I could

24   do September 30th.

25         THE COURT:  Okay.  Let's just -- I'm just

1    thinking of dates in mind.  But I wanted to make sure I

2    carved that out because you got me thinking about that and

3    --

4            MS. GOOTT:  Thank you.  I really appreciate that.

5    September 29th or 30th should be -- I'll be fine

6    (indiscernible - 12:53:27).

7            THE COURT:  Okay.  Let's just -- we'll have a

8    more fulsome on the record, but everybody knows those dates

9    are out.

10           MS. GOOTT:  Thank you.

11           THE COURT:  Okay.

12           MS. GOOTT:  (Indiscernible - 12:53:49).

13           THE COURT:  From a scheduling standpoint, before

14   we begin, let's go until -- let's do a hard stop at 1:30.

15   Folks can break for lunch, and then we'll pick back up

16   around 2:15 and then keep going.

17           MS. GOOTT:  (Indiscernible - 12:54:51).

18           THE COURT:  Do you all need a few minutes?  Do

19   you want to start at 1:00?  Do you need a few minutes, Mr.

20   Patterson?  I'll --

21           MR. PATTERSON:  Just.  Yes.  Three minutes --

22           THE COURT:  Okay.

23           MR. PATTERSON:  -- if that's okay.

24           THE COURT:  Yeah.  No.  It's 12:55.  Let's start

25   at 1:00.  I'll give you a moment.  Okay.

```
 1                    THE CLERK:  All rise.

 2                    (Recessed at 12:55 p.m.; reconvened at 1:00 p.m.)

 3                    THE COURT:  Mr. Loya, I will remind you that

 4      you're still under oath.  Back on the record in Vitol v.

 5      Brass.  Mr. Patterson, are you ready to begin?

 6                    MR. PATTERSON:  Yes, sir.

 7                    THE COURT:  Okay.  I've given you the

 8      capabilities.

 9                    MR. PATTERSON:  Thank you, Your Honor.

10      BY MR. PATTERSON:

11      Q.   All right, Mr. Loya, now I asked you earlier about

12      your insistence throughout this proceeding that there was

13      never a joint venture.  And isn't it true that this email,

14      August the 10th from Nick Fay to Mr. Kuo, isn't it true

15      that this summarizes Vitol's concern in dealing with Mr.

16      Brass and GCAC, where it says, I sincerely hope there will

17      not be damages for VIC on exit.  Isn't that true?  Isn't

18      that a concern -- wasn't that a concern of yours as CEO of

19      VIC?

20                    MR. AURZADA:  Objection.  Compound question.

21                    THE COURT:  Overruled.

22                    THE WITNESS:  You were asking me whether it's

23      true that, and also it's my concern or belief -- I'm not

24      sure.  Can you ask the question again, please?

25      BY MR. PATTERSON:
```

```
 1   Q.   Yes.  Isn't it true that your insistence that there
 2   hasn't -- there was never a joint venture with GCAC or Mr.
 3   Brass, isn't it true that that insistence is based upon
 4   this sentence in this email which says, I sincerely hope
 5   there will not be damages for VIC on exit?
 6   A.   No.
 7   Q.   What was he talking about?  He's a shareholder of
 8   Vitol.  What was he talking about?
 9        MR. AURZADA:  Calls for speculation.
10        THE COURT:  Sustained.
11   BY MR. PATTERSON:
12   Q.   What is your understanding he was talking about?
13   A.   I would be guessing what he's talking about.
14   Q.   I don't want you to guess.  I want you to read it and
15   tell me what it means to you.  I don't want you to
16   speculate on what you think he says.  I want you to read it
17   and tell me what it means.
18        MR. AURZADA:  Objection.  Calls for speculation.
19        THE COURT:  Sustained.
20        MR. PATTERSON:  His understanding of a sentence,
21   Your Honor.  I'm not asking him to speculate.  I'm asking
22   him to read and tell me what it means to him.  That's not
23   speculating as to anybody.
24        THE COURT:  You said what it means.  You didn't
25   add that to him on the last question.
```

1    BY MR. PATTERSON:

2    Q.   All right.  Would you read that question and tell me

3    what it means to you?

4    A.   As a Vitol shareholder, I sincerely hope there will

5    not be damages for VIC on exit, as you have repeatedly

6    assured us that no deal was signed.  To me, it says if they

7    can't come to an agreement, he hopes there are no losses,

8    especially because there was never a deal signed.  I mean,

9    it's what it says.

10   Q.   It's interesting that you said losses instead of

11   damages.  Is that the same word to you?  Losses and

12   damages.

13   A.   No, not necessarily.  Damages could be more

14   encompassing.

15   Q.   You incurred damaged when a trade goes the wrong way?

16   A.   There could be losses.  I might just -- thinking it

17   would be damages -- now, we're speaking of the word damage.

18   Damages, it could encompass reputational damage.

19   Q.   Right.

20   A.   So --

21   Q.   It could.  I'm asking you what it means to you, if

22   it's the same or not the same.

23   A.   No, perhaps when I read it, it was probably -- I

24   narrowed it too much.  I misread it.  It could be damages.

25   Q.   Like from a lawsuit?

 1    A.    No.

 2    Q.    No?

 3    A.    More reputational, I think.

 4    Q.    Really?  You don't read this as possibly encompassing

 5    damages from a lawsuit?

 6    A.    No.  That did not occur to me.

 7    Q.    And I'm asking you, again, is that not a reasonable

 8    interpretation, sitting here today?

 9              MR. AURZADA:  Calls for speculation, Your Honor.

10              THE COURT:  Overruled.

11              THE WITNESS:  It didn't cross my mind.  No.

12    BY MR. PATTERSON:

13    Q.    My question is isn't that a reasonable interpretation,

14    sitting here today?  Yes or no.

15              MR. AURZADA:  Same objection, Your Honor.

16              THE COURT:  Overruled.

17              THE WITNESS:  I think damages encompasses a lot

18    of things, including potential lawsuit.

19    BY MR. PATTERSON:

20    Q.    Excuse me.  Isn't it true, Mr. Loya, that this email

21    exchange prompted a phone call you had with Mr. Bake?

22    A.    I don't know that.

23    Q.    Isn't it true that this email prompted your meeting

24    with Mr. Kuo that we put up on the Board in which you said

25    stop?

```
 1    A.    No.

 2    Q.    Okay.  What did?  What prompted that meeting with Mr.

 3    Kuo, where you told him to stop the joint venture talk?

 4    A.    My --

 5              MR. AURZADA:  Mischaracterizes the prior

 6    testimony.

 7              THE COURT:  Sustained.

 8    BY MR. PATTERSON:

 9    Q.    Did you not have a meeting with Mr. Kuo in which you

10    instructed him to terminate the joint venture discussions?

11    A.    Yes.

12    Q.    Okay.  And, in fact, you testified to that yesterday;

13    did you not?

14    A.    Yes.

15    Q.    All right.  What prompted that meeting?

16    A.    The prior discussion I had with Chris Bake.

17    Q.    A telephone call, right?

18    A.    Yeah.

19    Q.    Right.  And you said it was around this time.  Could

20    have been middle to late August, right?

21    A.    Yes.

22    Q.    Was it prompted by this email exchange?  Was that

23    phone conversation with Mr. Bake prompted by this email

24    exchange?

25    A.    I don't know.
```

002851

```
1    Q.   But it was around the same time, right?

2    A.   Around.  Yes.

3    Q.   Was it before or after your meeting with Mr. Kuo?

4    A.   My conversation with Chris Bake?

5    Q.   This email exchange?

6              MR. AURZADA:  Objection, Your Honor.  Vague.

7              THE COURT:  Overruled.

8              THE WITNESS:  I don't know.

9              MR. PATTERSON:  Give me one second, Your Honor.

10   I may have just one more topic, but I'm close to being

11   finished.

12             THE COURT:  Yeah.

13             (Pause)

14             MR. PATTERSON:  I apologize for the delay.  One

15   minute and I'll be ready.

16             THE COURT:  No, that's fine.

17             (Pause)

18   BY MR. PATTERSON:

19   Q.   Okay, Mr. Loya, I put on the screen a document.  I'd

20   ask you to look at it for a minute.  And I'll scroll

21   through.  If you need me to stop, let me know.  And I'm

22   going to ask you if you recognize this document.

23   A.   Can you go back?  Stop there.

24   Q.   I'm just going to ask if you recognize it.  That's all

25   I want to know.
```

```
 1   A.    No.

 2   Q.    All right.  How about this document?  Do you recognize

 3   this document?

 4   A.    Which one?

 5   Q.    The one on the screen.

 6   A.    You moved too fast.  Can you go back?

 7   Q.    Okay.  Just tell me to slow down and I will.

 8   A.    Right there.  Stop.

 9   Q.    I just need to know if you recognize it or not.

10   A.    I think we saw it yesterday, did we not?

11   Q.    I'm asking you if you recognize this document.

12   A.    You're moving too fast.

13   Q.    All right.  Just tell me to slow down.  That's all.

14   A.    Stop right there.  I recognize this one.  I think it

15   was brought up yesterday.

16   Q.    Okay.  And that's the only time you recognize it from

17   yesterday?  You recognize it because you believe it was put

18   up on the screen yesterday?

19   A.    Because I remember reading it yesterday.

20   Q.    You remember reading this one yesterday?

21   A.    Or something very similar to it regarding the same

22   subject.  So perhaps it was a -- part of this.  You're

23   showing me several pages.  Some of those I recognize from

24   yesterday.

25   Q.    All right.  You don't recognize those documents from
```

1    any other time?

2    A.    No.

3    Q.    You haven't seen them at any other time?  You haven't

4    seen them before yesterday, if you saw them yesterday?

5    Right?

6    A.    I'm sorry.  Ask that again.

7    Q.    You haven't seen either of those documents before

8    yesterday, if you saw them yesterday?

9    A.    Yeah.  I have -- I don't recognize them.  I may have

10   seen them, but if I did, I forgot.

11   Q.    Okay.  You wouldn't have forgot if it was a week ago,

12   right?  Or two weeks ago?

13   A.    No, I wouldn't.

14   Q.    No.  You wouldn't forget that.  You would remember.

15   A.    No, it would be the --

16   Q.    Right.  I'm just confirming.  If it was recently, in

17   the last month, you would remember reading these emails?

18   A.    I only seen two documents.  And I would recognize one

19   of them.  The other one, it was a short email.

20   Q.    Right.  And my follow up was --

21   A.    I would recognize one.  I'm not sure I recognize the

22   short email.

23   Q.    All right.  And my question was, if you had read or

24   reviewed these emails in the last month, you would remember

25   either one.

1    A.    I haven't seen them.

2    Q.    Okay.  I'm putting up on the screen what's marked as

3    Exhibit 104-16 for the record, and I would ask Mr. Loya --

4    well, I'll offer it and see where it goes.

5            MR. AURZADA:  It's clearly a hearsay statement,

6    Your Honor.  I object on the basis of hearsay.

7            THE COURT:  Are you objecting?

8            MR. AURZADA:  I'm objecting on the basis of

9    hearsay, yes.

10           THE COURT:  Thank you.

11           MR. PATTERSON:  That's fine.  We'll bring him

12   back when we're able to authenticate this through another

13   witness.

14           On reconsideration, the objection, and I wasn't

15   paying attention.  Ms. Goott was paying attention.  The

16   objection is to hearsay, however, these are party opponent

17   statements.  These are clearly emails -- not the

18   foundation, these are Vitol documents.  But they're not --

19   they're an exception to hearsay, and I think they're even

20   defined as not hearsay because they're statements of party

21   opponent, and it's against their interest.

22           THE COURT:  Yes?

23           MR. AURZADA:  Okay.  First, no foundation has

24   been laid for this document.

25           MR. PATTERSON:  They didn't object to foundation.

```
1           MR. AURZADA:  Second, it is a hearsay statement.

2    And if you'll scroll to the top, it's from Daniel Sargent,

3    who is not a Vitol employee.

4           MR. PATTERSON:  That is not what the testimony is

5    provided today.  Vault is party of Vitol is what all the

6    testimony today was.

7           THE COURT:  I thought Vault was a subsidiary of

8    Vitol, at least the UK entity.

9           MR. AURZADA:  And Mr. Sargent is not a Vitol

10   employee.

11           (Pause)

12           THE COURT:  Anything else you wish to add,

13   counsel?  I'm not going to admit it at this time, Mr.

14   Patterson.  But you've got the right to recall him if you

15   get it in another way.

16           MR. PATTERSON:  Great.  Just as long as he's not

17   released, I'm good with that, Judge.

18           MR. AURZADA:  Your Honor, I see no basis not to

19   release the witness when he's done.

20           THE COURT:  Because we're going to hold a trial

21   where everybody's going to get everything they want to say

22   in the month -- this month, and then I'm going to rule.  So

23   I'm holding everyone.

24           MR. AURZADA:  Thank you, Your Honor.

25           MR. PATTERSON:  With that, Your Honor, I think
```

1    that we're good with Mr. Loya until recalled.

2              THE COURT:  Okay.  Let me ask, we've got about

3    ten minutes before we break.  Let me ask Vitol, do you

4    y'all have any redirect that you want to take up now, or do

5    you want to wait until we come back?  I'm going to leave

6    that up to you.  I just don't -- I don't know how much time

7    you need.  That's --

8              MR. AURZADA:  Your Honor, I think it's going to

9    be 25 to 30 minutes.  I'd rather not break it up, if that's

10   okay.

11             THE COURT:  Okay.  Yeah, no, no, that's

12   completely fine.  That's why I asked.  So why don't we just

13   break for lunch then and come back at -- let's just do --

14   let's keep our time, 2:15, and we'll come back.

15             Mr. Loya, I will remind you that you are still

16   under oath and you're not to discuss your testimony with

17   anyone.  We'll break for lunch and we'll come back at 2:15.

18             Ms. Goott, if you can, before we begin, just have

19   those dates ready we were just talking about.  I wanted to

20   keep Rosh Hashanah out of the dates that we -- that we keep

21   that window out, and obviously like the day after.  So

22   thank you.

23             MR. AURZADA:  Thank you, Judge.

24             THE CLERK:  All rise.

25             (Luncheon recess taken at 1:19 p.m.; to reconvene

1   at 2:18 p.m.)

2            THE CLERK:  All rise.

3            THE COURT:  All right.  Before we get started on

4    redirect, I took a look at my calendar again.  So in terms

5    of available dates, I'm going to block out the 26th through

6    the 28th of those days.  If we have to come in -- probably

7    do the afternoon of the 29th, but I'm telling everyone I've

8    got to -- I'm going to be in Victoria on the 30th, and

9    that's the last day that we're going to hold a trial.  So

10   we may ultimately end up where the case originally started

11   in Victoria.

12           So I'm just giving everyone a heads up.  And I am

13   out the 22nd and the 23rd.  And we're not doing the -- so

14   the 22nd through the 26th are out.  We'll see where this

15   goes.  The 30th will be the grand finale, and we'll do it

16   in Victoria.  And I guess Judge Isgur as a hearing on that

17   date.  I'm -- if we don't have to go to Victoria, I won't

18   do it, but I've got to be there on that date.  If any other

19   days work -- we'll work with my case manager to fit in as

20   many times in what we can do.  We'll see where that goes.

21   Lovely accommodations.  I'm sure you'll all enjoy it.

22           THE WITNESS:  Your Honor.

23           THE COURT:  Not you, Mr. Loya.  I'm just giving

24   you thoughts.  We can fit them in wherever we get them in.

25   I don't want anyone to commit.  I'm just telling you what

1    days are out.  That's, perhaps, the smartest thing for me

2    to say.  The 22nd through the 28th are out.  I am out on

3    those dates.  So that is the better way of communicating

4    it.  Yes.

5              MR. PATTERSON:  (Indiscernible - 2:20:34).

6              THE COURT:  No, I apologize.  22 through 28 are

7    out.  29th in the afternoon is in here in Houston.  The

8    30th, Victoria.

9              MR. PATTERSON:  (Indiscernible - 2:20:52).

10             THE COURT:  So anything before the 22nd would be

11   Houston.  Just keep that in mind.  Just easier for me to

12   say it now before you begin your -- okay.  Yes, Mr.

13   Patterson?

14             MR. PATTERSON:  (Indiscernible - 2:21:15).

15             THE COURT:  Okay.  Yes.  Mr. Loya.  And can you,

16   Mr. Loya, just if you can go to the opposite side of the

17   hallway?  There's a bench there.  I just want to make sure

18   that you're --

19             THE WITNESS:  (Indiscernible - 2:21:29).

20             (Witness exited the courtroom)

21             THE COURT:  Okay.  Let me just announce that

22   we're back on the record in *Vitol v. Brass*, September 2nd.

23   It's now 2:20.  Mr. Patterson?

24             MR. PATTERSON:  Judge, we -- there was evidence

25   that the witness reviewed two documents prior to his -- in

1  preparation for his testimony.  Counsel forwarded two

2  documents to me.  I showed those to the witness.  The

3  witness could not identify either document as having seen

4  either of those documents in the past month.

5           Now, what do we do with that?  I'm not really

6  sure.  But I think there needs to be -- I think I am

7  entitled to further investigate unless there is some other

8  evidence.  I'm not suggesting someone's not necessarily

9  being forthcoming, but all I know, the only evidence is he

10  reviewed two.  I was sent two.  He testified under oath

11  he's never seen -- he saw one, he thought yesterday in

12  evidence, and had never seen the other one.  And I think --

13  I don't know what you want to do with it.  I'm not sure

14  what I want to do with it yet, but I want everyone to know

15  where I'm at.  I'm concerned.  And I think I'm entitled to

16  figure out what's going on.

17           THE COURT:  Okay.

18           MR. AURZADA:  We're ready to recall Mr. Loya.

19           THE COURT:  Okay.  Mr. Patterson, I'm going to

20  reserve any comments until -- I'm going to give it some

21  thought, but I appreciate the comment.  And thank you for -

22  - I appreciate you doing it outside.  I think it was the

23  appropriate thing to do.  Yes, Mr. -- counsel?

24           (Court confers with Clerk)

25           THE COURT:  Mr. Aurzada, if you're -- are you

```
 1   going to need me to transfer the -- are you going to show

 2   any documents this -- just in terms of the technology, what

 3   do you want me to do?

 4           MR. AURZADA:  I'm going to use one document.  And

 5   if you could give control to Mr. Gross.

 6           THE COURT:  Mr. Gross.

 7           MR. AURZADA:  Ms. Meta (phonetic) is not here

 8   today.

 9           THE COURT:  No worries.  Okay.

10           MS. GOOTT:  (Indiscernible - 2:24:43).

11           MR. AURZADA:  Your Honor, that's Mr. Michael

12   Burnack (phonetic).  He's my partner from the Houston

13   office.

14           THE COURT:  Yeah.  Welcome.

15           MR. BURNACK:  Thank you, Your Honor.

16           THE COURT:  Mr. Gross, just before we get

17   started, let me see if -- I'm going to -- Mr. Gross, were

18   you able to -- I think we're okay.  Can you confirm?  Just

19   give me a thumbs up or something.  Okay.  Okay.  Okay.

20   Thank you.  We're back on the record.

21           (Witness entered the courtroom)

22                        REDIRECT EXAMINATION

23   BY MR. AURZADA:

24   Q.   Mr. Loya, you were asked some questions on cross-

25   examination about the notion of a loan versus a financing.
```

1   Do you remember those questions?

2   A.   Yes.

3   Q.   Can you explain to the Court what you mean by a loan?

4   A.   A loan is what -- in my mind is a bank that enters

5   into a loan agreement with a customer, client, in which

6   they agree to a certain amount of money that they're going

7   to transfer to a client, and with a promise to pay back a

8   schedule of when it's going to be paid back, interest

9   rates, all of that.  Basically, a formal lending of money.

10  Q.   Did Vitol make that kind of loan to Mr. Brass?

11  A.   No.

12  Q.   Did Vitol make that kind of loan to GCAC?

13  A.   No.

14  Q.   Now, you described another word called a financing.

15  Do you remember that?

16  A.   Yes.

17  Q.   Can you describe for the Court what you mean when you

18  say financing?

19  A.   When you provide financing, basically is you are

20  providing a -- agreeing to basically provide the money --

21  pay for the cost or acquiring of making a transaction

22  possible.  And that usually requires paying for the

23  inventory, whether it's a single product, or various

24  products are being blended, paying for the storage of that

25  inventory, paying for the transportation, delivery of that,

Page 108

1    and the losses and everything that goes with a normal

2    transaction.  You are providing the funds to execute that

3    transaction.  That's what I see by financing.  That's a

4    business that Vitol did often.

5                MS. GOOTT:  (Indiscernible - 2:27:40).

6                THE COURT:  Sustained.

7    BY MR. AURZADA:

8    Q.   Mr. Loya, does Vitol provide financing?

9    A.   Yes, it does.

10   Q.   Through what types of clients.

11   A.   Usually clients that don't have the financial

12   wherewithal to do those trades itself.

13   Q.   Was GCAC one such party?

14   A.   Yes.

15               MS. GOOTT:  (Indiscernible - 2:27:59).

16               THE COURT:  Sustained.

17   BY MR. AURZADA:

18   Q.   Did Vitol finance GCAC?

19   A.   Yes.

20   Q.   Can you describe that for the Court and how it was

21   done?

22   A.   Basically, Vitol provided the finance, the funds to --

23   Vitol would purchase under its name, purchase various

24   components, put them in storage, storage that Vitol

25   controlled, and paid for transportation, getting it there

1   and getting it to the client.  And all of the steps that

2   were required to be done.

3   Q.   Now, in that financing to GCAC, did Vitol perform all

4   of its obligations?

5   A.   Yes.

6   Q.   Did GCAC?

7   A.   No.  They never paid back the money that was --

8           MS. GOOTT:  (Indiscernible - 2:29:00).

9           THE COURT:  I'm going to give you a little bit of

10  leeway, but I'm going to start to quote Mr. Patterson on

11  the sidebar.  But the objection is sustained.

12  BY MR. AURZADA:

13  Q.   Did GCAC perform its obligations under the financing

14  with Vitol?

15          MS. GOOTT:  (Indiscernible - 2:29:26).

16          MR. AURZADA:  Your Honor, he just testified that

17  there was a financing, so I'm asking -- I asked him if

18  Vitol performed its obligations.  And now I'm just asking

19  did GCAC perform its.

20          MS. GOOTT:  (Indiscernible - 2:29:40).

21          THE COURT:  Overruled.  You can answer the

22  question.

23          THE WITNESS:  No.  GCAC did not live up to their

24  end of the bargain.

25  BY MR. AURZADA:

```
 1    Q.    On cross-examination, you mentioned security and
 2    financing transactions --
 3              MS. GOOTT:  (Indiscernible - 2:30:13).
 4              THE COURT:  Patterson did the same thing, so I'm
 5    going to give him a little leeway.  Go ahead.  Ask the
 6    question.
 7              MS. GOOTT:  (Indiscernible - 2:30:26).
 8              THE COURT:  I understand.
 9              MS. GOOTT:  (Indiscernible - 2:30:31).
10              THE COURT:  Overruled.  I understand.
11    BY MR. AURZADA:
12    Q.    What security did Vitol hold when doing business with
13    GCAC?
14              MS. GOOTT:  (Indiscernible - 2:30:42).
15              THE COURT:  Overruled.
16              THE WITNESS:  Vitol maintained control of the
17    product.
18    Q.    Can you tell the Court what that product was, just so
19    the Court clearly knows?
20    A.    It was asphalt, or components of asphalt.  They're
21    blended together to make asphalt.  They also make fuel oil.
22    It's -- those being similar products.
23    Q.    And how was it held?  What did Vitol do to hold it?
24    A.    It was in --
25              MS. GOOTT:  Objection.  (Indiscernible -
```

```
 1   2:31:12).

 2              THE COURT:  Overruled.

 3              THE WITNESS:  They held the product in there --

 4   under the control in their -- under their (indiscernible -

 5   2:31:26) they control.

 6   BY MR. AURZADA:

 7   Q.   Now, at some point, did Vitol release its security?

 8   A.   Yes.

 9   Q.   Describe for the Court exactly how that happened?

10   A.   That -- what GCAC would have to post some security,

11   whether it be pre-payment, or something that basically

12   would be value, would allow Vitol to then take that and

13   release the product.

14   Q.   And did that happen here?

15   A.   It happened at the beginning.  It didn't happen

16   towards the end.

17   Q.   And what does Vitol expect when it releases product to

18   a party it is financing?

19   A.   We expect them to pay for that product.

20   Q.   Would Vitol ever release product as a gift?

21   A.   No.

22   Q.   Did Vitol release product to GCAC?

23   A.   Did Vitol release product to GCAC?  They did.

24   Q.   Did it expect to be repaid?

25   A.   Yes, of course.
```

1    Q.   Let me ask you a little bit about -- sorry

2    (indiscernible - 2:32:42).  Is Vitol a logistics company?

3              MS. GOOTT:  (Indiscernible - 2:32:48).

4              THE COURT:  Sustained.

5    Q.   What is Vitol's business?

6    A.   It's a trading company.  It's a trading company, and

7    all the ramifications that trading encompasses.

8    Q.   In the commodities industry, is there a difference

9    between a broker and a trader?

10   A.   Yes.

11   Q.   Can you explain the differences to the Court?

12             MS. GOOTT:  (Indiscernible - 2:33:16).

13             THE COURT:  What's your response, counsel?

14             MR. AURZADA:  I'm asking his understanding of the

15   difference.

16             MS. GOOTT:  (Indiscernible - 2:33:27).

17             THE COURT:  What's your response, counsel?

18             MR. AURZADA:  Your Honor, they've made hours and

19   hours of -- I'm having a hard time answering this.  I do

20   not want to coach the witness is what I'm saying.  I'm

21   trying to get to the capacity in which Vitol acted for

22   GCAC, whether it was a broker or a trader, because those

23   words were both used on direct.  And I think it's important

24   that the Court hear those.

25             THE COURT:  Why don't you go down that road.

```
 1    BY MR. AURZADA:

 2    Q.    Okay.  Did Vitol act as a broker or trader in

 3    connection with GCAC?

 4              MS. GOOTT:  (Indiscernible - 2:34:11).

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Vitol acted as a trader.

 7    BY MR. AURZADA:

 8    Q.    Okay.  Why was that important to Vitol?

 9    A.    That's what its business is, what it does.

10    Q.    How many traders worker at Vitol in 2017?

11    A.    I don't know the exact number.  I would estimate

12    something around -- worldwide or Vitol Inc.?

13    Q.    Vitol Inc. in Houston.

14    A.    I don't know exactly the number, but I would say it's

15    around 70.

16    Q.    Did you know the details of all the transactions your

17    traders were working on?

18    A.    No.

19    Q.    Why not?

20    A.    It's just too many.  That's not my role.  My role is

21    basically get involved --

22              MS. GOOTT:  Objection.  (Indiscernible -

23    2:34:57).

24              THE COURT:  Sustained.

25    BY MR. AURZADA:
```

1   Q.   Was it your job to know the details of every

2   transaction the traders were working on?

3   A.   No.

4          MS. GOOTT:  (Indiscernible - 2:35:10).

5          THE COURT:  Overruled.  Overruled.  He can

6   answer.

7   Q.   Would it have been possible for you to do that?

8          THE COURT:  Well, I don't know what question

9   you're asking.  I overruled the objection and then you

10  asked another one.

11  BY MR. AURZADA:

12  Q.   Would it have been possible, Mr. Loya -- I'm going to

13  start again, Your Honor, if that's okay.  Mr. Loya, would

14  it have been impossible -- would it have been possible for

15  you to be involved in every trade that was done by your

16  traders?

17         MS. GOOTT:  (Indiscernible - 2:35:34).

18         THE COURT:  He can testify to the extent he

19  knows.

20         THE WITNESS:  No.  I know that it would be

21  impossible.  It is too many of them.

22  Q.   How many would there be?

23         MS. GOOTT:  (Indiscernible - 2:35:47).

24         THE COURT:  Yeah.  That's vague.  One what day,

25  what time, what period of time, what year.  I think that is

1    vague.

2    Q.   In August of 2017, how many trades would the Vitol

3    traders do in one day?

4    A.   It would --

5            MS. GOOTT:   (Indiscernible - 2:36:09).

6            THE COURT:   Counsel?

7            MR. AURZADA:   Your Honor, he just testified there

8    was approximately 70.

9            THE COURT:   All right.   Overruled.   He can

10   answer.

11           THE WITNESS:   I can answer?

12           THE COURT:   Uh-huh.

13           THE WITNESS:   It ranged, depending on how busy a

14   day was.   It ranged from -- it could be in -- and I'm

15   thinking about all transactions, it could be over 100 in a

16   busy day.

17   BY MR. AURZADA:

18   Q.   Can you describe for the Court the difference between

19   a joint venture that Vitol would do and a financing?

20   A.   Yes.

21   Q.   Would you please?

22           MS. GOOTT:   (Indiscernible - 2:37:15).

23           THE COURT:   Overruled.

24           THE WITNESS:   A joint venture would be one where

25   -- we had two types of joint ventures.   We had ones where

1    it would be a pure -- a single transaction, where it would

2    be a joint venture with another counterparty, and maybe

3    delivering a cargo or something like that.  And there were

4    joint ventures in which were longer -- for a period of

5    time, that would cover several transactions, many

6    transactions.  And I'm sorry, I forget the exact question.

7    BY MR. AURZADA:

8    Q.   How would that compare to a financing.

9         MS. GOOTT:  (Indiscernible - 2:37:55).

10        THE WITNESS:  And a financing would be providing

11   the funds in order to allow the person that Vitol decided

12   to finance, allow them to do a trade.  Enable, not allow.

13   Enable to be exact.

14   BY MR. AURZADA:

15   Q.   Are joint ventures more complicated or less

16   complicated than a financing?

17        MS. GOOTT:  Objection.  (Indiscernible -

18   2:38:22).

19        THE COURT:  I think he can cross him on it.  I

20   think if he's the CEO of Vitol Inc., he knows what a

21   financing sounds like, as he defined it.  And he can talk

22   about whether believes a J.V. is more or less complicated.

23   I think you can pick him up on cross on that.  Overruled.

24        THE WITNESS:  On -- in referring to a single

25   J.V., they're probably about the same.  If it's a long-term

1    J.V., it's far more complicated than a financing.

2    Q.   Please tell the Court what those complications are.

3    A.   Well, it has to be first is how we're going to

4    allocate the different responsibilities to the parties.

5    Who's going to do what?  How is it going to be financed?

6    Where's it going to be stored?  Who's going to cover those

7    costs?  How are they going to be split up?  Who's going to

8    make the decision of what market to approach, who

9    approaches that market?  How is that -- who is going to

10   determine the -- make the decision of pricing, for example,

11   or other decisions.  How we're going to transport it there?

12   Can we meet the time schedule?  And how is it going to be

13   supplied, if it's more than one area that the joint venture

14   partners are operating from?  How are the profits or losses

15   going to be split?  How will the activities be hedged?  Who

16   will hedge them?  Who will provide the financing for the

17   hedges?  Who's going to be the clearing house?  Under whose

18   name is it going to be?  How is that going to be allocated

19   later on.  How do we terminate the joint venture?  How do

20   we liquidate inventory that may be in tankage at the time

21   the joint venture expires.  It's a lot of questions.

22   That's why it would have to be put together, everything

23   agreed, and then at that point reviewed.

24   Q.   Were all of those items you just described agreed upon

25   between Vitol and GCAC?

1    A.    They were not?

2    Q.    Is there a different level of communication that is

3    required between the parties to a financing with Vitol and

4    the parties to a joint venture?

5    A.    What -- clearly a joint venture, again, one that

6    extends beyond one transaction is far more complicated and

7    will required a lot more communication and would take a lot

8    more time.  Financing, there's some details to be agreed,

9    but it's far simpler.

10   Q.    Does it require more or less documentation to do a

11   joint venture or a financing?

12          MS. GOOTT:  (Indiscernible - 2:41:28).

13          THE COURT:  I also think it's vague too.  What

14   financing?  I don't even -- I think you can ask another

15   question.

16          MR. AURZADA:  Sure.  Thank you, Your Honor.  I'll

17   rephrase.

18   BY MR. AURZADA:

19   Q.    When Vitol provides financing, how are the

20   transactions communicated by the counter-party to that

21   financing?

22          MS. GOOTT:  (Indiscernible - 2:42:06).

23          THE COURT:  I think everybody's going to have to

24   -- I'm telling you.  I'm going to either open it wide open

25   and everybody's going to get sidebar, or no one's going to

```
1    get it.  But y'all are going to have to figure out.

2              MS. GOOTT:  (Indiscernible - 2:42:19).

3              THE COURT:  I'm just saying, just everybody

4    choose.  I don't want to do it, but your objection is

5    valid.  Sustained.

6              MS. GOOTT:  (Indiscernible - 2:42:31).

7              THE COURT:  No, no, no, as long as --

8              MS. GOOTT:  (Indiscernible - 2:42:35).

9              THE COURT:  As long as the other side gets to do

10   it too, I'm fine with it.

11             MS. GOOTT:  (Indiscernible - 2:42:41).

12   BY MR. AURZADA:

13   Q.   Mr. Loya, when doing a financing in 2017, how did

14   Vitol communicate with its counterparties?

15             MS. GOOTT:  (Indiscernible -  2:43:00).

16             THE COURT:  Can you repeat the question.

17             MR. AURZADA:  Yeah.  I'm going to try to do it

18   word for word.

19             THE COURT:  Okay.

20   Q.   In 2017, when Vitol was providing financing to its

21   customers, how did it communicate with the customers?

22             MS. GOOTT:  (Indiscernible - 2:43:18).

23             THE COURT:  I think relevance is covered.  Maybe

24   you can answer the question to the extent you know.

25             THE WITNESS:  It would be a financing
```

```
1    transaction.  First, it would be led by the trader.  The

2    trader would then introduce that to the finance group, the

3    finance group under which credit operated, and incident,

4    the finance would report it to me.  Is that -- then the

5    finance group would assess the risk of the client, based on

6    his credit worthiness, determine what security would be

7    required for that.  And that would be done by the credit

8    department.

9            And then the finance board would give their

10   result of their analysis to the trader.  The trader would

11   communicate that to the client.  And that's how it was

12   done.

13   BY MR. AURZADA:

14   Q.   Does Vitol use the word position in a specific way

15   when discussing its business?

16   A.   Well, a position for Vitol is basically --

17           MS. GOOTT:  (Indiscernible - 2:44:49).

18           THE COURT:  Overruled.

19           THE WITNESS:  A position to Vitol is where

20   basically it refers to a trade and our stand -- it could

21   refer to many things.  It could refer to a trade.  It can

22   refer to an outstanding risk, be it a hedge that is

23   outstanding.  Or it could refer to a financing that's

24   ongoing, that hasn't been -- but it usually refers to a

25   business in which a transaction in which they're involved
```

1    in, and where they are physically.  And physically, I mean

2    is where their products, what -- how much product, where it

3    is.  That's the position.

4    BY MR. AURZADA:

5    Q.   So if you are asked -- well, I'm going to ask you now.

6    Did Vitol take Rio's position when it began doing business

7    with GCAC?

8    A.   I don't know the details of what Vitol took from Rio.

9    Q.   Did Vitol ever agree to share profits with GCAC?

10   A.   No.

11   Q.   Did Vitol ever agree to share profits with Mr. Brass?

12   A.   No.

13   Q.   Did Vitol ever agree to share losses with GCAC?

14   A.   No.

15   Q.   Did Vitol ever agree to share losses with Mr. Brass?

16   A.   No.

17   Q.   Did you ever tell Mr. Brass that you wanted to be in a

18   joint venture with him?

19   A.   No.

20   Q.   Did you tell him the contrary?

21   A.   I told him that we decided not to be in a joint

22   venture with him.

23   Q.   Did you approve a partnership with GCAC?

24              MS. GOOTT:  (Indiscernible - 2:46:44).

25              THE COURT:  Sustained.

```
 1   BY MR. AURZADA:

 2   Q.   What type of a relationship did you approve with GCAC

 3   between GCAC and Vitol?

 4   A.   Vitol would provide financing to GCAC, and eventually

 5   until the end of December.  That's it.

 6   Q.   Did GCAC control its own positions?

 7   A.   GCAC had their own trades, yes.

 8   Q.   And what does that mean to you?

 9   A.   It means they basically had to decide where -- what

10   they were going to sell, how they were going to sell it,

11   how they are going to hedge it, when they're going to hedge

12   it.  They were responsible for all of that.

13   Q.   Now, if GCAC -- excuse me.  If Vitol and GCAC had been

14   in a joint venture, would that be the -- your answer be the

15   same or different?

16              MS. GOOTT:  (Indiscernible - 2:47:45).

17              THE COURT:  Sustained.

18   Q.   Did Mr. Brass control any part of Vitol's business?

19   A.   None.

20   Q.   Did Vitol control any part of Mr. Brass's business?

21              MS. GOOTT:  (Indiscernible - 2:48:05).

22              THE COURT:  Overruled.

23              THE WITNESS:  No.

24   Q.   Is that important?

25              MS. GOOTT:  (Indiscernible - 2:48:15).
```

1          THE COURT:  It is vague.  I don't know what you

2    mean.  I don't know which question you were referring to.

3    You asked two and then you asked a question.

4          MR. AURZADA:  Okay.  Mr. Gross, can we look at

5    Defendant's Exhibit 13?

6          THE COURT:  I thought I did.  I apologize.

7    BY MR. AURZADA:

8    Q.   Do you recall looking at this email?

9    A.   Yes.

10   Q.   To your knowledge, has Mr. Brass ever seen this email

11   or any of the emails on here?  And if you need to take a

12   look at it, please do.

13   A.   I don't see him.

14   Q.   Okay.  Is Nick Fay a lawyer?

15   A.   No.

16   Q.   In your experience, does Nick Fay deal with business

17   terms or legal terms?

18   A.   Business terms.  He's a trader.

19   Q.   Would Nick Fay have been involved in the negotiations

20   between Vitol Inc. and GCAC?

21         MS. GOOTT:  (Indiscernible - 2:49:43).

22         THE COURT:  Sustained as to both.

23   Q.   To your knowledge, did Nick Fay negotiate with GCAC

24   directly?

25         MS. GOOTT:  (Indiscernible - 2:49:52).

1                THE COURT:  Overruled.

2                THE WITNESS:  No.  I don't think he did.

3                MR. AURZADA:  Your Honor, may I have a moment?

4                THE COURT:  Uh-huh.

5                (Pause)

6                MR. AURZADA:  No further redirect, Your Honor.

7                THE COURT:  Okay.

8                (Pause)

9                THE COURT:  Mr. Patterson, before you begin, I've

10    turned it over to the podium, just so you can connect if

11    you need to.

12                MR. PATTERSON:  Perfect.

13                THE COURT:  Okay.

14                          RECROSS-EXAMINATION

15    BY MR. PATTERSON:

16    Q.   Mr. Loya, your lawyer on recross and you discussed, I

17    guess, a clarification on your understanding of a loan and

18    financing, right?

19    A.   I don't understand the clarification.  But we

20    discussed the loan.

21    Q.   Right.  And I guess we need to clarify it a little bit

22    further.  What would you call me giving a business money

23    for their working capital?  Is that a loan or is that

24    financing?

25    A.   In my vernacular, I would call it financing.

```
1    Q.   You would?  So if you gave GCAC $500,000 as working

2    capital, that's financing?

3    A.   Financing.  Yeah, financing is very broad.

4    Q.   Well, yesterday you weren't.  Yesterday you said that

5    was a loan.  If you gave another person money, and they

6    promised to pay it back, that was a loan, not financing.

7    Do you remember this conversation we had?

8    A.   I do remember that conversation.

9    Q.   Yeah.  And so do you -- are you having second thoughts

10   about how you explained it to me?

11   A.   No.  Perhaps I should -- to me, a loan is a subset of

12   finance.

13   Q.   Okay.  Because yesterday that's not what you said.

14   You would agree with me there, right?

15   A.   Well, yeah.  I was trying to in my mind describe what

16   is a loan.  And to me, I see it more as a formal thing.

17   Q.   And so where are we today?  Tell me today what you

18   think the difference between a loan and financing is in

19   your mind.  Because you're using those words.  Your lawyer

20   stood up here, and you're using those words to make a

21   distinction.  You understand why it's important, right?

22             MR. AURZADA:  Objection.  Argumentative, Your

23   Honor.

24             THE COURT:  Overruled.

25   BY MR. PATTERSON:
```

```
 1   Q.   You understand why the distinction is important, don't

 2   you?

 3   A.   I understand that I have to give you what I believe is

 4   my definition of a loan and what is a finance.  The

 5   importance is up to you guys.

 6   Q.   If I said I have a business, Mr. Loya, and I want you

 7   to finance my business, what does that mean?

 8              MR. AURZADA:  Calls for speculation, Your Honor.

 9              THE COURT:  I'm going to give Mr. Patterson a

10   little bit of leeway here.  I think it will help clarify,

11   at least in my mind, the distinction that Mr. Loya is

12   making between a loan and a financing.

13              THE WITNESS:  Do you want me to answer?

14              THE COURT:  Just a second.  Mr. Patterson, that's

15   not an introduction to, you know, offer 15 hypos, but I do

16   think this one is valid.

17              MR. PATTERSON:  Okay.  Thank you, Your Honor.

18              THE WITNESS:  In your hypothetical, I would ask

19   for more detail.

20   BY MR. PATTERSON:

21   Q.   All right.

22   A.   Financing is very encompassing.

23   Q.   Okay.  What's the question?  What detail do you want

24   to know what to call -- you'd call that financing?

25   A.   No, you asked me what I'd do if you asked me that, and
```

1   I said I want more detail regarding what you needed.

2   Q.   And I said what would you call that, financing or a

3   loan?

4   A.   I would need more detail to know what it is that you

5   need.  You asked --

6   Q.   What do you need to know?  What do you need to know to

7   make the distinction?

8   A.   I need -- what are you asking for?  What do you want

9   me to pay for?  What is it you want/

10   Q.   Money.  Working capital.  You understand what working

11   capital is, don't you?

12   A.   You want a loan from me.  You want to borrow money.

13   Q.   Yeah.

14   A.   That I give you money.  We sign an agreement that says

15   I lend you so much, you pay me this interest rate, and this

16   is what you have to pay me back at --

17   Q.   Okay.

18   A.   But that would be a loan.

19   Q.   Okay.  You agree to finance someone's operations,

20   that's a loan, right?

21   A.   No.  It's a financing their operation.

22   Q.   What's the difference of that and what I just asked

23   you, the hypothetical?

24   A.   In my mind, a loan is a formal document.  You say here

25   it is.  I'm going to lend you money for a certain tenor,

1    certain interest rate.  This is how you've got to pay me,

2    and here's what happens if you don't pay me.  In financing,

3    you're asking me to -- can you finance my inventory, for

4    example.  Can you buy for me?  Can you hold it?  What

5    security you need, etcetera.  To me it's broader, more

6    complex.

7    Q.   Why would you describe what you did as financing

8    GCAC's operations?  Is that what you did?

9    A.   That's what we did.

10   Q.   You did?  You loaned them the money to operate?

11   A.   No.  You said why did we call it financing, because we

12   financed its operations.

13   Q.   How?  How without giving them money?  How did you do

14   that?

15   A.   We bought the inventory.

16   Q.   Who bought the inventory?

17   A.   Vitol bought the inventory.  It was sitting --

18   Q.   Right.  Vitol bought the inventory, right?  In Vitol's

19   name, right?

20   A.   On behalf of GCAC.

21   Q.   Hold on.  We'll get there.  One step at a time.  You,

22   Vitol, bought inventory, step one, right?

23   A.   Yes.

24   Q.   Now, you say now today, five years later, oh, we did

25   that on behalf of GCAC.  Right?  Today, five years later,

1    you sit here and you want us to believe that was done on

2    behalf of someone, right?

3    A.   No, I'm telling you what it was then.

4    Q.   I know you are.  What do you have?  What did you bring

5    in the hundreds of thousands of pages that you dumped in

6    this case, where is the piece of paper that says that?

7              MR. AURZADA:  Objection.  Argumentative.

8              THE COURT:  Sustained.

9    BY MR. PATTERSON:

10   Q.   Did you bring it today?

11   A.   Bring what?

12   Q.   That piece of paper.

13             MR. AURZADA:  Objection.  Argumentative.

14             THE COURT:  Sustained.

15   Q.   Do you have -- does Vitol have anything that reflects

16   that statement right there?

17             MR. AURZADA:  Objection.  Argumentative.

18             THE COURT:  Overruled.

19             THE WITNESS:  What statement?

20   Q.   The statement that what you bought Vitol was on behalf

21   of GCAC?

22   A.   That was the understanding from the very beginning.

23   Q.   No.  Do you have anything that says that?

24   A.   No.

25   Q.   Do you have an email that says that?

```
 1   A.   I don't know.  I don't know of all the emails that are

 2   --

 3   Q.   Right.

 4   A.   -- in existence.

 5   Q.   You've never seen it, right?

 6   A.   I don't know.  I don't think so.  No.

 7   Q.   No?  Well, have you?  If you did, you would remember,

 8   right?

 9   A.   I would.

10   Q.   Right.  So you don't remember.  You've never seen it.

11   A.   I don't remember seeing one.

12   Q.   No one brought you a piece of paper that says these

13   trades are really on behalf of GCAC, although Vitol's

14   putting their name on it, right?

15   A.   No, that's when we operated from the very beginning.

16   Q.   Whatever excuse doesn't matter.  There's -- the

17   paperwork, the trades are all in Vitol's name.  Isn't that

18   true, Mr. Loya?

19   A.   That was the financing.

20   Q.   Isn't that true, yes or no?

21   A.   Yes.

22   Q.   All right.  And it's also true that only now, with no

23   substantiation, are you saying that was on behalf of

24   someone else.

25            MR. AURZADA:  Argumentative.
```

```
 1              THE COURT:  Sustained.

 2              MR. AURZADA:  And he's mischaracterizing his

 3    testimony.

 4              THE COURT:  I think we all got the point.

 5    BY MR. PATTERSON:

 6    Q.   All right.  What else did you do to finance?  The

 7    trades were all Vitol's trades.  What else did you do that

 8    you say was financing?

 9    A.   We provided storage, paid for the storage.

10    Q.   Okay.  And that storage was done in whose name?

11    A.   Vitol's.

12    Q.   Vitol, right.  Do you have one piece of paper that

13    says you did it for somebody else?

14    A.   No.

15    Q.   Do you have one email that said this is really for

16    GCAC.  This is really for Mr. Brass.  One piece of paper.

17    One email.

18    A.   We didn't need one.

19    Q.   I know you don't think you needed one.  I'm asking you

20    if one exists.

21    A.   I don't know of one.

22    Q.   Have you seen it?

23    A.   If I don't know of one, I can't see it.

24    Q.   I know.  That's why I'm asking you.  You want to hedge

25    your answers.  I want a direct answer.
```

1    A.   No, I'm answering your question.  You asked me that

2    question again and again.

3    Q.   I want a direct answer.  Yes or no.

4              MR. AURZADA:  Argumentative, Your Honor.

5              THE COURT:  Sustained.  I think he's answered the

6    question.

7    BY MR. PATTERSON:

8    Q.   What else did you do that you think is financing?

9    A.   Paid for transportation.

10   Q.   All right.  In whose name did you pay or incur that

11   debt for transportation?

12   A.   Vitol.

13   Q.   All right.  And now five years later, you show up here

14   and you want to say, oh that's really for GCAC?

15             MR. AURZADA:  Argumentative.

16             THE COURT:  Sustained.

17   Q.   Is that your testimony today that you want the Court

18   to believe it was done on behalf of GCAC?

19             MR. AURZADA:  Argumentative, Your Honor.

20             THE COURT:  Overruled.  He can answer that one.

21             THE WITNESS:  The Court can make its own mind,

22   but the truth is that we -- it was done on behalf of GCAC>

23   BY MR. PATTERSON:

24   Q.   Right.  I know that's what you believe.  Is there one

25   piece of paper that substantiates that?

```
 1              MR. AURZADA:  Objection.  Asked and answered.

 2              THE COURT:  Sustained.

 3              MR. PATTERSON:  No, this is transportation.

 4   We've done hedging, trades, and we've done storage.  We

 5   haven't done transportation.

 6              THE COURT:  I think he answered that there wasn't

 7   a piece of paper to justify it, but maybe he can clarify.

 8   BY MR. PATTERSON:

 9   Q.   Is there one that says you did it on behalf of GCAC?

10   A.   None that I know of.

11   Q.   One email?

12   A.   Not that I know of.

13   Q.   It doesn't exist, does it?

14   A.   I don't know.

15   Q.   What else did you do on this financing arrangement

16   that you say?

17   A.   We released the product -- we sold the product to

18   GCAC, and we released it to them when we had security

19   provided by GCAC.

20   Q.   So your testimony today is that you sold product to

21   GCAC.  Is that what you're saying?

22   A.   We released it for them to sell.

23   Q.   Listen to my question.  Did you sell product to GCAC?

24   A.   We released -- they had the buyer.  We would release -

25   -
```

1   Q.   That's not my question.  Listen to my question.  You

2   ran the largest private trading company in the world and

3   I'm asking you a very simple trading question.

4           MR. AURZADA:  Argumentative, Your Honor.

5   BY MR. PATTERSON:

6   Q.   Did you sell --

7           THE COURT:  Sustained.

8   BY MR. PATTERSON:

9   Q.   Did you sell any product directly to GCAC?

10           MR. AURZADA:  Object as argumentative.

11           THE COURT:  Overruled.

12           THE WITNESS:  We delivered product to GCAC.  I

13   don't know how -- what the agreement was.  How that was.

14   The corporate way it was handled.

15           MR. PATTERSON:  Okay.  Let me --

16           THE COURT:  Let me ask the question, Mr.

17   Patterson.  Are you aware of any sale, transaction, between

18   Vitol Inc. and GCAC?

19           THE WITNESS:  Are you asking me?

20           THE COURT:  Yes, sir.

21           THE WITNESS:  No, I'm not, Your Honor.  I don't

22   know.

23           THE COURT:  Are you aware of any sale transaction

24   between Vitol and Mr. Brass?

25           THE WITNESS:  No.

1          THE COURT:  Thank you.

2    BY MR. PATTERSON:

3    Q.   Anything else that supports this financing arrangement

4    you say you had with Mr. Brass and/or GCAC?

5          MR. AURZADA:  Objection.  Vague.

6          THE COURT:  I'm going to overrule that.  I think

7    he can answer.

8          THE WITNESS:  Yes, I mean, they paid for the

9    product.  When it was released to them, they would pay for

10   it.

11   Q.   Okay.  But you just testified under oath they never

12   bought any product.

13   A.   No.  It was released to them I just said, on their

14   behalf.

15   Q.   I don't know what that means, but did you ever sell --

16   were they ever obligated to buy anything from you?  Vitol?

17   A.   Do I understand that we were doing what we were doing,

18   we were putting it together for them to sell.  We were

19   providing that facility.  That -- an all-encompassing

20   facility.  Basically, (indiscernible - 3:05:31) for them to

21   sell.  And they would have to provide security when they

22   took it from us, and they would have to pay for it.

23   Q.   So it was a bigger arrangement?  Is that what you're

24   saying?  Kind of like a joint venture?

25   A.   No, it was support -- it was financing for the

1   trading.

2   Q.   But you just said they didn't trade.  You traded.

3   A.   No, we didn't trade.

4   Q.   Vitol.

5   A.   We did not take price risk.  We did not take -- we did

6   not hedge it.  We hedged -- they hedged the product under

7   their instructions for them.  They were --

8   Q.   You're saying that now, but we're --

9        MR. AURZADA:  Your Honor, he's interrupting the

10   witness.

11        THE COURT:  Yeah.  I think that's right.  Why

12   don't we just let him answer or strike it.

13   BY MR. PATTERSON:

14   Q.   Explain it.

15   A.   Vitol provided the facilities, the money, the storage,

16   the transportation, paid for it in order to release product

17   for GCAC to sell, of which they had to pay for it.

18        THE COURT:  Can I ask you a question?  When you

19   say that you release the -- Vitol would release product

20   once it obtained security, what do you mean by that?  The

21   obtaining of the security?

22        THE WITNESS:  Well, basically, Your Honor, the

23   product is in tank.  If they come to pick it up, we would

24   not release the -- as long as you're holding it, you feel

25   secure.

1           THE COURT:  I understand that.

2           THE WITNESS:  You have security.

3           THE COURT:  But you're saying obtain security.

4    You would release the product --

5           THE WITNESS:  They would have to post --

6           THE COURT:  -- if you obtained security --

7           THE WITNESS:  It would be a letter of credit.  It

8    would be some value that would equal the --

9           THE COURT:  That's why I'm trying to understand.

10   So in this transaction, was there any such obtaining of the

11   security in the form of a letter of credit or some other

12   form of security?

13          THE WITNESS:  It was -- at the beginning, yes.

14   They would post security.

15          THE COURT:  I'm asking you when the product was

16   released.

17          THE WITNESS:  Yes.  They would have to post

18   security in order for a product to be released.

19          THE COURT:  Did that happen in this case?

20          THE WITNESS:  And that was what -- it happened

21   throughout the first -- the front end of the case.  The

22   mistake was when Vitol stopped, or the trader stopped

23   waiting for security to be posted and released it without

24   security.

25          THE COURT:  So is it fair to characterize it --

1   is it fair to say that at some point between the

2   relationship between GCAC and Vitol, there was a posting of

3   security and at some point, there was no posting of

4   security?

5          THE WITNESS:  Yes.  Several months in the

6   beginning, they was posting a security.  And then it

7   stopped.

8          THE COURT:  And Mr. Kuo would be the person to

9   know when that stopped?

10          THE WITNESS:  Yes.  He would have all the details

11   for that.  He's the one who would --

12          THE COURT:  Okay.  I apologize, Mr. Patterson.  I

13   just -- the obtaining security part, I was just a little --

14   I needed the clarification in my mind to understand the way

15   the transaction worked.

16   BY MR. PATTERSON:

17   Q.   And what was that security that was posted?

18   A.   I don't know in detail.

19   Q.   You don't know?  You just testified under oath that

20   you knew there was security.  What was it?

21          MR. AURZADA:  Argumentative, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  I don't know what form it took.  I

24   was informed we had secured transactions when we were doing

25   it, and that was good enough for me.  I did not get into

1    the details.

2    BY MR. PATTERSON:

3    Q.    Informed by -- from whom?

4    A.    By Eric.

5    Q.    And did you not say what was the security?

6    A.    No.

7    Q.    Do you have a standard form of security?

8    A.    No.  But then it would be whatever the -- was

9    acceptable to finance.  Usually, it would be a letter of

10   credit.  It could be a pre-payment.

11          THE COURT:  Are you aware of any documents that

12   can justify any form of security that you're describing?

13          THE WITNESS:  Any document that would serve as

14   security, Your Honor?

15          THE COURT:  No.  Anything that kind of provides

16   evidence that any such security at any point existed.

17          THE WITNESS:  Yes.  It would have been -- there

18   would be documents of what they posted for security.

19          THE COURT:  So to the extent that they existed,

20   there would be some document within Vitol --

21          THE WITNESS:  There would be -- yes.  In the --

22          THE COURT:  Okay.

23          THE WITNESS:  -- finance department.

24          THE COURT:  Thank you.

25   BY MR. PATTERSON:

1    Q.   Such security would be easy to access, even today,

2    right?  If -- I'm sorry.  Go ahead.

3    A.   Access by whom?

4    Q.   Vitol.

5    A.   I don't understand the question.

6    Q.   If you were sitting in your office at Vitol, and I

7    said, Mr. Loya, show me the security posted by GCAC for

8    these trades -- these alleged trades.  You could pick up

9    the phone.  How long would it take to get you a copy of

10   whatever it was?

11   A.   I would -- I don't know how long it would take the

12   finance department.  I would think probably fairly quickly.

13   Q.   Fairly quickly, right?  Do you have any idea why no

14   such document was ever produced in this case?

15           MR. AURZADA:  Objection, Your Honor.  I think

16   that mischaracterizes the facts.

17           MR. PATTERSON:  Let's see it.  We'll be informal

18   right here.  Let's see it.

19           THE COURT:  I think we can ask questions.  But I

20   understand your point, if you wish to make the request.

21   But I don't -- to the extent the witness may or may not

22   know whether something was produced or not, I'm not sure

23   he's going to be in a position to answer the question.

24           MR. PATTERSON:  Well, not only that, but we asked

25   for such things in discovery.  They didn't produce it.  And

1    I'm going to ask the Court to strike the testimony because

2    it's not admissible unless they produced it.  They can't

3    talk about something they in essence told us doesn't exist,

4    and then show up in Court and go, oh, it does exist, right?

5              THE COURT:  It also goes to the weight.  Right?

6              MR. PATTERSON:  Well, it does and it doesn't.  I

7    can't attack the weight unless I prove to you they didn't

8    produce it.  We asked for it, and it wasn't produced, and

9    I'm happy to go informal here, and let the lawyers.

10   They're good at explaining to you.  But it didn't -- it

11   doesn't exist as far as discovery in the hundreds of

12   thousands of pages that were dumped on us in this case, it

13   doesn't exist.

14             THE COURT:  Why don't you just keep asking the

15   witness questions, and we'll see where it goes.

16             MR. PATTERSON:  All right.

17   BY MR. PATTERSON:

18   Q.   And in fact, since you don't know, Mr. Loya, it's

19   possible and probable that there is no such security, isn't

20   there?

21             MR. AURZADA:  Objection.  Argumentative.

22             THE COURT:  Sustained.

23   BY MR. PATTERSON:

24   Q.   It's possible that there is no such security, isn't

25   there, Mr. Loya?

Page 142

1    A.   I would say highly unlikely.

2    Q.   Possible.

3    A.   I don't think my guys would be lying to you.

4    Q.   Well, we talked about yesterday, Mr. Kuo lied to you.

5    Right?

6              MR. AURZADA:  Objection, Your Honor.  That

7    mischaracterizes the testimony entirely.

8              THE COURT:  Sustained.

9              MR. PATTERSON:  Judge, it does not.  He said he

10   was misled by Mr. Kuo in the dealings with GCAC.  He was

11   walking through the trading floor, and he heard him

12   talking.  And that's the first he heard.  That's exactly

13   what he said.

14             THE COURT:  I think there's a difference between

15   misleading and lying.  I see one.

16   BY MR. PATTERSON:

17   Q.   You were misled by our traders.

18             MR. AURZADA:  Objection, Your Honor.  That wasn't

19   the testimony yesterday either.

20             THE COURT:  I think I've got what I need if

21   anybody's interested in what the judge things.

22             MS. GOOTT:  That's all that matters.

23   BY MR. PATTERSON:

24   Q.   Could there have been another mistake on this file?

25   A.   Another from which one?

1    Q.   Another one from Mr. Kuo's?  No security.

2    A.   No, that was a mistake when he failed to ask for

3    security later on during that transaction.

4    Q.   Right.  So maybe there never was any security.

5    A.   There was.

6    Q.   How do you know?

7    A.   I believe him.

8    Q.   You believe who?

9    A.   I believe him and we discussed it, I think -- no, in

10   fact, I know that we discussed it when this came up.  All -

11   - they discovered all this in February or March of the

12   following year that we were -- we went through finance and

13   all that, and what mistakes were made, and we discussed

14   when they were getting security and then when they stopped

15   getting security.

16   Q.   So now you remember the discussion you had when you

17   were investigating, because yesterday we talked, you didn't

18   have any details.  You just said you looked into it, right?

19            MR. AURZADA:  Objection, Your Honor.  It's --

20   BY MR. PATTERSON:

21   Q.   But now you specifically remember?

22   A.   No.  I don't think --

23            MR. AURZADA:  Compound and argumentative.

24            THE COURT:  Sustained.  I've got what I need, Mr.

25   Patterson.

002898

```
 1   BY MR. PATTERSON:

 2   Q.   But the security doesn't really matter because GCAC

 3   never made a trade; isn't that true, Mr. Loya?

 4           MR. AURZADA:  Argumentative.

 5           THE COURT:  Overruled.

 6           THE WITNESS:  No.  That's not the case at all.

 7   Q.   Do you have evidence that GCAC made a trade with

 8   Vitol?

 9           MR. AURZADA:  Argumentative, Your Honor.  He's

10   already testified about this.

11           THE COURT:  That's not argumentative, though.

12   Overruled.

13           THE WITNESS:  Basically, the evidence is that we

14   only release product to them to sell in exchange for

15   security.  And later on, we failed to get security when we

16   released product.

17   BY MR. PATTERSON:

18   Q.   Okay.  I asked you about a trade.  I didn't ask you

19   about buying any product from Vitol.  We'll get there.

20   Well, I have, but I -- that wasn't my specific question.

21   My specific question was GCAC never made a trade with

22   Vitol.  You never made a trade on behalf of Vitol; is that

23   correct?  You never made a trade on behalf of GCAC.

24   A.   The arrangement was in providing finance to enable

25   GCAC to do the trades.
```

```
 1   Q.   Every single -- you testified yesterday that you

 2   believe Mr. Brass and/or GCAC owed Vitol $10 million,

 3   right?

 4   A.   Yes.

 5   Q.   All right.  Let's break it down.  All right.  What's

 6   the first big piece of that $10 million?

 7              MR. AURZADA:  Your Honor, I would argue that this

 8   is outside the scope of the redirect.

 9              THE COURT:  I haven't heard the question yet.

10   Your right to reserve, I just haven't heard the question.

11   BY MR. PATTERSON:

12   Q.   $10 million, right?  That's what you said.

13   A.   Yes.

14   Q.   Okay.  What's the comprised of in general terms?

15              MR. AURZADA:  Your Honor, I object.  This -- he's

16   asking what he testified about yesterday, which means it's

17   got to be outside the scope of the redirect.

18              THE COURT:  I'll sustain that.

19              MR. PATTERSON:  Judge, he testified that he was -

20   -

21              THE COURT:  He was not asked about -- on

22   redirect, you asked -- you got to ask about the 10 million

23   before as is shown up there.  He was not asked those

24   questions.  He was asked the difference between financings

25   and loans, and what he believed about those two, and he was
```

1    shown an email.

2    BY MR. PATTERSON:

3    Q.   Is there anything owed to Vitol for activity other

4    than financing?

5    A.   The hedges fall under the financing.

6    Q.   I'm sorry?

7    A.   The hedges fall under the financing.

8    Q.   The hedges?

9    A.   Fall under the financing.

10   Q.   Well, is he liable for hedges or financing?  I mean,

11   you understand it can't be both, right?

12           MR. AURZADA:  Argumentative, Your Honor.

13           THE COURT:  Sustained.

14   Q.   Is it hedging or financing?

15   A.   What is?

16   Q.   I'm sorry?

17   A.   What is?

18   Q.   The debt.

19   A.   The source of the debt --

20   Q.   Yes.

21   A.   -- product for $10 million and hedging losses of about

22   $5 million.

23   Q.   Okay.  Because earlier you said it was financing.  But

24   now it's for product and hedging?

25   A.   No, the financing covered --

1          MR. AURZADA:  No, that mischaracterized the

2     testimony.  He went all the way through that.

3          THE COURT:  Sustained.  Sustained.

4     BY MR. PATTERSON:

5     Q.   Does he owe money for hedging transactions or for

6     financing?

7     A.   Financing is for the losses in hedging and for the

8     product given to you.

9     Q.   Okay.  Not financing.

10    A.   No, financing is what enabled that to happen.

11         MR. AURZADA:  Your Honor, we've been through this

12    a whole bunch.  I think the Court is clear on it, and it --

13         THE COURT:  I tend to agree.

14         MR. AURZADA:  And it has been asked and answered.

15         THE COURT:  I tend do agree.

16         MR. PATTERSON:  Well, quite frankly, I wish

17    someone would explain it to me because he can't even tell

18    us what the basis of the debt is, Judge.  Is it -- for

19    example --

20         THE COURT:  His testimony --

21         MR. PATTERSON:  -- is it a hedging transaction

22    that went bad, and was at a lost, and he owes him for the

23    hedging transaction?

24         THE COURT:  The testimony is what it is.

25         MR. PATTERSON:  Judge, this is 104-34, Vitol's

```
 1    first amended complaint.  I'd ask the Court to admit it.
 2              MR. AURZADA:  I believe it's already been
 3    admitted, Your Honor, but we don't have an objection.
 4              MR. PATTERSON:  I didn't have it marked, but I
 5    thought it was too, but --
 6              THE COURT:  To the extent we haven't done it
 7    before, 104-34 is admitted.
 8              (Defense Exhibit 104-34 admitted into evidence)
 9    BY MR. PATTERSON:
10    Q.   Just to wrap this up, Mr. Loya, this is the complaint
11    your lawyer filed.  Do you see it on your screen?
12    A.   Yes.
13    Q.   Do you see where it says this?  Vitol separately
14    agreed to finance GCAC's operations.  Do you see that?
15    A.   Yes.
16    Q.   That is incorrect, right?  You did not do that.
17    A.   Can I read the whole paragraph to understand --
18    Q.   No.  I asked you to read that phrase.  That's all I'm
19    looking at.
20    A.   I can't comment on it unless I read the --
21    Q.   You can't comprehend the one phrase?
22              MR. AURZADA:  Objection, Your Honor.  It's
23    argumentative.
24              THE COURT:  Sustained.
25    Q.   Do you not understand what separately agreed to
```

1    finance GCAC's operations means?

2           MR. AURZADA:  Same objection.  It's the same

3    question.

4           THE COURT:  Sustained.

5    BY MR. PATTERSON:

6    Q.   Brass represented that he would remit to Vitol the

7    proceeds of the sale of asphalt and other goods purchased

8    with Vitol's money.  Do you see that?

9    A.    Yes.

10   Q.   Is that true?

11   A.   Can I read the paragraph?

12   Q.   No.  I'm asking you if that statement is true.  Am I

13   unclear?

14          MR. AURZADA:  Your Honor, this is all

15   argumentative and beyond the scope.

16          THE COURT:  Yeah.  Mr. Patterson, it's the extra

17   question that usually gets you there.  I think it's fair to

18   ask you that.  Can we put the sentence back up.  I want to

19   know what he thinks about that.

20          THE WITNESS:  I can't see it, Your Honor.

21          THE COURT:  There you go.  Look at the underlined

22   sentence.  Is that a true -- do you believe that's a true

23   statement or not?

24          THE WITNESS:  I believe that's a true statement.

25   BY MR. PATTERSON:

1   Q.   All right.  And you can identify selling asphalt or

2   goods to Brass.

3   A.   Sorry?  Ask that question again.

4   Q.   You can identify a purchase made with Vitol's money.

5   You gave him money.

6         MR. AURZADA:  Mischaracterizes the document, Your

7   Honor.

8         THE WITNESS:  Yes.

9         MR. PATTERSON:  That's what it says.  With

10   Vitol's money.

11   BY MR. PATTERSON:

12   Q.   Did you give him the money or did you not give him any

13   money?

14   A.   It doesn't say that.

15   Q.   It says with Vitol's money.  What does it say if it

16   doesn't say that?

17   A.   It says purchased goods with Vitol's money.

18   Q.   With Vitol's money.

19   A.   Vitol bought the goods.

20   Q.   That's not what it says.  It says with your money.

21   A.   To me, it reads purchase of goods with Vitol's money.

22   Q.   All right.  Vitol entered into this interim agreement

23   because of representations made by Brass.  Do you see that?

24   A.   Yes.

25   Q.   What representations?

1   A.   I don't know.  I have to --

2           MR. AURZADA:  This is outside the scope.

3   BY MR. PATTERSON:

4   Q.   You don't?

5           THE COURT:  I agree.  This is --

6           THE WITNESS:  What --

7           THE COURT:  Hold on.  This is outside the scope

8   of the redirect.

9           MR. PATTERSON:  They asked him about the

10  financing, Judge.  How is this beyond the scope of the

11  financing if I can't ask him the basis of the financing?

12  Although he can't explain it.

13          THE COURT:  That was my point.  What's the

14  response?  What's the response, counsel?

15          MR. AURZADA:  Your Honor, it's outside the scope

16  of the redirect.  It was dealt with a bunch yesterday, both

17  in my direct and in the cross.  I just don't recall asking

18  him about the misrepresentations in my redirect.  That's

19  what I'm saying.  We dealt with this yesterday.

20          THE COURT:  I'm going to sustain the objection.

21  The question was just generally what his understanding was

22  the difference between a loan and a financing transaction,

23  and he believes that there was a financing.  We didn't get

24  into.  So I'll sustain that objection.  You can ask another

25  question.

1    BY MR. PATTERSON:

2    Q.   Vitol also provided GCAC with other funds.  Do you see

3    that?

4    A.   Yes.

5    Q.   Right?  How much funds -- what funds did they provide?

6    How much?

7              MR. AURZADA:  Same objection, Your Honor.

8              THE COURT:  No, on this one, I think it's within

9    the range.

10             THE WITNESS:  I don't know how much.

11   BY MR. PATTERSON:

12   Q.   You have no idea?  Millions?

13   A.   Millions, because hedging is in there.  So obviously.

14   Q.   No.  I said funds.  Funds.  Not hedging, operations.

15   Operations of Vitol is hedging.  Operations of GCAC is not

16   hedging, right?

17   A.   It says funds necessary for operations, including

18   freight, (indiscernible - 3:26:57), inspections, storage,

19   hedging, my emphasis, and other related costs.

20   Q.   Right.

21   A.   So you asked me how much.  I said I don't remember.  I

22   don't know.  Not I don't remember, I don't know.  It must

23   be large because it included hedging.

24   Q.   Right.  And I ask you, do you have any documents that

25   reflect any hedges made by GCAC, and you said no.

```
 1   A.    No, I didn't say that.

 2   Q.    Right?  No, you said you have an understanding that

 3   the hedges made by Vitol were going to be covered by GCAC.

 4   That's what you said, right?

 5   A.    I don't know what documents are available.  I don't

 6   know what emails are available.  I do not know.  I'm not in

 7   -- I was not reviewing documents.  I was not responsible

 8   for the documents.

 9   Q.    Let me -- what --

10   A.    I don't know how many documents, if any, are out

11   there.

12   Q.    What document would reflect that obligation on behalf

13   of GCAC?

14   A.    It would -- first, an understanding, even verbal would

15   be how it's operated, whether any record of claims or

16   demands for you owe this money for hedges, any payments for

17   previous hedges.  Things like that.

18   Q.    What document --

19   A.    Those are documents.

20   Q.    Those aren't -- an understanding is a document?  Where

21   is it?

22             MR. AURZADA:  Argumentative, Your Honor.

23             THE COURT:  I really thing we've crossed all of

24   these bridges a good four times, and I've allowed it to go.

25   He said he doesn't know if there are any documents out
```

1    there, and he hasn't reviewed any documents.  He did say he

2    believes documents would exist, but he doesn't know if any

3    of them are out there.  That's the testimony and it will

4    stand for what it says.

5          MR. PATTERSON:  He doesn't have a memory until

6    his lawyer's asking him questions.  And I think I should be

7    entitled to probe that and to evidence that for the record,

8    to show that his memory is much clearer when another man is

9    standing up here than when I'm standing up here.  It's

10   vague and cloudy when I ask him questions, and I think the

11   record should reflect that.

12         MR. AURZADA:  I object to every bit of that, Your

13   Honor.

14         THE COURT:  No.  The record's going to say what

15   it says and I'm going to reserve any thoughts and further

16   exploration on any other issues.  I'm taking it all under

17   advisement.  I've only heard one witness.  I'll see how

18   good everybody else's memory is in this case, and then

19   we'll see where we go.

20         MR. PATTERSON:  I have no further questions for

21   the witness, but I do want to address one thing, Your

22   Honor.

23         THE COURT:  Okay.  Well, hold on.  Can we let the

24   witness down before we address it, or do you need him up

25   here?

    1              MR. PATTERSON:  I just want to do it while he's

    2     in the courtroom because it deals with his scheduling.

    3              THE COURT:  I just want him to --

    4              MR. PATTERSON:  It's just a scheduling thing.

    5     And he can leave the witness stand.  I have no more

    6     questions for him.

    7              THE COURT:  Okay.

    8              THE WITNESS:  Do you want me to step down?

    9              THE COURT:  Yes, sir.  Thank you.

   10              THE WITNESS:  Thanks.

   11              (At 3:29 p.m., witness excused.)

   12              MR. PATTERSON:  And I really just wanted to

   13     address, Your Honor, Mr. Loya, tell him, I think, that he

   14     needs to remain available for the trial.  I've been

   15     informed that he has unavailable dates between the 8th and

   16     the 22nd of September.  And so I just want to make sure

   17     that we --

   18              THE COURT:  I understand.

   19              MR. PATTERSON:  -- if he's going to come back, we

   20     do it outside of those dates.

   21              THE COURT:  We do it -- and the 22nd, I believe,

   22     is even out anyway.  We're going to finish this trial by

   23     the 30th.  And if he's not available on one of those dates,

   24     we'll find him available -- Mr. Loya, I will just -- the

   25     18th through the 22nd, I will make sure that no one -- if

Page 156

1    you're out on those days, that's not going to be a problem

2    for me.  But there may be a day within the month of

3    September where you're asked to come back, and I just ask

4    that you make yourself available.

5              MR. LOYA:  (Indiscernible - 3:30:40).

6              MR. PATTERSON:  8th through the 22nd.  September

7    8th.

8              THE COURT:  the 8th?  All right.  Maybe we see

9    you in Victoria then.  It's fine.  The 8th through the

10   22nd.  I don't even know what dates we're using, but if

11   you've got to come back, I believe there's enough to go.

12   We'll see.  I can't guarantee -- if you're out from the 8th

13   to the 22nd, like on travel?  Are you just unavailable

14   those days?

15             MR. LOYA:  (Indiscernible - 3:31:02).

16             THE COURT:  Okay.  We'll make the accommodation.

17             MR. AURZADA:  Thank you, Your Honor.

18             THE COURT:  I don't -- but you will be available

19   in the month of September.  That's what I mean.  I don't

20   know what days, but obviously we'll make accommodations.

21             Mr. Patterson?

22             MR. PATTERSON:  (Indiscernible - 3:31:29).

23             THE COURT:  Do you understand that, Mr. Loya?

24             MR. LOYA:  (Indiscernible - 3:31:31).

25             THE COURT:  Okay.  Thank you.  I'm sure you'll

```
 1    want to.  Yes, sir.
 2             Are we bringing Mr. Wagner in?  Does he need a
 3    break?  Tissue?  We can take 5 minutes.  If anybody needs
 4    to use the restroom, grab a water, something like that,
 5    now's a good time.
 6             Mr. Gross, we're going to take -- I'm going to
 7    take five minutes to give everyone an opportunity to kind
 8    of get their papers, and reshuffle, and then we'll come
 9    back.  Thank you.
10             THE CLERK:  All rise.
11             (Recessed at 3:32 p.m., to reconvene at 3:42
12    p.m.)
13             THE CLERK:  All rise.
14             THE COURT:  Okay.  Folks, are we ready to
15    proceed?  Are you ready?  Okay.  Okay.
16             MR. PURCELL:  Your Honor, before we get started,
17    I believe Mr. Gross will be driving for us, if he can have
18    control.
19             THE COURT:  All right.  Just a second.
20             MR. PURCELL:  Thank you.
21             THE COURT:  Just give me a moment.
22             (Pause)
23             THE COURT:  Mr. Gross, you still may be a
24    presenter.  Okay.  Okay.  Just don't put anything up quite
25    yet.  Okay.
```

 1              Back on the record in *Vitol v. Brass*.  Mr.

 2     Purcell, what are we doing?

 3              MR. PURCELL:  Yes, Your Honor.  I'm going to

 4     finish the examination of -- direct examination of Mr.

 5     Wagner.

 6              THE COURT:  Okay.  Mr. Wagner, let me just remind

 7     you, sir, that you're still under oath and we'll proceed.

 8              MICHAEL WAGNER, WITNESS, PREVIOUSLY SWORN

 9                     DIRECT EXAMINATION

10     BY MR. PURCELL:

11     Q.   Mr. Gross, if you could please pull up Vitol Exhibit

12     81, and it's Bates No. EEPB-175.  It should be an Excel

13     spreadsheet.  Okay.  If you could please go to the first

14     tab of this document and --

15              THE COURT:  Can you just say what exhibit that is

16     again?  I apologize.

17              MR. PURCELL:  Vitol Exhibit 81.

18              THE COURT:  So it's Vitol 81.

19              MR. PURCELL:  Yes, Your Honor.

20              THE COURT:  Okay.

21              MR. PURCELL:  Bates EEPB-175.  Mr. Gross, would

22     you go to the top of the document, please?

23              THE COURT:  Okay.  You may proceed, counsel.

24     BY MR. PURCELL:

25     Q.   Mr. Wagner, do you recognize EEPB-175?

1   A.   I do.

2   Q.   What is it?

3   A.   It's the Gulf Coast asphalt consolidated income

4   statement.

5   Q.   Did you produce a copy of this document in this case?

6   A.   Yes.

7   Q.   Does this appear to be a true and correct copy of the

8   document you produced?

9   A.   It appears to be.

10  Q.   From where did you retrieve the document to produce

11  it?

12  A.   From (indiscernible - 3:45:19) file room, document

13  management software.

14  Q.   And why was this document in Go File Room?

15  A.   Because it's part of our work papers for preparation

16  of (indiscernible - 3:45:30).

17  Q.   Was it kept in the ordinary course of EPB's business?

18  A.   Yes.

19  Q.   Is it your regular practice to keep client income

20  statements?

21  A.   Yes.

22  Q.   Does EEPB have document retention policies?

23  A.   Yes.

24  Q.   Was this document kept in accordance with such

25  policies?

```
 1    A.   Yes.

 2    Q.   And did you use the information in EEPB-175 for any

 3    purpose?

 4    A.   We did.  We used it for the preparation of the tax

 5    return.

 6    Q.   And do you ordinarily rely on client income statements

 7    to prepare tax returns?

 8    A.   Yes.

 9             MR. PURCELL:  Your Honor, we're move to admit

10    EEPB-175 as business record.

11             MS. GOOTT:  (Indiscernible - 3:46:19).

12             THE COURT:  Tell me where that falls within 8036.

13             MS. GOOTT:  (Indiscernible - 3:46:33).

14             THE COURT:  Uh-huh.

15             MS. GOOTT:  (Indiscernible - 3:46:51).

16             THE COURT:  Do you want to just ask --

17             MS. GOOTT:  Objection.

18             THE COURT:  Okay.  Do you want to just ask the

19    question, counsel?

20    BY MR. PURCELL:

21    Q.   Mr. Wagner, from where did you receive this document?

22    A.   We got it from GCAC.

23             THE COURT:  Well, these -- I mean, we can go

24    through these one by one, but I know he testified when he

25    first got on the stand that he would receive all of his
```

1    documents from GCAC in connection of the preparation for

2    the tax returns.  We can do this one by one.  I think you

3    testified earlier.  But that's where he would receive

4    income statements from, and documents to prepare the tax

5    returns.  So that's what I was relying, Ms. Goott.  But if

6    we want to go one by one, I completely understand.

7              MS. GOOTT:  (Indiscernible - 3:47:43).

8              THE COURT:  No, no, no.  That was my confusion.

9    So we can -- you can ask one by one.  I was trying to see

10   if we were going to kind of take everything with EEPB on a

11   one document by one document basis.  That's why I was

12   asking the parties to talk.  But if we're going to do this

13   one spreadsheet at a time, we certainly can.  I just -- and

14   that'll be fine.

15             MS. GOOTT:  And I just --

16             UNIDENTIFIED:  Sorry to interrupt.

17             THE COURT:  I'm not saying people should have

18   agreed.

19             UNIDENTIFIED:  (Indiscernible - 3:48:11).

20             THE COURT:  No, that's --

21             UNIDENTIFIED:  (Indiscernible - 3:48:20).

22             THE COURT:  I just wanted to make sure that I was

23   clear as to what we were doing today, and that was a little

24   bit of confusion on my part.  So why don't you just go

25   through the full analysis every time.

1                    MS. GOOTT:  And (indiscernible - 3:48:34).

2                    THE COURT:  I got it, Ms. Goott.  No, I --

3                    MS. GOOTT:  I'm sorry for my frustration.  I just

4      -- he offers something into evidence.  I object on hearsay

5      that he doesn't comply, and then he gets another chance to

6      go --

7                    THE COURT:  Well, no, because I was relying on

8      the statements earlier, but it sounds like that's not what

9      we're doing.  So I've got to give him a chance, because he

10     testified at the very beginning that all of his -- all of

11     the documents that he receives, all income statements come

12     from GCAC, right?  That's what he testified at the very

13     beginning in the general statement.

14                   So this is another consolidated income statement

15     that he's seen, that he said he relied on in connection

16     with it, but his earlier testimony is that he only gets

17     these documents from GCAC.  So that testimony gets it

18     there, but if you want the clarification for purposes of

19     today, that it links with what he testified yesterday, we

20     can do that.

21                   MS. GOOTT:  Okay.  Thank you.

22     BY MR. PURCELL:

23     Q.   Mr. Wagner, just for clarification, from where did you

24     retrieve this document to produce it?

25     A.   From Go File Room, our document management system.

```
 1   Q.   What else is in that Go File Room for GCAC?

 2   A.   All the work papers that we just to prepare the tax

 3   return.  Copies of tax returns that we prepared.

 4   Q.   What financial documents would that include?

 5   A.   That would include balance sheets and income

 6   statements, trial balances.

 7   Q.   From where did EEPB receive those documents?

 8   A.   We received them from the client, GCAC.

 9   Q.   Is that the same for all the documents EEPB produced

10   in this case?

11   A.   Yes.

12   Q.   And did you rely on the trustworthiness of those

13   documents to create GCAC's tax returns?

14   A.   Yes.

15   Q.   Is that in the ordinary course of EEP's business?

16   A.   Yes.

17   Q.   So Exhibits 175 would be no different than any other

18   financial document you produced for GCAC?

19             MS. GOOTT:  Objection.  Leading.

20             THE COURT:  Sustained.

21   BY MR. PURCELL:

22   Q.   Mr. Wagner, why would EEPB have GCAC's income

23   statement?

24   A.   Because it's necessary for the preparation of the tax

25   returns since it shows the income and deductions of the
```

1    company.

2    Q.   Did you rely on the truthfulness of this statement in

3    creating tax returns for GCAC?

4    A.   Yes.

5              MR. PURCELL:  Your Honor, I'm going to move to

6    admit GCAC-175 -- I'm sorry.  I misstated that.  I'm going

7    to move to admit EEPB-175.

8              MS. GOOTT:  (Indiscernible - 3:51:36).

9              THE COURT:  It's --

10             MR. PURCELL:  It's a portion of Exhibit 81.  I

11   was just providing the Bates number, Your Honor.  So I --

12             THE COURT:  81.

13             MR. PURCELL:  81, EEPB-175.  It's just a portion

14   of that exhibit.

15             THE COURT:  Did you get that all, Ms. Martina?

16   Ms. Goott?

17             MS. GOOTT:  (Indiscernible - 3:51:54).

18                         VOIR DIRE

19   BY MS. GOOTT:

20   Q.   You testified that you relied on this exhibit to

21   create a tax return; is that correct?

22   A.   It's part of the information we use to prepare tax

23   returns.

24   Q.   And for what year?

25   A.   This would have been for the 2017 tax year.

1    Q.   And when was that tax return filed?

2    A.   It would have been filed at some point in 2018.  I

3    don't know the exact date.

4    Q.   Do you know what quarter?

5    A.   I don't know.  I could not say for certain.  It would

6    have been filed sometime before September 15th, which would

7    have been the extended due date.

8    Q.   Did you request an extension or did GCAC request an

9    extension?

10   A.   I don't recall.

11   Q.   So you don't know when this was filed?

12   A.   When -- this isn't the tax return.  So but yeah, I

13   don't remember --

14   Q.   The tax -- I apologize.  You're right.

15   A.   Right.  I don't remember when we filed the actual tax

16   return.

17   Q.   And when did you receive this document from GCAC?

18   A.   At some point in 2018.  I don't remember the exact

19   date.

20   Q.   And did you, and when I say you, I mean you and the

21   people that work for you, make any changes or modifications

22   to this Excel spreadsheet?

23   A.   No, we would not.

24   Q.   Is that not normal practice to make any modifications

25   or changes?

1   A.   Not to the client-provided data.  We don't make

2   modifications to it.

3   Q.   Okay.  Do you ever reproduce an Excel spreadsheet

4   based on the information that you do receive?

5   A.   We sometimes use that to create other Excel

6   spreadsheets, which would be our work papers and not the

7   client's work papers.

8   Q.   So you would have never modified this document after

9   you received it?

10  A.   Correct.

11  Q.   When did you produce this to Vitol?

12  A.   It was in 2020.  I don't remember the exact date.

13          MS. GOOTT:  Judge, just one quick question.  One

14  second.

15          (Pause)

16          THE COURT:  Okay.  Let me make sure I got this

17  right.  EEPB-81, can we call it hyphen 175?  I just want to

18  get something for the record that we all know.

19          MR. PURCELL:  Your Honor, sorry, I believe it

20  might be better to called it Vitol 81-175, to be clear.

21          THE COURT:  Vitol 81-175.  That works for me.  As

22  long as we all agree on what that means, it's admitted.

23          (Vitol Exhibit 81-175 admitted into evidence)

24          MR. PURCELL:  Mr. Gross, could you please pull up

25  Vitol Exhibit 81 at Bates 181.  That's a little confusing.

1    Vitol Exhibit 81 at EEPB-181.  Thank you.

2                    DIRECT EXAMINATION (Resumed)

3    BY MR. PURCELL:

4    Q.   Mr. Wagner, do you recognize this document?

5    A.   Yes.

6    Q.   What is it?

7    A.   It's the Gulf Coast Asphalt Company consolidated

8    balance sheet for 2018.

9    Q.   Did you produce this document in this case?

10   A.   Yes.

11   Q.   Does it appear to be a true and correct copy of the

12   document you produced?

13   A.   Yes.

14   Q.   From where did you retrieve this document to produce

15   it?

16   A.   From our Go File Room document management software.

17   Q.   And why was this document in Go File Room?

18   A.   Because it's used in the preparation of the tax

19   return.

20   Q.   Was it kept in the ordinary course of your business?

21   A.   Yes.

22   Q.   Was it kept with other Gulf Coast financial documents?

23   A.   Yes.

24   Q.   Is it your regular practice to keep client balance

25   sheets?

1    A.    Yes.

2    Q.    Who did EEPB receive this document from?

3    A.    We received it from GCAC.

4    Q.    Does EEPB have document retention policies?

5    A.    Yes.

6    Q.    And does this document fall within such policies?

7    A.    Yes, it does.

8    Q.    Was it kept in accordance with such policies?

9    A.    Yes, it was.

10   Q.    And did you rely on this document to create Gulf Coast

11   tax returns?

12   A.    Yes, we did.

13   Q.    And do you ordinarily rely on client balance sheets to

14   create tax returns?

15   A.    Yes, we do.

16         MR. PURCELL:  Your Honor, I'm going to move to

17   admit Vitol 81-181 into the record.

18         THE COURT:  Any objection?

19         MS. GOOTT:  (Indiscernible - 3:57:45).

20         THE COURT:  Okay.  Vitol 81-181 is admitted.

21         (Vitol Exhibit 81-181 admitted into evidence)

22         MR. PURCELL:  Mr. Gross, would you please pull up

23   Vitol Exhibit 81 at EEPB 190?

24   BY MR. PURCELL:

25   Q.    Mr. Wagner, do you recognize this document?

```
1    A.    Yes.

2    Q.    What is it?

3    A.    It's the Gulf Coast Asphalt Consolidated income

4    statement for 2018.

5    Q.    Did you produce this document?

6    A.    Yes.

7    Q.    Does it appear to be a true and correct copy of the

8    document you produced?

9    A.    Yes.

10   Q.    From where did you retrieve this document to produce

11   it?

12   A.    From our Go File Room document management system.

13   Q.    And why was this document in the Go File Room?

14   A.    Because it's part of our work papers for the

15   preparation of the tax return.

16   Q.    And who provided you with this document?

17   A.    It came from GCAC.

18   Q.    Was this document kept in the ordinary course of your

19   business?

20   A.    Yes.

21   Q.    Was it kept with other Gulf Coast financial documents?

22   A.    Yes.

23   Q.    Is it your regular practice to keep client income

24   statements?

25   A.    Yes.
```

1   Q.   Does EEPB have document retention policies?

2   A.   Yes.

3   Q.   Does this document fall within such policies?

4   A.   Yes.

5   Q.   Was this document kept in accordance with such

6   policies?

7   A.   Yes.

8   Q.   And did you use the information in this document to

9   create Gulf Coast tax returns?

10   A.   Yes, we did.

11   Q.   And do you ordinarily rely on such documents to create

12   tax returns?

13   A.   Yes, we do.

14   Q.   Okay.

15        MR. PURCELL:  Your Honor, we'd move to admit

16   Vitol 81-190 into the record.

17        THE COURT:  Any objection?

18        MS. GOOTT:  (Indiscernible - 3:59:33).

19        THE COURT:  Uh-huh.

20        MS. GOOTT:  (Indiscernible - 3:59:39).

21        THE WITNESS:  Not that I'm aware of.

22        MS. GOOTT:  (Indiscernible - 3:59:56).

23        THE COURT:  We do not make changes to the client

24   versions.

25        MS. GOOTT:  (Indiscernible - 4:00:02).

```
 1              THE COURT:  Okay.  Vitol 81-190 is admitted.

 2              (Vitol Exhibit 81-190 admitted into evidence)

 3              MR. PURCELL:  Your Honor, we have nothing further

 4      from this witness.

 5              THE COURT:  Okay.  Thank you for your patience.

 6      I hope you have a good weekend.

 7              THE WITNESS:  All right.  Thank you.

 8              (At 4:00 p.m., witness excused)

 9              THE COURT:  Okay.  Who's next?

10              MR. PURCELL:  Your Honor, Vitol calls Chris

11      Murray.

12              THE COURT:  Ms. Goott?

13              MS. GOOTT:  I'm going to object to Mr. Murray

14      being called as a witness --

15              THE COURT:  Okay.

16              MS. GOOTT:  -- in this case.  He was not listed

17      in their initial disclosures.  We had no knowledge that he

18      was going to be called as a witness to testify until they

19      filed their exhibit list.  The rules specifically require

20      witnesses, their contact information to be disclosed, and

21      he was not.

22              THE COURT:  Okay.  Mr. Beatty, why don't -- I

23      know you represent Mr. Murray, why don't -- let me resolve

24      this before, if at all, Mr. Murray's going to be called.

25      Okay?
```

```
 1              MR. BEATTY:  Certainly, Your Honor.

 2              THE COURT:  Okay.  Mr. Cooley.

 3              MR. COOLEY:  Yes, Your Honor.  Thank you.

 4              Counsel argues that we didn't supplement our

 5    initial disclosures to identify Mr. Murray as a potential

 6    witness having relevant information.  In fact, Your Honor,

 7    they told us.

 8              The text of the rule, and let's start there, Rule

 9    26 --

10              THE COURT:  Okay.  You can just get -- I just

11    want to make sure you have a mic so we can get there.

12              MR. COOLEY:  Thank you, Your Honor.  Let me make

13    sure I get in a better spot.

14              THE COURT:  Okay.

15              MR. COOLEY:  The text of Rule 26(e)(1)(A) says --

16              THE COURT:  Give me a second.  Let me get there.

17    Let's all get there.

18              MR. COOLEY:  Yes, of course.

19              THE COURT:  7026(e)(1)(A)?

20              MR. COOLEY:  Technically, this would be Rule

21    26(e)(1)(A) incorporated by 7026, Your Honor, but yes.

22              THE COURT:  Okay.

23              MR. COOLEY:  And the rule states that a party who

24    has made a disclosure under Rule 26(a), as we did at the

25    beginning of the case, must supplement or correct under
```

1    part A in a timely manner if the party learns that some

2    material respecting the disclosure response is incomplete

3    or incorrect, and if the additional or corrective

4    information has not otherwise been made known to the other

5    parties during the discovery process or in writing.  And it

6    says, or as otherwise ordered by the Court, but I'm not

7    interested in that piece of it today.  Or I'm not going to

8    be raising it.

9              I'm concerned with part A, which asks whether the

10   information has not otherwise been made known to the other

11   parties during discovery.  And, Your Honor, Advisory

12   Committee Note -- the Advisory Committee Note to Rule 26(e)

13   makes clear that there is no obligation to supplement where

14   "information has been otherwise made known to the parties

15   in writing, or during the discovery process, as when a

16   witness not previously disclosed is identified during the

17   taking of a deposition."  And that is a quote from the

18   Advisory Committee Note to Rule 26(e).

19             THE COURT:  For which year?

20             MR. COOLEY:  1983, I believe, Your Honor.

21             THE COURT:  All right.  Let's see if we can get

22   there.

23             (Pause)

24             THE COURT:  Why don't you point me -- I'm looking

25   at the '83 amendment notes.  Why don't you get me there?

```
1              (Pause)

2              THE COURT:  Can you tell me where?  Under which

3    subdivision it's describing there.  It should be under A,

4    right?  Or no, it should not be under A.  I see A, B.

5              MR. COOLEY:  I think I may have it on my screen

6    actually, Your Honor.

7              THE COURT:  Maybe you're looking --

8              MR. COOLEY:  I believe it is under subsection E

9    of the --

10             THE COURT:  Is that the 70th amendment?

11             MR. COOLEY:  -- notes.  And this is under -- and

12   I'm scrolling up.

13             THE COURT:  Is this the 70th amendment?

14             MR. COOLEY:  I'm just scrolling up to check that

15   very fact, Your Honor -- or that very question.  I

16   apologize.  The 1993 amendment --

17             THE COURT:  Yeah.

18             MR. COOLEY:  -- part E.

19             THE COURT:  All right.  1993 amendment of part E.

20   Which paragraph am I looking at here?

21             MR. COOLEY:  The last paragraph, just before the

22   beginning of subdivision F.

23             THE COURT:  The obligation?

24             MR. COOLEY:  Yes, sir.

25             THE COURT:  All right.
```

```
 1              (Pause)

 2              THE COURT:  Okay.  What's your point?

 3              MR. COOLEY:  In this case, Your Honor, that took

 4    place in the course of an exchange in Mr. Brass's -- or

 5    excuse me, in Vitol's deposition of Mr. Brass in this case

 6    during the discovery period on March 25th, 2002.

 7              If I may, Your Honor, I'd like to ask Mr. Gross

 8    to put that up on the board for the Court to see the

 9    relevant passage.

10              (Pause)

11              MR. COOLEY:  Your Honor, may I --

12              (Pause)

13              MR. PATTERSON:  (Indiscernible - 4:05:59).

14              MS. GOOTT:  The bottom line is, Your Honor, I

15    stand here today, and I have absolutely no idea what topics

16    are they calling Mr. Murray about the Debtor's schedules?

17    Are they calling him because he's the trustee of GCAC?  Are

18    they calling him because he's the trustee of Trifinery

19    (phonetic)?  I have no clue what even the topic could be.

20    This isn't the Debtor's CPA that we all can kind of figure

21    out he's going to talk to him about his tax returns.  I

22    have no clue.  Zero.  Because they didn't put it in their

23    initial disclosures and they didn't amend their

24    disclosures.

25              MR. COOLEY:  Your Honor, if I could finish my
```

1    presentation, perhaps some of these questions would be

2    answered.

3            MS. GOOTT:  If you could just tell us when and --

4            THE COURT:  Okay.  I'll let you -- no one's here.

5    It's just lawyers.  You can put it up, obviously.

6            MR. COOLEY:  Thank you, Your Honor.  Mr. Gross,

7    could I have Vitol Exhibit 121, and let's just start on the

8    first page.  And --

9            MS. GOOTT:  I'm going to object (indiscernible -

10   4:07:07).

11           THE COURT:  It's not offered -- I'm not sure it's

12   being offered for the truth of the matter asserted.  It's

13   just asserting whether you got notice of something.

14           MR. COOLEY:  And if we could have -- very -- just

15   showing the first page references March 25th, if we could

16   have pdf page 104.  And at this point, I'll ask the Court

17   to just take judicial notice that Mr. Murray is also the

18   Chapter 7 trustee, currently administering the case of Mr.

19   Brass.

20           THE COURT:  Uh-huh.

21           MR. COOLEY:  And at lines -- beginning at line 3,

22   it says, "By Mr. Aurzada, and he asked the question, if you

23   want to define the books and records of Gulf Coast,

24   including an income statement, a balance sheet, and a

25   general ledger, were would you go to find it?"  And at line

1   8, Mr. Patterson intercedes, according to the document, and

2   says, "Objection.  Calls for speculation.  We're going to

3   play hide and seek.  But if you are really looking for

4   them, go to the trustee.  They have possession of

5   everything."

6          Your Honor, our position here is that the rule

7   clearly states that supplemental disclosure is not

8   necessary as a matter of substance over form, where the

9   parties are already aware of the individual.  I would not,

10  Your Honor, that Mr. Murray was not on their disclosures as

11  someone who would have information relating to the books

12  and records, and yet, in a deposition, transcribed by a

13  court reporter, Mr. Patterson instructed Mr. Aurzada that

14  if we were looking for the books and records, to go to Mr.

15  Murray.

16         That told us that Mr. Murray was the person who

17  would have information about the books and records of the

18  Debtor, and that is the purpose for which he is being

19  called.

20         MS. GOOTT:  The Debtor is not GCAC in this case.

21  Period.  End of story.

22         MR. PATTERSON:  (Indiscernible - 4:09:10).

23         MR. COOLEY:  And, Your Honor, it --

24         THE COURT:  Hold on a second.  I think everybody

25  -- because everybody's arguing.  I've got four different

1   people arguing.  I'm just going to read the rule.  Tell me
2   where in this, Mr. Cooley, is there a statement that says
3   fine, that's what I'm going to do, so that you put them on
4   notice that's what you were going to do?
5           I got it.  They said go talk to them.  Is there
6   something in here that says, that's what I'll do, that
7   would trigger notice to the other side that that's what
8   you're going to do?
9           MR. COOLEY:  I don't know that there is, Your
10  Honor.  The point I'm here to make today is that they
11  provided notice to us that he was a person with
12  information.  Therefore, it was known to them -- there was
13  -- the issue here is whether they are surprised.  And I
14  understand the technicality that they are arguing to the
15  Court, but the argument, the issue surrounds the question
16  of notice.  The rules are designed to ensure parties
17  provide notice.  And for the Debtor to say, for Mr. Brass's
18  counsel to say that they were unaware of the possibility
19  that Mr. Murray would be a relevant witness, and in -- on
20  the books and records of GCAC.  I did misspeak earlier.  I
21  said the records of the Debtor.  The records of GCAC is
22  simply a disingenuous argument.
23          He has been known to all of the parties to have
24  the records.  Ultimately, that is what happened.  We went
25  and got his records.  And here we are today.

```
1              MS. GOOTT:  (Indiscernible - 4:10:39) subpoenaed?

2              THE COURT:  Hold on a second, folks.  I'm going

3    to think -- no, I'm going to think about this a little bit.

4              MS. GOOTT:  Subpoena them?

5              THE COURT:  No, no, no.

6              MR. COOLEY:  No, I don't believe we did.

7              THE COURT:  Folks.

8              MS. GOOTT:  Oh, so please -- you should probably

9    correct your statement.

10             THE COURT:  Folks, Murray's not testifying today.

11   I'm going to take this under advisement.  I see nothing

12   where they've been put on notice -- they have been put on

13   notice that this is what you're going to do.  Unless you

14   can find me a document, deposition transcript says this is

15   who -- you can go talk to -- I don't see anything where you

16   say this is what I'm going to do.

17             And I'm going to go back and I'm going to look at

18   the cases.  You know me.  I'll let you know.  And if

19   somebody has something that tells me the Fifth Circuit has

20   told me otherwise, I'll listen to it.  I do take the

21   advisory notes incredibly serious, but I'm looking at the -

22   - at what's happening here, and I don't see something in

23   writing.  Right?  So that's out.  And I don't see during

24   the discovery process as when a witness not previously

25   disclosed as identified during the taking of a depo -- I
```

1    don't -- I think that's a little bit of a -- I think you've

2    got to identify him and say this is what we're going to do.

3    Well, fine, we're going to go get them.

4            But I'm going to go take a look at the cases and

5    I'll know.  I'll know one way or the other.  You'll know my

6    answer by -- I'll post something.  If anything changes,

7    I'll file something.  You know I'll write it over the

8    weekend.

9            MS. GOOTT:  Thank you, Judge.  And while --

10   before Mr. Beatty leaves, because he's counsel for the

11   trustee, I think it's important for him to say, unless Mr.

12   Cooley wants to change his statement to the Court, but --

13           THE COURT:  I'm not worried about that.

14           MS. GOOTT:  Didn't depose him.  Didn't ask for

15   documents, so --

16           THE COURT:  No, no.  I'm asking for a --

17   something affirmative.  And if somebody can find something

18   affirmative, then that will do it.  If not, Murray's not

19   testifying.  We can go to Tomashevsky.

20           MR. COOLEY:  Very well, Your Honor.

21           THE COURT:  But I -- Mr. Beatty, I will tell you,

22   and I think you know this about me, I'm probably going to

23   spend the weekend looking at a lot of this, and so if any -

24   - if there is a -- no, that's fine.  I was going to do it

25   anyway.  If I see any briefing or anything that tells me

```
 1    absolutely, I'll call him back.  I'm just saying, he's not
 2    going to testify today based upon what I'm hearing, but I
 3    think it's important for me to get the right answer and not
 4    just the answer that I'm looking at, based on an advisory
 5    note.
 6             But I don't think it complies with the rule.  But
 7    I'll look at it and I'll -- if anything changes, I'll let
 8    you know.
 9             MR. BEATTY:  Thank you, Your Honor.  And just for
10    the record, we are Switzerland on this position.  If the
11    Court wants Mr. Murray to come testify, he's more than
12    happy to do so based on whatever the Court rules.
13             THE COURT:  Thank you.
14             MR. BEATTY:  And just for clarification, Your
15    Honor, can I tell Mr. Murray he's at least released for
16    today?
17             THE COURT:  Yeah.
18             MR. BEATTY:  Thank you.
19             THE COURT:  Tell him, you know, I may stick it to
20    him and make him come to Victoria at some point, but he
21    knows that.
22             Where do we go next, Tomashevsky?
23             MR. COOLEY:  Yes, Your Honor.
24             THE COURT:  Okay.  Or Tomashevsky depo.
25             MS. GOOTT:  And I might be able to speed this up
```

1    a little bit.

2              THE COURT:  Do you want me to step off?

3              MS. GOOTT:  No, no, no.  I just -- if I could

4    address the Court.

5              THE COURT:  Yeah.

6              MS. GOOTT:  We read the Court's ruling on

7    Tomashevsky and the -- we asked to strike it.  We get the

8    Court's ruling.  We don't oppose the entry of the

9    deposition but two things.  Number one, the whole thing

10   needs to come in.  If it's coming in pieces of it, all of

11   it needs to come in.  And number two, I made a lot of

12   objections and those need to be ruled on before -- within

13   the deposition.  That's all.

14             THE COURT:  That seems fair.

15             MR. PURCELL:  Your Honor, no problem with those.

16   And I think there's a couple of ways you can do it.  You

17   can do it with the video and we can call live shouts here,

18   and we can -- Ms. Goott can assert her objections and we

19   can ask for a ruling on it.  We can provide it to the Court

20   to do it on its on time.

21             MS. GOOTT:  Yeah.  It's already in the

22   (indiscernible - 4:14:44).

23             MR. PURCELL:  That's what I would recommend, but

24   I want to comply with the Court's wishes.

25             THE COURT:  That's what I would want.  Can

1   someone -- but is it -- where do I --

2          MR. PATTERSON:  (Indiscernible - 4:14:58).

3          THE COURT:  Yeah.  So they were going to try to

4   go live, but to get the full transcript in, would you all

5   be okay if it got filed as an exhibit?

6          MR. PURCELL:  And, Your Honor, we did include the

7   exhibits to Mr. Tomashevsky's deposition on our exhibit

8   list.  I can find those numbers.  I believe it's 108 to

9   115.  And they were designated as such.

10          THE COURT:  I'm saying, is there one way to just

11   have one document that I can then look at and then get the

12   whole -- if we can get the whole transcript in one time, I

13   can then on my -- rule on it.

14          MR. PATTERSON:  (Indiscernible 4:15:32).

15          THE COURT:  Yeah.

16          MR. PATTERSON:  (Indiscernible 4:15:34).

17          THE COURT:  No.

18          MR. PATTERSON:  (Indiscernible 4:15:36).

19          THE COURT:  Okay.

20          MR. PATTERSON:  (Indiscernible 4:15:39).

21          THE COURT:  No, no.  I understand what you meant.

22          MR. PATTERSON:  (Indiscernible 4:15:42).

23          THE COURT:  Yeah.  That seems fair to me.  As

24   long as --

25          MR. PATTERSON:  (Indiscernible 4:15:48).

Page 184

```
 1              THE COURT:  Uh-huh.

 2              MR. PATTERSON:  (Indiscernible 4:16:03).

 3              THE COURT:  Everybody's rights are reserved,

 4    yeah.  Because I think -- I suspect that within the depo

 5    transcripts, there will be objections to exhibits within

 6    there that I'd have to rule on.

 7              MR. PATTERSON:  (Indiscernible 4:16:13).

 8              THE COURT:  Agreed.

 9              MR. PATTERSON:  (Indiscernible 4:16:20).

10              MR. COOLEY:  That's right, Your Honor.  And

11    obviously we're fine with the -- microphone -- we're fine

12    with the entirety of the deposition transcript.  That's

13    certainly the simplest way, rather than the Court taking

14    our notice of deposition excerpts and going back and forth.

15              Obviously, a deposition is not a hearing.  And so

16    to the extent that objections have been made, counsel

17    didn't necessarily respond to those objections, so the

18    Court would not have the benefit of that.  I don't know

19    what the way is to handle that, other than perhaps if there

20    is an objection, that the Court believes may be valid in

21    such a way that would be dispositive of the issue, we would

22    certainly want an opportunity to respond.

23              THE COURT:  No, and I think everybody's rights

24    are reserved.  Why don't we just get the transcript in.  I

25    have never looked at the transcript, so I don't -- I need
```

1    to get a feel for what -- yes.  Which is why I don't want

2    to do it by video.

3                MR. COOLEY:  Yes, Your Honor.  And --

4                THE COURT:  Get a feel for what we're talking

5    about.

6                MR. COOLEY:  -- ultimately, so that -- I

7    apologize.

8                THE COURT:  And there may be two portions of it,

9    right?  Because I remember there was a split in it, and

10   then we -- or at least there was a phone call made during

11   it; wasn't there?

12               MR. COOLEY:  Yes, Your Honor.

13               THE COURT:  I do remember a phone call being made

14   during it.  So there could be -- maybe not two days, but

15   two -- I just want it all smooshed together is what I mean.

16   One document.

17               MR. COOLEY:  And --

18               MS. GOOTT:  (Indiscernible - 4:17:54).

19               THE COURT:  No, no.  I'm asking -- that's what

20   I'm asking for, but one document.  Not like a part one,

21   part two.  I want it all -- one document, to the extent it

22   is one, and we can all take it up at the appropriate time.

23   And then I can understand -- I do want everyone to have

24   advanced notice, if there's going to be objections to

25   individual exhibits within there, then I'll have an

1    opportunity to think about those as well.  So that when we

2    take up all the objections, we take them all up at once,

3    and I can -- individual to the testimony.  Individual to

4    the exhibits.  We're all clear, and I can take them all up

5    at one time.

6            MR. COOLEY:  I think that makes sense, Your

7    Honor.  We'll file it on the docket.  We will also

8    supplement our witness and exhibit list for simplicity's

9    sake.  I don't know what the next consecutive number, but

10   we'll just call it --

11           THE COURT:  Whatever the number is.

12           MR. COOLEY:  -- whatever it is.  Just to provide

13   context, I won't get into detail because I don't think this

14   is the time, but just so the Court knows why the Court is

15   going to spend the weekend reading this, we will be moving

16   the admission of one or more of the exhibits --

17           THE COURT:  No, no.  I understand.  I understand.

18           MR. COOLEY:  -- discussed in the course of the

19   deposition.

20           THE COURT:  I got it.  That makes sense.

21           MR. COOLEY:  That will be the purpose of it.

22           THE COURT:  That makes sense.  That makes sense.

23   Okay.  So you will then file it as Vitol, whatever the next

24   number is, the entire transcript.  Can you also file the

25   exhibits as well, as -- unless -- is there some

```
 1   confidential stuff in there?

 2           MR. COOLEY:  We'll check -- I don't know the

 3   answer to that, but we'll check on the confidential -- the

 4   issue I do know there will be is at least one of the

 5   exhibits is an Excel spreadsheet --

 6           THE COURT:  Oh, no I remember.  I remember.

 7           MR. COOLEY:  -- of which the Court may be

 8   familiar.

 9           THE COURT:  Yeah.  Yeah.  Which you're going to

10   be able to do.

11           MR. COOLEY:  We can certainly file a --

12           THE COURT:  We can deal with that.

13           MR. PATTERSON:  (Indiscernible - 4:19:31).

14           THE COURT:  That's exactly right.  Just -- that's

15   exactly right.

16           MR. COOLEY:  We'll do it, Your Honor.

17           THE COURT:  Yeah.  Okay.

18           MR. COOLEY:  We'll do it.

19           THE COURT:  So where does that leave us for --

20           MR. COOLEY:  Where that leaves us at this point,

21   Your Honor, is frankly racing ahead at a speed that we had

22   not anticipated at this point in the afternoon.

23           Mr. Kuo had travel plans --

24           THE COURT:  No, that's fine.

25           MR. COOLEY:  -- beginning later this afternoon,
```

1    and so --

2              THE COURT:  Why don't we --

3              MR. COOLEY:  -- based on where things were going

4    to be coming out --

5              THE COURT:  What's our next day?  When are we --

6              MR. COOLEY:  Your Honor called for Wednesday, so

7    we planned to come back Wednesday morning, if the Court

8    wishes.

9              THE COURT:  Ms. Goott, can you do Wednesday?

10             MS. GOOTT:  (Indiscernible - 4:20:27).

11             THE COURT:  I don't know.  No, I don't want to

12   start with anyone because we'll -- we won't get there.

13   We'll do -- who are you starting with, Mr. Kuo?

14             MR. COOLEY:  It would be Mr. Kuo, Your Honor.

15             THE COURT:  Okay.

16             MR. COOLEY:  Unless we were taking up Tomashevsky

17   at that point.  I don't know how that's going to play out.

18             THE COURT:  No.

19             MR. COOLEY:  But in terms of a live witness, we

20   would start with Mr. Kuo.

21             THE COURT:  I want to get live witnesses out.  We

22   can always come back.  So why don't we start -- let's see -

23   - just give me a second.

24             (Pause)

25             THE COURT:  I should have asked Mr. Beatty how

1    long is 10 o'clock was going to take on Wednesday.  He's

2    here.

3              MR. PATTERSON:  (Indiscernible - 4:21:14).

4              THE COURT:  No, no, no, it's an uncontested

5    motion to sell real property so it -- but it looks like

6    there's a -- they filed a notice of upset bid.  And I don't

7    know what that means.  I guess somebody else came up with

8    something more.

9              Why don't we start at 10:30 on Wednesday.  And

10   we'll just go.

11             MR. COOLEY:  Very well, Your Honor.

12             THE COURT:  My hope would be to be done with Kuo

13   on that day, so we should be able to go late into the day

14   on Wednesday.  What day after that are we going to go?

15   What -- after that -- what day do you need?  That would be,

16   according to your schedule, Mr. Brass?

17             MR. COOLEY:  According to our schedule, that

18   would be Mr. Brass.  And I was going to raise a related

19   point, which is, as I said, it is our intention to go

20   forward -- to begin with Mr. Kuo on Wednesday.  I know that

21   counsel has indicated that they have continuing potential

22   objections to one or more witnesses we intend to call.  I

23   don't know whether Mr. Kuo falls into that category, and if

24   he does, whether or not the Court would sustain such an

25   objection.

```
1            The reason I raise it is, if that were the case,
2    then in order not to waste the Court's time, our next
3    witness we would intend to call is Mr. Brass.  For obvious
4    reasons, Mr. Brass is the one witness here who I can't just
5    call on the telephone to confirm his attendance.
6            THE COURT:  Well, why don't we just bring Kuo --
7    I mean, Brass -- can we bring Kuo and Brass -- just -- I
8    don't know how long Kuo is going to take.  I suspect it
9    will be a while because -- but we can bring Kuo and Brass
10   that day as well.
11           MR. COOLEY:  That's fine with us, Your Honor.
12           THE COURT:  Okay.  We'll start on Wednesday.  But
13   after Wednesday, the 7th, what day are we looking at?  I
14   just -- the reason I'm asking is I don't -- I get -- my
15   case manager sets hearings over the weekends as well, and I
16   know she gets calls and stuff like that in the weekends.
17   Is there a date I can at least block to make sure that we,
18   you know -- Ms. Goott, I'll turn to you.  If it's the 7th -
19   - after the 7th.
20           MS. GOOTT:  I don't want the Court to think that
21   I'm not being -- that I'm being disingenuous, so I'm going
22   to address this issue, because when I hear you asking me
23   when am I going to bring Mr. Brass --
24           THE COURT:  That's -- no.  Then I misphrased.
25   No, no, then I misphrased it.
```

1          MS. GOOTT:  Because he has -- he has --

2          THE COURT:  I'm just wondering -- I'm just really

3    -- I completely misspoke.  On the 7th, I know we're going.

4    I'm just literally thinking of the next date that I could

5    block out.  And I don't mean to imply anything other than

6    what dates can I say that we will reconvene *Vitol v. Brass*.

7          MS. GOOTT:  Just the dates of who they think

8    they're going to call.

9          THE COURT:  Correct.

10          MS. GOOTT:  Got it.  I just didn't --

11          THE COURT:  No, no, no.  I'm just trying to block

12    dates out.  I'm just trying to block dates out.  That's

13    literally what I'm trying to do.  We can do the 7th, the

14    9th, whatever dates I gave you.  If the parties -- I just

15    want to put a block on it so that if Ms. (indiscernible -

16    4:24:27) gets a call for some emergency party that needs a

17    hearing or something, that she knows that we can block out

18    that -- that that time is blocked out now.  I want to give

19    *Vitol v. Brass* --

20          MS. GOOTT:  I'm free any time 7th, 8th, 9th.

21          THE COURT:  Okay.

22          MR. COOLEY:  Your Honor, if I may, in the spirit

23    of reserving rights, the reason I flagged it, as I said,

24    Mr. Brass is not under my control.  I certainly can't call

25    him up and --

```
 1              THE COURT:  No, no, no.  I got your point.  I got

 2    your point.

 3              MR. COOLEY:  And we have issued trial subpoenas.

 4    We have gone through -- we have issued trial subpoenas.  We

 5    have not been able to make personal hand delivery to Mr.

 6    Brass, although we have made several attempts.  A subpoena

 7    has been left at his house.  Service was attempted through

 8    counsel.  That was unsuccessful as well.

 9              MR. PATTERSON:  (Indiscernible - 4:25:22).

10              MR. COOLEY:  And so we are continuing --

11              THE COURT:  Guys, if somebody can just give me

12    dates, that's literally it.  And then everybody can have a

13    wonderful Labor Day.

14              MR. COOLEY:  Very well.

15              THE COURT:  Because literally, I just want -- I

16    just need Ms. Aldania (phonetic) to have a date.

17              MR. COOLEY:  In that case, from our standpoint,

18    Your Honor, we're prepared to go on the 7th.  The only

19    thing is at some point, depending on what happens with Kuo

20    and Brass, as I said, the next one is going to be Mr.

21    Dietz, and I know he had indicated --

22              THE COURT:  No, no.  I got it.  I just literally

23    want like one more day so that we can then talk on the 7th,

24    and then I can pick another day in advance.  So if I know -

25    - what other day are folks available?  And literally, I'm
```

1   just trying to put in a block.

2              MR. PATTERSON:  (Indiscernible - 4:26:02).

3              THE COURT:  Okay.  So --

4              MR. PATTERSON:  (Indiscernible - 4:26:07).

5              THE COURT:  Okay.  The 8th is bad for me.  I've

6   got to be honest.  I've got 7 -- so 7th at 10:30 until --

7   and then what about the week of the 12th?  What days look

8   okay for folks then?  If we did an afternoon, could we do

9   the afternoon of the 14th, just as a block, or 11 o'clock

10  on the --

11             MR. PATTERSON:  (Indiscernible - 4:26:35).

12             THE COURT:  Hold on a second.  You have all the

13  time you need on that -- you have to be there.

14             MR. PATTERSON:  (Indiscernible - 4:26:55).

15             THE COURT:  What about the 15th?  I'm giving you

16  the whole afternoon on that one.  What about the 15?

17             MR. PATTERSON:  (Indiscernible - 4:27:07).

18             THE COURT:  What about the afternoon of the 15th

19  -- or 11 o'clock on the 15th, starting at 11:00?

20             MR. COOLEY:  I believe from our side, we're good

21  each of those dates.  Again, Your Honor, I'm not speaking -

22  -

23             THE COURT:  No, no, no.

24             MR. COOLEY:  -- for Mr. Dietz, but at least --

25             THE COURT:  Got it.  No, no, no.  I'm just trying

1    to get to the -- and I may -- okay.  So I'm going to do --

2    I'm going to block off --

3               MR. PATTERSON:  (Indiscernible - 4:27:26).

4               THE COURT:  Yeah.

5               MR. PATTERSON:  (Indiscernible - 4:27:29).

6               THE COURT:  That's okay.  So why don't we start

7    at 11:00, go until we go, and then if we need to take a

8    break for an hour, that's completely fine with me.

9               MR. PATTERSON:  (Indiscernible - 4:27:50).

10              THE COURT:  We'll keep working around it.  Okay.

11   I'm going to block of 11 o'clock the rest of the afternoon.

12   That's Thursday.  It's Thursday.  I can't start until --

13   that's Thursday.  I teach.  I forgot.

14              You all are going to scare them off.  What about

15   the 16th, Friday, the 16th?

16              MR. PATTERSON:  (Indiscernible - 4:28:24).

17              THE COURT:  Just as a block, not in stone, just

18   as a block.

19              MR. COOLEY:  Yes, Your Honor.

20              THE COURT:  Yeah.  Why don't we start at 10:00 --

21   let's see.  Hold on.  Let me see if this is contested or

22   not.  Okay.  It looks like it -- why don't we start at --

23   I've got an uncontested confirmation hearing, but I don't

24   know how -- somebody's actually going to show up or not.

25   Why don't we start at 11 o'clock, and just go -- like 11:00

1   to 5:00.

2              MR. COOLEY:  On the 16th, Your Honor?

3              THE COURT:  On the 16th.  Just as a block.

4              MS. GOOTT:  As a bit of an update, I sent Mr.

5   Beatty a message, asking him what he believes his 10:00

6   a.m. hearing on Wednesday, how long that will take.  He

7   said 15 minutes, 30 at worst.

8              THE COURT:  Okay.

9              MS. GOOTT:  So that works.

10             THE COURT:  So let's start at 10:30 then on

11  Wednesday.  Okay.  Anything else, folks, today?  Thank you

12  very much.  Everybody can leave -- if you want to, you can

13  leave all your stuff here.  But if you could, just -- I

14  guess kind of -- to the extent you can, just organize them

15  in a way just in case we have some other parties here.

16             Thank you very much.  Have a wonderful week, and

17  a good Labor Day, and we will see each other next

18  Wednesday.  Thank you.

19             MR. COOLEY:  Your Honor?

20             THE COURT:  Yes.

21             MR. COOLEY:  I apologize.  I apologize.  Just one

22  last thing.  Would it be possible for us to -- upon an

23  appropriate -- we will be filing a motion for substitute

24  service in connection with the Brass issue, and I just

25  wanted to preview that, so the Court knows it will be

```
 1   coming.  We'll be asking for expedited consideration of it.

 2   I'm not asking the Court to rule, I just wanted to let the

 3   Court know that would be coming.

 4             THE COURT:  You're just letting me know there's

 5   going to be something on file?

 6             MR. COOLEY:  Yes, Your Honor.

 7             MS. GOOTT:  (Indiscernible - 4:30:15).

 8             THE COURT:  And just somebody -- people can file

 9   stuff and I can rule on it.  If there's something coming,

10   then I will know.  That's -- I got it.

11             MR. COOLEY:  Understood.  Thank you, Your Honor.

12             THE COURT:  All right, folks.  Thank you.

13             THE CLERK:  All rise.

14             (Proceedings adjourned at 4:30 p.m.)

15

16                     * * * * * * *

17

18

19

20

21

22

23

24

25
```

```
 1                          CERTIFICATION
 2
 3          I, Jamie, Gallagher, certify that the foregoing
 4     is a correct transcript from the official electronic sound
 5     recording of the proceedings in the above-entitled matter.
 6
 7
 8
 9
10
11
12
13     ___                    _____
14     Jamie Gallagher
       Dated:  September 16, 2022
15
16
17
18
19
20
21
22
23
24
25
```

002952

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   Arthur Jacob Brass,             )
                                     ) CASE NO. 21-60025
 4                  Debtor.          )
     ------------------------------)
 5   Vitol Inc.,                     ) CASE NO: 21-06006
                                     ) ADVERSARY
 6                  Plaintiff,       )
                                     ) Houston, Texas
 7        Vs.                        )
                                     ) Friday, September 16, 2022
 8   Arthur Jacob Brass,             )
                                     ) 10:04 A.M. to 5:51 P.M.
 9                  Defendant.       )
     ------------------------------)
10
                              TRIAL
11         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
12

13   APPEARANCES:
     For Plaintiffs:          MICHAEL P. COOLEY
14                            MICHAEL BERNICK
                              Reed Smith, LLP
15                            2501 N. Harwood, Suite 1700
                              Dallas, TX 75201
16
     For Defendant:           MIRIAM GOOTT
17                            JOHNIE J. PATTERSON
                              Walker & Patterson, PC
18                            P.O. Box 61301
                              Houston, TX 77208
19
     Court Reporter:          ZILDE MARTINEZ
20
     Courtroom Deputy:        ZILDE MARTINEZ
21
     Transcribed by:          Veritext Legal Solutions
22                            330 Old Country Road, Suite 300
                              Mineola, NY 11501
23                            Tel: 800-727-6396

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

002953

```
1                              INDEX

2   PLAINTIFFS' WITNESSES    DIRECT   CROSS   REDIRECT   RECROSS

3   Eric Kuo                            8        115        157

4   Arthur Brass             175

5   DEFENDANT'S WITNESSES    DIRECT   CROSS   REDIRECT   RECROSS

6

7

8   PLAINTIFFS' EXHIBITS                                 RECEIVED

9   Vitol Exhibit 14                                     89

10  Vitol Exhibit 8                                      190

11  Vitol Exhibit 9                                      194

12  Vitol Exhibit 20                                     240

13

14  DEFENDANT'S EXHIBITS                                 RECEIVED

15  Brass Exhibit 104-6                                  23

16  Brass Exhibit 104-7                                  31

17  Brass Exhibit 104-8                                  36

18  Brass Exhibit 104-11                                 40

19  Brass Exhibit 104-12                                 52

20  Brass Exhibit 104-15                                 58

21  Brass Exhibit 104-16                                 71

22  Brass Exhibit 33                                     230

23

24

25
```

002954

```
1        HOUSTON, TEXAS; FRIDAY, SEPTEMBER 16, 2022; 10:04 A.M.

2            THE COURT:  Okay.  Good morning, everyone.  This

3    is Judge Lopez.  It is September 16th.  I'm going to call

4    the 10:00 a.m. case, a continuation of the trial in Vitol v.

5    Brass.  I see counsel for Vitol here and counsel for Mr.

6    Brass.  Good morning to both of you.

7            MR. PATTERSON:  (indiscernible).

8            Completely understandable.  No disruption at all.

9    And please -- if you see her, please wish her the best from

10   me.  No worries.

11           Why don't we kind of just talk housekeeping of

12   kind of where we are and what we hope to accomplish today.

13           MR. COOLEY:  Judge, If I --

14           THE COURT:  Go ahead.

15           MR. COOLEY:  Thank you.  If I may.  Starting just

16   broad strokes.  Obviously we expect to continue with Mr.

17   Kuo.  Mr. Kuo is here today.  He's sitting out in one of the

18   witness cubbies --

19           THE COURT:  Okay.

20           MR. COOLEY:  -- until we bring him in.  And then

21   assuming that we conclude with Mr. Kuo today, and I assume

22   we will, then we are prepared to move from that to call Mr.

23   Brass and proceed with Mr. Brass.

24           I have two housekeeping notes just in terms of

25   witness issues.  The first one is we learned from Mr. Dietz
```

1    -- today is Friday -- the day before yesterday, late Friday,

2    that he had suffered some kind of knee injury.  I'm not sure

3    exactly what it is yet other than that I think it involves

4    the ACL and meniscus.  The important question that we should

5    know the answer to in the next couple of days is whether it

6    is a ear that would require surgery.  And if it is a tear

7    that requires surgery, whether he will have any kind of

8    travel restrictions for some period of time thereafter.  We

9    will keep the Court and counsel informed on that, obviously.

10   But to the extent that that creates an issue and his

11   physical presence is required versus attendance by video --

12   and obviously we are sensitive to the fact that he is being

13   called as an expert witness, which is a particularly

14   sensitive witness to try and present in anything other than

15   a live format, they we may have to -- I don't know if we'll

16   have to keep the trial open.  We'll have to figure that out.

17   But I wanted to just let the Court know about that.

18            THE COURT:  Okay.  Appreciate it.

19            MR. COOLEY:  And again, we're waiting for more

20   information.  We'll keep chambers --

21            THE COURT:  Okay.

22            THE COURT:  -- through the staff involved and

23   opposing counsel as well.  And then the only other thing I

24   was going to note -- we alerted counsel to this yesterday or

25   Wednesday, I forget when exactly, but fairly recently.

Page 5

 1    Since the last hearing, we have determined that we likely

 2    will seek to call Mr. Bruzek, Mike Bruzek, who is another

 3    Vitol employee who is on the witness exhibit list.  And we

 4    can take up any issues at the appropriate time.  But I just

 5    wanted to flag that for the Court since we had -- at our

 6    last meeting we had indicated that were expecting to go Kuo,

 7    Brass, Dietz.

 8          THE COURT:  Right.

 9          MR. COOLEY:  Right now I expect we will likely

10    call Mr. Bruzek.  At least from our standpoint, the scope of

11    his direct will be fairly limited.  He's being brought in to

12    address just a couple of issues.  But I wanted to just put

13    that on the Court's radar as well.

14          THE COURT:  Okay.  All right.

15          MR. COOLEY:  And I'm happy to answer your

16    questions.  But that's all I had in my notes for just

17    general housekeeping.

18          THE COURT:  Okay.  I appreciate it.  Ms. Goott, I

19    heard your -- I want you to come in, come out, do what you

20    need to do.  And I hope everything is okay.

21          MS. GOOTT:  Thank you, Judge.  And I apologize for

22    coming in late.  And I did hear the tail end of Mr. Cooley's

23    comments.  And I know that we're not at this issue at this

24    point.  But since we're telegraphing what's happening, Mr.

25    Bruzek was not on their initial disclosures.  So we are

002957

1    going to object to him.  And I thought it only fair for him

2    to know before he brings him down since he just said that

3    he's going to talk to him about various matters.  So we

4    don't know what that is.  He wasn't disclosed.

5            THE COURT:  Okay.  And one thing I'm going to do -

6    - and I can describe it later on.  I looked at various cases

7    and thought about the issue of the seal versus the

8    redaction.  And I'm going to require a redaction.  I think

9    it's consistent with First Circuit caselaw and also

10   consistent with our local rules.  I'd also require a

11   redaction and I'm giving everyone just now Local Rule 7037 -

12   - 9037.  That's -- you know, I think it applies here as

13   well.  The sealing of documents is discouraged.

14            If the parties were in agreement on it, I probably

15   would think differently about that scenario.  But unless

16   somebody tells me differently -- third parties can really

17   brief it if they want to, but I am going to require the

18   redaction, but I'm going to give everyone plenty of time so

19   that by the time the record is over -- so folks have got two

20   weeks to get it done and can get it in at the appropriate

21   time.  So that's the only housekeeping point that I had.

22   I'll let the parties figure out what needs to be redacted.

23   I don't think I need to get into that.  But I think

24   everybody knows what it is.  And it could be done

25   electronically.  I probably created a bunch of work for some

1    paralegal, but it is what it is.

2              Are we ready to proceed?

3              MR. COOLEY:  We are, Your Honor.

4              THE COURT:  Okay.  I see some new parties here.  I

5    just want to make sure that the rule has been invoked and it

6    remains invoked.  Are we good to bring Mr. Kuo in?

7              MS. GOOTT:  I just wanted (indiscernible) Mr.

8    Brass is in the courtroom as he was ordered.

9              THE COURT:  Okay.  Good morning, sir.  And you're

10   certainly free to stay.

11             So let's get Mr. Kuo in.  We're continuing Mr.

12   Patterson's cross-examination.  Is that right?  Okay.

13             Mr. Patterson, just from a -- I won't hold you to

14   it.  From a timing standpoint, how much -- do you have a

15   sense?

16             MR. PATTERSON:  I think we should be done

17   lunchtime, late lunchtime.  I hope.  Unless I run into

18   something I am not anticipating.

19             THE COURT:  Okay.  Let's just work through it

20   then.  Maybe we'll -- around 12:15 we'll take a look and see

21   where we are.

22             THE COURT:  Mr. Kuo, good morning, sir.  Mr.

23   Patterson, I've turned over to the podium access so you'll

24   have it whenever you want it.  The screen is blank, but

25   whenever you're -- I just want to make sure I give you

1    connectivity.

2              I'm going to remind you, sir, that you are still

3    under oath.  Okay?  And we are going to continue with your

4    cross-examination.

5              CONTINUED CROSS-EXAMINATION OF ERIC KUO

6    BY MR. PATTERSON:

7    Q    Good morning, Mr. Kuo.  Just to verify a couple of

8    things.  You haven't talked to anyone about your testimony

9    during the break?

10   A    I have not.

11   Q    Did you discuss it, ask anybody any questions?

12   A    I asked them what time we were starting this morning.

13   Q    All right.  Anything about the content of what you

14   testified to?

15   A    No.

16   Q    Anything about any exhibits?

17   A    No, sir.

18   Q    Did you communicate electronically with anyone about

19   it?

20   A    I did not.

21   Q    All right.  So let's -- I know it's been a couple of

22   weeks' break, and I want to make sure that we are both still

23   on the same page with respect to a couple of items, or

24   actually several items.  But do you recall when we broke --

25   A    The screen is blank.

```
 1                   THE COURT:  Be careful what you ask for, Mr. Kuo.

 2                   THE WITNESS:  That's correct.

 3      BY MR. PATTERSON:

 4      Q    I apologize.  I'm already scrambling here.  Here we go.

 5      And I think this is -- if you recall, this is where we ended

 6      up.  Do you remember us talking about this email?

 7      A    Yes, I do.

 8      Q    And we were talking about some statements that were

 9      made in the email about how people had viewed the process up

10      to this point in August of 2017, correct?

11      A    Yes, I remember.

12      Q    And there were some allegations that you hadn't been

13      completely honest through the process with I guess Vault

14      individuals.  Do you remember that?

15      A    Yes, I remember us discussing it.

16      Q    All right.  And you disagreed with that, right?

17      A    Yes.

18      Q    All right.  Now at this stage of the relationship,

19      let's call it August of 2017, what was your understanding of

20      the relationship between Vitol and GCAC and Mr. Brass?

21      A    We were -- it was unfortunate that we weren't able to

22      move forward with the original agreement that we had laid

23      out.  And so we were trying to find a work-around.  So we

24      were a bit in limbo as to what that work-around would be.

25      And so that's I believe what the relationship was during
```

1    that time.  We were trying to not dump them on the ground,

2    but to find a work-around and allow them a financing

3    arrangement which would allow them to continue doing

4    business.

5    Q    But my question is during the first week of August of

6    2017, what was your understanding as a snapshot of the

7    relationship between GCAC and Vitol?  Not what you were

8    working on and not what your feelings were about what you

9    were trying to do, but on that date, what was it?  What was

10   the relationship?

11   A    Do you mean during that month, or what particular day

12   are you talking about?

13   Q    Pick a day.  Let's say  August the 1st, 2017.

14   A    Honestly, I don't recall what I was thinking on August

15   1st, 2017.

16   Q    Okay.  How about August the 9th, 2017, the day of this

17   email on your screen?

18   A    Okay.

19   Q    You wrote this email, right?

20   A    Yes.

21   Q    All right?  And you say, "Not sure if they want to

22   dissolve this."  What is this?

23   A    The potential JV we were looking at doing.

24   Q    Well, if it's just potential, why are you needing to

25   dissolve it?

```
 1   A    Because we were going to leave it all together.  We
 2   were just going to part ways.
 3   Q    But again, if you weren't together, no need to part
 4   ways, right?  There's got to be something there to dissolve
 5   if you're talking about dissolving.  If there's nothing
 6   there, don't you just say we're done?
 7              MR. COOLEY:  Objection, argumentative.
 8              THE COURT:  Overruled.
 9   BY MR. PATTERSON:
10   A    We -- well, we had been discussing business for a long
11   period of time.  So you either just do not pick up the phone
12   and talk to each other anymore, or you try to find an
13   amicable way, a workaround.  And that's what we were trying
14   to do.
15   Q    All right.  But again, these are your words in your
16   email.  "Not sure if they want to dissolve this altogether."
17   And you're telling me you don't know what this is, right?
18   A    Dissolve the relationship, dissolve everything.  Just
19   part ways.
20   Q    The relationship.
21   A    Right.
22   Q    What was that relationship?
23              MR. COOLEY:  Objection, legal conclusion.
24              THE COURT:  Overruled.
25   BY MR. PATTERSON:
```

1   A    I don't know how you want me to describe a

2   relationship.

3   Q    These are your words.  I want you to describe it

4   however you were thinking.

5   A    I didn't say anything about a relationship.

6   Q    You just did, sitting here right now, you did.

7   A    But in this email it doesn't describe that.  You said I

8   wrote that.  I did not write that.

9   Q    You wrote this email, and you just described it as a

10  relationship right now under oath.  I'm asking you what are

11  you talking about in this email, to dissolve?

12  A    I just told you.  I said to dissolve what we were

13  working on altogether.  The entire project we were working

14  on.  We were looking to either continue or remove it

15  altogether.

16  Q    And in your words, wasn't really anything there to

17  begin with, right?  Is that accurate?  Other than talk.

18  A    There was multiple iterations of drafts that we had

19  proposed throughout the time.

20  Q    Right.  Nothing but talk.  Is that accurate?

21  A    No, not talk.  There was many papers back and forth.

22  Q    Okay.  Nothing but communication about what could be,

23  right?  Is that what you're suggesting?

24  A    That's what I'm saying.

25  Q    Right.  So let's keep going through your email.  "Not

1    sure if they want to dissolve this altogether or not.  But

2    feels like sometime --" but maybe something, "-- extreme is

3    going to happen soon.  Meaning they will just walk away and

4    do this with another party and Vic will be forced to pay

5    some of the damages."  Do you see that?

6    A    Yes.

7    Q    And those are your words again, right?  This is your

8    email?

9    A    Yes.

10   Q    Okay.  Explain if there was nothing that you can

11   describe in the form of a relationship between Vic and GCAC

12   and Mr. Brass, why do you write, "Vic will be forced to pay

13   some of the damages"?

14   A    Because I didn't know what was going to happen going

15   forward.

16   Q    No, that's not what you said.  You didn't say I don't

17   know what's going to happen.

18   A    I did.

19   Q    You said "Meaning".  Do you see that?  "Meaning".

20   You're explaining your prior sentence, right?  Correct me if

21   I'm wrong.

22   A    I'm just saying I didn't know where this was going.

23   That's what this implies, and that's what I wrote.  That's

24   what I meant when I wrote that.  I didn't know where we were

25   going with this because there were so many items in limbo

1   and we didn't know where the deal was going.

2   Q    Are you suggesting today now under oath that as of

3   August the 9th, 2017, you didn't believe there was a joint

4   venture between Vic and GCAC and Mr. Brass?

5   A    No.

6   Q    Okay.  Well then maybe we ought to go back in time a

7   little bit.

8        MR. PATTERSON:  Give me one second, Your Honor.

9   I'm sorry, I need to...

10       THE COURT:  Take your time.

11  BY MR. PATTERSON:

12  Q    I apologize for the delay, Mr. Kuo.  Okay.  I have put

13  up here what has been marked as Brass Exhibit 104-5.  I'm

14  going to ask you -- and I'll scroll this, and tell me if you

15  recognize this email.  Tell me to slow down if I need to.

16  This is the end.

17       THE COURT:  Mr. Patterson, before you let the

18  witness answer, is the last email that you showed -- what

19  was the -- what was the exhibit on that one?

20       MR. PATTERSON:  Brass 13.

21       THE COURT:  Brass 13?  Thank you, sir.  I

22  apologize.

23       MR. PATTERSON:  And I should have -- I'm sorry for

24  putting it up without telling everyone what it was.

25  BY MR. PATTERSON:

1    Q    Do you see this -- I'm sorry.  Do you recognize this

2    email?

3    A    I do.

4    Q    You do?  And as far as you can tell it's a true and

5    correct copy of the email string you were involved in?

6    A    I believe so.

7              MR. PATTERSON:  We would offer Brass Exhibit 5,

8    Your Honor.

9              THE COURT:  Any objection?

10             MR. COOLEY:  No objection, Your Honor.

11             THE COURT:  Okay.  And just for the record, would

12    that be 104-5?  Is that right?

13             MR. PATTERSON:  104-5.  Yes, sir.

14             THE COURT:  Okay.  104-5 is admitted.

15             (Brass Exhibit 104-5 entered into evidence)

16    BY MR. PATTERSON:

17    Q    And you'll see we'll start at the bottom.  We're going

18    to go back in time.  Because, remember, we were talking

19    about August 9th and you said no joint venture as far as you

20    know, right?

21    A    We had been discussing one, yes.

22    Q    But there wasn't one in your mind today.

23    A    There was not a signed joint venture.

24    Q    Okay.  I haven't said anything about a signed joint

25    venture.  Right?  Forget about signatures.  In your mind,

```
 1    was there a joint venture, a business joint venture between

 2    Vic and GCAC and Mr. Brass in July or August of 2017?

 3    A    There was one being proposed.

 4    Q    That's not my question.  My question is yes or no.

 5    Right?  In your mind, was there a business joint venture or

 6    venture, however you want to use the word, between Vic on

 7    the one hand and GCAC and/or Mr. Brass on the other?

 8    A    As I said, we had proposed one, but then none had been

 9    signed.

10    Q    Okay.  And again, remember I said forget about

11    signatures.  Ignore signatures.

12    A    I can't ignore that.

13    Q    Okay.  But I'm asking you to.  And you're going to need

14    to today.  All right?  Forget about a writing.  I'll --

15    let's make it a hypothetical.  There is no writing.  There

16    was never drafts, there was nothing.  Were you operating as

17    if there was a joint venture between Vic and GCAC and/or Mr.

18    Brass in July/August of 2017?

19              MR. COOLEY:  Objection.  Legal conclusion.

20              THE COURT:  Overruled.  I think the witness can

21    answer the question.  He is the businessperson working on a

22    joint venture.  Did you think there was an informal joint

23    venture?

24              THE WITNESS:  We were working --

25              THE COURT:  That's not what I asked.  Did you
```

1    think there was an informal joint venture, yes or no?

2              THE WITNESS:  Informal, yes.

3              THE COURT:  Thank you.

4    BY MR. PATTERSON:

5    Q    Right.  And was that informal venture active on July

6    13th, 2017 to the best of your recollection?

7    A    Yes.

8    Q    I'm sorry?

9    A    Yes.

10   Q    Right.  And so this is going to put -- make these

11   emails make a lot more sense, right?  Mr. Brass sends you an

12   email along with some others, says is there any reason you

13   guys see that we shouldn't let Gravity know -- who is

14   Gravity?

15   A    I think we already covered that, no?

16   Q    For the record, yes, we did.  One sentence briefly

17   would help the Court and everyone here and the record.  Who

18   is Gravity?

19   A    Gravity was the owner of a storage terminal.

20   Q    Right.  "Is there any reason you guys see that we

21   shouldn't let Gravity know, even if it's just informally,

22   that Vitol is taking Rio's place?"  Do you remember that?

23   A    Yes.

24   Q    Right.  And that is in reference to Vic going in and

25   buying out Rio's portion of an existing joint venture that

1    Rio was in with GCAC, correct?

2    A    No.

3    Q    Okay.  Explain it then.

4    A    That is --

5              THE COURT:  Please continue.

6    BY MR. PATTERSON:

7    A    That is just taking Rio's lease in that terminal.

8    Q    Was that just a typo where you said place instead of

9    lease?  Is that a typo?

10   A    Place could mean the place in the terminal.

11   Q    Of course it could.  It could mean lots of things.  I'm

12   asking you if that's a typo.  Did you really mean to say

13   lease since that's what you're saying here today?

14   A    I don't recall.

15             THE COURT:  Hold on a second, Mr. Patterson.  I'm

16   going to mute the line in every portion of this trial from

17   now on forward.  It is impossible that such few people

18   cannot put a phone on mute, but we're not dealing with this

19   anymore.  Just a second, Mr. Patterson.  I apologize.

20             MR. PATTERSON:  Not a problem.

21   BY MR. PATTERSON:

22   Q    So are you suggesting that that was a typo sitting here

23   today?

24   A    I don't know if it's a typo, but -- I don't know.

25   Q    That's not what you meant.  That's what you're saying

Page 19

1   under oath, that's not what you meant.  You meant lease,

2   very limited, versus stepping into their shoes, taking their

3   place, right?

4   A    I meant lease.

5   Q    Okay.  You weren't suggesting that there was a joint

6   venture going on in July of 2017?

7   A    Informally, yes.

8   Q    Okay, informally.  And then you reply, "I thought we

9   were going to notify them of the transfer of counterparts.

10  No reason not to approach them that I can see."  Right?

11  Letting them know.  Is this one self-explanatory or does it

12  not read as it should in your mind today?

13  A    I can explain.

14  Q    I'm sorry?

15  A    I can explain it.

16  Q    And my question is does it need explanation, or is it

17  clear?  And my reference is to the prior email, right?  Is

18  it clear?

19  A    To me it is.

20  Q    Okay.  And then Mr. Barth replies also, "Probably

21  better than letting them find out through the market."

22  Right?  And then a separate reply from you.  I mean, from

23  Mr. Brass which folds up some prior responses, right?

24  "Agreed.  We will certainly do that formally in writing.  I

25  just thought a verbal heads-up would be appreciated so they

```
 1   don't hear from someone else first and knowing what's going
 2   on."  Right?  So in your mind in July of 2017, there is this
 3   informal joint venture going on, right?  I'm not trying to
 4   put words in your mouth.  That's what you said, right?
 5   A    Okay, yes.
 6   Q    Okay.  And how far back did this informal joint venture
 7   start?
 8   A    The discussions?
 9   Q    No.  Forget about discussions.  Forget about writings.
10   We're talking about the informal business relationship
11   between Vic and GCAC and Mr. Brass.
12   A    Probably when we first purchased the product from Rio.
13   Q    And when was that?
14   A    Beginning of July.
15   Q    Beginning of July of 2017.  Somewhere in that range?
16   A    I believe so.
17   Q    You think that's fair?
18   A    I think that's fair.
19   Q    And if the evidence showed you purchased that produce
20   from Rio or you purchased their position from Rio a little
21   bit sooner, then you would go with that sooner date, right?
22   A    I don't know what date -- I mean, if you're telling me
23   there's another date, then...
24   Q    No, I'm not trying to trick you.  I'm asking you.  You
25   believed that was the triggering event, whenever it
```

Page 21

1   occurred, when Vic went in and purchased Rio's product I

2   think you said.  Right?

3   A    Yes.  That's when we were a bit pressured to begin

4   purchasing the product.

5   Q    Who is we?

6   A    Vitol.

7   Q    Someone pressured Vitol?

8   A    Yes.

9   Q    The largest commodities trader in the world, privately

10  Held, was pressured to do something?

11  A    Yes.

12  Q    By whom?

13  A    By Rio and GCAC.

14  Q    Okay.  And I've put on the screen, or it's coming up on

15  the screen, it's been marked as Brass 104-6.  104-6.  I'm

16  going to scroll through it as before and ask if you

17  recognize it.  All right?  And I'm scrolling from the bottom

18  to the top.  Do you recognize that?

19  A    Yes.

20  Q    And this is an email -- well, tell me what you

21  recognize it as.

22  A    An email.

23  Q    Were you a party to this email?

24  A    Yes.

25  Q    Does this appear to be a true and correct copy of that

1   particular email that you're a party of?

2           MR. COOLEY:  Objection, Your Honor.  I'm not sure

3   what we're looking at, but I want to note for the record

4   there's a Bates number in the middle of the page which is

5   unusual in my experience.  I don't know if we're looking at

6   a document or a compilation or what we're looking at

7   exactly.  The witness may recognize the content, but whether

8   this is an actual thread or compilation is unclear to me.

9   And I would object on that ground.

10          THE COURT:  Okay.  Mr. Patterson?

11          MR. PATTERSON:  I'm sorry, I didn't get what the

12   objection is.  It's been identified by the witness.  Is he

13   arguing with his own witness?  I'm not really sure, quite

14   frankly.  Just because he doesn't recognize something, I'm

15   not sure what that means.  I don't know what that objection

16   is.

17          THE COURT:  I guess my understanding of the

18   objection is whether this is a source of where this document

19   came from and whether it's a string or a compilation or it

20   came from somewhere else.

21          MR. COOLEY:  Your Honor, if I were to articulate

22   it more precisely, I guess I would say --

23          THE COURT:  I would appreciate it.

24          MR. COOLEY:  -- I object to this document as it

25   appears to be manipulated in some way from its original

1    form.  The witness may recognize individual emails, but the

2    document has hallmarks that suggest that it may have been

3    manipulated from its original form.  Maybe counsel can tell

4    us.  But that's my objection.

5          MR. PATTERSON:  Again, we have a new fact witness.

6    He's testifying as to authenticity of this document.  He's

7    arguing with his own witness.  I am happy to put Mr. Cooley

8    on the stand, but --

9          THE COURT:  That's not what we're going to do.

10   The question is just this --

11         MR. PATTERSON:  If he's suggesting that I've

12   manipulated the document, I have not.

13         THE COURT:  Any objection?  That's all I needed to

14   hear.  We can proceed.

15         MR. PATTERSON:  Thank you, Your Honor.  I would

16   ask the Court to admit 104-6.

17         THE COURT:  Any objection?

18         MR. COOLEY:  None beyond those I've asserted

19   already, Your Honor.

20         THE COURT:  Okay.  And those have been -- it's

21   admitted.  104-6 is admitted.

22         (Brass Exhibit 104-6 entered into evidence)

23         MR. PATTERSON:  Thank you, Your Honor.  And for

24   the record, I will verify when we have a break.  But the

25   only thing that has happened to any of these exhibits is

1   there were some highlights on them that I deleted before I

2   put them on the screen, and that's it.  But I will go back

3   and find this source and make sure this is complete.  If

4   it's not, I will notify the Court, we will retract it, and

5   we'll start over.

6             THE COURT:  Okay.  Thank you.

7   BY MR. PATTERSON:

8   Q    And so in July -- on July 25th, 2017, you wrote, "The

9   newco was merely their suggestion to separate GCAC from

10  their prior businesses and have a clean start to this joint

11  venture."  Do you see that?

12  A    Yes.

13  Q    So July 25th you were referring to this informal

14  relationship as a JV, right?

15  A    Informal, yes.

16  Q    I think that's what I said, informally.  Informal joint

17  venture.  That would be accurate, right?

18  A    Yes, informal, yes.

19  Q    All right.  "If it's an issue, they would revert back

20  to GCAC.  The cost into this venture are for their four

21  people --"  Do you see that?  "-- which are dedicated solely

22  to this venture."

23  A    Yes.  This was a proposal, yes.

24  Q    All right.  And so you knew in July, late July of 2017,

25  that GCAC was actually expending money, they were making

```
 1    investments in reliance upon this joint venture, right?

 2    A    I don't know that.  I don't know the answer to that.

 3    Q    Well, you say right here.  "The cost into the venture

 4    are for their four people in their organization which are

 5    dedicated solely to this venture."  They're hiring four

 6    people --

 7    A    They already worked there.

 8    Q    I'm sorry?

 9    A    They already worked there.

10    Q    So now you know who they are?

11    A    Yes.  We discussed this.

12    Q    We did?  We being whom?

13    A    With GCAC.

14    Q    VIC and GCAC discussed this?

15    A    Yes.

16    Q    Who at VIC, you?

17    A    Yes.  We were discussing the structure of the potential

18    JV and the potential newco.

19    Q    Actually, we've already established it's more than

20    potential.  It was this informal venture, right?  Informal

21    joint venture.

22    A    Okay.

23    Q    No?  Don't give me okay.  Do you agree or disagree?  I

24    thought we figured that out and you agreed with the Court

25    when he pressed you that this was an informal joint venture,
```

1    right?

2    A    I agree.

3    Q    All right.  And you keep pushing back on that as if --

4    and I don't want you testify under oath to something you

5    don't believe.  You believe that, right?  You understand

6    that.

7    A    Yes.

8    Q    All right.  And so this informal joint venture, you

9    also knew that there were costs that GCAC was incurring and

10   going to incur in reliance upon this, right?

11   A    I'm sorry, repeat the question again?

12   Q    You knew that GCAC was going to incur costs,

13   expenditures, expenses in reliance upon this informal joint

14   venture, right?

15   A    If you're -- define costs.  I mean, I don't know what

16   their costs were.  I didn't get into their side of the

17   ledge.  But their people, their four people that is

18   described here, were employees that they already had.

19   Q    "Initially GCAC were to provide all the support for the

20   business in terms of procurement, blending, marketing, and

21   sales.  If vault were to enter into this and add personnel,

22   then we would need to revise the contract."  Do you see

23   that?

24   A    Yes, I see that.

25   Q    All right.  And so you even in July of -- late July of

```
 1   2017 knew that Vault would have some input into this joint
 2   venture, right?
 3   A    We were trying to have Vault be a part of this.
 4   Q    And my point is on July the 25th, 2017, you knew two
 5   things; that there was an existing informal joint venture
 6   with GCAC and Mr. Brass and Vault had some input as to how
 7   it was going to operate, right?
 8   A    We were trying to find a way for Vault to enter into a
 9   JV with GCAC.  I was trying to step off of this and allow
10   them to try to figure out a way to do business together.
11   Q    And again, I know that we've talked about this, but
12   it's been two weeks, so bear with me.  Who is Nick Fay?
13   A    Nick Fay was the head of Vault.
14   Q    He ran Vault out of London, right?
15   A    Yes.
16   Q    All right.  And so he responds to you, "We do."  We
17   being who, Vault?
18   A    I assume so.  I don't know.  I didn't write the email.
19   Q    Well, it's from Mr. Fay, and he's in charge of Vault,
20   right?
21   A    Yes, he is.
22   Q    All right.  "If you want us to give you a view within a
23   reasonable timeframe, we need everything you have.  So far
24   we have zero financial information other than a flat P&L for
25   Rio, GCAC since January of 2015."  So he knew about Rio
```

Page 28

1   also, right?

2   A    I would assume so based on this email.

3   Q    All right.  How does this thing make money?  Why would

4   VIC want to commit to pay $2 million a year for tankage fees

5   plus half the cost for a four-man team?"  So he even

6   understood.  Vault in July even understood the joint venture

7   was that VIC would pay half the cost, right?

8   A    These were just hypotheticals.  These were just

9   proposals.

10  Q    No.  You told me there was an informal joint venture on

11  July 25th, 2017.  Was there not?

12  A    I think we're talking about the newco now.

13  Q    Where does it say newco?  I'm sorry.

14  A    On the email below.

15  Q    Yeah.  It says it was merely a suggestion.  It doesn't

16  say it's part of -- are you suggesting that the joint

17  venture, this informal joint venture was with someone other

18  than GCAC and/or Mr. Brass in July of 2017.  Is that your

19  suggestion?

20  A    I don't understand the question.

21  Q    All right.  Let's break it down.  Are you suggesting --

22  do you understand that part of the question?

23  A    Yes.

24  Q    Okay.  Are you suggesting in July of 2017 there was a

25  newco involve in this informal joint venture?

1   A    That was the name of the proposed joint venture, the

2   informal joint venture that we were working under.  That was

3   the moniker for the name.  We hadn't come up with a name.

4   Q    Oh, okay.  So when I see newco, it means --

5   A    It means new company.

6   Q    Hold on.  When I see the letters n-e-w-c-o, newco,

7   that's a reference to this informal joint venture?

8   A    Yes.

9   Q    All right.  Back to my original question though.  Mr.

10  Fay even understood that this informal joint venture

11  required VIC to pay half the cost, right?

12  A    It didn't require.  These were all proposals.

13  Q    You don't have a proposal in an informal joint venture.

14  You were operating an informal joint venture.  Isn't that

15  correct?

16         MR. COOLEY:  Objection.  Argumentative and

17  mischaracterizes prior testimony.

18         THE COURT:  I'll sustain.

19  BY MR. PATTERSON:

20  Q    July 25th, 2017, there was an informal joint venture

21  operating between VIC and GCAC and Mr. Brass.  Isn't that

22  correct?

23  A    That's correct.

24  Q    All right.  And there are terms to that joint venture,

25  right?

1   A    Terms that were not agreed upon, all agreed upon.

2   Q    All, I agree.  But Mr. Fay believes that half the cost

3   is going to fall on VIC, right?

4   A    That was just a proposal.

5   Q    Right.  And then you end up this string by basically

6   following up are we going to have a call, right?  Right?  I

7   need you to answer on the record.  I'm sorry.

8   A    I believe so, yes.

9   Q    Okay.  I'm going to put up on the screen what's been

10  marked as 104-7 and ask you to look at it as I scroll

11  through and see if you recognize it.  And again, tell me to

12  slow down if I'm going too fast.  Okay, I've scrolled

13  through it.  And if it wasn't too fast, do you recognize

14  that?

15  A    It looks familiar, yes.

16  Q    All right.  And what is it?

17  A    An email.

18  Q    Are you a party to this email?

19  A    Yes.

20  Q    Does it appear to be a true and correct copy of that

21  particular email string?

22  A    It appears so.

23         MR. PATTERSON:  We would offer 104-7, Your Honor.

24         THE COURT:  Any objection?

25         MR. COOLEY:  No objection.

```
 1              THE COURT:  104-7 is admitted.

 2              (Brass Exhibit 104-7 entered into evidence)

 3   BY MR. PATTERSON:

 4   Q   All right.  Let's start at the bottom.  And this is

 5   again in late July.  This is July 24th, 2017.  And Mr. Fay,

 6   head of Vault, intimately involved with you in finalizing

 7   the structure of this informal joint venture, right?

 8              MR. COOLEY:  Objection.  Mischaracterizes prior

 9   testimony.

10              THE COURT:  Sustained.

11   BY MR. PATTERSON:

12   Q   Let's go through it.  Mr. Fay writes you an email and

13   copies a few other people, including Mr. Sergeant.  And

14   again, just as a summary, Mr. Sergeant is the outsider, but

15   probably the largest interest holder in Vault, would you

16   say, other than VIC?

17   A   I don't know.

18   Q   All right.  But he is involved with Vault as well,

19   right?

20   A   Yes.

21   Q   All right.  "Morning, Eric and Ernie."  Ernie Kohnke.

22   Who is Ernie Kohnke?

23   A   Ernie is the general counsel for Vitol.

24   Q   All right.  So Mr. Fay, who runs Vault, is sending you

25   and general counsel an email.  "We are trying to get our
```

1    heads around this deal.  We are not clear what the role of

2    the newco is."  And newco we know is the informal joint

3    venture.  "And more importantly, what is the costs?  Please

4    can you share whatever you have on this.  Thanks, Nick."  Do

5    you remember getting this email July of 2017?

6    A     Vaguely, yes.

7    Q     And then Nick, Mr. Fay, follows up the next day, same

8    participants.  "Anything you can share on this, Eric?"  You,

9    right?  He is directing this to you.  Why would he direct

10   this to you for detail?

11   A     Because I was the point man on the informal JV.

12   Q     Right.  You were the inside guy over here, right?

13   A     One of them, yes.

14   Q     But you were the point man.

15   A     Yes.

16   Q     All right.  "Anything you can share on this, Eric?  We

17   are hearing rumors of a four-man team, including an asphalt

18   trader."  Which makes sense thinking about the earlier

19   exhibit, right, when you were discussing the cost of the

20   four people that GCAC was going to dedicate to this newco,

21   to this joint venture.  Right?

22   A     They could have put 400 people on there.  I mean --

23   Q     I understand they could have.  But we know they put

24   four, right?

25   A     No, I don't know that.  I don't know they put four.

1    These were all proposals.  These were talking points that we

2    were going through.

3    Q    Right.  And you respond, the newco was really their

4    suggestion to separate -- this is really the response that

5    we saw in the earlier exhibit, right?  Your response to this

6    question of rumors of a four-man team where you said the

7    cost of the venture for their four people in their

8    organization which are dedicated solely to this venture.

9    Right?  That's what you responded to his question.  They are

10   dedicating, they being GCAC, are dedicating four people to

11   this joint venture.

12   A    That's what they're proposing, yes.

13   Q    And then this is the conclusion of the prior exhibit,

14   would you agree with me?

15   A    It appears to be, yes.

16   Q    All right.  I'm going to put up on the screen for you

17   what's been marked as 104-8 and ask if you would look at it.

18   And I'll scroll through it.  It's one page.  Do you

19   recognize this?

20   A    Yes.

21   Q    All right.  And are you a party -- and what is it?

22   A    It looks like an email.

23   Q    Right.  And are you one of the parties to these emails?

24   A    It appears so, yes.

25   Q    Do these appear to be true and correct copies of those

1   emails?

2   A    I don't recall these emails exactly, but -- I don't

3   recall these emails.  Hold on.  Can I finish reading?

4   Q    I'm sorry.  Where do you want me to go?  Right here?

5   A    Right there.  Yes, I recognize it.

6   Q    All right.  And my question was does this appear to be

7   a true and correct copy of that email that you recall?

8   A    Yes.

9   Q    All right.

10           MR. PATTERSON:  I would offer 104-8.

11           MR. COOLEY:  Limited objection to the admission of

12   the top email from Mr. Bake if it's being offered for the

13   truth of the matter asserted.  If it's being admitted to

14   simply show the statement was made, to that limited extent,

15   we have no objection.

16           THE COURT:  Mr. Patterson?

17           MR. PATTERSON:  Well, we're not going to agree to

18   limit it.  But, quite frankly, it would take me a minute.

19   But this email is already -- this top email is already in

20   evidence in another exhibit.  But Mr. Kuo is a recipient of

21   this.  He testified it's at true and correct copy.  It's an

22   email that he received, and there's no reason to limit it.

23           MR. COOLEY:  Your Honor, he is not the declarant,

24   at least not at the top email.

25           THE COURT:  Well, if it gets in another way --

```
 1            MR. PATTERSON:  Chris Bake is -- it's Vitol.  This
 2   is a statement by Mr. Bake, or appears to be.  He says it
 3   is.  And that's a party opponent.  And it's admissible for
 4   all purposes.  It's not hearsay.  And so I'm not sure --
 5   just because they say they don't know, it's not excludable
 6   for any other reason.
 7            THE COURT:  You answered my question.  I was
 8   trying to -- I said the bottom email is in.  I just need to
 9   understand -- a reminder of who Chris Bake was.  Maybe you
10   can talk about that.
11            MR. PATTERSON:  I can do that, Your Honor.
12            THE COURT:  No, no, I think someone can just
13   answer the question.
14            MR. PATTERSON:  Bake is a Vitol employee from --
15            THE COURT:  I remember there were VIC employees
16   and there were more general Vitol employees.
17            THE WITNESS:  Mr. Bake is with Vault.
18            MR. PATTERSON:  That is not the testimony that
19   we've heard for a week, Judge.
20            THE COURT:  That's fine.  I just need to -- if
21   it's already in, then it doesn't really matter.  But why
22   don't we just admit it now for the purpose of just -- it
23   says what it says.  But I'll reserve judgement on that.  And
24   if we can get some additional information, then...
25            MR. PATTERSON:  I'll go back at a break or lunch
```

1   and I'll find the prior.

2          THE COURT:  But he can testify to the bottom and

3   the top.  It will come in -- bottom email comes in for our

4   purposes.  Top email will come in for now, an email received

5   to Mr. Kuo.  But that can come further -- I reserve your

6   right to address that at a different time.

7          MR. PATTERSON:  Yes, Your Honor.

8   BY MR. PATTERSON:

9   Q    Mr. Kuo, this top email, who is Mr. Bake?

10  A    Chris Bake is a Vitol employee and a board member of

11  Vitol, who also oversaw Vault.

12         THE COURT:  It's admitted for all purposes.

13         MR. PATTERSON:  Thank you, Your Honor.

14         (Brass Exhibit 104-8 entered into evidence)

15  BY MR. PATTERSON:

16  Q    Now, you write an email to Mr. Bake there at the

17  bottom, much earlier, in May of 2017, right?  That's the

18  date of this?

19  A    Yes.

20  Q    And do you recall writing this email?

21  A    I do.

22  Q    All right.  "I spoke with Mike."  Who is Mike?

23  A    Mike Loya.

24  Q    Mr. Loya.  And at the time he was your CEO, right?

25  A    Yes.

1   Q    "I spoke with Mike briefly this afternoon, but

2   (indiscernible) has resurfaced again after a couple of

3   years.  You may remember we spoke about this venture a

4   couple of years ago with the Sergeant acquisition.  We

5   tabled the discussion and GCAC partnered with Rio Energy."

6   Right?  "In short, Rio's management are keen on getting out

7   of the business due to the risk, asphalt pricing's lack of

8   hedging mechanisms, and are trying to sell their interest.

9   Do you see that?

10  A    Yes.

11  Q    And you remember earlier today we talked about your

12  referencing purchasing Rio's position, right?  And you said

13  it should have been a lease?

14  A    That was just -- the lease was one component of it.

15  Q    Right.  We need to go back?  Do you recall that

16  conversation?  You referenced it as something else and you

17  said it should be lease, right?

18  A    That was in reference to Gravity.

19  Q    Okay.  They're trying to sell their interest.  "This

20  currently involves the blending of ETBs to finished spec in

21  both Corpus and Mobile, along with a take-or-pay rack system

22  in Corpus Christi.  This would proceed even without the

23  purchase of the Gravity refinery."  Right?  Two months later

24  is when Mr. Bake responds, right?

25  A    July 31st.

1    Q    Right.  The first of May, end of July.  So that's three

2    full months before he replies, right?

3    A    I think that's two months.

4    Q    Well, May, June --

5    A    Okay, three months.

6    Q    Right?  So three months, 90 days before he replies.

7    And he tells you, "Thank you for your time this AM."  Do you

8    recall talking to him on the phone?

9    A    Vaguely.

10   Q    "As agreed, we are trying to cajole Dan into a

11   discussion with AJ."  Who is Dan?

12   A    Dan Sergeant.

13   Q    How does he fit in?  Who is he related to in this?

14   A    he is an employee of Vault.

15   Q    All right.  Is he an executive with Vault, or what does

16   he do for Vault, did he do for Vault back in July of 2017?

17   A    I don't know his exact position.

18   Q    Have any authority?

19   A    I believe so.

20   Q    Right.  "Aside from having one face to the market as

21   far as bitumen selling goes --" did I say that right?

22   A    Bitumen.

23   Q    Bitumen.  "We have to cross a few other bridges like

24   competing with the likes of your own rack sales, which

25   precludes us from buying bulk from them in Central America

```
 1    (indiscernible) there would need to be parameters agreed.  I
 2    really regret that when I received your heads up below,
 3    Eric, on the proposition below, that I did not go back and
 4    discuss more proactively with you the extent of the Vitol
 5    involvement in the bitumen side.  Anyway, we are where we
 6    are.  We need to try and find a way to make this work."
 7    Right?  Do you know -- what did you understand what he
 8    meant, "We are where we are"?
 9    A    I think he meant the informal joint venture.
10    Q    All right.  I'm going to put up on the screen for you
11    104-11.  And again, I'm going to scroll from the bottom and
12    ask you if you recognize this.  And tell me if you need me
13    to stop.
14    A    Okay.  Hold on.
15    Q    Good to go?
16    A    Yes, you can scroll halfway.  Okay.  Okay.
17    Q    Do you recognize this?
18    A    I do.
19    Q    And what is it?
20    A    An email chain.
21    Q    Were you a party to this email chain?
22    A    I am.
23    Q    And does this appear to be a true and correct copy of
24    this email chain in which you were a party?
25    A    It appears to be.
```

```
 1              MR. PATTERSON:  Offer 104-11.

 2              THE COURT:  Any objection?

 3              MR. COOLEY:  No objection.

 4              THE COURT:  104-11 is admitted.

 5              (Brass Exhibit 104-11 entered into evidence)

 6    BY MR. PATTERSON:

 7    Q    Okay.  Start off early August of 2017, right?  That's

 8    kind of where we started today.  You sent an email to

 9    Bernadette Scambray.  Who is that?

10    A    She was our -- she is our commercial assistant.  So she

11    takes care of -- not reconciliation, she takes care of all

12    of the trades, the systems.  She does the P&L, she pays --

13    she just -- she manages all of our back office.  Not all,

14    some of our more administrative things.

15    Q    If you need a bill paid, you send an email to her,

16    right?  Or you did in August --

17    A    She doesn't pay the bills.  She may be the conduit to

18    the next -- you know, to whomever in --

19    Q    Would it be accurate to say that she makes sure it gets

20    done?

21    A    Yes.

22    Q    All right.  And Mr. Abernathy, Lance Abernathy, who is

23    that?

24    A    He worked side-by-side with Bernadette.

25    Q    Same type, same --
```

1    A    pretty much, yes.

2    Q    -- responsibilities.

3    A    Yes.

4    Q    And you ask them, "Any idea if this will get paid

5    today?"  And there is -- there was a PDF, some document

6    attached.  Do you recall what that was?

7    A    I don't.  I don't.

8    Q    Well, the subject, does the subject help you out any?

9    A    It would appear so, but I don't know exactly.

10   Q    No, I understand.  It's five years ago.  But does that

11   help you?  Would you have put -- would you have put that

12   subject in your own email if it didn't somewhat describe

13   what you were attaching?

14   A    No.

15   Q    All right.  So is it fair to say it's probably a

16   storage invoice?

17   A    Most likely.

18   Q    Right?  And most likely a GCAC storage invoice?

19   A    Yes.

20   Q    All right.  And you're asking an employee of Vitol to

21   issue a Vitol check for storage, right?

22   A    Yes.

23   Q    And in fact you referred to it as GCAC storage, right?

24   A    Yes.

25   Q    And you wouldn't do that unless the joint -- you

Page 42

1    understood the joint venture required you to pay your half

2    of the expenses, right?

3    A    We paid all the expenses.

4    Q    All right.  Pursuant to this informal joint venture,

5    right?

6         MR. COOLEY:  Objection.  Mischaracterizes prior

7    testimony.

8         THE COURT:  He can answer.

9    BY MR. PATTERSON:

10   A    I'm sorry, what was the question again?

11   Q    Pursuant to this informal joint venture, you were

12   paying -- Vitol was paying the expenses.

13   A    We paid the expenses for this, yes.

14   Q    Right.  Then you send another email to the same, to Ms.

15   Scambray -- am I saying her name right, Scambray?

16   A    Yes.

17   Q    And also you included Mr. Abernathy again.  Jeanette

18   Wenn.  Who is Jeanette Wenn?

19   A    She was another -- she was similar position to

20   Bernadette and Lance.

21   Q    Okay.  And (indiscernible)?

22   A    I don't recall exactly what her position was.  She was

23   a back office person.

24   Q    Okay.  But you're talking to accounting payable people,

25   right?

Page 43

1    A    Yes.

2    Q    All right.

3    A    Well, I don't know if it's accounting.  I don't know if

4    these are people in accounting.

5    Q    But payables, right?  You needed stuff paid.

6    A    Correct.

7    Q    All right.  And you responded in response to Ms.

8    Scambray's earlier email -- excuse me -- in which she said,

9    "I have invoices of $246,000 for July tank rental and

10   $246,000 for August tank rental.  Included in this invoice

11   is $140,000 for actual tank rental at Mobile, Alabama and

12   then another 106 for July personnel expense.  Same amounts

13   apply for August as well.  I can attest to the validity of

14   these invoices.  If you give the okay and agree with these

15   amounts, then we will pay them today.  I just don't know

16   what is rightfully due them.  The invoices are attached."

17        Do you see that?

18   A    Yes.

19   Q    Okay.  What did she mean by the difference of tank

20   rental and actual tank rental, do you know?

21   A    I don't know.

22   Q    Okay.  And then you respond to her and say, "Yes.  That

23   is the right amount.  Let's pay them today if possible."

24   Right?

25   A    Yes.

1   Q    And it's your understanding that pursuant to this

2   informal joint venture, those expenses were to be paid by

3   Vitol, right?

4   A    That's correct.

5   Q    Right.  Ms. Scambray then responds to you, says, "Will

6   do.  What's the personnel expense for?  I thought this was

7   supposed to be a B2B deal."  What is that?

8   A    Back to back.

9   Q    Okay.  Do you understand what her question is?

10  A    Yes.

11  Q    All right.  Explain it, because it doesn't -- if you

12  would explain it.  What was her -- if you know, what was her

13  confusion based upon what she wrote?

14  A    I believe -- and -- I believe what she understood this

15  to be is we were moving to a deal where we were just

16  financing the business for them.  And it would be a back-to-

17  back deal where we were -- you know, we were paying it and

18  then we were receiving the money back from them at another

19  time.

20  Q    All right.  And then she says these are -- can I --

21  well, let's look.  She then -- the next email is from Ms.

22  Scambray.  She says, "These are now budged in Deal 1855791

23  under TRE for tank rental fees and under JVC for personnel

24  expenses since this could be reflected as a monthly draw??

25  This coding can be changed later if Eric disagrees.  For

002996

1    now, we need to pay these today.  And the total is $492,000.

2    Thanks."

3         And your response was, "We shouldn't be paying any

4    personnel expense; just storage costs."  Why did that

5    change?

6    A    Because we hadn't agreed on the terms of the informal

7    JV and hence there was -- we did not agree to have personnel

8    costs in this.

9    Q    In fact, isn't it true, Mr. Kuo, because you were

10   operating under an informal joint venture, you were then

11   picking and choosing what you wanted to pay by August of

12   2017?

13             MR. COOLEY:  Objection.  Mischaracterizes the last

14   answer.

15             MR. PATTERSON:  It was a question.

16             THE COURT:  It was a question.

17             MR. COOLEY:  Premised on a mischaracterization of

18   the last answer.

19             THE COURT:  Overruled.

20   BY MR. PATTERSON:

21   A    I'm sorry, can you repeat the question?

22   Q    Isn't it true that since you were operating under this

23   informal joint venture by August the 4th, 2017, you were

24   picking and choosing what VIC chose to pay for, correct?

25   A    No.