1  Q    All right.  So what was guiding this decision that you

2  weren't going to pay personnel expense on August the 4th of

3  2017?

4  A    Because we hadn't agreed to pay the personnel costs.

5  Q    Okay, that's fair enough.  And you just said we didn't

6  agree, so therefore we're not paying it.  Right?

7  A    They could put anything they want on the invoice.

8  Q    Likewise, Vitol can say whatever they want when they

9  get the invoice, right?

10  A    We're paying the funds.  We have a right to decide on

11  what we're paying.

12  Q    Right.  That's the attitude that Vitol took at that

13  time.  It's our money, we can do what we want, right?

14  A    No.  We just weren't paying for the personnel costs.

15  Q    Right.  Even though you would agree to this joint

16  venture with GCAC, right?

17  A    There was an informal joint venture.

18  Q    Correct.

19  A    But the terms were not complete.

20  Q    I understand.

21  A    And personnel costs were not agreed upon, despite it

22  being in the invoice.

23  Q    I understand.  That's the position that Vitol took

24  August the 4th of 2017.  That's all I'm trying to get at.

25  A    Yes.  That's the position we took.

1   Q    All right.  And it's also true in August you were

2   getting pressure from Vault.  Isn't that true?

3   A    It wasn't pressure.  I was trying to figure out a way

4   that Vault and GCAC could do business together.

5   Q    Why?

6   A    Because I knew that I could not go forward with what we

7   originally had proposed or structured or discussed.

8   Q    Why?  Explain why you knew you couldn't go forward with

9   the way you were operating at the time?

10   A    There was a global non-compete with Vault not allowing

11   any other Vitol entities.

12   Q    Right.  And you knew you had to terminate your deal

13   with GCAC and Mr. Brass, right?

14   A    Well, not terminate.  We were looking at finding work-

15   arounds, as evidenced by many emails.

16   Q    So Ms. Scambray replies, again August the 4th.  Okay.

17   So now we should only be paying a total of 279 for July and

18   August tank rental.  We are not paying the personnel expense

19   according to the below."  Which is your direction, right?

20   A    Mine and our legal direction, yes.

21   Q    And who else?

22   A    Our legal.

23   Q    Oh, are they on here?

24   A    No, but it's on a previous email I think that was

25   admitted under evidence.

1    Q    So your suggestion is that legal said -- your in-house

2    legal said you're not paying personnel expense?

3    A    Because we hadn't signed anything and that was part of

4    -- that was part of the proposal.  And we weren't willing to

5    pay that until it was signed.

6    Q    Okay.  But you were willing to pay your part of the

7    expenses, which is this email, right?

8    A    It's not our part, it's -- it was the only part.  It

9    was the whole part.

10   Q    And you had agreed to pay it, Vitol --

11   A    The whole part, yes.

12   Q    Yes.  "Eric, can we please talk to your contacts and

13   have them send us revised invoices for just tank rental and

14   then we will pay.  Thanks."

15        Molly (indiscernible) replies and said, "They just

16   called me and will send revised invoices to exclude

17   personnel."  Right?

18        Ms. Scambray then replies in this chain, "Okay, we will

19   now be paying personnel costs of 106 per month according to

20   Eric.  I budgeted this under OTH in deal 1855791, so please

21   book and pay."  So four days later, you change your mind and

22   said we will pay salary, right?

23   A    I don't believe so.  I don't think we ever -- we never

24   agreed.  I don't know what this email means.  I don't know

25   if she misspoke or if she misunderstood.

1  Q    Well, you had the last word here.  And you didn't say

2  don't pay, right?  You just say on the 8th on advice --

3  A    Don't pay.

4  Q    Any more invoices.  Right?  Nothing in the future.

5  Right?

6  A    I believe so.

7  Q    Okay.  But the below -- you didn't correct anything

8  below that Ms. Scambray said.  Hey, Eric said, Mr. Kuo said

9  pay $106,000 per month salaries.

10  A    Can you scroll down again?  I want to see --

11  Q    Of course.

12  A    Can you go down a little bit further?

13  Q    Sure.  You tell me when to stop.

14  A    Go back up just a little bit.

15  Q    Hmm?

16  A    Go back up just a little bit.  I said on the 4th that

17  we weren't going to be paying any personnel costs.

18  Q    Correct.  And then you changed your mind on the 8th,

19  right?

20  A    No.

21  Q    Well, let's look right here.  Right?  "We will now be

22  paying personnel costs of $106,000 according to Eric."  Do

23  you see that?

24  A    I see it written.

25  Q    Okay.  And you responded and you didn't correct her,

1    right?

2    A    I did above.

3    Q    I'm sorry?

4    A    I said, "We are not paying any more invoices."

5    Q    Any more, which would mean future, right?

6    A    I don't believe we ever paid any personnel costs.

7    Q    Well, you didn't tell her not to pay that one, did you?

8    A    I may have verbally told her.

9    Q    Maybe.  But maybe not.  It's not in writing is all we

10   know.  Right?

11   A    Right.  It's not in writing.

12   Q    It's not in writing.  So you would agree with me it's

13   safe to say that there was a point in time, however brief it

14   may have been, but there was a point in time which you felt

15   the joint venture obligated VIC to pay personnel costs as

16   well, right?

17   A    I don't believe so.

18   Q    Other than maybe this one moment, right?

19   A    I really don't recall.

20   Q    I know you don't recall.  That's why we have the

21   writing right in front of you.  This is your writing, and

22   I've put it right in front of you so you can look at it.  Do

23   you see that?

24   A    I didn't write that.  Bernadette did.

25   Q    She said you told her.

1   A    I don't recall telling her.

2   Q    I know you don't.  But I'm putting this in front of you

3   because she did at the time when she wrote this.  You would

4   agree her memory right after the event would be better than

5   yours five years later, right?

6   A    I don't know.

7   Q    You don't?  Was she a forgetful person?

8   A    I don't know.

9   Q    She did payables.  She is reliable, right?

10  A    Yes, she is reliable.

11  Q    And Vitol trusted her, right?

12  A    I believe so.

13  Q    She wrote checks for them, right?

14  A    No.

15  Q    She had them written, correct?

16  A    Yes.

17  Q    All right.  So they entrusted her with their $300

18  billion of revenue, right?

19  A    I don't know.

20  Q    Well, you just said that's what her job was.

21        MR. COOLEY:  Objection.  Mischaracterizes prior

22  testimony.

23        THE COURT:  Sustained.

24  BY MR. PATTERSON:

25  Q    Okay.  I am going to put up in front of you what's been

1    marked as Brass Exhibit 104-12.  I would ask you to look at

2    it.  I'll go to the bottom and ask (indiscernible).  Do you

3    recognize that?  I apologize.  Do you recognize this?

4    A    I do.

5    Q    All right.  And what is it?

6    A    It appears to be an email.

7    Q    All right.  And you are included on this email chain,

8    right?

9    A    Yes.

10   Q    Does it look like -- does it appear to be a true and

11   correct copy of the email chain that you are included on?

12   A    Yes.

13            MR. PATTERSON:  Offer 104-12, Your Honor.

14            THE COURT:  Any objection?

15            MR. COOLEY:  No objection.

16            THE COURT:  104-12 is admitted.

17            (Brass Exhibit 104-12 entered into evidence)

18   BY MR. PATTERSON:

19   Q    All right.  August 10th.  This is about a week later

20   from where we just left of paying bills, right?  2017.

21   Right?

22   A    I -- sure.

23   Q    You don't remember the date of the exhibit we just were

24   looking at?

25   A    I don't.  If you could go back to it.  It -- well, it

1    appears to be a couple days.  If you scroll to the top, the

2    8th of August.

3    Q    Right.

4    A    Two days, not a week.

5    Q    Okay.  And I want to go up here.  It's been redacted.

6    We don't know what the secret information is.  But Mr. Barth

7    on August the 10th sends an email to Mr. Bake and he copies

8    you, right?  The subject is GCAC, VIC and Vault.  Do you see

9    that?

10   A    I do.

11   Q    And was there anything going on out of the ordinary at

12   this time between Vault and you and Vic regarding the GCAC

13   informal joint venture?

14   A    What do you mean, anything going on?

15   Q    Well, was there anything out of the ordinary other

16   than, hey, we're trying to make this work at this time?

17   A    I don't believe so.

18   Q    All right.  But Mr. Barth -- and again remind us who

19   Mr. Barth is.

20   A    He is a business development employee for VIC --

21   Q    For VIC -- I'm sorry, I didn't mean to interrupt.  For

22   VIC here in the United States, right?

23   A    Yes.

24   Q    Right.  And he is writing a letter to Mr. Bake, who is

25   London or the U.K., right?

```
 1    A    Yes.

 2    Q    And he is involved with Vault, correct?

 3    A    Who?

 4    Q    Mr. Bake.

 5    A    Yes, he is.

 6    Q    Right.  But also works for VIC and is a shareholder of

 7    --

 8    A    He doesn't work for VIC.

 9    Q    That's correct.  He works for Vitol in the U.K. and

10    he's a shareholder of Vitol.

11    A    Yes.

12    Q    All right.  So Mr. Barth writes to Mr. Bake, "Chris, as

13    I do not know Nick well --" who is he referring to, do you

14    know?

15    A    I would assume Nick Fay.

16    Q    Nick Fay, who runs Vault.  Now, Mr. Barth, was he

17    working with you on this joint venture with GCAC and Mr.

18    Brass?

19    A    Yes, he conceived this project.

20    Q    Okay.  And you were the point man.

21    A    Eventually,  yes.

22    Q    At this time were you?

23    A    Yes.

24    Q    All right.  But you all were working closely together

25    on this joint venture?
```

```
 1    A     At this point in August, I don't believe so.

 2    Q     Were you taking over or was Mr. Barth taking over?

 3    A     I was.

 4    Q     All right.  But he was still obviously involved.

 5    A     I don't recall.  I think he phased out before this.

 6    Q     Okay.  Why was he involved in this email string then?

 7    Do you know?  Did he have any special relationships with any

 8    of these people on this email?

 9    A     I don't know.

10    Q     Right.  Anyway, he writes to Mr. Bake, "As I do not

11    know Nick well and I don't want to get involved in some sort

12    of food fight across the pond, I would offer these comments.

13    As you and I discussed before, there was no intention to do

14    anything to harm Vitol, Vault, or any other related party in

15    any way.  This looked like a profit opportunity.  It could

16    be an advantage in an attempt to acquire the terminal.

17    Also, neither Eric nor I thought we were doing anything in

18    conflict with a Vault commitment.  What Vault decides will

19    obviously have an impact here, but there indeed are no

20    agreements signed and any involvement can ultimately be

21    unwound."  Are those all accurate statements even as you sit

22    here today?

23    A     I believe so.

24    Q     Right.  And you respond, "Thanks.  Probably a good call

25    to email him directly."  Do you see that?
```

1   A    Yes.

2   Q    What did you mean?

3   A    That he --

4   Q    He being whom?

5   A    Steve.

6   Q    Okay.  So you were suggesting Steve email whom

7   directly?

8   A    I meant it was probably a good call that Steve emailed

9   Chris on the email below.

10  Q    Okay.  Because your response is just to Mr. Barth,

11  right?

12  A    Yes.  I'm basically saying that it was good that he

13  emailed Mr. Bake.

14  Q    You agreed with this email.  Good call.  That's what

15  you were saying in essence, right, to Mr. Barth?

16  A    Yes.

17  Q    This was a good idea, I agree with you.

18  A    I think what I was meaning here was that it was a good

19  idea that we were able -- since he conceived this project,

20  that he tell his side of what we were looking at doing and

21  why we couldn't do it.

22  Q    And why do you think he felt the need to explain

23  himself to these guys across the ocean?  What's the --

24  A    Because he was involved in conceiving this project.

25  Q    I understand.  Was he trying to gain credit for

```
 1    himself?  Was he trying to wave his arm and go, hey, make
 2    sure that I get credit for this deal, I'm involved?
 3               MR. COOLEY:  Objection.  Calls for speculation.
 4               THE COURT:  Sustained.
 5    BY MR. PATTERSON:
 6    Q    You said you agreed it was a good call to email him
 7    directly.  What did you mean?  You're going to get credit
 8    now for what you did?
 9    A    I just said that it was good that he sent this email.
10    Q    I know.  Why?  Why was it good?  That's what I'm trying
11    to figure out.
12    A    Because it was good that he told Chris that we had no
13    intention of harming  Vitol.
14    Q    Oh.  So you felt like it was good because there were
15    problems going on right now with Vault and Vitol, right?
16    August of 2017.
17    A    Yeah, we know that.  We knew that they did not like the
18    fact that we had...
19    Q    Okay.  And so you believed that Mr. Barth may be in
20    some trouble and you thought this as a good idea to kind of
21    smooth things over?
22    A    No, not in trouble.
23    Q    All right.  Okay.  I am going to put up on the screen
24    what's marked as 104-15.  And I'm going to go to the bottom.
25    And again, I'll scroll through.  And just tell me to stop if
```

```
 1   I go too fast.  I'm going to ask if you recognize this.
 2   A     I do.
 3   Q     Okay.  And what is it?
 4   A     It appears to be an email.
 5   Q     Were you a party to this email?
 6   A     Yes.
 7   Q     Does this appear to be a true and correct copy of the
 8   email that you recall?
 9   A     Yes.
10         MR. PATTERSON:  Offer 104-15.
11         THE COURT:  Any objection?
12         MR. COOLEY:  No objection.
13         THE COURT:  104-15 is admitted.
14         (Brass Exhibit 104-15 entered into evidence)
15   BY MR. PATTERSON:
16   Q     Okay.  We know who Mr. Fay is.  And this is in
17   September of 2017, right?  So we have now jumped forward a
18   couple of months from where we were from Mr. Barth's apology
19   or whatever email it was that he sent to Mr. Bake and the
20   Vault guys, right?
21   A     Yes.
22   Q     All right.  So a couple of months later Mr. Fay sends
23   you an email.  As well it includes lots of other people, Mr.
24   Sergeant, Mr. Bake, his contingent in the U.K., right?
25   A     Yes.  There are multiple people on this.
```

1   Q    Right.  "Gents, this is our indication to GCAC for term

2   supply from the JV."  Do you see that?

3   A    Yes.  I think we established there was an informal JV.

4   Q    Right.  And not only did you establish a joint venture,

5   but you publicized that fact, right, within the

6   organization.

7            MR. COOLEY:  Objection, mischaracterizes prior

8   testimony.

9            MR. PATTERSON:  It's a question.

10           THE COURT:  Question.  Overruled.

11  BY MR. PATTERSON:

12  A    I didn't write that email.

13  Q    I didn't ask if you wrote this email.  I said is it

14  true --

15  A    You asked if I publicized it, and I didn't.

16  Q    -- isn't it true that you publicized the fact that VIC

17  had entered into a joint venture, that you publicized that

18  fact across the organization.  Isn't that true?

19  A    No.

20  Q    How else would Mr. Fay know that there was a joint

21  venture then unless someone told him?

22  A    He knew there was an informal JV.

23  Q    Right.  Do you know how he knew?

24  A    Yes.

25  Q    How?

1    A    Because I spoke to him when we were looking at doing

2    this, and that's when he told us that we couldn't do it.

3    Q    So is the answer you told him, that's how he knew?

4    A    I'm sorry, what answer?

5    Q    I said do you know how he knew there was a joint

6    venture.  And you said yes, you talked to him.

7    A    I think we went through this.

8    Q    And I'm clarifying.  He knew because you told him there

9    was a joint venture, correct?

10   A    I told him we were looking at proposing a joint

11   venture.

12   Q    Okay.  But he says the joint venture.  Do you see that?

13   A    I do see that, but I did not write it and I did not

14   know what he meant by -- I don't know if he misspoke or if

15   he miswrote.  I don't know.

16   Q    "This was not how we had hoped things would work."

17   Right?  So you discussed the terms and the process of the

18   joint venture with him?

19   A    They saw the term sheet, yes.  It says in the email, in

20   the subject of the email.

21   Q    Right.  And he's discussing a particular transaction,

22   right?  "On Friday, GCAC were awarded five cargos, CIF,

23   October, February by Chevron for Panama.  Apparently, they

24   were not the best bid but gave better credit terms.  Their

25   offer was crude, formula-based.  Presumably price risk is

1   being handled by VIC, Eric, right?"  A question -- a

2   specific question to you, right?  He's presuming -- he's

3   assuming that you're going to do the hedging on this

4   transaction, right?  Did I read that correctly?

5   A    We did all the hedging, yes.

6   Q    Right.  That's where I'm going.  Before the joint

7   venture, VIC did all the hedging on every transaction,

8   right?

9   A    For the informal JV, yes, we did all of the hedging.

10  Q    Whatever you want to call it.  The business

11  relationship, which was a joint venture, you were doing the

12  hedging, right?

13  A    On the informal JV, I did the hedging, yes.

14  Q    Yeah, okay.  And in fact Mr. Fay knew that, right?

15  A    I said that in the email.

16  Q    Right.  He was presuming that it was going to go

17  according to the way it had gone, right?

18  A    Yes.

19  Q    All right.  And your response, "We would be doing the

20  hedging, correct."  And you were in fact telling him he was

21  right, that you on behalf of Vic would be doing the hedging

22  on this transaction.  And in fact you did do the hedging,

23  right?  On behalf of VIC.

24  A    Yes, we executed the hedge on behalf of GCAC.

25  Q    It's interesting that you say that at this point, that

```
 1    the hedge was done on behalf of GCAC.  And so GCAC paid you

 2    for this hedge?

 3    A    Well, the hedge -- sometimes they have to pay,

 4    sometimes you have to receive money.  It can work both ways.

 5    Q    Right.  So are you suggesting that they paid and/or you

 6    remitted the proceeds of this hedge to GCAC?

 7    A    There was a loss on the hedges.

 8    Q    How do you know?  On this hedge?

 9    A    Eventually.  The hedges take time to materialize.  They

10    don't -- there's not a payment for a hedge the day you do a

11    deal.

12    Q    The day you close the hedge, right?

13    A    The day you close the hedge, not the day you initiate

14    the hedge.

15    Q    Right.  And did the money go to GCAC?

16    A    No.  There was a loss.  We wouldn't give them --

17    Q    There was a loss on this hedge right here?

18    A    There was a loss overall on every -- on the overall

19    hedges.

20    Q    I'm talking about this hedge.

21    A    I do not know.  I don't know --

22    Q    Okay.  So your answer is you don't know if they got the

23    money or not, right?

24         MR. COOLEY:  Objection, mischaracterizes the

25    testimony.
```

```
 1              THE COURT:  Sustained.

 2    BY MR. PATTERSON:

 3    Q    If you don't know anything about this hedge, you don't

 4    know whether GCAC paid or got their money, right?

 5              MR. COOLEY:  Objection.  Assumes facts not in

 6    evidence.

 7              MR. PATTERSON:  I'm looking for that evidence by

 8    asking him the question.

 9              THE COURT:  Overruled.

10    BY MR. PATTERSON:

11    A    Hedges go into -- they're not -- I don't know hedge-by-

12    hedge, deal-by-deal what hedge goes on each deal and what

13    the profit and loss --

14    Q    Right.

15    A    -- if you look at it overall.

16    Q    I understand.

17    A    I don't think you do.

18    Q    Right.  And your testimony is that you were doing this

19    -- you -- let's focus on one.  You did this hedge for GCAC,

20    right?

21    A    Yes.

22    Q    Right.  As a retail account?

23    A    As an informal JV.

24    Q    And so we spent the morning with you reminding me over

25    and over that you didn't know what the terms of this joint
```

1    venture were, but you're sure that the terms of this joint

2    venture allocated all the risk to GCAC on the hedges.  Is

3    that your suggested testimony?

4    A    That doesn't make any sense.

5    Q    Right.  It doesn't, does it?

6    A    What you said doesn't make any sense.

7    Q    Whose risk -- who ran the risk -- who carried the risk

8    on the hedge?

9    A    Vitol carried not only the risk, but all of the

10   purchases for the product.

11   Q    That's right.  They were all in Vitol's name, weren't

12   they?

13   A    That's correct.

14   Q    And it was all their risk, wasn't it?

15   A    All Vitol's risk.

16   Q    All Vitol's risk.  No risk on GCAC.

17   A    I'm sorry --

18   Q    By agreement, right?

19   A    I'm sorry, I misspoke.  We were executing the risk on

20   behalf -- I don't recall if 2017 -- as I told you before, I

21   don't know where we were with the contracts and financing

22   agreements which were all never signed at this time in

23   September.

24   Q    Right.  Okay.  So let's keep going then.  And we'll

25   come back to this topic.  Since you don't remember whether

1    you were still operating under the joint venture or some --

2    I think you referred to it as a funding financing agreement

3    -- which we'll get to in time.  But we are not there yet,

4    right?  Or you're not sure whether you're there yet, right?

5    A    If you look at the email which you've submitted I think

6    for evidence, the financing agreement was I believe prior to

7    September of --

8    Q    I understand.  We'll get there.

9    A    That's an important component.

10   Q    I know you think that, but today is just to answer my

11   questions.  Okay?  We don't know.  Your testimony right now

12   is you're not sure where September 27th 2017 falls in your

13   prior testimony of joint venture/financing agreement, right?

14   It -- let me ask it differently.  Your testimony is the

15   joint venture agreement changed to a financing agreement at

16   some point in time.  Is that your testimony?

17   A    That is true.

18   Q    All right.  Do you know when?

19   A    If you pull up that email, that's when GCAC sent us the

20   proposed financing arrangement.  I don't recall the date of

21   that.

22   Q    You don't recall the date of when the arrangement

23   changed from a joint venture to a financing agreement,

24   right?  Sitting here today.

25   A    I do not.

1    Q    Okay.  And was there something that happened that you

2    believe reflected the change from this joint venture to the

3    financing?

4    A    Yes, the fact that Vault did not want to move forward

5    with the joint venture.  So instead of leaving them high and

6    dry, we agreed to do a financing arrangement.

7    Q    I understand.  And my point is without looking at

8    something else, you don't know when that change occurred

9    according to your understanding, right?

10   A    I'd have to look at the email on the financing

11   arrangement.

12   Q    Right.  Are you suggesting that the change happened the

13   moment you received that email?

14   A    No.

15   Q    Okay.  With respect -- you said you needed to see the

16   email.

17   A    The date.

18   Q    Why is that -- the date of the email important?

19   A    Because that's round about when we first started to put

20   on paper a financing arrangement.

21   Q    Okay.  And where in relation to that email did this

22   changeover happen?

23   A    Like I said, I don't remember the date of that email

24   for the financing arrangement.

25   Q    I understand.  I'm just asking for reference points.

003018

1   Right?

2   A    I don't know.

3   Q    Was it weeks, was it months, was it the next day?

4   A    I don't know exactly.

5   Q    Well, you suggested that by looking at the email, you

6   would know when the relationship changed from a joint

7   venture to a financing agreement.  And --

8   A    I would say round about.  I don't know the exact day

9   that it changed.

10  Q    But your testimony was you suggested that by looking at

11  the email, you would then remember the date when it

12  happened.

13  A    No, I didn't say that.  I said around when it would --

14  when -- around when we started discussing the financing.

15  That's what I said.  I didn't say I would know the exact

16  date.

17  Q    Okay.  So you believe that the joint venture converted

18  to financing around the date of that particular email, and

19  you'll know it when you see it, right?

20  A    I don't remember what day it was.

21  Q    I understand.

22  A    But I would say within weeks of that, y es.

23  Q    Okay.  All right.  Let's go back to 104-15.  All right?

24  Which is late September when Mr. Fay refers to it as the

25  joint venture.  So we know at least with respect to Vault,

```
 1   it's still a joint venture.  You didn't correct him.  You

 2   responded, right?  And you didn't say, no, no more joint

 3   venture, this is now financing, and so therefore we don't

 4   know whether GCAC is going to hedge this transaction.  You

 5   didn't say that, did you?

 6   A    I might have said it verbally.  I don't recall.

 7   Q    Right.  But here you didn't.

 8   A    I didn't send an email, no.

 9   Q    You were making this decision because you were a

10   partner in this joint venture, right?  Right?

11   A    At this point we did not have a formal joint venture.

12   Q    I understand.  But you don't --

13   A    You're asking me if I'm a partner.  There is no joint

14   venture.

15   Q    Well, there's informal.  You agreed with me that you

16   were operating under this informal joint venture, right?

17   A    At some point that stopped, as we just talked about --

18   Q    That's right.  I'm not trying to trick you on that.

19   A    You are.

20   Q    No.

21   A    Yes.

22   Q    We'll be there.  I'm going to give you your

23   opportunity.

24            THE COURT:  Mr. Kuo, I would remind you to only

25   answer the questions that are being asked of you.
```

```
 1    BY MR. PATTERSON:

 2    Q    So further along in the string, a couple of days later,

 3    Mr. Fay responds, "Thanks, Eric.  What's the BLIN margin on

 4    this deal?"  What's he referring to, BLIN margin?

 5    A    Potential profit on the deal.

 6    Q    All right.  And is he referring to the hedge as it

 7    relates to the purchase and -- let me ask it a different

 8    way.  When you hedge this transaction, sometimes it will cap

 9    what you could potentially make, right, by also limiting the

10    risk?

11    A    That's correct.

12    Q    All right.  And so is he asking you what the range of

13    possibilities on this transaction are based upon the

14    purchase in the hedge?

15    A    He is asking me, but I have no idea, as I stated.

16    Q    Okay.  And Chris says in response to your I don't know

17    response, "This is a joint venture that you run, isn't it?

18    Obviously does not help the cause if they are bidding

19    internationally with our support as we try and piece a deal

20    together.  They know the constraints we are operating

21    under."  Right?  As of September -- the end of September,

22    Mr. Bake says, look, you're running this thing.  You're

23    running this joint venture.

24    A    We were just doing deals on their behalf.

25    Q    No.  That's not what Mr. Bake said, and that's not his
```

1   understanding, right?

2   A    But that's what we were doing.

3   Q    Maybe.  Maybe.  But I'm asking you about this document

4   in front of you.  Mr. Bake on -- the end of September 27th

5   says, "This is a joint venture that you run, isn't it?"

6   A    That's what he said.

7   Q    All right.  I'm going to pull up what's been marked as

8   104-16 and ask if you've seen this before.

9   A    I have.

10   Q    Right.  And what is it?

11   A    It's an email.

12   Q    And are you a participant in this email?

13   A    A recipient, not a participant necessarily.  I haven't

14   seen the rest of the email.

15   Q    Does this appear to be a true and correct copy of the

16   email that you were a participant on?

17   A    I am a recipient, not...

18   Q    Correct.  Does it appear to be a true and correct copy?

19   A    Of the email?  Yes.

20             MR. PATTERSON:  Offer 104-16.

21             THE COURT:  Any objection?

22             MR. COOLEY:  No objection.

23             THE COURT:  104-16 is admitted.

24             (Brass Exhibit 104-16 entered into evidence)

25   MR. PATTERSON:

003022

```
 1   Q    Okay.  And so this email string starts with an email
 2   from Mr. Finocchi.  Who is Mr. Finocchi?
 3   A    I believe he worked for GCAC.
 4   Q    Okay.  And this first email has some supply or deal
 5   terms, right?
 6   A    It would appear so.
 7   Q    And Mr. Sergeant is copied on the original email of
 8   September 25th, 2017, right?
 9   A    It appears so.
10   Q    As well as Mr. Fay, which are the two big guys at
11   Vault, right?
12   A    Yes, they are both copied on the email.
13   Q    And Mr. Sergeant replies to this email, some two weeks
14   later.  And it's sent to Mr. Bake, but it copies you and the
15   other deal guys on this joint venture, right?  Right?
16   A    Yes.
17   Q    "Monday will be three weeks since we made a more than
18   fair offer to GCAC on a solution for all parties to move
19   forward with GCAC.  We have tried pursuing multiple
20   opportunities without success.  The latest failure to get a
21   deal through in my mind demonstrates a lack of commitment
22   from their side to make things work.  At the same time,
23   employees of GCAC such as Mr. Grace are actively pursuing a
24   time charter of an asphalt vessel on behalf of Vitol after
25   declining Vault's support to trade in the Caribbean in
```

```
 1   direct competition of Vault.  It is clear they have no

 2   desire to work with Vault.  At this point I would ask that

 3   the Vitol/GCAC relationship be terminated immediately to

 4   avoid any further conflicts, and I would refer you to the

 5   Vault Shareholder Agreement Non-Compete Clause."  Do you see

 6   that?

 7   A    I do.

 8   Q    All right.  And is this when the joint venture

 9   terminated?

10   A    I don't know.

11   Q    Well, what was your response to this email, October the

12   13th, 2017?

13   A    I don't know.  Is there an email?

14   Q    It's right on your screen.

15   A    My response.  I don't see a response.

16   Q    No, I'm asking you.  What was your response, if

17   anything?

18   A    I don't think I -- I don't know if I responded.

19   Q    So this was no big deal to you?

20   A    It wasn't written to me directly.

21   Q    No?  Was it relayed to you?

22   A    I am on copy, yes.

23   Q    So was this a non-event as far as you can remember?

24   A    I don't recall.

25   Q    You said you remembered this email.
```

1   A    I don't remember if it was a non-event or not.

2   Q    You don't remember doing anything in response to this

3   email?

4   A    In direct response to this email?  I do not remember.

5   Q    Do you remember anyone talking to you about this email

6   after they got it?

7   A    I don't know, to be honest.

8   Q    Did you go talk to Mr. Loya about it?

9   A    We had been discussing this for months, how to exist

10  this relationship.

11  Q    Why were you trying to exit?

12  A    Because we knew that we couldn't continue with the JV

13  and we knew that Vault did not want to move forward with

14  GCAC.

15  Q    Okay.  Why did you know you couldn't go forward with

16  the joint venture?

17  A    Because we knew that there was a -- because I found out

18  there was a non-compete clause.

19  Q    Well, no, you said you knew first.  Then you said you

20  found out.  I'm saying -- let me ask my question a little

21  bit clearer.  Your testimony I believe was that you knew you

22  couldn't go forward with this joint venture with GCAC and

23  Mr. Brass, right?

24  A    Yes.

25  Q    When did you know that?

1    A    After I spoke to Mr. Fay.

2    Q    Now, my question was when, not to whom.

3    A    Sometime at the end of July.

4    Q    So you operated and did transactions since the end of

5    July knowing that you were going to terminate your joint

6    venture with GCAC?

7    A    We were basically providing the financing during that

8    time.

9    Q    No, that's not what you said.

10           MR. COOLEY:  Objection.  Argumentative.

11   Mischaracterizes prior testimony.

12           THE COURT:  I'm going to sustain the objection,

13   but you can --

14           MR. PATTERSON:  Let's -- I'm sorry, Your Honor.

15           THE COURT:  Go ahead, walk him through.

16   BY MR. PATTERSON:

17   Q    Let's walk back your testimony.  Right?  We just spent

18   10, 15 minutes on this, Mr. Kuo.  And you said there was a

19   point in time in which this joint venture converted to a

20   financing agreement, right?

21   A    We were discussing all of these different potential

22   avenues and we didn't have anything concrete.  I don't know

23   the exact date that this turned over per se.  I don't know

24   what date or time this became one thing or another.

25   Q    But that's not my question.  Right?  Please listen to

1    my question.  And I believe it's yes or no.  I will try to

2    ask you a yes or no question.  Isn't it true that your

3    testimony earlier today was that there was a point in time -

4    - whenever that point was -- but there was a point in time

5    when this relationship changed from a joint venture to a

6    financing relationship, yes or no?

7    A    Yes.

8    Q    All right.  I believe you also said that you wanted to

9    see this bullet point email to help you remember at what

10   point in time that transformation occurred, right?

11   A    I don't know that the email will give me the exact

12   date, but it will help me remember at what point we started

13   discussing it.

14   Q    That's right.  Right?  And you also testified that you

15   don't remember when that date was, but you do remember that

16   since July, you knew you weren't going to go forward with

17   the joint venture with GCAC and Mr. Brass, isn't that true?

18   A    Yes.

19   Q    All right.  And so you operated, for however long,

20   knowing you were going to terminate, breach, whatever you

21   want to say, knowing you're going to terminate it without

22   telling GCAC or Mr. Brass.  Isn't that correct?

23   A    No.

24   Q    You told him in advance we're going to terminate this

25   thing?

1    A    I told him that we wouldn't be able to move forward in

2    regards to a joint venture, but that we would try to assist

3    them and finance them until they were able to find another

4    suitor.

5    Q    Right.  So the content of that sounds like it would

6    have occurred at the point in time that you believed the

7    relationship changed, right?

8    A    We were trying to find a time with Vault to step in

9    instead of VIC.

10    Q    Right.

11    A    So there was a period of time where we were trying of

12    accommodate GCAC and find a way that Vault could work with

13    them.

14    Q    Right.  And isn't it true that there was a period of

15    time in which you operated in this joint venture knowing

16    you're going to terminate it before you told Mr. Brass or

17    anyone else at GCAC?  Isn't that true?

18    A    We were trying to help them and we were -- by doing

19    this, it clearly shows that we were acting in good faith,

20    trying to still do business for them and help them and not

21    terminate the relationship on a particular date.  That's why

22    this went on for so long.

23    Q    And my question to you is you operated under the terms

24    -- the minimal terms of this joint venture for a period of

25    time knowing -- knowing you're going to terminate it without

1   telling Mr. Brass or GCAC, isn't that correct?

2   A    No.

3   Q    So your testimony -- your sworn testimony today is the

4   moment -- the moment you found out that you were going to

5   terminate, you told Mr. Brass?

6   A    The moment I found out that VIC could not move forward,

7   I tried to find a way for Vault to move forward.  So I did

8   not know we were terminating because I didn't know if Vault

9   wanted to do it.  And we spent months -- they spent months

10  trying to get the deal done.  We've seen all the emails.

11  Q    That's right.  And you knew in July, didn't you?  And

12  I'm showing you Exhibit 104-13.  Because Mr. Fay told you,

13  option three is exit and close the joint venture completely.

14  In July, right?  You knew that.  See?  This is to you.  This

15  email is to you.  And Mr. Fay told you, you fix it or you

16  exit.  And so you knew in July that you were going to

17  terminate this joint venture.  Isn't that true?

18  A    I knew that I could not move forward as VIC.

19  Q    That's right.  And you were going to terminate this

20  joint venture, right?

21  A    We were trying to find a work-around.

22  Q    Listen to my question.  You knew you were going to

23  terminate this joint venture one way or the other at least

24  by July 31st, 2017.  Isn't that correct?

25  A    There was only an informal joint venture.

003029

1    Q    I understand.  And you were going to terminate it.  And

2    you knew that, right?

3    A    I knew that and I relayed that to Mr. Brass.

4    Q    On July 31st?

5    A    Around about that time.  I don't remember exactly what

6    day.  I told him we couldn't move forward.  He knew that.

7              THE COURT:  Mr. Patterson, since you're in between

8    exhibits --

9              MR. PATTERSON:  Yes.

10             THE COURT:  Just from a timing standpoint, what...

11             MR. PATTERSON:  I have a couple hours, hour-and-a-

12   half.

13             THE COURT:  Okay.  Well, why don't we work until

14   12:30 and then take our break from 12:30 to 1:15 and then

15   come back.

16             MR. PATTERSON:  Whatever is convenient for

17   everyone.  I'm good.

18             THE COURT:  Is this a good stopping --

19             MR. PATTERSON:  It's as good as any, sure.

20             THE COURT:  Okay.  Then why don't we just -- why

21   don't we come back at 1:00 then?

22             MR. PATTERSON:  Perfect.

23             THE COURT:  And just from a housekeeping

24   standpoint, let's go until about 5:30 or 6:00 today, see

25   where it goes.

1          Mr. Brass, unfortunately it may mean that you need

2     to come back another day.  But we'll just continue to work

3     until we're done.

4          Mr. Kuo, as I testified earlier, you're -- or as

5     I've noted to you earlier I should say, I'll just remind you

6     that you are still under oath and you are not to discuss

7     your testimony with anyone.  Okay?  Let's come back -- I'll

8     give everyone an hour.  Why don't we just do 1:10 and just

9     start clean.  Thank you.

10         MR. PATTERSON:  Thank you, Judge.

11         CLERK:  All rise.

12         (Recess)

13         CLERK:  All rise.

14         THE COURT:  Please be seated.  Why don't we begin.

15    Back on the record in Vitol v. Brass.  I want to have a

16    discussion with -- just a little housekeeping.  Mr. Kuo, if

17    I could excuse you for a moment.  Just scheduling stuff.  I

18    don't want to bore you with it.

19         Yes, you actually can I think.

20         Okay.  I was just looking at scheduling.  I want

21    to give everyone as much time -- closings I'm going to limit

22    to 15 minutes.  I'm telling everyone now.  Just figure out

23    what you want to tell me, let me know.  In terms of things

24    to think about, because I'm trying to get ahead of things so

25    people know what to argue to me as I think about things.  I

Page 80

1   haven't heard all the evidence, so I'm not going to talk

2   about that.

3           I want everyone to read 611 B.R. 813.  It's the

4   Isgur Ultra decision, Ultra Petroleum decision, not

5   (indiscernible), obviously.  But I just want to -- sure, 611

6   B.R. 813.  611 B.R. 813.  And if you give me a second, I can

7   confirm that that's the actual cite.  It will all make --

8   it's just things that I'm thinking about as we proceed in

9   the trial.  And I'm trying to get folks to think about --

10  give me a second.  I can tell you about the cite.  Okay, 611

11  B.R. 813.  Asking the parties to read it.  It's not a today

12  issue.  It's not even a tomorrow issue.  It's just an issue

13  coming out of -- both parties are arguing and I want

14  everybody just to think about how to approach that and to

15  think about it at the right time.

16          In terms of scheduling, it's going to be clear

17  we're not going to be able to finish Kuo and Mr. Brass

18  today.  So I am holding hard and fast to finishing by

19  September 30th.  So I can move my schedule on September 28th

20  from 1:00.  And we can do it in Houston and we can go to

21  9:00, from 1:00 to 9:00.  Because I'm going to finish.  I'm

22  finishing in September.  Unless the parties have a better

23  day.  You can dress comfortable.  I don't care if you eat in

24  the courtroom.  Dress comfortably.  It gets a little hot

25  around 6:30, I will tell people.  But I promise I've already

1    talked to the security.  We're fine.  We're going to finish.

2    And hopefully we can finish with Mr. Brass at that time.

3    I've seen billion-dollar valuations get done in a day, so

4    I'm assuming we can get done with any expert in one day.

5    But we'll take it up.  Whatever we don't finish, we'll

6    finish.

7            But we need to pick a date for Dietz.  Clearly

8    that's not -- we don't know what it is yet, but we've got to

9    figure it out.  And maybe Dietz -- I don't want to say it,

10   but I need a really good excuse if Dietz can't go this

11   month.  And I know you know that.  But that's the day I'm

12   carving out.  Nothing is set in stone, obviously.  Let's see

13   how far we can get.  But we're going to go late one day.  I

14   don't want to do it today.  I think it would be unfair for a

15   lot of reasons to go late today.  One, (indiscernible) the

16   lack of notice.  And there are other things going on.  So

17   today is not the day.  And it's a Friday and no one has

18   notice.  So I want to go until 6:00.  I think everybody

19   could have expected that.  Take a look at your schedules.

20   The 28th, the 30th.  The 29th I just can't do.  I've got

21   something that I've -- I've pushed those folks out twice, so

22   I can't do it.  The closing argument will be 15 minutes each

23   side.  And then -- well, let's back up for a second.  At

24   that time I will consider any 7052 motion at that time.  And

25   if not, we'll proceed (indiscernible).  But I really want to

1    see how much we can get done before then and really push.

2          But I mean it, it gets a little hot around 6:30

3    around this place.  And I don't care what you bring.  But

4    everything shuts down, so you'll have to think about -- I'm

5    telling everyone, I'm telling folks you'll have to bring

6    food in here.  You know, just nothing crunchy.

7          But with that, I think we can bring Mr. Kuo back

8    in and continue the cross-examination.

9          MR. PATTERSON:  I just had one question.

10          THE COURT:  Yes.  And Ms. Goott, then I'll turn to

11    you.

12          MR. PATTERSON:  I heard the Court say September

13    29th was off the calendar for our purposes.  Was there still

14    time available on the 30th?  I know there have been some

15    discussions --

16          THE COURT:  Yeah, yeah.  The 30th is still there.

17          MR. PATTERSON:  And what's that time block?

18          THE COURT:  Oh, that's Victoria.  We've got all

19    day.  Nine to -- well, nine to -- I've got to find out what

20    time Victoria closes.  You're out of town that day?  Okay.

21    So maybe -- Friday the 30th.  Okay.  Let's see how much we

22    can get done between now and then.  I'll see what I can do

23    on the 27th then.  I'm out of town the 22nd and the 23rd.

24    That's the kicker.  6:00 a.m.  Maybe there's time on the

25    21st in the afternoon and maybe we can -- but it will be

1   like 2:00 to 6:00 or something, 2:00 to 7:00.  I can't go

2   late in Victoria, but I know I can go late here.  But we're

3   just going to have to get things done.

4           And then, Mr. Cooley, with respect to the

5   additional witness, whenever -- to the extent you can, I

6   want to start thinking about -- clearly your objection is

7   coming.  For me -- to the extent you can tell me -- and you

8   don't need to tell me now.  Let's get going.  But at some

9   point, for what purpose the witness would be called so that

10  I can consider things in my mind as I start thinking about

11  potential objections and what could be coming.  And I don't

12  want to prejudice Ms. Goott's right to have a full and fair

13  opportunity to object.  So I don't want to take it up now,

14  but I just want to think about it.  At least to the extent

15  we can identify what the issue is and what the issues are.

16  And then maybe -- we're just trying to think about things in

17  advance as opposed to kind of thinking about them and then

18  ruling later.  To the extent I can think about some of the

19  things up front, I'll know.  Obviously I know the rules that

20  are being implicated.  But it would just help me.

21          MR. PATTERSON:  Absolutely, Your Honor.  And I

22  understand the Court doesn't want to do that now.  That's

23  fine.  I'm happy to do that briefly at the end of the day or

24  whenever the Court --

25          THE COURT:  Yeah.  Maybe we could take it outside

1    of the -- let's get Mr. Kuo up and see if we can finish with

2    Kuo today.

3            Ms. Goott?

4            MS. GOOTT:  I would ask Your Honor if it's okay if

5    Mr. Brass is here pursuant to this Court's order.  He would

6    like to be able to go work.  And he is about 30 minutes, his

7    office, to get here.  Is it possible -- we want to get

8    permission if he can go to work and then we notify him, give

9    him a 30 minutes heads up.

10           THE COURT:  Yeah.  I don't have a problem with

11   that.  As long as, Mr. Brass, you understand that when you

12   get the call, you've got to come or make yourself available

13   so you can be here.  Right?  I treat this no different than

14   if you went into a room and back or across the street or

15   something.  As long as you know you (indiscernible), it's

16   completely fine with me.  You are excused.  And somebody can

17   step out and kind of give you a 30-minute heads up.  Maybe,

18   Mr. Patterson, you -- and you all will know when to call

19   him.

20           MR. PATTERSON:  (indiscernible).

21           THE COURT:  Yeah.  Mm-hmm.

22           MS. GOOTT:  And I'll get -- we'll get a good

23   sense.  I will make sure he is not late.

24           THE COURT:  You can work that out.

25           MS. GOOTT:  I just didn't want to let him go

1    without your permission.

2          THE COURT:  No, no, I appreciate that.  And we're

3    going to stop hard at 6:00 today.  So maybe you can pick a

4    time to have him back or you can just give him a 30-minute

5    heads up.  It's completely up to you all.  But in terms of

6    what you're asking me, completely fine with me.

7          MS. GOOTT:  Thank you, Judge.

8          THE COURT:  All right.  Let's get Mr. Kuo back in.

9          All right, Mr. Kuo, I would remind you that you're

10   still under oath, sir.

11         Mr. Patterson, I've given you the access.  You may

12   proceed whenever you are ready.

13         MR. PATTERSON:  Thank you, Your Honor.

14   BY MR. PATTERSON:

15   Q   Mr. Kuo, I have put up on your screen  Vitol's Exhibit

16   1.  And I apologize, I don't recall the docket reference for

17   these.  I don't think they're on the docket.  But Exhibit 1,

18   Vitol.

19         MR. COOLEY:  That's correct, they're not on the

20   docket for reasons previously discussed with respect to

21   confidentiality.

22         THE COURT:  But we can call it Vitol 1?

23         MR. COOLEY:  Yes, Your Honor.

24         THE COURT:  Okay, works for me.

25   BY MR. PATTERSON:

1    Q    It's been admitted.  So this email is November 2016.

2    Do you see that?

3    A    Yes.

4    Q    And it is -- has attached Vitol GCAC joint venture

5    talking points.  Do you see that?

6    A    Yes.

7    Q    And then attached you see this list of bullet point

8    issues, right?  Now, do you believe this governs -- this

9    informal joint venture we've talked about existed at least

10   up through October of 2017?

11   A    Are you asking me if every point here is what we --

12   Q    Any, some, all?

13   A    I mean, I can read them all first before I --

14   Q    Feel free.  I'm sorry.  I'm not trying to trick you on

15   anything.  I want to know if this governs the relationship

16   or not.

17   A    I don't think there was anything governing it per se.

18   These were just discussion points.

19   Q    Well, true.  The email said, here's what I think are

20   the main talking points.  Right?  "Clearly this is not

21   inclusive of all considerations, nor are we representing

22   that we have internal agreement regarding all the elements

23   of the structure.  However, we do think it gets us started

24   and has a chance."  Right?  Did I read that right?

25   A    I believe so.

1    Q    And so how do you interpret that?

2    A    That there are just talking points that we are going to

3    discuss.

4    Q    Okay.  And do you think that by sending or receiving

5    this email and these bullet points that anyone was bound?

6    A    That either party was bound?

7    Q    Yeah, anybody.  Anybody.

8    A    This is not a binding agreement.

9    Q    Right.  It's just talking points, right?  It's what you

10   were thinking about.  Or somebody was, anyway.  Right?

11   A    Correct.

12   Q    Somebody's thoughts to get the conversation started,

13   right?

14   A    Generally that's what these talking points are for.

15   Q    Right.  So nothing more than that.  Just a hey, here's

16   what we're thinking about, right?  Right?

17   A    I believe so.

18   Q    Okay.  I'm just -- I mean, you wouldn't think based on

19   this email -- even though it's sent by Mr. Barth, right?

20   Mr. Barth sent this email.  Does that bind in your mind

21   Vitol to all of these points?

22   A    I don't believe so.

23   Q    And does it bind GCAC or Mr. Brass because he received

24   it?

25   A    I don't believe so.

1    Q    No.  Okay.  I'm going to put up here Vitol's Exhibit

2    14, which has not been admitted, I don't believe.  My

3    records don't show that it's been admitted.  And ask you to

4    look at it.

5             MR. COOLEY:  I show that it was on September 7th.

6             MR. PATTERSON:  Okay.  I wasn't sure, but that's

7    even easier.

8             THE COURT:  Okay.

9    BY MR. PATTERSON:

10   Q    So here's the email --

11            THE COURT:  Mr. Patterson, before you begin.  So I

12   will consider this admitted.  Even if for some reason it

13   wasn't, I'm going to consider this admitted.

14            MR. PATTERSON:  Yes.

15            THE COURT:  Okay, perfect.

16            MR. COOLEY:  No objection.

17            THE COURT:  Vitol 14.

18            MR. PATTERSON:  Fourteen, 14.

19            THE COURT:  Okay, thank you.

20            (Vitol Exhibit 14 entered into evidence)

21   BY MR. PATTERSON:

22   Q    And so what we have here is kind of a similar email,

23   right?  Mr. Brass sends an email.  "This is roughly what we

24   are thinking."  Right?  Let's go back.  "Here are some main

25   talking points to get us started."  Right?  You would view

1   these as similar emails, correct?

2   A    They are discussion points.

3   Q    Right, discussion points.  Nothing more in your mind.

4   A    That's what I said.

5   Q    Okay.  And so you don't think that this email in any

6   way binds any party to some financing arrangement, right?

7   A    It's just discussion points.

8   Q    Right.  And my question is in your mind, it doesn't

9   bind anyone to anything on here, right?

10  A    I don't know.  I would need to read them all.  But...

11  Q    So it might say something different that would change

12  your mind?

13  A    I don't know.  I haven't seen this email in a long

14  time, so I don't know what it all says.

15  Q    But remember earlier this morning we were talking and

16  you said that there were some bullet points for financing

17  and that's about -- you needed to see it to see when you

18  thought this joint venture transitioned into a financing

19  arrangement.  Remember that?

20  A    Yes.

21  Q    Okay.  This is the email, right, that you were

22  referencing.

23  A    Yes.

24  Q    Okay.  And you would also agree with me that there's

25  nothing in this email that binds anyone to anything, right?

Page 90

1   A    Agree.

2   Q    Right.  And so what is it about this email that you

3   felt would help you remember when the transition from this

4   joint venture to this financing arrangement occurred?

5   A    Because this is around the time that I told Mr. Brass

6   that we could not move forward with the joint venture.  And

7   he sent the email specifically laying out discussion points

8   on an interim financing structure.

9   Q    I got it.  And so this also clears up a couple of other

10  things, I think.  Correct me if I'm wrong.  But you said you

11  found out in July, mid to late July that you had -- that

12  Vitol had no intention of following through with these

13  interim joint venture with GCAC, right?

14  A    No.

15  Q    That's not what you said this morning?

16  A    No.

17  Q    All right.  When did you find out?

18  A    Can I tell you what I said this morning?

19  Q    Well, the record is already there.  You've testified

20  under oath, so you --

21  A    Right.  I'm going to tell you again because you don't

22  seem to remember.

23  Q    -- can tell me what you remember.

24  A    I remember telling you that I found out around the end

25  of July that I -- that Vitol Inc. could not move forward

1   with a joint venture.

2   Q    Okay.

3   A    I didn't say that all Vitol couldn't move forward, I

4   said Vitol Inc. could not move forward with a joint venture.

5   Hence, we were going to approach Vault to see if they had

6   interest in moving forward with GCAC.  That's what I told

7   you.

8   Q    Okay.  You believe that, right?

9   A    Yes.

10   Q    All right.  And when did you tell GCAC and/or Mr. Brass

11   that Vitol had no intention of following through with their

12   joint venture?

13   A    You asked me the same question.  I just answered you.

14   Q    Well, I think you said this -- August, this email is

15   when you told Mr. Brass Vitol was not going to go forward

16   with --

17   A    That's not what I told you.

18        MR. COOLEY:  Objection.  Mischaracterizes prior

19   testimony.

20        THE COURT:  Yeah, Mr. Kuo, I need you to answer

21   questions or say that you don't understand.

22   BY MR. PATTERSON:

23   A    I don't understand.

24   Q    When did you let GCAC, Mr. Brass, know that Vitol was

25   not going to go forward with their joint venture?

```
 1              MR. COOLEY:  Objection.  Asked and answered.

 2              THE COURT:  Overruled.

 3    BY MR. PATTERSON:

 4    A    As I told you before, I notified Mr. Brass on or around

 5    the end of July that Vitol Inc. could not move forward with

 6    the joint venture as proposed.

 7    Q    Okay.  And you just told me that this was about the

 8    time you told GCAC or Mr. Brass that Vitol could not go

 9    forward with the joint venture.  And he responded with this

10    alternate plan, right?

11    A    I told him around about the end of July.  This email

12    was August 21st.  So it was not at this time.

13    Q    Okay.  Now you believe it was much earlier, three weeks

14    earlier or so?

15              MR. COOLEY:  Objection.  Argumentative.

16              THE COURT:  Sustained.

17    BY MR. PATTERSON:

18    Q    This helped you remember it was three weeks earlier?

19    A    Yes.

20    Q    All right.  And what about this helped you remember the

21    three weeks before this email you happened to notify Mr.

22    Brass of Vitol's intention not to go forward with the joint

23    venture or to terminate the joint venture?

24    A    I'm sorry, can you repeat the question again?

25    Q    What in this email helped you remember?
```

1   A    The date.

2   Q    The date.  The August 21st helped you remember that

3   three weeks earlier, you told Mr. Brass you were going to --

4   that Vitol was going to terminate the joint venture.

5   A    I think there was also multiple emails that also state.

6   Q    You think?

7   A    Yes.

8   Q    Well, do you remember?  You're testifying under oath

9   that you remember.  You're guessing?

10  A    Yes, I'm guessing.

11  Q    Okay.  I don't need you to guess today.  If you don't

12  know, you need to tell me you don't know.

13  A    I don't recall.

14  Q    Okay.  So in your mind, this email is nothing more than

15  discussion points, just like Exhibit 1 is nothing more than

16  talking points.  Right?

17  A    They're all discussion points.

18  Q    It's all the same as far as you're concerned.

19  A    All of the emails are discussion --

20  Q    All the emails are discussion points.  Okay.  So after

21  seeing this email, Mr. Kuo, that we talked at length about

22  this morning, does it -- can you now tell the Court when

23  this joint venture transitioned into a financing

24  arrangement?

25  A    I don't recall the date.

Page 94

```
 1   Q    You said this was going to help you remember.

 2   A    It was sometime after this.

 3   Q    Correct.  Between August 21st, 2017 and today, right?

 4   A    I suppose so.

 5   Q    You suppose so?  Because we started off your testimony

 6   by saying that you knew that this was just a financing

 7   transaction.  Right?

 8   A    It turned into a financing transaction.

 9   Q    I understand.  And I'm going back to the beginning of

10   your testimony where you sat there under oath saying that it

11   was always a financing transaction.

12   A    I did not say that.

13   Q    You didn't?

14   A    No.

15   Q    And if you did, you didn't mean it?

16   A    If I did, I misspoke.

17             MR. COOLEY:  Objection, argumentative.

18             THE COURT:  Sustained.

19   BY MR. PATTERSON:

20   Q    Did you mean it if you said it?

21   A    Did I mean what?

22   Q    That it was always a financing transaction?

23   A    If I said that, I misspoke.

24   Q    Okay.  So today your testimony is this was not a

25   financing transaction.  It wasn't a loan.  Right?  You would
```

1    agree with me.

2    A    I thought we spoke about this earlier.

3    Q    Don't worry about what we spoke about earlier.  Just

4    focus on my questions.  All right?  You would agree with me

5    this was not a loan transaction.

6            MR. COOLEY:  Objection.  Vague and asked and

7    answered.

8            THE COURT:  Overruled.

9    BY MR. PATTERSON:

10   A    I'm sorry, can you repeat the question?

11   Q    You would agree with me today that this was not a

12   lending/borrowing relationship?

13   A    Not from the onset.

14   Q    Ever.

15   A    Disagree.

16   Q    Okay.  When did it start?

17   A    I don't know.

18   Q    When was the first loan?

19   A    Sometime after August 21st.

20   Q    Agreed.  But you have no idea, right?

21   A    No.  Because it was very muddy.

22   Q    Right.  No clear lending relationship.

23   A    Correct, no clear lending relationship.

24   Q    Right.  And who might know the answer to my question?

25   A    I don't know.

1   Q     You have no idea, do you?

2   A     I do not.

3   Q     And you're the point man on this relationship, right?

4   A     Yes.

5   Q     And you reviewed documents, right?

6   A     Yes.

7   Q     Did you review the loan agreement?

8   A     Are you talking about this one in particular?

9   Q     No.  Any.  A loan agreement in writing.

10  A     No.

11  Q     You didn't, did you?

12  A     No.

13  Q     Did anyone tell you where it was?

14  A     I don't know.

15  Q     Do you know if one exists?

16  A     I don't believe so.

17  Q     Then let's take a step back.  And I guess a more

18  fundamental question is if you were -- I think there was

19  some discussion -- correct me if I'm wrong -- about you

20  executing trades on GCAC's behalf.  Is that true or is that

21  false?

22  A     That was under the structure of the financing

23  agreement.

24  Q     Which financing agreement?  And where is the structure?

25  A     The email we're looking at right here.

```
 1   Q    But you said this was just talking points.

 2   A    Yes.  Same with the informal JV that we had discussed.

 3   We operated under discussion points.

 4   Q    Are you now suggesting that this is somehow binding on

 5   somebody?

 6   A    I did not say that.

 7   Q    Okay.  You refer to this as a structure.  Are you

 8   suggesting that the court should read this and consider this

 9   the loan agreement?

10   A    I did not say that.

11   Q    Okay.  And so a more fundamental question.  Were there

12   trades made on GCAC's behalf?

13   A    Yes.

14   Q    There were.  Vitol executed trades on GCAC's behalf.

15   That's your testimony?

16   A    Acting as their bank, yes.

17   Q    Acting as their bank?  Oh.

18   A    Acting as their financer.  In -- in -- as a pseudo-

19   bank.  How about that?

20   Q    Oh, you're not having to satisfy me.  So don't ask me

21   if it's okay.  I want you to tell me what the truth is.

22   A    I just did.

23   Q    A pseudo-bank?

24   A    A lending agreement similar to what a bank would lend.

25   Q    A lending agreement?
```

1    A    Yes, financing and lending I equate to being

2    interchangeable.

3    Q    Okay.  Is this -- I guess I need to take a step back,

4    Mr. Kuo.

5    A    Okay.

6    Q    What does Vitol do for a living again?  What's their

7    business?

8    A    We are in the business of trading.

9    Q    Trading.  Right?  Not lending, trading.

10   A    We do lend to other people as well.  We have financing

11   agreements.  I told you this before.  We have financing

12   agreements that we make with multiple companies --

13   Q    Right.

14   A    -- across the world.

15   Q    Yeah.  But we haven't seen any of those, right?  You

16   tell me about them, but we haven't seen any.

17   A    It's public record.

18   Q    Maybe.  But we haven't seen any in here.  We're just

19   within these four walls.  Did you bring any?

20   A    I can look it up for you if you'd like.

21   Q    I know you probably can now.  But isn't it true, Mr.

22   Kuo, isn't it true that financing or lending never came out

23   of your mouth until Mr. Brass sued Vitol?  Isn't that true?

24   A    Very incorrect.

25   Q    Where?

1    A    We spoke about it many, many, many times.

2    Q    Maybe.

3    A    On the phone.

4    Q    Maybe.  Maybe --

5    A    Not maybe, yes.

6    Q    Maybe.  We don't have any evidence of that.  Right?

7    You would agree with me there, won't you?

8           MR. COOLEY:  Objection, argumentative.  The

9    witness has testified.

10          THE COURT:  Overruled.

11   BY MR. PATTERSON:

12   Q    Right?

13   A    I don't recall if there's an email or not, but there --

14   it was discussed many times.

15   Q    Okay.  And as a trader, Vitol trades commodities

16   generally, right?

17   A    That's one part of our business, yes.

18   Q    One part of your business.  And I went through the

19   parts of the business with Mr. Loya.  He was very eloquent

20   there.  But isn't it true that when someone trades on

21   someone else's behalf and loans them money -- what's that

22   called?  What's that trade called?  I'm doing a trade on

23   margin, right?

24   A    I don't equate that to margin, no.

25   Q    You don't?

1    A    No.

2    Q    Why not?

3    A    Doing a trade on behalf of someone.  What does that

4    have to do with margin?

5    Q    A brokerage is lending me money to execute my trade,

6    right?  That's what you say you're doing for GCAC and for

7    Mr. Brass, right?

8    A    We didn't loan him the money.  We paid for the product

9    and we sold the product, or they sold the product.  It was a

10   -- as you can see in the email stated here, Mr. Brass's

11   email, it's an interim financing structure.

12   Q    Okay.

13   A    You can call it whatever you want to call it.  It says

14   here interim financing structure.

15   Q    You're trying to explain it, so I'm going to let you

16   use whatever words you want.  Right?  And now are we going

17   to go back to this email having some operative effect?  Is

18   that what you're suggesting now?

19   A    It was a framework for what we did.

20   Q    Well, we'll get to what you did.  But right now let's

21   talk about this and talk about what you said happened,

22   right?  And my question is, isn't it true that if I go to my

23   broker and I make a trade using their money or borrowed

24   money, that's referred to as a transaction done on margin.

25   Isn't that true?

003052

```
 1   A    I don't know what you do with your brokers --

 2            MR. COOLEY:  Objection, relevance.  The question

 3   is about a broker.  The witness has testified extensively on

 4   that --

 5            MR. PATTERSON:  It's a speaking -- that's a

 6   speaking objection.  And he's coaching.  So if you'll just

 7   object.

 8            THE COURT:  I'll overrule.  You can answer.

 9   BY MR. PATTERSON:

10   Q    Isn't that true?

11   A    I don't know what you do with your brokers and your

12   margining.

13   Q    I didn't ask you what I did.

14   A    Yes, you did.

15   Q    Okay.  You don't get to argue with me.  You just get to

16   answer my question.  Okay, Mr. Kuo?  You may not like it,

17   but you're going to do it.  Right?  Isn't that what's

18   referenced as a margin transaction or a transaction done on

19   margin?

20   A    I don't know.

21   Q    All right.  You don't know because you're not a Texas

22   licensed broker dealer, are you?

23   A    No, I'm not.

24   Q    And you're not a licensed commodities futures trader,

25   are you?
```

```
 1   A    No, I am not.

 2   Q    And in fact, you don't hold any trading licenses

 3   whatsoever, do you?

 4   A    I do not.

 5   Q    And in fact, that bars you from providing guidance,

 6   providing information, or trading for the general public,

 7   doesn't it?

 8            MR. COOLEY:  Objection, foundation.

 9            THE COURT:  Sustained.

10   BY MR. PATTERSON:

11   Q    Why don't you trade for other people, Mr. Kuo?

12   A    I don't know.

13   Q    What do you mean, you don't know?  Why don't you have

14   retail accounts?

15   A    I don't know.

16   Q    Okay.  Was GCAC a retail account?

17   A    No.

18   Q    Okay.  But you were trading on their behalf is your

19   allegation, right?

20   A    We were.

21   Q    Okay.  And whether you like it or not, there was no

22   margin agreement between Vitol and GCAC or Mr. Brass, was

23   there?

24   A    There was an informal JV agreement.  That's what --

25   Q    I said a margin agreement.  Listen to my question.  I
```

1    didn't say joint venture agreement; I said margin agreement.

2    A    There was no agreements, period.

3    Q    Okay.  There was no margin agreement, was there?

4    A    No.

5    Q    All right.  And in fact, nothing in writing that

6    reflected any particular trade or any trades in general,

7    were there?

8    A    I believe there were.  There was many emails with

9    trades that they told us that they have completed.

10   Q    That they completed?

11   A    That they executed and we financed and we paid for.

12   Q    Okay.  I'm sure your lawyer will pull those up for us.

13   A    We've worked on many of them.

14            THE COURT:  Mr. Kuo, I'm going to remind you to

15   just answer questions.

16            THE WITNESS:  That was part of the question.

17            THE COURT:  No, it wasn't.

18            MR. PATTERSON:  And just so the Court is aware,

19   Your Honor, I told Ms. Goott to notify Mr. Brass that I have

20   probably 20 or so minutes.  I know that there will be

21   redirect, but...

22            THE COURT:  Okay.

23            MR. PATTERSON:  Just so everybody knows.

24            THE COURT:  Thank you.

25   BY MR. PATTERSON:

1    Q    You don't operate or manage a commodity pool do you,

2    Mr. Kuo?

3    A    Can you define commodity pool?

4    Q    If you don't know, just tell me what -- you don't know

5    what it is.

6    A    I don't know what a commodity pool is.

7    Q    Okay.  So it would be safe to say you don't manage a

8    commodity pool.

9    A    I don't know what a commodity pool is.

10   Q    So you couldn't be doing it for a business, right?

11   A    I don't know how to answer because I don't know what a

12   commodity pool is.

13   Q    Okay.  Now, ultimately Vitol engages in transactions

14   for a profit.  Would you agree or disagree with that

15   statement?

16   A    I would agree.

17   Q    And in fact generally they don't enter into

18   transactions in which they don't either earn a fee or a

19   profit, correct?

20   A    Not always.

21   Q    They would intentionally enter into a transaction in

22   which they would incur a loss?

23   A    Sometimes we enter in businesses where we may -- it may

24   allow us to understand different markets and allow us to get

25   into different areas of businesses that don't necessarily

1    show a profit on the surface.

2    Q    Okay.  And is that true in the asphalt business in

3    2017?

4    A    No.

5    Q    That would have been for profit, correct?

6    A    That's the way the informal JV was structured to be

7    profitable.

8    Q    Right.  So just split the profits, right?

9    A    That's the way it was conceived, yes.

10   Q    Yeah.  And that -- so -- and your allegation is that

11   there was at some point after August, middle of August 2017

12   there was this conversion from joint venture to financing.

13   Correct?

14   A    It was after we tried to have them do a deal with

15   Vault.  When all efforts were exhausted and we were moving

16   toward a financing agreement.

17   Q    I don't mean to bounce around, but this joint venture

18   was talked about as early as 2015, right?

19   A    I don't recall the date.

20   Q    Early 2017 then, right?

21   A    Yes.

22   Q    You and your business development guys sat down with

23   Mr. Brass and you talked about it on several occasions?

24   A    Yes.  We had many discussion points.

25   Q    And earlier when we looked at the emails and I pointed

003057

1    out the fact that GCAC relied upon the representations of

2    Vitol with respect to this joint venture by incurring cost

3    and employee cost, what was your response?

4    A    The employees that he was talking about were already

5    employed by GCAC.

6    Q    You said several times though they were already there.

7    Right?

8    A    Yes.  They weren't new employees.

9    Q    Right.  You know Mr. Perugini.  Is that one of the

10   four?

11   A    I believe so, yes.

12   Q    Okay.  And you knew him at the time, right?

13   A    At the time of what?

14   Q    2017, early 2017.

15   A    I did.

16   Q    Right.  And you knew -- he didn't work for GCAC, right,

17   at the time you started talking.

18   A    I don't recall when he stated with GCAC.

19   Q    But he wasn't there.  Where did he work before GCAC?

20   A    I believe he worked at Rio.

21   Q    Rio, right?  And Vitol was going to step in and

22   committed to stepping in and buying Rio's position correct?

23   Pursuant to this joint venture?

24   A    That was one of the -- that's one of the talking points

25   that we had --

1    Q    You talk about talking point, but that was part of the

2    joint venture, right?

3    A    It's no different than what you just said earlier.

4    Q    Maybe.  Maybe not.  But in reliance upon that, what did

5    Mr. Perugini do?

6    A    What do you mean, what did he do?

7    Q    What did he do?  Do you know?  Do you know what he did?

8    A    Like that morning?  I don't know what you're talking

9    about.

10   Q    Does he still work for Rio?

11   A    He does not.

12   Q    Okay.  Where does he work?

13   A    I do not know.

14   Q    Where did he work in 2017 after he left Rio?

15   A    I believe he went to GCAC.

16   Q    You believe.  In fact, that's exactly what he did, and

17   you knew it at the time, right?

18   A    I knew what at the time?

19   Q    That he was leaving Rio to go work for GCAC.

20   A    I believe yes, I did --

21   Q    Yes, you did know that.  And you knew it was in

22   reliance upon Vitol's representations that there was a joint

23   venture and they were going to buy Rio's position.  Isn't

24   that true?

25            MR. COOLEY:  Objection.  Lacks foundation.  Calls

```
 1    for speculation.

 2                 THE COURT:  Overruled.  He can answer if he knows.

 3    BY MR. PATTERSON:

 4    A    I'm sorry, can you repeat that question?

 5    Q    Yes.  In fact, you knew that he left Rio to go work for

 6    GCAC to work this deal in reliance upon the fact that Vitol

 7    said they were buying Rio's position pursuant to this joint

 8    venture.

 9    A    I do not know all those points you just stated.

10    Q    All right.  You believe that now though, don't you?

11    A    I don't know.

12    Q    Well, do we need to go back and look at the emails

13    where it says these four people are committed full-time to

14    this joint venture?  Do you remember those emails?

15    A    I do remember that email.

16    Q    Okay.  And so wouldn't it be reasonable to conclude

17    that he left for the sole purpose of working on this joint

18    venture?

19                 MR. COOLEY:  Objection.  Calls for speculation.

20                 MR. PATTERSON:  He was part of the conversation,

21    Judge.

22                 THE COURT:  Yeah.  He can answer if he knows.

23    BY MR. PATTERSON:

24    A    I don't know.

25    Q    All right.  I'm going to put up on the screen for you
```

1    Vitol Exhibit 7.  It's been admitted earlier today.  I'm

2    sorry, not Vitol 7, 104-7, which is Brass Exhibit 7.  Do you

3    remember this, when we looked at it?

4    A    Yes.

5    Q    Right?  And this is you, right?  "The cost into the

6    venture are for their four people in their organization

7    which are dedicated solely to this venture."  You said that.

8    You knew that.  Right?

9    A    This was a discussion point like all of the other --

10   Q    Is that really a discussion point?

11   A    Yes it was, absolutely.

12   Q    Right.  But it also indicated you knew that their four

13   people were dedicated solely to the joint venture, right?

14   A    It was a discussion point, yes.

15   Q    And where did the four people come from?  Who are the

16   four people?  Name them.

17   A    Mr. Perugini.

18   Q    Okay.  And we just determined that he left Rio to GCAC

19   for the sole purpose of working on this job, right?

20   A    I don't know that.

21   Q    Well, you said it right here.  Dedicated solely --

22   A    I did not say Mr. Perugini --

23   Q    Hold on.  "Dedicated solely to this venture."  Right?

24   You knew.  You knew, didn't you?

25   A    No.

```
1    Q    And you also know, pursuant to the joint venture, at

2    least for a while Vitol was required or agreed to pay a

3    salary, including Mr. Perugini's correct?

4    A    Incorrect.

5    Q    Okay.  Let's go to that email.  I'm going to pull up

6    104-11 for you, see if you remember us talking about this.

7    Do you remember this email?

8    A    Yes.

9    Q    Where Ms. Scambray says, "Okay, we will now be paying

10   personnel costs of $106,000 per month according to Eric."

11   Was she lying?

12   A    I don't know.

13   Q    What do you mean, you don't know?

14   A    I don't know if she was lying.

15   Q    She said it was per you.  Was it per you or not per

16   you?

17   A    I don't know.  I don't ever recall saying that we were

18   going to pay personnel costs.  From all the emails that I've

19   written and said, we are not paying personnel costs.

20   Q    So you don't know.  So you don't know the limited terms

21   of this joint venture, right?

22   A    I don't know what you mean by the limited terms.

23   Q    Well, every time I pull up an email that says you're

24   doing to do something pursuant to this joint venture, you

25   tell me you don't remember.
```

```
 1    A    The email below says we are not paying for personnel

 2    costs.

 3    Q    Okay.  And I'm pointing you to here where it says you

 4    are.

 5    A    I don't know why that is said there.

 6    Q    And that's my point.  Your sworn testimony is you don't

 7    know.  You don't remember.

 8    A    I don't.

 9    Q    Right?  Which pieces do you remember?  What part of the

10    joint venture do you remember?  Anything?

11    A    I remember in particular to this point here, I remember

12    that we were not -- the personnel costs were something that

13    GCAC  requested.  We said we would take it into

14    consideration and look at it, and we decided that we were

15    not going to pay the personnel costs.  I wrote that multiple

16    times.  I don't know why --

17    Q    Multiple times.

18    A    Yes.

19    Q    So there's multiple emails where you wrote that.  Have

20    we seen any today?  One?

21    A    Yes.

22    Q    Other than this one?

23    A    I don't know.

24    Q    What do you mean, you don't know.  I just asked you if

25    you've seen any today?
```

1   A    I don't know.  I don't recall if there's another one

2   today.

3   Q    Okay.  Anything about this joint venture, any term or

4   condition that you can tell the Court you remember?

5   A    I'm sorry, you want me to give you all the terms I

6   remember about the proposed --

7   Q    Sure.  Not the proposed.  What you were operating

8   under.  What were the conditions and the agreements you were

9   operating under?

10  A    We were operating under proposed bullet points and

11  structures, just like the financing agreement.  They were

12  not memorialized on paper.  They were just the points that

13  we were discussing.  No different than the financing

14  agreement.

15  Q    And so I guess likewise, do you have any recollection

16  of the terms and conditions of this financing arrangement

17  that you allege came into being?

18  A    I think they're on the email that you had pulled up

19  previously.

20  Q    I'm asking if you recall.  What are the terms?

21  A    That all the funds would be remitted back to Vitol

22  after the end of the -- when we concluded and reconciled the

23  end of the financing terms.

24  Q    All of that -- you remember that part of the financing,

25  right?

003064

1    A    And there was outstanding terms on interest rates,

2    there were terms on how they would -- how we would hedge for

3    them.  And these costs would eventually be borne back to

4    them for them to remit back to Vitol.

5    Q    You would hedge for them?  I thought you were loaning

6    them the money.

7    A    Hedging was part of the financing structure.

8    Q    Will you finance their hedges, or you hedged for them?

9    You understand the difference, right?

10   A    We hedged on behalf of them.

11   Q    So you took instruction from them?

12   A    Not in terms of which instrument to hedge, but to make

13   a hedge.

14   Q    You got to pick what to hedge, what term, what price,

15   right?  Is that what you're saying.

16           MR. COOLEY:  Objection.  Mischaracterizes the last

17   answer.

18           THE COURT:  Overruled.

19   BY MR. PATTERSON:

20   A    Yes.  And I described that to you earlier why I chose

21   different instruments.

22   Q    No.  I'm just -- I'm honestly trying to get a handle on

23   this financing agreement you say you've entered into.

24   Right?  And so under this financing, if GCAC needed a hedge,

25   Vitol decided what hedge to place, right?

```
 1   A    We decided and we informed them right afterwards.

 2   Q    Right.

 3   A    And there was never any objection.

 4   Q    So Vitol got to pick.  They chose the instrument, the

 5   timing, and the price.  Right?

 6   A    We didn't chose the price; the market chose the price.

 7   Q    And all those decisions that you made for GCAC resulted

 8   in a loss?

 9   A    On the hedges, yes.

10   Q    Isn't this what you do for a living?

11   A    It wasn't speculation, it's a hedge.  I don't think you

12   understand what a hedge is.

13   Q    I do.  That means there was a profit on the product,

14   right?

15   A    Correct.

16   Q    So that should wash, right?  If you're doing your job

17   right, which I assume you are, the hedge and the product

18   should wash.  It shouldn't be a net anything, right?

19   A    No.

20   Q    Really?

21   A    Yes.

22   Q    So you created a loss for GCAC with your trades?

23   A    Now you really don't understand what you're talking

24   about.

25   Q    Explain it.  Tell me.  You said you decided what to
```

003066

1    buy, you decided the price, you decided the timing, and it

2    resulted in a loss.  And I don't know what I'm talking

3    about?

4    A    No.

5    Q    Okay.  No further questions.

6         THE COURT:  Okay.  Mr. Cooley, any redirect?

7         MR. COOLEY:  Yes, Your Honor.  Thank you.

8         THE COURT:  Okay.  Please proceed.

9         MR. COOLEY:  Thank you, Your Honor.

10            REDIRECT EXAMINATION OF ERIC KUO

11   BY MR. COOLEY:

12   Q    Mr. Kuo, you were asked about -- let me make sure I

13   have a microphone near me.  You were asked about various

14   licenses.  Are you an attorney?

15   A    No.

16   Q    Do you know what it takes to create a joint venture as

17   a matter of law?

18   A    No.

19   Q    Do you know what it takes to create an informal joint

20   venture as a matter of law?

21   A    I do not.

22   Q    Do you know if an informal joint venture is a construct

23   that the law recognizes?

24   A    I don't know.

25   Q    You've talked a lot today and you've used the term

003067

```
 1   informal joint venture.  Is that anything other than just a

 2   -- what do you mean when you have been using that phrase

 3   then?

 4              MS. GOOTT:  (indiscernible).

 5              THE COURT:  Yeah.  Why don't you tighten up the

 6   question.

 7   BY MR. COOLEY:

 8   Q    What are you basing that on then when you refer to this

 9   construct as an informal JV?

10              MS. GOOTT:  (indiscernible).

11              THE COURT:  Yeah.  I'll overrule.  He can answer.

12   BY MR. PATTERSON:

13   Q    What are you basing that on then when you refer to this

14   construct as an informal joint venture?

15   A    They were discussion points that had been discussed for

16   months and months and months prior to purchasing of product.

17   So in this informal joint venture, we were operating under a

18   position where we weren't sure which direction we were

19   heading.

20              MS. GOOTT:  (indiscernible).

21              THE COURT:  I'll sustain.

22   BY MR. COOLEY:

23   Q    Do you have any idea whether as a matter of law a joint

24   venture ever existed between the parties?

25              MS. GOOTT:  (indiscernible).
```

```
 1              THE COURT:  Overrule.  You can answer.

 2    BY MR. COOLEY:

 3    A    I'm sorry, ask me again?

 4    Q    Do you have any idea whether as a matter of law a joint

 5    venture ever existed between Vitol and GCAC?

 6    A    As a matter of law, no.

 7              MS. GOOTT:  (indiscernible).

 8              THE COURT:  Sustained.  He just testified earlier

 9    based on your questions that he wasn't a lawyer and he

10    couldn't -- didn't know the answer to those questions.

11              MR. COOLEY:  That's why I asked, Your Honor, if he

12    had any idea...

13              THE COURT:  I'm not sure what relevance that would

14    have for me then.

15              MR. COOLEY:  Ms. Mehta, could I have Debtor

16    Exhibit 25?

17              THE COURT:  Ms. Mehta, hold on a second.  I need

18    to give you permission, or make you a presenter I should

19    say.

20              MR. COOLEY:  Yes, please.

21              THE COURT:  Ask a question, Mr. Kuo.  Now, I want

22    to -- some parties are characterizing this as an informal

23    joint venture or joint venture or a financing.  Just put

24    aside the terminology.  At what point, if you recall, did

25    Vitol, as you characterize it, purchase product on behalf of
```

1    GCAC.

2            THE WITNESS:  Sorry.  So at what point did --

3            THE COURT:  Do you recall the time period when --

4    I want to use your words.  I'm not accepting the proposition

5    and for all purposes I just want just to establish it.  You

6    testified that at some point in time, Vitol began to

7    purchase products or hedge on behalf of GCAC.  Do you recall

8    what time period that was?

9            THE WITNESS:  It was certainly after the fact that

10   -- after I learned that --

11           THE COURT:  I'm thinking of month and year, just

12   so you know, if you know.

13           THE WITNESS:  Okay.  I believe it to be sometime

14   after August of 2017.

15           THE COURT:  Okay.  Thank you.  Please proceed.

16           MR. COOLEY:  Yes, Your Honor.  Ms. Mehta, could we

17   blow up that page just enough so we can sort of see the text

18   a little better?  Perfect.

19           THE COURT:  Hold on.  Let me do this, too.

20           MR. COOLEY:  Perfect.

21   BY MR. COOLEY:

22   Q    Mr. Kuo, do you recall being asked some questions on

23   cross about this joint marketing agreement which is marked

24   as Debtor's Exhibit 104-25?

25   A    Yes.

1    Q    And in particular I think you were asked whether the

2    parties had operated under any of the terms of this

3    agreement.  Do you recall that?

4    A    Yes.

5    Q    I want to start just at the top here.  In the first

6    paragraph it indicates that this document, if it were

7    executed, would be by and between Vitol Inc. there in the

8    second line and Newco, a Delaware limited liability company,

9    in the third line.  Do you see that?

10   A    Yes.

11   Q    To your knowledge, was any such newco ever formed?

12   A    No.

13   Q    No you don't know or no it was never formed?

14   A    No, it was never formed.

15   Q    To your knowledge, did this newco entity ever exist at

16   any point in time during the period of the transactions that

17   has been the subject of this testimony?

18   A    No, it was not.

19   Q    And am I correct -- and to your knowledge -- well,

20   okay.  If we could scroll down, Ms. Mehta, on this page.

21   Actually, on the next page to -- I want to take a look at

22   Paragraph 1B.  Right there at the top of the page.

23        This term here at the top, Section 1B, requires Vitol

24   to maintain short-term subleases from GCAC of the terminal

25   agreement at the Mobile terminal.  Do you see that?

```
1              MS. GOOTT:  (indiscernible).

2              THE COURT:  I agree.

3              MR. COOLEY:  Judge, I --

4              THE COURT:  I'm going to overrule the objection.

5    BY MR. COOLEY:

6    Q    I simply wish to draw your attention to that sentence

7    there.  Do you see that?

8    A    I do.

9    Q    Very good.  Did that ever happen?

10             MS. GOOTT:  (indiscernible).

11             THE COURT:  Overruled.

12   BY MR. COOLEY:

13   A    I don't believe we ever took the subleases -- actually,

14   I think we -- I don't remember a hundred percent that we

15   took the subleases from Mobile.  I believe so based on the

16   last email, but I don't recall other than what I read

17   earlier

18   Q    Okay.  Next I would like you to take a look at Article

19   2 there in the middle of the page.  And this provision says,

20   "Upon the prior mutual agreement of the parties as to

21   quantity, specifications, et cetera, Vitol will use

22   commercially-reasonable efforts to purchase products.  Do

23   you see that term there?

24   A    Yes.

25   Q    In the course of dealing that you have testified to,
```

1   did the parties mutually agree as to the various terms of

2   each purchase?

3           MS. GOOTT:  (indiscernible).

4           THE COURT:  Overruled.

5   BY MR. COOLEY:

6   A    No.  I didn't have any say in any of the purchases or

7   the sales that they made.

8   Q    Thank you.  Next I'll direct your attention a little

9   bit further down the page to Section 3.1, Sale of Products.

10  And I'm going to ask you the same question -- well, first of

11  all, just take a moment and look at Section 3.1 and see what

12  it says.

13  A    I read it.

14  Q    And my question for you is in the course of dealing of

15  the transactions you've testified to, did Vitol and GCAC

16  mutually agree as to various enumerated terms when it came

17  to the sale of products under this arrangement?

18          MS. GOOTT:  (indiscernible).

19          THE COURT:  Overruled.

20  BY MR. COOLEY:

21  A    No.  I nor Vitol was involved in the efforts to make

22  the sale, nor identifying price or customer.

23          MS. GOOTT:  (indiscernible).

24          THE COURT:  Sustained.  Sustained.  Sustained

25  after no.

```
 1    BY MR. COOLEY:

 2    Q    And just to be clear, this provision -- do you see

 3    where this provision refers to the mutual agreement of the

 4    parties?  And the word "Parties" is capitalized.  Actually,

 5    strike that.  I'm going to move on.

 6         Next if we could take a look at the bottom of this

 7    page, Article 4.  Do you see there is a term here under

 8    Article 4 titled Hedging that says Vitol may maintain such

 9    hedging of the product as the parties may mutually determine

10    from time to time?  You've talked a lot about the hedging.

11    Is this one of the terms that the parties operated under in

12    the informal joint venture that you had described?

13              MS. GOOTT:  (indiscernible).

14              THE COURT:  Yeah.  That's leading.  I will sustain

15    that objection.

16              MR. COOLEY:  Your Honor --

17              THE COURT:  I've already ruled.  I think you can

18    ask a question without leading.  And there was an easy way

19    to do it.  You did it in 3.1.  I don't know what happened in

20    Article 4.

21    BY MR. COOLEY:

22    Q    Read Article 4 if you would, please.

23              MS. GOOTT:  (indiscernible).

24              THE COURT:  You just asked him to read him a

25    sentence, Ms. Goott.  I know.  I'm just saying you're
```

```
 1    objecting --

 2              MS. GOOTT:  (indiscernible).

 3              THE COURT:  No worries.

 4    BY MR. COOLEY:

 5    A    I've read it.

 6    Q    Does that term in this Article 4 describe a term that

 7    the parties operated under in the informal joint venture to

 8    which you have previously described?

 9              MS. GOOTT:  (indiscernible).

10              THE COURT:  I'll overrule.  Mr. Patterson can

11    cross him on it.  Overruled.

12    BY MR. COOLEY:

13    A    I'm sorry, your question again was?

14    Q    Is this one of the terms that the parties -- is this a

15    term that the parties operated under in this informal joint

16    venture that you described?

17    A    So you're asking me if hedging in general was a term

18    that we --

19    Q    Yes.

20    A    Yes, it was.

21    Q    Okay.  So this one was.

22              THE COURT:  That's not what he said.  You asked

23    him this term and he said hedging was.  I just want the

24    record to be clear.

25    BY MR. COOLEY:
```

```
 1    Q    Just to be clear, to the extent that hedging occurred -

 2    -

 3          THE COURT:  No, just ask him another question.

 4    You're asking him questions about a document and he's

 5    testifying as to things generally, and it's not related.

 6    That's not one of the terms to the agreement.  You can ask

 7    another question.

 8    BY MR. COOLEY:

 9    Q    Was the hedging that Vitol engaged in related to the

10    transactions that you participated in carried out consistent

11    with what's written here in Article 4?

12          MS. GOOTT:  (indiscernible).

13          THE COURT:  Sustained.

14    BY MR. COOLEY:

15    Q    I will direct your attention to the bottom of this

16    page, Article 5, which just for reference purposes is titled

17    Facility Costs and Cost Allocations.

18          Ms. Mehta, could we have the next page, please?

19          And I think you were asked in your cross-examination if

20    you could remember the specific terms of this agreement that

21    factored into the informal joint venture.  My question to

22    you is is this one of them?

23          MS. GOOTT:  (indiscernible).

24          THE COURT:  Overruled.

25          MR. COOLEY:  Your Honor --
```

1   BY MR. COOLEY:

2   A     I'm sorry, can you repeat that question again?

3   Q     On your cross-examination, you were asked if you

4   recalled which terms of this agreement the parties operated

5   under as part of their informal joint venture.  And my

6   question for you is, is this Section 5.1 one of those terms?

7               MS. GOOTT:  (indiscernible).

8               THE COURT:  Overruled.

9   BY MR. COOLEY:

10  A     5.1?

11  Q     Yes, sir.

12  A     Yes, that was one part of the -- yes, yes.  The answer

13  is yes.

14  Q     Okay.  If I could have Debtor's Exhibit 23, please?

15  This would be for the record the document identified as

16  Debtor's Exhibit 104-23.

17              THE COURT:  If I recall, this was admitted

18  already.  Is that correct?

19              MR. COOLEY:  That is correct, Your Honor.  This -

20  - just to shorthand it, this would be the text message --

21              THE COURT:  No, no.  I don't want you to -- the

22  answer is yes.  Okay, thank you.  I just wanted to make

23  sure.

24              MR. COOLEY:  Yes, Your Honor.

25  BY MR. COOLEY:

 1    Q    Do you recall in your cross-examination being asked

 2    about this document?

 3    A    Yes.

 4    Q    Ms. Mehta, could we have PDF Page 10?  And if we could

 5    -- can we blow up -- well, let's see.  If I start -- just

 6    kind of to -- I want to make sure we understand this

 7    document.  If we just take the top line and we read across,

 8    one, two, three, four, five.  The sixth column begins with a

 9    --

10              THE COURT:  I'm going to -- I can't read that.

11    So...

12              THE WITNESS:  I can't, either.

13              MR. COOLEY:  Ms. Mehta, if we could -- perfect.

14    Is that better, Your Honor?

15              THE COURT:  At least for these eyes.  The witness

16    is the one that has to testify to it though.

17              THE WITNESS:  Indeed.

18    BY MR. COOLEY:

19    Q    I want you to take a look at the first text message

20    here which appears in the middle of the page.  And the name

21    above it and the names a few columns to the left.  I don't

22    need anything highlighted, Ms. Mehta.

23         And my question, just to sort of orient ourselves, is

24    do you recognize this particular text message?

25    A    It looks familiar.

```
1    Q    And who are the parties communicating in this

2    particular text thread here?

3    A    Myself and Mr. Perugini.

4    Q    And do you recall did you in fact exchange text

5    messages with him from time to time?

6    A    Yes, we did.

7    Q    And so at the top of this page then I'm looking at the

8    email at the top.  And reading that email, would that be a -

9    - a text message, I apologize -- from him to you or from you

10   to him?

11             MS. GOOTT:  (indiscernible).

12             MR. COOLEY:  Those are the only two options, Your

13   Honor.  I'm just trying to get the directionality --

14             THE COURT:  Overruled.

15   BY MR. COOLEY:

16   A    This was an email from -- I mean a text message from

17   Mr. Perugini to myself telling me what they had done.

18             MS. GOOTT:  (indiscernible).

19             THE COURT:  You can just answer the question.

20   You've already answered the question.  You can ask another

21   one.

22             MR. COOLEY:  I'll ask the next question

23   BY MR. COOLEY:

24   Q    What is he telling you in this text message?

25   A    He's telling me that they have purchased 31,000 barrels
```

1    fixed price from Shell and to -- and to hedge the purchase.

2    Q    And --

3            MS. GOOTT:  (indiscernible).

4            MR. COOLEY:  Judge, we've been doing that for the

5    last several hours.

6            MS. GOOTT:  (indiscernible).

7            THE COURT:  I agree.  Overruled -- I'll sustain

8    the objection.  It says what it says.

9    BY MR. COOLEY:

10   Q    Were you surprised to get this email or this text

11   message from Mr. Perugini?

12   A    No.

13   Q    Why not?

14           MS. GOOTT:  (indiscernible).

15           THE COURT:  Overruled.

16   BY MR. COOLEY:

17   A    Because this was the normal course of business under we

18   were acting.

19   Q    And then looking down the page, there is another large

20   -- you can just leave, Ms. Mehta, where it is.  At the

21   bottom of the page in the center, there is another text

22   message from him to you.  And it appears to be August 29th,

23   2017.  Do you see that?

24   A    Yes.

25   Q    And just so that I know we're looking at the right one,

```
 1    would you just read for me the first line of the text?

 2    A    "Buying 33,000 barrels of fixed-price asphalt from

 3    Hunt."

 4    Q    That's fine.  Thank you.  Again, do you know what --

 5    why did he send you that text?

 6              MS. GOOTT:  (indiscernible).

 7              THE COURT:  He can answer if he knows.

 8    BY MR. COOLEY:

 9    A    I know.  Because he is asking me to hedge it.

10              MS. GOOTT:  (indiscernible).

11              THE COURT:  Overruled, Ms. Goott.

12    BY MR. COOLEY:

13    A    It says, "Need to hedge if you can."

14    Q    Were you surprised to get that text message from him?

15    A    No.

16    Q    Why not?

17    A    This is the normal course of business.

18    Q    Why would -- if you know, why would GCAC ask you to

19    hedge a transaction that they're describing to you like in

20    this manner?

21              MS. GOOTT:  (indiscernible).

22              THE COURT:  Overruled.

23    BY MR. COOLEY:

24    A    Because we had agreed from the beginning that all deals

25    fixed price were to be hedged.
```

1    Q    Could I have PDF -- same document.  Could I have PDF

2    Page 19?

3         Do you see the texts printed on this particular page?

4    A    I do.

5    Q    And do you know who this text thread would have been

6    between, what individuals this would have been between?

7    A    I believe it's between myself and Mr. Brass.

8    Q    And so we can orient ourselves --

9              THE COURT:  I'm sorry, I didn't hear you.  Between

10   you and whom?

11             THE WITNESS:  And Mr. Brass.

12             THE COURT:  Thank you.

13   BY MR. COOLEY:

14   Q    And some of the texts on this screenshot are on the ft

15   with a gray background.  Some are on the right with a blue

16   background.  Do you know which ones would have been from

17   you?

18   A    The gray background.

19   Q    Thank you.  I'm looking at -- do you recall being asked

20   some questions about whether and when you spoke to Mr. Brass

21   about Vault?

22   A    Yes.

23   Q    Can you tell the -- can you tell me what the of the

24   second text message is on this page?

25   A    The send one.  July 11th, 2017.

1    Q    And what did Mr. Brass write to you on that day?

2    A    He asked me if I spoke with -- did you talk to Vault.

3    Q    And do you know what he is referring to there?

4    A    I believe he is referring to speaking to Vault about

5    the proposed JV that we had talked about.

6    Q    Speak to Vault about what with regard to the JV?

7    A    I believe at the time it was just about doing a JV.

8    Q    Okay.  Could I have PDF Page 23?  I think that might be

9    PDF Page 22.  One more.  There we go.  Thank you.

10        Here I want to direct your attention to Mr. Brass's

11   first text at the top where he writes, "I assume Gunvor is

12   in your system, correct?"  Do you see that?

13   A    Yes.

14   Q    Who is Gunvor?

15   A    Gunvor is another trading company.

16   Q    And what did you understand him to be asking you when

17   he referred to being in your system?

18   A    I believe he ask if it's an approved counterpart.

19   Q    And is that an important distinction?

20   A    Yes, it is.

21   Q    Why?

22   A    Because Vitol needs to understand who they are trading

23   with, both buying and selling, before we will transact with

24   anybody.

25   Q    What happens if a potential counterparty is not an

003083

1   approved counterparty?

2          MS. GOOTT:  (indiscernible).

3          THE COURT:  He can speak within the context of his

4   understanding and within Vitol (indiscernible).

5   BY MR. COOLEY:

6   A    If a counterpart is not in our system, we request that

7   they send documents over so that our compliance department

8   can approve -- to approve the counterpart for trading.

9   Q    Did Mr. Brass ever ask Vitol to sell product to a

10  purchaser who was not an approved counterpart in the Vitol

11  system?

12         MS. GOOTT:  (indiscernible).

13         THE COURT:  Overruled.

14  BY MR. COOLEY:

15  A    Yes.

16  Q    And how many times did that happen?

17  A    I don't know.  I don't know.  I don't know exactly how

18  many times.

19  Q    More than once?

20  A    Yes.

21  Q    More than five times?

22  A    I don't recall at this point.

23  Q    Okay.

24         MS. GOOTT:  (indiscernible).

25         MR. COOLEY:  The witness said I don't recall.

1    That's fine.

2             THE COURT:  I'll sustain the objection for the

3    record.

4    BY MR. COOLEY:

5    Q    Looking at the text messages below on this page, do you

6    know what product it was that Mr. Brass was trying to sell

7    at that time?

8             MS. GOOTT:  (indiscernible).

9             THE COURT:  Overruled.

10   BY MR. COOLEY:

11   A    I don't remember in this particular case exactly what

12   it was.  But...

13   Q    I think that answers my question.  I'll ask a different

14   question.  Do you know whether this would have been product

15   that Vitol was holding at the time this text message was

16   sent?

17            MS. GOOTT:  (indiscernible).

18            THE COURT:  Overruled.

19   BY MR. COOLEY:

20   A    I don't know if this particular offer was product that

21   Vitol held.  I don't remember if that was.

22   Q    Okay.  And then in the fourth blue text on this page,

23   do you see it begins with the words, "Just FYI"?

24            THE COURT:  I think the fourth box is just fine.

25   There's only four.

```
1              MR. COOLEY:  Very good.

2    BY MR. COOLEY:

3    A    Yes, I see it.  I thought that's what you were talking

4    about previously.

5    Q    All right.  Thank you.  Did Mr. Brass ever solicit your

6    input on the terms of this particular transaction to your

7    knowledge?

8    A    He never solicited my input on any physical

9    transactions.

10             MS. GOOTT:  (indiscernible).

11             THE COURT:  Overruled.

12             MR. COOLEY:  Could I have Brass Exhibit 3?  This

13   would be the document marked 104-3, please.

14   BY MR. COOLEY:

15   Q    At the time of this -- do you recall being -- this is -

16   - what's the date of this email?

17   A    June 26th, 2017.

18   Q    And this is an email from you to whom?

19   A    To our credit team.

20   Q    And is anybody copied on the email?

21   A    Mr. Brass.

22   Q    I'd like you to take a look at the first sentence of

23   the body of your email.  Do you see that?

24   A    Yes.

25   Q    At the time of this email, did you believe that to be a
```

1    true statement?

2    A    Yes.

3    Q    At the time of this email, were you yet aware of the

4    existence of the Vault non-compete that you have since

5    testified about?

6    A    I did not.  I was not.

7          MR. COOLEY:  Could I have Brass Exhibit 13,

8    please?  This would be the document marked 104-13.

9    BY MR. COOLEY:

10   Q    And do you recall being asked questions about this

11   particular email?

12   A    Yes, I do.

13   Q    Could I have PDF Page 3, please?  And I want to start

14   with -- actually, let's have PDF Page 4.  This is the first

15   email, the earliest email in the chain.  So if we could have

16   Page 4, please.

17        Do you recall being asked questions about Mr. Fay's

18   three options laid out on this page?

19   A    Yes, I do.

20   Q    Is Nick Fay to your knowledge an attorney?

21   A    No, he is not.

22   Q    Was Nick Fay involved in the negotiations over the

23   joint management agreement that took place between Vitol and

24   GCAC?

25   A    No, he was not.

1    Q    To your knowledge, did Mr. Fay have firsthand knowledge

2    of the state of those negotiations at any particular point

3    in time?

4    A    Any point in time?

5    Q    Firsthand knowledge.

6    A    No, I don't believe so.

7    Q    Was Mr. Fay ever directly involved in the discussions

8    at Vitol that led to the financing arrangement you testified

9    about?

10            MS. GOOTT:  (indiscernible).

11            THE COURT:  Sustained.

12   BY MR. COOLEY:

13   Q    Was Mr. Fay involved in any of the discussions at Vitol

14   in which you participated that led to the financing

15   arrangement you've described?

16   A    I don't believe so.

17   Q    To your knowledge, was he ever involved in discussions

18   at Vitol, in those discussions at Vitol?

19   A    I'm not sure I understand the question.

20   Q    To your knowledge, did Mr. Fay -- was Mr. Fay ever

21   involved in the negotiations between Vitol and GCAC around

22   what you have described as the financing relationship?

23   A    I don't believe so, no.

24            MR. COOLEY:  Could I have PDF Page 1?  Still this

25   document.

1    BY MR. COOLEY:

2    Q    And we'll start at the bottom.  There is an email from

3    him to you dated August 10th about which you answered some

4    questions on cross-examination.  Do you see that and do you

5    recall those questions?

6    A    I do, yes.

7    Q    Were you surprised at the comments he made in that

8    email?

9    A    Yes, I was.

10   Q    Do you believe he accurately characterized your actions

11   in this matter?

12   A    No, I do not.

13   Q    And then just for the record, what again was the date

14   of this particular email and your response to it immediately

15   above?

16   A    August 10th, 2017.

17   Q    And could we have Vitol 14, please?  And what was the

18   date that Mr. Brass send you the interim financing structure

19   bullets?

20   A    August 21st, 2017.

21   Q    Eleven days later?

22   A    Approximately, yes.

23        MR. COOLEY:  Could I have Vitol Exhibit 19,

24   please?

25   BY MR. COOLEY:

1    Q    Do you recall being asked questions about this email

2    and others structurally similar to it?

3    A    Yes, I do.

4    Q    Just looking at this email, can you tell the Court

5    whether or not this represents a typical deal structure of

6    the sort that GCAC and Vitol were entering into?

7    A    Yes.  This is typical.

8    Q    Start with what's titled Deal Number 1 at the beginning

9    of Mr. Perugini's email.  Do you see that?

10   A    I do.

11   Q    Who would have negotiated the terms of that

12   transaction?

13             MS. GOOTT:  (indiscernible).

14             THE COURT: You can ask a little foundation.

15   BY MR. COOLEY:

16   Q    Were you involved in the negotiation of the terms

17   described in Deal 1?

18   A    I was not.

19   Q    To your knowledge was anybody at Vitol involved in the

20   negotiation of those terms?

21   A    I do not believe so.

22   Q    And would you know?  Would you expect to have been

23   aware had somebody at Vitol had been involved?

24   A    I would think so, but it's a big company and I don't

25   speak for every single employee.  But I do not believe that

1    anybody else was involved.

2    Q    For that matter, did Vitol ever negotiate terms of

3    deals like this with GCAC?

4              MS. GOOTT:  (indiscernible).

5              THE COURT:  Overruled.

6    BY MR. COOLEY:

7    A    Vitol did not engage in any physical transactions with

8    any counterparts relating to asphalt.

9    Q    So let me see if I can put it a little differently.  To

10   your knowledge, did you or anyone at Vitol have input on

11   those terms before they were set?

12   A    Absolutely not.

13             MS. GOOTT:  (indiscernible).

14             THE COURT:  Sustained.

15   BY MR. COOLEY:

16   Q    To your knowledge, did either you or anyone else at

17   Vitol participate in the negotiation of those terms before

18   they were communicated to you by Mr. Perugini?

19             MS. GOOTT:  (indiscernible).

20             THE COURT:  Why don't you rephrase?

21   BY MR. COOLEY:

22   Q    Did you participate in the negotiation of the terms

23   reflected in Deal 1 before they were communicated to you by

24   Mr. Perugini?

25             MS. GOOTT:  (indiscernible).

```
 1              THE COURT:  Yeah, that's sustained.

 2              MR. COOLEY:  I didn't think that was asked and

 3    answered.  I'm trying to get that.

 4              THE COURT:  Well, I thought he said no.

 5              MR. COOLEY:  Okay, very good.

 6    BY MR. COOLEY:

 7    Q    To your knowledge, was anyone else at Vitol involved in

 8    the negotiation of the terms described in Deal 1 before they

 9    were communicated to you by Mr. Perugini?

10    A    No.

11    Q    What about on the sell side?  Did Vitol ever engage in

12    negotiating the terms of these transactions on the sell side

13    involving GCAC?

14              MS. GOOTT:  (indiscernible).

15              THE COURT:  Overruled.

16    BY MR. COOLEY:

17    A    I know that I did not participate in any of the

18    purchases or sales of physical product.  I can't testify

19    that nobody in the whole company at Vitol discussed it with

20    them because I don't know.

21    Q    Fair enough.  But just to be clear, who was responsible

22    for sort of the day-to-day interaction between Vitol and

23    GCAC relating to these transactions?

24              MS. GOOTT:  (indiscernible).

25              THE COURT:  Clarify the time.
```

1    BY MR. COOLEY:

2    Q    During the period of the GCAC/Vitol transactions from

3    the first Rio purchase to the very last one, who at Vitol

4    was responsible for the day-to-day interaction between GCAC

5    and Vitol?

6    A    Myself.

7    Q    If somebody else were participating in discussions

8    relating to those transactions, would you have expected to

9    be made aware of it?

10             MS. GOOTT:  (indiscernible).

11             THE COURT:  That's a lot of -- I think you need to

12   tone down, everyone, on the speaking objections.  And I'll

13   overrule.

14   BY MR. COOLEY:

15   A    Your question was, again?  I'm sorry.  Was anybody

16   aware?  If somebody was -- somebody -- can you ask the

17   question again?

18   Q    I'm going to try.  If someone else at Vitol were

19   engaging in negotiations with GCAC relating to the

20   transactions that had been the subject of your testimony,

21   would you have expected to be made aware of it?

22   A    Yes.

23             MS. GOOTT:  (indiscernible).

24             THE COURT:  Overruled.

25   BY MR. COOLEY:

1   Q    So just looking at the deal as reflected on this page,

2   I want to make sure that I and the Court understand the

3   sequence here.  So starting with Deal Number 1, who would

4   have bought the described product from Exxon?

5         MS. GOOTT:  (indiscernible).

6         THE COURT:  Sustained.  He said he didn't know

7   anything about Deal 1.

8   BY MR. COOLEY:

9   Q    Do you recall receiving this email?

10  A    Yes, I do.

11  Q    Do you recall this particular transaction?

12  A    Vaguely.

13  Q    Looking at the transactions as described here, does

14  this describe what you would consider to be a typical or an

15  atypical transaction of the sort that Vitol and GCAC engaged

16  in?

17        MS. GOOTT:  (indiscernible).

18        THE COURT:  Overruled.

19  BY MR. COOLEY:

20  A    Yes.  This was very typical.

21  Q    And at least as it's described on the email

22  communicated to you from Mr. Perugini, who was supposed to

23  buy product from Exxon?

24        MS. GOOTT:  (indiscernible).

25        THE COURT:  Overruled.

1    BY MR. COOLEY:

2    A    Do you mean remitting the payment in terms of the

3    purchaser, or are you talking --

4    Q    Who was supposed to buy the product?  We'll get to the

5    payment part.

6    A    Vitol would -- Vitol was the buyer from Exxon.

7    Q    And then who would have paid the purchase price to

8    Exxon for that product?

9            MS. GOOTT:  (indiscernible).

10           THE COURT:  Overruled.  You're also asking him --

11   the words on the email say what it says.  But I'm not sure -

12   - he says he wasn't familiar with the transaction.  If

13   you're trying to get him to just say what the first line

14   says, it already says it.

15           MR. COOLEY:  No, Your Honor, I think the relevance

16   goes to just walking through how these transactions

17   unfolded.  The witness testified that this was -- he doesn't

18   remember each particular transaction, but that this was a

19   typical one.  I'm just asking the witness to go through and

20   explain what it is we're looking at.

21           THE COURT:  Then he can testify as to what a

22   typical transaction would look like, but he can't testify

23   about this one because he doesn't know about it.  Unless

24   you're just asking him to repeat what's already on the

25   email.

```
 1   BY MR. COOLEY:

 2   Q    So in a typical transaction like the one laid out on

 3   Exhibit 19, once the purchase price was paid to the Deal 1

 4   seller, who owned the product?

 5   A    Vitol had title of the product.

 6   Q    And then as we move down the page, there is a section

 7   titled Deal 2.  Was that a common element in types of

 8   instructions like this you would get from Mr. Perugini?

 9            MS. GOOTT:  (indiscernible).

10            THE COURT:  Overruled.

11   BY MR. COOLEY:

12   A    Yes, it is.

13   Q    How close together in time would Deal 1 and Deal 2

14   typically occur?

15            MS. GOOTT:  (indiscernible).

16            THE COURT:  Sustained.

17   BY MR. COOLEY:

18   Q    In these transactions that you described, were Deal 1

19   and Deal 2 contemporaneous?

20            MS. GOOTT:  (indiscernible).

21            THE COURT:  Sustained.

22   BY MR. COOLEY:

23   Q    Once Vitol purchased product under a typical

24   transaction, how long would Vitol typically hold that

25   product before disposing of it in some fashion?
```

```
 1   A     That varied.  I mean, that was not my decision whether

 2   to sell it or not.

 3   Q     And I appreciate it wasn't your decision.  I guess my

 4   question is was it typically minutes, hours, days, weeks, or

 5   was it just all over the place?

 6   A     It varied by -- I mean, there's no set time.  It could

 7   be a day, it could be a week, it could be a month.

 8   Q     Okay.  But eventually in one of these typical

 9   transactions would you have expected to see a Deal 2?

10   A     A sales side, yes.

11   Q     And at that point in time when that sale occurred, did

12   Vitol expect to be paid for the product that it sold?

13             MS. GOOTT:  (indiscernible).

14             THE COURT:  Overruled.

15   BY MR. COOLEY:

16   A     Yes.  We would expect to receive the proceeds from the

17   sale.

18   Q     And from whom would Vitol expect to receive those

19   proceeds?

20   A     Whomever the purchaser was, whomever the buyer was.

21   Q     What if any assurances did Vitol have that it would get

22   payment?

23   A     From anybody?

24   Q     Yes.  We'll start there.

25   A     It depended on if the credit group extended open credit
```

1    to a counterpart.  And if they did not extend open credit,

2    then they would ask for either a prepayment or they would

3    ask for a letter of credit.

4    Q    And what if the buyer were GCAC?  What assurances would

5    Vitol have had in those transactions?

6              MS. GOOTT:  (indiscernible).

7              THE COURT:  Overruled.

8    BY MR. COOLEY:

9    A    Your question is what assurances?

10   Q    Yes.

11   A    That's a good question.

12   Q    I'll unpack that.  Can you answer my question the way

13   it's asked?

14   A    Well, it's kind of a multifold answer.

15             MR. COOLEY:  Your Honor, if the witness is unclear

16   on my question, I'm happy to ask a different one.

17             THE COURT:  Why don't you just withdraw your

18   question and ask another one?

19             MR. COOLEY:  I'll withdraw that question.

20   BY MR. COOLEY:

21   Q    Did anyone at GCAC ever assure you that GCAC would pay

22   in a transaction such as that?

23             MS. GOOTT:  (indiscernible).

24             THE COURT:  I think you said typical transaction

25   and not Deal 1, so I will overrule the objection.

1   Overruled.

2   BY MR. COOLEY:

3   A    The question was -- I'm sorry?

4   Q    I'll try it again.  In a typical transaction in which

5   GCAC was the buyer from Vitol, did anyone at GCAC ever tell

6   you that GCAC would pay for the product it bought from

7   Vitol?

8   A    Yes.

9   Q    Who?

10  A    Mr. Brass.

11  Q    Did you receive a similar assurance with other trades

12  in which GCAC was the buyer from Vitol?

13  A    Yes.

14  Q    And how did those communications typically occur?

15          MS. GOOTT:  (indiscernible).

16          THE COURT:  I didn't hear it, either.  So I'm

17  going to ask him to rephrase.  I didn't hear his question

18  clearly.  I was going to ask him to rephrase.

19  BY MR. COOLEY:

20  Q    How did those communications typically occur?

21          MS. GOOTT:  (indiscernible).

22          THE COURT:  I don't, either.

23          MR. COOLEY:  Meant to be referring back to my last

24  question, which concerned communications the witness

25  described from Mr. Brass to himself.

```
 1              MS. GOOTT:  (indiscernible).

 2              THE COURT:  My understanding is -- well, why don't

 3    you just ask -- I'll give you an opportunity to kind of set

 4    it up.

 5              MR. COOLEY:  I'll back up and start over.  Not

 6    from the beginning, but just...

 7    BY MR. COOLEY:

 8    Q    Prior to selling product to GCAC in one of these

 9    typical transactions you described, did you receive

10    assurances from anyone at GCAC that GCAC would pay for the

11    product?

12              MS. GOOTT:  (indiscernible).

13              THE COURT:  Overruled.

14    BY MR. COOLEY:

15    A    I'm sorry, I'm going to ask you again.  I know it was

16    kind of a twofold question, but can you ask --

17    Q    I can.  And we're just --

18    A    I know.  I'm losing --

19    Q    -- backing up a couple of questions to try and reset

20    this.

21              THE COURT:  Why don't I just reset it so we can

22    all -- you testified earlier that you had received

23    assurances from Mr. Brass that GCAC would pay Vitol for the

24    product that Vitol purchased on behalf --

25              THE WITNESS:  Correct.
```

```
1              THE COURT:  How did you receive those assurances
2    from Mr. Brass?
3              THE WITNESS:  I don't know if there was an email.
4    I mean, we certainly talked about it numerous times.  There
5    were invoices sent to them, which they paid multiple times.
6    If you're asking me if there was a written assurance that
7    they would pay --
8              THE COURT:  You testified that you received
9    assurances.
10             THE WITNESS:  Yes, verbally.
11             THE COURT:  The answer is how did you get the
12   assurance.  Don't worry about what I'm asking.  I'm asking
13   you what you meant by that.
14             THE WITNESS:  Well, we talked about the funds and
15   he assured me verbally that they would be paying for it.
16   BY MR. COOLEY:
17   Q    Would Vitol have allowed these deals to occur if it was
18   not confident that GCAC intended to pay for product sold to
19   them?
20   A    No.
21   Q    Do you think that fact was ever communicated to GCAC?
22   A    The fact that they -- I'm sorry, what?
23   Q    The fact that Vitol would not do these deals without
24   assurance of being paid.
25   A    That's kind of understood.  When you do a transaction
```

1    with somebody, you expect to get paid unless you're giving

2    it to them for free as a gift.

3    Q    So you were asked some questions at the end of your

4    cross-examination about hedging and whether a hedge

5    generated a profit or a loss and so on and so forth.  Do you

6    recall those questions?

7    A    Yes.

8    Q    Is a hedge taking these asphalt transactions that have

9    been the subject of this testimony as our example, does a

10   hedge move in direct or inverse relationship to the

11   transaction that's being hedged?

12   A    It depends.  Sometimes it will move in the inverse,

13   sometimes it will be disassociated with the underlying

14   product.  So it can move either way.  It's not a -- as I

15   mentioned, as I testified earlier, these are not necessarily

16   direct correlated hedges.  So it can -- there are times

17   where they may not have the desired results.  There is no

18   terminal market, there's no spots market for asphalt.  So

19   hence we used other --

20   Q    What is the desired result of the hedge then?

21   A    It's to minimize the fixed price exposure of prices

22   going up or down?

23   Q    And so if the price of the asphalt goes up between

24   purchase and sale, what do you hope the hedge does?

25   A    Well, a hedge is a protection.  So you don't

003102

1   necessarily hope that it goes down.  But generally what

2   happens is it will -- the hedge will lose money if the

3   underlying product prices appreciate.  That's generally what

4   happens.  It doesn't always happen that way, but that is the

5   construct of a deal.

6   Q    And what if the reverse is true?  What if the price of

7   asphalt goes down?  What do you expect, what do you hope

8   happens to the price of the hedge?

9   A    You would expect the hedge to move.  You would expect

10  the hedge to make money because you are offsetting the

11  exposure.

12  Q    And -- okay.  And as you understood the relationship

13  between Vitol and GCAC, who would be advancing any costs

14  associated with those hedges?

15  A    Vitol carried all the hedges on our books.

16  Q    And as you understood the relationship, who would

17  ultimately be responsible for or liable for that cost if it

18  proved to generate a loss?

19  A    It's not necessarily the cost, it's the profit or loss.

20  It's not the cost.  But GCAC would be responsible for profit

21  or loss of those hedges.

22        MR. COOLEY:  Could I have Defendant's -- Debtor's

23  11?  This would be 104-11.  PDF Page 1.

24  BY MR. COOLEY:

25  Q    And I want to direct your attention -- you were asked

003103

1   several questions about the third email down from Emily

2   (indiscernible) on August 4th.  Do you see that?

3   A    Yes.

4   Q    And my question for you is she says, "They just called

5   and will settle revised invoices."  Do you know who the they

6   is she is referring to there?

7   A    I believe they are referring to GCAC.

8   Q    So to your knowledge at that time was GCAC aware of had

9   they been -- I'll just say it.  I'll just start over.  To

10  your knowledge at that time would GCAC have been aware that

11  personnel was not going to be an included expense at that

12  time?

13  A    Yes.

14       MR. COOLEY:  Could I have Defendant's Exhibit 15?

15  And I want to direct your attention to Mr. Fay's email at

16  the bottom of this first page.

17       Ms. Mehta, if you can blow it up a little bit and

18  give us the bottom part of the page.  Perfect.  Thank you.

19  BY MR. COOLEY:

20  Q    Do you recall being asked some questions about this

21  particular document in your cross-examination?

22  A    I do.

23  Q    Mr. Fay writes -- and do you recall being asked

24  questions about his refence to, "The JV" in the first line

25  there?

1   A    Yes.

2   Q    Now, you testified earlier that no newco entity was

3   ever formed.  Do you know what entity he is referring to

4   there when he says JV?

5   A    I assume he's referring to the proposed JV that we had,

6   the informal JV that we had in place.

7   Q    Now, I want you to read that first sentence in its

8   entirety.

9   A    Which sentence?

10  Q    Same paragraph we're looking at, the sentence that

11  includes the phrase, "From the JV".

12  A    "Gents, this is our indication to GCAC for terms supply

13  from the JV to Vault."

14  Q    Who would the supply have been coming from that he's

15  referring to?

16  A    Well, the supply was the supply that Vitol owned.

17  Q    Coming from who?

18  A    That GCAC purchased.

19  Q    So when he refers to the JV here, do you know if he's

20  referring to just GCAC?

21  A    I assume that he's referring to the informal JV that we

22  had in place.

23  Q    Okay.

24       MR. COOLEY:  Could I have Defendant's Exhibit 16,

25  please?

```
1    BY MR. COOLEY:

2    Q    And this was October 13, 2017.  Do you see that from

3    the email?

4    A    Yes.

5    Q    Do you recall being asked questions about this in the

6    cross?

7    A    Yes.

8    Q    In October of 2017, were Vitol and GCAC still engaged

9    in negotiations around the JMA document we looked at

10   earlier?

11   A    No.

12   Q    Were they still engaged in any kind of negotiations

13   around a potential form of joint venture?

14   A    Not with VIC.

15   Q    But that's what I meant, between Vitol and GCAC.

16   A    Vitol Inc.?

17   Q    Yes, sir.

18   A    No.

19   Q    Okay.  And then at the -- in the last paragraph of Mr.

20   Sergeant's email there at the top, he makes a reference to

21   terminating the relationship immediately.  Do you see that?

22   A    Yes.

23   Q    Did the relationship in fact terminate "immediately"?

24   A    No.

25   Q    Why not?
```

1    A    Because we had spoken with Mr. Loya and decided that

2    instead of terminating the relationship immediately, we

3    would continue to finance them before the end of the year as

4    a goodwill gesture.

5            MR. COOLEY:  Could I just briefly have Vitol 1,

6    please?

7    BY MR. COOLEY:

8    Q    This is the November 2016 joint venture talking points

9    email.  Do you recall being asked questions about that in

10   your cross?

11   A    Yes.

12   Q    And I think you were asked about whether or not this

13   was binding or whether you were guided by it.  Do you recall

14   that?

15   A    Yes.

16   Q    And just to remind me again, do you believe this was a

17   document that guided what the parties did in the weeks that

18   followed for some period of time?

19           MS. GOOTT:  (indiscernible).

20           THE COURT:  Sustained.

21           MR. COOLEY:  That's okay.  Could I have Vitol

22   Exhibit 14, please?

23   BY MR. COOLEY:

24   Q    Do you recognize this document?

25   A    Yes.

```
1   Q    Do you recall being asked questions about this document

2   in your cross?

3   A    Yes.

4   Q    From and after the date of this email, August 21st, did

5   what's in this document in any way guide the parties'

6   discussions and transactions from and after that date?

7   A    Yes.  Some of the points were.

8            MR. COOLEY:  Your Honor, could I have just a

9   moment to confer with my colleagues?

10           THE COURT:  Sure.  How much longer do you think

11  you have?

12           MR. COOLEY:  I may be done.  I may be very close,

13  which is why I would like to confer.

14           THE COURT:  Go ahead.  Go ahead.

15           MR. COOLEY:  Nothing further.  Pass the witness.

16  Thank you, Your Honor.

17           THE COURT:  Mr. Patterson.  Mr. Patterson, how

18  much time do you think you have?  I just need to give...

19           MR. PATTERSON:  Sure.  Even short for me.  Short,

20  short.

21               RECROSS-EXAMINATION OF ERIC KUO

22  BY MR. PATTERSON:

23  Q    Mr. Kuo, I want to -- it was suggested -- it was

24  unclear, but I believe you suggested that GCAC bought

25  product from Vitol and didn't pay for it.  Is that what you
```

1    were suggesting?

2    A    I think that was the case in a couple of instances,

3    yes.

4    Q    Okay.  And you understand the lawsuit doesn't allege

5    that, right?  That's not part of your damages, right?

6              MR. COOLEY:  Objection.  Foundation.

7              THE COURT:  He can -- I think he knows we're in a

8    lawsuit.  I think he can answer if he knows the answer.

9    BY MR. PATTERSON:

10   A    I believe it was.

11   Q    You do?

12   A    I think so.

13   Q    So you think part of the $10 million is for product

14   that was purchased and not paid for?

15   A    I believe so.

16   Q    Okay.  So if the judge were to ask you, Mr. Kuo, what's

17   the basis of the $10 million, what would you say?

18   A    It was part of product cost.  It was hedging losses,

19   and it was costs associated with running the business.

20             THE COURT:  Maybe you heard it, Mr. Patterson.  I

21   didn't.  I would just ask him if he could just speak a

22   little louder.

23   BY MR. PATTERSON:

24   A    You're asking me what --

25   Q    The basis.

```
1    A    The basis of it?

2    Q    The $10 million, yeah.

3    A    For product costs, hedging costs, hedging losses, and

4    costs associated with running their business.

5    Q    Anything else?

6    A    I don't know.

7    Q    What do you mean, you don't know.  I'm asking if

8    there's anything else.

9    A    I don't know.  I don't know.  I don't think there's

10   anything else.  I don't know.  I'm just a witness.  I don't

11   know.  I didn't file the lawsuit.

12   Q    You're the point man on the transaction with GCAC,

13   correct?

14   A    Correct.

15   Q    Anything else makes up this $10 million?  Product --

16   let's go through it, because this is -- this is

17   (indiscernible).  Because you say -- so you believe part of

18   the $10 million is GCAC purchased produce from Vitol.  And

19   when you say product, what are we talking about?

20   A    Either asphalt or asphalt components.

21   Q    Or both?

22   A    It could be either.

23   Q    What do you mean?  I know it could be.  It could be

24   anything.  I'm asking you what it is.

25   A    I don't know which particular deal you're talking
```

1    about.   There was many deals.

2    Q    I'm talking about the $10 million is what I'm talking

3    about.

4    A    There was fifty-plus transactions.   I mean, you're

5    saying -- some were asphalt, some were asphalt components.

6    Q    Okay.   Well, this is new information and I'm trying to

7    pin it down.   You're here on behalf of Vitol.   You were the

8    man running this joint venture, right?   And now Vitol is

9    saying that Mr. Brass owes  $10 million.   And I'm trying to

10   figure out -- now you're giving me three pieces of this $10

11   million that I haven't heard before, and so I'm trying to

12   figure this out.   Right?

13            MR. COOLEY:   Objection, Your Honor.   The fact that

14   counsel said --

15            MR. PATTERSON:   That's not an evidentiary

16   objection.   He is again trying to relay information to the

17   witness.

18            THE COURT:   I'll sustain the objection.   I think

19   you can just ask a question.

20   BY MR. PATTERSON:

21   Q    Are you familiar with the $10 million judgment?

22   A    I did not file the judgement.

23   Q    That wasn't my question, Mr. Kuo.   Did I ask who filed

24   the judgement?

25   A    Am I familiar with the $10 million judgement?

1    Q    Yes.

2    A    Yes.

3    Q    Okay.  And do you know what the $10 million is made up

4    of?

5    A    I believe it's the components that I mentioned to you.

6    Q    All right.  Three pieces, right?  What's the first

7    piece?

8    A    Product.

9    Q    Product.  And when you say product, is that shorthand

10   for, hey, he bought product and he didn't pay for it?

11   A    That's correct.

12   Q    How much in round numbers does the $10 million reflect

13   a product not paid for by GCAC?

14            MR. COOLEY:  Objection.  Lacks foundation.

15            THE COURT:  He can answer if he knows.

16   BY MR. PATTERSON:

17   A    I think the total was around -- I think the total

18   amount due was $15 million, but I think the judgement is

19   ten.  And of that original 15, around three-and-a-half

20   million dollars was product.

21   Q    And I don't want to have a misunderstanding later.  And

22   so I'm being specific and I'm being technical with my words,

23   if you will, so that I don't get a different story later.

24   So your allegation is that there was three-and-a-half

25   million dollars of product sold to GCAC that they just

1    failed to pay for and they took delivery?

2    A    I believe this is product that was sold to third

3    parties that they collected and didn't pay for.

4    Q    No.  You said that GCAC bought it.  That's what you

5    said.  That's what you said what your lawyer asked you, and

6    that's what you said when I asked you.  What is it?

7    A    I believe the transactions were GCAC bought the product

8    and they sold it to a third party.

9    Q    Okay.  I didn't ask about who they sold it to.  You

10   said they bought it from Vitol and they didn't pay for it,

11   right?

12   A    I believe that's correct.

13   Q    No.  You're guessing.  You're the one that said it, Mr.

14   Kuo.  You're the one that said it.

15         MR. COOLEY:  Objection.  Mischaracterizes the

16   testimony.  The witness has been saying I believe this whole

17   time.

18         MR. PATTERSON:  No.  He only says I believe when I

19   ask him a question, Judge.

20         MR. COOLEY:  Objection, argumentative.

21         THE COURT:  I'll sustain that objection.

22   BY MR. PATTERSON:

23   Q    I don't want you to believe.  You're testifying under

24   oath.  So tell me what you know.  And if you don't know, I

25   want you to say I don't know.  All right?  I think we've had

1    this conversation a couple of times.  You said that GCAC

2    bought product and they didn't pay for it.  Is that true or

3    is that false?

4    A    It's true.

5    Q    All right.  Three-and-a-half million dollars of the ten

6    million you allege that GCAC bought product from Vitol, took

7    delivery, and didn't pay for it, correct?

8    A    It's $15 million, not $10 million.

9    Q    You can call it whatever you want.  Three-and-a-half

10   million of it?

11   A    Approximately, I believe.

12   Q    Right.  Now listen to my question and answer my

13   question, please.  You allege that of the total amount,

14   three-and-a-half million is due to GCAC buying either

15   asphalt or component from Vitol, taking delivery, and not

16   paying for it, correct?

17   A    Yes.

18   Q    All right.  Second piece.  You said number one was

19   product.  Number two was?

20   A    Hedging losses.

21   Q    Hedging losses.  How much?  Round numbers.

22   A    I don't recall the amount.

23   Q    Just round numbers.

24   A    Objection.  Asked and answered.  Counsel is asking him

25   to speculate.

```
 1    Q    He can answer if he knows.  Do you know?

 2    A    I don't know the amount.

 3    Q    More than $10 million?

 4    A    I don't know.

 5    Q    So we can cross that one off, because you don't have

 6    any idea whether they actually owe you money for hedging

 7    losses or not, right?

 8    A    No.  It's in the reconciliation email that you pulled

 9    up earlier.

10    Q    No.  I said did you know.  Not did someone tell you

11    that that's what the number should be.  I'm asking if you

12    have any knowledge regarding hedging losses by GCAC or Mr.

13    Brass.  And I believe you said no.  But what's the answer?

14    A    I'm not an accountant and I don't account for...

15    Q    My question is do you know.  We've covered your

16    background and your educational experience and your

17    licensing.  We're done with that.  Do you know?

18    A    Do I know what?

19    Q    I'm going to give you a minute to think about my

20    question.  We haven't been here that long.  Do you not --

21    can you not remember 10, 15, 20 seconds ago?

22              MR. COOLEY:  Objection, argumentative.

23              THE COURT:  Sustained.

24              MR. PATTERSON:  Your Honor, he can't answer.  He

25    can't remember one question to the next.  If he has a
```

```
 1    problem, I am entitled to delve into it.

 2              THE COURT:  I'm going to sustain the objection.

 3    BY MR. PATTERSON:

 4    Q    Do you have a memory problem, Mr. Kuo?  Do you?

 5              MR. PATTERSON:  The Court will instruct the

 6    witness to answer my question, please.

 7              THE COURT:  Mr. Kuo, can you answer the question?

 8    BY MR. PATTERSON:

 9    A    No, I do not.

10    Q    All right.  Are you under any medication that affects

11    your memory or your ability to recall facts?

12    A    No.

13    Q    Alcohol, any other substance that might affect your

14    ability of recall?

15    A    No.

16    Q    Anything else that might affect your ability to

17    remember important facts as I ask them and for you to recall

18    them?

19    A    No.

20    Q    All right.  So when you say there was three pieces to

21    the 10 or $15 million that you claim GCAC or Mr. Brass owes

22    you, three-and-a-half million for product bought and

23    delivered by not paid for.  I'm going to cross hedging

24    losses because you have no idea.  Isn't that correct?

25    A    I have -- I wouldn't say I have no idea.  I don't know
```

1    the exact number --

2    Q    Okay.  And I'm asking you for round numbers.  What is

3    it?

4    A    Somewhere between five and $8 million.

5    Q    Five and $8 million.  And these hedging losses, these

6    are on hedges that Vitol placed under Vitol's name, and

7    Vitol took the risk on these.  Isn't that correct?

8    A    No.

9    Q    I'm going to see documents with hedges in GCAC's name.

10   Is that what I'm going to see?

11   A    No.

12   Q    I didn't think so.  They're all in Vitol's name, aren't

13   they?

14   A    Yes.

15   Q    And you're trying to pass on your failure to adequately

16   trade or hedge these transactions to GCAC, isn't that the

17   case, after the fact?

18   A    No.

19   Q    Is that funny?

20   A    No.

21   Q    You laughed when I asked you the question.  I'm just

22   curious.  Is that funny?

23   A    It didn't make any sense.

24   Q    Is that because GCAC -- that Vitol doesn't have losses

25   on their trades?

```
1    A     Because your question didn't make any sense.

2    Q     It doesn't?  Then why answer?  Why would you try to

3    answer a question that makes no sense to you?

4          THE COURT:  Why don't we just get to another

5    question, Mr. Patterson?

6    BY MR. PATTERSON:

7    Q     It's funny, isn't it?  You get a chuckle out of this,

8    the $5.8 million --

9          MR. COOLEY:  Objection, badgering.  This has been

10   an exceedingly long --

11         THE COURT:  Yeah.  Mr. Patterson, I just want to

12   get the questions that are relevant to me.

13         MR. PATTERSON:  All right.

14   BY MR. PATTERSON:

15   Q     Number three.  What was the third portion?

16   A     Ancillary costs.

17   Q     Ancillary costs.  And how much were ancillary costs?

18   A     I don't recall the amount, the exact amount.

19   Q     Raw numbers.

20   A     I don't recall the spreadsheet.  $4 to $5 million

21   possibly.  Maybe three.  I don't know what the exact number

22   is.

23   Q     All right.  Anything else?  Anything else?  Take a

24   minute to think.

25   A     Maybe interest costs.
```

1    Q    Maybe?  Are you guessing?

2    A    No.

3    Q    Why would you say maybe?

4    A    I think there was interest costs of a couple hundred-

5    thousand dollars.

6    Q    You think?  For how much?

7    A    A couple hundred-thousand.

8    Q    You think?  Did you have a deal or did you not have a

9    deal?

10   A    What are you referring to with a deal?  What do you

11   mean, do we have a deal?  I don't understand the question.

12   Q    Are these costs not related to some agreement you had,

13   or are they not.

14   A    They are.

15   Q    Okay.  Agreement, a deal.  Didn't you have an agreement

16   with respect to this stuff?

17         MR. COOLEY:  Objection.  Best evidence rule.  If

18   there's an agreement, let's talk about the agreement.

19         MR. PATTERSON:  I'll step away for the best

20   evidence.  I'm looking for a document for a year, Judge.  If

21   they'll just show me the document that's the best evidence,

22   I'm good.

23         THE COURT:  Why don't we just ask Mr. Kuo

24   questions and we can finish this recross.

25   BY MR. PATTERSON:

1   Q    You said there was an agreement.  Are you guessing now?

2   There was an agreement, wasn't agreement, what was it?

3   A    There was no signed agreement.

4   Q    There wasn't -- I didn't say signed.  See, you keep

5   adding.  I want to know whether there's an agreement.

6   A    I'm clarifying.

7   Q    I didn't ask you to clarify.  I asked you to answer my

8   question.

9   A    I can't answer without clarifying.

10   Q    Yes, you can.

11   A    No, I can't.

12          THE COURT:  Folks --

13          MR. PATTERSON:  I would instruct the witness to

14   answer my question.

15          THE COURT:  I'm going to overrule that.  He can

16   answer -- he felt like he needed to clarify.  Ask him

17   another question.

18   BY MR. PATTERSON:

19   Q    Was there an agreement?

20   A    There was no signed agreement.

21   Q    Okay.  But was there an agreement?

22   A    There was no signed agreement.

23   Q    Anything else, anything?  Maybe interest you said.

24   I'll even write that down.  Maybe interest.  Anything else?

25   A    No.

1   Q    Why is it your lawyer stands up here and talks to you,

2   I stand up here and talk to you.  I ask you to think, take

3   your time.  You filed a lawsuit against GCAC.  Said you

4   loaned them money and they owed you the money that you

5   loaned them.  But for 25 minutes now, I've asked you tell me

6   what they owe you money for, and you didn't once say we

7   loaned them money, they owed us the money back.  Not once.

8   Why is that?

9            MR. COOLEY:  Objection.  Mischaracterizes

10   testimony and argumentative.

11            THE COURT:  It is argumentative.

12   BY MR. PATTERSON:

13   Q    Why is that, Mr. Kuo?

14            THE WITNESS:  Am I answering that or not answering

15   that?

16            THE COURT:  Excuse me?

17            THE WITNESS:  Am I answering that or am I not

18   answering?

19            THE COURT:  No, he's got to ask you another

20   question.  That was argumentative.

21   BY MR. PATTERSON:

22   Q    And when you say that there was product bought and sold

23   to GCAC and not paid for, have you seen the documents that

24   reflect those transactions?

25   A    I believe there were transactions, there were documents

1    for those.

2    Q    That's not what I asked you.  My question is did you

3    review those documents, any documents that reflected any of

4    the three-and-a-half million dollars of product purchased by

5    GCAC and delivered by Vitol?

6              MR. COOLEY:  Objection.  Vague, time period.

7              MR. PATTERSON:  Any.  He said three-and-a-half

8    million, Judge.  I want any.

9              THE COURT:  Yeah, but I'm going to sustain.

10   Because your first question was -- you asked two different

11   questions.  You first asked him had he seen any.  And then

12   you're asking if he reviewed any.  It might be a minor

13   difference, but he can answer.  You can ask him --

14   BY MR. PATTERSON:

15   Q    Did you review any of the documents that reflect any of

16   the three-and-a-half million dollars of transactions?

17   A    What time period are you talking about?

18   Q    I didn't give you a time period.  I said any of the

19   three-and-a-half million that you testified to.

20   A    If I had seen them any time in the past vie years?

21   Q    Ever.  Ever.

22   A    Ever?  Yes.

23   Q    So there are such documents?

24   A    are you referring to the invoices that we had sent

25   them?

1    Q    I am referring to any document that reflects some or

2    this three-and-a-half million dollars of product that Vitol

3    sold to GCAC that they didn't pay for and took delivery of.

4    A    I believe there are invoices there.

5    Q    Well, now you're doing the believe again.  Right?

6    That's a hedge word.  You understand that.

7              MR. COOLEY:  Objection.  Argumentative.

8              MR. PATTERSON:  It's not, Your Honor.  I need him

9    to answer my question directly.

10             THE COURT:  But I think we can all ask it in a

11   different tone.  Why don't we just -- why don't we take ten

12   minutes and all kind of relax a little bit and then come

13   back.  We can finish this, and then we'll get Mr. Brass up.

14             MR. PATTERSON:  All right.

15             CLERK:  All rise.

16             (Recess)

17             THE COURT:  Back on the record in Vitol v. Brass.

18   Mr. Kuo, I would remind you, you are still under oath.

19             MR. COOLEY:  Thank you, Your Honor.  I don't have

20   any further questions.

21             THE COURT:  Okay.

22             MR. PATTERSON:  Mr. Kuo, thank you for coming in.

23   Have a good weekend.

24             THE COURT:  Mr. Cooley?

25             MR. COOLEY:  Nothing further from me, Your Honor.

1   Thank you.

2            THE COURT:  All right.  That would be the words

3   you want to hear, Mr. Kuo.  Thank you very much.  you can

4   step down.  You are free to go.  You just can't come back in

5   the courtroom.

6            MR. COOLEY:  Your Honor, I think he may be asking

7   about his ability to talk about testimony or trial

8   (indiscernible).

9            THE COURT:  I think everybody is still -- we're

10   still going to operate -- don't talk to anyone about your

11   testimony until this trial is complete.  Okay?  That's

12   exactly right.  Everybody is subject to a recall or some

13   other point.  But please just do not talk to anyone about

14   your testimony, as someone may need to notify you to come

15   back.  But we'll see if that happens.  Okay?  Thank you.

16            MR. BERNICK:  Your Honor, Michael Bernick here on

17   behalf of Vitol.  I'll be examining Mr. Brass.  And I intend

18   to use the chart for demonstrative if the Court would so

19   allow it.  And see if I could have a few minutes to get

20   setup and get a mobile mic.

21            THE COURT:  Yeah, absolutely.

22            MS. GOOTT:  Your Honor, I'm a little bit confused.

23   If we could have a little clarification.

24            THE COURT:  Sure.

25            MS. GOOTT:  My understanding was I guess at first

1    they said they were going to file a motion and ask this

2    Court to order Mr. Brass to appear.  And we were waiting on

3    that.  And it didn't get filed.  And then the Court entered

4    its own order.  And so my understanding based on the order

5    is that the Court had questions for Mr. Brass.

6            THE COURT:  My understanding based on what you

7    told me was that you didn't want me to start asking

8    questions, that they should be able to proceed, and I'll

9    step out of the way.  If you want, we can come back and I'll

10   be prepared.  But I'm not prepared today.  My understanding

11   was you didn't want to -- you said I'd rather not do that,

12   Your Honor, because I don't like objecting to judges.

13           MS. GOOTT:  Oh, I don't mind.  But I'm just --

14   that's fine.  No, if the Court isn't prepared to do that,

15   I'm not going to prolong it.

16           THE COURT:  No, no, no.  I mean, look, we can.

17   It's just that was my understanding, that it was -- I would

18   stay out of the way.

19           MS. GOOTT:  I guess I would clarify.  Because it

20   matters of me for one reason.  If you had certain questions,

21   then my understanding is that they would then be bound to

22   the scope of your questions.

23           THE COURT:  Right.  And I would put on a full --

24   if I was going to do it, then I would put on a full direct.

25   Because my understanding was that Mr. Brass was having

1    trouble -- they were having trouble locating Mr. Brass with

2    a subpoena.  And I was going to make sure that he got found.

3    But I didn't want to get into whether that was true or not.

4    So I said if I ordered it, we could avoid that whole fight.

5              MS. GOOTT:  All right.

6              THE COURT:  That's where we are.  Play at your own

7    risk.

8              MR. BERNICK:  Your Honor, we call Arthur Brass to

9    the stand.

10             THE COURT:  Mr. Brass, why don't you come up.

11             And Ms. (indiscernible) are you going to -- okay.

12   (indiscernible) are you the presenter?  Okay.  I think you

13   are.

14             MR. COOLEY:  Your Honor, I just received an email

15   from Max Beatty that says the electronic call dropped.  And

16   he was asking (indiscernible).

17             THE COURT:  We did it on purpose.

18             MR. BERNICK:  Your Honor, has the witness been

19   sworn?  Are we good to go?

20             THE COURT:  I'm going to make sure that -- I'm

21   going to give everyone a minute to see if they need to dial

22   in.

23             MR. BERNICK:  Understood.

24             THE COURT:  And if it's Mr. Beatty, tell him I did

25   it on purpose.  I can see a few parties are joining.  So

1    we'll just give it -- we can still proceed.

2            Mr. Brass, let me have you raise your right hand.

3    Do you swear to tell the truth, the whole truth, and nothing

4    but the truth?

5            MR. BRASS:  I do.

6            THE COURT:  Okay.  Thank you.  And thank you for

7    appearing today.  As you probably heard earlier today, you

8    might hear parties object to questions that are made.  I

9    would just ask that you give me the opportunity to resolve

10   the objection.  And I'll let you know if the question can be

11   answered or if someone needs to ask another question.  If at

12   any point you need a break, just let me know and we'll

13   accommodate you.  It's about 3:53 now.  The goal is to go to

14   a hard stop at 6:00.  But that's just to give you a

15   guideline as to how long we're going to go today.  But if

16   you need a break, just let me know, okay?

17           MR. BRASS:  Thank you, Your Honor.

18           THE COURT:  Okay.  Thank you.

19               DIRECT EXAMINATION OF ARTHUR BRASS

20   BY MR. BERNICK:

21   Q    Mr. Brass, you are familiar with the company Gulf Coast

22   Asphalt Company, correct?

23   A    Yes.

24   Q    And if I refer to Gulf Coast Asphalt Company as GCAC,

25   you'll know what I'm talking about?

```
 1    A    Yes.

 2    Q    You've been the president of GCAC since 2017.

 3    A    I believe that's correct.  I'm sorry, I'm terrible with

 4    dates.  If I waffle, it's not because I'm trying to do

 5    anything other than remember.

 6    Q    Were you the president of GCAC when GCAC filed a

 7    lawsuit against Vitol?

 8    A    Yes.

 9    Q    Earlier we heard that it was Vitol that filed the

10    lawsuit.  But that's not accurate, right?

11    A    No.

12    Q    GCAC is actually the one who sued Vitol?

13    A    That's correct.

14    Q    And Vitol filed counterclaims against GCAC, right?

15    A    Correct.

16         THE COURT:  Let me lay some ground rules.  I'm

17    going to treat this as a direct.  You can -- I'd call him --

18    but if I'm staying out of the way, then I'm going to treat

19    this as they call the witness and you can -- I'm just

20    setting ground rules.  I'm not saying object, what I'm

21    saying is those are the ground rules.  I'm not doing a

22    double cross, if you will.  I'm going to set this up as a

23    direct and a cross if I'm going to stay out of the way.

24    Okay.  I'm sorry, Counsel.

25         MR. BERNICK:  Your Honor, just so we're clear, so
```

1    I'm clear, as if I called him adversely?

2              THE COURT:  You did call him.  That's -- yeah.  I

3    ordered him to come testify today.  You called him.  So I'm

4    going to stay out of the way.  I'm going to let you put on a

5    direct.  And if we want, we can come back another day.  But

6    that's -- you asked for him in a subpoena.  So there's been

7    no direct, so I'm going to let you put him on as if this is

8    direct.

9              MR. BERNICK:  Understood, Your Honor.

10             THE COURT:  That's consistent with my

11   understanding of why I did it in the first place.

12             MR. PATTERSON:  Your Honor -- I'm sorry.

13   BY MR. BERNICK:

14   Q    Mr. Brass, GCAC -- strike that.  Mr. Brass, Vitol filed

15   counterclaims against GCAC, correct?

16   A    That's correct.

17   Q    And they filed claims against you individually?

18   A    Yes.  Just to clarify.  They filed them, then they were

19   withdrawn, and then they were filed again.  But yes, I

20   suppose the answer is yes.

21   Q    Vitol sued you for fraud, right?

22             MS. GOOTT:  (indiscernible).

23             THE COURT:  Sustained.

24             MS. GOOTT:  (indiscernible).

25             MR. BERNICK:  It's not bothering me, Your Honor.

I don't hear an echo or anything.

THE COURT: It's not bothering me, either.

MR. BERNICK: Your Honor, the Court took judicial notice of Vitol Exhibit 86, which was Vitol's counterclaim, second amended counterclaim and third-party petition against GCAC. Mr. Brass (indiscernible).

THE COURT: I took judicial notice that something was filed.

MR. BERNICK: Yes. Your Honor, and I am not asserting that you took judicial notice of it for everything in there as being accurate and true, just the fact that certain allegations were made.

MS. GOOTT: (indiscernible).

THE COURT: Sustained.

BY MR. BERNICK:

Q Mr. Brass, you reviewed Vitol's claims against you in the state court lawsuit?

A At a point, yes.

Q You're familiar with them?

A I believe so. It's been a while since I've looked at them, but at one point I did review them, yes.

Q If we could pull up Vitol Exhibit 86.

THE COURT: Hold on a second.

BY MR. BERNICK:

Q Mr. Brass, do you recognize this document?

```
 1              THE COURT:  I hate to interrupt.  Ms. Mehta -- and
 2    this is just for me, but it may assist Mr. Brass as well, I
 3    don't know.  And I don't want to -- and I don't think this
 4    is different than highlighting.  But if you can just zoom in
 5    on every document just a little bit, it would help me out a
 6    bit.  Thank you.
 7              Sorry about that, Mr. Brass.
 8              THE WITNESS:  No problem.  That helps me, too.
 9    Thank you.
10              THE COURT:  Young man, old man's eyes.
11              THE WITNESS:  I know which side I'm on.
12    BY MR. BERNICK:
13    Q    Do you recognize this document, Mr. Brass?
14    A    I'm looking at it.  I don't recognize it.  I see at the
15    top it was from 2019.  I don't recall it specifically, but
16    yeah, I think I recognize it.
17    Q    And is it a true and accurate copy of Vitol's
18    counterclaim against GCAC and third-party petition against
19    you, Mr. Brass?
20              MS. GOOTT:  (indiscernible).
21              THE COURT:  He said he recognized it.  He can
22    answer.
23    BY MR. BERNICK:
24    A    I don't recognize it as I sit here today, but I don't
25    dispute it, either.  I mean, I just don't remember it.
```

003131

1              MR. BERNICK:  Your Honor, we move to offer Exhibit

2    86.  The Court may take judicial notice of it.  We're not

3    offering it for the truth of the matter asserted, we are

4    offering it only for the fact that certain allegations were

5    made.  That's it.

6              MS. GOOTT:  (indiscernible).

7              THE COURT:  Sustained.

8              MR. BERNICK:  Your Honor, under -- we can come

9    back to it.

10   BY MR. BERNICK:

11   Q    Mr. Brass, Vitol also sued you individually for

12   fraudulent transfers, right?

13   A    I don't recall all their specific claims as I sit here

14   today.

15   Q    Do you recall being sued for fraudulent transfers by

16   Vitol?

17             MS. GOOTT:  (indiscernible).

18             THE COURT:  Overruled.

19   BY MR. BERNICK:

20   A    It sounds familiar.  I don't remember all their

21   specific claims, but I'm not disputing it, either.

22   Q    But it sounds familiar that Vitol sued you for

23   fraudulent transfer, right?

24   A    I guess it sounds familiar.

25   Q    Those fraudulent transfers related to money spent to

1    renovate your vacation home in (indiscernible) Texas, right?

2            MS. GOOTT:  Objection (indiscernible).

3            THE COURT:  Sustained.

4    BY MR. BERNICK:

5    Q    Your Honor, do you -- I'm sorry.  Mr. Brass, you recall

6    that Vitol sued you for fraudulent transfer related to money

7    spent to renovate your vacation home, right?

8            MS. GOOTT:  (indiscernible).

9            THE COURT:  Hold on.  Now everybody -- I think he

10   can testify if he recalls.  I don't think that was the

11   question.

12   BY MR. BERNICK:

13   A    I don't recall the specific allegations in Vitol's

14   lawsuit.

15   Q    Okay.

16   A    Counter lawsuit, or whatever you want to call it.

17   Q    Would it help to -- you reviewed the lawsuit at some

18   point, right?

19   A    At some point, yes.

20   Q    Would it help you to review the lawsuit?  Would it

21   refresh your recollection about what Vitol alleged?

22           MS. GOOTT:  (indiscernible).

23           THE COURT:  Overruled.

24   BY MR. BERNICK:

25   Q    Would that refresh your recollection?

```
 1   A    If you showed me the document?  Yeah, I could read it.
 2   Q    I'm showing you Document 86, Vitol 86, which is on the
 3   screen, Mr. Brass.  And if you could turn to -- I would
 4   direct the witness to Page 6.
 5   A    Do I do that or...
 6        THE COURT:  No.  I think you're doing exactly what
 7   Mr. Patterson was complaining that other people do.  So I've
 8   got to --
 9        MS. GOOTT:  (indiscernible).
10        MR. BERNICK:  Your Honor -- sorry.
11        THE COURT:  No.  It's got to work both ways.  So I
12   understand your objection.  I just -- you're explaining the
13   objection though.  But --
14        MS. GOOTT:  (indiscernible).
15        THE COURT:  I know.  Doesn't recall.  He doesn't
16   recall.  But it says what it says to me.
17   BY MR. BERNICK:
18   Q    Mr. Brass, as president of GCAC, you had certain
19   duties, correct?
20   A    Yes, sir.
21   Q    Those duties included looking over GCAC's financial
22   reports?
23   A    From time to time.  I was not the detail guy when it
24   came to GCAC and its books and records.  From time to time I
25   would get a financial statement or something from our
```

1    accounting guys I would look at it, but I can't say that I

2    verified for accuracy of GCAC's financial statements.

3    Q    Bug you did review GCAC's financial records from time

4    to time, right?

5    A    From time to time.

6    Q    And I said you weren't the detail guy, so instead you

7    hired someone to be your detail guy, right?

8    A    Yeah, we had detail guys.

9    Q    Instructed those guys?

10   A    Yeah.

11   Q    Felt their work was accurate?

12   A    I thought -- I believed their work to be accurate.  I

13   cannot tell you I checked it, but I have no reason to think

14   that they would have done anything intentionally inaccurate.

15   Q    And that would have been John Tomaszewski, your CFO?

16   A    He would have been one of them, yeah.

17   Q    (indiscernible), your bookkeeper?

18   A    Yeah.

19   Q    And since 2017, you, Mr. Brass, have had full control

20   of GCAC's finances?

21   A    Yes.

22   Q    Any distributions from GCAC's bank accounts would have

23   been authorized by you, right?

24   A    I believe that's correct.

25   Q    You had authority to pick the amount of a transfer out

1   of GCAC's bank account, right?

2   A    Yes.  If it was something smaller or ordinary course,

3   maybe I didn't --

4   Q    Petty cash kind of thing?

5   A    Well, the petty cash, but less than something -- I

6   don't know.  If it was on the smaller end of things, if it

7   was a -- I don't know what the threshold would be.  I think

8   it was guys trying to use their reasonable judgement.  But

9   if it was an ordinary course thing, paying Office Depot or

10  whatever, then I don't know that I would have been involved

11  in that.  But larger transactions, then yes, it would have

12  been at my direction or with my understanding.

13  Q    Certainly any five-figure transaction, you're going to

14  be -- you're going to have authorized that, right?

15  A    Yes.

16  Q    Any six-figure transactions, you're going to have to

17  authorize that?

18  A    Yes.

19  Q    Okay.  And the timing of any distributions from GCAC's

20  accounts, that was also in your control and authority since

21  2017?

22  A    I don't understand the question.  Could you say that

23  again?

24  Q    Sure.  The timing, the when transfers were made out of

25  GCAC's account, that timing, that was also within your

```
 1    authority and control from 2017, right?

 2    A    Yes.

 3    Q    And as president of GCAC, you believe you could take

 4    out money from GCAC's account for any reason?

 5    A    As president, owner, member, partner, whatever you want

 6    to call it, yes.

 7    Q    Any withdrawal, any distribution, any transfer out of

 8    GCAC's account, you believe you had full authority to do

 9    that, no matter what the transfer was for?

10    A    Yes.

11    Q    Now GCAC was owned 50 percent by Joyce Brass?

12    A    Yes, my mother.

13    Q    That's your mother.

14    A    Mm-hmm.

15    Q    Right?  And she owned 50 percent of GCAC in 2017?

16    A    Yes.

17    Q    And has owned 50 percent of GCAC since then?

18    A    Yes.

19    Q    The other 50 precent owner of GCAC was a company by the

20    name of Trifinery Inc., correct?

21    A    Yes.

22    Q    That's an entity that you're president of?

23    A    I believe that's correct, yes.

24    Q    And you effectively own a hundred percent of Trifinery,

25    right?
```

1    A    Yes, I think that's correct.

2    Q    And you effectively own 50 percent of GCAC then?

3    A    Yes.

4    Q    And, Mr. Brass, you will agree that whatever business

5    relationship existed between GCAC and Vitol, it was ongoing

6    from July 2017 through December 2017, right?

7    A    Or a little after.

8    Q    That's a fair -- from July 2017 to a little bit after

9    December 2017.  That's fair?

10    A    Yes, I think so.

11    Q    Okay.  And whatever business relationship existed

12    between GCAC and Vitol, GCAC didn't have a similar

13    relationship during that period with some other entity,

14    right?

15    A    Well, if what you're referring to is Rio, which was

16    another entity -- and this gets very confusing.  I'm not

17    entirely sure I understand how as I sit here today can

18    recall exactly how all the interplay went.  But prior to our

19    relationship with Vitol, we had a relationship with Rio.  I

20    believe it was called a joint marketing agreement.  In July

21    when we started the venture with Vitol, Rio was still in

22    some of the leases.  Vitol and Rio worked out some sort of a

23    buy-sell -- something that was a little more complicated

24    than maybe I understood, but some mechanism for passing --

25    I'm sorry, am I getting echo?  I'm sorry.  It sounds weird.

1    Some sort of mechanism for passing inventory and products

2    and contracts back and forth.  I can't recall exactly how

3    that worked.  They were not financially involved after July

4    other than sort of as a conduit to these leases and buys and

5    sells and stuff like that.  And that was between -- I don't

6    think the GCAC interfaced with Rio on those.  I may be mis-

7    recalling that, because it was pretty complicated.  But

8    there was technically probably a JSMA that was inactive

9    during that period of time while we had the joint venture

10   with Vitol.

11   Q    Let me ask the question a little bit differently, Mr.

12   Brass.

13   A    Sorry if I got off on a tangent on you there.  I didn't

14   mean to.

15   Q    When Vitol and GCAC had their business relationship

16   that you testified to existed between July 2017 and a little

17   bit after December 2017, remember that?

18   A    Yes, sir.

19   Q    Okay.  When that business relationship existed, Vitol -

20   - sorry, GCAC was not in any sort of active joint venture

21   with Rio, right?

22   A    I think that's correct.  I'm trying to be technically

23   specific about this.  Because at that point, we had not

24   technically cancelled the joint venture with Rio, if you

25   call it a joint venture, the joint marketing agreement or

1    whatever it was we called it with Rio.  But at the same

2    time, they weren't involved in the joint venture going

3    forward.  So their joint venture became one that was

4    basically a flat -- just passing produce back and forth.  It

5    may have technically existed because I know it wasn't

6    cancelled until later.  So I don't want to say we didn't

7    have a relationship with Rio because there was something

8    there, clearly.  But it wasn't one where there was like a

9    financial -- they had a financial indifference from a P&L

10   perspective starting at that point.  I don't know if I'm

11   answering your question, and I'm really trying to.

12   Q    Let me go about it this way.  Okay?  GCAC, Rio, they

13   weren't buying and selling asphalt together in 2017?

14   A    Other than as Rio providing -- and again, I'm not

15   trying to be argumentative, I swear -- other than as Rio

16   providing whatever conduit it needed to provide in order for

17   Vitol and GCAC to be able to conduct their business, no.

18   Q    Okay.  So any --

19   A    Does that make sense?

20   Q    It makes sense.  So any sales or any sales or buy-sells

21   between GCAC and Rio in July 2017, you believe that would

22   have been related to the Vitol-GCAC business relationship in

23   some way, shape, or form.

24   A    Yes.  But then to be clear, I don't think GCAC -- maybe

25   we are recalling this incorrectly.  But I don't recall GCAC

1    buying and selling with Rio.  I think it was Vitol that was

2    buying and selling with Rio.

3    Q    All right.  Now, GCAC had no cash on August 1st, 2017,

4    right?

5    A    I don't recall our cash balance on August 1st.

6    Q    I'm showing you what -- Vitol Exhibit 8.  Mr. Brass, do

7    you recognize this document?  (indiscernible).

8    A    I don't recall it, but I'm reading it.

9    Q    AJ@abrass.com is your email address, right?

10   A    AJ at -- yes.

11   Q    You received this document?

12   A    I would assume so.  My name is on it and I -- I don't

13   recall it, but you're showing it to me, and I can't dispute

14   its existence.

15   Q    Any reason to dispute its accuracy?

16   A    I don't know that I know any of the numbers in here are

17   correct or not correct or what Karen, who was at the time a

18   bookkeeper, whether she was correct about any of this or

19   not, but I see that the email exists and I recognize what it

20   says.

21           MR. BERNICK:  Your Honor, I am going to offer to

22   admit Vitol Exhibit 8.

23           THE COURT:  Any objection?  Vitol Exhibit 8.  And

24   that is -- Oh, Vitol 8 is admitted.

25           (Vitol Exhibit 8 entered into evidence)

```
 1    BY MR. BERNICK:

 2    Q    You received this email on July 31st, 2017?  The one at

 3    the bottom.

 4    A    August 1st.

 5    Q    Sorry, looking at the bottom.  The first --

 6    A    Oh, July 31st, yes.

 7    Q    The subject line is "Cash needed", right?

 8    A    Correct.  No -- oh yes, sorry.

 9    Q    And Ms. Caldwell is telling you -- Ms. Caldwell was

10    GCAC's bookkeeper at the time, right?

11    A    Yes.

12    Q    And she is telling you and Mr. Tomaszewski that

13    $182,000 is needed to get through the week for GCAC.

14    A    That's what it says, yes.

15    Q    On August 1st, 2017, GCAC's operating -- let me back up

16    a little bit.  So GCAC had an operating account at Iberia

17    Bank?

18    A    I don't remember where the accounts were at that time.

19    Q    Okay.  All right.  Let's pull up Exhibit 124 at Debtor

20    301, which has been admitted into evidence already.  124.

21    We have (indiscernible).

22         MR. BERNICK:  Your Honor, we have that certain

23    pages of these documents -- of 124 --

24         THE COURT:  I just need a moment to remember what

25    were the pages and the numbers that came in.  I do know that
```

1    there were some...

2              MR. BERNICK:  These pages, Your Honor, were...

3              THE COURT:  Okay.

4              MR. BERNICK:  And I'm only going to ask about

5    pages that (indiscernible).

6              THE COURT:  With your stipulation, but we'll

7    confirm if anything comes up.

8              MR. BERNICK: Sure.

9    BY MR. BERNICK:

10   Q    All right.  So turning back to Vitol 124 at Page 301.

11   Can you zoom in, Ms. Mehta?

12       Mr. Brass, you see this is a statement of account from

13   Iberia Bank addressed to Gulf Coast Asphalt Company and it

14   says operating account.  Do you see that?

15   A    Yes, I do.

16             MS. GOOTT:  (indiscernible).

17             MR. BERNICK:  Your Honor, I have a full list of

18   all the (indiscernible) that were entered -- that were

19   admitted that day.

20             THE COURT:  That's what I'm saying.  We can just

21   confirm whether 000301 is admitted.  We can always go back

22   and confirm.

23             MR. BERNICK:  We have 301 through 305, which is

24   marked right now as admitted.  We also have 503 at -- 503 --

25   493 to 519 marked as admitted.  And 49 through 103, Your

1   Honor, also have been admitted.  49 through 103.  493

2   through 519.

3           THE COURT:  Why don't we just proceed, and we can

4   always confirm.

5           MR. BERNICK:  Absolutely, Your Honor.

6           THE COURT:  Obviously if I didn't --

7           MR. BERNICK:  Exhibit 124 --

8           THE COURT:  No, no.

9           MR. BERNICK:  I'm sorry.

10          THE COURT:  I'm saying obviously if it turns out

11  that one of these docs or one of the pages in the docs

12  wasn't admitted, then we'll strike the testimony.

13          MR. BERNICK:  Okay.

14  BY MR. BERNICK:

15  Q    Mr. Brass, let's go to -- Mr. Brass, back to my

16  question.  This is a statement from Gulf Coast Asphalt

17  operating account dated August 31st, 2017.  Do you see that?

18  A    Yes.

19  Q    Okay.  Let's go to Page 503.  I'm sorry, 301.  And

20  we'll go to 303, please.  Please scroll down.  Do you see at

21  the bottom, Mr. Brass, where it says daily balance

22  information?

23  A    Yes.

24  Q    And on August 1st, the daily balance in GCAC's

25  operating account was $8,304.82.  Do you see that?

1    A    I'm sorry, what date did you say?

2    Q    August 1st.

3    A    Yes.

4    Q    Okay.  If we can go to Exhibit 124 at Debtor 503.  This

5    was a -- this is a statement for Gulf Coast payroll account

6    that covers August 2017.  Correct, Mr. Brass?

7    A    Yes.

8    Q    If we can go to Page 505.  Down at the daily balance

9    information, we see that on August 1st, GCAC has $7,972.95

10   in its payroll account, right?

11   A    Right.  Yes.

12   Q    Okay.  If you go to Debtor Exhibit -- Debtor 49 in

13   Exhibit 124.  This is the August 2017 statement for Gulf

14   Coast Asphalt sales account.  Correct, Mr. Brass?

15   A    Yes.

16   Q    If you can go to Page 54, please.  The daily balance on

17   August 1st was $4,207.11, right?

18   A    Yes.

19   Q    Okay.  So between those, GCAC had roughly $18,000 in

20   these three accounts?

21   A    In those three accounts, yes.

22   Q    Okay.  That's a little less than $20,000, right?

23   A    I haven't done the math.

24   Q    Okay.  Definitely not $183,000?

25            MS. GOOTT:  (indiscernible).

Page 194

```
 1              MR. BERNICK:  Your Honor, I'm showing that GCAC

 2    was cash-strapped here.

 3              THE COURT:  I'll overrule.  You can continue.

 4    BY MR. BERNICK:

 5    Q    Please pull up Vitol Exhibit 9.  Mr. Brass, do you

 6    recognize this document?

 7    A    I'm reading it.  I don't recall it, but I see it on the

 8    screen.

 9    Q    Okay.  What is it?

10    A    It's an email from John Tomaszewski to myself.

11    Q    Any reason to dispute the accuracy of this email?

12    A     No.

13              MR. BERNICK:  Your Honor, I would move to offer --

14    offer to admit Vitol Exhibit 9.

15              THE COURT:  Any objection?

16              MS. GOOTT:  (indiscernible).

17              THE COURT:  I think you did.  I'll admit it.

18    Vitol 9.

19              (Vitol Exhibit 9 entered into evidence)

20    BY MR. BERNICK:

21    Q    Mr. Brass, if we look at the email on the bottom from

22    Mr. Tomaszewski, August 2nd, 2017, Mr. Tomaszewski is

23    telling you that GCAC's Iberia payroll account is overdrawn

24    and needs to be covered, right?

25    A    That's what it says, yes.
```

1    Q    And if we scroll up, we see on August 3rd, Mr.

2    Tomaszewski states, "Operating account was charged to cover

3    payroll.  Now operating account is overdrawn and outstanding

4    checks will be sent back for insufficient funds."  Do you

5    see that?

6    A    That's what it says.

7    Q    Do you recall GCAC being short on cash at this time?

8    A    At some times, yes.  But then there was money coming

9    in.

10   Q    I'm asking as of this time, Mr. Brass.  At this point.

11   A    This day when we got this email, then yes.  GCAC seemed

12   to be short on funds.

13   Q    All right.  And you respond -- if you scroll up in the

14   email, you respond, 8:42 in the morning on Thursday, August

15   3rd.  "If we don't get Vitol money this AM, I'll have to

16   transfer more in."  Do you see that?

17   A    Yeah.

18   Q    Okay.  On Thursday, August 3rd, GCAC's operating

19   account had a balance of -$55,853.13.  Right?

20   A    I don't recall.

21   Q    Okay.  Let's pull up Debtor's -- Exhibit 123 at Debtor

22   303.  Down at the bottom, Mr. Brass.  Daily balance

23   information.  Looking at August 3rd.  Do you see where it

24   says $55,853.13 and there is a negative mark next to it?

25   A    Yeah.

1    Q    That indicates that GCAC's operating account was

2    overdrawn by over $55,000 on August 3rd.

3    A    On that one day.

4    Q    Right?  And if we go to Debtor 505 to the same exhibit.

5    See the daily ending balance on August 2nd in GCAC's payroll

6    account was zero dollars.  Right?

7    A    Yes.

8    Q    Or over negative $55,000 between these two accounts so

9    far, right?

10   A    You're picking that one day.

11   Q    Yes.

12   A    Okay.

13   Q    The day I am focusing on, Mr. Brass.  So then let's

14   look at Debtor 54 and 124, Exhibit 124.  At the bottom we

15   see the daily balance information.  It appears that on

16   August 3rd GCAC's sales account had only $3,207.11 in it,

17   right?

18   A    Okay.

19   Q    So between these three accounts on August 3rd, GCAC is

20   in the hole $52,000.

21   A    Okay.

22   Q    Right?

23   A    You're picking one day, but sure.  Do the math.  I

24   haven't done the math.  I'm assuming you have.

25   Q    If we could go back to Exhibit 124, Debtor 49.  August

1    3rd, GCAC is negative $55,000 between those three accounts.

2    Then it starts getting money in from the Vitol-GCAC business

3    relationship, right?

4    A    I don't recall.  I can't tell that from what's here.

5    Q    Okay.  Let's look at August 4th on this document.  Do

6    you see where it says 8/4, wire transfer credit, $139,605,

7    Vitol Inc.?

8    A    Yeah.

9    Q    That's money being deposited in GCAC's account from

10   Vitol, right?

11   A    I guess it was two...

12   Q    Oh, there's two.  Yeah.  So there's two payments from

13   Vitol on August 4th, each in the amount of $139,605, right?

14   A    Yeah, that's what it looks like.  I mean, I don't know

15   if that's duplicated for some reason.  I'm not a bank

16   statement expert.  But that's what it looks like to me.

17   Q    It looks like there was roughly $278,000 deposited in

18   GCAC's sales account on August 4th.  Right?

19   A    Okay.  That's what it looks like.

20   Q    All right.  GCAC is back in the black due to this money

21   from Vitol, right?  Right?

22            MS. GOOTT:  (indiscernible).

23            THE COURT:  I didn't hear the question.  I agree.

24   Agree.

25   BY MR. BERNICK:

1   Q    That same day, Mr. Brass, August 4th, 2017, do you

2   recall having GCAC leave some money in your personal

3   account?

4   A    No.

5   Q    If you could go to Debtor 52 on Exhibit 124.  That's

6   the Bates number.  I said Exhibit 124.  Bates 52.

7        So if you look at August 4th, you have a wire transfer

8   debit for $15,000 to AJ Brass.

9        Fifty-two.  The Bates number is 52.

10       Mr. Brass, looking at this document, do you see that on

11  August 4th, you had GCAC transfer to yourself, AJ Brass,

12  $25,000.

13  A    Correct.

14  Q    GCAC booked that as a loan?

15  A    No.  Oh, sorry.  Ask your question one more time,

16  please.

17  Q    GCAC booked this $15,000 transfer to you personally as

18  a loan.

19  A    I believe the way that we booked all transfers to

20  partners was as due-to/due-from.  I don't know that it was

21  or wasn't a loan.  We didn't think of it necessarily in

22  those terms.  But it would have been credited to the due-

23  from me account.

24  Q    You would have owed this money to GCAC.  That's what

25  you're saying?

1   A    It just would have been credited to the due-from me,

2   which is the same way we conducted our business since the

3   early nineties.  We always had due-to and due-from accounts.

4   When money was taken to a partner, then that was booked as a

5   due-from.  Sometimes those monies were forgiven, sometimes

6   they were repaid.  I can't object, I'm not a lawyer.  I

7   don't know what you mean by loan per se other than to say it

8   would have been recorded as increasing or decrease -- either

9   increasing the due-from or decreasing the due-to account.

10  Q    Mr. Brass, my question is this $15,000 that was

11  transferred to your personal account on August 4th, you

12  believe you had a duty to repay that to GCAC?

13  A    If GCAC, which is me, elected to have me repay it, then

14  yes.

15  Q    Okay.  So GCAC is you, right?

16  A    GCAC is controlled by me.  Sometimes GCAC would collect

17  money back from due-to and due-from accounts.  Sometimes it

18  wouldn't.  That's all I can tell you.

19  Q    There's not a promissory note related to this $15,000

20  transfer, right?

21  A    No.

22  Q    There's no interest rate tied to it.

23  A    No, but I believe we did impute some sort of a federal

24  standard interest rate.

25  Q    No written document with the interest rate on it.

Page 200

```
1    A    No, not that I recall.

2    Q    And no written document with a repayment term on it.

3    A    No, not that I recall.

4    Q    No repayment date for this $15,000 you took from GCAC,

5    right?

6    A    No.

7    Q    Okay.  GCAC didn't receive anything -- didn't receive

8    anything in exchange for this transfer of $15,000 to you.

9    A    I don't know if that's true or not.

10   Q    They didn't receive a promissory note, right?

11   A    They did not.

12   Q    They didn't receive any sort of security interest.

13   A    Social security --

14   Q    Any sort of security interest.

15   A    Oh, no.

16   Q    You didn't post any collateral when you took this

17   $15,000 from GCAC, right?

18   A    No, I did not.

19          THE COURT:  As you continue, I just want to make

20   sure that we have a clean record.  So if we can just have

21   one question, one answer.  Just make sure everybody...

22          THE WITNESS:  Am I doing it wrong?  I'm sorry.

23          THE COURT:  No, no, no.  I'm kind of just asking

24   both of you.  At times it's -- I just want to make sure that

25   whoever is going to transcribe this, to the extent somebody
```

1    asks for it, that we have a clean record.  So just allow

2    either the question to you finish, and I would ask counsel

3    to allow Mr. Brass the opportunity to finish his answer.

4              MR. BERNICK:  Certainly.

5              THE WITNESS:  I appreciate it.  Is there any way I

6    could get some water?  It seems like everyone's got water

7    but me.  I'm sorry.  I don't know if that's an appropriate

8    thing to ask for.

9              MR. BERNICK:  Fine, no.  (indiscernible).

10             THE WITNESS:  Thank you very much.

11             MR. BERNICK:  I hope I wasn't making you too

12   thirsty by drinking.

13             THE WITNESS:  Yeah, you were teasing me over

14   there.  That's okay.

15             THE COURT:  Part of the tactic.

16             THE WITNESS:  Is yours cold?  Because that's --

17             MR. BERNICK:  No, it's very room temperature.

18             THE WITNESS:  Okay.  As long as we're on even

19   footing, I'll allow it.  If I can allow anything.

20   BY MR. BERNICK:

21   Q    All right, Mr. Brass.  Then you see back on Exhibit

22   124, still on the page number Debtor 52, we see on August

23   7th there's another transfer to you individually from GCAC

24   for $15,000, right?

25   A    Correct.

Page 202

```
1    Q    No promissory note related to that transaction?

2    A    No.

3    Q    No loan agreement?

4    A    No.

5    Q    Right?

6             MS. GOOTT:  (indiscernible).

7             THE COURT:  Yeah, I agree (indiscernible).

8    BY MR. BERNICK:

9    Q    Sure.  There was no loan agreement related to that

10   $15,000 transfer, correct?

11   A    Correct.

12   Q    There was no repayment date on any written document for

13   this $15,000 transfer, correct?

14   A    Correct.

15   Q    There was no repayment date at all for this $15,000

16   transfer, right?

17   A    Nothing in writing, no.  You just said that.

18   Q    No specific date when it was due back to GCAC, correct?

19   A    That's correct.

20   Q    GCAC didn't receive anything in exchange for that

21   transfer, correct?

22            THE COURT:  Can you repeat the question?

23   BY MR. BERNICK:

24   Q    GCAC did not receive anything in exchange for this

25   $15,000 transfer on August 7th, correct?
```

1             MS. GOOTT:  (indiscernible).

2             THE COURT:  I also think it's asked and answered.

3     Yeah.  So I will sustain the objection.  I think he's

4     answered that question.

5     BY MR. BERNICK:

6     Q    On August 10th, if you go to Exhibit 124 at Debtor 53.

7     You see the top there, Mr. Brass, on August 10th we see

8     another $5,000 transfer to you individually from GCAC.

9     A    Correct.

10    Q    Did you approve that transfer?

11    A    I would assume I did.  I don't recall it specifically.

12    Q    No promissory note related to that transfer?

13    A    Sorry?

14    Q    No promissory note related to that transfer, correct?

15    A    Correct.

16    Q    There was no loan agreement related to that transfer,

17    correct?

18    A    Correct.

19    Q    Vitol -- let me back up.  GCAC receives $280,000 from

20    Vitol on August 4th.  That same day, you make a loan to

21    yourself for $15,000, right?

22    A    I didn't say it was a loan.  I said there was a wire

23    transfer that was made to me, and it was credited to the

24    due-to -- standard due-to/due-from accounts that we keep at

25    GCAC.  At least I assume it was.  It should have been if it

```
 1    wasn't.

 2    Q    Same day that GCAC receives $280,000, you transfer

 3    $15,000 to your personal account.  Fair?

 4    A    Yes.

 5    Q    Let's look at your personal account leading up to that

 6    transfer.  If we could go to Exhibit 75 at IBC 2044.  It

 7    might be 2042, the lead document.  Okay.  Exhibit 75 has

 8    been admitted?  Selected pages from Exhibit 75 have been

 9    admitted through Jason Phillips.

10         THE COURT:  I recall.

11    BY MR. BERNICK:

12    Q    Mr. Brass, your personal banking account was with

13    International Bank of Commerce, right?

14    A    Not currently.

15    Q    Back in 2017 it was.

16    A    Yes, primarily.  I can't remember if I had other

17    accounts or not.  But I definitely obviously had an account

18    at IBC.

19    Q    And this is definitely a personal account, right?

20    A    Yes.

21    Q    Okay.  If we can go to -- on IBC 2044, scroll to the

22    daily ending balance, please.  Scroll up a little bit.  The

23    very top of the page.  Zoom in there, please.

24         If you see the daily ending balance of your personal

25    account at IBC on August 3rd was $1,830.33, correct?
```

1    A    Yes.

2    Q    That's the day before you transferred $15,000 to

3    yourself.

4    A    Correct.

5    Q    And on August 4th, you had some outgoing activity on

6    your personal account, correct?

7    A    I can't tell that from here.  Maybe.

8    Q    All right.  Let's go to IBC 2042.  If you could zoom

9    into the portion in the middle of the page 6 and

10    (indiscernible), please.

11        Mr. Brass, if you look over in the third set of columns

12    on the right there, do you see the date August 4th?

13    A    Hold on.  It's out of order.

14    Q    It looks like they're putting check number and the

15    dates -- the dates are --

16    A    Just point to which one you want me to look at.

17    Q    On August 4th -- okay.  So third column from the right,

18    Mr. Brass.

19    A    The date column, the third --

20    Q    Yes.

21    A    Okay, yes.

22    Q    Do you see the date, 8/4?

23    A    Yes.

24    Q    Okay.  Check number 3460.

25    A    Yeah.

1    Q    $108.

2    A    Right.

3    Q    Right?  That's $108 going out of your checking account

4    on August 4th, right?  Right?

5    A    Yes.

6    Q    And if you go to Page IBC2043 on the next page, if you

7    could zoom in on the transactions for August 4th.  You see

8    you had an outgoing payment for an incoming wire fee of

9    $12.50, right?

10   A    Yeah.

11   Q    You had an Amex payment of $582.80 on August 4th,

12   correct?

13   A    That's what it says.

14   Q    And that was for your personal Amex, right?

15   A    I don't know.

16   Q    Was it for a GCAC Amex?

17   A    I doubt it.  I just don't know.  I don't remember in

18   August of 2017 what Amex I was paying.  But it could be my

19   personal one.

20   Q    Did GCAC have an Amex in August of 2017?

21   A    Maybe.

22   Q    You don't know for sure?

23   A    I don't remember.

24   Q    Even if you did, would GCAC pay its corporate Amex with

25   personal funds from your account?

```
 1              MS. GOOTT:  (indiscernible).

 2              THE COURT:  I'm going to allow it.

 3    BY MR. BERNICK:

 4    A    Maybe.  From time to time, I did pay things on GCAC's

 5    behalf with personal funds.  I do not know if this was my

 6    personal Amex or a GCAC Amex.  That's the most I can tell

 7    you.

 8    Q    What we do know is that there was an Amex payment on

 9    August 4th, right?

10    A    Yeah.

11    Q    And also on August 4th there was a payment to Smart

12    LLC.

13    A    Yeah.

14    Q    Smart LLC, Smart Tuition.  Do you see that?

15    A    Yeah.

16    Q    In the amount of $6,930.31, correct?

17    A    Correct.

18    Q    You have kids, Mr. Brass, right?

19    A    I do.

20    Q    They were going to private school at this time?

21    A    They were.

22    Q    Kincaid, correct?

23    A    Correct.  Are you stalking me online?

24    Q    Do you recognize that $6,930 transfer as a tuition

25    payment for your kids' private school?
```

1    A    That's most likely what it was, yes.

2    Q    So looking at this, Mr. Brass, on August 3rd you've got

3    roughly $1,800 in your personal account, right?

4    A    Sure.

5    Q    You have over $7,000 of expenses, of outgoing activity

6    that day.

7    A    Okay.

8    Q    Right?

9    A    Yeah.

10   Q    On August 4th, you have the money coming in from GCAC

11   for $15,000, right?

12   A    Yep.

13   Q    But for that -- and that money was used to pay personal

14   expenses on August 4th, correct?

15            THE COURT:  Sustained.

16   BY MR. BERNICK:

17   Q    Mr. Brass you, on August 4th, you had outgoing activity

18   on your personal account of over $7,500.  Yes?

19   A    Correct.

20   Q    The money you sent to yourself from GCAC was used to

21   pay that outgoing activity.

22            THE COURT:  He can answer.

23   BY MR. BERNICK:

24   A    I think to say that it specifically came from those

25   funds is a mixed characterization.  I think that I had a lot

1    of money coming in and going out --

2    Q    Okay.

3    A    And that money definitely came in.  Other money

4    definitely went out.  I don't know that you can draw a line

5    from that dollar to that dollar.  I'm sorry, I talk with my

6    hands.

7    Q    Let's go back to IBC 2042.  If we could zoom in near

8    the bottom.  Electronic activity credit.  You see that, Mr.

9    Brass?

10   A    Yep.

11           MR. BERNICK:  Please zoom in (indiscernible).

12   BY MR. BERNICK:

13   Q    There we see the August 4th incoming wire from GCAC for

14   $15,000, the third one on the page, right?

15   A    Yep.

16   Q    No other wires coming in that day.

17   A    That day.  Two days before, there was another wire

18   coming in.

19   Q    Okay.  We established --

20   A    -- days later, there was another wire coming in.

21   Q    And we established on August 3rd, the ending balance

22   was $1,830.33, right?  What your bank account says.

23   A    Okay.

24           THE COURT:  Overruled.

25   BY MR. BERNICK:

003161

```
1   Q    So the starting balance on 8/4 then would've been

2   $1,830.33, correct?

3   A    Sure.  If that's the math we did, sure.

4   Q    Nothing -- there's no other incoming activity on this

5   account on August 4th, correct?

6   A    As long as that's the only activity, this just seems to

7   be wires, but if there's no other activity, there's no other

8   activity.

9   Q    All right.  Let's go up to the credit section --

10  A    I'm not disputing you.  I'm just saying I don't know

11  exactly what that section says.

12  Q    Well, I want to make sure we get this right, so let's

13  look at the credit section in the middle of the page there,

14  Ms. Mehta.  Right there, yeah.

15  A    That's --

16       MR. BERNICK:  Above that, above that.  That's the

17  debit.

18  BY MR. BERNICK:

19  A    No, I think you're -- no.

20       MR. BERNICK:  Ms. Mehta, if you could zoom in on

21  the deposit section.

22  BY MR. BERNICK:

23  A    Nope.  Got to go down.

24  Q    Right there.  No -- in this section --

25  A    I don't think that's the right section.
```

Page 211

```
 1    Q    Where it says deposits/credits?

 2    A    Think you want electronic activity, don't you?

 3    Q    We just looked at -- we'll look back at that again.  We

 4    just looked at it.  Let's look at this section right now.

 5    Deposits.

 6    A    Okay.

 7    Q    There's no deposit on August 4th in this section,

 8    correct?

 9    A    Correct.

10         MR. BERNICK:  Let's go back down to electronic

11    activity, Ms. Mehta, please.

12    BY MR. BERNICK:

13    Q    You see an incoming wire on August 4th, correct?  We

14    talked about that.

15    A    Correct.

16    Q    No other incoming wires on August 4th.

17    A    Correct.

18    Q    So no other incoming activity on this account except

19    for that wire on August 4th, right?

20    A    Okay.

21    Q    You agree?

22    A    Yeah, that's what it looks like.

23    Q    So the only money that came in August 4th was the loan,

24    the transfer of GCAC's funds to yourself, correct?

25         THE COURT:  Yeah, I'll sustain that objection.
```

1    Why don't you ask it another way.

2    BY MR. BERNICK:

3    Q    The 15 --

4         MR. BERNICK:  Sure.

5    BY MR. BERNICK:

6    Q    On August 4th, we looked at the $15,000 wire on August

7    4th, correct?

8    A    Yes.

9    Q    That was the wire from GCAC to your personal account?

10   A    Yes.

11   Q    That was the only money we've seen on this statement

12   going into the account that day, right?

13   A    Yes.

14   Q    Any reason to dispute that this statement's inaccurate?

15   A    No.

16   Q    Okay.  We've got $7,500 worth of outgoing activity,

17   right?  Correct?

18   A    Yes.

19   Q    We had a starting balance of roughly $1,800, correct?

20        THE COURT:  Go ahead.  I'll overrule.  We can

21   continue to talk about this, if that's what counsel wants.

22   BY MR. BERNICK:

23   Q    Okay.  Let's move on to funds from that $15,000

24   transfer from GCAC, Mr. Brass.  That went to your personal

25   benefit, right?

1   A     It was $15,000 that went from GCAC to my personal

2   checking account.

3   Q     That you used for personal expenses.   Right?

4   A     Sure.

5   Q     Okay.

6          MR. BERNICK:  Ms. Mehta, if we could go to IBC

7   2044, Exhibit 75.  Go to the daily ending balance section.

8   BY MR. BERNICK:

9   Q     Mr. Brass, if you'll look at August 4th, you see the

10  ending balance for August 4th was $9,196.72.  You see that?

11  A     Yes.

12  Q     Okay.  And the next ending balance on this sheet is

13  August 7th, correct?

14  A     Yes.

15  Q     Okay.  No ending -- no activity on August 5th or August

16  6th, right?

17  A     They're two different numbers, so I assume there was

18  some sort of activity in between it, but I don't know what

19  it is from this.

20          MR. BERNICK:  We can go to IBC 2043, Ms. Mehta,

21  please.  And would you please zoom in on the activity for

22  August 7th.

23  BY MR. BERNICK:

24  Q     Mr. Brass, on August 7th, you had outgoing activity on

25  your personal account, correct?

1   A    Yes.

2   Q    A wire fee of $12.50, right?

3   A    Yep.

4   Q    You also paid your water bill of $657.14, correct?

5   A    Correct.

6   Q    On August 7th, you paid a Chase credit card in the

7   amount of $3,000, correct?

8   A    Correct.

9   Q    And you paid an AmEx -- made an AmEx payment in the

10  total of $10,000, right?

11  A    That's what it looks like, yeah.

12  Q    Sum of that outgoing activity on August 7th was over

13  $13,000, right, Mr. Brass?

14  A    Yes.

15  Q    We established that the daily ending balance on August

16  4th, the day before these transactions on August 7th, was

17  $9,000, right?

18  A    I don't -- getting lost in the math, but I'm -- sure.

19  That's right, that's right.

20  Q    August 7th, you transfer another -- you transferred

21  another $15,000 to yourself from GCAC, correct?

22  A    Did we already go over that?  I don't see that here.

23  Q    We can go to electronic -- we can go to 2042.

24          MS. GOOTT:  (indiscernible).

25          THE COURT:  I'm going to allow it.  I'm going to

```
 1   allow it.  Your examination, Counsel.  I'm going to let you.
 2   BY MR. BERNICK:
 3   Q    Mr. Brass, you see in electronic activity on August 7th
 4   that -- the wire from GCAC to your personal account for
 5   $15,000, right?
 6   A    Correct.
 7   Q    Okay.  That money was used for personal expenses?
 8   A    It was transferred from GCAC to my account.  To the
 9   extent there were things that weren't personal expenses that
10   went out of my account, then I guess no.  The extent that
11   everything that went out of my account was for personal
12   expenses, then I guess yes.
13   Q    No reason to dispute that those -- these four outgoing
14   payments on August 7th were personal expenses, right?
15   A    Say that one more time.  No reason to dispute --
16   Q    That the four payments on your personal account that
17   went out on August 7th, these were all personal expenses.
18   Right?
19             THE COURT:  Overruled.  I'll let him conduct his
20   examination.
21   BY MR. BERNICK:
22   A    Yes, I -- those all appear to be personal expenses.
23   Q    Mr. Brass, if we can look at IBC 2043 on August 9th.
24   It says, NSF returned item fee.  You see that, Mr. Brass?
25   A    Yep.
```

1    Q    NSF means not sufficient funds?

2    A    Correct.

3    Q    Do you recognize this to be that your mortgage payment

4    bounced that month?

5    A    I don't recognize that, but maybe something, maybe it

6    was an auto draft that got returned.

7    Q    If we could go down to 8/11 at the bottom of this.

8    There, Mr. Brass, you'll see a payment to Wells Fargo Home

9    Mortgage for $11,103.83.  You see that?

10   A    Yes.

11   Q    So that was the same amount that we just looked at on

12   the NSF payment.

13   A    Yeah.  The only thing I would caveat is it doesn't

14   necessarily mean the check was returned.  It may have been

15   that they notified me and said, hey, this -- you've got this

16   check coming through, cover it from another account or

17   something like that.

18   Q    You got charged a fee for insufficient funds related to

19   that payment, right?

20   A    I got charged a fee, yeah.  Sometimes they would credit

21   those back.

22   Q    And that's for the mortgage on your home in River Oak,

23   right?

24   A    Yes.

25   Q    There was another item returned for insufficient funds

1    in August 2017 on 8/11, right, Mr. Brass?

2    A    Another -- I'm sorry.  Say that one more time.

3    Q    On eight -- on August 11th, there was another item

4    returned for nonsufficient funds.

5    A    I don't know if it was returned.  I was charged a fee.

6    Q    You received a returned item fee for another payment on

7    August 11th, correct?

8    A    That's correct.

9    Q    And it says in the amount of $279,560.38.

10   A    Okay.

11   Q    Right?

12   A    Yep.

13   Q    That's -- that was a payment to Byer Builders, correct?

14   A    Could've been.

15   Q    Any reason to dispute that?

16   A    I don't see it on here.  If it's on here, then that's

17   what it was.  If it isn't, then I have no idea.

18   Q    All right.  Let's look at IBC 1666.  We could zoom in

19   to the top there.  Exhibit 124 at 166.  Mr. Brass, is this a

20   check you wrote to Byer Builders on August 8th, 2017?

21   A    Yes.

22   Q    That's your signature on this check?

23   A    Yeah.

24   Q    That -- the check was in the amount of $279,560.38,

25   correct?

```
 1    A    That's correct.

 2    Q    This was for -- this was related to the building of --

 3    or the construction of your vacation home, correct?

 4    A    Yes.

 5    Q    That's -- and Byer Builders was the building your

 6    vacation home, right?

 7    A    Yes.  Sure.

 8    Q    That's -- and built out at the club at Houston Oaks?

 9    A    That's correct.

10    Q    That's a private club?

11              MR. BERNICK:  Your Honor --

12              THE COURT:  Overruled.  I don't know what the

13    question was, but -- yeah.

14    BY MR. BERNICK:

15    Q    Houston Oaks is a private club, correct?

16    A    Yes.

17    Q    That's where you were building your vacation home.

18              THE COURT:  Overruled.

19    BY MR. BERNICK:

20    Q    And now, not anyone can buy a tract of land at Houston

21    Oaks, right?

22              MS. GOOTT:  Objection.

23              THE COURT:  That one, you took too far.

24              MR. BERNICK:  Okay.

25    BY MR. BERNICK:
```

```
1    Q    You have to be a member at Houston Oaks to buy a tract
2    of land out there, right?
3              MS. GOOTT:  (indiscernible).
4              THE COURT:  He can answer.  Witness can answer if
5    he knows the --
6    BY MR. BERNICK:
7    A    I don't know.  I don't think that's true, but it might
8    be.
9    Q    You signed a construction contract with Byer Builders,
10   correct, Mr. Brass?
11   A    Yes, I did.
12   Q    What was the contract price of your vacation home, if
13   you know.
14             THE COURT:  If he knows.
15   BY MR. BERNICK:
16   A    I don't recall.
17   Q    Did you know at some point?
18   A    Sure when I signed it, I did.
19   Q    Would it help to refresh your recollection to look at
20   the contract?
21             THE COURT:  Just -- I think he just asked him
22   would it help with recall, so I get it.  Let's just keep
23   going.  You can answer the question.
24   BY MR. BERNICK:
25   A    Can you ask the question again?
```

 1            THE COURT:  You probably don't even know which

 2   questions, at this point.

 3            THE WITNESS:  Little lost, but --

 4            THE COURT:  I think that's fair.

 5   BY MR. BERNICK:

 6   Q    Would it refresh --

 7            THE COURT:  Said he doesn't know the price and so

 8   the question is, would he know if he looked at the contract.

 9   I do find it relevant; I just don't know where this goes,

10   but maybe somebody will tie it for me.

11   BY MR. BERNICK:

12   Q    Would it help to look at the contract, Mr. Brass, to

13   know -- to see the contract price?

14   A    The contract ought to have some sort of construction

15   budget on it.

16            MR. BERNICK:  (indiscernible).  Your Honor, may I

17   approach the witness?

18            THE COURT:  Uh huh.

19            MS. GOOTT:  (indiscernible).

20            MR. BERNICK:  Your Honor, I'm --

21            THE COURT:  Go ahead.

22            MS. GOOTT:  (indiscernible).

23            MR. BERNICK:  Your Honor, he testified that he

24   knew at one point.

25            MS. GOOTT:  (indiscernible).

```
1              MR. BERNICK:  He said that looking at the contract
2     would help refresh his recollection.
3              THE COURT:  I'm going to let him look at -- I'm
4     going to let him look at the document, but Counsel I'm going
5     to ask you, you're going to -- at some point, you're going
6     to have to tie this to what this has to do with your claim,
7     what the claim.
8              MR. BERNICK:  Okay.  May I approach the witness,
9     Your Honor?
10             THE COURT:  Sure.  At some point, you're going to
11    have to explain to me how this relates to your client and
12    everything I've heard for the last six hearings.
13    BY MR. BERNICK:
14    Q    Mr. Brass, have you had a chance to review the
15    document?
16    A    No.  Sorry, I didn't know I was supposed to.
17         I reviewed it briefly.
18    Q    Did it help refresh your recollection about the
19    contract price of your vacation home?
20             THE COURT:  Overruled.  We can (indiscernible).
21    BY MR. BERNICK:
22    A    Well, this is not one that we signed.  I don't know if
23    this -- this is signed by, I assume, the builder, right,
24    because it says that in the initials, but I don't know that
25    this is the right --
```

Page 222

```
 1              MS. GOOTT:  (indiscernible).

 2              THE COURT:  I'll sustain your objection.

 3    BY MR. BERNICK:

 4    Q    Mr. Brass, could you go to Brass 21 in the document.

 5    A    Say that one more time?

 6    Q    -- go to Brass 21 in the document.

 7    A    What does that mean?  I'm sorry.

 8    Q    Bates number.  The Bates number.

 9              MS. GOOTT:  (indiscernible).

10    BY MR. BERNICK:

11    Q    Let me just go about this a different way, Mr. Brass.

12              THE COURT:  Thank you, Counsel.

13              MR. BERNICK:  Sure.

14    BY MR. BERNICK:

15    A    Do I give this back?

16              MR. BERNICK:  May I approach --

17              THE COURT:  Yes.

18    BY MR. BERNICK:

19    Q    Thank you.

20    A    No problem.

21    Q    Mr. Brass, your vacation home was a multimillion dollar

22    vacation home, correct?

23              MS. GOOTT:  (indiscernible).

24              THE COURT:  That's not argumentative.  Overruled.

25    BY MR. BERNICK:
```

```
1    A    Yes.  It was over a million dollars.

2    Q    Over $2 million?  Right?

3    A    Probably.  Or at.

4    Q    On August 4th -- well, let's go to the next thing.  So

5    if we -- August 2017, whatever business relationship between

6    -- is going on between GCAC and Vitol is going on in August

7    2017, right?  Let me rephrase that.

8    A    You're jumping around on me and you're --

9               THE COURT:  Well --

10   BY MR. BERNICK:

11   Q    The Vitol-GCAC business relationship was ongoing in

12   August 2017, right?

13   A    Yes.

14   Q    Okay.  GCAC began receiving funds from sales of product

15   under the Vitol-GCAC relationship in August 2017, correct?

16   A    Funds from sales of product?

17   Q    Yes.

18   A    I don't recall when that started.

19   Q    If you go to Exhibit 124 at 51, Debtor 51.  See a

20   deposit into GCAC's asphalt sales account --

21   A    Yep.

22   Q    -- on August 16th, Mr. Brass?

23   A    Yes.

24   Q    In the amount of $1.5 million and some change?

25   A    Yes.
```

1    Q    That's from -- it says wire transfer credit,

2    SemMaterials, Mexico, correct?

3    A    Yep.

4    Q    This was related -- this was proceeds from a

5    transaction under the GCAC-Vitol business relationship,

6    correct, Mr. Brass?

7    A    Yes.

8    Q    All right.  This deposit relates to product that was

9    sold under the Vitol-GCAC business relationship, correct?

10   A    Assumably.

11   Q    Would you turn to Debtor 54 in Exhibit 124?  Zoom in.

12   See a outgoing wire transfer on August 23rd in the amount of

13   $582,737?

14   A    Yes.

15   Q    To Byer Builders?

16   A    Correct.

17   Q    Builder of your personal vacation home, correct?

18   A    Correct.

19   Q    GCAC receives money under the Vitol-GCAC relationship

20   on August 16th, right?

21   A    Whatever that date was.

22   Q    And then the next week, a week later, you direct GCAC

23   to send $582,000 to the builder of your vacation home,

24   correct?

25   A    Okay.

1    Q    Right?

2    A    Yes.

3    Q    Didn't -- you didn't tell Vitol that you did this,

4    right?

5         THE COURT:  Well, let's ask him.

6    BY MR. BERNICK:

7    Q    Did you tell Vitol about this -- did you tell Vitol

8    that you sent $582,000 to your builder?

9    A    Actually, I know that Eric and I discussed the fact

10   that I was building a house out at Houston Oaks, because he

11   was building a house at Bluejack and we would compare notes

12   on that from time to time.  Whether or not I told him

13   specifically, hey, I just sent $582,000 out or not, but it

14   should not have been a secret that I was building the house

15   at Houston Oaks.  I don't think I ever concealed that from

16   him.

17   Q    You didn't tell -- Mr. Brass, did you tell Vitol that a

18   week after receiving proceeds for the sale of product under

19   the GCAC-Vitol business relationship, that you used $582,000

20   of Vitol funds to pay your personal builder?

21   A    I think characterizing it as their -- ask your question

22   one more time.  I'd like to answer it specifically.

23   Q    Sure.

24   A    Please.  Please.

25   Q    Did you tell Vitol that one week after receiving $1.5

1    million in sales proceeds under the Vitol-GCAC relationship

2    that you sent $582,000 from GCAC's account to your personal

3    vacation home builder?

4              THE COURT:  Overruled.

5    BY MR. BERNICK:

6    A    I don't know if I told them about that payment.  The

7    answer is I don't know.

8    Q    Did you tell them you were using sales proceeds from --

9    did you tell Vitol you were using sales proceeds from the

10   Vitol-GCAC relationship to pay your personal expenses?

11             MS. GOOTT:  (indiscernible).

12             THE COURT:  I'll sustain that objection.

13   BY MR. BERNICK:

14   Q    Did you tell GCAC that you were using -- did you tell

15   Vitol that you were using GCAC's corporate account to pay

16   your personal expenses?

17   A    I don't know if I did or didn't.

18   Q    You don't know if you told them that?

19   A    No.  They knew I owned --

20             MS. GOOTT:  (indiscernible).

21             THE COURT:  I'll sustain.

22   BY MR. BERNICK:

23   Q    Don't you think Vitol would've like to know?

24             MS. GOOTT:  Objection.

25             THE COURT:  Sustained.

```
1   BY MR. BERNICK:

2   Q    You never told Vitol in writing that you're using money

3   from your GCAC account for personal funds, right?

4           THE COURT:  Sustained.

5   BY MR. BERNICK:

6   Q    Mr. Brass, is it fair to say any transfers authorized

7   by you from your GCAC corporate account to your personally,

8   that there was never a loan agreement for any of those

9   transfers?

10          THE COURT:  Just asked if it was fair to say.  I

11  think you can answer the question.  I'll overrule.

12  BY MR. BERNICK:

13  A    I'm sorry.  Is the question, is it fair to say that or

14  is the question were there a loan document in place or --

15  Q    Was there a loan agreement for -- let's look at 2017.

16  Was there a loan agreement for any transfer between GCAC's

17  corporate account and your personal account?

18  A    I don't believe so.

19  Q    Was there a promissory note for any transfer between

20  GCAC's corporate account and your personal account?

21  A    I do not believe so.

22  Q    The $1.5 million in sales proceeds that we looked at

23  earlier, you remember that?

24  A    Yes.

25  Q    Those were from the sale of product provided by Vitol,
```

1    correct?

2    A    Those were sales of product from the Vitol joint

3    venture, yes.

4    Q    You didn't remit any portion of those sales proceeds to

5    Vitol, did you?

6    A    On that day?

7    Q    On that day, sure.  We'll start there.

8    A    No, not on that day.

9    Q    Any other time in the month of August?

10   A    I don't remember when we made payments to Vitol.  We

11   did make payments to them.  I don't know whether you say

12   it's for that cargo or another cargo or overall or whatever.

13   I don't know.  I don't think I can answer that.

14   Q    Well, let's look at the bank statements.

15   A    Look at it all you want; it's not going to answer the

16   question you're asking.

17   Q    There's no outgoing transfer to Vitol in this -- from

18   your sales account in August 2017, is there?

19   A    If you scan through it and there's no transfer to

20   Vitol, then there's no transfer to Vitol.

21   Q    If we could pull up Brass 33.  You recognize this

22   document, Mr. Brass?

23   A    There's no date on it.

24        MR. BERNICK:  Scroll through the document forward,

25   please, Ms. Mehta.

1    BY MR. BERNICK:

2    Q    You want us to go to the end, Mr. Brass --

3    A    Yeah, I just want to see the date.

4         MR. BERNICK:  Please scroll to the last page.  Go

5    up.  Page -- two pages before this, please, if you can.  One

6    more page.  One more page.

7    BY MR. BERNICK:

8    Q    You see the date there, Mr. Brass?

9    A    Yes.

10   Q    You recognize this document?

11   A    Yes.  I can't say I've got it memorized, but I

12   recognize what it is.

13   Q    This is the settlement agreement between you, GCAC,

14   Trifinery on one side and Vitol on the other.

15        MS. GOOTT:  (indiscernible).

16        THE COURT:  Yeah.  He can identify it.

17   BY MR. BERNICK:

18   Q    What is the document, Mr. Brass?

19   A    Sorry.  If you go back up to the top, I can read it.

20   It's something, something settlement -- yes.  Second

21   Confidential Settlement Agreement and Mutual Global Release.

22   Q    It's a true and accurate copy of that document?

23   A    I don't know, but I'm assuming if you produce it, that

24   it is.

25        MR. BERNICK:  Your Honor, we move to admit Brass

1    33.

2              THE COURT:  Any objection?  Okay.  Brass 33 is

3    admitted.

4              (Brass Exhibit 33 entered into evidence)

5    BY MR. BERNICK:

6    Q    This is a settlement agreement related to the lawsuit

7    that GCAC filed against Vitol, right?

8    A    Correct.

9              MR. BERNICK:  If we turn to page -- numbered

10   Paragraph 2 on the next page.  You could zoom in on that.

11   BY MR. BERNICK:

12   Q    Says, "The Brass parties recognize and accept that they

13   jointly and severally owe Vitol $10 million related to

14   claims asserted by Vitol against the Brass parties in the

15   lawsuit.  The Brass parties agree to the entry of the agreed

16   final judgment attached as Exhibit A, subject only to

17   Paragraph 5 below."  You see that?

18   A    Yes.

19   Q    The purpose of this agreement was to settle Vitol's

20   claims against you, GCAC, and Trifinery, right?

21             MS. GOOTT:  Objection.  (indiscernible).

22             THE COURT:  He can answer, if he knows what the

23   purpose of the settlement agreement was that he signed.

24   BY MR. BERNICK:

25   A    Ask your question one more time?

003182

1    Q    The purpose of the settlement agreement was to resolve

2    the claims that Vitol asserted against you, GCAC, and

3    Trifinery, correct?

4    A    And our claims against them.

5    Q    And under this agreement, you recognize and accepted

6    that you owed Vitol $10 million along with GCAC and

7    Trifinery, right?

8         MS. GOOTT:  (indiscernible).

9         MR. BERNICK:  Wasn't asking about the intention,

10   Your Honor.  Asked him what he agreed to under the

11   agreement.

12        THE COURT:  I do think it mischaracterizes the

13   testimony, so why don't you ask the question again.

14        MR. BERNICK:  Sure.

15   BY MR. BERNICK:

16   Q    Mr. Brass, under this agreement, you recognized you

17   were jointly and severally liable to Vitol for $10 million,

18   right?

19        THE COURT:  Overruled.

20   BY MR. BERNICK:

21   Q    You recognized that, Mr. Brass?

22        THE COURT:  I overruled.  He can answer.

23        THE WITNESS:  I can answer?

24        THE COURT:  Yes, sir.

25   BY MR. BERNICK:

```
1    A    I'm sorry.  Ask your question again so I can see if I
2    can answer it.
3    Q    Part of this agreement, you, Mr. Brass, recognized that
4    you owe Vitol $10 million, jointly and severally with GCAC
5    and Trifinery, right?
6    A    I would say that part of this agreement was that I
7    agreed that I would owe them $10 million from there forward.
8    I don't know that I would agree that this meant that I had
9    owed them $10 million from prior activity.
10   Q    Looking at Paragraph 2, it says you recognize and
11   accept that they jointly and severally owe Vitol $10 million
12   related to the claims asserted by Vitol in the lawsuit.  You
13   see that?
14   A    Yeah.  I'm just telling you -- I can read it.  You can
15   read it.  What I'm telling you is I don't necessarily think
16   that that means that I owed them $10 million.  It means that
17   I agreed to pay them $10 million, if I could.
18   Q    That's not what it says, though, right?
19          MS. GOOTT:  Objection.  (indiscernible).
20          THE COURT:  No, I'm going to allow it.  He can
21   ask.
22   BY MR. BERNICK:
23   A    Ask again?
24   Q    That's not what the agreement says, though, right?
25   A    I don't know that it doesn't, but I think it says that
```

Page 233

```
 1    I will owe them $10 million.  That's what it says to me.
 2    Q    Not -- doesn't say will owe.  It says owe.  Present
 3    tense.  Right?
 4    A    As of that date.
 5    Q    Related to the claims asserted by Vitol in the lawsuit,
 6    right?
 7    A    Not the way I viewed it.  If that's what it says,
 8    that's what it said.  I'm just telling you what my view of
 9    the agreement is.
10    Q    Mr. Brass, what did you do to prepare for your
11    testimony today?
12    A    I re-read some of my old deposition.
13    Q    Anything else?
14    A    No, not really.
15    Q    What do you mean by not really?
16    A    Not that I can recall.  I talked to my lawyers briefly
17    about it.
18    Q    I don't want to know what you talked to your lawyers
19    about, but -- so review any bank statements in preparation?
20    A    No, I didn't.
21    Q    You review the settlement agreement?
22    A    The one you're showing me right here?
23    Q    Sure.
24    A    No.
25    Q    Did you review the -- any pleadings or filings from the
```

Page 234

1    underlying lawsuit in state court action?

2    A    No, I did not.  I think I read Patrick Perugini's

3    deposition as well at some point.

4    Q    Other than reading your depositions and Mr. Perugini's

5    deposition, what other documents did you review in

6    preparation for today?

7    A    I think that was it.  That's all I can recall.

8         MR. BERNICK:  Go to Vitol Exhibit 22, please.

9    This has been previously admitted.

10        THE COURT:  Can you remind me which document this

11   is?  Vitol --

12        MR. BERNICK:  Sure.  Vitol 22.

13        THE COURT:  Thank you.

14   BY MR. BERNICK:

15   Q    Mr. Brass, let's go to the email at the bottom from

16   Patrick Perugini on October 11th from Mr. Kuo and to you.

17   You see that?

18   A    Yep.

19   Q    Okay.  And looking at deal number one, Mr. Perugini is

20   telling -- Mr. Perugini put the deal in -- like the terms of

21   the deal here, correct?

22   A    Yeah.

23   Q    He's explaining a deal that's already happened.

24   A    That true?  I don't know.

25   Q    Well, let's look at it this way.  In this email, Mr.

1    Perugini's telling Mr. Kuo and you that Vitol's going to be

2    the seller and GCAC's going to be the buyer.  Right?

3              THE COURT:  Overruled.

4    BY MR. BERNICK:

5    A    This is October?

6    Q    Yes.  In this email, Mr. Perugini is telling --

7    A    I'm sorry, I'm just reading it.

8    Q    -- Mr. Kuo and you -- let me just clean up the record

9    real quick.  We're talking over.  We're talking over --

10   A    All right.  Am I supposed to talk or are you supposed

11   to talk?

12   Q    I blame myself, Mr. Brass.

13   A    Okay.

14   Q    This email dated October 11th, Mr. Perugini is telling

15   Eric Kuo and they're telling you that Vitol's going to be

16   the seller and GCAC is going to be the buyer.  Right?

17   A    Yes, that's what he's recapping in this.

18   Q    And he's recapping that Vitol is going to sell to GCAC

19   at a certain price and a certain volume.  Right?

20   A    Yes.

21   Q    And if we scroll down the page, you see that GCAC, Mr.

22   Perugini is tell you and Mr. Kuo that GCAC is then going to

23   sell to Gunvor, right?

24   A    Okay.

25   Q    Right?

003187

1   A    Yep.

2   Q    Mr. Perugini is telling Vitol, Vitol you're going to

3   sell to GCAC and then GCAC's going to sell to Gunvor, right?

4   A    That's correct.

5   Q    Okay.  Mr. Perugini is telling Vitol what the terms of

6   the deal were.

7   A    No.  I do not agree necessarily with that.  A lot of

8   times, these recaps will come out.  Traders will have

9   discussed this, already done it.  He might have told Eric

10  about this and already been in agreement with it and then he

11  kind of sends this out afterwards.  So to say that he was

12  dictating terms to Eric or that Eric hadn't known about this

13  or agreed about -- with this or asked him to put it in a

14  certain way, I do not necessarily agree with that, just to

15  be clear.

16  Q    Have you been listening to the trial since it started,

17  Mr. Brass?

18  A    No.

19  Q    Have you listened to any of the testimony aside from

20  today?

21  A    No.

22  Q    Okay.  You're not aware of any document showing Mr.

23  Perugini and Mr. Kuo discussing and negotiating the terms of

24  this deal, are you?

25  A    I'm not aware that there are or aren't.

1   Q    You're not aware of any documents related to that?

2   A    No.  I mean, maybe his text chain has something.  I

3   don't know.

4   Q    You don't know.  Okay.

5   A    I don't know.  What I will say is I think it would be -

6   -

7              MS. GOOTT:  (indiscernible).

8              THE WITNESS:  Sorry.

9              THE COURT:  Sustained.

10             THE WITNESS:  Apologies.

11  BY MR. BERNICK:

12  Q    Mr. Brass, the deals that Mr. Perugini put forth in his

13  email, those terms had been agreed to by the time he sent

14  this email, right?

15             MS. GOOTT:  (indiscernible).

16             THE COURT:  He can answer if he knows.

17  BY MR. BERNICK:

18  A    Tell me who specifically you're saying the deals were

19  agree to --

20  Q    Sure.  Did Vitol -- Mr. Perugini's telling you and Mr.

21  Kuo that GCAC is going to sell to Gunvor, correct?

22  A    Or had.

23  Q    Or had.  Right, and telling you what the -- telling Mr.

24  Kuo what the volumes are going to be.  Right?

25  A    He's recapped.  We call it a recap.

Page 238

```
 1    Q    Recap means after the fact, right?

 2    A    Yeah.

 3    Q    Okay.  So let's go to the top.  Mr. Kuo responds, "Need

 4    to hedge the fixed price," right?  That's what he says?

 5    A    Yes.  That's what he says.

 6    Q    And then Mr. Perugini responds, "Correct."  Right?

 7    A    Yep.

 8    Q    No objection -- there's no objection in this email to

 9    Mr. Kuo hedging at the fixed price?

10    A    Not in this email.

11    Q    All right, and you don't have any documents showing

12    that GCAC objected to Vitol hedging this transaction?

13    A    This transaction, no, I don't think so.  Not that I

14    know of.

15         MR. BERNICK:  We're going to -- if we pull up

16    exhibit -- Vitol Exhibit 20.  And maybe scroll through it

17    for the witness, please.

18    BY MR. BERNICK:

19    Q    Do you recognize this document, Mr. Brass?

20    A    I don't recognize, but it looks like a contract.  I

21    didn't see who the counterparties were, but it looks like a

22    contract with Chevron.

23    Q    And you're a recipient of -- on this email chain -- on

24    this document, correct?

25    A    Yes.
```

```
 1   Q    Is it true and accurate --

 2   A    This is all one chain, is what you're telling me?

 3   Q    Yes.

 4   A    Then yes.

 5   Q    True and accurate --

 6             MS. GOOTT:  (indiscernible).

 7             THE COURT:  Overruled.

 8   BY MR. BERNICK:

 9   Q    This is true and correct copy of this document, Mr.

10   Brass?

11   A    I don't know.

12   Q    Any reason to dispute the accuracy of it?

13             THE COURT:  Overruled.

14   BY MR. BERNICK:

15   A    No, not from what I've scanned.

16             MR. BERNICK:  Your Honor, move to admit Vitol

17   Exhibit 20.

18             THE COURT:  What's the -- want to make sure.

19   Vitol 20?

20             MR. BERNICK:  Vitol 20.

21             THE COURT:  Okay.  Any objection?

22             MS. GOOTT:  (indiscernible).

23             THE COURT:  Counsel, what's your response?

24             MR. BERNICK:  I don't think that's what he's

25   testified to.  This -- I don't think he testified that he
```

```
 1   recognized a certain page in this document.

 2              THE COURT:  Ms. Mehta, can you make this larger?

 3   What are you saying exactly to, Ms. Goott?  I just want to

 4   make sure I'm following you.  I just want clarification.

 5              MS. GOOTT:  He did not lay a foundation.  We do

 6   not object to the first page of this exhibit.

 7   (indiscernible) specifically asked him (indiscernible) is

 8   that he did not recognize that document.

 9              THE COURT:  Okay.

10              MR. BERNICK:  He also said he recognized it as a

11   contract with Chevron.

12              MS. GOOTT:  (indiscernible).

13              THE COURT:  I agree.

14   BY MR. BERNICK:

15   Q    Mr. Brass, you're a recipient on all of these

16   communications, correct?

17              THE COURT:  Overruled.

18   BY MR. BERNICK:

19   A    Which ones are you talking about?

20   Q    All of the emails in the document we're looking at,

21   Vitol Exhibit 20.

22   A    Sorry, I'm confused.  I see that I was a recipient of

23   this one and I was a recipient of --

24   Q    Which one?  Which one?

25   A    The middle one.  And I saw I was a recipient of this
```

Page 241

```
 1    one from Patrick Perugini on September 22nd at 4:34.
 2              MR. BERNICK:  If we could scroll to the top,
 3    please.
 4    BY MR. BERNICK:
 5    Q    You see in the two lines that you're a recipient of the
 6    email from September 25th to Mr. Kuo?
 7    A    Yes.
 8    Q    Okay.  So you're a recipient on all three emails in
 9    this chain, correct?
10    A    Correct.
11    Q    Okay.  Any reason to dispute the accuracy of this
12    document?
13              MS. GOOTT:  Objection.
14              THE COURT:  Well, that was going to be my
15    question.
16              MR. BERNICK:  If you could scroll down, Ms. Mehta,
17    please.  Keep scrolling.  Keep scrolling.  Your Honor, we're
18    not arguing there's an attachment to this.  There's no --
19    this is how it produced to us.  We're not --
20              THE COURT:  No, no.  I got -- you're saying, I
21    don't know if this is an attachment to an email or if it's a
22    separate document, with a Bates label, a sequential Bates
23    label.  That's the only question I've got, so I don't know
24    if you're trying to admit one document or two documents.
25              MR. BERNICK:  (indiscernible), please, Ms. Mehta.
```

```
 1    Scroll it, please.  The bottom of 5443, says, "Important.
 2    This email including all attachments is confidential."
 3              MS. GOOTT:  (indiscernible).
 4              THE COURT:  I know.  I'm just t6rying to get an
 5    answer to my question.  Is this --
 6              MR. BERNICK:  There's no attachment, Your Honor.
 7    This is just one email string.
 8              THE COURT:  Well, I think he's laid a proper
 9    foundation for it, and quite frankly, it's an admission
10    against interest, but --
11              MS. GOOTT:  (indiscernible).
12              THE COURT:  I don't dispute that at all.  I don't
13    dispute that at all.  What are you asking me to do, Counsel?
14    I got your objection.  I'm asking for the response.
15              MR. BERNICK:  Your Honor, I'm moving to admit
16    this.  Moving to admit Vitol 20 into evidence.  Mr. Brass is
17    on all the emails.  He's said that --
18              THE COURT:  But that's -- he's on all the emails.
19    I got it.  His -- how do I know this is an attachment to
20    that email?
21              MR. BERNICK:  How do you know it's not?
22              THE COURT:  Yeah.  I don't -- really, when you see
23    emails, you see attachments or, like, something that shows
24    that there's an attachment to it.  I don't see that here.
25    Maybe you can point it to me.  Maybe you can --
```

1             MR. BERNICK:  Your Honor, we're not saying there's

2     an attachment.  I'm not saying there's an attachment.

3             THE COURT:  I thought you said it was attached to

4     the email.

5             MR. BERNICK:  No, no.  I'm saying it's a string.

6             THE COURT:  I'm confused.

7             MR. BERNICK:  I think if you go to the first page.

8             THE COURT:  You're saying this is part of the same

9     email?

10            MR. BERNICK:  Yes.  If you go to bottom of Page 1,

11    you see there's an email from Patrick Perugini to Mr. Kuo

12    and --

13            THE COURT:  This is the continuation of that

14    email?

15            MR. BERNICK:  Your Honor --

16    BY MR. BERNICK:

17    Q    Mr. Brass, you see where it says deal one at the bottom

18    of 5439?

19    A    Am I allowed to answer?  I don't --

20            THE COURT:  No -- yes, Mr. Brass, you can answer

21    that question.

22    BY MR. BERNICK:

23    A    I see where you highlighted deal number one.

24    Q    Mr. Brass, do you see anything indicating there's an

25    attachment to this document?

1    A    I don't even know where I would see that.

2         MR. BERNICK:  Your Honor, we move to admit the

3    document.  We move to admit Exhibit 20.

4         MS. GOOTT:  (indiscernible).

5         THE COURT:  No, he's copied on the email.  You're

6    not recognizing.  Nobody's copied on it.  I'm going to admit

7    it for the purpose -- we'll admit it.  I think there's a

8    sufficient foundation that he's received that email.  I just

9    couldn't tell whether that was an attachment or an email or

10   a continuation of the email on that date, so he clarified

11   that.

12         (Vitol Exhibit 20 entered into evidence)

13         MR. BERNICK:  Let's go to the earliest email in

14   the chain, October 11th.  I'm sorry.  (indiscernible).  Go

15   to exhibit -- I mean, stay on exhibit.  If we go to the

16   earliest email in the chain, September 25th.  Scroll down

17   more, please.

18   BY MR. BERNICK:

19   Q    Mr. Brass, Mr. Perugini is -- sends you an email on

20   September 22nd, and Mr. Kuo, subject, "Two deals out of Rio

21   inventory."  Do you see that?

22   A    Yes.

23   Q    This email alert reflects that GCAC is selling product

24   to Gunvor SA, right?

25         THE COURT:  Sustained.

Page  245

```
 1    BY MR. BERNICK:

 2    Q    Mr. Brass, Mr. Perugini puts -- recaps two deals in

 3    this email, correct?

 4    A    I'm --

 5    Q    We can scroll down if we need to.

 6    A    This looks like more than a recap.  I don't know what

 7    this is.

 8    Q    You see there where it says deal number two, Mr. Brass?

 9    A    Yep.

10    Q    And it says seller, Gulf Coast Asphalt Company, buyer,

11    Chevron Products Company.  Right?

12    A    Okay.

13    Q    And above that, says, "Please see below deal recap

14    discussed between our companies and kindly revert with your

15    confirmation by tomorrow at -- by tomorrow latest."

16    Correct?

17    A    Okay.

18    Q    Okay, so Mr. Perugini's characterizing this as a deal

19    recap.  Right?

20    A    Yeah.  I guess he's asking for approval or something.

21    Q    Scroll up.  Well -- it doesn't say he's asking for

22    approval in this email, does it?

23              MS. GOOTT:  Objection.

24              THE COURT:  Overruled.

25    BY MR. BERNICK:
```

003197

```
 1    A    I -- to me, when I read it, it says revert with your

 2    confirmation, that's asking for approval.  Maybe he wasn't.

 3    I don't know.

 4    Q    You don't know.

 5    A    I'm just reading what you put in front of me.

 6    Q    Okay.  There's nothing where he's saying, I need -- you

 7    know, there's nothing really saying, Mr. Brass I need

 8    approval on this, is there?

 9    A    Mr. Brass?

10    Q    Mm hmm.

11    A    I'm sorry.  I'm really confused as to who these emails

12    are between now and --

13    Q    Okay.

14    A    -- what is.  Can you go back up to the top?

15    Q    Let's scroll back up to the bottom of the first page.

16    Email from Mr. Perugini to Mr. Kuo, to you, and to others on

17    Friday, September 22nd.

18    A    To me -- when I read it, from what you've shown me, it

19    looks like he's asking Eric's approval to do the deal.

20    That's all I can tell you.

21    Q    It doesn't say -- the email doesn't say anything about

22    -- doesn't use the word approval at all, does it, Mr. Brass?

23    A    In our industry, when you say please confirm, that's

24    like asking for approval, in my experience.  Maybe he was

25    saying something different.  All I can do is read the email
```

1    and tell you what it means to me.

2    Q    Right.  But Mr. Perugini says, two deals.  Right?

3    A    Yes.

4    Q    Then he says, "We will have to buy the plats,

5    (indiscernible), and sell Brent for appropriate Monday."

6    Correct?

7    A    Okay.

8    Q    Right?

9    A    Yep.

10   Q    Okay.  And then if we go -- so he's telling -- Mr.

11   Perugini's telling Mr. Kuo, you, the other recipients of the

12   email, we're going to have to buy Brent to hedge on Monday

13   for these two deals.

14            MS. GOOTT:  (indiscernible).

15            THE COURT:  I'm going to sustain that objection.

16   I -- the document speaks for itself, Counsel.

17            MR. BERNICK:  All right.  If we can scroll up to

18   the top, then.  All right, let's stop in the middle email

19   there.

20   BY MR. BERNICK:

21   Q    Mr. Perugini sends another email Monday to Mr. Kuo

22   saying, "Eric, reminder.  Remember we have to buy some Brent

23   cracks today.  Thanks."  Right?

24   A    Yep.

25   Q    And Mr. Perugini is telling Vitol that they need to buy

1    Brent cracks, right?

2    A    Yes --

3    Q    That's a hedging instrument for asphalt?

4         THE COURT:  Why don't you ask him what Brent crack

5    are?

6    BY MR. BERNICK:

7    Q    What are brent cracks, Mr. Brass?

8    A    So my recollection is that this was a sale that was

9    done related to the price of Brent and Brent is a

10   discorrelated commodity from fuel oil and so since Eric

11   wanted to keep the book in fuel oil, then he had to hedge

12   the differential between Brent and fuel oil, so that's what

13   the -- I believe that's what the Brent cracks they're

14   speaking of here would be.

15   Q    The Brent cracks would've been used for hedging, right?

16   A    Well, maybe this is too much of an industry nuance, but

17   I think the Brent cracks would've been used to adjust the

18   pricing to something that was more normative to asphalt.  So

19   I think that's what he was doing.

20   Q    The pricing of fuel oil or --

21   A    Brent.

22   Q    -- something else?

23   A    Brent.  So if you look at the contract, my guess is

24   it's priced in Brent and that he's converting it to fuel

25   oil, effectively.

Page  249

1    Q    And then we see in the first email on the page, at the

2    top Mr. Kuo responds same day, Monday, September 25th saying

3    "Bought 140KB of November HS crack," and then lists the

4    hedges, right?

5    A    Mm hmm.

6    Q    That's what it says?

7    A    Yeah.

8    Q    And Mr. Perugini told Mr. Kuo to buy Brent crack.  Mr.

9    Kuo says he did it.  Right?

10         MS. GOOTT:  Objection.

11         THE COURT:  Overruled.  He can answer.

12   BY MR. BERNICK:

13   A    I -- scroll down just a little?  I think what he's

14   doing is reminding Eric that we had a Brent -- sorry.  I

15   don't remember your question.  I'm lost in all this.

16   Q    Mr. Perugini is telling Mr. Kuo on Monday, September

17   25th, we have to buy some Brent crack today.  That's what he

18   says, right?

19   A    Yes.

20   Q    And then that same day, Eric responds that he bought

21   it.

22   A    Correct.

23   Q    All right.

24         MR. BERNICK:  Excuse me, Your Honor.  Sorry.

25         THE WITNESS:  No problem --

1          THE COURT:  Take your time.  Yes, sir.

2          MR. COOLEY:  Just ask for a quick comfort break?

3          THE COURT:  Quick --

4          MR. COOLEY:  Comfort break.

5          THE COURT:  Yes, absolutely.  Counsel, we've got

6    about -- we have a hard stop at six and we're going to use

7    it -- how much --

8          MR. BERNICK:  I mean, I've got a lot more, Your

9    Honor, but --

10         THE COURT:  Does now make sense, then --

11         MR. BERNICK:  Yeah, we can break.

12         THE COURT:  Does it make sense to now break?

13   Because obviously --

14         MR. BERNICK:  I'm in between exhibits and

15   everything, so --

16         THE COURT:  Okay.  So maybe now is a good time.  I

17   know that there are some potential other dates.  Think about

18   the -- well, let me have my -- going to have my case manager

19   reach out to everybody.  Maybe we can kind of get another

20   date.  See if Wednesday the 28th would work to kind of

21   complete it and I want to make sure that date works.

22         Mr. Brass, thank you for today.  I'm going to

23   remind you that you are still under oath.  I'm going to ask

24   that you not discuss your testimony with anyone and we will

25   see -- hopefully -- Ms. Saldana's going to reach out to

1    folks either today or tomorrow and just -- so we can nail

2    down a date that will work and then we'll continue with the

3    examination.

4         Mr. Cooley?

5         MR. COOLEY:  I was just going to say, the Court

6    had previously suggested the 21st.  Is that what --

7         THE COURT:  Not the 21st.  I'm out of town on the

8    21st.  I think I said -- well, and if I did, I said it

9    wrong.  I think I said the 28th.  Oh, I did say the 21st

10   maybe.  Maybe the 21st.  Maybe the 21st, maybe the 28th.  I

11   got a -- I'll let Ms. Saldana reach out to all you all and

12   confirm a date and we can all do it, but I'll be ready to

13   do.  If it's the 21st, it'll be in the afternoon, if we can

14   continue to work on that date.  Not, we'll do the 28th.

15        Ms. Goott?

16        MS. GOOTT:  (indiscernible).

17        THE COURT:  Yep.  Yep.

18        MS. GOOTT:  (indiscernible).

19        THE COURT:  Okay.  Let's go to -- let's do the

20   21st and then we'll pick another date.

21        MS. GOOTT:  (indiscernible).

22        THE COURT:  So --

23        MS. GOOTT:  (indiscernible).

24        THE COURT:  Maybe first thing is to just think

25   about dates.  I'll have Ms. Saldana kind of put together a

1    slate of dates and then maybe we can kind of work from

2    there.  And if we can get it done in Houston, maybe it makes

3    the most sense to do that just for travel in and out and

4    convenient.

5          Mr. Brass, I am not going to hold your bladder any

6    more.  I appreciate it.  You all have a good weekend.  Thank

7    you.

8          Mr. Patterson?

9          MR. PATTERSON:  (indiscernible).

10         THE COURT:  It's his fault.

11         MR. PATTERSON:  (indiscernible).

12         THE COURT:  Yes, I meant -- yes.  I appreciate the

13   clarification.

14         MR. PATTERSON:  (indiscernible).

15         THE COURT:  Yes.  That's the clarification.  I

16   appreciate it.  Yes, you can speak to your lawyers.  Wanted

17   to make sure that I meant third parties, so -- yes.

18   Anything else?  All right, folks.  And you're free to keep

19   it here.  Just organize it nicely.  Thank you.

20         CLERK:  All rise.

21      (Proceedings adjourned at 5:51 p.m.)

22

23

24

25

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 22, 2022
```

003205

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3   Arthur Jacob Brass,             )
                                     )CASE NO. 21-60025
 4              Debtor.              )
     ------------------------------)
 5   Vitol Inc.,                     )CASE NO: 21-06006
                                     )ADVERSARY
 6              Plaintiff,           )
                                     )Houston, Texas
 7       Vs.                          )
                                     )Wednesday, September 22, 2022
 8   Arthur Jacob Brass,             )
                                     )1:16 P.M. to 5:28 P.M.
 9              Defendant.           )
     ------------------------------)
10
                               TRIAL
11           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                   UNITED STATES BANKRUPTCY JUDGE
12

13   APPEARANCES:
     For Plaintiffs:          MICHAEL P. COOLEY
14                            MICHAEL HALLEY BERNICK
                              Reed Smith, LLP
15                            2501 N. Harwood, Suite 1700
                              Dallas, TX 75201
16
     For Defendant:           MIRIAM GOOTT
17                            JOHNIE J. PATTERSON
                              Walker & Patterson, PC
18                            P.O. Box 61301
                              Houston, TX 77208
19
     Court Reporter:          ZILDE MARTINEZ
20
     Courtroom Deputy:        ZILDE MARTINEZ
21
     Transcribed by:          Veritext Legal Solutions
22                            330 Old Country Road, Suite 300
                              Mineola, NY 11501
23                            Tel: 800-727-6396

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

```
 1                              INDEX

 2   PLAINTIFFS' WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

 3

 4

 5

 6   DEFENDANT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

 7   Arthur Jacob Brass                   8

 8

 9   PLAINTIFFS' EXHIBITS                          RECEIVED

10   Vitol Exhibit 100                             17

11   Vitol Exhibit 54                              21

12   Vitol Exhibit 21                              25

13   Vitol Exhibit 83                              68

14   Vitol Exhibit 89                              69

15   Vitol Exhibit 4                               73

16   Vitol Exhibit 28                              81

17   Vitol Exhibit 35                              87

18   Vitol Exhibit 47                              88

19   Vitol Exhibit 51                              91

20

21   DEFENDANT'S EXHIBITS                          RECEIVED

22

23

24

25
```

Page 3

```
1    HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 22, 2022; 1:16 P.M.

2              THE COURT:  All righty, folks.  Let me turn to

3    Vitol v. Brass.  Why don't I take appearances in the

4    courtroom?  Or I should note, maybe Vitol -- I can note that

5    counsel for Vitol is here.  Counsel for Brass is here.

6    We're going to continue the cross examination of Mr. Brass.

7    Unless there's any housekeeping, I'd say we get right to it.

8              MR. COOLEY:  I was just going to take a moment to

9    give the court sort of a little bit of an update on the road

10   map --

11             THE COURT:  Okay.

12             MR. COOLEY:  So that the Court knows --

13             THE COURT:  all righty.

14             MR. COOLEY:  -- where we're headed because that's

15   exactly where we're headed next, is to continue with the

16   examination of Mr. Brass, which we're hopeful will be

17   completed today.  To the extent there's time left remaining

18   today, we thought today might be an appropriate time to come

19   back to the Tomaszewski deposition and that matter by which

20   we were seeking the admission of one of the documents based

21   on that deposition testimony.  I don't know if the Court is

22   prepared to deal with that yet.

23             THE COURT:  I'm going to tell you, I'm not.  I

24   apologize.  I had a kind of a really extensive set of

25   hearings that I -- just consumed my time but I'm turning to
```

Page 4

1    it this weekend like Saturday, Sunday.  I'm going to focus

2    on it hard and so I'll be ready to -- the next time we meet

3    I'll be ready to talk about it at detail.  I would have gone

4    through the entire deposition, made rulings on it, and got

5    it there.  But I understand why you need one.

6         MR. COOLEY:  That's fine, Your Honor.  Obviously,

7    we've seen the news reports, I think I got a pretty good

8    idea what's been keeping you busy, at least in part.  With -

9    -

10        THE COURT:  Don't tell me if it's good or bad.

11        MR. COOLEY:  I make the observation and I move on.

12        THE COURT:  Okay.

13        MR. COOLEY:  Also, Your Honor, I wanted to let the

14   Court know with respect to Mr. Ruzek whom we had mentioned

15   at the last hearing as being a potential witness we would

16   call.  He was identified in our supplemental disclosures,

17   but as we've continued to go back through the evidence thus

18   far and ways in which we can try and streamline this while

19   still getting the evidence we think we need, we believe at

20   this time, we do not need to call him and so that's time we

21   should be able to give back to the Court.

22        And then finally, I'm pleased to report with

23   respect to Mr. Dietz that -- who had the knee issue, he had

24   a pretty deep and sizable steroid injection I think earlier

25   this week for his knee.  It appears that surgery will not be

Page 5

1    necessary, at least not between now and the 28th, so he is

2    good for travel and we expect to have him here as we

3    previously discussed with the Court to get his examination

4    done on the 28th, which should wrap things up from our

5    perspective, subject to the lingering issue of Tomaszewski.

6            THE COURT:  I'll be ready by then.

7            MR. COOLEY:  Yeah, of course.  And then the one

8    other lingering issue that we have -- two things.  One, I

9    can put a button in, put a pin in.  The Court had asked us

10    if we needed a ruling on Mr. Murray, a written document.  We

11    don't, Your Honor.  We understand the ruling.  I meant to

12    mention that previously.  The Court can cross that off its

13    list.

14            And then the one other thing, and I'd like to do

15    it now, if possible, because it will be relevant to the

16    continued examination of Mr. Brass, is readdress the

17    question of the admission of what we had previously called

18    the Chubb jewelry rider, which was approximately 30 or so

19    pages in the larger Chubb documents.  The Court will recall

20    we had a witness and counsel stipulated on a limited basis

21    to authenticity, which allowed us to excuse the business

22    record custodian.  There were some other, I think, lingering

23    objections that counsel had that we can address, but I'd

24    like to see if we can address that so that if we're going to

25    get that document into evidence, we can get that done so

1    that we can -- because I do anticipate questions about --

2    questions to Mr. Brass regarding that document.

3              THE COURT:  Okay.

4              MR. COOLEY:  And I can refresh the Court.  I'll

5    pause there in case counsel has any housekeeping or general

6    updates, and if the Court is willing to entertain the Chubb

7    document, I'd like to quickly do that or will proceed as the

8    Court instructs.

9              THE COURT:  Okay.  Ms. Goott, any housekeeping?

10   Okay.  I think we just put him on and see where it goes and

11   if you want to bring something up, then we'll take the --

12   we'll take any objections up as they come along.  I just --

13   I'd rather just take them up.  Put Mr. Brass up and continue

14   the examination and we'll go from there.  Okay?

15             MR. COOLEY:  Very well, Your Honor.  That's how

16   we'll proceed.

17             THE COURT:  All right.  Let's just -- Mr. Brass,

18   give us a second.  We're going to turn the camera on in the

19   -- the just give me a second.  Counsel, in terms of timing,

20   how much time do you think you're --

21             MR. BERNICK:  Your Honor, I think --

22             THE COURT:  I won't hold you to it, I just --

23             MR. BERNICK:  Sure, sure.

24             THE COURT:  Just trying to get a sense of today.

25             MR. BERNICK:  I'm projecting about four hours, but

```
 1   hopefully -- we'll see how quickly or how long it takes.

 2              THE COURT:  Okay.

 3              AUTOMATED VOICE:  Conference muted.

 4              THE COURT:  Yeah.  Yeah.  You can get him up here.

 5   You can get him in.

 6              MR. COOLEY:  Your Honor, I would just not, the

 7   Court may recall Mr. Dietz lives in New York and has

 8   traveled back and forth, which is why the Court had

 9   previously indicated we would pick a date certain from him.

10              THE COURT:  Yeah.

11              MR. COOLEY:  Counsel's right.  We did have an

12   email exchange about this yesterday evening.  Obviously --

13   think anything could have been done at that point, even if

14   we wanted.

15              THE COURT:  What -- that's right, I remember that.

16   What's the -- is the 28th -- are folks ready to do that on

17   the 28th?  I think there were some scheduling issues that I

18   -- someone brought up.

19              MR. COOLEY:  We have our calendar marked, 1 to 9

20   p. m. on the 28th, if that still works for the Court.

21              THE COURT:  I just want to make sure.  I think

22   there were some issues on the 28th.  There was something

23   that came up and I can't remember what it was and I was --

24              Are you sure?  Okay.  Okay.  No, no, I just want

25   to make sure.  All right.  We'll get him up here on the 28th
```

1    and we'll -- we're going to finish with Brass today.  We

2    have to because I'm on a 6 a.m. flight because I haven't

3    learned my lesson about traveling with Judge Isgur who

4    booked our flight, so -- all right.  Just give me a second.

5            Mr. Brass, why don't you come on up?  And Ms.

6    Mehta, do you need -- all righty.  Mr. Brass.  I'm just

7    going to remind you that you're still under oath, sir.

8            THE WITNESS:  Yes, sir.

9            THE COURT:  Okay.  Before you begin, Ms. Mehta, I

10   don't see you -- there you are.  All right.  Counsel, you

11   may proceed.

12           MR. BERNICK:  Ms. Mehta, if we could please pull

13   up Vitol Exhibit 81 at EEPB 174.

14            CONTINUED CROSS-EXAMINATION OF ARTHUR JACOB BRASS

15   BY MR. BERNICK:

16   Q    Good afternoon, Mr. Brass.  Do you recognize the

17   document in front of you as GCAC's consolidated balance

18   sheet as of December 31st, 2017?

19   A    I can read that's what it says at the top.

20   Q    Let's -- if we can go to the second column titled GCAC

21   Holdings LLC.  Do you see that?

22   A    Yes.

23   Q    Okay.  This an entity you're familiar with Mr. Brass?

24   A    I don't recall what GCAC Holdings LLC is.  It may be

25   part of the corporate structure but I -- no, I'm actually

1    not familiar with it.  I don't remember what purpose, maybe

2    some historical entity that's in the corporate structure but

3    I don't remember what it is or what function it has.

4    Q    Fair to say, you don't recall it being in business in

5    2017?  Fair?

6    A    I don't recall.

7    Q    Okay.  Either way, you don't know what GCAC Holdings is

8    or what it does or what its business was, correct?

9    A    I don't know if they'd ever had -- I don't know what it

10   is.

11            MR. BERNICK:  So if we scroll down, Ms. Mehta, to

12   there, what's Row 48 where it says long term debt, member

13   shareholder loan.

14            THE COURT:  Counsel, can you remind me the

15   document --

16            MR. BERNICK:  Yes, Your Honor.  It's exhibit --

17   Vitol Exhibit 81.

18            THE COURT:  Thank you.

19            MR. BERNICK:  At EEPB

20            THE COURT:  Okay.

21   BY MR. BERNICK:

22   Q    Mr. Brass, do you see in the, in the second column

23   there there's a member shareholder loan listed as a

24   liability of GCAC Holdings LLC for $4.1 million.

25   A    I see that, yes.

```
 1              MR. BERNICK:  And if we scroll back up, Ms. Mehta,

 2    to --

 3    BY MR. BERNICK:

 4    Q    If you look on the first column here, which is related

 5    to Gulf Coast Asphalt Company; you see that, Mr. Brass?

 6    A    Yep.

 7    Q    Okay, and we see under other assets, there's a line

 8    item for investments loan GCAC Holdings in the same $4.1

 9    million amount that we just looked at, right?

10    A    Yes.

11    Q    GCAC had -- GCAC, Gulf Coast Asphalt Company had no

12    expectation of ever collecting on that loan in 2017,

13    correct?

14              THE COURT:  Sustained.

15    BY MR. BERNICK:

16    Q    Did GCAC even know of this loan?

17              THE COURT:  I'll overrule that.  Overruled.  He

18    can answer.

19    BY MR. BERNICK:

20    A    I don't know if GCAC knew about it or not.  I'm not --

21    like I said, I don't recall where GCAC Holdings fit into the

22    corporate structure.

23    Q    You don't recall GCAC ever trying to collect on this

24    loan?

25    A    Like I said, I don't recall how GCAC Holdings fit into
```

 1    the corporate structure.  I can't answer your question.  I

 2    don't know.  I didn't put the spreadsheet together.  I just

 3    don't remember.

 4    Q    Okay.  But you were the president of the GCAC, right?

 5    A    I was.

 6    Q    Okay, so you don't recall at any point you, as

 7    president of GCAC trying to collect on a $4.1 million loan

 8    from GCAC Holdings LLC; is that fair?

 9         THE COURT:  Overruled.  He can answer if he knows.

10    BY MR. BERNICK:

11    A    I don't recall.  This could be a bookkeeping entry.  I

12    don't know.

13    Q    Are you familiar with the entity Gulf Crude Gathering

14    that's in the third column, Mr. Brass?

15    A    I am.

16    Q    You are?  Fair to say that Gulf Crude Gathering wasn't

17    doing any business in 2017; is that fair?

18    A    Yes.

19    Q    And according to the -- to Exhibit 81 Golf Crude

20    Gathering only had $168 of assets in 2017,  right?

21    A    That's what it says.

22    Q    Mr. Brass, last week, do you recall us discussing that

23    the GCAC-Vitol relationship existed between July 2017 and

24    early January 2018; is that fair -- is that a fair recap of

25    what we talked about last week?

Page 12

```
 1   A    Yes.

 2   Q    Okay.  So if we're looking at December -- if we're

 3   looking at GCAC's balance sheet as of December 31, 2017.

 4            MR. BERNICK:  Ms. Mehta, can we scroll down?

 5   BY MR. BERNICK:

 6   Q    Mr. Brass, in Line 41 under liabilities and equity and

 7   current liabilities, you see the line item accounts payable,

 8   contingent liability in amount of $14,866,973?

 9   A    I do.

10   Q    And that line item, that account payable line item,

11   that relates to the GCAC-Vitol business relationship, right?

12            THE COURT:  Sustained.

13   BY MR. BERNICK:

14   Q    Mr. Brass, you've reviewed GCAC's financial statements

15   from time to time?

16   A    From time to time.

17   Q    You're the president of the company, right?

18   A    I am.

19   Q    You entrusted --

20   A    I was.

21   Q    You entrusted bookkeepers and your CFO to compile the

22   financial statements of GCAC?

23   A    Yes.

24   Q    You trusted their work?

25   A    Yes.
```

Page 13

```
 1    Q    You relied on the work that they did?

 2    A    Yes.

 3    Q    So do you -- are you disputing that the accounts

 4    payable contingent liability of 14.8 million is related to

 5    the Vitol-GCAC relationship?

 6    A    I don't know.  I didn't prepare this spreadsheet.  I

 7    don't know why it's listed.  I'm not an accountant.  I don't

 8    know why it's listed as an accounts payable contingent

 9    liability, whether that's appropriate or whether that's not

10    appropriate.

11    Q    So you don't know what this line item relates to?

12    A    Not really.  I -- no.

13    Q    Is it not really or is it no, Mr. Brass?

14    A    I believe it relates to the Vitol liability but I did

15    not enter it.  I don't know if it's appropriate to have it

16    in that line or not.

17    Q    Either way, this is how GCAC's financial folks booked

18    this entry, right?

19    A    It's in this interim financial statement.  I don't know

20    whether that was permanent, whether this was final, whether

21    this was something they did as an interim statement.  I

22    don't know.

23    Q    Okay.

24         MR. BERNICK:  Ms. Mehta, if we could go to Tab

25    June 2017, please.
```

```
 1   BY MR. BERNICK:

 2   Q    Across the top, Mr. Brass, you see, this is GCAC's

 3   consolidated balance sheet as of June 30th, 2017, right?

 4   A    That's what it says, yes.

 5        MR. BERNICK:  Ms. Mehta, if we could scroll down

 6   to the total liability section.

 7   BY MR. BERNICK:

 8   Q    Mr. Brass, looking at Exhibit 81 as of June 30, 2017,

 9   there's no $14.8 million account payable liability on GCAC's

10   balance sheet as of June 30th 2017, right?

11   A    Contingent liability --

12        THE COURT:  Overruled.

13   BY MR. BERNICK:

14   A    There's no contingent liability on this that I see.

15   Q    You don't see a liability for $14,866 -- sorry,

16   $14,866,973 on GCAC's balance sheet as of June 30th, 2017?

17   A    I do not see that contingent liability.

18        MR. BERNICK:  Ms. Mehta, if we could pull up

19   Exhibit 81, Vitol 81 at EEPB 181.

20   BY MR. BERNICK:

21   Q    Mr. Brass, you see across that, this is GCAC's

22   consolidated balance sheet as of December 31, 2018, right?

23   A    That's what it says, yes.

24   Q    And if we scroll down to current liabilities, we again

25   see an account payable contingent liability of $14,866,973,
```

1    right?

2    A    That is what it says.

3              MR. BERNICK:  If we could pull up Exhibit 100,

4    Vitol Exhibit 100.

5    BY MR. BERNICK:

6    Q    Do you recognize this document, Mr. Brass?

7    A    I don't recall ever seeing this.

8              MR. BERNICK:  Ms. Mehta, if we could scroll

9    through it.

10   BY MR. BERNICK:

11   Q     Mr. Brass, is that your signature go?

12   A     Go -- scroll it, please?  Just scroll up -- scroll up.

13   Other way.  Yes, that is.

14             MR. BERNICK:  Your Honor, I move to offer Vitol

15   Exhibit 100 into evidence.

16             THE COURT:  Any objection?  As opposed to the tax

17   return that's associated with it?

18             What are you trying to get in?

19             MR. BERNICK:  The entire tax return, Your Honor.

20             THE COURT:  Why don't you show the entire tax

21   return --

22             MR. BERNICK:  Yep.  Sure.  Ms. Mehta, if we could

23   scroll through this document.

24   BY MR. BERNICK:

25   Q    And Mr. Brass, if you need it scrolled faster or make

1   it large, please let us know.

2   A    Yeah, I would definitely need to --

3          MR. BERNICK:  Stop right there, Ms. Mehta, on Page

4   14.

5   BY MR. BERNICK:

6   Q    Mr. Brass, do you recognize that signature?

7   A    Yes.

8   Q    Is that your -- that's your signature?

9   A    Assuming you mean one in the middle.

10  Q    In the middle.  That's your signature?

11  A    Yes.

12  Q    Stop right there.  Mr. Brass, do you recognize the

13  signature on the bottom of Page 15?

14  A    Yes.

15  Q    That's your signature?

16  A    Yes it is.

17         MR. BERNICK:  Keep scrolling, please.

18         THE COURT:  That's fair.  I will admit -- can you

19  just --

20         MR. BERNICK:  Believe that'd be Page 1 and 13.

21         THE COURT:  Whatever pages they are.

22         MR. BERNICK:  -- transmittal.

23         THE COURT:  That refer to transmittal letters.

24  Just the actual exhibit.  Just want to make sure that that's

25  clear for the record.  Just for the --

```
 1              MR. BERNICK:  Absolutely.  It's exhibit -- Vitol
 2    Exhibit 100.
 3              THE COURT:  Vitol Exhibit 100 will be admitted,
 4    but in a redacted form for personally identifiable
 5    information, including Social Security numbers and whichever
 6    transmittal letters are in, we won't go through the time to
 7    go through it then, but will -- they'll be stricken.  Okay.
 8              (Vitol Exhibit 100 Entered into Evidence)
 9              MR. BERNICK:  Ms. Mehta, if we could turn to Page
10    14 of this PDF, Exhibit 100.  In the large paragraph of
11    texts there, can we zoom in on that?
12    BY MR. BERNICK:
13    Q    Mr. Brass, do you recall you testified earlier that you
14    signed this document, correct?
15    A    Yep.
16    Q    You recall signing this document under penalty of
17    perjury?
18    A    Okay.
19    Q    Right?
20    A    Sure.
21    Q    Okay.  Let's flip to Page 42.  Scroll down to Schedule
22    L, Line 17, other current liabilities.  Mr. Brass, you see
23    there's a line item for accrued expenses other with an
24    ending balance in 2017 of $14,866,973, correct?
25    A    I see that, yes.
```

1   Q    And that's the number that we saw on GCAC's December

2   31st, 2017 tax return as well?

3   A    Haven't compared it, but if it's the same, it's the

4   same.

5   Q    Okay.  Mr. Brass, GCAC filed suit against Vitol in May

6   of 2018; is that right?

7   A    I don't recall exactly.

8   Q    Early 2018.  Is that fair?

9   A    Something like that, yeah.

10   Q    You recall leading up to GCAC filing suit that Vitol

11   was claiming GCAC owed it money?

12   A    Yes.

13   Q    You recall Vitol claiming GCAC owed it over $14

14   million?

15          THE COURT:  Asking if he recalls.  Overruled.

16   BY MR. BERNICK:

17   A    I recall that Vitol made claims that we owed them

18   money, yes.

19   Q    Do you recall Vitol claiming GCAC owed it over $14

20   million?

21          THE COURT:  Overruled.

22   BY MR. BERNICK:

23   A    Yes.

24   Q    And that was -- you recall that prior to filing suit

25   against Vitol, correct?

1    A    Ask your question again.

2    Q    Sure.  You recall prior to GCAC filing suit against

3    Vitol that Vitol claimed GCAC owed over $14 million to

4    Vitol?

5    A    Yes.

6         MR. BERNICK:  We could pull up Exhibit 54.

7    BY MR. BERNICK:

8    Q    Mr. Brass, you recognize this document?

9    A    I'm on the email so -- I don't recognize it as I sit

10   here, but I'm not disputing that it's correct.  Actually,

11   no, I'm not on this email.

12   Q    At the top, do you recognize this email if you look at

13   this stop?

14   A    You're telling me that this is an email between Mike

15   Ruzek and Eric Kuo that was forwarded to me.  I just can't

16   tell from the headers.  The headers look weird.

17   Q    Mr. Brass, if you could just read across the top of

18   Exhibit 14 silent -- Exhibit 54 silently.

19        THE COURT:  Well, I agree, but Mr. Brass is saying

20   that he can't read the from and to at the top of the email

21   and see if it sounds like a forwarded email, if I'm

22   understanding it correctly.  He's saying it looks weird.

23   Maybe it -- I'm going to allow you to help him a little.

24        MR. BERNICK:  Sure.

25   BY MR. BERNICK:

1    Q    Mr. Brass, do you see your name at the top of Exhibit

2    54?

3    A    Yes.

4    Q    Fair to say you're a recipient, you received Exhibit

5    54?

6    A    Yeah, if you're saying that this is the email that was

7    forwarded to me at the top.  It just is an odd format.

8    That's all I'm saying.

9    Q    Yep.

10    A    I'm not -- go ahead.  Sorry.

11         MR. BERNICK:  Your Honor, we move to admit Vitol

12    Exhibit 54.

13         MS. GOOTT:  (indiscernible).

14         MR. BERNICK:  Your Honor, if I may respond.

15         THE COURT:  Yes.

16         MR. BERNICK:  If I may respond, Your Honor.  Mr.

17    Brass testified that this -- that he received this email.

18    Looks like an email he received.  The -- we're not admitting

19    -- we're not offering this document for the truth of the

20    matter asserted, but rather for notice which is separate

21    from truth of the matter asserted.  The notice here is

22    relevant to the Husky factors --

23         THE COURT:  Just need you --

24         MR. BERNICK:  Sorry.

25         THE COURT:  That's way beyond the scope.  I'm

1    going to -- it's admitted, just as an email that was

2    forwarded that Mr. Brass received.  That's what it's

3    admitted for, not the -- you said you're not offering for

4    the truth of the matter asserted.  It's an email and it says

5    what it says.

6              (Vitol Exhibit 54 Entered into Evidence)

7    BY MR. BERNICK:

8    Q    Mr. Brass, when you received this email --

9              MR. BERNICK:  If we can scroll down to the bottom,

10   first, Ms. Mehta.

11   BY MR. BERNICK:

12   Q    Mr. Brass, when you received this email in April 2018,

13   fair to say you were on notice of Vitol's claim against

14   GCAC?

15             MS. GOOTT:  (indiscernible).

16             THE COURT:  Think we're trying to find --

17   overruled.  I'm -- he can answer whether he's aware that --

18   (indiscernible).  That's not assuming any facts in evidence.

19   It's just not.  Overruled.

20             MS. GOOTT:  (indiscernible).

21             THE COURT:  You said assumes facts not in

22   evidence.  What's the fact?

23             MS. GOOTT:  (indiscernible).

24             THE COURT:  It's an assumption -- got it.

25   Overruled.

1    BY MR. BERNICK:

2    A    Ask your question again.

3    Q    Mr. Brass, you recall when receiving this email in

4    April of 2018 that you were on notice of Vitol's claim

5    against GCAC; is that fair?

6    A    No, I don't think that's fair.  I think -- no, I don't

7    think that's fair.

8    Q    You were aware at that time that -- you aware in April

9    2018 that Vitol was asserting GCAC owed it over $15 million÷

10   A    I think that they were asserting that this calculation

11   came up to that, but I don't think that means that we had

12   agreed at that point that we owed them or they owed us.

13   Q    That wasn't my question, Mr. Brass.  It was if -- in

14   April of 2018, do you recall Vitol claiming GCAC owed Vitol

15   over $15 million.

16   A    I don't know that that's what this email was referring

17   to.

18   Q    In April 2018, do you recall that Vitol claimed GCAC

19   owed it over $15 million?

20   A    Yes.

21   Q    Mr. Brass, during the GCAC-Vitol relationship, it's

22   fair to say that GCAC was bringing its marketing experience,

23   its asphalt selling experience to that relationship?  Is

24   that fair?

25   A    Sorry.  Say that one more time.

Page 23

1   Q    Sure.  As part of the GCAC-Vitol relationship, GCAC was

2   going to bring its asphalt marketing experience; is that

3   fair?

4   A    Amongst other things, yes.

5   Q    Okay.  And its experience selling asphalt, right?

6   A    Yes.

7   Q    And Vitol was going to bring its money.  That fair to

8   say?

9   A    Amongst other things, yes.

10  Q    And its credit?

11  A    Amongst other things, I guess.

12  Q    But that was included, right?

13  A    I'm not sure I understand what you mean by credit.  I'm

14  just trying to understand.  Just be clear about what you're

15  asking and I'm happy to answer.

16  Q    Sure.  Vitol was going to fund transactions in the

17  Vitol-GCAC relationship.

18  A    Vitol was intended to own the inventory if that's what

19  you're asking.

20  Q    They were going to -- Vitol was going to acquire that

21  inventory, correct?

22  A    Yes.

23  Q    On behalf of the relationship, right?

24  A    Yes.

25  Q    And then GCAC would sell that inventory to third

1   parties, right?

2   A     No.  That's not the way it was intended.

3   Q     Okay.  GCAC sold inventory to third parties during the

4   GCAC-Vitol relationship, right?

5   A     When requested by Vitol, yes.

6   Q     when requested by Vitol.

7   A     Yes.

8   Q     Okay.

9         MR. BERNICK:  If we could pull up Exhibit 21,

10  please.  Vitol Exhibit 21.

11  BY MR. BERNICK:

12  Q     And we'll have Ms. Mehta scroll through it, but Mr.

13  Brass, do you recognize Exhibit 21, once you've had a chance

14  to review it?

15  A     I don't recall it, but I can read it.

16  Q     What is it?

17  A     Looks to be a sale to VALT Asphalt.

18  Q     It's a series of emails?

19  A     Yes.

20  Q     Okay.  And are you on these emails, Mr. Brass?

21  A     I've got to go back up to the top.  (indiscernible).

22  Yes.

23  Q     Any reason to dispute the accuracy of this document,

24  Mr. Brass?

25  A     No.

```
 1              MR. BERNICK:  Your Honor, we move to admit Exhibit
 2    21 -- Vitol Exhibit 21.
 3    BY MR. BERNICK:
 4    A    Can I caveat one thing?  I don't know that this is
 5    actually -- I don't dispute the accuracy that this is what
 6    the email said.  I don't know that this is exactly what
 7    happened.  I'm not saying it didn't, I'm not saying it did.
 8    I just know that this is a confirm and if it got
 9    consummated, then great.  If it didn't, then I don't know.
10              MR. BERNICK:  Your Honor, we move to admit Exhibit
11    21.
12              THE COURT:  Any objection?  Vitol 21 is admitted.
13              (Vitol Exhibit 21 Entered into Evidence)
14              MR. BERNICK:  Let's go down to the bottom of Page
15    2 on Exhibit 21, Ms. Mehta, please.  Right there.  Scroll up
16    a little bit.  Little more.
17    BY MR. BERNICK:
18    Q    Mr. Brass, you see on Exhibit 21 Page 2, there's an
19    email from Scott Jellis to George Grace on October 2nd.  Do
20    you see that?
21    A    Yep.
22    Q    And George Grace, he worked for GCAC in 2017?
23    A    At the time, yes.
24    Q    What was his role?
25    A    He was a marketing guy.
```

1    Q    And Mr. Jellis says, "Geo, confirming tel con today.

2    Seller GCAC, buyer VALT Asphalt, product bitumen in bulk."

3    You see that?

4    A    Yes.

5    Q    Then the email goes on to state in terms of quantity,

6    price, and payment, among other things, right?

7    A    Correct.

8    Q    All right.

9         MR. BERNICK:  And if we can scroll up, Ms. Mehta.

10   BY MR. BERNICK:

11   Q    Mr. Grace then forwards this email on to other

12   employees at GCAC on October 2nd, right, Mr. Brass?

13   A    Yep.

14        MR. BERNICK:  We could scroll up a little bit

15   more, Ms. Mehta.  Page 1.

16   BY MR. BERNICK:

17   Q    So looking at Page 2, Mr. Brass, VALT was confirming --

18   in the email on Page 2, VALT was confirming to GCAC a

19   transaction related to the sale and purchase of bitumen in

20   bulk; is that fair?

21        MS. GOOTT:  (indiscernible).

22        THE COURT:  Sustained.

23   BY MR. BERNICK:

24   Q    Mr. Brass -- okay.  If we're looking at the email

25   that's on the screen now on Page 1, email from page one

```
1    email from Mr. Perugini to Mr. Kuo and to you, Mr. Brass, on

2    October 2nd.  See that?

3    A    This part that we're on right now?

4    Q    Yes.

5    A    Yes.

6    Q    Subject line, GCAC sale to VALT out of Rio inventory,

7    Mobile.  You see that?

8    A    That's what he wrote, yes.

9    Q    And Mr. Perugini, as he says in the subject line, is

10   recapping a GCAC sale to VALT, right?

11            THE COURT:  Yeah, I agree with that.  Sustained.

12   BY MR. BERNICK:

13   Q    If we look at deal one on Page 1, Mr. Brass, says "Deal

14   one, Rio inventory, Mobile."  Right?

15   A    Rio inventory in Mobile, yeah.

16   Q    Seller Vitol.  Buyer GCAC.  Right?

17   A    Yes.

18   Q    And it provides volume, price, and other terms.

19   A    Yes.

20   Q    Right?  And if we look down on the bottom half of Page

21   1, we see backup to deal number one.  You see that section,

22   Mr. Brass?

23   A    Yep.

24   Q    All right, and he says -- Mr. Perugini writes, "Deal

25   number one, Rio inventory Mobile, seller GCAC, buyer VALT."
```

Page 28

```
 1    That fair?

 2    A    Yep.

 3    Q    And then again, Mr. Perugini details volume, price,

 4    quantity, other terms of that that deal, right?

 5    A    Yes.

 6    Q    All right.  We look at -- so let's look at deal one.

 7    In deal one, Mr. Perugini is describing how Vitol is going

 8    to sell to GCAC at certain price, certain quantity, right?

 9              THE COURT:  Overruled.

10    BY MR. BERNICK:

11    A    Ask it again.

12    Q    In deal number one, Mr. Perugini is detailing that

13    there will be a sale from Vitol to GCAC at a certain volume,

14    at a certain price, right?

15              THE COURT:  Overruled.

16    BY MR. BERNICK:

17    A    That's what this says.

18    Q    And he's -- and then in the backup he says, the seller

19    is -- let's look down the page at the backup to deal number

20    one.  There he describes that the seller is GCAC and the

21    buyer is VALT, right?

22    A    Correct.

23    Q    At certain prices, at certain volumes.  Right?

24    A    Yes.

25    Q    Okay.  And the backup to deal one, is the same deal
```

1   that we saw on Page 2 in the email between Mr. Jellis and

2   Mr. Grace.  Same terms.

3   A    Okay.

4           THE COURT:  In what way?  Give us the same -- why

5   don't you show --

6           MR. BERNICK:  Sure.  Can you put Page 1 and 2 up

7   next to each other, Ms. Mehta, please?

8           THE COURT:  What's the difference, Ms. Goott?

9   Where's the mischaracterization?

10          I think he said it was the backup.  It's the same

11  deal, what I understood him to say.  So which are you

12  asking?

13          MR. BERNICK:  Your Honor, I can take him through

14  line by line.

15          THE COURT:  Okay.

16          MR. BERNICK:  Sure.

17  BY MR. BERNICK:

18  Q    Let's look at Page 2, Mr. Brass, the email between

19  Scott Jellis and George Grace.  (indiscernible) the seller

20  is GCAC and the buyer is VALT Asphalt, right?

21  A    Yes.

22  Q    And if we go to the backup of deal one on Page 1, se

23  see the seller is GCAC and the buyer VALT.  Right?

24  A    Yep.

25  Q    You take this to be the same thing?

```
 1              THE COURT:  Asking him if he understands them to
 2   be the same, all that's being asked.  That's not a best
 3   evidence question.  It's his understanding.  Overruled.
 4   Overruled.  Folks, at some point we're going to have to get
 5   through this evidence and at some point we're going to have
 6   to get through this evidence and you really don't want to me
 7   comment.  Because I can really -- I don't want to comment.
 8   I gave a lot of flexibility on cross examinations in other
 9   areas where people were asked some really tough questions
10   and even their ability to remember.  A lot of flexibility.
11   I think the other side is entitled to the same.  I've got to
12   be fair.  So you can ask him.
13   BY MR. BERNICK:
14   Q    Mr. Brass, and -- look at the price line on exhibit --
15   on Page 2.  Mr. Jellis' email says, USD 24750.  You see
16   that?
17   A    Yep.
18   Q    That's the same price that's in deal backup on number
19   one?
20   A    Correct.
21   Q    All right.  And if we look at quantity in Mr. Jellis'
22   email, it says from 15,000 net barrels, right?
23   A    Yes.
24   Q    (indiscernible) approximately 15,000 barrels, buyer's
25   option.  Right?
```

1    A    Sorry, I'm -- says 5,000 barrels.   Oh, fifteen -- this

2    says 15,000 barrels.   This says 15,000 barrels with some

3    option around 5,000.

4    Q    Okay.   So Mr. Brass, you recall that -- Mr. Brass, do

5    you understand that the deal referenced in Page 2 is the

6    same deal that's referenced in the backup to deal number

7    one?

8    A    I would assume so.   It's a little confusing the way

9    these are done.   If this is one continuous email string,

10   then yeah, this is -- backup is probably not the right word,

11   but this was probably a conversation that Scott and George

12   had and this is a conversation that Eric and Patrick had.

13   That make sense?

14   Q    Mr. Brass, so Mr. Jellis had told -- Mr. Jellis and

15   GCAC had confirmed their deal.   Right?

16         THE COURT:   I agree with that sustained.

17         MR. BERNICK:   Okay.   I'll move on, Judge.

18   BY MR. BERNICK:

19   Q    Mr. Brass, if -- let me back up.   You contend, Mr.

20   Brass, that at all times during the Vitol-GCAC relationship

21   that there was a joint venture in place?

22   A    Yes.

23   Q    Do you contend that under that joint venture there was

24   going to be a 50/50 split between GCAC and Vitol of profits

25   and losses?

```
 1    A     Yes.

 2    Q     Now to determine -- let's talk about profit.  Okay.  To

 3    determine profit, one would need to know the revenues,

 4    right?

 5    A     Yes.  I'm sorry.  I thought you were going on.

 6    Q     And also the expenses, correct?

 7    A     Yes.

 8    Q     Okay.  Without the two of those, you can't calculate

 9    profits and losses, right?

10    A     I think that's right.

11    Q     So there would need to be a reconciliation at some

12    point of the revenues and the costs to come up with the

13    profits and losses, right?

14          THE COURT:  Sustained.  You can ask in a different

15    way.

16    BY MR. BERNICK:

17    Q     Okay.  There was supposed to be reconciliations done

18    under the Vitol-GCAC relationship.  That's your contention,

19    right?

20    A     There was -- who?  Who was supposed to do

21    reconciliations?

22    Q     Just asking generally.  There were supposed to be --

23    there supposed to be reconciliations done of revenues and

24    costs under the Vitol-GCAC relationship.

25    A     (indiscernible).  I'm sorry.  Ask -- finish your
```

1    question.  I'm sorry.

2    Q    I'll slow down so we don't step on each other.  Sorry.

3    Under the Vitol-GCAC relationship, there were supposed to be

4    reconciliations of revenues and costs to calculate profits

5    and losses.

6    A    There were supposed to have been, yes.

7    Q    But that wasn't done in July of 2017, right?

8    A    I don't recall it ever being done.

9    Q    Never being done over the entire life of the

10   relationship; is that fair?

11   A    Yeah, I think so.  There were emails that went back and

12   forth between Patrick and Eric and I don't know.  It was

13   kind of amorphous.

14   Q    You don't recall any emails where Vitol and GCAC are

15   reconciling the revenues and the costs and coming up with

16   the profit and loss, right?

17   A    I don't know that that's correct.  There were emails

18   between Patrick and Eric and I think that from time to time

19   they attempted to do that or at least to keep each other

20   informed of what the general status of the P&L and what the

21   book was.  Pretty sure I recall those in general, not

22   specifically, but I don't think it's fair to say that there

23   were no discussions about the profits and losses of the

24   venture.

25   Q    So --

Page 34

```
1    A    I don't know if that answers your question, but that's
2    --
3    Q    -- mean to step on you, there.
4    A    (indiscernible).
5    Q    Let's back up.  So you agree there were no
6    reconciliations done.  That -- is that right?
7    A    Tell me what you mean by a reconciliation.
8    Q    Well, that's what you said earlier.  You said there
9    were no reconciliations done, right?
10   A    Not that were finalized.
11   Q    Okay.  No finalized reconciliations.  Okay.  And GCAC
12   sold product, finished product to third parties under the
13   GCAC-Vitol relationship.  Right?
14   A    Sold product.  Bought product.  Paid expenses.  Yeah.
15   All kinds of stuff.
16   Q    And when -- in some months, GCAC was selling product to
17   third parties and the proceeds from those sales were going
18   straight to GCAC, right?
19   A    That's correct.
20   Q    Those proceeds would be revenues; that fair to say?
21   A    I guess they were.  It was cash in.  I don't know, is
22   it revenues?  I don't know.  Is that -- that's kind of an
23   accounting term.  I don't want to say they were revenues in
24   a particular accounting definition, but they were money that
25   came in, if -- to the extent that GCAC billed a third party
```

1    and received it, yeah.

2    Q    Do you not understand the term revenues?

3    A    Well, I think that revenues are a specific accounting

4    term.  I think that you can receive cash in and not have it

5    be a revenue.  I'm not saying it wasn't revenues or it was

6    revenue.  I'm just saying, I'm not qualified to tell you

7    whether or not they should be specifically defined as

8    revenue.  I'm not trying to be argumentative.  I'm just

9    saying that I don't necessarily think that the sale of a

10   product and receipt of cash necessitates that that be

11   categorized as revenues.  I'm pretty sure that's correct.

12   Q    You understand the difference between revenues and

13   profits conceptually?  Mr. Brass?

14   A    Yeah, I think so.

15   Q    Okay.  So sales proceeds GCAC would receive from third

16   parties, those would be more akin to what you understand to

17   be revenues than profits, right?

18   A    Again, I don't want to get into try and define what

19   revenues and profits are.  I'm just trying to stay out of my

20   area of expertise.  If you ask me a question about did GCAC

21   sell product and receive cash for it, I can say yes.

22   Q    Okay.

23   A    Helpful?

24   Q    Did GCAC sell product and receive cash for it?

25   A    Yes, it did.

```
 1    Q    And some of those sales, GCAC -- let me back up.  So --
 2    and the cash that GCAC received for these sales totaled
 3    millions of dollars, right?
 4    A    Are you asking or --
 5    Q    Yes.
 6    A    Yeah.  Yes.
 7    Q    But on any particular sale, GCAC wouldn't know whether
 8    a sale was profitable or if it was done at a loss, unless it
 9    knew the costs, correct?
10    A    I think it's impossible to calculate the profit or loss
11    on any particular sale.  I think it's a way more complicated
12    business than that.  So I don't know what specifically
13    you're asking.  You asking, when you sell a barrel, do you
14    know what the profit or loss is on it?  Probably not.
15    Q    You can't -- I just want to make sure I heard you
16    right.  You can't calculate the profit or loss on any
17    particular sale in asphalt trading?
18    A    No.  It's extremely difficult on any trading business.
19    Sorry, liquid commodity trading business.
20    Q    Mr. Brass, from at least July 2017 through June 2019,
21    that two-year period --
22    A    Okay.
23    Q    -- GCAC was making so called loans to you, right?
24         THE COURT:  You can ask him.  Why don't you ask
25    him if they were making loans to him.
```

1    BY MR. BERNICK:

2    Q    Was GCAC making loans to you in -- between July 2017 to

3    July 2019?

4    A    Again  during that period of time GCAC sent money to me

5    or on my behalf.  I believe there was money that went back

6    to GCAC from me or on my behalf.  I don't think that as I

7    discussed before, we had this conversation, they were

8    credited to due to/due from accounts.  I don't think

9    necessarily that they were loans or that they weren't loans.

10   That's -- it's a different concept to me.  They were money

11   that was credited to the due to/due from account as was the

12   historical practice of the company.

13   Q    Let's talk about that.  So is money that you received

14   from GCAC under these due to/due from accounts, was -- let

15   me back up.  The money you received from GCAC under these

16   due to/due from accounts; there was no promissory note

17   related to those transactions, right?

18   A    No.

19   Q    No loan agreement, right?

20   A    Correct.

21   Q    And your mother Joyce Brass also received money from

22   GCAC under these due to/due from accounts, correct?

23            THE COURT:  Overruled.  Go ahead.

24   BY MR. BERNICK:

25   A    Sorry.  Ask that last part one more time.

003242

1    Q    Your mother Joyce Brass also received money from GCAC

2    under these due to/due from accounts.

3    A    More money was credited to her accounts because it was

4    done -- something on her behalf.  But yes.

5    Q    She did receive money from GCC under these due to/due

6    from accounts, right?

7    A    From time to time, yes.

8    Q    Your sister -- her name's Sandra Brass, correct?

9    Correct?

10   A    Yes.

11   Q    She also received money from GCAC under these due

12   to/due from accounts, correct?

13   A    To be specific, if she received money it would have

14   been on my mother's behalf and it would have been credited

15   to my mother's due to/due from --

16   Q    But your sister was the ultimate recipient?

17   A    I don't know if that's fair.  GCAC may have sent it on

18   behalf of my mother to Sandra, but it would have been on her

19   behalf.  I don't know if that -- I'm not trying to sway your

20   question.  I hope that answered it.

21        MR. BERNICK:  If we could pull up exhibit -- Vitol

22   Exhibit 70.

23   BY MR. BERNICK:

24   Q    You recognize this exhibit -- this document, Mr. Brass?

25   A    I don't recognize it in specificity.  I could read

1    what's at the top if you like.

2    Q    What is it?

3          MR. BERNICK:  He said he didn't know with -- what

4    it was with specificity.

5          THE COURT:  Why don't you just ask the question

6    again?

7          MR. BERNICK:  Sure.

8    BY MR. BERNICK:

9    Q    Do you recognize this document, Mr. Brass?

10   A    I don't recognize it but it doesn't --

11         THE COURT:  He can answer the question.

12         Overruled.

13   BY MR. BERNICK:

14   A    I'm sorry ask your question.

15   Q    Mr. Brass, do you recognize the document marked Vitol

16   Exhibit 70?

17   A    No.

18   Q    Not at all?

19   A    I can read what it is.  I can infer what it is, but I

20   do not recognize it.

21   Q    What do you infer that it is?

22         THE COURT:  He can answer if he knows.  Overruled.

23   BY MR. BERNICK:

24   A    It appears to be a series of -- see, it says loans.

25   This doesn't seem accurate.  I don't -- it's an excerpt from

1   what appears to be GCAC's general ledger.

2            THE COURT:  (indiscernible) an objection.  He

3   answered the question.  What's the -- ask your next

4   question.

5            MR. BERNICK:  Your Honor, we move to admit Exhibit

6   70.

7            THE COURT:  On what basis?

8            MR. BERNICK:  On -- he first testified that he

9   didn't -- he couldn't recognize it specifically.  Then he

10  later, after an objection, testified that he didn't

11  recognize it at all.  Then he told -- said he could infer it

12  to be and what it appears to be.

13           MS. GOOTT:  (indiscernible).

14           THE COURT:  Yes.  I know.  I'm just -- I'm being

15  honest with everyone.  I'm concerned that Mr. Brass has not

16  remembered a document this entire time that we've been here.

17  Since the prior date, has not recognized one document.  I've

18  sat here and taken note.  I'm just being honest.  I'm not

19  allowing it in.  I'm expressing my concern.  Just telling

20  you.  No, I'm just being honest with everybody.

21           There's a lot of objections going on.  Let's just

22  get through it.  It's not one -- if it could be an email,

23  could not be an email, could be -- that's, there's

24  difference.  Ms. Goott, I'm happy to have the discussion

25  with you, on and off the record, with Mr. Brass in or out,

1   but I'm just telling you, it's not in and I'm having

2   concerns with the foundation argument.  And I'm telling you

3   why.  I'm just being honest.  I'm having --

4            MS. GOOTT:  And I --

5            THE COURT:  -- foundation argument because it can

6   be used.  I'm not saying that's what he's doing, but it can

7   be used to essentially exclude every document from any

8   ledger, from any document ever.  And that's my concern.  But

9   this one, you're right about.  Doesn't come in.

10           MS. GOOTT:  No, I appreciate the comments.  If I

11  can just respond.

12           THE COURT:  Sure.  No, no, no.  Absolutely.

13           MS. GOOTT:  I don't think it's -- yeah, I don't

14  want to taint --

15           THE COURT:  Yeah, why don't we do that?  Mr.

16  Brass, why don't you step outside.

17           MS. GOOTT:  Walk all the way across, so you don't

18  hear us, please.

19           THE WITNESS:  That way or that --

20           MS. GOOTT:  Either way, just --

21           THE COURT:  Either way.  The door goes away.

22           MS. GOOTT:  Can --

23           THE COURT:  I was waiting on Mr. Patterson.  Look,

24  I'm being honest with you.

25           MS. GOOTT:  I want -- yep.  And I just would like

1    to respond to this.

2            THE COURT:  Well, let me get the whole thing out

3    then, since --

4            MS. GOOTT:  Okay.

5            THE COURT:  -- he's not here.  I allowed Mr.

6    Patterson to go really hard on Loya.  I let them go really

7    hard on Kuo about what they remembered and what they

8    couldn't remember.  And I've got to play it both ways.  I

9    mean, including whether these folks that were on medication

10   and whether they could remember anything.  Brass in my

11   opinion hasn't remembered a single document.  He says even

12   any email, and he says he can't remember anything but he can

13   certainly remember expertise when it comes to the asphalt

14   business.

15           And it's starting to give me some -- I agree the

16   document doesn't come in, but I'm saying this and I said it

17   out loud because I'm trying to be helpful, quite frankly, to

18   Mr. Brass and I don't -- and if we go five hours and he

19   doesn't remember anything, I don't know what to make of

20   that.  And maybe he just doesn't, but I let Mr. Patterson go

21   really hard on Loya.  I let him go -- I let you go -- and

22   I'm not saying you didn't have a right to.  Quite frankly, I

23   thought he did.  But I thought he went really hard on Kuo,

24   too, and I thought he could.

25           There's been nothing wrong with that.  I think

003247

Page  43

```
 1    Brass is presenting similar concerns and I think I've got to
 2    let them go out if they want to.
 3              MS. GOOTT:  I --
 4              MR. PATTERSON:  (indiscernible).
 5              THE COURT:  No, no, so for it.
 6              That's what I'm concerned about.  His memory gets
 7    really good on expertise when it comes to -- he can't
 8    testify what revenue is, but then he's going to testify
 9    about other aspects of the asphalt business?  It's getting -
10    - to say that a president of GCAC can't tell me what GCAC
11    Holdings is or has no memory of it?
12              MR. PATTERSON:  Well (indiscernible).
13              THE COURT:  Yeah, I'm not doing that, Mr.
14    Patterson.  What I am telling you is I'm going to let them
15    go.  I'm going to let them ask the questions that are tough
16    because I gave you plenty of leeway and I agree with you.  I
17    thought Mr. Loya gave me concerns when he couldn't remember
18    the three docs that you put them up in front of him.  I
19    thought that was fair game.  Just saying, you all are trying
20    to protect Brass, but I'm going to let them let them go at
21    him.  You are.  You are.
22              MR. PATTERSON:  (indiscernible).
23              THE COURT:  Don't see it.
24              MR. PATTERSON:  (indiscernible).
25              THE COURT:  Because I gave you the leeway.  I gave
```

```
 1   you -- and I'm doing it because I'm trying to be helpful to
 2   Brass.  You don't want me to just sit here and be quiet and
 3   then hold it all in.  He's got -- if his memory is being
 4   honest, if he's being not honest, then he's now heard from
 5   me.  If he's being 100 percent honest, I'm just telling you
 6   I'm concerned.
 7         But if that's his memory, that's his memory and it
 8   is what it is and I'll just take everybody's for what they
 9   are.  Loya, Kuo, and him.
10         MS. GOOTT:  Yes --
11         MR. PATTERSON:  We had this (indiscernible).
12         THE COURT:  New to me.
13         MR. PATTERSON:  (indiscernible).
14         MS. GOOTT:  Your Honor, if I can --
15         THE COURT:  Just trying to be helpful to you all.
16         MS. GOOTT:  I --
17         THE COURT:  I'm telling you, I really am.  And I'm
18   not saying that any of this equals a dollar owed Vitol
19   because it doesn't, right.  It just doesn't.  None of this
20   adds up.  None of this has anything to do with damages or
21   whether you've satisfied your requirements under the code.
22   It just doesn't mean anything.  I'm being 100 percent honest
23   with you.  You can show me all these docs in the world, but
24   they may not -- they may or may not add up to damages.  I'm
25   just being honest with the other side as well.
```

```
 1              MR. BERNICK:  We --

 2              MS. GOOTT:  Your Honor --

 3              MR. BERNICK:  (indiscernible).

 4              THE COURT:  You can.  I'm just telling you, but --

 5    you know.  I'm just being honest with you.  I'm not saying

 6    you can't.  Not saying it does.  I'm just saying maybe it

 7    does, maybe it doesn't.  We haven't had that discussion.

 8    Maybe it does, maybe it doesn't.  But this document doesn't

 9    come in, but maybe others do.  I don't know.

10              I'm just saying I'm going to give you latitude to

11    start asking a lot of questions.  Don't take this as a free

12    wheel, but I'm going to give you the latitude to ask

13    questions to see -- find out what he knows and what he

14    doesn't know, what he remembers and what he doesn't

15    remember.  That's what -- that's all I'm saying because I

16    think that's the latitude that I gave Mr. Patterson.

17              MR. BERNICK:  Your Honor, and we would submit

18    under Husky and the fraudulent transfer claims --

19              THE COURT:  It doesn't matter what you submit on

20    the Husky.  It just means -- we're talking about federal

21    rules of evidence and what you pled, right?  I mean, it just

22    doesn't equate to that.  We're talking about what you can

23    get in and what you can't and what Mr. Brass can testify to

24    and what he can't.  That's what I'm saying.

25              And if anybody's construing it as any different,
```

1    that's all I'm saying.  Ms. Goott, I --

2         MS. GOOTT:  Thank you.  I appreciate you giving us

3    some insight because I know everybody -- getting a little

4    frustrated.  I did just want to address a couple of comments

5    and I wrote down what you wrote so that I don't go beyond

6    it.

7         And Mr. Patterson started with what I wanted to

8    talk about was you did give latitude to Mr. Patterson when

9    he was questioning Mr. Kuo and Loya.  No question.  The

10   testimony was very different when they couldn't remember and

11   then suddenly did remember when the lawyers were asking,

12   number one.

13        Number two, and this is the part that maybe -- and

14   I apologize if I seem frustrated -- but they did not object

15   to foundation.  They did not make those objections.  The

16   objections they raised was argumentative, which I think

17   probably all of them were sustained --

18        THE COURT:  I agree.

19        MS. GOOTT:  Right?  But if they don't do their job

20   in objecting to foundation, it's -- I just don't think that

21   it's fair that I am then penalized saying, well I let them

22   do it.

23        THE COURT:  No, because the document's not coming

24   in.

25        MS. GOOTT:  No, no, no, and I appreciate -- and

```
 1    that wasn't in relation to this.  It was a comment that was

 2    made earlier by the Court.  And so I just wanted to address

 3    that I think that you would have potentially overruled some

 4    of -- or sustained some of their objections.  They just

 5    didn't make them.  So for me to not do it because they

 6    didn't do it, doesn't seem fair.  I'll leave it at that.

 7              THE COURT:  I agree with that.

 8              MS. GOOTT:  You also made a comment that he didn't

 9    remember a single document.

10              THE COURT:  Not a substantive document

11    (indiscernible).

12              MS. GOOTT:  So the emails, he did not say, I

13    don't know what this is.

14              THE COURT:  He said, I see it, probably -- I

15    probably got it and if it's -- if that's what it says then

16    that's what it says.  That's not -- what I'm saying is

17    everything is hedged.

18              MS. GOOTT:  And we -- and that is accurate;

19    however, I did not object to the entry of any --

20              THE COURT:  I'm not saying you did.

21              MS. GOOTT:  -- of those emails.  So we're not --

22    because, and maybe I misunderstood you, but what I heard or

23    what I interpreted was that by me making an objection, it

24    signals something --

25              THE COURT:  No, no --
```

Page 48

```
1              MS. GOOTT:  -- to him.

2              THE COURT:  -- no, and I don't -- no.

3              MS. GOOTT:  And I never -- I'm not going to.  I'm

4   going to tell everybody right here, I'm not going to object

5   to an email coming in where he's on it --

6              THE COURT:  Not saying you're doing that at all.

7              MS. GOOTT:  Okay.

8              THE COURT:  That's -- I don't --

9              MS. GOOTT:  And then --

10             THE COURT:  No.  That's absolutely.

11             MS. GOOTT:  Okay.

12             THE COURT:  To the extent that got communicated,

13   that's on me.  That's not -- I have no, I have zero concern

14   about that.

15             MS. GOOTT:  Okay.  And then the last piece.  They

16   know this.  They've known this for a very long time.  When

17   you put these financial documents in front of him, he

18   doesn't know this stuff.  If they would ask questions about

19   what he did, you would know why.  You would know the

20   struggles he has with this type of information, that it

21   doesn't compute.  I can tell you doing schedules with him

22   was difficult, but the point is, they have known.  They have

23   deposed.  They have -- this is their time to bring in their

24   witnesses to prove the stuff.

25             So all I'm saying is that the fact that Mr. Brass
```

Page 49

```
1    doesn't know about the numbers, that's not what he did.  I
2    don't have a clue about the numbers in my own firm.
3    Nothing.
4              THE COURT:  No, no.
5              MS. GOOTT:  Nothing.  I'm just saying, it's --
6              THE COURT:   And I --
7              MS. GOOTT:  -- a leap.
8              THE COURT:  I'm just telling you, Ms. Goott, the
9    concern that you expressed, I get and I do see it a lot, to
10   be honest with you, in terms of what you're describing.
11   Right?  I'm signaling, because I know this is an important
12   witness to everyone, these things are going on in my head
13   and I don't need to not express them.
14             MS. GOOTT:  No, I appreciate it and it will give
15   us some ability to ask certain questions to clear that up
16   for you so that you can understand.
17             THE COURT:  I think they're entitled to a little
18   latitude in terms of finding out what he knows, but I think
19   --
20             MS. GOOTT:  One hundred percent.
21             THE COURT:  But I think you needed to know as you
22   prepare for your examination on like what I think is
23   probably the key witness, I think, in all of this.
24             MS. GOOTT:  I agree and I appreciate the comments
25   and I do --
```

```
 1            THE COURT:  -- what I'm thinking and I'm going to

 2    -- I think I owe Mr. Brass an apology, because I don't think

 3    he knows what I meant and why I said it, and I don't want

 4    him thinking about it.  But -- in terms of, I need him to be

 5    honest in terms of what he knows and what he doesn't know

 6    and maybe that's what I'll just say to him, if that's okay

 7    with you all.

 8            MS. GOOTT:  I appreciate that.

 9            THE COURT:  Okay.

10            MS. GOOTT:  And I'm going to stand up and make

11    objections --

12            THE COURT:  That's not (indiscernible).

13            MS. GOOTT:  But --

14            THE COURT:  I just think that --

15            MS. GOOTT:  Yeah.

16            THE COURT:  I'm just giving you some latitude.

17            MS. GOOTT:  Yeah.

18            THE COURT:  In other words, you'll have a little

19    latitude to find out exactly what he knows and what he

20    doesn't know about a document.  But that's not a -- don't

21    take that as an open -- right, this isn't a deposition.

22    Right?  That's all I'm saying.

23            MR. BERNICK:  Understood, Your Honor.

24            MS. GOOTT:  Thank you, Judge.

25            THE COURT:  Let's get him back.
```

```
 1            WOMAN 1:  I'll go get him.

 2            THE COURT:  -- Brass, come on up and take the

 3    stand.  Have a seat, Mr. Brass.  I remind you that you're

 4    still under oath and I and I want to start off by just to

 5    the extent I miscommunicated anything I want to apologize to

 6    you.  I don't mean in any way to imply -- and this wasn't my

 7    intent, so I'm apologizing in advance, just in case it came

 8    out in a way that was communicated, to the extent you

 9    perceived any of it, but I want you to answer the questions

10    truthfully and honestly and I'm not saying that you're not.

11    I'm just repeating it for the record.

12            And what you know, you know, and what you know --

13    what you don't know, you don't know.  And that's being a

14    fact witness and that's completely fine with me.

15            THE WITNESS:  Yes, Your Honor, always.

16            THE COURT:  And so I don't want you to take

17    anything that I've said or implied or any questions that are

18    being asked one way or the other.  Your job is to testify on

19    under oath to the best of your ability and that's all that

20    I'm asking for.  Okay?

21            THE WITNESS:  Yes, sir.  I appreciate that.

22            THE COURT:  Okay.  Thank you.  Let's continue.

23    Seventy isn't in.

24            MR. BERNICK:  If we could go to Vitol Exhibit 81,

25    EEPB 174.
```

1                THE COURT:  You said 74?

2                MR. BERNICK:  174.

3                THE COURT:  174.

4                MR. BERNICK:  Exhibit 81 at EEPB --

5                THE COURT:  Oh, oh, oh.

6                MR. BERNICK:  I did.

7     BY MR. BERNICK:

8     Q    Okay.  So Mr. Brass, earlier we talked about the GCAC's

9     due from/due to.  How would you call it?  What would you

10    describe it as?  Due to --

11    A    Due to/due froms.

12    Q    GCAC's due to/due froms.  Okay.  Those due to/due froms

13    were periodic loans to GCAC shareholders and directors.

14    Right?

15    A    Again, I object to categorizing them as loans.  They

16    were cash that went to and cash that was received from.

17    Q    Were there interest rates related to these transfers?

18    A    I believe that at the end of the year they imputed some

19    sort of federal -- this is my recollection -- some sort of

20    federal minimum tax amount to it, but that's just my

21    recollection.  I'm not 100 percent sure that's accurate.

22    Q    You received some of these due to/due froms from GCAC,

23    correct?

24    A    Yes, sir.

25    Q    Do you recall ever paying interest on any of them?

Page 53

```
 1    A     Yes, sir, I believe I did.

 2    Q     Okay.  When did you pay interest on them?

 3    A     I don't recall.  I think that they -- like I said, it

 4    was either an accounting entry or it was done in the tax

 5    returns.  I don't know which but I believe there was a --

 6    some sort of an imputed interest rate or whatever EEPB and

 7    John did for purposes of making the books right.

 8    Q     What was it -- did you pay the interest or was it just

 9    a journal injury?

10    A     I don't recall.

11    Q     Do you recall GCAC ever trying to collect on these due

12    to/due froms from you or your mother?

13    A     Define trying to collect.

14    Q     Yeah.  Did you ever go to your mom say, mom, your due

15    to/due from are due.  Need you to pay them back.

16    A     Yeah, from time to time, we put money back in against

17    the due to/due froms.  That would be the front part.

18    Q     Okay.  But my question was, did you ever -- do you

19    recall, as GCAC's president, ever going to your mom, GCAC

20    shareholder, and saying we need you to pay back that due

21    to/due from?

22    A     Or part of it?  Is that your question?

23    Q     Sure.

24    A     Yeah, we made contributions back into -- over the --

25    this was a practice that was, to the best of my knowledge,
```

```
 1    done since the inception of the company and money would go
 2    back and forth between the partners of the company or owners
 3    of the company and the company at points the company owed
 4    the partners money, at points the partners owed the company
 5    money, and money flowed back and forth.  I don't know if
 6    that answers your question, but that is the case.
 7    Q    Other than you and your mother and your sister, GCAC
 8    wasn't making these due to/due from distributions to anyone
 9    else that you recall, right?
10              MS. GOOTT:  (indiscernible).
11              THE COURT:  Sustained.
12    BY MR. BERNICK:
13    Q    Aside from you and your mother, GCAC wasn't making any
14    of these due to/due from distributions to anyone else that
15    you recall?
16              THE COURT:  Agree.  You can --
17              MR. BERNICK:  Sure.
18    BY MR. BERNICK:
19    Q    Since 2017 -- since June -- sorry.  Since July 2017, do
20    you recall GCAC ever distributing money under a due to/due
21    from to anyone aside from you or your mother?
22    A    From time to time -- and I don't recall if it was
23    specifically during this time period or -- but in the recent
24    history, also due to/due froms were done for employees from
25    time to time.
```

1    Q    The main recipients of due to/due froms were you and

2    your mother though, correct?

3    A    Yes.

4    Q    Let's look at tab June 2017 on EEPB 174, which is in

5    Exhibit 81.  Mr. Brass, on Line 18, first column, we see due

6    from shareholders in the amount of $86,697 on June 31 --

7    June 30th, 2017, correct.

8    A    I'm sorry, tell me what you're looking at?  Oh, due

9    from shareholders.  Yes.  I see that right now.

10   Q    If we can go to December 2017 tab.  Mr. Brass, looking

11   at that same line in December of 2017, we see the due from

12   shareholders account has increased to $2.9 million, right?

13   A    That's what's written there, yes.

14   Q    So over the course of six months those due to -- due

15   from shareholders increased by essentially $2.9 million.

16   A    I didn't do the math, but if that's what it is, that's

17   what it is.

18   Q    Let's look at Exhibit 89, EEPB 181.  (indiscernible)

19   December 2018 consolidated balance sheet, GCAC, Mr. Brass,

20   and you see due from shareholders amount has increased to

21   $6.2 million on this one.

22   A    That's what's written there, yes.

23   Q    Now have those dollars -- had that $6 million not been

24   distributed to GCAC's shareholders, it could have been used

25   by GCAC for other business purposes, right?

1    THE COURT:  Overruled.  He can answer if he knows in his

2    capacity, GCAC.

3    BY MR. BERNICK:

4    A    Ask the question one more time, please.

5    Q    Sure.  If that $6.2 million hadn't been distributed to

6    GCAC's shareholders, it could have been used by GCAC for

7    other business purposes, right?

8    A    I guess that's true.

9    Q    Mr. Brass, you filed bankruptcy in March of 2021?

10    A    I believe that's correct.

11    Q    On the same day, GCAC filed for bankruptcy, too,

12    correct?

13    A    Correct.

14    Q    You signed GCAC's bankruptcy petition as its president?

15    A    Yes.

16    Q    You signed all of GCAC's schedules and disclosures as

17    its president?

18    A    I think that's correct.

19    Q    And Trifinery also filed for bankruptcy, too, correct?

20    A    Yes.

21    Q    In March of 2021 --

22    A    Correct.

23    Q    Right?  You signed Trifinery's bankruptcy filings as --

24    on behalf of Trifinery, right?

25    A    I assume that's correct.

```
1              MR. BERNICK:  Your Honor, I really need to go to
2    the bathroom.  If we could just (indiscernible) break.
3              THE COURT:  Overruled.  Keep -- no, I'm just
4    kidding.  Why don't we -- it's 2:53.  Why don't we come back
5    at three.
6              MR. BERNICK:  Okay, thank you.
7              CLERK:  All rise.
8              (Recess)
9              CLERK:  All rise.
10             THE COURT:  All right, folks.  Please continue.
11   Back on the record in Vitol v. Brass.
12             MR. BERNICK:  If we could pull up Debtor 84, which
13   is in -- Vitol Exhibit 124 at Debtor 84.
14             THE COURT:  I'm not sure I knew what that meant.
15             MR. BERNICK:  Sorry.  Back up.  Vitol Exhibit 124
16   at Page Debtor 84.
17             THE COURT:  You're referring to a Bates label?
18             MR. BERNICK:  I am.
19             THE COURT:  Got it.  Okay.  Don't stand up.  I'm
20   just going to step off.  I took my -- I left my pen in the
21   chambers.  I'm just going to come back.  I'll come back in
22   30 second.  Please don't stand.
23             MR. BERNICK:  Ready to go, Your Honor?
24             THE COURT:  Yes, yes.  Sorry.
25   BY MR. BERNICK:
```

003262

1    Q    Mr. Brass, showing you Vitol Exhibit 124 at Bates Page

2    Debtor 84.  You recognize that this is a statement of

3    account from Iberia Bank regarding GCAC's asphalt sales

4    account there?

5    A    Yes.  I don't see where it's the asphalt sales account,

6    but it's one of GCAC's accounts.

7    Q    Okay.  One of GCAC's accounts at Iberia Bank and it's -

8    - the date on the statement is December 29th, 2017, correct?

9    A    Yes, sir.

10         MR. BERNICK:  We scroll down just a little bit,

11   Ms. Mehta, please?

12   BY MR. BERNICK:

13   Q    Mr. Brass, do you see in there deposits and additions

14   on December 22nd.  GCAC received a $2 million deposit from

15   Chev Products International?

16   A    Yes.

17   Q    That's a transaction related to or done under the

18   Vitol-GCAC relationship, correct?

19   A    I believe so, yes.

20         MR. BERNICK:  If we can then turn to Page Debtor

21   89 of this exhibit.

22   BY MR. BERNICK:

23   Q    Mr. Brass, towards the bottom, do you see on December

24   22nd there's a wire transfer to you in the amount of

25   $675,000?

1    A    I do.

2    Q    That's one of these due to/due from transfers you've

3    been talking about?

4    A    I don't know that to be the case but if it's on the due

5    to/due froms, then yes.

6    Q    Is there something that keeps track of the due to/due

7    froms?

8    A    Yeah.  Our accountants should keep track of the due

9    to/do froms.

10   Q    Do they keep track of that in the general ledger, GCAC?

11   A    Yes.

12   Q    Have you seen the due to/due from account in the

13   general ledger?

14   A    That the one you just showed me?

15   Q    Is that it?

16   A    I'm sorry.  Ask the question.  I'm trying to -- I'm

17   really trying to answer.

18           THE COURT:  That makes two of us.  I didn't

19   understand the question either.

20           MR. BERNICK:  Sure, sure.

21   BY MR. BERNICK:

22   Q    GCAC -- do you agree that GCAC kept track of these due

23   to/due froms in its general ledger?

24   A    yes.

25   Q    Do you recall -- are you familiar with the due to/due

Page 60

```
1    from account in GCAC's general ledger?

2    A    Yes.  Not in specificity, like I couldn't recall what

3    exactly it was at any given point, but I'm aware of what it

4    is and I'm aware of what's supposed to go into it.

5              MR. BERNICK:  Let's go to Vitol Exhibit 70.

6    BY MR. BERNICK:

7    Q    Mr. Brass, do you recognize this document?

8              MS. GOOTT:  (indiscernible).

9              THE COURT:  That's my understanding.  Counsel?

10             MR. BERNICK:  Try it again, Your Honor.

11             MS. GOOTT:  (indiscernible).

12             MR. BERNICK:  Mr. Brass just testified that he

13   recalls seeing the ledger related to --

14             THE COURT:  Let's move on to another document,

15   Counsel.

16             MR. BERNICK:  All right, let's go back to Vitol

17   Exhibit 124 at Debtor 89.

18             THE COURT:  All right, Vitol Exhibit 124?

19             MR. BERNICK:  124 at --

20             THE COURT:  Okay, no, no, no --

21             MR. BERNICK:  -- Debtor --

22             THE COURT:  As long as I got it, Vitol 124, then

23   you're going to a Bates label 89.  Okay, got it.  Thank you.

24   I forgot Ms. Mehta is going to get me there anyway.  I

25   apologize.
```

```
 1              MR. BERNICK:  If we could scroll down, Ms. Mehta.

 2  BY MR. BERNICK:

 3  Q    Mr. Brass, we just talked about this $675,000 wired to

 4  you from GCAC on December 22nd, correct?

 5  A    Yes, sir.

 6  Q    You authorized this transfer, Mr. Brass; is that

 7  correct?

 8  A    Yes.

 9  Q    You recall that this $675,000 was transferred to your

10  personal bank account?

11  A    It's IBC Laredo at which I had a bank account.  I can't

12  tell what account it was transferred to.  Oh yeah, I can.

13  Yes.

14  Q    It was transferred to your personal bank account; is

15  that correct?

16  A    Yes.

17  Q    You recall on the same day having IBC Bank issue a

18  cashier's check?

19  A    I don't recall that.

20              MR. BERNICK:  Can we go to Exhibit 75 at IBC 61?

21  Exhibit 75 at Bates No. IBC 61.

22              THE COURT:  Vitol 75?

23              MR. BERNICK:  Vitol 75.

24              THE COURT:  No, no.  Take your time.

25              MR. BERNICK:  Certain pages -- Your Honor, certain
```

1    pages of this exhibit were admitted into evidence and this

2    is one of those pages.  On August 31st, it was admitted into

3    evidence.  The pages were.

4              THE COURT:  Bates --

5              MR. BERNICK:  Sixty -- IBC 61.  It's a long list.

6    BY MR. BERNICK:

7    Q    Mr. Brass --

8              THE COURT:  Hold on a second.  I'm going to --

9              MR. BERNICK:  I'm sorry.

10             THE COURT:  -- just -- I'm going to let you ask

11   questions about it, but it's the same stipulation that if it

12   turns out that it wasn't admitted I'm going to strike the

13   testimony on this completely.  Okay?  I know this is

14   housekeeping and I shouldn't do this now, but I'm going to

15   do it because I keep forgetting.  At the end of today before

16   we meet again, I'm going to ask the parties to confirm.  We

17   can go back and listen to the tape and we'll have all the

18   audio just a -- like a good agreed upon list and about what

19   was admitted and what wasn't and let's just have it ready so

20   we -- we're all in agreement as to kind of what we have.

21             No, no, no, no.  I -- and my notes are -- I've got

22   notes in a couple of different places and I want to compare

23   my notes with everyone else's notes, and as long as we can

24   all agree on what it is and we can go back and listen to the

25   tape if necessary, we'll be all in this good.  But for now,

1    we'll allow questions.  If it turns out that it wasn't,

2    we'll strike it.

3    BY MR. BERNICK:

4    Q    Mr. Brass, do you recognize this document -- this page

5    in this document?

6    A    I don't know that I've ever seen it, but I clearly

7    understand what it is.

8    Q    So this is a -- IBC 61, Mr. Brass, is a cashier's check

9    made out in your name to be paid to Zadok Jewelers, correct÷

10   A    Correct.

11   Q    And the date on the check is December 22nd, 2017.

12   A    Correct.

13   Q    That's the same day GCAC transferred $675,000 to your

14   personal account at IBC, correct?

15   A    Correct.

16   Q    This -- and you took those funds and went and bought

17   jewelry with them?

18   A    To be clear, I don't know that this reflects a purchase

19   that was made at that time.  This could just be money from a

20   purchase that was made a long time ago.

21   Q    Either way, you sent --

22   A    Yeah, money that went to Zadok Jewelers, if that's your

23   question.

24   Q    So the money you received on December 22nd went to

25   Zadok Jewelers.  Correct?

Page 64

```
 1   A    Correct.

 2   Q    Mr. Brass, do you recall what the balance of the due

 3   to/due from account between you and GCAC was at the time you

 4   filed bankruptcy?

 5   A    I don't.

 6   Q    Do you recall there being a balance of anything but

 7   zero?

 8   A    I don't recall.

 9             MR. BERNICK: Can we please pull up exhibit --

10   Vitol Exhibit 93?  Let's scroll through it slowly, please.

11   BY MR. BERNICK:

12   Q    Mr. Brass, do you recognize this document?

13   A    Yes.

14   Q    What is it?

15   A    It's part of the bankruptcy filing.

16             MR. BERNICK:  We can scroll to the last page

17   please.  Scroll up.

18   BY MR. BERNICK:

19   Q    Is that your electronic signature, Mr. Brass?

20   A    I'm sorry, I'm not familiar with electronic signatures.

21   I guess so.  It says -- yeah.

22             THE COURT:  No, no, I (indiscernible).

23             MR. BERNICK:  Okay.  Your Honor, we move to admit

24   Vitol Exhibit 93.

25             THE COURT:  Okay, Vitol 93 is admitted.  And look
```

1    -- and I will note that oftentimes, one gets a wet signature

2    and then -- or authorization from the client and then puts

3    on an S-slash on that, so it is not surprising at all to me.

4    I don't read anything into it.  No, no --

5           MR. BERNICK:  Thank you.

6           THE COURT:  There are many times in the practice

7    of law that even one client -- lawyers either get a wet

8    signature or the form of authorization and then they put the

9    S-slash on and they don't send it back to the client.  So I

10   completely understand that and I appreciate Ms. Goott's

11   stipulation, but let's just move on.

12   BY MR. BERNICK:

13   Q    If we could go back to page one of Exhibit 93, please.

14   Mr. Brass, this -- these are GCAC's bankruptcy schedules

15   from its bankruptcy filing; is that correct?

16          THE COURT:  Yeah if -- no, no, no, I to think

17   precision is here.  I think it's required.  If -- is all 19

18   pages the entire schedules or an excerpt or A, B. from the

19   schedules or --

20          MR. BERNICK:  It's A, B, Your Honor.

21          THE COURT:  Okay.  I sustain the objection.

22   BY MR. BERNICK:

23   Q    Mr. Brass, these are GCAC Schedule A, B from its

24   bankruptcy filing.

25   A    Okay.

```
 1    Q     Okay?  If we go to Page 2, Part 3, the accounts

 2    receivable portion.  Mr. Brass, the balance of the accounts

 3    receivable portion totals $35,000.  You see that?

 4    A     Yes.

 5    Q     Are any -- none of the due to/due froms are appearing

 6    on this portion of the schedule; is that correct?

 7    A     I don't think so.

 8    Q     Prior to filing bankruptcy, did GCAC receive all money

 9    owed to it under the due to/due from accounts?

10    A     No.

11    Q     How much was outstanding to GCAC?

12              THE COURT:  If he knows.

13    BY MR. BERNICK:

14    A     I don't know.

15    Q     Let's go back to 2017.  Do you recall prior to July

16    2017 that you and GCAC were sued by a company named Superior

17    Crude?

18    A     I recall that.

19              MR. BERNICK:  Can we pull up Vitol Exhibit 83?

20    By MR. BERNICK:

21    Q     You recognize this document, Mr. Brass?

22    A     I don't -- yes.

23    Q     What is it?  What is it?

24    A     It's a plaintiff's original petition.

25    Q     Is it a true and correct copy of that document?
```

```
 1   A    I don't know.  If you say it is.  If you got it off the

 2   legal website.  I haven't even read it, but I'm not

 3   disputing that.

 4           MR. BERNICK:  Your Honor, we move to admit Vitol

 5   Exhibit 83.

 6           THE COURT:  Sustained.

 7           MR. BERNICK:  Your Honor, we don't offer it for

 8   the truth of the matter asserted, but just for the fact that

 9   there was a filing done.  There was a filing -- that the

10   document says what it says, as (indiscernible) say.

11           THE COURT:  (indiscernible).

12           MR. BERNICK:  Your Honor, we're not offering the

13   document for the truth of the matter asserted, but we're

14   offering it for the fact that it was a lawsuit filed and it

15   was a lawsuit filed and offering for the fact that it was --

16   against who it was filed against -- who it was filed

17   against.  Not saying those are true, but just saying that

18   under notice or -- under notice or that the document says

19   what it says, that's why we're offering this Exhibit 83,

20   Your Honor.

21           And Your Honor, we can the Court to take judicial

22   notice and we also have a certified copy of it as well.

23           THE COURT:  I'm fine taking judicial notice of the

24   fact that it was filed.  That's it.  I mean, in other words,

25   I -- you want to -- that I'm comfortable doing if -- what
```

003272

1    purposes are you offering?  You just want to know that --

2    you just want to --

3            MR. BERNICK:  For notice purposes, Your Honor,

4    which is not under the truth of the matter asserted, but

5    that there was notice of this filing.

6            THE COURT:  That's a different set of questions,

7    right, that someone received notice of a filing as opposed

8    to whether there was a filing.  I view them as two different

9    things.  If -- in other words, but I'll admit it for the

10   purpose that there was a lawsuit, a plaintiff's original

11   petition filed in -- and against one party against another,

12   but not the contents of what -- not for the truth of the

13   matter asserted.  Okay?  After I said all that, I forgot

14   what document it was.

15           MR. BERNICK:  Exhibit eighty -- Vitol Exhibit 83,

16   Your Honor.

17           THE COURT:  Vitol 83 is admitted, but not as a

18   lawsuit between a plaintiff and defendants, but not for the

19   truth -- not for the statement.  But not for the truth of

20   the matter asserted in the statement in it.  Ms. Martinez,

21   I'm sure you'll translate that just perfectly.  I apologize.

22   Let's go.  Let's proceed.

23           (Vitol Exhibit 83 Entered into Evidence)

24   BY MR. BERNICK:

25   Q    Mr. Brass, do you recall how the lawsuit brought by

Page 69

```
 1    Superior Crude against you and GCAC was resolved?

 2    A    Yes.

 3    Q    How was it resolved?

 4    A    We settled it.

 5    Q    Did you enter an agreed judgment related to that

 6    settlement?

 7    A    Sorry, not being a lawyer, I honestly don't know.

 8            MR. BERNICK:  Can we pull up Vitol Exhibit 89,

 9    please?

10    BY MR. BERNICK:

11    Q    You recognize this document, Mr. Brass?

12    A    Yes, it's an agreed final judgment.

13            MR. BERNICK:  Your Honor, we move to offer Exhibit

14    89.

15            THE COURT:  Any objection?  Vitol 89?

16            MR. BERNICK:  Vitol 89.

17            THE COURT:  Vitol 89 is admitted.

18            (Vitol Exhibit 89 Entered into Evidence)

19    BY MR. BERNICK:

20    Q    Mr. Brass, this is Vitol's agreed judgment against you,

21    GCAC, and Trifinery, correct?

22    A    Yes.

23    Q    Amount of this judgment's for $10 million, correct?

24    A    I don't see that.

25            MR. BERNICK:  Scroll down.
```

```
 1   BY MR. BERNICK:

 2   A    Oh, I'm sorry, you skipped on me.  I'm an idiot.  I

 3   thought you were still in the Superior stuff.  I didn't

 4   know.  I got really confused.  I'm sorry.

 5   Q    Mr. Brass, let's talk about -- this is Vitol's judgment

 6   against you, Trifinery, and GCAC, correct?

 7   A    Yes.

 8   Q    And the judgment Vitol has against you, Trifinery, and

 9   GCAC is in the amount of $10 million, right?

10   A    Correct.

11   Q    Nothing has been paid on that judgment?

12   A    Correct.

13   Q    Switching gears a little bit here, Mr. Brass.

14   A    Back to Superior?  Just kidding.

15   Q    Let's talk about the Vitol-GCAC relationship.  Okay?

16   A    Okay.

17   Q    So you believe that at all times the Vitol-GCAC

18   relationship was a joint venture?

19   A    Yes.

20   Q    At some point Vitol told GCAC that it could no longer

21   proceed as a joint venture; is that correct?

22   A    No, I think that mischaracterizes the conversations.

23   Q    Do you recall Vitol disclosing to you the existence of

24   the VALT noncompete?

25   A    Yes.
```

1    Q    When did they disclose that to you?

2    A    I'm recalling -- and again, I just want to say if I

3    misstate a date or something, it's not because I'm trying to

4    misstate a date.  I'm just not good at dates.  But probably

5    August.

6    Q    August 2017?

7    A    Something like that.  Maybe a little earlier.  Maybe a

8    little later.

9         MR. BERNICK:  If we could go to Brass 23, please,

10   at Page 19.  Yes.

11   BY MR. BERNICK:

12   Q    Mr. Brass, you see on -- this is the -- let me back up.

13   This is an exchange of text messages between you and Mr.

14   Kuo?

15   A    Yes.

16   Q    Your texts are in the blue.  Blue bubbles, right?

17   A    Yes.

18   Q    And Mr. Kuo's texts would be in the gray?

19   A    Correct.

20   Q    Okay.  So on July 11th, 2017, you say to Mr. Kuo, "Hey,

21   did you talk to VALT?"  He responds, "Yes.  It wasn't the

22   easiest."  You say, "Want to chat?" and he says, "Will call

23   shortly."  Right?

24   A    Yep.

25   Q    Was it at this point that Vitol disclosed to you the

1    presence of the VALT noncompete?

2    A    I don't think so.

3    Q    Was it before this?

4    A    I think it was after.

5    Q    Okay.  What makes you say that?

6    A    Well, because when I'm looking at this and just kind of

7    refreshing my memory from this text that you're showing me,

8    down below, it says, "Hey there, let me know when you want

9    to do the operations meeting tomorrow."  And I don't think

10   if they said, hey, we've got this noncompete and it's a big

11   problem, I don't think we would have been doing the

12   operations meeting tomorrow.

13        So my guess is that at this point they were saying,

14   hey, we got some issue with VALT, we had to talk to them,

15   but I don't know that they disclosed the noncompete at this

16   point.  My recollection is that was later.  It was just

17   like, hey, there's a problem.  And then later on, more

18   details about the problem and trying to fix it.  That's my

19   recollection.

20   Q    You're saying that Vitol disclosed a problem to you, a

21   problem to you with VALT regarding VALT at this time but it

22   may or may not have been the noncompete?

23   A    Yeah.  I think this is after VALT found out that he had

24   done the deal with us.  And then my recollection is that

25   there's like a storm going on over there and he says, yeah,

1    I had a conversation with VALT or he said, I'm going to have

2    a conversation with VALT, and then he said it wasn't that

3    easy.  But I don't think he disclosed to me at this point.

4    My recollection is -- apologies if I'm wrong -- but my

5    recollection is the noncompete stuff didn't come up until a

6    little after this.

7              MR. BERNICK:  Objection as nonresponsive to

8    everything after Yeah.

9              THE COURT:  Overruled.

10             MR. BERNICK:  Can we please pull up Vitol Exhibit

11   4?

12   BY MR. BERNICK:

13   Q    Mr. Brass, do you recognize Vitol Exhibit 4?

14   A    Can you scroll down just a touch?  I don't remember it,

15   but I read it, yeah.

16   Q    You're a -- what is it?  What is it?

17   A    It's -- well, me actually read it.  Give me one second.

18   It's an email from me to Eric.  Sorry from -- yes, from me

19   to Eric.

20             MR. BERNICK:  Your Honor, we offer Vitol Exhibit

21   4.

22             THE COURT:  Any objection?  Vitol Exhibit 4 is

23   admitted.

24             (Vitol Exhibit 4 Entered into Evidence)

25             MR. BERNICK:  If we could scroll down, Ms. Mehta,

003278

1   please.  A little but further.  Okay, let's stop right

2   there.

3   BY MR. BERNICK:

4   Q    Mr. Brass, so this is an email from Mr. Kuo to you

5   dated July 18th, 2017, correct?

6   A    Yes.

7   Q    And Mr. Kuo's emailing you requesting information that

8   he can provide to Nick, correct?

9   A    Yes.

10   Q    And that -- you recognize that to be Nick Fay?

11   A    Yeah, I believe so.

12   Q    Of VALT?

13   A    VALT or Vitol.  I don't remember exactly.  I'm saying I

14   don't recall whether Nick Fay worked for VALT or for Vitol

15   or for Vitol assigned to VALT or whatever that was.  But I

16   believe it was Nick Fay.

17   Q    But by this point, you knew that VALT was requesting

18   information regarding the relationship between GCAC and

19   Vitol, right?

20         MR. BERNICK:  If we could go to -- let's go to

21   Brass Exhibit 23 at Page 20.

22   BY MR. BERNICK:

23   Q    Again, Mr. Brass, this is a series of text messages

24   between you and Mr. Kuo, correct?

25   A    Yes.

1   Q    And on July 26, 2017 at 9:20 a.m. you ask, "What time

2   is your VALT call?"

3   A    Yep.

4   Q    He said -- Mr. Kuo responds, "Had it an hour ago.  Will

5   see what they come back with.  They seem interested.  One

6   question will be personnel."  Right?

7   A    Yep.

8   Q    So, at this point in time, VALT is exploring whether it

9   can be a part of an arrangement with GCAC, correct?

10  A    Yeah, I think that's fair.

11  Q    At this point, you had knowledge of the VALT

12  noncompete, correct?

13  A    Again, I don't remember when I became -- I definitely

14  became aware of the VALT noncompete.  I don't remember when

15  exactly I became aware of it.  My recollection, it was

16  sometime in the August timeframe, but if you have something,

17  that says something different, I'm happy to look at it and

18  say you're right or you're wrong.  I just don't remember

19  exactly when.

20          MR. BERNICK:  Let's go to Brass Exhibit 23 at

21  Pages 24 through 25.  Starting on Page 24.

22  BY MR. BERNICK:

23  Q    At the bottom, Mr. Brass, August 6th you send a text

24  message to Mr. Kuo saying, "You back in U.S.?"  Mr. Kuo

25  responds, "Yes."  You reply with, "I'm in Montreal tomorrow

1    a.m. to meet with VALT.  Want to chat before I go so we're

2    on the same page."  Did I read that correctly?

3    A    Correct.

4    Q    So at this point, August 6, 2017, VALT and GCAC are

5    exploring if they can do some sort of arrangement together;

6    is that fair?

7    A    Well, with-- Vitol asked me to talk to VALT to see if

8    there was some way that we can incorporate them into the

9    deal.  If that's what you're saying, then yes.

10           MR. BERNICK:  Let's go to Vitol -- excuse me,

11   Brass 23 at Page 29.

12   BY MR. BERNICK:

13   Q    On August 21 at 9:21 a.m. you text Mr. Kuo, "Get

14   together this a.m.?  Can I come by your office?"  He

15   responds, "I can this afternoon.  This morning is booked."

16   You reply, "What time works for you?"  He responds, "2 p.m."

17   Right?

18   A    Yep.

19   Q    You say, "Okay, see you there.  You want to meet with

20   Mike tomorrow?"  Who's Mike?

21   A    I don't remember exactly, but I think it was Mike Loya.

22   Q    Go to the next page.

23           THE COURT:  What was that individual's last name?

24           THE WITNESS:  Loya.

25           THE COURT:  Oh, Loya --

```
 1              THE WITNESS:  Yeah.

 2              THE COURT:  Okay, got it, got it.  Sorry.  Thank

 3     you.

 4     BY MR. BERNICK:

 5     Q    So on the twenty -- August 21st, 2017, you're asking

 6     Mr. Kuo whether he wants to meet with Mike Loya the next

 7     day, right?

 8     A    I think he suggested it and I was saying, did you want

 9     to do what you suggested.  But anyway.

10     Q    He says, "Sure.  Up to you."  Right?

11     A    Mm hmm.

12     Q    Is that a yes?

13     A    Yes.

14     Q    You respond, "We can figure it out this afternoon.

15     Have you vetted the stuff we talked about?"  Mr. Kuo

16     responds, "Which part?  Payout to Rio?"  You reply, "Yes,

17     the short term deal to take them out."  Mr. Kuo responds, "I

18     haven't."  You then respond, "Do you need to?  Are you ready

19     to close on that?"  Mr. Kuo says, "We can talk to Mike about

20     that."

21     A    Okay.

22     Q    Right?

23     A    Yep.

24     Q    Then you say, "Okay, let's walk through it this

25     afternoon so we're on the same page.  Let me know what time
```

1    works for Mike tomorrow.  I'll make myself" --

2    MR. BERNICK:  And you can go to the next page.

3    BY MR. BERNICK:

4    Q    -- "available."  Mr. says, "2 p.m. tomorrow, okay?" and

5    you say, "Sure."  Okay?

6    A    Okay.

7    Q    Did you and Mr. Kuo meet at Vitol's offices on August

8    21st, 2017?

9    A    I don't remember.  I met with them on a number of

10   occasions.  I don't know if we actually met or if we

11   canceled or moved it or met by phone or whatever.  I don't

12   know.

13   Q    Do you recall meeting with Mike Loya at Vitol's office

14   in August 2017?

15   A    I know that I met with them at their offices.  I don't

16   remember if that was at this time.

17          MR. BERNICK:  Okay.  Let's pull up Vitol Exhibit

18   14, which had been previously admitted.

19   BY MR. BERNICK:

20   Q    That same day, August 21st, 2017, you send Mr. Kuo an

21   email.

22   A    Yep.

23   Q    Subject line, "Forward Vitol interim financing

24   structure bullets B2.docx."  Right?

25   A    Correct.

1    Q    and there's attachment, Vitol interim financing

2    structure bullets V2.docx, right?

3    A    Yep.

4    Q    You state to Mr. Kuo, "This is roughly what we are

5    thinking for interim," right?

6    A    Yes.

7    Q    Okay.

8              MR. BERNICK:  If we can scroll down to the second

9    page of Exhibit 14.

10   BY MR. BERNICK:

11   Q    There's a series of bullet points on Page 2.

12   A    Correct.

13   Q    You -- GCAC put together these bullet points, right?

14   A    I think so.  Yeah.

15   Q    You were involved in putting together these bullet

16   points?

17   A    Some degree, probably.

18   Q    And you were putting together these bullet points the

19   day before you were scheduling to meet with Mike Loya,

20   right?

21   A    No, this was after.

22   Q    Okay.  Let's scroll back up.  Email's dated August

23   21st, right?

24   A    Yep.

25   Q    Go back to Page 29 and 30 of Exhibit 23, the text

1    messages we just looked at.

2    A    Okay.

3            MR. BERNICK:  I'm sorry, Brass 23.  Pages 29 and

4    30.

5    BY MR. BERNICK:

6    Q    About midway down, you recall that we went through

7    these series of text messages between you and Mr. Kuo,

8    correct?

9    A    Yes.

10   Q    And that was -- and the date there is August 21st,

11   2017?

12   A    Yep.

13   Q    Any reason to dispute that?

14   A    No.

15   Q    Okay.  And in those text messages on August 21st,

16   you're talking to Mr. Kuo about scheduling a meeting with

17   Mike at Vitol, right?

18   A    Yeah, but I don't know that we didn't already meet with

19   Mike when --

20   Q    Let's scroll -- at the bottom there, do you see, "Do

21   you want to meet with Mike tomorrow?"

22   A    Yeah, I seen that.  Continue your questions.

23   Q    And so the same day you send -- you have this text

24   exchange with Mr. Kuo, is the same day you send Vitol

25   interim financing bullet points, right?

1   A    Yes.  But to be clear, I'm not sure that was our first

2   meeting with Mike.  I think that's talking about meeting

3   with Mike, but my recollection is that we had already met

4   with him.

5            MR. BERNICK:  Objection, nonresponsive.

6            THE COURT:  Overruled.

7            MR. BERNICK:  All right.  Pull up Vitol Exhibit

8   28.

9   BY MR. BERNICK:

10  Q    Do you recognize this document, Mr. Brass?

11  A    Yes.

12  Q    What is it?

13  A    Email from me to Jason Goldstein.

14  Q    Any reason to contest the accuracy of this document?

15  A    No.

16           MR. BERNICK:  Your Honor, we move to admit Vitol

17  Exhibit 28.

18           THE COURT:  Vitol 28 is admitted.

19           (Vitol Exhibit 28 Entered into Evidence)

20           MR. BERNICK:  Ms. Mehta, could we go to the bottom

21  of Page 2, please.

22  BY MR. BERNICK:

23  Q    All right, so Mr. Brass, you see there's an email on 13

24  November 2017 where Mike Ruzek writes to Joe Mattingly and

25  Kenny Hucker of GCAC with the subject line Vitol invoices,

```
 1   right?

 2   A    Yes.

 3   Q    Mr. Ruzek states, "Afternoon.  Should I need to invoice

 4   GCAC for the following which they should have collected from

 5   third party sales" --

 6             MR. BERNICK:  If we scroll down, the next page --

 7             THE COURT:  Sustained.

 8             MR. BERNICK:  Okay, let's go back up.

 9   BY MR. BERNICK:

10   Q    The email from Mr. Ruzek says, "Afternoon.  Should I

11   need to invoice --

12             THE COURT:  I think you can just --

13             MR. BERNICK:  I'm sorry.

14             THE COURT:  I think he can just read it.

15             MR. BERNICK:  Sorry.

16   By MR. BERNICK:

17   Q    -- "show" -- okay, I see.  (indiscernible).  Okay.

18   "Show I need to invoice" -- sorry --

19             THE COURT:  Again --

20             MR. BERNICK:  Yeah.

21             THE COURT:  He can testify to -- he can read it

22   and then you can ask him questions about it.

23             MR. BERNICK:  Okay.

24   BY MR. BERNICK:

25   Q    So Mr. Brass, can you read the email?  Can you read
```

1    this email from Mr. Ruzek?

2    A    "Afternoon.  Show I need to invoice GCAC for the

3    following which they should have collected from third party

4    sales."

5         MR. BERNICK:  Let's scroll down to the next page,

6    please.

7    BY MR. BERNICK:

8    Q    You see there's a list of figures there and a total of

9    $7.6 million --

10   A    Correct.

11   Q    -- roughly.  Right?

12   A    Yes.

13   Q    Mr. Ruzek says, "Let me know if you agree.  I will get

14   you invoices.  Would like to be funded on Thursday, November

15   16th."  Right?

16   A    That's what it says, yes.

17   Q    You eventually receive Mr. Ruzek's email.

18        MR. BERNICK:  We could scroll back up to the top,

19   please.

20   BY MR. BERNICK:

21   Q    Mr. Goldstein agreed with Vitol to wire them $4 million

22   tomorrow?

23   A    Correct.

24   Q    GCAC paid this money to Vitol because it owed Vitol the

25   money?

```
1              THE COURT:  Sustained.
2    BY MR. BERNICK:
3    Q    Did GCAC owe Vitol money at this time?
4    A    I think we sent them money as some sort of an interim
5    balancing.  I don't know that whether when we sent this, we
6    expected that it was money we owed them and they were going
7    to keep it or money that we're going to settle up later.  I
8    don't know.  But we came up with a $4 million dollar number
9    and we sent it to them.  That is true.
10   Q    So Vitol's -- Mr. Ruzek's email -- sorry.  Let me back
11   up.  Mr. Ruzek tells GCAC, Vitol's going to invoice GCAC for
12   the transactions that were listed on the third page?
13   A    He said that, yes.
14   Q    And in response to Mr. Ruzek stating that he's going to
15   invoice GCAC this, GCAC agrees to pay $4 million.
16   A    Well, you also have to read my email where I say, look
17   we're working with them.  It's not so simple as they're
18   saying.  We're talking and trying to work it through them
19   and then ultimately we wired them $4 million.
20   Q    Now, you're on notice that Vitol's going to invoice
21   GCAC over $7 million at this point, right?  That's their
22   intention, right?
23   A    Yes.
24   Q    And you end up paying Vitol $4 million -- GCAC does,
25   right?
```

003289

```
 1    A    Correct.

 2    Q    Okay.  In response to Mr. Ruzek's email, do you recall

 3    anyone at GCAC putting together a reconciliation of profits

 4    and losses as of that point?

 5    A    I don't recall.

 6    Q    That didn't happen, did it?

 7    A    I don't know if it happened or didn't.  I don't recall.

 8    Q    GCAC is a small company, Mr. Brass?

 9    A    It was at some point.  I don't know what your

10    definition of that is, but --

11    Q    In November of 2017, roughly how many employees are

12    working at GCAC?

13    A    I don't know.  Ten-ish?

14    Q    There's a multimillion dollar reconciliation going on

15    in November 2017.  Don't you think you would have known

16    about it as the president of GCAC?

17              THE COURT:  Overruled.

18    BY MR. BERNICK:

19    A    I think it would have been important to the company.

20    I'm not sure what you're asking, because you're asking me

21    about a reconciliation that I don't know about.  So I'm not

22    -- I don't know how to answer your question.

23    Q    I'm asking you if there was a reconciliation done in

24    November of 2017 on the Vitol-GCAC relationship --

25    A    Yeah.
```

1    Q     -- you, as the president of GCAC, would have known

2    about it, wouldn't you?

3    A     Maybe.  Look, we had a deal that was in flux.

4    Reconciling out any given day would have been difficult.  I

5    don't know if we did a reconciliation that day or not.  I

6    simply do not know.

7    Q     Either way in November 2017, Vitol is claiming it is

8    owed $7.6 million from GCAC.

9    A     I don't know that that's correct.

10   Q     They said they were going to invoice GCAC for it,

11   right?

12   A     Yeah, but just because they invoices GCAC for it,

13   doesn't mean that that's necessarily -- in the context of

14   this deal with expenses and people paying for different

15   stuff, because they say, hey, here's $7.6 million we're

16   going to invoice you for, that's more of a -- like a

17   perfunctory bookkeeping thing.  I'm not saying that they did

18   or didn't think they were owed $7 million.  I'm saying no

19   one knew.

20   Q     In response to a perfunctory bookkeeping thing, GCAC

21   sent Vitol $4 million?

22   A     Yes.

23         MR. BERNICK:  Let's go to Vitol Exhibit 35.

24   BY MR. BERNICK:

25   Q     You recognize this document, Mr. Brass?

```
 1   A    I can read it.  This one's pretty easy to read.  Yeah.

 2             MR. BERNICK:  Your Honor, I move to admit Exhibit

 3   35.

 4             THE COURT:  Vitol 35 -- did I get that right?

 5   Vitol 35?

 6             MR. BERNICK:  Vitol 35.

 7             THE COURT:  Vitol 35 is admitted.

 8             (Vitol Exhibit 35 Entered into Evidence)

 9   BY MR. BERNICK:

10   Q    Mr. Brass, on December 15, you instruct Jason Goldstein

11   to have John wire $3.7 million dollars to Vitol before

12   lunch.

13   A    Yes, I'm sorry.  I misread.  Yes, that's correct.

14             THE COURT:  Mr. Brass, can you remind me who Mr.

15   Goldstein is?

16             THE WITNESS:  Mr. Goldstein was our -- one of

17   these positions that's a little hard to describe.  He was an

18   investment banker by trade.  He did some -- way in the --

19   way, way, way before any of this.  He did some like

20   investment banking type work for us.  Then I included him in

21   the team that we formed to do the private equity, the old

22   gravity when we went out and sort of had this terminal

23   acquisition strategy that we're engaging in.  And so he

24   provided, I guess, finance guy, might be the best word.

25             THE COURT:  Got it.
```

```
 1              THE WITNESS:  He's not like an accountant, but
 2    more like our outwardly facing guy when it came to, I don't
 3    know, banks and documents and stuff like that.
 4              THE COURT:  Got it.
 5              THE WITNESS:  Detail guy.
 6              THE COURT:  Got it.
 7              THE WITNESS:  Okay.
 8              THE COURT:  Thank you.
 9              THE WITNESS:  No problem.
10              THE COURT:  Makes sense.
11    BY MR. BERNICK:
12    Q    Back to exhibit Vitol 35.  The John referenced in that
13    document, Mr. Brass, who was that?
14    A    John Tomaszewski.
15              MR. BERNICK:  Let's go to Vitol Exhibit 47.
16    BY MR. BERNICK:
17    Q    You recognize this document, Mr. Brass?
18    A    It's an email from me to Jason Goldstein.
19              MR. BERNICK:  Your Honor, I move to admit Vitol
20    Exhibit 47.
21              THE COURT:  Vitol 47 is admitted.
22              (Vitol Exhibit 47 Entered into Evidence)
23              MR. BERNICK:  Let's scroll down, Ms. Mehta, to the
24    bottom of this page.
25    BY MR. BERNICK:
```

Page 89

1    Q    -- Brass, you see the email from Jason Goldstein to you

2    on January 26, 2018 with the subject line Vitol at the

3    bottom of Page 1?

4    A    Yep.

5    Q    And you -- and Mr. Goldstein states, "Confirm that you

6    want to pay Vitol $8,934,401.25."

7    A    Correct.

8    Q    GCAC paid Vitol that amount of money in January of

9    2018, correct?

10   A    I don't -- if that's what we did.  I don't dispute it.

11   I'm not disputing it.  I just don't remember when we paid

12   it.

13   Q    Let's just scroll up to the top.  You don't dispute

14   that that amount of money was paid by GCAC to Vitol in --

15   A    I don't -- that's what it is in all the -- I know that

16   number's in evidence somewhere.  I just don't remember what

17   the number is, but I'm not disputing it.

18        MR. BERNICK:  Let's go to Brass 23 at Page 49.

19   Forty-nine.

20   BY MR. BERNICK:

21   Q    Okay, so April -- in April 2018, Mr. Brass, Vitol and

22   GCAC are no longer doing any transactions under whatever

23   relationship they had, right?

24   A    Correct.

25   Q    Right?  And here in April -- let's look at this text

003294

1    message from Mr. Kuo, April 2nd, 2018.  He says, "Can you

2    talk now?"  Right?

3    A    Correct.

4    Q    The next day he says, "AJ, any word on you making

5    payment?"

6    A    Correct.

7    Q    You don't respond via text, right?

8    A    Correct.

9    Q    So Mr. Brass -- I mean, Mr. Kuo's asking you for any

10   word on making payment to Vitol, right?

11   A    Correct.

12   Q    In fact, at this point GCAC was already in its

13   marketing agreement with Mercuria?

14   A    I think that's right.

15   Q    So the only thing left to do would've been to reconcile

16   the amounts owed under the GCAC-Vitol relationship?

17        THE COURT:  Sustained.  And I don't think it was a

18   question.

19   BY MR. BERNICK:

20   Q    Mr. Brass, in April -- Mr. Brass, in April 2018, Vitol

21   was making claims on GCAC for amounts Vitol contended it was

22   owed, correct?

23   A    Yes.  Wait, when did you say?

24   Q    April 2018.

25   A    I think that's right.

Page 91

1    Q      At that point, Vitol had already sent GCAC

2    reconciliations, correct?

3    A      I think that by that point, we had traded some back and

4    forth but I don't know what the status of them was.  I

5    wasn't as involved in that.

6    Q      Let's look at Exhibit 51.  You recognize this document,

7    Mr. Brass, Vitol Exhibit 51?

8    A      Yep.

9    Q      What is it?

10   A      An email from me to Eric copying other people.

11          MR. BERNICK:  Your Honor, I move to admit Exhibit

12   51 -- Vitol Exhibit 51.

13          THE COURT:  Vitol 51 is admitted.

14          (Vitol Exhibit 51 Entered into Evidence)

15   BY MR. BERNICK:

16   Q      This email is dated February 13th, 2018, correct?

17   A      Correct.

18   Q      And you write to Mr. Kuo, "Hi, Eric.  Attached is an

19   initial assessment of interim balance due Vitol."  Right?

20   A      Correct.

21          MR. BERNICK:  Scroll down.

22   BY MR. BERNICK:

23   Q      Balance was roughly $1.1 million, right?

24   A      Okay.

25   Q      That correct?

1    A    1.155.  Yes.

2    Q    Looking through this calculation, this calculation only

3    considers product costs; is that correct?

4    A    I think it's hard to tell from this, but that could be

5    correct.

6    Q    You don't say anything about freight or --

7    A    No, but a lot of times those things get included in the

8    purchase price or the sales price or something like that.

9    I'm not disputing that that's correct.  I just don't

10    remember.

11    Q    It's not listed here, though.

12    A    Not listed separately.

13    Q    There's nothing separately listed for freight.  Right?

14    A    No.

15    Q    And you don't see anything listed regarding demurrage

16    or inspections or storage costs, right?

17    A    No, except to the extent that they were included in one

18    of these other things.

19    Q    Before filing its lawsuit, GCAC never sent an

20    assessment to Vitol of what it believed Vitol owed GCAC,

21    right?

22    A    Not specifically enumerated, no.

23    Q    Never happened, right?

24    A    We didn't send one that was specifically enumerated.

25    Q    What do you mean by specifically --

1    A    In other words, we didn't say hey you owe us $4 or

2    whatever.

3    Q    GCAC never told Vitol what it believed Vitol owed GCAC,

4    before filing -- before GCAC filed its lawsuit, right?

5    A    That's not entirely true.  When I talked to Eric prior

6    to filing the lawsuit, I did tell them that there were

7    damages that Vitol had caused by their breach, other things

8    that we hadn't yet calculated.  They never entered into the

9    Canadian crude deals.  There was a list of things that I

10   said.  I did not give him specific quantities because I did

11   not know them at that time, but I did tell him that there

12   were things that that greatly offset this $14 million.  So

13   no, I don't agree with your statement.

14   Q    But we can agree that GCAC never said to Vitol before

15   it filed -- let me back up.  Before GCAC filed its lawsuit,

16   you can agree with me that GCAC never said to Vitol, you owe

17   us X amount of dollars.

18   A    I would agree with that.

19        MR. BERNICK:  Ms. Mehta, can we go back to Brass

20   23 at Page 49?

21   BY MR. BERNICK:

22   Q    Mr. Brass, at the bottom of Page 49 Exhibit 23, you --

23   there's a text message from you to Mr. Kuo on April 9th

24   stating, "Will call you right back."  Right?

25   A    Yeah.

1    Q    Okay.  Let's go to the next page, please.  Mr. Kuo

2    says, "Okay.  Need to speak with you urgently."  If you'll

3    recall, this is -- let me back up.  You recall, April --

4    around April 9th, April 10th is when Vitol was sending

5    reconciliations to GCAC, claiming GCAC owed Vitol over $15

6    million?

7    A    I don't recall that, but if I'm not disputing it.

8    Q    You recall looking at -- move back up.  Strike that.

9              MR. BERNICK:  Your Honor, I think I'm fairly close

10   to being done.  If I could just take a few minutes to --

11             THE COURT:  Yeah.  Why don't we take -- how much

12   time you think you need?

13             MR. BERNICK:  I think it'll be less than 30

14   minutes.

15             THE COURT:  No, no, no, I mean to gather yourself.

16             MR. BERNICK:  Can we just have like ten minutes?

17             THE COURT:  Yeah.  I'll come back on at 4:30.

18             CLERK:  All rise.

19             (Recess)

20             CLERK:  All rise.

21             THE COURT:  Please be seated.  Back on the record

22   in Vitol v. Brass.

23             MR. BERNICK:  Ms. Mehta, can we please pull up

24   Vitol Exhibit 77?  Ms. Mehta?  Can we please pull up Vitol

25   Exhibit 77?

1          Your Honor, this -- believe opposing counsel is

2   stipulated authenticity on this.

3          THE COURT:  Your -- I didn't get the second part.

4   Okay.

5          MR. COOLEY:  Your Honor, may I respond?

6          THE COURT:  I don't think --

7          MR. COOLEY:  -- my apologies.

8          THE COURT:  Well, no, I mean, I don't think

9   anybody's formally moved.  Maybe I misheard.

10         MR. COOLEY:  Well, maybe the objection is

11  premature.  I don't know.

12         THE COURT:  Well, no, no, no, no.  I think -- I

13  understood counsel to say -- Ms. Goott had stipulated to

14  something and I think she was clarifying yes, but don't read

15  too much into that.  I'm also objecting.  So --

16         MS. GOOTT:  (indiscernible).

17         THE COURT:  They haven't offered it yet.  No, but

18  I understood you saying, yes but there's more to the story.

19  Okay.

20         MR. BERNICK:  Your Honor, we move to offer Vitol

21  Exhibit 77.

22         THE COURT:  Okay.  Now we're here.  What's the

23  objection, Ms. Goott?

24         MS. GOOTT:  (indiscernible).

25         THE COURT:  We did, I just want to make sure --

 1                 MS. GOOTT:  Couple of weeks ago, just -- I don't

 2     want to waste time -- your time.  Couple things.  The big

 3     thing, this is -- I assume they're showing the first page.

 4     This is what we were referring to as the jewelry rider?  Is

 5     that right, Mr. Bernick?

 6                 MR. BERNICK:  Yes.

 7                 THE COURT:  Wait.  Hold on.

 8                 MR. BERNICK:  That's correct and --

 9                 THE COURT:  Hold on a second.  Wait, before we

10     have this discussion, should we have it in front of the

11     witness or do we need to --

12                 MS. GOOTT:  I think this is -- I mean this isn't

13     about the document.  This is about procedurally what

14     happened, but whatever the Court --

15                 THE COURT:  I just want to make sure that we're

16     all on the same page and --

17                 MS. GOOTT:  Yeah, I'm fine.

18                 THE COURT:  -- make sure that we're exploring it.

19                 MS. GOOTT:  Are you offering the whole document?

20                 MR. BERNICK:  No.  Your Honor, let me clarify for

21     the record.  This was --

22                 THE COURT:  Because --

23                 MR. BERNICK:  All we are offering --

24                 THE COURT:  Because that's what he said.

25                 MR. BERNICK:  That's right, Your Honor.  Just to

```
 1    clarify for the record, Exhibit 77 is the entirety of the
 2    Chubb document production that we had previously raised --
 3              THE COURT:  That's what I remember.
 4              MR. BERNICK:  -- under the cover of a business
 5    record affidavit covering I think 1,174 pages.
 6              THE COURT:  Yep.
 7              MR. BERNICK:  All we are offering, and this was
 8    what was discussed at the prior hearing on October 30 --
 9    excuse me, August 31st, is Chubb Pages 143 to 174 -- that's
10    000143 to 174.  Those approximately 30 pages comprise a
11    document --
12              THE COURT:  Got it.  Got it.
13              MR. BERNICK:  -- refer to as the jewelry rider.
14              THE COURT:  Let's just -- got it.  Got it.  Okay.
15    No, no, no.  Just -- so now we're getting a little bit more
16    precise.  So 143 to 174, Exhibit 77 is the specific request
17    which -- okay.  Now.
18              MS. GOOTT:  Okay.
19              THE COURT:  Okay.  No, no, no, I'm just -- I'm
20    glad we did this.  So --
21              MS. GOOTT:  Okay.  Yeah, I am, too.  So you're
22    offering the jewelry rider, correct?
23              MR. BERNICK:  Correct.
24              MS. GOOTT:  Okay, my objection to the jewelry
25    rider is, back to what we talked about before.  This jewelry
```

Page 98

1    rider, they told us, they told the Court, this is for the

2    underlying bankruptcy case for the objection to exemption.

3    They served the Debtor in the underlying bankruptcy case

4    with the 2004.

5         After they had already deposed them in the

6    adversary, in the adversary they started to talk about the

7    stuff, the jewelry rider.  We objected because our

8    understanding was this is the objection to exemptions.  They

9    said fine.  They stopped.  And then after the deposition in

10   the bankruptcy case, they filed the 2004 in the underlying

11   case and we came in here and we had this whole discussion,

12   right, because I've seen this happen plenty of times.  I

13   knew where this was headed.  Said, hey, this is for the

14   adversary and we had this whole discussion about how 2004 is

15   a fishing expedition and it's not right for them to do it in

16   the guise of a 2004.

17        They said, no Judge.  You said, no.  You objected

18   to exemptions, Vitol, you get to find out what jewelry he

19   has, whether it's his, whether it's his wife's, whether it's

20   property of the estate, what it's worth, all those things.

21   And they scheduled their 2004, which was scheduled for about

22   a week before trial was going to start.  The day that our

23   witness and exhibit lists were due was the day that we were

24   going to have the 2004 exam.  They canceled it.

25        I asked why.  I didn't get a response.  Doesn't

1    matter.  But the point is, we've rocked along on this issue

2    with them saying this is for the underlying case, and now

3    they show up and they want to use these documents and this

4    was my concern.  So I don't think they get it both ways.  I

5    raised this concern to the Court in advance of this problem

6    so that no one said I waived it, and here we are.

7            THE COURT:  Thank you.

8            MR. COOLEY:  May I respond, Your Honor?

9            THE COURT:  Absolutely.  Yes.

10           MR. COOLEY:  First of all, Vitol -- make sure I'm

11   on the microphone.  Vitol issued a document subpoena to

12   Chubb in this adversary proceeding on or about December 15,

13   2021.  The Court can find the notice on the docket of this

14   adversary proceeding at Docket Entry 22 and I have paper

15   copies if the Court would like to see it.  That was in the

16   adversary proceeding.

17           The documents were produced, I believe, in about

18   February although there's a date on the business record

19   affidavit to us in response to that subpoena.  On March 8, I

20   believe it is, we delivered.  We produced the entire Chubb

21   production, all 1,174 pages to counsel using the share file

22   system about which the Court has previously heard.  I told

23   you on August 31st that standing there at that time I could

24   not tell the Court to a moral certainty that I could confirm

25   that; although, I understood it to be true.

1          Subsequent to that date on September 5th, we filed

2     a notice on the docket together with a declaration of James

3     Tolbert.  That has been on the docket since September 5th at

4     ECF No. 137.  In his declaration, Mr. Tolbert with

5     screenshots of account logs and emails and so forth,

6     confirms that the entire Chubb production including the

7     jewelry rider was produced to counsel by email through the

8     share file system on March 8th.

9          The deposition that counsel is referring to, the

10    witness took place about two-and-a-half weeks later on March

11    25th.  Mr. Aurzada -- and we have that deposition

12    transcript.  We can put it on the screen if we need to, but

13    I'll just summarize as counsel has done.  In that

14    deposition, Mr. Aurzada began to ask questions about the

15    jewelry rider.  Counsel objected.  Asked what the relevance

16    was.  Mr. Aurzada specifically said that it -- we contend it

17    relates to one of the badges of fraud, specifically

18    concealment of assets.

19         Counsel voiced his objection again.  At that

20    point, Mr. Aurzada called for a lunch break and I think

21    said, I'll consider what you've said or what have you, and

22    then after lunch, moved on to another topic.  At no point in

23    time did anybody on either side waive any of their rights.

24    But if the question is whether the document was obtained

25    through discovery in this adversary proceeding and timely

1    produced in the discovery period to counsel, the answer is

2    an unqualified yes.  And then questions were asked in that

3    deposition.

4          Mr. Aurzada made the decision to stop asking

5    questions at that point and to move on to another topic, and

6    that's the end of it, Your Honor, on those facts, and given

7    counsel's limited stipulation to the admissibility of the

8    document which permitted us to excuse the business record

9    custodian who was here to testify to the 90211 and 8036

10   issues, we submit that the document is stipulated as to

11   authenticity for purposes of 90211 and 8036, that it was the

12   product of discovery conducted in the adversary proceeding,

13   that it was a document timely produced to opposing counsel,

14   and I believe I have responded to all of her objections.

15         THE COURT:  Ms. Goott?

16         MS. GOOTT:  I think half of what he said wasn't

17   relevant to my objection.  My point is we objected to

18   discussion of the jewelry rider.  The conversation -- no

19   further questions came regarding the jewelry rider because

20   we believed it was related to the underlying bankruptcy

21   case.  But most importantly, they came in here and they told

22   you this relates to the objection to exemptions.  Let us go

23   forward with it and do a 2004.

24         They can't come to this Court and say the opposite

25   when it's convenient and we walk into trial thinking what

1    does this have to do with this?  They already told us this

2    was related to the objection to exemptions.  We already got

3    a ruling from the Court that they get to go deal with that

4    in the underlying bankruptcy case under a 2004.  They can't

5    pick and choose and then now say, oh no, now it is.  It's

6    just not right.  It's what we all relied on.

7           And at the final point, the issue of notice was

8    never raised by us.  That was the question that the Court

9    had for them.  So I appreciate that they --

10          MR. COOLEY:  No, but --

11          MS. GOOTT:  -- jumped through those hoops, but

12   that wasn't me trying to pretend that I didn't get

13   something.  I never --

14          THE COURT:  I understand.

15          MS. GOOTT:  I never raised that.  My issue is, you

16   can't come in here and tell us one thing and get certain

17   relief and then turn around and say -- because this was my

18   exact worry.  This was the issue I was nervous would happen.

19          MR. COOLEY:  Your Honor, the document -- clearly

20   the document may have -- well, I appreciate the document may

21   have relevance and the Trustee may think so too, in the

22   bankruptcy case --

23          THE COURT:  Right.

24          MR. COOLEY:  But the two are not mutually

25   exclusive.  In the deposition, Mr. Aurzada specifically

 1    articulated why we thought it was relevant.  That was back

 2    in March.  It may also -- and prove relevant to exemptions

 3    or what have you, but a document is not limited to only one

 4    use.  If the question is, is this document the product of

 5    discovery conducted and timely delivered in this adversary

 6    proceeding, the answer is yes.

 7              THE COURT:  Yeah.  So I've considered the

 8    argument.  I actually went back and listened to the hearing

 9    that we had on this and Ms. Goott is right.  I'm the one

10    that raised the question of whether something was timely

11    produced or not, because I thought the issue's come up

12    before.  And so I needed to understand to make sure that

13    there was at least foundationally, that hurdle had been had

14    been crossed.

15              And I did note that the Chubb subpoena was

16    provided in this case and I did listen to the hearing.  I

17    don't think anyone waived any rights at that hearing and I

18    do understand Ms. Goott's point, but a document was produced

19    in connection with the adversary proceeding and I think

20    people get to use it.  So I'm going to allow -- I'm going to

21    admit 143 to 174, for what it's worth.  I should say Chubb,

22    Ms. Martinez.  I should say Chubb.  Or I should say, it's

23    Vitol 77 but only Pages 143 to 174.

24              MR. COOLEY:  Correct, Your Honor.  Yes.  I agree

25    with that --

```
 1              THE COURT:  Okay.

 2              MR. COOLEY:  -- characterization.

 3              THE COURT:  Okay.

 4              MR. BERNICK:  Ms. Mehta, can we go to Page 143 in

 5   Exhibit 77, please?

 6   BY MR. BERNICK:

 7   Q    Mr. Brass, I'm showing you the jewelry rider from your

 8   Chubb insurance policy.  You recognize this document?

 9   A    Yes.

10   Q    Okay.  Let's -- the effective date --

11              MR. BERNICK:  If we could go to Chubb 174, please?

12   BY MR. BERNICK:

13   Q    Mr. Brass, do you see 174 says name and address of

14   insured, and only your name is listed there, correct?

15   A    Yes, I do.

16   Q    You recognize that address as your business address

17   correct?

18   A    It was a former business address.  I don't know if it

19   was our business address at the time or if we just neglected

20   to change it, but it is a business address that we

21   maintained at one point.

22   Q    See the policy period of this rider is April 3, 2020 to

23   April 3, 2021, right?

24   A    Correct.

25              MR. BERNICK:  Can we go to Chubb 149 of Exhibit
```

1   77, please?

2   BY MR. BERNICK:

3   Q    Mr. Brass, you see there's a list of jewelry contained

4   in this insurance rider, correct?

5   A    Correct.

6   Q    If we go to Page 143, we see the rider is

7   (indiscernible) $3.8 million, correct?

8   A    Correct.

9   Q    So if this -- if jewelry covered by this writer was

10  lost or stolen and a claim was made, you, AJ Brass, would

11  receive the proceeds from that claim?

12  A    It covers myself and my wife.  So I'm not sure if she

13  lost something that was hers, that it wouldn't be funds

14  remitted to her.  I'm not sure exactly how that would work.

15  Q    All right, let's go back to 174, please.  Mr. Brass,

16  your wife's name is not on the name and the address of the

17  insured, correct?

18  A    No, but you're omitting all of the other documents that

19  go along with this that specifically state that she is

20  covered as my spouse and a member of my household.  So

21  whether or not it's listed on here is immaterial.  That's my

22  --

23  Q    But you --

24  A    -- understanding.  I'm not an insurance professional.

25  That is my understanding.

1    Q    Your understanding.  You've looked through these

2    insurance documents, right?

3    A    In the past, yes.

4    Q    Yeah.  When's the last time you looked at them?

5    A    Year ago.

6    Q    And you can recall how -- you can recall today how your

7    wife is covered under this insurance policy?

8    A    Yep.

9    Q    And how her belongings are recovered are covered under

10   this --

11   A    It's not a complicated concept.  I mean it's -- that's

12   the way insurance -- I mean this is part of my general

13   knowledge; that is the way insurance companies work.

14   Otherwise, I would certainly list her and it's actually

15   probably a better idea to have her listed in the long run,

16   because the only reason it matters is if I were to die, she

17   would be automatically covered and there would be no gap in

18   coverage.  But other than that, there's functionally no

19   difference, is my understanding.

20           MR. BERNICK:  Switching gears, can we go to

21   exhibit -- Vitol Exhibit 54?

22   BY MR. BERNICK:

23   Q    Mr. Brass, you know -- you knew --

24   THE COURT:  Correct.

25   BY MR. BERNICK:

```
 1    Q    This is -- Exhibit 54 is an email you received on April

 2    10th, 2018, correct?

 3    A    Yes.  No.  Sorry.  I can't read it.  Yes, it is.

 4    Q    So you knew as of that day that Vitol claimed it was

 5    owed by GCAC over $14 million?

 6              MS. GOOTT:  (indiscernible).

 7              THE COURT:  Counsel?

 8              MR. BERNICK:  Your Honor, we -- yes, this document

 9    was only admitted for the limited person -- purpose of

10    notice.  Mr. Brass, GCAC had notice of Vitol's claim.

11              MS. GOOTT:  (indiscernible).

12              THE COURT:  Yeah.  So but what is it?

13              MR. BERNICK:  I can ask another way, Your Honor.

14              THE COURT:  Yeah, why don't you.

15              MR. BERNICK:  Sure.

16              THE COURT:  So I'll sustain the objection, just

17    for the record.

18    BY MR. BERNICK:

19    Q    Mr. Brass, as of April 10th, 2018, GCAC knew Vitol

20    claimed that Vitol was owed money from GCAC, right?

21    A    Yes.

22    Q    And GCAC knew as of that date that Vitol was claiming

23    it was owed over $14 million, right?

24    A    I think that's correct.  Again, with some dates that

25    moved around.  I'm not sure this email says that, but --
```

1    Q    If we --

2    A    At some point.

3              MR. BERNICK:  If we could go to Brass 23.

4              THE COURT:  I was going to say, Mr. Brass, the

5    question wasn't related to the email specifically, just more

6    general.

7              THE WITNESS:  Okay, then --

8              THE COURT:  That's the way I understood.

9              THE WITNESS:   Then I think I answered --

10             THE COURT:  Yeah.  I think you did.

11             THE WITNESS:  Thank you, sir.

12             THE COURT:  I think that's exactly right.

13             THE WITNESS:  Thank you very much, sir.

14             MR. BERNICK:  Page 51, please, of exhibit -- Brass

15   Exhibit 23.

16   BY MR. BERNICK:

17   Q    Mr. Brass, again these were text messages between you

18   and Mr. Kuo, right?

19   A    Yes.

20   Q    And on April 13th, 2018, you stated to Mr. Kuo on your

21   email, "Sorry for delay.  Was shorthanded today."  Mr. Kuo

22   responds, "Okay.  I don't see a payment amount to be paid

23   next week.  Did I miss it?"  I read that correctly?

24   A    Mm hmm.

25   Q    Is that a yes?

1    A    Yes.

2    Q    You respond, "Changed the concept a bit.  Instead of a

3    fixed payment schedule, went with an increasing interest

4    rate schedule to incentivize payback quickly.  We can

5    discuss, but personally I like this better for all involved

6    for a number of reasons."  Did I read that correctly?

7    A    Yes.

8            MR. BERNICK:  Can we go to the next page?

9    BY MR. BERNICK:

10    Q    And Mr. Kuo responds, "So can we expect a payment next

11    week?"  You respond, "Plan for it."  Right?

12    A    Yes.

13    Q    But no payment was made by GCAC to Vitol in April of

14    2018, right?

15    A    Ask your question.  You read one -- a couple of words

16    out of it then asked me a question.  If you read the whole

17    thing, I'm happy to answer whatever it is you're trying to

18    get me to respond to.

19    Q    April 2018, Vitol is inquiring with GCAC about when

20    GCAC is going to make payments to Vitol, right?

21    A    Yes, I think that's right.

22    Q    And you told Vitol you're planning on it.  Planning to

23    make a payment, right?

24    A    No, I think what this says is we had talked about or

25    thought about -- I don't know talked about is right.  We had

1    thought about different payment structures.  We suggested

2    one that has more alignment and I think it -- nicely for

3    both of us.  Okay.  I forwarded it on to Loya.  Let's see

4    what he says.  That's the email exchange.  I just read it.

5    Q    So you talk about payment structures in which -- fixed

6    payment structures in which GCAC is going to be paying

7    Vitol, right?

8    A    Yes.

9    Q    You weren't discussing fixed payment structures where

10   GCAC is going to be paying -- or Vitol is going to be paying

11   GCAC, right?

12   A    That is correct.

13   Q    All right.

14        MR. BERNICK:  Let's go to Page 54 of Brass 23.

15   BY MR. BERNICK:

16   Q    On April 23rd, Mr. Kuo says, "Hey, bud.  Wanted to

17   check that we are still on schedule to receive a payment

18   this week."  You respond, "On schedule."  Right?

19   A    Yep.

20   Q    No payment was made that week.

21   A    No.

22        MR. BERNICK:  Let's go to Page 57 of Exhibit 23,

23   Brass 23.

24   BY MR. BERNICK:

25   A    But if you read -- sorry.

```
 1    Q     You see at the top of Page 57, it says May 2nd, 2018?

 2    A     Yep.

 3    Q     Mr. Kuo says, "Morning.  Any thoughts on a payment

 4    today?"  You respond, "Hey, on a conference call.  Need a

 5    few."  Mr. Kuo responds, "Okay.  Did you see my note above?"

 6    You respond, "Yes.  I have two ideas I want to run by you."

 7    Mr. Kuo says, "Okay."  So again on May 2nd, Mr. Kuo is

 8    following it up about GCAC sending Vitol a payment, right?

 9    A     Yes.

10    Q     Then down at the bottom of Page 57, still on May 2nd,

11    Mr. Kuo says, "Anything for today?"

12          MR. BERNICK:  Then we go to the next page, please.

13    BY MR. BERNICK:

14    Q     You say, "Give me 30 and I'll let you know what we

15    did."  He says, "Okay."  Still no payment made on May 2nd,

16    2018 by GCAC, right?  On this day.  That right?

17    A     Correct.

18    Q     And Mr. Kuo follows up and says, "Anything?  Can you

19    please let me know if you did anything, please?"  You see

20    that?

21    A     Yep.

22    Q     Then the next day, on May 3rd, Mr. Kuo says, "Can you

23    talk?"  Then he follows up three hours later and says, "Why

24    won't you respond?"  Right?

25    A     Yep.
```

1    Q    And you tell Mr. Kuo that you've given this to the

2    lawyers to handle, right?

3    A    Correct.

4    Q    At no time did you tell Mr. Kuo when he was demanding

5    payment that Vitol in fact owed money to GCAC.

6    A    Not true.

7    Q    That's not in any of these text messages?

8    A    No, it isn't.

9    Q    It's not in any email in this in this time period?

10   A    You asked me if I told him.

11              MR. BERNICK:  Your Honor --

12              MS. GOOTT:  (indiscernible).

13              MR. BERNICK:  Your Honor, the other side moved to

14   admit this exhibit.  It's in evidence.

15              MS. GOOTT:  (indiscernible).

16              MR. BERNICK:  Your Honor, the exhibit has been

17   admitted.  It's in.  This is a Brass document.

18              THE COURT:  I'm not sure I understand where he's

19   headed, so it's going to be difficult.  Maybe you just need

20   to get there and I can understand where you're going.  I can

21   deal with it, but --

22              MR. BERNICK:  I think I'm there, Your Honor.

23              MS. GOOTT:  (indiscernible).

24              THE COURT:  Maybe.  Why don't you ask the question

25   and we'll take it up.

```
 1   BY MR. BERNICK:

 2   Q    So in weeks -- Mr. Kuo is demanding payment from GCAC

 3   in April and May of 2018, correct?

 4   A    I'm sorry, I'm a little lost.  Just ask me that again.

 5   Q    In April and May of 2018, Mr. Kuo is demanding payment

 6   from GCAC --

 7   A    I don't think demanding payment correctly characterizes

 8   our conversations.  We're discussing how to settle --

 9          MS. GOOTT:  I'm going to (indiscernible).

10          THE COURT:  Counsel?

11          MR. BERNICK:  Your Honor, I did not ask about any

12   settlement communications.  I'm asking about demands from

13   payment -- demands for payment from Mr. Kuo.  That's what my

14   questions have been for the past ten minutes about these

15   text messages.  There's nothing in here saying that it's a

16   settlement.  There's nothing in here saying we demand a

17   settlement payment.  It's saying, where's the payment?  Why

18   haven't you paid?  Are you going to respond?

19          MS. GOOTT:  This is the heart of what it is, is a

20   settlement and you know that.  And to suggest otherwise,

21   unbelievable.

22          THE COURT:  I'm going to --

23          MS. GOOTT:  (indiscernible).

24          THE COURT:  Has this been established as a

25   settlement communication?  That's what I'm trying to get to.
```

```
 1              MR. BERNICK:  No.

 2              THE COURT:  At what point -- that's what I'm

 3    trying to get to.  Tell me where this is a settlement

 4    communication.

 5              MS. GOOTT:  (indiscernible).  Mr. Brass just said

 6    (indiscernible).

 7              MR. BERNICK:  No, he didn't.  Your Honor --

 8              THE COURT:  I didn't hear that part, and if that's

 9    what he did, then that's what he did, but we can take it up.

10    But I haven't heard that this is in the context of a

11    settlement because I don't know what people are settling in

12    the context right now.

13              But yeah, but I think what --

14              MS. GOOTT:  (indiscernible).

15              THE COURT:  No, no, no.  I guess what I'm saying

16    is, Ms. Goott, and I'm trying -- here's what I'm trying to

17    understand, is people use the word settle in a bunch of

18    different ways.  If there's a dispute over -- take this out

19    of context -- a dispute over, you know, a sale and what the

20    price is, right?  That's not a settlement communication.

21    Those are people trying to figure out how much something is

22    actually owed and hey, are you going to pay me, you're not

23    going to pay me.  Those are -- that's kind of the facts as

24    to how things took place.

25              If there's a settlement communication, how we're
```

1   going to resolve this and that's being offered to prove

2   either the existence of a debt or not, then I do agree with

3   that, comes within the scope of 408.

4           MS. GOOTT:  Well, I would imagine he would ask him

5   that question to clear it up.

6           THE COURT:  Why don't you do that or ask

7   questions.  Just got to take it up, because I -- we'll see

8   where this goes.  I'll allow it for now.

9   BY MR. BERNICK:

10  Q    Mr. Brass, based -- instead of paying Vitol anything in

11  April or May of 2018, GCAC instead sued Vitol, right?

12  A    We attempted to resolve our disputes.  It was clear

13  that Vitol was going to be immobile and not recognize any of

14  the damages they caused, any of their responsibility in this

15  situation that we found ourselves in, and I sued them.

16          MR. BERNICK:  Pass the witness.

17          THE COURT:  Okay.  Ms. Mehta, can you give me back

18  the powers that be?  I think you did.  Or I can do it.

19  Wait.  No, I think I just ruined everything.  I think I can

20  do it with.  Thank you.

21          Okay.  Ms. Goott, I will tell you, and I think you

22  deserve to hear this because I've shared other thoughts.  I

23  -- about the matters that we discussed.  I feel a lot better

24  now.

25          MS. GOOTT:  If it's okay, if we could just have

```
 1    maybe 10, 15 minutes

 2              THE COURT:  Yeah.

 3              MS. GOOTT:  I'm not sure that we're even going to

 4    ask him any questions.

 5              THE COURT:  I needed you to hear that from me.

 6              MS. GOOTT:  Thanks.

 7              THE COURT:  Okay?

 8              MS. GOOTT:  I really appreciate it.

 9              THE COURT:  So maybe the best thing to do is, can

10    you just let Ms. Martinez know when, good for me to come

11    out?  Just so you know, so I don't do the --

12              MS. GOOTT:  Thank you.

13              THE COURT:  Okay.  Thank you.

14              CLERK:  All rise.

15              (Recess)

16              CLERK:  All rise.

17              THE COURT:  Okay, we are back on the record in

18    Vitol v. Brass.

19              MS. GOOTT:  No questions for Mr. Brass.

20              THE COURT:  Okay.  I have no questions.  Mr.

21    Brass, thank you very much for your time.

22              THE WITNESS:  Thank you very much for your

23    consideration, Your Honor.

24              THE COURT:  Okay.  Getting down to I guess

25    housekeeping.  We're going to meet on the 28th.  Dietz will
```

1    be here?

2              MR. COOLEY:  Yes, Your Honor.

3              THE COURT:  And before then, I don't know if it's

4    possible.  If the parties could work on -- I don't know if -

5    -

6              MR. COOLEY:  I can provide some assistance on

7    that.  I think --

8              THE COURT:  About the agreed exhibits?  Yeah.

9              MR. COOLEY:  Your Honor, we have been maintaining

10   a record of the -- fairly real time -- advantages of having

11   a bunch of associates -- throughout the case.  I'd like to

12   take a look at it to make sure there's no super-secret stuff

13   in there, but we'd be happy to share that list with counsel

14   which they can then take a look at, see if they agree, if

15   they disagree with anything, and if we have a -- well, we

16   have a compendium that we're happy to use as a starting

17   point and share --

18             THE COURT:  Okay.  No, that'd be great.  So why

19   don't you send that over there and then -- not telling you

20   to agree to anything, Ms. Goott, it's just, if there's a

21   starting point, then we can all -- okay.  Any5thing else we

22   need to talk about today?  So if we're going to come on the

23   28th, then we'll take that up.  We'll just -- we'll try to

24   get -- well, obviously, Dietz.  We're going to have to get

25   done with Dietz that day because --

```
1              MR. COOLEY:  Yes, Your Honor.

2              THE COURT:  -- he'll be traveling.

3              MR. COOLEY:  And we understood you to day last

4    time that we would go -- we would start at 1 p.m. and go

5    until --

6              THE COURT:  Just -- yeah.  That's -- we're going

7    to have to finish with Dietz.

8              MR. COOLEY:  Rest comfortably.  Bring non-crunchy

9    food.

10             THE COURT:  Yeah.

11             MR. COOLEY:  I think we got the message last time.

12   We'll be prepared accordingly.  We'll --

13             THE COURT:  Okay.

14             MR. COOLEY:  We'll keep it non-crunchy for the

15   staff.  I know they'll appreciate that.

16             THE COURT:  You all are free to -- although you're

17   intimidating everyone who comes in here with all these

18   boxes, making everybody scared thinking it's -- it's their

19   hearing.  No, you're more than free to keep everything here.

20   Anything else we need to take care of today?

21             MR. COOLEY:  Think the only other thing was

22   Tomaszewski, of course, and Your Honor has said we'll take

23   that up next week as well.

24             THE COURT:  Yeah.

25             MR. COOLEY:  And then I guess the only thing I
```

1    would throw out and I don't know what counsel is planning,

2    but I don't know if -- to the extent counsel was planning to

3    call Mr. Brass in their own case, I don't know if -- we

4    don't have any objection to calling him out of order, if

5    they intended to do that and want to knock that out in the

6    time we have.  Otherwise --

7             THE COURT:  I'm going to let them figure all that

8    out.  It sounds like we're done for today and then we'll

9    take everything up.

10            MR. COOLEY:  Very good.

11            THE COURT:  So I'll see everyone on the 28th.  Ms.

12   Goott?

13            MS. GOOTT:  I just want to confirm, they have one

14   witness left?  Right?

15            MR. COOLEY:  That's my understanding, Your Honor.

16            THE COURT:  Okay.

17            MS. GOOTT:  Okay.  And then (indiscernible).

18            THE COURT:  All righty, folks.  I really

19   appreciate it.  Thank you very much.

20            MR. COOLEY:  (indiscernible).

21            THE COURT:  Yeah.  No, no, no.  I'm going to

22   (indiscernible).  We'll stay here on the 28th.  I've got to

23   (indiscernible) Victoria on the 30th, but we're not going to

24   be there on (indiscernible), so I'm just not going to go out

25   there for any reason, so we'll be here on the 28th.  All

1    righty, folks.  Thank you very much for your time and have a

2    good weekend.

3              MR. COOLEY:  Thank you, Judge.

4              CLERK:  All rise.

5

6        (Proceedings adjourned at 5:51 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7    *Sonya M. Ledanski Hyde*

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 26, 2022

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

## PLAINTIFF VITOL INC.'S TRIAL
## BRIEF IN SUPPORT OF JUDICIAL NOTICE

Counsel for Vitol Inc. ("**Vitol**") files this trial brief in support of its request for the Court

to take judicial notice of certain documents in this adversary proceeding, including:

Vitol Ex. 83    *Plaintiff's Original Petition* filed in a lawsuit styled *Superior Crude Gathering, Inc. v. Gulf Coast Crude Gathering & Marketing, LLC, et al.*, Cause No. S-17-5120CV-C

Vitol Ex. 86    *Second Amended Counterclaims, Third-Party Petition, and Application for Injunctive Relief* filed in a lawsuit styled *Gulf Coast Asphalt Company, LLC v. Vitol Inc.*, Cause No. 2018-31578

Vitol Ex. 90    *Schedules of Assets and Liabilities* of Arthur Jacob Brass filed in this Court in Case No. 21-60025

Vitol Ex. 93    *Schedules of Assets and Liabilities* of Gulf Coast Asphalt Company, LLC filed in this Court in Case No. 21-60024

Vitol Ex. 95    *Certification of Amendments* to *Schedules of Assets and Liabilities* of Arthur Jacob Brass filed in this Court in Case No. 21-60025

Each of these documents is relevant to Vitol's claim for relief based upon actual fraud under

11 U.S.C. § 523(a)(2) and is a document of which the Court may take judicial notice under Fed.

R. Evid. 201.  As explained below, the Court's power to take judicial notice of these documents

extends beyond their mere existence to include taking judicial notice of their contents as well. Thus, for example, the Court may take judicial notice (a) that the *Second Amended Counterclaim* included claims for fraud and fraudulent transfer; (b) that a complaint was filed by Superior Crude against Gulf Coast Asphalt Company, LLC ("**GCAC**") and Arthur J. Brass ("**Mr. Brass**" or "**Debtor**") in February 2017; and (c) that the bankruptcy schedules of GCAC do not identify any "due from" balances owed from Mr. Brass and Joyce Brass as assets of GCAC. As explained below, Vitol's request falls squarely within the scope of Fed. R. Evid. 201. Accordingly, Vitol respectfully requests the Court take judicial notice of its Exhibits [83, 86, 89-95 and GCAC's amended schedules] and respectfully states as follows:

## I.     The Permissible Scope of Judicial Notice

1.     Rule 201 states that the Court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court may take judicial notice *sua sponte* or at the request of a party, and may do so at any stage of the proceeding. Fed. R. Evid. 201(c), (d).[1]

2.     Importantly, Rule 201 governs only judicial notice of "adjudicative facts," as distinguished from "legislative facts." Fed. R. Evid. 201(a). In *Taylor v. Charter Medical Corporation*, the Fifth Circuit addressed the propriety of taking judicial notice and held that Rule 201 allows a court to take judicial notice of an "adjudicative fact" if the fact is not subject to

---

[1] While the party questioning the propriety of judicial notice must be heard, an opponent's right to be heard does not require a formal hearing on the matter. Fed. R. Evid. 201(e); *see also Badaiki v. Schlumberger Holdings Corp.*, No. 4:20-cv-02216, 2021 U.S. Dist. LEXIS 227301, at *8 (S.D. Tex. 2021) ("And even if resolution did require judicial notice, an 'opponent's right to be heard before a court takes judicial notice of a fact does not, under all circumstances, require a formal hearing on the matter.'") (citing *MAZ Encryption Technologies LLC v. Blackberry Ltd.*, 347 F. Supp 3d 283, 293 (N.D. Tex. 2018); *Center for Biological Diversity Inc. v BP Am. Production Co.*, 704 F.3d 413, 423 (5th Cir. 2013)).

reasonable dispute in that it is "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." *Taylor v. Charter Medical Corp.*, 162 F.3d 827, 829 (5th Cir. 1998).  Along those same lines, the Fifth Circuit determined that a court may take judicial notice of a "document filed in another court . . . to establish the fact of such litigation and related filings," but "cannot take notice of the factual findings of another court." *Id.*  This is consistent with the position of circuit courts across the country, which uniformly recognize that a "court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"  *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388-89 (2d Cir.1992) (collecting circuit cases).

3.      Although a court cannot take judicial notice of the factual allegations contained in pleadings for the *truth* of those allegations, the court may judicially notice *the fact that those allegations and claims were made*. *Smith v. CitiMortgage, Inc. (In re Smith)*, Nos. 04-50723, 11-05136, 2012 Bankr. LEXIS 1395, at *6-8 (Bankr. W.D. Tex. 2012).  Thus, for example, Judge Leif Clark in *Smith v. CitiMortgage* concluded that, while he could not take judicial notice of individual allegations made in a complaint filed in a related matter to the extent offered for their truth, "[t]he court may, however, take judicial notice of the fact that certain allegations were made against CitiMortgage in the Southern District litigation."  *Id.*

4.      In bankruptcy cases in particular, courts routinely take judicial notice of the existence and content of the *Schedules of Assets and Liabilities* and *Statement of Financial Affairs* filed by a debtor in its bankruptcy case.  For example, Judge Letitia Clark took judicial notice of the fact that bankruptcy schedules and statements of affairs had been signed by the debtor under penalty of perjury, and that those schedules reflected certain discrepancies when compared to the

debtor's pay stub.  *In re Flores*, 208 B.R. 30, 31-32 (Bankr. S.D. Tex. 1996).  This is so because such records, signed under penalty of perjury and maintained on the docket, are viewed as generally beyond reproach absent clear evidence to the contrary. *See, e.g., In re Cox*, No. 06-11717-CAG, 2007 Bankr. LEXIS 4048, at *13 n.6 (Bankr. W.D. Tex. 2007) (holding that it could take judicial notice of the debtor's schedules, which being signed by the debtor under penalty of perjury were "a party-opponent admission under Federal Rule of Evidence 802(d)(2) and must be rebutted with probative evidence") (internal citations omitted); *Manix Energy Ltd. v. James (In re James)*, 300 B.R. 890, 894-95 (Bankr. W.D. Tex. 2003) (observing that "[i]t has become a commonly-accepted practice to take 'judicial notice' of a court's records [and] is particularly useful in bankruptcy litigation…"); *In re Clement Cattle Co., LLC*, No. 15-10072-RLJ-11, 2015 Bankr. LEXIS 2271, at *3 (Bankr. N.D. Tex. 2015) (taking judicial notice of schedules and statement of financial affairs).

## II.    Vitol's Requests for Judicial Notice are permitted under Fed. R. Evid. 201

5.    Here, Vitol asks the Court take judicial notice of two categories of documents routinely noticed by courts in this and other jurisdictions: pleadings filed in certain Texas state courts and debtor schedules and statements filed in this Court. Based upon Fed. R. Evid. 201 and the applicable case law in this and other circuits, the Court may properly take judicial notice of each of these documents for the limited purpose for which they are offered in this adversary proceeding.

## A.    The Court may take judicial notice of *the fact* that certain allegations were made.

6.    The Court may take judicial notice of exhibits Vitol-83 and Vitol-86 for the limited purpose of showing the respective dates of their filing; the parties named in each; and the fact that certain claims, statements, and allegations are contained within them.  Vitol does not ask this Court to take any view—nor could it—on the truth of those claims, statements, and allegations.

7.     Beginning with Vitol-83, the Superior Crude petition is relevant in this adversary proceeding to show that Brass had been threatened with litigation prior to the transfers that form the basis of Vitol's claim under § 523(a)(2) and *Husky v. Ritz*, and that such transfers constitute actual fraud for purposes of § 523(a)(2)(A).  The document's relevance is therefore to show not that Brass or GCAC were liable to Superior Crude but that in February 2017 a complaint had been filed by Superior Crude Gathering Inc. against GCAC, Gulf Coast Crude Gathering, and Mr. Brass. Under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), and as recognized in *Husky*, the fact that the debtor had been sued or threatened with suit before transfers were made is one of the badges of fraud relevant to support a non-dischargeability claim. *See Husky Int'l Elecs., Inc. v. Ritz (In re Ritz),* 567 B.R. 715, 738-39 (Bankr. S.D. Tex. 2017).

8.     Here, Vitol has plead that Mr. Brass committed actual fraud through fraudulent conveyances and the existence of the Superior Crude Petition evidences his fraudulent intent as a badge of fraud. *See* Joint Pretrial Statement [Docket No. 106]. Accordingly, because it is both relevant and within the appropriate scope of judicial notice, Vitol requests the Court take judicial notice of the Superior Crude Petition for the limited purpose described herein. *See* Colonial Leasing Co. v. Logistics Control Grp. Int'l, 762 F.2d 454, 459 (5th Cir. 1985); *ITT Rayonier, Inc. v. United States*, 651 F.2d 343, 345 n.2 (5th Cir. 1981) (holding courts may take judicial notice of pleadings filed in other matters)

9.     Vitol also requests the Court to take judicial notice of Vitol-86, which is Vitol's own counterclaim filed in the action styled *Gult Coast Asphalt Company, LLC v. Vitol Inc.*, and assigned Cause No. 2018-31578 in the 295th District Court of Harris County, Texas. Like the plaintiff in *Smith v. CitiMortgage*, Vitol does not offer Vitol-86 for the truth of any of the allegations made in that filing, but only to establish *the fact* that certain allegations and claims

were made—in particular, that Vitol had at the time asserted claims against GCAC and Mr. Brass for fraud and for the avoidance of certain allegedly fraudulent transfers.

10.     Again, the relevance of these facts relates back to the badges of fraud required under the *Husky* analysis at the heart of Vitol's case and to the nexus between the Agreed Judgment [Vitol-89][2] and the conduct from which that Agreed Judgment arose.  In the Second Settlement Agreement [Brass-33],[3] Mr. Brass, GCAC, and Trifinery "recognize and accept that they jointly and severally owe Vitol $10,000,000 related to claims asserted by Vitol in the lawsuit." Without needing to establish the veracity of those claims, the Court may take judicial notice that Vitol's counterclaim filed in the lawsuit resolved via the Second Settlement Agreement included those for fraud and for fraudulent transfers under TUFTA.

11.     In sum, both documents are relevant to issues in this adversary proceeding and the Court is permitted to take judicial notice of Vitol-83 and Vitol-86 as set forth above.

**B.     The Court may take judicial notice of debtors' bankruptcy filings.**

12.     Vitol requests the Court take judicial notice of Vitol-90 (as amended by Vitol-95) and Vitol-93 as documents signed under penalty of perjury by Mr. Brass and filed in the respective debtor's bankruptcy cases.  Vitol further requests the Court take judicial notice that the GCAC *Schedules of Assets and Liabilities* do **_not_** schedule any "due from" loans owed by Mr. Brass or his mother as assets, and that the original Brass *Schedules of Assets and Liabilities* disclose the existence of only $23,705 in "jewelry," which Mr. Brass subsequently amended to $211,255.

13.     As noted above, bankruptcy courts can—and frequently do—take judicial notice of a debtor's schedules and statement of financial affairs filed with the court. *See In re Cox*, 2007 Bankr. LEXIS 4048, at *13 n.6 (Bankr. W.D. Tex. 2007) ("The Court can take judicial notice of

---

[2] Admitted in evidence in this adversary proceeding on September 21, 2022.

[3] Admitted in evidence in this adversary proceeding on September 16, 2022.

the Debtor's schedules, filed in the case under oath."); *Manix Energy Ltd. v. James (In re James)*, 300 B.R. 890, 894-95 (Bankr. W.D. Tex. 2003) ("It has become a commonly-accepted practice to take 'judicial notice' of a court's records… The practice is particularly useful in bankruptcy litigation in which individual adversary proceedings...all occur within, and are affected by, the context of the parent bankruptcy case.").

14.     As in *In re Flores* cited above, here these bankruptcy filings are relevant to show the fact of certain discrepancies between those filings and other records in disclosing the existence and amount of certain categories of asset.  In particular, the GCAC Schedules disclose no assets in the form of obligations owed from Mr. Brass and his mother to GCAC despite Mr. Brass's sworn testimony—corroborated by GCAC balance sheets [Vitol-81 at EEPB_174 and EEPB_181][4]—that such amounts represented assets of GCAC in the form of "due from / due to" balances.  In addition, Mr. Brass's own *Schedules of Assets and Liabilities* [Vitol-90] disclose less than \$24,000 in jewelry despite evidence that Mr. Brass has an ownership interest in as much as \$3.8 million in insured jewelry [Vitol-77, pages Chubb_000143-174].[5]

15.     Under TUFTA, as applied in *Husky v. Ritz,* concealment of assets is a badge of fraud that supports a finding of non-dischargeability based upon a fraudulent conveyance scheme. *See Husky*, 567 B.R.at 740. These discrepancies between bankruptcy schedules signed by Mr. Brass under penalty of perjury and other financial records are relevant to that and other badges of fraud applicable in the present dispute.  *See* Fed. R. Evid. 401 (defining relevant evidence to include anything that "has a tendency to make a fact more or less probable" and "is of consequence in determining the action").

---

[4] Admitted in evidence in this adversary proceeding on August 31 and September 2, 2022, respectively.

[5] Admitted in evidence in this adversary proceeding on September 21, 2022.

## CONCLUSION

WHEREFORE, Vitol respectfully requests the Court take judicial notice of Vitol-83, Vitol-86, Vitol-90, Vitol-93, and Vitol-95 for the purposes given above pursuant to Fed. R. Evid. 201. As shown, all of Vitol's requests are within the appropriate scope of judicial notice. Accordingly, Vitol requests that this Court takes judicial notice of these documents and for any such other and further relief, at law or in equity, to which Vitol may show itself to be justly entitled.

Dated: September 26, 2022

Respectfully submitted,

By: */s/ Michael P. Cooley*
    Keith M. Aurzada (SBN 24009880)
    Michael P. Cooley (SBN 24034388)
    Bradley J. Purcell (SBN 24063965)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T: 469.680.4200
    F: 469.680.4299
    kaurzada@reedsmith.com
    mpcooley@reedsmith.com
    bpurcell@reedsmith.com
    lrobin@reedsmith.com

    and

    Michael H. Bernick (SBN 24078277)
    Mason W. Malpass (SBN 24109502)
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T: 713.469.3834
    F: 713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

    *Attorneys for Vitol Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on **September 26, 2022**, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all parties registered to receive electronic notices in this adversary proceeding, including counsel for the Defendant.

<div align="right">

*/s/  Michael P. Cooley*
Michael P. Cooley

</div>

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S TRIAL BRIEF ON
THE LEGAL STANDARD APPLICABLE UNDER 11 U.S.C. § 523(A)(4)**

Vitol Inc. (the "*Vitol*" or "*Plaintiff*") files this trial brief regarding the applicable legal standard under 11 U.S.C. § 523(a)(4) for an objection to the dischargeability of a debt based on embezzlement and respectfully states as follows:

**I.
FACTUAL AND PROCEDURAL BACKGROUND**

1.     Among other claims, Vitol objects to the dischargeability of Defendant's debt to Plaintiff under § 523(a)(4) because the Defendant embezzled property entrusted to his care—specifically, quantities of asphalt and related components from which Defendant converted to his personal use approximately $3.7 million in sale proceeds. *See* Joint Pretrial Statement [Docket No. 106] at p. 4. To the extent the Court were to conclude that the parties were engaged in a joint venture, Vitol contends that Defendant misappropriated funds otherwise belonging to the joint venture and, by extension, Vitol, which would have had a right to its share of the funds misappropriated by the Defendant to himself.

2.      At trial, Defendant's counsel advanced the argument that Vitol's claim under § 523(a)(4) must fail because the Defendant was not an employee of Vitol. In fact, employment status is irrelevant to an embezzlement analysis under § 523(a)(4). Rather, the inquiry focuses on whether property was fraudulently appropriated by a person to whom the property was entrusted. *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602-03 (5th Cir. 1998). Here, no matter the legal status of the Vitol-GCAC relationship, a claim under § 523(a)(4) based on embezzlement may be sustained by evidence demonstrating that Vitol entrusted property to the Defendant that was subsequently appropriated by the Defendant and converted to his own purposes.

## II.
## ARGUMENTS AND AUTHORITIES

3.      In the Fifth Circuit, "embezzlement is defined for purposes of § 523(a)(4) as the 'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *Miller*, 156 F.3d at 602. Thus, a plaintiff may prevail on an embezzlement claim where "the debtor appropriated the [entrusted] property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Id.* at 603.

4.      Contrary to Defendant's claims in Court, there is no requirement the person entrusted with the property be an employee of the plaintiff. For example, embezzlement has been found against: (a) restaurateurs who misappropriated working capital investments for personal use, *see McClung v. Castaneda (In re Castaneda)*, 638 B.R. 737, 746 (Bankr. S.D. Tex. 2022); (b) a party to a joint venture, *see Pool v. Johnson*, Civil Action No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613, at *10 (N.D. Tex. 2002); (c) the owner of a construction company working on a project with another company, *see Powers v. Caremark Inc. (In re Powers)*, 261 F. App'x 719, 720-21 (5th Cir. 2008); and (d) a daughter entrusted with access to her mother's brokerage

accounts, *see Winn v. Holdaway (In re Holdaway)*, No. H-08-1532, 2009 U.S. Dist. LEXIS 25167, at *13 (S.D. Tex. 2009).

5.      Simply put, a debt may be held nondischargeable on an embezzlement claim regardless of whether an employer-employee relationship existed between plaintiff and defendant. Therefore, Vitol respectfully submits that, under applicable Fifth Circuit precedent, its claim under § 523(a)(4) is not defeated simply by the absence of any employer-employee relationship between Mr. Brass and Vitol.  Rather, Vitol need only show that the Defendant was entrusted with property that he misappropriated under circumstances indicating fraud.

[This space left intentionally blank.]

Dated:  September 28, 2022

Respectfully submitted,

**REED SMITH LLP**

By: */s/ Keith M. Aurzada*

Keith M. Aurzada (SBN 24009880)
Michael P. Cooley (SBN 24034388)
Bradley J. Purcell (SBN 24063965)
Lindsey L. Robin (SBN 24091422)
2501 N. Harwood, Suite 1500
Dallas, Texas 75201
T:  469.680.4200
F:  469.680.4299
kaurzada@reedsmith.com
mpcooley@reedsmith.com
bpurcell@reedsmith.com
lrobin@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834
F:  713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on September 28, 2022, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all parties registered to receive electronic notices in this adversary proceeding, including counsel for the Defendant.

*/s/  Michael P. Cooley*
Michael P. Cooley