4:59 ✓

**EK**

E Kuo ›

Dec 13, 2017, 11:33 AM

Talk to Mike?

Should I call him?

Dec 13, 2017, 3:11 PM

Have a sec?

On the line, call in a few

K

Dec 14, 2017, 11:22 AM

Hey, I think you sent the email with the summary but for some reason i can't find it anymore. Can you resend?

Sure. Will do right after lunch.

Thks

Dec 14, 2017, 2:34 PM

We also need to discuss a prompt payment of about 4M to satisfy the credit guys

iMessage

4:59

EK

E Kuo >

Dec 14, 2017, 2:34 PM

We also need to discuss a prompt payment of about 4M to satisfy the credit guys

Should be ok. Can we do that in AM? Just trying to juggle cats here.

Yes

Dec 19, 2017, 8:57 AM

You signed?

Dec 19, 2017, 12:11 PM

Almost. Should be this week.

Dec 19, 2017, 2:00 PM

Didn't you say the same thing last week :)

Damn. That smarts!

Dec 21, 2017, 2:50 PM

You guys done?

iMessage

5:00 ✔

**EK**

E Kuo ›

Jan 26, 2018, 9:53 AM

Have a sec?

Need a few, can i call you in 20m?

Sure.

Can you talk now?

Just got off call.

Give me 2 min.

Jan 30, 2018, 3:27 PM

Can you call me when you get a chance?

Feb 5, 2018, 11:28 AM

Ask Mike if he can tell you what the total number of barrels He shows sold directly to GCAC during the course of this deal since inception is in barrels

I'm sending you an email shortly,

iMessage

5:00

**EK**

E Kuo >

> Ask Mike if he can tell you what the total number of barrels He shows sold directly to GCAC during the course of this deal since inception is in barrels

I'm sending you an email shortly, will copy everyone

Feb 13, 2018, 1:57 PM

> In meeting. Give me a few and I'll call.

Ok

Feb 20, 2018, 2:19 PM

Hey, can we pls talk about the reconciliation?

> Yes. Give me a few to get off call.

Ok

Mar 1, 2018, 10:20 AM

> Call u in 1 sec.

iMessage

5:00 ✔

< **EK**

E Kuo ›

Mar 1, 2018, 2:54 PM

What number do we call on?

Is it ok if we call you?  Not sure about my direct dial.

713.230.2685

Got it

Mar 5, 2018, 1:18 PM

Hey, do you have any updates for us?

Yup. Just finishing it up.

Ok cool

Mar 6, 2018, 9:36 AM

Hi AJ, didn't think we saw anything from you guys yday. Are you almost finished?

Jason Just sent

Ok, thank you

iMessage

5:00 √

EK

E Kuo ›

We still good to meet tmrw?

I think so. Let me get through this am. Will confirm this afternoon.

I'm out next wk for spring break

I'm sure you are also

Got ya. I'm leaving tues.

Where r u going?

Would like to get the bulk of this sorted

Agreed.

Going to the Bahamas

Of course. Rematch w Jordan.

Where you headed?

LA

Mar 7, 2018, 10:20 AM

iMessage

3:01



EK

E Kuo ›



We on for today?

Can you reply to that email

Mar 7, 2018, 12:32 PM

Saw I missed your call, need me to call now?

Mar 20, 2018, 11:55 AM

Hi AJ, hope spring break was nice. You free for a call sometime today?

Mar 21, 2018, 9:55 AM

Free for a chat today?

Hey bud. Just back. Let me get my schedule together and hit you this afternoon.

Ok

Mar 26, 2018, 10:11 AM

Hey, can we speak today?

  iMessage 

      

3:01 ✓

**EK**

E Kuo ›

Yes. I'm around today.

Afternoon?

Anytime. Need to get this project done.

Think we said by end of March

Latest

Ok. Let me check in with guys. Will ping you.

Mar 27, 2018, 9:04 AM

Can we speak today please?

Mar 27, 2018, 3:39 PM

1 sec

Mar 27, 2018, 4:58 PM

Why do i get the feeling you are trying to dodge me ?

Apr 2, 2018, 9:46 AM

You free?

iMessage

3:01 ✔

**EK**

E Kuo ›

Will be in about 30

ok

Will call u

Apr 2, 2018, 11:43 AM

Can you talk now?

Apr 3, 2018, 3:49 PM

AJ- any word on making a payment?

Apr 5, 2018, 9:31 AM

Can you talk?

Need 30

K

Free?

Apr 9, 2018, 11:13 AM

Will call right back

iMessage



EK

E Kuo ›

Ok, need to speak with you urgently

Apr 9, 2018, 1:53 PM

Did you speak with Loya?

> No. I figured best to let him cool off and me cool off.
>
> I'll call him this afternoon.

Ok, fair enuf

Apr 11, 2018, 4:45 PM

You have anything for us?

> Just about to call you.
>
> Give me 10

Ok

Apr 13, 2018, 1:34 PM

> Had some people out this am but they're working on it. You'll have email today.

iMessage

  

      

5:02 ◀

EK

E Kuo ›

Thot you said by noon?

I may have.

Needed review.

Will be shortly.

Apr 13, 2018, 6:02 PM

On your email.

Sorry for the delay, was short handed today.

Ok

I don't see a payment amount to be paid next week, did i miss it?

Changed the concept a bit.

Instead of a fixed payment schedule, went with a increasing interest rate schedule to incentivize payback quickly. We can discuss but personally I like this better for all involved for a number of reasons.

iMessage

5:02

**EK**

E Kuo >

So can we expect a payment next week?

> Planned for but admittedly this structure focused on less structure and more alignment.
>
> I think it works nicely for us both but interested to hear your thoughts.

Apr 13, 2018, 7:52 PM

I forwarded on to Loya, let's see what he says

> K

> What did you think?

I think we need more definition and concrete figures, this feels like more pushing the can down the street

> I'm not sure I agree but happy to talk about it.

Sent it to Loya, think he wants

iMessage



E Kuo

Sent it to Loya, think he wants more definition. Didn't like this proposal

We can chat tomorrow if you want.

Sure

Apr 16, 2018, 9:03 AM

Let me know when you have a moment to talk

Sure. Give me 20.

K

Apr 16, 2018, 2:11 PM

1 sec

K

Apr 19, 2018, 10:23 AM

Call me when you get a sec

Apr 23, 2018, 3:17 PM



5:02

EK

E Kuo >

Apr 23, 2018, 2:17 PM

Hey bud, wanted to check that we are still on schedule to receive a payment this week?

On schedule.

FYI, never saw docs from you.

Did I miss them?

No, will be over shortly. Waiting on the lawyer

Apr 23, 2018, 4:46 PM

Sent

Apr 24, 2018, 1:51 PM

Have you had a chance to review the contract?

Apr 26, 2018, 3:08 PM

Can I have my atty at baker McKenzie talk directly to southerland? Do you have contact for whoever you're

iMessage

5:03

**EK**

E Kuo

> Can I have my atty at baker McKenzie talk directly to southerland? Do you have contact for whoever you're using?

Apr 30, 2018, 8:39 AM

> Can I call you later?

Yes. We didn't receive funds on Friday, was it sent?

Apr 30, 2018, 2:57 PM

Do you have a few mins to speak with me and Rick Evans on a call today?

> Yes. Will have to be "off record for discussion purposes only"
>
> If you're ok w that can talk in a bit.

Yes, it can be

> Ok. Give me a few to clear up

iMessage

5:03

EK

E Kuo

Apr 30, 2018, 4:36 PM

You almost ready?

Yes. 1 sec

Ready?

Cell?

Let me get Rick first

Just the 3 of us correct?

Yep

May 1, 2018, 2:13 PM

Give me 1 min

Ok

Sorry. Meant 30. Trying to get off a call.

Will be in a dentist chair at 3:30

I'm avail after 430

iMessage



5:03



EK

E Kuo >

May 2, 2018, 1:48 PM

Anything for today?

Give me 30 and I'll let you know what we did.

K

May 2, 2018, 3:59 PM

Anything?

Can you let me know if you did anything?

Please

May 3, 2018, 9:20 AM

Can you talk?

May 3, 2018, 12:05 PM

Why won't you respond?

May 4, 2018, 9:39 AM

Hi Eric. I'm sorry to have been unresponsive but I've been convinced it's best to let the

iMessage

  

      

5:04 ◁

**EK**

E Kuo ›

May 4, 2018, 9:39 AM

> Hi Eric. I'm sorry to have been unresponsive but I've been convinced it's best to let the attys handle for now. They have my authority to cut a settlement deal which I'm confident they will figure out.
>
> Sorry to have gone ghost, please know it's nothing personal.

I'm curious, do you think the proposal they have come up with for a settlement is reasonable?

> I think we have 2 very experienced attys working for us respectively and we should give them a minute to figure out a deal we can both live with.

9 years for repayment isn't a starting point

> Just tell him to get w Baker Mac and figure it out. They charge enough for God's sake

iMessage



**E Kuo** ›

deal we can both live with.

9 years for repayment isn't a starting point

Just tell him to get w Baker Mac and figure it out. They charge enough for God's sake.

Was the 9 years their idea or yours?

Seems like a big middle finger if you ask me

I can't back channel about the terms of what they're negotiating. Just let them get together and work it out.

I can tell you I've told them to do everything possible to achieve a wholistic settlement.

And I would never give you guys the middle finger. I'm just slightly classier than that.

Delivered

iMessage

      

## Joint Marketing Agreement

Joint Marketing Agreement (the "Agreement") made this 24 day of February, 2016, by and between Rio Energy International, Inc., a Texas corporation ("Rio") and Gulf Coast Asphalt Company, L.L.C., an Alabama limited liability company ("GCAC").  (Rio and GCAC may be referred to individually, as a "Party" or collectively, as "Parties").

### Witnesseth:

Whereas, Rio and GCAC wish to use their resources and expertise to jointly pursue the sourcing, purchase, blending, selling and marketing of asphalt and asphalt related products (the "Products") to and from the GOTAC Terminal located in Corpus Christi, Texas, owned and operated by Gravity Midstream Corpus Christi, LLC (the "GOTAC Terminal"), and the Arc Terminal located in Mobile, Alabama, operated by Arc Terminals Holdings LLC (the "Mobile Terminal") (the GOTAC Terminal and the Mobile Terminal hereinafter referred to collectively as the "Terminals") (the sourcing, purchasing, blending, selling and/or marketing of Products is referred to herein as the "Business"); and

Whereas, the parties wish to set forth in writing their understandings and agreements;

Now, Therefore, in consideration of the premises and the covenants contained herein, the parties agree as follows:

### Article I

### Terminals

(a)     During the term of this Agreement, Rio shall use its commercially reasonable efforts to maintain:

(i)     A terminal services agreement at the GOTAC Terminal (the "GOTAC Terminal Agreement"), upon such terms and conditions as the Parties shall mutually determine from time to time.

(ii)     A terminalling agreement at the Mobile Terminal (the "Rio Mobile Terminal Agreement"), upon such terms and conditions as the Parties shall mutually determine from time to time.

(iii)     A sub-terminalling agreement of the GCAC Mobile Terminal Agreement at the Mobile Terminal (the "Rio Mobile Sub Agreement"), upon such terms and conditions as the Parties shall mutually determine from time to time.

1

000501

(b)    During the term of this Agreement, GCAC shall use its commercially reasonable efforts to maintain a terminalling agreement at the Mobile Terminal (the "GCAC Mobile Terminal Agreement"), upon such terms and conditions as the Parties shall mutually determine from time to time.

## Article II

## Vessels

(a)    During the term of this Agreement, GCAC shall use its commercially reasonable efforts to maintain a charter (the "Iver Vessel Charter") for the vessel known as the "Iver Asphalt" (the "Iver Vessel"), upon such terms and conditions as the Parties shall mutually determine from time to time.

(b)    During the term of this Agreement, GCAC shall use its commercially reasonable efforts to cause its Affiliate, Gulf Coast Crude Gathering & Marketing, LLC, a Texas limited liability company ("GCCGM"), to maintain a charter (the "WSE Vessel Charter") for the vessel known as the "WSE New Building TBN13K" (the "WSE Vessel"), upon such terms and conditions as the Parties shall mutually determine from time to time.

(c)    Upon the mutual agreement of the Parties, the Iver Vessel and the WSE Vessel (collectively, the "Vessels") shall be used for the transportation of Products solely in connection with the Business from such locations, as the Parties may mutually agree from time to time.

## Article III

## Purchase of Products

Upon the prior mutual agreement of the Parties as to quantity, specifications, price and frequency of purchase, Rio will use its commercially reasonable efforts to purchase Products for delivery to the Terminals, and arrange, as necessary, for the blending of the Products.

## Article IV

## Sale of Products

4.1    Sale of Products. Upon the mutual agreement of the Parties as to quantity, specifications, price and identity of customer, Rio and GCAC will each use its commercially reasonable efforts to sell Products for delivery from the Terminals.

4.2    Direct Sales by GCAC. For Products sold by GCAC directly to a customer, immediately prior to the sale by GCAC, GCAC will purchase the Products from Rio upon such terms and conditions and price as the Parties shall mutually determine.

2

25444691v4



Article V

Hedging

Rio may maintain such hedging of the Product as the Parties may mutually determine from time to time.

Article VI

Facility/Vessel Costs

6.1 Rio Costs. Rio will pay all costs incurred with respect to the GOTAC Terminal Agreement, the Rio Mobile Terminal Agreement and the Rio Mobile Sub Agreement, including comprehensive property, casualty and liability insurance coverage as agreed by the Parties, and all costs incurred for any additional facilities or equipment acquired by Rio during the term of this Agreement, for use in connection with this Agreement, with the consent of GCAC (the "Rio Costs").

6.2 GCAC Costs. GCAC will pay all costs incurred with respect to the Vessels, and with respect to the GCAC Mobile Terminal Agreement to the extent not paid by Rio pursuant to the Rio Mobile Sub Agreement, including comprehensive property, casualty and liability insurance coverage as agreed by the Parties, and all costs incurred for any additional facilities or equipment acquired by GCAC during the term of this Agreement, for use in connection with this Agreement, with the consent of Rio (the "GCAC Costs").

Article VII

Calculation of Profits and Losses

7.1 Costs. Costs for purposes of determining profits and losses, and the sharing of costs and profits and losses, for transactions governed by this Agreement, shall include the Rio Costs and the GCAC Costs, and all obligations, liabilities and reasonable costs and expenses incurred by either Party, as well as taxes paid or payable, other than taxes imposed upon the income of the Parties, in connection with the Business, including letter of credit fees, cost of funds for financing the costs and purchase of Product, and hedging gains and losses, all as mutually determined by the Parties.

7.2 Overhead. Except as may be mutually agreed by the Parties from time to time, costs for purposes of determining profits and losses shall not include any general overhead expenses of either Party or the costs of any personnel employed by a Party.

7.3 Currency. All amounts of costs, profits and losses under this Agreement, and any payments to be made, shall be calculated using U.S. Dollars.

3



Article VIII

Reconciliation/Sharing of Profits and Losses/Records/Audit Rights

8.1.   Monthly and Quarterly Reconciliation.  On or before the thirtieth (30th ) day of each calendar month and within sixty (60) days following the end of each calendar quarter, Rio and GCAC will jointly determine the Rio Costs, the GCAC Costs, and other costs related to the Business,  the gross profit from sales of Product, and the net profit (or loss) of the Business during the prior calendar month or applicable quarter for transactions consummated during such month or applicable quarter in accordance with the provisions of this Agreement.  To the extent that one Party is entitled to a payment from the other Party in order for the Parties to share the costs, and net profits (or losses) of the Business, equally, or on such other basis as the Parties shall mutually determine in writing from time to time, a payment will be made to such Party from the other Party within ten (10) business days after such determination.

8.2   Annual Accounting.  Within sixty (60) days after the end of each calendar year, the Parties will perform an accounting of all transactions under this Agreement for the prior calendar year (the "Annual Accounting"), on the basis for the monthly and quarterly reconciliations.  To the extent that one Party is entitled to a payment from the other Party, a payment will be made to such Party from the other Party within ten (10) business days after such determination.

8.3   Final Accounting.  Within ninety (90) days after the expiration or termination of this Agreement or, if later, the earlier of the Expiration Date and the date Rio shall have no further obligations under the Terminal Agreements and GCAC shall have no further obligations under the Vessel Charters, the Parties will mutually perform a final accounting of all transactions under this Agreement (the "Final Accounting"), on the basis that the Parties are to share all costs and profits and losses equally, or on such other basis as the Parties mutually determined in writing.  The Party entitled to payment from the other based on the Final Accounting will generate and send an invoice for the amount as determined in the Final Accounting, which will be paid within ten (10) business days thereafter.

8.4   Records and Audit Rights.

(a)   Each Party shall keep complete, true and accurate books and records in relation to this Agreement and the Business. Each Party will keep such books and records for at least one (1) year following the completion of the Final Accounting.

(b)   Each Party may, upon written request and at its expense and no more than once per year, audit, during ordinary business hours, the books and records relating to the Business of the other Party and the correctness of any payments made or required to be made to or by such Party during such quarter, fiscal year or upon the Final Accounting, and any report, data or calculation underlying such payment (or lack thereof), pursuant to the terms of this Agreement.

4

25444691v4



(c)     On a monthly, quarterly and annual basis, each Party shall provide the other with a reasonably detailed report of all costs incurred by, sales by and gross profits from sales by, such Party, with respect to transactions under this Agreement.

Article IX

Term and Termination

9.1     Term.  The initial term (the "Term") of this Agreement shall commence on the Effective Date, and shall terminate on December 31, 2020 (the "Expiration Date"), subject to earlier termination in accordance with Section 9.2 hereof.

9.2     Termination.

(a)     The Parties may terminate this Agreement at any time upon mutual written agreement.

(b)     Either party may terminate this Agreement effective on or after December 31, 2016, upon not less than ninety (90) days prior written notice to the other.

(c)     In the event of a material breach of this Agreement by a Party (the "Defaulting Party"), which is not cured within thirty (30) days after written notice from the other Party (the "Non-Defaulting Party") specifying the particulars of such breach, the Non-Defaulting Party may terminate this Agreement.

(d)     Either Party may terminate this Agreement with notice if an Insolvency Event occurs in relation to the other Party. In any event when a Party first becomes aware of the likely occurrence of any Insolvency Event in regard to that Party, it shall promptly so notify the other Party in sufficient time to give the other Party sufficient notice to protect its interests under this Agreement.

9.3     Effect of Termination.  Upon a termination or expiration of this Agreement:

(a)     All Product at the Terminals, in the Vessels, or other mutually agreed storage facilities, as of the effective date of termination of this Agreement, will be sold at mutually agreed market price.

(b)     Rio will retain all rights to the Terminals, as evidenced by, and in accordance with the terms of, the Rio Mobile Terminal Agreement, the Rio Mobile Sub Agreement and the GOTAC Terminal Agreement (collectively the "Rio Terminal Agreements"), and be subject to all obligations and liabilities thereunder.

(c)     GCAC and GCCGM will retain all rights to the Vessels, as evidenced by the Vessel Charters, and the Mobile Terminal, as evidenced by, and in accordance with the terms

5

25444691v4

of, the GCAC Mobile Terminal Agreement, but subject to the Rio Mobile Sub Agreement, and be subject to all obligations and liabilities thereunder.

(d)    If this Agreement is terminated prior to the Expiration Date, other than as a result of an Insolvency Event relating to Rio, GCAC will reimburse Rio for fifty percent (50%) of the costs, expenses and liabilities incurred by Rio with respect to the Rio Terminal Agreements during the period commencing on the termination date and terminating on the earlier of the termination date of the Terminal Agreements and the Expiration Date, in excess of any payments received by Rio from third parties for use of the Terminals, to the extent that the Terminals are not used by Rio for its business purposes

(e)    If this Agreement is terminated prior to the Expiration Date, other than as result of an Insolvency Event relating to GCAC, Rio will reimburse GCAC for fifty percent (50%) of the costs, liabilities and expenses incurred by GCAC with respect to the Vessels and the GCAC Mobile Terminal Agreement, during the period commencing on the termination date and terminating on the earlier of the termination date of the Vessel Charters and the GCAC Mobile Terminal Agreement, and the Expiration Date in excess of any payments received by GCAC and GCCGM from third parties for use of the Vessels, and the Mobile Terminal, to the extent that the Vessels and Mobile Terminal are not used by GCAC or GCCGM for their business purposes and payments received by GCAC from Rio under the Rio Mobile Sub Agreement.

(f)    Each Party covenants and agrees to use its reasonable commercial efforts to mitigate the costs and expense reimbursable by the other under clauses (d) and (e) hereof; provided, however, that (i) in the event Rio proposes to sublease or assign any or all of its rights under the Terminal Agreements (a "Terminal Assignment"), Rio shall provide notice to GCAC of the terms and conditions of the Terminal Assignment and provide GCAC with the opportunity to accept a Terminal Assignment upon the same terms and conditions; and (ii) in the event GCAC or GCCGM propose to sublease or assign any or all of their rights under the Vessel Charters (a "Charter Assignment"), or the GCAC Mobile Terminal Agreement (the "Mobile Assignment") GCAC and/or GCCGM shall provide notice to Rio of the terms and conditions of the Charter Assignment or the Mobile Assignment and provide Rio with the opportunity to accept a Charter Assignment or the Mobile Assignment upon the same terms and conditions.

(g)    Except as otherwise expressly provided herein, the expiration or termination of this Agreement for any reason shall not release either Party from any liability that, at the time of such expiration or termination, has already accrued to the other Party or that is attributable to a period prior to such expiration or termination.

9.4.    Assignment of Terminal Agreements.  Notwithstanding the provisions of Section 9.3 hereof, in the event Rio shall elect to terminate this Agreement in accordance with Section 9.2 (b) hereof, upon an election by GCAC, in writing, within thirty (30) days after receipt of the notice of termination from Rio, Rio shall assign all of its rights under the Rio Terminal Agreements to GCAC, and GCAC shall assume all of Rio's obligations under the Rio Terminal Agreements, effective as of the termination date of this Agreement.  Upon such assignment,

6

000506

Rio shall have no obligations to reimburse GCAC for any costs, expenses or liabilities incurred by GCAC under the Terminal Agreements or by GCAC or GCCGM under the Vessel Charters, accruing or arising after the date of termination of this Agreement.

Article X

Exclusivity

10.1    Exclusivity Undertaking by Rio. During the Term of this Agreement, except in accordance with this Agreement or as agreed to by GCAC, Rio shall not, and shall cause each of its Affiliates not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others) in the Business, including, without limitation and by way of example only, (a) the acquisition of any interest in any company or undertaking engaged in the Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out the Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) Rio and its applicable Affiliates from performing their respective obligations under this Agreement and any applicable Terminal Agreement and (ii) Rio's or any of its Affiliates' purchase of a class of publicly traded equity securities of a company engaged in the Business so long as Rio and its Affiliates do not collectively own more than five percent (5%) of such class of issued and outstanding equity securities of such publicly traded company, and so long as neither Rio or any of its Affiliates otherwise exercise any management or control with respect to such publicly traded company

10.2    Exclusivity Undertaking by GCAC. During the Term of this Agreement, except in accordance with this Agreement or as agreed to in writing by Rio, GCAC shall not, and shall cause each of its Affiliates not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others), directly or indirectly, in the Business, including, without limitation and by way of example only, (a) the acquisition of any interest in any company or undertaking engaged in the Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out the Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) GCAC and its applicable Affiliates from performing their respective obligations under this Agreement and any applicable Vessel Charter or the GCAC Mobile Terminal Agreement and (ii) GCAC's or any of its Affiliates' purchase of a class of publicly traded equity securities of a company engaged in the Business so long as GCAC and its Affiliates do not collectively own more than five percent (5%) of such class of issued and outstanding equity securities of such publicly traded company, and so long as neither GCAC or any of its Affiliates otherwise exercise any management or control with respect to such publicly traded company.

10.3    Exception. The provisions of Section 10.1 hereof shall not restrict Rio or its Affiliates from the sourcing and/or purchasing of Products, from any location other than the Port of Corpus Christi or the Port of Mobile, and the blending, selling and/or marketing of

7

000507

Products, or maintaining separate terminal service agreements at the GOTAC Terminal or the Mobile Terminal for the blending and/or storage of Products, for sale into or use in fuel oil pools or other non-asphalt uses, and GCAC shall have (i) no right to share or participate in any profits therefrom and (ii) no obligation to share in any costs or liabilities therefrom.

<div align="center">

Article XI

FCPA

</div>

Each Party warrants to the other Party that it is familiar with the United States Foreign Corrupt Practices Act (as amended, the "FCPA") and its purposes, including its prohibition against paying or giving anything of value, directly or indirectly, by an American company to an official of a non-U.S. government for the purpose of influencing any act or decision in his or her official capacity, inducing such official to violate his or her lawful duty, inducing such official to use his or her influence with a non-U.S. government or an instrumentality thereof to affect or influence any act of such government or instrumentality, or obtaining any improper advantage in order to assist the American company to obtain or retain business. Each Party hereto warrants to the other that it shall not undertake any acts prohibited by the FCPA.

<div align="center">

Article XII

Confidentiality

</div>

12.1    Duty of Confidence. Each Party will maintain in confidence (and will not use to the detriment of the other Party), and will cause its respective Affiliates to maintain in confidence (and not to use to the detriment of the other Party), any written, oral or other Confidential Information obtained from the other Party in connection with this Agreement or the transactions contemplated hereby, or any Confidential Information concerning the Business, unless (a) such information becomes publicly available through no fault of such Party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consents or approvals required for the Business, or (c) the use of such information in connection with any claims by a Party under this Agreement or otherwise in respect of the Business. In the event the recipient Party is required to disclose Confidential Information of the disclosing Party by law or in connection with bona fide legal process, such disclosure shall not be a breach of this Agreement; provided that the recipient Party (i) if legally permitted, informs the disclosing Party as soon as reasonably practicable of the required disclosure; (ii) limits the disclosure to the required purpose; and (iii) at the disclosing Party's request and expense, assists in an attempt to object to or limit the required disclosure.

12.2    Enforcement. To the fullest extent permitted by law, if a Party or any of its Affiliates breaches, or threatens to commit a breach of, Section 12.1, the other Party shall have the right and remedy to have Section 12.1 specifically enforced by any court having jurisdiction, it being acknowledged and agreed that money damages would not provide an adequate remedy in the event of a breach of Section 12.1. Nothing herein shall be construed to limit the

<div align="center">8</div>

25444691v4



right of a Party to collect money damages in the event of a breach of Section 12.1 by the other Party.

<div align="center">Article XIII</div>

<div align="center">Intellectual Property</div>

13.1   Pre-Existing Property. Except as specifically documented in writing between the Parties, all property owned by a Party (whether real or personal, Intellectual Property, tangible or intangible or any other property) shall be owned by such Party, and the other Party shall not have any ownership interest of any nature in such property.

13.2   Ownership of Inventions. All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement shall be owned as follows:

(a)   All inventions, trade secrets and other Intellectual Property arising from the Parties activities under this Agreement, including any patent applications and patents, covering such inventions, trade secrets or other Intellectual Property, made solely by employees or agents of a Party, or its Affiliates, shall be owned by such Party or its respective Affiliates; provided, however, that the other Party shall have a non-exclusive royalty free license to use such Intellectual Property during the term of this Agreement.

(b)   All such inventions, trade secrets or other Intellectual Property developed jointly by employees or consultants of both Parties shall be owned jointly by the Parties.

(c)   Determination of inventorship shall be made in accordance with the patent laws of the United States, and any patent right with a name inventor that is an employee or consultant of each Party will be jointly owned.

13.3   No Other License Grants. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property, except as expressly provided in this Agreement.

13.4   Other Property Rights. Nothing in this Agreement creates, or is intended to create, any direct or indirect interest or right of a Party in the property and assets of the other Party, except as may be separately agreed to between the Parties.

<div align="center">Article XIV</div>

<div align="center">Representations of the Parties</div>

14.1   Representations and Warranties by Rio. Rio represents and warrants to GCAC that: (a) it is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas; (b) it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by law and its organizational documents to authorize the execution and delivery of this Agreement and the

<div align="center">9</div>

consummation of the transactions contemplated by this Agreement; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) all consents, approvals and authorizations from all governmental authorities or other third parties required to be obtained by Rio in connection with this Agreement have been obtained; and (e) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it is a party; or (iii) violate any law or order applicable to it or its properties.

14.2    Representations and Warranties by GCAC. GCAC represents and warrants to Rio that: (a) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Alabama; (b) it is duly qualified to transact business in and is in good standing in the State of Texas; (c) it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by law and its organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) all consents, approvals and authorizations from all governmental authorities or other third parties required to be obtained by GCAC in connection with this Agreement have been obtained; and (e) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it is a party; or (iii) violate any law or order applicable to it or its properties.

14.3    No Other Warranties. EXCEPT AS EXPRESSLY STATED IN THIS ARTICLE XIV, (A) NO REPRESENTATION, CONDITION OR WARRANTY WHATSOEVER IS MADE OR GIVEN BY OR ON BEHALF OF RIO OR GCAC; AND (B) ALL OTHER CONDITIONS AND WARRANTIES WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE ARE HEREBY EXPRESSLY DISCLAIMED AND EXCLUDED.

## Article XV

## Limitation of Liabilities

15.1    Special, Indirect and Other Losses. NEITHER PARTY NOR ANY OF ITS AFFILIATES SHALL BE LIABLE IN CONTRACT, TORT, NEGLIGENCE, BREACH OF STATUTORY DUTY OR OTHERWISE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR FOR LOSS OF PROFITS SUFFERED BY THE OTHER PARTY.

25444691v4

000510

Article XVI

Miscellaneous

16.1   Assignment.  This Agreement and the rights hereunder may not be assigned by a Party without the prior written consent of the other Party, which consent may be withheld in such Party's sole discretion.

16.2   Relationship of the Parties.  Nothing contained in this Agreement shall be deemed to constitute a partnership, joint venture, or legal entity of any type between the Parties, or to constitute one as the agent of the other. Moreover, each Party agrees not to construe this Agreement, or any of the transactions contemplated hereby, as a partnership for tax or any other purposes. Each Party shall act solely as an independent contractor, and nothing in this Agreement shall be construed to give any Party the power or authority to act for, bind, or commit the other.

16.3   Further Assurances.  Rio and GCAC hereby covenant and agree, without the necessity of any further consideration, to execute, acknowledge and deliver any and all such other documents and take any such other action as may be reasonably necessary to carry out the intent and purposes of this Agreement.

16.4   Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without reference to any choice of law provisions that would result in the application of the laws of another jurisdiction.

16.5   Meeting of the Parties.  Not less frequent than quarterly, the Parties shall meet to discuss and analyze the performance and strategy of the transactions hereunder.

16.6   Compliance with Law.  Each Party shall perform its obligations under this Agreement in accordance with all applicable laws. No Party shall, or shall be required to, undertake any activity under or in connection with this Agreement which violates, or which it believes, in good faith, may violate, any applicable law.

16.7   Expenses.  Each Party shall pay the fees and expenses of its respective lawyers and other experts and all other expenses and costs incurred by such Party incidental to the negotiation, preparation, execution and delivery of this Agreement, none of which shall be included in the determination of profits or losses or the sharing thereof.

16.8   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

25444691v4

000511

16.9   Cumulative Remedies. No remedy referred to in this Agreement is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to in this Agreement or otherwise available under law.

16.10   Dispute Resolution.

(a)   In the event of a dispute relating to the interpretation, performance or alleged breach of this Agreement, the Parties will refer the dispute to the senior executive officers of the Parties for discussion and resolution. If the senior executive officers cannot resolve such dispute within thirty (30) days of the matter being referred to them, either Party shall agree to mediate such dispute with a mutually agreed mediator.  If after such mediation the Parties are unable to resolve the dispute, either Party may be free to initiate litigation in Harris County, Texas.

(b)   Notwithstanding any of the other provisions hereof, nothing herein shall limit, restrict or delay a Party's right to seek and obtain injunctive relief or specific performance from a court of competent jurisdiction in order to protect its interests without first complying with this Section 16.10(a).

16.11   Waivers and Amendments. The failure of any Party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other Party. No waiver shall be effective unless it has been given in writing and signed by the Party giving such waiver. No provision of this Agreement may be amended or modified other than by a written document signed by authorized representatives of each Party.

16.12   Force Majeure.  Neither Party shall be responsible to the other for any failure or delay in performing any of its obligations under this Agreement, or for other nonperformance hereunder, if such delay or nonperformance is caused by strike, stoppage of labor, lockout or other labor trouble, fire, flood, accident, war, act of terrorism or of the government of any country or of any local government, or by cause unavoidable or beyond the control of any Party hereto, which event continues for more than one (1) month.  In such event, the Party affected will use its commercially reasonable efforts to resume performance of its obligations.

16.13   Notices.  All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when received by the addressee, at the addresses set forth below (or to such other addresses as a Party may designate by notice):

12

25444691v4

If to Rio Energy International, Inc.:

       5718 Westheimer
       Suite 1806
       Houston, Texas 77057
       Attn:_____

If to Gulf Coast Asphalt Company, L.L.C.:

       Attention: Vice President and General Counsel
       1990 Post Oak Blvd.
       Suite 2400
       Houston, Texas 77056

    16.14 This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and no modification or revision thereof shall have any force or effect unless the same is in writing and executed by the Parties hereto.

<div align="center">Article XVII</div>

<div align="center">Definitions</div>

    For purposes of this Agreement, the following terms shall have the meanings set forth in this Article:

"Affiliate" means, with respect to a Party, any Person that controls, is controlled by, or is under common control with that Party.

"Confidential Information" means all proprietary information, trade secrets and other confidential data of a financial, commercial or technical nature which the disclosing Party or any of its Affiliates has supplied or otherwise made available to the other Party or its Affiliates, whether made available orally, in writing or in electronic form.

"Insolvency Event" means, in relation to either Party, any one of the following: (a) that Party is the subject of voluntary or involuntary bankruptcy proceedings instituted on behalf of or against such Party (except for involuntary bankruptcy proceedings which are dismissed within sixty (60) days of commencement); (b) an administrative receiver, receiver and manager, interim receiver, custodian, sequestrator or similar officer is appointed in respect of that Party (collectively, the "Receiver") and that Party has not caused the underlying action or the Receiver to be dismissed within sixty (60) days after the Receiver's appointment; (c) the board of directors (or similar governing authority of such Party) has passed a resolution to wind up that Party, or such a resolution shall have been passed other than a resolution for the solvent reconstruction or reorganization of that Party; (d) a resolution shall have been passed by that Party or that Party's directors to make an application for an administration order or to appoint

25444691v4

<div align="center">13</div>

000513

an administrator; or (e) that Party makes a general assignment, composition or arrangement with or for the benefit of all or the majority of that Party's creditors, or makes, suspends or threatens to suspend making payments to al or the majority of that Party's creditors.

"Intellectual Property" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases that are owned or used by the applicable Party and its affiliates.

"Person" means any individual, partnership, limited liability company, firm, corporation, association, trust, unincorporated organization or other entity.

"Third Party" means any Person other than a Party or an Affiliate of a Party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on their respective behalf, by their respective officers, duly authorized, in multiple originals.

RIO ENERGY INTERNATIONAL, INC.

By: _____
Print Name: William Illisinc
Title: President

GULF COAST ASPHALT COMPANY, L.L.C.

By: _____
Print Name: Arthur J. Brisi
Title: Pres / Mgr

The undersigned hereby agrees to be bound by the provisions of this Agreement relating to the WSE Vessel and the WSE Vessel Charter:

Gulf Coast Crude Gathering & Marketing, LLC

By: _____
Print Name: Arthur J. Brisi
Title: Pres / Mgr

25444691v4

Joint Marketing Agreement

Joint Marketing Agreement (the "Agreement") made as of this __ day of ~~June~~July 2017 by and between Vitol Inc., a Delaware corporation located at 2925 Richmond Avenue, 11th Floor, Houston, Texas 77098 ("Vitol") and NewCo, a [Delaware] limited liability company located at 1990 Post Oak Blvd., Suite 2400, Houston, TX 77056 ("NewCo").  (Vitol and NewCo may be referred to individually as a "Party" or collectively, as "Parties").

Witnesseth:

Whereas, Vitol and NewCo wish to use their resources and expertise to jointly pursue the sourcing, purchase, blending, selling and marketing of asphalt and asphalt related products, and other products (collectively, the "Products") as mutually agreed between the Parties from time to time (collectively, the "Business").  Initially, the Parties shall pursue Business utilizing leased storage at (a) the GOTAC Terminal (the "GOTAC Terminal") located in Corpus Christi, Texas, owned and operated, as of the date hereof, by Gravity Midstream Corpus Christi, LLC ("Gravity"), and the Arc Terminal located in Mobile, Alabama (the "Mobile Terminal", and together with the GOTAC Terminal, the "Terminals"), operated by Arc Terminals Holdings LLC ("Arc").~;~ and

Whereas, the Parties wish to set forth in writing their understandings and agreements;

Now, therefore, in consideration of the premises and the covenants contained herein, the Parties agree as follows:

Article I

Terminals

During the term of this Agreement, Vitol shall use its commercially reasonable efforts to:

(a)    Obtain use of the assets pertaining to the current terminal services agreement between Rio Energy International, Inc. ("Rio") and Gravity at the GOTAC Terminal, upon such terms and conditions as currently exist between Rio and Gravity, or on such other terms and

1

Can't be sure if an Affiliate in Asia might be conducting similar Business in the Far East, but that should not be a problem given the scope of this agreement

Should this have a geographic restriction?  Will the Business be conducted domestically?  North America?  NA plus Mexico?

conditions as the Parties shall mutually determine from time to time, or (ii) receive an assignment from Rio of such terminal services agreement.

(b)      Maintain consecutive short-term subleases from Gulf Coast Asphalt Company, L.L.C. ("GCAC") of the terminalling agreement at the Mobile Terminal, upon such terms and conditions as currently exist, or as the Parties shall mutually determine from time to time.

Article II

Purchase of Products

Upon the prior mutual agreement of the Parties as to quantity, specifications, price and frequency of purchase, Vitol will use its commercially reasonable efforts to purchase Products for delivery to the Terminals, or such other locations as mutually agreed between the Parties, and arrange, as necessary, for the blending of the Products.

Article III

Sale of Products

3.1      Sale of Products.  Upon the mutual agreement of the Parties as to quantity, specifications, price and identity of customer, Vitol and NewCo will each use its commercially reasonable efforts to sell Products for delivery from the Terminals.

3.2      Direct Sales by NewCo.  For Products sold by NewCo directly to a customer, immediately prior to the sale by NewCo, NewCo will purchase the Products from Vitol upon such terms and conditions and price as the Parties shall mutually determine.

Article IV

Hedging

Vitol may maintain such hedging of the Product as the Parties may mutually determine from time to time.

Article V

Facility Costs and Cost Allocations

2

5.1     <u>Vitol Costs.</u>   Vitol will pay all costs incurred with respect to the Terminals, including comprehensive property, casualty and liability insurance coverage as agreed by the Parties, and all costs incurred for any additional facilities or equipment acquired by Vitol during the term of this Agreement, for use in connection with this Agreement, with the consent of NewCo (the "Vitol Costs").

5.2     <u>NewCo Costs.</u>   NewCo will pay or reimburse all costs related to the personnel directly responsible for the sourcing, purchasing, selling, blending and operations related to the Products and the Business, including all wages, salaries, benefits and other costs, including but not limited to discretionary bonuses as mutually agreed to between the Parties from time to time (the "Newco Costs"), including all salaries, wages, bonuses, employment taxes, and benefits (the "Trade Team Personnel").  The personnel shall include the Trade Team Personnel as of the date of this Agreement as set forth on Schedule A.  Any changes to the Trade Team Personnel or changes to their compensation shall be mutually agreed upon between the Parties from time to time.

<u>Article VI</u>

<u>Calculation of Profits and Losses</u>

6.1     <u>Costs</u>.   Costs for purposes of determining profits and losses, and the sharing of costs and profits and losses, for transactions governed by this Agreement, shall include the Vitol Costs and the NewCo Costs, and all obligations, liabilities and reasonable costs and expenses incurred by either Party, as well as taxes paid or payable, other than taxes imposed upon the income of the Parties, in connection with the Business, including letter of credit fees, cost of funds for financing the costs and purchase of Product, hedging gains and losses, direct and out-of-pocket costs incurred by either Party and mutually agreed upon between the Parties, as well as all other costs as mutually determined by the Parties. To the extent both parties agree, the book may pay incentive bonuses to Trade Team Personnel, but it is the intent of the Parties that any incentive compensation reasonable for Patrick Perugini, if any, would be paid by NewCo, at NewCo's discretion and expense.

6.2     <u>Overhead</u>.   Except as may be mutually agreed by the Parties from time to time, costs for purposes of determining profits and losses shall not include any general overhead expenses of either Party other than the specific Vitol Costs or Newco Costs described in Section 5.2, but shall include direct, out-of-pocket expenses of either Party incurred directly as a result

> Before execution of this Agreement, the Parties agree to have their respective operational and accounting personnel meet to discuss operational and accounting issues to be addressed during the term of this Agreement, and based on their discussions we can modify Articles 6 and 7 accordingly.

3

of pursuing the Business (e.g., asphalt industry association fees or personnel fees incurred with attending an industry conference), as mutually agreed between the Parties.

6.3     Currency.  All amounts of costs, profits and losses under this Agreement, and any payments to be made, shall be calculated using U.S. Dollars.

<div align="center">Article VII</div>

<div align="center">Reconciliation/Sharing of Profits and Losses/Records/Audit Rights</div>

7.1.    Monthly Payments and Reconciliation.  The Parties agree that it is their intent to equally share on a fifty/fifty percent basis the profits and losses of the Business.  To effect that intent, the Parties agree as follows:

(a)     On the first day of each calendar month, Vitol shall reimburse NewCo for fixed costs related to the Business, such month's payments under the Arc terminalling agreement and expected Trade Team Personnel salaries, draws and related benefits/full burden (collectively, "First of Month Charges"), provided that NewCo shall invoice Vitol for First of Month Charges five business days prior to the start of such month, and if NewCo fails to invoice Vitol for First of Month Charges five business days prior to the start of such month, such payment shall not be due until five business days following invoice.

(b)     No later than the 10th business day after the end of each month, (a) Vitol shall provide a draft reconciliation of the gross profit, and net profit including but not limited to the Vitol Costs and NewCo Costs to NewCo, and (b) NewCo shall provide a reconciliation of any changes to First of Month Charges previously invoiced as well as any other reconciling items, including but not limited to inspection charges, utility charges, etc., to Vitol.  Parties shall seek to review such drafts and agree to final monthly reconciliations of profits and losses ("Final Reconciliation") no later than the 15th business day following the end of such month.  To the extent that one Party is entitled to a payment from the other Party in order for Parties to equally share in profits or losses of the Business, or on such other basis as the Parties may mutually determine in writing from time to time, a payment shall be much to such Party from the other Party within three business days of such Final Reconciliation.

(c)     To the extent that, subsequent to the Final Reconciliation, either Party finds errors or discovers previously undiscovered income or costs related to the Business, such Party may present such errors or discoveries to the other Party, and the Parties shall seek to correct any such prior Final Reconciliations and make applicable payments in a reasonable period of time.

7.2     Final Accounting.  Within sixty days after the termination of this Agreement, the Parties will mutually perform a final accounting of all transactions under this Agreement (the "Final Accounting"), on the basis that the Parties are to share all costs and profits and losses equally, or on such other basis as the Parties mutually determined in writing.  The Party entitled

<div align="center">4</div>

to payment from the other based on the Final Accounting will generate and send an invoice for the amount as determined in the Final Accounting, which will be paid within three business days thereafter.

7.3    Records and Audit Rights.

(a)    Each Party shall keep complete, true and accurate books and records in relation to this Agreement and the Business. Each Party will keep such books and records for at least one (1) year following the completion of the Final Accounting.

(b)    Each Party may, upon written request and at its expense and no more than once per year, audit, during ordinary business hours, the books and records relating to the Business of the other Party and the correctness of any payments made or required to be made to or by such Party during such quarter, fiscal year or upon the Final Accounting, and any report, data or calculation underlying such payment (or lack thereof), pursuant to the terms of this Agreement.

(c)    On a monthly basis, each Party shall provide the other with a reasonably detailed report of all costs incurred by, sales by and gross profits from sales by, such Party, with respect to transactions under this Agreement.

Article VIII

Term and Termination

8.1    Term.  The initial term (the "Initial Term") of this Agreement shall commence on the date of this Agreement and shall expire on the second anniversary of the date of this Agreement.   The Initial Term shall automatically renew for an additional one year terms ("Renewal Term") unless written notice is provided by the non-renewing Party at least 180 days prior to the expiration of the Renewal Term or Initial Term, as applicable, unless terminated early in accordance with 8.2.

8.2    Termination Events.

(a)    In addition to the termination provisions of Section 8.1 of this Agreement, the Parties may terminate this Agreement at any time upon mutual written agreement.

(b)    Either party may terminate this Agreement effective on or after the first year of the Initial Term, upon not less than ninety (90) days prior written notice to the other.

(c)    (b)  In the event of a material breach of this Agreement by a Party (the "Defaulting Party"), which is not cured within thirty (30) days after written notice from the other Party (the "Non-Defaulting Party") specifying the particulars of such breach, the Non-Defaulting Party may terminate this Agreement.

5

(d)   ~~(c)~~ Either Party may terminate this Agreement upon written notice if an Insolvency Event occurs in relation to the other Party. In any event when a Party first becomes aware of the likely occurrence of any Insolvency Event in regard to that Party, it shall promptly so notify the other Party in sufficient time to give the other Party sufficient notice to protect its interests under this Agreement.

8.3    Effect of Termination.  Upon a termination or expiration of this Agreement:

(a)    All Product at the Terminals, or other mutually agreed storage facilities, as of the effective date of termination of this Agreement, will be sold at mutually agreed market price.

(b)    Except in the event of a termination of this Agreement by Vitol under (i) 8.2(b) or (ii) 8.2(c):

a.  If Vitol terminates, at the termination of this Agreement, at the request of NewCo, (x) Vitol and GCAC shall terminate the Mobile Terminal sublease, leaving GCAC with possession of the Mobile Terminal agreement with Arc, and, at the request of NewCo, (y) Vitol shall assign its rights, if any, under the GOTAC Terminal agreement to NewCo ~~whether such rights are rights between Vitol and Rio or, in the event that Rio has assigned the GOTAC terminal agreement to Vitol, Vitol shall assign such agreement to NewCo. In the event of a termination as contemplated in this subsection and an exercise of NewCo's rights herein, for a period of one year after such termination, Vitol shall comply with Section 9.1 and in connection therewith Vitol shall not compete with NewCo's activities in anyway related to the continuance of the Business after termination, except that Vitol and its affiliates may continue to operate in businesses in which it was already operating prior to such termination.~~ or Vitol will permit substitution of NewCo in place of Vitol as the party instructing Rio with respect to use of the GOTAC Terminal Agreement as it relates to this Agreement.

(c)   In the event of a termination by Vitol under Section 8.2(b) or if terminated by NewCo other than under Section 8.2(b), at the request of Vitol NewCo shall assign any rights it may have, if any, under the Mobile Terminal agreement and the GOTAC Terminal agreement to Vitol.

(d)   ~~b.~~ Notwithstanding anything to the contrary set forth above in this ~~subsection~~Sections 8.2(b) or 8.2(c), if with Vitol or NewCo elects to terminate this Agreement (as applicable, the "Terminating Party"), within 10 days following delivery of ~~NewCo's request of assignment of either or both of~~a request from other Party (the "Remaining Party") to the Terminating Party to assign to the Remaining Party the Mobile Terminal sublease and/or the

> Made the ROFR right mutual.

6

GOTAC Terminal agreement, ~~Vitol~~as applicable, the Terminating Party may elect, by providing written notice of the same to ~~NewCo~~the Remaining Party during such 10 day period ("Sale Notice")~~,~~, to elect to sell all of the rights of the Parties in the Business including all of their respective rights relating to the Mobile Terminal sublease and/or the GOTAC Terminal agreement (the "Purchased Assets") in an bona fide arms'' length transaction a third party unaffiliated with ~~Vitol~~Terminating Party, provided that such agreement(s) in each case are transferable under the terms of such agreements.  If ~~Vitol~~Terminating Party timely provides the Sale Notice, (i) ~~Vitol~~Terminating Party shall have 60 days from date of delivery to attempt to sell the Purchased Assets, and (ii) prior to entering into any agreements for such sale, ~~Vitol~~Terminating Party shall give ~~NewCo~~Remaining Party written notice of the terms of any such sale (including all details relating thereto, including purchase price, payment terms, conditions, etc. (collectively, the "Payment Terms") and offer ~~NewCo~~Remaining Party the right to purchase ~~Vitol's~~Terminating Party's 50% share of the Purchased Assets on such Payment Terms (less 50% of the amounts included therein), and ~~NewCo~~Remaining Party shall have a right to the same on such terms, by providing ~~Vitol~~Terminating Party with notice of acceptance of such offer within 20 days of delivery of the Sale Notice to ~~NewCo  If NewCo~~Remaining Party  If Remaining Party delivers such acceptance notice, then within 30 days thereafter ~~Vitol~~Terminating Party shall sell all of its rights, title and interest in and to the Purchased Assets at a time and place determined by ~~NewCo~~Remaining Party for 50% of the Payment Terms (and otherwise on the terms and conditions thereof..  If ~~NewCo~~Remaining Party does not provide a timely acceptance notice, ~~Vitol~~Terminating Party may sell the Purchased Assets for a period of 60 days after the end of the period during which ~~NewCo~~Remaining Party could have delivered an acceptance notice, but only at a purchase price that it is at least equal to the Purchase Terms.  If ~~Vitol~~Terminating Party does not complete such sale during the period referred to in the immediately preceding sentence, then ~~Vitol~~Terminating Party shall fully comply with ~~NewCo's~~ Remaining Party's request described in the first sentence of this subsection.

~~(c) In the event of a termination by Vitol (i) 8.2(b) or 8.2(c), NewCo shall assign any rights it may have, if any, under the Mobile Terminal agreement and the GOTAC Terminal agreement to Vitol. In the event of a termination under this Section 8.3(c) and an assignment to Vitol of any agreements outlined in this paragraph, for a period of one year after such termination, NewCo agrees not to compete with Vitol's activities related to the continuance of the Business after termination.~~

(e) ~~(d)~~ Except as otherwise expressly provided herein, the expiration or termination of this Agreement for any reason shall not release either Party from any liability that, at the time of such expiration or termination, has already accrued to ~~the other~~that Party or that is attributable to a period prior to such expiration or termination.

Article IX

7

000521

Exclusivity

9.1    Exclusivity Undertaking by Vitol. During the Term of this Agreement, except in accordance with this Agreement or as agreed by NewCo, Vitol shall not, and shall cause each of its Affiliates which are organized within the United States, other than VALT which is already operating in lines of business related to shipping asphalt on an international basis, not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others) in the Business, including, without limitation and by way of example only, (a) the acquisition of any interest in any company or undertaking engaged in the Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out the Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) Vitol and its applicable Affiliates from performing their respective obligations under this Agreement and any applicable Terminal Agreement and (ii) Vitol's or any of its Affiliates' purchase of a class of publicly traded equity securities of a company engaged in the Business so long as Vitol and its Affiliates do not collectively own more than five percent (5%) of such class of issued and outstanding equity securities of such publicly traded company, and so long as neither Vitol or any of its Affiliates otherwise exercise any management or control with respect to such publicly traded company

9.2    Exclusivity Undertaking by NewCo. During the Term of this Agreement, except in accordance with this Agreement or as agreed to in writing by Vitol, NewCo shall not, and shall cause each of its Affiliates not to, engage (whether directly or indirectly, alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others), directly or indirectly, in the Business, including, without limitation and by way of example only, (a) the acquisition of any interest in any company or undertaking engaged in the Business or (b) the participation in any joint venture, partnership or other business relationship which involves, or actively assists another Person in, carrying out the Business; provided, however, the foregoing shall not preclude, restrict or prohibit (i) NewCo and its applicable Affiliates from performing their respective obligations under this Agreement and any applicable Vessel Charter or the terminalling agreement at the Mobile Terminal and (ii) NewCo's or any of its Affiliates' purchase, including ownership, of a class of publicly traded equity securities of a company engaged in the Business so long as NewCo and its Affiliates do not collectively own more than five percent (5%) of such class of issued and outstanding equity securities of such publicly traded company, and so long as neither NewCo or any of its Affiliates otherwise exercise any management or control with respect to such publicly traded company.

8

Can't be sure if an Affiliate in Asia might be conducting similar Business in the Far East, but that should not be a problem given the scope of this agreement

Please explain this

Article X

FCPA

Each Party warrants to the other Party that it is familiar with the United States Foreign Corrupt Practices Act (as amended, the "FCPA") and its purposes, including its prohibition against paying or giving anything of value, directly or indirectly, by an American company to an official of a non-U.S. government for the purpose of influencing any act or decision in his or her official capacity, inducing such official to violate his or her lawful duty, inducing such official to use his or her influence with a non-U.S. government or an instrumentality thereof to affect or influence any act of such government or instrumentality, or obtaining any improper advantage in order to assist the American company to obtain or  retain business.  Each Party hereto warrants to the other that it shall not undertake any acts prohibited by the FCPA.

Article XI

Confidentiality

11.1    Duty of Confidence. Each Party will maintain in confidence (and will not use to the detriment of the other Party), and will cause its respective Affiliates to maintain in confidence (and not to use to the detriment of the other Party), any written, oral or other Confidential Information obtained from the other Party in connection with this Agreement or the transactions contemplated hereby, or any Confidential Information concerning the Business, unless (a) such information becomes publicly available through no fault of such Party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consents or approvals required for the Business, or (c) the use of such information in connection with any claims by a Party under this Agreement or otherwise in respect of the Business. In the event the recipient Party is required to disclose Confidential Information of the disclosing Party by law or in connection with bona fide legal process, such disclosure shall not be a breach of this Agreement; provided that the recipient Party (i) if legally permitted, informs the disclosing Party as soon as reasonably practicable of the required disclosure; (ii) limits the disclosure to the required purpose; and (iii) at the disclosing Party's request and expense, assists in an attempt to object to or limit the required disclosure.

11.2    Enforcement. To the fullest extent permitted by law, if a Party or any of its Affiliates breaches, or threatens to commit a breach of, Section 11.1, the other Party shall have the right and remedy to have Section 11.1 specifically enforced by any court having jurisdiction, it being acknowledged and agreed that money damages would not provide an adequate remedy in the event of a breach of Section 11.1. Nothing herein shall be construed to limit the right of a Party to collect money damages in the event of a breach of Section 11.1 by the other Party.

Article XII

9

Intellectual Property

12.1   Pre-Existing Property. Except as specifically documented in writing between the Parties, all property owned by a Party (whether real or personal, Intellectual Property, tangible or intangible or any other property) shall be owned by such Party, and the other Party shall not have any ownership interest of any nature in such property.

12.2   Ownership of Inventions. All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement shall be owned as follows:

(a)   All inventions, trade secrets and other Intellectual Property arising from the Parties' activities under this Agreement, including any patent applications and patents, covering such inventions, trade secrets or other Intellectual Property, made solely by employees or agents of a Party, or its affiliates, shall be owned by such Party or its respective affiliate(s).

(b)   All such inventions, trade secrets or other Intellectual Property developed jointly by employees or consultants of both Parties shall be owned jointly by the Parties. Determination of inventorship shall be made in accordance with the patent laws of the United States, and any patent rights with a named inventor that is an employee or consultant of each Party will be jointly owned.

12.3   No Other License Grants. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property, except as expressly provided in this Agreement.

12.4   Other Property Rights. Nothing in this Agreement creates, or is intended to create, any direct or indirect interest or right of a Party in the property and assets of the other Party, except as may be separately agreed to between the Parties.

Article XIII

Representations of the Parties

13.1   Representations and Warranties by Vitol. Vitol represents and warrants to NewCo that: (a) it is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas; (b) it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by law and its organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) all consents, approvals and authorizations from all governmental authorities or other third Parties parties required to be obtained by Vitol in connection with this Agreement have been obtained; and (e) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a

10

breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it, ~~or any of its Affiliates,~~ is a party; or (iii) violate any law or order applicable to it or its properties.

13.2    <u>Representations and Warranties by NewCo</u>. NewCo represents and warrants to Vitol that: (a) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of [XXXX]; (b) it is duly qualified to transact business in and is in good standing in the State of Texas; (c) it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by law and its organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) all consents, approvals and authorizations from all governmental authorities or other third ~~Parties~~parties required to be obtained by NewCo in connection with this Agreement have been obtained; and (e) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it is a party; or (iii) violate any law or order applicable to it or its properties.

13.3    <u>No Other Warranties</u>.  EXCEPT AS EXPRESSLY STATED IN THIS ARTICLE XIV, (A) NO REPRESENTATION, CONDITION OR WARRANTY WHATSOEVER IS MADE OR GIVEN BY OR ON BEHALF OF VITOL OR NewCo; AND (B) ALL OTHER CONDITIONS AND WARRANTIES WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE ARE HEREBY EXPRESSLY DISCLAIMED AND EXCLUDED.

<u>Article XIV</u>

<u>Limitation of Liabilities</u>

14.1    <u>Special, Indirect and Other Losses</u>.  NEITHER PARTY NOR ANY OF ITS AFFILIATES SHALL BE LIABLE IN CONTRACT, TORT, NEGLIGENCE, BREACH OF STATUTORY DUTY OR OTHERWISE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR FOR LOSS OF PROFITS SUFFERED BY THE OTHER PARTY.

<u>Article XV</u>

<u>Miscellaneous</u>

15.1    <u>Assignment.</u>  This Agreement and the rights hereunder may not be assigned by a Party without the prior written consent of the other Party, which consent may be withheld in such Party's sole discretion.

11

15.2   <u>Relationship of the Parties</u>. Nothing contained in this Agreement shall be deemed to constitute a partnership, joint venture, or legal entity of any type between the Parties, or to constitute one as the agent of the other. Moreover, each Party agrees not to construe this Agreement, or any of the transactions contemplated hereby, as a partnership for tax or any other purposes. Each Party shall act solely as an independent contractor, and nothing in this Agreement shall be construed to give any Party the power or authority to act for, bind, or commit the other.

15.3   <u>Further Assurances</u>. Vitol and NewCo hereby covenant and agree, without the necessity of any further consideration, to execute, acknowledge and deliver any and all such other documents and take any such other action as may be reasonably necessary to carry out the intent and purposes of this Agreement.

15.4   <u>Governing Law.</u> This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without reference to any choice of law provisions that would result in the application of the laws of another jurisdiction.

15.5   <u>Meeting of the Parties.</u> Not less frequent than quarterly, the Parties shall meet to discuss and analyze the performance and strategy of the transactions hereunder.

15.6   <u>Compliance with Law</u>. Each Party shall perform its obligations under this Agreement in accordance with all applicable laws. No Party shall, or shall be required to, undertake any activity under or in connection with this Agreement which violates, or which it believes, in good faith, may violate, any applicable law.

15.7   <u>Expenses</u>. Each Party shall pay the fees and expenses of its respective lawyers and other experts and all other expenses and costs incurred by such Party incidental to the negotiation, preparation, execution and delivery of this Agreement, none of which shall be included in the determination of profits or losses or the sharing thereof.

15.8   <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.9   <u>Cumulative Remedies</u>. No remedy referred to in this Agreement is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to in this Agreement or otherwise available under law.

15.10   <u>Dispute Resolution</u>.

(a)   In the event of a dispute relating to the interpretation, performance or alleged breach of <u>this Agreement, or in any way relating to, arising out of, or in connection with</u> this Agreement, the Parties will refer the dispute to the senior executive officers of the Parties for discussion and resolution. If the senior executive officers cannot resolve such dispute within

12

thirty (30) days of the matter being referred to them, either Party may request to mediate such dispute through a one-day mediation with a mutually agreed mediator.  If the dispute is not settled through mediation (if any), either Party may initiate litigation in Harris County, Texas, to whose jurisdiction the Parties hereby subject themselves.  In any such proceeding the Parties hereby waive any objection to forum including, without limitation, any objection based on lack of personal jurisdiction, improper venue, or inconvenient forum.  **EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT**.

(b)     Notwithstanding any of the other provisions hereof, nothing herein shall limit, restrict or delay a Party's right to seek and obtain injunctive relief or specific performance from a court of competent jurisdiction in order to protect its interests without first complying with this Section 15.10(a).

15.11   Waivers and Amendments. The failure of any Party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other Party. No waiver shall be effective unless it has been given in writing and signed by the Party giving such waiver. No provision of this Agreement may be amended or modified other than by a written document signed by authorized representatives of each Party.

15.12   Force Majeure.  Neither Party shall be responsible to the other for any failure or delay in performing any of its obligations under this Agreement, or for other nonperformance hereunder, if such delay or nonperformance is caused by strike, stoppage of labor, lockout or other labor trouble, fire, flood, accident, war, act of terrorism or of the government of any country or of any local government, or by cause unavoidable or beyond the control of any Party hereto.  In such event, the Party affected will use its commercially reasonable efforts to resume performance of its obligations.

15.13   Notices.  All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when received by the addressee, at the addresses set forth below (or to such other addresses as a Party may designate by notice):

If to Vitol Inc.:

2925 Richmond Avenue, 11th Floor
Houston, Texas 77098
~~Attn:_____~~
Attn:  Contract Administration
With a copy sent to Vitol Inc., Attn: General Counsel

If to NewCo:

13

Attention:  Chief Financial Officer
1990 Post Oak Blvd., Suite 2400
Houston, Texas 77056

With a copy to:
Steven Canner
Baker & McKenzie LLP
425 Fifth Avenue
New York, NY 10018

15.14  Entire Agreement.  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and no modification or revision thereof shall have any force or effect unless the same is in writing and executed by the Parties hereto.

15.15  Survival.  Sections 8.3(b), 8.3(c), 9.1, 9.2, 10, and 11.1, 14.1, and 15.10 shall survive the termination of this Agreement.

<div align="center">Article XVII</div>

<div align="center">Definitions</div>

For purposes of this Agreement, the following terms shall have the meanings set forth in this Article:

"Affiliate" means, with respect to a Party, any Person that controls, is controlled by, or is under common control with that Party.  Control means the ownership, directly or indirectly, of more than 50% of the shares or the rights of voting authority in a company, partnership or other legal entity.

"Confidential Information" means all proprietary information, trade secrets and other confidential data of a financial, commercial or technical nature which the disclosing Party or any of its Affiliates has supplied or otherwise made available to the other Party or its Affiliates, whether made available orally, in writing or in electronic form.

"Insolvency Event" means, in relation to either Party, any one of the following: (a) that Party is the subject of voluntary or involuntary bankruptcy proceedings instituted on behalf of or against such Party (except for involuntary bankruptcy proceedings which are dismissed within sixty (60) days of commencement); (b) an administrative receiver, receiver and manager, interim receiver, custodian, sequestrator or similar officer is appointed in respect of that Party (collectively, the "Receiver") and that Party has not caused the underlying action or the Receiver to be dismissed within sixty (60) days after the Receiver's appointment; (c) the board of directors (or similar governing authority of such Party) has passed a resolution to wind up that Party, or such a resolution shall have been passed other than a resolution for the solvent reconstruction or

<div align="center">14</div>

reorganization of that Party; (d) a resolution shall have been passed by that Party or that Party's directors to make an application for an administration order or to appoint an administrator; or (e) that Party makes a general assignment, composition or arrangement with or for the benefit of all or the majority of that Party's creditors, or makes, suspends or threatens to suspend making payments to al or the majority of that Party's creditors.

"Intellectual Property" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases that are owned or used by the applicable Party and its affiliates.

"Person" means any individual, partnership, limited liability company, firm, corporation, association, trust, unincorporated organization or other entity.

"Third Party" means any Person other than a Party or an Affiliate of a Party.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed on their respective behalf, by their respective officers, duly authorized, in multiple originals.

VITOL INC.

By:_____
Print Name:_____
Title:_____


NEWCO

By:_____
Print Name:_____
Title:_____

AGREED FOR THE SOLE PURPOSE OF SECTION 1(b):

GULF COAST ASPHALT COMPANY, L.L.C.


By: _____
Name:  Arthur J. Brass
Title:  President and Manager

15

Schedule A
Trade Team Personnel

16

000530

| **Summary report:** | |
|---|---|
| **Litéra® Change-Pro TDC 10.0.0.27 Document comparison done on 7/13/2017 3:01:05 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Vitol JSMA NewCo Draft Jun 20 2017 Sent to Vitol Jun 20 2017.docx | |
| **Modified filename:** GCAC Vitol JSMA draft 7-12-2017.docx | |
| **Changes:** | |
| Add | 49 |
| Delete | 48 |
| Move From | 2 |
| Move To | 2 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 101 |





| Purchases: | From | | By | BBL | Vitol Bbls Qty | Vitol Qty Paid | $ per | Vitol $ per | $ | Vitol $ | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Deal 5 | CITGO | Citgo | Vitol | 55,871.29 | 55,871.29 | 55,871.290 | 31.400 | 31.400 | $ 1,754,358.51 | $1,754,358.51 | |
| Deal 9 | P66 | P66 | Vitol | 40,832.00 | 40,832.12 | 40,832.120 | 41.000 | 41.000 | $ 1,674,112.00 | $1,674,116.92 | |
| Deal 10 | Exxon | Exxon | Vitol | 39,310.00 | 39,309.86 | 39,309.860 | 38.617 | 38.617 | $ 1,518,034.27 | $1,518,028.86 | |
| Deal 11 | CITGO | Citgo | Vitol | 25,232.00 | 25,231.92 | 25,231.920 | 32.567 | 32.567 | $ 821,730.54 | $821,727.94 | |
| Deal 12 | Hunt | Hunt | Vitol | 25,065.08 | 25,065.08 | 4,544.582 | 44.784 | 247.000 | $ 1,122,511.26 | $1,122,511.75 | |
| Deal 16 | P66 | P66 | Vitol | 37,858.56 | 37,858.56 | 6,814.205 | 45.898 | 255.000 | $ 1,737,622.28 | $1,737,622.28 | |
| Deal 17 | Shell | GCAC | Vitol | | 38,413.23 | 6,727.883 | | 267.500 | | $1,799,708.70 | |
| Deal 18 | Hunt | Hunt | Vitol | 31,362.35 | 31,362.35 | 5,707.278 | 43.675 | 240.000 | $ 1,369,747.20 | $1,369,747.20 | |
| Deal 21a | Exxon | Exxon | Vitol | 47,307.73 | 47,307.73 | 47,307.730 | 41.368 | 41.369 | $ 1,957,026.17 | $1,957,073.48 | |
| Deal 21b/28/29 | Exxon | Exxon | Vitol | 31,750.94 | 31,750.94 | 31,750.940 | 41.368 | 41.369 | $ 1,313,472.89 | $1,313,504.64 | |
| Deal 24 | Exxon | Exxon | Vitol | 39,308.79 | 39,366.22 | 39,366.220 | 39.887 | 39.887 | $ 1,567,896.60 | $1,570,188.61 | |
| Deal 25 | Exxon | Exxon | Vitol | 38,229.05 | 38,229.05 | 38,229.050 | 39.637 | 39.637 | $ 1,515,272.11 | $1,515,283.39 | |
| Deal 32 | Davison | Davison | Vitol | 33,946.76 | 33,946.76 | 6,150.419 | 45.040 | 250.000 | $ 1,528,962.07 | $1,537,605.00 | |
| Deal 30a | P66 | P66 | Vitol | 37,839.00 | 37,839.31 | 6,901.187 | 45.250 | 250.000 | $ 1,712,214.75 | $1,725,297.50 | |
| Deal 30b | P66 | P66 | Vitol | 36,036.56 | 36,036.56 | 6,558.150 | 45.250 | 240.000 | $ 1,630,654.34 | $1,573,956.00 | |
| Deal 30c | P66 | P66 | Vitol | 38,377.00 | 38,377.43 | 6,942.983 | 45.250 | 250.000 | $ 1,736,559.25 | $1,735,745.00 | |
| Deal 31 | CITGO | Citgo | Vitol | 49,557.13 | 49,557.13 | 49,557.130 | 46.840 | 46.847 | $ 2,321,255.97 | $2,321,090.78 | |
| Deal 34 | CITGO | Citgo | Vitol | 34,114.00 | 34,132.22 | 34,132.220 | 45.030 | 45.043 | $ 1,536,153.42 | $1,537,087.64 | |
| Deal 35 | CITGO | Citgo | Vitol | 19,584.05 | 19,433.34 | 19,433.340 | 43.680 | 43.680 | $ 855,431.30 | $848,848.30 | |
| Deal 37 | CITGO | Citgo | Vitol | 34,466.86 | 34,466.86 | 34,466.860 | 42.650 | 42.645 | $ 1,470,011.58 | $1,469,839.24 | |
| Deal 38a | CITGO | Citgo | Vitol | 51,837.52 | 51,837.52 | 51,837.520 | 46.940 | 46.803 | $ 2,433,253.19 | $2,426,151.45 | |
| Deal 42 | CITGO | Citgo | Vitol | 57,437.54 | 56,706.66 | 56,706.660 | 43.390 | 43.503 | $ 2,492,214.86 | $2,466,361.67 | |
| Deal 43 | CITGO | Citgo | Vitol | 48,860.00 | 48,859.73 | 48,859.730 | 44.040 | 44.040 | $ 2,151,794.40 | $2,151,782.50 | |
| Deal 44a | P66 | P66 | Vitol | | 39,449.38 | 7,144.713 | | 272.500 | | $1,946,934.29 | Dlvd Mobile +$3 bbl |
| Deal 44b | P66 | P66 | Vitol | | 40,681.36 | 7,349.038 | | 267.000 | | $1,962,193.15 | Dlvd Corpus + $2 bbl |
| Deal 44c | P66 | P66 | Vitol | 114,300.00 | 34,154.76 | 6,210.865 | 48.470 | 267.000 | $ 5,540,121.00 | $1,658,300.96 | Dlvd Corpus + $2 bbl |
| Deal 47 | Koch | Koch | Vitol | 20,084.13 | 20,084.13 | 20,084.130 | 53.550 | 53.550 | $ 1,075,505.16 | $1,075,505.16 | |
| Deal 49 | CITGO | Citgo | Vitol | 54,943.00 | 54,943.00 | 54,943.000 | 41.130 | 41.130 | $ 2,259,805.59 | $2,259,805.59 | |
| | | | | 1,043,511.34 | 1,081,104.50 | | | | | $46,850,376.51 | |

| | Contract # | Seller | Buyer | Volume | Price | Total |
|---|---|---|---|---|---|---|
| Deal 1 | PP17-07-704 | Rio | Vitol | 228,128.22 | $ 43.77 | $ 9,985,172.19 |
| | CC Bottoms | Rio | Vitol | 3,761.09 | $ 1.00 | $ 3,761.09 |
| | PP17-06-607B | Rio | Vitol | 38,059.40 | $ 43.77 | $ 1,665,859.94 |
| | PP17-06-608B | Rio | Vitol | 37,772.64 | $ 43.77 | $ 1,653,308.45 |
| | | | | 307,721.35 | | ########### |

| | |
|---|---|
| $(1,156,752.53) | Rio drafted from the Lockbox for July rack sales |
| $ (941,546.71) | Rio drafted from the Lockbox for August rack sales |
| $ (722,326.00) | Rio drafted from the Lockbox for September rack sales |
| $ (827,719.32) | Rio drafted from the Lockbox for October rack sales |
| $ (882,253.37) | Rio drafted from the Lockbox for November rack sales |
| $ (59,520.70) | Rio drafted from the Lockbox for December rack sales |
| $ 4,590,118.63 | |

| Sales | To | To | By | BBL | Vitol Bbl Qty | Vitol Qty Rec | $ per | $ per | $ | Vitol $ | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Deal 3 | Titanio | Titanio | Vitol | 33,108.00 | 33,108.38 | 5,975.818 | 43.416 | 236.000 | $ 1,437,426.08 | $1,410,293.05 | |
| Deal 4 | VALT | Rio | Vitol | 29,831.00 | 29,830.97 | 5,358.217 | 43.468 | 242.000 | $ 1,296,688.51 | $1,296,688.51 | |
| Deal 6 | Century | Century | Vitol | 32,665.00 | 32,665.07 | 5,896.749 | 41.525 | 225.000 | $ 1,356,416.50 | $1,326,768.53 | |
| Deal 6b | Genesis | Genesis | Vitol | 1,434.00 | 935.50 | 168.878 | 41.525 | 225.000 | $ 59,546.95 | $37,997.55 | * Note from Patrick said 935.50 bbls @ same price to Century |
| Deal 7 | VALT | Rio | Vitol | 27,785.00 | 27,785.48 | 4,988.208 | 41.525 | 236.000 | $ 1,177,217.09 | $1,177,217.09 | |
| Deal 8 | VALT | Rio | Vitol | | 31,747.75 | 5,752.006 | | 275.000 | | $1,581,801.65 | |
| Deal 13 | SEM | GCAC | Vitol | | 29,746.94 | 29,746.940 | | 44.000 | | $1,308,865.36 | |
| Deal 14 | Gunvor | GCAC | Vitol | | 34,443.70 | 6,235.884 | | 245.000 | | $1,527,791.58 | |
| Deal 15 | Gunvor | GCAC | Vitol | | 34,189.54 | 6,198.949 | | 249.000 | | $1,543,538.30 | |
| Deal 19 | VALT | GCAC | Vitol | | 25,602.30 | 4,638.423 | | 250.000 | | $1,159,605.75 | |
| Deal 20a | Chevron | GCAC | Vitol | | 34,563.75 | 34,563.750 | | 56.780 | | $1,962,529.73 | |
| Deal 20b | Chevron | GCAC | Vitol | | 32,330.96 | 32,330.960 | | 63.214 | | $2,043,769.31 | |
| Deal 20c | Chevron | GCAC | Vitol | | 32,119.26 | 32,119.260 | | 68.221 | | $2,191,208.04 | |
| Deal 21a / 27 | Freepoint | Freepoint | Vitol | 47,245.87 | 47,245.87 | 47,245.870 | 43.660 | 44.690 | $ 2,062,754.68 | $2,111,417.93 | |
| Deal 21b / 29 | Unity | Unity | Vitol | 20,257.82 | 20,257.82 | 20,257.820 | 51.130 | 51.210 | | $1,037,402.96 | |
| Deal 22 | VALT | GCAC | Vitol | | 14,598.53 | 2,639.816 | | 247.500 | | $653,354.46 | |
| Deal 23 | Gunvor | GCAC | Vitol | | 33,617.59 | 6,042.070 | | 245.000 | | $1,480,307.15 | |
| Deal 26 | Titanio | GCAC | Vitol | | 31,789.40 | 5,734.376 | | 250.000 | | $1,433,594.00 | |
| Deal 30a | Mercuria | Mercuria | Vitol | 37,839.31 | 37,839.31 | 37,839.310 | 45.980 | 45.128 | $ 1,739,851.47 | $1,707,612.38 | * usgc 3% Nov 13-30 less $9.55/bbl |
| Deal 30b | Mercuria | Mercuria | Vitol | 36,036.56 | 36,036.56 | 36,036.560 | 45.020 | 45.020 | $ 1,622,365.93 | $1,622,365.93 | |
| Deal 31b | Freepoint | Freepoint | Vitol | 49,557.13 | 49,557.13 | 49,557.130 | 47.030 | 47.016 | $ 2,330,671.82 | $2,329,978.02 | |
| Deal 33 | Colas | GCAC | Vitol | | 16,161.98 | 2,921.777 | | 250.000 | | $730,444.25 | |
| Deal 33 | Colas | GCAC | Vitol | | 7,743.81 | 1,410.246 | | 250.000 | | $352,561.50 | |
| Deal 34 | BoumenFlat | Bominflot | Vitol | 39,694.18 | 39,694.18 | 39,694.180 | 48.130 | 48.130 | $ 1,910,480.88 | $1,910,480.88 | |
| Deal 36 | SEM | GCAC | Vitol | | 42,809.71 | 7,655.202 | | 260.000 | | $1,990,352.52 | |
| Deal 38b | Exxon | Exxon | Vitol | 51,325.59 | 51,837.52 | 51,837.520 | 50.940 | 50.813 | $ 2,614,525.55 | $2,634,019.90 | |
| Deal 39 | VALT | GCAC | Vitol | | 35,438.75 | 6,374.019 | | 262.500 | | $1,673,179.99 | |
| Deal 40 | Exxon | Exxon | Vitol | 40,306.24 | 40,757.18 | 40,757.180 | 48.450 | 48.450 | $ 1,952,837.33 | $1,974,685.37 | |
| Deal 41 | BoumenFlat | Bominflot | Vitol | 40,811.86 | 40,392.51 | 40,392.510 | 46.200 | 45.450 | $ 1,885,507.93 | $1,835,839.58 | * usgc 3% Dec 4-6 less $7.75 bbl |
| Deal 45 | Bitumar | GCAC | Vitol | | 29,901.12 | 5,421.410 | | 275.000 | | $1,490,887.75 | |
| Deal 45 | Bitumar | GCAC | Vitol | | 65,141.83 | 11,811.017 | | 275.000 | | $3,248,029.68 | |
| Deal 46 | VALT | GCAC | Vitol | | 36,513.25 | 6,610.567 | | 275.000 | | $1,817,905.93 | |
| Deal 48 | Koch | Koch | Vitol | 37,352.00 | 37,352.38 | 37,352.380 | 49.650 | 49.650 | $ 1,854,526.80 | $1,854,545.67 | |
| Deal 50 | VALT | GCAC | Vitol | 14,679.44 | 14,679.44 | 2,671.344 | | 280.000 | | $747,976.32 | |
| | | | | - | 1,108,435.470 | | | | | $53,205,016.60 | |

| Deal 51 | | BBL | $ per | $ |
|---|---|---|---|---|
| Corpus | Inv purchase | 167,763.58 | 48.589 | $ 8,151,464.59 |
| | Bottoms | 3,761.09 | 1.000 | $ 3,761.09 |
| Mobile | Inv purchase | 16,408.99 | 48.589 | $ 797,296.42 |
| | | 187,933.66 | | $ 8,952,522.10 |

**GCAC Asphalt PNL Recap**

| | BBL | $ | |
|---|---|---|---|
| Initial buy from Rio (CC+Mobile + Exxon) | 307,721.35 | $13,308,101.67 | |
| Vitol Buys After initial (includes GCAC Shell) | 1,081,104.50 | $46,850,376.51 | |
| Total Purchases | 1,388,825.85 | $60,158,478.18 | |
| Vitol Sales to 3rd Parties | 1,108,435.47 | $53,205,016.60 | |
| Includes GCAC | | | |
| Sales to Rio at Termination | 187,933.66 | $8,952,522.10 | |
| Truck Rack Sales | 92,456.72 | $4,590,118.63 | Balanced Volume |
| Total Value Received | 1,388,825.85 | $66,747,657.33 | |
| Total Physical | - | $6,589,179.16 | |
| less storage related costs | | ($2,632,252.96) | |
| less deal related costs (Provisional) - inspection, freight, commish, etc. | | ($1,193,364.96) | |
| less TVM | | ($320,700.00) | |
| Total Physical | | $2,442,861.24 | |
| less hedging / paper | | ($6,431,730.00) | |
| Total PNL | | ($3,988,868.76) | |

**GCAC Cash Flow Summary**

| | $ | |
|---|---|---|
| Vitol buys from GCAC (as third party) | (1,799,708.70) | due GCAC |
| Vitol sells to GCAC (as third party - non rack) | 27,355,901.60 | |
| Vitol sess to GCAC (as third party rack sales) | 4,590,118.63 | |
| **Total due Vitol (Product)** | **30,146,311.52** | due vitol |
| Storage related costs | 2,632,252.96 | |
| Deal related costs | 1,193,364.96 | |
| TVM | 320,700.00 | |
| **Total due Vitol (Product + Costs)** | **34,292,629.44** | |
| less GCAC Payment - Nov. 17th | (4,000,000.00) | |
| less GCAC Payment - Dec. 15th | (3,700,000.00) | |
| less GCAC Payment - Jan. 26th | (8,934,401.25) | |
| Credit Rio Lockbox | (4,590,118.63) | |
| Credit Vitol - Aug. 4th payment for Jul '17 / Aug '17 Arc Mobile Storage | 279,210.00 | |
| **Total due Vitol (less credits)** | **13,347,319.56** | |
| add hedging / paper loss | 6,431,730.00 | due Vitol |
| less Physical Profit (credit) | (6,589,179.16) | due GCAC |
| **Total due Vitol** | **13,189,870.41** | |

| Purchases: | From | | By | BBL | Vitol Bbls Qty | Vitol Qty Paid | $ per | Vitol $ per | $ | Vitol $ | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Deal 5 | CITGO | Citgo | Vitol | 55,871.29 | 55,871.29 | 55,871.290 | 31.400 | 31.400 | $ 1,754,358.51 | $1,754,358.51 | |
| Deal 9 | P66 | P66 | Vitol | 40,832.00 | 40,832.12 | 40,832.120 | 41.000 | 41.000 | $ 1,674,112.00 | $1,674,116.92 | |
| Deal 10 | Exxon | Exxon | Vitol | 39,310.00 | 39,309.86 | 39,309.860 | 38.617 | 38.617 | $ 1,518,034.27 | $1,518,028.86 | |
| Deal 11 | CITGO | Citgo | Vitol | 25,232.00 | 25,231.92 | 25,231.920 | 32.567 | 32.567 | $ 821,730.54 | $821,727.94 | |
| Deal 12 | Hunt | Hunt | Vitol | 25,065.08 | 25,065.08 | 4,544.582 | 44.784 | 247.000 | $ 1,122,511.26 | $1,122,511.75 | |
| Deal 16 | P66 | P66 | Vitol | 37,858.56 | 37,858.56 | 6,814.205 | 45.898 | 255.000 | $ 1,737,622.28 | $1,737,622.28 | |
| Deal 17 | Shell | GCAC | Vitol | | 38,413.23 | 6,727.883 | | 267.500 | | $1,799,708.70 | |
| Deal 18 | Hunt | Hunt | Vitol | 31,362.35 | 31,362.35 | 5,707.278 | 43.675 | 240.000 | $ 1,369,747.20 | $1,369,747.20 | |
| Deal 21a | Exxon | Exxon | Vitol | 47,307.73 | 47,307.73 | 47,307.730 | 41.368 | 41.369 | $ 1,957,026.17 | $1,957,073.48 | |
| Deal 21b/28/29 | Exxon | Exxon | Vitol | 31,750.94 | 31,750.94 | 31,750.940 | 41.368 | 41.369 | $ 1,313,472.89 | $1,313,504.64 | |
| Deal 24 | Exxon | Exxon | Vitol | 39,308.79 | 39,366.22 | 39,366.220 | 39.887 | 39.887 | $ 1,567,896.60 | $1,570,188.61 | |
| Deal 25 | Exxon | Exxon | Vitol | 38,229.05 | 38,229.05 | 38,229.050 | 39.637 | 39.637 | $ 1,515,272.11 | $1,515,283.39 | |
| Deal 32 | Davison | Davison | Vitol | 33,946.76 | 33,946.76 | 6,150.419 | 45.040 | 250.000 | $ 1,528,962.07 | $1,537,605.00 | |
| Deal 30a | P66 | P66 | Vitol | 37,839.00 | 37,839.31 | 6,901.187 | 45.250 | 250.000 | $ 1,712,214.75 | $1,725,297.50 | |
| Deal 30b | P66 | P66 | Vitol | 36,036.56 | 36,036.56 | 6,558.150 | 45.250 | 240.000 | $ 1,630,654.34 | $1,573,956.00 | |
| Deal 30c | P66 | P66 | Vitol | 38,377.00 | 38,377.43 | 6,942.983 | 45.250 | 250.000 | $ 1,736,559.25 | $1,735,745.00 | |
| Deal 31 | CITGO | Citgo | Vitol | 49,557.13 | 49,557.13 | 49,557.130 | 46.840 | 46.847 | $ 2,321,255.97 | $2,321,090.78 | |
| Deal 34 | CITGO | Citgo | Vitol | 34,114.00 | 34,132.22 | 34,132.220 | 45.030 | 45.043 | $ 1,536,153.42 | $1,537,087.64 | |
| Deal 35 | CITGO | Citgo | Vitol | 19,584.05 | 19,433.34 | 19,433.340 | 43.680 | 43.680 | $ 855,431.30 | $848,848.30 | |
| Deal 37 | CITGO | Citgo | Vitol | 34,466.86 | 34,466.86 | 34,466.860 | 42.650 | 42.645 | $ 1,470,011.58 | $1,469,839.24 | |
| Deal 38a | CITGO | Citgo | Vitol | 51,837.52 | 51,837.52 | 51,837.520 | 46.940 | 46.803 | $ 2,433,253.19 | $2,426,151.45 | |
| Deal 42 | CITGO | Citgo | Vitol | 57,437.54 | 56,706.66 | 56,706.660 | 43.390 | 43.503 | $ 2,492,214.86 | $2,466,361.67 | |
| Deal 43 | CITGO | Citgo | Vitol | 48,860.00 | 48,859.73 | 48,859.730 | 44.040 | 44.040 | $ 2,151,794.40 | $2,151,782.50 | |
| Deal 44a | P66 | P66 | Vitol | | 39,449.38 | 7,144.713 | | 272.500 | | $1,946,934.29 | Dlvd Mobile +$3 bbl |
| Deal 44b | P66 | P66 | Vitol | | 40,681.36 | 7,349.038 | | 267.000 | | $1,962,193.15 | Dlvd Corpus + $2 bbl |
| Deal 44c | P66 | P66 | Vitol | 114,300.00 | 34,154.76 | 6,210.865 | 48.470 | 267.000 | $ 5,540,121.00 | $1,658,300.96 | Dlvd Corpus + $2 bbl |
| Deal 47 | Koch | Koch | Vitol | 20,084.13 | 20,084.13 | 20,084.130 | 53.550 | 53.550 | $ 1,075,505.16 | $1,075,505.16 | |
| Deal 49 | CITGO | Citgo | Vitol | 54,943.00 | 54,943.00 | 54,943.000 | 41.130 | 41.130 | $ 2,259,805.59 | $2,259,805.59 | |
| | | | | 1,043,511.34 | 1,081,104.50 | | | | | $46,850,376.51 | |

| | Contract # | Seller | Buyer | Volume | | Price | Total |
|---|---|---|---|---|---|---|---|
| Deal 1 | PP17-07-704 | Rio | Vitol | 228,128.22 | $ | 43.77 | $ 9,985,172.19 |
| | CC Bottoms | Rio | Vitol | 3,761.09 | $ | 1.00 | $ 3,761.09 |
| | PP17-06-607B | Rio | Vitol | 38,059.40 | $ | 43.77 | $ 1,665,859.94 |
| | PP17-06-608B | Rio | Vitol | 37,772.64 | $ | 43.77 | $ 1,653,308.45 |
| | | | | 307,721.35 | | | ########### |

| | |
|---|---|
| $(1,156,752.53) | Rio drafted from the Lockbox for July rack sales |
| $ (941,546.71) | Rio drafted from the Lockbox for August rack sales |
| $ (722,326.00) | Rio drafted from the Lockbox for September rack sales |
| $ (827,719.32) | Rio drafted from the Lockbox for October rack sales |
| $ (882,253.37) | Rio drafted from the Lockbox for November rack sales |
| $ (59,520.70) | Rio drafted from the Lockbox for December rack sales |
| $ 4,590,118.63 | |

| Sales | To | To | By | BBL | Vitol Bbl Qty | Vitol Qty Rec | $ per | $ per | $ | Vitol $ | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Deal 3 | Titanio | Titanio | Vitol | 33,108.00 | 33,108.38 | 5,975.818 | 43.416 | 236.000 | $ 1,437,426.08 | $1,410,293.05 | |
| Deal 4 | VALT | Rio | Vitol | 29,831.00 | 29,830.97 | 5,358.217 | 43.468 | 242.000 | $ 1,296,688.51 | $1,296,688.51 | |
| Deal 6 | Century | Century | Vitol | 32,665.00 | 32,665.07 | 5,896.749 | 41.525 | 225.000 | $ 1,356,416.50 | $1,326,768.53 | |
| Deal 6b | Genesis | Genesis | Vitol | 1,434.00 | 935.50 | 168.878 | 41.525 | 225.000 | $ 59,546.95 | $37,997.55 | * Note from Patrick said 935.50 bbls @ same price to Century |
| Deal 7 | VALT | Rio | Vitol | 27,785.00 | 27,785.48 | 4,988.208 | 41.525 | 236.000 | $ 1,177,217.09 | $1,177,217.09 | |
| Deal 8 | VALT | Rio | Vitol | | 31,747.75 | 5,752.006 | | 275.000 | | $1,581,801.65 | |
| Deal 13 | SEM | GCAC | Vitol | | 29,746.94 | 29,746.940 | | 44.000 | | $1,308,865.36 | |
| Deal 14 | Gunvor | GCAC | Vitol | | 34,443.70 | 6,235.884 | | 245.000 | | $1,527,791.58 | |
| Deal 15 | Gunvor | GCAC | Vitol | | 34,189.54 | 6,198.949 | | 249.000 | | $1,543,538.30 | |
| Deal 19 | VALT | GCAC | Vitol | | 25,602.30 | 4,638.423 | | 250.000 | | $1,159,605.75 | |
| Deal 20a | Chevron | GCAC | Vitol | | 34,563.75 | 34,563.750 | | 56.780 | | $1,962,529.73 | |
| Deal 20b | Chevron | GCAC | Vitol | | 32,330.96 | 32,330.960 | | 63.214 | | $2,043,769.31 | |
| Deal 20c | Chevron | GCAC | Vitol | | 32,119.26 | 32,119.260 | | 68.221 | | $2,191,208.04 | |
| Deal 21a / 27 | Freepoint | Freepoint | Vitol | 47,245.87 | 47,245.87 | 47,245.870 | 43.660 | 44.690 | $ 2,062,754.68 | $2,111,417.93 | |
| Deal 21b / 29 | Unity | Unity | Vitol | 20,257.82 | 20,257.82 | 20,257.820 | 51.130 | 51.210 | | $1,037,402.96 | |
| Deal 22 | VALT | GCAC | Vitol | | 14,598.53 | 2,639.816 | | 247.500 | | $653,354.46 | |
| Deal 23 | Gunvor | GCAC | Vitol | | 33,617.59 | 6,042.070 | | 245.000 | | $1,480,307.15 | |
| Deal 26 | Titanio | GCAC | Vitol | | 31,789.40 | 5,734.376 | | 250.000 | | $1,433,594.00 | |
| Deal 30a | Mercuria | Mercuria | Vitol | 37,839.31 | 37,839.31 | 37,839.310 | 45.980 | 45.128 | $ 1,739,851.47 | $1,707,612.38 | * usgc 3% Nov 13-30 less $9.55/bbl |
| Deal 30b | Mercuria | Mercuria | Vitol | 36,036.56 | 36,036.56 | 36,036.560 | 45.020 | 45.020 | $ 1,622,365.93 | $1,622,365.93 | |
| Deal 31b | Freepoint | Freepoint | Vitol | 49,557.13 | 49,557.13 | 49,557.130 | 47.030 | 47.016 | $ 2,330,671.82 | $2,329,978.02 | |
| Deal 33 | Colas | GCAC | Vitol | | 16,161.98 | 2,921.777 | | 250.000 | | $730,444.25 | |
| Deal 33 | Colas | GCAC | Vitol | | 7,743.81 | 1,410.246 | | 250.000 | | $352,561.50 | |
| Deal 34 | BoumenFlat | Bominflot | Vitol | 39,694.18 | 39,694.18 | 39,694.180 | 48.130 | 48.130 | $ 1,910,480.88 | $1,910,480.88 | |
| Deal 36 | SEM | GCAC | Vitol | | 42,809.71 | 7,655.202 | | 260.000 | | $1,990,352.52 | |
| Deal 38b | Exxon | Exxon | Vitol | 51,325.59 | 51,837.52 | 51,837.520 | 50.940 | 50.813 | $ 2,614,525.55 | $2,634,019.90 | |
| Deal 39 | VALT | GCAC | Vitol | | 35,438.75 | 6,374.019 | | 262.500 | | $1,673,179.99 | |
| Deal 40 | Exxon | Exxon | Vitol | 40,306.24 | 40,757.18 | 40,757.180 | 48.450 | 48.450 | $ 1,952,837.33 | $1,974,685.37 | |
| Deal 41 | BoumenFlat | Bominflot | Vitol | 40,811.86 | 40,392.51 | 40,392.510 | 46.200 | 45.450 | $ 1,885,507.93 | $1,835,839.58 | * usgc 3% Dec 4-6 less $7.75 bbl |
| Deal 45 | Bitumar | GCAC | Vitol | | 29,901.12 | 5,421.410 | | 275.000 | | $1,490,887.75 | |
| Deal 45 | Bitumar | GCAC | Vitol | | 65,141.83 | 11,811.017 | | 275.000 | | $3,248,029.68 | |
| Deal 46 | VALT | GCAC | Vitol | | 36,513.25 | 6,610.567 | | 275.000 | | $1,817,905.93 | |
| Deal 48 | Koch | Koch | Vitol | 37,352.00 | 37,352.38 | 37,352.380 | 49.650 | 49.650 | $ 1,854,526.80 | $1,854,545.67 | |
| Deal 50 | VALT | GCAC | Vitol | 14,679.44 | 14,679.44 | 2,671.344 | | 280.000 | | $747,976.32 | |
| | | | | - | 1,108,435.470 | | | | | $53,205,016.60 | |

| Deal 51 | | BBL | $ per | $ |
|---|---|---|---|---|
| Corpus | Inv purchase | 167,763.58 | 48.589 | $ 8,151,464.59 |
| | Bottoms | 3,761.09 | 1.000 | $ 3,761.09 |
| Mobile | Inv purchase | 16,408.99 | 48.589 | $ 797,296.42 |
| | | 187,933.66 | | $ 8,952,522.10 |

**GCAC Asphalt PNL Recap**

| | BBL | $ | |
|---|---|---|---|
| Initial buy from Rio (CC+Mobile + Exxon) | 307,721.35 | $13,308,101.67 | |
| Vitol Buys After initial (includes GCAC Shell) | 1,081,104.50 | $46,850,376.51 | |
| Total Purchases | 1,388,825.85 | $60,158,478.18 | |
| Vitol Sales to 3rd Parties | 1,108,435.47 | $53,205,016.60 | |
| Includes GCAC | | | |
| Sales to Rio at Termination | 187,933.66 | $8,952,522.10 | |
| Truck Rack Sales | 92,456.72 | $4,590,118.63 | Balanced Volume |
| Total Value Received | 1,388,825.85 | $66,747,657.33 | |
| Total Physical | - | $6,589,179.16 | |
| less storage related costs | | ($2,632,252.96) | |
| less deal related costs (Provisional) - inspection, freight, commish, etc. | | ($1,193,364.96) | |
| less TVM | | ($320,700.00) | |
| Total Physical | | $2,442,861.24 | |
| less hedging / paper | | ($6,431,730.00) | |
| Total PNL | | ($3,988,868.76) | |

**GCAC Cash Flow Summary**

| | $ | |
|---|---|---|
| Vitol buys from GCAC (as third party) | (1,799,708.70) | due GCAC |
| Vitol sells to GCAC (as third party - non rack) | 27,355,901.60 | |
| Vitol sess to GCAC (as third party rack sales) | 4,590,118.63 | |
| **Total due Vitol (Product)** | **30,146,311.52** | due vitol |
| Storage related costs | 2,632,252.96 | |
| Deal related costs | 1,193,364.96 | |
| TVM | 320,700.00 | |
| **Total due Vitol (Product + Costs)** | **34,292,629.44** | |
| less GCAC Payment - Nov. 17th | (4,000,000.00) | |
| less GCAC Payment - Dec. 15th | (3,700,000.00) | |
| less GCAC Payment - Jan. 26th | (8,934,401.25) | |
| Credit Rio Lockbox | (4,590,118.63) | |
| Credit Vitol - Aug. 4th payment for Jul '17 / Aug '17 Arc Mobile Storage | 279,210.00 | |
| **Total due Vitol (less credits)** | **13,347,319.56** | |
| add hedging / paper loss | 6,431,730.00 | due Vitol |
| less Physical Profit (credit) | (6,589,179.16) | due GCAC |
| **Total due Vitol** | **13,189,870.41** | |

## GCAC - Hedge 2007802 Purchases/Sales

| Recon # | POSI | DATE_CREATE | B_OR_S | EXEC_ID | DEAL_STAT | PERD_COD | TRADE_TYP | MTRX_COD | HEDGE_GR | PROD_COD | VITOL_OR | COUNTER_ | COUNTER_ORG_UNIT_FULL_NAME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3105432 | 30-Jun-17 | B | 1844757 | OPE | 17-Jul | PHY | FU | 2007802 | HSFO | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 5 | 314301 | 12-Jul-17 | B | 1845012 | REA | 17-Jul | PHY | FU | 2007802 | VTB | VIC | CITGO | CITGO PETROLEUM CORPORATION |
| 3 | 3114211 | 12-Jul-17 | B | 1834559 | REA | 17-Jul | PHY | FU | 2007802 | HSFO | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 10 | 3122201 | 20-Jul-17 | B | 1845090 | OPE | 17-Jul | PHY | FU | 2007802 | VTB | VIC | EXXONMO | EXXONMOBIL OIL CORPORATION |
| 9 | 3122695 | 21-Jul-17 | B | 1845083 | REA | 17-Jul | PHY | FU | 2007802 | VTB | VIC | P66CO | PHILLIPS 66 COMPANY |
| 1 | 3105432 | 21-Jul-17 | B | 1844757 | OPE | 17-Jul | PHY | FU | 2007802 | HSFO | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 1 | 3105432 | 21-Jul-17 | B | 1844757 | OPE | 17-Jul | PHY | FU | 2007802 | HSFO | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 1 | 3105432 | 21-Jul-17 | B | 1844757 | OPE | 17-Jul | PHY | FU | 2007802 | HSFO | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| | 3126644 | 25-Jul-17 | B | | | 17-Aug | PHY | FU | 2007802 | VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| | 3126641 | 25-Jul-17 | B | | | 17-Aug | PHY | FU | 2007802 | VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| | 3126637 | 25-Jul-17 | B | | | 17-Aug | PHY | FU | 2007802 | VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 2 | 3126632 | 25-Jul-17 | B | | | 17-Aug | PHY | FU | 2007802 | VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 11 | 3126576 | 25-Jul-17 | B | 1853922 | REA | 17-Jul | PHY | FU | 2007802 | VTB | VIC | CITGO | CITGO PETROLEUM CORPORATION |
| | 3130672 | 28-Jul-17 | B | | | 17-Aug | PHY | FU | 2007802 | VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 6 | 3143573 | 10-Aug-17 | B | 1845058 | OPE | 17-Jul | PHY | FU | 2007802 | VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 12 | 3147123 | 15-Aug-17 | B | 1866853 | OPE | 17-Aug | PHY | FU | 2007802 | PG6722 | VIC | HUNT REF | HUNT REFINING COMPANY |
| 16 | 3151012 | 18-Aug-17 | B | | | 17-Aug | PHY | FU | 2007802 | VTB | VIC | P66CO | PHILLIPS 66 COMPANY |
| 17 | 3158929 | 25-Aug-17 | B | | | 17-Aug | PHY | FU | 2007802 | VTB | VIC | GCAC | GULF COAST ASPHALT COMPANY, L.L.C. |
| 18 | 3161097 | 29-Aug-17 | B | 1877681 | OPE | 17-Sep | PHY | FU | 2007802 | PG6722 | VIC | HUNT REF | HUNT REFINING COMPANY |
| 21 | 3187254 | 25-Sep-17 | B | | | 17-Oct | PHY | FU | 2007802 | HSFO | VIC | EXXONMO | EXXONMOBIL OIL CORPORATION |

**TOTAL BARRELS PURCHASED**

| Recon # | POSI | DATE_CREATE | B_OR_S | EXEC_ID | DEAL_STAT | PERD_COD | TRADE_TYP | MTRX_COD | HEDGE_GR | PROD_COD | VITOL_OR | COUNTER_ | COUNTER_ORG_UNIT_FULL_NAME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 3105629 | 30-Jun-17 | S | 1834559 | REA | 17-Jul | PHY | FU | 2007802 | HSFO | VIC | INVERTIT | INVERSIONES TITANIO SRL |
| 3 | 3114206 | 12-Jul-17 | S | | | 17-Aug | PHY | FU | 2007802 | HSFO | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 6 | 3122729 | 21-Jul-17 | S | 1845058 | OPE | 17-Jul | PHY | FU | 2007802 | VTB | VIC | CENTERMI | CENTURY TERMINALS, LLC |
| 5 | 3126645 | 25-Jul-17 | S | 1845012 | REA | 17-Jul | PHY | FU | 2007802 | VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |

000534

000535

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 10 | 3126642 | 25-Jul-17 S | 1845090 OPE | 17-Jul PHY | FU | 2007802 VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 9 | 3126639 | 25-Jul-17 S | 1845083 REA | 17-Jul PHY | FU | 2007802 VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 4 | 3126634 | 25-Jul-17 S | | 17-Aug PHY | FU | 2007802 VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 7 | 3126629 | 25-Jul-17 S | | 17-Aug PHY | FU | 2007802 VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 7 | 3126629 | 25-Jul-17 S | | 17-Aug PHY | FU | 2007802 VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 8 | 3126626 | 25-Jul-17 S | | 17-Aug PHY | FU | 2007802 VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 11 | 3130669 | 28-Jul-17 S | 1853922 REA | 17-Jul PHY | FU | 2007802 VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 6 | 3143691 | 10-Aug-17 S | 1845058 OPE | 17-Jul PHY | FU | 2007802 VTB | VIC | GENESMAR | GENESIS MARINE, LLC |
| 14 | 3143612 | 10-Aug-17 S | | 17-Aug PHY | FU | 2007802 PG64/22 | VIC | GCAC | GULF COAST ASPHALT COMPANY, L.L.C. |
| 13 | 3143606 | 10-Aug-17 S | | 17-Aug PHY | FU | 2007802 PG64/22 | VIC | GCAC | GULF COAST ASPHALT COMPANY, L.L.C. |
| 6 | 3143562 | 10-Aug-17 S | 1845058 OPE | 17-Jul PHY | FU | 2007802 VTB | VIC | RIO ENER | RIO ENERGY INTERNATIONAL, INC. |
| 15 | 3147126 | 15-Aug-17 S | | 17-Aug PHY | FU | 2007802 PG6722 | VIC | GCAC | GULF COAST ASPHALT COMPANY, L.L.C. |
| 19 | 3178452 | 15-Sep-17 S | | 17-Sep PHY | FU | 2007802 ASP40/60 | VIC | GCAC | GULF COAST ASPHALT COMPANY, L.L.C. |
| 21 | 3185561 | 22-Sep-17 S | | 17-Oct PHY | FU | 2007802 HSFO | VIC | GCAC | GULF COAST ASPHALT COMPANY, L.L.C. |

**TOTAL BARRELS SOLD**

000536

| QTY | QTY_UOM | Quantity in BBLS | QTY_STAT | ACT_TITLE_CURR_PRICE | BEST_EST_STATUS_C | FORMULA_SHORT_DESC | | CONT_DATE | CONT_BROSUB_MTRXOPT_STRIK |
|---|---|---|---|---|---|---|---|---|---|
| 107,999.31 BBL | | 107,999.31 2AP | APP | 43.770 USD / BBL | 43.77 FPR | f_no6 3.0 usgc water low -0.3 | | 30-Jun-17 | FBP |
| 55,871.29 BBL | | 55,871.29 2AP | APP | 31.400 USD / BBL | 31.4 FPR | f_no6 3.0 usgc water low -13.0 | | 12-Jul-17 MARKET | FBP |
| 5,415.49 MTA | | 33,108.38 2AP | APP | 235.00 USD / STS | 235 FIP | | 235 | 12-Jul-17 | FBP |
| 39,309.86 BBL | | 39,309.86 2AP | APP | 38.617 USD / BBL | 38.6167 FPR | f_no6 3.0 usgc water mean -6.5 | | 20-Jul-17 MARKET | FBP |
| 40,832.12 BBL | | 40,832.12 2AP | APP | 41.000 USD / BBL | 41 FIP | | 41 | 21-Jul-17 | FBP |
| 124,011.04 BBL | | 124,011.04 2AP | APP | 43.770 USD / BBL | 43.77 FPR | f_no6 3.0 usgc water low -0.3 | | 30-Jun-17 | FBP |
| 37,772.64 BBL | | 37,772.64 2AP | APP | 43.770 USD / BBL | 43.77 FPR | f_no6 3.0 usgc water low -0.3 | | 30-Jun-17 | FBP |
| 38,059.40 BBL | | 38,059.40 2AP | APP | 43.770 USD / BBL | 43.77 FIP | f_no6 3.0 usgc water low -0.3 | | 30-Jun-17 | FBP |
| 60,000.00 BBL | | 60,000.00 PLA | UNK | 43.770 USD / BBL | 43.77 FIP | | 43.77 | 25-Jul-17 | FBP |
| 40,000.00 BBL | | 40,000.00 PLA | UNK | 43.770 USD / BBL | 43.77 FIP | | 43.77 | 25-Jul-17 | FBP |
| 38,000.00 BBL | | 38,000.00 PLA | UNK | 43.770 USD / BBL | 43.77 FIP | | 43.77 | 25-Jul-17 | FBP |
| 3,761.00 BBL | | 3,761.00 PLA | UNK | 1.000 USD / BBL | 1 FIP | | 1 | 25-Jul-17 | FBP |
| 25,231.92 BBL | | 25,231.92 2AP | APP | 32.567 USD / BBL | 32.56667 FPR | f_no6 3.0 usgc water low -14.0 | | 25-Jul-17 MARKET | FBP |
| 25,000.00 BBL | | 25,000.00 PLA | UNK | 43.770 USD / BBL | 43.77 FIP | | 43.77 | 28-Jul-17 | FBP |
| 32,411.04 BBL | | 32,411.04 2AP | APP | 43.770 USD / BBL | 43.77 FIP | | 43.77 | 10-Aug-17 | FBP |
| 4,544.58 STS | | 25,065.08 2AP | APP | 247.00 USD / STS | 246.9999 FIP | | 247 | 15-Aug-17 | FBP |
| 40,000.00 BBL | | 40,000.00 PLA | UNK | 255.00 USD / STS | 255 FIP | | 255 | 18-Aug-17 | FBP |
| 5,000.00 MTA | | 32,000.00 PLA | UNK | 267.50 USD / MTA | 267.5 FIP | | 267.5 | 25-Aug-17 | FBP |
| 5,707.28 STS | | 31,362.35 2AP | APP | 240.00 USD / STS | 240.0001 FIP | | 240 | 29-Aug-17 | FBP |
| 80,000.00 BBL | | 80,000.00 PLA | UNK | 40.655 USD / BBL | 40.655 UNP | f_no6 3.0 usgc water mean -8.0 | | 25-Sep-17 MARKET | FBP |
| | | **909,795.43** | | | | | | | |
| 5,415.49 MTA | | 33,108.38 2AP | APP | 240.54 USD / STS | 240.5404 FIP | 235.000 +1.0 | | 30-Jun-17 | FBP |
| 33,108.00 BBL | | 33,108.00 1AP | PLA | 235.00 USD / STS | 235 FIP | | 235 | 12-Jul-17 | FBP |
| 5,896.75 STS | | 32,665.07 2AP | APP | 225.00 USD / STS | 225 FIP | | 225 | 21-Jul-17 | FBP |
| 55,871.29 BBL | | 55,871.29 2AP | APP | 43.770 USD / BBL | 43.77 FIP | | 43.77 | 25-Jul-17 | FBP |

000537

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 39,309.86 BBL | 39,309.86 2AP | APP | 43.770 USD / BBL | 43.77 FIP | 43.77 | 25-Jul-17 | FBP |
| 40,832.12 BBL | 40,832.12 2AP | APP | 43.770 USD / BBL | 43.77 FIP | 43.77 | 25-Jul-17 | FBP |
| 5,150.00 MTA | 32,960.00 PLA | UNK | 242.00 USD / STS | 242 FIP | 242 | 25-Jul-17 | FBP |
| 1,000.00 MTA | 6,400.00 PLA | UNK | 236.00 USD / STS | 236 FIP | 236 | 25-Jul-17 | FBP |
| 4,000.00 MTA | 25,600.00 PLA | UNK | 236.00 USD / STS | 236 FIP | 236 | 25-Jul-17 | FBP |
| 35,000.00 BBL | 35,000.00 PLA | UNK | 275.00 USD / STS | 275 FIP | 275 | 25-Jul-17 | FBP |
| 25,231.92 BBL | 25,231.92 2AP | APP | 43.770 USD / BBL | 43.77 FIP | 43.77 | 28-Jul-17 | FBP |
| 1,434.00 BBL | 1,434.00 PLA | PLA | 43.770 USD / BBL | 43.77 FIP | 43.77 | 10-Aug-17 | FBP |
| 35,000.00 BBL | 35,000.00 PLA | UNK | 245.00 USD / MTA | 245 FIP | 245 | 10-Aug-17 | FBP |
| 30,500.00 BBL | 30,500.00 PLA | UNK | 44.000 USD / BBL | 44 FIP | 44 | 10-Aug-17 | FBP |
| 32,411.04 BBL | 32,411.04 2AP | APP | 43.770 USD / BBL | 43.77 FIP | 43.77 | 10-Aug-17 | FBP |
| 35,000.00 BBL | 35,000.00 PLA | UNK | 249.00 USD / MTA | 249 FIP | 249 | 15-Aug-17 | FBP |
| 28,000.00 BBL | 28,000.00 PLA | UNK | 250.00 USD / MTA | 250 FIP | 250 | 15-Sep-17 | FBP |
| 75,000.00 BBL | 75,000.00 PLA | UNK | 285.00 USD / MTA | 285 FIP | 285 | 22-Sep-17 | FBP |

**597,431.68**

| VESSEL_NA | INCO_COD | LOC_DESC | LOC_DESC | PIPELINE_C | CONT_LAYCA | CONT_LAYCAN | CYCLE_COM | TRANSPOR | TRANSPOR | MOVEMEN | POS_ACT_1 | POS_ACT_1 | ANTICIPATI | CONT_TYP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IN TANK TF | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 1-Jul-17 | 1-Jul-17 | | | BAR | B/L | 1-Jul-17 | | | PHY |
| TANK TRAN | DAT | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 12-Jul-17 | 14-Jul-17 | | | TNK | COD | 15-Jul-17 | | | PHY |
| ASPHALT S | STS | DOMINICAN REP. | DOMINICAN REP. | | 5-Jul-17 | 15-Jul-17 | | ASPHALT SPRING | BAR | B/L | 4-Jul-17 | | | PHY |
| TBN | DES | MOBILE, AL | MOBILE, AL | | 23-Jul-17 | 26-Jul-17 | | | BAR | COD | 25-Jul-17 | | | PHY |
| TBN | DES | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 20-Jul-17 | 30-Jul-17 | | | BAR | COD | 30-Jul-17 | | | PHY |
| IN TANK TF | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 1-Jul-17 | 1-Jul-17 | | | BAR | B/L | 1-Jul-17 | | | PHY |
| IN TANK TF | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 1-Jul-17 | 1-Jul-17 | | | BAR | B/L | 8-Jul-17 | | | PHY |
| IN TANK TF | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 1-Jul-17 | 1-Jul-17 | | | BAR | B/L | 6-Jul-17 | | | PHY |
| | FOB | ALABAMA | ALABAMA | | 1-Aug-17 | 1-Aug-17 | | | BAR | B/L | | | | PHY |
| | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 1-Aug-17 | 1-Aug-17 | | | BAR | B/L | | | | PHY |
| | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 1-Aug-17 | 1-Aug-17 | | | BAR | B/L | | | | PHY |
| | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 1-Aug-17 | 1-Aug-17 | | | BAR | B/L | | | | PHY |
| BARGE | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 26-Jul-17 | 28-Jul-17 | | | TNK | B/L | 27-Jul-17 | | | PHY |
| B/GENESIS | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 1-Aug-17 | 1-Aug-17 | | | BAR | B/L | 14-Jul-17 | | | PHY |
| BARGE | FOB | MOBILE, AL | MOBILE, AL | | 14-Jul-17 | 14-Jul-17 | | | BAR | B/L | 17-Aug-17 | | | PHY |
| | DES | CORPUS CHRISTI, TX | | | 16-Aug-17 | 18-Aug-17 | | | BAR | B/L | | | | PHY |
| | DES | CORPUS CHRISTI, TX | | | 16-Aug-17 | 14-Sep-17 | | | BAR | COD | | | | PHY |
| BARGE | DES | MOBILE, AL | MOBILE, AL | | 28-Aug-17 | 10-Sep-17 | | | BAR | COD | | | | PHY |
| | FOB | MOBILE, AL | | | 30-Aug-17 | 1-Sep-17 | | | BAR | COD | 3-Sep-17 | | | PHY |
| | FOB | PORT ALLEN, LA | | | 10-Oct-17 | 20-Oct-17 | | | BAR | B/L | | | | PHY |
| ASPHALT S | DES | SANTO DOMINGO | SANTO DOMINGO | | 6-Jul-17 | 8-Jul-17 | | ASPHALT SPRING | BAR | COD | 12-Jul-17 | | | PHY |
| | FOB | MOBILE, AL | MOBILE, AL | | 1-Aug-17 | 1-Aug-17 | | | BAR | B/L | 1-Aug-17 | | | PHY |
| B/GENESIS | DES | CHANNELVIEW, TEXAS | CHANNELVIEW, TEXAS | | 16-Jul-17 | 17-Jul-17 | | | BAR | COD | 18-Jul-17 | | | PHY |
| TANK TRAN | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | | 21-Jul-17 | 21-Jul-17 | | | BAR | B/L | 15-Jul-17 | | | PHY |

000538

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TBN | DAP | ALABAMA | ALABAMA | 21-Jul-17 | 21-Jul-17 | BAR | COD | 21-Jul-17 | PHY |
| TBN | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | 21-Jul-17 | 21-Jul-17 | BAR | B/L | 21-Jul-17 | PHY |
| | FOB | ALABAMA | ALABAMA | 1-Aug-17 | 1-Aug-17 | BAR | B/L | | PHY |
| | FOB | ALABAMA | ALABAMA | 1-Aug-17 | 1-Aug-17 | BAR | B/L | | PHY |
| | FOB | ALABAMA | ALABAMA | 1-Aug-17 | 1-Aug-17 | BAR | B/L | | PHY |
| | DES | ALABAMA | ALABAMA | 1-Aug-17 | 1-Aug-17 | BAR | COD | | PHY |
| BARGE | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | 26-Jul-17 | 28-Jul-17 | BAR | B/L | 27-Jul-17 | PHY |
| B/GENESIS | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | 14-Jul-17 | 14-Jul-17 | BAR | B/L | 14-Jul-17 | PHY |
| | FOB | CORPUS CHRISTI, TX | | 28-Aug-17 | 30-Aug-17 | | B/L | | PHY |
| | FOB | MOBILE, AL | | 11-Aug-17 | 13-Aug-17 | | B/L | | PHY |
| B/GENESIS | FOB | CORPUS CHRISTI, TX | CORPUS CHRISTI, TX | 14-Jul-17 | 14-Jul-17 | BAR | B/L | 14-Jul-17 | PHY |
| | FOB | MOBILE, AL | | 28-Aug-17 | 30-Aug-17 | BAR | B/L | | PHY |
| | FOB | MOBILE, AL | | 25-Sep-17 | 30-Sep-17 | | B/L | | PHY |
| | DAP | BALTIMORE, MD | | 20-Oct-17 | 25-Oct-17 | | COD | | PHY |

000539

000540

| CONT_CLA | BOOKING_ | PARENT_C | NB_PRICE | QTY_BIS | URIN_NUME |
|---|---|---|---|---|---|
| EXT | N | RIO ENER | 43.77 BBL | 107999.3 BBL | 3 working EJK |
| EXT | N | PDVSA | 31.4 BBL | 55871.29 BBL | 3 working EJK |
| EXT | N | RIO ENER | 235 STS | 33108.38 BBL | 3 working EJK |
| EXT | N | EXXONMOB | 38.617 BBL | 39309.86 BBL | 3 working EJK |
| EXT | N | PHILL66 | 41 BBL | 40832.12 BBL | 3 working EJK |
| EXT | N | RIO ENER | 43.77 BBL | 124011 BBL | 3 working EJK |
| EXT | N | RIO ENER | 43.77 BBL | 37772.64 BBL | 3 working EJK |
| EXT | N | RIO ENER | 43.77 BBL | 38059.4 BBL | 3 working EJK |
| EXT | N | RIO ENER | 43.77 BBL | 60000 BBL | 3 working EJK |
| EXT | N | RIO ENER | 43.77 BBL | 40000 BBL | 3 working LRA |
| EXT | N | RIO ENER | 43.77 BBL | 38000 BBL | 3 working EJK |
| EXT | N | RIO ENER | 1 BBL | 3761 BBL | 3 working EJK |
| EXT | N | PDVSA | 32.567 BBL | 25231.92 BBL | 3 working EJK |
| EXT | N | RIO ENER | 43.77 BBL | 25000 BBL | 3 working EJK |
| EXT | N | RIO ENER | 43.77 BBL | 32411.04 BBL | 3 working MRR |
| EXT | N | HUNT REF | 247 STS | 25065.08 BBL | 3 working EJK |
| EXT | N | PHILL66 | | 40000 BBL | 3 working EJK |
| EXT | N | GCAC | 267.5 MTA | 32000 BBL | 5 working EJK |
| EXT | N | HUNT REF | 240 STS | 31362.35 BBL | 3 working EJK |
| EXT | N | EXXONMOB | 40.655 BBL | 80000 BBL | 3 working EJK |
| EXT | N | INVERTIT | 240.54 STS | -33108.4 BBL | 90 calenda MRR |
| EXT | N | RIO ENER | 235 STS | -33108 BBL | 3 working EJK |
| EXT | N | CENTERMI | 225 STS | -32665.1 BBL | 3 working EJK |
| EXT | N | RIO ENER | 43.77 BBL | -55871.3 BBL | 3 working EJK |

000541

| | | | | | |
|---|---|---|---|---|---|
| EXT | N | RIO ENER | 43.77 BBL | -39310 BBL | 3 working ( LRA |
| EXT | N | RIO ENER | 43.77 BBL | -40832.1 BBL | 3 working ( LRA |
| EXT | N | RIO ENER | 242 STS | -32960 BBL | 3 working ( EJK |
| EXT | N | RIO ENER | 236 STS | -6400 BBL | 3 working ( EJK |
| EXT | N | RIO ENER | 236 STS | -25600 BBL | 3 working ( EJK |
| EXT | N | RIO ENER | 275 STS | -35000 BBL | 3 working ( EJK |
| EXT | N | RIO ENER | 43.77 BBL | -25231.9 BBL | 3 working ( EJK |
| EXT | N | GENESI | 245 MTA | -1434 BBL | 3 working ( MRR |
| EXT | N | GCAC | 44 BBL | -35000 BBL | 5 working ( EJK |
| EXT | N | GCAC | 43.77 BBL | -30500 BBL | 5 working ( EJK |
| EXT | N | RIO ENER | 43.77 BBL | -32411 BBL | 3 working ( MRR |
| EXT | N | GCAC | 249 MTA | -35000 BBL | 5 working ( EJK |
| EXT | N | GCAC | 250 MTA | -28000 BBL | 5 working ( EJK |
| EXT | N | GCAC | 285 MTA | -75000 BBL | 3 working ( EJK |

000542

| PRODUCT_UNTAXED_CARBON_II | BUSINESS_DOC_REFU | REQ_COLL | REQ_COLL_NB | IS_LINE | USER_CRE | USER_LAST | DATE_LAST_MODIFIED |
|---|---|---|---|---|---|---|---|
| N | OCR | N | 30-Jun-17 | N | EJK | BGH | 3-Aug-17 |
| N | OCR | N | 12-Jul-17 | N | EJK | MRR | 21-Jul-17 |
| N | OCR | N | 12-Jul-17 | N | EJK | LRA | 19-Jul-17 |
| N | OCR | N | 20-Jul-17 | N | EJK | BGH | 10-Aug-17 |
| N | OCR | N | 21-Jul-17 | N | EJK | MRR | 14-Aug-17 |
| N | OCR | N | 30-Jun-17 | N | MRR | BGH | 3-Aug-17 |
| N | OCR | N | 30-Jun-17 | N | MRR | BGH | 3-Aug-17 |
| N | OCR | N | 30-Jun-17 | N | MRR | BGH | 3-Aug-17 |
| N | OCR | N | 27-Jul-17 | N | LRA | BGH | 22-Aug-17 |
| N | OCR | N | 27-Jul-17 | N | LRA | BGH | 22-Aug-17 |
| N | OCR | N | 27-Jul-17 | N | LRA | BGH | 22-Aug-17 |
| N | OCR | N | 25-Jul-17 | N | EJK | BGH | 3-Aug-17 |
| N | OCR | N | 28-Jul-17 | N | LRA | BGH | 22-Aug-17 |
| N | OCR | N | 10-Aug-17 | N | MRR | MRR | 10-Aug-17 |
| N | OCR | N | 15-Aug-17 | N | EJK | MRR | 23-Aug-17 |
| N | OCR | N | 18-Aug-17 | N | EJK | BGH | 24-Aug-17 |
| N | LC | N | 25-Aug-17 | N | BGH | | |
| N | OCR | N | 29-Aug-17 | N | EJK | MRR | 11-Sep-17 |
| N | OCR | N | 5-Oct-17 | N | EJK | | |
| N | OCR | N | 1-Jul-17 | N | MRR | MRR | 21-Jul-17 |
| N | OCR | N | 27-Jul-17 | N | EJK | BGH | 23-Aug-17 |
| N | OCR | N | 21-Jul-17 | N | EJK | MRR | 10-Aug-17 |
| N | OCR | N | 25-Jul-17 | N | LRA | BGH | 2-Aug-17 |

000543

| | | | | | | |
|---|---|---|---|---|---|---|
| N | N | OCR | 25-Jul-17 N | LRA | MRR | 8-Aug-17 |
| N | N | OCR | 25-Jul-17 N | LRA | BGH | 29-Aug-17 |
| N | N | OCR | 27-Jul-17 N | LRA | BGH | 22-Aug-17 |
| N | N | OCR | 27-Jul-17 N | LRA | BGH | 22-Aug-17 |
| N | N | OCR | 27-Jul-17 N | LRA | BGH | 22-Aug-17 |
| N | N | OCR | 27-Jul-17 N | LRA | BGH | 22-Aug-17 |
| N | N | OCR | 28-Jul-17 N | LRA | BGH | 3-Aug-17 |
| N | N | OCR | 10-Aug-17 N | MRR | MRR | 10-Aug-17 |
| N | N | OCR | 23-Aug-17 N | EJK | | |
| N | N | OCR | 10-Aug-17 N | EJK | | |
| N | N | OCR | 10-Aug-17 N | MRR | MRR | 10-Aug-17 |
| N | N | OCR | 23-Aug-17 N | EJK | BGH | 15-Aug-17 |
| N | N | OCR | 20-Sep-17 N | EJK | | |
| N | N | OCR | 15-Oct-17 N | EJK | | |

## CGAC / Rio Summary

| Vitol Contract | Deal | Date | Vitol Counterparty | Supplier | Location | NBbls | Price |
|---|---|---|---|---|---|---|---|
| 3105432.0 | 1844757 | 30-Jun | Rio | Inventory | Mobile | 107,999.31 | 43.770 |
| 3105432.1 | 1844757 | 6-Jul | Rio | Exxon | Mobile | 38,059.40 | 43.770 |
| 3105432.2 | 1844757 | 7-Jul | Rio | Exxon | Mobile | 37,772.64 | 43.770 |
| 3105432.3 | 1844757 | 30-Jun | Rio | Inventory | Corpus | 120,128.91 | 43.770 |
| 3126632.0 | 1845096 | 30-Jun | Rio | Bottoms | Corpus | 3,761.09 | 1.000 |
| 3114301.0 | 1845012 | 12-Jul | Citgo | Citgo | Corpus | 55,359.48 | 31.400 |
| 3114301.1 | 1845012 | 12-Jul | Citgo | Citgo | Corpus | 511.81 | 31.400 |
| 3122695.0 | 1845083 | 30-Jul | P66 | P66 | Corpus | 40,832.12 | 41.000 |
| 3122201.0 | 1845090 | 25-Jul | Exxon | Exxon | Mobile | 39,309.86 | 38.617 |
| 3126576.0 | 1853922 | 25-Jul | Citgo | Citgo | Corpus | 25,231.92 | 32.567 |
| 3147123.0 | 1866853 | 17-Aug | Hunt | Hunt | Mobile | | |
| 3151012.0 | 1915049 | 6-Oct | P66 | P66 | Corpus | | |
| 3158929.0 | 1915053 | 11-Sep | GCAC | Shell Equilon | Mobile | | |
| 3161097.0 | 1877681 | 3-Sep | Hunt | Hunt | Mobile | | |
| 3213448.0 | 1915463 | 24-Oct | Exxon | Exxon | Baton Rouge | 39,366.22 | 39.887 |
| 3213447.0 | 1915467 | 24-Oct | Exxon | Exxon | Baytown | 38,229.05 | 39.637 |
| 3187254.0 | 1915150 | 25-Oct | Exxon | Exxon | Baton Rouge | 47,307.73 | 41.369 |
| 3187254.1 | 1915150 | 28-Oct | Exxon | Exxon | Baton Rouge | 31,750.94 | 41.369 |
| 3232017.0 | 1925598 | Nov 3-4 | Citgo | Citgo | Port Allen | 49,557.13 | 46.837 |
| 3239253.0 | 1941491 | 11-Nov | Citgo | Citgo | Corpus Christi | 34,132.22 | 45.043 |
| 3243802.0 | 1941925 | 15-Nov | Citgo | Citgo | Corpus Christi | 19,433.34 | 43.680 |
| 3248805.0 | 1942224 | 23-Nov | Citgo | Citgo | Corpus Christi | 34,466.86 | 42.645 |
| 3232026.0 | | Nov 10-30 | P66 | P66 | Lake Charles | 120,000.00 | |
| July Polymers | | | | | Corpus Christi | | |
| Aug Polymers | | | | | Corpus Christi | | |
| Sept Polymers | | | | | Corpus Christi | | |
| Sulfur | | | | | Corpus Christi | | |
| Total | | | | | | | |

| Vitol Contract | Deal | Date | Vitol Counterparty | Receiver | Location | NBbls | Price |
|---|---|---|---|---|---|---|---|
| 3126634.0 | 1845096 | 7-Jul | Rio | VALT | Mobile | | |
| 3105629.0 | 1834559 | 4-Jul | Inversiones Titanio | | Dom Rep | | |
| | | | Inversiones Titanio | | Dom Rep | | |
| 3126629.0 | 1845103 | 21-Jul | Rio | VALT | Mobile | | |
| 3126629.1 | 1845103 | 21-Jul | Rio | VALT | Mobile | | |
| 3122729.0 | 1845058 | 18-Jul | Century Terminals | Century Terminals | Channelview | | |
| 3143691.0 | 1845058 | 18-Jul | Genesis | Genesis | Channelview | 1,000.00 | |
| 3126626.0 | 1845105 | 12-Sep | Rio | United | Mobile | | |
| 3143606.0 | 1914582 | 11-Aug | GCAC | SEM | Mobile | 29,746.94 | 44.000 |
| 3143612.0 | 1915039 | 20-Aug | GCAC | Gunvor | Corpus Christi | | |
| 3147126.0 | 1915045 | 2-Sep | GCAC | Gunvor | Corpus Christi | | |
| 3178452.0 | 1915134 | 26-Sep | GCAC | VALT | Mobile | | |
| 3196252.0 | 1915419 | 23-Oct | GCAC | VALT | Mobile | | |
| 3204486.0 | 1915420 | 15-Oct | GCAC | Gunvor | Mobile | | |

| 3233787.0 | 1925598 | Nov 6-9 | Freepoint | Freepoint | Port Allen | 49,557.13 | 47.016 |

| Total |

| 29746.94 | 44 | 1,308,865.36 |
| 6235.884 | 245 | 1,527,791.58 |
| 6198.949 | 249 | 1,543,538.30 |
| 4638.423 | 250 | 1,159,605.75 |
| 2639.816 | 247.5 | 653,354.46 |
| 6042.07 | 245 | 1,480,307.15 |
| | | 7,673,462.60 |

| | | Purchases | | | | |
|---|---|---|---|---|---|---|
| **Short Tons** | **Price** | **Value** | **Invoice** | **Date Paid** | **Paid** | **Balance** |
| | | $4,727,129.80 | | | $0.00 | $4,727,129.80 |
| | | $1,665,859.94 | | | $0.00 | $1,665,859.94 |
| | | $1,653,308.45 | | | $0.00 | $1,653,308.45 |
| | | $5,258,042.39 | | | $0.00 | $5,258,042.39 |
| | | $3,761.09 | | | $0.00 | $3,761.09 |
| | | $1,738,287.67 | P1741005 | | $0.00 | $1,738,287.67 |
| | | $16,070.83 | P1758120 | | $0.00 | $16,070.83 |
| | | $1,674,116.92 | P1744983 | | $0.00 | $1,674,116.92 |
| | | $1,518,017.07 | P1743160 | | $0.00 | $1,518,017.07 |
| | | $821,719.53 | P1743401 | | $0.00 | $821,719.53 |
| 4,544.580 | 247.000 | $1,122,511.26 | P1746430 | | $0.00 | $1,122,511.26 |
| 6,814.205 | 255.000 | $1,737,621.00 | P1759997 | | $0.00 | $1,737,621.00 |
| 6,727.883 | 267.500 | $1,799,708.70 | | | $0.00 | $1,799,708.70 |
| 5,707.278 | 240.000 | $1,369,747.20 | P1748905 | | $0.00 | $1,369,747.20 |
| | | $1,570,188.61 | P1760602 | | $0.00 | $1,570,188.61 |
| | | $1,515,273.39 | P1759796 | | $0.00 | $1,515,273.39 |
| | | $1,957,054.56 | P1760597 | | $0.00 | $1,957,054.56 |
| | | $1,313,491.94 | P1760594 | | $0.00 | $1,313,491.94 |
| | | $0.00 | | | $0.00 | $0.00 |
| | | $0.00 | | | $0.00 | $0.00 |
| | | $2,321,107.30 | P1763270 | | $0.00 | $2,321,107.30 |
| | | $1,537,087.64 | P1763257 | 28-Nov | $0.00 | $1,537,087.64 |
| | | $848,848.29 | P1764708 | 28-Nov | $0.00 | $848,848.29 |
| | | $1,469,839.24 | P1469839.24 | 1-Dec | $0.00 | $1,469,839.24 |
| 21,239.000 | 240.000 | $5,097,360.00 | | | $0.00 | $5,097,360.00 |
| | | $0.00 | | | $0.00 | $0.00 |
| | | $0.00 | | | $0.00 | $0.00 |
| | | $0.00 | | | $0.00 | $0.00 |
| | | $75,347.22 | | | $0.00 | $75,347.22 |
| | | $9,240.23 | | | $0.00 | $9,240.23 |
| | | $58,023.37 | | | $0.00 | $58,023.37 |
| | | $1,910.00 | | | $0.00 | $1,910.00 |
| | | $42,880,673.65 | | | $0.00 | $42,880,673.65 |

| | | Sales | | | | |
|---|---|---|---|---|---|---|
| **Short Tons** | **Price** | **Value** | **Invoice** | **Date Paid** | **Paid** | **Balance** |
| 5,358.217 | 242.000 | $1,296,688.51 | | | $0.00 | $1,296,688.51 |
| 5,975.818 | 236.000 | $1,410,293.05 | S1773728 | | $0.00 | $1,410,293.05 |
| | | $256,589.95 | S1773728 | | $0.00 | $256,589.95 |
| 4,052.132 | 236.000 | $956,303.15 | | | $0.00 | $956,303.15 |
| 936.076 | 236.000 | $220,913.94 | | | $0.00 | $220,913.94 |
| 5,896.749 | 225.000 | $1,326,768.53 | S1753068 | | $0.00 | $1,326,768.53 |
| 180.522 | 225.000 | $40,617.45 | | | $0.00 | $40,617.45 |
| 5,752.006 | 275.000 | $1,581,801.65 | | | $0.00 | $1,581,801.65 |
| | | $1,308,865.36 | | | $0.00 | $1,308,865.36 |
| 6,235.884 | 245.000 | $1,527,791.58 | | | $0.00 | $1,527,791.58 |
| 6,198.949 | 249.000 | $1,543,538.30 | | | $0.00 | $1,543,538.30 |
| 4,638.423 | 250.000 | $1,159,605.75 | | | $0.00 | $1,159,605.75 |
| 2,639.816 | 247.500 | $653,354.46 | | | $0.00 | $653,354.46 |
| 6,042.070 | 245.000 | $1,480,307.15 | | | $0.00 | $1,480,307.15 |
| | | $0.00 | | | $0.00 | $0.00 |

| | | | |
|---|---|---|---|
| $0.00 | | $0.00 | $0.00 |
| $0.00 | | $0.00 | $0.00 |
| $2,329,978.02 | S1777969 | $0.00 | $2,329,978.02 |
| $0.00 | | $0.00 | $0.00 |
| $0.00 | | $0.00 | $0.00 |
| $0.00 | | $0.00 | $0.00 |
| $17,093,416.85 | | $0.00 | $17,093,416.85 |

| Comments |
| --- |

Check volume 124,011.04 nbbls - Backup
Is this included in the 124,011.04 nbbls?

Citgo billed quantity balance, had underbilled original

Need to change to STS and re-enter payable invoice

Need to change to STS

B/K27722 & 23
B/K27722 & 23

Px usgc 3% - 10.0 => Nov 8-10, sold Freepoint          GM 3000, 3002, 3003

| Comments |
| --- |

Need to change to STS and rebill
Asphalt Spring Frt - Mobile to Dom Rep

Bill Genesis for barge ROB at same as sales price to Century

Need to change to STS
Need to change to STS
Need to change to STS
Need to change to STS
Need to change to STS

000548

Px usgc 3% - 8.25, bot from citgo

**Opening Inventory 30 Jun 2017**

| Tank (Corpus) | Volume | Bottoms ? | Net less Bottoms |
|---|---|---|---|
| 312 | 41,431.84 | | 41,431.84 |
| 313 | 42,299.48 | 2,395.71 | 39,903.77 |
| 314 | 18,840.05 | | 18,840.05 |
| 315 | 9,338.14 | 607.19 | 8,730.95 |
| 316 | 0.00 | 84.00 | |
| 401 | 1,139.97 | 674.19 | 465.78 |
| 402 | 1,662.81 | | 1,662.81 |
| 403 | 1,829.17 | | 1,829.17 |
| 404 | 2,174.10 | | 2,174.10 |
| 405 | 1,245.12 | | 1,245.12 |
| 406 | 204.75 | | 204.75 |
| 407 | 2,089.96 | | 2,089.96 |
| 424 | 876.27 | | 876.27 |
| 245 | 879.38 | | 879.38 |
| Total | 124,011.04 | 3,761.09 | 120,333.95 |
| Rio Figures | 123,890.00 | 3,761.09 | 120,128.91 |

| Tank (Mobile) | Volume |
|---|---|
| 801 | 37,677.02 |
| 802 | 40,136.57 |
| 803 | 20,898.57 |
| 20 | 9,287.15 |
| Total | 107,999.31 |

| | |
|---|---|
| Grand Total | 232,010.35 |
| Rio Grand Total | 231,889.31 |

# GCAC - Hedge 2007802 Purchases/Sales

| No. | Notes | Position | Date Created | B/S | Deal | Date | Prod | Counter | QTY | UOM | Qty Status | Title after Status | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Inventory | 310543.2.0 | 30-Jun-17 | B | 1844757 | 17-Jul | HSFO | RIO ENERGY INTERNATIONAL, INC. | 107,999.310 | BBL | 2AP | APP | 43.770 USD / BBL |
| 1 | Inventory | 310543.2.1 | 21-Jul-17 | B | 1844757 | 17-Jul | HSFO | RIO ENERGY INTERNATIONAL, INC. | 38,059.400 | BBL | 2AP | APP | 43.770 USD / BBL |
| 1 | Inventory | 310543.2.2 | 21-Jul-17 | B | 1844757 | 17-Jul | HSFO | RIO ENERGY INTERNATIONAL, INC. | 37,772.640 | BBL | 2AP | APP | 43.770 USD / BBL |
| 1 | Inventory | 310543.2.3 | 21-Jul-17 | B | 1844757 | 17-Jul | HSFO | RIO ENERGY INTERNATIONAL, INC. | 120,128.910 | BBL | 2AP | APP | 43.770 USD / BBL |
| Total | | | | | | | | | 303,960,260 | | | | |
| 2 | Bottoms | 312663.2.0 | 25-Jul-17 | B | 1844757 | 17-Aug | VTB | RIO ENERGY INTERNATIONAL, INC. | 3,761,090 | BBL | PLA | UNK | 1.000 USD / BBL |
| 3 | | 3253359.1 | 12-Jul-17 | S | | | | VIC (internal) | 33,108.380 | BBL | 1AP | PLA | |
| 3 | | 3142206.0 | 12-Jul-17 | S | 1834559 | 17-Aug | HSFO | RIO ENERGY INTERNATIONAL, INC. | 33,108.380 | BBL | 2AP | PLA | 235.00 USD / STS |
| 3 | | 3114213.0 | 12-Jul-17 | S | 1834559 | 17-Jul | HSFO | INVERSIONES TITANO SRL | 5,415.485 | MTA | 2AP | APP | 235.00 USD / STS |
| 3 | | 3105629.0 | 30-Jun-17 | S | 1834559 | 17-Jul | HSFO | | 5,415.485 | MTA | 2AP | APP | 240.54 USD / STS |
| 4 | No offset - Inv? | 3226745.1 | 7-Jul-17 | B | 1845096 | 17-Jul | VTB | VIC (internal) | 5,358.217 | STS | PLA | | 242 |
| 4 | | 312663.4.0 | 25-Jul-17 | S | 1845096 | 17-Aug | VTB | RIO ENERGY INTERNATIONAL, INC. | 5,358.217 | STS | PLA | UNK | 242.00 USD / STS |
| 5 | | 3114301.0 | 12-Jul-17 | B | 1845012 | 17-Jul | VTB | CITGO PETROLEUM CORPORATION | 55,871.290 | BBL | 2AP | APP | 31.400 USD / BBL |
| 5 | | 312664.5.0 | 25-Jul-17 | S | 1845012 | 17-Jul | VTB | RIO ENERGY INTERNATIONAL, INC. | 55,871.290 | BBL | 2AP | APP | 43.770 USD / BBL |
| 5 | | 312664.4.0 | 25-Jul-17 | S | 1845012 | 17-Aug | VTB | RIO ENERGY INTERNATIONAL, INC. | 55,871.290 | BBL | PLA | UNK | 43.770 USD / BBL |
| 5 | | 3225366.0 | | S | 1845012 | | VTB | VIC (internal) | 55,871.290 | BBL | | | 43.77 |
| 6 | | 3253368.2 | | B | 1845058 | | | VIC (internal) | 32,411.040 | BBL | | | 43.77 |
| 6 | | 3143573.0 | 10-Aug-17 | B | 1845058 | 17-Jul | VTB | RIO ENERGY INTERNATIONAL, INC. | 32,411.040 | BBL | 2AP | APP | 43.770 USD / BBL |
| 6 | | 3143562.0 | 10-Aug-17 | B | 1845058 | 17-Jul | VTB | RIO ENERGY INTERNATIONAL, INC. | 32,411.040 | BBL | 2AP | APP | 43.770 USD / BBL |
| 6 | | 3122729.0 | 21-Jul-17 | S | 1845058 | 17-Jul | VTB | CENTURY TERMINALS, LLC | 5,896.749 | STS | 2AP | APP | 225.00 USD / STS |
| 6 | volumes different | 3148691.0 | 10-Aug-17 | S | 1845058 | 17-Jul | VTB | GENESIS MARINE, LLC | 1,434.000 | BBL | PLA | PLA | 43.770 USD / BBL |
| 7 | | 3226755.1 | | B | 1845103 | | VTB | VIC (internal) | 4,988.208 | STS | | | 43.77 |
| 7 | | 312662.9.0 | 25-Jul-17 | S | 1845103 | 17-Jul | VTB | RIO ENERGY INTERNATIONAL, INC. | 4,052.132 | STS | PLA | UNK | 236.00 USD / STS |
| 7 | | 3126629.1 | 25-Jul-17 | S | 1845103 | 17-Aug | VTB | RIO ENERGY INTERNATIONAL, INC. | 936.076 | STS | PLA | UNK | 236.00 USD / STS |
| 8 | | 3228733.1 | | B | 1845105 | | VTB | VIC (internal) | 5,725.289 | STS | | | |
| 8 | | 312662.6.0 | 25-Jul-17 | S | 1845105 | 17-Aug | VTB | RIO ENERGY INTERNATIONAL, INC. | 5,752.006 | STS | PLA | UNK | 275.00 USD / STS |
| 9 | | 3122659.0 | 21-Jul-17 | B | 1845083 | 17-Jul | VTB | PHILLIPS 66 COMPANY | 40,832.120 | BBL | 2AP | APP | 41.000 USD / BBL |
| 9 | | 3126637.0 | 25-Jul-17 | B | 1845083 | 17-Jul | VTB | RIO ENERGY INTERNATIONAL, INC. | 40,832.120 | BBL | PLA | UNK | 43.770 USD / BBL |
| 9 | | 3126639.0 | 25-Jul-17 | B | 1845083 | 17-Jul | VTB | RIO ENERGY INTERNATIONAL, INC. | 40,832.120 | BBL | PLA | UNK | 43.770 USD / BBL |
| 9 | | 3225373.0 | | S | 1845083 | | VTB | VIC (internal) | 40,832.120 | BBL | | | 43.77 |
| 10 | | 3122201.0 | 20-Jul-17 | B | 1845090 | 17-Jul | VTB | EXXONMOBIL OIL CORPORATION | 39,309.860 | BBL | 2AP | APP | 38.617 USD / BBL |
| 10 | | 3126641.0 | 25-Jul-17 | B | 1845090 | 17-Aug | VTB | RIO ENERGY INTERNATIONAL, INC. | 39,309.000 | BBL | PLA | UNK | 43.770 USD / BBL |
| 10 | | 3126642.0 | 25-Jul-17 | B | 1845090 | 17-Jul | VTB | RIO ENERGY INTERNATIONAL, INC. | 39,309.860 | BBL | PLA | UNK | 43.770 USD / BBL |
| 10 | | 3225400.0 | | S | 1845090 | | VTB | VIC (internal) | 39,309.860 | BBL | | | 43.77 |
| 11 | | 3126576.0 | 25-Jul-17 | B | 1853922 | 17-Jul | VTB | CITGO PETROLEUM CORPORATION | 25,231.920 | BBL | 2AP | APP | 32.567 USD / BBL |
| 11 | | 3130660.0 | 28-Jul-17 | B | 1853922 | 17-Jul | VTB | RIO ENERGY INTERNATIONAL, INC. | 25,231.920 | BBL | 2AP | APP | 43.770 USD / BBL |
| 11 | | 3130672.0 | 28-Jul-17 | B | 1853922 | 17-Aug | VTB | RIO ENERGY INTERNATIONAL, INC. | 25,231.920 | BBL | PLA | UNK | 43.770 USD / BBL |
| 11 | | 3225404.0 | | S | 1853922 | | VTB | VIC (internal) | 25,231.920 | BBL | | | 43.77 |
| 12 | | 3147123.0 | 15-Aug-17 | B | 1866853 | 17-Aug | PG6722 | HUNT REFINING COMPANY | 4,544.582 | STS | 2AP | APP | 247.00 USD / STS |
| 12 | | 3228876.0 | | B | 1866853 | | | RIO ENERGY INTERNATIONAL, INC. | 4,544.582 | STS | | | |
| 12 | | 3228876.1 | | B | 1866853 | | | RIO ENERGY INTERNATIONAL, INC. | 4,544.582 | STS | | | |
| 12 | | 3226891.0 | | S | 1866853 | | | VIC (internal) | 4,544.582 | STS | | | |
| 13 | | 3226949.1 | | B | 1914582 | | | GULF COAST ASPHALT COMPANY, L.L.C. | 29,746.940 | BBL | | | 43.77 |
| 13 | | 3143606.0 | 10-Aug-17 | S | 1914582 | 17-Aug | PG64/22 | GULF COAST ASPHALT COMPANY, L.L.C. | 29,746.940 | BBL | PLA | UNK | 44.00 |
| 14 | | 3227027.1 | | B | 1915039 | | PG64/22 | VIC (internal) | 6,235.884 | STS | | | 43.77 |
| 14 | | 3148612.0 | 10-Aug-17 | S | 1915039 | 17-Aug | PG64/22 | GULF COAST ASPHALT COMPANY, L.L.C. | 6,235.884 | STS | PLA | UNK | 245.00 USD / MTA |
| 15 | | 3227042.1 | | B | 1915045 | | | VIC (internal) | 6,198.949 | STS | | | |

000551

000552

| Row | Trade # | Date | B/S | Ref # | Date1 | Date2 | Prod | Counterparty | Volume | Unit | PLA | UNK | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | 3147126.0 | 15-Aug-17 | S | 1915045 | 17-Aug | 17-Aug | PG6722 | GULF COAST ASPHALT COMPANY, LLC | 6,198,949 | STS | PLA | UNK | 249.00 USD / MTA |
| 16 | 3151012.0 | 18-Aug-17 | B | 1915049 | 17-Aug | | | PHILLIPS 66 COMPANY | 6,814.205 | STS | PLA | UNK | 255.00 USD / STS |
| 16 | 3227052.0 | | S | 1915049 | | | | RIO ENERGY INTERNATIONAL, INC. | 6,814.205 | STS | | | |
| 16 | 3227053.0 | | S | 1915049 | | | | RIO ENERGY INTERNATIONAL, INC. | 6,814.205 | STS | | | |
| 16 | 3227059.0 | | | 1915049 | | | | VIC (internal) | 6,814.205 | STS | | | |
| 17 | 3158929.0 | 25-Aug-17 | B | 1915053 | 17-Aug | | VTB | GULF COAST ASPHALT COMPANY, LLC | 6,727.883 | STS | PLA | UNK | 267.50 USD / MTA |
| 17 | 3227061.0 | | S | 1915053 | | | | RIO ENERGY INTERNATIONAL, INC. | 6,727.883 | STS | | | |
| 17 | 3227080.0 | | S | 1915053 | | | | RIO ENERGY INTERNATIONAL, INC. | 6,727.883 | STS | | | |
| 17 | 3227083.0 | | | 1915053 | | | | VIC (internal) | 6,727.883 | STS | | | |
| 18 | 3161097.0 | 29-Aug-17 | B | 1877681 | 17-Sep | | PG6722 | HUNT REFINING COMPANY | 5,707.278 | STS | ZAP | APP | 240.00 USD / STS |
| 18 | 3227092.0 | | S | 1877681 | | | | RIO ENERGY INTERNATIONAL, INC. | 5,707.278 | STS | | | |
| 18 | 3227093.0 | | S | 1877681 | | | | RIO ENERGY INTERNATIONAL, INC. | 5,707.278 | STS | | | |
| 18 | 3227095.0 | | | 1877681 | | | | VIC (internal) | 5,707.278 | STS | | | |
| 19 | 3227105.1 | 15-Sep-17 | B | 1915134 | 17-Sep | | ASP40/60 | VIC (internal) | 4,638.423 | STS | PLA | UNK | 250.00 USD / MTA |
| 19 | 3178452.0 | | S | 1915134 | | | | GULF COAST ASPHALT COMPANY, LLC | 4,638.423 | STS | | | |
| 20 | Need full details... were deals even entered? | | | | | | | | | | | | |
| 21 A | 3187254.0 | 25-Sep-17 | B | 1915150 | 17-Oct | | HSFO | EXXONMOBIL OIL CORPORATION | 47,307.780 | BBL | PLA | UNK | 41.369 / 44.69 |
| 21 B | 3221283.0 | 18-Aug-17 | S | 1915150 | | | | FREEPONT COMMODITIES LLC | 47,245.870 | BBL | | | |
| 21 B | 3187254.1 | 25-Sep-17 | B | 1915150 | 17-Oct | | HSFO | EXXONMOBIL OIL CORPORATION | 31,750.940 | BBL | PLA | UNK | 41.369 / 51.128 / 43.77 / 43.77 / 43.77 |
| | 3215500.0 | | S | 1915150 | | | | UNITY BUNKERING | 20,257.820 | BBL | | | |
| | 3227135.0 | | S | 1915150 | | | | RIO ENERGY INTERNATIONAL, INC. | 11,924.540 | BBL | | | |
| | 3227136.0 | | S | 1915150 | | | | RIO ENERGY INTERNATIONAL, INC. | 11,924.540 | BBL | | | |
| | 3227137.0 | | | 1915150 | | | | VIC (internal) | 11,924.540 | BBL | | | |
| 22 | 3227171.1 | | B | 1915419 | | | VTB | VIC (internal) | 2,639.816 | BBL | | | |
| 22 | 3227170.0 | | S | 1915419 | | | | RIO ENERGY INTERNATIONAL, INC. | 2,639.816 | BBL | | | |
| 22 | 3227242.0 | | S | 1915419 | | | | RIO ENERGY INTERNATIONAL, INC. | 2,639.816 | BBL | | | |
| 22 | 3196252.0 | 2-Oct-17 | | 1915419 | 17-Oct | | | GULF COAST ASPHALT COMPANY, LLC | 2,639.816 | BBL | | | |
| 23 | 3227177.1 | 11-Oct-17 | B | 1915420 | 17-Oct | | ASP40/60 | VIC (internal) | 6,042.070 | BBL | PLA | UNK | 247.50 USD / MTA |
| 23 | 3204486.0 | | S | 1915420 | | | | GULF COAST ASPHALT COMPANY, LLC | 6,042.070 | BBL | | | |
| 24 | 3213448.0 | 19-Oct-17 | B | 1915463 | 17-Oct | | VTB | EXXONMOBIL OIL CORPORATION | 39,366.220 | BBL | PLA | UNK | 39.887 |
| 24 | 3214927.0 | | S | 1915463 | | | | RIO ENERGY INTERNATIONAL, INC. | | | | | |
| 24 | 3214928.0 | | S | | | | | RIO ENERGY INTERNATIONAL, INC. | | | | | |
| 24 | 3227131.0 | | | | | | | VIC (internal) | | | | | |
| 25 | 3213447.0 | 19-Oct-17 | B | 1915467 | 17-Oct | | VTB | EXXONMOBIL OIL CORPORATION | 38,229.050 | BBL | PLA | UNK | 39.637 |
| 25 | 3214932.0 | | S | 1915467 | | | | RIO ENERGY INTERNATIONAL, INC. | | | | | |
| 25 | 3214933.0 | | S | | | | | RIO ENERGY INTERNATIONAL, INC. | | | | | |
| 25 | 3227133.0 | | | | | | | VIC (internal) | | | | | |
| 26 | Need to enter deal - Ning Hai Wan to Titano | | | | | | | | | | | | |
| 27/28/29 >> see deal #21 | | | | | | | | | | | | | |
| 30 A | 3232026.1 | | B | 1931012 | | | VTB | PHILLIPS 66 COMPANY | 6,901.187 | STS | | | 250 |
| 30 A | 3239254.0 | | S | 1931012 | | | | MERCURIA | 37,839.310 | BBL | | | |
| 30 B | 3232026.0 | | B | 1931014 | | | VTB | PHILLIPS 66 COMPANY | 40,000.000 | BBL | | | 250 |
| 30 B | 3239260.0 | | S | 1931014 | | | | MERCURIA | 40,000.000 | BBL | | | |
| 30 C | 3232026.0 | | B | | | | VTB | PHILLIPS 66 COMPANY | 40,000.000 | BBL | | | 250 |
| 31 | 3232017.0 | | B | 1925598 | | | VTB | CITGO PETROLEUM | 49,557.130 | BBL | | | 46,847 |
| 31 | 3233787.0 | | S | 1925598 | | | | FREEPONT COMMODITIES LLC | 49,557.130 | BBL | | | 47,016 |
| 32 | 3230472.0 | | B | 1943899 | | | VTB | DAVISON PETROLEUM | 33,946.760 | BBL | | | |

000553

250

GULF COAST ASPHALT COMPANY, LLC. 24,000,000 BBL

VTB

S

3238311.0

33
33

# Cost Summary

| Rio Reference | Vitol Deal | Cost | Amount | Rio Invoice | Backup | Comments | Cost Type |
|---|---|---|---|---|---|---|---|
| PP17-07-701 | 1844757 | Inspection Fee | $587.45 | need invoice | X | | INS |
| PP17-07-702B | 1844757 | Inspection Fee | $915.39 | need invoice | X | | INS |
| PP17-07-703 | 1841757 | Inspection Fee | $1,160.90 | need invoice | X | | INS |
| PP17-07-703 | 1841757 | Customs Fee | $535.00 | need invoice | X | Do we have other VALT exports | OTH |
| PP17-07-703 | 1841757 | Commission Cost | $6,414.75 | need invoice | X | | COM |
| PP17-07-704B | 1841757 | Inspection Fee | $980.68 | need invoice | X | | INS |
| PP17-07-708 | 1841757 | Inspection Fee | $494.38 | need invoice | X | | INS |
| PP17-07-704 | 1841757 | Inspection Fee | $1,128.90 | need invoice | X | | INS |
| PP17-07-704 | 1841757 | Cargo Insurance (July & Aug) | $4,870.05 | need invoice | | Need Backup | CIN |
| | | Bank fee | $500.00 | | | Vitol to reconcile with GCAC* | |
| PP17-07-001 | | July Storage - Gravity CC | $146,032.50 | 17-07-379 | X | | TRE |
| PP17-08-001 | | July Storage - Gravity CC | $30,000.00 | 17-08-405 | X | | TRE |
| PP17-09-001 | | July Tank Expense - Gravity CC | $179,715.72 | 17-09-452 | X | | TAC |
| | | July Use or Pay - Gravity CC | $52,585.55 | | | | TRE |
| PP17-08-001 | | August Storage - Gravity CC | $176,032.50 | 17-08-405 | X | | TRE |
| PP17-10-001 | | August Tank Expense - Gravity CC | $209,658.71 | 17-10-500 | X | Rio invoiced this $171,660.11 | TAC |
| | | August Use or Pay - Gravity CC | $81,692.45 | | | | TRE |
| PP17-09-001 | | September Storage - Gravity CC | $176,032.50 | 17-09-452 | X | | TRE |
| | | September Tank Expense - Gravity CC | $154,294.86 | | | | TAC |
| | | September Use or Pay - Gravity CC | $84,762.45 | | | | TRE |
| PP17-10-001 | | October Storage - Gravity CC | $146,032.50 | 17-10-500 | X | | TRE |
| | | October Storage - Gravity CC | $30,000.00 | | x | | TRE |
| | | October Tank Expense - Gravity CC | $180,333.74 | | X | | TAC |
| | | October Use or Pay - Gravity CC | $75,159.80 | | | | TRE |
| | | TVM | $92,985.35 | | | | |
| | | | $1,832,906.13 | Due Rio for Expenses | | | |
| *$500 was left off of a draft from the Lockbox to cover bank fees | | | | | | | |
| | | November Storage | $146,032.50 | | | | |

**GCAC Asphalt Cost Summary** (Hdg 2007802)

| No. | Deal | Cost | Value | Vitol Voucher | Date Pd |
|---|---|---|---|---|---|
| 1 | 184757 | | | | |
| 2 | | | | | |
| 3 | 1834559 | FRE | $279,000.00 | P1737292 | 7-Jul |
| 3 | 1834559 | OTH | ($22,410.05) | S1748872 | 24-Jul |
| 3 | 1834559 | TCR | $11,917.49 | | 9-Oct |
| 4 | | | | | |
| 5 | 1845012 | COM | $3,000.00 | P1746218 | 30-Aug |
| | | TCR | $2,196.44 | | 3-Aug |
| 6 | 1845058 | FRE | $40,000.00 | | |
| 6 | 1845058 | SOT | $20,000.00 | | |
| 6 | 1845058 | INS | $5,000.00 | | |
| 6 | 1845058 | DHM | $1,773.29 | | |
| 6 | 1845058 | TCR | $2,911.72 | | |
| 7 | 1845103 | | | | |
| 8 | 1845105 | | | | |
| 9 | 1845083 | DEI | $2,406.25 | P1754345 | 28-Dec |
| 10 | 1845090 | DEI | $10,345.31 | P1756758 | 9-Jan |
| 10 | 1845090 | COM | $2,000.00 | P1746220 | 30-Aug |
| 11 | 1853922 | COM | $1,250.00 | P1746216 | 30-Aug |
| 11 | 1853922 | TVM | $383.47 | | |
| 11 | 1853922 | TCR | $914.41 | | |
| 12 | 1866853 | | | | |
| 13 | 1914582 | | | | |
| 14 | 1915039 | | | | |
| 15 | 1915045 | | | | |
| 16 | | | | | |
| 17 | 1915053 | | | | |
| 18 | 1877681 | | | | |
| 19 | 1915134 | | | | |
| 20 | | | | | |
| 21 | 1915150 | | | | |
| 22 | 1915419 | | | | |

23    1915420

24    1915463

25    1915467

000556

**Description**

Freight on Asphalt Spring - Mobile to Santo Domingo - CP in Rio's name
Freight credit from Rio for short load
Country Risk

Market Petroleum, Inc. commission
Country Risk

Genesis Barge Freight
Genesis Barge Heat
Inspection
Domestic Harbor Maintenance
Country Risk

Barge Dmrg

Barge Dmrg
Market Petroleum, Inc. commission

Market Petroleum, Inc. commission
Time Value
Country Risk

| Pool Hedge seq | Query seq | Site | Mtrx | Sub Mtrx | Sub Mtrx Name | Hedge group |
|---|---|---|---|---|---|---|
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |
| 36242313 | 3700300 | HOU | FU | FBP | Fuel Hou Asphalt | 2007802 |

000559

000560

000561

000563

000565

000567

000568

000571

000572

000575

000580