000881

000882

| Hierarchy level 1 | Hierarchy level 2 | Hierarchy level 3 | Hierarchy level 4 | Hierarchy level 5 |
|---|---|---|---|---|
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |
| All WW | Fuel WW | Fuel HOU | Fuel | USGC |

000886

000888

000889

000891

000893

000895

000897

000898

000899

000902

000903

000906

000907

| Hierarchy Root | Archived Flag | Hedge Computation Date | Is Cash |
|---|---|---|---|
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | N |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | Y |
| USGC | N | 10/26/2017 22:35 | Y |

000909

000911

000912

000913

000914

000916

000919

000920

000921

000925

000926

000928

000929

000930

000932

Mobile, AL

| Date | Volume | Counterparty | | Inv Bal |
|---|---|---|---|---|
| 6/30/2017 | 107,999.31 | Beginning Inv (Original deal) | | 107,999.31 |
| 7/4/2017 | (33,108.38) | Titanio | | 74,890.93 |
| 7/6/2017 | 38,059.40 | Exxon (Original deal) | | 112,950.33 |
| 7/7/2017 | (29,830.97) | Valt | | 83,119.36 |
| 7/8/2017 | 37,772.64 | Exxon (Original deal) | | 120,892.00 |
| 7/21/2017 | (27,785.48) | Valt | | 93,106.52 |
| 7/25/2017 | 39,309.86 | Vitol - Phillips | | 132,416.38 |
| 7/31/2017 | (446.06) | EOM bbl adj | | 131,970.32 |
| 8/11/2017 | (29,746.94) | Vitol - Sem Mexico | | 102,223.38 |
| 8/17/2017 | 25,065.08 | Vitol - Hunt | | 127,288.46 |
| 8/31/2017 | 154.42 | Vitol - Hunt (wash oil) | | 127,442.88 |
| 8/31/2017 | 322.20 | EOM bbl adj | | 127,765.08 |
| 9/2/2017 | (34,189.54) | Vitol - Gunvor | | 93,575.54 |
| 9/3/2017 | 31,362.35 | Vitol - Hunt | | 124,937.89 |
| 9/6/2017 | (31,575.69) | United | | 93,362.20 |
| 9/16/2017 | 38,413.23 | Vitol - SOPUS | | 131,775.43 |
| 9/26/2017 | (25,602.30) | Valt | | 106,173.13 |
| 9/30/2017 | (219.03) | EOM bbl adj | | 105,954.10 |

Corpus Christi, TX

| Date | Volume | Counterparty | | Inv Bal |
|---|---|---|---|---|
| 6/30/2017 | 120,128.91 | Beginning Inv (Original deal) | | 120,128.91 |
| 6/30/2017 | 3,761.09 | Beginning Inv (Original deal) | | 123,890.00 |
| 7/14/2017 | (32,411.04) | Century | | 91,478.96 |
| 7/15/2017 | 55,359.48 | Vitol - Citgo | | 146,838.44 |
| 7/27/2017 | 25,231.92 | Vitol - Citgo | | 172,070.36 |
| 7/30/2017 | 40,832.12 | Vitol - Phillips | | 212,902.48 |
| 7/31/2017 | (21,178.47) | Rack sales | | 191,724.01 |
| 7/31/2017 | 142.99 | EOM bbl adj | | 191,867.00 |
| 8/19/2017 | (34,443.70) | Vitol - Gunvor | | 157,423.30 |
| 8/31/2017 | (18,657.42) | Rack sales | | 138,765.88 |
| 8/31/2017 | 638.12 | EOM bbl adj | | 139,404.00 |
| 9/30/2017 | (12,674.40) | Rack sales | | 126,729.60 |
| 9/30/2017 | (3.60) | EOM bbl adj | | 126,726.00 |
| Arc tank 20 | | Inventory as of 9/30/17 | | 9,133.41 |
| Arc tanks 802 | | Inventory as of 9/30/17 | | 96,820.69 |
| Corpus tank 304 | | Inventory as of 9/30/17 | | 13,033.00 |
| Corpus tank 312 | | Inventory as of 9/30/17 | | 9,362.00 |
| Corpus tank 313 | | Inventory as of 9/30/17 | | 51,308.00 |
| Corpus tank 314 | | Inventory as of 9/30/17 | | 15,987.00 |
| Corpus tank 315 | | Inventory as of 9/30/17 | | 21,602.00 |
| Corpus tank 401 | | Inventory as of 9/30/17 | | 1,884.00 |
| Corpus tank 402 | | Inventory as of 9/30/17 | | 2,462.00 |
| Corpus tank 403 | | Inventory as of 9/30/17 | | 1,972.00 |
| Corpus tank 404 | | Inventory as of 9/30/17 | | 2,459.00 |
| Corpus tank 405 | | Inventory as of 9/30/17 | | 2,442.00 |
| Corpus tank 406 | | Inventory as of 9/30/17 | | 2,233.00 |
| Corpus tank 407 | | Inventory as of 9/30/17 | | 28.00 |
| Corpus tank 424 | | Inventory as of 9/30/17 | | 876.00 |
| Corpus tank 425 | | Inventory as of 9/30/17 | | 878.00 |
| Corpus tank 426 | | Inventory as of 9/30/17 | | 200.00 |
| | | | | 232,680.10 |

000933

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Rail Un/loading | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0517 | Jul-17 | 146,032.50 | | | | | | | | | 146,032.50 | |
| RIO0517 | May-17 | | 24,907.05 | 2,508.00 | 8,461.38 | 15,985.00 | 712.70 | 27,352.28 | 49,678.82 | 6,469.34 | 136,074.57 | not for Vitol |
| Total for Invoice | | 146,032.50 | 24,907.05 | 2,508.00 | 8,461.38 | 15,985.00 | 712.70 | 27,352.28 | 49,678.82 | 6,469.34 | 282,107.07 | |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Rail Un/loading | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0617 | Aug-17 | 176,032.50 | | | | | | | | | 176,032.50 | |
| RIO0617 | Jul-17 | 30,000.00 | | | | | | | | | 30,000.00 | |
| RIO0617 | Jun-17 | | (38,137.20) | 11,357.00 | 10,558.80 | 18,870.00 | 1,086.47 | 26,511.11 | 31,717.83 | | 61,964.01 | not for Vitol |
| Total for Invoice | | 206,032.50 | (38,137.20) | 11,357.00 | 10,558.80 | 18,870.00 | 1,086.47 | 26,511.11 | 31,717.83 | - | 267,996.51 | |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| RIO0717 | Sep-17 | 176,032.50 | | | | | | | | 176,032.50 |
| RIO0717 | Jul-17 | | 39,526.05 | 28,992.75 | 20,155.98 | 15,985.00 | 1,021.21 | 27,756.95 | 46,277.78 | 179,715.72 |
| Total for Invoice | | 176,032.50 | 39,526.05 | 28,992.75 | 20,155.98 | 15,985.00 | 1,021.21 | 27,756.95 | 46,277.78 | - | 355,748.22 |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0817 | Oct-17 | 146,032.50 | | | | | | | | 146,032.50 | |
| RIO0817 | Aug-17 | | 45,667.95 | 11,139.60 | 11,060.61 | 14,440.00 | 830.10 | 23,319.11 | 44,297.66 | 150,755.03 | |
| RIO0817 | Jul-17 | | | 17,395.65 | | | | | 3,509.43 | 20,905.08 | |
| RIO0817 | Jun-17 | | | 20,657.10 | | | | | | 20,657.10 | not for Vitol |
| RIO0817 | May-17 | | | 1,504.80 | | | | | | 1,504.80 | not for Vitol |
| RIO0817 | Apr-17 | | | 13,325.55 | | | | | | 13,325.55 | not for Vitol |
| RIO0817 | Mar-17 | | | 1,789.80 | | | | | | 1,789.80 | not for Vitol |
| RIO0817 | Feb-17 | | | 721.35 | | | | | | 721.35 | not for Vitol |
| Total for Invoice | | 146,032.50 | 45,667.95 | 66,533.85 | 11,060.61 | 14,440.00 | 830.10 | 23,319.11 | 47,807.09 | - | 355,691.21 |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| RIO0817-B | Oct-17 | 30,000.00 | | | | | | | | 30,000.00 |
| Total for Invoice | | 30,000.00 | - | - | - | - | - | - | - | - | 30,000.00 |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Adjustment ? | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0917 | Nov-17 | 146,032.50 | | | | | | | | | 146,032.50 |
| RIO0917 | Sep-17 | | 34,071.30 | 19,666.25 | | 24,765.00 | 955.71 | 25,111.12 | 49,726.42 | (0.94) | 154,294.86 |
| Total for Invoice | | 146,032.50 | 34,071.30 | 19,666.25 | - | 24,765.00 | 955.71 | 25,111.12 | 49,726.42 | (0.94) | 300,327.36 |

| | Annual Minimum | Monthly Allocation | Monthly Actual | (Overage)/ Underage | Rate | Monthly (Overage)/Underage | |
|---|---|---|---|---|---|---|---|
| Truck Loading | 64800 | 5400 | 3794.78 | 1605.22 | 15 | 24,078.30 | |
| PMA Fee | 27600 | 2300 | 1159.71 | 1140.29 | 25 | 28,507.25 | |
| | | | | | | 52,585.55 | Jul-17 |
| Truck Loading | 64800 | 5400 | 3323.02 | 2076.98 | 15 | 31,154.70 | |
| PMA Fee | 27600 | 2300 | 278.49 | 2021.51 | 25 | 50,537.75 | |
| | | | | | | 81,692.45 | Aug-17 |
| Truck Loading | 64800 | 5400 | 2271.42 | 3128.58 | 15 | 46,928.70 | |
| PMA Fee | 27600 | 2300 | 786.65 | 1513.35 | 25 | 37,833.75 | |
| | | | | | | 84,762.45 | Sep-17 |
| Truck Loading | 64800 | 5400 | 5400 | 0 | 15 | - | |
| PMA Fee | 27600 | 2300 | 2300 | 0 | 25 | - | |
| | | | | | | - | Oct-17 |
| | | | | | | - | |
| | | | | | | 219,040.45 | Total Use or Pay |

(v)  Truck Loading.  A fee of Fifteen Dollars ($15.00) per ton loaded into a truck; provided, however, that in the event that at the end of any calendar year during the Term, Customer shall have loaded fewer than 64,800 tons during the preceding year (5,400 tons per month multiplied by 12), Owner will invoice Customer and Customer will pay Operator (in accordance with the terms

(viii)  PMA Fee.  A PMA Plant fee of Twenty-Five Dollars ($25.00) per ton processed by Customer; provided, however, that in the event that at the end of any calendar year during the Term, Customer shall have processed fewer than 27,600 of tons of PMA during the preceding year (2,300 tons per month multiplied by 12), Owner will invoice Customer and Customer will pay Operator (in accordance with the terms and conditions herein applicable to monthly payments from Customer to Operator) an amount equal the difference between 27,600 tons and the total number of tons of PMA processed by Customer during the year multiplied by $25.00;

## GCAC - Hedge 2007802 Purchases/Sales

| NB_TAG FLAG NOTES | POSI | DATE_CREATE B_OR_S | EXEC_ID | PERD | COD HEDGE G.F PROD | COL COUNTER | COUNTER_ORG_UNIT_FULL_N W/QTY | QTY_UOM | Quantity in BBLS | QTY | STAT ACT | TITLE_CURR_PRICE | BEST_EST_STATUS | C/FORMULA_SHORT_DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Inventory | 3105432 | 30-Jul-17 B | 1844757 | 17-Jul | 2007802 HSFO | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 107,999.31 BBL | 107,999.31 | 2AP | APP | 43.770 USD /BBL | 43.77 FPR | f_nc6 3.0 usgc water low -0.3 · 1 |
| 1 Inventory | 3105432 | 21-Jul-17 B | 1844757 | 17-Jul | 2007802 HSFO | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 38,059.40 BBL | 38,059.40 | 2AP | APP | 43.770 USD /BBL | 43.77 FFR | f_nc6 3.0 usgc water low -0.3 · 235 |
| 1 Inventory | 3105432 | 21-Jul-17 B | 1844757 | 17-Jul | 2007802 HSFO | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 37,772.64 BBL | 37,772.64 | 2AP | APP | 43.770 USD /BBL | 43.77 FFR | f_nc6 3.0 usgc water low -0.3 |
| 1 Inventory | 3105432 | 21-Jul-17 B | 1844757 | 17-Jul | 2007802 HSFO | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 124,011.04 BBL | 124,011.04 | 2AP | APP | 43.770 USD /BBL | 43.77 FFR | f_nc6 3.0 usgc water low -0.3 |
| 2 Bottoms | 3126632 | 25-Jul-17 B | 1844757 | 17-Jul | 2007802 HSFO | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 3,761.00 BBL | 3,761.00 | 2AP | APP | 1.000 USD /BBL | 1 FP | 43.77 |
| 3 | 3114211 | 12-Jul-17 B | 1834559 | 17-Jul | 2007802 HSFO | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 5,415.49 MTA | 33,108.38 | 2AP | APP | 235.00 USD /STS | 235 FIP | 235 |
| 5 | 3141501 | 11-Jul-17 B | 1845012 | 17-Jul | 2007802 VTB | CITGO | CITGO PETROLEUM CORPORATI | 55,871.29 BBL | 55,871.29 | 2AP | APP | 31.440 USD /BBL | 31.4 FIP |  |
| 5 | 3126644 | 25-Jul-17 B | 1845012 | 17-Jul | 2007802 VTB | CITGO | CITGO PETROLEUM CORPORATI | 60,000.00 BBL | 60,000.00 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP |  |
| 6 | 3143573 | 10-Aug-17 B | 1845058 | 17-Aug | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 32,411.04 BBL | 32,411.04 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP |  |
| 9 | 3122695 | 25-Jul-17 B | 1845083 | 17-Jul | 2007802 VTB | P66CO | PHILLIPS 66 COMPANY | 40,832.12 BBL | 40,832.12 | 2AP | APP | 41.000 USD /BBL | 41 FIP |  |
| 9 | 3126637 | 25-Jul-17 B | 1845083 | 17-Jul | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 38,000.00 BBL | 38,000.00 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP |  |
| 10 | 3122201 | 25-Jul-17 B | 1845090 | 17-Aug | 2007802 VTB | EXXOMAO | EXXONMOBIL OIL CORPORATIO | 39,309.86 BBL | 39,309.86 | 2AP | APP | 38.617 USD /BBL | 38.6167 FPR | f_nc6 3.0 usgc water mean -6.5 |
| 10 | 3126641 | 25-Jul-17 B | 1845090 | 17-Aug | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 40,000.00 BBL | 40,000.00 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 11 | 3126576 | 25-Jul-17 B | 1853922 | 17-Aug | 2007802 VTB | CITGO | CITGO PETROLEUM CORPORATI | 25,231.92 BBL | 25,231.92 | 2AP | APP | 32.567 USD /BBL | 32.5667 FPR | f_nc6 3.0 usgc water low -14.0 |
| 11 | 3126672 | 28-Jul-17 B | 1853922 | 17-Aug | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 25,000.00 BBL | 25,000.00 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 12 Inventory? | 3147123 | 15-Aug-17 B | 1866853 | 17-Aug | 2007802 PG6722 | HUNT REF | HUNT REFINING COMPANY | 4,544.58 STS | 25,065.08 | 2AP | APP | 247.00 USD /STS | 246.9999 FIP | 247 |
| 16 Inventory? | 3151012 | 18-Aug-17 B |  | 17-Aug | 2007802 VTB | P66CO | PHILLIPS 66 COMPANY | 40,000.00 BBL | 40,000.00 | 2AP | APP | 255.00 USD /STS | 255 FIP | 255 |
| 17 Inventory? | 3158929 | 29-Aug-17 B |  | 17-Sep | 2007802 PG6722 | GCAC | GULF COAST ASPHALT COMPAN | 5,000.00 MTA | 32,000.00 | 2AP | UNK | 267.50 USD /MTA | 267.5 FIP | 267.5 |
| 18 Inventory? | 3161097 |  | 1877681 | 17-Sep | 2007802 VTB | HUNT REF | HUNT REFINING COMPANY | 5,707.28 STS | 31,362.35 | 2AP | UNK | 240.00 USD /STS | 240.0001 FIP | 240 |
| 21 | 3187354 | 25-Sep-17 B |  | 17-Oct | 2007802 HSFO | EXXOMAO | EXXONMOBIL OIL CORPORATIO | 80,000.00 BBL | 80,000.00 | PIA | UNK | 40.655 USD /BBL | 40.655 UNP | f_nc6 3.0 usgc water low -8.0 |
| 24 | 3214828 | 19-Oct-17 B |  | 17-Oct | 2007802 VTB | EXXOMAO | EXXONMOBIL OIL CORPORATIO | 40,000.00 BBL | 40,000.00 | PIA | UNK | 39.844 USD /BBL | 39.844 FPR | f_nc6 3.0 usgc water mean -10.0 |
| 24 | 3214928 | 20-Oct-17 B |  | 17-Oct | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 40,000.00 BBL | 40,000.00 | PIA | UNK | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 25 | 3213448 | 19-Oct-17 B |  | 17-Oct | 2007802 VTB | EXXOMAO | EXXONMOBIL OIL CORPORATIO | 40,000.00 BBL | 40,000.00 | PIA | UNK | 40.094 USD /BBL | 40.094 PPR | f_nc6 3.0 usgc water mean -9.75 |
| 25 | 3214933 | 20-Oct-17 B |  | 17-Oct | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 40,000.00 BBL | 40,000.00 | PIA | UNK | 43.770 USD /BBL | 43.77 FIP | 43.77 |

**TOTAL BARRELS PURCHASED 1,069,795.43**

| NB_TAG FLAG NOTES | POSI | DATE_CREATE B_OR_S | EXEC_ID | PERD | COD HEDGE G.F PROD | COL COUNTER | COUNTER_ORG_UNIT_FULL_N W/QTY | QTY_UOM | Quantity in BBLS | QTY | STAT ACT | TITLE_CURR_PRICE | BEST_EST_STATUS | C/FORMULA_SHORT_DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 3106629 | 30-Jul-17 S | 1834559 | 17-Jul | 2007802 HSFO | INVERTIT | INVERSIONES TITANO SRL | 5,415.49 MTA | 33,108.38 | 1AP | APP | 240.54 USD /STS | 240.5404 FIP | 235,000 +1.0 · 3 |
| 4 | 3114206 | 12-Jul-17 S |  | 17-Jul | 2007802 HSFO | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 33,108.00 BBL | 33,108.00 | 1AP | UNK | 235.00 USD /STS | 235 FIP | 235,000 +1.0 · 235 |
| 4 No offset - inv? | 3126634 | 25-Jul-17 S |  | 17-Jul | 2007802 HSFO | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 5,150.00 MTA | 32,950.00 | 1AP | UNK | 242.00 USD /STS | 242 FIP | 242 |
| 6 volumes different | 3127729 | 25-Jul-17 S | 1845012 | 17-Jul | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 55,871.29 BBL | 55,871.29 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 6 No offset - inv? | 3143562 | 10-Aug-17 S | 1845058 | 17-Aug | 2007802 VTB | CENTERM | CENTURY CENTURY TERMINALS, LLC | 32,665.07 BBL | 32,665.07 | 2AP | APP | 225.00 USD /STS | 225 FIP | 225 |
| 7 No offset - ex inv? | 3143691 | 10-Aug-17 S | 1845058 | 17-Aug | 2007802 VTB | GENESAW | GENESAW GENESIS MARINE, LLC | 1,434.00 BBL | 1,434.00 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 7 No offset - ex inv? | 3126629 | 25-Jul-17 S |  | 17-Jul | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 25,600.00 BBL | 25,600.00 | 2AP | UNK | 236.00 USD /STS | 236 FIP | 236 |
| 8 No offset - ex inv? | 3126626 | 25-Jul-17 S |  | 17-Jul | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 6,400.00 BBL | 6,400.00 | 2AP | UNK | 236.00 USD /STS | 236 FIP | 236 |
| 9 | 3126639 | 25-Jul-17 S |  | 17-Jul | 2007802 ASP40/60 | GCAC | GULF COAST ASPHALT COMPAN | 35,000.00 BBL | 35,000.00 | 2AP | UNK | 275.00 USD /STS | 275 FIP | 275 |
| 9 | 3126635 | 25-Jul-17 S | 1845083 | 17-Jul | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 40,832.12 BBL | 40,832.12 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 10 | 3126642 | 25-Jul-17 S | 1845090 | 17-Aug | 2007802 ASP40/60 | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 39,309.86 BBL | 39,309.86 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 11 | 3130669 | 28-Jul-17 S | 1853922 | 17-Aug | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 25,231.92 BBL | 25,231.92 | 2AP | APP | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 13 No offset - ex inv? | 3185561 | 22-Sep-17 S |  | 17-Aug | 2007802 PG64/22 | GCAC | GULF COAST ASPHALT COMPAN | 30,500.00 BBL | 30,500.00 | PIA | UNK | 44.000 USD /BBL | 44 FIP | 44 |
| 14 No offset - ex inv? | 3143612 | 10-Aug-17 S |  | 17-Aug | 2007802 PG64/22 | GCAC | GULF COAST ASPHALT COMPAN | 35,000.00 BBL | 35,000.00 | PIA | UNK | 245.00 USD /MTA | 245 FIP | 245 |
| 15 No offset - ex inv? | 3147126 | 15-Aug-17 S |  | 17-Aug | 2007802 PG64/22 | GCAC | GULF COAST ASPHALT COMPAN | 35,000.00 BBL | 35,000.00 | PIA | UNK | 249.00 USD /MTA | 249 FIP | 249 |
| 19 No offset - ex inv? | 3178452 | 15-Sep-17 S |  | 17-Sep | 2007802 ASP40/60 | GCAC | GULF COAST ASPHALT COMPAN | 28,000.00 BBL | 28,000.00 | PIA | UNK | 250.00 USD /MTA | 250 FIP | 250 |
| 22 No offset - ex inv? | 3196252 | 22-Sep-17 S |  | 17-Oct | 2007802 ASP40/60 | GCAC | GULF COAST ASPHALT COMPAN | 75,000.00 BBL | 75,000.00 | PIA | UNK | 285.00 USD /MTA | 285 FIP | 285 |
| 22 No offset - ex inv? | 3204486 | 2-Oct-17 S |  | 17-Oct | 2007802 ASP40/60 | GCAC | GULF COAST ASPHALT COMPAN | 15,000.00 BBL | 15,000.00 | PIA | UNK | 247.50 USD /MTA | 247.5 FIP | 247.5 |
| 23 No offset - ex inv? | 3204485 | 11-Oct-17 S |  | 17-Oct | 2007802 ASP40/60 | GCAC | GULF COAST ASPHALT COMPAN | 35,554.00 BBL | 35,554.00 | PIA | UNK | 245.00 USD /MTA | 245 FIP | 245 |
| 24 | 3214927 | 20-Oct-17 S |  | 17-Oct | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 40,000.00 BBL | 40,000.00 | PIA | UNK | 43.770 USD /BBL | 43.77 FIP | 43.77 |
| 25 | 3214932 | 20-Oct-17 S |  | 17-Oct | 2007802 VTB | RIO ENER | RIO ENERGY INTERNATIONAL, IP | 40,000.00 BBL | 40,000.00 | PIA | UNK | 43.770 USD /BBL | 43.77 FIP | 43.77 |

**TOTAL BARRELS SOLD 728,385.68**

**NET BARRELS 341,409.75**

000086

| Date | For | Bbls | Amount | Balance |
|---|---|---|---|---|
| 6-Jul | Arc tks | 107,999.31 | 4,727,129.80 | 4,727,129.80 |
| 6-Jul | Corpus tks | 123,503.00 | 5,244,864.49 | 9,971,994.29 |
| 6-Jul | Polymers | | 75,347.22 | 10,047,341.51 |
| 6-Jul | Gravity storage | | 146,032.50 | 10,193,374.01 |
| 9-Jul | Freight | | (279,000.00) | 9,914,374.01 |
| 11-Jul | Arc (Exxon) | 38,059.40 | 1,665,859.94 | 11,580,233.95 |
| 13-Jul | Arc (Exxon) | 37,772.64 | 1,653,308.45 | 13,233,542.40 |
| 13-Jul | Freight | | 256,589.95 | 13,490,132.35 |
| 13-Jul | Valt sale | (29,830.97) | (1,296,688.51) | 12,193,443.84 |
| 19-Jul | Titanio sale | (33,108.38) | (1,404,317.23) | 10,789,126.61 |
| 19-Jul | Freight refund | | 22,410.05 | 10,811,536.66 |
| 27-Jul | Valt sale | (22,570.73) | (956,278.15) | 9,855,258.51 |
| 31-Jul | Valt sale | (5,214.75) | (220,888.94) | 9,634,369.57 |
| 1-Aug | Gravity storage | | 206,032.50 | 9,840,402.07 |
| 3-Aug | Polymers | | 9,240.23 | 9,849,642.30 |
| 11-Aug | Century sale | (32,411.04) | (1,418,631.22) | 8,431,011.08 |
| 11-Aug | Citgo | 25,231.92 | 1,104,401.14 | 9,535,412.22 |
| 15-Aug | Rack sales (July) | (21,178.47) | (1,157,112.68) | 8,378,299.54 |
| 23-Aug | Gravity xtra chgs | | 179,715.72 | 8,558,015.26 |
| 23-Aug | Gravity storage | | 176,032.50 | 8,734,047.76 |
| 3-Sep | Polymers | | 59,933.37 | 8,793,981.13 |
| 15-Sep | Rack sales (August) | (18,657.42) | (941,546.71) | 7,852,434.42 |
| 21-Sep | United sale | (31,575.69) | (1,581,801.65) | 6,270,632.77 |
| 3-Oct | Polymers | | | 6,270,632.77 |
| 10-Oct | Gravity xtra chgs | | 171,660.11 | 6,442,292.88 |
| 10-Oct | Gravity storage | | 146,032.50 | 6,588,325.38 |
| 13-Oct | Gravity storage | | 30,000.00 | 6,618,325.38 |
| 15-Oct | Rack sales (Sept) | (12,674.40) | (726,433.80) | 5,891,891.58 |

000937

000938

000939

| | | | | |
|---|---|---|---|---|
| 6-Jul | 10,193,374.01 | 3.25% | 920.24 | 920.24 |
| 7-Jul | 10,193,374.01 | 3.25% | 920.24 | 1,840.47 |
| 8-Jul | 10,193,374.01 | 3.25% | 920.24 | 2,760.71 |
| 9-Jul | 9,914,374.01 | 3.25% | 895.05 | 3,655.75 |
| 10-Jul | 9,914,374.01 | 3.25% | 895.05 | 4,550.80 |
| 11-Jul | 11,580,233.95 | 3.25% | 1,045.44 | 5,596.24 |
| 12-Jul | 11,580,233.95 | 3.25% | 1,045.44 | 6,641.68 |
| 13-Jul | 12,193,443.84 | 3.25% | 1,100.80 | 7,742.47 |
| 14-Jul | 12,193,443.84 | 3.25% | 1,100.80 | 8,843.27 |
| 15-Jul | 12,193,443.84 | 3.25% | 1,100.80 | 9,944.07 |
| 16-Jul | 12,193,443.84 | 3.25% | 1,100.80 | 11,044.86 |
| 17-Jul | 12,193,443.84 | 3.25% | 1,100.80 | 12,145.66 |
| 18-Jul | 12,193,443.84 | 3.25% | 1,100.80 | 13,246.46 |
| 19-Jul | 10,811,536.66 | 3.25% | 976.04 | 14,222.50 |
| 20-Jul | 10,811,536.66 | 3.25% | 976.04 | 15,198.54 |
| 21-Jul | 10,811,536.66 | 3.25% | 976.04 | 16,174.58 |
| 22-Jul | 10,811,536.66 | 3.25% | 976.04 | 17,150.62 |
| 23-Jul | 10,811,536.66 | 3.25% | 976.04 | 18,126.67 |
| 24-Jul | 10,811,536.66 | 3.25% | 976.04 | 19,102.71 |
| 25-Jul | 10,811,536.66 | 3.25% | 976.04 | 20,078.75 |
| 26-Jul | 10,811,536.66 | 3.25% | 976.04 | 21,054.79 |
| 27-Jul | 9,855,258.51 | 3.25% | 889.71 | 21,944.50 |
| 28-Jul | 9,855,258.51 | 3.25% | 889.71 | 22,834.21 |
| 29-Jul | 9,855,258.51 | 3.25% | 889.71 | 23,723.92 |
| 30-Jul | 9,855,258.51 | 3.25% | 889.71 | 24,613.63 |
| 31-Jul | 9,634,369.57 | 3.25% | 869.77 | **25,483.40** |
| 1-Aug | 9,840,402.07 | 3.25% | 888.37 | 888.37 |
| 2-Aug | 9,840,402.07 | 3.25% | 888.37 | 1,776.74 |
| 3-Aug | 9,849,642.30 | 3.25% | 889.20 | 2,665.94 |
| 4-Aug | 9,849,642.30 | 3.25% | 889.20 | 3,555.15 |
| 5-Aug | 9,849,642.30 | 3.25% | 889.20 | 4,444.35 |
| 6-Aug | 9,849,642.30 | 3.25% | 889.20 | 5,333.55 |
| 7-Aug | 9,849,642.30 | 3.25% | 889.20 | 6,222.76 |
| 8-Aug | 9,849,642.30 | 3.25% | 889.20 | 7,111.96 |
| 9-Aug | 9,849,642.30 | 3.25% | 889.20 | 8,001.17 |
| 10-Aug | 9,849,642.30 | 3.25% | 889.20 | 8,890.37 |
| 11-Aug | 9,535,412.22 | 3.25% | 860.84 | 9,751.21 |
| 12-Aug | 9,535,412.22 | 3.25% | 860.84 | 10,612.04 |
| 13-Aug | 9,535,412.22 | 3.25% | 860.84 | 11,472.88 |
| 14-Aug | 9,535,412.22 | 3.25% | 860.84 | 12,333.71 |
| 15-Aug | 8,378,299.54 | 3.25% | 756.37 | 13,090.09 |
| 16-Aug | 8,378,299.54 | 3.25% | 756.37 | 13,846.46 |
| 17-Aug | 8,378,299.54 | 3.25% | 756.37 | 14,602.84 |
| 18-Aug | 8,378,299.54 | 3.25% | 756.37 | 15,359.21 |
| 19-Aug | 8,378,299.54 | 3.25% | 756.37 | 16,115.58 |
| 20-Aug | 8,378,299.54 | 3.25% | 756.37 | 16,871.96 |

| | | | | |
|---|---|---|---|---|
| 21-Aug | 8,378,299.54 | 3.25% | 756.37 | 17,628.33 |
| 22-Aug | 8,378,299.54 | 3.25% | 756.37 | 18,384.71 |
| 23-Aug | 8,734,047.76 | 3.25% | 788.49 | 19,173.20 |
| 24-Aug | 8,734,047.76 | 3.25% | 788.49 | 19,961.69 |
| 25-Aug | 8,734,047.76 | 3.25% | 788.49 | 20,750.18 |
| 26-Aug | 8,734,047.76 | 3.25% | 788.49 | 21,538.67 |
| 27-Aug | 8,734,047.76 | 3.25% | 788.49 | 22,327.16 |
| 28-Aug | 8,734,047.76 | 3.25% | 788.49 | 23,115.65 |
| 29-Aug | 8,734,047.76 | 3.25% | 788.49 | 23,904.14 |
| 30-Aug | 8,734,047.76 | 3.25% | 788.49 | 24,692.63 |
| 31-Aug | 8,734,047.76 | 3.25% | 788.49 | **25,481.12** |
| 1-Sep | 8,734,047.76 | 3.25% | 788.49 | 788.49 |
| 2-Sep | 8,734,047.76 | 3.25% | 788.49 | 1,576.98 |
| 3-Sep | 8,793,981.13 | 3.25% | 793.90 | 2,370.88 |
| 4-Sep | 8,793,981.13 | 3.25% | 793.90 | 3,164.78 |
| 5-Sep | 8,793,981.13 | 3.25% | 793.90 | 3,958.68 |
| 6-Sep | 8,793,981.13 | 3.25% | 793.90 | 4,752.59 |
| 7-Sep | 8,793,981.13 | 3.25% | 793.90 | 5,546.49 |
| 8-Sep | 8,793,981.13 | 3.25% | 793.90 | 6,340.39 |
| 9-Sep | 8,793,981.13 | 3.25% | 793.90 | 7,134.29 |
| 10-Sep | 8,793,981.13 | 3.25% | 793.90 | 7,928.19 |
| 11-Sep | 8,793,981.13 | 3.25% | 793.90 | 8,722.09 |
| 12-Sep | 8,793,981.13 | 3.25% | 793.90 | 9,515.99 |
| 13-Sep | 8,793,981.13 | 3.25% | 793.90 | 10,309.89 |
| 14-Sep | 8,793,981.13 | 3.25% | 793.90 | 11,103.79 |
| 15-Sep | 7,852,434.42 | 3.25% | 708.90 | 11,812.69 |
| 16-Sep | 7,852,434.42 | 3.25% | 708.90 | 12,521.59 |
| 17-Sep | 7,852,434.42 | 3.25% | 708.90 | 13,230.49 |
| 18-Sep | 7,852,434.42 | 3.25% | 708.90 | 13,939.40 |
| 19-Sep | 7,852,434.42 | 3.25% | 708.90 | 14,648.30 |
| 20-Sep | 7,852,434.42 | 3.25% | 708.90 | 15,357.20 |
| 21-Sep | 6,270,632.77 | 3.25% | 566.10 | 15,923.29 |
| 22-Sep | 6,270,632.77 | 3.25% | 566.10 | 16,489.39 |
| 23-Sep | 6,270,632.77 | 3.25% | 566.10 | 17,055.49 |
| 24-Sep | 6,270,632.77 | 3.25% | 566.10 | 17,621.59 |
| 25-Sep | 6,270,632.77 | 3.25% | 566.10 | 18,187.69 |
| 26-Sep | 6,270,632.77 | 3.25% | 566.10 | 18,753.79 |
| 27-Sep | 6,270,632.77 | 3.25% | 566.10 | 19,319.89 |
| 28-Sep | 6,270,632.77 | 3.25% | 566.10 | 19,885.99 |
| 29-Sep | 6,270,632.77 | 3.25% | 566.10 | 20,452.08 |
| 30-Sep | 6,270,632.77 | 3.25% | 566.10 | **21,018.18** |
| 1-Oct | 6,270,632.77 | 3.25% | 566.10 | 566.10 |
| 2-Oct | 6,270,632.77 | 3.25% | 566.10 | 1,132.20 |
| 3-Oct | 6,270,632.77 | 3.25% | 566.10 | 1,698.30 |
| 4-Oct | 6,270,632.77 | 3.25% | 566.10 | 2,264.40 |
| 5-Oct | 6,270,632.77 | 3.25% | 566.10 | 2,830.49 |
| 6-Oct | 6,270,632.77 | 3.25% | 566.10 | 3,396.59 |

| | | | | |
|---|---|---|---|---|
| 7-Oct | 6,270,632.77 | 3.25% | 566.10 | 3,962.69 |
| 8-Oct | 6,270,632.77 | 3.25% | 566.10 | 4,528.79 |
| 9-Oct | 6,270,632.77 | 3.25% | 566.10 | 5,094.89 |
| 10-Oct | 6,588,325.38 | 3.25% | 594.78 | 5,689.67 |
| 11-Oct | 6,588,325.38 | 3.25% | 594.78 | 6,284.45 |
| 12-Oct | 6,588,325.38 | 3.25% | 594.78 | 6,879.23 |
| 13-Oct | 6,618,325.38 | 3.25% | 597.49 | 7,476.71 |
| 14-Oct | 6,618,325.38 | 3.25% | 597.49 | 8,074.20 |
| 15-Oct | 5,891,891.58 | 3.25% | 531.91 | 8,606.11 |
| 16-Oct | 5,891,891.58 | 3.25% | 531.91 | 9,138.02 |
| 17-Oct | 5,891,891.58 | 3.25% | 531.91 | 9,669.92 |
| 18-Oct | 5,891,891.58 | 3.25% | 531.91 | 10,201.83 |
| 19-Oct | 5,891,891.58 | 3.25% | 531.91 | 10,733.74 |
| 20-Oct | 5,891,891.58 | 3.25% | 531.91 | 11,265.64 |
| 21-Oct | 5,891,891.58 | 3.25% | 531.91 | 11,797.55 |
| 22-Oct | 5,891,891.58 | 3.25% | 531.91 | 12,329.46 |
| 23-Oct | 5,891,891.58 | 3.25% | 531.91 | 12,861.36 |
| 24-Oct | 5,891,891.58 | 3.25% | 531.91 | 13,393.27 |
| 25-Oct | 5,891,891.58 | 3.25% | 531.91 | 13,925.18 |
| 26-Oct | 5,891,891.58 | 3.25% | 531.91 | 14,457.09 |
| 27-Oct | 5,891,891.58 | 3.25% | 531.91 | 14,988.99 |
| 28-Oct | 5,891,891.58 | 3.25% | 531.91 | 15,520.90 |
| 29-Oct | 5,891,891.58 | 3.25% | 531.91 | 16,052.81 |
| 30-Oct | 5,891,891.58 | 3.25% | 531.91 | 16,584.71 |
| 31-Oct | 5,891,891.58 | 3.25% | 531.91 | **17,116.62** |

**89,099.33**

TCR Rack Up

| No. | Deal | TCR | Direct | Ultimate |
|-----|------|-----|--------|----------|
| 3 | 1834559 | | | |
| 7 | 1845103 | $10,050.30 | | VALT |
| 8 | 1845105 | $6,658.50 | | |
| 23 | 1915420 | $3,882.97 | GCAC | VALT |

Comments

Need to delete TCR

**GCAC Settlement - 2nd Run**                                                                30-Jan-18

| No. | Deal | | Movement | Date | NBbls | Price Bbl | Short Tons | Price ST | Total |
|---|---|---|---|---|---|---|---|---|---|
| 13 | 1914582 | S | Iver Agile | 11-Aug-17 | 29,746.940 | 44.000 | | | $1,308,865.36 |
| 14 | 1915039 | S | Iver Blessing | 20-Aug-17 | 34,443.700 | | 6,235.884 | 245.000 | $1,527,791.58 |
| 15 | 1915045 | S | Iver Blessing | 2-Sep-17 | 34,189.540 | | 6,198.949 | 249.000 | $1,543,538.30 |
| 17 | 1915053 | B | GM-5018/5028 | 15-Sep-17 | (38,413.230) | | (6,727.883) | 267.500 | ($1,799,708.70) |
| 19 | 1915134 | S | Asphalt Spring | 26-Sep-17 | 25,602.300 | | 4,638.423 | 250.000 | $1,159,605.75 |
| 20A | 1992480 | S | Iver Blessing | 27-Oct-17 | 34,563.750 | 56.780 | | | $1,962,529.73 |
| 20B | 1992639 | S | Zhu Jiang | 11-Dec-17 | 32,330.960 | 63.214 | | | $2,043,769.31 |
| 20C | 2100806 | S | Ning Hai Wan | 9-Jan-18 | 32,119.260 | 68.221 | | | $2,191,208.04 |
| 22 | 1915419 | S | Asphalt Spring | 23-Oct-17 | 14,598.530 | | 2,639.816 | 247.500 | $653,354.46 |
| 23 | 1915420 | S | Da Hua Shan | 15-Oct-17 | 33,617.590 | | 6,042.070 | 245.000 | $1,480,307.15 |
| 26 | 2100773 | S | Ning Hai Wan | 7-Nov-17 | | | 5,734.376 | 250.000 | $1,433,594.00 |
| 33 | 1944082 | S | Iver Agile | 1-Nov-17 | 23,905.790 | | 4,332.023 | 250.000 | $1,083,005.75 |
| 36 | 1983462 | S | Da Wei Shan | 5-Dec-17 | 42,809.710 | | 7,655.202 | 260.000 | $1,990,352.52 |
| 39 | 1983528 | S | Asphalt Spring | 28-Nov-17 | 35,438.750 | | 6,374.019 | 262.500 | $1,673,179.99 |
| 45 | 1983804 | S | B205 | 2-Jan-18 | 95,042.950 | | 17,232.427 | 275.000 | $4,738,917.43 |
| 46 | 1983912 | S | Asphalt Sailor | 6-Jan-18 | 36,513.250 | | 6,610.567 | 275.000 | $1,817,905.93 |
| 50 | 2102423 | S | Asphalt Spring | 5-Jan-18 | 14,679.440 | | 2,671.344 | 280.000 | $747,976.32 |
| **Total Product x Barge/Vessel/Tank Xfer** | | | | | | | | | **$25,556,192.89** |

| Deal | Position | Month | NBbls | Price Bbl | Total |
|---|---|---|---|---|---|
| 1930834 | | Jul 17 | 21,511.940 | 53.789 | $1,157,112.68 |
| 1930834 | | Aug 17 | 19,300.210 | 48.784 | $941,546.73 |
| 1930834 | | Sept 17 | 12,906.650 | 56.271 | $726,265.15 |
| 1930834 | | Oct 17 | 14,391.460 | 57.172 | $822,793.54 |
| 1930834 | | Nov 17 | 16,197.640 | 54.468 | $882,253.37 |
| 1930834 | | Dec 17 | 10,150.260 | 52.922 | $537,167.60 |
| Total | | 2017 | 94,458.160 | 53.644 | $5,067,139.07 |
| TBA | | Jan 18 | 3,285.610 | 53.707 | $176,459.15 |
| **Total Rack Sales** | | | **97,743.770** | | **$5,243,598.22** |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | $146,032.50 |
| | | | | | $30,000.00 |
| | | | | | $179,715.72 |
| | | | | | $52,585.55 |
| | | | | | $176,032.50 |
| | | | | | $171,660.11 |
| | | | | | $81,692.45 |
| | | | | | $176,032.50 |
| | | | | | $154,294.86 |
| | | | | | $84,762.45 |
| | | | | | $146,032.50 |
| | | | | | $30,000.00 |
| | | | | | $180,333.74 |
| | | | | | $75,159.80 |
| | | | | | $146,032.50 |
| | | | | | $30,000.00 |
| | | | | | $190,000.00 |
| | | | | | $65,924.95 |
| | | | | | $146,032.50 |
| | | | | | $100,000.00 |
| | | | | | $138,500.00 |

| | |
|---|---|
| **Total Tank Expenses** | **$2,500,824.63** |

| | |
|---|---|
| **Total Due Vitol - Product + Storage Related Fees** | **$33,300,615.74** |

| | |
|---|---|
| | ($1,156,752.53) |
| | ($941,546.71) |
| | ($722,326.00) |
| | ($827,719.32) |
| | ($882,253.37) |
| | ($59,520.70) |
| **Credit GCAC - Rio Lockbox Rack Deposits** | **($4,590,118.63)** |

| | |
|---|---|
| Payment - 17 Nov 17 | ($4,000,000.00) |
| Payment - 15 Dec 17 | ($3,700,000.00) |
| Payment - 26 Jan 18 | ($8,934,401.25) |
| **GCAC Payments** | **($16,634,401.25)** |

| | |
|---|---|
| **Total Credits to GCAC** | **($21,224,519.88)** |

| | |
|---|---|
| **Provisional Balance due Vitol - prior deal related costs** | **12,076,095.86** |

| Comments |
| --- |
| Fixed $44.00/bbl |
| Fixed $245.00/ST |
| Fixed $249.00/ST |
| Fixed $267.50/ST |
| Fixed $250.00/ST |
| Oct. 1-31 1st line Brent less 0.85/bbl |
| Dec. 1-31 1st line Brent less 0.85/bbl |
| Jan 1-31 1st line Brent less 0.85/bbl |
| Fixed $247.50/ST |
| Fixed $245.00/ST |
| Fixed $250.00/ST |
| Fixed $250.00/ST |
| Fixed $260.00/ST |
| Fixed $262.50/ST |
| Fixed $275.00/ST |
| Fixed $275.00/ST |
| Fixed $280/ST |

| Comments |
| --- |
| |
| |
| |
| Need to enter contract |

July Storage - Gravity CC
July Storage - Gravity CC
July Tank Expense - Gravity CC
July Use or Pay - Gravity CC
August Storage - Gravity CC
August Tank Expense - Gravity CC
August Use or Pay - Gravity CC
September Storage - Gravity CC
September Tank Expense - Gravity CC
September Use or Pay - Gravity CC
October Storage - Gravity CC
October Storage - Gravity CC
October Tank Expense - Gravity CC
October Use or Pay - Gravity CC
November Storage - Gravity CC
November Storage - Gravity CC
November Tank Expense - Gravity CC
November Use or Pay Gravity
December Storage - Gravity CC
December Tank Expense - Gravity CC
December Use or Pay - Gravity CC

Credit - Rio drafted from the Lockbox for July rack sales
Credit - Rio drafted from the Lockbox for August rack sales
Credit - Rio drafted from the Lockbox for September rack sales
Credit - Rio drafted from the Lockbox for October rack sales
Credit - Rio drafted from the Lockbox for November rack sales
Credit - Rio drafted from the Lockbox for December rack sales



CAUSE NO. 2018-31578

| | | |
|---|---|---|
| GULF COAST ASPHALT<br>COMPANY, LLC<br>    *Plaintiff,*<br><br>v.<br><br>VITOL INC.<br>    *Defendant,* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br>OF HARRIS COUNTY, TEXAS<br>295TH JUDICIAL DISTRICT |

---

### Expert Report of David N. Fuller, CFA, ASA

---

## Introduction

1.    I am David N. Fuller, CFA, ASA. I have been retained on behalf of Gulf Coast Asphalt Company, LLC (the "Plaintiff" or "GCAC") in the dispute styled *Gulf Coast Asphalt Company, LLC, Plaintiff, v. Vitol Inc., Defendant.* I was asked to provide an opinion regarding the operating profits and losses sustained by GCAC and Vitol, Inc. (the "Defendant" or "Vitol"). The operating profits and losses were sustained during a period of time when GCAC and Vitol were engaged in various transactions (the "Venture") in the fuel oil and asphalt markets during parts of 2017 and 2018 (the "Venture Timeframe"). I was also asked to provide my opinion regarding the Plaintiff's lost profits due to Vitol's alleged actions with respect to other oil and gas ventures, specifically opportunities to transport Canadian crude oil by rail. Additionally, I was retained to offer expert testimony relating to this expert report in deposition and trial settings. No other use for my report is permitted without my express written consent.

2.    I am currently employed as the President of VALUE Incorporated, a financial valuation consulting firm located in Irving, Texas.  Prior to founding VALUE Incorporated, I was employed in various roles within a national financial valuation firm and in the valuation practice of a global accounting and consulting firm.

---

3.      For more than thirty years, I have provided financial valuation services to a wide variety of clients. During this time, I have performed thousands of valuations of common stock, preferred stock, derivative securities, intellectual property, lost profits, economic losses, and damages. These engagements have been completed for purposes relating to transactions, financial reporting requirements, tax reporting requirements and tax disputes, management planning, and litigation.

4.      I have calculated economic damages on numerous occasions.  I have been accepted as an expert and offered expert testimony relating to valuation and economic issues in numerous state district courts, federal district courts, the United States Bankruptcy Court, the United States Tax Court, and in many arbitration proceedings.

5.      I hold the Chartered Financial Analyst ("CFA") designation governed by the CFA Institute. I have also earned the Accredited Senior Appraiser ("ASA") designation governed by the American Society of Appraisers. My educational background includes a Masters of Business Administration degree from Southern Methodist University with a concentration in Finance, and a Bachelor of Arts degree from Austin College with a concentration in Economics. My professional qualifications are set forth in my resume, which is included as Attachment A to this report.

## Information Provided

6.      In forming my opinions, I have reviewed and relied upon information including, but not limited to, the following:

- Certain legal pleadings related to the above-captioned litigation including, but not limited to, the following:
  - i.   Plaintiff's Second Amended Petition ("Petition") dated February 21, 2019; and,
  - ii.  Counterclaimant and Third-Party Plaintiff Vitol Inc.'s Second Amended Counterclaims, Third-Party Petition, and Application for Injunctive Relief dated September 12, 2019.
- A spreadsheet prepared by Vitol detailing expenses incurred, as well as the purchases and sales of asphalt, during the Venture Timeframe;

- A spreadsheet prepared by GCAC detailing the purchases and sales of asphalt during the Venture Timeframe;
- Email correspondence relating to the profitability of the operations over the Venture Timeframe;
- Spreadsheets listing hedge transactions by Vitol over the Venture Timeframe;
- Documents related to rail transportation opportunities regarding Canadian crude oil;
- Email correspondence relating to the future opportunities being pursued by GCAC;
- Phone conversations with Messrs. Arthur Brass and Patrick Perugini; and,
- Other relevant documents produced in discovery, public data regarding the industry, financial markets, and the overall economy in general.

7.      The facts and data I relied upon are of a type commonly and reasonably relied upon by experts in my profession in forming opinions on these subjects.  I understand that the discovery process may continue and additional documents may be provided to me for review. I reserve the right to update my analysis should additional information be provided.

## Background of the Situation

8.      The following reflects my understanding of the background.  It should be noted that it is not my intention to repeat the facts and allegations contained in the pleadings in detail. The purpose of this section is simply to provide a description of the situation and timeline of events as a context for my analysis and opinions.

9.      It is my understanding that the subject litigation stems from a series of representations, agreements, and events that occurred between GCAC and Vitol regarding certain opportunities in the fuel oil and asphalt markets.

10.     GCAC is a commodities trading company that focuses its operations in the fuel oil and asphalt markets. It is my understanding that GCAC, beginning in early 2016, entered into a joint marketing agreement with a regional commodities trading firm with the intent of using their

combined resources and expertise to pursue opportunities to source, purchase, blend, sell, and market asphalt and related products.

11.     Approximately one year later, GCAC was informed by the regional commodities trading firm that it would not continue in the asphalt business. GCAC subsequently began to search for another company to replace the regional firm. This search eventually led GCAC to enter into an agreement with Vitol.

12.      It is my understanding that in May of 2017 GCAC and Vitol began to exchange drafts of a written agreement. While no written agreement was finished or signed, in July of 2017 Vitol purchased the entire position of the regional firm with whom GCAC has previously been working.

13.     After working together for a period of time, Vitol informed GCAC that a conflict had arisen with another partnership it was involved in. Subsequently, GCAC was told that the conflict could not be resolved and Vitol would no longer be able to work with GCAC.

14.     At the start of 2018, before GCAC could finalize a deal with a new partner, Vitol stopped entering into new transactions. I understand that GCAC was eventually able to engage with a new partner, but at a negotiating disadvantage which lead to less advantageous terms. Additionally, I understand that GCAC was unable to execute on favorable opportunities (the "Canadian Crude Deals") while it was searching to replace Vitol as a partner.

## Scope of Engagement and Summary of Opinions

15.     The scope of my analysis included the calculation of the losses sustained by Vitol over the Venture Timeframe. I understand that there is some dispute as to what type of agreement existed between the parties. I offer no opinions regarding liability or legal matters in this dispute. I calculated the losses sustained from operations under two scenarios: first, that Vitol was merely financing GCAC's operation and had no interest in the profits or losses, and second, that the parties shared interest in the outcome of the operations equally. Additionally, I calculated the future lost profits from the Canadian Crude Deals that GCAC could have pursued, but was unable to enter

due to Vitol's refusal to work with GCAC. These lost profits were also calculated under the aforementioned scenarios.

16.     In the event that the trier of fact finds that Vitol was merely providing financing for GCAC's operations, and has no interest in the outcome, my opinions can be summarized as follows:

  i.   Vitol's cash flow from working with GCAC can reasonably be stated as -$14.3 million, and;
  ii.  GCAC's future lost profits from forgone opportunities, due to Vitol ceasing to work with GCAC, can be reasonably stated at $19.7 million.

17.     In the event the trier of fact finds in that the parties shared 50/50 interest in the outcome, my opinions may be summarized as follows:

  i.   Vitol's net cash flow from working with GCAC can reasonably be stated as -$11.3 million, and;
  ii.  GCAC's future lost profits from forgone opportunities, due to Vitol ceasing to work with GCAC, can be reasonably stated at $9.8 million.

The scope of my opinions was based on the data provided to me at the time of this report. My analysis was based in part on this information as well as other data I developed independently. I have accepted as accurate the data provided to me and have not independently verified (to the extent that is even possible) the data. I reserve the right to supplement this report if additional information becomes available after the date of this report.

## Calculation of Venture Losses

18.     I calculated the net cash flows sustained by GCAC and Vitol during the Venture Timeframe. I relied on data produced by GCAC and Vitol when calculating the losses.[1]

---

[1] Spreadsheets "GCAC 09 Mar 18.xlsx", "True Up Buys Sells Only v2.xlsx", and an email "RE: Fwd:GCAC.msg".

19.     I began by reconciling the purchases and sales of asphalt with the amounts found on the profit and loss statement for the Venture Timeframe. This analysis can be found in Schedules A.1 through A.3 to this report.[2]

20.     It was my understanding that the profit and loss statement excluded certain expenses that GCAC incurred over the Venture Timeframe. I made adjustments to the profit and loss statement to include these expenses. I included $1.1 million in expenses related to Mobile Terminalling Storage, as well as $0.6 million in personnel expenses. These adjustments can be found in schedule B.2 and B.3

21.     I then calculated the cash flows that each company experienced over the Venture Timeframe. Vitol experienced $58.3 million expenditures related to purchases of asphalt while receiving $54.6 million in payments for sales of asphalt. Additionally, Vitol incurred other operating expenses, including hedging losses, of $10.5 million. These calculations can be found on Schedule B.1 to this report.

22.     GCAC had $1.7 million expenditures relating to purchases of asphalt, while receiving $28.7 million in payments for asphalt. Additionally, GCAC made $16.6 million in payments to Vitol over the timeframe. These calculations can be found in Schedule B.2 to this report.

23.     I then considered two scenarios when determining the amount due Vitol: first, that Vitol was merely financing GCAC's operation and had no interest in the outcome, and second, that the parties shared interest in the outcome of the operations equally.

24.     The losses of the operations were $5.8 million. Under the first scenario Vitol was merely providing financing while GCAC was wholly responsible for the losses sustained. In this scenario Vitol was owed $14.3 million.

25.     Under the second scenario Vitol would be responsible for half the losses, or $2.9 million. This amount was taken out of the cash flows, since GCAC would not be responsible for

---

[2] The dollar amounts reconciled with the exception of one transaction, Deal 30b, where the GCAC prepared spreadsheet showed a purchase price of $26.2 thousand less than purchase price shown in the Vitol prepared spreadsheet. I relied upon the amount contained in the Vitol prepared spreadsheet for the purposes of my analysis.

Vitol's share of the loss in this scenario. After adjusting for losses, Vitol was owed $11.3 million. The following table provides a summary of this analysis:

**Table 1: Conclusion of Cash Flows**

| *$ in Thousands* | Scenario 1: Vitol Providing Financing | Scenario 2: 50/50 Shared Interest |
|---|---|---|
| **Category** | | |
| GCAC Owes Vitol | $ 14,320.9 | $ 14,320.9 |
| Vitol's Share of Losses | - | (2,926.3) |
| **Due Vitol** | $ 14,320.9 | $ 11,394.7 |

26.     I understand that Vitol was responsible for executing a hedging strategy over the Venture Timeframe. Vitol recorded a loss of $6.4 million related to the hedging strategy. While Vitol provided a spreadsheet listing a number of purported hedge transactions, it's my understanding that Vitol has not provided documentation regarding the hedge strategy or documents demonstrating that the listed transactions were in fact related to the Venture. As such I calculated the amounts due to Vitol, excluding any hedging loss.

27.     After taking out the hedging losses from Vitol's cash flows, I determined that net cash flows to Vitol over the Venture Timeframe were -$7.8 million.

28.     Without the hedging loss, the operations had profits of $0.5 million. Under the first scenario Vitol was merely a providing financing while GCAC was wholly responsible for the losses sustained. In this scenario Vitol was owed $7.8 million.

29.     Under the second scenario Vitol would be benefit from half the profits, or $0.2 million. This amount was added to what was owed Vitol. After removing hedging losses and allocating half the profits to Vitol, Vitol was owed $8.1 million. The following table provides a summary of this analysis:

**Table 2: Conclusion of Cash Flows (without hedging losses)**

| $ in Thousands | Scenario 1: Vitol Providing Financing | Scenario 2: 50/50 Shared Interest |
|---|---|---|
| **Category** | | |
| GCAC Owes Vitol | $ 7,889.2 | $ 7,889.2 |
| Vitol's Share of Profits | - | 289.6 |
| **Net Due Vitol** | $ 7,889.2 | $ 8,178.8 |

## Assumptions Underlying My Analysis of Lost Profits from Canadian Crude Deals

30.      In preparing my analysis and lost profits calculations, I was asked to rely on certain assumptions. In each case, I evaluated these assumptions to ascertain that there was a reasonable basis to make the assumptions.

31.      I relied upon the pricing and cost data contained in the email correspondence that was produced during discovery.[3] Additionally I held conversations with Messrs. Brass and Perugini to assess the reliability of the data. I assumed the data contained in the email correspondence was accurate and complete.

## Calculation of Lost Future Profits

32.      When calculating the lost future profits, I relied upon conversations with Messrs. Brass and Perugini as well as certain emails produced in discovery. In late 2017 GCAC was pursuing an arbitrage opportunity that consisted of purchasing Western Canadian Select ("WCS") crude oil and transporting it by rail to the U.S. Gulf Coast. GCAC had multiple opportunities in early 2018 to capitalize on Canadian Crude Deals. Based on the information produced in discovery, I calculated the lost profits from two separate deals.

---

[3] GCAC 009521 – GCAC 009844

33.     Based on my conversations with Messrs. Brass and Perugini, I determined that GCAC had capacity to execute on two opportunities. The first deal would have begun in early 2018 and spanned a period of 12 months. The first deal would involve leasing 400 rail cars at $700.0 per car, with each car transporting 575 barrels of WCS.[4]

34.     I relied upon the pricing data for WCS and WTI that was contained in Mr. Perugini's original model as the prices would have been locked in at the time the deal was executed. Similarly, I relied on Mr. Perugini's model to determine the costs associated with the deal. Loading and unloading costs were forecasted to be $1.50 per barrel, transportation costs were forecasted to be $7,000.0 per rail car, and other costs totaled $0.50 per barrel.[5]

35.     Additionally, based on my conversation with Mr. Perugini, I added certain costs that were not included in the original model, but should have been. I included rail car positioning costs of $2,500.0 per rail car at the start of the deal and again at the termination of the deal. I also included excess mileage charges that were included in later variations of the model, as well as the costs of cleaning the cars the end of the period.[6]

36.     I forecasted the first part of Canadian Crude Deal to run for a period of 12 months. I discounted the cash flows using a discount rate of 15.9%.

37.     The second deal would have gone into effect in mid-2018 and would have spanned a period of 12 months. The second deal would involve leasing 600 rail cars at $545.0 per car, with each car transporting 575 barrels of WCS.[7]

38.     I again relied on Mr. Perugini's model during that timeframe as the basis for the prices of WCS and WTI.

39.     I included costs of $2,500.0 per rail car for positioning at the start of the deal and again at the termination of the deal. I also included transportation costs of $7,400.0 per rail car,

---

[4] GCAC 009600 and GCAC 009598
[5] GCAC 009598
[6] GCAC 009797 and GCAC 009811
[7] GCAC 009695 and GAC 009644

Expert Report of David N. Fuller, CFA, ASA                                    Page 9

loading and discharge fees of $1.75 per barrel, and cleaning fees of $4,500.0 per car at the end of the second deal.[8]

40.      Based on my conversations with Mr. Perugini, I also included an excess mileage charge that was not included in the original model.[9]

41.      I forecasted the first part of Canadian Crude Deal to run for a period of 12 months. I discounted the cash flows using a discount rate of 15.9%.

42.      I calculated the lost future profits under two scenarios: first, that Vitol was merely financing GCAC's operation and had no interest in the outcome, and second, that the parties shared interest in the outcome 50/50.

43.      Under the first scenario, Vitol was merely a providing financing while GCAC was wholly responsible for the outcome. In this scenario GCAC's lost future profits of the Canadian Crude Deals was reasonably determined to be $19.7 million.

44.      Under the second scenario, GCAC's lost profits were calculated to be $9.8 million. The follow table provides a summary of my calculations:

### Table 3: Canadian Crude Deals Summary

| $ in Thousands | Scenario 1: Vitol Providing Financing | Scenario 2: 50/50 Shared Interest |
|---|---|---|
| **Category** | | |
| 400 Rail Car Deal | $ 3,411.5 | $ 1,705.8 |
| 600 Rail Car Deal | 16,317.0 | 8,158.5 |
| **Lost Profits** | $ 19,728.5 | $ 9,864.3 |

## Conclusion

45.      Based on the analysis described above, I calculated to cash flows of GCAC and Vitol over the Venture Timeframe. I calculated the losses sustained from operations under two

---

[8] GCAC 009644
[9] GCAC 009811

Expert Report of David N. Fuller, CFA, ASA                                    Page 10

scenarios: first, that Vitol was merely financing GCAC's operation and had no interest in the outcome, and second, that the parties shared interest in the outcome of the operations 50/50.

46.     I also calculated the future lost profits from opportunities that GCAC could reasonably have pursued, but was unable to pursue after Vitol ceased to work with GCAC. These lost profits were also calculated under the aforementioned scenarios. Table 4 is a summary of these calculations

### Table 4: Summary

| $ in Thousands | Scenario 1: Vitol Providing Financing | Scenario 2: 50/50 Shared Interest |
|---|---|---|
| Category | | |
| GCAC Owes Vitol | $ 14,320.9 | $ 14,320.9 |
| Vitol's Share of Losses | - | (2,926.3) |
| Vitol Owes GCAC (lost profits) | (19,728.5) | (9,864.3) |
| Net Due Vitol (GCAC) | ($ 5,407.6) | $ 1,530.4 |

47.     As discussed above, I also calculated the amounts due Vitol removing the hedging losses. The following table summarizes these calculations:

### Table 5: Summary (without hedging losses)

| $ in Thousands | Scenario 1: Vitol Providing Financing | Scenario 2: 50/50 Shared Interest |
|---|---|---|
| Category | | |
| GCAC Owes Vitol | $ 7,889.2 | $ 7,889.2 |
| Vitol's Share of Profits | - | 289.6 |
| Vitol Owes GCAC (lost profits) | (19,728.5) | (9,864.3) |
| Net Due Vitol (GCAC) | ($ 11,839.3) | ($ 1,685.4) |

48.     I base my opinions on my academic and professional education, financial valuation experience and the work I have conducted in this case. I reserve the right to update my opinions and perform additional valuation work if necessary.

49.     My compensation in this matter was not contingent upon the conclusions reached. I understand that additional discovery may be completed and depositions may be taken. I expressly reserve the right to modify or revise my opinions based on additional information that becomes available in the future.


_____              _February 25, 2020_____
David Fuller, CFA, ASA

**Attachment A**

000961

# David N. Fuller, CFA, ASA

## Professional Experience

David Fuller founded VALUE Incorporated as a premier firm in the application of financial, valuation and economic theory.  Drawing on the experience and knowledge gained through thousands of financial consulting engagements, David has a wide range of industry experience, as well as experience with a wide variety of situations and circumstances.  He provides services to clients involved in mergers, acquisitions and corporate transactions.  He works with clients addressing valuation-related financial and tax reporting requirements.  He also provides expert analysis and testimony when engaged by clients involved in various sorts of litigation.   In addition, Mr. Fuller frequently provides services relating to the determination of reasonable compensation. Mr. Fuller has performed analyses in many industries, including: aerospace, agri-business, banking and financial services, construction, data processing, distribution, energy, food and beverage, healthcare, hospitality, insurance, manufacturing, materials, media, pharmaceuticals, real estate, restaurant, retail, securities, services, software, technology, telecommunications, transportation and utilities.

Prior to forming VALUE Incorporated, Mr. Fuller consulted extensively in the financial and valuation fields, in various roles with a national financial valuation firm and in the valuation practice of a global accounting & consulting firm.

Mr. Fuller has been published on several occasions in a variety of industry and trade journals. David has lectured to groups of executives and professionals, and assisted with teaching undergraduate and graduate level courses relating to valuation issues. David has testified on numerous occasions in deposition and trial settings in a variety of Federal and state courts and has served numerous clients with valuations relating to tax disputes in United States Tax Court.

## Formal Education

**Master of Business Administration** – 1989
      Concentration in Finance
      Southern Methodist University, Dallas, Texas
**Bachelor of Arts, Liberal Arts** – 1988
      Concentrations in Economics and Finance
      Austin College, Sherman, Texas

## Honors and Awards

Texas Business Hall of Fame, Scholarship Recipient – 1989
Dean's List, multiple occurrences
Eagle Scout

## Accreditations and Designations

Chartered Financial Analyst (CFA), designated by the CFA Institute (CFAI)
Accredited Senior Appraiser (ASA), designated by the American Society of Appraisers (ASA)

## Organizations and Professional Associations

Associate Board Member, Cox School of Business, Southern Methodist University
Member, Financial Executives International
Member, Association for Corporate Growth
Past President, DFW ACG Chapter
Member, CFA Institute
Member, Dallas Society of Financial Analysts
Member, American Society of Appraisers
Member, American Society of Appraisers, Dallas Chapter
Member, CEO Netweavers

## Publications

Mergers and Acquisitions in the Dallas/Ft. Worth Area. *Dallas Business Journal*, Spring 2003.

Integrating Valuation Services Saves Time and Money in Acquisitions. *Dallas Business Journal*, Spring 2003.

*Litigation Support Report Writing*. John Wiley & Sons, 2003. - Contributor

"What Should be in the Board Book" – Published in *Directors & Boards,* Spring 2001.

"Business Cycles:  Simulating Solvency" – Publication pending

"Positioning Your Company for Sale" – Publication pending

"Value Creation:  Theory and Practice" – Publication pending

"The 3 Jobs of Management" – Publication pending

"Conglomerate and Portfolio Discounts" – Position paper

"Investing in Troubled Companies" – Published in *Turnarounds and Workouts Survey,* September 1994.

"Break-even Analysis for the Amortization of Intangible Assets" – Published in *Journal of Accountancy,* June 1994.

"Purchase Price Allocation Break-even Analysis" – Position paper

000963

## Lectures and Appearances

"Deal Making Opportunities After the Downturn" – Bowne & Co., February 2009
"The Impact of Credit Markets on Valuations" – M&A Forum, CEO Netweavers, June 2008

Current Issues in Estate & Gift Tax Valuations" Malouf Estate Planning Study Group, June 2008

"Valuation of Intellectual Property" – CFO Forum of the AeA (American Electronics Association), May 2008

"Valuation Issues in Small Business" – Representing Small Business 2008, Texas Bar CLE, May 2007

"Business Valuation and the Business of Valuation" – Southern Methodist University, Cox School of Business, November 2005

"Business Valuation and the Business of Valuation" – University of Texas at Arlington, October 2005

"Valuation and Exit Strategies for Entrepreneurs" – Southern Methodist University, Cox School of Business, April 2005

"SFAS 123R – Valuation of Stock Based Compensation" – DFW SEC Reporting Group, April 2005

"Creating Shareholder Value in this Economic Environment" - Bank of America Regional Economic Seminar, April 2004

"Topics in Valuation" – Tarrant County Probate Bar, March 2004

"Valuation of Businesses" –Daedalian Society, March 2004

"Careers in the Consulting Industry" – panel participant, Cox School of Business, Southern Methodist University – September 2003

"Valuation Issues in Financial Reporting" – DFW SEC Reporting Group - January 2003

"Valuation of High-Technology Companies" – McCombs School of Business, University of Texas - September 2002

"Careers in the Consulting Industry" – panel participant, Cox School of Business, Southern Methodist University – September 2002

"Current Topics in Valuation" – Internal Revenue Service Estate and Gift Tax Group – August 2002

"Exit Planning for Business Owners" – SMU Cox School of Business, MBA course, Planning & Control for Growing Businesses – November 2001

000964

## Lectures and Appearances (continued)

"Companies that Create and Destroy Value: Common Threads" – Chief Executive's Round Table – October 2001

"What Should be in the Board Book:  The External Perspective" – American Society of Corporate Secretaries, Dallas, Texas – July 2001

"Value Extraction Strategies" – SMU Cox School of Business, MBA course, Planning & Control for Growing Businesses – Spring 2001

"Value Extraction Strategies" – SMU Cox School of Business, MBA course, two sections of Planning & Control for Growing Businesses – Fall 2000

"Valuation Issues in Divorce" - American Bar Association – Annual Family Law Conference, San Diego, CA – Spring 2000

"Daubert and Financial Experts" – South Texas College of Law CLE, Houston, Texas – Fall 1999

"Topical Issues and Tax Court Cases Relating to Gift and Estate Tax Valuation" – Internal Revenue Service, Dallas Texas – September 1997

"Current Approaches and Issues to the Valuation of Business and Investment Interests" – IRS Gift and Estates, Mid-States Region; Dallas Texas – May 1996

"Careers in Business Valuation" – SMU MBA Finance Association, Dallas Texas – September 1995

**Schedules**

# Profit and Loss of Venture

*($ in thousands)*



000967

| | BBL |
|---|---:|
| **Purchases** | |
| Initial buy from RIO (CC+Mobile+Exxon) | $ 13,308.1 (a) |
| Vitol buys after initial (includes GCAC Shell) | 46,850.4 (b) |
| **Total purchases** | $ 60,158.5 |
| | |
| **Vitol sales to 3rd parties (including GCAC)** | |
| Sales to 3rd parties | $ 25,849.1 (c) |
| Sales to GCAC | 27,355.9 (d) |
| Total product sales | $ 53,205.0 (c) + (d) |
| | |
| Sales to Rio at termination | $ 8,952.5 (e) |
| Truck rack sales | 4,590.1 (f) |
| **Total value received** | $ 66,747.7 |
| | |
| **Total Physical** | 6,589.2 |
| | |
| **Expenses** | |
| Less storage related costs | 2,632.3 |
| Less deal related costs | 1,193.4 |
| Less TVM | 320.7 |
| **Total Expenses** | 4,146.3 |
| | |
| **Total physical less expenses** | 2,442.9 |
| | |
| Less hedging/paper loss | 6,431.7 |
| **Total P&L** | ($ 3,988.9) |

| | BBL |
|---|---:|
| | 307.7 |
| | 1,081.1 |
| | 1,388.8 |
| | |
| | |
| | |
| | 571.7 |
| | |
| | 187.9 |
| | 92.5 |
| | 852.1 |

---

Notes:

(a), (b), (c), (d), (e), and (f) are verified in schedules B.1 and B.2

Source: "RE: Fwd GCAC" email with venture P&L

**Gulf Coast Asphalt**
**Profit and Loss**
**Schedule A.1**

**Physical Buys and Sells (GCAC)**

| Purchases | From | Cost | | Sales to 3rd parties | To | Revenue | | Project termination | | Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| Initial+Exxon | Rio/Exxon | $ 13,308,101.7 (a) | | Deal 3 | Titanio | $ 1,410,293.0 | | Sales to Rio at Terminal | | $ 8,952,522.1 (e) |
| | | | | Deal 4 | VALT | 1,296,688.5 | | Truck Rack Receipts | | 4,590,118.6 (f) |
| **Purchases** | **From** | **Cost** | | Deal 6 | Century | 37,997.6 | | | | |
| Deal 5 | CITGO | $ 1,754,358.5 | | Deal 6b | Genesis | 1,177,217.1 | | | | |
| Deal 9 | P66 | 1,674,116.9 | | Deal 7 | VALT | 1,581,801.7 | | | | |
| Deal 10 | Exxon | 1,518,028.9 | | Deal 8 | United | 2,111,417.9 | | | | |
| Deal 11 | CITGO | 821,727.9 | | Deal 27/Vitol 21a | Freepoint | 1,037,403.0 | | | | |
| Deal 12 | Hunt | 1,122,511.8 | | Deal 29/Vitol 21b | Unity | 1,707,612.4 | | | | |
| Deal 16 | P66 | 1,737,622.3 | | Deal 30a | Mercuria | 1,622,365.9 | | | | |
| Deal 17 | Sopus | 1,799,708.7 | | Deal 30b | Mercuria | 2,329,978.0 | | | | |
| Deal 18 | Hunt | 1,369,747.2 | | Deal 31b | Freepoint | 1,910,480.9 | | | | |
| Deal 21a | Exxon | 1,957,073.5 | | Deal 34 | BoumenFlat | 2,634,019.9 | | | | |
| Deal 21b/28/29 | Exxon | 1,313,504.6 | | Deal 38b | Exxon | 1,974,685.4 | | | | |
| Deal 24 | Exxon | 1,570,188.6 | | Deal 40 | Exxon | 1,835,839.6 | | | | |
| Deal 25 | Exxon | 1,515,283.4 | | Deal 41 | BoumenFlat | 1,854,545.7 | | | | |
| Deal 32 | Davison | 1,537,605.0 | | Deal 48 | Koch | | | | | |
| Deal 30a | P66 | 1,725,297.5 | | **Sales to 3rd Parties Subtotal** | | $ 25,849,115.0 (c) | | | | |
| Deal 30b | P66 | 1,573,956.0 | | | | | | | | |
| Deal 30b | P66 | 1,735,745.0 | | **Sales to GCAC** | **To** | **Revenue** | | | | |
| Deal 30c | P66 | 2,321,090.8 | | Deal 50 | GCAC | $ 747,976.3 | | | | |
| Deal 31 | CITGO | 1,537,087.6 | | Deal 13 | GCAC | 1,308,865.4 | | | | |
| Deal 34 | CITGO | 848,848.3 | | Deal 14 | GCAC | 1,527,791.6 | | | | |
| Deal 35 | CITGO | 1,469,839.2 | | Deal 15 | GCAC | 1,543,538.3 | | | | |
| Deal 37 | CITGO | 2,426,151.4 | | Deal 19 | GCAC | 1,159,605.8 | | | | |
| Deal 38a | CITGO | 2,466,361.7 | | Deal 20a | GCAC | 1,962,529.7 | | | | |
| Deal 42 | CITGO | 2,151,782.5 | | Deal 22 | GCAC | 653,354.5 | | | | |
| Deal 43 | P66 | 1,946,934.3 | | Deal 23 | GCAC | 1,480,307.2 | | | | |
| Deal 44/44a Vitol | P66 | 1,962,193.1 | | Deal 26 | GCAC | 1,433,594.0 | | | | |
| Deal 44b Vitol | P66 | 1,658,301.0 | | Deal 33/Vitol 33 | GCAC | 730,444.3 | | | | |
| Deal 44c Vitol | Koch | 1,075,505.2 | | Vitol 33 | GCAC | 352,561.5 | | | | |
| Deal 47 | CITGO | 2,259,805.6 | | Deal 36 | GCAC | 1,990,352.5 | | | | |
| Deal 49 | | | | Deal 20b | GCAC | 2,043,769.3 | | | | |
| **Total** | | $ 46,850,376.5 (b) | | Deal 39 | GCAC | 1,673,180.0 | | | | |
| | | | | Deal 45/Vitol 45 | GCAC | 1,490,887.8 | | | | |
| | | | | Vitol 45 | GCAC | 3,248,029.7 | | | | |
| | | | | Deal 46 | GCAC | 1,817,905.9 | | | | |
| | | | | Deal 20c | GCAC | 2,191,208.0 | | | | |
| | | | | **Sales to GCAC Subtotal** | | $ 27,355,901.6 (d) | | | | |
| | | | | | | | | | | |
| | | | | **Total Sales** | | $53,205,016.60 (c)+(d) | | | | |

Notes:
Source: ""True Up Buys Sells Only V2.xlsx"



000968

**Gulf Coast Asphalt**
**Physical Buys and Sells**
**Schedule A.2**



# Physical Buys and Sells (GCAC)

| Move # | From | Cost |
|---|---|---|
| 1 | Rio | $ 4,727,129.8 |
|  | Rio | 1,666,859.9 |
|  | Rio | 1,653,308.5 |
|  | Rio | 5,258,042.4 |
| 2 | Rio | 3,761.1 |
| **Total** |  | **$ 13,308,101.7 (a)** |

| Move # | From | Cost |
|---|---|---|
| 5 | Vitol | $ 1,754,358.5 |
| 9 | Vitol | 1,674,116.9 |
| 10 | Vitol | 1,518,017.1 |
| 11 | Vitol | 821,719.5 |
| 12 | Vitol | 1,122,511.3 |
| 16 | Vitol | 1,737,621.0 |
| 17 | Vitol | 1,799,708.7 |
| 18 | Vitol | 1,369,747.2 |
| 21A | Vitol | 1,957,054.6 |
| 21B | Vitol | 1,313,491.9 |
| 24 | Vitol | 1,570,188.6 |
| 25 | Vitol | 1,515,273.4 |
| 30A | Vitol | 1,725,297.5 |
| 30B | Vitol | 1,600,191.0 |
| 30C | Vitol | 1,735,745.0 |
| 31 | Vitol | 2,321,090.8 |
| 32 | Vitol | 1,537,605.0 |
| 34A | Vitol | 1,537,087.6 |
| 35 | Vitol | 848,848.3 |
| 37 | Vitol | 1,469,839.2 |
| 38 | Vitol | 2,426,168.7 |
| 42 | Vitol | 2,466,361.7 |
| 43 | Vitol | 2,151,782.5 |
| 44A | Vitol | 1,946,933.5 |
| 44B | Vitol | 1,962,193.1 |
| 44C | Vitol | 1,658,301.0 |
| 47 | Vitol | 1,075,505.2 |
| 49 | Vitol | 2,259,805.6 |
| **Total** |  | **$ 46,876,564.4 (b)** |

| Sales to 3rd parties | To | Revenue |
|---|---|---|
| 3 | Titanio | $ 1,410,293.0 |
| 4 | Rio | 1,296,688.5 |
| 6 | Century | 1,326,768.5 |
|  | Genesis | 37,997.6 |
|  | Rio | 956,303.2 |
| 7 | Rio | 220,913.9 |
| 8 | Rio | 1,581,801.7 |
| 27 | Freepoint | 2,111,417.9 |
| 28 | Unity | 1,037,403.0 |
| 29 |  | - |
|  |  | - |
|  |  | - |
| 34B | Mercuria | 1,707,612.4 |
|  | Mercuria | 1,622,365.9 |
|  | Freepoint | 2,329,978.0 |
|  | Bominflot | 1,910,480.9 |
| 40 | Exxon | 2,634,019.9 |
| 41 | Exxon | 1,974,685.4 |
|  | Bominflot | 1,835,839.6 |
| 48 | Koch | 1,854,545.7 |
| **Sales to 3rd Parties Subtotal** |  | **$ 25,849,115.0 (c)** |

| Sales to GCAC | To | Revenue |
|---|---|---|
| 13 | GCAC | $ 1,308,865.4 |
| 14 | GCAC | 1,527,791.6 |
| 15 | GCAC | 1,543,538.3 |
| 19 | GCAC | 1,159,605.8 |
| 20A | GCAC | 1,962,529.7 |
| 20B | GCAC | 2,043,769.3 |
| 20C | GCAC | 2,191,208.0 |
| 22 | GCAC | 653,354.5 |
| 23 | GCAC | 1,480,307.2 |
| 26 | GCAC | 1,433,594.0 |
| 33 | GCAC | 730,444.3 |
|  | GCAC | 352,561.5 |
| 36 | GCAC | 1,990,352.5 |
| 39 | GCAC | 1,673,180.0 |
| 45 | GCAC | 1,490,887.8 |
| 46 | GCAC | 3,248,029.7 |
|  | GCAC | 1,817,905.9 |
| 50 | GCAC | 747,976.3 |
| **Sales to GCAC Subtotal** |  | **$ 27,355,901.6 (d)** |
| **Total Sales** |  | **$ 53,205,016.60 (c)+(d)** |

| Project termination | | Revenue |
|---|---|---|
| 51 |  | $ 8,151,464.6 |
|  |  | 797,296.4 |
|  |  | 3,761.1 |
| **Total** |  | **$ 8,952,522.1 (e)** |
| **Rio Lockbox Cash Pass through** |  | **$ 4,590,118.6 (f)** |

Notes:
Source: "GCAC 09 Mar 18.xlsx"

000969

# Vitol Cash Flow

*($ in thousands)*

### Vitol Cash Out

| Product Purchases | Seller | Cash Flow[1] | Cash Flow[2] |
|---|---|---|---|
| Deal 1 | Rio | $ 13,304.3 | ($ 13,308.1) |
| Deal 2 | Rio | (3.8) | |
| Deal 5 | Citgo | (1,754.4) | (1,754.4) |
| Deal 9 | P66 | (1,674.1) | (1,674.1) |
| Deal 10 | Exxon | (1,518.0) | (1,518.0) |
| Deal 11 | Citgo | (821.7) | (821.7) |
| Deal 12 | Hunt | (1,122.5) | (1,122.5) |
| Deal 16 | P66 | (1,737.6) | (1,737.6) |
| Deal 18 | Hunt | (1,369.7) | (1,369.7) |
| Deal 21A | Exxon | (1,957.1) | (1,957.1) |
| Deal 21B | Exxon | (1,313.5) | (1,313.5) |
| Deal 24 | Exxon | (1,570.2) | (1,570.2) |
| Deal 25 | Exxon | (1,515.3) | (1,515.3) |
| Deal 30A | P66 | (1,725.3) | (1,725.3) |
| Deal 30B | P66 | (1,600.2) | (1,574.0) |
| Deal 30C | P66 | (1,735.7) | (1,735.7) |
| Deal 31 | Citgo | (2,321.1) | (2,321.1) |
| Deal 32 | Davison | (1,537.6) | (1,537.6) |
| Deal 34A | Citgo | (1,537.1) | (1,537.1) |
| Deal 35 | Citgo | (848.8) | (848.8) |
| Deal 37 | Citgo | (1,469.8) | (1,469.8) |
| Deal 38 | Citgo | (2,426.2) | (2,426.2) |
| Deal 42 | Citgo | (2,466.4) | (2,466.4) |
| Deal 43 | Citgo | (2,151.8) | (2,151.8) |
| Deal 44A | P66 | (1,946.9) | (1,946.9) |
| Deal 44B | P66 | (1,962.2) | (1,962.2) |
| Deal 44C | P66 | (1,658.3) | (1,658.3) |
| Deal 47 | Koch | (1,075.5) | (1,075.5) |
| Deal 49 | Citgo | (2,259.8) | (2,259.8) |
| **Total Product Expenses** | | **($ 58,385.0)** | **($ 58,358.8)** |

**Other Expenses[3]**

| | Cash Flow[1] |
|---|---|
| Storage Related Costs | ($2,632.3) |
| Deal Related Costs | (1,193.4) |
| TVM | (320.7) |
| Hedging Loss | (6,431.7) |
| **Total Other Expenses** | **($10,578.0)** |

### Vitol Cash In

| 3rd Party Sales | Receiver | Cash Flow[1] | Cash Flow[2] |
|---|---|---|---|
| Deal 4 | Rio | 1,296.7 | 1,296.7 |
| Deal 6 | Century | 1,326.8 | 1,326.8 |
| | Genesis | 38.0 | 38.0 |
| Deal 7 | Rio | 956.3 | 1,177.2 |
| | Rio | 220.9 | |
| Deal 8 | Rio | 1,581.8 | 1,581.8 |
| | Freepoint | 2,111.4 | 2,111.4 |
| | Unity | 1,037.4 | 1,037.4 |
| | Mercuria | 1,707.6 | 1,707.6 |
| | Mercuria | 1,622.4 | 1,622.4 |
| | Freepoint | 2,330.0 | 2,330.0 |
| Deal 34B | Bominflot | 1,910.5 | 1,910.5 |
| | Exxon | 2,634.0 | 2,634.0 |
| Deal 40 | Exxon | 1,974.7 | 1,974.7 |
| Deal 41 | Bominflot | 1,835.8 | 1,835.8 |
| Deal 48 | Koch | 1,854.5 | 1,854.5 |
| Deal 51 | Rio | 8,151.5 | 8,952.5 |
| | Rio | 797.3 | |
| | Rio | 3.8 | |
| **Total 3rd Party Sales** | | **$ 33,391.3** | **$ 33,391.3** |

**Other Cash In[3]**

| | Receiver | Cash Flow[1] |
|---|---|---|
| GCAC Payment #1 | Vitol | $ 4,000.0 |
| GCAC Payment #2 | Vitol | 3,700.0 |
| GCAC Payment #3 | Vitol | 8,934.4 |
| Rio Lockbox | Vitol | 4,590.1 |
| **Total Other** | | **$ 21,224.5** |

### Summary

| | Cash Flow[1] | Cash Flow[2] |
|---|---|---|
| Total Cash Out | ($ 68,963.0) | ($ 68,936.8) |
| Total Cash In | 54,615.9 | 54,615.9 |
| **Vitol Net Cash Flow** | **($ 14,347.1)** | **($ 14,320.9)** |
| Add: GCAC Net Cash Flow[4] | 8,468.4 | 8,468.4 |
| **Venture P&L** | **($5,878.7)** | **($5,852.5)** |

Notes:
[1] Values from Vitol's spreadsheet, "GCAC 09 Mar 18"
[2] Values from GCAC's spreadsheet, "True Up Buys Sells Only v2"
[3] Values from Feb 16, 2018 email, "RE:Fwd: GCAC"
[4] See Schedule A.3

**Gulf Coast Asphalt**
**Vitol Cash Flows**
**Schedule B.1**



000970

# GCAC Cash Flow

*($ in thousands)*



## GCAC Cash Out

| | Seller | Cash Flow[1] | Cash Flow[2] |
|---|---|---|---|
| **Product Purchases** | | | |
| Deal 17 | GCAC/Shell | ($1,799.7) | ($1,799.7) |
| **Total Product Expenses** | | ($1,799.7) | ($1,799.7) |
| | | | |
| **Other Expenses[3]** | | | |
| GCAC Payment #1 | Vitol | ($4,000.0) | |
| GCAC Payment #2 | Vitol | (3,700.0) | |
| GCAC Payment #3 | Vitol | (8,934.4) | |
| **Total Other Expenses** | | ($16,634.4) | |
| | | | |
| **Adjusted Expenses** | | | |
| Mobile Terminalling | | ($1,188.2) | |
| Personnel | | (675.5) | |
| **Total Other Expenses** | | ($1,863.7) | |

## GCAC Cash In

| | Receiver | Cash Flow[1] | Cash Flow[2] |
|---|---|---|---|
| **Product Sales** | | | |
| Deal 3[4] | Titano | $1,410.3 | $1,410.3 |
| Deal 13 | GCAC | $1,308.9 | $1,308.9 |
| Deal 14 | GCAC | 1,527.8 | 1,527.8 |
| Deal 15 | GCAC | 1,543.5 | 1,543.5 |
| Deal 19 | GCAC | 1,159.6 | 1,159.6 |
| Deal 20A | GCAC | 1,962.5 | 1,962.5 |
| Deal 20B | GCAC | 2,043.8 | 2,043.8 |
| Deal 20C | GCAC | 2,191.2 | 2,191.2 |
| Deal 22 | GCAC | 653.4 | 653.4 |
| Deal 23 | GCAC | 1,480.3 | 1,480.3 |
| Deal 26 | GCAC | 1,433.6 | 1,433.6 |
| Deal 33 | GCAC | 730.4 | 730.4 |
| | GCAC | 352.6 | 352.6 |
| Deal 36 | GCAC | 1,990.4 | 1,990.4 |
| Deal 39 | GCAC | 1,673.2 | 1,673.2 |
| Deal 45 | GCAC | 1,490.9 | 1,490.9 |
| | GCAC | 3,248.0 | 3,248.0 |
| Deal 46 | GCAC | 1,817.9 | 1,817.9 |
| Deal 50 | GCAC | 748.0 | 748.0 |
| **Total Product Sales** | | $28,766.2 | $28,766.2 |

## Summary

| | Cash Flow[1] | Cash Flow[2] |
|---|---|---|
| Total Cash Out | ($20,297.8) | ($20,297.8) |
| Total Cash In | 28,766.2 | 28,766.2 |
| **GCAC Net Cash Flow** | $8,468.4 | $8,468.4 |
| Add: Vitol Net Cash Flow[5] | (14,347.1) | (14,320.9) |
| **Venture P&L** | ($5,878.7) | ($5,852.5) |

Notes:
[1] Values from Vitol's spreadsheet, "GCAC 09 Mar 18"
[2] Values from GCAC's spreadsheet, "True Up Buys Sells Only v2"
[3] Values from Feb 16, 2018 email, "RE:Fwd: GCAC"
[4] True-up documents implied that GCAC received payment for Deal 3
[5] See Schedule A.2
[6] Expenses GCAC incurred that were excluded from P&L

000971

# Adjusted Profit and Loss

*($ in thousands)*

**Purchases**

| | |
|---|---|
| Initial buy from RIO (CC+Mobile+Exxon) | $ 13,308.1 |
| Vitol buys after initial (includes GCAC Shell) | 46,850.4 |
| **Total purchases** | $ 60,158.5 |

**Vitol sales to 3rd parties (including GCAC)**

| | |
|---|---|
| Sales to 3rd parties | $ 25,849.1 |
| Sales to GCAC | 27,355.9 |
| **Total product sales** | $ 53,205.0 |

| | |
|---|---|
| Sales to Rio at termination | $ 8,952.5 |
| Truck rack sales | 4,590.1 |
| **Total value received** | $ 66,747.7 |

| | |
|---|---|
| **Total Physical** | 6,589.2 |

**Expenses**

| | |
|---|---|
| Less storage related costs | 2,632.3 |
| Less deal related costs | 1,193.4 |
| Less TVM | 320.7 |
| **Total Expenses** | 4,146.3 |

**GCAC Expenses**

| | |
|---|---|
| Mobile Terminalling Storage Expense | 1,188.2 |
| Personnel Costs | 675.5 |
| **Total GCAC Expenses** | 1,863.7 |

| | |
|---|---|
| **Total physical loss expenses** | 579.2 |

| | |
|---|---|
| Less hedging/paper loss | 6,431.7 |
| **Total P&L** | ($ 5,852.5) |

Notes:

(a), (b), (c), (d), (e), and (f) are verified in schedules B.1 and B.2

Source: "RE: Fwd GCAC" email with venture P&L.

**Gulf Coast Asphalt**
**Adjusted Profit and Loss**
**Schedule B.3**


000972

## Projected Cash Flow Assumptions

*($ Actual)*

| Period Ending: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Rail Cars[1] | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Barrels per Car[2] | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 |
| **Total Barrels** | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 |
| | | | | | | | | | | | | |
| WTI Future Price[2] | $64.4 | $64.1 | $63.8 | $63.3 | $62.8 | $62.3 | $61.8 | $61.3 | $60.8 | $60.4 | $59.9 | $59.4 |
| Discount to WTI[2] | (7.1) | (6.8) | (6.4) | (6.1) | (5.8) | (5.6) | (5.5) | (5.5) | (5.6) | (5.7) | (5.8) | (6.1) |
| | | | | | | | | | | | | |
| Canadian Crude Differential[2] | ($26.9) | ($25.4) | ($23.1) | ($23.0) | ($23.4) | ($24.0) | ($24.6) | ($24.8) | ($24.9) | ($24.0) | ($22.7) | ($21.6) |
| | | | | | | | | | | | | |
| Beginning Net Revenue | | | | | | | | | | | | |
| Projected Net Sales ($ thousands) | $13,176.4 | $13,180.4 | $13,190.1 | $13,164.0 | $13,124.3 | $13,047.2 | $12,943.9 | $12,842.1 | $12,713.9 | $12,577.1 | $12,430.6 | $12,273.3 |
| | | | | | | | | | | | | |
| *Expenses:* | | | | | | | | | | | | |
| COGS | | | | | | | | | | | | |
| Canadian Crude Price | $37.5 | $38.8 | $40.7 | $40.3 | $39.4 | $38.4 | $37.2 | $36.5 | $35.9 | $36.4 | $37.2 | $37.8 |
| Discount to WCS[2] | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) |
| Rail Car Lease[3] | 700.0 | 700.0 | 700.0 | 700.0 | 700.0 | 700.0 | 700.0 | 700.0 | 700.0 | 700.0 | 700.0 | 700.0 |
| Rail Car Positioning Costs[3] | 2,500.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2,500.0 |
| Transportation Costs (per rail car)[2] | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 | 7,000.0 |
| Excess Mileage (per car)[4] | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 |
| Loading Costs (per bbls)[2] | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Discharge Costs (per bbls)[2] | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Other Shipping Fees (per bbls)[2] | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Fuel Bid[2] | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Cleaning Costs (per rail car)[4] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $4,500.0 |
| Cost of Borrowing | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% |

Notes:
[1] GCAC 009600
[2] GCAC 009698
[3] GCAC 009644
[4] GCAC 009811

**Gulf Coast Asphalt**
**Canadian Crude Deal #1: Discounted Cash Flow Analysis**
**Schedule C.1**


0g0973

# Discounted Cash Flows

*$ in thousands*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | $13,176.4 | $13,180.4 | $13,190.1 | $13,164.0 | $13,124.3 | $13,047.2 | $12,943.9 | $12,842.1 | $12,713.9 | $12,577.1 | $12,430.6 | $12,273.3 |
| **COGS** | | | | | | | | | | | | |
| Discounted WCS | 8,107.5 | 8,397.3 | 8,836.6 | 8,760.7 | 8,551.4 | 8,303.0 | 8,033.9 | 7,886.7 | 7,746.4 | 7,847.6 | 8,047.7 | 8,183.4 |
| Rail Car Lease | 280.0 | 280.0 | 280.0 | 280.0 | 280.0 | 280.0 | 280.0 | 280.0 | 280.0 | 280.0 | 280.0 | 280.0 |
| Rail Car Positioning Costs | 500.0 | - | - | - | - | - | - | - | - | - | - | 500.0 |
| Transportation Costs | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 | 2,800.0 |
| Excess Mileage | 32.8 | 32.8 | 32.8 | 32.8 | 32.8 | 32.8 | 32.8 | 32.8 | 32.8 | 32.8 | 32.8 | 32.8 |
| Loading Costs | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 |
| Discharge Costs | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 | 345.0 |
| Other Shipping Fees | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 | 115.0 |
| Fuel Bid | 230.0 | 230.0 | 230.0 | 230.0 | 230.0 | 230.0 | 230.0 | 230.0 | 230.0 | 230.0 | 230.0 | 230.0 |
| Cleaning Costs | - | - | - | - | - | - | - | - | - | - | - | 1,350.0 |
| Financing Costs | 25.5 | 25.1 | 26.0 | 25.8 | 25.4 | 24.9 | 24.4 | 24.1 | 23.8 | 24.0 | 24.4 | 28.4 |
| Total COGS | 12,780.9 | 12,570.2 | 13,010.4 | 12,934.4 | 12,724.7 | 12,475.8 | 12,206.1 | 12,058.6 | 11,918.0 | 12,019.4 | 12,219.9 | 14,209.6 |
| **Gross Profit** | 395.5 | 610.2 | 179.7 | 229.7 | 399.6 | 571.4 | 737.8 | 783.5 | 795.9 | 557.7 | 210.6 | (1,936.4) |
| **Net Profit** | 395.5 | 610.2 | 179.7 | 229.7 | 399.6 | 571.4 | 737.8 | 783.5 | 795.9 | 557.7 | 210.6 | (1,936.4) |
| Discount Period | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.50 | 6.50 | 7.50 | 8.50 | 9.50 | 10.50 | 11.50 |
| Present Value Factor[1] @ 15.9% | 0.9939 | 0.9818 | 0.9698 | 0.9580 | 0.9463 | 0.9348 | 0.9234 | 0.9121 | 0.9010 | 0.8900 | 0.8791 | 0.8684 |
| PV Net Profit | $393.1 | $599.0 | $174.3 | $220.0 | $378.1 | $534.1 | $681.3 | $714.6 | $717.1 | $496.3 | $185.2 | ($1,681.6) |
| | | | | | | | | | | | | |
| Sum of PVs | $3,411.5 | | | | | | | | | | | |

Notes:
[1] Duff and Phelps cost of equity for Crude Petroleum and Natural Gas Industry as of 1/1/2018

**Gulf Coast Asphalt**
**Canadian Crude Deal #1: Discounted Cash Flow Analysis**
**Schedule C.2**


000974

## Projected Cash Flow Assumptions

*($ Actual)*

| Period Ending: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Rail Cars[1] | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Barrels per Car[2] | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 |
| Total Barrels | 345,000 | 345,000 | 345,000 | 345,000 | 345,000 | 345,000 | 345,000 | 345,000 | 345,000 | 345,000 | 345,000 | 345,000 |
| WTI Future Price[2] | $66.5 | $66.1 | $65.8 | $65.4 | $65.1 | $64.8 | $64.4 | $64.0 | $63.6 | $63.2 | $62.8 | $62.4 |
| Discount to WTI[2] | (3.8) | (3.9) | (4.1) | (4.3) | (4.5) | (4.6) | (4.7) | (5.0) | (5.4) | (6.0) | (6.8) | (7.8) |
| Canadian Crude Differential[2] | ($18.1) | ($20.6) | ($23.7) | ($24.0) | ($24.3) | ($24.5) | ($24.0) | ($23.7) | ($23.3) | ($22.8) | ($21.1) | ($20.3) |
| Beginning Net Revenue / Projected Net Sales | $21,631.5 | $21,476.3 | $21,286.5 | $21,096.8 | $20,907.0 | $20,769.0 | $20,579.3 | $20,337.8 | $20,061.8 | $19,716.8 | $19,320.0 | $18,837.0 |
| **Expenses:** | | | | | | | | | | | | |
| **COGS** | | | | | | | | | | | | |
| Canadian Crude Price | $48.4 | $45.5 | $42.1 | $41.4 | $40.8 | $40.3 | $40.4 | $40.3 | $40.3 | $40.4 | $41.8 | $42.2 |
| Discount to WCS[2] | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) |
| Rail Car Lease[2] | 545.0 | 545.0 | 545.0 | 545.0 | 545.0 | 545.0 | 545.0 | 545.0 | 545.0 | 545.0 | 545.0 | 545.0 |
| Rail Car Positioning Costs (start)[2] | 2,500.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2,500.0 |
| Transportation Costs (per rail car)[2] | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 | 7,400.0 |
| Excess Mileage (per car)[3] | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 | 82.1 |
| Loading Costs (per bbls)[2] | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| Discharge Costs (per bbls)[2] | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| Other Shipping Fees (per bbls)[2] | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Fuel Bid[2] | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) | (0.5) |
| Cleaning Costs (per rail car)[2] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $4,500.0 |
| Cost of Borrowing | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% |

Notes:
[1]GCAC 009695
[2]GCAC 009644
[3]GCAC 009811

**Gulf Coast Asphalt**
**Canadian Crude Deal #2: Discounted Cash Flow Analysis**
**Schedule C.3**

000975

# Discounted Cash Flows

*$ in thousands*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | $21,631.5 | $21,476.3 | $21,286.5 | $21,096.8 | $20,907.0 | $20,769.0 | $20,579.3 | $20,337.8 | $20,061.8 | $19,716.8 | $19,320.0 | $18,837.0 |
| **COGS** | | | | | | | | | | | | |
| Discounted WCS | 14,974.6 | 13,982.9 | 12,786.1 | 12,569.7 | 12,365.5 | 12,164.7 | 12,200.4 | 12,164.9 | 12,178.9 | 12,226.5 | 12,680.5 | 12,826.8 |
| Rail Car Lease | 327.0 | 327.0 | 327.0 | 327.0 | 327.0 | 327.0 | 327.0 | 327.0 | 327.0 | 327.0 | 327.0 | 327.0 |
| Rail Car Positioning Costs | 750.0 | - | - | - | - | - | - | - | - | - | - | 750.0 |
| Transportation Costs | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 | 4,440.0 |
| Excess Mileage | 49.2 | 49.2 | 49.2 | 49.2 | 49.2 | 49.2 | 49.2 | 49.2 | 49.2 | 49.2 | 49.2 | 49.2 |
| Loading Costs | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 |
| Discharge Costs | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 | 603.8 |
| Other Shipping Fees | 172.5 | 172.5 | 172.5 | 172.5 | 172.5 | 172.5 | 172.5 | 172.5 | 172.5 | 172.5 | 172.5 | 172.5 |
| Fuel Bid | (172.5) | (172.5) | (172.5) | (172.5) | (172.5) | (172.5) | (172.5) | (172.5) | (172.5) | (172.5) | (172.5) | (172.5) |
| Cleaning Costs | - | - | - | - | - | - | - | - | - | - | - | 1,350.0 |
| Financing Costs | 43.5 | 40.1 | 37.7 | 37.2 | 36.8 | 36.4 | 36.5 | 36.4 | 36.4 | 36.5 | 37.4 | 41.9 |
| Total COGS | 21,791.8 | 20,046.7 | 18,847.5 | 18,630.7 | 18,426.0 | 18,224.9 | 18,260.6 | 18,225.0 | 18,239.1 | 18,286.8 | 18,741.7 | 20,992.4 |
| **Gross Profit** | (160.3) | 1,429.6 | 2,439.0 | 2,466.0 | 2,481.0 | 2,544.1 | 2,318.6 | 2,112.7 | 1,822.6 | 1,429.9 | 578.3 | (2,155.4) |
| **Net Profit** | (160.3) | 1,429.6 | 2,439.0 | 2,466.0 | 2,481.0 | 2,544.1 | 2,318.6 | 2,112.7 | 1,822.6 | 1,429.9 | 578.3 | (2,155.4) |
| Discount Period | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.50 | 6.50 | 7.50 | 8.50 | 9.50 | 10.50 | 11.50 |
| Present Value Factor[a] @  15.9% | 0.9939 | 0.9818 | 0.9698 | 0.9580 | 0.9463 | 0.9348 | 0.9234 | 0.9121 | 0.9010 | 0.8900 | 0.8791 | 0.8684 |
| PV Net Profit | ($159.4) | $1,403.5 | $2,365.3 | $2,362.4 | $2,347.7 | $2,378.1 | $2,140.9 | $1,927.0 | $1,642.1 | $1,272.6 | $508.4 | ($1,871.8) |
| Sum of PVs | $16,317.0 | | | | | | | | | | | |

Notes:
[a] Duff and Phelps cost of equity for Crude Petroleum and Natural Gas Industry as of 1/1/2018

**Gulf Coast Asphalt**
**Canadian Crude Deal #2: Discounted Cash Flow Analysis**
**Schedule C.4**

000976

V A L U E

000977

**Summary**

$ in Thousands

*Amount Due Vitol*

| Category | Scenario 1: Vitol Providing Financing | Scenario 2: 50/50 Shared Interest |
|---|---|---|
| GCAC Owes Vitol | $ 14,320.9 | $ 14,320.9 |
| Vitol's Share of Losses | - | (2,926.3) |
| Vitol Owes GCAC (lost future profits) | (19,728.5) | (9,864.3) |
| **Net Due Vitol (GCAC)** | ($ 5,407.6) | $ 1,530.4 |

$ in Thousands

*Amount Due Vitol (without hedging loss)*

| Category | Scenario 1: Vitol Providing Financing | Scenario 2: 50/50 Shared Interest |
|---|---|---|
| GCAC Owes Vitol | $ 7,889.2 | $ 7,889.2 |
| Vitol's Share of Losses | - | 289.6 |
| Vitol Owes GCAC (lost future profits) | (19,728.5) | (9,864.3) |
| **Net Due Vitol (GCAC)** | ($ 11,839.3) | ($ 1,685.4) |

**Gulf Coast Asphalt**
**Summary of Cash Flows**
**Schedule D.4**



# In the District Court of
# Harris County, Texas
# 295th Judicial District

## Gulf Coast Asphalt Company, LLC
## Plaintiff/Counter-Defendant,

## vs.

## Vitol Inc.
## Defendant/Counter-Plaintiff/Third-Party Plaintiff,

## vs.

## Arthur J. Brass and Trifinery, Inc.
## Third-Party Defendants

## REBUTTAL REPORT OF BOB BROXSON

Secretariat Advisors LLC

March 23, 2020

# Table of Contents

I.      Introduction ...........................................................................................................................3

II.     Summary of Opinions.............................................................................................................3

III.    Qualifications ........................................................................................................................3

IV.     Background ...........................................................................................................................4

V.      Rebuttal of Fuller Report ......................................................................................................5

        A.      GCAC Benefited from the Mercuria Transaction................................................5

        B.      Vitol's Cash Flow from Working with GCAC ....................................................6

        C.      GCAC was Aware of and Directed Hedging Activity .........................................7

        D.      Vitol had no Role in Purported Canadian Crude Deals .......................................9

VI.     Conclusion..........................................................................................................................11

## I.    Introduction

1.    My name is John Robert (Bob) Broxson.  I have been retained by Reed Smith LLP ("Counsel") on behalf of Vitol Inc. ("Vitol") to provide my professional expertise and opinions in the referenced case and to respond to the expert report of David N. Fuller dated February 25, 2020 ("Fuller Report").

## II.    Summary of Opinions

2.    I re-affirm the opinions presented in my expert report dated February 21, 2020, and submitted on February 24, 2020 in which I provide the following opinions:

   a.    Vitol and GCAC did not enter a joint marketing agreement.

   b.    Vitol provided GCAC interim financing to purchase product and hedge price risk in relation to GCAC's trade of asphalt and other products. GCAC has failed to repay Vitol in full under the interim financing arrangement.

   c.    GCAC owes no less than $14,793,947 to Vitol in damages related to GCAC's non-payment of funds advanced by Vitol as part of the interim financing arrangement.

3.    Based on my review of the Fuller Report, I have reached the following opinions:

   a.    The deal negotiated with Mercuria Energy Trading, Inc. ("Mercuria") provided terms that have benefited GCAC.

   b.    The Fuller Report substantially agrees with my analysis that under an interim financing arrangement, GCAC owes Vitol approximately $14.8 million.

   c.    GCAC was aware of Vitol's hedging and directed Vitol to place hedges, which resulted in a loss of $6,244,484.

   d.    The purported Canadian Crude Deals discussed in the Fuller Report took place after GCAC and Mercuria entered into a Marketing Agreement, and there is no evidence Vitol had any role in these potential deals.

## III.    Qualifications

4.    I am a Managing Director in the Disputes and Forensic Investigations practice of Secretariat Advisors LLC ("Secretariat").  My business address is Two Allen Center, 1200 Smith Street, 16th Floor, Houston, Texas 77002.

5.    I hold a Master of Business Administration degree from the C.T. Bauer College of Business, University of Houston and a Bachelor of Business Administration in Management degree from Evangel University.

6.    I have been actively involved in the energy industry since 1981, primarily focusing on commodity marketing, trading, and midstream commercial development. My experience

includes knowledge regarding the formation of companies and the development of joint ventures in commodity trading and project development.

7.      Over the course of my career, I have held senior executive positions in the energy industry. I have provided commercial and strategic advice to energy clients.  I have been recognized as an energy industry expert and assisted clients and their counsel in various types of litigation and arbitration matters. I have testified in United States federal courts, state courts, Canadian Provincial Courts as well as arbitration forums.

8.      In addition, I serve as an adjunct professor in the Global Energy Management Master of Business Administration program at the University of Houston, C.T. Bauer College of Business where I teach courses in midstream energy finance.

9.      I have relied on the documents that have been made available to me and that have been produced in this matter. A listing of documents I relied upon is found in Appendix A. This report and all supporting analyses have either been prepared by me or staff working pursuant to my direction and supervision. Secretariat is compensated for my time in this matter at an hourly rate of $650. No part of Secretariat's compensation is dependent on the outcome of this matter.

## IV.   Background

10.     In February of 2016, GCAC entered into a Joint Marketing Agreement ("RIO JMA") with Rio Energy International, Inc. ("Rio"). The purpose of the RIO JMA was to trade asphalt and related products and "share all costs and profits and losses equally."[1] Before the end of the initial term of the RIO JMA, Rio notified GCAC that it wanted out of the agreement. GCAC agreed and started looking for a replacement party.[2]

11.     In early 2017, GCAC through its President Arthur ("A.J.") Brass approached Vitol about a potential business venture with GCAC.

12.     During negotiations, GCAC and/or Mr. Brass proposed forming a new entity. Thus, several drafts of a proposed agreement referenced "NewCo". On July 3, 2017, Mr. Brass registered Hermosa Energy, LLC with the Texas Secretary of State, which GCAC represented to be the "NewCo" entity.

13.     As Vitol and GCAC/NewCo continued negotiating material terms of their proposed agreement, Vitol took over Rio's inventory position as of July 1, 2017 due to pressure from Rio, which wanted to exit the RIO JMA.

14.     In mid-July of 2017, Vitol notified GCAC/Mr. Brass that Vitol would be prohibited from entering a proposed JMA due to an existing contractual agreement involving another Vitol venture in the asphalt business.[3]

---

[1] Rio GCAC JMA (VITOL_00078952)

[2] Deposition of Arthur Brass on June 28, 2018 (Pgs. 62-63)

[3] Deposition of Arthur Brass on June 28, 2018 (Pgs. 33-34) and discussion with Eric Kuo on July 30, 2019

15. Although it was not under any contractual agreement to do so, Vitol offered to provide interim financing to GCAC. Between July 2017 and December 2017, Vitol extended interim financing to GCAC for dozens of transactions, which are discussed below.

16. GCAC made three payments to Vitol totaling $16,634,401 as partial repayment of the interim financing, but GCAC did not repay all amounts owed to Vitol.

17. Effective January 12, 2018, GCAC entered a Marketing Agreement with Mercuria Energy Trading, Inc. ("Mercuria") after several months of negotiations.

18. A Termination and Release Agreement executed by GCAC and Rio reflects that the RIO JMA remained in effect and was not terminated until January 12, 2018.

## V.    Rebuttal of Fuller Report

19. Mr. David N. Fuller, the expert representing GCAC, provides a summary of opinions which contains calculations under two scenarios; Vitol was providing financing, and Vitol and GCAC shared 50/50 interest in the outcome. Under each scenario, Mr. Fuller performs two calculations.

   a. The first calculation is Vitol's cash flow from working with GCAC related to asphalt sales and purchases.

   b. The second calculation is GCAC's alleged future lost profits from forgone opportunities related to Canadian crude oil sales, due to Vitol and GCAC ceasing to work together.

20. Mr. Fuller does not provide any support or evidence to illustrate the calculations he presents. Further, Mr. Fuller provides an unsupported calculation that eliminates Vitol's hedging losses incurred on GCAC's behalf. Mr. Fuller does not provide any support for the calculations he has provided.

### A.    GCAC Benefited from the Mercuria Transaction

21. In this matter, GCAC alleges to have been damaged by Vitol. In his expert report, Mr. Fuller states, "I understand that GCAC was eventually able to engage with a new partner, but at a negotiating disadvantage which lead to less advantageous terms."[4] This opinion is not supported as GCAC has actually benefited as a result of its deal with Mercuria.

22. For example, under the terms of the Marketing Agreement between Mercuria and GCAC ("Mercuria Agreement"), Mercuria absorbs 100% of any losses related to transactions while only retaining a portion of any profits. The Mercuria Agreement states, "Losses for any fiscal year or Stub Year, as the case may be, shall be **fully borne by Mercuria**… (emphasis added)"[5]

---

[4] Expert Report of David N. Fuller dated February 25, 2020; Page 4
[5] GCAC0001-128 (Page 9)

23.     GCAC benefited from the fact Mercuria absorbed 100% of the losses compared to Mr. Fuller's theory that "the parties shared a 50/50 interest in the outcome." Further, GCAC is better off under the Mercuria Agreement than it was under the Joint Marketing Agreement between GCAC and Rio, which would have required the parties to "share all costs and profits and losses equally."

24.     It is my understanding that due to variations in market conditions, the trades under the Mercuria Agreement have resulted in net losses. In the following excerpt from his deposition, Mr. Brian Falik, Chief Investment Officer at Mercuria, verifies this point:[6]

> Q: Generally how would you describe how the GCAC and Mercuria Marketing Agreement is performing today?
>
> A: Terribly.
>
> Q: Why do you say that?
>
> A: We lost money.
>
> Q: And do you know how much?
>
> A: It fluctuates daily with market (sic) to market.
>
> Q: And could you give an approximation over the life of the deal as to how much money Mercuria lost?
>
> A: I would say it's between three and nine million dollars, but I don't have a specific number.

25.     Additionally, GCAC received guaranteed income as a result of entering into the Mercuria Agreement. In conjunction with the Mercuria Agreement, GCAC entered into a Consulting Agreement with POTAC, LLC dated January 12, 2018, which provides $500,000 per year to GCAC through January 31, 2021.[7] This is different than any proposed agreement that was being negotiated with Vitol.

## B.     Vitol's Cash Flow from Working with GCAC

26.     In his report, Mr. Fuller agrees with my conclusion that under the financing agreement, GCAC owes Vitol an amount in excess of $14 million. As I discussed in my earlier report, GCAC has caused Vitol damages of at least $14,793,947. These damages include costs incurred by Vitol on behalf of GCAC as part of the interim financing agreement, plus a TVM (interest) amount.

---

[6] Deposition of Mr. Brian Falik on December 17, 2019 Page 32-33
[7] METI0000563-574

| Summary of Vitol's Damages | |
|---|---|
| **Particulars** | **Amount ($)** |
| Product Costs | 3,769,093 |
| Storage Related Costs | 2,632,253 |
| Deal Related Costs | 1,339,629 |
| Hedging | 6,244,480 |
| Interest | 351,012 |
| Credit Risk | 200,890 |
| Freight Titanio Delivery Deal #3 | 256,590 |
| **Total** | **14,793,947** |

27.   Mr. Fuller calculates the amount owed to Vitol by GCAC under a financing arrangement to be $14,320,900, which is $473,047 less than the damages I have calculated. A large portion of this difference is a result of Mr. Fuller not including amounts for Credit Risk or the Freight Titanio Delivery Deal #3. Mr. Fuller did not provide an explanation for why he excluded these costs, nor why the figures he used are different than those presented in my original report.

| Summary of Differences | | | |
|---|---|---|---|
| | **Broxson** | **Fuller** | |
| **Particulars** | **Amount ($)** | **Amount ($)*** | **Difference ($)** |
| Product Costs | 3,769,093 | 3,742,900 | 26,193 |
| Storage Related Costs | 2,632,253 | 2,632,300 | (47) |
| Deal Related Costs | 1,339,629 | 1,193,400 | 146,229 |
| Hedging | 6,244,480 | 6,431,700 | (187,220) |
| Interest | 351,012 | 320,700 | 30,312 |
| Credit Risk | 200,890 | - | 200,890 |
| Freight Titanio delivery Deal #3 | 256,590 | - | 256,590 |
| **Total** | **14,793,947** | **14,321,000** | **472,947** |

\* Fuller Report Schedule B.1

## C.   GCAC was Aware of and Directed Hedging Activity

28.   What is a hedge? "A hedge involves establishing a position in the futures or options market [financial instrument] that is equal and opposite to a position at risk in the physical market. For instance, a crude oil producer who holds (is "long") 1,000 barrels of crude can hedge by selling (going "short") one crude oil futures contract [financial instrument]."[8] This definition contemplates that if there is a loss on the physical commodity (i.e. a reduction or increase in the price of the underlying commodity), the financial instrument typically offsets this loss.

---

[8] www.kisfutures.com › GuideEnergyHedging_NYMEX

29.    In his summary of opinions, Mr. Fuller presents calculations for Vitol's cash flow from working with GCAC ranging from ($11.3) million to ($14.3) million depending on whether the trier of fact finds Vitol was providing financing or if Vitol had a 50% interest. Neither of these opinions excludes the losses from hedging activities.

30.    Later in his report, Mr. Fuller presents a separate calculation for Vitol's cash flow from working with GCAC that does not include hedging losses. While he does not provide an opinion on why removing the hedging losses is appropriate, he states, "it's my understanding that Vitol has not provided documentation regarding the hedge strategy or documents demonstrating that the listed transactions were in fact related to the Venture."[9] Mr. Fuller does not provide a single example of a hedge that was placed that was not directed by GCAC. Nor does Mr. Fuller provide any evidence or examples of any hedges that were disputed by GCAC, despite having awareness of hedges taking place.

31.    Moreover, Mr. Fuller ignores the numerous confirmation texts and communications from GCAC to Vitol directing hedging activity subsequent to GCAC's physical asphalt trades. Appendix D to my expert report dated February 21, 2020 details numerous examples of GCAC communications to Vitol to place hedges and subsequent confirmations from Vitol to GCAC detailing the hedges that were placed. This clearly illustrates GCAC was directing Vitol on when to place hedges and that they understood that hedging activity was being performed at GCAC's direction.

32.    While Mr. Fuller references a "hedging strategy," employed by Vitol, he provides no evidence in which GCAC questions any of the financial transactions Vitol used to hedge the physical sales and purchases of asphalt made by GCAC. There is also no evidence presented indicating GCAC did anything but send along its physical trade information with the expectation Vitol would execute financial trades to hedge the physical transaction executed by GCAC.

33.    Moreover, the hedges Vitol placed were consistent with industry practice. As I discussed in my earlier report, it is common in the energy industry to hedge in order to guard against volatility. It is my experience that energy traders balance their book by the end of each day, meaning they do not typically leave open positions for any period of time (i.e. unhedged trades).

34.    Typically, when there is a gain on physical sales, there will be a corresponding loss on the hedge. Patrick Perugini, GCAC's former head trader, agrees:[10]

---

[9] Expert Report of David N. Fuller dated February 25, 2020; Page 7
[10] Deposition of Patrick Perugini on June 29, 2018; Page 26

Q: If you're up -- is it true that if you're up on your physical trades you're going to be losing money, generally speaking, on your hedges?

A: It's not always the case but –

Q: Typically?

A: Yes.

35.     Further, it is the customary and normal practice in the industry to hedge physical asphalt transactions using the same methodologies employed by Vitol and GCAC here. Mr. Fuller provides no alternative to what he believes a proper hedging strategy should have been.

## D.   Vitol had no Role in Purported Canadian Crude Deals

36.     Mr. Fuller presents a calculation of damages for lost profits related to potential Canadian Crude Deals ("Potential Canadian ARB Concept"). Mr. Fuller states that he "calculated the future lost profits from the Canadian ARB Deals that GCAC could have pursued, but was unable to enter due to Vitol's refusal to work with CGAC."[11] Mr. Fuller provides no basis for this claim and does not provide a single piece of evidence Vitol in any way hindered GCAC's ability to pursue these concepts.

37.     The first correspondence regarding a Potential Canadian ARB Concept occurred on August 12, 2017[12], one month after Vitol informed GCAC they would not be able to move forward with a Joint Marketing Agreement. At the same time, GCAC was already negotiating with Mercuria about their potential relationship, discussing terminating their relationship with Vitol and pitching the concept of Canadian ARB to Mercuria.

38.     In a memo dated August 13, 2017 GCAC states, "Mgmt believes there may be a short window of opportunity to terminate its current relationship with Vitol in order to engage in a long-term strategic relationship with Mercuria."[13] This memo also lists "Canadian crude by rail" as one of several different "Other Growth Opportunities."

39.     On November 11, 2017, Michael Myhra with Mercuria emailed Arthur Brass to learn more about Potential Canadian ARB Concepts.[14] While Vitol was included on some correspondence regarding a Potential Canadian ARB Concept, the last communication in which Vitol was included on was January 31, 2018.[15]

40.     Mr. Fuller identifies two separate Potential Canadian ARB Concepts but has provided no evidence that these two separate Potential Canadian ARB Concepts are not simply continued negotiations of the same potential business development concept. Discussions between Mercuria and GCAC regarding the Potential Canadian ARB Concept began on August 12, 2017[16] and extended through at least October 18, 2018[17], and to my knowledge

---

[11] Expert Report of David N. Fuller dated February 25, 2020; Pages 4-5
[12] GCAC009530
[13] GCAC009533
[14] GCAC009557
[15] GCAC009597
[16] GCAC009530
[17] GCAC009839

no deal was ever executed. Further, Mr. Fuller has provided no evidence Vitol played any role in GCAC's and Mercuria's inability to get a deal negotiated. In fact, the documents he relies upon reference issues with other parties, not Vitol, as large contributing factors:

    a.    In an email dated January 9, 2018, Patrick Perugini (GCAC) wrote to Eric Kuo (Vitol), "If and when we ever get quotes from the railroads, this is where I think it is."[18]

    b.    In an email dated January 17, 2018, Patrick Perugini (GCAC) wrote to Bruce Greenbank (Vitol) and Erik Kuo (Vitol), "We are waiting on the railroads."[19]

    c.    In an email dated April 13, 2018, Daniel House (Mercuria) wrote to Patrick Perugini (GCAC) and Timothy Holan (Mercuria), "This is not a priority for Citgo. They have not shown any interest in terming this up."[20]

41.    The first purported opportunity Mr. Fuller identifies cites an email dated February 23, 2018 to describe the details of the potential transaction.[21] This email is from GCAC to Mercuria and begins, "Constantly getting new info on rates[sic] Updated numbers, railroads are more greedy than expected." The tone of this update indicates the details of a potential transaction were still evolving and there was no deal in place to be executed. It is also important to note there are multiple references in this update to "Mercuria/GCAC" and not a single mention of Vitol.

42.    Mr. Fuller's analysis for this purported opportunity uses the proposed terms as if they were final and ready to be executed. This is not supported by the evidence. Mr. Fuller states the potential transaction "would involve leasing 400 rail cars at $700.0 per car."[22] However, the document he is relying on[23] specifies "roughly 400 cars" at an expected rate of "$600-800." Mr. Fuller is making assumptions in his analysis without providing any support for using that quantity and rate in his calculation. Additionally, this document lists potential next steps including setting up a meeting to "discuss rates." It is clear the terms Mr. Fuller is relying on for this calculation were not final and required further negotiations.

43.    A second purported opportunity Mr. Fuller identifies (assuming it is not a continuation of the first opportunity) is based on an email chain between Mercuria and CIT, a rail lessor, dated between May 30, 2018 and June 1, 2018.[24] Negotiations for this potential opportunity occurred several months after GCAC entered into its Mercuria Transaction, and once again there is no mention of Vitol. This email also indicates Mercuria was actively involved in this potential opportunity, but the issues it was facing with CIT were putting the "deal in jeopardy."

---

[18] GCAC009574
[19] GCAC009576
[20] GCAC009604
[21] GCAC009600
[22] Expert Report of David N. Fuller dated February 25, 2020; Page 9
[23] GCAC009600
[24] GCAC009695

44.    As with the first purported opportunity he describes, the evidence referenced by Mr. Fuller does not support the details of his analysis. Mr. Fuller states, "the second deal would involve leasing 600 rail cars at $545.0 per car."[25] However, the document he relies on[26] states, "CIT has pulled their offer back." The document further states, "the offer has changed from 814 railcars at $545/18 months to 300 railcars at $695/36 months." Further correspondence regarding the "Rail deal" in July 2018 indicates that potentially only 110 railcars were available.[27] Once again, it is clear the terms cited by Mr. Fuller were not final, nor ready to be executed, and negotiations were still ongoing.

45.    Mr. Fuller makes no reference to how such Potential Canadian ARB Concepts are related to the GCAC's primary business – asphalt trading. Further, Mr. Fuller makes no reference nor provides any factual support as to why Vitol should be obligated to participate or provide financing for a potential business development concept without the mutual agreement of both parties.

46.    In my experience, it is common where marketing agreements exist for parties to have mutual agreement before a product is purchased or sold. For example the Rio JMA states, "Upon the **prior mutual agreement** of the parties as to quantity, specifications, price and frequency of purchase, Rio will use its commercially reasonable efforts to purchase Products for delivery to the Terminals, and arrange, as necessary, for the blending of the Products. (emphasis added)"

47.    Similarly, it is common under financing agreements, such as the one between Vitol and GCAC, for parties to require mutual agreement with regard to alternative activities that could be financed. For example, the interim financing structure Arthur Brass emailed to Vitol contained the following language for "GCAC/Non-Asphalt Products", "Vitol and GCAC JV other deals as **per mutual agreement**. (emphasis added)"

48.    The potential opportunities referenced in Mr. Fuller's report would have required the mutual agreement of the parties. Mr. Fuller did not identify any evidence Vitol agreed to participate in these potential concepts or was obligated to do so. In addition, Vitol was never presented with any Potential Canadian ARB Concept that was fully negotiated and ready for execution.

## VI.   Conclusion

49.    These facts support the contention that there are no damages suffered by GCAC. Rather, Vitol is the only party damaged.

50.    The hedging activity performed by Vitol was at the direction of GCAC and represents common hedging practices for asphalt trading.

---

[25] Expert Report of David N. Fuller dated February 25, 2020; Page 9
[26] GCAC009695
[27] GCAC009793

51.     GCAC did not enter into a joint marketing agreement with Vitol. Instead, Vitol provided GCAC interim financing for product purchases and to hedge price risk. GCAC has damaged Vitol by not paying the entirety of what is owed.

52.     GCAC has not been damaged by Vitol. GCAC benefitted from the Marketing Agreement with Mercuria. Vitol had no role in the Potential Canadian ARB Concept. The discussion for these potential business development concepts extended through at least October 2018 and no terms were ever finalized with Vitol, or to my knowledge, any other party.

53.     My conclusions and opinions are based on my industry experience and knowledge of the subject matter and the information and documents made available to me in this matter to date.

54.     To the extent additional documents and information are made available and I am asked to review them, I reserve the right to amend my opinions and this report accordingly.

Bob Broxson
March 23, 2020

APPENDIX A

**Bob Broxson Documents Relied Upon**

## Legal Documents

Gulf Coast Asphalt Company, LLC's original petition against Vitol, Inc. dated May 10, 2018.

Gulf Coast Asphalt Company, LLC's plea in abatement and original answer in response to Vitol, Inc.'s original petition dated June 08, 2018

Defendant Arthur J. Brass's plea in abatement and original answer in response to Vitol, Inc.'s original petition dated June 11, 2018

Defendant Vitol, Inc.'s original answer in response to the original petition filed by Plaintiff Gulf Coast Asphalt Company, LLC dated June 18, 2018

Plaintiff Gulf Coast Asphalt Company, LLC's first amended petition against Vitol, Inc. dated November 15, 2018

Defendant and Counterclaimant Vitol, Inc.'s notice of non-suit without prejudice dated January 4, 2019

Defendant and Counterclaimant Vitol, Inc.'s first amended answer and counterclaims in response to the first amended petition by Gulf Coast Asphalt Company, LLC dated January 17, 2019

Gulf Coast Asphalt Company, LLC's second amended petition against Vitol, Inc. dated February 21, 2019

Vitol, Inc.'s second amended counterclaims and third-party petition against Gulf Coast Asphalt Company, LLC and third party Defendants dated September 12, 2019

## Depositions and Exhibits

Arthur Brass

    Arthur Brass amended deposition notice dated June 17, 2019

    Transcript of the Testimony of Arthur Brass dated June 28, 2018

    Exhibit No. 1 to 10, Arthur Brass deposition

    Reporter certification to the oral and videotaped deposition of Arthur J. Brass dated June 28, 2018

Brain Falik

    Deposition transcript of Brain Falik dated December 17, 2019

    Exhibit No. 30 to 47, Brain Falik deposition

APPENDIX A

Jason Goldstein

    Transcript of oral and videotaped deposition of Jason Goldstein dated May 16, 2019

    Exhibit No. 18 to 29, Jason Goldstein deposition

Patrick Perugini

    Transcript of uthe testimony of Patrick Perugini dated June 29, 2018

    Exhibit No. 11 to 17, Patrick Perugini deposition

    Reporter's Certificate on oral videotaped deposition of Patrick Pergugini dated June 29, 2018

## Expert Reports and Exhibits

Expert Report of David N. Fuller dated February 25, 2020 and Exhibits

## Bates Numbered Documents

GCAC0001

GCAC000761-775

GCAC000870-888

GCAC001068-1069

GCAC004445

GCAC004631-632

GCAC004666

GCAC004694-695

GCAC005167-168

GCAC005427-428

GCAC005439-444

GCAC005591-593

GCAC005781-783

GCAC006107

GCAC006121-122

GCAC006224-227

GCAC006719

GCAC007009-41

APPENDIX A

GCAC007237-243

GCAC009521-842

METI0000001

METI0000014

METI0000072

METI0000081-90

METI0000092-304

METI0000383

METI0000384

METI0000396

METI0000402

METI0000436

METI0000470

METI0000543-574

METI0001021-1167

METI0001495-1500

METI0001536-538

METI0001572-573

METI0001820-828

Rio-GCAC Joint Marketing Agreement - Vitol_00078949 - 962

VITOL_00000194

VITOL_00000209

VITOL_00000304

VITOL_00000791

VITOL_00000794

VITOL_00000801

VITOL_00000808

VITOL_00000819

VITOL_00000821-827

VITOL_00001083-085

VITOL_00001846-854

APPENDIX A

VITOL_00001859

VITOL_00002127-130

VITOL_00002315-316

VITOL_00002333

VITOL_00002373-375

VITOL_00003198-199

VITOL_00004228-231

VITOL_00004612

VITOL_00004740

VITOL_00004918-930

VITOL_00006463

VITOL_00007596

VITOL_00007640

VITOL_00009088-090

VITOL_00009172

VITOL_00009177

VITOL_00009562

VITOL_00009572-588

VITOL_00010851-898

VITOL_00012352

VITOL_00074288

VITOL_00074368-369

VITOL_00074833-836

VITOL_00075544-547

VITOL_00076335-339

VITOL_00076792

VITOL_00078117

VITOL_00078124

VITOL_00078124

VITOL_00080066

VITOL_00081436-465

VITOL_00083883-4997

**Other**

Public Company Filings

Hermosa Energy, LLC – Documents filing history

Hermosa Energy, LLC – Certificate of formation of Limited Liability Company

Hermosa Energy, LLC – Tax account status as of January 11, 2019

Articles, Publications and Text Books

Energy Risk: Valuing and Managing Energy Derivatives, second edition authored by Dragana Pilovic

A Guide to Energy Hedging published by New York Mercantile Exchange.

Oil Traders Move into Bitumen Market authored by Rakesh Upadhyay,  dated July 19, 2016.

## SECOND CONFIDENTIAL SETTLEMENT AGREEMENT
## AND MUTUAL GLOBAL RELEASE

This Second Confidential Settlement Agreement and Mutual Global Release ("Agreement") is entered into by and among Gulf Coast Asphalt Company, LLC ("GCAC"), Arthur J. Brass ("Brass"), and Trifinery, Inc. ("Trifinery"; collectively, the "Brass Parties"), jointly and severally, on one hand, and Vitol Inc. ("Vitol"), on the other hand. Collectively, the Brass Parties and Vitol will be referred to as the "Parties" and each individually as a "Party."

### Definitions

The Parties agree to these definitions:

1. The **"Brass Released Parties"** means GCAC, Brass, and Trifinery and each of their current and past directors, officers, shareholders, managers, owners, committee members, attorneys, employees, insurers, accountants, reinsurers, agents, trusts, trustees, brokers, legal representatives, administrators, successors, heirs, beneficiaries, executors, affiliated entities, and assigns.

2. The **"Vitol Released Parties"** means Vitol and its current and past directors, officers, shareholders, managers, owners, committee members, attorneys, employees, insurers, accountants, reinsurers, agents, trusts, trustees, brokers, legal representatives, administrators, successors, heirs, beneficiaries, executors, affiliated entities (including without limitation, VALT), and assigns.

3. The **"Lawsuit"** means Cause No. 2018-31578, *Gulf Coast Asphalt Company, LLC v. Vitol Inc., v. Arthur J. Brass and Trifinery, Inc.* in the 295th Judicial District Court of Harris County, Texas.

4. **"Vitol's Released Claims"** means any claim or causes of action against the Brass Released Parties for damages (including but not limited to actual damages, compensatory damages, statutory damages, or punitive damages), attorneys' fees, pre- or post-judgment interest, court costs, or any other equitable or common-law relief, that arise out of, relate to or are based on the transactions and allegations in the Lawsuit. Vitol's Released Claims specifically include, but are not limited to, claims or causes of action whether known or unknown, fixed or contingent, liquidated or unliquidated, and whether asserted or unasserted that Vitol has or could have asserted in the Lawsuit or that may accrue in the future. Vitol's Released Claims also specifically include, but are not limited to, the following: any claims under Chapter 24 of the Texas Business and Commerce Code, as well as any other federal, state or local statutes, laws or ordinances; any tort claims (including but not limited to claims for negligence, fraud, defamation, and intentional or negligent misrepresentation) (except related to this Agreement); and any claims for breach of contract (except for breach of this Agreement), quasi-contract, or breach of express or implied duties of good faith and fair dealing.

5. **"Brass Parties' Released Claims"** means any claim or causes of action against the Vitol Released Parties for damages (including but not limited to actual damages, compensatory damages, statutory damages, or punitive damages), attorneys' fees, pre- or post-judgment interests, court costs, or any other equitable or common-law relief, that arise out of, relate to or are based on the transactions and allegations in the Lawsuit. Brass Parties' Released Claims specifically include, but are not limited to, claims or causes of action whether known or unknown, fixed or contingent, liquidated or unliquidated, and whether asserted or unasserted that the Brass Parties have or could have asserted in this Lawsuit or that may accrue in the future. Brass Parties' Released Claims also specifically include but are not limited to the following: breach of contract, negligent misrepresentations, as well as any other federal, state or local statutes, laws or ordinances; any tort claims (including, but not limited to, claims for negligence, fraud, defamation, and intentional or negligent misrepresentation) (except related to this Agreement); and any other claims for breach of contract (except for breach of this Agreement), quasi-contract, or breach of express or implied duties of good faith and fair dealing.

## Settlement, Release, and Agreed Final Judgment

In consideration of the mutual promises and covenants herein, the Parties agree as follows:

1. The Parties desire to settle all claims asserted in the Lawsuit, and any claims that could have been asserted arising out of the transactions and related events forming the basis of the claims asserted in the Lawsuit solely to avoid the expense of further investigation or litigation.

2. The Brass Parties recognize and accept that they jointly and severally owe Vitol $10,000,000 related to claims asserted by Vitol against the Brass Parties in the Lawsuit, and the Brass Parties agree to the entry of the Agreed Final Judgment attached as **Exhibit A**, subject only to paragraph 5, below. The Brass Parties agree that the Agreed Final Judgment is not appealable and waive any right to appeal.

3. In consideration for this Agreement, the Brass Parties hereby release, hold harmless, and forever discharge the Vitol Released Parties from Brass Parties' Released Claims.

4. In consideration of the Agreed Final Judgment and the right to file, enforce, execute, and collect payment on the Agreed Final Judgment until the Agreed Final Judgment is fully satisfied, Vitol hereby releases, holds harmless, and forever discharges the Brass Released Parties from Vitol's Released Claims. Nothing in this Agreement will be construed as a release or waiver of Vitol's absolute rights to enforce, execute or collect on the Agreed Final Judgment until the Agreed Final Judgment is fully satisfied, subject only to the limitation in paragraph 5, below.

5. Vitol will not file the Agreed Final Judgment until after 11:59pm on November 17, 2020.

6. On or after November 18, 2020, Vitol may, in its sole and absolute discretion, file the Agreed Final Judgment and pursue execution, enforcement and collection of the

Agreement Final Judgment. Any delay by Vitol in filing, executing, enforcing or collecting on the Agreed Final Judgment will not be deemed to be a waiver of Vitol's rights to file, enforce, and collect on the Agreed Final Judgment. Provided, however, that upon full satisfaction of the Agreed Final Judgment (i.e., the payment of $10 million and any accrued post-judgment interest to Vitol by the Brass Parties) Vitol's right to file, execute, enforce and collect on the Agreed Final Judgment shall expire.

7. This Agreement supersedes (i) the Rule 11 Agreement dated September 15, 2020 and, (ii) Confidential Settlement Agreement and Mutual Global Release dated October 15, 2020 (including the agreed order attached thereto) ((i) and (ii) collectively the "Prior Settlement Agreements"). The Prior Settlement Agreements are void, unenforceable, and of no force and effect.

<div align="center"><u>**Miscellaneous Provisions**</u></div>

1. **Entire Agreement; No Other Representations.** This Agreement contains the entire agreement between the Parties with respect to the matters hereto, and supersedes any prior or contemporaneous communications, agreements, commitments, obligations, understanding, or representations between the Parties with respect to such matters. Except as provided in this Agreement, the Parties have made no representations related to this Agreement. In entering into this Agreement, no Party has relied on any representations other than those contained in this Agreement.

2. **Authority.** The signatories to this Agreement below each represent and warrant that he or she is, on the date he or she signs this Agreement, duly authorized by all necessary and appropriate action to execute this Agreement on behalf of such Party and does so with full legal authority.

3. **Opportunity to Consult with Counsel.** The Parties have fully informed themselves of this Agreement's terms and conditions. The Parties have signed this Agreement after having been afforded the opportunity to consult with counsel of their choosing.

4. **Amendment.** This Agreement may be amended only by an instrument in writing that is signed by all Parties.

5. **Multiple Counterparts and Electronic Signature.** The Parties may execute this Agreement in multiple counterparts, including by electronic signature or scanned signature. Each copy will be deemed an original, but all copies together will constitute one and the same instrument.

6. **Choice of Law and Mandatory Venue.** The laws of the State of Texas govern all matters arising out of or relating to this Agreement, including its validity, interpretation, construction, performance, and enforcement, without giving effect to any conflict of law rules applicable in the State of Texas. The Parties agree that any lawsuit regarding or arising out of this Agreement or the claims released herein must be filed in, and the Parties consent to, Houston, Harris County, Texas as the exclusive venue. No other forum is permissible.

7. **Confidentiality.** The Parties shall not disclose to anyone, or provide anyone access to, any term or condition of this Agreement. The Parties acknowledge that the terms and conditions of this Agreement are sensitive and confidential, and must be held in the strictest confidence.

EXECUTED in multiple originals as of the 5th day of November, 2020 ("Effective Date").


Arthur J. Brass, individually


TRIFINERY, INC.


Arthur J. Brass, Owner


GULF COAST ASPHALT COMPANY, LLC


Arthur J. Brass, President


VITOL INC.

By: _____

_____Ben Marshall_____ NAME

_____CEO_____ TITLE

# Exhibit A

000999

CAUSE NO. 2018-31578

| | |
|---|---|
| GULF COAST ASPHALT COMPANY, LLC<br>            *Plaintiff* | IN THE DISTRICT COURT OF |
| *v.* | |
| VITOL INC.,<br>            *Defendant* | HARRIS COUNTY, TEXAS |
| *v.* | |
| ARTHUR J. BRASS AND TRIFINERY INC.,<br><br>        *Third-party Defendants* | 295TH JUDICIAL DISTRICT |

## AGREED FINAL JUDGMENT

On the date below, came to be heard this Agreed Final Judgment in the above-styled and numbered cause. The full names of the parties are Gulf Coast Asphalt Company, LLC ("GCAC"), Arthur J. Brass ("Brass"), Trifinery, Inc. ("Trifinery") (collectively the "Brass Parties"), and Vitol Inc. ("Vitol").

The Court has been informed that all matters have been resolved between and among the parties and that the parties have agreed that a final judgment, as set forth herein, should be entered disposing of all issues in this case. The Court, after reviewing all pleadings and materials before this Court, is of the opinion that this Agreed Final Judgment should be entered.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that a judgment be entered for Vitol against the Brass Parties, who are jointly and severally liable to Vitol, in the amount of $10,000,000 (ten million dollars and 00/100).

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that all writs and process for the enforcement and collection of this judgment may issue as necessary and that the

001000

Officer, including deputies, charged with obeying the command of any such writ or process may do so by any reasonable means necessary to accomplish such task.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Vitol is entitled to post-judgment interest on said judgment to be computed at the rate of 5% per annum on the amount of the judgment, said interest to accrue as allowed by law from the date this judgment is signed until this judgment is satisfied.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Brass Parties shall bear the parties' court costs.

This is a final judgment, and disposes of all claims, requests for relief, and all parties. All relief not expressly granted in the final judgment is denied.

The Court retains jurisdiction to enforce this Agreed Final Judgment.

SIGNED this _____ day of _____, 2020.

_____
JUDGE PRESIDING

AGREED AS TO FORM, SUBSTANCE, AND ENTRY:

William P. Maines
Neil E. Giles
HALL MAINES LUGRIN, P.C.
Williams Tower, 64th Floor
2800 Post Oak Blvd.
Houston, Texas  77056-6125
wmaines@hallmaineslugrin.com
ngiles@hallmaineslugrin.com
ATTORNEYS FOR PLAINTIFF AND
COUNTER-DEFENDANT
GULF COAST ASPHALT COMPANY, LLC

AGREED AS TO FORM, SUBSTANCE, AND ENTRY:

Adam P. Schiffer
Schiffer Hicks Johnson, PLLC
700 Louisiana, Suite 2650
Houston, Texas  77002
aschiffer@shjlawfirm.com
adinnell@shjlawfirm.com
ATTORNEYS FOR THIRD-PARTY DEFENDANTS
ARTHUR J. BRASS AND TRIFINERY INC.

AGREED AS TO FORM, SUBSTANCE, AND ENTRY:

Kenneth E. Broughton
State Bar No. 03087250
Michael H. Bernick
State Bar No. 24078227
Reed Smith LLP
811 Main Street, Suite 1700
Houston, Texas  77002-6110
Telephone: 713.469.3800
Telecopier: 713.469.3899

kbroughton@reedsmith.com
mbernick@reedsmith.com
ATTORNEYS FOR DEFENDANT, COUNTER-PLAINTIFF,
AND THIRD-PARTY PLAINTIFF VITOL INC.

001003

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

## FIRST AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBTS

Vitol Inc. (the "**Vitol**" or "**Plaintiff**") files this amended adversary complaint against Arthur Jacob Brass ("**Brass**" or "**Debtor**") and, in support thereof, would respectfully show this Court as follows:

## I.  JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).

2.     This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter final judgment on the merits of this case.

3.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409 based on the pendency of the above-captioned bankruptcy case in this Court.

## II.  PARTIES

4.     Plaintiff Vitol Inc. is a Delaware corporation with its principal place of business at 2925 Richmond Avenue, Houston, Texas 77098. Plaintiff may be contacted through its undersigned counsel.

5.      Defendant is the individual Debtor in the above-referenced chapter 7 case. The Debtor was served with summons and a copy of the Original Complaint on July 13, 2021.

### III.   FACTUAL ALLEGATIONS

6.      Vitol is an energy and commodities company that ships and trades crude oil and other related products. Gulf Coast Asphalt Company ("**GCAC**") marketed and traded asphalt and other related products for sale to third parties. The Debtor is the President of GCAC and owns 50% of GCAC through his entity Trifinery, Inc. ("**Trifinery**"); GCAC's other owner is the Debtor's mother Joyce Brass. GCAC and Trifinery shared a principal place of business in Houston, Texas. Brass maintained complete corporate and financial control over GCAC and often conducted GCAC business through his personal email address: aj@abrass.com.

7.      In 2017, Vitol and Brass entered discussions about entering into a profit-sharing joint marketing agreement to buy and sell asphalt between Vitol and a to-be-created entity. Although the joint venture ultimately did not materialize, Vitol separately agreed to finance GCAC's operations, including the purchase and storage of asphalt, on an interim basis while Brass looked for another counterparty interested in a joint marketing agreement with GCAC. Brass represented that he would remit to Vitol the proceeds of the sale of asphalt and other goods purchased with Vitol's money. Brass did not honor this obligation. On information and belief, Brass never intended to honor this obligation as evidenced by his actions in the transfer the funds of the sale of asphalt and other items to places other than Vitol.

8.      Vitol entered into this interim agreement because of representations made by Brass. Brass made oral representations that he would sell asphalt and other commodities purchased by Vitol and that he would return the funds from the sale of these commodities to Vitol. In August 2017, Brass sent Vitol an outline of the terms of this financing agreement wherein Brass represented that Vitol's funds would be used for the limited purpose of bridge financing and

hedging services and Brass committed to repay the amounts Vitol loaned with interest. The financing agreement was not a profit sharing agreement. Vitol also provided GCAC with other funds necessary for its operations, including freight, demurrage, inspections, storage, hedging, and other related costs. Brass, acting through GCAC, agreed to and accepted these benefits while committing to repay Vitol with interest for the funds received. Vitol relied on Brass's representations that GCAC would pay for all expenses incurred by Vitol when Vitol decided to extend GCAC funds for its operations.

9.     Unbeknownst to Vitol, GCAC was insolvent during the pendency of the interim agreement. The financing from Vitol was GCAC's only source of working capital and its trading facilitated by Vitol was GCAC's only line of business. In fact, on June 30, 2017—only days before Vitol and GCAC first began working together under the interim financing agreement—GCAC's debts and liabilities were nearly double its assets.

10.     Brass never intended to make GCAC perform its obligations under the interim agreement. After inducing Vitol into a business relationship with promises to fully reimburse Vitol for its services, Brass and GCAC refused to pay amounts justly due to Vitol. After the parties wound up the interim financing arrangement, GCAC and Brass owed Vitol at least $14,793,947 for the funds and services Vitol extended. During this interim financing arrangement, GCAC received funds from third parties for the sale of the asphalt that Vitol purchased; instead of using this money to repay Vitol as agreed between the parties, Brass and other members of GCAC used these proceeds for personal purchases.

11.     Brass siphoned funds Vitol provided to GCAC for his personal use and treated GCAC as his personal bank account. Brass alone had complete authority over GCAC's finances since at least 2017. This complete authority included the ability to take out money from GCAC as

an undocumented loan with impunity and regardless of GCAC's financial situation. During the course of the interim financing arrangement with Vitol, Brass caused GCAC to transfer to both himself and his mother millions of dollars in undocumented and evergreen loans. But these transfers were loans in name only; GCAC did not have any written agreements for these loans to Brass and his mother and there were no recorded repayment terms, due dates, or interest rates. Brass used this money to pay his home mortgage and his credit card, among other personal expenses. Brass also directed GCAC to directly pay hundreds of thousands of dollars to the contractor building Brass's multi-million dollar vacation home, among other Brass personal expenses supported by GCAC. At the time, GCAC did not have sufficient wherewithal to repay Vitol, but Brass took the money for himself and his family with no regard for the representations he made to Vitol and GCAC's obligations under the agreement.

12.     In May 2018, GCAC sued Vitol. Vitol then counter-sued GCAC, Trifinery, and Brass and asserted claims of, among others, fraud, conversion, alter ego, and fraudulent transfers to recover the at least $14,793,947 that had not been repaid to Vitol.

13.     The parties reached an initial settlement in September 2020, which required Brass, GCAC, and Trifinery to pay Vitol $8 million over the course of two payments. Brass, GCAC, and Trifinery, however, never intended to perform under the initial settlement agreement. In fact, Brass, GCAC, and Trifinery breached the initial settlement agreement by not making the first $1.5 million payment due to Vitol by October 15, 2020, which resulted in a failure of consideration. Brass claimed that the payment was delayed by some issue with the bank wire and promised to pay the following day. The money, however, never arrived. The settlement was undone by Brass's failure to perform, and the parties proceeded toward trial.

14.     On the eve of the reset trial, the parties reached a new settlement agreement and Brass, GCAC, and Trifinery accepted joint and several liability through an agreed judgment. On November 20, 2020 (the "**Judgment Date**"), the 295th Judicial District Court of Harris County, Texas entered an Agreed Final Judgment (the "**Judgment**") in Cause No. 2018-31578 in favor of Vitol against Brass, GCAC, and Trifinery. A true and correct copy of that Judgment is attached hereto as **Exhibit A-1** and is fully incorporated herein by reference. The Judgment awarded damages to Vitol in the amount of $10,000,000 jointly and severally against Brass, GCAC, and Trifinery and authorized post-judgment interest at 5% per annum from the Judgment Date until the award is satisfied. Neither Brass nor GCAC nor Trifinery satisfied the Judgment. The entire Judgment remains due and owing to Vitol along with post-judgment interest.

15.     Unfortunately, Brass again induced Vitol to settle the lawsuit without any intention of performing his obligations. The pre-settlement representations Brass made to Vitol regarding the accessibility of funds available to satisfy the judgment evidence that Brass never intended to perform his obligations. Specifically, Brass represented to Vitol that he had a $1.5 million dollar certificate of deposit, which he could use to pay part of the Judgment. In actuality, Brass had already pledged the entire certificate of deposit as security for a maxed out line of credit. Vitol discovered Brass's misrepresentations in post-judgment discovery when Vitol served a writ of garnishment on the bank holding the certificate. Brass also did not disclose the extensive other debts he had when he represented to Vitol that he was able to satisfy the Judgment.

16.     Vitol undertook extensive efforts to collect on the Judgment, but Brass refused to pay anything on the Judgment or to communicate, provide requested documents, or appear for deposition.

17.     For example, Vitol served Brass with discovery requests relating to assets available to satisfy the Judgment, but he did not substantively respond whatsoever. Instead, Brass gave identical, deflecting answers for each response and did not provide a single responsive document. Even after the District Court ordered Brass to respond to Vitol's requests following Vitol's Motion to Compel, he refused to do so. Brass also failed to appear for a post-judgment deposition despite assurances he would be available to be deposed.

18.     Vitol also diligently pursued other available post-judgment remedies, but was stifled by Brass's efforts to obstruct collection. Vitol sought writs of execution, multiple charging orders, and multiple writs of garnishment. But without discovery on the location of Brass's assets, Vitol was unable to collect anything on the Judgment. Shortly before filing for bankruptcy, Brass revealed that he kept large sums of money in his wife's accounts, including amounts traceable to the funding Vitol provided GCAC through the interim financing arrangement. Specifically, Brass indicated he moved some of the proceeds from sale of his vacation house—directly paid for in part by GCAC while Vitol was financing GCAC's operations—into his wife's account.

19.      From the Judgment Date to present Vitol has received no money or other consideration in satisfaction of the Judgment.

20.     Arthur Jacob Brass filed his voluntary petition for bankruptcy on March 26, 2021 (the "**Petition Date**"). GCAC and Trifinery filed for bankruptcy the same date.

### Alter Ego

21.     Upon information and belief: (i) the Debtor used GCAC as an alter ego for his own illegitimate and fraudulent purposes; (ii) GCAC, the Debtor, and associated entities and individuals comingled funds and ignored corporate distinctions; (iii) at the Debtor's direction through his role as President, beneficial owner, controller of the day-to-day operations, and de facto member of

GCAC with complete control over GCAC's finances, the Debtor used GCAC to funnel millions of dollars to the Debtor and/or other insiders/related entities with intent to hinder, delay, or defraud GCAC's creditors, including Vitol; and (iv) the funds the Debtor misappropriated are traceable to transactions financed by Vitol and were used by the Debtor for his own direct and personal benefit and to shield GCAC's assets from collection.

## IV. <u>CLAIMS</u>

**<u>COUNT ONE:</u> Non-Dischargeability of All Debts Under 11 U.S.C. § 523(a)(2)(A)**

22.     Plaintiff re-alleges all of the preceding paragraphs as if fully incorporated herein.

23.     Debtor obtained money from Vitol via false pretenses, false representations, and/or actual fraud.

24.     As a proximate result of the Debtor's actions, Vitol suffered damages in the minimum amount of $10,000,000.

25.     The damages Vitol suffered, including compensatory and punitive damages, are not dischargeable under 11 U.S.C. § 523(a)(2)(A).

**<u>COUNT TWO:</u> Non-Dischargeability of All Debts Under 11 U.S.C. § 523(a)(4)**

26.     Plaintiff re-alleges all of the preceding paragraphs as if fully incorporated herein.

27.     The Debtor owed fiduciary obligations to Vitol arising from their business arrangement, GCAC's insolvency, or other relationships.

28.      The Debtor breached those fiduciary obligations through his specific actions described above.

29.     As a proximate result of the Debtor's breach of his duty, Vitol suffered damages in the minimum amount of $10,000,000.

30.     The Debtor lawfully obtained property belonging to Vitol by selling asphalt and related products purchased by Vitol.

31.     The Debtor appropriated those lawfully obtained funds for his own personal use or benefit with fraudulent intent.

32.     As a proximate result of the Debtor's actions, Vitol suffered damages in the minimum amount of $10,000,000.

33.     The damages Vitol suffered, including compensatory and punitive damages, are not dischargeable under 11 U.S.C. § 523(a)(4).

**COUNT THREE:  Non-Dischargeability of All Debts Under 11 U.S.C. § 523(a)(6)**

34.     Plaintiff re-alleges and incorporate the preceding paragraphs.

35.     The Debtor willfully and maliciously caused injury to Vitol through his specific actions described above.

36.     There was an objective substantial certainty of harm to Vitol from the Debtor's actions, and/or the Debtor acted with a subjective motive to cause harm to Vitol.

37.     As a proximate result of the Debtor's actions, Vitol suffered damages in the minimum amount of $10,000,000.

38.     The damages Vitol suffered, including compensatory and punitive damages, are not dischargeable under 11 U.S.C. § 523(a)(6).

## CONDITIONS PRECEDENT

39.     All conditions precedent to Plaintiff's claims for relief have been performed, have occurred, or have been waived.

## PRAYER

In light of the foregoing, Plaintiff prays for judgment against the Debtor Arthur Jacob Brass, and that the Court award Plaintiff the following relief:

a.      The entry of judgment in favor of the Plaintiff awarding compensatory damages in an amount to be determined at trial, interest on such damages, and punitive and exemplary damages in an amount determined by the trier of fact;

b.      The entry of an order determining that the debts the Debtor Arthur Jacob Brass owes to Vitol Inc. are nondischargeable and that the discharge, if ultimately granted in this case, shall not discharge the debts Arthur Jacob Brass owes to Vitol, Inc.;

c.      That the Court enter a judgment awarding Plaintiff its attorneys' fees and expenses pursuant to 28 U.S.C. §§ 2201, 2202 or other applicable law;

d.      That Plaintiff recovers costs of court, prejudgment interest, and post-judgment interest at the maximum rate allowed by law; and

e.      Such other and further relief, both special and general, at law and in equity, to which Plaintiff Vitol Inc. may show itself to be justly entitled.

Dated:  **October 6, 2021.**

Respectfully submitted,

By: */s/ Keith M. Aurzada*
    Keith M. Aurzada (SBN 24009880)
    Lindsey L. Robin (SBN 24091422)
    Devan J. Dal Col (SBN 24116244)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T:  469.680.4200
    F:  469.680.4299
    kaurzada@reedsmith.com
    lrobin@reedsmith.com
    ddalcol@reedsmith.com

    and

    Michael H. Bernick (SBN 24078277)
    Mason W. Malpass (SBN 24109502)
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T:  713.469.3834
    F:  713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S RESPONSE IN OPPOSITION TO DEBTOR'S MOTION
FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

I. Introduction ...........................................................................................................................1

II. Statement of Facts ...............................................................................................................3
     A.     The Transfers to Insiders were made when GCAC was insolvent...........................3
     B.     Debtor never made any payments under either of the Settlement
            Agreements. ..........................................................................................................6

III. Arguments and Authorities ...............................................................................................7
     A.     The reduction of claims to a settlement agreement or agreed judgment does
            not alter the fact that the judgment nevertheless arose from fraudulent
            conduct. .................................................................................................................8
     B.     The Statute of Frauds does not apply to the agreement between Vitol and
            the Debtor..........................................................................................................11
     C.     There is evidence to Support Vitol's claim under Section 523(a)(4)....................11
     D.     Regardless of the Debtor's Arguments, Vitol's claims still survive under
            *Husky*................................................................................................................13
            (1) The Transfers were to Insiders ......................................................................16
            (2) The Debtor Retained Control over the Transfers ............................................16
            (3) The Transfers were Concealed ......................................................................17
            (4) The Transfers Occurred while a Suit was Pending .........................................18
            (5) The Transfers were Substantially All of the Debtor's Assets..........................18
            (6) The Debtor Removed and Concealed Assets ..................................................19
            (7) The Transfers were Not for Reasonably Equivalent Value .............................21
            (8) GCAC was Insolvent at the time of the Transfers..........................................21
            (9) The Transfers occurred while Substantial Debt was being Incurred...............22

PRAYER ................................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alport v. Ritter*,
  144 F.3d 1163 (8th Cir. 1998) ...............................................10

*Archer v. Warner*,
  538 U.S. 314 (2003).................................................... *passim*

*Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*,
  804 F.2d 879 (5th Cir. 1986) ...................................................8

*Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary*,
  L.P., 58 S.W.3d 263 (Tex. App.—Fort Worth 2001, pet. denied).............12

*Burrell-Richardson v. Ma. Bd. of Higher Ed. (In re Burrell-Richardson)*,
  356 B.R. 797 (B.A.P. 1st Cir. 2006) ...........................................9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................7

*First Nat'l Ins.Co. v. Kapetanakis (In re Kapetanakis)*,
  Nos. 08-32002, 08-03237, 2010 Bankr. LEXIS 1118 (Bankr. S.D. Tex. Apr.
  12, 2010) .........................................................................10

*Giaimo v. DeTrano (In re DeTrano)*,
  326 F.3d 319 (2nd Cir. 2003)...................................................9

*Hackney v. Johnson*,
  601 S.W.2d 523 (Tex. Civ. App.—El Paso 1980, writ ref'd n.r.e.).........12

*Husky Int'l Elecs., Inc. v. Ritz*,
  578 U.S. 355, 136 S. Ct. 1581 (2016).................................. *passim*

*Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*,
  567 B.R. 715 (Bankr. S.D. Tex. 2017) ............................... *passim*

*Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*,
  Adv. No. 10-03156 (Bankr. S.D. Tex.).....................................13

*Lawler v. Dallas Statler-Hilton Joint Venture*,
  793 S.W.2d 27 (Tex. App.—Dallas 1990, writ denied) ....................12

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) ...................................................7

*In re Luce*,
   960 F.2d 1277 (5th Cir. 1992) .................................................................................................10

*Mack v. Equable Ascent Fin., L.L.C.*,
   748 F.3d 663 (5th Cir. 2014) ....................................................................................................7

*Milbank v. Tomlin (In re Tomlin)*,
   Nos. 99-35175-BJH-7, 01-3458, 2003 Bankr. LEXIS 2295 (Bankr. N.D. Tex.
   Aug. 27, 2003) .........................................................................................................................20

*Moore v. Bearkat Energy Partners, LLC*,
   10-17-00001-CV, 2018 WL 683754 (Tex. App.—Waco Jan. 31, 2018, no
   pet.) ..........................................................................................................................................12

*Soza v. Hill (In re Soza)*,
   542 F.3d 1060 (5th Cir. 2008) .................................................................................................14

*Truly v. Austin*,
   744 S.W.2d 934 (Tex.1988).....................................................................................................12

**Statutes**

11 U.S.C. § 101(31) ......................................................................................................................16

11 U.S.C. § 523 ............................................................................................................................13

11 U.S.C. § 523(a)(2)(A) ...................................................................................................10, 13, 14

11 U.S.C. § 727(a)(2) ...................................................................................................................15

12 U.S.C. § 1701 ..........................................................................................................................11

Tex. Bus. & Com. Code Ann. § 24.001 .......................................................................................14

Tex. Bus. & Com. Code Ann. § 24.005 .......................................................................................14

Tex. Bus. & Com. Code Ann. § 24.005(a) ...................................................................................15

Tex. Bus. & Com. Code Ann. § 24.005(a)(1) ..............................................................................15

Tex. Bus. & Com. Code § 24.002(7) ...........................................................................................16

Tex. Bus. Com. Code Section 26.02(a)(1).....................................................................................11

Tex. Bus. Com. Code Section 26.02(a)(2).....................................................................................11

Tex. Bus. Com. Code § 26.02(b) ..................................................................................................11

Tex. Fam. Code § 3.003 ...............................................................................................................20

Tex. Fam. Code § 101.007 ...................................................................................................20

**Rules**

Fed. R. Bankr. P. 7056 .......................................................................................................7

Fed. R. Civ. P. 56 ...............................................................................................................7

Vitol Inc. (the "**Vitol**" or "**Plaintiff**") files this response in opposition (the "**Response**") to the Debtor's *Motion for Summary Judgment* [Docket No. 58] (the "**Motion**") filed by Arthur Jacob Brass (the "**Debtor**") and, in support thereof, would respectfully show this Court as follows:

## I. <u>INTRODUCTION</u>

1.      This nondischargeability case arises from a fraudulent conveyance scheme in which the Debtor took money from his insolvent company and used those finds for personal purposes (building a vacation home and making dividends to his mother). As a result of the Debtor's improper diversion of funds, Gulf Coast Asphalt Company ("**GCAC**") was unable to repay over $14.7 million of the more than $65 million in financing and other advances Vitol provided to or for the benefit of GCAC. In total, the Debtor took $4,143,224.34 from GCAC for himself and sent $1,344,748.69 to his mother - a total of $5,487,973.03 (collectively, the "**Transfers**"). The Transfers were done at a time when GCAC was insolvent and were part of the Debtor's fraudulent conveyance scheme from which Vitol's claims arise.

2.      Because GCAC failed to repay over $14 million in Vitol's financing, the parties engaged in litigation that resulted in two settlement agreements: the first for $8 million (which GCAC refused to pay) and a second for $10 million (that was never paid). The second settlement agreement included an agreed judgment against the Debtor and GCAC in the amount of $10 million. Neither the settlement agreement nor the judgment speaks to the Debtor's conduct in the underlying lawsuit or whether the judgment was intended to be dischargeable in bankruptcy. To the contrary, the second settlement provides that it was made "solely to avoid the expense of further investigation or litigation." Despite clearly disclaiming a resolution of the underlying claims, the Debtor now seeks summary judgment on the theory that the settlement agreement somehow insulates him from claims of nondischargeability. The case the Debtor cites in support of its thesis,

*Archer v. Warner*, 538 U.S. 314 (2003), in fact stands for the proposition that a settlement agreement does **not** convert a nondischargeable fraud claim into to a dischargeable contract claim.

3.      Alternatively, the Debtor argues that if the Court looks "behind" the settlement agreement to the underling conduct, Vitol's claims should be dismissed because "there is no evidence of a debt," as the statute of frauds "prohibits the introduction of any evidence of a loan between Vitol and the Debtor as there was no writing signed by the parties." Here the Debtor's flawed analysis is predicated on a statute that applies only to specific financial institutions – which Vitol is not.

4.      Finally, the Debtor seeks summary judgment on Vitol's claim under Section 523(a)(4) because "Vitol affirmatively and repeatedly alleges that Vitol was GCAC's lender" and that no fiduciary duty exists between borrowers and lenders. The Debtor's assertion might gain traction if the Debtor were to concede that the $65 million provided by Vitol was, in fact, a loan to GCAC. However, the Debtor continues to insist that Vitol and GCAC were parties to a profit sharing joint venture. In the unlikely event the Debtor is able to prove at trial that Vitol was a joint venturer with GCAC (rather than a lender), the Debtor owed Vitol fiduciary duties that were violated when he misappropriated asphalt sales proceeds. Accordingly, summary judgment is inappropriate on each of the grounds asserted by the Debtor.

5.      Moreover, even assuming that the Debtor's summary judgment assertions are correct and the second settlement agreement limits Vitol to a breach of contract claim, Vitol may still pursue its nondischargeability claims. Under the Supreme Court's *Husky* analysis, the term "actual fraud" in Section 523(a)(2) is not limited to a misrepresentation found in traditional common law fraud.[1] Rather, it has been broadly construed to include "fraudulent conveyance

---

[1] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 355, 136 S. Ct. 1581, 1583 (2016).

schemes, even when those schemes do not involve a false representation."[2] Here, the Transfers are nondischargeable obligations of the Debtor because they were part of a fraudulent scheme to hinder, delay, and defraud Vitol. Thus, summary judgment is improper.

## II.  STATEMENT OF FACTS

### A.  The Transfers to Insiders were made when GCAC was insolvent.

6.      Beginning in at least 2017, the Debtor owned a 50% interest in GCAC through his wholly owned interest in Trifinery, Inc. ("**Trifinery**"),[3] and the Debtor's mother, Joyce Brass, owned the other 50% of GCAC.[4] At that time the Debtor exercised complete financial control over GCAC.[5] From July 2017 through February 2018 Vitol supplied the Debtor with financing to fund its operations.[6] In total, Vitol provided in excess of $65 million in financing[7] to GCAC.[8] Despite repeated demands, GCAC failed to repay over $14.7 million of the financing.[9]

---

[2] *Id.*

[3] Deposition of Arthur Jacob Brass dated March 25, 2022 (the "**Brass Depo 2022**"), at 34:2-25, 35:1-2, attached hereto as **Exhibit 1;** Deposition of Arthur Brass dated June 28, 2018 ("**Brass Depo 2018**") at 45:23-46:19, attached hereto as **Exhibit 2**.

[4] Brass Depo 2022, 35:3-5.

[5] Brass Depo 2022, 26:15-19, ("Q: So you were the primary decision maker of GCAC? A: Yes. Q: You ran the company? A: Yes."); Brass Depo 2022, 43: 23-25, 44:1-5 ("Q: Who made the decision on when you would take those distributions? . . . A: Ultimately the decision was made by either myself or myself and my father."); Brass Depo 2022, 45: 13-14 (confirming GCAC did not have a board of directors); Deposition of GCAC dated 11/03/2020 ("**GCAC Depo. 2020**") at 89:11-14 ("Q. Okay. It's true that A.J. Brass is the -- has complete authority over the finances of GCAC and has since 2017? A. Yes. Q. No one else has signatory power on the GCAC bank account? A. No, I don't believe so.") attached hereto as **Exhibit 8**.

[6] *See, e.g.,* email from M. Ruzek to E. Kuo dated 4/11/2018 (Vitol_00080065-66), attached hereto as **Exhibit 3**; email from A. Brass to J. Tomaszewski 8/3/2017 ("Iberia payroll account overdrawn needs to be covered … Operating account was charged to cover payroll, now operating account is overdrawn and outstanding checks will be sent back with insufficient funds … If we don't get Vitol money this am I'll have to transfer more in.") (AJB0003960), attached hereto as **Exhibit 4**.

[7] The Debtor misrepresents to this Court as an "undisputed fact" that Vitol did not lend *money* to the Debtor or GCAC. In support of this falsehood, the Debtor misquotes Vitol's responses to the Debtor's interrogatories. For example, Vitol's response to the Debtor's first interrogatory reads "Vitol provided Debtor ***with tens of millions of dollars of financing consisting of*** product purchases, hedging services/purchases, deal costs, storage and transportation costs, and other associated fees and costs while also assuming the credit risk for the same." (emphasis added).

[8] *See, e.g.,* email from M. Ruzek to E. Kuo dated 4/11/2018 (Vitol_00080065-66), attached hereto as Exhibit 3.

[9] *See, e.g.,* email from M. Ruzek to R. Evans dated 4/16/2018 (Vitol_00082861), attached hereto as Exhibit 3.

---

7.      Unbeknownst to Vitol, GCAC was insolvent the entire time Vitol was providing financing.[10] At the same time, the Debtor was syphoning funds from GCAC for his personal use and used GCAC as his personal bank account.[11] During the course of the financing arrangement with Vitol, the Debtor caused GCAC to transfer to himself and his mother millions of dollars in undocumented, evergreen loans.[12] GCAC did not have any written agreements regarding these transfers to the Debtor or his mother, and there were no recorded repayment terms, maturity dates, or interest rates.[13] The Debtor used this money to pay his own personal expenses, including a payment of $582,737.02 directly to the contractor building his multi-million dollar vacation home.[14]

8.      The Transfers themselves may be identified in multiple contemporaneous records, including those produced by the Debtor, GCAC, GCAC's accounting firm EEPB, Inc. ("**EEPB**"), and by the Debtor and GCAC's respective banks.[15] For example, a Loan Summary extracted from GCAC's general ledger shows that on July 1, 2017, at the outset of the Vitol-GCAC financing agreement, Joyce Bass had a loan balance of $86,696.65 while the Debtor had a negative balance of $799,332.09 (meaning the Debtor credited himself with a loan **to** GCAC of nearly $800,000).[16]

---

[10] *See* Declaration of G. Deetz attached hereto as **Exhibit 5**.

[11] Brass Depo 2022, 38:3-7 (discussing taking GCAC's proceeds from the sale of the ARC Terminals for personal use); Brass Depo 2022, 43:17-19 (A: Over the period of time that I owned GCAC, I did receive profit distributions from GCAC.").

[12] Brass Depo 2018 at 45:23-46:19, Brass Depo 2022, 111:24-112:12, Exhibit 13 to Brass Depo. 2022 attached hereto as **Exhibit 6**; 115:24-116:18, Exhibit 14 to Brass Depo. 2022, attached hereto as **Exhibit 7.**

[13] GCAC Depo 2020 87:14-88:6 ("Q. What -- there's no promissory note related to that loan, right? A. Correct. Q. What's the repayment date on that loan? A. It doesn't have a repayment date. Those loans never have. They've been advanced and paid back over 20· years. Q. No -- so let me get this straight. For the money that GCAC loaned you personally to pay for the construction of your golf vacation house, there was no promissory note, right? A. Correct. Q. There was no repayment date, correct? A. Correct. And you can't tell me what the interest rate is on that loan? A. I can tell you it's whatever the federally mandated interest rate was") attached hereto as **Exhibit 8**.

[14] Brass Depo 2022, 132:17-133:13, Exhibit 19 to Brass Depo. 2022, attached hereto as **Exhibit 9.**

[15] During the State Court Litigation, GCAC produced an export of its general ledger accounts for loans to the Debtor and Joyce Brass (the "**Loan Summary**") and filed it in Response to Vitol's Motion to Compel. GCAC Depo. 2020 95:11.

[16] *See* Loan Summary, Exhibit 6.



9.       Once Vitol began financing GCAC in July 2017, these loan amounts increased dramatically as a result of the Transfers. By January 1, 2018, Joyce's debt to GCAC had grown to $946,969.55 and the Debtor went from a negative $799,332.09 to a positive $2,091,872.25 - meaning he "repaid" himself the $799,332.09 he alleged loaned to GCAC and withdrew nearly $1.3 million more in "loans" **from** GCAC.

| 1250 | Loan - A.J. Brass | 12/31/17 | | | | 2,091,872.25 |
| 1250 | Loan - A.J. Brass | | | | | |

10.      By May 2018, these insider withdrawals ballooned to $1,431,445.34 and $3,343,892.25 respectively.[17] Accordingly, from the time Vitol began financing GCAC in July 2017 until May 2018, the Debtor transferred a combined $5,487,973.03 to himself and his mother.

| 1250 | Loan - A.J. Brass | 5/18/18 | CDJ | 50,000.00 | | |
| 1250 | Loan - A.J. Brass | | | 60,000.00 | | 60,000.00 |
| 1250 | Loan - A.J. Brass | 5/31/18 | | | | 3,393,892.25 |

11.      The Transfers continued until June 30, 2019 at the least, the last date on the Ledger Summary. As of that date, the balance of the Transfers were $1,561,445.34 to Joyce Brass and $5,766,433.86 to the Debtor.[18] Although GCAC and the Debtor provided Vitol with the Loan

---

[17] Exhibit 13 to Brass Depo. 2022; Exhibit 14 to Brass Depo. 2022, Exhibits 6-7.
[18] Exhibits 6-7.

Summary in December 2019, more recent data was not available, supposedly because a power surge destroyed GCAC's servers.[19]



12.     The Transfers in the Loan Summary are also recorded in GCAC's bank statements as outgoing wires and checks and the majority are also found as deposits in the Debtor's bank statements.[20] The Transfers were likewise recorded in GCAC's accounting data retained by its accountant EEPB and used in the preparation of GCAC's tax returns.[21]

**B.      Debtor never made any payments under either of the Settlement Agreements.**

13.     As a result of GCAC's failure to repay Vitol, litigation ensued in Harris County.[22] In October 2020, the Debtor, GCAC, and Trifinery (a company for which Brass is the sole shareholder and whose only business is holding the Debtor's ownership interest in GCAC)[23] entered into a Confidential Settlement Agreement and Mutual Global Release (the "**First Settlement Agreement**") in which they agreed to pay Vitol $8 million to resolve the financing

---

[19] Dec. 12, 2019 email from GCAC lawyer attached hereto as **Exhibit 10**.

[20] Excerpts from GCAC's Bank Statements, attached hereto as **Exhibit 11**. Excerpts from the Debtor's Bank Statements, attached hereto as **Exhibit 13**. Vitol only has the Debtor's complete IBC bank records from June 26, 2017 – Aug. 27, 2018. When presented with his own and GCAC's bank statements at his deposition, the Debtor recognized them and verified they were his and GCAC's. GCAC Depo. 2020 91:15-98:5. The Transfers which were not directly deposited into the Debtor's bank account were nevertheless for his personal benefit and include: (1) a wire transfer from GCAC directly to the contractor for his vacation home, Byer Builders; (2) the proceeds from the sale of GCAC's holdings in Arc Terminals; (3) a wire transfer to Square 1 Containers LLC, an entity in which the Debtor owns a 30% interest per his bankruptcy schedule; and (4) a wire transfer to Popper & Company, LLC, a firm that did work with the Debtor's companies, including Trifinery as shown on Trifinery's bankruptcy schedules.

[21] EEPB's managing director Michael Wagner also verified that the GCAC accounting documents given to Vitol pursuant to a subpoena were made and kept in the ordinary course of business. EEPB affidavit attached hereto as **Exhibit 14**. Tomaszewski exhibits 4 and 6 attached hereto as **Exhibit 15-16**. GCAC's former CFO and bookkeeper, John Tomaszewski verified that he recognized the balance sheets and that they were GCAC's from the relevant time. Deposition of J. Tomaszewski, attached hereto as **Exhibit 17**.

[22] *See* Counterclaim filed by Vitol attached hereto as **Exhibit 18**.

[23] Brass Depo. 2022 34: 2-25, 35:1-2.

---

dispute.[24] The Debtor failed to make *any* settlement payments and on November 5, 2020 the Debtor, GCAC, and Trifinery entered into a Second Confidential Settlement Agreement and Mutual Global Release (the "**Second Settlement Agreement**").[25] In accordance with the Second Settlement Agreement, the parties filed an Agreed Final Judgment jointly and severally against the Debtor, GCAC, and Trifinery in the amount of $10 million in favor of Vitol.[26] The Agreed Final Judgment was entered on November 20, 2020 and is still outstanding in its entirety.[27]

14.     On March 23, 2021, each of the Debtor, GCAC, and Trifinery filed Chapter 7 bankruptcies in this Court.[28] Vitol filed a proofs of claim in each bankruptcy based on the Agreed Final Judgment.[29]

## III.  <u>ARGUMENTS AND AUTHORITIES</u>

15.     A court may grant a motion for summary judgment only if there is no genuine issue of material fact and the movant shows its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56, as incorporated by Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mack v. Equable Ascent Fin., L.L.C.*, 748 F.3d 663, 665 (5th Cir. 2014) citing to *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When both parties have submitted evidence of contradictory facts, courts resolve factual controversies in favor of the nonmoving party. *Little*, 37 F.3d at 1075. The court must review the evidence and any inferences to be drawn therefrom in

---

[24] *See* Confidential Settlement Agreement and Mutual Global Release (BK-Vitol0000022), attached hereto as **Exhibit 19**.

[25] *See* Second Confidential Settlement Agreement and Mutual Global Release (BK-Vitol0000009), attached hereto as **Exhibit 20**.

[26] *See* Agreed Final Judgment, attached hereto as **Exhibit 21**.

[27] *See, e.g.,* Brass Bankruptcy Schedules [Dkt. No. 19] at page 55, attached hereto as **Exhibit 22**.

[28] *See* Case No. 21-60023; Case No. 21-60024; Case No. 21-60025.

[29] *See* Case No. 21-60023, Proof of Claim No. 2-1; Case No. 21-60024, Proof of Claim No 5-1; Case No. 21-60025, Proof of Claim No. 6-1. Moreover, the Debtor scheduled the entire $10 million judgment and did not indicate that it was contingent, unliquidated, or disputed.

a light most favorable to the non-moving party. *See Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir. 1986) (per curiam).

16.     Here, the Debtor is not entitled to summary judgment because he failed to demonstrate that no issues of material fact exist. To the contrary, and as detailed herein, there are a number of genuinely disputed issue of material fact that must be litigated in connection with each of Vitol's inherently fact-intensive claims for exception to discharge under Section 523(a).  The Debtor's Motion relies on incorrect interpretations of law and, at best, disputed facts.

**A.      The reduction of claims to a settlement agreement or agreed judgment does not alter the fact that the judgment nevertheless arose from fraudulent conduct.**

17.     In the Motion, the Debtor alleges that Vitol's tort claims were released and superseded by the Second Settlement Agreement and, therefore, Vitol's only surviving claims sound in contract and, thus, are dischargeable. Contrary to the Debtor's assertion, the Second Settlement Agreement does not negate Vitol's nondischargeability claims because (a) the agreement does not claim to establish liability for the underlying conduct at issue and, thus, cannot be used for collateral estoppel purposes, and (b) the *Archer* case directs bankruptcy courts to look at the Debtor's underlying behavior to determine nondischargeability.

18.     The Debtor relies on the concept of novation to allege that any fraud the Debtor committed is superseded by the Second Settlement Agreement. In support of this contention, the Debtor relies on the Supreme Court's decision in *Archer*. In fact, the *Archer* decision stands for exactly the opposite proposition: that a settlement agreement does **not** convert a nondischargeable debt arising from fraud to a dischargeable debt arising from breach of contract except in limited circumstances not applicable here. *Archer v. Warner*, 538 U.S. 314, 322 (2003) ("We conclude that the Archers' settlement agreement and releases may have worked a kind of novation, but that fact

does not bar the Archers from showing that the settlement debt arose out of 'false pretenses, a false

representation, or actual fraud,' and consequently is nondischargeable.").

> …[t]he settlement agreement and promissory note here, coupled with the broad language of the release, completely addressed and released each and every underlying state law claim. That agreement left only one relevant debt: a debt for money promised in the settlement agreement itself. To recognize that fact, however, does not end our inquiry. We must decide whether that same debt can *also* amount to a debt for *money obtained by fraud*, within the terms of the nondischargeability statute. Given this Court's precedent, we believe that it can.

*Archer v. Warner*, 358 U.S. at 318-19 (internal citations omitted).  As the Supreme Court went on

to explain, there is a clear distinction between, on the one hand, whether the parties intended their

agreement to resolve all claims between them and, on the other hand, whether the parties intended

that settlement to absolve the fact that the debts thus settled originally arose from fraudulent or

tortious conduct.  *Id.* at 322 ("A debt embodied in the settlement of a fraud case 'arises' no less

'out of' the underlying fraud than a debt embodied in a stipulation and consent decree.").

19.     "Reducing a fraud claim to a settlement does not definitively change the nature of

the debt for dischargeability purposes." *Burrell-Richardson v. Ma. Bd. of Higher Ed. (In re Burrell-*

*Richardson)*, 356 B.R. 797, 802 (B.A.P. 1st Cir. 2006); *see also Giaimo v. DeTrano (In re*

*DeTrano)*, 326 F.3d 319, 322 (2nd Cir. 2003)("if the tort claims against [the debtor] would have

created a nondischargeable debt [. . .] had those claims been litigated to judgment in [the creditor's]

favor, then it is no defense for [the debtor] to state that he has replaced that possible liability with

a dischargeable contractual obligation through the settlement agreement."). "Where . . . the

judgment does not indicate the cause of action on which liability is based, *res judicata* does not

apply and a creditor is allowed to prove in a subsequent nondischargeability proceeding that the

underlying debt is based in fraud." *In re DeTrano*, 326 F.3d at 322. Thus, under *Archer* and its

progeny, a settlement agreement only precludes a nondischargeability claim if it specifically resolves culpability for the underlying tort claim.

20.     Here, the Second Settlement Agreement does not specifically resolve the Debtor's culpability for the underlying tort claims. To the contrary, the second settlement provides that it "settle[s] all claims asserted in the Lawsuit" and that it was made "solely to avoid the expense of further investigation or litigation."[30] Thus, under *Archer*, the Second Settlement Agreement does not change the nature of the debt for dischargeability purposes.

21.     Furthermore, that Vitol cited the Second Settlement Agreement in its proof of claim has no bearing on the validity of Vitol's dischargeability claims in this adversary proceeding. Although "the Court looks to the foundation of the debt . . . for determining whether the debt is excepted from discharge, the Court looks to the [judgment] to determine the amount of the debt." *First Nat'l Ins.Co. v. Kapetanakis (In re Kapetanakis)*, Nos. 08-32002, 08-03237, 2010 Bankr. LEXIS 1118, at *11 (Bankr. S.D. Tex. Apr. 12, 2010) citing to *Archer v. Warner,* 538 U.S. 314, 316, 123 S. Ct. 1462, 155 L. Ed. 2d 454 (2003); *In re Luce,* 960 F.2d 1277, 1285 (5th Cir. 1992) (holding that legal fees and costs may also be nondischargeable with the underlying debt if they are provided by state statutory or contractual grounds); *Alport v. Ritter,* 144 F.3d 1163, 1168 (8th Cir. 1998) (referring to the base contract to determine whether legal fees may be included in a nondischargeable debt under § 523(a)(2)(A)). Thus, the existence of the Second Settlement Agreement and Vitol's filing of a timely proof of claim do not—as the Debtor claims—defeat Vitol's claims as a matter of law, and cannot serve as a basis for summary judgment in the Debtor's favor.

---

[30] Second Settlement Agreement ¶ 1 p. 2.

**B.      The Statute of Frauds does not apply to the agreement between Vitol and the Debtor.**

22.      The Debtor also alleges that Vitol's underlying claim for breach of a financing agreement by GCAC is meritless because Section 26.02(b) of the Texas Business and Commerce Code requires a loan agreement to be in writing. The Debtor bases this argument on an incorrect understanding of the legal authority. The applicability of Section 26.02(b) of the Texas Business and Commerce Code is limited to agreements "pursuant to which a financial institution" loans money. Tex. Bus. Com. Code Section 26.02(a)(2). The Code defines a financial institution as "a state or federally chartered bank, savings bank, savings and loan association, or credit union, a holding company, subsidiary, or affiliate of such an institution, or a lender approved by the United States Secretary of Housing and Urban Development for participation in a mortgage insurance program under the National Housing Act (12 U.S.C. Section 1701 et seq.)." Tex. Bus. Com. Code Section 26.02(a)(1). The Debtor does not allege, much less introduce evidence that Vitol qualifies as a financial institution and, thus, fails to establish a necessary predicate for the applicability of this provision.  Regardless, however, the inapplicability of this statute to Vitol means it cannot be employed as the Debtor contends to defeat Vitol's claims as a matter of law.

**C.      There is evidence to Support Vitol's claim under Section 523(a)(4)**

23.      Finally, the Debtor alleges that Vitol's claims under Section 523(a)(4) must be dismissed because "Vitol affirmatively and repeatedly alleges that Vitol was GCAC's lender" and no fiduciary duties exist from borrowers to lenders. The Debtor's assertion *could* gain traction if the Debtor were willing to concede that the $65 million provided by Vitol was, in fact, a loan to GCAC. However, the Debtor continues to maintain that Vitol and GCAC were parties to a profit

sharing joint venture.[31] Indeed, the Motion itself alludes to the Debtor's maintenance of such a position. *See* Motion at ¶ 46 ("Vitol refuses to allege that it had a joint venture with GCAC").

24.    Vitol has pleaded its claim under Section 523(a)(4) in the alternative in the unlikely event that the Debtor is able to demonstrate at trial that the relationship between Vitol and GCAC was a joint venture. To be clear, Vitol does not believe that a joint venture existed between the parties; *but* if the Debtor is able to demonstrate the relationship was a joint venture, then the Debtor owed a fiduciary duties to Vitol. "Under Texas law, joint ventures are legal entities described as being 'in the nature of a partnership engaged in the joint prosecution of a particular transaction for mutual profit.'" *Lawler v. Dallas Statler-Hilton Joint Venture*, 793 S.W.2d 27, 33 (Tex. App.—Dallas 1990, writ denied) (citing to *Brown v. Cole,* 155 Tex. 624, 631, 291 S.W.2d 704, 709 (1956)). "Generally, joint ventures are governed by the rules applicable to partnerships. *Truly v. Austin,* 744 S.W.2d 934, 937 (Tex.1988); *Hackney v. Johnson,* 601 S.W.2d 523, 526 (Tex. Civ. App.—El Paso 1980, writ ref'd n.r.e.); *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary*, L.P., 58 S.W.3d 263, 273 (Tex. App.—Fort Worth 2001, pet. denied). A formal fiduciary relationship, which arises as a matter of law, exists between partners and joint venturers. *Moore v. Bearkat Energy Partners, LLC*, 10-17-00001-CV, 2018 WL 683754, at *8 (Tex. App.—Waco Jan. 31, 2018, no pet.) (explaining the difference between formal and informal fiduciary relationships).

25.    Thus, in the unlikely event that the Debtor is able to demonstrate at trial that a joint venture existed between GCAC and Vitol, the Debtor violated his fiduciary duties by misappropriating asphalt sales proceeds for his own personal benefit.

---

[31] Brass Depo 2018 at 10:11-21 ("Q. Okay. And on that 60 million that Vitol paid for these products, GCAC agreed to reimburse Vitol, true? A. No. Q. Okay. What do you think is different from what 16· I just said? A. I think that Vitol purchased those products, that Vitol and GCAC collectively sold those products, and that the profits or losses from those ultimate sales after all the attendant costs were to be split between the parties."); Brass Depo 2022, 47:11-24.

### D.    Regardless of the Debtor's Arguments, Vitol's claims still survive under *Husky*.

26.    Even assuming, *arguendo*, that the Debtor's interpretation of *Archer* is correct that the Settlement Agreement is a novation, Vitol may still pursue its claims under section 523(a)(2). Regardless of the nature of Vitol's underlying debt – whether it sounds in contract or tort – Vitol may pursue a nondischargeability claim arising from the Debtor's misappropriation of the Transfers.

27.    *Husky* was a watershed decision for nondischargeability claims arising from a debtor's fraudulent conduct. Prior to *Husky*, a split existed among the circuit courts regarding whether "actual fraud" required a misrepresentation to deny a discharge. In *Husky*, the Supreme Court decided that a constructively fraudulent transfer was sufficient to deny a discharge under 523(a)(2)(a) in the context of claim arising from breach of a master credit and sales agreement.[32]

28.    "The Bankruptcy Code prohibits debtors from discharging debts obtained by . . . false pretenses, a false representation, or actual fraud."[33] The term "actual fraud" is not limited to a misrepresentation found in traditional common law fraud.[34] Rather, it has been broadly construed to include "fraudulent conveyance schemes, even when those schemes do not involve a false representation."[35] Where a debtor engaged in such a fraudulent scheme, a creditor can pierce the corporate veil and hold the debtor who orchestrated the scheme personally liable and the court may then hold those debts nondischargeable.[36] Here, the Transfers are a nondischargeable obligation of

---

[32] The Supreme Court's consideration of imputed nondischargeability under Section 523(a)(2)(a) arising from a separate party's fraudulent conduct in *Bartenwerfer v. Buckley*, U.S., No. 21-908, cert. granted May 2, 2022, will not have an impact on the nondischargeability determination here because the Debtor is not an innocent spouse. Rather, the Debtor is on both sides of the transaction and was the party responsible for initiating the Transfers.

[33] 11 U.S.C. § 523(a)(2)(A).

[34] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 355, 136 S. Ct. 1581, 1583 (2016).

[35] *Id.* In the seminal *Husky* case, the underlying claim arose from breach of a Master Credit and Sales Agreement. *See* Plaintiff's Original Complaint to Deny Dischargeability of Debt Pursuant to 11 U.S.C. § 523, Docket No. 1, *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, Adv. No. 10-03156 (Bankr. S.D. Tex.).

[36] *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 738-39 (Bankr. S.D. Tex. 2017).

---

the Debtor because they were part of a fraudulent scheme to hinder, delay, and defraud Vitol.

29.     Under *Husky*, determining whether transfers are nondischargeable as part of a fraudulent conveyance scheme requires the Court to undertake the following three-step analysis:

(a)     "Are there sufficient badges of fraud for this Court to find that the Debtor committed actual fraud;"

(b)     "If so, was the Debtor's 'actual fraud' for his direct personal benefit;" and

(c)     is "the Debtor's personal liability []a nondischargeable obligation under § 523(a)(2)(A)."[37]

30.     Here, while Vitol submits that each of the three *Husky* elements is met here, at a minimum it is undeniable that there are several genuine issues of material fact relating to the *Husky* elements that make summary judgment flatly inappropriate here.

## The Badges of Fraud Demonstrate the Debtor's Fraudulent Intent

31.     To prove that the Transfers were fraudulent, Vitol may either introduce direct evidence from the Debtor admitting that he intended to hinder, delay, or defraud Vitol or Vitol may introduce circumstantial evidence showing the Debtor's intent.[38] Circumstantial evidence of fraudulent intent may be demonstrated by undertaking a "badge of fraud" analysis.[39] The Texas Uniform Fraudulent Transfer Act ("**TUFTA**")[40] provides a non-exclusive[41] list of eleven (11)

---

[37] *Husky,* 567 B.R at 719.

[38] *Husky,* 567 B.R at 739-740 (*citing In re 1701 Commerce, LLC*, 511 B.R. 812, 835-36 (Bankr. N.D. Tex. 2014) ("Direct evidence of actual fraud is seldom available, so Texas law allows a plaintiff to rely on circumstantial evidence to prove actual intent.")).

[39] *Id.*

[40] Tex. Bus. & Com. Code Ann. § 24.001, et seq.

[41] Although the Tex. Bus. & Com. Code Ann. § 24.005 ("**TUFTA**") enumerates eleven badges of fraud, "courts have identified various badges of fraud that tend to evidence a transfer made with intent to defraud under § 548 and § 727: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry." *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008).

badges of fraud, including whether:[42]

>    (1) the transfer was to an insider;
>
>    (2) the debtor retained possession or control of the property transferred after the transfer;
>
>    (3) the transfer was concealed;
>
>    (4) before the transfer was made was incurred, the debtor had been sued or threatened with suit;
>
>    (5) the transfer was of substantially all the debtor's assets;
>
>    (6) the debtor absconded;
>
>    (7) the debtor removed or concealed assets;
>
>    (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
>
>    (9) the debtor was insolvent or became insolvent shortly after the transfer was made;
>
>    (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
>    (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[43]

32.     "Not all, or even a majority of the badges of fraud must exist to find actual fraud."[44]

Indeed, the presence of even a single badge of fraud may be sufficient.[45] Here, the Transfers exhibit

at least nine of the eleven enumerated badges of fraud.

---

[42] *Husky,* 567 B.R at 739-740 (citing to Tex. Bus. & Com. Code Ann. § 24.005(a)-(a)(1) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor").

[43] *Husky* analyzes the TUFTA badges of fraud to determine whether transfers by the debtor are nondischargeable under 11 U.S.C. § 727(a)(2). *See Husky,* 567 B.R. at 740.

[44] *Id.* (citing *In re Soza,* 542 F.3d 1060, 1066-67 (5th Cir. 2008)).

[45] *Husky,* 567 B.R. at 743 ("This first badge considers transfers to an insider. This badge is so significant that in some cases an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud.").

---

(1) *The Transfers were to Insiders*

33.     Each of the Transfers was made to an insider of GCAC – the Debtor and his mother, Joyce Brass. Under TUFTA, insiders include directors, officers, control persons, and relatives of any director officer, or control person.[46] The Debtor was the president of GCAC,[47] owned 50% of GCAC through his holding company Trifinery,[48] and had "complete authority over the finances of GCAC."[49] Joyce Brass owned the other 50% of GCAC.[50] Thus, under TUFTA, each of the Transfers was made to an insider.

34.     Outside of TUFTA, courts considering insider status of individuals have evaluated "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length."[51] The Transfers were orchestrated by the Debtor to either himself or his mother. It is hard to imagine a greater closeness between transferor and transferee. This evidence alone creates a genuine issue of material fact regarding a *significant* element of the claim that counsels against summary judgment.[52]

(2) *The Debtor Retained Control over the Transfers*

35.     The Debtor retained possession or control over the Transfers as both the transferor and transferee. Indeed, most transfers were made directly from GCAC's bank account (for which the Debtor was the control person) to the Debtor's bank account, the Debtor's creditors, or the

---

[46] Tex. Bus. & Com. Code § 24.002(7); *see also* 11 U.S.C. § 101(31).

[47] Brass Depo 2018 36:6-10.

[48] Brass Depo 2018 45:23-46:19.

[49] GCAC Depo 2020 at 89:11-90:2.

[50] Brass Depo 2018 45:23-46:19.

[51] *Husky*, 567 B.R. at 743.

[52] "This badge is so significant that in some cases an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud." *Husky*, 567 B.R. at 743.

Debtor's mother.[53] Thus, the Debtor maintained control over the transferor and transferee of the Transfers.[54]

### (3) *The Transfers were Concealed*

36.     In determining whether transfers are concealed for purposes of dischargeability, the Court may consider whether the debtor attempted to reverse the transfers before the transferor filed for bankruptcy and whether the transfers were listed in the transferor's bankruptcy schedules.[55] As the president of GCAC and the personal with control over GCAC's finances,[56] the Debtor signed GCAC's bankruptcy schedules and statement of financial affairs.[57] Neither GCAC's bankruptcy schedules nor its statement of financial affairs indicate that the Debtor or his mother owed GCAC millions of dollars in unpaid loans.[58] Indeed, GCAC scheduled a meager $40,408.39 in total assets – none of which includes loans from the Debtor or his mother.[59] Likewise, there is nothing in the GCAC bankruptcy filings to indicate that the Debtor undertook any effort to repay the undisclosed loans to himself or his mother. This and other evidence of the Debtor's efforts to conceal the Transfers further warrants against a grant of summary judgment.

---

[53] *See* Loan Summary GCAC9511, Exhibit 6; GCAC Bank Records GCAC9846-10078, Exhibit 11; Brass bank records Brass50-90, Exhibit 13; GCAC Depo. 2020 96:11-98:21.

[54] *Husky,* 567 B.R at 744 (citing *Nwokedi v. Unlimited Restoration Specialists, Inc.,* 428 S.W.3d 191, 206 (Tex. App.— Houston [1st Dist.] 2014) (finding retention of possession when transferor was signatory on both transferor and transferee accounts)).

[55] *Husky,* 567 B.R at 749 ("Further, the Debtor, in his capacity of as director of Chrysalis, did not list on Chrysalis's Schedule B any claim that Chrysalis might have against him, individually, for his transferring the $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor- Controlled Entities … this Court finds that the Debtor concealed from Husky the transfers of $1,161,279.90 to the Debtor-Controlled Entities when he failed to disclose them on Chrysalis's Schedule B and when he failed to disclose on Chrysalis's Schedule B that the company might have a cause of action against him, personally. Thus, this badge of fraud is present and weighs in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky. The Court gives this badge significant weight in no small part because the Debtor made material misrepresentations under oath on Chrysalis's SOFA and Schedule B. His failure to disclose the transfers of $1,161,279.90 and the cause of action against himself are not [m]atters so trivial in nature as to have but little effect upon the estate and upon creditors.").

[56] GCAC Depo 2020 at 89:11-90:2.

[57] *See* GCAC Chapter 7 Statement of Financial Affairs and Schedules in case no. 21-60024 at Dkt. 12 and 14.

[58] *Id.*

[59] *Id.* Dkt. 14 at p. 9.

---

(4) *The Transfers Occurred while a Suit was Pending*

37.     Each of the Transfers was made while a lawsuit was pending against GCAC and the Debtor. On February 10, 2017 (four months before the Transfers began), GCAC and the Debtor were sued by Superior Crude Gathering, Inc. ("**Superior**") for $1,831,799.67.[60] In the lawsuit, Superior alleges that it provided short-term financing for GCAC's purchase and sale of crude oil in connection with the shared use of a crude oil tank farm. Under this arrangement, Superior funded the purchase of crude oil by GCAC on credit, which GCAC would repay after the oil was resold. After all transactions were completed, GCAC failed to repay over $1.8 million in financing. Superior, thus, sued GCAC and the Debtor for, among other things, fraud. The Superior lawsuit was pending at the time each Transfers was made.

(5) *The Transfers were Substantially All of the Debtor's Assets*

38.     The Transfer represented substantially all of GCAC's assets at the time they were made. As of June 2017, the time the Transfers began, GCAC's balance sheet reflects $1,922,534 in "Current Assets" which includes $429,915 in receivables from employees (loans due from the Debtor and his mother – loans that were never repaid).[61] Thus, GCAC's actual "Current Assets" should have reflected less than $1.5 million in assets. Although the balance sheet also includes "Other Assets" none if which had any real value. At a time when GCAC's assets were less than $1.5 million and its total cash was negative $79,975, GCAC began transferring substantial funds to the Debtor, eventually totaling over $5.7 million in Transfers to Brass and $1.5 million in Transfers to Joyce Brass.[62]

---

[60] *See* Original Petition of Superior Crude Gathering, LLC, attached hereto as **Exhibit 23**.
[61] *See* GCAC 2017 Balance sheet, Exhibit 15; *See also* EEPB Affidavit, Exhibit 14.
[62] *See* Declaration of G. Deetz, Exhibit 5.

(6) _The Debtor Removed and Concealed Assets_

39.     The Debtor also removed and concealed assets. Failing to disclose to creditors the amount of and reasons for transfers to insiders in bankruptcy schedules indicates actual intent to defraud creditors.[63] Here, the Debtor orchestrated a scheme in which millions of dollars were siphoned from GCAC to insiders. The Debtor also signed sworn bankruptcy schedules on behalf of GCAC.[64] The loans are not included in any of GCAC's bankruptcy schedules.[65] Indeed, were it not for discovery in separate litigation against the Debtor and GCAC, Vitol (and other creditors) would have no knowledge of the Transfers, nor the reason such insider transfers were orchestrated by the Debtor. Again, this evidence creates a genuine and triable issue of fact regarding whether the Debtor removed and concealed assets from creditors.

40.     Additionally, the Debtor has sought to conceal tens of thousands of dollars in artwork from his creditors. On July 13, 2021, the Court authorized the Chapter 7 Trustee to retain an appraiser to prepare a written appraisal of the Debtor's assets.[66] The Trustee's Appraisal Report indicates that the Debtor significantly and materially undervalued various items and categories of personal property, including artwork.[67] For example, the Debtor valued a piece of "cow artwork" at $150.00.[68] According to the Trustee's Appraisal Report, the "cow artwork" is actually an

---

[63] _Husky,_ 567 B.R at 749 ("Here, the Debtor did not disclose to Husky or any other creditors the amounts of and reasons for the transfers of $1,161,279.90 to the Debtor-Controlled Entities. Husky was entitled to payment for providing products to Chrysalis, and like the creditor in Vaso, was kept in the dark by the Debtor about his transfers of $1,161,279.90 to the Debtor-Controlled Entities. This is sufficient evidence for this Court to find that the Debtor concealed Chrysalis's assets. Indeed, the evidence presented at trial also leads this Court to find that the Debtor, by transferring the $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor-Controlled Entities, removed assets of Chrysalis—'which is sufficient proof of this badge of fraud even without a finding of concealment.' … Therefore, this badge is present and favors a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.").

[64] _See_ GCAC Chapter 7 Statement of Financial Affairs and Schedules in case no. 21-60024 at Dkt. 12 and 14.

[65] _Id._

[66] Cause No. 21-60025 [Docket No. 50].

[67] _Compare_ Exhibit 22 at pages 22-49 _with_ Appraisal Report, attached as **Exhibit 24**.

[68] _See_ Debtor's Schedules, Exhibit 22.

original 1971 screen print by Andy Warhol titled "Cow" with a market resale value of $15,000.00.[69] Another egregious example concerns a piece of art described by the Debtor as "Bottle Cap Artwork" which the Debtor valued at $250.00.[70] According to the Trustee's Appraisal Report, the "Bottle Cap Artwork" refers to an original portrait by Molly B. Right with a market resale value of $12,000.00.[71] Each of these valuable pieces of artwork is listed in the Debtor's exemptions, which meet or exceed the statutory cap at their nominal value.[72] If properly valued, the artwork would render assets non-exempt because the aggregate value of exemptions will exceed the statutory cap on exemptions. Thus, there is, at a minimum, a triable issue of fact as to whether Debtor has intentionally sought to conceal assets that would be available to creditors if properly valued.

41.     Furthermore, the Debtor has concealed millions of dollars in jewelry from his creditors. In response to a subpoena issued by Vitol in this proceeding, Chubb Lloyd's Insurance Company of Texas ("**Chubb**") produced the Debtor's individual insurance policies.[73] The production included a 2020 jewelry rider showing the Debtor individually insured vast amounts of jewelry (the "**Jewelry Rider**").[74] The Jewelry Rider includes detailed descriptions of 148 pieces of jewelry along with the insured value of each piece. Based on the Jewelry Rider, Vitol believes that some or all of the jewelry may be community property that is properly considered part of the bankruptcy estate.[75] Despite having a significant amount of jewelry insured in 2020, the Debtor

---

[69] *See* Appraisal Report, Exhibit 24.

[70] *See* Debtor's Schedules, Exhibit 22.

[71] *See* Appraisal Report, Exhibit 24.

[72] *See* Debtor's Second Amended Schedules, [Docket No. 91].

[73] *See* Chubb Jewelry Rider, Brass BK Dep. Ex. 12, filed as **Exhibit 25**.

[74] *Id.*

[75] Texas law creates a presumption that property possessed by either spouse during the marriage is community property. Tex. Fam. Code § 3.003. Clear and convincing evidence is required  to rebut the strong presumption of community property. *Id.*; Tex. Fam. Code § 101.007; *see also Milbank v. Tomlin (In re Tomlin)*, Nos. 99-35175-BJH-7, 01-3458, 2003 Bankr. LEXIS 2295 (Bankr. N.D. Tex. Aug. 27, 2003) (determining that jewelry was deemed

initially disclosed only $23,705 worth of jewelry on his schedules.[76] The Debtor later disclosed

$211,255 worth of jewelry via his Second Amended Schedules.[77]  Moreover, Vitol has identified

at least one significant piece of jewelry that was acquired using funds from a bank account jointly

held by the Debtor and his wife.[78] Based the presumption that such property is community property

under the Texas law and the fact that the Debtor himself (and not his wife) is the named insured in

the Jewelry Rider, there is a triable issue of facts as to whether Debtor concealed assets from his

creditors.

(7) *The Transfers were Not for Reasonably Equivalent Value*

42.     There is no evidence whatsoever that GCAC received any consideration or benefit

from the Transfers. Instead, the Transfers represent only a dissipation in GCAC's assets. The loans

to the Debtor and his mother are unwritten and evergreen loans - GCAC did not have any written

agreements for these loans and there were no recorded repayment terms, due dates, or interest

rates.[79] In short, GCAC received nothing in exchange for the Transfers.

(8) *GCAC was Insolvent at the time of the Transfers*

43.     GCAC was insolvent at the time each of the Transfers was made. GCAC was

---

community property absent clear and convincing evidence to the contrary). Here, that presumption is already bolstered by the existence of a Jewelry Rider identifying more than $3.8 million in jewelry for which the Debtor is the sole named insured.

[76] *See* Docket No. 19.

[77] *See* Docket No. 85. The Jewelry Rider also provides additional evidence that the Debtor intentionally undervalued his personal property. For example, the Debtor scheduled a "Patek Philip watch – 30 years old" with a value of $6,000. The Jewelry Rider includes a "Patek Philippe & Co Watch, circa 1990" with an insured value of $19,210. The Debtor scheduled a "Frank Mueller Master banker watch" with a value of $5,000. The Jewelry Rider includes a "Franck Muller 'Master Banker' watch" with an insured value of $35,612. The large discrepancy between the scheduled values and the insured values indicates potential deception by the Debtor.

[78] IBC Bank Statement, IBC_0001997, attached as **Exhibit 12**.

[79] GCAC Depo 2020 87:14-88:6 ("Q. What -- there's no promissory note related to that loan, right? A. Correct. Q. What's the repayment date on that loan? A. It doesn't have a repayment date. Those loans never have. They've been advanced and paid back over 20 years. Q. No -- so let me get this straight. For the money that GCAC loaned you personally to pay for the construction of your golf vacation house, there was no promissory note, right? A. Correct. Q. There was no repayment date, correct? A. Correct. And you can't tell me what the interest rate is on that loan? A. I can tell you it's whatever the federally mandated interest rate was").

---

insolvent at June 30, 2017, at December 31, 2017, and at January 31, 2018, failing all three recognized tests of solvency at each date.[80] GCAC's balance sheets from June 30, 2017 through January 31, 2018 contain $6.6 million of assets identified as Investments/Loans in affiliated companies that have minimal or zero assets, negative book equity, zero revenues, and negative income before tax. These Investments/Loans in affiliated companies have been excluded from the GCAC solvency analysis as these affiliated companies do not demonstrate any ability to repay amounts reflected on GCAC's balance sheets.

44.     From July 1, 2017 through December 31, 2018, GCAC transferred a net $6.9 million to the Debtor and his mother.[81] The net amounts transferred to the Debtor and his mother were recorded as "Due from Shareholders" assets of GCAC and represented more than 70% of Consolidated GCAC's $8.9 million of total assets.[82] The amounts transferred to the Debtor and his mother took place during a period that Consolidated GCAC had negative book equity.

(9) *The Transfers occurred while Substantial Debt was being Incurred*

45.     The Transfers also occurred at a time when GCAC was incurring substantial debt. GCAC was acquiring asphalt using funding provided by Vitol.[83] The funds that GCAC was siphoning to the Debtor were payments received from asphalt purchasers - funds that should have been used to repay Vitol.[84] Thus, each of the Transfers to the Debtor and his mother caused GCAC to incur additional debt to Vitol.

46.     Having established at least nine of the eleven badges of fraud provided in *Husky*, the Court must determine (a) whether the Transfers were for the Debtor's benefit; and (ii) whether

---

[80] *See* Deetz Declaration, Exhibit 5.

[81] *See* Deetz Declaration, Exhibit 5.

[82] *See* Deetz Declaration, Exhibit 5.

[83] *See, e.g.,* email from M. Ruzek to E. Kuo dated 4/11/2018 (Vitol_00080065-66), Exhibit 3.

[84] *Id.*

the Debtor's actual fraud renders the Transfers nondischargeable.

**The Transfers were made for the Debtor's Benefit**

47.     It is self-evident that payments directly to the Debtor or to his personal creditors with no connection to GCAC are for the Debtor's personal benefit. Here, each of the Transfers was to the Debtor, the Debtor's individual creditors, or the Debtor's mother.

**The Transfers are NonDischargeable**

48.     Having demonstrated that the Transfers contain sufficient badges of fraud and that the Transfers were for the Debtor's personal benefit, the last inquiry is whether the Transfers are nondischargeable under the Bankruptcy Code. Under relevant Fifth Circuit law, having demonstrated that the Transfers were done with actual fraud and personally benefitted the Debtor, they are nondischargeable.[85] In the face of evidence that the Transfers were made with actual fraud, there is a genuine issue of material fact as to their nondischargeability that necessitates denial of summary judgment so that the parties may proceed to trial on the merits.

49.     Further, Vitol's fees and expenses incurred in pursuing this Adversary Proceeding are a nondischargeable obligation of the Debtor, as well as pre-judgment and post-judgment interest.[86]

## **PRAYER**

In light of the foregoing, Plaintiff respectfully prays that the Court deny the Debtor's Motion for Summary Judgment and grant Plaintiff any such other and further relief, at law or in equity, to which Plaintiff may show itself to be justly entitled.

---

[85] *Husky,* 567 B.R at 764 ("This Court is bound by Fifth Circuit precedent, and therefore does not need to make a finding that the Debtor directly received the $1,161,279.90 that he transferred out of Chrysalis's account; or, alternatively, make a finding that he indirectly benefitted from his transferring these monies out of Chrysalis's account. Rather, this Court need only make a finding that the $1,161,279.90 transferred from Chrysalis's account to the accounts of the Debtor-Controlled Entities was done fraudulently by the Debtor—and this, the Court has already done.").

[86] *See Husky,* 567 B.R at 767.

Dated:  **May 9, 2022.**

Respectfully submitted,

By: */s/ Keith M. Aurzada*

Keith M. Aurzada (SBN 24009880)
Bradley J. Purcell (SBN 24063965)
Lindsey L. Robin (SBN 24091422)
**REED SMITH LLP**
2501 N. Harwood, Suite 1500
Dallas, Texas 75201
T:  469.680.4200
F:  469.680.4299
kaurzada@reedsmith.com
bpurcell@reedsmith.com
lrobin@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP**
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834
F:  713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on **May 9, 2022**, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all counsel of record.

*/s/  Bradley J. Purcell*
Bradley J. Purcell

9/24/2019 5:29 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 37092091
By: Kenya Kossie
Filed: 9/24/2019 5:29 PM

CAUSE NO. 2018-31578

| | |
|---|---|
| GULF COAST ASPHALT COMPANY, LLC | IN THE DISTRICT COURT OF |
| *Plaintiff/Counter-Defendant* | |
| v. | HARRIS COUNTY, TEXAS |
| VITOL INC., | |
| *Defendant/Counter-Plaintiff* | 295TH JUDICIAL DISTRICT |

## DEFENDANT AND COUNTERCLAIMANT VITOL INC.'S AMENDED EMERGENCY MOTION FOR LEAVE TO FILE AMENDED PLEADING ADDING THIRD-PARTY DEFENDANTS ARTHUR J. BRASS AND TRIFINERY, INC.[1]

The scope of this case changed when Counterclaimant Vitol, Inc. ("**Vitol**") timely filed its Second Amended Counterclaim in September 2019 adding claims against Counter-Defendant Gulf Coast Asphalt Company, LLC ("**GCAC**") under the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"). Because of new information Vitol uncovered in August 2019, the case has shifted from one centered on GCAC's breach of an interim financing contract to one also dealing with GCAC's fraudulent transfer of assets Vitol provided to GCAC. Because the current docket control order allows the parties to freely amend their pleadings until March 2, 2020, Vitol's TUFTA claims against GCAC are live claims without court intervention.

In August 2019, Vitol uncovered new information concerning GCAC's fraudulent transfers and also learned that GCAC's President Arthur J. Brass ("**Brass**") fraudulently transferred funds traceable to Vitol from GCAC to himself and/or other related entities or individuals, and has been using GCAC illegitimately as his personal checkbook and alter ego. Also, Vitol has recently received information indicating that GCAC has not been timely paying its debts, and GCAC and

---

[1] Vitol's Amended Motion does not seek additional or different relief. Instead it only provides additional context for the relief originally sought.

Brass are in the process of transferring and absconding with valuable property with the apparent intent to defraud Vitol. Responding to this information, Vitol timely amended its petition to add TUFTA claims.

As both the orchestrator and transferee of GCAC's fraudulent transfers, Brass and his solely owned and managed holding company, Trifinery, Inc. ("**Trifinery**"), are necessary parties for the resolution of Vitol's fraudulent transfer claims. Importantly, GCAC's failure to provide Vitol with discovery on Brass's role in the events giving rise to the suit, and GCAC's failure to timely present a corporate representative for deposition, are the primary reasons Vitol was, until recently, unable to determine whether to join Brass or other entities as parties. Moreover, Vitol only discovered the new information indicative of fraudulent transfers in the last six weeks, and could not have reasonably discovered such information any earlier. As such, Vitol requests the Court grant it leave to join Brass and Trifinery as third-party defendants.

Neither GCAC, Brass, nor Trifinery can claim surprise or prejudice from Vitol joining Brass and Trifinery as parties because: (i) trial is not set until May 2020, (ii) discovery is open until March 2020, (iii) Brass is – and has been – on full notice of the suit from the moment it was first filed and has been involved continuously as GCAC's president, (iv) Brass was originally a defendant and has already given a personal deposition, and (v) Trifinery is one of two purported shareholders of GCAC and is solely owned and controlled by Brass. Vitol respectfully requests that the Court grant Vitol leave to join Brass and Trifinery as third-party defendants so that injustice can be averted.[2]

---

[2] Vitol's 2d Am. Answer and Third-party Pet., attached as **Exhibit A**.

## I. Factual Background

Vitol is an energy-trading firm, and GCAC is a commodities trading firm purportedly focused on asphalt and fuel oil. Brass is the President of GCAC.[3] GCAC has two members: (i) Trifinery, a holding company owned solely by Brass, who is its only officer, and (ii) Joyce Brass, Brass's mother.[4]

In mid-2017, Brass discussed entering into a joint marketing agreement with Vitol using one of his companies to market and trade asphalt. At that time, GCAC was a party to a joint marketing agreement with another energy company.

Although a joint marketing agreement was discussed, no agreement was ever finalized or executed. Instead, the parties entered a financing arrangement under which Vitol provided Brass and his companies with financing to purchase product and hedge price risk in exchange for Vitol earning interest on amounts it loaned. Indeed, Vitol provided millions of dollars in interim financing to Brass and his companies for them to purchase product and hedge price risk. The financing arrangement ended and GCAC entered into a marketing agreement with an international energy-trading firm in early 2018. At present, this marketing agreement is GCAC's only business.[5]

Pursuant to the parties' financing arrangement, Vitol sought repayment of the funds Vitol provided along with the interest it was owed. Confirming the terms of the parties' financing arrangement, Brass and his companies made three payments to Vitol in late 2017 and early 2018. Since then, Brass and his companies have failed and refused to repay the remaining amounts owed. Despite repeated demands from Vitol, to date GCAC owes no less than $9 million in bridge

---

[3] Brass Dep. at 44:25 – 46:19, attached as **Exhibit B.**
[4] *Id* at 44:25 – 46:19; 57:14 – 23.
[5] Goldstein Dep. at 32:14 – 33:14, 112:8 – 21, attached as **Exhibit I.**

financing and another $6 million in hedging costs in addition to the interest that continues to accrue.

While the parties were discussing a potential resolution, and without prior notice, GCAC filed suit against Vitol in an effort to seek first-filer advantage. GCAC seeks an as of yet unspecified amount of damages including alleged loss in value, consequential damages, reliance damages, costs of procuring substitute performance, and mitigation costs. Despite its status as the nominal "plaintiff," GCAC has yet to provide Vitol a calculation of its claimed damages.

Vitol has denied GCAC's allegations and counterclaimed for the unpaid and overdue interim financing, product, and hedging repayments due Vitol—which are the true issues in dispute. Many of the key documents requested by Vitol to date from GCAC have yet to be produced despite repeated requests. The Court heard Vitol's Motion to Compel the production of these documents on September 16, 2019 and GCAC committed on the record to produce them by September 20, but failed to do so. On September 23, GCAC produced a mere three documents despite its affirmation it would provide Vitol with all of the documents requested related to the GCAC/Mercuria Marketing Agreement. Further, GCAC has still not produced an expert report quantifying the alleged—and as of yet unquantified—damages upon which it has sued. In short, this lawsuit is still very much underway and trial itself is not set until May 4, 2020.

Vitol recently learned that Brass has operated GCAC as his alter ego, comingling company funds with his own and transferring funds out of GCAC *despite* GCAC's inability to timely satisfy its debts and pay both its current and future obligations. In other words, Brass has used GCAC as an alter ego and as a vehicle for fraud. This newly discovered information led to the filing of Vitol's TUFTA claims.

## II. Procedural History

Vitol initially brought claims against both Brass and GCAC,[6] but later nonsuited Brass in good faith—and without prejudice—pending further discovery and a thorough investigation into the true relationship between GCAC and Brass.[7] Because GCAC failed to timely produce key and responsive documents, multiple extensions to scheduling deadlines occurred, including for the joinder of additional parties. These scheduling extensions were made to allow GCAC to produce the dozens of categories of documents requested (including information on GCAC's structure and records) and to ultimately allow Vitol to depose GCAC's corporate representative.

Specifically, on March 19, 2019, the parties agreed to extend the joinder deadline for two months while Vitol awaited information yet to be produced by GCAC including, but not limited to, information relating to Brass's role in the events precipitating the suit.[8] Given GCAC's continued failure to provide pending discovery information, on May 17, 2019, Vitol again agreed to further extend the joinder deadline until three days after the deposition of GCAC's corporate representative.[9] When the parties requested the Court enter new docket control order on July 2, 2019, there was no mention of abrogating this prior agreement tying the joinder deadline to GCAC's corporate representative deposition.[10]

GCAC has repeatedly failed to produce documents necessary for the deposition of Brass as GCAC's corporate representative.[11] Vitol was forced to postpone the deposition on multiple occasions because of GCAC's failure to provide discovery responses – including with regard to

---

[6] Vitol's Original Pet., attached as **Exhibit C**.
[7] Not. of Non-suit Without Prejudice, attached as **Exhibit D**.
[8] Emails dated Mar. 19, 2019, attached as **Exhibit E**; Rule 11 Agreement signed Mar. 20, 2019, attached as **Exhibit F**.
[9] Emails dated May 17, 2019, attached as **Exhibit G**.
[10] Joint Agreed Mot. for Continuance and New Docket Control Order, attached as **Exhibit H.**
[11] Vitol filed a motion to compel discovery with the Court on Aug. 27, 2019.

Brass's actions as president and de facto shareholder and with regard to GCAC's relevant documents and communications. Given GCAC's continued refusal to produce key documents, the joinder deadline set out in the most recent docket control order passed before Vitol was able to depose GCAC's corporate representative and before Vitol had the information necessary to make a determination of the necessity of bringing claims against Brass or other related entities.

Moreover, Vitol only now learned through its own counsel's investigations that there is strong reason to believe Brass is using GCAC and Trifinery as alter egos for his own purposes and has misused funds traceable to monies obtained from Vitol or belonging to Vitol as part of the financing arrangement. Vitol has also become aware that GCAC has not been paying its debts when they come due and may have been made insolvent. GCAC's limited September 23rd document production (which was produced as confidential) confirmed the validity of the information Vitol received regarding GCAC's insolvency. Furthermore, it appears that Brass has been fraudulently transferring GCAC funds for his own benefit. Due to this new information, which could not have reasonably been discovered earlier given – among other things – GCAC's refusal to produce information that has been sought for months by Vitol, Vitol now moves—a full nine (9) months before the May 4, 2020 trial setting—for leave to amend its pleading to add Brass and Trifinery as parties to the existing claims.

### III. Arguments and Authorities

The Court should grant Vitol leave to amend its pleadings and join Brass and Trifinery as third-party defendants because new information has become known and neither GCAC, Brass, nor Trifinery can make a showing of undue surprise or prejudice.

### A. Texas law provides for lenient leave to add parties.

Before a case is called for trial, a party may bring additional parties into the suit upon terms prescribed by the court so long as it will not cause unreasonable delay to the trial of the case. Tex. R. Civ. P. 37. A court shall grant a party leave to amend pleadings unless there is a showing that such filing will operate as a surprise to the opposing party or is otherwise prejudicial. *See* Tex. R. Civ. P. 63; *Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990). Critically, "[t]he burden of showing prejudice or surprise rests on the party resisting the amendment." *Greenhalgh*, 787 S.W.2d at 939. Moreover, when full relief cannot be accorded without a party's presence, that party shall be joined to the suit. Tex. R. Civ. P. 39.

### B. Brass and Trifinery are necessary parties to this litigation.

The scope of this case has fundamentally changed with the addition of Vitol's TUFTA claims. In essence, TUFTA exists to prevent a debtor from making himself judgment proof to stymie collection by a creditor, including by transferring assets to insiders. In the Texas Supreme Court's words, TUFTA's purpose is to "prevent debtors from prejudicing creditors by improperly moving assets beyond their reach." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016). "Accordingly, TUFTA "not only creates liability against 'the person for whose benefit the transfer was made,' such as the debtor, but also against 'the first transferee of the asset,' or any 'subsequent transferee.'" *Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (citing Tex. Bus. & Com. Code § 24.009(b)). There is no requirement that transferees in a fraudulent transfer case be judgment debtors of the party seeking to invalidate

the transfer. *Control Works, Inc. v. Seeman*, 2018 Tex. App. LEXIS 4829, at *7 (Tex. App.—Houston [1st Dist.] June 28, 2018, no pet.).

Here, Vitol must be able to join Brass and Trifinery to obtain full satisfaction for its TUFTA claims. The TUFTA claims against GCAC itself are live and will be adjudicated at trial in May 2020. These claims against GCAC directly intersect with those Vitol seeks to bring against Brass and Trifinery. Brass is the chief operator behind GCAC's fraudulent transfers as its President and as one of two members of GCAC through his holding company Trifinery. Moreover, upon information and belief, Brass and Trifinery are the transferees of GCAC's fraudulently transferred assets. Without Brass and Trifinery in this suit, Vitol may be thwarted from recovering its full measure of damages.

### C.  No basis exists for denial of leave to add Brass and Trifinery as parties.

GCAC, Brass, and Trifinery cannot show surprise or prejudice that would make joinder improper. There are still nine (9) months until trial, Brass was originally named as a defendant in his personal capacity, Brass has had notice Vitol may re-join him as a counter-defendant for many months since the time of his nonsuit without prejudice, and significant discovery remains outstanding (including dozens of document requests and pending depositions) as part of the lawsuit.

### 1.  Adding Brass and Trifinery would not cause surprise, let alone unfair surprise.

First, Brass is the president of GCAC and one of only two shareholders through his sole ownership and control of Trifinery. Brass brought this suit through GCAC in May 2018. He has been deposed in his individual capacity and is also GCAC's appointed corporate representative. He has an intimate understanding of the facts and allegations of this case as he has been in the driver's seat since its inception. Moreover, Trifinery is a self-described holding company solely

owned and managed by Brass and one of two owners of GCAC. In short, Brass is GCAC and Trifinery and neither Brass, Trifinery, nor GCAC can show that joining Brass and Trifinery would cause surprise – much less unfair surprise.

Second, Brass has been on notice that Vitol may bring claims against him **for over fifteen (15) months**. Vitol named Brass as a defendant when Vitol filed its petition in a parallel suit, which was eventually consolidated with the instant action.[12] After Vitol nonsuited Brass in good faith and without prejudice pending the completion of discovery, the parties entered into multiple agreements with GCAC to extend the joinder deadline while GCAC produced outstanding documents and information to allow Vitol to complete its investigation. This includes an agreed amendment to the joinder deadline explicitly premised on the results of the deposition of GCAC's corporate representative.[13] To preclude Vitol from adding Brass and Trifinery as defendants in this proceeding would be to improperly reward GCAC for circumventing its discovery obligations for months, and would result in severe prejudice to Vitol.

Third, the claims Vitol asserts against Brass and Trifinery are similar to both the claims against GCAC and those asserted against Brass in the original petition. For instance, in that petition Vitol asserted that Brass was believed to be using proceeds from Vitol for his own personal benefit.[14] At that time, Vitol also asserted a fraud claim against Brass in his individual capacity.[15] Thus, the claims Vitol now brings against Brass and Trifinery in its Second Amended Counterclaim and Third-party Petition can be no surprise to Brass, GCAC, or Trifinery.

---

[12] *See* Ex. C, Vitol's Original Pet.
[13] Ex. G, Emails dated May 17, 2019.
[14] Ex. C, Vitol's Original Pet. at ¶ 19.
[15] Ex. C, Vitol's Original Pet at ¶ 32-34.

**2.  Adding Brass and Trifinery would cause no prejudice – let alone unfair prejudice.**

Adding Brass and Trifinery as parties at this stage of litigation will cause no prejudice. There are still nine (9) months before trial, which is currently set for May 4, 2020. This is nearly as long a period as that provided when Brass initially caused GCAC to file suit, as there were only thirteen months between the time of GCAC's first petition and the original trial setting. Thus, Brass and Trifinery have ample time to prepare their defense to Vitol's claims, especially given that Brass joins this suit not as a stranger, but as President and principal of GCAC. Moreover, **the discovery period does not close until March 2, 2020**. Brass will suffer no harm from joining the suit nine months before trial. Because Trifinery is merely a holding company solely owned and managed by Brass, there is similarly no prejudice to its joinder.

Further, Vitol added Brass and Trifinery to the suit as soon as practicable given its identification of additional information and the ongoing discovery dispute with GCAC. The parties' previous joinder deadline – which has been amended on multiple occasions due to GCAC's non-compliance with its discovery obligations – only passed on July 31, 2019, and passed without GCAC ever fulfilling its May 17, 2019 agreement to produce documents necessary for the deposition of GCAC's corporate representative. As a reminder, the parties also agreed to extend the joinder deadline until three days after the completion of GCAC's corporate representative deposition.[16] The parties never repealed the agreement premising the joinder deadline on GCAC's corporate representative deposition.[17]

Moreover, Vitol did not glean the new information necessitating the joinder of Brass and Trifinery until mid-August, 2019. Vitol could not have independently learned this information any

---

[16] Ex. G, Emails dated May 17, 2019.
[17] Ex. H, Joint Agreed Mot. for Continuance and New Docket Control Order.

sooner, especially given GCAC's refusal to produce documents necessitating postponement of its corporate representative deposition. Vitol has been forced to repeatedly press GCAC over many months to obtain the information it needed to determine Brass's role in this case. However due to GCAC's continued failure to produce documents and its corporate representative for deposition, Vitol was not able to reach that conclusion before the latest scheduling order joinder deadline.

<div align="center">

**Prayer**

</div>

For the reasons stated above defendant/counterclaimant Vitol respectfully requests that this Court grant this Emergency Motion for Leave and permit Vitol to join Brass and Trifinery as third-party defendants and grant Vitol such other and further relief at law or in equity to which it may be justly entitled.

Respectfully submitted,

**REED SMITH LLP**

By: */s/ Kenneth E. Broughton*
    Kenneth E. Broughton
    State Bar No. 03087250
    Francisco Rivero
    State Bar No. 24046725
    Michael Bernick
    State Bar No. 24078227
    811 Main Street, Suite 1700
    Houston, Texas  77002-6110
    Telephone: 713.469.3819
    Telecopier: 713.469.3899
    kbroughton@reedsmith.com
    frivero@reedsmith.com
    mbernick@reedsmith.com

    ***Attorneys for Vitol Inc.***

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with GCAC's counsel on September 12, 2019 regarding the requested relief, but the parties were unable to reach an agreement to resolve all outstanding issues. Thus, the Court's intervention is required.

*/s/ Kenneth E. Broughton*
Kenneth E. Broughton

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served on all counsel of record on this 24th day of September 2019, in accordance with the Texas Rules of Civil Procedure.

William P. Maines - wmaines@hallmaineslugrin.com
Neil E. Giles - ngiles@hallmaineslugrin.com

*/s/ Kenneth E. Broughton*
Kenneth E. Broughton

CAUSE NO. 2018-31578

| | |
|---|---|
| GULF COAST ASPHALT COMPANY, LLC | IN THE DISTRICT COURT OF |
| *Plaintiff* | |
| *v.* | HARRIS COUNTY, TEXAS |
| VITOL INC., | |
| *Defendant* | 295TH JUDICIAL DISTRICT |

## COUNTERCLAIMANT AND THIRD-PARTY PLAINTIFF VITOL INC.'S SECOND AMENDED COUNTERCLAIMS, THIRD-PARTY PETITION, AND APPLICATION FOR INJUNCTIVE RELIEF

Counterclaimant and third-party plaintiff Vitol Inc. ("**Vitol**") files these Second Amended Counterclaim and Third-Party Petition against plaintiff and Counter-Defendant Gulf Coast Asphalt Company, LLC ("**GCAC**") and third-party defendants Arthur J. Brass ("**Brass**") and Trifinery, Inc. ("**Trifinery**") (Brass and Trifinery collectively "**Third-Party Defendants**").

### RELIEF

1.      Counterclaimant and third-party plaintiff Vitol seeks monetary relief over $1,000,000 and non-monetary relief. Tex. R. Civ. P. 47(c)(5).

### PARTIES

2.      Vitol is a Delaware corporation with its principal place of business at 2925 Richmond Avenue, Houston, Texas 77098 and has already entered an appearance.

3.      GCAC is an Alabama corporation with its principal place of business at 1990 Post Oak Blvd., Suite 2400, Houston, Texas 77056 and has already entered an appearance.

4.      Brass is an individual residing at 2508 Pelham Drive, Houston, Texas 77019. He may be served at his residence or wherever he may be found.



**EXHIBIT A**

5.      Trifinery is a Texas corporation with the same principle place of business as GCAC at 1990 Post Oak Blvd., Suite 2400, Houston, Texas 77056. Trifinery may be served through its registered agent, Joseph Mattingly Jr., at 1990 Post Oak Blvd., Suite 2400, Houston, Texas 77056.

## JURISDICTION

6.      The Court has subject-matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

## VENUE

7.      Venue is proper in Harris County because the facts giving rise to Vitol's causes of action occurred in Harris County. Tex. Civ. Prac. & Rem. Code § 15.002(a)(1). Additionally, GCAC and Trifinery's respective principal offices are in Harris County, and Brass resides in Harris County. *Id*. § 15.002(a)(2) and (3).

## SUMMARY OF RELIEF REQUESTED

### A.  Factual Background

8.      Beginning in 2017, Vitol provided millions of dollars in bridge financing, product, and hedging services to GCAC based on GCAC and Brass's representations and requests. In exchange for the bridge financing and hedging services, Brass/GCAC represented and promised that Vitol would be repaid the amounts loaned with interest.

9.      GCAC is owned 50% / 50% by two members: Trifinery and Joyce Brass, Brass's mother. Brass is the President of GCAC. Trifinery is a holding company solely owned by Brass, who is its only officer. At all relevant times, Brass exercised and still exercises complete control over GCAC and Trifinery. A former Brass associate recently raised the alarm and alerted Vitol that Brass has been using his entities to perpetrate a fraud in which Brass has illegitimately

2

siphoned money held by his entities for his personal use. On information and belief, funds provided by or owed to Vitol have been misappropriated by Brass through his entities.

10.     Although GCAC/Brass made a few payments to Vitol in late 2017 and early 2018 pursuant to the financing arrangement and as an inducement to obtain more funds from Vitol, GCAC/Brass subsequently failed and refused to repay approximately $9 million in bridge financing and $6 million in hedging costs despite repeated demands from Vitol. The debt remains due and interest continues to accrue. During the period of time in which Brass pretended to discuss his debt with Vitol, on information and belief, Brass fraudulently transferred money from GCAC to himself, using GCAC as his own personal checkbook. This despite the fact that the money held by GCAC had been provided by Vitol and/or was owed to Vitol.

11.     GCAC, Brass, and their associates made material misrepresentations to induce Vitol to provide these millions of dollars in bridge financing, product, and hedging services. According to a former Brass associate, Brass siphoned funds from GCAC for no legitimate business purpose. On information and belief, this money was used by Brass to fund his lavish lifestyle. GCAC and Brass either knew GCAC would be unable to repay and/or had no intention to repay. The statements made to Vitol were false when made or were made recklessly without knowledge of their truth and Vitol relied on such statements to its detriment.

12.     Upon information and belief, GCAC has failed to repay Vitol because of a lack of financial resources and inability to pay its debts and obligations. Vitol's recent investigations have similarly indicated Counter-Defendant and Third-Party Defendants are insolvent or are likely to become insolvent because they are not paying their debts when due. Vitol has learned through its investigation that Vitol is not the only party aggrieved by Counter-Defendant and Third-Party Defendants' inability to pay debts timely.

13.     Upon information and belief: (i) Brass has been using GCAC and Trifinery as alter egos for his own illegitimate and fraudulent purposes; (ii) GCAC, Brass, and associated entities and individuals have comingled funds and have ignored corporate distinctions; (iii) at Brass's direction through his role as President, beneficial owner, and de facto member of GCAC, GCAC has been utilized to funnel significant funds to Brass and/or and other insiders/related entities with intent to hinder, delay, or defraud GCAC's creditors, including Vitol; and (iv) the funds Brass misappropriated are traceable to transactions financed by Vitol and were used by Brass for his own direct and personal benefit and to shield GCAC's assets from collection.

**B.  Breach of Contract**

14.     Vitol incorporates by reference the factual statements set forth above.

15.     GCAC and Vitol had an agreement by which Vitol provided bridge financing, product, and hedging services to GCAC that GCAC was obligated to repay with interest.

16.     GCAC breached its agreement with Vitol by refusing to repay approximately $9 million in bridge financing and $6 million in hedging costs.

17.     Vitol has suffered damages of approximately $15 million, not including interest, which continues to accrue, and consequential damages.

**C.  Fraud**

18.     Vitol incorporates by reference the factual statements set forth above.

19.     GCAC and Brass made material misrepresentations to induce Vitol to provide millions of dollars in bridge financing, product, and hedging services that they either knew GCAC would be unable to repay and/or had no intention to repay.

20.     GCAC and Brass's statements were false when made or were made recklessly without knowledge of their truth and Vitol relied on such statements to its detriment.

001058

21.     As a result of GCAC and Brass's misrepresentations, Vitol has suffered damages in the amount of approximately $15 million. In addition to its actual damages, Vitol seeks an award of exemplary damages and the imposition of a constructive trust.

## D.  Quantum Meruit

22.     Vitol incorporates by reference the factual statements set forth above.

23.     Vitol provided valuable bridge financing, product, and hedging services to GCAC and GCAC accepted Vitol's bridge financing, product, and hedging services. GCAC had notice that Vitol expected to be compensated for its bridge financing, product, and hedging services. Vitol is owed approximately $15 million as the reasonable value of its services.

## E.  Conversion

24.     Vitol incorporates by reference the factual statements set forth above.

25.     Counter-Defendant and Third-Party Defendants have wrongfully exercised dominion over personal property belonging to Vitol. Vitol seeks the return of its property or payment received by Counter-Defendant and Third-Party Defendants.

## F.  Declaratory Judgment: Proposed JMA is not an Enforceable Contract

26.     Vitol incorporates by reference the factual statements set forth above.

27.     A dispute has arisen between GCAC and Vitol concerning the Proposed JMA. Vitol requests that the Court enter a judgment declaring that the Proposed JMA is not an enforceable contract between Vitol and GCAC; or, in the alternative, that GCAC may not recover the damages its seeks under the Proposed JMA.

28.     Vitol is entitled to recover its reasonable and necessary attorney's fees in relation to the declaratory judgment sought against GCAC.

001059

### G.  Fraudulent Transfer under Chapter 24 of Texas Business & Commerce Code

29.    Vitol incorporates by reference the factual statements set forth above.

30.    GCAC is owned by two members: Trifinery, Inc., a holding company owned solely by Brass, and Joyce Brass, Brass's mother.

31.    Upon information and belief, GCAC and Brass have comingled funds.

32.    Upon information and belief, GCAC is subject to Brass's complete control. At Brass's direction, GCAC has transferred significant funds out of its accounts to Brass with intent to hinder, delay, or defraud GCAC's creditors.

33.    Upon information and belief, despite Vitol's claim for approximately $15 million, GCAC and Brass have transferred these comingled funds and/or other property with the intent to hinder, delay, and/or defraud creditors of Counter-Defendant and Third-Party Defendants, including Vitol. Brass and GCAC are insiders and affiliates of one another, and transfers have been made amongst those insiders and affiliates after Vitol's claims arose against GCAC. In other words, Brass transferred the funds and/or property with the intent of preventing Vitol from collecting amounts owed by Counter-Defendant and Third-Party Defendants.

34.    Upon information and belief, Counter-Defendant and Third-Party Defendants are insolvent because they are not paying their debts when due. Vitol has learned through its investigation that Vitol is not the only party aggrieved by Counter-Defendant and Third-Party Defendants' inability to pay debts timely.

35.    As a result of Counter-Defendant and Third-Party Defendants' fraudulent transfer, Vitol has suffered damages.

6

36.     Vitol seeks to avoid all fraudulent transfers between GCAC, Brass, Trifinery, Joyce Brass, and other related persons/entities to the extent necessary to satisfy Vitol's claims.

37.     Vitol is entitled to recover costs and reasonable and necessary attorney's fees under Section 24.013 of the Texas Business & Commerce Code.

**H.  Unjust Enrichment**

38.     Vitol incorporates by reference the factual statements set forth above.

39.     Counter-Defendant and Third-Party Defendants have been unjustly enriched in the amount of approximately $15 million by uncompensated bridge financing, product, and hedging services provided by Vitol. Equity demands that this amount be repaid to Vitol by Counter-Defendant and Third-Party Defendants. Vitol also seeks a constructive trust on any funds and/or proceeds still held by Counter-Defendant and Third-Party Defendants.

**I.  Attorney's Fees**

40.     Vitol incorporates by reference the factual statements set forth above.

41.     As a result of GCAC's breach of contract, Vitol has incurred and continues to incur reasonable and necessary attorneys' fees.

42.     Vitol is entitled to recover its reasonable and necessary attorneys' fees from GCAC under Tex. Civ. Prac. & Rem. Code 38.001.

43.     Vitol is also entitled to recover costs and reasonable and necessary attorney's fees from Counter-Defendant and Third-Party Defendants under Section 24.013 of the Texas Business & Commerce Code and the Texas Declaratory Judgment Act.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTIONS

44.     Vitol incorporates by reference the factual statements set forth above.

001061

45.     Based upon the above-described facts, Vitol seeks a temporary restraining order and temporary injunction: (1) preventing GCAC from transferring property or making distributions to its members, Brass, or other related insiders/entities until after the resolution of this litigation, and (2) preventing Brass from transferring his property, by sale or otherwise, including his real property located in or around Hockley, Texas and all proceeds from any sale or transfer of that real property, unless and until Brass can establish that the funds used to purchase, pay for, or renovate such property are not traceable to Vitol. Vitol is entitled to recover the approximately $15 million of value it provided Counter-Defendant and Third-Party Defendants, and given the apparent insolvency of Counter-Defendant and Third-Party Defendants, an injunction is necessary to prevent the dissipation of Counter-Defendant and Third-Party Defendants remaining assets to frustrate collection.

46.     Section 24.008(a)(3)(A) of Tex. Bus. & Comm. Code allows creditors to obtain injunctive relief against further disposition by the debtor or a transferee, or both, of the assets transferred or of other property. *Sargent v. Al Saleh*, 512 S.W.3d 399 (Tex. App.—Corpus Christi 2016, no pet.) (citing Tex. Bus. & Comm. Code § 24.008(a)(3)(A)).

47.     Section 65.011 of the Texas Civil Practice and Remedies Code allows a court to issue an injunction when a party performs or is about to perform an act relating to the subject of pending litigation and the act would tend to render the judgment in that litigation ineffectual, or if irreparable injury to real or personal property is threatened irrespective of any remedy at law.

48.     To obtain injunctive relief, the applicant must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). As the Texas Supreme Court has recognized, "[t]he purpose of a TRO is to preserve the status quo"

pending the Court's more considered evaluation of the need for temporary injunctive relief. *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004). Further, an applicant for a temporary injunction does not have an adequate remedy at law if the non-movant party is insolvent. *Surko Enters. v. Borg-Warner Acceptance Corp*., 782 S.W.2d 223, 225 (Tex. App.—Houston [1st Dist.] 1989, no writ)).

49.     Vitol has multiple causes of action against Counter-Defendant and Third-Party Defendants as described above and it is probable Vitol will recover in this matter. Vitol provided Counter-Defendant and Third-Party Defendants with millions of dollars of bridge financing, physical product, and hedging services, approximately $15 million of which has not been repaid. Counter-Defendant and Third-Party Defendants made multiple payments to Vitol in late 2017 and early 2018 in recognition of their obligation to repay Vitol. Vitol has kept extensive records of such transactions and has provided these to Counter-Defendant and Third-Party Defendants, who still refuse to pay.

50.     Previous discussions indicate that the reason for Counter-Defendant and Third-Party Defendants' failure to repay Vitol is the lack of financial wherewithal and inability to pay their debts and obligations. Upon information and belief, GCAC in particular has been unable to pay its debts when due. Vitol's recent investigations have similarly indicated Counter-Defendant and Third-Party Defendants are insolvent. Accordingly, Vitol is entitled to an injunction to prevent any further dispersal of Counter-Defendant and Third-Party Defendants' remaining assets.

51.     If an injunction is not granted, the harm to Vitol is imminent because Counter-Defendant and Third-Party Defendants will likely dispose of property and assets that rightfully belong to Vitol. Further, if GCAC is allowed to make distributions to its members, including Brass, those funds may be lost forever. Vitol has no adequate remedy at law if it cannot recover what it is owed from Counter-Defendant and Third-Party Defendants due to their insolvency.

001063

52.     The risk of harm to Counter-Defendant and Third-Party Defendants by granting the injunction is minimal. The injunction is temporary in nature, limited in scope, and directed specifically to halt the disposal of what does not rightfully belong to Counter-Defendant and Third-Party Defendants. Granting the injunction will not interrupt GCAC's daily operations.

53.     Vitol asks the Court to set its application for a temporary restraining order and temporary injunction for hearing and, after hearing, issue a temporary restraining order, temporary injunction against Counter-Defendant and Third-Party Defendants.

### PRAYER

Defendant Vitol Inc. respectfully requests that the Court render judgment for Vitol on its counterclaims, issues temporary injunctive relief, and that Vitol be awarded such other and further relief, both at law and equity, to which it may be justly entitled.

By: /s/ *Kenneth E. Broughton*
Kenneth E. Broughton
State Bar No. 03087250
Francisco Rivero
State Bar No. 24046725
Michael Bernick
State Bar No. 24078227
811 Main, Suite 1700
Houston, Texas 77002
Telephone: 713.469.3800
Facsimile:  713.469.3899
kbroughton@reedsmith.com
frivero@reedsmith.com
mbernick@reedsmith.com

*Attorneys for Defendant and*
*Counterclaimant Vitol Inc.*

10

001064

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served upon all known parties and counsel of record in accordance with the Texas Rules of Civil Procedure on this 12th day of September, 2019.

William P. Maines
Neil E. Giles
HALL MAINES LUGRIN, P.C.
Williams Tower, 64th Floor
2800 Post Oak Blvd.
Houston, Texas  77056-6125
wmaines@hallmaineslugrin.com
ngiles@hallmaineslugrin.com

_/s/ Kenneth E. Broughton_
Kenneth E. Broughton

001065

CAUSE Nº 2018-31578

| | |
|---|---|
| GULF COAST ASPHALT<br>COMPANY, LLC | IN THE DISTRICT COURT OF |
| *Plaintiff* | |
| *v.* | HARRIS COUNTY, TEXAS |
| VITOL INC., | |
| *Defendant* | 295TH JUDICIAL DISTRICT |

## VERIFICATION OF ERIC KUO

STATE OF TEXAS

COUNTY OF HARRIS

    1.     My name is Eric Kuo.  I am over 21 years of age, of sound mind, and capable of making this affidavit.  The facts stated in this verification are within my personal knowledge and are true and correct.

    2.     I am currently employed as a Fuel Oil Trader at Vitol Inc. ("**Vitol**") in Houston, Texas. I have been employed at Vitol for approximately 8 years and was employed at Vitol when the events mentioned in this affidavit occurred. I came to have knowledge of the facts stated herein as part of my employment at Vitol.

    3.     I have read the foregoing Second Amended Counterclaim and Third-party Petition and the material factual allegations, including paragraphs 8-13, are true and correct to my own personal knowledge.

 

_____

Eric Kuo
Fuel Oil Trader
Vitol Inc.

 

    SUBSCRIBED TO AND SWORN TO BEFORE ME on this ⏐⏐ th day of September 2019, to certify which witness my hand and seal of office.



Notary Public in and for
The State of Texas

Cecilia Noemi Montejo
My Commission Expires
09/03/2022
ID No. 3357879

2

001067

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

## PLAINTIFF VITOL INC.'S INITIAL DISCLOSURES

Pursuant to Rule 26(a) of a Federal Rules of Civil Procedure, made applicable to this Adversary Proceeding under Rule 7026 of the Federal Rules of Bankruptcy Procedure, Plaintiff Vitol Inc. (the "**Vitol**" or "**Plaintiff**") files its Initial Disclosures as follows. These disclosures are based on information reasonably available to Vitol as of the date of this filing. Vitol does not represent that it is identifying every document, individual, or piece of evidence possibly relevant to this lawsuit, nor does Vitol waive any right to object to production of any document or other evidence on the basis of any privilege, the work product doctrine, relevancy, undue burden, or any other valid basis. Vitol reserves its right to supplement and/or amend these disclosures to the extent additional documents and/or information may be discovered.

## I.    **Individuals**.

Pursuant to Rule 26(a)(1)(A)(i), Vitol discloses the following individuals likely to have discoverable information. With respect to Vitol or its employees, all contact should be only through Vitol's undersigned attorneys.

1. Eric Kuo
   c/o Keith M. Aurzada
   Reed Smith LLP
   2850 N. Harwood Street, Ste. 1500
   Dallas, TX 75201
   T: 469.680.4211
   Mr. Kuo has general knowledge of the business relationship between Vitol and GCAC and interacted with Defendant Brass during the pendency of that relationship.

2. Mike Loya
   c/o Keith M. Aurzada
   Reed Smith LLP
   2850 N. Harwood Street, Ste. 1500
   Dallas, TX 75201
   T: 469.680.4211
   Mr. Loya has general knowledge of the business relationship between Vitol and GCAC and interacted with Defendant Brass during the pendency of that relationship.

3. Patrick Perugini
   Address unknown
   Mr. Perugini worked for the Debtor at GCAC and had knowledge of his appropriating funds properly due to Vitol.

4. A.J. Brass
   c/o Miriam Goott
   Walker & Patterson P.C.
   P.O. Box 61301
   Houston, TX 77208
   T: 713.956.5577
   As the Defendant and the Debtor, Mr. Brass has personal knowledge of his misrepresentations and frauds committed against Vitol.

5. Catherine Mattingly Brass
   2508 Pelham Dr.
   Houston, TX 77019
   As the wife of the Debtor, Catherine Brass may have knowledge of Debtor's finances and his use of company funds to support their lifestyle and the transfer of proceeds from the Hockley House to her personal bank accounts.

6.      Joyce Brass
        2508 Pelham Dr.
        Houston, TX 77019
        As the co-owner of GCAC, Joyce Brass should have knowledge of the Debtor's use
        of company funds and the undocumented loans transferred to her personal accounts.

7.      Sandra Brass
        Address unknown
        Sandra Brass should have knowledge of the alleged loan transferred to her personal
        accounts.

8.      All persons identified in documents disclosed by any party herein pursuant to Rule
        26(a)(1), in response to requests for discovery, attached to pleadings, or otherwise.

9.      Vitol reserves the right to supplement these disclosures consistent with the Federal
        Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure.

## II.      **Documents**.

Concurrently with serving these Disclosures, Vitol is producing on a rolling basis all documents in its possession, custody, or control that it presently has reason to believe are relevant to facts alleged in the pleadings. These documents include documents produced in the state court litigation.

## III.      **Computation of Damages**.

Vitol seeks to prevent Debtor from discharging at least $10 Million in damages arising from Debtor's conduct. In the state-court litigation, Vitol asserted damages of at least $14,793,974 arising from Debtor's conduct. Debtor and Vitol entered an Agreed Judgment in the state-court litigation for $10 Million as part of a settlement of Vitol's claims.

## IV.      **Insurance Agreements**.

Rule 26(a)(1)(D) requires production of "any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment." Vitol is unaware of any insurance agreement fitting this description.

Dated: **October 29, 2021.**                              Respectfully submitted,

By: */s/ Keith M. Aurzada*
    Keith M. Aurzada (SBN 24009880)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T: 469.680.4200
    F: 469.680.4299
    kaurzada@reedsmith.com
    lrobin@reedsmith.com

    and

    Michael H. Bernick (SBN 24078277)
    Mason W. Malpass (SBN 24109502)
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T: 713.469.3834
    F: 713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

    *Attorneys for Vitol Inc.*

### CERTIFICATE OF SERVICE

I certify that on **October 29, 2021** a true and correct copy of the foregoing document was served on Defendant's counsel *via email*.

    */s/ Keith M. Aurzada*
    Keith M. Aurzada

THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| IN RE | § | CASE NO. 21-60025 |
| | § | |
| ARTHUR J. BRASS | § | |
| DEBTOR | § | |
| | § | |
| VITOL INC. | § | ADVERSARY NO. 21-06006 |
| Plaintiff | § | |
| v. | § | RESPONSES TO PLAINTIFF'S |
| | § | FIRST SET OF REQUESTS FOR |
| ARTHUR J. BRASS | § | PRODUCTION |
| Defendant | § | |
| | § | |

**Vitol Inc.'s Objections and Responses to Debtors' First Set of Requests for Production**

Pursuant to FED. R. CIV. P. 34, Vitol Inc. ("**Vitol**"), serves these Objections and Responses to Arthur J. Brass's ("**Debtor**") First Set of Requests for Production to Vitol Inc.

As Vitol's investigation in this matter is continuing, Vitol reserves the right to supplement or amend its responses and objections to the extent allowed by the Federal Rules of Civil Procedure, Local Rules of the Court, any agreement of the parties, and any order of the Court.

001073

Dated: <u>January 28, 2022</u>

<div style="margin-left: 50%;">

By: <u>/s/ Keith M. Aurzada</u>

Keith M. Aurzada (SBN 24009880)
Lindsey L. Robin (SBN 24091422)
Devan J. Dal Col (SBN 24116244)
**REED SMITH LLP**
2850 N. Harwood, Suite 1500
Dallas, Texas 75201
T:  469.680.4200
F:  469.680.4299
kaurzada@reedsmith.com
lrobin@reedsmith.com
ddalcol@reedsmith.com
and
Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP**
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834
F:  713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 28**,** 2022 a true and correct copy of the foregoing document was served on Debtor's counsel via electronic transmission at mgoott@walkerandpatterson.com.

<div style="margin-left: 50%;">

<u>/s/ Bradley J. Purcell</u>
Bradley J. Purcell

</div>

001074

**REQUEST FOR PRODUCTION NO. 1:**

Produce all executed loan agreements between the Debtor and Vitol.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Vitol has produced all responsive documents at this time. Vitol refers GCAC to the documents produced including GCAC_4694.

**REQUEST FOR PRODUCTION NO. 2:**

Produce all executed loan agreements between the Debtor and GCAC.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Vitol has produced all responsive documents at this time. Vitol refers GCAC to the documents produced including GCAC_4694.

**REQUEST FOR PRODUCTION NO. 3:**

Produce all executed financing agreements between the Debtor and Vitol.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Vitol has produced all responsive documents at this time. Vitol refers GCAC to the documents produced including GCAC_4694.

**REQUEST FOR PRODUCTION NO. 4:**

Produce all executed financing agreements between GCAC and Vitol.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Vitol has produced all responsive documents at this time. Vitol refers GCAC to the documents produced including GCAC_4694.

**REQUEST FOR PRODUCTION NO. 5:**

Produce the interim financing agreement(s) that is referenced by Vitol in Paragraphs 9, 10 and 11 of the Amended Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Vitol has produced all documents related the financing agreement. Vitol refers GCAC to the documents produced including GCAC_4694.

**REQUEST FOR PRODUCTION NO. 6:**

Produce all executed settlement agreements between Vitol and the Debtor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Vitol has produced all responsive documents. Vitol refers Debtor to the Settlement Agreements BK-Vitol-9, BK-Vitol-22, and BK-Vitol-438.

**REQUEST FOR PRODUCTION NO. 7:**

Produce all executed settlement agreements between GCAC and the Debtor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

To the extent this request calls for the production of settlement agreements involving GCAC and the Debtor, Vitol refers Debtor to the Settlement Agreements BK-Vitol-9, BK-Vitol-22, and BK-Vitol-438.

**REQUEST FOR PRODUCTION NO. 8:**

Produce all executed agreements between Vitol and the Debtor that relate to Vitol extending funds to GCAC as alleged in Paragraph 8 of the Amended Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Vitol has produced documents responsive to this request, which include among other documents the email exchanges between the parties.

**REQUEST FOR PRODUCTION NO. 9:**

Produce all employment agreements between Vitol and GCAC.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

After conducting a search, Vitol has no responsive documents at this time.

**REQUEST FOR PRODUCTION NO. 10:**

Produce all employment agreements between Vitol and the Debtor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

After conducting a search, Vitol has no responsive documents at this time.

**REQUEST FOR PRODUCTION NO. 11:**

All documents obtained by Vitol during discovery in this Adversary, including but not limited to documents that were produced to Vitol from a subpoena.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Vitol has produced all responsive documents and will continue to produce responsive documents if any.

**REQUEST FOR PRODUCTION NO. 12:**

All communications between Vitol and the Chapter 7 Trustee in this Bankruptcy case.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Vitol will produce responsive documents.

**REQUEST FOR PRODUCTION NO. 13:**

Produce all documents that support Vitol's allegation in Paragraph 7 of the Amended Complaint that Vitol "separately agreed to finance GCAC's operations".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Vitol has already produced all responsive documents. Vitol refers debtor to documents including GCAC_4694, Vitol_9622, VITOL_00076042, VITOL_00004612, VITOL_00080111, and EEPB_174.

**REQUEST FOR PRODUCTION NO. 14:**

Produce all communications that support Vitol's allegation in Paragraph 7 of the Amended Complaint that Vitol "separately agreed to finance GCAC's operations".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

Vitol has already produced all responsive communications. Vitol refers debtor to communications including GCAC_4694, Vitol_9622, VITOL_00076042, VITOL_00004612, and VITOL_00080111.

**REQUEST FOR PRODUCTION NO. 15:**

Produce all documents that support Vitol's allegation in Paragraph 7 of the Amended Complaint that Brass represented that he would remit to Vitol the proceeds of the sale of asphalt and other goods purchased with Vitol's money.

001077

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Vitol has already produced all responsive documents. Vitol refers debtor to documents including GCAC_4694, VITOL_00076042, VITOL_00004612, VITOL_00080111, Vitol_221.

**REQUEST FOR PRODUCTION NO. 16:**

Produce all documents that support Vitol's allegation in Paragraph 9 of the Amended Complaint that GCAC was insolvent during the pendency of the interim agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

Vitol has already produced all responsive documents. Vitol refers Debtor to documents including EEPB_174, EEPB_175, GCAC_9845, and GCAC_9846-10078.

**REQUEST FOR PRODUCTION NO. 17:**

Produce all documents that support Vitol's allegation in Paragraph 9 of the Amended Complaint that the financing from Vitol was GCAC's only source of capital.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Vitol has already produced all responsive documents. Vitol refers debtor to documents including EEPB_174, EEPB_175, GCAC_9845, and GCAC_9846-10078.

**REQUEST FOR PRODUCTION NO. 18:**

Produce all communications that support Vitol's allegation in Paragraph 9 of the Amended Complaint that the financing from Vitol was GCAC's only source of capital.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Vitol has produced all responsive documents.

**REQUEST FOR PRODUCTION NO. 19:**

Produce all documents that support Vitol's allegation in Paragraph 10 of the Amended Complaint that Brass never intended to make GCAC perform its obligations under the interim agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Vitol has already produced all responsive documents. Vitol refers debtor to documents including EEPB_174, EEPB_175, GCAC_9845, GCAC_9846-10078, and Brass_50-90.

001078

**REQUEST FOR PRODUCTION NO. 20:**

Produce all communications that support Vitol's allegation in Paragraph 10 of the Amended Complaint that Brass never intended to make GCAC perform its obligations under the interim agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

Vitol has produced all responsive documents.

**REQUEST FOR PRODUCTION NO. 21:**

Produce all documents that support Vitol's allegation in Paragraph 10 of the Amended Complaint that Brass owed Vitol at least $14,793,947.00.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Vitol has already produced all responsive documents. Vitol refers debtor to documents including EEPB_174, VITOL_80066, GCAC_9845, GCAC_9846-10078, GCAC_9511, and Brass_50.

**REQUEST FOR PRODUCTION NO. 22:**

Produce all documents that support Vitol's allegation in Paragraph 10 of the Amended Complaint that GCAC owed Vitol at least $14,793,947.00.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

Vitol has already produced all responsive documents. Vitol refers debtor to documents including EEPB_174 and VITOL_80066.

**REQUEST FOR PRODUCTION NO. 23:**

Produce all communications that support Vitol's allegation in Paragraph 10 of the Amended Complaint that Brass owed Vitol at least $14,793,947.00.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Vitol has already produced all responsive communications. Vitol refers Debtor to communications including Vitol_1816 and Vitol_1979.

**REQUEST FOR PRODUCTION NO. 24:**

Produce all communications that support Vitol's allegation in Paragraph 10 of the Amended Complaint that GCAC owed Vitol at least $14,793,947.00.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Vitol has already produced all responsive communications. Vitol refers Debtor to communications including Vitol_1816 and Vitol_1979.

001079

**REQUEST FOR PRODUCTION NO. 25:**

Produce all documents that support Vitol's allegation in Paragraph 15 of the Amended Complaint that Brass made a "pre-settlement representation to Vitol regarding the accessibility of funds available to satisfy the judgment".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Vitol has produced all responsive documents.

**REQUEST FOR PRODUCTION NO. 26:**

Produce all communications that support Vitol's allegation in Paragraph 15 of the Amended Complaint that Brass made a "pre-settlement representation to Vitol regarding the accessibility of funds available to satisfy the judgment".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Vitol has produced all responsive documents.

**REQUEST FOR PRODUCTION NO. 27:**

Produce all documents that support Vitol's allegation in Paragraph 15 of the Amended Complaint that Brass represented to Vitol that he had a $1.5 million dollar certificate of deposit, which he could use to pay part of the Judgment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

Vitol has produced all responsive documents.

**REQUEST FOR PRODUCTION NO. 28:**

Produce all communications that support Vitol's allegation in Paragraph 15 of the Amended Complaint that Brass represented to Vitol that he had a $1.5 million dollar certificate of deposit, which he could use to pay part of the Judgment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

Vitol has produced all responsive documents.

**REQUEST FOR PRODUCTION NO. 29:**

Produce all written agreements between the Debtor and Vitol.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Vitol has produced all responsive documents. Vitol further refers Debtor to the Settlement Agreements BK-Vitol-9, BK-Vitol-22, and BK-Vitol-438.

- 8 -

**REQUEST FOR PRODUCTION NO. 30:**

Produce all written agreements between the Debtor and GCAC.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Vitol has produced all responsive documents. Vitol further refers Debtor to the Settlement Agreements BK-Vitol-9, BK-Vitol-22, and BK-Vitol-438.

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
|  | § |  |
| IN RE | § | CASE NO. 21-60025 |
|  | § |  |
| ARTHUR J. BRASS | § |  |
| DEBTOR | § |  |
|  | § |  |
| VITOL INC. | § | ADVERSARY NO. 21-06006 |
| Plaintiff | § |  |
| v. | § |  |
|  | § |  |
| ARTHUR J. BRASS | § |  |
| Defendant | § |  |
|  | § |  |

<u>**Vitol Inc.'s Objections and Responses to Debtor's First Set of Interrogatories**</u>

Pursuant to FED. R. CIV. P. 33, Vitol Inc. ("**Vitol**"), serves these Objections and Responses to Arthur J. Brass's ("**Debtor**") First Set of Interrogatories to Vitol Inc.

As Vitol's investigation in this matter is continuing, Vitol reserves the right to supplement or amend its responses and objections to the extent allowed by the Federal Rules of Civil Procedure, Local Rules of the Court, any agreement of the parties, and any order of the Court.

1

Dated: <u>January 28, 2022</u>        By: <u>*/s/ Keith M. Aurzada*</u>

Keith M. Aurzada (SBN 24009880)
Lindsey L. Robin (SBN 24091422)
Devan J. Dal Col (SBN 24116244)
**REED SMITH LLP**
2850 N. Harwood, Suite 1500
Dallas, Texas 75201
T:  469.680.4200
F:  469.680.4299
kaurzada@reedsmith.com
lrobin@reedsmith.com
ddalcol@reedsmith.com

and

Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP**
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834
F:  713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 28**,** 2022, a true and correct copy of the foregoing document was served on Debtor's counsel via electronic transmission at mgoott@walkerandpatterson.com.

<u>*/s/ Bradley J. Purcell*</u>

Bradley J. Purcell

        001083

## INTERROGATORIES

**INTERROGATORY NO. 1:**  Please identify all money, property, services, or an extension, removal or refinancing of credit that the Debtor received from Vitol as alleged in Count 1 of the Amended Complaint where Vitol claims that the Debtor's debts are nondischargeable under 11 U.S.C. § 523(a)(2)(A).

In answering this Interrogatory, please:

a) Identify with particularity what the Debtor received from Vitol (*e.g.* money, property, services, extension, removal or refinancing of credit, etc.);

b) The date the Debtor received any item listed in response to Interrogatory No. 1(a) above;

c) How the Debtor received any item listed in response to Interrogatory No. 1(a) above (*e.g.* bank transfer, check, direct deposit, delivery of assets, etc.)

**RESPONSE:**

Throughout the course of the interim financing agreement, Vitol provided Debtor with tens of millions of dollars of financing consisting of product purchases, hedging services/purchases, deal costs, storage and transportation costs, and other associated fees and costs while also assuming the credit risk for the same. Although the Debtor caused GCAC to make three payments to Vitol totaling $16,634,401.25 in partial repayment for the financing, over $14 million remains unpaid. Pursuant to Fed. R. Civ. P. 33(d), Vitol objects to this Request on the grounds that the Response may be determined by examining Vitol's business records previously produced in this matter and the burden of deriving the answer will be substantially the same for either party. Subject to the forgoing objection, Vitol refers Debtor to the comprehensive spreadsheets contemporaneously tracking and aggregating the credit, including Vitol_78124, Vitol_84993, and Vitol_80066.

**INTERROGATORY NO. 2:** Please describe in detail how much money the Debtor obtained from Vitol as alleged in Paragraph 23 of the Amended Complaint.

In answering this Interrogatory, please

a) Identify the amount of money that the Debtor received from Vitol;

b) The date that the money was received by the Debtor from Vitol;

c) How the money was received by the Debtor from Vitol (*e.g.* bank transfer, check, direct deposit, etc.); and

**RESPONSE:**

As provided in more detail in the response to Interrogatory No. 1 above, the Debtor, through his alter ego GCAC, received tens of millions of dollars in credit from Vitol, over $14 million of

which remains unpaid. Pursuant to Fed. R. Civ. P. 33(d), Vitol objects to this Request on the grounds that the Response may be determined by examining Vitol's business records previously produced in this matter and the burden of deriving the answer will be substantially the same for either party. Subject to the forgoing objection, the flow of credit from Vitol to the Debtor is detailed in the comprehensive spreadsheets contemporaneously tracking and aggregating the extensions of credit including Vitol_78124, Vitol_84993, and Vitol_80066.

**INTERROGATORY NO. 3:** Please describe in detail how much money GCAC obtained from Vitol as alleged in Paragraph 23 of the Amended Complaint.

In answering this Interrogatory, please

a) Identify the amount of money that GCAC received from Vitol;

b) The date that the money was received by GCAC from Vitol;

c) How the money was received by GCAC from Vitol (*e.g.* bank transfer, check, direct deposit, etc.); and

**RESPONSE:**

As provided in more detail in the responses to Interrogatories No. 1 and No. 2 above, GCAC, the alter ego of the Debtor, received tens of millions of dollars in credit from Vitol, over $14 million of which remains unpaid. Pursuant to Fed. R. Civ. P. 33(d), Vitol objects to this Request on the grounds that the Response may be determined by examining Vitol's business records previously produced in this matter and the burden of deriving the answer will be substantially the same for either party. Subject to the forgoing objection, the flow of credit from Vitol to the Debtor is detailed in the comprehensive spreadsheets contemporaneously tracking and aggregating the exchanged value including Vitol_78124, Vitol_84993, and Vitol_80066.

**INTERROGATORY NO. 4:** Please describe in detail the relationship between the Debtor and Vitol (*e.g.* lender/borrower, partner, joint venture, etc).

**RESPONSE:**

Vitol objects to this Request on the grounds that it calls for a legal conclusion. Subject to the foregoing objection, GCAC and Vitol had a borrower (GCAC) lender (Vitol) relationship. Moreover, GCAC was a fiduciary of Vitol based on the special trust and confidence Vitol placed in GCAC.

**INTERROGATORY NO. 5:** Please describe in detail the relationship between GCAC and Vitol (*e.g.* lender/borrower, employer/employee, partners, joint venture, agent/principal, etc).

**RESPONSE:**

Vitol objects to this Request on the grounds that it calls for a legal conclusion. Subject to the foregoing objection, GCAC and Vitol had a borrower (GCAC) lender (Vitol) relationship.

Moreover, GCAC was a fiduciary of Vitol based on the special trust and confidence Vitol placed in GCAC.

**INTERROGATORY NO. 6:** Please identify with particularity what Vitol is referring to as "other relationships" as alleged in Paragraph 27 of the Amended Complaint.

**RESPONSE:**

GCAC, the Debtor, and Vitol previously engaged in discussions to enter into a joint marketing agreement. An arrangement that did not come to fruition. That prior relationship and frequent communications between GCAC, the Debtor, and Vitol gave rise to a special relationship of trust and confidence.

**INTERROGATORY NO. 7:** Please identify what property the Debtor obtained from Vitol as alleged in Paragraph 30 of the Amended Complaint. In answering this interrogatory, please 1) describe the property in detail; 2) the date the property was obtained by the Debtor from Vitol; and 3) how the property was taken by the Debtor from Vitol.

**RESPONSE:**

Throughout the course of the interim financing agreement, Vitol provided Debtor with tens of millions of dollars of financing consisting of product purchases, hedging services/purchases, deal costs, storage and transportation costs, and other associated fees and costs while also assuming the credit risk for the same. Pursuant to Fed. R. Civ. P. 33(d), Vitol objects to this Request on the grounds that the Response may be determined by examining Vitol's business records previously produced in this matter and the burden of deriving the answer will be substantially the same for either party. Subject to the forgoing objection, the specifics of the purchases and sales and other extensions of credit can be found in the produced spreadsheets including Vitol_78124, Vitol_84993, and Vitol_80066.

**INTERROGATORY NO. 8:** Please Identify the Debtor's "specific actions" that were willful and malicious that caused Vitol injury as alleged in Paragraph 35 of the Amended Complaint.

**RESPONSE:**

The Debtor used the funds GCAC obtained during the financing agreement to enrich himself and his family through millions of dollars of transfers despite GCAC's insolvency and inability to repay Vitol for the loan advances Vitol provided as he had promised. While GCAC's internal records acknowledge it was not solvent and had a more than $14 million debt to Vitol, the Debtor continued to funnel funds out of the company. On information and belief, the Debtor used funds given to GCAC by Vitol for the purchase of a second home and other personal expenses.

**INTERROGATORY NO. 9:** Identify which of the Debtor's actions caused an objective substantial certainty of harm as alleged in Paragraph 36 of the Amended Complaint.

**RESPONSE:**

Vitol refers the Debtor to the response to Interrogatory No. 8 above. There was an objective substantial certainty of harm to Vitol because the Debtor knew he owed over $14 million to Vitol and used GCAC's assets for his own benefit and the benefit of his family despite having no wherewithal to repay the debt.

**INTERROGATORY NO. 10:**  In Paragraph 15 of the Amended Complaint Vitol alleges that Brass represented to Vitol that he had a $1.5 million dollar certificate of deposit, which he could use to pay part of the Judgment ("**CD Representation**"). In answering this Interrogatory, please identify

1) When did Brass make the CD Representation to Vitol;

2) To whom did Brass made this CD Representation to Vitol (Include the individual(s) name, position/relationship to Vitol; and contact information);

3) How Brass made the CD Representation to Vitol (e.g. telephone call, email, letter, in-person, etc.).

**RESPONSE:**

The Debtor made the CD Representation to Vitol after he breached the initial settlement agreement by failing to pay Vitol the $1.5 million first payment. The Debtor made this representation to Vitol's attorneys including Michael Bernick orally during in-person and telephonic meetings. Mr. Bernick explained these representations in the affidavit Vitol submitted with its Motion for Appointment of Receiver.

**INTERROGATORY NO. 11:**  Describe in detail**, w**hat, if anything, Vitol did to verify the value of the Debtor's assets or the amount of the Debtor's liabilities prior to entering into the Settlement Agreement.

**RESPONSE:**

Vitol relied on the representations of the Debtor. Vitol also conducted a search of public records for the Debtor's assets and liabilities.

**INTERROGATORY NO. 12:**  Please identify what the Debtor did to cause injury to Vitol as alleged in Count Three of the Amended Complaint (11 U.S.C. § 523(a)(6)).

In answering this Interrogatory, please:

a) Identify with particularity what the Debtor did (or did not do) to cause injury to Vitol.

b) Identify the date that any action occurred in response to Interrogatory (a) above

**RESPONSE:**

Vitol refers the Debtor to the responses to Interrogatories Nos. 8 and 9 above. Beginning in June 2017, Vitol provided the Debtor with tens of millions of dollar in loan advances which the Debtor

represented he would repay. When the Debtor made the representation, he knew that he was unable to fulfil that promise because of the debts and liabilities of himself and GCAC.  Pursuant to Fed. R. Civ. P. 33(d), Vitol objects to this Request on the grounds that the Response may be determined by examining Vitol's business records previously produced in this matter and the burden of deriving the answer will be substantially the same for either party. Subject to the forgoing objection, the specifics of the purchases and sales and other extensions of credit can be found in the produced spreadsheets including Vitol_78124, Vitol_84993, and Vitol_80066.

## VERIFICATION

STATE OF TEXAS              §
                           §
COUNTY OF HARRIS           §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Michael Ruzek, Analyst for Vitol Inc., personally known to me, and, after being duly sworn, stated on oath that he has reviewed the Objections and Responses to Arthur J. Brass's First Set of Interrogatories to Vitol Inc, and that the facts stated therein are within his personal knowledge and are true and correct.



Analyst for Vitol Inc.

SUBSCRIBED AND SWORN TO BEFORE ME on this the 27th day of January, 2022, to certify which witness my hand and seal of office.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

(Seal)

Erica Nicole Shepherd
My Commission Expires
01/29/2024
ID No. 132335533

8

001089

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **IN RE ARTHUR J. BRASS** | § | **CASE NO. 21-60025** |
| **DEBTOR** | § | |
| | § | |
| **VITOL INC.** | § | **ADVERSARY NO. 21-06006** |
| **Plaintiff** | § | |
| **v.** | § | |
| **ARTHUR J. BRASS** | § | |
| **Defendant** | § | |
| | § | |

<u>**Vitol Inc.'s Objections and Responses to Debtors' First Set of Requests for Admission**</u>

Pursuant to Fᴇᴅ. R. Cɪᴠ. P. 36, Vitol Inc. ("**Vitol**"), serves these Objections and Responses to Arthur J. Brass's ("**Debtor**") First Set of Requests for Admission to Vitol Inc.

As Vitol's investigation in this matter is continuing, Vitol reserves the right to supplement or amend its responses and objections to the extent allowed by the Federal Rules of Civil Procedure, Local Rules of the Court, any agreement of the parties, and any order of the Court.

Dated: <u>January 28, 2022</u>

By: <u>*/s/ Keith M. Aurzada*</u>

Keith M. Aurzada (SBN 24009880)
Lindsey L. Robin (SBN 24091422)
Devan J. Dal Col (SBN 24116244)
**REED SMITH LLP**
2501 N. Harwood, Suite 1700
Dallas, Texas 75201
T:  469.680.4200
F:  469.680.4299
kaurzada@reedsmith.com
lrobin@reedsmith.com
ddalcol@reedsmith.com
and
Michael H. Bernick (SBN 24078277)
Mason W. Malpass (SBN 24109502)
**REED SMITH LLP**
811 Main Street, Suite 1700
Houston, TX 77002
T:  713.469.3834
F:  713.469.3899
mbernick@reedsmith.com
mmalpass@reedsmith.com

*Attorneys for Vitol Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 28**,** 2022 a true and correct copy of the foregoing document was served on Debtor's counsel via electronic transmission at mgoott@walkerandpatterson.com.

<u>*/s/ Bradley J. Purcell*</u>

Bradley J. Purcell

001091

## REQUEST FOR ADMISSIONS

**REQUEST FOR ADMISSION NO.1:** Admit that Vitol executed the attached Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 2:** Admit that the attached Settlement Agreement is a true and correct copy executed by Vitol.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 3:**  Admit that Vitol did not enter into any written agreements with the Debtor <u>after</u> Vitol executed the attached Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 4:**  Admit that Vitol did not enter into any written agreements with GCAC <u>after</u> Vitol executed the attached Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 5:** Admit that Vitol did not enter into any settlement agreements with the Debtor after November 5, 2020.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 6:** Admit that Vitol did not enter into any settlement agreements with GCAC after November 5, 2020.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 7:** Admit that Vitol did not provide the Debtor with any money after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 8:**  Admit that Vitol did not provide GCAC with any money after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 9:**  Admit that Vitol did not provide the Debtor with any property after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 10:** Admit that Vitol did not provide GCAC with any property after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 11:**  Admit that Vitol did not provide the Debtor with any services after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO.  12:** Admit that Vitol did not provide GCAC with any services after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 13:** Admit that Vitol did not provide the Debtor with an extension of credit after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 14:** Admit that Vitol did not provide GCAC with an extension of credit after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO.  15:** Admit that Vitol did not refinance a debt with the Debtor after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 16:**  Admit that Vitol did not refinance a debt with GCAC after the execution of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 17:** Admit that Vitol did not provide the Debtor with removal of credit after the execution of the Settlement Agreement.

**RESPONSE:** Vitol objects to this Request on the grounds that the term removal of credit is ambiguous. Subject to the foregoing objection, deny.

**REQUEST FOR ADMISSION NO. 18:** Admit that Vitol did not provide GCAC with removal of credit after the execution of the Settlement Agreement.

**RESPONSE:** Vitol objects to this Request on the grounds that the term removal of credit is ambiguous. Subject to the foregoing objection, deny.

**REQUEST FOR ADMISSION NO. 19:** Admit that Vitol never executed any loan agreements with the Debtor.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 20:** Admit that Vitol never executed a loan agreements with GCAC.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 21:**  Admit that Vitol never executed a written financing agreements with the Debtor.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 22:** Admit that Vitol never executed a written financing agreements with GCAC.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 23:**  Admit that the Debtor never signed a loan agreement with Vitol.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 24:**  Admit that no one on behalf of the Debtor ever signed a loan agreement with Vitol.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 25:** Admit that GCAC never signed a written loan agreement with Vitol.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 26**: Admit that no one on behalf of GCAC ever signed a written loan agreement with Vitol.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 27:** Admit that the Debtor never executed an interim financing agreement with Vitol.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 28:**  Admit that GCAC never executed an interim financing agreement with Vitol.

**RESPONSE:** Deny. The written correspondence among the parties created a binding agreement.

**REQUEST FOR ADMISSION NO. 29:**  Admit that the Debtor and Vitol never executed a partnership agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 30:** Admit that GCAC and Vitol never executed a partnership agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 31:** Admit that GCAC and Vitol do not have an attorney-client relationship.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 32:** Admit that the Debtor and Vitol do not have an attorney-client relationship.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 33:** Admit that the Debtor was never employed by Vitol.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 34:** Admit that GCAC was never employed by Vitol.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 35:** Admit that Vitol was never employed by the Debtor.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 36:** Admit that Vitol was never employed by GCAC.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 37:** Admit that Ben Marshall was the CEO of Vitol when the Settlement Agreement was executed.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 38:** Admit that Ben Marshall executed the Settlement Agreement on behalf of Vitol.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 39:** Admit that the Debtor executed the Agreed Final Judgment as part of the Settlement Agreement.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 40:** Admit that Vitol filed the Agreed Final Judgment in the District Court of Harris County, Texas.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 41:**  Admit that Vitol sought to have a receiver appointed over the Debtor after the Agreed Final Judgment was filed by Vitol in the District Court of Harris County, Texas.

**RESPONSE:** Admit.

Eversheds Sutherland draft dated 06.23.2017
For discussion purposes only

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**) is entered into as of July 1, 2017 (the **"Effective Date"**), by and among **RIO ENERGY INTERNATIONAL, INC.**, a Texas corporation (**"Rio"**), and ~~[~~**VITOL__ INC.**~~,~~__ a Delaware corporation~~[●]~~ (**"Vitol"**).  Gulf Coast Asphalt Company, L.L.C., an Alabama limited liability company (**"GCAC"**), is a party to this Agreement for purposes of Sections 8 and 9).  Rio, Vitol and GCAC are referred to from time to time as a **"Party"** or collectively as the **"Parties"**.

W I T N E S S E T H:

WHEREAS, Rio and GCAC are parties to that certain Joint Marketing Agreement dated as of February [●], 2016 (as amended to date, the **"JSMA"**, a true, correct and complete copy of which is attached hereto as Exhibit A), pursuant to which Rio and GCAC jointly pursue the sourcing, purchase, blending, selling and marketing of asphalt and asphalt~~-~__ __related products; and

WHEREAS, Rio desires to assign to Vitol, and Vitol desires to assume from Rio, all of Rio's rights, duties and obligations in, to and under the JSMA; and

WHEREAS, Rio desires to sell, assign and transfer to Vitol, and Vitol desires to purchase, acquire and assume from Rio, product inventory and certain other assets used in connection with the JSMA; and

NOW, THEREFORE, in consideration of the premises, the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.      Assignment by Rio and Assumption by Vitol of the JSMA.  As of the Effective Date, Rio hereby fully and unconditionally assigns to Vitol all of Rio's rights, duties and obligations under the JSMA, whether accruing prior to, on, or after the Effective Date, and Vitol hereby fully and unconditionally assumes such rights, duties and obligations. Vitol's assumption of obligations set forth herein expressly constitutes an assumption of all liabilities and obligations of Rio under the JSMA (including all losses, claims, lawsuits or damages of any kind arising in connection with the JSMA) accruing prior to, on or after the Effective Date, subject to .

> **Commented [A1]:** Anything to be added here?

Section 2.      Compensation.   As consideration for Rio's agreement to effect the assignment contemplated hereby, Vitol will pay Rio the following amounts:

(i)      $250,000, due and payable on the Effective Date;

(ii)     $250,000, due and payable on October 2, 2017;

(iii)    Up to $1,250,000, due and payable in the following installments, with each installment due and payable on or before the date that is no later than [●] Business Days following a determination by Vitol that the Vitol Earnings Threshold corresponding thereto has been met:

1

| Amount | Vitol Earnings Threshold |
|--------|--------------------------|
| $250,000 | $6,000,000 |
| $250,000 | $8,500,000 |
| $500,000 | $10,000,000 |
| $250,000 | $15,000,000 |

For purposes of this Section 2(c)(iii), **"Vitol Earnings Threshold"** means fifty percent (50%) of the aggregate "net profit" of the Business measured from and after the Effective Date and up to and including July 1, 2020, calculated (i) in accordance with Articles VI, VII, and VIII of the JSMA, as those provisions have been interpreted and applied by Rio and GCAC prior to the Effective Date and without regard to any changes in interpretation or application or amendments to the JSMA that may be made thereto by Vitol and GCAC from and after the Effective Date; (ii) replacing "Rio" and "Rio Costs" with "Vitol" and "Vitol Costs" for purposes of all calculations to be made under the JSMA, and assuming that "Rio Costs" include costs incurred by Vitol or that are Vitol's responsibility pursuant to Section 4(d), and (iii) on the basis of the assets of the JSMA as comprised as of the Effective Date and without giving effect to the addition by Vitol or GCAC of additional terminaling, storage, or transportation assets or capacity. Vitol will promptly provide Rio with all calculations made pursuant to Articles VI, VII, and VIII of the JSMA, will maintain books and records in accordance with Section 8.4 of the JSMA, and Rio shall have audit rights with respect to such books and records, in accordance with Section 8.4 of the JSMA (as if such provision were incorporated herein) until July 1, 2021.

Section 3.    Sale and Purchase of Inventory.

(a)    On the Effective Date, Rio will sell to Vitol, and Vitol will purchase from Rio, all of Rio's inventory of Products (except for Products owned by Rio that are located at the Gravity Terminal as of the Effective Date, the sale by Rio and purchase by Vitol of which will be effected in accordance with Section 4(c), the **"Inventory"**) at the purchase price set forth in Schedule 3.1. Inventory will be delivered by Rio to Vitol (i) via in-tank transfer at the Mobile Terminal and title to the Inventory will transfer upon confirmation by the terminal operator of the effectiveness of the transfer, and (ii) *[NTD: any other Inventory?]*.

> **Commented [A2]:** In-tank means Vitol is taking over the storage contract currently held by Rio. I've not seen a copy.

(b)    Rio represents and warrants to Vitol as of the Effective Date that (i) Rio has, and conveys to Vitol, good and merchantable title to the Inventory, free and clear of all liens, claims and encumbrances, and (ii) the Inventory meets the specifications set forth in Schedule [●]. WITH RESPECT TO THE PRODUCT SOLD AND PURCHASED UNDER THIS AGREEMENT, THERE ARE NO REPRESENTATIONS, GUARANTEES OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS OR SUITABILITY OF THE PRODUCT FOR ANY PARTICULAR PURPOSE OR OTHERWISE, THAT EXTEND BEYOND THE FOREGOING AND SCHEDULE [●].

Section 4.    Assignment and Assumption of Gravity TSA.

(a)    *Delivery of Gravity TSA.*  Attached hereto as <u>Exhibit B</u> is a true, correct and complete copy of the First Amended and Restated Terminal Services Agreement (the **"Gravity TSA"**) between Rio and Gravity Midstream Corpus Christi, LLC (**"Gravity"**) dated as of August 31, 2016.

(b)    *Dedication of Gravity TSA for Vitol Use and Benefit; No Assignment Pending Consent.*

(i)    From and after the Effective Date, Rio will operate and maintain the Gravity TSA, enforce Rio's rights and remedies thereunder, and enforce Gravity's obligations under thereunder, for the sole and exclusive use and benefit of Vitol, all in accordance with and on and subject to the terms and conditions of this <u>Section 4</u>.

(ii)    Rio and Vitol acknowledge and agree that any assignment by Rio of the Gravity TSA is subject to Gravity's consent in accordance with <u>Section 26(e)</u> of the GTCs to the Gravity TSA.  Accordingly, until Rio's receipt of Gravity's consent, Rio and Vitol acknowledge and agree that Rio will maintain the Gravity TSA in full force and effect, and for the exclusive use by Vitol, in accordance with the terms and conditions of this <u>Section 4</u>.  Neither Rio nor Vitol will take, or will be required to take any action or refrain from taking any action, that could reasonably be deemed to constitute, evidence, or result in any assignment by Rio to Vitol of the Gravity TSA that is in contravention of the Gravity TSA.

(c)    *Title to Product at Gravity Terminal.*

(i)    As of the Effective Date, Rio holds title to Product at the Gravity Terminal as set forth in <u>Schedule 4(c)</u> (the **"Effective Date Gravity Inventory")**, which Rio will hold, maintain, and dedicate to Vitol's sole and exclusive use in accordance with this <u>Section 4</u>.  On the Effective Date, Rio will sell to Vitol, and Vitol will purchase from Rio, the Effective Date Gravity Inventory for a purchase price of $[●] per barrel, for forward delivery on one or more dates and via one or more delivery means to be identified by Vitol from time to time.  Title to the Effective Date Gravity Inventory will pass to Vitol upon delivery.

(ii)    To the extent that (x) Vitol wishes to deliver Product to the Gravity Terminal in order to make use of storage, terminaling or processing capacity of the Gravity Terminal, Rio will sell and Vitol will buy such Product in accordance with this <u>Section 4(c)</u>, or (y) Vitol wishes to withdraw Product (other than the Effective Date Gravity Inventory) from the Gravity Terminal, Rio will purchase and Vitol will sell such Product in accordance with this <u>Section 4(c)</u>, in order to ensure that in all circumstances Rio maintains title to the Product at all times that it is in the custody of the Gravity Terminal.  All purchases and sales will be made on a fixed price "first in/first out" basis  (the intent being that Rio will not have commodity price risk and neither Vitol nor Rio will earn any margin in connection with such transactions), and title to Product subject to such purchases and sales will transfer at the point at which custody of Product transfers to the Operator under the Gravity

**Commented [A3]:** This is different than what Vitol proposed. Checking with commercial to see if it is acceptable.  We will have paid for product where we have neither title nor risk of loss, so I am concerned we will not have an insurable interest yet we are out of pocket those funds.

**Commented [A4]:** Not sure I follow how this works.  If Vitol has prepaid for the product currently in-tank at GOTAC, and we want to withdraw that product, why is Rio purchasing the product?  We have paid for it and we're simply taking delivery (and title and risk of loss) upon delivery out of the GOTAC facility.  Under this construct, the difficult issue will be delivering additional product to the Rio's GOTAC tanks.  To satisfy the title-requirements of the GOTAC GTCs, Vitol would need to transfer title to the product without any associated transfer of funds, and when receiving that product back from Rio we take title back upon receipt from the GOTAC facility.

TSA.  The seller in each transaction will be deemed to make the representations and warranties set forth in Section 3(b) with respect to the Product purchased and sold thereunder, and Vitol will be deemed to have made the representations and warranties of the Customer under the Gravity TSA with respect to Product delivered to the Gravity Terminal.  Any Gravity Inventory remaining at the time of the assignment and assumption of the Gravity TSA contemplated by Section 4(g) or termination of the Gravity TSA will be sold by Rio and purchased by Vitol as of the assignment or termination date in accordance with this Section 4(c)(i).  Vitol's obligations with respect to the TSA Costs, as set forth in this Section 4(c) are not conditional or contingent (x) upon any ultimate assignment and assumption of the Gravity TSA that may ultimately be effected between Rio and Vitol, or (y) the extent to which Vitol makes use of or derives benefit from the Gravity TSA (whether in conjunction with the JSMA or otherwise).

> **Commented [A5]:** Commercial discussion needs to be had surrounding allocation of costs

(d)     *Gravity Terminal Costs, Expenses and Liabilities.*  From and after the Effective Date, Vitol shall be solely responsible for, and agrees to indemnify Rio, its Affiliates, and its and their respective equity holders, officers, directors, employees, representatives, agents, contractors (other than Gravity), successors and permitted assign from and against any and all costs, expenses, liabilities and damages (collectively, **"TSA Costs"**) incurred by Rio from and after the Effective Date in connection with Rio's performance of its obligations under the Gravity TSA, including, without limitation: (i) fees and reimbursements to be paid and made to Gravity for tankage, services, throughput and other services provided by Gravity under the TSA; (ii) taxes incurred by Rio in connection with its activities conducted under the TSA, including income, franchise, gross receipts, excise and ad valorem taxes; (iii) damages and liabilities paid by Rio in respect of deliveries of off-spec product or overage fees; (iv) fees and costs associated with tank cleaning and waste charges; (v) costs and expenses associated with any requirements that Rio provide collateral or credit or performance assurance; (vi) product loss; (vii) costs and expenses incurred pursuant to indemnification obligations; (viii) costs in connection with costs of insurance coverage required to be carried by Rio in accordance with Section 4(e) below; (ix) holdover costs and expenses; (x) costs and expenses incurred by Rio in connection with or in response to Product spills or other environmental-related costs or expenses; and (xi) financing charges incurred by Rio in connection with maintaining the Product at the Gravity Terminal, calculated in accordance with Schedule 4(d).  Notwithstanding the foregoing, Vitol shall not be responsible for any TSA Costs incurred as a direct result of any of the Rio Indemnified Parties' gross negligence or willful misconduct.

> **Commented [A6]:** Different from past discussions.  Commercial to approve.

(e)     *Insurance.* Rio will maintain the insurance coverages set forth in Schedule 4(e) on the terms and conditions set forth therein.  *[NTD:  Schedule to set forth required coverage; requirements for additional named insureds; provisions regarding waivers of subrogation, notices of cancellation, etc.; TBD]*

> **Commented [A7]:** Discussing with our insurance person how best to get Vitol covered under this title/payment structure proposed by Rio.

(f)     *Maintenance of Agreement*.  Rio will not waive any provision of, right or benefit under, or amend, terminate or otherwise agree to any variation in performance by Gravity under the Gravity TSA, without Vitol's prior written consent.

(g)     *Assignment and Assumption Upon Receipt of Consent or Removal of Consent Requirement*.  Rio will use its commercially reasonable efforts to obtain Gravity's unconditional

consent to Rio's assignment of the Gravity TSA to Vitol, but (x) Rio will have no obligation to make any payment to Gravity therefore, and (y) Rio may not make any concession to Gravity or amend or modify the Gravity TSA in consideration for such consent without Vitol's prior written consent.  Rio will assign, and Vitol will accept and assume, all of Rio's right, title and interest in and to the Gravity TSA promptly upon (x) Rio's receipt of consent to assignment by Gravity substantially in the form attached as Exhibit C hereto, or (y) Rio's and Vitol's reasonable determination that such consent is no longer legally required.

(h)      *Notices and Information.*  Rio agrees to promptly provide Vitol with copies of all notices provided to it under, and other correspondence and other communications received by Rio in connection with, the Gravity TSA.  Rio further agrees to provide to Vitol such other information regarding the Gravity TSA and Rio and Gravity's performance thereof as Vitol shall reasonably request from time to time.

(i)      *Vitol Instructions. Point of Contact; Scheduling, Nominations and Instructions.*  Vitol will instruct, and Rio will comply with Vitol's instructions with respect to the utilization of the capacity and services under the Gravity TSA, including but not limited to scheduling, nominations, blending and services instructions.  Notwithstanding the foregoing, (x) Rio will be under no obligation to implement Vitol's instructions to the extent that Rio reasonably determines that implementing Vitol's instructions could result in a violation by Rio of any Applicable Law (as defined in the Gravity TSA) or expose Rio to civil or criminal liability or losses, costs and expenses for which indemnification may not be available to Rio hereunder, and (y) Rio shall continue to be the point of contact with Gravity for all purposes under the Gravity TSA, including but not limited to scheduling, nominations, accounting, and contract administration.

(j)      *Take-or-Pay Obligations*.  The Gravity TSA requires that Rio pay specified minimum amounts in respect of fees for truck loading (Section 8(a)(v)) and utilization of the polymer plant (Section 8(a)(viii)) regardless of utilization.  To the extent that Gravity calculates a minimum payment obligation under either of such sections with respect to the 2017 calendar year (regardless of whether the Gravity TSA has by then been assigned to Vitol), Rio will pay to Gravity (or reimburse Vitol for) that portion of the minimum payment obligation that would be due and owing on July 1, assuming a six-month calculation period and calculated based on Rio's utilization for such six months compared to 50% of the relevant minimum volume); provided that Rio will receive a credit against any minimum payment obligation that is so calculated based on "surplus" volumes resulting from Vitol's utilization for the balance of the 2017 Contract Year that remains after Vitol has offset any of its own minimum payment obligations with any "surplus" volumes resulting from Vitol's utilization.

Section 5.      <u>Assignment and Assumption of Sublease.</u>  As of the Effective Date, Rio hereby fully and unconditionally assigns to Vitol all of Rio's rights, duties and obligations under that certain Short-Term Sublease Agreement dated May 11, 2017 between GCAC and Rio (the **"Sublease",** a true, correct and complete copy of which is attached hereto as Exhibit D) accruing on or after the Effective Date, and Vitol hereby fully and unconditionally assumes such rights, duties and obligations.

**Commented [A8]:** I don't think we've seen this

Section 6.      <u>Representations and Warranties of Rio.</u>  Rio represents and warrants to each of Vitol and GCAC, as of the Effective Date, as follows:

(a)     **Corporate Organization and Power**.  Rio (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas, and (ii) has all requisite power and authority to enter into this Agreement and perform its obligations hereunder.

(b)     **Power and Authorization**.  The execution and delivery by Rio of this Agreement, and the compliance by Rio with all of the provisions hereof (i) are within the ~~corporate~~ limited liability company powers of Rio, (ii) will not conflict with or result in any breach of any of the provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property of Rio under the provisions of, Rio's governing instruments, or any other agreement or instrument to which Rio is a party or by which it may be bound, or any license, judgment, decree, law, statute, order, rule or regulation of any court or governmental agency or body having jurisdiction over Rio or any of its activities or properties, and (iii) have been duly authorized by all necessary shareholder or member action on the part of Rio.

(c)     **Status of Contracts**.

(i)     The copy of each of the contracts attached hereto as <u>Exhibits A</u>, <u>B</u> and <u>D</u> (collectively, the "<u>Rio Subject Contracts</u>") is a true, correct and complete copy of such contract as in effect on the Effective Date.  There have been no amendments or modifications to any Subject Contract except as included in the relevant Exhibit, and each Subject Contract remains in full force and effect in accordance with its terms as of the Effective Date.

(ii)    There are no material breaches by, events of default with respect to, or defenses to enforceability asserted by Rio under any of the Rio Subject Contracts, and to the best of Rio's knowledge there are no material breaches by, events of default with respect to, or defenses to enforceability asserted by any other party to any of the Rio Subject Contracts.

(iii)   To the best of Rio's knowledge, there are no fees and other amounts payable to any party under any of the Rio Subject Contracts that are currently due and payable or that have accrued but are unpaid.

(iv)    Rio has not pledged or granted any lien or encumbrance on Rio's interest in any of the Rio Subject Contracts to any third party and has the full power and authority to assign its interest in the Rio Subject Contracts to Vitol in accordance with and subject to the terms and conditions of this Agreement.

**Section 7.     Representations and Warranties of Vitol**.  Vitol represents and warrants to each of Rio and GCAC, as of the Effective Date, as follows:

(a)     **Organization and Power**.  Vitol (i) is a corporation ~~[●]~~ duly organized and validly existing in good standing under the laws of <u>Delaware</u>~~[●]~~, (ii) has duly qualified as a foreign <u>corporation</u> ~~limited liability company~~ and is in good standing under the laws of the State of Texas and (iii) has all requisite power and authority to own and operate its

properties and to carry on its business as now being conducted and as presently proposed to be conducted.

(b) **Power and Authority.** The execution and delivery by Vitol of this Agreement, and the compliance by Vitol with all of the provisions hereof and of the JSMA (i) are within the limited liability company powers of Vitol, (ii) will not conflict with or result in any breach of any of the provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property of Vitol under the provisions of, Vitol's governing instruments, or any other agreement or instrument to which Vitol is a party or by which it may be bound, or any license, judgment, decree, law, statute, order, rule or regulation of any court or governmental agency or body having jurisdiction over Vitol or any of its activities or properties, and (iii) have been duly authorized by all necessary shareholder or member action on the part of Vitol.

**Section 8.** **Agreements by and with Respect to GCAC; Consent to Assignment and Release of Rio; Post-Assignment Reconciliation.**

(a) GCAC hereby consents to Rio's assignment of its rights, duties and obligations under the JSMA to Vitol and does hereby fully, finally and forever irrevocably and unconditionally release, acquit and discharge Rio, and all past, present and future parents, subsidiaries and affiliates of Rio, and all past, present and future officers, directors, members, employees, agents, attorneys, successors, heirs and assigns of Rio (other than Vitol), of and from any and all actions, causes of action or other claims, transactions, occurrences or other matters arising from, under or in connection with the JSMA and the transactions undertaken in connection therewith.

(b) GCAC represents and warrants to each of Rio and Vitol, as of the Effective Date, as follows:

(i) **Corporate Organization and Power.** GCAC (i) is a limited liability company duly organized and validly existing in good standing under the laws of the State of Alabama, (ii) has duly qualified as a foreign limited liability company and is in good standing under the laws of the State of Texas and (iii) has all requisite power and authority to own and operate its properties and to carry on its business as now being conducted and as presently proposed to be conducted.

(ii) **Power and Authorization**. The execution and delivery by GCAC of this Agreement, and the compliance by GCAC with all of the provisions hereof and of the JSMA (i) are within the limited liability company powers of GCAC, (ii) will not conflict with or result in any breach of any of the provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property of GCAC under the provisions of, GCAC's governing instruments, or any other agreement or instrument to which GCAC is a party or by which it may be bound, or any license, judgment, decree, law, statute, order, rule or regulation of any court or governmental agency or body having jurisdiction over GCAC or any of its activities or properties, and (iii) have been duly authorized by all necessary shareholder or member action on the part of GCAC.

(iii) **Status of Contracts.**

(x)     The copy of each of the contracts attached hereto as <u>Exhibits A</u> and <u>D</u> (collectively, the "<u>GCAC Subject Contracts</u>") is a true, correct and complete copy of such contract as in effect on the Effective Date.   There have been no amendments or modifications to any GCAC Subject Contract except as included in the relevant Exhibit, and each GCAC Subject Contract remains in full force and effect in accordance with its terms as of the Effective Date.

(y)     There are no material breaches by, events of default with respect to, or defenses to enforceability asserted by GCAC under any of the GCAC Subject Contracts, and to the best of GCAC's knowledge there are no material breaches by, events of default with respect to, or defenses to enforceability asserted by any other party to any of the GCAC Subject Contracts.

(iii)     To the best of GCAC's knowledge, there are no fees and other amounts payable to any party under any of the GCAC Subject Contracts that are currently due and payable or that have accrued but are unpaid.

(c)     Rio and GCAC will continue to perform their obligations, and maintain their legal rights and remedies, pursuant to the JSMA with respect to Business conducted by them under the JSMA prior to the Effective Date, including but not limited to calculation, reconciliation, and sharing of profits and losses, maintaining records and providing audit rights pursuant to and in accordance with <u>Articles VII</u> and <u>VIII</u> of the JSMA.  *[NTD:  Any hedges to terminate?]*

(d)     GCAC and Rio acknowledge and agree that the assignment and assumption of the JSMA contemplated hereby does not constitute a termination of the JSMA by either of Rio or GCAC (for purposes of <u>Article IX</u> of the JSMA or otherwise).

(e)     Vitol, Rio and GCAC acknowledge and agree that the provisions of <u>Article X</u> of the JSMA will not apply to Rio from and after the Effective Date.

**Section 9.     <u>Indemnities.</u>**

(i)     Rio hereby agrees to indemnify and hold Vitol harmless from and against any liability, claim, damage, loss or expense arising out of or incurred with respect to the performance of the Subject Contracts prior to the Effective Date, and (ii) Vitol hereby agrees to indemnify and hold Rio harmless from and against any liability or claim of liability, damage, loss or expense arising out of or incurred with respect to the performance of the Subject Contracts on or after the Effective Date.

(ii)     Each Party hereto agrees to indemnify and hold each of the other Parties harmless from and against any liability or claim of liability, damage, loss or expense arising out of or incurred with respect to any breach of any representation or warranty made by it hereunder.

(iii)     Notwithstanding <u>Sections 9(i)</u> or <u>9(ii)</u> above, no Party shall be entitled to indemnification for any liability, claim, damage, loss or expense arising out of or incurred as a result of such Party's gross negligence, willful misconduct, or intentional breach of any obligation under this Agreement.

001104

**Section 10.**      **Miscellaneous.**

(a)      Capitalized terms that are not otherwise defined herein have the meanings assigned to such terms in the JSMA, where the relevant provision pertains to the JSMA, or the Gravity TSA, where the relevant provision pertains to the Gravity TSA.

(b)      The parties hereto hereby agree to execute, deliver or provide to any of the other parties hereto upon their request such further agreements, papers and other instruments and to take such further actions, as any of the parties hereto may reasonably require in order to better effect or evidence the transactions described herein or otherwise assure compliance with the JSMA.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(c)      The representations of the parties hereunder shall survive the consummation of the transactions described herein and the assignment and assumption of the JSMA and shall not otherwise merge in the performance of any obligation by any of the parties hereto.

(d)      This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(e)      Any notice, request or other communication to be given hereunder shall be in writing and shall be delivered personally, sent by registered or certified mail, postage prepaid, by overnight courier with written confirmation of delivery or by electronic transmission (including e-mail) with written confirmation of receipt.  Any such notice shall be deemed given when so delivered personally or sent by electronic transmission (and immediately upon written confirmation of receipt), if mailed, on the date shown on the receipt therefor, or if sent by overnight courier, on the date shown on the written confirmation of delivery.  Such notices shall be given to the following address or to such changed address as may be fixed by notice hereunder; provided, however, that any notice of change of address shall be effective only upon receipt thereof.

| | | |
|---|---|---|
| To Rio: | [●] | |
| | [●] | |
| | Tel No.: | [●] |
| | E-Mail: | [●] |
| | Attention: | [●] |
| | | |
| To Vitol: | [●] | |
| | [●] | |
| | Tel No.: | [●] |
| | E-Mail: | [●] |
| | Attention: | [●] |
| | | |
| To GCAC: | [●] | |

[●]
Tel No.:    [●]
E-Mail:    [●]
Attention:    [●]

(f)      This Agreement (including all exhibits hereto) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all other prior agreements and understandings, both written and verbal, among the parties or their respective Affiliates or any of them with respect to the subject matter hereof. This Agreement may not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties or their respective successors in interest.

(g)      This Agreement shall be governed by the laws of the State of Texas. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the state and federal courts located in Harris County, Texas for the purposes of enforcing this Agreement. If any action is brought in a state court, the parties shall take such actions as are within their control to cause any matter contemplated hereby to be assigned to the United States District Court for the Southern District of Texas. In any action, each of the Parties irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above courts, that such action is brought in an inconvenient forum or that the venue of such action is improper. Each of the Parties also agrees that any final and unappealable judgment against a Party in connection with any such Action shall be conclusive and binding on such Party and that such award or judgment may be enforced in any court of competent jurisdiction, either within or outside of the United States. Each of the Parties waives trial by jury in any action for the purposes of enforcing this Agreement, and neither Party nor any successor or permitted assignee of a Party shall seek a jury trial in any action for the purposes of enforcing this Agreement. The provisions of this waiver have been fully discussed by the Parties, and the provisions shall be subject to no exceptions.

(h)      Nothing expressed or implied in this Agreement is intended to or shall confer upon any person, firm or entity, other than the Parties and their respective successors and permitted assignees, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

(i)      Except as otherwise provided herein, the Parties shall each bear their respective expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of counsel, actuaries and other Representatives.

(j)      The final determination of the invalidity or unenforceability of any provision or clause or portion thereof of this Agreement shall in no way impair or affect the validity or enforceability of any other provision of this Agreement, all of which shall remain in full force and effect. Notwithstanding the foregoing, if such invalidity or unenforceability would cause any Party to lose the material benefit of its economic bargain, then the Parties agree to negotiate in good faith to amend this Agreement in order to restore such lost material benefit.

(k)    The Parties will keep confidential and will not use or disclose the other Party's confidential information and the terms and conditions of this Agreement, including the exhibits and schedules hereto (if any).

(l)    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Neither Party may assign any of its rights, duties or obligations hereunder without the prior written consent of the other Party and any attempted assignment in violation of this provision shall be invalid *ab initio*; provided, however, that this Agreement shall inure to the benefit and bind those who, by operation of law, become successors to the Parties, including any receiver or any successor, merged or consolidated entity.

(m)    The table of contents, articles, titles, captions and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.  The Schedules and Exhibits referred to herein (if any) are be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein.  All references herein to Articles, Sections, Schedules and Exhibits shall be construed to refer to Articles and Sections of, and Schedules and Exhibits (if any) to, this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation".  Unless the context otherwise requires, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  All terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.  The definitions in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine genders of such term.  Any agreement or instrument defined or referred to herein or any agreement or instrument that is referred to herein means such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent and references to all attachments thereto and instruments incorporated therein.  Any statute or regulation referred to herein means such statute or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, includes any rules and regulations promulgated under the statute), and references to any section of any statute or regulation include any successor to the section.  Any agreements referred to herein include reference to all Schedules and Exhibits and other documents or agreements attached thereto.

Eversheds Sutherland draft dated 06.23.2017
For discussion purposes only

**IN WITNESS WHEREOF**, each of Rio and Vitol, and GCAC (for purposes of Section [●] herein), have caused this Agreement to be duly executed and delivered, under seal, by their duly authorized representatives, all as of the date first above written.

**RIO:**

**RIO ENERGY INTERNATIONAL INC.**,
a Texas corporation

By:_____
Name:_____
Title:_____

**VITOL:**

**[VITOL]**,
**a [●]**

By:_____
Name:_____
Title:_____

**GCAC (solely for purposes of Section [●] hereof):**

**GULF COAST ASPHALT COMPANY L.L.C.**,
an Alabama limited liability company

By:_____
Name:_____
Title:_____

**EXHIBIT A**

**JSMA**

001109

**EXHIBIT B**

**TSA**

001110

Jason Goldstein
May 16, 2019                                                                    1

```
 1                     CAUSE NO. 2018-31578

 2   GULF COAST ASPHALT COMPANY  )  IN THE DISTRICT COURT OF
     LLC                         )
 3        PLAINTIFF              )
                                 )
 4   VS.                         )  HARRIS COUNTY, T E X A S
                                 )
 5   VITOL, INC.,                )
          DEFENDANT              )  295TH JUDICIAL DISTRICT
 6

 7

 8             *****************************

 9              ORAL VIDEOTAPED DEPOSITION

10                   JASON GOLDSTEIN

11                     May 16, 2019

12             *****************************

13

14

15           ORAL VIDEOTAPED DEPOSITION of JASON GOLDSTEIN,

16   produced as a witness at the instance of the Defendant

17   and duly sworn, was taken in the above-styled and

18   numbered cause on May 16, 2019, from 9:43 a.m. to

19   4:11 p.m. before Roxanne K. Smith, Certified Shorthand

20   Reporter in and for the State of Texas, reported by

21   computerized stenotype machine at the offices of Hall

22   Maines Lugrin, Williams Tower, 2800 Post Oak Boulevard,

23   64th Floor, Houston, Texas, pursuant to the Texas Rules

24   of Civil Procedure and the provisions stated on the

25   record or attached hereto.
```

Jason Goldstein
May 16, 2019                                                                2

```
 1                      A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         Mr. Neil E. Giles
           Hall Maines Lugrin
 5         Williams Tower
           2800 Post Oak Boulevard, 64th Floor
 6         Houston, Texas 77056
           Telephone:  (713) 252-0172
 7            E-Mail:  Ngiles@hallmaineslugrin.com

 8

      FOR THE DEFENDANT:
 9
           Mr. Kenneth E. Broughton
10         State Bar No. 03087250
           Mr. Mason Malpass
11         Mr. Arturo M. Holguin
           Reed Smith, LLP
12         811 Main Street, Suite 1700
           Houston, Texas 77002
13         Telephone:  (713) 469-3645
              E-Mail:  Kbroughton@reedsmith.com

14

15    ALSO PRESENT:

16         Mr. Corey Laborde, Videographer

17

18                       *  *  *  *  *

19

20

21

22

23

24

25
```

Jason Goldstein
May 16, 2019                                                           3

```
 1                        INDEX

 2                                                      PAGE

 3   Appearances...................................    2

 4   JASON GOLDSTEIN

 5        Examination by Mr. Broughton..............    4

 6        Examination by Mr. Giles.................   148

 7   Changes and Signature........................   159

 8   Reporter's Certificate.......................   161

 9

10                     EXHIBIT INDEX

11   NO.    DESCRIPTION                              PAGE

12   18     E-mail dated 7/19/17....................   69

13   19     E-mail dated 1/19/25....................   71

14   20     E-mail dated 5/19/17....................   80

15   21     E-mail dated 6/30/17....................   82

16   22     E-mail dated 5/30/17....................   85

17   23     Joint Marketing Agreement...............   87

18   24     Revised JSMA............................   92

19   25     E-mail dated 7/28/17...................   102

20   26     E-mail dated 8/21/17...................   105

21   27     E-mail dated 9/25/17...................   114

22   28     E-mail dated 10/9/17...................   117

23   29     Marketing Agreement....................   120

24

25
```

Jason Goldstein
May 16, 2019                                                    4

1              THE VIDEOGRAPHER:  We are on the record at

2    9:43 a.m.

3                    JASON GOLDSTEIN,

4        having been duly sworn, testified as follows:

5                       EXAMINATION

6    BY MR. BROUGHTON:

7        Q.    Good morning, Mr. Goldstein.

8        A.    Good morning.

9        Q.    My name is Ken Broughton; and as you know, I

10   represent Vitol in this matter.  Would you give us your

11   full name including your middle name, please?

12       A.    Jason Brent Goldstein.

13       Q.    And what's your address?

14       A.    6215 Holly Springs Drive, Houston, Texas 77057.

15       Q.    And what's your date of birth?

16       A.    4/30/69.

17       Q.    And do you understand you're under oath here

18   today --

19       A.    I do.

20       Q.    -- just as if you were testifying in court?

21       A.    Uh-huh.

22       Q.    If you have -- you know, at any point you want

23   to take a restroom break or anything, just let us know.

24   I always try to take one about every hour anyway.

25       A.    Okay.

Jason Goldstein
May 16, 2019                                                    5

1      Q.    I usually don't forget and -- but, you know,
2   like I said, if you need a break --
3      A.    Okay.
4      Q.    -- just let us know.  We'll be happy to do
5   that.  If at any time you want me to repeat my question
6   or rephrase, let me know that.
7      A.    Okay.
8      Q.    And I'll be happy to do it.
9      A.    Okay.
10      Q.    Okay?
11      A.    Thank you.
12      Q.    So, tell us about -- did you grow up in
13   Houston?
14      A.    I did.  I wasn't born here, but I moved here
15   before I was one.
16      Q.    All right.
17      A.    And I grew up here through high school.
18      Q.    Great.  Tell us about your post high school
19   education.
20      A.    I got my bachelor of science in economics
21   degree from the Wharton School at the University of
22   Pennsylvania, and then I got my master's in
23   administration from the MIT Sloan School of Management.
24      Q.    And have you ever been deposed before?
25      A.    One time.

Jason Goldstein
May 16, 2019                                                     6

```
 1        Q.    Okay.  What kind of case was that?

 2        A.    It was a federal bankruptcy proceeding related

 3   to Trigeant bankruptcy.

 4        Q.    Okay.  And what were you testifying about in

 5   there?

 6        A.    It was really related to two factions of the

 7   Sargeant family, one of which owned Trigeant and one

 8   which had BTB Refining.  And they had a number of

 9   lawsuits between them, and they were both trying to get

10   this asset out of bankruptcy.  And so, there was -- we

11   were being deposed about our conversations with both

12   parties.

13        Q.    Okay.  And who were you working for at that

14   time?

15        A.    Well, I was working for two companies.

16        Q.    Okay.

17        A.    Gulf Coast Asphalt Company as well as Gravity

18   Midstream, but I was there solely on behalf of Gravity

19   Midstream.

20        Q.    Have you ever testified as a witness at a trial

21   or an arbitration?

22        A.    One time.  It was a number of years ago.  It

23   was related to a real estate project in Belize.  I

24   was an -- should I elaborate?

25        Q.    Sure.
```

Jason Goldstein
May 16, 2019                                                    7

```
 1        A.    I was an investment banker, and I was

 2   representing the purchaser.  The purchaser was alleging

 3   that the seller breached his obligation to sell.

 4        Q.    Okay.

 5        A.    And I was a witness in that trial.

 6        Q.    And who were you employed by at that time?

 7        A.    Blossom Street Capital.

 8        Q.    Do you know about when that Trigeant bankruptcy

 9   was when you gave a deposition, just more or less?

10        A.    Sure.  So, Gravity purchased that asset out of

11   bankruptcy in mid 2015.  So, it would have been either

12   '14 or '15, 2014 or 2015.

13        Q.    And about when do you think you testified for

14   Blossom Street in that Belize matter?

15        A.    That would have been sometime -- I don't

16   remember.  Sometime between 2003 and 2009.

17        Q.    Have you ever been a party to any sort of a

18   lawsuit?

19        A.    No.

20        Q.    Tell us about what you did to prepare for your

21   deposition.

22        A.    I went back over some of my e-mails to confirm

23   some dates, and I had some meetings with Neil and his

24   partner Bill here in this office.

25        Q.    And were these e-mails that you believe had
```

Jason Goldstein
May 16, 2019                                                    8

```
 1   been produced in -- in the lawsuit?

 2       A.   I don't know.  Just -- I just couldn't remember

 3   certain dates and I was thinking about the history of

 4   the events that happened.  I wanted to remind myself of

 5   certain -- certain historical dates --

 6       Q.   Okay.

 7       A.   -- is mostly what it was.

 8       Q.   Any -- any particular dates that you were

 9   interested in remembering?

10       A.   I couldn't remember when we entered into our

11   arrangement with Rio.  I couldn't remember the dates of

12   certain meetings during the Vitol relationship.  Most --

13   most of those dates I were unable -- I was unable to

14   find but I was looking for.

15       Q.   Have you read through any of the formal papers

16   that have been filed with the court?

17       A.   The -- I read the petitions shortly after they

18   were filed, but it's been a while.  So, I have not

19   reread them recently.

20       Q.   And how are you employed today?

21       A.   I'm an employee of Gulf Coast Asphalt Company.

22       Q.   And how long have you been employed by Gulf

23   Coast?

24       A.   Since January of 2010.

25       Q.   And tell us what the business of Gulf Coast
```

Jason Goldstein
May 16, 2019                                                           9

1    Asphalt Company is.

2        A.   As of today?

3        Q.   If it's changed over time, you might -- you

4    might tell us what it was like in 2010 and come forward

5    through --

6        A.   Sure.

7        Q.   -- today.

8        A.   So, when I joined in -- in 2010, the company,

9    its primary business was owning oil terminals -- oil

10   storage terminals.  We also had marketing and trading

11   operations.  Those oil storage terminals which we

12   expanded after I got there we sold off in 2013.

13       Q.   Let me stop you there.

14       A.   Sure.

15       Q.   Where were those terminals?

16       A.   In Alabama.  Mobil --

17       Q.   Mobil --

18       A.   -- Alabama and Saraland, Alabama.

19       Q.   Okay.  All right.  Apologize for interrupting

20   you.

21       A.   Sure.

22       Q.   So, you -- I interrupted you right after you

23   said you sold the terminals in 2013.

24       A.   After that, we've substantially been a marketer

25   and trader without owning any fixed assets.

Jason Goldstein
May 16, 2019                                                    10

```
 1       Q.   So, I take it, were your business duties pretty
 2   much the same from 2010 to 2013?
 3       A.   Generally speaking, although my role tends to
 4   be fairly transactional and I'm kind of the corporate
 5   one on the strategic side.  So, my duties frequently
 6   change from month to month and sometimes week to week,
 7   but -- but yes.
 8       Q.   Okay.  How many people are in the management
 9   and upper management of -- of Gulf coast?
10       A.   I would -- I would say that under AJ, who's our
11   president --
12       Q.   Uh-huh.
13       A.   -- the next group is four kind of next level
14   employees.
15       Q.   And who are those people?
16       A.   Myself, Joe Mattingly, George Grace and Hucker.
17       Q.   What was the last name?
18       A.   Hucker.
19       Q.   Hucker.  Just like it sounds?
20       A.   Yes, H-u-c-k-e-r.  I hope I'm not leaving
21   anybody out.
22       Q.   Do what?
23       A.   I hope I'm not leaving anyone out.
24       Q.   And what's your title right now?
25       A.   I do not carry a title.
```

Jason Goldstein
May 16, 2019                                                    11

```
 1       Q.    Okay.  What about Mattingly, if I said that

 2   right?

 3       A.    I'm not sure.

 4       Q.    Okay.

 5       A.    At one point he was vice president.  We were --

 6   Joe and I -- Joe Mattingly and I were asked to resign as

 7   officers, keep our employment but resign as officers and

 8   to relinquish our titles due to our majority of our time

 9   being spent in Gravity Midstream.

10       Q.    Okay.  And we'll get into that --

11       A.    Sure.

12       Q.    -- in a minute.  When -- when did -- so, you

13   were a VP also?

14       A.    My title was executive vice president --

15       Q.    Okay.

16       A.    -- when I joined.

17       Q.    So, from 2010 to --

18       A.    Roughly 20- -- I'll say from 2010 as a start

19   date to sometime between 2014 to 2016 --

20       Q.    Okay.

21       A.    -- I had that title, and then I -- I have not

22   had a title since, a formal title.

23       Q.    All right.  And Mr. Grace, what is his title?

24       A.    He's a trader.

25       Q.    Okay.
```

Jason Goldstein
May 16, 2019                                                    12

```
 1        A.    I don't know if that's a formal title under his

 2   employment agreement or not.

 3        Q.    Okay.  Mr. Hucker?

 4        A.    He is our blender, but I would guess that is

 5   not his formal title.

 6        Q.    Right.  Okay.

 7        A.    He's in charge of blending asphalt.

 8        Q.    Okay.  So, tell us what the -- well, before

 9   we -- we go to Gravity, tell me -- so, you said

10   primarily since -- since Gulf Coast sold the assets in

11   2013, it's been essentially a marketer and a trader; is

12   that right?

13        A.    GCAC, yes.

14        Q.    Yeah.  Is that what you call it, GCAC?

15        A.    That's an abbreviation for Gulf Coast Asphalt

16   Company.

17        Q.    Sure.  Okay.  And so, describe the sort of

18   marketing and -- and trading activities that -- that

19   GCAC has been involved in since 2013.

20        A.    Sure.  So, we will purchase asphalt and other

21   related products that if blended in a certain way could

22   become asphalt.  We will store those and then sell them

23   either wholesale, which generally means by barge or

24   ship, or retail which is by truck to road contractors.

25               In addition to asphalt, we've also bought
```

Jason Goldstein
May 16, 2019                                              13

```
 1   and sold heavy Canadian crude and fuel oil, but asphalt
 2   has always been the main business.
 3        Q.   And what is the ownership of GCAC?
 4        A.   It's 50 percent owned by Joyce Brass and
 5   50 percent owned by a company called Trifinery.
 6        Q.   Who is Joyce Brass?
 7        A.   That is AJ Brass' mother.
 8        Q.   And the name of the 50 percent owner, again,
 9   was what?
10        A.   Trifinery.  T-r-i-f-i-n-e-r-y.  I believe it's
11   Trifinery, Inc., but I have to confirm that.
12        Q.   Okay.  And who owns Trifinery, Inc.?
13        A.   It is owned by AJ at least beneficially.  I
14   think there might be some trusts, but it's
15   beneficially AJ and his half brother Dick Brass.
16        Q.   Okay.  And tell us about Gravity.
17        A.   So, shortly after we sold the assets in 2013,
18   we formed a new company while GCAC still existed
19   initially called ISIS unfortunately.  Unfortunately
20   named before the terrorist organization became something
21   we knew about.  We subsequently changed the name to
22   Gravity Midstream.
23        Q.   After an FBI investigation?  Yeah.
24        A.   Bad timing.  That was a partnership that we --
25   management certain members of GCAC management, not all,
```

Jason Goldstein
May 16, 2019                                                      14

```
 1   formed with a private equity firm called EnCap Flatrock
 2   Midstream, and we formed that for the purpose of
 3   developing or acquiring oil assets similar to what we
 4   had done in the past.
 5        Q.    Mostly asphalt related or not necessarily?
 6        A.    Not necessarily.
 7        Q.    Okay.
 8        A.    We had no -- at the time of the start of the
 9   partnership, we had no assets.  So, we looked -- we
10   looked at a lot of things, some of which had nothing to
11   do with asphalt.
12        Q.    And were you one of the members of management
13   that had an ownership interest?
14        A.    Yes.  I was the CFO of that organization.
15        Q.    And who else had an ownership interest?
16        A.    There would have been five individuals as part
17   of management.  Excuse me.  Myself, AJ Brass, Joe
18   Mattingly, Kenny Hucker and Dave Hubenak.  In addition,
19   EnCap Flatrock was an equity participant as well.  And
20   finally there was a small investment group which was
21   made up of friends and family of AJ's that was a small
22   passive investor.  That was the -- those were the
23   initial investors.  I believe that the Fenton family was
24   initial and not added later, but I'd have to go back and
25   double check.
```

Jason Goldstein
May 16, 2019                                          15

```
 1        Q.    And so, is Gravity Midstream still in business
 2   today?
 3        A.    It is not.
 4        Q.    Okay.  And when did it cease operating?
 5        A.    It sold substantially all of its assets, to my
 6   knowledge, in 2017.  I'd already left the company, but I
 7   believe it sold all of its assets in '17.  I can't tell
 8   you if as an entity it still exists or not beyond that,
 9   but it has had no operations since that time.
10        Q.    Okay.  So, you said you had left by that time.
11   So, tell us about your involvement in Gravity from 2013
12   until you ceased your involvement.
13        A.    Sure.  So, I was the CFO.  I was also on the
14   board of directors.  I oversaw all financial management
15   and operations.  I was part of the key strategic team.
16   I was heavily involved in looking at new projects.  In
17   the acquisition of the Trigeant/BTB facility done in
18   Corpus, all of our capital provider banking
19   relationships and, as we were a small team, generally
20   whatever else popped up on a week-to-week basis.
21        Q.    Okay.
22                    (Cell phone interruption.)
23                    (Discussion off the record for less than
24                     one minute.)
25        Q.    (By Mr. Broughton)  And so, that was pretty
```

Jason Goldstein
May 16, 2019                                                          16

1   much -- well, and so, for what period of time did that

2   go on with -- with your role being as you described?

3        A.   So, it was middle of 2013 --

4        Q.   Uh-huh.

5        A.   -- until late 2016, there was a short period

6   maybe about six months where I took over formally the

7   role as interim chief operating officer as well.

8        Q.   All right.  And who'd you take that over from?

9        A.   I'm not sure if we had that title formally at

10  that time.

11       Q.   Okay.

12       A.   I can't recall.

13       Q.   So, for six months you held both titles, CFO

14  and COO or just kind of merged into one or what?

15       A.   At one point or another, an individual became

16  CFO, Craig Peus.  So, I -- I can't recall when I

17  was COO, if I was maintaining both titles or if he had

18  already become CFO.

19       Q.   Okay.  And why did you become COO?

20       A.   I think we just wanted more oversight of the

21  physical operations in Corpus from our Houston corporate

22  headquarters.

23       Q.   If you can, go into more detail of what the

24  business of Gravity Midstream was from 2013 --

25       A.   Sure.

Jason Goldstein
May 16, 2019                                                    17

1      Q.   Oh, wait.  Before we do that, so, you said

2   prior to its sale in 2017, you ceased involvement --

3      A.   Uh-huh.

4      Q.   -- right?  And when did you cease involvement?

5      A.   Late 2016.

6      Q.   And why did you cease involvement?

7      A.   All five members of the management team at

8   various times during -- five founders at various times

9   left, and there were some obviously management changes

10  being made.

11     Q.   And -- and why did the five founders end up

12  leaving?

13     A.   Various reasons.

14     Q.   Okay.

15     A.   I left voluntarily.  I was offered the

16  opportunity to stay.  Not everybody was in the same

17  situation.

18     Q.   And I mean, who -- who was making these --

19  these decisions?  Was it EnCap Flatrock making these

20  decisions or --

21     A.   Ultimately it's the board of directors who

22  would make such a decision and EnCap Flatrock had a

23  majority of the seats.  However, at the time of my

24  departure, I believe there was a new CEO who also might

25  have, you know, had a say but not the ultimate

Jason Goldstein
May 16, 2019                                                    18

1    decision-making authority without board approval.

2         Q.    So, in 2016, I take it the board of directors

3    was not happy with the direction of Gravity Midstream,

4    or do you know what -- why they were asking some people

5    to leave?

6         A.    It was -- it was a challenging environment.  We

7    bought the asset in 2015, middle of 2015.  That was

8    right before crude prices went down substantially, if

9    you recall, to the 40-ish dollar range.  And we had

10   bought that asset without the intention of focusing on

11   asphalt, and that caused significant challenges for the

12   business.

13        Q.    And what was the business of Trigeant?  Was

14   it BTB?  Is that what you said?

15        A.    So, there were -- the Sargeant family had been

16   in the asphalt business for a long time.  There -- there

17   are two factions of it, if you will.  One of them owned

18   Trigeant, and one owned BTB Refining.  And actually part

19   of the lawsuits and part of the bankruptcy was the

20   resolution of which of those two companies owned which

21   assets related to the Corpus facility.  So, there were

22   no operations at the time of acquisition partially

23   because ownership was contested.

24        Q.    And what was -- was there any relationship

25   or -- how would you describe the relationship

Jason Goldstein
May 16, 2019                                                    19

1   between GCAC and Gravity Midstream?

2       A.    There really was not a significant relationship

3   except for the fact that most of the management team of

4   one company was the same as the management team of the

5   other company.  The only other relationship developed

6   subsequently in late '15 or early 2016 because Rio

7   Energy became a tenant at Gravity and GCAC had a

8   business relationship with Rio.

9       Q.    So, kind of going back to your work history,

10  what was your first job out of -- once you graduated?

11      A.    Well, for my first year after graduation, I

12  held a number of odd jobs that I wouldn't remember most

13  of the employers, everything from teaching tennis to

14  bartending, and so technically --

15      Q.    Okay.  Not really interested in those.

16      A.    Technically nothing professional for the first

17  year.

18      Q.    Okay.

19      A.    My first professional job was a year after

20  graduation I worked for British merchant banked called

21  Charter House.

22      Q.    What did you do for them?

23      A.    I was an analyst in the mergers and

24  acquisitions group.

25      Q.    And where did you go next?

Jason Goldstein
May 16, 2019                                                    20

```
 1        A.    My next job was with another investment bank

 2   based in Los Angeles called Dabney Resnick at the time.

 3   It's now been renamed as Imperial Capital.

 4        Q.    And what did you do there?

 5        A.    I was an analyst and then an associate in the

 6   investment banking group.

 7        Q.    Where'd you go from there?

 8        A.    After that, I -- for maybe just shy of a year,

 9   I did a bunch of independent projects myself, some

10   consulting.  I also formed or co-founded an internet

11   company initially called IMGIS subsequently renamed Ad

12   Force.  So, somewhere between six and 12 months I did

13   that as well as some other consulting projects.

14        Q.    And what of business was Ad Force?

15        A.    It initially started off as a real estate

16   listing service on-line and subsequently became an ad

17   serving -- advertisement serving business similar to

18   Double Click, if anyone remembers that.

19        Q.    That brings us up to '96 or so?

20        A.    Exactly.

21        Q.    Okay.  And what did you do next?

22        A.    I went back to graduate school as I mentioned

23   at MIT Sloan --

24        Q.    Sure.

25        A.    -- from '96 to '98.
```