**Falik** 120:4,8

**fall** 76:21,23

**familiar** 66:21 88:8
121:10

**family** 6:7 14:21,23
18:15

**fast** 147:21

**father's** 23:8

**fault** 73:20

**FBI** 13:23

**February** 40:13
52:5,12 124:4
141:13

**federal** 6:2

**feel** 60:23,25 65:2,
14 119:6 125:21
135:18 155:7

**feels** 146:19

**fees** 64:7 148:2

**felt** 72:15,18 116:14
143:20

**Fenton** 14:23

**figure** 86:4 136:12

**figuring** 65:9

**filed** 8:16,18

**fill** 53:12

**final** 81:3 82:17

**finalized** 34:4 93:17
104:8 127:19

**finally** 14:20

**financial** 15:14
22:15 43:24 45:19
62:10 114:24

**financing** 26:14
27:7 30:2 33:11
84:17,21 106:5,8,20
107:24 108:16
112:23 147:19,23,
24 149:4 150:11

**find** 8:14 53:12 61:8
109:13 138:13
145:4 146:13
147:17 149:22
150:20

**fine** 46:8 78:1
146:10

**finish** 74:18 94:22

**finished** 145:7

**firm** 14:1 21:13,14
22:9

**fit** 33:20

**fixed** 9:25 32:17
37:10 103:9,13
115:21

**Flatrock** 14:1,19
17:19,22 131:9

**flow** 104:17

**FOB** 33:1

**focused** 82:23

**focusing** 18:10

**follow** 44:25 138:22

**follow-up** 148:25

**followup** 146:24

**Force** 20:12,14

**forecast** 81:23

**forecasting** 81:20

**foresee** 93:12
144:12

**forget** 5:1 41:20

**forgot** 123:23

**forgotten** 124:3

**form** 83:2 88:22
93:18 108:14
118:15 137:21
145:24 154:18
155:11,21 156:2,11
158:1

**Forma** 64:25

**formal** 8:15 11:22
12:1,5 34:17 50:12,
13 122:23 131:13

**formalized** 36:19,21

**formally** 16:6,9
32:11 49:19,23

**Formas** 63:24

**formed** 13:18 14:1,2
20:10 25:17 86:8,9

**formulated** 63:4

**forward** 9:4 51:5
57:5 65:1 70:8
77:19 91:12 139:15

**found** 99:17 106:14
109:16 110:1

**founders** 17:8,11
27:2

**founding** 130:18

**frame** 54:18 67:15
84:24 111:6 146:20
156:18

**freight** 103:10,13,25
104:3

**frequently** 10:5 40:2
95:6

**friend** 116:19 117:2

**friends** 14:21

**front** 69:22

**fuel** 13:1 27:9 44:13,
15 47:6,11,20 48:21
49:4 52:19,20 61:3
62:25 63:15 80:15
111:16 115:1,21,22
116:9,11 117:20,24
118:18 126:17
143:4,23 144:2,15

**fuels** 115:5

**full** 4:11 39:25

**full-time** 28:4 30:22,
23 139:2

**fully** 26:9

**function** 49:5 81:12

**functions** 32:13

## G

**GACA** 119:25

**gain** 66:1

**gap** 109:12 119:18

**gave** 7:9 53:7 94:19

**GCAC** 12:13,14,19
13:3,18,25 19:1,7
22:24,25 23:1,7,11,
15 24:22 28:23
30:18,21 33:18
37:24 39:12 42:2,18
43:7 47:18 48:1,5,
10,12 49:23 55:19
57:15 78:10,18,21
79:18 84:8 85:22
87:5,10,11 88:5,10,
20 89:11 90:10,11,
13,17 91:2,5,12,15,
23 93:8,12,24 94:4,
14 95:7 96:19 99:25
100:2,6 102:11
103:16 104:10,12
105:4,5 106:10
108:14,18 110:24
111:3,6,7,9 112:12,
25 114:22 123:8,10,
12 124:16,22 125:2,
22 127:3,21 132:12,
24 133:8 134:9,25
137:19,23 138:7

**GCAC's** 39:4 48:21
51:14 81:9 84:11
88:14 90:7 100:20
116:2 118:13
121:24 125:10
140:23

**GCAC/ASPHALT**
146:25

**GCAC/MERCURIA**
33:23

**GCAC/NEWCO**
89:19

**GCAC/RIO** 40:12

**GCAC/VITOL** 89:19
123:9

**general** 66:6,7 75:6
80:8 96:9 138:17

**generally** 10:3 12:23
15:19 21:25 26:14
66:1 71:25 153:21
154:9

**gentleman** 56:22

**George** 10:16
122:14,15

**George's** 122:16

**get along** 57:2

**Giles** 34:2,11,15,20
35:1,3,8,11,14,20,
23 36:1 38:6,14
46:6,9 59:3,8,13,17
69:11 73:21 74:12,
15,20,23 75:1 77:25
83:2,5,7,11,16,19,
21,24 88:22,24
93:18 95:9 118:15
129:22,25 133:23
137:21 145:8,24
148:23 150:19
154:20 155:13,23
156:8,13 158:5,7

**gist** 73:10

**give** 4:10 85:15
90:11

**Glencore** 36:22

**gmail** 31:14

**Goldstein** 4:3,7,12
46:17 59:24 69:21

75:4 79:5 95:17
102:22 145:15
148:24

**good** 4:7,8 32:7
35:13 65:3,4,12
104:17 117:21
129:11,22 140:14,
17

**goodwill** 109:24
146:12

**GOTAC** 25:8,19
27:10 55:22 76:6
130:8 131:1

**grab** 59:7 150:15

**Grace** 10:16 11:23
122:17

**grades** 44:22,25

**graduate** 20:22

**graduated** 19:10

**graduation** 19:11,20

**Gravity** 6:17,18 7:10
11:9 12:9 13:16,22
15:1,11 16:24 18:3
19:1,7 23:13,15,17,
22 24:1,4,6,21,23
25:1,7,8,13,16,18
26:9,13,19,25 27:5,
20,25 28:3 29:6,25
30:4 31:6 37:15
39:19 40:19,22,23
42:7 55:18,19 71:18
76:3 78:20 121:6
130:18 139:2

**Gravity's** 72:1 78:10

**great** 5:18 35:11
58:21 73:11 100:15
145:8 158:7

**Greenway** 24:14

**grew** 5:17 30:21
52:21

**group** 10:13 14:20
19:24 20:6 21:6

**grow** 5:12

**guess** 12:4 28:12
42:15 43:19 50:9
54:10 61:7 62:4
71:24 88:10 91:25
107:10 110:5 113:4
115:8 124:21
128:16 131:22
137:24 154:1

**guessing** 58:17
103:25 109:1

**guidance** 64:10

**Gulf** 6:17 8:21,22,25
10:9 12:10,15 22:20
24:15 26:10,13
27:5,16 29:4,7,17
30:7,15 32:1,14
36:17 39:4 45:11
47:1

**guy** 144:2

**guys** 26:5 33:25
74:17

---

## H

**H-A-R-A-R-I** 120:10

**H-U-C-K-E-R** 10:20

**half** 13:15 21:23
70:3 100:2 108:25
147:6 148:15

**hampered** 135:16,
19

**hand** 62:12 71:13
120:21 123:8

**handle** 119:4

**handled** 120:13

**happen** 68:5 79:24
152:1

**happened** 8:4 27:18
53:13,14 65:7 67:17
86:22 87:6 101:18,
20 104:13 107:22
110:5 127:12,13
139:4

**happening** 107:24
150:12

**happy** 5:4,8 18:3
51:15,22 53:22 61:8
67:2 70:14 71:3
76:15

**Harari** 120:5

**hard** 77:21 127:6

**harder** 77:21 134:12

**head** 29:2 32:20
37:4

**heading** 112:3

**headquarters** 16:22

**heard** 67:13 148:16

**hearing** 102:16
103:21

**heat** 64:12

**heavily** 15:16 42:3
64:16

**heavy** 13:1 27:9
44:13 75:24 76:23
77:10,19,22 111:17
130:22

**hedge** 43:23,25
44:11,14,19 45:3,25
80:10,15 105:9
114:18,24 115:9,13,
17 116:15 117:25
122:10,11 137:2,3

**hedgeable** 44:23
47:21 63:16

**hedged** 47:20 116:8,
15

**hedges** 66:11 79:19,
23 80:9 118:13
133:2,4

**hedging** 33:17
38:24 39:12 45:5,15
46:19 49:12 52:15,
20 62:15 65:22
66:1,4,8 77:21
79:11,17 80:5,14
114:17,20,22,24
116:2,4,25 117:16,
19 122:9 132:1,13,
17

**held** 16:13 19:12
50:25 51:7 90:10
110:19

**helped** 116:25

**helping** 62:12

**Hermosa** 86:25
87:1,2,9,17 104:11,
12,24 105:1,4,6
152:3,5,10,16

**hey** 31:21 52:24
53:11,15 68:1,23
80:14 131:1 134:21

**high** 5:17,18 22:17
144:17

**higher** 28:23

**highs** 22:18

**hindsight** 65:1

**historical** 8:5 79:9,
12

**historically** 33:13
67:6 118:17

**history** 8:3 19:9
84:12

**hold** 109:25 146:13

**holder** 51:3

**Holly** 4:14

**hope** 10:20,23 127:6

**hopeful** 104:10,25

**Horowitz** 116:18,19

**hot** 74:15

**hour** 4:24 46:7

**House** 19:21

**Houston** 4:14 5:13
16:21 22:11,13
24:6,7,13 28:6
78:15

**how's** 126:11

**Hubenak** 14:18
27:24 42:21 92:8
149:24

**Hucker** 10:16,18,19
12:3 14:18 75:15

**hundred** 30:19
87:18 106:10
110:18 115:4,5

**hungry** 77:25

**hypothetical** 82:1

---

## I

**i-a-n** 120:8

**idea** 37:16 40:7
51:23 54:1,7 55:12
63:7 71:3 84:7,9,14
108:22 113:24
144:8

**ideas** 39:10 68:10
80:8 129:20 133:17

**identification** 69:16
71:12 72:23 80:20
82:12 85:3 87:22
92:4 102:21 105:17
114:7 117:4 120:20

**identified** 53:24
140:17 142:11

**idle** 86:23

**Iglesias** 42:15,17

**ill-advised** 156:5

**imagine** 25:2 39:13
75:9

**IMGIS** 20:11

**immediately** 76:2
88:19
**imminently** 135:13
**Imperial** 20:3
**impetus** 138:24
**implemented** 88:17
**important** 28:20
**in-house** 22:20
42:21 43:9
**in-person** 107:14,20
108:1,8
**inaccurate** 28:18
**inappropriate** 67:18
**included** 65:22
66:20 83:18 137:24
151:18
**including** 4:11
**inconsistency**
100:17
**inconsistent** 99:18
**incorrect** 138:12
**incur** 138:18
**incurred** 104:3
137:6,12
**independent** 20:9
84:16 87:6
**indicating** 157:22
**individual** 16:15
**individuals** 14:16
153:22
**influence** 122:20
**informal** 122:24
**information** 62:10,
13 64:5,7 105:10
127:23 138:12
**infrastructure** 37:18
**initial** 14:23,24 34:5
57:12 58:12 71:7
104:1 134:10
147:13 149:3
**initially** 13:19 20:11,
15 21:10 23:2 24:7,
14 27:19 56:19
58:11 62:14 67:22
71:7 84:13 87:19,20
101:25 102:9
125:16
**initiated** 51:25 72:20
84:9
**input** 63:19 75:11,13
76:25 81:9 132:21

**134:21**
**inputs** 62:15
**inspection** 96:23
**institutional** 22:1
**instruct** 113:15
**instructing** 114:2,12
**instruments** 43:24
**intended** 61:23
86:12 127:24
**intensive** 128:18
**intention** 18:10
91:14
**interacted** 42:16
**interaction** 56:20
**interactions** 54:17
**interest** 14:13,15
49:1 72:21 77:13
106:12 112:18
130:13 131:3 139:7
148:9,14
**interested** 8:9 19:15
48:20 72:7 78:17
130:16,19
**interim** 16:7 106:5
109:8,9,14 112:23
147:17 149:4
**intermediate** 76:1
**intermediation** 37:9
**internal** 126:13
**internet** 20:10
**interrupted** 9:22
**interrupting** 9:19
**interruption** 15:22
68:12
**inventory** 51:3
110:20 126:14,16,
17 135:21 137:13
138:19 142:24
143:3 147:4,11
**investigation** 13:23
**investment** 7:1
14:20 20:1,6 21:2,5,
8 94:16 154:3,9
**investments** 23:4
**investor** 14:22
**investors** 14:23
**invoice** 113:8,11,16,
18 114:13
**invoiced** 103:16
113:6

**invoicing** 112:25
113:14,21 114:2
**involve** 134:2
**involved** 12:19
15:16 22:12 23:7,9
24:3 27:4,6 29:6,8,
17 30:1,2 33:13,16,
18 37:2 38:23,24
39:6,12,14,16
40:11,18 41:22,25
42:4 43:3 46:1 47:9,
14 55:17 57:14
58:12 60:6,16,18
64:16 68:19,20
76:24 80:11,16
86:10 88:12 95:5
113:19,22 116:5,16
119:23 122:12
130:21 132:4,12
140:22 154:22
157:2
**involvement** 15:11,
12 17:2,4,6 58:5
85:22 113:24 116:2
121:23 122:3 132:8
**involving** 31:19
**ironically** 111:21
**irrelevant** 110:6
146:7
**ISIS** 13:19
**issue** 45:20 69:9
102:10
**issues** 103:22,23
126:13 141:21
**item** 56:7
**items** 29:1 103:9
**iteration** 81:3
**iterations** 81:2
82:16

---

**J**

---

**James** 56:22 75:6
76:9
**January** 8:24 22:24
49:20 52:11 71:17
72:1 135:12 140:8
141:13,15 152:12
**Jason** 4:3,12
**Jenrette** 21:3,13

**Jg@**
**gravitymidstream.**
**com** 31:9
**Jgoldstein@**
**gcachouston.com**
31:1
**jive** 101:2
**JMA** 43:14 49:13
51:15,24 52:2 68:23
103:9 105:11 107:2
151:4,10,17 156:16
**job** 19:10,19 20:1
22:25
**jobs** 19:12
**Joe** 10:16 11:6
14:17 140:23
**John** 32:3 81:11
**join** 57:24
**joined** 9:8 11:16
22:24 30:18 111:6
127:10 139:1
**joining** 57:15,19
**joint** 36:6,8,10,13,16
37:20 38:18 39:17
40:12 41:23 43:5
47:14 49:22 88:4
89:19 150:10 151:5
152:23,25 153:11
157:24
**jointly** 39:10
**Joyce** 13:4,6
**JSMA** 92:9 150:2
156:17
**July** 48:2 49:18
50:19 51:11 52:10,
12 67:15 70:5 80:10
91:24 92:7,14,18
94:6,8 95:4,19
96:13 97:1,8,14,23
98:4,9,12 100:8
101:19 103:1,2,9,
13,17,19 105:7
110:25 114:5
122:25 123:19
124:13,16 127:19
129:14 131:24
142:8 147:14
149:24 150:9,23
151:7 152:21 155:7
156:18 158:3
**June** 25:21 80:10
84:2 88:21 94:6
95:4,19 96:3 97:19

98:2 103:17,18
110:25 114:5
156:18

**K**

K-U-O 54:12
K-V 38:16
Kale 38:1 42:15 46:3
Kale's 38:15
Karen 81:11
Kaye 42:23
keeping 40:9 64:15
104:20 140:13,14
Ken 4:9 59:3
Kenny 14:18 75:15
122:19
Kenny's 29:23
key 15:15 61:20
kind 6:1 10:4,13
16:14 19:9 24:4
33:6,9 40:11 45:8
49:11 51:7 52:24
58:18 70:16 75:6
82:6 85:15,21 87:11
89:4,6 95:20,21
98:19 102:14 107:8,
9 111:24 112:23
118:3 126:14,15
127:21 131:24
134:1,12,15 138:16
139:10,12 141:18
143:12 146:12
147:16 149:1
kinds 41:4
knew 13:21 54:13
56:16 64:7 66:13
76:9 78:15 84:12
101:25 155:15
knowledge 15:6
27:1,3 32:3 47:15
92:1 97:9 105:8
131:16 139:23
149:17,18 150:8
151:8,9
Kohnke 92:8 149:23
Krhovjak 38:2
42:15,17
Kuo 51:21 54:10,12,
15,23 55:15 56:3
58:15 61:13 68:17,
18 71:4 76:16 94:15

102:18 108:11
128:25
Kuo's 76:21,25
127:7

**L**

labeled 84:5
labels 97:6
labor 85:24
Lake 21:10
large 21:13 37:10
largely 64:4
larger 122:4
lasted 108:23
late 16:5 17:5 19:6
25:23 50:16 52:17
53:2 67:15 96:3
105:7 114:11
141:15 156:18
lawsuit 7:18 8:1
133:9
lawsuits 6:9 18:19
lawyer 59:11 154:10
lead 85:25
leaning 37:17
lease 50:25 64:8
75:17 90:10,12
103:15 119:21
122:7 151:19
leased 32:25 50:6
151:15
leaseholder 39:1
119:18
leases 29:13 30:5
134:16 135:1
leave 18:5 22:14
43:12 48:12 116:3
leaving 10:20,23
17:12
led 49:11 50:12
119:24
left 15:6,10 17:9,15
22:23 25:22 26:19
28:1 30:17 48:1,14
51:6 130:18
left-hand 73:18
legal 28:3 36:7 42:1,
5 68:21 101:22
138:2 156:6

level 10:13
leverage 37:12
leveraged 21:15
light 72:5 75:21
76:18 111:18
limit 128:22
limited 48:19
lined 92:16 98:18
lines 70:17 88:6,13,
17 92:21 98:20
111:8 112:12 127:9,
11,23 128:4,17
129:1,13
lining 89:3
liquid 44:10
list 96:14 103:24
listing 20:16
literally 141:4
loan 110:17
located 22:11
lockstep 44:15,25
logical 54:6 139:19
142:17
long 8:22 18:16
25:18 42:22 47:25
52:1 54:16 74:16,19
108:22 111:1 112:1
141:12 144:9
long-term 33:20
53:21,22 80:16
134:24
longer 32:15 56:23
67:5 108:18 123:10
125:6,15 126:15
looked 14:9,10 40:6,
9,25 54:18 58:4,19
62:3 75:18 82:21
83:13 92:6 93:3
96:19 98:25 103:3
112:22 139:25
140:3 144:9 149:21
Los 20:2
lose 66:12
losing 41:3
loss 39:25 66:1
81:21 105:9 110:10
126:23 153:11
losses 36:14 40:5
51:10 96:17 106:11
107:1,5 108:19
125:2 136:9,11,13
137:3,6,10 138:8,17

142:2 153:4
lost 77:13 134:5
135:8
lot 14:10 36:20
37:18 38:10 45:6
65:6 72:3 107:3
117:13 127:1 134:5
135:12,15 140:8,11
153:4 155:5
lots 116:16
love 59:6,9,15 131:1
low 22:18,19 52:19
135:22 143:21
144:17
lower 62:6 78:6
126:22 142:24
lows 22:18
Loya 108:11
Lufkin 21:3,12
lunch 74:12 78:23
79:1 118:9
lunches 117:11

**M**

M-A-C-Q-U-A-R-I-E
49:10
M-A-R-L-O-W 41:19
M-A-U-R-I-C-E
120:9
Macquarie 49:7,8
made 14:21 17:10
37:18 61:12,13 71:9
76:22 84:18 88:15,
17 89:11,16 92:25
94:12 95:25 100:8
124:7,10 126:6,10
127:3,5,18 139:14,
15 140:18 157:23
main 13:2 58:15
85:21
maintaining 16:17
134:16
major 24:1,4 29:16
30:1,3 120:14
155:15
majority 11:8 17:23
make 17:22 25:17
66:12 98:21 103:24
122:21 126:23
144:16,18 149:2
150:15

makes 33:10 71:24
85:12 100:3 105:6
127:2

making 17:18,19
41:3 57:6 60:16
88:13 101:22
104:17 122:13
133:18 134:15,17
136:22 144:12

man 73:22

management 5:23
10:8,9 13:25 14:12,
17 15:14 17:7,9
19:3,4 21:23 27:14,
20 37:14 78:14
91:13,17 93:13
105:4,13 131:4,5
152:15

manually 63:19

manufacture 75:25

Marc 116:18,19
117:20,22

March 48:13 49:3
58:7

margin 62:24 64:9
127:25

margins 64:19,24
77:22 79:9,12 82:1
128:2

Marine 55:5,10

marked 59:25 69:15,
22 71:11,14 72:22
73:14 80:19 82:11
85:2 87:21 92:3
102:20,23 105:16,
23 114:6 117:3
120:19 145:16

market 44:11,23
72:16,19 77:17
111:2,19 126:20
131:11 143:6,25
144:1

marketer 9:24 12:11

marketing 9:10
12:18 32:19 36:10,
16 37:20 38:18
39:17 40:13 41:23
43:6 47:15 49:22
75:6,17 76:3 78:8
88:4 111:15 121:11
126:15 150:10
151:5 152:25
157:24

markup 89:13

Marlow 41:19

maroon 89:4

Mason 59:10 73:16

master's 5:22

match 45:18 111:22
117:25

matching 115:20

material 54:16 93:20
97:8,24 99:3,4
113:4 152:25 153:2,
5,6 155:20 156:1,13

materially 127:15

math 52:17

matter 4:10 7:14
53:6 95:21

matters 42:5 54:4

Mattingly 10:16
11:1,6 14:18 140:23

Maurice 120:5,9

maximum 123:13,25

Mckenzie 42:24

meaningful 58:23
71:23 77:5

means 12:23 44:16
82:8 104:6,7

meant 34:16 83:22
108:17 109:15
146:24

mechanism 116:25

medium 144:17

meeting 70:22 76:16
104:14,15 106:23
107:14,20,23 108:2,
8,9,15,20 109:10
110:9

meetings 7:23 8:12
45:23 58:16 118:10

member 87:20

members 13:25
14:12 17:7 130:18

memorized 73:9

memory 28:25
36:20

mention 148:16

mentioned 20:22
28:2,22,24 36:5
48:18 61:2 66:23
76:17 77:20 105:2
110:24 130:7 142:8

mentioning 142:6

merchant 19:20

Mercuria 32:23
33:17,19 48:18,24
65:14 112:9,10,15,
17,21 115:6 118:18,
23,25 119:8,20,24,
25 120:3 121:25
122:24 123:9
124:13,19,22 125:4,
19,21 126:1,5,8
127:5 134:11,22,25
139:5,14 140:9
141:15 143:1,7,14
144:22

Mercuria's 119:4
139:10

Mercuria/gcac
123:10

merged 16:14

mergers 19:23

message 31:18
102:14 108:12

met 23:2 56:19 68:7
128:13

methanol 111:12

mid 7:11 130:11
141:14

middle 4:11 16:3
18:7 25:20,22 50:24
56:11 146:25 149:9,
16,17

midstream 6:18,19
11:9 13:22 14:2
15:1 16:24 18:3
19:1 23:22 25:14,
16,18 26:9 29:6,25
155:4

Mike 108:11 140:24

million 65:21 82:9
136:10,17,21 137:7,
18 139:21 147:6

mind 28:18 90:25
125:10 131:10,12

minds 108:15

mine 64:24

minimal 23:16

minimum 40:2

minor 30:4 112:20

minus 56:14

minute 11:12 15:24
59:14 68:14 93:3

117:6

minutes 108:25

Miscellaneous
66:16

mission 143:22,23

mistakes 138:9

MIT 5:23 20:23

Mobil 9:16,17

Mobile 50:6,7,10,16
90:11 103:15
110:25 113:9 114:4
148:4,5 151:15

Monday 35:12

money 41:3 64:12
148:8,10

month 10:6 58:8
76:19 105:12

monthly 39:22 40:2
41:1 63:17,21

months 16:6,13
20:12 41:4 105:8
112:4,6 113:10
141:10,19 148:5

Moran 140:24

morning 4:7,8
131:24

mother 13:7

mouth 146:8 156:23

move 44:14,16
145:3

moved 5:14 24:20,
21,22,24

movement 44:3

moves 44:15,16

moving 40:21 50:4,
5,10

multiple 54:3

## N

named 13:20 56:22

names 25:5

necessarily 14:5,6
44:16 53:20 77:15
130:21

necessitated 91:17

needed 23:6 39:1
62:15 76:25 104:12
105:10 108:16

negative 41:14
96:25

negotiating 29:18
30:1 41:22 42:10
43:5 86:1 155:14
negotiation 110:2
negotiations 29:8,9
85:21 119:24
120:13 121:17
124:10 127:20
128:15 135:17
157:12
Neil 7:23
Newco 84:8 86:8,12,
15 88:11,21 89:17
90:5,14 91:12,15
92:10 93:13 122:25
151:18,19
newsletter 63:17
niche 48:22
no-no 150:16
nodding 32:20 37:4
noise 57:6
non-50/50 109:11
non-asphalt 106:17
125:19 145:21
146:15,18 149:8,14
noncompetitive
69:2
normal 104:3 120:8
North 78:16
notation 148:7
note 38:14 98:17
Noted 148:21
nothing's 109:22
notice 53:7 70:13
number 6:8,22
19:12 36:24 62:6
69:15 71:11,22
72:22 73:25 74:25
78:5 80:19 82:11
85:2 87:21 92:3
99:6 102:20 103:8
105:16 112:4 114:6,
21 115:1,2 117:3
120:19 124:10
128:1 137:24
139:24 148:18
numbered 59:4
numbers 59:14
126:4 136:23

**O**

Oak 24:22 27:12,24
28:4 64:8 118:25
oath 4:17
Objection 83:2
88:22 93:18 118:15
137:21 145:24
154:18 155:11,21
156:2,11 158:1
obligation 7:3 90:18
93:12
obligations 91:6
121:24
occasion 154:15
occasionally 132:8
occur 146:3,4,5
154:15
occurred 56:13 94:6
97:12 149:11
152:12
October 114:13,15
146:20
odd 19:12
offered 17:15
offering 78:17
offhand 26:1
office 7:24 24:10,13
30:5 37:17 39:3
96:21 104:15
officer 16:7 31:25
officers 11:7 32:1,2
offices 24:6,17,18,
24 28:6
offset 137:25
offsets 137:19
oil 9:9,11 13:1 14:3
22:3 25:1,8,11 27:9
44:13 47:7,11,20
48:21,22 49:4
52:19,20 62:25
90:12 110:11
111:12 115:1,21,22
117:24 118:18
126:17 143:4,23
144:2,15
on-line 20:16
on-the-job 45:8
onboard 48:20

operate 110:8
operated 36:13 67:6
operating 15:4 16:7
93:21 119:2 134:18,
19 135:3 158:3
operations 9:11
15:9,15 16:21 18:22
37:18 52:8,9
110:12,19 156:10
opined 60:15
opinion 136:7,20
137:9
opportunities 40:7
48:22 53:23 66:25
128:20 129:17
opportunity 17:16
51:17 75:23,24
129:4,8 134:5 135:8
opposed 51:18 84:8
132:5
ops 104:14
optimization 117:14
options 117:23
order 149:1
organization 13:20
14:14
original 69:1 150:14
originally 124:22
out-of-pocket 137:8
outline 112:23
outlines 105:11
outset 37:3
overhead 96:20
oversaw 15:14
overseas 32:12
oversight 16:20
owed 137:8
owned 6:7 13:4,5,13
18:17,18,20 25:13
87:2,6 115:5 151:14
owner 13:8
owners 27:15
ownership 13:3
14:13,15 18:23 25:7
26:20 84:12 87:11,
15,17
owning 9:9,25
owns 13:12 32:15

**P**

P&I 96:17,21,22
P-O-T-E-N 63:22
p.m. 69:18 79:1,2
95:12,13 130:3,4
145:11,12 148:21
158:10
paid 103:17,19
110:22,24 114:15
117:2 142:3
paper 58:14 86:6
156:24 157:14
papered 40:15
49:23 50:3,20
papers 8:15
paperwork 49:19
paragraph 76:15
78:9
part 14:16 15:15
18:18,19 45:23 48:7
57:12,15,19 68:5
82:20 83:19 85:16
86:14 89:19,20
96:13 100:11
109:10 130:24
137:11 139:13
145:19,20 146:15
147:13 153:3
part-time 30:8 32:8
parted 84:15
partially 18:22
participant 14:19
participate 122:9
participated 81:4
parties 6:12 58:13
93:17,20,22 94:7
155:9,15,16 157:3
parties' 94:13
partner 7:24 32:23
37:16 55:6 78:18
84:18 95:7 109:14,
16 110:1,3 146:13
147:17
partnering 119:13
partners 38:2 42:13,
14,16
partnership 13:24
14:9
parts 133:19,20
139:25 140:1

**party** 7:17 58:22 77:7 82:8 84:7 92:19

**pass** 148:20 158:5

**passive** 14:22

**past** 14:4 112:25 124:4

**Patrick** 35:15 37:25 42:13 46:3 51:20 57:14,15,18,22,23 60:21 70:10 79:24 80:6 94:14 95:6 109:6 112:19 122:14 127:10,21, 22,24 128:16 132:14 138:25 153:24

**Patrick's** 122:15

**pay** 100:2

**paying** 110:21,22

**payment** 103:9,12

**peculiar** 44:6

**pen** 86:6

**Pennsylvania** 5:22

**people** 10:8,15 18:4 29:21 41:15 44:11 60:12,16 61:15 66:12 68:9 72:3 100:5 101:13 108:10 140:3

**percent** 13:4,5,8 25:13 30:19 40:23 42:6 51:23 81:12 87:3,18 106:10 115:4 148:16,17

**percentage** 116:8

**perfect** 45:25 74:22 115:9

**perfectly** 51:15 66:9

**perform** 155:10

**performance** 126:21

**performed** 139:23

**performing** 79:15 118:13 121:24

**period** 16:1,5 25:7 29:5 52:18 67:24 96:3 131:25 141:8

**person** 54:8 55:18 58:15 64:1 70:25 85:21 107:19 117:21 128:24 154:2 157:8,9

**personal** 31:16 60:21 113:24

**personally** 39:16 113:13 121:24 128:25 131:17

**personnel** 82:23 96:18 99:19 101:1,5 103:16,18,20 113:22 123:11 124:18

**perspective** 60:23 94:14

**Perugini** 37:25 46:22,23 48:1 70:4 94:15,24 95:1 132:14,21

**Perugini's** 35:16 49:2 58:2

**peruses** 71:15 73:8 80:23 82:13 85:4 87:23 90:24 92:5 99:9 100:16 105:18 114:8 117:7 120:23

**Peter** 27:23

**petitions** 8:17

**Peus** 16:16 27:20

**phone** 15:22 68:8 70:25 106:23 107:18 108:3

**phrase** 67:7

**physical** 16:21 44:11 45:2,19 115:2,3 133:1

**picture** 116:5

**piece** 75:7 106:16

**pieced** 140:18

**pieces** 107:3

**piecing** 140:20

**Pin** 27:12,24 28:4 64:8 118:25

**place** 35:18 54:19 61:9 133:2 141:9

**placeholder** 51:8

**placements** 21:15, 24

**placing** 79:19 122:11

**plan** 96:8 139:13

**plate** 25:11

**play** 109:21,23

**played** 109:18

**Plaza** 24:14

**plug** 53:18

**point** 4:22 11:5 16:15 30:13 40:9 42:7,18 43:14 47:25 53:5 55:18 58:13,15 62:23 63:3 67:7 70:24 84:4 101:12, 13 102:2 117:18 147:22

**points** 148:11 151:2

**popped** 15:20

**populated** 62:14

**portion** 34:22 37:15 96:20 119:12

**position** 26:20 39:23,24 40:25 41:16 62:17 105:9 122:6

**positions** 22:2 27:2

**positive** 41:13 61:1

**possibility** 81:21

**possibly** 57:22 64:11 96:2 127:18 131:9

**post** 5:18 24:22 53:25

**Poten** 63:22 144:15, 17

**potential** 30:3 48:7 66:24 71:22 118:2

**potentially** 37:7 117:25 139:5

**Powerpoint** 69:6 79:8

**preceding** 76:2 88:19

**predated** 36:23 40:17

**predict** 77:21,22

**predominantly** 131:21

**prefer** 94:17 154:9, 11

**premise** 93:21

**preparation** 81:5

**prepare** 7:20 62:13 64:1

**prepared** 63:9

**preparing** 60:6,8 62:17

**present** 29:4

**presentation** 60:17, 19 61:12,16 70:5

**president** 10:11 11:5,14 64:22

**pressure** 135:12,16 137:14

**presume** 120:15

**presuming** 137:5

**presumption** 158:4

**pretty** 10:1 15:25 22:19 33:5,7,24 47:22 48:19 53:6 139:3

**previous** 76:17 83:13 98:18,19

**previously** 36:18 59:25 75:21 99:2 145:16

**price** 28:23 44:2 51:7 110:2 115:11, 15,21,22,24 135:21, 22 144:14

**prices** 18:8 52:18 63:18 111:20,21,23 116:9 126:17

**pricing** 61:4 112:3 143:4 144:20

**primarily** 12:10 27:4 29:6,20 32:18,22,23 43:6,7 44:13 72:11 120:4 140:24 156:19,23,24

**primary** 9:9 39:7,8 49:5 56:23 60:7 61:14

**prior** 17:2 47:17 49:22 68:15 82:4 96:13 97:23 111:11

**private** 14:1 21:15, 23,25 22:1

**privilege** 134:3

**Pro** 63:24 64:25

**problem** 59:13 68:1 71:8 101:24

**problems** 86:12

**proceeding** 6:2

**process** 48:24 55:20 94:13 141:12

**processing** 76:22 77:8,10,22 130:23

**produced** 8:1 34:24
41:1
**product** 29:22 63:17
114:22,23 142:3,4
143:6,24 147:4
156:4
**products** 12:21
76:1,22 111:13
122:8,21 142:10
145:21 149:8
**professional** 19:16,
19 40:24
**profit** 39:25 54:19
82:1 105:9 110:10
123:7 125:24,25
126:3,8,10 127:4
136:11 153:11
**profitable** 125:22
126:6 127:14 139:5
**profits** 36:14 40:5
51:10 81:20 86:2
96:17 106:11 107:1,
4 108:19 123:12
124:23 136:9,13
137:10 139:14
142:2 153:4 157:3
**proformas** 60:14
**progress** 101:22
**progressing** 101:22
**prohibit** 48:25
**project** 6:23 56:24
**projecting** 127:17
**projection** 82:9
**projections** 126:6,
10
**projects** 15:16 20:9,
13 22:12 30:20
138:24
**proper** 115:12
140:13
**proposal** 71:18 72:2
126:7 127:4
**proposed** 77:4 90:9
106:20
**proposing** 86:7
**provide** 28:2 45:2
105:5 137:5 147:2,
14,16 148:1
**provided** 37:7,8
39:2 62:11 64:5,11
75:14 85:16 106:12
115:11 136:23

138:11 147:3,24
**provider** 15:18
37:16
**providing** 27:7
110:13 147:10
**provision** 123:16
**publication** 144:15
**publicly** 63:13
**pull** 29:23 53:18
**pulled** 29:21
**pulling** 117:1
**purchase** 12:20
51:1,5 52:23 109:24
115:3,15 131:1
135:14 142:4
146:12
**purchased** 7:10
24:9 25:20 27:11
56:11 110:19 141:3
156:4
**purchaser** 7:2 119:1
**purchasers** 39:7
**purchases** 30:4
40:4 96:22 147:4,20
149:14
**purchasing** 27:8
29:12 32:24 33:8
39:6 55:20 122:8
130:13,16
**purely** 75:20 77:17
**purpose** 14:2 86:13
90:6 91:3 93:8
106:3
**pursue** 127:24
128:18 129:21
**pursued** 127:11
142:14
**pursuing** 106:18
128:5
**put** 58:14 62:2 69:6
86:6 89:25 105:24
106:1 112:19
114:23 127:22
131:13 146:8
148:10 153:9
156:22
**putting** 54:18 84:14
106:3 126:16

## Q

**qualify** 157:1
**qualitative** 60:12
123:3
**quantify** 134:5,12
**quantitative** 60:13,
14 123:2,5 124:12
**quantity** 115:12,15
**quarter** 123:13,14,
25 124:1,23
**quarterly** 39:23
**quarters** 41:13,14
**question** 5:5 43:18
69:1 90:25 116:13
138:2
**questions** 148:25
150:20 158:6
**quick** 148:25
**quickly** 53:23 58:21
139:3
**quirkier** 128:20
**quote** 151:18

## R

**raised** 67:8
**raising** 21:25 22:1
23:10
**range** 18:9
**rate** 106:12 148:10,
14
**reach** 54:2 108:14
**reached** 57:8 95:20
96:13 97:14,23
**reaching** 57:12
**read** 8:15,17 28:8,
11,14 31:21 58:2
90:21 98:1,15,23
**reading** 28:16 85:20
100:4 101:9
**ready** 46:5 74:12
78:2 87:24 94:21
105:20,21 153:24
**real** 6:23 20:15
80:21 132:7 147:21
**realization** 53:15
**realize** 29:5
**realized** 45:17

**reason** 44:19 48:17
77:12 84:21 90:19
99:23 127:10
138:11,25 139:1
**reasons** 17:13 44:21
60:22 77:15
**recall** 16:12,16 18:9
29:1 30:23 38:18,20
39:5 42:10,19 43:2
45:20,22 46:1 52:3,
13,18 53:8,12 54:17
58:5,9,22 61:11
62:1,4 63:6 66:19
67:11,20,25 70:12,
25 71:25 75:12
76:13 77:2,18 80:24
81:1 86:9 88:6,9
90:9 94:25 96:11,12
101:21 102:23,24
105:15,24 107:22
108:7,9,10 109:6
111:10 113:8 114:2
116:22 117:8,10
118:12,21 119:17
123:6 125:1 129:1,
3,17 130:12,15
131:9 140:21
143:17,19 144:21
150:5,7 157:15,17,
21
**recalled** 28:24
**receivables** 110:20
147:23,24
**receive** 106:11
**received** 61:15
105:8 142:4
**receiving** 105:12
**recent** 91:25
**recently** 8:19 33:8
**receptivity** 125:18
**recess** 46:13 59:20
69:17 79:1 95:12
130:3 145:11
**recipient** 61:14
**recognize** 60:3
73:11 88:3
**recollect** 50:2
**recollection** 54:1
70:9 71:8 92:12
94:5 101:19 103:19
128:3 148:6
**record** 4:1 15:23
34:20 35:15 46:11,

15 59:14,18,22
68:13 69:11,13,19
78:24 79:3 95:10,14
117:5 130:1,5
145:9,13 158:8
**record's** 99:5
**recording** 104:16
**records** 84:17
104:20
**red** 41:9 88:6,13,17
89:3 92:15,21 93:2
98:15,17,18,20
101:8
**refer** 68:23 151:4
**reference** 151:16
**referenced** 91:5
117:12 121:16
129:16 139:22
145:4
**references** 142:10
151:12
**referred** 78:4
**referring** 93:23
**refers** 85:8 151:5
**refinery** 25:11 75:25
**Refining** 6:8 18:18
**reflected** 79:11
**regard** 44:6 72:1
101:17 126:7,13
137:2
**regions** 63:19
**reimburse** 101:1
103:14 104:4
**reimbursed** 100:1
**reimbursement**
103:25 114:4,5
123:11 124:18
153:5
**related** 6:2,6,23
12:21 14:5 18:21
26:14 54:4 101:25
103:9 113:22 114:4
**relationship** 8:12
18:24,25 19:2,5,8
26:15 27:16 28:21
29:11 36:6,22 40:16
41:8 42:22 47:10
48:6 50:3 52:25
53:21,22 54:19
60:25 67:19 68:4
86:11,22 87:9,11
106:7,17 123:12

134:25 139:3
152:11
**relationship's**
125:13
**relationships** 15:19
39:7
**relative** 52:19 116:9,
11 142:4 143:22
**relevance** 146:17
**relevant** 145:20,21,
25
**relinquish** 11:8
**relinquished** 31:23
**rely** 157:22
**remaining** 27:19
**remains** 136:14
**remember** 7:16 8:2,
10,11 19:12 24:20
30:25 40:12 41:12,
13 47:25 49:16
52:1,16 56:19 57:11
61:15,18,19 68:18
71:20 77:6 79:7,15
84:25 85:6,7,11
89:9 94:7 98:2,12
105:22 107:15,16,
17,24 108:3,20
109:5 117:10,11
118:10,19 129:6
131:20 149:24
156:17
**remembered** 107:14
**remembering** 8:9
**remembers** 20:18
**remind** 8:4 130:10
**reminds** 34:15
**renamed** 20:3,11
21:22
**rental** 96:17 114:13,
15
**repeat** 5:5
**rephrase** 5:6 113:12
**replacement** 58:18
109:14
**report** 102:8 137:2
143:16
**reported** 63:13
102:6,9,12
**reporter** 32:5 72:25
**reporting** 104:17
**reports** 39:23,24

105:9 125:25
**represent** 4:10
**representing** 7:2
**repurchase** 51:4,6
**repurchased** 26:23
**requested** 40:3
**required** 78:20
**reread** 8:19
**resign** 11:6,7
**Resnick** 20:2
**resolution** 18:20
**resolve** 68:3 141:21
**respect** 24:4 29:4
39:17 112:22 142:6
**response** 53:16
82:15
**responsibilities**
30:21 38:19 39:5
**responsibility** 39:7,
8 60:8
**responsible** 100:6
**rest** 102:10,11
103:23
**restricted** 139:12
**restriction** 156:6
**restroom** 4:23
**result** 65:16 124:11
138:18,19
**retail** 12:24 40:8
65:18 124:9
**retain** 106:10
**retained** 32:11
**retired** 118:22
**retroactively** 35:1
**retrospect** 125:12
**revenues** 153:7,12
**reverse** 149:1
**review** 29:13 39:22
126:2
**reviewed** 88:15
92:15 99:19
**reviewing** 42:4 43:3
126:3
**revised** 92:9
**right-hand** 62:7 78:6
**rights** 134:11
**Rio** 8:11 19:6,8
26:15 28:21 29:11,
19 36:6,16,25 37:3,
7,20,24 38:1,17

39:17,23 41:1,16,
18,23 42:11 43:5,24
45:14,21 46:2,24
47:4 48:1 49:13,22,
23 50:19,22 51:2,3,
7,15,18,21 52:2,14
53:15,17,25 57:5
60:12,16,20,24 61:7
62:11 64:5,8 79:18,
21 94:15 109:12
110:4,21,22 114:25
118:18 119:16,18,
21,22 121:5 127:22
145:20 146:12
149:7,10
**Rio's** 38:19 46:18
51:23 109:24
**risk** 44:2,3 77:24
115:25
**River** 21:9,14,20,21
24:11 25:3
**road** 12:24 24:11
25:3
**Rob** 56:22 75:6
**robust** 72:5,19
**Roka** 117:11
**role** 10:3 16:2,7 51:8
64:24 113:14
**roll** 80:9
**rope** 80:7
**rose** 58:21
**roughly** 11:18 58:7
84:11 125:8 141:10
149:6
**runs** 33:9
**Ruzek** 140:24

---

**S**

**salads** 74:13
**salaries** 81:13 83:13
101:1 113:9
**salary** 81:13 114:5
153:5
**sale** 17:2 25:24
27:21 28:22 36:23
104:2 115:23
135:14
**sales** 33:9 40:4
96:22 115:20
149:14

**Salt** 21:10
**Sam** 27:23
**samples** 143:4
**sandwiches** 74:13
**Saraland** 9:18
**Sargeant** 6:7 18:15 26:5 55:5,10 68:9 70:24
**Saturday** 35:6
**scenarios** 82:7
**scheduled** 99:24 100:6 129:20
**Scholer** 42:23
**school** 5:17,18,21, 23 20:22
**science** 5:20
**screen** 62:3
**seat** 128:19
**seats** 17:23
**secret** 143:17
**section** 81:24 83:12 90:6,19 91:3,5 93:8 101:8 109:21,23 110:6 146:2,25 149:9,10,17
**sections** 149:7
**securely** 115:20
**seeking** 148:17
**sell** 7:3 12:22 26:20 27:2 51:2 114:25 122:13 124:9 138:19
**seller** 7:3
**sellers** 147:4
**selling** 27:8 29:12 32:25 39:8 40:9 62:25 110:11 122:8 137:13
**sells** 122:11 144:2
**semi-retired** 116:23
**send** 35:8 113:15 114:3 150:9
**sending** 70:9 114:14
**senior** 56:1 68:9
**sense** 33:10 37:18 71:24 85:12 98:21 100:3 105:6 110:17 126:23 127:2
**September** 114:11
**September-ish** 146:20

**sequential** 98:21
**service** 20:16 63:16 152:15
**services** 28:2,3 91:13,17 93:13 105:4,5,13
**serving** 20:17
**set** 84:16 86:13,15, 18 87:19,20 91:6 97:25 109:17 121:21 129:8 152:9
**setting** 104:10,24 152:3
**severely** 126:18
**share** 54:19 96:16 113:23 125:2 136:14 143:14 153:3
**shared** 36:14 96:24 104:6
**sharing** 106:25 107:4 108:19 136:9 138:8 153:11,12
**sheltered** 44:2
**ship** 12:24 25:12 33:2 67:1 134:22
**shipments** 104:1
**shipping** 39:1 40:4 55:8 96:22
**ships** 67:3
**shoes** 53:12
**shop** 51:22
**short** 16:5 45:1 115:1 116:11,12 155:6
**short-term** 90:11
**shorted** 115:6
**shorting** 117:20,23 118:18
**shortly** 8:17 13:17 28:12
**showed** 74:3
**showing** 126:21,22
**shown** 48:25
**shy** 20:8
**sic** 25:3 119:25
**side** 10:5 23:4 35:16 55:9 81:9 88:11 109:2 120:3 128:19 140:14,23,25 153:9, 20 156:24,25

**sides** 34:22 50:14 140:22
**sign** 52:10 78:20
**signature** 90:5,7,19 91:2 93:4 121:2
**signatures** 121:5
**signed** 47:18 52:3 94:17 122:24 127:19 150:3 151:6, 10 154:12,17 157:14,20,25
**significance** 37:1
**significant** 18:11 19:2 22:16 26:17 33:10,11,12 37:15 42:1 47:11 48:17 56:20 77:7 101:20
**significantly** 115:7 116:10
**signing** 101:13
**similar** 14:3 20:17 21:12,20 36:18,20, 22 40:17 47:17 50:2 54:18 55:5,11 76:2 78:14 93:7 94:23
**similar-ish** 54:21
**similarly** 73:13 126:12
**simply** 37:9 128:7 142:2
**single** 135:6
**sit** 68:2
**sitting** 61:25 65:9 68:6 127:22 138:6
**situation** 17:17 109:13
**skimming** 28:16
**skip** 98:8
**slash** 147:10
**slight** 126:23
**Sloan** 5:23 20:23
**slowly** 68:1
**small** 14:20,21 15:19 21:13,23 22:17 28:19 112:16 128:7,18
**smaller** 21:14 30:5 51:22 80:13 128:20 129:11 135:11
**social** 23:2
**sold** 9:12,23 12:10

13:1,17 15:5,7 25:21 26:22 27:10 37:10 111:11 113:4 114:23 130:8,10 133:1 135:22 141:3, 23 142:5,23 143:24, 25 144:21 147:25 156:4
**sole** 87:20 90:6 91:3 93:7
**solely** 6:18 94:12 100:6,20 134:15
**solid** 62:24
**solution** 45:24 147:17
**sooner** 52:8
**sort** 7:17 12:17 21:11 27:5 31:14 36:17 63:14
**sorts** 26:12
**sound** 40:14
**sounds** 10:19 35:13
**south** 139:3
**space** 30:5 39:11 75:17
**speak** 54:8 94:13
**speaking** 10:3 25:2 117:11
**special** 29:21
**specific** 37:9 45:22 88:6 115:11,15 135:11
**specifically** 38:20 48:25 71:21 106:25 141:2 142:9,11
**speculate** 37:8
**spell** 27:22 32:4 38:3 49:8 120:6
**spelling** 38:15
**spending** 37:14
**spent** 11:9 40:23 42:9
**split** 86:2 96:7 123:7
**splits** 85:9
**spoke** 54:9 70:24 71:1
**spot** 67:5
**spreadsheet** 85:11 140:17,21 148:15
**Springs** 4:14

**stab** 38:5
**stage** 120:13
**stages** 128:14
**stand** 29:3 50:23
**standard** 33:6
**standpoint** 36:7
   51:14 69:10 88:14
   91:16 132:9
**stands** 65:4
**start** 11:18 14:8 22:5
   43:18 52:24 58:14
   91:15 94:8 97:16
   105:10,13 106:10
   112:15 133:15
   136:5
**started** 20:15 28:21
   30:7,14 39:18 49:13
   50:16 52:8,14 56:12
   57:5 86:11,21 93:20
   96:2 101:23 106:13
   107:23 111:3
   114:25 133:12
   140:9 141:14
   155:16
**starting** 105:15
   137:15
**starts** 38:15
**stated** 38:20 105:10
**statement** 105:9
   142:23
**statements** 41:1,16
   62:17
**stay** 17:16
**step** 68:2
**Steve** 56:5,8,15,22
   71:17 75:5 76:24
   131:21
**Steve's** 86:5
**Steven** 43:2 88:16
**stickered** 150:15
**stocks** 32:24 62:24
**stop** 9:13 22:19
   50:19 80:14 91:15
   107:8 109:12
   119:18 140:2
**stopped** 135:13
   148:6
**storage** 9:10,11
   32:25 72:8 111:14
   115:3
**store** 12:22

**stored** 90:13
**storing** 111:12
**strategic** 10:5 15:15
   26:15,17 39:10 40:7
**strategies** 80:5
   119:4
**strategize** 117:21
**strategy** 26:15 27:7
   33:17 80:8 119:7
   122:4,10 132:9
**Street** 7:7,14 21:17,
   19,22 22:5,8,14
   23:3 30:16,18
   56:21,25 111:5
**stressful** 61:4
**strong** 111:20,21,22
   138:24
**strongly** 54:10
**struck** 28:18
**structure** 26:16
   36:19 47:17 104:11
   106:5,8 107:24
   108:17 109:11
   135:7 142:21
   150:10
**structured** 26:16
   149:4
**structures** 106:14
**stuck** 28:17
**stuff** 31:17 51:20
   111:16 117:1
   135:11 139:4
   143:13
**subject** 36:1 71:18
   95:21
**sublease** 104:12
   151:12,23
**subleased** 151:19
**submitted** 39:25
**subscribe** 63:17
**subsequent** 97:9
   131:5
**subsequently** 13:21
   19:6 20:11,16 21:21
   22:20 72:23
**subsidiaries** 84:12
**subsidiary** 25:16
   111:18
**substantial** 32:17
**substantially** 9:24
   15:5 18:8 29:24

   32:10 127:14
**substantive** 93:19
   94:1,2,3 101:10
**successful** 50:11
   118:21
**sufficiently** 155:9
**suggested** 68:2
**suggesting** 134:21
**suite** 24:24
**sum** 65:20
**summation** 107:10
**supply** 67:5
**support** 39:3
**suppose** 44:23 45:7
   91:8
**supposed** 99:23,25
   104:19 139:11
**surface** 58:21
**surprised** 102:25
**suspected** 101:24
**switch** 108:16
   109:11
**sworn** 4:4
**synergy** 67:3
**system** 63:20

---

**T**

**T-O-M-A-S-Z-E-W-S-
K-I** 32:6
**T-R-I-F-I-N-E-R-Y**
   13:10
**table** 62:14 81:24
   141:5
**tailored** 75:5,8,9
**taking** 72:8 78:18
   80:9 99:22 141:25
   142:1
**talk** 34:11 35:21
   41:18 90:1 98:8
   101:17 105:20
   118:7 119:3,12
   131:17
**talked** 34:22 55:20,
   24 57:25 58:20,23
   67:22 68:8 70:20,23
   76:8 103:14 106:8
   114:16 118:16
   119:17 131:23
   134:3 136:17
   138:23 139:6

   142:20 150:25
**talking** 45:24 54:23
   57:16 68:16 71:21
   72:3,7 95:6 99:3
   103:11 107:23
   111:23 118:12
   129:5 130:19,23
   131:20 149:2,9
**talks** 65:20
**tank** 39:11 40:4
   90:13 96:17 103:15,
   17,19 113:9 114:4,
   13,15 126:16
   134:16 135:1
**tankage** 33:2 50:7
   122:6,7 151:15
**tanks** 32:25 134:20
**tapered** 72:21
**tasks** 26:12
**TBM** 64:13
**teaching** 19:13
**team** 15:15,19 17:7
   19:3,4 27:14,20
   56:1 98:16 99:18
   100:5 101:1,5 113:9
   114:5 123:11
   124:17 128:19
   130:18 131:4,5
   153:5
**teams** 78:14
**technically** 19:14,16
   23:14 36:8
**telephone** 107:12
   128:24 157:7
**telling** 46:18 67:21
   95:3,17 102:16
**tenant** 19:7 51:4
   55:21 119:2
**tended** 92:24
**tennis** 19:13
**tenure** 23:15 24:22
   39:18
**term** 67:5 78:12,13
   98:13 109:7 125:15
   153:5
**terminal** 25:1,8,11
   26:2 29:13 39:2,11
   64:7 76:4,6 90:10
   151:15
**terminaling** 110:23,
   24 148:2 155:4

**terminals** 9:9,10,11,
15,23
**terminate** 51:24
60:25
**terminated** 43:14
49:14,17,18
**termination** 50:18
52:11
**terms** 42:5 66:11
68:23 93:20 94:2,4
96:4,6,9,11,12 97:8,
24 99:4 101:10
120:14 122:11
136:6 142:15
146:16,17 149:19,
20 152:25 153:2,6,
15,22 155:8,15,20
156:1,14 157:3
**terrorist** 13:20
**test** 36:20
**testified** 4:4 6:20
7:13 70:17
**testifying** 4:20 6:4
**testimony** 35:17
**Texas** 4:14
**text** 31:18,20
**theory** 116:10
**thing** 33:6 50:15
98:12,24 99:12,14,
17 100:8 101:20,21
105:1 115:19
117:20 118:16
139:19 146:22
**things** 14:10 21:15
28:19 29:13 33:20
36:18 39:11 65:8
103:24 109:18
120:15 130:20
136:6 138:13,20
140:15 141:5
150:24 157:4
**thinking** 8:3 46:6
57:19 138:5 151:21
**third-parties** 143:7
**third-party** 84:17
124:8 143:3,21
**thought** 53:24 54:6
67:3 68:1 81:10
83:11 84:10 86:4
87:16 107:14
117:21,22 118:1,2,6
123:20 135:25

146:11
**thoughts** 107:11
**three-way** 95:20
**three-year** 125:9
**through-putting**
77:23
**ties** 115:21
**till** 121:13
**time** 5:5,25 6:14,22
7:6 9:3 11:8 14:8
15:9,10 16:1,10
17:23 18:16,22 20:2
22:11,18 23:8,15,19
27:21,25 29:5
30:13,19,21 32:11
37:6,15 38:1 40:23,
24 42:7,9,20,22,23
48:1 50:7 52:14,18,
22 53:6 54:16,17
57:3,16 58:3,9
61:19 66:22 67:15
72:4 79:25 84:4,24
93:4 109:15 111:5,
7,17,24 114:25
115:24 116:9
117:18 118:7 126:4
128:18 129:22
131:25 141:8,16
144:10 146:20
148:8,9,21 151:14
156:18
**times** 17:8 25:5 36:5
49:21 115:4,6
128:14
**timing** 13:24
**title** 10:24,25 11:14,
21,22,23 12:1,5
16:9 31:23,24,25
32:12
**titles** 11:8 16:13,17
**today** 4:18 8:20 9:2,
7 15:2 32:2,14,22
61:25 82:4 111:19,
21 112:13,14
117:19 121:14
138:6 150:25
**told** 22:3 30:11
44:18 48:8 67:22
71:4,6,8 72:15
77:12 82:14 94:20
95:18 96:5 97:14,22
100:19 106:24
109:15 113:10,12

114:18 128:10,11
132:3 148:16
153:23
**Tom** 140:24
**Tomaszewski** 32:3
81:11
**top** 29:2 70:13 85:16
117:12 145:19
**total** 65:20 99:20
**touch** 64:23 150:24
**touched** 101:16
112:8 131:23
146:23
**tough** 38:8
**town** 103:6
**track** 98:20
**trade** 39:3 49:4
66:14 99:18 100:5
101:1,5 103:15
113:9 114:5,19
123:11 124:17
140:17 153:5
**trade-related** 113:18
**tradeable** 44:10
**trader** 9:25 11:24
12:11 47:5,7 80:13
112:18 113:20
116:21,22 118:22
**traders** 64:22 116:3,
4 132:4
**trades** 37:9 64:24
113:2 116:3
**trading** 9:10 12:18
38:24 111:15,18
155:2,5
**Traditionally** 62:23
**training** 45:9
**transact** 31:5
153:24
**transacted** 86:17
**transacting** 94:8
104:10 110:3
155:16
**transaction** 31:20
54:21 57:15,19 58:6
60:20 67:17 109:8,9
124:8 134:14
147:13 152:19
**transactional** 10:4
33:12
**transactions** 21:14
33:11 36:24 50:24

79:11 104:16
112:16 113:1
146:16 154:15
**transcript** 28:9
**transferring** 67:4
**trial** 6:20 7:5 35:9
**Trifinery** 13:5,10,11,
12
**Trigeant** 6:3,7 7:8
18:13,18 23:6
**Trigeant/btb** 15:17
**trouble** 101:22
**troubles** 77:20
**truck** 12:24
**true** 23:14 42:6
103:23 117:19
126:3
**trusts** 13:14
**turn** 79:8
**turned** 65:2,15
**turquoise** 89:6
**two-year** 125:11
**type** 54:19 63:15
68:4
**typical** 33:5
**typically** 29:8
122:12

---

### U

**Uh-huh** 4:21 10:12
16:4 17:3 22:10
24:25 25:9 38:22
39:20 41:2 44:9
46:21 49:15 51:19
54:5 55:7 57:1,7
63:25 64:14 65:10
68:22 69:4 70:2
75:22 76:20 78:11
81:25 82:5 84:3,6
89:5,15 90:4,8
92:11 93:6 98:22
99:21 103:4 112:24
115:16 117:15
120:17 132:2,25
136:2,19 137:4
140:10 144:3 149:5
150:22 154:5
**ultimate** 17:25
**ultimately** 17:21
47:1 49:14 54:20
55:2 100:2 131:10

**unable** 8:13

**unclear** 83:22

**uncomfortable** 43:25 52:21

**underpriced** 116:10

**understand** 4:17 84:23 86:14 96:4 106:19 132:20,22 137:16,17 147:12 155:22

**understanding** 45:14 47:13 55:3 71:5 80:4 89:12 90:16 91:4 97:21,23 99:18 100:9 128:9 132:16,23 137:20 152:22 155:20 156:1,9

**understood** 45:13 62:9 145:22 153:21

**undervalued** 126:18

**unhappy** 67:16,23 102:9

**unit** 127:21

**University** 5:21

**unknown** 140:12

**unknowns** 140:11

**unlike** 21:12 76:18

**unsuccessful** 68:11

**unusually** 52:19

**unwind** 146:21

**unwise** 156:7

**upper** 10:9

**upward** 112:3

**V**

**V-A-L-T** 66:18

**vacation** 103:6

**vaguely** 105:24

**VALT** 54:21 55:3,5 66:16,17,21,25 67:2,9,16,18,23 68:3,6,9 69:10 70:14,20,23 71:2,6, 8 101:17,24 102:2, 9,10 108:14

**valued** 143:21

**valuing** 143:2,23

**variety** 115:7 121:3

**vary** 115:6

**vehicle** 86:22,23

**venture** 36:6,8,13 152:23

**Version** 149:6

**versus** 70:25 134:10

**vetted** 118:3

**vice** 11:5,14

**view** 75:23 146:7

**viewed** 52:22 67:17 135:22

**viewing** 67:9

**viewpoint** 125:10

**Vitol** 4:10 8:12 48:7, 21,23 51:1,6,17 53:24 54:2,4,8 55:3, 21,25 56:21,23,25 57:9,20,25 58:6,10, 18,21 60:17 61:11 62:7,20 63:8 64:13 67:8 69:9 71:23 72:2,4,9,17,18 75:9 77:4,13 78:15 84:13 85:8 86:17,21,24 88:5 89:11,17,19,24 90:12 91:23 92:10 93:24 94:4,16 95:3, 5 96:20 98:13,15,17 100:7,25 101:18,23 102:2,17 103:9,14, 16,17 104:2,4,13, 14,19 105:11 106:4, 6,11,24 108:4,12, 16,18,21 109:13,20, 23 110:3,10,13,18 112:25 113:4 114:3, 13 116:21 118:13, 18 119:19 120:13 122:25 123:8 125:11 126:7,10 127:5,20 128:8,19 130:12,15,25 131:12,18,25 132:13,17,23,24 134:10,14,24 135:13 136:10,17, 21,23 137:18 138:7, 9 139:16,22 140:6, 11,13,19 142:3,4 146:12 147:1,9,23 149:4,19,23 150:8 151:24 152:7,11,19, 22 154:1 155:8,18,

24 156:9 157:18,19

**Vitol's** 90:13 102:11 134:21 140:25 157:22

**Vitol/newco** 84:5

**volatile** 22:17

**volatility** 44:4

**voluntarily** 17:15

**VP** 11:13

**W**

**wait** 17:1 150:14

**wanted** 8:4 16:20 51:21 53:19 57:6,23 60:19,20,21,24 61:10 106:7,9 107:8 109:11 119:12 146:5,16 150:13

**watch** 46:5

**ways** 84:15

**weak** 111:22

**week** 10:6 28:12,14 33:16 35:5,10 112:2 122:10

**week-to-week** 15:20 80:9

**weekend** 48:3

**weekly** 63:14

**weeks** 67:25 102:15 103:2

**weird** 111:24

**Wharton** 5:21

**what'd** 26:3

**whatnot** 128:3

**Where'd** 20:7

**who'd** 16:8

**wholesale** 12:23 40:10 65:18

**wholly-owned** 25:16

**why'd** 22:14

**Wind** 21:9,14,20

**winter** 52:16 53:1,4 61:3

**withdrawn** 72:24

**witnesses** 73:3

**word** 145:25

**words** 146:8 153:8 156:22 157:13,18

**work** 19:9 21:2,11,

24 23:4,6,9,18 30:15 33:13 35:4,12 39:9 42:24 47:10,16 48:1,5,18 53:24 56:25 66:25 67:24 78:20 103:22 107:10 108:15 118:20 136:14

**worked** 19:20 21:10 36:23 41:20 81:7

**working** 6:13,15 30:12 33:18 37:12, 16 48:20 81:1 91:15 103:22 106:12 111:2,3 125:14 127:7 132:22 133:16 146:21

**works** 41:21 73:22

**worth** 21:21 118:6 129:12 142:24 143:6 144:2,4,6

**Wow** 32:7

**writer** 73:18

**writing** 38:14 156:14

**written** 85:15 151:17 154:11,16

**wrong** 95:18

**Y**

**y'all** 58:19,25 141:4

**year** 19:11,17,19 20:8 24:21 30:25 48:13 59:11 126:21

**year-to-date** 126:23

**years** 6:22 21:23 32:9 54:4 64:21 84:11,13,15,22 96:7 114:21 125:5,8 129:5

**yesterday** 34:16 111:23

**yields** 75:14

**York** 21:10 42:23,24

**young** 118:22

Jason Goldstein
May 16, 2019                                                        1

```
 1                    CAUSE NO. 2018-31578

 2   GULF COAST ASPHALT COMPANY  )   IN THE DISTRICT COURT OF
     LLC                         )
 3        PLAINTIFF              )
                                 )
 4   VS.                         )   HARRIS COUNTY, T E X A S
                                 )
 5   VITOL, INC.,                )
          DEFENDANT              )   295TH JUDICIAL DISTRICT

 6

 7

 8           ******************************

 9            ORAL VIDEOTAPED DEPOSITION

10               JASON GOLDSTEIN

11                 May 16, 2019

12           ******************************

13

14

15        ORAL VIDEOTAPED DEPOSITION of JASON GOLDSTEIN,

16   produced as a witness at the instance of the Defendant

17   and duly sworn, was taken in the above-styled and

18   numbered cause on May 16, 2019, from 9:43 a.m. to

19   4:11 p.m. before Roxanne K. Smith, Certified Shorthand

20   Reporter in and for the State of Texas, reported by

21   computerized stenotype machine at the offices of Hall

22   Maines Lugrin, Williams Tower, 2800 Post Oak Boulevard,

23   64th Floor, Houston, Texas, pursuant to the Texas Rules

24   of Civil Procedure and the provisions stated on the

25   record or attached hereto.
```

Jason Goldstein
May 16, 2019                                                    2

```
 1                    A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFF:

 4          Mr. Neil E. Giles
            Hall Maines Lugrin
 5          Williams Tower
            2800 Post Oak Boulevard, 64th Floor
 6          Houston, Texas 77056
            Telephone:  (713) 252-0172
 7             E-Mail:  Ngiles@hallmaineslugrin.com

 8

       FOR THE DEFENDANT:
 9
            Mr. Kenneth E. Broughton
10          State Bar No. 03087250
            Mr. Mason Malpass
11          Mr. Arturo M. Holguin
            Reed Smith, LLP
12          811 Main Street, Suite 1700
            Houston, Texas 77002
13          Telephone:  (713) 469-3645
               E-Mail:  Kbroughton@reedsmith.com

14

15     ALSO PRESENT:

16          Mr. Corey Laborde, Videographer

17

18                        *  *  *  *  *

19

20

21

22

23

24

25
```

Jason Goldstein
May 16, 2019                                    3

```
 1                        INDEX

 2                                              PAGE

 3   Appearances....................................    2

 4   JASON GOLDSTEIN

 5        Examination by Mr. Broughton.............    4

 6        Examination by Mr. Giles.................  148

 7   Changes and Signature........................  159

 8   Reporter's Certificate.......................  161

 9

10                     EXHIBIT INDEX

11   NO.    DESCRIPTION                           PAGE

12   18     E-mail dated 7/19/17...................   69

13   19     E-mail dated 1/19/25...................   71

14   20     E-mail dated 5/19/17...................   80

15   21     E-mail dated 6/30/17...................   82

16   22     E-mail dated 5/30/17...................   85

17   23     Joint Marketing Agreement..............   87

18   24     Revised JSMA...........................   92

19   25     E-mail dated 7/28/17...................  102

20   26     E-mail dated 8/21/17...................  105

21   27     E-mail dated 9/25/17...................  114

22   28     E-mail dated 10/9/17...................  117

23   29     Marketing Agreement....................  120

24

25
```

Jason Goldstein
May 16, 2019                                                          4

```
 1              THE VIDEOGRAPHER:  We are on the record at

 2    9:43 a.m.

 3                    JASON GOLDSTEIN,

 4        having been duly sworn, testified as follows:

 5                     EXAMINATION

 6    BY MR. BROUGHTON:

 7        Q.   Good morning, Mr. Goldstein.

 8        A.   Good morning.

 9        Q.   My name is Ken Broughton; and as you know, I

10    represent Vitol in this matter.  Would you give us your

11    full name including your middle name, please?

12        A.   Jason Brent Goldstein.

13        Q.   And what's your address?

14        A.   6215 Holly Springs Drive, Houston, Texas 77057.

15        Q.   And what's your date of birth?

16        A.   4/30/69.

17        Q.   And do you understand you're under oath here

18    today --

19        A.   I do.

20        Q.   -- just as if you were testifying in court?

21        A.   Uh-huh.

22        Q.   If you have -- you know, at any point you want

23    to take a restroom break or anything, just let us know.

24    I always try to take one about every hour anyway.

25        A.   Okay.
```

Jason Goldstein
May 16, 2019                                                        5

1        Q.   I usually don't forget and -- but, you know,

2   like I said, if you need a break --

3        A.   Okay.

4        Q.   -- just let us know.  We'll be happy to do

5   that.  If at any time you want me to repeat my question

6   or rephrase, let me know that.

7        A.   Okay.

8        Q.   And I'll be happy to do it.

9        A.   Okay.

10       Q.   Okay?

11       A.   Thank you.

12       Q.   So, tell us about -- did you grow up in

13  Houston?

14       A.   I did.  I wasn't born here, but I moved here

15  before I was one.

16       Q.   All right.

17       A.   And I grew up here through high school.

18       Q.   Great.  Tell us about your post high school

19  education.

20       A.   I got my bachelor of science in economics

21  degree from the Wharton School at the University of

22  Pennsylvania, and then I got my master's in

23  administration from the MIT Sloan School of Management.

24       Q.   And have you ever been deposed before?

25       A.   One time.

Jason Goldstein
May 16, 2019                                                6

```
 1      Q.    Okay.  What kind of case was that?

 2      A.    It was a federal bankruptcy proceeding related

 3  to Trigeant bankruptcy.

 4      Q.    Okay.  And what were you testifying about in

 5  there?

 6      A.    It was really related to two factions of the

 7  Sargeant family, one of which owned Trigeant and one

 8  which had BTB Refining.  And they had a number of

 9  lawsuits between them, and they were both trying to get

10  this asset out of bankruptcy.  And so, there was -- we

11  were being deposed about our conversations with both

12  parties.

13      Q.    Okay.  And who were you working for at that

14  time?

15      A.    Well, I was working for two companies.

16      Q.    Okay.

17      A.    Gulf Coast Asphalt Company as well as Gravity

18  Midstream, but I was there solely on behalf of Gravity

19  Midstream.

20      Q.    Have you ever testified as a witness at a trial

21  or an arbitration?

22      A.    One time.  It was a number of years ago.  It

23  was related to a real estate project in Belize.  I

24  was an -- should I elaborate?

25      Q.    Sure.
```

Jason Goldstein
May 16, 2019                                                    7

```
 1        A.    I was an investment banker, and I was

 2   representing the purchaser.  The purchaser was alleging

 3   that the seller breached his obligation to sell.

 4        Q.    Okay.

 5        A.    And I was a witness in that trial.

 6        Q.    And who were you employed by at that time?

 7        A.    Blossom Street Capital.

 8        Q.    Do you know about when that Trigeant bankruptcy

 9   was when you gave a deposition, just more or less?

10        A.    Sure.  So, Gravity purchased that asset out of

11   bankruptcy in mid 2015.  So, it would have been either

12   '14 or '15, 2014 or 2015.

13        Q.    And about when do you think you testified for

14   Blossom Street in that Belize matter?

15        A.    That would have been sometime -- I don't

16   remember.  Sometime between 2003 and 2009.

17        Q.    Have you ever been a party to any sort of a

18   lawsuit?

19        A.    No.

20        Q.    Tell us about what you did to prepare for your

21   deposition.

22        A.    I went back over some of my e-mails to confirm

23   some dates, and I had some meetings with Neil and his

24   partner Bill here in this office.

25        Q.    And were these e-mails that you believe had
```

Jason Goldstein
May 16, 2019                                        8

1   been produced in -- in the lawsuit?

2       A.   I don't know.  Just -- I just couldn't remember

3   certain dates and I was thinking about the history of

4   the events that happened.  I wanted to remind myself of

5   certain -- certain historical dates --

6       Q.   Okay.

7       A.   -- is mostly what it was.

8       Q.   Any -- any particular dates that you were

9   interested in remembering?

10      A.   I couldn't remember when we entered into our

11  arrangement with Rio.  I couldn't remember the dates of

12  certain meetings during the Vitol relationship.  Most --

13  most of those dates I were unable -- I was unable to

14  find but I was looking for.

15      Q.   Have you read through any of the formal papers

16  that have been filed with the court?

17      A.   The -- I read the petitions shortly after they

18  were filed, but it's been a while.  So, I have not

19  reread them recently.

20      Q.   And how are you employed today?

21      A.   I'm an employee of Gulf Coast Asphalt Company.

22      Q.   And how long have you been employed by Gulf

23  Coast?

24      A.   Since January of 2010.

25      Q.   And tell us what the business of Gulf Coast

Jason Goldstein
May 16, 2019                                                    9

```
 1   Asphalt Company is.

 2       A.   As of today?

 3       Q.   If it's changed over time, you might -- you

 4   might tell us what it was like in 2010 and come forward

 5   through --

 6       A.   Sure.

 7       Q.   -- today.

 8       A.   So, when I joined in -- in 2010, the company,

 9   its primary business was owning oil terminals -- oil

10   storage terminals.  We also had marketing and trading

11   operations.  Those oil storage terminals which we

12   expanded after I got there we sold off in 2013.

13       Q.   Let me stop you there.

14       A.   Sure.

15       Q.   Where were those terminals?

16       A.   In Alabama.  Mobil --

17       Q.   Mobil --

18       A.   -- Alabama and Saraland, Alabama.

19       Q.   Okay.  All right.  Apologize for interrupting

20   you.

21       A.   Sure.

22       Q.   So, you -- I interrupted you right after you

23   said you sold the terminals in 2013.

24       A.   After that, we've substantially been a marketer

25   and trader without owning any fixed assets.
```

Jason Goldstein
May 16, 2019                                                    10

```
 1        Q.   So, I take it, were your business duties pretty
 2   much the same from 2010 to 2013?
 3        A.   Generally speaking, although my role tends to
 4   be fairly transactional and I'm kind of the corporate
 5   one on the strategic side.  So, my duties frequently
 6   change from month to month and sometimes week to week,
 7   but -- but yes.
 8        Q.   Okay.  How many people are in the management
 9   and upper management of -- of Gulf coast?
10        A.   I would -- I would say that under AJ, who's our
11   president --
12        Q.   Uh-huh.
13        A.   -- the next group is four kind of next level
14   employees.
15        Q.   And who are those people?
16        A.   Myself, Joe Mattingly, George Grace and Hucker.
17        Q.   What was the last name?
18        A.   Hucker.
19        Q.   Hucker.  Just like it sounds?
20        A.   Yes, H-u-c-k-e-r.  I hope I'm not leaving
21   anybody out.
22        Q.   Do what?
23        A.   I hope I'm not leaving anyone out.
24        Q.   And what's your title right now?
25        A.   I do not carry a title.
```

Jason Goldstein
May 16, 2019                                                    11

```
 1        Q.    Okay.  What about Mattingly, if I said that
 2   right?
 3        A.    I'm not sure.
 4        Q.    Okay.
 5        A.    At one point he was vice president.  We were --
 6   Joe and I -- Joe Mattingly and I were asked to resign as
 7   officers, keep our employment but resign as officers and
 8   to relinquish our titles due to our majority of our time
 9   being spent in Gravity Midstream.
10        Q.    Okay.  And we'll get into that --
11        A.    Sure.
12        Q.    -- in a minute.  When -- when did -- so, you
13   were a VP also?
14        A.    My title was executive vice president --
15        Q.    Okay.
16        A.    -- when I joined.
17        Q.    So, from 2010 to --
18        A.    Roughly 20- -- I'll say from 2010 as a start
19   date to sometime between 2014 to 2016 --
20        Q.    Okay.
21        A.    -- I had that title, and then I -- I have not
22   had a title since, a formal title.
23        Q.    All right.  And Mr. Grace, what is his title?
24        A.    He's a trader.
25        Q.    Okay.
```

Jason Goldstein
May 16, 2019                                                    12

```
 1        A.    I don't know if that's a formal title under his

 2   employment agreement or not.

 3        Q.    Okay.  Mr. Hucker?

 4        A.    He is our blender, but I would guess that is

 5   not his formal title.

 6        Q.    Right.  Okay.

 7        A.    He's in charge of blending asphalt.

 8        Q.    Okay.  So, tell us what the -- well, before

 9   we -- we go to Gravity, tell me -- so, you said

10   primarily since -- since Gulf Coast sold the assets in

11   2013, it's been essentially a marketer and a trader; is

12   that right?

13        A.    GCAC, yes.

14        Q.    Yeah.  Is that what you call it, GCAC?

15        A.    That's an abbreviation for Gulf Coast Asphalt

16   Company.

17        Q.    Sure.  Okay.  And so, describe the sort of

18   marketing and -- and trading activities that -- that

19   GCAC has been involved in since 2013.

20        A.    Sure.  So, we will purchase asphalt and other

21   related products that if blended in a certain way could

22   become asphalt.  We will store those and then sell them

23   either wholesale, which generally means by barge or

24   ship, or retail which is by truck to road contractors.

25              In addition to asphalt, we've also bought
```

Jason Goldstein
May 16, 2019                                                    13

```
 1   and sold heavy Canadian crude and fuel oil, but asphalt
 2   has always been the main business.
 3        Q.   And what is the ownership of GCAC?
 4        A.   It's 50 percent owned by Joyce Brass and
 5   50 percent owned by a company called Trifinery.
 6        Q.   Who is Joyce Brass?
 7        A.   That is AJ Brass' mother.
 8        Q.   And the name of the 50 percent owner, again,
 9   was what?
10        A.   Trifinery.  T-r-i-f-i-n-e-r-y.  I believe it's
11   Trifinery, Inc., but I have to confirm that.
12        Q.   Okay.  And who owns Trifinery, Inc.?
13        A.   It is owned by AJ at least beneficially.  I
14   think there might be some trusts, but it's
15   beneficially AJ and his half brother Dick Brass.
16        Q.   Okay.  And tell us about Gravity.
17        A.   So, shortly after we sold the assets in 2013,
18   we formed a new company while GCAC still existed
19   initially called ISIS unfortunately.  Unfortunately
20   named before the terrorist organization became something
21   we knew about.  We subsequently changed the name to
22   Gravity Midstream.
23        Q.   After an FBI investigation?  Yeah.
24        A.   Bad timing.  That was a partnership that we --
25   management certain members of GCAC management, not all,
```

Jason Goldstein
May 16, 2019                                                    14

```
1    formed with a private equity firm called EnCap Flatrock
2    Midstream, and we formed that for the purpose of
3    developing or acquiring oil assets similar to what we
4    had done in the past.
5         Q.   Mostly asphalt related or not necessarily?
6         A.   Not necessarily.
7         Q.   Okay.
8         A.   We had no -- at the time of the start of the
9    partnership, we had no assets.  So, we looked -- we
10   looked at a lot of things, some of which had nothing to
11   do with asphalt.
12        Q.   And were you one of the members of management
13   that had an ownership interest?
14        A.   Yes.  I was the CFO of that organization.
15        Q.   And who else had an ownership interest?
16        A.   There would have been five individuals as part
17   of management.  Excuse me.  Myself, AJ Brass, Joe
18   Mattingly, Kenny Hucker and Dave Hubenak.  In addition,
19   EnCap Flatrock was an equity participant as well.  And
20   finally there was a small investment group which was
21   made up of friends and family of AJ's that was a small
22   passive investor.  That was the -- those were the
23   initial investors.  I believe that the Fenton family was
24   initial and not added later, but I'd have to go back and
25   double check.
```

Jason Goldstein
May 16, 2019                                          15

1        Q.    And so, is Gravity Midstream still in business

2    today?

3        A.    It is not.

4        Q.    Okay.  And when did it cease operating?

5        A.    It sold substantially all of its assets, to my

6    knowledge, in 2017.  I'd already left the company, but I

7    believe it sold all of its assets in '17.  I can't tell

8    you if as an entity it still exists or not beyond that,

9    but it has had no operations since that time.

10       Q.    Okay.  So, you said you had left by that time.

11   So, tell us about your involvement in Gravity from 2013

12   until you ceased your involvement.

13       A.    Sure.  So, I was the CFO.  I was also on the

14   board of directors.  I oversaw all financial management

15   and operations.  I was part of the key strategic team.

16   I was heavily involved in looking at new projects.  In

17   the acquisition of the Trigeant/BTB facility done in

18   Corpus, all of our capital provider banking

19   relationships and, as we were a small team, generally

20   whatever else popped up on a week-to-week basis.

21       Q.    Okay.

22                   (Cell phone interruption.)

23                   (Discussion off the record for less than

24                   one minute.)

25       Q.    (By Mr. Broughton)  And so, that was pretty

Jason Goldstein
May 16, 2019                                                    16

```
 1   much -- well, and so, for what period of time did that
 2   go on with -- with your role being as you described?
 3        A.   So, it was middle of 2013 --
 4        Q.   Uh-huh.
 5        A.   -- until late 2016, there was a short period
 6   maybe about six months where I took over formally the
 7   role as interim chief operating officer as well.
 8        Q.   All right.  And who'd you take that over from?
 9        A.   I'm not sure if we had that title formally at
10   that time.
11        Q.   Okay.
12        A.   I can't recall.
13        Q.   So, for six months you held both titles, CFO
14   and COO or just kind of merged into one or what?
15        A.   At one point or another, an individual became
16   CFO, Craig Peus.  So, I -- I can't recall when I
17   was COO, if I was maintaining both titles or if he had
18   already become CFO.
19        Q.   Okay.  And why did you become COO?
20        A.   I think we just wanted more oversight of the
21   physical operations in Corpus from our Houston corporate
22   headquarters.
23        Q.   If you can, go into more detail of what the
24   business of Gravity Midstream was from 2013 --
25        A.   Sure.
```

Jason Goldstein
May 16, 2019                                                17

```
 1        Q.   Oh, wait.  Before we do that, so, you said
 2    prior to its sale in 2017, you ceased involvement --
 3        A.   Uh-huh.
 4        Q.   -- right?  And when did you cease involvement?
 5        A.   Late 2016.
 6        Q.   And why did you cease involvement?
 7        A.   All five members of the management team at
 8    various times during -- five founders at various times
 9    left, and there were some obviously management changes
10    being made.
11        Q.   And -- and why did the five founders end up
12    leaving?
13        A.   Various reasons.
14        Q.   Okay.
15        A.   I left voluntarily.  I was offered the
16    opportunity to stay.  Not everybody was in the same
17    situation.
18        Q.   And I mean, who -- who was making these --
19    these decisions?  Was it EnCap Flatrock making these
20    decisions or --
21        A.   Ultimately it's the board of directors who
22    would make such a decision and EnCap Flatrock had a
23    majority of the seats.  However, at the time of my
24    departure, I believe there was a new CEO who also might
25    have, you know, had a say but not the ultimate
```

Jason Goldstein
May 16, 2019                                                          18

1   decision-making authority without board approval.

2        Q.   So, in 2016, I take it the board of directors

3   was not happy with the direction of Gravity Midstream,

4   or do you know what -- why they were asking some people

5   to leave?

6        A.   It was -- it was a challenging environment.  We

7   bought the asset in 2015, middle of 2015.  That was

8   right before crude prices went down substantially, if

9   you recall, to the 40-ish dollar range.  And we had

10  bought that asset without the intention of focusing on

11  asphalt, and that caused significant challenges for the

12  business.

13       Q.   And what was the business of Trigeant?  Was

14  it BTB?  Is that what you said?

15       A.   So, there were -- the Sargeant family had been

16  in the asphalt business for a long time.  There -- there

17  are two factions of it, if you will.  One of them owned

18  Trigeant, and one owned BTB Refining.  And actually part

19  of the lawsuits and part of the bankruptcy was the

20  resolution of which of those two companies owned which

21  assets related to the Corpus facility.  So, there were

22  no operations at the time of acquisition partially

23  because ownership was contested.

24       Q.   And what was -- was there any relationship

25  or -- how would you describe the relationship

Jason Goldstein
May 16, 2019                                             19

```
1   between GCAC and Gravity Midstream?

2        A.   There really was not a significant relationship

3   except for the fact that most of the management team of

4   one company was the same as the management team of the

5   other company.  The only other relationship developed

6   subsequently in late '15 or early 2016 because Rio

7   Energy became a tenant at Gravity and GCAC had a

8   business relationship with Rio.

9        Q.   So, kind of going back to your work history,

10  what was your first job out of -- once you graduated?

11       A.   Well, for my first year after graduation, I

12  held a number of odd jobs that I wouldn't remember most

13  of the employers, everything from teaching tennis to

14  bartending, and so technically --

15       Q.   Okay.  Not really interested in those.

16       A.   Technically nothing professional for the first

17  year.

18       Q.   Okay.

19       A.   My first professional job was a year after

20  graduation I worked for British merchant banked called

21  Charter House.

22       Q.   What did you do for them?

23       A.   I was an analyst in the mergers and

24  acquisitions group.

25       Q.   And where did you go next?
```

Jason Goldstein
May 16, 2019                                                    20

```
1      A.    My next job was with another investment bank
2   based in Los Angeles called Dabney Resnick at the time.
3   It's now been renamed as Imperial Capital.
4      Q.    And what did you do there?
5      A.    I was an analyst and then an associate in the
6   investment banking group.
7      Q.    Where'd you go from there?
8      A.    After that, I -- for maybe just shy of a year,
9   I did a bunch of independent projects myself, some
10  consulting.  I also formed or co-founded an internet
11  company initially called IMGIS subsequently renamed Ad
12  Force.  So, somewhere between six and 12 months I did
13  that as well as some other consulting projects.
14     Q.    And what of business was Ad Force?
15     A.    It initially started off as a real estate
16  listing service on-line and subsequently became an ad
17  serving -- advertisement serving business similar to
18  Double Click, if anyone remembers that.
19     Q.    That brings us up to '96 or so?
20     A.    Exactly.
21     Q.    Okay.  And what did you do next?
22     A.    I went back to graduate school as I mentioned
23  at MIT Sloan --
24     Q.    Sure.
25     A.    -- from '96 to '98.
```

Jason Goldstein
May 16, 2019                                                    21

1      Q.    Okay.  What did you do in '98?

2      A.    I went to work for another investment bank

3  called Donaldson, Lufkin & Jenrette.

4      Q.    And what did you do there?

5      A.    I was an associate in the investment banking

6  group.

7      Q.    And where did you go after that?

8      A.    After that, I went to a -- another investment

9  bank called Wind River Capital which was based out of

10  Salt Lake City, although initially I worked in New York.

11      Q.    What sort of work were you doing there?

12      A.    Similar except unlike Donaldson, Lufkin &

13  Jenrette, which was a very large firm, we were a small

14  firm at Wind River.  So, we did smaller transactions,

15  private placements, leveraged buy-outs, things like

16  that.

17      Q.    And after that, you went to Blossom Street?

18      A.    Correct.

19      Q.    What did you do at Blossom Street?

20      A.    Very similar to Wind River Capital.  Wind

21  River, for whatever it's worth, has subsequently been

22  renamed Cortina.  Blossom Street we had for six and a

23  half years doing small management buy-outs, private

24  placements with equity and debt, some consulting work.

25  Generally capital raising was our -- private capital --

Jason Goldstein
May 16, 2019                                                    22

1    private institutional capital raising.

2         Q.    And in all these various positions you've just

3    told us about, much contact with oil, asphalt, any of

4    those?

5         A.    It really didn't start until Blossom Street

6    Capital.

7         Q.    Okay.

8         A.    And Blossom Street Capital was not out there as

9    an energy firm.

10        Q.    Uh-huh.

11        A.    But I was located in Houston and, so, over time

12   ended up getting involved in energy-related projects

13   just by being in Houston.

14        Q.    And why'd you leave Blossom Street?

15        A.    A combination of factors but the financial

16   crisis of the 2008-2009 era was a significant factor.

17   We had a small business.  It always was volatile, high

18   highs and low lows.  And during that time, the lows were

19   pretty low.  So, I decided to stop doing that, and I

20   subsequently went in-house with Gulf Coast Asphalt

21   Company which was a client.

22        Q.    And -- and so, that was in 2010.

23        A.    Yes.  I -- I left Blossom at the very end of

24   2009 and joined GCAC in January of 2010.

25        Q.    And how did you come across the job at GCAC?

Jason Goldstein
May 16, 2019                                                    23

1      A.    I had known AJ Brass and GCAC for a while.

2  Initially I met AJ through social connections, and I

3  ended up while I was at Blossom Street doing some

4  consulting work for some side investments he had that

5  had nothing to do with the energy business; and then

6  when he needed some work done for both Trigeant which he

7  was involved with up through 2007-2008, as well as GCAC

8  which at the time was his father's company which he was

9  not involved with, I ended up doing work in capital

10  raising for both of those entities.

11     Q.    So, you've been consistently employed by GCAC

12  since 2010.  You just also had an additional employment

13  with Gravity.

14     A.    Technically that is true, although during my

15  Gravity tenure, my time allotment to GCAC was very

16  minimal.

17     Q.    And any -- any other companies besides Gravity

18  that you were also doing work for?

19     A.    During that time?

20     Q.    Yeah.

21     A.    No.

22     Q.    Okay.  So, at Gravity Midstream, I think you

23  said you were on the board?

24     A.    Yes.

25     Q.    Okay.  So, the board was basically directing

Jason Goldstein
May 16, 2019                                                    24

 1   the major decision-making of -- of Gravity, I assume?

 2        A.   Yes.

 3        Q.   So, you would have been involved in all -- all

 4   kind of major decisions with respect to Gravity.

 5        A.   Yes.

 6        Q.   Gravity had offices here in Houston?

 7        A.   Initially just Houston.

 8        Q.   Okay.

 9        A.   And then when it purchased the facility in

10   Corpus, there was an office at the facility as well.

11        Q.   Is that the 6600 Up River Road?

12        A.   Yes.

13        Q.   Okay.  Where was its office in Houston?

14        A.   Initially 11 Greenway Plaza.

15        Q.   Is that where Gulf Coast was?

16        A.   It was at -- yes.

17        Q.   Was the same offices or --

18        A.   Same offices.

19        Q.   Okay.

20        A.   And then we moved -- I have to remember the

21   year.  But we moved -- sometime during the Gravity

22   tenure, we moved to Post Oak Boulevard, both GCAC and

23   Gravity.

24        Q.   Moved to the same suite of offices or --

25        A.   Uh-huh.

Jason Goldstein
May 16, 2019                                                    25

1       Q.    What is the Gravity oil terminal, if you know?

2       A.    I imagine you're speaking of the Corpus -- the

3    66 [sic] Up River Road facility?

4       Q.    Yeah.

5       A.    It's had different names at different times.

6       Q.    Okay.

7       A.    So, during the Gravity ownership period, it was

8    called GOTAC, the Gravity Oil Terminal at Corpus --

9       Q.    Uh-huh.

10      A.    -- as an -- as an acronym.  It is a deepwater

11   30,000-barrel a day name plate refinery and oil terminal

12   on the Corpus Christi ship channel.

13      Q.    And it was 100 percent owned by Gravity

14   Midstream?

15      A.    Yes.  Well by a -- by a -- I believe by a

16   wholly-owned subsidiary called Gravity Midstream Corpus

17   Christi that we formed to make the acquisition.

18      Q.    Okay.  And how long did Gravity Midstream own

19   GOTAC?

20      A.    We purchased it in the middle of 2015, I think

21   May or June but I could be off.  And then it was sold

22   somewhere in the middle of '17; but, again, I left in

23   late '16.  So, I don't know the exact date of that

24   sale --

25      Q.    Okay.

Jason Goldstein
May 16, 2019                                      26

1       A.    -- offhand.

2       Q.    And is that the same terminal as the B --

3  what'd you call it -- BTB before it was --

4       A.    Yes.

5       Q.    Okay.  That was the Sargeant -- you guys

6  changed the name --

7       A.    Yes.

8       Q.    -- once you bought it.  Okay.  So, you said

9  when you were fully engaged at Gravity Midstream, you

10  were doing very little for Gulf Coast?

11      A.    Yes.

12      Q.    Okay.  What sorts of tasks did you continue to

13  do with Gulf Coast while you were at Gravity?

14      A.    It would generally be related to financing

15  strategy or perhaps our strategic relationship with Rio,

16  how that was structured or amendments to that structure,

17  significant corporate strategic decisions, nothing

18  day-to-day.

19      Q.    And so, when you left Gravity in 2016, did you

20  sell your ownership position as well?

21      A.    Yes.

22      Q.    And -- and sold it to --

23      A.    It was repurchased by the company.

24      Q.    Okay.

25      A.    By Gravity.

Jason Goldstein
May 16, 2019                                                    27

```
 1        Q.    And to your knowledge, did -- did the other

 2   four founders sell their positions as well?

 3        A.    To my knowledge, they did.

 4        Q.    Okay.  And while you were primarily involved

 5   in -- at Gravity, what -- what sort of business was Gulf

 6   Coast continuing to be involved in that you were

 7   providing some financing strategy for?

 8        A.    The -- the purchasing, blending and selling of

 9   asphalt, fuel oil and crude, heavy crude.

10        Q.    And do you know who GOTAC was sold to?

11        A.    The company that purchased it I believe is

12   called Pin Oak Corpus Christi.

13        Q.    And do you know anything about that company?

14        A.    I know some of the management team, and I know

15   one of the owners.

16        Q.    None of them had any relationship to Gulf Coast

17   or --

18        A.    They -- they did.  So, it just -- what happened

19   is initially they brought on some of the remaining

20   management team from Gravity.  So, Craig Peus at the

21   time of the sale was CEO, I believe.

22        Q.    Can you spell his last name?

23        A.    P as in Peter, e-u-s, as in Sam.  He became

24   the CEO of Pin Oak Corpus Christi.  And Dave Hubenak,

25   who was still at Gravity at the time, I believe -- no,
```

Jason Goldstein
May 16, 2019                                        28

1   he -- he wasn't.  I believe Dave also left in 2016, as I

2   mentioned, but continued to provide consulting services

3   to Gravity, legal consulting services.  And then he was

4   brought in as a full-time employee at Pin Oak Corpus

5   Christi, and he's still there.

6        Q.   But he offices here in Houston?

7        A.   He does downtown.

8        Q.   Okay.  Have you -- have you read Mr. Brass'

9   deposition transcript?

10       A.   I have.

11       Q.   And when did you read that?

12       A.   Shortly after it came out I guess a week or so

13  after the deposition.  I did look at it some in the last

14  week or two as well.  I did not read it cover to cover

15  but...

16       Q.   As you were reading it or skimming through it,

17  I mean, is -- is there anything that stuck out in your

18  mind that struck you as inaccurate?

19       A.   There were a couple small things, but I don't

20  know if they're important or not.  I -- I think that the

21  Rio relationship perhaps started earlier than when he

22  mentioned.  And I believe that the sale -- the sale

23  price of the GCAC assets in 2013 were at a higher price

24  than he recalled, although he -- he mentioned he did

25  not -- he did not have an accurate memory of it.

Jason Goldstein
May 16, 2019                                                    29

1        Q.    That's the only two items you recall off the

2   top of your head?

3        A.    Those are what stand out.

4        Q.    From 2010 to the present with respect to Gulf

5   Coast -- and I realize that for a period of time, you

6   were primarily involved in Gravity Midstream.  But when

7   Gulf Coast would enter into contracts, would you

8   typically be involved in negotiations -- in the

9   negotiations of those contracts?

10       A.    So, if it were a -- a big contract, I'll say,

11  or something like the Rio relationship, yes.  If it was

12  purchasing a cargo of asphalt or selling a cargo of

13  asphalt, no.  I would review terminal leases, things

14  like that.

15       Q.    Would -- would the -- would there have been

16  contracts where you would be -- well, on these major

17  contracts, who at Gulf Coast would be involved in

18  negotiating them?

19       A.    Something like the Rio agreement, it would

20  primarily be myself and AJ Brass.  Perhaps different

21  people would be pulled in for special expertise.  So, if

22  there were product descriptions in the contract, we

23  might pull in Kenny's expertise, for example, but

24  substantially myself and AJ.

25       Q.    How about at Gravity Midstream?  Would you have

Jason Goldstein
May 16, 2019                                                    30

1    been involved in negotiating major contracts?

2        A.   Yes.   Everything involved in all financing

3    agreements, all potential customer agreements, any major

4    purchases, and -- and at Gravity, more minor agreements

5    as well, office space leases, some of the smaller

6    agreements.

7        Q.   Did you tell me when you first started at Gulf

8    Coast, it was part-time?

9        A.   It was.

10       Q.   Okay.

11       A.   I don't know if I told you that, but it was.

12       Q.   Okay.  And were you also working for someone

13   else at that point in time?

14       A.   So, just to be clear, when I first started

15   doing some work for Gulf Coast Asphalt Company, it was

16   not as -- it was while I was at Blossom Street Capital.

17   They were a client.  Then after I left -- after I left

18   Blossom Street Capital, I joined GCAC as an employee but

19   not with a hundred percent of my time, and I kept doing

20   some other consulting projects.  And then my

21   responsibilities and time dedication to GCAC grew, and I

22   became full-time.

23       Q.   Do you recall about when you became full-time?

24       A.   I think it would have been within the first

25   year of employment, if I remember right.

Jason Goldstein
May 16, 2019                                              31

```
 1       Q.    Has Jgoldstein@gcachouston.com always been your
 2   e-mail?
 3       A.    Yes.
 4       Q.    Do you use any other e-mail addresses to
 5   transact business?
 6       A.    During -- during Gravity, we had a Gravity
 7   e-mail as well.
 8       Q.    And what was that e-mail?
 9       A.    Jg@gravitymidstream.com, I believe is correct.
10   It's been a while.
11       Q.    Those would have been the only two that you
12   would have used?
13       A.    For business.
14       Q.    Okay.  Wouldn't use a gmail or any other sort
15   of account for business?
16       A.    I have one, but I only use it for personal
17   stuff.
18       Q.    How would you conduct business by text message?
19       A.    Nothing involving a commercial discussion or a
20   transaction or anything.  I might text my colleagues,
21   hey, did you read a document or something like that.
22       Q.    So, I think you said since 2017 -- well, you
23   said you -- you relinquished your title.  So, you just
24   have no title.
25       A.    No title and then I ceased to be an officer.
```

Jason Goldstein
May 16, 2019                                                        32

1      Q.    Okay.  Who are the officers at Gulf Coast?

2      A.    I believe the only officers today are AJ Brass

3    and John Tomaszewski, to my -- to my last knowledge.

4      Q.    Can you spell that last name for the court

5    reporter?

6      A.    T-o-m-a-s-z-e-w-s-k-i.

7      Q.    Wow.  Good for you.  What does he do?

8      A.    He is a -- so, he is now part-time.  But for

9    30-plus years, he had been the CFO.  And while he does

10   substantially the same activities he did during that

11   time, I'm not sure if he has formally retained that

12   title.  He does all of the accounting overseas, the

13   bookkeeping functions.

14     Q.    So, going back to as of today, you said Gulf

15   Coast no longer owns any assets currently; is that

16   right?

17     A.    Any -- any substantial fixed assets.

18     Q.    Right.  And so, primarily you're doing

19   marketing?

20     A.    (Witness nodding head.)

21     Q.    And describe that for us.

22     A.    Well, so, primarily the business today, which

23   we now do with Mercuria as a partner, primarily is

24   purchasing asphalt and asphalt blend stocks, blending

25   them in leased storage tanks and selling them either

U.S. LEGAL SUPPORT, INC
713-653-7100

001325

1    FOB, at -- at those facilities where we have -- where we

2    have tankage or delivered by barge or by ship to

3    customers.

4         Q.   Okay.  So, describe for us -- I mean, is there

5    a typical days of activity for you as far as just pretty

6    standard, I'm doing this kind of thing?

7         A.   It -- it's pretty atypical just more and more

8    so recently.  The business, other than the purchasing

9    sales and the blending kind of runs itself, if -- if

10   that makes sense.  We don't have any significant

11   transactions.  We do not have any significant financing

12   activity.  Most of the more significant transactional

13   work I have been involved with historically is not

14   something that's going on these days.

15        Q.   So, then, what are you doing?

16        A.   So, this week I -- I was involved in a -- in a

17   call to discuss hedging strategy with Mercuria.  I was

18   involved in -- or working on an amendment to the GCAC

19   Mercuria agreement.  We've had some discussions about an

20   employee and their long-term fit at the company, things

21   like that.

22        Q.   Okay.  And tell me about this -- discussions

23   about an amendment to the GCAC/Mercuria agreement.

24        A.   I'm -- I'm pretty sure I'm bound by

25   confidentiality, but if you guys tell me I need to say

```
 1    it, I'll -- I'll say it.

 2                 MR. GILES:  Where are you going?

 3        Q.   (By Mr. Broughton)  It's -- it's not been

 4    finalized yet?  This is just discussions or --

 5        A.   Well, correct.  But even -- even the initial

 6    agreement is confidential.  So, I would assume

 7    amendments we're discussing would be, but --

 8        Q.   Okay.

 9        A.   -- if -- if my attorney says to answer it,

10    I'll --

11                 MR. GILES:  Let -- let me talk to him at a

12    break.

13                 MR. BROUGHTON:  Sure.  We'll come back to

14    that, yeah.

15                 MR. GILES:  Which -- which reminds me, I

16    meant to call you on this yesterday, but we have never

17    entered into a formal confidentiality agreement.

18                 MR. BROUGHTON:  We can certainly do that,

19    yeah.

20                 MR. GILES:  But -- but on the record with

21    David by -- at the first deposition, which was AJ's, we

22    talked about that both sides can designate any portion

23    of the deposition or the documents that have already

24    been produced --

25                 MR. BROUGHTON:  That's correct.
```

Jason Goldstein
May 16, 2019                                          35

```
 1                    MR. GILES:  -- retroactively --

 2                    MR. BROUGHTON:  Okay.

 3                    MR. GILES:  -- that we do have an

 4      agreement.  So, why don't we work on that?  It would

 5      probably have to be the week after next because I'm

 6      going back to the last one Saturday.

 7                    MR. BROUGHTON:  Okay.

 8                    MR. GILES:  I'll send you something --

 9                    MR. BROUGHTON:  Well, I have a trial next

10      week, so --

11                    MR. GILES:  All right.  Great.  Well, then

12      we'll work on it -- why don't we do it Monday?

13                    MR. BROUGHTON:  Yeah.  Okay.  Sounds good.

14                    MR. GILES:  All right.  But -- but can we

15      agree on the record that just like AJ and Patrick

16      Perugini's depositions, that either side can designate

17      this testimony as confidential after the fact once we

18      have an agreement in place?

19                    MR. BROUGHTON:  Absolutely.

20                    MR. GILES:  Okay.  And on that one, let us

21      talk about it because I'm not --

22                    MR. BROUGHTON:  Sure.

23                    MR. GILES:  -- sure if that's -- if that's

24      something he can even divulge --

25                    MR. BROUGHTON:  Okay.
```

Jason Goldstein
May 16, 2019                                              36

```
 1              MR. GILES:  -- subject to a confidentially
 2    agreement.
 3              MR. BROUGHTON:  Sure.
 4       Q.   (By Mr. Broughton)  All right.  Let's see.
 5    Okay.  Several times so far, you -- you mentioned the
 6    Rio relationship.  That was a joint venture?
 7       A.   I don't think that from a legal standpoint it
 8    was technically classified as a joint venture.
 9       Q.   Okay.
10       A.   We had a joint marketing agreement --
11       Q.   Okay.
12       A.   -- where we effectively had a -- we -- we
13    operated like a joint venture, had a business together,
14    and we shared in the profits and losses of that
15    business.
16       Q.   Was that joint marketing agreement with Rio,
17    was that a new sort of a business endeavor for Gulf
18    Coast or had it done similar things previously?
19       A.    It was a more formalized structure.  We did --
20    we did a lot of similar activity -- test my memory.  I
21    believe while we didn't do it under a formalized
22    relationship, we had similar activity with Glencore that
23    predated the sale of the assets where we worked together
24    on a number of transactions.  But it was not exclusive
25    like the Rio deal was.  So, Rio was the first of -- of
```

Jason Goldstein
May 16, 2019                                          37

1    that significance.

2        Q.    So, were you -- were you involved at -- at the

3    outset of -- of discussions with Rio about the --

4        A.    (Witness nodding head.)

5        Q.    Okay.   Tell us about that.

6        A.    I think we had -- we had for some time done

7    business with Rio, potentially even provided -- I -- I

8    don't want to speculate.   They might have provided some

9    intermediation on specific trades.   We simply -- without

10   having the large fixed asset base because we had sold

11   the assets off, we didn't have as much assets to

12   leverage for capital -- for the working capital for the

13   business.

14              And secondly, management was spending a

15   significant portion of its time with Gravity.   So, the

16   idea of having a working capital provider partner and

17   also leaning on them for all of the back office

18   infrastructure and operations made a lot of sense for

19   us.

20       Q.    So, tell us how -- how the Rio joint marketing

21   agreement came about.

22       A.    I don't know who brought it up first, but it

23   probably would not have been -- I don't know if it was

24   Rio or GCAC, but it probably would not have been me.   It

25   probably would have been AJ with either Patrick Perugini

Jason Goldstein
May 16, 2019                                    38

 1   who at the time was a Rio employee or maybe Kale

 2   Krhovjak who's one of the partners there.

 3        Q.    Could you spell that last name for her?

 4        A.    I'm not sure I can.  I know it's in another

 5   deposition.  I'll -- I'll take a stab.  K --

 6                  MR. GILES:  I could get it at a break.

 7                  MR. BROUGHTON:  Okay.

 8        A.    It's tough.

 9        Q.    (By Mr. Broughton)  Yeah.

10        A.    It's a lot of consonants.

11        Q.    All right.  Well, I believe you.  Well, you did

12   so well on that last name.

13        A.    Well, I've known him for a little while.

14                  MR. GILES:  I'm writing a note to myself

15   right now to get Kale's spelling.  I know it starts with

16   K-v.  That's all I know.

17        Q.    (By Mr. Broughton)  So, under the -- the Rio

18   joint marketing agreement, do you recall what -- you

19   know, broadly what Rio's responsibilities were?

20        A.    I don't recall specifically what's stated in

21   the agreement, but --

22        Q.    Uh-huh.

23        A.    -- they -- they were involved in some of the

24   trading decisions.  They were involved in hedging

25   decisions.  They contracted most of if not all of the

Jason Goldstein
May 16, 2019                                        39

1   shipping we needed.  They were the leaseholder for the

2   Corpus terminal, and they provided all of the back

3   office support and trade book accounting.

4        Q.   And what were Gulf Coast -- GCAC's

5   responsibilities under that, as you recall?

6        A.   Also involved in purchasing decisions, my

7   primary responsibility for relationships with purchasers

8   of asphalt and selling and primary responsibility for

9   blending decisions.  And then both companies would work

10  jointly on strategic ideas, whether to take on a new

11  terminal space, an extra tank, things like that.

12       Q.   So, was GCAC involved in the hedging decisions?

13       A.   I -- I don't know.  I imagine so.

14       Q.   But you weren't involved.

15       A.   I was not.

16       Q.   Okay.  So, what were you personally involved in

17  with respect to the Rio joint marketing agreement?

18       A.   Well, again, it started after I began my tenure

19  with Gravity.

20       Q.   Uh-huh.

21       A.   So, very little on -- or nothing on a

22  day-to-day basis.  I would review the monthly and

23  quarterly position reports from Rio.

24       Q.   By "position reports," what do you mean?

25       A.   They submitted full profit and loss for the --

Jason Goldstein
May 16, 2019                                      40

```
 1   what we call the book, which is the business on a -- on

 2   a -- at a minimum a monthly basis and more frequently if

 3   requested, but had every aspect of the business

 4   purchases, sales, tank costs, shipping costs, demurrage,

 5   everything that goes into the profits and losses.

 6              And then to the extent we looked at

 7   strategic opportunities, was it a better idea to

 8   continue the retail business in Corpus; or maybe at one

 9   point, we looked at selling that business off, keeping

10   just the wholesale.  We -- we would -- I would get

11   involved in those kind of evaluations.

12        Q.   So, do you remember that the GCAC/Rio joint

13   marketing agreement began around February of 2016?  Does

14   that sound about right to you?

15        A.   Yes.  I believe that's when it was papered, but

16   I think we had a relationship where we acted in a

17   similar capacity that predated that.

18        Q.   But you weren't really involved in it

19   particularly because you were at Gravity or --

20        A.   I think that's -- that's fair.  I mean, I was

21   certainly aware there was asphalt that was moving into

22   the Gravity facility before 2016.  But I -- I would say

23   that 90 percent plus of my time was spent with Gravity,

24   of my professional time.

25        Q.   So, you said you looked at the position
```

Jason Goldstein
May 16, 2019                                          41

```
 1   statements that Rio produced on a monthly basis.

 2        A.    Uh-huh.

 3        Q.    Was it making money or losing money?

 4        A.    We had both kinds of months.

 5        Q.    All right.

 6        A.    Yes.

 7        Q.    Overall all together by the end of the -- of

 8   that relationship, had it -- had it been in the plus or

 9   in the -- or in red?

10        A.    I believe it was in the plus, but I don't know

11   that for sure.

12        Q.    Just don't remember one way or the other?

13        A.    Don't remember.  We had positive quarters, and

14   we had negative quarters.

15        Q.    Okay.  Did you have discussions with people at

16   Rio about the position statements?

17        A.    Yes.

18        Q.    Okay.  Who would you talk to at Rio?

19        A.    Probably mostly Andy Marlow, M-a-r-l-o-w.

20   Also, I -- I forget her last name -- Crystal, who worked

21   for Andy or -- or works for Andy.

22        Q.    Were you involved at all in the -- negotiating

23   the joint marketing agreement with Rio?

24        A.    Yes.

25        Q.    Okay.  How would you -- how were you involved?
```

Jason Goldstein
May 16, 2019                                                          42

```
 1        A.    I mean, any significant legal agreement like
 2   that with GCAC, I -- I would be with -- with counsel.
 3   We would always have counsel, but I would be heavily
 4   involved in reviewing and commenting both on commercial
 5   terms as well as on legal matters.
 6        Q.    So, that was even true even though 90 percent
 7   of your time was at Gravity at that point?
 8        A.    For -- for an agreement like that, I'm sure I
 9   would have spent time with that, yes.
10        Q.    And do you recall who was negotiating it on
11   behalf of Rio?
12        A.    I don't.  It could have been a -- a few -- a
13   couple of partners, plus perhaps Patrick would probably
14   have a couple of the partners.  There would have been --
15   I would guess Kale Krhovjak and Bill Iglesias.  They
16   were the two partners we interacted with the most.
17        Q.    Okay.  Krhovjak and Iglesias.  Okay.  And you
18   said GCAC had -- had an outside counsel at that point.
19   Do you recall who that was?
20        A.    So, I believe at that time, we would have had
21   in-house counsel, Dave Hubenak, as well as -- we've had
22   a relationship for a long time with an attorney who
23   is -- at the time was with Kaye Scholer in New York.
24   He's now with Baker McKenzie in New York.  We still work
25   with them.
```

Jason Goldstein
May 16, 2019                                                     43

```
 1      Q.   What's his name?

 2      A.   Steven Canner.  I -- I don't recall if there

 3  were additional outside counsel involved in reviewing

 4  that agreement.

 5      Q.   Okay.  So, in negotiating that -- the Rio joint

 6  marketing agreement, that would have been primarily --

 7  on behalf of GCAC would have been primarily you and

 8  Mr. Brass?

 9      A.   Correct.  And I'm sorry.  And our in-house

10  counsel.

11      Q.   And your counsel.  I wasn't -- I wasn't trying

12  to leave them out.

13      A.   Yeah.

14      Q.   And at some point that JMA was terminated,

15  correct?

16      A.   Yes.

17      Q.   And do you know -- why did that come about?

18      A.   That's a big question.  To start at the

19  beginning, I guess, and --

20      Q.   Sure.

21      A.   -- then I'll ask you what you want to ask next.

22      Q.   Okay.

23      A.   The asphalt business is very difficult to hedge

24  with financial instruments, and I believe that Rio

25  became uncomfortable with how difficult it was to hedge.
```

Jason Goldstein
May 16, 2019                                              44

1    Therefore, it -- it was -- it didn't -- it was not able

2    to be sheltered from commodity risk -- commodity price

3    movement risk, and that was something they weren't

4    accustomed to and didn't like that volatility.

5        Q.    Okay.  So, is asphalt from your experience

6    peculiar in that regard?

7        A.    A little bit.  I'm not saying it's the only one

8    like that --

9        Q.    Uh-huh.

10       A.    -- but there was no liquid tradeable asphalt

11   market, only physical.  So, most people, if they hedge

12   asphalt, which is not always done, it's usually done

13   with fuel oil primarily or perhaps heavy crude.  So, in

14   effect, it was called a dirty hedge; and it doesn't move

15   in lockstep if -- if fuel moves up a dollar, it doesn't

16   necessarily move that -- means that asphalt moves down a

17   dollar.

18       Q.    So, is that -- what you just told us, is that

19   the reason asphalt is difficult to hedge?

20       A.    Yes.

21       Q.    Any other reasons besides those?

22       A.    There's a -- there are so many grades of it.  I

23   suppose even if there was an asphalt hedgeable market,

24   it wouldn't apply to -- you know, there would be dozens

25   of grades that -- that wouldn't all follow in lockstep.

Jason Goldstein
May 16, 2019                                    45

1   But because you can't go short asphalt other than a

2   physical commitment to provide it, it's very difficult

3   to hedge.

4       Q.   So, do you consider yourself an expert on

5   asphalt hedging?

6       A.   I don't know if anybody is, but I've had a lot

7   of exposure to it, I suppose.

8       Q.   Okay.  And you got that kind of on-the-job

9   training?

10      A.   Yes.

11      Q.   No experience before you came to Gulf Coast?

12      A.   No.

13      Q.   Okay.  And from -- if I understood you

14  correctly, from your understanding, Rio had not had much

15  experience with the asphalt hedging and it -- it was of

16  concern to them, right?

17      A.   It became of concern I think when they realized

18  how -- how difficult it was to match those two factors,

19  the physical and the financial.

20      Q.   Do you recall discussing that issue with

21  anybody at Rio?

22      A.   I don't recall specific discussions, but I know

23  it was discussed.  I was probably part of some meetings

24  just talking about it, not that there was a solution but

25  just about the fact that it was not a perfect hedge.

Jason Goldstein
May 16, 2019                                             46

1        Q.   And who do you recall being involved in those

2   discussions?  You, Mr. Brass and who at Rio?

3        A.    Probably Patrick and Kale.

4              MR. BROUGHTON:  You know, you were looking

5   at your watch.  Are you ready for a break?

6              MR. GILES:  Yeah.  I was thinking we've

7   been going a little more than an hour.

8              MR. BROUGHTON:  That's fine, yeah.

9              MR. GILES:  Is that all right?

10             MR. BROUGHTON:  Yeah.

11             THE VIDEOGRAPHER:  We're off the record at

12  10:45.

13             (A recess was taken from 10:45 a.m. to

14             11:07 a.m.)

15             THE VIDEOGRAPHER:  We are on the record at

16  11:07.

17       Q.   (By Mr. Broughton)  Mr. Goldstein, just before

18  the break, you were telling us about Rio's discomfort

19  with -- with the difficulty of -- of hedging asphalt,

20  right?

21       A.    Uh-huh.

22       Q.   Now, Mr. Perugini -- does he say Perugini?

23       A.    Perugini, yes.

24       Q.   Yeah.  He had been at Rio, right?

25       A.    Yes.

Jason Goldstein
May 16, 2019                                                    47

1        Q.    Okay.  And then he ultimately went to Gulf

2    Coast; is that right?

3        A.    Correct.

4        Q.    Okay.  So, at -- at Rio, he was an asphalt

5    trader, right?

6        A.    No.  I think he would consider himself a fuel

7    oil trader.

8        Q.    Oh, okay.

9        A.    He was involved in asphalt only to the extent

10   of the work he did in this relationship.  He also had a

11   fuel oil business that I believe was a more significant

12   business of his.

13       Q.    So, at least from your understanding, he -- he

14   had not been involved with asphalt before this joint

15   marketing agreement, to your knowledge.

16       A.    Except for the fact that I believe we did work

17   with him under a similar structure prior to having the

18   signed agreement.  But before GCAC, I don't believe he

19   had done asphalt.

20       Q.    Okay.  So, fuel oil is hedged, though, right?

21       A.    It's -- it's more easily hedgeable.

22       Q.    Yeah.  I mean, it's -- that's pretty common,

23   right?

24       A.    Yes.

25       Q.    So, how long -- do you remember at what point

Jason Goldstein
May 16, 2019                                                          48

```
 1   in time Mr. Perugini left Rio and went to work for GCAC?

 2        A.   It was very close to July 1st of '17.  I might

 3   be off by a day or a weekend.

 4        Q.   And -- and do you know why he decided to go to

 5   work for GCAC?

 6        A.   He was excited about the new relationship with

 7   Vitol and the potential to be part of that.

 8        Q.   Was that what he told you?

 9        A.   Yes.

10        Q.   Okay.  And is he still at GCAC?

11        A.   No.

12        Q.   And when did he leave GCAC?

13        A.   In March of this year.

14        Q.   And did he tell you why he left?

15        A.   The most -- yes.

16        Q.   What did he say?

17        A.   The most significant reason is that we

18   currently work with Mercuria, as I mentioned, and our

19   activities have been pretty much limited to asphalt.

20   When he came onboard, he was interested in working with

21   Vitol to expand GCAC's activities into crude oil, fuel

22   oil and other niche -- niche business opportunities

23   and -- which he had discussed with Vitol during the

24   process.  While the Mercuria agreement doesn't

25   specifically prohibit it, they just haven't shown the
```

Jason Goldstein
May 16, 2019                                                    49

1   same interest.

2       Q.   And do you know what Mr. Perugini's been doing

3   since March of 2019?

4       A.   I know he went over there to trade fuel oil as

5   his primary function.  Other than that, I don't know.

6       Q.   Went over where?

7       A.   I'm sorry.  To Macquarie.

8       Q.   Okay.  Yeah.  Can you spell Macquarie for her,

9   please?

10      A.   M-a-c-q-u-a-r-i-e.

11      Q.   So, back to kind of what led to our discussion

12  about the difficulty of asphalt hedging, as I had

13  started out by asking why the JMA with Rio was

14  ultimately terminated, right?

15      A.   Uh-huh.

16      Q.   And -- and do you remember when it was

17  terminated?

18      A.   I -- I believe it was terminated on July 1st of

19  '17, but formally there was no executed paperwork until

20  January 11th of 2018.

21      Q.   So, you -- you've said a couple of times that

22  prior to the Rio joint marketing agreement being

23  formally papered, Rio and -- and GCAC were doing

24  business; is that right?

25      A.   Yes.

Jason Goldstein
May 16, 2019                                                    50

1      Q.    Describe that for us if you would.

2      A.    As far as I recollect, it was very similar to

3   what we did after the relationship was papered.  We were

4   moving barrels through the Corpus facility asphalt

5   barrels as early as 2015, and I believe we were moving

6   barrels through the Mobile -- we -- we had leased

7   tankage in Mobile as well at that time also in 2015.

8      Q.    And was it -- do you think it was that -- I

9   guess -- I assume that was in early 2015, anyway, that

10  moving barrels through Corpus and Mobile -- Mobile was

11  successful enough that -- that you decided to enter into

12  a formal.  Is that what led to the decision to have a

13  formal agreement?

14     A.    I believe so for -- for both sides.  But just

15  to correct one thing, if I may, Corpus would not have

16  started until late 2015.  I believe Mobile started

17  earlier than that.

18     Q.    So, on the -- on the termination, did the --

19  did the business with Rio actually stop on July 1, 2017,

20  even though it wasn't papered until later, if you know?

21     A.    Yeah, sure.  I will tell you that us and I

22  believe Rio both believed that Rio was out of the

23  business as a business, but they had to stand in the

24  middle of certain transactions until -- because they

25  still held the lease in Corpus.

Jason Goldstein
May 16, 2019                                           51

```
 1                So, when Vitol would purchase a barrel
 2   into the Corpus facility, it would sell it to Rio.  So,
 3   Rio was the inventory holder because they were the
 4   tenant.  But they would also enter into a repurchase
 5   agreement, essentially a forward purchase agreement so
 6   that when it left the facility, Vitol had to repurchase
 7   it at the same price.  So, Rio kind of held a
 8   placeholder role, if you will.  But I believe and -- and
 9   they believe that they were completely out of the
10   profits and losses of the business.
11        Q.   As of July 1, 2017.
12        A.   Yes.
13        Q.   Okay.  Okay.  So, I take it from -- from what
14   you've explained earlier that from GCAC's standpoint, it
15   was perfectly happy with the Rio JMA.
16        A.   Yes.  I think we were excited about the
17   opportunity that we believed we had with Vitol as
18   opposed to Rio.
19        Q.   Uh-huh.
20        A.   Because there was more stuff that Patrick and
21   Eric Kuo wanted to do than we could do with Rio, which
22   is a much smaller shop, but we were happy.
23        Q.   So, it -- it was 100 percent Rio's idea to
24   terminate the JMA, right?
25        A.   They initiated those discussions, yes.
```

Jason Goldstein
May 16, 2019                                              52

1       Q.   Okay.  Okay.  So, do you remember how long

2   the -- the Rio JMA was in effect?

3       A.   I -- I recall that the signed agreement was

4   early '16.

5       Q.   February of 2016, right?

6       A.   I think that's right.

7       Q.   Yeah.

8       A.   Again, I believe they started operations sooner

9   than that.  I believe we ceased operations under that

10  agreement on July 1st but that we did not sign a

11  termination of that agreement until January 11th of '18.

12      Q.   So, from February 2016 to July of 2017, how far

13  into it did it go -- the best that you can recall, when

14  was the first time Rio started expressing concern about

15  the difficulties of asphalt hedging?

16      A.   It was in the winter.  I can't remember if it

17  was late, get my math right, '16 or early '17.  But as I

18  recall, there was a time period where asphalt prices

19  were unusually low relative to fuel oil, which is bad

20  for this business and if you're hedging with fuel oil.

21  So, they -- they grew uncomfortable with that.  We

22  viewed that as a -- as a time to double down, if you

23  will, and purchase more asphalt.  They disagreed; and

24  that was kind of the start of, hey, maybe this isn't the

25  right relationship.

Jason Goldstein
May 16, 2019                                              53

1      Q.   So, that would have been the Winter of 2017.

2      A.   Late '16, early '17, yes.

3      Q.   Okay.

4      A.   That winter.

5      Q.   All right.  And then from that point on, it was

6  just a matter of time before -- then they pretty much

7  gave notice and --

8      A.   I -- I don't recall --

9      Q.   Yeah.

10     A.   -- exactly when.  They would have probably

11 called AJ and said, hey, we really would like you to

12 find someone else to fill our shoes.  I don't recall

13 when that happened.

14     Q.   And once that happened, when you -- when you

15 and Mr. Brass came to the realization, hey, Rio is -- is

16 exiting, what -- what did you do in response?

17     A.   Well, first of all, I don't believe that Rio

18 had a right to just pull the plug, but, you know, we

19 wanted to help them achieve what they wanted, and we

20 weren't -- we didn't necessarily want to be in a

21 long-term relationship with somebody who didn't want to

22 be in that long-term relationship.  So, we were happy to

23 explore other opportunities, and AJ very quickly

24 identified Vitol as somebody he thought we could work

25 with post Rio.

Jason Goldstein
May 16, 2019                                                    54

```
 1        Q.    So, your recollection is it was his idea to
 2   reach out to Vitol?
 3        A.    Probably.  We had had multiple discussions with
 4   Vitol for years on related matters.
 5        Q.    Uh-huh.
 6        A.    So, it was -- it was a logical thought.  But I
 7   think he -- it was probably his idea and he was probably
 8   the first person to speak to Vitol about it.
 9        Q.    Do you know who he spoke to first?
10        A.    I don't.  I would strongly guess Eric Kuo,
11   but --
12        Q.    Is Eric Kuo somebody -- and that's K-u-o.  Is
13   that somebody you already knew?
14        A.    Yes.
15        Q.    How did you know Mr. Kuo?
16        A.    Known him for a long time.  First material
17   interactions I can recall were probably in the 2014 time
18   frame, and we looked at putting together a similar
19   profit share type relationship in place that they
20   ultimately decided not to do with us and did a
21   similar-ish transaction that became VALT.
22        Q.    And so, you and -- and Mr. Brass had been
23   talking with -- with Kuo back in 2014 about a --
24        A.    It might have been '13, but I think it was '14.
25        Q.    Okay.
```

Jason Goldstein
May 16, 2019                                          55

```
1        A.    Yeah.  Yes.

2        Q.    All right.  And then ultimately from your

3   understanding, Vitol decided to do that with VALT.

4        A.    Yes.  And it wasn't the exact same business,

5   but it was similar.  Sargeant Marine which was the VALT

6   Partner --

7        Q.    Uh-huh.

8        A.    -- was more -- more in the asphalt shipping

9   side.  We were more in the asphalt blending side.

10  Sargeant Marine was both a customer and a competitor.

11  So, it was -- it was similar, but not -- I can't say it

12  was the same deal.  And I actually have no idea what

13  their deal was, so...

14       Q.    All right.  And after those discussions with

15  Mr. Kuo back in either 2013 or 2014, did you continue to

16  have some contact with him in 2015, 2016?

17       A.    Yes.  So, the -- he was involved.  Really it

18  wasn't as much of a point person.  When we at Gravity --

19  not -- not my GCAC capacity -- Gravity were in the

20  process of purchasing the facility in Corpus, we talked

21  to Vitol about being a tenant of that facility.

22       Q.    Of the BTB that became GOTAC?

23       A.    Correct.

24       Q.    Was that you who talked to them about -- talked

25  to Vitol about it?
```

Jason Goldstein
May 16, 2019                                                    56

 1        A.    It would have been most of our senior team, but

 2    I was -- I was one of them, yes.

 3        Q.    Okay.  And was that with Mr. Kuo or with

 4    somebody else?

 5        A.    And Steve Barth.

 6        Q.    Okay.

 7        A.    Probably on that particular item, probably

 8    Steve Barth more.

 9        Q.    And that would have been in '15 or '16, you

10    think?

11        A.    We purchased it in the middle of '15.  I -- I

12    think it's likely we started discussions before the

13    actual acquisition occurred and -- and probably after as

14    well, so, 15 plus or minus.

15        Q.    Okay.  And was Steve Barth -- and that's

16    B-a-r-t-h -- somebody you already knew also?

17        A.    Yes.

18        Q.    And how did you know Mr. Barth?

19        A.    I don't remember how I initially met him.  But

20    the first significant commercial interaction was when I

21    was at Blossom Street Capital.  Vitol was a client, and

22    Steve Barth and another gentleman named Rob James, who's

23    no longer with Vitol, were my primary contacts for that

24    consulting project.

25        Q.    So, Blossom Street was doing work for Vitol?

Jason Goldstein
May 16, 2019                                                    57

```
 1        A.    Uh-huh.

 2        Q.    Did you get along with Mr. Barth well at that

 3   time?

 4        A.    Yes.

 5        Q.    Okay.  So, going forward to when Rio started

 6   making noise like they wanted out --

 7        A.    Uh-huh.

 8        Q.    -- you believe that Mr. Brass reached out to

 9   Vitol?

10        A.    I believe so.

11        Q.    Okay.  But you weren't -- you don't remember

12   being part of that initial reaching out or you do?

13        A.    I -- I probably was not.  It may have been

14   Patrick involved in it as well, because -- because

15   Patrick was joining GCAC as part of this transaction, he

16   was -- those three were talking all the time, I -- I

17   believe.

18        Q.    Okay.  But I mean, Patrick wouldn't have been

19   thinking about joining as part of this transaction until

20   there obviously had been some discussions with Vitol,

21   right?

22        A.    Possibly.  It's possible that AJ and Patrick --

23   because I -- I think AJ really liked Patrick and wanted

24   him to join, it's possible that they -- you know, the

25   two of them talked about approaching Vitol as a --
```

Jason Goldstein
May 16, 2019                                           58

1    together.  I don't know.

2         Q.   Have you read Mr. Perugini's --

3         A.   I -- I did at the time it came out, and I have

4    not looked at it since then.

5         Q.   When do you recall your first involvement with

6    discussing this possible transaction with Vitol?

7         A.   Roughly March of '17.  It's possible I'm off by

8    a month.

9         Q.   And around that time, who was it you recall

10   having contact with at Vitol?

11        A.   Well, initially, I probably -- I probably would

12   not have been very involved in the initial discussions

13   until we got to the point of all the parties want to do

14   a deal and let's start to put something on paper.  But

15   it would have been Eric Kuo as the main point person.  I

16   probably attended one or two meetings with him, I'm

17   guessing.

18        Q.   Was -- was Vitol the only kind of replacement

19   company that y'all looked at?

20        A.   If -- if we talked about any others, it was not

21   to a great degree.  Vitol quickly rose to the surface,

22   and I -- I can't even recall another party that we

23   talked to.  I can't say we didn't but no meaningful

24   other conversations.

25        Q.   And did y'all use a broker or --

Jason Goldstein
May 16, 2019                                            59

1      A.    No.

2      Q.    Okay.

3            MR. GILES:  Ken, I believe that in our

4   first few depositions, we -- we consecutively numbered

5   exhibits.  I don't know if you want to continue that --

6            MR. BROUGHTON:  I would love to do that if

7   you will go grab them.

8            MR. GILES:  Yeah.

9            MR. BROUGHTON:  I would actually love to

10  do that.  And, you know, I'm blaming it on Mason.  He's

11  a first year lawyer.  I didn't think to tell him to do

12  that.

13           MR. GILES:  Yeah.  No problem.  Let's go

14  off the record a minute, and I'll go get the numbers.

15           MR. BROUGHTON:  Yeah.  I would love to do

16  that.

17           MR. GILES:  Yeah.

18           MR. BROUGHTON:  We're off the record at

19  11:29.

20           (A recess was taken from 11:29 a.m. to

21           11:42 a.m.)

22           THE VIDEOGRAPHER:  We are on the record at

23  11:42.

24      Q.    (By Mr. Broughton)  Mr. Goldstein, if you could

25  take a look at what's been previously marked as Brass

Jason Goldstein
May 16, 2019                                                          60

1   Exhibit 10.

2        A.   Okay.

3        Q.   Do you recognize this document?

4        A.   It looks -- yes -- yes.

5        Q.   Okay.  Do you think this is something you would

6   have been involved in preparing?

7        A.   Yes, I probably would have had primary

8   responsibility for preparing this.

9        Q.   Okay.  And if someone did assist you, who do

10  you think that might have been?

11       A.   It probably would have been AJ on some of the

12  qualitative aspects, and it may have been people at Rio

13  on some of the quantitative aspects.  And -- and AJ, on

14  some of the quantitative for the best case proformas, he

15  would have opined on those assumptions.

16       Q.   So, were people from Rio involved in making the

17  presentation to Vitol?

18       A.   I don't think they were involved in the

19  presentation, but they wanted to help us to get that

20  done because this was a transaction Rio wanted to do as

21  an entity and Patrick wanted to do for his own personal

22  reasons.

23       Q.   So, from your perspective, did you feel like --

24  well, let me ask you this:  Even though Rio wanted to

25  terminate, did you feel like the relationship was still

Jason Goldstein
May 16, 2019                                                    61

```
 1   a fairly positive one?
 2        A.   Yes.  I mean, I think that -- as I mentioned,
 3   that winter was -- that -- where asphalt and fuel
 4   diverged, and pricing was stressful and we had some
 5   disagreements about the best course of action.  But
 6   overall, I would answer that yes.
 7        Q.   And I guess obviously Rio would have -- was
 8   more than happy for you to find somebody to take their
 9   place.
10        A.   That's what they wanted.
11        Q.   Yeah.  Okay.  And do you recall who at Vitol
12   this presentation was made?
13        A.   It was probably made for -- Eric Kuo was the
14   primary recipient.  But I -- I don't know if other
15   people -- I can't remember if other people received it
16   by e-mail or -- or were in an actual presentation that
17   went through this.
18        Q.   You don't remember one way or the other.
19        A.   I don't remember, but I think at this time we
20   believed that Eric would be the key decision-maker on
21   this.
22        Q.   Okay.
23        A.   He would have been the -- the intended
24   audience.
25        Q.   All right.  So, and -- and sitting here today,
```

Jason Goldstein
May 16, 2019                                          62

1   you can't recall if it was -- if this was merely sent as

2   an e-mail or if everybody got together and put it up on

3   the screen and looked at it?

4        A.   I would guess both, but I don't recall.

5        Q.   Okay.  So, as we look through Brass 10, the

6   third page which has this Bates number on the lower

7   right-hand corner, Vitol 74469 --

8        A.   Yes.

9        Q.   -- if I understood you correctly, you believe

10  that that financial information probably would have been

11  provided by Rio; is that right?

12       A.   They certainly would have had a hand in helping

13  us to prepare this information.  I'm sure that I created

14  this table and initially populated it and may have

15  needed some assistance on some of the hedging inputs.

16       Q.   Because as you said earlier, they were doing

17  the accounting and preparing the position statements,

18  right?

19       A.   Correct.

20       Q.   Okay.  If we go to the next page which is Vitol

21  74470 --

22       A.   Yes.

23       Q.   -- this first bullet point says, Traditionally,

24  solid margin business buying asphalt blend stocks below

25  fuel oil and selling above fuel -- fuel oil.  Do you see

Jason Goldstein
May 16, 2019                                                      63

1    that?

2         A.   Yes.

3         Q.   Is -- is that a bullet point you think you

4    probably would have formulated or you think Mr. Brass

5    may have?

6         A.   I can't recall.  I really -- I really have no

7    idea.

8         Q.   If we go to the next chart there at Vitol

9    74471, this chart's probably prepared by you?

10        A.   I think we would have had the data to do this

11   ourselves, yes.

12        Q.   Okay.  And you would have just gotten that off

13   of some publicly reported data, do you think or --

14        A.   Sort -- sort of.  So, we keep a database weekly

15   of fuel and asphalt data.  There's no Bloomberg type

16   service for asphalt because, again, it's not a hedgeable

17   product.  So, we subscribe to a monthly newsletter that

18   has asphalt prices or estimates of asphalt prices in

19   different regions, and we manually input that into our

20   own database system.

21        Q.   And what's the name of that monthly --

22        A.   Poten, P-o-t-e-n.

23        Q.   And we go to the next page which is 74472,

24   entitled Base Case Pro Formas.

25        A.   Uh-huh.

Jason Goldstein
May 16, 2019                                                        64

1     Q.    And would you have been the person to prepare

2  this?

3     A.    Yes.

4     Q.    And, again, you think this was largely from

5  information provided by Rio?

6     A.    No.  I would say that this either was

7  information that I knew.  For example, terminal fees in

8  Corpus were a known fact under the Rio Pin Oak lease,

9  and margin assumptions probably would have been -- most

10  of my guidance for that probably would have been

11  provided by AJ.  They may have possibly commented on

12  some of the -- the heat, and COM is cost of money or --

13  or TBM is -- Vitol calls it.

14     Q.    Uh-huh.

15     A.    Because, again, they were keeping those books,

16  but they would not have been heavily involved in this

17  page, I don't think.

18     Q.    And why would Mr. Brass have been the one to

19  comment on the margins?

20     A.    Well, he's -- he's been in the asphalt business

21  for 30-some-odd years, and he's one of our -- even

22  though he's the president, he's one of the traders as

23  well.  So, he's just more commercially in touch with

24  trades and margins than -- in his role than in mine.

25     Q.    In looking at this Base Case Pro Forma and

Jason Goldstein
May 16, 2019                                                    65

1    going, you know, forward to -- you know, with hindsight,

2    how -- how do you feel like it's turned out?

3        A.   Well, I think it's a good estimation of our

4    business as it stands.  I think it's a good estimation

5    of what is very close to what we actually did in 2018.

6    I think there's obviously a lot of confusion around what

7    happened in 2017.  So, I don't even know exactly what to

8    compare this against because there's things we're

9    sitting here figuring out.

10       Q.   Uh-huh.

11       A.   But this is very close to what we did in '18,

12   and it's -- it's probably a good approximation of what

13   we expect to do in '19.

14       Q.   Okay.  So, you feel like under the Mercuria

15   in -- in 2018, this -- this turned out to be --

16       A.   The end result, yes.  I -- I would have to look

17   back at each of the assumptions because maybe we did

18   more wholesale and less retail.

19       Q.   Okay.

20       A.   But the total sum here where it talks about 5.8

21   million was very close.

22       Q.   And is hedging included in any of these

23   categories?

24       A.   I don't see it, and it probably wouldn't be,

25   because you really -- even though we're usually going to

Jason Goldstein
May 16, 2019                                                    66

1   have a gain or a loss from hedging, you don't generally

2   know which it's going to be.  So, you probably wouldn't

3   budget for it, and it looks like we didn't.

4       Q.   Okay.  So, hedging is not something normally

5   you would budget for, at least not in -- is -- is that

6   particular to asphalt or just in general?

7       A.   I think it's in general if you're -- if

8   you're -- unless you're -- perhaps if you're hedging

9   something perfectly and you just have brokerage costs

10  associated, you might -- you might budget in the

11  brokerage costs.  But in terms of how much the hedges

12  themselves make or lose, I don't know that people would

13  budget that, because if you really knew that, you'd

14  probably just trade.

15      Q.   Yeah.  So, this very last page says

16  Miscellaneous and VALT.

17                 MR. BROUGHTON:  Just so you know, VALT is

18  all caps, V-A-L-T.

19      Q.   (By Mr. Broughton)  So, do you recall why you

20  included this last page?

21      A.   Sure.  We were -- we were familiar with VALT.

22  We had done business with them at this time.  As I

23  mentioned, they were a customer and also a competitor

24  and we saw the potential for there to be additional

25  opportunities in how we could work with VALT.

Jason Goldstein
May 16, 2019                                                67

1            We -- we had one ship under charter that

2    we were happy to not have under charter, and VALT had

3    many ships.  So, we thought there could be some synergy

4    in transferring that charter and then perhaps some

5    longer term supply deal instead of the spot deals we had

6    historically operated under with them.

7       Q.   This last phrase in the last bullet point, he

8    says, and not competitive.  Vitol had raised some

9    concerns about VALT viewing it as competitive, right?

10      A.   Yes.

11      Q.   And tell us about when you recall that first

12   being brought up.

13      A.   Well, I would have only have heard about it

14   through AJ, not -- not to me directly.  But somewhere in

15   the late July or August time frame, I came to be aware

16   through AJ again that VALT was unhappy that this

17   transaction happened and -- and viewed it as

18   inappropriate given their -- given the VALT

19   relationship.

20      Q.   And what -- what exactly do you recall

21   Mr. Brass telling you about that?

22      A.   Initially he told me he talked to Eric and they

23   were -- VALT was unhappy, but it was going to be okay

24   and they would work through it.  And then over a period

25   of a few weeks, I recall conversations going from there

Jason Goldstein
May 16, 2019                                              68

1   slowly to, hey, it's more of a problem than we thought.

2   And then the next step was they suggested that we sit

3   down with VALT and see if we could resolve it through

4   some type of a -- agreed upon relationship.

5        Q.   And did that -- did that last part happen,

6   sitting down with VALT?

7        A.   AJ I believe either met -- I think he met with,

8   but it may have just been over the phone talked to Dan

9   Sargeant who's one of the senior people with VALT.  And

10  there were ideas or e-mails exchanged, but they were

11  unsuccessful.

12                 (Brief interruption.)

13                 (Discussion off the record for less than

14                 one minute.)

15       Q.   (By Mr. Broughton)  So, prior to May 16th,

16  2017, had -- had you been -- you, yourself, been talking

17  with Mr. Kuo and Mr. Barth about this deal?

18       A.   Certainly Mr. Kuo.  I don't remember the extent

19  to which Mr. Barth was involved in these particular --

20  he would have been involved in the -- he was involved in

21  the legal document --

22       Q.   Uh-huh.

23       A.   -- the JMA we refer to.  In terms of, hey,

24  should we do this business together or not, that would

25  have been more Eric.

Jason Goldstein
May 16, 2019                                                              69

1      Q.   Okay.  So, I had asked the original question

2   about the -- the noncompetitive because, I mean, this is

3   May of 2017.

4      A.   Uh-huh.

5      Q.   It -- it seems like perhaps that was a concern

6   in May or you wouldn't have put this in the PowerPoint,

7   right?

8      A.   I think we were concerned about whether it

9   would be an issue for Vitol or not, but we were assured

10  it was not from the -- from the VALT detail standpoint.

11              MR. GILES:  Can we go off the record?

12              MR. BROUGHTON:  Sure.

13              THE VIDEOGRAPHER:  We're off the record at

14  11:57.

15              (Exhibit Number 18 was marked for

16              identification.)

17              (A recess was taken from 11:57 a.m. to

18              12:01 p.m.)

19              THE VIDEOGRAPHER:  We are on the record at

20  12:01.

21      Q.   (By Mr. Broughton)  Mr. Goldstein, you've got

22  what's been marked as Exhibit 18 in front of you which

23  the attachment is the same --

24      A.   Okay.

25      Q.   -- as the Exhibit 10 we were just looking at.

Jason Goldstein
May 16, 2019                                                    70

1    And this is just a cover e-mail, right?

2         A.    Uh-huh.  Yes.

3         Q.    It looks like the bottom half of the e-mail you

4    sent Mr. Perugini, you know, a copy of this

5    presentation, right, on July 19th of 2017?

6         A.    That's what it looks like, yes.

7         Q.    And did you -- did you know he was going to

8    forward it on to --

9         A.    I have no recollection of even sending it to

10   Patrick.  Obviously I did --

11        Q.    Sure.

12        A.    -- but I just don't recall.

13        Q.    Okay.  And you'll notice at the top he says,

14   Eric, I think this is what you sent VALT.  We were happy

15   to have a further conversation with them.  Let me know

16   if you need anything else, right?  Just kind of along

17   the lines of what you just testified about a second ago,

18   right?

19        A.    Right.

20        Q.    So, you never talked to VALT, but you just

21   believe Mr. Brass had some calls, e-mails and maybe a

22   meeting.  You don't know one way or the other.

23        A.    Correct that I never talked to VALT.  I'm

24   not -- AJ, at some point, spoke to Dan Sargeant.  I

25   don't recall how often or -- or in person versus phone

Jason Goldstein
May 16, 2019                                                71

1   calls, but he spoke to him about it.

2        Q.   And Mr. Brass communicated to you that VALT was

3   not happy with the -- with the idea of the agreement.

4        A.   Mr. Brass told me that Eric Kuo told him that.

5        Q.   So, no one -- to your understanding, no one at

6   VALT directly told that to Mr. Brass?

7        A.   Not initially.  The initial awareness of the

8   VALT problem, my recollection is AJ told me that Eric

9   made him aware of that.

10       Q.   Okay.

11                (Exhibit Number 19 was marked for

12                identification)

13       Q.   (By Mr. Broughton)  I'll hand you what's been

14   marked as Exhibit 19.  Look through that.

15       A.   (Witness peruses document.)  Okay.

16       Q.   All right.  Exhibit 19 is an e-mail from you to

17   Steve Barth with a copy to others, January 19, 2015,

18   subject line, Gravity Proposal.  Do you see that?

19       A.   Yes.

20       Q.   Do you remember this e-mail at all?

21       A.   Not specifically, only in that we were talking

22   to a number of potential customers.  But I know we had

23   meaningful discussions with Vitol around this.  So, this

24   makes -- this makes sense to me, I guess.

25       Q.   Okay.  And -- and what do you recall generally

Jason Goldstein
May 16, 2019                                                    72

1   was going on in January of 2015 with regard to Gravity's

2   proposal to Vitol?

3       A.   Again, we were talking to a lot of people.  We

4   were just trying to get customers.  Vitol at the time

5   believed that there was a robust business to bring light

6   crude or condensate through Corpus Christi and was

7   interested in talking to us -- excuse me -- talking to

8   us about taking out storage at our facility to do that.

9       Q.   And you had -- you said Vitol believed that

10  based on discussions you had with Mr. Barth?

11      A.   Primarily, yes.

12      Q.   Did -- did any of this come about that's --

13      A.   No, none of it.

14      Q.   Okay.  And do you know why?

15      A.   What -- what we were told is that they felt the

16  market had changed too much, was not as --

17      Q.   Vitol did?

18      A.   Vitol felt the business they were trying to

19  bring through, there was not as robust of a market as

20  when we initiated discussions with them.  So, their

21  interest tapered off.

22                   (Exhibit Number 20 was marked for

23                   identification and subsequently

24                   withdrawn.)

25      Q.   (By Mr. Broughton)  So, the court reporter will

Jason Goldstein
May 16, 2019                                              73

1   keep all these, just so you know.

2        A.   Okay.

3        Q.   Sometimes the witnesses try to bundle them up

4   and take off with them.

5        A.   No thanks.

6        Q.   Let me know when you've had a chance to look

7   through this.

8        A.   (Witness peruses document.)  Okay.  I can't

9   tell you I've memorized every detail in here, but

10  I've -- I've got the gist.

11       Q.   All right.  Great.  So, do you recognize

12  Exhibit 20?

13       A.   Similarly --

14            MR. BROUGHTON:  I just see he's marked --

15  this was Brass 2.  Is that right?

16            MR. MASON:  Yes.

17            MR. BROUGHTON:  Let's -- let's change it.

18  Yeah, sorry.  I didn't -- you're a left-hand writer.

19  I'm only just looking to the right.  Yeah, sorry.

20  Everything's his fault again.

21            MR. GILES:  Yeah.  That's the way it

22  works, man.

23       Q.   (By Mr. Broughton)  Okay.  So, everything I've

24  just said about Exhibit 20, we're going to call it

25  Number 2.  Okay?

Jason Goldstein
May 16, 2019                                                    74

```
 1              All right.  So, do you think you had any
 2   assistance in drafting Exhibit 2?
 3       A.    The one you just showed me?
 4       Q.    Yeah.
 5       A.    Yes.
 6       Q.    Well, I took it back, didn't I?
 7       A.    Yes.
 8       Q.    Yeah.  Okay.  So, let's -- yeah.  Here it is
 9   right here.
10       A.    Thank you.
11       Q.    You got it back.
12              MR. GILES:  Lunch is ready whenever we
13   are, but it's sandwiches and salads.  So --
14              MR. BROUGHTON:  Okay.
15              MR. GILES:  -- it's not hot.  We can go as
16   long as you want and break whenever we want.  It's up to
17   you guys.
18              MR. BROUGHTON:  Yeah.  I'll finish up.  I
19   don't think this will be long --
20              MR. GILES:  Okay.
21              MR. BROUGHTON:  -- and then we'll take a
22   break.  Perfect.
23              MR. GILES:  All right.  So, this is Brass
24   2?
25              MR. BROUGHTON:  2.  Brass Number 2.
```

Jason Goldstein
May 16, 2019                                                          75

```
 1              MR. GILES:  Not Exhibit 20.

 2              MR. BROUGHTON:  Not Exhibit 20.

 3       Q.   (By Mr. Broughton)  All right.  So, it looks to

 4  me, Mr. Goldstein, as -- as probably the attachment was

 5  something not tailored to this e-mail to Steve Barth and

 6  Rob James but was maybe just kind of a general marketing

 7  piece that you might have sent to others, or do you

 8  think you tailored it just for this?

 9       A.   I -- I imagine it was tailored for Vitol.

10       Q.   Okay.  And would this have been something you

11  composed yourself or input from others or you don't

12  recall?

13       A.   Probably composed with input from others.

14  Probably the last page with the yields was provided to

15  me by either AJ Brass or Kenny Hucker.

16       Q.   And so, is this more of a -- of the

17  continuation of the marketing of the lease space effort

18  that we looked at or was this a bit broader concept?

19       A.   I would say it's just different.  So, this one

20  was purely around -- the one we just discussed

21  previously was around light crude and condensate --

22       Q.   Uh-huh.

23       A.   -- as an opportunity.  And I would view this as

24  a different opportunity at the same facility for heavy

25  crudes to manufacture asphalt and other refinery
```

Jason Goldstein
May 16, 2019                                             76

1   intermediate products.

2       Q.   But similar to the immediately preceding

3   exhibit, this is more marketing efforts by Gravity for

4   its terminal.

5       A.   Correct.

6       Q.   For the GOTAC terminal, right?

7       A.   Yes.

8       Q.   Okay.  And so, do you think you had talked with

9   Mr. Barth and Mr. James, and they knew this was coming

10  or out of the blue?

11      A.   Most likely.

12      Q.   Okay.

13      A.   I don't recall.

14      Q.   And it seems like maybe from that third

15  paragraph, it says, Also, we were happy to have a caller

16  meeting with Eric Kuo.  It seems like perhaps maybe his

17  name had been mentioned some previous discussion or --

18      A.   Sure.  So, unlike the -- the light crude

19  condensate, which I believe was the month before --

20      Q.   Uh-huh.

21      A.   -- which really wouldn't fall into Eric Kuo's

22  domain, the products being made here under processing

23  heavy crude would fall more under his domain.  So, while

24  Steve Barth was involved in both discussions, he

25  probably needed Eric Kuo's input to assess this second

Jason Goldstein
May 16, 2019                                                 77

1    one.

2        Q.   Okay.  And do you recall if you had any

3    communications or further discussions with anyone at

4    Vitol about what -- what you proposed here in Exhibit 2?

5        A.   I'm -- I'm sure we had fairly meaningful

6    discussions.  I don't remember them all.  But they were

7    a party that took a significant look at the asphalt

8    processing business there.

9        Q.   All right.  And --

10       A.   Heavy crude processing.  Sorry.

11       Q.   Right.  And so, I mean -- and is it that

12   nothing came of this for the same reason you've told us

13   about earlier, is that Vitol lost interest in the

14   condensate, et cetera?

15       A.   Not necessarily for the same reasons.

16       Q.   Okay.

17       A.   I believe the condensate was purely market

18   driven.  I'm not -- I can't recall why they didn't want

19   to go forward with this heavy crude asphalt, with the

20   exception that because of the troubles I mentioned with

21   hedging asphalt, it's hard to predict -- it's harder to

22   predict the margins out of the heavy crude processing

23   business than through-putting condensate.  So, it may

24   have just been a risk appetite.  I don't really know.

25                  MR. GILES:  Are you getting hungry?

Jason Goldstein
May 16, 2019                                      78

```
 1                  THE WITNESS:  I'm fine.

 2                  MR. BROUGHTON:  Oh, we're almost ready,

 3    yeah.

 4       Q.   (By Mr. Broughton)  So, you referred to here in

 5    the second page, it's -- I got the Bates Number 649, in

 6    the lower right-hand corner.

 7       A.   Okay.

 8       Q.   There under asphalt marketing, the second

 9    paragraph next to the last line, the second paragraph,

10    it says, Gravity's affiliate GCAC.

11       A.   Uh-huh.

12       Q.   Why did you use the affiliate term there?

13       A.   I don't know why I used that particular term,

14    but obviously as we had similar management teams at both

15    companies.  We -- we knew that Vitol at least in Houston

16    and North America did not have that asphalt expertise.

17    So, we were offering up if they were interested in

18    taking asphalt to capacity for -- to partner with GCAC,

19    while -- while being very clear that they -- they could

20    sign a deal with Gravity and not be required to work

21    with GCAC.

22                  MR. BROUGHTON:  All right.  Let's take our

23    lunch break.

24                  THE VIDEOGRAPHER:  We're off the record at

25    12:15.
```

Jason Goldstein
May 16, 2019                                                    79

```
 1                    (A lunch recess was taken from 12:15 p.m.

 2                    to 12:53 p.m.)

 3                    THE VIDEOGRAPHER:  We are on the record at

 4     12:53.

 5          Q.   (By Mr. Broughton)  Mr. Goldstein, if you would

 6     go back to Exhibit 18, it should be in there somewhere.

 7          A.   Okay.  I remember it.

 8          Q.   We're at the PowerPoint, and if you'll turn to

 9     the historical margins.

10          A.   Okay.

11          Q.   Were -- would hedging transactions be reflected

12     in the historical margins?

13          A.   I believe so.

14          Q.   Okay.

15          A.   I -- I don't remember performing the

16     calculations, but I would think so.

17          Q.   All right.  And the hedging was actually done

18     by Rio or by GCAC?

19          A.   Well, the placing of the hedges --

20          Q.   Yeah.

21          A.   -- that's something Rio did.

22          Q.   Okay.

23          A.   The discussions about the hedges were something

24     that would happen between probably Patrick and AJ at the

25     time.
```

Jason Goldstein
May 16, 2019                                                        80

1      Q.   Not you.

2      A.   Not me.

3      Q.   Okay.  So, that would have been -- to the best

4   of your understanding, the -- the discussions about the

5   hedging strategies would have been a combination of

6   Patrick and Mr. Brass; is that right?

7      A.   Yes.  I think AJ would rope me in if -- for

8   ideas and general strategy.  But on a day-to-day basis,

9   a week-to-week basis, taking hedges off and on to roll a

10  June hedge into a July hedge, I wouldn't have been

11  involved with that.

12     Q.   And why not?

13     A.   Just a -- it's more of a smaller trader

14  decision than a, hey, should we stop hedging against

15  fuel and hedge against crude.  That might be a more of a

16  long-term analytical decision that I might get involved

17  in.

18     Q.   That's it for that one.

19               (Exhibit Number 20 was marked for

20               identification)

21     Q.   (By Mr. Broughton)  Now we'll get to the real

22  Exhibit 20.

23     A.   (Witness peruses document.)  Okay.

24     Q.   All right.  This -- have you -- do you recall

25  ever seeing this before?

Jason Goldstein
May 16, 2019                                                  81

1      A.   I recall working on analyses like this.  This

2  is one of many iterations; so, I don't think it was the

3  final iteration.

4      Q.   So, you think you participated in the

5  preparation of -- of this analysis?

6      A.   I believe so.

7      Q.   Okay.  And who else would have worked on this

8  in addition to yourself?

9      A.   From GCAC's side, AJ would have given me input

10  as to what he thought was appropriate.  And then I might

11  have conferred with John Tomaszewski or Karen Caldwell

12  in an accounting function about benefits as a percent of

13  salary or confirming base salaries or something like

14  that.

15      Q.   And so, it appears Mr. Brass sent this to

16  Mr. Barth; is that right?

17      A.   That's what it looks like, yes.

18      Q.   Okay.  So, you were -- you were definitely only

19  seeing -- in this analysis, you're really only

20  forecasting profits, not -- not really seeing a

21  possibility of loss?

22      A.   Well, I wouldn't -- I wouldn't even call this a

23  forecast because I think if you look at the second

24  section of this table --

25      Q.   Uh-huh.

Jason Goldstein
May 16, 2019                                                82

1      A.    -- it's just hypothetical profit margins.

2      Q.    Okay.

3      A.    Right.  358 which was the -- which came from

4    that prior analysis we had here today --

5      Q.    Uh-huh.

6      A.    -- that was kind of our base case, a 10 and a

7    20, and just what would -- what would those scenarios

8    mean for each party.  I don't think that means the

9    20 million was our projection.

10     Q.    Right.  Okay.

11               (Exhibit Number 21 was marked for

12               identification)

13     A.    (Witness peruses document.)

14     Q.    (By Mr. Broughton)  Okay.  And I know you told

15   us in response to Exhibit 20 that that Exhibit 20 was

16   just one of several iterations and you do not believe it

17   was the final, right?

18     A.    That's correct.

19     Q.    Okay.  And so, this is -- is a different --

20   somewhat of a different analysis of part of what we

21   looked at in 20, right?

22     A.    Yes.

23     Q.    Really just focused on the -- on the personnel,

24   right?

25     A.    Yes.

Jason Goldstein
May 16, 2019                                              83

```
 1        Q.    Okay.   And --
 2                  MR. GILES:  Objection, form.  Go ahead.
 3                  MR. BROUGHTON:  I'm not trying to -- to do
 4    anything --
 5                  MR. GILES:  I know.
 6                  MR. BROUGHTON:  Yeah.
 7                  MR. GILES:  And if you want me to
 8    explain --
 9                  MR. BROUGHTON:  Yeah, go ahead and
10    explain.
11                  MR. GILES:  What I thought you were saying
12    was that the -- the section that is -- deals with
13    salaries is different from the previous one we looked
14    at, and I don't think it is, but --
15                  MR. BROUGHTON:  Oh, no.
16                  MR. GILES:  You were saying --
17                  MR. BROUGHTON:  Yeah.  I wasn't trying to
18    say -- I was just saying that the other one included --
19                  MR. GILES:  A different part.
20                  MR. BROUGHTON:  -- two different, yes.
21                  MR. GILES:  And I think that's what you
22    meant but it was a little unclear --
23                  MR. BROUGHTON:  Sure.  Okay.
24                  MR. GILES:  -- so that's all I'm saying.
25                  MR. BROUGHTON:  Yeah.  Yeah.
```

Jason Goldstein
May 16, 2019                                                        84

1      Q.    (By Mr. Broughton)  Right.  And so, in -- in

2    Exhibit 21, which is dated June 30, 2017 --

3      A.    Uh-huh.

4      Q.    -- by this point in time, the analysis is

5    labeled Vitol/NewCo, right?

6      A.    Uh-huh.

7      Q.    And whose idea was it to have the party be

8    NewCo as opposed to GCAC?

9      A.    I believe I initiated that idea.

10     Q.    And -- and what was your thought on that?

11     A.    GCAC's been around for roughly 30 years and has

12   history and ownership subsidiaries, and I knew that this

13   deal with Vitol initially was for two years.  And I

14   liked the idea of putting everything into a new entity

15   such that if at the end of two years, we parted ways, we

16   would have more of an independent clean set of books and

17   records to take to a third-party for bank financing or a

18   new partner or whatever it may be.  So, I just made it

19   cleaner.

20     Q.    And was that the -- the like banking and

21   financing, was that the reason for the concept about the

22   two years?  Or how -- how did the two years --

23     A.    I'm not sure I understand.

24     Q.    How did that time frame come about?

25     A.    I don't really remember.

Jason Goldstein
May 16, 2019                                          85

```
 1      Q.    Okay.
 2                  (Exhibit Number 22 was marked for
 3            identification)
 4      A.    (Witness peruses document.)  Okay.
 5      Q.    (By Mr. Broughton)  Okay.  So, is this a
 6   document you remember or not particularly?
 7      A.    I -- I can't say that I remember.  The -- the
 8   bottom of the e-mail refers to an attachment, the Vitol
 9   Asphalt book splits v 25.
10      Q.    Okay.
11      A.    I don't remember that exact spreadsheet and
12   it's not here; so, I can't -- but all this makes sense
13   to me.
14      Q.    All right.  So, Mr. Barth has really asked you
15   to kind of -- to give this written description which
16   you've provided here at the -- the top part of Exhibit
17   22.
18      A.    Yeah.
19      Q.    I mean, were you -- did you -- I mean, it looks
20   to me from -- from reading this e-mail, it looks like
21   you're kind of the main person doing the negotiations on
22   behalf of GCAC or -- or you've got a bigger involvement
23   in the day-to-day.  How would you characterize it as a
24   division of labor between you and Mr. Brass?
25      A.    I think I take lead when it comes to
```

Jason Goldstein
May 16, 2019                                                86

1    negotiating these agreements.  However, if it's a

2    discussion about should the profits be split 50/50 or

3    60/40, that's probably something AJ would take up

4    directly with Eric and figure out what they thought was

5    appropriate.  So, this is more of a -- Steve's asking me

6    how do we put pen to paper on these concepts, and I was

7    proposing something.

8         Q.    And was there a NewCo formed?

9         A.    There was.  I don't recall when it was formed,

10   and it never got involved in this business.  Because in

11   a very -- very early into the relationship, we started

12   to have problems.  Right?  So the NewCo that we intended

13   to set up never got set up for this purpose.

14        Q.    Well, I didn't understand that last part.

15        A.    We did set up a NewCo.

16        Q.    Right.

17        A.    It never transacted with Vitol.

18        Q.    Okay.  So, you set it up.  It just never did

19   any business.  Is that what you're saying?

20        A.    We eventually did business.  I don't -- I don't

21   think we started doing business until after the Vitol

22   relationship happened that we used that vehicle.  I

23   think the vehicle was essentially idle until after

24   Vitol.

25        Q.    And it was called Hermosa?

Jason Goldstein
May 16, 2019                                                    87

1       A.    Hermosa Energy, I believe.

2       Q.    And was -- Hermosa was -- how was it owned?

3       A.    100 percent by AJ Brass.

4       Q.    And so -- and you envisioned it actually having

5    nothing really to do with GCAC.  It was just an

6    independent company.  It just so happened to be owned

7    by AJ Brass?

8       A.    Could you ask that again?  I'm sorry.

9       Q.    Did you envision a relationship between Hermosa

10   and GCAC?

11      A.    If by relationship, kind of ownership by GCAC

12   or -- I don't -- I don't --

13      Q.    Sure.

14      A.    I don't --

15      Q.    We'll take that, ownership.

16      A.    No, I did not expect that.  I -- I thought it

17   was possible that the ownership of Hermosa may be

18   amended to not be a hundred percent AJ, but the desire

19   was just to get it set up initially and it was easier to

20   initially set it up as a sole member.

21                  (Exhibit Number 23 was marked for

22                  identification)

23      A.    (Witness peruses document.)

24      Q.    (By Mr. Broughton)  Are you ready for me to ask

25   you about 23?

Jason Goldstein
May 16, 2019                                              88

1        A.    I think so.

2        Q.    Is -- is Exhibit 23 a document that you

3   recognize?

4        A.    So, it's the joint marketing agreement for

5   Vitol and GCAC.  There were -- there were many drafts

6   and red lines; so, I don't recall this specific red

7   line.  I don't know who sent this to who, but it's a

8   document that is familiar.  There were a dozen different

9   drafts.  I can't recall which draft this is.

10       Q.    And who on the GCAC -- well, I guess this

11  actually says NewCo.  So, on the NewCo side, who -- who

12  would have been involved in looking at these drafts and

13  making red lines and comments?

14       A.    From GCAC's standpoint, myself and AJ would

15  have reviewed and made comments, probably more by me.

16  And most likely Steven Canner would have actually

17  implemented changes and made red lines.

18       Q.    So, does it appear to you that the drafts

19  immediately preceding this Exhibit 23 had -- had all

20  said GCAC, and as of this draft, whatever date it is in

21  June, it's now NewCo; is that right?

22                    MR. GILES:  Objection, form.

23                    THE WITNESS:  I should answer though?

24                    MR. GILES:  Yeah, yeah.

25       A.    That's what it looks like.

Jason Goldstein
May 16, 2019                                                    89

```
 1        Q.    (By Mr. Broughton)  Okay.  So, as of -- as of
 2   this date -- and do you know where -- where the -- and
 3   if you look in there, there's red lining that's --
 4   that's kind of this maroon color --
 5        A.    Uh-huh.
 6        Q.    -- and there's also this kind of a turquoise
 7   color.
 8        A.    Yeah.
 9        Q.    Do you remember whose was who?
10        A.    No.  I'm -- I don't -- I don't even know if
11   these changes were made by GCAC or Vitol.
12        Q.    Okay.  So, from your understanding, at least as
13   of whatever the date of this particular markup is on
14   Exhibit 23 --
15        A.    Uh-huh.
16        Q.    -- the decision had been made that it would be
17   between NewCo and Vitol; is that right?
18        A.    You're saying the decision.  You mean a
19   joint GCAC/Vitol -- or GCAC/NewCo on one part and Vitol
20   on the other part decision?
21        Q.    Yes.
22        A.    I don't know whether or not that was ever
23   confirmed.  I know that AJ discussed that with somebody
24   at Vitol.  I can't tell you that definitively they said,
25   yes, go ahead or whether they just said put it in there
```

Jason Goldstein
May 16, 2019                                               90

 1   and we'll talk about it.  I -- I don't know.

 2       Q.   So, if we look at Page 16, there towards the

 3   very end --

 4       A.   Uh-huh.

 5       Q.   -- the signature line is for NewCo, and then it

 6   says, Agreed for the sole purpose of Section 1-B, and

 7   there's GCAC's signature line.  Do you see that?

 8       A.   Uh-huh.  Uh-huh.

 9       Q.   Do you recall why -- why that was proposed?

10       A.   Yes.  Because GCAC has held the terminal lease

11   in Mobile, and GCAC was going to give short-term

12   assignments at that lease to Vitol so the oil being

13   stored in tank could be Vitol's.  And GCAC had the right

14   to do that.  NewCo did not.

15       Q.   Okay.  Other than that particular -- at least

16   as of the date of this draft, to your understanding,

17   did -- would -- would GCAC as an entity have had any

18   other obligation under this other than what you just

19   explained is the reason for this signature line, Section

20   1-B?

21       A.   I would really want to read this document again

22   to answer that.

23       Q.   Sure.

24       A.   Okay.  (Witness peruses document.)  Would you

25   mind asking me the question again?

Jason Goldstein
May 16, 2019                                          91

1      Q.    Sure.  So, you explained about why there was

2   a GCAC signature line on Page 16.  And it says, Agreed

3   for the sole purpose of Section 1-B, right?  And I asked

4   you, from your understanding, other than what's

5   referenced here in Section 1-B, would GCAC have had any

6   other obligations under this -- this draft as -- as set

7   forth here?

8      A.    I suppose the answer to that is no.  Can I

9   elaborate on my last answer or is that not appropriate?

10     Q.    Sure.

11     A.    I think that almost certainly had we gone

12  forward and done this, that GCAC and NewCo would have

13  had a management services agreement or something of the

14  like, because there was never an intention for everybody

15  to stop working at GCAC and start working at NewCo from

16  an employment standpoint.  So, that would have

17  necessitated a management services agreement between the

18  two entities.

19     Q.    Okay.  Do you know if Exhibit 23 was the last

20  draft that was exchanged either one way or the other?

21     A.    I don't think so.

22     Q.    Okay.

23     A.    I know there was a draft sent by Vitol to GCAC

24  on either July 12th or July 13th and I believe that's

25  the most recent draft, but I guess I don't have

Jason Goldstein
May 16, 2019                                    92

```
 1   definitive knowledge that's the case.

 2       Q.   Okay.

 3                 (Exhibit Number 24 was marked for

 4                 identification)

 5       A.   (Witness peruses document.)  Okay.

 6       Q.   (By Mr. Broughton)  So, having looked at

 7   Exhibit 24, which is the July 12th, 2017 draft, the

 8   coversheet says it's from Ernie Kohnke to Dave Hubenak.

 9   And it says, Dave, attached is the further revised JSMA

10   between Vitol and NewCo.  Do you see that?

11       A.   Uh-huh, yes.

12       Q.   To the best of your recollection, you believe

13   this was the last draft that went back and forth?

14       A.   I believe July 12th was authored -- I think

15   what the back of it said -- the draft I reviewed was red

16   lined.

17       Q.   Okay.

18       A.   This is clean.  But I believe July 12th was the

19   last draft that was sent by a party to another party.

20       Q.   All right.  And were you looking at each draft

21   and the red lines?

22       A.   Yes.

23       Q.   And Mr. Brass was as well?

24       A.   He tended to maybe take a last look after I had

25   made comments or -- myself and the outside counsel made
```

Jason Goldstein
May 16, 2019                                                          93

1    comments.  He might take a last look at the -- at our

2    comments to the red line.

3        Q.    And just as we looked at a minute ago, if we

4    look at the signature page -- this time it's on Page

5    14 --

6        A.    Uh-huh.

7        Q.    -- it has the similar, Agreed for the sole

8    purpose of Section 1-B or GCAC, right?

9        A.    It looks the same.

10       Q.    And would your answer be the same as the last

11   draft that -- that the -- this would be the only

12   obligation of GCAC except that you would foresee GCAC

13   and NewCo doing a management services agreement?

14       A.    I believe that's right.

15       Q.    You had said earlier that -- well, let me ask

16   you this:  Do you think any -- an agreement was

17   finalized and agreed to by both parties?

18                 MR. GILES:  Objection, form.

19       A.    I believe that the substantive economic

20   material terms were agreed to, and the parties started

21   operating under that premise.

22       Q.    (By Mr. Broughton)  Okay.  And which parties

23   are you referring to?

24       A.    Vitol and GCAC.

25       Q.    And when do you believe that -- did you say

Jason Goldstein
May 16, 2019                                              94

1   substantive agreement?  Is that what you said?

2       A.   Substantive terms.

3       Q.   Okay.  And when do you believe that substantive

4   terms were agreed to by GCAC and Vitol?

5       A.   My -- my recollection is that the last draft

6   that occurred before July 1st was on June 23rd, as I

7   remember; and then the three parties decided they were

8   just going to go ahead and start transacting July 1st

9   and not deal with the documents until after that.

10      Q.   And tell me about how -- that decision you just

11  described.

12      A.   I believe it was solely made between -- I can't

13  speak to the other parties' decision process but from my

14  perspective between AJ Brass on behalf of GCAC, Patrick

15  Perugini on behalf of Rio, and Eric Kuo on behalf of

16  Vitol deciding to do that.  As a former investment

17  banker, I prefer signed documents.

18      Q.   And -- and your -- the basis for your

19  explanation that you just gave us was something

20  Mr. Brass told you; is that right?

21      A.   Yes.  We were -- everybody was ready to just do

22  the deal as is, finish the details later.

23      Q.   Okay.  And did you have a similar discussion

24  with Mr. Perugini about that or was it only Mr. Brass?

25      A.   I may have.  I don't recall a discussion that I

Jason Goldstein
May 16, 2019                                                 95

 1    had to directly with Mr. Perugini.  I may have.

 2        Q.   Okay.  Did you have a discussion with anybody

 3    at Vitol or was it just Mr. Brass telling you this?

 4        A.   I don't think between June 23rd and July 1st, I

 5    was involved in discussions with Vitol about that.   I

 6    was talking to Patrick more frequently because he was

 7    also a partner that was coming to GCAC.

 8                    MR. BROUGHTON:  Take a little break here.

 9                    MR. GILES:  Sure.  Sure.

10                    THE VIDEOGRAPHER:  We're off the record at

11    1:33.

12                    (A recess was taken from 1:33 p.m. to 1:53

13                    p.m.)

14                    THE VIDEOGRAPHER:  We are on the record at

15    1:53.

16        Q.   (By Mr. Broughton)  So, just before the break,

17    Mr. Goldstein, you were telling us that Mr. Brass had

18    told you that -- if I -- correct me if I'm wrong.  I

19    think between June 23rd and July 1st, that there had

20    been kind of a three-way agreement reached regarding

21    kind of the subject matter of these drafts we've been

22    looking at, right?

23        A.   Yes.

24        Q.   Okay.  And you don't know exactly which day but

25    one of those days they made an agreement.  Is that --

Jason Goldstein
May 16, 2019                                                    96

1      A.    It's -- it's possible it had been done or those

2    conversations possibly started before the 23rd, but it

3    was somewhere in that late June period.

4      Q.    Okay.  And did you understand that the terms

5    of -- of this agreement that Mr. Brass told you about

6    was essentially these -- these same terms we've been

7    looking at, about a 50/50 split for two years regarding

8    this plan?

9      A.    Those -- those general terms are my belief of

10   what they were entering into.

11     Q.    Okay.  So, any other terms that you recall or

12   is it -- well, you tell me what terms you recall were

13   part of this agreement that was reached prior to July 1.

14     A.    This may not be a conclusive list.

15     Q.    Okay.

16     A.    But there would be essentially a share of

17   profits and losses.  In that P&L would be tank rental,

18   some of the personnel which is that -- I believe Exhibit

19   A to the document we just looked at of GCAC.  I believe

20   that Vitol was going to allocate a portion of overhead

21   for its back office to the -- the book, to the P&L.  The

22   P&L would have all purchases and sales and shipping

23   costs and demurrage costs and inspection costs.  And

24   then those would be shared 50/50, the -- whether it was

25   plus or negative.  That was my belief.

Jason Goldstein
May 16, 2019                                                    97

```
 1        Q.   Okay.  And in looking at this July 12th, was

 2   there anything --

 3        A.   This one?

 4        Q.   Yeah, sorry.

 5        A.   Sure.

 6        Q.   I can't see the exhibit labels that far.

 7        A.   Yeah.

 8        Q.   But looking at July 12th, any material terms

 9   change in these subsequent drafts, to your knowledge?

10        A.   I'm sorry.  You're saying between this draft

11   and this draft or between this draft and what actually

12   occurred?

13        Q.   In the agreement that you described that

14   Mr. Brass told you about that was reached before July 1.

15        A.   Okay.

16        Q.   All right.  We'll -- we'll start with -- with

17   this one that's Exhibit 23.

18        A.   Yes.

19        Q.   Okay.  Which has a June date.

20        A.   Okay.

21        Q.   I mean, is it your understanding that this

22   agreement that you -- that Mr. Brass told you about that

23   was reached prior to July 1, is it your understanding

24   the material terms would -- would be the same as those

25   set forth here in Exhibit 23?
```

Jason Goldstein
May 16, 2019                                              98

```
 1        A.    I would want to read this entire document.
 2   I -- I -- the last draft I remember is June 23rd --
 3        Q.    Okay.
 4        A.    -- before -- before the July 12th draft.  I
 5   don't know that this -- this doesn't say the date.
 6        Q.    Okay.
 7        A.    So --
 8        Q.    Let's skip that one and talk about the
 9   July 12th one.
10        A.    Okay.
11        Q.    All right.
12        A.    So, the thing I remember about July 12th, which
13   was a Vitol term --
14        Q.    Okay.
15        A.    -- Vitol draft -- again, I just read the red
16   line -- was that -- and I -- and I e-mailed our team to
17   take note of this, that Vitol did not red line it off
18   the previous draft we had sent them; but they red lined
19   off a previous draft they had sent us.  So, it was kind
20   of confusing to track those red lines because we weren't
21   dealing with a sequential draft.  Does that make sense?
22        Q.    Uh-huh.
23        A.    So, again, I could -- I could read the whole
24   thing.  But this is -- I don't know that this is exactly
25   what I looked at or not --
```

Jason Goldstein
May 16, 2019                                                      99

 1      Q.   Okay.

 2      A.   -- previously.

 3      Q.   And, again, are we talking about the material

 4   terms, what you would consider to be material terms.

 5             And just so the record's clear, you're

 6   looking at exhibit number what?

 7      A.   24.

 8      Q.   24.

 9      A.   (Witness peruses document.)  I'm not sure that

10   what you said is correct.

11      Q.   Okay.

12      A.   The first thing --

13      Q.   I wasn't saying.  I was just asking.

14      A.   Sure.  Sure.  The first thing -- I'm only on

15   Page 3.

16      Q.   Okay.

17      A.   The first thing that I found that seems to be

18   inconsistent with my understanding was the trade team

19   personnel, which we've reviewed, the five employees that

20   came out to a total of 1.275 --

21      Q.   Uh-huh.

22      A.   -- after taking into account benefits was

23   supposed to have been -- and the reason it was exhibited

24   in this agreement or scheduled in this agreement, it was

25   supposed to be a cost of the book and GCAC was supposed

Jason Goldstein
May 16, 2019                                                    100

```
 1   to be reimbursed for.  That would, therefore, be a cost

 2   of the book, and ultimately GCAC would still pay half of

 3   it, if that makes sense.

 4               In this draft that I'm reading now, it

 5   says that the trade team -- those five people are

 6   scheduled here but that GCAC is solely responsible for

 7   that.  And so, I don't know if that's a change Vitol

 8   made on July 12th or -- but that is the first thing

 9   that's different than my understanding.

10   Q.   Okay.

11   A.   I believe that would be part of the cost of the

12   book.

13   Q.   Okay.

14   A.   I could continue if you want me to.

15   Q.   Yeah, that would be great.

16   A.   (Witness peruses document.)  There's an

17   inconsistency.

18   Q.   Okay.

19   A.   So, I just told you what I said about those are

20   solely GCAC's costs, but at the end of the page it says

21   that --

22   Q.   End of page what?

23   A.   3.

24   Q.   Okay.

25   A.   Same page.  At the end it says Vitol was to
```

Jason Goldstein
May 16, 2019                                    101

1   reimburse those trade team personnel salaries costs.

2   So, that just seems to not jive there.

3        Q.   Okay.

4        A.   So, what -- what I'd say is with the exception

5   of the trade team personnel I just discussed --

6        Q.   Yeah.

7        A.   -- with the caveat that since I'm not looking

8   at a red line, if there was an entire section deleted, I

9   wouldn't know it.  But given what I'm reading, it looks

10  like the substantive terms.

11       Q.   Okay.  All right.  And so, none of these

12  agreements got to the point -- or these drafts got to

13  the point where people were actually signing documents,

14  right?

15       A.   Correct.

16       Q.   Okay.  You've touched on this earlier with

17  regard to VALT, but did you actually talk to anybody at

18  Vitol about -- well, tell me what happened, to your

19  recollection, after this July 12th draft was circulated.

20  What was the next significant thing that happened?

21       A.   The only thing I recall is that we were having

22  trouble making progress on progressing the legal

23  document with Vitol, and I started to be concerned that

24  we had a problem.  I -- I suspected it might be VALT

25  related, but I'm not sure I knew it initially.

Jason Goldstein
May 16, 2019                                                        102

```
 1        Q.   All right.  And did you ever have a discussion
 2   with anybody at Vitol about VALT at this point?
 3        A.   I did not.
 4        Q.   Okay.  And was it Mr. Brass who did?
 5        A.   Yes.
 6        Q.   And then he reported it to you?
 7        A.   Correct.
 8        Q.   And what did he report to you?
 9        A.   Initially he reported that VALT was unhappy or
10   there was an issue with VALT, but I and the rest of us
11   at GCAC rest assured that Vitol's got it.  We'll take
12   care of it.  That was what was reported back to me.
13        Q.   Okay.
14        A.   And that was kind of the consistent message for
15   at least two or three weeks, I believe.
16        Q.   That Mr. Brass was telling you he was hearing
17   from who at Vitol?
18        A.   Eric Kuo.
19        Q.   Okay.
20             (Exhibit Number 25 was marked for
21             identification)
22        Q.   (By Mr. Broughton)  Mr. Goldstein, do you
23   recall what's been marked as Exhibit 25?
24        A.   I don't recall it, but it looks -- again, it
25   looks like something that -- I'm not surprised by it.
```

Jason Goldstein
May 16, 2019                                                    103

1      Q.   Sure.  And this is July 28th.  So, this is a

2  couple of weeks after the last -- the July 12th draft

3  that we looked at, right?

4      A.   Uh-huh.

5      Q.   So, what -- what -- I take it you were going on

6  vacation or out of town somewhere?

7      A.   Correct.

8      Q.   So, explain what this is that's number two,

9  Vitol JMA related items, payment of July fixed

10 costs/reimbursement of freight.  What are you -- what

11 were you talking about there?

12     A.   Sure.  So, just going line by line, 2a, payment

13 of July fixed costs/reimbursement of freight.  In the

14 agreements we just talked about, Vitol was to reimburse

15 the Mobile tank lease costs as well as the trade

16 personnel.  So, we invoiced -- GCAC invoiced Vitol for

17 that for June and for July.  Vitol paid the tank costs

18 for June but not the personnel costs, and my

19 recollection is they also paid the tank costs for July

20 but not the personnel costs.

21            What I was hearing, again from AJ, was

22 they're working through issues and when they work

23 through those issues, they'll true the rest of that up.

24 But that was on my list of things to make sure we were

25 addressing.  I am guessing that reimbursement of freight

Jason Goldstein
May 16, 2019                                              104

1    had to do with one of the initial shipments where we may

2    have actually done the sale instead of Vitol and

3    incurred freight costs, which in the normal course,

4    again, Vitol would be expected to reimburse and then

5    that would go as a cost to the book that would then be

6    later shared.  So, that's what I think 2a means.

7                 2b I think just means we need to get this

8    document completely finalized and executed.

9                 2c clearly I was -- even though we were

10   already transacting as GCAC, still hopeful of setting up

11   this Hermosa structure in which case we would have

12   needed to have GCAC sublease to Hermosa and then Hermosa

13   to Vitol, but that never happened.

14                2d, meeting with Vitol accounting and ops

15   is just more of a back office meeting about how they

16   were recording all of the transactions, how they were

17   reporting it, making sure we had good communication flow

18   bilaterally.

19      Q.    So, Vitol was supposed to be the one doing the

20   accounting, keeping the accounting records?

21      A.    For the book, yes.

22      Q.    Okay.

23      A.    Yes.

24                Setting up Hermosa bank account,

25   consistent with 2c, I was -- I was still hopeful of

Jason Goldstein
May 16, 2019                                              105

```
 1    doing this as a Hermosa thing.

 2               And 2f, as we -- as we mentioned before

 3    the last break, if we did all this, we would need a

 4    management services agreement between Hermosa and GCAC

 5    so GCAC could still provide the services, just through

 6    Hermosa, if that makes sense.  And then obviously we

 7    were in late July.  So, this had been going on for about

 8    two months.  We had not received, to my knowledge,

 9    profit and loss statement or hedge position reports.

10    So, I stated we needed to start getting that information

11    from Vitol, which I -- I think the JMA outlines

12    receiving once a month I believe.

13        Q.   Did anyone start drafting a management services

14    agreement?

15        A.   I don't recall that ever starting, no.

16               (Exhibit Number 26 was marked for

17               identification)

18        A.   (Witness peruses document.)

19        Q.   (By Mr. Broughton)  Let me know when you're

20    ready to talk about 26.

21        A.   Okay.  I'm ready.

22        Q.   Okay.  Do you remember ever seeing what's been

23    marked as Exhibit 26 before?

24        A.   I -- I vaguely recall that I probably put this

25    together.
```

Jason Goldstein
May 16, 2019                                                    106

1     Q.    So, you think you put it together?

2     A.    I think so.

3     Q.    Okay.  And what was the purpose of you putting

4  this together on August 21st, 2017 entitled Vitol

5  interim financing structure bullets?

6     A.    I believe that Vitol had indicated that they

7  wanted to change our relationship from what we had just

8  talked to about to a -- more of a financing structure,

9  which what I mean by that is I believe they wanted to

10  start having GCAC retain a hundred percent of the

11  profits or losses and have Vitol just receive an

12  interest rate for capital -- working capital provided.

13  And so, I think we went back and started evaluating

14  structures I found to do that.

15             It looks like -- it looks like that was

16  contemplated for the asphalt piece but still a 50/50

17  relationship for the non-asphalt businesses we were

18  pursuing.

19     Q.    So, if I understand you correctly, this was --

20  was this your analysis about this proposed financing or

21  I mean --

22     A.    I don't think I'd describe it as analysis.  I

23  think there was a meeting or a phone call where we were

24  told -- this is by Vitol.  This is how we want to do it.

25  Specifically what I mean by that is not sharing in the

Jason Goldstein
May 16, 2019                                              107

1   profits or losses of the asphalt business anymore.

2       Q.   So, not doing the JMA.

3       A.   Well, a lot of the pieces would still be the

4   same but not -- not sharing 50/50 in the profits and

5   losses.

6       Q.   Okay.

7       A.   At least that's what they -- that's what they

8   wanted to stop doing.  And so, we kind of went back and

9   said -- it looks like we were kind of assessing how that

10  would work, and this is, I guess, a summation or

11  thoughts around that.

12      Q.   And so, did you say this was on a telephone

13  call?

14      A.   I thought I remembered an in-person meeting,

15  but I -- I remember being later than August 21st.  So,

16  I -- I can't really remember.

17      Q.   Okay.  So, you don't remember one way or the

18  other.  It could have been on the phone.  It could have

19  been in person.

20      A.   There was an in-person meeting --

21      Q.   Okay.

22      A.   -- that I recall, but maybe this happened

23  before that meeting, they started talking about the

24  financing structure.  I don't remember it happening

25  quite this early, but it doesn't mean it didn't.

Jason Goldstein
May 16, 2019                                              108

```
1      Q.   All right.  And we'll get to the in-person
2  meeting in a second.
3               Do you remember ever being on a phone call
4  with anyone from Vitol where these concepts were
5  discussed?
6      A.   No.
7      Q.   Okay.  So, tell me what you recall about this
8  in-person meeting.
9      A.   I recall a meeting that had at the meeting --
10 there may have been other people as well, but I recall
11 myself, AJ, Eric Kuo, Chris Bake and Mike Loya.  And
12 essentially the -- the message from Vitol to us was
13 this -- this isn't going to be able to continue in the
14 current form, and GCAC and VALT weren't able to reach a
15 meeting of the minds of how they could work together.
16 So, Vitol needed to switch this to a financing
17 structure.  And what -- what they meant by that, I
18 believe, is a deal where GCAC no longer has Vitol
19 sharing 50/50 in the profits or losses.
20     Q.   And do you remember where this meeting was?
21     A.   At Vitol.
22     Q.   Okay.  And any idea approximately how long it
23 lasted?
24     A.   I mean, it wasn't -- it was certainly not a
25 half day or anything.  Maybe -- maybe 45 minutes, I'm
```

Jason Goldstein
May 16, 2019                                    109

1    guessing.

2         Q.   And from your side you're -- you're confident

3    it was just you and Mr. Brass?

4         A.   I'm not confident.  That's -- that's what I

5    remember.  If anybody else were there, it probably would

6    have been Patrick, but I can't recall.

7         Q.   All right.  And -- and when you use this term

8    interim transaction what did -- what did you mean by an

9    interim transaction?

10        A.   Part of what was discussed at that meeting was

11   they wanted to switch to this non-50/50 structure as a

12   stop gap, and they were, much like Rio, asked to get out

13   of their situation.  Vitol asked us to find a

14   replacement partner for them.  And so, I think interim

15   meant from, you know, this time where they told us they

16   couldn't do 50/50 anymore until we found a new partner.

17        Q.   What's set forth here in Exhibit 26, is this

18   how things played out?

19        A.   I don't know.  What I can tell you is that no

20   deals were ever done outside of asphalt with Vitol.  So,

21   the last section is -- did not play out because it's --

22   nothing's applicable to that.  And as far as -- the

23   first section did not play out at all.  So, Vitol was

24   going to purchase Rio's -- effectively their goodwill in

25   the business and -- and hold that for us such that when

Jason Goldstein
May 16, 2019                                                    110

```
 1   we found a new partner, we could, as it says here, buy
 2   that at the same price and use that as negotiation with
 3   the new partner, and Vitol did not end up transacting
 4   with Rio on that.  So, the first and third never
 5   happened.  I guess I would say the first never happened
 6   and the third section was irrelevant.
 7                   And the second, I truly mean I don't know.
 8   So, we continued to operate the business the same way we
 9   had the day before that meeting; and since we never got
10   any profit or loss calculation from Vitol, we were just
11   going about buying and selling oil.  We didn't change
12   our operations at all.
13       Q.    So, was Vitol providing credit and providing
14   cash?
15       A.    Well, not cash.
16       Q.    Okay.
17       A.    So, it was not a loan in the sense that we
18   couldn't go ask for a hundred dollars for Vitol for
19   operations.  They purchased and held most of the
20   inventory, and they carried some of the receivables.
21   And then they were paying Rio -- I don't know if they
22   were paying current or at the end -- but they paid Rio
23   for all the terminaling costs in Corpus Christi.  And as
24   I mentioned, they paid GCAC for the terminaling cost in
25   Mobile but only for June and July.
```

Jason Goldstein
May 16, 2019                                                    111

1      Q.   You probably said this earlier.  But how long

2    have you been working in the asphalt market?

3      A.   Well, I started working with GCAC as a client,

4    not as an employee but as a client when I was at Blossom

5    Street probably dating back to the 2005 or 2006 time

6    frame.  And then I joined GCAC as an employee in 2010;

7    but at that time, GCAC had several businesses besides

8    just asphalt or several business lines I should say.

9      Q.   And when did GCAC go to just asphalt, if you

10   recall?

11     A.   We sold the assets in 2013.  So, prior to that,

12   we were storing crude oil.  We were storing methanol,

13   distinct other products.  I can say that after '13, it

14   became more -- we didn't have that storage.  So, it

15   became more of an asphalt marketing and trading

16   business, but we may have done some stuff in -- in fuel

17   and heavy crude during that time.  Excuse me.  We also

18   through a subsidiary did some trading in light crude.

19     Q.   How is the asphalt market doing today?

20     A.   It is -- prices are strong.  I mean, right at

21   today prices are strong and demand is ironically a

22   little weak which doesn't really match up with strong

23   prices, so -- we were just talking about that yesterday.

24   It's kind of a weird -- a bit of a weird time right this

25   second.

Jason Goldstein
May 16, 2019                                                    112

1      Q.    How long has that been going on?

2      A.    It really changes week to week.  I'd say

3  asphalt pricing has been heading in an upward direction

4  for some number of months.

5      Q.    So, for most of 2019?  Some of 2018 maybe?

6      A.    I would say at least two or three months.  I

7  don't know if it's all of '19.

8      Q.    And you may have touched on this earlier.  So,

9  other than the Mercuria agreement -- and we do actually

10  have a copy of that Mercuria agreement --

11     A.    Okay.

12     Q.    -- what other lines of businesses is GCAC doing

13  today?

14     A.    Today -- today none.  There have been -- since

15  the start of the Mercuria agreement, there were a couple

16  of small transactions done with -- in Canadian crude

17  where we effectively because Mercuria did not have an

18  interest in doing that with us as trader.  We just --

19  since we -- since Patrick put the deal together, we

20  brokered it.  It was minor.  Other than that, it's just

21  the Mercuria business.

22     Q.    So, with respect to -- and we looked at that

23  interim financing August 21, 2017 kind of outline.

24     A.    Uh-huh.

25     Q.    GCAC has been invoicing Vitol in the past

Jason Goldstein
May 16, 2019                                                    113

```
 1   for -- for some of these transactions, right, like, back
 2   -- back in 2017 for the trades that were being done,
 3   right?
 4        A.    If -- if we sold material to Vitol, I guess --
 5        Q.    Yeah.
 6        A.    -- we would have invoiced, I'm sure.
 7        Q.    Right.
 8        A.    I don't recall.  I know we did invoice again
 9   for the trade team salaries and for the Mobile tank
10   expense, the first two months; and then we were told
11   don't -- don't invoice us anymore.  Or I -- I should
12   rephrase.  I was told that by AJ that he was told that.
13        Q.    Okay.  So, I mean, would you have personally
14   had any role in -- in the invoicing?
15        A.    Only to instruct somebody to send out an
16   invoice.
17        Q.    Okay.  And that would -- you would --
18        A.    And if it was a trade-related invoice, then I
19   might not be involved in that.  That might come from a
20   trader.
21        Q.    Okay.  So, the only invoicing you would have
22   been involved in would have related to personnel and
23   share of expenses?  Is that -- I just want to get an
24   idea of what your personal involvement --
25        A.    The only --
```

Jason Goldstein
May 16, 2019                                                    114

1     Q.    -- would have been.

2     A.    The only invoicing that I recall instructing

3  our accounting department to send to Vitol would have

4  been related to the -- to Mobile tank reimbursement and

5  trade team salary reimbursement for June and July only.

6                    (Exhibit Number 27 was marked for

7                    identification)

8     A.    (Witness peruses document.)   Okay.

9     Q.    (By Mr. Broughton)   All right.   Tell us what

10  Exhibit 27 is to the extent you know.

11     A.    It looks like a late September e-mail from me

12  to accounting instructing our accounting department to

13  invoice Vitol for October tank rental.   I am not sure if

14  we ended up sending that or not.   I know that they never

15  paid October tank rental.

16     Q.    I don't think we -- we talked about your

17  description of the difficulty in asphalt hedging.   I

18  don't think you really told us.   How does one hedge an

19  asphalt trade?

20     A.    Well, the way that -- since we've been hedging,

21  which during the first number of years that I was

22  at GCAC, there was no hedging.   We just bought product

23  and sold product and didn't attempt to put on a

24  financial hedge.   I believe the financial hedging

25  started with Rio.   And since that time, we will sell

Jason Goldstein
May 16, 2019                                                    115

```
 1   little short some number of fuel oil barrels based on

 2   the number of asphalt barrels that we have in physical

 3   storage or physical -- physical commitments to purchase.

 4              At times it's a hundred percent, so, a

 5   hundred barrels owned, a hundred barrels of fuels

 6   shorted.  At times with Mercuria we -- we vary from that

 7   significantly based on a variety of factors.  It's more

 8   customized, I guess.

 9        Q.   Is there a perfect asphalt hedge?

10        A.   I don't think so.

11        Q.   Okay.  If you were provided a specific price

12   and quantity, could you come up with a proper asphalt

13   hedge?

14        A.   No.  I think the only way to -- sorry.

15   Specific price and quantity for us to purchase asphalt?

16        Q.   Uh-huh.

17        A.   And how to hedge it?

18        Q.   Right.

19        A.   No.  I think the only thing you can do that

20   securely is have a matching sales agreement that either

21   ties fixed price to fixed price or fuel oil differential

22   to fuel oil differential.  But if just have a price in

23   dollars and you don't have a sale that's contracted at

24   the same time, I think you're -- you're exposed to price

25   risk.
```

Jason Goldstein
May 16, 2019                                                    116

1      Q.   And I may have asked you this earlier.  But did

2   you have involvement in -- in hedging GCAC's asphalt

3   trades or did you leave that to the traders?

4      A.   The traders would do the hedging.  I would

5   sometimes get involved in -- in more of a big picture

6   analysis of what we should be doing.  For example, I

7   once tried to do analysis to see if we altered the

8   percentage of barrels that we hedged based on the

9   relative prices at the time of fuel to asphalt.  The

10  theory was if asphalt was significantly underpriced

11  relative to fuel, do you short more barrels here then

12  not short as many barrels when asphalt is -- and I would

13  do analyses like that.  But to your question before, I

14  could never come up with something that felt like we

15  were really well hedged.  Day-to-day, you know, hedge

16  50 -- 50 lots, 5,000 barrels, I wouldn't get involved in

17  that.

18     Q.   Who is Marc Horowitz?

19     A.   Marc Horowitz is a friend of AJ's who I know

20  and -- and have come to know through AJ.  He is a former

21  trader.  I'm not sure if he was with Vitol or somewhere

22  else.  I don't recall.  He's a former trader I believe

23  now semi-retired.  And we -- as we were doing some of

24  these more esoteric analyses of how do we come with a

25  better hedging mechanism, he helped us think about some

Jason Goldstein
May 16, 2019                                                117

```
 1   of that stuff, just pulling another brain into that
 2   analysis.  He wasn't paid.  He just did it as a friend.
 3                 (Exhibit Number 28 was marked for
 4                 identification.)
 5                 (Discussion off the record for less than
 6                 one minute.)
 7        A.    (Witness peruses document.)  Okay.
 8        Q.    (By Mr. Broughton)  Do you recall that
 9   particular e-mail?
10        A.    I don't recall the e-mail, but I remember
11   speaking to him and I remember the lunches at Roka Akor
12   that's referenced at the top of the e-mail.
13        Q.    If you look through here, you say a lot of
14   optimization could be done --
15        A.    Uh-huh.
16        Q.    -- for our hedging.  What -- what did you mean
17   by that?
18        A.    So, to this point in time -- and actually it's
19   still true today -- the only hedging that's been done is
20   shorting fuel, just one thing.  AJ brought in Marc
21   because he thought he was a good person to strategize
22   and Marc thought perhaps there was a -- through a
23   combination of shorting as well as options and of using
24   crude oil in addition to fuel oil, that maybe there was
25   potentially a better match or hedge to asphalt.
```

Jason Goldstein
May 16, 2019                                                    118

 1      Q.    That -- that was his thought.

 2      A.    A potential thought.  I mean, he never -- those

 3  are analyses that never kind of got vetted out, but he

 4  said maybe.

 5      Q.    Okay.

 6      A.    He thought it was worth looking at.

 7      Q.    Did you just talk to him that one time or do

 8  you think there were several discussions?

 9      A.    We -- we definitely had at least two lunch

10  meetings I can remember and probably a couple other

11  calls beyond that.

12      Q.    Do you recall ever talking to him about the

13  hedges that Vitol was performing at GCAC's direction?

14      A.    Only that we --

15            MR. GILES:  Objection, form.

16      A.    The only thing we had talked about is what we

17  had done historically in the business, whether it be

18  Rio, Vitol, Mercuria, which was shorting fuel oil.

19      Q.    (By Mr. Broughton)  And you don't remember who

20  he used to work for?  I think you said you...

21      A.    I don't recall, no.  He was a successful

22  retired trader, retired young.

23      Q.    Yeah.  So, how did the business with Mercuria

24  come about?

25      A.    So, Mercuria through Pin Oak Corpus Christi was

Jason Goldstein
May 16, 2019                                                    119

1    a purchaser of the facility in Corpus where we were

2    operating as an -- as an asphalt tenant.  I know I'm

3    bound by confidentiality to talk about some of

4    Mercuria's strategies.  I don't know how to handle that.

5    But --

6        Q.   I don't feel like I'm asking about their

7    strategy right now.  I was just really -- how did -- how

8    did the Mercuria --

9        A.   Okay.

10       Q.   -- come about.

11       A.   So, they -- they bought that facility or a

12   portion of it, and they wanted to talk to us about

13   partnering with them on the asphalt business there.

14       Q.   Okay.  And did they approach you or Mr. Brass

15   or who?

16       A.   I believe they approached Rio because they

17   bought the facility.  And if you recall, I talked

18   earlier about how Rio as a stop gap was the leaseholder

19   in Corpus and would do buy-sells with Vitol on barrels

20   that came in and out.  And so, when Mercuria bought the

21   facility, all they saw was the lease was a lease to Rio.

22   So, they approached Rio.

23       Q.   Okay.  And so, were you involved in

24   negotiations with Mercuria that led to the agreement

25   between GACA [sic] and -- and Mercuria?

Jason Goldstein
May 16, 2019                                                    120

1      A.   Yes.

2      Q.   Okay.  And who -- who were you dealing with on

3   the Mercuria side?

4      A.   We -- we dealt primarily with Brian Falik and

5   Maurice Harari.

6      Q.   Do you want to spell those for her while we're

7   here?

8      A.   Sure.  Brian is i-a-n, the normal way.  Falik,

9   F-a-l-i-k.  Maurice is M-a-u-r-i-c-e, and I believe it's

10  H-a-r-a-r-i, but I can -- I can check when we get to a

11  break.

12              I will say that even more so than during

13  the Vitol early stage negotiations, AJ handled most of

14  major commercial terms himself.

15     Q.   I presume you were looking it over and things

16  like that?

17     A.   Uh-huh.

18     Q.   Okay.

19              (Exhibit Number 29 was marked for

20              identification.)

21     Q.   (By Mr. Broughton)  I'm going to hand you

22  Exhibit 29.

23     A.   (Witness peruses document.)  I assume this is

24  the executed?

25     Q.   Yeah.  I think if you look at --

Jason Goldstein
May 16, 2019                                                   121

 1      A.    Yeah, okay.

 2      Q.    -- Page 39, there's Mr. Brass' signature.   And

 3  then there's a variety of other --

 4      A.    Right.

 5      Q.    -- signatures on some of the exhibits like Rio

 6  and Gravity and --

 7      A.    Okay.

 8      Q.    -- and others, right?

 9      A.    Yes.

10      Q.    Okay.   So, you have -- you are familiar with --

11  with this marketing agreement --

12      A.    Yes.

13      Q.    -- between -- yeah.   And is it till in effect

14  today?

15      A.    Yes.

16      Q.    And I know you referenced perhaps some

17  negotiations for an amendment.   But had those -- has it

18  been amended yet?

19      A.    No.

20      Q.    Okay.   So, it's still currently in effect as is

21  set forth here on Exhibit 29?

22      A.    I believe so, yes.

23      Q.    All right.   And how much day-to-day involvement

24  do you personally have in performing GCAC's obligations

25  under this Mercuria agreement?

Jason Goldstein
May 16, 2019                                          122

1       A.   I would say very little on a day-to-day basis.

2       Q.   Okay.  So, what is -- what -- what is your

3  involvement with it?

4       A.   Well, it would be more on larger strategy, for

5  example, amendments; if we're looking to take out a new

6  tankage position.  What I mean by that is an additional

7  lease of tankage, I might look at that.  On a day-to-day

8  basis what happens is purchasing and selling of products

9  and hedging.  I did participate in a hedging call last

10 week, but that was more about hedge strategy and not

11 about placing a hedge.  But in terms of buys and sells,

12 I typically am not involved in those.

13      Q.   And who's making the buy and sell decisions?

14      A.   It had been AJ and Patrick and George.  Now

15 that Patrick's gone, it's AJ and George.

16      Q.   What's George's last name?

17      A.   Grace.

18      Q.   Oh, yeah.

19      A.   I would just add to that that Kenny has a

20 influence in those decisions because he is the one that

21 knows how to blend products A and b to make C and how

22 much of each.

23      Q.   Have you ever done any analysis, whether formal

24 or informal, comparing the Mercuria signed contract with

25 a July 12th draft between NewCo and Vitol?

Jason Goldstein
May 16, 2019                                                123

1      A.    Yes.  I have done some comparison of

2   quantitative elements; however, there are some

3   qualitative elements that I wouldn't know how to

4   compare.

5      Q.    Okay.  And so, what quantitative elements do

6   you recall comparing?

7      A.    There was a different profit split between --

8   on one hand GCAC and Vitol, on the other hand GCAC and

9   Mercuria.  50/50 with GCAC/Vitol and about 60/40,

10  Mercuria/GCAC on that one. GCAC no longer has

11  reimbursement of the trade team personnel under that

12  relationship; however, GCAC does get first profits out

13  up to a maximum of 500,000 per quarter.

14     Q.    Did you say per quarter?

15     A.    Yes.

16     Q.    And that's a provision that -- that was not in

17  the --

18     A.    Actually --

19     Q.    -- July 12th draft; is that right?

20     A.    I'm sorry.  I just thought of something else.

21     Q.    Okay.

22     A.    There -- there has been amendment, an amendment

23  to this I forgot about.

24     Q.    Okay.

25     A.    Because that 500,000 a quarter is now a maximum

Jason Goldstein
May 16, 2019                                              124

1   of 450,000 a quarter.

2        Q.   All right.

3        A.   I'd forgotten about that.  That would have been

4   probably amended this past February.

5        Q.   Amended to 450,000?

6        A.   Yes.

7        Q.   Okay.  And why was that amendment made?

8        A.   We engaged in a transaction with a third-party

9   to sell the retail business in Corpus Christi, and there

10  were a number of negotiations and concessions made as a

11  result.

12       Q.   So, back to the quantitative comparison.  So,

13  the July 12 draft was 50/50 and the Mercuria agreement

14  was 60/40, correct?

15       A.   Correct.

16       Q.   You also said under the July 12th draft, GCAC

17  was being -- the trade team was getting some

18  reimbursement for personnel that didn't exist under the

19  Mercuria, right?

20       A.   Correct.

21       Q.   And then one difference, I guess, that was

22  better about the Mercuria was originally GCAC would get

23  first profits up to 500,000 per quarter which has now

24  been amended to 450,000.

25       A.   Correct.

Jason Goldstein
May 16, 2019                                                           125

1        Q.    Any other differences you recall?

2        A.    Yes.  GCAC does not share in losses of the

3   book.

4        Q.    And this Mercuria contract was also for two

5   years?

6        A.    I think it was a bit longer.  I think it goes

7   in -- it went into early 2021.  I have to look.  I

8   believe -- I believe it was roughly three years.

9        Q.    Okay.  Is three -- is a three-year contract in

10  your mind more desirable from GCAC's viewpoint than

11  the -- the two-year discussion with Vitol?

12       A.    I would -- I would say if the -- in retrospect

13  that the -- to the extent that the relationship's

14  working really well, you'd rather be in it -- you'd

15  rather have a longer term commitment.  So, I think, yes,

16  initially that -- that would be the case.  We'd rather

17  have a -- more of a commitment than less of a

18  commitment.  Again, there's been less receptivity to

19  doing non-asphalt activities with Mercuria.  So, that

20  may alter that answer but...

21       Q.    Do you feel like the Mercuria contract has been

22  a profitable one for GCAC?

23       A.    Yes.

24       Q.    And have you done any analysis of the profit?

25       A.    I have.  We get very detailed profit reports

Jason Goldstein
May 16, 2019                                    126

1   from Mercuria daily.  And then I did a -- a very

2   thorough review at the end of 2018 as we were -- we have

3   an annual profit true up, and I was reviewing the

4   numbers in detail at that time.

5       Q.    So, has the Mercuria contract been more

6   profitable than any projections you might have made with

7   regard to the arrangement proposal with Vitol and --

8       A.    And the profit we experienced with Mercuria in

9   2018 was coincidentally very, very consistent with the

10  profit projections we made to Vitol.

11      Q.    And how's it going in 2019?

12      A.    I think it's going similarly well.  However,

13  we've had some internal accounting issues with regard to

14  inventory evaluation where we are not -- it's kind --

15  kind of complicated.  We're not any longer marketing our

16  inventory and tank at asphalt.  We're now putting it at

17  fuel oil prices.  So, we have quite a bit of inventory

18  right now that we believe is severely undervalued.

19              So, if you took that up to what we believe

20  is a market asphalt value, then I think the book would

21  be showing performance consistent to last year.  If you

22  take that dramatically lower value, then it's showing a

23  slight loss year-to-date.  Does that make sense?

24      Q.    Yeah.  I believe it does.

25      A.    Okay.

Jason Goldstein
May 16, 2019                                              127

1      Q.   You know a lot more about it than I do.

2      A.   It doesn't -- it doesn't mean it makes sense.

3      Q.   Do you believe that GCAC would have made more

4   profit under the proposal it was discussing with -- with

5   Vitol than what it's made under the Mercuria contract?

6      A.   It's hard to say.  The hope, certainly and I

7   believe that Eric Kuo's excitement about working with us

8   was less about the asphalt and more about the other

9   lines of business that we were going to do, and that was

10   the reason that Patrick joined our company.  So,

11   I believe had we actively pursued those business lines,

12   not all of which would have happened but some of which

13   would have happened, then it could have been

14   substantially more profitable.  If all we did is

15   asphalt, I don't think it would have been materially

16   different.

17      Q.   So, how -- how would you go about projecting

18   what you believe could possibly have been made under --

19   had that July 12th draft been finalized and signed?

20      A.   Sure.  So, during the negotiations with Vitol,

21   we, GCAC and Patrick, as kind of one unit even though

22   Patrick was still sitting at Rio, put together

23   information for Eric about different lines of business

24   that Patrick intended to pursue and estimated annual

25   margin of each line of business.

Jason Goldstein
May 16, 2019                                              128

```
 1                 So, those were based on a number of
 2     assumptions of margins of the business, costs, cost of
 3     capital, whatnot.  There were my recollection is five or
 4     six new business lines that we were going to consider
 5     pursuing.  And I believe that Eric was more excited
 6     about those than he was about the asphalt business
 7     simply because the asphalt business was relatively small
 8     compared to what Eric's business is at Vitol, to my
 9     understanding.
10         Q.    Okay.  Now, were these what you just told us
11     based on your discussions with Eric or what was told to
12     you by others?
13         A.    I think both.  I -- I'd certainly met with Eric
14     a couple of times in the earlier stages of the
15     negotiations and -- and somewhat -- and somewhat by
16     others, I guess by Patrick.  What I came to believe is
17     that Eric liked these other lines of business but they
18     were too small and too time intensive for him to pursue
19     in his seat at Vitol.  So, having a team on the side to
20     go do these smaller quirkier opportunities was appealing
21     to him.
22         Q.    And -- and if you can, limit to just the -- the
23     conversations or communications, whether it was by
24     e-mail or by telephone or in person just the
25     communications you personally had with -- with Eric Kuo.
```

Jason Goldstein
May 16, 2019                                                          129

1   What do you recall him saying about these other lines of

2   business that were in addition to asphalt?

3       A.   I only recall him being excited about the

4   overall opportunity.  I certainly -- and it could just

5   be we're talking about two years ago.  I just don't

6   remember all the details.  I don't remember him saying,

7   I don't like asphalt and I do like this.  But I think

8   the overall opportunity set was exciting to him.  And I

9   believe -- and maybe he said it directly, maybe not that

10  just asphalt might not have been exciting.  Not because

11  it's not a good business, it's just smaller, maybe not

12  worth the -- the climb.

13      Q.   Okay.  Were these other lines of -- of business

14  discussed in the July 12th draft?

15      A.   I don't think they were in the agreement.  It

16  might -- it might have referenced and other

17  opportunities.  I -- I don't recall.

18      Q.   Okay.

19      A.   But they would not have been delineated or --

20  or scheduled out as here's five new ideas we might

21  pursue.

22               MR. GILES:  Would now be a good time for a

23  break?

24               MR. BROUGHTON:  Sure.

25               MR. GILES:  All right.

Jason Goldstein
May 16, 2019                                              130

```
 1                THE VIDEOGRAPHER:  We're off the record at

 2    2:57.

 3                     (A recess was taken from 2:57 p.m. to 3:18

 4                p.m.)

 5                THE VIDEOGRAPHER:  We're on the record at

 6    3:18.

 7        Q.   (By Mr. Broughton)  You mentioned earlier that

 8    the GOTAC facility was sold?

 9        A.   Yes.

10        Q.   And -- and remind me when that was sold?

11        A.   I -- I believe sometime in mid '17.

12        Q.   Okay.  And did -- do you ever recall Vitol

13    expressing an interest in purchasing that facility?

14        A.   Yes.

15        Q.   And tell us what you recall about Vitol being

16    interested in purchasing that facility.

17        A.   Well, so, at the -- AJ and -- and I and other

18    members of the founding Gravity team had left.  So, they

19    were interested in it, and we were talking to them about

20    things we could do there with them.  We were not

21    necessarily going to be involved in every business they

22    would do, but if there were asphalt businesses or heavy

23    crude processing, we were talking to them about maybe

24    being part of those businesses.

25        Q.   Okay.  And so, in that context, Vitol said,
```

Jason Goldstein
May 16, 2019                                                    131

1   hey, we would love to purchase GOTAC?

2       A.   They -- they have a -- I believe a serious

3   interest.  They -- they may have had conversations with

4   the then current management team and the --

5       Q.   The sub -- the management team subsequent to

6   you, right?

7       A.   Correct.

8       Q.   Yeah.

9       A.   And -- and possibly Flatrock, if I recall.

10  They ultimately changed their mind again I believe due

11  to market dynamics.

12      Q.   You think Vitol changed its mind?

13      A.   Yes.  I don't think it ever put a formal bid

14  in.

15      Q.   Okay.

16      A.   To my knowledge.

17      Q.   Right.  And did you personally talk with

18  anybody at Vitol about any of that?

19      A.   Sure.

20      Q.   Who -- who do you remember talking with?

21      A.   Probably would have been predominantly Steve

22  Barth, I guess.

23      Q.   We also talked about -- or just touched on I

24  think this morning maybe kind of the July through

25  December 2017 time period when Vitol was doing some

Jason Goldstein
May 16, 2019                                          132

1  hedging?

2       A.    Uh-huh.

3       Q.    Okay.  And I think you told me that -- that

4  really it was the traders that were involved in that as

5  opposed to -- to you?

6       A.    Yes.

7       Q.    Is that right?  Okay.  So, your only real

8  involvement would have been just more occasionally from

9  a strategy standpoint?

10      A.    Right, is there a better conceptual way to do

11 this.

12      Q.    Okay.  So, who at GCAC would have been involved

13 with Vitol in the day-to-day aspects of the hedging?

14      A.    It probably would have been Patrick Perugini

15 and AJ Brass.

16      Q.    And what -- and your understanding was that --

17 that Vitol was basically conducting that hedging; is

18 that right?

19      A.    Yes.

20      Q.    Okay.  And did you understand that Mr. Brass

21 and Mr. Perugini were having some input or what -- how

22 did you understand that was working?

23      A.    My understanding was that Vitol would know when

24 we -- I say "we" -- the collective Vitol GCAC book --

25      Q.    Uh-huh.

Jason Goldstein
May 16, 2019                                            133

1      A.    -- had bought or sold a physical barrel, and

2  they would then place hedges or take off hedges based on

3  that.

4      Q.    And who was deciding what hedges to actually

5  do?

6      A.    I don't know.

7      Q.    Okay.  Have you been asked to do any

8  calculations regarding the damages that GCAC is claiming

9  in this lawsuit?

10     A.    Not yet.

11     Q.    Okay.

12     A.    Just started to -- just started to embark along

13 that --

14     Q.    So, you've been asked to do that?

15     A.    I've been -- yes, just to start -- to start

16 working on that.

17     Q.    Okay.  Do you have any ideas about how you

18 would go about making such calculation?

19     A.    For some parts, yes, and for some parts, no.

20     Q.    Okay.  Well, so for the -- what parts do you

21 think you -- you don't know -- yet know how you will go

22 about calculating them?

23            MR. GILES:  And -- and let me just caution

24 you not to -- to the extent you can answer that without

25 divulging conversations you had with counsel, you may

Jason Goldstein
May 16, 2019                                    134

1  answer.  But just to be cautious about -- we're kind of

2  getting into an area that might involve attorney/client

3  privilege which we talked about.

4      A.   Okay.  I'm not sure I -- I would know without a

5  lot of help how to quantify some of the lost opportunity

6  aspects.

7      Q.   (By Mr. Broughton)  Okay.

8      A.   There are some differences in the two

9  agreements about the way -- what happens where GCAC is

10 going to be at the end of the initial Vitol deal versus

11 the Mercuria deal, what its assets are and its rights to

12 conduct business.  Those are kind of harder to quantify.

13     Q.   Explain that a little bit more to me.

14     A.   Well, in the Vitol transaction, I believe that

15 we were going to be kind of solely making up our

16 decisions and maintaining the tank leases.

17     Q.   Making which decisions?

18     A.   Operating --

19     Q.   Operating.

20     A.   -- where to have tanks and, you know, with

21 Vitol's input and approval.  It's suggesting, hey, we

22 should charter a ship or not charter a ship.  Mercuria

23 has more of a desire to be in the asphalt business

24 long-term I believe than Vitol did.  So, at the end of

25 the Mercuria relationship, we will not have any -- GCAC

Jason Goldstein
May 16, 2019                                          135

1   will not have any tank leases in its name or any other

2   asphalt assets.  So, we would be more challenged in

3   what -- how we continue as an operating entity after the

4   end of that agreement, I think.

5        Q.   Okay.

6        A.   That was probably my single biggest concern

7   with the structure.

8        Q.   All right.  So, lost opportunity and then

9   this -- what you've just described.  Anything else?

10       A.   I mean, there are some -- there are some

11  smaller specific stuff that we need to analyze.  You

12  know, we were under a lot of pressure on January 11th to

13  do something imminently.  Vitol had stopped entering

14  into purchase agreements or sale agreements as of

15  December 31st of '17.  So, we were under a lot of

16  pressure to -- we were maybe a little hampered in our

17  negotiations.

18       Q.   And how do you feel that you were maybe

19  hampered?

20       A.   Well, the -- as an example -- I'm not saying

21  it's conclusive -- the -- the price that the inventory

22  was sold at I think was -- we viewed as a low price.

23       Q.   Okay.  So, I think you were going to tell us

24  there were -- there were some components of -- of the

25  calculation that -- that you had already thought

Jason Goldstein
May 16, 2019                                                     136

1   about --

2        A.    Uh-huh.

3        Q.    -- how you might go about doing that.  Which --

4   can you describe those for us?

5        A.    So, I'm not sure where to start because there's

6   three things I would think about in terms of categories,

7   and -- and it's just my opinion.

8        Q.    Okay.

9        A.    One is a sharing in the profits and losses.  I

10  think Vitol would agree that the $15 million is not a --

11  that they're claiming is not a profit or the losses.

12  It's a different figure, a different calculation.  So, I

13  think that calculating the profits and the losses and

14  the share of that is -- is work that still remains to be

15  done.

16       Q.    I'm not sure I followed you exactly.  So,

17  the -- you talked about the 15 million that Vitol is

18  claiming.

19       A.    Uh-huh.

20       Q.    Okay.  So, what's your opinion about the

21  15 million that Vitol is claiming?

22       A.    I believe that that is -- making the assumption

23  that the numbers Vitol provided to us are factually

24  correct.

25       Q.    Okay.

Jason Goldstein
May 16, 2019                                                137

1      A.    I think there are some errors, but not with

2   regard to, for example, the -- the hedge report, the

3   hedge losses that were given to us.

4      Q.    Uh-huh.

5      A.    But presuming that -- that they provide us I --

6   I do believe that they incurred those losses.  So, I --

7   I believe the $15 million is the cash that effectively

8   they're out-of-pocket.  That doesn't mean that's owed in

9   my opinion because there's other factors such as the

10  profits and losses of the business, our -- our costs

11  that weren't part of the calculus, and then, you know,

12  certain damages that we incurred, as -- as an example,

13  you know, selling the inventory cheap, some dipping

14  under pressure.  So, we have not gone through -- we're

15  just starting to embark on that.

16     Q.    Okay.  And so, if I understand you correctly,

17  so, you're saying basically you understand the $15

18  million that Vitol is claiming, but you believe you had

19  offsets to it -- that GCAC has offsets against that.  Is

20  that -- is that what I'm understanding you to say?

21                  MR. GILES:  Objection, form.  You can

22  answer.

23     A.    I think GCAC also has some claims that are not

24  included in that number.  I guess that -- yes, I guess

25  that's considered an offset.

Jason Goldstein
May 16, 2019                                                    138

```
1         Q.    (By Mr. Broughton)   Okay.   I probably asked you

2    a legal question, so --

3         A.    That's all right.

4         Q.    So, what categories -- and I know you're still

5    thinking about it.   But just to the best of your ability

6    sitting here today, what categories of damages do you

7    believe that GCAC may have against Vitol?

8         A.    One would be sharing in -- in a book losses;

9    and two -- two would be any mistakes that Vitol --

10   errors in that 15-million-dollar calculation.   Again, I

11   have no reason to believe they were -- they provided

12   information they believed to be incorrect, but I think

13   that we may find that there's things in there that just

14   shouldn't be in there.

15        Q.    Okay.

16        A.    And then third would be a kind of -- the -- the

17   third general damages is how are we -- what losses do we

18   incur as a result of not being able to do Canadian crude

19   as a result of being -- of having to sell inventory

20   cheap, things like that.

21        Q.    Explain that a little bit to me.   I -- I didn't

22   follow about the Canadian crude.

23        A.    Well, we -- as we talked about before, there

24   was a strong impetus or -- or desire to do projects

25   outside of asphalt.   It's the reason that Patrick
```

1    joined GCAC.  That's the reason I came back to GCAC

2    full-time after Gravity.  And none of -- you know,

3    because the relationship went south pretty quickly, none

4    of that happened.  We tried to do some of that stuff

5    with Mercuria, which was potentially very profitable.

6    And -- and we talked about it, but there was not the

7    interest.  So, we weren't able to do it with anybody

8    else either.

9         Q.   Okay.

10        A.   We're kind of -- Mercuria's done everything

11   that they're supposed to do under our agreement, but

12   we're kind of restricted from doing other activities.

13        Q.   So, is part of what you plan to do to compare

14   the profits made for the Mercuria contract with what you

15   believe would have been made had a deal gone forward

16   with Vitol?

17        A.   I don't know.  I haven't gotten there to know

18   how to approach the analysis.  I would -- I would think

19   that's a logical thing to look at, but we just -- just

20   haven't got there.

21        Q.   Of the -- on the $15 million that you

22   referenced that Vitol is claiming, has -- to your

23   knowledge, has GCAC performed any analysis or accounting

24   of that number?

25        A.   Parts of it.  So, we looked at some of the

Jason Goldstein
May 16, 2019                                          140

1   parts that come to the 15-million-dollar claim.

2        Q.   Let me stop you right there.  Is this you?  Are

3   you saying you looked at it or you and some other people

4   or --

5        A.   Myself and others and in -- in conjunction with

6   Vitol for a while.

7        Q.   Okay.

8        A.   There's a lot of -- on January 12th, the day

9   after the -- Mercuria started and --

10       Q.   Uh-huh.

11       A.   -- Vitol ended, there was a lot of unknowns, I

12  think, just not even about -- the facts were unknown

13  between us and Vitol.  Nobody had been keeping proper --

14  neither side had been keeping good enough accounting.

15  It was one of those things where all everybody cared

16  about was getting out of the deal, and we didn't even

17  have a good spreadsheet that identified every trade that

18  had been made.  We would have -- we would have pieced

19  that together and we did that with Vitol.

20       Q.   Okay.  And so, on piecing together the

21  spreadsheet, who -- who would have -- do you recall

22  being involved on both sides?

23       A.   Myself and Joe Mattingly on GCAC's side

24  primarily, and Mike Ruzek and Tom Moran primarily on

25  Vitol's side.

Jason Goldstein
May 16, 2019                                          141

```
 1        Q.   All right.  And --
 2        A.   That's -- that's specifically regarding what
 3   barrels were purchased and sold.
 4        Q.   And did y'all literally get together around the
 5   table and were looking at things?
 6        A.   I think we did.  I mean, it was mostly by
 7   e-mail, but I think we did get together and look at it.
 8        Q.   Okay.  And over what period of time did that
 9   take place?
10        A.   It was roughly -- roughly two months.
11        Q.   Okay.
12        A.   It was a long process.
13        Q.   January and February or --
14        A.   It probably wouldn't have started until mid to
15   late January and probably the Mercuria closing and then
16   a little bit of time for everybody to catch their breath
17   for a second before we dug into it.
18        Q.   And -- and how did that kind of end up after a
19   couple of months?
20        A.   We -- we eventually, you know, as we were
21   trying to resolve the -- the issues and the analysis,
22   we -- we -- I think we came to a calculation of what
23   barrels were bought and sold and for how much.
24        Q.   Okay.
25        A.   For -- for -- without taking into account --
```

Jason Goldstein
May 16, 2019                                              142

1   and this may be confusing -- without taking into account

2   profits and losses of the book but just -- it simply was

3   a calculation of what Vitol had paid for product

4   purchase relative to what Vitol received for product

5   sold.

6        Q.   Okay.  And with respect to mentioning that

7   Canadian crude, the Canadian crude is not something

8   that's mentioned in the July 12th draft, right?

9        A.   No, not specifically.  I mean, the -- I believe

10  the draft references asphalt and other products, but

11  it's not -- it's not specifically identified, correct.

12       Q.   Okay.  But you think that was covered by that

13  draft?

14       A.   Yes.  I think had we pursued it, the -- the

15  terms of that agreement would have applied, I believe.

16       Q.   And why do you believe that?

17       A.   Because I don't have something more logical to

18  believe.  I don't -- I don't -- I don't -- there's no

19  basis for saying, okay, if it's Canadian crude, it's

20  70/30 or something.  We -- we only really talked about

21  one economic structure.  So, I don't know why it would

22  be different.

23       Q.   And your statement that you believe you sold

24  the inventory for lower than it was worth, what's

25  your -- what's the basis for that belief?

Jason Goldstein
May 16, 2019                                                    143

1      A.   The only way that Mercuria was comfortable,

2   because they weren't in the asphalt business, valuing

3   the inventory -- was to get third-party appraisals of

4   actual samples based on fuel oil pricing which came out

5   to an amount that was less than what we believe the

6   asphalt market value of the product was worth.

7      Q.   So, Mercuria actually went to the third-parties

8   and had them appraised.

9      A.   Yes.

10      Q.   Do you know who they used?

11      A.   I don't.  I think there was -- I think there's

12   some brokers out there or something who do that kind of

13   stuff.  We don't -- we've never done that.

14      Q.   So, did Mercuria ever share with you who they

15   used or you just know they used someone?

16      A.   They may have.  They may have sent us a report.

17   I -- I don't recall.  I mean, it wasn't a secret.

18      Q.   Right.

19      A.   But I just don't recall.

20      Q.   And you just felt that -- that those

21   third-party appraisers valued it too low.

22      A.   Not relative to the mission they were given.

23   They were given a mission of valuing it as fuel oil.

24   So, the same product could have one value when sold to

25   one market and another value when sold to another

Jason Goldstein
May 16, 2019                                                    144

1   market.  So, they said, you know, value -- what -- what

2   is this worth to a guy who blends and sells fuel oil.

3        Q.    Uh-huh.

4        A.    Not what is this worth to an asphalt customer.

5        Q.    And you believe to an asphalt customer, it

6   would have been worth more.

7        A.    Yes.

8        Q.    Okay.  And do you have any idea how much more?

9        A.    I haven't -- I looked at it a little bit a long

10  time ago, but I -- I don't know.  I think it's dollars

11  per barrel, but I don't know how many.

12       Q.    And how would you foresee going about making

13  such a calculation?

14       A.    I'd probably compare the actual price in the

15  fuel oil difference and use the Poten publication,

16  probably could make arguments about whether -- which --

17  you know, Poten has a high, a low, a medium.  Probably

18  we could all make arguments about which one to look at,

19  but that's the best benchmark we have for asphalt

20  pricing.

21       Q.    Do you recall how many barrels were sold to

22  Mercuria, ballpark?

23       A.    Ballpark, 200,000.

24       Q.    Okay.  Is it in that agreement somewhere?

25       A.    I don't know.

Jason Goldstein
May 16, 2019                                      145

1      Q.    Okay.

2      A.    I don't know.  I expect it's not because it's

3  something that could move on a daily basis.  We probably

4  would have just referenced it.  We could find out.

5      Q.    Okay.

6             MR. BROUGHTON:  Take a little break and I

7  might be finished.

8             MR. GILES:  Okay.  Great.

9             THE VIDEOGRAPHER:  We're off the record at

10  3:42.

11             (A recess was taken from 3:42 p.m. to 3:55

12             p.m.)

13             THE VIDEOGRAPHER:  We are on the record at

14  3:55.

15      Q.    (By Mr. Broughton)  Mr. Goldstein, if you will

16  look again at what we previously marked as Exhibit 26.

17      A.    Yes.

18      Q.    If you'll look at that second page.

19             So, basically you said the top part under

20  Rio Energy is not really relevant and the bottom part

21  under GCAC non-asphalt products isn't really relevant,

22  if I understood you correctly.

23      A.    I don't --

24             MR. GILES:  Objection, form.

25      A.    I don't know that relevant is the word --

Jason Goldstein
May 16, 2019                                                146

```
 1        Q.   (By Mr. Broughton)   Okay.

 2        A.   -- I would use.  So, the first section didn't

 3   occur.

 4        Q.   Didn't occur.  Okay.

 5        A.   We wanted it to occur.

 6        Q.   Okay.

 7        A.   So, I don't know if we'd view it as irrelevant.

 8        Q.   I wasn't trying to put words in your mouth.

 9        A.   Sure, sure, sure.

10        Q.   Yeah.  No, that's fine.

11        A.   We thought there might be some value for us in

12   having Vitol purchase the Rio goodwill on kind of an --

13   and hold it until we could find another partner.

14        Q.   Okay.

15        A.   And the last part, we never did any non-asphalt

16   transactions.  So, the terms -- we wanted to, but the

17   terms never applied or, you know, had relevance.

18        Q.   Okay.  And why didn't you do any non-asphalt?

19        A.   I don't know.  It just -- it feels like once we

20   got to that September-ish time frame, maybe October, all

21   anybody was doing was working on trying to unwind this

22   thing.

23        Q.   Okay.  So, you touched a little bit, and I

24   didn't ask really any followup about what you meant.

25   So, under the middle section under GCAC/asphalt says,
```

Jason Goldstein
May 16, 2019                                          147

1   Vitol provides credit.  And I think you said they didn't

2   provide cash, but they did provide credit.

3       A.    Well, they -- sorry.  They provided cash for

4   inventory purchases to sellers of product not -- but to

5   us, not to -- we didn't have a line that we just said,

6   okay, we want to take down half a million dollars or

7   something.

8       Q.    Okay.  So, did you have any dealings or

9   discussions with anybody at Vitol about why they were

10  providing credit, slash, providing cash for the

11  inventory?

12      A.    Well, that -- I'm not sure I understand.  It

13  was part of the initial transaction and -- that we had

14  on July 1st.  Had they ceased to provide it, we would

15  have been out of business the next day.  So, I think

16  they were trying to, again, provide some kind of an

17  interim solution until we could find another partner.

18      Q.    Okay.

19      A.    Had they just said we're not financing

20  purchases anymore, we would have been out of business

21  real fast.

22      Q.    Okay.  And then the second bullet point says,

23  Vitol provides receivables financing.  I think you said

24  earlier they provided some receivables financing.

25      A.    For everything they sold.

Jason Goldstein
May 16, 2019                                          148

1      Q.    Okay.  And I think you said they did provide

2   capital for all terminaling fees for Corpus?

3      A.    For Corpus they did.

4      Q.    Yeah.  And not Mobile.

5      A.    For Mobile they did for two months is my

6   recollection, and then they just stopped.

7      Q.    Okay.  And what's this last notation about the

8   time value of money?

9      A.    It's a time -- so, it's given them an interest

10  rate on the money that they've put out for these three

11  bullet points.

12     Q.    Okay.

13     A.    And I -- and I to this date am not exactly sure

14  what interest rate they would like or -- or believe is

15  fair.  I once saw a spreadsheet that had three and half

16  percent, but I also heard AJ mention that they told him

17  six percent.  I -- I don't know what they're seeking

18  under that number.

19     Q.    Okay.

20            MR. BROUGHTON:  We'll pass the witness.

21            (Time Noted:  3:58 p.m.)

22                       EXAMINATION

23  BY MR. GILES:

24     Q.    Okay.  Mr. Goldstein, I just want to ask you a

25  couple quick follow-up questions about a couple of these

```
 1   documents, and I'll just kind of go in reverse order to

 2   make it easier.  We were just talking about Exhibit 26

 3   and the -- what -- what you called in your initial

 4   e-mail the Vitol interim financing structured bullets --

 5       A.    Uh-huh.

 6       Q.    -- Version 2.  And we've roughly described

 7   these as three sections, Rio Energy, GCAC asphalt

 8   and GCAC non-asphalt products.  And you were just

 9   talking about this middle section, but I want to ask you

10   first:  You said the Rio Energy, the first section, that

11   never occurred, correct?

12       A.    Correct.

13       Q.    Okay.  And you said there were never any

14   non-asphalt sales or purchases, correct?

15       A.    Correct.

16       Q.    Okay.  Did anything in the middle -- to your

17   knowledge, in the middle section, GCAC asphalt, did

18   anyone from -- to your knowledge, from either GCAC or

19   Vitol ever agree to these terms?

20       A.    I don't think they were terms agreed to.

21       Q.    Okay.  Did -- did -- for example, we looked at

22   Exhibit 24 -- see if I can find that for you -- which

23   was an e-mail and draft from Ernie Kohnke at Vitol to

24   Dave Hubenak at GCAC dated July 12th.  Do you remember

25   that document?
```

Jason Goldstein
May 16, 2019                                                    150

 1       A.    Yes.

 2       Q.    And that was a draft of a JSMA agreement that

 3  was never signed.

 4       A.    Yes.

 5       Q.    Okay.  Did -- after -- do you recall ever

 6  seeing any drafts dated later than this?

 7       A.    I don't recall seeing.

 8       Q.    Okay.  Did -- to your knowledge, did Vitol ever

 9  send GCAC a draft after July 12th of 2017 that changed

10  this -- the structure of the deal from a joint marketing

11  agreement to a financing arrangement?

12       A.    I'm not aware of that happening.

13       Q.    Okay.  The other one I wanted to ask you about

14  is Exhibit 25.  Wait.  Okay.  You've got the original.

15  I want to make sure I didn't actually grab a stickered

16  one.  That's a no-no.

17             Do you have 25 over there?

18       A.    I have 24 and 26.

19       Q.    (By Mr. Giles)  I think maybe you just got

20  asked questions about it, but I'll find it.  Yeah, here

21  it is.

22       A.    Uh-huh.

23       Q.    And -- and 25 is an e-mail dated July 28th,

24  2017 from you to Mr. Brass, things we should touch base

25  on today.  And we talked -- or you talked to

Jason Goldstein
May 16, 2019                                                        151

1    Mr. Broughton about these a little bit, but I want to go

2    over a couple of these bullet points.

3         A.   Okay.

4         Q.   B under 2, JMA, what does that refer to?

5         A.   I believe that refers to the joint marketing

6    agreement that was never signed.

7         Q.   Okay.  After July 12th, were any additional

8    drafts ever exchanged, to your knowledge?

9         A.   Not to my knowledge, no.

10        Q.   And was a JMA ever signed?

11        A.   No.

12        Q.   Okay.  C references a GCAC Arc sublease.  What

13   is Arc?

14        A.   Arc is the company that at the time owned the

15   terminal in Mobile where we had leased tankage.

16        Q.   Okay.  And so, did this reference that if

17   the JMA, the written agreement had ever been executed

18   and it still included a quote, NewCo, that that GCAC

19   lease would have to be subleased to -- to the NewCo?

20        A.   That was -- had we gone through with all that,

21   that was what we were thinking was the right way to do

22   it.

23        Q.   Okay.  And then that entity would then sublease

24   it to Vitol?

25        A.   Right.

Jason Goldstein
May 16, 2019                                                              152

1        Q.    Okay.  Did any of that ever happen?

2        A.    No.

3        Q.    Okay.  Setting up Hermosa bank account, was --

4    I think you said -- well, let me ask you it this way:

5    Was an entity called Hermosa actually created?

6        A.    Yes.

7        Q.    Okay.  Did it ever do any business with Vitol?

8        A.    No.

9        Q.    Okay.  Was a bank account ever set up for

10   Hermosa?

11       A.    After the Vitol relationship ended.

12       Q.    Do you know if that occurred after January of

13   2018?

14       A.    Yes.

15       Q.    Okay.  Was the management service agreement

16   between Hermosa and GCAC ever entered into?

17       A.    No.

18       Q.    Okay.  Or with any other entity associated with

19   the Vitol transaction.

20       A.    No.

21       Q.    Okay.  As of July 1st, 2017, what was your

22   understanding as to whether GCAC and Vitol had entered

23   into a joint venture agreement?

24       A.    I believe it had entered into the -- the

25   economic and material terms of that joint marketing

Jason Goldstein
May 16, 2019                                          153

1    agreement we've discussed.

2        Q.   And what were those material terms?

3        A.   The biggest part was a 50/50 share of the

4    profits and losses.  There were a lot of -- I think that

5    the trade team salary reimbursement was a material term,

6    and then the other material terms were what constituted

7    costs and -- and revenues.

8        Q.   Okay.  So, in other words --

9        A.   What each side could put in the bucket, if you

10   will.

11       Q.   All right.  As a joint profit sharing or loss

12   sharing agreement, certain revenues and expenses would

13   be allowed or not allowed to go into it.

14       A.   Correct.

15       Q.   And you believe those terms had been agreed

16   into.

17       A.   Yes.

18       Q.   And who would have agreed to them?  Who had

19   agree to them?

20       A.   From our side?

21       Q.   Generally who do you understood agreed to those

22   terms, what two individuals?

23       A.   Well, I was told that -- by AJ that he and

24   Patrick and Eric were ready to transact based on this.

25       Q.   Okay.

Jason Goldstein
May 16, 2019                                          154

1        A.    So I guess -- I guess Eric would be the Vitol

2    person.

3        Q.    Now, you have experience as a investment

4    banker?

5        A.    Uh-huh.

6        Q.    I'm sorry.  Is that a "yes"?

7        A.    Yes.  Sorry.

8        Q.    And you -- I think you said earlier as an

9    investment banker, you -- you would generally prefer --

10   and I can tell you as a lawyer, I probably agree with

11   you.  You would prefer to have a written agreement?

12       A.    I'd rather have a signed agreement, yes.

13       Q.    Okay.  But in your -- in the -- in the energy

14   business and in the -- in your experience in the asphalt

15   business, do transactions occur on occasion where they

16   do business before there's a written agreement or a

17   signed agreement?

18             MR. BROUGHTON:  Objection, form.

19       A.    Do I answer?

20       Q.    (By Mr. Giles)  Yes.

21       A.    Yes, much more so than other businesses I've

22   been involved with.

23       Q.    Okay.  And when you say much more so, which --

24   you mean energy business or --

25       A.    Yeah, yes.

Jason Goldstein
May 16, 2019                                                    155

1     Q.    -- asphalt business?

2     A.    Well, the -- energy trading, I would say.  I

3  would -- I wouldn't apply it to all aspects of energy.

4  I wouldn't apply it to terminaling and midstream, but in

5  the trading business a lot gets done on a conversation

6  or -- or a short e-mail.

7     Q.    Okay.  As of July 1st of 2017, did you feel

8  that the terms of the agreement between GCAC and Vitol

9  were sufficiently definite to allow the parties to

10 perform under that agreement?

11            MR. BROUGHTON:  Objection, form.

12    A.    I think so.

13    Q.    (By Mr. Giles)  And why do you believe that?

14    A.    Well, we'd been be negotiating for a while.  I

15 think both parties knew the major economic terms, and

16 then the parties started transacting.  So, I just didn't

17 have another alternative to believe.

18    Q.    Do you believe that Vitol and GCAC could have

19 conducted the business they did without having an

20 understanding as to the material terms of the agreement?

21            MR. BROUGHTON:  Objection, form.

22    A.    I'm not sure I understand.

23    Q.    (By Mr. Giles)  Do you believe that GCAC and

24 Vitol could have conducted business under the

25 arrangement they had if they did not have an

Jason Goldstein
May 16, 2019                                              156

1    understanding of the material terms of their agreement?

2                MR. BROUGHTON:  Objection, form.

3         A.   So, you're asking could they have gone and

4    purchased and sold product and such activities?  I think

5    it would have been very ill-advised, but I don't know

6    that there was a contractual or legal restriction from

7    doing so.  I think it would be unwise.

8         Q.   (By Mr. Giles)  Do you believe that -- do you

9    have an understanding about whether Vitol and GCAC

10   actually began operations under an agreement?

11               MR. BROUGHTON:  Objection, form.

12        A.   I believe they did.

13        Q.   (By Mr. Giles)  Okay.  And are the material

14   terms of that agreement contained within any writing

15   that you know of?

16        A.   I believe they're in the drafts of the JMA or

17   JSMA -- I can't remember which it's called -- in the

18   late June and early July time frame.

19        Q.   You -- you primarily dealt with Mr. Barth; is

20   that correct?

21        A.   On the -- on the -- on the agreement, yes.

22        Q.   Okay.  And I don't want to put words in your

23   mouth, but I believe you said that you primarily dealt

24   with the paper side and Mr. Brass primarily dealt with

25   the business side; is that accurate?

Jason Goldstein
May 16, 2019                                          157

1       A.    Yes.   I -- I would only qualify that to say I

2    would get involved with the analytics of what the deal

3    would mean in terms of profits to different parties and

4    things like that, but yes.

5       Q.    Did -- did in your conversations with

6    Mr. Barth, I would assume you had both e-mail and

7    telephone conversations?

8       A.    And -- and in person.

9       Q.    And in person.   Regarding the exchange of

10   drafts of the agreement?

11      A.    Yes.

12      Q.    During those negotiations and discussions, did

13   Mr. Barth ever -- ever say words to the effect that we

14   don't have a deal until this paper is signed?

15      A.    I don't recall that.

16      Q.    Anyone -- I'm sorry.   Go ahead.

17      A.    I don't recall that being said.

18      Q.    Did anyone at Vitol ever tell you words to the

19   effect that there's no agreement between Vitol and GCAC

20   until that draft agreement is signed?

21      A.    I don't recall that being said.

22      Q.    Did GCAC rely on Vitol's conduct indicating

23   that an agreement had been made in conducting its

24   business even though that joint marketing agreement was

25   never signed?

Jason Goldstein
May 16, 2019                                         158

1                    MR. BROUGHTON:  Objection, form.

2        A.    Sure.  We -- we -- we absolutely assumed that

3   on July 1st, we were operating under that agreement.

4   So, everything we did was under that presumption.

5                    MR. GILES:  I'll pass the witness.

6                    MR. BROUGHTON:  No further questions.

7                    MR. GILES:  Great.  Thank you so much.

8                    THE VIDEOGRAPHER:  We're off the record at

9   4:11.

10                   (Deposition concluded at 4:11 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CHANGES AND SIGNATURE

2   WITNESS NAME:  JASON GOLDSTEIN      DATE:  MAY 16, 2019

3   PAGE LINE CHANGE                          REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

001452

Jason Goldstein
May 16, 2019                                          160

```
 1        I, JASON GOLDSTEIN, have read the foregoing

 2   deposition and hereby affix my signature that same is

 3   true and correct, except as noted above.

 4

 5                          _____

 6                          JASON GOLDSTEIN

 7   THE STATE OF _____)

 8   COUNTY OF_____)

 9        Before me, _____, on this day

10   personally appeared JASON GOLDSTEIN, known to me or

11   proved to me on the oath of _____ or through

12   _____(description of identity card or

13   other document) to be the person whose name is

14   subscribed to the foregoing instrument and acknowledged

15   to me that he/she executed the same for the purpose and

16   consideration therein expressed;

17        Given under my hand and seal of office on this

18   _____ day of _____, _____.

19

20

21                          _____

22                          NOTARY PUBLIC IN AND FOR

23                          THE STATE OF _____

24

25   My Commission Expires: _____
```

Jason Goldstein
May 16, 2019                                                     161

```
1                        CAUSE NO. 2018-31578

2    GULF COAST ASPHALT COMPANY  )   IN THE DISTRICT COURT OF
     LLC                         )
3         PLAINTIFF              )
                                 )
4    VS.                         )   HARRIS COUNTY, T E X A S
                                 )
5    VITOL, INC.,                )
          DEFENDANT              )   295TH JUDICIAL DISTRICT

6

7                      REPORTER'S CERTIFICATE

8                  ORAL VIDEOTAPED DEPOSITION

9                              OF

10                      JASON GOLDSTEIN

11                      May 16, 2019

12

13       I, Roxanne K. Smith, Certified Shorthand Reporter in

14   and for the State of Texas, hereby certify to the

15   following:

16       That the witness, JASON GOLDSTEIN, was duly sworn

17   and that the transcript of the deposition is a true

18   record of the testimony given by the witness;

19       That the deposition transcript was duly submitted on

20   _____ to the witness or to the attorney for

21   the witness for examination, signature, and return to me

22   by _____.

23       That pursuant to information given to the deposition

24   officer at the time said testimony was taken, the

25   following includes all parties of record and the amount
```

U.S. LEGAL SUPPORT, INC
713-653-7100

001454

Jason Goldstein
May 16, 2019                                                              162

1   of time used by each party at the time of the

2   deposition:

3        Mr. Kenneth Broughton (4 hours 4 minutes)
         Mr. Neil Giles        (13 minutes)
4

5        That a copy of this certificate was served on all

6   parties shown herein on _____ and filed

7   with the clerk.

8        I further certify that I am neither counsel for,

9   related to, nor employed by any of the parties in the

10  action in which this proceeding was taken, and further

11  that I am not financially or otherwise interested in the

12  outcome of this action.

13       Further certification requirements pursuant to Rule

14  203 of the Texas Code of Civil Procedure will be

15  complied with after they have occurred.

16       Certified to by me on this _____day of

17  _____, _____.

18

19

20                          _____
                            Roxanne K. Smith, CSR
21                          CSR No. 6290; Expires 10-31-21
                            U.S. Legal Support
22                          Firm Registration No. 122
                            16825 Northchase Dr., Suite 800
23                          Houston, Texas 77060
                            (713) 653-7100

24

25

```
 1              FURTHER CERTIFICATION UNDER TRCP RULE 203

 2        The original deposition was/was not returned to the

 3   deposition officer on _____.

 4        If returned, the attached Changes and Signature

 5   page(s) contain(s) any changes and the reasons therefor.

 6        If returned, the original deposition was delivered

 7   to Mr. Kenneth Broughton, Custodial Attorney.

 8        $_____ is the deposition officer's charges to the

 9   Defendant for preparing the original deposition and any

10   copies of exhibits;

11        The deposition was delivered in accordance with Rule

12   203.3, and a copy of the certificate, served on all

13   parties shown herein, was filed with the Clerk.

14        Certified to by me on this _____ day of

15   _____, _____.

16

17

18             _____
                Roxanne K. Smith, CSR
19             CSR No. 6290; Expires 10-31-21
                U.S. Legal Support
20             Firm Registration No. 122
                16825 Northchase Dr., Suite 800
21             Houston, Texas 77060
                (713) 653-7100
22

23

24

25
```

## Exhibits

**EX 0018 Jason Gold stein 051619** 69:15, 22 79:6
**EX 0019 Jason Gold stein 051619** 71:11, 14,16
**EX 0020 Jason Gold stein 051619** 72:22 73:12,24 75:1,2 80:19,22 82:15
**EX 0021 Jason Gold stein 051619** 82:11 84:2
**EX 0022 Jason Gold stein 051619** 85:2, 16,17
**EX 0023 Jason Gold stein 051619** 87:21 88:2,19 89:14 91:19 97:17,25
**EX 0024 Jason Gold stein 051619** 92:3,7 149:22
**EX 0025 Jason Gold stein 051619** 102:20,23 150:14
**EX 0026 Jason Gold stein 051619** 105:16,23 109:17 145:16 149:2
**EX 0027 Jason Gold stein 051619** 114:6, 10
**EX 0028 Jason Gold stein 051619** 117:3
**EX 0029 Jason Gold stein 051619** 120:19,22 121:21

## $

**$15** 136:10 137:7,17 139:21

## 1

**1** 50:19 51:11 96:13 97:14,23

**1-B** 90:6,20 91:3,5 93:8
**1.275** 99:20
**10** 60:1 62:5 69:25 82:6
**100** 25:13 51:23 87:3
**10:45** 46:12,13
**11** 24:14
**11:07** 46:14,16
**11:29** 59:19,20
**11:42** 59:21,23
**11:57** 69:14,17
**11th** 49:20 52:11 135:12
**12** 20:12 124:13
**12:01** 69:18,20
**12:15** 78:25 79:1
**12:53** 79:2,4
**12th** 91:24 92:7,14, 18 97:1,8 98:4,9,12 100:8 101:19 103:2 122:25 123:19 124:16 127:19 129:14 140:8 142:8 149:24 150:9 151:7
**13** 54:24 111:13
**13th** 91:24
**14** 7:12 54:24 93:5
**15** 7:12 19:6 56:9, 11,14 136:17,21
**15-million-dollar** 138:10 140:1
**16** 25:23 52:4,17 53:2 56:9 90:2 91:2
**16th** 68:15
**17** 15:7 25:22 48:2 49:19 52:17 53:2 58:7 130:11 135:15
**18** 52:11 65:11 69:15,22 79:6
**19** 65:13 71:11,14, 16,17 112:7
**19th** 70:5
**1:33** 95:11,12
**1:53** 95:12,15
**1st** 48:2 49:18 52:10 94:6,8 95:4,19 147:14 152:21 155:7 158:3

## 2

**2** 73:15,25 74:2,24, 25 77:4 149:6 151:4
**20** 72:22 73:12,24 75:1,2 80:19,22 82:7,9,15,21
**20-** 11:18
**200,000** 144:23
**2003** 7:16
**2005** 111:5
**2006** 111:5
**2007-2008** 23:7
**2008-2009** 22:16
**2009** 7:16 22:24
**2010** 8:24 9:4,8 10:2 11:17,18 22:22,24 23:12 29:4 111:6
**2013** 9:12,23 10:2 12:11,19 13:17 15:11 16:3,24 28:23 55:15 111:11
**2014** 7:12 11:19 54:17,23 55:15
**2015** 7:11,12 18:7 25:20 50:5,7,9,16 55:16 71:17 72:1
**2016** 11:19 16:5 17:5 18:2 19:6 26:19 28:1 40:13,22 52:5,12 55:16
**2017** 15:6 17:2 31:22 50:19 51:11 52:12 53:1 65:7 68:16 69:3 70:5 84:2 92:7 106:4 112:23 113:2 131:25 150:9,24 152:21 155:7
**2018** 49:20 65:5,15 112:5 126:2,9 152:13
**2019** 49:3 112:5 126:11
**2021** 125:7
**21** 82:11 84:2 112:23
**21st** 106:4 107:15
**22** 85:2,17
**23** 87:21,25 88:2,19 89:14 91:19 97:17, 25

**23rd** 94:6 95:4,19 96:2 98:2
**24** 92:3,7 99:7,8 149:22 150:18
**25** 85:9 102:20,23 150:14,17,23
**26** 105:16,20,23 109:17 145:16 149:2 150:18
**27** 114:6,10
**28** 117:3
**28th** 103:1 150:23
**29** 120:19,22 121:21
**2:57** 130:2,3
**2a** 103:12 104:6
**2b** 104:7
**2c** 104:9,25
**2d** 104:14
**2f** 105:2

## 3

**3** 99:15 100:23
**30** 84:2,11
**30,000-barrel** 25:11
**30-plus** 32:9
**30-some-odd** 64:21
**31st** 135:15
**358** 82:3
**39** 121:2
**3:18** 130:3,6
**3:42** 145:10,11
**3:55** 145:11,14
**3:58** 148:21

## 4

**4/30/69** 4:16
**40-ish** 18:9
**45** 108:25
**450,000** 124:1,5,24
**4:11** 158:9,10

## 5

**5,000** 116:16
**5.8** 65:20
**50** 13:4,5,8 116:16

**50/50** 86:2 96:7,24
  106:16 107:4
  108:19 109:16
  123:9 124:13 153:3
**500,000** 123:13,25
  124:23

**6**

**60/40** 86:3 123:9
  124:14
**6215** 4:14
**649** 78:5
**66** 25:3
**6600** 24:11

**7**

**70/30** 142:20
**74469** 62:7
**74470** 62:21
**74471** 63:9
**74472** 63:23
**77057** 4:14

**9**

**90** 40:23 42:6
**96** 20:19,25
**98** 20:25 21:1
**9:43** 4:2

**A**

**a.m.** 4:2 46:13,14
  59:20,21 69:17
**abbreviation** 12:15
**ability** 138:5
**absolutely** 35:19
  158:2
**account** 31:15 99:22
  104:24 141:25
  142:1 152:3,9
**accounting** 32:12
  39:3 62:17 81:12
  104:14,20 114:3,12
  126:13 139:23
  140:14
**accurate** 28:25
  156:25

**accustomed** 44:4
**achieve** 53:19
**acquiring** 14:3
**acquisition** 15:17
  18:22 25:17 56:13
**acquisitions** 19:24
**acronym** 25:10
**acted** 40:16
**action** 61:5
**actively** 127:11
**activities** 12:18
  32:10 48:19,21
  125:19 139:12
  156:4
**activity** 33:5,12
  36:20,22
**actual** 56:13 61:16
  143:4 144:14
**ad** 20:11,14,16
**add** 122:19
**added** 14:24
**addition** 12:25
  14:18 81:8 117:24
  129:2
**additional** 23:12
  43:3 66:24 122:6
  151:7
**address** 4:13
**addresses** 31:4
**addressing** 103:25
**administration** 5:23
**advertisement**
  20:17
**affiliate** 78:10,12
**agree** 35:15 136:10
  149:19 153:19
  154:10
**agreed** 68:4 90:6
  91:2 93:7,17,20
  94:4 149:20 153:15,
  18,21
**agreement** 12:2
  29:19 33:19,23
  34:6,17 35:4,18
  36:2,10,16 37:21
  38:18,21 39:17
  40:13 41:23 42:1,8
  43:4,6 47:15,18
  48:24 49:22 50:13
  51:5 52:3,10,11
  71:3 88:4 91:13,17
  93:13,16 94:1

95:20,25 96:5,13
  97:13,22 99:24
  105:4,14 112:9,10,
  15 115:20 119:24
  121:11,25 124:13
  129:15 135:4
  139:11 142:15
  144:24 150:2,11
  151:6,17 152:15,23
  153:1,12 154:11,12,
  16,17 155:8,10,20
  156:1,10,14,21
  157:10,19,20,23,24
  158:3
**agreements** 30:3,4,
  6 86:1 101:12
  103:14 134:9
  135:14
**ahead** 83:2,9 89:25
  94:8 157:16
**AJ** 10:10 13:7,13,15
  14:17 23:1,2 29:20,
  24 32:2 35:15 37:25
  53:11,23 57:22,23
  60:11,13 64:11
  67:14,16 68:7 70:24
  71:8 75:15 79:24
  80:7 81:9 86:3 87:3,
  7,18 88:14 89:23
  94:14 103:21
  108:11 113:12
  116:20 117:20
  120:13 122:14,15
  130:17 132:15
  148:16 153:23
**AJ's** 14:21 34:21
  116:19
**Akor** 117:11
**Alabama** 9:16,18
**alleging** 7:2
**allocate** 96:20
**allotment** 23:15
**allowed** 153:13
**alter** 125:20
**altered** 116:7
**alternative** 155:17
**amended** 87:18
  121:18 124:4,5,24
**amendment** 33:18,
  23 121:17 123:22
  124:7
**amendments** 26:16
  34:7 122:5

**America** 78:16
**amount** 143:5
**analyses** 81:1
  116:13,24 118:3
**analysis** 81:5,19
  82:4,20 84:4
  106:20,22 116:6,7
  117:2 122:23
  125:24 139:18,23
  141:21
**analyst** 19:23 20:5
**analytical** 80:16
**analytics** 157:2
**analyze** 135:11
**Andy** 41:19,21
**Angeles** 20:2
**annual** 126:3 127:24
**anymore** 107:1
  109:16 113:11
  147:20
**Apologize** 9:19
**appealing** 128:20
**appears** 81:15
**appetite** 77:24
**applicable** 109:22
**applied** 142:15
  146:17
**apply** 44:24 155:3,4
**appraisals** 143:3
**appraised** 143:8
**appraisers** 143:21
**approach** 119:14
  139:18
**approached** 119:16,
  22
**approaching** 57:25
**approval** 18:1
  134:21
**approximately**
  108:22
**approximation**
  65:12
**arbitration** 6:21
**Arc** 151:12,13,14
**area** 134:2
**arguments** 144:16,
  18
**arrangement** 8:11
  126:7 150:11
  155:25

**aspect** 40:3

**aspects** 60:12,13
132:13 134:6 155:3

**asphalt** 6:17 8:21
9:1 12:7,15,20,22,
25 13:1 14:5,11
18:11,16 22:3,20
27:9 29:12,13 30:15
32:24 39:8 40:21
43:23 44:5,10,12,
16,19,23 45:1,5,15
46:19 47:4,9,14,19
48:19 49:12 50:4
52:15,18,23 55:8,9
61:3 62:24 63:15,
16,18 64:20 66:6
75:25 77:7,19,21
78:8,16,18 85:9
106:16 107:1
109:20 111:2,8,9,
15,19 112:3 114:17,
19 115:2,9,12,15
116:2,9,10,12
117:25 119:2,13
126:16,20 127:8,15
128:6,7 129:2,7,10
130:22 134:23
135:2 138:25
142:10 143:2,6
144:4,5,19 149:7,17
154:14 155:1

**assess** 76:25

**assessing** 107:9

**asset** 6:10 7:10
18:7,10 37:10

**assets** 9:25 12:10
13:17 14:3,9 15:5,7
18:21 28:23 32:15,
17 36:23 37:11
111:11 134:11
135:2

**assignments** 90:12

**assist** 60:9

**assistance** 62:15
74:2

**associate** 20:5 21:5

**assume** 24:1 34:6
50:9 120:23 157:6

**assumed** 158:2

**assumption** 136:22

**assumptions** 60:15
64:9 65:17 128:2

**assured** 69:9 102:11

**attached** 92:9

**attachment** 69:23
75:4 85:8

**attempt** 114:23

**attended** 58:16

**attorney** 34:9 42:22

**attorney/client**
134:2

**atypical** 33:7

**audience** 61:24

**August** 67:15 106:4
107:15 112:23

**authored** 92:14

**authority** 18:1

**aware** 40:21 67:15
71:9 150:12

**awareness** 71:7

---

**B**

**B-A-R-T-H** 56:16

**bachelor** 5:20

**back** 7:22 14:24
19:9 20:22 32:14
34:13 35:6 37:17
39:2 49:11 54:23
55:15 65:17 74:6,11
79:6 92:13,15 96:21
102:12 104:15
106:13 107:8 111:5
113:1,2 124:12
139:1

**bad** 13:24 52:19

**Bake** 108:11

**Baker** 42:24

**ballpark** 144:22,23

**bank** 20:1 21:2,9
84:17 104:24 152:3,
9

**banked** 19:20

**banker** 7:1 94:17
154:4,9

**banking** 15:18 20:6
21:5 84:20

**bankruptcy** 6:2,3,10
7:8,11 18:19

**barge** 12:23 33:2

**barrel** 51:1 133:1
144:11

**barrels** 50:4,5,6,10
115:1,2,5 116:8,11,
12,16 119:19 141:3,
23 144:21

**bartending** 19:14

**Barth** 56:5,8,15,18,
22 57:2 68:17,19
71:17 72:10 75:5
76:9,24 81:16 85:14
131:22 156:19
157:6,13

**base** 37:10 63:24
64:25 81:13 82:6
150:24

**based** 20:2 21:9
72:10 115:1,7 116:8
128:1,11 133:2
143:4 153:24

**basically** 23:25
132:17 137:17
145:19

**basis** 15:20 39:22
40:2 41:1 80:8,9
94:18 122:1,8
142:19,25 145:3

**Bates** 62:6 78:5

**began** 39:18 40:13
156:10

**beginning** 43:19

**behalf** 6:18 42:11
43:7 85:22 94:14,15

**belief** 96:9,25
142:25

**believed** 50:22
51:17 61:20 72:5,9
138:12

**Belize** 6:23 7:14

**benchmark** 144:19

**beneficially** 13:13,
15

**benefits** 81:12 99:22

**bid** 131:13

**big** 29:10 43:18
116:5

**bigger** 85:22

**biggest** 135:6 153:3

**bilaterally** 104:18

**Bill** 7:24 42:15

**birth** 4:15

**bit** 44:7 75:18
111:24 125:6
126:17 134:13

**138:21 141:16
144:9 146:23 151:1**

**blaming** 59:10

**blend** 32:24 62:24
122:21

**blended** 12:21

**blender** 12:4

**blending** 12:7 27:8
32:24 33:9 39:9
55:9

**blends** 144:2

**Bloomberg** 63:15

**Blossom** 7:7,14
21:17,19,22 22:5,8,
14,23 23:3 30:16,18
56:21,25 111:4

**blue** 76:10

**board** 15:14 17:21
18:1,2 23:23,25

**book** 39:3 40:1 85:9
96:21 99:25 100:2,
12 104:5,21 125:3
126:20 132:24
138:8 142:2

**bookkeeping** 32:13

**books** 64:15 84:16

**born** 5:14

**bottom** 70:3 85:8
145:20

**bought** 12:25 18:7,
10 26:8 114:22
119:11,17,20 133:1
141:23

**Boulevard** 24:22

**bound** 33:24 119:3

**brain** 117:1

**Brass** 13:4,6,15
14:17 23:1 29:20
32:2 43:8 46:2
53:15 54:22 57:8
59:25 62:5 63:4
64:18 67:21 70:21
71:2,4,6 73:15
74:23,25 75:15 80:6
81:15 85:24 87:3,7
92:23 94:14,20,24
95:3,17 96:5 97:14,
22 102:4,16 109:3
119:14 132:15,20
150:24 156:24

**Brass'** 13:7 28:8
121:2

**breached** 7:3
**break** 4:23 5:2 34:12
38:6 46:5,18 74:16,
22 78:23 95:8,16
105:3 120:11
129:23 145:6
**breath** 141:16
**Brent** 4:12
**Brian** 120:4,8
**bring** 72:5,19
**brings** 20:19
**British** 19:20
**broader** 75:18
**broadly** 38:19
**broker** 58:25
**brokerage** 66:9,11
**brokered** 112:20
**brokers** 143:12
**brother** 13:15
**brought** 27:19 28:4
37:22 67:12 117:20
**Broughton** 4:6,9
15:25 34:3,13,18,25
35:2,7,9,13,19,22,
25 36:3,4 38:7,9,17
46:4,8,10,17 59:6,9,
15,18,24 66:17,19
68:15 69:12,21
71:13 72:25 73:14,
17,23 74:14,18,21,
25 75:2,3 78:2,4,22
79:5 80:21 82:14
83:3,6,9,15,17,20,
23,25 84:1 85:5
87:24 89:1 92:6
93:22 95:8,16
102:22 105:19
114:9 117:8 118:19
120:21 129:24
130:7 134:7 138:1
145:6,15 146:1
148:20 151:1
154:18 155:11,21
156:2,11 158:1,6
**BTB** 6:8 18:14,18
26:3 55:22
**bucket** 153:9
**budget** 66:3,5,10,13
**bullet** 62:23 63:3
67:7 147:22 148:11
151:2

**bullets** 106:5 149:4
**bunch** 20:9
**bundle** 73:3
**business** 8:25 9:9
10:1 13:2 15:1
16:24 18:12,13,16
19:8 20:14,17 22:17
23:5 27:5 31:5,13,
15,18 32:22 33:8
36:13,15,17 37:7,13
40:1,3,8,9 43:23
47:11,12 48:22
49:24 50:19,23
51:10 52:20 55:4
62:24 64:20 65:4
66:22 68:24 72:5,18
77:8,23 86:10,19,
20,21 107:1 109:25
110:8 111:8,16
112:21 118:17,23
119:13 124:9 127:9,
11,23,25 128:2,4,6,
7,8,17 129:2,11,13
130:21 134:12,23
137:10 143:2
147:15,20 152:7
154:14,15,16,24
155:1,5,19,24
156:25 157:24
**businesses** 106:17
111:7 112:12
130:22,24 154:21
**buy** 110:1 122:13
**buy-outs** 21:15,23
**buy-sells** 119:19
**buying** 62:24 110:11
**buys** 122:11

**C**

**calculating** 133:22
136:13
**calculation** 110:10
133:18 135:25
136:12 138:10
141:22 142:3
144:13
**calculations** 79:16
133:8
**calculus** 137:11
**Caldwell** 81:11

**call** 12:14 26:3
33:17 34:16 40:1
73:24 81:22 106:23
107:13 108:3 122:9
**called** 13:5,19 14:1
19:20 20:2,11 21:3,
9 25:8,16 27:12
44:14 53:11 86:25
149:3 152:5 156:17
**caller** 76:15
**calls** 64:13 70:21
71:1 118:11
**Canadian** 13:1
112:16 138:18,22
142:7,19
**Canner** 43:2 88:16
**capacity** 40:17
55:19 78:18
**capital** 7:7 15:18
20:3 21:9,20,25
22:1,6,8 23:9 30:16,
18 37:12,16 56:21
106:12 128:3 148:2
**caps** 66:18
**care** 102:12
**cared** 140:15
**cargo** 29:12
**carried** 110:20
**carry** 10:25
**case** 6:1 60:14
63:24 64:25 82:6
92:1 104:11 125:16
**cash** 110:14,15
137:7 147:2,3,10
**catch** 141:16
**categories** 65:23
136:6 138:4,6
**caused** 18:11
**caution** 133:23
**cautious** 134:1
**caveat** 101:7
**cease** 15:4 17:4,6
**ceased** 15:12 17:2
31:25 52:9 147:14
**cell** 15:22
**CEO** 17:24 27:21,24
**cetera** 77:14
**CFO** 14:14 15:13
16:13,16,18 32:9
**challenged** 135:2

**challenges** 18:11
**challenging** 18:6
**chance** 73:6
**change** 10:6 73:17
97:9 100:7 106:7
110:11
**changed** 9:3 13:21
26:6 72:16 131:10,
12 150:9
**channel** 25:12
**characterize** 85:23
**charge** 12:7
**chart** 63:8
**chart's** 63:9
**charter** 19:21 67:1,
2,4 134:22
**cheap** 137:13
138:20
**check** 14:25 120:10
**chief** 16:7
**Chris** 108:11
**Christi** 25:12,17
27:12,24 28:5 72:6
110:23 118:25
124:9
**circulated** 101:19
**City** 21:10
**claim** 140:1
**claiming** 133:8
136:11,18,21
137:18 139:22
**claims** 137:23
**classified** 36:8
**clean** 84:16 92:18
**cleaner** 84:19
**clear** 30:14 78:19
99:5
**Click** 20:18
**client** 22:21 30:17
56:21 111:3,4
**climb** 129:12
**close** 48:2 65:5,11,
21
**closing** 141:15
**co-founded** 20:10
**coast** 6:17 8:21,23,
25 10:9 12:10,15
22:20 24:15 26:10,
13 27:6,16 29:5,7,
17 30:8,15 32:1,15
36:18 39:4 45:11

47:2
**coincidentally**
126:9
**colleagues** 31:20
**collective** 132:24
**color** 89:4,7
**combination** 22:15
80:5 117:23
**comfortable** 143:1
**comment** 64:19
**commented** 64:11
**commenting** 42:4
**comments** 88:13,15
92:25 93:1,2
**commercial** 31:19
42:4 56:20 120:14
**commercially** 64:23
**commitment** 45:2
125:15,17,18
**commitments** 115:3
**commodity** 44:2
**common** 47:22
**communicated** 71:2
**communication**
104:17
**communications**
77:3 128:23,25
**companies** 6:15
18:20 23:17 39:9
78:15
**company** 6:17 8:21
9:1,8 12:16 13:5,18
15:6 19:4,5 20:11
22:21 23:8 26:23
27:11,13 30:15
33:20 58:19 87:6
127:10 151:14
**compare** 65:8 123:4
139:13 144:14
**compared** 128:8
**comparing** 122:24
123:6
**comparison** 123:1
124:12
**competitive** 67:8,9
**competitor** 55:10
66:23
**completely** 51:9
104:8
**complicated** 126:15

**components** 135:24
**composed** 75:11,13
**concept** 75:18 84:21
**concepts** 86:6 108:4
**conceptual** 132:10
**concern** 45:16,17
52:14 69:5 135:6
**concerned** 69:8
101:23
**concerns** 67:9
**concessions** 124:10
**concluded** 158:10
**conclusive** 96:14
135:21
**condensate** 72:6
75:21 76:19 77:14,
17,23
**conduct** 31:18
134:12 157:22
**conducted** 155:19,
24
**conducting** 132:17
157:23
**conferred** 81:11
**confident** 109:2,4
**confidential** 34:6
35:17
**confidentiality**
33:25 34:17 119:3
**confidentially** 36:1
**confirm** 7:22 13:11
**confirmed** 89:23
**confirming** 81:13
**confusing** 98:20
142:1
**confusion** 65:6
**conjunction** 140:5
**connections** 23:2
**consecutively** 59:4
**considered** 137:25
**consistent** 102:14
104:25 126:9,21
**consistently** 23:11
**consonants** 38:10
**constituted** 153:6
**consulting** 20:10,13
21:24 23:4 28:2,3
30:20 56:24
**contact** 22:3 55:16
58:10

**contacts** 56:23
**contained** 156:14
**contemplated**
106:16
**contested** 18:23
**context** 130:25
**continuation** 75:17
**continue** 26:12 40:8
55:15 59:5 100:14
108:13 135:3
**continued** 28:2
110:8
**continuing** 27:6
**contract** 29:10,22
122:24 125:4,9,21
126:5 127:5 139:14
**contracted** 38:25
115:23
**contractors** 12:24
**contracts** 29:7,9,16,
17 30:1
**contractual** 156:6
**conversation** 70:15
155:5
**conversations** 6:11
58:24 67:25 96:2
128:23 131:3
133:25 157:5,7
**COO** 16:14,17,19
**copy** 70:4 71:17
112:10
**corner** 62:7 78:6
**corporate** 10:4
16:21 26:17
**Corpus** 15:18 16:21
18:21 24:10 25:2,8,
12,16 27:12,24 28:4
39:2 40:8 50:4,10,
15,25 51:2 55:20
64:8 72:6 110:23
118:25 119:1,19
124:9 148:2,3
**correct** 21:18 31:9
34:5,25 43:9,15
47:3 50:15 55:23
62:19 70:23 76:5
82:18 95:18 99:10
101:15 102:7 103:7
124:14,15,20,25
131:7 136:24
142:11 149:11,12,
14,15 153:14

156:20
**correctly** 45:14 62:9
106:19 137:16
145:22
**Cortina** 21:22
**cost** 64:12 99:25
100:1,11 104:5
110:24 128:2
**costs** 40:4 66:9,11
96:23 100:20 101:1
103:15,17,18,19,20
104:3 110:23 128:2
137:10 153:7
**costs/**
**reimbursement**
103:10,13
**counsel** 42:2,3,18,
21 43:3,10,11 92:25
133:25
**couple** 28:19 42:13,
14 49:21 103:2
112:15 118:10
128:14 141:19
148:25 151:2
**court** 4:20 8:16 32:4
72:25
**cover** 28:14 70:1
**covered** 142:12
**coversheet** 92:8
**Craig** 16:16 27:20
**created** 62:13 152:5
**credit** 110:13 147:1,
2,10
**crisis** 22:16
**crude** 13:1 18:8 27:9
44:13 48:21 72:6
75:21 76:18,23
77:10,19,22 80:15
111:12,17,18
112:16 117:24
130:23 138:18,22
142:7,19
**crudes** 75:25
**Crystal** 41:20
**current** 108:14
110:22 131:4
**customer** 30:3
55:10 66:23 144:4,5
**customers** 33:3
71:22 72:4
**customized** 115:8

**D**

**Dabney** 20:2
**daily** 126:1 145:3
**damages** 133:8
137:12 138:6,17
**Dan** 68:8 70:24
**data** 63:10,13,15
**database** 63:14,20
**date** 4:15 11:19
25:23 88:20 89:2,13
90:16 97:19 98:5
148:13
**dated** 84:2 149:24
150:6,23
**dates** 7:23 8:3,5,8,
11,13
**dating** 111:5
**Dave** 14:18 27:24
28:1 42:21 92:8,9
149:24
**David** 34:21
**day** 25:11 48:3
95:24 108:25 110:9
140:8 147:15
**day-to-day** 26:18
39:22 80:8 85:23
116:15 121:23
122:1,7 132:13
**days** 33:5,14 95:25
**deal** 36:25 55:12,13
58:14 67:5 68:17
78:20 84:13 94:9,22
108:18 112:19
134:10,11 139:15
140:16 150:10
157:2,14
**dealing** 98:21 120:2
**dealings** 147:8
**deals** 67:5 83:12
109:20
**dealt** 120:4 156:19,
23,24
**debt** 21:24
**December** 131:25
135:15
**decided** 22:19 48:4
50:11 54:20 55:3
94:7
**deciding** 94:16

133:4
**decision** 17:22
50:12 80:14,16
89:16,18,20 94:10,
13
**decision-maker**
61:20
**decision-making**
18:1 24:1
**decisions** 17:19,20
24:4 26:17 38:24,25
39:6,9,12 122:13,20
134:16,17
**dedication** 30:21
**deepwater** 25:10
**definite** 155:9
**definitive** 92:1
**definitively** 89:24
**degree** 5:21 58:21
**deleted** 101:8
**delineated** 129:19
**delivered** 33:2
**demand** 111:21
**demurrage** 40:4
96:23
**department** 114:3,
12
**departure** 17:24
**deposed** 5:24 6:11
**deposition** 7:9,21
28:9,13 34:21,23
38:5 158:10
**depositions** 35:16
59:4
**describe** 12:17
18:25 32:21 33:4
50:1 106:22 136:4
**description** 85:15
114:17
**descriptions** 29:22
**designate** 34:22
35:16
**desirable** 125:10
**desire** 87:18 134:23
138:24
**detail** 16:23 69:10
73:9 126:4
**detailed** 125:25
**details** 94:22 129:6
**developed** 19:5

**developing** 14:3
**Dick** 13:15
**difference** 124:21
144:15
**differences** 125:1
134:8
**differential** 115:21,
22
**difficult** 43:23,25
44:19 45:2,18
**difficulties** 52:15
**difficulty** 46:19
49:12 114:17
**dipping** 137:13
**directing** 23:25
**direction** 18:3 112:3
118:13
**directly** 67:14 71:6
86:4 95:1 129:9
**directors** 15:14
17:21 18:2
**dirty** 44:14
**disagreed** 52:23
**disagreements** 61:5
**discomfort** 46:18
**discuss** 33:17
**discussed** 45:23
48:23 75:20 89:23
101:5 108:5 109:10
129:14 153:1
**discussing** 34:7
45:20 58:6 127:4
**discussion** 15:23
31:19 49:11 68:13
76:17 86:2 94:23,25
95:2 102:1 117:5
125:11
**discussions** 33:19,
22 34:4 37:3 41:15
45:22 46:2 51:25
54:3 55:14 56:12
57:20 58:12 71:23
72:10,20 76:24
77:3,6 79:23 80:4
95:5 118:8 128:11
147:9 157:12
**distinct** 111:13
**diverged** 61:4
**division** 85:24
**divulge** 35:24
**divulging** 133:25

**document** 31:21
60:3 68:21 71:15
73:8 80:23 82:13
85:4,6 87:23 88:2,8
90:21,24 92:5 96:19
98:1 99:9 100:16
101:23 104:8
105:18 114:8 117:7
120:23 149:25
**documents** 34:23
94:9,17 101:13
149:1
**dollar** 18:9 44:15,17
**dollars** 110:18
115:23 144:10
147:6
**domain** 76:22,23
**Donaldson** 21:3,12
**double** 14:25 20:18
52:22
**downtown** 28:7
**dozen** 88:8
**dozens** 44:24
**draft** 88:9,20 90:16
91:6,20,23,25 92:7,
13,15,19,20 93:11
94:5 97:10,11 98:2,
4,15,18,19,21 100:4
101:19 103:2
122:25 123:19
124:13,16 127:19
129:14 142:8,10,13
149:23 150:2,9
157:20
**drafting** 74:2 105:13
**drafts** 88:5,9,12,18
95:21 97:9 101:12
150:6 151:8 156:16
157:10
**dramatically** 126:22
**Drive** 4:14
**driven** 77:18
**due** 11:8 131:10
**dug** 141:17
**duly** 4:4
**duties** 10:1,5
**dynamics** 131:11

**E**

**e-mail** 31:2,4,7,8
61:16 62:2 70:1,3

71:16,20 75:5 85:8,
20 114:11 117:9,10,
12 128:24 141:7
149:4,23 150:23
155:6 157:6
**e-mailed** 98:16
**e-mails** 7:22,25
68:10 70:21
**e-u-s** 27:23
**earlier** 28:21 50:17
51:14 62:16 77:13
93:15 101:16 111:1
112:8 116:1 119:18
128:14 130:7
147:24 154:8
**early** 19:6 50:5,9
52:4,17 53:2 86:11
107:25 120:13
125:7 156:18
**easier** 87:19 149:2
**easily** 47:21
**economic** 93:19
142:21 152:25
155:15
**economics** 5:20
**education** 5:19
**effect** 44:14 52:2
121:13,20 157:13,
19
**effectively** 36:12
109:24 112:17
137:7
**effort** 75:17
**efforts** 76:3
**elaborate** 6:24 91:9
**elements** 123:2,3,5
**embark** 133:12
137:15
**employed** 7:6 8:20,
22 23:11
**employee** 8:21 28:4
30:18 33:20 38:1
111:4,6
**employees** 10:14
99:19
**employers** 19:13
**employment** 11:7
12:2 23:12 30:25
91:16
**Encap** 14:1,19
17:19,22

**end** 17:11 22:23
41:7 65:16 84:15
90:3 100:20,22,25
110:3,22 126:2
134:10,24 135:4
141:18
**endeavor** 36:17
**ended** 22:12 23:3,9
114:14 140:11
152:11
**energy** 19:7 22:9
23:5 87:1 145:20
149:7,10 154:13,24
155:2,3
**energy-related**
22:12
**engaged** 26:9 124:8
**enter** 29:7 50:11
51:4
**entered** 8:10 34:17
152:16,22,24
**entering** 96:10
135:13
**entire** 98:1 101:8
**entities** 23:10 91:18
**entitled** 63:24 106:4
**entity** 15:8 60:21
84:14 90:17 135:3
151:23 152:5,18
**environment** 18:6
**envision** 87:9
**envisioned** 87:4
**equity** 14:1,19 21:24
**era** 22:16
**Eric** 51:21 54:10,12
58:15 61:13,20
67:22 68:25 70:14
71:4,8 76:16,21,25
86:4 94:15 102:18
108:11 127:7,23
128:5,11,13,17,25
153:24 154:1
**Eric's** 128:8
**Ernie** 92:8 149:23
**errors** 137:1 138:10
**esoteric** 116:24
**essentially** 12:11
51:5 86:23 96:6,16
108:12
**estate** 6:23 20:15
**estimated** 127:24

**estimates** 63:18
**estimation** 65:3,4
**evaluating** 106:13
**evaluation** 126:14
**evaluations** 40:11
**events** 8:4
**eventually** 86:20
141:20
**Everything's** 73:20
**exact** 25:23 55:4
85:11
**EXAMINATION** 4:5
148:22
**exception** 77:20
101:4
**exchange** 157:9
**exchanged** 68:10
91:20 151:8
**excited** 48:6 51:16
128:5 129:3
**excitement** 127:7
**exciting** 129:8,10
**exclusive** 36:24
**excuse** 14:17 72:7
111:17
**executed** 49:19
104:8 120:24
151:17
**executive** 11:14
**exhibit** 60:1 69:15,
22,25 71:11,14,16
72:22 73:12,24 74:2
75:1,2 76:3 77:4
79:6 80:19,22
82:11,15 84:2 85:2,
16 87:21 88:2,19
89:14 91:19 92:3,7
96:18 97:6,17,25
99:6 102:20,23
105:16,23 109:17
114:6,10 117:3
120:19,22 121:21
145:16 149:2,22
150:14
**exhibited** 99:23
**exhibits** 59:5 121:5
**exist** 124:18
**existed** 13:18
**exists** 15:8
**exiting** 53:16

**expand** 48:21
**expanded** 9:12
**expect** 65:13 87:16
145:2
**expected** 104:4
**expense** 113:10
**expenses** 113:23
153:12
**experience** 44:5
45:11,15 154:3,14
**experienced** 126:8
**expert** 45:4
**expertise** 29:21,23
78:16
**explain** 83:8,10
103:8 134:13
138:21
**explained** 51:14
90:19 91:1
**explanation** 94:19
**explore** 53:23
**exposed** 115:24
**exposure** 45:7
**expressing** 52:14
130:13
**extent** 40:6 47:9
68:18 114:10
125:13 133:24
**extra** 39:11

**F**

**F-A-L-I-K** 120:9
**facilities** 33:1
**facility** 15:17 18:21
24:9,10 25:3 40:22
50:4 51:2,6 55:20,
21 72:8 75:24
119:1,11,17,21
130:8,13,16
**fact** 19:3 35:17
45:25 47:16 64:8
**factions** 6:6 18:17
**factor** 22:16
**factors** 22:15 45:18
115:7 137:9
**facts** 140:12
**factually** 136:23
**fair** 40:20 148:15
**fairly** 10:4 61:1 77:5

**Falik** 120:4,8
**fall** 76:21,23
**familiar** 66:21 88:8
  121:10
**family** 6:7 14:21,23
  18:15
**fast** 147:21
**father's** 23:8
**fault** 73:20
**FBI** 13:23
**February** 40:13
  52:5,12 124:4
  141:13
**federal** 6:2
**feel** 60:23,25 65:2,
  14 119:6 125:21
  135:18 155:7
**feels** 146:19
**fees** 64:7 148:2
**felt** 72:15,18 116:14
  143:20
**Fenton** 14:23
**figure** 86:4 136:12
**figuring** 65:9
**filed** 8:16,18
**fill** 53:12
**final** 81:3 82:17
**finalized** 34:4 93:17
  104:8 127:19
**finally** 14:20
**financial** 15:14
  22:15 43:24 45:19
  62:10 114:24
**financing** 26:14
  27:7 30:2 33:11
  84:17,21 106:5,8,20
  107:24 108:16
  112:23 147:19,23,
  24 149:4 150:11
**find** 8:14 53:12 61:8
  109:13 138:13
  145:4 146:13
  147:17 149:22
  150:20
**fine** 46:8 78:1
  146:10
**finish** 74:18 94:22
**finished** 145:7
**firm** 14:1 21:13,14
  22:9

**fit** 33:20
**fixed** 9:25 32:17
  37:10 103:9,13
  115:21
**Flatrock** 14:1,19
  17:19,22 131:9
**flow** 104:17
**FOB** 33:1
**focused** 82:23
**focusing** 18:10
**follow** 44:25 138:22
**follow-up** 148:25
**followup** 146:24
**Force** 20:12,14
**forecast** 81:23
**forecasting** 81:20
**foresee** 93:12
  144:12
**forget** 5:1 41:20
**forgot** 123:23
**forgotten** 124:3
**form** 83:2 88:22
  93:18 108:14
  118:15 137:21
  145:24 154:18
  155:11,21 156:2,11
  158:1
**Forma** 64:25
**formal** 8:15 11:22
  12:1,5 34:17 50:12,
  13 122:23 131:13
**formalized** 36:19,21
**formally** 16:6,9
  32:11 49:19,23
**Formas** 63:24
**formed** 13:18 14:1,2
  20:10 25:17 86:8,9
**formulated** 63:4
**forward** 9:4 51:5
  57:5 65:1 70:8
  77:19 91:12 139:15
**found** 99:17 106:14
  109:16 110:1
**founders** 17:8,11
  27:2
**founding** 130:18
**frame** 54:18 67:15
  84:24 111:6 146:20
  156:18
**freight** 103:10,13,25
  104:3

**frequently** 10:5 40:2
  95:6
**friend** 116:19 117:2
**friends** 14:21
**front** 69:22
**fuel** 13:1 27:9 44:13,
  15 47:6,11,20 48:21
  49:4 52:19,20 61:3
  62:25 63:15 80:15
  111:16 115:1,21,22
  116:9,11 117:20,24
  118:18 126:17
  143:4,23 144:2,15
**fuels** 115:5
**full** 4:11 39:25
**full-time** 28:4 30:22,
  23 139:2
**fully** 26:9
**function** 49:5 81:12
**functions** 32:13


                 **G**

**GACA** 119:25
**gain** 66:1
**gap** 109:12 119:18
**gave** 7:9 53:7 94:19
**GCAC** 12:13,14,19
  13:3,18,25 19:1,7
  22:24,25 23:1,7,11,
  15 24:22 28:23
  30:18,21 33:18
  37:24 39:12 42:2,18
  43:7 47:18 48:1,5,
  10,12 49:23 55:19
  57:15 78:10,18,21
  79:18 84:8 85:22
  87:5,10,11 88:5,10,
  20 89:11 90:10,11,
  13,17 91:2,5,12,15,
  23 93:8,12,24 94:4,
  14 95:7 96:19 99:25
  100:2,6 102:11
  103:16 104:10,12
  105:4,5 106:10
  108:14,18 110:24
  111:3,6,7,9 112:12,
  25 114:22 123:8,10,
  12 124:16,22 125:2,
  22 127:3,21 132:12,
  24 133:8 134:9,25
  137:19,23 138:7

**frequently** column continues...

  139:1,23 145:21
  149:7,8,17,18,24
  150:9 151:12,18
  152:16,22 155:8,18,
  23 156:9 157:19,22
**GCAC's** 39:4 48:21
  51:14 81:9 84:11
  88:14 90:7 100:20
  116:2 118:13
  121:24 125:10
  140:23
**GCAC/ASPHALT**
  146:25
**GCAC/MERCURIA**
  33:23
**GCAC/NEWCO**
  89:19
**GCAC/RIO** 40:12
**GCAC/VITOL** 89:19
  123:9
**general** 66:6,7 75:6
  80:8 96:9 138:17
**generally** 10:3 12:23
  15:19 21:25 26:14
  66:1 71:25 153:21
  154:9
**gentleman** 56:22
**George** 10:16
  122:14,15
**George's** 122:16
**get along** 57:2
**Giles** 34:2,11,15,20
  35:1,3,8,11,14,20,
  23 36:1 38:6,14
  46:6,9 59:3,8,13,17
  69:11 73:21 74:12,
  15,20,23 75:1 77:25
  83:2,5,7,11,16,19,
  21,24 88:22,24
  93:18 95:9 118:15
  129:22,25 133:23
  137:21 145:8,24
  148:23 150:19
  154:20 155:13,23
  156:8,13 158:5,7
**gist** 73:10
**give** 4:10 85:15
  90:11
**Glencore** 36:22
**gmail** 31:14
**Goldstein** 4:3,7,12
  46:17 59:24 69:21

**guessing** 58:17
103:25 109:1
**guidance** 64:10
**Gulf** 6:17 8:21,22,25
10:9 12:10,15 22:20
24:15 26:10,13
27:5,16 29:4,7,17
30:7,15 32:1,14
36:17 39:4 45:11
47:1
**guy** 144:2
**guys** 26:5 33:25
74:17

## H

**H-A-R-A-R-I** 120:10
**H-U-C-K-E-R** 10:20
**half** 13:15 21:23
70:3 100:2 108:25
147:6 148:15
**hampered** 135:16,
19
**hand** 62:12 71:13
120:21 123:8
**handle** 119:4
**handled** 120:13
**happen** 68:5 79:24
152:1
**happened** 8:4 27:18
53:13,14 65:7 67:17
86:22 87:6 101:18,
20 104:13 107:22
110:5 127:12,13
139:4
**happening** 107:24
150:12
**happy** 5:4,8 18:3
51:15,22 53:22 61:8
67:2 70:14 71:3
76:15
**Harari** 120:5
**hard** 77:21 127:6
**harder** 77:21 134:12
**head** 29:2 32:20
37:4
**heading** 112:3
**headquarters** 16:22
**heard** 67:13 148:16
**hearing** 102:16
103:21

**heat** 64:12
**heavily** 15:16 42:3
64:16
**heavy** 13:1 27:9
44:13 75:24 76:23
77:10,19,22 111:17
130:22
**hedge** 43:23,25
44:11,14,19 45:3,25
80:10,15 105:9
114:18,24 115:9,13,
17 116:15 117:25
122:10,11 137:2,3
**hedgeable** 44:23
47:21 63:16
**hedged** 47:20 116:8,
15
**hedges** 66:11 79:19,
23 80:9 118:13
133:2,4
**hedging** 33:17
38:24 39:12 45:5,15
46:19 49:12 52:15,
20 62:15 65:22
66:1,4,8 77:21
79:11,17 80:5,14
114:17,20,22,24
116:2,4,25 117:16,
19 122:9 132:1,13,
17
**held** 16:13 19:12
50:25 51:7 90:10
110:19
**helped** 116:25
**helping** 62:12
**Hermosa** 86:25
87:1,2,9,17 104:11,
12,24 105:1,4,6
152:3,5,10,16
**hey** 31:21 52:24
53:11,15 68:1,23
80:14 131:1 134:21
**high** 5:17,18 22:17
144:17
**higher** 28:23
**highs** 22:18
**hindsight** 65:1
**historical** 8:5 79:9,
12
**historically** 33:13
67:6 118:17

**history** 8:3 19:9
84:12
**hold** 109:25 146:13
**holder** 51:3
**Holly** 4:14
**hope** 10:20,23 127:6
**hopeful** 104:10,25
**Horowitz** 116:18,19
**hot** 74:15
**hour** 4:24 46:7
**House** 19:21
**Houston** 4:14 5:13
16:21 22:11,13
24:6,7,13 28:6
78:15
**how's** 126:11
**Hubenak** 14:18
27:24 42:21 92:8
149:24
**Hucker** 10:16,18,19
12:3 14:18 75:15
**hundred** 30:19
87:18 106:10
110:18 115:4,5
**hungry** 77:25
**hypothetical** 82:1

## I

**i-a-n** 120:8
**idea** 37:16 40:7
51:23 54:1,7 55:12
63:7 71:3 84:7,9,14
108:22 113:24
144:8
**ideas** 39:10 68:10
80:8 129:20 133:17
**identification** 69:16
71:12 72:23 80:20
82:12 85:3 87:22
92:4 102:21 105:17
114:7 117:4 120:20
**identified** 53:24
140:17 142:11
**idle** 86:23
**Iglesias** 42:15,17
**ill-advised** 156:5
**imagine** 25:2 39:13
75:9
**IMGIS** 20:11

---

**75:4** 79:5 95:17
102:22 145:15
148:24
**good** 4:7,8 32:7
35:13 65:3,4,12
104:17 117:21
129:11,22 140:14,
17
**goodwill** 109:24
146:12
**GOTAC** 25:8,19
27:10 55:22 76:6
130:8 131:1
**grab** 59:7 150:15
**Grace** 10:16 11:23
122:17
**grades** 44:22,25
**graduate** 20:22
**graduated** 19:10
**graduation** 19:11,20
**Gravity** 6:17,18 7:10
11:9 12:9 13:16,22
15:1,11 16:24 18:3
19:1,7 23:13,15,17,
22 24:1,4,6,21,23
25:1,7,8,13,16,18
26:9,13,19,25 27:5,
20,25 28:3 29:6,25
30:4 31:6 37:15
39:19 40:19,22,23
42:7 55:18,19 71:18
76:3 78:20 121:6
130:18 139:2
**Gravity's** 72:1 78:10
**great** 5:18 35:11
58:21 73:11 100:15
145:8 158:7
**Greenway** 24:14
**grew** 5:17 30:21
52:21
**group** 10:13 14:20
19:24 20:6 21:6
**grow** 5:12
**guess** 12:4 28:12
42:15 43:19 50:9
54:10 61:7 62:4
71:24 88:10 91:25
107:10 110:5 113:4
115:8 124:21
128:16 131:22
137:24 154:1

immediately 76:2
88:19
imminently 135:13
Imperial 20:3
impetus 138:24
implemented 88:17
important 28:20
in-house 22:20
42:21 43:9
in-person 107:14,20
108:1,8
inaccurate 28:18
inappropriate 67:18
included 65:22
66:20 83:18 137:24
151:18
including 4:11
inconsistency
100:17
inconsistent 99:18
incorrect 138:12
incur 138:18
incurred 104:3
137:6,12
independent 20:9
84:16 87:6
indicating 157:22
individual 16:15
individuals 14:16
153:22
influence 122:20
informal 122:24
information 62:10,
13 64:5,7 105:10
127:23 138:12
infrastructure 37:18
initial 14:23,24 34:5
57:12 58:12 71:7
104:1 134:10
147:13 149:3
initially 13:19 20:11,
15 21:10 23:2 24:7,
14 27:19 56:19
58:11 62:14 67:22
71:7 84:13 87:19,20
101:25 102:9
125:16
initiated 51:25 72:20
84:9
input 63:19 75:11,13
76:25 81:9 132:21

134:21
inputs 62:15
inspection 96:23
institutional 22:1
instruct 113:15
instructing 114:2,12
instruments 43:24
intended 61:23
86:12 127:24
intensive 128:18
intention 18:10
91:14
interacted 42:16
interaction 56:20
interactions 54:17
interest 14:13,15
49:1 72:21 77:13
106:12 112:18
130:13 131:3 139:7
148:9,14
interested 8:9 19:15
48:20 72:7 78:17
130:16,19
interim 16:7 106:5
109:8,9,14 112:23
147:17 149:4
intermediate 76:1
intermediation 37:9
internal 126:13
internet 20:10
interrupted 9:22
interrupting 9:19
interruption 15:22
68:12
inventory 51:3
110:20 126:14,16,
17 135:21 137:13
138:19 142:24
143:3 147:4,11
investigation 13:23
investment 7:1
14:20 20:1,6 21:2,5,
8 94:16 154:3,9
investments 23:4
investor 14:22
investors 14:23
invoice 113:8,11,16,
18 114:13
invoiced 103:16
113:6

invoicing 112:25
113:14,21 114:2
involve 134:2
involved 12:19
15:16 22:12 23:7,9
24:3 27:4,6 29:6,8,
17 30:1,2 33:13,16,
18 37:2 38:23,24
39:6,12,14,16
40:11,18 41:22,25
42:4 43:3 46:1 47:9,
14 55:17 57:14
58:12 60:6,16,18
64:16 68:19,20
76:24 80:11,16
86:10 88:12 95:5
113:19,22 116:5,16
119:23 122:12
130:21 132:4,12
140:22 154:22
157:2
involvement 15:11,
12 17:2,4,6 58:5
85:22 113:24 116:2
121:23 122:3 132:8
involving 31:19
ironically 111:21
irrelevant 110:6
146:7
ISIS 13:19
issue 45:20 69:9
102:10
issues 103:22,23
126:13 141:21
item 56:7
items 29:1 103:9
iteration 81:3
iterations 81:2
82:16

## J

James 56:22 75:6
76:9
January 8:24 22:24
49:20 52:11 71:17
72:1 135:12 140:8
141:13,15 152:12
Jason 4:3,12
Jenrette 21:3,13

Jg@
gravitymidstream.
com 31:9
Jgoldstein@
gcachouston.com
31:1
jive 101:2
JMA 43:14 49:13
51:15,24 52:2 68:23
103:9 105:11 107:2
151:4,10,17 156:16
job 19:10,19 20:1
22:25
jobs 19:12
Joe 10:16 11:6
14:17 140:23
John 32:3 81:11
join 57:24
joined 9:8 11:16
22:24 30:18 111:6
127:10 139:1
joining 57:15,19
joint 36:6,8,10,13,16
37:20 38:18 39:17
40:12 41:23 43:5
47:14 49:22 88:4
89:19 150:10 151:5
152:23,25 153:11
157:24
jointly 39:10
Joyce 13:4,6
JSMA 92:9 150:2
156:17
July 48:2 49:18
50:19 51:11 52:10,
12 67:15 70:5 80:10
91:24 92:7,14,18
94:6,8 95:4,19
96:13 97:1,8,14,23
98:4,9,12 100:8
101:19 103:1,2,9,
13,17,19 105:7
110:25 114:5
122:25 123:19
124:13,16 127:19
129:14 131:24
142:8 147:14
149:24 150:9,23
151:7 152:21 155:7
156:18 158:3
June 25:21 80:10
84:2 88:21 94:6
95:4,19 96:3 97:19

001466

98:2 103:17,18
110:25 114:5
156:18

**K**

K-U-O 54:12
K-V 38:16
Kale 38:1 42:15 46:3
Kale's 38:15
Karen 81:11
Kaye 42:23
keeping 40:9 64:15
104:20 140:13,14
Ken 4:9 59:3
Kenny 14:18 75:15
122:19
Kenny's 29:23
key 15:15 61:20
kind 6:1 10:4,13
16:14 19:9 24:4
33:6,9 40:11 45:8
49:11 51:7 52:24
58:18 70:16 75:6
82:6 85:15,21 87:11
89:4,6 95:20,21
98:19 102:14 107:8,
9 111:24 112:23
118:3 126:14,15
127:21 131:24
134:1,12,15 138:16
139:10,12 141:18
143:12 146:12
147:16 149:1
kinds 41:4
knew 13:21 54:13
56:16 64:7 66:13
76:9 78:15 84:12
101:25 155:15
knowledge 15:6
27:1,3 32:3 47:15
92:1 97:9 105:8
131:16 139:23
149:17,18 150:8
151:8,9
Kohnke 92:8 149:23
Krhovjak 38:2
42:15,17
Kuo 51:21 54:10,12,
15,23 55:15 56:3
58:15 61:13 68:17,
18 71:4 76:16 94:15

102:18 108:11
128:25
Kuo's 76:21,25
127:7

**L**

labeled 84:5
labels 97:6
labor 85:24
Lake 21:10
large 21:13 37:10
largely 64:4
larger 122:4
lasted 108:23
late 16:5 17:5 19:6
25:23 50:16 52:17
53:2 67:15 96:3
105:7 114:11
141:15 156:18
lawsuit 7:18 8:1
133:9
lawsuits 6:9 18:19
lawyer 59:11 154:10
lead 85:25
leaning 37:17
lease 50:25 64:8
75:17 90:10,12
103:15 119:21
122:7 151:19
leased 32:25 50:6
151:15
leaseholder 39:1
119:18
leases 29:13 30:5
134:16 135:1
leave 18:5 22:14
43:12 48:12 116:3
leaving 10:20,23
17:12
led 49:11 50:12
119:24
left 15:6,10 17:9,15
22:23 25:22 26:19
28:1 30:17 48:1,14
51:6 130:18
left-hand 73:18
legal 28:3 36:7 42:1,
5 68:21 101:22
138:2 156:6

level 10:13
leverage 37:12
leveraged 21:15
light 72:5 75:21
76:18 111:18
limit 128:22
limited 48:19
lined 92:16 98:18
lines 70:17 88:6,13,
17 92:21 98:20
111:8 112:12 127:9,
11,23 128:4,17
129:1,13
lining 89:3
liquid 44:10
list 96:14 103:24
listing 20:16
literally 141:4
loan 110:17
located 22:11
lockstep 44:15,25
logical 54:6 139:19
142:17
long 8:22 18:16
25:18 42:22 47:25
52:1 54:16 74:16,19
108:22 111:1 112:1
141:12 144:9
long-term 33:20
53:21,22 80:16
134:24
longer 32:15 56:23
67:5 108:18 123:10
125:6,15 126:15
looked 14:9,10 40:6,
9,25 54:18 58:4,19
62:3 75:18 82:21
83:13 92:6 93:3
96:19 98:25 103:3
112:22 139:25
140:3 144:9 149:21
Los 20:2
lose 66:12
losing 41:3
loss 39:25 66:1
81:21 105:9 110:10
126:23 153:11
losses 36:14 40:5
51:10 96:17 106:11
107:1,5 108:19
125:2 136:9,11,13
137:3,6,10 138:8,17

142:2 153:4
lost 77:13 134:5
135:8
lot 14:10 36:20
37:18 38:10 45:6
65:6 72:3 107:3
117:13 127:1 134:5
135:12,15 140:8,11
153:4 155:5
lots 116:16
love 59:6,9,15 131:1
low 22:18,19 52:19
135:22 143:21
144:17
lower 62:6 78:6
126:22 142:24
lows 22:18
Loya 108:11
Lufkin 21:3,12
lunch 74:12 78:23
79:1 118:9
lunches 117:11

**M**

M-A-C-Q-U-A-R-I-E
49:10
M-A-R-L-O-W 41:19
M-A-U-R-I-C-E
120:9
Macquarie 49:7,8
made 14:21 17:10
37:18 61:12,13 71:9
76:22 84:18 88:15,
17 89:11,16 92:25
94:12 95:25 100:8
124:7,10 126:6,10
127:3,5,18 139:14,
15 140:18 157:23
main 13:2 58:15
85:21
maintaining 16:17
134:16
major 24:1,4 29:16
30:1,3 120:14
155:15
majority 11:8 17:23
make 17:22 25:17
66:12 98:21 103:24
122:21 126:23
144:16,18 149:2
150:15

**makes** 33:10 71:24
85:12 100:3 105:6
127:2
**making** 17:18,19
41:3 57:6 60:16
88:13 101:22
104:17 122:13
133:18 134:15,17
136:22 144:12
**man** 73:22
**management** 5:23
10:8,9 13:25 14:12,
17 15:14 17:7,9
19:3,4 21:23 27:14,
20 37:14 78:14
91:13,17 93:13
105:4,13 131:4,5
152:15
**manually** 63:19
**manufacture** 75:25
**Marc** 116:18,19
117:20,22
**March** 48:13 49:3
58:7
**margin** 62:24 64:9
127:25
**margins** 64:19,24
77:22 79:9,12 82:1
128:2
**Marine** 55:5,10
**marked** 59:25 69:15,
22 71:11,14 72:22
73:14 80:19 82:11
85:2 87:21 92:3
102:20,23 105:16,
23 114:6 117:3
120:19 145:16
**market** 44:11,23
72:16,19 77:17
111:2,19 126:20
131:11 143:6,25
144:1
**marketer** 9:24 12:11
**marketing** 9:10
12:18 32:19 36:10,
16 37:20 38:18
39:17 40:13 41:23
43:6 47:15 49:22
75:6,17 76:3 78:8
88:4 111:15 121:11
126:15 150:10
151:5 152:25
157:24

**markup** 89:13
**Marlow** 41:19
**maroon** 89:4
**Mason** 59:10 73:16
**master's** 5:22
**match** 45:18 111:22
117:25
**matching** 115:20
**material** 54:16 93:20
97:8,24 99:3,4
113:4 152:25 153:2,
5,6 155:20 156:1,13
**materially** 127:15
**math** 52:17
**matter** 4:10 7:14
53:6 95:21
**matters** 42:5 54:4
**Mattingly** 10:16
11:1,6 14:18 140:23
**Maurice** 120:5,9
**maximum** 123:13,25
**Mckenzie** 42:24
**meaningful** 58:23
71:23 77:5
**means** 12:23 44:16
82:8 104:6,7
**meant** 34:16 83:22
108:17 109:15
146:24
**mechanism** 116:25
**medium** 144:17
**meeting** 70:22 76:16
104:14,15 106:23
107:14,20,23 108:2,
8,9,15,20 109:10
110:9
**meetings** 7:23 8:12
45:23 58:16 118:10
**member** 87:20
**members** 13:25
14:12 17:7 130:18
**memorized** 73:9
**memory** 28:25
36:20
**mention** 148:16
**mentioned** 20:22
28:2,22,24 36:5
48:18 61:2 66:23
76:17 77:20 105:2
110:24 130:7 142:8

**mentioning** 142:6
**merchant** 19:20
**Mercuria** 32:23
33:17,19 48:18,24
65:14 112:9,10,15,
17,21 115:6 118:18,
23,25 119:8,20,24,
25 120:3 121:25
122:24 123:9
124:13,19,22 125:4,
19,21 126:1,5,8
127:5 134:11,22,25
139:5,14 140:9
141:15 143:1,7,14
144:22
**Mercuria's** 119:4
139:10
**Mercuria/gcac**
123:10
**merged** 16:14
**mergers** 19:23
**message** 31:18
102:14 108:12
**met** 23:2 56:19 68:7
128:13
**methanol** 111:12
**mid** 7:11 130:11
141:14
**middle** 4:11 16:3
18:7 25:20,22 50:24
56:11 146:25 149:9,
16,17
**midstream** 6:18,19
11:9 13:22 14:2
15:1 16:24 18:3
19:1 23:22 25:14,
16,18 26:9 29:6,25
155:4
**Mike** 108:11 140:24
**million** 65:21 82:9
136:10,17,21 137:7,
18 139:21 147:6
**mind** 28:18 90:25
125:10 131:10,12
**minds** 108:15
**mine** 64:24
**minimal** 23:16
**minimum** 40:2
**minor** 30:4 112:20
**minus** 56:14
**minute** 11:12 15:24
59:14 68:14 93:3

117:6
**minutes** 108:25
**Miscellaneous**
66:16
**mission** 143:22,23
**mistakes** 138:9
**MIT** 5:23 20:23
**Mobil** 9:16,17
**Mobile** 50:6,7,10,16
90:11 103:15
110:25 113:9 114:4
148:4,5 151:15
**Monday** 35:12
**money** 41:3 64:12
148:8,10
**month** 10:6 58:8
76:19 105:12
**monthly** 39:22 40:2
41:1 63:17,21
**months** 16:6,13
20:12 41:4 105:8
112:4,6 113:10
141:10,19 148:5
**Moran** 140:24
**morning** 4:7,8
131:24
**mother** 13:7
**mouth** 146:8 156:23
**move** 44:14,16
145:3
**moved** 5:14 24:20,
21,22,24
**movement** 44:3
**moves** 44:15,16
**moving** 40:21 50:4,
5,10
**multiple** 54:3

---

**N**

**named** 13:20 56:22
**names** 25:5
**necessarily** 14:5,6
44:16 53:20 77:15
130:21
**necessitated** 91:17
**needed** 23:6 39:1
62:15 76:25 104:12
105:10 108:16
**negative** 41:14
96:25

negotiating 29:18
30:1 41:22 42:10
43:5 86:1 155:14
negotiation 110:2
negotiations 29:8,9
85:21 119:24
120:13 121:17
124:10 127:20
128:15 135:17
157:12
Neil 7:23
Newco 84:8 86:8,12,
15 88:11,21 89:17
90:5,14 91:12,15
92:10 93:13 122:25
151:18,19
newsletter 63:17
niche 48:22
no-no 150:16
nodding 32:20 37:4
noise 57:6
non-50/50 109:11
non-asphalt 106:17
125:19 145:21
146:15,18 149:8,14
noncompetitive
69:2
normal 104:3 120:8
North 78:16
notation 148:7
note 38:14 98:17
Noted 148:21
nothing's 109:22
notice 53:7 70:13
number 6:8,22
19:12 36:24 62:6
69:15 71:11,22
72:22 73:25 74:25
78:5 80:19 82:11
85:2 87:21 92:3
99:6 102:20 103:8
105:16 112:4 114:6,
21 115:1,2 117:3
120:19 124:10
128:1 137:24
139:24 148:18
numbered 59:4
numbers 59:14
126:4 136:23

## O

Oak 24:22 27:12,24
28:4 64:8 118:25
oath 4:17
Objection 83:2
88:22 93:18 118:15
137:21 145:24
154:18 155:11,21
156:2,11 158:1
obligation 7:3 90:18
93:12
obligations 91:6
121:24
occasion 154:15
occasionally 132:8
occur 146:3,4,5
154:15
occurred 56:13 94:6
97:12 149:11
152:12
October 114:13,15
146:20
odd 19:12
offered 17:15
offering 78:17
offhand 26:1
office 7:24 24:10,13
30:5 37:17 39:3
96:21 104:15
officer 16:7 31:25
officers 11:7 32:1,2
offices 24:6,17,18,
24 28:6
offset 137:25
offsets 137:19
oil 9:9,11 13:1 14:3
22:3 25:1,8,11 27:9
44:13 47:7,11,20
48:21,22 49:4
52:19,20 62:25
90:12 110:11
111:12 115:1,21,22
117:24 118:18
126:17 143:4,23
144:2,15
on-line 20:16
on-the-job 45:8
onboard 48:20

operate 110:8
operated 36:13 67:6
operating 15:4 16:7
93:21 119:2 134:18,
19 135:3 158:3
operations 9:11
15:9,15 16:21 18:22
37:18 52:8,9
110:12,19 156:10
opined 60:15
opinion 136:7,20
137:9
opportunities 40:7
48:22 53:23 66:25
128:20 129:17
opportunity 17:16
51:17 75:23,24
129:4,8 134:5 135:8
opposed 51:18 84:8
132:5
ops 104:14
optimization 117:14
options 117:23
order 149:1
organization 13:20
14:14
original 69:1 150:14
originally 124:22
out-of-pocket 137:8
outline 112:23
outlines 105:11
outset 37:3
overhead 96:20
oversaw 15:14
overseas 32:12
oversight 16:20
owed 137:8
owned 6:7 13:4,5,13
18:17,18,20 25:13
87:2,6 115:5 151:14
owner 13:8
owners 27:15
ownership 13:3
14:13,15 18:23 25:7
26:20 84:12 87:11,
15,17
owning 9:9,25
owns 13:12 32:15

## P

P&I 96:17,21,22
P-O-T-E-N 63:22
p.m. 69:18 79:1,2
95:12,13 130:3,4
145:11,12 148:21
158:10
paid 103:17,19
110:22,24 114:15
117:2 142:3
paper 58:14 86:6
156:24 157:14
papered 40:15
49:23 50:3,20
papers 8:15
paperwork 49:19
paragraph 76:15
78:9
part 14:16 15:15
18:18,19 45:23 48:7
57:12,15,19 68:5
82:20 83:19 85:16
86:14 89:19,20
96:13 100:11
109:10 130:24
137:11 139:13
145:19,20 146:15
147:13 153:3
part-time 30:8 32:8
parted 84:15
partially 18:22
participant 14:19
participate 122:9
participated 81:4
parties 6:12 58:13
93:17,20,22 94:7
155:9,15,16 157:3
parties' 94:13
partner 7:24 32:23
37:16 55:6 78:18
84:18 95:7 109:14,
16 110:1,3 146:13
147:17
partnering 119:13
partners 38:2 42:13,
14,16
partnership 13:24
14:9
parts 133:19,20
139:25 140:1

**party** 7:17 58:22 77:7 82:8 84:7 92:19

**pass** 148:20 158:5

**passive** 14:22

**past** 14:4 112:25 124:4

**Patrick** 35:15 37:25 42:13 46:3 51:20 57:14,15,18,22,23 60:21 70:10 79:24 80:6 94:14 95:6 109:6 112:19 122:14 127:10,21, 22,24 128:16 132:14 138:25 153:24

**Patrick's** 122:15

**pay** 100:2

**paying** 110:21,22

**payment** 103:9,12

**peculiar** 44:6

**pen** 86:6

**Pennsylvania** 5:22

**people** 10:8,15 18:4 29:21 41:15 44:11 60:12,16 61:15 66:12 68:9 72:3 100:5 101:13 108:10 140:3

**percent** 13:4,5,8 25:13 30:19 40:23 42:6 51:23 81:12 87:3,18 106:10 115:4 148:16,17

**percentage** 116:8

**perfect** 45:25 74:22 115:9

**perfectly** 51:15 66:9

**perform** 155:10

**performance** 126:21

**performed** 139:23

**performing** 79:15 118:13 121:24

**period** 16:1,5 25:7 29:5 52:18 67:24 96:3 131:25 141:8

**person** 54:8 55:18 58:15 64:1 70:25 85:21 107:19 117:21 128:24 154:2 157:8,9

**personal** 31:16 60:21 113:24

**personally** 39:16 113:13 121:24 128:25 131:17

**personnel** 82:23 96:18 99:19 101:1,5 103:16,18,20 113:22 123:11 124:18

**perspective** 60:23 94:14

**Perugini** 37:25 46:22,23 48:1 70:4 94:15,24 95:1 132:14,21

**Perugini's** 35:16 49:2 58:2

**peruses** 71:15 73:8 80:23 82:13 85:4 87:23 90:24 92:5 99:9 100:16 105:18 114:8 117:7 120:23

**Peter** 27:23

**petitions** 8:17

**Peus** 16:16 27:20

**phone** 15:22 68:8 70:25 106:23 107:18 108:3

**phrase** 67:7

**physical** 16:21 44:11 45:2,19 115:2,3 133:1

**picture** 116:5

**piece** 75:7 106:16

**pieced** 140:18

**pieces** 107:3

**piecing** 140:20

**Pin** 27:12,24 28:4 64:8 118:25

**place** 35:18 54:19 61:9 133:2 141:9

**placeholder** 51:8

**placements** 21:15, 24

**placing** 79:19 122:11

**plan** 96:8 139:13

**plate** 25:11

**play** 109:21,23

**played** 109:18

**Plaza** 24:14

**plug** 53:18

**point** 4:22 11:5 16:15 30:13 40:9 42:7,18 43:14 47:25 53:5 55:18 58:13,15 62:23 63:3 67:7 70:24 84:4 101:12, 13 102:2 117:18 147:22

**points** 148:11 151:2

**popped** 15:20

**populated** 62:14

**portion** 34:22 37:15 96:20 119:12

**position** 26:20 39:23,24 40:25 41:16 62:17 105:9 122:6

**positions** 22:2 27:2

**positive** 41:13 61:1

**possibility** 81:21

**possibly** 57:22 64:11 96:2 127:18 131:9

**post** 5:18 24:22 53:25

**Poten** 63:22 144:15, 17

**potential** 30:3 48:7 66:24 71:22 118:2

**potentially** 37:7 117:25 139:5

**Powerpoint** 69:6 79:8

**preceding** 76:2 88:19

**predated** 36:23 40:17

**predict** 77:21,22

**predominantly** 131:21

**prefer** 94:17 154:9, 11

**premise** 93:21

**preparation** 81:5

**prepare** 7:20 62:13 64:1

**prepared** 63:9

**preparing** 60:6,8 62:17

**present** 29:4

**presentation** 60:17, 19 61:12,16 70:5

**president** 10:11 11:5,14 64:22

**pressure** 135:12,16 137:14

**presume** 120:15

**presuming** 137:5

**presumption** 158:4

**pretty** 10:1 15:25 22:19 33:5,7,24 47:22 48:19 53:6 139:3

**previous** 76:17 83:13 98:18,19

**previously** 36:18 59:25 75:21 99:2 145:16

**price** 28:23 44:2 51:7 110:2 115:11, 15,21,22,24 135:21, 22 144:14

**prices** 18:8 52:18 63:18 111:20,21,23 116:9 126:17

**pricing** 61:4 112:3 143:4 144:20

**primarily** 12:10 27:4 29:6,20 32:18,22,23 43:6,7 44:13 72:11 120:4 140:24 156:19,23,24

**primary** 9:9 39:7,8 49:5 56:23 60:7 61:14

**prior** 17:2 47:17 49:22 68:15 82:4 96:13 97:23 111:11

**private** 14:1 21:15, 23,25 22:1

**privilege** 134:3

**Pro** 63:24 64:25

**problem** 59:13 68:1 71:8 101:24

**problems** 86:12

**proceeding** 6:2

**process** 48:24 55:20 94:13 141:12

**processing** 76:22 77:8,10,22 130:23

**produced** 8:1 34:24
41:1

**product** 29:22 63:17
114:22,23 142:3,4
143:6,24 147:4
156:4

**products** 12:21
76:1,22 111:13
122:8,21 142:10
145:21 149:8

**professional** 19:16,
19 40:24

**profit** 39:25 54:19
82:1 105:9 110:10
123:7 125:24,25
126:3,8,10 127:4
136:11 153:11

**profitable** 125:22
126:6 127:14 139:5

**profits** 36:14 40:5
51:10 81:20 86:2
96:17 106:11 107:1,
4 108:19 123:12
124:23 136:9,13
137:10 139:14
142:2 153:4 157:3

**proformas** 60:14

**progress** 101:22

**progressing** 101:22

**prohibit** 48:25

**project** 6:23 56:24

**projecting** 127:17

**projection** 82:9

**projections** 126:6,
10

**projects** 15:16 20:9,
13 22:12 30:20
138:24

**proper** 115:12
140:13

**proposal** 71:18 72:2
126:7 127:4

**proposed** 77:4 90:9
106:20

**proposing** 86:7

**provide** 28:2 45:2
105:5 137:5 147:2,
14,16 148:1

**provided** 37:7,8
39:2 62:11 64:5,11
75:14 85:16 106:12
115:11 136:23

**provider** 15:18
37:16

**providing** 27:7
110:13 147:10

**provision** 123:16

**publication** 144:15

**publicly** 63:13

**pull** 29:23 53:18

**pulled** 29:21

**pulling** 117:1

**purchase** 12:20
51:1,5 52:23 109:24
115:3,15 131:1
135:14 142:4
146:12

**purchased** 7:10
24:9 25:20 27:11
56:11 110:19 141:3
156:4

**purchaser** 7:2 119:1

**purchasers** 39:7

**purchases** 30:4
40:4 96:22 147:4,20
149:14

**purchasing** 27:8
29:12 32:24 33:8
39:6 55:20 122:8
130:13,16

**purely** 75:20 77:17

**purpose** 14:2 86:13
90:6 91:3 93:8
106:3

**pursue** 127:24
128:18 129:21

**pursued** 127:11
142:14

**pursuing** 106:18
128:5

**put** 58:14 62:2 69:6
86:6 89:25 105:24
106:1 112:19
114:23 127:22
131:13 146:8
148:10 153:9
156:22

**putting** 54:18 84:14
106:3 126:16

**Q**

**qualify** 157:1

**qualitative** 60:12
123:3

**quantify** 134:5,12

**quantitative** 60:13,
14 123:2,5 124:12

**quantity** 115:12,15

**quarter** 123:13,14,
25 124:1,23

**quarterly** 39:23

**quarters** 41:13,14

**question** 5:5 43:18
69:1 90:25 116:13
138:2

**questions** 148:25
150:20 158:6

**quick** 148:25

**quickly** 53:23 58:21
139:3

**quirkier** 128:20

**quote** 151:18

**R**

**raised** 67:8

**raising** 21:25 22:1
23:10

**range** 18:9

**rate** 106:12 148:10,
14

**reach** 54:2 108:14

**reached** 57:8 95:20
96:13 97:14,23

**reaching** 57:12

**read** 8:15,17 28:8,
11,14 31:21 58:2
90:21 98:1,15,23

**reading** 28:16 85:20
100:4 101:9

**ready** 46:5 74:12
78:2 87:24 94:21
105:20,21 153:24

**real** 6:23 20:15
80:21 132:7 147:21

**realization** 53:15

**realize** 29:5

**realized** 45:17

**reason** 44:19 48:17
77:12 84:21 90:19
99:23 127:10
138:11,25 139:1

**reasons** 17:13 44:21
60:22 77:15

**recall** 16:12,16 18:9
29:1 30:23 38:18,20
39:5 42:10,19 43:2
45:20,22 46:1 52:3,
13,18 53:8,12 54:17
58:5,9,22 61:11
62:1,4 63:6 66:19
67:11,20,25 70:12,
25 71:25 75:12
76:13 77:2,18 80:24
81:1 86:9 88:6,9
90:9 94:25 96:11,12
101:21 102:23,24
105:15,24 107:22
108:7,9,10 109:6
111:10 113:8 114:2
116:22 117:8,10
118:12,21 119:17
123:6 125:1 129:1,
3,17 130:12,15
131:9 140:21
143:17,19 144:21
150:5,7 157:15,17,
21

**recalled** 28:24

**receivables** 110:20
147:23,24

**receive** 106:11

**received** 61:15
105:8 142:4

**receiving** 105:12

**recent** 91:25

**recently** 8:19 33:8

**receptivity** 125:18

**recess** 46:13 59:20
69:17 79:1 95:12
130:3 145:11

**recipient** 61:14

**recognize** 60:3
73:11 88:3

**recollect** 50:2

**recollection** 54:1
70:9 71:8 92:12
94:5 101:19 103:19
128:3 148:6

**record** 4:1 15:23
34:20 35:15 46:11,

15 59:14,18,22
68:13 69:11,13,19
78:24 79:3 95:10,14
117:5 130:1,5
145:9,13 158:8
**record's** 99:5
**recording** 104:16
**records** 84:17
104:20
**red** 41:9 88:6,13,17
89:3 92:15,21 93:2
98:15,17,18,20
101:8
**refer** 68:23 151:4
**reference** 151:16
**referenced** 91:5
117:12 121:16
129:16 139:22
145:4
**references** 142:10
151:12
**referred** 78:4
**referring** 93:23
**refers** 85:8 151:5
**refinery** 25:11 75:25
**Refining** 6:8 18:18
**reflected** 79:11
**regard** 44:6 72:1
101:17 126:7,13
137:2
**regions** 63:19
**reimburse** 101:1
103:14 104:4
**reimbursed** 100:1
**reimbursement**
103:25 114:4,5
123:11 124:18
153:5
**related** 6:2,6,23
12:21 14:5 18:21
26:14 54:4 101:25
103:9 113:22 114:4
**relationship** 8:12
18:24,25 19:2,5,8
26:15 27:16 28:21
29:11 36:6,22 40:16
41:8 42:22 47:10
48:6 50:3 52:25
53:21,22 54:19
60:25 67:19 68:4
86:11,22 87:9,11
106:7,17 123:12

134:25 139:3
152:11
**relationship's**
125:13
**relationships** 15:19
39:7
**relative** 52:19 116:9,
11 142:4 143:22
**relevance** 146:17
**relevant** 145:20,21,
25
**relinquish** 11:8
**relinquished** 31:23
**rely** 157:22
**remaining** 27:19
**remains** 136:14
**remember** 7:16 8:2,
10,11 19:12 24:20
30:25 40:12 41:12,
13 47:25 49:16
52:1,16 56:19 57:11
61:15,18,19 68:18
71:20 77:6 79:7,15
84:25 85:6,7,11
89:9 94:7 98:2,12
105:22 107:15,16,
17,24 108:3,20
109:5 117:10,11
118:10,19 129:6
131:20 149:24
156:17
**remembered** 107:14
**remembering** 8:9
**remembers** 20:18
**remind** 8:4 130:10
**reminds** 34:15
**renamed** 20:3,11
21:22
**rental** 96:17 114:13,
15
**repeat** 5:5
**rephrase** 5:6 113:12
**replacement** 58:18
109:14
**report** 102:8 137:2
143:16
**reported** 63:13
102:6,9,12
**reporter** 32:5 72:25
**reporting** 104:17
**reports** 39:23,24

105:9 125:25
**represent** 4:10
**representing** 7:2
**repurchase** 51:4,6
**repurchased** 26:23
**requested** 40:3
**required** 78:20
**reread** 8:19
**resign** 11:6,7
**Resnick** 20:2
**resolution** 18:20
**resolve** 68:3 141:21
**respect** 24:4 29:4
39:17 112:22 142:6
**response** 53:16
82:15
**responsibilities**
30:21 38:19 39:5
**responsibility** 39:7,
8 60:8
**responsible** 100:6
**rest** 102:10,11
103:23
**restricted** 139:12
**restriction** 156:6
**restroom** 4:23
**result** 65:16 124:11
138:18,19
**retail** 12:24 40:8
65:18 124:9
**retain** 106:10
**retained** 32:11
**retired** 118:22
**retroactively** 35:1
**retrospect** 125:12
**revenues** 153:7,12
**reverse** 149:1
**review** 29:13 39:22
126:2
**reviewed** 88:15
92:15 99:19
**reviewing** 42:4 43:3
126:3
**revised** 92:9
**right-hand** 62:7 78:6
**rights** 134:11
**Rio** 8:11 19:6,8
26:15 28:21 29:11,
19 36:6,16,25 37:3,
7,20,24 38:1,17

39:17,23 41:1,16,
18,23 42:11 43:5,24
45:14,21 46:2,24
47:4 48:1 49:13,22,
23 50:19,22 51:2,3,
7,15,18,21 52:2,14
53:15,17,25 57:5
60:12,16,20,24 61:7
62:11 64:5,8 79:18,
21 94:15 109:12
110:4,21,22 114:25
118:18 119:16,18,
21,22 121:5 127:22
145:20 146:12
149:7,10
**Rio's** 38:19 46:18
51:23 109:24
**risk** 44:2,3 77:24
115:25
**River** 21:9,14,20,21
24:11 25:3
**road** 12:24 24:11
25:3
**Rob** 56:22 75:6
**robust** 72:5,19
**Roka** 117:11
**role** 10:3 16:2,7 51:8
64:24 113:14
**roll** 80:9
**rope** 80:7
**rose** 58:21
**roughly** 11:18 58:7
84:11 125:8 141:10
149:6
**runs** 33:9
**Ruzek** 140:24

―――――――

**S**

**salads** 74:13
**salaries** 81:13 83:13
101:1 113:9
**salary** 81:13 114:5
153:5
**sale** 17:2 25:24
27:21 28:22 36:23
104:2 115:23
135:14
**sales** 33:9 40:4
96:22 115:20
149:14

May 16, 2019

**Salt** 21:10
**Sam** 27:23
**samples** 143:4
**sandwiches** 74:13
**Saraland** 9:18
**Sargeant** 6:7 18:15 26:5 55:5,10 68:9 70:24
**Saturday** 35:6
**scenarios** 82:7
**scheduled** 99:24 100:6 129:20
**Scholer** 42:23
**school** 5:17,18,21, 23 20:22
**science** 5:20
**screen** 62:3
**seat** 128:19
**seats** 17:23
**secret** 143:17
**section** 81:24 83:12 90:6,19 91:3,5 93:8 101:8 109:21,23 110:6 146:2,25 149:9,10,17
**sections** 149:7
**securely** 115:20
**seeking** 148:17
**sell** 7:3 12:22 26:20 27:2 51:2 114:25 122:13 124:9 138:19
**seller** 7:3
**sellers** 147:4
**selling** 27:8 29:12 32:25 39:8 40:9 62:25 110:11 122:8 137:13
**sells** 122:11 144:2
**semi-retired** 116:23
**send** 35:8 113:15 114:3 150:9
**sending** 70:9 114:14
**senior** 56:1 68:9
**sense** 33:10 37:18 71:24 85:12 98:21 100:3 105:6 110:17 126:23 127:2
**September** 114:11
**September-ish** 146:20

**sequential** 98:21
**service** 20:16 63:16 152:15
**services** 28:2,3 91:13,17 93:13 105:4,5,13
**serving** 20:17
**set** 84:16 86:13,15, 18 87:19,20 91:6 97:25 109:17 121:21 129:8 152:9
**setting** 104:10,24 152:3
**severely** 126:18
**share** 54:19 96:16 113:23 125:2 136:14 143:14 153:3
**shared** 36:14 96:24 104:6
**sharing** 106:25 107:4 108:19 136:9 138:8 153:11,12
**sheltered** 44:2
**ship** 12:24 25:12 33:2 67:1 134:22
**shipments** 104:1
**shipping** 39:1 40:4 55:8 96:22
**ships** 67:3
**shoes** 53:12
**shop** 51:22
**short** 16:5 45:1 115:1 116:11,12 155:6
**short-term** 90:11
**shorted** 115:6
**shorting** 117:20,23 118:18
**shortly** 8:17 13:17 28:12
**showed** 74:3
**showing** 126:21,22
**shown** 48:25
**shy** 20:8
**sic** 25:3 119:25
**side** 10:5 23:4 35:16 55:9 81:9 88:11 109:2 120:3 128:19 140:14,23,25 153:9, 20 156:24,25

**sides** 34:22 50:14 140:22
**sign** 52:10 78:20
**signature** 90:5,7,19 91:2 93:4 121:2
**signatures** 121:5
**signed** 47:18 52:3 94:17 122:24 127:19 150:3 151:6, 10 154:12,17 157:14,20,25
**significance** 37:1
**significant** 18:11 19:2 22:16 26:17 33:10,11,12 37:15 42:1 47:11 48:17 56:20 77:7 101:20
**significantly** 115:7 116:10
**signing** 101:13
**similar** 14:3 20:17 21:12,20 36:18,20, 22 40:17 47:17 50:2 54:18 55:5,11 76:2 78:14 93:7 94:23
**similar-ish** 54:21
**similarly** 73:13 126:12
**simply** 37:9 128:7 142:2
**single** 135:6
**sit** 68:2
**sitting** 61:25 65:9 68:6 127:22 138:6
**situation** 17:17 109:13
**skimming** 28:16
**skip** 98:8
**slash** 147:10
**slight** 126:23
**Sloan** 5:23 20:23
**slowly** 68:1
**small** 14:20,21 15:19 21:13,23 22:17 28:19 112:16 128:7,18
**smaller** 21:14 30:5 51:22 80:13 128:20 129:11 135:11
**social** 23:2
**sold** 9:12,23 12:10

13:1,17 15:5,7 25:21 26:22 27:10 37:10 111:11 113:4 114:23 130:8,10 133:1 135:22 141:3, 23 142:5,23 143:24, 25 144:21 147:25 156:4
**sole** 87:20 90:6 91:3 93:7
**solely** 6:18 94:12 100:6,20 134:15
**solid** 62:24
**solution** 45:24 147:17
**sooner** 52:8
**sort** 7:17 12:17 21:11 27:5 31:14 36:17 63:14
**sorts** 26:12
**sound** 40:14
**sounds** 10:19 35:13
**south** 139:3
**space** 30:5 39:11 75:17
**speak** 54:8 94:13
**speaking** 10:3 25:2 117:11
**special** 29:21
**specific** 37:9 45:22 88:6 115:11,15 135:11
**specifically** 38:20 48:25 71:21 106:25 141:2 142:9,11
**speculate** 37:8
**spell** 27:22 32:4 38:3 49:8 120:6
**spelling** 38:15
**spending** 37:14
**spent** 11:9 40:23 42:9
**split** 86:2 96:7 123:7
**splits** 85:9
**spoke** 54:9 70:24 71:1
**spot** 67:5
**spreadsheet** 85:11 140:17,21 148:15
**Springs** 4:14

**stab** 38:5
**stage** 120:13
**stages** 128:14
**stand** 29:3 50:23
**standard** 33:6
**standpoint** 36:7
  51:14 69:10 88:14
  91:16 132:9
**stands** 65:4
**start** 11:18 14:8 22:5
  43:18 52:24 58:14
  91:15 94:8 97:16
  105:10,13 106:10
  112:15 133:15
  136:5
**started** 20:15 28:21
  30:7,14 39:18 49:13
  50:16 52:8,14 56:12
  57:5 86:11,21 93:20
  96:2 101:23 106:13
  107:23 111:3
  114:25 133:12
  140:9 141:14
  155:16
**starting** 105:15
  137:15
**starts** 38:15
**stated** 38:20 105:10
**statement** 105:9
  142:23
**statements** 41:1,16
  62:17
**stay** 17:16
**step** 68:2
**Steve** 56:5,8,15,22
  71:17 75:5 76:24
  131:21
**Steve's** 86:5
**Steven** 43:2 88:16
**stickered** 150:15
**stocks** 32:24 62:24
**stop** 9:13 22:19
  50:19 80:14 91:15
  107:8 109:12
  119:18 140:2
**stopped** 135:13
  148:6
**storage** 9:10,11
  32:25 72:8 111:14
  115:3
**store** 12:22

**stored** 90:13
**storing** 111:12
**strategic** 10:5 15:15
  26:15,17 39:10 40:7
**strategies** 80:5
  119:4
**strategize** 117:21
**strategy** 26:15 27:7
  33:17 80:8 119:7
  122:4,10 132:9
**Street** 7:7,14 21:17,
  19,22 22:5,8,14
  23:3 30:16,18
  56:21,25 111:5
**stressful** 61:4
**strong** 111:20,21,22
  138:24
**strongly** 54:10
**struck** 28:18
**structure** 26:16
  36:19 47:17 104:11
  106:5,8 107:24
  108:17 109:11
  135:7 142:21
  150:10
**structured** 26:16
  149:4
**structures** 106:14
**stuck** 28:17
**stuff** 31:17 51:20
  111:16 117:1
  135:11 139:4
  143:13
**subject** 36:1 71:18
  95:21
**sublease** 104:12
  151:12,23
**subleased** 151:19
**submitted** 39:25
**subscribe** 63:17
**subsequent** 97:9
  131:5
**subsequently** 13:21
  19:6 20:11,16 21:21
  22:20 72:23
**subsidiaries** 84:12
**subsidiary** 25:16
  111:18
**substantial** 32:17
**substantially** 9:24
  15:5 18:8 29:24

32:10 127:14
**substantive** 93:19
  94:1,2,3 101:10
**successful** 50:11
  118:21
**sufficiently** 155:9
**suggested** 68:2
**suggesting** 134:21
**suite** 24:24
**sum** 65:20
**summation** 107:10
**supply** 67:5
**support** 39:3
**suppose** 44:23 45:7
  91:8
**supposed** 99:23,25
  104:19 139:11
**surface** 58:21
**surprised** 102:25
**suspected** 101:24
**switch** 108:16
  109:11
**sworn** 4:4
**synergy** 67:3
**system** 63:20

---

**T**

**T-O-M-A-S-Z-E-W-S-
K-I** 32:6
**T-R-I-F-I-N-E-R-Y**
  13:10
**table** 62:14 81:24
  141:5
**tailored** 75:5,8,9
**taking** 72:8 78:18
  80:9 99:22 141:25
  142:1
**talk** 34:11 35:21
  41:18 90:1 98:8
  101:17 105:20
  118:7 119:3,12
  131:17
**talked** 34:22 55:20,
  24 57:25 58:20,23
  67:22 68:8 70:20,23
  76:8 103:14 106:8
  114:16 118:16
  119:17 131:23
  134:3 136:17
  138:23 139:6

142:20 150:25
**talking** 45:24 54:23
  57:16 68:16 71:21
  72:3,7 95:6 99:3
  103:11 107:23
  111:23 118:12
  129:5 130:19,23
  131:20 149:2,9
**talks** 65:20
**tank** 39:11 40:4
  90:13 96:17 103:15,
  17,19 113:9 114:4,
  13,15 126:16
  134:16 135:1
**tankage** 33:2 50:7
  122:6,7 151:15
**tanks** 32:25 134:20
**tapered** 72:21
**tasks** 26:12
**TBM** 64:13
**teaching** 19:13
**team** 15:15,19 17:7
  19:3,4 27:14,20
  56:1 98:16 99:18
  100:5 101:1,5 113:9
  114:5 123:11
  124:17 128:19
  130:18 131:4,5
  153:5
**teams** 78:14
**technically** 19:14,16
  23:14 36:8
**telephone** 107:12
  128:24 157:7
**telling** 46:18 67:21
  95:3,17 102:16
**tenant** 19:7 51:4
  55:21 119:2
**tended** 92:24
**tennis** 19:13
**tenure** 23:15 24:22
  39:18
**term** 67:5 78:12,13
  98:13 109:7 125:15
  153:5
**terminal** 25:1,8,11
  26:2 29:13 39:2,11
  64:7 76:4,6 90:10
  151:15
**terminaling** 110:23,
  24 148:2 155:4

**terminals** 9:9,10,11, 15,23
**terminate** 51:24 60:25
**terminated** 43:14 49:14,17,18
**termination** 50:18 52:11
**terms** 42:5 66:11 68:23 93:20 94:2,4 96:4,6,9,11,12 97:8, 24 99:4 101:10 120:14 122:11 136:6 142:15 146:16,17 149:19, 20 152:25 153:2,6, 15,22 155:8,15,20 156:1,14 157:3
**terrorist** 13:20
**test** 36:20
**testified** 4:4 6:20 7:13 70:17
**testifying** 4:20 6:4
**testimony** 35:17
**Texas** 4:14
**text** 31:18,20
**theory** 116:10
**thing** 33:6 50:15 98:12,24 99:12,14, 17 100:8 101:20,21 105:1 115:19 117:20 118:16 139:19 146:22
**things** 14:10 21:15 28:19 29:13 33:20 36:18 39:11 65:8 103:24 109:18 120:15 130:20 136:6 138:13,20 140:15 141:5 150:24 157:4
**thinking** 8:3 46:6 57:19 138:5 151:21
**third-parties** 143:7
**third-party** 84:17 124:8 143:3,21
**thought** 53:24 54:6 67:3 68:1 81:10 83:11 84:10 86:4 87:16 107:14 117:21,22 118:1,2,6 123:20 135:25

146:11
**thoughts** 107:11
**three-way** 95:20
**three-year** 125:9
**through-putting** 77:23
**ties** 115:21
**till** 121:13
**time** 5:5,25 6:14,22 7:6 9:3 11:8 14:8 15:9,10 16:1,10 17:23 18:16,22 20:2 22:11,18 23:8,15,19 27:21,25 29:5 30:13,19,21 32:11 37:6,15 38:1 40:23, 24 42:7,9,20,22,23 48:1 50:7 52:14,18, 22 53:6 54:16,17 57:3,16 58:3,9 61:19 66:22 67:15 72:4 79:25 84:4,24 93:4 109:15 111:5, 7,17,24 114:25 115:24 116:9 117:18 118:7 126:4 128:18 129:22 131:25 141:8,16 144:10 146:20 148:8,9,21 151:14 156:18
**times** 17:8 25:5 36:5 49:21 115:4,6 128:14
**timing** 13:24
**title** 10:24,25 11:14, 21,22,23 12:1,5 16:9 31:23,24,25 32:12
**titles** 11:8 16:13,17
**today** 4:18 8:20 9:2, 7 15:2 32:2,14,22 61:25 82:4 111:19, 21 112:13,14 117:19 121:14 138:6 150:25
**told** 22:3 30:11 44:18 48:8 67:22 71:4,6,8 72:15 77:12 82:14 94:20 95:18 96:5 97:14,22 100:19 106:24 109:15 113:10,12

114:18 128:10,11 132:3 148:16 153:23
**Tom** 140:24
**Tomaszewski** 32:3 81:11
**top** 29:2 70:13 85:16 117:12 145:19
**total** 65:20 99:20
**touch** 64:23 150:24
**touched** 101:16 112:8 131:23 146:23
**tough** 38:8
**town** 103:6
**track** 98:20
**trade** 39:3 49:4 66:14 99:18 100:5 101:1,5 103:15 113:9 114:5,19 123:11 124:17 140:17 153:5
**trade-related** 113:18
**tradeable** 44:10
**trader** 9:25 11:24 12:11 47:5,7 80:13 112:18 113:20 116:21,22 118:22
**traders** 64:22 116:3, 4 132:4
**trades** 37:9 64:24 113:2 116:3
**trading** 9:10 12:18 38:24 111:15,18 155:2,5
**Traditionally** 62:23
**training** 45:9
**transact** 31:5 153:24
**transacted** 86:17
**transacting** 94:8 104:10 110:3 155:16
**transaction** 31:20 54:21 57:15,19 58:6 60:20 67:17 109:8,9 124:8 134:14 147:13 152:19
**transactional** 10:4 33:12
**transactions** 21:14 33:11 36:24 50:24

79:11 104:16 112:16 113:1 146:16 154:15
**transcript** 28:9
**transferring** 67:4
**trial** 6:20 7:5 35:9
**Trifinery** 13:5,10,11, 12
**Trigeant** 6:3,7 7:8 18:13,18 23:6
**Trigeant/btb** 15:17
**trouble** 101:22
**troubles** 77:20
**truck** 12:24
**true** 23:14 42:6 103:23 117:19 126:3
**trusts** 13:14
**turn** 79:8
**turned** 65:2,15
**turquoise** 89:6
**two-year** 125:11
**type** 54:19 63:15 68:4
**typical** 33:5
**typically** 29:8 122:12

---

**U**

**Uh-huh** 4:21 10:12 16:4 17:3 22:10 24:25 25:9 38:22 39:20 41:2 44:9 46:21 49:15 51:19 54:5 55:7 57:1,7 63:25 64:14 65:10 68:22 69:4 70:2 75:22 76:20 78:11 81:25 82:5 84:3,6 89:5,15 90:4,8 92:11 93:6 98:22 99:21 103:4 112:24 115:16 117:15 120:17 132:2,25 136:2,19 137:4 140:10 144:3 149:5 150:22 154:5
**ultimate** 17:25
**ultimately** 17:21 47:1 49:14 54:20 55:2 100:2 131:10

**unable** 8:13
**unclear** 83:22
**uncomfortable** 43:25 52:21
**underpriced** 116:10
**understand** 4:17 84:23 86:14 96:4 106:19 132:20,22 137:16,17 147:12 155:22
**understanding** 45:14 47:13 55:3 71:5 80:4 89:12 90:16 91:4 97:21,23 99:18 100:9 128:9 132:16,23 137:20 152:22 155:20 156:1,9
**understood** 45:13 62:9 145:22 153:21
**undervalued** 126:18
**unhappy** 67:16,23 102:9
**unit** 127:21
**University** 5:21
**unknown** 140:12
**unknowns** 140:11
**unlike** 21:12 76:18
**unsuccessful** 68:11
**unusually** 52:19
**unwind** 146:21
**unwise** 156:7
**upper** 10:9
**upward** 112:3

**V**

**V-A-L-T** 66:18
**vacation** 103:6
**vaguely** 105:24
**VALT** 54:21 55:3,5 66:16,17,21,25 67:2,9,16,18,23 68:3,6,9 69:10 70:14,20,23 71:2,6, 8 101:17,24 102:2, 9,10 108:14
**valued** 143:21
**valuing** 143:2,23
**variety** 115:7 121:3

**vary** 115:6
**vehicle** 86:22,23
**venture** 36:6,8,13 152:23
**Version** 149:6
**versus** 70:25 134:10
**vetted** 118:3
**vice** 11:5,14
**view** 75:23 146:7
**viewed** 52:22 67:17 135:22
**viewing** 67:9
**viewpoint** 125:10
**Vitol** 4:10 8:12 48:7, 21,23 51:1,6,17 53:24 54:2,4,8 55:3, 21,25 56:21,23,25 57:9,20,25 58:6,10, 18,21 60:17 61:11 62:7,20 63:8 64:13 67:8 69:9 71:23 72:2,4,9,17,18 75:9 77:4,13 78:15 84:13 85:8 86:17,21,24 88:5 89:11,17,19,24 90:12 91:23 92:10 93:24 94:4,16 95:3, 5 96:20 98:13,15,17 100:7,25 101:18,23 102:2,17 103:9,14, 16,17 104:2,4,13, 14,19 105:11 106:4, 6,11,24 108:4,12, 16,18,21 109:13,20, 23 110:3,10,13,18 112:25 113:4 114:3, 13 116:21 118:13, 18 119:19 120:13 122:25 123:8 125:11 126:7,10 127:5,20 128:8,19 130:12,15,25 131:12,18,25 132:13,17,23,24 134:10,14,24 135:13 136:10,17, 21,23 137:18 138:7, 9 139:16,22 140:6, 11,13,19 142:3,4 146:12 147:1,9,23 149:4,19,23 150:8 151:24 152:7,11,19, 22 154:1 155:8,18,

24 156:9 157:18,19
**Vitol's** 90:13 102:11 134:21 140:25 157:22
**Vitol/newco** 84:5
**volatile** 22:17
**volatility** 44:4
**voluntarily** 17:15
**VP** 11:13

**W**

**wait** 17:1 150:14
**wanted** 8:4 16:20 51:21 53:19 57:6,23 60:19,20,21,24 61:10 106:7,9 107:8 109:11 119:12 146:5,16 150:13
**watch** 46:5
**ways** 84:15
**weak** 111:22
**week** 10:6 28:12,14 33:16 35:5,10 112:2 122:10
**week-to-week** 15:20 80:9
**weekend** 48:3
**weekly** 63:14
**weeks** 67:25 102:15 103:2
**weird** 111:24
**Wharton** 5:21
**what'd** 26:3
**whatnot** 128:3
**Where'd** 20:7
**who'd** 16:8
**wholesale** 12:23 40:10 65:18
**wholly-owned** 25:16
**why'd** 22:14
**Wind** 21:9,14,20
**winter** 52:16 53:1,4 61:3
**withdrawn** 72:24
**witnesses** 73:3
**word** 145:25
**words** 146:8 153:8 156:22 157:13,18
**work** 19:9 21:2,11,

24 23:4,6,9,18 30:15 33:13 35:4,12 39:9 42:24 47:10,16 48:1,5,18 53:24 56:25 66:25 67:24 78:20 103:22 107:10 108:15 118:20 136:14
**worked** 19:20 21:10 36:23 41:20 81:7
**working** 6:13,15 30:12 33:18 37:12, 16 48:20 81:1 91:15 103:22 106:12 111:2,3 125:14 127:7 132:22 133:16 146:21
**works** 41:21 73:22
**worth** 21:21 118:6 129:12 142:24 143:6 144:2,4,6
**Wow** 32:7
**writer** 73:18
**writing** 38:14 156:14
**written** 85:15 151:17 154:11,16
**wrong** 95:18

**Y**

**y'all** 58:19,25 141:4
**year** 19:11,17,19 20:8 24:21 30:25 48:13 59:11 126:21
**year-to-date** 126:23
**years** 6:22 21:23 32:9 54:4 64:21 84:11,13,15,22 96:7 114:21 125:5,8 129:5
**yesterday** 34:16 111:23
**yields** 75:14
**York** 21:10 42:23,24
**young** 118:22

Transcript of the Testimony of

# Patrick Perugini

## Date:

June 29, 2018

## Case:

VITOL vs GULF COAST ASPHALT , LLC

001477

Patrick Perugini                                          June 29, 2018

 1                    CAUSE NO. 2018-33445

 2  VITOL, INC.                 )   IN THE DISTRICT COURT
                                )
 3        Plaintiff,            )
                                )
 4  vs.                         )   HARRIS COUNTY, TEXAS
                                )
 5  GULF COAST ASPHALT          )
    COMPANY, LLC and ARTHUR J.  )
 6  BRASS                       )
                                )
 7        Defendants.           )   157TH JUDICIAL DISTRICT

 8

 9

10              ORAL VIDEOTAPED DEPOSITION

11                   PATRICK PERUGINI

12                   JUNE 29, 2018

13

14      ORAL VIDEOTAPED DEPOSITION OF PATRICK PERUGINI,

15  produced as a witness at the instance of the Plaintiff

16  and duly sworn, was taken in the above-styled and

17  numbered cause on June 29, 2018, from 10:04 a.m. to

18  11:55 a.m., before Dana Richardson, Certified Shorthand

19  Reporter in and for the State of Texas, reported by

20  computerized stenotype machine at the offices of Hall

21  Maines Lugrin, 2800 Post Oak Boulevard, 64th Floor,

22  Houston, Texas 77056, pursuant to the Texas Rules of

23  Civil Procedure and the provisions stated on the record

24  or attached hereto.

25

Patrick Perugini

Page 2

```
 1                    APPEARANCES
 2 FOR PLAINTIFF:
 3     Mr. David A. Baay
       EVERSHEDS SUTHERLAND (US) LLP
 4     1001 Fannin Street, Suite 3700
       Houston, Texas 77002
 5     Telephone: (713) 470-6100
       Fax:  (713) 654-1301
 6     E-mail: davidbaay@eversheds-sutherland.com
 7 FOR DEFENDANT:
 8     Mr. Neil E. Giles
       HALL MAINES LUGRIN
 9     2800 Post Oak Boulevard, 64th Floor
       Houston, Texas 77056
10     Telephone: (713) 871-9000
       Fax:  (713) 252-0172
11     E-mail: ngiles@hallmaineslugrin.com
12 FOR DEFENDANT AJ BRASS:
13     Mr. Adam M. Dinnell
       SCHIFFER HICKS JOHNSON PLLC
14     700 Louisiana Street, Suite 2650
       Houston, Texas 77002
15     Telephone: (713) 255-4107
       Fax:  (713) 357-5160
16     E-mail: adinnell@shjlawfirm.com
17 ALSO PRESENT:
18     Mr. Damon Norris, Videographer
19
20
21
22
23
24
25
```

Page 3

```
 1                     INDEX
 2                                          PAGE
 3 PATRICK PERUGINI
 4   Examination by Mr. Baay .........................4
     Examination by Mr. Giles .......................79
 5 Further Examination by Mr. Baay .................81
     Signature Page .................................84
 6 Court Reporter's Certificate ....................86
 7
 8                   EXHIBITS
 9
10 EXHIBIT       DESCRIPTION              PAGE
11
   Exhibit 11   GCAC Figures Not Confirmed from  19
12              Invoices
13 Exhibit 12   Copy of a text string            38
14 Exhibit 13   August 15, 2017, e-mail from     41
                Eric Kuo to Patrick Perugini,
15              et al.
16 Exhibit 14   Copy of text message string      45
17 Exhibit 15   E-mail string with top e-mail    52
                dated September 25, 2017, from
18              Eric Kuo to Patrick Perugini,
                et al.
19
   Exhibit 16   E-mail string with top e-mail    63
20              dated October 16, 2017, from
                Eric Kuo to Patrick Perugini,
21              et al.
22 Exhibit 17   E-mail string with top e-mail    65
                dated January 10, 2018, from
23              Patrick Perugini to Eric Kuo,
                et al.
24
25
```

Page 4

```
 1        THE VIDEOGRAPHER:  Today's date is
 2 June 29th, 2018.  We're now on the record.  The time is
 3 10:04 a.m.
 4              PATRICK PERUGINI,
 5 having been first duly sworn, testified as follows:
 6              EXAMINATION
 7 BY MR. BAAY:
 8   Q.  Good morning.
 9   A.  Good morning.
10   Q.  Please state your full name on the record.
11   A.  Patrick Thomas Perugini.
12   Q.  Patrick, my name is David Baay; and I represent
13 Vitol in this litigation.  Do you understand that?
14   A.  Yes.
15   Q.  Do you understand that GCAC has filed a suit
16 against Vitol and that Vitol has filed suit against
17 GCAC?
18   A.  Yes.
19   Q.  And do you understand that the lawsuit relates
20 to some asphalt purchases that were made by and between
21 GCAC and Vitol?
22   A.  Yes.
23   Q.  Okay.  Have you ever done this before, giving a
24 deposition?
25   A.  No.
```

Page 5

```
 1   Q.  All right.  Lucky you.
 2   A.  Yeah.
 3   Q.  You made it a long time without doing it.
 4        Okay.  Well, I'm sure you've -- you've had
 5 a chance to meet with your lawyer?
 6   A.  Yes.
 7   Q.  And he's described to you that everything we
 8 say here -- or you're under the obligation to tell the
 9 truth here?
10   A.  Yes.
11   Q.  And that everything we say is being taken down
12 so that it can be used at the time of trial?
13   A.  Yes.
14   Q.  There's no reason why you can't give best
15 testimony?  You're not on any medication that would
16 limit your effectiveness, right?
17   A.  Right.  Correct.
18   Q.  Okay.  If you don't understand my question,
19 which is going to be highly possible today, just ask me
20 to restate it.
21   A.  Okay.
22   Q.  All right?  If you don't ask me to restate it,
23 I'm going to assume you understood it.
24   A.  Okay.
25   Q.  Okay.  You're currently at GCAC?
```

Patrick Perugini

June 29, 2018
Pages 6 to 9

Page 6

1   A.   Yes.
2   Q.   And what's your role there?
3   A.   Trader.
4   Q.   And how long have you been in that role?
5   A.   One year.
6   Q.   Okay.  And you came from Rio Energy?
7   A.   Yes.
8   Q.   How long were you with Rio?
9   A.   Six years.
10  Q.   How about before that?
11  A.   I was at Koch Supply & Trading.
12  Q.   K-o-c-h?
13  A.   Yeah, K-o-c-h.
14  Q.   For how long?
15  A.   Two years.
16  Q.   How about before that?
17  A.   I was at Tauber for 11.
18  Q.   Okay.  And before that?
19  A.   You're making me --
20  Q.   I know.  Going back.
21  A.   It was MicroMasters for -- I think it was -- it
22  was three.
23  Q.   Okay.  Where did you get your undergraduate
24  degree?
25  A.   University of Texas.

Page 7

1   Q.   What year did you graduate from there?
2   A.   '91, 1991.
3   Q.   With a degree in what?
4   A.   Chemical engineering.
5   Q.   In all those entities that we listed, were
6   your -- was your role essentially a trader?
7   A.   No.  The early career, I was a chemical
8   salesman.
9   Q.   Okay.
10  A.   But -- but Tauber on -- it was all trader.
11  Q.   And was it trading in a specific commodity or
12  multi -- different commodities?
13  A.   I would call it multi commodities.
14  Q.   Okay.  What would -- what would you say you
15  have the most experience with, what commodity?
16  A.   6 oil.
17  Q.   6 oil?
18  A.   Yes, sir.
19  Q.   Okay.  And in your current role with GCAC,
20  what's the commodity you deal most frequently with?
21  A.   Asphalt.
22  Q.   Just describe for the jury the difference
23  between 6 oil and asphalt.
24  A.   Oh, I'm going to try to start with the
25  similarities.  The -- can I do it visually, too --

Page 8

1   Q.   Yeah.
2   A.   -- and talk it through?
3   Q.   Yeah.
4        THE WITNESS:  So I'll do it like we did it
5   the other day.
6   A.   If this is a barrel of crude oil and we -- it
7   goes into a refinery, this barrel of crude oil.  And we
8   trade on the back side of the refinery, if you will.  So
9   after the crude comes in, we buy things from the
10  refinery, basically.
11       So up here would be the gasolines, the
12  gasolines and naphthas, distillates and caro, vacuum gas
13  oil.  And then we trade down here.  And why -- why I'm
14  doing this visually is 6 oil and asphalt are kind of the
15  bottom of the barrel, and they're -- they're symbiotic.
16  They -- they kind of trade together.
17  Q.   (BY MR. BAAY)  Uh-huh.
18  A.   Almost all 6 oil's derive from the base of,
19  like, a heavy 6 oil.  A true 6 oil is derived from the
20  vacuum tower bottom, which is the asphalt.
21  Q.   Got it.
22  A.   So it's -- it's not that much different to --
23  it goes into different pricing mechanisms further down
24  the way, but you actually -- if you trade 6 oil, you
25  also trade vacuum tower bottoms, which is asphalt.

Page 9

1   Q.   Right.
2   A.   So we -- for me to get away -- like, there will
3   be times I'll sell my asphalt back into 6 oil, too.  So
4   there will be times I'll still trade 6 oil, so to speak.
5   Q.   Got it.  And are those referred to in the
6   industry as heavy oil or heavy fuels?
7   A.   Sure.  There's a lot of names for them.
8   Q.   Right.  Bunker fuel?
9   A.   Yeah.
10  Q.   Okay.  And effectively the same type of product
11  that you were dealing with when you were at Rio Energy?
12  A.   Yes.
13  Q.   Okay.  The -- I'm going to ask you about how
14  you're compensated at GCAC, and I assume it's you run
15  your own profit and loss sheet?
16  A.   Yes.
17  Q.   And when I say "P&L," you know that I'm talking
18  about that?
19  A.   Yes.
20  Q.   Or book?
21  A.   Correct.
22  Q.   Okay.  And this -- this trade that -- these
23  trades that happened between Vitol and GCAC, were those
24  all captured within your book?
25  A.   Yes.