Patrick Perugini

Page 10

1    Q.   All right.  So the -- if they made money, that
2 was to your benefit; and if they lost money, that was to
3 your detriment?
4    A.   Yes.
5    Q.   Okay.  Are you paid a set base every year?
6    A.   I am paid a draw against --
7    Q.   Against --
8    A.   -- future P&L.
9    Q.   And is that draw level every year?
10    A.   Yes.
11    Q.   And what is it?
12    A.   Actually I don't know exactly, but I think it's
13 240,000 a year.
14    Q.   Okay.  And that's effectively charged back
15 against your book?
16    A.   Yes.
17    Q.   And then are you assigned a certain percentage
18 of the -- whatever profits you make on your book?
19    A.   Yes.
20    Q.   Is that a set number?
21    A.   It's -- it steps up.  The more profitable the
22 book, the higher the percentage.
23    Q.   Okay.  Can you just give me an overview of the
24 structure?
25    A.   It's -- the first 5 million is 20 percent.  The

Page 11

1 next 5 million is 25.  And then the -- above the next 5
2 is 30.
3    Q.   So anything above 10 is at 30 percent?
4    A.   Uh-huh, correct.
5    Q.   Are you familiar with the structure of -- the
6 ownership structure of GCAC?
7    A.   No.
8    Q.   Would AJ Brass be the most familiar with its
9 structure?
10    A.   I -- I would guess so.  Yeah, I don't know.  I
11 mean, I would think so; but I -- I don't know.
12    Q.   Do you direct -- do you report directly to
13 Mr. Brass?
14    A.   Yes.
15    Q.   Anyone else that you report to?
16    A.   No.
17    Q.   How many other traders are there that do
18 effectively what you do for GCAC?
19    A.   There's probably one other.
20    Q.   And who's that?
21    A.   George Grace.
22    Q.   Was he involved at all in the Vitol
23 transactions?
24    A.   He would buy and sell barrels on behalf of the
25 venture.

Page 12

1    Q.   His name was George Grace?
2    A.   Yes, sir.
3    Q.   Okay.  Do you know what assets -- physical
4 assets GCAC has?
5    A.   No.
6    Q.   Okay.  Do you -- so you don't -- you're not
7 aware of any storage facilities or things like that that
8 they would own?  Better question is:  Are you aware of
9 any physical storage facilities they own?
10    A.   I don't -- I mean, to my knowledge, I -- I
11 don't think they own anything anymore; but I'm not
12 actually sure.
13    Q.   Are you aware that we deposed Mr. Brass
14 yesterday?
15    A.   Yes.
16    Q.   Did you have a conversation with him after our
17 deposition yesterday?
18    A.   Yes.
19    Q.   Okay.  And what did you talk about?
20    A.   Mostly business --
21         MR. GILES:  Hang on.  Let me instruct you.
22         A.   -- to the extent you're asking him to
23 divulge work product after reasonable anticipation of
24 litigation, since we're in it, then I'm going to
25 instruct him not to answer.

Page 13

1         MR. BAAY:  How would AJ have work product?
2         MR. GILES:  Well, work product covers
3 conversations between the clients.  I can show you the
4 rule if you'd like to see it.
5    Q.   (BY MR. BAAY)  Okay.  So what did you talk
6 about?
7         MR. GILES:  You can tell him the general
8 subject but not the content.
9    A.   Oh, mostly business stuff, like the current
10 transactions and stuff like that.
11    Q.   (BY MR. BAAY)  Okay.  Did he talk to you about
12 what we talked about in his deposition?
13    A.   No.
14    Q.   Did you -- how many times did you meet with
15 Mr. Giles to prepare?
16    A.   Including briefly this morning, three times.
17    Q.   Okay.  Did you look at any documents in
18 preparing for your deposition?
19    A.   I think I looked at one.
20    Q.   Which was?
21         THE WITNESS:  What was the one --
22         MR. GILES:  Well, I don't get to tell you.
23 You have to remember.
24    A.   I can't remember what that one was.  And we
25 didn't even end up looking at it.  Oh, you know what it

Patrick Perugini

June 29, 2018
Pages 14 to 17

Page 14

1 was? It was a -- a hedge sheet from Vitol.
2 Q. (BY MR. BAAY) Okay.
3 A. It was a -- yeah, that was the one that I
4 looked at.
5 Q. Was it a list of all hedges?
6 A. Yes.
7 Q. And was that something that Eric Kuo sent to
8 you from Vitol? Better question is: How did you get
9 it?
10 A. Well, I -- I got it that day when we were
11 preparing. I mean, is that what you're asking?
12 Q. No. Did you see it before you prepared for
13 your deposition? Is it a document you were familiar
14 with?
15 A. I saw it one time.
16 Q. And do you know where it came from, is the
17 question?
18 A. I don't. I -- I got it from, I think, our CFO.
19 He -- he provided it to me.
20 Q. But do you have knowledge as to who prepared
21 that document?
22 A. Huh-uh, I don't.
23 Q. So you don't know whether it was a GCAC
24 document or a Vitol document?
25 A. No, I was pretty sure it was a Vitol document.

Page 15

1 Q. Why are you sure of that?
2 A. Well, it was -- it was presented to me like it
3 was from Vitol.
4 Q. So someone represented to you that it was a
5 Vitol document?
6 A. Yes.
7 Q. We're going to talk a lot about those hedges.
8 And you're a trader. I'm a lawyer. So I'm going to ask
9 you a lot of remedial questions.
10 A. You're okay.
11 Q. Just have patience because --
12 A. No, no, no, you're okay.
13 Q. The -- before we get into that, though, what
14 was your understanding as to the agreement between Vitol
15 and GCAC, the terms of the agreement?
16 A. That we were going into a venture together and
17 to trade asphalt together.
18 Q. Okay. And to your knowledge, was the
19 relationship captured by a written contract?
20 A. I'm not as familiar with that. There was
21 dialogue going back and forth, but I -- I wasn't
22 involved in that.
23 Q. Who would have been?
24 A. My guess -- this is a guess, but AJ Brass and
25 Jason Goldstein.

Page 16

1 Q. When -- when --
2 A. You're talking about on the GCAC side?
3 Q. Correct.
4 A. Correct. Okay.
5 Q. But was most your communication with Vitol via
6 Eric Kuo?
7 A. Yes.
8 Q. And did you ever have a conversation with Eric
9 that put into your mind the definitive terms of the
10 agreement?
11 A. No.
12 Q. As you sit here today, do you know what the
13 terms of the agreement were?
14 A. No.
15 Q. Is that typical? In other words, with these
16 trades impacting your book, wasn't it to your benefit to
17 understand the terms?
18 A. Trades? What do you mean, trades?
19 Q. Well, okay. Sorry. The purchases that were
20 made of asphalt. And so the question is: If -- if
21 you're making or losing money on these purchases to your
22 book, don't you want to know the terms of the agreement
23 between the two companies?
24 A. From my role as, call it, lead trader, the --
25 the terms wouldn't necessarily matter between me and

Page 17

1 Vitol. A general understanding of what the splits are
2 might matter to me, but the terms -- as long as the
3 splits are defined, that's all I care about because
4 that's how the P&L gets transferred back and forth.
5 Q. And when you say "splits," the profit splits --
6 A. Yes.
7 Q. -- or the agreement to share in the profits?
8 A. Yes.
9 Q. And what did you understand them to be here?
10 A. I -- again, I didn't know exactly; but I was --
11 kind of indicated it was 50/50.
12 Q. Okay. And it -- was that knowledge gained via
13 discussions with AJ Brass?
14 A. Yeah. That -- I would guess so.
15 Q. Was there ever a time in July or August of 2017
16 where someone represented to you that there was a
17 definitive agreement in place?
18 A. No.
19 MR. GILES: Objection, form.
20 Q. (BY MR. BAAY) How did you know when to begin
21 interacting with Vitol, so to speak, if -- if you
22 weren't clear as to when the agreement was put in place?
23 A. June 30th, the position of the -- the book, if
24 you will, was transferred from Rio to Vitol.
25 Q. How was that done?

Patrick Perugini

June 29, 2018
Pages 18 to 21

---

Page 18

1    A.   Again, I -- I wasn't really involved, but
2 there -- I think there were purchase and sale agreements
3 generated between Vitol and Rio.  And then -- so I think
4 June 30th, I believe, was a Friday and we wanted to get
5 it done -- actually Rio was pushing to get it done for a
6 July 1 start date.  So we transferred positions on that,
7 which was physical and financial; and that Monday
8 morning, I was able to transact as Vitol.
9    Q.   What do you mean, transact as Vitol?
10    A.   I did a deal and bought and sold a barrel.  I
11 think I bought two barrels, if my memory is correct.  We
12 bought one from Citgo and bought one from Exxon that
13 first few days of the -- July as Vitol.
14    Q.   And when you say "as Vitol," using Vitol
15 financing?
16    A.   Yeah.  Well, the way our business works is when
17 you transact -- we do a lot of verbal contracts that are
18 followed up by paper.  So I was interacting -- let's say
19 in this case, if my memory is correct, that we bought a
20 barrel from Citgo.  I went in and negotiated the
21 commercial terms, you know, price, location, quality,
22 all that kind of stuff that we normally -- we normally
23 have six or seven main things that we do, and -- and
24 then it was stated and agreed to that I was acting on
25 behalf of Vitol.  So then we -- we -- we have a -- an

---

Page 19

1 agreement that Vitol was going to purchase -- Vitol,
2 Eric Kuo, was purchasing it from Citgo.  And that
3 contract and paper then was transmitted between those
4 two companies as a Vitol purchase from Citgo.
5    Q.   And the agreement was Vitol would pay for the
6 purchase?  In other words, no GCAC money was being used
7 to make that purchase?
8    A.   Yeah.  Vitol purchased it, yes.
9    Q.   And was part of the agreement that GCAC would
10 reimburse Vitol for those purchases?
11    A.   I don't -- not in that context like reimburse,
12 like --
13    Q.   So how does it work?
14    A.   Well, there -- generally speaking, I -- I don't
15 know the agreement, but I know roughly it's a 50/50
16 profit share.  So it would be settled at a later date.
17 They owned -- Vitol owned the barrel, again, that's in
18 inventory.  So Vitol owns that barrel.  We -- GCAC
19 doesn't give them any money for it because that barrel
20 is sitting in inventory, and Vitol owns it.
21          (Exhibit 11 marked)
22    Q.   (BY MR. BAAY)  Okay.  I'm going to hand you
23 what has been marked as Exhibit 11.  I'm hoping this is
24 going to help our conversation.
25    A.   Oh my gosh.  I'm getting old.  Do you mind if I

---

Page 20

1 turn my light on so I can --
2    Q.   No, that's fine.
3          MR. GILES:  Do have that "over 40" app?
4          THE WITNESS:  No.  I've been resisting it.
5    Q.   (BY MR. BAAY)  So I'll just represent to you
6 that this was prepared by someone at Vitol who is
7 familiar with the purchases.
8    A.   Okay.
9    Q.   And as it's been explained to me, you see that
10 left-hand block lists all the purchases from the
11 different third parties?  Do you see that?
12    A.   Yep.
13    Q.   And, in fact, the top one that you mentioned
14 was Citgo; and that's the first --
15    A.   Okay.
16    Q.   -- right?
17          And then if you go to the -- to the --
18 what I'm calling the block on the right, that's "SALES."
19 And those represent Vitol's sales to third parties.
20    A.   Sure.
21    Q.   And then the bottom box, so to speak, are GCAC
22 sales to third parties.
23    A.   Gotcha.
24    Q.   And do I understand it correctly that of all
25 the purchases made of asphalt and related product some

---

Page 21

1 Vitol sold to third parties and some Vitol sold to GCAC,
2 who then sold to third parties?
3    A.   Yes.
4    Q.   And as I understand it, the sales that GCAC
5 made were made at a profit.  In other words, Vitol
6 bought them at a certain price; and GCAC's goal was to
7 sell them at a higher price per barrel.
8    A.   I don't know that I would answer it that way
9 or -- or --
10    Q.   How would you describe it?
11    A.   -- or characterize it that way.  Maybe I'll
12 start -- the whole intent of a business is you try to
13 buy low and sell high, right?  That always -- that
14 doesn't always work out that way.  So to characterize it
15 as all GCAC forward sales were at a profit, I'm not so
16 sure that's the right characterization.  I'd have to go
17 deal by deal to check that.
18    Q.   But that's the -- my question was:  That's the
19 goal?
20    A.   For -- yes, correct.
21    Q.   And whether it happened one way or the other
22 for these specific transactions, you're saying you'd
23 have to look at each transaction?
24    A.   Yeah.  Because it would be a lot more detailed
25 than that because a lot of this stuff went into

---

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900       San Antonio, Texas 78232
210-697-3400                                                                      210-697-3408
                                                                                  001483

Patrick Perugini

June 29, 2018
Pages 22 to 25

Page 22

1 inventory. You carry inventory prices. You have hedges
2 against it. You have a lot of things going on.
3   Q.  Sure.
4   A.  So it would depend on how we pulled those
5 barrels out of inventory and all that kind of stuff and
6 what hedges were associated. I don't -- it's not that
7 complex, but it's -- it's a little bit more --
8   Q.  Nuanced?
9   A.  -- detailed, yeah, to -- to answer it as a yes
10 or no like that.
11   Q.  Okay. But of all the sales made by GCAC, to
12 the extent there was any profit, that's going -- that
13 was going to your book?
14   A.  Again, I would say that --
15   Q.  Percentage-wise.
16   A.  I would say that we did purchases and we did
17 sales, whether they were GCAC or Vitol sales, and the
18 profit or loss was going to the whole venture.
19   Q.  Understood. But there was a certain piece of
20 that reflected within your book, true?
21   A.  All of it was. That's all I'm getting at is
22 that they weren't isolated as GCAC sales or Vitol sales.
23 It's the book.
24   Q.  Okay.
25   A.  So all purchases in, all sales out.

Page 23

1   Q.  So that leads me to this question: What is
2 your memory as to your -- your gain or loss for 2017 as
3 relates to the purchases on Exhibit No. 11?
4   A.  On physical sales --
5   Q.  Uh-huh.
6   A.  -- and purchases?
7   Q.  Yes.
8   A.  We were up.
9   Q.  Up?
10   A.  Uh-huh.
11   Q.  Do you remember the number?
12   A.  Huh-uh.
13   Q.  And you -- you distinguished physical because
14 there were also a series of financial trades, right?
15   A.  Yeah.
16   Q.  And those were the -- the hedges?
17   A.  Yes.
18   Q.  And my understanding of the hedges is that they
19 were put in place to protect a move in a price between
20 the time Vitol bought it and the time it was sold to a
21 third party. Is that roughly correct?
22   A.  That's -- that's -- yes, correct.
23   Q.  And -- and all a hedge is is buying a -- a
24 price at a future date?
25   A.  Yes.

Page 24

1   Q.  Or selling?
2   A.  Now -- yes. That is true.
3   Q.  Okay.
4   A.  Except we're trading a commodity that doesn't
5 have a natural clean hedge.
6   Q.  And so the solution to that is you hedge off of
7 sulfur and Brent?
8   A.  6 oil or Brent is what -- yeah. There are
9 other things, but that's what Vitol wanted to do.
10   Q.  Okay. And explain why those are good hedges
11 for asphalt.
12   A.  Well, again, using my example, because they're
13 down here, 6 oil in particular, because they're tied
14 together a little bit symbiotic, they will -- if this is
15 the flow of the market pricing, like this, over time
16 6 oil will correlate pricing-wise with asphalt. There
17 are some nuances in there that it won't; and we would
18 deem that a dirty hedge, meaning it doesn't move exactly
19 with it. And there are times it spreads apart or comes
20 together; but it is the closest thing you can get to
21 what we would clean -- call a clean hedge, you know.
22        And then Brent is used from time to time
23 when -- to use another word, when there's not liquidity,
24 meaning -- again, 6 oil is a good -- a well-traded
25 commodity, but sometimes, because it's not like a -- a

Page 25

1 crude contract, is -- there's a lot of people that want
2 to buy and sell crude. So it's -- they -- they would
3 use the terminology "it's more liquid." There were
4 times, you know, whether it's late in the day -- not a
5 lot of people are trying 6 oil -- we would have to put
6 stuff in Brent, like -- because it's more liquid and it
7 trades more in 24 hours. It's a global commodity that
8 has a lot more volume in it. So it's easy to trade and
9 get market prices really quickly.
10   Q.  So financial trades with 6 oil are more
11 restrictive or limited?
12   A.  There's just less of them done. So we would
13 deem them as not as liquid of a market.
14   Q.  Understood. And is it true that if the price
15 dropped on a barrel of asphalt, the way the hedge
16 protected Vitol and GCAC is, is that it would -- it
17 would put a floor on the price? In other words, if
18 you're losing money on the physical sale, you're going
19 to make money on the financial side -- trade?
20   A.  If it's a perfect hedge, yes.
21   Q.  Okay.
22   A.  But that's not always the case on these hedges.
23   Q.  Understood. Understood. And -- and not all
24 these hedges that we're going to talk about today were
25 perfect hedges, I'm assuming?

Patrick Perugini

June 29, 2018
Pages 26 to 29

Page 26

1   A.  Oh, no.  Just by -- what I just described, none
2 of them are.
3   Q.  Yeah, right.  Because there's not a -- there's
4 not a like-kind index, right?
5   A.  Right.
6   Q.  If you're up -- is it true that if you're up on
7 your physical trades you're going to be losing money,
8 generally speaking, on your hedges?
9   A.  It's not always the case but --
10   Q.  Typically?
11   A.  Yes.
12   Q.  Do you know that to be the case here in the --
13 in the transactions that happened between Vitol and
14 GCAC?
15   A.  Say again what you're asking me.
16   Q.  Do you have any memory or understanding as to
17 whether the hedges that were tied to these physical
18 purchases of asphalt between GCAC and Vitol resulted in
19 a loss on the hedges -- on the hedging?
20   A.  Yes.  I believe that to be true.
21   Q.  Is it also true that you were giving
22 instruction to Vitol as to when to execute a hedge as
23 related to the physical purchase?
24   A.  Some of the time.  Some of the time, it was --
25 we would buy a barrel; and they would decide where to

Page 27

1 put it, you know.  And when I say "where to put it, what
2 month to put it in, what commodity brand or 6 oil,"
3 there were times that they made those decisions.
4   Q.  Sure.  But at a high level, you were giving the
5 instruction to hedge; but there were times when Eric and
6 Vitol were making decisions as to the details of the
7 hedge, true?
8   A.  Well, the way it started was a physical
9 contract, whether it was pricing days or not, would --
10 would dictate it, meaning if we had what we would call
11 event pricing, meaning, like, the Citgo purchase, let's
12 say, is priced July 1st, 2nd and 3rd, I wouldn't tell
13 him to do anything.  He would just go do it based as the
14 contract, meaning he would put hedges on on July 1st,
15 2nd and 3rd to try to mimic the contract.
16        When we did physical contracts, I might
17 send him notes and say, "Hey, we" -- "we sold something
18 fixed price.  Can you do the corresponding hedge to get
19 us out?"  And that might be me being very specific; or
20 it might be, "You" -- you know, "You" -- "you look at
21 our book and take a look and tell us where to take
22 hedges off or put them on accordingly."
23   Q.  So there's no question there were times
24 throughout this relationship where you were giving
25 specific instruction on the hedging transaction?

Page 28

1        MR. GILES:  Objection, form.
2        You can answer.
3   A.  Can you say it one more time?  Because I lost
4 my train of thought.  Sorry.
5   Q.  (BY MR. BAAY)  Sure, sure.  There's no doubt
6 that there were occasions on which you gave specific
7 instruction to Eric and to Vitol as to how you wanted
8 something hedged?
9        MR. GILES:  Objection, form.
10   A.  Yes.
11   Q.  (BY MR. BAAY)  And then there were times where
12 you may have just simply said, "Please hedge tied to
13 this purchase"?
14   A.  Yes.
15   Q.  And Eric would work out -- sort out the details
16 as the price and how many barrels?
17   A.  Yes.
18   Q.  Is it true that the ultimate design of the
19 hedging transactions was to protect barrels in storage,
20 so to speak?  Let me give you an example.  If -- if GCAC
21 sold 30,000 barrels to a third party, that was taken out
22 of inventory and there would be a need to protect the --
23 the remaining inventory in the storage; is that right?
24        MR. GILES:  Objection, form.
25   Q.  (BY MR. BAAY)  Let me ask a better question.

Page 29

1   A.  Yeah, yeah.  Sorry.
2   Q.  That was a terrible question.
3   A.  Sorry.
4   Q.  As I understand it, there were times where
5 hedges were made against the purchases, right?
6   A.  Yes.
7   Q.  And then there were also times when there were
8 hedges put against a sale?
9   A.  I wouldn't say it like that.
10   Q.  Okay.  How would you say it?
11   A.  When you buy and sell, you're trying to do the
12 inverse on hedges.  So -- and, yes, you're trying to
13 protect the pricing of the -- of the commodity over
14 time, you know, with the fluctuations in the market.  So
15 to -- to characterize the way you -- you're going to buy
16 and sell hedges correspondingly to the inverse of the
17 purchase con -- and sale contracts, right?
18   Q.  Right.
19   A.  So if you're buying a physical, you're going to
20 sell a financial.  You're selling a physical, you're
21 going to buy a financial.
22   Q.  Understood.
23   A.  So --
24   Q.  So for every purchase that we see on
25 Exhibit 11, is there a corresponding hedge -- or should

Patrick Perugini

June 29, 2018
Pages 30 to 33

Page 30

1 there be a corresponding hedge?

2    A.   Oh, man, I'd have to go one by one.

3    Q.   But I'm asking, you know, big picture --

4 philosophy-wise, should there have been?

5    A.   Let me think about that before I answer that.

6 I'm trying to think of a different scenario that --

7 would there be hedges?  Say again what you're asking.

8    Q.   I'm just wondering, are there occasions where

9 you are not making a financial trade tied to a physical

10 trade?

11    A.   I wouldn't think so.  I -- it's escaping me not

12 to think of, yeah, a scenario.

13    Q.   If you didn't, you'd be, so -- so to speak,

14 naked on the physical?

15    A.   Well, you just sit on it.  You can, and it's

16 a -- we're trading, right?  We're trying to find

17 different --

18    Q.   The arbitrage.

19    A.   Yeah.  And I think you're going down a path

20 where you think every barrel should be hedged and every

21 barrel should be unhedged when you sell it and all that

22 kind of stuff.  And that's not the case because you can

23 be -- you can carry a -- a flat price position, which

24 would be a long or a short position.  So you wouldn't

25 necessarily always have to hedge every barrel in and out

Page 31

1 unless that was your strategy, to be -- and let me

2 clarify.

3         If you want to run a balanced book, every

4 purchase will have a physical, will have a sale

5 financially; and every sale physically will have a

6 purchase physically, if you want to run a balance, for

7 equal amounts of volume.  But you can carry a -- a -- a

8 flat price position, meaning you could be imbalanced on

9 how much -- how much purchases you might have and how

10 many hedges you might have on.  You can -- you can run

11 a -- a book like that.

12    Q.   And -- and that would explain why there wasn't

13 a financial trade for every single one of these physical

14 trades, if that turns out to be the case?

15         MR. GILES:  Objection, form.

16    A.   It could be one of the answers.

17    Q.   (BY MR. BAAY)  What are some others?

18    A.   Of what?  Of --

19    Q.   Other explanations as to why not every one of

20 these physical purchases of asphalt was tied to a hedge.

21    A.   Oh, it could be that; or it could be a bust in

22 the system where they -- where someone didn't have a

23 hedge on that was supposed to be.  I mean, it -- it

24 could be a lot of things.  There could be -- there could

25 be errors, too.  Yeah, it -- it could be a decision to

Page 32

1 do it or it could be an error or -- yeah, I mean, those

2 are the two that I think come to mind.

3    Q.   Let's just assume it's true for a minute that

4 there was a 50 percent profit share agreement between

5 GCAC and Vitol.  Do you follow?

6    A.   Yep.

7    Q.   That would mean that, at the very least, GCAC

8 would be sharing in the -- either the cost or the profit

9 related to the financial trades?

10         MR. GILES:  Objection, form.

11    A.   I think I know what you're asking, and I --

12 this is where I want to -- I -- it would depend on the

13 way the agreement was structured between the two

14 companies.

15    Q.   (BY MR. BAAY)  Okay.  And -- and you have no

16 insight as to the terms of the agreement?

17    A.   I don't.  I don't.

18    Q.   Have you read the lawsuits that have been filed

19 in this case?

20    A.   I haven't.

21    Q.   Okay.

22    A.   I purposely didn't.

23    Q.   You're free from that?

24    A.   Yeah, I didn't -- I didn't want to know.

25    Q.   Okay.  So you're -- you're saying it's

Page 33

1 dependent upon the terms because the terms may --

2    A.   I think so.  That's -- yeah, I don't mean to

3 interrupt you; but that would be my guess.  Like, there

4 could be a situation where each party is held

5 accountable for what their skill sets are.  Apologize

6 for interrupting you.

7    Q.   Oh, that's all right.

8         You're saying there may be terms where one

9 party agrees to -- to take on all of the losses related

10 to certain types of trades?

11    A.   No.  What I'm saying is -- again, I'm just

12 speculating.  Like, maybe someone is in charge of

13 certain things.  Like, it's your responsibility, you

14 know, and in the -- you know what I mean?  I -- I don't

15 know --

16    Q.   Uh-huh.

17    A.   -- that -- yeah, all purchase and sales go in

18 and how were we deemed we were going to hedge this book

19 and all that kind of stuff; and then that's the split.

20 And if there were errors outside that agreement, I could

21 see -- like, if everyone did what they wanted, you'd

22 have a P&L.  Like, I'd be very upset as the lead trader

23 if it was no fault of my own that there were issues,

24 right, because, like you stated, it's -- it hits me --

25    Q.   Uh-huh.

Patrick Perugini

Page 34

1   A.  -- personally.

2   Q.  Uh-huh.

3   A.  And so depending on the -- the form of the
4 deal, yeah, they -- you could see those transactions
5 happening outside, like -- or a discussion happens,
6 whose fault it was, was it negligent, was it -- you know
7 what I mean, like, what -- what happened.  I think you
8 could -- you could -- you would get into a different
9 discussion, I think.

10   Q.  Were you aware that GCAC paid to Vitol more
11 than $60 million related to these transactions?

12   A.  No.

13   Q.  Would that have been a price charged against
14 your book?

15   A.  Well, I --

16       THE WITNESS:  Sorry, I can't turn my phone
17 off.

18       MR. GILES:  The light.

19   A.  I don't know what payments were made.  All I
20 know is all purchase, sales, hedges and corresponding
21 logistics costs will be inside the scope of my book.

22   Q.  (BY MR. BAAY)  And are you saying that you
23 didn't know the finer points of it?

24   A.  No.  What I'm saying is money could be changing
25 hands left and right, but there would be a

Page 35

1 reconciliation at the end.  So to point to certain
2 payments, they -- if they're in the context of the deal
3 that we bought and sold product, then, yeah, it would be
4 in there.

5   Q.  Yeah.  But what you're seeing is the final net
6 number?

7   A.  Yeah.  I'm keeping up all purchase sales,
8 costs.

9   Q.  If Vitol was sharing in the profits, wouldn't
10 that be reflected in your book?

11   A.  Oh, for sure.

12   Q.  And do you know whether that was reflected in
13 your book?

14   A.  No.  I just -- no.  I mean, I just assumed it
15 to be true.

16   Q.  That -- that Vitol was also sharing the
17 profits?

18   A.  Uh-huh.

19   Q.  But if they weren't -- if it was a straight
20 financing arrangement where Eric wasn't taking any of
21 the profit, all of that -- they would be bearing the
22 cost and all the profit would be going to GCAC, right?

23   A.  Yeah, if that were -- for sure.

24       MR. GILES:  Objection, form.

25   Q.  (BY MR. BAAY)  And that's -- that -- that would

Page 36

1 be clearly revealed through analysis of your book?

2   A.  What would be clear?

3       MR. GILES:  Objection, form.

4   Q.  (BY MR. BAAY)  The relationship, whether --
5 whether you're sharing 50/50 with Vitol or whether
6 they're in a purely financing arrangement?

7       MR. GILES:  Objection, form.

8   A.  It would be -- say again.  It would be clear in
9 the what, the --

10   Q.  (BY MR. BAAY)  In -- in an analysis of your
11 book.  In other words, the numbers of your book would --
12 would tell which one it was.

13       MR. GILES:  Objection, form.

14   A.  I'm not sure I -- again, I think I know where
15 you're going; but be it real simple, the way I looked at
16 it was:  Purchase sales, costs, what that number is,
17 half.

18   Q.  (BY MR. BAAY)  Uh-huh.

19   A.  So if that's what your reference is, is clear,
20 that that's what I would say.  That -- that's how I
21 would look at it.

22   Q.  But you understand that Vitol's claim here is
23 that there's some $15 million that GCAC owes them?

24   A.  Okay.

25   Q.  Right?  Do you understand that?

Page 37

1   A.  Yes.

2   Q.  And to -- to your view of the world, is that
3 because you owe them 50 percent of the profits or is it
4 because you owe them that and -- and the financing costs
5 that they incurred?

6       MR. GILES:  Objection, form.

7   A.  I would say that I'm really not sure what the
8 15 million is.  All I know is purchase sales, costs,
9 half.  That's what I know.

10   Q.  (BY MR. BAAY)  Right.  But that would be under
11 the assumption that there was an agreement for it to be
12 half?

13   A.  Yeah.  That was the -- that was the assumption
14 I was -- I was going under.

15   Q.  And my only question is:  If that's not the
16 agreement, if it was a financing arrangement where Vitol
17 has effectively just served as the bank, then your book
18 would reveal that you were enjoying 100 percent of the
19 profits?

20   A.  Yeah, or losses.

21   Q.  Right.  Okay.  What I'm going to do is go
22 through some of these transactions.  You okay?  You need
23 a break?

24   A.  No, no.  I'm fine.  I'll turn my light off,
25 though.

Patrick Perugini

June 29, 2018
Pages 38 to 41

Page 38

1        MR. BAAY:  I'm just going to give you
2 these.  I don't know that I'm going to mark them all --
3        MR. GILES:  Okay.
4        MR. BAAY:  -- but save me some time.  I'll
5 give you each one.
6        (Exhibit 12 marked)
7    Q.  (BY MR. BAAY)  I'm going to hand you what we've
8 marked as 12.  And I'll represent to you that that is a
9 text string between you and Mr. Kuo.
10   A.  Okay.
11   Q.  Does that exchange look familiar?
12   A.  No, but I'm sure it is.
13   Q.  Yeah.  That was my next question.
14   A.  Yeah.
15   Q.  It wasn't uncommon for you and Eric to trade
16 texts?
17   A.  That's -- that's true.
18   Q.  And the subject of those texts frequently was
19 the details around how were you going to -- how you were
20 going to hedge certain of these purchases; is that true?
21   A.  Yes.
22   Q.  And for this one that we marked as 12, I'm
23 understanding that everything on the left are your texts
24 and everything kind in a darker color --
25   A.  Yeah.

Page 39

1    Q.  -- are Eric's texts?
2    A.  That would be consistent.
3    Q.  And so you say at the top, "Did the sem deal,"
4 which I understand to mean you sold asphalt to SEM.
5    A.  Yes.
6    Q.  And you say, "30 kb fixed price," which means
7 30,000 barrels at a fixed price?
8    A.  Yes.
9    Q.  And then you -- the instruction you give to
10 Eric is, "Please buy back hedges to cover that volume,"
11 right.
12       MR. GILES:  Objection, form.
13   A.  Yes.
14   Q.  (BY MR. BAAY)  And then you say, "Thanks!"
15       And then he responds and says, "Hedge on
16 Sep bought at 46.30."
17   A.  Yes.
18   Q.  Which means he made a forward contract purchase
19 for either 6 oil or Brent in September at 46.30 --
20   A.  Yes.
21   Q.  -- per barrel?
22   A.  Uh-huh.
23   Q.  And so this goes back to my original
24 discussion.  Why would you be hedging barrels that you
25 just sold?  Does that make sense?

Page 40

1    A.  Not really.
2    Q.  So you -- you sold these barrels to SEM, right?
3    A.  Yeah.
4    Q.  They're no longer in your inventory; so you're
5 no longer subjected to the risk of a price movement?
6    A.  Yeah.  So you -- again, so -- think about it as
7 you always want the inverse, right?  If you want to run
8 a balanced book, you want the inverse.  So we sold fixed
9 price.  That means these -- these -- in theory, I think
10 if -- if I think of this deal and why we're saying it,
11 this was -- it probably came out of inventory.  And so
12 you have to then buy the corresponding hedge against
13 that so you create a netting effect.
14   Q.  Because it -- because those barrels are coming
15 out of your inventory?
16   A.  I don't know that -- well, let me say this:
17 They may or may not have come out of inventory, but
18 you've created something.  When you've done something at
19 a fixed price, you've created a position that you have
20 to address.
21   Q.  Understood.  In -- in real simple terms, you're
22 protecting against a movement in the physical price by
23 inversely buying the -- the financial hedge?
24   A.  That's the -- that's the general understanding
25 of hedging.

Page 41

1    Q.  If it were a perfect hedge --
2    A.  Yeah.
3    Q.  -- that's what you'd be doing?
4    A.  Yes.
5    Q.  So the next text on there from you is:  "Great.
6 Do you know fill on Gunvor deal from yesterday."  What
7 does that mean?
8    A.  That's from a prior transaction, asking where
9 the hedge was done.
10   Q.  And he responds, "46.20"?
11   A.  Yep.
12   Q.  So you were asking for price, and he gives it
13 to you?
14   A.  Yep.
15   Q.  Okay.  I'm just going to go through several of
16 these to see if I can get the hang of it.
17       (Exhibit 13 marked)
18   Q.  (BY MR. BAAY)  I'll hand you what I've marked
19 as 13, which is an e-mail between you and Eric on --
20 well, I should say the original e-mail is an e-mail
21 between you and Eric on August 15th, 2017; is that
22 right?
23   A.  Yep.
24   Q.  And Arthur -- AJ Brass is copied, and Kale
25 Krhovjak from Rio.  How do you pronounce the last name?

Patrick Perugini

June 29, 2018
Pages 42 to 45

Page 42

1   A.   Krhovjak.
2   Q.   Krhovjak.  I never get it right.  He would be
3   really upset with me.
4        He's on there because these are the --
5   passthrough, right, from some Rio transactions -- or the
6   transitioning of Rio positions?
7   A.   I don't know that I would say it like that.
8   Hold on.  Let me see when this is.  This is in August?
9   Q.   Uh-huh.
10  A.   The -- you're asking why Kale is on this?
11  Q.   Right.
12  A.   Kale is on this because at -- the way that the
13  deal was structured on June 30th was Rio still owned the
14  tankage lease in Corpus Christi.  So they had to own the
15  inventory, and we had to create buy/sells between Rio
16  and Vitol every time something went in and out of
17  inventory.
18  Q.   Got it.  Said otherwise, Vitol couldn't own
19  barrels sitting in Gravity's tanks?
20  A.   Because Rio still owned the lease.
21  Q.   With Gravity?
22  A.   Yes.
23  Q.   Yep.  And if I understand this correctly, that
24  Deal 2, which is in the middle of page -- Exhibit 13,
25  Vitol was selling 35,000 barrels to GCAC, true?

Page 43

1   A.   Yes.
2   Q.   And then the -- a corresponding sale was
3   made -- or, sorry, the first purchase was Hunt selling
4   to Vitol?
5   A.   Yes.
6   Q.   At 45,000 barrels?
7   A.   Yes.
8   Q.   And then Vitol turns and sells that to GCAC or
9   sells 35,000 barrels to GCAC, correct?
10  A.   Yeah.  Just so we're clear, these are two
11  different deals.
12  Q.   Right.
13  A.   So the -- the Deal 1 on this page is Hunt
14  selling Vitol into storage in Mobile, Alabama.  Deal 2
15  is Vitol selling to GCAC out of Corpus -- no, that's out
16  of -- oh, sorry, that is out of Mobile as well.  Okay.
17  Yeah.  So that's out of Mobile as well.  So -- I'm
18  sorry, again, I lost track of what your question is.
19  Q.   Well, I'm driving to an ultimate question.
20  A.   Yeah.  Sorry about that.
21  Q.   No, you're helping me on it.
22  A.   Yeah.
23  Q.   And so is the third step in that GCAC sales to
24  Gunvor?
25  A.   Yeah, that's -- yeah, that's the deal that

Page 44

1   happens that I showed that was happening because we
2   would have to do this from time to time because
3   credit-wise or something wasn't set up in Vitol's
4   system; so GCAC would have to sell it on behalf of the
5   venture.
6   Q.   And GCAC sold 35,000 barrels to Gunvor?
7   A.   Correct.
8   Q.   And the resulting hedge that Eric confirms with
9   you in that top e-mail is 10,000 barrels bought for
10  September, 6 oil, at 44.50 a barrel; is that right?
11  A.   Yes.
12  Q.   And the reason he's buying -- or the reason
13  he's hedging those 10,000 barrels is because those are
14  the barrels that remain in inventory?
15  A.   Actually, no.  But you're close.  It's just the
16  opposite.  The -- so it -- it looks like, if you just
17  follow them out, we bought 25,000 barrels --
18  Q.   Okay.
19  A.   -- to go in, and we sold 35.
20  Q.   I thought we agreed that we bought 45,000.
21  A.   It's 4500 tons, approximately 25,000 barrels.
22  It says it in the e-mail.
23  Q.   Got it.  Got it.
24  A.   It says it in there.
25  Q.   Got it.

Page 45

1   A.   If I agreed, then I misspoke.
2   Q.   No, no, I misstated it.
3   A.   No, but it's fine.  So it -- so the way this
4   transaction looks like it worked is these 25,000 barrels
5   went into inventory, 35 came out.  So we sold 10 more
6   than we bought.
7   Q.   Uh-huh.
8   A.   So we had to buy 10 hedges, and that's what
9   he's referencing:  I bought 10 hedges.
10  Q.   10,000 --
11  A.   Yes.
12  Q.   -- barrels --
13  A.   Yeah.
14  Q.   -- worth of hedges?
15  A.   Yes.  To -- to -- to -- to fix that imbalance.
16  Q.   Okay.  It's the hedges fixing the imbalance of
17  the inventory that remains in the project, that remains
18  in the -- in the partnership?
19  A.   Yeah.  Yeah.
20       (Exhibit 14 marked)
21  Q.   (BY MR. BAAY)  I'm going to hand you
22  Exhibit 14.
23  A.   Okay.
24  Q.   Again, this is a -- a text series between you
25  and Eric.  And the top text, you say:  "Morning.  Just

Patrick Perugini

June 29, 2018
Pages 46 to 49

Page 46

1 to be clear.  As we do deals, do them as GCAC" as -- I
2 think it should be "as your credit guy is satisfied?"
3         What -- what does that mean?
4    A.  I don't know.
5    Q.  But that's you saying that?
6    A.  For sure.
7    Q.  Yeah.
8    A.  I would guess so.  I mean, you -- you can --
9 I'm sure this is mine, I would bet.
10    Q.  Yeah, yeah.  So you're not remembering what
11 that means?
12    A.  Well, let me just try to -- well, let me see
13 that.
14         I'm not exactly sure, honestly, of what
15 that is.  That -- that might be driven off a verbal
16 conversation, too.  I'm not sure.
17    Q.  Uh-huh.  And then you say, down in the lower
18 part of 14:  "Vitol buys 40 mbs fixed price from
19 Phillips dlvd to corpus."
20         What does that mean?
21    A.  What I'm -- course -- like, trying to get
22 across to him -- we're always trying to -- try to speak
23 as quickly and as efficiently as we can.  So I'm trying
24 to tell him we've created a position because we did
25 something fixed price so he knows then what to go do

Page 47

1 hedging-wise to -- to help us balance out the position.
2 So, again, we bought 40,000.  Vitol buys 40,000 of
3 Phillips.  That means he's got to go do something,
4 40,000 barrels to sell on hedges.
5    Q.  So any time you make the physical purchase,
6 you're creating your position?
7    A.  Any time we do something fixed price, purchase
8 or sell, it does something to the position.
9    Q.  And, again, the -- the goal is to keep your
10 book balanced, relatively balanced?
11    A.  In -- in that phraseology, if we want to run a
12 balanced book, yes, that's what we would do.
13    Q.  Did you understand that -- that these
14 transactions weren't going to Eric's book?  In other
15 words, did you have that conversation to him -- with
16 him?
17    A.  What transactions?
18    Q.  All of these asphalt purchases that are -- that
19 appear on Exhibit 11.
20    A.  Well, that was a position they stated some --
21 sometime into this.  So whereabouts when they started to
22 state that, that was a pretty good ways into -- and when
23 I say good ways, June 30th for transfer positions and
24 sometime in September or October is when they deemed
25 they didn't want -- they -- they weren't allowed to be

Page 48

1 part of this.
2    Q.  Okay.  And so you understood at that point, at
3 the very least, that Eric wasn't running these purchases
4 to be -- for his book, for the purposes of -- of making
5 money through his book?
6         MR. GILES:  Objection, form.
7    A.  Yeah, I -- I -- I don't know that I could say
8 that.  I think it was their position that that's what
9 they wanted, for sure; but to say that there was an
10 agreement at some point in date and time that that was
11 absolute, I -- I wouldn't necessarily say that.
12    Q.  (BY MR. BAAY)  No, I'm not asking about
13 agreement.  I'm just asking about your understanding as
14 to how Eric was treating these transactions.
15    A.  How he thought about them?
16    Q.  Yeah, how he was viewing it.
17    A.  At some point in September, October, yeah, he
18 thought that they -- he was no longer a part of it.
19    Q.  And he made it clear to you -- well, let me ask
20 the question.  Did he make it clear to you that it was
21 because Vitol couldn't enter into a partnership with
22 GCAC?
23    A.  I don't know that he made it clear to me.  I --
24 I wasn't in all the meetings.  So I -- I can't say that
25 it was him, but there was some undercurrent -- yeah,

Page 49

1 they had a problem with their JV partner.
2    Q.  And from that point forward -- once you learned
3 that something had changed, were you then aware that
4 every purchase made from that point on was made with
5 Vitol solely serving as the financing arm of this
6 transaction?
7    A.  I wouldn't say that I knew that.
8    Q.  Okay.  What did you -- so a better question is:
9 What did you think had changed once you learned that
10 information?
11    A.  Honestly, I just kept trading the book.  I -- I
12 mean, completely honestly, I -- I was in some meetings
13 but not all; and I just felt like the best thing I could
14 do was just keep trading the book.
15    Q.  Because, frankly, it was to your benefit,
16 right?  The trades were making a profit for your book?
17    A.  I was -- I -- I and Eric were responsible for
18 the financials of the book.  So I knew that I had to
19 just try to keep making money.
20    Q.  Right.
21    A.  I had to --
22    Q.  Right.
23    A.  -- one shape or form and I just -- we were
24 trying to work it out with Vitol and their JV partner
25 along the way and I just -- just kept going, honestly.

Patrick Perugini

June 29, 2018
Pages 50 to 53

Page 50

1    Q.   So this is probably a repetitive question, but
2 do you have a memory as to the 2017 accounting as to the
3 profits to your P&L as a result of these trades you
4 did -- of these purchases you did?
5    A.   We never really got to a final number.  I had
6 to guesstimate it because I never was provided the hedge
7 summary that I could decipher.  So I -- I had to do it
8 from me having transactions like this, as many as I
9 could, to -- to try to piece it back together.  But even
10 then, I didn't have the full picture.
11    Q.   Did you do it via spreadsheet or some other
12 way?
13    A.   I tried to.
14    Q.   Okay.  Something you created?
15    A.   I -- yes.
16    Q.   Do you know of anyone else within GCAC created
17 something similar?
18    A.   I don't know.  I mean, I think they tried to
19 track it after the fact, if that's what you're asking.
20 They tried to piece it together after the fact.
21    Q.   But your comp for 17 had to be based on a final
22 number, right, for your P&L?
23    A.   Uh-huh.  Yes.
24    Q.   And what was that number?
25    A.   We didn't -- we haven't done it.

Page 51

1    Q.   So you haven't been -- you haven't been paid
2 for '17?
3    A.   No.
4    Q.   Is it because of there's no resolution on these
5 trades with Vitol?
6    A.   Yeah.  All this stuff, for sure.
7    Q.   Is that something that AJ said to you, is that,
8 "I can't pay you until we come to a resolution on this"?
9    A.   He didn't say anything, but I just knew we were
10 caught in this stuff.
11    Q.   But -- but putting aside the fact that your
12 comp has not been finalized, your memory is that the --
13 that on the physical side you were up?
14    A.   Oh, for sure.  Yeah.
15    Q.   And -- and you can't ballpark it?
16    A.   No, I can't.  I mean, I could probably after
17 the fact.  I just have to go look at my stuff, but I
18 can't.
19    Q.   Do you think that spreadsheet we're talking
20 about has a ballpark of how much you're up?
21    A.   Yeah.  On the physical?
22    Q.   Yeah.
23    A.   I think I could provide that.
24    Q.   Okay.  I've seen numbers in the
25 9 million-dollar range.  Does that sound --

Page 52

1    A.   I really won't, I mean, recall it like that
2 because I -- I really looked at his physical versus
3 financial like that.
4    Q.   I'm going to try to skip to some that are a
5 little bit different than the ones we've already talked
6 about.
7         Okay.  Let's look at this one I'll mark as
8 15.
9         (Exhibit 15 marked)
10    Q.   (BY MR. BAAY)  And this is a September 25,
11 2017, e-mail.
12         MR. BAAY:  Oh, I knew it.
13         MR. DINNELL:  4:52 p.m.?
14         MR. BAAY:  Yep.
15    Q.   (BY MR. BAAY)  Okay.  I'll just hand you this
16 and ask you:  This -- have you seen that e-mail before?
17         MR. GILES:  What number is that?  15?
18    A.   Yes.
19    Q.   (BY MR. BAAY)  And the same series of
20 discussions.  The e-mail is listing some of the physical
21 purchases, and then Eric is confirming certain hedges.
22 Do you agree to that characterization?
23    A.   Yes.
24    Q.   And the middle part of the e-mail on that first
25 page is, you say to him:  Hey, Eric, remember we need --

Page 53

1 we have to buy some Brent cracks today.
2    A.   Uh-huh.
3    Q.   What does that mean?  How does that translate?
4    A.   Like, when you say "translate," to --
5    Q.   Like, in plain English, what does that mean?
6 Are you telling him to put some hedges on for certain
7 physical trades?
8    A.   I probably reference a physical contract that's
9 doing something today.  You know what I mean?  Like,
10 just to -- as a reminder, like:  Hey, man, something is
11 starting to price, it looks like.
12    Q.   Uh-huh.
13    A.   Just remember.
14    Q.   Uh-huh.
15    A.   Like -- yeah.
16    Q.   So if you go down to the bottom of that page,
17 it says "2 deals."  And this is an e-mail you're sending
18 to Eric.  You're copying several people, including
19 AJ Brass.  And you say:  "We will have to buy the Platts
20 USGC" --
21    A.   That's the -- that the fuel oil.
22    Q.   That's the 6 oil?
23    A.   That's the 6 oil, yeah.
24    Q.   -- "and sell Brent for appropriate months
25 Monday."  Right?

Patrick Perugini

June 29, 2018
Pages 54 to 57

---

Page 54

1    A.   Yes.
2    Q.   And then Deal 1 is Vitol selling to GCAC,
3 correct?
4    A.   Uh-huh.
5    Q.   And how many barrels is that deal, 34,000?
6    A.   Just four cargoes of 34 each.
7    Q.   Oh, okay.  And can you tell what Deal 2 is?
8 Oh, here it is on page 3.
9    A.   Yeah, it's the same deal, basically.  So this
10 is, again, one of those ones that, for whatever reason,
11 I -- if I -- anyway, Vitol couldn't transact it.  So
12 GCAC had to.  So we created a -- a second contract to
13 accommodate that, whereas -- does that make sense?  For
14 whatever reason, whether it had been credit or
15 logistics, Vitol wasn't able to do it.  So then GCAC
16 would step in and do it.
17   Q.   When you say "do it," make the sale?
18   A.   Yeah, in this case -- yeah, in this
19 case, we've made the sale.
20   Q.   And that was a question I had for you that I
21 should have asked when we were looking at Exhibit 11.
22 What determined when Vitol was selling to third parties
23 and when GCAC was selling to third parties?
24   A.   Basically Vitol would do every transaction if
25 they could; but there would be circumstances on some

---

Page 55

1 that they couldn't, whether it be counter-party or that
2 counter-party couldn't get their credit or a certain
3 type of logistics, meaning they couldn't vet a certain
4 ship or -- you know what I mean?  Like, they -- the
5 intent was for Vitol to do them all, but there were
6 circumstances that arised that they couldn't or
7 wouldn't.  And so we made the -- the -- whatever.  We --
8 we figured out a way to do it.
9    Q.   On the barrels sold by Vitol to third parties,
10 how was the profit, to the extent there was one,
11 accounted for?  Do you understand that question?
12   A.   Huh-uh.
13   Q.   If GCAC is making the sale to a third party and
14 they're selling for a price higher than they bought it
15 for, that money just comes in to GCAC's books, right?
16   A.   Yeah, I don't -- there's not really
17 distinctions between Vitol and a GCAC sale.  If it's --
18 if it's a true back-to-back where we bought something
19 and we sold something, they would create a P&L right
20 there, real life, realtime, right?  You could see
21 realtime.  If we sold something that was out of
22 inventory, it would depend on how we did the inventory
23 cost, right?  It's not -- it's not one for one, right?
24 So -- and it wouldn't matter whether it's Vitol or us
25 selling.  It would just create a P&L, whatever that

---

Page 56

1 is --
2    Q.   That's reconciled?
3    A.   Yes, yes.
4    Q.   Understood.  And Exhibit 11 does a little bit
5 of that, doesn't it, because it has -- in that bottom
6 right-hand column, it has accounting for the sales to
7 Rio and all the GCAC payments and the truck-rack
8 receipts going to Vitol.  You see that?
9    A.   Yeah.  Yeah, the -- the -- like, again, the way
10 I would think of P&L is:  All of it in and split it.
11 Like, having payments -- I mean, I'm not weighing in on
12 the suit or anything like that.  It's just purchases,
13 sales and costs, all in together, however that happens.
14 That's what it would --
15   Q.   Shared 50/50?
16   A.   Yep.
17   Q.   Okay.  And just to finish with 15, Eric
18 confirms, it looks like, four different hedges.  Do you
19 agree with that?
20   A.   Yep.
21   Q.   And are these all, to your understanding, tying
22 back to the sale to Chevron?
23   A.   Oh, for sure.  For sure.
24   Q.   And it makes sense because this is a September
25 e-mail.  He's buying four contracts in November,

---

Page 57

1 December, January and February, right?
2    A.   Yes.
3        MR. GILES:  Objection, form.
4    A.   He's -- he's -- he's putting hedges on for a
5 transaction that was done.  I -- can you -- I mean, I
6 just want to make sure I understand, is there's a deal
7 done and because there's -- this is going to get into
8 nuance but -- the Chevron sale is sold Brent-related,
9 and he had to convert our inventory from a 6 oil hedge
10 to a Brent hedge in that corresponding time period.  And
11 that's what he's done here.  So -- so instead of -- we
12 have a physical position in this time period carried
13 against 6 oil.  He's now converted that 6 oil position
14 to be carried against Brent.  That's what he's done in
15 that -- in this e-mail.
16   Q.   (BY MR. BAAY)  The reason he has to do that is
17 why?
18   A.   Because the sale is Brent-related.  So we're --
19 this is one of the few -- few that we line up
20 immediately that now our physical and financial on this
21 volume lot is moving the same way.  We have it
22 completely hedged.
23   Q.   Which means it's perfectly hedged?
24   A.   Uh-huh.  Brent -- it's a Brent -- it's a Brent
25 sale, and we have -- we've converted the inventory at

---

Patrick Perugini

June 29, 2018
Pages 58 to 61

Page 58

1 that moment to a Brent hedge.  So it's locked in at that
2 moment, and forevermore it moves with the market.
3         Now, if the cargoes slide one month or
4 another, there's timing issues that can happen that
5 could cause it to go a little bit imbalanced from the --
6 not necessarily the commodity but the timing on the
7 hedge.
8     Q.   So help me understand what the price per barrel
9 was for the Chevron sale.
10    A.   The -- the sale price?
11    Q.   Uh-huh.  Yes.
12    A.   The sale price of the -- so it's -- the -- the
13 ICE Brent frontline settlement minus 85 cents a barrel.
14 So whatever the -- the month is that we deliver and they
15 price it, it -- it prices out -- when they say front
16 contract, it's the -- the contract -- it's the -- they
17 call it the most near-term contract.  So when you see
18 CNBC or whatever, when they list a price, it will be
19 that price that's coming up every day.  And it will
20 price out equally amongst every pricing days of that
21 month less 85 cents a barrel.
22    Q.   So is it correct to say it's kind of a weighted
23 average price?
24    A.   Yes.  For that month of delivery, yes.
25    Q.   And so let's just -- let's just pick a number

Page 59

1 for the sale.  Let's say that the sale of Chevron was
2 $62 a barrel.  Okay?  And I'm not holding you to that,
3 whether that's accurate or not.
4    A.   Yeah.  Sure, sure.
5    Q.   Explain how the purchase price on the hedges
6 protects that price -- or protects --
7    A.   Oh, man.  The --
8    Q.   I told you this would be remedial.
9    A.   Yeah.  My God, this is --
10    Q.   Or is this advanced?
11    A.   No.  Yeah, I mean -- okay.  So you want to know
12 if you sell it for a number, $62, and you're -- or do
13 you want to sell it for 62?  So tell me how to hedge?
14    Q.   How the hedge protects you at these prices that
15 are -- that appear on page 15 --
16    A.   All --
17    Q.   -- Exhibit 15.
18    A.   All this -- these are doing right here is --
19 I'll say it again -- I -- I'm sorry if I'm repeating
20 myself, but it converts the -- the high-sulfur-related
21 value to a Brent-related value.  That's what they put
22 in.  So at that moment, whatever our value in inventory
23 was in relation to -- to 3 percent, we converted that
24 relationship to Brent.  That's what those hedges did.
25 So they're in -- when we have that locked, then now we

Page 60

1 have 140,000 barrels, according to this e-mail, in
2 these -- it's 35,000 in each of these four months.  And
3 now we're carrying a sale contract in the hedge in Brent
4 instead of resid, basically.
5         So what it did, is when we -- the physical
6 action of this e-mail is we bought -- this is financial
7 I'm talking about -- we bought resid and we sold Brent.
8 So what -- what would happen is, in the same financial
9 column -- I'm only going to talk financial right now --
10 we would be buying back high sulfur contracts and
11 shorts, and then we would be putting on -- corresponding
12 a new hedge in Brent.  That's what this is doing.  And
13 so then -- then our inventory -- because our sale is
14 pricing out Brent-related, now we're moving with the
15 market because we've converted it all to Brent here.
16    Q.   Understood.  So that -- and that's why Eric
17 says:  We're buying a certain number of barrels at 6 oil
18 and selling them at Brent at a certain price?
19    A.   Uh-huh.  Yeah, he summarizes it up here:
20 Bought 140 November -- well, that's something different.
21 Sorry.
22         And then, yeah, these are the hedges he
23 did.  And so he does it -- so, you see, he bought
24 November high sulphur, sold February Brent, bought
25 December high sulfur, sold -- that's the months he's

Page 61

1 done it in, he's put these on.
2    Q.   And from GCAC, on this e-mail, is AJ Brass,
3 George Grace, Joe Mattingly -- is Kenny Hucker a GCAC
4 employee?
5    A.   Uh-huh.
6    Q.   What's he do?
7    A.   He's operations.
8    Q.   And you, Patrick?
9    A.   Uh-huh.
10    Q.   Right?
11    A.   Yep.  And Kale.  And it's on his -- in his ops,
12 too, I think.  He's got his ops and Kale on here, too.
13    Q.   Okay.  "His ops" meaning Vitol ops or --
14    A.   Vitol ops.
15    Q.   Yeah.
16         MR. GILES:  Would now be a good time to
17 take a break?
18         MR. BAAY:  Yeah, sure.
19         THE VIDEOGRAPHER:  Going off the record.
20 It's 11:12 a.m.
21         (Recess taken)
22         THE VIDEOGRAPHER:  Back on the record.
23 It's 11:26 a.m.
24    Q.   (BY MR. BAAY)  Okay.  We've taken a break.  You
25 understand, though, that you're still under oath to tell

Patrick Perugini

June 29, 2018
Pages 62 to 65

Page 62

1 the truth?
2   A.  Yes.
3   Q.  I may have asked this question before, but why
4 is it that you asked Eric Kuo and Vitol to make the
5 hedges as opposed to just doing it yourself?
6   A.  Because -- because that's the way the venture
7 was set up, that we would -- they would own inventory
8 and correspondingly hedge it.
9   Q.  And where was that agreement outlined?  You
10 said that was how it was set up.  How did you know
11 that's how it was set up?
12   A.  I mean, that was the understanding, that we're
13 going into a venture together and -- I don't know
14 exactly.  Like, that -- they took on the position from
15 Rio on June 30th, and I was to buy and sell barrels with
16 them to make money.  And that was clear that we were
17 going to do this and go.
18   Q.  Did it happen the same way under the Rio JV?
19 In other words, Rio was putting on the hedges?
20   A.  Yes.
21   Q.  And so the transfer in position from Rio to
22 Vitol, the roles of the parties didn't really change?
23 In other words, Vitol stepped into the shoes of Rio?
24   A.  Yes.  I think there were some nuances in the
25 agreement that were going to be different; but, yeah,

Page 63

1 the general of buying and selling and hedging, yes.
2   Q.  But you weren't involved in the negotiating of
3 the agreement or the finalizing of the agreement?
4   A.  Of -- between --
5   Q.  Vitol and GCAC.
6   A.  No.
7   Q.  But you are aware that a written contract was
8 never executed between the two?
9   A.  That is my understanding now.
10   Q.  You didn't know it at the time?
11   A.  Huh-uh.
12       MR. GILES:  You need to answer out loud.
13       THE WITNESS:  Oh, sorry.
14   A.  No, I don't.  I mean, no, I didn't know.
15       MR. GILES:  As opposed to nodding.
16       THE WITNESS:  Yeah.  Sorry.  Got it.
17       (Exhibit 16 marked)
18   Q.  (BY MR. BAAY)  I'm going to hand you just a
19 couple of more exhibits.  This one is marked as
20 Exhibit 16.  It's October 16th, 2017, at 2:58.
21   A.  Okay.
22   Q.  The top e-mail is going from Eric back to you
23 and several of the other folks we've already mentioned.
24 My question relates to some of your comments in the
25 middle part of the first page there.  You -- the deals,

Page 64

1 as I understand it, was Vitol sold to GCAC; and then
2 GCAC turned around to sell to Bitumar?
3   A.  Yep.
4   Q.  Am I saying that correctly?
5   A.  Yeah.
6   Q.  And it looks like that sale canceled.  You had
7 to find a new buyer for those.  So you say to Eric:  "We
8 have to re-hedge the inventory"?
9   A.  Yes.
10   Q.  What does that mean exactly?
11   A.  My presumption is I think I -- well, I can
12 probably see it.  Yeah, well, again, it's all the
13 inverse thing, you know, when you buy and sell.  So we
14 had -- my presumption is we sold 75,000 barrels fixed
15 price to Bitumar physical.  So he had already bought
16 back fixed-price hedges somewhere before this e-mail
17 transgression; and I'm reminding him:  Hey, man, if we
18 cancel this, you've got to re-hedge the inventory.
19   Q.  Because it's something that's still in
20 inventory and so you have to adjust for that?
21   A.  Yeah.  It -- yeah, again, not to get too
22 nuanced, it doesn't necessarily have to be in inventory.
23 You create a physical position when you buy or sell
24 fixed price.
25   Q.  Understood.  Understood.

Page 65

1   A.  Yeah.
2   Q.  And he responds and basically confirms he's
3 done just that with 6 oil, right?
4   A.  Yes.
5   Q.  He sold 75,000 barrels at 48.95?
6   A.  Yeah, in November.
7   Q.  November.
8   A.  Yep.
9       (Exhibit 17 marked)
10   Q.  (BY MR. BAAY)  I'm going to hand you
11 Exhibit 17.  This is one from you to Eric and others on
12 January 19th, 2018.
13   A.  Okay.
14       MR. GILES:  It was in our stack?
15       MR. BAAY:  Yes.
16       MR. GILES:  Okay.  January 19th, you said?
17 Okay.  Gotcha.  Yeah, okay.
18       MR. BAAY:  Yeah, the top line should say:
19 "Yes, please continue to price out the January cargo."
20 Is that what yours says?  Yeah.
21   Q.  (BY MR. BAAY)  All right.  Is it fair to
22 conclude based on this e-mail that even after
23 January 1st of 2018 Vitol was assisting GCAC with
24 hedging transactions?
25   A.  I guess so, yeah.  I mean, I'm -- you're saying

Patrick Perugini

June 29, 2018
Pages 66 to 69

Page 66

1 after January 1?  Is that --
2    Q.   Correct.
3    A.   Yeah.
4    Q.   And so it wasn't a hard cutoff at the end of
5 the year of 2017, the relationship between the two
6 parties; is that true?
7    A.   Yeah, I would guess that's true, yeah.
8    Q.   And you say "please continue to price out the
9 January cargo" at the top of this e-mail chain.  What
10 did you mean by that?
11    A.   I'm not sure.  I'm trying to catch up with you.
12    Q.   Yeah.  Yeah, take your time to look through.
13    A.   Yeah.  So it looks like Eric asked me, like,
14 because we're in this -- potentially this transition
15 period, because he says:  We have this deal pricing
16 through the end of January, assume we will continue to
17 price this out?
18         And I said:  Yes, please price this out.
19         And then he also asked:  How do you want
20 me to handle February?
21         And then I tell him:  Hey, go ahead and
22 close the February because we'll take that on in -- with
23 our new deal.
24    Q.   Which was with Mercuria?
25    A.   Correct.

Page 67

1    Q.   So it's clear from this e-mail that things were
2 winding down in January of 2018 between Vitol and GCAC?
3    A.   I don't know if it's clear in this e-mail, but
4 that's to be true.
5    Q.   That's your memory is what happened?
6    A.   Yeah, yeah, for sure.
7    Q.   And -- and we can take it by the fact that you
8 say close for February that you were transitioning to
9 Mercuria?
10    A.   Yes.  And that would mean we're picking up the
11 hedges from there.
12    Q.   Okay.  And that was my -- that's a related
13 question.  Once you got into your deal with Mercuria,
14 did you pick up the hedges or was it Mercuria making
15 him?
16    A.   Oh, it -- Mercuria is -- without going into
17 confidential stuff, is similar.  It's not the same, but
18 it's similar.  They -- they're going to --
19    Q.   How is it different?
20    A.   I can't say unless someone tells me I can.
21    Q.   You can say.  We have a -- we have an order in
22 place where this transcript will be -- if you say
23 something that's confidential about Mercuria, it will be
24 protected.
25    A.   Okay.

Page 68

1    A.   THE WITNESS:  Is that -- yeah.
2         MR. GILES:  We -- I -- we weren't real
3 clear.  If it's all right, I think the order says I can
4 either make it now or we can say it later.
5         MR. BAAY:  Designate it.  You can
6 designate it.
7         THE WITNESS:  Yeah, I -- sorry, I just
8 worried about that in the commercial --
9         MR. BAAY:  Fully understand.  That's why
10 we have that order in place.
11    A.   Okay.  The -- again, I -- I don't know the
12 terms of Vitol.  So it's hard for me to say.  So -- but
13 I think what you're asking is, just like Vitol is going
14 to slide into Rio's position, Mercuria's going to slide
15 into Vitol's position.  All purchases in, all sales in,
16 all costs, split it.
17    Q.   (BY MR. BAAY)  Okay.  And have you seen the JV,
18 the actual written agreement between Mercuria and GCAC?
19    A.   No.  No.
20    Q.   But, again, those trades that happen with
21 Mercuria are going to go to your book?
22    A.   Yes.  I have a general understanding of how the
23 deal -- similar.  Like, I'm there to make a P&L; and
24 then I know how the splits work and everything.
25    Q.   And you think the splits are 50/50?

Page 69

1    A.   They're not.
2    Q.   60/40?
3    A.   (Witness nods.)
4    Q.   To Mercuria's side?
5    A.   (Witness nods.)
6         MR. GILES:  You need to -- out loud.
7    A.   Yes.  Sorry.  60 percent to Mercuria.
8    Q.   (BY MR. BAAY)  Mercuria?
9    A.   Yes.
10    Q.   Okay.
11    A.   There's other things on that deal that are
12 different, too, one major thing.
13    Q.   Which is?
14    A.   Well, it's two major things.
15    Q.   Let's hear them.
16    A.   They are not responsible for cleaning of tanks
17 in Mobile, whereas Vitol was and Rio was.  And, again, I
18 hadn't seen the final deal; but we lose certain rights
19 at a certain time period.  We had to give up some stuff
20 to get this deal done.
21    Q.   After the passage of time, certain rights are
22 given up?
23    A.   Yeah.  Like, meaning we have no assurances that
24 this goes on; and we don't get to leave with the stuff
25 we brought like in other deals with Vitol and Rio.

Patrick Perugini

June 29, 2018
Pages 70 to 73

Page 70

1   Q.  So there's not a defined term to the agreement?
2   A.  No, there is.  What I'm saying is, like, we had
3 tank leases and stuff like that.  We give up rights to
4 them.  We put them in Mercuria's names, like -- and I
5 think you're familiar, again, what's -- the Rio deal is
6 you kind of left with what you came with --
7   Q.  Uh-huh.
8   A.  -- was kind of the -- the terminology, right?
9 Whether you had tank leases or whatever it was, you had
10 the option to leave with what you wanted.  Mercuria, we
11 don't, I don't think.
12   Q.  Were you involved in negotiating that JMA?
13   A.  I was asked questions; but, no, I wasn't in
14 the -- the negotiations.
15   Q.  And you weren't in the negotiations for the
16 Vitol/GCAC agreement?
17   A.  No.
18   Q.  And back to my question related to Exhibit --
19   A.  17, yeah.
20   Q.  -- 17.  It's true that there were physical
21 trades and financial trades that continued between Vitol
22 and GCAC into January of 2018?
23   A.  I think so.  Reading this, it looks like it.
24   Q.  And AJ was copied on these e-mails.  So he
25 would have been aware -- it's fair to say he would have

Page 71

1 been aware of the ongoing transactions and work being
2 done between the two parties, Vitol and GCAC?
3       MR. DINNELL:  Objection, form.
4       MR. GILES:  Objection, form.
5   A.  I don't even know that I could answer.  Like,
6 I -- yeah, I think so.  He's on the e-mail.
7   Q.  (BY MR. BAAY)  Right.
8   A.  Yeah, I would guess so.
9   Q.  And were you having continuing discussions with
10 him about these transactions?
11   A.  Which transactions, though?  The ones --
12   Q.  Just the asphalt purchases.
13   A.  AJ?
14   Q.  Uh-huh.
15   A.  Yeah.  Almost always.
16   Q.  He stays pretty closely in touch with your
17 activity?
18   A.  Yes.
19   Q.  So you understand that there are a significant
20 number of other e-mails and texts between you and Eric
21 regarding these hedging transactions?  In other words,
22 we haven't seen them all, right?
23   A.  I would -- I would suspect that.  I would think
24 that to be true.
25   Q.  Did you -- do you remember having conversations

Page 72

1 with Eric or text conversations about the resolution of
2 the money that Vitol claimed that GCAC still owed as a
3 result of these asphalt purchases?
4   A.  I wouldn't remember, I mean, honestly, specific
5 conversations like -- like on texts and stuff like that.
6 I'm kind of an abbreviated texter, too.  So I wouldn't
7 imagine it was too detailed in text, but I -- I don't
8 know.
9   Q.  How about phone conversations?
10   A.  Eric and I maybe had a few sentences each time
11 and stuff like that but not very much.  It was
12 uncomfortable for both of us.  We're friends, and it was
13 uncomfortable.  And I would typically acknowledge but
14 kind of say, "Man, you got to" -- "you got to talk to
15 AJ."
16   Q.  Right.
17   A.  Yeah, it wasn't -- it wasn't good between us
18 to -- to have to deal with that.
19   Q.  But this is certainly not good for you because,
20 as you've stated, this held up your 2017 comp
21 calculation?
22   A.  Yeah, generally speaking.  Yeah, this wasn't --
23 the whole thing wasn't -- wasn't good for me.  The whole
24 Vitol thing was not good for the book in general.  And I
25 wouldn't just blame it on the end of '17.  It was just

Page 73

1 the whole thing was not good for me.
2   Q.  Right.  You understand, we've talked about a
3 little bit, that there were payments that -- that went
4 from GCAC to Vitol, roughly $16 million.  Do you
5 understand that?
6   A.  Yeah.  You told me that, yeah.
7   Q.  Do you have any understanding as to why those
8 payments stopped?
9   A.  Oh, no.  I mean, no.  Again, I would have just
10 assumed anything was just reconciling, whatever that
11 means.  Money's changing hands.
12   Q.  Is the decision to make those payments fully
13 within the purview of AJ Brass?
14       MR. GILES:  Objection, form.
15   A.  I don't -- I don't know that; but I guess that
16 because, again, I don't know his ownership structure and
17 how that actually works.  But, yeah, I guess so.
18   Q.  (BY MR. BAAY)  In other words, you don't have
19 any authority to -- to license some payments to Vitol?
20   A.  No.  No.
21   Q.  But how would you describe -- we talked about
22 it a little bit, but how would you describe your role in
23 the Mercuria JV?
24   A.  Similarly.  I'm the lead trade, have a point of
25 contact that run things by, approve; but I'm in charge

Patrick Perugini

June 29, 2018
Pages 74 to 77

Page 74

1 of the P&L.
2   Q.   Point of contact within Mercuria?
3   A.   Natt Gorzell.
4   Q.   How -- do you know how to spell that?
5   A.   I think it's G-o-r-c-e-l-l.  Hold on, I can
6 tell you exactly.  G-o-r-z-e-l-l.
7   Q.   Okay.  So he serves effectively in the same
8 role that Eric served in your relationship with Vitol?
9   A.   Yes.
10   Q.   And if I'm understanding correctly, Mercuria is
11 responsible for the hedging transactions in the JV
12 between Mercuria and GCAC?
13   A.   Yes.
14   Q.   And how is Mercuria compensated for those
15 transactions?
16   A.   It's the same thing, all in.
17   Q.   Reconcile?
18   A.   Reconcile.
19   Q.   The P&L?
20   A.   Uh-huh.  The only thing -- the difference now
21 is we're running the book kind of how I told you, a
22 little bit more like we want to, which is -- it's not
23 barrel for barrel hedged.  We're -- we're actually doing
24 some different stuff with the book.  But it reconciles
25 the same way.

Page 75

1   Q.   Were you involved at all in finding Mercuria as
2 a partner?
3   A.   I'm trying to think.  Maybe, yeah.  I mean, all
4 of us were.  I mean, the guys at Rio, me.
5   Q.   And how did they come to the -- to the surface
6 as a viable partner?
7   A.   They bought the facility in Corpus Christi.
8   Q.   The Gravity facility?
9   A.   Yes.
10   Q.   And when did they do that?  Do you remember?
11   A.   They bought it sometime in the same time
12 period.  So I think they closed in July sometime.
13   Q.   So it made sense -- they were a natural
14 candidate because they were involved in part of the
15 physical assets that were involved in the trade?
16   A.   Yes.
17   Q.   And I didn't -- I missed it.  When did you say
18 they bought that?
19   A.   It's public, but I think it was in July they
20 closed, but I'm not -- I'm not positive of that date.
21   Q.   Do you remember any other potential partners?
22   A.   Huh-uh.  I don't know that we had any other
23 discussions, not that I know --
24   Q.   Okay.
25   A.   -- or that I can recall.  I don't remember.

Page 76

1   Q.   Would anyone other than you and AJ know that?
2   A.   Maybe.
3   Q.   Who's that?
4   A.   Jason Goldstein.
5   Q.   Is there something about the relationship you
6 had with Vitol that you think is relevant that we
7 haven't discussed, that I haven't thought to ask you the
8 question about?
9   A.   No.  Just sucks.  Good friend of mind.  So this
10 all sucks.
11   Q.   Eric is?
12   A.   Yeah.  That's it.
13   Q.   And it sucks because it's holding your comp up,
14 right?
15   A.   It just -- the whole thing.  I mean, I don't
16 know that there was any comp there because of the way it
17 worked out.  But the idea that we couldn't do what we
18 wanted to do and everything, it just -- it just was a
19 bad six months for all parties involved.
20   Q.   Ideally, you would have wanted to be a
21 long-term partner with Vitol?
22   A.   Yeah.  Eric and I worked well together.
23   Q.   Did you have an understanding as to what the
24 conflict was?
25   A.   Something to do with their JV partner Valt.

Page 77

1   Q.   Did you -- have you ever done any work with
2 Valt in your role as GCAC?
3   A.   No -- during this whole process -- you'll see
4 these deals -- we sold Valt.
5   Q.   How about any discussions with Valt as a
6 potential JV partner?
7   A.   There was a meeting that Eric set up prior
8 to -- I don't remember the date.  He could -- and he
9 probably won't remember either.  But we set up -- we had
10 a meeting all together at one point.
11   Q.   If that was in August 2017, does that sound
12 right?
13   A.   No, no, no.  There was one way prior to that.
14   Q.   Like, May-ish or, like, before 2017?
15   A.   It might have been before 2017.  That was part
16 of the heartburn between Valt and Vitol.
17   Q.   Yeah.  Do you view Valt as a competitor to
18 GCAC?
19   A.   That was where we -- we struggled.  Not
20 completely but sort of.  And that's --
21   Q.   How so?
22   A.   They sell certain areas that we sell, and they
23 wanted to own inventories in certain places we did.  So
24 we -- there was overlap between the two things, and
25 that's where we couldn't never come to terms with them

Patrick Perugini                                    June 29, 2018
                                                   Pages 78 to 81

Page 78

1 because of those overlapping functions.  We couldn't
2 devise a way to split those -- I don't know what you
3 call them -- would split -- like, make a clear, defined
4 line of who was on what side of it.  It was challenging
5 for us, and that's why we couldn't ever come together
6 with them.  We tried to, too, as well.  We tried to, but
7 we -- we couldn't figure it out.
8      Q.   Who -- did you have relationships with anyone
9 at Valt?
10     A.   I knew guys well, some of them; but there were
11 guys in our company that knew those guys a lot better
12 than I did.  I'm kind of new to asphalt, the last
13 three -- three years-ish.
14     Q.   Is there someone that -- that you do remember
15 the name at Valt that you dealt with?
16     A.   Yeah.  He's not there anymore.  The -- the guy
17 I was close to was Roberto Finocchi.
18     Q.   Do you know where he went?
19     A.   He's -- he's in -- I don't know what you call
20 it, but he's a convicted felon now in the whole
21 Brazilian Car Wash thing with Valt.
22     Q.   Oh, really?
23     A.   Yeah.  Sorry to -- like, he's -- he might be
24 State's witness against Sergeant.  So I don't -- I want
25 to be careful.  But, yeah, I don't know exactly.  Yeah,

Page 79

1 he's got issues.  He's on his own.
2      Q.   Understood.
3           MR. BAAY:  Okay, Patrick.  Thank you.
4 Those are all the questions I have.  I appreciate your
5 time.
6           THE WITNESS:  Thank you very much, David.
7           MR. GILES:  Give us a minute.
8           MR. BAAY:  Okay.
9           MR. GILES:  I may want to ask him a couple
10 of questions, but I want to ask him a question to see if
11 we need to do that so --
12          THE VIDEOGRAPHER:  Going off the record.
13 It's 11:46 a.m.
14          (Recess taken)
15          THE VIDEOGRAPHER:  Back on the record.
16 It's 11:50 a.m.
17          EXAMINATION
18 BY MR. GILES:
19     Q.   Mr. Perugini, the -- we were just looking at
20 Exhibit 17, which is a series of -- of e-mails involving
21 a lot of people, recipients, but essentially a
22 conversation between you and Eric Kuo.  Do you recall
23 that?
24     A.   Yes.
25     Q.   Okay.  And if you'll look at the -- at page 2

Page 80

1 of Exhibit 17, in the middle of the page, there's a
2 September 25th, 2017, e-mail at 4:52 p.m. from Eric Kuo
3 to you and some other people.  Do you see that?
4      A.   Yes.
5      Q.   And -- and would you pull out Exhibit 15?
6      A.   (Witness complying.)
7      Q.   Is that e-mail that's in the middle of the
8 second page of Exhibit 17 the same e-mail that starts at
9 the top of the first page of Exhibit 15?
10     A.   Yes.
11          MR. BAAY:  Object to leading.
12     Q.   (BY MR. GILES)  Okay.  Is the activity
13 described in the e-mails that follow in time, starting
14 with January 9th, 2018, just above the September 25th on
15 page 2 and ending with the top of page 1 of Exhibit 17,
16 those -- those are -- are -- are those discussions about
17 hedging transactions?
18     A.   Yes.
19     Q.   And are they new hedging transactions?
20     A.   No.
21     Q.   What -- what are y'all talking about there?
22     A.   Okay.  So the whole -- this whole packet in 17
23 is basis -- a deal that we entered into -- I'm trying to
24 look at the dates -- but sometime in September --
25     Q.   Okay.

Page 81

1      A.   -- where we sold four cargoes over time to
2 Chevron, ultimately.
3      Q.   Okay.  And one of those cargoes was sold in
4 January?
5      A.   Yes.
6           MR. BAAY:  Objection, leading.
7      Q.   (BY MR. GILES)  Okay.  And so -- do these
8 discussions in Exhibit 17 about the hedges relate to
9 the -- the January deliveries on that Chevron
10 September 2017 deal?
11     A.   Yeah.  It's all part of the same deal.
12     Q.   Okay.  And are you closing out hedge
13 transactions that had already been placed with relation
14 to that physical sale to Chevron in September?
15     A.   Yes.
16     Q.   Okay.
17          MR. GILES:  No further questions.
18          FURTHER EXAMINATION
19 BY MR. BAAY:
20     Q.   Do you have a memory as to whether there were
21 physical transactions in -- any time after December 31,
22 2017?
23     A.   You mean, like, new ones?
24     Q.   Yeah.
25     A.   That Vitol did?

Patrick Perugini

June 29, 2018
Pages 82 to 85

Page 82

1  Q.  Correct.

2  A.  We did deals and I cannot remember what -- what
3 side we put them on, that there were deals done the
4 first ten days of January, but I don't know who we put
5 them under.

6  Q.  But there's no doubt you were having
7 discussions with Eric Kuo well into 2018; is that true?

8  A.  Define "well."  Like --

9  Q.  In March -- February or March of 2018.

10  A.  I always talk to Eric.  So regarding, like --

11  Q.  This business in specific I'm asking about.

12  A.  Again, I'm not doing this to be -- I'm trying
13 to make sure I understand.  Like, when you say we're
14 having discussions about, like, what occurred or what's
15 happening still or --

16  Q.  No.  Sorry.  Contemporaneous business
17 discussions like you had in all the e-mails and texts we
18 looked at.

19  A.  Like different hedging and stuff like that?

20  Q.  Or -- or discussions about the physical trade.

21  A.  In March?

22        MR. GILES:  Objection, form.

23  Q.  (BY MR. BAAY)  No.  The question is --

24  A.  Sorry, man, I'm sorry.

25  Q.  Yeah.  Did you have communications with Mr. Kuo

Page 83

1 in 2018 specifically related to the purchase and sale of
2 asphalt?

3  A.  Into '18?  I would say probably most assuredly
4 in January.  Past that, I -- I don't recall.

5  Q.  Okay.  Would it surprise you if there are
6 February e-mails between the two of you, and texts?

7  A.  Probably not but I don't know.  Yeah, I --

8  Q.  You just don't have a specific memory?

9  A.  No.  And I'm -- I mean, I -- I mean, I see this
10 as easy.  But, yeah, it wouldn't surprise me, I guess.
11 I don't know.

12        MR. BAAY:  Okay.  Thank you, sir.  Those
13 are all my questions.

14        THE WITNESS:  Thanks.

15        THE VIDEOGRAPHER:  Off the record at
16 11:55 a.m.

17        (Deposition concluded at 11:55 a.m.)

18
19
20
21
22
23
24
25

Page 84

1              CHANGES AND SIGNATURE

2 PAGE LINE  CHANGE                    REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 85

1    I, PATRICK PERUGINI, have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted above.

4

5              _____

6              PATRICK PERUGINI

7

8 THE STATE OF _____)

9 COUNTY OF _____)

10

11   Before me, _____, on this day

12 personally appeared PATRICK PERUGINI, known to me or

13 proved to me on the oath of _____ or through

14 _____ (description of identity card

15 or other document) to be the person whose name is

16 subscribed to the foregoing instrument and acknowledged

17 to me that he/she executed the same for the purpose and

18 consideration therein expressed.

19   Given under my hand and seal of office on this _____

20 day of _____, _____.

21

22              _____

23              NOTARY PUBLIC IN AND FOR

24              THE STATE OF _____

25 My Commission Expires: _____

Patrick Perugini

June 29, 2018
Pages 86 to 88

---

Page 86

```
1                    CAUSE NO. 2018-33445
2 VITOL, INC.              )   IN THE DISTRICT COURT
                           )
3      Plaintiff,          )
                           )
4 vs.                      )   HARRIS COUNTY, TEXAS
                           )
5 GULF COAST ASPHALT       )
  COMPANY, LLC and ARTHUR J.)
6 BRASS                    )
                           )
7      Defendants.         )   157TH JUDICIAL DISTRICT
8
9
10                REPORTER'S CERTIFICATE
11      ORAL VIDEOTAPED DEPOSITION OF PATRICK PERUGINI
12                   JUNE 29, 2018
13
14      I, Dana Richardson, Certified Shorthand Reporter in
15 and for the State of Texas, hereby certify to the
16 following:
17      That the witness, PATRICK PERUGINI, was duly sworn
18 and that the transcript of the deposition is a true
19 record of the testimony given by the witness;
20      That the deposition transcript was duly submitted on
21 _____ to the witness or to the attorney for
22 the witness for examination, signature, and return to me
23 by _____.
24      That pursuant to information given to the deposition
25 officer at the time said testimony was taken, the
```

---

Page 87

```
1 following includes all parties of record and the amount
2 of time used by each party at the time of the
3 deposition:
4   Mr. David A. Baay (01h29m)
          Attorney for Plaintiff
5   Mr. Neil E. Giles (00h03m)
          Attorney for Defendant
6
7      That a copy of this certificate was served on all
8 parties shown herein on _____ and filed
9 with the Clerk.
10      I further certify that I am neither counsel for,
11 related to, nor employed by any of the parties in the
12 action in which this proceeding was taken, and further
13 that I am not financially or otherwise interested in the
14 outcome of this action.
15      Further certification requirements pursuant to
16 Rule 203 of the Texas Code of Civil Procedure will be
17 complied with after they have occurred.
18      Certified to by me on this 11th day of July, 2018.
19      _Dana Richardson_
20 _____
21         Dana Richardson, RPR, CSR
           Texas CSR 5386
22         Expiration: 12/31/19
           Kim Tindall & Associates, LLC, Firm No. 631
23         16414 San Pedro, Suite 900
           San Antonio, Texas 78232
24         Phone (210) 697-3400
           Fax (210) 697-3408
25
```

---

Page 88

```
1      FURTHER CERTIFICATION UNDER TRCP RULE 203
2      The original deposition was/was not returned to the
3 deposition officer on _____.
4      If returned, the attached Changes and Signature
5 page(s) contain(s) any changes and the reasons therefor.
6      If returned, the original deposition was delivered
7 to Mr. David A. Baay, Custodial Attorney.
8      $_____ is the deposition officer's charges to the
9 Plaintiff for preparing the original deposition and any
10 copies of exhibits;
11      The deposition was delivered in accordance with Rule
12 203.3, and a copy of this certificate, served on all
13 parties shown herein, was filed with the Clerk.
14      Certified to by me on this _____ day of
15 _____, _____.
16      _Dana Richardson_
17 _____
18         Dana Richardson, RPR, CSR
19         Texas CSR 5386
20         Expiration: 12/31/19
21         Kim Tindall & Associates, LLC, Firm No. 631
22         16414 San Pedro, Suite 900
23         San Antonio, Texas 78232
24         Phone (210) 697-3400
25         Fax (210) 697-3408
```

---

Patrick Perugini

June 29, 2018
Index: $15..9

---

### Exhibits

**Perugini, Patrick Ex 11** 3:11 19:21,23 23:3 29:25 47:19 54:21 56:4

**Perugini, Patrick Ex 12** 3:13 38:6

**Perugini, Patrick Ex 13** 3:14 41:17 42:24

**Perugini, Patrick Ex 14** 3:16 45:20,22

**Perugini, Patrick Ex 15** 3:17 52:9 59:17 80:5,9

**Perugini, Patrick Ex 16** 3:19 63:17,20

**Perugini, Patrick Ex 17** 3:22 65:9, 11 79:20 80:1,8,15 81:8

---

### $

**$15** 36:23

**$16** 73:4

**$60** 34:11

**$62** 59:2,12

---

### 1

**1** 18:6 43:13 54:2 66:1 80:15

**10** 11:3 45:5,8,9

**10,000** 44:9,13 45:10

**100** 37:18

**10:04** 4:3

**11** 6:17 19:21,23 23:3 29:25 47:19 54:21 56:4

**11:12** 61:20

**11:26** 61:23

**11:46** 79:13

**11:50** 79:16

**11:55** 83:16,17

**12** 38:6,8,22

**13** 41:17,19 42:24

**14** 45:20,22 46:18

**140** 60:20

**140,000** 60:1

**15** 37:8 52:8,9,17 56:17 59:15,17 80:5,9

**15th** 41:21

**16** 63:17,20

**16th** 63:20

**17** 50:21 51:2 65:9,11 70:19,20 72:25 79:20 80:1,8,15,22 81:8

**18** 83:3

**1991** 7:2

**19th** 65:12,16

**1st** 27:12,14 65:23

---

### 2

**2** 42:24 43:14 53:17 54:7 79:25 80:15

**20** 10:25

**2017** 17:15 23:2 41:21 50:2 52:11 63:20 66:5 72:20 77:11,14,15 80:2 81:10,22

**2018** 4:2 65:12,23 67:2 70:22 80:14 82:7,9 83:1

**24** 25:7

**240,000** 10:13

**25** 11:1 52:10

**25,000** 44:17,21 45:4

**25th** 80:2,14

**29th** 4:2

**2:58** 63:20

**2nd** 27:12,15

---

### 3

**3** 54:8 59:23

**30** 11:2,3 39:6

**30,000** 28:21 39:7

**30th** 17:23 18:4 42:13 47:23 62:15

**31** 81:21

**34** 54:6

**34,000** 54:5

**35** 44:19 45:5

**35,000** 42:25 43:9 44:6 60:2

**3rd** 27:12,15

---

### 4

**40** 20:3 46:18

**40,000** 47:2,4

**44.50** 44:10

**45,000** 43:6 44:20

**4500** 44:21

**46.20** 41:10

**46.30** 39:16,19

**48.95** 65:5

**4:52** 52:13 80:2

---

### 5

**5** 10:25 11:1

**50** 32:4 37:3

**50/50** 17:11 19:15 36:5 56:15 68:25

---

### 6

**6** 7:16,17,23 8:14,18,19,24 9:3,4 24:8,13,16,24 25:5,10 27:2 39:19 44:10 53:22,23 57:9,13 60:17 65:3

**60** 69:7

**60/40** 69:2

**62** 59:13

---

### 7

**75,000** 64:14 65:5

---

### 8

**85** 58:13,21

---

### 9

**9** 51:25

Patrick Perugini

June 29, 2018
Index: 91..bought

**91** 7:2

**9th** 80:14

**A**

**a.m.** 4:3 61:20,23 79:13,16 83:16,17

**abbreviated** 72:6

**absolute** 48:11

**accommodate** 54:13

**accountable** 33:5

**accounted** 55:11

**accounting** 50:2 56:6

**accurate** 59:3

**acknowledge** 72:13

**acting** 18:24

**action** 60:6

**activity** 71:17 80:12

**actual** 68:18

**address** 40:20

**adjust** 64:20

**advanced** 59:10

**agree** 52:22 56:19

**agreed** 18:24 44:20 45:1

**agreement** 15:14,15 16:10,13,22 17:7,17,22 19:1,5,9,15 32:4,13,16 33:20 37:11,16 48:10,13 62:9,25 63:3 68:18 70:1,16

**agreements** 18:2

**agrees** 33:9

**ahead** 66:21

**AJ** 11:8 13:1 15:24 17:13 41:24 51:7 53:19 61:2 70:24 71:13 72:15 73:13 76:1

**Alabama** 43:14

**allowed** 47:25

**amounts** 31:7

**analysis** 36:1,10

**answers** 31:16

**anticipation** 12:23

**anymore** 12:11 78:16

**Apologize** 33:5

**app** 20:3

**approve** 73:25

**approximately** 44:21

**arbitrage** 30:18

**areas** 77:22

**arised** 55:6

**arm** 49:5

**arrangement** 35:20 36:6 37:16

**Arthur** 41:24

**asphalt** 4:20 7:21,23 8:14,20,25 9:3 15:17 16:20 20:25 24:11,16 25:15 26:18 31:20 39:4 47:18 71:12 72:3 78:12 83:2

**assets** 12:3,4 75:15

**assigned** 10:17

**assisting** 65:23

**assume** 5:23 9:14 32:3 66:16

**assumed** 35:14 73:10

**assuming** 25:25

**assumption** 37:11,13

**assurances** 69:23

**assuredly** 83:3

**August** 17:15 41:21 42:8 77:11

**authority** 73:19

**average** 58:23

**aware** 12:7,8,13 34:10 49:3 63:7 70:25 71:1

**B**

**Baay** 4:7,12 8:17 13:1,5,11 14:2 17:20 19:22 20:5 28:5,11,25 31:17 32:15 34:22 35:25 36:4,10,18 37:10 38:1,4,7 39:14 41:18 45:21 48:12 52:10,12,14,15,19 57:16 61:18,24 63:18 65:10,15,18,21 68:5,9,17 69:8 71:7 73:18 79:3,8 80:11 81:6,19 82:23 83:12

**back** 6:20 8:8 9:3 10:14 15:21 17:4 39:10,23 50:9 56:22 60:10 61:22

63:22 64:16 70:18 79:15

**back-to-back** 55:18

**bad** 76:19

**balance** 31:6 47:1

**balanced** 31:3 40:8 47:10,12

**ballpark** 51:15,20

**bank** 37:17

**barrel** 8:6,7,15 18:10,20 19:17,18,19 21:7 25:15 26:25 30:20,21,25 39:21 44:10 58:8,13,21 59:2 74:23

**barrels** 11:24 18:11 22:5 28:16,19, 21 39:7,24 40:2,14 42:19,25 43:6,9 44:6,9,13,14,17,21 45:4,12 47:4 54:5 55:9 60:1,17 62:15 64:14 65:5

**base** 8:18 10:5

**based** 27:13 50:21 65:22

**basically** 8:10 54:9,24 60:4 65:2

**basis** 80:23

**bearing** 35:21

**begin** 17:20

**behalf** 11:24 18:25 44:4

**benefit** 10:2 16:16 49:15

**bet** 46:9

**big** 30:3

**bit** 22:7 24:14 52:5 56:4 58:5 73:3,22 74:22

**Bitumar** 64:2,15

**blame** 72:25

**block** 20:10,18

**book** 9:20,24 10:15,18,22 16:16,22 17:23 22:13,20,23 27:21 31:3,11 33:18 34:14,21 35:10,13 36:1,11 37:17 40:8 47:10,12,14 48:4,5 49:11,14,16,18 68:21 72:24 74:21, 24

**books** 55:15

**bottom** 8:15,20 20:21 53:16 56:5

**bottoms** 8:25

**bought** 18:10,11,12,19 21:6 23:20 35:3 39:16 44:9,17,20 45:6,9 47:2 55:14,18 60:6,7,20,23,24 64:15 75:7,11,18

Patrick Perugini

June 29, 2018
Index: box..contract

**box** 20:21

**brand** 27:2

**Brass** 11:8,13 12:13 15:24 17:13 41:24 53:19 61:2 73:13

**Brazilian** 78:21

**break** 37:23 61:17,24

**Brent** 24:7,8,22 25:6 39:19 53:1,24 57:10,14,24 58:1,13 59:24 60:3,7, 12,15,18,24

**Brent-related** 57:8,18 59:21 60:14

**briefly** 13:16

**brought** 69:25

**Bunker** 9:8

**business** 12:20 13:9 18:16 21:12 82:11,16

**bust** 31:21

**buy** 8:9 11:24 21:13 25:2 26:25 29:11,15,21 39:10 40:12 45:8 53:1, 19 62:15 64:13,23

**buy/sells** 42:15

**buyer** 64:7

**buying** 23:23 29:19 40:23 44:12 56:25 60:10,17 63:1

**buys** 46:18 47:2

C

**calculation** 72:21

**call** 7:13 16:24 24:21 27:10 58:17 78:3,19

**calling** 20:18

**cancel** 64:18

**canceled** 64:6

**candidate** 75:14

**captured** 9:24 15:19

**Car** 78:21

**care** 17:3

**career** 7:7

**careful** 78:25

**cargo** 65:19 66:9

**cargoes** 54:6 58:3 81:1,3

**caro** 8:12

**carried** 57:12,14

**carry** 22:1 30:23 31:7

**carrying** 60:3

**case** 18:19 25:22 26:9,12 30:22 31:14 32:19 54:18,19

**catch** 66:11

**caught** 51:10

**cents** 58:13,21

**CFO** 14:18

**chain** 66:9

**challenging** 78:4

**chance** 5:5

**change** 62:22

**changed** 49:3,9

**changing** 34:24 73:11

**characterization** 21:16 52:22

**characterize** 21:11,14 29:15

**charge** 33:12 73:25

**charged** 10:14 34:13

**check** 21:17

**chemical** 7:4,7

**Chevron** 56:22 57:8 58:9 59:1 81:2, 9,14

**Christi** 42:14 75:7

**circumstances** 54:25 55:6

**Citgo** 18:12,20 19:2,4 20:14 27:11

**claim** 36:22

**claimed** 72:2

**clarify** 31:2

**clean** 24:5,21

**cleaning** 69:16

**clear** 17:22 36:2,8,19 43:10 46:1 48:19,20,23 62:16 67:1,3 68:3 78:3

**clients** 13:3

**close** 44:15 66:22 67:8 78:17

**closed** 75:12,20

**closely** 71:16

**closest** 24:20

**closing** 81:12

**CNBC** 58:18

**color** 38:24

**column** 56:6 60:9

**comments** 63:24

**commercial** 18:21 68:8

**commodities** 7:12,13

**commodity** 7:11,15,20 24:4,25 25:7 27:2 29:13 58:6

**communication** 16:5

**communications** 82:25

**comp** 50:21 51:12 72:20 76:13,16

**companies** 16:23 19:4 32:14

**company** 78:11

**compensated** 9:14 74:14

**competitor** 77:17

**completely** 49:12 57:22 77:20

**complex** 22:7

**complying** 80:6

**con** 29:17

**conclude** 65:22

**concluded** 83:17

**confidential** 67:17,23

**confirming** 52:21

**confirms** 44:8 56:18 65:2

**conflict** 76:24

**consistent** 39:2

**contact** 73:25 74:2

**Contemporaneous** 82:16

**content** 13:8

**context** 19:11 35:2

**continue** 65:19 66:8,16

**continued** 70:21

**continuing** 71:9

**contract** 15:19 19:3 25:1 27:9,14,15 39:18 53:8 54:12 58:16,17 60:3 63:7

Patrick Perugini

**contracts** 18:17 27:16 29:17 56:25 60:10

**conversation** 12:16 16:8 19:24 46:16 47:15 79:22

**conversations** 13:3 71:25 72:1,5,9

**convert** 57:9

**converted** 57:13,25 59:23 60:15

**converts** 59:20

**convicted** 78:20

**copied** 41:24 70:24

**copying** 53:18

**corpus** 42:14 43:15 46:19 75:7

**correct** 5:17 9:21 11:4 16:3,4 18:11, 19 21:20 23:21,22 43:9 44:7 54:3 58:22 66:2,25 82:1

**correctly** 20:24 42:23 64:4 74:10

**correlate** 24:16

**correspondingly** 29:16 62:8

**cost** 32:8 35:22 55:23

**costs** 34:21 35:8 36:16 37:4,8 56:13 68:16

**counter-party** 55:1,2

**couple** 63:19 79:9

**cover** 39:10

**covers** 13:2

**cracks** 53:1

**create** 40:13 42:15 55:19,25 64:23

**created** 40:18,19 46:24 50:14,16 54:12

**creating** 47:6

**credit** 46:2 54:14 55:2

**credit-wise** 44:3

**crude** 8:6,7,9 25:1,2

**current** 7:19 13:9

**cutoff** 66:4

---

**D**

**darker** 38:24

**date** 4:1 18:6 19:16 23:24 48:10 75:20 77:8

**dates** 80:24

**David** 4:12 79:6

**day** 8:5 14:10 25:4 58:19

**days** 18:13 27:9 58:20 82:4

**deal** 7:20 18:10 21:17 34:4 35:2 39:3 40:10 41:6 42:13,24 43:13,14,25 54:2,5,7,9 57:6 66:15,23 67:13 68:23 69:11,18,20 70:5 72:18 80:23 81:10,11

**dealing** 9:11

**deals** 43:11 46:1 53:17 63:25 69:25 77:4 82:2,3

**dealt** 78:15

**December** 57:1 60:25 81:21

**decide** 26:25

**decipher** 50:7

**decision** 31:25 73:12

**decisions** 27:3,6

**deem** 24:18 25:13

**deemed** 33:18 47:24

**Define** 82:8

**defined** 17:3 70:1 78:3

**definitive** 16:9 17:17

**degree** 6:24 7:3

**deliver** 58:14

**deliveries** 81:9

**delivery** 58:24

**depend** 22:4 32:12 55:22

**dependent** 33:1

**depending** 34:3

**deposed** 12:13

**deposition** 4:24 12:17 13:12,18 14:13 83:17

**derive** 8:18

**derived** 8:19

**describe** 7:22 21:10 73:21,22

**design** 28:18

**designate** 68:5,6

**detailed** 21:24 22:9 72:7

**details** 27:6 28:15 38:19

**determined** 54:22

**detriment** 10:3

**devise** 78:2

**dialogue** 15:21

**dictate** 27:10

**difference** 7:22 74:20

**DINNELL** 52:13 71:3

**direct** 11:12

**directly** 11:12

**dirty** 24:18

**discussed** 76:7

**discussion** 34:5,9 39:24

**discussions** 17:13 52:20 71:9 75:23 77:5 80:16 81:8 82:7,14,17,20

**distillates** 8:12

**distinctions** 55:17

**distinguished** 23:13

**divulge** 12:23

**dlvd** 46:19

**document** 14:13,21,24,25 15:5

**documents** 13:17

**doubt** 28:5 82:6

**draw** 10:6,9

**driven** 46:15

**driving** 43:19

**dropped** 25:15

**duly** 4:5

---

**E**

**e-mail** 41:19,20 44:9,22 52:11,16, 20,24 53:17 56:25 57:15 60:1,6 61:2 63:22 64:16 65:22 66:9 67:1,3 71:6 80:2,7,8

**e-mails** 70:24 71:20 79:20 80:13 82:17 83:6

Patrick Perugini

**early** 7:7

**easy** 25:8 83:10

**effect** 40:13

**effectively** 9:10 10:14 11:18 37:17
74:7

**effectiveness** 5:16

**efficiently** 46:23

**employee** 61:4

**end** 13:25 35:1 66:4,16 72:25

**ending** 80:15

**Energy** 6:6 9:11

**engineering** 7:4

**English** 53:5

**enjoying** 37:18

**enter** 48:21

**entered** 80:23

**entities** 7:5

**equal** 31:7

**equally** 58:20

**Eric** 14:7 16:6,8 19:2 27:5 28:7,15
35:20 38:15 39:10 41:19,21 44:8
45:25 48:3,14 49:17 52:21,25 53:18
56:17 60:16 62:4 63:22 64:7 65:11
66:13 71:20 72:1,10 74:8 76:11,22
77:7 79:22 80:2 82:7,10

**Eric's** 39:1 47:14

**error** 32:1

**errors** 31:25 33:20

**escaping** 30:11

**essentially** 7:6 79:21

**event** 27:11

**EXAMINATION** 4:6 79:17 81:18

**exchange** 38:11

**execute** 26:22

**executed** 63:8

**exhibit** 19:21,23 23:3 29:25 38:6
41:17 42:24 45:20,22 47:19 52:9
54:21 56:4 59:17 63:17,20 65:9,11
70:18 79:20 80:1,5,8,9,15 81:8

**exhibits** 63:19

**experience** 7:15

**explain** 24:10 31:12 59:5

**explained** 20:9

**explanations** 31:19

**extent** 12:22 22:12 55:10

**Exxon** 18:12

**F**

**facilities** 12:7,9

**facility** 75:7,8

**fact** 20:13 50:19,20 51:11,17 67:7

**fair** 65:21 70:25

**familiar** 11:5,8 14:13 15:20 20:7
38:11 70:5

**fault** 33:23 34:6

**February** 57:1 60:24 66:20,22 67:8
82:9 83:6

**felon** 78:20

**felt** 49:13

**figure** 78:7

**figured** 55:8

**filed** 4:15,16 32:18

**fill** 41:6

**final** 35:5 50:5,21 69:18

**finalized** 51:12

**finalizing** 63:3

**financial** 18:7 23:14 25:10,19 29:20,
21 30:9 31:13 32:9 40:23 52:3 57:20
60:6,8,9 70:21

**financially** 31:5

**financials** 49:18

**financing** 18:15 35:20 36:6 37:4,16
49:5

**find** 30:16 64:7

**finding** 75:1

**fine** 20:2 37:24 45:3

**finer** 34:23

**finish** 56:17

**Finocchi** 78:17

**fix** 45:15

**fixed** 27:18 39:6,7 40:8,19 46:18,25
47:7 64:14,24

**fixed-price** 64:16

**fixing** 45:16

**flat** 30:23 31:8

**floor** 25:17

**flow** 24:15

**fluctuations** 29:14

**folks** 63:23

**follow** 32:5 44:17 80:13

**forevermore** 58:2

**form** 17:19 28:1,9,24 31:15 32:10
34:3 35:24 36:3,7,13 37:6 39:12
48:6 49:23 57:3 71:3,4 73:14 82:22

**forward** 21:15 39:18 49:2

**frankly** 49:15

**free** 32:23

**frequently** 7:20 38:18

**Friday** 18:4

**friend** 76:9

**friends** 72:12

**front** 58:15

**frontline** 58:13

**fuel** 9:8 53:21

**fuels** 9:6

**full** 4:10 50:10

**fully** 68:9 73:12

**functions** 78:1

**future** 10:8 23:24

**G**

**G-O-R-C-E-L-L** 74:5

**G-O-R-Z-E-L-L** 74:6

**gain** 23:2

**gained** 17:12

Patrick Perugini

June 29, 2018
Index: gas..inventories

**gas**  8:12

**gasolines**  8:11,12

**gave**  28:6

**GCAC**  4:15,17,21 5:25 7:19 9:14,23
11:6,18 12:4 14:23 15:15 16:2 19:6,
9,18 20:21 21:1,4,15 22:11,17,22
25:16 26:14,18 28:20 32:5,7 34:10
35:22 36:23 42:25 43:8,9,15,23
44:4,6 46:1 48:22 50:16 54:2,12,15,
23 55:13,17 56:7 61:2,3 63:5 64:1,2
65:23 67:2 68:18 70:22 71:2 72:2
73:4 74:12 77:2,18

**GCAC's**  21:6 55:15

**general**  13:7 17:1 40:24 63:1 68:22
72:24

**generally**  19:14 26:8 72:22

**generated**  18:3

**George**  11:21 12:1 61:3

**Giles**  12:21 13:2,7,15,22 17:19 20:3
28:1,9,24 31:15 32:10 34:18 35:24
36:3,7,13 37:6 38:3 39:12 48:6
52:17 57:3 61:16 63:12,15 65:14,16
68:2 69:6 71:4 73:14 79:7,9,18
80:12 81:7,17 82:22

**give**  5:14 10:23 19:19 28:20 38:1,5
39:9 69:19 70:3 79:7

**giving**  4:23 26:21 27:4,24

**global**  25:7

**goal**  21:6,19 47:9

**God**  59:9

**Goldstein**  15:25 76:4

**good**  4:8,9 24:10,24 47:22,23 61:16
72:17,19,23,24 73:1 76:9

**Gorzell**  74:3

**gosh**  19:25

**Gotcha**  20:23 65:17

**Grace**  11:21 12:1 61:3

**graduate**  7:1

**Gravity**  42:21 75:8

**Gravity's**  42:19

**Great**  41:5

**guess**  11:10 15:24 17:14 33:3 46:8
65:25 66:7 71:8 73:15,17 83:10

**guesstimate**  50:6

**Gunvor**  41:6 43:24 44:6

**guy**  46:2 78:16

**guys**  75:4 78:10,11

**H**

**half**  36:17 37:9,12

**hand**  19:22 38:7 41:18 45:21 52:15
63:18 65:10

**handle**  66:20

**hands**  34:25 73:11

**hang**  12:21 41:16

**happen**  58:4 60:8 62:18 68:20

**happened**  9:23 21:21 26:13 34:7
67:5

**happening**  34:5 44:1 82:15

**hard**  66:4 68:12

**hear**  69:15

**heartburn**  77:16

**heavy**  8:19 9:6

**hedge**  14:1 23:23 24:5,6,18,21
25:15,20 26:22 27:5,7,18 28:12
29:25 30:1,25 31:20,23 33:18 38:20
39:15 40:12,23 41:1,9 44:8 50:6
57:9,10 58:1,7 59:13,14 60:3,12
62:8 81:12

**hedged**  28:8 30:20 57:22,23 74:23

**hedges**  14:5 15:7 22:1,6 23:16,18
24:10 25:22,24,25 26:8,17,19 27:14,
22 29:5,8,12,16 30:7 31:10 34:20
39:10 45:8,9,14,16 47:4 52:21 53:6
56:18 57:4 59:5,24 60:22 62:5,19
64:16 67:11,14 81:8

**hedging**  26:19 27:25 28:19 39:24
40:25 44:13 63:1 65:24 71:21 74:11
80:17,19 82:19

**hedging-wise**  47:1

**held**  33:4 72:20

**helping**  43:21

**Hey**  27:17 52:25 53:10 64:17 66:21

**high**  21:13 27:4 60:10,24,25

**high-sulfur-related**  59:20

**higher**  10:22 21:7 55:14

**highly**  5:19

**hits**  33:24

**Hold**  42:8 74:5

**holding**  59:2 76:13

**honestly**  46:14 49:11,12,25 72:4

**hoping**  19:23

**hours**  25:7

**Hucker**  61:3

**Huh-uh**  14:22 23:12 55:12 63:11
75:22

**Hunt**  43:3,13

**I**

**ICE**  58:13

**idea**  76:17

**Ideally**  76:20

**imagine**  72:7

**imbalance**  45:15,16

**imbalanced**  31:8 58:5

**immediately**  57:20

**impacting**  16:16

**including**  13:16 53:18

**incurred**  37:5

**index**  26:4

**industry**  9:6

**information**  49:10

**inside**  34:21

**insight**  32:16

**instruct**  12:21,25

**instruction**  26:22 27:5,25 28:7 39:9

**intent**  21:12 55:5

**interacting**  17:21 18:18

**interrupt**  33:3

**interrupting**  33:6

**inventories**  77:23

Patrick Perugini

June 29, 2018
Index: inventory..meaning

**inventory** 19:18,20 22:1,5 28:22,23 40:4,11,15,17 42:15,17 44:14 45:5, 17 55:22 57:9,25 59:22 60:13 62:7 64:8,18,20,22

**inverse** 29:12,16 40:7,8 64:13

**inversely** 40:23

**involved** 11:22 15:22 18:1 63:2 70:12 75:1,14,15 76:19

**involving** 79:20

**isolated** 22:22

**issues** 33:23 58:4 79:1

---

### J

**January** 57:1 65:12,16,19,23 66:1, 9,16 67:2 70:22 80:14 81:4,9 82:4 83:4

**Jason** 15:25 76:4

**JMA** 70:12

**Joe** 61:3

**July** 17:15 18:6,13 27:12,14 75:12, 19

**June** 4:2 17:23 18:4 42:13 47:23 62:15

**jury** 7:22

**JV** 49:1,24 62:18 68:17 73:23 74:11 76:25 77:6

---

### K

**K-O-C-H** 6:12,13

**Kale** 41:24 42:10,12 61:11,12

**kb** 39:6

**keeping** 35:7

**Kenny** 61:3

**kind** 8:14,16 17:11 18:22 22:5 30:22 33:19 38:24 58:22 70:6,8 72:6,14 74:21 78:12

**knew** 49:7,18 51:9 52:12 78:10,11

**knowledge** 12:10 14:20 15:18 17:12

**Koch** 6:11

**Krhovjak** 41:25 42:1,2

**Kuo** 14:7 16:6 19:2 38:9 62:4 79:22 80:2 82:7,25

---

### L

**late** 25:4

**lawsuit** 4:19

**lawsuits** 32:18

**lawyer** 5:5 15:8

**lead** 16:24 33:22 73:24

**leading** 80:11 81:6

**leads** 23:1

**learned** 49:2,9

**lease** 42:14,20

**leases** 70:3,9

**leave** 69:24 70:10

**left** 34:25 38:23 70:6

**left-hand** 20:10

**level** 10:9 27:4

**license** 73:19

**life** 55:20

**light** 20:1 34:18 37:24

**like-kind** 26:4

**limit** 5:16

**limited** 25:11

**liquid** 25:3,6,13

**liquidity** 24:23

**list** 14:5 58:18

**listed** 7:5

**listing** 52:20

**lists** 20:10

**litigation** 4:13 12:24

**location** 18:21

**locked** 58:1 59:25

**logistics** 34:21 54:15 55:3

**long** 5:3 6:4,8,14 17:2 30:24

**long-term** 76:21

**longer** 40:4,5 48:18

**looked** 13:19 14:4 36:15 52:2 82:18

**lose** 69:18

**losing** 16:21 25:18 26:7

**loss** 9:15 22:18 23:2 26:19

**losses** 33:9 37:20

**lost** 10:2 28:3 43:18

**lot** 9:7 15:7,9 18:17 21:24,25 22:2 25:1,5,8 31:24 57:21 78:11 79:21

**loud** 63:12 69:6

**low** 21:13

**lower** 46:17

**Lucky** 5:1

---

### M

**made** 4:20 5:3 10:1 16:20 20:25 21:5 22:11 27:3 29:5 34:19 39:18 43:3 48:19,23 49:4 54:19 55:7 75:13

**main** 18:23

**major** 69:12,14

**make** 10:18 19:7 25:19 39:25 47:5 48:20 54:13,17 57:6 62:4,16 68:4,23 73:12 78:3 82:13

**makes** 56:24

**making** 6:19 16:21 27:6 30:9 48:4 49:16,19 55:13 67:14

**man** 30:2 53:10 59:7 64:17 72:14 82:24

**March** 82:9,21

**mark** 38:2 52:7

**marked** 19:21,23 38:6,8,22 41:17,18 45:20 52:9 63:17,19 65:9

**market** 24:15 25:9,13 29:14 58:2 60:15

**matter** 16:25 17:2 55:24

**Mattingly** 61:3

**May-ish** 77:14

**mbs** 46:18

**meaning** 24:18,24 27:10,11,14 31:8 55:3 61:13 69:23

---

Patrick Perugini

**means**  39:6,18 40:9 46:11 47:3 57:23 73:11

**mechanisms**  8:23

**medication**  5:15

**meet**  5:5 13:14

**meeting**  77:7,10

**meetings**  48:24 49:12

**memory**  18:11,19 23:2 26:16 50:2 51:12 67:5 81:20 83:8

**mentioned**  20:13 63:23

**Mercuria**  66:24 67:9,13,14,16,23 68:18,21 69:7,8 70:10 73:23 74:2, 10,12,14 75:1

**Mercuria's**  68:14 69:4 70:4

**Micromasters**  6:21

**middle**  42:24 52:24 63:25 80:1,7

**million**  10:25 11:1 34:11 36:23 37:8 73:4

**million-dollar**  51:25

**mimic**  27:15

**mind**  16:9 19:25 32:2 76:9

**mine**  46:9

**minus**  58:13

**minute**  32:3 79:7

**missed**  75:17

**misspoke**  45:1

**misstated**  45:2

**Mobile**  43:14,16,17 69:17

**moment**  58:1,2 59:22

**Monday**  18:7 53:25

**money**  10:1,2 16:21 19:6,19 25:18, 19 26:7 34:24 48:5 49:19 55:15 62:16 72:2

**Money's**  73:11

**month**  27:2 58:3,14,21,24

**months**  53:24 60:2,25 76:19

**morning**  4:8,9 13:16 18:8 45:25

**move**  23:19 24:18

**movement**  40:5,22

**moves**  58:2

**moving**  57:21 60:14

**multi**  7:12,13

### N

**naked**  30:14

**names**  9:7 70:4

**naphthas**  8:12

**Natt**  74:3

**natural**  24:5 75:13

**near-term**  58:17

**necessarily**  16:25 30:25 48:11 58:6 64:22

**negligent**  34:6

**negotiated**  18:20

**negotiating**  63:2 70:12

**negotiations**  70:14,15

**net**  35:5

**netting**  40:13

**nodding**  63:15

**nods**  69:3,5

**notes**  27:17

**November**  56:25 60:20,24 65:6,7

**nuance**  57:8

**nuanced**  22:8 64:22

**nuances**  24:17 62:24

**number**  10:20 23:11 35:6 36:16 50:5,22,24 52:17 58:25 59:12 60:17 71:20

**numbers**  36:11 51:24

### O

**oath**  61:25

**Object**  80:11

**Objection**  17:19 28:1,9,24 31:15 32:10 35:24 36:3,7,13 37:6 39:12 48:6 57:3 71:3,4 73:14 81:6 82:22

**obligation**  5:8

**occasions**  28:6 30:8

**occurred**  82:14

**October**  47:24 48:17 63:20

**oil**  7:16,17,23 8:6,7,13,14,19,24 9:3, 4,6 24:8,13,16,24 25:5,10 27:2 39:19 44:10 53:21,22,23 57:9,13 60:17 65:3

**oil's**  8:18

**ongoing**  71:1

**operations**  61:7

**opposed**  62:5 63:15

**opposite**  44:16

**ops**  61:11,12,13,14

**option**  70:10

**order**  67:21 68:3,10

**original**  39:23 41:20

**outlined**  62:9

**overlap**  77:24

**overlapping**  78:1

**overview**  10:23

**owe**  37:3,4

**owed**  72:2

**owes**  36:23

**owned**  19:17 42:13,20

**ownership**  11:6 73:16

**owns**  19:18,20

### P

**P&I**  9:17 10:8 17:4 33:22 50:3,22 55:19,25 56:10 68:23 74:1,19

**p.m.**  52:13 80:2

**packet**  80:22

**paid**  10:5,6 34:10 51:1

**paper**  18:18 19:3

**part**  19:9 46:18 48:1,18 52:24 63:25 75:14 77:15 81:11

**parties**  20:11,19,22 21:1,2 54:22,23 55:9 62:22 66:6 71:2 76:19

**partner** 49:1,24 75:2,6 76:21,25 77:6

**partners** 75:21

**partnership** 45:18 48:21

**party** 23:21 28:21 33:4,9 55:13

**passage** 69:21

**passthrough** 42:5

**Past** 83:4

**path** 30:19

**patience** 15:11

**Patrick** 4:4,11,12 61:8 79:3

**pay** 19:5 51:8

**payments** 34:19 35:2 56:7,11 73:3, 8,12,19

**people** 25:1,5 53:18 79:21 80:3

**percent** 10:25 11:3 32:4 37:3,18 59:23 69:7

**percentage** 10:17,22

**Percentage-wise** 22:15

**perfect** 25:20,25 41:1

**perfectly** 57:23

**period** 57:10,12 66:15 69:19 75:12

**personally** 34:1

**Perugini** 4:4,11 79:19

**Phillips** 46:19 47:3

**philosophy-wise** 30:4

**phone** 34:16 72:9

**phraseology** 47:11

**physical** 12:3,9 18:7 23:4,13 25:18 26:7,17,23 27:8,16 29:19,20 30:9,14 31:4,13,20 40:22 47:5 51:13,21 52:2,20 53:7,8 57:12,20 60:5 64:15, 23 70:20 75:15 81:14,21 82:20

**physically** 31:5,6

**pick** 58:25 67:14

**picking** 67:10

**picture** 30:3 50:10

**piece** 22:19 50:9,20

**place** 17:17,22 23:19 67:22 68:10

**places** 77:23

**plain** 53:5

**Platts** 53:19

**point** 35:1 48:2,10,17 49:2,4 73:24 74:2 77:10

**points** 34:23

**position** 17:23 30:23,24 31:8 40:19 46:24 47:1,6,8,20 48:8 57:12,13 62:14,21 64:23 68:14,15

**positions** 18:6 42:6 47:23

**positive** 75:20

**potential** 75:21 77:6

**potentially** 66:14

**prepare** 13:15

**prepared** 14:12,20 20:6

**preparing** 13:18 14:11

**presented** 15:2

**presumption** 64:11,14

**pretty** 14:25 47:22 71:16

**price** 18:21 21:6,7 23:19,24 25:14, 17 27:18 28:16 30:23 31:8 34:13 39:6,7 40:5,9,19,22 41:12 46:18,25 47:7 53:11 55:14 58:8,10,12,15,18, 19,20,23 59:5,6 60:18 64:15,24 65:19 66:8,17,18

**priced** 27:12

**prices** 22:1 25:9 58:15 59:14

**pricing** 8:23 24:15 27:9,11 29:13 58:20 60:14 66:15

**pricing-wise** 24:16

**prior** 41:8 77:7,13

**problem** 49:1

**process** 77:3

**product** 9:10 12:23 13:1,2 20:25 35:3

**profit** 9:15 17:5 19:16 21:5,15 22:12, 18 32:4,8 35:21,22 49:16 55:10

**profitable** 10:21

**profits** 10:18 17:7 35:9,17 37:3,19 50:3

**project** 45:17

**pronounce** 41:25

**protect** 23:19 28:19,22 29:13

**protected** 25:16 67:24

**protecting** 40:22

**protects** 59:6,14

**provide** 51:23

**provided** 14:19 50:6

**public** 75:19

**pull** 80:5

**pulled** 22:4

**purchase** 18:2 19:1,4,6,7 26:23 27:11 28:13 29:17,24 31:4,6 33:17 34:20 35:7 36:16 37:8 39:18 43:3 47:5,7 49:4 59:5 83:1

**purchased** 19:8

**purchases** 4:20 16:19,21 19:10 20:7,10,25 22:16,25 23:3,6 26:18 29:5 31:9,20 38:20 47:18 48:3 50:4 52:21 56:12 68:15 71:12 72:3

**purchasing** 19:2

**purely** 36:6

**purposely** 32:22

**purposes** 48:4

**purview** 73:13

**pushing** 18:5

**put** 16:9 17:22 23:19 25:5,17 27:1,2, 14,22 29:8 53:6 59:21 61:1 70:4 82:3,4

**putting** 51:11 57:4 60:11 62:19

**Q**

**quality** 18:21

**question** 5:18 12:8 14:8,17 16:20 21:18 23:1 27:23 28:25 29:2 37:15 38:13 43:18,19 48:20 49:8 50:1 54:20 55:11 62:3 63:24 67:13 70:18 76:8 79:10 82:23

**questions** 15:9 70:13 79:4,10 81:17 83:13

**quickly** 25:9 46:23

Patrick Perugini

## R

**range** 51:25

**re-hedge** 64:8,18

**read** 32:18

**Reading** 70:23

**real** 36:15 40:21 55:20 68:2

**realtime** 55:20,21

**reason** 5:14 44:12 54:10,14 57:16

**reasonable** 12:23

**recall** 52:1 75:25 79:22 83:4

**receipts** 56:8

**recess** 61:21 79:14

**recipients** 79:21

**Reconcile** 74:17,18

**reconciled** 56:2

**reconciles** 74:24

**reconciliation** 35:1

**reconciling** 73:10

**record** 4:2,10 61:19,22 79:12,15
   83:15

**reference** 36:19 53:8

**referencing** 45:9

**referred** 9:5

**refinery** 8:7,8,10

**reflected** 22:20 35:10,12

**reimburse** 19:10,11

**relate** 81:8

**related** 20:25 26:23 32:9 33:9 34:11
   67:12 70:18 83:1

**relates** 4:19 23:3 63:24

**relation** 59:23 81:13

**relationship** 15:19 27:24 36:4
   59:24 66:5 74:8 76:5

**relationships** 78:8

**relevant** 76:6

**remain** 44:14

**remaining** 28:23

**remains** 45:17

**remedial** 15:9 59:8

**remember** 13:23,24 23:11 52:25
   53:13 71:25 72:4 75:10,21,25 77:8,9
   78:14 82:2

**remembering** 46:10

**reminder** 53:10

**reminding** 64:17

**repeating** 59:19

**repetitive** 50:1

**report** 11:12,15

**represent** 4:12 20:5,19 38:8

**represented** 15:4 17:16

**resid** 60:4,7

**resisting** 20:4

**resolution** 51:4,8 72:1

**responds** 39:15 41:10 65:2

**responsibility** 33:13

**responsible** 49:17 69:16 74:11

**restate** 5:20,22

**restrictive** 25:11

**result** 50:3 72:3

**resulted** 26:18

**resulting** 44:8

**reveal** 37:18

**revealed** 36:1

**right-hand** 56:6

**rights** 69:18,21 70:3

**Rio** 6:6,8 9:11 17:24 18:3,5 41:25
   42:5,6,13,15,20 56:7 62:15,18,19,
   21,23 69:17,25 70:5 75:4

**Rio's** 68:14

**risk** 40:5

**Roberto** 78:17

**role** 6:2,4 7:6,19 16:24 73:22 74:8
   77:2

**roles** 62:22

**roughly** 19:15 23:21 73:4

**rule** 13:4

**run** 9:14 31:3,6,10 40:7 47:11 73:25

**running** 48:3 74:21

## S

**sale** 18:2 25:18 29:8,17 31:4,5 43:2
   54:17,19 55:13,17 56:22 57:8,18,25
   58:9,10,12 59:1 60:3,13 64:6 81:14
   83:1

**sales** 20:18,19,22 21:4,15 22:11,17,
   22,25 23:4 33:17 34:20 35:7 36:16
   37:8 43:23 56:6,13 68:15

**salesman** 7:8

**satisfied** 46:2

**save** 38:4

**scenario** 30:6,12

**scope** 34:21

**sell** 9:3 11:24 21:7,13 25:2 29:11,16,
   20 30:21 44:4 47:4,8 53:24 59:12,13
   62:15 64:2,13,23 77:22

**selling** 24:1 29:20 42:25 43:3,14,15
   54:2,22,23 55:14,25 60:18 63:1

**sells** 43:8,9

**sem** 39:3,4 40:2

**send** 27:17

**sending** 53:17

**sense** 39:25 54:13 56:24 75:13

**sentences** 72:10

**Sep** 39:16

**September** 39:19 44:10 47:24
   48:17 52:10 56:24 80:2,14,24 81:10,
   14

**Sergeant** 78:24

**series** 23:14 45:24 52:19 79:20

**served** 37:17 74:8

**serves** 74:7

**serving** 49:5

**set** 10:5,20 44:3 62:7,10,11 77:7,9

**sets** 33:5

Patrick Perugini

June 29, 2018
Index: settled..texts

**settled** 19:16

**settlement** 58:13

**shape** 49:23

**share** 17:7 19:16 32:4

**Shared** 56:15

**sharing** 32:8 35:9,16 36:5

**sheet** 9:15 14:1

**ship** 55:4

**shoes** 62:23

**short** 30:24

**shorts** 60:11

**show** 13:3

**showed** 44:1

**side** 8:8 16:2 25:19 51:13 69:4 78:4 82:3

**significant** 71:19

**similar** 50:17 67:17,18 68:23

**similarities** 7:25

**Similarly** 73:24

**simple** 36:15 40:21

**simply** 28:12

**single** 31:13

**sir** 7:18 12:2 83:12

**sit** 16:12 30:15

**sitting** 19:20 42:19

**situation** 33:4

**skill** 33:5

**skip** 52:4

**slide** 58:3 68:14

**sold** 18:10 21:1,2 23:20 27:17 28:21 35:3 39:4,25 40:2,8 44:6,19 45:5 55:9,19,21 57:8 60:7,24,25 64:1,14 65:5 77:4 81:1,3

**solely** 49:5

**solution** 24:6

**sort** 28:15 77:20

**sound** 51:25 77:11

**speak** 9:4 17:21 20:21 28:20 30:13 46:22

**speaking** 19:14 26:8 72:22

**specific** 7:11 21:22 27:19,25 28:6 72:4 82:11 83:8

**specifically** 83:1

**speculating** 33:12

**spell** 74:4

**split** 33:19 56:10 68:16 78:2,3

**splits** 17:1,3,5 68:24,25

**spreads** 24:19

**spreadsheet** 50:11 51:19

**stack** 65:14

**start** 7:24 18:6 21:12

**started** 27:8 47:21

**starting** 53:11 80:13

**starts** 80:8

**state** 4:10 47:22

**State's** 78:24

**stated** 18:24 33:24 47:20 72:20

**stays** 71:16

**step** 43:23 54:16

**stepped** 62:23

**steps** 10:21

**stopped** 73:8

**storage** 12:7,9 28:19,23 43:14

**straight** 35:19

**strategy** 31:1

**string** 38:9

**structure** 10:24 11:5,6,9 73:16

**structured** 32:13 42:13

**struggled** 77:19

**stuff** 13:9,10 18:22 21:25 22:5 25:6 30:22 33:19 51:6,10,17 67:17 69:19, 24 70:3 72:5,11 74:24 82:19

**subject** 13:8 38:18

**subjected** 40:5

**sucks** 76:9,10,13

**suit** 4:15,16 56:12

**sulfur** 24:7 60:10,25

**sulphur** 60:24

**summarizes** 60:19

**summary** 50:7

**Supply** 6:11

**supposed** 31:23

**surface** 75:5

**surprise** 83:5,10

**suspect** 71:23

**sworn** 4:5

**symbiotic** 8:15 24:14

**system** 31:22 44:4

_____

**T**

**taking** 35:20

**talk** 8:2 12:19 13:5,11 15:7 25:24 60:9 72:14 82:10

**talked** 13:12 52:5 73:2,21

**talking** 9:17 16:2 51:19 60:7 80:21

**tank** 70:3,9

**tankage** 42:14

**tanks** 42:19 69:16

**Tauber** 6:17 7:10

**telling** 53:6

**tells** 67:20

**ten** 82:4

**term** 70:1

**terminology** 25:3 70:8

**terms** 15:15 16:9,13,17,22,25 17:2 18:21 32:16 33:1,8 40:21 68:12 77:25

**terrible** 29:2

**testified** 4:5

**testimony** 5:15

**Texas** 6:25

**text** 38:9 41:5 45:24,25 72:1,7

**texter** 72:6

**texts** 38:16,18,23 39:1 71:20 72:5 82:17 83:6

Patrick Perugini

June 29, 2018
Index: theory..volume

**theory** 40:9

**thing** 24:20 49:13 64:13 69:12 72:23,24 73:1 74:16,20 76:15 78:21

**things** 8:9 12:7 18:23 22:2 24:9 31:24 33:13 67:1 69:11,14 73:25 77:24

**Thomas** 4:11

**thought** 28:4 44:20 48:15,18 76:7

**tied** 24:13 26:17 28:12 30:9 31:20

**time** 4:2 5:3,12 14:15 17:15 23:20 24:15,22 26:24 28:3 29:14 38:4 42:16 44:2 47:5,7 48:10 57:10,12 61:16 63:10 66:12 69:19,21 72:10 75:11 79:5 80:13 81:1,21

**times** 9:3,4 13:14,16 24:19 25:4 27:3,5,23 28:11 29:4,7

**timing** 58:4,6

**today** 5:19 16:12 25:24 53:1,9

**Today's** 4:1

**told** 59:8 73:6 74:21

**tons** 44:21

**top** 20:13 39:3 44:9 45:25 63:22 65:18 66:9 80:9,15

**touch** 71:16

**tower** 8:20,25

**track** 43:18 50:19

**trade** 8:8,13,16,24,25 9:4,22 15:17 25:8,19 30:9,10 31:13 38:15 73:24 75:15 82:20

**trader** 6:3 7:6,10 15:8 16:24 33:22

**traders** 11:17

**trades** 9:23 16:16,18 23:14 25:7,10 26:7 31:14 32:9 33:10 49:16 50:3 51:5 53:7 68:20 70:21

**trading** 6:11 7:11 24:4 30:16 49:11, 14

**train** 28:4

**transact** 18:8,9,17 54:11

**transaction** 21:23 27:25 41:8 45:4 49:6 54:24 57:5

**transactions** 11:23 13:10 21:22 26:13 28:19 34:4,11 37:22 42:5 47:14,17 48:14 50:8 65:24 71:1,10,

11,21 74:11,15 80:17,19 81:13,21

**transcript** 67:22

**transfer** 47:23 62:21

**transferred** 17:4,24 18:6

**transgression** 64:17

**transition** 66:14

**transitioning** 42:6 67:8

**translate** 53:3,4

**transmitted** 19:3

**treating** 48:14

**trial** 5:12

**truck-rack** 56:7

**true** 8:19 22:20 24:2 25:14 26:6,20, 21 27:7 28:18 32:3 35:15 38:17,20 42:25 55:18 66:6,7 67:4 70:20 71:24 82:7

**truth** 5:9 62:1

**turn** 20:1 34:16 37:24

**turned** 64:2

**turns** 31:14 43:8

**tying** 56:21

**type** 9:10 55:3

**types** 33:10

**typical** 16:15

**typically** 26:10 72:13

## U

**Uh-huh** 8:17 11:4 23:5,10 33:16,25 34:2 35:18 36:18 39:22 42:9 45:7 46:17 50:23 53:2,12,14 54:4 57:24 58:11 60:19 61:5,9 70:7 71:14 74:20

**ultimate** 28:18 43:19

**ultimately** 81:2

**uncomfortable** 72:12,13

**uncommon** 38:15

**undercurrent** 48:25

**undergraduate** 6:23

**understand** 4:13,15,19 5:18 16:17 17:9 20:24 21:4 29:4 36:22,25 39:4

42:23 47:13 55:11 57:6 58:8 61:25 64:1 68:9 71:19 73:2,5 82:13

**understanding** 15:14 17:1 23:18 26:16 38:23 40:24 48:13 56:21 62:12 63:9 68:22 73:7 74:10 76:23

**understood** 5:23 22:19 25:14,23 29:22 40:21 48:2 56:4 60:16 64:25 79:2

**unhedged** 30:21

**University** 6:25

**upset** 33:22 42:3

**USGC** 53:20

## V

**vacuum** 8:12,20,25

**Valt** 76:25 77:2,4,5,16,17 78:9,15,21

**venture** 11:25 15:16 22:18 44:5 62:6,13

**verbal** 18:17 46:15

**versus** 52:2

**vet** 55:3

**viable** 75:6

**view** 37:2 77:17

**viewing** 48:16

**visually** 7:25 8:14

**Vitol** 4:13,16,21 9:23 11:22 14:1,8, 24,25 15:3,5,14 16:5 17:1,21,24 18:3,8,9,13,14,25 19:1,4,5,8,10,17, 18,20 20:6 21:1,5 22:17,22 23:20 24:9 25:16 26:13,18,22 27:6 28:7 32:5 34:10 35:9,16 36:5 37:16 42:16,18,25 43:4,8,14,15 46:18 47:2 48:21 49:5,24 51:5 54:2,11,15,22,24 55:5,9,17,24 56:8 61:13,14 62:4,22, 23 63:5 64:1 65:23 67:2 68:12,13 69:17,25 70:21 71:2 72:2,24 73:4,19 74:8 76:6,21 77:16 81:25

**Vitol's** 20:19 36:22 44:3 68:15

**Vitol/gcac** 70:16

**volume** 25:8 31:7 39:10 57:21

Patrick Perugini

## W

**wanted** 18:4 24:9 28:7 33:21 48:9
70:10 76:18,20 77:23

**Wash** 78:21

**ways** 47:22,23

**weighing** 56:11

**weighted** 58:22

**well-traded** 24:24

**whereabouts** 47:21

**winding** 67:2

**wondering** 30:8

**word** 24:23

**words** 16:15 19:6 21:5 25:17 36:11
47:15 62:19,23 71:21 73:18

**work** 12:23 13:1,2 19:13 21:14
28:15 49:24 68:24 71:1 77:1

**worked** 45:4 76:17,22

**works** 18:16 73:17

**world** 37:2

**worried** 68:8

**worth** 45:14

**written** 15:19 63:7 68:18

## Y

**y'all** 80:21

**year** 6:5 7:1 10:5,9,13 66:5

**years** 6:9,15

**years-ish** 78:13

**yesterday** 12:14,17 41:6

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900     San Antonio, Texas 78232
210-697-3400                                                    210-697-3408
                                                                     001513


EXHIBIT
11

Thu, Aug 10, 10:49 AM

Did the sem deal.

30 kb fixed price.

Please buy back hedges to cover that volume.

Thanks!

Hedge on Sep bought at 46.30

Great.

Do you know fill on Gunvor deal from yesterday

46.20

Thx!

Tue, Aug 15, 12:42 PM

What is your credit guys name again?  Tom?



EXHIBIT

12

6-29-18

001515

**Eric Kuo**

| | |
|---|---|
| **From:** | Eric Kuo |
| **Sent:** | Tuesday, August 15, 2017 11:40 AM |
| **To:** | 'Patrick Perugini'; Arthur Brass; Kale Krhovjak |
| **Cc:** | Joe Mattingly; Kenny Hucker; George Grace |
| **Subject:** | RE: 2 deals |

Hedge on 10kb: Bought 10kb Sep HS @ 44.50

**From:** Patrick Perugini [mailto:pperugini@gcachouston.com]
**Sent:** Tuesday, August 15, 2017 10:40 AM
**To:** Eric Kuo; Arthur Brass; Kale Krhovjak
**Cc:** Joe Mattingly; Kenny Hucker; George Grace
**Subject:** 2 deals

Deal #1 – Rio inventory in Mobile
Seller: Hunt Refining Company
Buyer: Vitol
Volume: approx 4500 tons (approx. 25 mbs)
Price: $247/t
Location: FOB – Mobile, Al by buyer's vessel
Window: 8/16-18
Quality: PG 67-22 specifications
Credit: mutual between credit 3 ROI
Confirm attached

Deal #2 – Rio inventory in Mobile
Seller: Vitol
Buyer: GCAC
Volume: approx. 35,000 bbls
Price: $249
Location: FOB – Mobile, AL buyer's vessel
Window: 8/28-30
Quality: PG 67-22 and AC-30 specifications
Credit: Open 5 days after ROI

*Back up to deal #2*

*Deal #2 – Rio inventory in Mobile*
*Seller: GCAC*
*Buyer: Gunvor SA*
*Volume: approx. 35,000 bbls*
*Price: $251*
*Location: FOB – Mobile, AL buyer's vessel*
*Window: 8/28-30*
*Quality: PG 67-22 and AC-30 specifications*
*Credit: 3 days after ROI*



001516

Verizon  2:10 PM



## Eric

Sat, Aug 12, 9:56 AM

Morning

Just to be clear

As we do deals, do them as GCAC as long is your credit guy is satisfied?

Yep

Thu, Aug 17, 3:17 PM

Hello

Sent you an email

Vitol buys 40 mbs fixed price from Phillips dlvd to corpus

Call me with any questions or concerns

Thu, Aug 17, 5:01 PM

Got your msg sorry was swamped. I will hedge it



EXHIBIT
14
TQR 6-29-18

## Eric Kuo

| | |
|---|---|
| **From:** | Eric Kuo |
| **Sent:** | Monday, September 25, 2017 4:52 PM |
| **To:** | 'Patrick Perugini'; Mike Ruzek; Kale Krhovjak; Arthur Brass |
| **Cc:** | Joe Mattingly; Kenny Hucker; George Grace |
| **Subject:** | RE: 2 deals out of Rio Inventory having to do w/ term  Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018) |

Bought 140kb of Nov HS Crack

Hedges:

Bot 35kb Nov HS 48.85, sold 35kb Feb Brent 56.65
Bot 35kb Dec HS 46.80, sold 35kb Mar Brent 56.48
Bot 35kb Jan HS 48.45, sold 35kb Apr Brent 56.35
Bot 35kb Feb HS 48.35, sold 35kb May Brent 56.23

**From:** Patrick Perugini [mailto:pperugini@gcachouston.com]
**Sent:** Monday, September 25, 2017 11:31 AM
**To:** Eric Kuo; Mike Ruzek; Kale Krhovjak; Arthur Brass
**Cc:** Joe Mattingly; Kenny Hucker; George Grace
**Subject:** RE: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

Eric,

Remember we have to buy some brent cracks today.

thanks

**From:** Patrick Perugini
**Sent:** Friday, September 22, 2017 4:34 PM
**To:** 'Eric Kuo' <ejk@Vitol.com>; 'mrr@Vitol.com' <mrr@Vitol.com>; Kale Krhovjak <kale@rioenergy.com>; Arthur Brass <aj@abrass.com>
**Cc:** Joe Mattingly <jmattingly@gcachouston.com>; Kenny Hucker <khucker@gcachouston.com>; George Grace <ggrace@gcachouston.com>
**Subject:** 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

2 deals

We will have to buy the Platts USGC HSFO and sell Brent for appropriate months Monday.

Deal #1

Seller:    Vitol

1



Buyer:     GCAC

Product:   AC-30 ASTM D-3381 Table II specs and also meeting Paving Asphalt meeting PG 67-22 AASHTO M-320 and ASTM 6084 for Elastic Recover

Term:      Five months October 1, 2017 through February 28, 2018

Volume:    4 cargos, each 34,000 BBLS +/-10% in sellers option.

Price:     ICE Brent front line settlement minus $0.85 USD per BBL

Pricing:      Average of all available quotations of the month of delivery.   Delivery month to be agreed and 'deemed' (eg. 30 days per the nomination process below) and that is the deemed delivery month no matter if the vessel is slightly early or slightly late.   Provisional invoice should be based  5 Days around date of delivery (two days before, day of,  and two days after) and adjusted at the end of the month in final invoice to delivery month based on monthly average of ICE  Brent front line settlement.

Delivery:    Delivered to Chevron's terminal DAP Las Minas, Panama

Nominations: Buyer and seller should mutually agree to a 5 day delivery window at least 30 calendar days in advance of desired delivery.

Payment:   Payment five days after ROI and documents

Vessel:    Iver Blessing or substitute meeting Chevron vetting/approval

Laytime:   36 hrs SHINC + 6 hrs NOR

Demurrage: As per Charter Party rate.   However, in no case will demurrage exceed $18,000 USD per day (or $750 USD per hour).

Quality & Quantity determination:   Quality per load B/L and Quantity per discharge shoretank upguage.

Law: New York Law with arbitration.

The following US Sanctions language which is typical in almost all company's GT&Cs –

Despite anything to the contrary elsewhere in the Agreement:

Seller shall not deliver [Product] that originates from a country subject to United States, European Union or United Nations' trade sanctions. Seller shall provide documentation specifying the country of origin (i.e. the country of manufacture or production) of the [Products], failing which, documentation stating such [Product] did not originate from a country subject to United States, European Union or United Nations' trade sanctions. Such documentation shall be provided before, upon or promptly following loading of the [Product].

Neither party shall be obliged to perform any obligation otherwise required by the Agreement (including without limitation an obligation to (a) perform, deliver, accept, sell, purchase, pay or receive monies to, from, or through a person or entity, or (b) engage in any other acts) if this would be in violation of, inconsistent with, or expose such party to punitive measures under, any laws, regulations, decrees, ordinances, orders, demands, requests, rules or requirements of the EU, any EU member state, the United Nations or the United States applicable to the parties relating to trade sanctions, foreign trade controls, export controls, non-proliferation, anti-terrorism and similar laws (the "Trade

2

Restrictions").

Where any performance by a party would be in violation of, inconsistent with, or expose such party to punitive measures under, the trade restrictions, such party (the "Affected Party") shall, as soon as reasonably practicable give written notice to the other party of its inability to perform. Once such notice has been given the Affected Party shall be entitled:

(i) to immediately suspend the affected obligation (whether payment or performance) until such time as the Affected Party may lawfully discharge such obligation; and/or

(ii) where the inability to discharge the obligation continues (or is reasonably expected to continue) until the end of the contractual time for discharge thereof, to a full release from the affected obligation, provided that where the relevant obligation relates to payment for goods which have already been delivered, the affected payment obligation shall remain suspended (without prejudice to the accrual of any interest on an outstanding payment amount) until such time as the Affected Party may lawfully resume payment; and/or

(iii) where the obligation affected is acceptance of the Vessel, to require the other party to nominate an alternative Vessel;

In each case without any liability whatsoever (including but not limited to any damages for breach of contract, penalties, costs, fees and expenses).

Nothing in the Agreement is intended, and nothing herein should be interpreted or construed, to induce or require either party hereto to act in any manner (including failing to take any actions in connection with the Agreement) which is inconsistent with, penalised or prohibited under any laws, regulations, decrees, ordinance, order, demand, request, rules or requirements of the United States applicable to such party which relate to international boycotts of any type, including but not limited to the Antiboycott laws and regulations of the United States as applicable.

Nothing in this section shall be taken to limit or prevent the operation, where available under the governing law of the Agreement, of any doctrine analogous to the English common law doctrine of frustration (including frustration of the adventure or purpose of the Agreement).

## DEAL #2

Please see below deal recap discussed between our companies and please kindly revert with your confirmation by tomorrow latest.   Thank you.

Seller:     Gulf Coast Asphalt Company, LLC

Buyer:     Chevron Products Company

Product:   AC-30 ASTM D-3381 Table II specs and also meeting Paving Asphalt meeting PG 67-22 AASHTO M-320 and ASTM 6084 for Elastic Recover

Term:      Five months October 1, 2017 through February 28, 2018

Volume:    4 cargos, each 34,000  BBLS +/-10% in sellers option.

Price:     ICE Brent front line settlement minus $0.85 USD per BBL

3

Pricing:     Average of all available quotations of the month of delivery.   Delivery month to be agreed and 'deemed' (eg. 30 days per the nomination process below) and that is the deemed delivery month no matter if the vessel is slightly early or slightly late.   Provisional invoice should be based 5 Days around date of delivery (two days before, day of, and two days after) and adjusted at the end of the month in final invoice to delivery month based on monthly average of ICE Brent front line settlement.

Delivery:     Delivered to Chevron's terminal DAP Las Minas, Panama

Nominations: Buyer and seller should mutually agree to a 5 day delivery window at least 30 calendar days in advance of desired delivery.

Payment:     Payment five days after ROI and documents

Vessel:       Iver Blessing or substitute meeting Chevron vetting/approval

Laytime:     36 hrs SHINC + 6 hrs NOR

Demurrage: As per Charter Party rate.   However, in no case will demurrage exceed $18,000 USD per day (or $750 USD per hour).

Quality & Quantity determination:   Quality per load B/L and Quantity per discharge shoretank upgauge.

Law: New York Law with arbitration.

The following US Sanctions language which is typical in almost all company's GT&Cs –

Despite anything to the contrary elsewhere in the Agreement:

Seller shall not deliver [Product] that originates from a country subject to United States, European Union or United Nations' trade sanctions. Seller shall provide documentation specifying the country of origin (i.e. the country of manufacture or production) of the [Products], failing which, documentation stating such [Product] did not originate from a country subject to United States, European Union or United Nations' trade sanctions. Such documentation shall be provided before, upon or promptly following loading of the [Product].

Neither party shall be obliged to perform any obligation otherwise required by the Agreement (including without limitation an obligation to (a) perform, deliver, accept, sell, purchase, pay or receive monies to, from, or through a person or entity, or (b) engage in any other acts) if this would be in violation of, inconsistent with, or expose such party to punitive measures under, any laws, regulations, decrees, ordinances, orders, demands, requests, rules or requirements of the EU, any EU member state, the United Nations or the United States applicable to the parties relating to trade sanctions, foreign trade controls, export controls, non-proliferation, anti-terrorism and similar laws (the "Trade Restrictions").

Where any performance by a party would be in violation of, inconsistent with, or expose such party to punitive measures under, the trade restrictions, such party (the "Affected Party") shall, as soon as reasonably practicable give written notice to the other party of its inability to perform. Once such notice has been given the Affected Party shall be entitled:

(i) to immediately suspend the affected obligation (whether payment or performance) until such time as the Affected Party may lawfully discharge such obligation; and/or

(ii) where the inability to discharge the obligation continues (or is reasonably expected to continue) until

4

## Eric Kuo

| From: | Eric Kuo |
|---|---|
| Sent: | Monday, October 16, 2017 2:58 PM |
| To: | 'Patrick Perugini'; Mike Ruzek; Bernardette Scambray; Lance Abernathy |
| Cc: | Arthur Brass; Joe Mattingly; George Grace; Kenny Hucker |
| Subject: | RE: exxon purchase , bitumar sale |

We sold 75kb Nov HS at 48.95 to re-hedge

**From:** Patrick Perugini [mailto:pperugini@gcachouston.com]
**Sent:** Monday, October 16, 2017 10:10 AM
**To:** Eric Kuo; Mike Ruzek
**Cc:** Arthur Brass; Joe Mattingly; George Grace; Kenny Hucker
**Subject:** RE: exxon purchase , bitumar sale

We are cancelling below sale and releasing barge to someone else

We have to re-hedge the inventory

Let me know if you need anything.

Deal #2 – Vitol sells asphalt to GCAC ( who then sells Bitumar)  Eric hedged this sale on friday
Seller: Vitol
Buyer: GCAC
Volume 80 mbs +/- 10%
Price: $285/t
Location: DAP – Baltimore ( will charter the Penn 90 for delivery)
Window: 10/ 20-25
Quality: meeting PG64-22 specifications
Credit: 3 ROI

Backup for deal #2
Deal #2 – GCAC sells Bitumar
Seller: GCAC
Buyer: Bitumar
Volume 80 mbs +/- 10%
Price: $285/t
Location: DAP – Baltimore ( will charter the Penn 90 for delivery)
Window: 10/ 20-25
Quality: meeting PG64-22 specifications
Credit: 3 ROI

**From:** Patrick Perugini
**Sent:** Monday, September 25, 2017 11:48 AM
**To:** Eric Kuo <ejk@Vitol.com>; mrr@Vitol.com
**Cc:** Arthur Brass <aj@abrass.com>; Joe Mattingly <jmattingly@gcachouston.com>; George Grace



EXHIBIT
16
001522  29-18

<ggrace@gcachouston.com>; Kenny Hucker <khucker@gcachouston.com>
**Subject:** exxon purchase , bitumar sale

Deal #1 – Vitol buys vtbs from Exxon
Seller: Exxon
Buyer: Vitol
Volume: 80 mbs +/- 10%
Price: Platts USGC HSFO mn - $8.00/bbls
Price days: 10/1-31
Location: FOB – Port Allen, LA
Window: 10/10-20 to be narrowed
Quality: as attached
Credit: 3 ROI

Deal #2 – Vitol sells asphalt to GCAC ( who then sells Bitumar)  <mark>Eric hedged this sale on friday</mark>
Seller: Vitol
Buyer: GCAC
Volume 80 mbs +/- 10%
Price: $285/t
Location: DAP – Baltimore ( will charter the Penn 90 for delivery)
Window: 10/ 20-25
Quality: meeting PG64-22 specifications
Credit: 3 ROI

Backup for deal #2
*Deal #2 – GCAC sells Bitumar*
*Seller: GCAC*
*Buyer: Bitumar*
*Volume 80 mbs +/- 10%*
*Price: $285/t*
*Location: DAP – Baltimore ( will charter the Penn 90 for delivery)*
*Window: 10/ 20-25*
*Quality: meeting PG64-22 specifications*
*Credit: 3 ROI*

001523

## Eric Kuo

| | |
|---|---|
| **From:** | Patrick Perugini <pperugini@gcachouston.com> |
| **Sent:** | Friday, January 19, 2018 2:35 PM |
| **To:** | Eric Kuo; Arthur Brass |
| **Cc:** | Bernardette Scambray; Mike Ruzek |
| **Subject:** | RE: 2 deals out of Rio Inventory having to do w/ term  Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018) |

Yes, please continue to price out the January cargo

And please close any hedges associated w/ the Feb delivery.

**From:** Eric Kuo [mailto:ejk@Vitol.com]
**Sent:** Friday, January 19, 2018 9:01 AM
**To:** Patrick Perugini <pperugini@gcachouston.com>; Arthur Brass <aj@abrass.com>
**Cc:** Bernardette Scambray <bgh@Vitol.com>; Mike Ruzek <mrr@Vitol.com>
**Subject:** RE: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

We have this deal pricing through end Jan, assume we will continue to price this out?

Also, how do you want to handle the Feb delivery?

**From:** Patrick Perugini [mailto:pperugini@gcachouston.com]
**Sent:** Thursday, January 11, 2018 03:09 PM
**To:** Eric Kuo; Arthur Brass
**Cc:** Bernardette Scambray; Mike Ruzek
**Subject:** RE: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

Approx. 32 mbs

**From:** Eric Kuo [mailto:ejk@Vitol.com]
**Sent:** Thursday, January 11, 2018 3:09 PM
**To:** Patrick Perugini <pperugini@gcachouston.com>; Arthur Brass <aj@abrass.com>
**Cc:** Bernardette Scambray <bgh@Vitol.com>; Mike Ruzek <mrr@Vitol.com>
**Subject:** RE: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

What was the volume delivered?

**From:** Patrick Perugini [mailto:pperugini@gcachouston.com]
**Sent:** Thursday, January 11, 2018 03:08 PM
**To:** Eric Kuo; Arthur Brass
**Cc:** Bernardette Scambray; Mike Ruzek
**Subject:** RE: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

To be clear,

1



EXHIBIT
17
00152
9-18

The 3rd cargo (of 4)  has delivered and is pricing in January.

**From:** Eric Kuo [mailto:ejk@Vitol.com]
**Sent:** Thursday, January 11, 2018 2:54 PM
**To:** Patrick Perugini <pperugini@gcachouston.com>; Arthur Brass <aj@abrass.com>
**Cc:** Bernardette Scambray <bgh@Vitol.com>; Mike Ruzek <mrr@Vitol.com>
**Subject:** FW: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

As discussed with AJ, I have bought 67kb of March Brent at 69.17 to hedge what had priced out.

We still need to figure out the sale to Titanio and the exposure.

**From:** Patrick Perugini [mailto:pperugini@gcachouston.com]
**Sent:** Tuesday, January 09, 2018 11:08 AM
**To:** Eric Kuo
**Subject:** FW: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

**From:** Eric Kuo [mailto:ejk@Vitol.com]
**Sent:** Monday, September 25, 2017 4:52 PM
**To:** Patrick Perugini <pperugini@gcachouston.com>; Mike Ruzek <mrr@Vitol.com>; Kale Krhovjak <kale@rioenergy.com>; Arthur Brass <aj@abrass.com>
**Cc:** Joe Mattingly <jmattingly@gcachouston.com>; Kenny Hucker <khucker@gcachouston.com>; George Grace <ggrace@gcachouston.com>
**Subject:** RE: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

Bought 140kb of Nov HS Crack

Hedges:


Bot 35kb Nov HS 48.85, sold 35kb Feb Brent 56.65
Bot 35kb Dec HS 46.80, sold 35kb Mar Brent 56.48
Bot 35kb Jan HS 48.45, sold 35kb Apr Brent 56.35
Bot 35kb Feb HS 48.35, sold 35kb May Brent 56.23


**From:** Patrick Perugini [mailto:pperugini@gcachouston.com]
**Sent:** Monday, September 25, 2017 11:31 AM
**To:** Eric Kuo; Mike Ruzek; Kale Krhovjak; Arthur Brass
**Cc:** Joe Mattingly; Kenny Hucker; George Grace
**Subject:** RE: 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

Eric,

2

Remember we have to buy some brent cracks today.

thanks

**From:** Patrick Perugini
**Sent:** Friday, September 22, 2017 4:34 PM
**To:** 'Eric Kuo' <ejk@Vitol.com>; 'mrr@Vitol.com' <mrr@Vitol.com>; Kale Krhovjak <kale@rioenergy.com>; Arthur Brass <aj@abrass.com>
**Cc:** Joe Mattingly <jmattingly@gcachouston.com>; Kenny Hucker <khucker@gcachouston.com>; George Grace <ggrace@gcachouston.com>
**Subject:** 2 deals out of Rio Inventory having to do w/ term Chevron/GCAC Panama term asphalt deal recap (Oct 2017 thru February 2018)

2 deals

We will have to buy the Platts USGC HSFO and sell Brent for appropriate months Monday.

**Deal #1**

Seller:     Vitol

Buyer:     GCAC

Product:   AC-30 ASTM D-3381 Table II specs and also meeting Paving Asphalt meeting PG 67-22 AASHTO M-320 and ASTM 6084 for Elastic Recover

Term:      Five months October 1, 2017 through February 28, 2018

Volume:    4 cargos, each 34,000  BBLS +/-10% in sellers option.

Price:     ICE Brent front line settlement minus $0.85 USD per BBL

Pricing:    Average of all available quotations of the month of delivery.   Delivery month to be agreed and 'deemed'  (eg. 30 days per the nomination process below) and that is the deemed delivery month no matter if the vessel is slightly early or slightly late.   Provisional invoice should be based  5 Days around date of delivery (two days before, day of,  and two days after) and adjusted at the end of the month in final invoice to delivery month based on monthly average of ICE  Brent front line settlement.

Delivery:   Delivered to Chevron's terminal DAP Las Minas, Panama

Nominations: Buyer and seller should mutually agree to a 5 day delivery window at least 30 calendar days in advance of desired delivery.

Payment:   Payment five days after ROI and documents

Vessel:    Iver Blessing or substitute meeting Chevron vetting/approval

Laytime:   36 hrs SHINC + 6 hrs NOR

Demurrage: As per Charter Party rate.   However, in no case will demurrage exceed $18,000 USD per day (or $750 USD per hour).

3

Quality & Quantity determination:   Quality per load B/L and Quantity per discharge shoretank upguage.

Law: New York Law with arbitration.

The following US Sanctions language which is typical in almost all company's GT&Cs –

Despite anything to the contrary elsewhere in the Agreement:

Seller shall not deliver [Product] that originates from a country subject to United States, European Union or United Nations' trade sanctions. Seller shall provide documentation specifying the country of origin (i.e. the country of manufacture or production) of the [Products], failing which, documentation stating such [Product] did not originate from a country subject to United States, European Union or United Nations' trade sanctions. Such documentation shall be provided before, upon or promptly following loading of the [Product].

Neither party shall be obliged to perform any obligation otherwise required by the Agreement (including without limitation an obligation to (a) perform, deliver, accept, sell, purchase, pay or receive monies to, from, or through a person or entity, or (b) engage in any other acts) if this would be in violation of, inconsistent with, or expose such party to punitive measures under, any laws, regulations, decrees, ordinances, orders, demands, requests, rules or requirements of the EU, any EU member state, the United Nations or the United States applicable to the parties relating to trade sanctions, foreign trade controls, export controls, non-proliferation, anti-terrorism and similar laws (the "Trade Restrictions").

Where any performance by a party would be in violation of, inconsistent with, or expose such party to punitive measures under, the trade restrictions, such party (the "Affected Party") shall, as soon as reasonably practicable give written notice to the other party of its inability to perform. Once such notice has been given the Affected Party shall be entitled:

(i) to immediately suspend the affected obligation (whether payment or performance) until such time as the Affected Party may lawfully discharge such obligation; and/or

(ii) where the inability to discharge the obligation continues (or is reasonably expected to continue) until the end of the contractual time for discharge thereof, to a full release from the affected obligation, provided that where the relevant obligation relates to payment for goods which have already been delivered, the affected payment obligation shall remain suspended (without prejudice to the accrual of any interest on an outstanding payment amount) until such time as the Affected Party may lawfully resume payment; and/or

(iii) where the obligation affected is acceptance of the Vessel, to require the other party to nominate an alternative Vessel;

In each case without any liability whatsoever (including but not limited to any damages for breach of contract, penalties, costs, fees and expenses).

Nothing in the Agreement is intended, and nothing herein should be interpreted or construed, to induce or require either party hereto to act in any manner (including failing to take any actions in connection with the Agreement) which is inconsistent with, penalised or prohibited under any laws, regulations, decrees, ordinance, order, demand, request, rules or requirements of the United States applicable to such party which relate to international boycotts of any type, including but not limited to the Antiboycott laws and regulations of the United States as applicable.

Nothing in this section shall be taken to limit or prevent the operation, where available under the governing law of the Agreement, of any doctrine analogous to the English common law doctrine of frustration (including frustration of the adventure or purpose of the Agreement).

001527

DEAL #2

Please see below deal recap discussed between our companies and please kindly revert with your confirmation by tomorrow latest.  Thank you.

Seller:      Gulf Coast Asphalt Company, LLC

Buyer:      Chevron Products Company

Product:    AC-30 ASTM D-3381 Table II specs and also meeting Paving Asphalt meeting PG 67-22 AASHTO M-320 and ASTM 6084 for Elastic Recover

Term:       Five months October 1, 2017 through February 28, 2018

Volume:     4 cargos, each 34,000  BBLS +/-10% in sellers option.

Price:       ICE Brent front line settlement minus $0.85 USD per BBL

Pricing:     Average of all available quotations of the month of delivery.  Delivery month to be agreed and 'deemed' (eg. 30 days per the nomination process below) and that is the deemed delivery month no matter if the vessel is slightly early or slightly late.   Provisional invoice should be based  5 Days around date of delivery (two days before, day of,  and two days after) and adjusted at the end of the month in final invoice to delivery month based on monthly average of ICE  Brent front line settlement.

Delivery:    Delivered to Chevron's terminal DAP Las Minas, Panama

Nominations: Buyer and seller should mutually agree to a 5 day delivery window at least 30 calendar days in advance of desired delivery.

Payment:     Payment five days after ROI and documents

Vessel:      Iver Blessing or substitute meeting Chevron vetting/approval

Laytime:     36 hrs SHINC + 6 hrs NOR

Demurrage: As per Charter Party rate.  However, in no case will demurrage exceed $18,000 USD per day (or $750 USD per hour).

Quality & Quantity determination:   Quality per load B/L and Quantity per discharge shoretank upguage.

Law: New York Law with arbitration.

The following US Sanctions language which is typical in almost all company's GT&Cs –

Despite anything to the contrary elsewhere in the Agreement:

Seller shall not deliver [Product] that originates from a country subject to United States, European Union or United Nations' trade sanctions. Seller shall provide documentation specifying the country of origin (i.e. the country of manufacture or production) of the [Products], failing which, documentation stating such [Product] did not originate from a country subject to United States, European Union or United Nations' trade sanctions. Such documentation shall be provided before, upon or promptly following

5

loading of the [Product].

Neither party shall be obliged to perform any obligation otherwise required by the Agreement (including without limitation an obligation to (a) perform, deliver, accept, sell, purchase, pay or receive monies to, from, or through a person or entity, or (b) engage in any other acts) if this would be in violation of, inconsistent with, or expose such party to punitive measures under, any laws, regulations, decrees, ordinances, orders, demands, requests, rules or requirements of the EU, any EU member state, the United Nations or the United States applicable to the parties relating to trade sanctions, foreign trade controls, export controls, non-proliferation, anti-terrorism and similar laws (the "Trade Restrictions").

Where any performance by a party would be in violation of, inconsistent with, or expose such party to punitive measures under, the trade restrictions, such party (the "Affected Party") shall, as soon as reasonably practicable give written notice to the other party of its inability to perform. Once such notice has been given the Affected Party shall be entitled:

(i) to immediately suspend the affected obligation (whether payment or performance) until such time as the Affected Party may lawfully discharge such obligation; and/or

(ii) where the inability to discharge the obligation continues (or is reasonably expected to continue) until the end of the contractual time for discharge thereof, to a full release from the affected obligation, provided that where the relevant obligation relates to payment for goods which have already been delivered, the affected payment obligation shall remain suspended (without prejudice to the accrual of any interest on an outstanding payment amount) until such time as the Affected Party may lawfully resume payment; and/or

(iii) where the obligation affected is acceptance of the Vessel, to require the other party to nominate an alternative Vessel;

In each case without any liability whatsoever (including but not limited to any damages for breach of contract, penalties, costs, fees and expenses).

Nothing in the Agreement is intended, and nothing herein should be interpreted or construed, to induce or require either party hereto to act in any manner (including failing to take any actions in connection with the Agreement) which is inconsistent with, penalised or prohibited under any laws, regulations, decrees, ordinance, order, demand, request, rules or requirements of the United States applicable to such party which relate to international boycotts of any type, including but not limited to the Antiboycott laws and regulations of the United States as applicable.

Nothing in this section shall be taken to limit or prevent the operation, where available under the governing law of the Agreement, of any doctrine analogous to the English common law doctrine of frustration (including frustration of the adventure or purpose of the Agreement).

To verify that the signature to this message is valid and trusted, click on the authentication stamp. Its function is to assist you to ensure that the email is indeed generated by a sender from @vitol.com

IMPORTANT: This email (including all attachments) is confidential and may be privileged. It may be read, copied and used only by the intended recipients, and must not be re-transmitted in any form without our consent. If you have received it in error, please contact us immediately by return email. Please then delete it and do not disclose its contents to any other person.

Security and reliability of email is not guaranteed. Communications should be verified from a mailed or faxed copy. All emails to anyone @vitol.com are communications to the firm and are not private or confidential to any named individual.

001529

001530

1                      CAUSE NO. 2018-33445

2   VITOL, INC.,                )     IN THE DISTRICT COURT OF
          Plaintiff,            )
3                               )
    VS.                         )     HARRIS COUNTY, T E X A S
4                               )
    GULF COAST ASPHALT          )
5   COMPANY, L.L.C. AND         )
    ARTHUR J. BRASS,            )
6         Defendants.           )     157TH JUDICIAL DISTRICT

7

8         *******************************************

9              ORAL AND VIDEOTAPED DEPOSITION OF
                        ARTHUR J. BRASS
10                       June 28, 2018

11        *******************************************

12

13              ORAL AND VIDEOTAPED DEPOSITION OF ARTHUR J.

14   BRASS, taken on the 28th of June, 2018, from 10:12 a.m.

15   to 1:59 p.m., before Paula A. Lucchesi, CSR in and for

16   the State of Texas, reported by machine shorthand, taken

17   at the offices of Hall, Maines & Lugrin, Williams Tower,

18   2800 Post Oak Blvd., 64th Floor, Houston, Texas, 77056,

19   pursuant to the Texas Rules of civil procedure and the

20   provisions stated on the record or attached hereto.

21

22

23

24

25

```
 1                A P P E A R A N C E S

 2
     FOR THE PLAINTIFF:
 3
     Mr. David A. Baay
 4   EVERSHEDS SUTHERLAND (US) L.L.P.
     1001 Fannin, Suite 3700
 5   Houston, Texas 77002
     713-470-6161
 6   713-654-1301
     Davidbaay@eversheds-sutherland.com
 7

 8   FOR THE DEFENDANT:

 9   Mr. Neil E. Giles
     HALL, MAINES & LUGRIN
10   Williams Tower
     2800 Post Oak Blvd., 64th Floor
11   Houston, Texas  77056
     832-681-5416
12   Ngiles@hallmaineslugrin.com

13   Mr. Adam M. Dinnell
     SCHIFFER, HICKS & JOHNSON, P.L.L.C.
14   700 Louisiana Street, Suite 2650
     Houston, Texas  77002
15   713-255-4107
     713-357-5160 fax
16   Adinnell@shjlawfirm.com

17

     VIDEOGRAPHER:
18
     Terry Harrison
19

20

21

22

23

24

25
```

```
 1        INDEX

 2   PAGE

 3   Appearances                                    2

 4   Stipulations                                   5

 5   ARTHUR J. BRASS

 6        Direct Examination by Mr. Baay           6

 7   Changes and Signature                        140

 8   Reporter's Certificate                       142

 9
              EXHIBIT
10                                              PAGE
      NO.    DESCRIPTION                        MARKED
11

12    1      Agreed Protective Order.            54

13    2      Email to Steve Barth and Rob James
             from Jason Goldstein dated 2/9/15 with
14           attachment.                        65

15    3      Email to Eric Kuo from Arthur Brass
             dated 4/15/18.
16                                              72
      4      Email to A. J. Brass from Eric Kuo
17           dated 4/10/18 with attachment.     75

18    5      Email to Eric Kuo from Arthur Brass
             with attachment.                   85
19
      6      Affidavit of Arthur J. Brass dated
20           6/15/18.                           105

21    7      String of emails, first one being to
             Kale Krhovjak from Arthur Brass dated
22           7/13/17.                           109

23    8      String of emails, first one being to
             Arthur Brass from Tom Moran dated
24           4/4/18.                            122

25
```

001533

1   9        Email to Michael F. Chambers from
            Steve Barth dated 7/21/17.                    123
2
    10       Document entitled "Presentation to
3            Vitol Regarding GCAC/Rio Asphalt
            Business" dated May 16, 2017.                 125
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      IT IS STIPULATED and agreed by and between counsel

2   for the respective parties hereto that the deposition of

3   the witness named in the caption hereto may be taken at

4   this time and place before the officer named in the

5   caption hereto; that said deposition, or any part

6   thereof, when so taken, may be used on the trial of this

7   case with the same force and effect as if the witness

8   were present in court and testifying in person;

9      THAT the necessity for preserving objections at the

10  time of taking is waived, and that any and all legal

11  objections to the deposition, or any part thereof, may

12  be urged at the time same is sought to be offered in

13  evidence on the trial of this cause; except, however,

14  that objections to the form of the question and/or

15  responsiveness of the answer must be made at the time of

16  taking, or such objections are waived;

17     THAT the original deposition be presented to Mr.

18  Giles, who shall in turn present it to the witness for

19  examination and signing, and thereafter Mr. Giles shall

20  return same to the officer taking this deposition; that

21  if the signed original is not presented to Mr. Baay

22  prior to the time of trial, a copy may be used in lieu

23  thereof.

24

25

1           THE VIDEOGRAPHER:  Good morning.  Today is

2    June 28, 2018, the time is 10:12.

3           ARTHUR J. BRASS

4    was called as a witness by the Plaintiff, and being

5    first duly sworn, testified as follows:

6           DIRECT EXAMINATION

7    QUESTIONS BY MR. BAAY:

8        Q.  Good morning.

9        A.  Good morning.

10       Q.  Mr. Brass, my name is David Baay, and I

11   represent Vitol, Inc., you understand that?

12       A.  Yes.

13       Q.  I asked you the question before we came on the

14   record, but have you -- have you given a deposition

15   before, and you said yes?

16       A.  Yes.

17       Q.  So you understand you are under oath to tell

18   the truth?

19       A.  Yes.

20       Q.  On that question, how many times do you think

21   you have given a deposition?

22       A.  Twice, maybe three times.

23       Q.  Okay.  And was it all related to lawsuits

24   against GCAC?

25       A.  Yes.  No, no, I am sorry.  I don't know that I

1  have -- it's ever been with regards to lawsuits against

2  GCAC.

3       Q.   Tell me the context of the depos.

4       A.   There was at least one that had to do with an

5  old, old, old historical case between my father at the

6  time and Jerry Jones, the owner of the Dallas Cowboys.

7       Q.   Uh-huh.

8       A.   And then -- I am trying to remember.  I

9  can't -- I honestly can't remember what the other one

10  was.

11      Q.   Have they been recently?

12      A.   No, several years.

13      Q.   Okay.  So let me ask you this question.  Have

14  you given a deposition in a case related to a lawsuit

15  filed against GCAC or in which GCAC filed suit against

16  someone else?

17      A.   Not that I recall.

18      Q.   Okay.  You understand when I say GCAC, that's

19  Gulf Coast Asphalt Company, right?

20      A.   Yes.

21      Q.   And we are okay through the day -- you are

22  going to understand if I use that abbreviation?

23      A.   Yes.

24      Q.   On that point, if you don't understand a

25  question, ask me to rephrase it and I am happy to do

1    that.  If you answer without asking me to do that, I am
2    going to assume you understood it; is that fair?
3         A.   That's fair.
4         Q.   I am going to go through some simple kind of
5    fundamental facts to see if you and I have some
6    agreement on some areas, okay?
7         A.   Uh-huh.
8         Q.   And the first is do you agree that GCAC and
9    Vitol agreed that Vitol would finance asphalt purchases
10   from third parties and that GCAC agreed to reimburse
11   Vitol for those purchases?
12        A.   No.
13        Q.   What's your basis for disagreeing with that?
14        A.   I think that's overly -- an overly broad
15   simplification of a complicated set of transactions
16   between us and Vitol.
17        Q.   Fundamentally, through, do you agree that Vitol
18   was serving in a financing role for GCAC?
19        A.   No, not necessarily.
20        Q.   Why not?
21        A.   Again, I think that when you say financing
22   role, that has many potential implications, and I don't
23   know exactly what you mean by that.
24        Q.   Okay.  Well, you understand that the underlying
25   transactions here involve the purchase of asphalt?  You

1  agree with that?

2      A.  I think that the underlying transactions here

3  involve a partnership between us and Vitol.  And I

4  use -- partnership may not be the right word, but some

5  sort of collaborative profit sharing venture between us

6  and Vitol.

7      Q.  Okay.  But I am trying to understand the

8  fundamental transaction.  And as I understand, the

9  fundamental transaction was purchasing asphalt from

10  third parties?

11      A.  Again, the -- the relationship between us and

12  Vitol had to do with purchasing not just asphalt but

13  a -- but a number of products.

14      Q.  Okay.  What were those products?

15      A.  Asphalt, fuel oil, heavy crude.  We had -- we

16  had talked about a lot of things, but the -- by and

17  large the majority was purchasing products which were

18  ultimately turned into asphalt and sometimes fuel oil.

19      Q.  And you agree that those purchases occurred

20  roughly from July 2017 into early 2018?

21      A.  I believe that they stopped at the end of 2017.

22      Q.  Okay.  How about the start?  Did I get the

23  start right, roughly?

24      A.  Yes.  July -- the beginning of July.

25      Q.  And those purchases were paid for by Vitol; is

1    that true?

2        A.  Most of them, yes.

3        Q.  Right.  And do you agree that roughly 60

4    million dollars worth of product was purchased by Vitol,

5    or do you know that number?

6        A.  I don't know that number.

7        Q.  Okay.  You have seen it before, though, haven't

8    you?

9        A.  I don't know that I have seen 60 exactly, but

10   it -- it's not surprising to me.

11       Q.  Okay.  And on that 60 million that Vitol paid

12   for these products, GCAC agreed to reimburse Vitol,

13   true?

14       A.  No.

15       Q.  Okay.  What do you think is different from what

16   I just said?

17       A.  I think that Vitol purchased those products,

18   that Vitol and GCAC collectively sold those products,

19   and that the profits or losses from those ultimate sales

20   after all the attendant costs were to be split between

21   the parties.

22       Q.  Okay.  So you think that there is some

23   agreement where GCAC and Vitol agreed to that

24   fifty-fifty split?

25       A.  Yes.

1        Q.  But you understand there was never any written

2   agreement executed by either party?

3        A.  That there was no written agreement executed in

4   writing, as in signed, correct, not -- I don't

5   necessarily agree that there was no meeting of the minds

6   that the agreement was active, so to speak.

7        A.  Yes.  So your -- your case is you think there

8   was some informal agreement between the parties to

9   operate in the same manner as GCAC had been operating in

10  with Rio; is that true?

11       A.  I want to be clear about how I say it.  I am

12  sorry, can you say that one more time?

13       Q.  Yeah.  Your -- your view of this case is that

14  you -- that GCAC and Vitol had an agreement by which

15  they split costs 50 percent to each party and they split

16  the profits 50 percent to each party?

17       A.  Yes, collective net profits or losses.

18       Q.  All right.  But you don't dispute the fact that

19  there is no agreement that says that?

20       A.  No, I think there is an agreement that says

21  that.  I don't dispute the fact that it wasn't

22  ultimately signed, but I do believe vehemently that we

23  had an agreement, that we acted under the agreement, and

24  that that agreement was active.

25       Q.  And is your belief based upon just your

1  conversations with someone at Vitol?

2      A.  No, my belief is based on conversations with

3  Vitol, the conversations that we had with Vitol and Rio,

4  Vitol's subsequent acquisition of -- of all the

5  inventory and positions from Rio and our -- our

6  transacting under that agreement.

7      Q.  Okay.  And we will get -- get into the details

8  of that.

9      A.  Uh-huh.

10     Q.  I am just trying to understand at a high level.

11     A.  Sure.

12     Q.  The -- at some point, though, in July of 2017

13  it was very clear to you that Vitol was not going to go

14  forward under that agreement?

15     A.  No, I don't -- I don't think that is correct.

16     Q.  Do you remember saying something different in

17  your affidavit?  And I am not -- this is not a quiz.  I

18  am just seeing if you remember what you said in your

19  affidavit about that.

20     A.  I don't recall offhand.

21     Q.  At some point you did learn that Vitol was not

22  willing to move forward in a JV with GCAC, true?

23     A.  At some point, whether it was July or August, I

24  don't remember, or September, but at some point in -- in

25  that time frame I understood that Vitol was going to

 1   what I viewed as terminate their relationship that they

 2   had with GCAC.

 3       Q.  Right.  And so Vitol and GCAC's relationship

 4   continued until you went and found another partner,

 5   Mercuria, to come into your JV; is that true?  And when

 6   I say you, I mean GCAC.

 7       A.  Yes.

 8       Q.  And Mercuria stepped into that relationship in

 9   roughly January of 2018; is that right?

10       A.  Correct.

11       Q.  And it wasn't until January of 2018 that you

12   terminated your relationship with Rio Energy, right?

13       A.  Yes, I think that is correct.

14       Q.  Okay.  So help me understand how you think it

15   is that you had a JV with Vitol during the same period

16   that you had a JV with Rio Energy under the same terms

17   and conditions.

18       A.  Well, we didn't have a JV.  We had a -- we had

19   a deal with Rio with Vitol.  Vitol agreed essentially to

20   take over all the positions, and we operated under that

21   condition.  Rio had no activity -- no sensitivity to the

22   profits and losses of the business after whenever it

23   was, July whatever 2017.

24       Q.  Okay.  So under -- under your view of the

25   facts, you agree that there is some amount of money that

1    GCAC owes to Vitol that reflects the sharing of the

2    costs and the profits?

3        A.  I believe that there is a calculus that needs

4    to be done to determine what money is owed from whom to

5    whom.  I don't know that GCAC -- how much GCAC might owe

6    Vitol, if any at all.

7        Q.  Well, didn't you make that calculation before

8    you filed your suit against Vitol?

9        A.  No, we haven't done it yet.  We -- we -- we

10   know that there are damages to GCAC, but we haven't

11   calculated those yet.

12       Q.  So your petition -- have you read your petition

13   that you filed against Vitol?

14       A.  Yes, I have.

15       Q.  There is language in there that says GCAC

16   acknowledges that it owes money to Vitol, you remember

17   seeing that sentence?

18              MR. GILES:  Objection, form.

19       A.  I don't think that's what it says.

20       Q.  (By Mr. Baay)  Okay.  If that sentence is in

21   there as I stated it, you disagree with it it sounds

22   like to me?

23       A.  No, I don't necessarily disagree with it.  I

24   maybe disagree with your interpretation of what it

25   means.

1    Q.  All I am trying to ask you is is there some

2    amount of money that GCAC acknowledges that it owes to

3    Vitol?

4    A.  No.  There may be ultimately at the end of the

5    day, but that amount will be determined after we

6    determine how much money is owed from who to who, what

7    GCAC's damages are and what offsets there would

8    potentially be.

9    Q.  And you are telling me you have never done

10   those calculations?

11   A.  We have not yet done those calculations.

12   Q.  You understand that Vitol sent you an extensive

13   set of spread sheets showing the calculations by which

14   they came to the conclusion that GCAC owes Vitol more

15   than $15 million?  You have seen those, haven't you?

16   A.  There have been a number of calculations done,

17   correct, but I don't know that we agree that that -- I

18   would say we don't agree that $15 million was the right

19   calculation.  And I would say that a large portion of

20   that had to do with things that weren't substantively

21   explained, for example, the hedging and -- and I just --

22   I don't know that we ever got any real reconciliation as

23   to what the hedging was in any way that was meaningfully

24   understandable by us.

25   Q.  Okay.  My question is simply you agree that you

1  got information, namely spread sheets, that detailed a

2  lot of the accounting that supported Vitol's position in

3  this case?

4       A.   We did receive calculations from Vitol, yes.

5       Q.   And you never sent back anything to -- to --

6  any calculations to dispute those figures, did you?

7       A.   I don't know that that's correct.

8       Q.   Okay.  As you sit here, do you recall if you

9  sent anything, let's say, after April 10th of this year

10 to dispute Vitol's calculations?

11      A.   I can't remember when things were sent.  I do

12 know a bunch of numbers went back and forth, and they

13 didn't all say the same thing.  So I guess there was --

14 there were -- there were disputes as to what was owed or

15 how much -- how the calculations were, but I don't know

16 whether that was April 10th or before April 10th or

17 whatever.

18      Q.   If after you do your calculations you determine

19 that GCAC owes Vitol money under the 50 percent sharing

20 agreement, would GCAC be willing to pay that amount?

21      A.   I think that GCAC -- if there is an amount due

22 to Vitol, GCAC will pay.  The -- the substantive of how

23 much is due, we -- I think is more than just a

24 calculation of what funds went to who.  I think it's a

25 calculation of what damages GCAC sustained, what -- what

1    potential offsets there are to that.

2         I mean, I don't know what that number is, but

3    at the end of the day if there is a number due from GCAC

4    to Vitol, Vitol -- GCAC will pay it.

5         Q.  Okay.  And so why is it -- help me understand

6    why it is that you haven't made that calculation.

7         A.  We just haven't done it yet.  I don't know that

8    there is a reason.

9         Q.  Okay.  So my second question to you that's

10   related is -- and I think I know the answer to this

11   based on our discussion that we just had.  But do you

12   agree that GCAC currently owes Vitol approximately 3.8

13   million related solely to the asphalt or product

14   purchases made by Vitol?

15        A.  No, I don't agree with that -- sorry.  I don't

16   agree that GCAC necessarily owes or doesn't owe Vitol

17   any particular amount.

18        Q.  Okay.  And as I understand it, the basis for

19   your disagreement is you think you were under some

20   agreement that had terms and conditions that included a

21   50 percent sharing of profits and costs?

22             MR. GILES:  Objection, form.

23        A.  I believe that we were under an agreement.  I

24   believe that Vitol breached that agreement.  I believe

25   that there are consequences to Vitol for their breach of

1    that agreement, and I think that when we ultimately

2    determine what all those consequences are, that there

3    will be some general calculus as to overall who is

4    owed -- who owes who what money.

5         Q.  (By Mr. Baay)  Do you agree that the terms for

6    the services that were going to be provided by Vitol and

7    GCAC in this agreement were expected to last for more

8    than one year?

9         A.  Yes.

10        Q.  Do you agree that GCAC asked Vitol to engage in

11   various hedging transactions to support the physical

12   purchases made by Vitol?

13        A.  I agree that -- that hedges were put on to

14   support that.  I don't know that GCAC asked Vitol

15   particularly how to hedge it or that there were -- was a

16   meeting of the minds as to exactly how it should be

17   hedged or which hedges should be put on, but I do agree

18   that Vitol put on hedges to hedge product in this

19   portfolio.

20        Q.  So it's your testimony that you are unclear as

21   to whether instruction came from GCAC to Vitol to do

22   those transactions?

23             MR. GILES:  Objection, form

24        A.  I am sorry, ask that one more time.

25        Q.  (By Mr. Baay)  Sure.  Are you unclear as to

1  whether instruction came from GCAC to Vitol to make the

2  hedging transactions, to perform them?

3            MR. GILES:  Same objection.

4      A.  Yes, I am not sure that we gave them specific

5  instructions as to how to hedge the barrels.

6      Q.  (By Mr. Baay)  So I take it that means you

7  haven't seen emails going from employees of GCAC to

8  employees of Vitol saying "please make associated

9  hedging transactions"?  You haven't seen emails like

10 that?

11     A.  No -- I am not saying that I didn't.  I am just

12 saying I am not sure that we told them specifically how

13 to hedge it, in other words, saying "here is a barrel we

14 bought, hedge it" is one thing, but saying "here is a

15 barrel we bought, do specifically this, sell a certain

16 number of contracts or buy a certain number of

17 contracts," I don't know that we gave them that level of

18 specificity --

19     Q.  Okay.

20     A.  -- or relied on them to do what was appropriate

21 or gave them suggestions as to how they should do that

22 and let them figure out the minutiae.

23     Q.  So two steps there.  You don't dispute the fact

24 that GCAC gave instruction to Vitol to perform certain

25 hedges?

1            MR. GILES:  Objection, form.

2       A.  I don't dispute that there were discussions

3  about hedging, but I don't know that GCAC gave

4  instructions as to specifically what hedges to put on or

5  not put on.

6       Q.  (By Mr. Baay)  Yeah, I am trying to separate

7  the two.

8       A.  Okay.

9       Q.  I understand your testimony that you think

10  there may be a lack of detail, but you don't dispute the

11  fact that GCAC gave the instruction to Vitol to make

12  certain hedges?

13            MR. GILES:  Same objection.

14            MR. DINNELL:  Objection, form.

15       A.  Again -- and I am trying -- I am not trying to

16  be -- I am trying to --

17       Q.  (By Mr. Baay)  Sure.

18       A.  -- be clear about this.  So I don't -- to my

19  recollection, GCAC didn't give specific instructions.  I

20  might be wrong about that.  There may have been confirms

21  or something where hedging was discussed.  I don't

22  recall specifically at this time.

23       Q.  But you understand my -- my bigger question

24  which is kind of at a 30,000-foot level.  You don't

25  dispute the fact that there were conversations from GCAC

001550

1   going to Vitol saying "hey, put a hedge in place related

2   to this physical transaction"?

3       A.   That's possible.

4       Q.   You don't know one way or the other?

5       A.   My recollection is that GCAC told Vitol about

6   what physical trades were being put on, and then it was

7   left to Vitol to figure out exactly how to hedge that,

8   that's my recollection.  I am not saying it's not

9   possible that there is an email where someone said "hey,

10  hedge this" or "don't hedge this" or whatever.  I just

11  don't recall.

12          But that's my general recollection is that

13  we -- that -- that one of our traders would have relayed

14  to Vitol "this is what's going on in the physical"

15  and -- and expected them to do whatever needed to be

16  done in the financial.

17      Q.   So if there are specific emails from GCAC

18  employees saying "please hedge," you know, and I am

19  paraphrasing, that's not going to surprise you?

20      A.   No, it wouldn't shock me.

21      Q.   Okay.  And to that point, did you review any

22  documents getting ready for today?

23      A.   I met with my attorney and I looked at, I

24  think, our pleading in the case.

25      Q.   Uh-huh.  That's the only document?

1          A.   That's about it.  I think I looked at the --

2     the agreement between Vitol and GCAC that was in draft

3     form at some point.

4          Q.   Was that agreement a red line?

5          A.   Yes.

6          Q.   And is that the latest version that you had

7     seen?

8          A.   I believe it to be.

9          Q.   In other words, you don't think there was

10    anything developed past that red line that represented

11    the terms between the parties, do you?

12         A.   I don't recall.  As far as I know, that was --

13    I didn't compare dates or check it or anything like

14    that.  I just looked at what was in front of me.

15         Q.   Okay.  Do you think that there is an email

16    that -- you have acknowledged there is no signed

17    contract, so do you think that there is an email that --

18    that outlines the terms between Vitol and GCAC?

19         A.   Other than that document?

20         Q.   Well, you have admitted that that document was

21    never executed, so I am trying to understand --

22         A.   Correct.

23         Q.   -- how you came to the understanding of what

24    the terms were.

25         A.   Even though it wasn't executed, we agreed that

1  that document -- that the -- that the -- all the major

2  and even most of the minor commercial terms were

3  included in that document, and that when we transacted

4  and -- and -- and formed the venture, that it was being

5  done in conjunction with the terms and conditions of

6  that document.

7       Q.  Why is it that that document was never

8  executed?

9       A.  My best recollection is that the trader who was

10 handling this for Vitol who was Eric Kuo was on vacation

11 at the time, and that he just wasn't available to sign

12 it.  Maybe the red line had to be put into execution

13 form or whatever, and he was going to do it when he got

14 back.

15      Q.  Okay.  But he wasn't on vacation forever,

16 right?  At some point he came back and could have

17 executed it?

18      A.  Yes, sometime in the middle of July.

19      Q.  So then why is it that it was never executed

20 once he returned, if you know?

21      A.  I think there -- they dragged their feet for

22 some time -- I mean, not dragged their feet.  I don't

23 want to say it in a negative way.  But they were just --

24 had other stuff going on and didn't quite get it done.

25 As far as we were concerned, the transaction was done

1    and we were transacting under it.

2            I think everyone was under the -- the -- the --

3    the -- the assumption that the transaction was done, and

4    we were just waiting to kind of paper some of the deal.

5    And they had -- they had just some -- some -- things

6    weren't moving very quickly with their internal counsel

7    and he just wasn't available for some stuff, and it just

8    kind of dragged on.

9        Q.  Why is it that you were comfortable -- GCAC was

10   comfortable proceeding under an arrangement that didn't

11   have a contract supporting it?

12       A.  They told us the deal was done.

13       Q.  Okay.  That's my question.  Did they say that

14   in the email?

15       A.  We did receive -- we did receive emails from

16   them.  I can't remember whether we had one that said

17   "this deal is done," but certainly every inference and

18   every discussion said the deal is done.  I mean, they

19   would never have taken on all these positions and done

20   this deal if the deal wasn't done.  That wouldn't have

21   made any sense whatsoever.  So as far as we were

22   concerned, the deal was done.

23       Q.  Okay.  But you don't recall a specific email

24   between the parties saying "we have a deal"?

25       A.  I do recall one where -- I don't remember if it

1   was an email or a conversation, but we -- we -- I

2   believe it was an email.  We were going up to -- we had

3   done the deal, and we were going up to meet with

4   customers and we had ongoing relations -- ongoing things

5   that were going on, and we said, "hey, we want to tell

6   the market about all this, we just want to make sure you

7   are comfortable with that."  And they said "Yes, we are

8   done, go ahead."

9        Q.  Uh-huh.  I think I have seen that email, and --

10  and so my question is other than representations to the

11  wider marketplace, do you have a basis for your view

12  that there was -- there was an understanding between the

13  parties as to terms?

14       A.  Other than the -- I am sorry, ask that one more

15  time.

16       Q.  Sure.  I understand there are emails that you

17  rely upon that have representations to the broader

18  marketplace about you two beginning -- GCAC and Vitol

19  beginning a transaction.  My question is you have never

20  seen an email that has an express understanding that the

21  parties have agreed to terms on the deal?

22       A.  I can't say I haven't.  I don't recall one

23  offhand.

24       Q.  Okay.  And you don't recall any conversations

25  you might have had with anyone at Vitol that would

1  accomplish the same purpose?

2       A.   No, I disagree with that.

3       Q.   Okay.

4       A.   We expressly said "this deal is done."

5       Q.   Who did you say it to?

6       A.   Eric Kuo, Steve Barth, maybe their attorney, I

7  don't remember.  Rio certainly understood that.  I can't

8  think of who else, sorry.

9       Q.   How about conversations with Mike Loya, did you

10 have any of those where you thought you came to some

11 kind of agreement?

12      A.   I don't recall meeting with Mike at that time.

13      Q.   Do you agree that GCAC owes Vitol approximately

14 $6.2 million related to the hedging transactions we

15 discussed?

16      A.   No.

17      Q.   And do you disagree because you haven't done

18 the calculation and don't know the number?

19      A.   I disagree on -- on a couple of levels.  One, I

20 don't think we have ever seen anything that really tells

21 us what the hedging was relative to the positions they

22 may or may not have hedged, so I don't -- I just haven't

23 seen anything that I can really understand where that

24 number comes from.

25           Two, to the extent that there is a number

1  that -- that goes into this calculus for hedging, I

2  don't know that just saying GCAC owes Vitol money for

3  that is a -- is a fair statement.

4      Q.  Okay.  If -- do you agree that these -- that

5  any loss incurred on these hedging transactions would be

6  a cost shared under the agreement?

7      A.  To the extent that the hedges were put on per

8  mutual agreement and were taken off per mutual -- you

9  know, that they were done per mutual agreement and --

10  then -- then yes, I suppose they would be.

11      Q.  But you haven't done -- GCAC hasn't done an

12  accounting to understand what that number would be as it

13  relates specifically to the hedges?

14      A.  I don't think we -- I don't think we have any

15  of the information to be able to do that.

16      Q.  How is it that you don't have the information

17  if you were under a partnership with Vitol for those

18  transactions?

19      A.  We requested it, and they were either unable or

20  unwilling to send it to us.

21      Q.  When do you think that request was made?

22      A.  It was made a number of times during the course

23  of the transaction.  I think their -- the response that

24  I got was that their system was complicated and very

25  internal focused, and it was -- it was hard or

1    impossible to generate a report that showed kind of what

2    you would expect as a trader as to how your position --

3    how the financial positions were matched to the physical

4    positions.

5         Q.   Are these conversations you had with Eric Kuo?

6         A.   Yes.

7         Q.   Anyone else at Vitol that you had that

8    specific --

9         A.   Maybe Mike Ruzek.

10        Q.   Anyone else?

11        A.   Not that I can think of.

12        Q.   On the questions about the agreement, do you

13   understand that the -- or do you agree is a better

14   question -- that the red line of the joint marketing

15   agreement was a red line of the Rio/GCAC agreement?

16        A.   Say that one more time?

17        Q.   Yeah.  When the negotiations started between

18   GCAC and Vitol, the red line that was exchanged was the

19   joint marketing agreement that existed between Rio and

20   GCAC?

21        A.   I don't recall that.

22        Q.   Okay.

23        A.   I am not saying it's wrong, I just don't recall

24   that.

25        Q.   If it was, would it surprise you?

1      A.  A little bit.  But -- but to say it's a red

2  line, I mean, if it's so substantially changed that it

3  conforms to the new agreement, I guess that's possible.

4  It would have been a potential boilerplate place to

5  start, I suppose.

6      Q.  Right.  But to your earlier testimony, that

7  agreement was never put in place?

8            MR. GILES:  Objection, form.

9      A.  Back up and say that one more time.  Which

10  agreement are you talking about?

11      Q.  (By Mr. Baay)  Well, the agreement that was

12  exchanged between the parties was never executed?

13      A.  Between us and Vitol you are talking about?

14      Q.  Yes, correct.

15      A.  The -- I would not say it was not executed.  It

16  was not signed, but I believe the agreement was --

17      Q.  Is there a difference?

18      A.  Yes.  I believe that the agreement was agreed

19  to and that it was in force.

20      Q.  Right.  But the -- the physical paper was not

21  signed and finalized by the -- by GCAC and Vitol?

22      A.  It was not signed, correct.

23      Q.  Well, it was never finalized, was it?

24      A.  I don't know what you mean by finalized.  I

25  think that we had the terms of an agreement and I think

1    we were operating under that agreement.

2        Q.  Well, my question is did you ever see a final

3    draft of the agreement that was ready for your

4    execution?

5        A.  I think that the one that -- that -- somewhere

6    in all these papers is an agreement that I believe is

7    the most final of them.

8        Q.  The most final?

9        A.  Yes.  There was -- the final agreement, the

10   ultimate agreement.

11       Q.  So why is it that you didn't execute that?

12       A.  We were going to execute it when Eric got back

13   from vacation, that's all I can tell you.

14       Q.  The same question.  At some point Eric did

15   return from vacation, right?

16       A.  Yes.

17       Q.  Okay.  So why didn't you -- GCAC execute it

18   when he returned?

19       A.  It just dragged on.  It just didn't get -- it

20   just didn't get signed.  And we kept getting

21   reassurances that everything was done, that we were --

22   "we are transacting under the agreement."  I don't think

23   anyone really felt like it was -- at that point, anyway,

24   like it was that big a concern because we had done it.

25   It was already done.

1      Q.   Okay.  Help me understand that.  What was
2  already done?
3      A.   That Vitol took on the positions and we were
4  trading under the partnership.
5      Q.   You understand -- you have read the petition
6  that was filed by Vitol, haven't you?
7      A.   Yes.
8      Q.   And you understand that their position is that
9  there was never a formal agreement, but that there was
10  an informal financing arrangement that allowed GCAC to
11  bridge into their agreement with Mercuria, you
12  understand that?
13      A.   Do I understand that that's their position?
14      Q.   Yeah.
15      A.   Yes, I think so.
16      Q.   Okay.  And the basis -- if I understand, and
17  tell me if I am understanding this correctly, you
18  disagree with that position because you think there was
19  a formal agreement that lasted from July into January of
20  2018 between GCAC and Vitol?
21      A.   I believe that we entered into an agreement
22  with Vitol that we transacted under that was a
23  fifty-fifty partnership, for lack of a better
24  description, and that we did that deal.  I am not saying
25  that they didn't ultimately unilaterally exit or breach

1  that deal, but -- but we entered into that deal.

2         And on July 1st or 2nd or whatever it was that

3  we took that over, that was the deal that we were

4  operating under, and that's the deal that we did.

5         Q.  When do you think that deal was terminated?

6         A.  I don't know that it was ever terminated.  I

7  think that we -- at some point from -- between July and

8  December, maybe August or September, something like

9  that, they -- they came back and said "we can't do the

10  deal that we did due to an internal conflict."

11         And that discussion -- sort of rumblings about

12  that occurred earlier than that, maybe late July or

13  early August, when they started to say "hey, we have got

14  this conflict with" -- "with our other joint venture

15  partner, VALT, and we are not sure how to handle it, but

16  don't worry, we are going to get it worked out

17  internally."

18         Q.  So do you think that's when it terminated?

19         A.  I don't know that it ever terminated.  We just

20  never really addressed it.

21         Q.  So do you think it's still in place as we sit

22  here today?

23         A.  No.  I mean, clearly in January we did the deal

24  with Mercuria, and Vitol exited their relationship.

25  They no longer have any economic interest in the

 1   purchases and sales of the business, so clearly it

 2   terminated on January, whatever it was.

 3        Q.  You were fully aware -- you, GCAC, were fully

 4   aware of the VALT JV as -- the conflict that Vitol cited

 5   to you as the reason they couldn't continue in their

 6   relationship with GCAC, right?

 7                   MR. DINNELL:  Objection, form.

 8        A.  Say that one more time?

 9        Q.  (By Mr. Baay)  You just talked about how you

10   became aware that there was a JV between VALT and Vitol,

11   did I hear that testimony correctly?

12        A.  Correct.

13        Q.  So at the time you -- you, GCAC, were aware of

14   that fact in the summer of 2017?

15        A.  Before we did the deal did we know that VALT

16   existed as a G -- as a --

17        Q.  No, that's not my question.  Vitol explained to

18   you that the reason they couldn't proceed in a

19   relationship with GCAC was because of their relationship

20   with VALT.  You knew that, right?

21        A.  At some point, yes.

22        Q.  And you --

23        A.  But -- let me back up.  I am sorry, I didn't

24   mean to interrupt.

25        Q.  Go ahead.

1     A.  They -- they had an issue with VALT, but at
2  first what they said was "Look, we just have to work" --
3  "work it out with VALT.  Maybe we will bring them into
4  the deal, maybe we do a supply deal with them."  There
5  were a whole bunch of different concepts as to how they
6  could consummate the transaction and go forward.
7          And so we had some of those discussions with --
8  with VALT.  So I don't know that I became aware until --
9  at some point it became -- we couldn't get something
10  done with VALT, and -- and Vitol basically said "Look,
11  if we are going to be in conflict with someone, we would
12  rather be in conflict with you than with VALT, and we
13  have got to back out on the deal we made."
14     Q.  But there was an attempt made, wasn't there, to
15  put VALT and GCAC into a relationship?
16     A.  Yes, we discussed that with them.
17     Q.  And were you personally involved in those
18  discussions?
19     A.  Yes.
20     Q.  Do you have a memory as to why that
21  relationship didn't finalize?
22     A.  We just couldn't come to terms on -- VALT and
23  GCAC are in some respects competitors, and we just
24  couldn't crystalize a view as to exactly how we could
25  work together, or at least we couldn't at that time.

1      Q.  You understand, don't you, that GCAC paid Vitol

2  more than $16 million related to Vitol's purchase of

3  asphalt-related products?

4      A.  I would -- yes, I think that is correct.

5      Q.  And I am -- I am curious as to whether you

6  think that payment -- well, strike that.

7          Were those payments made by GCAC as a

8  reflection of its share in the costs of that product?

9      A.  No, I think that they were -- I think that they

10 were just payments that were made, because from time to

11 time GCAC made sales of product, and GCAC had -- sorry,

12 Vitol had purchased product, and we were just trying to

13 interim balance some of the cash flows.  That's my

14 recollection.

15     Q.  Did anyone ever reconcile that with what you

16 thought the terms of the deal were, those payments I am

17 talking about?

18     A.  No, because I don't think it was necessary to

19 look at it in terms of the overall deal or even in terms

20 of profits and losses.  I think it was just general

21 balancing of -- of -- of working capital.

22     Q.  But you would have to balance your working

23 capital -- capital according to the terms of the deal,

24 wouldn't you?

25     A.  I don't think those payments were intended to

 1   do that.  I think those payments were just interim

 2   payments.  I don't think that there is any real

 3   calculation that went behind them as far as I know.

 4        Q.  Was that your decision to make those payments?

 5        A.  Yes.

 6        Q.  And you are president of GCAC, right?  Do I

 7   have that title right?

 8        A.  Yes.  President, yes, I think that's right.

 9        Q.  How long has that been true?

10        A.  Around about 2009-ish, something like that.

11        Q.  What was your role prior to that?

12        A.  I wasn't involved with GCAC prior to that.

13        Q.  Were you involved with Trigeant?

14        A.  I was involved with Trigeant, but -- yeah,

15   until about 2007 or 2008, something like that.

16        Q.  So help me understand.  The $16 million that

17   GCAC paid Vitol was your decision to try to balance cash

18   flow?

19        A.  For working capital.

20        Q.  Okay.  And why is it that you decided that you

21   needed to make a payment to Vitol for working capital?

22        A.  Just because we had collected money, and -- and

23   it seemed like a reasonable thing to do.

24        Q.  But you didn't make those payments based on a

25   calculation that it was a sharing of profits, did you?

1    A.  No, I don't think the -- no, I don't think that

2    factored into it.

3    Q.  In fact, GCAC never made a payment to Vitol

4    that shared in the profits that GCAC made off of its

5    sales of the asphalt?

6    A.  I don't think we ever calculated what the

7    profits or losses were.

8    Q.  So you were never really acting under the terms

9    of the agreement that you think was in place?

10    A.  No, I don't think that's true.  I think that --

11    that --

12    Q.  As it relates to those payments, you were never

13    acting?

14    A.  As it relates to those payments, I don't think

15    those payments represented anything to do with profits

16    and losses or cost sharing or anything like that.

17    Q.  And it was -- to your explanation, it was an

18    attempt to balance -- to make the cash balance for

19    working capital?

20    A.  Yeah.  Not necessarily balance to zero, but

21    just to bring it more in line.

22    Q.  Why is it that you stopped making those

23    payments?  Why did GCAC stop making those payments?

24    A.  Well, I think we made them until such time as

25    we started to -- we made it through the term of the

1    agreement, and then after the agreement we started to

2    have discussions as to how to settle up and wind up

3    the -- the venture.

4         Q.   Okay.  And what happened to that?

5         A.   What happened to what?

6         Q.   The winding up of the venture.

7         A.   That's what I think we are still doing.

8         Q.   What in your mind needs to be done to wind --

9    to properly wind down the venture?

10        A.   I think that we need to calculate all the

11   profits and losses of the business, calculate

12   whatever -- whatever the costs were to GCAC, calculate

13   whatever the damages were to GCAC, and ultimately agree

14   on a -- on a number as to who owes who what.

15        Q.   But you haven't done any of that?  GCAC hasn't

16   done any of that?

17        A.   We haven't done any calculations as far as

18   damages go and as far as -- as other costs that may be

19   due to GCAC.

20        Q.   How did you have a good faith basis to file a

21   lawsuit if you had no idea if there was money coming to

22   GCAC?

23        A.   We know that there is -- that there is money

24   that's owed to GCAC.  We know GCAC was damaged.

25        Q.   Yeah, but you don't know that netted against

1   what you owe Vitol that it would result in money coming

2   to GCAC, do you?

3        A.  I don't know specifically that it would or

4   wouldn't.

5        Q.  So same question, how did you have a good faith

6   basis to file a lawsuit if you had no idea whether Vitol

7   owed you any money?

8        A.  Because we were damaged, we had damages.

9        Q.  Right, but you understand that if it's netted,

10  and your counter-party owes you no dollars, in fact you

11  owe them dollars, you have no good faith basis to pursue

12  damages?

13             MR. GILES:  Objection, form.

14             MR. DINNELL:  Objection, form.

15       A.  I don't know that that's correct and I don't

16  know that Vitol doesn't owe us money.

17       Q.  (By Mr. Baay)  Because you haven't done the

18  calculation?

19       A.  We know in generalities where we were damaged,

20  so --

21       Q.  But you understand it's a two-part calculation,

22  don't you?

23       A.  That what's a two-part calculation?

24       Q.  To understand what the final net is, you have

25  to calculate both what Vitol owes GCAC and vice-versa,

1   don't you?

2        A.   Yes, I suppose that is correct.

3        Q.   And what you are saying is you have never done

4   it -- you have never done the second half of that

5   transaction or calculation?  You have never determined

6   what you owe G -- what GCAC owes Vitol?

7        A.   You lost me a little bit there.  We -- state

8   your question one more time and I will try and answer

9   it.

10       Q.   GCAC has never done the calculation to

11  understand the sum total amount that GCAC owes to Vitol,

12  true?

13       A.   You are saying that as if it's a fait accompli

14  that GCAC does owe Vitol money, and I am not sure that's

15  correct.

16       Q.   I am simply asking the question, Mr. Brass, has

17  the calculation been done?

18       A.   The calculation of how much Vitol might owe

19  GCAC?  No, not yet.

20       Q.   No, I asked it in reverse, how much GCAC owes

21  to Vitol.

22       A.   We have -- I think I am saying the same thing

23  over and over.  We have not done the calculation to

24  figure out what GCAC's damages and costs are that would

25  then be netted against any amounts that might be owed to

1    Vitol to come up with a balance of how much GCAC might

2    be owed.

3        Q.   When do you plan to make that calculation --

4    when does GCAC plan to make that calculation?

5        A.   In short order, I would assume.

6        Q.   Is there some event that they are waiting on to

7    occur to make that calculation?

8        A.   Not that I know of.

9        Q.   If it's determined that the balance is GCAC

10   owing money to Vitol, what funds would be used to pay

11   that -- pay those damages?

12              MR. GILES:  Objection, form.

13       A.   Any -- GCAC would pay whatever money it owes

14   to -- to Vitol.

15       Q.   (By Mr. Baay)  Well, okay.  So is it your

16   testimony that GCAC has sufficient funds to cover any

17   damages that might be determined to be owing to Vitol?

18              MR. GILES:  Objection, form.  Are you

19   asking if GCAC currently has enough money to pay an

20   unknown amount of judgment?

21              MR. BAAY:  Uh-huh.

22              MR. GILES:  Okay.  I am -- you don't have

23   to answer that.

24              MR. BAAY:  On what grounds?

25              MR. GILES:  That's post judgment discovery.

1      MR. BAAY:  That's not a proper objection,
2  Neil, and you know it.  You can't instruct him not to
3  answer on those grounds.
4      MR. GILES:  What would be the basis for
5  your -- you are asking how much cash they have
6  effectively?
7      MR. BAAY:  Yeah.
8      MR. GILES:  And on what grounds would that
9  be?
10     MR. BAAY:  Because there has been no
11 payment to Vitol, so we have a right to discover whether
12 there are sufficient assets to cover a judgment.
13     MR. GILES:  No, you don't.  That's post
14 judgment discovery.
15     MR. BAAY:  I can ask the question in a
16 deposition.  The rule does not say I can't ask the
17 question in a deposition.
18     MR. GILES:  Ask the question again.
19     Q.  (By Mr. Baay)  Does GCAC -- let me ask you a
20 different question.  Does GCAC have sufficient assets to
21 cover its current debts?
22     A.  Yes.
23     Q.  And does GCAC make an accounting of -- some
24 form of public accounting of its assets and liabilities?
25     A.  Public accounting?

1      Q.   Public disclosure.

2      A.   No.

3      Q.   And you don't have to because you are a private

4  company, right?  You are an L.L.C.?

5      A.   Correct.

6      Q.   But there is obviously an internal accounting

7  that's done to prepare a balance sheet, true?

8      A.   Yes.

9      Q.   And the current balance sheet for GCAC shows

10  that it has sufficient assets to cover all of its

11  existing liabilities?

12      A.   Correct.

13      Q.   When was GCAC formed, if you know?

14      A.   In the early to mid '90's.

15      Q.   And was that done by your dad?

16      A.   Yes.

17      Q.   And how would you describe the purpose -- or

18  business purpose of GCAC at that time?

19      A.   You are asking me -- that's a long time ago.

20      Q.   Well, has it changed?

21      A.   So GCAC -- I can't remember all the -- the

22  details of how GCAC was formed and what -- I mean, it

23  was a long time ago, and I remember -- but basically

24  GCAC for most of its time has owned a terminal in

25  Mobile, Alabama.

1        Q.  When was that purchased, do you know?

2        A.  Like I said, early to mid '90's, somewhere in

3   there.  I just don't recall exactly.

4        Q.  Does it still own that terminal?

5        A.  No.

6        Q.  When was it sold?

7        A.  2012, 13.

8        Q.  For what price, do you know?

9        A.  I don't recall the exact price.

10       Q.  Ballpark?

11       A.  It was a good chunk of money.  I don't recall

12  what the number was.  It was a good chunk of money.  60

13  million or something like that ish.  Maybe that's high.

14       Q.  And who was the sale to?

15       A.  Arc Logistics.  And I want to clarify.  Like

16  that number, I am not sure that's right.

17       Q.  The terminal was a -- is it correct to say it

18  was an asphalt storage terminal?

19       A.  More than asphalt.  It was a multi-products

20  terminal.

21       Q.  Other products?

22       A.  Yes.

23       Q.  Heavy -- heavy products?

24       A.  Inlay.

25       Q.  Okay.  What was the, you know, total capability

1  storage wise?

2      A.  You mean total tankage?

3      Q.  Uh-huh.

4      A.  Around a million and a half barrels.

5      Q.  After GCAC sold the Mobile terminal, what other

6  assets did it have post 2012?

7      A.  It owned an interest in -- it owned stock in

8  Arc Logistics and the trading business.

9      Q.  Is -- are those two things still true today?

10  Are those their primary assets?

11      A.  It has sold its interest in Arc.

12          MR. GILES:  And let me state for the record

13  that to the extent you are asking about the specific

14  assets or liabilities of GCAC, we will designate that as

15  confidential.

16      Q.  (By Mr. Baay)  What did Arc Logistics do?

17      A.  It was an MLP, public master limited

18  partnership.

19      Q.  And that's the same company that bought the

20  terminals in Mobile?

21      A.  Yes, or affiliate or -- I don't know the

22  corporate structure, but I believe so.

23      Q.  Who are the members of GCAC?

24      A.  Trifinery, Inc. and -- and -- wait, members.  I

25  can tell you the owners.  I don't know what members

1  means specifically, but owners -- Trifinery, Inc. and

2  Joyce Brass.

3       Q.   Is that your mom?

4       A.   Yes.

5       Q.   What's the percentage between the two?

6       A.   Fifty-fifty.

7       Q.   And does Trifinery still exist?

8       A.   Yes.

9       Q.   What's its purpose?

10      A.   It's a holding company.

11      Q.   And who are the -- who are the officers of that

12  company?

13      A.   I believe it's just me.

14      Q.   You are president?

15      A.   Yes, or CEO or whatever it is.

16      Q.   No other officers?

17      A.   I don't recall.

18      Q.   Any other owners of GCAC?

19      A.   No.

20      Q.   How about subs of GCAC?

21      A.   There is one sub called Gulf Coast Crude

22  Gathering and Marketing.  I think I got that name right.

23      Q.   What does it do?

24      A.   Right now nothing.  It's inactive.

25      Q.   It doesn't have any employees?

1       A.  No.

2       Q.  What did it do?

3       A.  It was a crude oil trading venture.

4       Q.  Who were the officers there?

5       A.  I don't recall.  Maybe me.

6       Q.  Was it an L.L.C.?

7       A.  I don't recall.

8       Q.  Did it ever hold any assets?

9       A.  No, not really.  Nothing substantive.

10      Q.  So the only current asset of GCAC, if I

11  understood you correctly, is its trading business?

12      A.  Its trading business or whatever other cash and

13  receivables and stuff that it has.

14      Q.  What was the total revenue for GCAC in 2017?

15      A.  I don't recall offhand.

16      Q.  Ballpark?

17      A.  I don't know.  I don't know how we calculated

18  that.

19      Q.  Well, you are the President of GCAC.  You don't

20  know that number?

21      A.  I just haven't looked at it.

22      Q.  When is the last time you did look at it?

23      A.  I don't recall, I just don't recall.

24      Q.  Who does know that number?

25      A.  It would be in our books and records.

1    Q.  What person -- who is in charge of those books
2  and records that knows that number?
3              THE COURT REPORTER:  Can you spell that?
4              THE WITNESS:  Maybe.  I will give it a
5  shot. T-o-m-a-s-z-e-w-s-k-i.
6              THE COURT REPORTER:  Thank you.
7              THE WITNESS:  Did I get it right?
8              THE COURT REPORTER:  T-o-m-a-s-z-e-w-s-k-i.
9              THE WITNESS:  Sounds right.
10             MR. BAAY:  You nailed it.
11    Q.  (By Mr. Baay)  Is he your CFO?
12    A.  Yes.
13    Q.  Does he office here in Houston?
14    A.  No.
15    Q.  In Florida?
16    A.  He is between Florida and New York, and he
17  comes occasionally to Houston.
18    Q.  Who are the other officers of GCAC?
19    A.  It's myself, John, and I believe Joe Maddingly
20  may be an officer.
21    Q.  What's his title, do you know?
22    A.  It's V.P. something.  But I am not sure if Joe
23  is or isn't.  I would have to double check.
24    Q.  Is it correct to say that the only current
25  revenue for GCAC is whatever it is earning in its

1  partnership with Mercuria?

2       A.   Or whatever other trades it does.   Its revenue

3  is from its trading business.

4       Q.   Okay.   And those trades, are they focused

5  exclusively with product coming into the facility in

6  Corpus Christi?

7       A.   No.

8       Q.   Where else?

9       A.   Corpus Christi, Mobile, Alabama and New

10  Orleans.

11       Q.   And I take it that the terminals in Mobile and

12  New Orleans GCAC doesn't own?

13       A.   GCAC does not own any of the terminals.

14       Q.   In any of those locations?

15       A.   Correct.

16       Q.   As part of the operating costs, you pay some

17  fee to each of the owners of those terminals?

18       A.   Correct.

19       Q.   And is it true that the sharing of the cost

20  from Mercuria only exists in the -- at the Corpus and

21  the Mobile facility?

22       A.   No.

23       Q.   Okay.   What's the answer to that question?

24       A.   No.

25       Q.   How does -- what costs do Mercuria and GCAC

1   share?

2            MR. GILES:  Let me just say also that that

3   is subject to confidentiality in their agreement, and so

4   we are going to designate any information about the

5   transaction involving Mercuria as confidential and

6   attorney eyes only --

7            MR. BAAY:  Understood.

8            MR. GILES:  -- because they are a

9   competitor.

10            MR. BAAY:  Understood.

11       A.  I am sorry, please ask that again?

12       Q.  (By Mr. Baay)  What is the basis of the costs

13   that you -- that GCAC and Mercuria share?

14       A.  Whatever the costs are of the -- of the

15   business --

16       Q.  Okay.

17       A.  -- terminal fees and whatnot.

18       Q.  So there is -- there is no restriction on that?

19   It's all of GCAC's business is my point?

20       A.  Not necessarily.  It's -- it's -- the deal with

21   Mercuria has to do specifically with asphalt and fuel

22   oil.  To the extent that -- to the extent that GCAC were

23   to do something else, it could do that outside of

24   Mercuria.  I am not saying it would or should or has,

25   but it -- there are other products it could do that

1  would be outside of the relationship with Mercuria

2  potentially.

3      Q.  Is the primary focus of that business to

4  receive product and then sell it out to trucks for sale

5  to -- to third parties?

6      A.  Not just trucks but -- but wholesale asphalt as

7  well.  Primarily wholesale asphalt, barges and ships.

8      Q.  All right.  So trucks, barges and ships?

9      A.  Railcars.

10     Q.  And -- and you are receiving the product in the

11 terminal and selling it for a profit to third parties,

12 true?

13     A.  Correct.

14     Q.  That's the -- that's the core focus of GCAC

15 right now?

16     A.  Yes.

17     Q.  And that's a business that's currently making

18 money or losing money?

19     A.  Making money.

20     Q.  Okay.  And do you get like a monthly accounting

21 of whether that remains true?

22     A.  Either monthly or quarterly.

23     Q.  And how is that information provided to you?

24     A.  By email.

25     Q.  Who sends it?

1     A.  Mercuria.

2     Q.  Okay.  How about anyone internally at GCAC, are

3 they making those same calculations?

4           MR. GILES:  Objection, form.

5     A.  We check their numbers, is that a fair way of

6 saying it?

7     Q.  (By Mr. Baay)  Is John checking those numbers?

8     A.  No.

9     Q.  Who is?

10    A.  Either myself or -- really myself and Patrick

11 Perugini.

12          THE COURT REPORTER:  Perugini?

13          THE WITNESS:  P-e-r-u-g-i-n-i.  I think

14 that's right, yeah.

15    A.  So it's Patrick's job to make sure -- or to

16 keep track of the accounting with the Mercuria

17 relationship.  He and I do it together.

18    Q.  (By Mr. Baay)  And I think I heard you say you

19 look at those numbers monthly?

20    A.  Or even daily.

21    Q.  Okay.

22    A.  They send like a snapshot each day, and then we

23 get more consolidated information monthly, and a full

24 reconciliation, things like that.

25    Q.  Is it true that the Mercuria/GCAC relationship

1  has been profitable since its inception?

2      A.  Yes, it is.

3      Q.  Okay.

4      A.  And I am not saying there might not have been a

5  day somewhere in there that it showed negative, but then

6  it came back just -- but in general it's been

7  profitable.

8      Q.  So on balance for the year it's been

9  profitable?

10     A.  Yes.

11     Q.  Do you know a ballpark of how profitable?

12     A.  To date, 4 or 5 million dollars-ish.

13     Q.  So let me understand that.  GCAC is to the good

14  4 to 5 million dollars based on that relationship?

15     A.  The bulk is to the good 4 or 5 million dollars.

16     Q.  And is that -- is that a number that needs --

17  that's going to be split with Mercuria or that's GCAC's

18  take of the relationship?

19     A.  No, ultimately it will be split with Mercuria.

20     Q.  Okay.  When does that accounting happen?

21     A.  Quarterly and then annually.

22     Q.  So you have already had an accounting, a kind

23  of true-up, so to speak, with Mercuria this year?

24     A.  It's not really a true-up.  We get like interim

25  payments and then a final payment at the end of the

1    year, but we have had one quarterly payment from

2    Mercuria.

3         Q.  In what amount?

4         A.  Around 300-ish thousand dollars, something like

5    that.

6         Q.  300,000?

7         A.  Yeah, something like that.  Maybe a little

8    more, maybe a little less.

9         Q.  Is the split fifty-fifty?

10        A.  No, it's not.

11        Q.  What is it?

12        A.  It is 40 percent GCAC, 60 percent Mercuria.

13        Q.  And that's in the express terms of the

14   agreement, right?

15        A.  Yes.

16        Q.  I have got lots more questions, but we have

17   gone an hour, and so --

18                  MR. GILES:  Let's take a break.

19                  THE VIDEOGRAPHER:  Off the record at 11:10.

20                  (Recess taken.)

21                  THE VIDEOGRAPHER:  On the record, the time

22   is 11:26.

23                  (Brass Exhibit No. 1 was marked.)

24                  MR. GILES:  Before -- before we proceed

25   further, we want to put on the record that what we have

1    marked as Exhibit Brass 1 which is titled "Agreed

2    Protective Order," that the parties will be submitting

3    this or a very close proximity to this to the court for

4    signature, and pending final entry of a confidentiality

5    or protective order in this case, that the parties are

6    agreeing and stipulating for the purposes of depositions

7    and discovery until such time as there is an order in

8    place, that we will be acting under this document.

9                    MR. BAAY:  Agreed.

10                   MR. DINNELL:  Agreed on behalf of Mr.

11   Brass.

12                   MR. GILES:  Sorry.  We can go ahead and

13   proceed.

14        Q.  (By Mr. Baay)  You understand you are still

15   under oath?

16        A.  Yes.

17        Q.  And I meant to tell you at the start, but if

18   you need to take a break at any time, let me know.

19   Don't wait for me to say so.  A few more questions about

20   the companies related to GCAC.  A.G. Bullitt, L.L.C.?

21        A.  Oh, yes.

22        Q.  What is that?

23        A.  It's a small -- it's basically a single purpose

24   entity that owns a Sprinter van.  It's a van.

25        Q.  Do you still own that van -- does A.G. still

```
 1   own the van?
 2         A.   Yes.
 3         Q.   Is there any other purpose for A.G. Bullitt?
 4         A.   No.
 5         Q.   Are you the only member?
 6         A.   Of GCAC?
 7         Q.   No, no, of -- it's an L.L.C.  A.G. Bullitt is
 8   an L.L.C.
 9         A.   A.G. Bullitt, I believe, is owned 50 -- I think
10   it's owned 50 percent by us and 50 percent by another
11   entity that's a -- our partner in the Sprinter van.
12         Q.   When you say us, GCAC?
13         A.   GCAC.
14         Q.   You don't know the other entity?
15         A.   I can't remember the name of the entity.  It's
16   -- OTC Global Holdings is the ultimate --
17         Q.   Is this used for personal purposes or -- or for
18   business?
19         A.   Both.
20         Q.   Where does it sit, at GCAC?
21         A.   Yes.
22         Q.   We talked about Gulf Coast Crude Gathering and
23   Marketing?
24         A.   Uh-huh.
25         Q.   Does it currently have any employees?
```

1      A.  No.

2      Q.  At one time it did what?

3      A.  Bought and sold Texas crude.

4      Q.  Permian, Eagleford?

5      A.  Eagle -- I don't remember.  Mostly Eagleford, I

6  think.

7      Q.  Is there -- are there plans to re-ignite that

8  company --

9      A.  No.

10      Q.  -- for lack of a better term?

11      A.  No.

12      Q.  Is there a reason it hasn't been wound down?

13      A.  No, I don't think so.

14      Q.  Trifinery is just a holding company?

15      A.  Correct.

16      Q.  You are the only officer or director?

17      A.  I believe so, yeah.

18      Q.  Is there -- is there an owner of Trifinery,

19  Inc., or is it the ultimate parent?

20      A.  No, it's -- no other corporate structure.

21      Q.  Has Trifinery ever done anything other than be

22  a holding company?

23      A.  No, I don't think so, not to my recollection.

24      Q.  How about Petcore Services, Inc.?

25      A.  I don't even remember what those -- those were

1    like from my father's years.

2         Q.  They are not active any longer?

3         A.  No.

4         Q.  Tripetro?

5         A.  No.

6         Q.  Not active you are saying?

7         A.  No.  They may own some old royalty interests or

8    something like that.

9         Q.  Are they connected to GCAC?

10        A.  No, not that I am aware of.

11        Q.  Who are the officers in these companies, do you

12   know?

13        A.  I don't know.

14        Q.  Is your mom an officer in any of these

15   companies?

16        A.  I don't know.  I don't think so.

17        Q.  Are you?

18        A.  I don't think so.

19        Q.  Who would know?

20        A.  I can probably ask John, but I am pretty sure I

21   am not.

22        Q.  So John would know officers and directors of

23   all these entities?

24        A.  Of those entities, yes.

25        Q.  Well, of any GCAC-related entities.

1      A.   Yeah, but I don't -- those aren't really -- as

2   far as I know, those are not GCAC-related entities.

3   They were companies of my dad's.  I don't know that I

4   have ever had any involvement with them.  Maybe back in

5   the old Trifinery days.

6      Q.   Petroserv Services, Inc.?

7      A.   The same.

8      Q.   Your dad's entity?

9      A.   Or part of a structure of entities that he had

10  at one point.

11     Q.   That you don't think is active any longer?

12     A.   Correct, I don't believe so.

13     Q.   SBG Solar, Inc.?

14     A.   I don't think I have ever heard of that one.

15     Q.   Bitumen Marine 2?

16     A.   Uh-uh.

17     Q.   Never heard of it?

18     A.   No, not that I recall.

19     Q.   Are there any other affiliated entities with

20  GCAC?

21     A.   GCAC?  No, that's all I can recall.

22     Q.   At one time it's true, isn't it, that GCAC held

23  ownership in Gravity Midstream?

24     A.   No.

25     Q.   Okay.  Tell me, did you -- tell me the

1    relationship that Gravity and GCAC had, if any.

2        A.   There really wasn't one but that I had a -- I

3    ran GCAC and I was also the -- at one point a limited

4    partner in and the president of Gravity Midstream, but

5    there was no cross ownership or anything like that.

6        Q.   Okay.  And were you the president of Trigeant?

7        A.   I can't remember what my title was, chief

8    commercial officer, president.  I was one of the -- I

9    believe I was an officer of the company and I was in the

10   management of the company.

11       Q.   Okay.  And it became Gravity Midstream?

12       A.   No.

13       Q.   What happened to Trigeant?

14       A.   I sold my interest in Trigeant in 2007 or 8,

15   and then I don't really know.  I don't know what its

16   status is today.

17       Q.   Sold to who?

18       A.   I sold it to my partners in that who were

19   members of the Sergeant family.

20       Q.   For how much, do you know?

21       A.   I believe that the -- we are going back a long

22   time.  I believe the net -- sorry, not the net.  I

23   believe the gross valuation was somewhere around $70

24   million.

25       Q.   That was the value of your share that they

1   purchased?

2        A.  No, that was the value of the company.  And

3   then I owned, I think, 25 percent of it, but then there

4   was some debt and other obligations.  I don't remember

5   what the net number was, if you are even asking that.

6        Q.  Yes, I am.

7        A.  I don't remember what the net number was.

8        Q.  Do you have a memory that your conversations --

9   and when I say you, GCAC -- GCAC's conversations started

10  with Vitol back in 2015?

11               MR. GILES:  Objection, form

12       A.  Did we have conversations with them back then?

13       Q.  (By Mr. Baay)  Yes, I am asking if you

14  remember.

15       A.  Wait, you are going to have to be -- I am

16  sorry, you are going to have to be more clear.  As GCAC,

17  you are saying did we have conversations about some sort

18  of joint venture in 2015?

19       A.  I am just saying did you have any kind of

20  relationship with Vitol in 2015?

21       A.  I knew some of the guys over there, and we

22  had -- I think Gravity was talking to them about some

23  stuff back then.  Would it have been 2015?  It might

24  have been 2015.

25       Q.  Who did you know there at Vitol?

1        A.   Commercially Steve Barth.  Who else was

2   involved?  Eric.  I knew Mike Loya but never

3   commercially.

4        Q.   Uh-huh.  Was he also YEO?  Is that how you knew

5   him?

6        A.   YPO?  No, no.

7        Q.   YPO?

8        A.   No, I just know him really through his brother.

9        Q.   Okay.  Who is head of OTC?

10       A.   Yes.

11       Q.   Do you have --

12       A.   Just socially.

13       Q.   Got it.  Do you have a specific recall of any

14   conversations you had with any of those people you just

15   named at Vitol in 2015?

16       A.   Not specifically.  I know that as Gravity

17   Midstream, we were talking to them a number of things --

18   we were talking about -- to them about a number of

19   things --

20       Q.   Uh-huh.

21       A.   -- but I don't remember specifically what those

22   conversations were.

23       Q.   Help me understand why it was that GCAC was

24   looking to have a partner in its operations, asphalt

25   operations.

1      A.  Well, we had the partnership with Rio.  At some

2  point during that partnership with Rio they decided that

3  it really wasn't for them, that it was a little too

4  volatile and they were going in a different direction.

5  And so they asked us if -- you know, just -- that it was

6  a way to try and arrange sort of a graceful exit for

7  them.

8          So one of the people we were talking to was

9  Vitol, and we were also talking at that time about

10  potentially being involved in the -- in the acquisition

11  from Gravity, coincidentally, which I was no longer

12  involved with, the -- potentially acquiring the asphalt

13  refinery in Corpus Christi, and that ultimately evolved

14  into a suggestion, I think by them, that -- that maybe

15  we partner on this asphalt business.

16      Q.  Suggestion by Vitol?

17      A.  I believe so.

18      Q.  But if I am understanding you correctly, the

19  initial impetus for finding a new partner was because

20  Rio expressed a desire to exit the JMA?

21      A.  I think that's right.

22      Q.  The asphalt refinery was owned by Gravity, am I

23  understanding that correctly?

24      A.  At that time, correct.

25      Q.  And who is it currently owned by, do you know?

1          A.   Pin Oak Corpus Christi.

2          Q.   And did that purchase and sale happen in 2017?

3          A.   16 or 17.  It must be 7 -- no, it had to be 17,

4     that's right.

5          Q.   If there is email traffic showing that Vitol

6     and -- well, let me back up.  My first question was why

7     did GCAC ever seek out a partner?  In other words, what

8     led you to enter this agreement with Rio in the first

9     place?

10          A.   I think we were looking for a partner -- at

11     that time I was really mostly full-time involved in

12     operating Gravity Midstream.  We had GCAC.  Patrick

13     Perugini was at Rio, and I thought it was a good fit

14     to -- we had started doing something -- I can't remember

15     what the initial business we started doing with Patrick

16     was, but we started doing business with them, and it

17     just evolved into a good fit.

18               They wanted to -- to take on a lease at

19     Gravity, and they were uncomfortable doing that unless

20     they had someone to help with the asphalt -- marketing

21     the asphalt business and -- I don't know what other

22     details there are to it, but it just was sort of a good

23     fit and we entered into that business together.

24               (Brass Exhibit No. 2 was marked.)

25          Q.   I am going to hand you what we have marked as

1 Brass 2.

2            MR. BAAY:  I am sorry guys, you have to

3 share.

4       Q.  I will just ask you to look at it a minute and

5 see if you have ever seen this document before.  It's a

6 February 9, 2015 email from Jason Goldstein.

7       A.  I don't recall it, but I am not saying I

8 haven't seen it.

9       Q.  Yeah.  So Jason Goldstein was an employee of

10 GCAC at the time; is that right?

11       A.  Yes.

12       Q.  And what role was he in?

13       A.  Business development, finance, kind of

14 documents, that sort of thing.

15       Q.  Did he come from a hedge fund or some kind of

16 fund to come work at GCAC?

17       A.  No.  He had an investment banking background,

18 and we used him -- I can't remember what year it was,

19 but we used him sort of on a part-time basis, and then

20 he became a full-time employee.

21       Q.  Is he still a full-time employee?

22       A.  Yes.

23       Q.  And what is his -- is his current role still

24 business development?

25       A.  Yeah, business development, sort of financial

1  markets, that sort of stuff, investment banking type

2  stuff.

3      Q.  Right.  And it looks like that's the subject of

4  this email.  I see you reached out to Steve Barth and

5  Rob James who you know to be Vitol employees?

6      A.  Yes.

7      Q.  And --

8      A.  Rob is not any more.

9      Q.  Right.  But at the time in 2015 he was?

10     A.  Yes.

11     Q.  And this looks like an opportunity -- they call

12  it the asphalt opportunity in the attachment, do you see

13  that?

14     A.  Yes.

15     Q.  It was tied to Gravity Midstream, right?

16     A.  Yes.  So I guess G -- Gravity must have

17  purchased or been contemplating the purchase of the

18  facility then.  I can't remember what year they closed

19  down the acquisition.

20     Q.  Okay.  Did -- help me remember, but did

21  Trigeant own it at the time?

22     A.  At this time?

23     Q.  Yes.

24     A.  I don't remember -- 2015, I can't -- it's on

25  the bubble.  I can't remember whether Trigeant owned it

1  or Gravity had acquired it.

2      Q.  But Trigeant sold it to Gravity?

3      A.  Yes.

4      Q.  Okay.

5      A.  Trigeant, yes -- I am sorry.  I will make this

6  slightly a little more complicated.  So Trigeant -- the

7  refinery ultimately came to be owned by a company called

8  BTB which was a Sergeant affiliate.  I don't really know

9  who owned what.

10        Ultimately the whole thing ended up in

11  bankruptcy, and then -- and then whoever sold it I am

12  not sure, but -- but Gravity ended up acquiring it

13  through the bankruptcy proceeding.

14      Q.  Understood.  It's been the subject of a lot of

15  litigation, is that your memory, between BTB and

16  Gravity, not between you?

17      A.  No, not Gravity.  BTB and -- and other Sergeant

18  entities and Trigeant and all that, yes.

19      Q.  Okay.

20      A.  But that didn't have anything to do with us.

21      Q.  So Jason says in his email, "As discussed

22  Friday, the attached document is intended to outline at

23  a high level the opportunities we see around heavy oil

24  at the Trigeant facility."

25      A.  Uh-huh.

1    Q.  And obviously we are talking about what became

2  the Gravity facility?

3    A.  Correct.

4    Q.  And so does this bring back any memories as to

5  what this opportunity was that was proposed to Vitol in

6  2015?

7    A.  Yes.  Just looking, I mean, we had a lot of

8  conversations, and I guess this was us reaching out to

9  Vitol to say "hey, should we process it together or

10  somehow process heavy crudes and make asphalt at the

11  facility in Corpus Christi."

12    Q.  And if you look at the bottom sentence of that

13  first page of the attachment it says, "GCAC would want

14  Vitol" --

15    A.  I am sorry, where are you?

16    Q.  The bottom sentence there at the page you are

17  looking at.  "GCAC would want Vitol to provide working

18  capital and credit support for the terminalling

19  commitment, and GCAC could run operations and split

20  profits with Vitol," do you see that sentence?

21    A.  Uh-huh.

22    Q.  Yes?  You need to say yes or no.

23    A.  Yes.  I am sorry, yes.

24    Q.  Is that consistent with what the ask of Vitol

25  was at the time?  Is that consistent with your memory of

 1   what the ask was?

 2        A.   Yeah.   Just to be clear, my -- my vague

 3   recollection is this was more of just kind of like a

 4   high level talking points type thing.   I don't know that

 5   we were specifically -- maybe we were specifically

 6   proposing a deal, but -- I don't know how detailed it

 7   was, but yes.

 8        Q.   If we flip back to the first page of the email,

 9   Jason says, "We are happy to have a call or a meeting

10   with Eric Kuo."   He is the trader at Vitol that you

11   ultimately dealt with; is that true?

12        A.   Correct.

13        Q.   He says, "who we have met in the past and A.J.

14   believes understands this opportunity set well, if you

15   think that makes sense."   How did you have a -- a

16   familiarity with Eric and his skills, so to speak?

17        A.   I don't remember.   I don't think we did any

18   business with him.   Maybe I just met him around the

19   ways, but he was the fuel trader at -- at Vitol.

20        Q.   And the discussions that were started by this

21   email ultimately did not come to any kind of partnership

22   between GCAC and Vitol; is that true?

23        A.   Not at that time, no, correct.

24        Q.   Do you think that this is a -- is it fair to

25   say that this is the beginning of what ultimately became

1    the relationship between Vitol and GCAC in 2017?

2         A.   No, I think they were kind of two separate

3    things.

4         Q.   Okay.  How so?  Why so?

5         A.   Well, I don't know that it was, but maybe that

6    planted the seed that ultimately became the partnership.

7    I don't know.  It's hard to say.  But this was -- this

8    was, I believe, a refining type project that was

9    proposed.  Did we have conversations before this about

10   doing stuff?

11          I mean, we did stuff back -- with Vitol back in

12   2008-ish when there were other traders there like

13   processing.  We did a similar processing deal at a

14   refinery in -- in Louisiana.  I mean, we had done things

15   sporadically throughout the years.

16          So was this the beginning, was 2008 the

17   beginning, I don't know.

18        Q.   Yeah, but my question is more -- and you have

19   answered it -- the discussions in 2015 were for a deal

20   that was different than what the deal looked like in

21   2017?

22        A.   Yes.

23        Q.   And your memory is that nothing -- no formal

24   relationship was -- was the result of the discussions

25   that happened in 2015?  Better said, no -- no

 1   partnership formed in 2015, to your knowledge --

 2        A.   No, not to my knowledge.

 3        Q.   -- between GCAC and Vitol?

 4        A.   Correct.

 5        Q.   Okay.  And if you look at the timeline, it's

 6   January of 2016 when you enter into your joint marketing

 7   agreement with Rio Energy; is that true?

 8        A.   Yes.

 9        Q.   And your memory is that soon after you entered

10   that agreement with Rio, Rio was asking for a way out?

11             MR. GILES:  Objection, form.

12        A.   I don't know how you define soon.  I mean, it

13   was some -- sometime after we entered into it, you know,

14   six months, a year, whatever.

15        Q.   (By Mr. Baay)  Right.  It wasn't a long time

16   before you started having discussions that you needed to

17   go find a new partner; is that fair?

18        A.   Yeah, I mean, in the context of that.  I mean,

19   it was -- it was not like seven days later.

20        Q.   Right.

21        A.   It was at some point after that, yes.  It may

22   have been many months, I just don't recall.  Are we done

23   with this one?

24        Q.   Yes.

25             (Brass Exhibit No. 3 was marked.)

1      Q.   I am going to hand you what I have marked as

2   Brass 3.

3      A.   Uh-huh.

4      Q.   Have you seen this email before, Mr. Brass?

5      A.   Yes.

6      Q.   And it's an email you sent to Eric Kuo on April

7   13h of this -- of 2018; is that right?

8      A.   Yes.

9      Q.   And is it fair to say that the purpose of this

10  was to try to -- to settle the amounts in dispute

11  between Vitol and GCAC?

12     A.   Yes.

13     Q.   And if we skip down to that second section, you

14  say that "GCAC proposes to settle by paying Vitol a sum

15  of money of 14.9 million, equal to the true-up figure

16  that Vitol has proposed to GCAC;" is that right?

17     A.   That's what it says, yes.

18     Q.   Is it fair to say that at the time you made

19  this offer, you had done some internal calculation

20  sufficient to allow you to make that offer?

21     A.   I would say that we recognized that that's what

22  Vitol had proposed, that that was a number that they had

23  come up with, and probably some of that number had input

24  from us.

25     Q.   Okay.  So is the answer that you had done a

1  calculation to understand that number?

2       A.  Not necessarily to understand that particular

3  number.  I think that particular number came from Vitol.

4       Q.  Okay.  But it's true that as of April 13th,

5  2018, you were proposing to pay that -- the 14.9

6  million.  And if I -- if you read the rest of the email,

7  it looks like you were proposing to pay it over three

8  years; is that right?

9       A.  That was the proposal, yes.

10      Q.  Is there -- do you have a memory of receiving

11  something that caused you to reconsider the offer of

12  that number, in other words, did you later make a

13  calculation that you decided that this number was not a

14  good offer to number -- good number to offer?

15      A.  Well, we knew, and I think we said in here,

16  that that number was higher than what we owed.  What I

17  think this said was "Look, in consideration of

18  everything, to the extent that you will agree to these

19  terms," which they didn't, "that we would be willing to

20  pay you this amount, even though it's not the right

21  amount, over a period of time."

22      Q.  Okay.  And was the -- was GCAC's justification

23  for this number a calculation made under the terms of

24  the agreement that you think existed between GCAC and

25  Vitol?

1        A.   No, this was a --

2             MR. GILES:  Objection, form.  Go ahead.

3        A.   This was a number that Vitol came up with, not

4   GCAC.

5        Q.   (By Mr. Baay)  Then why is it that you were

6   willing to accept Vitol's number at that time?

7        A.   I think we were trying to -- to get along to

8   propose some framework under which we would be able

9   to -- that we would pay them and -- and continue to have

10  some sort of business relationship.  I think we also

11  recognized that there were other deals that we were

12  working on with Vitol, and that those could have

13  substantially offset the 14.9 million, so maybe it

14  wouldn't have been that much.  I mean --

15       Q.   What were those other deals?

16       A.   We were working on a -- on a Canadian crude by

17  rail deal down to -- to buy crude in Canada and bring it

18  down to the gulf coast or the west coast.

19       Q.   Is that still a deal that's in discussion?

20       A.   Not with Vitol.

21       Q.   Okay.  Are there any deals that are in

22  discussion with Vitol, between GCAC and Vitol?

23       A.   Not currently.

24       Q.   I saw an email where you did your own -- or you

25  sent a spread sheet that did a calculation -- a rough

1  calculation of the amounts owing between the two

2  entities.  Do you remember making that -- or sending

3  that email?

4       A.  Not particularly, not specifically.

5       Q.  I asked that question to ask this one.  Do you

6  remember any time after April 10th looking at the

7  numbers to understand the difference in amounts between

8  GCAC and Vitol?

9       A.  Sorry, ask that again?

10      Q.  Yeah.  Do you remember ever making -- you, Mr.

11 Brass, making a calculation that helped you understand

12 what might be due and owing between the two companies,

13 GCAC and Vitol?

14      A.  I don't recall making that calculation.  I am

15 not saying I didn't, but I don't recall it.

16                 (Brass Exhibit No. 4 was marked.)

17      Q.  I am going to hand you what I have marked as

18 No. 4 and ask you if you recognize that email?

19      A.  Is all this part of the attachments to that --

20 to that email?  I just don't remember.

21      Q.  Yes.

22      A.  Yes, I recognize this email.

23      Q.  Okay.  Do you remember reviewing it on or about

24 April 10th, 2018?

25      A.  I remember receiving it, yes.

001605

1     Q.  Do you remember reviewing it?

2     A.  I am sure I looked at it.

3     Q.  Is it fair to characterize this as an

4  accounting by Vitol, and specifically with Mike Ruzek,

5  of the money that they alleged was owed to Vitol by

6  GCAC?

7                 MR. GILES:  Objection, form.

8     A.  I believe this was part of a calculation -- I

9  believe this was a list of costs and expenses and

10  whatnot that they felt was in the calculation.

11     Q.  (By Mr. Baay)  Did you ever do anything to

12  challenge this calculation that you ultimately sent to

13  Vitol?

14     A.  No, but I think we discussed the fact that the

15  hedging -- we didn't understand the hedging, and I don't

16  know if we disputed the other costs or not.

17     Q.  And as you sit here today, is -- is it right --

18  is it correct to say that the hedging amount is the only

19  amount you dispute?

20     A.  I dispute --

21                 THE WITNESS:  Sorry.

22                 MR. DINNELL:  Objection, form.

23                 MR. GILES:  Go ahead.

24     A.  I dispute the general concept that this is an

25  amount that's due to Vitol.  I don't necessarily dispute

1  that these numbers in their individual calculations are

2  not right.  I haven't reviewed them in a while.  They

3  may be accurate, I don't know.

4          I really have no opinion on this hedging

5  because I don't understand it or know where it really

6  came from, and I don't know whether subsequent to this

7  we reviewed and agreed with the deal related -- these

8  other costs or the TVM or the TCR.

9      Q.  Who within GCAC understands the hedging costs?

10     A.  I don't think any -- I want to be clear.  I

11 don't think we have ever received something from Vitol

12 that allows us to look at it and make any determination

13 as to whether they are right or wrong.

14     Q.  Okay.  Well, surely you have your own

15 accounting of those costs, right --

16     A.  No.

17     Q.  -- or GCAC does?

18     A.  I am sorry, I didn't mean to interrupt you.

19 No.  In order to account for it, we would have to get

20 the individual trades to know how they rolled the

21 position, and we just don't have those numbers.

22     Q.  Do you have any idea who was having the

23 conversations with Vitol about the hedging expenses?

24     A.  I don't know that we ever had any conversations

25 about the hedging expenses.  I believe that we got that

1  $6.2 million -- somewhere after the end of the deal we

2  got that $6.2 million number, but I don't know that we

3  ever had real discussions about what they were.

4      Q.  Okay.  My question was more focused on who

5  within GCAC was -- whose job was it to make sure that

6  those transactions were occurring?

7      A.  If we ever received numbers to -- I mean, I

8  don't think we ever really received numbers to look at

9  and compare, like something to examine, per se.  So are

10  you asking who -- had we received that, who would look

11  at it?

12      Q.  Uh-huh.

13      A.  Probably Patrick Perugini.

14      Q.  So on the first page of Exhibit 4 here, the

15  product cost true-up due Vitol is roughly $3.8 million,

16  right?

17      A.  That's what it says, yes.

18      Q.  And if I am understanding you, you don't have

19  any basis to dispute that number?

20      A.  I am not saying we don't -- that we do or don't

21  dispute that number, but I don't know that it means

22  anything other than it's part of an overall calculation.

23      Q.  Okay.  Well, let's turn to Page 5 of that

24  exhibit in front of you.  It's dense but fairly simple

25  in overview.

1      A.   Uh-huh.

2      Q.   Do you remember reviewing this spread sheet in

3  any detail?

4      A.   I am sorry, I can't read it.  Am I the only --

5  is it me?

6      Q.   Well, I am saying at the time did you review

7  this in any detail?

8      A.   I don't recall whether I reviewed it in detail,

9  but I do think I recall seeing it.  I really can't read

10 it, I am sorry.

11     Q.   That's okay.  There are much bigger copies of

12 it.  On the left I will represent to you that there are

13 figures that represent the purchases that Vitol made

14 from third parties.  Is that consistent with your

15 understanding?

16     A.   That sounds right.

17     Q.   And if you see in this lower right-hand corner

18 of that first section -- see where my finger is pointing

19 at?

20     A.   Uh-huh.

21     Q.   There is a $60 million figure --

22     A.   Okay.

23     Q.   -- which represents the total amount Vitol paid

24 to third parties.  Any reason you have to dispute that

25 number?

1      A.   No.

2      Q.   And then if you look underneath that, it has --

3    it says "GCAC purchase deal," and to the right of it

4    it's a figure that's roughly $1.8 million.

5      A.   Okay.

6      Q.   And if I am understanding that correctly,

7    that's an amount that GCAC paid for products, so they

8    are backing that out of the 60 million to get the total

9    Vitol production of roughly 58 million, do you see that?

10     A.   Yes.

11     Q.   Okay.  Any reason to dispute that calculation?

12     A.   No.

13     Q.   And then in the right-hand column there are

14   figures that represent sales from Vitol to third

15   parties, do you understand that?

16     A.   Yes.  I can't see which column it is, but yes.

17     Q.   Well, generally this -- this second box to the

18   right.

19     A.   Okay.

20     Q.   And the figures as represented in this spread

21   sheet show that Vitol received roughly $24 million for

22   sales to third parties, do you see that?

23     A.   Okay.  I can't read it, but I am assuming --

24   yes, I will take your word for it.

25     Q.   That's -- is that a figure you have heard

1   before?

2        A.   I don't recall it, but if that's what it says,

3   then --

4        Q.   Is there someone else within GCAC who is paying

5   attention to these numbers other than you?

6        A.   Jason might have looked at this, Jason

7   Goldstein.

8        Q.   What about Patrick?

9        A.   He might have looked at it.

10       Q.   John?

11       A.   Probably not.

12       Q.   Is John your CFO?

13       A.   Yeah, but he really does general bookkeeping.

14   He is part-time.

15       Q.   Is Jason more of your CFO, operate more in the

16   role of CFO?

17       A.   No, Jason -- Jason does more just sort of

18   investment banking, modeling.  If it's -- if it's Excel

19   intensive sort of stuff, then he -- he kind of gets

20   involved.

21       Q.   Okay.  And then you see under that 24 million

22   there are several categories of numbers that are

23   effectively added to the 24 million, and it's all money

24   that Vitol receives, three payments from you, sales to

25   Rio, I think a Rio lockbox, and then the rack receipts.

1    You see all those categories there?

2         A.   Yes.

3         Q.   Okay.

4         A.   And I can't read them, but I see them.

5         Q.   Right.  But you understand the fundamental

6    calculation is Vitol took the money it paid minus the

7    money it received to come up with the roughly $3.8

8    million that it says are owed for product trip costs?

9         A.   Correct.

10        Q.   And you are not -- if I understand your

11   testimony, you don't dispute that number.  Your dispute

12   is you think that's a number that should be shared under

13   the agreement?

14        A.   Potentially, yes.

15        Q.   What do you mean, potentially?

16        A.   I mean, I think that -- I think that this

17   number is something that would go into the overall

18   calculation.  I don't know that it represents profit or

19   loss, I don't know if it represents that someone

20   definitively owes this amount to anyone.  I think it's

21   just a number that's part of an overall calculation of

22   who should -- how much should be owed to --

23        Q.   Well, you would agree that money spent to

24   purchase product is simply a cost?

25        A.   Yes.

1      Q.  And that any money GCAC made for the sale of

2   that product could potentially be a profit that's shared

3   between the two companies, right?

4      A.  Yes, as part of the calculation.

5      Q.  And this product has led to a profit for GCAC

6   in the neighborhood of $6 million.  Do you have any

7   memory of that?

8      A.  No, I am not sure what you are talking about.

9      Q.  Do you have any idea how much profit this

10  product generated for GCAC?

11               MR. GILES:  Objection, form.

12     A.  I am not sure what you are asking.  When you

13  say "this product," do you mean --

14     Q.  (By Mr. Baay)  The asphalt purchase by both

15  Vitol and GCAC.

16     A.  I don't know what the -- I don't sitting here

17  know.  I don't know that any -- I don't know.

18     Q.  Who does know that number?

19     A.  I don't know that anyone knows that number.

20     Q.  You are saying that no one in GCAC knows the

21  amount of profit they made on the sales of asphalt

22  they -- they made to third parties?

23     A.  I don't think we looked at it that way.  I

24  don't know what you are -- are you trying to say how

25  much did we -- I am sorry, I am confused.  I don't know

1    what you are asking.

2        Q.   Most businesses I know are interested in the

3    profit they are making from the product they are

4    selling, right?  Do you agree with that?

5        A.   Yes.

6        Q.   And here GCAC is selling asphalt-related

7    products, right --

8        A.   Correct.

9        Q.   -- to third parties at a price that's over and

10   above what either Vitol or GCAC paid for it?

11       A.   Yes, that's the goal.

12       Q.   Are you confused by that calculation?

13       A.   No, I am trying to -- trying to think of it in

14   a context of -- so we are off of this $3.8 million and

15   we are just talking about how much the gross profit was

16   from the sales of those asphalt products?

17       Q.   Correct.  I am asking you do you know that

18   number?

19       A.   I don't know that number.

20       Q.   Who within GCAC knows that number?

21       A.   I don't know.  Maybe Patrick.

22       Q.   And under your view of the world, whatever that

23   number is, it would be split 50 percent with Vitol,

24   right, according to the terms of the agreement?

25       A.   As part of the overall calculation, yes.

1      Q.  But you haven't made that calculation and you

2   don't know of anyone within GCAC that's made it?

3      A.  Yeah.  And just to be clear, you would have to

4   deduct expenses and costs and all that stuff.

5      Q.  Well, that's -- to your testimony, that was the

6   agreement, right, fifty percent share of the costs --

7      A.  Yeah.

8      Q.  -- and fifty percent share of the profits?

9      A.  Sure.

10                (Brass Exhibit No. 5 was marked.)

11     Q.  I hand you what I have marked Brass 5 which is

12  an email from you to Eric Kuo on February 13th, 2013.

13  Does that look familiar?

14     A.  No, but I sent it.

15     Q.  Okay.  You copied Jason Goldstein, Mike Ruzek

16  and Joe Maddingly.  And so my first question is -- and

17  the attachment is basically a snapshot of a spread

18  sheet -- spread sheet, you agree with that?

19     A.  Yes.

20     Q.  Okay.  And what you say to Eric is this is the

21  initial assessment of the balance due to Vitol; is that

22  right?

23                MR. GILES:  Objection, form.

24     A.  Yes, but I want to be clear that -- that the

25  balance due to Vitol in this case does not necessarily

1  mean that GCAC owed Vitol that amount of money.  It's
2  just bookkeeping or that that's -- that's an amount that
3  was -- was how much less they had received for product
4  than they had laid out.
5      Q.  And why would you be making that calculation if
6  you were under an agreement to share fifty percent of
7  the costs?
8      A.  Why would we be making that -- say that one
9  more time.
10     Q.  Well, your testimony is that this was a -- an
11 accounting to see the balance due to Vitol based on the
12 product they purchased minus the payments they received.
13     A.  Well, ultimately we were working towards some
14 sort of reconciliation of how much was due from who to
15 who.  So this was just part of that, trying to
16 understand what monies had gone where.
17     Q.  But in our first hour here this morning, I
18 understood you to say that you hadn't made that
19 calculation.
20     A.  We have not made the calculation of how much is
21 ultimately due from Vitol to GCAC or GCAC to Vitol.
22     Q.  But at least as of February 13th, you had done
23 some accounting to understand --
24     A.  No, this was an interim number that was just a
25 calculation of how much Vitol had laid out for purchases

1   versus how much they had bought.  It didn't mean

2   anything other than that.

3       Q.  So what's the -- what was the purpose of making

4   this calculation?

5       A.  It was just part of our ongoing attempt to

6   reconcile and settle between Vitol and GCAC.

7       Q.  Do you remember GCAC making any kind of payment

8   after February of 2018, after this email?

9       A.  I don't think so.

10      Q.  Why not?

11      A.  Because I don't think we knew that we owed them

12  anything.  We were trying to -- we never came to terms

13  on what a settlement would look like.

14      Q.  Okay.  But even to your own internal

15  calculations, you owed them at least 1.19 as of February

16  13th, 2010?

17      A.  No, I disagree with that.

18      Q.  You disagree with your own calculations?

19      A.  I disagree with the premise that this

20  calculation or that that number means that we owed them

21  a specific amount of money.  This was part of an

22  overall -- part of what would ultimately be an overall

23  calculation of who owed who what, and that's what we are

24  in the middle of doing.

25      Q.  But you said that never -- that calculation was

1  never made.

2      A.  We have not determined all of the appropriate

3  offsets, and we are going to determine a net number that

4  Vitol might do -- be owed to -- that Vitol might owe

5  GCAC or that GCAC might owe Vitol.

6      Q.  If you turn to that second page, you see you

7  include -- your starting number is roughly $58 million

8  in total purchases, you see that --

9      A.  Uh-huh.

10      Q.  -- in the middle column?

11      A.  Yes.

12      Q.  And we saw from Mr. Ruzek's spread sheet that

13  that number was really $60 million, right?

14      A.  Okay.

15      Q.  And I think the explanation for it is you have

16  this line -- this where it says "Rio paid for 725

17  Citgo," and you subtract that from Vitol's product cost,

18  right?

19          MR. GILES:  Objection, form.

20      Q.  (By Mr. Baay)  Or at least whoever prepared

21  this spread sheet did.

22      A.  Okay.

23      Q.  And that would be double-dipping for that

24  number if -- if Mr. Ruzek's spread sheet is accurate, do

25  you agree with that?

1      A.  That's possible.  It's possible there was an

2  error on the spread sheet.

3      Q.  And so it's -- it's possible that your

4  calculation of 1.1 was not an accurate figure as of

5  February 13th in terms of what was due to Vitol?

6      A.  Not in terms of what was due to Vitol, but in

7  terms of whatever this number represents, that if

8  what -- if what we are talking about is how much did

9  Vitol lay out for product, how much did they receive --

10  I am sorry.  I am sorry.

11              THE COURT REPORTER:  How much -- if we are

12  talking about how much --

13      A.  Vitol laid out for product versus how much they

14  received, that that 1.1 might be wrong and that it --

15  that it -- that Ruzek's spread sheet might be right,

16  yeah, I believe that's right.

17      Q.  (By Mr. Baay)  Okay.  So here's my question.

18  Is -- is this calculation the basis for GCAC's refusal

19  to pay the product true-up cost?

20              MR. GILES:  Objection, form.

21      Q.  (By Mr. Baay)  In other words, because you had

22  a different number, you didn't pay the amount due to

23  Vitol?

24      A.  No.  The reason we haven't paid is because we

25  haven't determined what the amount owed to Vitol or

1   Vitol owes to GCAC is yet.  This is just a -- a part of

2   that.

3        Q.  That's a pretty simple calculation, isn't it?

4        A.  No, I don't think so.

5        Q.  Why not?

6        A.  Because GCAC -- that doesn't include any costs

7   or damages or -- or any -- or anything that would be the

8   result of Vitol's breach of our agreement that would

9   offset other monies.

10       Q.  Going back to Exhibit No. 4, are there any of

11  these other amounts listed by Mr. Ruzek that GCAC chose

12  to challenge or that as you are sitting here think are

13  incorrect?

14              MR. DINNELL:  Objection, form.

15       A.  Incorrect or not, I don't know that we ever

16  really understood what TVM and TCR were.  I don't know

17  whether we verified that the other numbers were correct

18  or not.  But again, I don't agree with the premise that

19  just because any of these individual numbers are correct

20  that that would mean that that amount of money is due to

21  Vitol.

22       Q.  (By Mr. Baay)  Why not?

23       A.  Because I don't think it takes into account the

24  overal calculus of any damages or costs or -- or the

25  results of their actions, what that would have cost

1    GCAC.

2        Q.   Okay.  Let's talk about that for a minute.

3    What do you think is the -- was the breach by Vitol to

4    your agreement?

5        A.   They -- they failed to continue with the deal

6    that they agreed to do.

7        Q.   Okay.  What was the deal they agreed to do?

8        A.   It was what was laid out in the document we

9    talked about originally, that they agreed that we would

10   buy and sell asphalt together, split it fifty-fifty,

11   have a general partnership around the acquisition of --

12   of -- of products and the sale of products.

13       Q.   Okay.  Let's take those one at a time.  So do

14   you agree that Vitol did buy and sell asphalt from July

15   2017 to -- until at least the end of 17, right?

16       A.   Yes.

17       Q.   And so how is that conduct a breach?

18       A.   Well, they -- so they terminated the deal,

19   unilaterally terminated the deal sometime in late 2017

20   well ahead of the time that -- that was -- was agreed

21   to.

22       Q.   Where was the --

23       A.   They walked away from the deal.

24       Q.   Where was the time agreed to?

25                 THE COURT REPORTER:  I am sorry?

1     Q.   (By Mr. Baay)  Where was the time agreed to?

2     A.   It was in that deal.  It was two years.  It was

3 agreed to in that agreement.

4     Q.   So through July 2019?

5     A.   Yeah, I think that's right.

6     Q.   You are talking about the agreement that was

7 never executed or finalized?

8     A.   I am talking about the agreement that was never

9 signed.

10     Q.   And so in your mind -- in GCAC's view, any

11 performance that came up short of July 2019 would have

12 been a breach by Vitol, am I understanding that right?

13     A.   Say that again?

14     Q.   Is your view -- is your testimony that any

15 conduct in which Vitol stopped buying and selling

16 asphalt that stopped short of July 2019 was going to be

17 a breach of your agreement with them?

18     A.   I don't know if I would say any, but I think

19 that when they unilaterally said "we can't do the deal

20 that we did" and forced us to go and liquidate our

21 positions and find another partner, I think that was a

22 breach.

23     Q.   Okay.  So I am asking you when do you think

24 that occurred?

25     A.   I can tell you that we ended up transferring

1 the positions and liquidating things in January of 2018.

2 When do I think the breach occurred as opposed -- I

3 don't know.  I mean, sometime before that.

4      Q.  But you don't know or have a month or date in

5 mind?

6      A.  Sometime -- well, so I think we -- they told us

7 that they weren't going to be able to honor their deal

8 in -- sometime in the September time frame, to my

9 recollection.

10      Q.  And yet they continued to make purchases and

11 sales of asphalt for several months after September,

12 didn't they?

13      A.  Yes.

14      Q.  And in fact, you paid them three payments

15 totaling more than $60 million from roughly November

16 through January of 2017 into 2018, right?

17      A.  Yes, we made those payments.

18      Q.  So why is it that GCAC continued to perform if

19 they thought that Vitol was in breach as of September?

20      A.  Well, we didn't really have a choice.  I mean,

21 what else were we going to do?  The -- they put us in

22 the position where we either had to do what they said or

23 we were going to go out of business, I guess.  We

24 didn't --

25      Q.  Well, you had found a new partner as early as

1  July 2017, right?

2             MR. GILES:  Objection, form.

3       A.  I don't know what you are talking about.

4       Q.  (By Mr. Baay)  You found Mercuria to step into

5  the JMA in the summer of 2017?

6       A.  But they -- we didn't end up getting a deal

7  done with them until January of 2018.

8       Q.  Right.  And Vitol carried you until the time --

9  they financed your transactions until the time Mercuria

10  stepped into your agreement, didn't they?

11      A.  I don't agree that they were necessarily

12  financing the transactions.  They --

13      Q.  How would you like to describe it?

14      A.  We were in a -- in a no man's land where they

15  were continuing to buy stuff and we were continuing to

16  sell stuff, and we effectively kicked everything down

17  the road until after we got the deal done with Mercuria

18  and got -- and got the positions unwound.

19      Q.  So my question is Mercuria was in the picture

20  as early as August of 2017, true?

21      A.  I might --

22             MR. GILES:  Objection, form.

23      A.  I might have said September, but August might

24  be right.

25      Q.  (By Mr. Baay)  And you ultimately, as we have

1  discussed many times, completed your deal with Mercuria

2  in January of 2018?

3      A.   Correct.

4      Q.   Any other conduct that you believe Vitol is

5  liable for that constituted a breach?  Or a better

6  question is what else did Vitol do that you think is a

7  breach of the agreement?

8      A.   Other than walking on the agreement, as best I

9  can think of right now, I think that's the primary one.

10     Q.   And how is it that you were -- that GCAC was

11  disadvantaged by the termination by Vitol or how were

12  they -- how were they harmed by that?

13     A.   Well, we were forced to go out and find another

14  partner and -- you know, because Vitol was -- was

15  effectively in -- in November or December said "we are

16  just not putting any more trades in for you," and Rio

17  didn't want to resume our partnership, and so we really

18  had no negotiating leverage.  We had to take whatever

19  deal we could do with -- with Mercuria.

20     Q.   Is it your testimony that your deal with

21  Mercuria is worse than your deal with Rio Energy?

22     A.   Yes.

23     Q.   How so?

24     A.   A number of ways, not -- not to exclude

25  anything, but -- but in -- partly -- in our Rio deal,

1   Rio shared the liability for any tank cleaning in Mobile

2   and Mercuria doesn't.  Our deal with -- with Rio was a

3   50/50 deal and our deal with Mercuria is a 60/40 deal.

4        Our deal with Mercuria -- with Rio, sorry, we

5   had fairly even-handed control over what was going on

6   and extensions and -- and there was a lot of mutuality

7   in terms of decision making.  Our deal with Mercuria is

8   far more one-sided --

9        Q.  How so?

10       A.  -- in terms of Mercuria's right to -- to do

11  kind of what they want -- that we have to effectively

12  get permission from Mercuria to do anything.

13       Q.  Are you saying that's in the -- in the terms of

14  the agreement with Mercuria?

15       A.  Yeah.  It's -- I am just saying it's more

16  one-sided in terms of Mercuria's control as opposed to

17  the one that we had with Rio.  I have concerns that --

18  that the business we are doing with Mercuria, we are

19  transferring intellectual property to them that at the

20  end of the agreement, will we still have as much value

21  as -- as we did or we would have under -- under the

22  Vitol deal with the Rio deal.  I don't -- I am concerned

23  about that.

24       I don't know, I am sure there are other things

25  that I am just not thinking of.

1          Q.   Have you put a number to how you think the

2     Mercuria partnership has disadvantaged you vis-a-vis the

3     Rio partnership?

4          A.   Not yet.

5          Q.   Who is -- who is charged with making that

6     calculation?

7          A.   Ultimately it will be between our -- it will be

8     a collective effort.

9          Q.   And it will be a calculation, won't it, of

10    how -- the difference between what you have earned under

11    the 40/60 versus the 50/50 you had with Rio; is that

12    right?

13         A.   That will be part of it.

14         Q.   Okay.  What else is part of it?

15         A.   Whatever general damages to the business there

16    might be and whatever costs maybe we are assuming in

17    Mercuria that we wouldn't have in -- in the deal with

18    Rio.

19         Q.   Do you know what those are?

20         A.   Tank cleaning is one I can think of easily.

21    That was definitely part of our Rio agreement and it's

22    not part of our Mercuria agreement.

23         Q.   Same question.  Do you think that the Mercuria

24    agreement was -- put GCAC at a disadvantage vis-a-vis

25    the Vitol agreement that you allege was had between

1  Vitol and GCAC?

2       A.  I think quite possibly.

3       Q.  How so?

4       A.  Well, the Vitol deal was a 50/50 deal.  The

5  Vitol deal, we had a lot of mutuality in

6  decision-making.

7       Q.  Did you negotiate your deal with Mercuria?

8       A.  Yes.

9       Q.  I mean you alone within GCAC?

10      A.  Not necessarily alone.  I mean, documents and

11  we had lawyers and all that.

12      Q.  Did you feel like GCAC was in a position where

13  it couldn't go find another partner?

14      A.  I feel like we had very limited options.

15      Q.  Why is that?

16      A.  Because we had a ticking clock that Vitol put

17  on us to get the book transferred.

18      Q.  Okay.  When was that clock put on you?

19      A.  August, September.

20      Q.  By whom?

21      A.  Basically Eric.  I mean, Eric is the guy we

22  were talking -- I don't know who at Vitol made those

23  decisions, but Eric is the guy we were talking to.

24      Q.  So you had -- you had roughly five months to

25  find a new partner; is that right?  Is that fair?

1     A.  Well, not really.  The -- the -- so we had a

2  period of time where we had to find a partner, and then

3  we actually had to get a deal done, right?  And if --

4  if -- if ultimately they were going to say "hey, you

5  have to have this done by the end of December or we are

6  not going to put any trades in any more," then we really

7  had a limited amount of time.  We had maybe a couple of

8  months.

9     Q.  Okay.  But you had -- from the time that Vitol

10  told you that they weren't going to move forward with

11  you, you had five months until the end of the year,

12  true?

13     A.  That sounds like a lot.  I don't think it was

14  five months.

15     Q.  Did you talk to anyone -- did GCAC talk to

16  anybody else other than Mercuria?

17     A.  We might have had some discussions with other

18  people.  As a matter of fact, I -- I want to say we did,

19  but Mercuria -- we picked it up with Mercuria pretty

20  quickly because they seemed to have more motivation to

21  get something done quickly.

22     Q.  You understand, don't you, that the agreement

23  between Rio and GCAC was never assigned to Vitol, was

24  it?

25     A.  No, I don't believe it was.

1            MR. GILES:  Objection, form.

2       Q.  (By Mr. Baay)  So the other part of what you

3  include in your petition is that you claim that Vitol

4  made some negligent misrepresentations.  Did you see

5  that language?

6       A.  Yes.

7       Q.  What -- list for me the misrepresentations you

8  believe Vitol made.

9       A.  They told us they could do this deal.  They

10  told us that we entered into a deal with them.

11       Q.  Okay.  And there was a deal, according to your

12  testimony?

13       A.  Correct.

14       Q.  So what was the misrepresentation?

15       A.  If you -- I am not sure -- I would have to

16  reread the petition.  I am not sure exactly which part

17  you are talking about.

18       Q.  Well, were -- were you the person responsible

19  for making a list of the misrepresentations you thought

20  Vitol made to GCAC, or was that someone else?

21       A.  I don't recall that we had made a list per se,

22  but we discussed it with our attorneys.

23       Q.  Okay.  But the only one you can come up with as

24  we sit here today is that Vitol promised they would do a

25  deal with GCAC?

1            MR. GILES:  Objection, form.

2       A.   There may be others that I am just not

3  recalling right now.

4       Q.  (By Mr. Baay)  Do you recall receiving an email

5  from Mr. Ruzek or anyone at Vitol in roughly March of

6  this year, March of 2018, that provided all the invoices

7  proving up the product purchases that Vitol made?

8       A.   Other than the one you showed me before?

9       Q.   Yeah.  I mean, the ones I showed you before

10  were spread sheets.  I am asking you about invoices, the

11  actual invoices to prove up the purchases.

12       A.   I don't recall that, but I am not saying we

13  didn't receive it.

14       Q.   And if you did receive it, it wouldn't surprise

15  you, right?

16       A.   No.

17       Q.   And was it your job to go through there and

18  validate whether all of these invoices lined up with the

19  product that Vitol claimed it purchased?

20       A.   No.  That probably would have been Jason.

21       Q.   And did you ever have a conversation with Jason

22  as to whether the invoices proved up the amounts that

23  Vitol claimed?

24       A.   I don't recall that.  I know that there was --

25  there was a lot of back and forth and a lot of paperwork

1    and things, and I don't know whether -- the email you
2    are specifically talking about, whether they agreed with
3    that one or they subsequently agreed to a different one,
4    but ultimately I think they came to an agreement as to
5    what the purchases were.
6         Q.  Okay.  So as we sit here, you don't think there
7    is any dispute around that number, the product purchases
8    I am talking about?
9         A.  No, I don't think so.
10        Q.  Did you -- do you remember having discussions
11   with Tom Moran at Vitol?
12        A.  Maybe one.
13        Q.  Okay.  And you understood he was in the credit
14   department?
15        A.  Uh-huh.
16        Q.  And you made some promises to him to make
17   payment?
18        A.  No.
19        Q.  Okay.  You don't remember making those
20   promises?
21        A.  No.
22        Q.  So if there are emails where you promised to
23   make payment in response to emails that Tom sent you,
24   you don't remember those?
25        A.  Correct.

1           MR. GILES:  Can we take a break?

2           MR. BAAY:  Sure.

3           THE VIDEOGRAPHER:  Off the record at 12:26.

4           (Recess taken.)

5           THE VIDEOGRAPHER:  On the record, the time

6    is 1:09.

7       Q.  (By Mr. Baay)  All right, Mr. Brass.  We are

8    back from a lunch break.  Are you ready to continue?

9       A.  Yes, please.

10      Q.  Do you understand you are still under oath to

11   tell the truth?

12      A.  Yes, sir.

13      Q.  We have talked about various subjects, and I

14   want to go back to one related to the financing

15   arrangement.  If the deal was a financing arrangement

16   between the parties, you would agree that GCAC would owe

17   the costs that were outlined in Mike Ruzek's email of

18   May 10, 2018, wouldn't you?

19           MR. GILES:  Objection, form.

20      A.  It wasn't a financing arrangement, so I don't

21   know how to tell you what we potentially owe under a

22   deal that I don't -- under an alternate universe theory.

23      Q.  (By Mr. Baay)  Do you understand that -- well,

24   let me say it this way.  If I understood your testimony

25   this morning, you think that Vitol gave you notice of

1    termination sometime in late July, early August of 2017?

2        A.  They -- I don't know that I would say notice of

3    termination.  I am not sure that that would describe it

4    the right way.  They told us that they weren't going to

5    be able to honor their deal.

6        Q.  Okay.  So what did the arrangement turn into

7    after you got that notice?

8        A.  As far as we were concerned, unless we agreed

9    to something else, it was the deal that we had agreed

10   to.

11       Q.  So even though you got notice of termination,

12   you continued to operate as if you had a deal in place

13   at Vitol?

14       A.  I think the words --

15                MR. GILES:  Objection, form.  Go ahead.

16       A.  I don't know that the words "notice of

17   termination" mean anything in the context of this.  I

18   think that they told us that they weren't able to honor

19   the deal they did.  That's what I --

20       Q.  (By Mr. Baay)  Okay.  Yeah, I am not focused on

21   the specifics.  My question is more what do you think

22   the arrangement was after you got word from Vitol that

23   they were not going to move forward with GCAC?

24       A.  I don't think we really had an agreement as to

25   exactly what it was other than as far as I was

1   concerned, we were continuing with things as they were
2   until we agreed to something different.
3       Q.  And so when did that agreement for something
4   different happen?
5       A.  I don't think it has yet.
6       Q.  Okay.  So you think you are still under some
7   type of agreement with Vitol, GCAC is?
8       A.  No, not currently.
9       Q.  So then when did -- when did that change?
10      A.  I suppose it changed when we transferred the
11  positions to Mercuria in January.
12      Q.  Well, that's my question.  From August of 2017
13  until when you transferred your positions, what
14  agreement were you under?
15      A.  As far as I am concerned, we were still under
16  the agreement that we had made at the outset of the --
17  in July at the outset of the agreement.
18      A.  And that's some oral agreement you had with
19  Vitol -- between Vitol and GCAC?
20      A.  Yes.
21              (Brass Exhibit No. 6 was marked.)
22      Q.  I am going to hand you your affidavit that we
23  have marked as Brass No. 6.
24      A.  Uh-huh.
25      Q.  Do you remember completing this affidavit?

1      A.  Yes.

2      Q.  I think you attached it to a pleading -- recent

3  pleading they had related to a motion to consolidate.

4  Does that sound right to you?

5      A.  Okay.

6      Q.  Let me kind of walk down through this.  In the

7  third paragraph you make the statement that "GCAC was

8  under no obligation to terminate the relationship."  You

9  were talking about in that situation your relationship

10  with Rio; is that right?

11      A.  Yes.

12      Q.  But you said in the spirit of good commercial

13  relations you started looking for a new partner?

14      A.  Agreed.

15      Q.  And that search led you ultimately to Vitol in

16  2017, right?

17      A.  Correct.

18      Q.  And then in the next paragraph you talk about

19  discussions that began between Vitol and GCAC.  And in

20  that last sentence of paragraph four you say "After July

21  1, 2017, the parties continued to exchange drafts" --

22  and I think you meant to say "of a contract to

23  memorialize the agreement that had already" -- "already

24  commenced business operations."  Did I read that

25  correctly?

001636

1      A.  Yes.

2      Q.  Okay.  So it's your belief that the -- what you

3  are calling business operations happened before July

4  1st, 2017?

5      A.  No.  I think they commenced on or around July

6  1st.

7      Q.  Okay.  And what are those exactly?  If someone

8  was wondering what you mean by business operations, what

9  would you have said?

10     A.  The purchase of -- the purchase of various

11  blend stocks and sale of asphalt, blending and sales.

12     Q.  Then you go down to paragraph six and you talk

13  about an email where you -- "GCAC inquired if it was

14  appropriate to notify Gravity Midstream, a company

15  involved in storing products for the business, that

16  Vitol had replaced the regional firm in the JMA."  You

17  see that sentence?

18     A.  Yes.

19     Q.  And you say that "Kuo and Steve Barth, both

20  Vitol employees, confirmed in writing that such a

21  disclosure was appropriate"?

22     A.  Correct.

23     Q.  And you attached that email correspondence to

24  your affidavit here that we marked as Brass 6; is that

25  right?

1    A.   Correct.

2    Q.   In that email that you sent you just basically

3  say "Is there any reason you guys see that we shouldn't

4  let Gravity know, even if just informally, that Vitol is

5  taking Rio's place?"  Did I read that correctly?

6    A.   Correct.

7    Q.   You say "It's going to get in the market, and I

8  think we would rather they heard about it from us,"

9  right?

10    A.   Correct.

11    Q.   One of those people you copy on that email, it

12  says "Kale."  Do you see that on the "to" line?

13    A.   Yes.

14    Q.   And that's -- you understand that to be Kale

15  Krhovjak from Rio Energy?

16    A.   I don't think that -- Krhovjak, right?

17    Q.   Krhovjak, yes.

18    A.   Krhovjak, yes.

19    Q.   And you -- you have dealt with Kale over the

20  years; is that true?

21    A.   Yes.

22    Q.   And do you remember Kale responding to that

23  email?

24    A.   Not specifically.

25         (Brass Exhibit No. 7 was marked.)

1      Q.   I show you what I have marked as Brass 7.  He
2  responds about an hour after yours on the same day and
3  he says "Hey, let's talk before we do, but I want to
4  make sure we are all on the same page.  A.J., call me
5  when you land."
6      A.   Uh-huh.
7      Q.   And do you remember having that conversation?
8  You respond and say "will do," right?
9      A.   Yes.
10     Q.   So do you remember Rio kind of pumping the
11 brakes at that time to prevent any disclosure?
12     A.   No, not specifically.  I vaguely remember this,
13 but I don't think -- I -- I vaguely remember it.
14     Q.   Okay.  So is it your testimony that you don't
15 think Rio ultimately did object to the disclosure?
16     A.   I want to say they had a concern because they
17 were the -- the -- the -- what do you call it, the
18 terminal leaseholder or throughput or whatever you call
19 it, and we just wanted to make sure that whatever was
20 disclosed was disclosed appropriately.  That's my
21 recollection.
22     Q.   Was there a follow-up email where Rio gave
23 permission for the disclosure that you remember?
24     A.   Not that I recall.
25     Q.   Or based on your conversation with Kale, did

1   you --

2        A.   But I don't think he is -- I don't think he

3   is -- he is not saying "don't tell them."  He is just

4   saying "when you communicate it, let's make sure that we

5   are doing it in the right way and we are all on the same

6   page."

7        Q.   Well, that's my question is you wanted to have

8   a conversation before the disclosure was made --

9        A.   Correct.

10       Q.   -- is that a fair interpretation?

11       A.   Yes.

12       Q.   And so that's why I am asking you.  Did you

13   have a conversation with them that then led to some type

14   of disclosure?

15       A.   I talked to them, and I believe we talked to

16   Gravity about it, but I don't recall.

17       Q.   And there is nothing in this -- well, let me

18   ask you this.  Is this -- this is your basis for

19   believing that as of July 13th there was some type of

20   agreement in place between Vitol and GCAC?

21       A.   It's not my only reason, but this is clear

22   evidence of it.

23       Q.   Okay.  And you think it's clear evidence

24   because you are asking for permission to tell Gravity?

25       A.   No.  I think it's clear evidence because we are

```
 1  saying "hey, we are going to tell the market that we
 2  have a deal, and we want to make sure that we are" --
 3  "you guys are on board with us being disclosed to about
 4  this fact that we now have a deal," and they said "yes."
 5        Q.  And do you think there are other emails around
 6  this time that include the terms of the deal?
 7        A.  I am sorry, that include the terms of the deal?
 8        Q.  Yeah.
 9        A.  I don't recall.
10        Q.  I am trying to understand.  In your email you
11  think -- you said you thought the business was
12  transacting by July 1 --
13        A.  Uh-huh.
14        Q.  -- but as of July 13th you are still looking
15  for permission to disclose to other parties.
16        A.  We are not looking for permission.  We are --
17  it would be good partner relations if you are going to
18  talk to third parties about the fact that you have done
19  the partnership, and this is simply reaching out and
20  saying -- I don't believe it was controversial in any
21  way.
22            We reached out to our -- to our partners at
23  Vitol and we said, "Hey, guys, we are going to start
24  telling people about this deal or we want to tell
25  Gravity about this deal.  We want to make sure you know
```

1  we are going to be talking to them."

2       Q.  And I am not suggesting it was controversial.

3  My question is how is it that you were still asking for

4  permission on July 13th when in your affidavit you said

5  you were transacting business by July 1?

6       A.  We were already transacting business.

7       Q.  Okay.  So why were you seeking permission on

8  July 13th?

9       A.  I don't understand the correlation.  Just

10 because we are transacting business doesn't mean that

11 they might -- might not want to have a comment if we

12 were going to tell Gravity about what we are -- that --

13 that we had done it.  I mean, the fact that we were in

14 the partnership didn't necessarily mean that we were

15 obligated to tell Gravity before July 13th, so --

16      Q.  Well, you say "it's going to get into the

17 market and I think we would rather they heard about it

18 from us," right?

19      A.  Yes.

20      Q.  Well, Gravity was pretty centrally involved in

21 the transaction, weren't they, as the storage terminal?

22      A.  They were the storage terminal, but they

23 weren't necessarily a party.  They weren't party to our

24 transaction.

25      Q.  I didn't say they were a party to the

1   transaction.  I am saying they would have found out

2   about it quickly after -- after an agreement had

3   happened?

4        A.  Maybe, maybe not.  I don't know.  Are you still

5   on 6 or --

6        Q.  Is that what I marked that?  Yeah.  Bear with

7   me a minute.  So in eight you say that "after GCAC

8   located a company willing to assume Vitol's position in

9   the business, Vitol and GCAC began discussing how to

10  unwind their relationship."  Did I read that correctly?

11       A.  Uh-huh.

12       Q.  Okay.  And those discussions led to --

13            MR. GILES:  You have got to say yes or no.

14            THE WITNESS:  I am sorry.

15            MR. GILES:  I was trying to correct you.

16            THE WITNESS:  It's shockingly hard to

17  remember to do that.

18            MR. BAAY:  When you are having a

19  conversation, it's easy to forget.

20       Q.  (By Mr. Baay)  What was the agreement as to how

21  they were going to unwind their relationship?

22       A.  I am sorry, tell me again which number you are

23  on?

24       Q.  Eight.

25       A.  Well, we never came to an agreement.

1      Q.   There was never an agreement as to how to
2  unwind the relationship?
3      A.   No, as far as -- no.
4      Q.   So how did it happen that the parties continued
5  to conduct business for the next five months?
6              MR. GILES:   Objection, form.
7      A.   That which parties continued to
8  conduct business?
9      Q.   (By Mr. Baay)  Vitol and GCAC.  You understand
10  that's who we are talking about, right?
11      A.   Yes, but I am confused.  So where are you --
12  when you say unwind their position --
13      Q.   I am reading your words from your affidavit.
14      A.   Yeah, and I am just trying to figure out what
15  you are asking.
16      Q.   My question is what was the agreement as to how
17  that was going to be unwound?
18      A.   Well, they exited the position, but as of today
19  we haven't -- we don't have an agreement as to how we
20  are going to settle that up.
21      Q.   Okay.  Well, presumably there was one at the
22  time, true?
23      A.   No.  Why?
24      Q.   Well, then why were there discussions to unwind
25  the relationship if the relationship was never unwound?

1        A.   The relationship was unwound.

2        Q.   Was there an agreement?

3        A.   The relationship was unwound, but we never

4    determined what the ramifications of that were.  We

5    never had agreement as to what that -- what that

6    resulted in.

7        Q.   So are you saying you don't remember what the

8    discussions were --

9        A.   No.

10       Q.   -- or are you saying you don't understand how

11   it was unwound?

12       A.   No, I am saying that the discussions never bore

13   fruit.  I am saying that the discussions never resulted

14   in a meeting of the minds as to how it was going to be

15   wound up.  We wound it up.  We terminated -- we stopped

16   doing business as GCAC and Vitol.

17           Those positions were transferred through Rio to

18   Mercuria, but that doesn't mean that we came up with

19   a -- with a result as to how that was all going to be

20   wound up.

21       Q.   Well, whether you came to a -- to an agreement

22   or not, there are a series of transactions that occurred

23   from this point forward, do you agree --

24       A.   Correct.

25       Q.   -- between GCAC and Vitol?

1      A.   Yes.

2           MR. GILES:   Objection, form.

3      Q.   (By Mr. Baay)   And so your testimony is that

4  just happened out of the fact that you had to get to the

5  Mercuria agreement, and -- and that's the way GCAC

6  decided to do it?

7           MR. GILES:   Objection, form.

8           MR. DINNELL:   Objection, form.

9      A.   GC -- so -- what I am saying is that GCAC and

10  Vitol continued to do business until the middle of

11  January.  As of the middle of January they ceased doing

12  business, and there was a transaction or series of

13  transactions that transferred the positions ultimately

14  to Mercuria, and that's all I am saying.

15     Q.   (By Mr. Baay)   Okay.  And so it's your

16  testimony that all the transactions that occurred

17  between the moment these discussions were had to unwind

18  the relationship until January of 2018, your testimony

19  is those all occurred under this oral agreement that you

20  claim happened?

21     A.   Yes, because we never agreed to do anything

22  differently.

23     Q.   So -- so despite having the discussions, your

24  point is you never came to an agreement on how it was

25  going to end?

1      A.   Yes.

2      Q.   Who did you have these discussions with?

3      A.   With Eric primarily.

4      Q.   Anyone else?

5      A.   No, I don't think so.

6      Q.   You can put that one aside.

7      A.   Okay.

8      Q.   So the asphalt that was purchased by Vitol,

9  what did GCAC do with that product that it received?

10     A.   Well, Vitol -- explain a little further.  Tell

11  me what you are asking.

12     Q.   What don't you understand?

13     A.   Your question.  So that the -- so are you --

14  just ask it one more time if you don't mind.

15     Q.   So do you understand -- we have talked about ad

16  nauseam that there was product purchased by Vitol?

17     A.   Yes.

18     Q.   And my question is the product that was

19  purchased, what did GCAC do with that product?  And

20  obviously it's the product that Vitol didn't sell itself

21  to third parties.  In the event it gave it to GCAC, what

22  was done with that product?

23     A.   In the event that -- that GCAC purchased

24  product from Vitol in terms of this joint venture, then

25  it sold it.

1      Q.   To other third parties?

2      A.   Yes.

3      Q.   Would the -- would the GCAC sale to third

4  parties happen at the same price that it acquired the

5  product from Vitol at?

6      A.   Not necessarily.  I don't know on a

7  case-by-case basis.

8      Q.   Who would?

9      A.   Probably Patrick, but it's not -- not

10 necessarily.

11     Q.   You mean not necessarily Patrick?

12     A.   No, not necessarily at the same price.

13     Q.   And if it wasn't the same and obviously it was

14 at a higher price, that's profit that GCAC incurs or

15 enjoys?

16     A.   Yes, to the extent that happened.

17     Q.   So -- and I think I have asked you this

18 question already.  You don't have any understanding of

19 how much profit GCAC made from the sale of asphalt --

20 asphalt it acquired from Vitol?

21     A.   No, I don't have a sense of that.

22     Q.   A related question is the money that GCAC made

23 from the sales, where did that money go?

24     A.   The revenues that GCAC got?

25     Q.   The profit.

1      A.  I don't know.  I mean, I don't know -- you
2  are -- you are assuming that it had a profit, and I am
3  not sure it had a profit.
4      Q.  You just agreed that it did.
5      A.  No, I didn't.  I said -- you said "is it
6  necessarily the same price," and I said no.  It could
7  have been a higher price, it could have been a lower
8  price.  I am not -- I am not stipulating that they made
9  a profit on it.
10     Q.  Okay.  So in the assumption that a profit was
11 made, how was that money treated by GCAC?  What was done
12 with it?
13     A.  I don't know -- I don't know.  I am not sure
14 how to answer that.
15     Q.  You don't understand how money that comes into
16 your entity is used or accounted for?
17     A.  I mean, it would be -- it would have been
18 received by GCAC.  I don't know that we used -- that it
19 was used for anything.
20     Q.  Okay.  So is it still sitting in some bank
21 account?
22     A.  Possibly, part of it.
23     Q.  You don't know, though?
24     A.  No.  I mean, there is money in GCAC.  I don't
25 know that I can directly attribute it to this or that or

1   the other thing.

2       Q.   Who accounts for that within GCAC?

3           MR. GILES:   Objection, form.

4       A.   Most of that would be John Tomaszewski.

5       Q.   (By Mr. Baay)   Related question, do you have

6   any idea how the revenues from the Mercuria JV are

7   distributed?

8       A.   From Mercuria to GCAC you mean?

9       Q.   No, once GCAC receives them.

10      A.   I don't think they have them distributed from

11  GCAC.   It just gets the revenues -- gets the profit

12  share or whatever.

13      Q.   Okay.   And I think I remember you saying this

14  morning that that's happened once in --

15      A.   Yes.

16      Q.   -- in 2018?

17      A.   Correct.

18      Q.   And it was in the amount of $300,000?

19      A.   Roughly.

20      Q.   Did GCAC contribute anything to the joint

21  venture with Mercuria at the beginning of that

22  relationship?

23      A.   Other than general business, no -- I am trying

24  to remember.   Let me think for one second.   No cash.

25      Q.   Okay.

1      A.  It contributed its assets, its intellectual

2  property, its -- you know, its work effort, its -- all

3  that.

4      Q.  What assets?

5      A.  Intellectual property.  I guess it sublet -- it

6  subleases the Mobile terminal lease to them at cost.

7      Q.  When you sold that terminal in Mobile, did you

8  lease it back?  Is that how it happened?

9      A.  Yes, we leased part of it back.

10     Q.  Okay.  So there weren't any funds from the sale

11 of Vitol's asphalt contributed to the Mercuria JV that

12 you are aware of?

13     A.  No.

14     Q.  If there were, would John know about those?

15     A.  Yes, I think so.

16     Q.  Okay.  Are there any other relationships that

17 GCAC has, any other joint ventures or partnerships or

18 otherwise, that received cash from the sales of asphalt

19 that resulted from the Vitol/GCAC relationship?

20     A.  Not that I am aware of.

21     Q.  A better question is are there other JV's that

22 GCAC has other than this one with Mercuria?

23     A.  No.

24     Q.  None?

25     A.  No.

1          (Brass Exhibit No. 8 was marked.)

2          Q.  I hand you Brass 8.  So you -- turn to the

3    second page.  This is an email chain, and it looks like

4    the start is an email from Eric Kuo to Tom Moran that we

5    talked about already, and cc to you, Jason, Joe and

6    Mike, do you see that?

7          A.  Yes.

8          Q.  And Eric tells Tom with you in the copy that "I

9    spoke with A.J. yesterday, and he said they would send

10   us some money while we still sort through this."  And

11   this email was sent on March 29th, 2018; is that right?

12         A.  Correct.

13         Q.  Do you recall making that representation to

14   Eric?

15         A.  I don't recall that.

16         Q.  Would it surprise you that you were making

17   promises as of March 29th to send some money?

18         A.  I don't think we ever reached an -- is it

19   possible we discussed it, that's possible, but we never

20   reached an agreement on what we were going to do.

21         Q.  Is there a reason you didn't send money on

22   March 29th after telling Eric that you would?

23         A.  No, other than look, this is from Eric to Tom,

24   it's not from me to Eric.  I mean, I don't know what

25   Eric was telling people.  I mean, I would know from

1   this, but I don't know why he would have -- why he was

2   telling people -- what specific purposes he had for

3   telling people internally different things.  You would

4   have to ask him.

5       Q.  Well, presumably he had a conversation with you

6   and you said you would send some money.

7       A.  That's what he said.

8       Q.  And you are not really denying one way or the

9   other whether you said that or not?

10      A.  I think we had discussions.  I am not sure that

11  I firmly agreed to that.  I don't believe I firmly

12  agreed to that.

13      Q.  My only question is do you -- do you recall the

14  reason why you didn't send money in March of 2018?

15      A.  No, not offhand.

16      Q.  Do you agree that the last time GCAC sent a

17  payment to Vitol related to these transactions was late

18  January of 2018?

19      A.  That could be right.

20              (Brass Exhibit No. 9 was marked.)

21      Q.  I am going to hand you, Mr. Brass, Brass 9.

22  This is an email sent by Steve Barth at Vitol to Michael

23  Chambers.  Do you know Mr. Chambers?

24      A.  I don't.

25      Q.  Actually the first part of this chain Chambers

1    sends an email, do you see that, on July 21st?  And he

2    said, "You hearing anything from the bank on where it

3    stands and what are the next steps?"  You see that

4    sentence?  Do you see that sentence from Mr. Chambers?

5         A.  Oh, yes.  I was reading backwards.  Yes.

6         Q.  So it looks like Steve Barth responds to him

7    and says, "Just that they are moving forward with other

8    bidders.  Heard from A.J. that he thinks Mercuria is

9    lead horse right now."  Do you agree that as of July

10   21st, 2017 Mercuria was at the front to come in and take

11   the relationship with GCAC?

12        A.  No, this has nothing to do with that.

13        Q.  Okay.  What is -- what is it?

14        A.  This has to do with us and Vitol working to bid

15   on the acquisition of the refinery from Gravity, and

16   there were a number of bidders.  And we were chatting

17   about -- I don't know who Michael Chambers is or why he

18   is copied on this, but we were talking about -- maybe

19   that was Steve's boss.  I don't remember.

20             But anyway, we were talking about who was in --

21   who was vying for that, and this only had to do with

22   that.

23        Q.  So you think this relates to the fact that

24   Mercuria was at the lead to purchase the refinery?

25        A.  I believe so, yes.

1      Q.   Did its interest in the refinery lead to

2   discussions that led to its partnership with you, if you

3   recall?

4      A.   I don't recall what did it.  I don't -- just --

5   at this time, I don't think we had had any discussions

6   with Mercuria.

7      Q.   But it wasn't long after that, was it?

8      A.   Some period of time after that.

9      Q.   You don't have a memory of how long?

10      A.   It looks like maybe a month, estimating.

11              (Brass Exhibit No. 10 was marked.)

12      Q.   I hand you what I have marked Brass 10.  Does

13   this presentation look familiar to you, Mr. Brass?

14      A.   I am re-familiarizing myself with this paper.

15      Q.   Sure.

16      A.   Yeah, I think so.

17      Q.   Do you agree that this was sent by GCAC to

18   Vitol as part of the discussions to enter into some kind

19   of partnership related to the purchase and sale of

20   asphalt?

21      A.   I don't recall doing that, but I don't deny

22   that that's possible.

23      Q.   You don't recall sending a presentation you

24   mean?

25      A.   Yes.

1       Q.   Okay.

2       A.   But I am not saying we didn't.

3       Q.   It wouldn't be unusual in the course of

4  negotiations to send something like this, would it, for

5  GCAC?

6       A.   No.

7       Q.   And is this something that you prepared, do you

8  remember?

9       A.   I don't remember.  I am sure I saw it.

10       Q.   Who typically prepares these kind of -- is this

11  Jason Goldstein?

12       A.   Yes, more of a Jason thing.

13       Q.   If you flip to that second -- so this is dated

14  March 16th, 2017, right?

15       A.   May.

16       Q.   May 16th?

17       A.   Yes.

18       Q.   And it says -- that first bullet on the second

19  page says that "GCAC has been a blender, trader and

20  marketer of asphalt since '93."  Do you agree with that

21  date?

22       A.   Yes.

23       Q.   And then it says "and prior to that through

24  refining and terminalling operations at Trigeant since

25  the mid 1980's"?

1      A.   Fair.

2      Q.   And as we have discussed, Trigeant was sold to

3  Gravity, the terminal was?

4      A.   Yes, correct.

5      Q.   And the third bullet says you are

6  "contemplating a structure for Vitol to replace Rio as

7  the provider of working capital, hedging and credit

8  support for the operation."

9      A.   Okay.

10      Q.   And in fact, that is -- that's an accurate

11  description for what ultimately happened between the two

12  parties in 2017, in other words, Vitol did provide those

13  services, did it not?

14      A.   As a partner of GCAC, yes.

15      Q.   And then you also say that "I believe we" --

16  and I assume that means GCAC -- "can have a mutually

17  beneficial relationship with VALT" --

18      A.   Uh-huh.

19      Q.   -- did I read that right?

20      A.   Yes.

21      Q.   I heard -- I heard you earlier to say that you

22  thought VALT was a -- or you viewed VALT as a competitor

23  to GCAC?

24      A.   In some forms, yeah.

25      Q.   Then how is it that as of May of 2017 you

 1 | thought that they could be -- you could have a
 2 | beneficial relationship with them?
 3 |     A.  Just because we are competitors doesn't mean
 4 | the two competitors can't get together to make a
 5 | better -- a better business for the two of them.  We
 6 | thought that we added synergistic things to the
 7 | relationship.  VALT's strengths and our strengths could
 8 | marry up well.
 9 |     Q.  In fact, you explored that at length, didn't
10 | you, later the same year?
11 |     A.  We talked to them, yes, at Vitol's request.
12 |     Q.  You didn't -- GCAC didn't have an interest to
13 | talk at all?
14 |     A.  No, I just said that they requested that we
15 | talk to them, and that's where the basis of the
16 | discussions were.
17 |     Q.  Well, what's the reason why a relationship was
18 | not formed with VALT, to your memory?
19 |     A.  To my memory, we just couldn't come to terms.
20 | I think they were -- when -- when -- when Vitol did the
21 | deal with us and when VALT found out, and then they went
22 | back to Vitol and said "hey, wait a second, we have got
23 | a conflict here," I think VALT got pretty pissed off
24 | with Vitol, and I think that it became difficult to
25 | navigate through that.

1           But we have always had a good relationship with

2    VALT and continue to sell VALT today.  It's just -- it

3    just kind of soured, I think, the whole deal, in my

4    personal opinion.  That's just an opinion.

5           Q.  What was the -- the relationship that was

6    explored with VALT?

7           A.  A number of different ones.  I think primarily

8    the idea that there would be some sort of -- they would

9    be a marketer, we would be a manufacturer, some sort of

10   supply relationship.  We were having discussions along

11   those lines.

12          Q.  So if you turn to the second to last page, it

13   says "Corpus Retail Rack Opportunity," do you see that?

14          A.  Uh-huh, yes.

15          Q.  And it says that -- the bullet there says

16   "Currently negotiating supply/marketing deals with two

17   large oil companies that each have Texas retail asphalt

18   presence regarding one of those companies taking over

19   the Corpus retail rack marketing in exchange for high

20   quality asphalt supply and other economic advantages."

21          The question is, was this tied to the deal you

22   were contemplating with Vitol?

23          A.  No, I don't think so.  I think those were just

24   ongoing commercial discussions we were having.

25          Q.  Okay.  And how is it relevant to this

1    presentation to Vitol?

2        A.  I don't know.  I think it's just noting it as a

3    potential benefit.  We liked the idea of -- of -- of

4    bringing in someone who had rack expertise to take over

5    the rack and who also had asphalt supply that we could

6    use for -- for asphalt marketing and blending, and we

7    thought there was synergistically something beneficial

8    to that.

9        Q.  And then on the last page it says

10   "Miscellaneous/VALT," and it has three different bullets

11   about doing business with VALT, do you see those?

12       A.  Uh-huh.

13       Q.  Why was VALT featured so prominently in this

14   slide that you sent in May, do you recall?

15       A.  I don't recall.  I assume we were making it to

16   Vitol and we wanted to express why we thought there was

17   a good potential with -- with VALT.

18       Q.  Well, I mean, that's my question.  Did you know

19   that there was a JV between Vitol and VALT, and that's

20   why you had so much -- so many references to VALT here?

21       A.  Well, yes and no.  We did know that there was a

22   JV that VALT was -- owned or part owned or whatever it

23   is by Vitol, and also we had had some discussions with

24   VALT prior to this, and they were -- they were ongoing,

25   separate and apart from the idea that we might do --

1   that we were negotiating or trying to do something with

2   Vitol.

3       Q.  So -- and I am sure you said this and I missed

4   it.  What was the difference between the deal you were

5   trying to structure with Vitol and the one you were

6   trying to structure with VALT?

7       A.  VALT is -- to my recollection, what we were

8   talking about doing with VALT was a combination of --

9   they had -- they had shipping and marketing -- a sort of

10  Caribbean and Latin American marketing business.  We had

11  basically what's an asphalt manufacturing business when

12  you boil it all down, and we thought there was a synergy

13  between the two of those things.  It wasn't necessarily

14  a partnership, but it could have been.

15      Q.  So it was -- VALT's role would have been

16  different than Vitol's as contemplated by your -- your

17  agreement with Vitol?

18      A.  Maybe, maybe not.  We didn't get to the point

19  where I could tell you definitively what path it was

20  going to take.

21      Q.  So you say "We would view" -- in this last

22  bullet, "We would view our wholesale supply partnership

23  with VALT as synergistic to Vitol/VALT and not

24  competitive."

25      A.  Yes.

1      Q.   What does that mean?

2      A.   That we could work with VALT to -- to -- that

3  we thought there were opportunities to work together to

4  make -- to be synergistic.

5      Q.   Okay.  And those were explored, and ultimately

6  you decided -- GCAC decided that that wasn't a

7  partnership it wanted to enter into?

8      A.   No, I don't think that's the case.  They --

9  they were explored.  We had ongoing conversations with

10  VALT and continue to have ongoing conversations with

11  VALT.  They just never came to fruition.

12      Q.   How is that different from what I just said?

13      A.   Because you made it sound like GCAC --

14  unilaterally -- like there was a deal with VALT, and

15  GCAC unilaterally decided not to do it with VALT, and I

16  don't think that's the case.  I think -- I don't -- I

17  think just there was never a meeting of the minds.

18      Q.   There were never any agreements exchanged

19  between VALT and GCAC, true?

20      A.   Not to my recollection.

21      Q.   Not even markups?

22      A.   I don't think so.

23      Q.   And you feel confident there was never an oral

24  agreement between GCAC and VALT to do business or to

25  form a partnership?

 1      A.   No, I don't believe so.

 2      Q.   Let me ask the question differently because

 3  it's going to be confusing how you answered it.

 4      A.   Okay.

 5      Q.   Do you believe that there was ever an oral

 6  agreement between VALT and GCAC to form a partnership?

 7      A.   No.

 8      Q.   So in your -- I am going to hop around here, so

 9  bear with me.

10      A.   Uh-huh.

11      Q.   In your -- in GCAC's complaint or petition, you

12  make the allegation that Vitol failed to complete the

13  initial term.  What was the initial term?

14      A.   Two years.

15      Q.   Okay.  And so that -- you believe that two --

16  that two years was the express term of the agreement

17  between the parties, right?

18      A.   Yes.

19      Q.   But it was never written down anywhere?

20      A.   In the drafts.

21      Q.   So on that point -- well, strike that.

22           As the two -- as GCAC and Vitol -- Vitol

23  operated under this agreement that you believe was

24  formed, do you have an idea as to the cost that GCAC

25  incurred as part of that agreement?

1      A.   The cost that GCAC incurred by entering into

2   the agreement?

3      Q.   No.   You understand that according to your

4   view, there was an agreement to share costs 50 percent

5   between the parties, right?

6                MR. GILES:   Objection, form.

7      A.   There was an agreement to share profits and

8   losses.

9      Q.   (By Mr. Baay)   And costs?

10                MR. GILES:   Objection, form.

11      A.   Only to the extent that it went into the

12   calculation of profits and losses.

13      Q.   (By Mr. Baay)   Okay.   So my question is simple.

14   Do you have a knowledge of the costs that GCAC would

15   have incurred over the term of the agreement?

16      A.   Not as I sit here today.

17      Q.   Because you haven't done that calculation?

18      A.   Not as of yet.

19      Q.   How was it decided that -- how was the split

20   made between the product that Vitol sold and the product

21   that GCAC sold?

22      A.   I don't know.   I believe it was just kind of a

23   natural -- I don't know that there was any conscious

24   decision as to who did what.

25      Q.   Is there someone within GCAC who would know the

1  answer to that?

2      A.  I think I would, and I don't think there was

3  any real conscious decision as to why we sold one and

4  they sold one.

5      Q.  So what determined it?

6      A.  I think sometimes Eric would say "hey, would

7  you mind doing this sale," or it was just easier for us

8  to do it or whatever.  I don't think there was a real

9  method to it as far as I can recall.

10     Q.  But the decisions were the result of

11 conversations that happened between you and Eric?

12     A.  Yeah, I think so.  Maybe Patrick had some

13 involvement.

14     A.  And if I understood your testimony, the money

15 that you paid Vitol, you don't think it was for product.

16 I think your testimony was it was to balance the cash

17 flow?

18     A.  Yeah, just working capital, interim estimated

19 true-ups, whatever.

20     Q.  But all related to product costs, yes?

21     A.  Not necessarily.  Product cost -- I mean, I

22 don't know that there was a -- it wasn't earmarked as

23 this is for this or this is for that as far as I was

24 concerned.

25     Q.  So then how were the amounts determined by

1   GCAC?

2        A.   They were just estimated.

3        Q.   By whom?

4        A.   I think primarily me.

5        Q.   And estimated based off of the amount of

6   product purchased?

7        A.   I would say less math went into it than that.

8   I would say it was just Eric would say "hey, could

9   you" -- "could you pay us something," and I would say

10  "hey, how about I send you this," and he would go

11  "okay," and I sent him the money, and that was it.  I

12  don't think there was any more calculus that went into

13  it than that.

14       Q.   Okay.  So then how did you know when you --

15  when those payments needed to stop if there was not a

16  precise calculus to it?

17       A.   Well, they went on, and then we -- at the --

18  after the deal was over, we started talking about how to

19  settle it up and who would owe who what.

20       Q.   Did you ever at any point make the proposal

21  that the calculation was a 50 percent share of profits?

22       A.   Not -- I didn't make the proposal that it was a

23  50 percent share of profits, but I believe I did in all

24  of our -- our negotiations say "hey, look, you are

25  asking us to give up our contractual rights and you are

1  asking to modify this agreement."

2          "To the extent that we do that, we need to have

3  an agreement to do that, otherwise we are in this" -- as

4  far as I was concerned, "we are in this original deal

5  that we did."

6      Q.  Well, that's my question.  You think the

7  original deal was a 50 percent share of profits, right?

8      A.  Yes.

9      Q.  So why were none of your offers based on that

10  calculation?

11      A.  It is just not where we were negotiating.

12      Q.  You were negotiating as if there was a

13  financing arrangement, true?

14      A.  I was negotiating as if I was trying to appease

15  them, and I was trying to come up with a framework to

16  get them what they wanted.

17      Q.  Okay.  And what was your framework?

18      A.  That we would agree that -- that if we came to

19  an agreement, we would come up with a sum of money that

20  was, as I told them, more than what we owed them, but we

21  would pay it out to the extent that we wanted to pay it

22  out over time, and they would agree to that.

23              MR. GILES:  And before you continue, Mr.

24  Baay, as to this whole line of questioning about

25  settlement discussions, we are going to assert

1  confidentiality under Rule 408 as well as generally,

2  just so you know.

3           MR. BAAY:  408 doesn't say it's

4  confidential, but you can make your objection.

5       Q.  (By Mr. Baay)  The framework that you

6  proposed -- do you remember the email I showed you where

7  you made a calculation and sent it to Vitol on February

8  13th saying that the difference is roughly $1.1 million

9  in what GCAC owes to Vitol?  You remember that?

10      A.  I recall that email and again stipulate that

11 that didn't necessarily mean that GCAC owed them that

12 money, but I recall the email.

13      Q.  You made that clear when I asked you about the

14 document.

15      A.  Okay.

16      Q.  My question is how did you go from having a

17 $1.1 million calculation on February 13th to making a

18 $14.9 million settlement offer in April of 2018?

19      A.  Again, the $1.1 million was just one piece of a

20 calculation, and when we entered into the settlement

21 negotiations, that was part of it.  But we took into

22 account a lot of things including where we were, what

23 other deals we were working on with Vitol, the whole --

24 it was a holistic discussion.

25      Q.  Is it fair to say that your offer of 14.9 was

1   closely matched to Mike Ruzek's accounting that he sent
2   you on April 10th, 2018?
3       A.  Yes, it was close to that.
4       Q.  And none of that was under a framework that
5   considered a 50 percent share of profits between the two
6   parties, GCAC and Vitol?
7       A.  That is correct.
8               MR. BAAY:  I believe those are all my
9   questions.  Give me two minutes to make sure.
10              MR. GILES:  Sure.  You want us to give you
11  a minute or --
12              MR. BAAY:  No.
13              THE VIDEOGRAPHER:  Off the record at 1:55.
14              (Recess taken.)
15              MR. BAAY:  Okay, Mr. Brass.  Those are all
16  my questions.  Thanks for your time today.
17              THE WITNESS:  Thank you.
18              MR. GILES:  We will reserve ours for trial.
19              (Deposition concluded at 1:59 p.m.)
20
21
22
23
24
25

1                           CHANGES AND SIGNATURE

2    PAGE   LINE   CHANGE                          REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1            I, ARTHUR J. BRASS, have read the foregoing
deposition and hereby affix my signature that same is
2 true and correct, except as noted above.

3
                    _____
                    ARTHUR J. BRASS
4

5 THE STATE OF   _____  )

6 COUNTY OF        _____  )

7
            Before me, _____, on this day
8 personally appeared ARTHUR J. BRASS, known to me (or
proved to me under oath or through _____)
9 (description of identity card or other document) be the
person whose name is subscribed to the foregoing
10 instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
11 expressed.

12            GIVEN UNDER my hand and seal of office this
_____ day of _____, 2018.
13

14                    _____
                    NOTARY PUBLIC IN AND FOR
15                    THE STATE OF _____

16

17

18

19

20

21

22

23

24

25

001671

```
 1                      CAUSE NO. 2018-33445

 2   VITOL, INC.,                 )      IN THE DISTRICT COURT OF
          Plaintiff,             )
 3                               )
     VS.                         )      HARRIS COUNTY, T E X A S
 4                               )
     GULF COAST ASPHALT          )
 5   COMPANY, L.L.C. AND         )
     ARTHUR J. BRASS,            )
 6        Defendants.            )      157TH JUDICIAL DISTRICT

 7

 8                      REPORTER'S CERTIFICATION
                  TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9                           ARTHUR J. BRASS
                             June 28, 2018
10

11        I, Paula A. Lucchesi, Certified Shorthand Reporter
     in and for the State of Texas, hereby certify to the
12   following:

13        That the witness, ARTHUR J. BRASS, was duly sworn
     by the officer and that the transcript of the oral
14   deposition is a true record of the testimony given by
     the witness;

15
          That the deposition transcript was submitted on
16   _____, 2018, to the witness or to the attorney
     for the witness for examination, signature, and return
17   to me by _____, 2018.

18        That the amount of time used by each party at the
     deposition is as follows:
19
          David A. Baay - 02:55
20        Neil E. Giles - 00:00

21        That pursuant to information given to the
     deposition officer at the time said testimony was taken,
22   the following includes counsel for all parties of
     record:

23
          David A. Baay, Attorney for Plaintiff
24        Neil E. Giles, Attorney for Defendants

25        I further certify that I am neither counsel for,
```

1   related to, nor employed by any of the parties in the
    action in which this proceeding was taken, and further
2   that I am not financially or otherwise interested in the
    outcome of the action.
3
          Further certification requirements pursuant to Rule
4   203 of TRCP will be certified to after they have
    occurred.
5
          Certified to by me on this 8th day of July, 2018.
6
7
8         _____
          PAULA A. LUCCHESI, Texas CSR 1310
9         Expiration Date:  12/31/2018
          Kim Tindall & Associates, L.L.C.
10        Firm Registration No. 631
          16414 San Pedro, Suite 900
11        San Antonio, Texas  78232
          210-697-3400
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          FURTHER CERTIFICATION UNDER RULE 203 TRCP

2

          The original deposition was/was not returned to the
3    deposition officer on _____;

4          If returned, the attached Changes and Signature
     page contains any changes and the reasons therefor;
5
          If returned, the original deposition was delivered
6    to Mr. David A. Baay, Custodial Attorney;

7          That $_____ is the deposition officer's
     charges to the Vitol, Inc. Plaintiff for preparing the
8    original deposition transcript and any copies of
     exhibits;
9
          That the deposition was delivered in accordance
10   with Rule 203.3, and that a copy of this certificate was
     served on all parties shown herein on and filed with the
11   Clerk.

12         Certified to by me this _____ day of _____,
     2018.
13

14

15                   _____
                     PAULA A. LUCCHESI, Texas CSR 1310
16                   Expiration Date:  12/31/2018
                     Kim Tindall & Associates, L.L.C.
17                   Firm Registration No. 631
                     16414 San Pedro, Suite 900
18                   San Antonio, Texas  78232
                     210-697-3400
19

20

21

22

23

24

25

001674







001677



001678





001680



001681





001683



001684



001685









001689











**EXHIBIT**

Brass 1

## CAUSE NO. 2018-31578

| | | |
|---|---|---|
| GULF COAST ASPHALT COMPANY, LLC | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| VITOL, INC. | § § § | |
| Defendant. | § | 295th JUDICIAL DISTRICT |

### <u>AGREED PROTECTIVE ORDER</u>

It is hereby ordered that the following provisions shall govern claims of confidentiality in these proceedings:

    a.    Only documents containing trade secrets, special formulas, company security matters, customer lists, financial data, projected sales data, production data, matters relating to mergers and acquisitions, and data which touch upon the topic of price may be designated confidential, provided such documents have not previously been disclosed by the producing party to anyone except those in its employment or those retained by it ("Confidential Information"). Such documents or parts thereof will be designated after review by an attorney for the producing party by stamping the word "Confidential" on each page.

    b.    Review of Confidential Information by counsel, experts, or consultants for the litigants in the litigation shall not waive the confidentiality of the documents or objections to production.

    c.    The inadvertent, unintentional, or *in camera* disclosure of Confidential Information shall not generally be deemed a waiver, in whole or in part, of any party's claims of confidentiality.

    d.    If any party believes a document not described in the above paragraph should nevertheless be considered confidential, it may make application to the court. Such application shall only be granted for reasons shown and for extraordinary grounds.

    e.    Confidential Information shall only be used in connection with trial preparation, trial and other proceedings in this litigation and shall be shown only to the attorneys, the parties, parties' experts, actual or proposed witnesses, and other persons whom the

attorneys deem necessary to review the documents for the prosecution or defense of this lawsuit. Each person who is permitted to see confidential documents shall first be shown a copy of this order and shall further be advised of the obligation to honor the confidentiality designation.

f.    If a party believes that a document designated or sought to be designated confidential by the producing party does not warrant such designation, the party shall first make a good-faith effort to resolve such a dispute with opposing counsel. In the event that such a dispute cannot be resolved by the parties, the producing party shall apply to the court for a determination as to whether the designation is appropriate. The burden rests on the party seeking confidentiality to demonstrate that such designation is proper.

g.    At the time of deposition or within 10 days after receipt of the deposition transcript, a party may designate as confidential specific portions of the transcript which contain confidential matters under the standards set forth in paragraph (a) above. This designation shall be in writing and served upon all counsel. No objection shall be interposed at deposition that an answer would elicit confidential information. Transcripts will be treated as confidential for this 10-day period. Any portions of a transcript designated confidential shall thereafter be treated as confidential in accordance with this order, subject to the provisions of Paragraph (f).

h.    In filing materials with the court in pretrial proceedings, counsel shall file under seal only those specific documents and that deposition testimony designated confidential, and only those specific portions of briefs, applications, and other filings that contain verbatim confidential data, or that set forth the substance of such confidential information.

i.    This Court having reviewed the parties' Agreed Protective Order and being duly advised in the premised,

IT IS HEREBY ORDERED that the Agreed Protective Order is GRANTED.

Signed this __ day of _____, 2018.

_____
PRESIDING JUDGE

APPROVED AS TO FORM AND SUBSTANCE:

HALL MAINES LUGRIN P.C.

By:_____
Neil E. Giles
Texas Bar No. 00784126
Attorneys for Plaintiff


EVERSHEDS SUTHERLAND (US) LLP

By:_____
David A. Baay
Texas Bar No. 24027050
Attorneys for Defendant

| | |
|---|---|
| **From:** | Jason Goldstein |
| **To:** | Steve Barth; Rob James |
| **Subject:** | Heavy Oil/Asphalt in Corpus |
| **Date:** | Monday, February 09, 2015 1:40:19 PM |
| **Attachments:** | Heavy Oil Doc for Vitol.pdf |

Hi Guys,

I hope you had a good weekend.

As discussed Friday, the attached document is intended to outline at a high level the opportunities we see around heavy oil at the Trigeant facility.  We did not get into details around projected pricing, but we are happy to sit down and walk through project economics (margins as well as terminalling costs) if you think the opportunity is interesting based on the initial high level description.

Also, we are happy to have a call or meeting with Eric Kuo, who we have met with in the past and who AJ believes understands this opportunity set well, if you think that makes sense.

Just let me know how you would like to proceed.

Best,

Jason

EXHIBIT
Brass 2

001697

Name
Case 6:23-cv-00002   Document 8-16   Filed on 03/10/23 in TXSD   Page 218 of 282
Heavy Oil Doc for Vitol.pdf

**Gravity Midstream Corpus Christi, LLC**
Description of Heavy Oil / Asphalt Opportunity

## Overview

The historical use of the Trigeant assets has been the processing of heavy oil to make refinery intermediate products and asphalt, as well as the retail marketing of asphalt. This document is intended to outline these opportunities for Vitol.

## Processing

The processing unit was built in the 1980's under a netback deal with the predecessor companies to PDVSA to refine Boscan and other heavy crudes. The processing unit has a nameplate capacity of 30 KBPD and can comfortable handle throughputs of 25 KBPD of most heavy crudes. The processing unit produces: vacuum tower bottoms/asphalt (VTB), high sulfur vacuum gas oil (HSVGO), middle distillate oil (MDO), and pre-flash distillate (PFD). The yields and typical specifications of these products is outlined below.

Gravity management believes that the current economics to run heavy crudes to manufacture asphalt and intermediate products are attractive. Gravity is interested in securing a short-term customer (one year, plus or minus) tolling customer for this activity.

## Asphalt Marketing

Much like the heavy processing, asphalt marketing has been a core part of the Trigeant operations since inception. The primary business consists of "breaking bulk" asphalt, receiving asphalt in wholesale volumes either by marine vessel or from the processing unit and selling it in retail truck volumes over the facility truck loading rack to road contractors. The secondary business is the polymerization of asphalt, conducted by blending polymers into asphalt using the facility's polymer modified asphalt (PMA) plant.

Gravity management believes that the retail asphalt rack could generate sales volumes of 300-500 KBBL of asphalt per year, of which approximately 30% are PMA. While current margins are <u>significantly</u> higher, Gravity's affiliate Gulf Coast Asphalt Company (GCAC) typical models non-PMA margins of $50-$75/short ton, and PMA margins of $100/short ton (assume 5.56 BBL/short ton).

Gravity is seeking a two to three-year asphalt customer deal, which involves committing to 264 KBBL of asphalt storage (shell barrels), asphalt truck rack fees with minimum volumes, and polymer modification fees with minimum volumes.

## Other/Joint Ventures

*Retail Asphalt Marketing*

GCAC has a 20 year+ track record of marketing asphalt and has all of the personnel and infrastructure to manage the retail asphalt business, and GCAC would be interested in joint venturing this business with Vitol. This is an option but not a requirement; Gravity does not require that Vitol joint venture the business in order to be the retail asphalt customer. GCAC would want Vitol to provide working capital and credit support for the terminalling commitment, and GCAC could run operations and split profits with Vitol.

*Asphalt/VTB Blending*

Similarly, GCAC has a long-standing and successful track record of blending asphalt, fuel oil and VTB's on a wholesale basis. GCAC believes that it has rather unique know-how in the blending of asphalt and off-spec heavy barrels to produce on-spec asphalt for wholesale markets. GCAC currently engages in this activity out of tankage it rents in Mobile, AL, and at the present time the majority of GCAC's sales are to the Caribbean and LatAm markets, including via asphalt ships that GCAC takes on from time to time. In connection with the heavy businesses described above, GCAC would be interested in joint venturing asphalt/VTB blending opportunities in Corpus Christi, and, in the event of such an arrangement, would be open to joint venturing its entire Gulf Coast operations including Mobile in the pursuit of alignment of interests.

Regarding projected volumes, Gravity and GCAC management believe there is an opportunity to blend and throughput 1-2 million BBL/year of asphalt/VTB's, with quantities dependent on the market as well as on whether the processing unit is producing asphalt, with margins of $2-$5/BBL.

GCAC currently charters one ship 6,000 metric ton asphalt ship and has contracted to purchase a second, new 13,000 metric ton asphalt ship, which GCAC expects to take delivery of sometime 4Q2016.

## Heavy Crude Yields

| HEAVY CRUDE YIELDS | BOSCAN | DOBA | LLOYD | M-100 | MEREY | RUBIALES |
|---|---|---|---|---|---|---|
| CRUDE API | 11.0 | 21.3 | 12.3 | 14.5 | 15.3 | 12.4 |
| YIELDS: | | | | | | |
| VTB | 72.5% | 42.0% | 58.0% | 58.5% | 54.0% | 58.0% |
| HVGO | 10.5% | 39.0% | 21.5% | 27.8% | 22.5% | 21.5% |
| MDO | 11.5% | 14.5% | 16.0% | 12.5% | 17.0% | 18.0% |
| PFD | 5.0% | 4.0% | 4.0% | 0.7% | 6.0% | 2.0% |
| LOSS | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| TOTALS | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

TYPICAL SPECS

**HVGO**

| | BOSCAN | DOBA | LLOYD | M-100 | MEREY | RUBIALES |
|---|---|---|---|---|---|---|
| API | 21.1 | 23.4 | 22 | 23 | 23 | 19 |
| SULFUR | 3.7 | 0.1 | 2 | 1.9 | 2.1 | 1.7 |
| cst@122F | 33.5 | 28 | | 47 | 29 | |
| EP | 980 | 1025 | 1025 | 1020 | 1000 | 1000 |
| FLASH | 200+ F | 200+ F | 200+ F | 200+ F | 200+ F | 200+ F |
| ACID | 0.8 | 3.18 | | 0.01 | 1.1 | |

**MDO**

| | BOSCAN | DOBA | LLOYD | M-100 | MEREY | RUBIALES |
|---|---|---|---|---|---|---|
| API | 29 | 32.2 | 28 | 27 | 32 | 27 |
| SULFUR | 3.15 | 0.04 | 1.25 | 0.12 | 0.75 | 0.12 |
| cst@122F | 3.2 | 2.5 | | 5.5 | 3.4 | |
| EP | 740 | 682 | 725 | 760+ | 710 | 725 |
| FLASH | 155 | 110 F | 150 F | 185 F | 160+ | 150+ |
| ACID | | 1.5 | | | | |

**PFD**

| | BOSCAN | DOBA | LLOYD | M-100 | MEREY | RUBIALES |
|---|---|---|---|---|---|---|
| API | 48 | 55 | 45 | 46 | 55 | 45 |
| SULFUR | 1.6 | 0.01 | 0.7 | 0.5 | 0.12 | 0.07 |
| cst@122F | 1 | 1 | | 1.5 | 0.75 | |
| EP | 600 | 525 | 500+ | 580 | 540 | 500+ |

**To:** Eric Kuback[ekuback@vitol.com]
**From:** Arthur Brass
**Sent:** Fri 4/13/2018 6:01:30 PM
**Subject:** Vitol / GCAC

<u>FOR SETTLEMENT PURPOSES ONLY UNDER THE FEDERAL RULES OF CIVIL PROCEDURE</u>

Regarding our commercial relationship which began on July 1, 2017, GCAC and Vitol (each a "Party" and together, the "Parties") have disagreements regarding amounts of monies owed by Parties and timing payment of amounts owed. Either Party may or may not have additional rights or claims. The following outlines a non-binding, settlement proposal for discussion purposes only. Each Party has previously agreed verbally that any settlement discussions shall not be used against the other Party. Moreover, neither Party waives any rights it may have, each Party reserves all of its rights and remedies and may assert any such rights or remedies at any time or from time to time.

With this said, GCAC proposes to settle by paying Vitol a sum of money of $14.9 million, equal to the true-up figure that Vitol has proposed to GCAC. By agreeing settle at this amount:

-   GCAC would not contest the Vitol proposed $14.9 million, which GCAC believes is overstated by millions of dollars;
-   GCAC would agree to acknowledge and document sums due, thereby eliminating challenges and uncertainty around amounts a Party may owe another Party; and
-   As part of a mutual release of all other rights or claims, GCAC would relinquish any claims against Vitol, which may include, but are not limited to, breach of contract claims.

Further by agreeing to our proposal below, we will be highly motivated to pay the amounts agreed to as quickly as possible. If agreed upon, it would be our goal to make payments as soon as possible, and we are prepared to offer punitive interest penalties the longer it takes GCAC to make such payments.

All payments would be due within three years of date of the settlement agreement. Parties would add a simple interest rate to the agreed upon amount ($14.9 million) equal to 6% from date of agreement until the end of the third month after agreement, 9% from the end of the start of the fourth month after agreement until the end of the first year of the agreement, 12% during the second year of the agreement, and 20% during the third year of the agreement. Our intention is to create a structure that motivates the repayment of amounts as soon as possible.

Parties would need to discuss appropriate documentation for such agreement.

Please let me know your thoughts on this proposal at your earliest convenience.



EXHIBIT
Brass 3

001702

**To:** AJ Brass[aj@abrass.com]
**From:** Eric Kuo
**Sent:** Tue 4/10/2018 8:35:09 PM
**Subject:** Fwd: GCAC Sheet
GCAC Position 10 Apr 18.xlsx
ATT00001.htm

Begin forwarded message:

> **From:** Mike Ruzek <mrr@Vitol.com>
> **Date:** April 10, 2018 at 8:33:22 PM CDT
> **To:** Eric Kuo <ejk@Vitol.com>
> **Cc:** Tom Moran <tam@Vitol.com>, Mike Ruzek <mrr@Vitol.com>
> **Subject: GCAC Sheet**

I cleaned up

Small change from the numbers earlier as I had to have the TCR calc out to April 10, 2018

| Value | Description |
|---|---|
| $3,769,093.46 | Product cost true up due Vitol |
| $1,339,628.68 | Deal related costs (Freight, Demurrage, Inspection, etc.) |
| $2,632,252.96 | Storage related costs (Tank lease, heat, throughput, take or pay) |
| $351,012.20 | TVM      April 10, 2018 |
| $200,890.09 | TCR      *Now reflects April 10th (was Mar 7th on earlier version)* |
| $6,244,480.00 | Hedging |
| $279,210.00 | Arc Mobile tank rental Jul '17 & Aug '17 ($139,605 x 2) |
| $256,589.95 | Freight Titanio delivery Deal #3 |
| **$15,073,157.34** | **Total Due Vitol** |



EXHIBIT
Brass 4
001703

**GCAC Summary**

| Value | Description |
|---|---|
| $3,769,093.46 | Product cost true up due Vitol |
| $1,339,628.68 | Deal related costs (Freight, Demurrage, Inspection, etc.) |
| $2,632,252.96 | Storage related costs (Tank lease, heat, throughput, take or pay) |
| $351,012.20 | TVM    April 10, 2018 |
| $200,890.09 | TCR    *Now reflects April 10th (was Mar 7th on earlier version)* |
| $6,244,480.00 | Hedging |
| $0.00 | Arc Mobile tank rental Jul '17 & Aug '17 ($139,605 x 2) |
| $256,589.95 | Freight Titanio delivery Deal #3 |
| $14,793,947.34 | Total Due Vitol |

**Product Cost Summary**

| Purchases (Cash Out) | |
|---|---|
| (13,306,101.87) | Rev - Beginning Inventory |
| (45,038,855.73) | 3rd Party (including GCAC/Shell 1gallon) |
| (58,344,957.60) | Total cash paid for product |

| Sales (Cash In) | |
|---|---|
| 24,688,821.96 | 3rd Party Sales (excludes GCAC) |
| 4,000,000.00 | GCAC Payment #1 |
| 3,700,000.00 | GCAC Payment #2 |
| 8,534,601.25 | GCAC Payment #3 |
| 8,952,522.10 | Rev - Ending Inventory |
| 4,598,118.63 | Rm Lockbox Cash Pass through |
| 54,615,863.94 | Total cash received for product |

| (3,369,093.66) | GCAC cash settle product balance |



**Opening Inventory: 30-Jun-2017**

| Tank (Onyx) | Volume | Bottoms | Net Sum Bottoms |
|---|---|---|---|
| 612 | 45,405.84 | | 45,405.84 |
| 613 | 42,286.46 | 2895.731 | 39,392.77 |
| 614 | 18,640.01 | | 18,640.01 |
| 615 | 9,384.14 | 607.195 | 8,776.95 |
| 316 | 0.00 | 84.000 | |
| 401 | 1,119.97 | 658.180 | 461.78 |
| 402 | 1,662.81 | | 1,662.81 |
| 403 | 1,830.17 | | 1,830.17 |
| 404 | 2,174.10 | | 2,174.10 |
| 405 | 1,245.12 | | 1,245.12 |
| 406 | 264.71 | | 264.71 |
| 407 | 2,005.96 | | 2,005.96 |
| 424 | 876.27 | | 876.27 |
| 143 | 872.18 | | 872.18 |
| Total | 134,022.64 | 3241.090 | 130,529.55 |
| Max Figures | 132,000.000 | 3241.090 | 130,118.91 |
| | 123.04 | | |

| Tank (Mobile) | Volume |
|---|---|
| 801 | 57,617.02 |
| 802 | 40,135.57 |
| 803 | 35,069.57 |
| X | 9,387.19 |
| Total | 152,033.35 |
| Grand Total | 231,660.35 |
| Net Grand Total | 231,689.35 |

001708

**GCAC TVM Calculation**
see "hdg 2007802 Vouchers

TVM Rate 3.25%

| Date | Deal | Description | Quantity | Amount | Outstanding Balance | Date | Balance | PCT | Daily Value | TVM Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 6-Jul-17 | 1844757 | Product - Mobile Tanks | 107,999.310 | 4,727,129.80 | 4,727,129.80 | 6-Jul-17 | 10,210,313.00 | 3.25% | 921.76 | 921.76 |
| 6-Jul-17 | 1844757 | Product - Corpus Tanks | 120,128.910 | 5,258,042.39 | 9,985,172.19 | 7-Jul-17 | 10,489,313.00 | 3.25% | 946.95 | 1,868.72 |
| 6-Jul-17 | 1844757 | Products - Corpus Tanks (bottoms) | 3,761.090 | 3,761.09 | 9,988,933.28 | 8-Jul-17 | 10,489,313.00 | 3.25% | 946.95 | 2,815.67 |
| 6-Jul-17 | 1844757 | Corpus Polymers | | 75,347.22 | 10,064,280.50 | 9-Jul-17 | 10,489,313.00 | 3.25% | 946.95 | 3,762.62 |
| 6-Jul-17 | 1844757 | Corpus Storage | | 146,032.50 | 10,210,313.00 | 10-Jul-17 | 10,489,313.00 | 3.25% | 946.95 | 4,709.57 |
| 7-Jul-17 | 1834559 | Freight Asphalt Star (A) | | 279,000.00 | 10,489,313.00 | 11-Jul-17 | 12,155,172.94 | 3.25% | 1,097.34 | 5,806.91 |
| 11-Jul-17 | 1844757 | Exxon to Mobile (on water) | 38,059.400 | 1,665,859.94 | 12,155,172.94 | 12-Jul-17 | 12,155,172.94 | 3.25% | 1,097.34 | 6,904.26 |
| 13-Jul-17 | 1844757 | Exxon to Mobile (on water) | 37,772.640 | 1,653,308.45 | 13,808,481.39 | 13-Jul-17 | 12,511,792.88 | 3.25% | 1,129.54 | 8,033.79 |
| 13-Jul-17 | 1845096 | Sale to Rio/Valt - Feng Huang Ao | (29,830.970) | (1,296,688.51) | 12,511,792.88 | 14-Jul-17 | 12,511,792.88 | 3.25% | 1,129.54 | 9,163.33 |
| 19-Jul-17 | 1834559 | Freight Credit Asphalt Star (B) | | (22,410.05) | 12,489,382.83 | 15-Jul-17 | 12,511,792.88 | 3.25% | 1,129.54 | 10,292.87 |
| 19-Jul-17 | 1845012 | Citgo - Corpus (Provisional Px) | 55,871.290 | 1,738,287.70 | 14,227,670.53 | 16-Jul-17 | 12,511,792.88 | 3.25% | 1,129.54 | 11,422.40 |
| 27-Jul-17 | 1845012 | Citgo - Corpus (Final Px) | | 16,070.84 | 14,243,741.37 | 17-Jul-17 | 12,511,792.88 | 3.25% | 1,129.54 | 12,551.94 |
| 27-Jul-17 | 1845103 | Sale to Rio/VALT - Asphalt Spring | (22,570.730) | (956,303.15) | 13,287,438.22 | 18-Jul-17 | 12,511,792.88 | 3.25% | 1,129.54 | 13,681.48 |
| 31-Jul-17 | 1845103 | Sale to Rio/VALT - Asphalt Spring | (5,214.750) | (220,913.94) | 13,066,524.28 | 19-Jul-17 | 14,227,670.53 | 3.25% | 1,284.44 | 14,965.92 |
| 1-Aug-17 | 1844757 | Corpus Storage | | 206,032.50 | 13,272,556.78 | 20-Jul-17 | 14,227,670.53 | 3.25% | 1,284.44 | 16,250.36 |
| 3-Aug-17 | 1844757 | Corpus Polymers | | 9,240.23 | 13,281,797.01 | 21-Jul-17 | 14,227,670.53 | 3.25% | 1,284.44 | 17,534.80 |
| 3-Aug-17 | 1853922 | Citgo - Corpus | 25,231.920 | 821,719.53 | 14,103,516.54 | 22-Jul-17 | 14,227,670.53 | 3.25% | 1,284.44 | 18,819.25 |
| 4-Aug-17 | 1855791 | GCAC Jul/Aug '17 ARC Mobile Storage | | 279,210.00 | 14,382,726.54 | 23-Jul-17 | 14,227,670.53 | 3.25% | 1,284.44 | 20,103.69 |
| 10-Aug-17 | 1845090 | Exxon to Mobile | | 1,518,017.07 | 15,900,743.61 | 24-Jul-17 | 14,227,670.53 | 3.25% | 1,284.44 | 21,388.13 |
| 15-Aug-17 | 1845058 | Century Sale | (32,665.070) | (1,326,768.53) | 14,573,975.08 | 25-Jul-17 | 14,227,670.53 | 3.25% | 1,284.44 | 22,672.57 |
| 15-Aug-17 | 1845083 | Corpus Rack Sales (July '17) | | (1,156,752.53) | 13,417,222.55 | 26-Jul-17 | 14,227,670.53 | 3.25% | 1,284.44 | 23,957.02 |
| 15-Aug-17 | 1845083 | P66 to Corpus | 40,832.120 | 1,674,116.92 | 15,091,339.47 | 27-Jul-17 | 13,287,438.22 | 3.25% | 1,199.56 | 25,156.58 |
| 18-Aug-17 | 1845090 | Market Pet - Exxon Purch | | 2,000.00 | 15,093,339.47 | 28-Jul-17 | 13,287,438.22 | 3.25% | 1,199.56 | 26,356.14 |
| 18-Aug-17 | 1845012 | Market Pet - Citgo Purch | | 3,000.00 | 15,096,339.47 | 29-Jul-17 | 13,287,438.22 | 3.25% | 1,199.56 | 27,555.70 |
| 18-Aug-17 | 1853922 | Market Pet - Citgo Puch | | 1,250.00 | 15,097,589.47 | 30-Jul-17 | 13,287,438.22 | 3.25% | 1,199.56 | 28,755.26 |
| 23-Aug-17 | 1866853 | Hunt to Mobile | 25,065.080 | 1,122,511.26 | 16,220,100.73 | 31-Jul-17 | 13,066,524.28 | 3.25% | 1,179.62 | 29,934.88 |
| 23-Aug-17 | 1844757 | Corpus Jul storage xtra charges | | 179,715.72 | 16,399,816.45 | 1-Aug-17 | 13,272,556.78 | 3.25% | 1,198.22 | 31,133.09 |
| 23-Aug-17 | 1844757 | Corpus Storage | | 176,032.50 | 16,575,848.95 | 2-Aug-17 | 13,272,556.78 | 3.25% | 1,198.22 | 32,331.31 |
| 3-Sep-17 | 1844757 | Corpus Polymers | | 58,023.37 | 16,633,872.32 | 3-Aug-17 | 14,103,516.54 | 3.25% | 1,273.23 | 33,604.54 |
| 11-Sep-17 | 1877681 | Hunt to Mobile | 31,362.350 | 1,369,747.20 | 18,003,619.52 | 4-Aug-17 | 14,382,726.54 | 3.25% | 1,298.44 | 34,902.98 |
| 15-Sep-17 | 1930834 | Corpus Rack Sales (Aug '17) | | (941,546.71) | 17,062,072.81 | 5-Aug-17 | 14,382,726.54 | 3.25% | 1,298.44 | 36,201.42 |
| 21-Sep-17 | 1845105 | Sale to Rio/Unity | (31,575.690) | (1,581,801.65) | 15,480,271.16 | 6-Aug-17 | 14,382,726.54 | 3.25% | 1,298.44 | 37,499.86 |
| 3-Oct-17 | 1844757 | Corpus Polymers | | 24,176.40 | 15,504,447.56 | 7-Aug-17 | 14,382,726.54 | 3.25% | 1,298.44 | 38,798.31 |
| 10-Oct-17 | 1844757 | Corpus storage xtra charges | | 171,660.11 | 15,676,107.67 | 8-Aug-17 | 14,382,726.54 | 3.25% | 1,298.44 | 40,096.75 |
| 10-Oct-17 | 1844757 | Corpus Storage | | 146,032.50 | 15,822,140.17 | 9-Aug-17 | 14,382,726.54 | 3.25% | 1,298.44 | 41,395.19 |
| 13-Oct-17 | 1844757 | Corpus Storage | | 30,000.00 | 15,852,140.17 | 10-Aug-17 | 15,900,743.61 | 3.25% | 1,435.48 | 42,830.67 |
| 15-Oct-17 | 1930834 | Corpus Rack Sales (Sept '17) | | (722,326.00) | 15,129,814.17 | 11-Aug-17 | 15,900,743.61 | 3.25% | 1,435.48 | 44,266.15 |
| 2-Nov-17 | 1844757 | Corpus storage xtra charges | | 154,294.86 | 15,284,109.03 | 12-Aug-17 | 15,900,743.61 | 3.25% | 1,435.48 | 45,701.64 |
| 2-Nov-17 | 1844757 | Corpus Storage | | 146,032.50 | 15,430,141.53 | 13-Aug-17 | 15,900,743.61 | 3.25% | 1,435.48 | 47,137.12 |
| 2-Nov-17 | 1915049 | P66 to Corpus | 37,858.560 | 1,737,621.00 | 17,167,762.53 | 14-Aug-17 | 15,900,743.61 | 3.25% | 1,435.48 | 48,572.61 |
| 3-Nov-17 | 1915150 | Sale to Unity (Prepay) | (20,257.820) | (1,012,200.00) | 16,155,562.53 | 15-Aug-17 | 15,091,339.47 | 3.25% | 1,362.41 | 49,935.02 |
| 3-Nov-17 | 1915467 | Exxon FOB Baytown | 38,229.050 | 1,515,273.79 | 17,670,836.32 | 16-Aug-17 | 15,091,339.47 | 3.25% | 1,362.41 | 51,297.43 |
| 6-Nov-17 | 1915150 | Exxon to Freepoint | 47,307.730 | 1,957,054.56 | 19,627,890.88 | 17-Aug-17 | 15,091,339.47 | 3.25% | 1,362.41 | 52,659.84 |

| Date | Invoice | GCAC Payment | Volume | Amount | Balance |
|---|---|---|---|---|---|
| 7-Nov-17 | 1914582 | Intertek - Iver Agile to SEM | | 925.00 | 19,628,815.88 |
| 21-Nov-17 | 1915463 | Exxon FOB Baton Rouge | 39,366.220 | 1,570,188.61 | 21,199,004.49 |
| 8-Nov-17 | 1915150 | Exxon to Unity / Mobile | 31,750.940 | 1,313,491.94 | 22,512,496.43 |
| 14-Nov-17 | 1915150 | Freepoint from Exxon | (47,245.870) | (2,111,417.93) | 20,401,078.50 |
| 15-Nov-17 | 1930834 | Corpus Rack Sales (Oct '17) | | (827,719.32) | 19,573,359.18 |
| 16-Nov-17 | 1915150 | Sale to Unity (True up) | | (25,202.96) | 19,548,156.22 |
| 17-Nov-17 | 1914582 | Intertek - Iver Agile to SEM | | 450.00 | 19,548,606.22 |
| 17-Nov-17 | Various | | Total | (4,000,000.00) | 15,548,606.22 |

| Date | Invoice | GCAC Payment | Volume | Amount | Balance |
|---|---|---|---|---|---|
| 21-Nov-17 | 1925598 | Citgo to Freepoint - Pt Allen | 49,557.130 | 2,321,090.78 | 17,869,697.00 |
| 28-Nov-17 | 1941925 | Citgo xfer at Corpus | 19,733.340 | 848,848.30 | 18,718,545.30 |
| 28-Nov-17 | 1941491 | Citgo xfer at Corpus | 34,132.220 | 1,537,087.64 | 20,255,632.94 |
| 29-Nov-17 | 1915150 | K-27722 / 27723 | | 137,556.76 | 20,393,189.70 |
| 30-Nov-17 | 1935637 | Bominflot DAP Galveston x CC | (39,694.180) | (1,910,480.88) | 18,482,708.82 |
| 30-Nov-17 | 1925598 | Freepoint from Citgo - Pt Allen | (39,557.130) | (2,329,978.02) | 16,152,730.80 |
| 1-Dec-17 | 1942224 | Citgo xfer at Corpus | 34,466.860 | 1,469,839.24 | 17,622,570.04 |
| 5-Dec-17 | 1943899 | Davison to Mobile | 33,946.760 | 1,537,605.00 | 19,160,175.04 |
| 6-Dec-17 | 1844757 | Corpus Storage | | 176,032.50 | 19,336,207.54 |
| 6-Dec-17 | 1844757 | Corpus storage xtra charges | | 180,333.71 | 19,516,541.25 |
| 7-Dec-17 | 1930012 | Mercuria from P66 (#1) | (37,839.310) | (1,707,612.38) | 17,808,928.87 |
| 11-Dec-17 | 1930014 | Mercuria from P66 (#2) | (36,036.560) | (1,622,365.93) | 16,186,562.94 |
| 11-Dec-17 | 1915049 | P66 CBC 329/335 Dmrg | | 1,365.63 | 16,187,928.57 |
| 11-Dec-17 | 1845083 | P66 Gonsoulin Dmrg | | 2,172.92 | 16,190,101.49 |
| 5467..1925 | Various | Market Pet - various commissions | | 20,175.00 | 16,210,276.49 |
| 13-Dec-17 | 1930834 | Corpus Rack Sales (Nov '17) | | (32,863.62) | 16,177,412.87 |
| 13-Dec-17 | 1930012 | P66 to Mercuria (#1) | 37,839.310 | 1,725,297.50 | 17,902,710.37 |
| 14-Dec-17 | 1930012 | | | | |
| 15-Dec-17 | Various | | Total | (3,700,000.00) | 14,202,710.37 |

| Date | Invoice | GCAC Payment | Volume | Amount | Balance |
|---|---|---|---|---|---|
| 18-Dec-17 | 1933014 | P66 to Mercuria (#2) | 36,036.560 | 1,573,956.00 | 15,776,666.37 |
| 20-Dec-17 | 1965310 | Citgo to Exxon - Baton Rouge | 51,837.520 | 2,426,168.73 | 18,202,835.10 |
| 22-Dec-17 | 1965310 | Exxon from Citgo - Baton Rouge | (51,837.520) | (2,634,019.90) | 15,568,815.20 |
| 22-Dec-17 | 1966627 | Exxon DAP Baton Rouge | (40,757.180) | (1,974,685.37) | 13,594,129.83 |
| 22-Dec-17 | 1935637 | ICAP Commission | | 1,984.71 | 13,596,114.54 |
| 22-Dec-17 | 1930834 | Corpus Rack Sales (Nov '17) | | (161,233.90) | 13,434,880.64 |
| 26-Dec-17 | 1968171 | Koch ex Corpus | (37,352.380) | (1,854,545.67) | 11,580,334.97 |
| 27-Dec-17 | 1969310 | Citgo at Corpus | 48,842.130 | 2,151,782.50 | 13,732,117.47 |
| 29-Dec-17 | 1976564 | Koch at Corpus | 20,084.130 | 1,075,505.16 | 14,807,622.63 |
| 29-Dec-17 | 1930834 | Corpus Rack Sales (Nov '17) | | (530,721.20) | 14,276,901.43 |
| 29-Dec-17 | 1930834 | Corpus Rack Sales (Dec '17) | | (9,820.45) | 14,267,080.98 |
| various | | Dec '17 Inspection / misc fees | | 22,127.51 | 14,289,208.49 |

| Date | Invoice | GCAC Payment | Volume | Amount | Balance |
|---|---|---|---|---|---|
| 2-Jan-18 | 1844757 | Corpus storage xtra charges | | 218,440.70 | 14,507,649.19 |
| 2-Jan-18 | 1980532 | P66 at Corpus | 38,377.430 | 1,735,745.00 | 16,243,394.19 |
| 2-Jan-18 | 1980937 | Citgo ex Corpus | 54,943.000 | 2,259,805.59 | 18,503,199.78 |
| 5-Jan-18 | X0944,1969 | Market Pet - various commissions | | 9,875.00 | 18,513,074.78 |
| 8-Jan-18 | 1954505 | Bominflot DAP Galveston x CC | (40,392.510) | (1,835,839.58) | 16,677,235.20 |
| 10-Jan-18 | 1980944 | Citgo at Corpus | 56,706.660 | 2,466,361.67 | 19,143,596.87 |
| 11-Jan-18 | 1930834 | Corpus Rack Sales (Nov '17) | | (157,434.65) | 18,986,162.22 |
| 11-Jan-18 | 1930834 | Corpus Rack Sales (Dec '17) | | (49,700.25) | 18,936,461.97 |
| 11-Jan-18 | 1988722 | P66 to Mobile | 39,463.590 | 1,946,933.48 | 20,883,395.45 |

| Date | Balance | Rate | Daily | Cumulative |
|---|---|---|---|---|
| 18-Aug-17 | 15,097,589.47 | 3.25% | 1,362.98 | 54,022.82 |
| 19-Aug-17 | 15,097,589.47 | 3.25% | 1,362.98 | 55,385.80 |
| 20-Aug-17 | 15,097,589.47 | 3.25% | 1,362.98 | 56,748.77 |
| 21-Aug-17 | 15,097,589.47 | 3.25% | 1,362.98 | 58,111.75 |
| 22-Aug-17 | 15,097,589.47 | 3.25% | 1,362.98 | 59,474.73 |
| 23-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 60,971.16 |
| 24-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 62,467.59 |
| 25-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 63,964.02 |
| 26-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 65,460.45 |
| 27-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 66,956.88 |
| 28-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 68,453.31 |
| 29-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 69,949.74 |
| 30-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 71,446.17 |
| 31-Aug-17 | 16,575,848.95 | 3.25% | 1,496.43 | 72,942.60 |
| 1-Sep-17 | 16,575,848.95 | 3.25% | 1,496.43 | 74,439.04 |
| 2-Sep-17 | 16,575,848.95 | 3.25% | 1,496.43 | 75,935.47 |
| 3-Sep-17 | 16,633,872.32 | 3.25% | 1,501.67 | 77,437.14 |
| 4-Sep-17 | 16,633,872.32 | 3.25% | 1,501.67 | 78,938.80 |
| 5-Sep-17 | 16,633,872.32 | 3.25% | 1,501.67 | 80,440.47 |
| 6-Sep-17 | 16,633,872.32 | 3.25% | 1,501.67 | 81,942.14 |
| 7-Sep-17 | 16,633,872.32 | 3.25% | 1,501.67 | 83,443.81 |
| 8-Sep-17 | 16,633,872.32 | 3.25% | 1,501.67 | 84,945.48 |
| 9-Sep-17 | 16,633,872.32 | 3.25% | 1,501.67 | 86,447.15 |
| 10-Sep-17 | 16,633,872.32 | 3.25% | 1,501.67 | 87,948.82 |
| 11-Sep-17 | 18,003,619.52 | 3.25% | 1,625.33 | 89,574.15 |
| 12-Sep-17 | 18,003,619.52 | 3.25% | 1,625.33 | 91,199.47 |
| 13-Sep-17 | 18,003,619.52 | 3.25% | 1,625.33 | 92,824.80 |
| 14-Sep-17 | 18,003,619.52 | 3.25% | 1,625.33 | 94,450.13 |
| 15-Sep-17 | 17,062,072.81 | 3.25% | 1,540.33 | 95,990.45 |
| 16-Sep-17 | 17,062,072.81 | 3.25% | 1,540.33 | 97,530.78 |
| 17-Sep-17 | 17,062,072.81 | 3.25% | 1,540.33 | 99,071.10 |
| 18-Sep-17 | 17,062,072.81 | 3.25% | 1,540.33 | 100,611.43 |
| 19-Sep-17 | 17,062,072.81 | 3.25% | 1,540.33 | 102,151.76 |
| 20-Sep-17 | 17,062,072.81 | 3.25% | 1,540.33 | 103,692.08 |
| 21-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 105,089.61 |
| 22-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 106,487.13 |
| 23-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 107,884.66 |
| 24-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 109,282.18 |
| 25-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 110,679.70 |
| 26-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 112,077.23 |
| 27-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 113,474.75 |
| 28-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 114,872.28 |
| 29-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 116,269.80 |
| 30-Sep-17 | 15,480,271.16 | 3.25% | 1,397.52 | 117,667.33 |
| 1-Oct-17 | 15,480,271.16 | 3.25% | 1,397.52 | 119,064.85 |
| 2-Oct-17 | 15,480,271.16 | 3.25% | 1,397.52 | 120,462.38 |
| 3-Oct-17 | 15,504,447.56 | 3.25% | 1,399.71 | 121,862.08 |
| 4-Oct-17 | 15,504,447.56 | 3.25% | 1,399.71 | 123,261.79 |

001710

| Date | ID | Description | | Amount | Balance |
|---|---|---|---|---|---|
| 11-Jan-18 | 1941925, | Various Amspec | | 2,157.41 | 20,885,552.86 |
| 12-Jan-18 | 1844757 | Corpus Storage | | 15,000.00 | 20,900,552.86 |
| 12-Jan-18 | 1844757 | Use or Pay - Jul '17 - Dec '17 | | 454,562.60 | 21,355,115.46 |
| 12-Jan-18 | 1989372 | P66 to Corpus | 40,681.360 | 1,962,193.68 | 23,317,309.14 |
| 12-Jan-18 | 1968171 | Four Shamrocks - Commission | | 1,867.62 | 23,319,176.76 |
| 18-Jan-18 | 1915150 | Kirby | | 3,931.25 | 23,323,108.01 |
| 23-Jan-18 | 2100850 | P66 to Corpus | 34,154.760 | 1,658,299.62 | 24,981,407.63 |
| 23-Jan-18 | 1965310 | Coastal Gulf - Citgo to Exxon | | 700.00 | 24,982,107.63 |
| 24-Jan-18 | 1954505 | ICAP - Bomin Sale | | 2,019.63 | 24,984,127.26 |
| 25-Jan-18 | 1844757 | Rio - Inventory Repurchase (Mercuria) | | (8,952,522.10) | 16,031,605.16 |
| 25-Jan-18 | 1943899 | Intertek - Davison to Storage | | 675.00 | 16,032,280.16 |
| 26-Jan-18 | Various | GCAC Payment | Total | (8,994,401.25) | 7,097,878.91 |
| 26-Jan-18 | 1954505 | Amspec - various | | 6,423.75 | 7,104,302.66 |
| 30-Jan-18 | 1954505, | Amspec - various | | 4,827.80 | 7,109,130.46 |
| 2-Feb-18 | 1954505 | Kirby Dmrg | | 14,065.60 | 7,123,196.06 |
| 2-Feb-18 | 1954505 | Kirby Port / Ancillary Costs | | 26,181.07 | 7,149,377.13 |
| 9-Feb-18 | 1983804 | Intertek - inspection B205 | | 3,103.37 | 7,152,480.50 |
| 9-Feb-18 | 1976564 | Inspectorate - Kirby | | 450.00 | 7,152,930.50 |
| 9-Feb-18 | 1968171 | Inspectorate - Kirby | | 675.00 | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |
| | | | | | 7,153,605.50 |

| Date | Amount | Rate | Interest | Balance |
|---|---|---|---|---|
| 5-Oct-17 | 15,504,447.56 | 3.25% | 1,399.71 | 124,661.50 |
| 6-Oct-17 | 15,504,447.56 | 3.25% | 1,399.71 | 126,061.20 |
| 7-Oct-17 | 15,504,447.56 | 3.25% | 1,399.71 | 127,460.91 |
| 8-Oct-17 | 15,504,447.56 | 3.25% | 1,399.71 | 128,860.62 |
| 9-Oct-17 | 15,504,447.56 | 3.25% | 1,399.71 | 130,260.33 |
| 10-Oct-17 | 15,822,140.17 | 3.25% | 1,428.39 | 131,688.71 |
| 11-Oct-17 | 15,822,140.17 | 3.25% | 1,428.39 | 133,117.10 |
| 12-Oct-17 | 15,822,140.17 | 3.25% | 1,428.39 | 134,545.49 |
| 13-Oct-17 | 15,852,140.17 | 3.25% | 1,431.10 | 135,976.58 |
| 14-Oct-17 | 15,852,140.17 | 3.25% | 1,431.10 | 137,407.68 |
| 15-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 138,773.57 |
| 16-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 140,139.45 |
| 17-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 141,505.34 |
| 18-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 142,871.22 |
| 19-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 144,237.11 |
| 20-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 145,603.00 |
| 21-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 146,968.88 |
| 22-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 148,334.77 |
| 23-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 149,700.65 |
| 24-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 151,066.54 |
| 25-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 152,432.43 |
| 26-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 153,798.31 |
| 27-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 155,164.20 |
| 28-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 156,530.08 |
| 29-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 157,895.97 |
| 30-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 159,261.86 |
| 31-Oct-17 | 15,129,814.17 | 3.25% | 1,365.89 | 160,627.74 |
| 1-Nov-17 | 15,129,814.17 | 3.25% | 1,365.89 | 161,993.63 |
| 2-Nov-17 | 17,167,762.53 | 3.25% | 1,549.87 | 163,543.50 |
| 3-Nov-17 | 17,670,836.32 | 3.25% | 1,595.28 | 165,138.78 |
| 4-Nov-17 | 17,670,836.32 | 3.25% | 1,595.28 | 166,734.06 |
| 5-Nov-17 | 17,670,836.32 | 3.25% | 1,595.28 | 168,329.35 |
| 6-Nov-17 | 19,627,890.88 | 3.25% | 1,771.96 | 170,101.31 |
| 7-Nov-17 | 19,628,815.88 | 3.25% | 1,772.05 | 171,873.36 |
| 8-Nov-17 | 22,512,496.43 | 3.25% | 2,032.38 | 173,905.73 |
| 9-Nov-17 | 22,512,496.43 | 3.25% | 2,032.38 | 175,938.11 |
| 10-Nov-17 | 22,512,496.43 | 3.25% | 2,032.38 | 177,970.49 |
| 11-Nov-17 | 22,512,496.43 | 3.25% | 2,032.38 | 180,002.87 |
| 12-Nov-17 | 22,512,496.43 | 3.25% | 2,032.38 | 182,035.25 |
| 13-Nov-17 | 22,512,496.43 | 3.25% | 2,032.38 | 184,067.62 |
| 14-Nov-17 | 20,401,078.50 | 3.25% | 1,841.76 | 185,909.39 |
| 15-Nov-17 | 19,573,359.18 | 3.25% | 1,767.04 | 187,676.43 |
| 16-Nov-17 | 19,548,156.22 | 3.25% | 1,764.76 | 189,441.19 |
| 17-Nov-17 | 15,548,606.22 | 3.25% | 1,403.69 | 190,844.89 |
| 18-Nov-17 | 15,548,606.22 | 3.25% | 1,403.69 | 192,248.58 |
| 19-Nov-17 | 15,548,606.22 | 3.25% | 1,403.69 | 193,652.27 |
| 20-Nov-17 | 15,548,606.22 | 3.25% | 1,403.69 | 195,055.97 |
| 21-Nov-17 | 17,869,697.00 | 3.25% | 1,613.24 | 196,669.20 |

| Date | Balance | Rate | Amount | Total |
|---|---|---|---|---|
| 22-Nov-17 | 17,869,697.00 | 3.25% | 1,613.24 | 198,282.44 |
| 23-Nov-17 | 17,869,697.00 | 3.25% | 1,613.24 | 199,895.68 |
| 24-Nov-17 | 17,869,697.00 | 3.25% | 1,613.24 | 201,508.91 |
| 25-Nov-17 | 17,869,697.00 | 3.25% | 1,613.24 | 203,122.15 |
| 26-Nov-17 | 17,869,697.00 | 3.25% | 1,613.24 | 204,735.39 |
| 27-Nov-17 | 17,869,697.00 | 3.25% | 1,613.24 | 206,348.62 |
| 28-Nov-17 | 20,255,632.94 | 3.25% | 1,828.63 | 208,177.26 |
| 29-Nov-17 | 20,393,189.70 | 3.25% | 1,841.05 | 210,018.31 |
| 30-Nov-17 | 16,152,730.80 | 3.25% | 1,458.23 | 211,476.54 |
| 1-Dec-17 | 17,622,570.04 | 3.25% | 1,590.93 | 213,067.47 |
| 2-Dec-17 | 17,622,570.04 | 3.25% | 1,590.93 | 214,658.39 |
| 3-Dec-17 | 17,622,570.04 | 3.25% | 1,590.93 | 216,249.32 |
| 4-Dec-17 | 17,622,570.04 | 3.25% | 1,590.93 | 217,840.25 |
| 5-Dec-17 | 19,160,175.04 | 3.25% | 1,729.74 | 219,569.98 |
| 6-Dec-17 | 19,516,541.25 | 3.25% | 1,761.91 | 221,331.89 |
| 7-Dec-17 | 17,808,928.87 | 3.25% | 1,607.75 | 222,939.64 |
| 8-Dec-17 | 16,186,562.94 | 3.25% | 1,461.29 | 224,400.93 |
| 9-Dec-17 | 16,186,562.94 | 3.25% | 1,461.29 | 225,862.22 |
| 10-Dec-17 | 16,186,562.94 | 3.25% | 1,461.29 | 227,323.51 |
| 11-Dec-17 | 16,190,101.49 | 3.25% | 1,461.61 | 228,785.11 |
| 12-Dec-17 | 16,190,101.49 | 3.25% | 1,461.61 | 230,246.72 |
| 13-Dec-17 | 16,177,412.87 | 3.25% | 1,460.46 | 231,707.18 |
| 14-Dec-17 | 17,902,710.37 | 3.25% | 1,616.22 | 233,323.40 |
| 15-Dec-17 | 14,202,710.37 | 3.25% | 1,282.19 | 234,605.58 |
| 16-Dec-17 | 14,202,710.37 | 3.25% | 1,282.19 | 235,887.77 |
| 17-Dec-17 | 14,202,710.37 | 3.25% | 1,282.19 | 237,169.96 |
| 18-Dec-17 | 15,776,666.37 | 3.25% | 1,424.28 | 238,594.25 |
| 19-Dec-17 | 15,776,666.37 | 3.25% | 1,424.28 | 240,018.53 |
| 20-Dec-17 | 18,202,835.10 | 3.25% | 1,643.31 | 241,661.84 |
| 21-Dec-17 | 18,202,835.10 | 3.25% | 1,643.31 | 243,305.15 |
| 22-Dec-17 | 13,434,880.64 | 3.25% | 1,212.87 | 244,518.02 |
| 23-Dec-17 | 13,434,880.64 | 3.25% | 1,212.87 | 245,730.89 |
| 24-Dec-17 | 13,434,880.64 | 3.25% | 1,212.87 | 246,943.76 |
| 25-Dec-17 | 13,434,880.64 | 3.25% | 1,212.87 | 248,156.64 |
| 26-Dec-17 | 11,580,334.97 | 3.25% | 1,045.45 | 249,202.08 |
| 27-Dec-17 | 13,732,117.47 | 3.25% | 1,239.71 | 250,441.79 |
| 28-Dec-17 | 13,732,117.47 | 3.25% | 1,239.71 | 251,681.49 |
| 29-Dec-17 | 14,289,208.49 | 3.25% | 1,290.00 | 252,971.49 |
| 30-Dec-17 | 14,289,208.49 | 3.25% | 1,290.00 | 254,261.49 |
| 31-Dec-17 | 14,289,208.49 | 3.25% | 1,290.00 | 255,551.49 |
| 1-Jan-18 | 14,289,208.49 | 3.25% | 1,290.00 | 256,841.48 |
| 2-Jan-18 | 18,503,199.78 | 3.25% | 1,670.43 | 258,511.91 |
| 3-Jan-18 | 18,503,199.78 | 3.25% | 1,670.43 | 260,182.34 |
| 4-Jan-18 | 18,503,199.78 | 3.25% | 1,670.43 | 261,852.77 |
| 5-Jan-18 | 18,513,074.78 | 3.25% | 1,671.32 | 263,524.09 |
| 6-Jan-18 | 18,513,074.78 | 3.25% | 1,671.32 | 265,195.41 |
| 7-Jan-18 | 18,513,074.78 | 3.25% | 1,671.32 | 266,866.73 |
| 8-Jan-18 | 16,677,235.20 | 3.25% | 1,505.58 | 268,372.31 |

001712

| Date | | | | |
|---|---|---|---|---|
| 9-Jan-18 | 16,677,235.20 | 3.25% | 1,505.58 | 269,877.89 |
| 10-Jan-18 | 19,143,596.87 | 3.25% | 1,728.24 | 271,606.13 |
| 11-Jan-18 | 20,885,552.86 | 3.25% | 1,885.50 | 273,491.64 |
| 12-Jan-18 | 23,319,176.76 | 3.25% | 2,105.20 | 275,596.84 |
| 13-Jan-18 | 23,319,176.76 | 3.25% | 2,105.20 | 277,702.04 |
| 14-Jan-18 | 23,319,176.76 | 3.25% | 2,105.20 | 279,807.25 |
| 15-Jan-18 | 23,319,176.76 | 3.25% | 2,105.20 | 281,912.45 |
| 16-Jan-18 | 23,319,176.76 | 3.25% | 2,105.20 | 284,017.65 |
| 17-Jan-18 | 23,319,176.76 | 3.25% | 2,105.20 | 286,122.86 |
| 18-Jan-18 | 23,323,108.01 | 3.25% | 2,105.56 | 288,228.41 |
| 19-Jan-18 | 23,323,108.01 | 3.25% | 2,105.56 | 290,333.97 |
| 20-Jan-18 | 23,323,108.01 | 3.25% | 2,105.56 | 292,439.53 |
| 21-Jan-18 | 23,323,108.01 | 3.25% | 2,105.56 | 294,545.09 |
| 22-Jan-18 | 23,323,108.01 | 3.25% | 2,105.56 | 296,650.65 |
| 23-Jan-18 | 24,982,107.63 | 3.25% | 2,255.33 | 298,905.98 |
| 24-Jan-18 | 24,984,127.26 | 3.25% | 2,255.51 | 301,161.49 |
| 25-Jan-18 | 16,032,280.16 | 3.25% | 1,447.36 | 302,608.85 |
| 26-Jan-18 | 7,104,302.66 | 3.25% | 641.36 | 303,250.21 |
| 27-Jan-18 | 7,104,302.66 | 3.25% | 641.36 | 303,891.57 |
| 28-Jan-18 | 7,104,302.66 | 3.25% | 641.36 | 304,532.93 |
| 29-Jan-18 | 7,104,302.66 | 3.25% | 641.36 | 305,174.29 |
| 30-Jan-18 | 7,109,130.46 | 3.25% | 641.80 | 305,816.09 |
| 31-Jan-18 | 7,109,130.46 | 3.25% | 641.80 | 306,457.88 |
| 1-Feb-18 | 7,109,130.46 | 3.25% | 641.80 | 307,099.68 |
| 2-Feb-18 | 7,149,377.13 | 3.25% | 645.43 | 307,745.11 |
| 3-Feb-18 | 7,149,377.13 | 3.25% | 645.43 | 308,390.54 |
| 4-Feb-18 | 7,149,377.13 | 3.25% | 645.43 | 309,035.97 |
| 5-Feb-18 | 7,149,377.13 | 3.25% | 645.43 | 309,681.40 |
| 6-Feb-18 | 7,149,377.13 | 3.25% | 645.43 | 310,326.83 |
| 7-Feb-18 | 7,149,377.13 | 3.25% | 645.43 | 310,972.26 |
| 8-Feb-18 | 7,149,377.13 | 3.25% | 645.43 | 311,617.69 |
| 9-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 312,263.50 |
| 10-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 312,909.31 |
| 11-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 313,555.12 |
| 12-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 314,200.94 |
| 13-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 314,846.75 |
| 14-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 315,492.56 |
| 15-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 316,138.37 |
| 16-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 316,784.18 |
| 17-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 317,429.99 |
| 18-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 318,075.80 |
| 19-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 318,721.62 |
| 20-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 319,367.43 |
| 21-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 320,013.24 |
| 22-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 320,659.05 |
| 23-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 321,304.86 |
| 24-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 321,950.67 |
| 25-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 322,596.49 |

| Date | Balance | Rate | Amount | Total |
|---|---|---|---|---|
| 26-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 323,242.30 |
| 27-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 323,888.11 |
| 28-Feb-18 | 7,153,605.50 | 3.25% | 645.81 | 324,533.92 |
| 1-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 325,179.73 |
| 2-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 325,825.54 |
| 3-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 326,471.36 |
| 4-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 327,117.17 |
| 5-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 327,762.98 |
| 6-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 328,408.79 |
| 7-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 329,054.60 |
| 8-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 329,700.41 |
| 9-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 330,346.23 |
| 10-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 330,992.04 |
| 11-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 331,637.85 |
| 12-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 332,283.66 |
| 13-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 332,929.47 |
| 14-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 333,575.28 |
| 15-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 334,221.10 |
| 16-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 334,866.91 |
| 17-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 335,512.72 |
| 18-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 336,158.53 |
| 19-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 336,804.34 |
| 20-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 337,450.15 |
| 21-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 338,095.96 |
| 22-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 338,741.78 |
| 23-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 339,387.59 |
| 24-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 340,033.40 |
| 25-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 340,679.21 |
| 26-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 341,325.02 |
| 27-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 341,970.83 |
| 28-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 342,616.65 |
| 29-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 343,262.46 |
| 30-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 343,908.27 |
| 31-Mar-18 | 7,153,605.50 | 3.25% | 645.81 | 344,554.08 |
| 1-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 345,199.89 |
| 2-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 345,845.70 |
| 3-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 346,491.52 |
| 4-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 347,137.33 |
| 5-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 347,783.14 |
| 6-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 348,428.95 |
| 7-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 349,074.76 |
| 8-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 349,720.57 |
| 9-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 350,366.39 |
| 10-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 351,012.20 |
| 11-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 351,658.01 |
| 12-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 352,303.82 |
| 13-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 352,949.63 |
| 14-Apr-18 | 7,153,605.50 | 3.25% | 645.81 | 353,595.44 |

15-Apr-18    7,153,605.50    3.25%    645.81    354,241.25

001715

# TCR Cost Summary

| No | B/S | Deal | Position | Vista TCR [some GCAC sales Calc'd] | Revised TCR | Direct | Ultimate | Comments | Calc Date | Days | Qty | Px per | Px Tot | TCR | Yr | Day |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 & 2 | S | 1844757 | 3324522.0 | $439.97 | $0.00 | Rio | Rio | Inventory Buy / Sell - delete | | | | | | | | |
| 1 & 2 | S | 1844757 | 3324525.0 | $4,498.24 | $0.00 | Rio | Rio | Inventory Buy / Sell - delete | | | | | | | | |
| 1 & 2 | S | 1844753 | 3105629.0 | $100.85 | $0.00 | Rio | Rio | Inventory Buy / Sell - delete | | | | | | | | |
| 3 | S | 1834559 | 3114206.0 | $131,485.57 | $31,485.57 | Titanio | Titanio | Not received, asked GCAC to follow up | 12-Jul-17 | 272 | Invc51773728 | | 1,666,883 | 0.025 | 41,672 | 115.76 |
| 4 | S | 1845096 | 3126634.0 | $21,978.07 | Review | 77777 | Rio | no position associated with TCR | | | | | | | | |
| 5 | S | 1845096 | 3126645.0 | $12,059.60 | $0.00 | Rio | Citgo | S/8 with Rio - sale to Titanio - delete | | | | | | | | |
| 6 | S | 1845012 | 3127729.0 | $13,238.36 | $0.00 | Rio | VALT | S/8 with Rio - sale to VALT - deleter? Does it need to run through Jan 25? | | | | | | | | |
| 6 | S | 1845058 | 3134691.0 | $27,435.24 | $0.00 | Century | Century | Sell / Buy with Rio - Delete - netted against Rio | | | | | | | | |
| 7 | S | 1845058 | 3143562.0 | $2,844.19 | $2,844.19 | Genesis | Genesis | ok | | | | | | | | |
| 7 | S | 1845103 | | $139.64 | $139.64 | Rio | Century/Gen | sale of tank ROB - ok | | | | | | | | |
| 8 | S | 1845103 | 3126629.0 | $19,653.79 | $0.00 | 77777 | VALT | S/8 with Rio - sale to Century which is charged TCR, delete | | | | | | | | |
| 8 | S | 1845103 | 3126629.1 | $10,050.30 | Review | Rio | VALT | Delete | | | | | | | | |
| 9 | S | 1845105 | 3126626.0 | $9,989.38 | $0.00 | Rio | VALT | S/8 with Rio - sale to VALT - delete | | | | | | | | |
| 10 | S | 1845105 | 3126639.0 | $2,341.23 | $0.00 | Rio | United | S/8 with Rio - sale to VALT - delete | | | | | | | | |
| 11 | S | 1845044 | 3126642.0 | $10,050.30 | Review | Rio | Rio | Delete most - netted against Rio | | | | | | | | |
| 12 | B | 1853922 | 3130669.0 | $14,921.98 | $0.00 | P66 | Rio | S/8 with Rio - Sale to United - delete | | | | | | | | |
| 13 | B | 1866853 | 3208878.0 | $21,526.69 | $0.00 | Citgo | Rio | S/8 with Rio - purchase from P66 to storage - delete | | | | | | | | |
| 14 | B | 1914582 | 3143606.0 | $21,224.72 | $0.00 | Hunt | Rio | S/8 with Rio - purchase from Xom to storage - delete | | | | | | | | |
| 15 | S | 1915039 | 3143612.0 | $11,070.76 | $0.00 | GCAC | SEM | S/8 with Rio - purchase from Citgo to storage - delete | | | | | | | | |
| 16 | S | 1915045 | 3147126.0 | $12,408.24 | $0.00 | GCAC | Gunvor | S/8 with Rio - purchase from Hunt to storage - delete | | | | | | | | |
| 17 | S | 1915049 | 3227052.0 | $10,047.03 | $10,047.03 | P66 | Rio | cash applied | | | | | | | | |
| 18 | S | 1915053 | 3227067.0 | $10,678.84 | $10,678.84 | GCAC | Rio | cash applied | | | | | | | | |
| 19 | S | 1877681 | 3227092.0 | $9,249.05 | $9,249.05 | Hunt | Rio | cash applied | | | | | | | | |
| | B | 1915134 | 3178452.0 | $13,088.97 | $0.00 | GCAC | VALT | S/8 with Rio - purchase from P66 to storage - delete | | | | | | | | |
| | B | | | $18,130.50 | $0.00 | GCAC | Chevron | S/8 with Rio - purchase from GCAC to storage - delete | | | | | | | | |
| | B | | | $63,713.29 | $0.00 | GCAC | Chevron | S/8 with Rio - purchase from Hunt to storage - delete | | | | | | | | |
| | B | 1915134 | | $5,058.32 | $5,058.32 | GCAC | Chevron | cash applied | | | | | | | | |
| 20A | B | 1992480 | 3317111.1 | $27,497.92 | | GCAC | Chevron | How much? Need to estimate - COD Panama 27 Oct 17 | 27-Oct-17 | 165 | 34,563.750 | 56.780 | 1,962,530 | 0.025 | 49,063 | 136.29 |
| 20B | B | 1992639 | 3317111.2 | $17,031.41 | | GCAC | Chevron | How much? Need to estimate - COD Panama 11 Dec 17 | 11-Dec-17 | 120 | 32,330.960 | 63.214 | 2,043,769 | 0.025 | 51,094 | 141.93 |
| 20C | B | 2100806 | 3317111.3 | $13,847.22 | | GCAC | Rio | How much? Need to estimate - COD Panama 09 Jan 18 | 9-Jan-18 | 91 | 32,119.260 | 68.221 | 2,191,208 | 0.025 | 54,780 | 152.17 |
| 21A | S | 1915150 | 3187254.0 | $0.00 | $0.00 | Exxon | Exxon | ok | | | | | | | | |
| 21B | S | 1915150 | 3221283.0 | $196.91 | $196.91 | Freepoint | Freepoint | ok | | | | | | | | |
| | S | 1915150 | 3187254.1 | $0.00 | $0.00 | Exxon | Exxon | ok | | | | | | | | |
| | S | 1915150 | 3231500.0 | $17.76 | $17.76 | Unity | Unity | ok | | | | | | | | |
| | S | 1915419 | 3227135.0 | $9,154.42 | $0.00 | Rio | Rio | ok | | | | | | | | |
| 22 | S | 1915419 | 3196252.0 | $1,686.19 | $1,686.19 | GCAC | VALT | cash applied | | | | | | | | |
| 23 | S | 1915420 | 3227170.0 | $4,570.47 | $0.00 | Rio | Rio | S/8 with Rio Not needed to ext tank - delete | | | | | | | | |
| 24 | B | 1915463 | 3204486.0 | $4,700.44 | $4,700.44 | GCAC | Gunvor | cash applied | | | | | | | | |
| 25 | B | 1915667 | 3214927.0 | $11,120.40 | $0.00 | Exxon | Rio | S/8 with Rio - purchase from Xom to storage - delete | | | | | | | | |
| 26 | B | 2100773 | 3214932.0 | $0.00 | $0.00 | Exxon | Rio | S/8 with Rio - purchase from Xom to storage - delete | | | | | | | | |
| 27,28 & 29 | S | 2100773 | 3325247.0 | $9,761.10 | $15,928.82 | GCAC | Titanio | How much? Need to estimate - COD 01 Nov 17 | 1-Nov-17 | 160 | 5,734.376 | 250.000 | 1,433,594 | 0.025 | 35,840 | 99.56 |
| 30A | B | 1933012 | 3232026.1 | $0.00 | $0.00 | P66 | P66 | ok | | | | | | | | |
| 30B | B | 1933012 | 3229254.0 | $0.00 | $0.00 | Mercuria | Mercuria | ok | | | | | | | | |
| | B | 1933014 | 3232026.2 | $0.00 | $0.00 | P66 | P66 | ok | | | | | | | | |
| 30C | B | 1933014 | 3239260.0 | $0.00 | $0.00 | Mercuria | Mercuria | ok | | | | | | | | |
| 31 | B | 1980532 | 3232026.6 | $0.00 | $0.00 | P66 | P66 | phased out S/8 with Rio for storage barrels | | | | | | | | |
| | B | 1925598 | 3232021.0 | $0.00 | $0.00 | Citgo | Citgo | phased out S/8 with Rio for storage barrels | | | | | | | | |
| 32 | B | 1925598 | 3237587.0 | $0.00 | $0.00 | Freepoint | Freepoint | cash applied | | | | | | | | |
| 33 | B | 1943889 | 3230472.0 | $0.00 | $0.00 | Davison | Davison | cash applied | | | | | | | | |
| | S | 1944082 | 3238311.1 | $2,024.26 | $2,024.26 | GCAC | Colas | cash applied | | | | | | | | |
| | S | 1944082 | 3238311.0 | $4,224.81 | $4,224.81 | GCAC | Colas | cash applied | | | | | | | | |
| 34A | B | 1941491 | 3239253.0 | $0.00 | $0.00 | Citgo | Citgo | phased out S/8 with Rio for storage barrels | | | | | | | | |
| 34B | B | 1936037 | 3239773.0 | $0.00 | $0.00 | Rio | Bominflot | phased out S/8 with Rio for storage barrels | | | | | | | | |
| 35 | B | 1941151 | 3239885.0 | $0.00 | $0.00 | Citgo | Citgo | phased out S/8 with Rio for storage barrels | | | | | | | | |
| 36 | B | 1983462 | 3243882.0 | $37,215.58 | $0.00 | Citgo | Citgo | How much? Need to estimate - B/L 05 Dec 17 | 5-Dec-17 | 126 | 7,655.202 | 260.000 | 1,990,353 | 0.025 | 49,759 | 138.22 |
| 37 | B | 1942224 | 3248805.0 | $0.00 | $0.00 | Sem | Citgo | phased out S/8 with Rio for storage barrels | | | | | | | | |

Reference deal 21 A & B

| # | B/S | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 38 | B | 1965310 | 3246844.0 | $0.00 | $0.00 | Citgo | Citgo | ok | | |
| 39 | S | 1965310 | 3249911.0 | $0.00 | $0.00 | Exxon | Exxon | ok | | |
| 40 | S | 1983528 | 3250715.0 | $6,355.42 | $6,355.42 | GCAC | VALT | cash applied | | |
| 41 | S | 1966627 | 3252588.0 | $0.00 | $0.00 | Exxon | Exxon | ok | | |
| 42 | B | 1954505 | 3253485.0 | $0.00 | $0.00 | Bominflot | Bominflot | ok | | |
| 43 | B | 1980944 | 3259409.0 | $0.00 | $0.00 | Citgo | Citgo | phased out 5/8 with Rio for storage barrels | | |
| 44A | B | 1969310 | 3271211.0 | $0.00 | $0.00 | Citgo | Citgo | phased out 5/8 with Rio for storage barrels | | |
| 44B | B | 1988722 | 3279181.1 | $0.00 | $0.00 | P66 | P66 | phased out 5/8 with Rio for storage barrels | | |
| 44C | B | 1989372 | 3279181.2 | $0.00 | $0.00 | P66 | P66 | phased out 5/8 with Rio for storage barrels | | |
|  | B | 2100850 | 3279181.3 | $0.00 | $0.00 | P66 | P66 | phased out 5/8 with Rio for storage barrels | | |
| 45 | S | 1983804 | 3279190.0 | $2,739.96 | $2,739.96 | GCAC | GCAC | cash applied | | |
| 46 | S | 1983804 | 3279190.1 | $5,929.90 | $5,929.90 | GCAC | Bitumar | cash applied | | |
| 47 | S | 1983912 | 3279203.0 | $11,866.89 | $11,866.89 | GCAC | Bitumar | How much? Need to estimate - B/L 06 Jan 18 | 6-Jan-18 | 94 |
| 48 | B | 1976564 | 3280899.0 | $0.00 | $0.00 | Koch | Koch | phased out 5/8 with Rio for storage barrels | | |
| 49 | B | 1968171 | 3279174.0 | $0.00 | $0.00 | Koch | Koch | ok | | |
|  | B | 1980937 | 3279174.0 | $0.00 | $0.00 | Citgo | Citgo | phased out 5/8 with Rio for storage barrels | | |
| 50 | S | 2102423 | 3317111.3 | $4,934.57 | $4,934.57 | GCAC | VALT | How much? Need to estimate - B/L 05 Jan 18 | 5-Jan-18 | 95 |

Totals: $477,416.06   $200,890.09

Estimated   10-Apr-18

Right-side figures:

| Date | No. | | | | | | |
|---|---|---|---|---|---|---|---|
| 6-Jan-18 | 94 | 6,610.567 | 275,000 | 1,817,906 | 0.025 | 45,448 | 126.24 |
| 5-Jan-18 | 95 | 2,671.344 | 280,000 | 747,976 | 0.025 | 18,699 | 51.94 |
|  |  |  |  | 13,854,219 | | | |

## Storage Ancillary Cost Summary (Deal 1844757 - pass through to GCAC)

| Rio Reference | Vitol Deal | Cost | Amount |
|---|---|---|---|
| PP17-07-701 | 1844757 | Inspection Fee | $587.45 |
| PP17-07-702B | 1844757 | Inspection Fee | $915.39 |
| PP17-07-703 | 1844757 | Inspection Fee | $1,160.90 |
| PP17-07-703 | 1844757 | Customs Fees | $535.00 |
| PP17-07-703 | 1844757 | Commission Costs | $6,414.75 |
| PP17-07-704B | 1844757 | Inspection Fee | $980.68 |
| PP17-07-708 | 1844757 | Inspection Fee | $499.38 |
| PP17-07-704 | 1844757 | Inspection Fee | $1,128.90 |
| PP17-07-704 | 1844757 | Cargo Insurance (July, Aug, Sep, & Oct) | $8,229.43 |
| PP17-07-001 | 1844757 | July Storage - Gravity CC | $146,032.50 |
| PP17-08-001 | 1844757 | July Storage - Gravity CC | $30,000.00 |
| PP17-08-001 | 1844757 | July Tank Expense - Gravity CC | $52,585.55 |
| PP17-09-001 | 1844757 | July Use or Pay - Gravity CC | $179,715.72 |
| PP17-09-001 | 1844757 | August Storage - Gravity CC | $176,032.50 |
| PP1708-001 | 1844757 | August Tank Expense - Gravity CC | $171,660.11 |
| PP1710-001 | 1844757 | August Use or Pays - Gravity CC | $81,169.45 |
| | 1844757 | September Storage - Gravity CC | $176,032.50 |
| PP17-09-001 | 1844757 | Cargo Insurance (Nov) | $1,180.63 |
| | 1844757 | Bank Fees | $500.00 |
| | 1844757 | September Tank Expense - Gravity CC | $154,294.86 |
| | 1844757 | September Use or Pay - Gravity CC | $94,767.61 |
| PP17-10-001 | 1844757 | October Storage - Gravity CC | $146,032.50 |
| | 1844757 | October Storage - Gravity CC | $30,000.00 |
| | 1844757 | October Tank Expense - Gravity CC | $180,333.74 |
| | 1844757 | October Use or Pay - Gravity CC | $75,159.80 |
| | 1844757 | November Storage - Gravity CC | $146,032.50 |
| | 1844757 | Nov 16-Dec 15 Storage - Gravity CC | $30,000.00 |
| | 1844757 | November Tank Expense - Gravity CC | $218,440.70 |
| | 1844757 | November Use or Pay - Gravity | $655,924.95 |
| | 1844757 | December Storage - Gravity CC | $146,032.50 |
| | 1844757 | Dec 16-31 Storage - Gravity CC | $15,000.00 |
| | 1844757 | December Tank Expense - Gravity CC | $209,922.72 |
| | 1844757 | December Use or Pay - Gravity CC | $94,437.40 |
| | | | $2,632,252.96 |

001718

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Rail Un/loading | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0517 | Jul-17 | 146,032.50 | | | | | | | | | 146,032.50 | |
| RIO0517 | May-17 | | 24,907.05 | 2,508.00 | 8,461.38 | 15,985.00 | 712.70 | 27,352.28 | 49,678.82 | 6,469.34 | 136,074.57 | not for Vitol |
| Total for Invoice | | 146,032.50 | 24,907.05 | 2,508.00 | 8,461.38 | 15,985.00 | 712.70 | 27,352.28 | 49,678.82 | 6,469.34 | 282,107.07 | |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Rail Un/loading | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0617 | Aug-17 | 176,032.50 | | | | | | | | | 176,032.50 | |
| RIO0617 | Jul-17 | 30,000.00 | | | | | | | | | 30,000.00 | |
| RIO0617 | Jun-17 | | (38,137.20) | 11,357.00 | 10,558.80 | 18,870.00 | 1,086.47 | 26,511.11 | 31,717.83 | | 61,964.01 | not for Vitol |
| Total for Invoice | | 206,032.50 | (38,137.20) | 11,357.00 | 10,558.80 | 18,870.00 | 1,086.47 | 26,511.11 | 31,717.83 | - | 267,996.51 | |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Rail Un/loading | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0717 | Sep-17 | 176,032.50 | | | | | | | | | 176,032.50 |
| RIO0717 | Jul-17 | | 39,526.05 | 28,992.75 | 20,155.98 | 15,985.00 | 1,021.21 | 27,756.95 | 46,277.78 | | 179,715.72 |
| Total for Invoice | | 176,032.50 | 39,526.05 | 28,992.75 | 20,155.98 | 15,985.00 | 1,021.21 | 27,756.95 | 46,277.78 | - | 355,748.22 |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Rail Un/loading | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0817 | Oct-17 | 146,032.50 | | | | | | | | | 146,032.50 | |
| RIO0817 | Aug-17 | | 45,667.95 | 11,139.60 | 11,060.60 | 14,440.00 | 830.10 | 23,319.11 | 44,297.66 | | 150,755.03 | |
| RIO0817 | Jul-17 | | | 17,395.65 | | | | | 3,509.43 | | 20,905.08 | |
| RIO0817 | Jun-17 | | | 20,657.10 | | | | | | | 20,657.10 | not for Vitol |
| RIO0817 | May-17 | | | 1,504.80 | | | | | | | 1,504.80 | not for Vitol |
| RIO0817 | Apr-17 | | | 13,325.55 | | | | | | | 13,325.55 | not for Vitol |
| RIO0817 | Mar-17 | | | 1,789.80 | | | | | | | 1,789.80 | not for Vitol |
| RIO0817 | Feb-17 | | | 721.35 | | | | | | | 721.35 | not for Vitol |
| Total for Invoice | | 146,032.50 | 45,667.95 | 66,533.85 | 11,060.61 | 14,440.00 | 830.10 | 23,319.11 | 47,807.09 | - | 355,691.21 | |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| RIO0817-8 | Oct-17 | 30,000.00 | | | | | | | | 30,000.00 |
| Total for Invoice | | 30,000.00 | - | - | - | - | - | - | - | 30,000.00 |

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Adjustment ? | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|

001719

| Gravity Invoice # | Activity Month | Storage | Truck Loading | PMA | Dock Fees | Lab Fees | Water | Electricity | Natural Gas | Adjustment ? | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIO0917 | Nov-17 | 146,032.50 | | | | | | | | | 146,032.50 | |
| RIO0917 | Sep-17 | | 34,071.30 | 19,666.25 | - | 24,765.00 | 955.71 | 25,111.12 | 49,726.42 | (0.94) | 154,294.86 | |
| Total for Invoice | | 146,032.50 | 34,071.30 | 19,666.25 | - | 24,765.00 | 955.71 | 25,111.12 | 49,726.42 | (0.94) | 300,327.36 | |
| | | | | | | | | | | | | |
| RIO1017 | Dec-17 | 146,032.50 | | | | | | | | | 146,032.50 | |
| RIO1017 | Nov-17 | 30,000.00 | | | | | | | | | 30,000.00 | Nov 16 - Dec 15 |
| RIO1017 | Sep-17 | | 37,621.95 | 25,718.25 | 27,339.53 | 13,420.00 | 878.80 | 24,606.71 | 50,748.50 | | 180,333.74 | |
| Total for Invoice | | 176,032.50 | 37,621.95 | 25,718.25 | 27,339.53 | 13,420.00 | 878.80 | 24,606.71 | 50,748.50 | - | 356,366.24 | |
| | | | | | | | | | | | | |
| RIO1117 | Nov-17 | | 43,580.55 | 28,994.50 | 39,770.39 | 19,970.00 | 1,088.88 | 37,287.21 | 47,749.17 | | 218,440.70 | |
| RIO1117-B | Dec-17 | 30,000.00 | | | | | | | | | 30,000.00 | Dec 16 - Jan 15 (only 15,000 for Vitol) |
| Total for Invoice | | 30,000.00 | 43,580.55 | 28,994.50 | 39,770.39 | 19,970.00 | 1,088.88 | 37,287.21 | 47,749.17 | - | 248,440.70 | |

| | Annual Minimum | Monthly Allocation | Monthly Actual | (Overage)/ Underage | Rate | Monthly (Overage)/Underage | |
|---|---|---|---|---|---|---|---|
| Truck Loading | 64800 | 5400 | 3794.78 | 1605.22 | 15 | 24,078.30 | Jul-17 |
| PMA Fee | 27600 | 2300 | 1159.71 | 1140.29 | 25 | 28,507.25 | |
| | | | | | | 52,585.55 | |
| Truck Loading | 64800 | 5400 | 3323.02 | 2076.98 | 15 | 31,154.70 | Aug-17 |
| PMA Fee | 27600 | 2300 | 278.49 | 2021.51 | 25 | 50,537.75 | |
| | | | | | | 81,692.45 | |
| Truck Loading | 64800 | 5400 | 2271.42 | 3128.58 | 15 | 46,928.70 | Sep-17 |
| PMA Fee | 27600 | 2300 | 786.65 | 1513.35 | 25 | 37,833.75 | |
| | | | | | | 84,762.45 | |
| Truck Loading | 64800 | 5400 | 2508.13 | 2891.87 | 15 | 43,378.05 | Oct-17 |
| PMA Fee | 27600 | 2300 | 1028.73 | 1271.27 | 25 | 31,781.75 | |
| | | | | | | 75,159.80 | |
| Truck Loading | 64800 | 5400 | 2905.37 | 2494.63 | 15 | 37,419.45 | Nov-17 |
| PMA Fee | 27600 | 2300 | 1159.78 | 1140.22 | 25 | 28,505.50 | |
| | | | | | | 65,924.95 | |
| Truck Loading | 64800 | 5400 | 1842.04 | 3557.96 | 15 | 53,369.40 | Dec-17 |
| PMA Fee | 27600 | 2300 | 657.28 | 1642.72 | 25 | 41,068.00 | |
| | | | | | | 94,437.40 | |
| | | | | | | 454,562.60 Total Use or Pay | |

(v)     Truck Loading.  A fee of Fifteen Dollars ($15.00) per ton loaded into a truck; provided, however, that in the event that at the end of any calendar year during the Term, Customer shall have loaded fewer than 64,800 tons during the preceding year (5,400 tons per month multiplied by 12), Owner will invoice Customer and Customer will pay Operator (in accordance with the terms

(viii)     PMA Fee.  A PMA Plant fee of Twenty-Five Dollars ($25.00) per ton processed by Customer; provided, however, that in the event that at the end of any calendar year during the Term, Customer shall have processed fewer than 27,600 of tons of PMA during the preceding year (2,300 tons per month multiplied by 12), Owner will invoice Customer and Customer will pay Operator (in accordance with the terms and conditions herein applicable to monthly payments from Customer to Operator) an amount equal the difference between 27,600 tons and the total number of tons of PMA processed by Customer during the year multiplied by $25.00;

001721

EXHIBIT

Brass 5

**From:** Arthur Brass <aj@abrass.com>
**Sent:** Tuesday, February 13, 2018 4:16 PM
**To:** Eric Kuo
**Cc:** Jason Goldstein; Mike Ruzek; Joe Mattingly
**Subject:** Fwd:

Hi Eric

Attached is an initial assessment of interim balance due Vitol. While still under review, hopefully you can see that balances are far closer to even than your previous emails would suggest. We are continuing to refine and validate the numbers but wanted to let you know where we are at present.

Thanks

A.J.

Begin forwarded message:

**From:** Jason Goldstein <jgoldstein@qcachouston.com>
**Date:** February 12, 2018 at 5:44:52 PM EST
**To:** Arthur Brass <aj@abrass.com>

1

001722

| | BBL | $ | Per |
|---|---|---|---|
| Vital Buys After Initial | 1,081,924 | $ 65,055,721 | $ 61.68 |
| Initial + Exxon | 307,832 | $ 11,473,808 | $ 43.77 |
| Total Purchases | 1,389,756 | $ 58,969,529 | $ 42.14 |
| Sales to 3rd Parties | 525,250 | $ 24,136,600 | $ 46.13 |
| GCAC Purchased Barrels | 38,413 | $ 1,793,648 | $ 46.65 |
| Sales to Rio at Termination | 194,173 | $ 8,948,781 | $ 48.59 |
| Truck Rack Receipts | | $ 4,590,119 | |
| Rio Paid for 7/25 CITGO | 25,232 | $ 1,104,401 | |
| GCAC Payments | | $ 16,634,401 | |
| Total Value Received | | $ 57,413,931 | |
| | | $ 1,158,598 | |

2

## AFFIDAVIT OF ARTHUR J. BRASS

STATE OF TEXAS          §
                                       §

COUNTY OF HARRIS       §

Before me, the undersigned notary, on this day, personally appeared Arthur J. Brass, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.    My name is Arthur J. Brass. I am over 21 years of age, of sound mind, and capable of making this affidavit. I have personal knowledge of the facts stated in this affidavit. The statements contained in this affidavit are true and correct and based upon my personal knowledge

2.    I am the President of Gulf Coast Asphalt Company LLC ("GCAC"). I was personally involved in the transaction between GCAC and Vitol Inc. ("Vitol") to jointly pursue the sourcing, purchasing, blending, selling and marketing of asphalt and asphalt related products. I have read Vitol's Motion for Consolidation and the exhibits thereto. I provide these facts in response.

3.    Prior to July 1, 2017, GCAC had a Joint Marketing Agreement ("JMA") with a regional commodities trading firm to use their combined resources and expertise to jointly pursue the sourcing, purchasing, blending, selling and marketing of asphalt and asphalt related products. After approximately one year of the JMA, the regional firm informed GCAC it no longer wished to continue in the asphalt business. At that time, the regional firm was committed to the JMA for several years and GCAC was under no obligation to terminate the relationship. In fact, the long-term commitment of the regional firm provided value to GCAC. Nevertheless, in the spirit of good commercial relations, GCAC began looking for a suitable candidate to replace the regional firm.

4.    In early 2017, GCAC and Vitol began discussions for Vitol to replace the regional firm as GCAC's partner in the JMA. The parties began exchanging draft agreements as early as May 2017. As of July 1, 2017, Vitol and GCAC began transacting under the JMA (the "Business"). After July 1, 2017, the parties continued to exchange drafts a contract to memorialize the agreement that had already commenced business operations.

5.    In early July of 2017, GCAC had a trip to meet with another company in the asphalt business in New York. Prior to the trip, GCAC had a meeting with Eric Kuo ("Kuo"), a trader at Vitol involved in the Business. Kuo confirmed that GCAC was free to disclose to the New York company, and the asphalt market generally, that GCAC and Vitol had begun the Business.

**EXHIBIT**

Brass 6

001724

6.  On July 13, 2017, GCAC inquired if was appropriate to notify Gravity Midstream, a company involved in storing products for the Business, that Vitol had replaced the regional firm in the JMA. Kuo and Steve Barth (another Vitol employee) both confirmed in writing that such a disclosure was appropriate. A true and accurate copy of the email correspondence from Kuo and Barth is attached hereto as Exhibit 1.

7.  After GCAC and Vitol began conducting transactions through the Business, Kuo informed GCAC that a slight problem had arisen at Vitol but that he was confident it would be resolved. Within several weeks, Kuo contacted GCAC and stated that Vitol would be backing out of the Business. At all times between July 1, 2017 and the day Vitol announced it was terminating the Business, GCAC and Vitol had a contract to conduct the Business together. GCAC considered then and still considers Vitol's abruptly pulling out of the Business as a breach of the contract between Vitol and GCAC.

8.  After GCAC located a company willing to assume Vitol's position in the Business, Vitol and GCAC began discussing how to unwind their relationship. Vitol claimed that GCAC owed an amount of money that was significantly overstated. Notwithstanding that Vitol refused to acknowledge GCAC's legitimate claims for breach of contract and made excessive demands regarding its own claims, GCAC committed to try to resolve the dispute commercially and short of litigation.

9.  GCAC made sure to clarify with Vitol that any discussions would be for settlement purposes only and not binding on either party. In my first written communication, I intentionally and purposefully included language clearly indicating the ongoing discussions would be confidential and protected and not be used by either party against the other party. My communication was attached to Vitol's Motion for Consolidation as Exhibit A.

10. In that communication, I also made it clear that GCAC disputed the figure asserted in Vitol's claims and that GCAC had legitimate claims against Vitol, including, but not limited to, claims for breach of contract. I also made it clear that GCAC or Vitol reserved the right to assert any rights or claims, in court or otherwise, at any time. I wanted everyone to understand that having these discussions to attempt a commercial resolution did not preclude either party from filing suit to protect their interests.

11. During all the discussions I had directly with Vitol and all the discussions between my counsel and Vitol's counsel, GCAC had the full intent to try to resolve the dispute. To this very day, GCAC maintains the hope that an amicable, commercial resolution can be reached. But the situation changed. At a given point, Vitol made it clear that it's view of a reasonable resolution was inconsistent with GCAC's view. And at that time Vitol also threaten to file suit against

526600.2                                      2

GCAC. GCAC agreed to keep settlement discussions confidential and not use them against Vitol. Despite Vitol's blatant disregard for this agreement, GCAC intends to honor its end. Thus, without divulging the details of the negotiations, suffice it to say that GCAC believed Vitol's expression of the limits to which it was willing to go to resolve the dispute fell well below GCAC's view of what was fair and reasonable.

12. Under these circumstances and continuing to believe GCAC was the aggrieved party due to Vitol's reneging on the Business, GCAC decided to file suit to protect its interests.

13. Vitol's Motion alleges that Vitol presented a Promissory Note (Exhibit C to Vitol's Motion) that represented the then-current payment schedule proposed by GCAC. This is simply untrue. Kuo asked if his lawyers could draft a proposed settlement document. I told him to prepare a simple settlement agreement. In response, Vitol sent a complicated Promissory Note whose material terms differed significantly from the last proposal made by GCAC, including the total amount, the interest rate and most significantly the payment schedule, which Vitol's Note had shortened from three years to five months. Vitol's Motion asserts that GCAC stated it was rejecting the Promissory Note because GCAC wanted a different form. While GCAC did oppose the form, the primary reason for GCAC's concerns about the Promissory Note was that it varied significantly in content from GCAC's current proposal. GCAC informed Vitol of these concerns regarding the content of the Note.

FURTHER AFFIANT SAYETH NOT.

Arthur J. Brass

SUBSCRIBED AND SWORN TO BEFORE ME on June 5th, 2018.

Notary Public in and for the
State of Texas

GEORGIA A EDGAR
Notary Public, State of Texas
Comm. Expires 01-13-2019
Notary ID 11448374

526600.2                                    3

001726

**From:** Steve Barth [mailto:SZB@Vitol.com]
**Sent:** Thursday, July 13, 2017 10:03 AM
**To:** Eric Kuo <ejk@Vitol.com>
**Cc:** Arthur Brass <aj@abrass.com>; Kale Krhovjak <kale@rioenergy.com>; Jason Goldstein <jgoldstein@gcachouston.com>
**Subject:** Re: Gravity

Probably better than letting them find out through the market.

Sent from my iPhone

On Jul 13, 2017, at 9:52 AM, Eric Kuo <ejk@Vitol.com> wrote:

I thought we were going to notify them of the transfer of counterparts? No reason not to approach them that I can see

**From:** Arthur Brass [mailto:aj@abrass.com]
**Sent:** Thursday, July 13, 2017 09:51 AM
**To:** Kale; Steve Barth; Eric Kuo
**Cc:** Jason Goldstein
**Subject:** Gravity

Is there any reason you guys see the that we shouldn't let gravity know (even if just informally) that Vitol is taking Rio's place?

It's going to get into the market and I think we'd rather they heard about it from us.

AJ

Get Outlook for iOS

To verify that the signature to this message is valid and trusted, click on the authentication stamp. Its function is to assist you to ensure that the email is indeed generated by a sender from @vitol.com

IMPORTANT: This email (including all attachments) is confidential and may be privileged. It may be read, copied and used only by the intended recipients, and must not be re-transmitted in any form without our consent. If you have received it in error, please contact us immediately by return email. Please then delete it and do not disclose its contents to any other person.

Security and reliability of email is not guaranteed. Communications should be verified from a mailed or faxed copy. All emails to anyone @vitol.com are communications to the firm and are not private or confidential to any named individual.

**Exhibit**

**1**

exhibitsticker.com

001727

**To:**     Kale Krhovjak[kale@rioenergy.com]; Steve Barth[SZB@Vitol.com]; Eric Kuo[ejk@Vitol.com]
**Cc:**     Jason Goldstein[jgoldstein@gcachouston.com]
**From:**   Arthur Brass
**Sent:**   Thur 7/13/2017 9:55:03 AM
**Subject:** Re: Gravity

Will do.

Get Outlook for iOS

---

**From:** Kale Krhovjak <kale@rioenergy.com>
**Sent:** Thursday, July 13, 2017 10:54:26 AM
**To:** Arthur Brass; Steve Barth; Eric Kuo
**Cc:** Jason Goldstein
**Subject:** RE: Gravity

Lets talk before we do that I want to make sure we are all on the same page.  AJ call me when you land.

---

**From:** Arthur Brass [mailto:aj@abrass.com]
**Sent:** Thursday, July 13, 2017 9:51 AM
**To:** Kale Krhovjak; Steve Barth; Eric Kuo
**Cc:** Jason Goldstein
**Subject:** Gravity

Is there any reason you guys see the that we shouldn't let gravity know (even if just informally) that Vitol is taking Rio's place?

It's going to get into the market and I think we'd rather they heard about it from us.

AJ

Get Outlook for iOS


EXHIBIT
Brass 7
001728

**To:** Arthur Brass[aj@abrass.com]; Eric Kuo[ejk@Vitol.com]
**Cc:** Jason Goldstein[jgoldstein@gcachouston.com]; Joe Mattingly[jmattingly@gcachouston.com]; Mike Ruzek[mrr@Vitol.com]
**From:** Tom Moran
**Sent:** Wed 4/4/2018 8:50:51 AM
**Subject:** RE: Follow Up - Final Settlement

d Morning AJ,

My apologies for missing your call yesterday.  I was in meetings most of the day.
Can you **_please coordinate with Eric_** and agree to get the undisputed amounts paid this week.

My understanding of the undisputed amounts are:

| | |
|---|---|
| Product: | $3,200,000 |
| Costs: | $3,500,000 |
| Paper: | $5,000,000 |
| | -------------- |
| Total Undisputed: | $11,700,000 |

Best Regards,
Tom



**Tom Moran**
Director of Credit
Vitol Inc.

2925 Richmond Ave. | Houston, TX 77098
E: tam@vitol.com | P: +1 (713) 230-1438 | C: +1 (281) 687-3948

**From:** Tom Moran
**Sent:** Tuesday, April 03, 2018 10:58 AM
**To:** Arthur Brass; Eric Kuo
**Cc:** Jason Goldstein; Joe Mattingly; Mike Ruzek
**Subject:** RE: Follow Up - Final Settlement

I would appreciate a response.

AJ / Eric:  When will this be financially settled ?

Best Regards,
Tom



**Tom Moran**
Director of Credit
Vitol Inc.

2925 Richmond Ave. | Houston, TX 77098
E: tam@vitol.com | P: +1 (713) 230-1438 | C: +1 (281) 687-3948



EXHIBIT
Brass 8

001729

**From:** Tom Moran
**Sent:** Monday, April 02, 2018 12:08 PM
**To:** Eric Kuo; Arthur Brass
**Cc:** Jason Goldstein; Joe Mattingly; Mike Ruzek

Where are we on this all ?  We are way past the quarter end deadline for settling the cash.  Do we need to all get in a room again and settle this ?

Best Regards.
Tom

 **Tom Moran**
Director of Credit
Vitol Inc.

*2925 Richmond Ave. | Houston, TX 77098*
*E: tam@vitol.com | P: +1 (713) 230-1438 | C: +1 (281) 687-3948*

**From:** Eric Kuo
**Sent:** Thursday, March 29, 2018 03:01 PM
**To:** Tom Moran
**Cc:** Arthur Brass; Jason Goldstein; Joe Mattingly; Mike Ruzek
**Subject:** Re: Follow Up - Final Settlement

I spoke with AJ yesterday and he said they would send us some money while we still sort through this.

AJ- can we have funds sent today please?
On Mar 29, 2018, at 2:41 PM, Tom Moran <tam@Vitol.com> wrote:

> Where are we on this folks.  End of the quarter is tomorrow.
>
> **From:** Tom Moran
> **Sent:** Tuesday, March 27, 2018 04:59 PM
> **To:** Arthur Brass; Eric Kuo; 'Jason Goldstein'; Joe Mattingly; Mike Ruzek
> **Subject:** Follow Up - Final Settlement
>
> All -   Are we on target to have this closed by quarter end as discussed in our March 7th meeting ?
>
> Best Regards,
> Tom
>
> **Tom Moran**
> <image001.jpg>Director of Credit
> Vitol Inc.
>
> *2925 Richmond Ave. | Houston, TX 77098*
> *E: tam@vitol.com | P: +1 (713) 230-1438 | C: +1 (281) 687-3948*

**From:** Steve Barth
**To:** Michael F. Chambers
**Cc:** Brian Bormaster; Aaron Byrd
**Subject:** Re: Gravity
**Date:** Friday, July 21, 2017 9:57:32 AM
**Attachments:** image001.jpg

Just that they are moving forward with other bidders. Heard from AJ that he thinks Mercuria is lead horse right now.

Sent from my iPhone

On Jul 21, 2017, at 6:15 AM, Michael F. Chambers <mfc@Vitol.com> wrote:

You hearing anything from the Bank on where it stand and what are the next steps?

**Michael Chambers**

Vitol Group

2925 Richmond Ave , 11th Floor Houston. Tx 77098

T +1 713-230-2016
M: +1 713-724-3582
E MFC@vitol.com
<image001.jpg>





# Presentation to Vitol Regarding GCAC/Rio Asphalt Business

May 16, 2017

# Overview

- GCAC has been a blender, trader and marketer of asphalt since 1993 and prior to that through refining and terminalling operations at Trigeant since the mid 1980's

- We believe there is a strong opportunity to be a leader in USGC asphalt with US supply tightening

- Contemplating a structure for Vitol to replace Rio as the provider of working capital, hedging and credit support for the operation

- Believe we can have a mutually beneficial relationship with VALT

# Historical Margin

|  | 2015 MtM Margin | 2015 BBLS | 2016 MtM Margin | 2016 BBLS | 2017 MtM Margin | 2017 BBLS |
|---|---|---|---|---|---|---|
| Jan | | | $365,693 | 50,357 | $(266,736) | 209,587 |
| Feb | | | 170,453 | 60,632 | 508,572 | 190,691 |
| Mar | $254,553 | $106,701 | 204,813 | 181,096 | 593,884 | 213,187 |
| **1Q** | **254,553** | **106,701** | **740,960** | **292,085** | **835,720** | **613,464** |
| Apr | (761,417) | 81,760 | (25,827) | 111,975 | | |
| May | 82,937 | 35,491 | (166,744) | 121,983 | | |
| Jun | 458,940 | 64,096 | 573,803 | 227,141 | | |
| **2Q** | **(219,541)** | **181,348** | **381,233** | **461,099** | | |
| Jul | 1,714,776 | 237,847 | (108,278) | 111,954 | | |
| Aug | 1,822,895 | 83,540 | (82,490) | 154,529 | | |
| Sep | (786,096) | 159,171 | (908,276) | 82,496 | | |
| **3Q** | **2,751,575** | **480,557** | **(1,099,044)** | **348,979** | | |
| Oct | 3,405,932 | 46,403 | (1,179,468) | 9,356 | | |
| Nov | 227,592 | 41,763 | (584,060) | 50,004 | | |
| Dec | (389,023) | 34,963 | (1,840,714) | 113,695 | | |
| **4Q** | **3,244,501** | **123,130** | **(3,604,242)** | **173,054** | | |
| Total | $6,031,088 | 891,736 | $(3,581,094) | 1,275,217 | $835,720 | 613,464 |

001734

# Historical Margin – Critical Factors

- Traditionally solid margin business buying asphalt blend stocks below fuel oil and selling above fuel oil

- Late 2016 – sold inventory at a non-optimal time when USGC barge low asphalt was ~$10/BBL under fuel; need to hold when asphalt dislocates to the downside vs. fuel or coker feed

- Went into the winter (late 2016) season long too much inventory – amplified non-optimal sale issue above

- Started with new location in Corpus Feb 2016 – start-up costs + taking time to build retail business vs. take-or-pay minimums



# Historical Margin – Asphalt vs. Fuel

# Base Case Pro Formas

## Key Assumptions

**Base Assumptions:**

| | |
|---|---:|
| Mobile Monthly Tank Lease Excluding Heat, etc. | $ 139,605 |
| Corpus Monthly Tank Lease Excluding Heat, etc. | $ 146,033 |
| Corpus Truck Rack Minimums Tons/Month | 5,400 |
| Corpus Truck Loading Fees/Ton | $ 15.00 |
| Corpus PMA Minimums Tons/Month | 2,300 |
| Corpus PMA Fees/Ton | $ 25.00 |
| Corpus Assumed Polymer Costs/Ton | $ 55.00 |
| Corpus Rail Loading/Unloading Fees/Ton | $ 18.00 |
| Assumed Heat Costs/BBL | $ 0.35 |
| Assumed COM/BBL | $ 0.15 |
| Assumed Miscellaneous/BBL | $ 0.50 |
| Assumed Asphalt BBLs/Ton | $ 5.50 |

**Sales Assumptions:**

| | |
|---|---:|
| Wholesale Marine Volumes/Month (BBLs) | 175,000 |
| Wholesale Marine Gross Product Margin/BBL | $ 4.54 |
| Wholesale Rail Volumes/Month (BBLs) | 20,000 |
| Wholesale Rail Gross Product Margin/BBL | $ 4.54 |
| Retail Truck Rack Volumes/Month (BBLs) | 20,000 |
| % of Retail Truck Rack Volumes That are PMA | 50.0% |
| Non-PMA Additional Retail Margin/Ton vs. Wholesale | $ 22.00 |
| PMA Additional Margin/Ton vs. PG Retail (Excludes Cost of Polymer) | $ 125.00 |

## Financial Analysis

**Annual Gross Product Margin:**

| | |
|---|---:|
| Wholesale Marine | $ 9,534,000 |
| Wholesale Rail | 1,089,600 |
| Truck Rack Non-PMA Uplift | 2,049,600 |
| Truck Rack PMA Uplift (Net of Costs of Polymer) | 1,527,273 |
| Total Gross Product Margin | $ 14,200,473 |

**Costs (Excludes Overhead Allocation):**

| | |
|---|---:|
| Tank Rental - Shell Capacity - Corpus and Mobile | (3,427,650) |
| Excess Tank Turns Fees | - |
| Less Truck Rack Fees (Incl. Take-or-Pay Mins) | (972,000) |
| Less Rail Loading Fees (No Mins) | (785,455) |
| Less PMA Fees (Incl. Take-or-Pay Mins) | (632,182) |
| Less Heat | (903,000) |
| Less COM | (387,000) |
| Less Miscellaneous | (1,290,000) |
| Total Costs | (8,397,286) |
| **Pro Forma Gross Profit Margin** | **$ 5,803,186** |

# Corpus Retail Rack Opportunity

- Currently negotiating supply/marketing deals with two large oil companies that each have TX retail asphalt presence regarding one of those companies taking over Corpus retail rack marketing in exchange for high quality asphalt supply and other economic advantages:
  - Advantages:
    - Attractive option to purchase high quality, light asphalt blend stocks at attractive prices; ability to secure longer-term structural shorts with additional quality buffer
    - Future take-or-pay minimums to be borne by counterparty, not us
    - Attractive supply terms for us to supply wholesale BBLs to retail rack
    - Potential for additional fees/payments
  - Disadvantages:
    - Give up portion of retail marketing uplift

001738

# Miscellaneous/VALT

- Continues existing mutually beneficial supply/marketing dynamic with VALT

- We propose that VALT assume asphalt ship term charter that GCAC affiliate has starting July 2017 so as not to compete with VALT for shipping

- We would view our wholesale supply partner relationship with VALT as synergistic to VITOL/VALT and not competitive

727OBJ

## U.S. Bankruptcy Court
## Southern District of Texas (Victoria)
## Adversary Proceeding #: 21-06006

*Assigned to:* Bankruptcy Judge Christopher M. Lopez        *Date Filed:* 07/09/21
*Lead BK Case:* 21-60025
*Lead BK Title:* Arthur Jacob Brass
*Lead BK Chapter:* 7
*Demand:*

*Nature[s] of Suit:*  41 Objection / revocation of discharge - 727(c),(d),(e)
                       65 Dischargeability - other


### *Plaintiff*
-----------------------
**Vitol Inc.**                                    represented by **Keith Miles Aurzada**
2928 Richmond Ave                                                 Reed Smith LLP
Houston, TX 77098                                                 2850 N. Harwood Street
                                                                  Suite 1500
                                                                  Dallas, TX 75201
                                                                  469-680-4211
                                                                  Email: kaurzada@reedsmith.com

                                                                  **Michael Halley Bernick**
                                                                  Reed Smith LLP
                                                                  811 Main St
                                                                  Ste 1700
                                                                  Houston, TX 77002
                                                                  713-469-3834
                                                                  Email: mbernick@reedsmith.com

                                                                  **Michael P Cooley**
                                                                  Reed Smith LLP
                                                                  2501 N. Harwood, Suite 1700
                                                                  Dallas, TX 75201
                                                                  469-680-4213
                                                                  Email: mpcooley@reedsmith.com

                                                                  **Bradley James Purcell**
                                                                  Reed Smith LLP
                                                                  2501 N. Harwood St.
                                                                  Suite 1700
                                                                  Dallas, TX 75201
                                                                  469-680-4200
                                                                  Fax : 469-680-4299
                                                                  Email: bpurcell@reedsmith.com

                                                                  **Lindsey Lee Robin**
                                                                  Reed Smith

2850 N. Harwood St.
Suite 1500
Dallas, TX 75201
469-680-4222
Fax : 469-680-4299
Email: lrobin@reedsmith.com

V.

*Defendant*
-----------------------
**Arthur Jacob Brass**                    represented by **Miriam Goott**
2508 Pelham Dr                            Walker & Patterson, PC
Houston, TX 77019                         PO Box 61301
SSN / ITIN: xxx-xx-7454                   Houston, TX 77208
                                          713-956-5577
                                          Fax : 713-956-5570
                                          Email: mgoott@walkerandpatterson.com

                                          **Johnie J Patterson**
                                          Walker & Patterson,P.C.
                                          P.O. Box 61301
                                          Houston, TX 77208-1301
                                          713-956-5577
                                          Fax : 713-956-5570
                                          Email: jjp@walkerandpatterson.com

| Filing Date | # | Docket Text |
|---|---|---|
| 07/09/2021 | 1<br>(12 pgs; 2 docs) | Adversary case 21-06006. Nature of Suit: (41 (Objection / revocation of discharge - 727(c),(d),(e))),(65 (Dischargeability - other)) Complaint *Complaint to Determine Dischargeability of Debts* by Vitol Inc. against Arthur Jacob Brass. Fee Amount $350 (Attachments: # 1 Exhibit A) (Robin, Lindsey) (Entered: 07/09/2021) |
| 07/09/2021 | | Receipt of Complaint(21-06006) [cmp,cmp] ( 350.00) Filing Fee. Receipt number 23138378. Fee amount $ 350.00. (U.S. Treasury) (Entered: 07/09/2021) |
| 07/09/2021 | 2<br>(2 pgs) | Notice *Aversary Proceeding Cover Sheet*. (Related document(s):1 Complaint) Filed by Vitol Inc. (Robin, Lindsey) (Entered: 07/09/2021) |
| 07/09/2021 | 3<br>(2 pgs) | Docketed in Error - Request for Issuance of Summons on Arthur Jacob Brass. (Robin, Lindsey) Modified on 7/12/2021 (hler). (Entered: 07/09/2021) |
| 07/09/2021 | 4<br>(2 pgs) | Request for Issuance of Summons on Arthur Jacob Brass. (Robin, Lindsey) (Entered: 07/09/2021) |
| 07/12/2021 | 5<br>(2 pgs) | Summons Issued on Arthur Jacob Brass Date Issued 7/12/2021. (hler) (Entered: 07/12/2021) |

001741

| 08/02/2021 | 6 (14 pgs; 3 docs) | Motion to Dismiss Adversary Proceeding. Objections/Request for Hearing Due in 21 days. Filed by Arthur Jacob Brass (Attachments: # 1 Exhibit A - Objection to Exemptions # 2 Proposed Order) (Goott, Miriam) (Entered: 08/02/2021) |
| 08/23/2021 | 7 (32 pgs; 3 docs) | Response *and Motion for Leave to Amend* (related document(s):6 Motion to Dismiss Adversary Proceeding). Filed by Vitol Inc. (Attachments: # 1 Complaint # 2 Proposed Order) (Robin, Lindsey) (Entered: 08/23/2021) |
| 09/29/2021 | 8 (1 pg) | Order Denying Motion to Dismiss Adversary Proceeding 6:21-ap-6006 (Related Doc # 6) Signed on 9/29/2021. (kpico) (Entered: 09/29/2021) |
| 10/01/2021 | 9 (2 pgs) | BNC Certificate of Mailing. (Related document(s):8 Order on Motion to Dismiss Adversary Proceeding) No. of Notices: 2. Notice Date 10/01/2021. (Admin.) (Entered: 10/01/2021) |
| 10/06/2021 | 10 (10 pgs) | First Amended Complaint (Related document(s):1 Complaint) (Aurzada, Keith) (Entered: 10/06/2021) |
| 10/13/2021 | 11 (3 pgs) | Answer to Complaint (Related document(s):10 Amended Complaint) Filed by Arthur Jacob Brass (Goott, Miriam) (Entered: 10/13/2021) |
| 10/20/2021 | 12 (5 pgs) | Joint Discovery Plan/Case Management Plan (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 10/20/2021) |
| 10/24/2021 | 13 (2 pgs) | Initial Disclosure Rule 26 (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 10/24/2021) |
| 10/29/2021 | 14 (5 pgs) | Initial Disclosure Rule 26 (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 10/29/2021) |
| 11/29/2021 | | Certificate of Email Notice. Contacted M. Goot and L. Robin. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1 Complaint) Scheduling Conference is scheduled for 12/8/2021 at 11:30 AM by telephone and video conference. (kpico) (Entered: 11/29/2021) |
| 11/30/2021 | 15 (2 pgs) | Notice for Conference. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 11/30/2021) |
| 12/08/2021 | 16 (5 pgs) | Joint Discovery Plan/Case Management Plan (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 12/08/2021) |
| 12/08/2021 | | Courtroom Minutes. Time Hearing Held: 11:30 a.m. - 11:46 a.m. Appearances: Keith Aurzada for Plaintiff and Miriam Goott for Defendant (Related document(s):1 Scheduling Conference). Parties provide a status report and discuss deadlines. Court to issue scheduling order. Pretrial Conference is scheduled for 4/1/2022 at 11:00 AM by telephone and video conference. (kpico) (Entered: 12/08/2021) |
| 12/08/2021 | 17 (1 pg) | Scheduling Order Signed on 12/8/2021 (Related document(s):1 Complaint) Pre-Trial Conference set for 4/1/2022 at 11:00 AM at Houston, Courtroom 401 (CML). Discovery due by 2/7/2022. (kpico) (Entered: 12/08/2021) |

| 12/10/2021 | 18<br>(2 pgs) | BNC Certificate of Mailing. (Related document(s):17 Scheduling Order) No. of Notices: 2. Notice Date 12/10/2021. (Admin.) (Entered: 12/10/2021) |
|---|---|---|
| 12/15/2021 | 19<br>(13 pgs) | Notice *of Subpoena to Hightower Advisors*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/15/2021) |
| 12/15/2021 | 20<br>(10 pgs) | Notice *of Subpoena to EEPB*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/15/2021) |
| 12/15/2021 | 21<br>(15 pgs) | Notice *of Subpoena to Cadence Bank*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/15/2021) |
| 12/15/2021 | 22<br>(12 pgs) | Notice *of Subpoena to Chubb Lloyds Insurance Company of Texas*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/15/2021) |
| 12/17/2021 | 23<br>(2 pgs) | Stipulation By Vitol Inc. and. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 12/17/2021) |
| 12/17/2021 | 24<br>(14 pgs) | Notice *of Subpoena to International Bank of Commerce*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/17/2021) |
| 12/17/2021 | 25<br>(14 pgs) | Notice *of Subpoena to IberiaBank*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/17/2021) |
| 12/17/2021 | 26<br>(14 pgs) | Notice *of Subpoena to Veritex Community Bank*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 12/17/2021) |
| 12/17/2021 | 27<br>(3 pgs) | Answer to Complaint (Related document(s):1 Complaint, 10 Amended Complaint) Filed by Arthur Jacob Brass (Goott, Miriam) (Entered: 12/17/2021) |
| 12/20/2021 | 28<br>(2 pgs) | Stipulation and Agreed Order (Related document(s):23 Stipulation). Signed on 12/20/2021 . (rsal) (Entered: 12/20/2021) |
| 12/22/2021 | 29<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):28 Generic Order) No. of Notices: 2. Notice Date 12/22/2021. (Admin.) (Entered: 12/22/2021) |
| 12/29/2021 | 30<br>(2 pgs) | Stipulation By Veritex Community Bank f/k/a Green Bank, N.A. and. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Veritex Community Bank f/k/a Green Bank, N.A. ).(Related document(s):26 Notice) (Marmon, Shelley) (Entered: 12/29/2021) |
| 12/30/2021 | 31<br>(2 pgs) | Joint Stipulation Regarding Extension of Time to Respond to Subpoena (Related document(s): 30 Stipulation). Signed on 12/30/2021. (rsal) (Entered: 12/30/2021) |
| 01/01/2022 | 32<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):31 Generic Order) No. of Notices: 2. Notice Date 01/01/2022. (Admin.) (Entered: 01/01/2022) |
| 01/18/2022 | 33 | Stipulation By Vitol Inc. and Arthur J. Brass (Debtor). Does this |

001743

| | | |
|---|---|---|
| | (3 pgs) | document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Purcell, Bradley) (Entered: 01/18/2022) |
| 01/19/2022 | 34 (3 pgs) | Second Stipulation and Agreed Order. Signed on 1/19/2022 (Related document(s):33 Stipulation) (kpico) (Entered: 01/19/2022) |
| 01/21/2022 | 35 (5 pgs) | BNC Certificate of Mailing. (Related document(s):34 Generic Order) No. of Notices: 2. Notice Date 01/21/2022. (Admin.) (Entered: 01/21/2022) |
| 01/24/2022 | 36 (3 pgs) | Stipulation By Arthur Jacob Brass and Vitol, Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Arthur Jacob Brass ). (Purcell, Bradley) (Entered: 01/24/2022) |
| 01/28/2022 | 37 (3 pgs) | Third Stipulation and Agreed Order. Signed on 1/28/2022 (Related document(s):36 Stipulation) (kpico) (Entered: 01/28/2022) |
| 01/30/2022 | 38 (5 pgs) | BNC Certificate of Mailing. (Related document(s):37 Generic Order) No. of Notices: 2. Notice Date 01/30/2022. (Admin.) (Entered: 01/30/2022) |
| 02/04/2022 | 39 (3 pgs) | Stipulation By Vitol Inc. and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Purcell, Bradley) (Entered: 02/04/2022) |
| 02/07/2022 | 40 (3 pgs) | Fourth Stipulation and Agreed Order. Signed on 2/7/2022 (Related document(s):39 Stipulation) (kpico) (Entered: 02/07/2022) |
| 02/09/2022 | 41 (5 pgs) | BNC Certificate of Mailing. (Related document(s):40 Generic Order) No. of Notices: 2. Notice Date 02/09/2022. (Admin.) (Entered: 02/09/2022) |
| 02/16/2022 | 42 (3 pgs) | Stipulation By Vitol Inc. and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Aurzada, Keith) (Entered: 02/16/2022) |
| 02/17/2022 | 43 (3 pgs) | Fifth Stipulation and Agreed Order (Related document(s): 42 Stipulation). Signed on 2/17/2022. (rsal) (Entered: 02/17/2022) |
| 02/19/2022 | 44 (5 pgs) | BNC Certificate of Mailing. (Related document(s):43 Generic Order) No. of Notices: 2. Notice Date 02/19/2022. (Admin.) (Entered: 02/19/2022) |
| 02/22/2022 | 45 (3 pgs) | Stipulation By Arthur Jacob Brass and Vitol, Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Arthur Jacob Brass ).(Related document(s):17 Scheduling Order, 43 Generic Order) (Patterson, Johnie) (Entered: 02/22/2022) |
| 02/23/2022 | 46 (3 pgs) | Amended Fifth Stipulation and Agreed Order. Signed on 2/23/2022 (Related document(s):45 Stipulation) (kpico) (Entered: 02/23/2022) |

001744

| 02/25/2022 | 47<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):46 Generic Order) No. of Notices: 2. Notice Date 02/25/2022. (Admin.) (Entered: 02/25/2022) |
| --- | --- | --- |
| 03/10/2022 | 48<br>(3 pgs) | Stipulation By Vitol Inc. and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Vitol Inc. ). (Purcell, Bradley) (Entered: 03/10/2022) |
| 03/21/2022 | 49<br>(3 pgs) | Sixth Stipulation and Agreed Order (Adversary). Signed on 3/21/2022. (rsal) (Entered: 03/21/2022) |
| 03/23/2022 | 50<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):49 Generic Order (Adversary)) No. of Notices: 2. Notice Date 03/23/2022. (Admin.) (Entered: 03/23/2022) |
| 04/01/2022 | 51 | Courtroom Minutes. Time Hearing Held: 11:00 a.m. Appearances: Keith Aurzada, Vijay D'Cruz, Shawn Beloin, and Bradley Purcell for Plaintiff; Miriam Goott for Defendant. (Related document(s):1 Pretrial Conference). Comments made by parties. Mr. Azurada is to file a Discovery Related Motion by April 5, 2022. Mrs. Goott is to file a response by Noon on 4/7/2022. Hearing is scheduled for 4/8/2022 at 11:00 AM by telephone and video conference. Pre-trial conference is continued to 6/2/2022 at 11:00 AM by telephone and video conference. (kpico) (Entered: 04/01/2022) |
| 04/05/2022 | 52<br>(391 pgs; 3 docs) | Motion to Extend Time *Vitol, Inc.'s Expedited Motion to Extend Discovery* Filed by Vitol Inc. (Attachments: # 1 Declaration # 2 Proposed Order) (Aurzada, Keith) (Entered: 04/05/2022) |
| 04/05/2022 | 53<br>(5 pgs; 2 docs) | Response *in Opposition* (related document(s):52 Motion to Extend Time). Filed by Arthur Jacob Brass (Attachments: # 1 Exhibit A - Email) (Goott, Miriam) (Entered: 04/05/2022) |
| 04/08/2022 | 54<br>(1 pg) | Order Granting Motion to Extend Discovery. (Related Doc # 52) Signed on 4/8/2022. (kpico) (Entered: 04/08/2022) |
| 04/08/2022 | | Courtroom Minutes. Time Hearing Held: 11:00 a.m. Appearances: Miriam Goott for Defendant and Bradly Purcell for Plaintiff. (Related document(s): 52 Emergency Motion to Extend Discovery). Arguments heard. Court grants Motion to Extend Discovery for the reasons stated on the record; Order signed. (kpico) (Entered: 04/08/2022) |
| 04/08/2022 | 55<br>(5 pgs; 2 docs) | Notice *of Subpoena to John Tomaszewski*. Filed by Vitol Inc. (Attachments: # 1 Subpoena - Tomaszewski)(Aurzada, Keith) (Entered: 04/08/2022) |
| 04/10/2022 | 56<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):54 Order on Motion to Extend Time) No. of Notices: 2. Notice Date 04/10/2022. (Admin.) (Entered: 04/10/2022) |
| 04/14/2022 | 57<br>(5 pgs; 2 docs) | Notice *of Withdrawal and Issuance of Subpoena*. (Related document(s):55 Notice) Filed by Vitol Inc. (Attachments: # 1 Subpoena)(Purcell, Bradley) (Entered: 04/14/2022) |
| 04/18/2022 | 58 | Motion For Summary Judgment. Objections/Request for Hearing Due |

| | | |
|---|---|---|
| | (97 pgs; 12 docs) | in 21 days. Filed by Arthur Jacob Brass (Attachments: # 1 Exhibit 1 - Vitol's Amended Complaint # 2 Exhibit 2 - Settlement Agreement # 3 Exhibit 3 - Defendant's RFA # 4 Exhibit 4 - Vitol's Responses to RFA # 5 Exhibit 5 - POC with Agreed Judgment Attached # 6 Exhibit 6 - Affidavit # 7 Exhibit 7 - Responses to RFP # 8 Exhibit 8 - Responses to Interrogatories # 9 Exhibit 9 - The Email # 10 Exhibit 10 - Check rejected by Vitol # 11 Proposed Order) (Goott, Miriam) (Entered: 04/18/2022) |
| 04/22/2022 | 59 (4 pgs; 2 docs) | ***DISREGARD: Attorney efile error. Will be docketed the corrected entry/event**** Motion to Amend (related document(s):55 Notice, 57 Notice). Filed by Plaintiff Vitol Inc. (Attachments: # 1 Amended Subpoena; Purcell, Bradley) Modified on 4/22/2022 (BrittanyBoniface). (Entered: 04/22/2022) |
| 04/22/2022 | 60 (4 pgs; 2 docs) | Amended Notice of Subpoena. (Related document(s):55 Notice, 57 Notice) Filed by Vitol Inc. (Attachments: # 1 Notice of Amended Subpoena)(Purcell, Bradley) (Entered: 04/22/2022) |
| 04/25/2022 | | Certificate of Email Notice. Contacted M. Goott. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):58 Motion For Summary Judgment). Hearing is scheduled for 6/2/2022 at 11:00 AM by telephone and video conference. (rsal) (Entered: 04/25/2022) |
| 04/25/2022 | 61 (34 pgs; 11 docs) | Notice of Production of GCAC009845. Filed by Vitol Inc. (Attachments: # 1 Exhibit A # 2 Exhibit A-1 # 3 Exhibit A-3 # 4 Exhibit A-3 # 5 Exhibit A-4 # 6 Exhibit A-5 # 7 Exhibit B # 8 Exhibit B-1 # 9 Exhibit B-2 # 10 Exhibit B-3)(Bernick, Michael) (Entered: 04/25/2022) |
| 04/25/2022 | 62 (28 pgs; 8 docs) | Notice of Production of EEPB Documents. Filed by Vitol Inc. (Attachments: # 1 Exhibit A # 2 Exhibit A-1 # 3 Exhibit A-2 # 4 Exhibit A-3 # 5 Exhibit A-4 # 6 Exhibit A-5 # 7 Exhibit A-6)(Bernick, Michael) (Entered: 04/25/2022) |
| 04/26/2022 | 63 (24 pgs; 7 docs) | Supplemental Notice of Production. (Related document(s):61 Notice, 62 Notice) Filed by Vitol Inc. (Attachments: # 1 Exhibit A # 2 Exhibit A-1 # 3 Exhibit A-2 # 4 Exhibit B # 5 Exhibit B-1 # 6 Exhibit B-2) (Robin, Lindsey) (Entered: 04/26/2022) |
| 04/26/2022 | 64 (30 pgs; 8 docs) | Motion to Strike. Objections/Request for Hearing Due in 21 days (related document(s):60 Notice, 61 Notice, 62 Notice, 63 Notice). Filed by Arthur Jacob Brass (Attachments: # 1 Exhibit 1 # 2 Complaint 2 - Portion of depo transcript # 3 Exhibit 3 - Email with transcript # 4 Exhibit 4 - Second transcript after hearing # 5 Exhibit 5 - Vitol's Declaration # 6 Exhibit 6 - Declaration # 7 Proposed Order) (Goott, Miriam) (Entered: 04/26/2022) |
| 05/05/2022 | | Certificate of Email Notice. Contacted M. Goott. Movant to notice all interested parties and file a certificate of service with the court (Related document(s): 64 Motion to Strike). Hearing is scheduled for 6/2/2022 at 11:00 AM by telephone and video conference. (rsal) (Entered: 05/05/2022) |
| 05/09/2022 | 65 (30 pgs; 2 docs) | Response in Opposition to Debtor's Motion for Summary Judgment (related document(s):58 Motion For Summary Judgment). Filed by |

|  |  | Vitol Inc. (Attachments: # 1 Proposed Order) (Purcell, Bradley) (Entered: 05/09/2022) |
|---|---|---|
| 05/09/2022 | 66 (3 pgs) | Motion *to file Under Seal Exhibits to Its Response in Opposition to Debtor's Motion for Summary Judgment* Filed by Vitol Inc. (Purcell, Bradley) (Entered: 05/09/2022) |
| 05/09/2022 | 67 | Sealed Document *Motion to file Under Seal Exhibits to Its Response in Opposition to Debtor's Motion for Summary Judgment* (Filed By Vitol Inc. ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10) (Purcell, Bradley) (Entered: 05/09/2022) |
| 05/09/2022 | 68 | Sealed Document *Exhibits 11-25 to Motion to File Under Seal Exhibits to Its Response in Opposition to Debtors Motion for Summary Judgment* (Filed By Vitol Inc. ). (Attachments: # 1 Exhibit 11 # 2 Exhibit 12 # 3 Exhibit 13 # 4 Exhibit 14 # 5 Exhibit 15 # 6 Exhibit 16 # 7 Exhibit 17 # 8 Exhibit 18 # 9 Exhibit 19 # 10 Exhibit 20 # 11 Exhibit 21 # 12 Exhibit 22 # 13 Exhibit 23 # 14 Exhibit 24 # 15 Exhibit 25) (Purcell, Bradley) (Entered: 05/09/2022) |
| 05/16/2022 |  | Certificate of Email Notice. Contacted M. Goott, M. Beatty, and K. Aurzada. (Related document(s): 1 Complaint). Status Conference is scheduled for 5/17/2022 at 10:00 AM by telephone and video conference. (rsal) (Entered: 05/16/2022) |
| 05/17/2022 | 69 | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: M. Goott, M. Beatty, K. Aurzada, M. Durrschmidt, and B. Purcell. ERO: R. Saldana. (Related Document: 1 Status Conference). Status Conference held. Comments made by parties. There is no need for a further Status Conference. (rsal) (Entered: 05/17/2022) |
| 05/17/2022 | 70 (59 pgs; 11 docs) | Response *in Opposition to* (related document(s):64 Motion to Strike). Filed by Vitol Inc. (Attachments: # 1 Exhibit A-1 # 2 Exhibit A-1 # 3 Exhibit A-2 # 4 Exhibit A-3 # 5 Exhibit A-4 # 6 Exhibit A-5 # 7 Exhibit B # 8 Exhibit C # 9 Exhibit D # 10 Exhibit E) (Bernick, Michael) (Entered: 05/17/2022) |
| 05/30/2022 | 71 (599 pgs; 14 docs) | Witness List, Exhibit List (Filed By Arthur Jacob Brass ).(Related document(s):64 Motion to Strike) (Attachments: # 1 Exhibit 1 - Agreed Order # 2 Exhibit 2 - Declaration to Vitol's Motion to Depose # 3 Exhibit 3 - Order Granting Vitol's Motion # 4 Exhibit 4 - First transcript # 5 Exhibit 5 - Email from Purcell with transcript # 6 Exhibit 6 - Spreadsheet emailed during depo # 7 Exhibit 7 - Second transcript # 8 Exhibit 9 - Vitol's First Notice # 9 Exhibit 9 - Vitols Notice Docket 61 - Declaration # 10 Exhibit 10 - Vitol's Second Declaration # 11 Exhibit 11 - Docket # 12 Exhibit 12 - Properties of spreadsheet sent during depo # 13 Exhibit 13 - Size properties of spreadsheet emailed during deposition) (Goott, Miriam) (Entered: 05/30/2022) |
| 05/30/2022 | 72 (1 pg) | Notice *of Hearing*. (Related document(s):64 Motion to Strike) Filed by Arthur Jacob Brass (Goott, Miriam) (Entered: 05/30/2022) |
| 05/31/2022 | 73 (413 pgs; 26 docs) | Witness List, Exhibit List (Filed By Vitol Inc. ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit |

001747

| | | |
|---|---|---|
| | | 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 25 # 24 Exhibit 26 # 25 Exhibit 27) (Bernick, Michael) (Entered: 05/31/2022) |
| 05/31/2022 | 74 (75 pgs) | Additional Attachments Re: *Exhibit 23 part 1 of 3* (related document(s):73 Witness List, Exhibit List) (Filed By Vitol Inc. ). (Related document(s):73 Witness List, Exhibit List) (Bernick, Michael) (Entered: 05/31/2022) |
| 05/31/2022 | 75 (75 pgs) | Additional Attachments Re: *Exhibit 23 part 2 of 3* (related document(s):73 Witness List, Exhibit List) (Filed By Vitol Inc. ). (Related document(s):73 Witness List, Exhibit List) (Bernick, Michael) (Entered: 05/31/2022) |
| 05/31/2022 | 76 (70 pgs) | Additional Attachments Re: *Exhibit 23 part 3 of 3* (related document(s):73 Witness List, Exhibit List) (Filed By Vitol Inc. ). (Related document(s):73 Witness List, Exhibit List) (Bernick, Michael) (Entered: 05/31/2022) |
| 06/02/2022 | 77 | Courtroom Minutes. Time Hearing Held: 11:00 AM. Appearances: Miriam Goott and Johnie Patterson for Defendant; Keith Azurada, Michael Bernick, and Bradley Purcell for Plaintiff; Max Beatty for Christopher Murray. (Related document(s):1 Pretrial Conference, 58 Motion for Summary Judgment, and 64 Motion to Strike. Witness: James Tolbert. Arguments heard. Evidence presented. Vitol's exhibits 14 and 15 are admitted. Court takes 58 Motion for Summary Judgment under advisement for the reasons stated on the record. Hearing as to the Motion to Strike is continued to 7/8/2022 at 10:00 AM at Houston, Courtroom 401 (CML). (kpico) (Entered: 06/02/2022) |
| 06/22/2022 | 78 (16 pgs) | Declaration re: *James E. Tolbert* (Filed By Vitol Inc. ). (Bernick, Michael) (Entered: 06/22/2022) |
| 06/24/2022 | 79 (9 pgs) | Order Granting in part and Denying in part Motion For Summary Judgment in 6:21-ap-6006 (Related Doc # 58). Signed on 6/24/2022. (rsal) (Entered: 06/24/2022) |
| 06/26/2022 | 80 (11 pgs) | BNC Certificate of Mailing. (Related document(s):79 Order on Motion For Summary Judgment) No. of Notices: 2. Notice Date 06/26/2022. (Admin.) (Entered: 06/26/2022) |
| 07/01/2022 | 81 (19 pgs; 4 docs) | Supplemental Witness List (Filed By Vitol Inc. ). (Attachments: # 1 Exhibit 29 - Declaration of James Tolbert # 2 Exhibit 30 - Exhibit A to Tolbert Declaration # 3 Exhibit 31 - Exhibit A to Tolbert Declaration) (Bernick, Michael) (Entered: 07/01/2022) |
| 07/08/2022 | 82 | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: M. Goott, J. Patterson, M. Cooley, B. Purcell, M. Beatty, and S. Marmon. (Related document(s): 64 Motion to Strike/Status Conference). Motion is abated to a date to be determined. Parties are to file an agreed scheduling order. Witness/Exhibit lists and pre-trial statements are due by 4:00 PM on 8/22nd. Pre-Trial Hearing is scheduled for 8/24/2022 at 10:00 AM on (rsal) (Entered: 07/08/2022) |
| 07/18/2022 | 83 (3 pgs) | Stipulation By Vitol Inc. and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a |

001748

| | | document? Yes. (Filed By Vitol Inc. ). (Cooley, Michael) (Entered: 07/18/2022) |
|---|---|---|
| 07/19/2022 | [84](#) (3 pgs) | Sixth Stipulation and Agreed Order Pre-Trial Order, witness lists, and exhibits are due by 8/22/2022. Hybrid Pre-Trial Conference set for 8/24/2022 at 10:00 AM. Trial date set for 8/30/2022 and 8/31/2022 at 09:00 AM at Houston, Courtroom 401 (CML). Signed on 7/19/2022. (rsal) (Entered: 07/22/2022) |
| 07/27/2022 | [85](#) (1 pg) | Proposed Order RE: (Filed By Vitol Inc. ).(Related document(s):[64](#) Motion to Strike) (Cooley, Michael) (Entered: 07/27/2022) |
| 07/27/2022 | [86](#) (1 pg) | Order Regarding Attendance of Trial Witness (Related document(s): [64](#) Motion to Strike). Signed on 7/27/2022. (rsal) (Entered: 07/27/2022) |
| 07/27/2022 | [87](#) (6 pgs; 3 docs) | Notice *of Suboena to John Tomaszewski*. Filed by Vitol Inc. (Attachments: # [1](#) Trial Subpoena # [2](#) Proposed Order) (Aurzada, Keith) (Entered: 07/27/2022) |
| 07/27/2022 | [88](#) (5 pgs) | BNC Certificate of Mailing. (Related document(s):[84](#) Scheduling Order) No. of Notices: 2. Notice Date 07/27/2022. (Admin.) (Entered: 07/27/2022) |
| 07/29/2022 | [89](#) (3 pgs) | BNC Certificate of Mailing. (Related document(s):[86](#) Generic Order) No. of Notices: 2. Notice Date 07/29/2022. (Admin.) (Entered: 07/29/2022) |
| 08/08/2022 | [90](#) (41 pgs; 14 docs) | Docketed in Error - Notice *Trial Subponeas*. Filed by Vitol Inc. (Attachments: # [1](#) Trial Subpoena - AJ Brass # [2](#) Trial Subpoena - Arc Logistics Partners, LP # [3](#) Trial Subpoena - Cadence Bank # [4](#) Trial Subpoena - Catherine Brass # [5](#) Trial Subpoena - Chris Murray, Ch 7 Trustee for GCAC # [6](#) Trial Subpoena - Chubb Lloyd Insurance Co # [7](#) Trial Subpoena - EEPB PC # [8](#) Trial Subpoena - Hightower Advisors # [9](#) Trial Subpoena - IBC Bank # [10](#) Trial Subpoena - Jason Goldstein # [11](#) Trial Subpoena - Joe Mattingly # [12](#) 2022.08.08 - Trial Subpoena - Patrick Perugini # [13](#) Trial Subpoena - Vertext Community Bank) (Aurzada, Keith) Modified on 8/9/2022 (hler). (Entered: 08/08/2022) |
| 08/08/2022 | [91](#) (93 pgs; 14 docs) | Notice *of Trial Subpoena*. Filed by Vitol Inc. (Attachments: # [1](#) A_2022.08.08 - Trial Subpoena - AJ Brass # [2](#) B_2022.08.08 - Trial Subpoena - Patrick Perugini # [3](#) C_2022.08.08 - Trial Subpoena - Joe Mattingly # [4](#) D_2022.08.08 - Trial Subpoena - Jason Goldstein # [5](#) E_2022.08.08 - Trial Subpoena - Catherine Brass # [6](#) F_2022.08.08 - Trial Subpoena - EEPB PC # [7](#) G_2022.08.08 - Trial Subpoena - IBC Bank # [8](#) H_2022.08.08 - Trial Subpoena - Arc Logistics Partners, LP # [9](#) I_2022.08.08 - Trial Subpoena - Chubb Lloyd Insurance Co # [10](#) J_2022.08.08 - Trial Subpoena - Hightower Advisors # [11](#) K_2022.08.08 - Trial Subpoena - Veritext Community Bank # [12](#) L_2022.08.08 - Trial Subpoena - Chris Murray, Ch 7 Trustee for GCAC # [13](#) M_2022.08.08 - Trial Subpoena - Cadence Bank)(Aurzada, Keith) (Entered: 08/08/2022) |
| 08/09/2022 | [92](#) (4 pgs; 2 docs) | Notice *of Objection*. (Related document(s):[86](#) Generic Order, [87](#) Notice) Filed by Vitol Inc. (Attachments: # [1](#) Exhibit A)(Aurzada, Keith) (Entered: 08/09/2022) |
| 08/10/2022 | [93](#) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by Vitol |

| | (2 pgs) | Inc/Mason Malpass. This is to order a transcript of Motion Status Conference 7-8-2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Vitol Inc. ). (Bernick, Michael) Electronically forwarded to Veritext Legal Solutions 8/10/2022. Estimated Transcript Completion Date 8/17/2022. Modified on 8/10/2022 (BrandisIsom). (Entered: 08/10/2022) |
|---|---|---|
| 08/15/2022 | 94 (4 pgs) | Request for Hearing (Filed By Vitol Inc. ).(Related document(s):92 Notice) (Cooley, Michael) (Entered: 08/15/2022) |
| 08/15/2022 | 95 (6 pgs; 2 docs) | Response (Filed By Arthur Jacob Brass ).(Related document(s):94 Request for Hearing) (Attachments: # 1 Proposed Order) (Goott, Miriam) (Entered: 08/15/2022) |
| 08/17/2022 | 96 (7 pgs; 2 docs) | Notice *of of Trial Subpoena of Kevin Boston*. Filed by Vitol Inc. (Attachments: # 1 Exhibit Trial Subpoena - Kevin Boston)(Aurzada, Keith) (Entered: 08/17/2022) |
| 08/17/2022 | 97 | Transcript RE: held on 07/08/2022 before Judge Christopher M. Lopez. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 11/15/2022. (VeritextLegalSolutions) (Entered: 08/17/2022) |
| 08/18/2022 | 98 (1 pg) | Notice of Filing of Official Transcript as to 97 Transcript. Parties notified (Related document(s):97 Transcript) (hcar) (Entered: 08/18/2022) |
| 08/20/2022 | 99 (3 pgs) | BNC Certificate of Mailing. (Related document(s):98 Notice of Filing of Official Transcript (Form)) No. of Notices: 2. Notice Date 08/20/2022. (Admin.) (Entered: 08/20/2022) |
| 08/22/2022 | | Hearing Continued (Related document(s): 84 Scheduling Order). The Pre-Trial Conference scheduled for 8/24/2022 at 10:00 AM is RESET to 8/24/2022 at 4:00 PM (TIME CHANGE ONLY). (rsal) (Entered: 08/22/2022) |

### PACER Service Center

#### Transaction Receipt

| 08/22/2022 13:29:43 | | | |
|---|---|---|---|
| **PACER Login:** | johniepatterson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 21-06006 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

# U.S. Bankruptcy Court
## Southern District of Texas (Victoria)
## Bankruptcy Petition #: 21-60025

|  |  |
|---|---|
| *Date filed:* | 03/26/2021 |
| *341 meeting:* | 05/11/2021 |
| *Deadline for filing claims:* | 09/13/2021 |
| *Deadline for objecting to discharge:* | 07/12/2021 |
| *Deadline for financial mgmt. course:* | 07/12/2021 |

*Assigned to:* Bankruptcy Judge Christopher M. Lopez
Chapter 7
Voluntary
Asset

**Debtor**
**Arthur Jacob Brass**
2508 Pelham Dr
Houston, TX 77019
HARRIS-TX
SSN / ITIN: xxx-xx-7454

represented by **Miriam Goott**
Walker & Patterson, PC
PO Box 61301
Houston, TX 77208
713-956-5577
Fax : 713-956-5570
Email: mgoott@walkerandpatterson.com

**Johnie J Patterson**
Walker & Patterson,P.C.
P.O. Box 61301
Houston, TX 77208-1301
713-956-5577
Fax : 713-956-5570
Email: jjp@walkerandpatterson.com

**Lindsey Lee Robin**
Reed Smith
2850 N. Harwood St.
Suite 1500
Dallas, TX 75201
469-680-4222
Fax : 469-680-4299
Email: lrobin@reedsmith.com

**Trustee**
**Christopher R Murray**
Jones Murray LLP
602 Sawyer St
Ste 400
Houston, TX 77007
832-529-1999

represented by **Jon Maxwell Beatty**
The Beatty Law Firm PC
1127 Eldridge Pkwy
Suite 300, #383
Houston, TX 77077
832-529-3381
Fax : 832-852-1266
Email: max@beattypc.com

**U.S. Trustee**
**US Trustee**
Office of the US Trustee
515 Rusk Ave
Ste 3516

Houston, TX 77002
713-718-4650

| Filing Date | # | Docket Text |
|---|---|---|
| 03/26/2021 | [1](#)<br>(8 pgs) | Chapter 7 Voluntary Petition for Individuals . Fee Amount $338 Filed by Arthur Jacob Brass. (Goott, Miriam) (Entered: 03/26/2021) |
| 03/29/2021 | [2](#)<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Shelley B Marmon Filed by on behalf of Veritex Community Bank f/k/a Green Bank, N.A. (Marmon, Shelley) (Entered: 03/29/2021) |
| 03/29/2021 | [3](#)<br>(3 pgs) | Order: Possible Future Dismissal of Case. Court advises that 11 U.S.C. Section 521(i) requires automatic dismissal if information required by Section 521(a)(1) is not filed. Signed on 3/29/2021 (JosephWellsadi) (Entered: 03/29/2021) |
| 03/29/2021 | [4](#)<br>(1 pg) | No proof of attendance at an approved credit counseling course has been filed. (JosephWellsadi) (Entered: 03/29/2021) |
| 03/29/2021 | [5](#)<br>(2 pgs) | Initial Order for Prosecution Signed on 3/29/2021 (JosephWellsadi) (Entered: 03/29/2021) |
| 03/29/2021 | [6](#)<br>(2 pgs) | Meeting of Creditors, Proof of Claim deadline not set, 341(a) meeting to be held on 5/11/2021 at 04:30 PM at Trustee Murray Teleconference Line. Financial Management Course due: 7/12/2021. Last day to oppose discharge or dischargeability is 7/12/2021. Clerk to send Notice on Financial Management Requirement 6/25/2021. (JosephWellsadi) (Entered: 03/29/2021) |
| 03/29/2021 |  | Receipt of Voluntary Petition (Chapter 7)(21-60025) [misc,volp7] ( 338.00) Filing Fee. Receipt number 22919943. Fee amount $ 338.00. (U.S. Treasury) (Entered: 03/29/2021) |
| 03/29/2021 | [7](#)<br>(1 pg) | Certificate of Credit Counseling (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 03/29/2021) |
| 03/31/2021 | [8](#)<br>(4 pgs) | BNC Certificate of Mailing - Meeting of Creditors. (Related document(s):[6](#) Meeting of Creditors Chapter 7 No Asset) No. of Notices: 6. Notice Date 03/31/2021. (Admin.) (Entered: 03/31/2021) |
| 03/31/2021 | [9](#)<br>(2 pgs) | BNC Certificate of Mailing. (Related document(s):[4](#) Clerks Notice of No Proof of Credit Counseling Course Received.) No. of Notices: 1. Notice Date 03/31/2021. (Admin.) (Entered: 03/31/2021) |
| 03/31/2021 | [10](#)<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):[5](#) Initial Order for Prosecution) No. of Notices: 1. Notice Date 03/31/2021. (Admin.) (Entered: 03/31/2021) |
| 03/31/2021 | [11](#)<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):[3](#) Order: Possible Future Dismissal of Case) No. of Notices: 1. Notice Date 03/31/2021. (Admin.) (Entered: 03/31/2021) |
| 04/05/2021 | [12](#)<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Keith Miles Aurzada Filed by on behalf of Vitol Inc. (Aurzada, Keith) (Entered: |

| | | |
|---|---|---|
| | | 04/05/2021) |
| 04/06/2021 | [13](#)<br>(3 pgs; 2 docs) | Emergency Motion , Motion to Extend Deadline to File Schedules or Provide Required Information Filed by Debtor Arthur Jacob Brass (Attachments: # [1](#) Proposed Order) (Patterson, Johnie) (Entered: 04/06/2021) |
| 04/08/2021 | [14](#)<br>(1 pg) | Order Granting Emergency Motion To Extend Deadline to File Schedules or Provide Required Information (Related Doc # [13](#)) Signed on 4/8/2021. (kpico) (Entered: 04/08/2021) |
| 04/08/2021 | | Deadlines Updated (Related document(s):[14](#) Order on Emergency Motion, Order on Motion to Extend Deadline to File Schedules) Incomplete Filings due 4/27/2021. (kpico) (Entered: 04/08/2021) |
| 04/10/2021 | [15](#)<br>(4 pgs) | Debtor's Payment Advices or Certification under 11 USC 521 (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 04/10/2021) |
| 04/10/2021 | [16](#)<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):[14](#) Order on Emergency Motion) No. of Notices: 7. Notice Date 04/10/2021. (Admin.) (Entered: 04/10/2021) |
| 04/10/2021 | [17](#)<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):[14](#) Order on Emergency Motion) No. of Notices: 1. Notice Date 04/10/2021. (Admin.) (Entered: 04/10/2021) |
| 04/23/2021 | [18](#)<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Michael Halley Bernick Filed by on behalf of Vitol Inc. (Bernick, Michael) (Entered: 04/23/2021) |
| 04/27/2021 | [19](#)<br>(68 pgs) | Schedule A/B: Property Individual , Schedule C , Schedule D Individual-Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Individual , Schedule G Individual-Executory Contracts and Unexpired Leases , Schedule H Individual-Codebtors , Schedule I: Individual- Your Income , Schedule J Individual-Your Expenses , Summary of Assets and Liabilities Schedules for Individual , Declaration About Individual Debtor's Schedules (Filed By Arthur Jacob Brass ). (Patterson, Johnie) (Entered: 04/27/2021) |
| 04/27/2021 | [20](#)<br>(16 pgs) | Statement of Financial Affairs for Individual (Filed By Arthur Jacob Brass ). (Patterson, Johnie) (Entered: 04/27/2021) |
| 04/27/2021 | [21](#)<br>(2 pgs) | Statement of Intent. (Filed By Arthur Jacob Brass ). (Patterson, Johnie) (Entered: 04/27/2021) |
| 04/27/2021 | [22](#)<br>(2 pgs) | Disclosure of Compensation of Attorney for Debtor (Filed By Arthur Jacob Brass ). (Patterson, Johnie) (Entered: 04/27/2021) |
| 05/11/2021 | [23](#)<br>(1 pg) | Order Dismissing **Debtor** for deficiencies: Form 22a. Signed on 5/11/2021 (dhan) (Entered: 05/11/2021) |
| 05/11/2021 | [24](#)<br>(4 pgs) | Chapter 7 Statement of Your Current Monthly Income Form 122A-1 and Statement of Exemption from Presumption of Abuse Form 122A-1Supp The Debtor has Primarily Non-Consumer Debts. (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 05/11/2021) |

| 05/11/2021 | 25<br>(5 pgs; 3 docs) | Emergency Motion , Motion to Vacate. Objections/Request for Hearing Due in 21 days (related document(s):23 Order Dismissing Case for Deficiencies). Filed by Debtor Arthur Jacob Brass (Attachments: # 1 Proposed Order Setting Hearing # 2 Proposed Order) (Patterson, Johnie) (Entered: 05/11/2021) |
|---|---|---|
| 05/11/2021 | 26<br>(1 pg) | Order Vacating Dismissal and Order 341 Meeting to be Conducted (Related Doc # 25) (Related Doc # 25). Signed on 5/11/2021. (rsal) (Entered: 05/11/2021) |
| 05/11/2021 | 27<br>(48 pgs) | Amended Schedule C , Amended Schedule A/B: Property for Individual (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 05/11/2021) |
| 05/11/2021 | 28<br>(16 pgs) | Statement of Financial Affairs for Individual *AMENDED* (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 05/11/2021) |
| 05/13/2021 | 29<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):23 Order Dismissing Case for Deficiencies) No. of Notices: 12. Notice Date 05/13/2021. (Admin.) (Entered: 05/13/2021) |
| 05/13/2021 | 30<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):26 Order on Emergency Motion) No. of Notices: 14. Notice Date 05/13/2021. (Admin.) (Entered: 05/13/2021) |
| 05/14/2021 | 31<br>(13 pgs; 4 docs) | Application to Employ Jones Murray & Beatty LLP as General Bankruptcy Counsel. Objections/Request for Hearing Due in 21 days. Filed by Trustee Christopher R Murray (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (Beatty, Jon) (Entered: 05/14/2021) |
| 06/07/2021 | 32<br>(40 pgs) | Motion for Entry of Agreed Order (Automatic Stay) Filed by Creditor International Bank of Commerce (Freeman, Robert) (Entered: 06/07/2021) |
| 06/07/2021 | 33<br>(1 pg) | Motion for Entry of Agreed Order (Automatic Stay) Filed by Creditor International Bank of Commerce (Freeman, Robert) (Entered: 06/07/2021) |
| 06/07/2021 | 34<br>(7 pgs; 2 docs) | Motion *Vitol Inc.'s Objection to Exemptions* Filed by Creditor Vitol Inc. (Attachments: # 1 Proposed Order) (Aurzada, Keith) (Entered: 06/07/2021) |
| 06/08/2021 | 35<br>(2 pgs) | Order Authorizing the Trustee's Application to Employ Jones Murray & Beatty LLP as General Bankruptcy Counsel (Related Doc # 31). Signed on 6/8/2021. (rsal) (Entered: 06/08/2021) |
| 06/09/2021 | | Meeting of creditors held and concluded. Debtor appeared. Potential assets. Debtor appeared. (Murray, Christopher) (Entered: 06/09/2021) |
| 06/09/2021 | 36<br>(1 pg) | Trustee's Notice of Assets & Request for Notice to Creditors Proofs of Claims due by 9/13/2021. (Murray, Christopher) (Entered: 06/09/2021) |
| 06/09/2021 | 37<br>(3 pgs) | Stipulation By Christopher R Murray and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ). (Beatty, Jon) (Entered: 06/09/2021) |

| 06/10/2021 | 38<br>(3 pgs) | Stipulation and Agreed Order Extending the Trustee's Deadline to Object to Debtor's Claimed Exemptions. Signed on 6/10/2021 (Related document(s):37 Stipulation) (kpico) (Entered: 06/10/2021) |
| 06/10/2021 | 39<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):35 Order on Application to Employ) No. of Notices: 2. Notice Date 06/10/2021. (Admin.) (Entered: 06/11/2021) |
| 06/11/2021 | 40<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Scott Robert Cheatham Filed by on behalf of Superior Crude Gathering, Inc. (Cheatham, Scott) (Entered: 06/11/2021) |
| 06/12/2021 | 41<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):36 Trustee's Request for Notice of Assets) No. of Notices: 13. Notice Date 06/12/2021. (Admin.) (Entered: 06/12/2021) |
| 06/12/2021 | 42<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):38 Generic Order) No. of Notices: 2. Notice Date 06/12/2021. (Admin.) (Entered: 06/12/2021) |
| 06/17/2021 | 43<br>(11 pgs; 4 docs) | Application to Employ Asset Marketing Pros, LLC as Appraiser. Objections/Request for Hearing Due in 21 days. Filed by Trustee Christopher R Murray (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (Beatty, Jon) (Entered: 06/17/2021) |
| 06/17/2021 | 44<br>(5 pgs) | Certificate of Service (Filed By Christopher R Murray ).(Related document(s):43 Application to Employ) (Beatty, Jon) (Entered: 06/17/2021) |
| 06/27/2021 | 45<br>(2 pgs) | Response in Opposition (related document(s):34 Generic Motion). Filed by Arthur Jacob Brass (Goott, Miriam) (Entered: 06/27/2021) |
| 07/02/2021 | 46<br>(1 pg) | Agreed Order Granting Relief From Automatic Stay (Related Doc # 33). Signed on 7/2/2021. (rsal) (Entered: 07/02/2021) |
| 07/04/2021 | 47<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):46 Order on Entry of Agreed Order (Automatic Stay)) No. of Notices: 2. Notice Date 07/04/2021. (Admin.) (Entered: 07/04/2021) |
| 07/09/2021 | 48<br>(12 pgs; 2 docs) | Adversary case 21-06006. Nature of Suit: (41 (Objection / revocation of discharge - 727(c),(d),(e))),(65 (Dischargeability - other)) Complaint Complaint to Determine Dischargeability of Debts by Vitol Inc. against Arthur Jacob Brass. Fee Amount $350 (Attachments: # 1 Exhibit A) (Robin, Lindsey) (Entered: 07/09/2021) |
| 07/12/2021 | 49<br>(29 pgs; 5 docs) | Adversary case 21-06007. Nature of Suit: (62 (Dischargeability - 523(a) (2), false pretenses, false representation, actual fraud)),(68 (Dischargeability - 523(a)(6), willful and malicious injury)) Complaint to Determine Dischargeability of a Debt by Superior Crude Gathering, Inc. against Arthur Jacob Brass. Fee Amount $350 (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit Adversary Cover Sheet # 4 Exhibit Summons) (Cheatham, Scott) (Entered: 07/12/2021) |
| 07/13/2021 | 50<br>(2 pgs) | Order Authorizing the Trustee Application to Retain and Employ Appraiser (Related Doc # 43). Signed on 7/13/2021. (rsal) (Entered: 07/13/2021) |

| 07/15/2021 | 51<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):50 Order on Application to Employ) No. of Notices: 2. Notice Date 07/15/2021. (Admin.) (Entered: 07/17/2021) |
| 07/19/2021 | 52<br>(3 pgs) | Stipulation By Arthur Jacob Brass and Vitol Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Arthur Jacob Brass ).(Related document(s):34 Generic Motion) (Robin, Lindsey) (Entered: 07/19/2021) |
| 07/21/2021 | 53<br>(3 pgs) | Stipulation and Order Regarding Hearing on Vitol's Objection to Exemptions (Related document(s): 52). Signed on 7/21/2021. (rsal) (Entered: 07/21/2021) |
| 07/23/2021 | 54<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):53 Generic Order) No. of Notices: 2. Notice Date 07/23/2021. (Admin.) (Entered: 07/23/2021) |
| 07/27/2021 | 55<br>(3 pgs) | Stipulation By Christopher R Murray and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ).(Related document(s):38 Generic Order) (Beatty, Jon) (Entered: 07/27/2021) |
| 07/28/2021 | 56<br>(3 pgs) | Second Stipulation and Agreed Order Extending the Trustee's Deadline to Object to Debtor's Claimed Exemptions . Signed on 7/28/2021. (rsal) (Entered: 07/29/2021) |
| 07/31/2021 | 57<br>(18 pgs; 4 docs) | Emergency Motion *to Quash* Filed by Debtor Arthur Jacob Brass (Attachments: # 1 Exhibit A - 2004 Notice # 2 Exhibit B - Case # 3 Proposed Order) (Goott, Miriam) (Entered: 07/31/2021) |
| 07/31/2021 | 58<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):56 Generic Order) No. of Notices: 2. Notice Date 07/31/2021. (Admin.) (Entered: 07/31/2021) |
| 08/02/2021 | | Certificate of Email Notice. Contacted M. Goott. Movant to notice all interested parties and file a certificate of service with the court (Related document(s): 57 Emergency Motion to Quash). Hearing is scheduled for 8/3/2021 at 10:00 AM by telephone and video conference. (rsal) (Entered: 08/02/2021) |
| 08/02/2021 | 59<br>(1 pg) | Certificate *of Service* (Filed By Arthur Jacob Brass ).(Related document(s):57 Emergency Motion, Certificate of Notice) (Goott, Miriam) (Entered: 08/02/2021) |
| 08/02/2021 | 60<br>(38 pgs; 8 docs) | Witness List, Exhibit List (Filed By Arthur Jacob Brass ).(Related document(s):57 Emergency Motion) (Attachments: # 1 Exhibit 1 - Docket (Main Case) # 2 Exhibit 2 - Docket (Adversary) # 3 Exhibit 3 - Notice of Appearance # 4 Exhibit 4 - Objection to Exemption # 5 Exhibit 5 - Adversary complaint # 6 Exhibit 6 - Stipulation # 7 Exhibit 7- 2004 Notice) (Goott, Miriam) (Entered: 08/02/2021) |
| 08/03/2021 | 61<br>(8 pgs) | Response (related document(s):57 Emergency Motion). Filed by Vitol Inc. (Robin, Lindsey) (Entered: 08/03/2021) |
| 08/03/2021 | 62<br>(20 pgs; 2 docs) | Amended Response (related document(s):57 Emergency Motion). Filed by Vitol Inc. (Attachments: # 1 Exhibit Subpoena) (Robin, Lindsey) (Entered: 08/03/2021) |

| 08/03/2021 | | Courtroom Minutes. Time Hearing Held: 10:00 a.m. Appearances: Miriam Goott for Debtor (present), Keith Aurzada for Vital, Inc., and Christopher Murray. (Related document(s):57 Emergency Motion to Quash). Arguments heard. Court makes oral ruling as to 57 Emergency Motion to Quash and will issue a written order. (kpico) (Entered: 08/03/2021) |
| 08/03/2021 | 63 (1 pg) | Order Granting Emergency Motion to Quash 2004 Examination Notice. (Related Doc # 57) Signed on 8/3/2021. (kpico) (Entered: 08/03/2021) |
| 08/05/2021 | 64 (3 pgs) | BNC Certificate of Mailing. (Related document(s):63 Order on Emergency Motion) No. of Notices: 2. Notice Date 08/05/2021. (Admin.) (Entered: 08/05/2021) |
| 09/10/2021 | 65 (9 pgs; 2 docs) | Application to Employ William G. West, P.C., CPA as Accountant. Objections/Request for Hearing Due in 21 days. Filed by Trustee Christopher R Murray (Attachments: # 1 Proposed Order) (West, William) (Entered: 09/10/2021) |
| 09/29/2021 | 66 (3 pgs) | Stipulation By Christopher R Murray and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ) (Beatty, Jon) (Entered: 09/29/2021) |
| 09/30/2021 | 67 (3 pgs) | Third Stipulation and Agreed Order Extending the Trustee's Deadline to Object to Debtor's Claimed Exemptions. Signed on 9/30/2021 (Related document(s):66 Stipulation) (kpico) (Entered: 09/30/2021) |
| 10/02/2021 | 68 (5 pgs) | BNC Certificate of Mailing. (Related document(s):67 Generic Order) No. of Notices: 2. Notice Date 10/02/2021. (Admin.) (Entered: 10/02/2021) |
| 10/05/2021 | 69 (3 pgs) | Order Granting Application to Employ Accountant. (Related Doc # 65) Signed on 10/5/2021. (kpico) (Entered: 10/05/2021) |
| 10/07/2021 | 70 (5 pgs) | BNC Certificate of Mailing. (Related document(s):69 Order on Application to Employ) No. of Notices: 2. Notice Date 10/07/2021. (Admin.) (Entered: 10/07/2021) |
| 10/21/2021 | 71 (11 pgs; 3 docs) | Application for Compensation for Asset Marketing Pros, LLC, Appraiser, Period: 6/1/2021 to 10/15/2021, Fee: $28,200.00, Expenses: $0. Objections/Request for Hearing Due in 21 days. Filed by Attorney Jon Maxwell Beatty (Attachments: # 1 Exhibit 1 # 2 Proposed Order) (Beatty, Jon) (Entered: 10/21/2021) |
| 10/21/2021 | 72 (5 pgs) | Certificate of Service (Filed By Christopher R Murray ).(Related document(s):71 Application for Compensation) (Beatty, Jon) (Entered: 10/21/2021) |
| 10/28/2021 | 73 (2 pgs) | Notice of Appearance and Request for Notice Filed by Yoshie Valadez Filed by on behalf of WELLS FARGO BANK, N.A. (Valadez, Yoshie) (Entered: 10/28/2021) |
| 11/04/2021 | 74 (3 pgs) | Stipulation By Christopher R Murray and Arthur Jacob Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ) (Beatty, Jon) (Entered: 11/04/2021) |

| 11/05/2021 | 75<br>(3 pgs) | Fourth Stipulation and Agreed Order Extending Trustee's Deadline to Object to Debtor's Claimed Exemptions. Signed on 11/5/2021 (Related document(s):74 Stipulation) (kpico) (Entered: 11/05/2021) |
| 11/07/2021 | 76<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):75 Generic Order) No. of Notices: 2. Notice Date 11/07/2021. (Admin.) (Entered: 11/07/2021) |
| 11/17/2021 | 77<br>(3 pgs) | Stipulation By Christopher R Murray and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ). (Beatty, Jon) (Entered: 11/17/2021) |
| 11/17/2021 | 78<br>(2 pgs) | Order Granting Application For Compensation (Related Doc # 71). Granting for Asset Marketing Pros, LLC, fees awarded: $, expenses awarded: $ Signed on 11/17/2021. (clopez) (Entered: 11/17/2021) |
| 11/19/2021 | 79<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):78 Order on Application for Compensation) No. of Notices: 2. Notice Date 11/19/2021. (Admin.) (Entered: 11/19/2021) |
| 11/22/2021 | 80<br>(17 pgs; 3 docs) | Interim Application for Compensation for Jones Murray & Beatty LLP, Attorney, Period: 4/29/2021 to 11/19/2021, Fee: $14,190.00, Expenses: $42.07. Objections/Request for Hearing Due in 21 days. Filed by Attorney Jon Maxwell Beatty (Attachments: # 1 Exhibit 1 # 2 Proposed Order) (Beatty, Jon) (Entered: 11/22/2021) |
| 11/22/2021 | 81<br>(5 pgs) | Certificate of Service (Filed By Christopher R Murray ).(Related document(s):80 Application for Compensation) (Beatty, Jon) (Entered: 11/22/2021) |
| 11/22/2021 | 82<br>(3 pgs) | Order Approving Stipulation Re: Docket 77 Signed on 11/22/2021 (clopez) (Entered: 11/22/2021) |
| 11/24/2021 | 83<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):82 Generic Order) No. of Notices: 2. Notice Date 11/24/2021. (Admin.) (Entered: 11/24/2021) |
| 12/16/2021 | 84 | Trustee Certification of Services Rendered Under 11 U.S.C. Section 330(e). I rendered the following service in the case and am eligible for payment under 11 U.S.C. Section 330(e): Filed a Notice of Assets. I declare under penalty of perjury that the foregoing is true and correct. (Executed on 12/16/2021). (Related document(s):36 Trustee's Request for Notice of Assets) (Murray, Christopher) (Entered: 12/16/2021) |
| 12/16/2021 | 85<br>(50 pgs) | Amended Schedule A/B: Property for Individual , Amended Schedule C (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 12/16/2021) |
| 12/17/2021 | 86<br>(2 pgs) | Order Approving First Interim Application for Approval of Compensation for Trustee's General Bankruptcy Counsel Jones Murray & Beatty, LLP (Related Doc # 80). Granting for Jones Murray & Beatty LLP, fees awarded: $14190.00, expenses awarded: $42.07. Signed on 12/17/2021. (rsal) (Entered: 12/17/2021) |
| 12/19/2021 | 87<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):86 Order on Application for Compensation) No. of Notices: 2. Notice Date 12/19/2021. (Admin.) (Entered: 12/19/2021) |

| 12/20/2021 | 88<br>(13 pgs) | Notice *of Subpoena to American Express*. Filed by Vitol Inc. (Dotson, David) (Entered: 12/20/2021) |
| --- | --- | --- |
| 12/20/2021 | 89<br>(15 pgs) | Notice *of Subpoena to JPMorgan Chase Bank, N.A.*. Filed by Vitol Inc. (Dotson, David) (Entered: 12/20/2021) |
| 12/20/2021 | 90<br>(12 pgs) | Notice *of Subpoena to PayPal Holdings, Inc.*. Filed by Vitol Inc. (Dotson, David) (Entered: 12/20/2021) |
| 01/06/2022 | 91<br>(21 pgs) | Amended Schedule C (Filed By Arthur Jacob Brass ). (Goott, Miriam) (Entered: 01/06/2022) |
| 01/25/2022 | 92<br>(9 pgs; 2 docs) | Application *to Substitute Accountant* Filed by Trustee Christopher R Murray (Attachments: # 1 Proposed Order) (West, William) (Entered: 01/25/2022) |
| 02/04/2022 | 93<br>(171 pgs; 7 docs) | Objection to Debtor's Claim of Exemptions (Filed By Vitol Inc. ). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C-Part 1 # 4 Exhibit C-Part 2 # 5 Exhibit C-Part 1-3 # 6 Exhibit C-Part 4) (Aurzada, Keith) (Entered: 02/04/2022) |
| 02/04/2022 | 94<br>(3 pgs) | Stipulation By Christopher R Murray and Arthur Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ). (Beatty, Jon) (Entered: 02/04/2022) |
| 02/07/2022 | 95<br>(3 pgs) | Sixth Stipulation and Agreed Order Extending the Trustee's Deadline to Object to Debtor's Claimed Exemptions (Related document(s): 94 Stipulation). Signed on 2/7/2022. (rsal) (Entered: 02/07/2022) |
| 02/09/2022 | 96<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):95 Generic Order) No. of Notices: 2. Notice Date 02/09/2022. (Admin.) (Entered: 02/09/2022) |
| 02/22/2022 | 97<br>(1 pg) | Order Authorizing the Trustee to Substitute Accountant TPS-West LLC for William G. West, PC, CPA (Related Doc # 92). Signed on 2/22/2022. (rsal) (Entered: 02/22/2022) |
| 02/24/2022 | 98<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):97 Order on Generic Application) No. of Notices: 2. Notice Date 02/24/2022. (Admin.) (Entered: 02/24/2022) |
| 03/10/2022 | 99<br>(4 pgs) | Stipulation By Christopher R Murray and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ). (Beatty, Jon) (Entered: 03/10/2022) |
| 03/14/2022 | 100<br>(4 pgs) | Seventh Stipulation and Agreed Order Extending the Trustee's Deadline to Object to Debtor's Claimed Exemptions (Related document(s): 99 Stipulation). Signed on 3/14/2022. (rsal) (Entered: 03/14/2022) |
| 03/16/2022 | 101<br>(6 pgs) | BNC Certificate of Mailing. (Related document(s):100 Generic Order) No. of Notices: 2. Notice Date 03/16/2022. (Admin.) (Entered: 03/16/2022) |
| 04/15/2022 | 102<br>(4 pgs) | Stipulation By Christopher R Murray and Arthur J. Brass. Does this document include an agreed order or otherwise request that the judge sign |

| | | a document? Yes. (Filed By Christopher R Murray ). (Beatty, Jon) (Entered: 04/15/2022) |
|---|---|---|
| 04/18/2022 | 103<br>(11 pgs; 4 docs) | Application to Employ The Beatty Law Firm PC as General Bankruptcy Counsel. Objections/Request for Hearing Due in 21 days. Filed by Trustee Christopher R Murray (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Proposed Order) (Beatty, Jon) (Entered: 04/18/2022) |
| 04/21/2022 | 104<br>(4 pgs) | Eight Stipulation and Agreed Order Extending the Trustee's Deadline to Object to Debtor's Claimed Exemptions. Signed on 4/21/2022 (Related document(s):102 Stipulation) (kpico) (Entered: 04/21/2022) |
| 04/23/2022 | 105<br>(6 pgs) | BNC Certificate of Mailing. (Related document(s):104 Generic Order) No. of Notices: 2. Notice Date 04/23/2022. (Admin.) (Entered: 04/23/2022) |
| 04/29/2022 | 106 | Motion for 2004 Examination. Filed by Creditor Vitol Inc. (Attachments: # 1 Exhibit A-1 # 2 Exhibit A-2 # 3 Exhibit A-3 # 4 Proposed Order) (Bernick, Michael) (Entered: 04/29/2022) |
| 05/03/2022 | 107<br>(12 pgs; 3 docs) | Response *in Opposition* (related document(s): 109 Motion for 2004 Examination. filed by Creditor Vitol Inc., 110 Sealed Motion *for Order Authorizing Examination of the Debtor and Catherine Mattingly Brass Under Rule 2004* filed by Creditor Vitol Inc.. Modified on 5/12/2022 (rsal). (Entered: 05/03/2022) |
| 05/05/2022 | 108<br>(3 pgs) | Motion to Withdraw Document (related document(s):106 Motion for Examination). Filed by Creditor Vitol Inc. (Bernick, Michael) (Entered: 05/05/2022) |
| 05/09/2022 | 109<br>(28 pgs; 2 docs) | Motion for 2004 Examination. Filed by Creditor Vitol Inc. (Attachments: # 1 Proposed Order) (Purcell, Bradley) (Entered: 05/09/2022) |
| 05/09/2022 | 110 | Sealed Motion *for Order Authorizing Examination of the Debtor and Catherine Mattingly Brass Under Rule 2004* Filed by Creditor Vitol Inc. (Attachments: # 1 Proposed Order # 2 Exhibit A-2 # 3 Exhibit A-3) (Purcell, Bradley) (Entered: 05/09/2022) |
| 05/13/2022 | 111<br>(1 pg) | Order Granting Application to Employ the Beatty Law Firm as General Bankruptcy Counsel. (Related Doc # 103) Signed on 5/13/2022. (kpico) (Entered: 05/13/2022) |
| 05/13/2022 | 112<br>(24 pgs; 3 docs) | Final Application for Compensation for Jones Murray LLP, Trustee's Attorney, Period: 4/29/2021 to 11/19/2021, Fee: $22,327.50, Expenses: $103.60. Objections/Request for Hearing Due in 21 days. Filed by Attorney Christopher R Murray (Attachments: # 1 Exhibit 1 # 2 Proposed Order) (Murray, Christopher) (Entered: 05/13/2022) |
| 05/13/2022 | 113<br>(2 pgs) | Notice *of Final Fee Application*. (Related document(s):112 Application for Compensation) Filed by Jones Murray LLP (Murray, Christopher) (Entered: 05/13/2022) |
| 05/15/2022 | 114<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):111 Order on Application to Employ) No. of Notices: 2. Notice Date 05/15/2022. (Admin.) (Entered: 05/15/2022) |
| 05/16/2022 | | Certificate of Email Notice. Contacted M. Goott, M. Beatty, and K. |

001760

| | | Aurzada. Movant to notice all interested parties and file a certificate of service with the court (Related document(s): <u>1</u> Voluntary Petition (Chapter 7)). Status Conference is scheduled for 5/17/2022 at 10:00 AM by telephone and video conference. (rsal) (Entered: 05/16/2022) |
|---|---|---|
| 05/16/2022 | <u>115</u> (6 pgs) | Certificate *of Service* (Filed By Jones Murray LLP ).(Related document(s):<u>113</u> Notice) (Murray, Christopher) (Entered: 05/16/2022) |
| 05/16/2022 | <u>116</u> (2 pgs) | Notice *of Status Conference*. Filed by Christopher R Murray (Beatty, Jon) (Entered: 05/16/2022) |
| 05/17/2022 | 117 | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: M. Goott, M. Beatty, K. Aurzada, M. Durrschmidt, and B. Purcell. ERO: R. Saldana. (Related Document: <u>1</u> Status Conference). Status Conference held. Comments made by parties. There is no need for a further Status Conference. (rsal) (Entered: 05/17/2022) |
| 05/24/2022 | <u>118</u> (2 pgs) | Notice of Abandonment of Limited Partnership and Limited Liability Company Interests Filed by Christopher R Murray (Beatty, Jon) (Entered: 05/24/2022) |
| 05/25/2022 | <u>119</u> (6 pgs) | Certificate *of Service* (Filed By Christopher R Murray ).(Related document(s):<u>118</u> Notice of Abandonment) (Beatty, Jon) (Entered: 05/25/2022) |
| 06/07/2022 | <u>120</u> (3 pgs) | Objection *Vitol Inc.'s Objection to the Trustee's Notice of Abandonment*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 06/07/2022) |
| 06/08/2022 | <u>121</u> (2 pgs) | Order Approving Final Application For Compensation for Jones Murray & Beatty LLP (Related Doc # <u>112</u>). Granting for Jones Murray LLP, fees awarded: $22327.50, expenses awarded: $103.06. Signed on 6/8/2022. (rsal) (Entered: 06/08/2022) |
| 06/10/2022 | <u>122</u> (4 pgs) | BNC Certificate of Mailing. (Related document(s):<u>121</u> Order on Application for Compensation) No. of Notices: 3. Notice Date 06/10/2022. (Admin.) (Entered: 06/10/2022) |
| 06/22/2022 | <u>123</u> (9 pgs) | Notice *Notice of Subpoena to Arthur Jacob Brass*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 06/22/2022) |
| 06/22/2022 | <u>124</u> (9 pgs) | Notice *Notice of Subpoena to Catherine Brass*. Filed by Vitol Inc. (Aurzada, Keith) (Entered: 06/22/2022) |
| 07/08/2022 | <u>125</u> (7 pgs; 2 docs) | Notice *of Intent to Conduct a Rule 2004 Examination*. Filed by Christopher R Murray (Attachments: # <u>1</u> Exhibit 1) (Beatty, Jon) (Entered: 07/08/2022) |
| 07/21/2022 | 126 | Trustee Payment Under 11 U.S.C. Section 330(e) Processed for $60.00. Voucher Number GPC-22-1597. (ShannonSheriff) (Entered: 07/21/2022) |
| 07/25/2022 | <u>127</u> (6 pgs; 3 docs) | Objection to Debtor's Claim of Exemptions (Filed By Christopher R Murray ). (Attachments: # <u>1</u> Exhibit 1 # <u>2</u> Proposed Order) (Beatty, Jon) (Entered: 07/25/2022) |
| 08/08/2022 | <u>128</u> (7 pgs; 2 docs) | Notice *of Intent to Conduct a Rule 2004 Examination*. Filed by Christopher R Murray (Attachments: # <u>1</u> Exhibit 1) (Beatty, Jon) (Entered: |

| | | 08/08/2022) |
|---|---|---|
| 08/11/2022 | **129**<br>(2 pgs) | Response *in Opposition to Trustee's Objection to Exemptions*. Filed by Arthur Jacob Brass (Goott, Miriam) (Entered: 08/11/2022) |
| 08/17/2022 | 130 | Transcript RE: held on 07/08/2022 before Judge Christopher M. Lopez. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 11/15/2022. (VeritextLegalSolutions) (Entered: 08/17/2022) |
| 08/18/2022 | **131**<br>(1 pg) | Notice of Filing of Official Transcript as to 130 Transcript. Parties notified (Related document(s):130 Transcript) (hcar) (Entered: 08/18/2022) |
| 08/20/2022 | **132**<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):131 Notice of Filing of Official Transcript (Form)) No. of Notices: 3. Notice Date 08/20/2022. (Admin.) (Entered: 08/20/2022) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/22/2022 14:57:22 | | |
| **PACER Login:** | johniepatterson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 21-60025 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |