STATEMENT OF ACCOUNT

# IBERIABANK

```
                                    Date 11/30/17      Page     1
                                    Account Number    *******8673
GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056
```

```
------------------------- CHECKING ACCOUNT -------------------------------

COMMERCIAL CHECKING ANALYSIS                                            0
Account Number              *******8673  Statement Dates  11/01/17 thru 11/30/17
Previous Balance               7,401.98  Days this Statement Period        30
   5 Deposits/Credits        856,768.48  Average Ledger             57,353.47
   5 Checks/Debits           863,568.90  Average Collected          28,794.53
Service Charge                      .00
Interest Paid                       .00
Current Balance                  601.56
```

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 11/01 | Lockbox Deposit | 83,303.34 |
| 11/07 | Lockbox Deposit | 130,946.20 |
| 11/15 | Lockbox Deposit | 330,173.89 |
| 11/21 | Lockbox Deposit | 65,523.55 |
| 11/27 | Lockbox Deposit | 246,821.50 |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 11/02 | PAYMENTS   RIO ENERGY INT'L<br>CCD   Gulf Coast Asphalt Com | 90,103.76- |
| 11/09 | PAYMENTS   RIO ENERGY INT'L<br>CCD   Gulf Coast Asphalt Com | 130,946.20- |
| 11/17 | PAYMENTS   RIO ENERGY INT'L<br>CCD   Gulf Coast Asphalt Com | 330,173.89- |
| 11/24 | PAYMENTS   RIO ENERGY INT'L<br>CCD   Gulf Coast Asphalt Com | 65,523.55- |
| 11/29 | PAYMENTS   RIO ENERGY INT'L<br>CCD   Gulf Coast Asphalt Com | 246,821.50- |

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 11/01 | 90,705.32 | 11/07 | 131,547.76 | 11/15 | 330,775.45 |
| 11/02 | 601.56 | 11/09 | 601.56 | 11/17 | 601.56 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is
received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                  $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                           $ _____

## TOTAL                          $ _____

## SUBTRACT—

CHECKS OUTSTANDING                 $ _____

## BALANCE                        $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.



**Member FDIC**

### In Case of Errors or Questions About Your Electronic Transfers
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement  on which the problem appeared.

   1)Tell us your name and account number.
   2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
   3) Tell us the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.  If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have
use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account
used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions).
To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits.  This gives us the daily balance. We then add up
all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily
periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the
billing cycle. The result is the dollar figure shown on your statement as "Finance Charge."  Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account
and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account.  On the closing date of your billing cycle, we will calculate
the amount of your minimum payment due as per your original contract.  We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ-
ten to us to dispute that we are currently investigating).  "New Balance" means the total outstanding balance of your account at the end of your billing cycle which includes principal.  If the New Balance is less than
or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to
make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically
deducted from your checking account.  If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed
to the address shown on the statement, Attn.: Loan Accounting.  Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch
office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible.  We
must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
•  Your name and account number.
•  The dollar amount of the suspected error.
•  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about.  You do not have to pay any amount
   in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as
   delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# iBERIABANK

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

Date 11/30/17    Page    2
Account Number   *******8673

COMMERCIAL CHECKING ANALYSIS       *******8673   (Continued)

## Daily Balance Information

| Date | Balance | Date | Balance |
|------|---------|------|---------|
| 11/21 | 66,125.11 | 11/27 | 247,423.06 |
| 11/24 | 601.56 | 11/29 | 601.56 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                             Date 12/29/17      Page    1
    GULF COAST ASPHALT COMPANY LLC           Account Number    *******8673
    1990 POST OAK BLVD SUITE 2400
    HOUSTON TX 77056
```

```
    -------------------------- CHECKING ACCOUNT -------------------------------

COMMERCIAL CHECKING ANALYSIS                                                0
Account Number             *******8673   Statement Dates  12/01/17 thru 12/31/17
Previous Balance                601.56   Days this Statement Period       31
    3 Deposits/Credits      737,420.69   Average Ledger             48,177.08
    3 Checks/Debits         737,420.69   Average Collected          24,389.32
Service Charge                     .00
Interest Paid                      .00
Current Balance                 601.56
```

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 12/11 | Lockbox Deposit | 35,645.14 |
| 12/20 | Lockbox Deposit | 161,233.90 |
| 12/27 | Lockbox Deposit | 540,541.65 |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 12/13 | PAYMENTS   RIO ENERGY INT'L<br>CCD   Gulf Coast Asphalt Com | 35,645.14- |
| 12/22 | PAYMENTS   RIO ENERGY INT'L<br>CCD   Gulf Coast Asphalt Com | 161,233.90- |
| 12/29 | PAYMENTS   RIO ENERGY INT'L<br>CCD   Gulf Coast Asphalt Com | 540,541.65- |

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 12/01 | 601.56 | 12/20 | 161,835.46 | 12/29 | 601.56 |
| 12/11 | 36,246.70 | 12/22 | 601.56 | | |
| 12/13 | 601.56 | 12/27 | 541,143.21 | | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                       $ _____

## TOTAL                                 $ _____

## SUBTRACT—

CHECKS OUTSTANDING                $ _____

## BALANCE                             $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---

 Member FDIC

### In Case of Errors or Questions About Your Electronic Transfers
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**

 EQUAL HOUSING LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account (less any closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                    Date  1/31/18    Page    1
                                    Account Number   *******8673

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056
```

```
-------------------------- CHECKING ACCOUNT -------------------------------
```

**COMMERCIAL CHECKING ANALYSIS**                                         O
```
Account Number              *******8673   Statement Dates   1/01/18 thru  1/31/18
Previous Balance                 601.56   Days this Statement Period         31
    6 Deposits/Credits       685,162.75   Average Ledger              185,095.95
    1 Checks/Debits          207,134.90   Average Collected           162,993.92
Service Charge                      .00
Interest Paid                       .00
Current Balance             478,629.41
```

### Deposits and Additions

| Date | Description      | Amount     |
|------|------------------|-----------:|
| 1/09 | Lockbox Deposit  | 207,134.90 |
| 1/16 | Lockbox Deposit  | 155,208.75 |
| 1/22 | Lockbox Deposit  | 163,622.45 |
| 1/23 | Lockbox Deposit  | 107,504.60 |
| 1/24 | Lockbox Deposit  |  19,094.40 |
| 1/30 | Lockbox Deposit  |  32,597.65 |

### Withdrawals and Deductions

| Date | Description                       | Amount       |
|------|-----------------------------------|-------------:|
| 1/11 | PAYMENTS   RIO ENERGY INT'L       | 207,134.90-  |
|      | CCD   Gulf Coast Asphalt Com      |              |

### Daily Balance Information

| Date | Balance    | Date | Balance    | Date | Balance    |
|------|-----------:|------|-----------:|------|-----------:|
| 1/01 |     601.56 | 1/16 | 155,810.31 | 1/24 | 446,031.76 |
| 1/09 | 207,736.46 | 1/22 | 319,432.76 | 1/30 | 478,629.41 |
| 1/11 |     601.56 | 1/23 | 426,937.36 |      |            |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| **TOTAL** |  |  |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN ON THIS STATEMENT    $ _____

## ADD

DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY)    $ _____

## TOTAL    $ _____

## SUBTRACT—

CHECKS OUTSTANDING    $ _____

## BALANCE    $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---



Member **FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account plus any closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                          Date  2/28/18     Page    1
                                          Account Number   *******8673
     GULF COAST ASPHALT COMPANY LLC
     1990 POST OAK BLVD SUITE 2400
     HOUSTON TX 77056
```

```
-------------------------- CHECKING ACCOUNT -------------------------------

COMMERCIAL CHECKING ANALYSIS                                              0
Account Number             *******8673   Statement Dates   2/01/18 thru  2/28/18
Previous Balance            478,629.41   Days this Statement Period       28
    5 Deposits/Credits      544,722.19   Average Ledger            137,286.75
    6 Checks/Debits         739,445.98   Average Collected         123,266.17
Service Charge                     .00
Interest Paid                      .00
Current Balance             283,905.62
```

```
                            Deposits and Additions
Date     Description                              Amount
2/13     Lockbox Deposit                       113,771.05
2/21     Lockbox Deposit                       147,377.75
2/26     Wire Transfer Credit                   12,540.94
         MERCURIA ENERGY TRADING INC.
         311 SOUTH WACKER DRIVE, SUITE
         60606 CHICAGO, ILLINOIS
         USA
         BANK OF AMERICA, N.A.
         222 BROADWAY
         NEW YORK,NY,US 10038
         1291816/146261291819
         4625
         20180226B6B7HU1R010313
         20180226MMQFMP9H000878
         02261356FT01
2/27     Lockbox Deposit                       131,427.45
2/28     Wire Transfer Credit                  139,605.00
         MERCURIA ENERGY TRADING INC.
         311 SOUTH WACKER DRIVE, SUITE
         60606 CHICAGO, ILLINOIS
         USA
         BANK OF AMERICA, N.A.
```

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# **IBERIA**BANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                             $ _____

## TOTAL                             $ _____

## SUBTRACT—

CHECKS OUTSTANDING                   $ _____

## BALANCE                           $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.



Member
**FDIC**

### In Case of Errors or Questions About Your Electronic Transfers
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
**LENDER**

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account at any time. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                                Date  2/28/18     Page     2
     GULF COAST ASPHALT COMPANY LLC             Account Number   *******8673
     1990 POST OAK BLVD SUITE 2400
     HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
|      | 222 BROADWAY |  |
|      | NEW YORK,NY,US 10038 |  |
|      | 20180228B6B7HU1R008841 |  |
|      | 20180228MMQFMP9H000627 |  |
|      | 02281101FT01 |  |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 2/07 | From DDA *8673,To DDA *8665 | 478,100.00- |
| 2/15 | Wire Transfer Debit | 41,080.30- |
|      | MERCURIA ENERGY TRADING,INC |  |
|      | 20 E GREENWAY PLAZA |  |
|      | SUITE 650 |  |
|      | HOUSTON, TX 77046 |  |
|      | BK AMER NYC |  |
|      | 20180215MMQFMP9H001588 |  |
|      | 20180215B6B7HU3R012029 |  |
|      | 02151535FT01 |  |
| 2/15 | From DDA *8673,To DDA *8665 | 72,690.75- |
| 2/20 | Account Analysis Charge | 197.18- |
| 2/23 | Wire Transfer Debit | 43,990.30- |
|      | MERCURIA ENERGY TRADING,INC |  |
|      | 20 E GREENWAY PLAZA |  |
|      | SUITE 650 |  |
|      | HOUSTON, TX 77046 |  |
|      | BK AMER NYC |  |
|      | 20180223MMQFMP9H000539 |  |
|      | 20180223B6B7HU4R004720 |  |
|      | 02231048FT01 |  |
| 2/23 | From DDA *8673,To DDA *8665 | 103,387.45- |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                        Date  2/28/18    Page    3
   GULF COAST ASPHALT COMPANY LLC       Account Number  *******8673
   1990 POST OAK BLVD SUITE 2400
   HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS        *******8673  (Continued)

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 2/01 | 478,629.41 | 2/20 | 332.23 | 2/27 | 144,300.62 |
| 2/07 | 529.41 | 2/21 | 147,709.98 | 2/28 | 283,905.62 |
| 2/13 | 114,300.46 | 2/23 | 332.23 | | |
| 2/15 | 529.41 | 2/26 | 12,873.17 | | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                          Date  3/30/18     Page    1
    GULF COAST ASPHALT COMPANY LLC        Account Number   *******8673
    1990 POST OAK BLVD SUITE 2400
    HOUSTON TX 77056
```

```
---------------------------- CHECKING ACCOUNT --------------------------------
```

**COMMERCIAL CHECKING ANALYSIS**                                          0
```
Account Number           *******8673   Statement Dates   3/01/18 thru  4/01/18
Previous Balance          283,905.62   Days this Statement Period         32
    5 Deposits/Credits    428,946.50   Average Ledger               31,482.06
    7 Checks/Debits       712,772.43   Average Collected            18,077.48
Service Charge                   .00
Interest Paid                    .00
Current Balance               79.69
```

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 3/07 | Lockbox Deposit | 103,987.75 |
| 3/13 | Lockbox Deposit | 104,212.45 |
| 3/20 | Lockbox Deposit | 33,318.45 |
| 3/21 | Lockbox Deposit | 37,400.85 |
| 3/27 | Lockbox Deposit | 150,027.00 |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 3/02 | Wire Transfer Debit | 131,427.45- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180302MMQFMP9H001927 | |
|      | 20180302B6B7HU1R012280 | |
|      | 03021514FT01 | |
| 3/02 | From DDA *8673,To DDA *8665 | 152,145.94- |
| 3/08 | Wire Transfer Debit | 103,987.75- |
|      | MERCURIA ENERGY TRADING,INC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

### THIS FORM IS PROVIDED TO HELP YOU BALANCE
### YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is
received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT        $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                 $ _____

## TOTAL                 $ _____

## SUBTRACT—

CHECKS OUTSTANDING       $ _____

## BALANCE               $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE
Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

---



Member
**FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
**LENDER**

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account as of your closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

GULF COAST ASPHALT COMPANY LLC                    Date  3/30/18     Page     2
1990 POST OAK BLVD SUITE 2400                      Account Number  *******8673
HOUSTON TX 77056

COMMERCIAL CHECKING ANALYSIS         *******8673  (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
|      | 20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046<br>BK AMER NYC<br>20180308MMQFMP9H001471<br>20180308B6B7HU3R011211<br>03081607FT01 | |
| 3/15 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC | 104,212.45- |
|      | 20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046<br>BK AMER NYC<br>20180315MMQFMP9H001285<br>20180315B6B7HU1R010986<br>03151436FT01 | |
| 3/20 | Account Analysis Charge | 252.54- |
| 3/22 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC | 70,719.30- |
|      | 20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046<br>BK AMER NYC<br>20180322MMQFMP9H000858<br>20180322B6B7HU3R009420<br>03221334FT01 | |
| 3/29 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC | 150,027.00- |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                              Date  3/30/18      Page     3
    GULF COAST ASPHALT COMPANY LLC            Account Number   *******8673
    1990 POST OAK BLVD SUITE 2400
    HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
|  | 20 E GREENWAY PLAZA |  |
|  | SUITE 650 |  |
|  | HOUSTON, TX 77046 |  |
|  | BK AMER NYC |  |
|  | 20180329MMQFMP9H001731 |  |
|  | 20180329B6B7HU4R014112 |  |
|  | 03291519FT01 |  |

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 3/01 | 283,905.62 | 3/13 | 104,544.68 | 3/22 | 79.69 |
| 3/02 | 332.23 | 3/15 | 332.23 | 3/27 | 150,106.69 |
| 3/07 | 104,319.98 | 3/20 | 33,398.14 | 3/29 | 79.69 |
| 3/08 | 332.23 | 3/21 | 70,798.99 |  |  |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

VITOL EXHIBIT

124.12

Adv. No.: 21-06006 8/30/2022

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                        Date  4/30/18     Page    1
                                        Account Number   *******8673

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056
```

```
-------------------------- CHECKING ACCOUNT -------------------------------

COMMERCIAL CHECKING ANALYSIS                                              0
Account Number            *******8673   Statement Dates   4/02/18 thru  4/30/18
Previous Balance                79.69   Days this Statement Period         29
     5 Deposits/Credits     238,801.40  Average Ledger              14,525.67
     5 Checks/Debits        238,735.98  Average Collected            6,303.20
Service Charge                     .00
Interest Paid                      .00
Current Balance                145.11
```

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 4/03 | Lockbox Deposit | 68,781.75 |
| 4/10 | Lockbox Deposit | 32,246.25 |
| 4/17 | Lockbox Deposit | 57,639.00 |
| 4/23 | Transfer Credit | 350.00 |
| 4/24 | Lockbox Deposit | 79,784.40 |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 4/05 | Wire Transfer Debit | 68,781.75- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180405MMQFMP9H000522 | |
|      | 20180405B6B7HU1R005825 | |
|      | 04051133FTO1 | |
| 4/12 | Wire Transfer Debit | 32,246.25- |
|      | MERCURIA ENERGY TRADING,INC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                            $ _____

## TOTAL                            $ _____

## SUBTRACT—

CHECKS OUTSTANDING                  $ _____

## BALANCE                          $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.



**Member FDIC**



EQUAL HOUSING LENDER

### In Case of Errors or Questions About Your Electronic Transfers
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account at any billing cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In the letter, please give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                              Date  4/30/18      Page     2
     GULF COAST ASPHALT COMPANY LLC           Account Number    *******8673
     1990 POST OAK BLVD SUITE 2400
     HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| | ▇▇▇▇▇▇ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180412MMQFMP9H000099 | |
| | 20180412B6B7HU2R002988 | |
| | 04120915FT01 | |
| 4/18 | Wire Transfer Debit | 57,639.00- |
| | MERCURIA ENERGY TRADING,INC | |
| | ▇▇▇▇▇▇ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180418MMQFMP9H001721 | |
| | 20180418B6B7HU1R012728 | |
| | 04181649FT01 | |
| 4/20 | Account Analysis Charge | 284.58- |
| 4/26 | Wire Transfer Debit | 79,784.40- |
| | MERCURIA ENERGY TRADING,INC | |
| | ▇▇▇▇▇▇ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180426MMQFMP9H001516 | |
| | 20180426B6B7HU3R011953 | |
| | 04261512FT03 | |

## Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 4/02 | 79.69 | 4/10 | 32,325.94 | 4/18 | 79.69 |
| 4/03 | 68,861.44 | 4/12 | 79.69 | 4/20 | 204.89- |
| 4/05 | 79.69 | 4/17 | 57,718.69 | 4/23 | 145.11 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000649

STATEMENT OF ACCOUNT

# IBERIABANK

GULF COAST ASPHALT COMPANY LLC                    Date  4/30/18     Page     3
1990 POST OAK BLVD SUITE 2400                      Account Number   *******8673
HOUSTON TX 77056

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

### Daily Balance Information

| Date | Balance | Date | Balance |
|------|---------|------|---------|
| 4/24 | 79,929.51 | 4/26 | 145.11 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK



TO PLO R
GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

013260

Date  5/31/18     Page     1
Account Number   *******8673



013260

------------------------------ **CHECKING ACCOUNT** ------------------------------

**COMMERCIAL CHECKING ANALYSIS**                                              0
Account Number              *******8673    Statement Dates   5/01/18 thru  5/31/18
Previous Balance                 145.11    Days this Statement Period          31
    8 Deposits/Credits       460,738.95    Average Ledger                44,271.81
    6 Checks/Debits          460,738.95    Average Collected             27,941.54
Service Charge                      .00
Interest Paid                       .00
Current Balance                  145.11

### Deposits and Additions

| Date | Description | Amount |
|---|---|---|
| 5/01 | Lockbox Deposit | 123,409.50 |
| 5/04 | Lockbox Deposit | 22,883.49 |
| 5/08 | Lockbox Deposit | 137,342.25 |
| 5/15 | Lockbox Deposit | 35,316.75 |
| 5/16 | Lockbox Deposit | 117,889.05 |
| 5/21 | Transfer Credit | 267.41 |
| 5/22 | Lockbox Deposit | 7,506.00 |
| 5/30 | Lockbox Deposit | 16,124.50 |

### Withdrawals and Deductions

| Date | Description | Amount |
|---|---|---|
| 5/02 | Wire Transfer Debit | 123,409.50- |

MERCURIA ENERGY TRADING,INC

20 E GREENWAY PLAZA
SUITE 650
HOUSTON, TX 77046
BK AMER NYC
20180502MMQFMP9H001789
20180502B6B7HU4R010515
05021453FT03

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

001353

# **IBERIA**BANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                       $ _____

## TOTAL                                  $ _____

## SUBTRACT—

CHECKS OUTSTANDING                  $ _____

## BALANCE                             $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

---



Member
FDIC

### In Case of Errors or Questions About Your Electronic Transfers
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

    1) Tell us your name and account number.
    2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
    3) Tell us the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account as of the billing closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

Date  5/31/18    Page    2
Account Number    *******8673

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056



COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 5/09 | Wire Transfer Debit | 160,225.74- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180509MMQFMP9H000940 | |
|      | 20180509B6B7HU1R007260 | |
|      | 05091311FTO3 | |
| 5/21 | Account Analysis Charge | 267.41- |
| 5/22 | Wire Transfer Debit | 153,350.91- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180522MMQFMP9H000561 | |
|      | 20180522B6B7HU3R005987 | |
|      | 05221132FTO3 | |
| 5/25 | Wire Transfer Debit | 7,360.89- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180525MMQFMP9H000839 | |
|      | 20180525B6B7HU1R006132 | |
|      | 05251109FTO3 | |
| 5/31 | Wire Transfer Debit | 16,124.50- |
|      | MERCURIA ENERGY TRADING,INC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

001355

STATEMENT OF ACCOUNT

# IBERIABANK

GULF COAST ASPHALT COMPANY LLC        Date  5/31/18     Page      3
1990 POST OAK BLVD SUITE 2400         Account Number   *******8673
HOUSTON TX 77056



COMMERCIAL CHECKING ANALYSIS        *******8673   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|

20 E GREENWAY PLAZA
SUITE 650
HOUSTON, TX 77046
BK AMER NYC
20180531MMQFMP9H001358
20180531B6B7HU2R009811
05311239FT03

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 5/01 | 123,554.61 | 5/09 | 145.11 | 5/22 | 7,506.00 |
| 5/02 | 145.11 | 5/15 | 35,461.86 | 5/25 | 145.11 |
| 5/04 | 23,028.60 | 5/16 | 153,350.91 | 5/30 | 16,269.61 |
| 5/08 | 160,370.85 | 5/21 | 153,350.91 | 5/31 | 145.11 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                          Date  6/29/18    Page    1
     GULF COAST ASPHALT COMPANY LLC        Account Number    *******8673
     1990 POST OAK BLVD SUITE 2400
     HOUSTON TX 77056
```

```
    -------------------------- CHECKING ACCOUNT -------------------------------

COMMERCIAL CHECKING ANALYSIS                                              O
Account Number              *******8673   Statement Dates   6/01/18 thru  7/01/18
Previous Balance                 145.11   Days this Statement Period          31
   11 Deposits/Credits       702,245.92   Average Ledger               28,655.74
    8 Checks/Debits          702,391.03   Average Collected            10,851.08
Service Charge                      .00
Interest Paid                       .00
Current Balance                     .00
```

```
                         Deposits and Additions
   Date     Description                        Amount
   6/04     Lockbox Deposit                 52,734.78
   6/05     Lockbox Deposit                 21,335.00
   6/12     Lockbox Deposit                 16,084.74
   6/12     Remote DDA Deposit              31,614.90
   6/14     Remote DDA Deposit              93,676.80
   6/18     Lockbox Deposit                 22,392.00
   6/19     Lockbox Deposit                198,204.50
   6/21     Transfer Credit                    138.50
   6/26     Lockbox Deposit                115,901.68
   6/27     Wire Transfer Credit            19,645.10
            TERRA FIRMA MATERIALS LLC
            9312 E CURVE RD
            EDINBURG TX 78542
            TO PAY ASPHALT MATERIAL
            20180627GMQFMP01009311
            20180627MMQFMP9H000718
            06271327FT03
   6/27     Wire Transfer Credit           130,517.92
            IOC COMPANY LLC
            9312 E CURVE RD
            EDINBURG TX 78542
```

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN ON THIS STATEMENT $ _____

## ADD

DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY) $ _____

## TOTAL $ _____

## SUBTRACT—

CHECKS OUTSTANDING $ _____

## BALANCE $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.



Member FDIC



EQUAL HOUSING LENDER

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account (less any closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                                Date  6/29/18    Page    2
        GULF COAST ASPHALT COMPANY LLC          Account Number   *******8673
        1990 POST OAK BLVD SUITE 2400
        HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| | TO PAY ASPHALT MATERIAL | |
| | 20180627GMQFMP01009160 | |
| | 20180627MMQFMP9H000710 | |
| | 06271323FT03 | |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 6/06 | Wire Transfer Debit | 74,069.78- |
| | MERCURIA ENERGY TRADING,INC | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180606MMQFMP9H000449 | |
| | 20180606B6B7HU4R005400 | |
| | 06061120FT03 | |
| 6/13 | Wire Transfer Debit | 47,699.64- |
| | MERCURIA ENERGY TRADING,INC | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180613MMQFMP9H001385 | |
| | 20180613B6B7HU3R009536 | |
| | 06131440FT03 | |
| 6/18 | Wire Transfer Debit | 93,676.80- |
| | MERCURIA ENERGY TRADING,INC | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000657

STATEMENT OF ACCOUNT

# IBERIABANK

Date 6/29/18 Page 3
Account Number *******8673

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

COMMERCIAL CHECKING ANALYSIS       *******8673   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
|  | 20180618MMQFMP9H000146 | |
|  | 20180618B6B7HU1R002776 | |
|  | 06180918FT03 | |
| 6/19 | Wire Transfer Debit | 22,392.00- |
|  | MERCURIA ENERGY TRADING,INC | |
|  | ███████ | |
|  | 20 E GREENWAY PLAZA | |
|  | SUITE 650 | |
|  | HOUSTON, TX 77046 | |
|  | BK AMER NYC | |
|  | 20180619MMQFMP9H000584 | |
|  | 20180619B6B7HU4R005427 | |
|  | 06191205FT03 | |
| 6/20 | Wire Transfer Debit | 198,204.50- |
|  | MERCURIA ENERGY TRADING,INC | |
|  | ███████ | |
|  | 20 E GREENWAY PLAZA | |
|  | SUITE 650 | |
|  | HOUSTON, TX 77046 | |
|  | BK AMER NYC | |
|  | 20180620MMQFMP9H001137 | |
|  | 20180620B6B7HU1R009675 | |
|  | 06201425FT03 | |
| 6/20 | Account Analysis Charge | 283.61- |
| 6/27 | Wire Transfer Debit | 115,901.68- |
|  | MERCURIA ENERGY TRADING,INC | |
|  | ███████ | |
|  | 20 E GREENWAY PLAZA | |
|  | SUITE 650 | |
|  | HOUSTON, TX 77046 | |
|  | BK AMER NYC | |
|  | 20180627MMQFMP9H000662 | |
|  | 20180627B6B7HU2R007223 | |
|  | 06271225FT03 | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000658

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                          Date  6/29/18    Page    4
   GULF COAST ASPHALT COMPANY LLC         Account Number   *******8673
   1990 POST OAK BLVD SUITE 2400
   HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 6/27 | Wire Transfer Debit | 150,163.02- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | ████████ | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180627MMQFMP9H001350 | |
|      | 20180627B6B7HU3R011389 | |
|      | 06271517FT03 | |

## Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 6/01 | 145.11 | 6/13 | 145.11 | 6/21 | .00 |
| 6/04 | 52,879.89 | 6/14 | 93,821.91 | 6/26 | 115,901.68 |
| 6/05 | 74,214.89 | 6/18 | 22,537.11 | 6/27 | .00 |
| 6/06 | 145.11 | 6/19 | 198,349.61 | | |
| 6/12 | 47,844.75 | 6/20 | 138.50- | | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000660

STATEMENT OF ACCOUNT

# IBERIABANK



010535

TO PLO R
GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

Date  7/31/18    Page    1
Account Number   *******8673



010535

---------------------- **CHECKING ACCOUNT** ------------------------------

**COMMERCIAL CHECKING ANALYSIS**                                            0
Account Number              *******8673   Statement Dates   7/02/18 thru 7/31/18
Previous Balance                    .00   Days this Statement Period       30
    8 Deposits/Credits       666,692.89   Average Ledger             34,076.32
    7 Checks/Debits          666,543.85   Average Collected          10,488.71
Service Charge                      .00
Interest Paid                       .00
Current Balance                  149.04

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 7/03 | Lockbox Deposit | 41,272.30 |
| 7/10 | Lockbox Deposit | 145,175.25 |
| 7/17 | Lockbox Deposit | 144,829.44 |
| 7/20 | Transfer Credit | 336.71 |
| 7/23 | Lockbox Deposit | 71,073.00 |
| 7/23 | Deposit | 128,579.40 |
| 7/24 | Lockbox Deposit | 135,277.75 |
| 7/30 | Lockbox Deposit | 149.04 |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 7/05 | Wire Transfer Debit | 41,272.30- |

MERCURIA ENERGY TRADING,INC

20 E GREENWAY PLAZA
SUITE 650
HOUSTON, TX 77046
BK AMER NYC
20180705MMQFMP9H000778
20180705B6B7HU1R008985
07051224FT03

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

009927

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE
## YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                 $ _____

## TOTAL                                $ _____

## SUBTRACT—

CHECKS OUTSTANDING                      $ _____

## BALANCE                              $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE
Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.



**Member FDIC**



EQUAL HOUSING
LENDER

**In Case of Errors or Questions About Your Electronic Transfers**
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement  on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly.  If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits.  This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge."  Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account.  On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract.  We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating).  "New Balance" means the total outstanding balance of your account as of the closing date which includes principal.  If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly.  The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account.  If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting.  Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about.  You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                    Date  7/31/18     Page    2
GULF COAST ASPHALT COMPANY LLC      Account Number   *******8673
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056
```


010535

COMMERCIAL CHECKING ANALYSIS          *******8673  (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 7/13 | Wire Transfer Debit | 145,175.25- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180713MMQFMP9H000203 | |
|      | 20180713B6B7HU4R003300 | |
|      | 07130911FT03 | |
| 7/19 | Wire Transfer Debit | 144,829.44- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180719MMQFMP9H000105 | |
|      | 20180719B6B7HU1R003240 | |
|      | 07190921FT03 | |
| 7/20 | Account Analysis Charge | 336.71- |
| 7/23 | Wire Transfer Debit | 120,667.65- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180723MMQFMP9H001053 | |
|      | 20180723B6B7HU1R009876 | |
|      | 07231359FT03 | |
| 7/24 | Wire Transfer Debit | 78,984.75- |
|      | MERCURIA ENERGY TRADING,INC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

Date  7/31/18    Page    3
Account Number  *******8673



010535

COMMERCIAL CHECKING ANALYSIS          *******8673  (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
|      | ██████ |  |
|      | 20 E GREENWAY PLAZA |  |
|      | SUITE 650 |  |
|      | HOUSTON, TX 77046 |  |
|      | BK AMER NYC |  |
|      | 20180724MMQFMP9H000928 |  |
|      | 20180724B6B7HU1R007438 |  |
|      | 07241340FT03 |  |
| 7/25 | Wire Transfer Debit | 135,277.75- |
|      | MERCURIA ENERGY TRADING,INC |  |
|      | ██████ |  |
|      | 20 E GREENWAY PLAZA |  |
|      | SUITE 650 |  |
|      | HOUSTON, TX 77046 |  |
|      | BK AMER NYC |  |
|      | 20180725MMQFMP9H001896 |  |
|      | 20180725B6B7HU1R012584 |  |
|      | 07251620FT03 |  |

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 7/02 | .00 | 7/13 | .00 | 7/23 | 78,984.75 |
| 7/03 | 41,272.30 | 7/17 | 144,829.44 | 7/24 | 135,277.75 |
| 7/05 | .00 | 7/19 | .00 | 7/25 | .00 |
| 7/10 | 145,175.25 | 7/20 | .00 | 7/30 | 149.04 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

009930

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                          Date  8/31/18     Page    1
     GULF COAST ASPHALT COMPANY LLC       Account Number   *******8673
     1990 POST OAK BLVD SUITE 2400
     HOUSTON TX 77056
```

```
---------------------------- CHECKING ACCOUNT --------------------------------

COMMERCIAL CHECKING ANALYSIS                                              0
Account Number              *******8673   Statement Dates  8/01/18 thru  9/03/18
Previous Balance                 149.04   Days this Statement Period          34
     7 Deposits/Credits      824,304.66   Average Ledger               64,773.73
     7 Checks/Debits         725,486.28   Average Collected            33,074.19
Service Charge                      .00
Interest Paid                       .00
Current Balance               98,967.42
```

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 8/02 | Lockbox Deposit | 58,839.69 |
| 8/06 | Lockbox Deposit | 342,351.35 |
| 8/14 | Lockbox Deposit | 68,591.60 |
| 8/17 | Lockbox Deposit | 126,901.35 |
| 8/20 | Transfer Credit | 323.00 |
| 8/21 | Lockbox Deposit | 128,330.25 |
| 8/27 | Lockbox Deposit | 98,967.42 |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 8/01 | From DDA *8673,To DDA *8681,Cl ark Construction mistake | 149.04- |
| 8/06 | Wire Transfer Debit MERCURIA ENERGY TRADING,INC ▮▮▮▮▮▮ 20 E GREENWAY PLAZA SUITE 650 HOUSTON, TX 77046 BK AMER NYC 20180806MMQFMP9H000132 20180806B6B7HU1R003109 | 58,839.69- |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                    $ _____

## TOTAL                                   $ _____

## SUBTRACT—

CHECKS OUTSTANDING               $ _____

## BALANCE                               $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

 **Member FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299

 **EQUAL HOUSING LENDER**

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account as of your closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

Date  8/31/18     Page     2
Account Number    *******8673

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

COMMERCIAL CHECKING ANALYSIS        *******8673   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| | 08060916FTO3 | |
| 8/07 | Wire Transfer Debit | 342,351.35- |
| | MERCURIA ENERGY TRADING,INC | |
| | | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180807MMQFMP9H001000 | |
| | 20180807B6B7HU1R007970 | |
| | 08071405FTO3 | |
| 8/15 | Wire Transfer Debit | 68,591.60- |
| | MERCURIA ENERGY TRADING,INC | |
| | | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180815MMQFMP9H000578 | |
| | 20180815B6B7HU4R006267 | |
| | 08151140FTO3 | |
| 8/20 | Account Analysis Charge | 323.00- |
| 8/21 | Wire Transfer Debit | 126,901.35- |
| | MERCURIA ENERGY TRADING,INC | |
| | | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180821MMQFMP9H000117 | |
| | 20180821B6B7HU4R002559 | |
| | 08210919FTO3 | |
| 8/23 | Wire Transfer Debit | 128,330.25- |
| | MERCURIA ENERGY TRADING,INC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000667

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                              Date  8/31/18     Page    3
   GULF COAST ASPHALT COMPANY LLC              Account Number   *******8673
   1990 POST OAK BLVD SUITE 2400
   HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS         *******8673   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
|      | ████████ | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180823MMQFMP9H000448 | |
|      | 20180823B6B7HU2R005412 | |
|      | 08231106FT03 | |

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 8/01 | .00 | 8/14 | 68,591.60 | 8/21 | 128,330.25 |
| 8/02 | 58,839.69 | 8/15 | .00 | 8/23 | .00 |
| 8/06 | 342,351.35 | 8/17 | 126,901.35 | 8/27 | 98,967.42 |
| 8/07 | .00 | 8/20 | 126,901.35 | | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000668

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                              Date  9/28/18     Page    1
       GULF COAST ASPHALT COMPANY LLC         Account Number    *******8673
       1990 POST OAK BLVD SUITE 2400
       HOUSTON TX 77056
```

```
---------------------------- CHECKING ACCOUNT------------------------------

COMMERCIAL CHECKING ANALYSIS                                              0
Account Number            *******8673   Statement Dates  9/04/18 thru  9/30/18
Previous Balance              98,967.42  Days this Statement Period      27
     7 Deposits/Credits    1,412,626.90  Average Ledger            65,678.58
     9 Checks/Debits       1,511,594.32  Average Collected         13,369.76
Service Charge                     .00
Interest Paid                      .00
Current Balance                    .00
```

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 9/04 | Lockbox Deposit | 28,619.43 |
| 9/05 | Lockbox Deposit | 186,797.10 |
| 9/11 | Lockbox Deposit | 194,973.70 |
| 9/20 | Lockbox Deposit | 835,649.52 |
| 9/21 | Transfer Credit | 288.65 |
| 9/25 | Deposit | 1,823.10 |
| 9/25 | Lockbox Deposit | 164,475.40 |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 9/04 | Wire Transfer Debit | 98,967.42- |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 | |
|      | BK AMER NYC | |
|      | 20180904MMQFMP9H001412 | |
|      | 20180904B6B7HU2R012782 | |
|      | 09041353FT03 | |
| 9/05 | Wire Transfer Debit | 28,619.43- |
|      | MERCURIA ENERGY TRADING,INC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# **IBERIA**BANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE
## YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|--|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is
received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                     $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                              $ _____

## TOTAL                              $ _____

## SUBTRACT—

CHECKS OUTSTANDING                    $ _____

## BALANCE                           $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

---


Member
**FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**


EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement  on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly.   If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have
use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account
used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions).
To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits.  This gives us the daily balance. We then add up
all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily
periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the
billing cycle. The result is the dollar figure shown on your statement as "Finance Charge."  Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account
and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account.  On the closing date of your billing cycle, we will calculate
the amount of your minimum payment due as per your original contract.  We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ-
ten to us to dispute that we are currently investigating).  "New Balance" means the total outstanding balance of your line, using your closing date which includes principal.  If the New Balance is less than
or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to
make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically
deducted from your checking account.  If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed
to the address shown on the statement, Attn.: Loan Accounting.  Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch
office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We
must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
•   Your name and account number.
•   The dollar amount of the suspected error.
•   Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about.  You do not have to pay any amount
    in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as
    delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                            Date  9/28/18     Page     2
    GULF COAST ASPHALT COMPANY LLC          Account Number   *******8673
    1990 POST OAK BLVD SUITE 2400
    HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| | ███████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180905MMQFMP9H001610 | |
| | 20180905B6B7HU3R011742 | |
| | 09051533FT03 | |
| 9/06 | Wire Transfer Debit | 186,797.10- |
| | MERCURIA ENERGY TRADING,INC | |
| | ███████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 | |
| | BK AMER NYC | |
| | 20180906MMQFMP9H001901 | |
| | 20180906B6B7HU1R013785 | |
| | 09061654FT03 | |
| 9/13 | Wire Transfer Debit | 194,973.70- |
| | MERCURIA ENERGY TRADING,INC | |
| | ███████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20180913MMQFMP9H000113 | |
| | 20180913B6B7HU3R003683 | |
| | 09130920FT03 | |
| 9/20 | Account Analysis Charge | 288.65- |
| 9/21 | Wire Transfer Debit | 259,227.00- |
| | MERCURIA ENERGY TRADING,INC | |
| | ███████ | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                            Date  9/28/18     Page     3
    GULF COAST ASPHALT COMPANY LLC          Account Number   *******8673
    1990 POST OAK BLVD SUITE 2400
    HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS          *******8673  (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20180921MMQFMP9H001020 | |
| | 20180921B6B7HU1R007971 | |
| | 09211257FT03 | |
| 9/21 | Wire Transfer Debit | 262,670.35- |
| | MERCURIA ENERGY TRADING,INC | |
| | ████████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20180921MMQFMP9H001032 | |
| | 20180921B6B7HU2R008012 | |
| | 09211259FT03 | |
| 9/21 | Wire Transfer Debit | 313,752.17- |
| | MERCURIA ENERGY TRADING,INC | |
| | ████████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20180921MMQFMP9H001414 | |
| | 20180921B6B7HU3R009850 | |
| | 09211423FT03 | |
| 9/27 | Wire Transfer Debit | 166,298.50- |
| | MERCURIA ENERGY TRADING,INC | |
| | ████████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

Date  9/28/18    Page    4
Account Number   *******8673

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

COMMERCIAL CHECKING ANALYSIS        *******8673   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
|      | 20180927MMQFMP9H000123 | |
|      | 20180927B6B7HU3R003654 | |
|      | 09270911FTO3 | |

## Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 9/04 | 28,619.43 | 9/11 | 194,973.70 | 9/21 | .00 |
| 9/05 | 186,797.10 | 9/13 | .00 | 9/25 | 166,298.50 |
| 9/06 | .00 | 9/20 | 835,360.87 | 9/27 | .00 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000674

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                        Date 10/31/18     Page    1
   GULF COAST ASPHALT COMPANY LLC       Account Number   *******8673
   1990 POST OAK BLVD SUITE 2400
   HOUSTON TX 77056
```

```
   --------------------------- CHECKING ACCOUNT---------------------------

   Effective Oct 2018, Earnings Credit Rate will be tiered based on balances.
   Eligible account balances above $250,000 and $1,000,000 may qualify for a
   premium Earnings Credit Rate.
   Tier 1 -  $0.00 - $249,999.99
   Tier 2 -  $250,000.00 - $999,999.99
   Tier 3 -  $1,000,000.00 and greater
```

**COMMERCIAL CHECKING ANALYSIS**                                                 O

| | | | |
|---|---|---|---|
| Account Number | *******8673 | Statement Dates  10/01/18 thru 10/31/18 | |
| Previous Balance | .00 | Days this Statement Period | 31 |
| 8 Deposits/Credits | 1,640,484.79 | Average Ledger | 64,181.77 |
| 6 Checks/Debits | 1,337,162.99 | Average Collected | 21,082.05 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Current Balance | 303,321.80 | | |

### Deposits and Additions

| Date | Description | Amount |
|---|---|---|
| 10/03 | Lockbox Deposit | 295,033.06 |
| 10/10 | Lockbox Deposit | 98,361.35 |
| 10/10 | Wire Transfer Credit | 304,062.36 |
| | FREEPOINT COMMODITIES LLC | |
| | 58 COMMERCE RD | |
| | STAMFORD CT 06902-4506 | |
| | 20181010B1QGC08C014347 | |
| | 20181010MMQFMP9H001235 | |
| | 10101702FT03 | |
| 10/16 | Lockbox Deposit | 385,155.93 |
| 10/22 | Transfer Credit | 331.19 |
| 10/23 | Lockbox Deposit | 254,219.10 |
| 10/30 | Deposit | 14,168.70 |
| 10/31 | Lockbox Deposit | 289,153.10 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000675

# **IBERIA**BANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                       $ _____

## TOTAL                               $ _____

## SUBTRACT—

CHECKS OUTSTANDING           $ _____

## BALANCE                          $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.



Member
**FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
**LENDER**

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account at any closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                          Date 10/31/18    Page     2
     GULF COAST ASPHALT COMPANY LLC       Account Number   *******8673
     1990 POST OAK BLVD SUITE 2400
     HOUSTON TX 77056
```

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 10/04 | Wire Transfer Debit | 295,033.06- |
| | MERCURIA ENERGY TRADING,INC | |
| | ███████████████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20181004MMQFMP9H000700 | |
| | 20181004B6B7HU4R006565 | |
| | 10041202FT03 | |
| 10/10 | From DDA *8673,To DDA *8665 | 304,062.36- |
| 10/11 | Wire Transfer Debit | 98,361.35- |
| | MERCURIA ENERGY TRADING,INC | |
| | ███████████████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20181011MMQFMP9H001894 | |
| | 20181011B6B7HU2R013684 | |
| | 10111628FT03 | |
| 10/18 | Wire Transfer Debit | 385,155.93- |
| | MERCURIA ENERGY TRADING,INC | |
| | ███████████████ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20181018MMQFMP9H000156 | |
| | 20181018B6B7HU1R002862 | |
| | 10180901FT03 | |
| 10/22 | Account Analysis Charge | 331.19- |
| 10/25 | Wire Transfer Debit | 254,219.10- |
| | MERCURIA ENERGY TRADING,INC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

STATEMENT OF ACCOUNT

# IBERIABANK

|  | Date 10/31/18      Page    3 |
|---|---|
| GULF COAST ASPHALT COMPANY LLC | Account Number   *******8673 |
| 1990 POST OAK BLVD SUITE 2400 | |
| HOUSTON TX 77056 | |

COMMERCIAL CHECKING ANALYSIS        *******8673   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|---|---|---|
| | ▮▮▮▮▮▮▮ | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20181025MMQFMP9H001360 | |
| | 20181025B6B7HU4R009739 | |
| | 10251411FT03 | |

## Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 10/01 | .00 | 10/11 | .00 | 10/23 | 254,219.10 |
| 10/03 | 295,033.06 | 10/16 | 385,155.93 | 10/25 | .00 |
| 10/04 | .00 | 10/18 | .00 | 10/30 | 14,168.70 |
| 10/10 | 98,361.35 | 10/22 | .00 | 10/31 | 303,321.80 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000673

STATEMENT OF ACCOUNT

# IBERIABANK

```
                                                 Date 11/30/18      Page     1
                                                 Account Number   *******8673
     GULF COAST ASPHALT COMPANY LLC
     1990 POST OAK BLVD SUITE 2400
     HOUSTON TX 77056
```

```
     ---------------------------- CHECKING ACCOUNT-------------------------------

     Effective Oct 2018, Earnings Credit Rate will be tiered based on balances.
     Eligible account balances above $250,000 and $1,000,000 may qualify for a
     premium Earnings Credit Rate.
     Tier 1 -  $0.00 - $249,999.99
     Tier 2 -  $250,000.00 - $999,999.99
     Tier 3 -  $1,000,000.00 and greater
```

**COMMERCIAL CHECKING ANALYSIS**                                             0

| | | | |
|---|---|---|---|
| Account Number | *******8673 | Statement Dates  11/01/18 thru 12/02/18 | |
| Previous Balance | 303,321.80 | Days this Statement Period | 32 |
| 7 Deposits/Credits | 878,087.29 | Average Ledger | 131,886.37 |
| 8 Checks/Debits | 1,181,409.09 | Average Collected | 104,455.55 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |

### Deposits and Additions

| Date | Description | Amount |
|---|---|---|
| 11/06 | Lockbox Deposit | 8,825.88 |
| 11/07 | Lockbox Deposit | 22,333.60 |
| 11/14 | Lockbox Deposit | 263,790.85 |
| 11/20 | Lockbox Deposit | 247,672.90 |
| 11/26 | Transfer Credit | 301.20 |
| 11/26 | Lockbox Deposit | 30,433.41 |
| 11/27 | Lockbox Deposit | 304,729.45 |

### Withdrawals and Deductions

| Date | Description | Amount |
|---|---|---|
| 11/02 | Wire Transfer Debit | 14,168.70- |
| | MERCURIA ENERGY TRADING,INC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000679

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN ON THIS STATEMENT $ _____

## ADD

DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY) $ _____

## TOTAL $ _____

## SUBTRACT—

CHECKS OUTSTANDING $ _____

## BALANCE $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---

 Member FDIC

**In Case of Errors or Questions About Your Electronic Transfers**
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299

 EQUAL HOUSING LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your account at any day closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

STATEMENT OF ACCOUNT

# IBERIABANK

Date 11/30/18    Page    2
Account Number    *******8673

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

COMMERCIAL CHECKING ANALYSIS        *******8673   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
|  | 20 E GREENWAY PLAZA | |
|  | SUITE 650 | |
|  | HOUSTON, TX 77046 US | |
|  | BK AMER NYC | |
|  | 20181102MMQFMP9H001261 | |
|  | 20181102B6B7HU3R008975 | |
|  | 11021303FT03 | |
| 11/08 | Wire Transfer Debit | 289,153.10- |
|  | MERCURIA ENERGY TRADING,INC | |
|  | 20 E GREENWAY PLAZA | |
|  | SUITE 650 | |
|  | HOUSTON, TX 77046 US | |
|  | BK AMER NYC | |
|  | 20181108MMQFMP9H000082 | |
|  | 20181108B6B7HU3R003394 | |
|  | 11080914FT03 | |
| 11/09 | Wire Transfer Debit | 31,159.48- |
|  | MERCURIA ENERGY TRADING,INC | |
|  | 20 E GREENWAY PLAZA | |
|  | SUITE 650 | |
|  | HOUSTON, TX 77046 US | |
|  | BK AMER NYC | |
|  | 20181109MMQFMP9H001624 | |
|  | 20181109B6B7HU2R010670 | |
|  | 11091440FT03 | |
| 11/15 | Wire Transfer Debit | 263,790.85- |
|  | MERCURIA ENERGY TRADING,INC | |
|  | 20 E GREENWAY PLAZA | |
|  | SUITE 650 | |
|  | HOUSTON, TX 77046 US | |
|  | BK AMER NYC | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000681

STATEMENT OF ACCOUNT

# IBERIABANK

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

Date 11/30/18     Page     3
Account Number   *******8673

---

COMMERCIAL CHECKING ANALYSIS          *******8673   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
|  | 20181115MMQFMP9H001968 |  |
|  | 20181115B6B7HU2R014445 |  |
|  | 11151602FT03 |  |
| 11/20 | Account Analysis Charge | 301.20- |
| 11/26 | Wire Transfer Debit | 247,672.90- |
|  | MERCURIA ENERGY TRADING,INC |  |
|  | 20 E GREENWAY PLAZA |  |
|  | SUITE 650 |  |
|  | HOUSTON, TX 77046 US |  |
|  | BK AMER NYC |  |
|  | 20181126MMQFMP9H001264 |  |
|  | 20181126B6B7HU3R010321 |  |
|  | 11261512FT03 |  |
| 11/27 | From DDA *8673,To DDA *8681,H& | 2,638.65- |
|  | C overpayment |  |
| 11/28 | Wire Transfer Debit | 332,524.21- |
|  | MERCURIA ENERGY TRADING,INC |  |
|  | 20 E GREENWAY PLAZA |  |
|  | SUITE 650 |  |
|  | HOUSTON, TX 77046 US |  |
|  | BK AMER NYC |  |
|  | 20181128MMQFMP9H001529 |  |
|  | 20181128B6B7HU2R011156 |  |
|  | 11281504FT03 |  |

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 11/01 | 303,321.80 | 11/08 | 31,159.48 | 11/20 | 247,371.70 |
| 11/02 | 289,153.10 | 11/09 | .00 | 11/26 | 30,433.41 |
| 11/06 | 297,978.98 | 11/14 | 263,790.85 | 11/27 | 332,524.21 |
| 11/07 | 320,312.58 | 11/15 | .00 | 11/28 | .00 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000682



# IBERIABANK

## STATEMENT OF ACCOUNT

Date 12/31/18          Page 1 of 4



TO PLO R
**GULF COAST ASPHALT COMPANY LLC**
**1990 POST OAK BLVD SUITE 2400**
010542        **HOUSTON TX 77056**
   1



**PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

**24-hr Online Banking**
**iberiabank.com**

---

| COMMERCIAL CHECKING ANALYSIS | | ACCOUNT NUMBER *******8673 | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 12/03/18 thru 12/31/18 |
| 7 Deposits/Credits | 2,143,804.07 | Days this Statement Period | 29 |
| 7 Checks/Debits | 2,143,804.07 | Average Ledger Balance | 211,923.85 |
| Service Charge | .00 | Average Collected Balance | 138,009.28 |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |

## Your statement now has
# A NEW LOOK!
The difference may appear subtle on this account statement.
We simply made a few visual enhancements to make it easier to read.





→ **Not enrolled in e-Statements? Log in to Mobile or Online Banking to switch today!**
Receive your account information faster and more securely. In moments, you can download, print/save your statements, and access up to 18 months of statement history through Online Banking.

**IBERIABANK TreasuryConnect® and BusinessConnect users:** Please contact your Branch or Treasury Management Technical Support at 1 800 778 5915 to request e Statement access.

*All products and services are subject to approval, including credit approval.

## DEPOSITS AND CREDITS

| Date | Description | | Amount |
|---|---|---|---|
| 12/05 | Lockbox Deposit | | 200,583.00 |
| 12/10 | Lockbox Deposit | | 21,192.60 |
| 12/12 | Lockbox Deposit | | 492,750.85 |
| 12/18 | Lockbox Deposit | | 440,994.60 |
| 12/19 | Lockbox Deposit | | 303,672.60 |
| 12/24 | Transfer Credit | | 281.62 |
| 12/27 | Lockbox Deposit | | 684,328.80 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000237

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING NOT CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN ON THIS STATEMENT $ _____

### ADD

DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY) $ _____

### TOTAL $ _____

### SUBTRACT—

CHECKS OUTSTANDING $ _____

### BALANCE $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

### NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---



Member **FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 12/31/18          Page 3 of 4

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number ★★★★★★★8673

**WITHDRAWALS AND DEBITS**



| Date | Description | Amount |
|------|-------------|--------|
| 12/07 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20181207MMQFMP9H000986<br>20181207B6B7HU4R007243<br>12071226FT03 | 200,583.00 |
| 12/13 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20181213MMQFMP9H000859<br>20181213B6B7HU1R008250<br>12131241FT01 | 21,192.60 |
| 12/14 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20181214MMQFMP9H001111<br>20181214B6B7HU1R008643<br>12141231FT01 | 492,750.85 |
| 12/19 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20181219MMQFMP9H002322<br>20181219B6B7HU4R014773<br>12191652FT01 | 440,994.60 |
| 12/20 | Account Analysis Charge | 281.62 |
| 12/24 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20181224MMQFMP9H000730<br>20181224B6B7HU4R010762<br>12241426FT01 | 303,672.60 |

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000239

Debtor000685



**STATEMENT OF ACCOUNT**

Date 12/31/18          Page 4 of 4

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******8673

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 12/31 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20181231MMQFMP9H000568<br>20181231B6B7HU2R006227<br>12311019FT01 | 684,328.80 |

**DAILY BALANCE INFORMATION**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 12/03 | .00 | 12/13 | 492,750.85 | 12/24 | .00 |
| 12/05 | 200,583.00 | 12/14 | .00 | 12/27 | 684,328.80 |
| 12/07 | .00 | 12/18 | 440,994.60 | 12/31 | .00 |
| 12/10 | 21,192.60 | 12/19 | 303,672.60 | | |
| 12/12 | 513,943.45 | 12/20 | 303,390.98 | | |

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000240

Debtor000636



**STATEMENT OF ACCOUNT**

Date 1/31/19          Page 1 of 4



TO PLO R
GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056
013303

 **PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
iberiabank.com

013303

---

| COMMERCIAL CHECKING ANALYSIS | | ACCOUNT NUMBER *******8673 | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 1/01/19 thru 1/31/19 |
| 8 Deposits/Credits | 1,304,305.04 | Days this Statement Period | 31 |
| 7 Checks/Debits | 1,304,305.04 | Average Ledger Balance | 135,200.66 |
| Service Charge | .00 | Average Collected Balance | 65,175.79 |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |



## DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 1/02 | Lockbox Deposit | 265,668.75 |
| 1/09 | Lockbox Deposit | 137,015.45 |
| 1/16 | Lockbox Deposit | 263,850.35 |
| 1/18 | Lockbox Deposit | 288,921.15 |
| 1/23 | Lockbox Deposit | 116,974.75 |
| 1/25 | Transfer Credit | 297.54 |
| 1/29 | Deposit | 21,797.10 |
| 1/29 | Lockbox Deposit | 209,779.95 |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00001537



Page 2 of 4

**THIS FORM IS PROVIDED TO HELP YOU BALANCE
YOUR BANK STATEMENT**

CHECKS OUTSTANDING NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is
received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                             $ _____

## TOTAL                             $ _____

## SUBTRACT—

CHECKS OUTSTANDING                   $ _____

## BALANCE                           $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE
Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

---



Member
**FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 1/31/19          Page 3 of 4

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    **Account Number ＊＊＊＊＊＊＊8673**

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|-------:|
| 1/07 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190107MMQFMP9H000538<br>20190107B6B7HU2R006672<br>01071201FT01 | 265,668.75 |
| 1/10 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190110MMQFMP9H000933<br>20190110B6B7HU3R008658<br>01101317FT01 | 137,015.45 |
| 1/18 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190118MMQFMP9H000157<br>20190118B6B7HU1R003667<br>01180924FT01 | 263,850.35 |
| 1/22 | Account Analysis Charge | 297.54 |
| 1/24 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190124MMQFMP9H000791<br>20190124B6B7HU2R008084<br>01241300FT01 | 288,921.15 |
| 1/25 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190125MMQFMP9H000517<br>20190125B6B7HU4R004908<br>01251030FT01 | 116,974.75 |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.



**STATEMENT OF ACCOUNT**

Date 1/31/19          Page 4 of 4

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******8673

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 1/30 | Wire Transfer Debit | 231,577.05 |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 US | |
|      | BK AMER NYC | |
|      | 20190130MMQFMP9H002315 | |
|      | 20190130B6B7HU4R013838 | |
|      | 01301636FT01 | |

### DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 1/01 | .00 | 1/16 | 263,850.35 | 1/25 | .00 |
| 1/02 | 265,668.75 | 1/18 | 288,921.15 | 1/29 | 231,577.05 |
| 1/07 | .00 | 1/22 | 288,623.61 | 1/30 | .00 |
| 1/09 | 137,015.45 | 1/23 | 405,598.36 | | |
| 1/10 | .00 | 1/24 | 116,677.21 | | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00001540

Debtor000690

 **IBERIABANK**

**STATEMENT OF ACCOUNT**

Date 2/28/19                Page 1 of 5

TO PLO R

014326

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

 **PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
**iberiabank.com**


014326

| COMMERCIAL CHECKING ANALYSIS | | ACCOUNT NUMBER *******8673 | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 2/01/19 thru 2/28/19 |
| 7 Deposits/Credits | 2,448,106.20 | Days this Statement Period | 28 |
| 7 Checks/Debits | 2,448,106.20 | Average Ledger Balance | 49,475.95 |
| Service Charge | .00 | Average Collected Balance | 8,054.91 |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |

**DEPOSITS AND CREDITS**

| Date | Description | Amount |
|---|---|---|
| 2/06 | Lockbox Deposit | 225,537.60 |
| 2/06 | Wire Transfer Credit<br>MARTIN PRODUCT SALES LLC<br>MASTER FUNDING ACCOUNT<br>4200 STONE RD<br>KILGORE TX  75662 6935<br>ASSET PURCHASE<br>20190206F2QCZ00C002095<br>20190206MMQFMP9H000858<br>02061546FT01 | 1,288,000.00 |
| 2/13 | Lockbox Deposit | 253,118.25 |
| 2/19 | Lockbox Deposit | 470,247.20 |
| 2/20 | From DDA *8665,To DDA *8673 | 317.05 |
| 2/20 | Lockbox Deposit | 133,783.35 |
| 2/26 | Lockbox Deposit | 77,102.75 |

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|---|---|---|
| 2/06 | From DDA *8673,To DDA *8665 | 1,288,000.00 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00009325

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

### ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                             $ _____

### TOTAL                             $ _____

### SUBTRACT—

CHECKS OUTSTANDING                    $ _____

### BALANCE                           $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

### NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.



Member **FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly.   If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.  This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits.  This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge."  Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account.  On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract.  We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating).  "New Balance" means the total outstanding  balance of your line on any cycle closing date which includes principal.   If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly.  The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account.  If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting.  Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about.  You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 2/28/19      Page 3 of 5

---

**COMMERCIAL CHECKING ANALYSIS** (continued)      Account Number ******8673

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|-------:|
| 2/08 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190208MMQFMP9H000152<br>20190208B6B7HU3R003615<br>02080943FT01 | 225,537.60 |
| 2/14 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190214MMQFMP9H000805<br>20190214B6B7HU1R008932<br>02141317FT01 | 253,118.25 |
| 2/20 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190220MMQFMP9H001251<br>20190220B6B7HU1R010776<br>02201446FT01 | 470,247.20 |
| 2/20 | Account Analysis Charge | 317.05 |
| 2/21 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190221MMQFMP9H001030<br>20190221B6B7HU4R008327<br>02211252FT01 | 133,783.35 |
| 2/27 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190227MMQFMP9H001547<br>20190227B6B7HU4R010761<br>02271413FT01 | 77,102.75 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00009327

Debtor000693

014326



**STATEMENT OF ACCOUNT**

Date 2/28/19          Page 4 of 5

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    **Account Number *******8673**

**DAILY BALANCE INFORMATION**

| Date | Balance | Date | Balance | Date | Balance |
|------|--------|------|---------|------|---------|
| 2/01 | .00 | 2/14 | .00 | 2/26 | 77,102.75 |
| 2/06 | 225,537.60 | 2/19 | 470,247.20 | 2/27 | .00 |
| 2/08 | .00 | 2/20 | 133,783.35 | | |
| 2/13 | 253,118.25 | 2/21 | .00 | | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00009328

Debtor000694

**IBERIABANK**

**Effective April 1, 2019:  This schedule of fees will apply, fee changes are bolded.**

### Miscellaneous Fees – Business and Posting Order

| | |
|---|---|
| ACH/Government Reclamation | $10.00 / item |
| ATM Foreign Usage Fee (Non IBERIABANK ATM or its non affiliated networks) | $2.00 / transaction |
| ATM/Debit Card Replacement | $5.00 / card |
| ATM/Debit Card Expedited Replacement | $25.00 each |
| **Bill Pay   (Clients exceeding 25 items will be converted to a commercial product)** | **Free**   limited to 25 bills per month |
| Collection Items | |
|     Collection Fee   Domestic <=$100 | $7.50 |
|     Collection Fee   Domestic >$100 | $15.00 |
|     Collection Fee   International | $35.00 |
| Coin & Currency | |
|     Coin & Currency Deposited   After the first $10,000 per statement cycle | |
|     (Choice Business CK, Business Interest CK, Business Checking Plus, Advanced Business Checking) | $2.00 per $1,000 |
|     Coin & Currency Deposited | |
|     (Commercial Analysis) | $1.50 per $1,000 |
|     Bulk Coin Deposited | $3.00 / bag |
|     Currency Furnished | $0.50 / strap |
|     Coins Furnished | $0.15 / roll |
| Copies (includes check copies) and Faxes | $2.00 / page |
| Counter Checks | $1.00 for 5 checks |
| Deposit Assessment Fee (Commercial Analysis Accounts Only) | .010% on daily average ledger balance |
| Deposit Correction | $3.00 each |
| Deposit to Deposit Overdraft Protection Transfers | $10.00 / day |
| Dormant Account (applies to dormant account balances less than $100 per month) | $5.00 / month (not applicable in Texas) |
| Foreign Currency Exchange (additional fees may apply) | |
|     $300 or more | $10.00 / transaction |
|     Less than $300 | $20.00 / transaction |
| Legal Process | $75.00 / event |
| Money Bag | Varies |
| Medallion Stamp Guarantee (where available) | $15.00 |
| Money Market Account Excessive Transaction Fee | $15.00 / item |
| Negative Collected Balance Fee | Prime + 3% on daily average negative collected balance |
| Notary Services | May vary by State |
| Official Checks/Cashier Checks | $8.00 |
| Overdraft (Paid) Item Fee (applies to overdrafts created by checks, in person withdrawals, ATM                   withdrawals or other electronic means) | $35.00 per item; per presentment |
| Research (one hour minimum) | $25.00 / hour |
| Return Item Fee (applies when checks are returned as unpaid) | $35.00 per item; per presentment |
| Return Deposited Item | $5.00 each |
| Safe Deposit Box   Drilling Fee | $150.00 |
| Safe Deposit Box   Replacement Lock Fee | $70.00 |
| Special Reject Item | $1.00 each |
| Statements | |
|     Statements Copy | $10.00 each |
|     Statement Duplicate (complete statement) | $10.00 each |
|     **Statement (Receipt of both paper and e-Statement)** | **$5.00 per month** |
|     Statement Instant | $5.00 each |
|     Statement Reconciliation | $20.00 / hour |
|     Statement   Simplex Image Printing | $2.00 / event |
|     Statement Snapshot | $10.00 each |
| Stop Payment Fee (applies for 6 month period) | $35.00 each |
| Telephone Transfer of Funds (customer service assisted) | $5.00 each |
| **Verification of Deposit** | **$25.00 each** |
| Wires Transactions | |
|     Wire Transfer   Incoming (Domestic and Foreign) | $15.00 each |
|     Wire Transfer   Outgoing  (Domestic) | $25.00 each |
|     Wire Transfer   Outgoing (Foreign)   Foreign Currency | $40.00 each |
|     Wire Transfer   Outgoing (Foreign)   US Currency | $50.00 each |

**\*\*\* NOT ALL SERVICES ARE AVAILABLE AT ALL LOCATIONS**

### Notice Regarding Posting Order of Items

To assist you in handling your account with us, we are providing you with the following information on how we post transactional items to your account.

On each bank processing day, deposit and credit items post before debit items. Debit items post upon receipt in the following order: wire transfers, ATM and debit card transactions in authorization time and date order, paper checks in check number order, if available, checks without a check number post in low to high dollar amount order, then all other debit items in low to high dollar amount order.  Other debit items include but are not limited to Automated Clearing House (ACH) items, checks converted to ACH by merchants or vendors, telephone and online banking one time or recurring transfers, pre authorized debits and account withdrawals.

At times, certain debit items may not post in the above order due to missing or erroneous data or circumstances beyond our control.

If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item.  Overdraft (Paid) Item Fees and Return Item Fees are disclosed above and are subject to change.

We encourage you to keep careful records and practice good account management.  This will help you to avoid creating items without sufficient funds and incurring the resulting fees.

We offer Deposit to Deposit Overdraft Protection Transfer Service and Personal Lines of Credit (subject to credit approval) that can be used as overdraft protection on most accounts to avoid Overdraft (Paid) Item Fees and Return Item Fees.  Visit our website at www.iberiabank.com to learn more about Preventing and Managing Overdrafts.

Debtor000696

 **IBERIABANK**

**STATEMENT OF ACCOUNT**

Date 3/29/19          Page 1 of 3


**TO PLO R**

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
012663   HOUSTON TX 77056


012663

 **PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
iberiabank.com

---

**COMMERCIAL CHECKING ANALYSIS**                    **ACCOUNT NUMBER * * * * * * *8673**

| | | | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 3/01/19 thru  3/31/19 |
| 6 Deposits/Credits | 521,156.10 | Days this Statement Period | 31 |
| 6 Checks/Debits | 521,156.10 | Average Ledger Balance | 16,800.84 |
| Service Charge | .00 | Average Collected Balance | .00 |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |

---

Effective May 1, 2019 business checking transaction item counts will change to also include teller withdrawals and bill pay items. Please refer to your account disclosure terms for excessive transaction fees that may apply to your account.

---

**DEPOSITS AND CREDITS**

| Date | Description | Amount |
|---|---|---|
| 3/06 | Lockbox Deposit | 51,393.85 |
| 3/12 | Deposit | 176,692.07 |
| 3/19 | Lockbox Deposit | 166,337.40 |
| 3/20 | From DDA *8665,To DDA *8673 | 330.04 |
| 3/20 | Lockbox Deposit | 61,768.70 |
| 3/28 | Deposit | 64,634.04 |

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|---|---|---|
| 3/07 | Wire Transfer Debit | 51,393.85 |
| | MERCURIA ENERGY TRADING,INC | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20190307MMQFMP9H000660 | |
| | 20190307B6B7HU3R006867 | |
| | 03071151FT01 | |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00006007

Debtor000697

# IBERIABANK

Page 2 of 3

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING NOT CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN ON THIS STATEMENT      $ _____

## ADD

DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY)      $ _____

## TOTAL      $ _____

## SUBTRACT—

CHECKS OUTSTANDING      $ _____

## BALANCE      $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---

Member **FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly.   If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.  This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits.  This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge."  Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract.  We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating).  "New Balance" means the total outstanding  balance of your line on any cycle closing date which includes principal.  If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account.  If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting.  Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about.  You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 3/29/19          Page 3 of 3

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******8673

**WITHDRAWALS AND DEBITS**



| Date | Description | Amount |
|------|-------------|-------:|
| 3/13 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190313MMQFMP9H001642<br>20190313B6B7HU2R011930<br>03131606FT01 | 176,692.07 |
| 3/20 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190320MMQFMP9H000737<br>20190320B6B7HU1R007459<br>03201234FT01 | 166,337.40 |
| 3/20 | Account Analysis Charge | 330.04 |
| 3/21 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190321MMQFMP9H000854<br>20190321B6B7HU1R007493<br>03211238FT01 | 61,768.70 |
| 3/29 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190329MMQFMP9H003761<br>20190329B6B7HU3R020072<br>03291647FT01 | 64,634.04 |

**DAILY BALANCE INFORMATION**

| Date | Balance | Date | Balance | Date | Balance |
|------|--------:|------|--------:|------|--------:|
| 3/01 | .00 | 3/13 | .00 | 3/28 | 64,634.04 |
| 3/06 | 51,393.85 | 3/19 | 166,337.40 | 3/29 | .00 |
| 3/07 | .00 | 3/20 | 61,768.70 | | |
| 3/12 | 176,692.07 | 3/21 | .00 | | |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

Debtor000750



**STATEMENT OF ACCOUNT**

Date 4/30/19                    Page 1 of 3

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

 **PLEASE CONTACT YOUR
RELATIONSHIP MANAGER
WITH ANY QUESTIONS
OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
iberiabank.com

| COMMERCIAL CHECKING ANALYSIS | | ACCOUNT NUMBER ******8673 | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 4/01/19 thru  4/30/19 |
| 6 Deposits/Credits | 268,351.21 | Days this Statement Period | 30 |
| 6 Checks/Debits | 268,351.21 | Average Ledger Balance | 24,975.88 |
| Service Charge | .00 | Average Collected Balance | 9,339.04 |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |

Effective May 1, 2019 business checking transaction item counts will change to also include teller withdrawals and bill pay items. Please refer to your account disclosure terms for excessive transaction fees that may apply to your account.

### DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 4/09 | Lockbox Deposit | 140,085.72 |
| 4/16 | Lockbox Deposit | 10,287.63 |
| 4/19 | Lockbox Deposit | 37,887.26 |
| 4/22 | From DDA *8665,To DDA *8673,Lo ckbox bank charge | 297.26 |
| 4/26 | Lockbox Deposit | 62,638.34 |
| 4/29 | Lockbox Deposit | 17,155.00 |

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 4/12 | Wire Transfer Debit MERCURIA ENERGY TRADING,INC | 140,085.72 |
| | 20 E GREENWAY PLAZA SUITE 650 HOUSTON, TX 77046 US BK AMER NYC 20190412MMQFMP9H000803 20190412B6B7HU4R006649 04121126FT01 | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000555

Debtor000751

# IBERIABANK

Page 2 of 3

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT          $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)          $ _____

## TOTAL          $ _____

## SUBTRACT—

CHECKS OUTSTANDING          $ _____

## BALANCE          $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.



Member
FDIC

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

# IBERIABANK

## STATEMENT OF ACCOUNT

Date 4/30/19                    Page 3 of 3

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    **Account Number *******8673**

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 4/17 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190417MMQFMP9H002030<br>20190417B6B7HU3R013143<br>04171649FT03 | 10,287.63 |
| 4/22 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190422MMQFMP9H000630<br>20190422B6B7HU2R007691<br>04221235FT03 | 37,887.26 |
| 4/22 | Account Analysis Charge | 297.26 |
| 4/29 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190429MMQFMP9H000974<br>20190429B6B7HU3R008722<br>04291241FT03 | 62,638.34 |
| 4/30 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190430MMQFMP9H001533<br>20190430B6B7HU2R009885<br>04301259FT03 | 17,155.00 |

### DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 4/01 | .00 | 4/17 | .00 | 4/29 | 17,155.00 |
| 4/09 | 140,085.72 | 4/19 | 37,887.26 | 4/30 | .00 |
| 4/12 | .00 | 4/22 | .00 | | |
| 4/16 | 10,287.63 | 4/26 | 62,638.34 | | |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000557

Debtor000703

Debtor000754



**STATEMENT OF ACCOUNT**

Date 5/31/19                Page 1 of 3

15439 114397 R P0 T0


015439

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056


015439

 **PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
iberiabank.com

---

**COMMERCIAL CHECKING ANALYSIS**                **ACCOUNT NUMBER *******8673**

| | | | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 5/01/19 thru 6/02/19 |
| 6 Deposits/Credits | 448,928.01 | Days this Statement Period | 33 |
| 6 Checks/Debits | 448,928.01 | Average Ledger Balance | 55,341.27 |
| Service Charge | .00 | Average Collected Balance | 42,496.11 |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |

---

**DEPOSITS AND CREDITS**

| Date | Description | Amount |
|---|---|---|
| 5/06 | Lockbox Deposit | 125,114.70 |
| 5/10 | Wire Transfer Credit | 24,743.28 |
| | MERCURIA ENERGY TRADING INC. | |
| | GREENWAY PLAZA | |
| | 20 EAST, SUITE 650, HOUSTON, | |
| | TEXAS 77046, USA US | |
| | 20190510B6B7HU4R008112 | |
| | 20190510MMQFMP9H000621 | |
| | 05101146FT03 | |
| 5/13 | Lockbox Deposit | 127,680.65 |
| 5/20 | From DDA *8665,To DDA *8673 | 294.63 |
| 5/20 | Lockbox Deposit | 89,849.12 |
| 5/29 | Lockbox Deposit | 81,245.63 |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00006557

Debtor000755



### THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING NOT CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                     $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                    $ _____

## TOTAL                                   $ _____

## SUBTRACT—

CHECKS OUTSTANDING                $ _____

## BALANCE                               $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.



Member **FDIC**

### In Case of Errors or Questions About Your Electronic Transfers
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 5/31/19          Page 3 of 3

**COMMERCIAL CHECKING ANALYSIS** (continued)          Account Number ∗∗∗∗∗∗∗8673

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 5/10 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190510MMQFMP9H002541<br>20190510B6B7HU1R014724<br>05101654FT03 | 125,114.70 |
| 5/10 | From DDA *8673,To DDA *8665 | 24,743.28 |
| 5/20 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190520MMQFMP9H000549<br>20190520B6B7HU1R005591<br>05201136FT03 | 127,680.65 |
| 5/20 | Account Analysis Charge | 294.63 |
| 5/23 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190523MMQFMP9H000286<br>20190523B6B7HU1R004550<br>05230941FT03 | 89,849.12 |
| 5/31 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190531MMQFMP9H002670<br>20190531B6B7HU3R014432<br>05311429FT03 | 81,245.63 |

## DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 5/01 | .00 | 5/13 | 127,680.65 | 5/29 | 81,245.63 |
| 5/06 | 125,114.70 | 5/20 | 89,849.12 | 5/31 | .00 |
| 5/10 | .00 | 5/23 | .00 | | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00006559

Debtor000707

Debtor000758



# STATEMENT OF ACCOUNT

Date 6/28/19                    Page 1 of 3

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

 **PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
iberiabank.com

| COMMERCIAL CHECKING ANALYSIS | | ACCOUNT NUMBER *******8673 | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 6/03/19 thru 6/30/19 |
| 5 Deposits/Credits | 82,265.51 | Days this Statement Period | 28 |
| 5 Checks/Debits | 82,265.51 | Average Ledger Balance | 5,963.51 |
| Service Charge | .00 | Average Collected Balance | 2,433.11 |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |

## DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 6/04 | Lockbox Deposit | 17,487.15 |
| 6/10 | Lockbox Deposit | 30,727.56 |
| 6/17 | Lockbox Deposit | 25,320.05 |
| 6/20 | From DDA *8665,To DDA *8673 | 291.95 |
| 6/21 | Lockbox Deposit | 8,438.80 |

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 6/06 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190606MMQFMP9H000723<br>20190606B6B7HU2R007666<br>06061231FT03 | 17,487.15 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000055

# IBERIABANK

Page 2 of 3

**THIS FORM IS PROVIDED TO HELP YOU BALANCE
YOUR BANK STATEMENT**

CHECKS OUTSTANDING NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is
received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                             $ _____

## TOTAL                             $ _____

## SUBTRACT—

CHECKS OUTSTANDING                   $ _____

## BALANCE                           $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.


Member
**FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**


EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 6/28/19          Page 3 of 3

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    **Account Number *******8673**

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 6/11 | Wire Transfer Debit | 30,727.56 |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 US | |
|      | BK AMER NYC | |
|      | 20190611MMQFMP9H001070 | |
|      | 20190611B6B7HU4R007951 | |
|      | 06111334FT03 | |
| 6/20 | Wire Transfer Debit | 25,320.05 |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 US | |
|      | BK AMER NYC | |
|      | 20190620MMQFMP9H000744 | |
|      | 20190620B6B7HU1R007883 | |
|      | 06201205FT03 | |
| 6/20 | Account Analysis Charge | 291.95 |
| 6/24 | Wire Transfer Debit | 8,438.80 |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 US | |
|      | BK AMER NYC | |
|      | 20190624MMQFMP9H001081 | |
|      | 20190624B6B7HU4R010751 | |
|      | 06241356FT03 | |

### DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 6/03 | .00 | 6/10 | 30,727.56 | 6/20 | .00 |
| 6/04 | 17,487.15 | 6/11 | .00 | 6/21 | 8,438.80 |
| 6/06 | .00 | 6/17 | 25,320.05 | 6/24 | .00 |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000057

Debtor000721

Debtor0004752



## STATEMENT OF ACCOUNT

Date 7/31/19                    Page 1 of 3

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

 **PLEASE CONTACT YOUR
RELATIONSHIP MANAGER
WITH ANY QUESTIONS
OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
iberiabank.com

---

### COMMERCIAL CHECKING ANALYSIS

| | | | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 7/01/19 thru  7/31/19 |
| 7 Deposits/Credits | 666,034.33 | Days this Statement Period | 31 |
| 6 Checks/Debits | 659,112.96 | Average Ledger Balance | 45,484.48 |
| Service Charge | .00 | Average Collected Balance | 24,008.35 |
| Interest Paid | .00 | | |
| Current Balance | 6,921.37 | | |

**ACCOUNT NUMBER ＊＊＊＊＊＊8673**

---

### DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 7/02 | Lockbox Deposit | 21,888.96 |
| 7/08 | Lockbox Deposit | 178,480.68 |
| 7/10 | Lockbox Deposit | 59,303.74 |
| 7/16 | Lockbox Deposit | 34,539.88 |
| 7/24 | Lockbox Deposit | 364,625.28 |
| 7/25 | From DDA *8665,To DDA *8673,To cover bank analysis charge | 274.42 |
| 7/30 | Lockbox Deposit | 6,921.37 |

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 7/08 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190708MMQFMP9H000685<br>20190708B6B7HU4R006562<br>07081209FT03 | 21,888.96 |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000557

Debtor000713

# IBERIABANK

Page 2 of 3

### THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

**CHECKS OUTSTANDING NOT CHARGED TO ACCOUNT**

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

**BANK BALANCE SHOWN ON THIS STATEMENT**   $ _____

## ADD

**DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY)**   $ _____

## TOTAL   $ _____

## SUBTRACT—

**CHECKS OUTSTANDING**   $ _____

## BALANCE   $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---



Member **FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299



EQUAL HOUSING LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 7/31/19          Page 3 of 3

---

**COMMERCIAL CHECKING ANALYSIS** (continued)          Account Number *******8673

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 7/11 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190711MMQFMP9H000080<br>20190711B6B7HU1R004086<br>07110932FT03 | 178,480.68 |
| 7/15 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190715MMQFMP9H001112<br>20190715B6B7HU3R009165<br>07151309FT03 | 59,303.74 |
| 7/18 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190718MMQFMP9H000377<br>20190718B6B7HU1R005560<br>07181051FT03 | 34,539.88 |
| 7/22 | Account Analysis Charge | 274.42 |
| 7/25 | Wire Transfer Debit<br>MERCURIA ENERGY TRADING,INC<br><br>20 E GREENWAY PLAZA<br>SUITE 650<br>HOUSTON, TX 77046 US<br>BK AMER NYC<br>20190725MMQFMP9H000876<br>20190725B6B7HU3R007927<br>07251211FT03 | 364,625.28 |

**VITOL EXHIBIT**

**124.13**

Adv. No.: 21-06006 8/30/2022

www.exhibitsticker.com

### DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 7/01 | .00 | 7/11 | 59,303.74 | 7/22 | 274.42 |
| 7/02 | 21,888.96 | 7/15 | .00 | 7/24 | 364,350.86 |
| 7/08 | 178,480.68 | 7/16 | 34,539.88 | 7/25 | .00 |
| 7/10 | 237,784.42 | 7/18 | .00 | 7/30 | 6,921.37 |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

Debtor000726

 **IBERIABANK**

**STATEMENT OF ACCOUNT**

Date 8/30/19          Page 1 of 3

17201 115479 R P0 T0

 GULF COAST ASPHALT COMPANY LLC
017201   1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056


017201

 **PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**
**1-800-968-0801**

 **24-hr Online Banking**
**iberiabank.com**

---

### COMMERCIAL CHECKING ANALYSIS

**ACCOUNT NUMBER ******8673**

| | | | |
|---|---|---|---|
| Previous Balance | 6,921.37 | Statement Dates | 8/01/19 thru 9/02/19 |
| 7 Deposits/Credits | 548,916.76 | Days this Statement Period | 33 |
| 6 Checks/Debits | 555,838.13 | Average Ledger Balance | 67,374.08 |
| Service Charge | .00 | Average Collected Balance | 28,666.24 |
| Interest Paid | .00 | | |
| Current Balance | .00 | | |

---

### DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 8/02 | Lockbox Deposit | 14,616.00 |
| 8/09 | Lockbox Deposit | 99,743.36 |
| 8/14 | Lockbox Deposit | 28,226.88 |
| 8/16 | Lockbox Deposit | 250,009.92 |
| 8/19 | Lockbox Deposit | 42,978.24 |
| 8/21 | From DDA *8665,To DDA *8673 | 296.60 |
| 8/27 | Lockbox Deposit | 113,045.76 |

---

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 8/06 | Wire Transfer Debit | 21,537.37 |
| | MERCURIA ENERGY TRADING,INC | |
| | 20 E GREENWAY PLAZA | |
| | SUITE 650 | |
| | HOUSTON, TX 77046 US | |
| | BK AMER NYC | |
| | 20190806MMQFMP9H000847 | |
| | 20190806B6B7HU2R007371 | |
| | 08061305FT03 | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000705

Debtor000705

**IBERIABANK**

Page 2 of 3

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING NOT CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT          $ _____

### ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                  $ _____

### TOTAL                $ _____

### SUBTRACT—

CHECKS OUTSTANDING          $ _____

### BALANCE              $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

### NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---



Member
**FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 8/30/19          Page 3 of 3

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******8673

## WITHDRAWALS AND DEBITS


017201

| Date | Description | Amount |
|------|-------------|--------|
| 8/13 | Wire Transfer Debit | 99,743.36 |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 US | |
|      | BK AMER NYC | |
|      | 20190813MMQFMP9H001875 | |
|      | 20190813B6B7HU1R012770 | |
|      | 08131649FT03 | |
| 8/16 | Wire Transfer Debit | 28,226.88 |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 US | |
|      | BK AMER NYC | |
|      | 20190816MMQFMP9H001297 | |
|      | 20190816B6B7HU1R009605 | |
|      | 08161341FT03 | |
| 8/20 | Account Analysis Charge | 296.60 |
| 8/21 | Wire Transfer Debit | 292,988.16 |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 US | |
|      | BK AMER NYC | |
|      | 20190821MMQFMP9H001488 | |
|      | 20190821B6B7HU3R011265 | |
|      | 08211538FT03 | |
| 8/30 | Wire Transfer Debit | 113,045.76 |
|      | MERCURIA ENERGY TRADING,INC | |
|      | 20 E GREENWAY PLAZA | |
|      | SUITE 650 | |
|      | HOUSTON, TX 77046 US | |
|      | BK AMER NYC | |
|      | 20190830MMQFMP9H002860 | |
|      | 20190830B6B7HU2R015953 | |
|      | 08301444FT03 | |

## DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 8/01 | 6,921.37 | 8/13 | .00 | 8/20 | 292,691.56 |
| 8/02 | 21,537.37 | 8/14 | 28,226.88 | 8/21 | .00 |
| 8/06 | .00 | 8/16 | 250,009.92 | 8/27 | 113,045.76 |
| 8/09 | 99,743.36 | 8/19 | 292,988.16 | 8/30 | .00 |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000707

Debtor0007 19

Debtor000720



**STATEMENT OF ACCOUNT**

Date 9/30/19                    Page 1 of 2

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

 **PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
iberiabank.com

---

**COMMERCIAL CHECKING ANALYSIS**                    **ACCOUNT NUMBER *******8673**

| | | | |
|---|---|---|---|
| Previous Balance | .00 | Statement Dates | 9/03/19 thru 9/30/19 |
| Deposits/Credits | .00 | Days this Statement Period | 28 |
| 1 Checks/Debits | 294.76 | Average Ledger Balance | 115.79 |
| Service Charge | .00 | Average Collected Balance | 115.79 |
| Interest Paid | .00 | | |
| Current Balance | 294.76 | | |

---

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|---|---|---|
| 9/20 | Account Analysis Charge | 294.76 |

**DAILY BALANCE INFORMATION**

| Date | Balance | Date | Balance |
|---|---|---|---|
| 9/03 | .00 | 9/20 | 294.76 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000189

Debtor000721



## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT           $ _____

### ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                    $ _____

### TOTAL                  $ _____

### SUBTRACT—

CHECKS OUTSTANDING          $ _____

### BALANCE                $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

### NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

---



Member
**FDIC**

### In Case of Errors or Questions About Your Electronic Transfers
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

### LINE OF CREDIT ACCOUNT INFORMATION

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 10/31/19          Page 1 of 2

9693 115949 R P0 T0


009693

GULF COAST ASPHALT COMPANY LLC
1990 POST OAK BLVD SUITE 2400
HOUSTON TX 77056

 **PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

 **24-hr Online Banking**
iberiabank.com

---

### COMMERCIAL CHECKING ANALYSIS

| | | | |
|---|---|---|---|
| Previous Balance | 294.76 | **ACCOUNT NUMBER ******8673** | |
| 3 Deposits/Credits | 529.63 | Statement Dates | 10/01/19 thru 10/31/19 |
| 2 Checks/Debits | 234.87 | Days this Statement Period | 31 |
| Service Charge | .00 | Average Ledger Balance | 188.45 |
| Interest Paid | .00 | Average Collected Balance | 188.45 |
| Current Balance | .00 | | |

---

### DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 10/21 | Phone/In Person Transfer | 528.98 |
| 10/22 | ANALYSIS REVERSAL PARTIAL SEPT AA FEE | .65 |
| 10/23 | Closing entry  Credit balance | .00 |

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 10/21 | Account Analysis Charge | 207.93 |
| 10/23 | Account Analysis Charge | 26.94 |

### DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance |
|---|---|---|---|
| 10/01 | 294.76 | 10/22 | 26.94 |
| 10/21 | 26.29 | 10/23 | .00 |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000095

**IBERIABANK**

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING NOT
CHARGED TO ACCOUNT

| No. | $ | |
|-----|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

### ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                             $ _____

### TOTAL                           $ _____

### SUBTRACT—

CHECKS OUTSTANDING                   $ _____

### BALANCE                         $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

### NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---



**Member FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299



EQUAL HOUSING LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the **FIRST** statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ ten to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3     Arthur Jacob Brass,              )
                                        )CASE NO. 21-60025
 4                Debtor.               )
       ------------------------------)
 5     Vitol Inc.,                      )CASE NO: 21-06006
                                        )ADVERSARY
 6                Plaintiff,            )
                                        )Houston, Texas
 7          Vs.                         )
                                        )Wednesday, September 28, 2022
 8     Arthur Jacob Brass,              )
                                        )1:15 P.M. to 6:23 P.M.
 9                Defendant.            )
       ------------------------------)
10
                                 TRIAL
11            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                   UNITED STATES BANKRUPTCY JUDGE
12

13     APPEARANCES:
       For Plaintiffs:          MICHAEL P. COOLEY
14                              MICHAEL HALLEY BERNICK
                                BRADLEY JAMES PURCELL
15                              Reed Smith, LLP
                                2501 N. Harwood, Suite 1700
16                              Dallas, TX 75201

17     For Defendant:           MIRIAM GOOTT
                                JOHNIE J. PATTERSON
18                              Walker & Patterson, PC
                                P.O. Box 61301
19                              Houston, TX 77208

20     Court Reporter:          ZILDE MARTINEZ

21     Courtroom Deputy:        ZILDE MARTINEZ

22     Transcribed by:          Veritext Legal Solutions
                                330 Old Country Road, Suite 300
23                              Mineola, NY 11501
                                Tel: 800-727-6396
24
       Proceedings recorded by electronic sound recording;
25     Transcript produced by transcription service.
```

```
 1                              INDEX

 2   PLAINTIFFS' WITNESSES     DIRECT    CROSS    REDIRECT    RECROSS

 3   Gene Dietz                33/66      103       158         167

 4

 5

 6   DEFENDANT'S WITNESSES     DIRECT    CROSS    REDIRECT    RECROSS

 7

 8

 9   PLAINTIFFS' EXHIBITS                                     RECEIVED

10

11   DEFENDANT'S EXHIBITS                                    RECEIVED

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 28, 2022; 1:15 P.M.

2            THE COURT:  Okay.  If I may call 21-06006, Vitol

3    v. Brass.  I see counsel for Vitol here.  Counsel for Brass

4    is also here.  Mr. Patterson, I think you've reminded me

5    Miss Goott won't be here today.  So that's complete.  I hope

6    she's okay.

7            MR. PATTERSON:  (indiscernible)

8            THE COURT:  Okay.

9            MR. PATTERSON:  (indiscernible)

10           THE COURT:  I did.  If we can just have a hint of

11   housekeeping.  Is there anything the parties want to tell

12   me?  And then I had a quick comment about something.  Yes,

13   Mr. Cooley.

14           MR. COOLEY:  Yes, for the record, Michael Cooley

15   from Reed Smith.  Thank you, Your Honor.  Just to sort of

16   give the Court a roadmap of where we are, what we have left,

17   I think sort of consistent with what we described last time

18   with a couple of items that have come up along the way.  Our

19   intention would be to take up the Tomaszewski matter first

20   today, however, the Court wishes to handle that.  Mr.

21   Purcell from my office will deal with that.

22           THE COURT:  Okay.

23           MR. COOLEY:  And then, as we indicated we would at

24   the last hearing date, we did provide to counsel a listing

25   of what we understand to be the documents that have been

1    admitted into evidence, whether they were judicial notice or

2    fully admitted.  Mr. Patterson has provided us comments

3    back.  There are a couple of open items.  I think we'll want

4    to address those, if we can, before we take up, before we

5    move on to Mr. Dietz simply because one of those documents

6    is Vitol Exhibit 124, which was the big compendium of bank

7    statements.  The Court may recall Miss Williams answered

8    questions as the records custodian and so forth.  There's a

9    question about the scope of what was actually admitted

10   because those records are financial records that may come up

11   in the course of Mr. Dietz's examination.  We would propose

12   to see if we can clear that up and I can bracket that issue

13   for the Court at the appropriate time.

14           We'll then present Mr. Dietz.  And then if there's

15   any final exhibit clean up, we need to do at the end, we

16   will do that.  And then we will be prepared to rest.

17           THE COURT:  How much time do you think -- are you

18   going to take on direct with Dietz do you think?

19           MR. COOLEY:  Subject to objections and how that

20   goes?

21           THE COURT:  No, I'm just talking about Dietz

22   direct.

23           MR. COOLEY:  Yes, Your Honor.  Yes, that's what I

24   mean, objections to questions and that sort of thing.  I'm

25   estimating two hours.   underestimated with Mr. Kuo.  I

1    recognize -- and that's a function in part of the number of

2    objections.  And counsel has that right, obviously.  I can't

3    predict that part.  I'm estimating about two hours for the

4    direct.

5            THE COURT:  Okay.  On Tomaszewski, just one

6    question.  I went back and looked at it.  I should say

7    Celine did.  But we did look and it appeared to me -- and I

8    want you to tell me if I'm wrong about this -- what are you

9    asking for?  What are you seeking the admission of?  I know

10   that the entire transcript and I've got to give rulings on

11   that.  And I'm just going to issue an order saying what the

12   rulings were on the objections.  But in terms of documents

13   that you seek to get in, what documents that you seek to

14   admit, if any?

15           MR. COOLEY:  Your Honor, at this point, the only

16   document that I believe we're still moving for the admission

17   of based upon that transcript is the general ledger.  I'm

18   going to glance back at Mr. Purcell who's going to nod or

19   shake his head appropriately.

20           THE COURT:  That's the only one you're looking

21   for?

22           MR. COOLEY:  Yes, Your Honor.  Because the other

23   documents that come up in the course of that transcript --

24   there's some balance sheets and other things -- those have

25   already been admitted into evidence other ways.

1           THE COURT:  Your Trial Exhibit 115, where did that

2     one come in?  Did it come in?  I know GCAC, the general

3     ledger.

4           MR. COOLEY:  No, not 115, Your Honor.  That would

5     be --

6           THE COURT:  I just want to be, I just want to be

7     crystal clear about what you're asking.

8           MR. COOLEY:  Correct, Your Honor.  That is, 115 is

9     an income statement.  And I don't recall if that particular

10    income statement was also the one that was part of the

11    Exhibit 81.

12          THE COURT:  I have no idea.

13          MR. COOLEY:  Yeah, but my understanding is the

14    only document we're seeking the admission of through Mr.

15    Tomaszewski --

16          THE COURT:  And on what basis are you seeking the

17    admission of that document?

18          MR. COOLEY:  On what basis?

19          THE COURT:  Um-hum.

20          MR. COOLEY:  Your Honor, I would suggest I turn it

21    over to Mr. Purcell to let him address the substance.

22          THE COURT:  Okay.  I can rule on -- and I won't

23    waste anyone's time.  I'll just issue an order showing which

24    objections.  But on the general ledger, what's the basis for

25    the admission on that?  I have seen the objections.

1            MR. PURCELL:  I'm sorry?

2            THE COURT:  I said I've read the objections in the

3      transcript.  So tell me what the basis of admission is for

4      it.

5            MR. PURCELL:  Yes, Your Honor.  And to be clear,

6      that would be Exhibit 3 to Mr. Tomaszewski's deposition

7      which is Vitol Exhibit 109.

8            THE COURT:  109.

9            MR. PURCELL:  Yes, Your Honor.  So first, Your

10     Honor, we believe that Mr. Tomaszewski authenticated Exhibit

11     3 as a portion of the Gulf Coast general ledger.

12           THE COURT:  Okay.

13           MR. PURCELL:  That would be on Pages 26 and 27.

14     He was specifically asked whether he recognized Exhibit 3.

15           THE COURT:  Right.

16           MR. PURCELL:  He said, yes, he identified it as

17     the general ledger.  We also believe that Mr. Tomaszewski

18     testified sufficiently to overcome the hearsay objection and

19     established it as a business record.

20           THE COURT:  Let's go through that.

21           MR. PURCELL:  Yes, sir.

22           THE COURT:  Let's pull up a transcript.

23           MR. PURCELL:  Yes, Your Honor.

24           THE COURT:  Let me first pull up the transcript.

25     Mr. Patterson, you will have every right to object.  And I'm

Page 8

1    not going to rule on this.  I just want to make sure that I

2    understand kind of what was asked of me and just to go

3    through it.  You will have every right to -- this is without

4    prejudice.

5           MR. PATTERSON:  (indiscernible)

6           THE COURT:  That's where we're going.  That's

7    where I'm going.  I'm just trying to have him lay it out.

8           MR. PATTERSON:  (indiscernible)

9           THE COURT:  So there's a hearsay objection already

10   on the transcript.  On what basis do you seek the admission?

11   You say business record?

12          MR. PURCELL:  Yes, Your Honor.

13          THE COURT:  Okay.  Walk me through it.

14          MR. PURCELL:  Yes, Your Honor.  First, if you go

15   to Page 6.

16          THE COURT:  Okay.  Yeah, I'm going to I'm going to

17   put it up on the screen myself.  Actually, Miss Mehta, can I

18   give you -- do you have -- I'll do it, I'll do it.  It's

19   quicker.  Let me screen share.  There we go.  Okay.  You

20   said Page 6?

21          MR. PURCELL:  Page 6, yes, Your Honor.  On Lines

22   21 through 23, we can see Mr. Tomaszewski establishes his

23   familiarity with Gulf Coast Asphalt Company.  If we can go

24   to the next page, Page 7.

25          THE COURT:  Page 7.

1              MAN 1:  The Judge is doing it.

2              MR. PURCELL:  Okay, sorry.

3              THE COURT:  Yeah, Page 6, Page 7.

4              MR. PURCELL:  Yes, Your Honor.  Lines 3 through

5    10, Mr. Tomaszewski testifies as to the nature of the work

6    he performed for Gulf Coast, which was accounting and

7    financial consulting work.

8              THE COURT:  Yeah.

9              MR. PURCELL:  If we continue down, Pages 16 -- I'm

10   sorry, excuse me, Your Honor.  Lines 16 through 25, he

11   established his familiarity --

12             THE COURT:  Wait, I'm sorry.  On the same page?

13             MR. PURCELL:  Yes, Your Honor.  I apologize.  I

14   said page.  I meant lines, excuse me.

15             THE COURT:  So page?

16             MR. PURCELL:  Page 7, Your Honor.

17             THE COURT:  Page 7.

18             MR. PURCELL:  Yes.  If we look at 3 through 10 --

19             THE COURT:  Yup.  I got 3 through 10.

20             MR. PURCELL:  -- he talks about the type of work

21   he performed which was financial and accounting consulting.

22   Lines 16 through 25, he provided testimony about his

23   familiarity with Gulf Coast financial documents.  On the

24   next page, which is Page 8, Lines 1 through 5, he

25   established that he was familiar with the general ledger of

1    Gulf Coast and that he had access to the general ledger.

2              THE COURT:  Yeah.

3              MR. PURCELL:  We then skip, please, to page --

4              THE COURT:  Hold on a second.  You said it was

5    page -- what were the lines?

6              MR. PURCELL:  I'm sorry, Your Honor.  It was Page

7    8, Lines 1 through 5.

8              THE COURT:  Yes, he did have access to the general

9    ledger.

10             MR. PURCELL:  He was familiar with it, yes, Your

11   Honor.  Next we skip to Page 15.

12             THE COURT:  Right, because then there was

13   discussion about whether it was the same document.  I

14   remember.  10 through 15, right?  So we've got to go to 15.

15             MR. PURCELL:  Yeah.  Lines 19 through 23, again,

16   reestablishing his familiarity with the general ledger.

17   He's asked about how it's maintained and that continues on

18   to Page 16.  He testifies that it's maintained on the

19   Peachtree accounting software.

20             THE COURT:  Right.  So let's stop at 16, 10

21   through 12.

22             MR. PURCELL:  Yes, Your Honor.

23             THE COURT:  Where they made at or near the time of

24   the transfer?  I can't answer these questions since I was

25   only there for four days a month.

1      MR. PURCELL:  Yes, Your Honor.  And we'll address

2    that again later in this deposition.

3      THE COURT:  All right.  This is why I'm asking the

4    question, right?  And who was responsible for maintaining

5    the ledger?  He would say --

6      MR. PURCELL:  Kevin Boston.

7      THE COURT:  Kevin Boston.  But if you look at 10-

8    12, he says, I was only there four days a month.  So I can't

9    say what happened all the time.  Right?

10      MR. PURCELL:  Correct, Your Honor.  But later --

11      THE COURT:  No, I'm just going through.  I'm just

12    telling you why I'm asking the question.  This is why -- I

13    didn't want to.  I was going to issue an order but I wanted

14    to make sure I knew what -- whether you were seeking

15    admission of any documents so that we were clear.  And then

16    what the basis for the admission of the document because I

17    did recognize that there were some that were already

18    admitted in the EEPB docket.  So I just wanted to make sure

19    that we had a clean record.  So, okay.

20      MR. PURCELL:  And Your Honor, just to make clear.

21    I want to keep going through this, but if we would jump, I

22    think we could answer this issue.

23      THE COURT:  No, no, no.  Just keep -- I'm just

24    telling you why I asked the question.  Right?

25      MR. PURCELL:  Fair enough, fair enough.  Okay, if

1    we could skip to Page 18.

2              THE COURT:  Okay.

3              MR. PURCELL:  Lines 7 through 8, Mr. Tomaszewski

4    testifies that he did periodically check the general ledger

5    to make sure that transfers were being accurately recorded.

6              THE COURT:  Okay.

7              MR. PURCELL:  So he didn't enter everything.  But

8    he checked to make sure everything was being accurately

9    recorded at least.  If we continue on to Lines 14 through

10   19, that he was checking the ledger on the days that he was

11   working at Gulf Coast.

12             THE COURT:  Okay.

13             MR. PURCELL:  If we continue to Page 19, Your

14   Honor, please, at the bottom of Page 19.  He further

15   testifies that he used the general ledger to create and the

16   information maintained on the Peachtree accounting system on

17   which it was maintained to create financial documents for

18   Gulf Coast.  That would include the balance sheets, income

19   statements at the relevant time that we talked about, which

20   was 2017 and 2018.  If we continue on to the top -- that

21   answer, excuse me, continues on to the top of Page 20, Lines

22   1 through 6.  If we then skip to the bottom of the page,

23   Lines 20 -- I'm sorry Lines 15 --

24             THE COURT:  On Page 20?

25             MR. PURCELL:  On Page 20 and continuing to Line 6

1    on Page 21 --

2             THE COURT:  Hold on.  So 15 through Line 6.

3             MR. PURCELL:  Yes.

4             THE COURT:  Okay.

5             MR. PURCELL:  Mr. Tomaszewski establishes that he

6    transmitted portions of the general ledger to EEPB, who

7    we've heard from.  And that EEPB used the documents he

8    personally transmitted to create Gulf Coast tax returns.  If

9    we continue on that page, Lines 15, continuing on to Page 22

10   Line 3 --

11            THE COURT:  On what page?

12            MR. PURCELL:  Same page, 21 Line 15 and then

13   continuing on to the top of Page 22, Mr. Tomaszewski

14   testifies about the contents.  He was familiar with the

15   contents of the general ledger.  He testified that included

16   --

17            THE COURT:  Wait, wait.  Do you know if the

18   general included receipts?  That's not the contents of the

19   general ledger.  That's general receipts from sales of

20   asphalt and payments for goods and services.  So yes to

21   that.  No to the broader contents of the general ledger.  I

22   don't see the word "contents" of the general ledger.  That's

23   what I'm saying.

24            MR. PURCELL:  Your Honor, yes, I'm sorry but I'm

25   establishing items.  He was familiar with these particular

1    items that were identified within the general ledger.

2          THE COURT:  Agreed.  I just want to make sure that

3    we're really specific about what you're saying.

4          MR. PURCELL:  Yes, thank you, Your Honor.  He

5    acknowledged that the general ledger included asphalt

6    payments.  As we continue, he states that included receipts

7    from -- I'm sorry we have that -- payments for goods and

8    services in 2017 and 2018.  It included -- continuing on to

9    Page 22 -- it included cash transfers to Arthur Brass and

10   Joyce Brass in the years 2017 and 2018.  If we continue on

11   the very bottom of Page 22, this is where Mr. Tomaszewski

12   authenticates the general ledger.  We asked him what it is.

13   He identifies it.

14         THE COURT:  What line are you referring to?

15         MR. PURCELL:  On, continuing on to the Page 23,

16   Your Honor.

17         THE COURT:  I'm going to put up what was Exhibit

18   3, yeah, the Excel spreadsheet.  Yes.

19         MR. PURCELL:  Okay.  So I have him confirm the

20   name of the document there on Page 23.  So we're very clear

21   about what we're discussing.  If we can then jump please,

22   Your Honor, to Page 26, Line 13.

23         THE COURT:  Okay.

24         MR. PURCELL:  And this is where Mr. Tomaszewski is

25   pretty specific about what this is.  I asked him to identify

1    the spreadsheet.  He states what it is, it's -- and how he

2    can identify it as the general ledger.  It has accounting

3    numbers, IDs, et cetera.  I asked him whether it's a portion

4    of the general ledger.  He said it appears to be.  He says

5    that a couple of times continuing from Page 26 to Page 27.

6    And then if we could, Your Honor, jump to Page 54.  The

7    bottom of Page 54, starting Lines 22.

8              THE COURT:  Okay.

9              MR. PURCELL:  Mr. Tomaszewski was asked about

10   identifying whether while working at Gulf Coast he reviewed

11   these financial documents, which includes the general

12   ledger, and he says yes.  If you continue on to Page 58, and

13   this is where I want to address the issue from earlier about

14   Mr. Boston, sorry, Page 58, thank you, Your Honor, Mr.

15   Boston inputting most of the data starting at Lines 13, Did

16   you rely on the information input by Mr. Boston into the

17   general ledger to create financial documents?  He says he

18   personally prepared these important financial documents,

19   consolidated balance sheets, and income statements by

20   information pulled from the Peachtree accounting system that

21   maintained the general ledger.  And then that continues on

22   Page 59, Lines 1 through 8 that he, in fact, also relied on

23   that same information to transmit financial data to EEPB to

24   prepare Gulf Coast tax returns.

25              So, Your Honor, I would stipulate -- or I would

1    submit that --

2              THE COURT:  So I've gone through everything now.

3    So tell me where he testifies as to how the ledger is

4    prepared.

5              MR. PURCELL:  Well, I think we were looking at

6    that earlier.  He stated that Mr. Boston input most of the

7    data and that he here testifies that he relied on the

8    information.

9              THE COURT:  I got that.

10             MR. PURCELL:  Okay.

11             THE COURT:  How did Mr. Boston do it?

12             MR. PURCELL:  In the Peachtree accounting system.

13   I think we have that a few times that Mr. Boston input the

14   data into the Peachtree accounting system.

15             THE COURT:  Tell me where it's made at or near the

16   time.

17             MR. PURCELL:  Well he doesn't specifically use

18   those words "at or near the time."

19             THE COURT:  Tell me, tell me what you think

20   satisfies that prong of the business record exception.

21             MR. PURCELL:  That he stated that he reviewed --

22   the four days a month that he was at Gulf Coast, he reviewed

23   the entries into the Peachtree system for their accuracy.

24             THE COURT:  Okay.

25             MR. PURCELL:  And I can find that page and line if

1    the Court --

2              THE COURT:  No, I remember.  I just want -- I'm

3    thinking of the elements and I want to make sure.  You

4    walked me through things and I just want to make sure that I

5    understood what the argument was as to their admissibility.

6    Okay.

7              Mr. Patterson, there were hearsay objections here.

8    I've got them there, foundational.

9              MR. PATTERSON:  Right.  I'm (indiscernible).

10             THE COURT:  Okay.  Let me just get there, Mr.

11   Patterson.

12             MR. PATTERSON:  (indiscernible).

13             THE COURT:  All right, Mr. Patterson, can you just

14   get closer to the mike?  I want to make sure we can hear you

15   pretty well.  Okay.  Thank you.  What line?

16             MR. PATTERSON:  (indiscernible).

17             THE COURT:  Okay.

18             MR. PATTERSON:  (indiscernible).

19             THE COURT:  Okay.

20             MR. PATTERSON:  (indiscernible).

21             THE COURT:  Take your time.

22             MR. PATTERSON:  (indiscernible).

23             THE COURT:  I'm not going to admit 3.  I'm going

24   to tell you why.  You know I look at even sentences, I see

25   nothing in here knowing that when Mr. Tomaszewski testified

1    that the ledger, entries in the ledger were made at or near

2    the time that they were made.  I also find interesting your

3    question, Do you know if GCAC maintained this ledger as

4    general part of his regular business activity?  You asked

5    him to elaborate.  You said, Do you know if the ledger was

6    kept up?  And he said, I can't say if it was done on a

7    regular basis with, you know, me not being there all the

8    time.  I couldn't honestly say, no, I wouldn't know.  This

9    doesn't satisfy.  It's not made out any of the time.  You

10   can't testify whether it's part of the regular conducted

11   activity.  I think 803(6) is pretty straightforward.  I do

12   believe, though, that the other exhibits are already

13   entered.  So we don't have to cross that bridge what I would

14   call Vitol 111, Vitol 113.  Those are already admitted in

15   the record.  And GCAC, what I would call Vitol Exhibit 109

16   is not a business record.  I shouldn't say -- I should say

17   Mr. Tomaszewski cannot testify to establish the business

18   record exception to the hearsay rule based on his own

19   testimony.  He showed up four days a week and not to say

20   that he couldn't have done it.  He just -- when you look at

21   the testimony here, you don't have enough to overcome -- to

22   satisfy what's required under 803(6).  And I'm looking at

23   this on Page 17.  Asked did he ever review it for accuracy?

24   He says that's a tough question.  And really, you know, so

25   he doesn't know whether the record was made at any other

1    time -- or I should say there's no evidence of that.  And he

2    doesn't testify affirmatively that the record was kept in

3    the course of a regularly conducted business activity.  So

4    for that reason, I'll make rulings as to the testimony and I

5    will enter an order on that, but it doesn't come in.  The

6    parties are -- my understanding is the parties aren't

7    seeking the admission of any other document.  But I would

8    note for the record that 111 and 113 are admitted in another

9    form through business records EEPB.  So anything else we

10   need to talk about with Mr. Tomaszewski?

11         MR. COOLEY:  Your Honor, I think that takes care

12   of Item 1, Mr. Tomaszewski.  The next thing I wanted to pick

13   up was, as I said, we exchanged draft admitted exhibits list

14   with counsel.  We provided that to them.  They had a chance

15   to look at it.  And there were  two points of disagreement.

16   One is a legal issue and one is a factual issue I think we

17   can resolve.

18         The legal issue concerns the extent to which

19   certain documents are being made the subject of judicial

20   notice rather than being fully admitted.  We've had a few

21   documents of which the Court has taken judicial notice.

22   We've had a whole lot of back and forth in court about what

23   that means and what that can and cannot include.  We have --

24   we disagree with counsel on the extent to which the Court

25   may take judicial notice of a document.  For example, can

1    the Court take judicial notice that an allegation was made?

2    Not whether it was true, but that an allegation was made in

3    a document, for example, a court filing.  We believe that it

4    can.  We have submitted, we have filed a short trial brief

5    on the docket in the last few days.

6           THE COURT:  My apologies to the associate who had

7    to draft that but go ahead.

8           MR. COOLEY:  Everyone is getting a lot of

9    education in this one, Your Honor, from top to bottom.  We –

10   – I don't need to argue that issue here today.  I'm

11   satisfied to rest on our papers, but I wanted to flag that

12   one.

13          THE COURT:  Okay.

14          MR. COOLEY:  The other issue I think that we may

15   need to address, although, I think we can, is there's a

16   disagreement regarding Vitol 124.  The Court may recall this

17   was a collection of bank statements, predominantly.  We

18   removed some blank pages from it and poor Mr. Purcell stood

19   up here on August 31st and read into the record Pages A to

20   B, C to D, E to F, all the way down the line.  Then Mr.

21   Patterson took the records custodian, Miss Kim Williams, on

22   a voir dire --

23          THE COURT:  Oh, yeah.

24          MR. COOLEY:  -- following which the Court, Mr.

25   Purcell re-urged the admission of the previously described

1    pages and the Court, we understood, admitted those

2    previously identified pages.  I have copies of the

3    transcript if that would be helpful.

4              THE COURT:  What's the docket number?

5              MR. COOLEY:  I don't know --

6              THE COURT:  What's the issue?  Why don't we start

7    there.

8              MR. COOLEY:  So my understanding from Mr.

9    Patterson and his redline back to us, he struck out most of

10   the page counts of that list that we had included and left a

11   smaller number of three or four page counts.  I'm not sure

12   where those come from.  I've sent Mr. Patterson a copy of

13   the transcript and kind of told him where we're coming from.

14   I'm not sure his position on it.  This was happening this

15   morning and that's kind of where that issue sits.  And I

16   think Mr. Patterson may be about to tell us where he's

17   coming from on it.  But I also have paper copies of the

18   transcript.  I'm happy to walk through that if it becomes

19   necessary.

20             THE COURT:  Mr. Patterson.

21             MR. PATTERSON:  We can look at it, Judge.  I'm not

22   sure why we're taking time to do this today unless they need

23   something for Mr. Tomaszewski  -- or from Mr. Dietz.

24             THE COURT:  That makes two of us.

25             MR. PATTERSON:  I just didn't have time.  I said

1    these can probably be resolved by looking at the

2    transcripts.  They were trying to do it at ten o'clock this

3    morning and I wasn't able to take the time to do it.  That's

4    all.

5              THE COURT:  Got it.

6              MR. PATTERSON:  I've responded what's in my

7    records.

8              THE COURT:  Right.

9              MR. PATTERSON:  And I told them the disagreements

10   can be probably cleared up with the transcript.  I don't

11   know why we're -- I'm happy to show you what I have.  My

12   records indicate --

13             THE COURT:  I don't want to take it up.  If Dietz

14   is an expert, why does it matter for purposes of today?

15             MR. PATTERSON:  I just wanted to make sure to the

16   extent because that was a document concerning -- containing

17   financial records.  To the extent we get into that document,

18   I didn't want to get into an issue of whether or not I could

19   question him about those documents.  If we can proceed

20   through the examination to the extent those come up, then

21   what's actually evidence in the record, the Court can

22   determine.  I mean experts are allowed to rely on hearsay,

23   even if it turns out I'm mistaken.

24             THE COURT:  That's what I'm trying --

25             MR. PATTERSON:  I just wanted to -- I wanted to

1    flag the issue because I didn't want this to frankly disrupt

2    the testimony if we get into it and there's suddenly an

3    issue.  I'm just trying to be proactive with the issues.

4    That's all.

5              THE COURT:  Okay.

6              MR. COOLEY:  I'll do.  I'll do whatever the Court

7    wants to do.

8              THE COURT:  No, I'm not taking that up today.  I

9    think the parties can work that out.  I think the expert can

10   testify as an expert and we'll take up issues as they come

11   along.

12             MR. PATTERSON:  And to take a step back, judicial

13   notice, the Court's ruled.

14             THE COURT:  What's what I said.  The Court's rule

15   will be the Court's rule.  And it is what it is.  I'm not

16   taking up that issue either.

17             MR. PATTERSON:  Three strikes on all of these

18   objections is just taking forever.

19             THE COURT:  No, no. I just think judicial notice

20   is what judicial notice is and it is what it is.  And the

21   Court can take judicial notice of what it can and what it

22   can't.  That's all I mean.

23             MR. PATTERSON:  And so my housekeeping is that it

24   might be efficient -- I have some -- based upon what I've

25   read, I'm going to have some objections to Mr. Dietz's

1    testimony.  I don't know if you want to talk about those

2    before he gets on the stand or not, just so we're all kind

3    of prepared, or just let me hit it at the time.  I'm happy

4    to do it either way.

5              THE COURT:  I don't know what you're going to say,

6    so that's tricky.

7              MR. PATTERSON:  There are two issues.

8              THE COURT:  I don't know what you're going to say.

9    So --

10             MR. PATTERSON:  I'm just telling the Court I'm

11   happy with Mr. Dietz, I'm happy to give the Court a roadmap

12   of what I'm going to be doing so you can think about it or

13   I'm happy to do it as we go.  So either one.

14             THE COURT:  The rooms in both of these -- are we

15   clear to have open discussion at this point?  I don't know

16   who else is in the room?  I'm just looking around.

17             MR. PATTERSON:  No one, but Mr. Dietz, I would

18   want him to step out.

19             MR. COOLEY:  Mr. Dietz is in a room.

20             THE COURT:  Mr. Dietz is outside.

21             MR. PATTERSON:  Because I'm going to argue about -

22   -

23             THE COURT:  Is everybody else okay to be in or do

24   we need to remove anyone?

25             MR. COOLEY:  Everyone else is okay.

```
1            MR. PATTERSON:  Okay.  I think everyone else is
2     fine.
3            THE COURT:  Okay.  I only ask because I'm -- well.
4            MR. PATTERSON:  I assume that there's no one on
5     the camera that that's mine shouldn't be.
6            THE COURT:  And we can -- what I'm going to do is
7     mute the line.  So how did we mute outgoing?  Okay.  I have
8     muted the outgoing and then I don't know who left the room
9     but I don't need to know.  But as long as we -- are we
10    comfortable proceeding?  It sounds like it's just lawyers
11    in-house.
12           MR. COOLEY:  That's correct, Your Honor.
13           THE COURT:  Okay.  All right.  This is just a
14    roadmap only judge.
15           MR. PATTERSON:  Roadmap only, Judge.
16           THE COURT:  Got it, okay.
17           MR. PATTERSON:  Just so we can all kind of think
18    about it.  I generally don't like to do it just because
19    these smart guys over here will get six associates on it,
20    while -- before they ever stand up.  So number one, and let
21    me get this report, I don't know if they're going to offer
22    but I'm going to object to the entry of the report itself.
23           THE COURT:  All right.
24           MR. PATTERSON:  But I want to show you a couple of
25    things.
```

         1          THE COURT:  Hold on a second, Mr. Patterson.

         2  There's someone I just need to mute.  Start getting your

         3  stuff together.  I'm going to mute the line here.  Mr.

         4  (indiscernible), I can still hear you.  You need to mute

         5  your line.  Oh, that's right.  I forgot.  Folks, this is

         6  Judge Lopez.  I can still hear you.  You need to make your

         7  line.  Just give me a second, Mr. Patterson.

         8          MR. PATTERSON:  So --

         9          THE COURT:  Hold on a second, Mr. Patterson, I

        10  want to mute, I want to mute that line to make sure I can

        11  hear you just fine.  Because I didn't get through the whole

        12  Chapter 13 panel.  It takes a few seconds to kick in, Mr.

        13  Patterson.  Hold on a second.  There we go.

        14          AUTOMATED VOICE:  Conference muted.

        15          THE COURT:  I'm sorry, go ahead.

        16          MR. PATTERSON:  Okay.  So if we look at his, what

        17  was produced as his report --

        18          THE COURT:  Where would I find that?

        19          MR. PATTERSON:  It's -- if you'll turn the screen

        20  on, I have it, but it's a listed exhibit.

        21          THE COURT:  I'll just do that.  It makes it

        22  easier.

        23          MR. PATTERSON:  You'll see in Paragraph 2; you'll

        24  see this is his declaration of what he was asked to do.  And

        25  you'll see here in 2, I was asked to prepare a summary of

1   the accounting for Vitol GCAC transactions.  Right?  And

2   then he says the documents that I considered are attached.

3   But what the evidence I believe is going to show you is that

4   he based his calculations on a spreadsheet prepared by

5   Vitol.  That's it.  No source documents, nothing beyond what

6   Vitol gave him in the form of Excel spreadsheets or emails.

7   Right?  Number one, that's not an expert opinion to provide

8   a summary, right?  To say, here's, here's what we think it

9   is.  Can you summarize it for your report?  That requires no

10  expertise and is not an expert opinion.  And, in fact, it's

11  merely utilized to circumvent the hearsay rules that we've

12  dealt with all along.  There's a Fifth Circuit case that I

13  think is really instructive.  It's 705 F.3d 518.  It's a

14  2013 Fifth Circuit case, Factory Mutual Insurance Company

15  versus Alon, A L O N.  And what the Fifth Circuit said is

16  that expert witnesses may base opinions on facts or data the

17  expert has been made aware of or personally observed.  And

18  then it goes on to talk about what experts generally rely on

19  in the field and then it says courts nevertheless must serve

20  as a gatekeeping function with respect to Rule 703 opinions

21  to ensure the expert isn't being used as a vehicle for

22  circumventing the rules of evidence.  It wasn't, 703 wasn't

23  intended to abolish the hearsay rule and to allow a witness

24  under the guise of giving expert testimony to in effect,

25  become the mouthpiece of the witnesses on whose statements

1    or opinions the expert purports to base his opinion.

2         And I believe, and we're going to argue that we

3    believe Mr. Dietz merely took information from Vitol.  He

4    didn't go in and look at the trade tickets.  He didn't go in

5    and look at purchase orders, invoices.  He didn't follow the

6    money.  He took the information and he's going to

7    regurgitate it to the Court as an expert opinion.  And I

8    think it's improper.

9         THE COURT:  Okay.

10        MR. PATTERSON:  And so my plan was to, as they get

11   to that piece, ask the Court to take him on voir dire and

12   investigate the basis of this expert opinion.  And so I

13   think you can kind of see why I didn't want him in here to

14   talk about that.

15        THE COURT:  No, I appreciate that.

16        MR. PATTERSON:  But based upon what we've seen and

17   read, that's all he's done.  And it's improper and he can't

18   sit up there and say, oh Mr. Brass or GCAC owes Vitol $15

19   million based upon my summary.  Right?  Which is all he was

20   asked to do.  And he can't go beyond this now.  And so

21   that's not an expert opinion.  That is anything an

22   accounting clerk could do is take the spreadsheet and

23   summarize it.

24        THE COURT:  Okay.  For what purpose is the expert

25   being offered today?  My understanding was for solvency.

1   Did I get that wrong?

2          MR. COOLEY:  No, Your Honor.  He is being

3   presented today primarily on two areas.  The first is

4   solvency.  The Court is correct.  And the second is on the

5   accounting and tabulation of the transfers from GCAC to Mr.

6   Brass, to his mother, or for their benefit.  The transfers

7   that are the subject, the basis of the Husky claim.  That's

8   one of the tasks that was described in his report as the

9   items for which he was engaged.  So those are the two main

10  items.  I hear Mr. Patterson's objection.  I appreciate the

11  heads up.  I thought counsel said there were two items

12  unless that was both items kind of together, that seemed

13  like just one item, but maybe I misheard

14         MR. PATTERSON:  The admissibility.

15         MR. COOLEY:  Oh, I'm sorry.  Yeah, the

16  admissibility, understood.  And we understand the case law

17  surrounding that.  What Mr. Patterson describes sounds like

18  appropriate subject for cross-examination.  And he'll

19  certainly have that opportunity, but the Court will decide

20  when it's going to be taken up.  I'm not going to deal with

21  the facts or the allegations because the witness is the only

22  person the Court needs to hear from about that.  I am

23  familiar with the Factory Mutual Insurance versus Alon USA

24  case.  And what the Circuit goes on to say after it says the

25  expert witnesses may base opinions on facts or data that the

1   expert has been made aware of or personally observed, is it

2   goes on to say if the facts and data relied upon are the

3   sort that experts in that field would reasonably rely upon,

4   which tracks the rule, then those facts need not be

5   admissible for the opinion to be admitted so long as the

6   information is the sort reasonably relied upon in the

7   experts field, the purpose of this rule is largely

8   practical.  Experts generally base their opinions on

9   information, which to be admissible in court, would entail

10   the expenditure of substantial time in producing and

11   examining various authenticating witnesses, something we

12   have regrettably endured in this case.  And then it goes on

13   to explain that experts are allowed -- so and I just wanted

14   to raise that the Court will -- at the appropriate time, the

15   Court may take the opportunity to look at the case, but I

16   just wanted to flag that I'm familiar with the case.

17          THE COURT:  I'm familiar with the case.  But I

18   understood Mr. Patterson's objection was kind of twofold.  I

19   didn't hear it the solvency, but as to the accounting and

20   tabulation portion of it and that's really not, you know,

21   that doesn't require an expert for it, right?  That's simple

22   math that anyone can do and it doesn't require expertise to

23   then look at an accounting ledger and say that the money

24   went from A to B, if I understood -- that's my understanding

25   from what Mr. Patterson was saying, that that's what he

1    wanted to take him up on, that that doesn't require expert

2    testimony.  So that's why I was asking --  Mr. Patterson, if

3    I got that wrong, I need you to really tell me because

4    that's was --

5              MR. PATTERSON:  No, that's correct.

6              THE COURT:  Okay.

7              MR. COOLEY:  And we can delve into that on cross-

8    examination.

9              THE COURT:  Okay.  That was the Part B that I was

10   hearing in him.  So it was kind of more of a foundational.

11   Is this the subject of expert testimony on that?  Not for

12   this -- I'll let him argue what he wants -- but that was the

13   part that he directed me to that related to this tabulation

14   portion.  And I'll have to hear about it and see what he

15   said.

16             MR. COOLEY:  And rather than me previewing it, I'm

17   just going to let the witness speak for himself.

18             THE COURT:  Yeah.  I'm glad we had this

19   discussion.  It gives me a heads up to think about some

20   things and I -- but I also wanted to flesh out a little bit

21   what Mr. Patterson was arguing.  Why don't we, why don't we

22   bring the witness in and then we'll get him going.  Miss

23   Mehta are you going to --

24             CLERK:  (indiscernible) Mike Pesce.

25             THE COURT:  Who is?  Mike Pesce?

1          CLERK:  Yes.

2          THE COURT:  Is Mr. Pesce in the courtroom?

3          MR. COOLEY:  He's coming in with --

4          THE COURT:  Oh, is that who we kicked off?

5          MR. COOLEY:  He's coming in with (indiscernible).

6          THE COURT:  Unfortunately, the Court can't call

7    you.  We're going to have to let someone bring you in.

8          MR. COOLEY:  Apologies, Your Honor.  Vitol calls

9    Mr. Gene Dietz.

10         THE COURT:  Okay.  Okay.  Just get close to the

11   mike.  I want to make sure we can all hear you.

12         MR. DIETZ:  Certainly, Your Honor.

13         THE COURT:  Do you swear to tell the truth, the

14   whole truth, and nothing but the truth?

15         MR. DIETZ:  I do.

16         THE COURT:  Okay, thank you very much.  And please

17   have a seat and we will -- the microphone, it's one of those

18   that if you point it in the right direction, it should pick

19   up your voice just fine.  Just please speak loud enough for

20   it to hear.  There may be objections that are lodged during

21   your testimony.  Just please give me an opportunity to

22   resolve the objection.  Okay, Mr. Martinez, if at any

23   point, just raise your right hand and let me know if you can

24   hear the witness, okay?  Okay.  All right.  Counsel, you may

25   proceed.

Page 33

```
1          MR. COOLEY:  Thank you, Your Honor.
2          DIRECT EXAMINATION OF GENE DIETZ
3    BY MR. COOLEY:
4    Q    Sir, would you state your name for the record?
5    A    Gene Lawrence Dietz.
6    Q    And would you describe to the Court just generally your
7    educational background and professional licensing?
8    A    Yes, of course, I graduated from Cal State Fresno in
9    1972 with a bachelor's degree in economics.  And after my
10   graduation, I went to work for an accounting firm in Fresno,
11   California called Stoughton, Davidson, DenHartog, and Cowan
12   and became a CPA in 1975 in California.  And ever since that
13   year, I've maintained an active CPA license in California.
14   In 2003 or '04, I became a CPA in New York, as well as
15   Pennsylvania one or two years after that.  I hold
16   certifications in valuation.  I have an ASA, Senior ASA.
17   I'm ABV accredited in business valuation from the American
18   Institute of Certified Public Accountants.  I have
19   certifications in entity and intangible valuation,
20   certifications in financial instrument valuations,
21   certifications in financial forensics.  I have been an
22   auditor, audit partner, tax partner in practice.  And every
23   year since the early 1970s, I've taken 40-80 hours of
24   continuing professional education to maintain my licenses
25   but also maintain my areas of practice and expertise.
```

004307

1    Q    And so sitting here today, are all of the licenses and

2    certifications you described, are all of those active?

3    A    Yes, they are.

4    Q    You mentioned being certified in financial forensics.

5    Can you explain to the Court what financial forensics is?

6    A    Certainly.  So financial forensics is where I would use

7    my audit and accounting background to analyze financial

8    transactions, the finances of the company, or the reporting

9    of financial transactions in a financial statement for

10   financial reporting.

11   Q    Can you give me a for instance?

12   A    Sure, I can give you -- of course.  So as an example, I

13   was an independent examiner appointed in the DOJ Swiss Bank

14   Program which sent me to Zurich to analyze thousands and

15   thousands of bank records because the IRS and the DOJ Tax

16   Division were concerned about tax reporting and compliance

17   for offshore accounts.  So I would look at thousands and

18   thousands of bank records at private Swiss banks, prepare a

19   report on those transactions -- it was coded because you

20   couldn't use their name --  and report directly to the Tax

21   Division of the DOJ as well as the Criminal Division of the

22   IRS.

23   Q    Was that particular expertise in -- or that particular

24   experience in financial forensics at all relevant in this

25   engagement?

1    A    It is because -- I was going to add it is because in

2    addition to that example, there's cases where you're looking

3    at detailed financial records of individuals' borrowing,

4    repayments, loans.  And in this case, I did a forensic

5    analysis of the loans to repayments of those loans for the

6    loan accounts of A.J. Brass and Joyce Brass.

7    Q    Describe for the Court, again, just briefly, some of

8    your experience in connection with -- in evaluating the

9    solvency or insolvency of business enterprises.

10   A    Sure.  So I've had several expert appointments or

11   qualifications for entities that have in litigation or

12   bankruptcy litigation.  For example, last summer, in the

13   Stone Panels case, which was a fraudulent conveyance case,

14   where I opined on the solvency of Stone Panels in a

15   refinancing where they took out several million dollars of

16   money as part of that refinancing.  Prior to that, I had

17   several cases for Bank of America related to the acquisition

18   of Countrywide Home Loan and Bank of America's roll up of

19   the Countrywide assets into their operations.  Prior to

20   that, I've done a significant amount of work in the Lehman

21   Brothers failure for Lehman Brothers Special Finance and

22   litigation about when they became bankrupt as a subsidiary

23   of the parent Lehman Brothers and other bank acquisitions.

24   The Lloyds Group acquisition of HBOS in London where there

25   was alleged failure of the subsidiary upon acquisition.  All

1    of those had the consideration of solvency.  Did they pass

2    the balance sheet tests?  And most of those also had the

3    other two tests, the capital adequacy test, as well as the

4    cash flow test.

5    Q    Do you have any particular tax experience or expertise?

6    A    I do.  I was a tax partner at Stoughton Davidson for 20

7    years.  I have prepared individual, partnership, and

8    corporate returns.  I've handled those returns on audit and

9    done other consulting in audits before the Internal Revenue

10   Service.  I've testified in the United States Tax Court.

11   And I have maintained an active membership in the tax

12   section of the AICPA.

13   Q    In your work, do you ever have occasion to analyze the

14   tax consequences of a transaction for a client?

15   A    Regularly for the last 30 plus years.

16   Q    And where are you currently employed?

17   A    Ankura Consulting.

18   Q    When did you join Ankura?

19   A    August of 2018.

20   Q    Have you ever testified before as an expert witness in

21   a court proceeding?

22   A    Yes.

23   Q    On what subjects, if any, have you previously been

24   qualified as an expert?

25   A    Solvency, the three tests I talked about: the balance

1    sheet solvency, capital adequacy, and cash flow, valuation,

2    damages and other topics as well.

3    Q    If you can say approximately how many times have you

4    been qualified as an expert witness in one topic or another?

5    A    I would estimate north of 50 times.

6    Q    Have you ever not been qualified?

7    A    No, I've never not been qualified.

8    Q    Have you ever had any of your opinions excluded by a

9    court?

10   A    On one occasion, I had three of my opinions excluded

11   and the rest of my opinions admitted in a case called -- it

12   was 2012.  I'll think of the name and I'll mention it on the

13   record before I go today.  Stoker, I apologize, Brian

14   Stoker.

15   Q    In connection with your engagement by Vitol in this

16   particular case, did you prepare a written report of your

17   analysis and conclusions?

18   A    I did, yes.

19   Q    Mr. Pesce, could I have Vitol Exhibit 97?

20            THE COURT:  Allow me.  I need to make Mr. Pesce a

21   presenter.  I just want to make sure he was in the room or

22   in the virtual room.

23            MR. COOLEY:  He's sitting right here at the

24   counsel table.

25            THE COURT:  All right.  Just a second.

 1          MR. COOLEY:  And could we have page -- well,

 2   actually, Your Honor, it's been brought to my attention the

 3   outgoing line is still muted.  So people on the phone can't

 4   hear.

 5          THE COURT:  Well, folks, we muted the line.  You

 6   missed nothing.  Please proceed.

 7          MR. COOLEY:  No offense taken, Your Honor.

 8          THE COURT:  No, no, we just covered background

 9   facts.  No major objections.  We listened to Mr. Dietz's

10   background.  I appreciate it, folks.

11   BY MR. COOLEY:

12   Q    Mr. Pesce, would you scroll down just a bit.  Mr.

13   Dietz, do you recognize this document?

14   A    I do, yes, Mr. Cooley.

15   Q    Okay.  And Mr. Pesce, would you go to I think PDF Page

16   3?  Perfect.  And this is the total -- I'll just note this

17   is a 65-page total PDF page count document.  Mr. Dietz, is

18   this the report that you were just referring to?

19   A    This is the cover page of the report I was referring

20   to.  Yes.

21   Q    And does this report contain the analysis and opinions

22   that you performed and rendered in this case?

23   A    Yes.  It contains all of my opinions and the underlying

24   analysis supporting those opinions, including the work that

25   I've done, the documents I relied upon, and the

1   methodologies I applied.

2   Q    Mr. Pesce, could I have PDF Page 47?  Excuse me, 43, I

3   think.  And let's go up a page.  Actually, let's go to PDF

4   Page 40, I apologize.  Let's scroll up just a little bit

5   more.  That's fine.  Do you recognize this portion of the

6   report that's on the screen?

7   A    I do, yes.

8   Q    Can you tell me what it is?

9   A    Yes, it's my CV.

10  Q    And if we scroll down to PDF Page 44.  Does this appear

11  to be the last page of your CV within that, within that

12  document?

13  A    It does, yes.

14          MR. COOLEY:  Your Honor, I would move for the

15  admission of what's noted in here as Appendix 1 to the

16  report, which is simply the witness's CV found at Pages 40

17  to 44.

18          MR. PATTERSON:  (indiscernible).

19          THE COURT:  Yeah, we're not admitting any expert

20  reports.  He can testify today.  I'll overrule.

21          MR. COOLEY:  I'm sorry, I just want --

22          THE COURT:  Excuse me, I'm sustaining the

23  objection.

24          MR. COOLEY:  I just wanted to make sure I

25  understood.  Very well.

1          THE COURT:  Yeah, no, I appreciate it.

2    BY MR. COOLEY:

3    Q    On what general matters, just high level, on what

4    general matters were you asked to give an opinion in this

5    case?

6    A    The solvency of GCAC, both standalone and GCAC

7    Consolidated, the analysis of the transactions, what I'll

8    refer to as the GCAC Vitol transactions, and the additions

9    and repayments of transfers to the AJ Brass loan account on

10   GCAC standalone books and to Joyce Brass' loan account on

11   that same set of books.

12   Q    Are you here today to testify as to whether any

13   particular debt is dischargeable or nondischargeable?

14          MR. PATTERSON:  (indiscernible).

15          THE COURT:  Sustained.

16   BY MR. COOLEY:

17   Q    Do you have any particular expertise in the question of

18   dischargeability under bankruptcy law?

19          MR. PATTERSON:  (indiscernible).

20          THE COURT:  Overruled.

21   BY MR. COOLEY:

22   A    No.

23   Q    Are here today to testify on anything to do with

24   whether or not a particular debt is dischargeable?

25          MR. PATTERSON:  (indiscernible).

1          THE COURT:  Sustained.

2    BY MR. COOLEY:

3    Q    Does your report set out -- in your report, did you set

4    out the facts and data that you considered in arriving at

5    your opinions?

6          MR. PATTERSON:  Objection (indiscernible).

7          MR. COOLEY:  That's exactly what I'm --

8          MR. PATTERSON:  (indiscernible).

9          MR. COOLEY:  Exactly what I'm doing, Your Honor,

10   is educating the Court about the witness's background.

11   We're going to get into the work that was done and the

12   detail provided and so forth.  I'm not seeking to admit the

13   report.

14         THE COURT:  Why don't you ask it that way?  I'm

15   going to sustain the objection.

16   BY MR. COOLEY:

17   Q    Were there any documents that you were provided or

18   obtained to review in connection with your analysis?

19   A    Yes.  There was a significant amount of documents that

20   I was provided and that I reviewed carefully as part of my

21   work in this case.

22   Q    Did you maintain any kind of a list of those documents?

23   A    Yes, I did.

24   Q    Would that list be found anywhere?

25   A    It would be an appendix to my report.  It's

1     approximately 10 pages of documents that I considered and

2     reviewed in completed my analysis in this matter.

3     Q    Mr. Pesce, could I have PDF Page 45, please?

4          MR. PATTERSON:  (indiscernible)

5          MR. COOLEY:  May I respond, Your Honor?

6     I'm not seeking to introduce the report itself.  The

7     opinions, the conclusions will come from the testimony of

8     the witness.  But there are certain facts here, such as the

9     documents that are reviewed that go to the weight of the

10    report.  So the Court is aware --

11         THE COURT:  It's not the weight of the report.

12    The witness is going to testify.  Right?  So it doesn't go

13    to the weight of the report because the report is not going

14    to come in.  But if you want to --

15         MR. COOLEY:  What I meant was the weight of the

16    conclusions as to whether or not he relied on --

17         THE COURT:  In other words, why don't I do this?

18    Mr. Pesce, why don't take the report down?  Why don't you

19    just ask him what he reviewed and then you can ask him other

20    questions and we can proceed that way.

21         MR. COOLEY:  Yes, Your Honor.

22    BY MR. COOLEY:

23    Q    Describe for me generally, just generally in this case,

24    the categories of documents that you reviewed in the course

25    of your work?

1    A    Certainly.  So I reviewed certain bank statements for

2    GCAC, what I will refer to as the IberiaBank statements,

3    focusing particularly on July of '17 through January '18,

4    which I would refer to as the solvency period in my

5    analysis.  In addition to reviewing in detail the bank

6    statements during that period, particularly for Account 1036

7    and 1021, in GCAC's general ledger, I reviewed the

8    production by EEPB, which included all of the work papers

9    that they produced that were utilized in preparing the 2017

10   tax return for GCAC.  I reviewed several bankruptcy filings

11   and productions by Vitol relating to the GCAC Vitol

12   transactions that were entered into between July and January

13   of 2017.  I reviewed various pleadings and deposition

14   transcripts and performed analytical and accounting tasks to

15   satisfy myself that those records that I was using were

16   reliable and the like.

17   Q    Did you review any prepared financial statements?

18   A    I did.  I reviewed the balance sheet, consolidated

19   balance sheet of GCAC at June of '17, January -- I'm sorry

20   let me go through it more carefully -- January '17, February

21   of '17, March of '17, April of '17, May of '17, June of '17,

22   and December of '17, as well as December of '18.  And those

23   would be the consolidating financial statements that include

24   GCAC standalone, GCAC Holding, Crude Gathering, AJ Bullet,

25   and then the consolidated totals.

1    Q     Did you review any general ledgers?

2             MR. PATTERSON:  (indiscernible).

3             THE COURT:  Overruled.

4    BY MR. COOLEY:

5    A     Yes, I did.  I reviewed the general ledger of GCAC

6    Standalone from July 1st of '17 through July of '18.  In the

7    review of that general ledger, I took for each and every

8    bank statement I had from Iberia for Account 1036 and 1021,

9    I took each and every entry on each and every bank statement

10   and I traced it into the general ledger to satisfy myself

11   that the general ledger contained and accurately reflected

12   the information that was on the IberiaBank statements.  In

13   addition to that, I reconciled the sales of product, the

14   Vitol GCAC sales of product where GCAC sold that product to

15   Vitol's records that were produced to me in this case.  I

16   did the same thing for the contingent account payable that

17   was recorded on the general ledger of GCAC and reconciled

18   that to the production by Vitol.  In addition to that, I

19   took every line item in the general ledger, that now I have

20   satisfied myself contained all of the bank information from

21   Iberia, and I reconciled that not only to the financial

22   statements that Mr. Tomaszewski testified about, but to the

23   actual federal tax return that Mr. Wagner testified about

24   that was prepared by EEPB.

25   Q     Why would you undertake such a process in this

1    engagement?

2    A    To satisfy myself that there was internal consistency

3    and external consistency within the financial documents of

4    GCAC, that the general ledger clearly was supported by all

5    of the bank records, and that the general ledger clearly

6    supported the financial statements.  And the general ledger

7    and the financial statements clearly supported the 2017 tax

8    filings by GCAC.

9    Q    You said you wanted to satisfy yourself.  Did you?

10   A    Yes.

11   Q    And what did you, what did you find?  I concluded that

12   these were very reliable records to base my analysis on.

13           MR. COOLEY:  Your Honor, at this time before I

14   proceed further, I would tender Mr. Dietz as an expert under

15   Federal of Evidence 703 in the matters of general financial

16   accounting, valuation, insolvency, forensic finance and

17   general tax matters.

18           THE COURT:  Any objection?

19           MR. PATTERSON:  (indiscernible).

20           MR. COOLEY:  Your Honor, I would submit that he is

21   an expert in all of those areas going back to being a CPA

22   from 1975 forward.

23           THE COURT:  Can you identify those areas one more

24   time?

25           MR. COOLEY:  General -- and I think the one to

 1    which Mr. Patterson may be particularly objecting --

 2              THE COURT:  No, no, just list them first and then

 3    you can --

 4              MR. COOLEY:  Yes, Your Honor.  Yes, Your Honor.

 5    General financial accounting, valuation and solvency,

 6    forensic finance, and general tax matters.

 7              THE COURT:  How is one an expert in general tax

 8    matters?  What does that mean?

 9              MR. COOLEY:  Your Honor, I think the witness could

10    probably best answer that.

11              THE COURT:  Well, no, you're the one moving for

12    him as an expert.  And what does it mean?  What does it

13    mean?

14              MR. COOLEY:  Your Honor, what I'm referring to

15    here is the witness's particular expertise in matters of not

16    only preparing tax returns but advising clients on the tax

17    consequences of transaction -- particular transactions or on

18    the tax consequences of certain actions taken or not taken

19    within a filed tax return, which I think is squarely within

20    the scope of what the witness described he did for some 20

21    years as a tax partner.

22              MR. PATTERSON:  (indiscernible).

23              THE COURT:  Why don't you -- if you want to take

24    him up on voir dire, why don't you do that, Mr. Patterson?

25    And we can --

```
1              MR. PATTERSON:  Sure.

2                     VOIR DIRE OF GENE DIETZ

3    Q    (indiscernible).

4    A    2001.

5    Q    (indiscernible)

6              MR. PATTERSON:  (indiscernible).

7              MR. COOLEY:  Your Honor, may I redirect the

8    witness?

9              THE COURT:  Sure.

10             MR. COOLEY:  Just briefly.

11                    REDIRECT OF GENE DIETZ

12   BY MR. COOLEY:

13   Q   Mr. Dietz, since 2001, has any of your work involved

14   the advising of clients on the tax consequences of a

15   particular transaction?

16             MR. PATTERSON:  (indiscernible).

17             THE COURT:  Sustained.

18             MR. COOLEY:  Your Honor, I'm trying to answer --

19   get to a specific point.

20             THE COURT:  Why don't I just do this?  I'm going

21   to certify Mr. Dietz as an expert in general financial

22   accounting, valuation, solvency, forensic accounting and I

23   would note that the category of general tax consequences is

24   it's too broad of a scope, but certainly recognize that Mr.

25   Dietz has expertise in tax consequences in connection with
```

1   his line of work in general financial accounting and

2   forensic accounting.  It just necessarily flows from there.

3   But that's going to be subject to cross-examination as to

4   the extent of that as it applies in this case.  But general

5   tax matters may be a little bit too broad for today.  But

6   general financial accounting, valuation, insolvency,

7   forensic accounting, certainly certified for purposes of

8   today.

9          MR. COOLEY:  Understood, Your Honor

10          THE COURT:  Mr. Dietz, that doesn't mean that

11   you're not in in other areas.  Just based upon what I hear

12   today and what I -- where I think we're going, you're

13   covered.

14          THE WITNESS:  Thank you, Your Honor.

15          MR. COOLEY:  May I proceed, Your Honor

16          THE COURT:  Yes.

17          MR. COOLEY:  Very good.

18   BY MR. COOLEY:

19   Q    Before I tendered you as a witness, you were describing

20   to the court work you had done comparing certain documents

21   to other documents to determine if they were reliable, so on

22   and so forth.  Did you prepare any kind of work paper in

23   connection with that process?

24   A    I did.

25   Q    From what from what sources did you draw the

 1    information that you used for that analysis?

 2    A    From the GCAC general ledger and from the financial

 3    statements and from the federal tax return.

 4    Q    And when you say financial statements, can you be more

 5    precise for me?

 6    A    Sure.  So the financial statements for GCAC -- I

 7    apologize.  The standalone and consolidated financial

 8    statements for GCAC for 2017 in particular.

 9    Q    And are those documents something that an expert in

10    your field would ordinarily rely upon to form the opinions

11    you've been called here to provide?

12              MR. PATTERSON:  (indiscernible).

13              THE COURT:  Sustained.

14              MR. COOLEY:  Your Honor, may I respond?  That goes

15    to a specific element under federal rule.

16              THE COURT:  I know.  You're just leading.  You can

17    just ask him though.  Go ahead.  Ask him again.

18    BY MR. COOLEY:

19    Q    Are these are those documents that you ordinarily rely

20    upon in conducting analyses and rendering opinions such as

21    those you're giving here today?

22              MR. PATTERSON:  (indiscernible).

23              THE COURT:  Overruled.

24    BY MR. COOLEY:

25    A    Yes, they are.

1    Q    To your knowledge, are these documents that others in

2    the field similarly rely upon?

3              MR. PATTERSON:  (indiscernible).

4              THE COURT:  Overruled.  You can answer.

5    BY MR. COOLEY:

6    A    Yes, in all of my work, including expert work.  It is –

7    – it has been my experience consistently with myself and

8    others that have been in matters that I have been in or

9    matters that I've reviewed, that the financial statements

10   and the general ledger underneath those financial statements

11   are regularly used and regularly relied upon.

12   Q    Are these documents that you've described for this

13   particular case, are these documents voluminous in nature?

14   A    They are.

15   Q    Did you prepare a summary of the data to aid in your

16   analysis?

17   A    I did.

18   Q    Mr. Pesce, could I have Vitol Exhibit 101?  Mr. Dietz,

19   I've put up on the screen what has been marked as Vitol

20   Exhibit 101.  Do you recognize this document?

21   A    I do recognize it, yes, thank you.

22   Q    Can you identify to the Court?

23   A    Yes.  It's a document I prepared that starts on the

24   left hand side with the standalone GCAC, Judge.

25             MR. PATTERSON:  (indiscernible).

1                   MR. COOLEY:  I'll ask a follow-up question.

2    BY MR. COOLEY:

3    Q     Let's just start with is this the work paper to which

4    you were referring a moment ago?

5    A     Yes, it is.

6    Q     And does this document summarize any of the data that

7    you were describing that you reviewed?

8                   MR. PATTERSON:  (indiscernible).

9                   THE COURT:  Overruled.

10   BY MR. COOLEY:

11   A     It does summarize the general ledger, the financial

12   statements, and the tax return in 2017 for GCAC.

13   Q     And Mr. Pesce, could we drop down to the bottom of the

14   page for just a moment?  Do you see at the bottom where it

15   says sources?

16   A     Yes.

17   Q     Are you familiar with what those documents are?

18                  MR. PATTERSON:  (indiscernible).

19                  THE COURT:  Yeah, I'm sorry.  Who prepared this

20   document?

21                  THE WITNESS:  I did, Your Honor.

22                  THE COURT:  Okay.  Thank you.  I just needed to

23   understand that.  Thank you.

24   BY MR. COOLEY:

25   Q     And I just want to -- Mr. Dietz, if you would confirm

1    for me, are these the sources from which -- is what's listed

2    there the sources from which you prepared this document?

3              MR. PATTERSON:  (indiscernible).

4              THE COURT:  Overruled.  You can answer.

5              THE WITNESS:  Yes, they are the documents I used

6    to prepare this.

7              MR. COOLEY:  Your Honor, I move for the admission

8    of Vitol 101 as a summary of voluminous documents under

9    Federal Rule of Evidence 1006.

10             MR. PATTERSON:  (indiscernible).

11             MR. COOLEY:  If I may respond briefly, Your Honor?

12             THE COURT:  All right.

13             MR. COOLEY:  The rule does not require that the

14   documents have been admitted into evidence.  The rule

15   requires that the documents have been made available to the

16   other side.

17             MR. PATTERSON:  (indiscernible).

18             MR. COOLEY:  I'll read from the rule, Your Honor.

19             MR. PATTERSON:  (indiscernible).

20             MR. COOLEY:  Your Honor, the basic rule of 1006,

21   1st of all operates as a special exception to the hearsay

22   rule, that again comes back to the Fifth Circuit, 303 F,

23   Appendix 229.

24             THE COURT:  You're trying to get in a voluminous

25   record through an expert witness.  Is that what you're

1    trying to do?

2              MR. COOLEY:  A summary, Your Honor.

3              THE COURT:  Yeah.  Go ahead, keep going.

4    BY MR. COOLEY:

5    Q    Now, I don't want to go through every -- I'm not going

6    to go through every record on this page.  Could we have the

7    top of the page again please, Mr. Pesce?

8              THE COURT:  Here's the problem.  You're going to

9    have to show me that each document has to be independently

10   admissible.  It's not a backdoor vehicle and there's plenty

11   of case law on that.  So tell me how each one of these

12   documents is independently admissible.

13             MR. COOLEY:  If we could scroll to the bottom.

14   I'll just take them in reverse order.  The Item C refers to

15   -- and I'll represent to the Court and we can track down the

16   numbers, represent to the Court that's the tax documents

17   previously admitted.

18             THE COURT:  A is --

19             MR. COOLEY:  The general ledger, Your Honor.

20             MR. PATTERSON:  (indiscernible).

21             MR. COOLEY:  Very well.

22             THE COURT:  Why don't you just move on.

23             MR. COOLEY:  Mr. Pesce, you can take it down.

24   BY MR. COOLEY:

25   Q    Mr. Dietz, in the course of your analysis that you

1   described, tell me what steps you took -- what steps, if

2   any, you took two reconcile asset or liability categories

3   across documents?

4   A     So I took the general ledger for GCAC and I accumulated

5   the balance, the year-end balance in 2017 from all of the

6   accounts in the general ledger, the assets and the

7   liabilities.  And I grouped them, and I'll give you an

8   example of that, to match -- and they did match to the

9   financial statements, the GCAC financial statements.  And

10  for example when I say "group," there are five bank accounts

11  and the GCAC general ledger and one cash account in the

12  financial statements.  So you have to add up the five bank

13  accounts in the general ledger to get the total for the one

14  cash item on the financial statements.  And I did that for

15  all of the accounts where there was not a 1-1 match between

16  the line item in the general ledger and the line item on the

17  financial statement.  I satisfied myself that the amounts in

18  the financial statement for all the assets and all the

19  liabilities were those amounts that were in the general

20  ledger.  I performed a similar process from the financial

21  statements, assets and liabilities to the federal tax

22  return.  And the federal tax return, there's a page that

23  presents the beginning balance sheet, and in this case, that

24  would be the 12/31/16 balance sheet of GCAC Consolidated and

25  right next to it is the 12/31/17 balance sheet for GCAC

1    Consolidated in the federal tax return.  And the amounts

2    that were on the financial statements at 12/31/17 agreed to

3    the amount that represented in the federal tax return for

4    12/31/17 as well.

5    Q    And again, why did you perform that task as part of

6    this engagement?

7    A    The essence of that task is to look at the general

8    ledger that agrees to the financial statements and agrees to

9    a federal tax return that was filed under the penalty of

10   perjury.

11   Q    All right.  Let's move on to the first of your opinions

12   that I'd like to talk about, which is relating to solvency.

13   Generally described -- generally speaking, would you

14   describe for the Court -- you alluded to them by name

15   earlier -- but would you describe for the Court the

16   methodologies you used to evaluate solvency in this case?

17   A    Yes, I applied, I applied three tests.  One is referred

18   to as the balance sheet test and the second is referred to

19   as the adequate capital test and the third is referred to as

20   the cash flow test.  And I applied those tests and

21   methodologies in developing my opinion as to the solvency or

22   not of GCAC on a consolidated basis and GCAC on a standalone

23   basis.

24   Q    And for purposes of the work that you did here, what is

25   your understanding of what the balance sheet test examines?

1    A    The balance sheet test examines whether or not the

2    assets at a full and fair value exceed the liabilities of a

3    particular company, here GCAC standalone and GCAC

4    consolidated.  And if the assets at a full and fair value do

5    exceed the liabilities, then you would, you would find that

6    they were, from a balance sheet perspective on that test,

7    they were solvent.  And if the liabilities exceed the assets

8    of a full and fair value, then you would, you would, that

9    would indicate that they're insolvent and failed to balance

10   sheet test.

11   Q    And what about the capital adequacy test?  What is your

12   understanding of that test as you applied it here?

13   A    Capital adequacy looks at a cushion and a cushion that

14   would absorb the normal ebbs and flows of a business through

15   a normal cycle.  So that does the entity have adequate

16   capital or have access to capital that would provide a

17   cushion that could be reasonably expected to absorb the ebbs

18   and flows of a business?

19   Q    And the third one?

20   A    Cash flow test, how I think about that is do they have

21   the cash flow available to them to meet and pay their

22   obligations as they come due?

23   Q    Why did you use these three tests?

24   A    Those are the three tests that I would generally use,

25   and others in practice that I have seen and worked with,

1    would generally use to assess the solvency as well as the

2    capital adequacy and cash flow of a particular company.

3    Q    And you may have alluded to this already, but I want to

4    make sure the record is clear.  Were there particular points

5    in time at which you measured solvency under these tests?

6    A    Thank -- I apologize, I didn't articulate that and I

7    was asked to do it at June 30th of '17, December 31st of '17

8    and January 31st of 2018.

9    Q    So let's start with the first one, the balance sheet

10   test?  What are some of the documentary sources that you

11   relied on or considered for this analysis?

12   A    For the balance sheet test, I relied on the general

13   ledger and independent of the general ledger, the financial

14   statements  in conducting the analysis of the balance sheet

15   test.  And there are others -- other documents I considered

16   as well.  I consider deposition testimony and certain

17   information available in the bankruptcy, subsequent

18   bankruptcy filings of Mr. Brass, Trifinery, and GCAC.

19   Q    And is there a play -- are those and the other

20   documents you considered all identified in the report you

21   prepared?

22   A    Yes, they are.

23   Q    Did you conduct any interviews, talk to third parties?

24   A    I did.  So I talked to Michael Wagner, EEPB and I

25   discussed with him the records he received from GCAC, and

1    the records that he used in the preparation of the 2017

2    federal income tax returns that he filed.  And I also had a

3    call -- and it was in March of 2022, I also had a call in

4    March of 2022 with Mr. Kuo and Mr. Ruzek at Vitol.

5    Q    And why did you, why did you talk to Mr. Wagner?  Why

6    do you think that was important?

7    A    Well, I wanted to make sure I understood the documents

8    that he had received.  We had a chat about that and then

9    also that those documents were actually used in the

10   preparation of the 2017 tax return.

11   Q    Did you also say you had a conversation with Mr. Kuo?

12   A    I had.

13   Q    Why did you do that?

14   A    I had brief phone call with him to get a general

15   understanding of certain of the documents that Vitol had

16   produced.

17   Q    Did you consider Mr. Wagner to be a reliable source of

18   information?

19              MR. PATTERSON:  (indiscernible).

20              THE COURT:  Sustained.

21   BY MR. COOLEY:

22   Q    Are you -- in any giving your opinions, are you in any

23   way relying on information you got from Mr. Wagner?

24   A    My interview of him was part of the work I did to

25   satisfy myself that I understood what he received from GCAC

 1   and that that was used in the preparation of their tax

 2   returns.

 3   Q    So, again, staying with the balance sheet analysis,

 4   what was your starting point for valuating assets and

 5   liabilities?

 6   A    The assets and liabilities and equity of GCAC

 7   standalone in GCAC consolidated at June 30, 2017.

 8   Q    Mr. Pesce, could we have Vitol Exhibit 81, EEPB 174.

 9   If you scroll up, if you go to the June 2017 tab and scroll

10   up to the top.  Do you recognize this document?

11   A    I do, yes.

12   Q    Is this the document you were referring to a moment ago

13   in your testimony?

14           MR. PATTERSON:  (indiscernible).

15           THE COURT:  Overruled.

16   BY MR. COOLEY:

17   A    It is, yes.

18   Q    Going just off of this balance sheet presented here,

19   were you able to draw any conclusions about the solvency of

20   GCAC in June of 2017?

21   A    Yes.

22   Q    What were those conclusions?

23   A    That GCAC on a consolidated basis was in --

24           MR. PATTERSON:  (indiscernible).

25           MR. COOLEY:  It doesn't, Your Honor.  If we're

1   going back to the report, the report specifically details

2   analysis performed of both standalone and consolidated

3   entities.

4           MR. PATTERSON:  I'll read the scope of work,

5   Judge.

6           THE COURT:  Why don't we, why don't we pull it up?

7   So I could look at it.

8           MR. COOLEY:  Sure.  Mr. Pesce, could we have

9   Exhibit 97.

10          MR. PATTERSON:  Go to Page 3, Paragraph 2, I'm

11  sorry, Paragraph 7, Section 2, Paragraph 7, Page 3.  I've

12  been asked by Reed Smith, counsel for Vitol, to analyze the

13  solvency, financial condition of GCAC of three dates.

14  Nowhere in the scope of work was he asked to do any analysis

15  on GCAC on a consolidated basis.  GCAC is defined as the

16  standalone.  So to go and now to say that he made

17  conclusions on a consolidated basis goes beyond his stated

18  scope of work.

19          MR. COOLEY:  May I respond, Your Honor?

20          MR. PATTERSON:  And he has the same statement in

21  his affidavit, which is Page 1.

22          THE COURT:  Okay.

23          MR. COOLEY:  Mr. Pesce, could we have PDF Page 11?

24          MR. PATTERSON:  It doesn't matter what he did.  If

25  he exceeded his scope of work, it doesn't automatically

1    amend his scope of work.  He was hired to do two things and

2    to testify beyond that scope of work is an improper opinion.

3            MR. COOLEY:  I would submit, Your Honor, that were

4    we to read through the report and I realized we won't, what

5    the Court would see is -- well, unless the Court wants to --

6    what we would see is that while there is a reference in the

7    scope of work simply to GCAC, the balance of the report goes

8    into details specifically defining two entities, two GCAC

9    concepts.  One is consolidated GCAC.  The other is

10   standalone GCAC.  Standalone GCAC is defined as the single

11   entity.

12           MR. PATTERSON:  (indiscernible).

13           MR. COOLEY:  Your Honor, objecting to the sidebar

14   about coaching.  Under the rule, the scope of work is not

15   even part of what is ordinarily called for.  It is, it is

16   surplus in the report.  Disclosure of expert testimony in

17   Rule 26(b)(2)(B) states that the report must contain, it

18   enumerates several items, the first one of which is a

19   complete statement of all opinions the witness will express

20   and the basis and reasons for them.  The scope of work is in

21   there as a disclosure.  It is informative.  It helps set the

22   stage.  But the relevant question when it comes to expert

23   testimony is that an expert is limited to the opinions that

24   the expert gives.  And an expert is required to disclose

25   what those opinions are.  And the expert report in very

```
 1   great detail, and the Court can see on this page, but we can

 2   look at others, specifically defines and delineates at

 3   various points consolidated GCAC and standalone GCAC.

 4              MR. PATTERSON:  (indiscernible).

 5              THE COURT:  Where do you -- where do I find the

 6   exhibit?  What's the docket number?

 7              MR. COOLEY:  Your Honor, because the Vitol

 8   exhibits were so voluminous, they were not put on the

 9   docket.  However, I suspect that I could put my hands on a

10   paper copy of it in one of the binders behind us if the

11   Court would find that useful.

12              THE COURT:  No, give me a minute.

13              MR. PATTERSON:  (indiscernible).

14              THE COURT:  No, no.  I'm opening it up right now.

15   Just give me a second, Bill.  What's the relevance of

16   consolidated GCAC?

17              MR. COOLEY:  I was actually having a similar

18   thought, Your Honor.

19              THE COURT:  I'll tell you why, I'll tell you why

20   I'm asking cause I don't want to be (indiscernible).  I look

21   at what he says here and I also look at what you testified.

22   Vitol's unchallenged expert will testify that GCAC was

23   insolvent at all relevant times.  So, so what is the purpose

24   of consolidated?  I'm looking at your joint pretrial

25   statement as well.
```

1           MR. COOLEY:  Your Honor, I know, I know the answer

2    to that question.  I hesitate because I don't want, I don't

3    want to be viewed as coaching the witness.

4           THE COURT:  No, no.  Well then, let's get the

5    witness, let's get the witness out.

6           MR. PATTERSON:  I think I was actually suggest to

7    the Court putting that exact question to the witness and see

8    if that helps.  If the Court will allow, I'll ask --

9           THE COURT:  No.  Mr. Dietz, why don't we -- can I

10   ask you to step out for a second?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  What's the -- tell me what we're doing

13   here folks?

14          MR. COOLEY:  Yes, Your Honor.  The relevance of

15   the solvency of the other entities goes to the fact that in

16   order -- it is bound up in inextricably -- and this is

17   described in detail.  This is not my analysis; this is

18   what's in the witness' report.  It is bound up in the

19   question of the solvency of GCAC because a large portion of

20   what is on the GCAC standalone balance sheet are a series of

21   related company investment assets.

22          THE COURT:  I don't want you to -- I think the --

23   I want to make sure the witness is testifying, but why don't

24   you ask questions about standalone GCAC.  And then asked him

25   why he finds that and whether there's other factors that

1     relate to it.  But I think starting out with consolidated

2     GCAC when it's not in your joint pretrial statement -- and

3     it's not -- then it starts to make me wonder what the -- why

4     he needed it.  But maybe he can testify to himself as to

5     just focusing on, I guess because you're defining it, I

6     haven't focused on the definitions, but what my

7     understanding of what standalone GCAC is and, you know,

8     obviously he is going to go through the three tests and then

9     you know what other factors he considers.  And I think you

10    can ask him what effect, if any, about because, you know,

11    does -- you know what factors -- I guess you can ask him

12    about it, but I don't, in other words, I don't know the

13    relevancy of consolidated GCAC being insolvent when I think

14    Husky is going to go to standalone GCAC.  Right?  Because

15    that's going to be that where you're going.  And I think,

16    and I think Mr. Patterson, if he thinks it's important, then

17    I think you can take him up on cross and then figure out

18    what, you know, what's going on there or not.  But I do, I'm

19    sympathetic to Mr. Patterson's argument.  It seemed almost

20    going to, you look at your joint pretrial statement, you're

21    focusing on one and now you're asking questions about a

22    consolidated entity.  It makes you stop.  But if you go

23    through one and then open it up, I think you probably get

24    there.

25                 MR. COOLEY:  I think I was just a handful of

```
 1    questions away from getting to the very question the Court
 2    is driving at.
 3             THE COURT:  Okay.
 4             MR. COOLEY:  I think we will be able to clear this
 5    up and I will, I will be precise with -- I'll try to be
 6    precise with the witness to talk about GCAC on a standalone
 7    basis and try to distinguish the two and see if we can
 8    navigate that.
 9             THE COURT:  If you focus in on that, then it seems
10    like it's a weight issue to me.
11             MR. COOLEY:  Sure.
12             MR. PATTERSON:  (indiscernible).
13             THE COURT:  Yeah.  Yeah, that makes perfect sense.
14    Why don't we come back at three o'clock.  And I'll actually
15    come out at three o'clock.  I know I'm notorious for coming
16    out at 3:02, 3:03.  I'll come right back out at three.
17             MR. PATTERSON:  (indiscernible).
18             MR. COOLEY:  Thank you, Your Honor.
19             CLERK:  All rise.
20             (Off the record)
21             CLERK:  All right.
22             THE COURT:  All right.  We ready?  You thought I
23    was joking.  The expert has to get the lawyers?  All right.
24    Mr. Dietz, why don't you come back on the stand.  Thank you.
25             MR. COOLEY:  Your Honor, I apologize.
```

1          THE COURT:  No worries.  Let's proceed.  Mr.

2    Dietz, I remind you that you're still under oath, sir.

3          THE WITNESS:  Yes, Your Honor.

4          CONTINUED DIRECT EXAMINATION OF GENE DIETZ

5    BY MR. COOLEY:

6    Q    Mr. Pesce, could we have back on the screen Vitol 81,

7    EEPB 174?  Mr. Dietz, do you remember me starting to ask you

8    questions about this document a few minutes ago?

9    A    Yes.

10   Q    Okay.  I'd like to start with the column headed at the

11   top, "Gulf Coast Asphalt Co."  Do you see that?

12   A    I do.

13   Q    And for the moment, I want to focus on questions about

14   Gulf Coast Asset Co, all right?

15   A    I'm sorry, Gulf Coast Asphalt Co.?

16   Q    Asphalt Co, the single entity.

17   A    Yes.

18   Q    Mr. Brass' entity known as GCAC.  Going just off of

19   this document, and I think this was the question where I

20   left off and I'm just going to ask it more precisely.  Going

21   just off this document to start with, were you able to draw

22   any conclusions about the solvency of standalone GCAC, that

23   entity, GCAC, Gulf Coast Asphalt Co?

24   A    Could you shrink this so I can see the entire document,

25   please?  Or scroll down.  Based on this document as it is,

1    as it sits, without any further analysis or adjustment, Gulf

2    Coast Asset -- Asphalt, now you got me doing it -- Gulf

3    Coast Asphalt Co, Column C, would have total assets that

4    exceeded its total liabilities and have positive numbers

5    equity.  And on its face, that would indicate that it was

6    balance sheet solvent.

7    Q    Thank you.  Let's go to the next worksheet, still in

8    this document, that's titled "December 2017."  Do you

9    recognize this particular document?

10   A    I do, yeah.

11   Q    Is this a document you consulted in your analysis?

12   A    Yes.

13   Q    Okay.  Same basic question, going just off this balance

14   sheet and again focusing on Gulf Coast Asphalt Co., on a

15   standalone basis --

16   A    Yes.

17   Q    -- were you able to draw any conclusions about the

18   solvency of that entity at December 2017?

19   A    And again, if you could let me just slowly scroll

20   through the document and then I'll answer your question

21   directly.  Yes, and again, this would indicate that Gulf

22   Coast Asphalt Co. has liabilities now that are in excess of

23   its total assets.  And this would be an indication it was

24   insolvent as of December 31st, 2017.

25   Q    Okay.  In the course of your analysis, the third date

1    your mentioned was January 31st, 2018.  In the course of

2    your analysis, were you able to find in the records provided

3    to you a balance sheet for GCAC for January 2018?

4    A    I was not able to find a balance sheet for GCAC for

5    1/31/18, no.

6    Q    Based on the records that you had available to you,

7    were you able to nevertheless draw any conclusions about the

8    solvency of that entity on a balance sheet basis in January

9    of 2018?

10   A    Yes.

11   Q    How?

12   A    By taking each of the accounts in the general ledger on

13   January 31st, 2018 and putting them in the balance sheet

14   format.  And that indicated that the liabilities were

15   greater than the assets on January 31st, 2018, indicating

16   that GCAC standalone was insolvent.

17   Q    And how do you know such a process as that can be

18   reliable?

19   A    Well, I've done that hundreds of times in my career,

20   but I demonstrated to myself that when there were financial

21   statements and tax returns, that when I aggregated the

22   accounts of the general ledger, they agreed to those amounts

23   and so consistent with that, I created a balance sheet from

24   the general ledger in that same format incorporated all of

25   the accounts in the general ledger at 1/31, all of the asset

1    and liability accounts at 1/31/18.

2    Q    And is this the same general ledger that you described

3    earlier in your testimony?

4    A    It is.

5    Q    Is this a general, is this the same general ledger that

6    you described in your process of comparing to other

7    documents for accuracy et cetera?

8    A    Yes.

9    Q    Based on that work product, what were you able to

10   conclude about the balance sheet solvency of standalone GCAC

11   at January 31st, 2018?

12   A    That that indicated that they were insolvent.

13   Q    Do you recall by what margin?

14   A    I don't recall specifically, but I think it would be

15   approximately -- before any adjustments, approximately $2

16   million.

17   Q    Is there a document that you created that would contain

18   that number that you calculated in your analysis?

19   A    Yes, it would be both on Exhibit 1 to my report and

20   Exhibit 1.1 to my report.

21   Q    Would it aid in your testimony here today to see that

22   document to reference the number that you calculated as you

23   described?

24   A    Yes, it would.

25   Q    Mr. Pesce, could I have Vitol Exhibit 98, Page 1.  Now

1    without describing anything for me yet, do you recognize

2    this document?

3    A    Yes.  This is Exhibit 1 to my expert report.

4    Q    Is this the document you're referring to a moment ago?

5    A    Yes, it is.

6    Q    And do you believe that -- is this the document that

7    you said -- that you testified would aid in your ability to

8    identify the correct figure?

9            MR. PATTERSON:  (indiscernible).

10           THE COURT:  Yeah, I agree.

11           MR. COOLEY:  I don't think I've asked him about

12   the contents.  I've specifically just asked, is this the

13   document?  Would it aid in his recollection?  I'm going to

14   have the witness guide me to what he wants to look at on the

15   page, Your Honor.

16           THE COURT:  Okay.  I'll overrule the objection.

17   BY MR. COOLEY:

18   Q    Can you tell me what you would want to look at on this

19   page in order to answer my question about the precise level

20   of insolvency at January 31st, 2018?

21   A    Sure.  The total assets, total liabilities, and the

22   members equity.

23   Q    Mr. Pesce, could you scroll down just a little bit?  Do

24   you see the number you're looking for January 2018?

25   A    Yes, it's the second from the bottom on the far right,

1    1,587,403 in brackets indicating that the total liabilities

2    of 16,425,671 are greater than the total assets of 14,838,

3    268.

4    Q    So from that starting point, did you conduct any

5    analysis or evaluation of any of the assets identified on

6    these balance sheets?

7    A    I did.

8    Q    Which assets?

9    A    There are three assets, three asset accounts on this

10   balance sheet.  There's an investment/loan GCAC Holdings,

11   Investment Gulf Coast Crude, and Investment AJ Bullet.  And

12   you'll see those in the total other asset category right

13   above total assets.  And, for example, in January 31st,

14   2018, the investment and loan in GCAC Holdings is 4,183,753.

15   The investment in Gulf Coast Crude is 2,437,087.  And the

16   investment in AJ Bullet is $44,108.

17   Q    And I just want to be clear.  Well, okay.  So, Mr.

18   Pesce, we can, we can take down this document for a moment.

19   So then with respect to those loans you just described,

20   those investment or loans, whatever they are, what, if any,

21   adjustment did you make to the value of those assets as

22   listed on the balance sheet?

23   A    I reviewed the assets and liabilities and income and

24   expense for all three of those assets that appear in the

25   consolidated financial statements at 2017 and determined

1    that they were nonoperating entities.  They had negative

2    equity and obligations in an equal and offsetting amount to

3    the assets that show up on GCAC standalone and that they did

4    not demonstrate the ability to repay those.  And so I

5    adjusted those balances off of the balance sheet, which

6    further reduced the equity and made it a larger negative

7    equity for those adjustments.

8    Q    Mr. Pesce, could I have Vitol 81, EEPB 174 again?  And

9    let's scroll up to the asset portion.  Mr. Dietz, is this

10   one of the documents you were just referring to?

11   A    Yes.

12   Q    And what, if anything, does this balance sheet tell you

13   about the assets and liabilities of these affiliate

14   entities?

15   A    So if you were to look at -- for all three of them, for

16   GCAC Holdings, Gulf Coast -- Gulf Crude Gathering, and AJ

17   Bullet, they have minimal assets, very small cash accounts

18   and very small other assets.  And if you were to look at

19   that in relationship to their liabilities --

20   Q    If we would scroll down, Mr. Pesce.

21   A    Scroll down, Mr. Pesce, thank you, which are in the

22   millions of dollars for Holdings and Crude Gathering, the

23   tens of thousands of dollars for AJ Bullet, but they don't

24   appear to have any assets for operations that would provide

25   the cash to repay these obligations to GCAC standalone.

1    Q    And why, if at all, is the assets and liabilities of

2    these entities relevant to an assessment of the solvency of

3    standalone GCAC?

4    A    Well, if they had been carrying these values on their

5    balance sheet without considering the collectability for a

6    full and fair value balance sheet for solvency purposes, you

7    would want to adjust those to what, in my opinion, would be

8    the inability to repay those amounts.  And so I wrote them

9    off in total.

10   Q    Did you look at any documents to determine -- well,

11   I'll say that differently.  Could I have Vitol 81 EEPB 175?

12   And if we could start with the June 2017 worksheet -- oh, I

13   think we're still on 174, I see.

14           MR. PESCE:  I think it's frozen.

15           MR. COOLEY:  Your Honor, it appears that the Go To

16   Meeting screen may be currently frozen.  So Mr. Pesce is

17   going to --

18           THE COURT:  Hold on.  Let me -- it looks like

19   that's moving again.  Mr. Pesce, let me know if you've got

20   control.  Yeah, we can make the screen on the bottom right

21   of the screen.

22           MR. PESCE:  Your Honor, can make the screen on

23   bottom right, you see Michael Pesce on the screen?

24           THE COURT:  Can I make it what?

25           MR. PESCE:  Can you make the on the bottom right

1   (indiscernible)?

2            THE COURT:  Oh, yes, yes.  That Mike Pesce, yes.

3            MR. PESCE:  Thank you, Your Honor.  Thank you.

4            THE COURT:  No pressure.

5            MR. COOLEY:  Thank you, Judge.

6   BY MR. COOLEY:

7   Q    All right.  I put in front of you the consolidated

8   income statement of Gulf Coast Asphalt Company for June

9   2017.  First of all, do you recognize this document?

10  A    I do, yes.

11  Q    Is this one of the documents you considered in your

12  analysis?

13  A    It is, yes.

14  Q    Was this document in any way relevant to the question

15  of the collectability of these related party loans you've

16  been describing?

17  A    Yes, it is.

18  Q    How so?

19  A    It demonstrates that the revenue for GCAC Holdings is

20  zero.  The revenue for Crude Gathering is zero.  The revenue

21  for AJ Bullet is zero and it shows the expenses.  And if you

22  were to scroll down please, Mr. Pesce, you'll see that it

23  shows at the bottom a negative income before taxes.  Either

24  zero or negative income before taxes.  So no revenue,

25  expenses, and negative amounts for the income before taxes.

1    Q    What, if anything, does that tell you about the

2    collectability of the related party loans shown as assets on

3    the GCAC balance sheet?

4    A    Yeah, this document indicates that these are

5    nonoperating companies with no revenue generation.  And so

6    it would be very difficult to understand how they could

7    repay those amounts to GCAC standalone.

8    Q    Mr. Pesce, could we have the December 2017 worksheet?

9    Did you conduct a similar analysis as of the other two

10   measuring dates, December 31st and January 31st?

11   A    I did -- from this document, I did December 31st, yes.

12   Q    And what conclusion, if any, did you reach based on

13   that document?

14   A    It shows similarly to the six-month financial statement

15   we just looked at, again, continuing no revenue, expenses,

16   and losses for either zero income before taxes or negative

17   income before taxes.

18   Q    And so were there any other records that you consulted

19   in connection with your evaluation of these related party

20   loan assets on the balance sheet?

21   A    Yes.  I reviewed deposition testimony and also

22   bankruptcy filings that were filed subsequent to these

23   balance sheet dates.

24   Q    And how, if at all, did those documents bear on your

25   analysis?

1    A    They -- in the bankruptcy documents for GCAC, there was

2    no amount shown as value for these, for these items.  So

3    they weren't reflected there and they weren't reflected as

4    assets, which confirms what I had determined at 12/31/17 and

5    June 30, '17.  And so that was just confirming what my

6    initial analysis had had led me to.

7    Q    And so ultimately what, if any, conclusion did you

8    reach about how these related loan, related party assets

9    should be reflected on the GCAC balance sheet?

10   A    For solvency purposes, they should be written off -- in

11   my opinion, I apologize, in my opinion, they should be

12   written off and I prepared a schedule, an analysis that

13   writes those amounts off continuing to indicate that GCAC

14   was insolvent at June and December and January of '18.

15   Q    Written off in what amount?

16   A    In full.

17   Q    And so what effect does that have taking the --

18   otherwise taking the existing GCAC balance sheets as they

19   exist, what, if any, impact does that have on the balance

20   sheet solvency of standalone GCAC at each of the three

21   measuring points?

22   A    It reduces their equity to an increasing negative

23   amount by taking the asset off the balance sheet, it reduces

24   the assets and thereby reduces the equity.

25   Q    Do you recall by how much?

1    A    Yeah, the amounts are approximately $6.6 million for

2    all three of them together.

3    Q    Approximately 6.6 million off of each?  Did you conduct

4    any other analysis of any other assets to evaluate the, how

5    they're valued on the balance sheet?

6    A    I did.  So as I said, I reviewed the bankruptcy filings

7    and there was a patent that was listed.  And I evaluated

8    what, if any, value the patent had and concluded based on my

9    analysis and the lack of any licensee revenue, that the

10   patent didn't have any additional value.  And I considered

11   it a liability that was reflected in the bankruptcy filing

12   and did not include that because it was unclear to me if

13   that was the liability of GCAC's as of my date of analysis

14   for solvency.

15   Q    If you were -- if you had included it, what impact

16   would it have had on solvency?

17   A    It would have been, it would have made them more

18   insolvent.

19   Q    Mr. Pesce, could I have Vitol 81, EEPB 174 again?  And

20   if we could go to the top of the June 7 -- June 2017

21   worksheet.  I want to direct your attention to Line 18 which

22   describes a current asset called "Due from Shareholders."

23   Do you see that?

24   A    I do see that.

25   Q    Is that something that you reviewed or analyzed in the

1    course of your work?

2    A    Yes.

3    Q    For purposes of your balance sheet solvency analysis,

4    is there any adjustment to be made of that figure?

5    A    For purposes of my balance sheet analysis, there's two

6    accounts that I considered.  One of the Due From

7    Shareholder, which is the AJ Brass loan account and Due From

8    Shareholder, which is the Mrs. Joyce Brass loan account.

9    And I analyzed those for the increase in the amount in those

10   loan accounts during the solvency period.  But I did not, I

11   did not reflect an adjustment -- a further downward

12   adjustment to equity by writing those amounts off.  And so

13   in other words, to the extent that during this time period,

14   July '17 to January '18 time period, to the extent that Mr.

15   Brass and Miss Joyce Brass had a loan balance outstanding

16   that was due to GCAC, I did not remove that from equity.  I

17   did not write it off the balance sheet, nor did I remove it

18   for equity for purposes of my solvency analysis.  I did

19   isolate those amounts just so that I could see the amounts

20   that would -- in and out of those loan accounts during this

21   period of analysis, but I did not actually write the equity

22   off and make that part of my solvency analysis.

23   Q    And when you say you isolated those amounts, I think

24   that was the phrase you used, which amounts are you

25   referring to?

1    A    I apologize, let me unpack that.  So in the, in the AJ

2    Brass and Miss Joyce Brass loan accounts, I believe it's

3    1250 and 1270 accounts in the general ledger, you can see

4    each month when they -- when cash is transferred to those

5    accounts, it increases the loan that's due to GCAC and when

6    cash is received accredited to those balances, it reduces

7    it.  And so I isolated the activity for July, August,

8    September, October, November, December and January, the

9    activity that's in both of those loan accounts so that I

10    could understand the activity in the Due to From loan

11    accounts as part of my analysis.

12    Q    What is the due to -- you used the phrase there, what

13    does it due to from account?

14    A    So, as an example if Mr. AJ Brass took a cash transfer

15    or a cash transfer was charged to his loan account, the cash

16    account for GCAC would go down and the loan amount due from

17    Mr. AJ Brass would go up.  And that would be due from him to

18    GCAC for the $100,000.  Correspondingly, if he repaid that

19    $100,000, the cash account would go up because he put that

20    100,000 back in in my hypothetical and then the loan amount

21    would be reduced.  So -- and to the extent that he put more

22    money back than he had previously taken that was coded to

23    that account, then he would have a Due From GCAC, a

24    liability of GCAC.  And as of June 30 of '17, that's exactly

25    the circumstance where Mrs. Joyce Brass owed GCAC a few

1    $1000 and Mr. AJ Brass was owed from GCAC for I think about

2    700, $800,000.

3    Q    How's that different from a shareholder just getting a

4    distribution because they're an owner of the company?

5    A    If you were to take it as a distribution, you could

6    think about it -- so you would think about reducing the cash

7    account.  So Mr. Brass, in my hypothetical, took $100,000

8    out of GCAC, the cash would go down.  And if you took it as

9    a distribution, the equity of the company would go down.  If

10   he -- alternatively, if he takes the $100,000, again in my

11   hypothetical, and records it as a loan that's receivable

12   from him by GCAC, then the assets are neutral.  They have

13   less cash, but they have an asset called Due From AJ Brass

14   that is an equal and offsetting amount.  And it doesn't have

15   any impact on equity.

16   Q    Are there tax implications associated with doing it one

17   way or the other?

18            MR. PATTERSON:  (indiscernible).

19            THE COURT:  Overruled.

20   BY MR. COOLEY:

21   A    In a flow through entity, generally it would have no

22   impact.  Let me just make a couple of quick comments to be

23   complete.  So when you take an advance or a loan, it doesn't

24   have any P&L impact.  It's a balance sheet transaction where

25   the cash is adjusted downward and the loan adjusted upward.

004354

1    The distribution to a partner in a partnership -- and this

2    is an LLC, but it's taxed like a partnership -- generally,

3    it would be a nontaxable distribution if the receiving

4    partner has tax bases to absorb that.  If the receiving

5    partner did not have tax bases in their investment in the

6    partnership, then it could have tax implications.  But

7    generally, distributions to partners in a partnership

8    subject to the basis rules are nontaxable, just like a loan

9    taken out from a company would be nontaxable.

10   Q    Could we have the December 2017 worksheet up on the

11   screen?  And from June of 2017 to December 2017, that figure

12   on this slide Due From Shareholders now shows 2,998,000 as

13   of 12/31.  Do you see that?

14   A    I do see that.

15   Q    Is that something you had all looked into in connection

16   with the analysis you were doing?

17   A    Yes.  That's just what I described in my previous set

18   of answers.  So I looked at the amounts that were

19   transferred, cash transfers that were recorded in this

20   account to either -- recorded as to Mr. Brass or to Ms.

21   Joyce Brass.  That would increase this amount.  And the cash

22   repaid by them to GCAC, that would increase the cash account

23   of GCAC and reduce this amount.  So there's a net increase

24   here and that net increase I analyzed on a month-by-month

25   basis from July through December and for July through

```
 1   January -- I'm sorry, July of '17 through December '17 and

 2   July '17 through January of '18.

 3   Q    And what, if any, conclusion did you draw about the

 4   value of the Due From Shareholder asset listed on these

 5   balance sheets?

 6   A    I didn't just I didn't adjust the value downward.  I

 7   treated in my solvency analysis as if it was fully

 8   repayable.  It would be fully repaid by Mr. Arthur AJ Brass

 9   and Miss Joyce Brass.

10   Q    Did you consider as part of your analysis whether or

11   not it might actually be fully repayable?

12   A    I considered, I considered that, that it could be

13   subject to an impairment.  So, in other words, there's a

14   receivable now on the company's books for 2,998,569.  And I

15   considered whether or not that might be impaired if they

16   could repay it only in part, not in total, but I didn't make

17   any adjustments.  I considered it, but I didn't make any

18   adjustment at all.

19   Q    So turning to the liability side of the ledger of the

20   balance sheet and we can stay here on December 2017 for the

21   moment.  Were there any of the liabilities presented on the

22   GCAC, standalone GCAC balance sheet that you adjusted for

23   purposes of your analysis?

24   A    Can I have the question again, Mr. Cooley?

25   Q    Yes.  Again, looking at the standalone GCAC balance
```

1    sheet column, the first column, and looking at the

2    liabilities here, were there any of the liabilities that you

3    adjusted the values of for purposes of your balance sheet

4    solvency analysis?

5    A    I don't believe so.  I think I took the book value of

6    those liabilities.

7    Q    Based on your analysis that you've described to the

8    Court and your experience that you've described as well,

9    were you ultimately able to form an opinion as to the

10   solvency or insolvency of standalone GCAC on a balance sheet

11   basis as of the three measuring dates?

12   A    In my opinion, I think they're insolvent on three of

13   those -- on all three of those, excuse me, on all three of

14   those measurement dates.

15   Q    Thank you.  I'll turn now to the capital adequacy and

16   cash flow tests.  What are the key elements that go into

17   evaluating whether a company is adequately capitalized?

18   A    Like we talked about on the front end of this, do they

19   have an adequate cushion to absorb the capital cushion or

20   access to capital to absorb the ebbs and flows of business?

21   Here, my solvency balance sheet has negative equity, so

22   there's no capital cushion.  And I wasn't aware of any other

23   financing sources that were available to GCAC from my

24   analysis of the financial records that would provide

25   operating capital to pay those debts as they came due or to

1    provide a cushion for the ebbs and flows of business.

2    Q    In the course of your analysis, did you evaluate the

3    availability of net income to standalone GCAC over any

4    historical period?

5    A    I did.  I looked at the, I looked at the historical

6    loss -- historical net income which was a loss for 2016.

7    The losses in 2017, both through June 30th for six months,

8    and for the entire year of 2017.  And noted that they were

9    significantly lost making.

10   Q    What -- in particular, what documents did you review to

11   determine the availability of net income in the 2016 and

12   2017 period through June 30th?

13   A    The 2016 period would have been from the general ledger

14   which gives me the, which I could, I could analyze and

15   calculate the loss for that period.  And then 2017, I could

16   get from both the general ledger and from the financial

17   statements.

18   Q    And what about for the period of  June '17 to January

19   2018, were you able to evaluate the availability of net

20   income in that period too?

21   A    I was.  In the January of '18 piece, you need to use

22   the general ledger because I didn't have a standalone

23   financial statement for that one month period.

24   Q    And what about for June and December of 2017?

25   A    Yes.  We're looking at those documents right now.

1   Q    Okay.  And in the course of your analysis, did you

2   prepare any kind of calculation of the total net income or

3   net loss of the company, standalone GCAC, over the time

4   periods you described?

5   A    I did, yes.

6   Q    Do you recall sitting here today exactly what the

7   calculation was you arrived at?

8   A    Precisely?  No.  It was several million dollars when

9   you, when you looked at '16 and then looked at '17 and the

10  January of '18 and added them together.  So it was in the

11  10, $12 million range.  It could have been a little more

12  than that.  I don't recall precisely though as I sit here

13  today.

14  Q    10 to 12 million positive or negative?

15  A    I'm sorry, all negative.

16  Q    Is there a document that you could look at that would

17  aid in your recollection of what precisely the number was

18  you calculated in your analysis?

19  A    Well, I have a summary chart that's in my report that

20  lays that out.  That would refresh my recollection

21  specifically.  Or I could go back through the documents if

22  you wanted to take the time and reconstruct that analysis.

23  Q    Mr. Pesce, could I have Vitol Exhibit 97, PDF Page 31?

24  And I'll direct you here to Paragraph 74 and don't read out

25  anything on the page, but just looking at it, is this the

1    summary that you were referring to a moment ago?

2    A     It is.

3    Q     Okay.

4    A     Excuse me.  Yes, it is.

5    Q     Okay.  And does looking at this aid in your

6    recollection of the precise numbers that you calculated in

7    your analysis?

8    A     For the first -- for the 12 months of '16 and six

9    months of '17 through June, it does.  The cumulative loss

10   for those two periods for GCAC standalone was 5,286,348.

11   2.2 million for the 12 months and '16 and 3.48 million for

12   the six months and '17.

13   Q     And just for the record, are those all positive or

14   negative numbers?

15   A     Those are negative numbers.  Those are losses.

16   Q     And then did you also -- is there a document were you

17   were able to calculate the net income, positive or negative,

18   for the June 2017 to January 2018 period?

19   A     I believe it's -- yes, the answer is yes.  And that

20   that this table is expanded later on in this document that

21   has a summary of that as well.

22   Q     Do you recall precisely what the calculations were that

23   you made in your analysis?

24   A     Not precisely, but I would estimate it at $7, 8 million

25   of losses bringing the 5 million to 12 or 13 million.

1    Q    Is there a particular document that you prepared that

2    would aid in your recollection of precisely what those

3    numbers are?

4    A    Yes.  There's a table in this report that does

5    precisely that.

6    Q    Do you happen to recall which one it was?

7    A    I don't.  It's going to be probably four or five or six

8    pages behind this one.  I couldn't tell you exactly what

9    paragraph but I know it's there a few pages back.

10   Q    Could I have a Vitol Exhibit 98, PDF Page 4.  And

11   again, we'll just start with -- if we just sort of center

12   that on the page.  Perfect.  Again, without reading aloud

13   any of the text, do you recognize the document on the screen

14   before you?

15   A    I do.

16   Q    Is this the document you're referring to?

17   A    It's not, but it'll do -- it'll serve the same purpose.

18   Q    Does this document aid and your recollection of the

19   figure that you're testifying to?

20        MR. PATTERSON:  I'm going to object to leading.

21   If he wants him to read document, just tell him to read the

22   document.

23        MR. COOLEY:  I'm just asking the witness, if this

24   is the document -- if this document would aid in his

25   recollection.

004361

1           THE COURT:  Overruled.  you can answer.

2    BY MR. COOLEY:

3    A    Yes.

4    Q    And So I'll pose the question that I started with,

5    which is in the June 2017 to January 2018 time period, what

6    did you calculate as the positive or negative net income of

7    GCAC?

8    A    It would be the difference between the 10,000,193 in

9    January of '18 for the cumulative loss and the June 30 loss

10   of 3,000,048 or approximately $7 million dollars of loss.

11   Q    Thank you.  If we're talking about adequacy of capital,

12   did you consider the question of working capital of the

13   company?

14   A    I did.

15           MR. PATTERSON:  Objection.  (indiscernible)

16           THE COURT:  Overruled.

17   BY MR. COOLEY:

18   Q    What elements comprise working capital?

19   A    Current assets and current liabilities would be the

20   general foundation of a working capital analysis.

21   Q    And how, if at all, is it is working capital relevant

22   to the question of adequate capitalization?

23   A    It would be one source of capital that you would have

24   available to you to consider a cushion for the ebbs and

25   flows of the business.

1    Q    Did you, did you have access to GCAC records containing

2    information that would allow you to evaluate its working

3    capital at the relevant time periods?

4    A    Yes.

5    Q    What were some of those documents?

6    A    The balance sheets that we've been looking at this

7    afternoon, Mr. Cooley.

8    Q    Could I have Vitol 81 again, EEPB 174?  Starting at,

9    well just looking at the December 2017 balance sheet before

10   you, is this one of the documents that you were referring

11   to?

12   A    It is, yes.

13   Q    And based on this and other documents, were you able to

14   form a conclusion about the amount of working capital that

15   GCAC had available to it at the various measuring points?

16   A    Yes.

17   Q    And what was that conclusion?

18   A    That they had negative working capital which would

19   provide no cushion for the ebbs and flows of the business.

20   Q    And just to use this, I don't want to go through all

21   the measuring dates, but just to use this one as an example,

22   can you, can you walk me through what elements on this

23   balance sheet factored into that conclusion?

24   A    Yes.  If you look at the total current assets of Gulf

25   Coast Asphalt Co in Column C, they're 16,536,184.  And if

1    you could scroll down to the liabilities.  The total current

2    liabilities are 25,281,337, indicating that there's a

3    significant negative position in working capital.

4    Q    So based on your analysis, did you form an opinion as

5    to whether GCAC was adequately capitalized during the period

6    from June 2017 and January 2018?

7    A    I did.

8    Q    And what was that opinion?

9    A    That they were not adequately capitalized.

10   Q    And again, pivoting to the cash flow test, did you form

11   an opinion as to whether GCAC could satisfy the cash flow

12   test over that same time period?

13   A    I did form an opinion.  Yes.

14   Q    And what is that opinion?

15   A    That they could not, in my opinion, that they did not

16   have sufficient cash flow to pay their debts as they came

17   due.

18   Q    Based on your analysis, how was GCAC able to sustain

19   losses such as those you've described over such an extended

20   time period?

21   A    They had generated cash flow, not profit, but cash flow

22   from the sale of product from the Vitol GCAC transactions.

23   And in addition to a deteriorating working capital position,

24   and that allowed them to continue.  But in that continuance,

25   you see this very negative working capital position.

1    Q    When you say that GCAC was able to generate cash flow,

2    not profit, Can you explain to me what the distinction is

3    that you're drawing there?

4    A    Sure.  So if -- in GCAC Vitol transactions, they

5    generated during this time period $30.5 million in sales.

6    GCAC sales of product that was financed by Vitol.  And that

7    $30.5 million dollars of revenue, of that, they remitted

8    back to GCAC -- I'm sorry, remitted back to Vitol during

9    this time period approximately $16.6 million in three

10   payments: a $4 million payment, a $3.7 million payment, and

11   an $8.9 million payment.  In addition to that, there was one

12   deal that GCAC paid for the product directly, referred to as

13   a shell deal for about a million seven.  So during this time

14   period of revenue of $30.5 million from the sale of product,

15   they remitted to Vitol or paid shell directly approximately

16   $18 million.  And there's roughly a $12 million margin

17   between the revenue they collected from the Vitol GCAC sales

18   and what was remitted from GCAC to Vitol.

19   Q    Where did the difference in revenue go?

20   A    It went to operations and well as, in part, funded the

21   increase in the loans due from AJ Brass and Joyce Brass.

22   Q    Off the top of your head during the period from June to

23   December 2017, do you recall by how much the loans to Mr.

24   Brass and Joyce Brass increased?

25   A    Approximately $4 million.

1   Q    Did you conduct an analysis of any kind of the

2   transfers made from GCAC to Mr. Brass and to his mother,

3   Joyce Brass?

4   A    I did a monthly analysis from July of '17 to January

5   '18 for the transfers that were recorded in the Due From

6   Arthur Brass account and the Due From Joyce Brass account

7   each month for all the transactions.

8   Q    Is that just a tabulation or is there some kind of

9   analysis?  Are you drawing on any kind of expertise when

10  you're doing that work?

11  A    Well sure.  So what I did when I when I did that, so

12  for each of those transactions, except one I'll talk about

13  in particular, there was a reduction in a bank account for

14  GCAC.  So in other words, I could, I could go find these

15  amounts that are recorded in the loan accounts on the bank

16  statement, IberiaBank statement with the exception of a

17  December entry for the sale of the Ark Terminal shares,

18  which I couldn't find on a bank statement.  And I put a

19  footnote in my analysis explaining that, but absent that,

20  then all of these amounts, all of the other amounts, you

21  could find both the amounts charged to the loan account and

22  amounts credited to the loan account for repayment, you can

23  find on a bank statement.

24  Q    And how did you satisfy yourself that the information

25  you were looking at could be relied upon?

1          MR. PATTERSON:  (indiscernible).

2          THE COURT:  I'm going to sustain the objection.

3     Why don't you ask another question?  I'm comfortable with

4     where we are.

5     BY MR. COOLEY:

6     Q    In looking at these transactions, did you consider the

7     data you looked at to be reliable?

8     A    Yes.

9     Q    Why?

10    A    Because the data of the transactions, I could trace to

11    a bank statement with one exception.  So I satisfied myself

12    that these were really cash transactions except with one

13    exception and that exception I footnoted and described as

14    the sale of the Ark shares.

15    Q    And so in the course of your work, in the course of

16    your analysis, well, let me say it differently.  In this

17    engagement what -- describe to the Court the nature of the

18    analysis you did with respect to these Due From Shareholder

19    transfers.

20         MR. PATTERSON:  (indiscernible).

21         MR. COOLEY:  The second opinion specifically goes

22    to the question of the calculation, verification and

23    evaluation of the Due to, Due From shareholder transfers

24         THE COURT:  Overruled, overruled.

25         THE WITNESS:  Can I have the question back please?

```
1    BY MR. COOLEY:

2    Q    Oh, boy.  I've forgotten the question I asked.  I'm

3    going to ask a different question and we're going to see how

4    we do.  In the course of your analysis, were you able to

5    satisfy yourself as to the accuracy of the data that you

6    were relying on in this analysis?

7    A    Yeah.

8    Q    And describe for me again the nature of the analysis

9    you were performing relating to these transfers.

10   A    I looked at the transactions in both Mr. AJ Brass's

11   loan account and Mrs. Joyce Brass's loan account.  And I

12   traced those to an IberiaBank statement to identify them as

13   transactions that were actually cash transactions with the

14   exception of and an increase to Mr. Brass's loan account for

15   the sale of the Ark shares where I did not see those amounts

16   on the bank statement.

17   Q    Over what time period did the transactions fall that

18   you analyzed in your work?

19            MR. PATTERSON:  (indiscernible).

20            THE COURT:  Overruled.  You can continue.

21   BY MR. COOLEY:

22   Q    Over what time period did the transactions arise?

23   A    July of '17 to January of '18.

24   Q    Did you look at transactions for any period before or

25   after that date?
```

```
 1    A    I did.

 2    Q    And from what sources did you draw the data for your

 3    analysis?

 4    A    The general ledger, subledgers from the general ledger

 5    of GCAC.

 6    Q    In the course of your analysis -- in the course of your

 7    analysis, did you look for any kind of patterns in the data?

 8    A    Yes.

 9         MR. PATTERSON:  Objection, Your Honor.

10    (indiscernible).

11         MR. COOLEY:  No, Your Honor.  This is a very

12    different question.  I asked about patterns.  The witness is

13    an experienced, certified forensic, financial forensic.

14         THE COURT:  I don't, I don't know what you mean by

15    patterns.  Maybe you can ask him.

16    BY MR. COOLEY:

17    Q    I'll ask it a different way.  You said you looked at --

18    how far back?  You said you looked at transactions prior to

19    June 2017.  How far back did you look?

20    A    2016.

21    Q    From 2016 forward, did you form any conclusions from

22    the data you reviewed about the pattern of transfer activity

23    from GCAC to and from Mr. Brass and his mother?

24         MR. PATTERSON:  (indiscernible).

25         THE COURT:  I'm going to, I'm going to sustain the
```

1    objection.  I don't, I don't need it.  I want to be focusing

2    on 2017 through these dates.  So just move on to another

3    question.  Believe me, I don't need it.

4    BY MR. COOLEY:

5    Q    Let's do this.  We still have EEPB 174 up on the

6    screen.  Could I have the June 2017 worksheet?  As of June

7    30, 2017, this document shows Due From Shareholders balance

8    of $86,000 and change.  Do you see that?

9    A    I do.

10   Q    Do you know what the total transactions, the total

11   amount advanced through that category were in the period

12   that you're describing prior to June of 2017 to Mr. Brass

13   and his mother?

14        THE COURT:  You're really not catching the point.

15   I'm going to sustain the objection.  You're trying and I

16   need you to read the room.  Move on to another question,

17   counsel.  You can try.  I'll sustain the objection.  I'm

18   just telling you what I'm looking for and what I'm

19   interested in.

20        MR. COOLEY:  Very well, Your Honor.

21   BY MR. COOLEY:

22   Q    From here, from June 30, 2017 to January -- to

23   December, excuse me, to December 2017, did that balance go

24   up or down?

25   A    It went up?

1    Q    By about how much?

2    A    $3.7 million.

3    Q    And based on the data you analyzed, was that transfer

4    activity consistent with historical transfer activity?

5              MR. PATTERSON:  Objection, Your Honor.

6              THE COURT:  He just keeps trying.  I don't -- I

7    just telling you sustained.  Now keep trying though.  I've

8    got all day.

9              MR. COOLEY:  Very well.

10   BY MR. COOLEY:

11   Q    Let's go to December 2017 worksheet.  Scroll up to the

12   top.  The Due From Shareholder balance here shows 2,998,569.

13   From that point forward, did that balance go up or down and

14   from the data you reviewed?

15             MR. PATTERSON:  (indiscernible).

16             MR. COOLEY:  Your Honor, this is not the solvency

17   analysis.  This this goes straight to the Husky factors --

18             MR. PATTERSON:  (indiscernible).  He's trying to

19   use him as a fact witness.  He just said he goes beyond the

20   analysis of an expert.  You're trying to use him for facts.

21             THE COURT:  Hold on a second.  What's the

22   question?

23             MR. COOLEY:  Your Honor --

24             THE COURT:  What's the question?

25             MR. COOLEY:  If I may, Your Honor.

```
 1              THE COURT:  What's the question.

 2              MR. COOLEY:  This is not on the solvency question

 3    but on the second question that the witness undertook, which

 4    was an evaluation of the transactional history.

 5              THE COURT:  Between what period and what period

 6    did he analyze?

 7    BY MR. COOLEY:

 8    Q    Sir, over what period did you analyze that the transfer

 9    history between GCAC and Mr. Brass and his mother from when

10    to when, back to front?

11    A    Back to front in total would have been 2016 through

12    June of 2019, I believe.

13              THE COURT:  Okay.  What's your question now,

14    counsel?

15    BY MR. COOLEY:

16    Q    From December 31, 2017 to June of 2019, did the

17    shareholder balance go up or down or stay the same?

18              MR. PATTERSON:  (indiscernible).

19              THE COURT:  I'm going to allow it  We'll be here

20    all night.  I've given everyone thoughts on what I think

21    about this level of analysis.  It will be what it will be.

22    Mr. Cooley, have your time.  You may answer the question.

23    BY MR. COOLEY:

24    A    It went up.

25    Q    By how much?
```

1    A    I couldn't tell with precision, a few million dollars.

2    Q    Is there a document that would aid in your recollection

3    of that precise number?

4    A    Yeah.

5    Q    Let me rephrase that.  Did you prepare such a

6    calculation?

7    A    I did.

8    Q    Is there a document that would aid in your recollection

9    of what that number is?

10   A    I believe Exhibit 3 to my report has that breadth of

11   that analysis and certainly there's a table I put in my

12   report from Exhibit 3, that would do that as well.

13   Q    We're not going to go for the breadth of the analysis.

14   I just want to get the answer to the question.  Mr. Pesce,

15   could you put up on the screen Vitol 98, PDF 5?  Without

16   reading aloud any of the data on the page, can you tell me

17   if you recognize this document?

18   A    I do.

19   Q    Is this the document you're referring to?

20   A    Yes.

21   Q    Does this document aid in your recollection of the

22   answer to my question, which is what was the total amount by

23   which the Due From Shareholder balance increased through

24   June of 2019?

25   A    From December 31 of '17 through June 30 of '19, it

1    would be a little over $4 million.

2    Q    And would that number then, to get the entirety going

3    back to June of 2017, would we add that to the 3.7 million

4    figure you testified to earlier?

5           MR. PATTERSON:  (indiscernible).

6           THE COURT:  Let them, let them continue, please

7    continue, Mr. Cooley.

8           THE WITNESS:  I'm sorry.  Could I have a question

9    please.

10   BY MR. COOLEY:

11   Q    In order to get the total increase in the Due From

12   Shareholder period of calculation from June 2017 forward,

13   would we add the figure you just gave to the $3.7 million

14   figure you testified to previously?

15   A    Yes.

16   Q    Thank you.  And by the way, just to be clear, is that a

17   gross number or a net number?

18   A    That's a net number.

19          MR. PATTERSON:  (indiscernible).

20          THE COURT:  Overruled.

21   BY MR. COOLEY:

22   Q    I'm sorry.  What was the answer?

23   A    Net.

24   Q    Thank you.  I think you alluded to this earlier, but as

25   part of your analysis, as part of your work, did you conduct

1   any kind of analysis of the cash that GCAC collected in the

2   June to December 2017 time period compared to the cash that

3   it paid for the product?

4   A    Yeah.

5         MR. PATTERSON:  (indiscernible).

6         MR. COOLEY:  I haven't assumed any facts.  I've

7   asked if there was an analysis done of the two numbers.  Not

8   I didn't suppose one way or the other.

9         THE COURT:  Overruled.  He can answer.

10  BY MR. COOLEY:

11  A    Yeah.

12  Q    And why was that analysis, why was that work relevant

13  to the work you were doing?

14  A    Well, I was asked to analyze the GCAC Vitol

15  transactions, which would include broadly the product that

16  GCAC sold, the amount it remitted to Vitol for that product,

17  as well as the recording of the contingent liability for

18  $14.8 million on the books of GCAC in December of '17.

19  Q    What data documents did you consult in the course of

20  that particular analysis?

21  A    It would be the financial statements we've been talking

22  about in December of '17, the general ledger and certain

23  documents produced by Vitol relative to its transactions

24  with GCAC from July '17 to January of '18.

25  Q    What, if any, conclusion did you reach about the amount

1    of cash GCAC collected in that time period compared to the

2    cash that it paid out for product?

3    A    They collected $30.5 million from sales and paid out a

4    little over $18 million for product, 16.6 of which went to

5    Vitol, and 1.7 went to a deal called the Shell deal

6    directly.

7    Q    And was that $18 million figure, did that $18 million

8    figure reconcile to what was supposed to have been paid by

9    GCAC in that time period?

10             MR. PATTERSON:  (indiscernible).

11             THE COURT:  Overruled.

12             THE WITNESS:  Can I have a question back please?

13   BY MR. COOLEY:

14   Q    Did that $18 million figure, based on your analysis,

15   reconcile to the amount that GCAC was -- would otherwise be

16   required to pay for the product that it transacted during

17   that period?

18   A    Based on Vitol's schedules, it would have been $3.7

19   million short on the product side.

20             MR. PATTERSON:  (indiscernible).

21             MR. COOLEY:  Your Honor, the witness is providing

22   his own analysis and has described in detail the processes

23   he's gone through to satisfy himself as to the reliability

24   of every document he's considered.  It may go to the weight

25   the testimony gives it, but it's absolutely permissible as

1   testimony from an expert.

2           THE COURT:  Overruled, overruled.  He can answer.

3   BY MR. COOLEY:

4   A    As recorded on GCAC's books, the amount that was due to

5   Vitol, as claimed by Vitol, was 3 point -- for product only

6   was $3.7 million.

7           MR. COOLEY:  Your Honor, I think I may be very

8   close.  May I have a just a couple of minutes to speak to

9   the dream team?

10          THE COURT:  Yeah, absolutely.

11          MR. COOLEY:  Thank you, Your Honor.  Your Honor, I

12  pass the witness.  Thank you.

13          THE COURT:  Okay.  Mr. Patterson.  Actually, let

14  me ask.  Mr. Dietz, do you need a break or are you okay

15  continuing?

16          THE WITNESS:  I'm good if everybody else is good,

17  Your Honor.

18          THE COURT:  Okay.

19                  CROSS-EXAMINATION OF GENE DIETZ

20  BY MR. PATTERSON:

21  Q    Do I do okay up here or do I need it?  Good afternoon,

22  Mr. Dietz.  I'm going to go back.

23  A    Good afternoon, Mr. Patterson.

24  Q    Let's go back to where we started and you -- and I'm

25  going to need you to correct me if I'm wrong, but I believe

1   you testified that when you started this process, you were

2   given a scope of work, right?

3   A    I put the scope of work in my report, yes.

4   Q    Well, no, my question is a little bit different.  When

5   you were hired, did someone give you a scope of work?

6   A    Yes.  They asked me, they asked me to perform these

7   analyses.

8   Q    Right.  And did they tell you where they were going,

9   what they needed?

10        MR. COOLEY:  Objection, Your Honor.  Counsel is

11   asking about communications between the attorney and the

12   experts.  Those are privileged under Rule 26(b)(4).

13        THE COURT:  I think the question is -- yeah, I'm

14   going to overrule it.  I think the question goes more to

15   bias, you know, in other words, was there a desired result

16   asked?  I think, I think that's fine.  I think you can

17   answer that question.  Mr. Dietz, you can answer..

18   BY MR. PATTERSON:

19   A    They did not communicate to me the outcome they would

20   like, did not.

21   Q    Were you told they needed an insolvent finding based

22   upon the books and records?

23   A    No.

24   Q    They didn't give you any indication who they

25   represented?

1    A    I knew who they represented.

2    Q    Okay.  And you understood the claims they were making?

3    A    I'm not sure I understand that question, Mr. Patterson.

4    Q    All right.  Did you understand the claims that were

5    asserted in this litigation prior to or at the time you were

6    hired?

7    A    I don't believe specifically I did understand them.

8    Q    All right.  And did you understand that Vitol, to be

9    successful, needed an insolvency, an insolvent GCAC?

10   A    I think I generally had that understanding but I don't

11   -- it didn't specifically come from anything that they told

12   me.

13   Q    Okay.  And you prepared an initial draft of this

14   report, of your report?

15   A    Yeah.

16   Q    And did you send it to the lawyers?

17   A    I did not.

18   Q    They didn't see an initial draft of your report?  A

19   preliminary draft?

20   A    They might have seen one but not that I sent them.

21   Q    Who did you send it to?

22   A    I wouldn't send it to anyone.

23   Q    They never saw this until you finalized it?

24   A    Let me, let me just be direct here.  They could have

25   seen it like on a Teams call or on a Webex or something like

1    that.  But you asked me if I sent it to him.  I didn't send

2    it to them, but I certainly could have reviewed a draft with

3    them back in March or February of the report before it was

4    finalized.

5    Q    All right.  And were you given instruction to make

6    modifications or changes in any way?

7    A    No.

8    Q    You weren't?

9    A    I was not.

10   Q    All right.  Now you said that you reviewed the

11   accounting records for GCAC, right?

12   A    Yes.

13   Q    And you went all the way down to the base level, which

14   I'll call the general ledger, right?

15   A    Below that to the bank statements.  But including the

16   general ledger, yes.

17   Q    Right.  And I believe your testimony is you found them

18   very reliable.

19   A    Yes.  And there was no reason not to find them

20   credible, believable, accurate.  Right?

21   A    I don't think there's -- they're very reliable.  I

22   don't think there's any reason not to utilize them for my

23   analysis.

24   Q    Right.  And even as you went through your analysis, did

25   you find gross errors, over statements, under statements,

1    just general unreliability?

2    A    No.  The records, let me just go through that with you

3    briefly.

4    Q    I just need you to answer yes or no.

5    A    No.

6    Q    All right.  And in addition to these reliable

7    accounting records, you talked to the tax accountant, right?

8    A    Yes.

9    Q    And what was the purpose of that?

10   A    To make sure that I understood what he'd received from

11   GCAC and that he used that in his process of preparing and

12   filing the tax return.

13   Q    Okay.  And did you talk to him about the product that

14   he produced?  The tax return?

15   A    Yes.

16   Q    And did you make sure you understood what he produced?

17   A    I understood that he produced a federal tax return.

18   Q    No, I didn't ask you if you understood what he

19   produced?  I asked you if you understood the content of that

20   document?

21   A    Generally, yes, I did.

22   Q    Not generally.  Did you talk to him and make sure that

23   your questions were answered?

24   A    Yes, I did.

25   Q    All right.  And how much time did you spend with him?

1    A    Less than an hour, more than 30, 45 minutes.  So close

2    to an hour.

3    Q    Okay.  And based upon your discussions with -- let me

4    back up.  He was a CPA also, right?

5    A    That's correct.

6    Q    And you're a CPA.  You're not licensed in the state of

7    Texas, are you?

8    A    I am not.

9    Q    All right.  So you're not a licensed CPA here as we sit

10   here today?

11   A    That's correct.

12   Q    All right.  And you can't hold yourself out to be a CPA

13   within the borders of this state, can you?

14   A    No, I'm not licensed in Texas.

15   Q    Right.  So as we sit here today, you're not a licensed

16   CPA?

17          MR. COOLEY:  Objection, mischaracterizes the

18   testimony and also calls for a legal conclusion.

19          THE COURT:  No, I think he's answered the

20   question.  So I like asked and answered better.

21   BY MR. PATTERSON:

22   Q    And so the CPA who prepared the tax return, you talked

23   to him 30 minutes to an hour.  Did you make any adjustments

24   based upon your discussions with the CPA who prepared the

25   tax return?

1   A    I did not.

2   Q    Did not.  And he answered all your questions?

3   A    He did.

4   Q    Right.  And I don't believe you testified you talked to

5   anybody else, did you?

6   A    I believe I talked, I did testify about Mr. Kuo and Mr.

7   Ruzek.  I might have forgotten his name.

8   Q    Right.  And I was thinking more of account financial,

9   along the lines of your expertise.  Anyone else that would

10  answer your financial questions?

11  A    That I spoke to directly?  No, I did not.

12  Q    Yeah, right.  And did you talk to, let me ask you this

13  question first.  You're an expert in valuation, right?

14  A    Yes.

15  Q    Now, just generally when you go and you're going to

16  value a business, a company, just give me the baseline.

17  What are you going to do?  Basics, a bare minimum.  I say I

18  need you to go value my son's business.  What do you do?

19  What's the first -- give me five things you're going to do.

20  The most important things.

21  A    What's the purpose of the valuation?

22  Q    Tax reporting.

23  A    Okay.  And that tells me that the standard is fair

24  market value, because for federal income tax purposes, I'm

25  going to apply the fair market value standard.

1    Q    Right.

2    A    And then I'm going to ask you what business this is and

3    get an explanation from you of what that business is.

4    Q    Me or my son?

5    A    You or your son, who can never give me the information.

6    Q    Okay.  I'm not involved.

7    A    So it will be the son.

8    Q    So you're going to need to talk to him.

9    A    Right.

10   Q    Okay.

11   A    I'm not going to need to talk to him.

12   Q    But you're going to.

13   A    I possibly could.  And often times, I would not need to

14   at all.  It depends on the records I get.

15   Q    Right, okay.

16   A    So then from those financial records, I would consider

17   what methodology I was going to apply, what approach.  And

18   then I would consider the approach and apply that to the

19   financial records of the company.

20   Q    Okay.  Simple as that.  Sit at your desk.  It's half a

21   day?

22   A    It's not a simple process, but it requires an

23   understanding of the valuation approaches and methodology.

24   Q    Okay.  But you just said for fair market value, a

25   business you didn't know anything about, you're going to get

004384

1    some financials, you don't even talk to the owner, you're

2    going to go sit down at your desk, spend a half a day and

3    you're going to come up with a fair market value?

4    A    That's not what I testified to.

5    Q    Okay.  That's what I'm trying to find.  What else do

6    you need to do?  Just kind of a baseline?

7    A    Well, it's not, there's no kind of a baseline.  First

8    of all, it's going to be facts and circumstances of that

9    business that will drive the amount of time I take.

10   Q    Tell me what -- you get hired, you just got hired.

11   What are you going to do?  You're going to say, well, I

12   don't know what I'm going to do because it depends on facts

13   and circumstances and I really don't know what I'm going to

14   do.

15           MR. COOLEY:  Objection, relevance.

16           THE COURT:  Overruled.

17   BY MR. PATTERSON:

18   A    So I'm going to get an understanding of the financial

19   operations of the business.

20   Q    Okay, and how, tell me how -- just generally how are

21   you going to do that?

22   A    By reviewing financial documents.

23   Q    Okay.  Which ones?

24   A    The general ledger, the financial statements, what's

25   available?

1    Q    You're going to need the general ledger, balance sheet,

2    the income statement, whatever he's got or she's got.

3    A    That's correct.

4    Q    Okay.  For how long?

5    A    That depends.  So in other words, it could be for the

6    current period.  It could be for historical periods.

7    Q    Okay.  We're doing a fair market value valuation.

8    What's the minimum that you're going to want to see?

9    A    It's going to be financial records that are adequate to

10   allow me to value it.  So I can't give you a checklist as I

11   sit here.  But it's going be the core financial documents.

12   Q    And I'm asking you, how do we get to that checklist?

13   What do you need to know?  Tell me, we're just having a

14   conversation, tell me what you need to know.

15   A    So I need to, I need to know what the assets and

16   liabilities the company are.

17   Q    Hard assets or book values, accounting?  What?

18   A    I'm going to start with the book values.  And then

19   consider, consider any adjustments from there.

20   Q    Okay.  All right.

21   A    And then that will just be a review of the assets and

22   the -- like I described with the affiliates this afternoon.

23   And then I'm going to look at the prospects, the operating

24   prospects of the company.

25   Q    How are you going to do that?

1   A    I'm going to look at the revenue and expenses of the

2   company.

3   Q    So historically -- history is going to tell you the

4   future?

5   A    No.  I'm going look at the current period.

6   Q    Okay.

7   A    I may look at the prior period and then I could

8   consider the prospects in the future.

9   Q    How do you consider prospects?

10  A    How I consider prospect?  I consider the performance in

11  the past and then where they stand today and what the

12  outlook is for the future.

13  Q    Okay.  And I just ask you, history tells the future and

14  you go, oh, no, no.  No, no, no.  History doesn't tell the

15  future.  And then you just told me again that you're going

16  to look at history and that's going to tell you the future.

17  A    I didn't say that.  Let me be more clear.

18  Q    Okay, please.

19  A    Valuation is forward looking.

20  Q    All right.

21  A    So the key here is what prospects that you might have

22  in the future.  But history informs your ability to deliver

23  on those potential prospects.

24  Q    Maybe, right, maybe.

25  A    You evaluate that.

1    Q    And I'm asking you, how do you get that?  How do you

2    get that future?  We got to see what the future might hold,

3    right?  How do you get that in valuing a business?

4    A    You look at the facts and circumstances and you

5    evaluate.  I don't, I don't have a better answer than that.

6    Q    You're an expert.  You ought to be able to tell me,

7    right?

8              MR. COOLEY:  Objection, argumentative.

9              THE COURT:  Sustained.

10   BY MR. PATTERSON:

11   Q    We can't do any better with a financial valuation

12   expert then I'm going to look at past, and I'm going to look

13   at current financials, and we're just going to kind of see

14   where we go because it's based on the future.

15             MR. COOLEY:  Objection, argumentative, ongoing

16   hypothetical.

17             THE COURT:  I'll go with the argumentative.

18   BY MR. PATTERSON:

19   Q    Do you have anything to add on valuation of a business?

20             MR. COOLEY:  Objection, vague.

21             THE COURT:  Overruled.

22   BY MR. PATTERSON:

23   A    You're going to consider what their current position

24   is.

25   Q    Okay.

1    A    And you're going to consider their past performance.

2    Q    Okay.

3    A    And you're going to look at what they would forecast or

4    consider they would have for their future prospect.

5    Q    Okay.  And you're legitimately concerned with me asking

6    these questions because you have, in effect, valued several

7    businesses in your analysis.  Right?

8    A    Yes.

9    Q    Right.  And you're concerned because that's really all

10   you did in valuing these three or four businesses, right?

11           MR. COOLEY:  Objection.  Assumes facts not in

12   evidence, concerned.

13           THE COURT:  He can answer.  Overruled.

14   BY MR. PATTERSON:

15   A    Can I have the question?  I apologize, Mr. Patterson.

16   Q    Sure you're concerned, you're struggling with my

17   questions because you don't want to go beyond what you

18   actually did to value these three businesses in coming to

19   your conclusions or your opinion today, right?

20   A    Absolutely not, absolutely not concerned.

21   Q    Okay.

22   A    Absolutely not.

23   Q    All right.  Good.  Because you went out and valued

24   these businesses is what you're telling the Court?

25   A    I went through and assessed each of the assets and

1    liabilities and listen to me.  I'm going to get to the

2    answer.

3    Q    My answer is easy.  It's yes or no.  Did you value them

4    as an expert?

5    A    For solvency purposes, you bet I did.

6    Q    You did.  Who'd you talk to?

7    A    Who did I talk to?

8    Q    Yeah.

9    A    I analyzed the financial records and I read --

10   Q    My question is who did you talk to?

11   A    I talked to Mr. Wagner and the two gentlemen at Vitol.

12   Q    Who at the businesses?

13   A    I didn't speak directly with anyone at the business.

14   Q    No one?

15   A    No.

16   Q    Did you call over there?

17   A    I did not.

18   Q    Did you go look and see what's there?

19   A    No.

20   Q    Did you ask anybody about goodwill?

21   A    I didn't ask anyone -- I didn't speak to anyone at that

22   business.

23   Q    Right.  Did you ask anyone about future prospects?  You

24   said value is future, right?  That's what you said.  It's

25   future.  Did you talk to anyone about the future of these

1    businesses?

2    A    I didn't, I didn't talk to anyone but I did read the

3    transcript very carefully.  The deposition testimony which

4    serves as a proxy for that interview.

5    Q    My question though is, Did you talk to anyone?

6          THE COURT:  Mr. Patterson, I want to make sure he

7    gets the opportunity to answer the question.

8          MR. PATTERSON:  I apologize.

9          THE COURT:  No worries.

10   BY MR. PATTERSON:

11   Q    My question is did you talk to anyone?

12   A    I did not  I did not talk to anyone at GCAC.

13   Q    So you didn't have the ability to ask anyone any

14   questions about the future of any of these businesses,

15   right?

16   A    I didn't ask.  No, I didn't ask anyone specifically

17   about the future of these businesses.

18   Q    And you don't know if there were pending contracts,

19   right?

20   A    I'm sorry?

21   Q    Any pending contracts for any of these companies,

22   right?

23   A    What I do know, well let me back up.  The answer is

24   they had a contract.  They had a JV of some sort with

25   Mercuria, and let me just slow down for a second, when they

1    went from Vitol to Mercuria.  And I read the deposition

2    transcript of Mr. Brass and everybody else in this case when

3    they talked about, when he talked about the future

4    opportunities that they had before them and that nothing

5    came of those future opportunities.  I considered that

6    carefully in my analysis.

7    Q    And when you valued because I think you said you valued

8    GCAC Holdings, right?  Did you value GCAC Holdings?

9    A    No, I determined --

10   Q    Well you wrote them you wrote them off as worth zero.

11   That's a valuation isn't it?

12   A    Yeah, I did that, as I testified, that they did not

13   appear to have, in my opinion, did not have the ability to

14   repay that amount to GCAC Holdings.

15   Q    Right.

16   A    GCAC standalone.  I'm sorry.

17   Q    You valuated business, right?  You valued it at zero.

18   A    No, I evaluated their ability to pay that debt at zero.

19   Q    Oh, I thought you told the Court that they were worth

20   zero.  So you wrote them off.

21   A    I could have said that, which would be also true.  I

22   wrote those amounts off for sure.

23   Q    Right, because they were valued at zero?

24   A    Because I didn't think they had, which was probably

25   saying the same thing, I didn't think they had any ability

1   to repay those amounts.

2   Q    Okay.  Is that a valuation -- as an expert, is that a

3   valuation?

4   A    Yes.  That would be a valuation of that --

5   Q    Okay.  And so did you talk to anyone at GCAC Holdings?

6   A    No.

7   Q    Did you go to their office?

8   A    No.

9   Q    Do you know where their office is?

10  A    I've seen the address, but I couldn't tell you where it

11  was.

12  Q    You didn't go.  Did you pick up the phone and call?

13  A    No, I didn't.

14  Q    Did you ask me or my partner, hey, I'd really like to

15  interview someone that knows something?  Just spend 30

16  minutes?

17  A    No.

18  Q    I mean you spent an hour talking to the CPA who

19  prepared a tax return, but you didn't even inquire as to

20  what GCAC Holdings was?

21  A    I didn't make any specific inquiry.  I read documents

22  and I read deposition transcripts.

23  Q    Okay.  Likewise Gulf Coast Crude.  You valued that

24  business at zero.  Right?

25  A    I did.

1    Q    Okay.  Based on what?

2    A    The fact that they're not operating.

3    Q    How do you know they're not operating?

4    A    They have no revenue and they --

5    Q    Okay, for what period of time?

6    A    2017.

7    Q    Okay.  Did you ask anyone to verify that it wasn't

8    periodic income?  Did you ask anyone, maybe they just hadn't

9    recorded anything in a while.  Maybe it's a different kind

10   of business.  Right?

11   A    I didn't ask anyone, but I did read Mr. Brass'

12   deposition transcript where he addressed the fact that they

13   were not operating.

14   Q    Okay.  And did you confirm with anyone?

15   A    Other than reading the deposition transcript, I did

16   not.

17   Q    All right.  And when was this deposition taken?

18   A    It was March of 2022.

19   Q    Right, so we're talking about four years.  So 2022,

20   they're not operating but we're talking about 2017 and 2018.

21   Right?

22   A    His testimony was as of 2017.

23   Q    Is that right?

24   A    Yes.

25   Q    They weren't operating?

1     A     That's correct.

2     Q     AJ Bullet, what'd you do?

3     A     The same thing, analyzed the financial records.  No

4     revenue, only expenses.  There's a Sprinter van that they

5     used to go to San Antonio with.

6     Q     Is it your testimony that a nonoperating company is

7     always worth zero?

8     A     No.

9     Q     That's not right.

10    A     That's not my testimony.  These nonoperating --

11    Q     Well that's what you said you based it on.  You said it

12    wasn't operating so therefore it supports my valuation of

13    zero.

14              MR. COOLEY:  Objection, mischaracterizes

15    testimony.

16              THE COURT:  Sustained.

17    BY MR. PATTERSON:

18    Q     Are you suggesting that a statement in a deposition

19    four years later that it's not operating or wasn't operating

20    then is the basis for your valuation of zero?

21    A     No, it's not.  It's part of the basis.  So I looked at

22    the financial records which show no operations and in the

23    case of Gathering and Holding, multimillion-dollar

24    obligations with no operation in 2017 and confirmed by Mr.

25    Brass' own testimony that they're nonoperating back in '17,

1    I felt formed a reasonable basis to conclude that they were

2    not capable of repaying those amounts.

3    Q    Okay.

4    A    And in addition to that, I think I also testified that

5    they don't show up on the bankruptcy schedules as well.

6    Q    Did you check any bank accounts?

7    A    I checked the balances, GCAC's balances as well as the

8    balances on all three of those affiliated companies.

9    Q    Okay.  And so even though you said that through your

10   investigation you found the financials to be very reliable,

11   this is an exception?

12   A    Reliable in the sense that they balanced and they had

13   transaction detail and they recorded the book value of those

14   obligations, which often happens.  I take the book value of

15   those obligations and I can -- I look at them and evaluate

16   what the full and fair value is and conclude they didn't

17   have any ability to repay those and I wrote them off as

18   zero.

19   Q    Did you confirm that there were no guarantors on these

20   loans?

21   A    I didn't confirm outside of the testimony.

22   Q    So you don't know if someone else, if they were some

23   value based upon security, right?  Did you check to see if

24   there was security for these loans?

25            MR. COOLEY:  Objection, assumes facts not in

```
 1   evidence?

 2              THE COURT:  Overruled.

 3   BY MR. PATTERSON:

 4   A    So I looked at the financial records and read the

 5   deposition transcript which said there was no terms, no

 6   terms on these obligations at all.  And that's the extent of

 7   the work I did, but I considered carefully their own

 8   operations, their own balance sheets, their own income

 9   statements and the fact that they were nonoperating.  I

10   didn't go full the title search for any security

11   obligations.

12   Q    Did you ask to see any security documents or any

13   documents related to the loans?

14   A    The three affiliate loans we're talking about?

15   Q    Correct.

16   A    Yeah, I did not.

17   Q    You didn't?

18   A    No.

19   Q    So you don't know if they exist or doesn't exist?

20   A    Well I --

21   Q    Is that an appropriate way to value a business or an

22   asset?

23   A    I think it is in this case.

24   Q    Without asking to see the documents?

25   A    I asked -- I saw all the financial records that were
```

```
 1   available to me.

 2   Q    The asset is a note.  Did you ask to see the note?

 3   A    The testimony indicated there was no note.

 4   Q    Okay.  But did you ask?  Did you follow up on that at

 5   all?

 6   A    I did not.

 7   Q    All right.  What assumptions did you make in performing

 8   your solvency analysis, if any?

 9   A    I'm sorry?

10   Q    What assumptions did you make in performing your

11   solvency analysis, if any?

12   A    Assumptions about?  I'm sorry I don't understand the

13   question, Mr. Patterson.

14   Q    Okay.  You performed a solvency analysis on GCAC, yes

15   or no?

16   A    Yes.

17   Q    All right.  Did you make any assumptions in performing

18   that analysis?

19   A    Let me describe the analysis.  I took the financial

20   records, the balance sheet, and income statement, the

21   balance sheets for the balance sheet test of GCAC, which is

22   recorded at GAP book value and I considered each of the

23   asset categories to make adjustments as we've been

24   discussing.  I wrote off the three affiliates.  That's -- I

25   say that's a result of my analysis, not an assumption of
```

1    what they were worthless.  But I did an analysis to conclude

2    that in my opinion they were worthless.  And then I did the

3    analysis of where that rendered them with negative equity

4    and concluded that they failed the balance sheet test.

5    Q    So the answer is no, no assumptions.

6    A    I'm trying to think of one and I can't think of one as

7    I sit here right now.

8    Q    Okay, well you're the one that did it.  So if there

9    were assumptions you would know what they were, right?

10   A    As I sit here today, I can't think of any assumptions

11   that aren't laid out as part of the analysis.

12   Q    Okay.

13          MR. PATTERSON:  If I could have, I don't know if

14   you've given me the --

15          THE COURT:  I believe I did, Mr. Patterson, let me

16   know.

17          MR. PATTERSON:  Okay.  We'll see if it pops up.

18   BY MR. PATTERSON:

19   Q    All right.  And you referred to this document -- we're

20   looking at Page 174 of Vitol Exhibit 81.  And you referred

21   to this quite a bit and do you see what's on your screen

22   there?

23   A    I see -- I'm sorry, can you shrink it just a little

24   bit, Mr. Patterson?

25   Q    Do you not recognize this?

```
 1    A     I do recognize it.

 2    Q     Okay.

 3    A     I just wanted to get the date.  That's all, sir.

 4    Q     Okay.

 5    A     Just to get the date.

 6    Q     Okay.  All right.  And these were the balance sheets

 7    that were produced.  I think you referred to them as

 8    reliable.  Right?

 9    A     Yeah.

10    Q     This is and this is what people at the business, GCAC

11    would look at if they were reviewing their financial

12    statements, right?

13    A     I'm not sure what they would look at, but this was

14    available and I think prepared by Mr. Tomaszewski.

15    Q     That's your understanding anyway.  R

16    A     From his testimony.

17    Q     Right.  And January 2017 balance sheet, solvent or not

18    solvent?

19    A     I'm sorry.  Which column would you like me to look at?

20    Q     The GCAC.  I'm only going to talk about GCAC.

21    A     Standalone, yeah.  So based on this document without

22    any adjustments, they had total assets of 12 million, total

23    liabilities of five million -- scroll down please, if you

24    could, just so I can see the equity real quick -- and they

25    have members equity of $7 million.  And on its face, that
```

1    would indicate that they would be solvent in January of '17.

2    Q    Right, balance sheet solvent, right?

3    A    Without any adjustments, yeah.

4    Q    I didn't ask you about adjustments.  I'm asking what

5    this financial, this reliable financial, you said they were

6    reliable, right?

7    A    Yes.

8    Q    Okay.

9    A    Mr. Patterson, let me clarify that --

10   Q    February of 2017 --

11   A    Or not.

12   Q    February 2017, GCAC balance sheet, solvent or not

13   solvent in your expert opinion based upon this financial

14   statement?

15   A    Well, it's not an expert opinion.  If you take this

16   balance sheet at its face value, a book value under US GAP,

17   then, and again, I can't see the equity but I assume it's

18   positive.

19   Q    Why do you need to see the equity.  Can you just look

20   at assets and liabilities for the balance sheet test?

21   A    I can definitely do that.

22   Q    Okay.

23   A    The screen is moving just a little bit.  It's 10.4

24   million for assets and 3.4 for liability.

25   Q    Right.

1    A    So on its face, this would indicate that they're

2    balance sheets solvent.

3    Q    June 2017.

4    A    Right.

5    Q    Balance sheet solvent, right.

6    A    In my opinion, they're insolvent, but they only become

7    insolvent when I write off the affiliates.

8    Q    Right.  And I'm asking, this is what someone at GCAC

9    would see, right?  They don't, they don't have the benefit

10   of your expert opinion.  Right?

11   A    I don't know who saw it or didn't see it.  But if you

12   look at this document and didn't make the adjustments I did,

13   this would indicate you're balance sheet solvent.

14   Q    Right.  So I think you said that you understood this

15   came from GCAC, right?

16   A    Yeah.

17   Q    That's what they would look at if an officer or a board

18   member were looking at financial statements, as far as you

19   know, right?

20   A    I wouldn't have an opinion on that.  I don't know who

21   looked at it.

22   Q    Okay.  And in fact, the only way, the only way they're

23   insolvent is you deciding to write down assets, right?

24   A    As of June 30, '17?

25   Q    Yeah.

1    A    The only way they're balance sheet insolvent is by

2    adjusting those three accounts to zero, which I think is

3    appropriate and renders them insolvent.

4    Q    Of course you think it's appropriate.  That's what you

5    did, right?

6    A    Right.

7    Q    But you did it without any real analysis other than

8    reading a deposition, right?

9    A    That's not correct.  That is not correct at all.

10   Q    What else did you do?

11   A    In terms of the adjustment to those, those three

12   companies?

13   Q    In determining that they're worth zero, all three.

14   A    Right.  So I looked at their balance sheet, their

15   individual balance sheets, their individual income

16   statements, and their nonoperating status.  And they didn't

17   appear to have, they didn't appear to have any ability to

18   repay those amounts.

19   Q    Right.  And you just happened not to provide that as an

20   exhibit to your report, right?

21   A    I'm sorry, provide what?

22   Q    Those balance sheets of those three companies or the

23   income statements.

24   A    I did.

25   Q    As an exhibit here?  I'm looking through your exhibits

1    and I just don't see that.  I see a summary.

2    A    I'm sorry, Mr. Patterson, the exhibits to my report?

3    Q    Yeah.

4    A    It's 4, 5 and 6.

5    Q    Right.  That's what I'm looking at.  Those are your

6    summaries, not the balance sheets and income statements,

7    right?  You provided the information in a separate form, not

8    what you reviewed.  You didn't provide what you reviewed.

9    Right?

10   A    I believe I did provide what I reviewed.

11   Q    A reference to it.  Not as an exhibit, right?

12   A    You mean like a picture of it?

13   Q    Right.

14   A    I didn't take a picture of it.  No.

15   Q    Well a scan, a PDF.

16   A    No, I didn't literally replicate it and put it in my

17   report.

18   Q    Right.  And you would also acknowledge without those

19   adjustments, those particular adjustments, GCAC would be

20   solving under each of those tests?

21   A    At June 30 for the balance sheet test, without those

22   adjustments, they would pass the balance sheet test.

23   Q    Right.

24   A    That would not necessarily cause them to have adequate

25   capital or be able to pay their debts as they come due.  You

1    would have to make the further assumption, Mr. Patterson,

2    that they can convert those assets into money.

3    Q    And did you investigate that?

4    A    I did.

5    Q    Who'd you talk to?

6    A    I didn't talk to anyone.

7    Q    Okay.  You just looked at -- again, you read the

8    deposition from 2022 and you looked at the balance sheet and

9    the income statements, right?

10   A    The deposition 2022 that was addressing the state of

11   affairs in 2017 and I reviewed the financial statements of

12   each of the three companies carefully.

13   Q    That's it?

14   A    Yeah.

15   Q    Okay.  And you see here your adjustments to get to

16   balance sheet insolvency?

17            MR. COOLEY:  Your Honor, I'm going to object to a

18   question about something that hasn't been identified for the

19   record what we're looking at.

20            THE COURT:  Mr. Patterson.

21            MR. PATTERSON:  I'm going to ask a question.

22            THE COURT:  Yeah, I know.

23            MR. PATTERSON:  I will.

24            THE COURT:  Why don't we.

25   BY MR. PATTERSON:

1   Q    So your adjustments as reflected here on Exhibit 1.1 of

2   your report, you recognize this, right?

3   A    I do.

4   Q    Okay.  And so this reflects and identifies the

5   adjustments that you had to make to get GCAC balance sheet

6   insolvent, right?

7   A    That's not correct.

8   Q    What does it reflect?

9   A    The adjustments I did make.  I didn't have to; I didn't

10  have to make any adjustments.  These are adjustments I felt

11  was appropriate under the circumstances of my analysis.

12  Q    Okay.

13  A    I put forward the adjustments and the effect of those

14  adjustments in the calculation.

15  Q    Right.  And so June, after you make almost $7 million

16  in adjustments, GCAC is reflected as balance sheet insolvent

17  by a million dollars, right?

18  A    That's correct.

19  Q    And you make another $6 million adjustment, same for

20  July, which puts some $1 million balance sheet insolvent,

21  right?

22  A    It's the same amount applied each month because it's an

23  asset that's being written off.  But that's correct.

24  Q    Right.  Okay.  So when you were trying to identify

25  adjustments, let me, let me just ask you.  How did you come

1   up and identify that this adjustment needed to be made?  Who

2   brought it to your attention?

3   A    No one did.

4   Q    No one?

5   A    No one.

6   Q    You just looked at the balance sheet and go, hey, I

7   ought to look at these and I don't, I don't think they're

8   worth anything.  Right?

9   A    No, I didn't do that either.  I looked at, I looked at

10  each of the accounts on the balance sheet, assets and

11  liabilities.

12  Q    Right.

13  A    And I investigated each one of those to the extent I

14  had underlying data and I had underlying data for these.

15  Q    Okay.

16  A    And I looked at the underlying data which indicated

17  they were, they had negative assets, they were loss-making,

18  they were nonoperating entities consistent with the

19  deposition testimony that they would not have the ability to

20  repay these three amounts.

21  Q    Okay.  And during your investigation of possible

22  adjustments, did you look for assets that may be undervalued

23  or not listed?

24  A    Yes.

25  Q    You did?

1   A    I did.

2   Q    And what did you do to look for those?

3   A    I went through the financial records.

4   Q    Well, but if it wasn't recorded, it wouldn't show up.

5   Right?

6   A    Well, if it was unrecorded, I went through the

7   deposition testimony and I looked at the bankruptcy filing

8   to see if there were assets mentioned there that would have

9   been known or knowable in 2017.  I considered all of that

10  information in my analysis.

11  Q    And are you aware that GCAC sued Vitol in 2018?

12  A    Generally, yes.

13  Q    Well, did you read their complaint?

14  A    I certainly could have, but I don't recall sitting here

15  today if I did or not.

16  Q    Now, is a litigation claim an asset?

17  A    A litigation claim could be a potential asset.

18  Q    Right.  It has some value to it, right?

19  A    Not necessarily.

20  Q    I didn't say necessarily.  I said it could.

21  A    Theoretically it could, yes.

22  Q    Right.  You're an expert.  It's possible.  Right?

23  Intangibles, you're familiar with that, right?

24  A    I am.

25  Q    Okay.  Intangibles can and many times do have value,

1    right?

2    A    That's true.

3    Q    Right?

4    A    Yes.

5    Q    And so you were generally aware that there was a

6    lawsuit filed by GCAC, right?

7    A    Yeah.

8    Q    And did you read the complaint?

9    A    Again, I don't recall specifically if I read it or not.

10   If it's in my documents considered list, I read it.  I just

11   don't recall as I sit here today.  I was aware of it.

12   Q    Why wouldn't you?  Why wouldn't you read it?

13   A    If I had it, I read it.

14   Q    Well, this is the day.  Did you, did you consider it an

15   asset?

16   A    Their lawsuit against --

17   Q    Yeah.

18   Q    What I considered was the fact that there was a $10

19   million -- I incorporated that I believe in the following

20   way.  There's a $10 million judgment and I perform a

21   sensitivity analysis where I adjust the $14.8 million that

22   GCAC recorded as due to Vitol.  And I adjusted that to $10

23   million for the amount of the judgment.

24   Q    What kind of sensitivity analysis is needed to do that?

25   A    Well that increases their equity by $4.8 million.

1    Q     No, what kind of sensitivity?  I understand what

2    sensitivity analysis is.  Explain the analysis to reduce it

3    from 14 to 10.  What kind of sensitivity analysis is that?

4    A     I'm sorry.  I don't understand the question.

5    Q     I'm using your words.  You said you performed a

6    sensitivity analysis and reduce the 14 to 10.

7    A     Right.  And does that alter the conclusion, or my

8    opinion on solvency.

9    Q     Okay, sensitivity as to the effect on solvency, not

10   sensitivity to the why you reduced it from 14 to 10.

11   A     No, absolutely not.  The sensitivity on the effect on

12   solvency.

13   Q     Right.  Back to my question.  Why did you not

14   investigate the claims made by GCAC against Vitol?

15   A     I considered that as considering those claims.

16   Q     How can you testify today you considered it when you

17   can't even testify whether you read the complaint or not?

18   A     Well, I know that the outcome, the outcome was a $10

19   million judgment.  I that $4.8 million as a proxy for that

20   that value.

21   Q     So you didn't look into it.  You didn't investigate.

22   A     Other than considering the impact on the, on the

23   judgment, I didn't go -- I didn't consider that particular

24   item any further, no.

25   Q     Any further.  Did you consider it or you did not

1    consider it?

2    A    I considered it.  I considered it when I reduced the

3    14.8 million to $10 million.

4    Q    But you didn't read the complaint.

5    A    I certainly could have read the complaint.  I just

6    don't recall as I sit here today specifically reading it.

7    Q    Okay.  And did you consider the fact that in analyzing

8    the financial transactions and analyzing the financial

9    reporting that GCAC and Vitol had entered into a joint

10   venture?

11   A    Did I consider it?  Yes.

12   Q    And how, how did you consider it?

13   A    I have the GCAC transactions, the sale of product and

14   the cost of product and the recording of the contingent

15   account payable.

16   Q    You referred to this.  You said you had the documents.

17   A    I'm sorry, could I just finish?  I'll be real brief.

18   In part of my analysis, so I analyzed the recording of this

19   account by GCAC.  And so I have those amounts in my

20   analysis.

21   Q    And is it appropriate, in your opinion as an expert,

22   when you're reviewing, analyzing, adjusting financial

23   statements for a particular period of time, do you look two

24   years in the future to see what it finally occurred?  Or do

25   you report as it was at that time?

1    A    What's known or knowable at the date of the analysis.

2    Q    That's right.  What was known at the time of the

3    reporting?  Isn't that true?

4    A    That's absolutely true.

5    Q    Absolutely true.  And so why as an expert would you

6    say, I looked at the $10 million dollars and determined that

7    there was no value at the time of those claims?  Why would

8    you do that?

9    A    That's the best information I had available to me to

10   make a sensitivity adjustment.

11   Q    No.  You had the complaint, right.  And you chose not

12   to read it.

13   A    I -- that's not my testimony.

14   Q    Okay.  Tell me what your testimony is.

15   A    I don't recall as I sit here today whether or not I did

16   read it.

17   Q    You gave it no serious thought or consideration.  Is

18   that fair?

19   A    The value of the litigation?

20   Q    Right.

21   A    Again, I can't -- I incorporated that in adjusting from

22   14.8 million to 10 million.

23   Q    You didn't because you don't even know if you read it.

24   A    I incorporated, incorporated the value of that

25   disagreement over what was due between Vitol and GCAC.

1    Q    But you agree with me that's an inappropriate standard

2    to look in the future.  You just agreed with me that you

3    consider the facts at the time of the reporting.  Right?

4    A    That's right.

5    Q    We can both agree --

6    A    Can I please finish?

7    Q    We can both agree that considering something in the

8    future is inappropriate when you're adjusting or finalizing

9    financial reporting for a particular period of time.  Isn't

10   that true?  Yes or no?

11   A    That's not a yes or no answer.  So I'm going to say

12   that there are circumstances when subsequent data is

13   appropriate to consider and I believe this is one of those

14   circumstances because I did -- let me just finish, I'll be

15   quick -- because I didn't have any, there's no better amount

16   to take into account what might have been the value of those

17   claims.

18   Q    Really.  What if it was a joint venture?  Wouldn't the

19   reporting be different?

20   A    It would be.

21   Q    All right.  Did you consider that?

22   A    I did.

23   Q    How did you consider that?  What did you do to consider

24   the fact that it was a joint venture?

25             MR. COOLEY:  Objection, foundation, the fact that

```
1    it was a joint venture.
2              MR. PATTERSON:  He just testified he considered
3    it.
4              THE COURT:  Overruled.
5    BY MR. PATTERSON:
6    A    The accounting, as recorded by GCAC, was that they were
7    responsible for 100 percent of the operation between the
8    Vital GCAC transaction.
9    Q    Where did you see that?
10   A    I saw in the general ledger how they accounted for
11   these transactions.
12   Q    How do you know that's 100 percent?
13   A    Because they have $14.8 million as a liability that
14   they deducted on their tax returns.
15   Q    How do you know that's 100 percent?
16   A    It's 100 percent of what Vito claimed they owed them.
17   Q    Why do you care what Vitol claimed unless they're
18   telling you what it should be?
19   A    They didn't tell me what it should be.  But all I'm
20   saying is that's how it was recorded -- my testimony is --
21   Q    You just said that's what they told you.
22   A    No, that's what Vitol claimed GCAC owed them.  Right?
23   Q    I don't know.  You tell me.
24   A    That's correct and what my testimony is, is that's what
25   GCAC recorded as a contingent liability on their books and
```

1    records.

2    Q    Okay.  Let's talk about that.  It was reported --

3    recorded as a contingent liability.

4    A    Correct.

5    Q    Okay.  And you're doing a solvency, insolvency

6    analysis.  How do you value a contingent claim?

7    A    Well it was, it was recorded as a contingent liability.

8    Q    Right.

9    A    They didn't treat it as a contingent liability at all.

10   Q    How do you know?

11   A    Because they deducted it on their tax return.

12   Q    Okay.

13   A    Once you've deducted it on your tax return, it means

14   that all the events necessary to make it a legitimate

15   deduction have been met.

16   Q    No, that's not what it means and you know that, right?

17   A    That's the --

18            MR. COOLEY:  Objection, argumentative.

19            THE COURT:  Overruled.

20   BY MR. PATTERSON:

21   A    That's the all event status and that's exactly what it

22   means.

23   Q    Right.  And what happens if it turns out not to be

24   true?

25   A    If it turns out not to be true?

1    Q    Right.

2    A    Then you would record a different amount and you'd

3    amend your tax return.

4    Q    Right, which is, in fact, what happened.  Right?

5    A    I don't know what happened.

6    Q    You just said it resulted in $10 million debt instead

7    of 14.

8    A    I don't know that they amended their tax return.

9    Q    I don't care about the tax return.  We're talking about

10   a solvency analysis that you did and the assumptions you

11   made, right?

12   A    I used $10 million, a reduction of $4.8 million as the

13   proxy, the best available information I had as a proxy for

14   the potential value of those claims.

15   Q    No, it's the best information that you chose to look

16   into, right?  There was other information that you chose not

17   to consider.  Isn't that true.

18   A    As I sit here today, I don't know what that would be.

19   Q    Well number one, let's go down the list.  There was a

20   complaint out there, that GCAC said we had a joint venture

21   and Vitol breached it and they ruined our business and they

22   caused us tens of millions of dollars of damage.  Right?

23   Did you, did you -- you don't know because you didn't read

24   it, right?

25   A    I don't recall that, Mr. Patterson.  I don't recall it.

1    Q    Because you didn't read the complaint.  Right?

2    A    No, my testimony is I don't recall reading the

3    complaint as I sit here today.

4    Q    Right.  That's right.  And therefore, you don't recall

5    any of the facts and circumstances of the allegations.

6    Right?

7    A    That's in the complaint?  I don't.

8    Q    Right.  And as a valuation expert, if, in fact, there

9    were some truth to those allegations, it would come into

10   play in your valuation or your accounting.  Isn't that

11   correct?

12   A    And I took that into account in two ways.

13   Q    How could you take into account something you don't

14   even remember looking at?

15   A    There's --

16   Q    How?  Tell me.

17   A    Let me just get my answer out.  So the first one, we

18   just talked about.  The 14.8 becomes $10 million.

19   Q    Forget about that, that's future.  That's future.

20   A    So in Mr. Brass' deposition --

21   Q    Okay.

22   A    -- he talks about the opportunity.  He talks about the

23   ideas and discussions that they had at the time with Vitol.

24   And one of the things -- and he talks about several

25   opportunities that they had that didn't come to fruition.

1    Q    Right.

2    A    And I considered those.

3    Q    Really?  Were in your report, do you say, You know I

4    looked into it.  I considered it.  I talked to the parties.

5    I talked to the lawyers.  I determined it was zero?  Just

6    tell me where in your report that is.

7    A    I don't say that explicitly in my report.

8    Q    Right.  In fact, you don't even mention it.  Right?

9    A    I mentioned the fact that I considered all assets and

10   liabilities and I read the deposition testimony.

11   Q    I'm talking about the lawsuit.  You didn't consider it.

12   It's not in your report, is it?  Potentially a significant

13   asset with some value at the time -- I know you looked into

14   the future, but we both agree that's inappropriate.  Right?

15   A    No, I --

16           MR. COOLEY:  Objection, the question assumes facts

17   not in evidence.

18           THE COURT:  Overruled.

19   BY MR. PATTERSON:

20   A    I don't agree in these circumstances that it is

21   inappropriate.

22   Q    Oh, this is an exception?

23   A    And when we're talking about the ideas and discussion

24   or what you say were opportunities --

25   Q    Right.

```
 1   A      -- I read Mr. Brass' deposition where he talks about

 2   that and talks about that nothing came to fruition.

 3   Q      Right, future.  Again, you're talking about you looked

 4   into the future.  You weren't focusing at the time, right?

 5   A      I was focused exactly at the time.

 6   Q      No.  You said that in fruition means in the future.

 7   Right?

 8   A      That's not what I said.

 9   Q      That's later in time.  When did the judgment get

10   entered?

11   A      I'm not talking about the judgment.

12   Q      You are.  You said the $10 million from 14 million.

13   A      I'm talking about the opportunities that Mr. Brass

14   discussed at the time.

15   Q      Opportunities for what?  What are you talking about?

16   A      For the businesses that he anticipated doing with

17   Vitol?

18   Q      I'm talking about the claims he had against Vitol.

19   A      And he said he had claims in his deposition.

20   Q      Yes.  And how did you consider that?

21   A      That's what I'm trying to tell you.

22   Q      Okay.  What does it have to do with his other

23   businesses and their opportunities?

24   A      His testimony was that he had claims against Vitol --

25   Q      Right.
```

```
 1   A     -- that would reduce the $14.8 million, but that none

 2   of those --

 3   Q    Let's get his deposition.  You keep saying this and I'm

 4   not sure what it is you're referring to that he said that

 5   they had claims worth $14 million against him.

 6   A    I didn't, I didn't say that he had claims that would

 7   offset the amount that Vitol would claim.

 8   Q    Okay.  And what did you do to figure out what those

 9   were?

10   A    So here's what I did specifically.  I considered the

11   fact that none of the opportunities came to fruition.  He

12   testified --

13   Q    You looked into the future.

14         THE COURT:  Mr. Patterson, I need you to let him

15   finish the answer.

16   BY MR. PATTERSON:

17   A    He testified to that.  Mr. Brass testified to that,

18   that none of them came to fruition.

19   Q    In 2022.

20   A    As of 2017.

21   Q    How could that possibly be when the lawsuit wasn't

22   filed till 2018.

23   A    That was his testimony.

24   Q    Let's get his testimony.  Where is it?

25   A    I think it's Page 86-89 of his March deposition.
```

1    Q    What did you say?  What page?

2    A    86-89 of the March deposition, Mr. Patterson.

3    Q    All right.  We're on Page 86.  I'm going to just scroll

4    through.  You tell me when to stop.

5    A    So I think it's Mr. Aurzada is examining him.  And he's

6    asking about the negotiations.

7    Q    Point me to the page.  I don't care about what you

8    think interpreting it.  Just tell me what's the basis for

9    what you're saying.

10        THE COURT:  Hold on.  I think we're getting way

11   too argumentative.  I think folks can ask questions and the

12   witness can answer.

13   BY MR. PATTERSON:

14   A    More specifically, why don't we go then to 87.

15   Q    Okay.  I'm on 87.

16   A    Or 88.

17   Q    Well you decide.

18   A    Let me just read -- okay, let's go to 88.  I mean Line

19   4, go to the answer.  There were a number of business terms

20   discussed.  This is Vitol and GCAC.  This is Mr. Brass's

21   testimony about the discussion.  I mean my involvement was

22   more on the general business plan and what we were

23   discussing, how we were going to participate together and

24   try to make money and what were the terms of that

25   participation, the terms of that participation?  We were

1    going to buy and sell asphalt and try and start several

2    other business lines that we talked about.  We had a

3    Canadian crude trading idea that we were looking -- that we

4    were working on that.  That should have gotten done.  We

5    were talking about repurposing spent diesel for drilling

6    fluid and we had a number of things that were, we were

7    discussing.

8    Q    Okay.

9    A    Of all the things you just mentioned, what was actually

10   done?

11   Q    Okay.

12   A    When you say what --

13   Q    Correct me if I'm wrong, but my question had to do with

14   the claims he had.  And you said I read the deposition and I

15   came to the conclusion they were worthless.

16   A    Right.

17   Q    Where?

18   A    I took these to be those claims that the opportunities

19   that they didn't get to do.  In his allegation, the

20   opportunities they didn't get to do.

21   Q    Show me again, where as an expert here, you valued his

22   litigation claims based on what?

23   A    We had a Canadian crude trading idea and we had a

24   number of other things we were discussing.  None of those

25   came to fruition.  And that's how you valued his litigation

1    claims as of 2018?

2    A    In addition to the discussion about the 10 million and

3    the 14.8.  They never came to fruition.  He was loss-making.

4    He didn't --

5    Q    Wait a minute, loss-making?

6    A    GCAC was a loss-making company in '16 and '17.

7    Q    What does that mean.

8    A    They had losses.

9    Q    Okay.

10   A    And then none of these came to fruition.

11   Q    None of what?

12   A    The opportunities that he's describing here.

13   Q    How do you know?

14   A    Because he said so.

15   Q    Okay.

16   A    And then, so what I have is we had some ideas and some

17   discussions.  Nothing happened.  And from -- and not only

18   did it not happen with Vitol, it didn't happen with Rio, it

19   didn't happen with Mercuria.  It didn't happen.

20   Q    How do you know?  How did you come to the conclusion it

21   didn't happen?

22   A    Just because Mr. Brass testified it.

23   Q    What did Vitol tell you?

24   A    They didn't tell me anything.

25   Q    They didn't?

1   A    No.

2   Q    You didn't get any documents from Vitol?  No emails,

3   nothing from general counsel?

4   A    No, I had emails and documents but nothing to address

5   this.

6   Q    I didn't say address this.  I said anything.  What did

7   they tell you about this case?

8   A    They didn't tell me anything.

9   Q    What documents did they give you?

10  A    I have a variety of emails and analysis of the

11  transactions, the Vitol GCAC transactions.

12  Q    Their analysis.

13  A    Yes.

14  Q    They didn't give you any source documents of anything.

15  No invoices, packing slips, transportation bills, storage

16  bills?  You just didn't see any of that.  Right?

17  A    I got, I got several of those items.

18  Q    Several meaning how many?

19  A    I'm guessing hundreds.

20  Q    Of?

21  A    Underlying foundational documents.

22  Q    Emails?

23  A    No invoices and bills of laden and stuff like that.

24  Q    All right.  Anything else that you utilized to value or

25  not value the litigation claims that were present in 2017

```
 1    and 2018?  Anything else other than this testimony right

 2    here?

 3    A    I don't know that the litigation claims were present in

 4    2017.

 5    Q    That's correct.  You didn't follow up at all, did you?

 6    A    I don't know that there was a lawsuit filed in 2017.

 7    Q    That's right.  You don't know.  You didn't even read

 8    the lawsuit, right?

 9              MR. COOLEY:  Objection, asked and answered.

10              THE COURT:  Sustained.

11              MR. PATTERSON:  No, Judge.  He testified he knew

12    about it, but he didn't read it.  Now, he just said he

13    didn't know about it.  So I think --

14              MR. COOLEY:  It mischaracterizes the testimony.

15    The witness has said he doesn't recall whether he read it or

16    not.

17              THE COURT:  Hold on folks.  The objection is

18    sustained.

19              MR. PATTERSON:  Thank you, Your Honor.

20    BY MR. PATTERSON:

21    Q    Anything else?

22    A    No, I think I've covered it.

23    Q    Okay.  You didn't ask any lawyers, right?

24    A    About what?

25    Q    The litigation claims, the asset.
```

1   A    No, I did not.

2   Q    And you didn't ask anyone about whether -- well, what

3   was the -- what's the basis of the $10 million debt?  As far

4   as you know?

5   A    The judgment.

6   Q    The judgment.  What does the judgment say?

7   A    That they are joint and severally liable for it.

8   Q    Anything else.  Any other basis for that?

9   A    I have to read the judgment.  I have read the judgment.

10  Q    And how do you know that that judgment has anything to

11  do with what was on the balance sheet of GCAC?

12  A    My recollection and my understanding is that the

13  judgment is what took the $14.8 million down to a $10

14  million obligation.

15  Q    Okay.  If the judgment doesn't reference any of that,

16  how do you know that?  How did you come to that conclusion

17          MR. COOLEY:  Objection, best evidence.  Counsel is

18  characterizing a document to the witness.

19          THE COURT:  Overruled.

20  BY MR. PATTERSON:

21  A    How?

22  Q    How.

23  A    That's how I interpret it.

24  Q    How?  I'm asking you.  You have a piece of paper.  It's

25  a $10 million judgment.  It's different amounts.  I mean

1   you're a financial guy.  Right?

2   A    Yeah.

3   Q    And so if you have two documents that reference the

4   exact same number, sometimes you can come to a conclusion

5   that they're related.  Right?  You have a report and an

6   invoice the exact same number, but no description either

7   way.  Sometimes you can make a connection.  Right?

8   A    Yeah.

9   Q    Okay.  But this here, we have 14 million and 10

10  million.  Right?

11  A    Right.

12  Q    We also have on the 14 million sometime in 2017,

13  December 2017.  Right?

14  A    Yes.

15  Q    Right.  The 10 million is when?  What's that dated?

16  A    It's in the future.  I don't recall specifically.

17  Q    Several years in the future.

18  A    Yes.

19  Q    I'm asking you how you made the connection?

20  A    I don't have a specific recollection, but it was my

21  clear understanding that that was to settle that obligation.

22  Q    How?

23  A    I don't -- as I sit here, Mr. Patterson, I don't have a

24  specific recollection.

25  Q    Did someone tell you?  Did a lawyer tell you?

1    A    No, I don't -- no one told me that.  I just did it from

2    my analysis and I came to that conclusion.

3    Q    Okay.  Instead of doing an independent evaluation of

4    the 14 million contingent liability.  Right?

5    A    I did it, I did an independent analysis of the 14

6    million.

7    Q    Okay.  And what you come up with?

8    A    Well they deducted it on their tax return.  So the GCAC

9    accounted for it as if it was an obligation that they had at

10   the time.

11   Q    Right.  And you just took that as good?

12   A    No, I just took that as the way they accounted for it.

13   Q    Right.  What analysis did you do, if any?

14   A    Analysis?  I'm sorry.  I don't understand the question.

15   Q    Of the 14.  It's listed as a contingent liability.

16   That means what to you?

17   A    The word contingent liability means that it is

18   contingent upon other events.

19   Q    Okay.  And in this case, what was it contingent upon?

20   A    I don't have a specific recollection.  My point is --

21   Q    You're not making a point.  I'm asking questions today.

22   All right.  So let's stick to my questions.

23           THE COURT:  Folks, again, I really want to turn

24   the temperature down.  Let's just ask questions and get

25   answers.

1    BY MR. PATTERSON:

2    Q    So my point is we both agree that when something is

3    listed as contingent, that means there's something out there

4    that may affect the liability amount or both, right?

5    A    When it's listed as contingent, that's true.

6    Q    Okay.  And so in this case, it was listed as

7    contingent, correct?

8    A    On the general ledger, it was listed as contingent.

9    Q    Right.  And so in your mind and in other professionals

10   and experts, that raises the question, is contingent on

11   what?  Right?

12   A    Contingent on what, yes.  My point is --

13   Q    And so what, did you do?

14   A    I looked at that facts.

15   Q    Hold on.  Let me finish my question.  All right?  What

16   did you do knowing that at least it's reported as being

17   dependent on a future act of some kind?  Right?  What did

18   you do to figure that out, to get an answer to why it was

19   contingent?

20   A    I noticed that they deducted it on their federal income

21   tax return in full.

22   Q    Okay.  You said that four times.  Forget about that.

23   What did you do to investigate the entry?

24   A    The entry came from information provided to them from

25   GC -- from Vitol.  And it's very important that they

1    deducted it on the tax return.

2    Q    I know you -- look, just forget about the tax return.

3    All right?  That's a future event and we both agreed future

4    events aren't appropriate to consider when you're looking at

5    a time period financial, right?

6    A    The tax return --

7          MR. COOLEY:  Objection.  Sidebar and

8    argumentative.

9          THE COURT:  Overruled.

10   BY MR. PATTERSON:

11   A    The tax return is not a future event.  That happened in

12   2017.

13   Q    How could a 2017 tax return for an event in December of

14   2017 be filed in 2017?

15   A    No, the data is for 2017.  It's filed in September of

16   '18.

17   Q    Right.  In the future.  Right?

18   A    Filed nine months after year end, yeah.

19   Q    That's the future.  Right?

20   A    From December, yeah.

21   Q    What did you do -- forget about the tax return.  What

22   else did you do to investigate the contingent nature of that

23   report?  That entry on that report?

24   A    Other than consider in the alternative the $10 million

25   judgment, I didn't do anything.

1    Q    Right, why?

2    A    Because GCAC themselves recorded it and deducted it on

3    a tax return.

4    Q    You also testified that you had no information of --

5    for January 31, 2018, right?  No financial information?

6    A    That's not correct.  I didn't have a financial

7    statement.

8    Q    Right, you had to create your own.

9    A    No, I had that information contained in the general

10   ledger.

11   Q    And you, and you used that information to create a

12   balance sheet.  Right?

13   A    That's correct.

14   Q    Right.  You created it, right?

15   A    Yes, from the general ledger data.

16   Q    All right.  It's not, it's not a corporate record of

17   any kind.  It's your creation, right?

18   A    As far as I'm aware of, there's not another financial

19   statement for January.

20   Q    And the adjustments -- you make a point in your

21   assumptions of pointing out that these Due From and Due To

22   were not supported by a note, by a written note, right?

23   A    I don't know that I make a point of it.  I think I

24   testified that I understood that there was no note.

25   Q    Right.  And what did you say about that?  Anything?

1    A    I don't believe I did.

2    Q    Right.  And you also -- but you found them to be

3    enforceable or real notes, right?  Or no?  You don't need to

4    look at him.

5              MR. COOLEY:  Objection, assume facts --

6              THE COURT:  Overruled.

7              MR. COOLEY:  Folks.  We're going way too for me.

8    So let's take five minutes and let's finish up.

9              MR. COOLEY:  Right.

10             CLERK:  All rise.

11             (Off the record)

12             CLERK:  All rise.

13             MR. PATTERSON:  Thank you, Your Honor.  I don't

14   have any further questions.

15             THE COURT:  Okay.  Any redirect?

16             MR. COOLEY:  Yes, Your Honor, but I can keep it

17   pretty brief.

18             THE COURT:  Mr. Pesce, you still may have control.

19   I just want to make sure.  If not, let me know.

20             MR. PESCE:  All right.  Thank you.

21                  REDIRECT EXAMINATION OF GENE DIETZ

22   BY MR. COOLEY:

23   Q    I think what I want to start with is just where we left

24   off.  You got a lot of questions about what happened in the

25   present 2017 time versus the future.  And I want to talk

1    about this $14 million.  I want to ask you about the $14

2    million liability that you were asked about that was

3    reflected on the financials.  Do you recall those questions?

4    A    Yes.

5    Q    Okay.  How was -- and this was described as what was

6    the name of it again?  An account --

7    A    Contingent account payable.

8    Q    Contingent account payable.  And was that listed on the

9    2017 balance sheet of GCAC?

10   A    Yes.

11   Q    How was it listed?

12   A    In the general ledger, I recall specifically it said

13   contingent account.

14   Q    Okay, sorry, listed as an asset or a liability?

15   A    Liability.

16   Q    Okay.  Could I have Vitol 81, EEPB 174?  And if we

17   scroll down to the liabilities, is that the liability you're

18   referring to there, listed on the screen in front of you?

19   A    Yeah, account payable contingent liability 14,866,873.

20   Q    What, if any, steps did you take to investigate or

21   verify for your purposes the source of that figure in the

22   general ledger?

23   A    The source of that figure was an analysis from Vitol

24   that showed --

25            MR. PATTERSON:  (indiscernible).

1          THE COURT:  Yeah.  Why don't you ask another

2     question.

3     BY MR. COOLEY:

4     Q    Did you invest or did you look at the general ledger to

5     see whether or how that figure was presented in the general

6     ledger?

7     A    I did.

8     Q    And what, if anything, did you find in the general

9     ledger when you looked at it?

10    A    The credit to the contingent liability for 14,866,000

11    is the exact amount of several debits that are in the profit

12    and loss statement, debits being deductions.  One of those

13    amounts is $3.7 million for unpaid product.  There are

14    amounts for storage.  There's amounts for freight and

15    demerge.  There's amounts for time value of money.  There's

16    amounts for counterparty risk known as trade country risk --

17          MR. PATTERSON:  (indiscernible).

18          THE COURT:  Overruled.

19    BY MR. COOLEY:

20    A    Among others.

21    Q    Okay.  Now when you prepared the January 2018 balance

22    sheet that you described earlier, what -- remind me again,

23    what was your source material for that?

24    A    The general ledger of GCAC.

25    Q    And when you prepared that balance sheet based on the

1    general ledger, did this figure still appear on the balance

2    sheet of GCAC as you prepared it?

3    A    Yes.

4    Q    And do you have an understanding as to who was

5    responsible for the maintenance of this general ledger?

6    A    The maintenance of the ledger?

7    Q    In real time, in 2017, for example.

8    A    My understanding is Kevin Boston.

9    Q    And there were a lot of questions back and forth.  I

10   want to be clear.  How was this figure, did this figure

11   appear in the GCAC 2017 tax return?

12   A    Yes.

13   Q    In what capacity?

14   A    Both as a liability and for the deductions in the same

15   amount and across the several accounts that I talked about

16   but they deducted 14.86 million on their tax return and

17   recorded this liability on their tax return.

18   Q    Could I have Vitol Exhibit 100 please?  And

19   specifically Page 14 -- PDF 15.  Do you recognize this

20   document?

21   A    I do.

22          MR. PATTERSON:  (indiscernible).

23          MR. COOLEY:  Well, that's just it, Your Honor.

24   Counsel's questions -- the witness testified to the tax

25   return.  Counsel said, I don't care; I don't want to talk

1    about that.  But the witness testified that the tax return

2    was relevant to the analysis.  So it's absolutely within the

3    scope.

4              MR. PATTERSON:  (indiscernible)

5              MR. COOLEY:  The questions, yes.  The answers come

6    from the witness and the witness said this was important.

7              THE COURT:  Overruled, you can answer.

8    BY MR. COOLEY:

9    A    I recognize this.  It's the 2017 federal tax return.

10   Q    Is this the tax return you were referring to in your

11   testimony earlier?

12   A    Yes.

13   Q    And where would I look in this tax return if I were to

14   look for the source of -- the presence of the $14 million

15   figure we've been talking about?

16   A    The first think you would look at is the balance sheet,

17   which is a few pages behind this.

18   Q    Mr. Pesce, could I have PDF Page 19.

19             MR. PATTERSON:  (indiscernible)

20             THE COURT:  Overruled.

21   BY MR. COOLEY:

22   A    So on Line 17, this is the balance sheet at the end of

23   year tax yea on the right hand side, the 2017 balance sheet.

24   And on Line 17, other current liabilities, Statement 4 is

25   16,414,382.  And if you were to go --

1    Q    Before we do that, just so the record is clear, at the

2    top of the page, this says Schedule L.  Would you, would you

3    tell me what the Schedule L refers to?

4    A    It's the balance sheet of GCAC consolidated as 12/31/17

5    on the right hand side.  And it's 12/31/16 on the left hand

6    side.

7    Q    Thank you.  And for the $16.4 million figure you've

8    described, where do we find what that's broken into?

9              MR. PATTERSON:  (indiscernible).

10             THE COURT:  Sustained.  Continue.

11   BY MR. COOLEY:

12   Q    PDF Page 42, please.  Scroll down just a bit.  Looking

13   at the page before you, PDF Page 42 of Vitol Exhibit 100, is

14   this the reference to the $14 million figure in the tax

15   return that you were testifying to earlier?

16             MR. PATTERSON:  (indiscernible).

17             THE COURT:  Overruled.

18   BY MR. COOLEY:

19   A    Yes, it's accrued expenses -- excuse me, Your Honor.

20   It's expenses, accrued expenses other, in the full amount of

21   14,866,973.

22   Q    Was the presence of that figure relevant to your

23   analysis of whether and how that figure in the balance sheet

24   should be treated in the 2017 timeframe?

25             MR. PATTERSON:  (indiscernible)

```
 1              THE COURT:  Overruled.

 2   BY MR. COOLEY:

 3   A    Yes.

 4   Q    How?

 5   A    Because they've deducted this in their tax return.  And

 6   so that liability, on GCAC's books, they record that

 7   liability and they deduct it on the tax return, which

 8   indicates that it's, at that point in time, not considered

 9   contingent.

10   Q    And just to be clear, this tax return would have been

11   as of what date?

12   A    December 31st, '17.

13   Q    Thank you.  By the way, if we take that number on the

14   balance sheet of the debtor and we move it to $10 million as

15   you described, does that make the debtor more solvent or

16   less solvent?

17   A    Less insolvent.

18   Q    Less insolvent.  Okay.  Have you been present in the

19   courtroom through some of the other trial days that have

20   taken place in this trial?

21              MR. PATTERSON:  (indiscernible).

22              THE COURT:  Sustained.  It's irrelevant.

23   BY MR. COOLEY:

24   Q    In the course of this trial, have you heard any

25   testimony that would suggest to you that the GCAC claims
```

1    described in the complaint that counsel referred to had

2    value?

3              MR. PATTERSON:  (indiscernible).

4              THE COURT:  Sustained and irrelevant.

5    BY MR. COOLEY:

6    Q    If, as counsel contends, GCAC believed that its

7    litigation claims had value, where would you have expected

8    to find them on the GCAC balance sheet?

9    A    As an asset?

10   Q    Did you?

11   A    No.

12   Q    To know your knowledge, is GCAC operating today?

13   A    I don't know.

14   Q    Do you know what chapter of the bankruptcy code it

15   filed under?

16             MR. PATTERSON:  (indiscernible).

17             THE COURT:  I'll overrule it.  He can answer if he

18   knows.

19   BY MR. COOLEY:

20   A    I don't know if it was 11 or 7.

21   Q    Okay.  In order to conduct the analysis you did and to

22   give the opinions, was it necessary for you to talk to

23   anybody that you didn't get a chance to talk to?

24   A    No.

25   Q    Is there anybody you wish you could have talked to in

1    order to make your analysis better?

2          MR. PATTERSON:  (indiscernible).

3          THE COURT:  Overruled.

4    BY MR. COOLEY:

5    A    No.

6    Q    If there's someone you had thought you needed to talk

7    to, do you have any reason to think you could not have

8    reached out and tried to arrange that if you felt it was

9    necessary?

10   A    No.

11   Q    You were asked some questions about what you knew about

12   some of these, the related entities and whether they might

13   be operating today.  As part of your analysis, did you

14   review the schedules of assets and liabilities of GCAC?

15   A    I don't understand the question.

16   Q    Sorry.  In the course of your balance sheet solvency

17   analysis, did you review, did you ever look at the schedules

18   and of assets and liabilities that GCAC filed in its

19   bankruptcy case?

20   A    Yeah.

21   Q    Do you recall whether those schedules listed any of

22   these related company loans as assets?

23         MR. PATTERSON:  (indiscernible).

24         MR. COOLEY:  There was a great deal of cross-

25   examination on the process.

```
 1                THE COURT:  Overruled.

 2   BY MR. COOLEY:

 3   A    They're not listed there.

 4   Q    What, if anything, does that tell you about GCAC's view

 5   of the value of those related party assets?

 6   A    At that point in time, the filing point in time, they

 7   had no value.

 8                MR. COOLEY:  I could have just a moment, Your

 9   Honor.

10                THE COURT:  Sure.

11   BY MR. COOLEY:

12   Q    Just one last question.  Out of all the financial

13   statements you looked at the general ledger, did any of

14   those documents indicate to you that GCAC expected at any

15   point in time to receive money back from Vitol?

16   A    No.

17                MR. COOLEY:  Nothing further, thank you.  Your

18   Honor.

19                THE COURT:  Any recross?

20                MR. PATTERSON:  (indiscernible).

21                    RECROSS-EXAMINATION OF GENE DIETZ

22   BY MR. PATTERSON:

23   Q    And you said you looked at the tax return for this $16

24   million loss and that answered the question for you, right?

25   A    I'm sorry, Mr. Patterson, I don't understand what
```

1    you're asking me.

2    Q    You referred to the tax return and the treatment that

3    the debtor gave that debt in the tax return as determinative

4    on how you treated it, right?

5    A    No, it indicated -- it was 14.8.  But my testimony was

6    that it is not contingent if you deduct it on tax return.

7    That was my testimony.

8    Q    And you looked at the tax return and that answered your

9    question for you.  No further investigation, right?

10   A    As to the word contingent, I didn't do anything past

11   that.  And then I testified the components of the 14.86.

12   Q    Well, you said you didn't know the components, but you

13   looked at the tax return.  Remember?

14         MR. COOLEY:  Objection, Your Honor.

15   Mischaracterizes the prior testimony.

16         THE COURT:  Overruled.

17   BY MR. PATTERSON:

18   Q    The lawyer showed it to you, right?

19   A    Yes.

20   Q    And you took it.  You looked at the balance sheet on

21   the tax return, right?

22   A    Yes.

23   Q    What does the balance sheet on the tax return show

24   regarding solvency?

25   A    On its face -- I'd have to look at again -- but on its

1    face, I think it shows that they're insolvent in December of

2    '17.

3    Q    Really?

4    A    Yeah.

5    Q    How much are the assets?  16 million?

6    A    In December of '17?

7    Q    Yeah.

8    A    I don't have it in front of me.  Thank you.

9    Q    Column D, end of tax year, total assets 16,874,000,

10   right?

11   A    Right.

12   Q    And what did you have?  Do remember this?

13   A    I do.

14   Q    All right.  What would be the result if you said it was

15   16 million as the tax return said?

16   A    We have to take their liabilities as well on the tax

17   return.

18   Q    I understand.  On your analysis, if the assets are 16

19   million instead of what you calculated, December of 2017?

20   A    They have the same net equity, Mr. Patterson, that's my

21   point.

22   Q    No, solvency on balance sheet.

23   A    Right.  That's equity, net assets, assets minus

24   liability.

25   Q    Right.

1   A    It's minus 11 million on the tax return.  They're

2   insolvent.

3   Q    I'm asking you, instead of your total assets after your

4   adjustments, if you used 16.8 million.  What is the answer

5   on the solvency?

6   A    I'm sorry.  I'm looking to Exhibit 1.1, Mr. Patterson.

7   Can you direct me to what you want me to look at?

8   Q    I'm asking about your analysis and your opinion if you

9   use 16.8 million as total assets for December 31, 2017?  The

10  balance sheet analysis, what does that give you?

11  A    They're insolvent.

12  Q    Okay.

13          THE COURT:  Anything further?

14          MR. PATTERSON:  No, Your Honor.

15          THE COURT:  Mr. Dietz, thank you very much for

16  your time.

17          THE WITNESS:  Thank you.

18          (Witness excused)

19          MR. COOLEY:  If I could have just a moment, Your

20  Honor.

21          THE COURT:  Absolutely.

22          MR. COOLEY:  Your Honor, can I suggest we take a

23  five-minute break (indiscernible)?

24          THE COURT:  Yeah, not a problem.  I'll come back

25  at 5:45.

1              MR. COOLEY:  Thank you, Judge.

2              CLERK:  All rise.

3              (Off the record)

4              THE COURT:  Mr. Cooley.

5              MR. COOLEY:  Your Honor.  Thank you for that.

6    That helped us to sort of make sure that we had, we were on

7    the same page where we needed to be.  Mr. Dietz is our final

8    witness.  I have two -- I have a couple of cleanup

9    evidentiary housekeeping matters that I want to touch on and

10   then I'm prepared to rest.

11             THE COURT:  Okay.

12             MR. COOLEY:  The first of the two is I just want

13   to let the Court know that with respect to the redaction

14   process, we have completed that redaction process for the

15   documents that have been admitted into evidence in the

16   course of the trial.  My understanding is those documents

17   redacted and only those documents are being uploaded to

18   Pacer, I think as we speak, so that the Court and the record

19   will have those.  Now I understand that we have one or two

20   open questions and we're not -- I want to be very clear.

21   Nothing we are doing is intended in any way to sneak

22   anything by.  Once we get that sorted out, the record is

23   what it is.  But I just wanted to let the Court know we're

24   getting that done.

25             THE COURT:  Okay.

1          MR. COOLEY:  And those are being uploaded so the

2     Court will have the benefit of those because I wanted to

3     have that.

4          I don't know since they're in a slightly different

5     form because they've now been redacted if I need to remove

6     their admission in this form or if the Court wants to go

7     based on the admissions thus far, but I can certainly do

8     that if that's helpful to make for a clean record.  Again,

9     I'm not looking to add any documents.  It's just whether

10    it's clear.

11         THE COURT:  I think it's clear that the documents

12    are what they are just in a redacted format.  That's the way

13    we discussed it.

14         MR. COOLEY:  Very good, Your Honor.  And then the

15    second thing is I wanted to ask the Court to take judicial

16    notice of a few additional documents.  They're the ones that

17    were identified in the papers, the trial papers we filed

18    previously.  These -- again, this is only for judicial

19    notice purposes and I can give the Court the documents.

20         THE COURT:  What are they?

21         MR. COOLEY:  Vitol Exhibit 83, which is the

22    Superior Crude petition.  The Court has already, I believe,

23    taken judicial notice of that.

24         THE COURT:  Okay.

25         MR. COOLEY:  Vitol Exhibit 86, which is the second

1    amended counterclaim document.  This was the counterclaim

2    filed by Vitol so on in the Brass in the GCAC Vitol

3    litigation.

4              THE COURT:  It's a court document is what you're

5    saying?

6              MR. COOLEY:  Yes, Your Honor, it's a court

7    document.  It's exactly that.

8              THE COURT:  Okay.  And then the schedules of

9    assets and liabilities of Mr. Brass, which is Vitol Exhibit

10   90 filed in this court, obviously, in his personal case.

11   The schedules of assets and liabilities of GCAC filed in

12   this court in its case.  That's Vitol Exhibit 93.  And then

13   finally, Vitol Exhibit 95, which is the certification of

14   amendments to Mr. Brass's schedules of assets and

15   liabilities again filed in his case.  So that's Vitol

16   Exhibits 83, 86, 90, 93, 95.  And that's it, Your Honor.

17             THE COURT:  Okay.

18             MR. COOLEY:  And again, I understand there's a

19   dispute as to what judicial notice means.  I'm not taking

20   that up.  I'm just asking the Court take judicial notice of

21   those documents to the extent is permitted under of the

22   rules, et cetera.

23             THE COURT:  Thank you.  Miss Goott.

24             MS. GOOTT:  Thank you, Judge.  In response to 83

25   and 86, you've already ruled.  We've already gone through

1    this.  We argued.  You ruled.  He's now asking you to take

2    judicial notice --

3         THE COURT:  If I've already taken up 83 and 86,

4    then the ruling is what it is on that.

5         MS. GOOTT:  Okay.  So, done.  Judicial notice is

6    appropriate of facts.  That's what courts take judicial

7    notice of.  What's happened here is now that they're done

8    and they've released their witnesses, they don't have

9    anybody here to ask you to take judicial notice of

10   schedules.  They can ask the Court to take judicial notice

11   of the fact that schedules were filed in these three cases.

12   And we don't object to that.  When Mr. Brass was on the

13   stand, they asked him to identify certain schedules.  We

14   didn't oppose.  He's not here.  It is just inappropriate to

15   ask the Court to take judicial notice of his schedules.

16   It's not what judicial notice is for.

17        I don't oppose judicial notice of the fact that

18   these schedules are filed on a date certain.  It's clear

19   what's happening.  They're done.  They forgot.  But to come

20   in and ask this Court to do something that's beyond judicial

21   notice is inappropriate.

22        THE COURT:  That's for 90 and 93.  What about 90 -

23   - so would that apply to 90, 93 and 95?

24        MS. GOOTT:  Yes sir.

25        THE COURT:  Okay.  I just want to make sure.

1    Thank you.

2            MR. COOLEY:  I'll just note very briefly, Your

3    Honor, as we lay out in in the briefing we found on the

4    docket, courts routinely take judicial notice of schedules

5    including where they represent admissions by party opponent.

6    But it is a routine thing for courts to take judicial

7    notice.  Thank you.

8            THE COURT:  I will take judicial notice of 90, 93,

9    and 95.  Okay.  What else do we do?

10           MR. COOLEY:  With that, Your Honor, the plaintiff

11   rests.

12           THE COURT:  Okay.  Ms. -- let me turn to Brass'

13   side then.

14           MS. GOOTT:  They rest, you've rested, right?

15           THE COURT:  Correct.

16           MR. COOLEY:  Yes.

17           MS. GOOTT:  Then at this time we ask the Court for

18   a motion -- for a ruling under 7052 for partial findings.

19   I'd also -- I'd like to back up one second.  Earlier in this

20   trial, the Court asked us or referred to an opinion by Judge

21   Isgur.  And I've read it and I wanted to just briefly

22   comment on it, but first I want to make sure that I read the

23   right piece, that the fact -- I presume that what you wanted

24   us to take from it is that the court can make rulings beyond

25   what's in the complaint based on what's in the joint

1    pretrial?

2              THE COURT:  There was a decision -- that there was

3    a discussion about that.  That's the part I wanted to focus

4    on and let the parties think about how what their arguments

5    were in respect to that because that case is out there.

6    That that was the purpose of it.

7              MS. GOOTT:  Okay, I just wanted to make sure.  I

8    just wanted to be sure I pulled the right part it.

9              THE COURT:  Yeah, I apologize.

10             MS. GOOTT:  And I would like to just briefly, if

11   the Court wants.

12             THE COURT:  Yeah, please.

13             MS. GOOTT:  A couple things.  In that opinion,

14   Judge Isgur says, okay, you didn't plead this stuff in the

15   complaint, but it was in the joint pretrial statement.

16   Everybody consented to it.  And it was in the contested

17   issues of law.  So, I'm going to rule.  So start with that.

18   In order to come to that conclusion, Judge Isgur relies on

19   Fifth Circuit cases and he pulls from there the Circuit case

20   law that says, we get to go beyond it because the joint

21   pretrial order from the lower courts put everybody on notice

22   and in other courts, unlike bankruptcy, we didn't have a

23   joint pretrial order.  We didn't.  We weren't ordered by the

24   court to say these are the issues, this is what you're

25   trying.  We have a joint pretrial statement which is

1    different than being ordered by the court.  So that's one

2    clarification that I would argue with Judge Isgur on that

3    piece.

4            But even without that, Judge Isgur then goes on to

5    say, well here we have a joint pretrial statement, right?

6    And in Ultra Petroleum, I believe, yeah, in the Ultra

7    Petroleum case, Judge Isgur says in your contested issues of

8    law, the issue was right there.  You knew it.  You consented

9    to it.  You signed your name on it.  And he even references

10   a Fifth Circuit case that discusses this consent issue.

11           And I went back and I read our joint pretrial

12   statement because after I read his opinion, I thought, oh

13   no, now I need to put in a joint pretrial statement, I

14   disagree.  I'm not consenting, right?

15           And I went back and I read it and I put that in

16   there.  Probably more luck than anything else.  But I put in

17   the joint pretrial statement, these issues that Vitol is now

18   raising in their joint pretrial statement, they can't do it

19   because they didn't raise it before.  I don't consent to it.

20   A week before we start trial, they're going to come up with

21   these new alternative arguments when discovery is over and

22   I'm not consenting to it is totally improper.  So in the

23   joint pretrial statement, I made it very clear that they

24   can't do it.

25           Number two, the difference between this case and

1    Ultra Petroleum is there's a section under contested issues

2    of law.  In this joint pretrial statement, the contested

3    issues of law are straight from the complaint.  They don't

4    put anything in there that's different that they were trying

5    to argue in court.  They don't put in the contested issues

6    of law, oh, Judge, if you decide to determine that this is a

7    joint venture, then we have this embezzlement argument.

8    It's not even in there.  So not only do I not consent, it's

9    not listed as a contested issue.  It's in their argument.

10   But under what Judge Isgur relied on was in the contested

11   issues of law, this was listed.  You knew.  So that's, I

12   think, a very big distinction between Ultra Petroleum.

13          Next.  When we got to court, Day One, we told the

14   Court we do not waive this argument.  In my opening, I said

15   it.  Mr. Patterson got up here and said, we are not waiving

16   this.  We are not waiving our argument that they don't get

17   to go beyond their pleadings.  So we didn't consent to it.

18   We think it's fundamentally unfair that one week before

19   trial they can change their legal argument, their position.

20          And in Ultra Petroleum, it was different.  They

21   said, hey, you didn't plead exactly how you get to your

22   damages.  You missed that piece in your complaint.  But it

23   was in the joint pretrial statement.  It wasn't an

24   alternative theory.  Here they're saying, Judge, even if the

25   whole complaint is there was a loan, the discovery, what's

1    your relationship, borrower lender.  And if they've come in

2    here now and wanting the Court to find something beyond

3    that, we don't believe they should.  That's my, that's my

4    response.

5            THE COURT:  Okay.

6            MS. GOOTT:  And then where I started was we asked

7    for a motion for findings under 7052.  I'm happy to go

8    through it, if you want.  I'm also, you've been here.

9    You've heard it.

10           THE COURT:  Let me, just one question for you, Ms.

11   Goott, are you asking for partial findings on all --

12           MS. GOOTT:  On everything.

13           THE COURT:  Okay.  I just wanted to make sure.

14           MS. GOOTT:  We believe that under A(2), A(4), A(6)

15   and then if you're going to consider their request for

16   attorney's fees, I know in the beginning the Court said you

17   weren't, but I see it as A(2), A(4), A(6), and a request for

18   attorney fees, they have not met their burden.  And I can go

19   through each one of those if you want.  I also don't want to

20   waste your time if, so I'll leave it up to the Court.

21           THE COURT:  Okay.  Let me, let me hear from Mr.

22   Cooley.

23           MR. COOLEY:  Your Honor, I'll start with the Ultra

24   Petroleum issue that the Court laid out.  Like Ms. Goott and

25   Mr. Patterson, we went back read the opinion very carefully,

1   thought a lot about it.  And I -- first of all, counsel said

2   in the joint pretrial statement, I think she even said maybe

3   it was just lucky that somewhere in the joint pretrial

4   statement they said, we do not consent or words to that

5   effect to amended claims or what have you.

6        I'm not sure where that is in the joint pretrial

7   statement.  I've looked at it, nothing leaps out at me.

8   Maybe counsel can clear that up in a moment.  But then the

9   other thing, Your Honor, and I hear what counsel is saying

10  that we're not allowed to raise new arguments, we're not

11  allowed to raise new legal theories, but I haven't heard

12  counsel articulate what the new legal theory is that we have

13  asserted that is not in our amended complaint.  Because if

14  we go back to -- even just, even setting aside the pretrial

15  order and whether the pretrial order changed anything, the

16  amended complaint included causes of action based on false

17  representation, based on actual fraud, and indeed includes

18  factual allegations relating to a number of the Husky

19  factors: whether the debtor was insolvent, whether Mr. Brass

20  intended to perform, whether the proceeds were used for

21  personal use, whether Mr. Brass had personal authority, and

22  so on and so forth.

23       Also in the amended complaint, we assert the

24  fiduciary claim has obviously been dealt with, but the

25  embezzlement claim is asserted.  Well, the embezzlement

1    claim I think was asserted from the start under 523(a)(4)

2    and then the 523(a)(6)claim is in there and we laid out each

3    one of those claims again in the joint pretrial statement

4    and for sure we, you know, we called out Husky very

5    explicitly.  We've been ringing that bell quite a lot I

6    think.  But in the pretrial statement we put that front and

7    center, cited the case, went through the factors one by one

8    to line up and I hope give the Court a little bit of a

9    roadmap of where we hoped to go in this.  But I am still

10   unclear, if it is being alleged that we are asserting --

11   that we appear to be advancing an argument or a legal theory

12   of the case that was not originally pled, I haven't heard

13   what that is.  And so I'm not sure -- assuming it's even

14   directed at me, I'm not sure how to respond to it.

15          And the Court put that case out for all parties to

16   consider, and I appreciate the way the Court did that, but

17   if that's being directed at Vitol, it is not clear to me

18   what anyone thinks is the new claim.

19          THE COURT:  Let me, let me be just be really

20   clear.  At least that's why I mentioned the case.  It's out

21   there.  It talks about some of the issues and it's a case

22   that I will have to review and consider.  So, I wanted to

23   get the benefit of the parties' thoughts on it.  That's

24   literally -- and it wasn't directed at anyone.  I's an issue

25   and it's an opinion that Isgur decided, right?  It's not

1    binding on me, but it's out there.  And I just wanted to get

2    the benefit of the parties' legal argument while you were

3    still here.  That's really, that was the purpose of that.

4         MR. COOLEY:  Understood.  And so I'm happy to

5    address those issues here, or in --

6         THE COURT:  Why don't you address the 7052

7    request?

8         MR. COOLEY:  Yes, Your Honor  With respect to

9    7052, I guess the main thing, like Ms. Goott, I'm happy to

10   walk through each of the claims one by one and I'm prepared

11   to do so and articulate for the Court how we think we have

12   made out a preponderance of the evidence, but certainly a

13   prima facie case that would defeat a Rule 7052 motion.  I'm

14   happy to go claim by claim if the Court would like me to.

15        What I'll say at the outset though, is under a

16   Rule 52(c) motion, which I think is what this is, a motion

17   for judgment on partial findings, when considering a motion

18   under Rule 52(c), the Court applies the same standard of

19   proof and weighs the evidence as it would at the conclusion

20   of the trial.  And so we've had eight days of trial

21   testimony, extended difficult sometimes testimony, a large

22   number of exhibits, documentary evidence.  And so as a

23   practical matter, unless the Court is considering ruling

24   from the bench on it, particularly to grant it, I think that

25   would be -- I don't know how the Court would go about doing

1    that, given that I don't imagine the Court would normally

2    rule on a trial like this from the bench, but the standard

3    of proof is the same in both.

4            And the standard looks at whether the plaintiff

5    has failed to make out a prima facie case.  It's not --

6    that's just evidence that would sustain the elements of each

7    of the respective claims.  And again, I'm happy to go

8    through them.  I'm happy to start right now at the top and

9    walk through each one of them if that's what the Court would

10   like.

11           THE COURT:  Let me just hear from Ms. Goott, Mr.

12   Patterson, on what -- not Mr. Patterson, Mr. Cooley

13   articulated.  I just want there to be a clean record that he

14   was unaware as to what you meant by a new argument when one

15   considers this first amended complaint and I'll give you an

16   opportunity to respond to that Ms. Goott.

17           MS. GOOTT:  Let me pull it up.

18           THE COURT:  Hold on, let me give you.

19           MS. GOOTT:  And I'm sorry if I wasn't clear but in

20   the lawsuit --

21           THE COURT:  I just want you to have an opportunity

22   just for the record.

23           MS. GOOTT:  Thank you.  So in the lawsuit and in

24   discovery that we talked about in court, the whole time they

25   said borrower lender, borrower lender, we loaned them money,

 1   they took our money.  Look at A(2).  It says clear as day.

 2   A(2) is very simple.  Four sentences I believe.  We loaned

 3   them money, right?  That's what they said the whole time.

 4   And then a week before trial, they file a joint pretrial

 5   statement where they start talking about, well, Judge, if

 6   you decide it was a joint venture, right, we still win.  And

 7   that piece is where I write Vitol claims that its debt is

 8   nondischargeable because Brass fraudulently obtained the

 9   funds it borrowed from Vitol.  Vitol is bound by its

10   pleadings and the factual allegations contained in their

11   pleadings and as a result, cannot prevail.  Right?

12           We're not accepting this argument that they're

13   coming up with now.  Up until the day of trial, we've been

14   fighting this fight for a long time.  And the whole time

15   they have -- that's why I sent this discovery.  Let me make

16   sure it's really clear what you're telling me that it's

17   alone because this case would have been so different had

18   they come in and said, we agree it was a joint venture.

19           We would have had accountants, we would have

20   people coming up here with numbers, but they have to first

21   prove that there was a loan because that's what they pled.

22   That's what we relied on.  Then we sent discovery to confirm

23   that.

24           They can't just show up the week before trial and

25   say, hey, let me plead in the alternative, Judge.  We all

1    know why they don't plead in the lawsuit in the alternative,

2    because then they exposed themselves to the Sargeant family.

3    Then they say, we breached, we breached our joint venture

4    with you guys.  Because in that lawsuit, those damages, I

5    imagine, are going to be much higher than anything they

6    could recover here.  They have to pick one and I get why

7    they want to come up with a story that there was a loan.

8    They got it.  They're stuck with it.  And that's my only

9    point.

10             THE COURT:  Thank you.  Mr. Cooley.

11             MS. GOOTT:  And I do agree --

12             THE COURT:  Go ahead, Ms. Goott.

13             MS. GOOTT:  And under 7052, that's what we do.  We

14   get up in court at the end of the trial and say they didn't

15   meet their burden.  They didn't show you these five things.

16   And if you don't even have evidence of hedges, you don't

17   have evidence of product, you don't have the basic evidence

18   to prove their case before we ever even get to Husky.  The

19   Court has been here as long as we have.  They didn't get the

20   basic evidence to prove their case and I think that it's

21   wholly appropriate.  We don't need to spend; I appreciate

22   they have an army to go sit and write 50 briefs.  They've

23   written to in the last couple of days, but we got limited

24   manpower.  We've sat here.  I think the Court has listened

25   and we'd like to get a ruling and if not, then we'll have to

1    go forward with our case.  Thank you.

2          THE COURT:  Okay.  Thank you.  Mr. Cooley.

3          MR. COOLEY:  Yes, Your Honor, and that was very

4    helpful.  Looking back at the pretrial order and

5    understanding the issue as Ms. Goott has articulated it, as

6    I read the pretrial order, excuse me, the pretrial

7    statement.  I've heard it and I don't mean to miss -- the

8    document is what it is.  I would submit that we were ordered

9    by the Court to provide whatever it is that is required in

10   the Southern District of Texas.  And this is the form

11   required, but I don't know whether that's just semantics or

12   not.  Right now, I'm going to set that aside.

13         To the joint venture question or issue raised by

14   Ms. Goott, as I read the joint pretrial statement, Vitol

15   invokes the phrase joint venture in its own sections of the

16   statement as opposed to the parties' joint statements or

17   defendant's response one time.  And that is in connection

18   with the embezzlement claim under 523(a)(4), I noticed

19   there's a typo in it now.  It says (a)(6), but it refers to

20   nondischargeable because it arose from Brass's embezzlement

21   of funds.  This is at the bottom of Page 4 of Docket Entry

22   106, if the Court is following along.  And we write that

23   Vitol contends that the agreed judgment debt is

24   nondischargeable because it arose from Brass's embezzlement

25   of funds entrusted to his care.  We go on to explain why.

```
 1          Then, at the top of the next page, we say, reach
 2    the conclusion.  Then at the top of Page 5, we say, in
 3    addition to the extent that the Court should conclude that
 4    Vitol and GCAC were at any point in time participants in a
 5    joint venture, Vitol would still have an equal right to any
 6    distributions -- another typo, I apologize -- made to the
 7    joint venture participants under such circumstances, et
 8    cetera, et cetera.
 9          So far as I can tell from looking at this
10    document, that is the only instance where Vitol invoked the
11    phrase "joint venture."  Through all of our claims, and I
12    think from the start, our position has always been
13    consistent.  We also recognize that the debtor has argued
14    vigorously that this was a joint venture and that that
15    impacts these claims.  And so I guess what I would say is to
16    the extent that that can be construed as an issue or a newly
17    pled legal theory, first of all, it is on that very limited
18    basis.  And I think the point of it is not a new legal
19    theory, but Judge, we have asserted that we are entitled to
20    this relief.  But even if you find it's a joint venture,
21    we're still entitled to this relief for the following
22    reasons.
23          The second thing I would point out is the line
24    that counsel pointed to at the bottom of Page 6 as the
25    nonconsent.  You know I've been in this situation before
```

1    where I am objecting or declaring my nonconsent to the trial

2    of a particular issue or to what I perceived to be an

3    amendment of a complaint.  And you are allowed, you're

4    noisy, you're consistent -- you are specific in ringing the

5    Rule 15 bell saying this is an improper unauthorized

6    amendment.  I do not consent to trial on this issue.  What

7    it says here is Vitol is bound by its pleadings and the

8    factual allegations contained in their pleadings and as a

9    result, cannot prevail under 523(a)(2).  So, first of all,

10   it only says that as to 523(a)(2).  But the other thing I

11   would note, Your Honor, is that the Ultra Petroleum case

12   that the Court cited to us makes it very clear that that

13   statement, that right there represents an argument.  That

14   represents their position that we should be bound to the

15   complaint.  Ultra says something different.

16          Ultra says, well, but if the pretrial order is

17   entered and it states the claims and they are not objected

18   to, then that -- then that is the statement of the claims.

19   And I would note that the reservation of rights language or

20   the nonconsent articulated by counsel here is with respect

21   to 523(a)(2), which is not the embezzlement claim.  It is

22   the false representation/actual fraud Husky claim.  So we're

23   talking about two different things because the statement

24   pointed to by counsel specifically refers to 523(a)(2).  It

25   doesn't -- it's not presented in any fashion to suggest a

1    lack of consent to trial of any of the other issues.

2    Frankly, I don't think it expresses a lack of consent to

3    trial of the issues under 523(a)(2), but it certainly

4    doesn't refer to any of the others.

5         And so I would say that, with respect to the joint

6    pretrial statement.  I'll pause there.  I don't know where

7    the Court wants to go.

8         THE COURT:  I'm going to, I'm going to deny the

9    7052.  The Court has the ability to defer until the final

10   ruling on evidence.  And I've heard a lot and there's a lot

11   for me to think about.  I understand the arguments, but the

12   rule gives me the opportunity to decline to render any

13   judgment until the close of evidence.  And that's what I'm

14   going to do.  I'm going to write a decision on this.  And I

15   think there's a lot of money at stake and I think, and I'm

16   going to do all the findings of fact and conclusion of law

17   at the closing of evidence.  And we'll see where that goes.

18        So we now turn to Brass and maybe we can talk

19   about where we go from here.  And that includes the ruling

20   on -- I will get the order on the Tomaszewski deposition

21   rulings on the on the transcript itself.  109, the ledger,

22   isn't in.  111 and 113 were already admitted and no one

23   moved for it.  115, my understanding is you didn't, you

24   didn't move for that admission of 115.  So I'll get that

25   this evening.  You'll have it at some point this evening.

1        MR. COOLEY:  I believe that's correct, Your Honor.

2        THE COURT:  Okay.  And the parties are going to

3   agree on -- and maybe I think that can be resolved by the

4   transcript.  But if anything, maybe the parties can then --

5   it may be easier to just file, you know, decision as to

6   whether this document is admissible or not basically and

7   just do that.  And I will just rule on it.  I'll go back and

8   listen to the transcript and do that.  Not today, not

9   tomorrow.  Let parties kind of think about where things go.

10        MR. COOLEY:  And Your Honor, I understand that

11   that Mr. Patterson -- there wasn't a lot of time to work

12   through the list and I appreciate that fact.  And so you

13   know just saying we reached out to counsel, happy to

14   continue that dialogue to see if we can mutually get to the

15   bottom of it and if we can't, we know where to find the

16   Court.

17        THE COURT:  If not -- I just want like here are

18   the ones that we're contesting and just Bates labels, right?

19   And I can make, I can tell you what I did.

20        MR. COOLEY:  We can either work it out or we can

21   give you that.

22        THE COURT:  Okay, that's perfect.  Okay.  Let me

23   turn to Brass.  What do you want to do today?

24        MR. PATTERSON:  (indiscernible).

25        THE COURT:  No, no.  I was going to ask you, kind

1    of a housekeeping matter today.  What your thoughts were and

2    things of that nature.

3            MR. PATTERSON:  (indiscernible).

4            THE COURT:  Who are you planning on -- do you

5    think we just talk, that would be easier?

6            MR. PATTERSON:  (indiscernible).

7            THE COURT:  Okay.

8            MR. PATTERSON:  (indiscernible).

9            THE COURT:  Recall Loya?  Okay.  In terms of --

10           MR. PATTERSON:  (indiscernible).

11           THE COURT:  So kind of one full day --

12           MR. PATTERSON:  (indiscernible).

13           THE COURT:  Okay, okay.

14           MR. COOLEY:  Your Honor, in keeping with the

15   spirit of flagging objections in advance, which counsel has

16   done for us a couple of times, the debtor's witness and

17   exhibit list identifies no witness by name other than Mr.

18   Brass.  It identifies conceptually there is a reference to a

19   Vitol corporate rep which I know has a meaning under Rule

20   30(b)(6) when one is taking the deposition of a corporate

21   represent -- trying to depose a corporate entity.  But when

22   it comes to trial testimony, witnesses are identified by

23   name.

24           THE COURT:  I got it.  Look Loya and Brass will

25   testify.  In terms of time -- I need -- I'm not in a

1    position -- t's going to be easier for me to talk with Ms.

2    Saldana and then pick dates, but you're talking one full

3    day.  Maybe we can all look --

4              MR. PATTERSON:  (indiscernible).

5              THE COURT:  Okay.

6              MR. PATTERSON:  (indiscernible).

7              THE COURT:  I just got to pick a date and maybe

8    just move some things around and take a look at my schedule

9    and, you know, it's just move things around.  Let me just

10   tell everyone in terms of closing, I thought a little bit

11   more about it.  I really want no more than 30 minutes each

12   side, if at all.  And you ought to think about no more than

13   30 minutes on admins and damages.  Anything you want me to,

14   anything in the record that you really think is super

15   important that's been admitted into the record that I should

16   focus on and how -- I want to know, based on how you

17   calculate your damages, I want to know, well, I know what

18   Brass is going to say, but I'll let you kind of figure out

19   your time in terms of how you want to do it.  One day, let

20   me, I'm hoping in the next -- and I don't want to jam

21   anymore.  So I'm going to work -- I'm going to have Ms.

22   Saldana work on it.  It don't make -- I know you're not

23   going to be here on Friday, but it doesn't make any sense to

24   do that.  Let's all like really sit back and think about it,

25   a day, day and a half that really works.  But I'm going to

1    try to do it back to back so that we don't lose momentum and

2    then we close that day, so that travel, you know, you got

3    two days and you can get it in a day, a day and a half and

4    close.

5              MR. PATTERSON:  (indiscernible).

6              THE COURT:  And I'm and going to go old school and

7    pull out the timer.  Like I really do mean like a 30

8    minutes.

9              MR. PATTERSON:  (indiscernible).

10             THE COURT:  Yeah.

11             MR. PATTERSON:  (indiscernible).

12             THE COURT:  Which means that I'm going to commit

13   to moving things around so we can start early and finish and

14   what I'm doing -- and even if we can do it in one day, then

15   that that will be the goal.

16             MR. COOLEY:  Judge, we're here to do what we can

17   to make that happen.

18             THE COURT:  No, no, no.

19             MR. COOLEY:  I don't mean today.  I mean --

20             THE COURT:  No, no, I know.  The goal, so Goal

21   Number One is, you know, may be by Monday the latest, can

22   the parties just at least let me know what issues are

23   outstanding with the admitted documents to date.  Right?  I

24   think that can get done by Monday and Ms. Saldana will reach

25   out to everyone with dates tomorrow.  I just -- I need to

1    just make a couple of phone calls, see if I can move some

2    things around and, you know, whether people are really going

3    to go and not go but -- and then we'll pick one day and

4    we'll have one more day and that'll be it and we're done.

5    But I'm going to have Ms. Saldana throw out a couple of days

6    so that we can confirm that Mr. Brass can be, just with the

7    travel schedules and all that stuff, and Mr. Loya.  Okay?

8    All right folks.  Thank you.

9            CLERK:  All rise.

10       (Proceedings adjourned at 6:23 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>CERTIFICATION</u>

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7    *Sonya M. Ledanski Hyde*

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  October 6, 2022

```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3                                )  CASE NO: 21-60025
                                  )
 4    ARTHUR JACOB BRASS,         )  ADV. CASE NO: 21-06006
                                  )
 5                                )  Houston, Texas
               Debtors.           )
 6                                )  Thursday, October 13, 2022
                                  )
 7    Vitol Inc.,                 )  2:01 p.m. to 3:05 p.m.
                                  )
 8                   Plaintiffs,  )
                                  )
 9        Vs.                     )
                                  )
10    Arthur Jacob Brass,         )
                                  )
11                   Defendants.  )
      -----------------------------)
12
                             TRIAL
13          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE
14
      APPEARANCES:
15
      For Plaintiffs:          MICHAEL P. COOLEY
16                             Reed Smith, LLP
                               2501 N. Harwood, Suite 1700
17                             Dallas, TX 75201

18    For Defendant:           JOHNIE J. PATTERSON
                               Walker & Patterson, PC
19                             P.O. Box 61301
                               Houston, TX 77208
20
      Court Reporter:          ZILDE MARTINEZ
21
      Courtroom Deputy:        ZILDE MARTINEZ
22
      Transcribed by:          Veritext Legal Solutions
23                             330 Old Country Road, Suite 300
                               Mineola, NY 11501
24                             Tel: 800-727-6396
      Proceedings recorded by electronic sound recording;
25    Transcript produced by transcription service.
```

Page 2

```
 1        HOUSTON, TEXAS; THURSDAY, OCTOBER 13, 2022; 2:01 P.M.

 2             CLERK:  All rise.  Be seated.

 3             THE COURT:  Okay.  Good afternoon, everyone.  This

 4   is Judge Lopez here for the 2:00 case, which is Vitol v.

 5   Brass here on closing arguments.  I'm seeing everything

 6   filed on the docket.  Is there anything else -- is there

 7   anything we need talk about before we get right to it?

 8             MR. COOLEY:  Nothing substantive.  Nothing

 9   substantive, Your Honor.  One thing I just wanted to let the

10   Court know, I've been in contact with Ms. Saldana.  We did

11   put all of our exhibits on the docket, as we'd previously

12   indicated, with the exception of Exhibit 75, which was so

13   large it would have to be broken into 58 pieces.

14             THE COURT:  Okay.

15             MR. COOLEY:  After some discussions with Chambers,

16   we understood that we could provide a copy on CD instead.

17             THE COURT:  That's just of 75 or --

18             MR. COOLEY:  It's actually all of them.  We

19   figured we'd go ahead and just put all of them on there, but

20   75 is on there.  I have one for Counsel as well.

21             THE COURT:  Okay.

22             MR. COOLEY:  If I can -- may I approach?

23             THE COURT:  Yeah.  Absolutely.  Okay.

24             MR. COOLEY:  And that was all from our --

25             THE COURT:  Before we get to kind of closing
```

1   arguments, is there going to be any tech that I should be

2   aware of?  I'm still going to hold everyone to the 30

3   minutes per side.  I just want -- if anybody's going to put

4   anything on a screen or show me anything, I just -- before I

5   start your timer, I wanted to make sure I handed the tech

6   off to anyone who needed it.

7            MR. COOLEY:  We're planning to, Your Honor.  Yeah.

8            THE COURT:  Okay.  Who do I make --

9            MR. COOLEY:  Me, to the podium.

10           THE COURT:  Oh.  You got it.  Before we start, I'd

11   be remiss if I didn't thank all the parties for all the hard

12   work that's gone into this.  I really appreciate all the

13   hard work and the testimony.

14          And before we begin officially, my understanding

15   is that your side is resting, and I just wanted to just -- I

16   don't think we had officially done that on the record, and I

17   just wanted to make sure before we proceeded to closings

18   that we had the official word so that the record was clear.

19   Okay.  Okay.  Wait.  I'm going to.  I really do mean this.

20   I'm going to pull out -- I brought my phone out here, so...

21   Okay.  Mr. Cooley, I'll turn it over to you, sir.

22          MR. COOLEY:  Thank you, Your Honor.  And may it

23   please the Court, I want to start at the outset by putting

24   some numbers up on the screen to frame the discussion,

25   beginning with the amount and the origin of Vitol's claim.

1          Now, in a lot of discharge trials, the Court's

2     first task before it gets to the question of determining

3     dischargeability is to liquidate the claim sought to be

4     excepted from discharge.  Now here, that determination is

5     not necessary for the Court because Vitol already has a

6     liquidated claim.  That claim arose between June and

7     December 2017 as a result of a series of transactions in

8     which Vitol fronted money for the purchase and sale of

9     asphalt as well as expenses associated with that, holding

10    the asphalt, heating, hedging, transportation, and so forth.

11         And regardless of the nature of that relationship

12    and whether its character changed at any particular point in

13    time, by December of 2017, GCAC showed no joint venture

14    asset on its balance sheet but a $14.866 million contingent

15    liability.  And I would make air quotes there because eight

16    months later, Mr. Brass signed a tax return in which that

17    same contingent liability was apparently determined to have

18    satisfied the all events test under the internal revenue

19    code so that GCAC could declare it as an accrued expense on

20    the 2017 tax return, as the Court saw during the trial.  And

21    Mr. Brass did not come and take the stand in this case to

22    tell the Court any differently.

23         Now, of that 14 million, $3,769,000 represented

24    the sale proceeds that GCAC, we contend, was required to

25    remit to Vitol, but that claim was ultimately liquidated in

1   its entirety in the amount of a $10 million agreed judgment

2   entered into among the parties.

3        Now this is, from our perspective, where it gets

4   interesting because if the Court is wondering why Vitol

5   pursued the case, this next slide is why.  Because at the

6   same time that GCAC was short paying sale proceed expenses

7   and other costs to Vitol to the tune of $3.769 million, Mr.

8   Brass was causing GCAC to transfer almost the exact same sum

9   of money, $3.711 million, to himself and to his mother.  And

10  we know this from a simple comparison of the due to

11  shareholder asset line and the due from shareholder -- I got

12  that backwards -- the due from shareholder asset line and

13  the due to shareholder liability line at June and December

14  2017, as the Court can see on the screen with citations to

15  the record.

16       In the next 12 months, the 2018 balance sheet told

17  us that Mr. Brass transferred another $3.247 million to

18  insiders, and the bank statements reveal another $1.051

19  million in insider transfers in 2019.

20       Your Honor, we have tabulated the 2019 transfers

21  on the next slide, all of which brings the total insider

22  transfers to $8.01 million.  Two are for the benefit of

23  insiders.  All of which is verified by GCAC's own balance

24  sheets admitted into evidence, and bank statements, and

25  tracks closely with Mr. Dietz's testimony regarding the

1    fruits of his own analysis.  Without these transfers, Your

2    Honor, we're not standing here today.  Without these

3    transfers, there would be nothing for us to talk about.

4          Now before I turn to the claims themselves, I just

5    want to leave the Court with these few key figures to keep

6    in mind as I go forward.

7          Today, Mr. Brass owes Vitol a debt of $10 million

8    per the agreed judgment which arose out of the 2017

9    transactions out of which GCAC at the time believed itself

10   to owe an even larger sum.  And that's important, Your

11   Honor, because of not only the timing of the transactions

12   but also because GCAC effectively conceded that liability

13   when it claimed the full amount on its tax return.

14         Out of that liability, $3.7 million approximately

15   represents sale proceeds withheld from Vitol and instead

16   transferred to Mr. Brass and his mother from June to

17   December 2017, a sum that eventually grew to $8 million.

18         Now with that backdrop, I will turn to Vitol's

19   claims and the elements of those claims which fall into two

20   main categories.  The first category, Your Honor, are those

21   claims based on the debtor's fraudulent misappropriation of

22   asphalt sale proceeds that were contractually required to be

23   paid over to Vitol.  The evidence for each of those claims,

24   as the Court will see as we walk through it, is largely the

25   same and revolves around breach of GCAC's promise to pay

1    Vitol for product as reflected in the various what I'll call

2    Deal 1, Deal 2 emails the Court may recall under

3    circumstances that we contend indicate fraud.

4          The second basket is of course the Husky claim.

5          Now for all of these claims, the burden of proof

6    is the same.  Section 523(a) is construed narrowly, and we

7    understand that.  But the evidentiary standard here is

8    preponderance of the evidence, not clear and convincing.  In

9    other words, it is a more likely than not test, and I would

10   submit to the Court that when we get to the actual elements

11   of those claims, the matter of whether the party's original

12   relationship was in the nature of a joint venture or a

13   financing of some kind is going to be largely mooted by the

14   agreed judgment.

15         If the parties were still litigating their claims

16   or if we had come into court and had to ask this Court to

17   liquidate Vitol's damages, its underlying claim, it might be

18   different.  But at this stage, I think the Court will see as

19   we walk through the elements that the issue is largely

20   irrelevant to the actual legal elements of each claim under

21   Section 523(a).

22         Now I want to start with the Husky claim and the

23   reason is because the badges of fraud analysis that is the

24   centerpiece of that analysis is going to ripple through the

25   other 523 claims.

1       Now Vitol contends that under Section
2  523(a)(2)(a), Mr. Brass owes a debt to Vitol that was
3  obtained by actual fraud in the form of a series of
4  fraudulent transfers to himself and to his mother.  And as I
5  said, that figure is approximately $8 million as I laid out
6  on the earlier slide.
7       Now the facts of this case, Your Honor, we contend
8  line up closely with those of Husky versus Ritz.  In Husky,
9  the Court described a three-step analysis.  The first two
10  steps ask whether Mr. Brass can be held personally liable
11  for the obligations of GCAC.  Now Mr. Brass is already
12  personally liable on the agreed judgment.  But these two
13  steps are also relevant to establish Mr. Brass' culpability
14  for the fraudulent transfer of funds that caused GCAC to be
15  unable to repay Vitol.  And then in the third step, we
16  consider whether Mr. Brass' personal liability gives rise to
17  a nondischargeable obligation under Section 523(a)(2)(a),
18  and a three-part test spelled out in Husky.
19       Now direct evidence of fraud is rare.  The Court
20  knows this, and therefore fraud is typically proven through
21  the badges of fraud set out in Texas Business and Commerce
22  Code Section 24.005(b).  Not all of them must be satisfied,
23  and some of them we know bear more on the analysis than
24  others.  So how did the evidence in this trial line up with
25  the badges of fraud?

1          From June 2017 to June 2019, Mr. Brass caused GCAC

2     to transfer over $8 million to insiders, himself as the 100

3     percent owner of Trifinery, and to his mother, Joyce Brass.

4     As Judge Bohm observed in the Husky case, this badge is so

5     significant that an insolvent debtor's transfer of funds to

6     an insider can warn a finding of fraud even in the absence

7     of any other badge.  And as Mr. Brass conceded in his

8     examination here, he exercised control over all of GCAC's

9     accounts at all relevant times.

10          And Mr. Brass indeed retained control of these

11     funds, which is the next element, as evidenced by the fact

12     that they were transferred into his or his mother's account

13     or were paid to vendors for his personal benefit.  The

14     transfers were concealed.  Consistent with the facts that

15     Judge Bohm describes in the Husky case, Mr. Brass made no

16     attempt to undo these transfers before he filed bankruptcy,

17     which is something Judge Bohm pointed to.  And Mr. Brass

18     failed to disclose the resulting due to/due from balances as

19     assets in the GCAC schedules, despite the presence on the

20     balance sheets.

21          Furthermore Your Honor, we would contend that the

22     Chubb insurance jewel rider suggests a broader pattern of

23     concealment insofar as Mr. Brass ensures and apparently owns

24     up to $3.8 million in undisclosed jewelry, and Mr. Brass did

25     not take the stand in this case to tell the Court any

1    differently.

2            THE COURT:  Just a second.  I'm going to pause

3    your time.  There's someone that needs to put their phone on

4    mute.  I'm sorry.  Hold on a second.  I apologize.  Please

5    continue.

6            MR. COOLEY:  Not at all, Your Honor.  Thank you.

7    Turning to the next factor, litigation was pending at the

8    time these transfers were made in the form of an action

9    commenced by Superior Crude against GCAC in February of 2017

10   and another action commenced by Mr. Brass in -- against

11   Vitol in 2018, but that itself resulted in claims being

12   asserted against Mr. Brass and GCAC.

13           The transfers occurred after a substantial debt

14   was incurred.  After all, the Court saw GCAC's own balance

15   sheets and tax returns listed the Vitol debt at $14.8

16   million making it the largest debt on the balance sheet by

17   far.  And the pattern of transfers shows unequivocally that

18   Mr. Brass only began draining GCAC of cash after the GCAC

19   Vitol relationship began, beginning with $672,000 in August

20   of 2017.  And again, Your Honor, these cites are provided on

21   the screen, Vitol 124 for that last point at pages 51 to 54.

22           There was no equivalent value received in exchange

23   for these transfers.  They were recorded as due from loans,

24   but as the testimony showed were not supported by any

25   written documentation.  And indeed, Mr. Brass himself

1   repeatedly insisted in his testimony that he didn't view

2   them as loans himself.  In fact, he objected to their

3   characterization as such.

4          And finally as solvency, it was, we contend,

5   uncontroverted, as established by Mr. Dietz and corroborated

6   in black and white by GCAC's own balance sheets.  And while

7   Mr. Dietz fielded a number of questions about whether or not

8   he considered the possibility of a contingent litigation

9   asset with value on the balance sheet, Mr. Dietz testified

10  that he did not consider that to be something that needed to

11  be added into his analysis.  And indeed, the debtor has come

12  forward with no evidence to suggest that any such asset

13  existed or should have been considered in the context of the

14  balance sheet.  GCAC was insolvent before and after these

15  events occurred.

16         Now Judge Bohm also points to what he describes in

17  the Husky decision as "suspicious facts."  And we start here

18  with the debtor's own credibility, as Judge Bohm did in

19  Husky.  And as the Court itself noted in the course of the

20  trial, Mr. Brass himself was unable to authenticate a single

21  financial record, including a list of transfers made to his

22  own personal checking account.  Indeed, at this point the

23  Court probably has a sense of why we started this trial with

24  a fistful of business record affidavits for GCAC's and the

25  debtor's own financial records.  Mr. Brass himself of course

1    did not testify affirmatively in this case but only in

2    response to our adverse examination.  And so if the Court

3    was hoping to hear Mr. Brass' side of the story, Mr. Brass

4    was unwilling to tell it.

5          Second, Mr. Brass, we contend, made false

6    statements on the GCAC schedules and appears to have done so

7    on his own schedules too.  On his own schedules, Mr. Brass

8    lists approximately $23,000 in jewelry assets amended to

9    $221,000, but the Court has seen evidence that he was

10   insuring another $3.8 million in jewelry that is not

11   disclosed anywhere.  And on GCAC's schedules, Mr. Brass

12   failed to disclose the existence of the $8 million in

13   outstanding due from balances.  And if they weren't actually

14   loans, as Mr. Brass repeatedly insisted in his testimony,

15   then they must be recognized for the illicit insider

16   distributions that they were.  It has to be one or the

17   other.

18         All of this, Your Honor, we contend raises a

19   presumption of fraud that the debtor can only rebut with

20   evidence of a legitimate purpose of the transfers, and Mr.

21   Brass has offered no such explanation.

22         Now Step 2 in the analysis is not complicated, any

23   more than it was in the Husky decision.  The evidence here

24   is uncontroverted that the transfers Mr. Brass engineered

25   were for his own personal benefit and for his mother's.

1    Funds were transferred to his bank accounts.  They were paid

2    to vendors for his benefit, such as the jeweler and the

3    builder as well, which takes us to Step 3, which asks

4    whether the debtor's personal liability is nondischargeable

5    under Section 523(a)(2)(a).

6           Now, Judge Bohm broke this element down into three

7    steps, all of which are established by the evidence at

8    trial.  First, money was obtained.  Here, Mr. Brass

9    transferred to himself and his mother more than $8 million

10   out of GCAC beginning in August of 2017.  Money was

11   obtained, and the obtaining of money was done through the

12   debtor's actual fraud.  This is established, as it was in

13   Husky, by the badges of fraud analysis I've already walked

14   through.

15          Finally, as a result, a personal debt of the

16   debtor was created.  And I put a couple of quotes from Husky

17   on the screen for the Court, but the Husky decision makes

18   clear this is a but-for test, and the debt arises for

19   purpose of Section 523(a)(2) where the failure to pay would

20   not have occurred but for the debtor's draining of the

21   company accounts.

22          So how much is the nondischargeable debt under

23   section 523(a)(2) in the Husky analysis?  Well, in the Husky

24   case, the Court awarded actual damages equal to "the sum of

25   the invoices that Husky sent to Chrysalis but which

1    Chrysalis failed to pay," the sum of the debt.  Here, that

2    amount is $10 million as reflected in the agreed judgment.

3    At a minimum, however, the nondischargeable obligation here

4    is equal to the sum of the fraudulent transfers that caused

5    GCAC to fail to pay an equivalent portion of its debt to

6    Vitol or $8.01 million.

7           I'll now turn to Vitol's other three claims under

8    523(a)(2), (4), and (6).  And, as I think the Court will

9    see, the evidence here as well lines up closely with the

10   legal elements of the claims.

11          We begin with the false representation claim.  The

12   concept of a false representation typically centers on a

13   knowing falsehood regarding a past or current fact that was

14   justifiably relied upon by the creditor.  But a debtor's

15   promise relating to a future action also meets the standard

16   if at the time the promise was made, the debtor had no

17   intention of fulfilling it.  Here, it turns out there were

18   two promises.  The first was a promise to remit sale

19   proceeds from asphalt and other components turned over to

20   GCAC for sale to third parties as shown in the numerous Deal

21   1, Deal 2 emails and testimony accompaniment.

22          As those emails show, the transactions which were

23   reflected in emails prepared by GCAC consistently came with

24   credit terms tied to a specified period of days after

25   receipt of invoice, ROI.  The Court will recall seeing three

```
1     ROI, five ROI.  Those emails and those credit terms

2     originated from GCAC, and Mr. Brass did not take the stand

3     to tell this Court otherwise.

4          The second promise was Mr. Brass' promise to pay

5     the $10 million agreed judgment.  Now the next element looks

6     for the lack of intention to perform, which is an important

7     element.  On the promise to remit sale proceeds, Mr. Brass'

8     fraudulent intent is demonstrated through the badges of

9     fraud, and in particular, the fact that Mr. Brass caused

10    GCAC to transfer $3.7 million to himself and his mother at

11    the same time that GCAC short paid Vitol by almost the exact

12    same amount on product sales.

13         In fact, if you consider the timeline, Your Honor,

14    Mr. Brass began sending money out of GCAC to Vitol beginning

15    with $672,000 in August of 2017.  And I mentioned the cite

16    already.  It's in the bank records, and it's in this

17    PowerPoint.  That is almost exactly the same time that the

18    discussions between GCAC and Vitol about Mr. Brass' hoped-

19    for joint venture fell apart, and Mr. Brass sent his August

20    2017 email to Mr. Kuo with the quote "interim financing

21    structure bullets." The events happened at almost exactly

22    the same time, and Mr. Kuo's testimony corroborated by those

23    same Deal 1, Deal 2 emails establishes Vitol's justifiable

24    reliance on that promise to pay for product in accordance

25    with those stated terms.
```

1          As for the second promise, the promise to pay on

2     the agreed judgment itself, Mr. Brass I think admitted at

3     trial his lack of intention to perform when he said about

4     the judgment, quote, "What I'm telling you is I don't

5     necessarily think that means I owed them $10 million.  It

6     means I agreed to pay them $10 million if I could."  Trial

7     Day 6, page 232.

8          Finally, the discharge exception only applies with

9     respect to a debt for money to the extent it was obtained by

10     the false representation.  Here we have an undisputed agreed

11     judgment liquidated in the amount of $10 million.  The

12     evidence shows that debt represents the party's agreement to

13     liquidate Vitol's claims arising out of the events of June

14     to December 2017, and noting the Court's prior ruling on the

15     Archer decision, represents money arising out of Mr. Brass'

16     fraudulent conduct.  And of that sum at a minimum, we can

17     point to $3.769 million as money obtained by Mr. Brass and

18     GCAC's false promise to pay Vitol for product sale proceeds.

19          Next we turn to Section 523(a)(4).  For purposes

20     of this code section, embezzlement is defined as the

21     fraudulent appropriation of property by a person to whom

22     such property has been entrusted or into whose hands it has

23     lawfully come.  There is no requirement in the caselaw or

24     the statute that the person entrusted with the property be

25     an employee of the plaintiff.  Rather, there are plenty of

1    cases out there in which creditors prevailed on embezzlement

2    claims under 523(a)(4) that did not involve an

3    employer/employee relationship, and I would direct the Court

4    as an example to 638 B.R. 737 out of this district in 2022,

5    McClung versus Castaneda as an example.

6         Here, property was entrusted to Mr. Brass in the

7    form of asphalt and related components, transferred to GCAC

8    as described in the various Deal 1, Deal 2 emails in

9    evidence.  Second, Mr. Brass misappropriated that property

10   and the proceeds of that property when he caused GCAC to

11   transfer $3.769 million in sale proceeds back to himself and

12   other insiders instead of remitting it back to Vitol.  And

13   we know that the funds came from those sales because at the

14   June -- at June of 2017, GCAC's balance sheet had a negative

15   cash balance, and there's no evidence of any other non-Vitol

16   business activity in the record, which means every dollar in

17   GCAC came from one of those transactions.  Finally, Mr.

18   Brass converted those funds to his personal use in

19   circumstances indicating fraud.  Again, we point to the

20   badges of fraud analysis.

21        And finally on this claim as well, we have to show

22   that Vitol is owed a debt arising from such embezzlement,

23   and again we have an undisputed $10 million agreed judgment

24   liquidating damages incurred by Vitol as a result of the

25   events of June to December 2017.  And of that sum, we can

1    point to $3,769,000 and change as arising from Mr. Brass'

2    fraudulent misappropriation of Vitol property and the

3    proceeds of it, which brings me to the last claim under

4    523(a)(6).

5            The Fifth Circuit has stated that a knowing breach

6    of a clear, contractual obligation that is certain to cause

7    injury may prevent discharge under Section 523(a)(6).

8    Perhaps, Your Honor, the best analog here is found in Texas

9    v. Walker, 142 F.3d 813, Fifth Circuit case, in which a

10   university faculty member was contractually obligated to

11   turn over to the university all professional fees he

12   incurred -- or he earned outside of his university position.

13   He failed to do so, and the university objected to the

14   discharge of his debt in the subsequent Chapter 7 case.  The

15   Fifth Circuit held that denial of discharge was appropriate

16   if his failure to remit fees required to be turned over

17   would necessarily harm the university, for example, by

18   depriving them of funds they were contractually entitled to.

19           Here, GCAC was contractually obligated to remit

20   payment within three to five days after receipt of invoice,

21   ROI, per the Deal 1, Deal 2 emails that Mr. Kuo described in

22   the course of his testimony as being typical of the party's

23   transactions.  Instead, Mr. Brass retained those funds for

24   himself and his mother, like the university faculty member

25   in Texas v. Walker, depriving Vitol of payment and injuring

1    Vitol to the extent of those funds wrongfully withheld.  Mr.

2    Brass' intent is established by the fact that like in Texas

3    v. Walker, his retention of those funds for himself was

4    substantially certain to harm Vitol in a like dollar amount,

5    thus satisfying the narrow requirements of 523(a)(6).

6         And finally, once again, we have to show that

7    Vitol is owed a debt arising from such injury.  And again,

8    we have an undisputed $10 million agreed judgment

9    liquidating damages that Vitol incurred as a result of the

10   events of 2017, and of that sum, 3.69 million arose from Mr.

11   Brass' fraudulent misappropriation of Vitol product.

12        Finally, there is the matter of interest and fees.

13   In the Husky case, Judge Bohm went through a pretty detailed

14   analysis of the caselaw to conclude that it was appropriate

15   to add to the claim nondischargeable prejudgment interest

16   accruing from the time demand is made or an adversary

17   proceeding is instituted, and nondischargeable post-judgment

18   interest until satisfied.  Here, that interest rate per the

19   agreed judgment is 5 percent, as in the record.

20        In addition, as the Court held in Husky, if the

21   Court grants Vitol relief on its Husky claim, attorneys'

22   fees can be awarded based on the fact that this suit, like

23   the suit in Husky, constitute a proceeding under TUFTA,

24   Chapter 24 of the Texas Business and Commerce Code, which

25   permits an award of fees under Section 24.008(a)(3)(c) in a

1    proceeding under that chapter.

2              For these reasons, Your Honor, and based upon the

3    evidence at this trial, we would ask the Court to grant

4    Vitol relief on its claims.

5              I'm happy to answer any questions the Court has.

6    I would otherwise ask if I might reserve the handful of

7    minutes I have remaining for rebuttal.

8              And the last thing I'll note, Your Honor, is I

9    have copies of the PowerPoint presentation as a

10   demonstrative or pedagogical device as the Fifth Circuit

11   call it which the Court may find useful insofar as it

12   summarizes what we believe to be the most relevant evidence

13   that the Court should look at, and I'll be happy to hand

14   that up at the appropriate time.

15             THE COURT:  Thank you.  I'll give you -- my timer

16   has got you at 27 minutes, but I think about 20 seconds of

17   it was delayed, so I'll give you a little over three minutes

18   for rebuttal time.  Oh, absolutely.  Do you want me to step

19   out or do you...  No, absolutely.  No, feel free to go.

20             MR. PATTERSON:  Thank you, Judge.  I'm sorry for

21   the delay.

22             THE COURT:  No, no.  There's no need to apologize

23   at all.

24             MR. PATTERSON:  Are we ready?

25             THE COURT:  If you're ready, I'm ready.

```
 1            MR. PATTERSON:  I'm ready, Judge.

 2            Interesting, Your Honor, we sat -- we've sat

 3   through eight days of testimony, and then we listened to

 4   closing.  And after eight days of testimony, unless I missed

 5   something, I believe Counsel said that in support -- the

 6   evidence that supports each of their causes of action boils

 7   down to, in essence, seven emails.  Right?  They believe

 8   that those seven emails prove misrepresentation, they prove

 9   a contractual obligation, and they prove embezzlement that

10   he was required to turn over this money.

11            And so -- and that's really why we took a break,

12   because I had no idea after eight days that their whole case

13   relies on seven emails.  I guess we have to look at them,

14   and I think that's what we're going to do.  And let's just

15   see what their entire case rests on because -- let me take

16   one step back.

17            I believe Mr. Cooley started out by saying GCAC --

18   that Vitol fronted money to GCAC.  Think back over these

19   eight days.  Think back about me at the board, Mr. Loya, Mr.

20   Kuo.  How many times I asked them -- how many different ways

21   I asked them, "Tell me how much money you loaned GCAC."  How

22   many different ways?  How many times did I wave my arms and

23   raise my voice?  I don't know how many different things I

24   tried.  How many answers did I get from the witnesses, Mr.

25   Loya and Mr. Kuo?  How many times did they give you a dollar
```

1    fee?  Zero.  Not one time.

2         Their whole case is we loaned them money.  Right?

3    Yes, there's a $10 million judgment.  Right?  But your job,

4    this Court's job -- what their job is, is to show you, is to

5    take the $10 million and say, "This is why -- number one --

6    this is why the debtor owes us money."  Why, not how much.

7    We know how much: $10 million.  We know how much.  But they

8    want to turn back the clock and say, "Yes, and this is why

9    he owes us $10 million."

10         Their pleadings say, "He owes us $10 million

11   because we loaned him money."  What did Mr. Loya say about

12   that lending transaction?  He said, "We don't loan money,

13   and I don't know any details.  I'm the CEO, but I can't

14   really explain it to you because I don't know."  What did

15   Mr. Kuo -- Mr. Kuo's the one that signed the affidavit

16   swearing to the petition in state court.  He's the one that

17   said he was in charge of this relationship.  What did he

18   tell us about the loan?  "I don't really know.  I don't

19   know."  Did he give us any dollars?  Not one.  Could he give

20   us any transactions?  Not one.

21         I asked them -- if you recall, I asked them over

22   and over, "Do you have any evidence, documents reflecting

23   these alleged loan transactions?"  I even went so far as to

24   say -- they described them as financing, right, credit

25   transactions.  Okay.  Where's the evidence that they did

1    that?  One piece, Judge.  One piece of evidence that shows

2    one trade.  They talked about trades.  They said they did

3    it.  They're the largest oil trading company in the world,

4    and you're telling me they don't have a piece of paper that

5    evidences the purchase of asphalt, the purchase of oil, the

6    transportation of asphalt, the storage of asphalt, the sale

7    of asphalt?  Okay.

8         The other interesting question is they said

9    there's no writing, that we agreed to this but there's no

10   writing.  Our word is our bond.  That's what Mr. Loya said.

11   Our word is our bond.  That's what we said.

12        Well, I finally got them to acknowledge that they

13   were talking about a joint venture.  Was their word their

14   bond then?  No.  They had one of the largest law firms in

15   the world drafting up the joint venture agreement.  We saw

16   it.  We saw the draft.  Now, they couldn't remember it, of

17   course, but we saw it, and they were putting it in writing.

18   They hired lawyers to do that.  Does it makes sense that

19   they would loan tens of millions of dollars to GCAC and Mr.

20   Brass without calling their lawyer, without putting it in

21   writing?  No.

22        The fact is the conclusion this course can make

23   and should make is that when we walk backwards from the $10

24   million, as we're supposed to do, their obligation was to

25   prove to you that they loaned $10 million.  Step 1, what is

1    the basis of the debt?  That's the first thing they have to

2    do.  Whether it's dischargeable or nondischargeable doesn't

3    matter.  That's what they have to prove to you.  They said,

4    "We loaned them the money."  Zero evidence.  Zero.  Not one

5    piece, Judge.

6           The question is so what's the consequence of that?

7    They have a judgment.  Yes, we owe them $10 million.  Mr.

8    Brass -- which is important -- is a party to that judgment.

9    He owes the $10 million.

10          Now, they want to -- this Court to find it's

11   nondischargeable, and they can't prove -- or they don't

12   prove the basis of the judgment.  Do they just throw their

13   hands up and go, "It doesn't really matter.  We know he owes

14   the 10 million"?  Right?  No.  I think that their case fails

15   at that moment.  They're done.  They allege, "We loaned them

16   10 million."  That's the basis of the lawsuit, and I believe

17   we were able -- or they were unable to prove that that was

18   true.  Therefore, this lawsuit stops, and they're done, and

19   you must deny their relief at that point.

20          Now let's look at this proof that Mr. Cooley cited

21   for every one of their causes of action.  These sale --

22   these deal emails, right?  I think that's how they referred

23   to them.  Deal emails.  Here's Vitol Exhibit Number 12.

24   Let's go to the bottom.  And what I ask the Court to focus

25   on -- what I'm going to focus on is two things.  Where are

1     these representations they say that Mr. Brass made or GCAC

2     made in these emails?  And Number 2, where's the obligation?

3     Where's this obligation?

4            Number 1, where's the evidence that the sale

5     proceeds went to GCAC?  That never came up.  But Number 2,

6     let's assume it did.  Where's the obligation in these emails

7     that he turn it over?  Or a more logical conclusion, they

8     were selling GCAC's asphalt.  There's no evidence whose

9     asphalt they were selling.  None.  Mr. Kuo couldn't tell

10    you.  Mr. Loya certainly couldn't tell you.  And they didn't

11    even ask Mr. Brass.  Why I don't know.  Maybe they didn't

12    want the answer.  But I think you could just as easily come

13    to the logical conclusion that what was being sold belonged

14    to GCAC.  It was their money.  They want to point to the

15    financials of GCAC to prove up these bad acts, but they have

16    no evidence of the source of any of this information.  Where

17    did the money come from?  We don't know.  They sold their

18    own asphalt.  That was their money.

19           Let's look at these -- the so-called proof of each

20    of these elements.  Exhibit Number 12, there is no

21    representation and no obligation of anything that I see.

22           Exhibit Number 18.  Let's go to the bottom.

23    Again, the original email is not from -- it doesn't -- it is

24    -- I apologize for that.  The email merely outlines some

25    transaction.  Maybe it was past.  Maybe it was future.

1    Maybe it's proposed.  No one can tell.  If you remember, Mr.

2    Kuo couldn't testify as to any of these, and I couldn't even

3    get them in with Mr. Loya because Mr. Loya said, "I don't

4    know anything about it," and he wasn't on the email, and I

5    couldn't even get them in, if you remember.  Mr. Kuo

6    couldn't tell me whether it happened or didn't happen.

7    Right?  But tell me, where in here is there this

8    representation of Mr. Brass or GCAC?  Where is this

9    obligation to turn over funds?  It's just not there.

10           Let's go to 19.  Same.  Let's go down to the

11   bottom.  Again, it's merely an outline.  They gave you no

12   evidence that this ever even happened.  We don't know if it

13   closed.  We don't know if it was rejected.  Maybe Mr. Loya

14   said, "We're not doing it."  Maybe Mr. Kuo said, "We're not

15   doing it."  We don't know.  But just from the text of the

16   email, you can't come to that conclusion other than here.

17   Monday we sold.  Monday we bought.  Friday we bought.  All

18   right.  That's Vitol doing it, not GCAC.  And there's

19   clearly no evidence of what Vitol did with the money.  Did

20   they turn it over?  Maybe they owed -- they had an

21   obligation to turn over money.  There's no evidence.

22           Vitol Exhibit 20.  All right.  Bottom email from

23   Mr. Peugini, GCAC to Mr. Kuo.  Two deals out of Rio

24   inventory having to do with term Chevron, GCA Panama term

25   asphalt deal recap.  October 2017 through February 2018.  Is

1    that even within our window?  Two deals.  We will have to

2    buy.  It doesn't say we did, but we have, but we have to in

3    the future buy the (indiscernible), just GCHSFO, and sell

4    Brent for appropriate months Monday, which would be in the

5    future.  We don't have any evidence that it actually

6    happened.  Seller Vitol, buyer GCAC.  Where's the obligation

7    there?  Where's the contract there?  They didn't allege they

8    breached the contract to buy asphalt.  That's what this

9    email talks about though.  Pricing, delivery to Panama.

10   Doesn't have anything about some obligation of GCAC.  It's

11   not there.

12        Go up.  Eric, remember we have to buy some Brent

13   cracks today.  There's no evidence of what that is or that

14   it happened.  And then Mr. Kuo Monday on September of 2017

15   says, "We bought 140,000 barrels of November HS crack," and

16   there were hedges.  Again, zero representation by GCAC or

17   Mr. Brass.  Not that I see.

18        21, again, same.  We can go through.  Here, GCAC

19   is selling.  If GCAC was the seller, where's the obligation

20   and whose money is it?  Seems to me would be GCAC's money if

21   they're the seller in a typical transaction.  Where's

22   Vitol's evidence that somehow this is Vitol's money if in

23   fact it happened?  There is none.  Go up.  Look at the rest

24   of this email.  I don't see the things that Vitol says are

25   contained in these emails.

```
 1              Exhibit 22.  Again outlines, options,

 2    possibilities.  No representations.  No obligations.

 3              Exhibit 23 -- and remember, this is their case.

 4    This is their nondischargeability case, Judge.  This is

 5    everything.  This is what they got out of nine days, eight

 6    days?  I would agree.  This is it.  This is all they got,

 7    Judge.

 8              They also talk about -- and I wrote it down -- a

 9    series of transactions.  We heard this and we read about it

10    in their complaint, but we got no evidence.  Again, they

11    refer to these eight emails.  There's no proof any of that

12    happened, Judge.  And not only that, assume some or all did,

13    there was no evidence.  Mr. Kuo couldn't tell me how much

14    asphalt they sold.  They couldn't tell me one single

15    transaction.  Mr. Loya couldn't.  How do they trace that?

16    How do they attribute that to GCAC?  How do they say they

17    didn't turn over money when they can't identify one closed

18    transaction?  Not one.  All right.

19              Sales proceeds.  This entire case depends on sales

20    proceeds and what happened to them.  They say two things

21    happened to them.  GCAC failed to turn them over, refused,

22    even though they represented that they would or had a

23    contractual obligation to, which I don't know where that

24    came from.  And two, they didn't transfer them to themselves

25    instead of paying Vitol.  All right.
```

1          I challenge the Court.  Identify $10 of sales

2     proceeds that anyone talked about here to a particular

3     transaction.  One sale.  One hedge.  They said there were

4     net losses on the hedges.  Could anyone give you one hedge

5     that resulted in a loss?  Not one.

6          They want to tell you, "Oh, Judge, we put it all

7     together, and we came up with $14 million."  Mr. Cooley even

8     said that.  Where did that come from?  One piece of evidence

9     that shows me that Vitol can come in here and look behind

10    the judgment and say, "See, Judge.  $6 million is from

11    hedging losses that we did on behalf of GCAC."

12         How hard is that, Judge?  How hard is that for a

13    trading company to say, "I executed trades on behalf of

14    GCAC.  They resulted in losses, and they didn't pay for

15    them"?  That's easy.  "Here are the trade tickets.  Here are

16    the executions.  Here's where we closed them.  Here's the

17    net loss."  It's simple math.  Simple math.  "And oh, by the

18    way, here's the agreement for him to pay for them."  How

19    hard is that?  Or, "This is when we had the conversation,

20    and he promised to do that."

21         They couldn't even tell you that.  But that's

22    simple, and where is it?  The largest trading company in the

23    world doesn't have trading tickets?  Doesn't have invoices?

24    They don't have proof of storage?  Come on.  That's just not

25    true.  They chose not to bring it, but you can't tell me

1    they don't have proof of trades, they don't document their

2    trades, they don't document the payment of their expenses,

3    but they chose to to bring it.

4           You know what else they chose not to do?  They

5    chose not to ask Mr. Brass all these things.  Right.  They

6    raise all these questions.  Mr. Brass sat right there, and

7    he answered all their questions.  And what did they not ask

8    him?  It's interesting what they didn't ask him.  They

9    didn't say, "What was your deal with Vitol, Mr. Brass?"

10   They didn't ask him that.  They didn't say, "Why didn't you

11   turn this money over to Vitol?"  They didn't ask him that.

12   Why not?  I don't know.  They don't have any evidence.  It's

13   not there.

14          He also made a big deal out of the concealment of

15   these loans, what had been referred to as due to/due from

16   accounts, these amounts that were transferred in the

17   schedules.  Well, I don't think I need to point this out to

18   the Court, but I will put it on the record.  Those transfers

19   occurred beyond the disclosure requirements of the SOFA.

20   Everyone knows that.  They weren't required to be disclosed.

21          And they talk about the jewelry.  The jewelry

22   belonged to his wife, another thing they didn't ask him

23   about.  Right.  Assets of third parties aren't required to

24   be disclosed on the schedules, so there's no concealment.

25   Right.  Belonged to someone else.  It wasn't community

1    property.  It was separate property.  They know about it.

2    They're fighting it.  They're objecting.  That's fine.  But

3    to stand up and say it was concealment is -- borders on

4    misrepresentation.

5          Promise to pay we talked about.  Again, they said

6    there was this promise to pay that was breached, and they

7    identified it as Exhibits 12 and 18 through 23, which is

8    what we looked at.  I didn't see promise to pay in there

9    anywhere.

10         Sale proceeds.  They keep saying 3.8 million of

11   sale proceeds.  3.8 million of sale proceeds.  Where's the

12   evidence?  Is that the emails we looked at?  Because that's

13   not evidence anything happened.  That's evidence there were

14   some things bought, and I think the emails disclosed and

15   said maybe we sold something.  I don't remember, but it

16   doesn't have price.  Doesn't have net proceeds.  Doesn't

17   have gross proceeds.  Doesn't say an obligation.  Doesn't

18   say who owned it, whose money it was.  None of that.  It's

19   not there.  They want you to look and read into it, but it's

20   not there.

21         They say asphalt and components were entrusted to

22   Brass.  We ask the same question, Judge.  Where's that

23   evidence?  We don't even know how much asphalt was bought.

24   We don't know if any asphalt was bought.  I don't remember,

25   but I don't think there was any evidence that anyone bought

1    any asphalt.  They talked about trades.  They talked about

2    owning asphalt, buying Rio's position.  Right.  But again,

3    we have no evidence that any particular asphalt or some

4    volume was purchased.  We don't know that.

5         Contractual obligations.  He intentionally

6    breached his contractual obligations.  I don't know where

7    that would be, Judge.  I looked and I looked.  I asked Mr.

8    Kuo and Mr. Loya where is the writing?  Was it in writing?

9    No, no, no.  Nothing's in writing.  Suddenly there's an

10   email that says there are terms, and that's the writing.

11   Doesn't satisfy, Judge.  You know that.  I know that.  One

12   email.  That's what they hang their hat on, and it just

13   doesn't work.

14        And I want to close just talking briefly about

15   Husky.  Husky is interesting.  It's wrong, but it's

16   interesting.  And as it applies to this case, it doesn't

17   fit, and here's why.  It took me a long time to understand

18   Husky, but I think that I do.  And Husky stands for the

19   proposition that the obligation of the debtor has to arise

20   due to the acts complained of, the fraudulent transfer, or

21   the piercing the corporate veil.  Right?  That has to be the

22   source -- the only source of the obligation to pay, right?

23        So for example, if Mr. Brass in this case -- let's

24   keep it within the confines of this case -- and let's assume

25   that there was the loan.  And if Mr. Brass had signed as a

1    guarantor on these loans, right, that would be the source of

2    his obligation to Vitol, this guarantee for the $10 million,

3    let's say.  Right.

4           At that point, Husky doesn't apply.  Husky has got

5    nothing to do with that case.  Zero because the source of

6    Mr. Brass' obligation is the guarantee.  The source of his

7    obligation isn't alleged fraudulent transfers, let's say.

8    All right.

9           What Husky stands for, the case is that Mr. Brass

10   would have to be a non-guarantor principle.  The obligation

11   -- this loan obligation to GCAC -- but Mr. Brass is not

12   obligated on that loan obligation.  Right?  And two years

13   later, right, he denudes the corporation and creates a

14   liability by his acts, by his fraudulent transfers.  Right.

15          That's Husky.  Right?  That's Husky because the

16   source of his obligation is his fraudulent acts, the

17   fraudulent transfers, the acts that allowed the corporate

18   form to be disregarded.  That's the source.  And so Husky

19   says, "That's good enough fraud under 523."  Right?

20          But you read the cases that came after Husky, and

21   you'll see there are the example I gave, the loan guarantee

22   where the principle guaranteed the loan, and the source of

23   his obligation to pay is the guarantee.  That's just not

24   Husky, right?  That's not fraud.  He signed a guarantee, and

25   he didn't pay.  Right.

 1           Why that's important is back to where I started.

 2     They weren't able to prove the source of this $10 million.

 3     And if they can't do that, they can't just say, "Oh, Judge.

 4     None of it really matters because he's a bad guy, and he

 5     made -- he created these fraudulent transfers, and therefore

 6     Husky says he's liable under 523.  That's fraud."  Right.

 7           You can't do it because Husky requires that the

 8     source of the obligation be these fraudulent acts in order

 9     to satisfy 523.  They can't do it because they couldn't

10     prove to you where the 10 million came from, or the 14, or

11     the three, all the numbers they used.  They count.  They

12     brought no proof, and therefore they can't prove that the

13     source of Mr. Brass' obligation is these fraudulent acts.

14           Their claims have to be denied.  They brought no

15     evidence.  They just wanted to throw mud.  They did, but it

16     doesn't satisfy 523.  Thank you, Your Honor.

17           THE COURT:  Thank you.  Mr. Cooley, if you have a

18     copy of your demonstrative, I just want to take a look at

19     something.  I'll just look through it.

20           MR. COOLEY:  May I approach, Your Honor?

21           THE COURT:  Yes.  Thank you.

22           MR. COOLEY:  And Your Honor, I have nothing

23     further, unless the Court has a question for me, I have

24     nothing further to add as far as rebuttal.

25           THE COURT:  No.  All right.

1          MR. COOLEY:  I'll give the Court back the time.

2          THE COURT:  I've got nothing.  I've got no

3    questions.  The only question I have is who's going to pick

4    up the boxes in the back, but that's a whole other --

5          MR. PATTERSON:  Your Honor, my -- the Court has

6    met our team.  Her name is Shakendra, and she will be here

7    tomorrow morning to collect everything, Your Honor.  We've

8    made arrangements with Chambers.

9          THE COURT:  That is cruel.  That is cruel.  No, I

10   appreciate it.  I thank everyone for their time.  I'm going

11   to take some time and think about everything everyone has

12   said.  I thank everyone.  This is going to take me a little

13   time to kind of get through.

14          As I get close to reaching a decision, I will --

15   I'll try to give everyone a four-, five-day heads up.  I

16   think that's probably fair that it's coming out in four,

17   five days.  And at that point, I'm just cite checking and

18   doing all that -- all that stuff just to kind of make sure

19   everything is what it is.

20          I think I have everything here.  Is there anything

21   else anyone wishes to tell me before I say thank you to

22   everyone?  All right.

23          MR. COOLEY:  Nothing from us, Your Honor.

24          THE COURT:  All right.  It's not actually raining.

25   They're cleaning the windows, and it creates a nice hint of

```
1    an afternoon rain.  So thanks, everyone.

2              CLERK:  All rise.

3         (Proceedings adjourned at 3:05 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          CERTIFICATION

 2

 3      I certify that the foregoing is a correct transcript from

 4      the electronic sound recording of the proceedings in the

 5      above-entitled matter.

 6

 7      Sonya M. Ledanski Hyde

 8

 9

10      Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  October 31, 2022
```

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 21, 2022

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-60025** |
| **ARTHUR JACOB BRASS,** | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |
| | § | |
| **VITOL, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 21-06006** |
| | § | |
| **ARTHUR JACOB BRASS,** | § | |
| | § | |
| Defendant. | § | |

### JUDGMENT AND ORDER[1]
### (RE: DOCKET NO. 10)

Vitol, Inc. filed a complaint to determine the dischargeability of a $10 million debt against Arthur Brass under Sections 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code. Based on the evidence and applicable law, $3,769,093.52 is nondischargeable under Section 523(a)(2)(A) and Section 523(a)(6).

---

[1] If any findings of fact in this Judgment and Order may be treated as conclusions of law, they are also deemed conclusions of law. If conclusions of law may be treated as findings of fact, they are also deemed findings of fact.

## Background

Before this case started, Brass was the president of Gulf Coast Asphalt Company ("**GCAC**").[2] GCAC marketed and traded asphalt for sale to third parties. GCAC was owned equally between Brass's mother and Trifinery, Inc.[3] Brass owned Trifinery, thus giving him a 50% beneficiary interest in GCAC.[4]

Vitol is a Houston based energy and commodities company that ships and trades crude oil and related products in the United States.[5] Vitol is one of many entities under the umbrella of what is referred to here as the Vitol Group.[6] Around November 2016, Vitol was looking for a business partner in the finished asphalt market.[7] So it began discussions with GCAC about starting a joint venture to buy and sell asphalt through a jointly owned entity. This was good news for GCAC because it was also looking for a new business partner during this time.[8]

Brass, on behalf of GCAC, and Eric Kuo (a fuel trader), on behalf of Vitol, worked on the potential joint venture deal. Despite months of negotiating and drafts reviewed by lawyers, the parties never finalized and executed a joint venture agreement.[9] Around July/August 2017, representatives of the Vitol Group informed Kuo and other Vitol employees about a potential conflict. A member of the Vitol Group called VALT (Vitol Asphalt Limited Trading) was already party to an agreement with a third party that contained a global noncompete clause about the sale of asphalt.[10] A Vitol/GCAC joint venture could potentially breach the VALT noncompete.

---

[2] Sept. 16 Trial Tr., Adv. No. 21-06006, Docket No. 161, 176:2–8.

[3] *Id.*, 185:11–186:1.

[4] *Id.,* 186:2–3.

[5] Sept. 1 Trial Tr., Adv. No. 21-06006, Docket No. 148, 8:18–9:23.

[6] *Id.,* 9:15-23; 38:10–11.

[7] Sept. 7 Trial Tr., Adv. No. 21-06006, Docket No 145, 35:6–7.

[8] GCAC was a joint venture partner with a commodities firm that wanted to exit the joint venture. Sept. 16 Trial Tr., 186:15–187:10.

[9] Sept. 7 Trial Tr., 47:18–21; 192:11–18.

[10] *Id.,* 48:13–49:5.

004508

Representatives of Vitol contemplated several options to continue a business relationship with GCAC and Brass.[11] But ultimately the Vitol/GCAC joint venture discussions stopped.[12] This was bad news for GCAC because at the beginning of August it had a negative $55,853.13 balance in its operating account, no cash in its payroll account, and $3,207.11 in its sales account.[13] Brass also had very little personal cash during this time.[14]

Ultimately, rather than pursuing a joint venture deal, Vitol agreed to serve as a financing partner for GCAC.[15] Kuo and Brass exchanged bullet points about a potential financing structure and spoke about repayment terms.[16] Vitol and GCAC never executed a formal written contract to memorialize their agreement. Brass believes that the parties operated under an informal joint venture. But that's not accurate. Rather, the evidence demonstrated that the parties generally operated under the following financing arrangement:

1. GCAC would inform Vitol about a deal with a third party;
2. Vitol would purchase product and title it in its own name;
3. Vitol, through Kuo, would hedge the deal;[17]
4. Vitol would "sell" the product to GCAC (GCAC did not have cash to buy product. So Vitol effectively loaned/financed GCAC the purchase price for the product.);
5. GCAC would sell the product to the third party;
6. GCAC would receive the sale proceeds, and then was supposed to repay Vitol[18] for—well Vitol and Brass/GCAC disagree on this point.

Vitol believes GCAC had to repay sale proceeds, any losses on hedges, and deal related storage and transportation expenses.[19] Kuo and Brass spoke about these financing terms. Kuo also believes that Brass assured him GCAC would pay Vitol according to these terms.[20] Brass disagrees.

[11] *Id.*, 226:3–15; Vitol Ex. 14.

[12] Sept. 7 Trial Tr., 50:4–12.

[13] Vitol Ex. 124, at Bates Nos. Debtor000303, Debtor000505, and Debtor000054.

[14] Vitol Ex. 75, at Bates No. IBC_0002044 (showing Brass had about $1,800 in his personal account at the beginning of August 2017).

[15] Sept. 7 Trial Tr., 58:25–59:1.

[16] Vitol Ex. 14; Sept. 7 Trial Tr., 64:25–65:2.

[17] Vitol was responsible for all hedges and carried them on its books. Sept. 16 Trial Tr., 151:12–15.

[18] Vitol Exs. 12, 18, 19–23; Sept. 7 Trial Tr., 58:25–59:8.

[19] Sept. 7 Trial Tr., 69:22–70:6.

[20] *Id.*, 64:25–65:12; 70:19–25.

Vitol eventually informed Brass and GCAC that it would only finance deals through the end of 2017.[21] GCAC repaid some outstanding debt between August 2017 and January 2018. In fact, GCAC made five payments to Vitol or for Vitol's benefit totaling $18,431,603.48 during this time.[22] Vitol provided GCAC and Brass an accounting reconciliation in early 2018 showing that GCAC owed Vitol about $15 million.[23] The reconciliation listed about $3.7 million for unremitted sales proceeds, about $6.2 million for losses on Vitol hedges, and the remainder for transportation and related expenses.[24] More importantly, Kuo testified that GCAC owed Vitol about $15 million, consisting of around $3.5 million for unpaid product, between $5-$8 million for hedging losses, and the rest for deal related expenses.[25] GCAC's records also listed an approximately $14.9 million contingent debt to Vitol on its financial statements and 2017 tax return.[26]

GCAC ultimately could not repay Vitol because Brass was secretly transferring cash out of GCAC.[27] Brass controlled GCAC's spending.[28] If Brass wanted cash from GCAC there was no internal control or authorization required. He believed he could take cash from GCAC for any reason.[29] Brass regularly transferred cash out of GCAC for his direct personal benefit through undocumented loans from GCAC.[30] Sometimes he reimbursed GCAC for loans.[31] But starting around August 2017—when GCAC started receiving proceeds of the financing arrangement with Vitol—Brass started siphoning an alarming amount of cash out of GCAC for his personal benefit.[32] He was spending cash on, among other things, a

---

[21] *Id.*, 72:6–12.

[22] Vitol Ex. 124, at Bates Nos. Debtor000060 ($1,690,065.00), Debtor000066 ($107,137.23), Debtor000078 ($4,000,000.00), Debtor000088 ($3,700,000.00), and Debtor000102 ($8,934,401.25).

[23] Sept. 7 Trial Tr., 110:17–22; 115:15–21; 116:17–25; Vitol Ex. 54.

[24] Vitol Ex. 54.

[25] Sept. 16 Trial Tr., 157:16–19; 160:17–165:4.

[26] *See, e.g.*, Vitol Exs. 81-174, at 8; 81-181 (GCAC Dec. 2017 and 2018 Consolidated Income Statements); 100, at 42 (2017 tax return).

[27] *See, e.g.*, Vitol Ex. 124, at Bates Nos. Debtor000108–Debtor000176.

[28] Sept. 16 Trial Tr., 183:19–185:10.

[29] *Id.*, 185:3–10.

[30] *See, e.g.*, Vitol Ex. 124, at Bates Nos. Debtor000021, Debtor000052, Debtor000060, Debtor000075 (transfers to Arthur Brass); Debtor000069, Debtor000087, Debtor000101 (transfers to Joyce Brass).

[31] *See, e.g.*, *id.*, at Bates No. Debtor000031.

[32] *Id.,* at Bates Nos. Debtor000052–Debtor000053; Debtor000068–Debtor000079.

4

multi-million dollar second home[33] and expensive jewelry.[34] Brass transferred about $6 million from GCAC between July 2017 through December 2018, and about $1 million in 2019.[35]

Brass and Kuo regularly communicated about the debt repayment. But around March/April 2018 Kuo realized Brass and GCAC were not repaying Vitol.[36] In May 2018, while Brass kept transferring cash,[37] GCAC went on the offensive by starting a lawsuit against Vitol in Harris County District Court.[38] Vitol counterclaimed and added third-party claims against Brass and Trifinery.[39] Vitol alleged, among other things, that Brass fraudulently stole about $15 million financed to GCAC.[40] The parties eventually settled before trial by entering into a Second Confidential Settlement Agreement and Mutual Global Release.[41] The Settlement Agreement provided that Brass, GCAC, and Trifinery were jointly and severally liable to Vitol for $10 million.[42] The Settlement Agreement included an Agreed Final Judgment for $10 million, which was later approved by the state court in November 2020.[43]

No party ever paid Vitol. Instead, Brass filed a voluntary chapter 7 case in March 2021. GCAC and Trifinery also started separate chapter 7 cases in this District.[44] In July 2021, Vitol filed a complaint to determine the dischargeability of

---

[33] *Id.*, at Bates No. Debtor000054; Sept. 16 Trial Tr., 224:11–226:7.

[34] Vitol Exs. 124, at Bates Nos. Debtor000088–Debtor000089; 75, at Bates No. IBC_0000061 (Dec. 2017 payment to jeweler for $665,105.85); Sept. 22 Trial Tr., Adv. No. 21-06006, Docket No. 165, 63:8–64:1.

[35] Vitol Exs. 81-174; 81-181; 124 at Bates Nos. Debtor000419, Debtor000423, Debtor000198–Debtor000200, Debtor000207–Debtor000212, Debtor000215–Debtor000219, and Debtor000223. In 2019, at least $100,000 was also transferred to Brass's mother, Joyce, as well as $110,000 to his sister, Sandra.

[36] *See* Brass Ex. 23, at 44–60.

[37] Vitol Ex. 124, at Bates Nos. Debtor000136–Debtor000139.

[38] Vitol's First Am. Compl., Adv. No. 21-06006, Docket No. 10; Brass's Am. Answer, Adv. No. 21-06006, Docket No. 27.

[39] Vitol Ex. 86.

[40] *Id.*, at 4–5.

[41] Joint Pre Trial Statement, Adv. No. 21-06006, Docket No. 106, at 8.

[42] *Id.*

[43] Vitol Ex. 89.

[44] *In re Gulf Coast Asphalt Co., LLC*, Case No. 21-60024, Bankr. S.D. Tex.; *In re Trifinery, Inc.*, Case No. 21-60023, Bankr. S.D. Tex.

004511

debt and a first amended complaint in October 2021.[45] Vitol reiterated its state court allegations that Brass took money Vitol financed to GCAC and used it for personal purposes.[46] Vitol also alleged that Brass never paid—and never intended to pay—the settlement amount and requested an order stating that the $10 million debt is nondischargeable under Sections 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code.[47] Brass moved for summary judgment on each of Vitol's claims.[48] The Court granted summary judgment on Vitol's claim under Section 523(a)(4) (fraud while acting in a fiduciary capacity) and denied summary judgment on the remaining claims.[49] The parties then held a multi-day trial that included testimony from Miguel Loya (former Vitol CEO), Eric Kuo (Vitol fuel trader), Gene L. Deetz (valuation expert), and Brass.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction under 28 U.S.C. § 1334. The parties' express and implied consent also provides this Court constitutional authority to enter a final judgment under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–83 (2015) and *Kingdom Fresh Produce, Inc. v. Stokes Law Off., L.L.P. (In re Delta Produce, L.P.)*, 845 F.3d 609, 617 (5th Cir. 2016).

## Nondischargeability under Sections 523(a)(2)(A), (4), (6)

Section 523(a) of the Bankruptcy Code excepts certain debts from discharge against an individual debtor. A creditor must prove nondischargeability of a debt by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

**Section 523(a)(2)(A)**

A debt is nondischargeable under Section 523(a)(2)(A) if it is for money obtained by "false pretenses, a false representation, or actual fraud." False pretenses, false representation, and actual fraud are common law terms and require separate proof requirements. *See AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001). Vitol argues the $10 million debt is

---

[45] Adv. No. 21-06006, Docket Nos. 1 and 10 (Vitol's Original and First. Am. Compl.).

[46] Vitol's First Am. Compl., ¶¶ 6–11.

[47] *Id.*, ¶¶ 14–15, 22–38.

[48] Mot. Summ. J., Adv. No. 21-06006, Docket No. 58.

[49] Summ. J. Order, Adv. No. 21-06006, Docket No. 79.

004512

nondischargeable based on false representations and actual fraud. The Court finds that there is not sufficient proof of false representations, but there is actual fraud.

## A.      False Representations

To prove a false representation, a debtor must have made (1) a knowing and fraudulent falsehood, (2) describing past or current facts, that is (3) relied on by the other party. *See Jacobson v. Ormsby (In re Jacobson)*, No. 06-51460, 2007 WL 2141961, at *2 (5th Cir. 2007). "'A misrepresentation is fraudulent if the maker ... knows or believes ... the matter is not as' represented, or 'does not have the confidence in the accuracy of his representation' as stated or implied, or 'knows ... he does not have the basis for his representation' as stated or implied." *Mercer*, 246 F.3d at 407 (citation omitted). A debtor's promise about a future action may satisfy Section 523(a)(2)(A) if, at the time of the representation, the creditor can show that the debtor had no intention to fulfill it. *See e.g.*, *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 484 (5th Cir. 1992). Finally, the reliance standard for false representations is "justifiable reliance." *See Field v. Mans*, 516 U.S. 59, 77 (1995).

Vitol claims the $10 million debt represents money obtained from Vitol through its reliance on Brass's false representations to Vitol that proceeds of asphalt sales received by GCAC would be remitted directly to Vitol. Vitol claims that Brass had no intention of complying due to GCAC's insolvency and Brass's history of transferring money held in GCAC accounts to himself and his mother. And that Vitol justifiably relied on the false representations. While it is true that GCAC received sales proceeds from the Vitol/GCAC financing arrangement and that Brass transferred millions out of GCAC, there is insufficient evidence that Brass made false representations to warrant nondischargeability of debt.

There is an email where Brass outlines thoughts on the terms of interim financing deals[50] and Kuo's testimony about speaking to Brass about repayment terms.[51] But none of this is firm evidence of Brass making false representations about repayment at the time of the financing deals. It is also unclear whether any such representations would have been made on behalf of GCAC or Brass individually.

---

[50] Vitol Ex. 14.

[51] Sept. 7 Trial Tr., 58:25–59:8.

There are also emails detailing actual financing deals where Vitol purchased product that GCAC could sell to a third party.[52] But those emails show representations between Vitol employees and GCAC employees. Brass is copied on some emails but Patrick Perugini from GCAC is usually the main business contact.[53] And Vitol overlooks that GCAC paid Vitol millions of dollars between July and December 2017, including about $8.9 million in January 2018.[54] Thus, there is insufficient evidence that, at the time of the financing deals, Brass made false representations that he had no intention of making GCAC pay its bills.

## B.   Actual Fraud

Vitol also claims that Brass committed actual fraud under Section 523(a)(2)(A). Vitol seeks to prove actual fraud by establishing several badges of fraud under the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"). The obvious issue is that Vitol conducted business with GCAC, not Brass individually, and the proceeds of the Vitol/GCAC financing arrangement were deposited in GCAC's bank account, not Brass's. But in *Husky Int'l Electronics, Inc. v. Ritz (In re Ritz)*, the Supreme Court held that claims like Vitol asserts here are permissible:

> It is of course true that the transferor does not "obtai[n]" debts in a fraudulent conveyance. But the recipient of the transfer—who, with the requisite intent, also commits fraud—can "obtai[n]" assets "by" his or her participation in the fraud . . . If that recipient later files for bankruptcy, any debts "traceable to" the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A).

578 U.S. 356, 365 (2016).

The Supreme Court remanded *Ritz* to the Fifth Circuit. On remand, the Fifth Circuit confirmed that establishing actual fraud under TUFTA may establish fraud under Section 523(a)(2)(A) and that actual fraud may satisfy a veil piercing claim:

> [E]stablishing that a transfer is fraudulent under the actual fraud prong of TUFTA is sufficient to satisfy the actual fraud requirement of veil-piercing because a transfer that is made "with the actual intent to hinder,

---

[52] Vitol Exs. 12, 18, 19–23.

[53] *Id.*

[54] *See, e.g.*, Vitol Ex. 124 at Bates No. Debtor000102 ($8.93 million payment to Vitol in Jan. 2018).

8

delay, or defraud any creditor," . . . necessarily "involves dishonesty of purpose or intent to deceive."

*Husky Int'l Electronics, Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 567 (5th Cir. 2016) (internal quotation marks and footnote omitted).

The Fifth Circuit also held in *Ritz* that a debt could be nondischargeable under Section 523(a)(2)(A) if actual fraud is established under TUFTA and the actual fraud was for the individual debtor's direct personal benefit. *Id.* at 569. This case resembles the facts in *Ritz* because the individual who allegedly caused and benefitted from the actual fraud filed a bankruptcy case. Thus, under binding precedent, a debt is nondischargeable here if Vitol proves actual fraudulent transfers between GCAC and Brass under TUFTA, and that Brass used these funds for his direct personal benefit.[55]

Direct evidence of actual fraud is often difficult to establish. So TUFTA includes 11 badges of fraud:

1. the transfer was to an insider;
2. the debtor retained possession or control of the property transferred after the transfer;
3. the transfer or obligation was concealed;
4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5. the transfer was of substantially all the debtor's assets;
6. the debtor absconded;
7. the debtor removed or concealed assets;
8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b).

---

[55] Vitol uses TUFTA to establish a nondischargeable prepetition debt. This is not a TUFTA action seeking to avoid transfers and a return of funds to the GCAC estate. So there is no concern here about whether Vitol is asserting a cause of action held by GCAC's chapter 7 trustee.

004515

Vitol doesn't need to prove all or even a majority of the badges of fraud to succeed. *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008); *see also Roland v. United States,* 838 F.2d 1400, 1402–03 (5th Cir. 1988) (interpreting TUFTA and finding "several" badges to be sufficient to find fraudulent intent).

There are several badges of fraud present here.

First, Brass was the president of GCAC, so he was an insider during the relevant time.[56] Brass also controlled GCAC's spending.[57] The evidence shows that he transferred about $6 million from GCAC between July 2017 and December 2018—the overwhelming majority for his direct personal benefit and also to benefit his mother (another GCAC insider).[58] The transfers were booked on GCAC's books and records as a purported loan to Brass, but even he recognized they could just be amounts credited to him.[59] He appears to have repaid some of these "loans" in the past. From January to May 2017, for example, GCAC's bank statements show a pattern of Brass transferring funds into his personal account, but later transferring funds back into GCAC's account:[60]

But when GCAC started receiving funds from the financing arrangement around August 2017, Brass sped up the rate of transfers from GCAC to his personal account for his personal benefit. He even caused GCAC to transfer money to his mother. These transfers occurred on a weekly, sometimes even daily, basis.[61] And, at the same time, he essentially stopped repaying GCAC.

Brass had about $1,800 in his personal bank account then, so the transfers definitely helped him continue a very good lifestyle.[62] Sometimes Brass transferred cash around the same time large sums of money from Vitol/GCAC financing deals were deposited into GCAC's bank account. For example, one week after GCAC received over $1.5 million from a deal in August 2017, Brass transferred $582,737.02 from GCAC's bank account to a company contracted to build his second

---

[56] Sept. 16 Trial Tr., 176:2–8.

[57] *Id.*, 183:19–185:10.

[58] Brass's transfers may also properly be considered in the aggregate as part of a scheme to divest GCAC of property.

[59] Sept. 16 Trial Tr., 198:14–199:9; 199:16–18 ("GCAC is controlled by me. Sometimes GCAC would collect money back from due-to and due-from accounts. Sometimes it wouldn't. That's all I can tell you").

[60] Vitol Ex. 124, at Bates Nos. Debtor000005–Debtor000035.

[61] *See, e.g.*, *id.*, at Bates Nos. Debtor000068–Debtor000089.

[62] Vitol Ex. 75, at Bates No. IBC_0002044 (Brass's personal account balance as of August 3, 2017).

004516

home in a prestigious Houston area neighborhood.[63] Then, in December 2017, the same day GCAC received over $2 million from another Vitol related deal, Brass transferred $675,000 to his personal account.[64] Brass's personal bank records show that on the same day, Brass wrote a check to a well-known fine jewelry retailer for about $665,000.[65]

Starting around February 2018, when it became clear the business relationship between the parties ended (and Vitol was repeatedly asking about a final payment from GCAC), Brass consistently caused GCAC to transfer cash to him—and sometimes his mother—at an alarming rate. GCAC's June 2017 balance sheet shows a "due from" shareholder loan balance of $86,696.[66] Between July 1, 2017 and December 31, 2017, that amount increased to $2,998,569.[67] From January 1, 2018 to December 2018, it skyrocketed to $6,246,338.[68] Thus, Brass transferred over $6 million out of GCAC in just 1.5 years. There is no evidence of Brass repaying GCAC even 1% of these amounts withdrawn.

Second, the transfers were for substantially all of GCAC's assets. As explained in the insolvency discussion below, Brass's transfer campaign against GCAC left the company with virtually no cash, undercapitalized, and unable to pay its bills in the ordinary course of business.

Third, transfers were made while litigation was pending against GCAC and Brass. Brass and GCAC were sued in state court by Superior Crude Gathering, Inc. in February 2017 for, among other things, fraud related to nonpayment of about $1.8 million.[69] And in May 2018, Vitol countersued Brass and GCAC in state court for fraud.[70]

Fourth, GCAC did not receive reasonable consideration for the millions transferred to Brass.

---

[63] Vitol Ex. 124, at Bates Nos. Debtor000051 and Debtor000054; Sept. 16 Trial Tr., 224:11–226:7.

[64] Vitol Ex. 124, at Bates Nos. Debtor000084 and Debtor000089.

[65] Vitol Ex. 75, at Bates No. IBC_0000061.

[66] Vitol Ex. 81-174, at 7.

[67] *Id.*, at 8.

[68] Vitol Ex. 81-181.

[69] Vitol Ex. 83.

[70] Vitol Ex. 86.

004517

And finally, GCAC was insolvent at the time of the transfers and soon after. By December 2017, GCAC had negative $10 million income and continued to have negative income through 2018.[71] And GCAC's 2017 and 2018 balance sheets showed an approximately $14.9 million outstanding contingent liability owed to Vitol.[72] Vitol's expert Gene Deetz analyzed GCAC's solvency as of June 30, 2017, as of December 31, 2017, and as of January 2018.[73] He performed a solvency analysis using three tests: the balance sheet test, the capital adequacy test, and the cash flow test.[74] Deetz's testimony and conclusions about GCAC's solvency were very thoughtful, detailed, and credible. He provided convincing evidence that GCAC was insolvent on all three target dates.[75]

The balance sheet test examines whether a company's assets at a full and fair valuation exceeds the company's liabilities.[76] Deetz provided convincing evidence that GCAC was balance sheet insolvent on the target dates. GCAC's books and records showed equity in 2017 and 2018.[77] The book equity included about $6.6 million for investments or loans in three affiliated entities: GCAC Holdings, Gulf Coast Crude, and AG Bullet.[78] But between January and December 2017 these entities had little to no assets, no revenues, and negative income before taxes.[79] Thus, Deetz concluded that these amounts should be written off, making GCAC insolvent. The Court also agrees with Deetz's additional adjustments further deepening GCAC's insolvency.

Deetz also provided convincing evidence that GCAC was inadequately capitalized. The capital adequacy test analyzes a company's cushion to address the normal ebbs and flows of a business through a normal cycle.[80] He demonstrated that GCAC operated with negative working capital. Thus, GCAC was forced to use

---

[71] Vitol Exs. 81-175, at 14; 81-190, at 2.

[72] Vitol Exs. 81-174, at 8; 81-181.

[73] Sept. 28 Trial Tr., Adv. No. 21-06006, Docket No. 200, 57:3–8.

[74] *Id.*, 55:11-23. The capital adequacy test and the cash flow test are also used in constructive fraudulent transfer actions under TUFTA.

[75] Deetz also provided convincing testimony that GCAC was insolvent on a consolidated basis with other GCAC non-debtor related entities.

[76] Sept. 28 Trial Tr., 56:1–10.

[77] Vitol Exs. 81-174; 81-181; Sept. 28 Trial Tr., 77:1–5.

[78] Sept. 28 Trial Tr., 71:4–16.

[79] *Id.,* 71:4–77:18; 83:7–14.

[80] *Id.,* 56:13–15.

004518

the sale proceeds of the Vitol/GCAC financing arrangement for capital.[81] But, as discussed above, Brass was transferring millions from GCAC to himself. GCAC was inadequately capitalized even booking Brass's transfers as loans on the books.

GCAC also failed the cash flow test, meaning that it could not pay its debts as they matured.[82] While GCAC received millions between August and December 2017 from the sales proceeds of the Vitol/GCAC financing arrangement, Brass was causing GCAC to transfer millions to himself. GCAC did not have another source of income to offset Brass's transfers.[83]

Thus, there is sufficient evidence that Brass committed actual fraud under Section 523(a)(2)(A).

**Section 523(a)(6)**

Section 523(a)(6) disallows dischargeability of a debt "for willful and malicious injury by the debtor to another entity." This section generally relates to intentional torts. Thus, there must be "a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

A willful and malicious injury requires a showing of either: (1) an objective substantial certainty of injury or (2) a subjective motive to cause harm on the part of the debtor. *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998). "Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be nondischargeable do so by determining whether '[the debtor's] actions were at least substantially certain to result in injury.'" *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x. 360, 361–62 (5th Cir. 2007). And besides satisfying one prong under this test, the Fifth Circuit has also held that the injury must "not be sufficiently justified under the circumstances to render it not 'willful and malicious.'" *Id.*

In *Ritz*, the Supreme Court stated that "[T]he debtors who commit fraudulent conveyances *and* the debtors who make false representations under § 523(a)(2)(A) could likewise also inflict 'willful and malicious injury' under § 523(a)(6). There is, in short, overlap, but that overlap appears inevitable." *Ritz*, 578 U.S. at 363. That is the case here.

---

[81] *Id.*, 83:18–84:1; 89:13–19; 90:4–9.

[82] *Id.*, 90:10–17.

[83] *See id.*, 91:1–21.

13

This Court incorporates its findings in the Section 523(a)(2)(A) actual fraud section here. Around the time Brass learned that Vitol would not finalize a joint venture with GCAC, he transferred over $6 million of sales proceeds from the Vitol/GCAC financing arrangement for his personal benefit and an additional $1 million in 2019 while the parties were litigating in state court.[84] Text messages between Kuo and Brass confirm that Brass knew Vitol was owed significant funds.[85] Brass also admitted in trial that the transferred funds could have been used to repay Vitol.[86]

Brass had little to no cash when the financing arrangement started in July/August 2017. And when it was clear Vitol was no longer financing GCAC deals—thus ending his personal source of cash to spend on second homes and other lavish items—Brass stopped repaying Vitol but kept siphoning cash from GCAC. Brass was the president of GCAC and controlled its spending. Brass knew that the joint venture discussions and the financing arrangement were over, which meant there would be no additional financing for Vitol to fund his desired lifestyle through GCAC. Yet he continued to cause GCAC to move funds from its account to his personal account anyway.

The Court finds that Brass's actions amount to more than recklessness or bad management. Brass's actions were substantially certain to harm Vitol. And these actions were not sufficiently justifiable under the circumstances to render it not willful and malicious. In fact, the evidentiary record revealed Brass's actions were not justified at all. Thus, Brass caused a willful and malicious injury to Vitol under Section 523(a)(6).

**Section 523(a)(4)**

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." This Court granted summary judgment for Brass on Vitol's nondischargeability claim based on fraud while acting in a fiduciary capacity.[87] So Vitol's remaining potential claim under

---

[84] Vitol Ex. 124, at Bates Nos. Debtor000419, Debtor000423, Debtor000198–Debtor000200, Debtor000207–Debtor000212, Debtor000215–219, and Debtor000223.

[85] *See* Brass Ex. 23, at 44–60.

[86] *See, e.g.*, Sept. 22 Trial Tr., 56:5–8.

"Q: Sure. If that $6.2 million hadn't been distributed to GCAC's shareholders, it could have been used by GCAC for other business purposes, right?

A: I guess that's true."

[87] *See* Summ. J. Order.

Section 523(a)(4) is embezzlement. Embezzlement for the purpose of Section 523(a)(4) is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller*, 156 F.3d at 602 (citations omitted); *NextGear Cap., Inc. v. Rifai (In re Rifai)*, 604 B.R. 277, 325 (Bankr. S.D. Tex. 2019).

Vitol argues that the debt is nondischargeable under Section 523(a)(4) because it arose from Brass's embezzlement of funds entrusted to his care. According to Vitol, cash proceeds GCAC received from the financing deals were earmarked for Vitol. Therefore, Brass embezzled these funds when he transferred them to his personal account rather than remit them to Vitol.

There is no embezzlement here because the financing deals were set between Vitol and GCAC employees.[88] And cash proceeds derived from the deals were deposited into GCAC's account, not Brass's.[89] Thus, they were entrusted to GCAC. There is a difference between entrusting property to the care of a company and entrusting property to the president of that company in his individual capacity. *See Rifai*, 604 B.R. at 326 (no embezzlement when funds and assets entrusted to debtor's company and not the debtor). Thus, there is no embezzlement claim here.

## Damages

Vitol claims that the $10 million debt is nondischargeable. Vitol argues that GCAC's consolidated financials in December 2017 and 2018 listed an approximately $14.9 million debt owed to Vitol. And GCAC's tax returns listed that debt too. Kuo testified GCAC owed Vitol about $15 million, consisting of around $3.5 million for unpaid product, between $5-$8 million for hedging losses, and the rest for related costs.[90] Brass counters that GCAC and Vitol never finally reconciled debts. He also tried to argue that he understood the Settlement Agreement required him to repay Vitol if he could.[91]

---

[88] *See* Vitol Exs. 12, 18, 19–23.

[89] *See* Vitol Ex. 124 (GCAC bank statements).

[90] Sept. 16 Trial Tr., 157:16–19; 160:17–165:4.

[91] Sept. 16 Trial Tr., 232:3–17. Brass was not credible about repayment of the Settlement Agreement or his lack of knowledge about basic information on GCAC financials.

004521

The best measure of damages come from the financing deals. GCAC's financial statements and bank statements support product sales debt. GCAC's Consolidated Income Statement for the 12 months ending December 31, 2017 lists $22,200,697 in sales.[92] GCAC made five payments to Vitol or for its benefit totaling $18,431,603.48.[93] Subtracting GCAC's payments from cost of sales equals $3,769,093.52.

Vitol also seeks nondischargeability of debt related to hedging losses, as well as storage, transportation, and related expenses. There are emails confirming that GCAC and Brass knew Vitol was hedging deals, but there is no firm evidence about who pays for losses on hedges. Vitol chose the type of hedge and the terms of the hedge.[94] And there is not enough evidence about how Vitol calculated hedging losses. There is also a lack of firm evidence about the calculation of transportation and related expenses. These debts were covered by Vitol and therefore differ from sale proceeds Brass transferred to himself.

Thus, $3,769,093.52 is the nondischargeable debt owed to Vitol.

**Attorney's Fees**

Under the "American Rule," each party pays its own attorney's fees arising out of litigation absent specific authority granted under a statute or a fee shifting provision in a contract. *See Alyeska Pipeline Serv. Co. v. Wilderness* Soc'y, 421 U.S. 240, 247 (1975). The Bankruptcy Code does not provide creditors a claim for attorneys' fees in nondischargeability cases. But the Fifth Circuit has held that creditors may recover attorney's fees if there is a contractual or statutory right to fees. *Jordan v. Southwest Nat'l Bank (In re Jordan)*, 927 F.2d 221, 226–27 (5th Cir. 1991) (overruled on other grounds); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1285–86 (5th Cir. 1992).

Vitol is not entitled to attorney's fees here. There is no contract or other evidence of a fee-shifting arrangement about attorney's fees. There is also no statutory right. Vitol prevailed on a Section 523(a)(2)(A) claim by establishing actual fraud using TUFTA badges of fraud as permitted under the Supreme Court and Fifth Circuit *Husky* decisions. But using TUFTA factors to establish actual fraud does not transform Vitol's nondischargeability action into a full-blown TUFTA action. Just like Vitol may not seek avoidance or other remedies under separate

---

[92] Vitol Ex. 81-175, at 13.

[93] Vitol Ex. 124, at Bates Nos. Debtor000060 ($1,690,065.00), Debtor000066 ($107,137.23), Debtor000078 ($4,000,000.00), Debtor000088 ($3,700,000.00), and Debtor000102 ($8,934,401.25).

[94] Sept. 16 Trial Tr., 113:14–21.

16

TUFTA sections, Vitol is also not entitled to seek attorney's fees under it either. This case is about the determination of a nondischargeable debt only.

Thus, for the reasons stated above, it is:

**ORDERED** that the debt owed by Brass to Vitol for $3,769,093.52 is nondischargeable under Section 523(a)(2)(A) and Section 523(a)(6) of the Bankruptcy Code. No additional award to Vitol for attorney's fees or pre- or post-judgment interest.

Signed:  December 21, 2022

Christopher Lopez
United States Bankruptcy Judge

17

004523