IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| ARTHUR JACOB BRASS, | § § | Case No: 6:23-cv-00002 |
| | § | Bankruptcy Case No: 21-60025 |
| Debtor. | § § § | |
| | § § | |
| VITOL INC. | § § | |
| v. | § § | Adversary No. 21-06006 |
| ARTHUR JACOB BRASS | § § § | |

**REPLY BRIEF OF APPELLEE/CROSS APPELLANT VITOL INC.**

REED SMITH LLP
Keith M. Aurzada (SBN 24009880)
Omar J. Alaniz (SBN 24040402)
Lindsey L. Robin (SBN 24091422)
Taylre C. Janak (SBN 24122751)
2501 Harwood, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
kaurzada@reedsmith.com
oalaniz@reedsmith.com
lrobin@reedsmith.com
tjanak@reedsmith.com

REED SMITH LLP
Mason W. Malpass (SBN 24109502)
1221 McKinney Street, Suite 2100
Houston, TX 77010
T: 713.469.3800
F:713.469.3899
mmalpass@reedsmith.com

## **TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| I. | Summary of the Argument ..................................................................................1 | |
| II. | The Bankruptcy Court erred in failing to award Vitol a judgment in the amount of Brass's actual fraud: $8,010,474. ..........................................2 | |
| | A. | Brass is not entitled to discharge for any debts traceable to a fraudulent conveyance scheme. ..........................................................2 |
| | B. | Under TUFTA, a creditor defrauded by illicit transfers is entitled to judgment in the lesser amount of the "claim" or the total transfers. ...............................................................................5 |
| | | i. TUFTA's remedies. ................................................................5 |
| | | ii. Vitol's TUFTA claim: settled from $14.7 million to $10 million. ......................................................................6 |
| | C. | The Bankruptcy Court determined that all of the transfers after the inception of the Vitol-Brass relationship met TUFTA and 523(a)(2)(A)'s actual fraud standard. ...............................9 |
| | D. | Because Brass orchestrated $8,010,474 in fraudulent transfers, that is the proper quantum of the fraudulent conveyance-based judgment. ............................................................10 |
| | E. | Brass is liable for all of the fraudulent transfers. ................................12 |
| III. | Conclusion .............................................................................................................13 | |
| Certificate of Compliance ...................................................................................................15 | | |
| Certificate of Service .........................................................................................................16 | | |

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Archer v. Warner*,
　538 U.S. 314 (2003) ................................................................................................. 3, 4

*Brown v. Felsen*,
　442 U.S. 127 (1979) ....................................................................................................... 3

*Hodess v. Wong (In re Wong)*,
　802 F. App'x 280 (9th Cir. 2020) ........................................................................... 2, 4, 13

*Husky Int'l Elecs., Inc. v. Ritz*,
　578 U.S. 355 (2016) ............................................................................................. 2, 4, 13

*Thomas v. Hughes*,
　27 F.4th 995 (5th Cir. 2022) ......................................................................................... 5

**Statutes**

Cal. Civ. Code § 3439.08(b)(1) ............................................................................................ 4

Tex. Bus. & Com. Code § 24.002(3) ............................................................................. 6, 7

Tex. Bus. & Com. Code § 24.005(a)(1) ............................................................................. 5

Tex. Bus. & Com. Code § 24.005(b) ................................................................................. 5

Tex. Bus. & Com. Code § 24.008(a)(1) ............................................................................. 6

Tex. Bus. & Com. Code § 24.009 .................................................................................. 6, 8

Tex. Bus. Com. & Code 24.009(b)(1) ................................................................................ 4

I.    **Summary of the Argument**

While the Bankruptcy Court properly determined Brass committed actual fraud and therefore was not entitled to discharge, it erred in determining that only $3,769,093.52 of Brass's undisputed $10 million debt to Vitol was not dischargeable. The uncontroverted evidence established that Brass transferred $8,010,474 out of insolvent GCAC, which he admitted could have been used to repay Vitol. *See, e.g.,* R. 8-8 at 264:5–8. Accordingly, the Bankruptcy Court should have concluded that—at a minimum—$8,010,474 of the $10 million debt owed to Vitol was not dischargeable.

The Bankruptcy Court did not properly apply precedent and instead recalculated GCAC's debt to Vitol as $3.77 million, even though Brass conceded pre- and post-bankruptcy that Vitol is owed $10 million. The proper measure of non-discharge for a fraudulent conveyance-based claim is the amount which could have been used to repay the debt but for the debtor's fraudulent transfers. At trial, Vitol proved that Brass was liable on a $10 million debt and that he fraudulently transferred $8,010,474, which could have been used to repay Vitol.

Therefore, the record contains sufficient evidence for this Court to reverse the Bankruptcy Court's decision on damages and render a judgment of $8,010,474 to Vitol that is not dischargeable.

**II.     The Bankruptcy Court erred in failing to award Vitol a judgment in the amount of Brass's actual fraud: $8,010,474.**

The Bankruptcy Court should have held that at least $8,010,474 of Brass's undisputed $10 million debt to Vitol was nondischargeable because that is the value of the assets Brass fraudulently transferred—the proper measure of non-dischargeability under *Husky* and the Texas Uniform Fraudulent Transfer Act ("TUFTA").

    **A.     Brass is not entitled to discharge for any debts traceable to a fraudulent conveyance scheme.**

A nondischargeable debt for actual fraud encompasses any debt that is "traceable to" a fraudulent conveyance scheme. *Hodess v. Wong (In re Wong)*, 802 F. App'x 280, 283 (9th Cir. 2020) (citing *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 365 (2016)). Here, the Bankruptcy Court correctly held that Brass committed actual fraud under Section 523(a)(2)(A) through a fraudulent conveyance scheme, and therefore Brass's debt to Vitol is not dischargeable.

But when determining the amount of the nondischargeable judgment, the Bankruptcy Court chose to focus on the underlying asphalt commercial arrangement between Vitol and Brass's alter ego entity—GCAC—without explaining its relevance for determining the amount traceable to the fraudulent conveyance scheme. Specifically, the Bankruptcy Court chose to look only to the "financing deals" and "product sales debt" involved in the underlying, pre-settlement

transaction in determining the debt amount to Vitol. In performing this analysis, the Bankruptcy Court glossed over the Settlement Agreement in which Brass and GCAC, jointly and severally, agreed to $10,000,000 in liability.

Because the $10 million is not disputed, the proper analysis per the Supreme Court's circumscribed instructions in *Archer* and *Brown* was to determine what portion of *that debt* was traceable to Brass's fraud. These decisions held that a debt for money promised in a settlement agreement or agreed judgment accompanied by a release of underlying claims can amount to a debt obtained by fraud for purposes of dischargeability. *See Brown v. Felsen*, 442 U.S. 127, 138 (1979) ("[T]he mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the *true nature* of the debt.") (citations omitted, emphasis added); *Archer v. Warner,* 538 U.S. 314, 321 (2003) ("Congress intended the fullest possible inquiry to ensure that all debts arising out of fraud are excepted from discharge, no matter what their form… Congress also intended to allow the relevant determination (*whether a debt arises out of fraud*) to take place in bankruptcy court, not to force it to occur earlier in state court at a time when nondischargeability concerns are not directly in issue and neither party has a full incentive to litigate them.") (emphasis added).

Under these precedents, the Settlement Agreement and Agreed Judgment would only have a bearing on the viability of Vitol's 523 claims if those documents

explicitly addressed nondischargeability, which they plainly and undisputedly do not. *See Archer* 538 U.S. at 321–22. Moreover, these decisions instruct the court to look to the underlying facts to determine the "true nature" of the debt and whether it "arises out of fraud." As such, the relevant inquiring is determining whether the debtor committed fraud—which the Bankruptcy Court found Brass did.

So although the Bankruptcy Court properly looked behind the Settlement Agreement and determined Brass's debt arose out of his actual fraud, it erred in overlooking the appropriate measure of non-dischargeable debt that underlies the 523(a)(2)(A) and (a)(6)-based judgment. Following *Husky's* direction, the Bankruptcy Court properly applied the TUFTA badges of fraud in determining actual fraud. *Husky*, 578 U.S. at 355; R. 8-20 at 335–38. Thus, the Bankruptcy Court should have looked to TUFTA's guidance to determine the appropriate quantum of non-dischargeable debt and entered a judgment for $8,010,474—the value of the assets Brass fraudulently transferred that otherwise would have been available to pay the debt to Vitol. *See In re Wong*, 802 F. App'x at 282 ("[T]he extent of a defendant's liability for a fraudulent transfer is determined by the value of the assets transferred." (citing Cal. Civ. Code § 3439.08(b)(1), identical to Tex. Bus. Com. & Code 24.009(b)(1)).

By looking to the specific line-item components of the asphalt transactions Vitol initially sued Brass and GCAC for, the Bankruptcy Court improperly

disregarded both the effect of the settlement and the correct measure of damages under TUFTA.

> **B. Under TUFTA, a creditor defrauded by illicit transfers is entitled to judgment in the lesser amount of the "claim" or the total transfers.**

Vitol is entitled to a judgment for $8,010,474 because that is the value of the assets Brass fraudulently transferred, a lesser amount as compared to Vitol's $14,793,947 "claim" under TUFTA and the $10 million liquidated settlement amount. TUFTA's statutory background is instructive because it provides the method for determining the appropriate quantum of the undisputed $10 million debt traceable to Brass's fraud.

> **i. TUFTA's remedies.**

Under TUFTA, a transfer is fraudulent as to a creditor, "whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation before or within a reasonable time after the transfer was made if the debtor made the transfer or incurred the obligation…with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Com. Code § 24.005(a)(1). Actual fraudulent intent may be proved circumstantially through the badges of fraud analysis. *Id.* 24.005(b); *Thomas v. Hughes*, 27 F.4th 995, 1015 (5th Cir. 2022)

("TUFTA permits plaintiffs to rely on circumstantial evidence to establish the defendant's fraudulent intent.") (internal quotations omitted).

The broad, statutory definition of "claim" includes: "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" while a "creditor" is simply "a person…who has a claim." Tex. Bus. & Com. Code § 24.002(3); (4).

A transfer that meets § 24.005(a)'s standard for fraud is voidable "to the extent necessary to satisfy the creditor's claim." *Id*. § 24.008(a)(1). Alternatively, to the extent a transfer is voidable—that is fraudulent—a creditor is entitled to a judgment "for **the value of the asset transferred**…**or** the amount necessary to **satisfy the creditor's claim**, whichever is less." *Id*. § 24.009 (emphasis added).

In sum, under TUFTA, any person who "has a right to payment or property, whether or not the right is reduced to judgment . . ." may recover a judgment against a debtor who fraudulently transfers assets (or transferees) in the lesser of the amount of that claim or the value of the assets transferred.

### ii. Vitol's TUFTA claim: settled from $14.7 million to $10 million.

It is undisputed that prior to the Settlement, Vitol's "claim," as defined by TUFTA, was for $14,793,947. *See* Vitol's state court counterclaim, R. 8-18 at 112–25. When Vitol first added its fraudulent transfer claims against Brass and his alter

- 6 -

ego GCAC, Vitol sought to recover the "approximately $15 million [in] bridge financing, product, and hedging services provided by Vitol" from Brass and GCAC, which Vitol specifically pled Brass used "as [an] alter ego[] for his own illegitimate and fraudulent purposes." Vitol's state court counterclaim. *Id.* at 115–18. This is accordingly the measure of Vitol's "claim," for TUFTA purposes. *See* .Tex. Bus. & Com. Code § 24.002(3).

Additionally, both Brass and GCAC were aware of the amount of Vitol's claim: (1) during the parties' relationship, (2) prior to the state court lawsuit, and (3) before Brass agreed to $10 million in personal liability in the Settlement Agreement.[1] Brass is therefore wrong when he claims Vitol did not "argue that GCAC was liable to Vitol in an amount exceeding $3.77 million prior to the Settlement Agreement." Dkt. 17 at p. 48. In reality, Vitol claimed more than $14 million from both GCAC and Brass prior to the Settlement Agreement.

Vitol's TUFTA "claim" amount was reduced from $14.7 million to $10 million because of the Settlement Agreement. As such, Vitol registered its claim for $10 million in the Brass, GCAC, and Trifinery bankruptcy proceedings. *See* Vitol's Proof of Claim against Brass, R. 8-1 at 162–170; *see also* Southern District of Texas

---

[1] *See, e.g.*, R. 8-20 at 329, 340 ("GCAC's consolidated financials in December 2017 and 2018 listed an approximately $14.9 million debt owed to Vitol. And GCAC's tax returns listed that debt too. Kuo testified GCAC owed Vitol about $15 million, consisting of around $3.5 million for unpaid product, between $5-$8 million for hedging losses, and the rest for related costs.").

Bankruptcy Case No. 21-60023 [Trifinery], Proof of Claim No. 2-1 and Case No. 21-60024 [GCAC], Proof of Claim No 5-1. None of those parties have disputed or objected to the claim or that they owed (and still owe) Vitol $10 million. Indeed, Brass admits under oath in his bankruptcy schedules that he owes Vitol $10 million and did not mark such debt as "contingent, unliquidated, or disputed" (which is permitted by the bankruptcy form). GCAC Schedules, R. 8-18 at 141; Brass Schedule, Case. No. 21-60025 at Dkt. 19 at p. 55. The Bankruptcy Court took judicial notice of Brass's schedule, Vitol Ex. 90, R. 8-20 at 268.

> Debtor 1  Arthur Jacob Brass                    Case number (if known) 21-60025
>
> 4.7                                                                    $10,000,000.00
> Vitol Inc
> Nonpriority Creditor's Name
> 2925 Richmond Avenue
> Number      Street
>
> Last 4 digits of account number ___ ___ ___ ___
> When was the debt incurred? _____
> As of the date you file, the claim is: Check all that apply.
> ☐ Contingent
> ☐ Unliquidated
> ☐ Disputed
>
> Houston          TX    77098
> City            State  ZIP Code
>
> Who incurred the debt?  Check one.
> ☒ Debtor 1 only
> ☐ Debtor 2 only
> ☐ Debtor 1 and Debtor 2 only
> ☐ At least one of the debtors and another
>
> ☐ Check if this claim is for a community debt
>
> Is the claim subject to offset?
> ☒ No
> ☐ Yes
>
> Type of NONPRIORITY unsecured claim:
> ☐ Student loans
> ☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
> ☐ Debts to pension or profit-sharing plans, and other similar debts
> ☒ Other. Specify  Judgment

Brass Bankruptcy Schedule at p. 55.

Pre-settlement, the non-dischargeable amount of Brass's debt to Vitol would have been the lesser of: (1) Vitol's claim of $14.7 million and (2) the value of assets transferred with the requisite intent. *See* Tex. Bus. & Com. Code § 24.009. When

Brass executed the Settlement Agreement, the amount of Vitol's claim was consequently reduced to $10 million. The Bankruptcy Court erred by rendering a judgment in a third amount untethered to Vitol's fraudulent conveyance-based nondischargeability claim.

### C. The Bankruptcy Court determined that all of the transfers after the inception of the Vitol-Brass relationship met TUFTA and 523(a)(2)(A)'s actual fraud standard.

In the Bankruptcy Order, the Bankruptcy Court held that Brass made all of the transfers at issue—those occurring after the inception of the Vitol-Brass relationship in Summer 2017—with actual fraudulent intent. R. 8-20 at 333–38. Specifically, the Bankruptcy Court conducted a badges of fraud analysis and found that once "GCAC started receiving proceeds of the financing arrangement with Vitol—Brass started siphoning an alarming amount of cash out of GCAC for his personal benefit." R. 8-20 at 329. In fact, when describing the transfers Brass made with actual fraudulent intent, the Bankruptcy Court discussed transfers from July 2017 through 2019. R. 8-20 at 330 ("Brass transferred about $6 million from GCAC between July 2017 through December 2018, and about $1 million in 2019").

Additionally, while the Bankruptcy Court did not delineate every transfer Brass made from July 2017 – July 2019, it held the following five badges of fraud sufficient to prove Brass's actual fraudulent intent were present during this period: (1) the transfers were to insiders; (2) the transfers were for substantially all of GCAC's assets; (3) the transfers were made while litigation was pending against Brass and GCAC; (4) GCAC did

not receive reasonable consideration; and (5) GCAC was insolvent during the entire period. R. 8-20 at 334–37.

While Brass now cherry-picks a few specific transfers and speculates as to their possible nature as reimbursements or otherwise, when given the opportunity at trial Brass offered no evidence that GCAC received any value in return for any of the transfers Vitol entered into the Bankruptcy Court record.

### D. Because Brass orchestrated $8,010,474 in fraudulent transfers, that is the proper quantum of the fraudulent conveyance-based judgment.

As the Bankruptcy Court erred by analyzing the mechanics of the underlying asphalt relationship instead of looking to the remedies available under TUFTA as guidance, the Bankruptcy Court did not provide a sum total of the transfers it held Brass made with actual fraudulent intent. The evidence Vitol introduced, however, proves that Brass fraudulently directed $8,010,474 in transfers,[2] and the Court expressly found that Brass made the transfers with actual fraudulent intent. R. 8-20 at 335–38.

Although Vitol presented this number at closing, the Bankruptcy Court instead erroneously looked to the original asphalt transactions, not the claim amount or the value of transfers as TUFTA guides. Specifically, Vitol presented the data

---

[2] Dkt. 15, Appendix at 1–16, 21–5, 28–31, 36–41, 44–8, 51, 53–61, 63–68, 70–87, 91, 98–100, 102, 105, 109, 112–18, 124–17, 132–37, 143–47, 151–53, 158–164, 168–69, 173–76, 180, 188–89, and 194; R. 8-18 at 273–75, 277, 281–83, 288–90, and 294–300; R. 8-19 at 4–5, 10–12, 17, and 20; R. 8-18 at 94–102.

below, which demonstrates exfiltration of value from GCAC to Brass and his family. Specifically, GCAC recorded these transfers on its balance sheet in the "due from shareholders" line item, although as Brass admitted, these transfers were never really "due."[3] Additionally, the "member shareholder loan" line item shows that while Brass had at one time nominally contributed funds to GCAC, as soon as he began working with Vitol he only extracted value.[4]

June 2017 to Dec 2017

|  | As of Jun 2017[5] | As of Dec 2017[5] | Net Change |
|---|---|---|---|
| Due from Shareholders | $86,696 | $2,998,569 | $2,911,873 |
| Member Shareholder Loan | ($1,039,332) | ($240,000) | $799,332 |
|  |  |  | $3,711,205 |

**$3,711,205** total transfers to or for benefit of insiders

Jan 2018 to Dec 2018

|  | As of Dec 2017[5] | As of Dec 2018[6] | Net Change |
|---|---|---|---|
| Due from Shareholders | $2,998,569 | $6,246,338 | $3,247,769 |
| Member Shareholder Loan | ($240,000) | ($240,000) | - |
|  |  |  | $3,247,769 |

**$3,247,769** total transfers to or for benefit of insiders

---

[3] *See* R. 8-8 at 153:17–154:9 (Brass: "We always had due-to and due-from accounts. When money was taken to a partner, then that was booked as a due-from. Sometimes those monies were forgiven, sometimes they were repaid."); R. 8-8 at 154:6–18 (Brass: "GCAC is controlled by me. GCAC would collect money back from due-to and due-from accounts. Sometimes it wouldn't.").
[4] *See* R. 8-20 at 171:3–173:2 (explaining due to/due from accounts and noting the June 2017 balance sheet includes a "due to" liability of $800,000 which was later eliminated through transfers to Brass).
[5] *See* R. 8-18 at 94–101, GCAC's 2017 Balance Sheet [Vitol-81 EEPB_174].
[6] *See* R. 8-18 at 102, GCAC's 2018 Balance Sheet [Vitol-81 EEPB_181].

Jan 2019 to Jun 2019[7]

| Date | Transferee | Amount | Vitol-124 | Vitol-75 | Date | Transferee | Amount | Vitol-124 | Vitol-75 |
|---|---|---|---|---|---|---|---|---|---|
| 1/8/19 | Arthur J. Brass | 6,500 | _419 | _1994 | 3/18/19 | Arthur J. Brass | 315,000 | _209 | _1689 |
| 2/1/19 | Arthur J. Brass | 12,000 | _423 | _2007 | 3/21/19 | Arthur J. Brass | 10,000 | _210 | _1689 |
| 2/4/19 | Arthur J. Brass | 9,000 | _423 | | 3/21/19 | Arthur J. Brass | 35,000 | _211 | _1689 |
| 2/5/19 | Arthur J. Brass | 26,000 | _423 | _2007 | 3/21/19 | Arthur J. Brass | 15,000 | _211 | |
| 2/7/19 | Arthur J. Brass | 10,000 | _198 | _2007 | 3/26/19 | Arthur J. Brass | 5,000 | _212 | _1689 |
| 2/7/19 | Arthur J. Brass | 50,000 | _198 | _2007 | 3/28/19 | Arthur J. Brass | 20,000 | _212 | _1696 |
| 2/12/19 | Joyce Brass | 50,000 | _199 | | 4/1/19 | Sandra Brass | 20,000 | _215 | |
| 2/14/19 | Arthur J. Brass | 140,000 | _200 | _2007 | 4/1/19 | Arthur J. Brass | 7,500 | _215 | _1696 |
| 2/25/19 | Joyce Brass | 40,000 | _200 | | 4/4/19 | Arthur J. Brass | 5,000 | _216 | _1696 |
| 2/26/19 | Arthur J. Brass | 22,500 | _200 | _2008 | 4/4/19 | Arthur J. Brass | 5,000 | _216 | _1696 |
| 3/1/19 | Sandra Brass | 25,000 | _207 | | 4/8/19 | Arthur J. Brass | 5,000 | _216 | _1696 |
| 3/5/19 | Arthur J. Brass | 15,000 | _207 | _1689 | 4/11/19 | Arthur J. Brass | 5,000 | _217 | _1696 |
| 3/7/19 | Arthur J. Brass | 5,000 | _207 | _1689 | 4/15/19 | Sandra Brass | 20,000 | _217 | |
| 3/8/19 | Arthur J. Brass | 3,000 | _208 | _1689 | 4/17/19 | Joyce Mericle Brass | 25,000 | _218 | |
| 3/11/19 | Arthur J. Brass | 10,000 | _208 | _1689 | 4/18/19 | Arthur J. Brass | 5,000 | _218 | _1696 |
| 3/12/19 | Arthur J. Brass | 50,000 | _208 | _1689 | 4/22/19 | Arthur J. Brass | 5,000 | _218 | _1696 |
| 3/13/19 | Joyce Mericle Brass | 25,000 | _209 | | 4/24/19 | Sandra Brass | 20,000 | _219 | |
| 3/15/19 | Sandra Brass | 25,000 | _209 | | 5/6/19 | Arthur J. Brass | 5,000 | _223 | _1703 |
| | | | | | | | **$1,051,500** | | |

**$1,051,500** total transfers to or for benefit of insiders

The sum of the three totals above is $8,010,474. This figure quantifies "the value of the asset[s] transferred" by Brass with fraudulent intent, which is less than Vitol's $10 million liquidated claim amount. As such, the amount of Brass's debt to Vitol that is "traceable to" a fraudulent transfer scheme and thus not subject to discharge under § 523(a)(2)(A) and (a)(6) is $8,010,474. The Bankruptcy Court erred in not rendering judgment in that amount.

**E.     Brass is liable for all of the fraudulent transfers.**

Before Brass's fraudulent transfers, GCAC had $8,010,474 available to pay its debt to Vitol. Instead, Brass transferred $8,010,474 to himself and his family

---

[7] GCAC Bank statements: R. 8-19 at 17 [Vitol-124 at 419], at 20 [Vitol-124 at 423], Dkt. 15, Appendix at 29–53 [Vitol-124 at 198–223].

while GCAC was insolvent. Because the Bankruptcy Court correctly held those transfers were actually fraudulent, Brass should not get a discharge for any of that amount.

As Brass agreed to personal liability in the Settlement Agreement, he is wrong when he claims that the roughly $4.65 million he personally received as a transferee "is the outside amount of debt Brass owed to Vitol" under the TUFTA theory adopted by the Bankruptcy Court. Dkt. 17 at 49. If Brass was correct, then there would be no recourse for the other roughly $3.35 million in fraudulent transfers he directed. Brass should not be able allowed to obtain discharge of $3.35 million of his debt, which is traceable to his actual fraud.

The measure of damages for a fraudulent conveyance-based theory, as Brass's own cited authority recognizes is the value of the assets transferred for the debt traceable to the fraud. *See In re Wong*, 802 F. App'x at 282. Here, all $8,010,474 in value is traceable to Brass's fraud. Thus, per the Supreme Court's instructions, $8,010,474 of Brass's $10 million debt is not dischargeable. *See Husky*, 578 U.S. at 365.

## III. Conclusion

For the foregoing reasons, the Court should reverse the Bankruptcy Court's ruling that $3,769,093.52 is the non-dischargeable amount and render a judgment to Vitol that the non-dischargeable amount owed to Vitol is $8,010,474.

August 9, 2023

Respectfully submitted,

/s/  Omar J. Alaniz
  Omar J. Alaniz (SBN 24040402)
  Keith M. Aurzada (SBN 24009880)
  Lindsey L. Robin (SBN 24091422)
  Taylre C. Janak (SBN 24122751)
  Reed Smith LLP
  2501 Harwood, Suite 1500
  Dallas, Texas 75201
  T: 469.680.4200
  F: 469.680.4299
  kaurzada@reedsmith.com
  oalaniz@reedsmith.com
  lrobin@reedsmith.com
  tjanak@reedsmith.com

Mason W. Malpass (SBN 24109502)
Reed Smith LLP
1221 McKinney Street, Suite 2100
Houston, TX 77010
T:  713.469.3834
F:  713.469.3899
mmalpass@reedsmith.com

*Counsel for Appellee/Cross Appellant Vitol Inc.*

## Certificate of Compliance

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8016(d)(2)(C) because it contains a total of 2,665 words, excluding the parts of the brief exempted by Bankruptcy Rule 8015(g). This brief also complies with the typeface requirements of Bankruptcy Rule 8015(a)(5) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

                                                                              */s/  Omar J. Alaniz*
                                                                               Omar J. Alaniz

## Certificate of Service

I hereby certify that, on August 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Texas by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

>                            */s/ Omar J. Alaniz*
>                              Omar J. Alaniz