United States District Court
Southern District of Texas
**ENTERED**
July 30, 2025
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ARTHUR J. BRASS, | § | Bankruptcy Case No. 6:21-BK-60025 |
| | § | |
| Debtor. | § | CHAPTER 7 |
| | § | |

| | | |
|---|---|---|
| ARTHUR J. BRASS, | § | |
| | § | |
| Appellant, | § | Civil Action No. 6:23-CV-00002 |
| | § | |
| v. | § | |
| | § | Adversary Case No. 6:21-AP-06006 |
| VITOL, INC., | § | |
| | § | |
| Appellee. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises from a failed business relationship between an energy trading company, Appellee Vitol, Inc. ("Vitol"), and an asphalt supplier, Gulf Coast Asphalt Company ("GCAC"), controlled by Debtor and Appellant Arthur Brass ("Brass"). What began as a financing arrangement ended in allegations that Brass siphoned company funds to finance a lavish lifestyle, leaving Vitol out of pocket almost $15 million. A $10 million state-court settlement appeared to resolve the matter. But when Brass later filed for bankruptcy, the question remained: Could he walk away from the debt, or was it the product of fraud and thus non-dischargeable?

The bankruptcy court found that Brass had fraudulently transferred millions from the company to himself and insiders. But it stopped short of making the full amount non-

dischargeable, capping Vitol's recovery at $3.77 million.    Unsatisfied, both sides appealed.  Brass disputes the findings of fraud and willful injury, and Vitol argues that the full $8.01 million in fraudulent transfers should be barred from discharge.

Pending before the Court are the Parties' cross-appeals, (Dkt. Nos. 1, 3, 5), of the bankruptcy court's December 21, 2022, Judgment and Order, (Dkt. No. 8-20 at 326–42). For the following reasons, the Court **AFFIRMS in** part and **REVERSES in part** the bankruptcy court's Judgment, (*id.*), and **REMANDS** the case for further proceedings.  The Court affirms that Brass's debt to Vitol, Inc. is non-dischargeable under Sections 523(a)(2)(A) and (a)(6) of the Bankruptcy Code but reverses the bankruptcy court's holding that the amount of the non-dischargeable debt is $3,769,093.52.  Therefore, the case is remanded to the bankruptcy court to determine the amount of Brass's non-dischargeable debt.

I.    BACKGROUND

Vitol is a Houston-based energy and commodities trading company that ships and trades crude oil and related products in the United States.  (Dkt. No. 8-6 at 171–72, 181); (Dkt. No. 8-3 at 7).  Vitol is one of many entities under the umbrella of "the Vitol Group." (Dkt. No. 8-6 at 172, 201).  GCAC is an asphalt-trading business.  (Dkt. No. 8-3 at 7); (Dkt. No. 8-5 at 157).  Brass was president of GCAC, (Dkt. No. 8-8 at 131), and the company was owned equally between Brass's mother—Joyce Brass—and Trifinery, Inc. ("Trifinery"), (*id.* at 140).  Brass owned Trifinery, giving him a 50% beneficial interest in GCAC.  (*Id.* at 141).

A.    THE BUSINESS RELATIONSHIP

In November 2016, Vitol and GCAC began discussing a joint venture to buy and sell asphalt.  (Dkt. No. 8-5 at 158–59).  Brass, on behalf of GCAC, and Eric Kuo, a fuel trader on behalf of Vitol, worked on the potential joint-venture deal.  (Dkt. No. 8-20 at 327).  Despite months of negotiations and drafts, the Parties never finalized or executed a joint-venture agreement.  (Dkt. No. 8-5 at 171–73); (Dkt. No. 8-6 at 16).

Around July 2017, representatives of the Vitol Group informed Kuo and other Vitol employees about a potential conflict.  (Dkt. No. 8-5 at 172–73).  One of Vitol's affiliates already had an agreement with a third party that included a global noncompete on asphalt sales.  (*Id.*).  A Vitol/GCAC joint venture could potentially breach that noncompete.  (*Id.*).

Soon after, Vitol/GCAC joint-venture discussions stopped.  (*Id.* at 173–74).  Instead, Vitol agreed to finance GCAC's operations, "essentially acting as [its] bank."  (*Id.* at 182–83); (Dkt. No. 8-6 at 175); (Dkt. No. 8-7 at 299).  While Kuo and Brass exchanged bullet points about a potential financing structure, (Dkt. No. 16 at 19–20), and spoke about repayment terms, (Dkt. No. 8-5 at 188-89), Vitol and GCAC never executed a written contract formalizing their agreement, (*id.* at 171–73); (Dkt. No. 8-20 at 328).  Brass believed that GCAC and Vitol were operating as a joint venture—a belief that the bankruptcy court dismissed as unsupported.  (Dkt. No. 8-20 at 328).

According to the bankruptcy court's factual findings, the Parties generally operated under the following arrangement: Vitol would purchase asphalt, take title in its own name, and then sell the asphalt to GCAC on credit.  (*Id.*) ("GCAC did not have cash

to buy product.  So Vitol effectively loaned/financed GCAC the purchase price for the product."); (*see* Dkt. No. 8-5 at 182–83, 189–191); (Dkt. No. 8-6 at 209); (Dkt. No. 8-7 at 297, 299); (Dkt. No. 8-17 at 15–16).  To offset the risk of the purchase, (Dkt. No. 8-5 at 152–53), Vitol was also responsible for "hedging"[1] each deal, (Dkt. No. 8-20 at 328 n.17) ("Vitol was responsible for all hedges and carried them on its books." (citing Dkt. No. 8-8 at 106)); (Dkt. No. 8-5 at 163–64).  GCAC, in turn, was expected to resell the asphalt to third parties and use the proceeds to repay Vitol for the financing, (*see* Dkt. No. 8-17 at 15–16); (8-5 at 191, 193), and—according to Vitol—for the sale proceeds, any losses on hedges, and deal-related storage and transportation expenses, (Dkt. No. 8-5 at 188–89, 192–94).

The business relationship was short-lived.  (Dkt. No. 8-6 at 175).  Within a few months, Vitol informed GCAC that it was "not willing to move forward with the financing arrangement past the end of the year."  (Dkt. No. 8-5 at 196).  GCAC repaid some of its outstanding debt, making five payments totaling $18,431,603.48 to Vitol or for Vitol's benefit.[2]  (Dkt. No. 8-20 at 329).

---

[1]   That is, Vitol would enter into financial contracts, such as futures or options, designed to offset potential losses if asphalt prices changed between the time Vitol purchased the asphalt for GCAC and the time GCAC repaid Vitol from third-party sales.  (Dkt. No. 8-5 at 152–53, 169).

[2]   "Vitol Ex. 124 at Bates Nos. Debtor000060 ($1,690,065.00), Debtor000066 ($107,137.23), Debtor000078 ($4,000,000.00), Debtor000088 ($3,700,000.00), and Debtor000102 ($8,934,401.25)." (Dkt. No. 8-20 at 329 n.22) (citing Dkt. No. 16 at 341, 347, 359, 369, 383).

Vitol Exhibit 124 spans hundreds of pages, was filed in thirteen parts in the adversary proceeding docket, *see Vitol Inc. v. Brass* (*In re Brass*), Ch. 7 Case No. 6:21-BK-60025, Adv. No. 6:21-AP-06006 (Bankr. S.D. Tex. Dec. 21, 2022), ECF Nos. 187–199, and was transferred to this Court through multiple (sometimes duplicative) filings, (*compare* Dkt. Nos. 8-18–8-20 *with* Dkt. Nos. 16, 16-1).  Adding to the confusion, Vitol's briefing cites the exhibit by referring to a separate appendix attached to its briefing.  (*See* Dkt. No. 15-1).  Given the document's length and the inconsistencies in citations among the bankruptcy court, the Parties, and this Court, this Order provides Bates numbers for Vitol Exhibit 124 citations to ensure clarity and convenience.

Yet despite these repayments, an accounting reconciliation showed that GCAC still owed Vitol about $15 million.  (*Id.* at 329) (first citing Dkt. No. 8-5 at 234, 239–40; and then citing Dkt. No. 16 at 46).  This outstanding balance represented "[t]he funds that were received from GCAC and not remitted back to Vitol[,] . . . hedging losses[,] . . . ancillary costs such as tank storage fees, barging, inspection costs and any costs associated with the deal transactions," and "time value of money calculations." (Dkt. No. 8-5 at 240).  Specifically, the reconciliation email listed about $3.7 million for unremitted sales proceeds, about $6.2 million for losses on Vitol hedges, and the remainder for transportation and other deal-related costs.  (Dkt. No. 8-20 at 329) (citing Dkt. No. 16 at 46).  Kuo's testimony corroborated this email: he testified that GCAC owed Vitol about $15 million, consisting of around $3.5 million for unpaid product, between $5–$8 million for hedging losses, and the rest for deal-related expenses.  (*Id.*) (citing Dkt. No. 8-8 at 112, 115–120).  GCAC's records also listed an approximately $14.9 million contingent debt to Vitol on its financial statements and 2017 tax return.  (*Id.*) (citing Dkt. No. 16 at 147, 162) (GCAC's Dec. 2017 and 2018 Consolidated Income Statements); (*see also* Dkt. No. 16 at 248) (GCAC's 2017 Tax Returns).

GCAC did not repay Vitol.  It couldn't—because behind the scenes, Brass had been quietly draining the company's accounts for his own benefit.  Brass controlled GCAC's spending and believed he could take cash from GCAC for any reason.  (Dkt. No. 8-20 at 329) (citing Dkt. No. 8-8 at 138–140).  Although he occasionally reimbursed GCAC, (*id.*)

(citing Dkt. No. 16 at 313),[3] Brass regularly transferred funds out of the company through undocumented loans to himself and, at times, to his mother, (*id.*) (citing Dkt. No. 16 at 304, 333, 341, 356 (transfers to Arthur Brass), 350, 368, 382 (transfers to Joyce Brass)).[4]

This activity escalated in August 2017, when GCAC began receiving proceeds from its financing arrangement with Vitol.  (*Id.*).  From that point forward, Brass siphoned what the bankruptcy court described as an "alarming amount of cash out of GCAC for his personal benefit."  (*Id.*) (citing Dkt. No. 16 at 333–34, 349–360).[5]  He used company funds to purchase, among other things, a multimillion-dollar second home, (*id.* at 330) (first citing Dkt. No. 16 at 335;[6] and then citing Dkt. No. 8-8 at 179–181), and expensive jewelry, (*id.*) (first citing Dkt. No. 16 at 369–70;[7] then citing Dkt. No. 15-1 at 3;[8] and then citing Dkt. No. 8-8 at 271–72).

By the end of 2017, GCAC was insolvent.  (Dkt. No. 16 at 160–61).  Yet Brass continued to extract company funds well into the following years.  Trial evidence showed

---

[3]    Vitol Ex. 124 at Bates No. Debtor000031.

[4]    Vitol Ex. 124 at Bates Nos. Debtor000021, Debtor000052, Debtor000060, Debtor000075 (transfers to Arthur Brass); Debtor000069, Debtor000087, Debtor000101 (transfers to Joyce Brass).

[5]    Vitol Ex. 124 at Bates Nos. Debtor000052–53, Debtor000068–79.

[6]    Vitol Ex. 124 at Bates No. 000054.

[7]    Vitol Ex. 124 at Bates Nos. Debtor000088–89.

[8]    Vitol Ex. 75 at Bates No. IBC_0000061 (Dec. 2017 payment to jeweler for $665,105.85).

Vitol Exhibit 75 was listed in both filings of the Notice of Admitted Exhibits, which attached the exhibits admitted by the bankruptcy court at trial.  (Dkt. No. 8-17 at 2–3); (Dkt. No. 16 at 6–7).  But the exhibit itself was not included in either filing despite being listed.  (Dkt. No. 15 at 13 n.1).  Vitol's attached appendix includes excerpts of Vitol Exhibit 75 that were admitted at trial but not transmitted as part of the appellate record.  (Dkt. No. 15-1).  For clarity, as with Vitol Exhibit 124, the Court includes Bates numbers when citing Vitol Exhibit 75.

that he transferred approximately $6 million from GCAC between July 2017 and December 2018 and an additional $1 million in 2019.  (Dkt. No. 8-20 at 330) (first citing Dkt. No. 16 at 140–47, 162, 473–75, 480–85, 488–92, 495;[9] and then citing Dkt. No. 16-1 at 177, 180);[10] (*see also* Dkt. No. 16 at 388–453) (showing transfers from February–October 2018).[11]

Brass and Kuo communicated about the debt repayment.  (Dkt. No. 8-20 at 330). But by March or April of 2018, Kuo realized that Brass and GCAC were not repaying Vitol.  (*Id.*) (citing Dkt. No. 8-10 at 4–20).

Then the lawsuits started.

### B.    STATE-COURT LITIGATION AND SETTLEMENT AGREEMENT

In May 2018, GCAC went on the offensive, suing Vitol in Harris County District Court.  (*Id.*); Original Petition, *Gulf Coast Asphalt Co. LLC v. Vitol Inc*, No. 2018-31578 (295th Dist. Ct., Harris County, Tex. filed May 10, 2018).  Vitol counterclaimed and added third-party claims against Brass and Trifinery.  (Dkt. No. 8-18 at 112–125).  Vitol alleged that Brass fraudulently stole approximately $15 million financed to GCAC.  (*Id.* at 113–18).

On November 5, 2020, the Parties settled before trial by entering into a settlement agreement (the "Settlement Agreement" or "Agreement").  (Dkt. No. 8-3 at 8); (Dkt. No. 8-13 at 115–18).  The Settlement Agreement provided that Brass, GCAC, and Trifinery were jointly and severally liable to Vitol for $10 million, plus post-judgment interest at a

---

9    Vitol Ex. 124 at Bates Nos. Debtor000198–200, Debtor000207–212, Debtor000215–19, Debtor000223.

10    Vitol Ex. 124 at Bates Nos. Debtor000419, Debtor000423.

11    Vitol Ex. 124 at Bates Nos. Debtor000108–176.

rate of 5% per year starting from the date of the judgment. (Dkt. No. 8-13 at 116–17); (Dkt. No. 8-3 at 8). In exchange, the Settlement Agreement released all prior claims, except for obligations arising from the settlement itself. (Dkt. No. 8-13 at 115–16).

On November 20, 2020, the Harris County District Court entered an Agreed Final Judgment based on the Settlement Agreement. (Dkt. No. 8-18 at 126–27). The Agreed Final Judgment provided that GCAC, Trifinery, and Brass were jointly and severally liable to Vitol for $10 million, plus post-judgment interest at a rate of 5% per year from the date of the judgment. (*Id.*).

### C.    BANKRUPTCY PROCEEDINGS

But Brass did not pay Vitol. (Dkt. No. 8-20 at 330). Instead, four months later—on March 26, 2021—he filed for Chapter 7 bankruptcy.[12] *In re Brass*, Ch. 7 Case No. 6:21-BK-60025 (Bankr. S.D. Tex. filed Mar. 26, 2021) [hereinafter Bankruptcy Proceeding]. Vitol filed a proof of claim in the Bankruptcy Proceeding for the $10 million judgment and the 5% interest. (Dkt. No. 8-18 at 127); (Dkt. No. 8-1 at 162–65). It also filed an adversary proceeding. *Vitol Inc. v. Brass* (*In re Brass*), Ch. 7 Case No. 6:21-BK-60025, Adv. No. 6:21-AP-06006 (Bankr. S.D. Tex. Dec. 21, 2022) [hereinafter Adversary Proceeding]. In the Adversary Proceeding, Vitol sought to have the $10 million judgment and post-judgment interest declared non-dischargeable under two provisions of the bankruptcy code: (1) Section 523(a)(2)(A) (actual fraud) and (2) Section 523(a)(6) (willful and

---

[12]    GCAC and Trifinery also filed Chapter 7 cases in this district. *In re Gulf Coast Asphalt Co., LLC*, Ch. 7 Case No. 6:21-BK-60024 (Bankr. S.D. Tex. filed Mar. 26, 2021); *In re Trifinery, Inc.*, Ch. 7 Case No. 6:21-BK-60023 (Bankr. S.D. Tex. filed Mar. 26, 2021).

malicious injury).[13]  (*See* Dkt. No. 8-1 at 23–29) (Vitol's original Adversary Proceeding Complaint); (*id.* at 84–93) (Vitol's live Adversary Proceeding Complaint).  Brass responded, (*id.* at 98–100), and moved for summary judgment on each of Vitol's claims, (*id.* at 101–113).  Among other things, Brass argued that "Vitol released fraud and other related tort claims supporting its complaint under a prepetition settlement agreement approved by a Texas state court." (Dkt. No. 8-2 at 123).

The bankruptcy court denied Brass's Motion in part and allowed the two claims to proceed.  (*Id.* at 125–31).  It held that (1) the Agreed Final Judgment does not preclude Vitol "from arguing fraud or any other issue related to nondischargeability of debt" because the Agreement did not litigate or resolve whether the debt was incurred through fraud, (*id.* at 126–27) (citing *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979)); and (2) the Settlement Agreement did not operate "as a novation that deprived Vitol of a nondischargeable debt determination against Brass" because a settlement agreement does not transform a nondischargeable fraud-based debt into a dischargeable contract claim, (*id.* at 127–29) (citing *Archer v. Warner*, 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003)).

---

[13]    Vitol also raised three additional theories of non-dischargeability, which the bankruptcy court rejected and neither Party appealed: (1) fraud while acting in a fiduciary capacity under Section 523(a)(4); (2) embezzlement under Section 523(a)(4); and (3) money obtained by false representations under Section 523(a)(2)(A).  (*See* Dkt. No. 8-1 at 27) (Vitol's original Adversary Proceeding Complaint); (*id.* at 120–21) (Vitol's live Adversary Proceeding Complaint); (Dkt. No. 8-2 at 129–31) (granting summary judgment to Brass on fiduciary-fraud claim); (Dkt. No. 8-20 at 332–33) (rejecting false-representation theory); (*id.* at 339–40) (rejecting embezzlement theory).

The Parties then tried the case over several days, (Dkt. No. 8-20 at 331), after which the bankruptcy court issued the disputed December 21, 2022, Judgment and Order (the "Judgment"), (*id.* at 326–342).  It held that Brass had engaged in actual fraud and had willfully inflicted an injury, making a portion of his debt to Vitol non-dischargeable under Sections 523(a)(2)(A) and (a)(6) of the Bankruptcy Code.  (*Id.* at 331–39, 342).

In evaluating Vitol's claims under Section 523(a)(2)(A) (actual fraud), the bankruptcy court applied the framework established in *Husky International Electronics, Inc. v. Ritz*, 578 U.S. 355, 136 S.Ct. 1581, 194 L.Ed.2d 655 (2016), which permits fraudulent conveyances to be considered "actual fraud" under Section 523(a)(2)(A).  (*Id.* at 333–38).  The bankruptcy court concluded that Brass had committed actual fraud after finding numerous "badges of fraud" under the Texas Uniform Fraudulent Transfer Act ("TUFTA").[14]  (*Id.* at 338).  This included: making transfers to insiders, making transfers while litigation was pending, transferring substantially all of GCAC's assets, failing to receive reasonably equivalent value in exchange for the transfers, and making the transfers while GCAC was insolvent.  (*Id.* at 334–38).

As to Vitol's claim under Section 523(a)(6), the bankruptcy court found that Brass's conduct constituted a "willful and malicious injury" to Vitol, holding that Brass's intentional diversion of funds was substantially certain to harm Vitol and was not justified under the circumstances.  (*Id.* at 338–39).

---

[14]    Tex. Bus. & Com. Code § 24.005.

Based on these conclusions, the bankruptcy court determined that $3,769,093.52 of Brass's debt to Vitol was non-dischargeable under Sections 523(a)(2)(A) and (a)(6). (*Id.* at 341). It reached this amount by first calculating the amount of income GCAC received in product sales in 2017: $22,200,697. (*Id.*) (citing Dkt. No. 16 at 160) (GCAC's 2017 Consolidated Income Statement). It then subtracted the payments GCAC made to Vitol in 2017 and January of 2018: $18,431,603.48. (*Id.*) (citing Dkt. No. 16 at 341 ($1,690,065.00), 347 ($107,137.23), 359 ($4,000,000.00), 369 ($3,700,000.00), 383 ($8,934,401.25)).[15] "Subtracting GCAC's payments from" its sales revenue brought the court to a non-dischargeable debt of $3,769,093.52. (*Id.*).

## D. THE PARTIES' APPEALS

Both Parties challenge the Judgment on appeal. Brass disputes the findings of fraud and willful injury, (Dkt. Nos. 13, 17), while Vitol seeks an increase of the non-dischargeable amount to reflect the full $8.01 million in fraudulent transfers it contends were identified at trial, (Dkt. Nos. 15, 18).

## II. LEGAL STANDARD

District courts have jurisdiction to hear appeals "from final judgments" of bankruptcy courts. 28 U.S.C. § 158(a); *In re Berman-Smith*, 737 F.3d 997, 1000 (5th Cir. 2013) (per curiam). In reviewing a bankruptcy court's final judgment, a district court sits "as an appellate court," reviewing the "bankruptcy court's factual findings for clear error

---

[15] Vitol Ex. 124 at Bates Nos. Debtor000060 ($1,690,065.00), Debtor000066 ($107,137.23), Debtor000078 ($4,000,000.00), Debtor000088 ($3,700,000.00), and Debtor000102 ($8,934,401.25).

and its conclusions of law de novo." *BVS Constr., Inc. v. Prosperity Bank*, 18 F.4th 169, 172 (5th Cir. 2021).

## III.    DISCUSSION

Individuals can apply for bankruptcy under Chapter 7 of the Bankruptcy Code, *see generally* 11 U.S.C. §§ 701–84, and have certain debts "discharged," 11 U.S.C. § 727(a), meaning that those debts are no longer enforceable outside the context of the bankruptcy proceeding, *see id.* § 727(b); 11 U.S.C. § 524(a).  But some debts, such as those for fraud or certain types of misconduct, can't be discharged.  *See In re Rifai*, 604 B.R. 277, 305 (Bankr. S.D. Tex. 2019) ("[T]he [Bankruptcy] Code affords relief only to the 'honest but unfortunate debtor,' and an individual may not obtain a discharge of debts incurred through his own wrongful conduct." (quoting *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991))).  Relevant here, a debtor cannot discharge a debt for (1) "money . . . to the extent obtained by . . . actual fraud," 11 U.S.C. § 523(a)(2)(A); or (2) "willful and malicious injury by the debtor to another entity," *id.* § 523(a)(6).

### A.    "THE DEBT"

In piecing together two Bankruptcy Code sections, a Texas fraudulent-transfer statute, a settlement agreement, and an agreed final judgment in search of an answer to dischargeability, *see infra* Section III(B)–(C), it is easy to lose the forest for the trees.  The task is to determine if a "debt" owed by Brass to Vitol is dischargeable under the Bankruptcy Code.  This analysis, therefore, begins by asking—what debt does Brass owe to Vitol?

Under the Bankruptcy Code, "[a] 'debt' is defined . . . as 'liability on a claim,' a 'claim' is defined in turn as a 'right to payment,' and a 'right to payment,' [the Supreme Court has] said, 'is nothing more nor less than an enforceable obligation.'" *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998) (internal citations omitted) (first quoting 11 U.S.C. § 101(12) (defining "debt"); then quoting *id.* § 101(5)(A) (defining "claim"); and then quoting *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559, 110 S.Ct. 2126, 2131, 109 L.Ed.2d 588 (1990)).  Vitol holds only one enforceable obligation against Brass: the debt created by the Parties' Settlement Agreement and Agreed Final Judgment, which includes a $10 million payment and an award of 5% post-judgment annual interest.[16]  (*See* Dkt. No. 8-1 at 162–68) (Vitol's only filed Proof of Claim). Consequently, the debt under scrutiny is precisely that: Brass's outstanding obligation to Vitol under the Settlement Agreement and Agreed Final Judgment (the "Debt").

Having established what the relevant debt is, the Court turns to what the parties seem to have thought it was—and why those theories are incorrect.  The debt is *not* the value of money Brass or GCAC allegedly owed Vitol under their ambiguous financing arrangement—as Brass assumes.  (Dkt. No. 8-20 at 340–41) (finding $3,769,093.52 non-dischargeable based on GCAC's sales revenue less its payments to Vitol); (Dkt. No. 17 at 44, 46–48) (arguing non-dischargeable debt is limited to the amount that GCAC owed Vitol before the Settlement Agreement).  Nor is it what Brass might have owed Vitol

---

[16]    And any other costs that the bankruptcy court determines on remand were contractually or judicially awarded under the Settlement Agreement or Agreed Final Judgment.  *See infra* Section III(D).

under TUFTA had the Parties litigated those claims—as Brass argues in the alternative. (*See* Dkt. No. 17 at 48–49). Nor is it the amount that Brass fraudulently transferred during the relevant time period—as Vitol argues. (Dkt. No. 15 at 64–66) (arguing $8,010,474 should be non-dischargeable based on total amount of Brass's transfers between June 2017 and June 2019).

First, none of these theories meets the Bankruptcy Code's definition of a "debt," which requires a legally enforceable obligation. Starting with Vitol's theory, Vitol does not hold an enforceable claim against Brass merely because he transferred money. The transfers themselves do not create a debt. Rather, Vitol may claim only what Brass is legally obligated to pay it—such as amounts due under a breached supply contract, an unpaid invoice, or a settlement imposing a duty to pay. The amount of those obligations may differ from Brass's total transfer activity. *See In re Ritz*, 567 B.R. at 755, 765 (finding debtor fraudulently transferred $1,161,279.90 but only finding "that the Debtor's personal obligation to [Creditor] in the amount of $163,999.38 [was] a non-dischargeable debt under § 523(a)(2)(A)."). The correct debt calculation is therefore the sum of Brass's legal obligations to Vitol—not the total of his transfers between June 2017 and June 2019. (*Cf.* Dkt. No. 15 at 64–66).

Similarly, the requirement that a "debt" be a currently enforceable obligation defeats Brass's argument that the non-dischargeable debt is whatever his TUFTA liability would have been. Vitol does not hold an enforceable judgment under TUFTA, and this

14

discharge proceeding does not create one.[17]  Instead, as Brass himself recognizes, "an action under Section 523(a) is to determine whether and to what extent debts *that already exist* are excepted from discharge—it does not provide an independent right to actual [TUFTA] damages."  (Dkt. No. 17 at 49) (emphasis added); (*see also id.* at 44, 46–49).  TUFTA may help establish whether a debt is dischargeable.  *See infra* Section III(B)(1).  But it does not define the debt itself.

Finally, with respect to the bankruptcy court's approach to defining the non-dischargeable debt, Vitol has no enforceable obligation against Brass for the financing it provided during the Parties' nebulous business relationship.  As a result, it was error for the bankruptcy court to limit the amount of nondischargeable debt because there was "no firm evidence about who pays for losses on hedges" and a "lack of firm evidence about the calculation of transportation and related expenses."  (Dkt. No. 8-20 at 341).  Perhaps this evidence would have been relevant to GCAC's liability under the Parties' ill-defined financing arrangement.  But the bankruptcy court was not tasked with determining liability under the financing arrangement; instead, the bankruptcy court's task was to determine whether the settlement debt—the only remaining enforceable obligation between the Parties—was or was not dischargeable.

Second, claim preclusion prohibits construing "the debt" as the amount of money Brass owed Vitol under that previous arrangement or would have owed Vitol under

---

17    As Brass points out: "[TUFTA] liability could have only existed prior to the Settlement Agreement because all claims under TUFTA were released by the Settlement Agreement."  (Dkt. No. 17 at 46).

TUFTA. As in *Archer v. Warner*, the Parties' Settlement Agreement, "coupled with the broad language of the release, completely addressed and released each and every underlying state law claim," leaving "only one relevant debt: a debt for money promised in the settlement agreement itself." 538 U.S. at 318–19, 123 S.Ct. at 1466. Consequently, the "parties are each bound by the amount of the debt established" by the Settlement Agreement. *In re Gamble-Ledbetter*, 419 B.R. 682, 695 (Bankr. E.D. Tex. 2009) (applying collateral estoppel to hold that debt at issue in discharge proceeding equaled amount in the parties' settlement agreement and agreed state-court judgment).[18] A settlement agreement does not preclude a court from considering whether the debt *resulting from* the settlement agreement arose from fraud or willful and malicious injury. *See Archer*, 538 U.S. at 323, 123 S.Ct. at 1468; *see infra* Section III(B)(1)(b). But it does bind the Parties as to what the debt at issue *is*.

In holding otherwise, the bankruptcy court calculated the relevant "debt" as GCAC's sales revenue minus its payments to Vitol, and it seemed to assume that the maximum amount it could find non-dischargeable was the amount of money that GCAC fraudulently obtained and failed to repay. (*See* Dkt. No. 8-20 at 340–41). Brass makes a

---

[18]    *See also In re Davenport*, 353 B.R. 150, 192 (Bankr. S.D. Tex. 2006) ("That the Debtor owes [Creditor] this sum is no longer in question; the Judgment conclusively settled this issue and, notwithstanding any appeal, it is not to be relitigated."); *First Nat'l Ins. Co. of Am. v. Kapetanakis* (*In Re Kapetanakis*), Ch. 7 Case No. 4:08-BK-32002, Adv. No. 4:08-AP-03237, 2010 WL 1463437, at *4 (Bankr. S.D. Tex. Apr. 12, 2010) (holding courts look to the underlying obligation to determine dischargeability but "to the Consent Judgment to determine the amount of the debt"), *subsequently aff'd sub nom. In re Kapetanakis*, 478 F.App'x 217 (5th Cir. 2012) (per curiam) (affirming entire amount of consent judgment was non-dischargeable); *Star High Yield Inv. Mgmt. Corp., Inc. v. Schwartz* (*In re Schwartz*), Ch. 7 Case No. 4:07-BK-30508, Adv. No. 4:07–AP-03170, 2008 WL 3285770, at *8–9 (Bankr. S.D. Tex. Aug. 7, 2008) (finding entire state court judgment non-dischargeable).

similar argument in his briefing.  (*See* Dkt. No. 17 at 48–49) (arguing non-dischargeability is limited to the value of fraudulent transfers from GCAC to Brass).  Both theories presume that non-dischargeability is capped at the wrongful benefit actually received by the fraudster (GCAC or Brass).

But this limitation was expressly rejected by the Supreme Court.  *See Cohen*, 523 U.S. at 219, 118 S.Ct. at 1217 (rejecting that "§ 523(a)(2)(A) excepts from discharge only the portion of the damages award in a fraud action corresponding to the *value* of the 'money, property, services, or . . . credit' the debtor obtained by fraud." (emphasis in original)).  There, the Court held that the Bankruptcy Code protects creditors more broadly and "prohibit[s] the discharge of *any liability arising from* a debtor's fraudulent acquisition of money, property, etc.," which may result in the non-dischargeability of a greater amount than the debtor wrongfully obtained.  *Id.* at 119–223, 118 S.Ct. at 1217–19 (emphasis added).

In sum, the amount GCAC previously owed to Vitol, Brass's potential liability under TUFTA, or the amount of benefit that Brass (or GCAC) received from the fraud are not "debts" that can be discharged.  There is only one currently outstanding debt between the Parties: the obligations arising from the Settlement Agreement and Agreed Final Judgment.  The Court reviews the bankruptcy court's finding that Brass's fraudulent conduct and willful infliction of injury gave rise to the debt.

### B.    11 U.S.C. § 523(a)(2)(A): ACTUAL FRAUD

The bankruptcy court relied on the framework established in *Husky Electronics v. Ritz* to conclude that Brass had committed actual fraud under Section 523(a)(2)(A).  (Dkt.

No. 8-20 at 333–38).  Before jumping into Brass's objections to this analysis, an overview of the legal landscape governing dischargeability for fraudulent-conveyance schemes under Section 523(a)(2)(A) is instructive.

### 1.    Legal Landscape

In *Ritz*, the Supreme Court held that "actual fraud" under Section 523(a)(2)(A) includes "fraudulent conveyance schemes."[19]  578 U.S. at 359, 366, 136 S.Ct. at 1586, 1590. A recipient of the fraudulent transfers who acts with "the requisite intent" to commit fraud can be prevented from discharging "any debts 'traceable to' the fraudulent conveyance" under Section 523(a)(2)(A).  *Id.* at 365, 136 S.Ct. at 1589 (internal citations omitted) (quoting *Field v. Mans*, 516 U.S. 59, 64, 116 S.Ct. 437, 440, 133 L.Ed.2d 351 (1995)). Neither the Supreme Court—nor the Fifth Circuit on remand—explained what must be shown to establish that a "fraudulent conveyance scheme" occurred or that the recipient acted with "the requisite intent" to commit fraud.  *See In re Ritz*, 832 F.3d 560, 565 (5th Cir. 2016) (describing limits of Supreme Court's holding); *see also id.* at 569 (remanding to the bankruptcy court to determine non-dischargeability under Section 523(a)(2)(A) as a matter of first impression).  That said, both strongly suggested that satisfying TUFTA's actual-fraud prong[20] would also satisfy Section 523(a)(2)(A)'s "actual fraud"

---

[19]    "Fraudulent conveyances typically involve 'a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration,'" *Ritz*, 578 U.S. at 361, 136 S.Ct. at 1587 (quoting *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 541, 114 S.Ct. 1757, 1763, 128 L.Ed.2d 556 (1994)), that is "designed 'to delay, hinder or defraud creditors and others,'" *BFP*, 511 U.S. at 540, 114 S.Ct. at 1763 (quoting 13 Eliz., ch. 5 (1570)).

[20]    Tex. Bus. & Com. Code § 24.005.

requirement.[21]  Indeed, on remand, the bankruptcy court in *Ritz* held that non-discharge was proper under Section 523(a)(2)(A) because the debtor had "effectuated fraudulent transfers under TUFTA."  *In re Ritz*, 567 B.R. 715, 739, 761–62 (Bankr. S.D. Tex. 2017).

As in *Ritz*, the bankruptcy court here relied on TUFTA's actual-fraud prong to establish that Brass committed fraud under Section 523(a)(2)(A).  The Court therefore provides an overview of TUFTA.

a.    <u>TUFTA</u>

Fraudulent transfers are defined in, and prohibited by, Section 24.005 of the Texas Business and Commerce Code, otherwise known as the Texas Uniform Fraudulent Transfer Act or "TUFTA."  TUFTA explains that a "transfer made or obligation incurred by a debtor is fraudulent . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."  Tex. Bus. & Com. Code § 24.005(a). In other words, if a transfer is made with the intent to defraud, it is fraudulent.

Because "direct evidence" of fraudulent intent "is often scarce, TUFTA 'supplies a non-exclusive list of eleven factors, commonly known as badges of fraud, that courts may consider in determining whether a debtor actually intended to defraud creditors under TUFTA.'"  *In re Ritz*, 832 F.3d at 568 (internal quotations omitted) (quoting *Spring St.*

---

[21]    *See Ritz*, 578 U.S. at 360, 366, 136 S.Ct. at 1586, 1590 ("[A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud' [under Section 523(a)(2)(A)]. . . . [W]e interpret 'actual fraud' [under Section 523(a)(2)(A)] to encompass fraudulent conveyance schemes . . . ."); *In re Ritz*, 832 F.3d at 566–68 (holding "a fraudulent transfer under TUFTA" constitutes "actual fraud" under Texas state law because a fraudulent transfer under TUFTA, "necessarily 'involves dishonesty of purpose or intent to deceive.'" (internal quotations omitted) (quoting *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.))).

*Partners-IV, L.P. v. Lam*, 730 F.3d 427, 437 (5th Cir. 2013)).  "These badges of fraud, which

aid '[i]n determining actual intent,' include whether:

> (1)    the transfer or obligation was to an insider;
>
> (2)    the debtor retained possession or control of the property transferred after the transfer;
>
> (3)    the transfer or obligation was concealed;
>
> (4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5)    the transfer was of substantially all the debtor's assets;
>
> (6)    the debtor absconded;
>
> (7)    the debtor removed or concealed assets;
>
> (8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10)   the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11)   the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

*Id.* (alteration in original) (quoting Tex. Bus. & Com. Code § 24.005(b)).

"Not all, or even a majority, of the 'badges of fraud' must exist to find actual fraud.

Indeed, '[w]hen several of these indicia of fraud are found, they can be a proper basis for

an inference of fraud.'"  *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008) (alteration in

original) (quoting *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988)).  Though

"several" lacks precision, "there is no bright-line rule that more than two badges of fraud must be found." *Tow v. Speer*, No. 4:11-CV-03700, 2015 WL 1058080, at *11 (S.D. Tex. Mar. 10, 2015). Rather, courts evaluate the totality of the circumstances to determine whether fraud may be inferred from the badges. *Id.*; *Roland*, 838 F.2d at 1402–03.

> b.    "Obtained By" and the Effects of a Settlement Agreement or Judgment

A final note on Section 523(a)(2)(A): It only exempts debt for "money . . . to the extent *obtained by* . . . actual fraud." § 523(a)(2) (emphasis added). Some have noted that "fraudulent conveyances (unlike other forms of actual fraud) cannot be used to 'obtai[n]' debt because they function instead to hide valuables that a debtor already possesses." *Ritz*, 578 U.S. at 364, 136 S.Ct. at 1589 (alteration in original). The Supreme Court dismissed this argument in *Ritz*:

> [i]t is of course true that the transferor does not "obtai[n]" debts in a fraudulent conveyance. But the recipient of the transfer—who, with the requisite intent, also commits fraud—can "obtai[n]" assets "by" his or her participation in the fraud. If that recipient later files for bankruptcy, any debts "traceable to" the fraudulent conveyance will be nondischargable under § 523(a)(2)(A). Thus, at least sometimes a debt "obtained by" a fraudulent conveyance scheme could be nondischargeable under § 523(a)(2)(A). Such circumstances may be rare because a person who receives fraudulently conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy, [but they make clear] that fraudulent conveyances are not wholly incompatible with the "obtained by" requirement.

*Id.* at 365, 136 S.Ct. at 1589 (internal citations omitted).

In short, while a debtor who transfers assets in a fraudulent conveyance does not "obtain" debt, a recipient who knowingly participates in the fraud can "obtain" assets

through it, making any debts traceable to that fraud potentially non-dischargeable under Section 523(a)(2)(A).

This holding, however, becomes complicated when a creditor who has allegedly been defrauded through a fraudulent-conveyance scheme agrees to settle with the debtor, and the *original* obligation arising from money loaned (and fraudulently transferred) is replaced by a *new* obligation arising from either a settlement agreement or an agreed judgment. Is this new obligation still considered to be a debt traceable to money "obtained by" actual fraud?

According to the Supreme Court, yes. In *Archer*, the Court held that a debt from a settlement agreement can be deemed non-dischargeable if a creditor can show that the original debt would have been non-dischargeable. *See* 538 U.S. at 319–23, 123 S.Ct. at 1466–68; *see also United States v. Spicer*, 57 F.3d 1152, 1156 (D.C. Cir. 1995) ("Settlement makes the dishonest debtor no more honest, and no more entitled to the relief Congress intended to reserve for the honest debtor."). Similarly, a debt arising from a consent judgment settling state-court fraud claims may be dischargeable if the creditor can show that the settled debt was for money obtained by fraud. *Brown*, 442 U.S. at 133–34, 137–39, 99 S.Ct. at 2211–13 ("[T]he mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt.").

## 2. <u>The Bankruptcy Court's Findings</u>

Here, the bankruptcy court found that Brass had committed actual fraud under Section 523(a)(2)(A). (Dkt. No. 8-20 at 338). In reaching this conclusion, the bankruptcy court evaluated the transfers between GCAC and Brass (and others) under TUFTA. (*Id.*

at 335–38).  Because the transfers met five of TUFTA's "badges of fraud," the court concluded that Brass "committed actual fraud under Section 523(a)(2)(A)" and a portion of his debt was thus non-dischargeable.  (*Id.* at 338, 341–42).

Brass has a number of objections to this analysis.  In summary, Brass argues that

1)    the bankruptcy court could not consider whether Brass violated TUFTA because the Settlement Agreement and Agreed Final Judgment resolved Brass's TUFTA liability; collateral estoppel barred relitigating that issue in this proceeding;

2)    the bankruptcy court was not permitted to consider TUFTA because Vitol did not plead a TUFTA claim in its Complaint;

3)    even if Vitol had pled TUFTA, the bankruptcy court erred in relying on badges of fraud that Vitol did not plead;

4)    TUFTA liability alone does not establish actual fraud under Section 523(a)(2)(A); and

5)    any debt Brass may owe under TUFTA is not a debt owed "to" Vitol.

**3.    <u>Collateral Estoppel: Effect of the Settlement Agreement and Agreed Final Judgment</u>**

The Court first addresses Brass's collateral-estoppel arguments.  Brass contends that the Parties' Settlement Agreement and Agreed Final Judgment explicitly resolved "the issue of Brass's liability under TUFTA."  (Dkt. No. 13 at 32).  In other words, he argues that those agreements determined that his conduct did *not* violate TUFTA. Accordingly, Brass maintains that collateral estoppel barred the bankruptcy court from reconsidering whether his transfers violated TUFTA.  He asserts that the court was required to accept that his transfers were not fraudulent under TUFTA, which precluded it from relying on TUFTA to establish "actual fraud" under Section 523(a)(2)(A).  (*See id.* at 32–39, 54–57).

Specific to the bankruptcy court's Judgment, Brass argues that either (1) the bankruptcy court made an error of *law* by not considering if the Settlement Agreement resolved the issue of Brass's fraud under TUFTA, (*id.* at 32–39); (Dkt. No. 17 at 30); or (2) the bankruptcy court made an error of *fact* by incorrectly concluding that the Settlement Agreement did *not* resolve whether his transfers were fraudulent under TUFTA, (Dkt. No. 13 at 54–56); (Dkt. No. 17 at 26–29). As a third line of attack, Brass argues that the Agreed Final Judgment also collaterally estops any analysis of his transfers under TUFTA in this proceeding. (Dkt. No. 13 at 38). These arguments fail.

a.    The Settlement Agreement

First, as Brass concedes, "the bankruptcy court analyzed the intent of the parties reflected in the Settlement Agreement and the collateral estoppel of the Agreed Final Judgment in connection with its ruling in the Summary Judgment Order." (*Id.* at 35 & n.11). While Brass may dispute the bankruptcy court's interpretation of the Parties' intent, there is no question that it considered whether the Parties meant for the Settlement Agreement and Agreed Final Order to resolve whether Brass's transfers were fraudulent under TUFTA.

Brass's second argument—that the bankruptcy court erred in finding that the Parties did *not* agree to resolve whether Brass's transfers violated TUFTA, (*see id.* at 32–39, 54–57)—is similarly unpersuasive. Brass argues that the Settlement Agreement was clearly intended to resolve that issue because it "expressly provided that the claims that Vitol was releasing included 'any claims under Chapter 24 of the Texas Business and Commerce Code.'" (*Id.* at 36) (quoting Dkt. No. 8-13 at 115). He also points to testimony

stating that the Parties designed the Settlement Agreement to "resolv[e] Vitol's claims against GCAC, Brass, and Trifinery, as well as GCAC's claims against Vitol" and to clarify that Brass's personal liability under the agreement did not relate to his past conduct.  (*Id.* at 55–56).

As Brass acknowledges, the bankruptcy court's finding on whether the Parties intended the Settlement Agreement and the Agreed Final Judgment to decide TUFTA liability is a question of fact.  (*Id.* at 34).  A bankruptcy court's findings of fact are reviewed for clear error.  *BVS Constr.*, 18 F.4th at 172; *In re Osborne*, 951 F.3d 691, 697 (5th Cir. 2020). Accordingly, this Court will not reverse unless "considering all the evidence, [it is] left with the definite and firm conviction that a mistake has been made."  *In re Osborne*, 951 F.3d at 697 (quoting *In re Norris*, 70 F.3d 27, 29 (5th Cir. 1995)).

Brass's arguments and evidence have not so firmly convinced the Court.  To the contrary, the Court finds them unpersuasive because they conflate claim and issue preclusion.  While settlement agreements often give rise to *claim preclusion*—barring a party from bringing "any *claim* 'based on the same cause of action' that [it] had brought in state court," *Archer*, 538 U.S. at 319, 123 S.Ct. at 1466 (emphasis added) (quoting *Brown*, 442 U.S. at 131, 99 S.Ct. at 2209), they "ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear . . . that the parties intend their agreement to have such an effect," *Arizona v. California*, 530 U.S. 392, 414, 120 S.Ct. 2304, 2319, 147 L.Ed.2d 374 (emphasis in original), *supplemented*, 531 U.S. 1, 121 S.Ct. 292, 148 L.Ed.2d 1 (2000).

Here, while the Settlement Agreement clearly bars Vitol from bringing a future *claim* of fraud under TUFTA, (*see* Dkt. No. 8-13 at 115), it does not necessarily resolve the *issue* of whether Brass *committed* fraud under TUFTA.  In fact, in *Archer*, the Supreme Court considered a nearly identical settlement release[22] and held that while it "ensured 'a blanket release' of the underlying claim of fraud," it did *not* establish "that the parties meant to resolve the *issue* of fraud or, more narrowly, to resolve that issue for purposes of a later claim of nondischargeability in bankruptcy."  538 U.S. at 321–22, 123 S.Ct. at 1467 (emphasis in original).  And as the bankruptcy court correctly found, "The release here is no broader than the release in *Archer*."  (Dkt. No. 8-2 at 128 n.16).

Apart from the releases, the only indication of the Parties' intent in the Settlement Agreement is their stated desire "to settle all *claims* asserted in the lawsuit 'solely to avoid the expense of further investigation or litigation.'"  (*Id.* at 128) (emphasis added) (quoting Dkt. No. 8-13 at 116).  As a result, there is no indication that the Parties intended the agreement "to resolve the *issue* of fraud . . . for purposes of a later claim of nondischargeability in bankruptcy."  *Archer*, 538 U.S. at 322, 123 S.Ct. at 1467 (emphasis in original).

b.    The Agreed Final Judgment

Finally, Brass argues that—even aside from the Parties' intentions—Texas law bars reconsideration of his TUFTA liability because the Agreed Final Judgment denied

---

[22]    *Compare* (Dkt. No. 8-13 at 115) (releasing "any claim or causes of action . . . including but not limited to . . . any claims under Chapter 24 of the Texas Business and Commerce Code, as well as . . . [for] fraud") *with Archer*, 538 U.S. at 317, 123 S.Ct. at 1465 (releasing "any and all claims . . . arising out of this litigation").

"Vitol's requested avoidance of the transfers from GCAC," making TUFTA liability "a matter actually litigated."  (Dkt. No. 13 at 38).  Brass reasons that because the state court reviewed all the pleadings and materials and concluded that the Agreed Final Judgment should be entered, it must have rejected the TUFTA-based request in Vitol's state-court counterclaim as legally deficient—a conclusion that "*necessarily required* finding[] that the transfers were not avoidable under Tex. Bus. & Com. Code § 24.005(a)(1)."   (*Id.*) (emphasis in original).  He contends that, accordingly, the issue of TUFTA liability was "actually litigated" and that issue preclusion "applies to Brass's liability to Vitol arising under TUFTA."  (*Id.*).

The Court disagrees.  Neither federal nor Texas law[23] supports the view that the Agreed Final Judgment collaterally estops consideration of the TUFTA badges in this discharge proceeding.  As the Fifth Circuit has made clear, collateral estoppel applies in "limited circumstances" to bankruptcy-dischargeability proceedings.  *In re Clem*, 124 F.4th 341, 349 (5th Cir. 2024) (quoting *In re Dennis*, 25 F.3d 274, 278 (5th Cir. 1994)).  "For collateral estoppel to apply in this context, the first court must have 'made specific, subordinate, factual findings on the identical dischargeability issue in question—that is, an issue which encompasses the same *prima facie* elements as the bankruptcy issue.'"  *Id.* (quoting *In re Dennis*, 25 F.3d at 278).

Here, the Agreed Final Judgment issued by the state court makes no findings of fraud—factual or otherwise.  (*See* Dkt. No. 8-18 at 126).  Its sole conclusion is that "the

---

[23]   A Texas state court entered the Agreed Final Judgment, (*see* Dkt. No. 8-18 at 126), so the Court applies Texas rules of issue preclusion, *see In re Clem*, 124 F.4th 341, 348 n.3 (5th Cir. 2024).

Brass Parties . . . are jointly and severally liable to Vitol" for $10 million. (*Id.*). That legal determination does not meet the threshold for issue preclusion. *See In re Clem*, 124 F.4th at 349.

## 4.    **Pleading Arguments**

Brass's next set of arguments addresses purported pleading deficiencies. He contends that the bankruptcy court's findings were inconsistent with Vitol's Complaint in the bankruptcy adversary proceeding, (Dkt. No. 8-1 at 84–93), and the Parties' Joint Pretrial Statement, (Dkt. No. 8-3 at 1–11). Specifically, Brass argues that either Vitol did not plead a fraudulent-transfer theory under TUFTA in its Complaint, (Dkt. No. 13 at 17, 26–29); (Dkt. No. 17 at 11–14, 21–26), or failed to plead it with the specificity required for fraud claims under Federal Rule of Civil Procedure 9(b), (Dkt. No. 17 at 12, 14–18). Consequently, Brass asserts that the bankruptcy court legally erred because (1) it was bound to consider only the legal theories alleged in Vitol's Complaint, and (2) its consideration of TUFTA violated Rule 9(b).

The Court disagrees. First, the bankruptcy court did not exceed the bounds of Vitol's Complaint because it used the TUFTA framework only as a guide for determining actual fraud under Section 523(a)(2)(A), (*see* Dkt. No. 8-20 at 334–38), and the first claim in Vitol's Complaint is "Non-Dischargeability of All Debts Under 11 U.S.C. § 523(a)(2)(A)," (Dkt. No. 8-1 at 90). So any alleged pleading deficiencies related to the

merits of a TUFTA claim are irrelevant, and any suggestion that the bankruptcy court stepped beyond Vitol's Complaint is incorrect.

Second, Brass has waived his Rule 9(b) objection,[24] and in any case, the allegations in Vitol's Complaint satisfy Rule 9(b)'s particularity requirement. Rule 9(b) ensures that the defendant will have sufficient information about the alleged fraud to defend against the allegations. *United States ex rel. Stewart v. The La. Clinic*, No. 2:99-CV-01767, 2002 WL 257690, at *2 (E.D. La. Feb. 22, 2002); (citing *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)). The Court finds that Vitol's allegations provided sufficient information about the alleged fraudulent-transfer scheme to allow Brass to defend against the allegations—as he in fact did defend against them throughout the adversary proceeding and at trial. Vitol particularly alleged that:

1.      "GCAC received funds from third parties for the sale of the asphalt that Vitol purchased; instead of using this money to repay Vitol as agreed between the parties, Brass and other members of GCAC used these proceeds for personal purchases," (*id.* at 86);

---

[24]   *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994) ("[Rule 9(b)'s] heightened pleading standard provides defendants with fair notice of the plaintiffs' claims . . . and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs"); *Kujat v. Harbor Freight Tools USA, Inc.*, No. 2:09-CV-14183, 2010 WL 3463928, at *2 (E.D. Mich. Aug. 30, 2010) ("The purpose of the heightened pleading standard is to assure that defendants are apprised of the allegations against them in sufficient detail to frame an adequate responsive pleading."); *accord* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1300 (4th ed. 2024) (noting that challenges to "a pleading based on insufficient particularization of the circumstances of an alleged fraud typically is asserted" with a Rule 12 motion; therefore, "several courts have held that a party who fails to object to the manner in which fraud or mistake is pleaded at the pleading stage waives the specificity requirement set out in Rule 9(b)"); *see, e.g.*, *Payne v. United States*, 247 F.2d 481, 485–86 (8th Cir. 1957) (holding objections based on heightened-pleading requirement were waived when defendant only raised them after trial); *Finman v. ClearCellular, Inc.*, No. 2:22-CV-00272, 2023 WL 2742720, at *1 (D. Utah Mar. 31, 2023); *PSC Indus., Inc. v. Johnson*, No. 3:19-CV-00362, 2021 WL 1663574, at *14 n.24 (M.D. Tenn. Apr. 28, 2021).

2.    "Brass siphoned funds Vitol provided *to GCAC* for his personal use and treated GCAC as his personal bank account," (*id.*) (emphasis added);

3.    "During the course of the interim financing arrangement with Vitol, Brass caused GCAC to transfer to both himself and his mother millions of dollars in undocumented and evergreen loans," (*id.* at 87);

4.    "[Brass] used GCAC as an alter ego for his own illegitimate and fraudulent purposes," (*id.* at 89); and

5.    "[Brass] used GCAC to funnel millions of dollars to [Brass] and/or other insiders/related entities with intent to hinder, delay, or defraud GCAC's creditors, including Vitol; and . . . the funds [Brass] misappropriated are traceable to transactions financed by Vitol and were used by [Brass] for his own direct and personal benefit and to shield GCAC's assets from collection," (*id.* at 90).

Based on these allegations, the Court is not persuaded that Brass lacked adequate notice of Vitol's theory of fraud merely because Vitol summarized five pages of factual allegations as "[Brass] obtained money from Vitol" rather than "[Brass] obtained the money from GCAC, which had obtained it from Vitol."[25]

\* \* \*

Because neither the Settlement Agreement, the Agreed Final Judgment, nor any pleading deficiencies prevented the court from considering whether Brass's transfers were fraudulent under TUFTA for purposes of establishing "actual fraud" in the discharge proceeding, the Court now reviews the bankruptcy court's analysis of whether the Debt "arose out of" Brass's fraudulent conduct. *See Archer*, 538 U.S. at 321, 123 S.Ct.

---

[25]    As Vitol points out, Brass himself has conflated his individual persona with GCAC. (Dkt. No. 15 at 59) ("By his own admission, Brass did not consider there to be any substantive difference between himself and GCAC."); (*id.* at 58–59) ("If GCAC, **which is me**, elected to have me repay it, then yes . . . GCAC is controlled by me." (emphasis in original) (quoting Dkt. No. 8-8 at 154)).

at 1467 ("'Congress intended the fullest possible inquiry' to ensure that 'all debts arising

out of' fraud are 'excepted from discharge,' no matter what their form." (quoting *Brown*,

442 U.S. at 138, 99 S.Ct. at 2213)); *see also* 11 U.S.C. § 523(a) (referring to "any debt").

### 5.     <u>The Bankruptcy Court's TUFTA Analysis</u>

The bankruptcy court first considered whether the transfers underlying the

Settlement Agreement and Agreed Final Judgment were fraudulent under TUFTA,

thereby causing the Settlement Agreement and Agreed Final Judgment to arise from

Brass's "actual fraud."  (*See* Dkt. No. 8-20 at 333–38).  The bankruptcy court concluded

that the transfers were fraudulent under TUFTA (and by extension, Section 523(a)(2)(A))

after finding that five TUFTA "badges of fraud" were present with respect to the disputed

transfers: (1) the transfers were made to insiders; (2) they were made while litigation was

pending; (3) they involved substantially all of GCAC's assets; (4) GCAC did not receive

reasonably equivalent value in exchange; and (5) GCAC was insolvent at the time of

transfers.  (*Id.* at 334–38).

Brass argues that the bankruptcy court's TUFTA analysis was flawed in both its

legal reasoning and factual findings.  The Court begins with the alleged legal errors.

### a.     <u>Alleged Errors of Law</u>

Brass argues that the bankruptcy court's TUFTA analysis was legally flawed for

two reasons.  First, he contends that the court erred by relying on badges of fraud that

Vitol purportedly either did not plead in its Complaint or did not plead with the

particularity required under Rule 9(b).  (Dkt. No. 13 at 29–32); (Dkt. No. 17 at 12, 18–21).

Second, he argues that because the bankruptcy court was limited to considering only the

two badges of fraud pled by Vitol, *if* it found that Brass committed actual fraud—a finding Brass disputes was made, *see infra* Section III(B)(5)(b)— that finding would be erroneous because two badges of fraud are insufficient to establish fraudulent intent. (Dkt. No. 13 at 19, 31–32, 52). In sum, Brass maintains that the court needed direct evidence of fraudulent intent, which it lacked. (*Id.*).

Starting with the first argument, Brass asserts that some of the badges of fraud relied upon by the bankruptcy court were either not pled or inadequately pled in Vitol's Complaint. (*Id.* at 29–32); (Dkt. No. 17 at 12, 18–21). He argues that Vitol's Complaint only alleged two badges: "(a) the transfers were to insiders and (b) [GCAC] was insolvent when the obligations were incurred." (Dkt. No. 13 at 30) (citing Dkt. No. 8-1 at 86–87). Thus, Brass contends that the bankruptcy court improperly considered additional badges such as the transfers (1) being made during pending litigation, (2) involving substantially all of GCAC's assets, and (3) lacking reasonably equivalent value in exchange. (*See* Dkt. No. 8-20 at 336).

The Court disagrees. Once a claim has been sufficiently pled, the standards or criteria used to evaluate that claim are a matter of substantive law, and courts are not bound by the pleadings in the factors they choose to consider or not consider. *See Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-02384, 2016 WL 8216509, at *3 n.4 (N.D. Tex. July 27, 2016) (citing *Franz v. Iolab, Inc.*, 801 F.Supp. 1537, 1541 (E.D. La. 1992) (allowing fraud claim to proceed despite word "fraud" not appearing in complaint because "it is not required that the plaintiff specifically allege the legal theory of fraud, only that he 'allege with particularity *the defendant's acts* which the plaintiff contends amount to fraud'"

(emphasis in original) (quoting *Unimobil 84 Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986)))).[26]  Accordingly, the bankruptcy court on remand in *Ritz* considered six additional badges of fraud beyond those the plaintiff pled, including some that are not even in the TUFTA statute.

> This Court has reviewed thirteen badges of fraud—the eleven enumerated badges set forth in TUFTA, plus two other badges that are particularly germane to the suit at bar.  Of these thirteen badges of fraud, Husky raised seven of them, six of which are present.  This Court, *sua sponte*, has reviewed six other badges, five of which are present.  Thus, a total of eleven badges of fraud are present.

*Ritz*, 567 B.R. at 753.[27]

And Brass's cited authorities do not save his argument that the bankruptcy court was prohibited from considering unpled badges of fraud.  (Dkt. No. 13 at 30) (first citing *In re: Brown Med. Ctr., Inc.*, 552 B.R. 165, 171–72 (S.D. Tex. 2016); and then citing *Taylor v. Scheef & Stone, LLP*, No. 3:19-CV-02602, 2020 WL 4432848, at *13 (N.D. Tex. July 31, 2020)); (Dkt. No. 17 at 20–21) (same).  These cases address situations where a plaintiff's complaint

---

[26]    *See also Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 863 (8th Cir. 2015) ("Courts may consider any factors they deem relevant to the issue of fraudulent intent."); *In re Tronox, Inc.*, 429 B.R. 73, 94 (Bankr. S.D. N.Y. 2010) ("Defendants' argument rests on the flawed contention that badges of fraud must be pled to satisfy Rule 9(b).  While courts often allow parties to rely on badges of fraud because of the difficulty of proving intent, this is not a requirement."); *Kipperman v. Onex Corp.*, 411 B.R. 805, 853 (N.D. Ga. 2009) ("In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts may look to a number of badges of fraud.").

[27]    Because "direct evidence" of fraudulent intent "is often scarce," the Fifth Circuit has made clear that courts are not limited to the badges of fraud pled in the complaint—or even those listed in TUFTA—when evaluating intent.  *In re Ritz*, 832 F.3d at 568 (describing TUFTA's badges as a "*non-exclusive list*" of fraud indicators (emphasis added) (quoting *Spring St. Partners-IV*, 730 F.3d at 437)).  Courts may instead consider any relevant factor and assess intent based on the totality of the circumstances.  *Tow*, 2015 WL 1058080, at *11; *see, e.g., In re Wiggains*, 848 F.3d 655, 661 (5th Cir. 2017) (determining intent without using enumerated statutory badges of fraud).

fails to plead the fraud claim *as a whole* with the particularity required under Rule 9(b). *See In re: Brown Med. Ctr*, 552 B.R. at 172; *Taylor*, 2020 WL 4432848, at *13. They do not speak to whether a court may rely on additional, unpled badges *once a fraud claim has been adequately pled*.

In short, a pleading need only allege a plausible claim, *see* Fed. R. Civ. P. 8(a), and even Rule 9(b)'s heightened requirement for fraud claims only requires that the complaint "allege with particularity *the defendant's acts* which the plaintiff contends amount to fraud," *Spurney*, 797 F.2d at 216 (emphasis added). That is exactly what Vitol's Complaint did. It states:

(1)    "[Brass] used GCAC to funnel millions of dollars to [himself] and/or other insiders," (Dkt. No. 8-1 at 90);

(2)    "[t]he financing from Vitol was GCAC's only source of working capital and its trading facilitated by Vitol was GCAC's only line of business . . . only days before Vitol and GCAC first began working together under the interim financing agreement—GCAC's debts and liabilities were nearly double its assets," (*id.* at 86);

(3)    "Brass caused GCAC to transfer to both himself and his mother millions of dollars in undocumented and evergreen loans . . . these transfers were loans in name only; GCAC did not have any written agreements for these loans to Brass and his mother and there were no recorded repayment terms, due dates, or interest rates," (*id.* at 87); and

(4)    "[u]nbeknownst to Vitol, GCAC was insolvent during the pendency of the interim agreement," (*id.* at 86).

Accordingly, Vitol adequately pled at least four badges of fraud: (1) transfers to insiders; (2) of substantially of GCAC's assets; (3) without receiving reasonable consideration in return; (4) while GCAC was insolvent. This was enough to allege a plausible—indeed, successful—claim of actual fraud under Section 523(a)(2)(A) as

informed by the TUFTA badges. *See In re Ritz*, 567 B.R. at 740–41. The bankruptcy court was then free to make whatever additional relevant findings were supported by the trial record.

Consequently, the Court rejects Brass's arguments that the bankruptcy court erred by considering allegedly unpled or insufficiently pled badges of fraud. And for the same reason, the Court rejects Brass's argument that the bankruptcy court needed direct evidence of fraud, (Dkt. No. 13 at 19, 31–32, 52)—an argument that depends on Brass's incorrect contention that the bankruptcy court was limited to considering only two allegedly pled badges.

b.     <u>Alleged Errors of Fact</u>

The Court now considers Brass's objections to the bankruptcy court's factual findings under TUFTA. First, he argues that the bankruptcy court never made the ultimate finding of "actual fraud." (Dkt. No. 13 at 49–51); (Dkt. No. 17 at 38–39). Second, he contends that, even if the bankruptcy court did find actual fraud, this was clearly erroneous. (Dkt. No. 13 at 51–54).

Again, the Court disagrees. To begin with, the bankruptcy court made a finding of "actual fraud" under Section 523(a)(2)(A). (Dkt. No. 8-20 at 338). Brass's argument to the contrary is difficult to credit. Following a detailed badges-of-fraud analysis, the bankruptcy court concluded: "Thus, there is sufficient evidence that Brass committed actual fraud under Section 523(a)(2)(A)." (*Id.*). Brass's objection that the court failed to make an "actual fraud" finding is overruled.

The Court also finds no merit in Brass's argument that the bankruptcy court clearly erred in finding that he acted with "actual intent to hinder, delay, or defraud" Vitol. (Dkt. No. 13 at 52–54) (referencing TUFTA's requirement for fraudulent transfers). Brass points to two items in the trial record that he contends undermine a finding of fraudulent intent: his participation in settlement discussions with Vitol, (*id.* at 53) (citing Dkt. No. 8-6 at 178–79), and the supposed ambiguity surrounding the Parties' financial obligations, (*id.*) (citing Dkt. No. 8-7 at 271–72).

In addition to citing the trial record, Brass makes two arguments grounded in rhetoric rather than evidence. First, he contends that the bankruptcy court erred in finding fraudulent intent because the transfers didn't ultimately shield the funds from Vitol—he later agreed to personal liability for more than the non-dischargeable amount that the bankruptcy court awarded. (*Id.*) (first citing Dkt. No. 8-13 at 116; then citing Dkt. No. 8-18 at 1; and then citing Dkt. No. 8-20 at 340–41). Second, he argues that using the funds to support his "desired lifestyle" contradicts a finding of intent to defraud. (*Id.* at 48–49, 53–54) (citing Dkt. No. 8-20 at 339). Based on these two points, Brass argues that, "[t]o the extent that the bankruptcy court *did* determine that the transfers GCAC made to Brass were done with the intent to hinder, delay, or defraud creditors, this was a clear error of fact." (*Id.* at 54) (emphasis in original).

The Court reviews a finding of fraudulent intent under Section 523(a)(2)(A) for clear error. *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003) (citing *In re Perez*, 954 F.2d 1026, 1029 (5th Cir. 1992)). This standard is especially deferential where, as here, intent turns on witness credibility, "because the trier of fact has seen and judged the witnesses." *In re*

*Wiggains*, 848 F.3d 655, 660 (5th Cir. 2017) (quoting *Moore v. CITGO Refin. & Chems. Co.*, 735 F.3d 309, 315 (5th Cir. 2013)).   Because intent is a fact-intensive inquiry often grounded in a debtor's demeanor and testimony, "[d]eference to the bankruptcy court's findings is particularly appropriate."   *Id.* at 663.  This Court "will not attempt to reassess the credibility of witnesses whom [it has] not had an opportunity to see on the stand."[28] *Id.* (quoting *Tex. Mortg. Servs. Corp. v. Guadulupe Sav. & Loan Assoc.* (*In re Tex. Mortg. Servs. Corp.*), 761 F.2d 1068, 1078 (5th Cir. 1985)).

The bankruptcy court did not clearly err in concluding that Brass acted with fraudulent intent when he made the disputed transfers.   The trial evidence Brass cites does not "clearly" demonstrate that his actions were anything other than self-serving. And Brass's two remaining points are unpersuasive.   Brass's argument that his later agreement to personal liability somehow negates fraudulent intent at the time of the transfers falls flat.   TUFTA focuses on the debtor's intent *at the time the transfer occurred*— not what he promised after being caught.   *Roland*, 838 F.2d at 1402 ("We [have] held that under the Texas Fraudulent Transfers Act the debtor's intent *at the time of the conveyance* was the crucial element." (emphasis added)).   Post hoc agreements—however favorable to the creditor—do not erase the fraudulent intent that tainted the transfers when they were made.   And the Court finds no contradiction in the bankruptcy court's finding that Brass siphoned funds to support his "desired lifestyle" *and* avoid repaying Vitol.   These motives are not mutually exclusive.   On the contrary, funding a lavish and unearned

---

[28]     The Court does observe, though, that the only testimony the bankruptcy court expressly found "not credible" at several points was Brass's.   (Dkt. No. 8-20 at 340 n.91).

lifestyle is precisely why someone would fraudulently transfer funds away from a creditor in the first place.

Accordingly, the Court finds no clear error in the bankruptcy court's factual determination that Brass acted with the intent to hinder or delay Vitol's collection of the debt GCAC owed.

* * *

Finding no legal or clear factual errors, the Court **AFFIRMS** the bankruptcy court's conclusion that Brass's transfers were fraudulent under TUFTA and that therefore Brass committed actual fraud under Section 523(a)(2)(A).

### 6.    <u>Other Alleged 523(a)(2)(A) Legal Errors</u>

Having determined that Brass's transfers were fraudulent using the TUFTA badges, the Section 523(a)(2)(A) analysis would typically end—as it did in the bankruptcy court.  (Dkt. No. 8-20 at 338).  Because Brass's transfers were fraudulent according to the TUFTA badges, his conduct constitutes "actual fraud" under Section 523(a)(2)(A).  *Ritz*, 578 U.S. at 360, 136 S.Ct. at 1586 ("[A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud'" under Section 523(a)(2)(A)); *In re Ritz*, 832 F.3d at 567 (holding "that a transfer is fraudulent under the actual fraud prong of TUFTA . . . necessarily 'involves dishonesty of purpose or intent to deceive.'" (internal citation and quotations omitted) (quoting *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.))); *see, e.g.*, *In re Ritz*, 567 B.R. at 761–62.

This means that Brass obtained money "by" his "actual fraud."  11 U.S.C. § 523(a); *see Ritz*, 578 U.S. at 365, 136 S.Ct. at 1589; *see also supra* Section III(B)(1)(b).  It follows that

the Settlement Agreement and Agreed Final Judgment—which resolved claims for that money—also arise out of fraud, and the resulting obligations are non-dischargeable. *Cohen*, 523 U.S. at 218, 118 S.Ct. at 1216 ("Once it is established that specific money or property has been obtained by fraud, . . . 'any debt' arising therefrom is excepted from discharge."); *Archer*, 538 U.S. at 320–21, 123 S.Ct. at 1467 (holding settling of "valid claim[s] for fraud," either in form of "a stipulation and consent decree" or settlement agreement, arise out of "the underlying fraud"); *see supra* Section III(B)(1)(b). Accordingly, the Debt that Brass owes Vitol under the Settlement Agreement and Agreed Final Judgment is non-dischargeable.

That's how the analysis *should* work. But Brass has two as-of-yet-unaddressed objections to the bankruptcy court's Section 523(a)(2)(A) analysis—arguments that fall outside both the Section 523(a)(2)(A) and TUFTA frameworks.

Brass's two remaining objections are as follows. First, he argues that the bankruptcy court could not find non-dischargeability under Section 523(a)(2)(A) based solely on TUFTA violations without also piercing GCAC's corporate veil. In his view, veil-piercing was necessary to establish that his debt to Vitol is "for" money he fraudulently obtained. (Dkt. No. 13 at 43–46); (Dkt. No. 17 at 33–35, 39–40); *see* 11 U.S.C. § 523(a)(2) (excepting from discharge of debts "for" money obtained by fraud). He further contends that any veil-piercing finding would have been reversible error. (Dkt. No. 17 at 35–37).

Second, he argues that the debt arising from his TUFTA-based fraud would be owed to GCAC's Chapter 7 bankruptcy estate—not to Vitol—and therefore does not meet

Section 523(a)(2)(A)'s requirement that the debt be owed to the creditor asserting non-dischargeability. (*Id.* at 37–38); (Dkt. No. 13 at 40–43).

The Court addresses each argument in turn.

a.   Brass's debt is "for" his actual fraud.

Brass argues that the bankruptcy court erred in concluding that his debt to Vitol was non-dischargeable under Section 523(a)(2)(A) because the bankruptcy court relied solely on his TUFTA violations. According to Brass, the court needed an additional finding—that veil-piercing was appropriate—to hold him personally liable for money fraudulently transferred from GCAC. (Dkt. No. 13 at 43–46); (Dkt. No. 17 at 33–35, 39–40). He further contends that any veil-piercing determination would constitute reversible error. (Dkt. No. 17 at 35–37).

Brass's argument is difficult to follow, not only because it is scattered across his briefing, (*see id.* at 33–37, 39–40); (Dkt. No. 13 at 43–46), but also because it misstates the law. It rests on two flawed premises: (1) that the bankruptcy court found Brass liable under TUFTA and; (2) that this determination did not require finding that Brass possessed fraudulent intent. (Dkt. No. 17 at 40); (*see id.* at 33–37, 39–40); (Dkt. No. 13 at 43–46).

First, the bankruptcy court did not find Brass liable under TUFTA. It relied on factors in the TUFTA statute to determine if Brass's conduct was fraudulent under Section 523(a)(2)(A). (Dkt. No. 8-20 at 338). And second, it concluded that Brass *acted with fraudulent intent.* (*Id.*). Based on that finding of fraudulent intent, the bankruptcy court concluded that Brass's transfers constituted "actual fraud" under Section 523(a)(2)(A).

40

(*Id.*).  That fraud led to the Debt memorialized in the Parties' Settlement Agreement and Agreed Final Judgment.    The Debt is therefore non-dischargeable under Section 523(a)(2)(A) because it is "for"—or, as Brass prefers, "caused by," (Dkt. No. 13 at 18, 40, 44)—his fraud.

        b.    <u>A veil piercing determination is not required to find Brass's debt non-dischargeable.</u>

The discussion in Section III(B)(6)(a) is sufficient to dispose of Brass's objections. But because the bankruptcy court also mistakenly assumed that Vitol had to satisfy Texas's veil-piercing statute—and because Brass now argues that either this finding did not occur or was reversible error, (Dkt. No. 17 at 35–37)—the Court clarifies two points: (1) veil-piercing is not required here; but (2) the bankruptcy court's error in conducting a veil-piercing analysis was harmless.

The bankruptcy court erred by treating Texas's veil-piercing requirements as necessary to a Section 523(a)(2)(A) non-dischargeability finding.    That error stemmed from a misunderstanding of both the nature of the debt at issue and the Fifth Circuit's holding in *Ritz*.  First, as discussed above, *see supra* Section III(A), the bankruptcy court assumed that the relevant "debt" is what *GCAC* would have owed Vitol under the prior business arrangement, (*see* Dkt. No. 8-20 at 340–41).  From that premise, it reasoned that *Brass* would only be personally liable if GCAC's corporate veil could be pierced.  (*See id.* at 333–34).  That premise was incorrect.  The relevant debt is not GCAC's hypothetical liability—it is the debt Brass personally owes Vitol under the Settlement Agreement and

Agreed Final Judgment, *see supra* Section III(A), which impose joint and several liability

on Brass in his individual capacity, (Dkt. No. 8-13 at 116); (Dkt. No. 8-18 at 126).

Second, the bankruptcy court appears to have read *Ritz* as holding that TUFTA-

based fraud is not enough to support a Section 523(a)(2)(A) without veil-piercing.  (*See*

Dkt. No. 8-20 at 334) ("The Fifth Circuit also held in *Ritz* that a debt could be

nondischargeable under Section 523(a)(2)(A) if actual fraud is established under TUFTA

*and* the actual fraud was for the individual debtor's direct personal benefit." (emphasis

added)).  But that reading confuses *Ritz*'s veil-piercing analysis with its dischargeability

analysis.

In *Ritz*, the debtor owned a company that incurred a large debt and then

fraudulently transferred company assets for personal use.  *In re Ritz*, 832 F.3d at 563.  The

creditor sought to hold the debtor personally liable and obtain a non-dischargeability

finding under Section 523(a)(2)(A).  *Id.*  But because there was no agreement creating a

direct personal obligation between the debtor and creditor, the creditor first had to pierce

the corporate veil.  *Id.* at 566 ("Because corporations offer their shareholders limited

liability, a plaintiff seeking to impose individual liability on a shareholder must pierce

the corporate veil to do so.").  To do that, the creditor relied on Section 21.223(b) of the

Texas Business Organizations Code, which allows veil-piercing when the debtor used the

corporation to commit actual fraud "primarily for [his] *direct personal benefit*."  *Id.*

(emphasis in original) (quoting Tex. Bus. Orgs. Code § 21.223(b)).  TUFTA may establish

the "actual fraud" element, *id.* at 567, but the plaintiff must also show personal benefit—

a requirement of Texas veil-piercing law, *not* of Section 523(a)(2)(A), *compare* Tex. Bus. Orgs. Code § 21.223(b) *with* 11 U.S.C. § 523(a)(2)(A).

The Fifth Circuit in *Ritz* made clear that the analysis on remand should proceed in two distinct steps. First, establish personal liability through veil-piercing. *In re Ritz*, 832 F.3d at 569. Then, if successful, apply Section 523(a)(2)(A) to determine whether the debt is non-dischargeable. *Id.*

On remand, the bankruptcy court in *Ritz* followed that sequence: it first addressed veil-piercing, then applied the standard Section 523(a)(2)(A) framework. *In re Ritz*, 567 B.R. at 724, 737–39. The "direct personal benefit" element appeared only in the veil-piercing analysis. *See id.* at 759–61. It played no role in the Section 523(a)(2)(A) determination once personal liability was established. *Id.* at 762 (listing elements of non-dischargeability: (1) money was obtained; (2) through actual fraud; (3) resulting in a personal debt.

Here, the bankruptcy court collapsed the two steps. It treated "direct personal benefit" as part of the Section 523(a)(2)(A) inquiry itself. (*See* Dkt. No. 8-20 at 334–35). That was error. In this case, "direct personal benefit" is irrelevant because veil-piercing is unnecessary. Brass is already personally liable under the Settlement Agreement—which he signed in his individual capacity—and the Agreed Final Judgment, which imposes personal liability. (Dkt. No. 8-13 at 116); (Dkt. No. 8-18 at 126).

In short, because Section 523(a)(2)(A) only requires a finding of actual fraud—which can be established by reference to the TUFTA badges, *see supra* Section III(B)(1)—a finding of fraud based under the TUFTA badges alone can support non-dischargeability

under Section 523(a)(2)(A), *see, e.g.*, *In re Ritz*, 567 B.R. at 761–63, 765. Veil-piercing is unnecessary unless it is required to establish personal liability between the debtor and creditor.

Although the bankruptcy court erred in treating veil-piercing as a prerequisite to non-dischargeability in this case, that error was harmless for two reasons. First, veil-piercing isn't required here, so omitting it does not change the outcome. Second, even if veil-piercing were necessary, the bankruptcy court did not clearly err in finding that Brass's transfers were made for his direct personal benefit, as would support veil-piercing under Texas law. (*See* Dkt. No. 8-20 at 329, 335–36, 339). Brass's arguments on this issue are therefore unavailing.

c.    <u>Brass's debt is owed "to" Vitol.</u>

Brass raises one final set of arguments related to the bankruptcy court's Section 523(a)(2)(A) analysis. He contends that (1) only the Chapter 7 trustee could bring a TUFTA claim and (2) any debt arising from his fraudulent transfers under TUFTA would be owed to GCAC's bankruptcy estate, not Vitol—meaning that the debt cannot satisfy Section 523(a)(2)(A)'s requirement that it be owed to the creditor seeking non-dischargeability. (Dkt. No. 13 at 40–43); (Dkt. No. 17 at 37–38).

This argument fails because it misapprehends both TUFTA's role in this proceeding and the nature of the debt at issue. As the bankruptcy court correctly held, "[t]his is not a TUFTA action." (Dkt. No. 8-20 at 334 n.55). It is a discharge proceeding for which the TUFTA badges served as a helpful guide. Likewise, the debt at issue is not some hypothetical liability Brass or GCAC might owe under TUFTA—it is the Debt that

Brass personally owes to Vitol under the Settlement Agreement and Agreed Final Judgment. (Dkt. No. 8-13 at 116); (Dkt. No. 8-18 at 126). Because that debt is a personal obligation that Brass owes to Vitol, Section 523(a)(2)(A)'s requirement that the debt be owed to the creditor is satisfied.

* * *

Finding no legal or clear factual errors, the Court **AFFIRMS** the bankruptcy court's conclusion that Brass's Debt to Vitol is non-dischargeable under Section 523(a)(2)(A).

### C.    11 U.S.C. § 523(a)(6): WILLFUL AND MALICIOUS INJURY

The bankruptcy court also found that Brass's debt was non-dischargeable under Section 523(a)(6) of the bankruptcy code. (Dkt. No. 8-20 at 338–39). Section 523(a)(6) exempts "any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (emphasis in original).

"Applying the Supreme Court's pronouncement that Section 523(a)(6) requires actual intent to cause injury, the Fifth Circuit has held that for a debt to be nondischargeable, a debtor must have acted with 'objective substantial certainty or subjective motive' to inflict injury." *In re Williams*, 337 F.3d 504, 508–09 (5th Cir. 2003) (quoting *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156 F.3d 598, 603 (5th Cir. 1998)). "The test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a

single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." *Id.* at 509 (quoting *Miller*, 156 F.3d at 606). The Fifth Circuit has also held that the injury must "not be sufficiently justified under the circumstances to render it not 'willful and malicious.'" *Berry v. Vollbracht* (*In re Vollbracht*), 276 F.App'x 360, 362 (5th Cir. 2007) (per curiam).

While Section 523(a)(2)(A) and 523(a)(6) can cover distinct conduct — "§ 523(a)(2)(A) covers only fraudulent acts" whereas "§ 523(a)(6) covers debts 'for willful and malicious injury,' whether or not that injury is the result of fraud" — a debt can be nondischargeable under both sections. *Ritz*, 578 U.S. at 363, 136 S.Ct. at 1588. For example, "debtors who commit fraudulent conveyances . . . under § 523(a)(2)(A) could likewise also inflict 'willful and malicious injury' under § 523(a)(6)." *Id.* "There is, in short," the potential for "overlap." *Id.*

The bankruptcy court found that Brass's debt was non-dischargeable under Section 523(a)(6) because his conduct was substantially certain to cause harm to Vitol without justification. (Dkt. No. 8-20 at 338–39). Specifically, the bankruptcy court found that Brass transferred over $7 million from GCAC to himself despite knowing that GCAC owed a substantial debt to Vitol. (*Id.* at 339). These transfers effectively drained GCAC of its assets, making it objectively certain that the company could not repay its debt to Vitol. (*Id.*). Because the harm to Vitol was objectively certain — and because the injury was not justified under the circumstances (in fact, "the evidentiary record revealed Brass's actions were not justified at all") — the bankruptcy court held that the resulting debt was non-dischargeable under Section 523(a)(6). (*Id.*).

46

Based on the bankruptcy court's factual findings—which the Court finds are not clearly erroneous—Brass's conduct is non-dischargeable under Section 523(a)(6). Specifically, the Court affirms the bankruptcy court's findings that (1) Brass transferred millions from GCAC for his own benefit while knowing that GCAC owed a substantial debt to Vitol; (2) the transfers effectively depleted GCAC's assets; (3) Brass continued making transfers even after Vitol stopped financing; and (4) the transfers continued during active litigation. The Court agrees that this was substantially certain to harm Vitol and was not justifiable under the circumstances. *See In re Tegeler*, 586 B.R. 598, 696–97 (Bankr. S.D. Tex. 2018) (holding that debtor who transferred loan proceeds and collateral for personal gain should have known that the conduct was substantially certain to injure creditor's ability to collect). The bankruptcy court's Section 523(a)(6) discharge analysis is therefore affirmed.

In reaching this conclusion, the Court acknowledges but is not persuaded by Brass's arguments to the contrary. First, it rejects Brass's characterization that the bankruptcy court based its Section 523(a)(6) ruling "on liability under TUFTA." (Dkt. No. 13 at 23) (citing Dkt. No. 8-20 at 338–39). Although the bankruptcy court *incorporated* "its findings in the Section 523(a)(2)(A) actual fraud section" into its 523(a)(6) analysis, (Dkt. No. 8-20 at 339), it did not rely on its findings of fraud under TUFTA to support non-dischargeability under Section 523(a)(6). Instead, the bankruptcy court applied the correct legal framework to its factual findings and concluded that Brass's debt was non-dischargeable—not because the conduct was fraudulent, but because it was "substantially certain to harm Vitol" and lacked justification. (*Id.*). Accordingly, Brass's

arguments that the bankruptcy court's Section 523(a)(6) ruling exceeded the scope of Vitol's pleadings, (Dkt. No. 13 at 21–26), or contravened the Fifth Circuit's decision in *Ritz*, (*id.* at 46–49), are overruled.

Second, the bankruptcy court's analysis under Section 523(a)(6) aligned with Vitol's pretrial theory, and the record supports non-dischargeability on that basis. Vitol argued that Brass's conduct was objectively and substantially certain to injure Vitol because Brass knew that Vitol expected repayment but nonetheless drained GCAC of its assets, effectively ensuring that GCAC could not meet its financial obligations to Vitol. (*See* Dkt. No. 8-3 at 2, 10).

Because Vitol's pleadings alleged a "clear *contractual* obligation," and the bankruptcy court acknowledged that "there was never a formal written contract and that the repayment terms were disputed," (Dkt. No. 13 at 25) (emphasis added) (citing Dkt. No. 8-20 at 328, 330), Brass contends that the bankruptcy court could not have found that "Brass's debt to Vitol was the result of" his "*knowing* breach of a clear contractual obligation," (Dkt. No. 17 at 43) (emphasis added). According to Brass, "any such finding would be inconsistent" with the bankruptcy court's "other findings." (*Id.*).

The Court disagrees. First, as explained above, the bankruptcy court's Section 523(a)(6) analysis did not rely on TUFTA and instead closely tracked the theory advanced in Vitol's pleadings. Second, non-dischargeability under Section 523(a)(6) does not require that the debtor admit to knowing of a legal obligation or intentionally breaching it. As the Fifth Circuit has recognized, "[b]ecause debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be non-dischargeable do

so by determining whether '[the debtor's] actions were at least substantially certain to result in injury.'" *Vollbracht*, 276 F.App'x at 361–62 (alteration in original) (quoting *Miller*, 156 F.3d at 606).

Thus, regardless of Brass's testimony at trial—that "the parties operated under an informal joint venture," (Dkt. No. 8-20 at 328)—the bankruptcy court properly assessed whether a reasonable person in Brass's position would have understood that his conduct was substantially certain to injure Vitol, *see Miller*, 156 F.3d at 606.

Brass notes correctly that, in some instances, a business arrangement may be so ambiguous that a party retains money due to a genuine mistake rather than an intent to wrongfully deprive the other party. *See, e.g.*, *State of Tex. By & Through Bd. of Regents of Univ. of Tex. Sys. v. Walker*, 142 F.3d 813, 824 (5th Cir. 1998) ("An issue of fact exists regarding whether [the defendant] was aware of his obligations to the [plaintiff] under the [contract] and nonetheless knowingly kept his professional fees with the intent of depriving the [plaintiff] of money owed to it.").

Brass argues that the uncertainty of his business relationship with Vitol precludes a finding that he acted willfully or maliciously when he drained GCAC of its assets. (*See* Dkt. No. 13 at 25–26); (Dkt. No. 17 at 43). As evidence of the relationship's ambiguity, he points to testimony from Mr. Kuo—Vitol's principal contact with GCAC, (Dkt. No. 8-7 at 287)—who "described the relationship between GCAC and Vitol as 'muddy' and said that he was not sure what the relationship or the exact terms of the relationship," (Dkt. No. 13 at 25) (citation omitted) (first quoting Dkt. No. 8-8 at 50; and then citing Dkt. No. 8-6 at 58). Brass also cites the bankruptcy court's Judgment, which acknowledged that

49

the repayment terms between the Parties were unclear. (Dkt. No. 17 at 43) (citing Dkt. No. 8-20 at 341).

But the bankruptcy court's findings of fact—to which this Court defers unless clearly erroneous—and the record do not support Brass's position that the financial arrangement was *so* vague that a reasonable person could have believed Vitol had simply given GCAC millions of dollars without no expectation of repayment. Brass's own text messages show that he knew GCAC owed Vitol money. (Dkt. No. 8-9 at 99–100); (Dkt. No. 8-10 at 2, 4, 9–20). He and Kuo discussed repayment terms. (Dkt. No. 16 at 19–20); (Dkt. No. 8-5 at 188-89). In early 2018, Vitol sent him an accounting reconciliation showing a $15 million debt. (Dkt. No. 8-5 at 234, 239–40); (Dkt. No. 16 at 46). GCAC's financials from 2017 and 2018 also list a contingent liability to Vitol in that amount. (Dkt. No. 16 at 147, 162) (GCAC's Dec. 2017 and 2018 Consolidated Income Statements); (*see also id.* at 248) (GCAC's 2017 Tax Returns). Even amid uncertainty about the financing terms, the record confirms that a reasonable person in Brass's position would have understood that GCAC owed Vitol a substantial debt and that Vitol expected repayment. Accordingly, draining GCAC of nearly all its funds was substantially certain to prevent repayment, thereby injuring Vitol. Brass's argument that the bankruptcy court erred in finding that his was willful or malicious is therefore overruled.

Finally, Brass's argument—that the debt he owes Vitol is not "for" the injury he caused, (*see* Dkt. No. 13 at 48–49)—fails for the same reason it failed under the bankruptcy court's Section 523(a)(2)(A) analysis, *see supra* Section III(B)(6)–(6)(a). He cites no authority for the proposition that settling claims for a willful or malicious injury severs

50

the link between the debtor's conduct and the resulting debt. (*See* Dkt. No. 13 at 49). In fact, the law is to the contrary: courts routinely look past settlement agreements to determine whether the debtor's underlying conduct was "substantially certain" to injure the creditor. *See Arche*r, 538 U.S. at 320–23, 123 S.Ct. at 1466–68; *Brown*, 442 U.S. at 138–39, 99 S.Ct. at 2213. If Brass were right, any debtor could insulate a willful injury from non-dischargeability simply by settling the resulting claim—a loophole the *Brown* and *Archer* Courts explicitly rejected. *See Brown,* 442 U.S. at 138, 99 S.Ct. at 2213 ("[A]ll debts arising out of conduct specified in [the discharge provisions][29] should be excepted from discharge and the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt."); *Archer,* 538 U.S. at 321, 123 S.Ct. at 1467 ("'Congress intended the fullest possible inquiry' to ensure that 'all debts arising out of' fraud are 'excepted from discharge,' no matter what their form." (quoting *Brown*, 442 U.S. at 138, 99 S.Ct. at 2213)); *accord In re Davenport*, 353 B.R. 150, 194–95, 202–04 (Bankr. S.D. Tex. 2006) (applying *Archer* and *Brown* to find debt arising from parties' settlement agreement non-dischargeable under § 523(a)(6)); *In re Gamble-Ledbetter*, 419 B.R. at 693, 698–99 (same).

Here, the bankruptcy court correctly looked beyond the Settlement Agreement and Agreed Final Judgment to assess whether the underlying injury stemmed from willful and malicious conduct. It found that Vitol's injury—its inability to recover the

---

[29] *Brown* was decided under Section 17 of the Bankruptcy Act of 1970. *Brown*, 442 U.S. at 129 n.1, 99 S.Ct. at 2208 n.1 (citing Bankruptcy Reform Act of 1978, Pub.L. 95–598, § 401(a), 92 Stat. 2682). The Court noted that Section 17's discharge provisions are substantially similar to those in 11 U.S.C. § 523, the corresponding provision in current law. *Id.*

millions loaned to GCAC—was caused by Brass's willful and malicious actions. Because the Settlement Agreement and Agreed Final Judgment resolved claims arising from that conduct, the resulting Debt arises out of and is "for"—that is, "caused by"—Brass's wrongful acts. It is therefore non-dischargeable. *See Cohen*, 523 U.S. at 218, 118 S.Ct. at 1216; *Archer*, 538 U.S. at 320–21, 123 S.Ct. at 1466–67.

* * *

Finding no legal or clear factual errors, the Court **AFFIRMS** the bankruptcy court's conclusion that Brass's conduct was willful and malicious and therefore his Debt to Vitol is non-dischargeable under Section 523(a)(6).

### D.    TOTAL NON-DISCHARGEABLE AMOUNT

As noted above, the relevant "debt" between Vitol and Brass is any enforceable liability created by the Parties' Settlement Agreement and Agreed Final Judgment. *See supra* Section III(A). And for the reasons explained above, this Debt is non-dischargeable under Sections 523(a)(2)(A) and (a)(6). *See supra* Sections III(B)–(C).

The bankruptcy court erred by construing the relevant debt as the hypothetical liability Brass might have faced under the Parties' prior business relationship, rather than identifying a currently-existing, enforceable obligation between them. (*See* Dkt. No. 8-20 at 340–41). The Court therefore remands the case for the bankruptcy court to reassess the debt at issue and determine the amount of Brass's non-dischargeable liability.

In reaching that figure, the Court notes *Cohen*'s holding that non-dischargeability applies to "any liability arising from money, property, etc., that is fraudulently obtained." *Cohen*, 523 U.S. at 223, 118 S.Ct. at 1219. That may include (1) actual damages, (2) pre-

judgment interest on the amount of actual damages, and (3) reasonable attorneys' fees or other court costs.  *Id.*; *In re Ritz*, 567 B.R. at 766; *In re Rifai*, 604 B.R. at 332–36.  Once the specific amount is determined, it will bear post-judgment interest, which will also be non-dischargeable.  *In re Ritz*, 567 B.R. at 766.

IV.    CONCLUSION

For the above reasons, the Court **AFFIRMS in part**, **REVERSES in part**, and **REMANDS** the case to the bankruptcy court for further proceedings consistent with this Order to determine the amount of Brass's Debt that is non-dischargeable.

It is SO ORDERED.

Signed on July 29, 2025.

DREW B. TIPTON
UNITED STATES DISTRICT JUDGE